**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION (YOUNGSTOWN)**

| | | |
|---|---|---|
| **OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, On Behalf of Itself and all Others Similarly Situated,** | : | **CIVIL ACTION NO. ____________** |
| **Plaintiff** | : | **JUDGE ______________________** |
| **vs.** | : | |
| **FEDERAL HOME LOAN MORTGAGE CORPORATION a/k/a FREDDIE MAC, RICHARD F. SYRON, PATRICIA L. COOK, ANTHONY S. PISZEL, EUGENE M. McQUADE, RICHARD KARL GOELTZ, ROBERT R. GLAUBER, THOMAS S. JOHNSON, SHAUN F. O'MALLEY, STEPHEN A. ROSS, BARBARA T. ALEXANDER, WILLIAM M. LEWIS, JR., JEFFREY M. PEEK, GEOFFREY T. BOISI AND RONALD F. POE** | : | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |
| **Defendants.** | : | |

## TABLE OF CONTENTS

I. NATURE OF THE ACTION ........................................................................ 4

II. JURISDICTION AND VENUE ..................................................................... 7

III. PARTIES ................................................................................................ 8

IV. FACTUAL BACKGROUND ..................................................................... 14

V. FALSE AND MISLEADING STATEMENTS DURING CLASS PERIOD ........ 20

VI. ADDITIONAL SCIENTER ALLEGATIONS ................................................ 53

VII. CLASS ACTION ALLEGATIONS ........................................................... 59

VIII. INAPPLICABILITY OF STATUTORY SAFE-HARBOR ............................. 62

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET .... 63

X. LOSS CAUSATION .................................................................................. 64

XI. CAUSES OF ACTION ............................................................................. 66

XII. PRAYER FOR RELIEF ........................................................................... 70

Freddie Mac has secretly and intentionally participated in one of the largest housing investment deceptions of modern U. S. economic times. The fraud is simple. Previously, Freddie Mac repeatedly publicly denied that it had any substantial investments in or risk or exposure to the subprime financing of U.S. housing. However, Freddie Mac recently shocked the market by revealing that it in fact had substantial involvement in the subprime industry, $150 billion of its mortgage portfolio was riskier than investors were previously told, and as a result, Freddie Mac had incurred a record $2 billion loss, with more significant losses expected. These unanticipated disclosures caused Freddie Mac's common stock to plunge 29%, from $37.50 to $26.74 per share, and a market capitalization loss of almost $6.6 billion in one day.

Despite its public statements and assurances to the contrary, Freddie Mac was in fact at significant risk in subprime financing in at least four different ways -- portfolio investments, mortgage guarantees, deficient accounting and internal control systems, and reliance on insurance protection from providers who were financially unable to meet insurance demands.

- Freddie Mac hid from the investing public that Freddie Mac had invested, for its <u>own portfolio</u>, billions of dollars in high risk, low quality mortgages that carried extraordinarily high credit risks.

- Freddie Mac failed to disclose that its <u>internal controls</u> and business methods were incapable of managing, identifying and guarding against massive losses in these investments and its guarantee exposure.

- Freddie Mac also hid the fact that it had <u>guaranteed</u> billions of dollars of the subprime, high risk mortgages sold to others — guarantees that Freddie Mac must now meet.

- Freddie Mac also failed to reveal to the public that its guarantee exposure was <u>not protected</u> or properly transferred to credit-worthy mortgage insurers. Freddie Mac knew but failed to reveal that many of its third party mortgage insurers were not financially able to meet their insurance contracts — the very contracts that

were supposed to protect sizeable portions of Freddie Mac's mortgage investment holdings and guarantee exposure.

## I. NATURE OF THE ACTION

1. This is a class action against Freddie Mac and certain of its senior officers and Board committee members for violations of the federal securities laws. Plaintiff brings this action on behalf of all purchasers of Freddie Mac common stock during the period from August 1, 2006 through and including November 23, 2007 (the "Class Period") who were damaged thereby, except for Defendants and certain of their related parties as described below (the "Class").

2. Throughout the Class Period, Defendants, to the extent they issued anything, issued to the public materially false and/or misleading earnings press releases, financial statements and reports and other statements that artificially inflated the price of Freddie Mac's common stock, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. Even when specifically asked, Freddie Mac failed for years to disclose the extent and amount of its subprime lending and guarantee exposure. Freddie Mac had the opportunity to make these problems known, but hid behind the fact that it is not required to file periodic financial reports with the SEC. Its larger rival Fannie Mae, on the other hand, voluntarily files its financial reports with the SEC.

3. Freddie Mac provides funds to mortgage lenders through the purchase of mortgage assets, and issues and guarantees mortgage-related securities that facilitate the flow of funds into the mortgage market. Beginning at least in the summer of 2006, a declining housing market and increasing delinquency rate among mortgage lenders

caused a crisis in the mortgage market as the value of mortgage backed securities declined substantially. Freddie Mac, as a purchaser or mortgage related assets, was not immune to this crisis.

4. On November 20, 2007, Freddie Mac stunned Wall Street and investors by announcing a third quarter 2007 record net loss of $2.0 billion or $3.29 per diluted share, three times what some analysts had estimated. Freddie Mac also reported (i) a provision for credit losses of $1.2 billion due to the significant deterioration of mortgage credit resulting from the continued weakness in the housing market, which was almost four times the second-quarter amount, (ii) a decrease in the fair value of net assets attributable to common stockholders, before capital transactions, of approximately $8.1 billion, and (iii) total GAAP mark-to-market losses of $3.6 billion, which included a $1.5 billion interest rate market-to-market hit, compared with a gain of $1.1 billion in the previous quarter, and a credit-related market-to-market loss of $2.3 billion, more than five times bigger than the prior quarter.

5. The market's reaction to this disclosure was substantial, the price of Freddie Mac common stock tumbled 29%, its biggest decline since it started publicly trading in 1988, to a 52 week low of $26.74 per share, compared to a low of $36.66 the day before.

6. The impact of these previously undisclosed risks is profound. Now the reality of Freddie Mac's financial troubles threatens its survival. The impact of its subprime exposure has left Freddie Mac with just $600 million over its minimum capital requirement to its regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO"). Since these disclosures, Freddie Mac has had to cut its common stock

dividend to its shareholders by 50% to $0.25 per share – the first dividend cut since it went public in 1989, and to dilute each shareholders' interests with the precipitous issuance of $6.6 billion in preferred stock – all to bolster its capital in order to meet its mandatory capital requirements.

7. Further, in a conference call on November 19, 2007 to discuss the third quarter results with investors and analysts, Freddie Mac management indicated that more and larger losses could be expected. Moreover, questions still remain about the value of Freddie Mac's securities backed by subprime mortgage loans. These are "nonagency" securities issued by Wall Street firms rather than Freddie Mac or Fannie Mae. For the first time on November 20, 2007, Freddie Mac disclosed that it had $105.4 billion of these bonds, accounting for about 15% of its holdings of mortgages and related securities. Analysts at Credit Suisse Group in New York warn that Freddie Mac may need to write down the value of these subprime bonds by as much as $5 billion next year. In a Wall Street Journal interview on November 23, 2007, however, Defendant Piszel continues to argue against the need for a write-down of these loans. Freddie Mac claims to have insured some of its mortgage failure risk with bond "insurers." Unbeknownst to the public, in reality these alleged "insurance" transactions were little more than credit risk derivative transactions, with the "insurers" being nothing more than the economic equivalent of derivative counterparties. Without disclosure to the investing public, Freddie Mac intentionally used the appearance of these transactions and the false credit ratings assigned to the "insurers" to avoid taking write-downs in their mortgage portfolios.

8. Even though Freddie Mac uses the capital markets, including the New York Stock Exchange, to raise and maintain capital, it has blatantly refused to file voluntarily its financials (as Fannie Mae does) with the SEC. Freddie Mac was previously engaged in an accounting scandal in 2003, and it was forced to restate $5 billion in earnings. Remarkably, Freddie Mac has also ignored its 2003 commitments to OFHEO made in connection with the prior accounting scandal, that it would address the adequacy of its public disclosures and internal controls, have in place effective ongoing management oversight of its public disclosure practices, internal controls and risk management, and would ensure that its public reports meet all applicable legal and regulatory requirements.

9. As a result of Defendants' violations of federal securities laws, Plaintiff and the other members of the Class have been damaged by purchasing Freddie Mac common stock at artificially inflated prices during the Class Period and by suffering losses when the price of Freddie Mac common stock declined after the revelations of the fraud at the Company.

## II. JURISDICTION AND VENUE

10. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. 240.10b-5).

11. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

12. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Many of the acts in

furtherance of the alleged fraud and/or the effects of the fraud occurred within this District, Plaintiff maintains its principal place of business in Columbus, Ohio and its members who were damaged by the fraud are located throughout the State of Ohio, including in this District.

13. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

14. Plaintiff Ohio Public Employees Retirement System ("OPERS"), formed in 1935, provides retirement, disability, survivor and health care benefits and services for public employees throughout the State of Ohio who are not covered by another state or local retirement system. OPERS serves more than 920,000 members and more than 3,700 public employers in Ohio are part of the OPERS system. OPERS currently has assets exceeding $77.6 billion, making it the 14th largest retirement system in the United States. As set forth in the certification attached as Exhibit A hereto, incorporated by reference herein, OPERS purchased shares of common stock of Freddie Mac during the Class Period at artificially inflated prices and has been damaged thereby.

15. Defendant Freddie Mac is a Federally-chartered corporation with its principal place of business located at 8200 Jones Branch Drive, McLean, Virginia. Congress established Freddie Mac in 1970 to support rental housing and home ownership. Freddie Mac is owned by its shareholders and its common stock is listed

and publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol “FRE.”

16. Defendant Richard F. Syron (“Syron”) was, at all relevant times, Chairman of the Board and Chief Executive Officer (“CEO”) of the Company.

(a) Syron received total 2006 compensation of $14.73 million.

(b) As Chairman of the Board and Chief Executive Officer, Syron’s primary responsibilities included overseeing the overall success or failure of the Company; providing leadership for the formulation and achievement of the Company’s vision, mission, strategy, financial objectives and goals; ensuring that effective and qualified management were retained by the Company; ensuring that the Company established and maintained appropriate internal and disclosure controls, policies and procedures that were adequate to protect corporate assets; and directing the conduct and affairs of the Company in furtherance of its safe and sound operation.

(c) Syron, along with the other Defendants, was responsible for ensuring the accuracy of Freddie Mac’s public financial reports and other public statements. Syron publicly commented on the Company’s financial performance in its quarterly and annual earnings press releases issued and investor conference calls held during the Class Period and during interviews with the media. Syron also signed letters to shareholders commenting upon the Company’s performance and disclosure policies in Freddie Mac’s Annual Reports issued during the Class Period.

(d) Syron also personally attested to and certified the accuracy of Freddie Mac’s reported financial results during the Class Period. For example, Syron

signed a certification included in Freddie Mac's Information Statement for the fiscal year ended December 31, 2006, in which he personally certified that:

(i) the Information Statement did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Information Statement, and,

(ii) the consolidated financial statements and other financial information included in the Information Statement fairly presented in all material respects the financial condition, results of operation and cash flow of the Company as of and for the periods presented.

17. Defendant Patricia L. Cook ("Cook") was, at all relevant times, Executive Vice President, Investments and Capital Markets of the Company.

(a) Cook received total 2006 compensation of $4.89 million.

(b) Cook, along with the other Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements. Cook publicly commented on the Company's financial performance in press releases issued and conference calls held during the Class Period.

18. Defendant Anthony S. Piszel ("Piszel") was, at all relevant times, the Company's Executive Vice President and Chief Financial Officer ("CFO").

(a) Piszel received total 2006 compensation of $3.65 million.

(b) As CFO, Piszel was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements. Piszel publicly

commented on the Company's financial performance in its quarterly and annual earnings press releases issued and investor conference calls held during the Class Period and during interviews with the media.

(c) Piszel also personally attested to and certified the accuracy of Freddie Mac's reported financial results during the Class Period. For example, Piszel signed a certification included in Freddie Mac's Information Statement for the fiscal year ended December 31, 2006, in which he personally certified that:

(i) the Information Statement did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Information Statement, and,

(ii) the consolidated financial statements and other financial information included in the Information Statement fairly presented in all material respects the financial condition, results of operation and cash flow of the Company as of and for the periods presented.

19. Defendant Eugene M. McQuade ("McQuade") was President and Chief Operating Officer ("COO") of the Company from September 1, 2004 until his resignation on September 1, 2007.

(a) McQuade received total 2006 compensation of $7.64 million.

