**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION (YOUNGSTOWN)**

| | | |
|---|---|---|
| **OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, On Behalf of Itself and all Others Similarly Situated,** | : | **CIVIL ACTION NO. 4:08-cv-160** |
| **Plaintiff** | : | **JUDGE John R. Adams** |
| **vs.** | : | |
| **FEDERAL HOME LOAN MORTGAGE CORPORATION a/k/a FREDDIE MAC, RICHARD F. SYRON, PATRICIA L. COOK, ANTHONY S. PISZEL, and EUGENE M. McQUADE,** | : | **FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| **Defendants.** | : | **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


I. INTRODUCTION ....................................................................................1

II. NATURE OF THE ACTION....................................................................3

III. JURISDICTION AND VENUE ..............................................................4

IV. PARTIES ..........................................................................................5

V. FACTUAL BACKGROUND ....................................................................9

A. Freddie Mac's Undisclosed Exposure to Subprime and Nontraditional Mortgage Related Risks ....................................................................10

1. Background ....................................................................................10

2. Defendants' Material Omissions.........................................................26

3. Defendants' Misrepresentations During the Class Period ............29

4. Freddie Mac's Response to New York Attorney General's Industry-Wide Investigation Of Mortgage Fraud ............................51

5. The November 20, 2007 Disclosures ...............................................56

6. OFHEO's 2008 Report to Congress ..................................................57

B. The Safety and Soundness of Freddie Mac's Capital ..............................58

1. Freddie Mac's Capital Impairment .....................................................59

2. Freddie Mac's Misrepresentations with Respect to Its Capital.....65

C. Defendants Also Engaged in Material Omissions With Regard to Other Practices Related to Freddie Mac's Risk Exposure and Capital..............68

VI. EXECUTIVE COMPENSATION AND INSIDER TRADING INCENTIVIZED THE DEFENDANTS TO HIDE LOSSES AND DENY RISK.....……………………... .........70

VII FREDDIE MAC HAS A SPECIAL DUTY TO BE TRUTHFUL BECAUSE IT HAS A POSITION OF PUBLIC TRUST ........................................................... 75

VIII. ADDITIONAL SCIENTER ALLEGATIONS............................................................78

**IX. CLASS ACTION ALLEGATIONS ........................................ 79**

**X. INAPPLICABILITY OF STATUTORY SAFE-HARBOR ........................................ 82**

**XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ........................................ 83**

**XII. LOSS CAUSATION ........................................ 84**

**XIII. CAUSES OF ACTION ........................................ 86**

**COUNT I ........................................ 86**

**Violations of Sections 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder ........................................ 86**

**COUNT II ........................................ 89**

**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ........................................ 89**

**XIV. PRAYER FOR RELIEF ........................................ 90**

## I. INTRODUCTION

1. The Federal Home Loan Mortgage Corporation, commonly known as “Freddie Mac,” was created by Congress in 1970 as a federally-chartered and stockholder-owned corporation, with a purpose to support, stabilize, and expand the secondary market for mortgages. As a government-sponsored enterprise (GSE) responsible for maintaining liquidity in the U.S. housing market, Freddie Mac enjoyed a special mandate and position of public trust. Throughout the Class Period, defined below, Defendants continually, repeatedly and publicly stated that Freddie Mac had no substantial exposure to or risk of loss from subprime and other nontraditional mortgages. Further, until November 20, 2007, neither Freddie Mac nor any of the other Defendants disclosed to the investing public that Freddie Mac’s subprime and nontraditional mortgage losses had seriously eroded its financial strength and its “safety and soundness.”

2. The representations and denials about Freddie Mac’s financial risks from participation in the subprime and nontraditional mortgage were revealed to be false. First, in early November, the New York Attorney General launched an investigation of Freddie Mac, as part of a broader investigation into fraudulent practices in the subprime market. Thereafter, on November 20, 2007, Freddie Mac revealed its precarious financial position - losses of over $2 billion for just the three months ending September 20, 2007 with more significant losses expected. Substantially all the announced losses came from Freddie Mac’s

investment in nontraditional mortgages commonly called "subprime" and "Alt-A" mortgages.

3. Freddie Mac's losses in turn raised serious questions regarding impairment of its mandated minimum capital required by its regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO"). As a direct result of these revelations, the value of Freddie Mac common shares dropped 29% in one day and the owners of Freddie Mac shares immediately lost approximately $6.6 billion in share value. (*See* attached Appendix A).

4. The November 20, 2007 revelation of losses and potential capital impairment caught the investing public completely by surprise. As described in more detail below, Defendants purposefully misrepresented Freddie Mac's true financial condition to investors, delaying and concealing revelation of the truth as long as possible. This delay allowed the Individual Defendants (as defined below) to reap the rewards of compensation and bonuses, negotiate new increased compensation packages, exercise stock options, and implement insider trading incentives. For example, Freddie Mac's two highest officers, in the summer and early fall of 2007, sold nearly two million dollars of their stock at prices above $60 just weeks before Freddie Mac's inevitable write-downs caused its stock to fall below $30.

5. As was later explained by OFHEO in its April 15, 2008 Annual Report to Congress, by the fall of 2007 Freddie Mac had further weakened its capital position, had in fact fallen below the OFHEO directed capital level required to maintain Freddie Mac's "safety and soundness," and had placed itself

in danger of being ordered by OFHEO to “cease and desist” its mortgage buying activities until it restored its reduced capital base.

6. Freddie Mac was so imperiled financially that it resorted to an expensive $6.5 billion emergency infusion of capital in December 2007 in order to meet OFHEO’s mandated 30% minimum capital requirement. It sold preferred shares to raise this money, thereby severely diluting the value of the stock owned by common shareholders. The proceeds from this emergency sale of preferred shares were used to conceal yet another $3.0 billion loss due to subprime and nontraditional investment activities that were far riskier than disclosed.

7. Freddie Mac continues to be impacted by the effects of its high-risk mortgage investments during the Class Period. On May 14, 2008, Freddie Mac reported further realized mortgage losses of $1.4 billion and unrealized subprime and Alt-A mortgage losses of $28 billion. The total realized and unrealized losses incurred by Freddie Mac to date have been at least $34 billion – despite countless public reassurances by Freddie Mac and the Individual Defendants that Freddie Mac’s investments were sound and secure.

## II. NATURE OF THE ACTION

8. This is a class action against Freddie Mac and certain of its senior officers for violations of the federal securities laws. Lead Plaintiff Ohio Public Employees Retirement System (“OPERS”) brings this action on behalf of all purchasers of Freddie Mac common stock during the period from August 1, 2006 through and including November 20, 2007 (the "Class Period") who were

damaged thereby, except for Defendants and certain of their related parties as described below (the "Class").

9. Throughout the Class Period, Defendants publicly issued materially false and/or misleading earnings press releases, financial statements and reports, and other statements that artificially inflated the price of Freddie Mac's common stock, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

## III. JURISDICTION AND VENUE

10. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. 240.10b-5).

11. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

12. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Many of the acts in furtherance of the alleged fraud and/or the effects of the fraud occurred within this District. Plaintiff maintains its principal place of business in Columbus, Ohio and its members who were damaged by the fraud are located throughout the State of Ohio, including in this District.

13. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United

States mails, interstate telephone communications, and the facilities of a national securities exchange.

## IV. PARTIES

14. Lead Plaintiff OPERS, formed in 1935, provides retirement, disability, survivor and health care benefits, and services for public employees throughout the State of Ohio who are not covered by another state or local retirement system. OPERS serves more than 920,000 members, and more than 3,700 public employers in Ohio are part of the OPERS system. OPERS has assets exceeding $77.6 billion, making it the 14th largest retirement system in the United States. As set forth in the certification appended to the Plaintiff's Original Complaint and incorporated by reference herein, OPERS purchased shares of common stock of Freddie Mac during the Class Period at artificially inflated prices and has been damaged thereby.

15. Defendant Freddie Mac is a federally–chartered corporation with its principal place of business at 8200 Jones Branch Drive; McLean, Virginia. Congress established Freddie Mac in 1970 to support rental housing and home ownership. Freddie Mac is owned by its shareholders, and its common stock is listed and publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "FRE."

16. Defendant Richard F. Syron ("Syron") was, at all relevant times, Chairman of the Board and Chief Executive Officer ("CEO") of the Freddie Mac.

(a) As Chairman of the Board and Chief Executive Officer, Syron's primary responsibilities included overseeing the overall success or failure

of Freddie Mac; providing leadership for the formulation and achievement of Freddie Mac's vision, mission, strategy, financial objectives and goals; ensuring that effective and qualified management were retained by Freddie Mac; ensuring that Freddie Mac established and maintained appropriate internal and disclosure controls, policies and procedures that were adequate to protect corporate assets; and directing the conduct and affairs of Freddie Mac in furtherance of its safe and sound operation.

(b) Syron, along with the other Individual Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements. Syron publicly commented on Freddie Mac's financial performance in its quarterly and annual earnings press releases, in investor conference calls held during the Class Period, and during interviews with the media. Syron gave public speeches to investment bankers and to Congress and also signed letters to shareholders commenting upon Freddie Mac's performance and disclosure policies in Annual Reports issued during the Class Period.

(c) Syron personally attested to and certified the accuracy of Freddie Mac's reported financial results during the Class Period. For example, Syron signed a certification on March 23, 2007, included in Freddie Mac's Information Statement for the fiscal year ended December 31, 2006, in which he personally certified that based on his knowledge:

(i) ". . . this Information Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to

make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Information Statement," and,

(ii) ". . . the consolidated financial statements and other financial information included in this Information Statement fairly present in all material respects the financial condition, results of operation, and cash flow of [Freddie Mac] as of and for the periods presented [in the Information Statement]."

17. Defendant Patricia L. Cook ("Cook") was, at all relevant times, Freddie Mac's Chief Business Officer and Executive Vice President for Investments and Capital Markets. Cook, along with the other Individual Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements. Cook publicly commented on Freddie Mac's financial performance in press releases, conference calls, articles and other public presentations and speeches held during the Class Period.

18. Defendant Anthony S. Piszel ("Piszel") was and continues to be Freddie Mac's Executive Vice President and Chief Financial Officer ("CFO") from November 13, 2006 to the present.

(a) Piszel was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements. Piszel publicly commented on Freddie Mac's financial performance in its quarterly and annual earnings, press releases, and investor conference calls held during the Class Period, and during interviews with the media.

(b) Piszel also personally attested to and certified the accuracy of Freddie Mac's reported financial results during the Class Period. For example, Piszel signed a certification included in Freddie Mac's Information Statement for the fiscal year ended December 31, 2006, in which he personally certified that based on his knowledge:

(i) ". . . this Information Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Information Statement," and,

(ii) ". . . the consolidated financial statements and other financial information included in this Information Statement fairly present in all material respects the financial condition, results of operation, and cash flow of [Freddie Mac], as of and for the periods presented."

19. Defendant Eugene M. McQuade ("McQuade") was Freddie Mac's President and Chief Operating Officer ("COO") from September 1, 2004 until his resignation on September 1, 2007. McQuade, along with the other Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements. McQuade publicly commented on Freddie Mac's financial performance, condition, and results during the Class Period.

20. Defendants Syron, Cook, Piszel, and McQuade are collectively referred to herein as the "Individual Defendants."

## V. FACTUAL BACKGROUND

21. Freddie Mac is one of the largest purchasers of mortgages in the United States and also operates an extensive mortgage securitization business. In the securitization side of its business, Freddie Mac generates income when it issues securities to investors backed by pools of mortgage loans. Freddie Mac calls these securities mortgage Participation Certificates ("PCs"). Principal and interest payments on the mortgages in the pool are passed through to PC holders by Freddie Mac on a monthly basis. Freddie Mac typically assumes the credit risk on the underlying mortgages, meaning the risk that borrowers will default on their payment obligations. This is commonly referred to as the "Freddie Mac Guarantee."

22. Freddie Mac earns fee income for assuming the mortgage credit risk and administering or "servicing" the mortgage securities.

23. In addition to securitizing mortgages, Freddie Mac purchases for investment purposes both mortgage loans and mortgage-related securities and holds them as on-balance sheet assets in its "Retained Portfolio."

24. Freddie Mac refers to mortgage investments as its "Retained Portfolio" for those securities that it intends to hold as an investment.

25. Freddie Mac funds the purchase of mortgages and mortgage-related securities by issuing short and long-term debt and preferred stock offerings.

26. When Freddie Mac holds mortgages in its Retained Portfolio, it is exposed to both credit risk (that is, the possibility that the borrower will default)

and interest-rate risk (that is, the interest cost incurred by Freddie Mac to buy the mortgage will be larger than the actual interest rate paid by the homeowner).

## A. Freddie Mac's Undisclosed Exposure to Subprime and Nontraditional Mortgage Related Risks

### 1. Background

27. In 2004-2005, the record-low interest rates that had fueled prior unprecedented growth in home loan originations and refinancings began to increase. As a result, loan activity began to decline and with it, the record profits earned by industry players, *i.e.*, investment banks, lenders and brokers.

28. To counteract the declines in loan activity, nontraditional higher risk mortgages were offered by large mortgage producers like Countrywide and Washington Mutual as well as hundreds of smaller mortgage producers. These mortgage producers began to favor quantity (generating more broker fees) over the safety of quality mortgages. They then sold the risks of these lower quality mortgages along with the mortgage.

29. Attempting to reverse the trend of declines in loan activity and maintain the flow of originations to the secondary market, lenders and brokers began aggressively to market more and riskier nontraditional loan products. These products included:

- interest-only and payment-option adjustable rate mortgages ("ARMs"), originally intended for use by sophisticated real estate investors and professionals;
- reduced documentation loans, originally intended for use by self-employed borrowers and other borrowers who possessed the necessary income and/or assets to qualify

but, for one reason or another, had difficulty in being able to document that ability consistent with Fannie Mae/Freddie Mac underwriting standards ("stated income" loans);

- "2/28" or "3/27" ARM loans, with an initial 2- or 3-year period during which the interest rate would remain fixed; and
- so-called "80-20 piggyback" loans, 80% loan-to-value ("LTV") first-lien loans combined with 20% LTV second-lien loans, designed to eliminate the need for expensive private mortgage insurance.

Whereas, in 2001, subprime and Alt-A loans constituted 8% of the loan market, by 2006, the percentage of such loans had tripled to 24% of the market. In 2006, conventional prime and jumbo prime loans constituted less than half the loans originated. Freddie Mac was losing this market because of its Congressionally mandated conforming loan standards.

30. Marketing efforts by mortgage originators for these more nontraditional loan products, were often directed to borrowers who otherwise would not have qualified for more traditional loan products and for whom these loans were particularly risky. Marketing efforts were also boosted by the use of short-term below-market "teaser" rates. The features of these various types of loans were often combined to make the loan "work," *i.e.*, so that the loan could close regardless of the lending standards in place.

