**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION (YOUNGSTOWN)**

| | | |
|---|---|---|
| **OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, On Behalf of Itself and all Others Similarly Situated,** | : : : : | |
| **Plaintiff,** | : : | **CIVIL ACTION NO. 4:08-cv-160** |
| **vs.** | : : | **JUDGE  JOHN R. ADAMS** |
| **FEDERAL HOME LOAN MORTGAGE CORPORATION a/k/a FREDDIE MAC, RICHARD F. SYRON, PATRICIA L. COOK, ANTHONY S. PISZEL, and EUGENE M. McQUADE,** | : : : : : | **THIRD AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| **Defendants.** | : : : : : : : : | **JURY TRIAL DEMANDED** |

_____

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................1

II.  NATURE OF THE ACTION ...............................................................6

III.  JURISDICTION AND VENUE ..........................................................7

IV.  PARTIES ............................................................................................7

V.  FACTUAL BACKGROUND ............................................................13

     A.  Freddie Mac's Undisclosed Exposure to Subprime and
        Nontraditional Mortgage Related Risks...................................14

        1.  Background ...................................................................14

        2.  Defendants' Material Omissions...................................53

        3.  Defendants' Misrepresentations During the
            Class Period.................................................................56

        4.  Freddie Mac's Response to New York Attorney General's
            Industry-Wide Investigation of Mortgage Fraud .........81

        5.  The November 20, 2007 Disclosures ..........................86

        6.  OFHEO's 2008 Report to Congress.............................87

     B.  The Safety and Soundness of Freddie Mac's Capital ...........................88

        1.  Freddie Mac's Capital Impairment...............................89

        2.  Freddie Mac's Misrepresentations with Respect
            to its Capital ................................................................95

     C.  Defendants Also Engaged in Material Omissions with
        Regard to Other Practices Related to Freddie Mac's Risk
        Exposure and Capital.............................................................98

     D.  Subsequent Loss Revelations Regarding Freddie Mac's
        Capital Impairment and its Pre-2008 Subprime, Alt-A,
        and Other Non-Traditional Mortgage Investments ...............100

i

VI.    EXECUTIVE COMPENSATION AND INSIDE TRADING
INCENTIVIZED THE DEFENDANTS TO HIDE LOSSES AND
DENY RISKS.................................................................................104

VII.   FREDDIE MAC HAS A SPECIAL DUTY TO BE TRUTHFUL
BECAUSE IT HAS A POSITION OF PUBLIC TRUST....................109

VIII.  ADDITIONAL SCIENTER ALLEGATIONS ....................................112

IX.    CLASS ACTION ALLEGATIONS ..................................................113

X.     INAPPLICABILITY OF STATUTORY SAFE-HARBOR ..................115

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD
ON THE MARKET .......................................................................117

XII.   LOSS CAUSATION ......................................................................118

XIII.  CAUSES OF ACTION ..................................................................120

        COUNT I.....................................................................................120

        Violations of Sections 10(b) of the Exchange Act and
        SEC Rule 10b-5 Promulgated Thereunder ...................................120

        COUNT II....................................................................................122

        Violations of Section 20(a) of the Exchange Act Against
        the Individual Defendants ..............................................................122

XIV.  PRAYER FOR RELIEF..................................................................124

## I.  INTRODUCTION

1.     The Federal Home Loan Mortgage Corporation, commonly known as "Freddie Mac," is a stockholder-owned corporation chartered by Congress in 1970 with a public mission to support, stabilize, and expand the secondary market for mortgages.   As a government-sponsored enterprise ("GSE") responsible for maintaining liquidity in the U.S. housing market, Freddie Mac enjoyed a special mandate and position of public trust.  Freddie Mac and its senior officers violated that public trust by perpetrating a fraud upon investors which resulted in billions of dollars in damages to hundreds of thousands of class members when Defendants' fraud was revealed and the price of Freddie Mac's common stock collapsed.

2.     Throughout the Class Period, Defendants made a series of materially false and misleading public statements relating to, among other things, (i) its exposure to or risk of loss from subprime mortgage loans and other nontraditional, high risk mortgages, including "Alt-A" mortgages (a mortgage industry term to describe reduced documentation/higher credit risk loans); (ii) its underwriting guidelines and Defendants' adherence to those guidelines, (iii) its loan analysis software and fraud detection systems, (iv) its risk management measures and its risk management performance, and (v) its capital position.

3.     The primary fraud was Defendants' failure to disclose Freddie Mac's true subprime exposure.  Throughout the Class Period, Defendants made affirmative misstatements of fact with respect to Freddie Mac's exposure to mortgage loan losses, repeatedly representing that it had "basically no subprime

1

exposure" and that its exposure to subprime loans was very low - between $2 billion and $6 billion, or between 0.1 percent and 0.2 percent of its Single Family Guarantee portfolio - when in fact they knew, but hid and intentionally failed to disclose, that Freddie Mac's exposure was far greater, reaching $206 billion (13% of its entire single family guarantee portfolio) by September 30, 2007. Additionally, Defendants made affirmative misstatements of fact during the Class Period regarding Freddie Mac's exposure to Alt-A mortgage loans, representing that less than 10% of its portfolio was in this type of high credit risk loans, when in fact they knew but did not disclose that its Alt-A portfolio was growing rapidly, reaching $484 billion in such loans (an additional 30% of its single family guarantee portfolio).  By the end of the Class Period over 40% of Freddie Mac's entire single family mortgage loan portfolio was in low credit and high risk instruments.

4.    The representations and denials about Freddie Mac's risk management measures and financial risks from participation in subprime and nontraditional mortgages were revealed to be false.  First, in early November, the New York Attorney General launched an investigation of Freddie Mac as part of a broader investigation into fraudulent practices in the subprime market. Thereafter, on November 20, 2007, Freddie Mac revealed its precarious financial position - losses of over $2 billion for just the three months ending September 20, 2007 with more significant losses expected.  Substantially all the announced losses came from Freddie Mac's investments in subprime, Alt-A and other nontraditional mortgages.

5.     Freddie Mac's losses in turn raised serious questions regarding its ability to continue its business, because its previously undisclosed subprime losses impaired its mandated minimum capital required by its regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO").[1]  By the fall of 2007, Freddie Mac had so severely weakened its capital position that it had fallen below the capital level required by OFHEO to maintain its "safety and soundness," and had placed itself in danger of being ordered by OFHEO to "cease and desist" its mortgage buying activities until it restored its reduced capital base.

6.     The November 20, 2007 revelation of significant subprime losses and potential capital impairment caught the investing public completely by surprise.  As a direct result of the revelation of Freddie Mac's subprime exposure and financial peril, the value of Freddie Mac common shares dropped 29% in one day and the owners of Freddie Mac shares immediately lost approximately $6.6 billion in share value.  (*See* attached Appendix A).

7.     As described in more detail below, Defendants purposefully misrepresented Freddie Mac's true financial condition to investors, delaying and concealing revelation of the truth as long as possible.  This delay allowed the Individual Defendants (as defined below) to reap the rewards of compensation and bonuses, negotiate new increased compensation packages, exercise stock options, and implement insider trading incentives.  For example, Freddie Mac's two highest officers, in the summer and early fall of 2007, sold nearly two million

---

[1] The Federal Housing Finance Agency ("FHFA") is now the successor agency to OFHEO.

dollars of their stock at prices above $60 just weeks before Freddie Mac's disclosure of its inevitable write-downs caused its stock price to fall below $30.

8. Freddie Mac was so imperiled financially that it resorted to an expensive $6.5 billion emergency infusion of capital in December 2007 in order to meet OFHEO's mandated 30% minimum capital requirement. It sold preferred shares to raise this money, thereby severely diluting the value of the stock owned by common shareholders. The proceeds from this emergency sale of preferred shares were used to conceal yet another $3 billion loss due to subprime and nontraditional investment activities that were far riskier than previously disclosed.

9. Freddie Mac continues to be impacted by the effects of its undisclosed materially deficient underwriting, risk management and fraud detection practices that resulted in high-risk mortgage investments during the Class Period. On May 14, 2008, Freddie Mac reported further realized mortgage losses of $1.4 billion and unrealized subprime and Alt-A mortgage losses of $28 billion. For 2008 alone, Freddie Mac had losses in excess of $45 billion. The total realized and unrealized losses incurred by Freddie Mac to date have been at least $72 billion, attributable substantially to Freddie Mac's losses incurred during the Class Period from subprime and other forms of nontraditional mortgages – despite countless public reassurances by Freddie Mac and the Individual Defendants that Freddie Mac's investments were sound and secure and it had "basically no subprime exposure."

10. As a result of Defendants' fraud, on September 7, 2008, the federal government took the unprecedented step of placing Freddie Mac into a

conservatorship and terminating all members of its senior management, including Defendant Syron and, shortly thereafter, Defendant Piszel.  James B. Lockhart III, FHFA's Director at the time, testified to Congress that the conservatorship was necessary in part because Freddie Mac had continued "to take on risky Alt-A, low documentation and other nontraditional mortgages in 2006 and well into 2007," even though Freddie Mac had received "repeated warnings about credit risk" from its employees.

11.    On December 9, 2008, the U.S. House of Representatives Committee on Oversight and Government Reform (the "Committee") held a hearing on "The Role of Fannie Mae and Freddie Mac in the Financial Crisis."  As part of its investigation leading to the hearing, the Committee obtained nearly 400,000 documents from Fannie Mae and Freddie Mac.  According to Committee Chairman Henry A. Waxman, those "documents make clear that Fannie Mae and Freddie Mac knew what they were doing.  Their own risk managers raised warning after warning about the dangers of investing heavily in the subprime and alternative mortgage market, but these warnings were ignored."  At the hearing Charles W. Calomiris—the Henry Kaufman Professor of Financial Institutions at Columbia Business School—after reviewing the documents provided to the Committee, testified that:

- Freddie Mac made a "conscious decision to encourage the underestimation of risk in subprime and Alt-A lending, which drove the financial crisis."

- Freddie Mac boosted its support for subprime and Alt-A lending "even when its own risk managers were sounding the alarms about the high risks of these products, as well as the way that the poor underwriting standards in the market encouraged fraud

and predatory lending . . . . The emails, in particular, provide clear and unambiguous support for the proposition that Freddie Mac consciously undertook the acquisition of loans with poor underwriting processes in spite of factual evidence, both from the past and the current market experience, which led its own risk managers to recommend raising auditing standards and scaling back their involvement in these loans."

12.     On December 16, 2011, the Securities and Exchange Commission ("SEC") filed a securities fraud complaint against Defendant Richard F. Syron, Freddie Mac's former Chairman of the Board and Chief Executive Officer, and Defendant Patricia L. Cook, Freddie Mac's former Executive Vice President of Investments and Capital Markets and Chief Business Officer, for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder based upon the misconduct alleged herein.  At that same time, Freddie Mac entered into a Non-Prosecution Agreement with the SEC, agreeing to a statement of facts set forth in Exhibit A to the Non-Prosecution Agreement, many of which facts substantially support the claims herein.  This Court has taken judicial notice of the Non-Prosecution Agreement, and Plaintiff incorporates its allegations by reference.

## II.  NATURE OF THE ACTION

13.     Lead Plaintiff Ohio Public Employees Retirement System ("Plaintiff") brings this class action against Federal Home Loan Mortgage Corporation a/k/a Freddie Mac and certain of its former senior officers on behalf of the purchasers of Freddie Mac's common stock from August 1, 2006 through and including November 20, 2007 (the "Class Period"), seeking redress for Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934, as amended (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

## II.  JURISDICTION AND VENUE

14.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. 240.10b-5).

15.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

16.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Many of the acts in furtherance of the alleged fraud and/or the effects of the fraud occurred within this District.  Plaintiff maintains its principal place of business in Columbus, Ohio and its members who were damaged by the fraud are located throughout the State of Ohio, including in this District.

17.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## IV.  PARTIES

18.    Lead Plaintiff, formed in 1935, provides retirement, disability, survivor and health care benefits, and services for public employees throughout the State of Ohio who are not covered by another state or local retirement

7

system.   Plaintiff serves more than 920,000 members, and more than 3,700 public employers in Ohio are part of the OPERS system.  It had total net assets of $76.5 billion at the end of 2010, making it the 14th largest retirement system in the United States.   As set forth in the certification appended to the Plaintiff's Original Complaint and incorporated by reference herein, Plaintiff purchased shares of common stock of Freddie Mac during the Class Period at artificially inflated prices and has been damaged thereby.

19.    Defendant Freddie Mac is a federally–chartered corporation with its principal place of business at 8200 Jones Branch Drive, McLean, Virginia. Congress established Freddie Mac in 1970 to support liquidity, stability and affordability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold.  Freddie Mac is owned by its shareholders, and until July 8, 2010, its common stock was listed and publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "FRE."

20.    Defendant Richard F. Syron ("Syron") was Chairman of the Board ("Chairman") and Chief Executive Officer ("CEO") of Freddie Mac from December 2003 until September 7, 2008.  Syron's compensation grew from approximately $14.7 million in 2006 to $18.3 million in 2007 – tied, in part, to the "Touch More Loans" initiative discussed herein.   Syron's employment with Freddie Mac formally ceased on November 7, 2008.  Syron is a resident of Massachusetts.

(a)    As Chairman and CEO, Syron's primary responsibilities included overseeing the overall success or failure of Freddie Mac; providing leadership for the formulation and achievement of Freddie Mac's vision, mission,

strategy, financial objectives and goals; ensuring that effective and qualified management were retained by Freddie Mac; ensuring that Freddie Mac established and maintained appropriate internal and disclosure controls, policies and procedures that were adequate to protect corporate assets; and directing the conduct and affairs of Freddie Mac in furtherance of its safe and sound operation.  As Chairman, Syron was a regular attendee at Board meetings and Board committee meetings, including the Board's Mission, Sourcing and Technology Committee meetings.  As CEO, he chaired a team that he personally selected from the upper echelons of executive management called the "SET" or "Senior Executive Team," which met periodically to consider Freddie Mac's strategic direction.  Syron also regularly attended monthly meetings of the Enterprise Risk Management Committee (the "ERMC"), which was comprised of executives and senior management from Freddie Mac's three reportable segments that considered the status of credit, market and operational risks, among others, to the Freddie Mac enterprise. Syron additionally received monthly materials from the ERMC that apprised him of the credit, market and operational risks, among others, to the Freddie Mac enterprise.

(b)     Syron, along with the other Individual Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements.  Syron regularly received and reviewed, prior to public distribution, drafts of Freddie Mac Information Statements and Annual Reports to Stockholders and supplements to the Information Statements.  Syron publicly commented on Freddie Mac's financial performance in its quarterly and

annual earnings press releases, in investor conference calls held during the Class Period, and during interviews with the media.  Syron gave public speeches to investment bankers and to Congress and also signed letters to shareholders commenting upon Freddie Mac's performance and disclosure policies in Annual Reports issued during the Class Period.

(c)    Syron personally attested to and certified the accuracy of Freddie Mac's reported financial results and disclosures in its Information Statements and Supplements published during the Class Period.  For example, Syron signed a certification on March 23, 2007, included in Freddie Mac's Information Statement for the fiscal year ended December 31, 2006, in which he personally certified that based on his knowledge:

(i)       ". . . this Information Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Information Statement," and,

(ii)      ". . . the consolidated financial statements and other financial information included in this Information Statement fairly present in all material respects the financial condition, results of operation, and cash flow of [Freddie Mac] as of and for the periods presented [in the Information Statement]."

21.    Defendant Patricia L. Cook ("Cook") was an officer of Freddie Mac and held several titles, including Chief Business Officer ("CBO") and Executive Vice President ("EVP") for Investments and Capital Markets from August 2004

through September 26, 2008.  Cook's compensation was $4.9 million in 2006 and $4.8 million in 2007 – tied, in part, to the Touch More Loans strategy described herein.  Cook formally ceased to be an employee of Freddie Mac on November 17, 2008.  Cook is a resident of Washington, D.C.

(a)     As EVP of Investments and Capital Markets and as CBO, Cook oversaw the Single Family Business.  Cook attended Board meetings and Board committee meetings, including the Board's Mission, Sourcing and Technology Committee meetings.  Cook was one of the senior executives who served on Syron's SET.  She also attended or, on occasion, sent representatives on her behalf, to the monthly ERMC meetings. She received materials from the ERMC that apprised her of the credit, market and operational risks, among others, to the Freddie Mac enterprise.  As the senior executive in charge of the Single Family Business, Cook was knowledgeable about Freddie Mac's investments and the performance of Freddie Mac's high risk loan portfolio, including certain loans the company internally considered to be subprime.

(b)     Cook was responsible for ensuring that the Single Family Business public disclosures were accurate, along with ensuring generally the accuracy of Freddie Mac's public financial reports and other public statements. Cook was considered an expert on credit risk within Freddie Mac and the Freddie Mac Disclosure Committee consulted Cook regarding the company's public disclosures concerning subprime.

(c)     Cook signed sub-certifications directed to Syron and other senior executives for each Freddie Mac Information Statement and Information

11

Statement Supplement published during the Class Period. Each of Cook's sub-certifications covered the Company's subprime disclosures. Cook publicly commented on Freddie Mac's financial performance in press releases, conference calls, articles and other public presentations and speeches held during the Class Period.

22. Defendant Anthony S. Piszel ("Piszel") was Freddie Mac's Executive Vice President and Chief Financial Officer ("CFO") from November 13, 2006 until September 22, 2008.

(a) Piszel was responsible for ensuring the accuracy of Freddie Mac's public financial reports, financial disclosures and other public statements. Piszel publicly commented on Freddie Mac's financial performance in its quarterly and annual earnings, press releases, and investor conference calls held during the Class Period, and during interviews with the media.

(b) Piszel also personally attested to and certified the accuracy of Freddie Mac's reported financial results and disclosures during the Class Period. For example, Piszel signed a certification included in Freddie Mac's Information Statement for the fiscal year ended December 31, 2006, in which he personally certified that based on his knowledge:

(i) ". . . this Information Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Information Statement," and,

(ii)      ". . . the consolidated financial statements and other financial information included in this Information Statement fairly present in all material respects the financial condition, results of operation, and cash flow of [Freddie Mac], as of and for the periods presented."

23.    Defendant Eugene M. McQuade ("McQuade") was Freddie Mac's President and Chief Operating Officer ("COO") from September 1, 2004 until his resignation on September 1, 2007.  McQuade, along with the other Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports, disclosures and other public statements.  McQuade publicly commented on Freddie Mac's financial performance, condition, and results during the Class Period.

24.    Defendants Syron, Cook, Piszel, and McQuade are collectively referred to herein as the "Individual Defendants."

## V.   FACTUAL BACKGROUND

25.    Freddie Mac is one of the largest purchasers of mortgages in the United States and also operates an extensive mortgage securitization business.  In the securitization side of its business, Freddie Mac generates income when it issues securities to investors backed by pools of mortgage loans.  Freddie Mac manages its business through three reportable segments: (1) single-family guarantee, (2) multifamily, and (3) investments.  Freddie Mac's primary business segment is its single-family guarantee portfolio ("Single Family Business"), through which it guarantees the payment of principal and interest on single-family mortgage related securities in exchange for guarantee fees.  The Single Family

Business purchases residential mortgages and mortgage-related securities in the secondary mortgage market and securitizes them as Freddie Mac mortgage-backed securities known as Participation Certificates ("PCs"). Freddie Mac guarantees the payment of principal and interest on the mortgage loans that underlie these PCs. The multifamily segment activities include purchases or multifamily mortgage-related securities and mortgages underlying multifamily housing revenue bonds. Through the investment segment, which includes the retained portfolio, the company invests principally in mortgage-related securities and single-family mortgages, including its own PCs. Freddie Mac reported that the size of its Single Family Business was $1.4 trillion as of December 31, 2006, $1.7 trillion as of December 31, 2007, and $1.8 trillion as of June 30, 2008. Freddie Mac earns fee income for assuming the mortgage credit risk and administering or "servicing" the mortgage securities.

26.     Freddie Mac funds the purchase of mortgages and mortgage-related securities by issuing short and long-term debt and preferred stock offerings.

27.     When Freddie Mac holds mortgages in its retained portfolio, it is exposed to both credit risk (that is, the possibility that the borrower will default) and interest-rate risk (that is, the interest cost incurred by Freddie Mac to buy the mortgage will be larger than the actual interest rate paid by the homeowner).

**A.     Freddie Mac's Undisclosed Exposure to Subprime and Nontraditional Mortgage Related Risks**

**1.     Background**

28.     As part of its loan acquisition and securitization process in the Single Family credit guarantee portfolio, Freddie Mac provided mortgage loan originators with a series of mortgage underwriting standards and/or automated underwriting software tools, including, since at least 1995, its proprietary automated underwriting system ("AUS") called "Loan Prospector."

29.     Loan originators used Loan Prospector to obtain an AUS score, which could be used to determine the terms on which a loan could be sold to Freddie Mac. For example, whether a loan could be sold to Freddie Mac without certain representations and warranties or without additional cost.

