**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, On Behalf of Itself and all Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>FEDERAL HOME LOAN MORTGAGE CORPORATION a/k/a FREDDIE MAC, RICHARD F. SYRON, PATRICIA L. COOK, ANTHONY S. PISZEL, and EUGENE M. McQUADE,<br><br>Defendants. | CIVIL ACTION NO. 4:08-cv-160<br><br>JUDGE BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE<br>WILLIAM H. BAUGHMAN, JR. |

**MEMORANDUM OF LAW IN SUPPORT OF FREDDIE MAC'S**
**<u>MOTION TO DISMISS THE THIRD AMENDED COMPLAINT WITH PREJUDICE</u>**

# TABLE OF CONTENTS


**Page**

INTRODUCTION .......... 1

STATEMENT OF THE ISSUES .......... 1

SUMMARY OF THE ARGUMENTS PRESENTED .......... 2

PRELIMINARY STATEMENT .......... 2

ARGUMENT .......... 7

I. PLAINTIFF FAILS ADEQUATELY TO PLEAD LOSS CAUSATION .......... 7

A. Plaintiff Fails Sufficiently To Plead The Existence Of Any "Corrective Disclosure." .......... 9

1. The November 20, 2007 Press Release Does Not Reveal The Falsity Of Any Prior Disclosure .......... 10

2. Long Before November 20, 2007, Freddie Mac Disclosed The Increase In Its Purchases Of Loans With Riskier Credit Characteristics .......... 13

B. The "Fraud-On-The-Market" Doctrine Precludes Plaintiff From Pleading Loss Causation Regarding Freddie Mac's Exposure To Non-Traditional Loans .......... 16

C. Plaintiff Fails To Plead Facts Sufficient To Exclude More Likely Explanations For Investor Losses .......... 19

II. THE THIRD AMENDED COMPLAINT SHOULD BE DISMISSED UNDER THE PSLRA AND RULE 9(b) .......... 21

A. Plaintiff Fails Adequately To Plead Scienter .......... 21

1. Plaintiff Must Plead Specific Facts Giving Rise To A Strong Inference Of Scienter .......... 21

2. Plaintiff Pleads No Specific Facts Giving Rise To A Strong Inference Of Scienter .......... 22

3. Plaintiff's Conclusory Allegations Regarding What Defendants Allegedly Knew Do Not Give Rise To A Strong Inference Of Scienter .......... 25

4. Plaintiff's Confidential Source Allegations Do Not Support Any Inference Of Scienter .......... 27

5. Plaintiff's "Motive And Opportunity" Allegations Do Not Support A Strong Inference Of Scienter .......... 29

a. The Absence Of Sales By Freddie Mac's CEO, CFO, And COO, And The Millions Of Dollars Of Investment Losses Incurred By The Individual Defendants, Undermines Any Inference Of Scienter .......... 30




A/75750334

**TABLE OF CONTENTS**
(continued)

**Page**


b. Freddie Mac's Repurchase Of Over $2.2 Billion Of Its Own Shares Refutes Any Inference Of Scienter......... 34

c. Plaintiff's Allegations Concerning The Individual Defendants' Compensation Cannot Support Any Inference of Scienter...................... 34

d. The Mere Fact That The SEC Brought An Enforcement Action Against Certain Of The Individual Defendants Does Not Support A Strong Inference Of Scienter.......... 35

6. The Opposing Inferences Of Nonfraudulent Intent Are More Plausible Than Any Inference Of Fraud........... 36

B. The Alleged Misrepresentations And Omissions Are Not Pled With The Particularity Required By The PSLRA And Rule 9(b) ........... 40

III. THE THIRD AMENDED COMPLAINT SHOULD ALSO BE DISMISSED UNDER RULE 12(b)(6) BECAUSE THE PLAINTIFF HAS FAILED TO ALLEGE ANY ACTIONABLE MISREPRESENTATIONS OR OMISSIONS OF MATERIAL FACT ............. 42

A. Plaintiff Has Not Alleged Any Omission Of Material Fact Actionable Under Section 10(b).................................. 42

1. Plaintiff Does Not And Cannot Allege That Any Actual Statement Was "So Incomplete As To Mislead." ............ 43

2. Allegations Of Business Mismanagement Do Not State A Claim For Violation Of The Federal Securities Laws ............. 43

3. Freddie Mac Disclosed Its Increased Participation In Non-Traditional Mortgage Markets, The Attendant Risks, The Lack Of A Universal Definition Of Subprime, And The Precise Credit Characteristics Of Its Guarantee Portfolio........................ 46

a. Freddie Mac Disclosed Both That It Was Increasing Its Participation In The Non-Traditional Mortgage Market And The Increased Risk That Such Loans Presented.............. 47

b. Freddie Mac Disclosed That There Is No Universally Accepted Definition Of Subprime................ 48

c. Freddie Mac Broadly Disclosed The Credit Characteristics Of The Loans In Its Guarantee Portfolio ......................... 50




A/75750334

**TABLE OF CONTENTS**
(continued)

**Page**

d. Freddie Mac Disclosed The Amount Of Its Capital Base, Its Minimum Capital Requirements, And The Risk That Its Capital Base May Decline Below Required Levels ..................... 56

B. The Statements Upon Which Plaintiff Bases Its Claims Are Not Actionable Under Section 10(b) .................................... 58

1. Accurate Statements Of Historical Fact Are Not Actionable ...... 59

2. Vague And Indefinite Statements Of Optimism Are Immaterial, As A Matter Of Law......................... 59

3. Statements That "Bespeak Caution" Are Not Actionable As A Matter Of Law................................... 61

4. Characterizations Cannot Replace Actionable Statements .......... 62

C. An Application Of The Foregoing Legal Doctrines To Each Of The Challenged Statements Establishes That None Of The Challenged Statements Is Actionable, As A Matter Of Law............ 63

IV. PLAINTIFF'S SECTION 20(a) CLAIMS SHOULD BE DISMISSED ............. 65

CONCLUSION ......................................................................................................... 66

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

In re 2007 NovaStar Fin., Inc., Sec. Litig.,
No. 07-cv-0139, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008) ....43

In re Almost Family, Inc. Sec. Litig.,
No. 10-cv-00520, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ....10, 59

In re Alpharma Inc. Sec. Litig.,
372 F.3d 137 (3d Cir. 2004) ....32

Andropolis v. Red Robin Gourmet Burgers, Inc.,
505 F. Supp. 2d 662 (D. Colo. 2007) ....61

Arazie v. Mullane,
2 F.3d 1456 (7th Cir. 1993) ....25

Ashcroft v. Iqbal,
556 U.S. 662 (2009) ....9

Ashland, Inc. v. Oppenheimer & Co.,
648 F.3d 461 (6th Cir. 2011) .... *passim*

Ashland Inc. v. Oppenheimer & Co.,
689 F. Supp. 2d 874 (E.D. Ky. 2010) ....35

Backman v. Polaroid Corp.,
910 F.2d 10 (1st Cir. 1990) ....43

Basic Inc. v. Levinson,
485 U.S. 224 (1988) ....16, 42, 46

Beaver Cnty. Ret. Bd. v. LCA-Vision Inc.,
No. 07-cv-750, 2009 WL 806714 (S.D. Ohio Mar. 25, 2009) ....22, 34, 35

Bell Atlantic Corp. v. Twombly,
550 U.S. 544 (2007) ....8, 41

Benzon v. Morgan Stanley Distribs., Inc.,
420 F.3d 598 (6th Cir. 2005) ....46

In re Boston Tech., Inc. Sec. Litig.,
8 F. Supp. 2d 43 (D. Mass. 1998) ....22

Bovee v. Coopers & Lybrand C.P.A.,
272 F.3d 356 (6th Cir. 2001) ....25

Campbell v. Lexmark Int'l, Inc.,
234 F. Supp. 2d 680 (E.D. Ky. 2002) ....................................................................31, 33

In re Capstead Mortg. Corp. Sec. Litig.,
258 F. Supp. 2d 533 (N.D. Tex. 2003) ..........................................................................25

City of Pontiac Gen. Emps. Ret. Sys. v. Stryker Corp.,
865 F. Supp. 2d 811 (W.D. Mich. 2012) ........................................................... *passim*

City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) .........................................................................32

Coble v. Broadvision Inc.,
No. 01-1969, 2002 WL 31093589 (N.D. Cal. Sept. 11, 2002) .......................................60

Cohen v. Stevanovich,
722 F. Supp. 2d 416 (S.D.N.Y. 2010)...............................................................................8

In re Comshare Inc. Sec. Litig.,
183 F.3d 542 (6th Cir. 1999) .........................................................................................29

In re Comshare, Inc. Sec. Litig.,
No. 96-cv-73711, 1997 WL 1091468 (E.D. Mich. Sept. 18, 1997) ..................................31

In re Copley Pharm., Inc. Sec. Litig.,
No. 94-11897, 1995 WL 169215 (D. Mass. Mar. 16, 1995) ...........................................63

In re Credit Acceptance Corp. Sec. Litig.,
50 F. Supp. 2d 662 (E.D. Mich. 1999).......................................................................6, 31

In re Cytyc Corp. Sec. Litig.,
No. 02-12399, 2005 WL 3801468 (D. Mass. Mar. 2, 2005) .....................................61, 62

D.E.&J. Ltd. P'ship v. Conaway,
133 F. App'x 994 (6th Cir. 2005) ..................................................................... *passim*

In re Dell Inc., Sec. Litig.,
591 F. Supp. 2d 877 (W.D. Tex. 2008)..............................................................................9

Dent v. U.S. Tennis Ass'n,
No. 08-cv-1533, 2008 WL 2483288 (E.D.N.Y. June 17, 2008).......................................36

In re Donald J. Trump Casino Sec. Litig.,
7 F.3d 357 (3d Cir. 1993) ..................................................................................61, 63, 65

In re Downey Sec. Litig.,
No. 08-3261, 2009 WL 736802 (C.D. Cal. Mar. 18, 2009).................................28, 60, 63

Dura Pharms. Inc. v. Broudo,
544 U.S. 336 (2005)........................................................................................ *passim*

ECA v. JP Morgan Chase Co.,
553 F.3d 187 (2d Cir. 2009)..........................................................................47, 60

Elam v. Neidorff,
544 F.3d 921 (8th Cir. 2008) ..............................................................................32

In re Ferro Corp. Sec. Litig.,
No. 04-cv-1440, 2007 WL 1691358 (N.D. Ohio June 11, 2007) .................................. *passim*

In re The First Marblehead Corp. Sec. Litig.,
639 F. Supp. 2d 145 (D. Mass. 2009).....................................................................20

In re First Union Corp. Sec. Litig.,
128 F. Supp. 2d 871 (W.D.N.C. 2001) ...................................................................31

Fitzer v. Sec. Dynamics Techs., Inc.,
119 F. Supp. 2d 12 (D. Mass. 2000) ......................................................................60

Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.,
No. 12-cv-2001, 2013 WL 4054630 (N.D. Ohio Aug. 9, 2013)..................................8, 33, 35

In re Ford Motor Co. Sec. Litig.,
381 F.3d 563 (6th Cir. 2004) ........................................................................... *passim*

In re Gander Mt. Cnty. Sec. Litig.,
No. 05-183, 2006 WL 140670 (D. Minn. Jan. 17, 2006).......................................................27

Glaser v. The9, Ltd.,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)......................................................................32

Glazer Capital Mgmt. v. Magistri,
549 F.3d 736 (9th Cir. 2008) ..............................................................................35

In re Goodyear Tire & Rubber Co. Sec. Litig.,
436 F. Supp. 2d 873 (N.D. Ohio 2006)............................................................ *passim*

Greenberg v. Compuware Corp.,
889 F. Supp. 1012 (E.D. Mich. 1995)......................................................................59

Greenhouse v. MCG Capital Corp.,
392 F.3d 650 (4th Cir. 2004) ..............................................................................46

Grillo v. Tempur-Pedic Int'l, Inc.,
553 F. Supp. 2d 809 (E.D. Ky. 2008) .....................................................................21

Guerra v. Teradyne Inc.,
No. 01-11789, 2004 WL 1467065 (D. Mass. Jan. 16, 2004)....................................................25

Helwig v. Vencor, Inc.,
251 F.3d 540 (6th Cir. 2001) ..........................................................................................22, 62

Hess v. Am. Physicians Capital Inc.,
No. 04-cv-0031, 2005 WL 459638 (W.D. Mich. Jan. 11, 2005)............................................62

Hubbard v. BankAtlantic Bancorp, Inc.,
625 F. Supp. 2d 1267 (S.D. Fla. 2008) ....................................................................................28

In re Huntington Bancshares Inc. ERISA Litig.,
620 F. Supp. 2d 842 (S.D. Ohio 2009) .....................................................................................40

In re Impac Mortg. Holdings, Inc. Sec. Litig.,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ....................................................................................44

Ind. State Dist. Council of Laborers & Hod Carriers
Pension & Welfare Fund v. Omnicare, Inc.,
583 F.3d 935 (6th Cir. 2009) ........................................................................................... *passim*

In re John Alden Fin. Corp. Sec. Litig.,
249 F. Supp. 2d 1273 (S.D. Fla. 2003) ....................................................................................33

In re K-tel Int'l Inc. Sec. Litig.,
300 F.3d 881 (8th Cir. 2002) ...................................................................................................43

Katyle v. Penn Nat'l Gaming, Inc.,
637 F.3d 462 (4th Cir. 2011) .....................................................................................................8

In re Kindred Healthcare, Inc. Sec. Litig.,
299 F. Supp. 2d 724 (W.D. Ky. 2004)..................................................................................22, 62

Kuriakose v. Fed. Home Loan Mortg. Corp.,
897 F. Supp. 2d 168 (S.D.N.Y. 2012)............................................................................. *passim*

Kuriakose v. Fed. Home Loan Mortg. Corp.,
No. 08-cv-7281, 2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011).................................... *passim*

Lentell v. Merrill Lynch & Co.,
396 F.3d 161 (2d Cir. 2005)............................................................................................ *passim*

In re Level 3 Commc'ns Inc. Sec. Litig.,
667 F.3d 1331 (10th Cir. 2012) ...............................................................................................32

Ley v. Visteon Corp.,
543 F.3d 801 (6th Cir. 2008) ........................................................................................... *passim*

Local 295/Local 851 IBT Emp'r Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp,
731 F. Supp. 2d 689 (S.D. Ohio 2010) ....27

Lormand v. U.S. Unwired, Inc.,
565 F.3d 228 (5th Cir. 2009) ....8

Maldonado v. Dominguez,
137 F.3d 1 (1st Cir. 1998) ....33

Melder v. Morris,
27 F.3d 1097 (5th Cir. 1994) ....63

In re Merrill Lynch & Co., Research Reports Sec. Litig.,
218 F.R.D. 76 (S.D.N.Y. 2003) ....35

In re Metro. Sec. Litig.,
532 F. Supp. 2d 1260 (E.D. Wash. 2007) ....61

Metzler Inv. GMBH v. Corinthian Colls., Inc.,
540 F.3d 1049 (9th Cir. 2008) ....9, 26, 32

Meyer v. Greene,
710 F.3d 1189 (11th Cir. 2013) .... *passim*

Miller v. Champion Enters.,
346 F.3d 660 (6th Cir. 2003) .... *passim*

Nathenson v. Zonagen Inc.,
267 F.3d 400 (5th Cir. 2001) ....33

Next Century Commc'ns Corp. v. Ellis,
318 F.3d 1023 (11th Cir. 2003) ....60

In re Nike, Inc. Sec. Litig.,
181 F. Supp. 2d 1160 (D. Or. 2002) ....33

Nolte v. Capital One Fin. Corp.,
390 F.3d 311 (4th Cir. 2004) ....49

Olkey v. Hyperion 1999 Term Trust, Inc.,
98 F.3d 2 (2d Cir. 1996) ....46

In re Party City Sec. Litig.,
147 F. Supp. 2d 282 (D.N.J. 2001) ....33

In re Peritus Software Servs. Inc. Sec. Litig.,
52 F. Supp. 2d 211 (D. Mass. 1999) ....59

In re Philip Morris Sec. Litig.,
872 F. Supp. 97 (S.D.N.Y. 1995)....................................................................................63

Pittleman v. Impac Mortg. Holdings, Inc.,
No. 07-0970, 2009 WL 648983 (C.D. Cal. Mar. 9, 2009)....................................................40

PR Diamonds, Inc. v. Chandler,
364 F.3d 671 (6th Cir. 2004) ........................................................................... *passim*

In re PXRE Grp. Ltd., Sec. Litig.,
600 F. Supp. 2d 510 (S.D.N.Y. 2009)..............................................................................40

Raab v. Gen. Physics Corp.,
4 F.3d 286 (4th Cir. 1993) ..............................................................................................7, 48

In re Radian Sec. Litig.,
612 F. Supp. 2d 594 (E.D. Pa. 2009) ...............................................................................40

Ricker v. Zoo Entm't, Inc.,
No. 11-cv-00490, 2012 WL 3070717 (S.D. Ohio July 30, 2012)..........................................22

Ricker v. Zoo Entm't, Inc.,
No. 12-cv-3951, 2013 WL 4516095 (6th Cir. Aug. 27, 2013) ...................................... *passim*

Rosenzweig v. Azurix Corp.,
332 F.3d 854 (5th Cir. 2003) ..........................................................................................60

In re Royal Appliance Sec. Litig.,
No. 94-cv-3284, 1995 WL 490131 (6th Cir. Aug. 15, 1995) ................................................46

RSM Prod. Corp. v. Fridman,
643 F. Supp. 2d 382 (S.D.N.Y. 2009)..............................................................................36

Santa Fe Indus. v. Green,
430 U.S. 462 (1977)........................................................................................................43

S.E.C. v. Goble,
682 F.3d 934 (11th Cir. 2012) .........................................................................................12

S.E.C. v. Simpson Capital Mgmt., Inc.,
586 F. Supp. 2d 196 (S.D.N.Y. 2008)................................................................................5

In re Sec. Capital Assurance Ltd. Sec. Litig.,
729 F. Supp. 2d 569 (S.D.N.Y. 2010)..............................................................................60

Shaw v. Digital Equip. Corp.,
82 F.3d 1194 (1st Cir. 1996)............................................................................................26

In re Silicon Graphics Sec. Litig.,
183 F.3d 970 (9th Cir. 1999) ....................25

In re Sofamor Danek Grp., Inc.,
123 F.3d 394 (6th Cir. 1997) ....................42, 46, 59

In re Sportsline.com Sec. Litig.,
366 F. Supp. 2d 1159 (S.D. Fla. 2004) ....................31

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
551 U.S. 308 (2007).................... *passim*

In re Tibco Software, Inc. Sec. Litig.,
No. 05-2146, 2006 WL 1469654 (N.D. Cal. May 25, 2006)....................34

Tripp v. IndyMac Fin. Inc.,
No. 07-1635, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ....................44

Wade v. Wellpoint, Inc.,
892 F. Supp. 2d 1102 (S.D. Ind. 2012)....................32

Winer Family Trust v. Queen,
503 F.3d 319 (3d Cir. 2007)....................43

Wyser-Pratte Mgmt. Co. v. Telxon Corp.,
413 F.3d 553 (6th Cir. 2005) ....................11

Zack v. Allied Waste Indus.,
No. 04-1640, 2005 WL 3501414 (D. Ariz. Dec. 15, 2005)....................28

Zaluski v. United Am. Healthcare Corp.,
527 F.3d 564 (6th Cir. 2008) ....................42

**STATUTES AND REGULATIONS**

12 U.S.C. § 1454....................3

15 U.S.C. § 78a....................30

15 U.S.C. § 78u....................62

17 C.F.R. 240.10b5-1....................32

17 C.F.R. 240.16....................30

H.R. Rep. No. 104-369 (1995) (Conf. Rep.).................... *passim*

# INTRODUCTION

Defendant Federal Home Loan Mortgage Corporation ("Freddie Mac") hereby submits this Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Third Amended Complaint ("TAC").

Congress enacted the Private Securities Litigation Reform Act of 1995 (the "PSLRA") in order to deter "baseless and extortionate securities lawsuits." H.R. Rep. No. 104-369, at 32 (1995) (Conf. Rep.), as reprinted in 1995 U.S.C.C.A.N. 730, 731. The legislation was:

> prompted by significant evidence of abuse in private securities lawsuits . . . [which] include . . . the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action[.]

