1

```
1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION

3    OHIO PUBLIC EMPLOYEES        )
     RETIREMENT SYSTEM, on        )  Case No. 4:08-cv-160
4    behalf of itself and all     )  Youngstown, Ohio
     others similarly             )  Wednesday, June 11, 2014
5    situated,                    )  2:22 p.m.
                                  )
6             Plaintiffs,         )
                                  )
7        vs.                      )
                                  )
8    FEDERAL HOME LOAN            )
     MORTGAGE CORPORATION, aka    )
9    FREDDIE MAC, et al.,         )
                                  )
10            Defendants.         )

11              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE BENITA Y. PEARSON
12              UNITED STATES DISTRICT JUDGE

13                   ORAL ARGUMENT

14   APPEARANCES:

15   FOR THE PLAINTIFFS:
          Markovits, Stock & DeMarco
16        By:  Christopher D. Stock, Esq.,
          and Wilbert B. Markovits, Esq.
17        Suite 530
          119 East Court Street
18        Cincinnati, Ohio  45202
          (513) 651-3700
19        cstock@msdlegal.com
          bmarkovits@msdlegal.com
20


21

                MARY L. UPHOLD, RDR, CRR
22   Thomas D. Lambros Federal Building and U.S. Courthouse
              125 Market Street, Room 337
23           Youngstown, Ohio  44503-1780
                  (330) 884-7424
24          Mary_Uphold@ohnd.uscourts.gov

25        Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.
```

2

1      **APPEARANCES (CONTINUED):**

2      **FOR THE PLAINTIFFS (CONTINUED):**
           Strauss & Troy
3          **By:** Richard S. Wayne, Esq.
           Suite 400
4          150 East Fourth Street
           Cincinnati, Ohio  45202
5          (513) 621-2120
           rswayne@strausstroy.com
6
       **ALSO PRESENT FOR THE PLAINTIFFS:**
7          Kevin Lewis, Technician
           Dylan Gould, Intern
8
       **FOR THE DEFENDANT FEDERAL HOME LOAN MORTGAGE CORPORATION,**
9      **aka FREDDIE MAC:**
           Bingham McCutchen LLP
10         **By:** Jordan D. Hershman, Esq.,
           and Jason D. Frank, Esq.
11         One Federal Street
           Boston, Massachusetts  02110
12         (617) 951-8000
           jordan.hershman@bingham.com
13         jason.frank@bingham.com

14         and

15         Porter Wright Morris & Arthur LLP
           **By:** Hugh E. McKay, Esq.
16         Suite 500
           950 Main Avenue
17         Cleveland, Ohio  44113
           (216) 443-2580
18         hmckay@porterwright.com

19         Freddie Mac
           **By:** Barry Michael Parsons, Associate General Counsel
20         Legal Division/General Litigation
           8200 Jones Branch Drive
21         MS 202
           McLean, Virginia  22102-3110
22         (703) 903-2390
           barry_parsons@freddiemac.com

23

24

25

```
1    APPEARANCES (CONTINUED):

2    FOR THE DEFENDANT RICHARD F. SYRON:
          Sidley Austin
3         By:  Frank R. Volpe, Esq.
          1501 K Street, NW
4         Washington, DC  20005
          (202) 736-8366
5         fvolpe@sidley.com

6    FOR THE DEFENDANT PATRICIA L. COOK:
          Zuckerman Spaeder
7         By:  Carl S. Kravitz, Esq.,
          and Caroline E. Reynolds, Esq.
8         Suite 1000
          1800 M Street, NW
9         Washington, DC  20036
          (202) 778-1800
10        ckravitz@zuckerman.com
          creynolds@zuckerman.com
11
     FOR THE DEFENDANT ANTHONY S. PISZEL:
12        Murphy & McGonigle
          By:  James K. Goldfarb, Esq.
13        1185 Avenue of the Americas
          21st Floor
14        New York, New York  10036
          (212) 880-3961
15        jgoldfarb@mmlawus.com

16        and

17        Squire Patton Boggs LLP
          By:  Joseph C. Weinstein, Esq.
18        4900 Key Tower
          127 Public Square
19        Cleveland, Ohio  44114
          (216) 479-8426
20        joe.weinstein@squirepb.com

21   FOR THE DEFENDANT EUGENE M. McQUADE:
          Dechert
22        By:  Michael S. Doluisio, Esq.
          2828 Arch Street
23        Philadelphia, Pennsylvania  19104
          (215) 994-2325
24        michael.doluisio@dechert.com

25                              - - -
```

4

                    P R O C E E D I N G S

                          -  -  -

 3          LAW CLERK:  The matter before the court is Case

 4   Number 4:08-cv-160, Ohio Public Employees Retirement System

 5   versus Federal Home Loan Mortgage Corporation.

 6          THE COURT:  Good afternoon, everyone.  You may

 7   retake your seats.

 8          Thank you for joining me here this afternoon to

 9   hear oral argument and defendants' renewed motions to

10   dismiss plaintiffs' third amended complaint.

11          I have what I believe is a comprehensive list of

12   counsel who are present, but I will still ask if you'll take

13   a moment to introduce yourselves so that the record

14   correctly reflects those who are present.  I will start with

15   plaintiffs' counsel.

16          Will one of you volunteer to introduce all of you

17   or each of you rise and introduce yourselves?

18          MR. STOCK:  Your Honor, I'll volunteer.  My name

19   is Chris Stock, Markovits, Stock & DeMarco, on behalf of the

20   plaintiff.

21          And with me today is Kevin Lewis, our technician;

22   Mr. Rick Wayne; Dylan Gould, that's G-o-u-l-d, who is an

23   intern with us; and Mr. Bill Markovits, who is also of

24   Markovits, Stock & DeMarco.  Thank you.

25          THE COURT:  Thank you, Mr. Stock.

5

1          On behalf of the defendants, Freddie Mac as well

2     as the individual defendants, I would appreciate it if you

3     would introduce yourselves, or if one of you is capable, to

4     introduce all of you.  A heavy task, I know, but I'll allow

14:27:27   5     you to decide.

6               Mr. Hershman, will you begin?

7               MR. HERSHMAN:  I think I'll beg off, Your Honor.

8               THE COURT:  But at least introduce yourself.

9               MR. HERSHMAN:  Yes.  Jordan Hershman of Bingham

14:27:38   10    McCutchen for Freddie Mac, and with me is Jason Frank of

11    Bingham McCutchen for Freddie Mac.

12              MR. FRANK:  Good morning, Your Honor.  And with us

13    from Freddie Mac is Barry Parsons.

14              MR. PARSONS:  Good morning, Your Honor, or

14:27:52   15    afternoon.

16              THE COURT:  Good afternoon.  Welcome to you all.

17    Next then.

18              MR. PARSONS:  Thank you, Your Honor.

19              THE COURT:  Certainly.

14:27:54   20    MR. DOLUISIO:  Michael Doluisio from Dechert on

21    behalf of Eugene McQuade.

22              THE COURT:  Thank you.  Anyone with you, sir?

23              MR. DOLUISIO:  No, Your Honor.

24              THE COURT:  Okay.  Fantastic.

14:28:04   25    MR. GOLDFARB:  Hi.  I'm James Goldfarb, Your

 1    Honor.  Good afternoon.  I'm with Murphy McGonigle, and we

 2    represent Defendant Anthony Piszel.  Also, local counsel for

 3    both of our clients is here, Joe Weinstein from Squire

 4    Sanders Patton?

14:28:18  5             MR. WEINSTEIN:  Squire Patton Boggs.

 6             MR. GOLDFARB:  Squire Patton Boggs.

 7             THE COURT:  Welcome.

 8             Mr. Kravitz?

 9             MR. KRAVITZ:  Yes.  Carl Kravitz for Patty Cook,

14:28:27 10    from Zuckerman Spaeder.  Caroline Reynolds is here with me.

 11             THE COURT:  Welcome.

 12             MR. McKAY:  Your Honor, Hugh McKay, also local for

 13    Freddie Mac.

 14             THE COURT:  Welcome, Mr. McKay.

14:28:39 15             MR. VOLPE:  Good afternoon, Your Honor.  Frank

 16    Volpe from Sidley Austin on behalf of Richard Syron.

 17             THE COURT:  Thank you.  And I think that means

 18    that all of you have been introduced.  Am I correct on that?

 19             UNIDENTIFIED SPEAKER:  Yes.

14:28:50 20             THE COURT:  Now, Counsel, as you know from my

 21    modified or second order spreading out the protocol, the

 22    individual defendants will have 30 minutes of my time.  If I

 23    interrupt you, I'll try to balance it out by giving you a

 24    little more time, if you need it.  Freddie Mac, you'll have

14:29:07 25    30 minutes.  And those are for your initial arguments.

7

1          Plaintiff, if you care to use it, I'll give you up

2    to an hour.  Use what you need.  If it's up to the 60

3    minutes, you have it.

4          Defendants collectively, I'm permitting you 15

14:29:20  5    minutes for rebuttal.

6          Before you begin, Defendants, and I assume that

7    you've already decided how you'll start, which one of you

8    will speak first, I want to inform you that I have a jury in

9    residence.  The jury -- at least the attorneys for the case

14:29:34 10    know that this matter takes precedence over that, at least

11    for now.  If there is something that can wait, such as a

12    verdict, it shall wait.  But if there is something urgent, I

13    might have to turn my attention to that.  So I explain that

14    to you now just so that you'll understand.

14:29:52 15          With that, for the defense, are you prepared to

16    start?

17          MR. HERSHMAN:  We are, Your Honor.

18          THE COURT:  Will you tell me what you have in mind

19    in terms of how you'll proceed?

14:30:01 20          MR. HERSHMAN:  Your Honor, Freddie Mac will go

21    first.  Defendant Syron has ceded his time to Freddie Mac,

22    so I will be -- with the leave of court, I will be going for

23    the first 37 1/2 minutes.  After me -- and, by the way,

24    thank you very much, Your Honor, for granting us the extra

14:30:26 25    time that we requested.  We greatly appreciate it.

8

1          MR. KRAVITZ:  I am Carl Kravitz here.  I am going

2     to go second for Patty Cook.

3          THE COURT:  Thank you.

4          MR. GOLDFARB:  Your Honor, James Goldfarb for

14:30:39  5     Mr. Piszel.  I will speak after Carl.

6          MR. DOLUISIO:  And, Your Honor, Michael Doluisio.

7     I will speak last, on behalf of Mr. McQuade.

8          THE COURT:  Okay.  And that's in the opening

9     presentation, you're not speaking about rebuttal?

14:30:53  10          MR. DOLUISIO:  Correct, Your Honor.

11          THE COURT:  Understood.  And all I'll ask is that

12     when you do present, if you'll do it from the podium.

13     Because you've appropriately shared that table, some of you

14     don't have microphones, and it will just be best if all of

14:31:07  15     you speak from the microphone.

16          Plaintiffs' counsel, sometimes your view of me

17     will be blocked.  Not a big deal to me.  I'm not really

18     expressive.  But if it matters to you, you can move around

19     to a place where you have a better vantage point.

14:31:23  20          MR. STOCK:  Thank you, Your Honor.

21          THE COURT:  Absolutely.  When you're ready.

22          MR. HERSHMAN:  Your Honor, may I -- as I was here

23     last time, I have some demonstratives that I used like last

24     time, and I'll set them up over there as I did last time and

14:31:32  25     project from there.  I have copies for everyone.  And I have

9

```
 1    a handout for the court as well.

 2              THE COURT:  Will you hand --

 3              MR. HERSHMAN:  Thank you, Your Honor.

 4              THE COURT:  Do you have enough to give us each

 5    one?

 6              MR. HERSHMAN:  I absolutely do, Your Honor.

 7              THE COURT:  Thank you.  I'd appreciate it.

 8              MR. HERSHMAN:  And more if you need.

 9              THE COURT:  I have a few interns here.  Maybe you

10    can leave extras.  But for now I think we're fine.

11              MR. HERSHMAN:  We have a few extras, that would be

12    fine.

13              THE COURT:  Okay.

14              MR. HERSHMAN:  Your Honor?

15              THE COURT:  Yes, you may begin, sir.  Thank you.

16              MR. HERSHMAN:  I'd like to start off by addressing

17    the issue of loss causation, Your Honor.  We think it's

18    dispositive in this case.  And what I am going to do is

19    focus on the leading Sixth Circuit cases, as we are relying

20    on Sixth Circuit cases to support our motion.

21              Those Sixth Circuit cases require that a plaintiff

22    allege the existence of a corrective disclosure that

23    revealed the alleged fraud.

24              I am going to be talking about the Omnicare case

25    and the D.E.&J. case in particular, Sixth Circuit cases.
```

Timestamps in left margin: 14:31:52 (line 5), 14:31:59 (line 10), 14:32:17 (line 15), 14:32:33 (line 20), 14:32:48 (line 25)

1            Now, you have asked for us to address the issue of

2    a materialization of the risk theory of loss causation,

3    which I will do throughout.  And in particular, I am going

4    to focus on the case called Almost Family, which

14:33:05  5    specifically analyzes every sort of approach of this

6    materialization of the risk theory that the plaintiff is

7    relying upon here and rejected it, focusing upon the very

8    same case that the plaintiff is relying upon, Lentell versus

9    Merrill Lynch, and I'll talk about that.

14:33:23  10            As to all of these cases, we rely upon them in our

11    moving brief.  The plaintiffs have no answer to any of these

12    cases.  They don't even cite these cases.  They say nothing

13    about these cases in their opposition brief.  These are the

14    leading cases.

14:33:44  15            I am going to start out first by focusing on the

16    Omnicare case.

17            Excuse me one second, Your Honor.

18            THE COURT:  Mr. CSO, if you want to move your

19    chair back so you can read those, then you are welcome to do

14:34:01  20    so.

21            CSO:  Get out of the line of fire.

22            MR. HERSHMAN:  Your Honor, from a big picture

23    standpoint, I am going to focus on a few of these leading

24    cases, and then I am going to show how this law applies to

14:34:12  25    the facts here.

11

1          The first case I'm going to focus on is the

2     Omnicare case.  In the Omnicare case, the Sixth Circuit was

3     looking at a number of specific types of alleged

4     misrepresentations.  Some involved Medicare Part D.  Some of

14:34:25  5     them involved revenue calculations.

6          On the Medicare Part D allegations, the CEO

7     stated -- this is the alleged misrepresentation -- "We are

8     pretty confident that we are not going to be hurt by moving

9     into the Part D structure."

14:34:43  10          During the class period, there was an article that

11     came out that discussed "struggles to overcome major

12     glitches associated with new Medicare Part D drug program."

13          Nonetheless, the Sixth Circuit held that this did

14     not plead loss causation under Sixth Circuit law, stating

14:35:02  15     "The complaint 'failed to explain how the statements were

16     revealed to be false and thereby caused the stock drop.'"

17          Under Sixth Circuit law, the disclosure, the

18     event, the loss cause and event must reveal the falsity of

19     the challenged statements under Sixth Circuit law.  This is

14:35:25  20     Omnicare, the leading Sixth Circuit controlling case.

21          Now, there are also GAAP allegations.  The Sixth

22     Circuit also held loss causation was not pled:  "Complaint

23     nowhere suggests how or when any of these alleged accounting

24     improprieties were disclosed."  The falsity of the

14:35:48  25     challenged statements, the falsity of the accounting issues

12

1    had to have been revealed, had to have been disclosed.  It

2    wasn't.  No loss causation.

3         Now, the Sixth Circuit also rejected the argument

4    that the GAAP allegations "were implicitly disclosed because

14:36:07  5    Omnicare's allegedly illegal conduct translated into the

6    accounting violations."

7         That's not good enough.  The Sixth Circuit itself

8    holds, "No, no, it's not that it's implicitly disclosed, it

9    has to be that the falsity, the corrective disclosure

14:36:24 10    reveals the falsity of the challenged statement."

11         Now, the next case that I am going to focus on is

12    the D.E.&J. case.  This is also a Sixth Circuit case on loss

13    causation.  It gets cited very frequently.  It also

14    self-discusses the Lentell case on which the plaintiffs

14:36:43 15    rely.

16         The allegations supporting loss causation in

17    D.E.&J. are, frankly, far stronger than those that are at

18    issue in this case.  Why do I say that?

19         In that case, the allegation was the fraud was

14:36:57 20    disclosed in connection with the following events and

21    revelations:  Kmart went bankrupt.  It triggered a 60

22    percent drop in its stock price.

23         In this case, we don't have a bankruptcy, we

24    simply have Freddie Mac announcing a quarterly loss.  In

14:37:15 25    this case, Freddie Mac's stock price dropped 29 percent, not

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

13

1    the 60 percent in this case, in D.E.&J.

2          Also, Kmart received a whistleblower letter

3    alleging that there was an accounting scheme, a fraudulent

4    accounting scheme involving the president and COO.

5          There were statements by former Kmart employees

6    and vendors that allegedly supported these accounting fraud

7    allegations.

8          And Kmart subsequently announced a $2.42 billion

9    loss, a restatement of its financial results, and another

10   $1.45 billion loss.

11         Those are the facts in that case.

12         Now, here's what the Sixth Circuit ruled:  None of

13   that established sufficient pleading of loss causation.  It

14   affirmed the grant of motion to dismiss on loss causation

15   grounds.  It said the stock drop 60 percent, the bankruptcy,

16   the restatement, the many billions of dollars in losses,

17   more than that that occurred in this case, none of them

18   establish loss causation under Sixth Circuit law.

19         "The observation that a stock price dropped on a

20   particular day, whether as a result of a bankruptcy or not,

21   is not the same as alleging that a defendant's fraud caused

22   the loss."

23         And then the court concluded, and this is a quote:

24   "Absent facts establishing a causal connection between the

25   plaintiff's loss and the alleged misrepresentation:  The

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

14

1    securities laws would become nothing more than 'a partial

2    downside insurance policy.'"

3          And that's an internal quote by the Sixth Circuit

4    to the Supreme Court's ruling in the Dura case, which is the

14:39:06  5    controlling Supreme Court case on loss causation.

6          Now, I just want to focus on just a few more

7    details in the D.E.&J. case that are worth pointing out.  In

8    the ruling at 133 Federal Appendix at page 1000, the court

9    says the following in D.E.&J.:  "As to the bankruptcy

14:39:27  10    filing, D.E.&J.," meaning the plaintiff, "never alleged that

11    Kmart's bankruptcy announcement disclosed any prior

12    misrepresentations to the market."

13          So, again, the focus was by the Sixth Circuit.

14    There has to be a revelation of the falsity of the prior

14:39:41  15    alleged misrepresentation.

16          And, the Sixth Circuit discusses the Lentell case,

17    on which plaintiffs rely.  In the glossary that they

18    submitted to you, their definition of "materialization of

19    the risk" is literally from the Lentell case in the Second

14:39:59  20    Circuit.  And in D.E.&J., the Sixth Circuit cites Lentell

21    and states the following in its own parenthetical.

22          And let me just tell you very briefly, Lentell

23    involves Merrill Lynch analysts putting out very positive

24    analyst reports on Internet companies, supposedly not

14:40:18  25    believing them to be true, that artificially inflated the

1    value of these companies, and then it came out that they

2    didn't believe that they were true.

3         And in Lentell, the Second Circuit holds loss

4    causation was not established in the Lentell case on which

14:40:32  5    the plaintiff relies.

6         And here's what the Sixth Circuit says about

7    Lentell.  It describes it as follows:  "Explaining that

8    Defendant Merrill Lynch's downgrade in its stock

9    recommendations from 'accumulate' to 'neutral' and from

14:40:47 10    'buy' to 'accumulate'" -- meaning that the alleged

11    corrective disclosures, the point at which Merrill Lynch

12    started downgrading the stocks and that was the alleged

13    corrective disclosure -- "did not amount to a corrective

14    disclosure," this is quoting Lentell itself, "because they

14:41:03 15    do not reveal to the market the falsity of the prior

16    recommendations."

17         So that's the actual Second Circuit law from

18    Lentell.  It has to be that the corrective disclosure, that

19    the event that ends the class period reveals the falsity of

14:41:21 20    the challenged statements.

21         Now, the last of the cases that I'm going to focus

22    upon right now on loss causation is this Almost Famous case.

23    And that's because in this case, the court looked at this

24    exact argument that the plaintiffs make here, this sort of

14:41:41 25    what I'll -- I'll call, frankly, a bit of a

16

1    misinterpretation of Second Circuit law.  Because the Sixth

2    Circuit has no acceptance of this theory.  And this issue is

3    looked at in this particular case, which is a district court

4    in the Sixth Circuit.

