PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| OHIO PUBLIC EMPLOYEES | ) | |
| RETIREMENT SYSTEM, *etc*., | ) | CASE NO. 4:08cv160 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| FEDERAL HOME LOAN MORTGAGE | ) | |
| CORP., *et al*., | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** [Regarding ECF Nos. 289; 291; |
| Defendants. | ) | 292; 293; 295] |

Pending before the Court are motions to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6)

and Rule 9(b)) filed by Defendants Federal Home Loan Mortgage Corporation, *aka* "Freddie

Mac"; Richard F. Syron; Patricia L. Cook; Anthony S. Piszel; and Eugene M. McQuade

(collectively "Defendants").  ECF Nos. 289; 291; 292; 293; 295.  The Court has been advised by

the record, including the parties' submissions, applicable law, and oral argument.  For the

reasons explained below, the Court grants Defendants' motions.

## I.  Background

### A.  The Parties

Lead Plaintiff, Ohio Public Employees Retirement System (also referred to as "OPERS"),

is a state pension fund.  Defendant Freddie Mac is a government-sponsored enterprise chartered

by Congress.  ECF Nos. 166 at 4, ¶1.  Its public mission is to support, stabilize, and expand the

secondary market for mortgages by purchasing mortgages and mortgage-related securities.  *Id.*;

297 at 13.  Under the terms of its charter, Freddie Mac's business is limited to the purchase of

(4:08cv160)

home mortgages and securities—it may not originate loans or engage in any other business. *Id.* at 13-14; *see also* 12 U.S.C. § 1454. Freddie Mac packages the mortgages into securities and sells them in the capital markets (the "guarantee portfolio"). ECF No. 297 at 14. It also purchases mortgage-related securities created by others (the "retained portfolio"). *Id.* On November 20, 2007, the value of Freddie Mac's common shares dropped 29% in one day. ECF No. 166 at 6, ¶6. The owners of Freddie Mac shares immediately lost approximately $6.6 billion in share value. *Id.*

OPERS purchased Freddie Mac's common stock and filed this putative class action on behalf of itself and all others similarly situated and seeking redress for financial loss caused by the alleged material misrepresentations and omissions made by Defendants spanning August 1, 2006 to November 20, 2007, the "class period." ECF No. 166 at 9, ¶13. In addition to suing Freddie Mac, Plaintiff also brings this action against certain Freddie Mac executives. Defendant Richard Syron was Chairman of the Board and Chief Executive Officer, *Id.* at 11, ¶20, and Defendant Patricia Cook was Chief Business Officer and Executive Vice President for Investments and Capital Markets during the class period. *Id.* at 13-14, ¶21. Defendant Anthony Piszel was Executive Vice President and Chief Financial Officer, *Id.* at 15, ¶22, and Defendant Eugene McQuade was President and Chief Operating Officer for most of the class period. *Id.* at 16, ¶23.

**B. Allegations**[1]

---

[1] The Court does not attempt to recount the entire 130-page Third Amended Complaint ("TAC"). *See* ECF No. 166. Relevant factual bases regarding Plaintiff's specific allegations are more fully provided in the analysis portion of the opinion, *infra*.

2

(4:08cv160)

The Third Amended Complaint ("TAC") alleges two causes of action. Count 1 alleges a violation of Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, for making false statements of material fact in connection with the purchase or sale of any security. Count 2 alleges a violation of Section 20(a) of the Act, 15 U.S.C. § 78t(a), for control person liability. *See* ECF No. 166 at 123-127.

Generally, Plaintiff alleges that, during the class period, Defendants misrepresented the amount of products it purchased that were considered "subprime" loans. *Id*. at 4, ¶3. There is no universally accepted definition of "subprime."[2] *Id*. at 80, ¶182 (citing Freddie Mac's 2Q07 Report); ECF No. 301 at 41. "Subprime" is generally used to describe a loan that is high risk due to a greater likelihood of default, and may "include a combination of high loan-to value ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income." *Id*. at 12; ECF No. 166 at 80, ¶182. Plaintiff alleges that Defendants committed fraud when they made statements indicating Freddie Mac's subprime exposure was low despite knowing that Freddie Mac's subprime exposure was high. ECF No. 166 at 5, ¶3. Plaintiff alleges that Defendants

