**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, On Behalf of Itself and all Others Similarly Situated, | ) ) ) ) | |
| | ) | CIVIL ACTION NO. 4:08-CV-00160 |
| Plaintiff, | ) ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) ) | |
| | ) | MAGISTRATE JUDGE |
| FEDERAL HOME LOAN MORTGAGE CORPORATION, a/k/a FREDDIE MAC, RICHARD F. SYRON, PATRICIA L. COOK, ANTHONY S. PISZEL AND EUGENE M. McQUADE, | ) ) ) ) ) | WILLIAM H. BAUGHMAN, JR. |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S
MOTION TO SUBSTITUTE EXPERT ON THE ISSUE OF MARKET EFFICIENCY**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ................................................................................ 2

I.     DR. HALLMAN IS NOT UNAVAILABLE ........................................ 3

    A.     COUNTER STATEMENT OF FACTS
        ON DR. HALLMAN'S AVAILABILITY ........................................ 3

        1.     Dr. Hallman's Academic Job Responsibilities Have Not
               Increased Since He Submitted His Expert Report In This Case ............... 3

        2.     Charles River Associates Did Not
               Provide Support To Dr. Hallman On His Report ....................................... 4

        3.     McCombs Expressly
               Permitted Dr. Hallman To Work On This Case ......................................... 5

        4.     Dr. Hallman Has Continued To Do Extensive Expert Work .................... 6

        5.     Dr. Hallman Is Available To Appear For Testimony ............................... 8

    B.     THE ALLEGED REASONS FOR DR. HALLMAN'S
        UNAVAILABILITY DO NOT JUSTIFY EXPERT SUBSTITUTION ............. 10

II.    THERE HAS BEEN NO CHANGE IN MARKET
    EFFICIENCY LAW JUSTIFYING NEW EXPERT TESTIMONY ............................. 12

    A.     HALLIBURTON II DID NOT LOWER THE BAR
        A SECURITIES FRAUD PLAINTIFF MUST CLEAR
        IN ORDER TO ESTABLISH MARKET EFFICIENCY ................................... 13

    B.     EVENT STUDIES CONTINUE TO BE THE
        LEADING METHOD OF TESTING MARKET EFFICIENCY ....................... 17

III.   GRANTING THIS MOTION WOULD
    SUBSTANTIALLY PREJUDICE THE DEFENDANTS ............................................. 19

CONCLUSION ........................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

In re Accredo Health, Inc. Sec. Litig.,
    No. 03-cv-2216, 2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006) .........................................15

In re Arthrocare Corp. Sec. Litig.,
    No. 08-cv-00574 (W.D. Tex.)..................................................................................................6

Bennet v. Sprint Nextel Corp.,
    298 F.R.D. 498 (D. Kan. 2014)...........................................................................................18

Bentley v. Highlands Hosp. Corp.,
    No. 15-cv-00097, 2016 WL 5867496 (E.D. Ky. Oct. 6, 2016) .............................................11

Brown v. China Integrated Energy, Inc.,
    No. 11-cv-02559 (C.D. Cal.) .................................................................................................7

Carpenter's Pension Tr. of St. Louis v. Barclays PLC,
    310 F.R.D. 69 (S.D.N.Y. 2015) ..........................................................................................18

Crandall v. Hartford Cas. Ins. Co.,
    No. 10-cv-00127, 2012 WL 6086598 (D. Idaho Dec. 6, 2012).............................................11

Dean v. China Agritech,
    No. 11-cv-01331, 2012 WL 1835708 (C.D. Cal. May 3, 2012)............................................19

In re DePuy Orthopaedics Inc. - Pinnacle Hip Implant Prods. Liab. Litig.,
    No. 11-MD-2244 (N.D. Tex.)................................................................................................7

In re Diamond Foods Inc. Sec. Litig.,
    No. 11-cv-05386 (N.D. Cal.) .................................................................................................7

In re Freddie Mac Sec. Litig.,
    281 F.R.D. 174 (S.D.N.Y. 2012) ................................................................................ *passim*

In re Freddie Mac Sec. Litig.,
    No. 09-cv-832, 2012 WL 4435292 (S.D.N.Y. Sept. 26, 2012) .............................................12

Gay v. Waiters' & Dairy Lunchmen's Union,
    489 F. Supp. 282 (N.D. Cal 1980) ......................................................................................19

Green v. City & Cnty. of San Francisco,
    No. 10-cv-02649, 2015 WL 1738025 (N.D. Cal. Apr. 8, 2015)............................................11

Gulf Coast Shippers Ltd. P'Ship v. DHL Express (USA), Inc.,
    No. 09-cv-00221, 2013 WL 5739781 (D. Utah Oct. 22, 2013)...................................... *passim*

Halliburton Co. v. Erica P. John Fund, Inc.,
    134 S. Ct. 2398 (2014) ................................................................ *passim*

Leibel v. NCL (Bahamas) Ltd.,
    185 F. Supp. 3d 1354 (S.D. Fla. 2016) ............................................10, 19

Lilly v. Harris-Teeter Supermarket,
    545 F. Supp. 686 (W.D.N.C. 1982) ........................................................19

In re Marriage of K.R.J. & A.J.,
    No. 13-2647 (Tex. Dist. Ct.) ...................................................................7

Piskura v. TASER Int'l,
    No. 10-cv-00248, 2012 WL 1267990 (S.D. Ohio Apr. 13, 2012) ...........11

Plumbers & Pipefitters Nat'l Pension Fund v. Burns,
    967 F. Supp. 2d 1143 (N.D. Ohio 2013)................................................15

In re Polymedica Corp. Sec. Litig.,
    432 F.3d 1 (1st Cir. 2005)................................................................15, 16

Scheel v. Harris,
    No. 11-cv-0017, 2012 WL 3879279 (E.D. Ky. Sept. 6, 2012) ...............19

Smith v. Reynolds Transp. Co.,
    No. 11-cv-02728, 2013 WL 247714 (D.S.C. Jan. 23, 2013) ..................10

State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc.,
    No. 12-cv-11500, 2014 WL 10294798 (E.D. Mich. June 16, 2014) .........2

Taylor v. Dean,
    No. 05-cv-00397, 2007 WL 7622152 (M.D. Fla. Jan. 19, 2007) ..............11, 19, 20

Unishippers Global Logistics, LLC v. DHL Express (USA), Inc.,
    526 F. App'x 899 (10th Cir. 2013) .........................................................10

Unishippers Global Logistics, LLC, v. DHL Express (USA), Inc.,
    No. 08-cv-00894 (D. Utah)......................................................................6

United States v. Premo Pharm. Labs, Inc.,
    511 F. Supp. 958 (D.N.J. 1981) ............................................................19

Whiteside v. State Farm Fire & Cas. Co.,
    No. 11-cv-10091, 2011 WL 5084981 (E.D. Mich. Oct. 26, 2011)...........11

Worldwide Express v. DHL Express (USA), Inc.,
    No. DC-08-15314 (Tex. Dist. Ct.) ...........................................................6

## PRELIMINARY STATEMENT

OPERS contends that it should be allowed to replace its retained market efficiency expert, Dr. Greg Hallman, based on his purported unavailability for testimony, and reopen briefing on market efficiency in connection with its class certification motion.  OPERS's motion (the "Motion") is baseless and should be denied.  In fact, Dr. Hallman is not unavailable to do what little remaining work he may need to do in this case, i.e., appear for testimony on some unscheduled date in the future, on the lone issue on which he has opined: market efficiency.

