**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, On Behalf of Itself and all Others Similarly Situated, | ) ) ) ) | CIVIL ACTION NO. 4:08-CV-00160 |
| Plaintiff, | ) ) ) | JUDGE BENITA Y. PEARSON |
| v. | ) ) ) | MAGISTRATE JUDGE WILLIAM H. BAUGHMAN, JR. |
| FEDERAL HOME LOAN MORTGAGE CORPORATION, a/k/a FREDDIE MAC, RICHARD F. SYRON, PATRICIA L. COOK, ANTHONY S. PISZEL AND EUGENE M. McQUADE, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANT FREDDIE MAC'S**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**LEAD PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION**

DB3/ 201420290.17

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ......................................................................................................................... 4

I.  OPERS HAS FAILED TO ESTABLISH THAT FREDDIE
MAC'S  COMMON STOCK TRADED IN AN EFFICIENT MARKET ........................ 5

    A.  OPERS Must Establish Market
Efficiency To Invoke A Presumption Of Reliance ................................................ 5

    B.  OPERS Has Failed To Establish That The Market For Freddie
Mac Common Stock Was Efficient Throughout The Class Period ........................ 7

        1.  Dr. Feinstein's Single-Date Event
Study Fails To Establish Market Efficiency .............................................. 8

        2.  Dr. Feinstein's Z-Test Likewise
Fails To Establish Market Efficiency ........................................................ 8

            a.  A Z-Test Cannot Prove Market Efficiency .................................... 9

            b.  Dr. Feinstein's Z-Test Contains Numerous Methodological
Flaws Rendering It Scientifically Unreliable.............................. 10

        3.  The Lack Of Price Impact Rebuts Any Presumption Of Reliance .......... 13

II.  OPERS HAS FAILED TO ESTABLISH THAT
DAMAGES CAN BE MEASURED ON A CLASS-WIDE
BASIS CONSISTENT WITH ITS THEORIES OF LIABILITY ................................... 15

    A.  Comcast Requires That Putative Class Plaintiffs
Demonstrate A Method For Measuring Damages On A
Class-Wide Basis Consistent With The Pleaded Theory Of Liability ................. 15

    B.  OPERS's Proposed Methodology For  Calculating
Damages Cannot Be Applied Uniformly Across The
Proposed Class In A Manner Consistent With Its Theories Of Liability ............ 16

        1.  Dr. Feinstein's Vague Damages Model Is
"No Model At All," And For That Reason
Alone, OPERS Has Failed To Satisfy Comcast....................................... 16

        2.  Dr. Feinstein's Damages Model Is
Inconsistent With OPERS's Theories Of Liability.................................. 17

        3.  Dr. Feinstein's Model Fails To Exclude
Price Impacts Caused By Numerous Factors
Not Compensable Under Section 10b And Therefore,
Too, Is Inconsistent With Plaintiff's Theories Of Liability..................... 19

DB3/ 201420290

# TABLE OF AUTHORITIES

**Cases**

Basic Inc. v. Levinson,
485 U.S. 224 (1988).................................................................................................5, 6, 7

Bell v. Ascendant Solutions, Inc.,
No. 01-cv-0166, 2004 WL 1490009 (N.D. Tex. 2004), aff'd, 422 F.3d 307
(5th Cir. 2005)..........................................................................................................11

Bell v. Ascendant Solutions, Inc.,
422 F.3d 307 (5th Cir. 2005) .....................................................................................8

Brown v. China Integrated Energy Inc.,
No. CV1102559BROPLAX, 2014 WL 12576643 (C.D. Cal. Aug. 2014) ...............................6

Cammer v. Bloom,
711 F. Supp. 1264 (D.N.J. 1989) ........................................................................6, 7, 13

Carpenters Pension Tr. of St. Louis v. Barclays PLC,
310 F.R.D. 69 (S.D.N.Y. 2015) .................................................................................7

Comcast Corp. v. Behrend,
133 S. Ct. 1426 (2013)..................................................................................... *passim*

In re ConAgra Foods, Inc.,
302 F.R.D. 537 (C.D. Cal. 2014)...............................................................................17

In re Credit Suisse First Boston Corp. (Lantronix Inc.) Analyst Sec. Litig.,
250 F.R.D. 137 (S.D.N.Y. 2008) ...............................................................................14

Daubert v. Merrell Dow Pharma., Inc.,
509 U.S. 579 (1993)..................................................................................................5

Erica P. John Fund, Inc. v. Halliburton Co.,
563 U.S. 804 (2011)..................................................................................................1

In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.,
281 F.R.D. 174 (S.D.N.Y. 2012)...........................................................................6, 8, 9

Finkelstein v. Liberty Digital, Inc.,
2005 WL 1074364 (Del. Ch. Apr. 25, 2005) ..........................................................3

Första AP-Fonden v. St. Jude Med., Inc.,
312 F.R.D. 511 (D. Minn. 2015).................................................................................7

-ii-

Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.,
    301 F.R.D. 116 (S.D.N.Y. 2014) ...............................................................................17

Freeman v. Laventhol & Horwath,
    915 F.2d 193 (6th Cir. 1990) ......................................................................................1

George v. China Automotive Sys., Inc.,
    2013 WL 3357170 (S.D.N.Y. July 3, 2013) ..............................................................8

Halliburton Co. v. Erica P. John Fund, Inc.,
    134 S. Ct. 2398 (2014)......................................................................................6, 7, 13

IBEW Local 90 Pension Fund v. Deutsche Bank AG,
    No. 11-cv-4209, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013)..................................8

IBEW Local 98 Pension Fund v. Best Buy Co.,
    818 F.3d 775 (8th Cir. 2016) ...............................................................................14, 15

In re Kosmos Energy Ltd. Sec. Litig.,
    299 F.R.D. 133 (N.D. Tex. 2014) .............................................................................15

Loritz v. Exide Techs.,
    2015 WL 6790247 (C.D. Cal. July 21, 2015).........................................................17

Ludlow v. BP, P.L.C.,
    800 F.3d 674 (5th Cir. 2015) .......................................................................15, 19, 20

In re Moody's Corp. Sec. Litig.,
    274 F.R.D. 480 (S.D.N.Y. 2011) ..............................................................................14

Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.,
    358 F. App'x 643 (6th Cir. 2009) ...............................................................................5

In re Petrobras Secs.,
    862 F.3d 250 (2d Cir. 2017)............................................................................. passim