(b) McQuade, along with the other Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public

statements. McQuade publicly commented on the Company's financial performance, condition and results during the Class Period.

20. Defendant Richard Karl Goeltz was the Chairman of the Audit Committee of the Freddie Mac Board of Directors during the relevant period and, according to Freddie Mac's 2007 Proxy Statement, was determined by the Board to be an "audit committee financial expert" as defined under SEC regulations. Mr. Goeltz was Vice Chairman, Chief Financial Officer and Member of the Office of the Chief Executive of American Express Company from 1996 to 2000, and was formerly a Chief Financial Officer of NatWest Group and Exxon Corporation. Defendants Robert R. Glauber, Thomas S. Johnson, Shaun F. O'Malley and Stephen A. Ross were members of the Audit Committee during the relevant period. Defendant O'Malley was also the Lead Director from December 2003 throughout the Class Period, and he was previously the Chairman and Senior Partner of Price Waterhouse LLP (Freddie Mac's current independent auditor). The Audit Committee was responsible for (i) overseeing the integrity and accuracy of Freddie Mac's financial statements and disclosures, including its earnings press releases and public financial reports and other statements, (ii) ensuring that the Company had adequate and proper disclosure controls and procedures and internal controls, and (iii) ensuring the Company had adequate and proper guidelines and policies governing the processes for assessing and managing Freddie Mac's risks. In their capacity as members of this Committee, Defendants Goeltz, Glauber, Johnson, O'Malley and Ross are collectively referred to herein as the "Audit Committee Defendants."

21. Defendant Stephen A. Ross was the Chair of the Finance and Capital Deployment Committee of the Freddie Mac Board during the relevant period. Defendants Barbara T. Alexander, Robert R. Glauber, Richard Karl Goeltz, William M. Lewis, Jr., and Jeffrey M. Peek were members of the Finance and Capital Deployment Committee during the relevant period. The Finance and Capital Deployment Committee was responsible for the oversight of (i) funding, investment and hedging activities associated with Freddie Mac's retained and sold portfolios, credit risk arising from the guarantee portfolio, and the mortgage and non-mortgage investment portfolios, (ii) the content and implementation of Freddie Mac's Asset/Liability Management Policy and Plan, (iii) management of Freddie Mac's capital, and (iv) management of Freddie Mac's credit risk, market risk and operational risk. In their capacity as members of this Committee, Defendants Ross, Alexander, Glauber, Goeltz, Lewis and Peek are collectively referred to herein as the "Finance and Capital Deployment Committee Defendants."

22. Defendant Shaun O'Malley was Chairman of the Governance, Nominating and Risk Oversight Committee during the relevant period. Defendants Geoffrey T. Boisi, Richard Karl Goeltz, Ronald F. Poe and Stephen A. Ross were members of the Governance, Nominating and Risk Oversight Committee during the relevant period. The Governance, Nominating and Risk Oversight Committee was responsible for Freddie Mac's risk framework and oversight of Freddie Mac's risk exposures, including credit risk, market risk, liquidity risk, model risk, strategic risk, reputation risk, legislative risk and operational risk. In their capacity as members of this Committee, Defendants

O'Malley, Boisi, Goeltz, Poe and Ross are collectively referred to herein as the "Governance and Risk Oversight Committee Defendants."

23. Defendants Syron, Cook, Piszel, and McQuade are collectively referred to herein as the "Officer Defendants." The Officer Defendants, Audit Committee Defendants, Finance and Capital Deployment Committee Defendants, and Governance and Risk Oversight Committee Defendants are collectively referred to herein as the "Individual Defendants."

## IV. FACTUAL BACKGROUND

24. Congress established Freddie Mac in 1970 with the public mission to stabilize the nation's residential mortgage markets and expand opportunities for home ownership and affordable rental housing. It fulfills its mission by purchasing residential mortgages and mortgage-related securities in the secondary mortgage market.

25. Freddie Mac is one of the largest purchasers of mortgages in the United States, and it also runs a very large mortgage securitization business. In the securitization side of its business, Freddie Mac issues securities to investors backed by pools of mortgage loans. Freddie Mac calls these securities Mortgage Participation Certificates ("PCs"). Principal and interest payments on the mortgages in the pool are passed through to PC holders by Freddie Mac on a monthly basis. Freddie Mac typically assumes the credit risk on the underlying mortgages, meaning the risk that borrowers will default on their payment obligations. Most of the interest-risk associated with PCs is borne by the buyers of the PCs, rather than Freddie Mac. Freddie Mac earns fee income for assuming the mortgage credit risk and administering the mortgage securities.

26. In addition to securitizing mortgages, Freddie Mac purchases mortgage loans and mortgage-related securities and holds them as on-balance sheet assets. Freddie Mac refers to mortgage investments that it intends to hold on its balance sheet as its "retained portfolio." Freddie Mac funds these purchases of mortgages and mortgage-related securities by issuing short and long-term debt. When the Company holds mortgages in its retained portfolio, it is exposed to both credit risk and interest-rate risk. The Company earns money on its retained portfolio by funding its mortgage purchases with debt securities that have a lower yield than the mortgages being acquired.

27. Before and during the Class Period, Defendants falsely and continually assured investors that Freddie Mac did not have significant subprime exposure, that they knew how to and were managing risks effectively, that they were continuing to improve their internal control policies and procedures, and that they had adequate disclosure policies and procedures.

28. For example, on January 24, 2006, the Company issued a press release entitled "Freddie Mac Chairman and CEO Richard Syron Discusses Company's Risk Management, Vital Role in America's Housing Finance System." The release stated in part:

> Freddie Mac continues to manage interest-rate and other risks prudently, and provides highly transparent and timely disclosures on its risk-management measures, Syron explained.

29. On February 1, 2006, at a Citigroup Financial Services Conference, Defendant McQuade stated:

> Our goals for this year are . . . .

- First, continue to fulfill our house mission. That's what Congress put us here to do.

- Second, focus on improving what is in our control - by which I mean get our financials current, get registered with the SEC, and continue striving for operational and risk excellence.

30. On February 8, 2006, at a Credit Suisse First Boston Financial Services Conference, Defendant Cook stated:

> We continue to improve our systems and controls, and I think every time we get a question on the timeliness of our financial reporting, you get the answer back that that is our goal. The requirement to getting back to timely financial reporting is continuing to improve on the controls so that we can get the timeline down for issuing our financial reports to something that is relatively quick.
>
> * * *
>
> So what are the priorities for '06? Obviously, to continue to execute against our housing mission. This is the number one objective for Freddie Mac. The second is to focus on what we can control in terms of continuing to strengthen our risk management infrastructure and our financial reporting infrastructure.

31. On March 31, 2006, the Company issued a press release entitled "Freddie Mac Provides Market Update; Total Mortgage Portfolio Up 12 Percent in 2005; Company Maintains Strong Capital Position, Balance Sheet." The release stated in part:

> **Internal Controls/Financial Reporting Update**
>
> The company is pursuing a series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal control environment. The objective of these initiatives is to strengthen the internal control environment to reduce the risk of error to an acceptable level and enable the company to execute the monthly close process to enable it to submit timely, unqualified capital reports and meet the 45-day quarterly filing requirement for SEC registrants. Most significantly, these initiatives include an end-to-end assessment of the design and effectiveness of the company's internal controls environment, and an initiative to improve information technology-related controls, together with remedial actions needed to address any issues identified in the course of these reviews. In addition, the company is scheduled to implement

several of its planned system enhancements to its accounting, financial reporting and operational infrastructure later in the year.

The company expects to release quarterly and full-year 2005 financial results in late May. As previously disclosed, the company's reporting schedule for its 2005 results will allow management to implement a significant improvement in its method for determining the estimated fair values of its guarantee assets and guarantee obligations. For periods beginning with 2005 and going forward, the company will make greater use of third-party market information in its valuation methodology and is implementing this change in its 2005 financial statements as of the beginning of the year. This will be reflected as a change in estimate and significantly improves reliability and transparency in the valuation of these instruments. This change will not affect the company's previously released audited financial statements for 2004 and prior years.

32. On May 30, 2006, at the Company's fourth quarter 2005 earnings conference call, defendants made the following statements:

[Syron:]

We've accelerated our efforts to complete the needed improvements in our internal controls and infrastructure.

This is our highest and most urgent priority. And let me assure you, Gene and I and everyone else here are treating it as such. We are committed to getting this done and we mean to succeed. We expect to complete the first major phase of our end-to-end design work and systems infrastructure enhancement this fall. Getting our house in order is essential to completing our return to timely reporting and meeting the requirements that our regulator, OFHEO, has established for us under our 30 percent capital surplus framework.

This is even more important now. Director Lockhart has indicated that he intends to consider whether additional remedial actions may be appropriately applied to Freddie Mac while we continue to fix our control environment. And this could include consideration of portfolio growth limitations for some period of time. We have great respect for the new Director and the staff of OFHEO and we will continue to talk to them about our progress towards remediating our controls and complying with appropriate regulatory directives. But most important, we owe it to our shareholders to achieve a level of operational excellence in our financial reporting controls and in everything we do to achieve our housing mission and to generate long-term value.

* * *

[Ed Groshans, Fox-Pitt Kelton Analyst:]

Well, I think all the key topics have been asked. Just more to follow-up, in the opening comments there was discussion that the phase one would be completed in the full of the end-to-end systems integration. And do you have a sense of how many phases there are? And is phase one the longest phase and the other phases will be shorter? Or is it a 10-step process, a three-step process?

[McQuade:]

Well, I wouldn't bore you with the details, it's an eight-step process. Phase one actually is more of the planning stage. We are operating under a timeline that we would hope to be able to accomplish this by the end of the year, remediate any new control issues that would turn up, test the controls to make sure they are operating. We've got a substantial amount of corporate resources, they gave us this project. And we are hopeful that this will really build a pillar that we need in terms of the control environment in the company.

33. Also on May 30, 2006, the Company issued a press release entitled "Freddie Mac Reports 2005 Financial Results; Company Reports Market Share Growth and Continued Solid Risk Management Performance." The release stated in part:

**INTERNAL CONTROLS UPDATE**

Improving internal control over financial reporting and addressing the risks of material weaknesses and other control deficiencies have been priorities for us and will continue to be so in 2006. The company is pursuing a series of initiatives to improve our financial reporting infrastructure and remediate material weaknesses and other deficiencies in our internal control environment. Most significantly, these initiatives include an end-to-end assessment of the design and effectiveness of the company's internal control over financial reporting, and an initiative to improve information technology-related controls, together with remedial actions needed to address any issues identified in the course of these reviews. Additionally, we are scheduled to implement several planned system enhancements later in the year. A more complete discussion of the status of our remediation efforts is included in the Information Statement Supplement dated as of today and available on our Web site.

> Despite our ongoing challenges in these areas, we believe our interest-rate and credit risks remain well managed, as demonstrated by our reported risk metrics and results.

34. In the Company's 2005 Annual Report, issued June 28, 2006, defendant Syron's "Message from the Chairman" stated in part:

> Our most urgent task is to do everything it takes to ensure that our internal controls and accounting systems are of the same high caliber as our financial risk management and reporting. There is no higher priority for Freddie Mac's senior management than completing this work and becoming timely in our financial reporting. This company must become the standard of excellence not only for managing mortgage risk, but for the accounting and internal controls associated with it.

The Annual Report further stated, under the heading "Risk Management":

> Executive management committees and other internal advisory groups monitor performance against our risk management strategies and established risk limits; identify and assess potential issues; and provide oversight regarding changes in business processes and activities. Within the business units, risk management personnel identify, monitor and report risks. Independent oversight of risk management is provided by our Enterprise Risk Oversight, Corporate Compliance and Internal Audit divisions, in addition to the oversight provided by the board of directors and its committees. Together, these groups assess the adequacy and effectiveness of the risk management functions across the company.
>
> While we believe that both our day-to-day and long-term management of interest-rate and other market risks and credit risks is satisfactory, weaknesses exist in our overall risk governance framework. We are focused on strengthening our capacity in four important areas: risk governance, risk identification, risk measurement and assessment, and related education and communication. Our risk management framework is being reviewed under a new leadership team in our Enterprise Risk Oversight to address these issues and to establish clear lines of authority, clarify roles and responsibilities, and to improve the overall effectiveness of the risk oversight function. We recently created an executive management enterprise risk committee to provide an enterprise-wide view of risk. Our board of directors also assigned primary responsibility for oversight of enterprise risk management to the newly re-chartered Governance, Nominating and Risk Oversight Committee of the board of directors.