31. Speculators used these nontraditional products to purchase properties without having to put up a lot of their own money or prove income and assets. Borrowers, and/or loan officers in some cases, also exaggerated income on stated income loans (often referred to as "liar's loans") in order to obtain loans

for which they would not otherwise have qualified. Many of the features of these loans made it easier to perpetrate property-flipping and other illegal schemes.

32. This nontraditional mortgage market could sustain itself so long as interest rates remained stable and home values continued to appreciate, thereby enabling borrowers to refinance before their loan rates adjusted.

33. Accordingly, as revealed by recent investigations, certain industry players ensured that home values appreciated through artificially inflated appraisals.

34. By the mid-2000s, Freddie's traditional market of conventional prime mortgages had matured, and it was looking for new ways to sustain its past decade's success and meet investor expectations. Because its public charter enables it to raise funds more cheaply than fully private financial institutions, Freddie Mac generally could expand into the subprime market share by outpricing its competitors. With full knowledge of the risks inherent in these nontraditional mortgages, Freddie Mac determined to increase its purchases in this market.

35. In 2005, Defendants instituted a new program, called the "Expanding Mortgage Conduit", which allowed Freddie Mac to create additional sourcing and aggregation capabilities.

36. These Freddie Mac strategies and campaigns were given the internal code name of "XMC." These strategies were intentionally designed: (1) to enable Freddie Mac to buy more and more from the changing mortgage market that was producing nontraditional, high risk mortgages, and (2) to change

and/or ignore any quality systems and controls Freddie Mac had previously used to guard against large mortgage losses.

37. Defendant Richard Syron, Freddie Mac's Chairman and CEO, incentivized by his personal compensation plan, including bonus rewards, led all new campaigns with rousing talks and employee communications.

38. Defendant Syron and the other Individual Defendants divided the "XMC Strategy" into six categories. Syron named the strategies the "Six Levers" and each had associated code names and phrases. The dominant "Lever" was called "TML"—meaning Touch More Loans. The TML initiative became the guiding corporate strategy to buy more low credit, high-risk mortgages. The more loans "touched" by Freddie Mac meant larger bonuses for the Defendants Syron, McQuade, Piszel, and Cook.

39. As a component of this program, the Whole Loan REMIC ("WLR") initiative was also created. The WLR initiative enabled Freddie Mac to purchase loans that otherwise could not be purchased through traditional purchasing and servicing paths and to compete more effectively for whole loan portfolios with private label issuers.

40. WLR transactions involved the bulk purchase of closed loans in large amounts. These pools differed in size and structure, as well as in the manner in which sellers of such pools, including Countrywide and Washington Mutual, marketed the selected loans. Bidders, who included Wall Street investment banking firms as well as Freddie Mac and Fannie Mae, had only five days to review the loans from the time they were offered. Bidders could reject

loans and have them replaced in the pools, but the sheer size and the time pressures imposed upon bidders militated against such practice. These same time constraints also precluded bidders from reviewing the replacement loans, further militating against replacing loans. According to Employee A, a senior loan analyst who reviewed portfolio loan purchases through March 2006, it was rare for Freddie Mac to have an opportunity to review a sample of the new loans to confirm they did not have problems of their own. The replacement loans "wouldn't be looked at, at all."

41. Freddie Mac did not have the staffing capability to evaluate the loans, so it outsourced the due diligence function to Clayton Group, Inc. ("Clayton"), a company based in Connecticut that reviewed home loans for many investment banks, as well as for Freddie Mac. Employee A reviewed loans with Clayton.

42. According to Employee A, Clayton applied ratings to each of the loans from the pools, using a system that rated loans on a scale from 1 to 3. Loans rated 1 had "no material exceptions." Loans rated 2 had "non-material exceptions." Loans rated 2W had "material exceptions waived." Loans rated 3C had "only curable material exceptions noted." Loans rated 3 had "material exceptions noted." Loans with any material exceptions (Categories 2W, 3C and 3) did not comply with Freddie Mac's lending standards. Still, Freddie Mac purchased these loans.

43. Throughout the Class Period, according to Employee B, a member of Freddie Mac's technical department who held the position title "Technical

Lead" and worked directly on quality control and fraud detection projects from May 2005 through July 2007, Freddie Mac routinely purchased a high percentage of loans where material exceptions had been waived. A typical Loan Disposition Summary, prepared by Clayton in connection with its review of a $124 million pool purchased from Washington Mutual in June 2006, reflected that approximately 25% of the loans in the pool were rated 2W, "material exceptions waived." Another loan summary, prepared for a $145.5 million dollar loan pool, purchased from Washington Mutual in December 2005, reflected that approximately 34% were also 2W. Another loan summary prepared by Clayton with respect to another loan pool purchased from Washington Mutual in June 2006, reflected that over 40% of the loans were again 2W. These exceptions related directly to the credit-worthiness of the borrower, with the largest categories of exceptions relating, *inter alia*, to appraisals, borrower's income, borrower's assets, and credit history. Freddie Mac accepted these loans even though they failed to comply, in a material manner, with Freddie Mac's underwriting guidelines.

44. According to Employee B, based upon his review of similar summaries throughout the Class Period, the percentage of loans with material exceptions waived continued in this range throughout the Class Period. As Employee C, a Senior Director of IT working with two separate business groups, Analytics and Risk Management until May 2007, explained, this estimate was conservative. During his tenure at Freddie Mac, the decision to accept loans through granting "exceptions" ballooned to the point that Freddie Mac was buying

as many or more loans with exceptions than loans that complied with Freddie Mac's underwriting standards. This was a source of constant complaints at monthly meetings, held by Senior Vice President of Credit Policy and Portfolio Management Donald Bisenius on the third Tuesday of each month, and attended by 20 to 25 people including, among others, the officers in charge of Mortgage Policy, External Operations Risk Management, including Vice President Michael Wade, and Vice President with Valuation and Pricing responsibilities Bob Ryan. At one such meeting, recalled Employee C, one Vice President, who was Director of Credit Risk policy, asked: "Why do we even have a credit risk policy if we allow more exceptions than we have compliance?" The deteriorating quality of Freddie Mac's loans was later confirmed by Defendant Cook, in an investor presentation on February 28, 2008, wherein she admitted that "the overall credit policy of [Freddie Mac's] 2007 deliveries was worse than 2006."

45. As a consequence, during the Class Period, a material percentage of loans purchased and then reviewed by Clayton did not satisfy Freddie Mac's lending standards. Furthermore, according to an article published in the New York Times on January 27, 2008, the large number of exceptions was not disclosed to ratings agencies such as Moody's and Fitch, who gave many of these pools AAA ratings. Had the extent of the exceptions been disclosed to the ratings agencies, the ratings agencies would not have given the pools such high ratings.

46. Employee A stated that, in particular, inflated appraisals were common and presented serious problems. Pursuant to Freddie Mac's charter, it

was not permitted to purchase a mortgage where the LTV ratio was greater than 80% without obtaining additional protection. Defendants knowingly circumvented this restriction by means of inflated appraisals.

47. According to Employee A, the appraisals on loans purchased by Freddie Mac were either stretched so the loan could meet guidelines or the appraiser made an exception based on some supposedly unique characteristic of the house:

> "Appraisals were stretched. The biggest problem we had was that appraisals were stretched for refinance loans." [There was] "no way the borrower could repay and the lender was giving them more money."

The appraisals purported to show a 70% LTV ratio, "but if you looked closely at the appraisal you saw it was inflated." In reality, the borrower had closer to a 100 LTV or 125 LTV. He said: "Everyone we spoke with knew the values of homes were going up" too far and too fast. "It was being done by appraisals . . . Every refinance in a neighborhood sets a new and higher comp. At some point it is going to crash and houses will lose value."

48. Freddie Mac also knowingly skirted its 80% LTV requirement by so-called "piggyback loans." As reported in the Washington Post in an article dated December 7, 2007, homeowners were permitted to take out a second loan for the remaining 20%. As a result, such owners were left with no equity and were more likely to default.

49. Freddie Mac did not disclose to what extent mortgages that it purchased were encumbered by piggyback loans until after the close of the Class Period. In its Supplement, dated November 20, 2007, filed in connection with its

results for the third quarter of 2007, Freddie Mac disclosed that if such piggyback loans were included in the calculation of the LTV, the percentage of its single-family portfolio with LTV ratios above 90% was 14%, not the 4% as calculated without the piggyback that Defendants had previously reported to the market.

50. During the Class Period, Defendants falsely represented to investors that Freddie Mac delegated underwriting for the single-family mortgages that it purchased. Defendants falsely represented that Freddie Mac provided originators with a series of mortgage underwriting standards and that the originators assured that the mortgages sold to Freddie Mac met those requirements. In fact, a large percentage if not the majority of loans purchased by Freddie Mac did not meet Freddie Mac's underwriting standards.

51. According to Employee C, Countrywide and Washington Mutual, two banks from which Freddie Mac purchased a high percentage of loans, were well known for the low quality of their loans**.** Stated Employee D, a Senior Administrative Coordinator from July 2006 through May 2007, "Countrywide was well known in the market to generate a lot of subprime and predatory loans. If you deal with them you are going to get bad loans, period." Nevertheless, "Freddie Mac had to compromise on loan quality to keep Countrywide and Washington Mutual business." "Freddie Mac couldn't afford to drop them because they were too big," and Freddie Mac had "to cater to lenders to keep them happy."

52. Employee E, a Senior Risk Analyst from September 2006 through February 2007, created a Non-Performing Loan ("NPL") Report, distributed at a

meeting held in the middle of each month by Senior Vice President Shelley Poland, and attended by the entire Credit Policy and Portfolio Management Group, as well as Senior Vice President Bisenius. The summary page identified the overall rate of NPL and what appeared to be the current drivers for NPL and included credit metrics such as FICO scores and LTV ratios. The summary also identified the sellers of loans to Freddie Mac who were disproportionately providing loans that went bad. Another set of metrics reviewed in the reports included how quickly loans went into default, how often those loans were brought back current by borrowers (also known as "Roll Rate"), and how often the loans went into foreclosure. Employee E recalled that Countrywide and Washington Mutual were consistently among the largest sellers of loans to Freddie Mac and they also consistently had among the highest levels of NPL.

53. As Freddie Mac expanded its market share, the percentage of adjustable rate mortgages that it purchased each year rose from 7% in 2005, to 16% in 2006, and to 30% in 2007, according to the supplement filed by Freddie Mac in connection with its year-end results for 2007. Nontraditional mortgage products made up approximately 24% of Freddie Mac's securitization volume for the first nine months of 2006 and 33% of the volume for the first nine months of 2007.

54. In its retained portfolio, by the end of the third quarter of 2007, the percentage of interest-only loans in Freddie Mac's retained portfolio had nearly doubled from 5% to 9%. The total percentage of ARMs, Option Arms, Balloon Resets, Interest-Only, and "Other" Loans, according to the supplement filed by

Freddie Mac at the end of that period, totaled 17%. Interest-only loans accounted for 23% of securitization volume in the first three quarters of 2007, up from 14% in the corresponding period in 2006.

55. The purchase of these products caused further due diligence problems for Freddie Mac because its evaluative software, Quantum, was antiquated and did not have fields for new products. For example, while Quantum had algorithms to evaluate a 30-year fixed mortgage, it had no data to evaluate a 50-year mortgage. Freddie Mac was aware of the deficiencies in its software. An Architecture Assessment, prepared by Freddie Mac's External Operations Risk Management Group ("EORM") in late 2005, identified the problems of Quantum and Freddie Mac's other evaluative software and devised a plan to replace it by the beginning of 2007 due to, according to a document entitled "Whole Loan Remic – Pre-funding Due Diligence Reporting Architecture" "unsupported software and the specialized skills [required] to maintain it**.**"

56. In this Assessment, Freddie Mac stated that Freddie Mac's "business process and technical needs [were] continuously changing as Freddie Mac purchase[d] new products." Nevertheless, Freddie Mac recognized that its "Quantum system used legacy technology. It [did] not provide the flexible support to accommodate new products, data quality controls, accurate and timely reporting capability, and integration with other Freddie Mac systems." According to the Assessment, the "legacy system does not meet business needs."

57. Among its flaws, Quantum could not "anticipate changes to the system to address impacts to policy, process, procedures, and technology," and

could not "integrate with [Loan Prospector] and other systems, including DPM and Midas." In particular, according to Employee B who worked on this Assessment, Quantum could not handle Stated Income Stated Asset ("SISA") loans; Employee F, a Manager of Operations and Servicing Manager for Non-Performing Loans through March 2007, also recalled that "in meetings we discussed that the new loan programs, particularly the large number of ARMs, were going to contribute to problems." Freddie Mac software could not "accept" ARMs, they could only process fixed rate loans. "There were no systems to do ARM loans." Employee G, a Freddie Mac employee from 2000 to March 2007 who was a Project Manager for a project, never completed, to replace "legacy" software, confirmed that Freddie Mac software could not handle any of the "newer loan products" such as option ARMs.

58. The inability to handle nontraditional loan products exposed Freddie Mac to a great deal of risk because it meant that Freddie Mac could not effectively track problems in these loans. As a result, underwriters were manually inserting fields and exceptions into the underwriting software, without any empirical basis or reliable theoretical basis. The Assessment recognized that this resulted, among other things, in inconsistency, duplicate or redundant datasets, and poor data integration. This permitted underwriters to circumvent, and lower, Freddie Mac's underwriting standards (to the extent that *any* uniform standards existed for these new, nontraditional products).

59. As Freddie Mac admitted in its subsequent disclosures, these nontraditional mortgages defaulted at a far greater rate than traditional

mortgages. Indeed, overall, the loans in Freddie Mac's portfolio defaulted at an increasingly faster rate in 2006, and then again in 2007. For example, in 2005, the percentage of delinquent subprime loans in Freddie Mac's portfolio did not reach 5% until the loans were aged 16 months. In 2006, Freddie Mac's delinquencies reached 5% after 12 months. In 2007, delinquencies reached that figure in 8 months. The rate of delinquencies is significant, because the earlier a large percentage of loans default, the greater the likelihood that the loan pool, overall, will be plagued by a larger number of delinquencies in the future.

60. With respect to Alt-A loans, 60-day delinquencies reached 2% in 22 months in 2005, in 14 months in 2006, and in 8 months in 2007. During this period, Defendants did not disclose that the rate of delinquencies was accelerating, and that, notwithstanding the acceleration of delinquencies, Freddie Mac was increasing its purchase of nontraditional loans. To the contrary, as discussed below, Defendants announced in February 2007 that it would *tighten* its lending standards with respect to subprime debt and that it would cease buying certain nontraditional loans after September 1, 2007. Moreover, they specifically disclaimed that the reason for doing so was related to risk exposure. For example, Defendant Syron told the market in March 2007 that "we took this step not out of concern for our exposure to these products" but "out of a desire to lead the market from a mission perspective."

61. In fact, in 2007, Freddie Mac increased the number of low quality loans that it purchased. *After* the third quarter of 2007, Freddie Mac disclosed that the percentage of loans to borrowers with FICO scores below 620, the

percentage of loans with LTV ratios above 90%, and the percentage of loans used to refinance a mortgage other than a cash-out refinance, had all increased 50% over the comparable period in 2006. Rather than acting merely as a stabilizer, Freddie Mac was an increasingly aggressive participant in the subprime market.