30.     Loan Prospector was based on performance models calibrated to loans in Freddie Mac's guarantee portfolio and to other data acquired by Freddie Mac. Using these models, Loan Prospector generated a credit risk classification for each loan.

31.     During the Class Period, Loan Prospector generated a score that estimated the risk of default for each loan. The scores, in turn, were grouped into six bands or "grades," which roughly corresponded to the level of anticipated risk: A+, AI, A2, A3, CI or C2. These grades were visible to Freddie Mac but not to mortgage loan originators or the public. Loans falling into the first four grades (A+, AI, A2 and A3) were designated "Accept Loans." Loans falling into the bottom two grades (CI and C2) were designated "Caution Loans."

32.     A loan designated as an Accept Loan permitted automated underwriting, reduced documentation and generally did not require originators to make special representations and warranties regarding the credit quality of the

loan, because Loan Prospector had already determined the loan was creditworthy.

33.     By contrast, Loan Prospector's designation of a loan as a Caution Loan meant that the system had identified concerns about the loan's creditworthiness.  Originators were required manually to underwrite Caution Loans, produce additional documentation regarding the borrower's creditworthiness, and make special representations and warranties regarding the credit quality of the loan.  Caution Loans had multiple higher risk characteristics, such as high loan-to-value ("LTV") ratios, borrowers with lower FICO scores, unusual property types or high debt-to-income ratios, and were recognized within Freddie Mac as loans that had a high risk of default relative to Accept Loans. Internally at Freddie Mac, Caution Loans were considered to be equivalent to subprime.

34.     On October 8, 1997, Freddie Mac publicly announced the roll-out of its "A-minus Program" at the Mortgage Bankers Association's annual meeting in New York.  "A-minus" was a term commonly used in the marketplace to refer to subprime loans. The next day, the American Banker published an article reporting on Freddie Mac's announcement and observed that "Freddie Mac is diving into subprime lending, ending months of speculation over how deeply the agency would go into the burgeoning market." Under the A-minus Program, Caution Loans that received a score of C1 in Loan Prospector could be sold to Freddie Mac on the same terms as an Accept Loan with the payment of an additional fee by the seller.  As noted by the American Banker article, the A-

16

minus Program was publicly perceived as expanding Freddie Mac's exposure to subprime loans.

35.    In or about November 1998, in connection with the A-minus Program, Freddie Mac revised its Credit Policy Book as it related to the broader credit risk parameters and processes under which Freddie Mac was willing to guarantee loans in Single Family. The memorandum authorizing these revisions described mortgages eligible for the A-minus Program as "[m]ortgages that generally comprise the first and second tier of subprime lender risk grades" and "mortgages generally includ[ing] 54% to 56% of the subprime market."  Mortgage loans that received a C1 rating in Loan Prospector were described as having a credit quality of "A-minus," and those that received a C2 rating in Loan Prospector were described as having a credit quality of "subprime."

36.    In or about 1999, Freddie Mac developed an econometric model called "Segmentor" which enhanced Loan Prospector's ability to identify subprime loans prior to Freddie Mac guaranteeing those loans. The model scored mortgage loans on a variety of credit risk characteristics, such as debt ratio, FICOs, and time since most recent foreclosure, and generated a "subprime score." If the Segmentor "subprime score" fell below certain thresholds or had certain characteristics such as a high debt-to-income ratio, the loan received an automatic rating of C1 or C2 in Loan Prospector.

37.    Loan Prospector developed and evolved over time, but the internal view that Caution Loans (CI and C2) were synonymous with subprime or were "subprime-like" did not change. Freddie Mac's investment and exposure to C1

17

loans grew from approximately $40 billion in the 1st quarter of 2005 to nearly $120 billion by the end of 2007.   Similarly Freddie Mac's investment and exposure to C2 loans grew from approximately $35 billion in the 1st quarter of 2005 to nearly $100 billion by the end of 2007.  By the end of the Class Period, instead of "no exposure to" subprime, Freddie Mac had subjected nearly  $227 billion of its loan portfolio to subprime and other low credit quality (C1, C2 and "Expanded Approval, described below") risks.

### Freddie Mac Determines to Expand Its Loan Products

38.    In 2004-2005, the record-low interest rates that had fueled prior unprecedented growth in home loan originations and refinancings began to increase.  As a result, loan activity began to decline and with it, the record profits earned by industry players, *i.e.*, investment banks, lenders and brokers.

39.     To counteract the declines in loan activity, nontraditional higher risk mortgages were offered by large mortgage producers like Countrywide and Washington Mutual as well as hundreds of smaller mortgage producers.  These mortgage producers began to favor quantity (generating more broker fees) over the safety of quality mortgages.  They then sold the risks of these lower quality mortgages along with the mortgage.

40.    Attempting to reverse the trend of declines in loan activity and maintain the flow of originations to the secondary market, lenders and brokers began aggressively to market more and riskier nontraditional loan products. These products included:

- interest-only and payment-option adjustable rate mortgages ("ARMs"), originally intended for use by sophisticated real estate investors and professionals;

- reduced documentation loans, originally intended for use by self-employed borrowers and other borrowers who possessed the necessary income and/or assets to qualify but, for one reason or another, had difficulty in being able to document that ability consistent with Fannie Mae/Freddie Mac underwriting standards ("stated income" loans);

- "2/28" or "3/27" ARM loans, with an initial 2- or 3-year period during which the interest rate would remain fixed; and

- so-called "80-20 piggyback" loans, 80% loan-to-value ("LTV") first-lien loans combined with 20% LTV second-lien loans, designed to eliminate the need for expensive private mortgage insurance.

Whereas, in 2001, subprime and Alt-A loans constituted 8% of the loan market, by 2006 the percentage of such loans had tripled to 24% of the market.  In 2006, conventional prime and jumbo prime loans constituted less than half the loans originated.  Freddie Mac was losing this market because of its Congressionally mandated conforming loan standards.

41.    Marketing efforts by mortgage originators for these more nontraditional loan products were often directed to borrowers who otherwise would not have qualified for more traditional loan products and for whom these loans were particularly risky.  Marketing efforts were also boosted by the use of short-term below-market "teaser" rates.  The features of these various types of loans were often combined to make the loan "work," *i.e.*, so that the loan could close regardless of the lending standards in place.

42.     Speculators used these nontraditional products to purchase properties without having to put up a lot of their own money or prove income and assets.  Borrowers, and/or loan officers in some cases, also exaggerated income on stated income loans (often referred to as "liar's loans") in order to obtain loans for which they would not otherwise have qualified.  Many of the features of these loans made it easier to perpetrate property-flipping and other illegal schemes.

43.     This nontraditional mortgage market could sustain itself so long as interest rates remained stable and home values continued to appreciate, thereby enabling borrowers to refinance before their loan rates adjusted.

44.     Accordingly, as revealed by subsequent investigations, certain industry players ensured that home values appreciated through artificially inflated appraisals.

45.     By the mid-2000s, Freddie Mac's traditional market of conventional prime mortgages had matured, and it was looking for new ways to sustain its past decade's success and meet investor expectations.  Because its public charter enables it to raise funds more cheaply than fully private financial institutions, Freddie Mac generally could expand into the subprime market share by out-pricing its competitors.

46.     Defendants were aware of the risks of this expansion.   The New York Times has reported that, in 2004, Defendant Syron "received a memo from Freddie Mac's chief risk officer [David A. Andrukonis], warning him that the firm was financing questionable loans that threatened its financial health."   That memo stated "that the firm's underwriting standards were becoming shoddier and

that the Company was becoming exposed to losses," according to Mr. Andrukonis and two others familiar with the document.  Mr. Andrukonis "recalled telling Mr. Syron in mid-2004 that the company was buying bad loans that would likely pose an enormous financial and reputational risk to the company and the country."

47.    In particular, Andrukonis repeatedly urged Freddie Mac's management, and Syron in particular, to cease purchasing loans without income or asset requirements, so-called Stated Income Stated Assets ("SISA") or No Income No Assets ("NINA") loans.  In an e-mail to Syron, dated September 7, 2004, Andrukonis expressly recommended that Freddie Mac "withdraw from the NINA market as soon as practicable."  Andrukonis noted that "NINA appears to target borrowers who would have trouble qualifying for a mortgage if their financial position were adequately exposed."  As evidence of this assertion, Andrukonis noted that delinquency rates on these mortgages ranged from 8% to 13%, depending upon the lender, in the first year alone.

48.    Andrukonis was not alone in urging that Freddie Mac stop guaranteeing NINA mortgages.  Freddie Mac's senior credit risk officers advocated to Syron that the Company stop guaranteeing NINA mortgages, in part, because of the high risk of default associated with such mortgages within their first year and because of perceived reputation risk to the Company.

49.    With full knowledge of the risks inherent in these nontraditional mortgages, Syron rejected the advice of his senior credit risk officers and

authorized Freddie Mac's continued purchase of those loans.  He terminated Mr. Andrukonis.

## Freddie Mac Increases Its Subprime Exposure Without Disclosure to Investors

50.    In 2005, Defendants instituted a new program, called the "Expanding Mortgage Conduit", which allowed Freddie Mac to create additional sourcing and aggregation capabilities.

51.    These Freddie Mac strategies and campaigns were given the internal code name of "XMC."  These strategies were intentionally designed: (1) to enable Freddie Mac to buy more and more from the changing mortgage market that was producing nontraditional, high risk mortgages, and (2) to change and/or ignore any quality systems and controls Freddie Mac had previously used to guard against large mortgage losses.

52.    Defendant Richard Syron, Freddie Mac's Chairman and CEO, incentivized by his personal compensation plan, including bonus rewards, led all new campaigns with rousing talks and employee communications.

53.    Defendant Syron and the other Individual Defendants divided the "XMC Strategy" into six categories.  Syron named the strategies the "Six Levers" and each had associated code names and phrases.  The dominant "Lever" was called "TML"—meaning Touch More Loans.  The TML initiative became the guiding corporate strategy to buy more low credit, high-risk mortgages.  The more loans "touched" by Freddie Mac meant larger bonuses for the Defendants Syron, McQuade, Piszel, and Cook.

22

54.     As a means to acquire more low-credit, high-risk loans, Freddie Mac created the Whole Loan REMIC ("WLR") initiative.  The WLR initiative enabled Freddie Mac to purchase loans that otherwise could not be purchased through traditional purchasing and servicing paths and to compete more effectively for whole loan portfolios with private label issuers.

55.     WLR transactions involved the bulk purchase of closed loans in large amounts.  These pools differed in size and structure, as well as in the manner in which sellers of such pools, including Countrywide and Washington Mutual, marketed the selected loans.  Bidders, who included Wall Street investment banking firms as well as Freddie Mac and Fannie Mae, had only five days to review the loans from the time they were offered.  Bidders could reject loans and have them replaced in the pools, but the sheer size and the time pressures imposed upon bidders militated against such practice.  These same time constraints also precluded bidders from reviewing the replacement loans, further militating against replacing loans.  According to Employee A, a senior loan analyst who reviewed portfolio loan purchases through March 2006, it was rare for Freddie Mac to have an opportunity to review a sample of the new loans to confirm they did not have problems of their own.  The replacement loans "wouldn't be looked at, at all."

56.     Freddie Mac did not have the staffing capability to evaluate the loans, so it outsourced the due diligence function to Clayton Group, Inc. ("Clayton"), a company based in Connecticut that reviewed home loans for many

investment banks, as well as for Freddie Mac. Employee A reviewed loans with Clayton.

57. According to Employee A, Clayton applied ratings to each of the loans from the pools, using a system that rated loans on a scale from 1 to 3. Loans rated 1 had "no material exceptions." Loans rated 2 had "non-material exceptions." Loans rated 2W had "material exceptions waived." Loans rated 3C had "only curable material exceptions noted." Loans rated 3 had "material exceptions noted." Loans with any material exceptions (Categories 2W, 3C and 3) did not comply with Freddie Mac's lending standards. Still, Freddie Mac purchased these loans.

58. Throughout the Class Period, according to Employee B, a member of Freddie Mac's technical department who held the position title "Technical Lead" and worked directly on quality control and fraud detection projects from May 2005 through July 2007, Freddie Mac routinely purchased a high percentage of loans where material exceptions had been waived. A typical Loan Disposition Summary, prepared by Clayton in connection with its review of a $124 million pool purchased from Washington Mutual in June 2006, reflected that approximately 25% of the loans in the pool were rated 2W, "material exceptions waived." Another loan summary, prepared for a $145.5 million dollar loan pool, purchased from Washington Mutual in December 2005, reflected that approximately 34% were also 2W. Another loan summary prepared by Clayton with respect to another loan pool purchased from Washington Mutual in June 2006, reflected that over 40% of the loans were again 2W. These exceptions

related directly to the credit-worthiness of the borrower, with the largest categories of exceptions relating, *inter alia*, to appraisals, borrower's income, borrower's assets, and credit history.  Freddie Mac accepted these loans even though they failed to comply, in a material manner, with Freddie Mac's underwriting guidelines.

59.    According to Employee B, based upon his review of similar summaries throughout the Class Period, the percentage of loans with material exceptions waived continued in this range throughout the Class Period.  As Employee C, a Senior Director of IT working with two separate business groups, Analytics and Risk Management until May 2007, explained, this estimate was conservative.  During his tenure at Freddie Mac, the decision to accept loans through granting "exceptions" ballooned to the point that Freddie Mac was buying as many or more loans with exceptions than loans that complied with Freddie Mac's underwriting standards.  This was a source of constant complaints at monthly meetings, held by Senior Vice President of Credit Policy and Portfolio Management Donald Bisenius on the third Tuesday of each month, and attended by 20 to 25 people including, among others, the officers in charge of Mortgage Policy, External Operations Risk Management, including Vice President Michael Wade, and Vice President with Valuation and Pricing responsibilities Bob Ryan.  At one such meeting, recalled Employee C, one Vice President, who was Director of Credit Risk policy, asked: "Why do we even have a credit risk policy if we allow more exceptions than we have compliance?"  The deteriorating quality of Freddie Mac's loans was later confirmed by Defendant Cook, in an investor

presentation on February 28, 2008, wherein she admitted that "the overall credit policy of [Freddie Mac's] 2007 deliveries was worse than 2006."

60.     As a consequence, during the Class Period, a material percentage of loans purchased and then reviewed by Clayton did not satisfy Freddie Mac's lending standards.  Furthermore, according to an article published in the New York Times on January 27, 2008, the large number of exceptions was not disclosed to ratings agencies such as Moody's and Fitch, who gave many of these pools AAA ratings.  Had the extent of the exceptions been disclosed to the ratings agencies, the ratings agencies would not have given the pools such high ratings.

61.     Coinciding with the introduction of Touch More Loans, the Company embarked on two additional initiatives to expand market share:

(a)     First, in February 2005, Freddie Mac introduced a new residential mortgage product called Home Possible, which was geared to low-to-moderate income borrowers (such as teachers, law enforcement personnel, healthcare workers and the military) and permitted lower down payments or higher loan-to-value ratios, among other higher credit risk characteristics, than had previously been allowed. Loans acquired through Home Possible were internally considered to be "subprime-like."

(b)     Second, on August 17, 2005, Freddie Mac internally issued a policy statement authorizing increased guarantees of a Fannie Mae proprietary product called "Expanded Approval" (or "EA") loans.  As of December 2004, Freddie Mac guaranteed the principal and interest on EA loans in the

approximate amount of $69 million. From the first quarter of 2005 through the second quarter of 2008, Freddie Mac increased its total exposure to EA loans from approximately $1 billion to $11 billion (with the largest increase of approximately $8 billion coming between the fourth quarter of 2006 and the fourth quarter of 2007). EA loans were considered to have, at best, credit risk equivalent to A-minus loans and were internally described in this policy statement as (1) "appear[ing] to be subprime in nature[;]" and (2) "high risk ... since performance compares to subprime products."  In fact, on August 20, 2007, in an email that was sent to Cook and others, the Senior Vice President of Credit Policy and Portfolio Management described EA loans as "clearly subprime."

62.     Employee A stated that, in particular, inflated appraisals were common and presented serious problems.  Pursuant to Freddie Mac's charter, it was not permitted to purchase a mortgage where the LTV ratio was greater than 80% without obtaining additional protection.  Defendants knowingly circumvented this restriction by means of inflated appraisals.

63.     According to Employee A, the appraisals on loans purchased by Freddie Mac were either stretched so the loan could meet guidelines or the appraiser made an exception based on some supposedly unique characteristic of the house:

> Appraisals were stretched.  The biggest problem we had was that appraisals were stretched for refinance loans.  [There was] no way the borrower could repay and the lender was giving them more money.

The appraisals purported to show a 70% LTV ratio, "but if you looked closely at the appraisal you saw it was inflated."  In reality, the borrower had closer to a 100

LTV or 125 LTV. He said: "Everyone we spoke with knew the values of homes were going up" too far and too fast. "It was being done by appraisals . . . Every refinance in a neighborhood sets a new and higher comp. At some point it is going to crash and houses will lose value."

64. Freddie Mac also knowingly skirted its 80% LTV requirement by so-called "piggyback loans." As reported in the Washington Post in an article dated December 7, 2007, homeowners were permitted to take out a second loan for the remaining 20%. As a result, such owners were left with no equity and were more likely to default.

65. Freddie Mac did not disclose to what extent mortgages that it purchased were encumbered by piggyback loans until after the close of the Class Period. In its Supplement, dated November 20, 2007, filed in connection with its results for the third quarter of 2007, Freddie Mac disclosed that if such piggyback loans were included in the calculation of the LTV, the percentage of its single-family portfolio with LTV ratios above 90% was 14%, not the 4% as calculated without the piggyback that Defendants had previously reported to the market.

66. During the Class Period, Defendants falsely represented to investors that Freddie Mac delegated underwriting for the single-family mortgages that it purchased. Defendants falsely represented that Freddie Mac provided originators with a series of mortgage underwriting standards and that the originators assured that the mortgages sold to Freddie Mac met those requirements. In fact, a large percentage if not the majority of loans purchased by Freddie Mac did not meet Freddie Mac's underwriting standards.

67.    The  approximate  aggregate  amount  (in  billions  of  U.S.  dollars), measured  by  unpaid  principal  balance  of  C1,  C2  and  EA  loans—loans considered  internally  to  be  subprime  or  have  subprime  risk—on  Freddie  Mac's single-family  credit  guarantee  book  at  the  end  of  the  following  periods  was  as follows:

| Single-Family Guarantee Portfolio | | | | | | | |
|---|---|---|---|---|---|---|---|
| Period | EA | C1 | C2 | Total C1 and C2 | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
| 3Q06 | $2 | $71 | $54 | $125 | $127 | $1,428 | 9% |
| 4Q06 | $3 | $78 | $60 | $138 | $141 | $1,467 | 10% |
| 1Q07 | $4 | $89 | $67 | $156 | $160 | $1,528 | 10% |
| 2Q07 | $6 | $100 | $77 | $177 | $183 | $1,586 | 12% |
| 3Q07 | $8 | $110 | $88 | $198 | $206 | $1,642 | 13% |
| 4Q07 | $11 | $118 | $98 | $216 | $227 | $1,692 | 13% |

68.    Freddie  Mac's  single-family  guarantee  segment  entered  into contracts  with  certain  larger  customers  that  required  the  companies  to  sell  to  or securitize  with  Freddie  Mac  a  specified  minimum  share  of  their  eligible  loan originations,  subject  to  certain  conditions  and  exclusions.  The  purchase  and securitization  of  mortgage  loans  from  customers  under  these  longer-term contracts  had  fixed  pricing  schedules  for  Freddie  Mac's  guarantee  fees  that  were negotiated  at  the  outset  of  the  contract.  Freddie  Mac  referred  to  these transactions  as  "flow"  activity  (the  "flow  channel"),  which  represented  the  majority of  Freddie  Mac's  purchase  volumes  during  the  Class  Period.  The  remainder  of

Freddie Mac's purchases and securitizations of mortgage loans during the Class Period occurred in "bulk" transactions for which purchase prices and guarantee fees were negotiated on an individual transaction basis.

69.     During a June 7, 2007 Board committee meeting attended by Cook and others, the following information was presented:

- As of January 2007, approximately 40% of Freddie Mac's flow channel purchases came through Fannie Mae's own proprietary automated underwriting system, called Desktop Underwriter ("DU"), and through an automated underwriting system used by Countrywide Financial Corporation ("Countrywide"), called "CLUES."

- "Countrywide is particularly volatile and a high proportion of defects are subprime in nature[.]"

- The defect rate for Freddie Mac's purchases through both DU and CLUES at that time was at least 20%.

70.     During the Class Period, one of Freddie Mac's largest customers was, as noted above, Countrywide.  Countrywide organized its business into two channels - the "Retail" channel and the "TPO" (third-party originator) channel. Countrywide's Retail channel included Full Spectrum Lending. Full Spectrum Lending was a subprime lending division.  From 2005 forward, Freddie Mac substantially increased its exposure to loans from Full Spectrum Lending. Between 1999 and 2004, Freddie Mac acquired loans from Countrywide's Full Spectrum Lending division in the aggregate amount of approximately $279 million. From 2005 through 2008, Freddie Mac acquired approximately $12 billion of Full Spectrum Lending loans, with the largest increase between 2006 (approximately $3 billion) and 2007 (approximately $6 billion).