Id. at 31, as reprinted in 1995 U.S.C.C.A.N. at 730 (emphasis added). "The 'purpose' of the PSLRA is to screen out lawsuits having no factual basis [and] to prevent harassing strike suits . . . ." PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 700 (6th Cir. 2004), abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1323-25 (2011); see also Miller v. Champion Enters., 346 F.3d 660, 691-92 (6th Cir. 2003) (PSLRA's purpose is "to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis"). This litigation is exactly the type of baseless securities suit that the PSLRA was designed to prevent.

# STATEMENT OF THE ISSUES

A. Should the Court dismiss the TAC for failure to plead loss causation where the TAC does not identify any corrective disclosure?

B. Should the Court dismiss the TAC for failure sufficiently to allege scienter because Plaintiff's allegations fail to support an inference of scienter that is at least as compelling as the countervailing non-fraudulent inference because: (1) the Defendants sold no Freddie Mac stock during the putative class period, and thereby incurred large investment losses on their Freddie Mac holdings; and (2) Freddie Mac fully disclosed, inter alia, its exposure to non-traditional loans, including the specific credit characteristics and increased credit risk associated with those loans?

C. Should the Court dismiss the TAC for failure sufficiently to allege any omission of material fact where: (1) Plaintiff does not allege any challenged statement was "so incomplete as to mislead;" (2) Plaintiff's allegations of mismanagement do not support a claim under federal securities laws; and (3) Freddie Mac disclosed its increased participation in non-traditional mortgage markets, the attendant risks, the lack of a universal definition of subprime, and the precise credit characteristics of its guarantee portfolio?

D. Should the Court dismiss the TAC for failure sufficiently to allege any misstatement of material fact where Plaintiff fails adequately to explain why any challenged statement was false, and the statements that Plaintiff challenges: (1) are forward-looking statements accompanied by meaningful cautionary language; (2) bespeak caution in outlook; (3) are accurate statements of historical fact; (4) are vague and indefinite statements of general optimism; and (5) are mischaracterizations of Defendants' actual statements?

## SUMMARY OF THE ARGUMENTS PRESENTED

Plaintiff fails adequately to plead loss causation, having failed to identify a causal connection between any alleged misrepresentation by Defendants and Plaintiff's purported loss. In addition, Plaintiff has not and cannot sufficiently plead scienter. Indeed, Plaintiff fails to assert a single fact that would give rise to a strong inference that any Defendant knew that any statement at issue was false. Moreover, Plaintiff does not allege any actionable misrepresentation or omission of material fact or plead its claims with particularity as required.

Plaintiff's claims should be dismissed in their entirety, with prejudice.

## PRELIMINARY STATEMENT

Freddie Mac is a government-sponsored enterprise ("GSE") chartered by Congress in 1970 to promote homeownership by providing liquidity, stability and affordability to the home mortgage market. TAC ¶ 1. To accomplish its congressionally-mandated mission, Freddie Mac purchases mortgages and mortgage-related securities, thereby providing a flow of capital to

mortgage lenders. Under the terms of its charter, Freddie Mac's business is limited to the purchase of home mortgages and securities; it may not originate loans or engage in any other business. 12 U.S.C. § 1454. Freddie Mac packages those mortgages into securities that it sells in the capital markets (its "guarantee portfolio"), and it also purchases mortgage-related securities created by others (its "retained portfolio"), thereby facilitating the flow of funds between the capital and mortgage markets. See App. 3 at 1 (2007 Annual Report).[1] Under its charter, Freddie Mac also was required to meet certain affordable housing goals set by the Department of Housing and Urban Development ("HUD").[2]

In the years leading up to 2006, as Freddie Mac pursued its mission by purchasing mortgage loans and mortgage-related securities, real estate values skyrocketed throughout the country. During that period, Freddie Mac warned investors that, if real estate values declined, or credit tightened, or interest rates changed, it was likely to incur unavoidable losses. App. 1 at 14-15, 126 (2005 Annual Report); App. 2 at 14 (2006 Annual Report). Further, Freddie Mac made candid and extensive disclosures regarding: (1) its intent to increase its participation in non-traditional mortgage markets; (2) the increased risk presented by non-traditional mortgage loans; and (3) the precise credit characteristics of the loans in its guarantee portfolio. See infra Part III.A.3.

Then, in 2007, the steep increase in home prices came to an abrupt end. This rise and drop in U.S. home values is illustrated by the chart below:

[1] The Appendix filed herewith contains complete copies of documents referenced herein as "App. ___."

[2] The goals and subgoals HUD set for Freddie Mac were "intended to expand housing opportunities for low- and moderate-income families, low-income families living in low-income areas, very low-income families and families living in HUD-defined underserved areas." App. 3 at 7-8 (2007 Annual Report).




In 2007, credit tightened severely and loan defaults increased dramatically. Just as Freddie Mac had warned investors, its financial results and its stock price suffered as a result of the collapse of the financial markets. In November 2007, Freddie Mac publicly disclosed that it incurred a $2 billion loss in the third quarter of 2007 ("Q3 2007"). Shortly after Freddie Mac announced the losses on November 20, 2007, Plaintiff filed a knee-jerk lawsuit alleging that Freddie Mac and members of its senior management had engaged in "fraud."

The losses about which Plaintiff complains did not result from fraud by anyone at Freddie Mac. It is thus not surprising that Plaintiff falls woefully short of its pleading obligations under the PSLRA and Rules 9(b) and 12(b)(6). Indeed, in dismissing virtually identical claims against Freddie Mac in the Kuriakose class action, Judge Keenan stated:

> This shift in the housing market caused Freddie Mac to report a loss of more than $2 billion on November 20, 2007, causing its stock price to fall from $37.50 at the close of trading on November 19 to $26.74 at the close of trading on November 20.

Kuriakose v. Fed. Home Loan Mortg. Corp., No. 08-cv-7281, 2011 WL 1158028, at *4 (S.D.N.Y. Mar. 30, 2011).

As discussed below, Plaintiff's claims here are subject to dismissal for many of the same reasons that, in Kuriakose, Judge Keenan held virtually identical allegations legally defective. To begin, Plaintiff fails adequately to allege loss causation. See infra Part I. Loss causation is an element of a private securities fraud claim, but not a claim by the Securities and Exchange Commission ("SEC").[3] The TAC fails to allege a single fact suggesting that the market ever learned during the proposed class period ("Class Period") that any challenged statement was false. This alone is fatal to Plaintiff's claims. In addition, Plaintiff also fails adequately to allege scienter. See infra Part II.A. Furthermore, Plaintiff fails to identify a single actionable misrepresentation or omission of material fact. See infra Parts II.B & III.

At bottom, Plaintiff's claims lack merit because Freddie Mac candidly, and repeatedly, disclosed the very information that was allegedly concealed, particularly respecting the increase in its purchase of loans with riskier credit characteristics. More specifically, both before and during the Class Period, Freddie Mac made extensive disclosures regarding its intent to increase its purchase of non-traditional mortgage products with riskier credit characteristics; the amount, by product, of such loans that it purchased; the risks associated with such purchases, including the fact that such loans were expected to default at a higher rate; the delinquency data that showed those loans did default at higher rate; and, most importantly, the exact amount of loans that Freddie Mac held in its guarantee portfolio with various riskier credit characteristics, such as low FICO scores and higher loan-to-value ("LTV") ratios. Plaintiff does not contest the accuracy of any of those disclosures.

For these reasons, as this Court noted in its Order dated August 23, 2013: "The judge in Kuriakose held that the plaintiffs had failed adequately to plead scienter due to, inter alia, 'the bevy of truthful disclosures that Freddie Mac made throughout the Class Period.'" ECF No. 281 at 5 n.2 (quoting Kuriakose v. Fed. Home Loan Mortg. Corp., 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012)). As the Kuriakose court wryly observed in dismissing that related case:

---

[3] See S.E.C. v. Simpson Capital Mgmt., Inc., 586 F. Supp. 2d 196, 201 (S.D.N.Y. 2008) ("Unlike private litigants, the SEC is not required to prove investor reliance, loss causation, or damages in an action for securities fraud.").

> It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures. If Freddie Mac executives sought to shield its investors from "learning the truth of" its business, they needed to be measurably more opaque.

897 F. Supp. 2d at 185.

The same reasoning applies with equal force in this case, as Freddie Mac made similarly "fulsome disclosures" during the earlier Class Period pled here. Id. If Plaintiff, or any other investor, did not want to take on the risks presented by Freddie Mac's fully disclosed decision to increase further its purchase of relatively riskier loans, Plaintiff's recourse was to refrain from buying Freddie Mac stock. Plaintiff has no valid ground for knowingly assuming those disclosed risks and thereafter falsely accusing Freddie Mac and its management of having fraudulently concealed information.

Plaintiff's fraud claims are further undermined by the fact that none of the Individual Defendants[4] sold a single share of Freddie Mac stock during the Class Period, except pursuant to Rule 10b5-1.[5] See infra Part II.A.5. In fact, as the unprecedented financial crisis wreaked havoc on Freddie Mac's business and the world economy, the Individual Defendants -- Freddie Mac's most senior management at that time -- saw the value of **their own** investments in Freddie Mac decline by over **$38 million** during the Class Period. See id. In addition, Freddie Mac itself **bought** over **$2.2 billion** in its own stock during the Class Period. As Judge Keenan aptly noted at oral argument on defendants' motions to dismiss in the Kuriakose case: "What is [the] motive of these three fellows? They didn't sell any stock[.] This stock tanked. They didn't get rid of one share . . . [That] certainly is germane." 08-cv-7281 (ECF No. 167 at 56-57) (S.D.N.Y. Aug. 31, 2010). The foregoing facts are flatly inconsistent with Plaintiff's concocted allegations of

[4] "Individual Defendants" refers collectively to Mr. Syron, Ms. Cook, Mr. McQuade, and Mr. Piszel.

[5] As discussed below, stock trades made pursuant to Rule 10b5-1 do not support any inference of scienter. See infra Part II.A.5. Here, the only two stock trades made by any Defendant during the Class Period were made by Ms. Cook pursuant to Rule 10b5-1. See id. This Court properly may consider, without turning this motion into one for summary judgment, "the full text of SEC filings, prospectus, analysts' reports and statements integral to the complaint, even if not attached to the complaint." In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 662, 669 (E.D. Mich. 1999) (citing In re Royal Appliance Sec. Litig., No. 94-cv-3284, 1995 WL 490131, at *2 (6th Cir. Aug. 15, 1995)).

fraud. See Part II.A.5.b. In sum, failing to predict historically unprecedented macroeconomic developments, or the inevitable losses that they triggered, does not constitute securities fraud.[6] As many courts have recognized:

> [H]indsight does not establish fraud. If it did, any drop in the price of shares would result in lawsuits from disappointed investors. The market has risks; the securities laws do not serve as investment insurance.

Raab v. Gen. Physics Corp., 4 F.3d 286, 291 (4th Cir. 1993). "Investment insurance" -- to which Plaintiff is not entitled -- is plainly what Plaintiff is looking for here. Id. For all of these reasons, the Plaintiff's TAC should be dismissed in its entirety, with prejudice.

## ARGUMENT

### I. PLAINTIFF FAILS ADEQUATELY TO PLEAD LOSS CAUSATION.

A plaintiff in a securities fraud class action must plead and prove loss causation. Dura Pharms. Inc. v. Broudo, 544 U.S. 336, 346-48 (2005). Loss causation requires "a causal connection between the material misrepresentation and the loss." Id. at 342. Merely alleging that investors purchased stock at an inflated price is not enough to state a claim. "[R]ather, a plaintiff must show that an economic loss occurred after the truth . . . became known to the market." Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 944 (6th Cir. 2009) (citing Dura, 544 U.S. at 346-47).

As the Supreme Court explained in Dura:

> [A] person who "misrepresents the financial condition of a corporation in order to sell its stock" becomes liable to a relying purchaser "for the loss" the purchaser sustains "**when the facts . . . become generally known" and "as a result" share value "depreciate[s].**"

544 U.S. at 344 (emphasis added). Put another way, the plaintiff must show "that the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price." Meyer v. Greene, 710 F.3d 1189, 1195 (11th Cir. 2013) (affirming dismissal of securities fraud class action for failing adequately to plead loss causation) (quotation

[6] Such allegations of "fraud by hindsight" cannot state a claim under the federal securities laws. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 320 (2007); In re Goodyear Tire & Rubber Co. Sec. Litig., 436 F. Supp. 2d 873, 903 (N.D. Ohio 2006) ("What Plaintiffs attempt to do is to plead 'fraud by hindsight,' a technique that has been flatly rejected by [the] Sixth Circuit.").

marks omitted). That is, the plaintiff must plead facts sufficient to establish that his or her loss was caused by the revelation of the alleged fraud, and not some other revelation concerning the company's business or prospects. Id. As the Supreme Court explained in Dura:

> When the purchaser subsequently resells [her] shares . . . at a lower price, that lower price may reflect, not the earlier misrepresentation, **but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price**.

544 U.S. at 342-43 (emphasis added). Following Dura, courts routinely find Section 10(b) claims legally defective for failure adequately to plead loss causation. See, e.g., Omnicare, 583 F.3d at 944-45 (affirming dismissal of Section 10(b) claims on loss causation grounds where, inter alia, "none [of the allegations] explain how the statements were revealed to be false and thereby caused a drop in the stock price"); D.E.&J. Ltd. P'ship v. Conaway, 133 F. App'x 994, 999-1000 (6th Cir. 2005) (affirming dismissal of securities fraud claims for failure to plead loss causation).[7]

Like its other fraud allegations, Plaintiff's loss causation allegations must satisfy Rule 9(b)'s heightened pleading requirements. See Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462, 471 n.5 (4th Cir. 2011); Cohen v. Stevanovich, 722 F. Supp. 2d 416, 432 n.9 (S.D.N.Y. 2010).[8] Plaintiff's TAC cannot meet this burden. Indeed, even if the less rigorous standard of Rule 8 applied, Plaintiff nonetheless fails to state a claim for relief. Under Rule 12, a complaint must contain more than "labels and conclusions," and "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A plaintiff's complaint must be "plausible" and "possess enough heft to sho[w] that the

[7] See also Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005) ("[A] plaintiff must allege . . . that the **subject** of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, **when** **disclosed**, negatively affected the value of the security.") (emphasis added).

[8] The Circuit Courts are split as to which pleading standard applies to loss causation. The Fourth Circuit has held that the heightened requirements of Rule 9(b) apply because loss causation is "among the circumstances constituting fraud." Katyle, 637 F.3d at 471, n.5. But see Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 256-58 (5th Cir. 2009). The Sixth Circuit has yet to rule on the issue. See Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp., No. 12-cv-2001, 2013 WL 4054630, at *13 (N.D. Ohio Aug. 9, 2013).

pleader is entitled to relief." Id. at 555-57. Further, determining whether a complaint states a claim for relief is "a context-specific task," Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), and a complaint should be dismissed where, as here, the allegations fail to exclude "more likely explanations." Id. at 681.

To begin, Plaintiff has not sufficiently alleged any "corrective disclosure" that revealed the "truth" concerning any alleged prior misstatement. In addition, Plaintiff's reliance on the "fraud-on-the-market" doctrine precludes Plaintiff from establishing loss causation with respect to its claim that Freddie Mac misrepresented its exposure to non-traditional loans. Further, Plaintiff fails sufficiently to plead facts to exclude more likely explanations for investor losses.

### A. Plaintiff Fails Sufficiently To Plead The Existence Of Any "Corrective Disclosure."

The Sixth Circuit and other courts routinely reject efforts by plaintiffs to suggest that negative news that generally caused stock price declines somehow revealed prior statements to be false. See, e.g., Omnicare, 583 F.3d at 944-45 (holding that allegations failed to explain how challenged statements were revealed to be false); D.E.&J., 133 F. App'x at 1000 (rejecting boilerplate allegation that misrepresentation caused losses); Meyer, 710 F.3d at 1197-98 (affirming dismissal on loss causation grounds because neither of plaintiff's alleged corrective disclosures actually corrected any prior alleged misrepresentation).[9] To adequately plead loss causation, a plaintiff in a securities fraud class action must sufficiently identify the existence of a "corrective disclosure" that disclosed the prior alleged misrepresentations to the market. Omnicare, 583 F.3d at 944-45 (affirming dismissal on loss causation grounds where alleged corrective disclosure failed to disclose any prior misrepresentations to the market); D.E.&J., 133 F. App'x at 1000 (same); Lentell, 396 F.3d at 174-75 (same). A drop in stock price "must at least relate back to the misrepresentation and not to some other negative information about the

[9] See also Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1063-65 (9th Cir. 2008) (rejecting argument that negative announcement somehow revealed fraud, where prior statement was not mentioned in announcement); In re Dell Inc., Sec. Litig., 591 F. Supp. 2d 877, 911 (W.D. Tex. 2008) (stating that argument that negative earnings were "materialization of [the] risk" concealed by alleged fraud "would eviscerate Dura's loss causation requirement, as any negative earnings news following a misrepresentation could, arguably, 'materialize' the risk of a prior misrepresentation").

company." Meyer, 710 F.3d at 1197. Further, "[t]he disclosures must amount to more than revelations of *possible risks*" that a defendant was engaged in fraud; rather, the plaintiff must show some revelation of the alleged fraud **itself**. In re Almost Family, Inc. Sec. Litig., No. 10-cv-00520, 2012 WL 443461, at *12-13 (W.D. Ky. Feb. 10, 2012) (dismissing complaint for failure adequately to allege loss causation).

Here, the alleged corrective disclosure that Plaintiff cites, the November 20, 2007 Press Release, failed to disclose any fact that Plaintiff alleges was fraudulently misrepresented or concealed during the Class Period. Rather, in a vain attempt to manufacture a "corrective disclosure," Plaintiff grossly mischaracterizes the November 20, 2007 Press Release. The TAC alleges that Freddie Mac's November 20, 2007 Press Release revealed the "truth" respecting the alleged fraud about which Plaintiff complains. See TAC ¶ 134; see also id. ¶¶ 4, 6, 190. Specifically, Plaintiff alleges that the November 20, 2007 Press Release revealed "[f]or the first time" that "Freddie Mac's investments in subprime and nontraditional mortgage products had subjected Freddie Mac to significant risk and caused it to sustain substantial losses." TAC ¶ 190. The November 20, 2007 Press Release does not constitute a corrective disclosure because: (1) it did not reveal the falsity of any prior disclosure; and (2) long before November 20, 2007, Freddie Mac disclosed the increase in its purchases of loans with riskier credit characteristics.

### 1. The November 20, 2007 Press Release Does Not Reveal The Falsity Of Any Prior Disclosure.

Nothing in the November 20, 2007 Press Release revealed the alleged falsity of **any** prior disclosure, including any disclosure relating to "subprime and nontraditional mortgage products." TAC ¶ 190.[10] Rather, that press release reports that Freddie Mac incurred a net loss of $2 billion in Q3 2007 "due to increased credit-related expenses and losses on mark-to-market items" and to the "deterioration" in "the country's housing and credit markets" in 2007. See

[10] Compare TAC ¶¶ 78-79, 88-90, 119, 157-58, 168-69, 176, 182 (allegations regarding disclosures of the amount of subprime and Alt-A loans in the guarantee portfolio) with App. 42 (Nov. 20, 2007 Press Release) (not once mentioning "subprime" or "Alt-A" loans in Freddie Mac's guarantee portfolio, let alone revealing that prior disclosures of the disclosed amounts of each were inaccurate); compare TAC ¶ 118 (allegation about Freddie Mac management's characterization of its exposure to subprime loans) with App. 42 (Nov. 20, 2007 Press Release) (not disclosing anything concerning Freddie Mac's exposure to subprime loans).