14:41:58    5         And it rejects as inconsistent with D.E.&J., the

6    Sixth Circuit case I just showed you, the argument that loss

7    causation may be established by alleging "materialization of

8    a risk that was concealed by fraud."

9         And then the court went on to explain, "Under

14:42:18   10    Sixth Circuit law, a plaintiff 'must show some revelation of

11    the defendants' fraud,' which 'must amount to more than

12    revelations of possible risks'" -- the emphasis was in the

13    original there -- "that defendants engaged in fraud."

14         And then the court goes on to further explain, "If

14:42:40   15    the purpose of the loss causation requirement is to ensure

16    that an investor's loss is actually caused by a defendant's

17    fraud, and not by an unrelated circumstance in the market,

18    then a plaintiff cannot satisfy her pleading requirements

19    while the fraud remains concealed from the market.

14:42:56   20         "Stated another way, the market cannot respond to

21    fraud until it has been revealed."

22         Now --

23         THE COURT:  Do you want to help him with that?

24         MR. HERSHMAN:  And just a few other things I'd

14:43:13   25    like to point out about this Almost Family case.  Almost

17

1    Family looks specifically at the Lentell case, analyzes the

2    Lentell case that the plaintiff relies upon, has a very

3    lengthy footnote doing that, Footnote 6, in the case.

4        And what they say in there, among other things, is

14:43:32  5    as follows:  "The court has carefully considered Lentell and

6    is satisfied that the Second Circuit seemingly recognizes

7    that, at the very least, fraud must be uncovered and

8    responded to by the market before loss causation can be

9    established."

14:43:54  10       And then they go on to say, the Second Circuit,

11   quote -- the Second Circuit's analysis "appears to

12   contemporaneously contemplate that such misstatements must

13   be revealed to and responded to by the market before loss

14   causation can be established."

14:44:13  15       So this is their analysis of Lentell.

16       Also in Almost Family, the court looks at the

17   D.E.&J. case, which is not surprising, as that's a Sixth

18   Circuit case and this is a district court in the Sixth

19   Circuit, and they say about D.E.&J., that "Relying on the

14:44:30  20   loss causation analysis set forth in Dura Pharmaceuticals,"

21   which is the Supreme Court case on loss causation, "the

22   court concluded that the plaintiffs had," and now this is

23   quoting D.E.&J., "done nothing more than note that a stock

24   price dropped after a bankruptcy announcement, never

14:44:48  25   alleging that the market acknowledgement of prior

18

1    misrepresentations caused the loss."  There has to be an

2    acknowledgement that the prior statements were false.

3            And then they go on to say, quote -- this is

4    summing up their whole analysis of the materialization of

14:45:07  5    the risk issue.  They conclude as follows in that case:

6    "Relying on the circuit court analyses," including Lentell

7    and D.E.&J., "this court concludes that plaintiffs must show

8    some revelation of defendants' fraud."

9            And then they go on to say, "In order to satisfy

14:45:27  10   the pleading requirements of loss causation, the disclosures

11   must amount to more than revelations of possible risks,"

12   emphasis in the original, "possible risks that defendants

13   were engaged in such prohibited practices."

14           And now, now I want to apply this law to the facts

14:45:45  15   of this case.  In this case, there is only one alleged

16   corrective disclosure, and that is Freddie Mac's November

17   20, 2007 press release, which announced that Freddie Mac had

18   incurred a loss in the third quarter of 2007.

19           THE COURT:  Now, let me interrupt you for the

14:46:04  20   first time to help you clarify a point for me.

21           There is, of course, referenced in the third

22   amended complaint, and I think it's at paragraph 190, the

23   November 20th, 2007 press release.  There is no attachment,

24   so I don't -- to the third amended complaint of the press

14:46:23  25   release.

1          MR. HERSHMAN:  Okay.

2          THE COURT:  So I'm left looking to what the

3     defendants have suggested was produced by Freddie Mac on

4     that date as the press release, and I have been given two

14:46:34   5     different documents, I believe.

6          One came from Freddie Mac.  It's filed at ECF

7     Number 298 as Attachment 42.  The other is attached to

8     Ms. Cook's motion to dismiss, and it's filed at ECF 290, at

9     Attachment Number 22.  One is 109 pages long; one is 50

14:47:02   10     pages long.

11          So at an initial point, it would be helpful to me

12     to know exactly what it is when you say "the November 20th,

13     2007 press release."  Do you have that?  Can you point to me

14     what that singular document is?  Because it's not attached

14:47:17   15     to the complaint, and at least two defendants have suggested

16     two different documents as being that.

17          Can you help?

18          MR. HERSHMAN:  Yeah.  I guess what I would say,

19     Your Honor, is the following.  There are two things I would

14:47:30   20     say.  One is, I'll do the best that I can to get you that

21     press release.  And I don't know whether literally in this

22     second in the middle of the argument that I can produce it

23     to you, but we certainly will get it to you.

24          THE COURT:  What you can do, if not present the

14:47:44   25     physical item, which would have been beyond my hope, make

1   sure that I know what you're talking about when you speak

2   about the November 20th, 2007 press release.  And then at

3   some point, if not before we separate, soon after, you'll

4   give me what it is you're referring to.

14:48:01  5         MR. HERSHMAN:  Okay.  I will do that, Your Honor,

6   and I am sorry for any confusion.

7         THE COURT:  Well, that's why we're here, to clear

8   up confusion.

9         MR. HERSHMAN:  But this much I will tell you, Your

14:48:10  10  Honor:  Whether it's a shorter version or a longer version

11  of the press release, there is nothing in the complaint and

12  nothing in the press release to show that any version of a

13  press release issued by Freddie Mac on November 20th, 2007,

14  revealed the falsity of any prior statement that Freddie Mac

14:48:34  15  made regarding subprime loans, Alt-A exposure, capital

16  adequacy, underwriting or internal controls.  There is

17  nothing in that disclosure that reveals the falsity of any

18  prior challenged statement by Freddie Mac on any of those

19  subjects.

14:48:51  20        And if the court compares either version, but I

21  will resolve any of those issues -- yeah.  I mean, the press

22  release itself I think is three pages.  I think there are

23  exhibits that you may be referring to, but I am going to get

24  to the bottom of that and sort it out.

14:49:07  25        But having said that, if the court compares the

21

1   alleged corrective disclosure in this case, and that's only

2   things that came out November 20th, 2007, the end of the

3   class period, to the challenged corrective disclosures, in

4   the Sixth Circuit's rulings in Omnicare, in D.E.&J., in the

14:49:27   5   cases applying them, Eaton Corp and Almost Family, there is

6   no way that under Sixth Circuit law, we believe there can be

7   a conclusion that anything Freddie Mac issued on November

8   20th, 2007 constitutes a corrective disclosure within the

9   meaning of controlling Sixth Circuit law.

14:49:47   10   And, therefore, it's like in the Omnicare case,

11   where OPERS' allegation that the press release -- here,

12   OPERS' allegation that the press release constitutes a

13   corrective disclosure improperly "rests entirely on

14   speculation."  That's quoting the Sixth Circuit rejecting

14:50:04   15   the argument that in that case, the corrective disclosure

16   was a corrective disclosure.  They said, "No, no, that's

17   just purely speculation for you to say that this is actually

18   revealing a prior fraud.  It doesn't do that."

19   Now, I now want to focus, in particular, on the

14:50:28   20   plaintiffs' allegation as they relate to the quantity of

21   subprime loans in Freddie Mac's guarantee portfolio and how

22   that ties to the loss causation argument.

23   Now, I am going to jump to the chase first, and

24   then I am going to back it up.  Here's the chase:  From a

14:50:46   25   law standpoint, they're relying on Second Circuit law.  They

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

22

1    don't even cite Omnicare and D.E.&J., which is the Sixth

2    Circuit law.

3         And, they make the same allegations, literally

4    identically the same on this issue as are in the Central

14:51:05  5    States case, where the Second Circuit itself applied Second

6    Circuit law, applied, literally, Lentell, to literally these

7    exact same factual allegations.  Not similar ones, the exact

8    same factual allegations.

9         And the Second Circuit concluded, in applying

14:51:24 10    Second Circuit law, which isn't really what applies here,

11    that plaintiff there failed to plead loss causation under

12    Lentell and the Second Circuit law.  And so there's no way

13    that the plaintiffs here can plead loss causation as to

14    these allegations consistent with Second Circuit law,

14:51:44 15    because that is what was applied in Central States.

16         Now, why do I say these things?  According to

17    OPERS, Freddie Mac disclosed that as of the second quarter

18    of 2007, "only a tenth of 1 percent of its single family

19    guarantee portfolio was classified as subprime mortgage

14:52:01 20    loans," but it "internally recognized that at least 12

21    percent of the single family portfolio was subprime."

22         Now, where does 12 percent come from?  It comes

23    specifically from this table that's in paragraph 67 of the

24    third amended complaint.  This table is literally copied

14:52:25 25    from the SEC case complaint, which didn't come out until

1    late 2011.  This information that's on here, whether you

2    think it's true or it's not true, never was disclosed to the

3    marketplace in any way by anyone until late 2011.

4         When the plaintiffs moved to amend to add these

5    allegations, they said, "This is recently received

6    information," just as the plaintiffs in the Central States

7    case did.  They also copied those same allegations into the

8    complaint in that case.

9         Now, so as I said, OPERS concedes that the

10   information was first revealed to the market four years

11   after the class period ended.

12        For this exact reason, the Second Circuit held

13   that the exact same allegations failed to plead loss

14   causation.  In the words of the Second Circuit, applying

15   Lentell, the case that the plaintiffs want you to use,

16   "Plaintiff fails to connect Freddie Mac's subprime exposure,

17   or any alleged misrepresentations regarding it, to the

18   events that are alleged to have caused the relevant stock

19   price decline."

20        Now, in that case, the stock price decline was

21   triggered when Freddie Mac was put into conservatorship in

22   September of 2008, and its stock price dropped over 80

23   percent that day.  Here it dropped around 30 percent, about

24   a year earlier, because it simply announced a quarterly

25   loss.

24

1          In this case, notwithstanding those facts, the

2     Second Circuit said, "No, that's not loss causation, because

3     this information did not trigger the loss.  The loss

4     happened in September of 2008, and nothing about those

14:54:29  5     events revealed the falsity, the alleged falsity, of the

6     challenged statements about the quantity of subprime loans

7     in Freddie Mac's guarantee portfolio."

8          And if that were true, it's simply not possible

9     here, under the same analysis, to come to a different

14:54:55  10     conclusion, because here, this is a year earlier.  Under the

11     Second Circuit, applying its own law, it concludes that a

12     year later, this information hasn't even been revealed to

13     the market.  So it couldn't possibly be the case that on

14     November 20th, 2007, that information had already hit the

14:55:12  15     marketplace, when the court concluded that a year later it

16     hadn't yet, as it hadn't because it first hit when the SEC

17     brought suit.

18          Now, OPERS says, "The materialization of Freddie

19     Mac's risk of loss from subprime and other nontraditional

14:55:30  20     mortgages caused the November 20, 2007 stock price decline."

21          If they are right, the Second Circuit would have

22     had to have come to the opposite conclusion.  They are

23     obviously not correctly applying the Second Circuit law,

24     because the Second Circuit applied that law to these exact

14:55:47  25     same factual allegations, and said that even a year later,

25

1    that didn't establish loss causation.

2         And in their words, they say, "Plaintiff concedes

3    that the non-prosecution agreement cited in the third

4    amended complaint is not a loss-causing event, and otherwise

14:56:03  5    fails to allege the existence of any corrective disclosure

6    during the class period that reveals Freddie Mac's subprime

7    exposure was vastly understated."  And if that didn't happen

8    as of the end of the class period in Central States, it

9    couldn't have possibly happened as of the end of the class

14:56:22  10   period here.

11        Now, so plaintiffs' last argument here, because

12   they say very little about Central States in their brief, is

13   they say, "Well, it's distinguishable"; and here's why they

14   say it's distinguishable:  They say, "On November 20th,

14:56:45  15   2007, Freddie Mac supposedly disclosed," for the first time,

16   for the first time, "its increased involvement in

17   nontraditional mortgage markets and the 'greater credit

18   risks' from 'increased delinquencies and credit losses' on

19   such products."

14:57:03  20        The problem with that is it's not what Central

21   States' ruling said and it's not what happened, and the

22   documents that are incorporated by reference in the

23   complaint and Freddie Mac's SEC filings show that before and

24   during the last period, Freddie Mac disclosed the very type

14:57:16  25   of information that the plaintiffs say was supposedly first

26

1    disclosed on November 20th, 2007.

2         So, again, on November 20th, 2007, there weren't

3    any of those disclosures of the sort that came out for the

4    first time when the SEC brought its suit, but there were

14:57:35  5    previously these types of disclosures.  Freddie Mac made no

6    secret of the fact that it was increasing its purchase of

7    nontraditional mortgage products, with some higher-risk

8    characteristics that were going to cause those loans to

9    default at a higher rate than more traditional mortgage

14:58:02  10    loans.

11         It stated, "Freddie Mac's 2005 annual report, that

12    it had increased its purchases of nontraditional, or

13    alternative, mortgage loans, like interest-only loans,

14    option ARM mortgages, to 550 percent the amount they had

14:58:20  15    been in 2004."

16         And they disclose, and this is all in our -- we've

17    put this all before you.  It's in our brief.  It's in the

18    attachments.  It expected that trend to continue in 2006,

19    but this disclosure, the 2005, that's before the class

14:58:32  20    period begins.

21         Then during the class period -- well, they said --

22    they said, in 2005, "We expect that this trend is going to

23    continue in 2006.  We're exploring ways to become more

24    involved with these products.  We expect our participation

14:58:48  25    in nontraditional mortgage products 'to grow in the coming

1    years.'  And we expect each of these products to default

2    more often than traditional products."

3             And then, during the class period, Freddie Mac

4    disclosed it continued to increase its purchase of

14:59:07   5    nontraditional mortgage products in 2006, just as it said it

6    would.

7             That was not concealed.  It was disclosed along

8    with all the credit characteristics, detailed credit

9    characteristics, regarding all of these loans, all their

14:59:24  10    FICO scores, all their LTV ratios.

11             Plaintiffs rely upon some cases where this kind of

12    information is never disclosed.  That's not the case here.

13    It was disclosed.

14             And it's simply not true; it's not supported by

14:59:36  15    the documents incorporated by reference in the complaint

16    that Freddie Mac disclosed anything new about that subject

17    on November 20th, 2007.  What it said about that subject on

18    November 20th, 2007 wasn't the first time it said it, and it

19    was entirely consistent with everything it previously said

14:59:54  20    about the subject.  It didn't reveal the falsity of anything

21    it said before, it was just consistent with everything it

22    said before.

23             Now, I am about to switch gears to the subject of

24    scienter, Your Honor, and before I do, I just want to say

15:00:12  25    this:  The subject that I just focused upon, loss causation,

28

1    that is independently a show stopper.  For that reason

2    alone, the case should be dismissed as to all defendants.

3    Without being able to adequately plead loss causation, which

4    plaintiff has failed to do, the case is legally defective

15:00:31   5    and it should be dismissed.

6            Now, I am now going to talk about scienter, which

7    is an independent reason for the dismissal of the case.

8            First I want to start with Sixth Circuit law.  I'm

9    focusing on the Ricker case.  We rely upon it in our moving

15:00:48   10   brief.  Again, the plaintiff doesn't even cite this in their

11   opposition brief.  This is the law of the Sixth Circuit,

12   Ricker.

13           Here is Ricker.  They give you a sense for how

14   high the standard for pleading scienter is in the Sixth

15:01:01   15   Circuit.  Here's the fact pattern in this case:

16           An accountant for the company personally warned

17   the CEO and CFO that a major customer was not paying on

18   time, which put the company on notice that SEC filings would

19   be inaccurate.

15:01:15   20           The company's auditor issued an opinion raising

21   substantial doubt about the company's ability to continue as

22   a going-concern.

23           And then, the company announced a restatement of

24   its financial results.

15:01:28   25           Those were the types of information that was out

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

29

1    there.  And the Sixth Circuit concluded as follows:  The

2    case -- they affirmed the grant of a motion to dismiss.  And

3    they say as to scienter, this is an adequately pled scienter

4    as a matter of law and adequately pled, that "at most, this

15:01:51    5    shows that the company was financially mismanaged, not that

6    the defendants had fraudulently misled the public."

7            Now, here, I am not going to dwell on this case,

8    the Kuriakose case, I won't overrely on it, but there is one

9    point I do want to make about it.  This is the fundamental

15:02:16    10    scienter argument.  This is a fraud case, Your Honor.  These

11    people we all represent, they are being accused of fraud.

12            And as Judge Keenan concluded when he looked at

13    this issue, are there sufficient allegations to show that

14    these people were trying to hide information, they were

15:02:34    15    deliberately trying to trick people, to mislead people, he

16    concluded as follows:  "The bevy of truthful disclosures

17    that Freddie Mac made throughout the class period, covering

18    everything from detailed credit characteristics to extensive

19    risk assessments, negates an inference of scienter."

15:02:52    20            In his words, it defies logic to conclude that

21    executives who are seeking to perpetrate fraudulent

22    information upon the market would make such fulsome

23    disclosures.

24            And he, last line, said, "If Freddie Mac

15:03:09    25    executives sought to shield investors from 'learning the

1    truth' of its business, they needed to be measurably more

2    opaque."

3            Now, why did he say it?  He said it because

4    Freddie Mac disclosed so much detailed information.  If you

15:03:25    5    compare -- there is an explanation for why Central States

6    came out the way it did, why Kuriakose comes out the way it

7    did, as compared to other cases that the defendants rely --

8    that the plaintiff relies upon.  And that's because they're

9    factually distinguishable.  Here, you've got Freddie Mac

15:03:39    10    making extensive disclosures about everything having to do

11    with its guarantee portfolio and the loans in the guarantee

12    portfolio and its retained portfolio that enabled people to

13    assess the degree of risk.

14            Now, I want to focus for a minute on an article

15:03:54    15    that the plaintiffs cite in the complaint.  This is one of

16    the alleged misrepresentations, is based on this article,

17    where they quote Ms. Cook from this article.

18            But here's what I want to emphasize about the

19    article.  It's from *Mortgage Risk* magazine in October of

15:04:08    20    2007, very close to the end of the class period.  And what

21    you see is, you see that Freddie Mac makes these disclosures

22    and the street is aware, the investing public is aware of

23    the risk characteristics of the Freddie Mac guarantee

24    portfolio.

15:04:24    25            And what are they focused upon?  Here's the

1    article:  "Characteristics such as high loan-to-value ratios

2    ('LTVs') and low credit scores are largely absent."  I want

3    to stop there for a second.  Those are the risk metrics that

4    folks who look at these things look at to assess the degree

15:04:43    5    of risk presented by a book of loans.  Those are the key

6    metrics.  That's why the article is focusing on those

7    statistics.  It's like if you were talking about sports and

8    you said, "Well, what's his points per game and assists per

9    game and rebounds per game?"  There are certain key

15:05:00   10    statistics.  These are them.

11          So they go on to say, "In the words of one

12    analyst, Freddie's book of business is 'about as good a book

13    of loans as you could hope to find.'"  This is in that

14    article.

15:05:11   15          Now, they're focusing on the actual statistics

16    themselves.  So why do they say that?  They say, "Loans to

17    borrowers with FICO score credit lower than 620 make up 4

18    percent of the total portfolio."  So they're reading these

19    statistics.  There is no challenge to the accuracy of these

15:05:30   20    disclosures.

21          Then they say, "But significantly, loans with both

22    original LTVs over 90 percent and FICO scores below 620 make

23    up a tiny portion of the portfolio of less than 1 percent."

24          So you asked in your glossary about risk layering.

15:05:44   25    That's risk layering.  That's the issue of risk layering.

32

1     That's the difference.  Freddie Mac's book of loans; yes,

2     they had some loans to borrow with FICO scores below 620, 4

3     percent of the portfolio.  They disclosed it.  If some

4     people define subprime that way, that's the amount.  If it's

15:06:03   5     below 660, they have disclosed the full amount of those

6     loans.  But as far as those two things being together, 1

7     percent of the portfolio.

8          Now, at the same time, the market also knew that

9     if there was a substantial decline in home values, Freddie

15:06:18  10     Mac was going to suffer losses inevitably.  And

11     specifically, this is what the article says that's quoted in

12     the complaint:  "Both Freddie Mac and fellow GSE Fannie Mae

13     remain vulnerable to a substantial downturn in house prices,

14     something that looks increasingly likely."  The market knew

15:06:37  15     this.