> made a series of materially false and misleading public statements relating to, among other things, (i) its exposure to or risk of loss from subprime mortgage loans and other nontraditional, high risk mortgages, including "Alt-A" mortgages (a mortgage industry term to describe reduced documentation/higher credit risk loans); (ii) its underwriting guidelines and Defendants' adherence to those guidelines, (iii) its loan analysis software and fraud detection systems, (iv) its risk

---

[2] *See also Kuriakose v. Fed. Home Loan Mortgaging Corp*., 897 F.Supp.2d 168, 183 (S.D.N.Y. 2012) ("Plaintiffs attempt to convince the Court that Freddie Mac was intentionally 'muddying the waters' with changing internal definitions of 'subprime.' Absent a universally accepted definition of the term, however, the Court cannot infer such fraudulent intent . . . .").

(4:08cv160)

management measures and its risk management performance, and (v) its capital position.

*Id*. at 4, ¶2.

On November 20, 2007, Freddie Mac issued a press release that Plaintiff alleges revealed, "[f]or the first time, . . . that [Freddie Mac's] investments in subprime and nontraditional mortgage products had subjected [it] to significant risk and caused it to sustain substantial losses."  *Id*. at 89, ¶190.  As a result of these "unanticipated revelations," Plaintiff alleges, Freddie Mac stock dropped 29%.  *Id*. at ¶191.  This lawsuit followed.

## II.  Legal Standard

In deciding a motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in a light most favorable to the plaintiff.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id*. at 679.  The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555 (citing authorities).

In other words, claims set forth in a complaint must be plausible, rather than conceivable. *Id*. at 570.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere

4

(4:08cv160)

possibility of misconduct, the complaint has alleged — but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. Pro. 8(a)(2)). The factual allegations in the complaint "must contain something more . . . than . . . merely creat[ing] a suspicion of a legally cognizable right." *Twombly*, 550 U.S. at 555-56 (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, p. 235–236 (3d ed.2004)). In addition to reviewing the claims set forth in the complaint, a court may also consider exhibits, public records, and items appearing in the record of the case as long as the items are referenced in the complaint and are central to the claims contained therein. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *Erie County, Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 863 (6th Cir. 2012).[3]

---

[3] Additionally, the Sixth Circuit set forth three steps a court should consider when faced with a Rule 12(b)(6) motion in a Section 10(b) action: (1) "the plaintiff's factual allegations must be accepted as true"; (2) "the complaint and other sources normally considered by a court when ruling on a 12(b)(6) motion must be considered in their entirety, including 'documents incorporated into the complaint by reference,'"; and (3) "'take into account plausible opposing inferences' when determining whether there is a strong inference of scienter." *See Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)). "A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (Internal citations omitted.). Additionally, because Plaintiff's claims allege fraud, the heightened pleading requirements of Fed. R. Civ. Pro. 9(b) apply. *See Frank v. Dana*, 547 F.3d 564, 569–70 (6th Cir. 2008). Futhermore, the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires a complaint to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

Because, as explained herein, the Third Amended Complaint fails to plausibly plead causation, an essential element, the Court does not reach scienter or the failure to plead fraud with particularity.

(4:08cv160)

### III. Analysis

"Section 10(b) of the Securities Exchange Act of 1934[] and Rule 10b–5 'prohibit fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.'" *Zaluski v. United American Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 680-81 (6th Cir. 2004)).  To prevail on Count 1, a successful plaintiff must prove each of the following: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 157 (2008)).  Count 2 requires a predicate Section 10(b) violation.  *PR Diamonds*, 364 F.3d at 696–97.  Therefore, failure to adequately plead Count 1 dooms Count 2.

In the case at bar, Plaintiff alleges five types of misstatements: (1) Freddie Mac's subprime exposure; (2) Freddie Mac's underwriting guidelines and its adherence to those guidelines; (3) Freddie Mac's loan analysis software and fraud detection system; (4) Freddie Mac's risk management measures and risk management performance; and (5) Freddie Mac's capital position.  Plaintiff alleges that the "primary fraud was Defendants' failure to disclose Freddie Mac's true subprime exposure."  ECF No. 166 at 4, ¶3.