Unsatisfied with Dr. Hallman's expert report, OPERS now seeks a "do-over" under the guise of his claimed unavailability and alleged changes to the law.  As set forth in Defendants' pending Daubert motion, Dr. Hallman relied on defective methodologies and made admissions at deposition that fatally undermine the accuracy and reliability of his opinions.  OPERS, understandably, would like to try to save its class certification motion by replacing Dr. Hallman.

As discussed below, however, Dr. Hallman's own statements, documents, and calendar demonstrate that the facts regarding his "unavailability" do not add up.  Similarly, since the date of his expert report, the law respecting market efficiency has not changed.  The bar that a plaintiff must clear in order to establish market efficiency remains exactly where it was when Dr. Hallman issued his report.  See infra Part II.A.  There is no ground for Dr. Hallman, let alone any new expert, to submit new expert evidence in this case on the issue of market efficiency.  Id.

The meritless nature of OPERS's demand for replacement of Dr. Hallman here is highlighted by the very case to which OPERS has selectively drawn the Court's attention:  Gulf Coast Shippers.[1]  In that case, the defendant, DHL, filed an earlier motion to replace Dr. Hallman

---

[1] Memo. in Support of Mot. for Leave to Name a New Expert on Class Certification Issues and Submit Add'l Expert Evidence on the Issue of Market Efficiency ("Memo.") at 3-4 (citing Gulf

on the ground of his alleged unavailability.  The non-movant argued, as Defendants could here: "[W]hat this motion really ought to be styled is motion to change expert that prepared [a] poor report and did bad[ly at his] deposition."[2]  Denying the motion, the court found that because, as here, Dr. Hallman had already submitted his report, been deposed, and needed only to make time for potential further testimony, there was no valid basis to grant DHL's motion: "[D]r. Hallman, for want of a better word, is a big boy. . . . I think in this case DHL has to dance with the one they brung.  I do think there's prejudice."  Id. at 81:4-5, 97:23-25.  That rationale applies with equal force here.

Granting to OPERS a second, unjustified opportunity to meet its evidentiary burden on market efficiency would be highly prejudicial, particularly given the costly work that Defendants performed over many months rebutting Dr. Hallman's opinions, and the substantial additional cost Defendants would need to incur in rebutting a new expert report on that issue.  Granting the Motion would also conflict with sound public policy and create troubling precedent.  Lacking good cause, OPERS's Motion should be denied.

## ARGUMENT

To substitute a new expert on market efficiency, OPERS must show good cause and that the substitution would not prejudice Defendants.[3]  It cannot do so for three reasons:

1. Dr. Hallman is not unavailable to perform the limited things necessary to complete his case-related obligations;

---

Coast Shippers Ltd. P'Ship v. DHL Express (USA), Inc., No. 09-cv-00221, 2013 WL 5739781 (D. Utah Oct. 22, 2013) ("Gulf Coast")).  As discussed below, OPERS has cited to a motion to replace Dr. Hallman that was granted later in the case on distinguishable facts.  See infra 9-10.

[2] Transcript of Oct. 14, 2011 Proceedings in Gulf Coast, 89:11-13, attached as Exhibit A to the Declaration of Emily E. Renshaw, Esq. ("Renshaw Decl.").

[3] See State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc., No. 12-cv-11500, 2014 WL 10294798, at *4-5 (E.D. Mich. June 16, 2014) (citing Inge v. Rock Fin. Corp., 281 F.3d 613, 625 (6th Cir. 2002)); Fed. R. Civ. P. 16 & 37.

2. There has not been any change in the law respecting market efficiency that would justify the submission of new evidence on market efficiency; and

3. Defendants would be substantially prejudiced were this Motion granted.

## I.      **DR. HALLMAN IS NOT UNAVAILABLE**

### A.      **COUNTER STATEMENT OF FACTS ON DR. HALLMAN'S AVAILABILITY**

The linchpin for OPERS's argument is Dr. Hallman's supposed unavailability.  OPERS asks the Court to permit "Dr. Feinstein to testify about market efficiency as a replacement for the **unavailable** Dr. Hallman."  Memo. at 6 (emphasis added).  "If this is permitted," OPERS argues, "it would also make sense to allow Dr. Feinstein to provide his own report on market efficiency" because, "due to [Dr. Hallman's supposed] **unavailability**, he will not be able to defend [his report] at any *Daubert* hearing, class certification hearing, or at trial."  Id. (emphasis added).  As the evidence shows, however, the contention that Dr. Hallman is indefinitely "unavailable" to testify is simply untrue.

### 1.      **Dr. Hallman's Academic Job Responsibilities Have Not Increased Since He Submitted His Expert Report In This Case**

Dr. Hallman is a professor at the McCombs School of Business, University of Texas at Austin ("McCombs"), a position he has held since 2002.  OPERS contends that "a few years ago," **after** Dr. Hallman did work in this case in mid-2012, his McCombs-related responsibilities changed dramatically.  Id.  OPERS asserts that Dr. Hallman is now, therefore, unavailable to appear even for a single day of testimony "at any *Daubert* hearing, class certification hearing, or at trial."  Id.  OPERS's representations are belied by the facts.

According to Dr. Hallman's own sworn affidavit testimony in the Gulf Coast case, the allegedly dramatic change in his University of Texas job responsibilities occurred well **before**, **not after**, OPERS retained him in **June 2012**.  Indeed, OPERS retained him knowing that his

work would accordingly need to be restricted to the market efficiency issue. In his <u>Gulf Coast</u> Affidavit, Dr. Hallman testified that, "[i]n **April 2011**" "[his] duties at the University changed dramatically," creating demands on his time that precluded his further participation in that case. <u>See</u> Renshaw Decl., Ex. B ¶ 2 (emphasis added).