Plumbers & Pipefitters Nat'l Pension Fund v. Burns,
    967 F. Supp. 2d 1143 (N.D. Ohio 2013)....................................................................7

In re Polymedica Corporation Securities Litigation,
    432 F.3d 1 (1st Cir. 2005).........................................................................................6

In re POM Wonderful LLC,
    No. ML 10-02199, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014)..........................18

In re Scotts EZ Seed Litig.,
    304 F.R.D. 397 (S.D.N.Y. 2015) ..............................................................................17

Stream Sicav v. Wang,
No. 12-cv-6682, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ................................................15

Strougo v. Barclays PLC,
312 F.R.D. 307 (S.D.N.Y. 2016) .......................................................................................7

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,
546 F.3d 196 (2d Cir. 2008).............................................................................................6

Unger v. Amedisys Inc.,
401 F.3d 316 (5th Cir. 2005) ...........................................................................................5

In re VHS of Mich., Inc.,
601 F. App'x 342 (6th Cir. 2015) ..................................................................................16

Wal-Mart Stores, Inc. v. Dukes,
131 S. Ct. 2541 (2011)................................................................................................4, 5

Willis v. Big Lots, Inc.,
No. 2:12-cv-604, 2017 WL 1063479 (S.D. Ohio Mar. 17, 2017) .........................................16

**Other Authorities**

Paul A. Ferrillo, Frederick C. Dunbar, & David Tabak, "The 'Less Than'
Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in
Fraud-on-the-Market Cases," 78 St. John's Law Review 81, 119-22 (2004)...........................9

Rule 23 ........................................................................................................... passim

## PRELIMINARY STATEMENT

Plaintiff OPERS moves to certify a proposed class of purchasers of Freddie Mac common stock between August 1, 2006 and November 20, 2007 (the "Class Period"). This Court should deny the motion pursuant to Rule 23(b)(3), as OPERS's newly proffered expert, Dr. Steven Feinstein, has failed to demonstrate that Freddie Mac's common stock traded in an efficient market during the Class Period. Nor has Dr. Feinstein demonstrated that he can calculate damages on a class-wide basis in a manner consistent with OPERS's theory of liability, as is required by Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013). Thus, individual issues will predominate over common issues in this matter, and class certification is inappropriate.

A class-wide presumption of reliance through the fraud-on-the-market theory is a prerequisite for class certification in securities fraud cases. Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 810 (2011) ("Halliburton I"). To benefit from the fraud-on-the-market presumption, OPERS must at least show that Defendants made misrepresentations that impacted the price of a security that is actively traded on an efficient market, i.e., that the market price for Freddie Mac stock rapidly reflected all public material information throughout the Class Period. See Freeman v. Laventhol & Horwath, 915 F.2d 193, 197 (6th Cir. 1990). Here, OPERS has not made that showing, and that failure is fatal to certification.

As the Court may recall, OPERS previously moved for class certification based on the expert report of Dr. Gregory Hallman. Claiming that Dr. Hallman was unavailable to defend his report, OPERS asked this Court for permission to identify a new expert, Dr. Feinstein, to submit a new report on market efficiency and damages. OPERS's argument for market efficiency is premised exclusively on Dr. Feinstein's report. Dkt. No. 372-3, Ex. E ("Feinstein Rpt.").

To assess whether a market was efficient – that is, whether a company's stock price

-1-

reacted rapidly to new information throughout a period of time – economists typically conduct event studies. Event studies ordinarily test price reactions on a series of specific dates, seeking to determine whether prices moved in statistically significant amounts (controlling for market volatility) on dates when information ("news") about the company was released to the market, such as the dates that companies publicly release financial results ("earnings dates"). When these tests demonstrate that prices react consistently (and in the correct direction) to news, one can conclude that a market for that stock is efficient.

In this case, OPERS's prior expert, Dr. Hallman, decided that it was appropriate to conduct an event study on Freddie Mac's six earnings dates during the Class Period. He found that only two yielded statistically significant results, one of which was the last day of OPERS's chosen class period, November 20, 2007, when Freddie Mac announced a $2 billion loss. Reviewing Dr. Hallman's work, Freddie Mac's expert, Dr. Mukesh Bajaj, explained that Dr. Hallman had erred, as a market that reacts to news on two out of six days is not an efficient one. Dr. Bajaj further found that Dr. Hallman committed various other econometric errors; only one of the six dates, November 20, 2007, actually yielded a statistically significant result. Transcript of Deposition of Steven P. Feinstein, Ph.D. ("Feinstein Tr.") 91:2-92:17 (attached as Ex. 1).

Like Dr. Hallman, and in keeping with academic literature, OPERS's new supposed expert, Dr. Feinstein, has always used multiple dates (and typically earnings dates) to conduct an event study. Expert Report of Mukesh Bajaj ("Bajaj Rpt.") (attached as Ex. 2), ¶ 63. In this case, however, aware that Dr. Hallman's event study had yielded statistically insignificant results (and thus failed to establish market efficiency), Dr. Feinstein decided to do something completely unsupported in the academic literature, and something he had never done before: conduct an "event study" of only a single date (over a 330-day Class Period) to "prove" market efficiency.

Bajaj Rpt. IV.B.1. This is a classic example of "data snooping," which violates the axiom that research should not be "motivated by the successes and failures of past investigations." Bajaj Rpt. ¶ 118 & n.140. In his report, Dr. Feinstein opined that this single-date event study "proves" that the market for Freddie Mac stock was efficient. Feinstein Rpt. ¶ 137. This statement in his report is directly contradicted by his testimony at deposition that his single-date event study does not prove market efficiency for the entirety of the Class Period. Feinstein Tr. 178:7-18.

Dr. Feinstein's selection of this lone date as the sole basis for his ostensible event study is also improper because it is the last day of the putative class period. Economists – including economists upon whom Dr. Feinstein relies – agree that using the last day of a class period is not a scientifically valid way to test for market efficiency because, among other reasons, securities plaintiffs intentionally select such dates for purposes of increasing potential damages. Bajaj Rpt. IV.B.1.c. In addition, it is simply not the case that stock price movement on a single date can support such a conclusion over an extended period of time. After all, as Dr. Feinstein conceded at deposition, for a market to be efficient, it needs to be rapidly incorporating available information all the time. Feinstein Tr. 97:5-8; see also Third Am. Cmplt. ¶ 267 (defining an efficient market as one "promptly digest[ing] current information … at all relevant times"). If stock prices only "sometimes," or only "rarely," incorporate new information, then the markets for such stocks are not efficient. Feinstein Tr. 96:11-97:4.