## V. FALSE AND MISLEADING STATEMENTS DURING CLASS PERIOD

35. On August 1, 2006, Freddie Mac issued a press release announcing its preliminary first half of 2006 business results, under a headline "Company Issues Market Update Showing Strong Financial Performance and Risk Management." Relevant portions of the press release stated:

> INTERNAL CONTROLS AND FINANCIAL REPORTING UPDATE
>
> We continue to work on a series of initiatives to improve our financial reporting infrastructure and remediate material weaknesses and other deficiencies in our internal control environment identified in our annual report, and identified to us by OFHEO in the course of its ongoing supervisory examinations. These initiatives include an assessment of the design and effectiveness of the company's internal control over financial reporting, and an initiative to improve information technology-related controls, together with remedial actions needed to address previously identified issues and any additional issues identified in the course of our ongoing reviews. Additionally, we are scheduled to implement several planned system enhancements later in the year. . . .
>
> YEAR-TO-DATE BUSINESS RESULTS
>
> The company also provided an update on the first half of 2006 business performance, reporting continued excellent interest rate and credit risk management performance. Freddie Mac announced preliminary estimates of financial performance for the first quarter of 2006 and continuing progress on capital transactions.
>
> "We have a very good first half in terms of our business," said Eugene M. McQuade, Freddie Mac's president and chief operating officer. "The estimates we're providing today of our first quarter financial net income indicate strong performance, and our fair value returns have improved. We are also making good progress in completing the capital management activities announced last year. And we are focused on driving continued enhancement of our financial reporting and controls."
>
> Credit-Risk Management
>
> Our mortgage credit risk, as measured by loan-to-value (LTV) ratio and other credit characteristics, remains low. We estimate the LTV ratio of our credit guarantee portfolio to be 56 percent as of the end of the first quarter. Our credit guarantee portfolio remains well diversified nationally, and long-term, fixed-rate prime mortgages continue to comprise more than 80% of the total mortgage

portfolio as of May 31, 2006, despite the recent increase in our purchases of floating-rate and non-traditional mortgage products.

Management continues to expect credit losses to remain low by historical standards.

36. On August 1, 2006, at a Freddie Mac Market Update, defendants made the following statements:

[Syron:]

We have put out a press release earlier today that describes our first-quarter results at a summary level. However, I'm also quite sure that many of you were very interested in a voluntary action we announced today to constrain our portfolio growth as we continue our financial remediation. Let me touch on that first, and then we will dedicate most of this call to taking your questions. The most important thing we can do is to try to be responsive to what you are most interested in. So we're anxious to get to that part of the call.

First, let me give you a sense of how we're thinking about the agreement in the context of Freddie's overall long-term mission and business. Today, we announced a voluntary undertaking to maintain an average annual growth of the Company's retained mortgage portfolio at no more than 2% above the level at June 30 of this year until we return to quarterly financial reporting. Simply put, we would say our regulator made a request of us, and we took action in response to that request. We acted because we believe a constructive relationship with our regulator is necessary and essential to our ability to generate long-term shareholder value.

Importantly, the letter states a specific condition precedent for expiration for the agreement. Namely, we must return to quarterly financial reporting in accordance with GAAP**.** We believe that it is important to provide certainty to investors, our customers and our employees, regarding what management needs to do in order to move forward. Today's announcement reinforces management's top priority. As we've said previously, our objective is to return to quarterly reporting, following the release of our full year 2006 reports in early 2007. Toward that objective, we are making progress in improving our infrastructure and remediating our control issues. But we must work hard during the remainder of this year and going forward to achieve quarterly reporting.

We are working closely with the examination staff from OFHEO to keep them up to speed on our progress and to address the concerns that they

brought to our attention. To be successful, we need to achieve a number of objectives relating to controls and reporting systems. We plan on updating the market on our progress towards these objectives on a regular basis.

* * *

[Paul Miller, Friedman, Billings, Ramsey Analyst:]

Can you address some of the conversations that Lockhart has been saying about Freddie Mac [I does not have the controls and systems in place at this part of the juncture that they put you in the same category as Fannie Mae and getting their controls and it could take years before you could maybe raise your dividend or do any substantial buybacks without issuing preferred stock?

[Syron:]

I don't want to characterize or speak for the director. I would say that we believe we have strong [] I and you can look at the numbers that we've put out on this [] credit risk and interest rate controls. But we do agree with the director that we have more work that we need to do with our operating systems and in addressing operating risks.

[McQuade:]

I would say there are three big areas that we're focused on. Just very broadly, I would say first is remediation of a number of both broad as well as specific control weaknesses in the Company. You can start by looking at our Annual Report; we've got six material weaknesses there. We've got a number of comments that OFHEO has given us over the course of the last six or eight months. We've got some internal audit comments here that we're very focused on cleaning up. And we will communicate with you over the course of the year, particularly on the material weaknesses as we bring those down.

Second general area would be on our financial close process. As we've switched to the accounting for GA/GO, we've had to slow down our close process. Our goal is that we would get current on our close process probably by October. And we would report to you then that we've got a crisp close process, where we're able to produce numbers, I would expect in about 30 days' time.

Then thirdly, we're going through a series of systems implementations over the next year or so. We've got some very large implementations going on this year. We have in the last two months switched our liquidity and contingency portfolio to a more permanent solution. That's about a $60 billion portfolio in and of itself. We've also switched our clearing systems to

> JP Morgan, so we've outsourced that. We've had good success with that. We've gone to an intraday overdraft system with the Fed as of July 20. We've had very good success on that conversion.
>
> We have two other, very large systems conversions that I think would be milestones in the course of the year. One would be the switch of our retained portfolio from an interim accounting system to a permanent accounting system. I expect that to happen in the September/October timeframe. And then probably towards the beginning of next year, the switch of our debt and derivatives system, from again, an interim solution to a more final solution. And that would also be a big milestone in terms of essentially at that point getting the vast, vast, vast majority of our assets and liabilities on to more permanent system solutions.

37. On September 8, 2006, in his prepared remarks at the Company's Annual Shareholder Meeting, defendant Syron stated:

> As for our controls work, suffice it to say our approach is comprehensive. We are fixing known issues; implementing improvements to our close-the-books process; implementing critical systems initiatives; and finally, carrying out a control review to ensure that from end to end, our entire upgraded system is working as seamlessly as it should. We've made progress in several of these areas already, and will have more to tell you at our next market update call.

38. On September 8, 2006, at the Company's Annual Shareholder Meeting conference call, defendant Syron made the following statements:

> There is one thing that our voluntary agreement with OFHEO has done, and that is of course, to reinforce across our organization and to singe into all of our minds the importance of completing our internal controls and accounting remediation. Now, more than ever, getting this done and getting it done right is the highest priority of senior management and every Freddie employee, and I don't think there's any question about that if you would go across the company. Our objective is to return to quarterly reporting, following the release of our full year 2006 results. What does that mean?
>
> Well, in terms of timing, our goal is to report full-year 2006 by late in the first quarter 2007. Then our focus will shift to getting out the quarters for 2007. As to how our controls work, suffice it to say that our approach is indeed comprehensive. We're very encouraged that we've just finished our comprehensive plan. We're fixing known issues, implementing improvements to close the book's process, implementing critical system

> initiatives under the leadership of Joe Smialowski, and controlling our end-to-end review process.
>
> All of the senior management of Freddie Mac at their own volition came together and suggested that we all work - even people who weren't directly responsible for this or are involved in it any way, but we set up a team and all of us focused a substantial part of our efforts on that. As a result, we've made progress in several of these areas already and we'll have more to tell you on our next market update call, which won't be too far away.

39. On September 12, 2006, in his prepared remarks at a Lehman Brothers Financial Services Conference, Defendant Syron stated:

> **Comprehensive plan/financial reporting objectives**
>
> Increasingly at Freddie Mac, success in our mission and in our business is dependent on success in improving our internal systems and controls. This point is important to our customers, our investors and of course our regulators.

40. On September 18, 2006, speaking at the Bank of America 36th Annual Investment Conference, Senior Vice President and Treasurer of Freddie Mac, Timothy Bitsberger, made the following statements:

> **Financial reporting objectives/comprehensive plan**
>
> Increasingly at Freddie Mac, success in our mission and in our business is dependent on improving our internal systems and controls. This point is important to our customers, our investors and of course our regulators.
>
> * * *
>
> We have made progress on enhancing our internal financial reporting infrastructure so that we will be able to return to timely, GAAP-compliant financial reporting. We recognize that it's a critical and necessary step in order to operating with transparency and unlock value for shareholders. I know everyone's been waiting for this for a long time, but the problems were worse than we originally believed.

41. On October 3, 2006**,** the Company issued a press release entitled "Freddie Mac Provides Market Update; Estimated Net Income for First Half of 2006 of

$2.7 Billion; Company Maintains Strong Capital Position and Continued Sold Risk Management Performance." The release stated in part:

> **INTERNAL CONTROLS AND FINANCIAL REPORTING UPDATE**
>
> The company continues to work on a series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to quarterly financial reporting following the release of full year 2006 results. The comprehensive plan includes mitigation and remediation of identified control issues; strengthening of our financial close process; implementing critical systems initiatives; and completion of a review of the company's system of internal controls related to the processing and recording of the company's financial transactions. Management recently updated the Board and its regulator, OFHEO, on the elements of the plan and is executing and monitoring the critical path elements of the plan to enable the company to resolve these longstanding issues. Management will continue to update the market on the company's progress toward these objectives.
>
> As part of this plan, the company recently implemented a new investments accounting platform for its liquidity and contingency portfolio. Management expects to implement this same platform for its retained portfolio prior to the end of the year. These systems enhancements will provide Freddie Mac with industry standard processes for the principal assets in its investment portfolio. On a related front, in September, Freddie Mac implemented an arrangement with JPMorgan Worldwide Securities Services to provide the company with industry standard transaction processing and record-keeping services for its retained portfolio. In addition, JPMorgan yesterday began providing the company with custodial services for its liquidity and contingency portfolio. Collectively, these efforts are providing significant improvements in the efficiency and controls relating to these critical processes.

42. On October 3, 2006**,** at the Company's Market Update conference call, defendants made the following statements:

> [Syron:]
>
> And lastly and very importantly, under the leadership of Gene, we have made significant headway on our comprehensive plan for remediating our internal controls and systems. It's taken too long, but we're getting there. This is clearly the top priority for us at Freddie, and today represents a significant component of the day-today responsibilities of more than half of

our officers. While there's still a lot of work left to do, I'm confident that we're well on our way to fixing our accounting infrastructure and our internal controls and returning to quarterly GAAP compliant financial reporting.

* * *

[McQuade:]

Then finally, we're making good progress in fixing our underlying financial controls. As you know, this has been the top management priority, and we've brought in a much broader group of officers from across the company to focus on getting the job done.

We currently have a number of important initiatives relating to our financial reporting systems coming online that will give us a much stronger basis for closing our books. We're also working on enhancements to our closing process.

In the past few months, we've brought a new investment accounting platform online, outsourced our settlement and custody functions and finalized our comprehensive plan for transforming Freddie to a much stronger control environment. Our targets remain the release of our full-year 2006 financials before the end of the first quarter of 2007 and the return to quarterly reporting during 2007.

To sum it all up, we had a great first half of the year financially, our risks continue to be well managed and controlled, and we're making good progress on our financial remediation efforts.

43. On January 5, 2007, the Company issued a press release entitled Freddie Mac Provides Quarterly Market Update," which stated in part:

**INTERNAL CONTROLS AND FINANCIAL REPORTING UPDATE**

The company is continuing to make progress on the series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to quarterly financial reporting. The comprehensive plan includes mitigation and remediation of identified control issues; strengthening of the financial close process; implementing critical systems initiatives; and completion of a review of the company's system of internal controls related to the processing and recording of the company's financial transactions.

> The company's plan is to release 2006 results prior to the end of the first quarter of 2007. An important milestone for the company's return to quarterly reporting will be the progress achieved in the remediation of internal controls and implementation of new accounting systems. Throughout 2007, management will evaluate the company's remediation progress each quarter to determine whether the company has reduced the risk of a material misstatement to an acceptable level.