62. All of these figures were routinely reported to Freddie Mac's management and its board of directors. Employee H, a financial analyst for operations from April 2006 through May 2007, helped prepare a monthly report for the board. Each report included purchases, loan payoffs, delinquencies and portfolios.

63. Defendants excused Freddie Mac's participation in the subprime market by asserting that virtually all of its subprime debt was rated AAA by the ratings agencies. However, as alleged above, the ratings agencies were not given all material facts by Defendants when they gave such ratings.

64. Freddie Mac was concealing more than the lowering of its credit standards with regard to subprime and nontraditional mortgages. A significant portion of the loans Freddie Mac purchased were plagued by fraud. According to Employee I, an operational risk manager who worked in Freddie Mac's Fraud Investigation Unit ("FIU") from February 2006 through May 2007, Freddie Mac had no automated system to detect fraud on a large scale. Fraud detection was done manually, reviewing random samples. For the most part, fraud was not detected proactively, but reactively, after a number of loans from the same source had defaulted.

65. According to Employee C, fraud detection was basically just an "ad hoc system." Fraud detection at Freddie Mac "was underfunded forever. The assumption was that the lender [who sells loans to Freddie Mac] is responsible for fraud detection." There appeared to be a concern at Freddie Mac that if they did too much fraud detection or developed too solid a fraud detection competency "we might be accepting responsibility" for fraud detection, rather than maintaining the argument the responsibility lay with lenders. The FIU only had three, or at most four, members, so it lacked the manpower to review the huge volume of loans purchased by Freddie Mac or large numbers of cases of fraud. That team only found approximately a handful of cases involving fraud every year, even though Freddie Mac purchased more than 1 million loans per year. For example, in a fourth quarter report for the year 2005 to OFHEO, the FIU disclosed seven instances of fraud, at a time when Freddie Mac was processing 160,000 loans per month.

66. According to Employee I, OFHEO notified Freddie Mac in 2006 that it needed to analyze its loans for mortgage fraud on a much larger scale using data mining technology. Employee B was part of the project, named "Fraud Prevention & Reporting (AIM ID:6QRMC8)," created to address this problem. Among the objectives of this project, according to its Charter prepared in June 2006, were to "incorporate fraud risk scores into sampling algorithms for Quality Control" and to "alleviate the audit finding deficiency around the lack of data mining techniques and enable the Fraud Investigation Unit to be more proactive in detecting fraud and minimizing losses to Freddie Mac."

67. The importance of the project was revealed in or about July 2006 when Employee B attended an in-person meeting with Wade Wilson (a Freddie Mac Vice President), the FIU, other members of EORM, and representatives from a company called CoreLogic, Inc. ("CoreLogic"). CoreLogic is one of the premier companies involved in analyzing loan and borrower data to identify mortgage fraud. Mortgage fraud includes borrower or broker misstatements about the borrower's income, employment, assets and other obligations. CoreLogic is based in Sacramento, California but also employs an expert mathematician based in Virginia, and this mathematician attended the meeting along with executives from CoreLogic's headquarters in California.

68. At this July 2006 meeting, the CoreLogic mathematician explained that based on publicly available information about the Freddie Mac loan portfolio and models CoreLogic built and tested against mortgage originators' portfolios, "he estimated that 10% of Freddie Mac loans had been obtained based on some level of fraud." The meeting was convened to discuss a plan to have CoreLogic fully analyze Freddie Mac loans and give Freddie Mac an assessment of how many of its loans were infected by fraud. CoreLogic has an automated system to check loans and loan applications for fraud using a large number of data points, including borrower zip code, social security numbers and other borrower Personal Private Information ("PPI").

69. Subsequent to this meeting, Employee B examined six sample pools for fraud to test CoreLogic's estimate. These statistical samples confirmed CoreLogic's determination that 10% of Freddie Mac's loans were infected by

fraud. In or about October 2006, senior executives of CoreLogic flew to Virginia and met directly with Defendant Syron. As part of a Touch More Loans project, Syron green lighted the retention of CoreLogic and the application of data mining software to identify fraudulent loans.

70. Freddie Mac immediately began working on mechanisms to allow CoreLogic to review every loan that Freddie Mac processed. As of November 2006, the technical issues were solved and Freddie Mac had a means to transmit data securely to and from CoreLogic for purposes of conducting the mortgage fraud analysis.

71. According to Employee B, Defendants almost immediately reversed course, slowing the project down by limiting CoreLogic's review to substantially smaller samples, and then stopping it altogether. Freddie Mac was required by its charter to report any instance of fraud to the Justice Department within thirty days of discovering it. Defendants limited the sample size of loans to be analyzed by CoreLogic in part because they were afraid that Freddie Mac did not have the resources to report all the fraud they were going to find to the Justice Department.

72. As of June 2007, the CoreLogic system still had not been implemented.

**2. Defendants' Material Omissions**

73. On November 20, 2007, Freddie Mac finally revealed what it had knowingly or recklessly failed to disclose during the Class Period:

(a) that it in fact had heretofore unrevealed substantial involvement in the nontraditional low credit mortgage industry;

(b) that at least $200 billion of its $700 billion mortgage portfolio was at high risk of substantial losses; and

(c) that for just the 3 months ending September 20, 2007, Freddie Mac had incurred a record $2 billion loss on its mortgage investments, with more significant losses expected.

74. As discussed above, Freddie Mac's third quarter losses disclosed on November 20, 2007 showed that Freddie Mac faced a previously non-disclosed yet serious financial risk from its conscious decision to increase its exposure to subprime and nontraditional mortgages.

75. The 2008 OFHEO Report to Congress issued April 15, 2008 later confirmed the undisclosed risk, stating in part: "Throughout 2007 and at a level much higher than management's plan, the Enterprise continued to purchase and guarantee higher-risk mortgages." The OFHEO Report also states: "Deterioration in credit quality reflects both market developments and management's strategic decision to purchase and guarantee certain single-family mortgages originated in 2006 and 2007 with higher-risk characteristics. In addition, mortgage credit declines resulted in substantial deterioration in the fair value of the subprime and Alt-A and AAA securities portfolios."

76. Defendants, having made representations regarding the risks Freddie Mac faced relating to subprime and nontraditional mortgages and its ability to manage them, were under a duty to disclose fully those risks. Instead,

they intentionally omitted disclosure of both the nature and extent of those material risks, and their ability to control or manage them.

77. During the Class Period, Defendants concealed the following information, causing their statements to be materially false and misleading:

(a) that with respect to a large percentage of loans, Freddie Mac had not adhered to its own underwriting standards, but had acquired loans that failed to meet such standards in a material manner;

(b) that ratings agencies which had rated certain securities acquired by Freddie Mac as AAA, had not been informed that a material percentage of whole loans purchased had material "exceptions" that had been waived;

(c) that Freddie Mac's underwriting software was obsolete and that it could not reliably assess nontraditional mortgage products, and that Freddie Mac underwriters were manually altering the software without any reliable basis;

(d) that Freddie Mac was increasing the amount of subprime and nontraditional loan products that it was purchasing in 2006 and 2007, notwithstanding its commitment, in February 2007, to withdraw from such market by September 2007;

(e) that delinquencies in its newer loans were increasing at a rate faster than the rate experienced by Freddie Mac's prior loans;

(f) that Freddie Mac had no reliable systemic mechanism to detect fraud on any meaningful scale;

(g) that Defendants had determined that at least 10% of Freddie Mac's loans were infected by some form of fraud; and

(h) that, as a result, the business of Freddie Mac was far riskier than Defendants had disclosed, and investors were incapable of measuring accurately the true financial performance and risk of Freddie Mac's business.

### 3. Defendants' Misrepresentations During the Class Period

78. Before and during the Class Period leading up to November 20, 2007, Defendants made numerous misrepresentations intended to convey that Freddie Mac did not have significant subprime and nontraditional exposure and that they knew how to and were managing those risks effectively.

79. On January 24, 2006, in a Company press release entitled "Freddie Mac Chairman and CEO Richard Syron Discusses Company's Risk Management, Vital Role in America's Housing Finance System," Defendant Syron falsely claimed:

> Freddie Mac continues to manage interest-rate and other risks prudently, and provides highly transparent and timely disclosures on its risk-management measures.

80. On February 1, 2006, at a Citigroup Financial Services Conference, Defendant McQuade misrepresented Freddie Mac's risk position, stating in part:

> [Slide 18] Over the course of the past year, we've all witnessed a steady increase in the number of questions about credit quality. This isn't surprising, given the sharp run-up in house prices, the changing nature of mortgage products and the higher interest-rate environment. ***Notwithstanding these trends, it is hard to over-***

> ***emphasize how strong our current credit risk position is.***[1] It seems that all the traditional indicators are in our favor. . . .
>
> * * *
>
> ***Not only are the typical risks in check, our exposure to emerging concerns is as well, as we continue to display a low level of activity in IO mortgages and neg am structures relative to the market as a whole.*** Based on these facts, and excluding the effects of Katrina and Rita, we expect 2006 credit losses to increase somewhat from those experienced in 2005, but to remain very low relative to historic levels. ***So we are very well positioned on the credit side of our portfolio.***
>
> * * *
>
> Freddie Mac is one of the largest issuers of callable debt in the world. . . As this slide shows, our callable debt financing is equivalent to about half of the fixed-rate mortgage convexity in our retained mortgage portfolio. ***We think this positions us well to continue managing our downside risks and capturing the long-term risk-adjusted returns we anticipate in adding mortgages to our balance sheet.***
>
> * * *
>
> We at Freddie Mac are ready to supply this growing market, and we have the right team, the right plan and a strong, well-capitalized franchise for doing so. ***Those are all the ingredients we need to build value for our shareholders that will hold up over the long term. . . .***

81. In Freddie Mac's May 30, 2006 Fourth Quarter 2005 Earnings Conference Call, Defendant McQuade stated unequivocally, and falsely, that:

> One thing should be clear though, while we will buy these non traditional mortgage products to help more families attain affordable mortgages ***our participation in these products has been and will continue to be deliberate, responsible, and accompanied by appropriate risk return considerations***.

[1] All emphasis is added.

82. In June 2006, *Mortgage Banking* magazine published an article by Defendant Syron entitled "The Enduring Mission of the GSEs." In it, he misrepresented Freddie Mac's risk profile, stating in part:

> [T]here are at least five reasons why having the GSEs manage and distribute a good share of the risk – even if our share has become increasingly constrained by competition – means the United States incurs *less* systemic risk than by relying solely on depository institutions and hedge funds.
>
> For one thing, the GSEs provide more risk disclosures and satisfy more demanding capital stress tests than anyone. On the interest-rate risk side, we mark-to-market our exposure daily and publish the average monthly. On the credit-risk side, we make extensive disclosures, use credit enhancements and produce credit losses at a small fraction of the rate of depository institutions' residential mortgage portfolios. And we pass a stress test for capital that simulates a collapse worse than any since the Great Depression. ***On all these measures, Freddie Mac's very favorable risk profile leaves no doubt about our safety and soundness.***

83. These assurances, made just prior to the start of the Class Period, were false. Far from providing extensive disclosures of Freddie Mac's risk exposure, Defendants actively concealed the added risk resulting from Freddie Mac's increasing participation in nontraditional mortgage products during the Class Period. Contrary to Defendant Syron's false claim, Freddie Mac's true risk profile was anything but favorable.

84. On August 1, 2006, the first day of the Class Period, Freddie Mac issued a press release entitled "Freddie Mac Voluntarily Adopts Temporary Limited Growth for Retained Portfolio; Company Issues Market Update Showing Strong Financial Performance and Risk Management." In it, Defendants falsely portrayed Freddie Mac's exposure to risk:

> The company also provided an update on the first half of 2006 business performance, reporting continued excellent interest rate and credit risk management performance.
>
> * * *
>
> Credit-Risk Management
>
> Our mortgage credit risk, as measured by loan-to-value (LTV) ratio and other credit characteristics, remains low. . .
>
> Management continues to expect credit losses to remain low by historical standards. . .

85. On August 1, 2006, at a Freddie Mac Market Update, Defendants repeated the substance of that press release, making the following knowingly false statements:

> [Syron:]
>
> Turning to the market update, I would emphasize that our underlying business fundamentals are really unchanged from our last call on May 30th. ***Our low level of interest rate and credit risk is unchanged***. ***Our release today demonstrates that our risk management approach is time-tested, and we continue to operate our business in a manner that is consistent with strong interest rate and credit risk management.…***
>
> [Paul Miller, Friedman, Billings, Ramsey Analyst:]
>
> Can you address some of the conversations that Lockhart has been saying about Freddie Mac has not – does not have the controls and systems in place that – at this part of the juncture; that they put you in the same category as Fannie Mae in getting their controls and it could take years before you could maybe raise your dividend or do any substantial buybacks without issuing preferred stock?
>
> [Syron:]
>
> I don't want to characterize or speak for the director. ***I would say that we believe we have strong — and you can look at the numbers that we've put out on this – credit risk and interest rate control.*** But we do agree with the director that we have more

work that we need to do with our operating systems in addressing operating risk.

86. On September 12, 2006, Defendant Syron's prepared remarks at a Lehman Brothers Financial Services Conference contained the following misrepresentations:

> Since this time last year, the slowdown in the US housing market and concerns about deteriorating credit have grabbed news headlines. And some have continued to question the GSEs' future role in the housing market.
>
> ***Despite these pressures, Freddie Mac has managed to increase shareholder value and sustain our guarantee portfolio market share of the GSE market, while keeping our traditional risks low.***
>
> In addition, we have made progress on enhancing our internal financial reporting infrastructure so that we will be able to return to timely, GAAP-compliant financial reporting. We are focusing on this priority, ***and we recognize that it's a critical and necessary step to operating with transparency and unlocking value for shareholders***.
>
> * * *
>
> In both examples, our increased breadth of investment and guarantee activity has helped us to meet our mission and broader business objectives. ***But let me assure you that while we have made headway in expanding the types of mortgages we guarantee and purchase, we continue to manage our portfolios in a very prudent, balanced and responsible way.***
>
> * * *
>
> ***On the credit side, on the right, you see that our exposure to a national house price decline is also very low. . .***
>
> ***We owe this low credit risk sensitivity to the combined effects of a strong loan-to-value ratio, and a broadly diversified national mortgage portfolio. . .***
>
> If we get slower or negative growth in home prices, we would expect this LTV number, as well as our credit losses, to increase as

> they have in the past, but the point is that ***we are well diversified from credit shocks, and our guarantee business is positioned to weather even a harsh credit environment***.
>
> [Slide 9] shows that as of the end of 2005, our credit guarantee portfolio is geographically diversified throughout the US. As a result, ***even if we experience weak conditions in some regions of the country, the portfolio's overall value should be protected by continuing strength in other markets***.
>
> * * *
>
> ***Because of our strong capital position, we think we are very well positioned to weather local and regional down turns***, but as you'd expect, we are watching the situation very carefully.