71.     Countrywide delivered loans from both of its origination channels to Freddie Mac.  Countrywide Retail deliveries to Freddie Mac included approximately $3 billion worth of loans from Full Spectrum Lending in 2006; $6 billion in 2007; and $2 billion in 2008.

72.     According to Employee C, Countrywide and Washington Mutual, two banks from which Freddie Mac purchased a high percentage of loans, were well known for the low quality of their loans.  Stated Employee D, a Senior Administrative Coordinator from July 2006 through May 2007, "Countrywide was well known in the market to generate a lot of subprime and predatory loans.  If you deal with them you are going to get bad loans, period."  Nevertheless, "Freddie Mac had to compromise on loan quality to keep Countrywide and Washington Mutual business."  "Freddie Mac couldn't afford to drop them because they were too big," and Freddie Mac had "to cater to lenders to keep them happy."

73.     Beginning in or about 2004, in addition to purchasing and guaranteeing the payment of principal and interest on loans that had been underwritten using Loan Prospector, Freddie Mac increasingly purchased and guaranteed mortgage loans underwritten through other proprietary AUSs.  For example, Freddie Mac purchased and guaranteed mortgage loans underwritten using AUSs such as Fannie Mae's Desktop Underwriter and Countrywide's CLUES.

74.     To assess the relative risk of mortgages underwritten through other AUSs, Freddie Mac used an internal modeling system called LP Emulator to

approximate how the loans would have scored under Loan Prospector. LP Emulator used the same scoring metric as Loan Prospector - Accept Loans (A+, A1, A2 and A3) and Caution Loans (C1 and C2) - but LP Emulator was run on a loan after Freddie Mac had agreed to guarantee the loan. Using LP Emulator, Freddie Mac could identify a loan that would have been designated as a Caution Loan if underwritten through Loan Prospector, but had instead been guaranteed on terms equivalent to an Accept Loan after being underwritten through another AUS. Loans falling into this category were deemed to have a "defect." Beginning in 2004, Freddie Mac tracked the "defect rate" of loans acquired through other AUSs.

75.     In the second quarter of 2003, before Freddie Mac increased its purchases through AUSs other than Loan Prospector, Freddie Mac's aggregate defect rate was approximately 1%. Freddie Mac's purchase and guarantee of mortgages underwritten through other AUSs increased to the point where it was acquiring fewer loans through Loan Prospector (approximately 27%) than through Fannie Mae's Desktop Underwriter (approximately 31%). The defect rate rose dramatically, and in August 2007, the aggregate defect rate reached a historical high of approximately 22%.  Approximately 22% of the loans Freddie Mac purchased and guaranteed that were underwritten through other AUSs therefore met the Freddie Mac internal definition of subprime.  Beginning in or about early 2007, executive-level reports prepared for monthly meetings of Freddie Mac's Enterprise Risk Management Committee (the "ERMC") attended by senior executives at Freddie Mac observed that "[l]oan level risk grades are

blurred as capital retreats in [the] subprime market, increasing the risk that we are already purchasing subprime loans under existing acquisition programs." This language continued to appear in essentially the same form in these reports throughout 2007. Syron, Piszel, and Cook generally attended these ERMC meetings.

76.     In February 2007, Freddie Mac's senior executives, including the Syron, Piszel, Cook and the SVP for Credit Policy, attended a two-day offsite meeting.  A presentation used at the meeting stated the following:

> Freddie Mac was "taking on more risky product ... and combining higher-risk loans with higher-risk borrowers[.]"

> Freddie Mac was purchasing and guaranteeing increasing amounts of "risk layering" loans, "leading to more 'Cautions[.]'"

> "'Caution' loans have greater default costs ... resulting in higher expected losses[. ]"

> Freddie Mac "already purchase[d] subprime-like loans ... but with considerably lower fees[.]"

> The "worst 10% of [Freddie Mac's] Flow Business" were "subprime-like loans[.]"

77.     In March 2007, Freddie Mac's senior executives, including Syron, Piszel, Cook and SVP for Credit Policy, attended a Board of Directors meeting. Cook and the former President and Chief Operating Officer led a discussion at the meeting concerning a slide in which the "worst 10% of [Freddie Mac's] Flow Business" was listed as an example of "subprime-like loans" the company already purchased, and in which they conveyed:

> "We already purchase subprime-like loans to help achieve our HUD goals ... [but we receive considerably lower fees than subprime loans would fetch in the market."

"Some of our current purchases have subprime-like risk[.]"

"[F]ixed-rate subprime doesn't look all that different than the bottom of our purchases, with returns five to six times as great, not universal for all subprime."

78.     The same day that Freddie Mac released the 2006 Annual Report, it held an earnings conference call with research analysts. On the earnings conference call, Freddie Mac's CFO discussed the company's "very low levels" of credit-related expenses, and attributed that "to the fact that our portfolio is predominantly based on long-term fixed-rate mortgages, our overall average LTV ratio is about 57%, and we have little to no exposure to the subprime risk layered mortgage products that have drawn so much activity lately."

79.     At December 31, 2006, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $141 billion of C1, C2 and EA loans, which equated to approximately 10% of Freddie Mac's single-family credit guarantee portfolio. As described above, Freddie Mac disclosed in its 2006 Annual Report that the number of subprime loans underlying the PCs and Structured Securities in its single-family credit guarantee portfolio was "not significant."

80.     During 2007, Freddie Mac internally explored the possibility of offering a new product, referred to as the "model subprime offering."

81.     One project undertaken by the team charged with developing the model subprime offering involved an analysis of Freddie Mac's existing products. Those existing products were compared to the proposed parameters for purchasing and guaranteeing mortgages under the model subprime offering.

Under the direction of Freddie Mac's SVP for Credit Policy, the team concluded in June 2007 that:

> "Subprime mortgages are not considered unique in the industry. An analysis of Freddie Mac's existing products indicates our current A-minus offering has credit risk and product parameters (business terms) that match, and in some cases, are broader than those outlined in the proposed model Subprime offering."

> The model subprime offering "will compete with affordable offerings like Home Possible and [Fannie Mae's] My Community Mortgage, as well as our LP A-minus offering and [Fannie Mae's] newly revamped EA program."

82.     Senior executives and officials within Freddie Mac, including Employee C, were aware of the conclusions of this analysis.

83.     On May 11, 2007, the then-head of External Reporting, in an e-mail including Freddie Mac's SVP for Credit Policy, among others, remarked on a draft version of a speech to be given by Freddie Mac's CEO at the UBS Global Financial Services Conference (the "UBS Conference"): "We need to be careful how we word this. Certainly our portfolio includes loans that under some definitions would be considered subprime. Look back at the subprime language in the annual report and use that as a guide as what to say. Basically, we said we don't have a definition of subprime and we don't acquire loans from subprime lenders. We should reconsider making as sweeping a statement as we have 'basically no subprime exposure.'"

84.     On May 14, 2007, Syron spoke at the UBS Conference (the "May 14 speech") and stated: "As we discussed in the past, at the end of 2006,

Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio."

85.     On May 17, 2007, Freddie Mac's Cook gave a speech at the Lehman Brothers 10th Annual Financial Services Conference and stated: "As we discussed in the past, at the end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio."

86.     Freddie Mac's single-family credit guarantee portfolio is the Company's largest business segment (by portfolio unpaid principal balance), which purchases and guarantees the payment of principal and interest on mortgage loans originated by lenders and packages such loans into mortgage-backed securities. Freddie Mac's retained portfolio is under the Company's Investments segment, and holds mortgage-related securities and single-family mortgages for investment purposes.

87.     Prior to June 14, 2007, Freddie Mac did not publicly disclose its quantitative exposure to Alt-A loans.  On June 14, 2007, Freddie Mac held its first quarter of 2007 financial results conference call with research analysts. In response to an analyst's question, Freddie Mac's CBO stated "[t]he mix of our portfolio that is defined as Alt-A by our customers, because that is really the only way you get at that designation, we would estimate that maybe 5 percent or less of our portfolio that comes through flow is Alt-A, and on the bulk business it is about 2. So I am comfortable saying it is less than 10."

88.    On August 30, 2007, in its 2Q07 information supplement, Freddie Mac disclosed the following:

> Many mortgage market participants classify single-family loans that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category or may be underwritten with lower or alternative documentation than a full documentation mortgage loan. Although there is no universally accepted definition of Alt-A, industry participants have used this classification principally to describe loans for which the underwriting process has been streamlined in order to reduce the documentation requirements of the borrower or allow alternative documentation. We principally acquire mortgage loans originated as Alt-A from our traditional lenders that largely specialize in originating prime mortgage loans. These lenders typically originate Alt-A loans as a complementary product offering and generally follow an origination path similar to that used for their prime origination process.
>
> In determining our Alt-A exposure in loans underlying our single-family mortgage portfolio, we have classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements which indicate that the loan should be classified as Alt-A. We estimate that approximately $120 billion, or eight percent, of loans underlying our single-family mortgage portfolio at June 30, 2007 were classified as Alt-A mortgage loans. For these loans, our average credit score was 715 and our estimated current LTV ratios were 71 percent.

89.    The same day that Freddie Mac released the 2Q07 information supplement, it held a financial results conference call with research analysts. On the conference call, Defendant Piszel said: "On mortgage product concentrations, we have low exposure to all day [sic] and risk-layered loans, and when taken together, these represent about 8 percent of the total single-family guarantee portfolio. On the Alt-A side, as of the end of June, we guaranteed $120 billion of loans that were either identified by the originator as Alt-A or had reduced levels of documentation."

90.     At June 30, 2007, Freddie Mac's Single Family credit guarantee portfolio consisted of approximately $462 billion of reduced documentation loans, which equated to approximately 29% of Freddie Mac's single-family credit guarantee portfolio.  Only a portion of these loans were included in Freddie Mac's disclosed amount of $120 billion.

91.     Freddie Mac's quantification of its Alt-A exposure was derived from seller-identified loans and an internal model known as DEFCAP that was used to calculate its guarantee obligation. Certain reduced documentation loan programs were not flagged as "low-or no-doc" loans within the DEFCAP model based upon determinations made at the time. Those determinations were not reviewed in connection with providing public disclosure of the company's exposure to Alt-A loans. As such, those loans were not included in Freddie Mac's quantification of its Alt-A exposure in its 2Q07 information supplement.

92.     On October 15, 2007, Freddie Mac's Vice President, Customer Facing Models and Analytics, wrote an e-mail in which he stated: "It is said that Countrywide 'Fast and Easy' loans, for example, have ... morphed into some aggressive true 'Low Doc' dimensions more recently." However, Freddie Mac determined not to flag Countrywide's Fast and Easy loans as "low- or no-doc" in the DEFCAP model; thus, they were not included in the quantification of Alt-A loan exposure that Freddie Mac provided in its public disclosures.

93.     Employee E, a Senior Risk Analyst from September 2006 through February 2007, created a Non-Performing Loan ("NPL") Report, distributed at a meeting held in the middle of each month by Senior Vice President Shelley

Poland, and attended by the entire Credit Policy and Portfolio Management Group, as well as Senior Vice President Bisenius.  The summary page identified the overall rate of NPL and what appeared to be the current drivers for NPL and included credit metrics such as FICO scores and LTV ratios.  The summary also identified the sellers of loans to Freddie Mac who were disproportionately providing loans that went bad.  Another set of metrics reviewed in the reports included how quickly loans went into default, how often those loans were brought back current by borrowers (also known as "Roll Rate"), and how often the loans went into foreclosure.  Employee E recalled that Countrywide and Washington Mutual were consistently among the largest sellers of loans to Freddie Mac and they also consistently had among the highest levels of NPL.

94.     As Freddie Mac expanded its market share, the percentage of adjustable rate mortgages that it purchased each year rose from 7% in 2005, to 16% in 2006, and to 30% in 2007, according to the supplement filed by Freddie Mac in connection with its year-end results for 2007.  Nontraditional mortgage products made up approximately 24% of Freddie Mac's securitization volume for the first nine months of 2006 and 33% of the volume for the first nine months of 2007.

95.     In its retained portfolio, by the end of the third quarter of 2007, the percentage of interest-only loans in Freddie Mac's retained portfolio had nearly doubled from 5% to 9%.  The total percentage of ARMs, Option Arms, Balloon Resets, Interest-Only, and "Other" Loans, according to the supplement filed by Freddie Mac at the end of that period, totaled 17%.   Interest-only loans

accounted for 23% of securitization volume in the first three quarters of 2007, up from 14% in the corresponding period in 2006.

96.    The purchase of these products caused further due diligence problems for Freddie Mac because its evaluative software, Quantum, was antiquated and did not have fields for new products.  For example, while Quantum had algorithms to evaluate a 30-year fixed mortgage, it had no data to evaluate a 50-year mortgage.  Freddie Mac was aware of the deficiencies in its software.  An Architecture Assessment, prepared by Freddie Mac's External Operations Risk Management Group ("EORM") in late 2005, identified the problems of Quantum and Freddie Mac's other evaluative software and devised a plan to replace it by the beginning of 2007 due to, according to a document entitled "Whole Loan Remic – Pre-funding Due Diligence Reporting Architecture" "unsupported software and the specialized skills [required] to maintain it**.**"

97.    In this Assessment, Freddie Mac stated that Freddie Mac's "business process and technical needs [were] continuously changing as Freddie Mac purchase[d] new products."  Nevertheless, Freddie Mac recognized that its "Quantum system used legacy technology.  It [did] not provide the flexible support to accommodate new products, data quality controls, accurate and timely reporting capability, and integration with other Freddie Mac systems."  According to the Assessment, the "legacy system does not meet business needs."

98.    Among its flaws, Quantum could not "anticipate changes to the system to address impacts to policy, process, procedures, and technology," and could not "integrate with [Loan Prospector] and other systems, including DPM

and Midas."   In particular, according to Employee B who worked on this Assessment, Quantum could not handle Stated Income Stated Asset ("SISA") loans; Employee F, a Manager of Operations and Servicing Manager for Non-Performing Loans through March 2007, also recalled that "in meetings we discussed that the new loan programs, particularly the large number of ARMs, were going to contribute to problems."  Freddie Mac software could not "accept" ARMs, they could only process fixed rate loans. "There were no systems to do ARM loans."  Employee G, a Freddie Mac employee from 2000 to March 2007 who was a Project Manager for a project, never completed, to replace "legacy" software, confirmed that Freddie Mac software could not handle any of the "newer loan products" such as option ARMs.

99.    The inability to handle nontraditional loan products exposed Freddie Mac to a great deal of risk because it meant that Freddie Mac could not effectively track problems in these loans.   As a result, underwriters were manually inserting fields and exceptions into the underwriting software, without any empirical basis or reliable theoretical basis.  The Assessment recognized that this resulted, among other things, in inconsistency, duplicate or redundant datasets, and poor data integration.  This permitted underwriters to circumvent, and lower, Freddie Mac's underwriting standards (to the extent that *any* uniform standards existed for these new, nontraditional products).

100.   As Freddie Mac admitted in its subsequent disclosures, these nontraditional mortgages defaulted at a far greater rate than traditional mortgages.   Indeed, overall, the loans in Freddie Mac's portfolio defaulted at an

41

increasingly faster rate in 2006, and then again in 2007. For example, in 2005, the percentage of delinquent subprime loans in Freddie Mac's portfolio did not reach 5% until the loans were aged 16 months. In 2006, Freddie Mac's delinquencies reached 5% after 12 months. In 2007, delinquencies reached that figure in 8 months. The rate of delinquencies is significant, because the earlier a large percentage of loans default, the greater the likelihood that the loan pool, overall, will be plagued by a larger number of delinquencies in the future.

101. With respect to Alt-A loans, 60-day delinquencies reached 2% in 22 months in 2005, in 14 months in 2006, and in 8 months in 2007. During this period, Defendants did not disclose that the rate of delinquencies was accelerating, and that, notwithstanding the acceleration of delinquencies, Freddie Mac was increasing its purchase of nontraditional loans. To the contrary, as discussed below, Defendants announced in February 2007 that it would *tighten* its lending standards with respect to subprime debt and that it would cease buying certain nontraditional loans after September 1, 2007. Moreover, they specifically disclaimed that the reason for doing so was related to risk exposure. For example, Defendant Syron told the market in March 2007 that "we took this step not out of concern for our exposure to these products" but "out of a desire to lead the market from a mission perspective."

102. In fact, in 2007, Freddie Mac increased the number of low quality loans that it purchased. *After* the third quarter of 2007, Freddie Mac disclosed that the percentage of loans to borrowers with FICO scores below 620, the percentage of loans with LTV ratios above 90%, and the percentage of loans

42

used to refinance a mortgage other than a cash-out refinance, had all increased 50% over the comparable period in 2006.  Rather than acting merely as a stabilizer, Freddie Mac was an increasingly aggressive participant in the subprime market.

103.  All of these figures were routinely reported to Freddie Mac's management and its board of directors.  Employee H, a financial analyst for operations from April 2006 through May 2007, helped prepare a monthly report for the board.  Each report included purchases, loan payoffs, delinquencies and portfolios.

104.  Defendants excused Freddie Mac's participation in the subprime market by asserting that virtually all of its subprime debt was rated AAA by the ratings agencies.  However, as alleged above, the ratings agencies were not given all material facts by Defendants when they gave such ratings.

105.  Freddie Mac was concealing more than the lowering of its credit standards with regard to subprime and nontraditional mortgages.  A significant portion of the loans Freddie Mac purchased were plagued by fraud.  According to Employee I, an operational risk manager who worked in Freddie Mac's Fraud Investigation Unit ("FIU") from February 2006 through May 2007, Freddie Mac had no automated system to detect fraud on a large scale.  Fraud detection was done manually, reviewing random samples.  For the most part, fraud was not detected proactively, but reactively, after a number of loans from the same source had defaulted.

106.    According to Employee C, fraud detection was basically just an "ad hoc system."  Fraud detection at Freddie Mac "was underfunded forever.  The assumption was that the lender [who sells loans to Freddie Mac] is responsible for fraud detection."  There appeared to be a concern at Freddie Mac that if they did too much fraud detection or developed too solid a fraud detection competency "we might be accepting responsibility" for fraud detection, rather than maintaining the argument the responsibility lay with lenders.  The FIU only had three, or at most four, members, so it lacked the manpower to review the huge volume of loans purchased by Freddie Mac or large numbers of cases of fraud.  That team only found approximately a handful of cases involving fraud every year, even though Freddie Mac purchased more than 1 million loans per year.  For example, in a fourth quarter report for the year 2005 to OFHEO, the FIU disclosed seven instances of fraud, at a time when Freddie Mac was processing 160,000 loans per month.

107.    According to Employee I, OFHEO notified Freddie Mac in 2006 that it needed to analyze its loans for mortgage fraud on a much larger scale using data mining technology.  Employee B was part of the project, named "Fraud Prevention & Reporting (AIM ID:6QRMC8)," created to address this problem.  Among the objectives of this project, according to its Charter prepared in June 2006, were to "incorporate fraud risk scores into sampling algorithms for Quality Control" and to "alleviate the audit finding deficiency around the lack of data mining techniques and enable the Fraud Investigation Unit to be more proactive in detecting fraud and minimizing losses to Freddie Mac."

108.    The importance of the project was revealed in or about July 2006 when Employee B attended an in-person meeting with Wade Wilson (a Freddie Mac Vice President), the FIU, other members of EORM, and representatives from a company called CoreLogic, Inc. ("CoreLogic").  CoreLogic is one of the premier companies involved in analyzing loan and borrower data to identify mortgage fraud.  Mortgage fraud includes borrower or broker misstatements about the borrower's income, employment, assets and other obligations. CoreLogic is based in Sacramento, California but also employs an expert mathematician based in Virginia, and this mathematician attended the meeting along with executives from CoreLogic's headquarters in California.

109.    At this July 2006 meeting, the CoreLogic mathematician explained that based on publicly available information about the Freddie Mac loan portfolio and models CoreLogic built and tested against mortgage originators' portfolios, "he estimated that 10% of Freddie Mac loans had been obtained based on some level of fraud."  The meeting was convened to discuss a plan to have CoreLogic fully analyze Freddie Mac loans and give Freddie Mac an assessment of how many of its loans were infected by fraud.  CoreLogic has an automated system to check loans and loan applications for fraud using a large number of data points, including borrower zip code, social security numbers and other borrower Personal Private Information ("PPI").

110.    Subsequent to this meeting, Employee B examined six sample pools for fraud to test CoreLogic's estimate.  These statistical samples confirmed CoreLogic's determination that 10% of Freddie Mac's loans were infected by

fraud.  In or about October 2006, senior executives of CoreLogic flew to Virginia and met directly with Defendant Syron.  As part of a Touch More Loans project, Syron green lighted the retention of CoreLogic and the application of data mining software to identify fraudulent loans.

111.   Freddie Mac immediately began working on mechanisms to allow CoreLogic to review every loan that Freddie Mac processed.  As of November 2006, the technical issues were solved and Freddie Mac had a means to transmit data securely to and from CoreLogic for purposes of conducting the mortgage fraud analysis.