App. 42 (Nov. 20, 2007 Press Release). That press release does not link those losses to any particular mortgage product. Indeed, the November 20, 2007 Press Release does not contain a single reference to subprime, Alt-A or non-traditional loans, at all. Compare TAC ¶¶ 6, 190, 227, with App. 42 (Nov. 20, 2007 Press Release). The TAC likewise points to no fact suggesting that the market regarded the November 20, 2007 Press Release as revealing the supposed falsity of any prior disclosure. Plaintiff alleges that "professional financial analysts who carefully follow Freddie Mac were caught off guard" by that press release. TAC ¶ 191. However, Plaintiff fails to identify any analyst report, or anything else, demonstrating that, on or before November 20, 2007, the market learned of the alleged falsity of any prior statement respecting any matter, including but not limited to the quantity of Freddie Mac's subprime or Alt-A loan holdings in its guarantee portfolio.[11]

Indeed, Plaintiff's allegations regarding the quantity of Freddie Mac's subprime or Alt-A loan holdings in its guarantee portfolio illustrate Plaintiff's failure to allege loss causation. See, e.g., TAC ¶¶ 3, 37, 61, 67, 78-79, 88-92, 157-58, 168-69, 176, 182. Plaintiff's subprime allegations are lifted almost wholesale from the complaint that the SEC filed against former Freddie Mac officers on December 16, 2011 (the "SEC Litigation") and accompanying Non-Prosecution Agreement between the SEC and Freddie Mac ("NPA"). The SEC filed that complaint three years after the Class Period ended. See App. 51 (SEC Litigation complaint). Cribbing from the SEC's allegations, Plaintiff challenges Freddie Mac's statements regarding the amount of loans in its guarantee portfolio, alleging that Freddie Mac should have included in the disclosed amount of its "subprime" loans those loans denominated as "C1," "C2" and "EA" by its automated underwriting system. Id.[12] Plaintiff also attacks alleged inaccuracies in Freddie

[11] See generally TAC ¶ 191; see also App. 53 (Bear Stearns & Co. Inc., "Freddie Mac: GAAP Loss Reflects Reduced Market Liquidity & Is Restricting Liquidity As Well" (Nov. 20, 2007)); App. 54 (Morgan Stanley, "Freddie Mac Reports 3Q07 Loss" (Nov. 20, 2007)).

[12] In an accompanying appendix, Freddie Mac provides documents this Court may consider on this Motion. See Tellabs, 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference . . . ."); Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 560 (6th Cir. 2005) (the Court may properly consider "other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice").

Mac's Alt-A loan disclosures, which Plaintiff copied from Exhibit A to the NPA between the SEC and Freddie Mac, but which the SEC itself chose not to include in its own complaint. See id.

Nowhere, however, does Plaintiff contend that any alleged misstatement about the amount of Freddie Mac's subprime or Alt-A loans in its guarantee portfolio was revealed to be false during the Class Period.[13] To the contrary, Plaintiff asserts that the market never learned that those statements were allegedly inaccurate until "the **recent revelations**" in the SEC Litigation complaint and NPA, three years **after** the Class Period ended. See ECF No. 137 at 1 (emphasis added). According to Plaintiff, "**since the Second Amended Complaint was filed in 2008**, additional facts have come to light" that support the new claims in the TAC. Id. (emphasis added); see also TAC ¶ 12. Thus, those "additional facts," allegedly revealed to the market long after the end of the Class Period, could not possibly have caused Plaintiff's losses. See Lloyd v. CVB Fin. Corp., No. 10-cv-6256 (C.D. Cal. May 9, 2013) (ECF No. 84 at 67-68) ("A disclosure cannot be a legal cause of a decline in stock price if the disclosure occurred after the loss; rather, plaintiff must demonstrate that the stock price dropped *in reaction to* the disclosure.").

Judge Keenan's decision in the Kuriakose class action underscores the fact that Plaintiff's losses could not have been caused by these alleged events years after the Class Period. In Kuriakose, Judge Keenan held legally defective the **exact same** allegations that both Plaintiff here and the Kuriakose plaintiffs drew from the SEC Litigation complaint and NPA. Kuriakose, 897 F. Supp. 2d at 178. When the Kuriakose plaintiffs moved to amend the complaint to add those very same allegations, Judge Keenan denied that motion, holding that those allegations failed to state a claim in a private securities class action like this one, as a matter of law, because, inter alia, Plaintiffs could not plead the loss causation element of a private Section 10(b) claim as to those allegations.[14] Id. As Judge Keenan explained:

[13] See Dura, 544 U.S. at 346-47 (allegation that plaintiffs "paid artificially inflated prices for Dura['s] securities" and "suffered 'damages'" were insufficient to plead loss causation); D.E.&J., 133 F. App'x at 1000.

[14] Plaintiff may argue that Judge Sullivan's denial of the Defendants' motions to dismiss in the SEC Subprime Litigation has some relevance here. It does not. That ruling was not issued in a private securities class action governed by the PSLRA. See S.E.C. v. Goble, 682 F.3d 934, 943 (11th Cir. 2012) (explaining that loss causation is not a required element of a claim in a civil enforcement action brought by the SEC). For that reason,

> Turning to the FHFA Memo in the SAC and the SEC Non-Prosecution Agreement in the proposed TAC, **the Court notes that both were released years after the end of the Class Period and thus do not help establish loss causation**. Because the FHFA Memo was only recently released, it is impossible to classify any of its conclusions as "corrective disclosures" to investors during the Class Period. **This logic applies with equal force to the SEC Non–Prosecution Agreement**, which was released after the FHFA Memo. As a result, **the new factual allegations in the SAC and proposed TAC cannot cure the defects the Court identified in the FAC with respect to loss causation.**

Id. (emphasis added). For the very same reason, those same allegations fail to satisfy the loss causation element of the claim here. In fact, Judge Keenan's reasoning applies with even greater force in this case, because the Class Period here ends almost a year **before** the end of the putative class period in Kuriakose. Id. Where, as here, the ostensible falsity of the challenged statements is not even alleged to have been revealed to the market until **long after** the Class Period ended,[15] the challenged statements cannot, as a matter of law or logic, support a private claim asserted under Section 10(b).

### 2. Long Before November 20, 2007, Freddie Mac Disclosed The Increase In Its Purchases Of Loans With Riskier Credit Characteristics.

As noted above, the TAC alleges that, in the November 20, 2007 Press Release, Freddie Mac disclosed "**[f]or the first time**" that its investment in non-traditional mortgage products subjected it to increased risks. TAC ¶ 190. That allegation is inconsistent with the very Freddie Mac documents on which Plaintiff relies. Those documents show that, both before and during the Class Period in this case, Freddie Mac disclosed that it was increasing its exposure to non-traditional mortgage products, as well as the risk that non-traditional mortgage products would default at a higher rate than traditional mortgage products.

---

and crucially, that ruling does not even address the element of "loss causation" because loss causation is not an element of a Section 10(b) claim in an SEC enforcement action. Conversely, loss causation is a required element in a private Section 10(b) action like this one. See infra Part I. The Kuriakose court held the loss causation issue to be an independent basis for dismissal in that case, for reasons that squarely apply here. In addition, the PSLRA, which governs the pleading standard in this case, applies only in private securities cases, not in SEC enforcement actions. See supra n.3

[15] TAC ¶ 12.

Specifically, in its Annual Report for **2005**, Freddie Mac expressly disclosed to investors the **exact information** that Plaintiff falsely alleges Freddie Mac did not disclose until November 20, 2007, i.e., that Freddie Mac had been increasing substantially its purchase of non-traditional mortgage products, such as **interest-only loans** as well as **loans originated with lower documentation**:

> **The dramatic increases in housing prices over the last few years have resulted in the origination of a greater proportion of alternative mortgage products, including initial interest-only loans and option adjustable-rate mortgage loans, or Option ARMs.** We have historically purchased limited amounts of these alternative products through our securitization programs. **However, recently we have increased our purchases of these products consistent with the increase in their prevalence in the market.** We are continuing to explore ways in which we can become **more involved** with these products and **we expect our participation in these products to grow over the coming years.**
>
> * * *
>
> During 2005 and 2004, **there was a rapid proliferation of alternative product types designed to address a variety of borrower needs,** including issues of affordability and **lack of income documentation**. While each of these products has been on the market for some time, their prevalence increased in 2005 and 2004. **We expect each of these products to default more often than traditional products** and we consider this when determining our guarantee fee. **Our purchases of interest-only and Option ARM mortgage products increased in 2005, representing approximately 11 percent of our Total mortgage portfolio purchases as compared to 2 percent in 2004, and we expect this trend to continue in 2006.**

App. 1 at 3, 65 (2005 Annual Report) (emphasis added).

Freddie Mac made the above-quoted disclosure **before** the Class Period here even began (as Freddie Mac's 2005 Annual Report was issued on June 28, 2006, and the Class Period here begins on August 1, 2006). In that disclosure, Freddie Mac candidly informed investors that, in 2005, it had increased its purchases of non-traditional mortgage products like interest-only and Option ARM mortgage products to **550%** of the amount of those products it had purchased in 2004 (i.e., 11% in 2005 as compared to 2% in 2004). Freddie Mac also advised investors that Freddie Mac expected that trend to continue in 2006; that it was exploring ways in which it could

"become more involved with these products;" that it expected its participation in those non-traditional mortgage products "to grow in the coming years;" and that it expected "each of these products to default more often than traditional products." Id. These disclosures defeat Plaintiff's allegation that Freddie Mac revealed its exposure to non-traditional mortgage products "[f]or the first time" in the November 20, 2007 Press Release. See, e.g., TAC ¶ 134-35, 137-86, 189.

Moreover, just as Freddie Mac had advised investors in its above-quoted 2005 Annual Report, it continued to increase its purchase of non-traditional mortgage products in 2006, as those products became even more prevalent in the market. As Freddie Mac disclosed in its Annual Report for 2006:

> During the past several years, there was a **rapid proliferation of nontraditional mortgage product types designed to address a variety of borrower and lender needs**, including issues of affordability and **reduced income documentation requirements**. While features of these products have been on the market for some time, **their prevalence in the market and our Total mortgage portfolio increased in 2006 and 2005**. *See* "REGULATION AND SUPERVISION -- Office of Federal Housing Enterprise Oversight -- *Nontraditional Mortgage Product Risks*" and "RISK FACTORS -- Legal and Regulatory Risks." **We expect each of these products to default more often than traditional products** and we consider this when determining our credit and guarantee fees. **Our purchases of interest-only and option ARM mortgage products increased in 2006, representing approximately 18 percent of our Total mortgage portfolio purchases as compared to 11 percent in 2005**.

App. 2 at 69 (2006 Annual Report) (emphasis added).

Freddie Mac made the above-quoted disclosure on March 23, 2007, i.e., **during** the Class Period in this case. Thus, Plaintiff has no valid ground for falsely contending that Freddie Mac and its personnel fraudulently concealed this above-quoted information until November 20, 2007. See, e.g., TAC ¶ 134-35, 137-86, 189. Freddie Mac openly disclosed that allegedly concealed information, and considerable additional information about these loans purchases, well before the Class Period here and in Kuriakose;[16] that was a principal reason that Judge Keenan

[16] Among other things, Freddie Mac disclosed the exact credit characteristics, including the credit scores and LTV ratios, for all of the loans in its guarantee portfolio, including all non-traditional mortgage products, as well as delinquency rate data for the entire portfolio, including those non-traditional mortgage products, both before and during the Class Period here. See infra Part III.A.3.

granted the motion to dismiss in Kuriakose; and that very same rationale applies with equal force here. In Kuriakose, Judge Keenan held that the plaintiffs there had failed adequately to plead, inter alia, loss causation due to "the bevy of truthful disclosures that Freddie Mac made." Kuriakose, 897 F. Supp. 2d at 185. The same is true in this case.

In sum, Plaintiff's failure to "connect the alleged fraud with the ultimate disclosure and loss" is fatal to its amended claims. See D.E.&J., 133 F. App'x at 1000; see also Omnicare, 583 F.3d at 944-45.

### B. The "Fraud-On-The-Market" Doctrine Precludes Plaintiff From Pleading Loss Causation Regarding Freddie Mac's Exposure To Non-Traditional Loans.

Plaintiff's loss causation allegations are also legally defective due to its reliance on the "fraud-on-the-market theory," which is based on the "efficient market hypothesis." TAC ¶¶ 266-67.[17] As the Eleventh Circuit recently noted in Meyer, "[t]he efficient market [hypothesis] . . . is a Delphic sword: it cuts both ways." 710 F.3d at 1195, 1198 (holding that plaintiffs' reliance on "fraud-on-the-market" theory had a "dire -- and indeed fatal -- effect on their ability to demonstrate loss causation"). As Meyer explains:

> **Investors cannot contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation**. **Either the market is efficient or it is not**. A plaintiff in the Investors' situation **must take the bitter with the sweet**, and if he chooses to embrace the efficient market theory for purposes of proving one element of a § 10(b) claim, **he cannot then turn around and contend that the market is not efficient for purposes of proving another element of the very same claim**.

Id. at 1198-99 (emphasis added).

[17] First recognized by the Supreme Court in Basic Inc. v. Levinson, the "fraud-on-the-market" theory allows plaintiffs in securities fraud class actions to show reliance on defendant's alleged misrepresentations on a class-wide basis by demonstrating the defendant's securities were traded in a well-developed and efficient market. 485 U.S. 224, 241-42 (1988). "[T]he market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations," which creates a rebuttable presumption that investors relied upon any alleged misrepresentation when purchasing defendant's stock. Id. at 246. Therefore, the "fraud-on-the-market" theory allows plaintiffs in securities fraud class action to "forego the onerous task of demonstrating individual reliance on a purported misstatement." Meyer, 710 F.3d at 1195.

Here, Plaintiff alleges that it and "the members of the Class are entitled to the presumption of reliance established by the fraud-on-the-market doctrine" because "the market for Freddie Mac common stock was an efficient market." TAC ¶ 266. Consequently, Plaintiff alleges that "the market for Freddie Mac common stock **promptly digested current information regarding Freddie Mac from all publicly available sources and reflected such information in the market prices for Freddie Mac common stock at all relevant times**." TAC ¶ 267 (emphasis added). As discussed below, before and throughout the Class Period, Freddie Mac disclosed in exacting detail its exposure to non-traditional mortgages and the risks posed by such exposure. On the basis of Plaintiff's own allegations, those disclosures were reflected in the price of Freddie Mac common stock long before the release of the November 20, 2007 Press Release. Thus, there was no new information disclosed in the November 20, 2007 Press Release concerning Freddie Mac's alleged exposure to non-traditional mortgage products that could have possibly caused the stock drop at issue.

More specifically, both before and during the Class Period, Freddie Mac made extensive disclosures regarding its intent to increase its purchase of non-traditional mortgage products with riskier credit characteristics; the amount, by product, of such loans that it purchased; the risks associated with such purchases, including the fact that such loans were expected to default at a higher rate; the delinquency data that showed those loans did default at higher rate; and, most importantly, the exact amount of loans that Freddie Mac held in its guarantee portfolio with various riskier credit characteristics, such as low FICO scores and higher LTV ratios. See App. 1 at 67; App. 2 at 70; App. 3 at 96; App. 5 at 59; App. 36 at 31. The Plaintiff does not contest the accuracy of any of those disclosures.

Furthermore, regarding the issue of so-called "subprime" loans, as the TAC concedes, Freddie Mac disclosed that "[t]here is no universally accepted definition of subprime," and that "[t]here is no longer a clear-cut distinction between prime and subprime mortgages." TAC ¶¶ 182, 117. Indeed, in its complaint filed in its action against the former CEO of Countrywide, Angelo Mozilo, the SEC itself has acknowledged the different definitions that market



A/75750334

participants then ascribed to the term "subprime" loan: "While guidance issued by the banking regulators referenced a credit score ('FICO score') at 660 or below as being an indicator of a subprime loan, some within the banking industry drew the distinction at a score of 620 or below." SEC v. Mozilo, No. 09-cv-03994 (C.D. Cal.), Compl. ¶ 21, ECF No. 1.

However, regardless of whether any investor viewed a FICO score of 660 or 620 as an indicator of a "subprime" loan, Freddie Mac expressly disclosed **the exact percentage** of loans in its guarantee portfolio made to borrowers with FICO scores below **either 660 or 620**, and no one has contested the accuracy of those disclosures. Specifically, Freddie Mac's annual and quarterly statements included charts that set forth the exact percentage of its guarantee portfolio that was comprised of loans to borrowers with various credit scores. See, e.g., App. 1 (2005 Annual Report, at 67, Table 37); App. 2 (2006 Annual Report, at 70, Table 38); App. 3 (2007 Annual Report, at 96, Table 46); App. 5 (Form 10-Q for Period Ended June 30, 2008, at 59, Table 37). Similarly, in these same charts, Freddie Mac set forth the percentage of its guarantee portfolio that was comprised of loans with particular LTV ratios. See id.[18] The market was well aware of the quantity of loans in Freddie Mac's guarantee portfolio that fell within any definition of subprime based on specific credit scores or LTV ratios. Freddie Mac also disclosed default rate information and specific product-type data for the non-traditional loans it purchased for its guarantee portfolio. See App. 1 at 67; App. 2 at 70; App. 3 at 96; App. 5 at 59; App. 36 at 31.

In Kuriakose, Judge Keenan held that Freddie Mac's disclosures before and during the class period in that case precluded plaintiffs from pleading loss causation on claims nearly identical to Plaintiff's claims here. Kuriakose, 897 F. Supp. 2d at 177-78. In that case, like here, plaintiff alleged that the price of Freddie Mac's stock dropped after the alleged "truth" concerning its exposure to subprime and non-traditional mortgages was disclosed to the market. Id. However, after examining Freddie Mac's disclosures concerning its exposure to subprime and non-traditional loans, Judge Keenan explained as follows the legal defectiveness, in a

[18] Freddie Mac also included the various percentages of its guarantee portfolio at the end of each year, and the percentage of its purchases made in each year, that were loans made to borrowers based on other categories of characteristics: different loan purposes, property types, and occupancy types. See, e.g., App. 1, 2, 3, & 5.

PSLRA case, of the allegations that the plaintiffs there, and here, have drawn from the SEC Litigation complaint:

> Plaintiffs' claims are made even more tenuous by the fact that in annual and quarterly statements, **<u>Freddie Mac routinely detailed the credit characteristics of the loans in its guarantee portfolio, divulged the specific credit scores of borrowers in its guarantee portfolio, and disclosed loan-to-value ratios</u>**.
>
> Plaintiffs allege in the TAC that Freddie Mac misled investors as to the number of "Caution Loans (C1, C2) and EA [Expanded Approval] loans" in its guarantee portfolio. According to Plaintiffs, these loans should have been labeled as "subprime;" and failure to classify them as such constituted a material misstatement. Plaintiffs' arguments fail because **<u>Freddie Mac's broad disclosure [of] all of its loan characteristics was an accurate way to relay information to investors, given the confusion surrounding the term "subprime."</u>** Freddie Mac's method of disclosing information made it possible for a reasonable investor to, with little effort, take his own measure of risk in Freddie Mac's loan portfolio.
>
> * * *
>
> Throughout the Class Period, Freddie Mac made investors aware of its exposure to "non-traditional" mortgages. Whether executives referred to these loans as "risky," "non-prime," "subprime-like," or "subprime" is irrelevant since **<u>Freddie Mac fully disclosed the composition of the company's portfolio</u>**.

<u>Kuriakose</u>, 897 F. Supp. 2d at 182, 185 (emphasis added).

In other words, Freddie Mac's disclosures "formed part of the 'total mix' of information available," <u>id.</u> at 183, to investors and, therefore, were reflected in Freddie Mac's share price. <u>Id.</u> at 177. Consequently, Judge Keenan held that plaintiffs there, much like Plaintiff here, had failed to identify any "corrective disclosure" revealing any prior fraud:

> As the Court already held, Freddie Mac made **<u>detailed disclosures</u>** regarding the company's portfolios throughout the Class Period. Because **<u>all relevant information was already available to investors</u>**, these purported disclosures **<u>cannot possibly be "corrective</u>."**

<u>Id.</u> (emphasis added). Judge Keenan's reasoning applies with equal force in this case. <u>See</u> <u>Meyer</u>, 710 F.3d at 1197-98 ("[C]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time."); <u>Lentell</u>, 396 F.3d at 176 (finding challenged

reports not "corrective disclosures" where reports were replete with warnings and, thus, "the high-risk nature of the investment . . . was available to the marketplace").

For this additional reason, the November 20, 2007 Press Release cannot constitute a "corrective disclosure," as a matter of law.