16          And then they go on to say, "Freddie Mac was

17     created to support the mortgage market in good times and

18     bad.  How far that turns out to be an obligation, an

19     opportunity, or both, perhaps depends on how bad the bad

15:06:53  20     times turn out to be."  No one had a crystal ball.  Those

21     analysts didn't have a crystal ball.

22          But what happened?  This is what happened:  The

23     single largest decline in home prices in recorded United

24     States history.  As you saw, the analysts were aware, the

15:07:17  25     street was aware, Freddie Mac was going to suffer losses if

 1    there were home declines, home price declines.

 2         If there is going to be the biggest home price

 3    decline in recorded history, it's going to hurt Freddie Mac.

 4    Freddie Mac's principal assets are home mortgages and

 5    mortgage-backed securities.

 6         And Freddie Mac didn't hide that.  As Freddie Mac

 7    repeatedly warned investors, a decline in home values was

 8    likely to cause Freddie Mac to recognize losses.

 9         On November 20th, 2007, investors began to suffer

10    losses from the effect of this decline in home values.

11         And there's nothing that Freddie Mac could do

12    about it.  But that's not fraud.  It's not fraud.  And there

13    is nothing that the plaintiffs have alleged to show that

14    that had anything to do with anyone at Freddie Mac trying to

15    mislead anybody, or a revelation that they had.

16         Now, the point of this chalk is just to show you

17    one thing.  In these glossaries that you asked for, the

18    plaintiff wants you to think that everything -- that Freddie

19    Mac's guarantee portfolio was chock-full of the worst

20    quality loans, that everything they had was equivalent of

21    the loans that were literally labeled subprime loans by the

22    originators, sold as subprime loans.  That's the market for

23    subprime loans.  There were literally hundreds of billions

24    of dollars of loans sold during this period of time that

25    were originated by originators that called them subprime

1    loans -- subprime loans -- classified them as subprime

2    loans, labeled them subprime loans, sold them as subprime

3    loans.  If they were called subprime loans, Freddie Mac

4    wasn't buying them.

15:09:20    5           Now, what Freddie Mac was doing is,

6    mortgage-backed securities that were backed by those

7    subprime loans, Freddie Mac was buying that, just as it

8    disclosed, literally over a hundred billion dollars in its

9    retained portfolio of mortgage-backed securities, backed by

15:09:35   10    the loans that were classified and sold by the originators

11    as subprime loans.

12           Now, back to the guarantee portfolio, though,

13    because that's what this case is about.  The proof is in the

14    pudding.  They talk about defaulting and risk of default.

15:09:51   15    These are the actual defaults of the loans.  Here are the

16    statistics on defaults.  This is Freddie Mac's book.

17    Freddie Mac's entire guarantee portfolio was defaulting at

18    these rates of serious delinquency.

19           And if you look, even at the worst here, this is

15:10:10   20    at the end of December of 2009, let alone the class period,

21    the default rate is less than 4 percent.  The default rate

22    for subprime loans, according to the statistics published at

23    that time by Mortgage Bankers Association, these are just

24    the public statistics, 30 1/2 percent default rate.

15:10:33   25           Freddie Mac -- if Freddie Mac's book was full of

35

1    subprime loans, things that are the same as subprime loans,

2    it would have to be the case that the default rate for their

3    book was much higher than this.  In fact, the default rate

4    was lower than a book -- the average default rate of all

15:10:50  5    prime loans at the time, let alone all loans, and, of

6    course, way lower than subprime loans.

7         So to conclude, Your Honor, while we have many

8    arguments that we've made other than these, I thank you for

9    your indulgence in allowing me to get through this

15:11:16  10    presentation, thank you very much, for an eye focused on

11    doing this presentation, although we have others, loss

12    causation and scienter.

13         And to sum up the scienter argument, Your Honor,

14    there just simply -- the law is Ricker.  The standard is

15:11:31  15    very high.  That's the Sixth Circuit law that we cite, that

16    the plaintiff ignores.  And they have to allege specific

17    facts that give rise to a strong inference of scienter, a

18    strong inference that these folks really were trying

19    deliberately to mislead people and hide things, rather than

15:11:49  20    there being some more cogent explanation, some more logical

21    explanation that the inferences would support.

22         You might say, "Gee, that's a lot to ask on a

23    motion to dismiss."  No, not in a PSLRA case.  Under the

24    Tellabs case, the Supreme Court case on scienter, the court

15:12:07  25    is required to make that assessment.

36

1          Now, here, I'm just going to mention the issue of

2     stock trading.  Unlike so many -- the plaintiff cites the

3     Countrywide case.  The defendants sold over $700 million

4     worth of Countrywide stock.  The CEO alone sold over $400

15:12:27  5     million worth of Countrywide stock.  Okay.  That was not

6     insignificant in supporting the inference of scienter.

7          Here, as Judge Keenan pointed out in the oral

8     argument in the Kuriakose case, it's certainly germane.  Why

9     would they do it?  All of these defendants, they -- none of

15:12:46  10     them made a voluntary sale of stock.  The CEO, the CFO, the

11     COO didn't sell any shares.  They suffered $34 million of

12     losses on their own.

13          Only one of the defendants made a small amount of

14     trading, and that trading was pursuant to Rule 10b5-1

15:13:04  15     trading plan, which doesn't support any inference of

16     scienter.  And Freddie Mac itself repurchased $2.2 billion

17     of its own stock.

18          These facts are completely inconsistent with the

19     notion that the management team of Freddie Mac was

15:13:18  20     deliberately trying to mislead people, and that they knew

21     that the company was way worse off than they let on.  They

22     don't sell any stock, and they take a bath, and the company

23     buys back $2.2 billion of its own stock during this period.

24          So to sum up, the opposing inference -- and this

15:13:40  25     issue, by the way, is also tied to loss causation, because

1    the plaintiff relies on the Lentell case, and Lentell says,

2    "When there are -- when there are macroeconomic events that

3    cause similar losses across the board, then the burden is

4    even higher in pleading loss causation."  And that's what

5    you have here.

6         The plaintiffs just recently stuck in a case in

7    their glossary that we've never seen before, where, of

8    course, "There wasn't any other reason even suggested for

9    the loss."  This is the opposite fact pattern as that.  This

10   is the single biggest decline of real estate value in

11   recorded history that causes losses across the board.

12        So the opposing inference here is the much

13   stronger inference.  There is nothing to support the

14   inference that anyone was trying to trick anybody.  And the

15   far stronger inference is that the dramatic decline in home

16   values caused Freddie Mac to report a quarterly loss at the

17   end of the third quarter of 2007.  There was simply no

18   other -- there was no avoiding it.

19        The market knew, as I showed you from the article

20   from October of 2007, if there were big losses, if there

21   were -- I mean, if there were declines in home values,

22   Freddie Mac was going to suffer losses, Fannie Mae was going

23   to suffer losses, no avoiding it.  That happened.  Biggest

24   decline in home values in history.  They reported a

25   quarterly loss.  That's not fraud.

38

1          So for all of those reasons, we think that this

2     motion to dismiss should be granted, and I thank you for

3     indulging me today.

4          THE COURT:  Thank you, sir.

15:15:10  5     Next, Mr. Kravitz?

6          MR. KRAVITZ:  Yes.  Good afternoon, Your Honor.  I

7     am Carl Kravitz for Patty Cook.  I can give you a

8     preliminary answer on the press release, and then -- because

9     we went and took a look at this.

15:15:58  10          THE COURT:  I'd appreciate it.

11          MR. KRAVITZ:  And it appears -- I mean, the press

12    release, as far as we can tell, is the same in both

13    Freddie's filing and our filing, although it's a different

14    format.  It appears that we have consolidated financial

15:16:10  15    statements attached and something called core tables, and I

16    think that Freddie's attachments are different.  We will

17    pursue that and make sure that we clear that up.

18          THE COURT:  Thank you.

19          MR. KRAVITZ:  But that's our preliminary report on

15:16:26  20    what the difference is.  But in terms of what the release

21    is, I believe it's verbatim.

22          THE COURT:  Verbatim as?

23          MR. KRAVITZ:  In other words -- in other words,

24    the press release on November 20th that is attached to

15:16:37  25    Freddie's papers I think are the same words as ours.  It's

1    about two pages, I believe.

2            THE COURT:  Then identify those pages for me.  And

3    I know that plaintiff does draw my attention to two pages,

4    which I think are pages 75 and 76 of the filing in your

15:16:56  5    client's case.  That's ECF 290, at Attachment 22.

6            But enough said about that.  You know my quest.

7    If it's those two pages or something else, you'll have some

8    time shortly after this to make sure that I'm on the right

9    page.

15:17:15  10            MR. KRAVITZ:  Absolutely.

11            THE COURT:  Pun intended.

12            MR. KRAVITZ:  We will try to clarify that.

13            In any event, for Patty Cook, she should be

14    dismissed for the reasons that Mr. Hershman just said, as

15:17:27  15    well as all the individual defendants.

16            There are also some specific arguments that I

17    believe apply to Patty Cook based on who she was in the

18    company and the allegations as to her.

19            Just quickly as to who she was.  She was an

15:17:45  20    executive on the business side of the company.  She was

21    initially responsible for the retained portfolio, and then

22    later the guarantee portfolio as well.  And she became the

23    chief business officer in June 2007, which was late in the

24    class period.  That's who she is.

15:18:05  25            This, as you well know, is a disclosure or a

40

1    deception case involved alleged -- involving alleged

2    material misrepresentations and omissions.

3        Ms. Cook did not sign any of the company's

4    information statements.  She didn't actually make any of the

15:18:19  5    press releases.  And there is no allegation in this case

6    that she drafted, edited or created any of the company's

7    statements.

8        She was not on the Disclosure Committee, and it is

9    not alleged that she was.  Nor is it alleged that she

15:18:34 10    supervised, oversaw or controlled the Disclosure Committee

11    or investor relations part of the company.  Those are the

12    parts of the company responsible for drafting the

13    information statements and the releases at issue.  Those

14    functions were in other parts of the company that reported

15:18:53 15    up a different chain.  So that's who she was.

16        I'd like to turn now to my first main substantive

17    point, which is that there is no actionable material

18    misrepresentation alleged in the complaint against Patty

19    Cook.  And I want to dispense with something first up front

15:19:18 20    so that we can focus on what Patty Cook's statements were.

21        And that point is that Patty Cook, under

22    controlling law, cannot be responsible for the company's

23    statements, because she didn't make any of those statements.

24        Now, I am not suggesting in any way that those

15:19:33 25    statements are false or fraudulent, it's just that she,

41

1    because of where she sat in the company and her role, didn't

2    make the statements.  There is no aider liability under the

3    securities laws, only primary violators; in other words,

4    those that make the statement can be held liable.  That's

15:19:52  5    the Janus case.  And the Janus case makes clear what I

6    believe was clear since 1994, that simply participating,

7    creating or assisting in the statement behind the scenes is

8    not enough in a private securities action.

9         And as I said, Patty didn't sign the statements,

15:20:11  10   they're not attributed to her, they don't even mention her.

11   And based on where she sits in this company, she cannot be

12   said to have ultimate control over the content of those

13   statements.  That's just not who she was.

14        THE COURT:  How do you place the analogy the Janus

15:20:29  15   court used of the speechwriter and the speech-giver, how

16   would you compare that to your client's role?

17        MR. KRAVITZ:  I would say that she's not even

18   close to being alleged to be the speechwriter.

19        THE COURT:  Uh-huh.

15:20:39  20   MR. KRAVITZ:  And in Janus, obviously, the

21   speechwriter is not liable, because the person who stands up

22   and delivers the speech actually has ultimate control over

23   the content.

24        But she didn't -- there's no allegation that she

15:20:51  25   drafted any of this stuff, she edited it.  If the plaintiffs

42

1    had something, they would.  I know that there's a stack of

2    documents that were produced in this case having to do with

3    the Disclosure Committee, and if they had found something in

4    that stack saying that Patty Cook had drafted anything, we'd

15:21:11    5    know about it.

6         And in any event, even if that made her the

7    speechwriter, it doesn't make her the speaker and it doesn't

8    make her the maker of the statement; and so under Janus, she

9    can't be tagged with the company's statements, either in the

15:21:28    10   information statements or the press releases.  So that's

11   sort of the first point that I'd like to make.

12        And the one fact -- or the fact that they focus

13   on, the plaintiff focuses on much -- mostly in regard to

14   this is that she signed a subcertification under -- under

15:21:50    15   Sarbanes-Oxley, she had to certify that to the best of her

16   knowledge, that the financial statements as a whole were

17   true and accurate.

18        But that, by the way, is an internal document.  It

19   is not shown to the investing public.  No one could rely on

15:22:04    20   it.  And so it couldn't give rise to liability for that

21   reason.

22        And in any event, you know, at most -- and we

23   would dispute this vigorously, but it would be providing

24   assistance to the statement-makers, and that's just not

15:22:22    25   enough in a private securities action.

43

1       So that's really the one fact that they focus on,

2   factual matter they focus on.  There's a lot of conclusory

3   stuff, but that's the fact they talk about.  So we believe

4   that she can't be held liable for that and she should not be

5   tagged for that.

6       And that gets us to Ms. Cook's statements.  And

7   there are four of them, I believe, that are mentioned in the

8   complaint, one in January of 2007, to the Citigroup

9   conference; May 17th, 2007, to the Lehman conference;

10  September 10, 2007, to another Lehman Conference; and

11  October 2007, there are statements in a mortgage

12  publication.

13      And here's another thing that I'm just going to

14  say, because there's no way that I could address this in

15  this time frame, but that virtually everything complained of

16  in the statements that Ms. Cook actually made fall into the

17  category of soft opinion, puffery, prediction of the future

18  or statements that would speak caution.

19      We've got a chart for all of those.  And that

20  covers most everything.  The comeback is, "Well, yes, that's

21  the law," except if you have actual knowledge that those

22  soft statements are false, we don't believe, and we've

23  argued in our brief that there is no allegation of actual

24  knowledge that those were incorrect.  But we will rely on

25  our papers for that.  It's just too detailed for this.

44

1          So that really gets down to I think the one

2     statement in the things that Patty actually said that's not

3     non-actionable on its face, and that's where she said,

4     "Basically" -- "There's basically no subprime in the

15:24:11  5     guarantee portfolio."  And I would like to address that.

6     That was at the Lehman conference in May of 2007, and she

7     said a few similar things otherwise.

8          And we've heard some argument on this today, but

9     this is -- this is sort of the take on it that I think I'd

15:24:31  10    urge the court to consider:  That if you ask yourself, what

11    are the facts about Freddie's portfolio in this time frame?

12    And that -- you heard Mr. Hershman, but in 2005, 2006, as

13    you start moving towards the financial crisis, the company

14    was guaranteeing or purchasing more loans with higher risk

15:24:55  15    and more nontraditional products.  Those are the facts.

16         And not only that, but Freddie's risk increased as

17    the housing market declined and credit deteriorated.  Those

18    are the facts.  Those are the material facts that an

19    investor would want to know about this company.  That's the

15:25:16  20    core of it.

21         And I think that you heard from Mr. Hershman, but

22    it's true with respect to the company, but it's very true

23    with respect to Patty Cook.  She disclosed those essential,

24    material facts that are important to an investor.  And we've

15:25:31  25    cited things at page 21 of our brief and reply at 17.

45

1          But here are the things that I'd like to focus on:

2     She specifically disclosed increasing numbers of

3     nontraditional products, including option ARMs and

4     interest-only loans and risk-layered products.  And I cite

5     to the TAC at paragraph 152, and Exhibits 16 and 14, which

6     are attached to our brief.  And those are documents

7     incorporated by reference in the complaint.  That's number

8     one.

9          Number two, the company's disclosures also set

10     forth the loans with high loan-to-value ratios and low FICO

11     scores.  In other words, they gave granular data regarding

12     factors associated with the company's higher credit risks.

13     And that was -- so that that information is clearly out

14     there and part of the mix of information.

15          Ms. Cook also specifically referred in her

16     statements to Freddie's increased credit risk.  At TAC 152,

17     it's alleged that she said there were growing risks

18     associated with alternative mortgage products.

19          And in TAC 170, she referred to a period of

20     heightened credit risk.

21          And then lastly, Patty also said that she

22     specifically said that Freddie's portfolio was sensitive to

23     declines in the housing market and deterioration of credit.

24     And that's at TAC 186, where she specifically said, "When

25     the housing market does poorly, our credit losses go up."

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

46

1      And that is quotes in a magazine article.

2              So I believe, and I would urge the court to accept

3      that, that Patty Cook, like the company -- but Patty Cook

4      actually disclosed the essential facts, the material facts,

5      what's important about this company's portfolio.

6              And so what does the plaintiff say about this?

7      What the plaintiff says about this is that in addition to

8      disclosing that there were more loans with higher risks and

9      more nontraditional products, it should have also labeled

10     some of those loans as subprime, and that failing to do it

11     was a material omission.

12              And that's really -- in my view, that's what this

13     case comes down to, whether or not you buy that argument.

14     There are all the other issues about scienter and loss

15     causation, on which I believe we win as well.  But in terms

16     of falsity, that's what it really comes down to.

17              And on this falsity point, I have four quick

18     points to make.  The first is that disclosing the material

19     substantive facts should be enough.  And I cite the court to

20     the Benzon versus Morgan Stanley case.  It's in our brief.

21     It's a 2005 Sixth Circuit decision.  And there the court

22     held that where the substantive facts were disclosed, you

23     can't sue someone for failing to characterize them.

24              That case involved four different classes of

25     stock, and the claim was, "Well, you didn't characterize

1    that or label them as to what would be best/the worst for

2    investors."  And the court rejected that.  And we think that

3    that is on point here.

4         The second point I'd like to make on the falsity

15:28:57  5    point is that -- and I refer to TAC at 120.  But the

6    allegation there, and it incorporates it -- it discusses the

7    senior executive training meeting in February of 2007, and

8    there is a set of slides that went along with that, that

9    meeting.

15:29:16  10         And it was said there, according to the

11   allegations, that "It was generally understood that subprime

12   were loans purchased from self-identified subprime

13   originators."

14        And that's what is alleged that the people --

15:29:32  15   attendees at that meeting believed.  Patty Cook was there,

16   as were others.  And by that alleged definition, these

17   statements, in terms of how much subprime were in the

18   portfolio, are true.  There is no argument that if the

19   standard is, did these come from the subprime channel --

15:29:52  20   now, there is the self-identified subprime lenders -- that

21   the numbers in these disclosures and the numbers mentioned

22   by Patty Cook are true.

23        So that's number two, which is that by that

24   standard, this is true.  And there is no reason why you

15:30:09  25   should be able to say that having disclosed the facts, and

48

1    it's true by that standard, which they allegedly believe,

2    that somehow they had some obligation to label these things

3    differently.

4         The third point that I would like to make is, is

15:30:25  5    that it would have been misleading to label the loans with

6    higher risk as subprime.

7         And I would like to refer the court to this chart

8    that Mr. Hershman put up here, which has -- it shows the

9    difference in serious delinquencies between the subprime

15:30:44 10    channel, or subprime segment of the market, and what was

11    going on at Freddie Mac.

12         And in order for the plaintiff to sustain its

13    burden of showing that the loans with higher risk could

14    properly be classified as subprime, they would have to

15:31:03 15    allege that they performed like subprime.

16         And it is not alleged that those loans performed

17    like subprime.  They can't allege that those loans performed

18    like subprime, because it would be simply not true.  And I

19    tell you that if they could make that allegation, they

15:31:21 20    would.

21         And the idea that we are here because they said

22    that we should have labeled loans with higher risk that we

23    disclose, something that is just not justified by the facts

24    and they haven't alleged, I think defeats their claim.

15:31:38 25         And then the last point I'd make on falsity is

1    that there was no universal definition of subprime in the

2    market.  Yes, Freddie Mac, or at least the attendees at the

3    SET meeting and Patty Cook believe what I just said.  But

4    there was no universally accepted definition.

15:31:57  5          And given that, labeling the nontraditional loans

6    and loans with higher risk as subprime does not add to the

7    mix of information, particularly where the underlying facts

8    are disclosed.  The label, where there was no generally

9    accepted definition of what it means, doesn't really add

15:32:13 10   anything to the disclosure that "Hey, we've got these

11   loans."  And for that reason, I think that the allegations

12   about the falsity of subprime just don't stand up.

13          Let me then say -- I have a couple points on

14   scienter, and then I'm done.

15:32:33 15          THE COURT:  And how much longer will you be before

16   you're done?

17          MR. KRAVITZ:  I will be two minutes.

18          THE COURT:  Okay.

19          MR. KRAVITZ:  Okay.  I'll go really fast.

15:32:40 20          THE COURT:  Well, I want to understand you, so --

21          MR. KRAVITZ:  Okay.  If I go too fast, I'm sorry

22   if I --

23          THE COURT:  No, no, no, so far you've been fine.

24   If you go faster, you might give our court reporter a

15:32:50 25   problem.