Defendants argue that the Third Amended Complaint should be dismissed because Plaintiff fails to allege three essential elements of Count 1--a false material statement or

6

(4:08cv160)

omission, a strong inference of scienter, and loss causation–and, because there is no primary

violation, Count 2's claim for secondary or control person liability also fails, as alleged in Count

2. The Court addresses the element of loss causation first.

### A. Loss Causation

A plaintiff in a securities fraud class action must plead and prove loss causation. *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 346 (2005). This is essential. Failure to meet this element is fatal to a claim of securities fraud. *See D.E. & J. Ltd. P'ship v. Conway*, 133 Fed. App'x 994, 999 (6th Cir. 2005) (affirming district court dismissing action for failure to plead loss causation, explaining that "private securities-fraud plaintiffs may recover damages only when they 'adequately allege and prove the traditional elements of causation and loss[,]'" quoting *Dura*, 544 U.S. at 346)); *In re KBC Asset Mgmt N.V.*, 2014 WL 3397593, at *3-5 (6th Cir. July 11, 2014) (affirming district court dismissal for failure to plead loss causation).

Loss causation requires "a causal connection between the material misrepresentation and the loss." *Id.* at 342. Merely alleging that investors purchased stock at an inflated price is not enough to state a claim—"a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market." *Omnicare*, 583 F.3d at 944) (citing *Dur*a, 544 U.S. at 346-47). *See also D.E. & J. Ltd. P'ship*, 133 Fed. App'x at 998-99); *In re KBC Asset Mgmt N.V.*, 2014 WL 3397593, at *3-5).

Defendants argue that Plaintiff's Third Amended Complaint does not adequately plead

(4:08cv160)

loss causation.  ECF No. 297 at 18.[4]

Plaintiff advances two theories under which loss causation can be alleged—"(a) a corrective disclosure or a previously undisclosed truth [that] causes a[] decline in the stock price, or (b) the materialization of a concealed risk [that] causes a stock price decline."[5]  ECF No. 301 at 75.

Regardless of the descriptor affixed to the causation theory, the parties agree that there must be some disclosure or revelation that had previously been concealed from the market.  *See, e.g.,* ECF Nos. 301 at 77 (Plaintiff's opposition brief); 318 at 6 (Plaintiff's glossary); 290 at 46 (Defendant Cook's motion brief).  As explained below, the Court finds that Plaintiff fails to plausibly plead loss causation.

## I.

---

[4]  Each of the five Defendants filed separate briefs tailored to the specific allegations against them, as well as the global issues presented; each brief refers to and, in some cases, incorporates, the arguments of other Defendants.  *See, e.g.,* ECF No. 292-1 at 8; 290 at 12 n.1. Generally, the Court, for convenience, cites to one brief, although briefs filed by other Defendants contains the same or similar arguments.

[5]  The Sixth Circuit has not recognized the theory of materialization of concealed risk.  In its briefing, Plaintiff espoused a theory of loss causation based, at least in part, on a theory of materialization of concealed risk that primarily hinges on Second Circuit trial court rulings.  *See* ECF No. 301 at 75-76 (arguing that "Freddie Mac's stock price fell on November 20, 2007 in response to the materialization of the subprime and other nontraditional risk exposure Freddie Mac had concealed throughout the class period.")(case citations omitted)).  At oral argument, Plaintiff admitted that "the Sixth Circuit is focused on the revelation of the truth," but nevertheless argued (what can best be described as a conflation of corrective action and materialization theories) that "materialization of the risk still, under the Sixth Circuit law, reveals the truth . . . about the misrepresentations."  ECF No. 325 at 85-86.  *See also* ECF No. 318 at 6 (glossary of terms, in which Plaintiff defines materialization of the concealed risk as "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.").

(4:08cv160)

Plaintiff identifies a press release and a financial report both released by Freddie Mac on

November 20, 2007 as the conduits for the alleged materialization or revelation.[6]  ECF No. 301

at 77, n. 309.  Plaintiff submits that on November 20, 2007, Freddie Mac disclosed that

> (a) it lost over $2 billion during the third quarter (in stark contrast to a first quarter net
> loss of $211 million and a second quarter net gain of $764 million),
> (b) its "increased purchases of these mortgages and issuances of guarantees on them
> expose us to greater credit risks," which "will likely reduce our earnings in future periods
> and could adversely affect our results of operations or financial condition," [and]
> (c) it was in danger of falling below its minimum capital requirements.