Dr. Hallman now states that he is currently teaching two courses at McCombs in the fall semester, and three in the spring semester; that he is serving as the director of the Real Estate Finance and Investment Center, overseeing a student real estate investment ("REIT") fund; and that he is running two one-day conferences per year.[4] These job responsibilities are either the same as, or less taxing than, the ones he had **before** he undertook his engagement with OPERS in June 2012. <u>Compare</u> <u>Gulf Coast</u> Aff. ¶ 2 (as of April 2011, his job responsibilities broadened to include teaching **four** classes, not the two or three he now teaches; serving as the director of the Real Estate Finance and Investment Center; overseeing a REIT fund; attending meetings and conferences; accepting speaking engagements; and, as of April 2012, serving as Director of the Masters in Finance program), <u>with</u> Hallman Report in this case, Renshaw Decl., Ex. C ¶ 2 (his academic responsibilities at McCombs then included teaching four classes and serving as the McCombs REIT fund Director, a Director of the Masters in Finance program, and a member of the McCombs MBA Investment Fund advisory committee).

### 2. Charles River Associates Did Not Provide Support To Dr. Hallman On His Report

OPERS's other excuses for Dr. Hallman's alleged unavailability are just as empty. For example, it contends that Dr. Hallman "is no longer associated with the economic consulting group of Charles River Associates, and he no longer has the staff used on his prior report, so he

---

[4] Dkt. No. 355-3, ¶ 2 (Dec. 13, 2016 Declaration of Dr. Greg Hallman) ("Hallman Decl.").

does not have the support necessary for further analysis." Memo. at 2. This contention is irrelevant, if not misleading, as it contradicts Dr. Hallman's expert report in this case ("Charles River is not working with me on this matter"),[5] and his deposition testimony in this case (testifying that he had not taken any new work from Charles River since 2010).[6]

Similarly unavailing is the contention that Dr. Hallman's colleague, Professor Jay Hartzell, is unavailable to provide expert assistance. Professor Hartzell's current curriculum vitae prominently states that he currently performs expert witness and consulting work. See Renshaw Decl., Ex. E. Moreover, these "lack of assistance" contentions are irrelevant to Dr. Hallman's ability to appear to testify, and given the seniority of his positions at McCombs and all the expert work he has done in the past six years, see infra 6-8, it strains credulity to suppose that he is unable to obtain any support.[7]

### 3. McCombs Expressly Permitted Dr. Hallman To Work On This Case

OPERS's argument that Dr. Hallman is unavailable because "the University expects him to focus on his responsibilities there" is also meritless. Memo. at 2. Putting aside the extensive expert work he has done recently, see infra 7-8, OPERS's contention is again at odds with Dr. Hallman's prior sworn testimony. In his Gulf Coast Affidavit, Dr. Hallman explained that, given the prior increase in his duties at McCombs, he specifically asked for, and received, "the permission of the [McCombs] Finance Department" to work on this Freddie Mac case before accepting the engagement. Renshaw Decl., Ex. B ¶ 13. He got that approval by agreeing to opine solely on the market efficiency issue:

---

[5] Renshaw Decl., Ex. C ¶ 2.

[6] Id., Ex. D at 15:23-16:4.

[7] Of course, OPERS has not stated that there is any reason why it could not hire Charles River or another economic consulting firm to provide any assistance that would be needed (although none is needed).

> In [the OPERS litigation], I agreed to serve as an expert **because** defense counsel indicated that my services would be **limited to providing testimony on market efficiency**, as opposed to performing any computational damages analysis.  In other words, the job did not require me to compile a damages schedule, review financial documents or other schedules, and **it did not require the involvement of other expert analysts or support** as is typical for expert damages work.[8]

Of course, that testimony is also at odds with OPERS's representation that, when it retained Dr. Hallman, "Plaintiff's Counsel assumed that Dr. Hallman would later render opinions on loss causation and damages . . . ."  Memo. at 2.

**4.      Dr. Hallman Has Continued To Do Extensive Expert Work**

OPERS's last excuse—that, "since [Dr. Hallman] provided [the OPERS] report, [he has] moved out of this of type litigation consulting work and into full-time duties with the University," Hallman Decl. ¶ 6—likewise lacks factual basis.  As the chronology below shows, Dr. Hallman has accepted many new expert engagements and performed extensive expert work after his job responsibilities changed dramatically (i.e., April 2011):

| Date | Expert Engagement or Work Performed[9] |
|------|----------------------------------------|
| April 2011 | Engaged as expert in market efficiency in In re Arthrocare Corp. Securities Litigation, No. 08-cv-00574 (W.D. Tex.) |
| May 2011 | Trial testimony in Worldwide Express v. DHL Express (USA), Inc., No. DC-08-15314 (Tex. Dist. Ct.) |
| May 2011 | Engaged in Gulf Coast |
| July 2011 | Trial testimony in Unishippers Global Logistics, LLC, v. DHL Express (USA), Inc., No. 08-cv-00894 (D. Utah) |
| August 2011 | Report submitted in Gulf Coast |
| September 2011 | Deposition testimony in Gulf Coast |
| November 2011 | Market efficiency/damages report submitted in Arthrocare Sec. Litig. |
| May 2012 | Engaged as consulting expert in Velocity v. MHD |
| June 2012 | Engaged in Freddie Mac |

---

[8] Id. ¶ 10 (emphasis added).

[9] Unless otherwise noted, entries are derived from Dr. Hallman's Amended Response to Defendant's Subpoena (Jan. 10, 2017), attached as Exhibit F to the Renshaw Declaration.