Recognizing the weakness of his single-date event study, Dr. Feinstein also conducted a "z-test." Id. at 368:10-19. To paraphrase criticism of Dr. Feinstein leveled by a judge in another case: "The problems with his [] analysis are so pervasive and numerous that it is impossible to describe all of them." Finkelstein v. Liberty Digital, Inc., 2005 WL 1074364, at *14-15 (Del. Ch. Apr. 25, 2005) (rejecting Dr. Feinstein's valuation analysis, which Dr. Feinstein testified he may

use in this case to calculate damages).

Dr. Feinstein's z-test involved the testing of only nine dates (including November 20, 2007) out of the 330 trading days in the Class Period, and it demonstrates that Freddie Mac stock reacted to news in a statistically significant manner on <u>four days</u>, or <u>1.2%</u>, of those days. As discussed below and in the report of Dr. Bajaj, that test does not prove market efficiency.

As an initial matter, a z-test is not a peer-reviewed process that economists accept as a method to establish market efficiency. Moreover, even if a z-test were an accepted and proper method to assess market efficiency (which it is not), the z-test conducted by Dr. Feinstein is unreliable due to the numerous methodological flaws that infect it. <u>See</u> <u>infra</u> at 11-13. The many flawed statistical gymnastics underlying Dr. Feinstein's z-test evince a blatant effort to bias his results in favor of his client, OPERS. OPERS has failed to demonstrate market efficiency, and its motion should be denied.

OPERS's motion also should be denied for an additional and independent reason that Dr. Feinstein's report and testimony fail to explain, with any (let alone the required) degree of specificity, how he could calculate damages consistent with OPERS's allegations, and in particular OPERS's materialization of the risk theory of liability. <u>See</u> <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426 (2013) (requiring that class plaintiffs demonstrate, at the certification stage, that damages can be determined on a class wide basis and consistent with the plaintiff's theory of liability).

## **ARGUMENT**

OPERS has the burden of demonstrating that class certification is appropriate under Rule 23. <u>See</u> <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2551 (2011). A district court must make "findings" following a "rigorous analysis" of whether the plaintiff has satisfied each Rule 23 requirement, which "frequently" involves consideration of the merits. <u>Id.</u> at 2552.

In a securities case premised on the fraud-on-the-market presumption of reliance, a district court must make a factual determination as to whether an efficient market existed, and it "may not simply presume the facts in favor of an efficient market." Unger v. Amedisys Inc., 401 F.3d 316, 319, 323 (5th Cir. 2005) (vacating order certifying class for erroneously apply[ing] too lax a standard of proof to the plaintiffs' fraud-on-the-market allegations). The court "must engage in thorough analysis, weigh the relevant factors, require both parties to justify their allegations, and base its ruling on admissible evidence." Id. at 325.

In conducting the "rigorous analysis" of OPERS's proffered proof, the Court may, and should, carefully weigh the persuasiveness of expert testimony, even if that means resolving disputes among conflicting expert opinions. Wal-Mart, 131 S. Ct. at 2553-54. At the class certification stage, the Court also may exclude expert testimony that fails to meet the reliability standard of Daubert v. Merrell Dow Pharma., Inc., 509 U.S. 579 (1993), or disregard expert opinions that are unreliable, unpersuasive, or methodologically flawed. See Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc., 358 F. App'x 643, 654 (6th Cir. 2009) (excluding expert report where expert's methodologies fell "short of the level of rigor professional economists normally exercise."). Applying these standards, this Court should deny class certification.

## I.   OPERS HAS FAILED TO ESTABLISH THAT FREDDIE MAC'S  COMMON STOCK TRADED IN AN EFFICIENT MARKET.

OPERS fails to demonstrate that the market for Freddie Mac common stock was, "in fact," efficient during the Class Period. Wal-Mart, 131 S. Ct. at 2551. Accordingly, this Court should deny class certification for failure to satisfy Rule 23(b)(3)'s predominance requirement.

### A.   OPERS Must Establish Market Efficiency To Invoke A Presumption Of Reliance.

To invoke the fraud-on-the-market presumption of reliance, securities plaintiffs must demonstrate that the securities at issue were traded in an "efficient market." Basic Inc. v.

Levinson, 485 U.S. 224, 248 n.27 (1988). Under Basic, the market for a particular stock is deemed efficient if the market price for the stock rapidly reflects all publicly available information. Id.[1] To assess whether the market for a particular stock is efficient, courts often analyze five factors first articulated in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989), commonly called the "Cammer factors." The "Cammer factors are intended to be an analytical tool, not a checklist" to be applied mechanically. In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig., 281 F.R.D. 174, 181 (S.D.N.Y. 2012) ("Freddie Mac Kreysar").

Of the five Cammer factors, "the critical factor – the sine qua non of efficiency" is the fifth factor: evidence of a cause-and-effect relationship between unexpected news and stock price movements. See Freddie Mac Kreysar, 281 F.R.D. at 182 (holding plaintiffs failed to show that market was efficient despite the fact that "the less important Cammer . . . factors support an inference of efficiency"). The cause-and-effect factor is "the essence of an efficient market and the foundation for the fraud on the market theory." See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 207 (2d Cir. 2008) (quoting Cammer, 711 F. Supp. at 1287). As Dr. Feinstein testified in another matter, "the fifth factor is the essence of market efficiency." See Bajaj Rpt. ¶ 23 & n.23 (quoting testimony). The fifth factor maintains its prominence following Halliburton II. See e.g., Brown v. China Integrated Energy Inc., No. CV1102559BROPLAX, 2014 WL 12576643, at *6 (C.D. Cal. Aug. 2014) ("The most important factor discussed in Cammer is the fifth one: whether there is a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the

---

[1] OPERS argues that Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398 (2014) ("Halliburton II") somehow reduced "the level of informational efficiency" a plaintiff must demonstrate, and "essentially" rejected the First Circuit's formulation of informational efficiency in In re Polymedica Corp. Sec. Litig., 432 F.3d 1, 18 (1st Cir. 2005). Halliburton II affirmed Basic without alteration. Bajaj Rpt. ¶ 25, n.31 Notably, since Halliburton II, Polymedica has been cited eight times on the issue of market efficiency, not once disapprovingly.