44. On January 5, 2007, during the Company's Market Update conference call, defendants made the following statements:

> [Syron:]
>
> Lastly, we remain very focused on completing the job of remediating our internal controls environment and returning to regular quarterly reporting of our financial results. We are making good progress and we continue to believe we will publish our full 2006 results by the end of the first quarter of this year. Then, we will set our sights on returning to quarterly reporting, which requires us to complete the systems work that we now have underway.
>
> * * *
>
> Let me now shift to our financial reporting, which is my number one priority. We continue to make progress on remediating our internal control weaknesses and improving our financial reporting capabilities and let me give you a brief update on our efforts.
>
> First, our near-term goal is to release our full-year 2006 financial results prior to the end of the first quarter. While that is not as timely as the public market standard, for us, it is a big step in the right direction and so far, we are on track.
>
> Second, as Dick said, we need to get back to regular quarterly reporting on a sustainable basis. Critical steps in completing this work are the strengthening of a number of our key controls, as well as the installation of several new accounting systems, including those for our investment portfolio and the debt and derivatives portfolio. Our current timetable for the systems to be completed is by mid-2007. That is a little later than we had initially planned, but it still puts us in a position to return to quarterly reporting in the second half of the year.
>
> [Eric Wasserstrom - UBS Analyst:]
>
> Buddy, I was wondering if you could- you touched on this a little bit in your commentary, but could you just remind us what systems implementations

have already occurred and what you need to occur beyond the ones that you indicated on the call?

[Piszel:]

Well, we have made the first installation of the investment portfolio system for the liquidity and contingency portfolio. So we have got some experience with that. There has been a lot of work over the last year or so on automating a lot of things that were very manual and that process continues.

The two big ones that we have coming up really are the entire retained – the rest of the retained portfolio and the debt and derivatives portfolios. And those are big events because right now there is a lot of manual work associated with the recordkeeping for those and when they get it installed, it dramatically reduces the overall risk environment that we operate in. So those are two big dating actions that will enable us to get back to competence in our quarterly reporting.

[Syron:]

I would add to that. We outsourced our custodial function in the late summer and fall, which also had a significant reduction in the amount of risk we had in the company. We outsourced that to JPMorgan and that has gone very well since we have done that and it has essentially brought our recordkeeping to a daily recordkeeping basis.

[Wasserstrom:]

And so beyond the implementation of the remaining portion of the retained portfolio and the derivative portfolio, are there other major systems events that need to occur?

[Piszel:]

Yes, we will be further automating the single-family business and the multifamily business. We will be making improvements to the overall financial systems architecture. So it is not like there are two systems and we are done. This work is going to continue for a number of years.

[Wasserstrom:]

Okay. But in terms of getting beyond the point where there are material risks to your reporting, at what point could we consider that to be accomplished?

[Piszel:]

> Well, we will be returning to timely quarterly reporting in the second half and we would have to have a stable control environment to be able to get there.
>
> [Wasserstrom:]
>
> And just so that I understand that point entirely, is it possible that when you return to - is it therefore implicit in your return to quarterly reporting that there will be no significant material weaknesses or is it possible that there could still be some?
>
> [Piszel:]
>
> It is possible that there could be some. The whole idea here is to firm up the internal control environment and with that said, we will still have to perform a number of additional steps that normally wouldn't be there, but we believe we understand what those would be to mitigate whatever risks we have remaining and that is the plan. So you can think about an environment where the control environment is improving, but as that improves, we have to do less additional work to be able to substantiate the financial statements.

45. On January 30, 2007, in the Company's prepared remarks at a Citigroup Financial Services Conference, defendant Cook made the following statements:

> Finally, with a variety of both competitive pressures and market opportunities presenting themselves, it is more important than ever for us to complete the remediation of our financial reporting infrastructure. While many of our efforts have not been visible to the market, we have actually made meaningful progress on these fronts in the past year. I know it's been a long time coming, but we've got good traction.

46. On February 27, 2007, the Company issued a press release entitled "Freddie Mac Announces Tougher Subprime Lending Standards to Help Reduce the Risk of Future Borrower Default," which stated in part:

> Freddie Mac today announced that it will cease buying subprime mortgages that have a high likelihood of excessive payment shock and possible foreclosure. First, Freddie Mac will only buy subprime adjustable-rate mortgages (ARMs) - and mortgage-related securities backed by these subprime loans - that qualify borrowers at the fully-indexed and fully-amortizing rate. The goal is to protect future borrowers from the payment shock that could occur when their adjustable rate mortgages increase.
>
> *　　　*　　　*

Second, the company will limit the use of low-documentation underwriting for these types of mortgages to help ensure that future borrowers have the income necessary to afford their homes. In addition, Freddie Mac will strongly recommend that mortgage lenders collect escrow accounts for borrowers' taxes and insurance payments.

In keeping with its statutory responsibility to provide stability to the mortgage market, Freddie Mac will implement the new investment requirements for mortgages originated on or after September 1, 2007, to avoid market disruptions.

"Freddie Mac has long played a leading role in combating predatory lending and putting families into homes they can afford and keep," said Richard F. Syron, chairman and CEO of Freddie Mac. "The steps we are taking today will provide more protection to consumers and enhance the level of underwriting standards in the market."

Freddie Mac's new requirements cover what are commonly referred to as 2/28 and 3/27 hybrid ARMs, which currently comprise roughly three-quarters of the subprime market. Specifically, the company is requiring that borrowers applying for these products be underwritten at the fully- indexed and amortizing rate, as opposed to the initial "teaser" rate. The company also will limit the use of low-documentation products in combination with these loans. For example, the company will no longer purchase "No Income, No Asset" documentation loans and will limit "Stated Income, Stated Assets" products to borrowers whose incomes derive from hard-to-verify sources, such as the self-employed and those in the "cash economy." There will be a reasonableness standard for stated incomes.

47. In a 2/27/2007 interview with Bloomberg News, Defendant Syron said:

"The last thing you want to do to that market is take out a major purchaser overnight," Freddie Mac Chairman and Chief Executive Officer Richard Syron said in an interview today. "I saw the New England credit crunch as president of the Boston Fed, everyone turned off the spigot all at once, and it's a very, very unhappy result," said Syron, who was head of the Federal Reserve Bank of Boston from 1989 to 1994.

Freddie Mac probably buys about 20 percent of AAA rated subprime-mortgage bonds, which represents most of its activity in the subprime market, Syron said.

Because investors in AAA mortgage bonds aren't impacted by loan losses until they reach high levels, "this is not at all a concern, from a Freddie perspective, of safety and soundness," Syron said.

48. On March 23, 2007**,** in its 2006 Annual Report, defendants made the following statements:

> While Freddie Mac reached many of our goals last year, some major challenges remained unmet. Foremost among them was the essential task of getting current in our financials and strengthening our internal controls. There's no question this has taken longer than any of us expected.
>
> Fortunately, we have developed and are carrying out a comprehensive plan that embodies our detailed blueprint for completing this job. We have first-rate teams and project leaders implementing this plan and they are making good progress. Our goal is to return to quarterly financial reporting this year. And we are working assiduously to improve our internal controls systems and infrastructure. As I said in last year's letter to stockholders, Freddie Mac must become the standard of excellence not only for managing mortgage risk, but for the accounting and internal controls associated with it.
>
> * * *
>
> **Operational Risks**
>
> Operational risks are inherent in all of our business activities and can become apparent in various ways, including accounting or operational errors, business interruptions, fraud, failures of the technology used to support our business activities and other operational challenges from failed or inadequate internal controls. We face a number of significant operational risks, including material weaknesses and other significant deficiencies in our internal control over financial reporting. These operational risks may expose us to financial loss, may delay or interfere with our ability to return to and sustain timely financial reporting, or may result in other adverse consequences. Governance over the management of our operational risks takes place through the enterprise risk management framework described above. Business areas retain primary responsibility for identifying, assessing and reporting their operational risks.
>
> Our business processes are highly dependent on our use of technology and business and financial models. We face challenges in the areas of system security, change management and information technology application and general controls. *See "Internal Control Over Financial Reporting"* for more information concerning material weaknesses related to our systems. In recent years, we have strengthened our processes to validate model assumptions, code, theory and the system applications that utilize our models. We are currently improving our model oversight processes and enhancing our staffing both within the business areas and in our risk oversight functions.

We continue to make significant investments to build new financial reporting systems and move to more effective and efficient business processing systems. Until those systems are implemented, we continue to remain more reliant on end-user computing systems than is desirable and we are challenged to effectively and timely deliver integrated production systems. Reliance on certain of these end-user computing systems increases the risk of errors in some of our core operational processes and increases our dependency on monitoring controls. In the near term, we are mitigating this risk by improving our documentation and controls over these systems and placing certain key end-user systems into a change management process controlled by our information technology group.

Our efforts to develop and deploy new financial reporting and business process systems have limited our flexibility to release new products and other business initiatives in response to competitive market forces. We manage this risk through a management committee that monitors key projects and allocates resources to development efforts.

We outsource certain key functions to external parties, including (a) processing functions for trade capture, market risk management analytics and asset valuation, (b) custody and recordkeeping and (c) processing functions for mortgage loan underwriting. In addition, we use a process of delegated Underwriting for the single-family mortgages we purchase or securitize. We also expect to implement a process of delegated underwriting for certain multifamily mortgages we purchase or securitize. *See* "Credit Risks - *Mortgage Credit Risk- Underwriting Requirements and Quality Control Standards*" for information about how we mitigate the risks associated with delegated underwriting. We mitigate the risk from our use of external parties by engaging in active vendor management, such as establishing detailed vendor requirements, reviewing business continuity plans, monitoring quality assurance processes and using third party reviews of our vendors.

In recognition of the importance of the accuracy and reliability of our valuation of financial instruments, we engage in an ongoing internal review of our valuations. We perform analysis of internal valuations on a monthly basis to confirm the reasonableness of the valuations. This analysis is performed by a group that is independent of the business area responsible for valuing the positions. Our verification and validation procedures depend on the nature of the security and valuation methodology being reviewed and may include: comparisons with external pricing sources, comparisons with observed trades, independent verification of key valuation model inputs and independent security modeling. Results of the monthly verification process, as well as any changes in our valuation methodologies, are reported to a management committee that is responsible for reviewing and approving the

approaches used in our valuations to ensure that they are well controlled and effective, and result in reasonable fair values.

* * *

**Internal Control Over Financial Reporting**

**. . .** During 2006**,** we developed a comprehensive plan for returning to quarterly financial reporting. The comprehensive plan includes mitigation and remediation of identified material weaknesses and significant deficiencies; strengthening of our financial close process; implementation of critical systems initiatives; and completion of a review of our system of internal controls related to the processing and recording of financial transactions.

We have made progress implementing changes to our accounting, financial reporting and operational infrastructure that have improved our internal control environment, including outsourcing the custody and recordkeeping functions for our Retained portfolio and Cash and investments portfolio, implementing a new accounting sub-ledger for our Cash and investments portfolio and upgrading our general ledger system. However, certain key initiatives, including the implementation of a new sub-ledger for our Retained portfolio, were not completed by year-end as originally planned and will continue to be part of our remediation efforts in 2007.

As a result of our efforts, we made significant progress toward the remediation of our material weaknesses, as described below. However, each of the material weaknesses identified in prior years persisted throughout 2006 and they continue to present challenges for us in 2007**.**

We also made progress in the remediation of the significant deficiencies in our internal control and we have mitigated some of them so that they have been reduced to control deficiencies in our internal control over financial reporting. For example, we enhanced our risk governance framework thereby reducing the severity of the weaknesses that existed in this area. We also improved our processes for identifying security impairments and the governance of and change management processes related to the amortization of deferred premiums, discounts and deferred fees for assets held in our Retained portfolio.

While we have made progress in our remediation efforts, our material weaknesses and remaining significant deficiencies will continue to pose significant risks to our financial reporting processes until adequately remediated. The material weaknesses that affected us through December 31, 2006 and continue to present challenges for us, as well as our related remediation activities, are described below:

*Integration among our systems, business units and external service providers.* Our systems and processes related to our operational and financial accounting systems, business units and external service providers are not adequately integrated. This inadequate integration increases the risk of error in our financial reporting due to: (a) the potential failure to correctly pass information between systems and processes; (b) incompatibility of data between systems; (c) incompatible systems; or (d) a lack of clarity in process ownership. To compensate for this weakness, we have implemented mitigating controls, including extensive manual procedures to perform data validation and financial analytics. We have also enhanced the communication and coordination between our business units.

Our remediation efforts are targeted to address risks posed by (a) the hand-off of data between systems, business units and various data owners, (b) the reliance on end-user computing solutions or (c) reliance on simplifying assumptions in the applications of our accounting policies. We have also formalized internal guidance for controls over the hand-off of data at all stages of our financial close processes, end-user computing solutions and the use of simplifying assumptions in our accounting policies. Our remediation plans include identifying areas that require attention, evaluating our application of the new internal guidance for the hand-off of data and remediating any control deficiencies identified. We have also undertaken an initiative to more clearly link the application of our accounting policies to our systems and our end-user computing solutions.