87. On October 3, 2006, Freddie Mac issued a press release entitled "Freddie Mac Provides Market Update; Estimated Net Income for First Half of 2006 of $2.7 Billion; Company Maintains Strong Capital Position and Continued Solid Risk Management Performance" that included the following false statements:

> "In the midst of a changing economy and housing market, Freddie Mac continued to meet our mission and build momentum in our business," said Richard F. Syron, Freddie Mac chairman and CEO. ***"We are managing credit and interest-rate risks prudently, achieving low funding costs, maintaining our strong capital base and building close ties with our business partners – all of which strengthens our franchise."***
>
> Credit-Risk Management
>
> The company's mortgage credit risk, as measured by the current loan-to-value ("LTV") ratio of its credit guarantee portfolio and other credit characteristics, also remains low.

88. On October 3, 2006, during a Freddie Mac Market Update conference call, Defendants McQuade and Syron made the following misrepresentations:

[McQuade:]

The numbers we put out this morning provide you with our best current estimate of both GAAP and fair value results. ***While these numbers are still preliminary, they do point to the continued strength in our franchise and our ability to keep producing good, long term returns by focusing on fundamentals and keeping risks low***.

* * *

On the retained portfolio side, we actually shrank a bit in the first half, primarily due to the fact that credit spreads remained very tight and we are not going to sacrifice our return discipline just to keep growth positive. In addition, as we get later in the year, ***the voluntary growth limit on the portfolio will make it important for us to be selective in which mortgages we purchase to achieve the strongest returns possible for the limited growth we are going to have***.

* * *

To sum it all up, we had a great first half of the year financially, ***our risks continue to be well managed and controlled***, and we're making good progress on our financial remediation efforts.

[Robert Napoli, Piper Jaffray analyst:]

How much do you want to play – I mean, what role do you see for Freddie in the non-conforming portion?

[Syron:]

Well, ***the way we look at how we want to play is the mixture of our mission, safety and soundness, and how we handle things for shareholders***. I mean, we will take part, I would like to say, but I think it is – what I have to use responsibly in that market. ***But we have been cautious and I think you can expect us it to be cautious on the most esoterical products.*** I think we will be guided in substantial measure by what we think is appropriate for different types of borrowers, that's the way we have been handling things and so far we are pretty comfortable about how we have entered the market.

89. On October 18, 2006, Defendant Syron publicly made the following misrepresentations:

> At times like this, there is yet another part of Freddie Mac's GSE mission that gains importance. Our congressional charter gives us a special responsibility to think about more than getting potential homeowners in the front door. We have to worry about those same families not having to leave through the back door. And about the effect that things like predatory lending or high foreclosure rates have not just on families, but entire neighborhoods. . . It's why we are aggressive in our anti-fraud efforts, because mortgage fraud is behavior that harms everyone.
>
> ***It's why we have purchased the newer, more untraditional loans in a very prudent and balanced way – with very low credit losses as an added benefit.***

90. During a January 5, 2007 Market Update conference call, Defendants provided the following false assurances:

> [Piszel:]
>
> Next on risk management, this is an extremely important aspect of our business as it is essential not only to our safety and soundness, but to our expected economic returns as well. Despite recent changes in the markets, Freddie has continued to display very low and well-managed interest rate and credit exposures, and has stayed focused on our strategy of generating positive long-term fair value returns.
>
> As you can see in our press release, and Monthly Volume Summaries, through November 2006, Freddie has kept our primary interest-rate risk metric, portfolio market value sensitivity, at about 1%. In addition, our duration gap has remained roughly unchanged, at near zero months.
>
> ***On the credit risk side, the story is much the same.*** Through September, we estimate that our loan-to-value ratio on the credit guarantee portfolio remained at a level of about 56%, up slightly from the 55% at year-end 2005. In addition, our total single-family delinquencies have fallen to 51 basis points at the end of the third quarter, down from 69 basis points at the beginning of the year.

91. On January 30, 2007, Defendant Cook presented the following prepared remarks at a Citigroup Financial Services Conference, falsely downplaying Freddie Mac's risk exposure:

> [Slide 11] As important as these mortgage structuring and debt funding activities are, ***Freddie's investment strategy fundamentally rests on sound risk management practices. . . .***
>
> [Slide 12] ***This story is played out in our current credit risk measures as well.*** Through the third quarter, Freddie's total single-family delinquencies and credit losses have stayed at very low, manageable levels.
>
> [Slide 13] ***This continued low sensitivity is largely the result of strong LTV ratios on our existing book of guarantees, reflecting our prudent underwriting standards*** as well as the strong house price appreciation in the past several years. As of the end of September 2006, we estimate that our guarantee portfolio maintained an average loan to value ratio of about 56 percent.
>
> OK, I know many of you are probably saying to yourselves, that's yesterday's news, Patti – ***what about credit in the next three to five years?*** That's a good question and I want to address it directly.
>
> ***I've mentioned some of the benefits we derived in 2006 from increasing our activities in alternative mortgage products. Now, let's talk about the risks.*** A lot of media attention and research notes have focused in on the deteriorating credit, particularly as it is related to alternative products such as IO and Option ARM loans.
>
> All I would say here is that ***we are very conscious of the risk/reward trade offs that we are making, and that historically, Freddie has been very good at making disciplined risk management decisions. Going forward, this will remain a core competency as we continue to "touch more loans."***
>
> ***Improving our understanding of the market's view on credit risk is one area where we made significant progress in 2006.*** Through our work on marking the guarantee obligation to market, we have begun to see the key differences in how we view future credit risk relative to the Street.

> As we complete our work on financial reporting and controls, ***I would anticipate that we would invest incremental resources in improving our customer facing systems and credit risk management processes so that we can continue to respond to changing market opportunities in a safe, and profitable manner in the years to come.***

92. On February 8, 2007, Defendant McQuade presented prepared remarks at Credit Suisse Financial Services Conference, echoing Defendant Cook's January 30th misrepresentations:

> In addition, despite the changing credit environment and volatile financial markets, ***Freddie maintained very low interest-rate and credit risk exposures*** throughout the year. . . .
>
> Despite this progress in 2006, Freddie experienced significant volatility in our GAAP and fair value results from quarter to quarter. While these gains and losses accurately reflect the impact of market changes and accounting policies on our business, they do not reflect our long-term return potential or ***our consistently stable credit and interest-rate risk exposures***.
>
> * * *
>
> [Slide 6] ***Our job at Freddie Mac is to serve our mission in a profitable way for our shareholders. Throughout our history this has meant keeping our credit and interest-rate risks low and well managed.*** Here you can see that despite the increased mission efforts, and expanded guarantee activities in 2006, ***our current credit risk measures remain within, or below our historical levels***.

93. Information that is now publicly available, but was concealed during the Class Period, indicates that as Freddie Mac moved into 2007, its investment in subprime and nontraditional mortgages dramatically increased along with its risk. However, during the Class Period, Defendants told investors that Freddie Mac was reducing its participation in these riskier products. On February 27, 2007, Freddie Mac issued a press release entitled ***"Freddie Mac Announces***

***Tougher Subprime Lending Standards to Help Reduce the Risk of Future Borrower Default."*** In this release, Defendants announced that as of September 1, 2007, Freddie Mac would only buy subprime adjustable-rate mortgages (ARMs) - and mortgage-related securities backed by these subprime loans - that qualify borrowers at the fully-indexed and fully-amortizing rate. Freddie Mac would also limit the use of low-documentation underwriting for these types of mortgages.

94. In a February 27, 2007 interview with Bloomberg News, Defendant Syron again falsely claimed that Freddie's investments in nontraditional products were insulated from risk, stating:

> Because investors in AAA mortgage bonds aren't impacted by loan losses until they reach high levels, "***this is not at all a concern, from a Freddie perspective, of safety and soundness***," Syron said.

95. In a February 27, 2007 interview with Dow Jones International News, Syron further falsely assured the investing public that Freddie had "***virtually no credit exposure" to subprime mortgages and mortgage related securities backed by those loans***.

96. On March 23, 2007, in Freddie Mac's 2006 Annual Report, Defendants made the following misrepresentation: *"**With respect to our Retained portfolio, we do not believe that any meaningful amount of the agency securities we hold is backed by subprime mortgages**."* Defendants also falsely reported:

> ***On the credit risk side, Freddie Mac's exposures remained well controlled*** and our total single-family 90-day delinquencies actually declined during the year.

* * *

*Types of Mortgages We Purchase*

*Loan Quality.* Under our charter, our mortgage purchases are limited, so far as practicable, to mortgages we deem to be of a quality, type and class that generally meet the purchase standards of private institutional mortgage investors***. To manage credit risks with respect to our mortgage purchases, we have developed internal credit policies and appraisal, underwriting and other purchase policies and guidelines.***

* * *

*Portfolio Diversification*

During the past several years, there was a rapid proliferation of nontraditional mortgage product types designed to address a variety of borrower and lender needs, including issues of affordability and reduced income documentation requirements. While features of these products have been on the market for some time, their prevalence in the market and our Total mortgage portfolio increased in 2006 and 2005.

. . . ***We will continue to monitor the growth of these products in our portfolio and, if appropriate, may seek credit enhancements to further manage the incremental risk.***

*Interest-only and option ARM loans*. We generally mitigate credit risk inherent in these securities through a guarantee from the third party issuer or the underlying structure of the security.

* * *

*Subprime loans*. Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime.

While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant. Also included in our credit guarantee portfolio are Structured

> Securities backed by non-agency mortgage-related securities where the underlying collateral was identified as being subprime by the original issuer. At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.
>
> ***With respect to our Retained portfolio, we do not believe that any meaningful amount of the agency securities we hold is backed by subprime mortgages.*** However, at December 31, 2006 and 2005, we held approximately $124 billion and $139 billion, respectively, of non-agency mortgage-related securities backed by subprime loans. These securities include significant credit enhancement based on their structure and more than 99.9 percent of these securities were rated AAA at December 31, 2006.

97. In a press release that accompanied its Annual Report for 2006 Financial Results, Defendants again emphasized, falsely, that Freddie Mac did not face risk from its nontraditional mortgage exposure:

> ***We also maintained our low credit and interest-rate risk profiles, leaving us well positioned to deal with a broad range of interest rate conditions, and with the value of our shareholders' equity well protected.***

98. During a March 23, 2007 earnings conference call, Defendant Syron discussed Freddie Mac's February 27, 2007 announcement that it would cease buying certain subprime mortgages, falsely claiming that the step was not due to increased risk concerns:

> In order to counter this trend and help improve recent mortgage origination standards, we recently announced a change in our policy for purchasing and guaranteeing hybrid ARM subprime mortgages. ***We took this step not out of concern for our exposure to these products,*** as that is limited to AAA rated tranches of private label securities, ***but rather, out of a desire to lead the market from a mission perspective.***

99. On the same call, Defendant Piszel falsely stated:

> Our asset quality remains very high with ***retained portfolio sub-prime exposure limited to AAA securities. . .***
>
> * * *
>
> Expenses
>
> As a percent of our total mortgage portfolio, credit related expenses were only 2 basis points. Still at very low levels compared our historical norms.
>
> This is due to the fact that our portfolio is predominantly based on long term fixed rate mortgages, our overall average LTV ratio is about 57 percent, and ***we have little to no exposure to the sub-prime risk-layered mortgage products that have drawn so much note recently***.

100. A March 23, 2007 article by Bloomberg News, quoting Defendant McQuade, reported in part the following misrepresentation:

> *"**We don't think we'll lose any money at all on subprime**," **McQuade said**.* "Credit has never been better." Freddie Mac's delinquency rate "is about 20 percent or 30 percent less than it was a year ago at this time," he said. A decline of capital in the subprime mortgage market "is a great opportunity for us," McQuade said. "This is where we really shine."

101. In an April 16, 2007 Business Week article entitled "How Big is the Bite on Freddie and Fannie? The mortgage giants' exposure to risky loans could be bigger than they say," ***Defendant Piszel dismissed concerns raised in the article that GSEs are underplaying their exposure to subprime risk and stated: "Having [a lot of] size doesn't mean having [a lot of] risk."*** Based on reassurances from GSEs like the statement from Piszel, the article concluded that "subprime is only a small piece of their overall business" and that Freddie Mac and Fannie Mae "mitigate their risk by primarily owning the highest-rated securities in the subprime group and then adding credit enhancements, extra insurance against potential losses."

102. On May 14, 2007, Syron provided still further unqualified false assurances regarding FRE's ability to purchase subprime loans without risk:

> Last month we announced that we will purchase up to $20 billion in fixed rate and hybrid ARM subprime products structured to limit payment shock on borrowers. In doing this ***we will focus on higher quality segments of the market and will stay away from the riskier loan products and those with no documentation***.

Syron knew when he made this commitment, that Freddie Mac was not limiting its purchases of subprime products only to high quality. In fact, Freddie Mac was in the process of expanding its participation in riskier loan products and stated income or no documentation mortgages.

103. Also on May 14th, at a conference sponsored by UBS, Syron, instead of acknowledging the risk that Freddie Mac's nontraditional portfolio created, assured investors that FRE actually benefited from nontraditional exposure:

> ***We have achieved this growth by maintaining a disciplined approach in underwriting the credit risk we take on***, and by enhancing the value proposition we bring to our customers.
>
> It is important to note that our business volumes will vary over time, and ***we will not imprudently chase growth at the expense of long-term shareholder returns***.
>
> [Slide 11] ***Freddie's disciplined approach to credit underwriting and our high asset quality has put us in the position to make this commitment.***
>
> * * *
>
> Thus, through low delinquency rates and our diversified regional exposure, ***Freddie Mac is better positioned than most market competitors to withstand this period of heightened credit risk***.

104. At the May 17, 2008 Lehman Brothers 10th Annual Financial Services Conference Defendant Cook echoed Defendant Syron's remarks of May 14th when she said:

> ***We have achieved this growth by maintaining a disciplined approach in underwriting the credit risk we take on***, and by enhancing the value proposition we bring to our customers.
>
> It is important to note that our business volumes will vary over time, and ***we will not imprudently chase growth at the expense of long-term shareholder returns***. The most significant market trend in the first quarter has been the deterioration of subprime mortgage credit.
>
> * * *
>
> Our recent subprime commitment is a good example of how we fulfill our mission.
>
> [Slide 11] ***Freddie's disciplined approach to credit underwriting and our high asset quality has put us in the position to make this commitment.***
>
> * * *
>
> Thus, through low delinquency rates and our diversified regional exposure, ***Freddie Mac is better positioned than most market competitors to withstand this period of heightened credit risk.*** Particularly since the amount of our business coming from California and other high-cost states is lower than most market participants.