112.   According to Employee B, Defendants almost immediately reversed course, slowing the project down by limiting CoreLogic's review to substantially smaller samples, and then stopping it altogether.  Freddie Mac was required by its charter to report any instance of fraud to the Justice Department within thirty days of discovering it.  Defendants limited the sample size of loans to be analyzed by CoreLogic in part because they were afraid that Freddie Mac did not have the resources to report all the fraud they were going to find to the Justice Department.

113.   As of June 2007, the CoreLogic system still had not been implemented.

114.   On May 25, 2006, Cook attended a meeting of the Board's Finance and Capital Deployment Committee. Prior to that meeting, she received a memorandum authored by the Company's then-Chief Enterprise Risk Officer, highlighting for her and the other attendees that "[t]he credit parameters of new

single-family purchases continue to decline. In order to support our business strategies to increase customer focus, build market share and meet affordable goals, we continue to expand credit policies and increase purchases of higher-risk products."

115. Six days later, on May 31, 2006, Syron and Cook attended a meeting of the Board's Mission, Sourcing and Technology Committee, where it was highlighted that the Touch More Loans strategy had resulted in significantly greater credit risk to the Company. Specifically, a presentation made by a senior credit risk officer stated that, pursuant to Touch More Loans, Freddie Mac was "expanding our appetite" for, among other things, risk layering of lower FICOs, higher LTV's, other AUSs, and other high-risk loans. To the extent it was not already clear to them prior to the meeting, Syron and Cook also were informed that the Company was loosening its underwriting standards through its implementation of the Touch More Loans strategy by, among other things, increasing exceptions to the Company's existing credit policy exceptions that had almost tripled between 2004 and 2005, from 286 in 2004 to 770 in 2005.

116. On November 30, 2006, internal memoranda reflected that loans from Fannie Mae's Desktop Underwriter "have a much higher percent of defect loans, loans that are subprime-like, loans that have very low FICOs" in referring to loans that contributed to the increasing "defect rate" at the Company.

117. On December 7, 2006, Syron and Cook attended a meeting of the Mission, Sourcing and Technology Committee of the Board of Directors. Attached to a presentation prepared for that meeting was a glossary of terms, the

47

purpose of which was to inform the Board of how management used certain terms. The glossary defined "Subprime Mortgages" as follows:

> There is no longer a clear-cut distinction between prime and subprime mortgages as the mortgage market has evolved to provide for mortgage credit to a full range of borrowers with a variety of products and processes. Subprime mortgages generally are mortgages that involve elevated credit risk.  Whereas prime loans are typically made to borrowers who have a strong credit history and can demonstrate a capacity to repay their loans, subprime loans are typically made to borrowers who have a blemished or weak credit history and/or a weaker capacity to repay.

118.   Ultimately, during the Relevant Period, the Company's public subprime disclosures were inconsistent with how management characterized its use of the term "subprime" for its own Board members.

119.   Beginning on or about January 18, 2007, Freddie Mac's ERMC began to report on Freddie Mac's exposure to subprime loans.  Attendees of the January 18 ERMC meeting, including Syron and Cook, were told that "[l]oan level risk grades are blurred as capital retreats in [the] subprime market, increasing the likelihood that we are already purchasing subprime loans under existing acquisition programs."  Accordingly, this presentation reinforced to attendees of this meeting that it was likely that Freddie Mac already was purchasing loans with credit risk characteristics similar to loans originated by self-identified subprime originators, and that market participants would consider to be subprime loans. The ERMC met monthly after this and Syron and Cook generally attended ERMC meetings. Going forward, the ERMC reports consistently contained this same warning. Syron typically received the ERMC reports in advance of the meetings and generally reviewed them prior to the meetings.

120.   On February 6 and 7, 2007, Syron gathered his Senior Executive Team, including Defendants Cook, Piszel and McQuade, for a two-day offsite planning meeting in Florida to discuss Freddie Mac's strategic direction.  Cook attended as a member of the SET.  At least one presentation was devoted to Freddie Mac's role in the subprime market. That presentation highlighted for attendees the following regarding Freddie Mac's exposure to subprime:

> Freddie Mac "already purchase[s] subprime-like loans ... but with considerably lower fees[,]" which attendees generally understood meant that Freddie Mac was purchasing loans with credit risk and expected default rates similar to the loans originated by a small handful of institutions that self-identified as subprime originators.

> The "[w]orst 10% of [the Single Family] Flow Business" – which comprised approximately 70 percent of Single Family purchases in 2006 - were "subprime-like loans."

> Freddie Mac was purchasing greater percentages of "risk layer[ed]" loans, defined as loans consisting of total LTV greater than 90 percent and FICO scores less than 680, which was "leading to more 'Cautions'" and a higher "[d]efect rate."

> "'Caution' loans have greater default costs ... resulting in higher expected losses[.]"

121.   On February 17, 2007, Syron received and responded to an email from Donald Bisenius, a senior vice president, regarding a new "Subprime Project."  Bisenius told Syron and others that an expanded role in the subprime market only made sense if Freddie Mac was adequately compensated for the risk.  He reminded Syron and others that there were certain categories of loans, including "free cautions," that the Company already purchased but did not receive adequate compensation for the risk.

49

122.    On March 2 and 3, 2007, Syron, Cook Piszel and McQuade attended a two-day Board of Directors meeting, a significant portion of which was dedicated to the Company's strategic direction in subprime. Cook was one of the presenters at the Board meeting and she, along with defendant McQuade, presented similar information to the Board as contained in the February 6 and 7 offsite meeting. Specifically, Cook and the then-Chief Operating Officer led a discussion at the meeting concerning a slide in which the "worst 10% of [Freddie Mac's] Flow Business" was listed as an example of "subprime-like loans" the Company already purchased, and in which they conveyed:

> We already purchase subprime-like loans to help achieve our HUD goals ... [b]ut we receive considerably lower fees than subprime loans would fetch in the market.

> Some of our current purchases have subprime-like risk[.]

> [F]ixed-rate subprime doesn't look all that different than the bottom of our purchases, with returns five to six times as great, not universal for all subprime.

123.    In addition to receiving at least the SET and Board materials referred to above in Paragraphs 120 and 122, which highlighted, among other things, that a material portion of the Single Family business was "subprime-like," and monthly ERMC reports which repeatedly warned of the increasing risk that Freddie Mac was buying subprime loans (and showed data suggesting that the credit risk of the principal and interest of loans to be securitized by Freddie Mac was increasing to historic proportions), Syron also was aware at least as early as February 17, 2007 of Freddie Mac's efforts to develop a model subprime offering targeted at customers of self-identified subprime originators.

124.  By at least early April 2007, Bisenius transitioned into a new role at Freddie Mac, where he was placed in charge of developing a Model Subprime Offering that was later publicly known as a product called "Freddie Mac Safe Step Mortgages," to give subprime borrowers a more consumer-friendly mortgage option.

125.  Although the Model Subprime Offering purportedly had been developed as an alternative to subprime products, Freddie Mac personnel, including Syron and Cook, recognized that it actually competed with existing programs that Freddie Mac had internally recognized as "subprime," "otherwise subprime," or "subprime-like."

126.  On April 12, 2007, a Senior Vice President proposed abolishing Freddie Mac's A-minus Program - which was long-recognized as subprime - "so as to not canabalize [sic] our [Model Subprime Offering]."

127.  By mid-April 2007, this Senior Vice President also knew that the credit characteristics of loans to be guaranteed under the Model Subprime Offering were similar to those of other existing Freddie Mac programs in addition to the A-minus Program, such as Home Possible and Fannie Mae's EA program, which he was well aware internally were perceived as programs that exposed Freddie Mac to subprime or subprime-like loans - as he had used those same descriptions for those programs.

128.  Bisenius regularly briefed Cook on the Model Subprime Offering. Cook requested these briefings to discuss the role of the Company's existing Single Family guarantee programs relative to the Model Subprime Offering.  At a

briefing on April 20, 2007, Bisenius highlighted that there were "alignment" issues between the Model Subprime Offering loans and Freddie Mac's existing loan programs.

129. On May 16, 2007, Bisenius sent an e-mail commenting on a set of recommendations regarding certain of Freddie Mac's current offerings as related to the Model Subprime Offering. In the email, Bisenius observed that the recommendations did not "address DU approves or Proprietary AUS approves that we think are subprime (ie., [sic] they would score Caution in LP) and therefore might compete with our model offering."

130. On June 7, 2007, Cook and Bisenius attended a meeting of the Board's Mission, Sourcing and Technology Committee, where it was conveyed that:

> Certain higher risk loans sold to Freddie Mac through other AUSs were equivalent to subprime.
>
> Freddie Mac-securitized loans obtained through Fannie Mae's Desktop Underwriter had a "higher share of low FICO loans and subprime-like loans" relative to other AUS loans.
>
> Loans sold to Freddie Mac through Countrywide's CLUES were "particularly volatile" and, in particular, of those loans sourced through CLUES that were later scored by Freddie Mac's LP Emulator as "Caution," (called "defect loans" for their contributions to the "defect rate"), a high proportion of such loans were "subprime in nature."

131. On or about June 11, 2007, Cook and others received an "Executive Summary" sponsored by Bisenius, that stated that the Model Subprime Offering would compete with existing loans the Company acquired and guaranteed, such as "[Freddie Mac's] affordable offerings like Home Possible and [Fannie Mae's] My Community Mortgage, as well as our LP Loan Prospector

A-minus offering and [Fannie Mae's] newly revamped EA program."  The Executive Summary also highlighted that:

> Subprime mortgages are not considered unique in the industry.  An analysis of Freddie Mac's existing products indicates our current A-minus offering has credit risk and product parameters (business terms) that match, and in some cases, are broader than those outlined in the proposed model Subprime offering.

Cook attended the meeting of the New Products Committee where this Executive Summary was discussed.

132.  At the September 25, 2007 ERMC meeting, both Syron and Cook were told that the defect rate of purchases, which had been steadily rising, had increased from approximately 13% at the end of June 2007, to 19% in July 2007, to approximately 22% in August 2007.  The presentation highlighted for Syron and Cook that principal drivers of the defect rate were low FICOs and high LTVs.  Syron and Cook were presented with similar facts at the October 23, 2007 ERMC meeting.

133.  Additionally, on September 26, 2007, Cook received a memorandum describing how the Model Subprime Offering would be positioned for marketing purposes. The memorandum noted that the Model Subprime Offering was consistent with Freddie Mac's "longer term corporate 'touch more loans' strategy to expand into adjacent markets" and that the offering would replace Freddie Mac's A-minus loan program.

## 2.  Defendants' Material Omissions

134.  On November 20, 2007, Freddie Mac finally revealed what it had knowingly or recklessly failed to disclose during the Class Period:

(a)    that it in fact had heretofore unrevealed substantial involvement in the nontraditional low credit mortgage industry;

(b)    that at least $200 billion of its $700 billion mortgage portfolio was at high risk of substantial losses; and

(c)    that for just the 3 months ending September 20, 2007, Freddie Mac had incurred a record $2 billion loss on its mortgage investments, with more significant losses expected.

135.   As discussed above, Freddie Mac's third quarter losses disclosed on November 20, 2007 showed that Freddie Mac faced a previously non-disclosed yet serious financial risk from its conscious decision to increase its exposure to subprime and nontraditional mortgages.

136.   The 2008 OFHEO Report to Congress issued April 15, 2008 later confirmed the undisclosed risk, stating in part:  "Throughout 2007 and at a level much higher than management's plan, the Enterprise continued to purchase and guarantee higher-risk mortgages."    The OFHEO Report also states: "Deterioration in credit quality reflects both market developments and management's strategic decision to purchase and guarantee certain single-family mortgages originated in 2006 and 2007 with higher-risk characteristics.    In addition, mortgage credit declines resulted in substantial deterioration in the fair value of the subprime and Alt-A and AAA securities portfolios."

137.   Defendants, having made representations regarding the risks Freddie Mac faced relating to subprime and nontraditional mortgages and its ability to manage them, were under a duty to disclose fully those risks.  Instead,

they intentionally omitted disclosure of both the nature and extent of those material risks, and their ability to control or manage them.

138.    During the Class Period, Defendants concealed the following information, causing their statements to be materially false and misleading:

(a)    that with respect to a large percentage of loans, Freddie Mac had not adhered to its own underwriting standards, but had acquired loans that failed to meet such standards in a material manner;

(b)    that ratings agencies which had rated certain securities acquired by Freddie Mac as AAA, had not been informed that a material percentage of whole loans purchased had material "exceptions" that had been waived;

(c)    that Freddie Mac's underwriting software was obsolete and that it could not reliably assess nontraditional mortgage products, and that Freddie Mac underwriters were manually altering the software without any reliable basis;

(d)    that Freddie Mac was increasing the amount of subprime and nontraditional loan products that it was purchasing in 2006 and 2007, notwithstanding its commitment, in February 2007, to withdraw from such market by September 2007;

(e)    that delinquencies in its newer loans were increasing at a rate faster than the rate experienced by Freddie Mac's prior loans;

(f)    that Freddie Mac had no reliable systemic mechanism to detect fraud on any meaningful scale;

55

(g)    that Defendants had determined that at least 10% of Freddie Mac's loans were infected by some form of fraud; and

(h)    that, as a result, the business of Freddie Mac was far riskier than Defendants had disclosed, and investors were incapable of measuring accurately the true financial performance and risk of Freddie Mac's business.

### 3.    Defendants' Misrepresentations During the Class Period

139.    Before and during the Class Period leading up to November 20, 2007, Defendants made numerous misrepresentations intended to convey that Freddie Mac did not have significant subprime and nontraditional exposure and that they knew how to and were managing those risks effectively.

140.    On January 24, 2006, in a Company press release entitled "Freddie Mac Chairman and CEO Richard Syron Discusses Company's Risk Management, Vital Role in America's Housing Finance System," Defendant Syron falsely claimed:

> Freddie Mac continues to manage interest-rate and other risks prudently, and provides highly transparent and timely disclosures on its risk-management measures.

141.    On February 1, 2006, at a Citigroup Financial Services Conference, Defendant McQuade misrepresented Freddie Mac's risk position, stating  in part:

> [Slide 18] Over the course of the past year, we've all witnessed a steady increase in the number of questions about credit quality. This isn't surprising, given the sharp run-up in house prices, the changing nature of mortgage products and the higher interest-rate environment. ***Notwithstanding these trends, it is hard to over-***

> ***emphasize how strong our current credit risk position is.***[2]  It
> seems that all the traditional indicators are in our favor.  . . .
>
> * * *
>
> ***Not only are the typical risks in check, our exposure to
> emerging concerns is as well, as we continue to display a low
> level of activity in IO mortgages and neg am structures relative
> to the market as a whole.***  Based on these facts, and excluding
> the effects of Katrina and Rita, we expect 2006 credit losses to
> increase somewhat from those experienced in 2005, but to remain
> very low relative to historic levels.  ***So we are very well positioned
> on the credit side of our portfolio.***
>
> * * *
>
> Freddie Mac is one of the largest issuers of callable debt in the
> world. . . As this slide shows, our callable debt financing is
> equivalent to about half of the fixed-rate mortgage convexity in our
> retained mortgage portfolio.  ***We think this positions us well to
> continue managing our downside risks and capturing the long-
> term risk-adjusted returns we anticipate in adding mortgages
> to our balance sheet.***
>
> * * *
>
> We at Freddie Mac are ready to supply this growing market, and we
> have the right team, the right plan and a strong, well-capitalized
> franchise for doing so.  ***Those are all the ingredients we need to
> build value for our shareholders that will hold up over the long
> term. . . .***

142.  In  Freddie  Mac's  May  30,  2006  Fourth  Quarter  2005  Earnings

Conference Call, Defendant McQuade stated unequivocally, and falsely, that:

> One thing should be clear though, while we will buy these non
> traditional mortgage products to help more families attain affordable
> mortgages ***our participation in these products has been and
> will continue to be deliberate, responsible, and accompanied
> by appropriate risk return considerations***.

---

[2] All emphasis is added.

143.   In June 2006, *Mortgage Banking* magazine published an article by Defendant Syron entitled "The Enduring Mission of the GSEs."   In it, he misrepresented Freddie Mac's risk profile, stating in part:

> [T]here are at least five reasons why having the GSEs manage and distribute a good share of the risk – even if our share has become increasingly constrained by competition – means the United States incurs *less* systemic risk than by relying solely on depository institutions and hedge funds.
>
> For one thing, the GSEs provide more risk disclosures and satisfy more demanding capital stress tests than anyone.  On the interest-rate risk side, we mark-to-market our exposure daily and publish the average monthly.  On the credit-risk side, we make extensive disclosures, use credit enhancements and produce credit losses at a small fraction of the rate of depository institutions' residential mortgage portfolios.  And we pass a stress test for capital that simulates a collapse worse than any since the Great Depression. ***On all these measures, Freddie Mac's very favorable risk profile leaves no doubt about our safety and soundness.***

144.   These assurances, made just prior to the start of the Class Period, were false.   Far from providing extensive disclosures of Freddie Mac's risk exposure, Defendants actively concealed the added risk resulting from Freddie Mac's increasing participation in nontraditional mortgage products during the Class Period.  Contrary to Defendant Syron's false claim, Freddie Mac's true risk profile was anything but favorable.

145.   On August 1, 2006, the first day of the Class Period, Freddie Mac issued a press release entitled "Freddie Mac Voluntarily Adopts Temporary Limited Growth for Retained Portfolio; Company Issues Market Update Showing Strong Financial Performance and Risk Management."   In it, Defendants falsely portrayed Freddie Mac's exposure to risk:

The company also provided an update on the first half of 2006 business performance, reporting continued excellent interest rate and credit risk management performance.

* * *

Credit-Risk Management

Our mortgage credit risk, as measured by loan-to-value (LTV) ratio and other credit characteristics, remains low. . .

Management continues to expect credit losses to remain low by historical standards. . .

146.   On August 1, 2006, at a Freddie Mac Market Update, Defendants repeated the substance of that press release, making the following knowingly false statements:

[Syron:]

Turning to the market update, I would emphasize that our underlying business fundamentals are really unchanged from our last call on May 30th.  **Our low level of interest rate and credit risk is unchanged.  Our release today demonstrates that our risk management approach is time-tested, and we continue to operate our business in a manner that is consistent with strong interest rate and credit risk management....**

[Paul Miller, Friedman, Billings, Ramsey Analyst:]

Can you address some of the conversations that Lockhart has been saying about Freddie Mac has not – does not have the controls and systems in place that – at this part of the juncture; that they put you in the same category as Fannie Mae in getting their controls and it could take years before you could maybe raise your dividend or do any substantial buybacks without issuing preferred stock?

[Syron:]

I don't want to characterize or speak for the director. **I would say that we believe we have strong — and you can look at the numbers that we've put out on this – credit risk and interest rate control.** But we do agree with the director that we have more

59

work that we need to do with our operating systems in addressing operating risk.

147.   On September 12, 2006, Defendant Syron's prepared remarks at a

Lehman Brothers Financial Services Conference contained the following

misrepresentations:

Since this time last year, the slowdown in the US housing market and concerns about deteriorating credit have grabbed news headlines.  And some have continued to question the GSEs' future role in the housing market.

**Despite these pressures, Freddie Mac has managed to increase shareholder value and sustain our guarantee portfolio market share of the GSE market, while keeping our traditional risks low.**

In addition, we have made progress on enhancing our internal financial reporting infrastructure so that we will be able to return to timely, GAAP-compliant financial reporting. We are focusing on this priority, **and we recognize that it's a critical and necessary step to operating with transparency and unlocking value for shareholders**.

\* \* \*

In both examples, our increased breadth of investment and guarantee activity has helped us to meet our mission and broader business objectives. **But let me assure you that while we have made headway in expanding the types of mortgages we guarantee and purchase, we continue to manage our portfolios in a very prudent, balanced and responsible way.**

\* \* \*

**On the credit side, on the right, you see that our exposure to a national house price decline is also very low. . .**

**We owe this low credit risk sensitivity to the combined effects of a strong loan-to-value ratio, and a broadly diversified national mortgage portfolio. . .**

If we get slower or negative growth in home prices, we would expect this LTV number, as well as our credit losses, to increase as

60

they have in the past, but the point is that **we are well diversified from credit shocks, and our guarantee business is positioned to weather even a harsh credit environment**.

[Slide 9] shows that as of the end of 2005, our credit guarantee portfolio is geographically diversified throughout the US. As a result, **even if we experience weak conditions in some regions of the country, the portfolio's overall value should be protected by continuing strength in other markets**.

* * *

**Because of our strong capital position, we think we are very well positioned to weather local and regional down turns**, but as you'd expect, we are watching the situation very carefully.