### C. Plaintiff Fails To Plead Facts Sufficient To Exclude More Likely Explanations For Investor Losses.

Plaintiff also fails sufficiently to plead loss causation because it fails to allege facts to exclude more likely explanations for Freddie Mac's stock price decline. "[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," and the complaint must be dismissed unless it alleges "facts which, if proven, would show that its loss was caused by the alleged misstatements **as opposed to intervening events**." Lentell, 396 F.3d at 174 (emphasis added). Indeed, as the Eleventh Circuit recently held in Meyer, to plead loss causation a plaintiff must:

> [E]liminat[e] other possible explanations for th[e] price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure -- **as opposed to other possible depressive factors** -- that caused at least a 'substantial' amount of the price drop.

Meyer, 710 F.3d at 1196-97 (emphasis added).[19]

Plaintiff pleads no facts sufficient to question the far more likely cause for Freddie Mac's losses. At bottom, Plaintiff's allegations ignore the single worst financial crisis since the Great Depression. Accordingly, Plaintiff has failed adequately to allege loss causation, as Plaintiff fails to allege "a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud) . . . [and that] eliminate[s] other possible explanations" for its losses. Meyer, 710 F.3d at 1196-97. On this

[19] Plaintiff fails to allege any facts to exclude the most obvious explanation for Freddie Mac's stock price decline -- the impact of a dramatic, unprecedented financial markets collapse. See Lentell, 396 F.3d at 174; see also In re The First Marblehead Corp. Sec. Litig., 639 F. Supp. 2d 145, 165 (D. Mass. 2009) (defendant's disclosures, coupled with "the deterioration in the credit markets," and a "preexisting pattern of stock declines," negated plaintiff's loss causation theory).

ground alone, Plaintiff's claims should be dismissed.

## II. THE THIRD AMENDED COMPLAINT SHOULD BE DISMISSED UNDER THE PSLRA AND RULE 9(b).

Plaintiff does not meet its pleading obligations under the PSLRA and Federal Rule of Civil Procedure 9(b). Plaintiff fails to plead fraud with particularity, fails adequately to plead scienter, and fails to plead any alleged misrepresentations or omissions of material fact, as required by the PSLRA and Rule 9(b).

### A. Plaintiff Fails Adequately To Plead Scienter.

In asserting a claim of securities fraud, a plaintiff must plead specific facts that create a strong inference of scienter; i.e., that the defendant knowingly made a false statement. Here, Plaintiff fails to plead a single specific fact that gives rise to any inference -- let alone the requisite strong inference -- that any Defendant acted with scienter.

#### 1. Plaintiff Must Plead Specific Facts Giving Rise To A Strong Inference Of Scienter.

As the Supreme Court has held, the PSLRA's "[e]xacting pleading requirements" compel plaintiffs to "state with particularity facts giving rise to a **strong inference** that the defendant acted with the required state of mind." Tellabs, 551 U.S. at 313-14 (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis added); see also Ashland, Inc. v. Oppenheimer & Co., 648 F.3d 461, 469-71 (6th Cir. 2011) (applying Tellabs and affirming dismissal of securities fraud action for failure to plead specific facts raising strong inference of scienter); City of Pontiac Gen. Emps. Ret. Sys. v. Stryker Corp., 865 F. Supp. 2d 811, 833 (W.D. Mich. 2012) (applying Tellabs and dismissing complaint that failed adequately to plead scienter); Grillo v. Tempur-Pedic Int'l, Inc., 553 F. Supp. 2d 809 (E.D. Ky. 2008) (same). To be "strong," the inference must be "cogent and **at least as compelling** as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324 (emphasis added); see also Ricker v. Zoo Entm't, Inc., No. 12-cv-3951, 2013 WL 4516095, at *4 (6th Cir. Aug. 27, 2013) (affirming grant of motion to dismiss for failure adequately to plead scienter). Plaintiff's allegations fail to satisfy this strict pleading standard.[20]

[20] Further, in the Sixth Circuit, "plaintiff must 'prove that [a] forward-looking statement . . . was made with actual knowledge' to prevail, a formidable burden at the pleading stage." Helwig v. Vencor, Inc., 251 F.3d 540, 554

### 2. Plaintiff Pleads No Specific Facts Giving Rise To A Strong Inference Of Scienter.

Although recognizing that determining scienter "is an untidy, case-by-case concept," the Sixth Circuit has provided courts with a number of factors to consider. Helwig, 251 F.3d at 551. These factors include the divergence between internal reports and public statements, and the disregard of current factual information. Id. at 552 (describing factors two and six). While "the Helwig factors are non-exhaustive . . . the absence of these factors indicates the absence of scienter." Goodyear, 436 F. Supp. 2d at 900. Thus, in attempting to establish scienter, plaintiffs "typically identify internal reports, memoranda, or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time." In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 57 (D. Mass. 1998) (granting motion to dismiss securities fraud complaint). Securities fraud complaints that fail to identify such documents or other contemporaneous facts tending to show that the defendants knew the statements in question were false when made are subject to dismissal. See PR Diamonds, 364 F.3d at 692 (affirming grant of motion to dismiss where, inter alia, there were "no specific allegations of a divergence between internal reports and external statements on the same subject"); Ricker v. Zoo Entm't, Inc., No. 11-cv-00490, 2012 WL 3070717, at *5 (S.D. Ohio July 30, 2012) (granting motion to dismiss for failure to allege scienter where "the mere existence" of reports, without specific allegations concerning their "content," "cannot possibly lend support to an inference of scienter"), aff'd, 2013 WL 4516095 (6th Cir. Aug. 27, 2013); Beaver Cnty. Ret. Bd. v. LCA-Vision Inc., No. 07-cv-750, 2009 WL 806714, at *21-22 (S.D. Ohio Mar. 25, 2009) (same); In re Ferro Corp. Sec. Litig., No. 04-cv-1440, 2007 WL 1691358, at *16 (N.D. Ohio June 11, 2007) (same); In re Kindred Healthcare, Inc. Sec. Litig., 299 F. Supp. 2d 724, 740 (W.D. Ky. 2004) (same).

Here, the TAC does not reference **one specific fact** supporting any inference -- let alone a strong inference -- that any Defendant knew that any challenged statement was false when made. The TAC does not refer to one specific document, meeting, or conversation supporting any

(6th Cir. 2001) (quoting 15 U.S.C. § 78u-5(c)(1)(B)). In the Sixth Circuit, to plead "actual knowledge," a plaintiff must allege specific facts demonstrating that "the speaker does not believe the opinion and the opinion is not factually well grounded." In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 572 (6th Cir. 2004).

inference that **<u>any</u>** Defendant acted with scienter. Further, Plaintiff fails to cite any document, communication, conversation or meeting supporting the contention that any Defendant ever believed that what Freddie Mac disclosed externally was different from what anyone at Freddie Mac believed to be true. Indeed, the very documents cited by Plaintiff highlight the distinctions that Freddie Mac employees drew between "subprime" loans and "subprime-like" loans.

For example, the TAC quotes from a slide presentation offered at a Board of Directors meeting on March 2 and 3, 2007. <u>See</u> TAC ¶¶ 122-26. Plaintiff grossly mischaracterizes the content of that presentation, which actually undermines its assertions of fraud. When read in its entirety, it is clear that the presentation relates to a debate at Freddie Mac on whether to alter its practices by increasing its participation in that part of the market that Freddie Mac itself regarded as "subprime." <u>See</u> App. 23 (Freddie Mac, Board of Directors Meeting Slide Presentation (Mar. 2-3, 2007)). As the presentation shows, Freddie Mac was then considering doing so because it would have generated substantially higher guarantee fees for guaranteeing loans that Freddie Mac, and others in the market, regarded as "subprime," as compared to the guarantee fees that Freddie Mac received for guaranteeing certain "subprime-like" loans that it then held in its guarantee portfolio. <u>See</u> <u>id.</u> at 9.

More specifically, Plaintiff alleges that the presentation states: "We already purchase **<u>subprime-like loans</u>** to help achieve our HUD goals . . . [b]ut we receive considerably lower fees than **<u>subprime loans</u>** would fetch in the market." TAC ¶ 122; App. 23 (Freddie Mac, Board of Directors Meeting Slide Presentation (Mar. 2-3, 2007)) at 9. This slide **<u>contrasts</u>** "subprime like loans" **<u>against</u>** what Freddie Mac, and others in the market, regarded as "subprime loans." <u>See</u> <u>id.</u> That slide makes clear that Freddie Mac, internally, and the market, externally, treated the "subprime-like loans" that Freddie Mac then held and the "subprime loans" to which this presentation refers as **<u>different</u>**, not the same. That is the very reason that guarantee fees that Freddie Mac would have been paid for guaranteeing the "subprime loans" to which the presentation refers would have been **<u>five to six times higher</u>** than the guarantee fees that Freddie

Mac received for the "subprime-like loans" that Freddie Mac then held.[21]

In addition, the TAC challenges the accuracy of Freddie Mac's disclosures of the amount of Alt-A loans in its guarantee portfolio. See TAC ¶¶ 87-92. However, Plaintiff does not allege that Defendants knew that any disclosed amounts of Alt-A loans were false when made. To the contrary, Plaintiff essentially alleges that the disclosed amounts were inaccurate due to a mistake relating to how a computer program flagged loans, not due to fraud by Freddie Mac. See TAC ¶¶ 91-92. According to Plaintiff:

> Freddie Mac's quantification of its Alt-A exposure was derived from seller-identified loans and an internal model known as DEFCAP that was used to calculate its guarantee obligation. Certain reduced documentation loan programs were not flagged as "low-or-no-doc" loans within the DEFCAP model based upon determinations made at the time. . . . As such, those loans were not included in Freddie Mac's quantification of its Alt-A exposure . . . .

TAC ¶ 91.

There are no allegations that any of the Defendants, or anyone else, knew about this computer flagging issue when reporting Alt-A loan numbers, and so Plaintiff fails to show the required state of mind to bring a securities fraud claim based upon these disclosures, which may explain why the SEC itself did not assert these claims. Accordingly, for these reasons, as well as all of the reasons discussed below, Plaintiff alleges no specific facts giving rise to a strong inference that any Defendant knowingly made a single false statement during the Class Period.

[21] As Plaintiff alleges, again citing a slide from that presentation: "[F]ixed-rate subprime doesn't look all that different than the bottom of our purchases, **with returns five to six times as great**, not universal for all subprime." TAC ¶ 122 (emphasis added); App. 23 (Freddie Mac, Board of Directors Meeting Slide Presentation, (Mar. 2-3, 2007)) at 9.

### 3. Plaintiff's Conclusory Allegations Regarding What Defendants Allegedly Knew Do Not Give Rise To A Strong Inference Of Scienter.

As the Sixth Circuit has held, courts should give no credence to conclusory, "must have known" allegations, which by their nature are unsupported by specific facts actually known by defendants. See Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 361 (6th Cir. 2001) ("Plaintiffs may not simply rely on the proposition that Defendants must have known or should have known . . . ."). As the Sixth Circuit has further explained, "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information." PR Diamonds, 364 F.3d at 688; see also Miller, 346 F.3d at 674 & n.7 (citing as "insufficient" under the PSLRA an allegation that defendant's "position made him privy to and provided him with actual knowledge of the [allegedly concealed] material facts"); Stryker Corp., 865 F. Supp. 2d at 834 (dismissing securities claims and rejecting argument that scienter may be inferred from defendants' "high level positions in the company and access to company information").

It is well established that general allegations regarding the types of different reports maintained by a company and conclusory assertions regarding what those reports showed are insufficient to give rise to any inference of scienter, as a matter of law. In re Silicon Graphics Sec. Litig., 183 F.3d 970, 985 (9th Cir. 1999) (plaintiffs' description of contents of three named reports regularly generated by defendants held insufficient for lack of specific description of content of particular reports); Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir. 1993) (holding insufficient "scanty descriptions" of internal documents not augmented by facts showing "who sent the memo, when it was received, or whether it reflected a final determination") (emphasis added); Guerra v. Teradyne Inc., No. 01-11789, 2004 WL 1467065, at *25 (D. Mass. Jan. 16, 2004) (holding it insufficient to identify "specific types of reports" while failing to "identify any specific report itself, the information in the reports they deem significant, or how such information rendered the representations at issue misleading"); In re Capstead Mortg. Corp. Sec. Litig., 258 F. Supp. 2d 533, 564-65 (N.D. Tex. 2003) (allegations that defendants knew from internal documents that prepayment levels were "adversely affecting" income insufficient to give

rise to strong inference of scienter).

Furthermore, as numerous courts have held, conclusory allegations -- like those Plaintiff makes here -- regarding what defendants allegedly learned through use of a computerized internal reporting system that tracks performance data do not support any inference of scienter, as a matter of law. See, e.g., Metzler Inv. GMBH, 540 F.3d at 1058, 1066 (holding that generalized allegations based on the defendant company's use of a "sophisticated information management system" did not "give rise to a strong inference of scienter sufficient to defeat dismissal"); Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1224 n.38 (1st Cir. 1996) ("[W]e think that the plaintiffs' allegations of a 'highly-efficient reporting system' may speak to the question of *how* defendants might have known what they allegedly knew, but absent some indication of the specific factual *content* of any single report generated by the alleged reporting system, do not independently provide a factual basis for inferring any such knowledge."); see also Goodyear, 436 F. Supp. 2d at 897 (defendants' "weekly meeting" "to discuss problems with the inter-company billing system is not suggestive of scienter").

Thus, Plaintiff gets nowhere with the allegation that the Individual Defendants supposedly received "a monthly report" that "included purchases, loan payoffs, delinquencies and portfolios." TAC ¶ 103. Plaintiff fails to allege any specific facts regarding any one report that any particular Defendant allegedly received, such as the date of any report, the specific content of any report, or how any information in any report was allegedly inconsistent with any challenged statement. Nor does Plaintiff show that any particular report contradicted either that any defendant said or believed. Plaintiff is left to rely solely on conclusory allegations regarding what Defendants allegedly knew, which cannot support a strong inference of scienter, as a matter of law. Ferro, 2007 WL 1691358, at *10 ("Plaintiff must plead *facts* giving rise to a strong inference of scienter -- complaints containing conclusory allegations are properly dismissed."). At bottom, Plaintiff's conclusory allegations about what Defendants "must have known," whether from unspecific allegations concerning internal reports, the Individual Defendants'

positions within Freddie Mac, or unproven allegations from another case, are insufficient to raise the necessary strong inference of scienter, as a matter of law.[22]

**4. Plaintiff's Confidential Source Allegations Do Not Support Any Inference Of Scienter.**

Plaintiff's "confidential witness" allegations do not cure Plaintiff's pleading defects. See TAC ¶¶ 55-59, 62-63, 72, 93, 98, 103, 105-107, 110, 112, 201-203. As the Sixth Circuit has held, conclusory allegations attributed to unspecified confidential witnesses should be discounted. Omnicare, 583 F.3d at 945-46 (affirming dismissal of securities fraud class action and "steeply discount[ing]" allegations of confidential witness where "no information was given regarding [the confidential witness] except the title of his position") (citing Ley v. Visteon Corp., 543 F.3d 801, 811 (6th Cir. 2008) (discounting allegations of confidential witnesses because they were "too vague and conclusory" and "failed to allege who . . . knew about . . . alleged improprieties and what, when, where and how they knew"), abrogated on other grounds by Matrixx, 131 S. Ct. at 1323-25; Ferro, 2007 WL 1691358, at *12 (discounting confidential witness allegation where they "amount to no more than blatant speculation regarding what Defendants . . . should have/could have/would have known regarding the alleged fraud").[23]

In Ley, the Sixth Circuit affirmed dismissal of securities claims despite the fact that plaintiffs' allegations were based on alleged statements of the defendant company's former senior finance director. The company had restated its financial results, admitting that its

[22] As the court observed in Stryker Corp. in dismissing a similar securities strike suit:

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later, the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. There is no "fraud by hindsight" . . . and hindsight is all [Plaintiffs] offer.

865 F. Supp. 2d at 815 (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627-28 (7th Cir. 1990)).

[23] Alleged statements of Employees A and J are entitled to no weight whatsoever, as they allegedly departed the company prior to the Class Period. See TAC ¶¶ 55, 201; Stryker Corp., 865 F. Supp. 2d at 825 (finding unreliable confidential witness statements where "some [confidential witnesses] were not even employed with the company during the class period"); Local 295/Local 851 IBT Emp'r Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp, 731 F. Supp. 2d 689, 722 (S.D. Ohio 2010) ("First, all of CW–2's information pre-dates the class period and, thus, is irrelevant."); In re Gander Mt. Cnty. Sec. Litig., No. 05-183, 2006 WL 140670, at *10 (D. Minn. Jan. 17, 2006) (finding two confidential witnesses who terminated their employment with the defendant company before the start of the class period unreliable).

"previously issued financial statements contained '$108 million in accounting errors which understated net losses by in excess of $60 million.'" Ley, 543 F.3d at 805. Alleging that the restatement revealed fraud, plaintiffs cited the senior finance director, who allegedly stated that, in violation of generally accepted accounting principles, defendants "book[ed] customer rebates obtained from suppliers in the year the supplier contract was entered, even though the rebates had not yet actually been received," and "would 'defer' surcharges [passed on by suppliers] and not account for them in its financial statements." Id. at 811. The Sixth Circuit held these allegations defectively vague because plaintiffs "fail[ed] to allege who at [the company] knew about these alleged accounting improprieties and what, when, where, and how they knew." Id.

Similarly, here, Plaintiff has failed to allege who at Freddie Mac knew that any public statement was allegedly false when made, and "what, when, where, and how they knew." Id. In fact, not one of the confidential witnesses is alleged to have had any communications with the Individual Defendants revealing that any Individual Defendant knew that any challenged statement was allegedly false when made. See Stryker Corp., 865 F. Supp. 2d at 824-27 (dismissing securities fraud claims, and finding "the [confidential witness] statements . . . fail to establish that Defendants were aware of the issues cited by the [17 confidential witnesses]" where "none of the [confidential witnesses] is alleged to have had any direct contact with either [Individual Defendant] on any topic").[24]

For example, Plaintiff cites three confidential witnesses in support of allegations regarding purported deficiencies in Freddie Mac's underwriting standards and the number of loans that Freddie Mac allegedly excepted from meeting those standards. TAC ¶¶ 55, 57, 59. Missing from those allegations is a single particularized fact indicating that any alleged confidential witness communicated any alleged deficiency in Freddie Mac's underwriting standards, or any allegedly improper "exception" thereto, to any one of the Individual

[24] See also In re Downey Sec. Litig., No. 08-3261, 2009 WL 736802, at *13 (C.D. Cal. Mar. 18, 2009) (finding that statements of thirteen confidential witnesses "lack the requisite specificity" because, inter alia, "[m]any of the statements do not relate to any of the Individual Defendants"); Hubbard v. BankAtlantic Bancorp, Inc., 625 F. Supp. 2d 1267, 1284-91 (S.D. Fla. 2008); Zack v. Allied Waste Indus., No. 04-1640, 2005 WL 3501414, at *7 (D. Ariz. Dec. 15, 2005) ("Notably, the Amended Complaint does not allege CW1 personally received directives from named Defendants.").

Defendants. See id. Plaintiff's remaining confidential witness allegations are deficient for the same reason, particularly regarding: (1) the quality of loans originating from Countrywide and Washington Mutual (Employees A, B, C, D & E); (2) alleged deficiencies in Freddie Mac's software programs and internal applications (Employees B, F & G); (3) alleged deficiencies in fraud detection (Employees I, C, & B); (4) alleged deficiencies in accounting and portfolio valuation (Employees J, K & L); and (5) monthly loan reports, none of which were allegedly sent to any Individual Defendant (Employees E & H). See TAC ¶¶ 55-59, 62-63, 72, 93, 98, 103, 105-107, 110, 112, 201-203.[25] None of those confidential witness allegations gives rise to any inference, let alone a strong inference, that any Defendant acted with scienter.

In sum, Plaintiff's confidential witnesses offer only what amounts to "water-cooler gossip, irrelevant speculation, and gratuitous criticism." Ferro, 2007 WL 1691358, at *12. Such conclusory allegations are insufficient to satisfy the strict pleading requirements of the PSLRA and Rule 9(b), and they do not support any inference of scienter against any Defendant.