50

1          MR. KRAVITZ:  Okay.  I will try to do it.

2          In any event, scienter is another issue that has

3     to be decided defendant by defendant.  The plaintiffs say

4     that the Matrixx court case from the Supreme Court

15:33:05  5     essentially overruled the PSLRA's requirement that you have

6     to allege scienter as to each alleged misrepresentation and

7     omission.  That's not what we believe the case says.

8          But in terms of Patty Cook's scienter, I want to

9     make four points here, too.  The first is, and I've

15:33:25 10     mentioned this, at the SET meeting in February of 2007, it

11     is alleged that the attendees, including Ms. Cook, believed

12     that the definition of subprime was from self-identified

13     subprime originators; in other words, the subprime channel.

14     And if, by that definition, which she believed the statement

15:33:43 15     was true, and it undoubtedly was true by that definition,

16     then there can be no fraudulent intent.  That's number one.

17          Number two is that there are many facts or

18     scienter negating facts alleged.  And I'm going to point

19     to -- a lot of that's in the brief, and the plaintiffs

15:34:07 20     explain why they don't think that's right.  I just want to

21     call the court's attention to two of them.

22          In Exhibit 18, which is what goes along with the

23     March 2000 Board of Director meeting, it makes clear that

24     Ms. Cook believed that subprime was an adjacent market; in

15:34:30 25     other words, adjacent to what Freddie did, and was a market

51

1    that the company had missed.

2            And in the SET meeting, which is February of 2007,

3    and it's Exhibit 19, when you look at the charts, it shows

4    that, there's something that says, "Where we are not."  And

15:34:49  5    under that heading, you see all of these different items of

6    subprime.  And then it essentially asks the question:

7    "Well, should we move into those markets?"

8            And my point is that this is entirely consistent

9    with respect to Ms. Cook, that she believed that subprime is

15:35:09  10    measured by, does it come from one of these originators.

11    And when you look at these things, it shows that she

12    believed they were not in that market, measured by that

13    standard, and they had missed it, it was adjacent, and they

14    were saying, "Should we get into it?"  That's number two.

15:35:26  15            Number three is when you look at her actual

16    statement, the quote is, "Basically no subprime exposure in

17    our guarantee business, and 124 billion of AAA-rated

18    subprime exposure in our retained portfolio."

19            It just simply makes no sense that Ms. Cook would

15:35:42  20    disclose $124 billion on the retained side, but somehow

21    obscure the subprime on the guarantee side.  Both are

22    measured by the same standards I've just mentioned, and that

23    negates scienter.

24            In terms of her stock sales, they say nothing

15:35:58  25    about her scienter.  Six were forfeitures, two were pursuant

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

52

1    to 10b5-1 plans, and they are presumptively not suspicious.

2    And she retained 94 percent of her stock and lost $4 million

3    when the market went down.

4        So I would like you to focus on those when you

15:36:16  5    think about Ms. Cook's scienter.

6        And then I would just say that the case should be

7    dismissed with prejudice.  And because there is no way to

8    cure some of the main defects here, one, you can't fix the

9    fact, if you're the plaintiff, that the essential facts were

15:36:36  10    disclosed.  That can't change.  That's historical fact.

11        And, number two, you can't allege what you need to

12    allege to say that the loans with higher risk perform like

13    subprime.  That's historical fact.  They did not.  They

14    can't go back to their office and replead this case and

15:36:53  15    overcome those defects.  Those defects are matters of

16    historical fact.  They've had four chances now, and it

17    should be dismissed with prejudice.  Thank you.

18        THE COURT:  Thank you, sir.

19        Mr. Goldfarb?

15:37:11  20        MR. GOLDFARB:  Good afternoon, Your Honor.  James

21    Goldfarb for Defendant Anthony Piszel.  And, Your Honor, we

22    had a bet about whether the defendants would be able to keep

23    within their hour time limit.  I'm pleased to let you know

24    that I won, so I have very little incentive to keep running

15:37:35  25    the clock here, and I'll be brief.

53

1          THE COURT:  I appreciate that.

2          MR. GOLDFARB:  The court should grant Mr. Piszel's

3     motion for the reasons already outlined, Your Honor.  I just

4     wanted to highlight three additional reasons unique to

15:37:51  5     Mr. Piszel, and these have to do with scienter.

6          In short, Your Honor, Mr. Piszel did not deceive

7     anyone, intentionally, recklessly, negligently, or

8     otherwise.

9          And the third amended complaint does not plead

15:38:04 10     facts that give rise to any inference, let alone the

11     required strong inference, of scienter.

12          In fact, OPERS' own allegations raise a compelling

13     inference of the exact opposite.  First, OPERS tries to get

14     traction from the SEC proceedings, but that is a

15:38:24 15     non-starter.  Mr. Piszel is not even a party to that action.

16     Indeed, after its three-year investigation, the SEC did not

17     charge Mr. Piszel.  Instead, it issued him a closing letter.

18     In Ceridian, the Eighth Circuit held that similar facts gave

19     rise to a compelling inference that defendants there lacked

15:38:44 20     scienter.

21          OPERS has no response to Ceridian, or to the fact

22     that Mr. Piszel is never mentioned in the SEC complaint or

23     the court's decision on the motion to dismiss.

24          Second, OPERS tries to get traction from alleged

15:39:01 25     stock sales and bonuses, but that too is a non-starter.

54

1    OPERS admits that Mr. Piszel made no stock sales during the

2    proposed class period, and it does not deny that Mr. Piszel

3    lost $5 million when Freddie's stock price declined.

4           Stymied by these facts, OPERS attempts to amend

15:39:22    5    its complaint in its own opposition papers.  It alleges that

6    Mr. Piszel was motivated to commit fraud to receive $208,000

7    in dividends on restricted stock units.

8           But even if the law permitted OPERS to amend its

9    complaint and put new facts in its opposition papers, which

15:39:43   10    the law does not permit them to do, OPERS' argument simply

11    does not add up.  OPERS is asking the court to conclude that

12    motivated by $208,000 in dividend payments, Mr. Piszel put

13    at risk $5 million in his stock holdings.  Courts simply do

14    not draw such economically irrational conclusions, even on a

15:40:06   15    motion to dismiss.

16           Third, and finally, Your Honor, OPERS tries to

17    allege that the individual defendants knew, or should have

18    known, that their statements were false or misleading when

19    made, but that too is a non-starter.

15:40:20   20           OPERS points to supposed subprime-related

21    developments at Freddie Mac, but Mr. Piszel is not mentioned

22    in any allegation about those developments, many of which

23    predated his arrival at Freddie Mac.

24           OPERS also alleges that the individual defendants

15:40:38   25    received or had access to information inconsistent with

55

1    their public statements.  They didn't.  And, again, OPERS

2    does not allege that Mr. Piszel was involved in or even

3    aware of communications, meetings or reports supposedly

4    containing such inconsistent information.

15:40:56  5           And so, Your Honor, let's just take a step back,

6    because as OPERS says in its papers, you are required to

7    consider the scienter allegations holistically.

8           Here's what the complaint shows holistically:

9    Mr. Piszel joined Freddie Mac three months into the proposed

15:41:14 10   class period.  He was not intimately involved with the

11   single-family business.  He did not receive any material

12   information contradicting his subsequent statements.  And he

13   lost $5 million by not selling Freddie Mac during the time

14   that he supposedly knew about a fraud.

15:41:34 15          Why would he mislead the market then?  OPERS gives

16   a reason that is simply common to all executives:  To

17   protect his job, and, although they never actually plead

18   this, the possibility that $208,000 in unvested dividends

19   eventually would vest.

15:41:53 20          We know of no court that has found these facts to

21   give rise to a strong inference of scienter.  Simply put,

22   they are neither cogent, nor compelling.

23          And finally, Your Honor, what I'm saying is not

24   news to OPERS.  We made these arguments on the initial

15:42:11 25   motion to dismiss, and here.  OPERS has had ample

56

1    opportunity to respond.  Its silence speaks volumes; and,

2    therefore, the court should grant the motion.

3         If you have any questions, Your Honor; otherwise,

4    I will sit down.

15:42:24  5         THE COURT:  Please sit down.  Thank you.

6         MR. DOLUISIO:  Good afternoon, Your Honor.  My

7    name is Mike Doluisio.  I represent Gene McQuade.

8         I join in all the arguments that the other

9    defendants have raised.  It seems to me that the plaintiff

15:42:46  10   hasn't stated a claim against anybody.  But I wanted to come

11   up and talk about some of the circumstances that provide

12   additional support for why the plaintiffs' claims against

13   Mr. McQuade fail.

14        As we pointed out in our brief, there are some

15:42:59  15   special circumstances for Mr. McQuade.  He didn't sign or

16   certify a single one of Freddie Mac's statements at all

17   during the class period.  And I'm not trying to imply that

18   there's something wrong with those statements, but he didn't

19   have that responsibility with regard to them.

15:43:15  20        His tenure at Freddie Mac ended well before the

21   end of the class period.  He resigned in the spring of 2007.

22   And although he stayed at the company for a few more months,

23   his job was effectively reassigned to someone else as soon

24   as he gave his resignation.

15:43:30  25        He sat on the Board of Directors, but didn't sit

1    on a single board committee.  He did not sell any stock

2    during the class period.  He did have some forfeitures for

3    tax reasons.  And in our briefing we cite five cases holding

4    that forfeitures don't give rise to an inference of

15:43:48   5    scienter.  Instead, he held, and he lost, a lot of money.

6    He lost about $11 million.

7         Plaintiff does not allege that Mr. McQuade

8    analyzed the credit risk of the mortgages in the guarantee

9    portfolio.  Plaintiff does not allege that Mr. McQuade was

15:44:05   10   responsible for deciding how the mortgages should be

11   described.  They don't allege that he signed any

12   subcertifications, served on a Disclosure Committee, or had

13   any other responsibilities with regard to Freddie Mac's

14   disclosures.

15:44:16   15        None of the confidential witnesses has a thing to

16   say that's relevant to plaintiffs' claims against

17   Mr. McQuade.  In Exhibit D to their brief, plaintiffs list

18   every alleged misrepresentation that Mr. McQuade allegedly

19   made, and then they list the facts that they say show that

15:44:32   20   the statement is false and was made with an intent to

21   defraud.  Not one of the confidential witnesses is mentioned

22   anywhere in Exhibit D to the plaintiffs' brief.

23        And significantly, after a lengthy investigation,

24   the SEC chose not to bring an action against Mr. McQuade.

15:44:50   25   They didn't even send him a Wells notice, which is a letter

58

1    saying that the staff is contemplating recommending an

2    action.

3            So it is true that the plaintiff advocates for a

4    holistic view of scienter.  I would submit that these facts

15:45:04  5    strongly suggest that the plaintiff has not alleged a strong

6    inference of scienter with regard to Mr. McQuade.

7            Now, in its brief, the plaintiff tries to gloss

8    over these facts.  It consistently lumps the defendants

9    together in a way that's really misleading.

15:45:19  10            On page 43 of their brief in opposition to the

11    individual defendants' motions to dismiss, they say that all

12    of the individual defendants ratified, approved and

13    certified Freddie Mac's statements.  That's not true.  And

14    the allegation of the complaint that they cite says nothing

15:45:36  15    like that about Mr. McQuade.

16            The closest that the plaintiffs say about

17    Mr. McQuade is that he was "responsible for ensuring the

18    accuracy of Freddie Mac's financial reports and

19    disclosures."  They offer no support for that conclusion.

15:45:52  20            As I mentioned, they don't allege that Mr. McQuade

21    drafted, certified or had any other responsibility for

22    Freddie Mac's public statements.

23            Even if their allegation was true, Your Honor, it

24    wouldn't matter.  In the PR Diamonds case by the Sixth

15:46:08  25    Circuit, the plaintiff alleged that the chief operating

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

59

1    officer in that case had access to all company information,

2    and even controlled the public's disclosures.  And the court

3    said that those allegations were not sufficient to establish

4    scienter.

5    15:46:24    So because Mr. McQuade did not certify any of the

6    public disclosures, he can't be responsible for them.  That

7    does flow from the Janus decision, and Your Honor's decision

8    in the Louisiana Municipal Police Employees' Retirement

9    System case.

10   15:46:38    So that means we've got to look at the few

11   allegations that are made about Mr. McQuade.  Plaintiffs

12   allege that he made oral misrepresentations on three days:

13   October 3rd, 2006; February 8, 2007; March 23rd, 2007, about

14   seven or eight months before the end of the class period.

15   15:46:58    In our reply brief, we addressed every single

16   alleged misrepresentation that the plaintiffs had listed on

17   Exhibit D to their brief.  It would be much too

18   time-consuming and difficult to go through each of them.

19             But I did want to go through just one example,

20   15:47:14 because my client has been sued for fraud.  And I think when

21   you look at just one example, it really does illustrate the

22   sorts of problems that pervade all the allegations against

23   Mr. McQuade and the other defendants.

24             Plaintiff alleges that Mr. McQuade made a

25   15:47:30 material, fraudulent misrepresentation when on October 3rd

60

1    he said, "Looking at capital, we continue to maintain a

2    strong position there."  They say that that was a fraudulent

3    statement.

4         A number of problems with this:  First, it's not

15:47:46  5    false.  On that day, the company disclosed that it had

6    regulatory core capital of $37.1 billion.  Plaintiff does

7    not allege that the company's disclosure in that regard is

8    false.

9         OFHEO, O-F-H-E-O, issued a report about Freddie

15:48:07  10    Mac for the entire 2006 year.  That report came out in March

11    of 2007.  Talking about 2006, the time period covered by

12    Mr. McQuade's statement, OFHEO said, "Freddie Mac was

13    adequately capitalized and maintains satisfactory cushions

14    above statutory, regulatory, and OFHEO-directed capital

15:48:31  15    levels."

16         The statement is also pure puffery.  I mean, he

17    says "capital position is strong."  We cited a couple of

18    cases saying that the word "strong" is puffery; the

19    plaintiffs ignore them.

15:48:43  20         The statement is also immaterial.  Investors don't

21    care about the characterization that is put on hard facts,

22    they care about the hard facts.  And here the hard facts had

23    been disclosed:  37 billion in regulatory core capital.

24         The statement is also an opinion.  To the extent

15:48:59  25    it could be actionable at all, and it is not, it's an

1    opinion by Mr. McQuade that he believes regulatory core

2    capital is strong.  Plaintiffs allege no facts suggesting

3    that Mr. McQuade did not believe that regulatory core

4    capital is strong.

15:49:14  5         So, Your Honor, that's just one example of the

6    kind of allegation that Mr. McQuade is being sued for, and

7    is being sued for fraud.

8         With that, unless Your Honor has any questions, I

9    would just like to reiterate that, you know, Mr. McQuade is

15:49:29 10   in a different situation here, and the allegations that you

11   do have to look at one by one don't state a claim.

12        THE COURT:  Thank you, sir.

13        MR. DOLUISIO:  Thank you.

14        THE COURT:  I think that satisfies the opening

15:49:42 15  presentation by the defense.  Am I correct?

16        MR. HERSHMAN:  Yes, Your Honor.

17        THE COURT:  Now for the plaintiffs.

18        MR. STOCK:  Good afternoon, Your Honor.  Chris

19   Stock on behalf of the plaintiff.

15:49:59 20        THE COURT:  Good afternoon.

21        MR. STOCK:  A little housekeeping before I get

22   into addressing the arguments.  You've heard arguments from

23   the defendants to this point about essentially loss

24   causation and about scienter, with a sprinkling of

15:50:14 25  misrepresentations and omissions thrown in.

62

1          I will be addressing the loss causation arguments.

2     My colleague, Mr. Wayne, will be addressing the

3     scienter-based arguments.  And we'll both be addressing

4     misrepresentations and omissions as they come up through our

15:50:30  5     presentations, if that's okay with the court.

6          THE COURT:  It is, but let me give you some

7     indication of what I'd like to hear from one or both of you.

8          MR. STOCK:  Sure.

9          THE COURT:  And there are a couple of things in

15:50:43  10    particular.  I appreciate the glossary submitted by both

11    sides.  In your third amended complaint, you identify five

12    topics:  subprime exposure, underwriting guidelines, fraud

13    detection, risk management, capital position.

14         I'm not sure, from the drafting of that document,

15:51:04  15    whether or not you allege that each of those five topics

16    allege a separate claim, or whether it's possible that one

17    could be a subtopic to the other.

18         For instance, that as a subtopic to subprime

19    exposure, there is the underwriting guidelines or fraud

15:51:21  20    detection.

21         Do you understand?

22         MR. STOCK:  I think I understand, and I'll take a

23    stab at --

24         THE COURT:  Well, don't take your stab yet,

15:51:28  25    because I'm going to give you my laundry list so that you

63

1    and Mr. Wayne can decide, because ideally you both don't

2    need to speak to me about these.  If it fits better into

3    one's presentation than the other, then you can do that.

4    But if both need to address it, you can.

15:51:44  5         I have been struggling with the definition of

6    "subprime," and that is the initial reason that I requested

7    that you submit the glossary.

8         Tell me, one or both of you, how do your

9    allegations regarding subprime and the deceit that you

15:52:04 10   believe happened regarding subprime, how does it meet the

11   pleading requirements if there is no single or uniform

12   definition of "subprime"?

13        I think it's true that throughout the 284

14   paragraphs of the complaint, there are possibly three that

15:52:26 15   I've been able to divine, maybe more, definitions, but I

16   can't tell which definition of subprime is used at any --

17   "any" is too strong -- at certain, key for my holistic

18   review, times.

19        Do you follow what I mean there?

15:52:47 20        MR. STOCK:  I follow, yes.

21        THE COURT:  Okay.  So if one of you could identify

22   that, or give me what guidance you are able to.  And you've

23   already heard the global question that I put out to both

24   sides:  If you can help me to understand what press release

15:53:03 25   you referenced at, and I believe that's paragraph 190 of the

64

1    third amended complaint.  I wish it were attached, but it's

2    not.  It's certainly something that I can consider because

3    it's incorporated at least by reference, but I'm not sure

4    what document it is that you're referring to.

15:53:20    5            And as I say, later in your pleadings you refer me

6    to pages 75 and 76 of an attachment to Ms. Cook's brief, and

7    if that's it, tell me.

8            Now, if you can work that into the time allotted,

9    you'll satisfy me.

15:53:34   10            MR. STOCK:  I think I can, but could I ask a

11   clarifying question of the court?  It deals with the first

12   issue that you raised.

13           I understood you to be asking if these are

14   separate claims -- if, for instance, nontraditional

15:53:51   15   mortgages, subprime mortgages are separate claims as they

16   relate to underwriting standards or risk management

17   practices.

18           What is the question that the court wants answered

19   so I can do that?

15:54:05   20           THE COURT:  Or are you saying that the defendants

21   committed fraud in each of these ways, regarding subprime

22   exposure, regarding the use of underwriting guidelines,

23   regarding fraud detection, software or otherwise?

24           Do you follow what I mean?

15:54:21   25           MR. STOCK:  I do.  I do.  Thank you for that

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

65

1   clarification.

2           THE COURT:  Sure.

3           MR. STOCK:  I will attempt to address your

4   questions off the top here.  It is interesting that -- I

15:54:34   5   think I have some slides that sort of help get us focused in

6   the right direction.

7           The first question, though, that you asked, I

8   think the very easy answer to it is, the plaintiff has

9   alleged as a global matter that securities fraud was

15:54:50  10   committed, that misrepresentations and omissions were

11   committed in the context of all these different issues.

12           There were misrepresentations and omissions

13   related to subprime, for instance.  There were

14   misrepresentations and omissions related to risk management

15:55:04  15   practices, related to underwriting standards, with the fact

16   that Freddie Mac was representing that it had very stringent

17   underwriting standards and was following those underwriting

18   standards, when, in fact, the company wasn't following those

19   standards at all.

15:55:21  20           You look at risk management practices.  You see

21   disclosures in the -- in the annual reports and the

22   information supplements that suggest, "We have a very strong

23   and high level of risk management practices."  Well, the

24   complaint alleges throughout, and we discuss it quite a bit

15:55:37  25   in our briefs, that, in fact, they weren't following these

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

66

1   risk management practices.

2        And with respect to the first issue that you

3   raised, the subprime and other nontraditional exposure,

4   there are representations made throughout the annual report,

15:55:52  5   and in all of these information statements throughout the

6   class period, suggesting a minimal to negligible amount of

7   exposure to these subprime and nontradiional topics.