*Id*. at 77.[7]  Plaintiff contends that, "[i]n light of this new information," Freddie Mac's stock

dropped 29% in a single day.  *Id*.  Plaintiff argues that the drop in price "confirms empirically

that the market was previously unaware of the full extent of Freddie Mac's exposure to, and risk

---

[6]  Plaintiff identified two documents that were issued by Freddie Mac on November 20, 2007: (1) the "Freddie Mac November 20, 2007 press release" and (2) the "November 20, 2007 Freddie Mac Financial Report."  *See* ECF No. 301 at 77, n. 309 (citing ECF Nos. 298-42; 290-22).  Different versions of the 2007 press release–varying in style and format--were filed; the content, however, was identical.  *See* ECF No. 326 (Freddie Mac's Notice of Clarification explaining the different  versions of the 2007 press release states "[w]hile the contents of the press releases submitted by Freddie Mac and Ms. Cook are identical, Freddie Mac submitted the five-page version that appeared on its website, which had smaller font and more compact formatting than the eight-page version submitted by Ms. Cook, which was included in Freddie Mac's Information Statement Supplement.").

[7]  Plaintiff, throughout the Third Amended Complaint, quotes and cites numerous documents, including the November 20, 2007 press release in which it alleges that Defendants made revelations and disclosures.  *See, e.g.*, ECF No. 166 at 89, ¶190.  The November 20, 2007 press release, among other documents referenced in the complaint, was attached as an exhibit to Defendants' motion to dismiss and is central to the claims contained therein.  As such, the Court can consider the documents in a motion pursuant to Fed. R. Civ. Pro. 12(b)(6).  *See Tellabs*, 551 U.S. at 322 ("faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must . . . consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference . . . .").

9

(4:08cv160)

from, non-traditional mortgages (and risk of falling below its minimum capital requirements), and, thus, loss causation." *Id*. Defendants contend the drop was caused by the national financial crisis.[8]  ECF No. 306 at 46.

Regarding the information complained of in Plaintiff's item (a), the Court observes that disclosing a $2 billion loss during the third quarter, by itself, does not reveal that Freddie Mac had concealed its subprime and other nontraditional risk exposure, and, as importantly, Plaintiff does not allege otherwise.  As for Plaintiff's item (b), the increased purchases of certain mortgages refers to "[t]otal non-traditional mortgage products, including those designated as Alt-A and interest-only loans," not loans deemed "subprime." *See*  ECF No. 290-22 at 104. Furthermore, before November 2007, Freddie Mac had already disclosed that it was increasing its purchase of non-traditional mortgage products that may default more often:

> During the past several years, there was a rapid proliferation of nontraditional mortgage product types designed to address a variety of borrower and lender needs, including issues of affordability and reduced income documentation requirements. *While features of these products have been on the market for some time, their prevalence in the market and our Total mortgage portfolio increased*

---

[8]  The financial crisis Defendants refer to has been described as follows:

The 2008 financial crisis, generally described as the worst and costliest financial crisis to hit the United States since the Great Depression, was largely caused by problems emanating from the residential mortgage markets.  The United States had experienced a major housing bubble during the early-to mid-2000s, and when this began to burst in late 2006, home prices experienced a steady decline, ultimately falling more than 33% from their peak.  Coupled with falling employment and stagnant wages, the bursting of the housing bubble would lead to historically high delinquency rates on U.S. residential mortgages.

David Min, *How Government Guarantees Promote Housing Finance Stability*, 50 HARV. J. ON LEGIS. 437, 438 (2013) (internal citations omitted).

10

(4:08cv160)

> *in 2006 and 2005.* See "REGULATION AND SUPERVISION- Office of Federal
> Housing Enterprise Oversight- Nontraditional Mortgage Product Risks" and
> "RISK FACTORS- Legal and Regulatory Risks." *We expect each of these
> products to default more often than traditional products and we consider this
> when determining our credit and guarantee fees.* Our purchases of interest-only
> and option ARM mortgage products increased in 2006, representing
> approximately 18 percent of our Total mortgage portfolio purchases as compared
> to 11 percent in 2005. Despite this recent increase in purchases, these products
> represent a small percentage of the unpaid principal balance of our Total mortgage
> portfolio. At December 31, 2006 and 2005, interest-only and option ARMs
> collectively represented approximately 6 percent and 3 percent, respectively, of
> the unpaid principal balance of the Total mortgage portfolio. We will continue to
> monitor the growth of these products in our portfolio and, if appropriate, may seek
> credit enhancements to further manage the incremental risk.