| Date | Expert Engagement or Work Performed[9] |
|------|----------------------------------------|
| August 2012 | Report submitted in Freddie Mac |
| December 2012 | Deposition testimony in Freddie Mac |
| March 2013 | Engaged as market efficiency consulting expert in In re Diamond Foods Inc. Securities Litigation, No. 11-cv-05386 (N.D. Cal.) |
| November 2013 | Engaged as consulting expert in Wickline (valuation matter) |
| August 2014 | Engaged in In re Marriage of K.R.J. & A.J., No. 13-2647 (Tex. Dist. Ct.) |
| September 2014 | Engaged as a market efficiency consulting expert in Brown v. China Integrated Energy, Inc., No. 11-cv-02559 (C.D. Cal.) |
| December 2014 | Report submitted in K.R.J. |
| December 2014 | Deposition testimony in K.R.J. |
| December 2014 | Trial testimony in K.R.J. |
| March 2015 | Engaged in In re DePuy Orthopaedics Inc. - Pinnacle Hip Implant Prods. Liab. Litig., No. 11-MD-2244 (N.D. Tex.) |
| August 2015 | Report submitted in DePuy Orthopaedics |
| September 2015 | Engaged as a consulting expert in Herbalife Ltd. v. KPMG, LLP |
| October 2015 | Deposition testimony in DePuy Orthopaedics |
| February 2016 | DePuy Orthopaedics engagement ends |
| March 2016 | Herbalife consulting engagement ends |
| June 29, 2016 | Dr. Hallman holds a meeting concerning prospective new expert witness work in a litigation matter, reflected in his professional calendar as: <br> • "meet [REDACTED] and attorney re **new case**" <br> • "meeting with [REDACTED] and [REDACTED] - **expert witness**." <br> Renshaw Decl., Ex. G at DGH000219 (emphasis added) |
| July 20, 2016 | Sixth Circuit reverses and remands this case |
| "Shortly following the opinion of the Sixth Circuit" Dkt. No. 355-4. | Counsel for OPERS "contact[s] Dr. Hallman regarding work going forward on market efficiency and related matters. . . . Dr. Hallman indicated that he was unavailable going forward and that he had in fact not been engaged for several years in the type of litigation consulting for which [OPERS's counsel] intended to use him." Id. |
| August 18, 2016 | Dr. Hallman holds a telephone conference concerning prospective new expert witness work in a litigation matter, reflected in his calendar as: <br> • "call [REDACTED] punis [i.e., punitive damages] in **new matter**" <br> Renshaw Decl., Ex. G at DGH000232 (emphasis added) |

In his Gulf Coast Affidavit, dated September 5, 2013, Dr. Hallman represented to the

court: "I have not taken on new active expert matters and, unless and until my duties at the

University change, I have told DHL's counsel that I have no interest in doing any further work on this case, and I do not foresee that changing." Renshaw Decl., Ex. B ¶ 15. Even though his duties at the University did not subsequently change, Dr. Hallman immediately thereafter took on several new and substantial engagements in November 2013, August 2014, September 2014, March 2015, and September 2015. Accordingly, little credence can be placed on Dr. Hallman's representation here that he no longer intends to perform additional expert work.

Indeed, contrary to OPERS's contention that Dr. Hallman "is no longer providing this type of consulting," Memo. at 2, his own **current** LinkedIn profile states that he specializes in, inter alia, "**litigation consulting and expert testimony** in commercial damages and **securities**." See Renshaw Decl., Ex. H (emphasis added). Dr. Hallman has continued to take on new expert engagements and perform new expert work since 2012, even attending meetings for a potential new expert engagement as recently as this past summer. In the past two years alone, Dr. Hallman has performed extensive expert work in **four** different cases, submitting two expert reports, sitting for two depositions, and testifying in a trial, yet he somehow can do no further work at all in **this** case. See id., Ex. F at 4-6. Given his extensive recent expert work, OPERS's claim that Dr. Hallman is unable to appear for even a day of testimony to answer questions regarding his own opinions is ludicrous.

### 5. Dr. Hallman Is Available To Appear For Testimony

As to Dr. Hallman's availability to testify, OPERS represents that Dr. Hallman's academic obligations are so all-consuming that "due to his unavailability, he will not be able to defend his expert opinion on market efficiency at any *Daubert* hearing, class certification hearing, or at trial," even though no testimony is even scheduled. Memo. at 6.

As the foregoing chart shows, for the past six years Dr. Hallman has consistently been able to make himself available to testify at deposition or trial, and to do extensive other expert

8

work.  In this case alone, Dr. Hallman had no difficulty appearing for a deposition on his report on December 7, 2012, and making time for a deposition in his effort to be excused from this case.  Renshaw Decl., Ex. I at 1 (stating that he "could get downtown most anytime [during his preferred week of January 9] you guys want to talk").

Further, over the last six years, Dr. Hallman has begun his expert engagements in March, April, May, June, July, August, September, and November, and has performed work on his cases in every single month of the year.  Dr. Hallman's professional calendar for the months during McCombs's 2017 spring semester (i.e., January through May 2017) reveals only 29 out of 104 work days containing appointments.  Id., Ex. G at DGH000273-289.  Beyond that, Dr. Hallman's calendar for the following 19 months (i.e., June 2017 through December 2019) contains **only a single** appointment.  Id. at DGH000290-320.  Thus, Dr. Hallman plainly is not indefinitely "unavailable" to appear for a day of testimony.

Gulf Coast illustrates the point and supports the conclusion that Dr. Hallman's schedule and responsibilities are not a basis for his withdrawal and replacement at this stage of the case.  As to this issue, the magistrate judge refused to allow Dr. Hallman to withdraw, because there, like here, all that was left for him to do was to testify at trial:

> But I'm assuming that Mr. Hallman, for want of a better word, is a big boy. You know, it seems to me that he's created a career for himself, for want of a better word. Part of that is – part of the building block is he wants to do expert testimony, he wants to teach, he wants to maybe write. I don't know what all of his aspirations and aspects are.  But – and obviously there are always conflicts and priorities that, you know, weigh against one another. But it seems to me that from a professional standpoint, being a professional, you know, he's taken on a job for DHL. And he's halfway through the job, so to speak, and all of a sudden, he says, Well, I've got other priorities. I don't want to show up anymore. I've got to tell you that's not very impressive to me in terms of Dr. Hallman's willingness to follow through on his professional responsibilities.
>
> *      *      *
>
> I think that I'm going to deny the motion to amend the scheduling order. I think in this case DHL has to dance with the one they brung. **I do think there's**

**prejudice**. I'm sensitive to Dr. Hallman's concerns. But I think he's a professional, and I think that he's – has to understand that when he takes on these kinds of assignments and – and so on that he needs to see it through.[10]

The magistrate judge's decision was affirmed by the District Court and later reaffirmed by a second District Court to which the case was transferred.  Gulf Coast, Dkt. Nos. 370, 386. OPERS does not mention that the same arguments it makes here concerning Dr. Hallman's responsibilities, schedule, and unavailability were expressly rejected in Gulf Coast.

After these rulings, the District Court allowed a new expert to substitute for Dr. Hallman, but only after the issuance of the Tenth Circuit's decision in a related case, Unishippers Global Logistics, LLC v. DHL Express (USA), Inc., 526 F. App'x 899 (10th Cir. 2013), which the District Court found to have changed the relevant law, and required the expert witnesses for the parties to submit entirely new expert reports and appear for a second round of depositions.  See Gulf Coast, 2013 WL 5739781, at *1.  As demonstrated in Part II, there is no such change in the law on the issue Dr. Hallman is addressing—market efficiency—that could justify his substitution here.