stock price.") (quotation and citation omitted).[2]

OPERS argues against the importance of Cammer factor five in determining market efficiency, perhaps hoping to rely on lesser indicators of market efficiency. OPERS Memo. at 9.[3] But the only case within the Sixth Circuit that OPERS cites for its position expressly rejects OPERS's argument. See Plumbers & Pipefitters Nat'l Pension Fund v. Burns, 967 F. Supp. 2d 1143, 1155 (N.D. Ohio 2013) ("[T]he most important Cammer factor is the cause-and-effect relationship between new, unexpected information and [stock] prices.") (emphasis added).[4]

**B.      OPERS Has Failed To Establish That The Market For Freddie Mac Common Stock Was Efficient Throughout The Class Period.**

OPERS's proof of market efficiency rests solely on the conclusions of its replacement expert, Dr. Feinstein. Dr. Feinstein purports to analyze the fifth Cammer factor through two analyses: (1) a purported "event study" of the last day of the Class Period, November 20, 2007 (which he calls an "allegation-related event"); and (2) a "z-test," a statistical test comparing the proportion of statistically significant price movements on nine purported "news" days (that he selected) to 321 non-news days (as he defines them). Dr. Feinstein's tests are fatally flawed in concept and execution, rendering them unreliable and invalid. Bajaj Rpt. IV.B.

**1.      Dr. Feinstein's Single-Date Event Study Fails To Establish Market Efficiency.**

Dr. Feinstein's single-date event study based on the last day of the Class Period is

---

[2] See also Polymedica, 453 F. Supp. 2d at 278 (holding plaintiff failed to demonstrate that the stock traded in an efficient market, despite finding that the first four Cammer factors favored finding of market efficiency).

[3] While OPERS contends that the structural Cammer factors support a finding of market efficiency, Dr. Feinstein admitted that Freddie Mac was not eligible to file Forms S-3 during the Class Period, which is one of the Cammer factors. Feinstein Tr. 99:5-11; Bajaj Rpt. ¶ 19, n.16.

[4] The other cases that OPERS cites do not state that Halliburton II changed the law, but merely observe that Basic does not mandate a specific method for proving market efficiency. See Strougo v. Barclays PLC, 312 F.R.D. 307, 315-17 (S.D.N.Y. 2016); Carpenters Pension Tr. of St. Louis v. Barclays PLC, 310 F.R.D. 69, 78-80 (S.D.N.Y. 2015); Första AP-Fonden v. St. Jude Med., Inc., 312 F.R.D. 511, 518 (D. Minn. 2015).

methodologically unsound and does not "prove" market efficiency. See Feinstein Rpt. ¶137. Dr. Feinstein admits that he has never used a single-date event study before. Feinstein Tr. 75:19-76:4. Relying on a mere handful of dates, let alone just one, is methodologically unsound. Bajaj Rpt. IV.B.1.a. & ¶ 54. Courts also require the testing of many more dates throughout a class period to establish market efficiency. See, e.g., George v. China Auto. Sys., Inc., 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) (price reaction on seven out of sixteen days "is an insufficient foundation upon which to pronounce market efficiency") ; Freddie Mac Kreysar, 281 F.R.D. at 182 (16 of 57 news days insufficient to establish market efficiency because "plaintiff must show that the market price responds to most new, material news").

The need to test a large number of dates is particularly acute where, like here, the plaintiff has chosen a lengthy class period. See, e.g., IBEW Local 90 Pension Fund v. Deutsche Bank AG, 2013 WL 5815472, at *21 (S.D.N.Y. Oct. 29, 2013). For these reasons, as a matter of law and logic, a "single decline on the last day of the class period is plainly insufficient by itself to show market efficiency throughout the class period . . ." Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 316 (5th Cir. 2005). Indeed, even Dr. Feinstein ultimately conceded – as he must – that his single-date event study fails to prove market efficiency. Feinstein Tr. 178:7-18.

### 2. Dr. Feinstein's Z-Test Likewise Fails To Establish Market Efficiency.

A "z-test" is a common statistical tool used for analyzing whether two data sets differ significantly on some single, categorical characteristic. Bajaj Rpt. ¶ 73. Here, Dr. Feinstein purports to use the z-test to analyze whether Freddie Mac's stock price was statistically more likely or equally likely to fluctuate on "news days" versus "non-news days." His approach and claimed conclusions are rife with problems.

While the z-test has been employed in other circumstances over the years, its potential application to market efficiency analysis has its origins in a 2004 law review article by authors

Ferrillo, Dunbar, and Tabak (the "FDT Article").[5]  The z-test is not commonly used by economists attempting to establish market efficiency, and this case appears to be only the third time Dr. Feinstein has done so. See In re Petrobras Secs., 862 F.3d 250 (2d Cir. 2017); Bajaj Rpt., Ex. 2. As explained below, Dr. Feinstein's putative z-test cannot and does not assess whether a market is efficient. In addition, even if the z-test could test market efficiency – and it cannot – Dr. Feinstein's z-test is scientifically unreliable due to a host of fundamental design problems and a series of assumptions (many of which are inconsistent with his methods in prior reports) that bias and predetermine his conclusions in favor of a finding of market efficiency.

### a.  A Z-Test Cannot Prove Market Efficiency.

 Dr. Feinstein's solitary claims notwithstanding, a z-test is not a method accepted by economists to establish market efficiency. Bajaj Rpt. IV.B.2.a. To begin, a z-test is not a method accepted by economists to establish market efficiency because this is not what it does. Bajaj Rpt. IV.B.2.b. As Dr. Feinstein agreed during his deposition, "[f]or a market to be efficient, it needs to be incorporating available information, all the time,"[6] and a market is not efficient if it only "sometimes," or "rarely," incorporates available information.[7]  See also Freddie Mac Kreysar, 281 F.R.D. at 180.

A z-test does not even evaluate whether a market for a security is "sometimes" efficient. It does not, for instance, determine whether stock price movements are "directionally" appropriate – i.e., that the stock price increases upon favorable news and decreases upon unfavorable news – the essence of market efficiency. Bajaj Rpt. IV.B.2.c. Accordingly, even if Freddie Mac's stock price routinely moved in the opposite direction than expected (i.e., that the

---

[5] Paul A. Ferrillo, Frederick C. Dunbar, & David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," 78 St. John's Law Review 81, 119-22 (2004).

[6] Feinstein Tr. at 97:5-8.