We have undertaken an initiative to redesign our financial close process to make timely financial reporting possible. Our remediation efforts currently focus on implementing enhancements to our current financial close process, while addressing our objective of long-term sustainability in our processes. We have defined and begun monitoring performance metrics to evaluate our progress in achieving close targets, with a focus on accuracy and timeliness.

*Information technology general controls as they relate to change management.* Our controls over managing the introduction of program and data changes need improvement. Weaknesses in these controls include a lack of consistent standards and inadequate testing of changes prior to deployment; an environment and processes that increase the difficulties of establishing and maintaining internal control; and issues arising from inherent system limitations.

We are implementing new change management processes so that changes to our system applications and new system implementations are properly designed and approved, fully tested and meet the requirements of the business. We are also focused on promoting an environment of accountability for adhering to change management processes and providing

our staff with the tools and training to implement system changes appropriately.

*Information technology general controls as they relate to security administration, management and technology.* Our controls over information systems security administration and management functions need to improve in the following areas: (a) granting and revoking user access rights; (b) segregation of duties; (c) monitoring user access rights; and (d) periodic review of the appropriateness of access rights. Weaknesses in these controls could allow unauthorized users to access, enter, delete or change data in these systems, as well as increase the possibility that entries could be duplicated or omitted inadvertently.

Our remediation efforts include reviewing the design of our existing controls against industry standards, establishing new procedures to secure data and restrict access to appropriate users, and the development of new tools to monitor access to data and the types of access granted to specific users. We are also centralizing the responsibility for granting user access to key system applications and enhancing our automation of controls designed to prevent unauthorized or inappropriate levels of system access.

*Monitoring of results within financial operations and reporting functions.* The controls we use to monitor the results of our financial reporting process, such as the performance of financial analytics and account reconciliations, failed to identify certain issues that required adjustments to our financial results prior to our reporting them.

Our remediation efforts have included a detailed evaluation and redesign of our financial analytics and reconciliation procedures, and the implementation of regular, structured reviews of monthly financial results and accounting matters. We are continuing to identify additional financial analytics improvements that we need to make. Additionally, we need to continue to execute the new controls for a period of time in order to assess their effectiveness.

*Staffing adequacy.* During 2006, we made progress in our efforts to build a strong management team by filling several key senior management positions. However, we must continue to recruit additional qualified people into leadership and key staff positions in targeted functions within the company to achieve our objectives for the remediation of our internal control deficiencies. Our employee voluntary turnover rate was higher in 2005 than prior years, but voluntary turnover in 2006 was significantly lower than 2005. Undesirable voluntary turnover strains existing resources and contributes to increased operational risk. Furthermore, our standards of performance need to be enforced in order to create a more effective culture of accountability.

Our remediation activities are focused on addressing staffing issues in targeted areas across the company by identifying and filling critical vacancies, addressing staff development and training needs, and eliminating key person dependencies in critical roles. Additionally, we are taking steps to build a culture of accountability that supports operational risk management decision-making and promotes the urgency to identify and address deficiencies in our internal controls. For example, risk management accountability has been formally included as an objective for all our employees. We are also reinforcing accountability through staff training that raises the awareness of risks in our business and highlights the importance of maintaining effective internal controls.

*Management risk and control self-assessment process.* We do not currently have a self-assessment process for our internal control over financial reporting in order to reliably enable management to identify deficiencies in our internal control, evaluate the effectiveness of internal control or modify our control procedures in response to changes in risk in a timely manner.

Our remediation activities are focused on an in-depth assessment of the design of internal control over financial reporting in our existing business processes and the development of a self-assessment process that will provide management with a more timely and reliable tool to identify changes to our processes, risks, and controls in order to identify and remediate control deficiencies. The new management self-assessment process will be implemented under an enhanced risk governance structure designed to identify and escalate risk issues and control deficiencies in a timely manner. Our objective for this new process is to allow us to assess the design and effectiveness of our internal control over financial reporting in a manner consistent with the requirements of the Sarbanes-Oxley Act of 2002.

In addition to these material weaknesses, we identified a number of significant deficiencies in our internal control over financial reporting that, although not determined to be material weaknesses as of the end of the year, still present risks of error in our financial statements and disclosures. These significant deficiencies include:

- deficiencies in our processes related to the valuation of our guarantee-related assets and liabilities;

- deficiencies in our controls over the accuracy and completeness of data received from external counterparties or passed between our business processes and used in our transaction processing and financial reporting systems;

- over-reliance on end-user computing solutions with insufficient development, documentation and change controls;

- deficiencies in our new product implementation process; and

- deficiencies in our procedures for monitoring our use of simplifying assumptions in the application of our accounting policies, and our excessive reliance on such assumptions. The excessive use of simplifying assumptions increases the risk that insignificant differences, when compared to a stricter application of our accounting policies, could become consequential over time and result in errors that are not detected *(e.g.,* if the underlying transaction volume affected by a simplifying assumption increases).

As we continue our remediation activities, we may identify additional material weaknesses, significant deficiencies or other operational issues in our internal controls or conclude that significant deficiencies we have already identified should be regarded as material weaknesses, either individually or in the aggregate. Improvements to the processes and controls we put in place to remediate our control deficiencies need to operate for a period of time to enable us to evaluate their effectiveness.

The material weaknesses and significant deficiencies in our internal control over financial reporting adversely affect our ability to record, process, summarize and report financial data in a timely manner. Based on the continued existence of material weaknesses at December 31, 2006, our Chief Executive Officer and Chief Financial Officer have concluded that our internal control over financial reporting was not effective at December 31, 2006. In order to compensate for the material weaknesses and other deficiencies in our internal controls, we continue to perform extensive verification and validation procedures to provide reasonable assurance that our consolidated financial statements are prepared in accordance with GAAP. Therefore, in view of the additional procedures we performed, we believe that these weaknesses do not prevent us from preparing and issuing our consolidated financial statements in conformity with GAAP.

Our resumption of interim financial reporting will depend on continued progress with our remediation efforts; however, our objective is to return to quarterly reporting during the second half of 2007. We will begin the process of registering our common stock with the SEC after resuming timely quarterly reporting.

* * *

**Subprime loans**. Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime.

> While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant. Also included in our credit guarantee portfolio are Structured Securities backed by non-agency mortgage-related securities where the underlying collateral was identified as being subprime by the original issuer. At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.
>
> With respect to our Retained portfolio, we do not believe that any meaningful amount of the agency securities we hold is backed by subprime mortgages. However, at December 31, 2006 and 2005, we held approximately $124 billion and $139 billion, respectively, of non-agency mortgage-related securities backed by subprime loans. These securities include significant credit enhancement based on their structure and more than 99.9 percent of these securities were rated AAA at December 31, 2006.

49. On March 23, 2007, in a Company press release entitled "Freddie Mac Reports 2006 Financial Results," defendants stated:

> “Freddie Mac grew its business, strengthened its franchise and improved long-term value for its shareholders, despite a challenging year for housing and mortgage finance,” said Richard F. Syron, chairman and chief executive officer. “In 2006, both net income and fair value return before capital transactions exceeded $2 billion, as we grew our guarantee business. We also maintained our low credit and interest-rate risk profiles, leaving us well positioned to deal with a broad range of interest rate conditions, and with the value of our shareholders’ equity well protected.
>
> Credit Risk Management
>
> The company’s mortgage credit risk, as measured by the current loan-to-value ratio (LTV) of its credit guarantee portfolio and other credit characteristics, remained low. The company estimates that the credit guarantee portfolio had a LTV of 57 percent as of December 31, 2006, compared with 56 percent for 2005, and the portfolio remains geographically well diversified. Long-term, fixed-rate mortgages constituted 82 percent of the credit guarantee portfolio, despite an increase in the purchase of variable-rate products, including non-traditional mortgage products, during 2006.
>
> At December 31, 2006, the company’s $704 billion retained portfolio included $238 billion of non-agency mortgage-related securities, 95 percent

of which were rated AAA or equivalent. Included in this amount were $124 billion of non-agency mortgage-related securities based by subprime loans, of which more than 99.9 percent were AAA rated.

Internal Controls

The company is continuing to make progress on the series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to quarterly financial reporting. The comprehensive plan includes mitigation and remediation of identified material weaknesses and significant deficiencies; strengthening of the financial close process; implementing critical systems initiatives; and completion of a review of the company's system of internal controls related to the processing and recording of the company's financial transactions.

50. On March 23, 2007, during the Company's fourth quarter 2006 earnings conference call, defendants made the following statements:

[Syron:]

Through the continued hard work of our employees and the expanded capabilities in our executive team, Freddie Mac made significant progress towards fixing our internal controls and financial reporting structure. This call and the release of our 2006 financials about 80 days after the end of the year demonstrates that progress and marks an improvement of two months over our 2005 timeline. We believe we are improving our process every month and expect to continue to make improvements in our disclosure and reporting timeline throughout 2007. This work will ultimately make our internal controls and processes as strong as our balance sheet is.

* * *

[Piszel:]

Third, we were able to generate all of the information contained in the Annual Report and all the supplemental information we've provided and go through a full audit and still be done in around 80 days. This is a big step in the right direction and gives us confidence in getting back to quarterly reporting in 2007**.** Lastly, our control environment grows stronger every day. We're making good progress on remediating our control issues. In the first quarter of 2007, we have remedied 3 of our 16 serious matters. We are intensely focused on the rest and you should see items drop off the list each quarter. Ultimately, as Dick said, we want our internal controls and processes as strong as our balance sheet and I'm confident we can get there.

51. In a March 23, 2007 article by Bloomberg News, Defendant McQuade was quoted as follows:

> It plans to provide results for the first quarter of 2007 "sometime after Memorial Day," a U.S. holiday on May 28, Freddie Mac Chief Operating Officer Eugene McQuade said today in an interview.
>
> "We don't think we'll lose any money at all on subprime," McQuade said. "Credit has never been better." Freddie Mac's delinquency rate "is about 20 percent or 30 percent less than it was a year ago at this time," he said. A decline of capital in the subprime mortgage market "is a great opportunity for us," McQuade said. "This is where we really shine." While "others are withdrawing their liquidity, we have stepped in during the first two months" of 2007 and bought mortgages and mortgage securities, he said.

52. In a April 16, 2007 Business Week article, Defendant Piszel was quoted as stating the following:

> The biggest quibble is over Freddie and Fannie's investments in securities created from pools of mortgages not issued or guaranteed by the two agencies. These so-called private-label loans total some $235 billion and $114 billion, respectively, for Freddie and Fannie. The companies include roughly half of that category in their subprime totals. But Paul Miller, an equity analyst at Friedman Billings Ramsey, says they should include more: "Subprime is in the eye of the beholder."
>
> "Having [a lot of] size doesn't mean having [a lot of] risk," says Freddie financial chief Anthony Piszel.

53. On June 8, 2007**,** at the Company's Annual Stockholders' Meeting, defendant Syron stated in his prepared remarks:

> The third issue is financial reporting and internal controls - and it's one where we were heartened by the progress we made, but obviously not totally satisfied. We have implemented a sound, comprehensive plan to make the needed improvements and we have made considerable progress in the past year.
>
> Our sign of this progress was our annual report; it took roughly 80 days to release our 2006 financials. And as I noted at the outset, we will resume quarterly reporting when we release our first quarter 2007 earnings next week, on the morning of June 14.

> So our progress tells us we are turning the comer in this area. And we will not ease up our efforts to strengthen our internal controls until that vital job is done, as well.

54. On June 8, 2007, at the Company's Annual Stockholders' Meeting, defendant Syron made the following statements:

> The third issue I said I'd mention, obviously, is financial reporting and internal controls. This is one where we were gratified by the progress we made last year in 2006, but not totally satisfied by that progress.
>
> We have implemented a very sound, comprehensive plan to make the needed improvements. We've made considerable progress. I won't go through it now, but if you look at our successive reports, they've come in with less and less delay, if I can put it that way. And as I said, we're very proud that next week, for the first time in five years, we'll return to quarterly reporting.
>
> So, we think we're turning the corner. And we're not going to ease up on our efforts to strengthen our internal controls until that's done.

55. In a June 26, 2007 Bloomberg News article, Freddie Mac Treasurer Timothy Bitsberger was quoted as saying the following during a speech in London that day:

> Freddie Mac Treasurer Timothy Bitsberger said the subprime mortgages slump is “severe but contained.”
>
> Problems are “very well defined” and largely confined to a small percentage of borrowers in seven states, Bitsberger told Euromoney’s investor conference. The holders of subprime mortgages are “large institutional players who can withstand the loss.”