105. On June 8, 2007, Defendant Syron's prepared remarks delivered at Freddie Mac's Annual Stockholders' Meeting misleadingly stated :

> ***Your company ended the year in a good position to weather the current housing downturn. . .***
>
> * * *
>
> ***Credit risk management is another comparative advantage for Freddie Mac.*** Through this March, our total single-family 90-day

> delinquencies stayed very low, although we expect this to increase some in coming months. Like everyone, we are keeping a very watchful eye on our 2006 book of business. But thanks to our low delinquency rates, diversified regional exposure, and our average loan-to-value ratio of 58 percent, ***we are better positioned than most market competitors to withstand the expected period of heightened credit risk.***

106. On June 14, 2007, during Freddie Mac's first quarter 2007 financial results conference call, Defendants made the following false statements:

> [Syron:]
>
> Yet despite these headwinds, Freddie Mac gained some ground last quarter. ***Thanks to our continued high asset quality, low risk exposures and improving operations, Freddie Mac is much better positioned for long-term profitability than a year ago.***
>
> * * *
>
> Going forward, we intend to compete and succeed not only by leveraging our traditional strengths in the conventional conforming market, but also by developing new capabilities to serve our customers and our mission.
>
> We have already begun to do so this year by demonstrating leadership in responding to the pressing and very visible problems in the subprime market. In February, we became the first major secondary market participant to announce that ***we will no longer buy subprime mortgages that pose an unacceptable risk of excessive payment shock and possible foreclosure***. In April, we followed up by announcing we will purchase up to $20 billion in fixed-rate and hybrid ARM products that are being developed to limit payment shock and provide lenders with more and safer choices to offer subprime borrowers. Purchases under this program will start early this summer.
>
> The steps we're taking on subprime will clearly serve our congressional charter and public mission. We are confident they will serve our business objectives, as well.
>
> * * *
>
> [Piszel:]

> ***Just as a reminder we don't hold subprime loans directly, so there is no contribution in the numbers I just mentioned from subprime. Also, we continue to expect no losses from our subprime-backed AAA rated ABS security exposure.***

107. On June 14, 2007, Freddie Mac issued a press release entitled "Freddie Mac Releases First Quarter 2007 Financial Results; Company Resumes Quarterly Reporting," which provided a false financial outlook. In it, Defendants stated:

> "Our credit guarantee portfolio showed strong growth in the first quarter and ***we seized market opportunities to grow our retained portfolio prudently***." (quoting Syron).
>
> * * *
>
> "While significant mark-to-market losses on our portfolio of derivatives, which are used to hedge our interest-rate risk, and on our credit guarantee activities have resulted in a GAAP loss, ***we remain encouraged with the underlying fundamentals of Freddie Mac's business***." (quoting Piszel).
>
> * * *
>
> ***Overall, Freddie Mac's credit guarantee portfolio continued to exhibit credit characteristics that were better than historical averages*** as measured by current delinquencies, loan-to-value ratio (LTV), and charge-offs.

108. The same day, on Freddie Mac's conference call to discuss first quarter 2007 financial results, Defendants falsely stated:

> [Syron:]
>
> ***Thanks to our continued high asset quality, low risk exposures and improving operations, Freddie Mac is much better positioned for long-term profitability than a year ago.***
>
> * * *

> ***Importantly, we have achieved this growth while maintaining a disciplined approach in underwriting the credit risk we take on.*** This has helped our aggregate credit statistics such as delinquencies to stay lower than the market as a whole.
>
> * * *
>
> [Piszel:]
>
> Just as a reminder we don't hold subprime loans directly, so there is no contribution in the numbers I just mentioned from subprime. Also, ***we continue to expect no losses from our subprime-backed AAA rated ABS security exposure.***
>
> That said, we do expect our credit-related metrics to worsen from their extremely low levels seen in the past few years but ***our overall strong credit position should enable us to weather the housing downturn better than the market as a whole.***

109. On July 2, 2007, Bloomberg News quoted Freddie spokesperson Sharon McHale. In response to an estimate of Freddie Mac's mortgage exposure, Ms. McHale ***denied that a loss by Freddie Mac in the neighborhood of $3 billion would deplete Freddie Mac's mandatory capital reserve requirements. According to McHale, Freddie Mac was not exposed to losses of that magnitude and that loss estimates of that size were "absurd."*** As ultimately revealed at the end of the Class Period, Ms. McHale's statement was false, as Freddie Mac was exposed to and, in fact, suffered losses of even greater magnitude.

110. On July 28, 2007, the Wall Street Journal published an article entitled ***"Fannie, Freddie Are Said to Suffer in Subprime Mess."*** In it, Citigroup Inc. analysts estimated that falling prices on subprime mortgage bonds have cut the value of such securities held by Fannie Mae and Freddie Mac by

$4.7 billion, $3.2 billion of which was attributed to Freddie Mac.. ***A Freddie Mac spokeswoman called the analysts' estimate "mistaken." She said the company uses third-party sources to value its holdings and hasn't seen "any material markdown of value."*** Again, this statement was false.

111. On August 30, 2007, at the Freddie Mac second quarter 2007 financial results conference call, Defendant Piszel falsely characterized Freddie Mac's risk as follows:

> ***We have provided you with a much-expanded view of credit data that focuses on the riskier portions of our portfolio***. A few key takeaways:
>
> - One, ***our overall exposure to higher risk products is low relative to our competition***.
> - Two***, we have limited and manageable exposure to Alt-A and risk-layered products***, such as those loans with both high LTV and low FICO scores.
> - Three, ***delinquencies are low***, but are trending up particularly in Florida and California.
> - Finally, ***our overall credit profile equips us to weather this downturn better than other market participants***.
>
> * * *
>
> ***When we put all this together on the credit front, from the regional exposure, product concentration and counterparty credit risk perspectives, we are well positioned for the current environment.***

112. On September 10, 2007, at the Lehman Brothers 5th Annual Financial Services Conference, Defendant Cook further falsely assured investors that Freddie Mac's investments in nontraditional mortgages were safe and would not subject Freddie Mac to write-downs:

> Despite the recent market turbulence, today's trends benefit Freddie Mac in the long run. Our growth is good. ***Our credit position is relatively strong with limited exposure to the riskiest mortgage products. Bottom line, at a time when many of our competitors are weakening, Freddie Mac's position is growing stronger.***
>
> Do the coming quarters hold some big challenges? You bet. But looking around, we like our set of advantages, and believe that ***Freddie is well positioned to succeed and produce shareholder value in the long term***.
>
> * * *
>
> Due largely to our congressionally chartered mission, ***our sound risk management practices*** and our ability to add value through our credit guarantee and investment activities, ***we have benefited from the recent market disruptions in ways that underscore the importance of our mission and will benefit our shareholders over the long run***.
>
> * * *
>
> ***While we are being very deliberate in the credit risk we will take on, I want to be very clear that the current credit market situation presents an opportunity for us. . .***
>
> [Slide 7] The table behind me shows that ***on an absolute basis, Freddie Mac has very low exposures to Alt-A and risk layered mortgage products***. When taken together, these represent about 8 percent of our total single-family guarantee portfolio. . .
>
> So again, whether you view our overall portfolio, or look to our Alt-A book, layered products, total single-family delinquencies, or charge-offs, ***we feel our credit position is near the very best in the industry.***

113. On September 17, 2007, at the Bank of America Securities 37th Annual Investor Conference, Defendant Piszel again misrepresented Freddie Mac's risk exposure and falsely denied that Freddie Mac would write down any of its subprime portfolio – a denial that was proven to be untrue just two months later:

> ***Freddie Mac's low exposure to the riskiest mortgage products positions us for lower credit risk and lower future credit losses in basis points than practically any other company in this industry***.
>
> * * *
>
> ***Another major reason for our strong credit performance relative to the market is that we have very low exposures to Alt-A and risk layered mortgage products.*** Taken together, these represent about 8 percent of our total single-family guarantee portfolio. . .
>
> So again, whether you view our overall portfolio, or look to our Alt-A book, layered products, total single-family delinquencies, or charge-offs, ***we feel our credit position is near the very best in the industry***.
>
> [Slide 6] ***While we are being very deliberate in the credit risk we take on, I want to be very clear that the current credit market situation also presents us with the opportunity to regain some pricing power.*** While this slide doesn't make the point clear because of noise from amortization amounts, since mid 2006, our all-in guarantee fees have begun to improve.
>
> * * *
>
> ***Due to this protection, we have not yet taken any meaningful credit losses on this position, and we do not expect to take any in the future.***

114. An article entitled "Subprime winner: Patricia Cook on Freddie Mac's corporate mission and why it's good for business" appeared in the October 2007 issue of *Mortgage Risk* magazine. In it, Defendant Cook gave further false reassurances concerning Freddie Mac's risk exposure:

> As one of the two main government-sponsored entities (GSEs) standing behind the US mortgage market, Freddie has substantial exposure to the sector. Yet, when chief business officer Patricia Cook addressed delegates at Lehman Brothers' financial services conference in New York last month she told them: "Despite the

> recent market turbulence, today's trends benefit Freddie Mac in the long run . . . ***At a time when many of our competitors are weakening, Freddie Mac's position is growing stronger***."
>
> * * *
>
> Now, as the subprime turmoil unfolds, the company's first piece of good fortune is that ***scrutiny from its regulator encouraged a conservative approach to risk management precisely when the worst excesses of lax underwriting were at their height.***
>
> Cook says ***the agency took an early view that returns on subprime debt didn't match the risks. As a consequence, when Freddie invested in subprime it did so mostly in the form of triple-A rated mortgage-backed securities (MBS) rather than riskier collateralized debt obligations or portfolios of loans***, she said.
>
> * * *
>
> Q: Can you tell us how you see credit losses on your portfolio developing?
>
> [Patricia Cook] A: . . . When the housing market is doing really well our credit losses go down and when the housing market turns around and does poorly our credit losses go up. Having said that, ***we have an incredibly high quality book of business***. That's why we have the capacity to take on, in a diligent and disciplined way, some increased credit risk at a good price.

**4. Freddie Mac's Response to New York Attorney General's Industry-Wide Investigation Of Mortgage Fraud**

115. On November 7, 2007, the Office of the New York State Attorney General issued a press release which stated in part:

> Attorney General Andrew M. Cuomo today announced his office has sent Letters of Notice and Demand, providing notice of the issuance of Martin Act subpoenas and a demand for an Independent Examiner, to the nation's two largest financiers of home mortgages, Fannie Mae and Freddie Mac. Cuomo also announced that Fannie Mae and Freddie Mac have agreed to the demand to retain an independent Examiner, subject to the Attorney

General's approval, to conduct a total review of all Washington Mutual appraisals and mortgages purchased by the companies.

* * *

Today's announcement marks the latest expansion of Cuomo's industry-wide investigation of mortgage fraud. Last week, Cuomo filed suit against First American Corporation, and its subsidiary eAppraiseIT, one of the nation's largest real estate appraisal management companies, for colluding with Washington Mutual to inflate the appraisal values of homes.

"In order to fulfill their duty to consumers and investors, Fannie Mae and Freddie Mac must ensure that Washington Mutual's mortgages have not been corrupted by inflated appraisals," said Attorney General Cuomo. "Our expanding investigation into the mortgage industry has uncovered that Washington Mutual improperly pressured appraisers to provide inflated values that best served the lender's interest. Knowing this, Fannie Mae and Freddie Mac cannot afford to continue buying Washington Mutual mortgages unless they are sure these loans are based on reliable and independent appraisals."

The subpoenas issued include requests for:

- Information about all of the mortgage loans Fannie Mae and Freddie Mac have purchased from any bank, including Washington Mutual, and the mortgage-backed securities associated with those loans;

- Information about due diligence practices of Fannie Mae, Freddie Mac;

- Information about appraisals and valuations by the originating lenders;

- Policies and procedures related to valuing properties and appraisals.

Fannie Mae (Federal National Mortgage Association) and Freddie Mac (Federal Home Loan Mortgage Corporation) are two of the largest financiers of home mortgages in the country, and both purchase loans from Washington Mutual. Washington Mutual is the third largest provider of loans to Freddie Mac, selling $24.7 billion in loans in 2007 alone. Washington Mutual is also the fourteenth largest provider of loans to Fannie Mae, selling $7.8 billion in loans in 2007.

"The integrity of our mortgage system depends on independent appraisers," said Cuomo. "Washington Mutual compromised the fairness of this system by illegally pressuring appraisers to provide inflated values. Every company that buys loans from Washington Mutual must be sure that the loans they purchased are not corrupted by this systemic fraud."

The lawsuit filed last week details a scheme in numerous e-mails showing First American and eAppraiseIT caved to pressure from Washington Mutual to use appraisers who provided inflated appraisals on homes. E-mails also show that executives at First American and eAppraisalT knew their behavior was illegal, but intentionally broke the law to secure future business with Washington Mutual. Between April 2006 and October 2007, eAppraisalT provided over 250,000 appraisals for Washington Mutual.

116. In connection with the investigation, Attorney General Cuomo had sent the following letter to Defendant Syron on November 6, 2007:

Dear Mr. Syron,

Over the last nine months, the Office of the New York Attorney General (this "Office") has conducted a wide-ranging investigation into conflicts of interest and fraud in the mortgage industry. During the course of our investigation, we have uncovered a pattern of collusion between lenders and appraisers that has resulted in widespread inflation of the valuations of homes.

As you no doubt are aware, lenders now regularly sell the mortgage loans they make into the financial markets, either directly or to investment banks or Government Sponsored Enterprises ("GSEs"), such as Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The loans are then pooled together, scrutinized, and sold to the general public as mortgage backed securities.

This configuration has the effect of making the lender less vigilant against risky loans since any risk is quickly transferred to the purchasers of the loans. Moreover, as the lender does not hold many of its loans in its portfolio, the lender's interest is ensuring the accuracy of the appraisal backing the loan is severely diminished. Even worse, because lender's profits are determined by the quantity of loans they successfully close, and not the quality of

those loans, there is an incentive for a lender to pressure appraisers to reach values that will allow the loan to close, whether or not the appraisal accurately reflects the home value.

Further jeopardizing the process, mortgage brokers and the lenders' loan production staff are almost always paid on commission. Thus, the income of these individuals depends on whether a loan closes and on the size of the loan. Accordingly, brokers and loan production staff have strong personal incentives to pressure appraisers to value a home at the maximum possible amount, so that loans will close and generate maximum commissions. For these reasons, mortgage brokers and lenders frequently subject real estate appraisers to intense pressure to change values in appraisal reports.

The investment banks and GSEs may also have an interest in inflating (or at least in not questioning) the value of the pooled loans. The values of these loans serve as a basis for the value of their securities. As such, the higher the value of the loans closed, the greater the value for which the securities are sold on the secondary market.

As part of investigation, this office recently filed a complaint against First American Corporation ("First American") and its subsidiary First American eAppraiseIT ("eAppraiseIT"), a company that performed over 260,000 appraisals for Washington Mutual, Inc. ("WaMu"). The complaint alleges that under pressure from WaMu, EA violated the Uniform Standards of Professional Appraisal Practice ("USPAP") and federal and state law by permitting WaMu to control the selection of property appraisers engaged to appraise collateral for WaMu-originated mortgages based on whether the appraisers "hit the values" required to close loans. This practice led to inflated property valuations and enabled WaMu to originate larger, more profitable, mortgages, and a greater number of mortgages, than would have been possible had appraisals been performed, as required by fully independent appraisers. The complaint against First American and eAppraiseIT, is enclosed.