148.  On October 3, 2006, Freddie Mac issued a press release entitled "Freddie Mac Provides Market Update; Estimated Net Income for First Half of 2006 of $2.7 Billion; Company Maintains Strong Capital Position and Continued Solid Risk Management Performance" that included the following false statements:

"In the midst of a changing economy and housing market, Freddie Mac continued to meet our mission and build momentum in our business," said Richard F. Syron, Freddie Mac chairman and CEO. **"We are managing credit and interest-rate risks prudently, achieving low funding costs, maintaining our strong capital base and building close ties with our business partners – all of which strengthens our franchise."**

Credit-Risk Management

The company's mortgage credit risk, as measured by the current loan-to-value ("LTV") ratio of its credit guarantee portfolio and other credit characteristics, also remains low.

149.  On October 3, 2006, during a Freddie Mac Market Update conference call, Defendants McQuade and Syron made the following misrepresentations:

[McQuade:]

The numbers we put out this morning provide you with our best current estimate of both GAAP and fair value results. ***While these numbers are still preliminary, they do point to the continued strength in our franchise and our ability to keep producing good, long term returns by focusing on fundamentals and keeping risks low***.

\* \* \*

On the retained portfolio side, we actually shrank a bit in the first half, primarily due to the fact that credit spreads remained very tight and we are not going to sacrifice our return discipline just to keep growth positive. In addition, as we get later in the year, ***the voluntary growth limit on the portfolio will make it important for us to be selective in which mortgages we purchase to achieve the strongest returns possible for the limited growth we are going to have***.

\* \* \*

To sum it all up, we had a great first half of the year financially, ***our risks continue to be well managed and controlled***, and we're making good progress on our financial remediation efforts.

[Robert Napoli, Piper Jaffray analyst:]

How much do you want to play – I mean, what role do you see for Freddie in the non-conforming portion?

[Syron:]

Well, ***the way we look at how we want to play is the mixture of our mission, safety and soundness, and how we handle things for shareholders***. I mean, we will take part, I would like to say, but I think it is – what I have to use responsibly in that market. ***But we have been cautious and I think you can expect us it to be cautious on the most esoterical products.*** I think we will be guided in substantial measure by what we think is appropriate for different types of borrowers, that's the way we have been handling things and so far we are pretty comfortable about how we have entered the market.

150.   On October 18, 2006, Defendant Syron publicly made the following misrepresentations:

> At times like this, there is yet another part of Freddie Mac's GSE mission that gains importance. Our congressional charter gives us a special responsibility to think about more than getting potential homeowners in the front door. We have to worry about those same families not having to leave through the back door. And about the effect that things like predatory lending or high foreclosure rates have not just on families, but entire neighborhoods. . .  It's why we are aggressive in our anti-fraud efforts, because mortgage fraud is behavior that harms everyone.
>
> **It's why we have purchased the newer, more untraditional loans in a very prudent and balanced way – with very low credit losses as an added benefit.**

151.   During a January 5, 2007 Market Update conference call, Defendants provided the following false assurances:

>  [Piszel:]
>
> Next on risk management, this is an extremely important aspect of our business as it is essential not only to our safety and soundness, but to our expected economic returns as well.   Despite recent changes in the markets, Freddie has continued to display very low and well-managed interest rate and credit exposures, and has stayed focused on our strategy of generating positive long-term fair value returns.
>
> As you can see in our press release, and Monthly Volume Summaries, through November 2006, Freddie has kept our primary interest-rate risk metric, portfolio market value sensitivity, at about 1%.   In addition, our duration gap has remained roughly unchanged, at near zero months.
>
> **On the credit risk side, the story is much the same.**   Through September, we estimate that our loan-to-value ratio on the credit guarantee portfolio remained at a level of about 56%, up slightly from the 55% at year-end 2005.   In addition, our total single-family delinquencies have fallen to 51 basis points at the end of the third quarter, down from 69 basis points at the beginning of the year.

152.   On January 30, 2007, Defendant Cook presented the following prepared remarks at a Citigroup Financial Services Conference, falsely downplaying Freddie Mac's risk exposure:

[Slide 11] As important as these mortgage structuring and debt funding activities are, ***Freddie's investment strategy fundamentally rests on sound risk management practices. . . .***

[Slide 12] ***This story is played out in our current credit risk measures as well.*** Through the third quarter, Freddie's total single-family delinquencies and credit losses have stayed at very low, manageable levels.

[Slide 13] ***This continued low sensitivity is largely the result of strong LTV ratios on our existing book of guarantees, reflecting our prudent underwriting standards*** as well as the strong house price appreciation in the past several years. As of the end of September 2006, we estimate that our guarantee portfolio maintained an average loan to value ratio of about 56 percent.

OK, I know many of you are probably saying to yourselves, that's yesterday's news, Patti – ***what about credit in the next three to five years?*** That's a good question and I want to address it directly.

***I've mentioned some of the benefits we derived in 2006 from increasing our activities in alternative mortgage products. Now, let's talk about the risks.*** A lot of media attention and research notes have focused in on the deteriorating credit, particularly as it is related to alternative products such as IO and Option ARM loans.

All I would say here is that ***we are very conscious of the risk/reward trade offs that we are making, and that historically, Freddie has been very good at making disciplined risk management decisions. Going forward, this will remain a core competency as we continue to "touch more loans."***

***Improving our understanding of the market's view on credit risk is one area where we made significant progress in 2006.*** Through our work on marking the guarantee obligation to market, we have begun to see the key differences in how we view future credit risk relative to the Street.

As we complete our work on financial reporting and controls, *I would anticipate that we would invest incremental resources in improving our customer facing systems and credit risk management processes so that we can continue to respond to changing market opportunities in a safe, and profitable manner in the years to come.*

153.  On February 8, 2007, Defendant McQuade presented prepared remarks at Credit Suisse Financial Services Conference, echoing Defendant Cook's January 30th misrepresentations:

In addition, despite the changing credit environment and volatile financial markets, *Freddie maintained very low interest-rate and credit risk exposures* throughout the year. . . .

Despite this progress in 2006, Freddie experienced significant volatility in our GAAP and fair value results from quarter to quarter. While these gains and losses accurately reflect the impact of market changes and accounting policies on our business, they do not reflect our long-term return potential or *our consistently stable credit and interest-rate risk exposures*.

\* \* \*

[Slide 6] *Our job at Freddie Mac is to serve our mission in a profitable way for our shareholders. Throughout our history this has meant keeping our credit and interest-rate risks low and well managed.* Here you can see that despite the increased mission efforts, and expanded guarantee activities in 2006, *our current credit risk measures remain within, or below our historical levels*.

154.  Information that is now publicly available, but was concealed during the Class Period, indicates that as Freddie Mac moved into 2007, its investment in subprime and nontraditional mortgages dramatically increased along with its risk.  However, during the Class Period, Defendants told investors that Freddie Mac was reducing its participation in these riskier products.  On February 27, 2007, Freddie Mac issued a press release entitled *"Freddie Mac Announces*

***Tougher Subprime Lending Standards to Help Reduce the Risk of Future***

***Borrower Default.***"   In this release, Defendants announced that as of September 1, 2007, Freddie Mac would only buy subprime adjustable-rate mortgages (ARMs) - and mortgage-related securities backed by these subprime loans - that qualify borrowers at the fully-indexed and fully-amortizing rate. Freddie Mac would also limit the use of low-documentation underwriting for these types of mortgages.

155.   In a February 27, 2007 interview with Bloomberg News, Defendant Syron again falsely claimed that Freddie's investments in nontraditional products were insulated from risk, stating:

> Because investors in AAA mortgage bonds aren't impacted by loan losses until they reach high levels, "***this is not at all a concern, from a Freddie perspective, of safety and soundness***," Syron said.

156.   In a February 27, 2007 interview with Dow Jones International News, Syron further falsely assured the investing public that Freddie had "***virtually no credit exposure" to subprime mortgages and mortgage related securities backed by those loans***.

> On March 23, 2007, in Freddie Mac's 2006 Annual Report, Defendants made the following misrepresentation: "***On the credit risk side, Freddie Mac's exposures remained well controlled*** and our total single-family 90-day delinquencies actually declined during the year.

> \* \* \*

> *Types of Mortgages We Purchase*

> *Loan Quality.* Under our charter, our mortgage purchases are limited, so far as practicable, to mortgages we deem to be of a quality, type and class that generally meet the purchase standards

of private institutional mortgage investors. **To manage credit risks with respect to our mortgage purchases, we have developed internal credit policies and appraisal, underwriting and other purchase policies and guidelines.**

\* \* \*

*Portfolio Diversification*

During the past several years, there was a rapid proliferation of nontraditional mortgage product types designed to address a variety of borrower and lender needs, including issues of affordability and reduced income documentation requirements. While features of these products have been on the market for some time, their prevalence in the market and our Total mortgage portfolio increased in 2006 and 2005.

. . . **We will continue to monitor the growth of these products in our portfolio and, if appropriate, may seek credit enhancements to further manage the incremental risk.**

*Interest-only and option ARM loans.*  We generally mitigate credit risk inherent in these securities through a guarantee from the third party issuer or the underlying structure of the security.

\*    \*    \*

*Subprime loans.*   Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime.

While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant. Also included in our credit guarantee portfolio are Structured Securities backed by non-agency mortgage-related securities where the underlying collateral was identified as being subprime by the original issuer. **At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.**

> *With respect to our Retained portfolio, we do not believe that any meaningful amount of the agency securities we hold is backed by subprime mortgages.* However, at December 31, 2006 and 2005, we held approximately $124 billion and $139 billion, respectively, of non-agency mortgage-related securities backed by subprime loans. These securities include significant credit enhancement based on their structure and more than 99.9 percent of these securities were rated AAA at December 31, 2006.

157. The statement in the 2006 Annual report that Freddie Mac's subprime exposure in Single Family was "not significant" was materially false and misleading because it communicated the misleading impression that after considering a mix of credit risk characteristics to assess its exposure to subprime loans, Freddie Mac determined that its Single Family guarantee portfolio had no significant exposure.

158. Contrary to its disclosure, at December 31, 2006, Freddie Mac's Single Family credit guarantee portfolio consisted of approximately $141 billion of C1, C2 and EA loans - loans that Single Family internally described as "subprime," "otherwise subprime" or "subprime-like loans" - which represented approximately 10% of Freddie Mac's Single Family credit guarantee portfolio.

159. In a press release that accompanied its Annual Report for 2006 Financial Results, Defendants again emphasized, falsely, that Freddie Mac did not face risk from its nontraditional mortgage exposure:

> *We also maintained our low credit and interest-rate risk profiles, leaving us well positioned to deal with a broad range of interest rate conditions, and with the value of our shareholders' equity well protected.*

160. During a March 23, 2007 earnings conference call, Defendant Syron discussed Freddie Mac's February 27, 2007 announcement that it would

cease buying certain subprime mortgages, falsely claiming that the step was not

due to increased risk concerns:

> In order to counter this trend and help improve recent mortgage origination standards, we recently announced a change in our policy for purchasing and guaranteeing hybrid ARM subprime mortgages. **We took this step not out of concern for our exposure to these products,** as that is limited to AAA rated tranches of private label securities, **but rather, out of a desire to lead the market from a mission perspective.**

161.   On the same call, Defendant Piszel falsely stated:

Our asset quality remains very high with **retained portfolio sub-prime exposure limited to AAA securities. . .**

* * *

Expenses

As a percent of our total mortgage portfolio, credit related expenses were only 2 basis points. Still at very low levels compared our historical norms.

This is due to the fact that our portfolio is predominantly based on long term fixed rate mortgages, our overall average LTV ratio is about 57 percent, and **we have little to no exposure to the sub-prime risk-layered mortgage products that have drawn so much note recently**.

162.   On that same call, Syron had the following question and answer

exchange with a research analyst:

> Q: "Seems like over the last couple of years that subprime market has really replaced the FHA product. You and to some degree Fannie Mae both have abstained from those higher LTV products .... "

> A: "Fortunately, at least speaking for ourselves as a GSE, we, as you know, weren't involved in underwriting much of that business or any of that business directly. Having said all of that ... [w]e are working fairly intensely right now on how we can develop products in the subprime space that [are]

69

both shareholder and consumer friendly ... we're doing it on a pretty accelerated basis."

163.   Syron's statement that, with respect to the subprime market, Freddie Mac was not "involved in underwriting much of that business or any of that business directly" was materially false and misleading. Furthermore, his answer reinforced the already misleading impression that Freddie Mac did not participate in the "subprime space," but was exploring ways to develop products for that market.

164.   A March 23, 2007 article by Bloomberg News, quoting Defendant McQuade, reported in part the following misrepresentation:

> "**We don't think we'll lose any money at all on subprime**," **McQuade said**. "Credit has never been better." Freddie Mac's delinquency rate "is about 20 percent or 30 percent less than it was a year ago at this time," he said. A decline of capital in the subprime mortgage market "is a great opportunity for us," McQuade said. "This is where we really shine."

165.   In an April 16, 2007 Business Week article entitled "How Big is the Bite on Freddie and Fannie? The mortgage giants' exposure to risky loans could be bigger than they say," **Defendant Piszel dismissed concerns raised in the article that GSEs are underplaying their exposure to subprime risk and stated: "Having [a lot of] size doesn't mean having [a lot of] risk."** Based on reassurances from GSEs like the statement from Piszel, the article concluded that "subprime is only a small piece of their overall business" and that Freddie Mac and Fannie Mae "mitigate their risk by primarily owning the highest-rated securities in the subprime group and then adding credit enhancements, extra insurance against potential losses."

166.   On May 14, 2007, Syron provided still further unqualified false assurances regarding FRE's ability to purchase subprime loans without risk:

> Last month we announced that we will purchase up to $20 billion in fixed rate and hybrid ARM subprime products structured to limit payment shock on borrowers.  In doing this **we will focus on higher quality segments of the market and will stay away from the riskier loan products and those with no documentation**.

Syron knew when he made this commitment, that Freddie Mac was not limiting its purchases of subprime products only to high quality.  In fact, Freddie Mac was in the process of expanding its participation in riskier loan products and stated income or no documentation mortgages.

167.   Also on May 14th, at a conference sponsored by UBS, Syron, instead of acknowledging the risk that Freddie Mac's nontraditional portfolio created, assured investors that FRE actually benefited from nontraditional exposure:

> **We have achieved this growth by maintaining a disciplined approach in underwriting the credit risk we take on**, and by enhancing the value proposition we bring to our customers.
>
> It is important to note that our business volumes will vary over time, and **we will not imprudently chase growth at the expense of long-term shareholder returns**.
>
> [Slide 11] **Freddie's disciplined approach to credit underwriting and our high asset quality has put us in the position to make this commitment.**
>
> * * *
>
> Thus, through low delinquency rates and our diversified regional exposure, **Freddie Mac is better positioned than most market competitors to withstand this period of heightened credit risk**.

71

168.   At that conference, Syron also stated: "As we discussed in the past, at the end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio."

169.   Syron's statement was materially false and misleading because the statements reinforced the misleading impression that Freddie Mac had little or no exposure to subprime loans in its Single Family guarantee business and was not in the "subprime space."

170.   At the May 17, 2007 Lehman Brothers 10th Annual Financial Services Conference, Defendant Cook echoed Defendant Syron's remarks of May 14th when she said:

> As we discussed in the past, at the end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio."
>
> **We have achieved this growth by maintaining a disciplined approach in underwriting the credit risk we take on**, and by enhancing the value proposition we bring to our customers.
>
> It is important to note that our business volumes will vary over time, and **we will not imprudently chase growth at the expense of long-term shareholder returns**. The most significant market trend in the first quarter has been the deterioration of subprime mortgage credit.
>
> * * *
>
> Our recent subprime commitment is a good example of how we fulfill our mission.
>
> [Slide 11] **Freddie's disciplined approach to credit underwriting and our high asset quality has put us in the position to make this commitment.**
>
> * * *

72

Thus, through low delinquency rates and our diversified regional exposure, **Freddie Mac is better positioned than most market competitors to withstand this period of heightened credit risk.** Particularly since the amount of our business coming from California and other high-cost states is lower than most market participants.

171.   Prior to these speeches, Syron and Cook both knew or were reckless in not knowing that it was false and misleading to claim the Company "had basically no subprime exposure."  The then-head of External Reporting and others at Freddie Mac recognized that this statement was inaccurate.

172.   Prior to Syron and Cook giving these speeches, Freddie Mac's then-head of External Reporting reviewed a draft of Syron's speech and warned Bisenius, among others, that it would be false to state that Freddie Mac has basically no exposure to subprime:

> We need to be careful how we word this. Certainly our portfolio includes loans that under some definitions would be considered subprime. … We should reconsider making as sweeping a statement as we have "basically no subprime exposure."

173.   On June 8, 2007, Defendant Syron's prepared remarks delivered at Freddie Mac's Annual Stockholders' Meeting misleadingly stated:

> **Your company ended the year in a good position to weather the current housing downturn. . .**
>
> * * *
>
> **Credit risk management is another comparative advantage for Freddie Mac.** Through this March, our total single-family 90-day delinquencies stayed very low, although we expect this to increase some in coming months. Like everyone, we are keeping a very watchful eye on our 2006 book of business. But thanks to our low delinquency rates, diversified regional exposure, and our average loan-to-value ratio of 58 percent, **we are better positioned than most market competitors to withstand the expected period of heightened credit risk.**

174.    On June 14, 2007, Freddie Mac published its Financial Report for the Three Months Ended March 31, 2007 (the "lQ07 Report"). In the lQ07 Report, Freddie Mac did not quantify its subprime exposure but incorporated by reference the misleading subprime disclosure contained in its 2006 Information Statement.

175.    Freddie Mac did not include any statement regarding its exposure to subprime loans in its Single Family credit guarantee portfolio.

176.    At March 31, 2007, Freddie Mac's Single Family credit guarantee portfolio consisted of approximately $160 billion of C1, C2 and EA loans, which equated to approximately 10% of Freddie Mac's Single Family credit guarantee portfolio.  As described above, in the 1Q07 Report Freddie Mac did not include any statement regarding its subprime exposure in its Single Family guarantee portfolio.

177.    On June 14, 2007, during Freddie Mac's first quarter 2007 financial results conference call, Defendants made the following false statements:

[Syron:]

Yet despite these headwinds, Freddie Mac gained some ground last quarter. ***Thanks to our continued high asset quality, low risk exposures and improving operations, Freddie Mac is much better positioned for long-term profitability than a year ago***.

\* \* \*

Going forward, we intend to compete and succeed not only by leveraging our traditional strengths in the conventional conforming market, but also by developing new capabilities to serve our customers and our mission.

We have already begun to do so this year by demonstrating leadership in responding to the pressing and very visible problems in the subprime market. In February, we became the first major secondary market participant to announce that **we will no longer buy subprime mortgages that pose an unacceptable risk of excessive payment shock and possible foreclosure**.  In April, we followed up by announcing we will purchase up to $20 billion in fixed-rate and hybrid ARM products that are being developed to limit payment shock and provide lenders with more and safer choices to offer subprime borrowers. Purchases under this program will start early this summer.

The steps we're taking on subprime will clearly serve our congressional charter and public mission. We are confident they will serve our business objectives, as well.

\* \* \*

[Piszel:]

***Just as a reminder we don't hold subprime loans directly, so there is no contribution in the numbers I just mentioned from subprime. Also, we continue to expect no losses from our subprime-backed AAA rated ABS security exposure***.

178.   On June 14, 2007, Freddie Mac issued a press release entitled

"Freddie Mac Releases First Quarter 2007 Financial Results; Company Resumes

Quarterly Reporting," which provided a false financial outlook.  In it, Defendants

stated:

"Our credit guarantee portfolio showed strong growth in the first quarter and **we seized market opportunities to grow our retained portfolio prudently**." (quoting Syron).

\* \* \*

"While significant mark-to-market losses on our portfolio of derivatives, which are used to hedge our interest-rate risk, and on our credit guarantee activities have resulted in a GAAP loss, **we remain encouraged with the underlying fundamentals of Freddie Mac's business**." (quoting Piszel).

\* \* \*

75

> *Overall, Freddie Mac's credit guarantee portfolio continued to exhibit credit characteristics that were better than historical averages* as measured by current delinquencies, loan-to-value ratio (LTV), and charge-offs.

179.   The same day, on Freddie Mac's conference call to discuss first quarter 2007 financial results, Defendants falsely stated:

[Syron:]

> *Thanks to our continued high asset quality, low risk exposures and improving operations, Freddie Mac is much better positioned for long-term profitability than a year ago.*

> * * *

> *Importantly, we have achieved this growth while maintaining a disciplined approach in underwriting the credit risk we take on.* This has helped our aggregate credit statistics such as delinquencies to stay lower than the market as a whole.

> * * *

[Piszel:]

> Just as a reminder we don't hold subprime loans directly, so there is no contribution in the numbers I just mentioned from subprime. Also, *we continue to expect no losses from our subprime-backed AAA rated ABS security exposure.*

> That said, we do expect our credit-related metrics to worsen from their extremely low levels seen in the past few years but *our overall strong credit position should enable us to weather the housing downturn better than the market as a whole.*

180.   On July 2, 2007, Bloomberg News quoted Freddie spokesperson Sharon McHale. In response to an estimate of Freddie Mac's mortgage exposure, Ms. McHale *denied that a loss by Freddie Mac in the neighborhood of $3 billion would deplete Freddie Mac's mandatory capital*

*reserve requirements. According to McHale, Freddie Mac was not exposed to losses of that magnitude and that loss estimates of that size were "absurd."* As ultimately revealed at the end of the Class Period, Ms. McHale's statement was false, as Freddie Mac was exposed to and, in fact, suffered losses of even greater magnitude.