#### 5. Plaintiff's "Motive And Opportunity" Allegations Do Not Support A Strong Inference Of Scienter.

Where a plaintiff fails to plead specific facts supporting a strong inference of scienter, it cannot salvage its claims by simply making "motive and opportunity" allegations. In re Comshare Inc. Sec. Litig., 183 F.3d 542, 551 (6th Cir. 1999) ("[T]he bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter."). Here, Plaintiff's "motive and opportunity" allegations, which are based on alleged insider trading and executive compensation, do not support any inference of scienter regarding any challenged statement. Rather, and as explained below, they are wholly inconsistent with any such inference.

[25] Even if Plaintiff's confidential source allegations met the particularity requirement -- and they do not -- they do not support a Section 10(b) claim. At most, they support claims for purported mismanagement, which is not actionable under federal securities law. See infra Part III.A.2.

**a. The Absence Of Sales By Freddie Mac's CEO, CFO, And COO, And The Millions Of Dollars Of Investment Losses Incurred By The Individual Defendants Undermines Any Inference Of Scienter.**

Contrary to Plaintiff's allegations, the Company's CEO, Richard F. Syron, CFO, Anthony Piszel, and COO, Eugene McQuade, sold no stock at all during the Class Period.[26] Plaintiff's allegations to the contrary are based on a gross distortion of the very documents on which it relies, i.e., Forms 4 available during the Class Period on Freddie Mac's website. The actual facts undermine any inference of scienter.

Officers of a public company are required to file Forms 4 when they transact in company stock. On the Form 4, they must identify a one-letter "Transaction Code," characterizing the type of transaction at issue. See 15 U.S.C. § 78a; see also 17 C.F.R. 240.16a-2, 240.16a-3. For example, an "**S**" refers to an "[o]pen market or private **sale** of non-derivative or derivative security," and a "P" refers to the purchase of such a security. See App. 43 (Freddie Mac's Form 4 General Instructions) (emphasis added). An "**F**" denotes neither a sale nor a purchase, but rather a **forfeiture** of stock. See id. A "forfeiture" of stock is a transaction "solely between the reporting person and the issuer and [does] **not** involve any **sale** of securities in the public markets." See id. (emphasis added); see also United States Securities and Exchange Commission, Form 4 General Instructions, http://www.sec.gov/about/forms/form4data.pdf.

As the Forms 4 on which Plaintiff relies plainly indicate, every single "sale" that Plaintiff attributes to Freddie Mac's CEO or COO was **not** a **sale**, but a "**forfeiture**." See App. 44. (Individual Defendant Trading Exhibit and Related Forms) (emphasis added). Furthermore, the face of each such Form 4 explains that the designation "F," for "forfeiture," refers to Freddie Mac's automatic retention of stock, rather than to any Defendant's sale of stock on the open market. Each designation "F" on each Form 4 is accompanied by an asterisk referencing the following explanatory note:

> *Shares **automatically retained by Freddie Mac** to cover taxes associated with the lapse of restrictions on restricted stock award.

[26] The trading activity of the Individual Defendants is summarized in the chart attached at App. 44, which is supported by the Forms 4 also included at App. 44.

App. 44 (Individual Defendant Trading Exhibit and Related Forms) (emphasis added).

The distinction between a sale and a forfeiture of stock is important because forfeitures -- which are not sales to any other person, and in this case occurred "automatically" -- cannot give rise to any inference of scienter. See In re Sportsline.com Sec. Litig., 366 F. Supp. 2d 1159, 1173 (S.D. Fla. 2004) (rejecting allegation that forfeitures of small percentages of holdings gave rise to any inference of scienter).

As the Forms 4 show, the Company's CEO, CFO, and COO collectively held 776,896 shares and exercisable options as of the end of the Class Period -- yet they had **no** "**sales**" during that time.[27] App. 44. Consequently, the value of Mr. Syron's holdings declined by more than **$18 million** from the Class Period high of $71.23 on November 8, 2006 to the opening of trading on the last day of the Class Period ($26.74 on November 20, 2007). App. 44; App. 45. Similarly, the value of Mr. Piszel's holdings declined by more than **$5 million**, and the value of Mr. McQuade's holdings declined by more than **$10 million** during that same period. App. 44.

This absence of stock sales by Freddie Mac's CEO, CFO, and COO negates any inference of scienter. See Stryker Corp., 865 F. Supp. 2d at 834-35 (that "the Amended Complaint fails to allege that [defendant] sold any stock during the class period . . . actually undermines an inference of scienter"); In re Comshare, Inc. Sec. Litig., No. 96-cv-73711, 1997 WL 1091468, at *10 (E.D. Mich. Sept. 18, 1997), aff'd on other grounds, 183 F.3d 542 (6th Cir. 1999) ("[T]he **CEO and CFO would have been essential participants in any scheme**, thus, **their having sold no stock, undermines any suggestion of knowledge** on the part of defendants due to the other sales.") (emphasis added).[28]

Nor do Ms. Cook's transactions give rise to any inference of scienter. Ms. Cook engaged

[27] As courts in the Sixth Circuit have recognized, when assessing total holdings, "it [is] appropriate to consider both direct holdings and vested stock options." Campbell v. Lexmark Int'l, Inc., 234 F. Supp. 2d 680, 686 n.7 (E.D. Ky. 2002) (citing Silicon Graphics, 183 F.3d at 985-86).

[28] See also In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 899 (W.D.N.C. 2001) (fact that "many key First Union executives . . . -- including the Company's Chief Financial Officer -- did not sell a single share . . . is fatal to Plaintiffs' effort to establish scienter through stock sales"); Credit Acceptance Corp., 50 F. Supp. 2d at 677 ("The fact that [the CFO] did not sell any shares during the class period undermines the suggestion that the Defendants engaged in securities fraud.").

in eight transactions during the Class Period. See App. 44 (Individual Defendant Trading Exhibit and Related Forms). Six of the eight transactions were forfeitures, not sales, which cannot give rise to any inference of scienter, as a matter of law.[29] See supra Part II.A.3. The other two transactions were trades made pursuant to Rule 10b5-1, and Rule 10b5-1 sales cannot support any inference of scienter, as a matter of law. See App. 44.

Pursuant to SEC Rule 10b5-1, a person's trading is **not** "on the basis of" material non-public information if the person adopted, and sold their securities pursuant to, a written trading plan consistent with the terms of Rule 10b5-1. See 17 C.F.R. 240.10b5-1. Courts have interpreted this rule to provide that, on a motion to dismiss, a plaintiff may not rely on such transactions to support an inference of scienter. See In re Level 3 Commc'ns Inc. Sec. Litig., 667 F.3d 1331, 1346-47 (10th Cir. 2012) (holding that sales made pursuant to "automatic transactions" "rebut any inference of scienter we might otherwise draw regarding these sales"); Elam v. Neidorff, 544 F.3d 921, 928 (8th Cir. 2008) ("Stock sales pursuant to Rule 10b5 trading plans 'can raise an inference that the sales were prescheduled and not suspicious.'"); Metzler Inv. GMBH, 540 F.3d at 1067 n.11 ("Sales according to pre-determined [10b5-1 trading] plans may 'rebut [] an inference of scienter.'") (second alteration in original).[30]

Moreover, Ms. Cook's two Rule 10b5-1 sales could not support any inference of scienter, even if they had not been made pursuant to Rule 10b5-1 (which they were). Stock trading by insiders, standing alone, is not probative of scienter. See In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 152 (3d Cir. 2004) ("[A] large number of today's corporate executives are compensated in terms of stock and stock options. . . . [and] [i]t follows . . . that these individuals will trade those securities in the normal course of events.'"), abrogated on other grounds by

[29] Contrary to Plaintiff's unsupported allegations, see TAC ¶ 247, Ms. Cook forfeited shares on August 2, 2006, May 6, 2007, June 5, 2007 and August 2, 2007, and did not "sell" shares on these dates or on January 31, 2007. See App. 44 (Individual Defendant Trading Exhibit and Related Forms).

[30] See also Wade v. Wellpoint, Inc., 892 F. Supp. 2d 1102, 1137 (S.D. Ind. 2012) (noting that "automatic, nondiscretionary sales made pursuant to 10b5-1 plans . . . do not give rise to a strong inference of scienter") (citation omitted); City of Royal Oak Ret. Sys. v. Juniper Networks, Inc., 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012) (holding Rule 10b5-1 plan was an "innocent, alternative explanation for the stock sales [that] negates an inference of scienter"); Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) ("[I]t is well established that 'trades under [a] 10b-5-1 plan do not raise a strong inference of scienter.'") (citations omitted).

Tellabs, 551 U.S. 308; see also Ferro, 2007 WL 1691358, at *14. Trading by insiders may give rise to an inference of scienter only if, among other things, the plaintiff adequately pleads that the trading is "suspicious" -- i.e., unusual in amount in light of prior trading history and near in time to the "bad news" being disseminated. See PR Diamonds, 364 F.3d at 682; Eaton Corp., 2013 WL 4054630, at *10; Ferro, 2007 WL 1691358, at *14-15. Plaintiff has failed to meet that burden here, where Ms. Cook sold only approximately **6%** of the total shares and options that she owned during the Class Period, and she did not engage in **any** trades at a suspicious time, e.g., immediately before the November 20, 2007 disclosure.[31] See App. 44 (Individual Defendant Trading Exhibit and Related Forms).[32]

Furthermore, this is not merely a case where senior management did not sell shares (other than Ms. Cook's two non-actionable Rule 10b5-1 trades); here, Messrs. Syron, Piszel and McQuade collectively suffered investment losses of over **$34 million** on their Freddie Mac holdings during the Class Period. See App. 44 (Individual Defendant Trading Exhibit and Related Forms). Ms. Cook also suffered investment losses exceeding **$4 million**. See id. Where, as here, defendants have suffered enormous investment losses, courts have found it implausible that such defendants possessed any intent to defraud. See, e.g., Maldonado v. Dominguez, 137 F.3d 1, 12 n.9 (1st Cir. 1998) (noting that any inference of scienter was undermined by defendants' personal loss of $1.5 million); Stryker Corp., 865 F. Supp. 2d at 834-35 ("[T]he substantial losses by individual defendants undermines any inference of scienter.") (quoting Guerra, 2004 WL 1467065, at *28); Campbell, 234 F. Supp. 2d at 686-87 (fact that retained holdings subjected defendants to substantial losses tended to undermine any inference of scienter).

[31] As courts have observed, "[a] broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter." In re Party City Sec. Litig., 147 F. Supp. 2d 282, 313 (D.N.J. 2001); see also In re Nike, Inc. Sec. Litig., 181 F. Supp. 2d 1160, 1169 (D. Or. 2002) (one-month gap between sales and adverse disclosure negates scienter).

[32] Where, as here, only one of the individual defendants actually traded company stock during the period at issue, there is no strong inference of scienter. See, e.g., Nathenson v. Zonagen Inc., 267 F.3d 400, 420-21 (5th Cir. 2001) (no strong inference of scienter where only one out of three insider defendants sold corporate stock); In re John Alden Fin. Corp. Sec. Litig., 249 F. Supp. 2d 1273, 1282 (S.D. Fla. 2003) (insider trading allegations inadequate where only one of four individual defendants sold stock during the class period).

**b. Freddie Mac's Repurchase Of Over $2.2 Billion Of Its Own Shares Refutes Any Inference Of Scienter.**

Plaintiff alleges that the Company's "$1 billion program of buying back" its own stock supports an inference of scienter. TAC ¶ 211(e)(i). To the contrary, courts have held that a defendant company's repurchase of its own shares through a stock buyback program **refutes** any inference of scienter. See, e.g., LCA-Vision Inc., 2009 WL 806714, at *24 (fact that company repurchased shares during class period undermined inference of scienter); In re Tibco Software, Inc. Sec. Litig., No. 05-2146, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006) ("[S]tock repurchase programs actually *negate* a finding of scienter.").

During the Class Period, Freddie Mac purchased over 36 million shares of its common stock pursuant to board-authorized repurchase programs, at a total cost of at least **$2.2 billion**. See App. 2 at 19 (2006 Annual Report); App. 3 at 72 (2007 Annual Report). Further, Freddie Mac's "$1 billion program of buying back" its own stock was in no way suspicious or unusual, as it announced a $2 billion stock buyback initiative in October 2005. See App. 2 at 19 n.1 (2006 Annual Report). These stock buybacks evidence that Freddie Mac believed its stock was **undervalued, not overvalued**. Thus, Plaintiff's allegations regarding Freddie Mac's stock repurchase program "actually **negate** a finding of scienter." Tibco, 2006 WL 1469654, at *21 (emphasis added).

**c. Plaintiff's Allegations Concerning The Individual Defendants' Compensation Cannot Support Any Inference of Scienter.**

Plaintiff also attempts to raise an inference of scienter by pointing to the incentive-based bonuses and stock awards received by the Individual Defendants. TAC ¶¶ 238-50. However, numerous courts have held that this type of motive allegation -- merely asserting that a defendant's compensation is tied to earnings -- is insufficient to raise a strong inference of scienter. See, e.g., Ashland, 648 F.3d at 467, 469-70 (finding that commission-based allegations did not give rise to inference of scienter); PR Diamonds, 364 F.3d at 690 ("All corporate managers share a desire for their companies to appear successful. That desire does not comprise a motive for fraud. Neither does an executive's desire to protect his position within a company

or increase his compensation.") (citations omitted); Eaton Corp., 2013 WL 4054630, at *11 ("[A] defendant's inherent desire to maintain job security and personal wealth is insufficient to show scienter."); LCA-Vision Inc., 2009 WL 806714, at *24-25 (finding that bonus-based allegations did not give rise to inference of scienter); Ferro, 2007 WL 1691358, at *18 (same).

Here too, Plaintiff has failed to plead specific facts regarding the Individual Defendants' compensation. Instead, Plaintiff relies on bare numbers with the misguided hope that the Court, contrary to controlling Sixth Circuit authority, will find the requisite strong inference of scienter simply because the Defendants were compensated for their work.

#### d. The Mere Fact That The SEC Brought An Enforcement Action Against Certain Of The Individual Defendants Does Not Support A Strong Inference Of Scienter.

The mere fact that the SEC has filed a complaint in an SEC enforcement action against two of the Individual Defendants does not support a strong inference of scienter.[33] See Glazer Capital Mgmt. v. Magistri, 549 F.3d 736, 748-49 (9th Cir. 2008) (holding that allegations based on DOJ and SEC settlement agreement did not support a strong inference of scienter under PSLRA); see also Ashland Inc. v. Oppenheimer & Co., 689 F. Supp. 2d 874, 888 (E.D. Ky. 2010), aff'd, 648 F.3d 461 (fact that state securities division brought enforcement action against defendant did not give rise to strong inference of scienter). Further, unproved allegations from SEC complaints do not constitute particularized facts required by the PSLRA:

> [R]eferences to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f) of the Federal Rules of Civil Procedure.

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) (striking private securities litigation complaint's references and adoption of allegations of

[33] Plaintiff's TAC also grossly mischaracterizes the related NPA between the SEC and Freddie Mac. See, e.g., TAC ¶ 12. Nothing in Exhibit A to the NPA constitutes an admission by Freddie Mac, and Freddie Mac is free to dispute the statements in Exhibit A in any legal proceeding to which the SEC is not a party, such as this case. See App. 46 (NPA) at 4, ¶ 8; see also id. at 4 n.1 ("Nothing in this Agreement affects [Freddie Mac's] and Related Person's (i) testimonial obligations or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.").

SEC and NASD complaints) (citing Lipsky v. Commonwealth United Corp., 551 F.2d 887, 892-94 (2d Cir. 1976)).[34]

As this case law makes clear, Plaintiff's reliance on the mere filing by the SEC of an enforcement action, or the making by the SEC of unproven allegations in an enforcement action, cannot save Plaintiff's defectively pleaded allegations from dismissal under the PSLRA. Indeed, in its ruling dated September 24, 2012, the Kuriakose court analyzed, inter alia, the legal sufficiency under the PSLRA of the allegations from the SEC Litigation complaint and NPA and ruled that those allegations did not support any valid federal securities law claims in a private class action subject to the PSLRA, as a matter of law. See Kuriakose, 897 F. Supp. 2d at 178, 182-83. The same allegations that Plaintiff grafted from those same documents are just as legally defective in this case for all of the same reasons.

### 6. The Opposing Inferences Of Nonfraudulent Intent Are More Plausible Than Any Inference Of Fraud.

Tellabs requires courts to weigh competing inferences when assessing whether a securities complaint adequately alleges a strong inference of scienter. 551 U.S. at 314. The Court must determine whether the TAC contains specific facts that raise an inference that is "**cogent and at least as compelling as any opposing inference of nonfraudulent intent**." Id. (emphasis added). The Sixth Circuit recently applied the Tellabs standard in Ricker, and affirmed the grant of a motion to dismiss for failing adequately to allege scienter. 2013 WL 4516095, at *4 (applying competing inference analysis and affirming dismissal where fraudulent inference was not as strong as opposing nonculpable inference).

Ricker highlights the high bar for pleading a strong inference of scienter in this Circuit, which Plaintiff fails to clear. See id. In Ricker, the Sixth Circuit affirmed the dismissal of securities fraud claims despite the existence of facts far more suggestive of scienter than the conclusory allegations in the TAC. Id. In that case, the plaintiff specifically alleged that a

[34] See also RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (striking references to "complaints filed in actions that were never resolved on the merits" as immaterial as a matter of law); Dent v. U.S. Tennis Ass'n, No. 08-cv-1533, 2008 WL 2483288, at *3 (E.D.N.Y. June 17, 2008) ("In addition to being inadmissible as hearsay, unproved allegations of misconduct are not proof of anything.").

confidential witness -- an accountant for the defendant company -- personally warned the company's CEO and CFO that a major customer was failing to pay on time, which plaintiff alleged put the company on notice that its SEC filings would be inaccurate. Id. at *1-2. Thereafter, the company's auditor issued an opinion "raising 'substantial doubt about [defendant company's] ability to continue as a going concern.'" Id. at *1. Concurrently, the company also disclosed that it had discovered errors in its prior financial statements filed with the SEC, which would require the company to restate its consolidated financial statements. Id. Despite these facts, the Sixth Circuit held that plaintiff's allegations showed "**at most**, that [the company] was financially mismanaged, not that Defendants fraudulently misled the public." Id. at *4 (quotation and citation omitted) (emphasis added).

As compared to the allegations that the Sixth Circuit found wanting in Ricker, the allegations in the TAC are even less suggestive of scienter. Here, unlike in Ricker: (1) not one confidential witness is alleged to have communicated any alleged fact to any Individual Defendant that contradicted any challenged statement (see supra Part II.A.4); (2) Freddie Mac has not restated a single line item in any of its Class Period financial statements despite certification by its outside auditor (see Kuriakose, 897 F. Supp. 2d at 181); and (3) the TAC lacks any specific facts demonstrating that any Defendant knew that any challenged statement was false when made. Accordingly, Plaintiff's scienter allegations cannot possibly satisfy the Tellabs standard as applied by the Sixth Circuit in Ricker.

Lest there be any doubt as to that fact, the court in Kuriakose applied the same Tellabs standard that the Sixth Circuit applied in Ricker to allegations virtually identical to the allegations in the TAC. To begin, the court in Kuriakose explained that the extensive disclosures that Freddie Mac made regarding the credit characteristics of the loans in its guarantee portfolio undermined the legal sufficiency of the allegations that the plaintiff there, and here, copied from the SEC Litigation complaint, stating:

> Plaintiffs' claims are made even more tenuous by the fact that in annual and quarterly statements, **Freddie Mac routinely detailed the credit characteristics of the loans in its guarantee portfolio, divulged the specific credit scores of borrowers in its guarantee portfolio, and disclosed loan-to-value ratios**.

Id. at 182 (emphasis added). According to Plaintiff, those are the very sort of "higher risk characteristics" that caused Freddie Mac to categorize certain loans internally as "Caution" loans, and Freddie Mac candidly disclosed **all** of the loans it had in its guarantee portfolio that had those "higher risk characteristics." TAC ¶ 33.