8   However, internally, these folks were recognizing, "We have

9   a significant amount of subprime and nontraditional."

15:56:11  10       And one issue that sort of overlies all of these

11  is the question about credit risk.  Because -- and I plan to

12  discuss the corrective disclosure in this case that goes to

13  your second issue, that what was the corrective -- what

14  happened on November 20th, the paragraph 190 issue.

15:56:32  15       I plan to show the court what exactly did happen

16  in that disclosure.  I will point the court to it.  And I

17  will show the corrective disclosure in the context of credit

18  risk misrepresentations.

19       Because credit risk is sort of the barometer for

15:56:50  20  this company.  All the other things that I just discussed,

21  subprime and nontraditional, risk management, underwriting

22  standards, everything falls under the umbrella of credit

23  risk.  It was a top-of-the-mind issue for these investors.

24       And I say that because we recognize that Freddie

15:57:05  25  Mac is a monoline business.  It buys and sells mortgages,

67

1    essentially.  And so when a company -- excuse me.  When an

2    investor is asking, "What's the credit risk with this

3    company," it's essentially asking, "What's this company's

4    financial health?"

15:57:21  5        And with Your Honor's permission, I'd like to get

6    into how that credit risk was being portrayed in the context

7    of loss causation.

8        Because what we've heard from the defendants to

9    this point are a number of issues about why we haven't pled

15:57:36  10   loss causation.  We haven't pled loss causation or

11   materialization of the risk.  We haven't pled loss causation

12   because there's been no corrective disclosure.  We haven't

13   pled loss causation because of these factual issues about

14   how, "No, no, Freddie Mac did disclose its increased

15:57:51  15   participation in the nontraditional mortgage.  Freddie Mac

16   did disclose that it had some subprime, or that this

17   definition of subprime is a nebulous definition."

18        And I'll get to that.  But I want to address your

19   third point right off the top before I get into loss

15:58:07  20   causation.  And the question was, as I understood Your

21   Honor, you were having some -- maybe some cognitive

22   dissidence as to what definition is being used with respect

23   to subprime throughout the complaint.

24        And one of the issues that we heard from Freddie

15:58:29  25   Mac, I think already, or I think it was actually

1   Mr. Kravitz, Defendant Cook's counsel, was there is no

2   universal definition of subprime.  We heard that.

3        And what the plaintiffs are alleging -- Kevin, if

4   you could, please turn to slide 52.  I've already given it

15:58:57   5   to her; just give them to the defendants.

6        Now, we added the definitions of subprime to our

7   glossary.  I want to take a step back and talk about a

8   hypothetical, a counterfactual.  If Fred -- I direct the

9   court's attention to the second cutout there, Freddie's

15:59:16  10   subprime definition.  And this comes from ECF number 298-37,

11   and that's at page ID 13618 and 619.

12        THE COURT:  Is that what I also have here in this

13   binder?

14        MR. STOCK:  It is.  Your Honor, it's slide 52.

15:59:30  15   The numbers are there at the bottom.

16        THE COURT:  Thank you.

17        MR. STOCK:  And what I was directing the court's

18   attention to was the first sentence in the second pullout,

19   where it says, "Freddie's Subprime Definition."  And I want

15:59:43  20   to start with a counterfactual to address the court's third

21   question.

22        If, if Freddie Mac would have said, "There is no

23   universally accepted definition of subprime," period, and on

24   the basis of the fact that there is no universally accepted

16:00:04  25   definition of subprime, Freddie Mac would have not disclosed

69

1    any exposure to subprime, we wouldn't have a case, at least

2    as it relates to subprime, at least as it relates to

3    subprime.  We'd have a case with respect to credit risk,

4    nontraditional, all the other stuff, but we wouldn't have a

16:00:21  5    case with respect to subprime.

6         But that's not what Freddie did, and here's why:

7    If you look at -- this is the same -- the annual report, the

8    2006 annual report.  That's ECF 298-2, and the page ID is

9    12402.  Defendant Syron, in his key message from the

16:00:42 10    chairman, says to investors, mortgage loans are "made to

11    borrowers having spottier credit histories and posing higher

12    risks."  Okay.  Freddie continues with that, that sort of

13    vague notion of subprime, in the statement that I just read

14    to you, 298-37, where Freddie doesn't stop with saying

16:01:10 15    there's no universally accepted definition of subprime.

16         Freddie goes on to say, "The subprime segment of

17    the market ..." and I'll skip down "... such loans typically

18    have a mix of credit characteristics that indicate a higher

19    likelihood of default and higher loss severities than prime

16:01:29 20    loans.  Such characteristics," and they go on, "might

21    include a combination of high loan-to-value ratios, low

22    credit scores or originations using lower underwriting

23    standards such as limited or no documentation of a

24    borrower's income."

16:01:43 25         So what Freddie and Defendant Syron are saying to

70

1    the public is, "Hey, we understand what subprime is, we

2    understand that there's no universally -- there's no

3    universally accepted definition of subprime, but we're going

4    to tell you what we believe it is."  Defendant Syron:  "We

5    believe subprime loans are made to borrowers having spottier

6    credit histories," this broad definition.

7          And in the context of these broad definitions of

8    subprime, Freddie Mac represents that it has ".1 percent

9    subprime in our guarantee portfolio."  Freddie Mac doesn't

10   say, "Hey, we only define subprime as loans originated --

11   loans originated by subprime lenders."  You can see that's

12   not in these definitions here.  And, by all means, the

13   defendants can go to ECF Number 298-2 and -37.

14         And in the context of those discussions about

15   subprime, never once does Freddie Mac or Defendant Syron put

16   the limitation on it that you heard them suggest today.  It

17   has always, always defined subprime as broadly as what

18   you've seen quoted here.  And that's for a reason.

19         Because if Freddie Mac defines subprime with its

20   arms wide open like this, and then tells investors, in the

21   very next paragraph, that "And, oh, by the way, we only have

22   .1 percent subprime," well, then that's a pretty strong

23   signal to investors that "Wow, the mortgage loans made to

24   borrowers having spottier credit risk and posing higher

25   risks, they only have .1 percent of those, that's a company

1    who's stayed away from the subprime loans.  We're going to

2    invest on that basis."

3            That's the problem with Freddie Mac's

4    loosey-goosey definition of subprime here.  Again,

16:03:44  5    counterfactually, if Freddie Mac would have suggested to the

6    investing public that "By the way, Investing Public, we are

7    only telling you, we define subprime loans incredibly

8    narrowly, we define them to mean only originators who have

9    originated as subprime," then we wouldn't be here talking

16:04:05 10    about misrepresentations and omissions.  As they relate to

11    subprime.  We'd still have all the others.

12            So if that's addressed the court's sort of

13    initial --

14            THE COURT:  It does, in part.

16:04:17 15            Let me ask you, you heard Mr. Hershman's

16    representation that touched I think directly upon this, and

17    he used a slide, which you had a copy of, although you may

18    not have been able to see the blowup, the one that begins,

19    according to OPERS, "Freddie Mac disclosed that as of the

16:04:34 20    second quarter 2007, only .1 percent of its single ..." you

21    know the slide I mean.

22            MR. STOCK:  I believe so.

23            THE COURT:  I think your -- Mr. Lewis is handing

24    it to you.

16:04:46 25            MR. STOCK:  Thank you.

1          THE COURT:  Do you have something that looks like

2     this?

3          MR. STOCK:  Oh.  This comes from paragraph 67 of

4     the complaint.  Yes.

16:04:54  5          THE COURT:  Right.  And I'd like you to, if you

6     can, to include Mr. Hershman's response to what you've just

7     said, meaning make your statement that you've just made now

8     more directly responsive to what he said moments ago.

9     Because I think he's quoted what you've said just now as

16:05:18  10     having been said by plaintiff earlier.

11          I'm correct on that, aren't I, in that first

12     bullet point?

13          MR. STOCK:  Yes, that is correct.  That is a

14     correct statement in that we've alleged that, and actually,

16:05:36  15     the documents have proven that out.  Although, again, we're

16     here on a motion to dismiss.  Because of the unique

17     procedural posture here, we've seen the documents bear that

18     misrepresentation out.

19          We have alleged that, yes, when you look at --

16:05:53  20     when you get more granular than the two definitions that

21     Freddie Mac has put here in its -- in its annual reports and

22     such, Freddie Mac internally was defining subprime to mean

23     all loans, including EA, C1 and C2.

24          And EA loans are expanded approval loans.  They

16:06:17  25     are -- technically, they are loans that come in through

1    Fannie Mae's automated underwriting system.  It's a

2    classification for a loan that is highly risky.  The same

3    with C1 and C2.

4         So internally, they have a system for determining

16:06:34  5    exactly what was subprime and its credit risk.

6         And remember, when we talk about subprime, when we

7    talk about nontraditional loans, when we talk about Alt-A

8    loans, the question isn't really, how much subprime do you

9    have?  The question is really, what does the credit risk

16:06:54  10    look like?

11         So you could think of credit risk as being, how

12    likely is it that any given loan in this portfolio is going

13    to go belly up?  And so internally, they had a number of

14    metrics that they used to figure this out, one of which was

16:07:06  15    looking at EA, C1 and C2 as a combination, in recognition

16    that each of these loans was either "clearly" subprime, or

17    had subprime risk, or all internally recognized to be

18    subprime.  So that's the allegation.  Again, I've said it's

19    borne out in the papers -- in the documents we've received.

16:07:30  20    We'll be back here presumably on summary judgment discussing

21    those issues.

22         But the allegation, as it's pled in paragraph 67

23    of the complaint, is, internally they recognized this to be

24    subprime, at 12 percent, while externally they're telling

16:07:47  25    the public, "We only have .1 percent subprime."  That's a

1    one to one misrepresentation.  And Mr. Wayne will come up

2    here and he will explain the scienter behind the

3    misrepresentation.  But that's where the misrepresentation

4    comes from.

16:08:00  5          THE COURT:  Thank you.

6          MR. STOCK:  Okay.

7          To go back to Mr. Hershman's discussion about loss

8    causation, Mr. Hershman suggested a number of ways in which

9    we had not pled loss causation.  And it's like I -- I was

16:08:23  10   writing down Mr. Hershman's arguments as they came, and I

11   expect to be able to address each one of them.  It looked

12   like Mr. Hershman said, you know, "The Sixth Circuit doesn't

13   allow the pleading of materialization of the risk," or "We

14   haven't had a corrective disclosure here," or "Central

16:08:42  15   States controls," and so on and so forth.

16         So before we get into Mr. Hershman's arguments

17   about why he thinks we haven't pled loss causation, I

18   thought it might be helpful for the court to sort of

19   affirmatively talk about what the Sixth Circuit, and in

16:08:55  20   particular, what the Northern District has found to be

21   adequate allegations of loss causation.

22         THE COURT:  The Sixth Circuit would be my greater

23   preference, because as you know, while I have great respect

24   for my colleagues, their actions don't bind mine, nor mine

16:09:08  25   theirs.

75

1           MR. STOCK:  I understand.  I understand.  I think

2      by way of example, Judge Carr's decision in the Hawaii

3      Ironworkers case, which came from 2011, does, in my view, an

4      excellent job of looking at Dura, which is the seminal loss

5      causation opinion out of the Supreme Court, and applying

6      that in the context of the complaint there, the allegations

7      there.  Similar to what happened in the Almost Family case,

8      and the other cases upon which Mr. Hershman relied.

9           If you look -- slide 4, Kevin.  Excuse me.  Kevin,

10     let's go to slide 6, please.

11          This is the formulation that Judge Carr used in

12     Hawaii Ironworkers.  Again, not binding, but probative in

13     the sense that he's taking right from Dura.  It's a

14     three-part test, and it's a -- it's, again, citing the Dura

15     case.  If you look at part 1, which is at page 7, the first

16     question that was asked, again, in connection with Dura:

17     "Did the plaintiff allege that the company's share price

18     fell significantly after the truth became known?"  This is

19     the first question the court asks.

20          And, of course, we allege that all over the third

21     amended complaint.  In particular, you see that in paragraph

22     6, the second sentence there:  "As a direct result of the

23     revelation of Freddie Mac's subprime exposure and financial

24     peril, the value of Freddie Mac common shares dropped 29

25     percent in one day and the owners of Freddie Mac shares

16:09:28 (line 5)
16:10:01 (line 10)
16:10:20 (line 15)
16:10:37 (line 20)
16:10:55 (line 25)

76

1     immediately lost approximately $6.6 billion in share value."

2     So we have alleged that the company's share price fell

3     significantly after the truth became known.

4          The second question that Judge Carr asked on the

16:11:12  5     basis of Dura is:  "Did the plaintiff specify the relevant

6     economic loss?"

7          And we see that again all over the third amended

8     complaint.  In particular, paragraph 191.  And we also just

9     discussed that in connection with paragraph 6.  I won't

16:11:26  10    review it again.

11         The third question that Judge Carr asks, or breaks

12    into two, and that first part is:  "Did the plaintiff allege

13    that defendants' conduct artificially inflated the stock

14    price?"

16:11:41  15         And you see in paragraph 269 of the third amended

16    complaint that, yes, we do, in fact, allege that defendants'

17    conduct artificially inflated the stock price.

18         And the third and final question of the Hawaii

19    Ironworkers test is:  "Did the plaintiff allege some partial

16:12:02  20    revelation of 'the nature and extent of defendants' fraud,'

21    and did the share price fall as a result of this

22    revelation?"

23         Again, I am not going to spend my time reading to

24    the court.  You will see that in paragraph 61, in fact, we

16:12:13  25    do allege the nature, extent and effect of the fraudulent

1    scheme revealed, and we do again allege that the share price

2    fell as a result.

3          Now, quoting Dura, Judge Carr notes -- and you can

4    see that at our slide 5, quoting Dura, Judge Carr notes that

16:12:35  5    "The pleading rules for loss causation were 'not meant to

6    impose a great burden upon a plaintiff,' and that plaintiffs

7    need only plead 'a short and plain statement,' that provides

8    defendants with 'some indication of the loss and the causal

9    connection that the plaintiff has in mind.'"

16:12:56  10          And you see, as Judge Carr has gone through the

11    Dura test, and as we've just gone through the Dura test,

12    that we've met that "not great burden" here.

13          Now, you heard that the -- you heard the

14    defendants argue, "Well, wait a minute, wait a minute, wait

16:13:13  15    a minute.  The Sixth Circuit in D.E.&J. says you can't plead

16    loss causation here because you haven't shown

17    materialization of the risk."

18          Lay aside the question of materialization of the

19    risk for a moment.  Let's look and see what it was that was

16:13:25  20    defective in D.E.&J. that the court found rendered the

21    allegations ineffective.

22          And we see that at slide 36, Kevin.

23          In D.E.&J., Judge Sutton wrote that "The plaintiff

24    did not plead," number one, "that the alleged fraud became

16:13:52  25    known to the market on any particular day," number two, "did

78

1    not estimate the damages that the alleged fraud caused,"

2    and, number three, "did not connect the alleged fraud with

3    the ultimate disclosure and loss."

4         Now, we just went through D.E.&J.'s formulation

16:14:10  5    with the Hawaii Ironworkers test.  And as you saw, we did

6    allege that the fraud became known to the market on November

7    20th.  And we'll discuss that in great detail in a moment.

8         We did estimate the damages of the loss cause.

9    That was $6.6 billion.  And you see that at paragraph 191

16:14:27 10    and paragraph 6 in the complaint.

11         And then, of course, number three, we did connect

12    the alleged fraud with the ultimate disclosure and loss.

13    That connection element is important, and we'll explain why.

14         You see also -- Kevin, if you could, at 37 --

16:14:46 15    defendants cited the Almost Family case and the Omnicare

16    case.  In the Almost Family case at 37, the court concluded

17    "that plaintiffs must show some revelation of defendants'

18    fraud," just show some revelation of defendants' fraud.

19    That wasn't shown in Almost Family.  It wasn't shown in

16:15:06 20    Omnicare either.

21         You will see that in slide 38, the same language

22    in Omnicare, the Sixth Circuit case, was that "none" --

23    three lines down, if you are following along, "... none of

24    those allegations explain how the statements were revealed

16:15:25 25    to be false and thereby caused a drop in the stock price."

79

1          The question on the Sixth Circuit's mind, it is

2     clear, is:  "What statements were revealed to be false and,

3     therefore, caused a drop in the stock price?"  And I'd like

4     to talk about that.  I'd like to talk about that in the

16:15:44  5     context of these credit risk misrepresentations that I

6     brought up earlier.

7          If you look at slide 16, this is the definition of

8     "credit risk" as pulled from Freddie Mac's documents.  And

9     I'll give the cite, at ECF Number 298-2, page ID 12476.

16:16:13 10     This is slide 16.

11          Essentially, Freddie Mac defines "credit risk" as

12     "the risk that a borrower will fail to make timely payments

13     on a mortgage or security Freddie Mac owns or guarantees."

14     And, again, to me, that is the question:  How likely is it

16:16:29 15     that any given mortgage in this portfolio is going to

16     default?

17          And we already talked about why it is that credit

18     risk is the top-of-the-line issue for investors, because

19     it's the direct barometer of Freddie Mac's health.

16:16:43 20          So let's look at some misrepresentations in the

21     credit risk context, and then look at what happened on

22     November 20th to reveal the truth about these

23     misrepresentations.

24          So let's borrow the Sixth Circuit's standard,

16:16:57 25     let's borrow even defendants' higher standard, and see where

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

1    we end up.  I will go through these very quickly, because we

2    will do a compare and contrast in a moment.

3            But if you look at slide 17, this is Defendant

4    Syron, on June 14th, 2007, making a representation that the

5    second -- the last sentence there, "Thanks to our continued

6    high asset quality, low risk exposures and improving

7    operations, Freddie Mac is much better positioned for

8    long-term profitability than a year ago."  Okay.  That's

9    three months before the corrective disclosure.

10           Then you're getting closer, and slide 18, this is

11   August 30th, 2007.  This is Defendant Piszel.  It says the

12   same thing, the second bullet there:  "We have limited and

13   manageable exposure to Alt-A and risk-layered products."

14           We're getting a little closer there at slide 19.

15   This is Defendant Cook on September 10th, 2007.  The last

16   two sentences there, she is saying, "Our credit position is

17   relatively strong with limited exposure to the riskiest

18   mortgage products."  Undefined, by the way.  "Bottom line,

19   at a time when many of our competitors are weakening,

20   Freddie Mac's position is growing stronger."

21           We can test that, as you might imagine.  And this

22   is weeks now -- I'm at slide 20 -- this is weeks now before

23   the corrective disclosure.  You have Defendant Cook saying,

24   in response to a question, by the way, about the

25   top-of-the-line issue:  "Tell us how you see credit losses

1    on your portfolio developing."

2          Here is Defendant Cook saying, four lines up from

3    the bottom, "We have an incredibly high quality book of

4    business.  That's why we have the capacity to take on, in a

16:18:56  5    diligent and disciplined way, some increased credit risk at

6    a good price."  This is weeks, weeks before the corrective

7    disclosure.

8          And so at 21, I'm not going to review these again,

9    but you see all summarized, you have Freddie Mac making

16:19:11  10    representations in the weeks and months leading up to the

11    corrective disclosure that credit risk exposure is low; that

12    the credit position is actually better now than it was a

13    year ago, that's September 2007; that, in fact, Freddie's

14    credit position is getting stronger; and that it's so strong

16:19:29  15    that they can take on all this additional risk, at a good

16    price, she says.

17          So let's look at what happened on November 20th,

18    because we had a lot of discussion today about "nothing was

19    said in the press release, nothing was said in this November

16:19:45  20    20th, 2007 disclosure that corrected any of the mistakes."

21          Well, first -- "misrepresentations," excuse me.

22    Well, first of all, that's not the standard.  We saw that

23    the Sixth Circuit question is:  Was there a revelation of

24    the truth?  Was there a revelation of the truth?  Not did

16:20:04  25    they correct any previous misstatements.  Okay.  And that's

1    an important distinction.  We'll see why.

2         On November 20th, 2007, and Your Honor asked the

3    defendants about what it was this corrective disclosure --

4    where it came from.  We have it down there at the bottom of

16:20:18  5    slide 22, that this corrective disclosure upon which we rely

6    is ECF number 290-22, and I will direct the court's

7    attention to page ID number 10991, 10991.

8         And what this disclosure says is, "We're taking a

9    $2 billion loss 'due to continued credit deterioration in

16:20:45  10   our single-family credit guarantee portfolio, primarily due

11   to 2006 and 2007 loan originations.'"  So that's the setup.

12   The setup is, "Hey, we're taking a $2 billion loss related

13   to our credit risk."