ECF No. 298-2 at 81 (Freddie Mac's 2006 Annual Report, dated March 23, 2007) (emphasis

added). *See also* ECF No. 298-1 at 81 (2005 Annual Report, dated June 28, 2006). Plaintiff

identifies the following portion of the November 20, 2007 financial report as a disclosure of risk

that had been previously concealed by Freddie Mac:

> The proportion of higher risk mortgage loans that were originated in the market
> during the last four years increased significantly.  We have increased our
> securitization volume of non-traditional mortgage products, such as interest-only
> loans as well as loans originated with lower documentation in the last two years in
> response to the prevalence of these products within the origination market.  Total
> non-traditional mortgage products, including those designated as Alt-A and
> interest-only loans, made up approximately 33% and 24% of our single-family
> mortgage purchase volume in the nine months ended September 30, 2007 and
> 2006, respectively.  Consequently, our increased purchases of these mortgages and
> issuances of guarantees on them expose us to greater credit risks.  We expect to
> experience increased delinquencies and credit losses, which will likely reduce our
> earnings in future periods and could adversely affect our results of operations or
> financial condition.

*See* ECF No. 290-22 at 103-104.  At oral argument, referring to the passage above, Plaintiff

intoned:

(4:08cv160)

> [H]ere, for the first time, we have Freddie Mac saying, 'Consequently, our
> increased purchases of these mortgages and issuances of guarantees on them
> expose us to greater credit risks.  We expect to experience increased delinquencies
> and credit losses, which will likely reduce our earnings in future periods and could
> adversely affect our results of operations or financial condition.'  Here, on
> November 20th, Freddie Mac has come clean about its credit risk exposure.  It is
> telling the market, 'Remember all those things that we said before?  They're not
> true.  We have bad credit risk.  It's only going to get worse.'

ECF  No. 325 at 82-83.  Contrary to Plaintiff's argument, Freddie Mac's 2006 Annual Report

had revealed that it was increasing the number of riskier mortgages that it purchased and that it

expected them to default more frequently.  November 20, 2007 was not the first time Freddie

Mac disclosed its credit risk exposure.

In the Third Amended Complaint, Plaintiff refers to the alleged disclosures as "a newly

emerging truth."  ECF No. 166 at 123, ¶271.  Plaintiff alleges,

> Although the November 20, 2007 press release admitted that the Company had
> been investing in subprime, Alt-A and nontraditional mortgage products, and
> although the *April 15, 2008* OFHEO Report indicated that the Company's capital
> surplus had precipitously declined, *Defendants continued to obscure the full
> extent of the Company's risk exposure and precarious capital position resulting
> from Freddie Mac's ownership and investment in these mortgage products.*

*Id*. at 103, ¶227 (emphasis added).  It goes without saying that events occurring after November

20, 2007 did not cause events occurring November 20, 2007.[9]  Furthermore, Freddie Mac had

previously disclosed that it was investing in non-traditional mortgage products.  *See* ECF Nos.

298-2 at 81 (2006 Annual Report); 298-1 at 81 (2005 Annual Report).

---

[9]  *See* Plaintiff's filing at ECF No. 328 at 2, n.2 ("The *subject* of defendants' fraud—the nature and extent of exposure to subprime and nontraditional mortgages— was concealed from the market until November 20, 2007, when the true extent of exposure became apparent." (citations omitted)).  In this statement, even Plaintiff acknowledges that the event causing the harm must precede it.

12

(4:08cv160)

Plaintiff also alleges that

[t]he nature, extent and effect of Defendant's fraudulent scheme were revealed to the market through earnings releases and other public statements. . . . These [stock price] declines are directly attributable to the market's reaction to revelations of the nature, extent and impact of the fraud at Freddie Mac, and to its adjustment of the price to reflect the newly emerging truth about Freddie Mac's investments, risk management, financial condition and results.  Thus, these price declines were directly caused by Defendants' fraud alleged herein, and by the market's response to the subsequent partial corrective disclosures.

ECF No. 166 at 122, ¶271 (emphasis added). Once again, Plaintiff does not identify a portion of

the November 20, 2007 press release or financial report that amounted to a relevant partial

corrective disclosure.