**B.  THE ALLEGED REASONS FOR DR. HALLMAN'S UNAVAILABILITY DO NOT JUSTIFY EXPERT SUBSTITUTION**

Courts permit substitution of a new or belated expert opinion only where a completely unexpected and legally or physically debilitating event prevents the original expert from testifying.  See Leibel v. NCL (Bahamas) Ltd., 185 F. Supp. 3d 1354, 1356 (S.D. Fla. 2016) (collecting cases where expert substitution was permitted where the designated expert: developed a legal conflict of interest; was suffering from leukemia; had been arrested and imprisoned; and developed Alzheimer's disease); Smith v. Reynolds Transp. Co., No. 11-cv-02728, 2013 WL 247714, at *3 n.4 (D.S.C. Jan. 23, 2013) (denying motion to substitute, but noting that "this court

---

[10] Renshaw Decl., Ex. A at 81; 97-98 (emphasis added).

has found good cause for belated substitution where a party promptly informs the court that a previously identified expert cannot serve due to illness, injury, or other unanticipated event").[11] Courts also have allowed substitution where the expert unexpectedly is completely unreachable in advance of a scheduled event.[12]  OPERS fails to identify any such circumstance, there is no scheduled hearing date for which Dr. Hallman is allegedly unavailable, and there may never be such a hearing date.  Furthermore, the one case that OPERS describes as the "closest analogy Plaintiff could find," Memo. at 4, is factually inapposite.[13]

Conversely, a party's dissatisfaction with its expert does not constitute good cause to substitute.  See, e.g., Crandall v. Hartford Cas. Ins. Co., No. 10-cv-00127, 2012 WL 6086598, at *3 (D. Idaho Dec. 6, 2012) (party's regret that expert's opinions will not withstand summary judgment—i.e., "buyer's remorse"—is not good cause to replace expert); Taylor v. Dean, No. 05-cv-00397, 2007 WL 7622152, at *5-6 (M.D. Fla. Jan. 19, 2007) (party may not "revamp its case by obtaining another expert simply because their disclosed expert turned out not to be an effective witness," where substitution would require "[d]efendants [to] incur additional expense and . . . result in . . . further delay"); cf. Bentley v. Highlands Hosp. Corp., No. 15-cv-00097, 2016 WL 5867496, at *4 (E.D. Ky. Oct. 6, 2016) (belated tactical expert disclosures permit "an

---

[11] Whiteside v. State Farm Fire & Cas. Co., No. 11-cv-10091, 2011 WL 5084981 (E.D. Mich. Oct. 26, 2011), cited by OPERS, illustrates the point.  There, the court permitted substitution for a witness who had suffered life threatening injuries in a motorcycle crash, and the moving party notified opposing counsel **five days** after learning of its expert's unavailability.  Id. at *1-2. Conversely, Dr. Hallman's own sworn statements and his expert report reveal that OPERS was aware of Dr. Hallman's other professional responsibilities prior to the issuance of his expert report in 2012, over four years ago.  See supra Parts I.A.1, 3.

[12] See, e.g., Piskura v. TASER Int'l, No. 10-cv-00248, 2012 WL 1267990, at *5 (S.D. Ohio Apr. 13, 2012) (no communication from expert for three months preceding expert's deposition).

[13] Green v. City & Cnty. of San Francisco, No. 10-cv-02649, 2015 WL 1738025 (N.D. Cal. Apr. 8, 2015) (court did not address a motion to substitute an expert, but rather held that substitute expert's report stayed within parameters of original expert's report, after the parties had **stipulated** to the original expert's unavailability).

end-run around the normal timetable for conducting discovery" and risk "invit[ing] the very gamesmanship [expert disclosure deadlines were] meant to curtail").

Here, OPERS has failed to identify any unexpected and legally or physically debilitating event that precludes Dr. Hallman's testimony, but rather it appears OPERS is merely dissatisfied with its expert. OPERS's attempted expert swap is highly reminiscent of events in a separate but analogous securities case against some of the same defendants here. In <u>In re Federal Home Loan Mortgage Corporation Securities Litigation</u>, the Southern District of New York found similar arguments unpersuasive. 281 F.R.D. 174 (S.D.N.Y. 2012). There, the court denied plaintiff's motion for class certification based on its failure to demonstrate that the market for Freddie Mac's preferred stock was efficient. <u>Id.</u> at 182. The court later denied plaintiff's request for leave to file a renewed class certification motion and substitute its expert, explaining: "Plaintiff was free to choose his most persuasive expert in support of class certification. A plaintiff who wants to lead a class action should be prepared to put his best foot forward on the initial application." No. 09-cv-832, 2012 WL 4435292, at *1. Similarly, OPERS had the opportunity to choose its most persuasive expert in support of its class certification motion. That OPERS is now dissatisfied with its choice is not a sufficient ground for allowing it to substitute a new expert, and subjecting the Defendants to the substantial prejudice arising out of that action.

## II.  THERE HAS BEEN NO CHANGE IN MARKET EFFICIENCY LAW JUSTIFYING NEW EXPERT TESTIMONY

Contrary to OPERS's assertion, <u>Halliburton Co. v. Erica P. John Fund, Inc.</u>, 134 S. Ct. 2398 (2014) ("<u>Halliburton II</u>"), did not have a "dramatic impact" on a plaintiff's burden of establishing the existence of an efficient market in a corporate defendant's securities, and does not justify allowing OPERS to replace Dr. Hallman and have Dr. Feinstein "provide his own report on market efficiency under **current legal standards**." Memo. at 6 (emphasis added). In

fact, the applicable standards have not changed.

### A. HALLIBURTON II DID NOT LOWER THE BAR A SECURITIES FRAUD PLAINTIFF MUST CLEAR IN ORDER TO ESTABLISH MARKET EFFICIENCY

In 1988, the Supreme Court held in Basic that "securities fraud plaintiffs can in certain circumstances satisfy the reliance element of a Rule 10b-5 action by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." Halliburton II, 134 S. Ct. at 2408 (citing Basic Inc. v. Levinson, 485 U.S. 224 (1988)).  The presumption of fraud is premised on the "efficient capital markets hypothesis," which holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" Id. (citing Basic, 485 U.S. at 246).  Twenty-eight years later, the Supreme Court in Halliburton II confirmed that Basic is still the law:

> [E]ven though the efficient capital markets hypothesis may have "garnered substantial criticism since Basic," [defendant] has not identified the kind of fundamental shift in economic theory that could justify overruling a precedent on the ground that it misunderstood, or has since been overtaken by, economic realities.

Id. at 2410.  Halliburton II did not lower the bar a plaintiff must clear on market efficiency, as OPERS contends.