[7] Id. at 96:11-97:4; 183:1-6

9

market behaved in an illogical, inefficient manner), Dr. Feinstein could claim that the test proved an efficient market. That is akin to performing a test for a new drug's efficacy, in which the only thing measured is whether the drug had a significant impact on patients, as compared to other patients who received a placebo. Under Dr. Feinstein's logic, the drug could kill every patient that took it, but that result would "prove" its effectiveness. Bajaj Rpt. ¶ 102. Given this fundamental shortcoming, a z-test is simply not a test that can support a finding of market efficiency.

Counsel for Freddie Mac are aware of only one case in which class certification has been granted on direct and indirect evidence of market efficiency that included a z-test. In re Petrobras Secs., 862 F.3d 250 (2d Cir. 2017). Petrobras's stock price fell precipitously after the "exposure of a multi-year, multi-billion-dollar money-laundering and kickback scheme." Id. at 256. There, the Second Circuit affirmed the District Court's grant of class certification, without discussing the z-test and holding that its decision "falls within the range of permissible decisions." Id. at 277 (citation omitted). Dr. Feinstein was the plaintiffs' expert there, and the District Court recognized several errors and mischaracterizations that he made in his original and rebuttal reports, but nevertheless declined to "let the perfect become the enemy of the good." Id. As explained above, a z-test does not represent "the good," as it does not test for market efficiency. Further, Dr. Feinstein's numerous errors and biased assumptions here utterly undermine any potential probative value of his statistical testing in this case.

> **b.** **Dr. Feinstein's Z-test Contains Numerous**
> **Methodological Flaws Rendering It Scientifically Unreliable.**

The z-test conducted by Dr. Feinstein suffers from a host of fundamental design problems and relies on a series of assumptions (many of which are inconsistent with his methods in prior reports), all of which serve to bias his conclusions in favor of a finding of market efficiency.

Bajaj Rpt. IV.B.2.d. Some of these design flaws represent deviations from the procedures used in the textbooks and the FDT Article he cites to justify his test. Several more represent departures from how he has conducted z-tests in the past. While some bias his test in favor of his conclusion, others are outcome determinative for his calculations. Below is a summary of these various flaws and unsupported assumptions made, which indicate that his test results are not reliable:

- **Insufficient sample size:** A statistically valid z-test requires that the two samples – here news and non-news days – must be sufficiently large for the test results to be valid. Indeed, a text that Dr. Feinstein relies on sets forth three sample size conditions that a z-test must meet to be considered reliable. Dr. Feinstein's test failed all three conditions, and his robustness tests do not cure that failure. Bajaj Rpt. ¶¶ 104-09; 148-54.

- **Too few dates:** Dr. Feinstein's z-test identified a total of only four "news" days with statistically significant abnormal returns. Among economists, event studies that assess a relatively small number of dates is not an accepted method of assessing market efficiency. Id. Courts also refuse to certify a class where only a handful of dates yield statistically significant results during a proposed class period. See, e.g., Polymedica, 453 F. Supp. 2d at 269-70 (expert's "mere listing of five days on which news was released and which exhibited large price fluctuations proves nothing"); Bell, 2004 WL 1490009, at *3 & n.2 (rejecting event study as unreliable where expert selected only "six or seven 'information days,'" which included "dates that appear to be consciously chosen in order artificially to support his hypothesis of efficiency").

- **Unprecedented date selection process:** In the two prior z-test reports he issued in other cases, Dr. Feinstein used dates of earnings and corporate announcements. In this case, knowing that those dates yielded insignificant results, Dr. Feinstein conveniently rejected his customary approach, and devised his own selection process. This newfound process has no support in the economic literature and is inconsistent with his own views of "news" days generally and "news" days in this case and the definition of news for the purpose of assessing market efficiency. Bajaj Rpt. ¶¶ 110-11.[8]

- **Inclusion of "corrective disclosure" date:** The authors of the FDT z-test were careful to specify steps necessary to mitigate potential bias in the performance of the FDT z-test, including an express instruction that economists should exclude "corrective disclosure" dates from the "news day" population. Such an exclusion recognizes that securities plaintiffs routinely select as the last day of a class period a date with a significant stock price decline, and inclusion of such a date would bias results in favor of a finding of

---

[8] Courts are skeptical of results yielded from cherry-picked dates. See Bell v. Ascendant Solutions, Inc., 2004 WL 1490009, at *3 (N.D. Tex. 2004), aff'd, 422 F.3d 307 (5th Cir. 2005) ("Professor Pettit's identification of 'information days' includes dates that appear to be consciously chosen in order artificially to support his hypothesis of efficiency.").

market efficiency. Notwithstanding this known and obvious flaw, Dr. Feinstein included November 20, 2007 – OPERS's alleged corrective disclosure date within his news days population. The inclusion of this date biased his results in favor of OPERS. Bajaj Rpt. ¶¶ 121-25.

- **Improper pooling of standard deviation estimates:**  When sample sizes are similar, statisticians typically employ a "pooled" estimate of the standard deviation of the test statistic (or "standard error") based on both populations. A "pooled" estimate combines, or "pools," the standard errors of the two samples and effectively assumes that both sets of data have common variability. In contrast, when comparing small and unbalanced samples such as those here, the strength of the inferences one may draw generally improves if separate standard deviation estimates are used for each population – the "unpooled" approach. Notably, the FDT authors used the unpooled approach. Once again deviating from the FDT approach, Dr. Feinstein failed to use an "unpooled" approach to his calculations in conducting his new, customized z-test, instead pooling the standard deviation estimates, thereby significantly impacting his ultimate results in favor of OPERS. Id. ¶¶ 126-29.

- **Failure to employ a continuity correction:**  As explained by Dr. Bajaj, in statistics, a continuity correction accounts for the difference in the binomial and the normal distributions when the sample size is small by reducing the difference between the sample proportions. Because the number of "news-days" in Dr. Feinstein's test is small (9), the z-statistic calculation should have employed a "continuity correction" in estimating his z-statistic to account for the difference between the discrete binomial distribution and the continuous normal distribution. This failure biased his results in favor of OPERS. Id. ¶¶130-32.