56. On June 14, 2007, the Company issued a press release entitled "Freddie Mac Releases First Quarter 2007 Financial Results; Company Resumes Quarterly Reporting," which stated in part:

> Internal Controls
>
> Remediation of the material weaknesses and significant deficiencies in Freddie Mac's financial reporting process continues to be a top corporate priority in 2007. The company is continuing to make progress on a series of initiatives to improve its financial reporting infrastructure &d remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to timely quarterly financial reporting. Efforts made to date have resulted in a strengthened control environment.
>
> The company has made significant progress in addressing its internal control issues. For example, it has addressed the material weakness related to the adequacy of its staffing by adequately filling the company's critical vacancies in areas related to controls and financial reporting. Additionally, the company has addressed the significant deficiency related to-governance over new products processes by redesigning the process and controls over the implementation of new products.

57. On June 14, 2007, during the Company's first quarter 2007 financial results conference call, defendant Piszel made the following statements:

> I will close on our progress on capital management, financial reporting and internal controls. First, capital- following the release of our '06 results, we initiated our preferred-for-common swap under o& $1 billion authorization. We began our activities in late March, and I am pleased to tell you that we bought back $750 million in common shares and issued $500 million in preferred stock through the end of May.
>
> Having spoken directly with many of our investors in the past few months, I know how important progress is on this front. While we still have work to do, our recent actions make it clear that this is a high priority for our management team and that we'll take every opportunity we can to deliver shareholder value through capital management activities.
>
> On controls, improving our controls and financial timeline can only help in this effort. So let me make a couple points. First, with today's release, in 75 days we achieved an improvement of one full week over our year-end '06 release. My goal is to get to 60 days for the third quarter, and at this rate we're right on target.
>
> Second, having been here for a little over six months, I am increasingly comfortable with our monthly and our quarterly processes and am confident that we will be able to issue our full-year 2007 Annual Report within 60 days

> of year end, which is timely by any standards. This puts us in a good position to begin the SEC registration process in mid-2008.
>
> * * *
>
> Lastly, we have addressed two more of our control issues -the first addressed the material weakness on the adequacy of staffing. We did this by filling critical vacancies in the controls and financial reporting areas and also by improving our HR practices. Second, we resolved issues related to new products governance, where we redesigned the process and controls over the implementation of new products. Overall, we're making very good progress on the remaining issues, and I'm optimistic that we will have the bulk of our control issues behind us by the end of the year.

58. On August 30, 2007, the Company issued a press release entitled "Freddie Mac Releases Second Quarter 2007 Financial Results; Net Income of $764 Million, Value Increase of $800 Million," which stated in part:

> "Freddie Mac was created to provide liquidity, stability and affordability to the mortgage market in good times and bad," said Richard F. Syron, chairman and chief executive officer. "Rarely has that role been as important as it has been during this period of volatility in the U.S. housing and residential mortgage markets. Furthermore, we have been able to serve the market while maintaining a disciplined approach to risk."
>
> "On the credit front we are seeing weakening, but we are well positioned relative to the overall marketplace to weather the ongoing disruptions in the mortgage markets and emerge as an even stronger player.
>
> Freddie Mac's regulatory core capital was estimated at $36.3 billion at June 30, 2007, which represented an estimated $1.8 billion in excess of the 30 percent mandatory target capital surplus set by the Office of Federal Housing Enterprise Oversight (OFHEO).
>
> Credit-related expenses, consisting of provision for credit losses and real estate owned (REO) operations expense, were $336 million for the second quarter of 2007, compared to $63 million for the second quarter of 2006. The year-over-year increase primarily resulted from the recognition of a $320 million provision for credit losses during the second quarter of 2007. This increase largely reflects credit deterioration on 2006 and 2007 loan originations that have exhibited higher transition rates from delinquency to foreclosure and higher loan loss severities resulting from slower home price appreciation and higher unpaid principal balances.

Capital Management

In accordance with the previously announced authorization to repurchase up to $1 billion of common stock in conjunction with the issuance of up to $1 billion of non-cumulative perpetual preferred stock, the company repurchased $750 million of common stock (approximately 11.9 million shares) at an average purchase price of $63.23 per share and issued $500 million of non-cumulative, perpetual preferred stock during the three months ended June 30, 2007.

During the third quarter of 2007, the company completed its repurchase plan, buying $250 million of common stock (approximately 4.2 million shares) at an average purchase price of $58.74 per share and issuing another $500 million of non-cumulative, perpetual preferred stock.

Credit guarantee activities increased fair value by an estimated $1.8 billion during the second quarter of 2007. This increase includes the receipt of cash primarily related to management, guarantee and other up-front fees.

Internal Controls

Remediation of the material weaknesses and significant deficiencies in Freddie Mac's financial reporting process continues to be a top corporate priority in 2007. The company is continuing to make significant progress on a series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to timely quarterly financial reporting. Efforts made to date have resulted in a strengthened control environment.

59. During a conference call on 8/30/2007 to discuss the second quarter results, Defendants Syron and Piszel said the following to investors, the following portions of which were later reported in *The New York Times*, the *Dow Jones News Service* or the *Bloomberg News*:

"While I was an early bear of the housing market, I was not bearish enough given the degree to which house pricing were outstripping income growth," said Chairman and Chief Executive Dick Syron during a conference call, adding: "I do think some of the most negative foresights out there today are too severe and many of the recent problems will be worked out in the next 18 months or so." He predicted that about 1.5 million additional households will be able to "take up some of the current inventory overhang."

"We were not immune to market forces and we continue to take a cautious view toward the housing market," Syron said. Credit losses will persist throughout 2007 and rise next year, Chief Financial Officer Anthony Piszel said during the call.

While those losses are worsening, they are still below average for the company, the chief financial officer, Anthony S. Piszel, said. "Given the credit environment, we think we performed reasonably well," he said.

We are in a relatively stronger credit position than anybody out there in the broad market," Piszel said. "We think we are certainly in a manageable position to weather this for the long run," said Piszel. Piszel also told analysts and investors during the call that Freddie Mac has "eliminated any manageable exposure" to so-called Alt-A mortgages as well as such "risk-layered" loans that have high loan-to-value ratios and low credit scores. Alt-A loans are made to borrowers whose credit is deemed good enough to forgo verification of claimed income or assets.

Freddie Mac also said its investments in subprime mortgages had dipped from the end of 2006. It announced in April that it planned to purchase up to $20 billion in subprime loans to provide financially strained borrowers with more flexibility to refinance. The company said Thursday it had made its first purchase of $106 million of mortgages pursuant to this commitment in July. Those loans had an average credit score of 613.

60. Also during the August 30, 2007 second quarter 2007 financial results conference call, defendants made the following statements:

[Syron:]

So those are the headlines: a return to profitability, very tangible execution of our mission in a tough time, improved controls and accelerated financial reporting.

* * *

[Piszel:]

I'll close by discussing our progress on our capital management, financial reporting and internal controls.

* * *

On a control front and timeline, let me make a couple points. First, with today's release in 61 days, we have meaningfully accelerated our financial release process. As a reminder, our target for the third quarter was 60 days, so we're basically a quarter ahead of schedule. Given the success and our

> commitment to continue to improve with each release, we are targeting the release of the third quarter results by Thanksgiving. That would represent a further improvement of 10 days.
>
> Second, as we've just advanced the timeliness of our financial reporting, we are also making progress on new and more understandable results presentation. I would expect to roll that out with a full set of presentation and disclosures in early 2008 in anticipation of SEC registration. Lastly, in this quarter, we've addressed two more significant deficiencies in our financial reporting process. The first related to tightening of our GAAP policies and the second related to improved oversight of our financial and business models. So we are making very good progress on our overall remaining issues, and I'm optimistic that we will have the bulk of our control issues behind us by year-end. With that, let me turn it back to Dick.

61. On September 10, 2007, at the Lehman Brothers 5th Annual Financial Services Conference, defendant Cook made the following statements:

> On our timeline - with our release of second-quarter results in 61 days we have accelerated our financial release process. Given this success and our commitment to keep improving with each release, we're targeting the release of third-quarter results by Thanksgiving. I give Buddy and his team a lot of credit for this success and it gives us increasing confidence in our ability to complete our remediation process and register with the SEC in the middle of next year.

62. On September 17, 2007, at the Bank of America Securities 37th Annual Investor Conference, defendant Piszel made the following statements:

> If I think about where we are in our time line and the remediation process, we're really pleased with the progress that we've made. We started out the year, first quarter, we got our year end numbers out in decent timing, 75 days. First quarter we were able to bring that down, second quarter we were able to bring that down to about 61 days. What we've announced is that for the third quarter, we'll have our numbers out by Thanksgiving, that's around 50 days. That's getting to that magic number of 45 which is what we need in order to go through the SEC regulation and we're still confident that we can do that by midyear 2008.

63. On November 7, 2007, the Office of the New York State Attorney General issued a press release which stated in part:

Attorney General Andrew M. Cuomo today announced his office has sent Letters of Notice and Demand, providing notice of the issuance of Martin Act subpoenas and a demand for an Independent Examiner, to the nation's two largest financiers of home mortgages, Fannie Mae and Freddie Mac. Cuomo also announced that Fannie Mae and Freddie Mac have agreed to the demand to retain an independent Examiner, subject to the Attorney General's approval, to conduct a total review of all Washington Mutual appraisals and mortgages purchased by the companies.

* * *

Today's announcement marks the latest expansion of Cuomo's industry-wide investigation of mortgage fraud. Last week, Cuomo filed suit against First American Corporation, and its subsidiary eAppraiseIt, one of the nation's largest real estate appraisal management companies, for colluding with Washington Mutual to inflate the appraisal values of homes.

"In order to fulfill their duty to consumers and investors, Fannie Mae and Freddie Mac must ensure that Washington Mutual's mortgages have not been corrupted by inflated appraisals," said Attorney General Cuomo. "Our expanding investigation into the mortgage industry has uncovered that Washington Mutual improperly pressured appraisers to provide inflated values that best served the lender's interest. Knowing this, Fannie Mae and Freddie Mac cannot afford to continue buying Washington Mutual mortgages unless they are sure these loans are based on reliable and independent appraisals."

The subpoenas issued include requests for:

- Information about all of the mortgage loans Fannie Mae and Freddie Mac have purchased from any bank, including Washington Mutual, and the mortgage-backed securities associated with those loans;

- Information about due diligence practices of Fannie Mae, Freddie Mac;

- Information about appraisals and valuations by the originating lenders;

- Policies and procedures related to valuing properties and appraisals.

Fannie Mae (Federal National Mortgage Association) and Freddie Mac (Federal Home Loan Mortgage Corporation are two of the largest financiers of home mortgages in the country, and both purchase loans from Washington Mutual. Washington Mutual is the third largest provider of loans to Freddie Mac, selling $24.7 billion in loans in 2007 alone.

Washington Mutual is also the fourteenth largest provider of loans to Fannie Mae, selling $7.8 billion in loans in 2007.

"The integrity of our mortgage system depends on independent appraisers," said Cuomo. "Washington Mutual compromised the fairness of this system by illegally pressuring appraisers to provide inflated values. Every company that buys loans from Washington Mutual must be sure that the loans they purchased are not corrupted by this systemic fraud."

The lawsuit filed last week details a scheme in numerous e-mails showing First American and eAppraiseIT caved to pressure from Washington Mutual to use appraisers who provided inflated appraisals on homes. E-mails also show that executives at First American and eAppraisalT knew their behavior was illegal, but intentionally broke the law to secure future business with Washington Mutual. Between April 2006 and October 2007, eAppraisalT provided over 250,000 appraisals for Washington Mutual.

64. The November 6, 2007 letter from Andrew M. Cuomo, Attorney General for the State of New York, stated:

Dear Mr. Syron,

Over the last nine months, the Office of the New York Attorney General (this "Office") has conducted a wide-ranging investigation into conflicts of interest and fraud in the mortgage industry. During the course of our investigation, we have uncovered a pattern of collusion between lenders and appraisers that has resulted in widespread inflation of the valuations of homes.

As you no doubt are aware, lenders now regularly sell the mortgage loans they make into the financial markets, either directly or to investment banks or Government Sponsored Enterprises ("GSEs"), such as Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The loans are then pooled together, scrutinized, and sold to the general public as mortgage backed securities.

This configuration has the effect of making the lender less vigilant against risky loans since any risk is quickly transferred to the purchasers of the loans. Moreover, as the lender does not hold many of its loans in its portfolio, the lender's interest is ensuring the accuracy of the appraisal backing the loan is severely diminished. Even worse, because lender's profits are determined by the quantity of loans they successfully close, and not the quality of those loans, there is an incentive for a lender to pressure appraisers to reach values that will allow the loan to close, whether or not the appraisal accurately reflects the home value.