We understand that Freddie Mac purchases significant number of purportedly "conforming" mortgages from WaMu. The evidence shows, however, that these mortgages may be premised on fraudulently inflated appraisals and not upon appraisals that met USPAP and related statutory and regulatory standards. ***Accordingly, Freddie Mac's own shareholders and investors who purchased securities issued by Freddie Mac may have***

> ***been harmed.*** Some of these shareholders and investors were New York individuals and institutions.
>
> In light of the above, Freddie Mac should immediately retain an Independent Examiner, subject to this Office's approval, to investigate, review and analyze all appraisals that support the WaMu mortgages that Freddie Mac purchases or securitizes; the manner in which WaMu engages appraisers and manages its appraisal process; and all appraisals conducted by First American and eAppraiseIT that support any mortgages Freddie Mac purchases or securitizes. Should you decline to immediately retain such an Independent Examiner, Freddie Mac should immediately cease and desist purchasing and securitizing WaMu loans and any loans supported by First American and eAppraiseIT appraisals.
>
> Furthermore, pressure on appraisers and inflated appraisals appear to be widespread problems in the mortgage industry. We are, therefore, expanding our investigation to determine the extent of Freddie Mac's knowledge of, and actions regarding, these problems as they relate to past mortgage purchases and securitizations by Freddie Mac. For that reason, pursuant to this Office's investigative authority under New York General Business Law § 352 and New York Executive Law § 63(12), accompanying this letter is a subpoena to Freddie Mac returnable on November 28, 2007.
>
> Sincerely yours,
>
> Andrew M. Cuomo

117. On November 7, 2007, Freddie Mac issued a press release entitled "Freddie Mac Statement in Response to New York Attorney General Subpoenas," which continued to conceal the fraud by stating in part:

> Accurate appraisals are fundamental to our effective credit risk management as well as to the long-term success of the homebuyers we are charted to serve. In fact, ***Freddie Mac has no incentive to accept inflated appraisals on the loans we purchase and guarantee. Indeed, Freddie Mac has a long-standing commitment to fighting mortgage fraud, as evidenced by its leadership role in the industry through our active internal fraud investigations, quality control activities, Freddie Mac-instituted remedial steps, and assistance with criminal prosecutions.*** We look forward to cooperating fully with

> the New York Attorney General's investigation and have agreed to appoint an Independent Examiner, as requested, to review the appraisal practices cited in the Attorney General's complaint.

### 5. The November 20, 2007 Disclosures

118. On November 20, 2007, Freddie Mac issued a press release entitled "Freddie Mac Reports Third Quarter 2007 Net Loss of $2.0 Billion or $3.29 per diluted share." For the first time, Defendants admitted that Freddie Mac's investments in subprime and nontraditional mortgage products had subjected Freddie Mac to significant risk and caused it to sustain substantial losses. Defendants stated:

> "Without doubt, 2007 has been an extremely difficult year for the country's housing and credit markets and, as our third quarter financial results reflect, ***we have been impacted by the deterioration in these markets***," said Richard F. Syron, Freddie Mac chairman and chief executive officer. "We recognized the challenges facing the mortgage markets, however, and have taken further steps to address them. . .
>
> "Weakening house prices and deteriorating credit have hurt Freddie Mac's results, as well as those of other participants in the mortgage market," said Buddy Piszel, chief financial officer. "You can see the impact of these trends in our credit results and throughout our financial statements. Year-to-date, we have recognized $4.6 billion in net credit-related items on a pre-tax basis.
>
> "During the past year we have taken important steps to address the impact of the declining housing and credit markets to our business," Piszel added. "We have begun raising prices, tightened our credit standards and enhanced our risk management practices. We also continue to improve our internal controls as we move closer to completing our remediation efforts and returning to timely financial reporting. These actions position us well to take advantage of opportunities when the current market dislocation ends."

This release was in stark contrast to Defendants' repeated Class Period assertions of minimal risk exposure from these investments.

119. The market's reaction was swift and sharp. Dozens of professional financial analysts who carefully follow Freddie Mac were caught off guard, having predicted collectively an average of a one cent ($.01) per share loss. In fact, the reported loss was over 300 times greater than expected, or $3.29 per share. These unanticipated revelations caused Freddie Mac's common stock to plunge 29%, from $37.50 to $26.74 per share, creating a market capitalization loss to its shareholders of almost $6.6 billion in one day.

**6. OFHEO's 2008 Report to Congress**

120. On April 15, 2008 OFHEO's issued its 2008 Report to Congress, stating in part that for year-end 2006 and all four quarters of 2007, Freddie Mac's "risk to capital has increased dramatically, primarily because of market and credit risks, which directly impacted capital through reduced current and future earnings." 2008 OFHEO Report at 51. In addition:

> On the basis of restated results in early 2008, Freddie Mac's surplus as a percentage of the OFHEO-directed requirement significantly declined from $2.1 billion, or 6.2 percent, for the fourth quarter of 2006 to $0.9 billion, or 2.6 percent, for the third quarter of 2007. ***The surplus continued to decline through October and November, with Freddie Mac failing to meet the OFHEO-directed requirement on November 30, 2007, prior to year-end 2007 accounting adjustments***. Freddie Mac took action to return to capital compliance by issuing $6 billion in preferred stock in early December 2007.
>
> * * *
>
> ***Freddie Mac's expensive emergency corrective action in the fourth quarter emphasizes the need for more permanently heightened attention to income forecasting, and more prudent capital management generally.*** In retrospect, Freddie Mac's common stock buyback in the first half of 2007 and dividend increase were mistimed.

2008 OFHEO Report at 51-52. This report highlights that during the period Defendants were claiming that Freddie Mac's exposure was low and capital was sound, the opposite was in fact true.

121. Moreover, Defendant's claim that Freddie Mac is committed to fighting mortgage fraud through, *inter alia*, internal fraud investigations was false because while Defendants knew that at least 10% of Freddie Mac's mortgages were infected by fraud, they intentionally obstructed implementation of the CoreLogic fraud detection software to prevent actually identifying, and, in turn, having to acknowledge the financial implications of the known fraud.

**B. The Safety and Soundness of Freddie Mac's Capital**

122. In addition to misleading the public regarding Freddie Mac's risk exposure arising from its participation in non-traditional mortgage products, Defendants also deceived the public regarding Freddie Mac's ability to meet the mandatory capital requirements imposed by OFHEO.

123. Capital - the difference between a company's assets and its liabilities - is the bulwark of any financial enterprise. Freddie Mac is required by federal statute to meet both minimum and risk-based capital standards to be classified as adequately capitalized. The amount of capital that Freddie Mac had to maintain was set by law and by its regulator OFHEO. OFHEO sets this amount to assure the public that Freddie Mac is operated in a "safe and sound" manner.

124. By letter dated January 28, 2004, OFHEO directed Freddie Mac "to maintain a mandatory target capital surplus as a prudential action as the

company undertakes remedial steps to improve financial reporting and controls…" OFHEO set Freddie Mac's mandatory target capital surplus at thirty percent (30%) over its minimum capital requirement. OFHEO further directed Freddie Mac to provide a weekly analysis and calculation of the mandatory target capital surplus, as well as to continue providing a monthly minimum capital report. The thirty percent (30%) mandatory target capital surplus requirement was in effect at all times during the Class Period.

**1. Freddie Mac's Capital Impairment**

125. During the Class Period, as set forth above, Freddie Mac repeatedly assured the public that it was comfortably maintaining the minimum capital levels required by OFHEO. In reality, in the face of multi-billion dollar losses in non-traditional mortgage-related investments, Defendants concealed that Freddie Mac's capital was so impaired that its capital levels were in danger of falling below the federal requirements – which, in fact, happened on November 30, 2007.

126. Defendants disguised billions of dollars of Freddie Mac subprime and nontraditional mortgage losses by intentional manipulation of its Accumulated Other Comprehensive Income account ("AOCI").

127. Freddie Mac accomplished this by segregating "unrealized" losses in low credit mortgages to what Freddie Mac called "available-for-sale securities" in its AOCI account. The "unrealized" losses were never reported to reduce Freddie Mac's profits. In this manner, Freddie Mac was able to avoid offsetting the AOCI "unrealized" losses against its assets or its profits. As was later

revealed, Freddie Mac had incurred tens of billions of losses that were never reported to reduce its earnings or profits.

128. Moreover, unlike other financial enterprises that maintain sophisticated internal controls to determine losses, Freddie Mac limited its internal controls, per Defendants' directive to obfuscate losses and to delay disclosure of its risk exposure for as long as possible. Senior executives, therefore, assumed the responsibility of determining the value of Freddie Mac's retained mortgage portfolio and whether it was sustaining losses. According to OFHEO's 2008 Report to Congress, the timing of losses was left to the subjective and conflicted judgments of Freddie Mac's senior executives, and Freddie Mac's models became "less reliable and require[d] greater management judgment increasing the potential for error in pricing and other metrics…." Defendants failed to disclose to investors, analysts, and the market at large that Freddie Mac was relying on subjective criteria when valuing its portfolio. Instead, Defendants represented that they were relying on independent third party rating services.

129. The findings of OFHEO's Report were confirmed by former employees of Freddie Mac. Employee J, a Director of Technical Services for Investments and Capital markets through 2005, recalled that there was "no formalized process" or system in place for valuing assets in the retained portfolio. He was tasked with developing software to automate mark to market valuations, known as "Unified Pricing Services," a process that was never completed. In the absence of a software solution or formal process, Investment and Capital Market

employees gathered pricing information for similar securities from securities dealers such as Lehman Brothers. However, Freddie Mac declined to disclose the specifics of its portfolio, but instead described a "hypothetical" security with certain "characteristics."

130. Employee K, a Test Engineer Leader from July 2006 through October 2007, recalled that Freddie Mac had between fifteen to eighteen different applications for accounting and valuation, including Summit, Midas, and Peoplesoft, but was unable to integrate them into one uniform application. This resulted in "inaccurate company reports." Every month and every quarter Employee K received emails and other announcements from top management at Freddie Mac reviewing the accuracy achieved in the past period and reiterating the commitment that the following month or quarter Freddie Mac will achieve 100% accuracy. *The actual accuracy for Freddie Mac financial numbers as described in these emails or announcements was "never more than 80% or 90%."* "Every single quarter we always heard the goal of 100% accuracy, but it was never achieved."

131. Employee L, a Vice President of Business Operations from September 2003 through April 2007, recalled that in late 2006 and thereafter this was a major topic of discussion among senior management of Freddie Mac. He was informed by his superior that there were regular meetings in the CFO's and President's office regarding portfolio values and internal control problems. "McQuade and Piszel were on the valuation of portfolio weekly." Employee L

personally told defendant Piszel, in January 2007, that due to flaws in the legacy systems used by Freddie Mac, "the probability of being right in the future is zero."

132. Because of Freddie Mac's losses in its nontraditional mortgages, Freddie Mac's capital has declined from $27.2 billion in 2005 to $16.0 billion as of March 31, 2008. In November 2007, Freddie Mac revealed that its OFHEO directed minimum capital account, as of September 30, 2007, was almost totally depleted. In November 2007, Freddie Mac disclosed that it had been forced to liquidate $20 billion in unpaid principal balance of Freddie Mac's retained portfolio assets to manage to the 30 percent mandatory capital surplus. By November 2007, Freddie Mac's capital minimum had fallen by billions below the minimum required by OFHEO.

133. In October 2007, Freddie Mac was forced to liquidate assets to meet its capital requirements, yet Defendants never disclosed the October circumstances that precipitated the need for emergency capital.

134. Because Defendants had provided repeated assurances to the market during the first half of the Class Period that Freddie Mac's capital position was strong and it was maintaining prudent surpluses, they had a duty to inform the market when those circumstances reversed. Instead, Defendants simply remained silent on the issue throughout the Fall of 2007, withholding this material information from the public until the November 20, 2007 disclosures.

135. Defendants' intentional concealment of Freddie Mac's capital situation is underscored by the fact that OFHEO, not Defendants, for the first time in April of 2008 revealed the full extent of the problem. In its April 15, 2008,

Report to Congress, OFHEO stated: "*During 2007 Freddie Mac failed to maintain core capital above the OFHEO-directed requirement for the month ending November 2007, due to significant market and credit-related losses impacting capital prior to corrective management actions [raising $6.5 billion in a preferred stock offering and cutting its dividend by 50%].*"

136. While Defendants knew that Freddie Mac's capital situation was deteriorating rapidly, as evidenced by its weekly, non-public capital reports to OFHEO, neither Defendants nor OFHEO alerted the public to how dire the situation had become. Defendants, however, unlike OFHEO, had an affirmative duty to apprise Freddie Mac's shareholders of this material information.

137. To the contrary, Defendants continued to use Freddie Mac's capital simply to support its stock price through a "stock buy back" program, allowing for Defendants' profitable insider sales during 2007. As discussed by Defendant Piszel during Freddie Mac's first quarter 2007 financial results conference call on June 14, 2007, Freddie Mac instituted a "stock buy back" program to raise capital. Significantly, the 2008 OFHEO Report characterized this program as "ill-timed."

138. Defendants also failed to disclose to the public the fact that on at least two occasions (once soon after March 20, 2007 and once soon after September 30, 2007), OFHEO had sent supervisory response letters requiring Freddie Mac to take prompt corrective action to its declining net income and the impact such fall would have on Freddie Mac's capital. While Freddie Mac

responded, it failed to provide the public with any information describing OFHEO's concerns about its capital.

139. The revelation of the losses to Freddie Mac's capital was intentionally delayed by Defendants for months for multiple reasons, including:

(a) Defendant Syron was in the process of renegotiating his employment contract for a higher salary and large bonus.

(b) Officers of Freddie Mac, including Syron and McQuade, planned to sell and did sell millions of dollars of stock they owned at the highest price possible.

(c) The revelation of the subprime losses would have required OFHEO to possibly order Freddie Mac to cease doing business or impose other severe penalties upon Freddie Mac.

(d) Freddie Mac had, for months, secretly been trying to raise additional capital to stay in business. Because of its precarious capital position, Freddie Mac had no choice but to issue preferred stock, a very expensive way to raise capital, which in turn increased Freddie Mac's expenses and caused further earnings losses. Once it found this high-priced capital, Freddie Mac needed the announcement of this infusion to keep its stock price from collapsing further than it did.

(e) To support a high Freddie Mac stock price before releasing information about impending losses, Freddie Mac executives:

(i) Engaged in a $1 billion program of buying back 16.1 million shares of Freddie Mac's own stock from the market – using the cash it needed to support its losing operations;

(ii) Increased Freddie Mac dividend payments - once again imperiling its available cash to cover losses; and

(iii) Sold millions of dollars of their own stock.