181.    On July 28, 2007, the Wall Street Journal published an article entitled *"Fannie, Freddie Are Said to Suffer in Subprime Mess."*  In it, Citigroup Inc. analysts estimated that falling prices on subprime mortgage bonds have cut the value of such securities held by Fannie Mae and Freddie Mac by $4.7 billion, $3.2 billion of which was attributed to Freddie Mac.  *A Freddie Mac spokeswoman called the analysts' estimate "mistaken."  She said the company uses third-party sources to value its holdings and hasn't seen "any material markdown of value."*  Again, this statement was false.

182.    On August 30, 2007, Freddie Mac published its Financial Report for the Three and Six Months Ended June 30, 2007 (the "2Q07 Report"). Freddie Mac stated in the 2Q07 Report that:

> Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by broadening the availability of mortgage credit.

We estimate that approximately $2 billion, or 0.1 percent, and $3 billion, or 0.2 percent, of loans underlying our single-family mortgage portfolio, at June 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans.

With respect to our Retained portfolio, at June 30, 2007 and December 31, 2006, we held investments of approximately $119 billion and $124 billion, respectively, of non-agency mortgage-related securities backed by subprime loans. These securities include significant credit enhancement, particularly through subordination, and approximately 99.9 percent of these securities held at June 30, 2007, were rated AAA at August 27, 2007.

This representation was false.  At June 30, 2007, Freddie Mac's Single Family credit guarantee portfolio consisted of approximately $182 billion of C1, C2 and EA loans, which equated to approximately 12% of Freddie Mac's single-family credit guarantee portfolio.

183.   On August 30, 2007, at the Freddie Mac second quarter 2007 financial results conference call, Defendant Piszel falsely characterized Freddie Mac's risk as follows:

> **We have provided you with a much-expanded view of credit data that focuses on the riskier portions of our portfolio**.  A few key takeaways:
>
> - One, **our overall exposure to higher risk products is low relative to our competition**.
>
> - Two**, we have limited and manageable exposure to Alt-A and risk-layered products**, such as those loans with both high LTV and low FICO scores.
>
> - Three, **delinquencies are low**, but are trending up particularly in Florida and California.
>
> - Finally, **our overall credit profile equips us to weather this downturn better than other market participants**.
>
> \* \* \*

*When we put all this together on the credit front, from the regional exposure, product concentration and counterparty credit risk perspectives, we are well positioned for the current environment.*

184.  On September 10, 2007, at the Lehman Brothers 5th Annual Financial Services Conference, Defendant Cook further falsely assured investors that Freddie Mac's investments in nontraditional mortgages were safe and would not subject Freddie Mac to write-downs:

Despite the recent market turbulence, today's trends benefit Freddie Mac in the long run. Our growth is good. *Our credit position is relatively strong with limited exposure to the riskiest mortgage products.  Bottom line, at a time when many of our competitors are weakening, Freddie Mac's position is growing stronger.*

Do the coming quarters hold some big challenges? You bet. But looking around, we like our set of advantages, and believe that *Freddie is well positioned to succeed and produce shareholder value in the long term*.

* * *

Due largely to our congressionally chartered mission, *our sound risk management practices* and our ability to add value through our credit guarantee and investment activities, *we have benefited from the recent market disruptions in ways that underscore the importance of our mission and will benefit our shareholders over the long run*.

* * *

*While we are being very deliberate in the credit risk we will take on, I want to be very clear that the current credit market situation presents an opportunity for us. . .*

[Slide 7] The table behind me shows that *on an absolute basis, Freddie Mac has very low exposures to Alt-A and risk layered mortgage products*. When taken together, these represent about 8 percent of our total single-family guarantee portfolio. . .

So again, whether you view our overall portfolio, or look to our Alt-A book, layered products, total single-family delinquencies, or charge-offs, *we feel our credit position is near the very best in the industry.*

185.   On September 17, 2007, at the Bank of America Securities 37th Annual Investor Conference, Defendant Piszel again misrepresented Freddie Mac's risk exposure and falsely denied that Freddie Mac would write down any of its subprime portfolio – a denial that was proven to be untrue just two months later:

> *Freddie Mac's low exposure to the riskiest mortgage products positions us for lower credit risk and lower future credit losses in basis points than practically any other company in this industry*.

* * *

> *Another major reason for our strong credit performance relative to the market is that we have very low exposures to Alt-A and risk layered mortgage products.* Taken together, these represent about 8 percent of our total single-family guarantee portfolio.  .  .

> So again, whether you view our overall portfolio, or look to our Alt-A book, layered products, total single-family delinquencies, or charge-offs, *we feel our credit position is near the very best in the industry*.

> [Slide 6]  *While we are being very deliberate in the credit risk we take on, I want to be very clear that the current credit market situation also presents us with the opportunity to regain some pricing power.*  While this slide doesn't make the point clear because of noise from amortization amounts, since mid 2006, our all-in guarantee fees have begun to improve.

* * *

> *Due to this protection, we have not yet taken any meaningful credit losses on this position, and we do not expect to take any in the future.*

186.    An article entitled "Subprime winner:  Patricia Cook on Freddie Mac's corporate mission and why it's good for business" appeared in the October 2007 issue of *Mortgage Risk* magazine.  In it, Defendant Cook gave further false reassurances concerning Freddie Mac's risk exposure:

> As one of the two main government-sponsored entities (GSEs) standing behind the US mortgage market, Freddie has substantial exposure to the sector.  Yet, when chief business officer Patricia Cook addressed delegates at Lehman Brothers' financial services conference in New York last month she told them:  "Despite the recent market turbulence, today's trends benefit Freddie Mac in the long run . . .  **At a time when many of our competitors are weakening, Freddie Mac's position is growing stronger.**"
>
> * * *
>
> Now, as the subprime turmoil unfolds, the company's first piece of good fortune is that **scrutiny from its regulator encouraged a conservative approach to risk management precisely when the worst excesses of lax underwriting were at their height.**
>
> Cook says **the agency took an early view that returns on subprime debt didn't match the risks.  As a consequence, when Freddie invested in subprime it did so mostly in the form of triple-A rated mortgage-backed securities (MBS) rather than riskier collateralized debt obligations or portfolios of loans**, she said.
>
> * * *
>
> Q:  Can you tell us how you see credit losses on your portfolio developing?
>
> [Patricia Cook] A: . . . When the housing market is doing really well our credit losses go down and when the housing market turns around and does poorly our credit losses go up.  Having said that, **we have an incredibly high quality book of business**.  That's why we have the capacity to take on, in a diligent and disciplined way, some increased credit risk at a good price.

**4.      Freddie Mac's Response to New York Attorney General's Industry-Wide Investigation Of Mortgage Fraud**

187.   On November 7, 2007, the Office of the New York State Attorney

General issued a press release which stated in part:

> Attorney General Andrew M. Cuomo today announced his office has sent Letters of Notice and Demand, providing notice of the issuance of Martin Act subpoenas and a demand for an Independent Examiner, to the nation's two largest financiers of home mortgages, Fannie Mae and Freddie Mac. Cuomo also announced that Fannie Mae and Freddie Mac have agreed to the demand to retain an independent Examiner, subject to the Attorney General's approval, to conduct a total review of all Washington Mutual appraisals and mortgages purchased by the companies.
>
> * * *
>
> Today's announcement marks the latest expansion of Cuomo's industry-wide investigation of mortgage fraud. Last week, Cuomo filed suit against First American Corporation, and its subsidiary eAppraiseIT, one of the nation's largest real estate appraisal management companies, for colluding with Washington Mutual to inflate the appraisal values of homes.
>
> "In order to fulfill their duty to consumers and investors, Fannie Mae and Freddie Mac must ensure that Washington Mutual's mortgages have not been corrupted by inflated appraisals," said Attorney General Cuomo. "Our expanding investigation into the mortgage industry has uncovered that Washington Mutual improperly pressured appraisers to provide inflated values that best served the lender's interest. Knowing this, Fannie Mae and Freddie Mac cannot afford to continue buying Washington Mutual mortgages unless they are sure these loans are based on reliable and independent appraisals."
>
> The subpoenas issued include requests for:
>
> - Information about all of the mortgage loans Fannie Mae and Freddie Mac have purchased from any bank, including Washington Mutual, and the mortgage-backed securities associated with those loans;
>
> - Information about due diligence practices of Fannie Mae, Freddie Mac;
>
> - Information about appraisals and valuations by the originating lenders;

- Policies and procedures related to valuing properties and appraisals.

Fannie Mae (Federal National Mortgage Association) and Freddie Mac (Federal Home Loan Mortgage Corporation) are two of the largest financiers of home mortgages in the country, and both purchase loans from Washington Mutual.  Washington Mutual is the third largest provider of loans to Freddie Mac, selling $24.7 billion in loans in 2007 alone. Washington Mutual is also the fourteenth largest provider of loans to Fannie Mae, selling $7.8 billion in loans in 2007.

"The integrity of our mortgage system depends on independent appraisers," said Cuomo. "Washington Mutual compromised the fairness of this system by illegally pressuring appraisers to provide inflated values. Every company that buys loans from Washington Mutual must be sure that the loans they purchased are not corrupted by this systemic fraud."

The lawsuit filed last week details a scheme in numerous e-mails showing First American and eAppraiseIT caved to pressure from Washington Mutual to use appraisers who provided inflated appraisals on homes. E-mails also show that executives at First American and eAppraisalT knew their behavior was illegal, but intentionally broke the law to secure future business with Washington Mutual.  Between April 2006 and October 2007, eAppraisalT provided over 250,000 appraisals for Washington Mutual.

188.   In connection with the investigation, Attorney General Cuomo had

sent the following letter to Defendant Syron on November 6, 2007:

Dear Mr. Syron,

Over the last nine months, the Office of the New York Attorney General (this "Office") has conducted a wide-ranging investigation into conflicts of interest and fraud in the mortgage industry. During the course of our investigation, we have uncovered a pattern of collusion between lenders and appraisers that has resulted in widespread inflation of the valuations of homes.

As you no doubt are aware, lenders now regularly sell the mortgage loans they make into the financial markets, either directly or to investment banks or Government Sponsored Enterprises ("GSEs"), such as Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The loans are then pooled together, scrutinized, and sold to the general public as mortgage backed securities.

This configuration has the effect of making the lender less vigilant against risky loans since any risk is quickly transferred to the purchasers of the loans.  Moreover, as the lender does not hold many of its loans in its portfolio, the lender's interest is ensuring the accuracy of the appraisal backing the loan is severely diminished. Even worse, because lender's profits are determined by the quantity of loans they successfully close, and not the quality of those loans, there is an incentive for a lender to pressure appraisers to reach values that will allow the loan to close, whether or not the appraisal accurately reflects the home value.

Further jeopardizing the process, mortgage brokers and the lenders' loan production staff are almost always paid on commission. Thus, the income of these individuals depends on whether a loan closes and on the size of the loan.  Accordingly, brokers and loan production staff have strong personal incentives to pressure appraisers to value a home at the maximum possible amount, so that loans will close and generate maximum commissions. For these reasons, mortgage brokers and lenders frequently subject real estate appraisers to intense pressure to change values in appraisal reports.

The investment banks and GSEs may also have an interest in inflating (or at least in not questioning) the value of the pooled loans. The values of these loans serve as a basis for the value of their securities. As such, the higher the value of the loans closed, the greater the value for which the securities are sold on the secondary market.

As part of investigation, this office recently filed a complaint against First American Corporation ("First American") and its subsidiary First American eAppraiseIT ("eAppraiseIT"), a company that performed over 260,000 appraisals for Washington Mutual, Inc. ("WaMu"). The complaint alleges that under pressure from WaMu, EA violated the Uniform Standards of Professional Appraisal Practice ("USPAP") and federal and state law by permitting WaMu to control the selection of property appraisers engaged to appraise collateral for WaMu-originated mortgages based on whether the

appraisers "hit the values" required to close loans. This practice led to inflated property valuations and enabled WaMu to originate larger, more profitable, mortgages, and a greater number of mortgages, than would have been possible had appraisals been performed, as required by fully independent appraisers. The complaint against First American and eAppraiseIT, is enclosed.

We understand that Freddie Mac purchases significant number of purportedly "conforming" mortgages from WaMu. The evidence shows, however, that these mortgages may be premised on fraudulently inflated appraisals and not upon appraisals that met USPAP and related statutory and regulatory standards. ***Accordingly, Freddie Mac's own shareholders and investors who purchased securities issued by Freddie Mac may have been harmed.*** Some of these shareholders and investors were New York individuals and institutions.

In light of the above, Freddie Mac should immediately retain an Independent Examiner, subject to this Office's approval, to investigate, review and analyze all appraisals that support the WaMu mortgages that Freddie Mac purchases or securitizes; the manner in which WaMu engages appraisers and manages its appraisal process; and all appraisals conducted by First American and eAppraiseIT that support any mortgages Freddie Mac purchases or securitizes. Should you decline to immediately retain such an Independent Examiner, Freddie Mac should immediately cease and desist purchasing and securitizing WaMu loans and any loans supported by First American and eAppraiseIT appraisals.

Furthermore, pressure on appraisers and inflated appraisals appear to be widespread problems in the mortgage industry. We are, therefore, expanding our investigation to determine the extent of Freddie Mac's knowledge of, and actions regarding, these problems as they relate to past mortgage purchases and securitizations by Freddie Mac. For that reason, pursuant to this Office's investigative authority under New York General Business Law § 352 and New York Executive Law § 63(12), accompanying this letter is a subpoena to Freddie Mac returnable on November 28, 2007.

Sincerely yours,

Andrew M. Cuomo

189.   On November 7, 2007, Freddie Mac issued a press release entitled "Freddie Mac Statement in Response to New York Attorney General Subpoenas," which continued to conceal the fraud by stating  in part:

> Accurate appraisals are fundamental to our effective credit risk management as well as to the long-term success of the homebuyers we are charted to serve. In fact, **Freddie Mac has no incentive to accept inflated appraisals on the loans we purchase and guarantee.  Indeed, Freddie Mac has a long-standing commitment to fighting mortgage fraud, as evidenced by its leadership role in the industry through our active internal fraud investigations, quality control activities, Freddie Mac-instituted remedial steps, and assistance with criminal prosecutions.**  We look forward to cooperating fully with the New York Attorney General's investigation and have agreed to appoint an Independent Examiner, as requested, to review the appraisal practices cited in the Attorney General's complaint.

### 5.    The November 20, 2007 Disclosures

190.   On November 20, 2007, Freddie Mac issued a press release entitled "Freddie Mac Reports Third Quarter 2007 Net Loss of $2.0 Billion or $3.29 per diluted share."   For the first time, Defendants admitted that Freddie Mac's investments in subprime and nontraditional mortgage products had subjected Freddie Mac to significant risk and caused it to sustain substantial losses. Defendants stated:

> "Without doubt, 2007 has been an extremely difficult year for the country's housing and credit markets and, as our third quarter financial results reflect, **we have been impacted by the deterioration in these markets**," said Richard F. Syron, Freddie Mac chairman and chief executive officer. "We recognized the challenges facing the mortgage markets, however, and have taken further steps to address them. . .
>
> "Weakening house prices and deteriorating credit have hurt Freddie Mac's results, as well as those of other participants in the mortgage market," said Buddy Piszel, chief financial officer. "You can see the impact of these trends in our credit results and throughout our

financial statements. Year-to-date, we have recognized $4.6 billion in net credit-related items on a pre-tax basis.

"During the past year we have taken important steps to address the impact of the declining housing and credit markets to our business," Piszel added. "We have begun raising prices, tightened our credit standards and enhanced our risk management practices. We also continue to improve our internal controls as we move closer to completing our remediation efforts and returning to timely financial reporting. These actions position us well to take advantage of opportunities when the current market dislocation ends."

This release was in stark contrast to Defendants' repeated Class Period assertions of minimal risk exposure from these investments.

191.    The market's reaction was swift and sharp.  Dozens of professional financial analysts who carefully follow Freddie Mac were caught off guard, having predicted collectively an average of a one cent ($.01) per share loss.  In fact, the reported loss was over 300 times greater than expected, or $3.29 per share.  These unanticipated revelations caused Freddie Mac's common stock to plunge 29%, from $37.50 to $26.74 per share, creating a market capitalization loss to its shareholders of almost $6.6 billion in one day.

### 6.    OFHEO's 2008 Report to Congress

192.    On April 15, 2008 OFHEO's issued its 2008 Report to Congress, stating in part that for year-end 2006 and all four quarters of 2007, Freddie Mac's "risk to capital has increased dramatically, primarily because of market and credit risks, which directly impacted capital through reduced current and future earnings."  2008 OFHEO Report at 51.  In addition:

On the basis of restated results in early 2008, Freddie Mac's surplus as a percentage of the OFHEO-directed requirement significantly declined from $2.1 billion, or 6.2 percent, for the fourth quarter of 2006 to $0.9 billion, or 2.6 percent, for the third quarter of 2007.  **The surplus continued to decline through October and**

> **November, with Freddie Mac failing to meet the OFHEO-directed requirement on November 30, 2007, prior to year-end 2007 accounting adjustments**. Freddie Mac took action to return to capital compliance by issuing $6 billion in preferred stock in early December 2007.
>
> * * *
>
> **Freddie Mac's expensive emergency corrective action in the fourth quarter emphasizes the need for more permanently heightened attention to income forecasting, and more prudent capital management generally.** In retrospect, Freddie Mac's common stock buyback in the first half of 2007 and dividend increase were mistimed.

2008 OFHEO Report at 51-52. This report highlights that during the period Defendants were claiming that Freddie Mac's exposure was low and capital was sound, the opposite was in fact true.

193. Moreover, Defendant's claim that Freddie Mac is committed to fighting mortgage fraud through, *inter alia*, internal fraud investigations was false because while Defendants knew that at least 10% of Freddie Mac's mortgages were infected by fraud, they intentionally obstructed implementation of the CoreLogic fraud detection software to prevent actually identifying, and, in turn, having to acknowledge the financial implications of the known fraud.

### B. The Safety and Soundness of Freddie Mac's Capital

194. In addition to misleading the public regarding Freddie Mac's risk exposure arising from its participation in non-traditional mortgage products, Defendants also deceived the public regarding Freddie Mac's ability to meet the mandatory capital requirements imposed by OFHEO.

195. Capital - the difference between a company's assets and its liabilities - is the bulwark of any financial enterprise. Freddie Mac is required by federal statute to meet both minimum and risk-based capital standards to be

classified as adequately capitalized.  The amount of capital that Freddie Mac had to maintain was set by law and by its regulator OFHEO.  OFHEO sets this amount to assure the public that Freddie Mac is operated in a "safe and sound" manner.

196.   By letter dated January 28, 2004, OFHEO directed Freddie Mac "to maintain a mandatory target capital surplus as a prudential action as the company undertakes remedial steps to improve financial reporting and controls…."  OFHEO set Freddie Mac's mandatory target capital surplus at thirty percent (30%) over its minimum capital requirement.  OFHEO further directed Freddie Mac to provide a weekly analysis and calculation of the mandatory target capital surplus, as well as to continue providing a monthly minimum capital report.  The thirty percent (30%) mandatory target capital surplus requirement was in effect at all times during the Class Period.

## 1.    Freddie Mac's Capital Impairment

197.   During the Class Period, as set forth above, Freddie Mac repeatedly assured the public that it was comfortably maintaining the minimum capital levels required by OFHEO.  In reality, in the face of multi-billion dollar losses in non-traditional mortgage-related investments, Defendants concealed that Freddie Mac's capital was so impaired that its capital levels were in danger of falling below the federal requirements – which, in fact, happened on November 30, 2007.

198.   Defendants disguised billions of dollars of Freddie Mac subprime and nontraditional mortgage losses by intentional manipulation of its Accumulated Other Comprehensive Income account ("AOCI").

199.   Freddie Mac accomplished this by segregating "unrealized" losses in low credit mortgages to what Freddie Mac called "available-for-sale securities" in its AOCI account.   The "unrealized" losses were never reported to reduce Freddie Mac's profits.   In this manner, Freddie Mac was able to avoid offsetting the AOCI "unrealized" losses against its assets or its profits.   As was later revealed, Freddie Mac had incurred tens of billions of losses that were never reported to reduce its earnings or profits.

200.   Moreover, unlike other financial enterprises that maintain sophisticated internal controls to determine losses, Freddie Mac limited its internal controls, per Defendants' directive to obfuscate losses and to delay disclosure of its risk exposure for as long as possible.   Senior executives, therefore, assumed the responsibility of determining the value of Freddie Mac's retained mortgage portfolio and whether it was sustaining losses.   According to OFHEO's 2008 Report to Congress, the timing of losses was left to the subjective and conflicted judgments of Freddie Mac's senior executives, and Freddie Mac's models became "less reliable and require[d] greater management judgment increasing the potential for error in pricing and other metrics…." Defendants failed to disclose to investors, analysts, and the market at large that Freddie Mac was relying on subjective criteria when valuing its portfolio. Instead,

Defendants represented that they were relying on independent third party rating services.