To demonstrate precisely how Freddie Mac enabled investors, and the market at large, to "measure [the] risk in Freddie Mac's loan portfolio," Kuriakose, 897 F. Supp. 2d at 182, the court in Kuriakose provided the following example:

> **Freddie Mac disclosed that 6% of its purchases during 2007 were of loans to borrowers with credit scores less than 620, and 11% were of loans to borrowers with credit scores between 620 and 659**. These disclosures formed part of the "total mix" of information available. Through simple arithmetic (11 + 6), investors could ascertain that 17% of Freddie Mac's purchases involved credit scores less than 660. **A review of Freddie Mac's disclosures over the Class Period reveals that the company relayed ample information to investors about not only the details of its guarantee portfolio, but also the risk factors associated with its exposure to non-traditional markets.** As such, investors could assess for themselves the degree of risk presented by Freddie Mac's holdings.

Id. at 182-83 (emphasis added). The same example applies here respecting the disclosures made before and during the Class Period.

The Kuriakose court also addressed the fundamental flaw in grounding a securities fraud class action on alleged misrepresentations regarding the term "subprime" loans, considering that, as Freddie Mac disclosed, and as Plaintiff and the SEC itself has conceded, there was no universal definition of the term "subprime" loans:

> Plaintiffs attempt to convince the Court that Freddie Mac was intentionally "muddying the waters" with changing internal definitions of "subprime." Absent a universally accepted definition of the term, however, the Court cannot infer such fraudulent intent; to do otherwise would be to impose liability for failing to maintain uniform definitions of industry terms across departments, at all times. Indeed, **the fact that Freddie Mac employees attributed different definitions to the term "subprime" in internal correspondence has no bearing on whether Freddie Mac's public disclosures were misleading; rather it only highlights that the term had no set definition**.

Id. at 183 (emphasis added). Not surprisingly, the court in Kuriakose held that those allegations failed to support a strong inference of scienter, stating:

> **The Court also finds that a reasonable person would not deem Plaintiffs' purported inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged"** . . . . Throughout the Class Period, Freddie Mac made investors aware of its exposure to "non-traditional" mortgages. Whether executives referred to these loans as "risky," "non-prime," "subprime-like," or "subprime" is irrelevant since Freddie Mac fully disclosed the composition of the company's portfolio. **Under these circumstances, Plaintiffs' allegations do not support an inference of scienter**.

Id. at 184-85 (emphasis added; citation omitted). Summing up his rationale for dismissing all claims on scienter grounds, Judge Keenan concluded:

> Finally, **the bevy of truthful disclosures that Freddie Mac made** throughout the Class Period, covering everything from detailed credit characteristics to extensive risk assessments, also negates an inference of scienter. **It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures.** If Freddie Mac executives sought to shield its investors from "learning the truth" of its business, they needed to be measurably more opaque.

Id. at 185 (emphasis added). Judge Keenan's scienter analysis in Kuriakose applies with equal force here.

Moreover, after Freddie Mac was placed into conservatorship in 2008, its Conservator, the Federal Housing Finance Agency ("FHFA"), took over and completed a three-year investigation that "uncovered no evidence sufficient to demonstrate that any of the Company's current or former officers or directors engaged in willful misconduct, a knowing violation of criminal law or of any federal or state securities law, or any acts from which they derived improper personal benefit, including in connection with the Company's acceptance and management of credit risk from 2004 through 2007." See App. 47, Ex. A at 3 (SLC Report). On March 16, 2011, based on the results of this investigation, FHFA filed motions to voluntarily dismiss all claims in the derivative actions pending against former Freddie Mac officers. See App. 47 & 49. On April 20, 2011 and May 31, 2011, respectively, the district courts granted FHFA's motions to dismiss. See App. 50.

For its part, applying Tellabs and Ricker, and informed by Judge Keenan's consideration of nearly identical allegations in Kuriakose and the results of the FHFA investigation, this Court is now asked to determine whether the inference that the Defendants intentionally misrepresented Freddie Mac's exposure to subprime and non-traditional mortgages is at least as strong as the competing inference that Freddie Mac -- a company compelled by federal law to invest in home mortgage assets -- suffered losses as a result of a dramatic and historically anomalous financial market collapse. Here, as in Ricker, Kuriakose and similar cases,[35] Plaintiff has failed to meet its burden of adequately pleading scienter. For this separate and independent reason, Plaintiff's claims should be dismissed.

### B. The Alleged Misrepresentations And Omissions Are Not Pled With The Particularity Required By The PSLRA And Rule 9(b).

To satisfy the heightened pleading requirements of the PSLRA and Rule 9(b), "a plaintiff must detail specifically the facts and circumstances it claims constitute the defendant's fraudulent conduct." Goodyear, 436 F. Supp. 2d at 890. As the Sixth Circuit has observed:

> [T]he PSLRA mandates that the complaint "**specify each statement** alleged to have been misleading, **the reason or reasons why** the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall **state with particularity all facts on which that belief is formed**."

Ford Motor Co., 381 F.3d at 567 (quoting 15 U.S.C. § 78u-4(b)(1)) (emphasis added). Given this law, "claims of securities fraud cannot rest on speculation and conclusory allegations." Goodyear, 436 F. Supp. 2d at 897 (quoting PR Diamonds, 364 F.3d at 692). Here, Plaintiff has failed to allege any specific facts explaining how any challenged statement was false when made.

---

[35] See, e.g., In re Radian Sec. Litig., 612 F. Supp. 2d 594, 619 (E.D. Pa. 2009) ("The plaintiffs' allegations regarding the condition of the subprime industry and the nature of [defendants' investments], especially when considered together with the defendants' related disclosures, are not specific evidence that individual defendants knew or must have known their actions presented a danger of misleading buyers or sellers."); Pittleman v. Impac Mortg. Holdings, Inc., No. 07-0970, 2009 WL 648983, at *4 (C.D. Cal. Mar. 9, 2009) ("This case is about a company involved in a volatile industry at the onset of a long, destructive economic downturn."); In re PXRE Grp., Ltd. Sec. Litig., 600 F. Supp. 2d 510, 546 (S.D.N.Y. 2009) ("Taken collectively, Plaintiff's factual allegations suggest an industry, and a company, shocked by a unique and devastating catastrophe."); In re Huntington Bancshares Inc. ERISA Litig., 620 F. Supp. 2d 842, 853 (S.D. Ohio 2009) (dismissing "stock drop case[]" where company's financial difficulties were part of the "economic climate in general, which of course includes the subprime lending crisis").

Even under Rule 12(b)(6), plaintiffs must allege more than mere speculation to survive a motion to dismiss. See Twombly, 550 U.S. at 555-56. Under the PSLRA and Rule 9(b), they must allege far more, including specific facts supporting a statement-by-statement explanation as to how each challenged misrepresentation is false or misleading when made. See supra Part II.A.1.

Here, Plaintiff has failed to allege any specific facts explaining how any challenged statement was false when made. For example, in Paragraph 149 of the TAC, Plaintiff simply inserts a lengthy block quote, omits key disclosures from the quote, bolds and italicizes certain statements within the block quote, and then leaves it to the Court and Defendants to figure out which particular quoted statements are allegedly false or misleading, and why. Although Plaintiff bolds a collection of statements for apparent emphasis, nowhere does Plaintiff allege how or why any statement made was false or misleading. For example, Plaintiff bolds the statement that "the voluntary growth limit on the portfolio will make it important for us to be selective in which mortgages we purchase to achieve the strongest returns possible for the limited growth we are going to have." TAC ¶ 149. Plaintiff nowhere alleges that it **was not** important for Freddie Mac to be selective respecting the mortgages it purchased.[36] Indeed, Plaintiff fails to allege specific facts explaining how any other statement cited in the TAC is false. See App. 62 (statement-by-statement analysis).[37]

For all of these reasons the TAC should be dismissed under the PSLRA and Rule 9(b).

[36] These bolded statements are also too vague to be actionable, as a matter of law. See infra Part III.B.2.

[37] Plaintiff's "confidential witness" allegations do not cure this pleading defect. See TAC ¶¶ 55-59, 62-63, 72, 93, 98, 103, 105-107, 110, 112, 201-203. Not one alleged fact that Plaintiff attributes to any of its confidential witnesses contradicts any challenged statement purportedly made by any Individual Defendant. See supra Part II.A.4.

## III. THE THIRD AMENDED COMPLAINT SHOULD ALSO BE DISMISSED UNDER RULE 12(b)(6) BECAUSE THE PLAINTIFF HAS FAILED TO ALLEGE ANY ACTIONABLE MISREPRESENTATIONS OR OMISSIONS OF MATERIAL FACT.

In addition to failing under the PSLRA and Rule 9(b), Plaintiff's claims also fail under Rule 12(b)(6). Here, Plaintiff fails to meet even that more lenient pleading standard, failing to allege any omission of material fact or misstatement of material fact actionable under Section 10(b).

### A. Plaintiff Has Not Alleged Any Omission Of Material Fact Actionable Under Section 10(b).

It is well settled that, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic, 485 U.S. at 239 n.17. "Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure." In re Sofamor Danek Grp., Inc., 123 F.3d 394, 400 (6th Cir. 1997) (emphasis added); see also Ashland, 648 F.3d at 468 ("[A] misrepresentation or omission must pertain to material information that the defendant *had a duty to disclose*.") (emphasis in the original). Materiality alone is not sufficient to place a company under a duty of disclosure. See Zaluski v. United Am. Healthcare Corp., 527 F.3d 564, 572 (6th Cir. 2008). To hold otherwise would "deluge investors with marginally useful information, and would damage corporations' legitimate needs to keep some information non-public." Id.[38]

Freddie Mac had no duty to disclose the allegedly omitted information. As explained below: (1) Plaintiff does not and cannot allege that any actual statement was "so incomplete as to mislead;" (2) Plaintiff's allegations of business mismanagement do not state a claim for violation of the federal securities laws; and (3) Defendants in fact disclosed Freddie Mac's increased participation in non-traditional mortgage markets, that there is no universal definition of subprime, and the exact credit characteristics of its guarantee portfolio, rendering any alleged omission immaterial as a matter of law.

[38] In the Sixth Circuit, courts distinguish "hard information" -- "typically historical information or other factual information that is objectively verifiable" -- from "soft information" -- "predictions and matters of opinions." Zaluski, 527 F.3d at 572; see also Sofamor Danek, 123 F.3d at 402. No duty exists to disclose soft information unless it is "virtually as certain as hard facts." Zaluski, 527 F.3d at 572. Like most matters of opinion, any predictions that are not "substantially certain to hold" do not come within the duty of disclosure. Sofamor Danek, 123 F.3d at 402.

**1. Plaintiff Does Not And Cannot Allege That Any Actual Statement Was "So Incomplete As To Mislead."**

A statement that is allegedly "so incomplete as to mislead" is only actionable under very limited circumstances. See Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990).[39] The First Circuit's en banc ruling in Polaroid illustrates how very narrowly courts construe what it means for a statement to be "so incomplete as to mislead." Id. at 16. In its ruling, the First Circuit stressed that "complete and accurate" disclosure does not require that a company publish every fact about every subject it voluntarily discloses. Id.

Just as in Polaroid, Plaintiff's conclusory allegations fail to indicate how any of the alleged statements were "so incomplete as to mislead." While Plaintiff has quoted en masse allegedly false statements, it fails to allege any well-pled facts that were omitted from such statements that rendered them misleading. Accordingly, Plaintiff has not alleged any omission of material fact that is actionable under Section 10(b).

**2. Allegations Of Business Mismanagement Do Not State A Claim For Violation Of The Federal Securities Laws.**

Many of the omissions the Plaintiff alleges are also not actionable because they amount to no more than claims of supposed corporate mismanagement. Such allegations cannot support a federal securities law claim, as a matter of law. See Santa Fe Indus. v. Green, 430 U.S. 462, 479 (1977) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."); Ricker, 2013 WL 4516095, at *4 (affirming grant of motion to dismiss where plaintiff's allegations showed "at most, that [the company] was financially mismanaged, not that Defendants fraudulently misled the public"). Indeed, courts have granted motions to dismiss securities fraud claims founded on allegations of corporate mismanagement that are strikingly similar to the allegations in the TAC. See, e.g., Stryker Corp., 865 F. Supp. 2d at 815 ("Because Plaintiffs allege, at most, poor management decisions, the Court will grant Defendants' motion and dismiss the Amended Complaint."); In re 2007 NovaStar Fin., Inc., Sec. Litig., No. 07-cv-0139, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June

[39] See also Winer Family Trust v. Queen, 503 F.3d 319, 330 (3d Cir. 2007) (applying Polaroid in affirming dismissal of securities fraud claims); In re K-tel Int'l Inc. Sec. Litig., 300 F.3d 881, 897 (8th Cir. 2002) (same).

4, 2008) at *13 (dismissing, with prejudice, complaint alleging fraud in connection with defendant's investment in subprime loans); In re Impac Mortg. Holdings, Inc. Sec. Litig., 554 F. Supp. 2d 1083, 1087 (C.D. Cal. 2008) (granting motion to dismiss securities fraud class action where, inter alia, plaintiffs' allegations "at most" amounted to corporate mismanagement that is "not actionable fraud under the securities laws"); Tripp v. IndyMac Fin. Inc., No. 07-1635, 2007 WL 4591930, at *3-4 (C.D. Cal. Nov. 29, 2007) (allegations that defendant inappropriately loosened underwriting guidelines amounted only to corporate mismanagement).

As these cases illustrate, Plaintiff's allegations with respect to the following subjects cannot support a federal securities law claim, because they amount to no more than non-actionable charges of supposed mismanagement:

- Freddie Mac's publicly disclosed decision to increase its purchase of subprime and non-traditional mortgage products allegedly through its implementation of the "Touch More Loans" and "Whole Loan REMIC" initiatives (TAC ¶¶ 45, 50-55, 94-95);
- Alleged deficiencies in Freddie Mac's due diligence capabilities surrounding its evaluation of loans (TAC ¶¶ 56-60);
- Alleged decisions by Freddie Mac to waive material exceptions to certain of its (unspecified) underwriting guidelines (TAC ¶¶ 56-60);
- Alleged purchases by Freddie Mac of an unspecified number of loans that were subject to inflated appraisals (TAC ¶¶ 62-63);
- Alleged practices that supposedly led to Freddie Mac's purchase of a greater percentage of loans with a LTV ratio above 80% (TAC ¶¶ 62-65);
- Alleged failures by Freddie Mac to comply with certain of its own (unspecified) underwriting standards (TAC ¶ 66);
- Freddie Mac's decision to purchase certain loans originated by Countrywide and Washington Mutual (TAC ¶¶ 72, 93);
- Alleged deficiencies in a Quantum computer software system (TAC ¶¶ 96-98); and
- Alleged deficiencies in Freddie Mac's fraud detection systems and a supposed failure to implement a product offered by CoreLogic. (TAC ¶¶ 105-113, 193).

In addition to its legally deficient allegations of mismanagement, Plaintiff blatantly distorts various facts as well as statements allegedly made by Freddie Mac. For example, Plaintiff alleges that, according to a New York Times article, Freddie Mac purchased an

unspecified number of loans that "did not satisfy Freddie Mac's lending standards" and then concealed this information from ratings agencies. TAC ¶¶ 60, 104. Plaintiff claims:

> [A]ccording to an article published in the New York Times on January 27, 2008, the large number of exceptions [to Freddie Mac's lending standards] was not disclosed to ratings agencies such as Moody's and Fitch, who gave many of these pools AAA ratings. Had the extent of the exceptions been disclosed to the ratings agencies, the ratings agencies would not have given the pools such high ratings.

TAC ¶ 60; see id. ¶ 104 ("[A]s alleged above, the ratings agencies were not given all material facts **by Defendants** when they gave such ratings.") (emphasis added).

As an initial matter, it is not clear from the TAC which January 27, 2008 New York Times article Plaintiff cites in support of its allegation.[40] In any case, Plaintiff's allegations run directly counter to the facts discussed in whichever New York Times article that it chose to distort. Plaintiff does not, and cannot, allege that ratings agencies, such as Moody's or Fitch, based their ratings on statements allegedly made by Freddie Mac. To the contrary, Freddie Mac was a **purchaser**, not an issuer, of the securities referenced in that article. See, e.g., TAC ¶¶ 60, 104. Freddie Mac did not generate, but rather **relied on**, the ratings set by the agencies for those bonds. See App. 55. Nor is Freddie Mac an investment bank. If any investment bank withheld information from ratings agencies, Freddie Mac would have been a victim, not a perpetrator, of that non-disclosure.

In sum, none of Plaintiff's allegations regarding supposed mismanagement at Freddie Mac can support any of its claims in this action.

[40] The only New York Times article published on January 27, 2008 that mentions Freddie Mac is entitled O Wise Bank, What Do We Do? (No Fibbing Now). See App. 55 (Gretchen Morgenson, O Wise Bank, What Do We Do? (No Fibbing Now), N.Y. Times, Jan. 27, 2008). That article provides no basis for Plaintiff's charges, as it **makes no mention whatsoever** of any alleged lending practices at Freddie Mac or any disclosures or lack of disclosures to ratings agencies by Freddie Mac. Plaintiff, however, asserted in response to Defendants' initial motion to dismiss that it intended to reference a different article, entitled Loan Reviewer Aiding Inquiry Into Big Banks. That article does not even mention Freddie Mac. See Pl.'s Opp'n Mot. Dismiss First Am. Compl. App'x 6. Instead, the article reported on the New York State Attorney General's office inquiry into whether unnamed investment banks withheld information concerning mortgage-backed securities from investment ratings firms. Id.

### 3. Freddie Mac Disclosed Its Increased Participation In Non-Traditional Mortgage Markets, The Attendant Risks, The Lack Of A Universal Definition Of Subprime, And The Precise Credit Characteristics Of Its Guarantee Portfolio.

Plaintiff's omission allegations suffer from yet another defect, which independently dictates the dismissal of the vast majority of Plaintiff's omission claims. Where a plaintiff's claims are based on the alleged omission of information that was, in fact, disclosed, such claims are ripe for dismissal. See, e.g., Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996) ("The prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed."). An examination of the alleged omissions, see, e.g., TAC ¶¶ 134-138, 225-226, along with Freddie Mac's relevant disclosures, reveals that Freddie Mac broadly disclosed to investors much of the allegedly omitted information.[41]

For an alleged misrepresentation or omission to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S at 231-32. "Misrepresentations are not material if the investors are privy to the truth." Royal Appliance, 1995 WL 490131, at *2. Securities fraud claims cannot stand where a fact allegedly concealed was actually revealed, or where the alleged misrepresentations are immaterial in light of other disclosures.[42] "[A] 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." Greenhouse v. MCG Capital Corp., 392 F.3d 650, 656 (4th Cir. 2004). Even

[41] Defendants do not argue that Freddie Mac disclosed all of the allegedly omitted information because some of the allegedly omitted "facts" are not facts at all, but rather just conclusory assertions, unsupported by the particularized pleading necessary to survive a motion to dismiss.

[42] See, e.g., Benzon v. Morgan Stanley Distribs., Inc., 420 F.3d 598, 608-09 (6th Cir. 2005) (affirming dismissal where alleged omissions "are merely interpretations drawn from the facts presented in the prospectuses, and do not actually provide new information, [so] they would not have 'significantly altered the 'total mix'' of the information already presented in the prospectuses"); Sofamor Danek, 123 F.3d at 402 (affirming motion to dismiss where medical supply company's failure to disclose allegedly illegal promotion of products was not material in part because the company had disclosed its receipt of an FDA warning letter that "any analyst could easily obtain a copy of . . . and could make an independent judgment of its significance").

admittedly false statements are immaterial where they would not have altered the "total mix" of information to investors.[43]

Here, the TAC alleges that Freddie Mac misrepresented the amount of its subprime holdings by failing to disclose, as "subprime," loans labeled as "C1," "C2," and "EA" by an automated underwriting systems. Plaintiff further contends that the Defendants misrepresented and concealed information regarding the quantity of loans in Freddie Mac's guarantee portfolio that were "subprime," "subprime-like," or had "subprime risk." TAC ¶¶ 37, 61, 67; see also TAC ¶¶ 3, 78-79, 115, 157-58, 168-70, 174-76, 182. As discussed below, these alleged misrepresentations and omissions are immaterial, as a matter of law, in view of the candid and extensive disclosures that Freddie Mac made regarding: (1) its intent to increase its participation in non-traditional mortgage market and the increased risk presented by those loans; (2) the fact that there is no universally accepted definition of the term "subprime" loan; and (3) the precise credit characteristics of the loans in its guarantee portfolio.