14        Now, for the corrective disclosure on the same

16:21:02  15   date, this is at slide number 23.  And for the court's

16   edification, this is the pages 75 and 76 that I think the

17   court discussed earlier.  It is ECF number 290-22, and the

18   page ID number, for the record, is 11061-62.

19        Now, it's a big corrective disclosure.  The money

16:21:27  20   aspect of this particular paragraph comes at the end.  And

21   here, for the first time, we have Freddie Mac saying,

22   "Consequently, our increased purchases of these mortgages

23   and issuances of guarantees on them expose us to greater

24   credit risks.  We expect to experience increased

16:21:48  25   delinquencies and credit losses, which will likely reduce

1    our earnings in future periods and could adversely affect

2    our results of operations or financial condition."

3            Here, on November 20th, Freddie Mac has come clean

4    about its credit risk exposure.  It is telling the market,

16:22:06    5    "Remember all those things that we said before?  They're not

6    true.  We have bad credit risk.  It's only going to get

7    worse."

8            So let's go back and compare and contrast.  Now,

9    you recall, we just talked about the June 14th, 2007

16:22:20    10   misrepresentation by Syron.  This is at slide 24.  You will

11   see that Mr. Syron is saying:  "Thanks to our continued high

12   asset quality, low risk exposures and improving operations,

13   Freddie Mac is much better positioned for long-term

14   profitability than a year ago."

16:22:41    15          Contrast that with what it says here on November

16   20th:  "For the nine months ended September 30th, 2007 and

17   2006, credit-related expenses were $1.8 billion and $151

18   million, respectively."

19          That's not better position for long-term

16:22:58    20   profitability than a year ago.  That's exponentially worse

21   than things were a year ago.

22          Now, let's go to slide number 25 to see this

23   revelation of the truth in action again.  Now, here we take

24   Defendant Cook's piece.  This is a misrepresentation from

16:23:16    25   September 10th, 2007.  And we recall, this is Defendant Cook

84

1        saying, "Hey, we have limited exposure to the riskiest

2        mortgage products."  And this is the key:  "At a time when

3        many of our competitors are weakening, Freddie Mac's

4        position is growing stronger."

16:23:34  5              That was not the case.  And the revelation of the

6        truth happened on November 20th, 2007, where it says:  "No,

7        the position is not growing stronger."  Second sentence:

8        "We expect to experience increased delinquencies and credit

9        losses, which will likely reduce our earnings in future

16:23:53  10        periods," et cetera.

11              This is a direct revelation of the truth of the

12        falsity in Defendant Cook's statement from only two months

13        before.

14              And I'll give you one more example, Your Honor.

16:24:05  15              THE COURT:  Before you do, let me ask you this,

16        and maybe you can use your next example to clarify.

17              It's not clear to me that you distinguish

18        corrective disclosure from materialization of concealed

19        risk.  And these two have been great examples of how I see

16:24:26  20        that they are intermingled in your usage, at least as I

21        interpret.

22              Maybe the third example will help, or after the

23        third example you can pull apart for me so that I know what

24        you are speaking about.  Because I would think this next --

16:24:38  25        this last, what you've shown me on slide 25, may be more

85

1    akin to materialization of concealed risk.  And I do that to

2    show the surprise, it emanates out of as opposed to

3    corrective disclosure, which I think you used as an example

4    for the earlier slide.

16:24:54  5            MR. STOCK:  It's a fair point, Your Honor.  And

6    Your Honor is touching on why -- it's a little tricky in the

7    Sixth Circuit to discuss corrective disclosure versus

8    materialization of the risk, because it appears -- although

9    it's not entirely clear, it appears that the Sixth Circuit

16:25:14  10   is focused on the revelation of the truth.  Okay.  While

11   sometimes the courts within the Sixth Circuit use the

12   construction or the construct of corrective disclosure,

13   sometimes courts use the construct of materialization of the

14   risk.

16:25:32  15           I'm here today to prove that we've adequately

16   alleged loss causation under the Dura standard, as we've

17   discussed with Hawaii Ironworkers, but also -- pick a

18   construct, in essence.  We've also alleged a corrective

19   disclosure in the context of the credit risk

16:25:50  20   misrepresentations.

21           I will turn my focus, after -- as a matter of

22   fact, after we talk about these revelations of the truth,

23   the construct of materialization of the risk, where the

24   materialization of the risk still, under the Sixth Circuit

16:26:04  25   law, reveals the truth, reveals the truth about the

86

1    misrepresentations related to subprime and the risk

2    management and the underwriting and the core capital, but

3    was not, in fact, a confession of fraud, as defendants

4    attempt to suggest is the standard.

16:26:21  5          I hope that clarified.

6           THE COURT:  It helps, and I'd like to continue

7    following along with you, keeping that in mind.

8           MR. STOCK:  And so the third revelation of the

9    truth with respect to credit risk disclosures is set forth

16:26:37  10    here at slide 26.  This is Defendant Piszel talking about,

11    again, on August 30th, "... we have limited and manageable

12    exposure to Alt-A and risk-layered products."

13           The revelation of the truth of the falsity of that

14    statement comes again on November 20th, where defendant

16:26:58  15    comes cleans and says, "Yeah, approximately one out of every

16    three of our single purchases was related to Alt-A and

17    interest-only loans that related to these risk-layered

18    products."  The revelation of the truth occurred on November

19    20th.

16:27:12  20          Now, I will concede something.  I will concede

21    that on November 20th, there was no corrective disclosure,

22    there was no corrective disclosure, there was no confession

23    of the fraud as it relates to these other -- these other

24    misrepresentations and omissions that I've discussed.

16:27:31  25          Kevin, if you could put slide 28 up there.

1          Defendants are right.  They didn't come clean with

2     respect to subprime, Alt-A and other nontraditional mortgage

3     misrepresentations, they didn't come clean.

4          But this goes back to a fundamental misperception

16:27:54   5     of the loss causation standard.  What defendants are

6     suggesting to you is that without a confession, there would

7     be no loss causation.  And if there's no loss causation,

8     there's no securities fraud.

9          That is incorrect as a matter of law, and it's

16:28:13  10     actually incorrect as a matter of common sense.

11          Kevin, if you could go to slide 13.

12          And, Your Honor, I apologize for jumping all over

13     these slides, but I'm trying to address his arguments in

14     order.

16:28:25  15          THE COURT:  I am following you, so you are doing

16     fine.

17          MR. STOCK:  This is a case out of the Sixth

18     Circuit, similar to the Almost Family case that Mr. Hershman

19     discussed.  And I go back to Mr. Hershman's formulation that

16:28:39  20     no confession of fraud equals no loss causation.  And I

21     mentioned earlier that this doesn't make sense from a

22     commonsense standpoint, because if it were the case that a

23     defendant could sidestep liability for securities fraud by

24     simply refusing to come clean about any misrepresentations

16:28:59  25     or omissions, there would never be a securities fraud case.

88

1      There would never be loss causation.  Because all the

2      defendant had to do was stay mum on confessing the fraud.

3              And, in fact, that's -- this formula of loss

4      causation has been rejected over and over again.  Winslow,

16:29:17  5    out of the Sixth Circuit, a Middle District of Tennessee

6      case, I think said it much more eloquently than I did, which

7      is, "If a fact-for-fact disclosure were required to

8      establish loss causation, a defendant could defeat liability

9      by refusing to admit the falsity of its prior

16:29:36 10    misstatements."

11             And, in fact, if you look at slide 14, one court

12     recently said, "Neither the Supreme Court in Dura, nor any

13     other court addressing the loss causation pleading

14     standard," "any other court," "require a corrective

16:29:52 15    disclosure to be a 'mirror image' tantamount to a confession

16     of fraud."

17             And you'll see at 15, I'm certainly not going to

18     go through them, there are any number of other cases

19     rejecting that formula as it relates to loss causation.

16:30:09 20             But I go back to where we started, which was,

21     okay, if there's been no -- if there has been no confession,

22     was there a -- to borrow from the Sixth Circuit, was there a

23     revelation of the truth as it related to these

24     misrepresentations and omissions?

16:30:30 25             And I think that one way that we might go about

89

1    analyzing that question is by looking at the Bear Stearns

2    case.  Again, Bear Stearns, it doesn't compel a result here,

3    but it's an interesting case in that it deals with the exact

4    same allegations as are what are at issue here, with an

16:30:52    5    almost identical end of class date disclosure.  I'll slip

6    and call it a corrective disclosure, but end of class date

7    disclosure.  And so from that perspective, I think it

8    provides some guidance.

9            And if you look at the Bear Stearns case, this is

16:31:07   10    at slide 31, as I said before, the misrepresentations and

11    omissions are identical -- almost identical.  They deal with

12    misrepresentations from subprime and other nontraditional

13    mortgages, misrepresentations concerning risk management

14    practices, concerning internal controls, and concerning

16:31:31   15    compliance with regulatory capital requirements.  And I'm

16    not going to go through them, but we've alleged those exact

17    same misrepresentations and omissions in our complaint.

18            And at paragraph 32 -- I'm sorry.  And at slide

19    32, we have appended all of the paragraphs in the complaint

16:31:47   20    that make those allegations for the court's edification.

21            Now, I direct the court to slide 33.  On the class

22    period end date in Bear Stearns, dealing with the same

23    misrepresentations and omissions, "Bear Stearns announced

24    that its liquidity position had significantly deteriorated,

16:32:07   25    requiring the company to seek financing via a secured loan."

90

1          And then, in response to this news, "Bear Stearns'

2     common stock fell by 47.3 percent."  That's exactly, exactly

3     what happened here.  On November 20th, 2007, in our case,

4     Freddie Mac announced that its credit risk position had

16:32:31  5     significantly deteriorated, and we just saw that.  And then

6     what we didn't look at, but Freddie Mac also informed

7     investors that it would be seeking a loan, potentially, to

8     shore up its credit position, and would be cutting the

9     dividends.  We have the exact same thing pled as to Bear

16:32:46  10    Stearns.

11          Now, what Bear Stearns didn't say, by the way, is

12    the class period end date, Bear Stearns didn't come clean

13    with respect to its subprime and nontraditional mortgage

14    exposure, or its risk management practices, or its core

16:33:02  15    capital problems.  It didn't come clean with respect to

16    those.  It was this indication of the deterioration of its

17    liquidity position that revealed the truth related to those

18    other misrepresentations.  And you will see how the court

19    dealt with that issue at 34.

16:33:21  20          Again, I don't want to read this to the court, but

21    the point is, the same thing happened that I just discussed.

22    When the liquidity position was revealed, the truth

23    regarding the previous misrepresentations, about subprime,

24    about risk management, et cetera, were also revealed to the

16:33:43  25    market, also -- "Defendants' conduct" -- this is the last

1    sentence there, "Defendants' conduct, as alleged herein,

2    proximately caused foreseeable losses and damages to Lead

3    Plaintiff and members of the Class."

4            Well, look at, if you will, slide number 10.

16:34:03  5    Slide number 10 alleges those very words, very words.  You

6    see the last sentence -- and I promised you, Your Honor, I

7    would not read you paragraph 271.  I guess I broke my

8    promise to the extent that I would like to read you the last

9    sentence there.  And it says -- remember the Bear Stearns

16:34:21 10    decision -- "The fraud perpetrated by the Defendants

11    described in this Complaint proximately caused foreseeable

12    losses to the Plaintiff and the other members of the Class."

13            There has been adequate allegation of loss

14    causation here.  Whether it is under Hawaii Ironworkers

16:34:42 15    using the Dura standard, whether it is under a corrective

16    disclosure rubric, whether it is under materialization of

17    the risk, the point is, the revelation of the truth -- to

18    borrow from the Sixth Circuit, the revelation of the truth

19    occurred on November 20th, with respect to credit risk,

16:34:59 20    subprime, nontraditional, Alt-A, risk layering, underwriting

21    standards.  That was all revealed by this catastrophic

22    decline in the credit position, just like Bear Stearns.

23            Now, you heard Freddie Mac suggest, "Well, wait a

24    minute, Central States has already given you this answer."

16:35:19 25    I am mindful of the court's admonishment not to talk about

92

1    Kuriakose and Central States, but I will say one word about

2    it.

3            If you look at slide 41, Central States says, "At

4    the outset," so at the very beginning of the decision, the

16:35:40  5    court says, "we note that on November 20th, 2007, the first

6    day of the class period, Freddie reported a loss of more

7    than $2 billion, causing its stock price to close -- stock

8    price to fall," as we've discussed.

9            "On the same date, Freddie Mac issued a supplement

16:36:04  10    to its 2006 Annual Report disclosing both its increased

11    involvement in nontraditional mortgage markets and the

12    'greater credit risks' from 'increased delinquencies and

13    credit losses' involving nontraditional mortgage products,"

14    and then it goes on.

16:36:22  15            The entire decision in Central States is framed by

16    what it says, "At the outset," which is, "Hey, guys, caveat

17    emptor at this point.  On November 20th, the fraud was out

18    on the market.  If you were going to buy into that position,

19    if you were going to buy into Freddie Mac after November

16:36:41  20    20th, caveat emptor."

21            That is entirely consistent with what we're

22    saying, because November 20th is the last day of our class

23    period.  And we're saying, on that day, investors were taken

24    by surprise.  They were taken by surprise.  They weren't

16:36:57  25    ready for it.  That's quintessential loss causation.

93

1    Central States isn't a barrier to pleading loss causation in

2    our case, it's a helper.  It helps us plead it.  It shows

3    why we've pled it correctly.

4         The next thing that I heard Mr. Hershman talk

16:37:13  5    about was that they told everyone that they were getting

6    into nontraditional loans.  And, "We told everyone."

7         And that's not the case.  And, in fact, whether it

8    was the case or wasn't the case, it's certainly a fact issue

9    not relevant at the motion to dismiss stage.

16:37:34 10         You know, our allegation is, "Hey, defendants lied

11    about their exposure to nontraditional risk."  Defendants

12    say, "No, we didn't lie about it, we told the truth about

13    it."  The Ganino case that we've cited at 48, and a number

14    of other cases that we've cited there, all suggest that when

16:37:52 15    you have these truth-on-the-market questions, when one party

16    says, "The light is red," one party says, "The light is

17    green" in the securities context, that's an issue for

18    summary judgment.  It's really an issue for trial, but

19    that's at least an issue for summary judgment, not one to be

16:38:09 20    dealt with at the motion to dismiss stage.  But also, if the

21    court would indulge questions of truth on the market at this

22    stage, they're not even correct.

23         If you look at slide 49, I'll explain why.  Slide

24    49 says, "At year's end, only 6 percent" -- this is --

16:38:29 25    excuse me.  This is Defendant Syron talking in the 2006

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1    annual report.  And I'll try the quote again.  "At year's

2    end, only 6 percent of our total mortgage portfolio was in

3    nontraditional mortgages and the portfolio's average

4    loan-to-value ratio was 57 percent."

16:38:46  5         Now, the truth, we put down a little bit lower,

6    was, in fact, at year's end, 11.1 percent of the total

7    mortgage portfolio was in nontraditional mortgages; not 6

8    percent, 11.1 percent, almost 100 percent greater than what

9    they're representing to the market.

16:39:05  10         Now, we must have struck a nerve with Freddie Mac,

11   because Freddie Mac takes us to task in the reply brief on

12   this point.  And you'll see that at 50, at slide 50.

13         Freddie Mac suggests:  "Plaintiff also improperly

14   contrasts facts relating to what are, on their face,

16:39:27  15   different portfolios in an effort to manufacture a

16   discrepancy."  And I skip over a couple sentences.

17   "Further, the total mortgage portfolio is obviously,"

18   "obviously," "the total of all of Freddie Mac's mortgage

19   portfolios, not just the single-family portfolio, and

16:39:48  20   Plaintiff should know better than to conflate the two."

21         Well, we weren't conflating the two.  And, in

22   fact, you don't have to take my word for it, you can take

23   Defendant Syron's word for it, because Defendant Syron gave

24   us a clue in his statement that, in fact, he was talking

16:40:01  25   about only the single-family portfolio, not all of the

95

1    portfolios.

2           Let's look back at Defendant Syron's statement for

3    our clue.  I am not going to read it again, but there's

4    Defendant Syron saying "6 percent of our total mortgage

5    portfolio," and then at the end is the clue, "the average

6    loan-to-value ratio was 57 percent."

7           Well, in fact, in this very annual report, there

8    is a table that discusses the characteristics of the

9    single-family total mortgage portfolio.  That's at slide 51.

10   And you see there at the top, we say "Syron Was Talking

11   About the Single-Family Total Mortgage Portfolio," because

12   there it is, the estimated LTV ratio is 57 percent.

13   Plaintiffs weren't conflating these two; plaintiffs were

14   just talking about what Defendant Syron was talking about.

15          And the point is, Defendant Syron's representation

16   to the public is that "Hey, we've only got 6 percent of

17   nontraditional mortgages in our portfolio."  In fact, it was

18   11.1 percent.

19          Mr. Wayne will discuss why Defendant Syron and the

20   rest of the defendants knew these things.  And although I

21   don't have a watch with me, I expect that my time has grown

22   short and I will allow Mr. Wayne to come up and do that,

23   unless the court has any further questions.

24          THE COURT:  No, not at this time.  I might for

25   Mr. Wayne.

96

1          Counselors, I am going to take a brief break.

2     I've received two notes from the jury, and I think I can

3     handle both without bringing them into this room, especially

4     since the last one is a request that they be allowed to

16:41:39  5     leave for the day.

6          I am going to try to handle that matter as

7     expeditiously as possible, but I will ask that you give me

8     at least ten minutes.  So to the extent you can benefit from

9     a ten-minute break, you have the same break.

16:41:52  10          We're in recess.

11         (Recess at 4:41 p.m., and the proceedings resumed at

12          4:53 p.m.)

13          THE COURT:  Are we reassembled?

14          Mr. Wayne?

16:53:19  15          MR. WAYNE:  Mr. Stock had one additional point he

16     wanted to make that goes to his report.  Thank you.

17          MR. STOCK:  Your Honor, I come up here sheepishly

18     and apologetically.  Mr. Markovits instructed me that I

19     should discuss this, and I have a four-and-a-half-hour drive

16:53:36  20     home with him, so for my sanity, I am here to present one

21     last slide to you.  That is slide 46.

22          This is what happened empirically on the last day

23     of the class period.  This is a collection of financial

24     industry folks who -- and I should preface by saying that

16:54:02  25     slide 45 has the cite data, the data populating this chart.

97

1    It comes from ECF number 79-17, at page ID 3049 to 50.  The

2    numbers from this chart don't come out of thin air, in other

3    words.

4         You will see that on the day of these disclosures,

16:54:24  5    the blue, the blue is what the industry expected would be

6    the change as a result of the housing crisis.  So the

7    housing crisis is hitting all of these -- all of these

8    financial sector companies significantly, and in relatively

9    the same way.

16:54:48  10         And I would be remiss if I didn't show you that in

11    slide 45, the dates all come from the same time period, the

12    same three- to four-month time period.  The losses and

13    write-downs are all nearly equivalent.  But the excess

14    return -- and the excess return is sort of a term of art

16:55:09  15    that means the difference between what the market expected

16    and how the stock dropped.

17         The excess return for all of these other financial

18    industry companies that were hit in the same way by the

19    housing crisis, to the same magnitude by the housing crisis,

16:55:27  20    you see an excess return of .39 percent.  You know, that

21    means they bested industry expectations by, you know,

22    four-tenths of a percent, or down 1 percent, et cetera,

23    et cetera, 2 percent, 4 percent.

24         But Freddie Mac's excess return, that is the

16:55:46  25    difference between the expectation of what would happen on

98

1    November 20th and what actually happened, the excess return

2    was 28 percent.  That's empirical evidence that the market

3    had not factored in the extent of the housing crisis, in the

4    same way that the market had factored in the extent of the

5    housing crisis with respect to all these other financial

6    institutions.  You can see it.  The proof is in the pudding

7    there in that excess return category on 45 and in 46.

8         And Mr. Markovits reminded me that we presented

9    this chart to the court five years ago.  Mr. Markovits also

10   presented this exact chart to Your Honor a year ago, when we

11   were here first discussing Freddie Mac.

12        And at that point, Mr. Markovits made the same

13   comment that I'm about to make.  Mr. Markovits challenged

14   Mr. Hershman and said, "What is it in these disclosures that

15   makes all the rest of these financial industry participants

16   different than Freddie Mac?  Why did the excess return in

17   the case of Freddie Mac exceed any of these others by such

18   an extraordinary magnitude?"

19        And the answer is:  Because the truth had not been

20   revealed to the market prior to November 20th in the way

21   that the truth had been revealed to the market with respect

22   to all these others.