Almost as an aside, Plaintiff submits that what Defendants meant when they publically

used the word "subprime" was not the same as what Defendants meant when they internally used

the word "subprime."  *See* ECF No. 301 at 41-43.  This, however, is Plaintiff's rationale for the

alleged wrongdoing—that Defendants purposefully misled the public about the amount of

subprime loans Freddie Mac was exposed to by Defendants' use, or non-use, of the word

"subprime."  *Id*.  Neither the November 20, 2007 press release nor the financial report, however,

altered Defendants' prior definition of subprime.  Neither disclosed that previous data regarding

the type of loans Freddie Mac had purchased had been incorrect.  Neither disclosed that

underwriting guidelines, loan analysis software, fraud detection, or risk management measures

were faulty or had not been followed.  Neither disclosed that Freddie Mac's capital position had

previously been misstated.

Plaintiff, in its item (c) above, posits that on November 20, 2007 Freddie Mac disclosed

that it was in danger of falling below its minimum capital requirements.  ECF No. 301 at 77.

13

(4:08cv160)

Plaintiff does not allege that Freddie Mac inaccurately reported the amount of its core capital base or that Freddie Mac's capital base fell below minimum capital requirements at any point during the Class Period.[10]  Moreover, Plaintiff does not respond to Freddie Mac's argument that it "cautioned investors that, among other things, house prices could adversely affect the adequacy of its regulatory capital." ECF No. 297 at 69 (quoting its 2005 Annual Report detailing how "[f]actors that could adversely affect the adequacy of our regulatory capital for future periods include . . . changes in the economic environment, such as large interest-rate or implied volatility moves or house-price declines.").

## II.

At oral argument, Plaintiff relied on *Hawaii Ironworkers Annuity Trust Fund v. Cole, et al.*, 2011 WL 1257756 (N.D.Ohio March 31, 2011) in support of its position.[11]  In that case, the lead plaintiff alleged the defendants, a supplier of automotive parts, misrepresented to the public that they were "thriving" despite a severe downturn in the automotive parts industry.  *Id.* at *1. "When the overstatements became known, [defendant] had to redo its financial statements for those [previous] quarters," resulting in a severe stock drop.  *Id.*  The court, relying on *Dura*, denied the defendants' motion to dismiss, finding that the plaintiff had sufficiently alleged loss

---

[10]  In the Third Amended Complaint, Plaintiff describes how Freddie Mac fell below its minimum capital requirements on November 30, 2007, ten days after the class period ends.  ECF No. 166 at 92, ¶197.

[11]  Plaintiff appeared to have relied on *Hawaii Ironworkers* to support both its corrective disclosure theory and materialization of a concealed risk theory.  *Cf* ECF No. 325 at 75-77 (discussing *Hawaii Ironworkers* and comparing it to *In re Almost Family, Inc. Sec. Litig.*, 2012 WL 443461, at * 10-11 (W.D.Ky. Feb. 10, 2012), a case that rejected the materialization of a concealed risk theory).

(4:08cv160)

causation.  *Id*. at *13-14.  The court found that, "[w]hile it is true that the purposes of securities

actions is "not to provide investors with broad insurance against market losses," *Dura, supra*,

544 U.S. at 345, it is sufficient that the decline results from revelation of the falsity of prior

disclosures." *Id*. at 13.  Applying *Dura* to the facts, the court in *Hawaii Ironworkers* recited the

allegations in the complaint before it:

> The announcement that Dana would have to restate its financials to "correct
> inappropriate recognition of price increases," that an "ongoing internal
> investigation" had revealed that its financial statements "should no longer be
> relied upon," and the identification of CVS as the problematic division alerted
> investors to the falsity of Dana's FY04, 1 Q05 and 2Q05 financial results.
> (Internal quotation marks and citation omitted.)

*Id*.  The *Hawaii Ironworkers* court rejected the defendants' argument that the disclosure had to

reveal "the misconduct itself," rather than "the economic impact of the fraudulent scheme." *Id*.

The *Hawaii Ironworkers* court further stated that the "rapid decline of Dana's stock price

following the news of inappropriate recognition of price increases in CVS indicates a substantial

causal link between the defendants' alleged accounting fraud at CVS and the value of Dana's

stock." *Id*. at 14.

Thus, in *Hawaii Ironworkers*, the plaintiff alleged, and the court relied on, some

revelation to the public that amounted to a correction of previously disclosed information.