What Halliburton II did do, and what it is widely cited for, was hold that if a plaintiff successfully establishes market efficiency, a defendant can seek to rebut the presumption of reliance by introducing evidence on price impact.  Id. at 2415-17.[14]  In other words, Halliburton II added a tool for defendants, not plaintiffs, to use at the class certification stage.

OPERS and Dr. Feinstein rely on one sentence from Halliburton II in support of their assertion that Halliburton II somehow "clarified" Basic and lowered the market efficiency bar,

---

[14] The price impact holding is not relevant here, where Defendants do not intend to submit additional evidence on price impact.

but rather than clarifying Basic, the Court directly quotes the opinion; it does not change it:  "The [Basic] Court instead based the presumption on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"  134 S. Ct. at 2410 (citing Basic, 485 U.S. at 247 n.24) (cited at Feinstein Decl. ¶ 19).  Nor does OPERS cite a single case in support of its assertion, and an exhaustive survey by Defendants of post-Halliburton II decisions has not located one either. In short, one solitary sentence in Halliburton II that, literally, quotes law that the Supreme Court set forth in Basic, 28 years ago, cannot effect a change in the law.  OPERS has cited no subsequent case stating that Halliburton II lowered the market efficiency bar, and Defendants are not aware of one.

Lacking any textual or case law support, OPERS cites a lone law review article[15] and otherwise relies exclusively on the unsupported assertions of its own proposed new expert:

> But, as one commentator noted, the "most enlightening conceptual contribution made by the majority opinion in Halliburton II is on market efficiency."  In particular, Chief Justice Roberts' opinion "stresses that the efficiency question is not to be particularly rigorous – 'generalized' efficiency is sufficient, not some idealized vision of hyper-efficiency.  On this, he is clearly right."[16]

The quoted passage, however, does not state that Halliburton II changed any standard.  In fact, the sentences framing the quoted language acknowledge otherwise:  "Do developments in our contemporary understanding of stock market efficiency . . . call into question Basic's fundamental assumptions?  **The Chief Justice's answer in Halliburton II is no** . . . ."  Judgment Day at 51-52 (emphasis added).  Moreover, nothing in this passage is quoted from Halliburton II—the words "rigorous,"  "idealized," and "hyper-efficiency" are Dr. Langevoort's words.

---

[15] Donald C. Langevoort, Judgment Day v. Fraud-on-the-Market: Reflections on Amgen and the Second Coming of Halliburton, 57 Ariz. L. Rev. 37 (2015) ("Judgment Day").

[16] Memo. at 5-6 n.1 (citing Judgment Day, 57 Ariz. L. Rev. at 51).

Even the word "generalized," despite appearing as a direct quote, is not found in <u>Halliburton II</u>.

Other than Dr. Langevoort's law review article, OPERS's sole support for <u>Halliburton II</u>'s asserted "dramatic impact on market efficiency" is Dr. Feinstein's own affidavit.  <u>See</u> Memo. at 5.  Dr. Feinstein claims that <u>Halliburton II</u> changed the law by only requiring a showing of informational efficiency rather than fundamental efficiency.  Feinstein Decl. ¶ 20.  As Defendants' expert, Dr. Mukesh Bajaj, explains in his affidavit submitted herewith, Dr. Feinstein's claim is incorrect.  Affidavit of Dr. Mukesh Bajaj ("Bajaj Aff."), Section B.

In fact, nothing has changed because fundamental efficiency has **never been required** to establish the fraud-on-the-market presumption of reliance, and Dr. Feinstein stated as much in an amicus brief he co-authored in <u>Halliburton II</u>, where he wrote:  "To trigger the [fraud-on-the-market] presumption, plaintiffs generally must meet the multi-factor test developed in [<u>Cammer</u>] . . . The factors of the test are valid indicators that the market for a stock is **informationally efficient**."[17]  In his <u>Petrobras</u> report, Dr. Feinstein made clear that informational efficiency has always been the standard:  "An efficient market, **as defined by *Cammer, Basic, Amgen*,**. . . is a market in which publicly-available information is rapidly incorporated into the price of a security such that the trading price reflects all publicly-available information."[18]  "Informational efficiency" was precisely what Dr. Hallman's event study was designed to assess.  Renshaw

---

[17] Brief of Testifying Economists, No. 13-317, 2014 WL 507164, at *2 (U.S.); <u>see also</u> <u>In re Polymedica Corp. Sec. Litig.</u>, 432 F.3d 1, 16 (1st Cir. 2005) ("[F]or purposes of establishing the fraud-on-the-market presumption of reliance, investors need only show that the market was informationally efficient."); <u>Plumbers & Pipefitters Nat'l Pension Fund v. Burns</u>, 967 F. Supp. 2d 1143, 1154 (N.D. Ohio 2013) ("For purposes of the fraud-on-the-market theory, market efficiency means that 'prices will reflect all relevant information, a definition of efficiency known as informational efficiency.'"); <u>In re Accredo Health, Inc. Sec. Litig.</u>, No. 03-cv-2216, 2006 WL 1716910, at *10 (W.D. Tenn. Apr. 19, 2006) ("[T]he few cases that have addressed this issue have squarely rejected this fundamental value approach . . . .") (collecting cases).

[18] Report on Market Efficiency of Dr. Feinstein, No. 14-9662, 2015 WL 93936757, ¶ 47 (S.D.N.Y. Oct. 15, 2015).

Decl., Ex. C ¶¶ 19-20.  As Dr. Feinstein has acknowledged, the law governing informational efficiency has not changed.  Therefore, it is no surprise that, despite his claim of a "substantial development" in the "legal, academic, and practitioner arenas" since <u>Halliburton II</u>, he does not cite a single case, treatise, or economic publication to support that claim.  Notably, Dr. Bajaj, who has testified on issues of market efficiency both before and after <u>Halliburton II</u>, is not aware of any change in the definition of, or the standard applied to, market efficiency since <u>Halliburton II</u>.  Bajaj Aff. ¶ 17.

Dr. Feinstein's contention that <u>Halliburton II</u> changed the law is based on the very same quote OPERS uses in its brief, which as noted above, is a direct quote from the Supreme Court's 1988 decision in <u>Basic</u>.[19]  That sentence merely sets forth what the law respecting market efficiency has been since 1988.  It does not evidence any change to the evidentiary showing a plaintiff must make to establish market efficiency.  Bajaj Aff. ¶ 18.

As Dr. Bajaj explains, it was well understood, long before <u>Halliburton II</u>, that for purposes of securities fraud cases, only informational efficiency is required to prove reliance.  Bajaj Aff. ¶ 19.  As the <u>Polymedica</u> court explained in 2005:  "[F]or purposes of establishing the fraud-on-the-market presumption of reliance, investors need only show that the market was informationally efficient."  <u>In re Polymedica</u>, 432 F.3d at 16.