- **Unlike his previous implementations of the z-test, Dr. Feinstein chose to "dummy" out variables, a choice that is outcome determinative:**  When Dr. Feinstein performed his FDT Z-test in Petrobras, he used earnings dates as his news days. Had he done so here his test would have failed. In another odd departure from his FDT z-test design in Petrobras, Dr. Feinstein "dummied out" (i.e., replaced with neutral variables) his 9 news days from his regression model estimation period (to determine statistically significant stock price fluctuations). This dubious departure from customary practice and standards again intentionally biased the outcome in favor of his client. Again, if he had applied here the same methodology he applied in Petrobras, his test would have failed. Id. ¶¶ 133-34.

- **Unlike a previous implementation of his z-test, Dr. Feinstein chose to combine estimation periods resulting from a "structural break" in the market:** When using regression models to test stock price reactions, economists assume that market volatility remains unchanged and adjust the models to control for changing market volatility, as warranted. Here, Dr. Feinstein did just that for a market disruption (a "structural break") that he identified on August 9, 2007. While he divided the Class Period into two sub-periods to test for price reactions, he combined his results across these two periods when calculating his z-statistic. That is not how he performed his z-test in another recent report, and that decision was outcome determinative here. Id. ¶¶ 135-40.

- **Dr. Feinstein failed to correct for a volatility change in February 2007:**  While Dr. Feinstein made an adjustment for a structural beak on August 9, 2017, he failed,

conveniently, to make the same type of adjustment for another structural break that occurred on February 27, 2007. This failure once more biased his results in favor of his client, OPERS. Id. ¶¶ 141-43.

- **Dr. Feinstein does not account for the statistical error inherent in his market model when calculating his z-statistic:** Dr. Feinstein's z-test treats the dates he determined as having statistically significant results (the second stage of his z-test) as an irrebuttable, exogenously observable variable (like the proportion of "yes" answers for men and women in a survey regarding whether they like baseball). In fact, the classification of significant abnormal return days is determined by using regressions and statistical tests, which are subject to error. In his FDT z-test stage (the third stage of his z-test), Dr. Feinstein entirely ignores the statistical error present in his variables estimated in his determination of abnormal returns. By ignoring this additional source of statistical error from using estimated variables, Dr. Feinstein is most likely inflating the precision of his estimates in his z-test analysis. Id. ¶¶144-45.

In sum, Dr. Feinstein's tests do not establish market efficiency. The structural Cammer factors are not enough, alone, to establish market efficiency. Dr. Feinstein's single-date event study, by his own admission, does not prove market efficiency. Even if a z-test could demonstrate market efficiency (and it cannot), Dr. Feinstein's z-test suffers from multiple, serious design flaws that make it scientifically unsound and legally insufficient, and render his conclusion of market efficiency disingenuous at best. Crucially, correcting just several of these flaws leads to statistically insignificant results, undermining his opinion. Bajaj Rpt. IV.B.2.e. Upon weighing the evidence, as this Court must, this Court should hold that OPERS has failed establish market efficiency and should deny OPERS's motion.

### 3. The Lack Of Price Impact Rebuts Any Presumption Of Reliance.

In Halliburton II, the Supreme Court held that, where plaintiffs have sufficiently established market efficiency, defendants may rebut the presumption of reliance with evidence of a lack of price impact. 134 S. Ct. at 2417. Applying Halliburton II, the Eighth Circuit recently held that a defendant had successfully rebutted the presumption at the class certification stage by showing that the alleged misstatements did not have any impact on the company's stock price at the time they were made. IBEW Local 98 Pension Fund v. Best Buy Co., 818 F.3d 775, 782 (8th

Cir. 2016); see also In re Moody's Corp. Sec. Litig., 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (denying class certification where defendants demonstrated that no alleged misrepresentation caused a statistically significant increase in stock price).

Here, Dr. Bajaj's report similarly demonstrates that the claimed misstatements in this case did not impact Freddie Mac's stock price, rebutting the presumption of reliance. Bajaj Rpt. V. OPERS has alleged misrepresentations on 23 dates during the Class Period. Using a corrected version of Dr. Feinstein's regression model, Dr. Bajaj conducted tests that yielded statistically insignificant stock price reactions or reactions that were statistically significant in the wrong direction on 22 of the 23 effective dates. An application of Dr. Feinstein's z-test also yields statistically insignificant results. Id.

OPERS cannot meaningfully argue that the misrepresentations artificially maintained the price of the stock until risks materialized, as that argument proves too much at the class certification stage, where OPERS has the burden of persuasion, as an evidentiary matter. In re Credit Suisse First Boston Corp. (Lantronix Inc.) Analyst Sec. Litig., 250 F.R.D. 137, 145 (S.D.N.Y. 2008) (rejecting "price maintenance theory" given that "Rule 23 determinations must be based on 'relevant facts'"). A theory that statements maintained an inflated stock price is not evidence that can refute otherwise overwhelming evidence of no price impact. Best Buy, 818 F.3d at 783. Here, the evidence is overwhelming as Dr. Bajaj's tests demonstrate. Bajaj Rpt. V. Further, Dr. Bajaj conducted an analysis of the economic evidence surrounding the November 20, 2007 disclosures, and he concluded that there was no evidence to suggest that the Company's disclosures were disclosures linked to the alleged misrepresentations and omissions in the Complaint. Id. It is Plaintiff's burden to demonstrate market efficiency at the class certification stage under the "rigorous scrutiny" of the Court, and OPERS has failed to do so.

**II.    OPERS HAS FAILED TO ESTABLISH THAT
DAMAGES CAN BE MEASURED ON A CLASS-WIDE
BASIS CONSISTENT WITH ITS THEORIES OF LIABILITY.**

**A.    <u>Comcast</u> Requires That Putative Class Plaintiffs
Demonstrate A Method For Measuring Damages On A
<u>Class-Wide Basis Consistent With The Pleaded Theory Of Liability.</u>**

In <u>Comcast</u>, the Supreme Court held that the predominance requisites of Rule 23(b)(3) apply with equal force to a class action plaintiff's proposed method of calculating damages, requiring plaintiffs to establish through "evidentiary proof" that their alleged damages are measurable "on a class-wide basis" through the use of a "common methodology." <u>Comcast</u>, 133 S. Ct. at 1430. The Court in <u>Comcast</u> stressed that plaintiffs' proposed damages methodology may not be "speculative" or "arbitrary," which effectively would "reduce Rule 23(b)(3)'s predominance requirement to a nullity." <u>Id.</u> at 1433. Critically, this ensures that a proposed damages model "<u>measures only those damages attributable to [plaintiffs'] theory</u>," and "<u>does not identify damages that are not the result of the wrong</u>." <u>Id.</u> at 1433-34 (emphasis added).