Further jeopardizing the process, mortgage brokers and the lenders' loan production staff are almost always paid on commission. Thus, the income of these individuals depends on whether a loan closes and on the size of the loan. Accordingly, brokers and loan production staff have strong personal incentives to pressure appraisers to value a home at the maximum possible amount, so that loans will close and generate maximum commissions. For these reasons, mortgage brokers and lenders frequently subject real estate appraisers to intense pressure to change values in appraisal reports.

The investment banks and GSEs may also have an interest in inflating (or at least in not questioning) the value of the pooled loans. The values of these loans serve as a basis for the value of their securities. As such, the higher the value of the loans closed, the greater the value for which the securities are sold on the secondary market.

As part of investigation, this office recently filed a complaint against First American Corporation ("First American") and its subsidiary First American eAppraiseIIT ("eAppraiseIIT"), a company that performed over 260,000 appraisals for Washington Mutual, Inc. ("WaMu"). The complaint alleges that under pressure from WaMu, EA violated the Uniform Standards of Professional Appraisal Practice ("USPAP") and federal and state law by permitting WaMu to control the selection of property appraisers engaged to appraise collateral for WaMu-originated mortgages based on whether the appraisers "hit the values" required to close loans. This practice led to inflated property valuations and enabled WaMu to originate larger, more profitable, mortgages, and a greater number of mortgages, than would have been possible had appraisals been performed, as required by filly independent appraisers. The complaint against First American and eAppraiseIIT, is enclosed.

We understand that Freddie Mac purchases significant number of purportedly "conforming" mortgages from WaMu. The evidence shows, however, that these mortgages may be premised on fraudulently inflated appraisals and not upon appraisals that met USPAP and related statutory and regulatory standards. ***Accordingly, Freddie Mac's own shareholders and investors who purchased securities issued by Freddie Mac may have been harmed.*** Some of these shareholders and investors were New York individuals and institutions.

In light of the above, Freddie Mac should immediately retain an Independent Examiner, subject to this Office's approval, to investigate, review and analyze all appraisals that support the WaMu mortgages that Freddie Mac purchases or securitizes; the manner in which WaMu engages appraisers and manages its appraisal process; and all appraisals conducted

> by First American and eAppraiseIT that support any mortgages Freddie Mac purchases or securitizes. Should you decline to immediately retain such an Independent Examiner, Freddie Mac should immediately cease and desist purchasing and securitizing WaMu loans and any loans supported by First American and eAppraiseIT appraisals.
>
> Furthermore, pressure on appraisers and inflated appraisals appear to be widespread problems in the mortgage industry. We are, therefore, expanding our investigation to determine the extent of Freddie Mac's knowledge of, and actions regarding, these problems as they relate to past mortgage purchases and securitizations by Freddie Mac. For that reason, pursuant to this Office's investigative authority under New York General Business Law § 352 and New York Executive Law § 63(12), accompanying this letter is a subpoena to Freddie Mac returnable on November 28, 2007.
>
> Sincerely yours,
>
> Andrew M. Cuomo

65. On November 7, 2007, Freddie Mac issued a press release entitled "Freddie Mac Statement in Response to New York Attorney General Subpoenas," which stated in part:

> Accurate appraisals are fundamental to our effective credit risk management as well as to the long-term success of the homebuyers we are charted to serve. . . . We look forward to cooperating fully with the New York Attorney General's investigation and have agreed to appoint an Independent Examiner, as requested, to review the appraisal practices cited in the Attorney General's complaint.

66. Then, on November 20, 2007, Freddie Mac announced it had lost $2 billion in the third quarter and announced it would have to raise fresh capital to meet regulatory requirements. The Company posted negative revenue of $678 million, as it sustained losses under generally accepted accounting principles of $3.6 billion in the quarter. The revenue compared with positive revenue of $91 million a year earlier. Defendant Piszel was quoted:

> "We have begun raising prices, tightened our credit standards and enhanced our risk management practices. We also continue to improve our internal controls . . . ."

67. As a result, Freddie Mac's stock price dropped from $60 in mid-October 2007 to $26.74 on November 20, 2007. This decrease in Freddie Mac's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

68. On Friday, November 23, 2007, after the close of the market, Freddie Mac announced the sale of $6 billion of noncumulative, perpetual preferred stock. This drastic measure, which diluted the interests of the common stockholders, was necessary to shore up its capital, as the losses caused by Freddie Mac's subprime exposure had left Freddie Mac's Capital surplus at its lowest since 2000 and perilously close to the minimum capital required by OFHEO. The price of Freddie Mac common stock decreased further on this news, closing at $24.50 on Monday, November 26, 2007.

69. In fact, during the Class Period, Defendants concealed the following information which caused their statements to be materially false and misleading:

(a) Defendants were not implementing sufficient risk management controls to protect the Company from acquiring billions of dollars worth of mortgages with poor underwriting standards and the Company's internal controls and business methods were incapable of managing, identifying and guarding against massive losses in subprime investments and guarantee exposure, causing the Company to have an untenable amount of risky loans.

(b) Defendants were not implementing controls to ensure that appraisals were done appropriately and to prevent collusion between lenders and appraisers, increasing the risk of defaults.

(c) The Company was not adequately reserving for uncollectible loans, causing its financial results to be misleading.

(d) The Company had invested, for its own portfolio, in billions of dollars of high risk, low quality mortgages that carried extraordinarily high credit risks which it would eventually have to write off, causing losses and capital deficiencies.

(e) The Company had guaranteed billions of dollars of subprime, high risk mortgages sold to others, which it would eventually have to write off;

(f) The Company's guarantee exposure was not protected or properly transferred to credit-worthy mortgage insurers and that many of its third party mortgage insurers were not finally able to meet their insurance contracts – the very contracts that were supposed to protect sizeable portions of Freddie Mac's mortgage investment holdings and guarantee exposure.

70. In addition to the foregoing, the Audit Committee intentionally and/or recklessly:

(a) Did not oversee the integrity of Freddie Mac's financial statements and, permitted the false and/or misleading earnings and other press releases and quarterly, annual and other financial reports to be distributed;

(b) Did not ensure that Freddie Mac's disclosure controls and procedures, including internal controls over financial reporting, were adequate;

(c) Did not ensure that management developed and implemented adequate systems and programs for the detection and prevention of fraud; and

(d) Did not ensure that management had appropriate guidelines and policies governing processes for assessing and managing Freddie Mac's risks and did not monitor and control Freddie Mac's major financial risk exposures.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

71. The Officer Defendants were the Company's principal officers during the relevant period and were responsible for and controlled Freddie Mac, its investments and risk strategies, and its financial statements and public disclosures. Each of them directly participated in the management of the Company and was directly involved in the day-to-day operations of the Company at the highest levels.

72. Throughout the Class Period, the Officer Defendants intentionally, or at the very least recklessly, made materially false and misleading statements and/or failed to disclose material adverse information known to them concerning the Company's subprime and other exposures, internal controls, risk policies and procedures, financial condition and results and operations, as detailed herein.

73. The Audit Committee Defendants, as members of the Audit Committee, were intimately familiar with, were responsible for and controlled Freddie Mac's earnings press releases and financial statements and public disclosures.

74. According to the Charter of the Audit Committee, the Committee was responsible for:

- Overseeing the integrity of Freddie Mac's financial statements and disclosures, including:

- reviewing with the independent public accounts, Executive Vice President-Finance and Chief Financial Officer drafts of Freddie Mac's quarterly condensed financial statements and annual financial statements, including Management's Discussion and Analysis of Financial Condition and Results of Operations;
- reviewing with the Executive Vice President-Finance and Chief Financial Officer drafts of Freddie Mac's earnings press releases and the types of information to be disclosed, and the types of presentations to be made, in any earnings guidance provided to analysts and rating agencies; and
- reviewing with the Executive Vice President-Finance and Chief Financial Officer, the adequacy of Freddie Mac's disclosure controls and procedures, including internal controls over financial reporting.

- Assist the Board with oversight of Freddie Mac's compliance with legal and regulatory requirements.
- Oversee management's development and implementation of systems and programs for the detection and prevention of fraud/
- With respect to risk assessment and risk management, at least annually:
  - review with the Executive Vice President-Finance, the Chief Financial Officer, the Senior Vice President-Chief Enterprise Risk Officer and other members of management, as appropriate,

management's guidelines and policies governing the processes for assessing and managing Freddie Mac's risks; and

- o meet in joint session with the Finance & Capital Deployment Committee to review Freddie Mac's major financial risk exposures (including but not limited to market, credit and operational risks) and the steps management has taken to monitor and control such exposures.

75. In sum, it was the Audit Committee's job to detect and prevent precisely the type of fraud which occurred at Freddie Mac, and they should have had a heightened skepticism of management and the policies and practices of the Company in light of the previous fraud that occurred at Freddie Mac.

76. The Audit Committee Defendants reviewed drafts of the false and/or misleading earnings press releases, financial reports and other public statements and allowed them to be released to the public. In addition, the Audit Committee was grossly reckless in, among other things, (i) failing to ensure the integrity of Freddie Mac's financial statements and disclosures, (ii) failing to correct the severely deficient internal controls at Freddie Mac and to ensure adequate and proper disclosures about the deficiencies in those internal controls, and (iii) failing to ensure the Company had appropriate risk management policies and procedures in place and to ensure the disclosures about the Company's risk management policies and practices in its public statements was accurate and not misleading.

77. In light of their specific responsibilities for overseeing the integrity of Company's accounting and financial reporting process, and in light of the adverse

information disclosed here which was known or recklessly disregarded by the Audit Committee Defendants, any purported reliance by the Audit Committee Defendants upon the Officer Defendants or Freddie Mac's outside auditor with respect to the accuracy of the Company's financial statements and/or the integrity or adequacy of its internal controls was inherently unreasonable.

78. The Finance and Capital Deployment Committee Defendants were responsible for the funding, investment and hedging activities of Freddie Mac's retained and sold portfolio's, credit risk arising from the guarantee portfolio, and the mortgage and non-mortgage investment portfolios.

79. According to the Charter of the Finance and Capital Deployment Committee, the Committee was responsible for:

- Overseeing the funding, investment and hedging activities associated with Freddie Mac's retained and sold portfolios, credit risk arising from the guarantee portfolio, and mortgage and non-mortgage investment portfolios (collectively, the "Investment Operations"), including:
    - o Freddie Mac's investment, credit and liquidity strategies and activities, and the results of those strategies and activities (including the profitability thereof);
    - o Freddie Mac's strategy and business plan associated with Investment Operations
- Oversee the content and implementation of Freddie Mac's Asset/Liability Management Policy and Asset/Liability Management Plan, including

    - Review of Freddie Mac's asset/liability management performance, risk exposures (including credit risk, market risk and operational risk) and, as necessary, any material changes or exceptions to the Asset/Liability Management Plan or the Management Policies

- Oversee the management of Freddie Mac's capital, including aggregate portfolio risks, including credit, market and operational risks, and asses the adequacy of capital relative to those risks.

- With respect to risk management, the Committee will review the management of credit risk, market risk (including interest rate and liquidity risk) and operational risk and, to the extent not otherwise included in the foregoing, counterparty risk associated with Investment Operations, funding activities and mortgage-related securities activities, including:

    - Freddie Mac's strategies, policies and performance with respect to management of such risks; and

    - The appropriateness reliability and completedness of the risk management systems and processes employed by management to identify, measure, manage and control such risks.

- Oversee investor relations activities relating to equity, debt and mortgage-related securities and their strategic implications and Freddie Mac's relationships with rating agencies.

80. The Finance and Capital Deployment Committee Defendants were intimately familiar with, or reckless in not being familiar with, Freddie Mac's subprime

investments and involvement and the risk exposures related thereto, and intentionally and/or recklessly failed to disclose these investments and substantial risks to the public.

81. The Governance, Nominating and Risk Oversight Committee was responsible for the oversight of Freddie Mac's risk framework. According to its Charter, the Committee was responsible for:

- With respect to Freddie Mac's risk framework, to assist the Board in the oversight, on an enterprise-wide basis, of Freddie Mac's risk exposures, including credit risk, market risk, liquidity risk, model risk, strategic risk, reputation risk, legislative risk and operational risk (collectively "risk"), which exposures may be reviewed by other Board committees in connection with their oversight of business activities, by:
    - Approving policies relating to enterprise risk management strategies and governance, except that any risk limits or metrics embedded in such policies shall instead be subject to approval by the Finance and Capital Deployment Committee;
    - Reviewing major enterprise risk exposures and controls and assessments of such exposures and controls, and, where appropriate, assigning oversight responsibility for such exposures and controls;
    - Reviewing capabilities for, and the adequacy of resources allocated to, enterprise risk management, including staffing, systems and programs (including corporate-wide training and communication programs);

  - Reviewing management's strategies to manage enterprise risk.