### 2. Freddie Mac's Misrepresentations With Respect to Its Capital

140. During the Class Period, Defendants repeatedly told the market that Freddie Mac's capital position was, and would continue to be, strong and secure due to Freddie Mac's responsible and thoughtful capitalization decisions. The revelation of November 20, 2007, was the first indication that Defendants had misrepresented the truth with regard to Freddie Mac's capital.

141. Even despite the sell-off in mid-March of financial stocks exposed to nontraditional mortgage losses and despite Freddie Mac's knowledge of the low credit mortgage market unwinding in the Spring of 2007, Defendants continued falsely to deny to the public that Freddie Mac's capital position was at all compromised as a result of its investment in the subprime and nontraditional mortgage markets.

142. For example, on September 8, 2006, in his prepared remarks at Freddie Mac's Annual Shareholder Meeting, defendant Syron stated:

> Finally, let me say a word about capital, which I know is a top-of-mind issue for all of you – and for all of us on your senior management team as well.

> ***Freddie Mac grew our regulatory core capital to almost $36 billion last year – well above the capital requirements set by our safety and soundness regulator. As a result of our strong capital position and confidence in our profitability, we increased our quarterly stock dividend twice last year.*** In fact, since December 2003 we have raised the common stock dividend by 81 percent.
>
> In addition, we sought and received board authorization last year to repurchase shares of our common stock in a swap for preferred stock. And since then, we have made good progress in executing on that authorization.

143. On March 31, 2006, Freddie Mac issued a press release entitled "Freddie Mac Provides Market Update; Total Mortgage Portfolio Up 12 Percent in 2005; ***Company Maintains Strong Capital Position***, Balance Sheet."

144. On September 18, 2006, speaking at the Bank of America 36th Annual Investment Conference, Senior Vice President and Treasurer of Freddie Mac, Timothy Bitsberger, stated, in part, that ***Freddie Mac had a "strong and growing capital base."***

145. On October 3, 2006, Freddie Mac issued a press release entitled "Freddie Mac Provides Market Update; Estimated Net Income for First Half of 2006 of $2.7 Billion; ***Company Maintains Strong Capital Position*** and Continued Sold Risk Management Performance." The release stated in part:

> In the midst of a changing economy and housing market, Freddie Mac continued to meet our mission and build momentum in our business," said Richard F. Syron, Freddie Mac chairman and CEO. "We are managing credit and interest-rate risks prudently, achieving low funding costs, ***maintaining our strong capital base*** and building close ties with our business partners – all of which strengthens our franchise.

146. The same day, on Freddie Mac's Market Update conference call, Defendant McQuade falsely stated: "***Looking at capital we continue to maintain a strong position there as well.***"

147. On January 5, 2007, Freddie Mac issued a press release entitled "Freddie Mac Provides Quarterly Market Update," falsely providing assurances that:

> Management expects to continue maintaining a surplus over both the regulatory minimum capital requirement and OFHEO's 30 percent mandatory target capital surplus across a wide range of market conditions.

148. On March 23, 2007, Freddie Mac issued its Annual Report to shareholders for the year 2006. It stated in part:

> ***Going forward, Freddie Mac remains strongly capitalized.***
>
> *** * ***
>
> ***Our primary objective in managing capital is preserving our safety and soundness.***
>
> * * *
>
> ***We assess and project our capital adequacy relative to our regulatory requirements as well as our economic risks.*** This includes targeting a level of additional capital above each of our capital requirements to help support ongoing compliance and to accommodate future uncertainties. ***We evaluate the adequacy of our targeted additional capital in light of changes in our business and risk exposures.***

149. Freddie Mac issued a press release the same day entitled "Freddie Mac Reports 2006 Financial Results." In the 2006 Highlights, it stated:

> ***Continuing to build shareholder value and manage capital prudently***, company announces plan to repurchase additional $1 billion in common stock and issue $1 billion in preferred stock.

Later that day, during Freddie Mac's fourth quarter 2006 earnings conference call, Defendant Syron stated in part: "***Our continued capital strength is a continued strategic advantage for Freddie.***"

150. As noted above, in June 2006, *Mortgage Banking* magazine published an article by Defendant Syron entitled "The Enduring Mission of the GSEs," which stated, ***"we pass a stress test for capital that simulates a collapse worse than any since the Great Depression."***

151. During this time, Defendants affirmatively dismissed concerns addressed to them about Freddie Mac's capital levels, all the while knowing these assurances were false. As noted above, on July 2, 2007, Bloomberg News reported that a Freddie Mac spokesperson dismissed as "absurd" the suggestion Freddie Mac was exposed to a $3 billion loss that would deplete its mandatory capital requirements.

152. Similarly, as discussed above, in a July 28, 2007 Wall Street Journal article, a Freddie Mac spokesperson was quoted as saying that a Citigroup estimate that Freddie Mac's capital may have decreased in value by as much as $3.2 billion was "mistaken," adding that Freddie hasn't seen "any material markdown in value."

### C. Defendants Also Engaged in Material Omissions With Regard to Other Practices Related to Freddie Mac's Risk Exposure and Capital

153. Despite its public statements to the contrary, Freddie Mac was at a significant risk in at least three other areas in addition to its increased investment in nontraditional loan products, imperiling its capital. Defendants hid Freddie

Mac's deficient accounting reporting and internal control systems, hid the nature and extent of its exposure to risk in connection with mortgage guarantees, and hid its reliance on insurance protection from providers who were financially unable to meet insurance demands.

(a) Defendants failed to disclose that Freddie Mac's internal controls and business methods were incapable of managing, identifying and guarding against massive losses in these investments and its guarantee exposure.

(b) Defendants failed to reveal that Freddie Mac had no reliable and auditable method of valuing its mortgage holdings. Defendants held secret from the public that, despite repeated requests from Freddie Mac's regulator, they had refused to divulge how or even if its valuation system worked. In fact, Freddie Mac's only valuation system had no quality assurance checks and was not designed for nontraditional mortgage products or assets. Its public auditors could not and did not check the validity of Freddie Mac's valuation methodology, and Defendants never disclosed this to the public.

(c) Defendants hid the fact that Freddie Mac had guaranteed billions of dollars of the nontraditional high-risk mortgages sold to others — guarantees that Freddie Mac must now meet.

154. Defendants also failed to reveal to the public that Freddie Mac's guarantee exposure was not protected or properly transferred to credit-worthy mortgage insurers. Defendants knew, but failed to reveal, that many of Freddie Mac's third party mortgage insurers were not financially able to meet their

insurance contracts — the very contracts that were supposed to protect sizeable portions of Freddie Mac's mortgage investment holdings and guarantee exposure.

## VI. EXECUTIVE COMPENSATION AND INSIDER TRADING INCENTIVIZED THE DEFENDANTS TO HIDE LOSSES AND DENY RISK

155. Each Individual Defendant received significant compensation including a program of bonuses when Freddie Mac reached certain financial and earnings targets. The target bonuses rewarded executives on a variety of factors, including the portfolio growth in the Retained Portfolio. Freddie Mac executives would receive larger bonuses if the Retained Portfolio grew larger.

156. More specifically, the Board was required to take into account in the calculation of bonus awards:

(a) The return on equity for new business in retained portfolios, and

(b) Accomplishing a specified growth goal for the retained portfolio.

157. Indeed, the Individual Defendants derived the vast majority of their compensation from bonuses and stock awards based on the growth of the Retained Portfolio, including the nontraditional mortgages held in the portfolio. In 2006, over 80% of executive compensation came from the Individual Defendants' bonuses and stock awards based in part on how large the Retained Portfolio grew.

158. The Individual Defendants, therefore, understood that announcing that Freddie Mac was losing over a billion dollars from the nontraditional

mortgages that Freddie Mac held in its Retained Portfolio would directly impact the calculation of bonuses, just as failing to buy billions of dollars of nontraditional mortgages would cause the Retained Portfolio to shrink, not grow.

159. Freddie Mac's executives further benefited from high stock prices for Freddie Mac when they sold the stock they received through stock awards and option awards. Indeed, during the Class Period, Freddie Mac's executives sold well over 100,000 shares of Freddie Mac and received approximately $7 million. If Freddie Mac's executives had reported Freddie Mac's losses in a timely manner, the stock price would have fallen and the amount of money they received from their stock sales correspondingly would have decreased by at least 75%.

**Richard F. Syron**

160. Defendant Syron was Chairman and Chief Executive Officer of Freddie Mac. In 2006, Syron received total compensation of $14.73 million. In 2006 Syron derived 87% (over $12 million) of his compensation from Retained Portfolio bonuses and stock related awards. Syron's compensation for the years 2004-2006 consisted of the following:

| Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2006 | $1,100,000 | $2,400,000 | $7,162,488 | $3,261,460 | $355,273 | $453,882 | $14,733,063 |
| 2005 | $1,100,000 | $2,200,000 | $4,821,289 | | | $298,222 | $8,419,511 |
| 2004 | $1,100,000 | $2,500,000 | $4,826,707 | | | $452,015 | $8,878,722 |

161. In addition to his compensation, Syron also earned over $3 million from his sale of Freddie Mac stock. During the Class Period, Syron sold 50,163 shares of Freddie Mac and earned $3,313,705.12. Syron averaged $66 for each share that he sold. During the Class Period, Syron made the following sales:

(a) On 12/31/2006, Syron received $1,442,807.10 from the sale of 21,249 shares at $67.90.

(b) On 04/01/2007, Syron received $474,670.71 from the sale of 7,979 shares at $59.49.

(c) On 05/06/2007, Syron received $543,277.83 from the sale of 8,193 shares at $66.31.

(d) On 06/05/2007, Syron received $852,949.48 from the sale of 12,742 shares at $66.94.

162. In addition to maximizing his bonuses, stock awards, and the price of the stock that he sold, Syron was motivated to delay announcing Freddie Mac's losses because he was also negotiating a lucrative extension of his employment contract. On November 9, 2007, immediately before Syron and Freddie Mac announced Freddie's disastrous third quarter results, Syron entered into a new employment contract with Freddie. The agreement provides Syron with a bonus of $3.5 million and annual salary increase that raises his salary to $1.3 million. The salary increase is retroactive to July 1, 2007. His new contract also provides that Freddie Mac will increase his long-term equity incentive award (the "Annual Equity Grant") by $800,000 and guarantees him annual equity grants of $8,800,000.

**Patricia Cook**

163. Defendant Cook was Freddie Mac's Chief Business Officer and Executive Vice President for Investment and Capital Markets. In 2006, Cook received total compensation of $4.89 million. In 2006 Cook derived 81% (almost $4 million) of her compensation from Retained Portfolio bonuses and stock related awards. Cook's compensation consisted of the following:

| Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2006 | $600,000 | $2,300,000 | $1,118,767 | $533,747 | $221,353 | $123,062 | $4,896,929 |
| 2005 | $600,000 | $2,750,000 | $1,095,889 | | | $20,462 | $4,466,351 |
| 2004 | $250,000 | $3,000,000 | $1,873,771 | | | $104,605 | $5,228,376 |

164. In addition to her compensation, Cook also received over $1.3 million from her sale of Freddie Mac stock during the Class Period when she sold 20,593 shares of Freddie Mac. Cook averaged $63.76 for each share that she sold. During the Class Period, Cook made the following sales:

(a) On 08/02/2006, Cook made two trades and received $101,142.50 from the sale of 1,759 shares at $57.50 and $111,895 from the sale of 1,946 shares at $57.50.

(b) On 01/31/2007, Cook made two trades and received $290,395.60 from the sale of 4,258 shares at $68.20 and $194,155.40 from the sale of 2,847 shares at $68.20.

(c) On 05/06/2007, Cook received $132,155.83 when she sold 1,993 shares at $66.31.

(d) On 06/05/2007, Cook earned $275,056.46 from the sale of 4,109 shares at $66.94.

(e) On 08/02/2007 Cook made two trades and received $98,954.28 from the sale of 1,748 shares at $56.61 and received $109,427.13 from the sale of 1,933 shares at $56.61.

**Eugene M. McQuade**

165. Defendant McQuade was Freddie Mac's President and Chief Operating Officer until his resignation on September 1, 2007. In 2006, McQuade received total compensation of $7.6 million. McQuade derived 81% ($6.2 million) of his compensation from Retained Portfolio bonuses and stock related awards. McQuade's compensation consisted of the following:

| Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2006 | $900,000 | $1,500,000 | $3,627,289 | $1,088,677 | $193,180 | $338,313 | $7,647,459 |
| 2005 | $900,000 | $1,500,000 | $3,287,666 | | | $95,286 | $5,782,952 |
| 2004 | $300,000 | $2,565,000 | $6,253,875 | | | $15,5190 | $9,274,065 |

166. In addition to his compensation, McQuade sold 42,723 shares of Freddie and earned $2.7 million. McQuade averaged $64 for each share that he sold. During the Class Period, McQuade made the following sales:

(a) On 09/01/2006, McQuade received $892,893.57 from the sale of 14,037 shares at $63.61.

(b) On 05/06/2007, McQuade received $396,334.87 from the sale of 5,977 shares at $66.31.

(c) On 06/05/2007, McQuade received $621,872.60 from the sale of 9,290 shares at $66.94.

(d) On 09/01/2007, McQuade received $826,744.59 from the sale of 13,419 shares at $61.61.

### Anthony "Buddy" Piszel

167. Defendant Piszel was Freddie Mac's Executive Vice President and Chief Financial Officer. In 2006, Piszel received total compensation of $3.6 million. Piszel derived 87% (approximately $3.2 million) of his compensation from Retained Portfolio bonuses and stock related awards. Piszel's compensation consisted of the following:

| Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| $88,750 | $3,100,000 | $93,593 | $0 | $0 | $367,954 | $3,650,297 |

## VII. FREDDIE MAC HAS A SPECIAL DUTY TO BE TRUTHFUL BECAUSE IT HAS A POSITION OF PUBLIC TRUST

168. Congress, in 1970, enacted the Federal National Mortgage Association Charter Act to create Freddie Mac as a federally chartered and stockholder-owned corporation. The purpose of Freddie Mac is to:

(a) provide stability in the secondary market for residential mortgages;

(b) respond appropriately to the private capital market;

(c) provide ongoing assistance to the secondary market for residential mortgages by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and

(d) promote access to mortgage credit throughout the United States (including central cities, rural areas and undeserved areas).

169. Because Congress created Freddie Mac and imbued it with special rights not shared by private corporations, Freddie Mac is known as a Government Sponsored Entity ("GSE").

170. As a GSE, Freddie Mac is not an ordinary corporation. Though it is owned by shareholders and its shares are traded on the New York Stock Exchange, it has an array of connections with the federal government that gives it a heightened responsibility to the public.

(a) The President of the United States can appoint 5 of the 18 board members of Freddie Mac.

(b) The Secretary of the Treasury is authorized to purchase up to $2.25 billion of its debt liabilities.

(c) It is exempt from all state and local income taxes.

(d) It can use the Federal Reserve as its fiscal agent.