201. The findings of OFHEO's Report were confirmed by former employees of Freddie Mac. Employee J, a Director of Technical Services for Investments and Capital markets through 2005, recalled that there was "no formalized process" or system in place for valuing assets in the retained portfolio. He was tasked with developing software to automate mark to market valuations, known as "Unified Pricing Services," a process that was never completed. In the absence of a software solution or formal process, Investment and Capital Market employees gathered pricing information for similar securities from securities dealers such as Lehman Brothers. However, Freddie Mac declined to disclose the specifics of its portfolio, but instead described a "hypothetical" security with certain "characteristics."

202. Employee K, a Test Engineer Leader from July 2006 through October 2007, recalled that Freddie Mac had between fifteen to eighteen different applications for accounting and valuation, including Summit, Midas, and Peoplesoft, but was unable to integrate them into one uniform application. This resulted in "inaccurate company reports." Every month and every quarter Employee K received emails and other announcements from top management at Freddie Mac reviewing the accuracy achieved in the past period and reiterating the commitment that the following month or quarter Freddie Mac will achieve 100% accuracy. *The actual accuracy for Freddie Mac financial numbers as described in these emails or announcements was "never more than 80% or*

*90%."* "Every single quarter we always heard the goal of 100% accuracy, but it was never achieved."

203.   Employee L, a Vice President of Business Operations from September 2003 through April 2007, recalled that in late 2006 and thereafter this was a major topic of discussion among senior management of Freddie Mac.  He was informed by his superior that there were regular meetings in the CFO's and President's office regarding portfolio values and internal control problems. "McQuade and Piszel were on the valuation of portfolio weekly."  Employee L personally told defendant Piszel, in January 2007, that due to flaws in the legacy systems used by Freddie Mac, "the probability of being right in the future is zero."

204.   Because of Freddie Mac's losses in its nontraditional mortgages, Freddie Mac's capital declined from $27.2 billion in 2005 to $16.0 billion as of March 31, 2008.  In November 2007, Freddie Mac revealed that its OFHEO directed minimum capital account, as of September 30, 2007, was almost totally depleted.  In November 2007, Freddie Mac disclosed that it had been forced to liquidate $20 billion in unpaid principal balance of Freddie Mac's retained portfolio assets to manage to the 30% mandatory capital surplus.  By November 2007, Freddie Mac's capital minimum had fallen by billions below the minimum required by OFHEO.

205.   In October 2007, Freddie Mac was forced to liquidate assets to meet its capital requirements, yet Defendants never disclosed the October circumstances that precipitated the need for emergency capital.

206.   Because Defendants had provided repeated assurances to the market during the first half of the Class Period that Freddie Mac's capital position was strong and it was maintaining prudent surpluses, they had a duty to inform the market when those circumstances reversed.   Instead, Defendants simply remained silent on the issue throughout the Fall of 2007, withholding this material information from the public until the November 20, 2007 disclosures            .

207.   Defendants' intentional concealment of Freddie Mac's capital situation is underscored by the fact that OFHEO, not Defendants, for the first time in April of 2008 revealed the full extent of the problem.  In its April 15, 2008, Report to Congress, OFHEO stated: "*During 2007 Freddie Mac failed to maintain core capital above the OFHEO-directed requirement for the month ending November 2007, due to significant market and credit-related losses impacting capital prior to corrective management actions [raising $6.5 billion in a preferred stock offering and cutting its dividend by 50%].*"

208.   While Defendants knew that Freddie Mac's capital situation was deteriorating rapidly, as evidenced by its weekly, non-public capital reports to OFHEO, neither Defendants nor OFHEO alerted the public to how dire the situation had become.  Defendants, however, unlike OFHEO, had an affirmative duty to apprise Freddie Mac's shareholders of this material information.

209.   To the contrary, Defendants continued to use Freddie Mac's capital simply to support its stock price through a "stock buyback" program, allowing for Defendants' profitable insider sales during 2007.  As discussed by Defendant Piszel during Freddie Mac's first quarter 2007 financial results conference call on

June 14, 2007, Freddie Mac instituted a "stock buyback" program to raise capital. Significantly, the 2008 OFHEO Report characterized this program as "ill-timed."

210.    Defendants also failed to disclose to the public the fact that on at least two occasions (once soon after March 20, 2007 and once soon after September 30, 2007), OFHEO had sent supervisory response letters requiring Freddie Mac to take prompt corrective action to its declining net income and the impact such fall would have on Freddie Mac's capital.   While Freddie Mac responded, it failed to provide the public with any information describing OFHEO's concerns about its capital.

211.  The revelation of the losses to Freddie Mac's capital was intentionally delayed by Defendants for months for multiple reasons, including:

(a)    Defendant Syron was in the process of renegotiating his employment contract for a higher salary and large bonus.

(b)    Officers of Freddie Mac, including Syron and McQuade, planned to sell and did sell millions of dollars of stock they owned at the highest price possible.

(c)    The revelation of the subprime losses would have required OFHEO to possibly order Freddie Mac to cease doing business or impose other severe penalties upon Freddie Mac.

(d)    Freddie Mac had, for months, secretly been trying to raise additional capital to stay in business.  Because of its precarious capital position, Freddie Mac had no choice but to issue preferred stock, a very expensive way to raise capital, which in turn increased Freddie Mac's expenses and caused further

earnings losses.  Once it found this high-priced capital, Freddie Mac needed the announcement of this infusion to keep its stock price from collapsing further than it did.

(e)    To support a high Freddie Mac stock price before releasing information about impending losses, Freddie Mac executives:

(i)    Engaged in a $1 billion program of buying back 16.1 million shares of Freddie Mac's own stock from the market – using the cash it needed to support its losing operations;

(ii)    Increased Freddie Mac dividend payments - once again imperiling its available cash to cover losses; and

(iii)    Sold millions of dollars of their own stock.

## 2.    Freddie Mac's Misrepresentations With Respect to Its Capital

212.    During the Class Period, Defendants repeatedly told the market that Freddie Mac's capital position was, and would continue to be, strong and secure due to Freddie Mac's responsible and thoughtful capitalization decisions. The revelation of November 20, 2007, was the first indication that Defendants had misrepresented the truth with regard to Freddie Mac's capital.

213.    Even despite the sell-off in mid-March of financial stocks exposed to nontraditional mortgage losses and despite Freddie Mac's knowledge of the low credit mortgage market unwinding in the Spring of 2007, Defendants continued falsely to deny to the public that Freddie Mac's capital position was at all compromised as a result of its investment in the subprime and nontraditional mortgage markets.

214.   For example, on September 8, 2006, in his prepared remarks at Freddie Mac's Annual Shareholder Meeting, defendant Syron stated:

> Finally, let me say a word about capital, which I know is a top-of-mind issue for all of you – and for all of us on your senior management team as well.
>
> **Freddie Mac grew our regulatory core capital to almost $36 billion last year – well above the capital requirements set by our safety and soundness regulator. As a result of our strong capital position and confidence in our profitability, we increased our quarterly stock dividend twice last year.** In fact, since December 2003 we have raised the common stock dividend by 81 percent.
>
> In addition, we sought and received board authorization last year to repurchase shares of our common stock in a swap for preferred stock. And since then, we have made good progress in executing on that authorization.

215.   On March 31, 2006, Freddie Mac issued a press release entitled "Freddie Mac Provides Market Update; Total Mortgage Portfolio Up 12 Percent in 2005; **Company Maintains Strong Capital Position**, Balance Sheet."

216.   On September 18, 2006, speaking at the Bank of America 36th Annual Investment Conference, Senior Vice President and Treasurer of Freddie Mac, Timothy Bitsberger, stated, in part, that **Freddie Mac had a "strong and growing capital base."**

217.   On October 3, 2006, Freddie Mac issued a press release entitled "Freddie Mac Provides Market Update; Estimated Net Income for First Half of 2006 of $2.7 Billion; **Company Maintains Strong Capital Position** and Continued Sold Risk Management Performance." The release stated in part:

> In the midst of a changing economy and housing market, Freddie Mac continued to meet our mission and build momentum in our business," said Richard F. Syron, Freddie Mac chairman and CEO.

"We are managing credit and interest-rate risks prudently, achieving low funding costs, **maintaining our strong capital base** and building close ties with our business partners – all of which strengthens our franchise.

218.   The same day, on Freddie Mac's Market Update conference call, Defendant McQuade falsely stated: "**Looking at capital we continue to maintain a strong position there as well.**"

219.   On January 5, 2007, Freddie Mac issued a press release entitled "Freddie Mac Provides Quarterly Market Update," falsely providing assurances that:

> Management expects to continue maintaining a surplus over both the regulatory minimum capital requirement and OFHEO's 30 percent mandatory target capital surplus across a wide range of market conditions.

220.   On March 23, 2007, Freddie Mac issued its Annual Report to shareholders for the year 2006.  It stated in part:

> **Going forward, Freddie Mac remains strongly capitalized.**
>
> * * *
>
> **Our primary objective in managing capital is preserving our safety and soundness.**
>
> * * *
>
> **We assess and project our capital adequacy relative to our regulatory requirements as well as our economic risks.**  This includes targeting a level of additional capital above each of our capital requirements to help support ongoing compliance and to accommodate future uncertainties.  **We evaluate the adequacy of our targeted additional capital in light of changes in our business and risk exposures.**

221.   Freddie Mac issued a press release the same day entitled "Freddie Mac Reports 2006 Financial Results."  In the 2006 Highlights, it stated:

97

***Continuing to build shareholder value and manage capital prudently***, company announces plan to repurchase additional $1 billion in common stock and issue $1 billion in preferred stock.

Later that day, during Freddie Mac's fourth quarter 2006 earnings conference call, Defendant Syron stated in part: "***Our continued capital strength is a continued strategic advantage for Freddie.***"

222.    As noted above, in June 2006, *Mortgage Banking* magazine published an article by Defendant Syron entitled "The Enduring Mission of the GSEs," which stated, ***"we pass a stress test for capital that simulates a collapse worse than any since the Great Depression."***

223.    During this time, Defendants affirmatively dismissed concerns addressed to them about Freddie Mac's capital levels, all the while knowing these assurances were false.  As noted above, on July 2, 2007, Bloomberg News reported that a Freddie Mac spokesperson dismissed as "absurd" the suggestion Freddie Mac was exposed to a $3 billion loss that would deplete its mandatory capital requirements.

224.    Similarly, as discussed above, in a July 28, 2007 Wall Street Journal article, a Freddie Mac spokesperson was quoted as saying that a Citigroup estimate that Freddie Mac's capital may have decreased in value by as much as $3.2 billion was "mistaken," adding that Freddie hasn't seen "any material markdown in value."

**C.    Defendants Also Engaged in Material Omissions With Regard to Other Practices Related to Freddie Mac's Risk Exposure and Capital**

98

225.   Despite its public statements to the contrary, Freddie Mac was at a significant risk in at least three other areas in addition to its increased investment in nontraditional loan products, imperiling its capital.   Defendants hid Freddie Mac's deficient accounting reporting and internal control systems, hid the nature and extent of its exposure to risk in connection with mortgage guarantees, and hid its reliance on insurance protection from providers who were financially unable to meet insurance demands.

(a)   Defendants failed to disclose that Freddie Mac's internal controls and business methods were incapable of managing, identifying and guarding against massive losses in these investments and its guarantee exposure.

(b)   Defendants failed to reveal that Freddie Mac had no reliable and auditable method of valuing its mortgage holdings.  Defendants held secret from the public that, despite repeated requests from Freddie Mac's regulator, they had refused to divulge how or even if its valuation system worked.  In fact, Freddie Mac's only valuation system had no quality assurance checks and was not designed for nontraditional mortgage products or assets.  Its public auditors could not and did not check the validity of Freddie Mac's valuation methodology, and Defendants never disclosed this to the public.

(c)   Defendants hid the fact that Freddie Mac had guaranteed billions of dollars of the nontraditional high-risk mortgages sold to others — guarantees that Freddie Mac must now meet.

226.    Defendants also failed to reveal to the public that Freddie Mac's guarantee exposure was not protected or properly transferred to credit-worthy mortgage insurers.  Defendants knew, but failed to reveal, that many of Freddie Mac's third party mortgage insurers were not financially able to meet their insurance contracts — the very contracts that were supposed to protect sizeable portions of Freddie Mac's mortgage investment holdings and guarantee exposure.

**D.    Subsequent Loss Revelations Regarding Freddie Mac's Capital Impairment and its Pre-2008 Subprime, Alt-A, and Other Non-Traditional Mortgage Investments.**

227.    Although the November 20, 2007 press release admitted that the Company had been investing in subprime, Alt-A and nontraditional mortgage products, and although the April 15, 2008 OFHEO Report indicated that the Company's capital surplus had precipitously declined, Defendants continued to obscure the full extent of the Company's risk exposure and precarious capital position resulting from Freddie Mac's ownership and investment in these mortgage products.

228.    On February 28, 2008, Freddie Mac reported its disastrous 2007 fourth quarter and year-end results.  Freddie Mac reported an actual net loss of $3.7 billion in the fourth quarter of 2007 alone – substantially all of which was related to subprime, Alt-A and other nontraditional credit losses and guarantees on those mortgages purchased between 2005 and 2007.

229.    On May 14, 2008, the Company announced $1.4 billion in additional losses from its investment in subprime, Alt-A and other nontraditional

mortgage products, "primarily due to 2006 and 2007 loan originations."  The Company further acknowledged that it had previously failed to report or recognize another $1.3 billion loss for 2005-2007 subprime and Alt-A credit guarantee liability through the use of an accounting device that the Federal Housing Finance Agency (FHFA, formerly OFHEO) and the Conservator later strongly challenged.  Between the November 20, 2007 report and the May 14, 2008 report, Freddie Mac took at least $6.4 billion in losses and expenses associated with 2005-2007 subprime and other nontraditional mortgage exposure – all of which it intentionally hid from the public prior to November 20, 2007.

230.   On August 6, 2008, Freddie Mac released its Second Quarter 2008 Financial Results and announced still further losses related to pre-2008 subprime, Alt-A and other nontraditional mortgage products.  For the second quarter alone, Freddie Mac took losses of $2.8 billion on its "nontraditional products in the mortgage origination market purchased prior to 2008;" and the Company reported that for much of these pre-2008 low-credit mortgage products, it anticipated an additional $7.2 billion obligation.

231.   On September 7, 2008, United Press International ("UPI") reported that "Freddie Mac understated [its] financial troubles" and has "a smaller capital cushion than previously thought."  UPI further reported that "[s]crutiny of the troubled mortgage compan[y] revealed [its] accounting methods were concealing a much more dire financial situation.... The companies [Freddie Mac and Fannie Mae], which own or back $5.3 trillion in mortgages, failed to properly account for

losses, using questionable accounting methods to push them into the future so that they wouldn't need to be reported until next year."

232.   That same day, Henry Paulson, the Secretary of the U.S. Treasury, took the unprecedented step of placing Freddie Mac into a government conservatorship, "[b]ased upon what we have learned about [Freddie Mac] over the last four weeks – including what we learned about [its] capital requirements." According to a September 7, 2008 *New York Times* article, the government's decision to place Freddie Mac into conservatorship was guided by a U.S. Treasury-requested Morgan Stanley investigation, which concluded that the Company had overstated its capital reserves by billions of dollars through the use of questionable accounting methods.

233. On September 8, 2008, as news of the government conservatorship spread across the financial industry, FHFA Director James Lockhart confirmed the *New York Times* article, stating that its regulatory review of Freddie Mac's accounting uncovered "big questions," such as "significant issues with their credit reserves," that ultimately led the government to seize control of Freddie Mac.  "My big issue is really that they were not going to be able to fulfill their mission," Lockhart said in a Bloomberg Television interview on September 8, 2008.  Freddie Mac "could not fulfill the mission of the liquidity and stability, it was going to really hurt the mortgage market and the U.S. economy, so we felt the best decision was to put [Freddie Mac] in conservatorship." Further, FHFA sent Freddie Mac "a letter enumerating failings that it argued were grounds for their seizure."  The letter, Reuters reported, "listed almost everything

that had been a concern or under examination since" Freddie Mac "had to restate earnings after accounting scandals....It was basically a grab-bag."  In effect, the letter highlighted that Freddie Mac's disclosures as to its capital and risk exposure were demonstrably false.

234.   Also on September 8, 2008, the Dallas Federal Reserve President, Richard Fisher, further stated in response to an audience question at an Austin, Texas speech, "[w]e conclude[d] that the capital of these institutions [Freddie Mac and Fannie Mae] was too low relative to their exposure" and "that capital in and of itself was of low quality."

235.   U.S. Senator Richard Shelby of Alabama confirmed the damage caused by Freddie Mac's subprime, Alt-A and other nontraditional mortgage investments, as Bloomberg reported on September 9, 2008: "Once they got someone looking closely at Fannie and Freddie's books, they realized there just wasn't adequate capital there....They found out they had a house of cards."

236.   On September 19, 2008, Freddie Mac disclosed that two weeks after lending Lehman Brothers $1.2 billion on an unsecured, noncollateralized loan, Freddie Mac would likely lose the entire amount as a result of Lehman Brothers' September 15, 2008 bankruptcy filing.

237.   On September 23, 2008, FHFA Director James Lockhart testified before Congress that the Company continued "to take on risky Alt-A, low documentation and other nontraditional mortgages in 2006 and well into 2007," even though Freddie Mac had received "repeated warnings about credit risk." Lockhart further testified that "critical safety and soundness concerns" – concerns

103

that Defendants repeatedly minimized, obscured or, often, simply ignored – prompted the government takeover.

## VI.    EXECUTIVE COMPENSATION AND INSIDER TRADING INCENTIVIZED THE DEFENDANTS TO HIDE LOSSES AND DENY RISK

238.    Each Individual Defendant received significant compensation including a program of bonuses when Freddie Mac reached certain financial and earnings targets.   The target bonuses rewarded executives on a variety of factors, including the portfolio growth in the Retained Portfolio.   Freddie Mac executives would receive larger bonuses if the Retained Portfolio grew larger.

239.    More specifically, the Board was required to take into account in the calculation of bonus awards:

(a)    the return on equity for new business in retained portfolios, and

(b)    accomplishing a specified growth goal for the retained portfolio.

240.    Indeed, the Individual Defendants derived the vast majority of their compensation from bonuses and stock awards based on the growth of the Retained Portfolio, including the nontraditional mortgages held in the portfolio.   In 2006, over 80% of executive compensation came from the Individual Defendants' bonuses and stock awards based in part on how large the Retained Portfolio grew.

241.    The Individual Defendants, therefore, understood that announcing that Freddie Mac was losing over a billion dollars from the nontraditional mortgages that Freddie Mac held in its Retained Portfolio would directly impact

the calculation of bonuses, just as failing to buy billions of dollars of nontraditional mortgages would cause the Retained Portfolio to shrink, not grow.

242.   Freddie Mac's executives further benefited from high stock prices for Freddie Mac when they sold the stock they received through stock awards and option awards.  Indeed, during the Class Period, Freddie Mac's executives sold well over 100,000 shares of Freddie Mac and received approximately $7 million. If Freddie Mac's executives had reported Freddie Mac's losses in a timely manner, the stock price would have fallen and the amount of money they received from their stock sales correspondingly would have decreased by at least 75%.

**Richard F. Syron**

243.   In 2006, Syron received total compensation of $14.73 million. In 2006 Syron derived 87% (over $12 million) of his compensation from Retained Portfolio bonuses and stock related awards. Syron's compensation for the years 2004-2006 consisted of the following:

| Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|------------------------------------------------------------------------|------------------------|-------|
| 2006 | $1,100,000 | $2,400,000 | $7,162,488 | $3,261,460 | $355,273 | $453,882 | $14,733,063 |
| 2005 | $1,100,000 | $2,200,000 | $4,821,289 | | | $298,222 | $8,419,511 |
| 2004 | $1,100,000 | $2,500,000 | $4,826,707 | | | $452,015 | $8,878,722 |

244.   In addition to his compensation, Syron also earned over $3 million from his sale of Freddie Mac stock.  During the Class Period, Syron sold 50,163

shares of Freddie Mac and earned $3,313,705.12.  Syron averaged $66 for each share that he sold.  During the Class Period, Syron made the following sales:

(a) On 12/31/2006, Syron received $1,442,807.10 from the sale of 21,249 shares at $67.90.

(b) On 04/01/2007, Syron received $474,670.71 from the sale of 7,979 shares at $59.49.

(c) On 05/06/2007, Syron received $543,277.83 from the sale of 8,193 shares at $66.31.

(d) On 06/05/2007, Syron received $852,949.48 from the sale of 12,742 shares at $66.94.