#### a. Freddie Mac Disclosed Both That It Was Increasing Its Participation In The Non-Traditional Mortgage Market And The Increased Risk That Such Loans Presented.

As discussed above (supra Part I.A.2), both before and during the Class Period in this case, Freddie Mac disclosed that it was increasing its exposure to non-traditional mortgage products, as well as the risk that non-traditional mortgage products would default at a higher rate than traditional mortgage products. In its Annual Reports for 2005 and 2006, Freddie Mac expressly disclosed to investors the **exact information** that Plaintiff falsely alleges Freddie Mac did not disclose until November 20, 2007, i.e., that Freddie Mac had been increasing substantially its purchase of non-traditional mortgage products, such as **interest-only loans** as well as **loans originated with lower documentation.** App. 1 at 3, 65 (2005 Annual Report); App. 2 at 69 (2006 Annual Report). Freddie Mac warned investors that it expected that trend to continue during the Class Period; that it was exploring ways in which it could "become more

[43] See, e.g., ECA v. JP Morgan Chase Co., 553 F.3d 187, 203-05 (2d Cir. 2009) (affirming dismissal where mischaracterization of certain loans as trading activity was a false statement, but immaterial where there was no substantial likelihood that accurate reporting would have significantly altered the total mix of information available).

involved with these products;" that it expected its participation in those non-traditional mortgage products "to grow over the coming years;" and that it expected "each of these products to default more often than traditional products." Id.

Freddie Mac's disclosures negate Plaintiff's allegation that Freddie Mac concealed its intent to increase its exposure to non-traditional mortgage products from investors. See, e.g., TAC ¶ 134-35, 137-86, 189. If Plaintiff, or any other investor, did not want to take on the risks presented by Freddie Mac's fully disclosed decision to increase even further its purchase of relatively riskier non-traditional mortgage products, Plaintiff's recourse was to refrain from buying Freddie Mac stock. The federal securities laws are not designed to provide investment insurance to investors, like Plaintiff here, who knowingly assume disclosed risks and thereafter suffer investment losses when those risks materialize. See Dura, 544 U.S. at 345 ("[T]he [securities] statutes make [private securities fraud] actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.").[44]

### b. Freddie Mac Disclosed That There Is No Universally Accepted Definition Of Subprime.

As Freddie Mac disclosed, "**[p]articipants in the mortgage** market often characterize loans based upon their overall credit quality **at the time of origination**, generally considering them to be prime **or subprime**." App. at 2 at 69 (emphasis added). Of course, as the market was well aware, Freddie Mac does not originate loans and, therefore, does not categorize loans as "prime" or "subprime" at origination, but rather purchases loans only from "prime" originators. See Kuriakose, 897 F. Supp. 2d at 183 (noting that Freddie Mac did not purchase or guarantee loans from "traditional subprime channels"). Furthermore, as the TAC concedes, Freddie Mac disclosed that "[t]here is no universally accepted definition of subprime" that originators, or the market as a whole, apply to determine whether a particular loan is "subprime," and that "[t]here is no longer a clear-cut distinction between prime and subprime mortgages." TAC ¶¶ 182, 117.

[44] As courts have long recognized, "[t]he market has risks; the securities laws do not serve as investment insurance." Raab, 4 F.3d at 291.

In fact, it is generally accepted that there is no universally accepted subprime definition: "there is no standard industry-wide approach to the definition[] of . . . subprime." Nolte v. Capital One Fin. Corp., 390 F.3d 311, 317 (4th Cir. 2004). For example, in 2002, agencies proposed collecting data on subprime lending programs, but the Federal Financial Institutions Examination Council ("FFIEC")[45] decided not to proceed due to the lack of any standard definition of "subprime" and the belief that it was almost impossible to define.[46] The definition of "subprime" continues to vex policymakers. As recently as October 31, 2012, the FDIC revised its rules to incorporate its March 2012 Notice of Proposed Rulemaking, which acknowledged differing subprime definitions and concerns that a subprime definition would overstate exposure and generate inconsistent results.[47] The revised Rule no longer requires insured institutions to report "subprime" loans, but instead "higher-risk consumer loans." Id.

The court in Kuriakose specifically addressed the fundamental flaw in grounding a securities fraud class action on alleged misrepresentations regarding the term "subprime" loans, considering that, as Freddie Mac disclosed, and as the SEC itself has conceded,[48] there was no universal definition of the term "subprime" loans: "Absent a universally accepted definition of the term, however, the Court cannot infer such fraudulent intent; to do otherwise would be to impose liability for failing to maintain uniform definitions of industry terms across departments, at all times." Kuriakose, 897 F. Supp. 2d at 183. Underscoring the validity of that ruling by Judge Keenan, government and industry participants did not even agree on which credit, or FICO,[49] score was an indicator of a "subprime" loan during the relevant period, a fact that the

[45] The FFIEC is a formal interagency body of the United States government empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Office of the Comptroller of the Currency, and the Consumer Financial Protection Bureau and to make recommendations to promote uniformity in the supervision of financial institutions. See Federal Financial Institutions Examination Council, www.ffiec.gov.

[46] See, e.g., App. 52 (American Bankers Ass'n., Predatory Lending Bank in the News, 24 ABA Bank Compliance 2, 3-4 (Feb. 2003)).

[47] See App. 61 (FDIC, Notice of Proposed Rulemaking on Assessments, Large Bank Pricing (Mar. 20, 2012); FDIC, Final Rule (Oct. 31, 2012)).

[48] See supra Part I.B (discussing SEC v. Mozilo).

[49] "FICO" is a commonly used abbreviation for Fair Isaac Corporation scores, which assess the credit-worthiness of borrowers.

SEC itself has conceded. See supra Part I.B. (discussing SEC's allegation in SEC v. Mozilo). Indeed, the lack of any universally accepted definition of subprime is why Freddie Mac disclosed, on a granular level, the precise credit characteristics of the loans in its guarantee portfolio, i.e., it allowed investors to assess for themselves the degree of risk presented by Freddie Mac's holdings.

**c. Freddie Mac Broadly Disclosed The Credit Characteristics Of The Loans In Its Guarantee Portfolio.**

As discussed above, Freddie Mac accurately disclosed the exact amount of loans it held with the very credit characteristics used to assess the credit risk of loans, including: (1) general information regarding the types of credit characteristics common to the subprime segment of the market, as variously defined; and (2) the precise characteristics of the loans in its guarantee portfolio. Given these disclosures, and as Judge Keenan held in Kuriakose, the market was well aware of the extent to which Freddie Mac purchased loans with credit characteristics that might bring them within one or another definition of the term "subprime."[50] Plaintiff's claims should be dismissed for this reason alone.

Freddie Mac disclosed the percentage of loans in its guarantee portfolio that were made to borrowers with specific credit scores, including credit scores under 620 and between 620 to 659, 660 to 699, 700 to 739, and 740 and above. See id. In its 2005 Annual Report, Freddie Mac disclosed that **4%** of its guarantee portfolio as of December 31, 2005 was comprised of loans to borrowers with credit scores less than 620 and **4%** of its purchases that year were of loans with credit scores less than 620. See App. 1 (2005 Annual Report, at 67, Table 37). In its 2006 Annual Report, Freddie Mac disclosed that **5%** of its purchases during the year ended December 31, 2006 were of loans to borrowers with credit scores less than 620 and that **10%**

[50] Although Plaintiff alleges that Freddie Mac revealed the extent of Freddie Mac's participation in non-traditional mortgage markets on the last day of the Class Period, Freddie Mac made the very same type of detailed disclosures both before and during the Class Period. Compare App. 1 at 67, Table 37 & App. 2 at 70, Table 38, with TAC ¶ 102 ("After the third quarter of 2007, Freddie Mac disclosed that the percentage of loans to borrowers with FICO scores below 620, the percentage of loans with LTV ratios above 90%, and the percentage of loans used to refinance a mortgage other than a cash-out refinance, had all increased 50% over the comparable period in 2006. Rather than acting merely as a stabilizer, Freddie Mac was an increasingly aggressive participant in the subprime market.").

were of loans to borrowers with credit scores between 620 and 659, and so simple arithmetic revealed to the market that **15%** of Freddie Mac's guarantee portfolio loan purchases were of loans to borrowers with credit scores less than 660. See App. 2 (2006 Annual Report, at 70, Table 38). In each year, Freddie Mac disclosed prior year data, thus apprising the market that the percentage of purchased loans made to borrowers with credit scores less than 660 had increased **1%** in 2006 compared to 2005. See id. Accordingly, to the extent that any investor, or the market at large, allegedly defined subprime loan by a borrower's credit score of less than 620 or 660, Freddie Mac disclosed the exact amount of its exposure to such loans.

Freddie Mac likewise disclosed that **1%** of its guarantee portfolio as of December 31, 2005 was comprised of loans to borrowers with original LTV ratios above 95% and **5%** was comprised of loans to borrowers with original LTV ratios from 90% to 95%. See App. 1 (Freddie Mac, 2005 Annual Report, at 67, Table 37). Further, Freddie Mac disclosed that **2%** and **4%** of its purchases during that year were of loans with original LTV ratios above 95% and from 90% to 95%, respectively. See id. Freddie Mac also disclosed the same data for the two prior years. See id.[51] Freddie Mac made similar disclosures for 2006. See App. 2 (Freddie Mac, 2006 Annual Report, at 70, Table 38).

Significantly, neither Plaintiff nor the SEC has challenged the accuracy of any of the credit characteristics data that Freddie Mac disclosed before and throughout the Class Period. See supra Part I.B. Thus, Plaintiff's argument that Freddie Mac misrepresented its subprime exposure by not including all C1, C2 and EA loans is fundamentally flawed. Regardless of the label, each loan that was categorized as C1, C2 or EA had certain borrower characteristics, and thus its exposure in Freddie Mac's guarantee portfolio was known to the market. According to Plaintiff: "Caution Loans had multiple higher risk characteristics, such as high LTV ratios, borrowers with lower FICO scores, unusual property types or high debt-to-income ratios, and were recognized within Freddie Mac as loans that had a high risk of default relative to Accept

[51] Freddie Mac also disclosed the percentage of loans in its guarantee portfolio and purchases during each year made to borrowers with original LTV ratios in numerous other categories. See App. 1.

Loans." TAC ¶ 33. As set forth above, Freddie Mac disclosed the precise percentages of its guarantee portfolio's exposure to loans made to borrowers with various LTV ratios and FICO credit scores. Thus, the labels on some of those loans -- attached by an automated underwriting system (see TAC ¶¶ 28, 31) -- were immaterial, because investors knew the precise credit characteristics that enabled them to assess the risk that such holdings presented, overall, to an investment in Freddie Mac securities. Judge Keenan held precisely that in the Kuriakose case.

As Judge Keenan explained, the allegations that both plaintiffs in Kuriakose, and Plaintiff here, copied from the SEC Litigation complaint "are made even more tenuous by the fact that . . . **Freddie Mac routinely detailed the credit characteristics of the loans in its guarantee portfolio, divulged the specific credit scores of borrowers in its guarantee portfolio, and disclosed loan-to-value ratios**. Kuriakose, 897 F. Supp. 2d at 182 (emphasis added). Explaining further the legal defectiveness, in a PSLRA case, of the exact same allegations from the SEC Litigation complaint that Plaintiff here has made the centerpiece of this case, Judge Keenan wrote that "Plaintiffs' arguments fail because **Freddie Mac's broad disclosure [of] all of its loan characteristics was an accurate way to relay information to investors, given the confusion surrounding the term 'subprime.'"** Id. (emphasis added). Judge Keenan proceeded to provide specific examples of how, "through simple arithmetic," "investors could assess for themselves the degree of risk presented by Freddie Mac's holdings." Id. at 183.

These facts, coupled with the TAC's allegation of an alleged "fraud on the market," doom Plaintiff's claims. Freddie Mac's detailed public disclosures of the credit characteristics of loans in its guarantee portfolio -- as Judge Keenan ruled -- "made it possible for a reasonable investor to, with little effort, take his own measure of risk in Freddie Mac's loan portfolio" regardless of which definition of "subprime loan" a reasonable investor chose to apply. Id. at 182. Furthermore, that information, according to Plaintiff's fraud on the market allegation, was reflected in Freddie Mac's stock price. See supra Part I.B.

The court in Kuriakose also rejected the allegations, drawn from the SEC Litigation complaint, that Freddie Mac's management misrepresented Freddie Mac's "subprime" loan

exposure in oral statements that they made. For example, the Kuriakose plaintiffs alleged that former Freddie Mac CEO, Richard Syron, made a material misrepresentation when he stated that Freddie Mac "didn't do any subprime business." No. 08-cv-07281, ECF No. 234-1 ¶ 16. Plaintiff here makes virtually the identical allegation. See, e.g., TAC at ¶ 84 ("On May 14, 2007, Syron spoke at the UBS Conference (the "May 14 speech") and stated: "As we discussed in the past, at the end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio.").

As Judge Keenan observed, Mr. Syron conveyed that Freddie Mac had not purchased for its guarantee portfolio any material amount of "**loans originated by traditional subprime channels**," i.e., loans that were marketed and designated by the lending banks upon origination as "subprime" loans. Kuriakose, 897 F. Supp. 2d at 183. As the Federal Reserve contemporaneously noted, and as the market understood: "The classification 'subprime' generally is **a lender-given designation** for loans extended to borrowers with some sort of credit impairment, say, due to missing installment payments on debt or the lack of a credit history." See App. 57 at 6 (The Subprime Mortgage Market, 2007 Annual Report of the Federal Reserve Bank of San Francisco).[52] Leaving no doubt respecting that matter, Freddie Mac disclosed that mortgage lenders characterized loans upon origination as either prime or subprime, although they did not adhere to any universal definition of the term subprime.[53] The loans that were characterized as "subprime" upon origination by the lender were the loans that were "originated by traditional subprime channels." Kuriakose, 897 F. Supp. 2d at 183.

At the same time, however, Freddie Mac plainly disclosed that Freddie Mac was increasing its purchases (through the prime loan channel) of non-traditional mortgage products and other loans with riskier credit characteristics, such as lower FICO scores and higher LTV

[52] The Report also notes respecting the lack of consistency in the criteria used by lenders in designating or classifying a loan as "subprime" loan: "There is no one definition of a subprime mortgage. . . . FICO scores range from 300 to 850, **with subprime generally assumed to be below the 620 to 660 range**." Id. at 6 (emphasis added).

[53] See, e.g., App. 2 at 69 (2006 Annual Report) ("Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime.").

ratios. Freddie Mac did not conceal this information or seek to mislead any investor regarding those facts. To the contrary, Freddie Mac plainly warned investors regarding the risks presented by the increase in its purchases of non-traditional mortgage products, and Freddie Mac disclosed the specific credit characteristics of those loans, which, as Judge Keenan rightly ruled, enabled investors and the market at large to "assess for themselves the degree of risk presented by Freddie Mac's holdings." Id.

It is also worth noting that, after a year-long investigation into the causes of the financial crisis, the Federal Crisis Inquiry Commission ("FCIC") found that putative definitions of "subprime" and "Alt-A" mortgages proffered by critics of Freddie Mac and Fannie Mae are overly simplistic and do not comport with the actual loan performance demonstrated by the subject loans purchased by Freddie Mac and Fannie Mae, which showed vastly superior performance compared to loans purchased by non-GSEs:

> The Commission also probed the performance of the loans purchased or guaranteed by Fannie and Freddie. While they generated substantial losses, delinquency rates for GSE loans were substantially lower than loans securitized by other financial firms. For example, data compiled by the Commission for a subset of borrowers with similar credit scores—scores below 660—show that by the end of 2008, GSE mortgages were far less likely to be seriously delinquent than were non-GSE securitized mortgages: 6.2% versus 28.3%.
>
> * * *
>
> Using strict cutoffs on FICO score and loan-to-value ratios that ignore risk layering and thus are only partly related to mortgage performance (as well as relying on a number of other assumptions), [Edward] Pinto estimates that as of June 30, 2008, 49% of all mortgages in the country—26.7 million of them—were risky mortgages that he defines as subprime or Alt-A. Of these, Pinto counts 11.9 million, or 45%, that were purchased or guaranteed by the GSEs. In contrast, the GSEs categorize fewer than 3 million of their loans as subprime or Alt-A.
>
> Importantly, as the FCIC review shows, the GSE loans classified as subprime or Alt-A in Pinto's analysis did not perform nearly as poorly as loans in non-agency subprime or Alt-A securities. **These differences suggest that grouping all of these loans together is misleading. In direct contrast to Pinto's claim, GSE mortgages with some riskier characteristics such as high loan-to-value ratios are not at all equivalent to those mortgages in securitizations labeled subprime and Alt-A by issuers.** The performance data assembled and analyzed by the FCIC show that non-GSE securitized loans experienced much higher rates of delinquency than did the GSE loans with similar characteristics.[54]

[54] App. 60 (Fin. Crisis Inquiry Comm'n, Final Report of the Nat'l Comm'n on the Causes of the Fn. & Econ. Crisis in the U.S. at xxvi & 219 (Jan. 2011)) (emphasis added) (footnotes omitted).

Indeed, the data to which the FCIC alludes validates the distinctions that Freddie Mac drew between various non-prime loans depending on their exact credit characteristics and risk layering.

Similarly, as the chart below demonstrates, Freddie Mac's serious delinquency rates for its guarantee portfolio are far lower than those of the entire market or **even the market for only "prime" loans**:[55]




As the above chart illustrates, the delinquency rate for the Freddie Mac guarantee portfolio as of year-end 2009 was 3.87 percent -- slightly over half of the serious delinquency rate for all prime loans in the market (7.01 percent), slightly over one-third the serious delinquency rate for all mortgage loans (9.42 percent), and approximately one-eighth of the serious delinquency rate for all subprime loans (30.56 percent). Thus, regardless of the label

[55] This data comes directly from the National Delinquency Survey of the Mortgage Bankers Association, with the Freddie Mac statistic coming from Freddie Mac, 2009 Annual Report, at 69, Table 7 & n.2, and with a delinquency defined as 90 days past due or in foreclosure. App. 7.

applied to the loans, Freddie Mac's guarantee portfolio is comprised of loans that are far less risky than a portfolio containing all **prime** loans in the market.

* * *

To conclude, regardless of differing definitions of "subprime" loan that may have been used in the market, and as the court held in Kuriakose, Freddie Mac's candid and extensive disclosures made the market well aware of the quantity of loans in Freddie Mac's guarantee portfolio with credit characteristics that might bring them within any of those definitions. In short, Freddie Mac plainly disclosed the allegedly concealed information regarding: (1) the increase in its participation in non-traditional mortgage markets; and (2) the quantity of loans in its guarantee portfolio with "subprime-like" credit characteristics (such as low FICO scores and high LTVs). For all of these reasons, the alleged misrepresentations in the TAC are immaterial, as a matter of law.

**d. Freddie Mac Disclosed The Amount Of Its Capital Base, Its Minimum Capital Requirements, And The Risk That Its Capital Base May Decline Below Required Levels.**

Plaintiff alleges that Freddie Mac deceived investors by assuring the public during the Class Period that Freddie Mac "was comfortably maintaining the minimum capital levels required by OFHEO." TAC ¶ 197. According to Plaintiff, "Defendants concealed that Freddie Mac's capital was so impaired that its capital levels were in danger of falling below the federal requirements." Id. Plaintiff's allegations regarding Freddie Mac's capital base are belied by the very documents upon which Plaintiff purportedly relies.

Notably, Plaintiff does not allege that Freddie Mac ever inaccurately reported the amount of its core capital base or that Freddie Mac's capital base fell below minimum capital requirements at any point during the Class Period. Indeed, in its report to Congress, OFHEO, the Company's prior regulator, found that Freddie Mac was adequately capitalized under the agency's capital classification standards for all four quarters of 2007:

> OFHEO classified Freddie Mac as **adequately capitalized for year-end 2006 and all four quarters of 2007**. Since the year-end 2006 classification, **Freddie Mac's capital classification was consistent with publicly released financial statements by the Enterprise** . . . .