23        And I'll say the same thing Mr. Markovits said.

24   The first time we hear an explanation for that will be in

25   reply here today, and the plaintiff looks forward to it.

1    Thank you.

2              THE COURT:  Thank you.

3              Mr. Wayne, by my clock, you probably have

4    something around 12 minutes now.

16:57:41  5              MR. WAYNE:  I will talk fast.  Not as fast as

6    Mr. Kravitz, but I'll talk fast.

7              THE COURT:  I don't know why that's the suggested

8    response.  Say less.

9         (Laughter.)

16:57:52 10              MR. WAYNE:  I'm only teasing.

11              THE COURT:  Just off the top of my head.  But in

12    any case, I will hear you.

13              MR. WAYNE:  Well, thank you, Your Honor.

14              As Mr. Stock said, what I am going to talk about

16:58:05 15    is the issue of scienter, and we've already talked about the

16    law in the Sixth Circuit, PR Diamonds, and the Supreme Court

17    law in terms of Matrixx and Tellabs, in terms of the

18    holistic view.

19              What I want to do is talk about a couple of things

16:58:21 20    I think are important, scienter, and then I want to make

21    sure -- I will move quickly, because then I want to make

22    sure I address a number of things that were raised by

23    defense counsel, many of which are in our brief, but there's

24    a couple I want to make sure I cover.

16:58:35 25              I think the first thing is to make sure that we

100

1    understand that any analysis starts with looking at the

2    positions of the defendants, because these individual

3    defendants, we have claims two ways against them.

4         One, we have a direct claim as a direct

5    perpetrator, a primary perpetrator under 10b, and we also

6    have a claim because of their position, a control position

7    under 20a of the 1934 Act.  So there are two sets of claims

8    here in terms of how you could get liability against the

9    individual defendants.

10        But in terms of dealing with the issue of analysis

11   of scienter and their access to information and their

12   positions with the company, it's very important to look at

13   what -- we know Mr. Syron was the chair- -- Mr. Syron was

14   the chairman of the board.  We know that he sat on a number

15   of committees.

16        The one important committee I'd like to talk about

17   is the Enterprise Risk Management Committee, the ERMC.  And

18   that's a committee that was tasked with looking at the

19   credit, the market -- I should say the risk, the credit

20   risks, the market risks and the operational risks of the

21   company.  And that's where a lot of the discussion took

22   place in terms of the risks of getting into subprime, the

23   dealing with the underwriting type of mechanics and

24   standards as well, and fraud detection and things like that,

25   whether or not they were really being maintained.

1          And, you know, when you look at it, every one of

2    these individuals was in a position of control.  Every one

3    of them had a responsibility to make sure the financial

4    information was correct.  Every one of them attended the

17:00:17  5    ERMC meetings.

6          Now, Mr. Piszel didn't start attending those

7    meetings until 2007, but he attended all of those meetings.

8    And in our complaint, which I'll talk about in a minute,

9    those meetings are where the risk, the market and credit

17:00:32 10    risk were discussed.

11          After you do that, in looking at that, then you

12    look in terms of -- in terms of scienter, you look in terms

13    of, what knowledge did they have, the individual defendants,

14    and whether or not that knowledge was con- -- contradicted

17:00:51 15    the statements that they made.

16          And when you look at that, what you find with

17    these individuals is that they had information, and the

18    disclosures that they made weren't complete, weren't

19    fulsome, and we don't believe that they complied with the

17:01:08 20    '34 Act, 10b-5.

21          And if you look at it to start with, I'd like

22    to have -- this is a -- it's Docket 302-3, FMAC 082819602.

23    And this is from the Freddie Mac -- the Freddie Mac -- the

24    ERMC -- I'm not doing this right.  I don't know if you can

17:01:48 25    see that.

1          THE COURT:  I can pretty well.

2          MR. WAYNE:  Okay.  This is one of the EMC

3     meeting -- the ERMC meetings, and this is a meeting that

4     Mr. Syron, Ms. Cook and Mr. McQuade attended.  This comes

17:02:03  5     out of the materials that are presented every month.

6          And what it says here, in talking and addressing

7     the expansion -- and this is in June of 2006.  It was

8     shortly before the class period, and they were already

9     talking about getting into the high-risk mortgages.

17:02:23  10          It talks about "Purchase and guarantee of higher

11     risk mortgages, both in structure and underwriting

12     standards, from nontraditional sectors is expanding faster

13     than our ability to develop requisite risk management and

14     control capabilities.  Factors driving our concern include:

17:02:41  15     Increase in waivers and exceptions, our ability to fully

16     identify, track and evaluate them, a paucity of performance

17     data on higher risk products, and internal and external data

18     integrity issues."

19          What's important is that this is at a period of

17:02:57  20     time when they were -- the company was talking about, and

21     they knew they were going to get -- they were going to relax

22     the underwriting standards, they were going to get into this

23     high risk, higher risk subprime mortgage area,

24     nontraditional mortgage area.  And this was the beginning of

17:03:11  25     it.

103

1          There's a very similar one from October 3rd, 2006.

2     I will put this one up as well.  Maybe just to save time, I

3     will go through it.  But it was on the October 3rd, 2006

4     ERMC report.

17:03:34  5          And in this one, it's in the month- -- it comes in

6     a monthly packet, goes to all the individuals -- all four of

7     the individual defendants, and talks about the current risk

8     concerns of the company.

9          And the page I'm referring to is FMAC 082820934.

17:03:55  10    And in this, it says that -- in talking about the risk

11    description -- "We are approaching management-approved risk

12    limits for both relative risk and alternative mortgage

13    products.  The market continues to produce mortgages with

14    higher risk profiles.  Our strategy of buying representative

17:04:14  15    market share pushes purchase and portfolio activities

16    towards the limit.  We have limited capabilities to transfer

17    risk."

18          And it goes on and talks about the assessment and

19    the trend, and it said, "It's high and rising.  The

17:04:27  20    portfolio rebalancing may be necessary."

21          So at this point in time, we're talking about

22    June, October, we go to as well, they're continuing to talk

23    about reduced underwriting standards and getting into this

24    higher risk area.

17:04:39  25          These continue on.  You know, there is a January

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

104

1  2007, January 18th, 2007, which we allege in the complaint

2  at paragraph 119.  That is another meeting where this was

3  discussed.  Syron and Cook attended this meeting and were

4  told that "Loan level risk rates are blurred as capital

17:05:01  5  retreats in the subprime market, increasing the likelihood

6  we are already purchasing subprime loans under existing

7  acquisition programs."

8       This is a warning they gave to the members, that

9  management gave to the members of this committee, all of

17:05:16  10  these four individuals.  And this warning was in -- from

11  that point on, was in every packet that the ERMC received

12  going forward after January of 2007.

13       This is significant, because it shows that all of

14  the individual defendants attended this meeting.  It shows

17:05:32  15  that they all -- they understood what they were getting

16  into, and that that was something that the company was going

17  to pursue.

18       It goes on, in the next meeting, in the complaint

19  at paragraph 132, and this is a meeting that just Syron and

17:05:53  20  Cook attended.  They were told at this meeting, and they're

21  again talking about these high risk, non-prime mortgages,

22  and they said that -- they were told that the defect rate of

23  purchases had been steadily rising, had increased from

24  approximately 13 percent at the end of June of 2007 to 19

17:06:12  25  percent at the end of July, and they went up to 22 percent

1    in August.

2         They were also told that the principal drivers for

3    this was the -- and the defect rates were the low FICO

4    scores -- the drivers of the defect were the low FICO

17:06:32  5    scores, which is a predictor of whether or not someone can

6    pay, and the high LTV values, which was the loan-to-value

7    ratios, it was very high.

8         So, you know, and these are facts that they knew.

9    They all knew that -- all four of these defendants knew that

17:06:50 10    they were getting into this particular type of product.

11         And then we take a look at -- in the complaint at

12    the various statements.  We know that they know about

13    getting into this, we know that underwriting standards are

14    going down, and now we are moving into what they say in

17:07:05 15    terms of the statements.

16         In the complaint, there is a paragraph 151.  We

17    talk about, this is where Mr. Piszel attended a market

18    update conference in January of 2007, talking about these.

19    He said, "Freddie has continued to display very low and well

17:07:20 20    managed interest rate and credit exposure."

21         Then there was a conference that's referred to

22    that Mr. McQuade attended, and that's referred to in

23    paragraph 153 of the complaint.  That's on February 8th.

24    That's a Credit Suisse conference.

17:07:35 25         And he made a presentation.  At that conference,

1    he says that Freddie maintained very low interest rate and

2    credit risk exposures throughout the year.  He said Freddie

3    had consistently stable credit and interest rate risk

4    exposure, and that Freddie's current credit risk measure

17:07:54    5    remained within or below historical rates.

6         These go on.  There is another conference on May

7    14th of 2007.  That's a UBS conference that Mr. Syron

8    attended.  And instead of talking about the risk at that

9    particular conference, he stated that "Freddie Mac had

17:08:11    10    achieved its growth by maintaining a disciplined approach in

11    underwriting credit risk Freddie Mac takes on."  He also

12    indicated that "Freddie Mac's disciplined approach of credit

13    underwriting and Freddie's high asset quality has put

14    Freddie in the position to make the commitment that it will

17:08:29    15    not chase growth at the expense of long-term shareholder

16    returns."

17         These were -- Ms. Cook was at a conference, a

18    Lehman conference, and Mr. Kravitz talked about in May, made

19    the same comments again.  And they didn't disclose in any of

17:08:43    20    these -- they continued the refrain of talking about being

21    in low credit risk products, talking about their disciplined

22    credit underwriting.

23         But at this time when they're making these

24    statements, they knew precisely the problems, and the fact

17:09:01    25    that these were high risk types of loans, and they didn't

1    make full disclosure.

2         And when you look at the securities laws, the

3    securities laws require, once you have this information,

4    you're required to make full disclosure of all the

17:09:15  5    information.  And you have to look at it in context.

6         And I think that's why the Supreme Court talks

7    about it in terms of a complaint has to be considered

8    holistically.  You can't take out one particular statement,

9    you have to look at all the statements.  If you're talking

17:09:29  10    about a particular class period from, like, August of '06 to

11    November of '07, you have to see the pattern of disclosures

12    over the period of time.

13         So, and that's the one area talking about the

14    particular risk.

17:09:41  15         The second area I'd like to talk about is their

16    subprime exposure.  There's a lot of allegations in the

17    complaint -- I mean, it's 125 pages -- in terms of what was

18    being said at the time.  But their knowledge, again, goes

19    back to the ERMC.

17:09:58  20         In the ERMC reports, beginning early in 2007,

21    paragraph 119 alleges that Freddie Mac indicated that it was

22    "already purchasing loans with credit risk characteristics

23    similar to subprime loans originated by self-identified

24    subprime originators under their -- under their existing

17:10:22  25    acquisition programs."

108

1          You know, we've heard about this definition, you

2     know, that their definition of subprime was subprime that

3     came from particular originators of subprime loans.

4          You know, they don't say that.  That's not -- if

17:10:34  5     you look at paragraph 182 of the complaint, it talks about

6     subprime being high-risk loans.  It never talks about

7     subprime, you know, being some loan that comes from a

8     subprime originator.

9          And, in fact, that was an issue that came up in

17:10:49 10     the SEC versus Syron case.  You know, in that case, when

11     Judge Sullivan is talking about the issue of scienter as to

12     Mr. Syron, he says -- he's talking about the allegations,

13     the same thing we've gone through here, the ERMC reports,

14     the senior management meetings, and he talks about, after

17:11:09 15     reviewing the statements that were being made in terms of

16     talking about subprime, he said at the -- he says that

17     "These allegations establish an inference that Syron knew

18     the term subprime could be used to describe loans with high

19     credit risk, that he knew Freddie Mac was already acquiring

17:11:28 20     such loans, that he knew Freddie Mac classified such loans

21     as caution loans, and, thus, he knew that or was willfully

22     blind to the risk that sweeping statements like 'We have

23     basically no subprime exposure in our guarantee business'

24     and 'We didn't do any subprime business' would mislead the

17:11:52 25     investors."

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

1          And that's exactly the very -- the similar pattern

2     of allegations are in our complaint.  That's what happened.

3     You know, we go through the information at these meetings

4     where they're talking about subprime being high risk, and

17:12:08  5     what they're purchasing.

6          And then when you get into the disclosures that

7     are made, you see that the disclosures that are made -- for

8     example, on February 27, 2007, Mr. Syron -- after the

9     financials come out for the year, Mr. Syron was interviewed.

17:12:26  10          And in the interview, he falsely assured the

11     public that Freddie Mac, in his words, "had virtually no

12     credit exposure to subprime mortgages and mortgage-related

13     securities backed by these loans."

14          The complaint also alleges that, in paragraph 161,

17:12:43  15     Mr. Piszel, at an earnings conference on March 23rd, when

16     asked about Freddie Mac's involvement in the subprime,

17     falsely stated that "We, Freddie Mac, have little to no

18     exposure to the subprime, risk layered and mortgage products

19     that have drawn so much note recently."

17:13:02  20          Similar statements were made by Mr. McQuade when

21     he was interviewed by *Bloomberg News*.

22          So, in this pattern, when you say subprime in the

23     way he said it, "We have no exposure to subprime," he had a

24     duty under the securities laws to say what it was, to tell

17:13:18  25     the market what he meant by that.

1          If he meant that it was all non-prime, he should

2     have said that.  If he meant it was just the C1, C2 and EA

3     loans, he should have said that as well.

4          But the sweeping statements, the sweeping

17:13:32   5     statements were insufficient to let the market have the

6     entire information that they're required to have under the

7     securities laws.

8               THE COURT:  Let me stop you for just one minute --

9               MR. WAYNE:  Sure.

17:13:44  10               THE COURT:  -- to ask your position.  I'm

11     referring to the Sixth Circuit's language in Frank v. Dana,

12     a 10(b) action --

13               MR. WAYNE:  Right.

14               THE COURT:  -- when it speaks about -- it gives

17:13:56  15     guidance about what a court should be looking at when trying

16     to decide a 12(b)(6).  And I won't read it all to you, but

17     just to acquaint you with where I want you to be.  All

18     right?

19               "First, all of plaintiffs' factual allegations

17:14:10  20     must be accepted as true."  Nothing unusual.

21               "Second, the complaint and other sources should be

22     considered in their entirety."  That's what I think we've

23     spoken about the holistic.

24               MR. WAYNE:  Holistic, collectively, yes.

17:14:21  25               THE COURT:  Yes.  "Third" -- so I'm jumping down a

111

1    bit now that I think you are where I want you to be.

2         "Third, the court must take into account

3    'plausible opposing inferences' when determining whether

4    there is a strong inference of scienter.  A complaint will

17:14:34  5    survive 'only if a reasonable person would deem the

6    inference of scienter cogent and at least as compelling as

7    any opposing inference one could draw from the facts

8    alleged.'"

9         What I want to speak to you -- or you to speak to

17:14:50  10   me about is the opposing inferences.  My interpretation of

11   that language is that the inference of scienter must be at

12   least as strong as the opposing inferences.

13        So I am certainly not disagreeing that there's at

14   least inferences of scienter in the vein that plaintiffs

17:15:10  15   have argued.

16             MR. WAYNE:  Right.

17             THE COURT:  But there are also the opposing

18   inferences.

19             MR. WAYNE:  That's right.

17:15:16  20             THE COURT:  And some of those have been alluded

21   to, the disclosures that have been made.

22        Can you say anything to better inform me or just

23   share your position about -- and I don't want to be so broad

24   as to say the weighing of --

17:15:27  25             MR. WAYNE:  Well, I think that's what it comes

112

```
           1    down to.  I think that's kind of what it comes down to.

           2              THE COURT:  In part, right.

           3              MR. WAYNE:  In the sense that they have to be

           4    equal.  One doesn't have to be better than another, but ours

17:15:37   5    has to be our -- a reasonable person with this series of

           6    facts has to be able to weigh them in the nature of being

           7    equal, equally --

           8              THE COURT:  And your inferences have to be at

           9    least as strong as the opposing?

17:15:48  10              MR. WAYNE:  They don't have to be stronger --

          11              THE COURT:  Right.

          12              MR. WAYNE:  -- but they have to be at least as

          13    strong.

          14              THE COURT:  Right.

17:15:52  15              MR. WAYNE:  That's correct.  And that's what the

          16    law -- the Supreme Court has said that as well.

          17              THE COURT:  And your position is you meet that?

          18              MR. WAYNE:  Oh, I think we meet it by far.  I

          19    think -- yeah.  We're talking about in terms of pleading

17:16:04  20    information.  You know, we heard about the Kuriakose case

          21    earlier today in the sense of saying, "Well, this case is

          22    just like Kuriakose."

          23              Well, it's not like Kuriakose.  I mean, Kuriakose,

          24    the class period begins on the day our class period ends.

17:16:14  25    We say disclosure is made on November 20th, 2007.  That's
```

 1    the day the Kuriakose claim begins.  That's the beginning of

 2    their class period.

 3         So I think you've got to look at these kinds of

 4    issues, and I think that when you look at, you know, those

17:16:27  5    inferences, it's got to be -- it's got to be equal.

 6         THE COURT:  Okay.  Fair enough.  Thank you for

 7    that.  Are you wrapping up?

 8         MR. WAYNE:  Yeah.  I just want to -- I think a lot

 9    of these points have been --

17:16:37  10        THE COURT:  I'll give you the time to wrap up.  I

11    stole a moment from you.

12         MR. WAYNE:  Okay.  I just want to go through just

13    a couple of -- unless the court has any other questions.

14         THE COURT:  If I do, I'll speak up.

17:16:46  15        MR. WAYNE:  I think that I'm -- just briefly, in

16    terms of Ms. Cook, I think her subcertifications, I think

17    the position she had with the company, I think being at

18    every one of these ERMC meetings where the risk was

19    discussed and subprime was discussed, and she had that

17:17:01  20    information, went to the market and made statements that

21    said they had basically no exposure, I think puts her in the

22    position where she's a primary perpetrator under 10b-5.  If

23    not, she would be included under 20a as a control person.

24         You know, I think that -- everybody is talking

17:17:16  25    about the stock sales.  That's certainly one of the elements

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

114

1    that -- or one of the elements that Helwig talks about in

2    the Sixth Circuit.  You know, but nobody talked about the

3    fact that the compensation here was basically -- the large

4    parts of the compensation here was basically

17:17:29   5    performance-based, hitting the targets in terms of their

6    portfolio.

7              And, in fact, in 2006, 80 percent of the

8    compensation of these four individuals came from

9    compensation through performance-based compensation.  It

17:17:41  10    wasn't just direct salaries, they made more for reaching

11    these target levels.  So that's a factor under -- because

12    Helwig says, "I'm going to give you a list of nine factors.

13    These aren't exhaustive, there are other measures."  When

14    you're looking at interest in terms of what people are

17:17:55  15    making, I think that's a factor you have to look at as well.

16              Stock losses.  Piszel.  Piszel, the same thing, in

17    terms of they said there was no scienter.  You know, they

18    talked about the statements that he made.  I think that he

19    was at those meetings, the ERMC meetings where the risk was

17:18:21  20    talked about, where subprime was talked about, starting in

21    2007.  I think he had the knowledge of that information.  I

22    think he had a duty to speak completely in terms of what he

23    had to disclose under the securities laws, and I don't think

24    he did it.

17:18:38  25              McQuade we've talked about.  I've gone through

1    McQuade's.  And Syron we've gone through as well.

2            I have nothing further, Your Honor, at this point

3    based upon my time being up.  But if there's any other

4    questions, I'd be happy to answer them.

17:18:51  5            THE COURT:  Let me ask you this:  And I ask it as

6    I have all my questions, not intending to augur any result,

7    but just to ask this question.

8            You heard, and I think it was Mr. Kravitz, who

9    said that he believed the case should be dismissed with

17:19:06 10    prejudice, and essentially said, "Plaintiffs can't fix this.

11    They've had," I think he said, "four chances at it now," and

12    if there are three amendments and the original complaint,

13    then I guess that is four.

14            Do you agree -- I'm not asking you to agree that

17:19:21 15    it should be dismissed.  Obviously, you are stridently

16    against that.

17            Do you agree that you've done your bona fides; if

18    this third amended complaint doesn't satisfy the court, then

19    it deserves a respectful burial?

17:19:35 20            MR. WAYNE:  I say this with all due respect.

21    That's a catch-22 question.  You know, on one side I can say

22    that "Well, depending upon how the court rules, we may be

23    able to fix it."