Plaintiff does not appear to disagree with this reading of *Hawaii Ironworkers*, and during oral

argument presented slides and argued that the "test" in *Hawaii Ironworkers* included a share

price that fell "after the truth became known"; "some partial revelation of 'the nature and extent

of defendants' fraud'"; and whether "the share price f[e]ll as a result of this revelation." ECF

No. 325 at 75-76 (showing slides).  Plaintiff submits, and Defendants agree, that a plaintiff is not

15

(4:08cv160)

required to allege that a defendant confessed a fraud.  *See* ECF No. 301 at 75 (Plaintiff's

opposition brief) (stating "the loss causation inquiry focuses not on whether the company

disclosed 'that a fraud was committed *per se*, but that the truth about the company's underlying

condition, when revealed, causes the economic loss.'").  Even so, there must be some revelation

or disclosure about the truth of Defendants' previously concealed condition that caused a

subsequent loss.

> In the instant case, Plaintiff alleges that
>
> Freddie Mac's financial results, exposure to subprime investments, inadequacy of
> risk management and internal controls and inadequacy of financial disclosures
> were material information to Plaintiff and other members of the Class.  Together,
> these facts reflect that Freddie Mac was a far riskier investment than it disclosed,
> and that its representations that it was managing risk were completely false. When
> these risks were realized, the market price of Freddie Mac plummeted.

ECF No. 166 at 122, ¶270.  Although the paragraph above describes the stock price dropping

"[w]hen these risks were realized," again, Plaintiff fails to describe a portion of the November

20, 2007 press release or financial report or any other document disclosed to the public that

reveals that Freddie Mac had previously released false information.  Rather, the information

disclosed on November 20, 2007 merely communicated bad news to the public.[12]

Plaintiff makes much of Syron's statement in the 2006 Annual Report that, "[a]t years

end, only 6 percent of our total mortgage portfolio was in nontraditional mortgages and the

---

[12]  In response to Plaintiff's argument that Freddie Mac's stock price drop was 27.77%
greater than the "industry's expected change," Freddie Mac explained that it is a monoline
company that only holds home mortgage products, unlike the other entities Plaintiff compared it
to in the market.  Because Freddie Mac's stock price was fully tied to the mortgage market, its
losses were greater than other, diversified entities.  ECF No. 325 at 118-119.

(4:08cv160)

portfolio's average loan-to-value ratio was 57 percent."  ECF No. 301 at 46-47; 325 at 95.

Plaintiff contends that the actual number of non-traditional mortgages at that time was 11.1%,

and cites to the March 20, 2007 Enterprise Risk Reports in support.  ECF No. 301 at 47.

However, the Enterprise Risk Report states, "[t]he portfolio is well-diversified and overall risk

remains low with the share of *untested* mortgage products (UMPs) in the portfolio having risen

from 10.1 percent at December 31, 2005, to 11.1 percent at December 31, 2006."  ECF No.

302-10 at 16 (emphasis added).  Even if "untested" and "non-traditional" are synonymous, as

Plaintiff alleges, Plaintiff still does not identify information disclosed on November 20, 2007 that

reveals to the public that the numbers in the previously released 2006 Annual Report had been

misstated.  *See Kuriakose*, 897 F.Supp.2d at 177 ("although some of Freddie Mac's statements

were ultimately proven wrong, they 'were accompanied by the underlying, accurate financial

data, so that [investors] could review the financial information and evaluate the risk for

themselves.'").

        In summary, Plaintiff does not allege how the disclosures made on November 20, 2007

were corrective or revealed a truth behind the alleged misrepresentations.  *See Omincare*, 583

F.3d at 944 ("a plaintiff must show that an economic loss occurred after the truth behind the

misrepresentation or omission became known to the market").  The Court must agree with

Defendant Freddie Mac's assessment:

> [the documents previously released by Freddie Mac] show that, both before and
> during the class period in this case, Freddie Mac expressly disclosed to investors
> the exact information that Plaintiff falsely alleges Freddie Mac did not disclose
> until November 20, 2007 . . . the Press Release does not even "mention"
> subprime, Alt-A or non-traditional mortgage products, "much less correct[]" any
> alleged prior misrepresentation regarding any such mortgage products.