Significantly, as a matter of practice, Dr. Feinstein's interpretation of <u>Halliburton II</u> is demonstrably incorrect.  If <u>Halliburton II</u> had changed the law relating to what securities plaintiffs needed to demonstrate to establish market efficiency, we would have expected to see a flurry of activity in the courts, where experts were required to submit revised reports and parties relitigated recently briefed or recently decided class certification matters.  Neither counsel for the

---

[19] Feinstein Decl. ¶ 19 (quoting <u>Halliburton II</u>, which quoted <u>Basic</u>, 485 U.S. at 247 n. 24).

Defendants—experienced practitioners in securities cases—nor Dr. Bajaj observed any such flurry of activity.  Bajaj Aff. ¶ 21.  That is because no such flurry of activity occurred.

Although <u>Halliburton II</u> was decided three years ago, counsel for Defendants and Dr. Bajaj are unaware of any case in which, in the aftermath of that ruling, a plaintiff was granted leave to submit new or supplemental expert evidence on the market efficiency issue, based on the contention that <u>Halliburton II</u> altered the law governing the evidentiary showing a plaintiff must make to establish market efficiency.  <u>Id.</u> ¶ 22.  Were the Court in this case to issue such a ruling, it would be the first in the nation to do so.  <u>Id.</u>

In short, Dr. Feinstein's interpretation of the implications of the <u>Halliburton II</u> decision is simply incorrect; "informational efficiency" was always the standard for proving reliance, and <u>Halliburton II</u> did not change that law.  <u>Id.</u> ¶ 23.  There are simply no new legal standards justifying Dr. Hallman's substitution.

**B.    EVENT STUDIES CONTINUE TO BE THE
<u>LEADING METHOD OF TESTING MARKET EFFICIENCY</u>**

OPERS also argues that a new market efficiency analysis by Dr. Feinstein is warranted because event studies, of the type previously conducted by Dr. Hallman, are not "required to show market efficiency."  Memo. at 6.  Yet, Dr. Feinstein states that he "generally support[s]" the "methodology and conclusions" of Dr. Hallman's event study, and that, were he permitted to serve as OPERS's new expert on market efficiency, he, too, would conduct his own event study.  Feinstein Decl. ¶¶ 27-28.[20]  Just because Dr. Feinstein would "prefer" to conduct his own event study does not provide good cause for OPERS's redoing the event study that Dr. Hallman has

---

[20]  Dr. Feinstein concedes that an event study is the "preeminent empirical test of market efficiency."  <u>Id.</u> ¶ 16; <u>see also</u> Bajaj Aff. ¶ 14 (event study remains the "gold standard").

already done and that has been the subject of substantial study and discovery.[21]

The only other purported justification provided by OPERS for an expert substitution is Dr. Feinstein's assertion that the "substantial developments" that he identified—which, as discussed above, did not occur—"beckoned the application of new empirical tests."  Feinstein Decl. ¶ 21.  "Accordingly," Dr. Feinstein claims, "new empirical tests" relating to market efficiency—the "Z-test," "the Ansari-Bradley test, F-test, and Binomial test,"—"have been created," which "[v]ery recently" "have been gaining more widespread use and acceptance by courts."  Id. ¶¶ 21-23.  These proposed "additional tests" are neither new nor relevant.  See Bajaj Aff. ¶¶ 29-33.

To the contrary, these tests were available to Dr. Hallman in 2012, and he could have used any of these tests at the time he submitted his report.  Id. ¶ 26.  Dr. Hallman actually **did use** an F-test, and he discusses it in his original report.  Renshaw Decl., Ex. C ¶ 28.  Likewise, the use of the Z-test for market efficiency purposes was proposed in 2004, long before Dr. Hallman's reports in this matter.  Id.; see also In re Freddie Mac Sec. Litig., 281 F.R.D. 174 (S.D.N.Y. 2012) (decided before Halliburton II, plaintiffs sought to use the Z-test five months before Dr. Hallman's report in this case); Bajaj Aff. ¶ 31.

The two other tests Dr. Feinstein mentions also predate Halliburton II by decades.  See Bajaj Aff. ¶ 32.  The binomial test and the F-test, along with the Z-test, have all been cited by

---

[21] The cases that OPERS cites on this point are also inapposite here.  In both Bennet v. Sprint Nextel Corp., 298 F.R.D. 498 (D. Kan. 2014), and Carpenter's Pension Trust of St. Louis v. Barclays PLC, 310 F.R.D. 69 (S.D.N.Y. 2015), the courts made no statement that Halliburton II changed the market efficiency analysis or somehow limited the purpose of an event study at the class certification stage.

18

courts for over 30 years.[22]  And Dr. Feinstein tried unsuccessfully to use the Ansari-Bradley test in **2012**, before the 2014 decision in Halliburton II and before Dr. Hallman issued his report in this case.[23]  Nothing in Halliburton II suggests the use of these "additional tests" to establish market efficiency, nor does Dr. Feinstein cite any support for his claim that their use to establish market efficiency has increased since Halliburton II.

In sum, in 2012, OPERS could have chosen Dr. Feinstein to opine on market efficiency, but it did not, instead choosing Dr. Hallman.  The legal standards and accepted economic principles that were applicable to Dr. Hallman's opinion at that time are the same legal standards and economic principles that apply today, and OPERS has not identified any change in either that justifies an expert substitution or new testimony on market efficiency.

## III.  GRANTING THIS MOTION WOULD SUBSTANTIALLY PREJUDICE THE DEFENDANTS

Courts frequently deny motions to substitute experts where, as here, the opponent has expended substantial resources responding to the previously-disclosed opinions of a party's original expert.  See, e.g., Leibel, 185 F. Supp. 3d at 1358 n.7 (denying motion to substitute where "Defendant expended significant resources filing [two motions based on the original expert's opinions]"); Scheel v. Harris, No. 11-cv-0017, 2012 WL 3879279, *11 (E.D. Ky. Sept. 6, 2012) (additional discovery, briefing, and delay "would be unfair to [defendant], whose reliance on the Scheduling Order was reasonable and justified"); Taylor, 2007 WL 7622152, at *5-6 (granting motion to strike substituted expert opinion, which would require "[d]efendants

---

[22] See, e.g., Gay v. Waiters' & Dairy Lunchmen's Union, 489 F. Supp. 282 (N.D. Cal 1980) (Z-test); Lilly v. Harris-Teeter Supermarket, 545 F. Supp. 686 (W.D.N.C. 1982) (binomial test); United States v. Premo Pharm. Labs, Inc., 511 F. Supp. 958 (D.N.J. 1981) (F-test).