Contrary to the position OPERS takes in its Motion, numerous courts have applied <u>Comcast</u> to deny class certification in securities fraud class actions. <u>See, e.g.</u>, <u>Ludlow v. BP, P.L.C.</u>, 800 F.3d 674, 690-91 (5th Cir. 2015) (affirming denial of class certification under <u>Comcast</u>); <u>Stream Sicav v. Wang</u>, 2015 WL 268855, at *5-6 (S.D.N.Y. Jan. 21, 2015) (denying class certification under <u>Comcast</u>); <u>In re Kosmos Energy Ltd. Sec. Litig.</u>, 299 F.R.D. 133 (N.D. Tex. 2014) (same). Indeed, only a few months ago OPERS itself conceded that <u>Comcast</u> applies to this case. <u>See</u> Dkt. 360 at 10 ("<u>Comcast</u> has created a change in the law that will require a new expert opinion on class certification.") (emphasis added).[9]

_____

[9] OPERS cites cases establishing that <u>Comcast</u> is particularly applicable here, where there are multiple theories of liability that may result in aggregated damages. <u>See</u> <u>In re VHS of Mich., Inc.</u>, 601 F. App'x 342, 344 (6th Cir. 2015) (holding that <u>Comcast</u> applies where multiple theories of liability may result in aggregated damages); <u>Willis v. Big Lots, Inc.</u>, No. 2:12-cv-604,

**B.      OPERS's Proposed Methodology For
Calculating Damages Cannot Be Applied Uniformly Across The
Proposed Class In A Manner Consistent With Its Theories Of Liability.**

OPERS has not put forward a common methodology for calculating damages that could

survive this Court's rigorous scrutiny of the evidentiary proof. Dr. Feinstein's report generalizes

how damages are ordinarily calculated in securities cases, and at deposition, he offered only a

myriad of vague possibilities and pronouncements. Dr. Feinstein's "I'll figure it out later"

approach to damages is not sufficient under Comcast.

**1.      Dr. Feinstein's Vague Damages Model Is "No Model At All,"
And For That Reason Alone, OPERS Has Failed To Satisfy *Comcast.***

Dr. Feinstein briefly addresses damages in his report, stating he would use "generally

accepted valuation tools and models" to calculate damages while supposedly "controlling" for

confounding news and other market factors. Feinstein Rpt. at ¶ 152. Dr. Feinstein, however,

makes no effort to explain what specific "valuation tools and models" he would use and, at his

deposition, was incapable of explaining his damages calculation approach in any specific or

definite terms. Feinstein Tr. 293:23-294:22. Dr. Feinstein's description is so vague and

unspecific as to be "no model at all," and for that reason alone, OPERS has failed to satisfy

Comcast's requirements. See Report of Dr. Paul Gompers ¶¶ 53-62 ("Gompers Rpt.") (attached

as Ex. 3).

When a class plaintiff presents a damages model that is vague, indefinite and unspecific,

or simply asserts (as did Dr. Feinstein) that there are unspecified "tools" available to measure

damages, the model amounts to "no damages model at all," and the class cannot be certified. In

re ConAgra Foods, Inc., 302 F.R.D. 537, 552 (C.D. Cal. 2014) ("Although the methodologies he

---

2017 WL 1063479, at *11 (S.D. Ohio Mar. 17, 2017) (same). OPERS's citation to In re Allergan
is off the mark, as it did not address that issue. No. 8:14-cv-02004, Doc. 318 (C.D. Cal. Mar. 17,
2017).

describes may very well be capable of calculating damages in this action, Weir has made no showing that this is the case."); Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co., 301 F.R.D. 116, 142 (S.D.N.Y. 2014) (denying class certification in a securities case: "without assurance beyond Mason's say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis").[10]

Where a plaintiff's expert fails to articulate a damages model, offering only vague plans to calculate damages in the future, class certification should be denied. Loritz v. Exide Techs., 2015 WL 6790247, at *22-23 (C.D. Cal. July 21, 2015). Here, as in Exide, the plaintiff's expert fails to account for: (1) multiple alleged misrepresentations (Gompers Rpt. V.E.); (2) corrective information allegedly disclosed at multiple times (Gompers Rpt. V.C.3 & 96); (3) corrective information regarding different alleged misrepresentations allegedly disclosed on the same day (Gompers Rpt. V.E.); and (4) allegedly concealed facts arising or being made known to the company (and thus becoming, for the first time, able to be disclosed) during the class period (Gompers Rpt. V.E.). Id. The court in Exide denied class certification, as should the Court here. See id. at *22.

### 2. Dr. Feinstein's Damages Model Is Inconsistent With OPERS's Theories Of Liability.

To the extent Dr. Feinstein's model can be divined it cannot be said that his damages model "measure[s] only those damages attributable to [Plaintiff's] theory," and does not "identif[y] damages that are not the result of the wrong." Comcast, 133 S. Ct. 1433-34; see also In re POM Wonderful LLC, 2014 WL 1225184, at *5-6 (C.D. Cal. Mar. 25, 2014) (decertifying

---

[10] In re Scotts EZ Seed Litig., 304 F.R.D. 397, 413 (S.D.N.Y. 2015), is distinguishable because there, unlike here, the damages expert was able to "identif[y] statistical methodologies by which he would be able" to perform the liability theory in question, and further "described each methodology in detail," though even so the court rejected two damages approaches inconsistent with plaintiffs' theories of liability.

class where plaintiffs' damages model did not comport with <u>Comcast</u> because expert failed to tie damages calculations to the alleged misrepresentations). As summarized below and explained in detail in the report of Paul Gompers, Dr. Feinstein's approach would result in damages inconsistent with OPERS's liability theory, instead reflecting a theory of liability that would result in individualized issues predominating. Gompers Rpt. V.C.1-5.

Here, Plaintiff claims Defendants concealed certain risks that, when they materialized, caused the stock price to drop. To calculate damages, then, an expert must devise a model that will measure the amount by which the stock price was inflated due to the concealment of the risks at the time the misstatements were made. Gompers Rpt. V.C.1.