- To oversee Freddie Mac's compliance with the December 9, 2003, Consent Order with the Office of Federal Housing Enterprise Oversight ("OFHEO"), and related guidance from OFHEO.

82. The Governance and Risk Oversight Committee intentionally and/or recklessly did not ensure that Freddie Mac complied with the OFHEO Consent Order, did not ensure the Company had adequate and appropriate risk management policies and procedures, and allowed false and/or misleading statements about Freddie Mac's compliance with OFHEO orders and the Company's risk management policies and procedures to be publicly disseminated.

83. In light of their specific responsibilities for overseeing the integrity of Company's financial reporting process, internal controls, capital and/or risk management, and in light of the adverse information disclosed here which was known or recklessly disregarded by them, any purported reliance by the Audit Committee Defendants, Finance and Capital Deployment Committee Defendants and Governance and Risk Oversight Committee upon the Officer Defendants or Freddie Mac's outside auditor with respect to these matters was inherently unreasonable.

## VII. CLASS ACTION ALLEGATIONS

84. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased Freddie Mac common stock during the Class Period (the "Class"). Excluded from the Class are (i) Defendants, (ii) any person who was an officer or director of Freddie Mac during the Class Period, (iii) the members of the immediate families of the Individual Defendants,

(iv) any incentive, retirement, stock or other benefit plan that benefitted solely the Individual Defendants, (v) any entity in which any Defendant had a controlling interest during the Class Period, (vi) any subsidiary of Freddie Mac, and (vii) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

85. The members of the Class for whose benefit this action is brought are dispersed throughout the United States and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that Class members number, at a minimum, in the hundreds of thousands. As of February 28, 2007, Freddie Mac had over 661 million shares outstanding. Record owners and other members of the Class may be identified from records maintained by Freddie Mac or its stock transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

86. Plaintiff's claims are typical of those of the Class as all members of the Class are similarly affected by Defendants' actionable conduct in violation of federal law that is alleged herein.

87. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent.

88. A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein, because joinder of all members is impracticable. Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote and Plaintiff anticipates no difficulties in the management of this action as a class action.

89. Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants violated federal securities laws by the acts and/or omissions alleged herein;

b. whether Defendants' Class Period public statements and reports misrepresented and/or omitted material information;

c. whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

d. whether Defendants participated in and pursued the common course of conduct complained of herein;

e. whether the market price of Freddie Mac common stock was inflated artificially as a result of Defendants' material misrepresentations and/or omissions during the Class Period;

f. whether the Individual Defendants are liable as control persons under the federal securities laws; and

g. to what extent the members of the Class have sustained damages and the proper measure of damages.

## VIII. INAPPLICABILITY OF STATUTORY SAFE-HARBOR

90. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint. Many of the statements alleged to be false and misleading herein were not specifically identified as "forward-looking statements" when made, and many were statements of historical fact and/or representations about the Company's then-existing condition to which the statutory safe harbor does not apply. Moreover, Plaintiff primarily alleges material omissions of material facts by Defendants.

91. To the extent any statements alleged to be false herein may be characterized as forward-looking to which the statutory safe harbor applies, (i) those statements were not accompanied by meaningful cautionary statements identifying the important then-present factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and (ii) the particular speakers of such statements knew in each case that their statements were false or misleading and/or the statements were authorized and/or approved by an executive officer of the Company who knew that those statements were false or misleading, in each case when such statements were made.

92. Any purported warnings contained in or accompanying any of the press releases, periodic financial reports and financial statements and other public statements described herein were generic and unparticularized boilerplate statements that lacked

the meaningful cautionary language necessary to insulate any forward-looking statements.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

93. In bringing the claims herein, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the fraud-on-the-market doctrine. At all times relevant to this Complaint, the market for Freddie Mac common stock was an efficient market for the following reasons, among others:

a. Freddie Mac common stock was listed and actively traded on the NYSE, a highly efficient and automated market. Freddie Mac's common stock trading volume was substantial. The average weekly trading volume of Freddie Mac common stock throughout the Class Period was over a million shares;

b. Freddie Mac published quarterly earnings press releases, Annual Reports and Information Statements and made such releases and reports available to its investors through mailings and/or on its website www.freddiemac.com.

c. Freddie Mac regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Freddie Mac was followed by numerous national securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

94. As a result of the foregoing, the market for Freddie Mac common stock promptly digested current information regarding Freddie Mac from all publicly available sources and reflected such information in the market prices for Freddie Mac common stock at all relevant times. Under these circumstances, Plaintiff and other members of the Class, as purchasers of Freddie Mac common stock during the Class Period, suffered similar injury through their purchase of Freddie Mac's common stock at artificially inflated prices and a presumption of reliance applies.

95. In addition to the foregoing, Plaintiff and the Class is entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding Freddie Mac's subprime exposure, internal controls, risk management, financial condition, results and business operations.

## X. LOSS CAUSATION

96. Throughout the Class Period, the prices of Freddie Mac's common stock were inflated as the result of the Defendants' comprehensive scheme to misrepresent Freddie Mac's financial condition and results. Not only did the Defendants publish materially false statements on Freddie Mac's financial condition and results, but they also publicly misrepresented that, among other things, Freddie Mac did not purchase subprime loans or securities backed by subprime loans, its exposure to the subprime crisis was not significant, it had "excellent" risk management, and the Company maintained adequate internal financial controls.

97. Freddie Mac's financial results, exposure to subprime investments, adequacy of risk management and internal controls and adequacy of financial disclosures were material information to Plaintiff and other members of the Class. Had

Plaintiff and the other Class Members known the truth – that the Company's reported financial results were materially false and misleading and painted a rosier picture of the Company's results and stability than the true facts warranted and in fact its exposure to the subprime crises was huge – Plaintiff and the other members of the Class either would not have purchased Freddie Mac common stock at all, or would have done so only at substantially lower prices than the artificially inflated prices which they actually paid.

98. The nature, extent and effect of Defendants' fraudulent scheme were revealed to the market through earnings releases and other public statements. As alleged herein, these revelations caused significant declines in the price of Freddie Mac common stock, causing Plaintiff and other members of the Class who continued to hold Freddie Mac common stock at the time of these disclosures to suffer significant losses.

99. The Company's common stock price fell 29% - from $37.50 per share on November 19, 2007, to $26.74 per share on November 20, 2007. These declines are directly attributable to the market's reaction to revelations of the nature, extent and impact of the accounting fraud at Freddie Mac, and to its adjustment of the price to reflect the newly emerging truth about Freddie Mac's investments, risk management, financial condition and results. Thus, these price declines were directly caused by Defendants' fraud alleged herein, and by the market's response to the subsequent partial corrective disclosures.

100. The fraud perpetrated by the Defendants described in this Complaint proximately caused foreseeable losses to the Plaintiff and the other members of the Class.

## XI. CAUSES OF ACTION

**COUNT I**
**Violations of Sections 10(b) of the Exchange Act and**
**SEC Rule 10b-5 Promulgated Thereunder**

101. Plaintiff repeats and realleges each of the allegations set forth above as if set forth fully herein.

102. As described in detail above, throughout the Class Period, the Defendants, directly or indirectly, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications and a national securities exchange, employed a device, scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of the common stock of Freddie Mac during the Class Period, all in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

103. The Company and the Individual Defendants, as the most senior officers or Board Committee members of Freddie Mac during the Class Period, are liable as direct participants in all of the wrongs complained of herein. Through their positions of control and authority, the Individual Defendants were in a position to and did control all of the Company's false and misleading statements and omissions, including the contents of all of its public filings and reports and press releases, as more particularly set forth above. In addition, certain of these false and misleading statements constitute

"group published information," which the Individual Defendants were responsible for creating. The Company is liable for each of the statements of the Individual Defendants through the principles of respondeat superior.

104. As detailed above, the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express responsibility for knowing such facts. Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Freddie Mac's earnings volatility and true financial and operating condition from the investing public and supporting the artificially inflated price of Freddie Mac's common stock.

105. Plaintiff and the other members of the Class relied upon the Freddie Mac Defendants' statements and/or on the integrity of the market in purchasing Freddie Mac's common stock during the Class Period.

106. As a direct and proximate cause of the wrongful conduct described herein, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Freddie Mac common stock at artificially inflated prices during the Class Period. Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by the Defendants, or been aware of the truth behind the Defendants' material misstatements, they would not have purchased Freddie Mac common stock at artificially inflated prices during the Class Period.

107. By virtue of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the members of the Class who have been damaged as a result of such violations.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**<u>Against the Individual Defendants</u>**

108. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

109. As set forth in Count I above, Freddie Mac and the Individual Defendants each violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) by their acts and omissions as alleged in this Complaint.

110. Throughout the Class Period, the Individual Defendants were controlling persons of Freddie Mac within the meaning of Section 20(a) of the Exchange Act. By virtue of their board committee membership and/or high-level positions, their stock ownership and contractual rights and/or their specific acts described above, the Individual Defendants had the power to and did, directly or indirectly, exercise control over Freddie Mac, including the content and dissemination of the various statements and financial reports which Plaintiff contends are false and misleading. Each of the Individual Defendants either made, participated in the preparation of, were responsible for and/or were provided with or had unlimited access to the Company's reports, financial statements, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after they were issued and had the ability to prevent the issuance of the statements or cause the statements to be

corrected. Each of the Individual Defendants had direct and supervisory or oversight responsibility for and involvement in, the day-to-day operations of the Company and induced or permitted Freddie Mac to engage in the acts constituting the violations of the federal securities laws alleged herein.

111. As a result of Defendants' false and misleading statements and omissions alleged herein, the market price of Freddie Mac common stock was artificially inflated during the Class Period. The members of the Class relied upon either the integrity of the market or upon the statements and reports of the Defendants in purchasing Freddie Mac common stock during the Class Period.

112. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock at artificially inflated prices during the Class Period. Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Freddie Mac, or been aware of the truth behind its material misleading statements or misstatements, they would not have purchased Freddie Mac common stock at artificially inflated prices during the Class Period.

113. By virtue of their positions as controlling persons of Freddie Mac, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act to Plaintiff and the members of the Class who have been damaged as a result of Freddie Mac's underlying securities violations.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and all other Class members, pray for judgment as follows:

A. A determination that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein, and a certification of Plaintiff as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. An award of compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest thereon;

C. An award to Plaintiff and the Class of their reasonable costs and expenses incurred in this action, including reasonable counsel fees, expert fees and other costs; and

D. A grant of such other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

/s/ Marc Dann (consent)
ATTORNEY GENERAL FOR
THE STATE OF OHIO MARC DANN
Andrea L. Seidt, Deputy Chief Counsel
Beth A. Finnerty, Deputy Chief Counsel
30 E. Broad Street, 17th Floor
Columbus, Ohio 43215
Telephone: (614) 728-5454
Facsimile: (614) 995-0246
E-mail: ASeidt@ag.state.oh.us
E-mail: BFinnerty@ag.state.oh.us

/s/ Stanley M. Chesley
Stanley M. Chesley (Ohio Bar 0000852)
James R. Cummins (Ohio Bar 0000861)
Melanie S. Corwin (Ohio Bar 0046513)
Jean M. Geoppinger (Ohio Bar 0046881)
Waite Schneider, Bayless & Chesley Co., L.P.A.
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 621-0267
Facsimile: (513) 381-2375
E-mail: stanchesley@wsbclaw.com
E-mail: jcummins@wsbclaw.com
E-mail: mcorwin@wsbclaw.com
E-mail: jeangeoppinger@wsbclaw.com
*Special Counsel to the Attorney General of the State of Ohio and Counsel for Plaintiff*

/s/ Martin D. Chitwood (consent)
Martin D. Chitwood
Chitwood Harley Harnes LLP
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone: (404) 873-3900
Facsimile: (404) 876-4476
E-mail: mchitwood@chitwoodlaw.com
-and-
Darren T. Kaplan
John F. Harnes
Gregory E. Keller
Chitwood Harley Harnes LLP
11 Grace Avenue, Suite 306
Great Neck, New York 11021
Telephone: (404) 873-3900
Facsimile: (404) 876-4476
E-mail: dkaplan@chitwoodlaw.com
E-mail: jfharnes@chitwoodlaw.com
E-mail: gkeller@chitwoodlaw.com
*Special Counsel to the Attorney General of the State of Ohio and Counsel for Plaintiff*

32324