(e) Its debt is eligible for use as collateral for public deposits, for purchase by the Federal Reserve in open-market operations, and for unlimited investment by federally insured depository institutions (*i.e.,* commercial banks, saving and loan associations and thrifts).

(f) Its securities, including its common stock, are exempt from the Securities and Exchange Commission's registration and reporting requirements and fees.

(g) Its securities are exempt from the provisions of many state investor protection laws.

(h) It is exempt from bankruptcy law and no receivership provisions apply, so that in the event that it was to experience financial difficulties and could not satisfy all financial claims made upon it, only the Congress could resolve the situation.

171. As a GSE, Freddie Mac is subject to the following unique restrictions:

(a) Its charter restricts it to residential finance.

(b) It is explicitly forbidden to engage in mortgage origination.

(c) It is subject to a maximum size of mortgage (which is linked to an annual index of housing prices) that it can finance; *i.e.*, a maximum value for a mortgage that can be the basis for issuing MBS or purchased for holding in their portfolios. For 2006 to 2008, that maximum (which is called the conforming loan limit) is $417,000.

(d) The mortgages that it finances must have at least a 20% down payment (*i.e.*, a maximum loan-to-value ratio of 80%) or a credit enhancement (such as mortgage insurance).

(e) It is subject to safety-and-soundness regulation by OFHEO, which is located within the Department of Housing and Urban Development (HUD).

(f) It is subject to "mission oversight" by HUD, which approves specific housing finance programs and sets social housing targets for the two companies.

172. These special features of Freddie Mac and other GSEs have created an aura or "halo" due to perceptions of extensive federal government entanglements with a nominally private organization.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

173. Defendants understood that their public statements and reports were materially misleading. The reasons include:

(a) During the Class Period, Freddie Mac's external statements differed from its internal reports. For example, Defendants repeatedly represented that 99.9% of Freddie Mac's retained subprime portfolio qualified for an AAA rating; they also represented that Freddie Mac was well capitalized. However, in reality, its internal reports demonstrate that its retained portfolio was over-valued and that a significant portion of its retained subprime portfolio failed to meet its underwriting standards and was tainted by fraud. Similarly, Freddie Mac's internal reports reveal that Freddie Mac was severely undercapitalized and required an immediate infusion of capital to satisfy the minimum capital requirements of OFHEO.

(b) During the Class Period, Defendants disregarded Freddie Mac's current financial information and on a routine and regular basis, including several times just before it released its disastrous 2007 third quarter results, and made false representations concerning the quality of Freddie Mac's retained

subprime portfolio and its capitalization. For example, on September 17, 2007 Freddie's Chief Financial Officer Anthony Piszel told an Investor Conference that Freddie Mac was safe from subprime credit losses. "Due to this protection, we have not yet taken any meaningful credit losses on this position, and we do not expect to take any in the future." Within weeks Freddie announced that it was on the verge of collapse and required an immediate infusion of capital to survive.

(c) During the Class Period, Defendants disclosed Freddie Mac's accounting information in a manner that was deceptive to even sophisticated investors to understand the negative implications of the financial information. Unlike Fannie Mae, Freddie Mac does not comply with the Securities and Exchange Commission's rules governing the disclosure of financial information. It does not file with the SEC quarterly or annual statements. Nor does it file other required SEC disclosures. Also, Freddie Mac uses its own nomenclature to describe its accounting items in its financial statements. Equally important, during the Class Period Defendants acknowledged that Freddie Mac's internal controls were not effective. Thus, even the most sophisticated investors were not capable of fully understanding the flaws in Freddie Mac's financial disclosures.

## IX. CLASS ACTION ALLEGATIONS

174. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased Freddie Mac common stock during the Class Period (the "Class"). Excluded from the Class are (i) Defendants, (ii) any person who was an officer or director

of Freddie Mac during the Class Period, (iii) the members of the immediate families of the Individual Defendants, (iv) any incentive, retirement, stock or other benefit plan that benefited solely the Individual Defendants, (v) any entity in which any Defendant had a controlling interest during the Class Period, (vi) any subsidiary of Freddie Mac, and (vii) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

175. The members of the Class for whose benefit this action is brought are dispersed throughout the United States and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that Class members number, at a minimum, in the hundreds of thousands. As of February 28, 2007, Freddie Mac had over 661 million shares outstanding. Record owners and other members of the Class may be identified from records maintained by Freddie Mac or its stock transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

176. Plaintiff's claims are typical of those of the Class as all members of the Class are similarly affected by Defendants' actionable conduct in violation of federal law that is alleged herein.

177. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent.

178. A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein, because joinder of all members is impracticable. Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote and Plaintiff anticipates no difficulties in the management of this action as a class action.

179. Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated federal securities laws by the acts and/or omissions alleged herein;

(b) whether Defendants' Class Period public statements and reports misrepresented and/or omitted material information;

(c) whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

(d) whether Defendants participated in and pursued the common course of conduct complained of herein;

(e) whether the market price of Freddie Mac common stock was inflated artificially as a result of Defendants' material misrepresentations and/or omissions during the Class Period;

(f) whether the Individual Defendants are liable as control persons under the federal securities laws; and

(g) to what extent the members of the Class have sustained damages and the proper measure of damages.

## X. INAPPLICABILITY OF STATUTORY SAFE-HARBOR

180. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint. Many of the statements alleged to be false and misleading herein were not specifically identified as "forward-looking statements" when made, and many were statements of historical fact and/or representations about Freddie Mac's then-existing condition to which the statutory safe harbor does not apply. Moreover, Plaintiff primarily alleges material omissions of material facts by Defendants.

181. To the extent any statements alleged to be false herein may be characterized as forward-looking to which the statutory safe harbor applies, (i) those statements were not accompanied by meaningful cautionary statements identifying the important then-present factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and (ii) the particular speakers of such statements knew in each case that their statements were false or misleading and/or the statements were authorized and/or approved by an executive officer of the Company who knew that those statements were false or misleading, in each case when such statements were made.

182. Any purported warnings contained in or accompanying any of the press releases, periodic financial reports and financial statements and other public statements described herein were generic and unparticularized boilerplate statements that lacked the meaningful cautionary language necessary to insulate any forward-looking statements.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE:FRAUD ON THE MARKET

183. In bringing the claims herein, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the fraud-on-the-market doctrine. At all times relevant to this Complaint, the market for Freddie Mac common stock was an efficient market for the following reasons, among others:

(a) Freddie Mac common stock was listed and actively traded on the NYSE, a highly efficient and automated market. Freddie Mac's common stock trading volume was substantial. The average daily trading volume of Freddie Mac common stock throughout the Class Period was over twenty million shares per day.

(b) Freddie Mac published quarterly earnings press releases, Annual Reports and Information Statements and made such releases and reports available to its investors through mailings and/or on its website www.freddiemac.com.

(c) Freddie Mac regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire

services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Freddie Mac was followed by numerous national securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

184. As a result of the foregoing, the market for Freddie Mac common stock promptly digested current information regarding Freddie Mac from all publicly available sources and reflected such information in the market prices for Freddie Mac common stock at all relevant times. Under these circumstances, Plaintiff and other members of the Class, as purchasers of Freddie Mac common stock during the Class Period, suffered similar injury through their purchase of Freddie Mac's common stock at artificially inflated prices and a presumption of reliance applies.

185. In addition to the foregoing, Plaintiff and the Class is entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding Freddie Mac's subprime exposure, internal controls, risk management, financial condition, results and business operations.

## XII. LOSS CAUSATION

186. Throughout the Class Period, the prices of Freddie Mac's common stock were inflated as the result of the Defendants' material misrepresentations

and omissions. Not only did the Defendants publish materially false statements on Freddie Mac's financial condition and results, but they also publicly misrepresented that, among other things, Freddie Mac did not purchase nontraditional loans or securities backed by low credit loans, its exposure to the nontraditional crisis was not significant, it had "excellent" risk management, and the Company maintained adequate internal financial controls.

187. Freddie Mac's financial results, exposure to subprime investments, inadequacy of risk management and internal controls and inadequacy of financial disclosures were material information to Plaintiff and other members of the Class. Together, these facts reflect that Freddie Mac was a far riskier investment than it disclosed, and that its representations that it was managing risk were completely false. When these risks were realized, the market price of Freddie Mac plummeted. Had Plaintiff and the other Class Members known the truth – that the Company's reported financial results were materially false and misleading and painted a more positive picture of the Company's results and stability than the true facts warranted and in fact its exposure to the nontraditional mortgages was huge – Plaintiff and the other members of the Class either would not have purchased Freddie Mac common stock at all, or would have done so only at substantially lower prices than the artificially inflated prices which they actually paid.

188. The nature, extent and effect of Defendants' fraudulent scheme were revealed to the market through earnings releases and other public statements. As alleged herein, these revelations caused significant declines in

the price of Freddie Mac common stock, causing Plaintiff and other members of the Class who continued to hold Freddie Mac common stock at the time of these disclosures to suffer significant losses.

189. The Company's common stock price fell 29% - from $37.50 per share on November 19, 2007, to $26.74 per share on November 20, 2007. These declines are directly attributable to the market's reaction to revelations of the nature, extent and impact of the fraud at Freddie Mac, and to its adjustment of the price to reflect the newly emerging truth about Freddie Mac's investments, risk management, financial condition and results. Thus, these price declines were directly caused by Defendants' fraud alleged herein, and by the market's response to the subsequent partial corrective disclosures.

190. The fraud perpetrated by the Defendants described in this Complaint proximately caused foreseeable losses to the Plaintiff and the other members of the Class.

## XIII. CAUSES OF ACTION

### COUNT I

### Violations of Sections 10(b) of the Exchange Act and <u>SEC Rule 10b-5 Promulgated Thereunder</u>

191. Plaintiff repeats and realleges each of the allegations set forth above as if set forth fully herein.

192. As described in detail above, throughout the Class Period, the Defendants, directly or indirectly, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications and a national securities exchange, employed a device,

scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of the common stock of Freddie Mac during the Class Period, all in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

193. The Company and the Individual Defendants, as the most senior officers or Board Committee members of Freddie Mac during the Class Period, are liable as direct participants in all of the wrongs complained of herein. Through their positions of control and authority, the Individual Defendants were in a position to and did control all of the Company's false and misleading statements and omissions, including the contents of all of its public filings and reports and press releases, as more particularly set forth above. In addition, certain of these false and misleading statements constitute "group published information," which the Individual Defendants were responsible for creating. The Company is liable for each of the statements of the Individual Defendants through the principles of respondeat superior.

194. As detailed above, the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express

responsibility for knowing such facts. Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Freddie Mac's earnings volatility and true financial and operating condition from the investing public and supporting the artificially inflated price of Freddie Mac's common stock.

195. Plaintiff and the other members of the Class relied upon the Defendants' statements and/or on the integrity of the market in purchasing Freddie Mac's common stock during the Class Period.

196. As a direct and proximate cause of the wrongful conduct described herein, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Freddie Mac common stock at artificially inflated prices during the Class Period. Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind the Defendants' material misstatements, they would not have purchased Freddie Mac common stock at artificially inflated prices during the Class Period.

197. By virtue of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the members of the Class who have been damaged as a result of such violations.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

198. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

199. As set forth in Count I above, Freddie Mac and the Individual Defendants each violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) by their acts and omissions as alleged in this Complaint.

200. Throughout the Class Period, the Individual Defendants were controlling persons of Freddie Mac within the meaning of Section 20(a) of the Exchange Act. By virtue of their board committee membership and/or high-level positions, their stock ownership and contractual rights and/or their specific acts described above, the Individual Defendants had the power to and did, directly or indirectly, exercise control over Freddie Mac, including the content and dissemination of the various statements and financial reports which Plaintiff contends are false and misleading. Each of the Individual Defendants either made, participated in the preparation of, were responsible for and/or were provided with or had unlimited access to Freddie Mac's reports, financial statements, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after they were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Each of the Individual Defendants had direct and supervisory or oversight responsibility for and involvement in, the day-to-day operations of

Freddie Mac and induced or permitted Freddie Mac to engage in the acts constituting the violations of the federal securities laws alleged herein.

201. As a result of Defendants' false and misleading statements and omissions alleged herein, the market price of Freddie Mac common stock was artificially inflated during the Class Period. The members of the Class relied upon either the integrity of the market or upon the statements and reports of the Defendants in purchasing Freddie Mac common stock during the Class Period.

202. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Freddie Mac's common stock at artificially inflated prices during the Class Period. Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind its material misleading statements or misstatements, they would not have purchased Freddie Mac common stock at artificially inflated prices during the Class Period.

203. By virtue of their positions as controlling persons of Freddie Mac, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act to Plaintiff and the members of the Class who have been damaged as a result of Freddie Mac's underlying securities violations.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and all other Class members, pray for judgment as follows:

(a) A determination that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b) An award of compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest thereon;

(c) An award to Plaintiff and the Class of their reasonable costs and expenses incurred in this action, including reasonable counsel fees, expert fees and other costs; and

(d) A grant of such other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

THOMAS R. WINTERS
FIRST ASSISTANT ATTORNEY GENERAL FOR THE STATE OF OHIO
/s/ Britt Strottman
Britt K. Strottman (0079816)
Assistant Attorney General
30 E. Broad Street, 17th Floor
Columbus, Ohio 43215
Telephone: (614) 387-5600
Facsimile: (614) 387-6697
E-mail: bstrottman@ag.state.oh.us

/s/ Stanley M. Chesley
Stanley M. Chesley (Ohio Bar 0000852)
James R. Cummins (Ohio Bar 0000861)
W.B. Markovits (Ohio Bar 0018514)

Melanie S. Corwin (Ohio Bar 0046513)
Jean M. Geoppinger (Ohio Bar 0046881)
Waite Schneider, Bayless & Chesley Co., L.P.A.

1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 621-0267
Facsimile: (513) 381-2375
E-mail: stanchesley@wsbclaw.com
E-mail: jcummins@wsbclaw.com
E-mail: mcorwin@wsbclaw.com
E-mail: jeangeoppinger@wsbclaw.com
*Special Counsel to the Attorney General of the State of Ohio and Lead Counsel for Lead Plaintiff*

/s/ Martin D. Chitwood (consent)
Martin D. Chitwood
James M. Wilson, Jr.
Krissi T. Gore
Chitwood Harley Harnes LLP
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone: (404) 873-3900
Facsimile: (404) 876-4476
E-mail: mchitwood@chitwoodlaw.com

-and-

John F. Harnes
Gregory E. Keller
Darren T. Kaplan
Chitwood Harley Harnes LLP
11 Grace Avenue, Suite 306
Great Neck, New York 11021
Telephone: (404) 873-3900
Facsimile: (404) 876-4476
E-mail: dkaplan@chitwoodlaw.com
E-mail: jfharnes@chitwoodlaw.com
E-mail: gkeller@chitwoodlaw.com
*Special Counsel to the Attorney General of the State of Ohio and Lead Counsel for Lead Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2008, a copy of foregoing pleading was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

/s/ Stanley M. Chesley
Stanley M. Chesley