245.    In addition to maximizing his bonuses, stock awards, and the price of the stock that he sold, Syron was motivated to delay announcing Freddie Mac's losses because he was also negotiating a lucrative extension of his employment contract.  On November 9, 2007, immediately before Syron and Freddie Mac announced Freddie's disastrous third quarter results, Syron entered into a new employment contract with Freddie.  The agreement provides Syron with a bonus of $3.5 million and annual salary increase that raises his salary to $1.3 million.  The salary increase is retroactive to July 1, 2007.  His new contract also provides that Freddie Mac will increase his long-term equity incentive award (the "Annual Equity Grant") by $800,000 and guarantees him annual equity grants of $8,800,000.

**Patricia Cook**

246.    In 2006, Cook received total compensation of $4.89 million.  In 2006 Cook derived 81% (almost $4 million) of her compensation from Retained

Portfolio bonuses and stock related awards. Cook's compensation consisted of the following:

| Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|--------------------------------------------------------------------------|------------------------|-------|
| 2006 | $600,000 | $2,300,000 | $1,118,767 | $533,747 | $221,353 | $123,062 | $4,896,929 |
| 2005 | $600,000 | $2,750,000 | $1,095,889 | | | $20,462 | $4,466,351 |
| 2004 | $250,000 | $3,000,000 | $1,873,771 | | | $104,605 | $5,228,376 |

247.    In addition to her compensation, Cook also received over $1.3 million from her sale of Freddie Mac stock during the Class Period when she sold 20,593 shares of Freddie Mac. Cook averaged $63.76 for each share that she sold.  During the Class Period, Cook made the following sales:

(a)    On 08/02/2006, Cook made two trades and received $101,142.50 from the sale of 1,759 shares at $57.50 and $111,895 from the sale of 1,946 shares at $57.50.

(b)    On 01/31/2007, Cook made two trades and received $290,395.60 from the sale of 4,258 shares at $68.20 and $194,155.40 from the sale of 2,847 shares at $68.20.

(c)    On 05/06/2007, Cook received $132,155.83 when she sold 1,993 shares at $66.31.

(d)    On 06/05/2007, Cook earned $275,056.46 from the sale of 4,109 shares at $66.94.

(e)    On 08/02/2007 Cook made two trades and received $98,954.28 from the sale of 1,748 shares at $56.61 and received $109,427.13 from the sale of 1,933 shares at $56.61.

**Eugene M. McQuade**

248.   In 2006, McQuade received total compensation of $7.6 million. McQuade derived 81% ($6.2 million) of his compensation from Retained Portfolio bonuses and stock related awards.   McQuade's compensation consisted of the following:

| Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------------------------|------------------------|-------|
| 2006 | $900,000 | $1,500,000 | $3,627,289 | $1,088,677 | $193,180 | $338,313 | $7,647,459 |
| 2005 | $900,000 | $1,500,000 | $3,287,666 | | | $95,286 | $5,782,952 |
| 2004 | $300,000 | $2,565,000 | $6,253,875 | | | $15,5190 | $9,274,065 |

249.   In addition to his compensation, McQuade sold 42,723 shares of Freddie and earned $2.7 million.   McQuade averaged $64 for each share that he sold.   During the Class Period, McQuade made the following sales:

(a)   On 09/01/2006, McQuade received $892,893.57 from the sale of 14,037 shares at $63.61.

(b)   On 05/06/2007, McQuade received $396,334.87 from the sale of 5,977 shares at $66.31.

(c)   On 06/05/2007, McQuade received $621,872.60 from the sale of 9,290 shares at $66.94.

(d)   On 09/01/2007, McQuade received $826,744.59 from the sale of 13,419 shares at $61.61.

**Anthony "Buddy" Piszel**

250.   Defendant Piszel was Freddie Mac's Executive Vice President and Chief Financial Officer.   In 2006, Piszel received total compensation of $3.6 million.   Piszel derived 87% (approximately $3.2 million) of his compensation

from Retained Portfolio bonuses and stock related awards. Piszel's compensation consisted of the following:

| Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| $88,750 | $3,100,000 | $93,593 | $0 | $0 | $367,954 | $3,650,297 |

## VII.   FREDDIE MAC HAS A SPECIAL DUTY TO BE TRUTHFUL BECAUSE IT HAS A POSITION OF PUBLIC TRUST

251. Congress, in 1970, enacted the Federal National Mortgage Association Charter Act to create Freddie Mac as a federally chartered and stockholder-owned corporation. The purpose of Freddie Mac is to:

(a)   provide stability in the secondary market for residential mortgages;

(b)   respond appropriately to the private capital market;

(c)   provide ongoing assistance to the secondary market for residential mortgages by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and

(d)   promote access to mortgage credit throughout the United States (including central cities, rural areas and undeserved areas).

252.    Because Congress created Freddie Mac and imbued it with special rights not shared by private corporations, Freddie Mac is known as a Government Sponsored Entity ("GSE").

253.    As a GSE, Freddie Mac is not an ordinary corporation.  Though it is owned by shareholders and its shares are traded on the New York Stock Exchange, it has an array of connections with the federal government that gives it a heightened responsibility to the public.

(a)    The President of the United States can appoint 5 of the 18 board members of Freddie Mac.

(b)    The Secretary of the Treasury is authorized to purchase up to $2.25 billion of its debt liabilities.

(c)    It is exempt from all state and local income taxes.

(d)    It can use the Federal Reserve as its fiscal agent.

(e)    Its debt is eligible for use as collateral for public deposits, for purchase by the Federal Reserve in open-market operations, and for unlimited investment by federally insured depository institutions (*i.e.,* commercial banks, saving and loan associations and thrifts).

(f)    Its securities, including its common stock, are exempt from the SEC's registration and reporting requirements and fees.

(g)    Its securities are exempt from the provisions of many state investor protection laws.

(h)    It is exempt from bankruptcy law and no receivership provisions apply, so that in the event that it was to experience financial difficulties

and could not satisfy all financial claims made upon it, only the Congress could resolve the situation.

254.  As a GSE, Freddie Mac is subject to the following unique restrictions:

(a)  Its charter restricts it to residential finance.

(b)  It is explicitly forbidden to engage in mortgage origination.

(c)  It is subject to a maximum size of mortgage (which is linked to an annual index of housing prices) that it can finance; *i.e.*, a maximum value for a mortgage that can be the basis for issuing MBS or purchased for holding in their portfolios.  For 2006 to 2008, that maximum (which is called the conforming loan limit) is $417,000.

(d)  The mortgages that it finances must have at least a 20% down payment (*i.e.*, a maximum loan-to-value ratio of 80%) or a credit enhancement (such as mortgage insurance).

(e)  It is subject to safety-and-soundness regulation by OFHEO, which is located within the Department of Housing and Urban Development (HUD).

(f)  It is subject to "mission oversight" by HUD, which approves specific housing finance programs and sets social housing targets for the two companies.

255.  These special features of Freddie Mac and other GSEs have created an aura or "halo" due to perceptions of extensive federal government entanglements with a nominally private organization.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

256.    Defendants understood that their public statements and reports were materially misleading. The reasons include:

(a)    During the Class Period, Freddie Mac's external statements differed from its internal reports.   For example, Defendants repeatedly represented that 99.9% of Freddie Mac's retained subprime portfolio qualified for an AAA rating; they also represented that Freddie Mac was well capitalized. However, in reality, its internal reports demonstrate that its retained portfolio was over-valued and that a significant portion of its retained subprime portfolio failed to meet its underwriting standards and was tainted by fraud.  Similarly, Freddie Mac's internal reports reveal that Freddie Mac was severely undercapitalized and required an immediate infusion of capital to satisfy the minimum capital requirements of OFHEO.

(b)    During the Class Period, Defendants disregarded Freddie Mac's current financial information and on a routine and regular basis, including several times just before it released its disastrous 2007 third quarter results, and made false representations concerning the quality of Freddie Mac's retained subprime portfolio and its capitalization.  For example, on September 17, 2007 Freddie's Chief Financial Officer Anthony Piszel told an Investor Conference that Freddie Mac was safe from subprime credit losses.  "Due to this protection, we have not yet taken any meaningful credit losses on this position, and we do not expect to take any in the future."  Within weeks Freddie announced that it was on the verge of collapse and required an immediate infusion of capital to survive.

(c)     During the Class Period, Defendants disclosed Freddie Mac's accounting information in a manner that was deceptive, making it difficult for even sophisticated investors to understand the negative implications of the financial information.   Unlike Fannie Mae, Freddie Mac's securities were not registered with the SEC during the Class Period and therefore it did not file with the SEC quarterly or annual statements and did not follow the SEC disclosure rules.   Also, Freddie Mac uses its own nomenclature to describe its accounting items in its financial statements.   Equally important, during the Class Period Defendants acknowledged that Freddie Mac's internal controls were not effective.   Thus, even the most sophisticated investors were not capable of fully understanding the flaws in Freddie Mac's financial disclosures.

## IX.     CLASS ACTION ALLEGATIONS

257.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased Freddie Mac common stock during the Class Period (the "Class").   Excluded from the Class are (i) Defendants, (ii) any person who was an officer or director of Freddie Mac during the Class Period, (iii) the members of the immediate families of the Individual Defendants, (iv) any incentive, retirement, stock or other benefit plan that benefited solely the Individual Defendants, (v) any entity in which any Defendant had a controlling interest during the Class Period, (vi) any subsidiary of Freddie Mac, and (vii) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

258.   The members of the Class for whose benefit this action is brought are dispersed throughout the United States and are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that Class members number, at a minimum, in the hundreds of thousands.  As of February 28, 2007, Freddie Mac had over 661 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Freddie Mac or its stock transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

259.   Plaintiff's claims are typical of those of the Class as all members of the Class are similarly affected by Defendants' actionable conduct in violation of federal law that is alleged herein.

260.   Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent.

261.   A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein, because joinder of all members is impracticable.  Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them.   The likelihood of individual Class members

prosecuting separate claims is remote and Plaintiff anticipates no difficulties in the management of this action as a class action.

262. Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated federal securities laws by the acts and/or omissions alleged herein;

(b) whether Defendants' Class Period public statements and reports misrepresented and/or omitted material information;

(c) whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

(d) whether Defendants participated in and pursued the common course of conduct complained of herein;

(e) whether the market price of Freddie Mac common stock was inflated artificially as a result of Defendants' material misrepresentations and/or omissions during the Class Period;

(f) whether the Individual Defendants are liable as control persons under the federal securities laws; and

(g) to what extent the members of the Class have sustained damages and the proper measure of damages.

## X.    INAPPLICABILITY OF STATUTORY SAFE-HARBOR

263. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false

statements pled in this Complaint.  Many of the statements alleged to be false and misleading herein were not specifically identified as "forward-looking statements" when made, and many were statements of historical fact and/or representations about Freddie Mac's then-existing condition to which the statutory safe harbor does not apply.  Moreover, Plaintiff primarily alleges material omissions of material facts by Defendants.

264.   To the extent any statements alleged to be false herein may be characterized as forward-looking to which the statutory safe harbor applies, (i) those statements were not accompanied by meaningful cautionary statements identifying the important then-present factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and (ii) the particular speakers of such statements knew in each case that their statements were false or misleading and/or the statements were authorized and/or approved by an executive officer of the Company who knew that those statements were false or misleading, in each case when such statements were made.

265.   Any purported warnings contained in or accompanying any of the press releases, periodic financial reports and financial statements, and other public statements described herein were generic and unparticularized boilerplate statements that lacked the meaningful cautionary language necessary to insulate any forward-looking statements.

## XI.  APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

266.   In bringing the claims herein, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the fraud-on-the-market doctrine.  At all times relevant to this Complaint, the market for Freddie Mac common stock was an efficient market for the following reasons, among others:

(a)    Freddie Mac common stock was listed and actively traded on the NYSE, a highly efficient and automated market.  Freddie Mac's common stock trading volume was substantial.  The average daily trading volume of Freddie Mac common stock throughout the Class Period was over twenty million shares per day.

(b)    Freddie Mac published quarterly earnings press releases, Annual Reports and Information Statements and made such releases and reports available to its investors through mailings and/or on its website www.freddiemac.com.

(c)    Freddie Mac regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Freddie Mac was followed by numerous national securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage

117

firms. Each of these reports was publicly available and entered the public marketplace.

267. As a result of the foregoing, the market for Freddie Mac common stock promptly digested current information regarding Freddie Mac from all publicly available sources and reflected such information in the market prices for Freddie Mac common stock at all relevant times. Under these circumstances, Plaintiff and other members of the Class, as purchasers of Freddie Mac common stock during the Class Period, suffered similar injury through their purchase of Freddie Mac's common stock at artificially inflated prices and a presumption of reliance applies.

268. In addition to the foregoing, Plaintiff and the Class is entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding Freddie Mac's subprime exposure, internal controls, risk management, financial condition, results and business operations.

## XII.   LOSS CAUSATION

269. Throughout the Class Period, the prices of Freddie Mac's common stock were inflated as the result of the Defendants' material misrepresentations and omissions. Not only did the Defendants publish materially false statements on Freddie Mac's financial condition and results, but they also publicly misrepresented that, among other things, Freddie Mac did not purchase nontraditional loans or securities backed by low credit loans, its exposure to the

nontraditional crisis was not significant, it had "excellent" risk management, and the Company maintained adequate internal financial controls.

270. Freddie Mac's financial results, exposure to subprime investments, inadequacy of risk management and internal controls and inadequacy of financial disclosures were material information to Plaintiff and other members of the Class. Together, these facts reflect that Freddie Mac was a far riskier investment than it disclosed, and that its representations that it was managing risk were completely false. When these risks were realized, the market price of Freddie Mac plummeted. Had Plaintiff and the other Class Members known the truth – that the Company's reported financial results were materially false and misleading and painted a more positive picture of the Company's results and stability than the true facts warranted, and in fact its exposure to the nontraditional mortgages was huge – Plaintiff and the other members of the Class either would not have purchased Freddie Mac common stock at all, or would have done so only at substantially lower prices than the artificially inflated prices which they actually paid.

271. The nature, extent and effect of Defendants' fraudulent scheme were revealed to the market through earnings releases and other public statements. As alleged herein, these revelations caused significant declines in the price of Freddie Mac common stock, causing Plaintiff and other members of the Class who continued to hold Freddie Mac common stock at the time of these disclosures to suffer significant losses. The Company's common stock price fell 29% - from $37.50 per share on November 19, 2007 to $26.74 per share on

November 20, 2007.  These declines are directly attributable to the market's reaction to revelations of the nature, extent and impact of the fraud at Freddie Mac, and to its adjustment of the price to reflect the newly emerging truth about Freddie Mac's investments, risk management, financial condition and results. Thus, these price declines were directly caused by Defendants' fraud alleged herein, and by the market's response to the subsequent partial corrective disclosures. The fraud perpetrated by the Defendants described in this Complaint proximately caused foreseeable losses to the Plaintiff and the other members of the Class.

## XIII.   CAUSES OF ACTION

### COUNT I

**Violations of Sections 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder**

272.   Plaintiff repeats and realleges each of the allegations set forth above as if set forth fully herein.

273.   As described in detail above, throughout the Class Period, the Defendants, directly or indirectly, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications and a national securities exchange, employed a device, scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with

their purchases of the common stock of Freddie Mac during the Class Period, all in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

274.   The Company and the Individual Defendants, as the most senior officers or Board Committee members of Freddie Mac during the Class Period, are liable as direct participants in all of the wrongs complained of herein. Through their positions of control and authority, the Individual Defendants were in a position to and did control all of the Company's false and misleading statements and omissions, including the contents of all of its public filings and reports and press releases, as more particularly set forth above.   In addition, certain of these false and misleading statements constitute "group published information," which the Individual Defendants were responsible for creating.  The Company is liable for each of the statements of the Individual Defendants through the principles of *respondeat superior*.

275.   As detailed above, the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express responsibility for knowing such facts.  Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Freddie Mac's earnings volatility and true financial and operating condition from the investing public and supporting the artificially inflated price of Freddie Mac's common stock.

276.   Plaintiff and the other members of the Class relied upon the Defendants' statements and/or on the integrity of the market in purchasing Freddie Mac's common stock during the Class Period.

277.   As a direct and proximate cause of the wrongful conduct described herein, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Freddie Mac common stock at artificially inflated prices during the Class Period.  Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind the Defendants' material misstatements, they would not have purchased Freddie Mac common stock at artificially inflated prices during the Class Period.

278.   By virtue of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the members of the Class who have been damaged as a result of such violations.

### COUNT II

#### Violations of Section 20(a) of the Exchange Act
#### Against the Individual Defendants

279.   Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

280.   As set forth in Count I above, Freddie Mac and the Individual Defendants each violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) by their acts and omissions as alleged in this Complaint.

281.   Throughout the Class Period, the Individual Defendants were controlling persons of Freddie Mac within the meaning of Section 20(a) of the Exchange Act.  By virtue of their board committee membership and/or high-level positions, their stock ownership and contractual rights and/or their specific acts described above, the Individual Defendants had the power to and did, directly or indirectly, exercise control over Freddie Mac, including the content and dissemination of the various statements and financial reports which Plaintiff contends are false and misleading.  Each of the Individual Defendants either made, participated in the preparation of, were responsible for and/or were provided with or had unlimited access to Freddie Mac's reports, financial statements, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after they were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Each of the Individual Defendants had direct and supervisory or oversight responsibility for and involvement in the day-to-day operations of Freddie Mac, and induced or permitted Freddie Mac to engage in the acts constituting the violations of the federal securities laws alleged herein.

282.   As a result of Defendants' false and misleading statements and omissions alleged herein, the market price of Freddie Mac common stock was artificially inflated during the Class Period.  The members of the Class relied upon either the integrity of the market or upon the statements and reports of the Defendants in purchasing Freddie Mac common stock during the Class Period.

283.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Freddie Mac's common stock at artificially inflated prices during the Class Period.  Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind its material misleading statements or misstatements, they would not have purchased Freddie Mac common stock at artificially inflated prices during the Class Period.

284.  By virtue of their positions as controlling persons of Freddie Mac, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act to Plaintiff and the members of the Class who have been damaged as a result of Freddie Mac's underlying securities violations.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and all other Class members, pray for judgment as follows:

(a)     A determination that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)     An award of compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest thereon;

(c)     An award to Plaintiff and the Class of their reasonable costs and expenses incurred in this action, including reasonable counsel fees, expert fees and other costs; and

(d)     A grant of such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all issues so triable.

March 28, 2012                    Respectfully submitted,

                                 OHIO ATTORNEY GENERAL
                                 MICHAEL DeWINE
                                 Attorney General of Ohio
                                 30 East Broad Street, 17th Floor
                                 Columbus, Ohio  43215
                                 Telephone:  (614) 387-5600
                                 Facsimile:  (614) 387-6697

                                 */s/ Jean M. McCoy (née Geoppinger)*
                                 Joseph T. Deters (0012084)
                                 W.B. Markovits (0018514)
                                 James R. Cummins (0000861)
                                 Melanie S. Corwin (0046513)
                                 Jean M. McCoy (née Geoppinger) (0046881)
                                 Christopher D. Stock (0075443)
                                 WAITE, SCHNEIDER, BAYLESS,
                                 & CHESLEY CO., L.P.A.
                                 1513 Fourth & Vine Tower
                                 One West Fourth Street
                                 Cincinnati, Ohio  45202
                                 Telephone:  (513) 621-0267
                                 Facsimile:  (513) 621-0262
                                 E-mail:  joedeters@wsbclaw.com
                                 E-mail:  billmarkovits@wsbclaw.com
                                 E-mail:  jcummins@wsbclaw.com
                                 E-mail:  mcorwin@wsbclaw.com
                                 E-mail:  jeangeoppinger@wsbclaw.com
                                 E-mail:  chrisstock@wsbclaw.com

                                 *Special Counsel to the Attorney*
                                 *General of the State of Ohio and*
                                 *Lead Counsel for Lead Plaintiff*

                                 */s/ Martin D. Chitwood (consent)*
                                 Martin D. Chitwood
                                 James M. Wilson, Jr.
                                 Krissi T. Gore
                                 Chitwood Harley Harnes LLP
                                 2300 Promenade II
                                 1230 Peachtree Street, N.E.
                                 Atlanta, Georgia 30309
                                 Telephone: (404) 873-3900
                                 Facsimile: (404) 876-4476
                                 E-mail:  mchitwood@chitwoodlaw.com

126

-and-

John F. Harnes
Gregory E. Keller
Darren T. Kaplan
Chitwood Harley Harnes LLP
1350 Broadway, Suite 908
New York, New York 10018
Telephone:  (917) 595-4600
Facsimile:  (404) 876-4476
E-mail:  dkaplan@chitwoodlaw.com
E-mail:  jfharnes@chitwoodlaw.com
E-mail:  gkeller@chitwoodlaw.com

*Special Counsel to the Attorney General of
the State of Ohio and Lead Counsel for Lead
Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2012, a copy of the foregoing

pleading was filed electronically.  Notice of this filing will be sent by operation of

the Court's CM/ECF system to all parties indicated on the electronic filing receipt.

Plaintiffs may access this filing through the Court's system.

*/s/ Jean M. McCoy (née Geoppinger)*
Jean M. McCoy (née Geoppinger)

127