App. 59 at 51 (OFHEO Report) (emphasis added). As OFHEO noted, Freddie Mac's regulatory core capital levels during the Class Period were: (1) above OFHEO's minimum regulatory capital requirement during the Class Period; (2) consistent with Freddie Mac's public disclosures; and (3) accurately disclosed to investors through certified financial statements during the Class Period. Id. Indeed, as the U.S. District Court for the Eastern District of Virginia stated:

> In general, OFHEO's reports about Freddie Mac were positive; as recently as July 2008, OFHEO's director described Freddie Mac and Fannie Mae as "adequately capitalized."

In re Fed. Home Loan Mortg. Corp. Deriv. Litig., No. 08-cv-773 (E.D. Va. July 27, 2009) (quoting Fannie, Freddie Adequately Capitalized: Lockhart, CNBC.com, July 8, 2008 (App. 48)).

In addition, Freddie Mac's capital base disclosures during the Class Period have been certified by its outside auditor. No one has requested that Freddie Mac restate any of its prior capital base disclosures, even during the five-year period since the government conservatorship was imposed. Kuriakose, 897 F. Supp. 2d at 181. These incontrovertible facts are dispositive of Plaintiff's capital adequacy claims. Put simply, Plaintiff fails to allege a single particularized fact challenging the accuracy of any Freddie Mac financial disclosure concerning its regulatory core capital.

Rather, Plaintiff pins its hopes on the strained allegation that Defendants "**concealed** that Freddie Mac's capital levels were **in danger of** falling below the federal requirements." TAC ¶ 197 (emphasis added). In fact, Freddie Mac repeatedly and accurately disclosed its core capital position to investors and, contrary to Plaintiff's allegation, the specific amount by which its core capital exceeded OFHEO's 30 percent minimum target capital surplus. The following chart

details Freddie Mac's regulatory core capital per quarter as regularly reported by Freddie Mac.[56]

| Quarter | Reported Regulatory Core Capital (in millions) | Reported Minimum Capital Requirement (in millions) | Reported Regulatory Minimum Capital Surplus (in millions) | Amount Over Regulatory Capital Requirement |
|---|---|---|---|---|
| **Q4 2007** | $37,867 | $26,473 | $11,394 | $3.5 billion |
| **Q3 2007** | $34,672 | $26,001 | $8,671 | $0.9 billion |
| **Q2 2007** | $35,573 | $26,355 | $9,218 | $1.3 billion |
| **Q1 2007** | $35,503 | $26,112 | $9,391 | $1.6 billion |
| **Q4 2006** | $35,365 | $25,607 | $9,758 | $2.1 billion |
| **Q3 2006** | $36,151 | $25,721 | $10,430 | $2.7 billion |

Plaintiff does not challenge the accuracy of these core capital disclosures.

Moreover, as stated above, Freddie Mac also cautioned investors that, among other things, house prices could adversely affect the adequacy of its regulatory capital:

> Factors that could adversely affect the **adequacy of our regulatory capital** for future periods include . . . changes in the economic environment, such as large interest-rate or **implied volatility moves or house-price declines** . . . .

App. 1 at 126 (2005 Annual Report) (emphasis added).[57] Plaintiff does not -- because it cannot -- explain how Defendants could possibly have "concealed" and "danger" to Freddie Mac's "capital levels" when Freddie Mac accurately disclosed its core capital levels, their relation to OFHEO's minimum capital surplus requirement, and the risk that its capital levels might be adversely impacted by house-price declines.

### B. The Statements Upon Which Plaintiff Bases Its Claims Are Not Actionable Under Section 10(b).

Just as Plaintiff has failed to state a claim against Defendants based on any **omission** of material fact, Plaintiff also has failed to state a claim based on any allegedly false or misleading **statement** of material fact. Every statement that Plaintiff challenges as an alleged misrepresentation is not actionable as a matter of law.

[56] See App. 4 at 5, 24.

[57] Freddie Mac provided to investors a similar warning in its 2006 Annual Report. App. 2 at 14.

### 1. Accurate Statements Of Historical Fact Are Not Actionable.

It is well-settled that accurate statements of historical fact are not actionable under Section 10(b). See Ford Motor Co., 381 F.3d at 570; Sofamor Danek, 123 F.3d at 401 n.3 ("[A] violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."); In re Almost Family, Inc. Sec. Litig., 2012 WL 443461, at *3 (same). Another court explained: "To give . . . credence [to claims based on accurate historical statements] would be akin to imposing liability for truthfully saying the 'sky was blue yesterday' when the sky turns out to be gray the next day." Greenberg v. Compuware Corp., 889 F. Supp. 1012, 1017 (E.D. Mich. 1995). Many statements included in the lengthy block quotes that Plaintiff includes in its TAC are not actionable because they are accurate statements of historical fact that are not challenged as false.

### 2. Vague And Indefinite Statements Of Optimism Are Immaterial, As A Matter Of Law.

Immaterial statements upon which a reasonable investor would not rely, such as "vague, soft, puffing statements or obvious hyperbole," cannot give rise to liability under the federal securities laws. Ford Motor Co., 381 F.3d at 570. Indeed, as the Sixth Circuit explained in Omnicare:

> Courts have consistently found immaterial "a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the market place -- loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important . . . ."

583 F.3d at 944 (quoting Ford Motor Co., 381 F.3d at 570-71). Such inactionable puffery includes "loose optimism about both an issuer's current state of affairs and its future prospects." In re Peritus Software Servs. Inc. Sec. Litig., 52 F. Supp. 2d 211, 220 (D. Mass. 1999) (cited with approval in PR Diamonds, 364 F.3d at 688).

A large number of the statements that Plaintiff challenges as false or materially misleading contain statements or phrases that courts regularly hold to be inactionable corporate

puffery. For example, generalized optimistic statements concerning a company's risk management constitute mere puffery:[58]

> See, e.g., JP Morgan, 553 F.3d at 205-06 (statements that company's risk management processes were "**highly disciplined**" and "**set the standard**" for "**integrity**" were "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable") (emphasis added); In re Sec. Capital Assurance Ltd. Sec. Litig., 729 F. Supp. 2d 569, 597 (statements that the company's underwriting approach was "**disciplined**" and "**conservative**" and that its overcollateralization triggers were "**robust**" in the face of deterioration were "**classic examples of puffery**") (emphasis added).

Similarly, courts hold statements containing phrases such as "well-positioned" when used to describe a company's positioning vis-à-vis competitors, and the market in general, to be inactionable as a matter of law:[59]

> See, e.g., Coble v. Broadvision Inc., No. 01-1969, 2002 WL 31093589, at *1 (N.D. Cal. Sept. 11, 2002) (statement that company was "**well positioned** . . . to thrive and emerge even a stronger player" not actionable) (emphasis added); Fitzer v. Sec. Dynamics Techs., Inc., 119 F. Supp. 2d 12, 23 (D. Mass. 2000) (statement that "[t]here are very **few companies** that **are positioned as well as us** and have the track record" and other statements "relating to whether [company] was '**well positioned**'" deemed no more than inactionable puffing) (emphasis added).

Statements using vague, generalized terms such as "strong" and "prudent" when used to describe, inter alia, a company's business, fundamentals, or performance are also considered immaterial puffery under the federal securities laws:[60]

> See, e.g., Omnicare, 583 F.3d at 943-44 (statement that growth outlook was **"positive"** given company's **"strong"** fundamentals and **"proven"** growth strategy was immaterial puffery) (emphasis added); Rosenzweig v. Azurix Corp., 332 F.3d 854, 869 (5th Cir. 2003) (statement that "'**[o]ur fundamentals are strong**' is obviously immaterial puffery") (emphasis added); Next Century Commc'ns Corp. v. Ellis, 318 F.3d 1023, 1028 (11th Cir. 2003) (CEO's statement that company's performance was "**strong**" constituted mere puffery) (emphasis added); In re Downey Sec. Litig., 2009 WL 736802, at *6 (statements regarding defendant's "**strong capital position**" were "far too vague to be actionable under the PSLRA") (emphasis added).

---

[58] See TAC ¶¶ 140-43, 145-49, 151-53, 156, 159, 165, 170, 173, 179, 183-86.

[59] See TAC ¶¶ 141, 147, 156, 159, 167, 170, 173, 177, 179, 183-85.

[60] See TAC ¶¶ 140, 141, 146-150, 167, 170, 178, 184, 215-18, 220-22.

### 3. Statements That "Bespeak Caution" Are Not Actionable As A Matter Of Law.

"[W]hen statements of 'soft' information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the 'soft' statements" are not actionable as a matter of law, because they "bespeak caution." See In re Cytyc Corp. Sec. Litig., No. 02-12399, 2005 WL 3801468, at *21 (D. Mass. Mar. 2, 2005). The "bespeaks caution" doctrine, while similar to the PSLRA safe harbor, provides "an independent test of materiality." Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F. Supp. 2d 662, 676 (D. Colo. 2007); see also In re Metro. Sec. Litig., 532 F. Supp. 2d 1260, 1291 n.8 (E.D. Wash. 2007) ("While the PSLRA Safe Harbor codifies the bespeaks caution doctrine, the bespeaks caution doctrine remains a defense in its own right."). As the Third Circuit has explained, "'bespeaks caution' is essentially shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 364 (3d Cir. 1993) (holding, inter alia, that bespeaks caution doctrine rendered immaterial alleged misrepresentations and omissions in light of meaningful cautionary language).

Many of the challenged statements in this case bespoke caution in outlook and therefore are not actionable, as a matter of law. Citing press releases, presentations and conference calls, Plaintiff challenges as false or misleading numerous forward-looking statements. See TAC ¶¶ 145-47, 149, 152, 166-67, 177-79, 183-84, 219. Those press releases, presentations and conference calls all contain meaningful cautionary language and/or expressly refer to the risk factors in Freddie Mac's Annual Reports.[61] As set forth above, Freddie Mac's Annual Reports for 2005 and 2006 set forth in great detail the numerous risks that could affect Freddie Mac's

[61] See App. 8 at 3 (Aug. 1, 2006 Press Release); App. 9 at 1 (Aug. 1, 2006 Conf. Call); App. 11 at 1 (Slides from Sept. 12, 2006 Lehman Bros. Conf.); App. 14 at 2 (Oct. 3, 2006 Conf. Call); App. 18 at 16 (Slides from Jan. 30, 2007 Citigroup Conf.); App. 29 at 17 (Slides from May 17, 2007 Lehman Bros. Conf.); App. 31 at 4-5 (June 14, 2007 Press Release); App. 32 at 2 (June 14, 2007 Conf. Call); App. 36 at 2 (Aug. 30, 2007 Conf. Call); App. 38 at 12 (Slides from Sept. 10, 2007 Lehman Bros. Conf.); App. 16 at 4 (Jan. 5, 2007 Press Release). In a public disclosure containing forward-looking statements, a corporation may incorporate by reference the risk factors set forth in its recent financial disclosures. See Miller, 346 F.3d at 677-78.

investments and business, as did the many press releases on which Plaintiff relies. In light of these extensive cautionary disclosures, the "bespeaks caution" doctrine precludes Plaintiff's claims with respect to the challenged forward-looking statements.

The PSLRA's safe harbor provision is a statutory codification of the "bespeaks caution" doctrine. See Helwig, 251 F.3d at 547-48. This safe harbor provision shields defendants from liability even if the challenged forward-looking statement was knowingly false when made. See Miller, 346 F.3d at 672 ("[I]f the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind.") (emphasis added). The PSLRA's safe harbor applies not only to statements that are expressed in the future tense, or couched in terms of belief or expectation, but also to statements that, while stated in the present tense, are dependent on future events before their veracity can be determined. See Hess v. Am. Physicians Capital Inc., No. 04-cv-0031, 2005 WL 459638, at *6-7 (W.D. Mich. Jan. 11, 2005) (holding that disclosures regarding the adequacy of defendant's loss reserves were forward looking); see also In re Kindred Healthcare, Inc. Sec. Litig., 299 F. Supp. 2d at 738.[62]

To obtain the protections of the PSLRA's safe harbor, companies do not have to predict the future accurately, but rather they must disclose those risks important to their projections. See In re Cytyc Corp. Sec. Litig., 2005 WL 3801468, at *21. Applying the safe harbor, courts have confirmed that cautionary language shields a company from liability for its forward-looking statements. See, e.g., Miller, 346 F.3d at 676-78; Ferro, 2007 WL 1691358, at *20; Stryker Corp., 865 F. Supp. 2d at 829-32.

### 4. Characterizations Cannot Replace Actionable Statements.

Plaintiff's TAC is laden with characterizations in lieu of what Defendants actually said, and snippets of Defendants' statements that Plaintiff removes from their context. See Ley, 543 F.3d at 811 (rejecting plaintiff's characterization of challenged statement after reviewing the

[62] When forward-looking statements are prefaced with underlying present tense assumptions, both the forward-looking statements and the present tense assumptions are protected by the PSLRA's safe harbor. See 15 U.S.C. § 78u-5(i)(1)(D); see also Miller, 346 F.3d at 677.

challenged statement in context) (citing In re Trump Casino Sec. Litig., 7 F.3d at 371 ("[W]e must consider an alleged misrepresentation within the context in which the speaker communicated it."); In re Downey Sec. Litig., 2009 WL 736802, at *6 (same). As courts have held, however, such characterizations lack any legal significance. See In re Copley Pharm., Inc. Sec. Litig., No. 94-11897, 1995 WL 169215, at *2 (D. Mass. Mar. 16, 1995). Like the TAC, the 60-page complaint in Copley "center[ed] around 'impressions,'" which the court termed "the securities analogue to 'penumbras and emanations' left by the statements." Id. In dismissing 28 of the 29 statements at issue, the court held:

> Securities law is not about fostering senses; it is about actual statements, whether or not they are true or false, and, if false, whether or not the utterer knew at the time the statements were made that they were false.

Id. at *2 n.5.

Similarly, Plaintiff here cannot remedy its failure to allege a single specific misstatement by mischaracterizing what Defendants actually said. See Melder v. Morris, 27 F.3d 1097, 1100 (5th Cir. 1994) (affirming grant of motion to dismiss securities fraud class action where "plaintiffs fail[ed] to base their allegations on statements *actually* made by [defendants], opting instead to selectively distort the company's public statements to create an inference of fraud"). Admittedly, while the Court needs a machete to cut through the dense jungle of characterizations contained in Plaintiff's TAC, none of the statements that Defendants actually made constitutes a material misrepresentation of fact.

### C. An Application Of The Foregoing Legal Doctrines To Each Of The Challenged Statements Establishes That None Of The Challenged Statements Is Actionable, As A Matter Of Law.

In the TAC, Plaintiff challenges as false or materially misleading myriad statements issued between August 1, 2006 and November 20, 2007. A statement-by-statement examination of the challenged statements, however, tells a story that is completely at odds with Plaintiff's misleading distortions. Indeed, the "totality of [the] statements" the Plaintiff relies on here, i.e., each statement examined in full and in context, "reflects neither misleading optimism nor fraud." See In re Philip Morris Sec. Litig., 872 F. Supp. 97, 101 (S.D.N.Y. 1995).

Here, Plaintiff quotes statements set forth in numerous sources, including press releases, financial reports, an annual report, earnings conference calls, investor presentations, newspaper articles and the like. See, e.g., TAC ¶¶ 139-190. None of the challenged statements is actionable, as a matter of law, because each is either: (1) an accurate statement of historical fact not challenged as false; (2) a vague and indefinite statement of optimism, which is immaterial as a matter of law; or (3) a statement that is protected by the PSLRA's safe harbor for forward looking statements or that "bespeaks caution" in outlook. While this Court must engage in a statement-by-statement analysis of the TAC to assess whether Plaintiff has stated a claim based on each alleged misstatement, it is simply not possible to discuss the numerous statements that Plaintiff has attacked within the confines of this brief. A chart of each alleged misstatement and the reasons why that challenged statement is not actionable, as a matter of law, is provided herewith as App. 62. Nevertheless, the following examples illustrate the deficiencies found in all of the statements that Plaintiff challenges.

Plaintiff alleges that, in a March 23, 2006 press release that accompanied its 2006 Annual Report, Freddie Mac supposedly "emphasized, falsely, that Freddie Mac did not face risk from its nontraditional mortgage exposure." TAC ¶ 159. However, that is not what the press release actually states. According to the TAC, Freddie Mac actually stated the following, which Plaintiff uses as the basis for its above-quoted distortion:

> We also maintained our low credit and interest-rate risk profiles, leaving us well positioned to deal with a broad range of interest rate conditions, and with the value of our shareholder's equity well protected.

TAC ¶ 159. Read in the context of this press release accompanying Freddie Mac's financial report for its 2006 fiscal year, that sentence refers to Freddie Mac's historical financial performance during 2006. See App. 24. Plaintiff does not contest the accuracy of any hard financial data that Freddie Mac reported for that year, or any other financial quarter or year within the Class Period. Furthermore, as discussed above, Freddie Mac disclosed the precise credit characteristics of the loans in its guarantee portfolio, which allowed investors to "assess for themselves the degree of risk presented by Freddie Mac's holdings." Kuriakose, 897 F.

Supp. 2d at 183. The statement about Freddie Mac being "well positioned to deal with a broad range of interest conditions" that might arise in the future is a forward-looking statement accompanied by cautionary language and thus immune from liability. In any event, is too vague to be actionable. See supra Parts III.B.2-3.

By way of further example, Plaintiff alleges that, in a Mortgage Risk magazine article entitled "Subprime Winner," Ms. Cook "gave further false reassurances concerning Freddie Mac's risk exposure." TAC ¶ 186. Plaintiff, however, fails to support that conclusory allegation with any specific facts indicating that any single statement that the article attributes to Ms. Cook was false when made. See supra Part II.B. Further, Plaintiff mischaracterizes Ms. Cook's statements, ignoring the numerous disclosures in the article that detail Freddie Mac's exposure to non-traditional and subprime mortgages loans, including disclosures regarding the billions of dollars in securities backed by such loans that Freddie Mac held in its retained portfolio. App. 40 at 11-12; see supra Part III.A.3. As this article evidences, the market **knew the precise extent** of Freddie Mac's exposure to non-traditional mortgages. Likewise, the TAC is replete with lengthy quotations from press releases, annual reports, conference calls, and the like, that are pulled out of context. When read in context, none of the challenged statements are actionable under Section 10(b), as a matter of law. See Ley, 543 F.3d at 811 (citing In re Trump Casino Sec. Litig., 7 F.3d at 371); see also supra Part III.B.4.

## IV. PLAINTIFF'S SECTION 20(a) CLAIMS SHOULD BE DISMISSED.

As set forth above, Plaintiff has failed adequately to allege a primary violation of Section 10(b) and SEC Rule 10b-5. Accordingly, the TAC cannot state a claim for violation of Section 20(a), as a matter of law. See PR Diamonds, 364 F.3d at 696-98.

## CONCLUSION

For all of the foregoing reasons, the TAC should be dismissed, with prejudice. See, e.g., Ford Motor Co., 381 F.3d at 572-74 (affirming denial of leave to replead).

Respectfully submitted,

*/s/ Hugh E. McKay*
Hugh E. McKay (0023017)
**PORTER WRIGHT MORRIS & ARTHUR LLP**
925 Euclid Avenue, Suite 1700
Cleveland, OH 44115-1483
Tel: (216) 443-2580
Fax: (216) 443-9011
E-mail: hmckay@porterwright.com

-and-

**BINGHAM McCUTCHEN LLP**
Jordan D. Hershman
Jason D. Frank
One Federal Street
Boston, MA 02110-1726
Tel: (617) 951-8000
Fax: (617) 951-8736
E-mail: jordan.hershman@bingham.com
E-mail: jason.frank@bingham.com
*Counsel for Defendant Federal Home Loan Mortgage Corporation*

**OF COUNSEL:**

Lance J. Wolf
Howard Lindenberg
FREDDIE MAC
8200 Jones Branch Drive
McLean, Virginia 22102
Tel: (703) 903-2000
Fax: (703) 903-2485

October 9, 2013

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)

Pursuant to Local Rule 7.1(f), I hereby certify that this document complies with the 70-page limitation requested by Freddie Mac in Defendants' Unopposed Motion to Amend Schedule and to Set Page Limits on Briefing of Defendants' Motions to Dismiss Third Amended Complaint. ECF No. 288.

*/s/ Hugh E. McKay*
Hugh E. McKay

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2013, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ Hugh E. McKay*
Hugh E. McKay