24            THE COURT:  Uh-huh.

17:19:45 25            MR. WAYNE:  You know, but on the other side, I

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1    will tell you that I think in terms of the pleading

2    requirements, in terms of a 10b-5 claim, in terms of the

3    disclosures that were made here, based upon the information

4    that was available, when you contrast that with the

17:19:58  5    disclosures which were made, I think there is a strong

6    inference of scienter here that would allow us to proceed

7    with this case.

8              THE COURT:  Thank you, sir.

9              MR. WAYNE:  Thank you, Your Honor.

17:20:07  10             THE COURT:  Rebuttal?

11             MR. HERSHMAN:  Your Honor, the first point I want

12   to make is based on something that Mr. Stock said, and it's

13   this:  A securities fraud case turns on the actual

14   statements made by the defendants themselves, not on the

17:20:38  15   plaintiffs' characterizations of what they said.

16             And it's very important, and I know the court will

17   be very careful in actually looking at what the defendants

18   actually said, or what the documents actually say as

19   compared to anything that's been on slides today or been

17:20:52  20   represented to you.  And I say that in particular because of

21   one of the points that Mr. Stock made which was related to

22   his slide 49, where he took to task the defendants in our

23   briefing.

24             And, in particular, in his slide, which I don't

17:21:07  25   have in front of me, but you may have -- it's in this

117

1    record, he pointed to argumentation, and he said -- he

2    pointed to a statement in their brief, "At year's end, only

3    6 percent of our total mortgage portfolio was in

4    nontraditional mortgages, and the portfolio's average

17:21:25  5    loan-to-value ratio was 57 percent."  And then he said,

6    quoting our briefing, then he comes down and he said -- it

7    says, "The truth is that at year end, 11.1 percent of the

8    total mortgage portfolio was in nontraditional mortgages."

9    Now, what he left out in referring to our briefing

17:21:42  10   is the following statement in our brief at page 34 of our

11   reply brief:  "Even a cursory glance at Wayne Exhibit 9, on

12   which plaintiff relies, makes clear that the 11.1 percent

13   figure refers to 'untested mortgage products' not

14   'nontraditional mortgages.'"

17:22:03  15   Now, the reason that that's significant is because

16   these things are different.  You have to look at the

17   documents.  You have to be very careful about what it is

18   that they actually say.

19   Now, what I next want to focus on is the issue of

17:22:16  20   loss causation.  And Mr. Stock has asked this question:

21   "Why did Freddie Mac's stock price drop this day in a

22   greater amount than expectations as compared to other

23   companies?"

24   Well, first of all, the law regarding whether or

17:22:33  25   not loss causation is adequately pled has nothing to do with

1    the size of a stock drop.  The fact is that the stock drop

2    in, for example, D.E.&J. is 60 percent, and the Sixth

3    Circuit affirmed the grant of a motion to dismiss in that

4    case saying that loss causation wasn't adequately pled.

17:22:49  5        Stock prices drop a lot whenever the market hears

6    information that is surprising that day.  Every single

7    securities fraud class action, every one deals with a big

8    stock drop that triggered a case, and every case where loss

9    causation is the basis that the case is thrown out is

17:23:09 10   concluding, yes, the market was surprised that day by what

11   it heard, it triggered a big stock drop, but there's nothing

12   to show that that was the result of the revelation of the

13   fraud, the falsity of a prior challenged statement.

14        Now, here where Freddie Mac is a monoline company

17:23:25 15   that is only invested in home mortgages and mortgage-backed

16   securities, it isn't surprising that in the midst of one of

17   the largest declines in real estate values and recorded

18   history, it would react more negatively to the falling real

19   estate market than a bunch of companies that have a lot of

17:23:42 20   other parts of their business, not just real estate loans

21   and securities backed by real estate loans.

22        THE COURT:  Are you telling me then that the

23   others on slide 45 are not monoline like Freddie Mac?

24        MR. HERSHMAN:  I don't believe so.  I don't

17:23:59 25   have -- they're a bunch of investment -- I don't have it in

1    front of me, but --

2              THE COURT:  You don't have it?

3              MR. KRAVITZ:  Yes.

4              THE COURT:  Thank you, sir.

17:24:06  5              MR. KRAVITZ:  Yes, Your Honor, you are correct,

6    they are companies with a wide variety of businesses.

7              MR. HERSHMAN:  You've got Morgan Stanley,

8    Citigroup.  These companies are -- Freddie Mac, by law --

9    Bank of America, Bear Stearns.  These are large investment

17:24:20  10   banks that have many parts of their businesses whereas

11   Freddie Mac, by law, can only be invested in home

12   mortgage -- you know, home mortgages or securities backed by

13   home mortgages, period.

14              I want to talk a little just for a second about

17:24:33  15   the law as it relates to loss causation.  And I'll be very

16   quick on this, but I will use my demonstratives quickly.

17              So, first of all, Mr. Stock referred repeatedly to

18   the revelation of truth.  I don't know what he means

19   exactly, but this is Omnicare, this is the Sixth Circuit,

17:24:57  20   and here is the language of the Sixth Circuit:  "The

21   complaint failed to 'explain how the statements were

22   revealed to be false and thereby caused a drop in the stock

23   price.'"  There has to be a revelation of the falsity of the

24   challenged statement, and that's not what's present here.

17:25:17  25              THE COURT:  Well, you heard what he also said.  He

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1    said, "Well, if we have to wait for a revelation when

2    there's certainly motivation to keep secret that which

3    caused the loss, then there'd never be a securities case."

4              MR. HERSHMAN:  Well, and it's not that there is --

17:25:31  5    and I'm relying here on the law itself.

6              THE COURT:  I appreciate that.

7              MR. HERSHMAN:  It's not that there is a

8    requirement that there be, quote, unquote, "a confession."

9              But the fact is, under these cases, it has to be

17:25:44  10   the case that somehow the market learned of the falsity of

11   the challenged statement, and that, accordingly, the fraud

12   caused the loss, the revelation of a fraud caused the loss.

13   And that's because if it weren't for that, then it would

14   just be a windfall.

17:26:09  15             If there was no revelation whatsoever of fraud, it

16   would simply be that -- if you created a cause of action for

17   that, it would just be -- as the Supreme Court said in Dura,

18   it would be investment insurance.  If the loss has nothing

19   to do with the revelation there had been a fraud, then

17:26:30  20   there's just a windfall to the plaintiffs' class.

21             So the law is very clear that it has to be the

22   case, under Omnicare, under D.E.&J., under Dura, under

23   Lentell, every one of those cases makes clear that it has to

24   be the case, as of the end of the class period, there has

17:26:45  25   been something that has revealed the falsity, in the

121

1    language of Omnicare, the falsity of the challenged

2    statement, which thereby caused the drop.  I think that's

3    literally -- that's literally the language of the case:

4    "How the statements were revealed to be false and thereby

17:27:05  5    caused a drop in the stock price."  That's the governing law

6    of the Sixth Circuit.

7         Now, on the issue of subprime and loss causation,

8    Mr. Stock made a -- frankly, a candid but stunning and very

9    important concession, which is, there is nothing that is

17:27:24  10    disclosed on November 20th, 2007, that reveals the alleged

11    falsity of any statement regarding the quantity of loans in

12    Freddie Mac's guarantee portfolio.

13         So quite specifically here, and I'll talk in a

14    minute about the statements, Mr. Syron saying, "We

17:27:48  15    essentially have no subprime in the guarantee portfolio."

16    Let's just presume for a second that that's a

17    misrepresentation, which we do not concede, and which Judge

18    Keenan held wasn't even a misrepresentation, let alone one

19    that was made with scienter.

17:28:02  20         But even if it was, there is nothing that came out

21    on November 20th, 2007, as Mr. Stock conceded, that revealed

22    that there was anything inaccurate ever said about the

23    quantity of subprime, "subprime loans," however you define

24    them, in the guarantee portfolio.  And their own statement

17:28:27  25    is saying here it was off by 12 percent.  And that exact

1    number is drawn from information that was first revealed to

2    the market, according to them, in 2011, which is four years

3    after the class period ended.

4         We dispute the notion that these aren't subprime

17:28:49  5    loans, which I'll talk about.  But even if they were,

6    there's no loss causation, which is exactly what the Second

7    Circuit held in Central States on that exact allegation,

8    applying the exact case, Lentell versus Merrill Lynch, on

9    which the plaintiff relies.

17:29:05  10        Now, as far as their attempts to distinguish

11   Central States, I'm just going to come back to what I said

12   before.  And you can cross-reference my chalks to their

13   exhibits.  If you look at the decision in Central States,

14   the court doesn't say, "On November 20th, this was the first

17:29:27  15   time Freddie Mac said this."  And the Second Circuit doesn't

16   say, "The fraud was revealed on November 20th, 2007."

17        They simply say, "On November 20th, 2007, there

18   was information disclosed that day of the sort that they

19   point to."  And they say there was a stock drop that day.

17:29:48  20   Now, and that's true.  They don't say that it's as a result

21   of fraud or the revelation of any -- that any statement made

22   previously was false.

23        And, the fact is, there was bad news that

24   happened, and that kept on happening, as home price values

17:30:07  25   kept going lower and lower and lower, which caused

123

1    unavoidable losses at Freddie Mac.  No one had a crystal

2    ball.  I mean, we've cited in our briefing before

3    pronouncements by the treasurer of the United States and all

4    sorts of folks in the middle of the year of 2007, in the

17:30:22    5    summer of 2007.  People didn't know that it was going to get

6    worse, and then worse, and then worse.  People don't have a

7    crystal ball.

8         And in a second, I will focus on their supposed

9    alleged misrepresentations by Ms. Cook and Mr. Syron, which

17:30:35   10    were right after the second quarter results were announced.

11    They were talking about the results for the second quarter.

12    You have to go and look and see the context of the

13    statements that they're pointing to.  When are these

14    statements being made?  Freddie Mac announced its results

17:30:49   15    for the second quarter on August 30th, 2007.  They are at

16    conferences literally in the next week talking about Freddie

17    Mac's results for the second quarter of 2007.

18         There is nothing that was revealed at the end of

19    the third quarter of 2007 that showed that what they said

17:31:06   20    about where Freddie Mac stood as of the end of the second

21    quarter of 2007 was false when it was made.

22         What did happen is the real estate market got much

23    worse, and kept getting worse afterwards.  But that doesn't

24    mean that what they said after the end of the second

17:31:22   25    quarter, where there wasn't a big stock drop after the

124

1   announcement, was false when it was made.  It was just that

2   things got worse.

3           Now, there's a very famous case that talks about

4   that.  And it's a line that comes from a Seventh Circuit

17:31:40   5   case called DiLeo.  And I'll just -- it's in our -- we refer

6   to it in our briefing at -- I think it's our reply brief at

7   page 27.  And --

8           THE COURT:  Those numbers at the top of the page

9   you have --

10          MR. HERSHMAN:  Ahh.

11          THE COURT:  -- that's the secret.

12          MR. HERSHMAN:  For you, isn't it?  What, a page ID

13   number?

14          THE COURT:  That would help, yes.

17:32:05   15          MR. HERSHMAN:  12183.  And the quote is as

16   follows:  It's from the DiLeo versus Ernst & Young case, a

17   very famous securities case.  "The story in this complaint

18   is familiar in securities litigation.  At one time the firm

19   bathes itself in a favorable light.  Later the firm

17:32:27   20   disclosed that things are less rosy.  The plaintiff contends

21   that the difference must be attributable to fraud.  'Must

22   be' is the critical phrase, for the complaint offers no

23   information other than the differences between the two

24   statements of the firm's condition.  There is no 'fraud by

17:32:37   25   hindsight,' and hindsight" -- you know, and that's the issue

125

1    here.

2              Those kinds of allegations, Mr. Stock is simply

3    putting up a bunch of statements made after a quarter that

4    was successful.  And then there's another quarter and it's

17:32:54    5    not successful, and that's because market conditions changed

6    and they reported a loss.  That doesn't show that what they

7    said earlier was fraudulent or false when it was made.

8              Now, getting back to this point I want to just

9    close out on, those allegations that are the basis for their

17:33:10    10    distinction of Central States; and the same with Mr. Wayne

11    talking about, do you see these internal dockets, where

12    they're talking about how they're getting into these

13    nontraditional mortgages in 2006?

14              Never mind 2006; I am showing you 2005.  Those

17:33:23    15    internal documents are completely consistent with what

16    Freddie Mac has been publicly stating for years.  If the

17    court compares the disclosures on which Mr. Stock focused,

18    on November 20th, 2007, and the portion of Central States

19    that quotes part of the disclosure from November 20th, 2007,

17:33:46    20    and compares it to the same sections of numerous other

21    disclosure documents that we've cited, the court will see

22    that that's not the first time Freddie Mac said it.  Freddie

23    Mac said it going back to 2000 and -- I just started in

24    2005.  Those disclosures go back even further than that,

17:34:04    25    before the class period even began.

1          They told investors, "We are going to be buying

2     more of these nontraditional mortgage products.  They are

3     riskier, relatively speaking, to the more traditional ones.

4     They are going to default at a higher rate.  This is new for

17:34:20   5     us.  This is different for us.  These are mortgage products

6     of specific types we haven't been buying before,

7     interest-only loans, option ARM loans.  And that's new.

8     That's a new thing for us.  It gives rise to new risks.  If

9     you don't like it, if you don't like those risks, this is

17:34:44  10     the way the securities laws work, don't buy Freddie Mac

11     stock."

12          But it is not accurate to say that Freddie Mac

13     disclosed that information for the first time on November

14     20th, 2006.  It is simply not so.

17:35:04  15          Let me just run quickly through what I have here,

16     Your Honor.

17          THE COURT:  And you meant November 20th, '07?  You

18     said "'06."

19          MR. HERSHMAN:  I'm sorry, November 20th, '07.

17:35:20  20          Now, I do want -- Mr. Stock also referred to what

21     Freddie Mac said in its disclosures about its subprime

22     holdings.  And I just want to read to you exactly what

23     Freddie -- so I guess, full stop, the plaintiffs have

24     conceded they haven't pled loss causation as to the subprime

17:35:43  25     allegations.

127

1          And I am saying to you that as to the credit risk

2     allegations that they pointed to, there's no loss causation

3     as to those either, and that's because those statements were

4     statements that were talking about the state of play at

17:35:58  5     Freddie Mac in an earlier point in time, really in the

6     context of having just reported their results for the second

7     quarter of 2007.

8          And there's nothing that Freddie Mac reported in

9     the third quarter of 2007 press release that showed that any

17:36:13 10     of those statements were false when they were made, or that

11     showed that Freddie Mac is now disclosing something it had

12     hidden before.  The disclosures it made regarding its

13     nontraditional mortgage products, regarding the performance

14     of those products, regarding its buying, that was simply

17:36:30 15     utterly consistent with the prior statements it had made on

16     that subject for literally years.  Not new.

17          As far as -- so for that reason, there is no loss

18     causation pled, on anything, anything.  There is nothing in

19     the November 20th press release that actually reveals the

17:36:47 20     falsity of any of the challenged statements on any subject

21     at all.

22          Now, I want to also say, Freddie Mac subprime

23     disclosures, the ones that Mr. Stock pointed to, what they

24     actually say about the .1 percent is, "Also included in our

17:37:04 25     credit guarantee portfolio are structured securities backed

128

1    by non-agency mortgage-related securities where the

2    underlying collateral was identified as being subprime by

3    the original issuer."  That's the actual disclosure.

4         So, and then the other disclosure, similarly, is

17:37:26  5    referring to a certain amount of those securities that were

6    "classified as subprime mortgage loans," that's what Freddie

7    Mac is saying.  It's saying, "We have a bright line."  These

8    are things that were literally identified as being subprime

9    by the original issuer, classified as subprime.

17:37:47 10         Freddie Mac, for the guarantee portfolio, was not

11   buying those loans, with the exception of this very small

12   amount that was disclosed.  In the same disclosure, on the

13   same page, they talk about their retained portfolio.  And

14   they say, literally, "We are holding over $100 billion" --

17:38:11 15   that's a massive amount -- "of mortgage-backed securities

16   backed by subprime loans, loans classified as subprime."

17        Now, Freddie Mac wasn't saying, "We don't have any

18   loans that have low FICO scores or any loans with high LTV

19   ratios."  They talk about the E-Trade case.  That company

17:38:32 20   literally was saying, "We have all high FICO" -- I mean,

21   "all high FICO, all low LTV loans," and then it comes out

22   that's not true.

23        That's not Freddie Mac.  Freddie Mac is disclosing

24   all the hard data, and there is no allegation that any of it

17:38:43 25   is false.  So that's just -- that's not this case.

129

1            But the issue of no universal definition was,

2   "We're not buying it for the guarantee portfolio if it's

3   called subprime, and we're telling you the amount that we

4   have that was called subprime, and we're really not in that

17:38:59  5   business," and that really does explain why the performance

6   of Freddie Mac's loans is so much better; and we have

7   referred you to the FCIC report which confronted this exact

8   same argument and said, "Grouping together these loans, the

9   loans Freddie Mac held as compared" -- and the truly

17:39:16 10  subprime loans that were issued by the investment banks that

11  were backing the mortgage-backed securities that Freddie Mac

12  was buying, that's misleading because of the fact that they

13  are going -- they are performing very, very differently.

14            Freddie Mac's loans -- Freddie Mac and Fannie Mae

17:39:32 15  loans with FICO scores 660 or below were defaulting at 6

16  percent, and the FCIC found that the same population of

17  loans held by -- that were labeled subprime, that were FICO

18  score 660 or below, defaulting at 28 percent.  That's not a

19  little bit different.  That's not even double.  That's over

17:39:53 20  400 percent different, which shows that the management of

21  Freddie Mac was drawing valid distinctions between the loans

22  that they were buying in their guarantee portfolio and loans

23  that were literally labeled and classified as subprime

24  loans.

17:40:11 25            Having said that, there was no universal

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

130

1    definition that the originators were using when they labeled

2    loans subprime, which Freddie Mac disclosed.

3         And the SEC, for its part, in a complaint filed

4    against Countrywide, refers to one definition, FICO score

17:40:33   5    below 620; another definition of subprime, FICO score below

6    660.  Two differing definitions.

7         Now, under some definitions, if those are your

8    definitions, I guess some of what Freddie Mac holds is

9    subprime, except for this:  Freddie Mac disclosed to the

17:40:49   10   market 100 percent of the loans it held with FICO scores

11   below 620, 4 percent at a particular point during this class

12   period, and 100 percent of the loans it had with FICO scores

13   below 660.

14        So if you're a FICO below 620 person, if that's

17:41:05   15   your definition of subprime, have at it.  Freddie Mac has 4

16   percent, if that's your definition.  It's not Freddie Mac's

17   definition, but if that's yours, 4 percent.

18        If you're a FICO 660 person, it looks like it's

19   about 15 percent.  If that's your definition of subprime, it

17:41:19   20   isn't Freddie Mac's, but if that's yours, this is 100

21   percent of what we have that would fit within that

22   definition.

23        That's why Judge Keenan came out the way he did,

24   because those literally are the metrics that the street

17:41:33   25   uses, that folks use when they assess the risks presented by

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1       mortgage loans.  And Freddie Mac disclosed all of that

2       information.  It wasn't hiding anything.

3              And so for all -- for all of those reasons, Your

4       Honor, we believe that the motion to dismiss should be

17:41:54  5    granted, and should be granted, in our view, with prejudice.

6       It's the third amended complaint.  We think that's enough.

7       We think none of these folks did anything wrong.  They

8       didn't try to do anything wrong.  They did their best to get

9       it right, and I think they did get it right.

17:42:07  10          Thank you very much for your time, Your Honor.

11             THE COURT:  Thank you, and thanks to all of you.

12      I appreciate you all being so well prepared and trying, as

13      best you could, to stay within your allotted timelines, and

14      sometimes I encouraged you to go outside.

17:42:21  15          Consider the matter heard and submitted.

16             As you might have been able to tell, I've already

17      begun to do some substantial work.  I'll take the time to

18      carefully review the rest of the record, meaning what we've

19      augmented it by here today, and anything more I need before

17:42:35  20    issuing my decision.  So while it might not come out

21      immediately, it will come out relatively soon.

22             And with that, I bid you all good night and safe

23      travels.  It looks cloudy.  I can't tell if we have any rain

24      or weather, but do take care.

17:42:49  25          ALL:  Thank you, Your Honor.

132

1          THE COURT:  We're adjourned.

2      (Proceedings concluded at 5:42 p.m.)

133

1                   C E R T I F I C A T E

2

3        I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled

5   matter.

6

7             S/Mary L. Uphold              June 19, 2014
              Mary L. Uphold, RDR, CRR        Date
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25