17

(4:08cv160)

ECF No. 327 at 3-4 (quoting *Eaton Corp.*, 2014 WL 3397593, at *4).  The circumstances are no different for the individual Defendants.

The parties agree that, in the Sixth Circuit, loss causation requires some revelation to the public that caused harm.  Plaintiff had failed to identify such a revelation.  This is fatal to Count 1.

### III.

While acknowledging that Sixth Circuit case law requires a revelation, Plaintiff persists in arguing that it has adequately pleaded loss causation under the materialization of a concealed risk theory, a theory not adopted by the Sixth Circuit or persuasive to the Court.[13]  *See* ECF No. 301 at 75-76.  Plaintiff defines this theory as

> A method of pleading loss causation in which a plaintiff must allege that the loss was foreseeable (*i.e.*, "within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor"); and "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered . . *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." (Source: *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).)

ECF No. 318 at 5-6.

Plaintiff presents no binding authority supporting a theory of loss causation that does not

---

[13]  *See* note 5, *supra*.  *See also* ECF No. 308 at 33 (Cook's reply brief)("Plaintiff argues in the alternative that it may plead loss causation by alleging that a "materialized risk" caused a drop in the stock price. Opp. 86-87.  That is not the law in this Circuit.  *See D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 999 (6th Cir. 2005)"); *See also* ECF No. 306 at 9 (Freddie Mac's brief) (*"Under the controlling Sixth Circuit law on loss causation that Plaintiff ignores*, its Third Amended Complaint ("TAC") fails adequately to plead loss causation for one simple reason: Plaintiff fails to plead how the alleged falsity of any challenged statement was revealed to the market on or before November 20, 2007, when the Class Period ended.") (emphasis added).

(4:08cv160)

require a corrective revelation.  *See, e.g., In re Almost Family, Inc. Sec. Litig., 2012 WL 443461, at * 10-11 (W.D.Ky. Feb. 10, 2012)* (rejecting the plaintiff's materialization of a concealed risk theory, concluding that the plaintiffs "must show some revelation of Defendant's fraud [] in order to satisfy the pleading requirements of loss causation.)."  Perhaps more telling, even Plaintiff's definition of materialization of a concealed risk requires a disclosure or revelation of a misstatement or omission.

Because the Third Amended Complaint fails to plead loss causation—a showing of how Defendants' revelations caused Plaintiff's loss, a required element of a PSLRA claim—the Court need not consider whether the other elements are sufficiently pleaded.  Additionally, because Plaintiff's claim under § 10(b) and Rule 10b-5 (Count 1) is dismissed, Plaintiff's secondary claim for control person liability under § 20 is also dismissed.  *See Omnicare, 583 F.3d at 947*.

### B.  Leave to Amend Complaint

Plaintiff, in its brief opposing the individual Defendants' motions to dismiss, requests leave to file an amended complaint if the Court finds the Third Amended Complaint deficient.  ECF No. 302 at 98.  Permitting Plaintiff to amend the Third Amended Complaint would be futile.  Plaintiff is a sophisticated institutional investor.  Given the time and the obvious effort invested in this nearly six-year-old case, the Court has no bases to reasonably expect that Plaintiff can produce an improved pleading that would cure the fatal infirmary in the Third Amended Complaint.  Moreover, Plaintiff did not file a formal motion for leave to amend, instead requesting permission to amend the complaint "almost as an aside in their brief opposing Defendants' motions to dismiss."  *See D.E.& J. Ltd. P'ship, 133 Fed.App'x at 1001-02*

(4:08cv160)

(affirming the district court's ruling denying the plaintiffs' request to file a fourth amended

complaint).  A Plaintiff "cannot expect 'an advisory opinion from the Court informing them of

the deficiencies of the complaint and then an opportunity to cure those deficiencies.'" *Id*. at 1002

(quoting *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000)).

Accordingly, Plaintiff's request to amend the complaint a fourth time is denied.

## IV.  Conclusion

For the reasons explained above, the Court grants Defendants' Motions to Dismiss.  ECF

Nos. 289; 291; 292; 293; 295.  Accordingly, Plaintiff's Third Amended Complaint is dismissed

with prejudice and leave to file a fourth amended complaint is denied.


IT IS SO ORDERED.


 October 31, 2014                              */s/ Benita Y. Pearson*
Date                                            Benita Y. Pearson
                                                United States District Judge

20