[23] See Dean v. China Agritech, No. 11-01331, 2012 WL 1835708, at *7 (C.D. Cal. May 3, 2012) (denying plaintiff's motion for class certification, which was based on a report by Dr. Feinstein that sought to establish market efficiency through use of F-test and Ansari-Bradley test).

[to] incur additional expense and . . . result in . . . further delay").

Here, the parties have already engaged over a seven-month period in significant expert efforts related to Dr. Hallman's opinions, including:

- Extensive document discovery propounded on both Dr. Hallman and Dr. Bajaj;

- Defendants' counsel deposing Dr. Hallman for a full day;

- Defendants' hiring an expert of their own, Dr. Bajaj, to file a report rebutting the Hallman Report.  Dkt. No. 214;

- Plaintiff's counsel deposing Dr. Bajaj for a full day;

- OPERS seeking leave to file an 88-page rebuttal report of Dr. Hallman, Dkt. No. 223; which this Court denied on February 8, 2013.  Dkt. No. 227;

- OPERS seeking leave to file a supplemental expert declaration, or, in the alternative, the previously stricken Hallman rebuttal report, Dkt. No. 234, to which Defendants filed an opposition, Dkt. No. 235, and OPERS filed a reply brief, Dkt. No. 236, and which this Court denied without prejudice to refiling at a later date.  Unnumbered docket entry dated Aug. 23, 2013 ("Aug. 23 Order").

- Defendants' filing a motion to exclude the Hallman Report, Dkt. Nos. 229 & 230, which the Court held in abeyance.  Aug. 23 Order.

It would be highly prejudicial to the Defendants to render all of their work a nullity, and to force them to expend substantial additional time and resources on the exact same issue that was the subject of this extensive prior work.  See, e.g., Taylor, 2007 WL 7622152, at *5-6 (denying plaintiff opportunity to "revamp his case" through substituted testimony where it would prejudice defendants by forcing them to take additional depositions, obtain additional experts, prepare additional expert reports, and file new briefing).  Moreover, granting the Motion on these facts regarding Dr. Hallman's availability would create troubling precedent that would sanction such gamesmanship and encourage similar tactics.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court deny OPERS's Motion.

Dated:  January 20, 2017

**FEDERAL HOME LOAN MORTGAGE CORPORATION**

By its attorneys,

*/s/ Hugh E. McKay*
Hugh E. McKay (0023017)
PORTER WRIGHT MORRIS & ARTHUR LLP
950 Main Avenue, Suite 500
Cleveland, OH 44113
Tel:  (216) 443-2580
Fax:  (216) 443-9011
E-mail: hmckay@porterwright.com

Jordan D. Hershman
Jason D. Frank
William R. Harb
Emily E. Renshaw
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA  02110-1726
Tel: (617) 951-8455
Fax: (617) 951-8736
E-mail: jordan.hershman@morganlewis.com
E-mail: jason.frank@morganlewis.com
E-mail: william.harb@morganlewis.com
E-mail: emily.renshaw@morganlewis.com

**RICHARD F. SYRON**

By his attorneys,

*/s/ Frank R. Volpe*
John C. Fairweather (0018216)
Lisa S. DelGrosso (0064938)
Kerri L. Keller (0075075)
BROUSE MCDOWELL
388 S. Main Street, Suite 500
Akron, Ohio  44311
Tel:   (330) 535-5711
Fax:  (330) 253-8601
E-mail:  jfairweather@brouse.com
E-mail:  ldelgrosso@brouse.com
E-mail:  kkeller@brouse.com

21

Thomas C. Green
Mark D. Hopson
Frank R. Volpe
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC  20005
Tel:   (202) 736-8000
Fax:  (202) 736-8711
E-mail:  tcgreen@sidley.com
E-mail:  mhopson@sidley.com
E-mail:  fvolpe@sidley.com


**PATRICIA L. COOK**

By her attorneys,

*/s/ Carl S. Kravitz*
John C. Fairweather (0018216)
Lisa S. DelGrosso (0064938)
Kerri L. Keller (0075075)
BROUSE MCDOWELL
388 S. Main Street, Suite 500
Akron, Ohio  44311
Tel:   (330) 535-5711
Fax:  (330) 253-8601
E-mail:  jfairweather@brouse.com
E-mail:  ldelgrosso@brouse.com
E-mail:  kkeller@brouse.com

Carl S. Kravitz
Adam L. Fotiades
ZUCKERMAN SPAEDER LLP
1800 M Street N.W., Suite 1000
Washington, DC  20036
Tel:   (202) 778-1800
Fax:  (202) 822-8106
E-mail:  ckravitz@zuckerman.com
E-mail:  afotiades@zuckerman.com

**ANTHONY S. PISZEL**

By his attorneys,

*/s/ James K. Goldfarb*
Joseph C. Weinstein (0023504)
Steven A. Delchin (0068276)
SQUIRE SANDERS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH  44114-1304
Tel:  (216) 479-8500
Fax: (216) 479-8780
E-mail:  joe.weinstein@squirepb.com
E-mail: steven.delchin@squirepb.com

James K. Goldfarb
Michael V. Rella
Jonathan S. Bashi
MURPHY & MCGONIGLE, P.C.
1185 Avenue of the Americas
New York, NY 10036
Tel:   (212) 880-3961
E-mail:  jgoldfarb@mmlawus.com
E-mail: mrella@mmlawus.com
E-mail:  jbashi@mmlawus.com

William E. Donnelly
MURPHY & MCGONIGLE, P.C.
555 13th Street, N.W., Suite 410
Washington, D.C.  20004
Tel:  (202) 661-7000
Fax: (202) 661-7049
E-mail:  william.donnelly@mmlawus.com

**EUGENE M. MCQUADE**

By his attorneys,

*/s/ Michael S. Doluisio*
Joseph C. Weinstein (0023504)
Steven A. Delchin (0068276)
SQUIRE SANDERS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH  44114-1304
Tel:  (216) 479-8500
Fax: (216) 479-8780
E-mail:  joe.weinstein@squirepb.com
E-mail: steven.delchin@squirepb.com

Andrew J. Levander
DECHERT LLP
1095 Avenue of the Americas
New York, NY  10036-6797
Tel:  (212) 698-3683
Fax:  (212) 698-3599
E-mail:  andrew.levander@dechert.com

Michael S. Doluisio
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808
Tel:  (215) 994-2139
Fax:  (215) 655-2139
E-mail:  michael.doluisio@dechert.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 20, 2017, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by operation of the Court's CM/ECF system to all parties indicated on the electronic filing receipt.  This filing may be accessed through the Court's CM/ECF system.

*/s/ Hugh E. McKay*
Hugh E. McKay