Dr. Feinstein's damages approach, by contrast, appears to begin by measuring Freddie Mac's stock price decline following the November 20, 2007 alleged "materialization of the risk." <u>See</u> OPERS's Memo. at 18 ("Dr. Feinstein's report shows that he intends to use an event study to calculate out-of-pocket damages on a classwide basis"). As Dr. Gompers explains, the economic value of the <u>materialization</u> of the risk is not the same as the economic value of the concealment of the risk at the time of the alleged misstatement. Gompers Rpt. ¶¶ 63-68. The mere <u>risk</u> of a <u>future loss</u> will have less price impact than when the same risk becomes a <u>certainty</u> – <u>i.e.</u>, what happens to price when the risk materializes. Dr. Feinstein's damages model, however, begins its calculation with the price impact at the time when the risk became a certainty.

Dr. Feinstein's damages model is therefore fundamentally inconsistent with Plaintiff's theories of liability and would grossly overstate the amount of damages. OPERS is claiming that Freddie Mac failed to disclose risks, not that it failed to disclose certainties.

### 3. Dr. Feinstein's Model Fails To Exclude Price Impacts Caused By Numerous Factors Not Compensable Under Section 10b And <u>Therefore, Too, Is Inconsistent With Plaintiff's Theories Of Liability.</u>

Dr. Feinstein's proposed model fails to explain how he would exclude the price impact

18

caused by several categories of factors for which OPERS is not, and could not, seek damages under Section 10(b). As explained in Dr. Gompers's report (¶¶ 75-84), these include:

- **Price Impact Of The Materialization Of Disclosed Risks:** As Dr. Gompers explains, Freddie Mac disclosed numerous risks before and during the Class Period which materialized alongside the alleged materialization of supposedly concealed risks. Dr. Feinstein explains no method for disaggregating the impact of disclosed risks (which are not compensable) as compared to allegedly fraudulently concealed risks (which are). Gompers Rpt. V.C.1.

- **Price Impact From Actions Taken In Response To Changing Market:** On November 20, 2007, Freddie Mac also disclosed actions it would take in response to changing market conditions, such as reducing its dividend by 50%. As Dr. Gompers notes, Dr. Feinstein has failed to propose a method for excluding the price impact of this action and other measures that impacted Freddie Mac's stock price. Gompers Rpt. V.C.4.

- **Varying Price Inflation Resulting From Changing Market Conditions:** As Dr. Gompers explains and Dr. Feinstein verified with his Chow test, the market changed significantly during the Class Period, impacting the degree of price inflation attributable to allegedly concealed risks. The price impact of a disclosure about subprime risk in mid-2006 was dramatically different than what it would be in late 2007. Damages models must account for these variations. Dr. Feinstein's model does not. Gompers Rpt. V.D.1-5.

- **Price Impact From Different Categories Of Misrepresentations:** OPERS alleges five different categories of misrepresentations, occurring at different points in time. If any of them are held inactionable, the price impact attributable to that category of misrepresentation must be excluded from a damages calculation. Dr. Feinstein's model fails to offer any method of doing so. Gompers Rpt. V.E.

In these many ways, Dr. Feinstein's damages model is inconsistent with Plaintiff's theories of liability. Rather, it is consistent solely with an alternative theory that would require individual inquiry as to investors' risk tolerances. Gompers Rpt. V.C.5; V.D.3.

In Ludlow, the Fifth Circuit denied class certification for this very reason. 800 F.3d 689. The plaintiff pursued a "materialization-of-the-risk theory" of damages premised on its allegation that defendant failed to disclose the true risk that it would suffer a catastrophic oil spill. Id. However, plaintiff's proposed damages model would award damages to the proposed class not on the theory that the plaintiff purchased the stock at an inflated price (i.e., out-of-pocket damages measured by the amount of price inflation), but on the premise that the plaintiff

19

would not have purchased the stock at all had it known the true risk (i.e., the total loss in stock price after the spill occurred). Id. at 690. As the court held in Ludlow, that theory of damages "hinges on a determination that each plaintiff would not have bought BP stock *at all* were it not for the alleged misrepresentations" – a determination requiring individual inquiry. Id. Depending on their individual risk tolerances, some investors would have still purchased BP stock had they known the true risk, albeit at a lower price. Id. For those investors, "full materialization-of-the-risk damages would prove a windfall." Id. (citation omitted). Securities laws protect investors only "against those economic losses that misrepresentations actually cause" and do not provide "broad insurance against market losses." Id. Thus, the Fifth Circuit held: "Unlike the stock inflation model [i.e., out-of-pocket damages], the materialization-of-the-risk model cannot be applied uniformly across the class, as Comcast requires, because it lumps together those who would have bought the stock at the heightened risk with those who would not have." Id. at 691. Consequently, the Fifth Circuit affirmed the district court's decision denying class certification under Comcast. Id.

In sum, Dr. Feinstein's proposed damages approach is general and vague, and it fails to account for issues presented by OPERS's theories of damages. As OPERS has failed to satisfy Comcast, OPERS's motion should be denied for this reason as well.

## CONCLUSION

For the foregoing reasons, the Court should deny OPERS's motion for class certification.

20

Respectfully submitted,

Defendant,

**FREDDIE MAC**

**OF COUNSEL:**               By its attorneys,

Lance J. Wolf                 */s/ Hugh E. McKay*
Howard Lindenberg        Hugh E. McKay (0023017)
Yolanda Hawkins-Bautista  **PORTER WRIGHT MORRIS & ARTHUR LLP**
Barry Parsons             950 Main Avenue, Suite 500
Freddie Mac               Cleveland, OH 44113
8200 Jones Branch Drive    Tel:  (216) 443-2580
McLean, Virginia  22102    Fax:  (216) 443-9011
Tel:  (703) 903-2000       E-mail: hmckay@porterwright.com
Fax:  (703) 903-2485

Jordan D. Hershman
Jason D. Frank
William R. Harb
Emily E. Renshaw
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110-1726
Tel:  (617) 951-8455
Fax:  (617) 951-8736
E-mail: jordan.hershman@morganlewis.com
E-mail: jason.frank@morganlewis.com
E-mail: william.harb@morganlewis.com
E-mail: emily.renshaw@morganlewis.com
*Counsel for Defendant Freddie Mac*

Dated: September 1, 2017

21

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2017 a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

/s/  Hugh E. McKay
Hugh E. McKay (0023017)
**PORTER WRIGHT MORRIS & ARTHUR LLP**
925 Euclid Avenue, Suite 1700
Cleveland, OH  44115-1483
Tel:  (216) 443-2580
Fax:  (216) 443-9011
E-mail: hmckay@porterwright.com