# Exhibit A

Page 1

1          Steven P, Feinstein, Ph.D

2          UNITED STATES DISTRICT COURT

3          NORTHERN DISTRICT OF OHIO

4               EASTERN DIVISION

5

6     *******************************

7     OHIO PUBLIC EMPLOYEES RETIREMENT
      SYSTEM, on Behalf of Itself and
8     all Others Similarly Situated,

9               Plaintiff

10    vs.                    CA NO. 4:08-CV-00160

11    FEDERAL HOME LOAN MORTGAGE
      CORPORATION, a/k/a FREDDIE MAC,
12    RICHARD F. SYRON,
      PATRICIA L. COOK,
13    ANTHONY S. PISZEL and
      EUGENE M. MC QUADE,

14

              Defendants
15    *******************************

16

17          VIDEOTAPED DEPOSITION OF:

18          STEVEN P. FEINSTEIN, PH.D.

19               MORGAN LEWIS

20          One Federal Street

21          Boston, Massachusetts

22     August 10, 2017        8:39 a.m.

23

24    Reported By: Darlene M. Coppola, RMR, CRR

25    Job No: 127062

Page 2

```
1          Steven P, Feinstein, Ph.D
2   APPEARANCES:
3   Representing the Plaintiff:
4       MARKOVITS STOCK & DE MARCO
5       3825 Edwards Road
6       Cincinnati, OH 45209
7       BY:  WILLIAM MARKOVITS, ESQUIRE
8
9   -and-
10
11
12      STRAUSS TROY CO., LPA
13      150 East Fourth Street
14      Cincinnati, OH 45202
15      BY:  RICHARD WAYNE, ESQUIRE
16
17
18  Representing the Defendant Anthony Piszel:
19      MURPHY & MC GONIGLE
20      1185 Avenue of the Americas
21      New York, NY 10036
22      BY:  JAMES GOLDFARB, ESQUIRE
23
24
25      (Continued on next page)
```

Page 3

```
1          Steven P, Feinstein, Ph.D
2   APPEARANCES: (Continued):
3   Representing the Defendant Federal Home
4   Loan Mortgage Corporation a/k/a Freddie
5   Mac:
6       MORGAN LEWIS & BROKIUS
7       One Federal Street
8       Boston, MA 02110
9       BY:  JASON FRANK, ESQUIRE
10      LIZA HAYS, ESQUIRE
11      MICHAEL BLANCHARD, ESQUIRE
12      EMILY RENSHAW, ESQUIRE
13
14
15
16
17
18  Representing the Defendant Richard Syron:
19      SIDLEY AUSTIN
20      1501 K Street Northwest
21      Washington, DC 20005
22      BY:  FRANK VOLPE, ESQUIRE
23
24
25      (Continued on next page)
```

Page 4

```
1          Steven P, Feinstein, Ph.D
2   APPEARANCES (Continued):
3   Representing the Defendant Eugene McQuade:
4       DECHERT
5       Cira Centre
6       2929 Arch Street
7       Philadelphia, PA 19104
8       BY:  CATHERINE WIGGLESWORTH, ESQUIRE
9
10
11
12  Representing the Defendant Patricia Cook:
13      ZUCKERMAN SPAEDER
14      1800 M Street Northwest
15      Washington, DC 20036
16      BY:  ADAM FOTIADES, ESQUIRE
17
18
19
20
21  Also Present:
22  Howard Lindenberg, Freddie Mac
23  Nikolai Caswell, Navigant Consulting
24  David Marcus, Ph.D., Cornerstone Research
25  Crystal Strawbridge, Videographer
```

Page 5

```
1          Steven P, Feinstein, Ph.D
2               INDEX
3           EXAMINATION
4   Witness Name
5   Page
6   Steven P. Feinstein, Ph.D.
7
8    Direct By Mr. Frank
     ..............................................
     9
9
10
11           EXHIBITS
12
13  Exhibit    Description
14  Exhibit No. 95   Declaration, Steven P.
    Page 19
15      Feinstein, Ph.D.
    Exhibit No. 96   Report on Market
    Page 55
16      Efficiency, June 7, 207
17  Exhibit No. 97   Report on Market
    Page 122
18      Efficiency, February 6,
        2015
19
20  Exhibit No. 98   Report on Market
    Page 125
21      Efficiency, February 13,
        2015
22  Exhibit No. 99   Expert Report, Petrobras
    Page 127
23  Exhibit No. 101  KBR Report
    Page 128
24  Exhibit No. 102  Expert Report, World
25  Page 131
```

Page 6

```
 1              Steven P, Feinstein, Ph.D
 2              Acceptance Corporation
 3  Exhibit No. 103  Expert Report, Eletrobras
    Page 133
 4
    Exhibit No. 100  Exhibit 7A - Petrobras ADR
 5  Page 144
                Regression Study
 6
    Exhibit No. 104  Freddie Mac Reports
 7  Page 187
 8
 9  (Continued on next page)
10              INDEX
11              EXHIBITS
12  Exhibit   Description
    Page
13
    No. 105  The"Less Than" Efficient
14  187
            Capital Markets
15          Hypothesis:  Requiring
            More Proof from Plaintiffs
16          in Frand-o-theMarket Cases
17  No. 106    Applied Statistics for
    188
18          Public Policy
19  No. 107    Probability and Statistics
    224
20          for Engineering in the
            Sciences
21
    No. 108    Press Release
22  326
23  No. 109    NERA Manuscript
    361
24
25
```

Page 7

```
 1          Steven P, Feinstein, Ph.D
 2          THE VIDEOGRAPHER:  This is the
 3  start of tape labeled No. 1 of the
 4  videotaped deposition of Dr. Steven
 5  Feinstein fine in the matter of Ohio Public
 6  Employees Retirement, et al. verus the
 7  Federal Home  Loan Mortgage Corporation, et
 8  al., in the United States District Court,
 9  the Northern District of Ohio, Eastern
10  Division, Civil Action No. 4:08-CV-00160.
11          This deposition is being held at One
12  Federal Street, Boston, Massachusetts on
13  August 10, 2017, at approximately 8:39 a.m.
14          My name is Crystal Strawbridge from
15  TSG Reporting, Inc., and I am the legal
16  video specialist.  The court reporter is
17  Darlene Coppola in association with TSG
18  Reporting.
19          Will counsel please introduce
20  yourselves.
21          MR. MARKOVITS:  Bill Markovits
22  on behalf of Markovits, Stock & DeMarco, on
23  behalf of the plaintiff, Ohio Public
24  Employees Retirement System.
25          MR. WAYNE:  Rick Wayne,
```

Page 8

```
 1          Steven P, Feinstein, Ph.D
 2  Strauss Troy, on behalf of plaintiffs.
 3          MR. VOLPE:  Frank Volpe,
 4  Sidley Austin on behalf Richard Syron.
 5          MR. GOLDFARB:  James Goldfarb
 6  from Murphy & McGonigle on behalf of
 7  Anthony Piszel.
 8          MR. FOTIADES:  Adam Fotiades,
 9  Zuckerman Spaeder, on behalf of Patricia
10  Cook.
11          MS. WIGGLESWORTH:  Catherine
12  Wigglesworth, Dechert, LLP on behalf of
13  Eugene McQuade.
14          MR. LINDENBERG:  Howard
15  Lindenberg on behalf of Freddie Mac.
16          MS. HAYS:  Elizabeth Hays on
17  behalf of Freddie Mac, Morgan Lewis.
18          MR. BLANCHARD:  Michael
19  Blanchard, Morgan Lewis, on behalf of
20  Freddie Mac.
21          MR. FRANK:  Good morning,
22  everyone.
23          Jason Frank on behalf of Freddie Mac
24  with Morgan Lewis.
25          MR. MARKOVITS:  Can we have
```

Page 9

```
 1          Steven P, Feinstein, Ph.D
 2  identification of the other people present?
 3          MR. FRANK:  Sure.  They're
 4  nonlawyers here, and if they could put
 5  their presence on the record, that would be
 6  great.
 7          DR. MARCUS:  David Marcus from
 8  Cornerstone Research.
 9          MR. CASWELL:  Nikolai Caswell
10  from Navigant Consulting.
11
12          STEVEN P. FEINSTEIN, PH.D.,
13          a witness called for examination
14  by counsel for the Defendant Federal
15  Home Loan Mortgage Corporation a/k/a
16  Freddie Mac, having been satisfactorily
17  identified by the production of his
18  driver's license and being first duly
19  sworn by the Notary Public, was examined
20  and testified as follows:
21
22          DIRECT EXAMINATION
23  BY MR. FRANK:
24      Q.  Good morning, Dr. Feinstein.
25      A.  Good morning.
```

Page 10

1          Steven P, Feinstein, Ph.D
2          MR. FRANK:  Before we begin,
3  counsel for the plaintiff and I will just
4  put a few stipulations on the record, if
5  that's all right.
6          THE WITNESS:  Sure.
7          MR. FRANK:  Very good.
8  Mr. Markovits, good morning.
9          MR. MARKOVITS:  Good morning.
10         MR. FRANK:  Can we agree that
11 we'll reserve all objections except as to
12 the form of the question and all motions to
13 strike until the testimony is offered to
14 the court?
15         MR. MARKOVITS:  Yes.
16         MR. FRANK:  And we're willing
17 to agree that the witness can review and
18 sign the transcript under the pains and
19 penalties of perjury and that no formal
20 signing before a court reporter is
21 necessary.
22         Is that acceptable?
23         MR. MARKOVITS:  Yes.
24         MR. FRANK:  And we'd like to
25 stipulate to the sufficiency of the notice

Page 11

1          Steven P, Feinstein, Ph.D
2  of the deposition and the subpoena that
3  brings us here today, and the credentials
4  of the court reporter and the videographer.
5          Is that acceptable?
6          MR. MARKOVITS:  Yes.  The
7  sufficiency of the notice to the extent it
8  is for today.  As you know, we objected to
9  any deposition beyond today.
10         MR. FRANK:  We understand that
11 there is an agreement to disagree with
12 respect to the length of the deposition,
13 and hopefully, the parties can work that
14 out over the proceedings.
15         MR. MARKOVITS:  Fair enough.
16         MR. FRANK:  Very good.
17 BY MR. FRANK:
18     Q.  Dr. Feinstein, you've been deposed
19 many times before; is that fair to say?
20     A.  Yes.
21     Q.  You've been engaged as an expert by
22 plaintiff shareholders in securities cases
23 previously, correct?
24     A.  Yes.
25     Q.  And in connection with those

Page 12

1          Steven P, Feinstein, Ph.D
2  engagements, you've been deposed over 20
3  times?
4      A.  Yes.
5      Q.  Over 30 times?
6      A.  Probably.  Yes, yes.
7      Q.  Over 40 times?
8      A.  I don't have a specific count.
9  There is a -- there's an exhibit in my
10 report with the depositions I've given over
11 the last four years, but we can count them
12 if you like.  I haven't.
13     Q.  But that exhibit isn't complete
14 insofar as it only identifies matters over
15 the course of four years, correct?
16     A.  Well, that's what it identifies.
17 That's what it states it identifies.
18     So it doesn't include depositions
19 prior to four years.
20     Q.  Fair enough.
21     So it is incomplete in the sense
22 that it's not a complete record of all of
23 the matters in which you've worked.  It's
24 complete only insofar as it covers a
25 four-year period?

Page 13

1          Steven P, Feinstein, Ph.D
2      A.  Correct.  But actually, there were
3  three depositions since the date of the
4  report.  So it's incomplete in that sense
5  as well.  But also, it does not include,
6  and it doesn't set out to include, the
7  depositions prior to four years.
8      So you're right.  There were more
9  depositions earlier than four years prior
10 to today.
11     Q.  What are the matters in which you've
12 been engaged, if any, that are not listed
13 in the report post the finalization of the
14 report?
15     A.  You mean which cases?
16     Q.  Yes.
17     A.  Okay.  ARCP, it's American Realty
18 Capital Partners.  It's a securities
19 litigation.  LSB, is another securities --
20 class action securities case.  And the
21 third one slips my mind.  RSO, Resource --
22 Resource Capital.
23     Q.  Are there any other matters that you
24 would list in your -- in that disclosure if
25 you were finalizing it today?

Page 14

1          Steven P, Feinstein, Ph.D
2    A.  No.
3    Q.  The only three that are omitted from
4  the disclosure, because it simply -- they
5  simply hadn't been -- they hadn't occurred
6  yet are, ARCP, LSB, and RSO?
7    A.  To the best of my recollection, yes.
8    Q.  Now, in this matter, OPERS engaged
9  you as its expert; is that correct?
10    A.  Counsel for OPERS, yes.
11    Q.  When did counsel for OPERS engage
12  you as an expert?
13    A.  I don't recall specifically.  If I
14  can see the -- my -- the date -- sometime
15  last year in 2016.  It was a couple of
16  months before the date of the declaration
17  that I submitted.
18    Q.  You submitted a declaration in this
19  case, correct?
20    A.  Right, and that was in 2016.
21    Q.  And it's -- to the best of your
22  recollection, you were engaged two months
23  prior to your signing that declaration?
24    A.  Approximately, yes.
25    Q.  Now, at some point after you were

Page 15

1          Steven P, Feinstein, Ph.D
2  engaged, were you assigned a task?
3    A.  Yes.
4    Q.  What was that task?
5    A.  You mean after the first
6  engagement -- when I was first engaged, I
7  was asked questions about what had changed
8  in recent years with respect to how
9  economists would set out to prove or
10  disprove or evaluate market efficiency and
11  if anything in the profession or in the
12  legal arena has changed that affects the
13  methodology.
14    It's -- essentially, I was asked the
15  questions that are listed as the scope in
16  declaration that I submitted, and I was
17  asked to write a declaration to that
18  effect, memorializing my answer to those
19  questions.
20    Q.  At some point after you signed your
21  declaration, were you asked to perform
22  additional tasks?
23    A.  Yes.
24    Q.  What were those?
25    A.  Well, actually, I do want to add

Page 16

1          Steven P, Feinstein, Ph.D
2  something to the earlier answer, which is I
3  was also asked initially to review the
4  reports of Dr. Hallman and Dr. Bajaj, and
5  that was part of the engagement, the
6  initial engagement, from which I produced
7  the declaration.
8    Subsequent to submitting the
9  declaration, I was asked to conduct my own
10  evaluation of market efficiency for Freddie
11  Mac stock and also opine as to whether or
12  not a common damage methodology was
13  available that could compute damages in a
14  common method -- methodology for all class
15  members.
16    Q.  So prior to signing your declaration
17  in this matter, you reviewed the Hallman
18  report and Bajaj report from 2012; is that
19  correct?
20    A.  That's my recollection.  I may be
21  wrong, but that's, as I sit here now, what
22  I recall.
23    Q.  Now, you've written reports --
24    A.  Actually, can I -- just to be sure
25  and make sure I'm correct about that, can I

Page 17

1          Steven P, Feinstein, Ph.D
2  see the declaration and the -- can I see
3  those documents?
4    Q.  We'll be marking them soon and
5  you'll have a chance to look at them, and
6  if you need to correct anything, you'll
7  have a chance.
8    A.  Okay.
9    Q.  You've written reports on market
10  efficiency in other cases, correct?
11    A.  Yes.
12    Q.  In every one of those reports, you
13  concluded that the security at issue traded
14  in an efficient market; is that correct?
15    A.  That's right.
16    Q.  You have never written a report in
17  which you concluded that the security at
18  issue traded in a market that was not
19  efficient, correct?
20    A.  Well, I -- the specific answer to
21  your question is, that is correct.
22    Although, I have reached a
23  conclusion on a number of occasions that I
24  would not be able to prove or opine that
25  the stock traded in an efficient market.

Page 18

1              Steven P, Feinstein, Ph.D
2      Q.   Now, you own a firm; is that
3   correct?
4      A.   That's right.
5      Q.   What's the name of the firm?
6      A.   Crowninshield Financial Research.
7      Q.   And what is the corporate structure
8   of that firm?
9      A.   It's an S corporation.
10     Q.   Now, have you been engaged by
11  counsel for OPERS as an expert, or has your
12  firm been engaged?
13     A.   I think specifically the -- again,
14  if I had the engagement letter in front of
15  me, I could tell you for sure.  But to the
16  best of my recollection, without the
17  document, the firm is engaged, but the
18  engagement letter specifically says that I
19  will be the lead expert and analyst on the
20  case.
21     Q.   And in addition to your own fees,
22  fees from others at your firm are being
23  charged in connection with this engagement;
24  is that correct?
25     A.   That's right.

Page 19

1              Steven P, Feinstein, Ph.D
2      Q.   In total, including your own fees,
3   how much has been billed to date?
4      A.   I don't know.  It's not one of the
5   documents that I reviewed in preparation
6   for today's deposition.  Sometimes I review
7   that, but in this case, I was reviewing
8   other things.
9      Q.   Can you estimate that more than
10  $100,000 has been invoiced to date?
11     A.   I think that's correct, as an
12  approximation.  I don't think it's much
13  more than that.
14     Q.   Now, are you the sole owner of the
15  firm?
16     A.   Yes, and that's written in my
17  report.
18     Q.   So in -- so all of the profits from
19  this engagement go to you; is that correct?
20     A.   Well, profits over costs, yes.
21
22          MR. FRANK:  Let's mark this.
23
24          (Exhibit No. 95 marked for
25          identification.)

Page 20

1              Steven P, Feinstein, Ph.D
2
3   BY MR. FRANK:
4      Q.   Dr. Feinstein, I'm putting before
5   you a document that has been marked as
6   Exhibit 95.
7          What is Exhibit 95?
8      A.   (Witness reviews document.)
9          This is the 2016 declaration that I
10  described earlier.
11     Q.   This is a declaration of Professor
12  Steven P. Feinstein, Ph.D., CFA, dated
13  December 16, 2016, correct?
14     A.   Correct.
15     Q.   And this is your signature that
16  appears on page --
17     A.   Eight.
18     Q.   -- 8 of the document.
19     A.   Yes.
20     Q.   And you drafted this document; is
21  that correct?
22     A.   Yes.
23     Q.   And you reviewed this document in
24  preparation for coming here today,
25  correct?

Page 21

1              Steven P, Feinstein, Ph.D
2      A.   Yes.
3      Q.   And to the best of your knowledge as
4   you sit here today, everything in this
5   Exhibit 95 is truthful; is that correct?
6      A.   Yes.
7      Q.   Now, after you signed this document,
8   you were tasked with assessing the market
9   efficiency of Freddie Mac's common stock
10  over a particular period of time,
11  correct?
12     A.   That's right.
13     Q.   And you're familiar with the factors
14  set forth in the Cammer case, correct?
15     A.   Of course.
16     Q.   There are five factors, right?
17     A.   Yes.
18     Q.   And in connection with the fifth
19  factor, you conducted two tests; is that
20  correct?
21     A.   That's correct.
22     Q.   One of those tests was an event
23  study and the other test was a z-test; is
24  that correct?
25     A.   Right.  The z-test is a collective

Page 22

1  Steven P, Feinstein, Ph.D
2  event study, actually, but it's a different
3  type of event study.
4  Q.  So you consider both of those tests
5  to be forms of event studies?
6  A.  Right.  The first is the more
7  traditional event study.  The second is a
8  type of event study, but it's not the
9  traditional event study.  It's also
10  known -- by the way, it's also known as the
11  FDT test for the authors who first wrote
12  about it.
13  Q.  What are the names of the authors
14  who first wrote about it?
15  A.  Ferrillo, Dunbar and Tabak.
16  Q.  And you referenced their article in
17  your declaration; is that correct?
18  A.  Yes.
19  Q.  And if I refer to -- and that
20  article is specifically referenced in
21  Footnote 5 of Exhibit 95, correct?
22  A.  Yes.
23  Q.  The name of the article is "The
24  'Less Than' Efficient Capital Market's
25  Hypothesis:  Requiring More Proof From

Page 23

1  Steven P, Feinstein, Ph.D
2  Plaintiffs in Fraud on the Market Cases."
3  Do you see that?
4  A.  I do.
5  Q.  Did I read that correctly?
6  A.  You did.
7  Q.  And if I refer to that article as
8  the FDT article, you'll know what I'm
9  referring to, correct?
10  A.  Yes.
11  Q.  Now, what is an event study?
12  A.  Oh, an event study is a type of
13  economic -- financial economic analysis --
14  that has a number of components.
15  It isolates the -- what's called the
16  residual return, which is a portion of a
17  stock or a securities return that is
18  controlled for market and peer effects, and
19  then tests whether or not the residual
20  return was of such magnitude that it would
21  be extremely unlikely to observe that
22  result had the return -- residual return
23  been caused by random volatility alone.
24  And therefore, it's -- because of
25  those features, it's a test that assesses

Page 24

1  Steven P, Feinstein, Ph.D
2  whether or not information has caused the
3  stock price to move on the date of the
4  event.
5  So it's an analysis to determine
6  whether or not information in the course of
7  a particular event has caused the security
8  price to move.
9  Q.  And let me turn your attention to
10  Paragraph 22 of your declaration.  That's
11  on Page 6.
12  On Paragraph 22, you describe a
13  z-test as follows:  You write, "One such
14  test is a z-test that collectively compares
15  the differential incidence of significant
16  stock price movements across two groups of
17  dates, where one group comprises dates with
18  high information flow and the second group
19  is composed of dates with less information
20  flow."
21  Do you see that?
22  A.  I do.
23  Q.  Did I read that correctly?
24  A.  Yes.
25  Q.  Is that, as you sit here today,

Page 25

1  Steven P, Feinstein, Ph.D
2  still an accurate description of what a
3  z-test is?
4  A.  Well, it's a description of the FDT
5  test.  The FDT test is -- uses the z-test.
6  The z-test is in statistics
7  textbooks.  It's a very old test for this
8  purpose.  The FDT test applies the z-test
9  to the application of testing market
10  efficiency and testing the impact of
11  information.
12  But because the z-test is so
13  essential and central to the FDT test, some
14  people call the entire FDT test the z-test.
15  And others refer to a z-test as being the
16  statistical test that is a component of FDT
17  test.
18  I just want to give a very complete
19  answer so you understand the difference.
20  As I'm using the word "z-test" here,
21  yes, I'm using the word "z-test" here to
22  refer to the FDT test.  And, therefore,
23  yes, this is a correct and true
24  statement.
25  Q.  A z-test is a standard statistical

Page 26

1          Steven P, Feinstein, Ph.D
2    test that has existed for many decades that
3    compares the incidence of statistical
4    significance across two populations; is
5    that correct?
6        A.  Right.  The incidence of anything,
7    really.  It could be the incidence of
8    statistical significance or the incidence
9    of a cure from a medical treatment.  But
10   it's an incidence frequency test that
11   compares whether the incidence of something
12   in one sample is different from the
13   incidence of that same thing in the other
14   sample.
15       Q.  And an FDT test is just a z-test as
16   applied in the context of assessing market
17   efficiency?
18       A.  Yes.
19       Q.  Now, when was a z-test first used in
20   a securities case?
21       A.  Quite some time ago.  I think -- I
22   think it goes back at least to PolyMedica.
23   I think Dr. Dunbar used it in PolyMedica.
24       Q.  When did you first use a z-test in a
25   securities case?

Page 27

1          Steven P, Feinstein, Ph.D
2        A.  I'm not sure.  I've used -- I
3    developed a test similar to the z-test,
4    very similar, but it's not exactly the
5    z-test, and I've been using it for a few
6    years.
7          My test used a binomial test, rather
8    than the z-test, to test for the difference
9    in -- a significant difference in
10   frequencies of significance.
11         I also used a similar test that
12   looked at -- compared price dynamics
13   between two samples; a sample of news days
14   versus a sample of non-news days.
15         But I can't tell you specifically.
16   I would have to check my records to answer
17   that question with precision.  But a few
18   years; several years.
19         I used it in Petrobras -- I used it
20   in Petrobras, which goes back at least a
21   couple of years now.
22       Q.  And when you say you used it in
23   Petrobras, are you saying that you used the
24   FDT test in Petrobras, or that you used the
25   test that you developed that was similar to

Page 28

1          Steven P, Feinstein, Ph.D
2    the FDT test?
3        A.  I'd have to look at my Petrobras
4    report, but they're very similar.  I
5    consider them almost interchangeable.
6        Q.  Did you use the FDT test in this
7    case?
8        A.  Yes, yes.
9        Q.  Did you use your version of a z-test
10   in this case or the FDT z-test?
11       A.  I used the FDT test, both in this
12   case and in Petrobras.  I remember now for
13   sure.
14       Q.  Now, other than this case and
15   Petrobras, have you used the FDT z-test in
16   any other cases?
17       A.  Yes.
18       Q.  What are those cases?
19       A.  Most of the cases in recent years.
20       Q.  Can you name them for me?
21       A.  Again, I would -- not with 100
22   percent precision, but with, essentially,
23   an approximation based on my recollection.
24   But if we look at Exhibit 2 to this
25   declaration and look at the cases I've done

Page 29

1          Steven P, Feinstein, Ph.D
2    since Petrobras, which is December 2015,
3    I'm quite confident it's each of these:
4    December 2015, January 2016, KBR, Symbol
5    Technologies, and others as well.  I
6    just -- I would have to check my records to
7    know for sure.  But I have used it
8    frequently.
9        Q.  So on Exhibit 2 to Exhibit 95 as
10   marked in this deposition, we see a listing
11   of your testimony over the last four years,
12   correct?
13       A.  Yes.
14       Q.  And if you turn to Page 22, we see
15   that there's a -- in the middle of the
16   page, there's "in re: Petrobras securities
17   litigation."
18         Do you see that?
19       A.  Yes.
20       Q.  And there, it says Case No.
21   14CV-9662-JSR.
22       A.  Yes.
23       Q.  Do you see that?
24       A.  Yes.
25       Q.  And is it your understanding that

Page 30

Steven P, Feinstein, Ph.D
1
2  the -- that at the beginning of the case,
3  the number is an indication of the year in
4  which the case was filed?
5      A.  I think that's right.
6      Q.  And so, this Petrobras is a case
7  that was filed in the year 2014; is that
8  right?
9      A.  I'll take your word for it.  I
10  wouldn't know for sure.
11      Q.  But what you do know for sure is
12  that you gave deposition testimony in that
13  case in October and December of 2015; is
14  that right?
15      A.  That's right.
16      Q.  And then you gave testimony at an
17  evidentiary hearing in December of 2015,
18  correct?
19      A.  That's right.
20      Q.  And you list those facts here on
21  Exhibit 2 of Deposition Exhibit 95,
22  correct?
23      A.  Right.  Yes.
24      Q.  Now, you recall that you used an FDT
25  z-test in the Petrobras matter, correct?

Page 31

Steven P, Feinstein, Ph.D
1
2      A.  Yes.
3      Q.  And that was a securities class
4  action; is that right?
5      A.  Yes.  It was in the Petrobras case
6  that the judge validated its use.  And
7  prior to that, there hadn't been as much
8  court validation of the test.
9      Q.  Now, in the Symbol Technologies
10  case, you gave deposition testimony in
11  January of 2016; is that right?
12      A.  Right.
13      Q.  And as you sit here today, it's your
14  memory that you used the FDT z-test in the
15  Symbol case, correct?
16      A.  Right.
17      Q.  And in the KBR matter, you gave
18  deposition testimony in April of 2016; is
19  that correct?
20      A.  Right, and I just want to -- I'll --
21  yes, that's true.
22          I mean, I'm doing -- what's in those
23  reports I'm reporting to you from memory.
24  So I just want to caveat that my memory
25  isn't perfect.  I mean, I believe I used

Page 32

Steven P, Feinstein, Ph.D
1
2  the test, but I would have to check the
3  report to know for sure.
4      Q.  So as you sit here today, it's your
5  memory that you used the FDT z-test in the
6  KBR matter?
7      A.  I wouldn't say that exactly.
8          I would say it's a reasonable
9  inference from what I know about from when
10  I started using it, but I would have to
11  check to see for sure.
12      Q.  Is it fair to say that you're just
13  not sure whether you used the FDT test in
14  the KBR matter?
15      A.  Yes, that's -- that's fair.
16      Q.  Is it fair to say that as you sit
17  here today, you're just not sure whether
18  you used the FDT z-test in the Symbol
19  Technologies matter?
20      A.  I'm not 100 percent sure.  That's
21  correct.
22          I mean, I would be 100 percent sure
23  if I had the documents in front of me to
24  check it.
25      Q.  Right.  But you just don't know one

Page 33

Steven P, Feinstein, Ph.D
1
2  way or another, as you sit here today,
3  without looking at the document?
4      A.  Not with 100 percent certainty.
5  Generally, when I do any analysis or write
6  reports, I have my sources at hand.
7          I don't like to rely only on my
8  memory.  But if you're asking that I do so,
9  that's the best that I can do.
10      Q.  Well, let's look at Groupon, which
11  is the case where you gave deposition
12  testimony in December of 2015.
13          Is it your memory that you didn't
14  use the Z -- the FDT z-test in the Groupon
15  matter?
16      A.  I just don't recall one way or the
17  other without the document.
18      Q.  Now, in terms of the in re Petrobras
19  matter that is the very last matter listed
20  on Exhibit 2 of Deposition Exhibit 95, did
21  you use an FDT z-test in that matter?
22      A.  I just don't recall.  I remember
23  that was an opt-out case.  So I know that
24  they didn't need an opinion for purposes of
25  the fraud-on-the-market reliance doctrine,

Page 34

```
1            Steven P, Feinstein, Ph.D
2    but I do think I addressed market
3    efficiency for other purposes.  And I do
4    believe my analysis was consistent with the
5    analysis I had done for Petrobras earlier.
6        Q.  But you just don't recall, as you
7    sit here today, whether you used an FDT
8    z-test or not?
9        A.  If I -- if you show me the reports,
10   I can tell you for sure, if I had the
11   reports.
12           I mean, if you asked me any other
13   time when I can look at my reports, that's
14   what I would do is I would give you a
15   definitive answer based on what's written
16   down.  But just from memory, it's -- you
17   know, I'm reluctant to do so.
18       Q.  Now, the ARCP case and the LSB case
19   and the RSO case, those matters, did you
20   use the FDT z-test in those matters?  Do
21   you know?
22       A.  Or some variant of the collective
23   test.
24       Q.  What are variants of the collective
25   tests?
```

Page 35

```
1            Steven P, Feinstein, Ph.D
2        A.  Well, like I said earlier, one test
3    is, rather than using the formal
4    statistical z-test, I test whether the
5    incidence of statistical significance
6    within the news sample is itself
7    significant, is itself unlikely under an
8    assumption of market inefficiency or only
9    random volatility causing the stock price
10   to move.
11           I would use a binomial distribution
12   test.  If we know that 5 percent of stock
13   returns are -- appear to be significant,
14   what's the likelihood under that -- so
15   there's a 5 percent chance of significance,
16   and a 95 percent chance of nonsignificance
17   based on random volatility alone, what's
18   the probability of, let's say, having four
19   out of nine events being statistically
20   significant given the binomial
21   distribution?
22           So instead of using the z-test as
23   the underlying statistical driver, I used
24   the binomial test, which is legitimate.
25   It's a variant.
```

Page 36

```
1            Steven P, Feinstein, Ph.D
2            And the other one is -- another test
3    is to test whether the dispersion of stock
4    returns in the news sample is significantly
5    different from the dispersion of stock
6    returns in the non-news sample, based on
7    either an F-test or an Ansari-Bradley,
8    A-n-s-a-r-i, nonparametric test to
9    determine whether the stock price dynamics
10   in a news sample are different from the
11   stock price dynamics in a non-news sample,
12   which would prove that the market doesn't
13   ignore information.
14           So those are variants built off the
15   same underlying principle as the FDT test.
16       Q.  In this case, you didn't use a
17   binomial test right?
18       A.  Correct.
19       Q.  In this case, you didn't use a
20   dispersion test?
21       A.  Correct.
22       Q.  In this case, you didn't use an
23   F-test?
24       A.  That's right, for good reason.  And
25   I can explain it.
```

Page 37

```
1            Steven P, Feinstein, Ph.D
2        Q.  In this case, you didn't use an
3    Ansari-Bradley test?
4        A.  Right.
5        Q.  You used the FDT z-test?
6        A.  That's right.
7        Q.  And a more traditional event study
8    as well?
9        A.  Exactly.
10       Q.  What is a binomial distribution?
11       A.  Binomial distribution is -- well,
12   the binomial model addresses events that
13   either happen or don't happen, like a coin
14   flip.  You flip a coin, it's either going
15   to be heads or tails.  So it's -- binomial
16   means there's two outcomes, two possible
17   outcomes.  When you flip a coin, it's
18   either heads or tails.  I guess within the
19   realm of possibility, the coin can land on
20   its edge, but we usually rule that out.
21           And then the binomial distribution
22   is the statistics that characterize how
23   likely it is to land on a head versus how
24   likely it is to land on a tail; the coin.
25           With a coin, if it's a fair coin,
```

Page 38

Steven P, Feinstein, Ph.D

1 it's 50 percent one and 50 percent the
2 other, and that's all there is to the
3 distribution.
4
5        With the statistical significance of
6 a stock return under the assumption of
7 market inefficiency, every -- by design,
8 every return would have a distribution
9 of -- it would appear to be statistically
10 significant.  It would be in the 5 percent
11 extreme; tails 5 percent of the time, thus
12 heads as a 5 percent probability, and tails
13 would be -- it's in the middle of the
14 distribution away from the tails, 95
15 percent of the time.
16     Q.  Are you familiar with an expression
17 "normal distribution"?
18     A.  Yes.
19     Q.  What's a normal distribution?
20     A.  That's the distribution where the
21 histogram conforms to the bell-shaped curve
22 that most of us are familiar with.
23     Q.  So what's the difference between a
24 binomial distribution and a normal
25 distrubution?

Page 39

Steven P, Feinstein, Ph.D

1
2     A.  Well, distribution is a continuous
3 distribution.  The range of outcomes is
4 continuous.
5        Like, a return could be 0 or .1 or
6 .2. It's in every point in between.  A
7 continuous range of outcomes is possible
8 with a normal distribution.
9        The binomial distribution is
10 discreet.  There's only two outcomes, yes
11 or no, heads or tails, significant or
12 nonsignificant.
13     Q.  Are there any statistical techniques
14 that allow a statistician to adjust a
15 binomial distribution to approximate a
16 normal distribution?
17     A.  Exactly the way you said it, no.
18        But I think I know what you're
19 getting at.
20        In a repeated experiment, the
21 binomial converges into -- the cumulative
22 statistics of a binomial converge to normal
23 under certain circumstances.
24     Q.  And so that would require testing on
25 a larger population for a binomial

Page 40

Steven P, Feinstein, Ph.D

1
2 distribution to approach the normal
3 distribution?
4     A.  Yes.
5     Q.  And when --
6     A.  A larger number of observations.
7     Q.  And when a smaller number of
8 observations are used -- strike that.
9        When a smaller number of
10 observations are made, are there any
11 statistical techniques that statisticians
12 use to adjust for the fact that there are a
13 smaller number of observations?
14     A.  It depends on what the test is.  It
15 really depends on which test is being
16 applied and the nature of the distributions
17 under the null hypothesis.  Sometimes it's
18 necessary; sometimes it's not.
19     Q.  What about in the context of an FDT
20 z-test?
21     A.  There are diagnostics that can be
22 run to determine whether there's an impact
23 of a relatively small population, something
24 like the Fisher's exact test, which I did
25 run and the diagnostic indicated there was

Page 41

Steven P, Feinstein, Ph.D

1
2 no problem.
3        But depending on the nature of the
4 data and the null hypothesis and the sample
5 size and the results, it may or may not be
6 necessary.
7        I ran diagnostics and found it was
8 not an issue in this case.
9     Q.  What diagnostics did you run in this
10 case?
11     A.  Well, I did that one.
12        You mean in running the FDT test?
13     Q.  Yes.
14     A.  Well, I did -- I ran the test
15 consistent with the way it was described in
16 the literature.  But I did run the Fisher's
17 exact test to see if there was an issue
18 with small sample, and there wasn't.
19        I can't recall others that were
20 necessary.
21     Q.  What literature are you referring
22 to?
23     A.  Well, two articles, one by Michael
24 Hartzmark on the subject, and then one by
25 the FDT original study, and then actually

11  (Pages 38 to 41)

Page 42

Steven P. Feinstein, Ph.D

1    Steven P. Feinstein, Ph.D
2  textbooks on the z-test, in general, that
3  I, over my career, relied on and learned
4  from.
5    Q.  Was it your intent to run an FDT
6  z-test consistent with the methodology used
7  by FDT in their article -- their FDT
8  article?
9    A.  Not entirely consistent.  I thought
10  there were some issues with their event
11  selection methodology, so I refined that.
12    But the general framework is the
13  same.
14    Q.  Putting aside the issue of event
15  selection, was it your intent to run the
16  FDT z-test in this case using the same
17  methodology that the FDT authors used in
18  the FDT article?
19    A.  No.  I mean, I don't blindly follow
20  their example.  I run what I think is
21  appropriate and defensible, and that's what
22  I did here.
23    Q.  Well, in what ways did your FDT
24  z-test differ from the FDT z-test run by
25  the FDT authors in the FDT article, putting

Page 43

1    Steven P. Feinstein, Ph.D
2  aside event selection?
3    A.  I'd have to -- I don't think they
4  differed in any material way.
5    Q.  Are you aware of any immaterial ways
6  in which they differed, putting aside event
7  selection?
8    A.  Again, just based on recollection
9  but what I ran is appropriate and
10  consistent with the statistics literature
11  and defensible, given the null hypothesis
12  and the sample size and the distribution.
13  There may have been some issues with the
14  diagnostic for small sample.
15    There may have been some issues with
16  respect to bootstrapping, which I know that
17  Michael Hartzmark paid some attention to,
18  but I don't think either of those issues
19  apply in any material way to this case.
20    Q.  Now, you earlier testified that you
21  ran the Fisher's exact test, which is a
22  diagnostics test, in this matter; is that
23  correct?
24    A.  Right.
25    Q.  Do you mention the Fisher's exact

Page 44

1    Steven P. Feinstein, Ph.D
2  test in your report?
3    A.  No, because it was immaterial.  I
4  mean, it turned out to be irrelevant.
5    It's -- it was a check.  It was a
6  diagnostic.  And it was -- it indicated no
7  issues.
8    Q.  Did you provide counsel for OPERS
9  with any of your Fisher's exact test
10  calculations?
11    A.  I'm not sure.  I may have run these
12  tests -- these diagnostics subsequent to
13  submitting the report, confirming what I
14  originally knew, which is that it wasn't an
15  issue here, in which case then it would not
16  have been provided if it was run subsequent
17  to the production.
18    Q.  As you sit here today, do you know
19  whether or not you ran the Fisher's exact
20  test prior to or after the finalization of
21  the report?
22    A.  No, no.  But I did run it, and I
23  know it's not an issue.
24    Q.  Well, what were the results of the
25  Fisher's exact test?

Page 45

1    Steven P. Feinstein, Ph.D
2    A.  The results that I observed are
3  robust and well-founded in the results of
4  the test.
5    Q.  Well, is the Fisher's exact test a
6  statistical test?
7    A.  Yes.
8    Q.  And does it yield numbers?
9    A.  Yes.
10    Q.  And those numbers -- what were those
11  numbers?
12    A.  I don't recall.  I know that they
13  were just not over the threshold to
14  indicate any issue with sample size.
15    Q.  Do you have a record of the tests --
16  the Fisher's exact test that you ran?
17    A.  Yes.
18    Q.  And did you run any other
19  diagnostics tests, other than the Fisher's
20  exact test in this case?
21    A.  I probably ran the binomial test as
22  well to see if four out of nine is
23  statistically significant under a binomial
24  distribution.  I'm pretty sure I would do
25  that.  And confirmed that whichever

Page 46

Steven P, Feinstein, Ph.D
1   statistical test was applied, the results
2   would be the same.
3       Four out of nine is a very extreme
4   result under the assumption that
5   information is not causing the stock price
6   to move, therefore, you can reject the
7   assumption reasonably that information has
8   no effect on the stock price.
9       Q.  As you sit here today, do you know
10  one way or another whether you actually ran
11  the binomial test?
12      A.  I'm quite sure I did, as a
13  diagnostic check.
14      Q.  And do you still have the results of
15  that test?
16      A.  Most likely.  Possibly.
17      Q.  And do you know what the numerical
18  outcome of that test was?
19      A.  I know the qualitative result, which
20  is that the results are robust, that the
21  result is confirmed.  The conclusion I drew
22  from the test is correct.
23      The specific test statistic and the
24  P value, I don't recall that.

Page 47

Steven P, Feinstein, Ph.D
1       Q.  Do you know whether or not you ran
2   the binomial test before or after you
3   finalized and signed your report in this
4   case?
5       A.  I'm pretty sure I would have run
6   that before.
7       Q.  And you didn't provide the
8   calculations that you ran in the binomial
9   test to OPERS counsel; is that correct?
10      A.  Well, I directed my staff to produce
11  everything.  But this is something -- I
12  guess if you don't have it, then you don't
13  have it.  We could provide it.
14      Q.  You didn't mention the binomial test
15  in your report; is that correct?
16      A.  No.  It wasn't necessary.  It's --
17  like I said, it's a diagnostic.  It's a
18  check to see if there's any issues with the
19  report.
20      It's almost like proofreading to see
21  if there's anything that needs to be
22  considered.  And nothing needed to be
23  considered.  Nothing additional needed to
24  be considered.

Page 48

Steven P, Feinstein, Ph.D
1       Q.  Well, you discussed the binomial
2   test in other expert reports that you've
3   authored, correct?
4       A.  Well, usually it's one or the other.
5   Usually I would use the z-test or the
6   binomial.  They're conceptually similar;
7   very similar.
8       Q.  Have you ever, previously in a case,
9   run both a z-test and a binomial test?
10      A.  Again, you're asking me, from
11  recollection, all of my prior reports.
12      I would guess that I did not,
13  because they're so similar that it's not
14  necessary to run them both.
15      But I can imagine that maybe
16  sometime it may have been mentioned both
17  times.  But it's usually not necessary, and
18  usually I would advise against it.
19      Q.  Why is it -- strike that.
20      You've discussed the Fisher's exact
21  test in prior reports, correct?
22      A.  I may have.
23      Q.  And in those --
24      A.  I mean, usually, it would be in a

Page 49

Steven P, Feinstein, Ph.D
1   rebuttal.  If it's the kind of issue that a
2   defense expert is concerned with -- and
3   frankly, they should know that they
4   shouldn't be concerned with it, given the
5   degree of significance that these results
6   have affiliated with -- but if it's
7   something that they're concerned about,
8   then in a rebuttal, I might say, all right,
9   if you want to see the Fisher's exact test
10  results and if you can't run them yourself,
11  here they are.
12      It's not usually something I would
13  present in an opening report because it's
14  not hard to infer from the degree of
15  significance of the results that it's not a
16  problem.
17      That what the Fisher's exact test
18  might identify as a problem is simply not a
19  problem in this -- with these -- with these
20  data.
21      Q.  Is it your standard practice to run
22  a Fisher's exact test in connection with
23  conducting an FDT z-test?
24      A.  Generally, only if there's some

13  (Pages 46 to 49)

Page 50

Steven P, Feinstein, Ph.D

1
2  doubt; but not, generally, if there's no
3  doubt.
4      Q.  Now, what is -- what is the title of
5  the Michael Hartzmark article that you
6  referenced earlier, if you recall?
7      A.  I don't know.  I don't recall.
8      Q.  Is it listed in your report or
9  declaration?  Do you know?
10      A.  Well, it's not something I relied
11  upon specifically for this report or for
12  the declaration.
13          It's background literature
14  supporting the use of the model.
15          (Witness reviews document.)
16          Let me see.
17      Q.  I --
18      A.  Yes, it's -- this document -- the
19  declaration doesn't have a reviewed and
20  relied upon list, so...
21      Q.  Now, it's your memory that you tried
22  to conduct your FDT z-test in this case
23  consistent with the way that Dr. Hartzmark
24  describes it in his article; is that fair
25  to say?

Page 51

Steven P, Feinstein, Ph.D

1
2      A.  Well, not exactly.  I mean, not
3  exactly following their methodology step by
4  step, but motivated in addressing the
5  issues as in a manner that's consistent
6  with what's in the literature.
7      Q.  Now, you mentioned earlier issues of
8  bootstrapping and issues of small samples.
9          Do you recall that?
10      A.  You brought it up and I answered
11  your questions, yes.
12      Q.  I don't -- I don't believe I brought
13  up bootstrapping.  But regardless, no need
14  to quibble.
15          What are issues of bootstrapping?
16      A.  Bootstrapping is a way of testing
17  empirically whether the distribution of the
18  data conforms to what you -- what the
19  assumptions of the distribution are in your
20  testing algorithm.
21      Q.  And did you do anything in this case
22  to address or analyze issues of
23  bootstrapping?
24      A.  Again, what -- I'm not sure.  I'm
25  not sure.

Page 52

Steven P, Feinstein, Ph.D

1
2          I mean, it's -- I have -- you know,
3  I work with the staff, and we have general
4  procedures to identify whether, you know,
5  to do diagnostics on tests to see if there
6  are any issues that need to be addressed.
7          It's a matter of course that we run
8  diagnostics to see if there are no issues.
9  No issues were brought to my attention.  So
10  I'm pretty sure that the general procedures
11  were followed and that it was just not an
12  issue that needed to be addressed.
13      Q.  What are issues of small samples?
14      A.  Sometimes -- usually the issue with
15  small sample is that the power of the test
16  is low; that the power of the test to
17  reject a null hypothesis when the null
18  hypothesis should be rejected, the
19  probability of rejecting the hypothesis is
20  low.  So the test has low power because
21  you're not the looking at enough data.
22          It just wasn't a problem here.  With
23  looking at all the data in the class period
24  and the nine events in the collective event
25  study, we know that the power of the test

Page 53

Steven P, Feinstein, Ph.D

1
2  was powerful enough because there was a
3  very strong rejection of the null
4  hypothesis, that information doesn't move
5  the stock price.
6          So just to hone in on and give you
7  an answer specifically to your question,
8  small sample issues are that the test may
9  have low power because of the small sample,
10  and you may get a nonrejection of a null
11  hypothesis, not because the -- whether the
12  hypothesis is true or false, but just the
13  test itself is weak because of the small
14  sample.  That was not a problem here.
15      Q.  In your declaration, you discuss a
16  Brav and Heaton article about how event
17  studies may sometimes have low power; is
18  that correct?
19      A.  That's right.
20      Q.  And is it fair to say that the
21  concerns raised in that article don't apply
22  to this case because, in your view, the
23  event study and the z-test you conducted
24  here don't exhibit those -- that issue?
25      A.  Yes, that's right.

Steven P, Feinstein, Ph.D
1       Steven P, Feinstein, Ph.D
2       Q.  The low power issue is not an issue
3  for the Freddie Mac case; fair to say?
4       A.  That's what I concluded from the
5  data and the statistical results.
6       Can we take a short break?
7       MR. FRANK:  Sure.
8       THE VIDEOGRAPHER:  We are off
9  the record.  The time is 9:27.
10
11       (Recess taken from 9:27 a.m.
12       to 9:40 a.m.)
13
14       THE VIDEOGRAPHER:  We are back
15  on the record at 9:40.
16
17  BY MR. FRANK:
18       Q.  Dr. Feinstein, is a Fisher's exact
19  test an event study?
20       A.  No.
21       Q.  Is a binomial test an event study?
22       A.  No.
23       Q.  And --
24       A.  It's a component of one version of
25  the collective event study.  But by itself,

1       Steven P, Feinstein, Ph.D
2  it's not an event study.
3       Q.  Is an Ansari-Bradley test an event
4  study?
5       A.  Again, it's a component of a variant
6  of an event study, but in itself, it's not
7  an event study.
8       Q.  Is an F-test an event study?
9       A.  Same answer.
10       Q.  And for the binomial test, that's
11  not itself an event study, it's a component
12  of a variant of an event study; is that
13  correct?
14       A.  Exactly right.
15       MR. FRANK:  Let's mark the
16  report.
17
18       (Exhibit No. 96 marked for
19       identification.)
20
21  BY MR. FRANK:
22       Q.  Dr. Feinstein, I've put before you a
23  document that's been marked as Exhibit 96.
24       What is Exhibit 96?
25       A.  This is the report on market

1       Steven P, Feinstein, Ph.D
2  efficiency that I submitted in this matter.
3  It's a report on market efficiency, but it
4  also includes a section on damages model.
5       Q.  This is your report in this case,
6  right?
7       A.  Yes.
8       Q.  And all of your opinions in this
9  case are set forth in this report; is that
10  fair to say?
11       A.  Yes.
12       Q.  You didn't leave any opinions that
13  you have about market efficiency in this
14  case out of the report, right?
15       A.  Correct.
16       Q.  And you didn't leave any opinions
17  you have about how to construct a damages
18  model out of this report; is that right?
19       MR. MARKOVITS:  Objection.
20       A.  Correct.  Well, I hesitated for a
21  moment because some of what we discussed
22  this morning are opinions that I have that
23  pertain to this case and are not in the
24  report, things like that the results are
25  robust enough such that certain diagnostics

1       Steven P, Feinstein, Ph.D
2  can easily be inferred from the results.
3       I mean, that's an opinion.  It's
4  not -- it's what's explicated in the
5  report, but it is an opinion I have and it
6  relates to this case.
7       But the only reason I expressed it
8  is because you asked questions about it.
9  BY MR. FRANK:
10       Q.  Well, there's no -- if you were to
11  testify in this case at trial about your
12  opinions in this case, I would know in
13  advance what your opinions are because
14  they're set forth in this report, right?
15       A.  Right.  But as today you asked
16  questions related to the report, related to
17  the case that are not in the report, and I
18  answered them.
19       So to the extent that that could
20  happen, the -- to the extent that it
21  happened today, I imagine it could happen
22  again.
23       Q.  So it's fair to say that --
24       MR. MARKOVITS:  Can I object.
25       Can I just interrupt.  I'm sorry to

Page 58

1          Steven P, Feinstein, Ph.D
2    interrupt.
3              MR. FRANK:  Sure.
4              MR. MARKOVITS:  I would like
5    to object with regard to the testifying at
6    trial, because the opinion he gives with
7    regard to damages is with regard to the
8    ability to determine damages on a
9    class-wide basis.
10             Were he to testify at trial, he
11   would have conducted a damage analysis by
12   that time, and he would be testifying in
13   that regard, not with regard to this
14   opinion.
15   BY MR. FRANK:
16   Q.  Is it fair to say that you have
17   opinions about market efficiency -- about
18   the market efficiency of Freddie Mac's
19   stock that are not in this report?
20   A.  As of this juncture right now, I do
21   not have opinions about the efficiency of
22   the market of Freddie Mac stock that are
23   not in this report.
24             All the opinions I have about
25   Freddie Mac common stock market efficiency

Page 59

1          Steven P, Feinstein, Ph.D
2    as of right now are in this report.
3    Q.  Now, we've discussed that you
4    performed two tests in connection with
5    assessing the fifth factor of the Cammer
6    case, right?
7    A.  Yes.
8    Q.  Okay.  Now, which test did you
9    perform first?
10   A.  Oh, the single -- the single-event
11   event study.
12             And by that, I mean that it's an
13   event study focused on an event.  In this
14   case, there's a single event.
15   Q.  And now, prior to performing the
16   single-event event study, you reviewed
17   Dr. Hallman's report dated August 16, 2012,
18   correct?
19   A.  Yes.
20   Q.  And to the best of your
21   recollection, you reviewed that report
22   when?
23   A.  Sometime within the month or two
24   before December 16, 2016.
25   Q.  Prior to performing the single-event

Page 60

1          Steven P, Feinstein, Ph.D
2    event study, you reviewed Dr. Bajaj's
3    report dated December 14, 2012, correct?
4    A.  That's right.
5    Q.  That was approximately within the
6    month or two before December 16 of 2016,
7    right?
8    A.  (Witness reviews document.)
9              Yes.
10   Q.  Now, you were aware that Dr. Hallman
11   conducted an event study also, correct?
12   A.  Yes.
13   Q.  You were aware that Dr. Hallman
14   conducted an event study based on the
15   testing of dates that Freddie Mac released
16   earnings results, right?
17   A.  That's right.
18   Q.  That's a common way to conduct an
19   event study, isn't it?
20   A.  Not always.  Sometimes it's
21   well-motivated and sometimes it isn't.
22   Q.  Well, putting aside the motivations,
23   is it --
24   A.  I mean -- what I mean is sometimes
25   it's supportable as the rule to how to

Page 61

1          Steven P, Feinstein, Ph.D
2    select the events for single-event event
3    studies, and sometimes it's not.
4    Q.  Dr. Feinstein, you have -- let's
5    back up for a second.
6              There's a couple of phases
7    associated with conducting an event study,
8    correct?
9    A.  Yes.
10   Q.  Or steps, so to speak, right?
11   A.  Right.
12   Q.  What's the first step?
13   A.  Well, I mean, certain steps can be
14   done in various orders.  But initially, you
15   gather the data and you run a market model
16   to assess what the residual returns are,
17   which is what are the returns after
18   controlling for market and sector effect.
19             Actually, my first step is I read
20   the news articles and the analyst reports
21   to get a sense of what the company is, and
22   what the company's about, and what kind of
23   information is -- or what kind of events
24   and news occurred over the life of the --
25   in the life of the company over the period

Page 62

1          Steven P, Feinstein, Ph.D
2    of time at issue.
3          That's my first step.
4          But then construction of the
5    regression model, and then selection of
6    events.
7          Q.  Now, before you construct the
8    regression model or select events, you do
9    some reading; is that correct?
10         A.  That's right.
11         Q.  And among other things, you just
12   testified that you read analyst reports and
13   newspaper articles; is that right?
14         A.  That's right.
15         Q.  And all of the analyst reports and
16   newspaper articles that you read are
17   identified in your report; is that
18   correct?
19         A.  Yes.  Right.
20         Q.  Now, you read other things in
21   addition to analyst reports and newspaper
22   articles, right?
23         A.  That's right.
24         Q.  For example, you read the operative
25   complaint in this matter, which I believe

Page 63

1          Steven P, Feinstein, Ph.D
2    is the third amended complaint; is that
3    right?
4          A.  Yes.
5          Q.  You read that before you took any
6    other steps in connection with your event
7    study, right?
8          A.  That's right.
9          Q.  What else in addition to the
10   complaint, analyst reports, newspaper
11   articles, the reports of Dr. Bajaj and
12   Dr. Hallman did you read before doing
13   anything else in connection with your event
14   study?
15         A.  Company press releases and
16   conference call transcripts.
17         Q.  Those are all listed in your report
18   as well?
19         A.  Right.
20         Q.  Anything else that you reviewed?
21         A.  I think that's it.
22         Q.  The next step is that you construct
23   a regression model; is that right?
24         A.  Actually -- actually, no.
25             The next step is selection of events

Page 64

1          Steven P, Feinstein, Ph.D
2    to determine what events ought to be
3    tested, what events in the life of the
4    company over the course of the analysis
5    period would be good candidates for an
6    event study, based on the news and based on
7    valuation principles.
8          Q.  Dr. Hallman, when he conducted an
9    event study, he selected six dates; is that
10   right?
11         A.  Can I see the Hallman report?  I
12   thought it was -- no, that sounds about
13   right.  Right.
14         Q.  You recall that he selected dates
15   based on the fact that those were dates on
16   which Freddie Mac released earnings
17   results, right?
18         A.  Right.
19         Q.  And in the past, you have selected
20   dates based on that same criteria, the
21   announcement of earnings results,
22   correct?
23         A.  Yes and no.  Let me be clear about
24   this.
25             For a collective event study, it's

Page 65

1          Steven P, Feinstein, Ph.D
2    often a good selection criterion to take
3    all event studies and to analyze the group
4    collectively because, generally, earnings
5    announcement dates have a greater flow of
6    information than nonearnings announcement
7    dates.
8          So I have frequently used whether or
9    not a date is an earnings announcement date
10   as the criterion for forming a bucket of
11   events which are the high information flow
12   events against which to compare all other
13   events.
14         The other times that I would use
15   earnings announcement -- so that would
16   be -- that's when I would use the earnings
17   announcement dates without an in-depth
18   analysis of the news content on earnings
19   announcement dates.
20         The other times I would use earnings
21   announcement dates is I would read earnings
22   announcement date news report, the press
23   report, the news report, analyst
24   commentary, to see if, in fact, it was
25   indisputably a date on which very positive

Page 66

Steven P, Feinstein, Ph.D

1    Steven P, Feinstein, Ph.D
2  or very negative news that arrived to the
3  marketplace in a manner that reasonably
4  would elicit a statistically significant
5  stock price return, making it, therefore, a
6  good candidate for a single-event event
7  study.
8        So I wouldn't select events the way
9  that Dr. Hallman did, which is to pick all
10 earnings announcement dates without any eye
11 towards what information came out on those
12 dates for use in a single-event event
13 study.
14        By single-event event study, I mean
15 an event study focused each time it's run
16 on a single event.
17    Q.  Well, let me break that down a
18 little bit, in part because I think you
19 actually misspoke, and I want your
20 testimony to be what you actually believe.
21        You said, for a collective event
22 study, it's often a good selection criteria
23 to take all event studies and to analyze
24 the group collectively because -- and then
25 you went on.

Page 67

1    Steven P, Feinstein, Ph.D
2    A.  I meant earnings announcements.  To
3  take all earnings announcements and use all
4  earnings announcements as the group of high
5  information flow events.
6        And if you do that, you don't need
7  to examine each earnings announcement to
8  determine whether there was unconfounded,
9  highly material, highly impactful
10 information that came out on each of those
11 days.
12        You would just -- you select them
13 and keep them isolated in a group because
14 you know that, in general, earnings
15 announcement dates have -- on average, have
16 a higher information flow than nonearnings
17 announcement dates.
18        So yes, you're right, I misspoke.  I
19 meant earnings announcements.
20        But that's not what Dr. Hallman did,
21 and that's not what I did either.
22    Q.  What do you mean by "dates with
23 higher information flow"?
24    A.  Well, the literature says that
25 earnings announcement dates are dates in

Page 68

1    Steven P, Feinstein, Ph.D
2  which the company speaks to the
3  marketplace.
4        So compared to a more typical day,
5  it's day in which more information is going
6  to be arriving to the marketplace -- more
7  information about the company is likely to
8  be arriving to the marketplace about the
9  company.
10        And if the dynamics of the stock
11 price on those high information flow dates
12 is different from the dynamics on more
13 typical low information flow dates, that
14 proves that information matters, which is
15 informational efficiency, which is what the
16 courts care about in cases like this.
17    Q.  Now, at some point in time, did you
18 determine that you wanted to do an event
19 study based on a single date?
20    A.  Well, I set out to do what we call
21 single-event event studies.  I looked for
22 ideal candidates to use or appropriate
23 candidate events to use for the traditional
24 event study.
25        And because of the nature of this

Page 69

1    Steven P, Feinstein, Ph.D
2  case, I found one such event.
3    Q.  When did you decide to do a
4  single-event event study?
5    A.  When I took the case.
6    Q.  Now --
7    A.  It's the -- the traditional event
8  study is an important component of a market
9  efficiency analysis.
10    Q.  What other cases -- strike that.
11        In what other cases have you
12 conducted a single-event event study?
13    A.  I mean, there has to be good reason
14 not to, but in most other cases I have.
15        In Petrobras, I didn't.  And I
16 explained in the Petrobras case why I
17 didn't and used a collective test instead.
18        But when I can, I do it.  And it's
19 not -- what I mean by when I can is, I
20 don't get to choose the history of the
21 company.  I don't get to choose what
22 announcements the company made.  I have to
23 deal with the history of the company as it
24 is.
25        So if the history of the company and

Page 70

Steven P, Feinstein, Ph.D

1
2    the nature of its events make it possible
3    and appropriate to do a single -- you know,
4    either one or a series of single-event
5    event studies, I'll run them.
6        Q.   Did you do a single-event event
7    study in the CVS Caremark case?
8        A.   Can I see the report, please?
9        Q.   You don't remember offhand?
10       A.   Correct.
11       Q.   Do you know whether or not you did a
12   single-event event study in the JP Morgan
13   case?
14       A.   I see that you have the reports
15   there.  If you show me, I can answer the
16   question definitely.
17       Q.   Well, I'll been honest.  I'm not
18   trying to play games.  We may mark these.
19   I'm hoping -- I'd love to do them faster
20   than slower, because I know you prefer this
21   whole process to go faster than slower.
22       So if you don't remember, you can
23   say that you don't remember.  It's okay.
24   We may get to them.
25       A.   Well, I know that in Petrobras, I

Page 71

Steven P, Feinstein, Ph.D

1
2    ran exclusively the collective event test,
3    which is why the judge focused on that.
4        And in the vast majority, if not all
5    other cases, I have run the traditional
6    event study focused on individual events.
7        Q.   So is it your view that you, in the
8    vast majority of cases, have run
9    single-event event studies?
10       A.   Yes, and perhaps also the collective
11   test.
12       Q.   And when you -- what do you mean
13   when you say "single-event event study"?
14       A.   The traditional event study where I
15   focus -- each time the methodology is run,
16   it's focusing on the statistical
17   significance of a -- the stock return that
18   occurred in response or that occurred at
19   the -- on the day of a single event.
20       Q.   Did Dr. Hallman run a single-event
21   event study?
22       A.   Yes, he did.  He ran a series of
23   them.
24       Q.   I see.  He ran a -- so he tested six
25   dates, correct?

Page 72

Steven P, Feinstein, Ph.D

1
2        A.   Right.
3        Q.   And you called those single-event
4    event studies because he ran a series of
5    six single-event event studies; is that
6    correct?
7        A.   That's right.
8        Q.   Okay.  All right.  So let's just get
9    on the same page.
10       You, in this case, for your event
11   study as opposed to your z-test, you didn't
12   run a series of single-event event studies,
13   correct?
14       A.   Oh, I ran one.
15       Q.   You ran one?
16       A.   That's right, because I found one
17   appropriate event candidate.
18       Q.   And in how many other cases have you
19   run an event study based solely on one date
20   without testing other dates?
21       A.   Well, in this one, I did test other
22   dates.  I tested the other dates by also
23   running the collective event study.
24       Q.   Well, let's -- I don't want to --
25       A.   So you said "other," and that's --

Page 73

Steven P, Feinstein, Ph.D

1
2        Q.   Right.
3        A.   -- an improper choice of words,
4    because I didn't do that in this case.
5    I --
6        Q.   Let's just be clear.
7        You ran a z-test that was predicated
8    on nine dates, right?
9        A.   That examined information flow dates
10   versus noninformation flow dates, and the
11   information flow dates comprised nine
12   dates.
13       Q.   Let's put the z-test aside.
14       A.   Okay.
15       Q.   Let's talk about the event study
16   that you ran.
17       A.   Let's call that the traditional
18   event study.
19       Q.   Well, I'm not sure it's a
20   traditional event study.  So why don't we
21   call it the November 20 event study.
22       Is that acceptable?
23       A.   Sure.
24       Q.   Because you ran that event study on
25   the date November 20, 2007?

Page 74

Steven P, Feinstein, Ph.D
1
2    A.  Right.
3    Q.  Fair enough?
4    A.  Right.
5    Q.  So the November 20 event study, that
6  was an event study that was run on only one
7  date, right?
8    A.  Well, traditional event studies
9  always run on one date.  You might run a
10  series of traditional event studies, but
11  each time it will be on one date.
12    Q.  In other cases, you have run a
13  series of event studies; is that correct?
14    A.  If the history of the company is
15  such that there are more appropriate --
16  there are additional appropriate
17  candidates, then I use all appropriate
18  candidates.
19       In this case, I found one
20  appropriate candidate.
21       So in Petrobras, there were,
22  essentially, zero for the traditional event
23  study.  So I ran zero single-event event
24  studies there.
25       And in Groupon, I think there may

Page 75

Steven P, Feinstein, Ph.D
1
2  have been three over the course of the
3  class period.
4       In this one, I found one.
5    Q.  In some cases, there's zero
6  appropriate dates to test, in your view,
7  right?
8    A.  For a traditional event study, yes.
9    Q.  In other cases, there are multiple
10  dates to test; is that correct?
11    A.  That's right.
12    Q.  And in other cases, you have tested
13  multiple dates, correct?
14    A.  Yes.
15    Q.  In this case, you tested only one
16  date for your November 20 event study,
17  correct?
18    A.  That's right.
19    Q.  Have you ever, in any other case,
20  run an event study that tested only a
21  single date?
22    A.  Well, like I said, Petrobras, it was
23  zero.
24       I don't recall.  I think it's not
25  likely, but I don't recall for sure.

Page 76

Steven P, Feinstein, Ph.D
1
2       But if there's only one appropriate
3  date to test, that's dictated by the
4  history of the company, not by my choices.
5    Q.  How do you determine what is an
6  appropriate date to test?
7    A.  Well, I have a section in the report
8  about that.
9       Let me draw your attention to it.
10       (Witness reviews document.)
11       Paragraph 115.  Well...
12       I look for dates that, based on the
13  nature of the news and based on evaluation
14  principles, there was news that transpired
15  that reasonably was of such magnitude, such
16  importance, arriving in an unconflicted or
17  unconfounded manner such that the arrival
18  of that news would reasonably elicit a
19  statistically significant stock price
20  reaction.
21       Only because I exantide determined
22  that it would reasonably elicit a
23  statistically significant stock price
24  reaction does it then make sense to test if
25  it did elicit a statistically significant

Page 77

Steven P, Feinstein, Ph.D
1
2  reaction, because if, based on the news or
3  evaluation principles, you would expect the
4  stock price not to move, then observing it
5  later not to move doesn't either prove or
6  disprove market efficiency.
7       What you would need to assess market
8  efficiency is an event that should move the
9  market, and then you observe to see whether
10  it did or did not move the market.
11       That's how you test market
12  efficiency.
13       So the selection criterion -- the
14  selection criteria are to look for events
15  that -- where the news is important and
16  arrived in a manner that was somewhat, you
17  know, not mixed, somewhat unconflicted and
18  unconfounded, such that, according to
19  valuation principles, it should move the
20  market a large amount over the threshold
21  for statistical significance.
22    Q.  In other cases, you've selected
23  earnings dates as appropriate dates to test
24  in your event study, correct?
25    A.  If and only if the news on the

Page 78

Steven P, Feinstein, Ph.D

1    Steven P, Feinstein, Ph.D
2    earnings date fit those criteria that I
3    just explained.
4        Q.  Now, in this case, did you seek to
5    determine whether there was more than one
6    date that might be appropriate to test?
7        A.  I did.
8        Q.  And you ultimately concluded that
9    there was -- that in the 330-day class
10   period, there was not a single other date
11   that was appropriate to test?
12       A.  That was my conclusion.  I mean, to
13   test in the traditional event study manner.
14       There were lots of dates, as I did
15   ultimately examine, that could be tested in
16   the collective manner.
17       Q.  Now, how is the criterion for
18   choosing dates in what you call the
19   traditional event study different from the
20   criteria for choosing dates in the FDT
21   z-test?
22       A.  So for the traditional event study,
23   you've got to do an in-depth news analysis
24   on the event itself to determine what news
25   came out and whether that news arrived in a

Page 79

1    Steven P, Feinstein, Ph.D
2    straightforward, unconfounded, unconflicted
3    manner or whether it was mixed, and whether
4    the news was of such importance relative,
5    you know, on the basis of evaluation
6    principles that it should move the market.
7        For the FDT test, all you need is a
8    -- it's a more objective selection -- set
9    of selection criteria.  You need a rule, an
10   objective rule that's replicable that
11   identifies dates on which there was
12   substantially higher news flow of any kind
13   without an eye towards whether each
14   individual date -- whether the news on each
15   individual date itself was enough to move
16   the market price an amount above the
17   threshold for statistical significance.
18       The rule for the FDT test is a rule
19   that -- you pick a rule that's objective
20   and replicable that identifies higher news
21   flow days.
22       Q.  Is it fair to say that your
23   selection of dates for the November 20
24   event study was not objective and
25   replicable?

Page 80

1    Steven P, Feinstein, Ph.D
2        A.  I think it was.  I think it's unfair
3    to say it was not objective and replicable.
4        I think no reasonable person would
5    look at the news that came out on
6    November 20 and say that that wasn't a
7    red-letter date in the life of this
8    company, on the basis of evaluation
9    principles and on the basis of the news
10   that came out, regardless of whatever other
11   events, such as a lawsuit or a complaint or
12   other people's reports, came out.
13       I think anybody coming into this --
14   studying this company, studying this case,
15   regardless of what they did or did not
16   read, would agree that November 20 was an
17   appropriate date for an event study because
18   it was momentous news that, according to
19   evaluation principles, should have moved
20   the stock market -- the stock -- the market
21   for that company's stock.
22       Q.  What about the other 329 days in the
23   class period?
24       Was your decision not to select any
25   of those days objective and replicable?

Page 81

1    Steven P, Feinstein, Ph.D
2        A.  Absolutely.  I'm waiting to see what
3    your experts come up with.  If they say
4    other dates should have been tested, I'll
5    evaluate that.  If I think they're right,
6    I'll take that into account.
7        But I don't think they'll find other
8    dates that should have been tested.
9        Q.  Well --
10       A.  The nature of this company -- the
11   nature of Freddie Mac, the nature of the
12   period in which we're talking about was
13   somewhat unique and caused it to not have
14   dates that -- event dates that were such
15   that would be ideal for a market efficiency
16   event study.
17       It did have dates that were ideal
18   for a collective event study, but I'm eager
19   to see what they come up with so that I can
20   evaluate whether they're right or wrong.  I
21   think they'll be wrong if they think there
22   are other dates besides what I found.
23       Q.  What is it about the nature of
24   Freddie Mac that was unique that caused it
25   to not to have event dates that were ideal

Page 82

1          Steven P, Feinstein, Ph.D
2    for a market efficiency event study?
3          A.  People saw it as a bastion of safety
4    in a turbulent market.
5          Over this period of time, the
6    housing market was increasingly risky.
7    Other companies were -- they were suffering
8    as a result of that riskiness and that
9    turbulence in the marketplace.  And people
10   saw the government-sponsored enterprises as
11   being more secure, safer, a bastion of
12   safety.
13         So, in fact, like the riskier the
14   rest of the market got, the safer by
15   comparison Freddie Mac looked.
16         That's essentially it.
17         It was a fortress is the way it was
18   perceived, it's a fortress is the way the
19   company portrayed itself.
20         Just read the complaint, and I did
21   and I know you did, too, but
22   cross-reference it with the primary
23   sources.  Over and over again you have the
24   executives of the company saying that they
25   weren't facing the same kind of risks that

Page 83

1          Steven P, Feinstein, Ph.D
2    other companies were facing and that they
3    had adequate analysis to analyze laws
4    and -- loans and detect fraud, and that
5    they had adequate capital.
6          It's on the marketplace.  And that's
7    why it made the company much more stable
8    than other companies at that time.
9          Q.  So is it fair to say that in your
10   decision not to test dates other than
11   November 20, 2007 in what you call your
12   traditional event study, you were relying
13   in part upon the allegations in the
14   complaint?
15         A.  No.  That's -- that misinterprets
16   what I just said.
17         I said that you can -- one easy
18   place to consolidate the quotes that I'm
19   referring to would be to look at the
20   complaint.  But what I also said was that I
21   cross-referenced those against the primary
22   sources.
23         I read the conference call
24   transcripts.  I saw what the executives of
25   this company were telling the public.  And

Page 84

1          Steven P, Feinstein, Ph.D
2    that's what I mean.
3          I mean, if you want, you know, I
4    could have said why don't we just go back
5    and read the conference call transcripts,
6    but relevant excerpts are in the complaint.
7          So it's not the fact that there's an
8    allegation of securities fraud that matters
9    here.  I'm just talking about how the
10   company portrayed itself.
11         Q.  And you think that any other
12   economist who was faced with the task of
13   having to conduct what you call a
14   traditional event study would have excluded
15   every date from the class period other than
16   November 20, 2007; is that fair to say?
17         A.  I -- well, I don't know what other
18   economists are going to do.  That's why I
19   said I'm eager to see what your economists
20   do.
21         But I think that if they arrive at a
22   decision that differs from mine, that they
23   would be wrong.
24         And I'll tell you why I believe
25   that.  I did go through every single day in

Page 85

1          Steven P, Feinstein, Ph.D
2    the life of this company over the course of
3    the class period.  I read the news that
4    came out on those days.  I read the analyst
5    reports that reported on the news that came
6    out on those days.
7          And there's -- there were times when
8    there was big announcements, but they would
9    be confounded or conflicted.
10         If you look at the analyst reports
11   that came out after each of the earnings
12   announcements, except for the last one,
13   they all say mixed results.  They all say,
14   there's some good news and there's some bad
15   news, or the company posted a loss but the
16   loss was expected.
17         So, the analysis I did -- I went
18   through every single day.  I went through
19   the news on every single day, and I did not
20   find, except for the last day of the class
21   period, a good candidate for a single-event
22   event study.
23         Q.  Well, you reviewed Dr. Hallman's
24   report, correct?
25         A.  I did.

Page 86

Steven P, Feinstein, Ph.D

1            Steven P, Feinstein, Ph.D
2    Q.  Who's Dr. Hallman?
3    A.  He is a -- I could read his
4  credentials out of his report if you would
5  like, but he serves as an expert in this
6  case.
7    Q.  And Dr. Hallman chose to examine six
8  dates for his event study, correct?
9    A.  Right.
10    Q.  And you believe, as you sit here
11  today, that that was a mistake; is that
12  fair to say?
13    A.  Well, he chose a different approach.
14  What his approach was, is to use all
15  event -- all earnings announcements, and
16  then after observing that four of the six
17  were not significant, seek to explain why
18  they ought to have not been significant.
19       That's a legitimate approach in some
20  context. I just don't believe it's the
21  best approach or the best approach to use
22  in this case.
23       I think what would have been better
24  is to select -- to read the news first
25  before running the event study and

Page 87

1            Steven P, Feinstein, Ph.D
2  determine whether it was an appropriate
3  candidate to even test.
4       And for those first four, and
5  arguably the fifth, of the earnings
6  announcements, I saw, and I believe other
7  economists would see as well, that the news
8  was mixed or expected such that a
9  statistically significant reaction was not
10  to be expected.
11    Q.  And is it fair to say that you
12  exercised your judgment in determining
13  whether or not the news was mixed?
14    A.  It's not just judgment. If you look
15  at the analyst reports, the word "mixed" is
16  right in them.
17    Q.  For every one of the dates you
18  rejected?
19    A.  No. For the analyst reports on the
20  earnings announcement dates.
21    Q.  But you excluded 329 dates from your
22  event study, correct?
23    A.  Right. Some of those had no
24  relevant or no strongly material news.
25  Most of them had no strongly material

Page 88

1            Steven P, Feinstein, Ph.D
2  news.
3    Q.  Some of them did have material news;
4  is that fair to say?
5    A.  But not of the kind that you would
6  expect necessarily would have -- exantide
7  would have statistically significant impact
8  on the stock price.
9       I mean, it would have impact on the
10  stock price, and you would detect it in a
11  collective event study. But individually,
12  because of high threshold for significance,
13  the kind of news that came out typically on
14  each day of the class period was not the
15  kind of news that would reasonably cause
16  one to expect a statistically significant
17  stock price response.
18       So therefore, testing it is not
19  informative, because if it's not supposed
20  to -- if it wouldn't reasonably have a
21  significant impact and then it doesn't,
22  that nonsignificance doesn't tell you that
23  the market's inefficient. It just confirms
24  your prior assessment that the news wasn't
25  that extreme.

Page 89

1            Steven P, Feinstein, Ph.D
2    Q.  From your perspective and your
3  opinion, there was only one appropriate
4  date to test in what you call the more
5  traditional event study?
6    A.  There was one most appropriate date,
7  and the methodology that I chose, which I
8  believe is the best methodology for this
9  case, identified one such event.
10    Q.  Were there other appropriate dates?
11    A.  For a single-event event study? No.
12    Q.  And in your view, reasonable minds
13  cannot differ on that matter?
14    A.  No, I think they can. I think
15  reasonable -- that's why we have
16  litigation, I guess.
17       So I'm eager to see what events your
18  experts believe should have been included,
19  but I believe that when they present those
20  dates and we analyze them, we'll see that
21  they were -- that the market -- based on
22  what I now know about the market, having
23  run my entire analysis, we'll see that
24  Freddie Mac's stock reacted appropriately.
25       I'm eager to see those dates that

Page 90

Steven P, Feinstein, Ph.D

1
2 they either reasonably or unreasonably may
3 propose as being reasonable candidates for
4 testing.
5       I didn't find any, and I believe
6 there aren't any.
7             MR. FRANK:  Just for purposes
8 of the record, I just want it to be
9 perfectly clear that my motions to strike
10 are reserved.
11            MR. MARKOVITS:  Yes.
12 BY MR. FRANK:
13    Q.   Now, upon reviewing Dr. Hallman's
14 report, you recognize that he found that
15 only two dates yielded statistically
16 significant results, correct?
17    A.   That's right.  Two of the six he
18 tested.
19    Q.   Two of the section he tested.
20    A.   Yes.
21    Q.   And one of those dates that yielded
22 statistically significant results,
23 according to Dr. Hallman, was November 20
24 of 2007, correct?
25    A.   Right.

Page 91

Steven P, Feinstein, Ph.D

1
2    Q.   Now, Dr. Bajaj criticized
3 Dr. Hallman's analysis, generally; is that
4 right?
5    A.   Yeah, that was his job, as he saw
6 it.
7    Q.   And he identified a number of flaws,
8 in his opinion, with Dr. Hallman's
9 analysis, correct?
10    A.   That's my understanding.
11    Q.   And he concluded that if you
12 corrected Dr. Hallman's analysis, that only
13 one date would have yielded statistically
14 significant results, correct?
15    A.   That -- that's my recollection, yes.
16    Q.   He believed that that date was also
17 November 20, 2007, correct?
18    A.   Right.
19    Q.   So you knew before you constructed
20 your single-event event study that both
21 Dr. Hallman and Dr. Bajaj had concluded
22 that November 20, 2007 was a date that,
23 upon testing, yielded statistically
24 significant price movement, correct?
25    A.   Well, I mean, the record is what it

Page 92

Steven P, Feinstein, Ph.D

1
2 is.  The history of the company is what it
3 is.
4       We can't -- it's not like a
5 laboratory, a scientific laboratory, where
6 we can change the facts and see what the --
7 if the results change.
8       But yes, I did know, and because I
9 did know, I was very careful to make sure
10 that I could explain that the nature of the
11 news that transpired that day was such so
12 that under the objective selection
13 criterion -- under the objective selective
14 criteria, that date would be selected
15 regardless of whether someone knew or did
16 not know what the stock price reaction was
17 that day.
18    Q.   Well, what was the news that
19 transpired that day?
20    A.   The company posted a $2 billion
21 loss.  The company said that they would
22 likely have to cut their dividend.  The
23 company said that they would -- they had to
24 investigate strategic alternatives for
25 capital infusion.  The company disclosed

Page 93

Steven P, Feinstein, Ph.D

1
2 that their exposure to nontraditional
3 higher-risk loans was substantially greater
4 than what the market previously knew.
5    Q.   In what -- you just testified that
6 the company disclosed that their exposure
7 to nontraditional higher-risk loans was
8 substantially greater than what the market
9 previously knew.
10       Did I get that right?
11    A.   Exactly right.
12    Q.   And was that disclosed in the
13 company's press release issued that day, or
14 was it disclosed in its supplement to its
15 information statement?  Do you know?
16    A.   I recall reading it in the
17 conference call transcript.
18    Q.   Your recollection is it was in a
19 conference call transcript?
20    A.   Well, actually, I recall in the
21 conference call transcript one analyst
22 commented on it, mentioned a 29 percent
23 exposure.  No, I don't recall which
24 document the company released that day has
25 the information.  I do recall it was on

Page 94

Steven P, Feinstein, Ph.D

1   Steven P, Feinstein, Ph.D
2   Page 4 of one of those two documents, but I
3   don't recall which document it was.
4   Q.  When you say "one of those two
5   documents," what are the two documents
6   you're referring to?
7   A.  The ones -- the one you just
8   mentioned.  The press release and then
9   there's the supplement.  I don't recall
10  which document.  But it was disclosed that
11  day.
12  Q.  Now, Dr. Bajaj also tested a total
13  of 28 days prior to and during the class
14  period, right?
15  A.  My -- the scope of my engagement was
16  not to respond to Dr. Bajaj's report.
17       I read his report.  I considered it
18  to the extent that it informed what I
19  thought would be proper methodology for my
20  analysis.
21       But I didn't seek to rebut him.  So
22  I -- I don't recall --
23  Q.  Well, I didn't ask you anything
24  about the purpose of your reviewing
25  Dr. Bajaj's report.

Page 95

1   Steven P, Feinstein, Ph.D
2   I just asked you whether he
3   tested 28 dates, and the answer to that has
4   got to be either yes, no, I don't know.
5       So, if you don't remember, it's
6   really okay.  It's just going to lengthen
7   the day if we don't answer the questions.
8   A.  It's the latter.
9   Q.  So it's the latter being you don't
10  recall?
11  A.  Right.
12  Q.  Okay, that's fine.
13       Now, plaintiffs chose the class
14  period in this case, correct?
15  A.  Yes.
16  Q.  And what is your understanding of
17  the last day in the class period?  What day
18  is that?
19  A.  November 20, 2017.
20  Q.  2007, I think you mean?
21  A.  2007, right.  2007.
22  Q.  We're not there yet.
23       So -- now, let me turn your
24  attention back to your report.
25       In Paragraph 40 -- in Paragraph 40,

Page 96

1   Steven P, Feinstein, Ph.D
2   you write, "An efficient market, as defined
3   by Cammer, Basic, Amgen, Halliburton II,
4   Bromberg and Lowenfels, and Fama, is a
5   market in which available information is
6   rapidly incorporated into the price of a
7   security such that the trading price
8   reflects all available information."
9       Do you see that?
10  A.  I do.
11  Q.  Where available information is only
12  sometimes rapidly incorporated into the
13  price of a security, is that an efficient
14  market?
15  A.  Well, the other times the market is
16  either disregarding material information or
17  there's an impediment to trading or an
18  impediment to the information flow, then
19  that would be inefficiency.
20  Q.  And if available information is only
21  rarely rapidly incorporated into the price
22  of a security, that's not an efficient
23  market either, correct?
24  A.  Well, if you have some reason to
25  believe that it's -- yes, yes, I would say

Page 97

1   Steven P, Feinstein, Ph.D
2   yes.
3       If it's only rarely incorporated,
4   that would not be efficient.
5   Q.  For a market to be efficient, it
6   needs to be rapidly incorporating available
7   information all the time, right?
8   A.  Right.
9   Q.  Now, what are Form S-3 eligibility
10  requirements?
11  A.  Well, those are for publicly traded
12  companies.  It's an expedited way to
13  register secondary issues of stock that are
14  available to companies that satisfy certain
15  criteria.
16  Q.  And being eligible to file a
17  Form S-3 is one of the factors that was set
18  forth in the Cammer test, right?
19  A.  That's right.
20  Q.  And --
21  A.  Well, you call it a Cammer test.  I
22  wouldn't call it a Cammer test.  It's not a
23  set of necessary conditions that a stock or
24  company have to -- has to satisfy in order
25  to be deemed efficient.

25  (Pages 94 to 97)

Page 98

Steven P. Feinstein, Ph.D

1
2      It's -- they're factors that are
3   considered in the aggregate to determine
4   whether it's more likely than not that the
5   stock trades in an efficient market.
6      Q.  Fair enough.  I did not mean to
7   misspeak.  That's fair.
8      Being eligible to file a Form S-3 is
9   one of the factors that was set forth in
10  the Cammer decision?
11     A.  Yes.
12     Q.  And at the time that the Cammer
13  decision issued, one of the criteria for
14  being eligible to file a Form S-3 was that
15  over the preceding 36 months, the company
16  was regularly filing its Form 10-Ks and
17  10-Qs with the SEC; is that correct?
18     A.  That's right.
19     Q.  Now, at the time -- and that has
20  changed, I take it?
21     A.  Yes.
22     Q.  It's now a twelve-month look-back
23  period; is that right?
24     A.  That's right.
25     Q.  Now, during the class period in this

Page 99

Steven P. Feinstein, Ph.D

1
2   case, Freddie Mac wasn't an SEC registrant,
3   correct?
4      A.  That's right.
5      Q.  And so just as a matter of fact, it
6   wasn't eligible to file Form S-3s, putting
7   aside the Form S-3 eligibility criteria,
8   correct?
9      A.  Right.  It was an exceptional
10  company and as a result of that unique
11  nature, it wasn't eligible.
12     Q.  Now, instead of filing Forms 10-K
13  and Forms 10-Q, Freddie Mac posted on its
14  website other forms, right?  Is that
15  correct?
16     A.  That's right.  Right.
17     Q.  Do you remember what those are
18  called?
19     A.  Yes.  They filed an annual report
20  and information supplements.
21     Q.  And do you recall that its annual
22  report was sometimes called -- was called
23  an information statement?
24     A.  Yes.
25     Q.  And when it supplemented its annual

Page 100

Steven P. Feinstein, Ph.D

1
2   reports, it called those supplements to
3   information statements?
4      A.  Yes.
5      Q.  Now, when do companies typically
6   file annual reports with the SEC?
7      A.  There's a schedule.  They have a
8   certain number of days following the
9   closing of the quarter.
10     Q.  And when it comes to annual reports,
11  they typically file within, is it fair to
12  say, two months or so of the close of the
13  fiscal year?
14     A.  Right.
15     Q.  And quarterly reports, somewhere
16  around 45 days within the close of the
17  quarter; is that right?
18     A.  Or so, yes.
19     Q.  Now, in connection with your work on
20  this case, did you take a look at Freddie
21  Mac's information statements and
22  information statement supplements for the
23  36-month period preceding the class
24  period?
25     A.  I did.

Page 101

Steven P. Feinstein, Ph.D

1
2      Q.  And do you know how long after the
3   close of Freddie Mac's fiscal year in
4   2003 --
5      A.  2003?
6      Q.  Yes.  So let's back up.  So 36
7   months before August 1 of 2006 takes us to
8   August 1 of 2003, correct?
9      A.  Right.
10     Q.  So, in the year 2000, Freddie Mac
11  would have been posting its 2002
12  information statement, right?
13     A.  I'll take your word for it.  Sure.
14     Q.  Well, we can all agree that 2002
15  doesn't end until December 31 of 2002,
16  right?
17     A.  Right.
18     Q.  So it was filing its annual
19  statement sometime in the year 2003,
20  right?
21     A.  Yes.  Right.
22     Q.  Do you know how promptly Freddie Mac
23  filed that information statement?
24     A.  No.
25     Q.  How about for 2003 or '04 of '05?

Steven P, Feinstein, Ph.D

1           Steven P, Feinstein, Ph.D
2  Do you know how promptly it filed its
3  information statement?
4     A.  No, I did observe -- I mean, I don't
5  know specifically, but I did observe that
6  it took longer than publicly traded
7  companies that are required by the SEC to
8  file these reports.  It typically and
9  routinely took much longer.
10    Q.  Did you notice that when it comes to
11  supplements to information statements that
12  Freddie Mac wasn't posting them
13  quarterly?
14    A.  Correct.
15    Q.  It was posting them less frequently?
16    A.  I'd have to check that.  But my
17  recollection is that it was longer and less
18  regular than for typical SEC registrants.
19    Q.  Why is Form S-3 eligibility relevant
20  to the consideration of whether a security
21  trades in an in an efficient market?
22    A.  I have that written on Page 22, at
23  least what the court considered, Page 22,
24  Paragraph 79 of my report.
25     I wrote: "Cammer court noted that

1           Steven P, Feinstein, Ph.D
2  S-3 registration eligibility is indicative
3  of market efficiency, because the filing
4  requirement ensures that financial data are
5  available to market participants, and the
6  public flow requirement indicates that many
7  market participants would have examined the
8  information."
9     Then the quotes from the Cammer
10  court's decision, if you look at the last
11  one, to speeds things up, "It is the number
12  of shares traded and value of shares
13  outstanding that involve the facts which
14  imply efficiency."
15     So that's why.  It's a size
16  requirement, that means that it's a big
17  enough company that people would be paying
18  attention to it.  People were certainly
19  paying attention to Freddie Mac.
20    Q.  It's also a requirement, isn't it,
21  that the company is regularly sharing its
22  information in compliance with SEC
23  quarterly and annual filing requirements,
24  correct?
25    A.  Right.  And what's on Page 22 --

1           Steven P, Feinstein, Ph.D
2  I'll read the rest of it, since you asked.
3    Q.  I'm sorry.  I don't think I asked
4  you to read from your report.
5    A.  No, you -- you -- your question was,
6  is it not the case that the filing
7  requirement is also important?
8     So because you asked that, I'll read
9  the part that I skipped.
10     "Proposed Form S-3 recognizes the
11  applicability of the efficient market
12  theory to the registration statement
13  framework with respect to those registrants
14  which usually provide high-quality
15  corporate reports, including exchange
16  document reports and whose corporate
17  information is broadly disseminated,
18  because such companies are widely followed
19  by professional analysts and investors in
20  the marketplace."
21     Well, regardless of whether Freddie
22  Mac took 45 days or two and a half months,
23  no one can dispute that Freddie Mac was
24  widely followed by professional analysts
25  and investors in the marketplace.

1           Steven P, Feinstein, Ph.D
2  So that's why I did not consider the
3  longer period of time to be relevant to the
4  determination of market efficiency or the
5  lack thereof.
6    Q.  So --
7    A.  It also says, "Because of the
8  foregoing observations made by the SEC, the
9  existence of Form S-3 status is an
10  important factor, weighing in favor of a
11  finding that a market is efficient."
12     And then the next two pieces from
13  the Cammer decision focused on the size of
14  the company, the public flow and the size
15  of the company as being the relevant
16  portion of the requirements, not the speed
17  at which it produces its reports.
18    Q.  Well, let's put aside speed.  Let's
19  talk about regularity.
20     Do you think that the fact that
21  Freddie Mac wasn't providing regular
22  quarterly reports during the period
23  preceding the class period is relevant to
24  whether or not analysts or investors had as
25  much available information about the

Steven P, Feinstein, Ph.D
1
2  company as compared to companies that were
3  complying with their SEC filing
4  obligations?
5      A.  That's exactly -- no, they did not
6  have as much information during some
7  periods of time as other companies.  And
8  efficiency means that the stock price
9  reacts and incorporates the information
10  that's available.  It doesn't say that --
11  only if we're talking about the strong form
12  efficient market hypothesis, and that's not
13  what we're talking about here.  But for the
14  semi-strong form efficient market
15  hypothesis, the question is, is the market
16  incorporating the information that is made
17  available.
18      The fact that some information may
19  not be made available doesn't mean it's
20  going to be inefficient with respect to
21  information that is made available.
22      Q.  Now, what is the null hypothesis?
23      A.  Of which test?
24      Q.  Well, what does the expression "null
25  hypothesis" mean?

Steven P, Feinstein, Ph.D
1
2      A.  Oh.  Well, in statistics, most --
3  the way you prove things in statistics is
4  by assuming the opposite of a proposition
5  and then showing that reality doesn't
6  conform to the implications of that
7  opposite proposition.
8      So the opposite proposition is the
9  null hypothesis.
10      You state something like, the market
11  is not efficient, the market ignores
12  information, and then you do a test to see
13  if the reality is consistent with the
14  market ignoring information.
15      And if the reality is not consistent
16  with the market ignoring information, you
17  could reject that null hypothesis that the
18  market is inefficient.
19      Q.  Now, then, applying the null
20  hypothesis to your two tests, what is the
21  null -- strike that -- what was the null
22  hypothesis for your single-event event
23  study test?
24      A.  That the stock price movement that
25  day was simply a random fluctuation and the

Steven P, Feinstein, Ph.D
1
2  movement in the stock price was not caused
3  by information; that the market did not
4  react to the information that came out that
5  day.
6      Q.  With respect to your FDT z-test, was
7  there one null hypothesis or more than one
8  null hypothesis?
9      A.  It's one.  The null hypothesis is
10  that the market disregards available
11  information, such that stock price is not
12  impacted by available information.
13      Q.  Now, in each of those instances,
14  your event study or single-event event
15  study on the one hand and the FDT z-test on
16  the other, can the null hypothesis be
17  reduced to an econometric equation?
18      I'm going to give you a hint.
19      Are there equations that have the
20  letter P in them that economists use to
21  express the null hypothesis in their tests?
22      A.  No, that's not quite right.  I mean,
23  I think what you're getting at, and if you
24  would like me to explain, I will.
25      P is the probability of observing

Steven P, Feinstein, Ph.D
1
2  the result that you observe under the
3  assumption that the null hypothesis is
4  true.
5      So a P value is derived from a
6  regression, based on the assumption of a
7  particular null hypothesis.
8      Q.  So, a null hypothesis cannot be
9  expressed in an equation using P and other
10  variables?
11      A.  It probably can.  And it would be
12  meaningful only to other econometricians,
13  but I guess if you want me to do that, what
14  it would be is that the probability -- no,
15  I'm going to say you can't do that.
16      I mean, that's -- I think if you
17  reduce it too far, then you're too far
18  from -- it's not as meaningful as if you
19  express it the way I expressed it.
20      Q.  Not as -- well, it might not be
21  meaningful to me, but assume that we've
22  engaged an expert economist.
23      Is there a meaningful way to express
24  the null hypothesis that economists would
25  understand?

Page 110

```
 1              Steven P, Feinstein, Ph.D
 2      A.  No.  The stated null hypothesis in
 3  each of my empirical tests is that the
 4  market ignores information and is,
 5  therefore, inefficient.  And by
 6  demonstrating repeatedly that it's not the
 7  case, we have examples and demonstrations
 8  of the stock being efficient and behaving
 9  efficiently.
10              MR. FRANK:  Why don't we take
11  a break here.  I'm going to label a number
12  of exhibits, so it probably makes sense to
13  be more efficient about it.  Off the
14  record, please.
15              THE VIDEOGRAPHER:  We are off
16  the record at 10:36.
17
18              (Recess taken from 10:36 a.m.
19              to 11:05 a.m.)
20
21              THE VIDEOGRAPHER:  We're back
22  on the record at 11:05.
23
24  BY MR. FRANK:
25      Q.  Dr. Feinstein, we were talking
```

Page 111

```
 1              Steven P, Feinstein, Ph.D
 2  earlier about how you went about selecting
 3  dates for your single-event event study.
 4      Do you recall that?
 5      A.  Yes.
 6      Q.  And you were testifying about the
 7  subject of reviewing dates that might have
 8  mixed news, confounding information, where
 9  news was expected and where, as a result,
10  that news wasn't expected to cause stock
11  price movement.
12      Do you recall that discussion?
13      A.  Wasn't expected to cause a stock
14  price movement above the threshold for
15  significance.
16      Q.  If news isn't expected to cause
17  stock price movements above the level of
18  significance, is that evidence of market
19  inefficiency?
20      A.  No.
21      Q.  Well, if a stock price moves on no
22  news, is that evidence of market
23  inefficiency?
24      A.  Generally not, because there's --
25      Q.  If --
```

Page 112

```
 1              Steven P, Feinstein, Ph.D
 2      A.  -- background volatility.  It's
 3  well-established in the literature that
 4  there's a current of background volatility
 5  affecting all stocks.
 6      Q.  And your regression analysis is
 7  designed to adjust for that background
 8  volatility; is that correct?
 9      A.  Not to adjust for it, but to
10  establish a comparison benchmark so that we
11  can discern whether a movement is so big
12  that it's not reasonably caused by that
13  background volatility.
14      Q.  So if there's no news and you've run
15  your regression analysis to discern whether
16  a movement -- what level of movement would
17  be needed to conclude that the movement is
18  not reasonably caused by that background
19  volatility -- well, strike that.
20      Too complicated.
21      Are there any tests that can be run
22  to establish market inefficiency?
23      A.  Yes.
24      Q.  And could you use a single-event
25  event study to do that?
```

Page 113

```
 1              Steven P, Feinstein, Ph.D
 2      A.  Well, if you have a date that you --
 3  or an event that you believe really should
 4  have moved the stock price, and then you
 5  observe that the stock price did not move
 6  and there's, perhaps, other evidence that
 7  it was completely disregarded and ignored
 8  by the market irrationally, that's an
 9  indicator -- that's evidence of
10  inefficiency.
11      I mean, we're speaking in the
12  hypothetical here, in the general.  But
13  that would weigh against a finding of
14  market efficiency.
15      I don't know if -- depending on how
16  clear and certain the conclusion was that
17  the market simply ignored -- irrationally
18  ignored the information, you may or may not
19  need additional evidence.
20      Q.  If the stock price moved in a
21  statistically significant way in the
22  opposite of the expected direction, would
23  that be evidence of market inefficiency?
24      A.  Well, it depends.  I mean, if the
25  nature of the news is such that it is
```

Page 114

Steven P, Feinstein, Ph.D

1 absolutely clear and indisputable which
2 direction the stock price should move, if
3 investors are rational, and the price moved
4 in the opposite direction, that would weigh
5 against fundamental efficiency.
6     I mean, whatever model you're using
7 to determine the correct direction of the
8 price movement, it would -- that would be
9 evidence that the market was not using that
10 same model, that the market was, perhaps,
11 was -- perhaps they're reacting to the
12 news, so there's no impediment to
13 information flow or trading, but perhaps
14 there's some irrationality there, which
15 would weigh against fundamental efficiency.
16     Q.  Now, in connection with your effort
17 to select one or more dates for your
18 single-event event study, you described
19 earlier the review of information you did
20 to select an event, correct?
21     A.  Yes.
22     Q.  Is there any literature that
23 supports the approach that you took in this
24 case to select an event for your

Page 115

Steven P, Feinstein, Ph.D

1 single-event event study?
2     A.  Yeah.  I cite to it.
3     There's an established literature on
4 how to run an event study.
5     Q.  And what literature are you
6 referring to?
7     A.  Well, specifically, I think the
8 seminal work or, actually, the seminal
9 review is the review article by, Lo and
10 MacKinlay.  There's also the -- I cite to
11 it here.
12     (Witness reviews document.)
13     The Nicholas Crew chapter, "Federal
14 Securities Acts in Area of Expert
15 Analysis in Litigation Services Handbook,"
16 Chapter 24, also presents the standard
17 events study methodology, and event
18 selection methodology is a component of
19 that.
20     Q.  I'm sorry.  What page of your report
21 are you on?
22     A.  52, "Academic and Professional
23 Literature" in "Documents and Other
24 Information Considered."

Page 116

Steven P, Feinstein, Ph.D

1     Q.  And --
2     A.  The fourth bullet point from the
3 bottom.
4     Q.  And it's your understanding that the
5 Nicholas Crew article entitled "Federal
6 Securities Acts and Areas of Expert
7 Analysis," describes the method that you
8 used in this case to select      November
9 20, 2007 for your single-event event study?
10     A.  Well, they discuss the event study
11 methodology and how to do it.
12     I believe what I did is supported by
13 the literature.  I don't know if they -- if
14 they explain -- I don't know how much -- I
15 don't recall exactly how much detail they
16 go into in event selection.  But certainly,
17 what I did is consistent with -- well, not
18 only consistent, it's directed by the
19 principles that they explain, them and
20 Campbell and Lo and MacKinlay, about how to
21 run an event study.
22     Q.  Other than Crew and Campbell, Lo and
23 MacKinlay, are there any other academic or
24 professional articles that, in your view,

Page 117

Steven P, Feinstein, Ph.D

1 support the approach that you took in
2 developing and selecting -- in selecting
3 the November 20 date for your single-event
4 event study?
5     A.  And to be clear, what we mean by
6 that methodology is that I read the news
7 and assessed whether the news was such that
8 it would reasonably cause a statistically
9 significant movement before subjecting that
10 event to an event study.  That's what we're
11 talking about.  Right?
12     Q.  Other than Crew and Campbell, Lo and
13 MacKinlay, are there any other academic or
14 professional articles that, in your view,
15 support the approach that you took in
16 selecting the November 20 date for your
17 single-event event study?
18     A.  Well, other than these seminal
19 works, there may be.  I would have to
20 check.  I don't have the -- I know the
21 principles from the literature, but I don't
22 have memorized the bibliography of where
23 these principles reside.
24     Q.  None come to mind as you sit here

Page 118

Steven P, Feinstein, Ph.D

1    today, other than what you've already
2    identified?
3        A.  Well, because I've identified these
4    two, and I always felt that was sufficient.
5    But if you want additional ones, I would
6    have to go review the literature.
7        Q.  No other ones come to mind as you
8    sit here right now?
9        A.  Right.
10       Q.  Now --
11       A.  I mean, that's not to say they're
12   not there.  They just don't come to mind.
13   Let me be clear about that.
14       Q.  Now, you used a different approach
15   to selecting dates for your FDT test,
16   correct?
17       A.  It's a different test.  It calls for
18   a different selection algorithm.
19       Q.  And is there any literature that
20   supports the view that the selection of
21   dates for an FDT z-test should be different
22   than the selection of dates for an event
23   study?
24       A.  Yeah.  Yes.  I believe the original

Page 119

Steven P, Feinstein, Ph.D

1    FDT test describes separation of dates into
2    news and non-news categories, rather than
3    identification of appropriate dates for a
4    single-event event study.
5        Q.  When you refer to the original FDT
6    test, are you referring to the FDT article?
7        A.  That's what I meant, the article.
8        Q.  Now, in the past, you have used
9    earnings dates as the dates that were
10   tested for purposes of an FDT z-test; is
11   that correct?
12       A.  That's right.
13       Q.  You didn't do that in this case,
14   right?
15       A.  That's right.
16       Q.  Why not?
17       A.  Well, they've already been picked
18   over, essentially, by Hallman and Bajaj.
19   They -- I mean, the FDT test separates the
20   buckets, separates the dates into two
21   categories based on information flow or low
22   information flow without examining whether
23   each particular day should be significant
24   or not significant based on the nature of

Page 120

Steven P, Feinstein, Ph.D

1    the news.
2        So since they've already done that
3    analysis and I was aware of that analysis,
4    it was inappropriate to use the -- to retry
5    the same territory and use the same dates,
6    the same event categories.
7        So I looked for a different rule
8    that would -- that would identify a broader
9    and different selection of news event
10   dates.
11       Q.  Did Dr. Hallman conduct an FDT
12   z-test in this case?
13       A.  No, but he did, in response to
14   Dr. Bajaj, the detailed news analysis to
15   explain why the events should or should not
16   be significant.
17       Once you've done that, you can't use
18   the same selection, or I don't think you
19   should use the same selection rule.  You
20   should look for a different selection rule
21   that captures event -- news flow dates,
22   high news flow dates as opposed to low news
23   flow dates.
24       Q.  Why shouldn't an economist like

Page 121

Steven P, Feinstein, Ph.D

1    yourself use the same rule?
2        A.  Because it was already established
3    that at least four of the six earnings
4    announcement dates were such that they
5    would not be statistically significant.
6    They already established that.
7        So a different rule would provide
8    new information.
9        Q.  You already knew before you even
10   constructed your FDT z-test that at least
11   four of the six earnings dates over the
12   class period in this case yielded
13   statistically insignificant results; isn't
14   that right?
15       A.  Right.  So I could have entered that
16   fray, but I thought it would be more
17   informative not to, to choose a different
18   rule and a different test.
19       MR. FRANK:  Let's mark the CVS
20   Caremark report.
21       Let's go off the record for
22   one moment.
23       THE VIDEOGRAPHER:  We are
24   going off the record at 11:19.

31  (Pages 118 to 121)

Page 122

1          Steven P, Feinstein, Ph.D
2
3          (Brief recess.)
4
5          (Exhibit No. 97 marked for
6          identification.)
7
8          THE VIDEOGRAPHER:  We are back
9     on the record at 11:19.
10
11    BY MR. FRANK:
12       Q.  Dr. Feinstein, I'm showing you a
13    document that has been marked as
14    Exhibit 97.
15          What is Exhibit 97.
16       A.  This is a report on market
17    efficiency that I wrote and submitted in
18    February of 2015 in conjunction with the
19    CVS Caremark case.
20       Q.  And did you perform an event study
21    in this case?
22       A.  (Witness reviews document.)
23          Yes.
24       Q.  What page are you looking at?
25       A.  I'm looking at the table of

Page 123

1          Steven P, Feinstein, Ph.D
2     contents, where it -- which refers to
3     Page 19, event study test of market
4     efficiency throughout the class period.
5       Q.  And if you turn to Page 19, you'll
6     see that the -- at the top of the page,
7     it's Paragraph 86.
8          Do you see that?
9       A.  Yes.
10      Q.  And do you see in the first
11    sentence, it says, "The second empirical
12    test was an event study that investigates
13    whether CVS Caremark common stock exhibited
14    market efficiency by generally moving more
15    in response to the earnings and guidance
16    events than it moved typically on all other
17    dates."
18          Do you see that?
19      A.  Yes.
20      Q.  And does this document refresh your
21    recollection that you actually used
22    earnings and guidance events as the dates
23    you studied in your event study for the CVS
24    Caremark matter?
25      A.  Yes.  I mean, for the collective

Page 124

1          Steven P, Feinstein, Ph.D
2     test.
3       Q.  Was there a single-event event study
4     that you conducted in this case that was
5     not a collective test?
6       A.  Yes.
7       Q.  And where is that set forth in the
8     report?
9       A.  (Witness reviews document.)
10          Page 22, there were two events,
11    January 9, 2009 and November 5, 2009.
12          And the results, I mean, beginning
13    on Page -- Paragraph 96 is the description
14    of that test, and that runs through
15    Paragraph 123.
16      Q.  And you identified those two dates
17    that you studied in Paragraph 99, correct?
18      A.  Yes.
19      Q.  And those were both earnings
20    disclosure dates, correct?
21      A.  Not really.  I think what it says
22    here is January 9 was a guidance date -- a
23    guidance change date, not an earnings
24    announcement date.
25      Q.  It changes its guidance for expected

Page 125

1          Steven P, Feinstein, Ph.D
2     earnings, correct?
3       A.  Right, while November 5 was an
4     earnings announcement date.
5       Q.  You didn't perform a z-test in the
6     CVS Caremark case, did you?
7       A.  No, I used the F-test and the
8     Ansari-Bradley test.
9       Q.  And let me turn your attention to
10    the next exhibit that has been marked as
11    Exhibit 98.
12
13          (Exhibit No. 98 marked for
14          identification.)
15
16    BY MR. FRANK:
17      Q.  Is it fair to say that Exhibit 98 is
18    your expert report in the JPMorgan
19    securities litigation?
20      A.  Yes.
21      Q.  Dated February 13, 2015, correct?
22      A.  Yes.
23      Q.  And then in that case, you also did
24    an event study, correct?
25      A.  Yes.

Page 126

Steven P, Feinstein, Ph.D
1
2     Q.  You did both a single-event event
3  study and a collective test, correct?
4     A.  Correct.
5     Q.  And while you did a collective test,
6  it wasn't a z-test, correct?
7     A.  That's right.  An F-test and then
8  Ansari-Bradley.
9     Q.  And you used -- and please turn your
10  attention to Page 19, Paragraph 83.
11     A.  Yes.
12     Q.  And there you see in the second
13  paragraph, it says, "The events tested
14  during this examination period were all
15  earnings and guidance announcements."
16        Do you see that?
17     A.  I do.
18     Q.  And in Paragraph 84, it also says
19  you examined the earnings and guidance
20  announcements; is that right?
21     A.  Yes.
22     Q.  And you examined more than one date
23  for your single-event event study in that
24  case, correct?
25     A.  It seems to be three events, yes.

Page 127

Steven P, Feinstein, Ph.D
1
2
3        (Exhibit No. 99 marked for
4        identification.)
5
6  BY MR. FRANK:
7     Q.  Now, let me turn your attention to
8  the next exhibit.
9        This is a -- this is a document
10  that's been marked as Exhibit 99.
11        Exhibit 99 is your report in the
12  Petrobras securities litigation dated
13  October 15, 2015; is that correct?
14     A.  Yes.
15     Q.  You did an FDT z-test in this case,
16  correct?
17     A.  Yes.
18     Q.  Do you know how many total FDT
19  z-tests you have done as an expert in
20  securities litigation?
21     A.  No.
22     Q.  But this is one of the cases?
23     A.  Yes.
24     Q.  Now, in this case, you used earning
25  dates as the dates that were the subject of

Page 128

Steven P, Feinstein, Ph.D
1
2  your FDT z-test, correct?
3     A.  No.  Yeah, I ran the test on
4  earnings dates.  I also ran it on 6-K event
5  dates as well, which are like 8-Ks, but for
6  a foreign company.
7
8        (Exhibit No. 101 marked for
9        identification.)
10
11  BY MR. FRANK:
12     Q.  Let me turn your attention to a KBR
13  report.  I'm showing you a document that
14  has been marked as Exhibit 101.  We're
15  going to go a little bit out of order,
16  because we premarked it.
17        Exhibit 101 is your report dated
18  February 19, 2016 in the KBR securities
19  litigation; is that correct?
20     A.  Yes.
21     Q.  In the KBR case, you did both a
22  single-event event study and a collective
23  test, correct?
24     A.  Yes.
25     Q.  And how many dates -- when you say

Page 129

Steven P, Feinstein, Ph.D
1
2  "single-event event study," you use that
3  expression to include when you do that for
4  a series of cases, right, a series of
5  dates, right?
6     A.  Yes.
7     Q.  When you say "single-event event
8  study," you don't mean that there was
9  necessarily a single event for the entire
10  event study, correct?
11     A.  Correct.  But each time the event
12  study is run, it's focused on a single
13  event.
14     Q.  Right.  And how many dates did you
15  look at in the KBR matter?
16     A.  (Witness reviews document.)
17        Four.
18     Q.  And for the collective test, you
19  used -- strike that.
20        For both the event study and the
21  collective test, you used earnings dates,
22  correct?
23     A.  Let me check.
24        (Witness reviews document.)
25        Well, it's -- what it says on

Page 130

```
1            Steven P, Feinstein, Ph.D
2    Paragraph 104 and -5 is that I used
3    corrective disclosure dates, which -- well,
4    some of which -- the first, third and
5    fourth -- were financial reporting dates;
6    and the second one, May 5th, 2014, was not.
7    It was a date where they announced that
8    they would be restating their financials.
9        Q.  Let me turn your attention to
10   Paragraph 93.
11          There you say -- that you ran -- the
12   second set of tests you ran collectively is
13   a broad set of events that occur over the
14   course of a full year that ends with the
15   class period?
16       A.  That's right.
17       Q.  You wrote "The events tested during
18   this estimation period were all earnings
19   and guidance announcements."
20          Is that correct?
21       A.  Yes.
22       Q.  And what you wrote there was true?
23   For your collective test you were looking
24   at earnings and guidance announcements,
25   right?
```

Page 131

```
1            Steven P, Feinstein, Ph.D
2        A.  That's right.
3        Q.  And --
4        A.  That was the sorting variable.
5        Q.  And for your event study that wasn't
6    a collective event, you also looked at
7    dates -- you looked at four dates; is that
8    correct?
9        A.  Right.  I picked dates that were the
10   red-letter dates in the life of this
11   company, which were the corrective
12   disclosure dates, one of which was not an
13   earnings announcement date.
14       Q.  But three of which were?
15       A.  Right.
16
17          (Exhibit No. 102 marked for
18          identification.)
19
20   BY MR. FRANK:
21       Q.  Let me turn your attention to a
22   document that's been marked as
23   Exhibit 102.
24          This is your expert report in the
25   World Acceptance Corporation securities
```

Page 132

```
1            Steven P, Feinstein, Ph.D
2    litigation, dated September 28, 2016.
3          MR. MARKOVITS:  Do I have that
4    in the binder here?
5          MS. HAYS:  You should.
6          MR. MARKOVITS:  Five is
7    missing.
8          MR. FRANK:  We're going to
9    make a donation to the cause.
10         MR. MARKOVITS:  Thank you.
11   I'm sorry.  What exhibit number was this?
12         MR. FRANK:  102.
13   BY MR. FRANK:
14       Q.  Exhibit 102, you have that before
15   you, correct, sir?
16       A.  Yes.
17       Q.  And did you -- you didn't do an FDT
18   test in this World Acceptance Corporation
19   matter, right?
20       A.  You're saying I did not?
21       Q.  You did not.
22       A.  I did the collective test using the
23   F-test and Ansari-Bradley test.
24       Q.  You didn't do the z-test?
25       A.  Correct.
```

Page 133

```
1            Steven P, Feinstein, Ph.D
2        Q.  Now, what dates did you choose for
3    your collective test?
4        A.  Earnings announcement events.
5
6          (Exhibit No. 103 marked for
7          identification.)
8
9    BY MR. FRANK:
10       Q.  Now, let me turn your attention to
11   the next exhibit.
12          This is Exhibit 103.  Exhibit 103
13   is, I think, if we've done this right, is
14   your report in the Eletrobras securities
15   case, dated June 30, 2017.
16          Do you see that?
17       A.  Yes.
18       Q.  And you did a z-test, an FDT z-test
19   in this case, correct?
20       A.  Yes.
21       Q.  And do you, essentially, use the
22   term z-test and FDT z-test to mean the same
23   thing when you're talking about this test
24   in the securities litigation context?
25       A.  Yes.
```

Page 134

1   Steven P, Feinstein, Ph.D
2  Q. And you used earnings dates as the
3 basis of your test -- your z-test in the
4 Eletrobras case, correct?
5  A. Yes.
6  Q. Let me turn your attention to your
7 report in this case.  You should still have
8 that before you.  I believe that's been
9 marked as Exhibit 96.
10  A. I have it.
11  Q. And do you see that there's an
12 Exhibit 7 at the end of your report?
13  A. Yes.
14  Q. And do you see that on Exhibit 7,
15 there's, I guess, four panels; is that fair
16 to say?
17  A. Yes.  Well, yes.
18  Q. What word do you use to describe the
19 different tables?
20  A. There's two panels.  These are
21 regression results, but for the two
22 subperiods.
23  Q. Two panels.  So let's talk about the
24 first panel.
25  A. Okay.

Page 135

1   Steven P, Feinstein, Ph.D
2  Q. Do you see in the first panel the
3 second table that lists coefficient
4 standard errors and T-statistics?
5  Do you see that?
6  A. Yes.
7  Q. We see an intercept in the far left
8 column, correct?
9  A. Yes.
10  Q. And a market index, right?
11  A. Yes.
12  Q. And a peer index, right?
13  A. Yes.
14  Q. And then we see five dates.  Do you
15 see that?
16  A. I do.
17  Q. What -- why are those five dates on
18 this table?
19  A. (Witness reviews document.)
20  Well, these are the dates that are
21 tested.  These are the specific dates that
22 are tested in the two different empirical
23 tests.
24  So if -- and if, under the null
25 hypothesis that there's no difference

Page 136

1   Steven P, Feinstein, Ph.D
2 between information and no information
3 dates or high information and low
4 information dates, it's benign to control
5 for abnormal -- the abnormal nature of
6 event dates and only under the alternative
7 assumption that the market is efficient and
8 that the information -- that the market
9 response to information, then, these dates
10 should be controlled for, since what we're
11 trying to do is measure typical background
12 volatility and not volatility that's
13 impacted by the atypical responses to
14 atypical news.
15  Q. I think at the beginning of your
16 answer, you said these are the dates that
17 were tested in the two different tests.
18 I'm not sure that that's accurate.
19  What are the two tests you're
20 referring to?
21  A. The single-event event study, that
22 November 20, 2007 is controlled for.  And
23 if you look at Page 79, these are the --
24 this is the collective date -- the
25 collective event test.  The right-hand

Page 137

1   Steven P, Feinstein, Ph.D
2 column on Page 79 tells us which is the
3 effective date of the event, and they
4 correspond exactly to what you see in
5 Exhibit 7: February 27, April 18, May 22,
6 June 14, August 8, August 30,
7 September 27, November 8 and
8 November 20.
9  Q. Did you control for these five dates
10 in your regressions for both the
11 single-event event study and the FDT
12 z-test?
13  A. Yes.
14  Q. And that's what this -- these two
15 tables are showing?
16  A. Yes.  I mean, the reason for running
17 a regression in an event study is to
18 measure typical volatility, the typical
19 level of background volatility.
20  If there's some reason to suspect
21 that some dates might have atypical
22 volatility, they should be controlled for.
23  Q. Is it a mistake to fail to control
24 for them?
25  A. Again, I wouldn't paint it black or

Page 138

1           Steven P, Feinstein, Ph.D
2    white like that.
3           You have to consider that in the
4    interpretation of the results if they
5    weren't controlled for.
6           If anything, not controlling for
7    them would bias the test toward a finding
8    of nonsignificance for an event date.  So
9    you have to consider that when evaluating
10   the power of the test and the results.
11      Q.  When you say it might bias the test
12   in favor of finding nonsignificance, is
13   that another way of saying that if you
14   include these dates in your regression,
15   it's more likely that you would find
16   nonsignificance; and if you exclude them,
17   it's more likely that you would find
18   significance?
19      A.  If you exclude them, and the fact of
20   the matter, the real world is such that the
21   market's efficient and does react to
22   information -- let me say that again.
23         The fact of the matter is that the
24   world is efficient and that this stock
25   trades in an efficient market, such that

Page 139

1           Steven P, Feinstein, Ph.D
2    the price reacts to information, if you do
3    not control for event dates that are
4    unusual dates, your regression will be more
5    likely to find an event nonsignificant.
6       Q.  Well, when you make the decision as
7    to whether to include them or exclude them,
8    you have to be agnostic as to whether or
9    not the market is efficient, correct?
10      A.  That's right.  And that's why this
11   is a good assumption, because being
12   agnostic and not knowing what the results
13   are and relying on the test to vindicate
14   what the results are, it's completely
15   benign under the null hypothesis to exclude
16   event dates or to dummy for event dates, to
17   control for event dates.
18         But it wouldn't be benign to not
19   control for them if, in fact, the market is
20   efficient.
21         So the right course of action is to
22   control for them.  Certainly, before you
23   know the results, before you've run the
24   regression.
25      Q.  Isn't it possible that if the market

Page 140

1           Steven P, Feinstein, Ph.D
2    is inefficient, that controlling for them
3    can affect the results of the testing?
4       A.  Well, I mean, if you mean -- when
5    you run the test two different ways, you'll
6    always find slight differences.  But you
7    want to see if there's a systematic
8    difference caused by a factor relevant to
9    the null hypothesis or the alternative
10   hypothesis.
11         But what you want to see is, if it's
12   benign, taking into account what you're
13   trying to test.  And in this case, it would
14   be benign to control for them if the market
15   is inefficient.  And it would be
16   appropriate to control for them if the
17   market is either inefficient or efficient.
18         So the right course of action would
19   be to control for them.
20      Q.  Did you run your test without
21   controlling for them?
22      A.  Could I or did I?
23      Q.  Did you.
24      A.  No.
25      Q.  Well, so do you actually know

Page 141

1           Steven P, Feinstein, Ph.D
2    whether or not -- strike that.
3         Do you know how it would affect your
4    results if you hadn't controlled for these
5    five dates?
6       A.  In theory, but not the
7    quantification.
8       Q.  What's your understanding in
9    theory?
10      A.  In theory, if the market is
11   efficient such that information dates have
12   unusual price dynamics, then not
13   controlling for them -- in other words,
14   letting these days appear in the data
15   series as typical days -- would upwardly
16   bias the measured level of volatility, and
17   therefore, downwardly bias the likelihood
18   of finding a statistically significant
19   event result.
20      Q.  Isn't it possible that if the
21   market's not efficient, then controlling
22   for them biases the results in favor of the
23   a finding of market efficiency?
24      A.  I wouldn't call that bias.  I mean,
25   it's certainly possible that the -- because

Page 142

Steven P, Feinstein, Ph.D

1   Steven P, Feinstein, Ph.D
2   of random effects that -- well, because of
3   random effects, changing the specification
4   of the regression will change the
5   regression results to some extent.
6        That's why it's important to do it
7   right.  That's why it's important to drive
8   the decision of whether to include them or
9   not include them on the basis of
10  statistical -- generally accepted, widely
11  used and correct statistical methodology,
12  which is what I did.
13       But if you do it wrong, yeah, you'll
14  see a different result.  I mean,
15  theoretically the result would be to find
16  less significance if you do not control for
17  these dates.
18       But that would be spurious and
19  wrong.
20   Q.  Now, it would be spurious and wrong
21  not to control for the dates?  That's your
22  view?
23   A.  Yes.
24   Q.  Okay.  Now, I see that there are --
25   A.  I mean, the result would be spurious

Page 143

1   Steven P, Feinstein, Ph.D
2   and wrong.  The methodology would be wrong,
3   and the result of finding nonsignificance
4   when, in fact, the date -- the event is
5   actually significant, that would be a
6   spurious result.
7        The methodology isn't spurious, the
8   result would be spurious based on the wrong
9   approach.
10   Q.  If you assume that the market's
11  efficient?
12   A.  No, not based on the assumption.
13       Whether the market's efficient or
14  not -- okay.
15       Let's make a decision.  Do you
16  control for the event dates or do you not
17  control for the event dates?
18       Under the null hypothesis that the
19  market is inefficient, it doesn't make any
20  difference.
21       So -- so we don't have to -- we
22  don't have a directive from that
23  consideration.
24       But under the alternative hypothesis
25  that the market is efficient, not

Page 144

1   Steven P, Feinstein, Ph.D
2   controlling for them would lead to a
3   spurious result, and controlling for them
4   would lead to the correct result.
5        So given that out of the four
6   possibilities -- controlling, not
7   controlling, efficient, not efficient --
8   considering those four possibilities, the
9   right thing to do is to control for them.
10   Q.  But let me --
11   A.  It's benign -- if you're -- it's
12  benign if the market is inefficient.  And
13  it matters and it's correct if the market
14  is efficient.
15
16          (Exhibit No. 100 marked for
17          identification.)
18
19  BY MR. FRANK:
20   Q.  Well, let me show you a document
21  that has been marked as Exhibit 100.  We've
22  stapled it in the top right for your ease
23  of review.
24       I will represent to you that this is
25  Exhibit 7A from the Petrobras report that

Page 145

1   Steven P, Feinstein, Ph.D
2   you reviewed earlier.
3        Now, you'll see on Exhibit 7A that
4   this is a Petrobras common ADR regression
5   summary.
6        Do you see that?
7   A.  Yes.
8   Q.  Now, I see that there's a column for
9   intercept there.  Do you see that?
10   A.  Yes.
11   Q.  And just like on Exhibit 7 of your
12  report in this case, there's a row for
13  intercept, right?
14   A.  Yes.
15   Q.  And there's a column for market
16  index, right?
17   A.  Yes.
18   Q.  Coefficient?  And we see market
19  index on your report here, right?
20   A.  Yes.
21   Q.  And we see a peer index coefficient,
22  just like we see a peer index row here in
23  your report in this case, right?
24   A.  Yes.
25   Q.  But there are no dates listed there,

Page 146

1          Steven P, Feinstein, Ph.D
2     right?
3          A.   Correct.
4          Q.   And just like this case, in the
5     Petrobras case, you used earnings dates as
6     the basis for your FDT z-test, correct?
7          A.   In -- I used earnings, and I ran the
8     test also using the 6-Ks.  There are
9     something like eight-five 6-Ks.
10         Q.   You used earnings dates and 6-K
11    dates?
12         A.   Right.
13         Q.   Is that correct?
14         A.   That's right.
15         Q.   In your regression summary in
16    Petrobras, you did not control for the
17    earnings dates or the 6-K dates, correct?
18         A.   That's right, for good reason.
19         Q.   And what's --
20         A.   Or two good reasons.
21         Q.   What are the two good reasons?
22         A.   One, that would have required about
23    85 or 90 dummy variables.  Reports have
24    already looked and said economists dummying
25    out 85 or 90 days.

Page 147

1          Steven P, Feinstein, Ph.D
2          So I didn't want to make that
3     mistake or even raise the appearance that I
4     was dummying out too many dates, such that
5     the regression could be considered or
6     considered unreliable.
7          So you can imagine how wide this
8     document would have been if I had 85 or 90
9     dummy variables.
10         And I think I may have explained,
11    either in the report or in testimony, for
12    that case, the same thing that I told you
13    today, which is that if anything, not
14    dummying out and controlling for tested
15    event dates, if anything, that would bias
16    the result towards a finding of
17    inefficiency and nonsignificance.
18         So, basically, I -- this was a
19    conservative decision to run the regression
20    in a manner that was most favorable to
21    defendants and see what results are
22    produced.
23         Q.   Does dummying out the dates bias the
24    test in favor of efficiency or
25    inefficiency?

Page 148

1          Steven P, Feinstein, Ph.D
2          A.   Neither.  If -- neither.  Because
3     in -- if the market is, in fact,
4     inefficient, there should be no effect.
5          And if the market is determined to
6     be efficient, then dummying out is the
7     correct unbiased approach.
8          Q.   How can you be certain that if the
9     market is inefficient, there should be no
10    effect?
11         A.   Because the purpose of the
12    regression is to measure the typical
13    volatility.  And event dates will have
14    typical volatility in an inefficient
15    market.
16         In an inefficient market investors
17    are ignoring the flow of information --
18    this is the working definition for
19    inefficiency -- for whatever reason, the
20    information is being ignored and not
21    impacted into the price, event dates will
22    be -- will behave like typical dates.  And
23    they should -- they, therefore, can be
24    included in the regression without any
25    impact on the regression results.

Page 149

1          Steven P, Feinstein, Ph.D
2          Q.   Now, you testified earlier that a
3     Form 6-K is like a Form 8-K but rather than
4     Form 8-Ks that are filed by domestic US
5     companies, 6-Ks are filed by foreign
6     companies, correct?
7          A.   That's right.
8          Q.   And what's a Form 8-K?
9          A.   Well, it's a form that, according to
10    SEC directives, SEC registered companies
11    must file when there are material
12    developments, material events, or events
13    that they consider material.  And they're
14    not material from the point of view of an
15    econometrician necessarily, but they're
16    material from the point of view of the
17    management of the company as to what's
18    important and relevant for the market to
19    know.
20         Q.   And the Form 6-K is just the
21    equivalent for the foreign corporation?
22         A.   That's right.
23         Q.   Now, in terms of -- I just want to
24    make sure I understand.
25         In terms of whether you dummy out

## Page 150

```
1              Steven P, Feinstein, Ph.D
2    variables or not, dummying out variables
3    makes it more likely that -- or strike
4    that.
5              Including these dates and not
6    dummying them out makes it more likely that
7    there's a finding of market inefficiency,
8    correct?
9        A.  Under -- under -- well, now we're
10   talking about type 1 and type 2 error.
11             In a world -- if, in fact --
12   unbeknownst to the researchers, but it's a
13   fact, God knows, that it's an efficient
14   market.  If that's the case, then dummying
15   out the events will give you the correct
16   result -- will be more likely to give you
17   the correct result that, in fact, the
18   market is efficient.
19             On the other hand, let's say the
20   truth of the matter is that the market is
21   inefficient -- God knows it, but we don't
22   yet know it, we have to do the econometrics
23   to determine it.  Dummying out the
24   variables will have no effect.  So it makes
25   it more likely that you get the correct
```

## Page 151

```
1              Steven P, Feinstein, Ph.D
2    result when the market is efficient.  It
3    has no result on correct or incorrect when
4    the market is -- I said that backwards.
5    Wait.
6              If the market is efficient, you get
7    the correct result; it's more likely you
8    get the correct result.
9              If the market is inefficient, it
10   won't affect the results one way or the
11   other in terms of bias and changing the
12   probabilities of a particular finding.
13       Q.  And is dummying out the variables
14   favorable to plaintiff or defendant in your
15   view?
16       A.  I think it's favorable to the court,
17   because we get at the right answer.  I
18   mean, it's -- that's how I view it.
19       Q.  So it's not your view that it's
20   favorable to one party or another?
21       A.  It's the correct methodology -- it's
22   the correct methodology to get at the right
23   answer.
24       Q.  And you didn't do it in Petrobras,
25   not because it wasn't the correct
```

## Page 152

```
1              Steven P, Feinstein, Ph.D
2    methodology, but just because there were so
3    many dates that you thought you would be
4    criticized for dummying out so very many
5    dates?
6        A.  Right.  There are cases where
7    experts have been excluded for having too
8    many variables dummied out in their
9    regressions.
10             And being cognizant of the fact of
11   that, but also the fact that, if anything,
12   it would bias the results towards a finding
13   of inefficiency, I chose that as the
14   correct approach for that case, given that
15   set of facts.
16       Q.  Now, would it have been possible in
17   that case for you to just dummy out the
18   earnings dates and not the 6-K dates?
19       A.  Anything's possible.  That just
20   simply would have opened the door towards
21   criticism of why did I stop at the earnings
22   dates?
23             I mean, there's a wide range of
24   reasonable approaches, each with advantages
25   and disadvantages.  What I did, I think,
```

## Page 153

```
1              Steven P, Feinstein, Ph.D
2    was the best balance.
3        Q.  When constructing a test like this,
4    you have to make choices; is that right?
5        A.  Yes.  Yes.
6        Q.  And your choice in that case was not
7    to dummy out the dates that were being
8    otherwise tested, correct?
9        A.  Correct.
10       Q.  And in that case, you felt justified
11   in doing that, in part, because not
12   dummying out those dates would bias the
13   test in favor of the defendants; is that
14   right?
15       A.  No, I -- could I hear your question
16   again.
17       Q.  Sure.
18             In that case, you felt justified in
19   not dummying out the dates, in part,
20   because that would bias the test in favor
21   of the defendants, correct?
22       A.  Yes.  The course that I did choose,
23   if anything, would have -- would bias the
24   result in favor of the defendants.  So I
25   chose the more conservative approach, at
```

Page 154

Steven P, Feinstein, Ph.D

1
2  least conservative from the perspective of
3  the plaintiff -- for the plaintiff's side.
4      Q.  In the Petrobras case?
5      A.  In the Petrobras case.
6      Q.  Now, in the FDT z-test that you
7  conducted here, when you selected dates,
8  you -- how did you go about your selection
9  process?
10     A.  I read the news.  I read the analyst
11  reports.  I read the documents that we
12  talked about.  And -- well, along the way,
13  I made a decision that I would not retread
14  over the same ground that Hallman and Bajaj
15  had covered.
16         And it became -- I observed that
17  strictly from -- strictly from the
18  fundamental economic valuation perspective,
19  there just didn't seem to be a -- from
20  reading the news and the analyst reports, I
21  realized that this is a unique company,
22  that it -- that what investors cared and
23  were concerned about frequently, what they
24  asked questions about at conference calls
25  was more than just the fundamental

Page 155

Steven P, Feinstein, Ph.D

1
2  valuation principles that are usually
3  covered in conference calls, but that
4  investors and analysts understood that this
5  is a political creature, Freddie Mac, and
6  the political environment had a lot to do
7  with the fortunes of this company and the
8  future fortunes of this company and the
9  valuation of this company.
10         So the kind of news that it appeared
11  from reading the analyst reports and the
12  news articles, the kind of news that people
13  seemed to be concerned about from that part
14  of the Cammer and Krogman analysis was
15  looking at news articles and analyst
16  coverage, informed me that for the
17  empirical test I should choose a rule that
18  would somehow capture information flow
19  about the political environment in which
20  Freddie Mac was operating.
21         And so, I gave it a lot of thought.
22  I discussed the matter with my team.  And
23  we thought that rather than pick -- that
24  any rule that was completely subjective
25  that I would come up with myself about what

Page 156

Steven P, Feinstein, Ph.D

1
2  kind of information should be moving the
3  market would be open to criticism because
4  it would be highly subjective, and it's
5  important to have an objective rule that
6  could be replicable, and the objective rule
7  had to take into account the financial as
8  well as the political news flow for this
9  company.  And it made sense to let the news
10  media choose which events were high news
11  flow days and which events were low news
12  flow days.
13         I then looked back at our files of
14  news articles and saw that there's 2,900
15  articles, not that just mentioned Freddie
16  Mac -- there's actually more than that that
17  mention Freddie Mac -- it's 2,900 that
18  Factiva identifies where Freddie Mac's the
19  subject of the articles.  So it's quite
20  extensive news coverage.
21         And if I would pick every one of
22  those dates, it wouldn't be separating high
23  news flow from low news flow.  They'd all
24  be picked.  All dates would be considered
25  news dates.

Page 157

Steven P, Feinstein, Ph.D

1
2  So in order to run the test, I
3  needed some rule that would separate days
4  and events into, like, extraordinarily high
5  news flow versus lesser news flow.
6         The Wall Street Journal is a
7  preeminent financial news source, and New
8  York Times is the, if not one of the,
9  preeminent news sources for everything
10  else.
11         So the rule was that if both
12  companies -- if both news sources cover an
13  event, one could be pretty sure that this
14  was an important event in the life of the
15  company.
16         That was the process by which I
17  arrived at that rule.
18     Q.  And you arrived at that rule in
19  connection with your work in this case?
20     A.  Yes.
21     Q.  You've never used that rule in any
22  prior case, correct?
23     A.  Correct.
24     Q.  Now, the methodology that you
25  usually use for an FDT z-test on those

Page 158

```
1              Steven P, Feinstein, Ph.D
2    several occasions when you've done it is
3    looking at company announcements, like
4    earnings guidance or Form 6-K, correct?
5        A.  Right.
6        Q.  And here, you didn't use earnings
7    announcements because you already knew that
8    Dr. Hallman had studied those earnings
9    announcements and that, if you had run a
10   test on those announcements, it would have
11   yielded statistically insignificant
12   results, correct?
13       A.  It's not the results.  It was the
14   conflict between Bajaj and Hallman that I
15   wanted to stay away from.
16          I mean, Hallman had some pretty
17   compelling arguments as to why his results
18   were what they were and why those results
19   should be what they were in an efficient
20   market.  I just wanted to stay out of that
21   fray entirely.
22       Q.  Did you form an opinion as to
23   whether you agreed or disagreed with
24   Dr. Hallman's opinions?
25       A.  Yes.
```

Page 159

```
1              Steven P, Feinstein, Ph.D
2        Q.  What was your opinion?
3        A.  I did look at the analyst reports
4    for each -- well, I looked at all the
5    analysts reports, but I reviewed -- again,
6    in another phase of the research -- the
7    analyst reports, specifically responding to
8    the earnings announcement dates, and I saw
9    that, in fact, they just were not -- they
10   were mixed news or expected news and not
11   the kind of news that would reasonably
12   elicit a statistically significant response
13   for the majority of them.
14          So I mean, I think, ultimately,
15   that's consistent with his conclusion.
16       Q.  Now, did you -- you reviewed
17   Dr. Bajaj's report as well, right?
18       A.  Yes.
19       Q.  And did you disagree with all of
20   Dr. Bajaj's conclusions or only with some
21   of them?
22       A.  I, frankly, don't recall.  I mean,
23   it wasn't part of my scope to rebut his
24   report, and I didn't memorialize my
25   opinions about his report in my report.
```

Page 160

```
1              Steven P, Feinstein, Ph.D
2    I'm sure there are things I agreed
3    with and things I disagreed with.
4        Q.  Now, at the time you were selecting
5    dates for the FDT z-test, you were aware
6    that if you had run an FDT z-test on the
7    earnings announcement dates that the
8    results would have been statistically
9    insignificant, right?
10       A.  I'm not sure.  Because one thing I
11   did do, one thing I did agree with
12   Dr. Bajaj about was that I tested using a
13   Chow test whether there was a structural
14   break in the data.  So I did break the data
15   at August 8, 2007, which I believe is
16   something that Dr. Hallman did not do.
17          So if I were to rerun his test, it
18   would have been different for that reason.
19          I know that three earnings
20   announcement dates did show up in my z-test
21   because they were dates that The Wall
22   Street Journal and the New York Times each
23   reported on.  And I did find the second to
24   the last earnings announcement date to be
25   statistically significant, and I believe
```

Page 161

```
1              Steven P, Feinstein, Ph.D
2    Dr. Bajaj did not.
3          Taking all that into account, I
4    don't know specifically what the result
5    would be.
6        Q.  You were aware at the time that you
7    selected dates for your FDT z-test that
8    Dr. Bajaj had already opined that only one
9    of those dates yielded statistically
10   significant results, correct?
11          MR. MARKOVITS:  Objection.
12       A.  I thought he said two did.  I
13   thought he said two.  He said two of his
14   earnings announcements did.
15   BY MR. FRANK:
16       Q.  Your memory was that Dr. Bajaj had
17   identified two statistically significant
18   dates among the earnings announcements?
19       A.  That's my recollection.  Yes,
20   actually, that is what he said.
21       Q.  Now --
22       A.  And I think Dr. Bajaj said, no, it
23   was only one, but...
24          MR. MARKOVITS:  There's the
25   confusion.  He was asking about Bajaj, and
```

Page 162

```
 1            Steven P, Feinstein, Ph.D
 2    you were just talking about Hallman.
 3            THE WITNESS:  Oh, I'm sorry.
 4            MR. FRANK:  Let's make it
 5    clear, because I think you end up
 6    testifying to something you don't believe
 7    because of that confusion.
 8    BY MR. FRANK:
 9        Q.  So --
10        A.  I think Dr. Bajaj said one was
11    significant, and Dr. Hallman said two were
12    significant.
13            Does that clear it up?
14        Q.  Except for the fact that there was
15    no pending; almost.
16            So it was -- before you conducted
17    your FDT z-test and chose your dates for
18    that test, you knew that Dr. Hallman,
19    plaintiff's selected expert, had concluded
20    that only two of the earnings announcement
21    dates were statistically significant,
22    correct?
23        A.  Right.  And he argued that the other
24    four reasonably should not have been.
25        Q.  Reasonably should not have been
```

Page 163

```
 1            Steven P, Feinstein, Ph.D
 2    what?
 3        A.  Statistically significant.
 4        Q.  Now, you were also aware, before you
 5    selected your dates, that Dr. Bajaj had
 6    concluded that only one of the tested
 7    earnings announcement dates yielded a
 8    statistically significant result,
 9    correct?
10        A.  Correct.
11        Q.  Now, at Paragraph 137 of your
12    report, you write, "The event study shows
13    that for the allegation-related event,
14    there was a strongly statistically
15    significant price reaction to
16    company-specific news."
17            Do you see that?
18        A.  Yes.
19        Q.  Did I read that correctly?
20        A.  Yes.
21        Q.  You then write, "This finding proves
22    that Freddie Mac common stock reacted to
23    new information, and its market was
24    efficient and, in particular, efficient
25    with respect to the information at issue in
```

Page 164

```
 1            Steven P, Feinstein, Ph.D
 2    this case."
 3            Do you see that?
 4        A.  I do.
 5        Q.  What is the information at issue in
 6    this case?
 7        A.  The disclosures that -- well, the
 8    information about the risks the company was
 9    bearing on account of its increased
10    exposure to nontraditional higher-risk
11    loans, its ability to analyze loans and
12    detect fraud, its capital adequacy, its
13    adherence to underwriting standards, and
14    the impact of that information on the
15    company's likelihood of experiencing a loss
16    such as was experienced on   November 20
17    or announced on       November 20, 2007.
18        Q.  Now, are you aware that prior to the
19    class period, Freddie Mac had disclosed
20    that it was increasing its purchases of
21    nontraditional mortgage loans and intended
22    to continue doing so?
23        A.  I'm aware of announcements to that
24    effect.  I'm aware of announcements that --
25        Q.  Well, I was only asking you about
```

Page 165

```
 1            Steven P, Feinstein, Ph.D
 2    that announcement.
 3            I or your counsel can ask you about
 4    another announcements later.
 5            But you're aware about announcements
 6    to that effect, correct?
 7        A.  Yeah.  But it's important to also
 8    realize that in the context of
 9    countervailing assurances that what the
10    market hears and what the market receives
11    might not be as clear as how you phrased
12    it.
13        Q.  Now, when you wrote "The finding
14    proves that Freddie Mac common stock
15    reacted to new information and its market
16    was efficient," are you able to draw a
17    conclusion that, from your single-day event
18    study, that Freddie Mac's market was
19    efficient on other days?
20        A.  Well, let's break it down.
21            I mean, from that single event, it's
22    a demonstration that the stock did react to
23    new information.  So it's proof that the
24    stock did react to new information.
25            And it's proof that the market was,
```

Page 166

Steven P, Feinstein, Ph.D

1 therefore, informationally efficient on
2 that day in reaction to that event.
3 There's no reason to believe that if
4 that event had occurred one day earlier,
5 the reaction would have been any different
6 one day earlier, especially in light of the
7 Cammer and Unger factors that I analyzed.
8 So I believe that this demonstration
9 of market efficiency on that day is
10 extendable to other days in the class
11 period, all previous days in the class
12 period.
13 Q. Is it your opinion -- well, strike
14 that.
15 Are you aware of any academic
16 literature that supports your opinion that
17 analysis of a single day is sufficient to
18 prove market efficiency over the course of
19 a class period?
20 A. I mean, there aren't -- the
21 literature presents principles and
22 methodologies and case studies and then
23 expects researchers to be able to adapt
24 those to specific applications.

(line numbers 1-25 as printed)

Page 167

Steven P, Feinstein, Ph.D

1 So I don't know of applications that
2 are exactly identical to this one and, in
3 particular, this case over this period of
4 time.
5 But I believe that this inference is
6 supported by the literature, and I could
7 be -- I can be more clear about that or
8 expound on it just for a moment.
9 It's -- the literature's -- there's
10 extensive literature on market efficiency,
11 and the literature accepts that there are
12 reasons for, a number -- a handful of
13 reasons for market inefficiency. And the
14 reasons that are often given are
15 impediments to information flow,
16 impediments to trading and investor
17 irrationality.
18 And what we see with this
19 demonstration, with this one event, is in
20 conjunction with the other Cammer and Unger
21 factor is that there were no impediments to
22 information flow and there were no
23 impediments to trading.
24 And this event shows us that, at

Page 168

Steven P, Feinstein, Ph.D

1 least then and there, the market was not
2 observably irrational.
3 So if this event allows us to rule
4 out the three causes of inefficiency, then
5 we can draw -- we can deduce from this
6 event that the market over the class period
7 for Freddie Mac common stock was efficient.
8 And that's -- it's --
9 Q. Well, let me ask you --
10 A. I don't know of an article that lays
11 out the syllogism that way, but every one
12 of the principles in my argument is in the
13 literature.
14 Q. Are there any particular authors,
15 practitioners, scholars that you would
16 identify who have written on the issue of
17 the use of a single date in an event study
18 proving market efficiency over a period of
19 time?
20 A. Yeah. Yes. I mean, there are
21 scholars and authors in the academic
22 literature that draw inferences from single
23 events all the time.
24 They'll observe a single episode of

Page 169

Steven P, Feinstein, Ph.D

1 inefficiency and, therefore, make a claim
2 that markets are inefficient.
3 It also follows that if you find a
4 demonstration of efficiency, you can make a
5 determination, a deduction, that if the
6 structure of the market hadn't changed over
7 the entire class period that that
8 demonstration of market efficiency would
9 apply to other dates as well.
10 Q. Can you --
11 A. But there are -- it is in the
12 literature where anecdotal or episodic
13 evidence is used to make a deduction that's
14 more broad. That happens all the time.
15 Q. Can you identify for me, as you sit
16 here today, a single textbook or article
17 that supports the proposition that a
18 demonstration of efficiency on one date
19 supports a conclusion of market efficiency
20 on other dates?
21 A. Well, like I said, I mean, I am
22 reluctant to try. I'm reluctant to do so,
23 because you're asking me to recall from
24 memory the literature, the bibliography of

Page 170

1           Steven P, Feinstein, Ph.D
2   literature, and I can't do that.
3           But even -- and when I get back to
4   my office, if you want me to review the
5   literature, I can tell you that the way the
6   literature works is principles and concepts
7   are tested and grounded and presented and
8   adjudicated in the marketplace of ideas,
9   and then it's expected that people apply
10  these principles and methodologies to an
11  infinite number of applications.  So I
12  don't expect to find someone who has done
13  exactly what I've done.  But I do expect to
14  find examples of people that have done
15  analysis and drawn conclusions similar to
16  the manner in which I did in this.
17      Q.   Do you think it's fair to draw a
18  conclusion based on your single-event event
19  study that Freddie Mac's common stock
20  traded in an efficient market in the year
21  1995?
22      A.   Based on just the single-event event
23  study?
24      Q.   Yes.
25      A.   Ignoring the Cammer and Unger

Page 171

1           Steven P, Feinstein, Ph.D
2   factors and ignoring and study of Cammer
3   and Unger factors that apply to 1995?
4       Q.   Yes.
5       A.   No, I wouldn't draw that conclusion.
6   I wouldn't take a single-event event study
7   in isolation, separated from all other work
8   I've done and draw a conclusion like that.
9   I would not.
10      Q.   Now, include the Cammer and Unger
11  factors.
12          Do you think it's fair to conclude
13  that, based on your single-event event
14  study and a consideration of the Cammer and
15  Unger factors, that Freddie Mac's common
16  stock traded in an efficient market in the
17  year 1995?
18      A.   Well, are you saying that if the
19  Cammer and Unger factors that I studied for
20  the class period were also similarly robust
21  to the period 1995?
22      Q.   Yes.
23      A.   So in other words, a Cammer and
24  Unger factor that covered the period from
25  1995 through 2007; that's 22 years.  No,

Page 172

1           Steven P, Feinstein, Ph.D
2   twelve years, right?
3           I think in that hypothetical, I
4   would be reluctant to do that.
5           Twelve years, I would be reluctant
6   to do that.
7           I expect that over the course of
8   twelve years, I would be able to find more
9   events to test -- more appropriate events
10  to test.  And then I would only draw a
11  conclusion after having done that analysis
12  to see if there are additional events to
13  test that are in closer proximity to 1995.
14      Q.   Assume that you just had the Cammer
15  and Unger factors, all of which were
16  satisfied with the exception of factor
17  five, you hadn't run any tests.
18          If all of the factors are satisfied,
19  but you run no economic tests, is that
20  sufficient economic evidence from which you
21  can conclude market efficiency?
22      A.   I've thought about this question a
23  lot.
24          It depends on your standard of
25  proof, your standard of conclusion.

Page 173

1           Steven P, Feinstein, Ph.D
2   I wouldn't say I'm 100 percent
3   absolutely iron-clad sure.  But I would
4   certainly -- I would probably say -- I
5   would say if all the Cammer and Unger
6   factors were satisfied to the degree
7   they're satisfied over the class period, I
8   would say it's far more likely than not
9   that that stock is trading in an efficient
10  market even in the absence of an empirical
11  test.
12          Of course, I would want to run an
13  empirical test and see if there are
14  demonstrations of either inefficiency,
15  which would change my mind, or
16  efficiencies, which would add support to
17  the conclusion.  But if there was some
18  reason that I couldn't run an empirical
19  test of any kind, the literature, the
20  empirics, what we know about the rest of
21  the financial market would support a
22  conclusion that it's more likely than not
23  that that stock trades in an efficient
24  market.
25          Just for the record, this is

Page 174

1        Steven P, Feinstein, Ph.D
2    important, so I want to make sure I explain
3    why.
4            We know what kind of stocks from the
5    literature are likely to be inefficient.
6        I teach courses on security
7    valuation and investments, and students ask
8    me, where should I look for wrongly or
9    undervalued stocks? And it's not just me,
10   it's the chartered financial analysts
11   curriculum has answers to this.
12           You look at the small stocks that
13   are too small to be of concern to
14   institutional investors. You look at
15   stocks where there's very little trading,
16   so that information is not being brought to
17   the marketplace via the trading mechanism.
18   You look for stocks with no analyst
19   coverage, so that people are on their own
20   making evaluations of what the valuation
21   is, and you might be more right than the
22   other investor who's operating without the
23   support of analyst coverage.
24           Those are the kinds of things you
25   look for. Those are the kinds of things

Page 175

1        Steven P, Feinstein, Ph.D
2    that might make a market inefficient. And
3    those are the kinds of things we foreclose
4    when we see that Freddie Mac handily
5    satisfied all of the Cammer factors being
6    large, well-covered, and actively traded
7    with many market makers on the New York
8    stock exchange.
9        Q.  Now, assume the Cammer factors were
10   met -- well, strike that.
11           Assume the world as you have it.
12   You have assessed, as you have, the Cammer
13   and Krogman factors and you've run the
14   tests that you have.
15       A.  Right.
16       Q.  Was Freddie Mac's stock price a
17   stock trading in an efficient market in the
18   year 2000?
19       A.  I haven't drawn a conclusion about
20   the year 2000.
21       Q.  What about August 1 of 2006?
22       A.  I think that's close. I mean, I did
23   do Cammer and Unger analysis for that
24   period. And the two empirical tests that I
25   ran are close enough in proximity to that

Page 176

1        Steven P, Feinstein, Ph.D
2    date to support the finding of market
3    efficiency.
4        Q.  Now, let's put aside the FDT z-test.
5    Just the Cammer and Unger factors -- Cammer
6    and Krogman -- am I getting that wrong?
7        A.  Either.
8            MR. FRANK: They're
9    interchangeable, aren't they?
10           MR. MARKOVITS: Yes.
11   BY MR. FRANK:
12       Q.  So strike that.
13           So put aside your FDT z-test.
14       A.  Okay.
15       Q.  Assuming everything else is the
16   same, can you conclude that this market for
17   Freddie Mac's common stock was efficient as
18   of the first day of the class period,
19   August 1, 2006, even though your event
20   study only tested a single date, November
21   20, 2007?
22       A.  Well, I mean, I would take into
23   account that the event study result was
24   pretty dramatic. There's no question about
25   it that it was news and that the news was

Page 177

1        Steven P, Feinstein, Ph.D
2    -- and that impacted the stock price, and
3    that people received the news, they
4    processed the news, the stock price reacted
5    immediately.
6            So there's just no question about
7    that that event is a very strong, stark,
8    clear, indisputable demonstration of market
9    efficiency.
10           Having said that, if I, for some
11   reason, was unable to run any other
12   empirical test, I would be less confident
13   in my conclusion than I am having had the
14   ability to run the additional empirical
15   test.
16           So there are degrees of confidence.
17   I would be less confident without the
18   z-test than I am with the z-test.
19       Q.  Well, you, in your report, at the
20   paragraph we were just looking at, you
21   state that your single-date event study
22   proves that Freddie Mac's common stock
23   reacted to new information and its market
24   was efficient.
25           Isn't that right?

Page 178

Steven P, Feinstein, Ph.D
1
2     A.  It does.  And the degree of proof
3  would be less based only -- if it had to be
4  based only on that result, than if I'm able
5  to consider the other empirical results as
6  well.
7     Q.  But from your perspective, the
8  single-event event study was sufficient to
9  prove that Freddie Mac's stock price was
10  trading in an efficient market for the
11  entire class period; is that fair to say?
12     A.  No, no, it's not fair to say.
13     Q.  Why not?
14     A.  It doesn't say for the entire class
15  period in Paragraph 137.  It says that it
16  proved the market was efficient and it was
17  efficient with respect to the information
18  at issue in this case.
19        I think the other Cammer and Krogman
20  factors -- the other factors, the Cammer
21  and Krogman factors, and the other
22  empirical test allow one to correctly
23  deduce that if this information had come
24  out at an earlier day, you would have seen
25  a similar response on an earlier day.  And

Page 179

Steven P, Feinstein, Ph.D
1
2  if -- and we have proof for that particular
3  day, and maybe for a period of time in
4  closer proximity from that event.
5        But to extend it to the rest of the
6  class period, the rest of my analysis is
7  not superfluous; it's necessary.
8     Q.  The single-event event study is not
9  enough on its own to prove market
10  efficiency for the entirety of the class
11  period; isn't that correct?
12     A.  If you mean by that eliminating
13  consideration of the Cammer and Krogman
14  factors, it depends on what standard of
15  proof.
16        For some purposes it might be.
17  Maybe for the court, it would be.  For me
18  to stake my reputation on, it wouldn't be.
19        By that's hypothetical, because in
20  the real world, what I am staking my
21  reputation on is I ran many additional
22  tests:  the Cammer test, the Krogman factor
23  test and the collective test.
24     Q.  Now, let me give you a hypothetical.
25        There's a manufacturing company.  It

Page 180

Steven P, Feinstein, Ph.D
1
2  has one manufacturing plant.  It trades in
3  an inefficient market.  We know that
4  because the company doesn't meet any of the
5  Cammer and Krogman factors because
6  economists have tested how its stock price
7  performs using every test of which you're
8  aware.  It is not efficient, the market in
9  which it trades.
10        On a single day, the sole
11  manufacturing plant of this manufacturing
12  company burns to the ground; a total loss.
13  That event gets covered in The Boston Globe
14  and other major newspapers, including The
15  Wall Street Journal and the New York Times.
16        The stock price in that company
17  falls dramatically, such that if you tested
18  the stock price on that date using a
19  single-date event study, you would find
20  statistical significance.
21        Is it possible that the stock price
22  would fall in that scenario, given the fact
23  that the market is generally inefficient?
24     A.  It's possible it would be efficient
25  that day with respect to that episode and

Page 181

Steven P, Feinstein, Ph.D
1
2  that news.
3        And it's -- it may be, depending on
4  the specifics in the hypothetical, you can
5  draw an inference that if that event had
6  happened a week earlier, two weeks earlier,
7  a month earlier or a year earlier, it would
8  have -- the market would have reacted
9  efficiently with respect to that news on
10  those days as well.
11     Q.  Well, for purposes of my
12  hypothetical, the stock is trading in an
13  inefficient market where generally material
14  news does not affect the stock price.
15        Fair enough?
16     A.  But with respect to information
17  about a fire, it suddenly becomes efficient
18  is what you're saying?
19        So that's how your hypothetical
20  works.  It's inefficient, but with respect
21  to a certain category of news, it is
22  efficient.
23     Q.  Well, let's change the hypo
24  slightly.
25     A.  Okay.

Page 182

Steven P, Feinstein, Ph.D

1
2    Q.  A manufacturing company, trading in
3    an inefficient market.  The manufacturing
4    facilities burn to the ground.
5        Is it possible in an inefficient
6    market for the stock price to decline in a
7    statistically significant way upon the
8    reporting of that event?
9        A.  Well, the definition of
10   "inefficiency" is that people ignore
11   information.  They disregard material
12   information.  It's overlooked.  It's too
13   small.  Nobody really cares.
14       It's -- and it's unlikely that you
15   would see a significant stock price
16   reaction if the stock is overlooked and
17   disregarded by the marketplace.
18       On the other hand, if you do observe
19   that it's -- that people care about this
20   company when this kind of information's
21   available, that would be a demonstration
22   that the -- that that company, while it may
23   be inefficient with respect to other
24   information, is efficient with respect to
25   that kind of information.

Page 183

Steven P, Feinstein, Ph.D

1
2    Q.  Is it not possible for securities
3    that trade in inefficient markets to
4    sometimes, but not always, respond
5    appropriately to material news?
6        A.  It's possible.  And that's why
7    testing market efficiency, I run a battery
8    of tests.  I don't base my decision on only
9    one result.  Each result contributes or --
10   contributes to whatever the conclusion may
11   be, one way or the other.
12       Q.  Now, having run the tests that you
13   ran, is it possible for you to conclude
14   that Freddie Mac's common stock traded in
15   an efficient market in July of 2006?
16       A.  I didn't test for July of 2006.
17       I -- if I were asked to test for
18   July of 2006, I would run all the tests
19   that I ran over that extended period.  I
20   would look at Cammer factors, Unger and
21   Krogman factors, and see if there also were
22   good candidates for empirical testing in
23   that additional month.
24       I started my analysis in August
25   of 2006.

Page 184

Steven P, Feinstein, Ph.D

1
2    Q.  So having run the tests that you
3    ran, you believe you can conclude that
4    Freddie Mac's common stock traded in an
5    efficient market in August of 2006?
6        A.  Yes.
7        Q.  Now, you didn't test any dates in
8    August of 2006, correct?
9        A.  I didn't do the -- I didn't do event
10   study tests on dates in 2006, but I did
11   Cammer and Krogman factor tests for 2006.
12       Q.  When it comes to factor 5 of --
13       A.  And the rule wasn't temporally
14   isolate it.  I didn't -- the rule wasn't I
15   would only look for these kind of events in
16   2007.
17       The rule dictated that the events
18   were -- appeared in 2007 and in 2006,
19   apparently, from the perspective of the New
20   York Times and the Wall Street Journal, was
21   fairly calm for Freddie Mac, which is why
22   no events showed up in that period.
23       Q.  You didn't test in either your
24   single-event event study or your FDT z-test
25   any dates in the year 2006, correct?

Page 185

Steven P, Feinstein, Ph.D

1
2    A.  Correct, as a result of the rule not
3    finding any dates in that period.
4        Q.  Well, when you say "the rule," what
5    rule are you referring to?
6        A.  The Wall Street Journal and the
7    New York Times coverage rule.
8        Q.  I was asking about both tests.
9        A.  Okay.  Well, the -- for the
10   collective test, the New York Times and
11   Wall Street Journal media coverage test.
12   And for individual event dates, I was
13   looking -- we already talked about what my
14   selection criteria were:  momentous
15   red-letter dates where the news flow was
16   such that it appeared in an unconfounded
17   and unexpected way that would reasonably
18   move the stock price, not just a little
19   bit, but over the threshold for statistical
20   significance.
21       And I didn't find dates like that
22   between August 2006, actually, until the
23   last one.  The nature of this company, it's
24   a fairly unique company.
25           MR. FRANK:  Bill, this is a

Page 186

1        Steven P, Feinstein, Ph.D
2   good time for a lunch break, if you would
3   like to take one.
4          MR. MARKOVITS:  That's fine.
5          MR. FRANK:  Off the record,
6   please.
7          THE VIDEOGRAPHER:  We're going
8   off the record at 12:26.
9
10         (Recess taken from 12:26 p.m.
11         to 1:16 p.m.)
12
13         THE VIDEOGRAPHER:  We're back
14  on the record at 1:16.
15
16  BY MR. FRANK:
17     Q.  Good afternoon, Dr. Feinstein.
18     A.  Good afternoon.
19     Q.  Let me turn your attention back to
20  Exhibit 96.  This is your report.
21     A.  Okay.
22     Q.  Do you have that before you?
23     A.  I do.
24     Q.  Do me a favor, turn to Exhibit 1.
25  That's on Page 48 of your report.

Page 187

1        Steven P, Feinstein, Ph.D
2       Are you there?
3     A.  Yes.
4     Q.  Exhibit 1 is a list of documents and
5   other information considered; is that
6   correct?
7     A.  Yes.
8     Q.  This list is incomplete; is that
9   right?
10    A.  That's right.
11    Q.  You had Mr. Markovits provide to me
12  this morning some additional documents that
13  you had considered in connection with your
14  report that are not on this list; is that
15  right?
16    A.  Right.  It's one type of document.
17  There's a number of editions of it, but
18  it's one type of document.
19
20         (Exhibit No. 104 marked for
21         identification.)
22
23         (Exhibit No. 105 marked for
24         identification.)
25

Page 188

1        Steven P, Feinstein, Ph.D
2         (Exhibit No. 106 marked for
3         identification.)
4
5   BY MR. FRANK:
6       I'm sharing with you a set of
7   documents marked as Exhibit 104.
8       I will represent to you that this is
9   the set of documents that       Mr.
10  Markovits -- that you gave to       Mr.
11  Markovits and that Mr. Markovits gave to
12  me.
13    A.  Yes.
14    Q.  Do you recognize the documents that
15  are collected and marked       Exhibit
16  104?
17    A.  I do.
18    Q.  Now, what are these documents?
19    A.  This is -- these are reports -- what
20  I believe they are is they're  reports from
21  Freddie Mac's investor relations team to
22  management.
23    Q.  How did they come to be in your
24  hands?
25    A.  These were provided by counsel.

Page 189

1        Steven P, Feinstein, Ph.D
2     Q.  Did you request them from counsel?
3          MR. MARKOVITS:  Objection.
4     A.  At some point, I did.  Not
5   specifically, but I asked if there was
6   anything generally like this that they had,
7   and this is what arrived.
8   BY MR. FRANK:
9     Q.  Why is it that you requested
10  documents like these documents?
11    A.  Well, I suspected they would show
12  what they actually do show, which is that
13  the company itself understood that
14  information is what was affecting its stock
15  price over time.
16    Q.  And do you rely upon these documents
17  in forming the conclusions that are set
18  forth in your report?
19    A.  I don't -- I didn't rely on them.  I
20  don't generally rely on them, but I do --
21  but they do add support to my conclusion.
22       This is evidence or documentation
23  that my conclusion is something that,
24  apparently, Freddie Mac management and
25  their investor relations team would agree

Page 190

1          Steven P, Feinstein, Ph.D
2    with.
3        Q.   And when did you come into
4    possession of the documents that have been
5    marked as Exhibit 104?
6        A.   I don't recall specifically, but I
7    do know it was prior to filing the report.
8        Q.   And let's take a look at the first
9    document that is collected in Exhibit 104.
10        This is a document that's entitled
11    "Equity Investor Relations Monthly Update,
12    August 2006."
13        Do you see that?
14        A.   Yes.
15        Q.   And what is it in this document in
16    particular that you believe supports any of
17    the conclusions that you've reached in your
18    report?
19        A.   (Witness reviews document.)
20        It's Page 5 with -- I guess the
21    Bates number 630 -- is a price chart, a
22    volume chart and price chart, and it's
23    annotated with various price movements
24    pointed out in an information explanation
25    for why the price moved on those days.

Page 191

1          Steven P, Feinstein, Ph.D
2        Q.   Is there any other information in
3    this August 2006 document that you believe
4    supports any of the conclusions you've
5    drawn in your report?
6        A.   Well, what I said was -- the main
7    thing that I recall, and how it -- how I
8    recalled that it supported my conclusion.
9        But reviewing the document -- well,
10    Page 6 talks about how the analyst
11    coverage -- it talks about analyst
12    coverage.  I mean, that just supports what
13    I found about analyst coverage that was
14    extensive.
15        But it says specifically in this
16    particular month's version or edition,
17    "Credit Suisse and Merrill Lynch downgrade
18    Freddie Mac stock to hold in early June
19    based upon concerns over increased
20    regulatory risk, potential portfolio caps,
21    and delayed time frame to return excess
22    capital to shareholders."
23        So, again, it's attributing
24    valuation impacts to information.  It's
25    another page in the document that does

Page 192

1          Steven P, Feinstein, Ph.D
2    that.
3        Q.   Now, you don't reference any of the
4    reports that are set forth in   Exhibit
5    104 anywhere in your report, correct?
6        A.   That's right.
7        Q.   And you didn't include them on
8    Exhibit 1 of your report, right?
9        A.   Well, that was -- that was an
10    oversight.  It should have been included.
11        Q.   Were there any other documents or
12    other information that you considered that
13    you did not include in Exhibit 1 as a
14    result of an oversight?
15        A.   Not that I'm aware of.
16        Q.   And when did you come to realize
17    that you had failed to identify the
18    documents collected in Exhibit 104 as among
19    the documents that you considered and
20    listed in Exhibit 1?
21        A.   Yesterday, while preparing for the
22    deposition.
23
24            (Exhibit No. 105 marked for
25            identification.)

Page 193

1          Steven P, Feinstein, Ph.D
2
3    BY MR. FRANK:
4        Q.   I'm showing you a document that has
5    been marked as Exhibit 105.
6        Is Exhibit 105 the article that we
7    have been referring to today as the FDT
8    article?
9        A.   Yes.
10        Q.   This is the -- is this the only
11    academic literature on the application of
12    the z-test to assessing market efficiency
13    in securities cases?
14        A.   No.
15        Q.   What other articles would you
16    identify that discuss the application of
17    the z-test to assessing market efficiency
18    in securities cases?
19        A.   My recollection is there's an
20    article by Hartzmark.  I think it's
21    Hartzmark and Seyhun.
22        Q.   That's one article?
23        A.   Yes.
24        Q.   Any other academic literature that
25    you're aware of that discuss the

Page 194

Steven P, Feinstein, Ph.D

1  application of z-test for the purpose of
2  assessing market efficiency in securities
3  cases?
4      A.  No, not if you mean published
5  articles.
6      Q.  Is this article a peer-reviewed
7  article?
8      A.  I believe it's not, in the sense
9  that it's usually -- how the term's usually
10 used.
11     Q.  How is the term usually used?
12     A.  Well, it's not an academic -- this
13 is a law review article.  It's not an
14 economic or finance academic journal.
15     Q.  And articles that are published in
16 economic or finance academic journals are
17 generally subject a peer-review process?
18     A.  Right.  That's right.
19     Q.  Law review articles are not?
20     A.  I'm not entirely sure what the
21 review process is for law review.
22     Q.  Now, let me turn your attention to
23 Page 119 of the FDT article.
24     A.  Okay.
25

Page 195

Steven P, Feinstein, Ph.D

1      Q.  At the bottom of Page 119, it -- the
2  authors write, "Because stock prices move
3  all the time, one must compare the
4  movements in response to news stories with
5  a control group of prices."
6         Do you see that?
7      A.  Yes.
8      Q.  And you agree with that statement,
9  right?
10     A.  Well, for purposes of this test,
11 yes.
12     Q.  For purposes of the FDT z-test,
13 right?
14     A.  That's right.
15     Q.  And you did an FDT z-test here,
16 right?
17     A.  Yes.
18     Q.  And then they write, "One way to do
19 this would be to look at a sample of days
20 in a class period, exclusive of those days
21 alleged to be corrected disclosures and
22 perform a news search."
23         Do you see that?
24     A.  Yes.
25

Page 196

Steven P, Feinstein, Ph.D

1      Q.  And you did look at a sample of days
2  in a class period in this case, right?
3      A.  Yes.
4      Q.  But you did not exclude those days
5  alleged to be corrected disclosures,
6  right?
7      A.  From the control group, I did.  It
8  wasn't -- it wasn't in the control group.
9         The control group is the non-news
10 days.
11     Q.  Well, is it -- is a control group --
12 isn't the control group all of the other
13 days in the class period other than the
14 sample?
15     A.  Yes.
16     Q.  And if you look at Footnote 155, the
17 authors write, "The examination would
18 exclude those days in which a corrective
19 disclosure was made because plaintiffs
20 would normally choose a class period where
21 corrective disclosures coincide with large
22 negative price movements.  Including those
23 days in the analysis would bias the
24 results."
25

Page 197

Steven P, Feinstein, Ph.D

1  Do you see that?
2      A.  Well, I see that.
3      Q.  And do you agree with that?
4      A.  Well, I would agree that they should
5  be excluded from the control group, but I
6  do not agree they should be excluded from
7  the sample of news days that are selected
8  by the news day rule.
9      Q.  Isn't it fair to say that plaintiffs
10 normally choose a class period where a
11 corrective disclosure coincides with a
12 large negative price movement?
13     A.  Often, but not always.  Sometimes
14 plaintiffs think there is a large residual
15 decline and when I do the analysis, I find
16 that it's not.
17         But I think that the day should be
18 included as an event day if the rule says
19 it should be included as an event day and
20 if there's good, objective foundation -- a
21 good, objective foundation for assessing
22 that it belongs in the news day category,
23 that it was a high information flow day.
24         I do not agree that it should be
25

Page 198

Steven P, Feinstein, Ph.D

1    Steven P, Feinstein, Ph.D
2   excluded because it's a corrective
3   disclosure.
4        Q.  Isn't it fair to say that if
5   economists conducted event studies that
6   were based on solely a single date and
7   always chose the last day of a class period
8   in a securities case, that that would bias
9   results in favor of a findings of market
10  efficiency?
11       A.  No.
12       Q.  Why not?
13       A.  Well, I mean, if you mean bias in
14  the sense that it's going to produce a
15  result that's not indicative of the
16  underlying truth, I don't believe that's
17  the case.
18       I mean, in this particular case,
19  taking that as a hypothetical and using
20  this case as an example, I mean, it's
21  indisputable that that was a high
22  information flow date, November 20, and
23  whether there's a lawsuit or not is
24  completely inconsequential to the
25  determination that that was a high -- an

Page 199

1    Steven P, Feinstein, Ph.D
2   unusually high information flow date and
3   belongs in a study of high information flow
4   dates, especially when the objective event
5   selection rule is that it's covered -- that
6   the event is covered by the New York Times
7   and the Wall Street Journal.
8        Q.  And it's your interpretation of
9   these sentences that we read that the
10  authors are solely referring to excluding
11  the last day of the class period or
12  corrective disclosure date from the control
13  group and not from the sample or -- strike
14  that.  That was confusing.
15       You see where it says in Footnote
16  155, "The examination would exclude those
17  days in which a corrective disclosure was
18  made."
19       Do you see that?
20       A.  I see that.
21       Q.  Is it your understanding that the
22  authors, in describing the examination,
23  were describing both the selection of a
24  sample of days as well as the control
25  group?

Page 200

1    Steven P, Feinstein, Ph.D
2        A.  It's not entirely clear what they
3   meant.
4        I mean, in the paragraph -- in the
5   sentence that's footnoted, that the
6   footnote is attached to, they're talking
7   about the control group.  But if they do
8   mean that you cannot consider corrective
9   disclosures in assessing market efficiency,
10  I would say they're wrong.
11       I mean, that would be an area where
12  we disagree.  I accept their methodology in
13  general but do believe that you should look
14  at the red-letter dates in the life of the
15  company, and if they can be objectively and
16  indisputably identified as news dates, then
17  it doesn't matter whether lawyers have also
18  identified those as important dates for
19  their purposes.
20       Q.  Are you aware of this article
21  discussing anywhere a single-date event
22  study as a -- well, strike that.
23       Are you aware of the authors, either
24  collectively or individually, of this
25  article ever writing about the subject of

Page 201

1    Steven P, Feinstein, Ph.D
2   assessing market efficiency through the use
3   of an event study that evaluates a single
4   day?
5        A.  Well, I think they -- I know that
6   David Tabak generally opines that single --
7   single-event event studies are never enough
8   evidence.  It's his belief that there's
9   never enough dates to test -- to draw
10  conclusions.
11       I disagree with him about that.
12       Dunbar is no longer with us.  I
13  can't tell you what he thinks.
14       I don't -- I don't know of any of
15  the others opining one way or the other.
16       Q.  Now, when it comes to a z-test, what
17  is the null hypothesis for a z-test?
18       A.  That the market ignores relevant
19  information; that the market disregards
20  information in determining the stock price.
21       Q.  Now, is it your view that Ferrillo,
22  Dunbar and Tabak are authorities on
23  z-tests?
24       A.  It depends how you define
25  "authority."

Page 202

Steven P, Feinstein, Ph.D

1
2      They wrote this article.  They give
3  credit for being the first to apply that
4  type of test to this type of problem.
5      Q.  And you cite this article regularly
6  in your work, correct?
7      A.  Yes.
8      Q.  And you cited them in your report in
9  this case, right?
10      A.  Yes.
11      Q.  And you cited the article in your
12  declaration, right?
13      A.  Yes.
14      Q.  And you've cited this article in
15  many other reports, too, correct?
16      A.  Yes.
17      Q.  Now, turning to your declaration,
18  the z-test is -- you mention in
19  Footnote 4, this is Exhibit 95, I believe,
20  on Page 6, that --
21      A.  My report now?
22      Q.  Your declaration.  Exhibit 95.
23      Do you see Paragraph 22?
24      A.  Yes.
25      Q.  There, it says -- I've actually read

Page 203

Steven P, Feinstein, Ph.D

1
2  this sentence into the record previously.
3  This is where you describe the z-test.
4      Do you see it?
5      A.  Yes.
6      Q.  Then at the end you drop to Footnote
7  4, correct?
8      A.  Yes.
9      Q.  And in Footnote 4, you say, "See,
10  for example," and you list a number of
11  textbooks or other authorities; is that
12  right?
13      A.  Yes.  Those are authorities and
14  citations in the statistics literature to
15  the incidence frequency test.  That is,
16  essentially, when applied to the question
17  of market efficiency, the z-test -- the FDT
18  z-test.
19      Q.  These are textbooks that you
20  selected that are authorities that discuss
21  the z-test, generally, but not in the
22  context of securities cases; is that
23  correct?
24      A.  That's right.
25

Page 204

Steven P, Feinstein, Ph.D

1
2      (Exhibit No. 106 marked for
3      identification.)
4
5  BY MR. FRANK:
6      Q.  You should have -- Dr. Feinstein, do
7  you have before you a document marked as
8  Exhibit 106?
9      A.  (Witness reviews document.)
10  I do.
11      Q.  Exhibit 106 is an excerpt from a
12  document -- from a book, the title of which
13  is "Applied Statistics for Public Policy,"
14  by Brian P. Macfie and Philip Nufrio.
15      Do you see that?
16      A.  Yes.
17      Q.  And this is one of the authorities
18  you cite in your declaration, correct?
19      A.  Yes.
20      Q.  Now, if you turn your attention to
21  Page 323, there's a section called "Sample
22  Size."
23      Do you see that?
24      A.  I do.
25      Q.  And it says there, "In Chapter 12,

Page 205

Steven P, Feinstein, Ph.D

1
2  we saw how to determine adequate sample
3  size in order to test the hypothesis about
4  a population proportion using a sample
5  proportion.  When testing for differences
6  between two population proportions with two
7  sample proportions, the necessary criteria
8  are defined a bit differently.  The
9  following three conditions must be met for
10  both samples to assure the sample sizes are
11  sufficiently large enough to conduct a
12  hypothesis test for differences."
13      Do you see that?
14      A.  Yes.
15      Q.  And then it provides three
16  conditions, right?
17      A.  Yes.
18      Q.  Are you aware that your FDT z-test
19  that you conducted in this case doesn't
20  satisfy any of those three conditions?
21      A.  I ran diagnostics.  Actually, I had
22  my team run diagnostics, and we determined
23  that, based on the diagnostics, that the
24  test is legitimate and the results are
25  reliable.

Page 206

Steven P, Feinstein, Ph.D

1
2     But I would have to review
3  conditions 2 and 3 to answer your question
4  for sure, but with 1, I could agree.
5     Q.   As you sit here today, you know that
6  you did not meet condition 1, which
7  requires that both samples need to have at
8  least 30 observations each, correct?
9     A.   Right.  But there are diagnostics to
10 run to test whether the test is legitimate,
11 robust to relaxation of these conditions
12 and the results reliable, and those
13 diagnostics were run.  They're routinely
14 run by my team.
15     Q.   Well, we're going to discuss the
16 diagnostics.
17     And I believe you testified a little
18 bit about them earlier, correct?
19     A.   Yes.
20     Q.   You ran two diagnostics, one before
21 you finalized your report and one after,
22 correct?
23     A.   Well, my understanding is my team
24 runs the diagnostics when they run the
25 test.  I might have asked about it

Page 207

Steven P, Feinstein, Ph.D

1
2  afterwards as a check, but they run the
3  diagnostics routinely.
4     Q.   So is it fair to say that you may
5  not have been aware of the diagnostics, one
6  or both of them, before you finalized your
7  report?
8     A.   No, that's not fair.
9     The way -- our procedure is they run
10 the diagnostics when they run the tests.
11     When I say, run the FDT test on this
12 data, they run that test and they run the
13 diagnostics, bring to my attention if
14 there's any issue with the diagnostics.
15     Q.   Now, they never brought to your
16 attention that there was any issue with the
17 diagnostics; is that right?
18     A.   Correct.
19     Q.   Do you instruct them what
20 diagnostics to run?
21     A.   Yes.  I mean, we've talked about it
22 numerous times.
23     Q.   In other cases, you've run -- is the
24 binomial test a diagnostic?
25     A.   No, it's a different type of test.

Page 208

Steven P, Feinstein, Ph.D

1
2     Q.   What are the --
3     A.   In fact, it's different type of test
4  that I don't think would be -- that isn't
5  subject to these conditions either.
6     So, actually, you could say it's a
7  diagnostic.  If that binomial test gives
8  the same results, then the test run on a
9  sample size less than 30 is still going to
10 be reliable in the z-test.
11     Q.   What are the diagnostics that your
12 team was instructed to run in this case?
13     A.   Well, what they routinely run -- I
14 don't have to tell them from case to case,
15 specifically instruct them -- they
16 routinely run bootstrapping and Fisher's
17 exact test, among others.
18     There's a battery of diagnostic
19 tests.  Those are what I recall as I sit
20 here now.
21     Q.   Well, I want you to try to exhaust
22 your memory for me.
23     Are there any other diagnostic tests
24 that your team routinely runs?
25     A.   I couldn't tell you for sure.  I

Page 209

Steven P, Feinstein, Ph.D

1
2  know that they are -- we've, in the past,
3  considered these issues.  And there's a way
4  of running the tests to determine whether
5  these issues are relevant.  And they were
6  not brought to my attention as relevant.
7     And as I sit here now, I could do a
8  quick back-of-the-envelope calculation.  If
9  you use the binomial test as a diagnostic,
10 four out of nine is supportive of the
11 result at I reported it for the z-test.
12     Q.   Well, you didn't run a binomial test
13 here, correct?
14     You've already testified to that, I
15 believe.
16     A.   No.  I did a report a binomial test.
17 I didn't run the test -- I didn't describe
18 the test as a binomial test.
19     But it's a simple test of
20 calculating what's the probability of
21 having four significant events out of a
22 population or out of a sample of nine when
23 the probability of each event being
24 statistically significant is 5 to 6
25 percent.  And it's a very, very low

Page 210

Steven P, Feinstein, Ph.D
1
2  probability if, in fact, information days
3  and noninformation days have the same
4  dynamics.
5       Q.  You didn't include the binomial test
6  in your report, correct?
7       A.  Correct.
8       Q.  You didn't produce the calculations
9  for a binomial test in your report,
10  right?
11      A.  Right.  But knowing what the result
12  is gives me confidence that this test, as I
13  presented it, is legitimate and valid and
14  robust, notwithstanding that it -- there
15  aren't 30 observations in the information
16  group.
17      Q.  Who ran the -- well, let's back up.
18          Did you or your team run a binomial
19  test in this case?
20      A.  I -- we considered what -- we
21  considered what the results of a binomial
22  test would be, and it's easy to do a quick
23  calculation, even without a computer, that
24  indicates that these are robust and valid
25  results.

Page 211

Steven P, Feinstein, Ph.D
1
2       Q.  I understand that as you sit here
3  today, you can calculate -- you can
4  consider what the results of a binomial
5  test would be in your head; is that fair to
6  say?
7       A.  It was certainly considered during
8  the drafting of the report as well.
9       Q.  By whom?
10      A.  Me.
11      Q.  But you didn't put it in your
12  report, because you didn't think that it
13  was important enough to put in your report;
14  is that fair to say?
15      A.  That's right.
16      Q.  Now, your team routinely runs
17  bootstrapping and Fisher's exact
18  diagnostics tests, right?
19      A.  That's right.
20      Q.  And if anything arises, they alert
21  you to the fact, right?
22      A.  That's right.
23      Q.  And if nothing arises, they don't
24  talk to you about those tests; is that
25  correct?

Page 212

Steven P, Feinstein, Ph.D
1
2       A.  That's right.
3       Q.  And so you never talked to any of
4  your team about a Fisher's exact or a
5  bootstrapping test, right?
6       A.  That's not true.  That's not
7  accurate.
8          I mean, in preparation for this
9  deposition, it came up and they said, yes,
10  of course, we ran the Fisher's exact test,
11  and the results were robust.
12      Q.  Who did you talk to about the
13  Fisher's exact at the time?
14      A.  Dan Bettencourt and Miguel
15  Villanueva.
16      Q.  And you spoke to them about the
17  Fisher's exact test following -- well,
18  strike that.
19          When did you talk to Dan and Miguel
20  about the Fisher's exact test?
21      A.  Yesterday.
22      Q.  And --
23      A.  And they said, yes, of course it was
24  run, and there's no issue.
25      Q.  And did they share with you any of

Page 213

Steven P, Feinstein, Ph.D
1
2  the results of the test?
3       A.  They said there was no issue.
4  That's the results of the test.
5       Q.  But I assume that this is a
6  statistical test that yields numbers; is
7  that fair to say?
8       A.  Right.  But it's the qualitative
9  result that I'm more concerned about.
10      Q.  Well, allow me to be concerned both
11  about the numbers and the qualitative
12  result.
13          What were the numbers?
14      A.  I don't recall.
15      Q.  Did they share them with you or
16  not?
17      A.  Not.
18      Q.  So it's not that you don't recall,
19  you never knew; is that fair to say?
20      A.  That's fair.
21      Q.  And the Fisher's exact test yields
22  numbers, right?
23      A.  Yes.
24      Q.  And the bootstrapping test yields
25  number, right?

Page 214

1           Steven P, Feinstein, Ph.D
2      A.   Right.
3      Q.   And you never knew what those
4   numbers were, and as you sit here today,
5   you don't know what they are, correct?
6      A.   That's right.
7      Q.   And a binomial test yields numbers,
8   too, right?
9      A.   That's right.
10      Q.   And to the best of your knowledge,
11   your team never provided to plaintiff's
12   counsel in this case any of the
13   calculations that relate to a bootstrapping
14   test, correct?
15      A.   Well, I'll take your word for it,
16   but my understanding is that everything
17   that was in our files pertaining to this
18   case was produced.
19           So it's possible the test was run
20   outside the files or on a local computer
21   instead of the system computer.
22           But if you're saying you don't have
23   it, I don't -- I don't dispute that.
24      Q.   If I don't have it, is it possible
25   that they weren't run prior to the time

Page 215

1           Steven P, Feinstein, Ph.D
2   that the report was finalized?
3      A.   I asked if they were run.  They said
4   they were run.
5      Q.   You didn't get into the details of,
6   when were they run?
7      A.   No.
8      Q.   Now, with respect to category 2
9   here, this condition, do you see where it
10   says N-1 times P-1 and N-2 times P-2 have
11   to be greater than 5?
12           Do you see that?
13      A.   I see that.
14      Q.   And N is -- N is, in your test, is
15   4; isn't it?
16           Isn't N-1 the number 4?
17      A.   No, it's 9.
18      Q.   It's 9?
19      A.   Right.
20      Q.   And what's P-1?
21      A.   That's 44 percent.  The proportion
22   of the sample that was statistically
23   significant, that's 44 percent.
24      Q.   And can we agree that 9 times 44
25   percent is less than the number 5?

Page 216

1           Steven P, Feinstein, Ph.D
2      A.   Yes.
3      Q.   And so as you sit here today, you
4   can calculate that your test didn't satisfy
5   the second criteria either, correct?
6      A.   Yes.
7      Q.   Now, the third criteria is going to
8   strain my arithmetic abilities, but maybe
9   not yours.
10           This says N-1 times 1 minus P-1.
11           Do you see that?
12      A.   So that would be 56 percent.  1
13   minus 44 is 56.
14      Q.   And is --
15      A.   That might be more than 5.  I would
16   have to run it through a calculator.
17      Q.   You believe it's 9 times 56 percent?
18      A.   Yes.
19      Q.   Isn't -- isn't a number greater than
20   5 -- the next number that's greater than 5
21   the number 6?
22           We can agree that a number greater
23   than 5 is the number 6?
24      A.   Yes.
25      Q.   And so --

Page 217

1           Steven P, Feinstein, Ph.D
2      A.   1 minus P-1, though, is 1 minus 44
3   percent.
4      Q.   Bear with me.
5           So we agree the next number after
6   the number 5 is the number 6?
7      A.   Yes.
8      Q.   And 6/9 is two-thirds, which is 66
9   percent, right?
10      A.   Yes.
11      Q.   So if you multiplied 9 by 66
12   percent, you would get 6, right, or 67
13   percent, right?
14      A.   Yes.
15      Q.   Well, here we're multiplying 9 by 56
16   percent, right?
17      A.   Yeah.
18      Q.   It's less than 6, right?
19           MR. MARKOVITS:  Objection.
20   More than 5.
21      A.   Oh, I see.  It might be greater than
22   5.  I just -- can we check it?
23   BY MR. FRANK:
24      Q.   Well, this all assumes that you're
25   right and that N-1 is 9, correct?  Is it

Page 218

Steven P, Feinstein, Ph.D

1
2 possible --
3    A.  It is 9.
4    Q.  Are you sure?
5    A.  Either N-1 or N-2.  I mean, it
6 depends how you define -- which one you
7 assign to N-1 and which one you assign to
8 N-2 is arbitrary.
9    Q.  And in your report, when you discuss
10 these numbers, you don't simply discuss
11 four results out of nine; you discuss three
12 results out of the eight as well, don't
13 you?
14    A.  Yes.
15    Q.  You consider what your z-test would
16 look like if you excluded the November 20
17 date, right?
18    A.  Yes.
19    Q.  Why did you do that?
20    A.  To show that if you -- if someone
21 were to make an issue of the inclusion of
22 that last date, that the result is robust.
23    Q.  Why did you think that someone might
24 make an issue about the inclusion of that
25 last date?

Page 219

Steven P, Feinstein, Ph.D

1
2    A.  I'm familiar with your argument.
3    I don't agree with it, but I'm
4 familiar with it.  It's been raised before
5 and I've addressed it before.
6    Q.  When you say you're familiar with my
7 argument, what you mean is that you're
8 familiar with the notion that economists,
9 when they conduct z-tests shouldn't be
10 using the last day of a class period?
11    A.  No.  I'm familiar with the
12 fallacious argument that selection of what
13 happens to be the final corrective
14 disclosure of a class period -- of a
15 proposed class period could be considered
16 selection bias.
17    And as it's a fallacious argument
18 because taking into account the nature of
19 the information that emerged on that day,
20 the nature of the information that
21 transpired on that day, it's indisputable
22 that it's not simply a spurious result,
23 it's not an arbitrarily selected result,
24 it's not a selection based on a
25 reverse-event study where you firsts look

Page 220

Steven P, Feinstein, Ph.D

1
2 at the results and then choose that date
3 because you know it's statistically
4 significant rather than you chose that date
5 because the information flow that date was
6 substantial.
7    If there was some question
8 whatsoever about whether or not the
9 information flow that day was substantial,
10 then I could buy into your argument.
11    But there is absolutely no question
12 that the information flow that day was
13 remarkable and unusual, meriting that
14 date's inclusion in these event studies.
15    Q.  Are you aware of any academic
16 literature that supports your view that
17 z-tests, as applied to securities class
18 actions, properly include the last day of
19 the class period?
20    A.  The principles that this decision
21 was based on is in the literature,
22 statistical literature as well as
23 econometric literature, that what may
24 appear to be -- that there is something
25 called selection bias, and selection bias

Page 221

Steven P, Feinstein, Ph.D

1
2 is defined.
3    This is not selection bias.  And the
4 concept of a reverse-event study and
5 peek-ahead bias as it's sometimes called,
6 is described in the literature.  This
7 choice of this date because of the
8 information that came out that day does
9 not -- is not peek-ahead bias or selection
10 bias.
11    Q.  Well --
12    A.  So, I mean, the literature explains
13 what the error is and what the error would
14 be if someone picked that date
15 inappropriately.
16    So it's clear in the literature.
17 The literature makes it very clear what the
18 error would be.  And the information we
19 have about that date makes it clear that
20 what I did is not that error.
21    Q.  What is peek-ahead bias?
22    A.  Well, you pick the events because
23 you know they were significant.
24    Now, you might pick the same events.
25 You might have known that the events were

Page 222

Steven P, Feinstein, Ph.D

1
2    significant, but if you pick them
3    specifically because there's -- it's
4    indisputable that there was high
5    information flow on those days, making
6    those days or that day appropriate for an
7    event study, it's not peek-ahead bias.
8        Q.  When you chose November 20, 2007 to
9    include in your single-event event study,
10   you knew that date was one that would yield
11   a statistically significant result,
12   correct?
13       A.  Right.  And I wouldn't have picked
14   it except for the fact that also looking at
15   what information came out that day
16   identified that day as the most important
17   red-letter date in the life of this company
18   over the class period.
19       Q.  Weren't you concerned that you would
20   be subject to an accusation that you had
21   peek-ahead bias?
22       A.  Well, that's the answer to the
23   question I gave a few moments ago.  That's
24   why I also gave the results for three out
25   of eight.

Page 223

Steven P, Feinstein, Ph.D

1
2        But four out of nine is a legitimate
3    result, because this is not peek-ahead
4    bias.
5        Q.  What is selection bias?
6        A.  The same thing, essentially, that
7    you -- that your selection is in some way
8    unscientific or inappropriate in a way that
9    biases the results of the test.
10       Q.  Are you aware of any academic
11   literature that discusses your approach to
12   selecting dates in this case for your
13   z-test?
14       A.  Sure.  There's an extensive
15   literature.  There's an extensive section
16   in the chartered financial analyst
17   curriculum on testing and selection bias,
18   and it describes what selection bias is and
19   cautions against it and explains how to not
20   fall into that error, and I followed those
21   protocols.
22       Q.  And the authority you just
23   referenced discusses selecting Wall Street
24   Journal dates and New York Times dates in
25   an effort to select dates for a z-test like

Page 224

Steven P, Feinstein, Ph.D

1
2    this?
3        A.  No, it doesn't -- it describes
4    principles that I applied in order to apply
5    this rule correctly.
6        Q.  Now, let me turn your attention to a
7    document that we're going to mark as
8    Exhibit 107.
9
10           (Exhibit No. 107 marked for
11           identification.)
12
13   BY MR. FRANK:
14       Q.  Exhibit 107 is a document entitled
15   "Probability and Statistics for Engineering
16   and the Sciences," ninth edition, by J.L.
17   Devore.
18       Now this is one of the authorities
19   that you cite in Footnote 4 of your
20   declaration, correct?
21       A.  Yes.
22       Q.  Let me turn your attention to Page
23   393.
24       Do you see that there's a box
25   highlighted in blue?

Page 225

Steven P, Feinstein, Ph.D

1
2        A.  Yes.
3        Q.  Now, do you see where the -- it says
4    "Test statistic value, large samples, Z
5    equals," and then a formula?
6        A.  Right.
7        Q.  Do you know if that's the formula
8    you used in this case?
9        A.  I believe it is, but I did
10   bootstrapping to determine that the large
11   sample formula works with our smaller
12   sample as well.  I mean, I didn't do it,
13   but my team did.
14       Q.  I understand that you ran diagnostic
15   tests.
16       But what I'm curious about is, do
17   you see the sentence at the bottom of the
18   blue box?  Do you see that sentence?
19       A.  I do.
20       Q.  There it says, "The test can safely
21   be used as long as MP HAT 1, MQ HAT 1, NP
22   HAT 2, and NQ HAT 2 are all at least
23   ten."
24       A.  Right.
25       Q.  Do you see that?

Page 226

Steven P, Feinstein, Ph.D

1    A.   It's a different set of criteria
2  than was in the prior article, which shows
3  you that there's -- I wouldn't call it
4  disagreement among statisticians, but
5  there's an understanding that -- that
6  diagnostic evaluation on a case-by-case
7  basis is called for.
8    Q.   Well, are you aware of any academic
9  authority that supports the view that one
10  can properly run a z-test where the
11  conditions set forth in either   Exhibit
12  106 or 107 are not met?
13    A.   Yes.
14    Q.   What's that?
15    A.   Well, there's procedures for that.
16         There's a bootstrapping to test to
17  see if the critical values hold and that
18  the critical values are valid in a small
19  sample environment as well as a large
20  sample environment.
21    Q.   Well --
22    A.   That's how we always conduct the
23  test.
24    Q.   Can you point me to any academic

Page 227

Steven P, Feinstein, Ph.D

1  authorities that support your view that
2  these conditions do not need to be met if
3  you were able to satisfy the diagnostic
4  test that you referenced?
5    A.   Yes.  Not as I sit here now, but
6  yes, I can.
7    Q.   Are they referenced -- are they
8  referenced anywhere in your report?
9    A.   No.  They generally don't have to
10  be.  Usually people understand the
11  principles and are satisfied with the
12  principles well enough to know that it's
13  not going to make a difference if the
14  diagnostic test passed.
15    Q.   Now, for your z-test, you didn't
16  just choose a single date, correct?
17    A.   Correct.  I mean, it's the nature of
18  a z-test, you compare two samples And it's
19  samples that are more -- each greater than
20  1.
21    Q.   Now, in constructing a z-test, I
22  believe you testified, and it's in your
23  report, that it's important to choose dates
24  on which there's greater information flow,

Page 228

Steven P, Feinstein, Ph.D

1  correct?
2    A.   Right.
3    Q.   Now, the dates that you chose are
4  not actually the dates on which The Wall
5  Street Journal or the New York Times
6  published an article, right?
7    A.   That's right.  They are -- the Wall
8  Street Journal and the New York Times were
9  used to identify the date of the event, and
10  then the date of the event is the date
11  that's tested for the return.
12    Q.   So, for example, if the New York
13  Times came out with an article and said
14  that Freddie Mac was going to be reporting
15  something tomorrow --
16    A.   Yes.
17    Q.   -- and then The Wall Street Journal
18  came out with an article two days later
19  saying Freddie Mac reported something
20  yesterday, in that example, you chose the
21  date in between?
22    A.   Well, I chose the date that the
23  testimony before Congress actually occurred
24  where Freddie Mac described to Congress

Page 229

Steven P, Feinstein, Ph.D

1  what its program was for shoring up certain
2  borrowers' mortgages.
3         So, I mean, the earlier date -- I
4  mean, there was actually -- I could have
5  put in the exhibit -- in the report the
6  follow-up article from the New York Times
7  or from the Wall Street Journal reporting
8  on the testimony itself.
9         I mean, it would have still pointed
10  to the day of the testimony as the day of
11  the event.
12    Q.   Well, let's be specific, because I
13  gave you a bit of a hypothetical and you
14  jumped to a particular example.
15         So if you turn to Exhibit 5 of your
16  report, which I hope is Exhibit 96, if I'm
17  doing this right.
18         Doctor, is it Exhibit 96?
19         MR. MARKOVITS:  I think it's
20  Exhibit 96, even if you're not doing it
21  right.
22    A.   Yes.
23         MR. FRANK:  It depends what
24  "it" is, I suppose.

58  (Pages 226 to 229)

Page 230

Steven P, Feinstein, Ph.D

1
2       BY MR. FRANK:
3           Q.   So are you looking at Exhibit 5 in
4       deposition Exhibit 96?
5           A.   Yes.
6           Q.   Okay.  And this exhibit sets forth
7       the dates you selected for your z-test,
8       correct?
9           A.   That's right.
10          Q.   And we see in the first line, for
11      example, the first row, under New York
12      Times, it says "Freddie Mac Tightens
13      Standards," by Vikas Bajaj, 28 February
14      2007, correct?
15          A.   Yes.
16          Q.   And then under The Wall Street
17      Journal it says, "Freddie Mac Won't Buy
18      Some Subprime Loans," by James Hagerty and
19      Damian Paletta, 28 February 2007, right?
20          A.   Right.  And they both refer to
21      announcements that came out the previous
22      day.
23          Q.   Both of those articles were
24      published on February 28, 2007, right?
25          A.   Right.

Page 231

Steven P, Feinstein, Ph.D

1
2           Q.   But you chose the prior date because
3       they were discussing an event from the
4       prior date, right?
5           A.   Right.  And it was covered in other
6       wire sources on February 27th.  So the
7       market knew about it on February 27th.
8           Q.   So is it fair to say that you didn't
9       use your selection criteria to identify
10      dates where there was more -- there were
11      more news articles or greater information
12      flow, but rather, you used your selection
13      criteria to identify dates where material
14      company information was disclosed?
15          A.   Yes, I think that's fair.
16          Q.   You weren't looking for --
17          A.   Oh, no, no, no, no, no, not just --
18      I mean, I'm looking for dates that The Wall
19      Street Journal and the New York Times
20      collectively or together each determined
21      something important had happened for
22      Freddie Mac, which necessarily is going to
23      be an information flow date.
24          Q.   Well --
25          A.   I mean, information about the

Page 232

Steven P, Feinstein, Ph.D

1
2       important event.
3           Q.   You weren't choosing the day that
4       the newspapers published their articles,
5       right?
6           A.   I picked the event -- the date of
7       the events that the newspaper articles was
8       about.
9           Q.   And did you look at the dates that
10      the newspaper articles actually came out?
11          A.   Yes.
12          Q.   And what did you determine upon
13      looking at those dates?
14          A.   Well, I would check to see if -- I
15      used other sources to see if the event
16      occurred on the 28th or the 27th.  Or I
17      also looked to see if the article was
18      published, if it's, like, the Wall Street
19      Journal wire edition and it's after the
20      close, then the effective event date would
21      be the next day.
22          Q.   Did you apply any economic test to
23      those other dates?
24          A.   No.
25          Q.   Did you consider any other selection

Page 233

Steven P, Feinstein, Ph.D

1
2       criteria other than the Wall Street
3       Journal, New York Times approach you
4       described in your report?
5           A.   Yeah.  I sat with my team for a good
6       long time thinking about what would be the
7       most reasonable event selection algorithm.
8           Q.   What were the other algorithms you
9       discussed with your team?
10          A.   Well, we considered using dates on
11      which any news article was written, for
12      example, but rejected that possibility
13      because that would have, essentially,
14      picked every day.
15               So it had to be more important news
16      sources.
17          Q.   Did you consider any other
18      algorithms?
19          A.   I'm sure we did, but didn't test any
20      others.  We decided on this one before
21      running a test.
22          Q.   As you sit here today, can you
23      recall any other algorithms you considered?
24          A.   I just did.  I just explained one
25      that comes to mind.

Page 234

Steven P, Feinstein, Ph.D

1
2   Q.   That's why I used the word "other."
3   A.   Other than that.  Yeah.  I remember
4   saying, hey, why don't we use the 8-Ks, and
5   then my team reminded me that there are no
6   8-Ks for this company.  So that didn't
7   work.
8          We thought about earnings
9   announcements, but the problem there was,
10  like, I said it's already -- that path has
11  already been tread upon.
12         No.  We thought -- I mean, we
13  brainstormed for a while, and this is what
14  made the most sense.
15         And I still believe this is the best
16  algorithm for selecting dates.  And if you
17  think there's some other dates that ought
18  to be tested, let me know and we'll look at
19  them together.
20  Q.   You didn't test the earnings
21  announcement dates, right?
22  A.   Well, only the earnings announcement
23  dates that were selected by this
24  methodology.  Three of them were.
25         If the Wall Street Journal and the

Page 235

Steven P, Feinstein, Ph.D

1
2   New York Times thought that what Freddie
3   Mac said about earnings on an earnings
4   announcement date was not consequential
5   enough to report, we basically agreed with
6   the New York Times and the Wall Street
7   Journal and felt it was an inappropriate
8   date.
9   Q.   Well, your methodology was that they
10  both had to conclude it was significant
11  enough to report on --
12  A.   That's right.
13  Q.   -- and they also had to write upon
14  it within a particular period of time; is
15  that right?
16  A.   Well, yes.
17  Q.   Now, since you drafted this report,
18  have you applied this date selection
19  methodology in any other case?
20  A.   Not exactly this methodology, no.
21  Q.   And since you finalized and signed
22  this report, you have authored other expert
23  reports on market efficiency, correct?
24  A.   Yes.
25  Q.   Did you identify all of those

Page 236

Steven P, Feinstein, Ph.D

1
2   earlier in your deposition?
3   A.   Yes, yes.
4   Q.   So --
5   A.   No.  I mean, in this deposition, I
6   identified testimonies for you.  I did not
7   seek to -- I don't recall if something was
8   submitted where I have not yet been
9   deposed.
10  Q.   Well, thank you for that
11  clarification.  Maybe we'll just see if we
12  can make it clear.
13         In Exhibit 96, we see on the front
14  page of your report that it's dated
15  June 7, 2017, correct?
16  A.   Yes.
17  Q.   And now some time has passed since
18  June 7, correct?
19  A.   Right.
20  Q.   And have you finalized any reports
21  on market efficiency since June 7 of 2017?
22  A.   I would have to check my records.
23  As I sit here now, I can't recall for sure.
24  Q.   You testified -- well, you draft
25  reports fairly often in these sorts of

Page 237

Steven P, Feinstein, Ph.D

1
2   cases; is that fair to say?
3   A.   Yes.
4   Q.   It seems likely that there are other
5   reports, but you just can't recall whether
6   and how many?
7   A.   I wouldn't say it's necessarily
8   likely, but I just can't recall whether and
9   how many.
10  Q.   Now, you mentioned earlier that you
11  looked at Factiva.  Do you recall that?
12  A.   Yes.
13  Q.   What's Factiva?
14  A.   It's a news reporting service, from
15  which I can download news articles.
16  Q.   And did you make any effort to
17  identify what news sources were reporting
18  most frequently on Freddie Mac?
19  A.   No.
20  Q.   So, for example, if a newspaper like
21  the Financial Times or the Washington Post
22  report far more frequently on Freddie Mac
23  than the New York Times, you wouldn't be
24  aware of that one way or another; is that
25  right?

Page 238

1           Steven P, Feinstein, Ph.D
2       A.   Essentially, correct.
3       Q.   Now in the Petrobras matter, you did
4   an FDT z-test, correct?
5       A.   Yes.
6       Q.   You didn't use this news selection
7   approach there, right?
8       A.   Correct.  They had 6-Ks.
9       Q.   Well they don't have 8-Ks, right?
10      A.   Right, but they have 6-Ks.  Freddie
11  Mac has neither.
12      Q.   Well, Freddie Mac -- 6-Ks are the
13  form in which a foreign company updates the
14  market in an equivalent way as an 8-K
15  right?
16      A.   Yes.
17      Q.   What is an information statement
18  supplement?  Do you know?
19      A.   Well, my understanding is that was,
20  essentially, their financial reporting,
21  financial results.
22      Q.   Are you aware of whether or not
23  Freddie Mac also used supplements to
24  information statements as a surrogate for
25  Forms 8-K?

Page 239

1           Steven P, Feinstein, Ph.D
2       A.   Well, I read them.  They're -- I
3   don't recall that that's how they used
4   them.
5            (Witness reviews document.)
6       Q.   What are you looking at --
7       A.   I'm looking at --
8       Q.   -- Dr. Feinstein?
9       A.   -- the filings that I have on
10  Page 51.
11           Yes, to some extent, but they're not
12  subject to the same rules as an 8-K.  I
13  understood that there were press releases
14  from Freddie Mac from time to time.
15      Q.   Now, you also did an FDT z-test in
16  Eletrobras?
17      A.   Yes.
18      Q.   And you didn't use this Wall Street
19  Journal and New York Times selection method
20  in that case either, right?
21      A.   That's right.
22      Q.   And as you sit here today, can you
23  think of any case where you used -- that
24  you're certain that you used the FDT z-test
25  other than this case, Eletrobras, and

Page 240

1           Steven P, Feinstein, Ph.D
2   Petrobras?
3       A.   Not without checking my records.
4       Q.   Now, to conduct an event study --
5   strike that.
6            To conduct a z-test after you select
7   dates, you have to create a market model;
8   isn't that correct?
9       A.   Correct.
10      Q.   And was your market model for your
11  z-test the same as your market model for
12  your single-event event study?
13      A.   Yes.
14      Q.   Now, in your market model, you used
15  two estimation periods, correct?
16      A.   Yes.
17      Q.   Why do you do that?
18      A.   Well, one thing that I gleaned from
19  the Bajaj report was a suspicion that there
20  was a structural break around   August of
21  2007, that the price dynamics before August
22  of -- or August 8th, I believe it was,
23  before August 8, 2007 were different than
24  the price dynamics afterwards.
25           So there's a test for that.  I ran

Page 241

1           Steven P, Feinstein, Ph.D
2   the test.  It's called a Chow test.  And in
3   fact, it identified that the price dynamics
4   were different.
5            So that's why I ran two separate --
6   one way to accommodate analysis when
7   there's a structural break is to divide the
8   data up according to the two regimes and
9   run a regression on each separate piece.
10      Q.   What is a structural break?
11      A.   Its means that the price dynamics
12  are different before than they were after
13  that point in time.
14      Q.   What are price dynamics?
15      A.   What drives the -- what drives the
16  stock price, with respect to a market
17  factor, a peer group factor, and the random
18  volatility factor.
19      Q.   Now, you identified a structural
20  break after reviewing the Bajaj report,
21  correct?
22      A.   Right.
23      Q.   Did you do any independent testing
24  of your own to identify any other
25  structural breaks in the market?

Page 242

Steven P, Feinstein, Ph.D

1
2     A.  No.  He had reasons for placing it
3  at August 8th.  And rather than grope
4  around, I accepted his reasons and ran the
5  test on the date that he stated was the
6  structural break date.
7     Q.  And your test confirmed that he was
8  correct?
9     A.  Yes.
10     Q.  Is it possible that there were other
11  structural breaks during the class period
12  in this case?
13     A.  Well, it's possible but unlikely.  I
14  mean, there was a -- there was a
15  fundamental market-based reason for stating
16  that there was one on August 8th, and I
17  didn't see that kind of compelling argument
18  for any other date.
19     Q.  If there are other structural breaks
20  in the class period, might that affect the
21  conclusions that you reached in your
22  report?
23     A.  It could conceivably, if in fact the
24  dynamics did change significantly and that
25  August 8th isn't the most appropriate place

Page 243

Steven P, Feinstein, Ph.D

1
2  to place the break; but it also might not.
3     I don't think any kind of changed
4  econometrics is going to change the
5  conclusion that November 20th was a date
6  that the market reacted to the
7  information -- to Freddie Mac's specific
8  information.  It's just too strong a
9  result.
10     And the -- I would say it's
11  unlikely.  Leave it at that.  I would say
12  it's -- anything's possible but it's
13  unlikely.
14     Q.  And was the structural break in
15  August due to a liquidity crisis?
16     A.  Well, a systemic -- a systemic
17  market liquidity crisis or a systemic
18  market dislocation is, I believe, how other
19  people have characterized it.
20     Q.  Well, based on the results of your
21  model, would you agree that the stock
22  market was more volatile following the
23  systemic market liquidity crisis in August?
24     A.  Yes.
25     Q.  What is a Chow test?

Page 244

Steven P, Feinstein, Ph.D

1
2     A.  A Chow test is a test to see if the
3  dynamics have changed at a potential break
4  point.
5     Q.  And you conducted it because of what
6  you had reviewed in Dr. Bajaj's report?
7     A.  Yes.
8     Q.  He had identified a structural
9  break, and you wanted to confirm that or
10  refute it, correct?
11     A.  Exactly.
12     Q.  And did you do a Chow test for the
13  entirety of the class period or just for
14  that one date?
15     A.  That date.
16     Q.  Is it fair to say that the evidence
17  of a structural break in the market means
18  that the relationship between Freddie Mac's
19  stock and the broader market changed during
20  the class period -- the proposed class
21  period?
22     A.  It can mean that.  It could also
23  mean that the background volatility has
24  changed.  It could either be that the
25  coefficients have changed or the volatility

Page 245

Steven P, Feinstein, Ph.D

1
2  level has changed.
3     Q.  And did you do anything to determine
4  which it was?
5     A.  Yes.
6     Q.  What did you do?
7     A.  Ran the two regressions.  You see
8  them juxtaposed on Exhibit 7.
9     Q.  And what do those reveal?
10     A.  Well, the volatility is certainly
11  greater after August 8, 2007 than it was
12  before.  You see that in the standard error
13  level.
14     Q.  What about the relationship between
15  Freddie Mac's stock and the broader market?
16     A.  I don't see -- just eyeballing these
17  numbers, I don't see a significant
18  difference in the peer index.  I see a
19  difference in the value.  But looking at
20  the standard error of the coefficient, it
21  doesn't appear to be a statistically
22  significant difference in the peer index
23  coefficient and, really, the same -- I
24  mean, I'm eyeballing it.  I'm not running
25  the formal test.

Page 246

1         Steven P, Feinstein, Ph.D
2         But I don't -- I see different
3    values for the peer index and the market
4    index coefficient.  But comparing those to
5    the starred error of the coefficients, it's
6    not clear that they're significant.
7         Q.  Now, you just turned to Exhibit 7 in
8    your report, correct?
9         A.  That's right.
10        Q.  Now, if you look at the -- the top
11   of the page is the first estimation period
12   and the bottom is the second estimation
13   period, correct?
14        A.  Yes.
15        Q.  You have two estimation periods in
16   your regression model, right?
17        A.  Yes.
18        Q.  And if you look at the first
19   estimation period, what is the standard
20   error?
21        A.  0.77 percent.
22        Q.  And where -- and that is in the very
23   first panel next to standard error,
24   right?
25        A.  Yes.

Page 247

1         Steven P, Feinstein, Ph.D
2         Q.  And if you look at the second
3    estimation period, the standard error is
4    1.66 percent, correct?
5         A.  That's right.
6         Q.  And how do you interpret those two
7    statistics?
8         A.  Well, it means there's much more
9    background noise subsequent to
10   August 9, 2007.
11        Q.  Would you agree that the volatility
12   of the residual returns in the second
13   period is more than twice that of the first
14   period?
15        A.  Yes.
16        Q.  What do you think caused this
17   increased volatility in the residual
18   returns?
19        A.  I didn't do a lot of analysis on
20   that.  I just accepted it for what it was.
21        It's possibly that just the
22   volatility in the input data, such that we
23   see volatility in the unexplained part of
24   the regression output.
25        Q.  Now, the first and second estimation

Page 248

1         Steven P, Feinstein, Ph.D
2    periods have coefficients for market index
3    of negative .081 and .328, respectively.
4         How do you interpret those results?
5         A.  I'm sorry, which two?
6         Q.  So if you look at market index.
7         A.  Yes.
8         Q.  You'll see under coefficient, it
9    says negative .081?
10        A.  Right.
11        Q.  And then if you look at the second
12   estimation period, next to market index,
13   you see a coefficient of positive .328?
14        A.  Right.  Neither of those are
15   statistically significant, which means that
16   the significant relationship is between
17   Freddie Mac and its peer index.  That's
18   swamping any relationship that there may be
19   between the market index and Freddie Mac.
20        Q.  And so what is -- what does that
21   mean for your layperson?
22        A.  I don't know what you mean by the
23   question.
24        What it means is that what the data
25   indicate is that Freddie Mac was moving

Page 249

1         Steven P, Feinstein, Ph.D
2    more with the peer index, more closely with
3    a higher correlation with the peer index,
4    other financials, than it was with the
5    overall stock market.  And that it probably
6    did have a correlation with the market
7    index, but that was being proxied for by
8    the peer index sufficiently that the market
9    index relationship looked weak.
10        Q.  When you testified that the numbers
11   weren't statistically significant, what
12   were you looking at to determine that?
13        A.  On the very right-hand column, the
14   "T" statistics, the letter "T" -- they're
15   not -- they're nowhere close to 2.
16        For the early subperiod, it's
17   negative 0.5, and for the later subperiod,
18   it's 0.9.
19        Q.  When you use the number 2, is that
20   because a statistically significant result
21   would be greater than 1.96?
22        A.  A statistically significant
23   relationship between an explanatory
24   variable and Freddie Mac stock returns
25   would be borne out or indicated by a "T"

Page 250

Steven P, Feinstein, Ph.D

1 statistic greater than roughly -- or
2 roughly in the neighborhood of 2, greater
3 than 1.96.
4 Q.  Is it fair to say that Freddie Mac's
5 stock is more sensitive to changes in the
6 market during the second period after
7 August 9, 2007?
8 A.  No, I don't -- I don't think you can
9 drew that.  I wouldn't draw that
10 conclusion.
11 Q.  Does the negative coefficient in the
12 first period strike you as unusual?
13 A.  No, because of its -- it's not
14 statistically significant, and there's a
15 positive relationship -- a significant
16 positive relationship with the peer index,
17 and the peer index is somewhat -- is a
18 correlation with the market index.  So it
19 could be picking up its market effect
20 through the peer effect.
21 Q.  Can you provide an economic
22 explanation for why your model says Freddie
23 Mac's stock moved opposite to the market in
24 the first period?
25

Page 251

Steven P, Feinstein, Ph.D

1 A.  It didn't.  That's my explanation.
2 It didn't.  This is a nonsignificant
3 result.
4 Q.  So the fact that it's negative
5 doesn't matter to you because of its
6 statistical insignificance?
7 A.  Right.  The regression indicates
8 that it's not deterministically or
9 definitively positively or negatively
10 correlated with the market in the first
11 period, in a regression where the peer
12 index also appears.
13 Q.  Now, turning to the intercept
14 figures.
15 A.  Yes.
16 Q.  I see that the first and second
17 estimation periods have coefficients for
18 intercept of .02 percent and negative 3.4
19 percent, respectively.
20 A.  Yes.
21 Q.  Do you see that?
22 A.  Yes.
23 Q.  How do you interpret those
24 statistics?
25

Page 252

Steven P, Feinstein, Ph.D

1 A.  The same way.  I mean, this is --
2 we're working with real data, and real data
3 has a random component to it, as well as
4 noise and measurement data.  And real
5 data's sometimes messy.
6 I mean, what we're trying -- that's
7 why we run regressions, to try to ferret
8 out signal from noise.
9 The noise in the data is such that
10 these are the values, but neither are
11 statistically significant.
12 Q.  Does this negative intercept in the
13 second period strike you as unusual?
14 A.  A little bit unusual, but not
15 terribly unusual.
16 It means that the data were such
17 that the stock seemed to trend down.  But
18 again, it's not a statistically significant
19 result at the 95 percent two-tailed
20 confidence level.
21 Q.  Are you familiar with pooling versus
22 unpooling standard errors?
23 A.  I've reviewed it, but not recently.
24 Q.  What does it mean to pool or unpool
25

Page 253

Steven P, Feinstein, Ph.D

1 a standard error?
2 A.  I -- I'm not prepared to answer that
3 question today.  I mean, like I said, this
4 is something that I've studied, reviewed,
5 learned, been tested on, but not recently.
6 Q.  Well, in terms of conducting the
7 calculation that underlies the z-test, who
8 actually performed that calculation?
9 Was it you or someone who worked for
10 you?
11 A.  Someone who works for me.
12 Q.  Who was that?
13 A.  It's Miguel Villanueva.
14 Q.  And to the --
15 A.  But he does it according to the
16 directions that I've constructed with him
17 and for him.
18 Q.  And did you give him any directions
19 regarding pooling or unpooling standard
20 errors?
21 A.  No.
22 Q.  And did he -- did you ever discuss
23 with him the subject of whether he was
24 going to pool or unpool the standard
25

Page 254

Steven P, Feinstein, Ph.D

1    errors?
2        A.  No.  I think it depends on what you
3    mean by pooling or unpooling.
4        We have discussed -- do you mean
5    pooling and unpooling the standard errors
6    across the two samples, or across the two
7    data -- I'm sorry -- the two time regimes,
8    or the news and the non-news samples?
9        Q.  The news and the non-news samples.
10       A.  Right.  That, we've discussed and we
11   determined that it's not necessary in this
12   case.  Because, essentially, if the null
13   hypothesis is that the news and the
14   non-news samples have the same price
15   dynamics and, in fact -- well, and you run
16   the test under the null hypothesis, then
17   there's no need to make adjustment for
18   volatility.
19       The test is run under the null
20   hypothesis of market inefficiency in which
21   the two samples have -- the two samples
22   have the same price dynamics.  That's why
23   it's not necessary to make adjustments to
24   the volatility for the two -- to the news

Page 255

Steven P, Feinstein, Ph.D

1    sample versus the non-news sample.
2        Q.  When did you discuss that matter
3    with Miguel?
4        A.  We've -- that's something we've
5    discussed a number of times in many cases.
6        Q.  So was that something that you've
7    discussed specifically in connection with
8    this case, or simply in the past in
9    connection with how to perform an FDT
10   z-test?
11       A.  It did come up.  We've discussed it
12   in the past, and it did come up again in
13   this case.  I'm not exactly sure what
14   motivated it to come up in this case, but
15   we did.
16       Q.  Did you raise it with him, or did he
17   raise it with you?
18       A.  I don't recall.
19       Q.  And how long did your discussion
20   regarding pooling or unpooling last?
21       A.  No more than 20 minutes; 15 or 20
22   minutes.
23       Q.  And what did you say to him, and
24   what did he say to you about the subject?

Page 256

Steven P, Feinstein, Ph.D

1        A.  I said that in this context, because
2    the null hypothesis -- I explained to him
3    exactly what I explained to you just
4    before:  that if, in fact, the data are
5    such that the volatilities are
6    significantly different between the news
7    and the non-news, well, then that proves
8    the market is reacting to news and that
9    there's some -- that there's a difference.
10   That would -- if defense experts would say,
11   we have proof that the volatilities in the
12   two samples are different, well, then they
13   would have proved market efficiency because
14   they would have proved that the information
15   is impacting the stock price.
16       So it's just not a necessary
17   adjustment for this application.
18       Q.  What is a standard deviation?
19       A.  It's the square root of the average
20   squared distance between each observation
21   and the mean.
22       Q.  And what is a standard error?
23       A.  It's the estimator of -- well, in
24   this case, it's the estimate of the

Page 257

Steven P, Feinstein, Ph.D

1    dispersion in the residuals from the
2    regression.
3        Q.  Isn't it fair to say that standard
4    errors can vary considerably based upon
5    sample size?
6        A.  Well, if you've changed the sample
7    size, you're changing the data that you're
8    estimating over, so they may.
9        I have a section in the report where
10   I describe the choice of estimation period,
11   and the literature specifically says that
12   in an event study, you can choose -- there
13   are three generally accepted periods:  A
14   period that straddles the event, a period
15   that precedes the event, or a period that's
16   subsequent to the event.
17       What I did is consistent with what's
18   done in event study testing.
19       Q.  Well, in your z-test, you look at
20   two populations, correct?
21       A.  The news versus non-news.
22       Q.  The news versus non-news?
23       A.  Right.
24       Q.  Right?

Page 258

1              Steven P, Feinstein, Ph.D
2       A.   Right.
3       Q.   And the news population you look at
4  is a total of nine dates, correct?
5       A.   That's right.
6       Q.   The non-news population you look at
7  is a total of two hundred -- I'm sorry --
8  321 dates, right?
9       A.   Approximately, right.
10      Q.   Two very different sample sizes,
11  correct?
12      A.   Right.
13      Q.   And those two different populations
14  had different standard errors, correct?
15      A.   Well, if they do, then that's proof
16  that information is impacting the stock
17  price.
18           If the -- if there's greater
19  dispersion in a sample of days where the
20  stock is being impacted by news than there
21  is in a sample of days where there's not as
22  much news or not as much news flow, that's
23  proof that the market is not disregarding
24  news but, in fact, is reacting to the news.
25      Q.   Isn't it possible that the

Page 259

1              Steven P, Feinstein, Ph.D
2  differences are explained, in part, by the
3  sample size differences?
4       A.   Well, that's why you -- that's the
5  reason -- no.  No, if you've run an F-test
6  and an Ansari-Bradley test and determined
7  that these are statistically significant
8  differences in dispersion.
9       Q.   And you didn't run an F-test or an
10  Ansari-Bradley test in this case,
11  correct?
12      A.   Well, you can't run the
13  Ansari-Bradley and the F-test across two
14  regressions with a structural break.  I can
15  do it on each, but I couldn't do it on the
16  entire class period because of the
17  structural break, which is why those test
18  results are not in the report.
19      Q.   And you didn't run it either way,
20  right?
21      A.   I don't know what you mean.
22      Q.   Well, you said that you could -- you
23  couldn't run it over the entire class
24  period, but you could do it over each
25  estimation period; is that what you said?

Page 260

1              Steven P, Feinstein, Ph.D
2       A.   No.  Well, yeah, you -- since we
3  don't have one regression, we have two
4  regressions, you can't run the
5  Ansari-Bradley test and the F-test over the
6  entire class period.
7           Conceivably, you can run it over
8  each subperiod, except now you're talking
9  about a very small sample.  It's -- you're
10  looking at dispersion among -- well, in the
11  second period, for example, it's almost
12  meaningless to say we're looking at a
13  measure of dispersion across three dates.
14  It's just not a meaningful test.
15      Q.   Why not?
16      A.   Because it's -- it's a measure of --
17  the test is to see whether the dispersion
18  among the news days is different from the
19  dispersion among the non-news days.  But if
20  the news days -- if you've restricted it to
21  only the post August 9, 2007 data, there's
22  only three news dates in there.  And
23  dispersion among three days is just not as
24  meaningful -- is not as meaningful a
25  concept as it would be if it were over nine

Page 261

1              Steven P, Feinstein, Ph.D
2  days.
3       Q.   At some point, sample sizes become
4  too small to be meaningful?
5       A.   No.  At that point, sample sizes
6  become too small to run a test to see if
7  the standard deviation differences are
8  significant.
9       Q.   And for that reason, you didn't run
10  an Ansari-Bradley or an F-test?
11      A.   That's right.
12           How about a break?
13           MR. FRANK:  Sure, sure.
14           THE WITNESS:  Is this a decent
15  time?
16           MR. FRANK:  Sure.  Any time.
17           THE VIDEOGRAPHER:  We are off
18  the record at 2:33.
19
20           (Recess taken from 2:33 p.m.
21           to 2:46 p.m.)
22
23           THE VIDEOGRAPHER:  We are back
24  on the record at 2:46.
25

66 (Pages 258 to 261)

Page 262

Steven P, Feinstein, Ph.D

1          Steven P, Feinstein, Ph.D
2   BY MR. FRANK:
3       Q.  Dr. Feinstein, isn't it fair to say
4   that when sample sizes are similar,
5   statisticians typically employ a pooled
6   estimate of the standard error based on
7   both populations?
8       A.  I would have to see the specific
9   application.  I don't think that's correct
10  or accurate, generally.
11      Q.  What do you think is wrong about
12  it?
13      A.  I just don't think it's accurate.  I
14  mean, it depends on the application.
15      Q.  When do statisticians use an
16  unpooled approach?
17      A.  Can you define your terms, what you
18  mean exactly by a pooled approach and an
19  unpooled approach?
20      Q.  Well, are you not familiar -- I
21  thought you had -- strike that.
22          Didn't you discuss the issue of
23  pooling with Miguel from your office --
24      A.  Yes.
25      Q.  -- in connection with this matter?

Page 263

1          Steven P, Feinstein, Ph.D
2       A.  Well, I told you what we discussed
3   was whether it was necessary to make an
4   adjustment to the volatility estimated for
5   the news sample on account of it, perhaps,
6   being different from the volatility of the
7   non-news sample and determined that it was
8   not necessary.
9          So, if that's what you mean by
10  pooling and unpooling, then your question
11  doesn't quite make sense.
12          It's -- if you mean something else
13  by pooling and unpooling, I would need to
14  know.
15      Q.  Well, did you discuss with Miguel
16  the issue of pooling the standard errors in
17  connection with the calculation underlying
18  the z-test?
19      A.  Pooling the standard errors from the
20  two regressions, each run on a different
21  part of the class period?  That's what you
22  mean?
23      Q.  No.  I'm talking about -- well,
24  strike that.
25          When you were speaking to Miguel,

Page 264

1          Steven P, Feinstein, Ph.D
2   did you actually use the word "pooling" or
3   "unpooling"?
4       A.  No.  That's why I clarified before I
5   gave my answers before to see if that's
6   what you were referring to, that issue.
7       Q.  You discussed with him whether any
8   adjustments needed to be made given the two
9   different estimate periods in the
10  regression model?
11      A.  No.
12      Q.  What did you discuss with him that
13  you were testifying about earlier?
14      A.  Whether an adjustment needed to be
15  made, given the two apparent volatilities
16  between the news and the non-news sample.
17      Q.  And if someone were to ask you about
18  the subject of pooling standard errors, you
19  would say, I don't really know what you're
20  talking about; is that fair?
21      A.  Well I wouldn't say that I don't
22  know econometrics or that I don't know -- I
23  would ask them, well, what part of
24  econometrics are you referring to?  Are you
25  talking about panel data?  Is that what

Page 265

1          Steven P, Feinstein, Ph.D
2   you're asking about?  I mean, is it a panel
3   data approach?  Is it a -- are you talking
4   about a GARCH model?  What exactly are you
5   asking about?  Define your terms.  By
6   pooling and unpooling, what do you mean?
7       Q.  Well, isn't the z-test a formulaic
8   calculation?
9       A.  Well.  No, the calculation of the
10  Z-statistic is formulaic, but its
11  application and its subjecting to
12  diagnostics requires some judgment and
13  analysis and considerations.
14      Q.  And when you calculate the
15  Z-statistic, do you need to take into
16  account the standard errors for the two
17  populations you're comparing?
18      A.  I'd have to review that.
19      Q.  Do you recall --
20      A.  To check that.
21      Q.  -- whether or not the standard error
22  is one of the variables in the Z-statistic
23  formula?
24      A.  Oh, this is the standard error of
25  the -- let me check.  Let me check.

Page 266

Steven P, Feinstein, Ph.D

1
2  Q.  What are you looking at?
3  A.  Well, we have it here, the formula.
4      (Witness reviews document.)
5  Q.  Just to be clear, sir, what are you
6  looking at?
7  A.  It's Exhibit 106.
8  Q.  Is that the "Applied Statistics for
9  Public Policy" article excerpt?
10 A.  Yes.
11     It's not.  It's -- the Z-statistic
12 is given on formula 13.1 there, and it's a
13 function of the proportions of each sample
14 that are significant, the proportion of the
15 total sample that's significant -- of the
16 combined samples that are significant, and
17 the sizes of the samples is the
18 Z-statistic, and that's --
19 Q.  Are you looking at Figure 13.1
20 that's under the heading "The Pooled
21 Standard Error of a Proportion"?
22 A.  Yes.
23 Q.  And are you familiar with the notion
24 of an unpooled standard error of a
25 proportion?

Page 267

Steven P, Feinstein, Ph.D

1
2  A.  (Witness reviews document.)
3      Well, what's here is the formula for
4  the Z-statistic, which they're also calling
5  the pooled standard error of proportion.
6  Q.  And if I ask you to describe how the
7  pooled standard error of a proportion
8  differs from unpooled standard error of a
9  proportion, could you do so?
10 A.  I would want to review the
11 literature first and the articles.
12 Q.  But without reviewing any literature
13 or articles, are you able to do so, as you
14 sit here today?
15 A.  I want to be real clear.  It's not
16 necessary for running the z-test.  The
17 formula for the z-test is here, and this is
18 the formula that I used, and it does not
19 require the calculation -- it does not --
20 what it says is that it's the pooled
21 standard error of proportion that's
22 calculated.
23     The unpooled is not an element of
24 the test, according to this article --
25 according to this chapter.

Page 268

Steven P, Feinstein, Ph.D

1
2      As I sit here now, I can't provide a
3  dissertation on the difference between
4  pooled and unpooled standard error
5  calculations.
6  Q.  I'm not going to pretend I can
7  either.
8      So I just want to understand whether
9  you know the difference between a pooled
10 standard error of a proportion and an
11 unpooled standard error of a proportion?
12 A.  I couldn't elaborate or explain it
13 or provide a dissertation on it as I sit
14 here now.  But I can tell you that for
15 purposes of running the z-test according to
16 the sources, it's irrelevant.
17 Q.  Well, putting aside its relevance,
18 isn't it fair to say that you ran the
19 pooled standard error -- well, let me put
20 it that way.
21     Putting aside whether it's relevant
22 or not, we can agree that the formula you
23 used was the pooled standard error of a
24 proportion, correct?
25 A.  That's right.

Page 269

Steven P, Feinstein, Ph.D

1
2  Q.  You did not use the unpooled
3  standard error of a proportion, correct?
4  A.  Correct.
5  Q.  And you --
6  A.  I may have considered it in the
7  context of the discussion I described
8  before, which didn't assign those labels to
9  it, but I didn't calculate a variable that
10 I termed, during the time of my
11 calculations, the unpooled standard error.
12 Q.  And you referred to a conversation
13 that you had had with your colleague,
14 Miguel, correct?
15 A.  That's right.
16 Q.  And you -- during that conversation,
17 which lasted 15 to 20 minutes, you didn't
18 use the terms "pooled" or "unpooled,"
19 correct?
20 A.  That's correct.
21 Q.  And you, actually, aren't certain
22 that what you discussed was the decision as
23 to whether or not to run the calculation in
24 a pooled manner or unpooled, correct?
25 A.  Only because I haven't heard from

Page 270

Steven P, Feinstein, Ph.D
1  Steven P, Feinstein, Ph.D
2  you what you mean by "pooled" and
3  "unpooled."
4      I know what I meant when I was
5  having the discussion, but I don't know
6  what you mean when you use those terms.
7      Q.  Well, when you were having the
8  discussion, you didn't use the terms
9  "pooled" or "unpooled," correct?
10     A.  Correct.
11     Q.  And looking at this text, we see
12 that it's a pooled standard error of
13 proportion, correct?
14     A.  Yes.
15     Q.  And you don't really know what the
16 unpooled standard error of proportion is,
17 right?
18     A.  It's not here.  It's not written
19 here.  It's not relevant to this test.
20     And I may know what it is, if -- I
21 can possibly tell you my experience with
22 working with it once you show me what, you
23 know, the source that describes what we're
24 talking about.
25     Q.  Well, you don't --

Page 271

1  Steven P, Feinstein, Ph.D
2      A.  I mean, I don't want to go on the
3  record testifying that I don't know
4  anything about pooled and unpooled, if I
5  don't know what you mean by pooled and
6  unpooled.
7      I may well very know -- I may very
8  well know a lot about pooled and unpooled
9  standard errors once you explain to me what
10 you're asking about.
11     Q.  I --
12     A.  I mean, I can go through my
13 credentials and tell you --
14     Q.  I'm sure --
15     A.  -- where I've had to pass exams in
16 quantitative methods, where I taught
17 courses in quantitative methods, oral and
18 written exams in order to get my Ph.D.,
19 where I'm sure I covered those aspects of
20 quantitative methods in econometrics.
21     But until you tell me what you're
22 asking about, I can't tell you -- I can't
23 help you understand it better.
24     Q.  Well, let me ask you this question:
25 What is an unpooled standard error of a

Page 272

1  Steven P, Feinstein, Ph.D
2  proportion?
3      MR. MARKOVITS:  Objection.
4  Asked and answered.
5      A.  I don't know what you mean by the
6  question.
7      If you direct me to a source where
8  they define the term or if you can define
9  the term for me, I can help you understand
10 it better.
11     I can explain to you what I know
12 about it and what I don't know about it.
13     But until we know what we're talking
14 about, I can't do that.
15 BY MR. FRANK:
16     Q.  Do you know -- strike that.
17     Do you have the FDT article?
18     A.  I should.  Here it is.  Yes.
19     Q.  Let me turn your attention to
20 Page 119.  Okay?
21     So Page 119 through 122 is a section
22 of this article where FDT discussed the FDT
23 z-test, correct?
24     A.  Yes.
25     Q.  And they, actually, have an example

Page 273

1  Steven P, Feinstein, Ph.D
2  of an FDT test that they ran, correct?
3      A.  Yes.
4      Q.  And do you know whether or not FDT
5  used the same formula that you used in your
6  z-test calculation?
7      A.  (Witness reviews document.)
8      Well, I always assume so.  I mean,
9  they say they're using a z-test for
10 comparing the incidence rate.
11     But they don't actually -- they
12 don't have their formula for the
13 Z-statistic in their article.  They just
14 allude to it.  They allude to using the
15 Z-statistic.
16     Q.  You used the formula that was set --
17 that is set forth in Figure 3.1 of the
18 Applied Statistics textbook, correct?
19     A.  Right.
20     MR. MARKOVITS:  13.1?
21     THE WITNESS:  That's right.
22 BY MR. FRANK:
23     Q.  13.1?
24     A.  Yes.
25     Q.  And you don't know whether they used

## Page 274

Steven P, Feinstein, Ph.D

1            Steven P, Feinstein, Ph.D
2 that formula or another formula; is that
3 correct?
4     A.  Because they don't present --
5 because they don't present their formula,
6 yes.
7     Q.  Well --
8     A.  But they say they used the
9 Z-statistic, and the Z-statistic is defined
10 in the sources.
11     Q.  Well, is it fair to say that you
12 don't know whether they used the pooled
13 standard error of a proportion or the
14 unpooled standard error of a proportion?
15     A.  Without defining our terms, that
16 would be fair to say.
17     Q.  Well, let me define our terms.
18     Do you have the "Applied Statistics
19 for Public Policy" textbook before you?
20     Right under your forearm.
21 I'm sorry, Exhibit 105.
22     A.  Okay.
23     Q.  We were discussing before
24 Figure 3.1, correct?
25     A.  Yes.

## Page 275

1            Steven P, Feinstein, Ph.D
2     MR. MARKOVITS: 13.1.
3     MR. FRANK: 13.1.  Thank you,
4 Mr. Markovits.
5 BY MR. FRANK:
6     Q.  Just so the record's clear, we're
7 looking at Exhibit 106, which is the
8 "Applied Statistics for Public Policy"
9 textbook excerpt.
10     Do you see that?
11     A.  I do.
12     Q.  And on first page of the text --
13 it's excerpted -- which is Page 322 of the
14 textbook, we see Figure 13.1, correct?
15     A.  Yes.
16     Q.  And that has a formula that is under
17 the section heading entitled "The Pooled
18 Standard Error of a Proportion."
19     Do you see that?
20     A.  Yes.
21     Q.  And is it your understanding that
22 that formula is the pooled standard error
23 of a proportion?
24     A.  Because the authors define it as
25 such, yes.

## Page 276

1            Steven P, Feinstein, Ph.D
2     Q.  And that is a formula that you used
3 for purposes of your FDT z-test in this
4 case, correct?
5     A.  Yes.
6     Q.  And is it fair to say that you do
7 not know whether or not FDT used that
8 formula in connection with their z-test
9 that appears in their law review article?
10     A.  (Witness reviews document.)
11     Well, they don't say one way or the
12 other.  They do say that they calculate a P
13 value based on the -- to determine whether
14 there's a statistically significant
15 difference between the incidence rates.
16     They do say in Footnote 158 that
17 they allow -- the test examines whether the
18 means of the two samples with potentially
19 different variances are the same.  So that
20 may be relevant to our discussion.  I
21 determined that it was not necessary to run
22 the test under the assumption or under a
23 null hypothesis that would allow the two
24 variances to be the same.
25     My analysis is that if it's

## Page 277

1            Steven P, Feinstein, Ph.D
2 stipulated that the variances are
3 different, then that's akin to accepting
4 the assumption that the price dynamics of
5 the news sample is different from the price
6 dynamics of the non-news sample.
7     So, I think 158 might be a relevant
8 factor in deciphering whether they use a
9 different Z-statistic than what's in
10 Exhibit 106.
11     But if they do, and I ran my test
12 differently, I still maintain my way is
13 correct, given what we're trying to test.
14     Q.  To the extent that Footnote 158
15 suggests that the two samples should not be
16 run using the pooled approach that you
17 used, you disagree with FDT, the authors of
18 the article; is that fair to say?
19     A.  Well, we haven't established that
20 they did use a different statistic.  But if
21 they maintain that you must use a different
22 statistic, I would disagree.
23     Because that stipulated point would
24 prove what the entire test was designed to
25 examine, which is the news days have

Page 278

Steven P, Feinstein, Ph.D

1
2  different price dynamics than non-news
3  days, which indicates that news and
4  information matter, which is the essence of
5  informational efficiency.
6      Q.  You believed that you had no choice
7  but to calculate your Z-statistic in the
8  manner you did?
9      A.  No, I never said that.
10     Q.  Did you have a choice?
11     A.  Oh, I could have done it a different
12  way, but I just didn't think a different
13  way was appropriate.
14     Q.  Well, when you say "appropriate," do
15  you mean incorrect, or is this a choice
16  among two acceptable approaches?
17     A.  I think the -- well, I mean, both
18  may be acceptable to some degree.  But I
19  think what's more acceptable is the
20  stronger test, which would be the way I ran
21  it, not making an adjustment for
22  potentially different variances in the two
23  samples.  Because under the maintained null
24  hypothesis, the dynamics are the same.
25     Q.  Is it possible to replicate FDT's

Page 279

Steven P, Feinstein, Ph.D

1
2  analysis that's set forth on Page 121 of
3  the FDT article?
4      A.  Yes.
5      Q.  Have you ever done it?
6      A.  No.
7      Q.  If you did it, would that reveal
8  whether or not FDT used the same formula
9  that you used?
10     A.  Possibly.  I'm not sure.  Until I
11  try it, I wouldn't know for sure.
12     Q.  Are you aware of whether or not
13  using a pooled calculation versus an
14  alternative calculation that takes into
15  account different variances affects your
16  results?
17     A.  Well, I'm sure one test is stronger
18  than the other.  So it could be -- it might
19  reveal weakness in an alternative approach.
20         But the test I ran was strong enough
21  for the purposes that it was applied to.
22     Q.  You're not aware of how taking into
23  account the potentially different variances
24  that FDT identified in     Footnote 158
25  would affect your results?

Page 280

Steven P, Feinstein, Ph.D

1
2      A.  No.  As I explained, I don't think
3  it's appropriate, given that null
4  hypothesis, to modify the test to account
5  for potentially different variances.
6         The null hypothesis is that the
7  price dynamics are the same between the two
8  samples.
9      Q.  Are you familiar with the concept of
10  a continuity correction?
11     A.  I've seen -- I've seen a lot --
12  again, it's not something I can elaborate
13  upon as I sit here now, but I've
14  encountered it and studied it.
15     Q.  Well, can you explain to me what it
16  is?
17         What's a continuity correction?
18     A.  No, not as I sit here now.  It's not
19  something I came prepared to do today.
20     Q.  Is it your opinion that you can
21  calculate damages in this case?
22     A.  Yes.
23     Q.  It's your view that the alleged
24  misrepresentations in this case impacted
25  the price of Freddie Mac's stock?

Page 281

Steven P, Feinstein, Ph.D

1
2      A.  No, that's not my view.  No.
3         I haven't done a loss causation
4  analysis yet or a damages analysis.  So I
5  haven't arrived at that -- an opinion on
6  that topic one way or the other.
7      Q.  Well, how can you calculate damages
8  if the alleged misrepresentations in this
9  case didn't impact the price of Freddie
10  Mac's stock?
11     A.  Well, the methodology would show
12  that there are no damages.
13         I mean, a calculation of damages
14  might turn up a value of damages being
15  zero.  I just don't know yet, since I
16  haven't done the calculations yet.
17     Q.  What is your understanding of the
18  allegations in this case?
19     A.  We actually went through that
20  earlier today.
21         The allegations are that the
22  company, Freddie Mac, concealed from the
23  public information about its exposure to
24  nontraditional high-risk -- higher-risk
25  loans and mortgages; concealed from the

Page 282

1       Steven P, Feinstein, Ph.D
2   public its -- the level of its competence
3   in and system's ability to detect fraud and
4   analyze loans; concealed from the public
5   that it had deviated from adhering to
6   stated underwriting standards for the loans
7   that it was acquiring and investing in; and
8   concealing information about its capital
9   adequacy.
10      Q.  Now, when -- now you used the word
11  "concealed" repeatedly in your answer.
12          Is it your understanding that
13  plaintiff's claims in this case are based
14  solely on omissions, or that there are both
15  affirmative misrepresentations and
16  omissions, or just misrepresentations?
17      A.  Both.  Omissions and
18  misrepresentations.  That some of what they
19  said made other things they said
20  misleading.
21      Q.  Is it your view that the alleged
22  misrepresentations and omissions are
23  limited to the topics covered by Freddie
24  Mac's disclosures on November 20, 2007?
25      A.  No.  I mean, my view?  Or is it my

Page 283

1       Steven P, Feinstein, Ph.D
2   understanding of the allegation?
3       Q.  Your understanding?
4       A.  My understanding of the allegation
5   is that they're not limited to the contents
6   of the explicit disclosures made, the
7   announcements made; that the market -- some
8   disclosure took the form of
9   materialization of the risk on that day.
10      Q.  Have you ever heard the expression
11  "caution loans"?
12      A.  "Caution loans"?  No, I -- I'm not
13  familiar with the term.
14      Q.  Have you ever heard -- are you
15  familiar with the term C-1 or C-2 or EA
16  loans?
17      A.  Yes.  That, I saw in the documents.
18      Q.  What is your understanding of what
19  C-1, C-2 or EA loans are?
20      A.  Well, there's -- the company had a
21  rating system for riskiness of loans, and
22  C-1 and C-2 were at the lower end of the
23  credit ratings.
24      Q.  And is it your understanding of this
25  case that Freddie Mac -- strike that.

Page 284

1       Steven P, Feinstein, Ph.D
2          Is it your understanding of
3   plaintiff's allegations in this case that
4   Freddie Mac should have disclosed the
5   amount of its C-1 and C-2 loans at an
6   earlier date?
7       A.  I don't have an opinion about that.
8   I don't -- I haven't formed an opinion
9   about what Freddie Mac should have done.
10         I formed opinions about its stock
11  trading in an efficient market and a damage
12  expert's ability to calculate damages in a
13  methodology -- using a methodology common
14  for all class members, not what Freddie
15  should have done or shouldn't have done
16  from either a legal or ethical point of
17  view.
18      Q.  Are you aware that Freddie Mac
19  disclosed the credit characteristics of the
20  loans in its guaranteed portfolio?
21          MR. MARKOVITS:  Objection.
22  Misstates the record.
23      A.  I'm aware that that's an area of
24  some dispute between the parties.
25          I don't have an opinion one way or

Page 285

1       Steven P, Feinstein, Ph.D
2   the other at this point.
3   BY MR. FRANK:
4       Q.  Are you aware that Freddie Mac
5   disclosed the FICO scores of loans in its
6   guaranteed portfolio?
7       A.  Same answer.
8       Q.  Which was?
9       A.  That I'm aware that that's an area
10  of some dispute; whether there was full,
11  honest, forthcoming, disclosure or not.
12          I don't think anyone's relying on me
13  to be a fact witness.  I haven't done an
14  independent investigation of the facts of
15  those allegations to determine for myself
16  whether the allegations are true or not.
17          If I were to calculate damages, I
18  would be doing it on the basis of an
19  assumption that the allegations and
20  liability were there.
21      Q.  Is it your understanding that
22  November 20, 2007 represents a date on
23  which certain risks materialized?
24      A.  Well, again, I want to be careful
25  with the language.

Page 286

Steven P, Feinstein, Ph.D

1            Steven P, Feinstein, Ph.D
2     I think the risks may have
3  materialized somewhat before then. But the
4  repercussions of the risks materializing
5  were disclosed, or announced, presented to
6  the marketplace that day.
7     Q.  Is it possible that some of the
8  risks that were disclosed that day --
9  strike that.
10     Is it possible that the materialized
11  risks that were disclosed that day had been
12  disclosed at earlier points in time?
13     Let me make that a little cleaner.
14     You understand that one of the
15  allegations in this case is that Freddie
16  Mac didn't adequately disclose certain
17  risks; is that fair?
18     A.  Yes, and certain facts.
19     Q.  You understand that on     November
20  20th, Freddie Mac disclosed that certain
21  risks had materialized; is that correct?
22     A.  I understand that's the allegation.
23  And my reading of the news from that day
24  supports that.
25     Q.  Is it possible that Freddie Mac's

Page 287

1            Steven P, Feinstein, Ph.D
2  losses that were disclosed on
3  November 20, 2007 were the result of both
4  the materializations of risks that were
5  disclosed and the materializations of risks
6  that were not disclosed?
7     MR. MARKOVITS:  Objection.
8  Calls for speculation.
9     A.  Yes, I don't think the record's been
10  fully developed enough to know -- for me,
11  for my perspective, to know one way or the
12  other.
13     I'm not the trier of fact in this
14  case, but -- so I would say that from where
15  I sit, anything's possible, and I would
16  take all that into account if I were asked
17  to calculate damages.
18  BY MR. FRANK:
19     Q.  And how would your damages model
20  disaggregate amounts associated with risks
21  that were disclosed and amounts associated
22  with risks that were not disclosed?
23     A.  Well, there are tools for that.
24  The -- if they were previously -- if the
25  risks were previously disclosed, the price

Page 288

1            Steven P, Feinstein, Ph.D
2  would have already -- the price of those
3  disclosures would have already been felt,
4  would have already been impounded in the
5  price.
6     And some assessment would have to be
7  made as to what factors that were
8  undisclosed to losses that were
9  sustained and reported.
10     This is the kind of valuation work
11  that analysts do all the time.
12     Q.  When you said earlier there are
13  tools, what are the tools that you're
14  referring to?
15     A.  Valuation tools, valuation models,
16  informed by the literature on various types
17  of information and disclosures and
18  nondisclosures and also informed, to some
19  extent, by the empirics of the stock price
20  movement when the event occurred on
21  November 20th.
22     I mean, analysts, investors value
23  stocks all the time under a variety of
24  scenarios, actual scenarios and
25  hypothetical scenarios, and report those

Page 289

1            Steven P, Feinstein, Ph.D
2  findings.
3     I would do the same thing with the
4  added advantage of I get to see what
5  happened when this information became
6  available to the market -- perhaps, in
7  concert with other information and other
8  developments, perhaps -- on November 20th.
9     Q.  So we discussed over the course of
10  the day various tests that you used or
11  could have used to assess market
12  efficiency, correct?
13     A.  Right.
14     Q.  These tests have names, such as a
15  z-test or a Ansari-Bradley test or an
16  F-test?
17     A.  Right.
18     Q.  Or a Z -- we said z-test already.
19  They have names, correct?
20     A.  Right.
21     Q.  What are the names of the valuation
22  tools or the valuation models that you
23  would use in this case?
24     A.  Well, I would use the event study.
25  I would observe to see what the stock price

Page 290

Steven P, Feinstein, Ph.D

1              Steven P, Feinstein, Ph.D
2 behavior was when the information became
3 available to the marketplace. I would
4 disaggregate that information into pieces,
5 and I -- and in looking at the models that
6 analysts use, I can evaluate how these
7 different pieces of information would
8 affect their valuation models and would,
9 therefore, affect the stock price
10 reasonably.
11        I mean, they use the -- they use
12 discounted cash flow models. They use
13 valuation multiple models. The literature
14 talks about liquidity effects. The
15 literature talks about reputation effects.
16        I would include all of these factors
17 to determine what would the stock price
18 have been had the full disclosure occurred
19 earlier and what impact unexpected events
20 related to previously disclosed risks might
21 have also had on the stock price.
22        I mean, I would do a careful
23 analysis of what the market was expecting
24 versus what they observed, and what risks
25 they knew about and what risks they didn't

Page 291

1              Steven P, Feinstein, Ph.D
2 know about.
3        It's a valuation analysis. It's
4 done every day for every stock that's
5 traded by a large number of analysts.
6    Q. So I understand you would use your
7 event study, correct?
8    A. Yes.
9    Q. And when you say you would use your
10 event study, you're referring to the
11 single-event event study that assessed
12 November 20th, 2007; is that right?
13    A. Right, because that event study
14 quantifies how much the stock fell after
15 controlling for market and peer group
16 effects. So that would be useful.
17    Q. You wouldn't use the study that
18 underlies your z-test; is that correct?
19    A. As I sit here now, I don't see how I
20 would. I don't want to foreclose the
21 possibility that there may be some useful
22 information there.
23        But it's -- the most useful
24 information empirically would be the
25 residual return from November 20th, which

Page 292

1              Steven P, Feinstein, Ph.D
2 comes out of the November 20th event study.
3    Q. I think you said you would use a
4 discounted cash flow model; is that
5 correct?
6    A. I could. I mean, until I get into
7 it -- I mean, I would use all models that
8 are available, all models that are in the
9 literature, whatever -- you know, after the
10 record is fully developed and we can see
11 what the parties agree or the trier of fact
12 has determined or what I'm instructed to
13 assume about the facts, I would know better
14 which valuation models were most
15 appropriate.
16        But at my disposal is discounted
17 cash flow, valuation multiple models, event
18 studies run by other -- by academics that
19 are reported in the literature that show
20 what is the valuation impact of reputation
21 effects on liquidity shocks. Those kind of
22 things would all be relevant and at my
23 disposal, if I were the damage expert.
24    Q. Now, it seems like in terms of
25 damages, the models don't have as

Page 293

1              Steven P, Feinstein, Ph.D
2 interesting names.
3        Are there any names to these models
4 so that I could -- so that I know what
5 specific models that you're going to use?
6    A. Discounted cash flow. I mean, I
7 don't know if I would specifically use the
8 discounted cash flow model, but it's
9 available to me to use.
10        Part of it has to do -- part of the
11 determination as to which models to use
12 would be an evaluation of what models
13 analysts used when they wrote their
14 reports.
15        My recollection is some used
16 valuation multiples models, price earnings,
17 cash flow, price to cash flow. Some of the
18 parts models are often used.
19        MR. MARKOVITS: That's a good
20 name, Jason.
21    A. So these are all at my disposal.
22 BY MR. FRANK:
23    Q. But to date, you haven't decided how
24 you would calculate damages; is that fair
25 to say?

Page 294

Steven P, Feinstein, Ph.D

1  Steven P, Feinstein, Ph.D
2  A.  Well, I've assessed the facts enough
3  to know that it's possible, that there's
4  nothing so unusual about this case that it
5  would be impossible to calculate the value
6  of Freddie Mac's stock in the but-for world
7  with perfect and correct -- what plaintiffs
8  consider correct disclosure.
9  But the specifics of exactly which
10  model I would use, I have not yet
11  determined.
12  I just know that I would have at my
13  disposal all valuation models that other
14  analysts have used to value Freddie Mac and
15  other companies.
16  But I -- but it's really important
17  to note, I have more than they do.  I mean,
18  not only can I use all the models that
19  other analysts valuing Freddie Mac used, I
20  also have the event study and I also have
21  the literature on reputational liquidity
22  effects.
23  Q.  Let me turn your attention to
24  Paragraph 152, Section 3 of your report.
25  Here you say, in Section 3 -- I'm

Page 295

1  Steven P, Feinstein, Ph.D
2  sorry.  If you look at the fourth line --
3  well, we'll start at the end of the third
4  line.
5  You say "That is, for each class
6  member" --
7  A.  I'm sorry, where are we?
8  MR. MARKOVITS:  Page 43, small
9  3?
10  MR. FRANK:  Yes, 43, Roman
11  numeral III.
12  THE WITNESS:  Okay.
13  BY MR. FRANK:
14  Q.  The third line down, you write,
15  "That is, for each class member, per share
16  damages would be calculated as the
17  difference between the inflation on the
18  date the shares were purchased and the
19  inflation on the date those same shares
20  were subsequently sold, excluding any
21  inflation dissipation caused by factors
22  other than corrective disclosure."
23  Do you see that?
24  A.  Yes.
25  Q.  How would per share damages change

Page 296

1  Steven P, Feinstein, Ph.D
2  if there was a proportion of undisclosed
3  risk?
4  A.  What do you mean?
5  The allegation is that there was a
6  proportion of undisclosed risk.
7  Q.  Well, does your proposed damages
8  model differentiate between risks that were
9  disclosed and risks that were allegedly
10  undisclosed?
11  A.  Yes.
12  Q.  How so?
13  A.  It would assign damages that stem
14  from the losses from the actionable --
15  actionable misrepresentations and omissions
16  that concealed risks.
17  Q.  As between the proportion of
18  undisclosed risk and disclosed risk, how
19  would per share damages change if the
20  proportion of undisclosed risk was
21  increased?
22  A.  Damages would go up.
23  Q.  And how --
24  A.  I mean, if, in fact, it's determine
25  that those undisclosed risks should have

Page 297

1  Steven P, Feinstein, Ph.D
2  been disclosed.
3  Q.  And how exactly would you exclude
4  any inflation dissipation caused by factors
5  other than the corrective disclosure?
6  A.  Well, the inflation isn't dissipated
7  by -- there's no inflation caused -- almost
8  by definition, there's no artificial
9  inflation caused by factors that aren't
10  fraud related.
11  So I would have to focus on the
12  fraud-related factors that were causing
13  inflation and the fraud-related artificial
14  inflation that dissipated upon the
15  disclosure.
16  Q.  When you say "the inflation
17  dissipation caused by factors other than
18  corrective disclosure," what do you mean?
19  A.  That's -- you know, that's
20  hearkening back to the Dura decision.
21  Dura, D-u-r-a.
22  Even if there was artificial
23  inflation caused by actionable
24  misrepresentations and omissions, if that
25  artificial inflation dissipates for some

Page 298

Steven P, Feinstein, Ph.D

1           Steven P, Feinstein, Ph.D
2 reason that's not a corrective disclosure,
3 it's not recoverable is what Dura
4 instructs.
5       So I would have to see, for example,
6 I mean, I haven't decided yet, but if it's
7 a percentage ribbon, for example, a
8 percentage inflation ribbon, and the
9 inflation dissipates, not because there's a
10 corrective disclosure but rather because
11 the stock price fell for other reasons,
12 that reduction of inflation -- of
13 artificial inflation is not recoverable.
14 It would be excluded from the calculation
15 of damages.
16     Q.  And how would you be able to
17 determine how much inflation to exclude?
18     A.  Well, in that example I just gave,
19 if there's no corrective disclosure, all of
20 the inflation dissipation that occurred
21 that day as a result of the stock price
22 falling for unrelated reasons should be
23 excluded; all of it.  If it's -- if there's
24 no corrective disclosure that day.
25     Q.  If -- but if the stock price falls,

Page 299

1           Steven P, Feinstein, Ph.D
2 does the inflation ribbon band stay the
3 same as a general matter?
4     A.  If it's a percentage ribbon, no.
5 The inflation ribbon would -- the inflation
6 would decrease.  But that decrease
7 pre-Dura, we would call it, that would have
8 been considered damages, but post-Dura,
9 that's not, that has to be excluded from
10 damages.
11     Q.  And have you excluded inflation
12 dissipation in other cases?
13     A.  Oh, yes.
14     Q.  Now, in Paragraph 152, Section 1,
15 you state that "First valuation tools,
16 which would include event study analysis
17 such as that described herein, and
18 potentially other empirical analysis, if
19 necessary, would be used to establish that
20 the disclosures correcting the alleged
21 misrepresentations and omissions caused the
22 price of Freddie Mac common stock to fall."
23     A.  Yes.
24     Q.  Is it fair to say that you have not
25 actually created a damages model for this

Page 300

1           Steven P, Feinstein, Ph.D
2 case other than to describe your approach
3 to damages at a broad level?
4     A.  No, I don't think that's fair to
5 say.
6       I think the damage model that I
7 explain here -- I haven't created it.  I
8 mean, it's fair to say that I didn't create
9 the damage model.
10       The damage is the damage model
11 that's usually used by experts, myself
12 included, and other experts in 10b-5 cases
13 and has been accepted by courts.
14       The damage model is to -- is an
15 out-of-pocket model.  I didn't invent it,
16 but it's what's been determined as
17 applicable to a 10b-5 case.
18       It's a calculation of inflation, and
19 the change of inflation over the investors'
20 holding period is the basis of the damages,
21 with exclusions made for dissipation that's
22 not fraud related.
23       So that's the model.  It's not --
24 that's not just a -- that is the model.
25       I mean, I haven't actually executed

Page 301

1           Steven P, Feinstein, Ph.D
2 the model.  I haven't calculated inflation
3 yet.  But I -- but I did -- I did do an
4 examination to determine that I could.
5     Q.  To be clear, you've not performed a
6 damages analysis for this case beyond what
7 you state in your report, correct?
8     A.  That's right.
9     Q.  And do you know if you would make
10 any changes to the event study model in
11 connection with calculating damages?
12     A.  I don't think I would.  But I'll
13 certainly take into account what your
14 experts propose.  If they think there's
15 some other type of regression that's
16 superior to one that I wrote and ran, I
17 would consider that.  And so that it might
18 call for a change.
19       I don't think that's the case.  As I
20 sit here now, I think I did it right, and I
21 can't imagine a better way.
22       But if I'm proved wrong and
23 convinced that there's a better way, I
24 would certainly adapt.
25     Q.  In Paragraph 155, you state that

76 (Pages 298 to 301)

Page 302

Steven P, Feinstein, Ph.D

1
2  your damages -- your "damages methodology
3  will take into account all relevant
4  valuation factors and do so correctly."
5      Do you see that?
6      A.  Yes.
7      Q.  What are the relevant valuation
8  factors?
9      A.  Well, I don't know yet.  For sure, I
10  mean, these are -- I wrote that sentence in
11  response, in a previous case, you know, to
12  someone who suggested that I would make --
13  that I would necessarily perform
14  valuation -- commit valuation errors.
15      For the record, I don't think I
16  will.  I will try to do it correctly and
17  consistent with valuation methodologies
18  that are generally accepted and widely
19  used.
20      But, for example if there's some --
21  if some factor is -- if I become aware of a
22  factor, through my research into the
23  history and experience of this company,
24  either my own research or something I read
25  in the -- as this case develops, that

Page 303

Steven P, Feinstein, Ph.D

1
2  impacts the valuation -- that impacts the
3  correct valuation of the stock in the
4  but-for world, I would take it into
5  account.
6      Q.  Well, what specific steps are
7  involved in taking into account valuation
8  factors correctly?
9      A.  Well, what the steps are, the goal
10  is to calculate an inflation ribbon.  And
11  the inflation ribbon is -- well, the
12  inflation at any point in time is the
13  difference between the observed stock price
14  for Freddie Mac and what the stock price
15  would have been had there been full
16  disclosure, full and complete and correct
17  disclosure, on that same day.
18      So, I mean, the allegation is that
19  had there been full and correct disclosure,
20  the price would have been lower.
21      I'll study and analyze to see if
22  that's the case.
23      And in studying and analyzing to see
24  if that's the case, I'll take into account
25  all the things that may have affected the

Page 304

Steven P, Feinstein, Ph.D

1
2  stock price on that day had there been full
3  and complete disclosure.
4      Q.  Now, in addition, you say, "If
5  varying investment risk is an issue, the
6  full set of generally accepted and widely
7  used valuation tools will measure the
8  valuation impact of risk, just as investors
9  and analysts routinely take this factor in
10  account in real-time."
11      Do you see that?
12      A.  Yes.
13      Q.  What issues arise with varying
14  investment risk in term of your efforts to
15  calculate damages?
16      A.  Well, it's possible that the
17  valuation impact of a piece of information
18  is either greater or less earlier in the
19  class period than it was at the end of the
20  class period.  I would take that into
21  account.
22      If the -- if the disclosure of risk
23  would have a very -- let's say a very small
24  impact late in the class period but a very
25  large impact on the stock price early in

Page 305

Steven P, Feinstein, Ph.D

1
2  the class period, I would take that into
3  account.
4      I wouldn't just necessarily assume
5  that the change in price when the risk
6  became known to the marketplace necessarily
7  applies to all earlier dates in the class
8  period.
9      Q.  Well, how specifically do investors
10  and analysts routinely take risk into
11  account in real-time?
12      A.  Well, that's how they value stocks.
13  I mean, if it's a discounted cash flow
14  model, the numerator is projected future
15  cash flows, the denominator is a discount
16  rate, which has -- and discount rate is
17  typically higher for riskier stocks.  If
18  there's greater risk, discounting will be
19  at a higher rate to produce lower security
20  price.
21      Another way that risk is taken into
22  account is expected future cash flows.  If
23  there's scenarios that the market is aware
24  of in which substantial losses could be
25  realized, the numerator or the expected

77 (Pages 302 to 305)

Page 306

Steven P, Feinstein, Ph.D

1     cash flow would reflect that by probability
2     weighting potential scenarios that are
3     associated with different cash flows.
4           So that's two ways that it's taken
5     into account.
6           There may be others, but at least
7     those two address your question.
8     Q.   Let me give you a hypothetical.
9           An energy company tells investors
10    that it is certain to receive regulatory
11    approval from the Environmental Protection
12    Agency to build a major oil pipeline when,
13    in fact, the company knew that the EPA was
14    not going to approve the project.
15          Assume that when the EPA announces
16    its refusal to approve the project the
17    stock price declines by $10.
18          Dr. Feinstein's engaged --
19    A.   Can I just interrupt?
20    Q.   Yes.
21    A.   Can I --
22    Q.   I'm just getting to the juicy part.
23    A.   Well, I just want to make sure that
24    I understand the nonjuicy part.

Page 307

Steven P, Feinstein, Ph.D

1           So the company knew that it would
2     not be approved?  Is that what you said?
3     Q.   Yes.
4     A.   But they told the public it would be
5     approved?
6     Q.   Yes.
7     A.   And then -- and so the market
8     expected it to be approved, the company
9     knew it would not be approved, so that's
10    why the stock price is inflated.  And then
11    when it's not approved, the stock price
12    falls, and there's no disagreement among
13    any participants about the value of that --
14    was it an oil refinery or a power plant?
15    Q.   Major oil pipeline.
16    A.   Pipeline.  So there's no
17    disagreement about what the value of this
18    pipeline is worth.  It's not like the EPA
19    said, you can never build a pipeline, which
20    would have a bigger effect than if they
21    said, you can't build this specific
22    pipeline in a small geography.
23    Q.   Well, without adding those facts to
24    the hypothetical --

Page 308

Steven P, Feinstein, Ph.D

1     A.   Okay.
2     Q.   -- I will just say that when the
3     news comes out that the EPA is refusing to
4     approve the project, the stock price
5     declines by $10.
6     A.   Okay.
7     Q.   A gentleman named Dr. Feinstein is
8     engaged by a shareholder.  He determines
9     that the market is efficient, and the stock
10    price fell $10 as a result of a concealment
11    that the EPA would be declining approval.
12          What was the amount of the stock
13    price inflation on the date of the
14    misrepresentation?
15    A.   So that's why we need to clarify
16    the -- in order to answer the question, I
17    need more information.
18    Q.   What information do you need?
19    A.   Possibly more analysis, but even
20    more information.
21          So there is no disagreement among
22    any parties -- this is what I asked
23    before -- there's no disagreement among any
24    parties as to what the value of that

Page 309

Steven P, Feinstein, Ph.D

1     pipeline was?
2     Q.   Assume that's the case.
3     A.   And there's no disagreement about
4     the implications of this refusal for any
5     future regulatory actions whatsoever.
6           So there's absolutely no
7     distribution among economic ramifications
8     of the decision.  The only moving part is
9     the market's understanding of the
10    probability.
11          So, like, in the real world, for any
12    decision, two things are moving:  the
13    probability is being adjusted and updated
14    with new information, but also so is the
15    economic ramifications of various outcomes
16    and scenarios.
17          But in your hypothetical, your
18    unrealistic hypothetical, there's no --
19    there's no disagreement about the economic
20    value of the EPA's decision.
21          Okay.
22    Q.   Fair enough.
23    A.   All right.  And so, since there's no
24    disagreement about the economic value of

Page 310

Steven P, Feinstein, Ph.D

1    the decision, the company knew that its
2    stock price should have been $10 less all
3    along.
4        And if -- and if -- and as the
5    forensic analyst, I would likely -- I mean,
6    probably with more time, I would think
7    about it a lot longer than this -- but as a
8    forensic analyst, I would estimate what
9    would other people have forecasted or
10   estimated the price to be, what would they
11   have assigned as a price?  And it seems
12   reasonable from your hypothetical that it
13   would have been $10.
14       So the inflation would be $10.
15   Q.  And let's change the hypothetical
16   slightly.
17   A.  Okay.
18   Q.  We'll agree with all the caveats
19   that you just shared with me.  All else
20   being equal, we're only going to change the
21   following facts:
22       When the company tells investors
23   that it is certain to receive regulatory
24   approval from the EPA, in fact, the

Page 311

Steven P, Feinstein, Ph.D

1    probability of approval was only 90 percent
2    and the company knew it.  It concealed the
3    10 percent risk that the EPA would deny
4    approval.
5        Assume that risk materialized and
6    the stock price declined by $10, just like
7    we discussed earlier.
8        In that case, what is the -- all
9    else being equal, what was the inflation of
10   the stock price at the time that the
11   misrepresentation was made?
12   A.  Well, again, it's -- I want to point
13   out why the hypothetical is highly
14   unrealistic.  It's because in the real
15   world, there is a range of -- there's a
16   distribution and a range of potential
17   economic repercussions or implications of
18   the decision.
19       There's reputation effects that have
20   to be considered that, you know, the --
21   well, actually -- that's why it takes
22   more -- it's more analysis than I can do
23   just sitting here right on the spot.
24       It would have to take into account

Page 312

Steven P, Feinstein, Ph.D

1    reputation effects.  It would have to take
2    into account that the EPA's decision --
3    well, we would have to take into account
4    why the EPA decided that and whether the
5    reason for EPA's rationale for rejecting
6    the pipeline applies to other projects at
7    the company, future projects of the
8    company, the company's viability, the
9    company's ability to operate as an oil
10   pipeline company going forward.
11       So it's more complicated in the real
12   world.
13       But in the hypothetical, in the
14   extremely unrealistic hypothetical, if, in
15   fact, there's absolute 100 percent
16   agreement, not only among all parties
17   involved but all -- that all parties know
18   with certainty, which they generally don't
19   in the real world, but if they knew in this
20   hypothetical what the stock price -- what
21   the valuation implication of the EPA's
22   decision was, then the inflation would be
23   less than the full $10 in that example.
24   Q.  And in the --

Page 313

Steven P, Feinstein, Ph.D

1    A.  But the real world is more
2    complicated because you have two
3    distributions.  You have uncertainty about
4    the probabilities.  You also have
5    uncertainty about the nature of the
6    economic implications of the EPA's
7    decision.
8        When people see the stock price fall
9    $10, it may actually be the case that the
10   prior inflation was greater than $10
11   because maybe the EPA said, your pipeline
12   is being rejected, but this has no bearing
13   on your future business and we may very
14   well revisit your case in six months after
15   you do some clean-up operations, in which
16   case the price dropped less than what the
17   inflation would have been prior to that
18   disclosure.
19       Those are the kind of things that
20   have to be analyzed in the real-world
21   example that don't fit neatly into the
22   hypothetical.
23   Q.  In my second hypothetical, the
24   company concealed a 10 percent chance of a

Page 314

Steven P, Feinstein, Ph.D

1    $10 loss, correct?
2        A.   But we're assuming in that second
3    hypothetical that everyone knew it had to
4    be a $10 loss.  It couldn't be more.  It
5    couldn't be less.
6        And the in the real world, when you
7    observe the $10 loss, you have to take into
8    account that the loss might have   been
9    20, it might have been 50, it might have
10   been a $100 loss.  So $10 might, actually,
11   be relatively good news.
12       Q.   Let me be clear, if I wasn't before.
13   I'm asking you a hypothetical.
14       A.   Right.
15       Q.   I'm not asking you about the real
16   world.
17       A.   I understand that you're not asking
18   me about the real world.
19       Q.   So let's -- let's just be clear, so
20   we have no confusion, that we'll be clear
21   when we're talking about the real world and
22   we'll be clear when we're talking about
23   hypotheticals.
24       A.   Okay.

Page 315

Steven P, Feinstein, Ph.D

1        Q.   So in my hypothetical, there's only
2    a 10 percent chance of a $10 loss, correct?
3        A.   Right.
4        Q.   And it wouldn't be fair to calculate
5    the inflation amount associated with the
6    misrepresentation as a $10 inflation,
7    correct?
8        A.   Right, but -- yes, because everyone
9    knows that the maximum possible extent of
10   the loss was $10 and it could not
11   conceivably been higher.
12       If that $10 turns out to be on the
13   smaller side of the range of possible
14   losses, then the inflation earlier might
15   have been greater than $10, even if the
16   probability wasn't 0/100, but 90/100.
17       Q.   Now, how does your proposed damages
18   model take into account the differences
19   between my first hypothetical where the
20   entire loss is -- the entire risk of loss
21   is concealed, and my second hypothetical
22   where only a portion of the risk of loss is
23   concealed?
24       A.   From investigation and analysis of

Page 316

Steven P, Feinstein, Ph.D

1    what caused the loss.
2        How much was foreseeable given what
3    was known and what was -- and how much
4    would have been foreseeable given what was
5    concealed?  That's the kind of analysis
6    that investors and analysts do all the
7    time.
8        Q.   Well, you understand that this is a
9    case that involves a loss that was
10   disclosed on November 20 of 2007, correct?
11       A.   Right.
12       Q.   And you understand that you may be
13   faced with a prospect, if you're going to
14   calculate damages, with, disaggregating the
15   amount of the loss that was associated with
16   risks that were disclosed and the amount of
17   the loss that's associated with risks that
18   were allegedly not disclosed, correct?
19       A.   For sure.  I never said it would be
20   easy, but I don't believe it's impossible.
21       Q.   So I'm just trying to understand how
22   you would do it.
23       A.   By investigating what caused the
24   actual loss and whether the factors that

Page 317

Steven P, Feinstein, Ph.D

1    caused the actual loss were risks that were
2    previously disclosed or risks that were
3    undisclosed.
4        Q.   And how will you -- so how will you
5    calculate those differences?
6        A.   Again, I mean, just as a preamble,
7    let me say that there's widely used
8    generally accepted methodology for doing
9    exactly that.
10       If you look at analyst reports, they
11   often provide a table of potential
12   scenarios based on the range of possible
13   outcomes given risks as they understand
14   them to be.
15       And since they're able to construct
16   that table, they're also able -- I would be
17   able to use their methodologies and
18   construct a table that's different on
19   account of a different set of risks that
20   may have been -- that -- in the but-for
21   world would have been disclosed.
22       So if other analysts are able to
23   produce a table of scenarios and outcomes
24   given known risks, I would -- I could use

Page 318

Steven P, Feinstein, Ph.D

1
2 the same tools, or another damage expert
3 can use the same tools to prepare an
4 alternative table and then compare the two.
5        But the way that's done is to look
6 at -- it's to get into the weeds and get
7 into the analysis of what caused the actual
8 loss and how much of that loss was caused
9 by known risks versus unknown risks.
10        Did the -- did the -- did defaults
11 and losses on Freddie Mac's retained
12 portfolio -- for example, can you estimate
13 that they were outside the norm of what
14 would have been reasonably expected, given
15 the nature of the risks that they had
16 previously disclosed?
17        That's the question that would have
18 to be investigated.
19    Q. What --
20    A. And based on the answer to that
21 question, you can differentiate between
22 losses that were caused by known risks
23 versus losses that were caused by concealed
24 risks.
25    Q. And what are the names of the

Page 319

Steven P, Feinstein, Ph.D

1
2 economic -- the econometric tools that
3 you'll use to disaggregate those two kinds
4 of losses?
5    A. Valuation analysis. This is
6 valuation analysis, news analysis,
7 information analysis, scenario analysis.
8    Q. I'm showing you a document that was
9 previously marked as Exhibit No. 28 in this
10 case.
11        Exhibit No. 28 is the company's
12 annual report for the year 2005, which is
13 dated June 28, 2006.
14        Have you ever seen Exhibit 28
15 before?
16    A. (Witness reviews document.)
17        Yes, I believe so.
18    Q. Did you review Exhibit 28 in
19 connection with preparing your report?
20    A. (Witness reviews document.)
21        No, this is 2005. Exhibit 28 is the
22 2005 annual report. I read the 2006 and
23 2007.
24    Q. So you didn't read the 2005 annual
25 report?

Page 320

Steven P, Feinstein, Ph.D

1
2    A. According to my Exhibit 1, that's
3 correct.
4    Q. Well, I draw your attention to
5 page -- to the first page of the
6 information statement that comes after the
7 colored pages, and on its face it says,
8 "Information Statement and Annual Report to
9 Stockholders."
10        So if you flip past the -- the pages
11 that are printed in color, you'll see the
12 first page.
13    A. Oh, okay.
14    Q. Are you there?
15    A. Yes.
16    Q. And you see at the bottom, it says
17 this information statement is dated
18 June 28, 2006, correct?
19    A. One moment.
20        (Witness reviews document.)
21        Okay.
22    Q. And you understand the class period
23 here begins August 1, 2006, correct?
24    A. Yes.
25    Q. So this is information that was

Page 321

Steven P, Feinstein, Ph.D

1
2 publicly available prior to the class
3 period, correct?
4    A. Yes.
5    Q. Now, let me turn your attention to
6 Page 65. Actually, I'll turn your
7 attention to Page 67.
8        Do you see on Page 67, there's a
9 table that's labeled "Characteristics of
10 Single-Family Total Mortgage Portfolio"?
11    A. Yes.
12    Q. Have you ever seen this table or a
13 table like this table before?
14    A. I have seen tables like this before.
15    Q. And you -- did you see Freddie Mac's
16 table describing the characteristics of its
17 single-family total mortgage portfolio in
18 its other information statements that you
19 did review?
20    A. I actually don't recall, as I sit
21 here now.
22    Q. Well, were you aware that prior to
23 and during the class period, Freddie Mac
24 was disclosing the data that we see listed
25 in Table 37 on Page 67 of Exhibit 28?

Page 322

Steven P, Feinstein, Ph.D
1
2    A.  Yes.
3    Q.  And you were aware that it was
4  showing its LTV for all of the mortgage
5  loans in its guaranteed portfolio, right?
6         MR. MARKOVITS:  Objection.
7  That's a matter in dispute.
8  BY MR. FRANK:
9    Q.  You can answer.
10    A.  I was going to say something along
11  those lines, that I know what they
12  purported to report.
13       I know -- I've seen printed pages
14  like this before, but I understand that
15  there's some dispute about how disclosive
16  and correct that was.
17    Q.  Do you see the section on credit
18  score?
19    A.  Yes.
20    Q.  Were you aware that Freddie Mac was
21  disclosing the loans in its portfolio and
22  in its guaranteed portfolio by credit
23  score?
24    A.  I can tell you --
25         MR. MARKOVITS:  Same

Page 323

Steven P, Feinstein, Ph.D
1
2  objection, but go ahead.
3    A.  I can tell you what I see here now.
4  I just don't recall data -- what data
5  similar to this I've seen for this case
6  throughout the class period.
7  BY MR. FRANK:
8    Q.  Now let me turn your attention back
9  to Page 65.
10       Do you see at the bottom of the
11  page, there's a paragraph that states,
12  "During 2005 and 2004, there was a rapid
13  proliferation of alternative product types
14  designed to address a variety of borrower
15  needs, including issues of affordability
16  and lack of income documentation."
17       Do you see that?
18    A.  I see that.
19    Q.  Do you see it says, "While each of
20  these products has been on the market for
21  some time, their prevalence increased in
22  2005 and 2004."
23       Do you see that?
24    A.  Yes.
25    Q.  And it says, "We expect each of

Page 324

Steven P, Feinstein, Ph.D
1
2  these products to default more often than
3  traditional products, and we consider this
4  when determining our guarantee fee."
5       Do you see that?
6    A.  I do see that.
7    Q.  And then it says, "Our purchase of
8  interest-only and option-arm mortgage
9  products increased in 2005, representing
10  approximately 11 percent of our total
11  mortgage portfolio purchases as compared to
12  2 percent in 2004, and we expect this trend
13  to continue in 2006."
14       Do you see that?
15    A.  I do.
16    Q.  Were you aware of those facts when
17  you drafted your report?
18         MR. MARKOVITS:  Objection;
19  characterization as facts.
20    A.  I was aware of those words.  I think
21  they were excerpted into one of your briefs
22  that's reported in my exhibits.
23  BY MR. FRANK:
24    Q.  And how, if at all, do you expect to
25  take disclosures like that into account in

Page 325

Steven P, Feinstein, Ph.D
1
2  connection with developing your damages
3  model?
4    A.  Well, that's why we need the -- at
5  this point, I need the full development of
6  the record to see what's adjudicated as
7  being supported allegations of concealment
8  and -- misrepresentations and omissions.
9       Once I understand what the
10  misrepresentations and omissions are to
11  be -- which omissions and
12  misrepresentations are to be assumed, I'll
13  be able to conduct that analysis.
14       I mean, my understanding is that
15  plaintiffs allege that there are statements
16  that made these statements misleading or --
17  or gave the marketplace a different
18  understanding of the company and that it
19  has to be taken into account.
20       Once I understand from the
21  development of the record what I'm to
22  assume the market was led to believe --
23  development of the record plus my research
24  what the market was led to believe, I can
25  compare it to what they could have been led

Page 326

Steven P, Feinstein, Ph.D

1 to believe had there been more full
2 disclosure.
3
4
5 (Exhibit No. 108
6 marked for identification.)
7
8 BY MR. FRANK:
9 Q. Let me turn your attention to a
10 document that's been marked as
11 Exhibit 108.
12 Exhibit 108 is Freddie Mac's press
13 release from November 20 of 2007, correct?
14 A. Yes.
15 Q. This is the press release where
16 Freddie Mac reported a third quarter 2007
17 net loss of 2 billion or $3.29 per diluted
18 share.
19 Do you see that?
20 A. Yes.
21 Q. Is it your understanding that this
22 press release corrected a prior
23 misrepresentation, according to the
24 plaintiff, relating to Freddie Mac's
25 exposure to subprime loans?

Page 327

Steven P, Feinstein, Ph.D

1
2 MR. MARKOVITS: Objection.
3 It's not within the scope of his opinions.
4 A. I understand that that's the
5 allegation. And my understanding is that
6 it corrected it in the sense that it
7 removed the inflation that had previously
8 been caused by misrepresentations and
9 omissions.
10 BY MR. FRANK:
11 Q. Do you have an understanding of the
12 meaning of the term "subprime loan"?
13 A. I have an understanding of it.
14 MR. MARKOVITS: Objection.
15 A. I also understand that it's a matter
16 of some dispute in this case, and it's been
17 suggested in this case that there's no
18 consensus meaning to the term.
19 Although -- so it's always meant
20 something to me.
21 BY MR. FRANK:
22 Q. What -- what has it always meant to
23 you?
24 A. These are loans that are more
25 credit -- that, for a variety of potential

Page 328

Steven P, Feinstein, Ph.D

1
2 reasons, riskier than conventional,
3 conforming, traditional, higher-quality
4 loans; higher credit quality loans.
5 Q. What does it mean for a loan to be a
6 conventional loan?
7 A. That there's -- that there's
8 adherence to conventional underwriting
9 standards, of documentation and scoring on
10 the variety of characteristics that are
11 used to score the credit worthiness of a
12 loan; that there's the documentation to
13 support the scoring and the underwriting;
14 and that there's conformity to the
15 standards, without exceptions, without
16 having to deviate in conforming exceptions,
17 that there's conformity to the generally
18 accepted standards for the loans is what's
19 meant by the prime conventional conforming
20 loans.
21 Subprime are loans that, for
22 whatever reason, either fall below those
23 standards or don't have the documentation
24 to support that scoring.
25 Q. What are conforming loans?

Page 329

Steven P, Feinstein, Ph.D

1
2 MR. MARKOVITS: Objection.
3 Jason, I have indicated before that
4 I would give you some leeway with regard to
5 time and you spend your time as you see
6 fit. But you're delving into areas now
7 that are not part of his opinion with
8 regard to market efficiency, nor are they
9 part of his opinion with regard to the
10 damages that can be calculated on a
11 class-wide basis.
12 Again, you spend your time as you
13 see fit, but you have a limited amount of
14 time today, and these questions have
15 nothing to do with the current opinions
16 he's been asked to provide.
17 BY MR. FRANK:
18 Q. You can answer.
19 A. Let me answer and then we'll take a
20 break.
21 The loans that conform to stated
22 underwriting standards without a need for
23 special exceptions and exceptions.
24 Can we take a break?
25 Q. You need to take a break?

83 (Pages 326 to 329)

Page 330

Steven P, Feinstein, Ph.D

1        Steven P, Feinstein, Ph.D
2    A.   Yes.
3        MR. FRANK:  Okay.  Let's go
4    off the record.
5        THE VIDEOGRAPHER:  We're going
6    off the record at 3:59.
7
8        (Recess taken from 3:59 p.m.
9    to 4:29 p.m.)
10
11       THE VIDEOGRAPHER:  Back on the
12   record at 4:29.
13
14   BY MR. FRANK:
15   Q.   Dr. Feinstein, have you proposed a
16   damages model that will allow you to
17   separate out damages caused by any of the
18   alleged misstatements or omissions
19   individually?
20   A.   I believe so.
21   Q.   And how does your damages model do
22   that?
23   A.   We talked about that before the
24   break.
25       Once I understand what

Page 331

1        Steven P, Feinstein, Ph.D
2    misrepresentations and omissions remain as
3    are supported as actionable, I can
4    calculate the impact of those particular
5    misrepresentations and omissions on the
6    stock price throughout the class period,
7    compare that but-for price to the actual
8    price to construct an inflation ribbon, and
9    then damages for any individual investor
10   would be the change in the inflation over
11   the course of their holding period subject
12   to the Dura cap.
13   Q.   I think you were saying to me
14   earlier before the break that the world is
15   complicated.
16   A.   Yes.
17   Q.   And aren't there some
18   misrepresentations -- alleged
19   misrepresentations that are about similar
20   subjects?
21   A.   Yes.
22   Q.   And how would you disaggregate the
23   impact of those alleged misrepresentations
24   about similar subjects?
25   A.   With estimation about how the

Page 332

1        Steven P, Feinstein, Ph.D
2    information impacted the stock price.
3    Q.   And how would you go about making
4    that estimation?
5    A.   Again, it's an exercise in
6    valuation.
7        How does changing information --
8    what analysts and investors do every day is
9    they observe what information has changed
10   about the subject security and based on the
11   change in the information for the subject
12   security, they arrive at a new equilibrium
13   price, a new price that they believe -- or
14   a new value that they believe the security
15   is worth.
16       I would do the same thing.  As
17   pieces of information change, I would
18   assess through estimation and valuation
19   tools the impact of that information on the
20   value of the company.
21       It's -- if it's positive news, it
22   would have a positive impact.  If it's
23   negative news, it would have a negative
24   impact.
25       Comparing -- to assessing how it

Page 333

1        Steven P, Feinstein, Ph.D
2    might affect the probability of future cash
3    flows or the probability for stated value
4    of expected performance metrics, that would
5    indicate what the change in value should be
6    as a result of the changing information
7    set.
8    Q.   What are the specific estimation and
9    valuation tools that you just referenced?
10   A.   Discount cash flow, valuation
11   multiples, and the literature on effects
12   caused by reputation, liquidity, and also
13   with some information from the event study.
14       There may be others, but that's what
15   comes to mind now.
16   Q.   In connection with your damages
17   model --
18   A.   Scenario analysis.  Add that to the
19   set of tools.
20   Q.   Is it fair to say that you would use
21   the loss that was realized on   November
22   20, 2007 to estimate stock price inflation
23   at the beginning of the class period?
24   A.   I think there's information in the
25   empirical drop.  It somewhat informs what

Page 334

```
 1            Steven P, Feinstein, Ph.D
 2   the inflation would be earlier.  But I
 3   wouldn't simply use the drop at the end
 4   as -- unless I -- it's always possible
 5   depending on what I find when I delve into
 6   the analysis, but it's not likely that I
 7   would claim or contend or conclude based on
 8   the data and evidence that the inflation at
 9   the end was exactly the same as the
10   inflation at the beginning.  It likely
11   changed over time.
12        Q.   And how would you determine how it
13   changed over time?
14        A.   I would look at other companies.
15   There's a number of tools.  It's an
16   evaluation exercise.
17            Just like other analysts and
18   investors update their valuation of a
19   company based on new information, I would
20   look at the flow of information over the
21   course of the class period and update the
22   but-for valuation the same way.
23        Q.   The same way as what?
24        A.   As other analysts and investors.
25        Q.   And --
```

Page 335

```
 1            Steven P, Feinstein, Ph.D
 2        A.   I would value the company given a
 3   different set of information, which is
 4   exactly what the other investors would have
 5   done had they been provided with
 6   information.
 7            Investors and analysts constantly,
 8   continuously update their assessments of
 9   the value of many securities based on
10   changing information.
11            I would do the exact same thing, if
12   I were the damage expert, to calculate how
13   the changing information set affects my
14   estimate of the value of the company,
15   Freddie Mac.
16        Q.   Would your valuation be based in
17   part on the damage -- on the event study
18   you conducted with respect to
19   November 20, 2007?
20        A.   I wouldn't ignore that.  I would
21   certainly take it into account.
22        Q.   Now, knowing Freddie Mac's true
23   subprime exposure in 2007, to the extent
24   that it's a true subprime exposure, is it
25   possible that some investors would not have
```

Page 336

```
 1            Steven P, Feinstein, Ph.D
 2   purchased shares in Freddie Mac?
 3        A.   I think it's certainly possible.
 4   It's not part of my damage model, except to
 5   the extent that had some investors shied
 6   away from it, the price probably would have
 7   been less for that reason alone.  I mean,
 8   for that reason, which is...
 9        Q.   Is it --
10        A.   In concert with other reasons.
11        Q.   Is it possible that some investors
12   before would have been willing to purchase
13   shares but only at a lower price?
14        A.   It's certainly possible, but that's
15   not the basis of the proposed damage model.
16        Q.   Is it --
17        A.   The basis of the proposed damage
18   model is the inflation.  Without
19   speculating as to who would have bought and
20   who wouldn't have bought, we can conclude
21   that the price that people paid was
22   inflated, was too high, if, in fact, that's
23   what the data show.
24        Q.   So your damages model doesn't
25   distinguish between investors that would
```

Page 337

```
 1            Steven P, Feinstein, Ph.D
 2   not have purchased shares and investors
 3   that would have purchased shares but at a
 4   lower price?
 5        A.   It's not a model.  It's not a
 6   transaction causation model.  It's a model
 7   that doesn't seek to speculate as to who
 8   wouldn't have bought.
 9            It's a model that calculates, for
10   everyone who did buy, how much they
11   overpaid and how much they lost as a result
12   of over paying.
13        Q.   Would you agree that US housing
14   prices declined significantly during the
15   proposed class period?
16        A.   Yes.  That's my understanding of the
17   data.
18        Q.   Are you aware of any other times
19   where the US housing prices have declined
20   to this degree?
21        A.   No.
22        Q.   Fair to say the US housing market
23   decline during this period was
24   unprecedented?
25        A.   You know, there are -- I don't like
```

Page 338

Steven P, Feinstein, Ph.D

1  to make blanket statements like that.  I
2  know that certain regions during certain
3  periods had similar declines.
4      It's -- so I don't want to say it's
5  unprecedented.  I know that Texas in the
6  1980s was a difficult housing market.
7      But nationwide, people consider this
8  period extraordinary in the history of real
9  estate prices.  And it's been -- as a
10  result, it's -- there's quite a literature
11  that I could rely on, too, about the impact
12  of the housing market decline on
13  valuations.
14      Q.  What typically happens to mortgage
15  loan portfolios when real estate prices
16  decline?
17      A.  You mean in terms of are they worth
18  more or less?
19      Q.  Yes.
20      A.  Well, they're worth less, generally,
21  typically.  But the amount that they're
22  worth less depends on the quality of -- the
23  credit quality of those loans.
24      I mean, the whole purpose of
25

Page 339

Steven P, Feinstein, Ph.D

1  underwriting is to provide safety features
2  to insulate the mortgage loan portfolios
3  from declining real estate values.
4      Q.  Would you agree that mortgage
5  defaults increased significantly during the
6  proposed class period generally?
7      A.  If you look across all classes, yes.
8      Q.  All classes -- what classes are you
9  referring to?
10      A.  Prime versus subprime, prime sub,
11  Alt-A, subprime.
12      Q.  All different kinds of loans
13  experienced significantly greater mortgage
14  defaults during the proposed class period,
15  to your knowledge?
16      A.  Well, some more than others.  The
17  whole idea of underwriting and scoring
18  loans is to categorize the loans according
19  to credit quality.  And the higher credit
20  quality loans don't default as much as the
21  lower credit quality loans.  There's data
22  and statistics on that.  There's studies --
23  there are intensive studies out there on
24  that.
25

Page 340

Steven P, Feinstein, Ph.D

1      Q.  Well, putting aside the difference
2  in performance between classes, it's your
3  understanding that all classes of loans had
4  significantly increased mortgage defaults
5  during the proposed class period, correct?
6      A.  It's my understanding, yes.
7      Q.  And those defaults, they increased
8  over the course of the class period, right?
9      A.  Right.
10      Q.  Would you agree that rising mortgage
11  defaults was a significant contributing
12  factor to the liquidity crisis in August of
13  2007?
14      A.  It was a factor.  You mean,
15  systemically?
16      Q.  Yes.
17      A.  Nationwide.  Yes.
18      Q.  In your view, did market
19  participants anticipate the degree of
20  losses in the mortgage market during this
21  period of time?
22      A.  Some did.
23      Q.  Some did.
24      A.  There are famous examples, and many
25

Page 341

Steven P, Feinstein, Ph.D

1  didn't.
2      Q.  Did market regulators?
3      A.  I would have to review that.  I'd
4  rather not speak for them.
5      Q.  If the court were to conclude that a
6  particular corrective disclosure day -- for
7  example, November 20, 2007 -- contained
8  confounding news, how would an event study
9  analysis disentangle the effects of
10  multiple pieces of news released at the
11  same time?
12      A.  Well, the event study analysis
13  doesn't do that.  The evaluation analysis
14  would be applied to do that.
15      Q.  And how does the evaluation analysis
16  do that?
17      A.  Well, the event study tells you the
18  aggregate effect of all of the news.  To
19  see what the major contributing factors
20  were, one has to see what was the negative
21  news, which news was expected, which news
22  was unexpected; and of the news that was
23  unexpected, what typically, you know, how
24  does it fit into a valuation model?  Once

Page 342

Steven P, Feinstein, Ph.D

1
2 we know how it fits into a valuation model,
3 we can weigh and value each piece of news
4 and, therefore, disaggregate the pieces.
5       It's not easy, but it can be done.
6     Q. In order to do it, would it require
7 your personal judgment and estimate?
8     A. Valuation requires judgment and some
9 level of subjectivity, because ultimately,
10 when you get to the heart of it, valuation
11 is an estimation of what one fully informed
12 market participant would pay another fully
13 informed market participant for security.
14 You're estimating what two human beings
15 would do.
16       So there's definitely a human and
17 subjective element in valuation. I have to
18 anticipate what other market participants
19 would have done.
20     Q. Now let me turn your attention back
21 to your report. I believe it's marked as
22 Exhibit 96.
23     A. What page?
24     Q. Page 42, Paragraph 152, Roman II.
25     A. Okay.

Page 343

Steven P, Feinstein, Ph.D

1
2     Q. Do you see where you wrote, "Second,
3 an inflation ribbon would be constructed
4 for the stock using generally accepted
5 empirical analysis and valuation tools"?
6     A. Yes.
7     Q. How do you propose to construct the
8 inflation ribbon for each day of the class
9 period?
10     A. Again, it depends on what I find in
11 the information, but I have at my disposal
12 the entire array of valuation tools.
13 Valuation tools are designed for
14 specifically that purpose, determining what
15 a security is worth under a particular
16 information set. That's what the field of
17 valuation is about.
18       I would apply the principles and
19 tools from the field valuation to that
20 task.
21       Until I actually execute the
22 valuation, I couldn't tell you exactly
23 which tool I would use for each component,
24 but I would have at my disposal all the
25 tools available, all the tools that the

Page 344

Steven P, Feinstein, Ph.D

1
2 field provides.
3     Q. As you sit here today, you just have
4 not chosen which tools you would use?
5     A. Well, I anticipate that I would make
6 use of the event study, and, I would make
7 use of the models that are in the analysts'
8 reports. And my recollection is they use
9 the standard tools, which are discounted
10 cash flow and valuation multiples.
11       I also know from other cases that I
12 would probably use published research that
13 studies the impact of changing reputation
14 effects and liquidity effects.
15     Q. Are you familiar with the difference
16 between a constant dollar inflation band
17 and a constant percentage inflation band?
18     A. Yes.
19     Q. And which would you propose to use?
20     A. I'm not sure yet. But I would make
21 that decision when analyzing the facts and
22 circumstances and executing the damage
23 calculation.
24       One of those will be more
25 appropriate than the other, but I haven't

Page 345

Steven P, Feinstein, Ph.D

1
2 determined at this point which one is.
3     Q. What are the factors that would
4 determine which approach would be more
5 appropriate than the other?
6     A. Generally, the percentage inflation
7 ribbon is compelled by an observation that
8 the misrepresentations and omissions were
9 about the viability and forward-looking
10 profitability of the entire company.
11       Whereas, a dollar inflation ribbon
12 is compelled by facts and circumstances
13 that indicate that the alleged
14 misrepresentations and omissions are about
15 the valuation of a particular asset that's
16 owned by the company.
17       In this case, it's not clear yet
18 which -- I have to do more investigation to
19 choose one, because there seems to be
20 elements of both, and I would have to pick
21 one or the other.
22       Generally, the dollar ribbon is the
23 more conservative ribbon that gives the
24 lower damages. And sometimes when it's
25 unclear which is the better way, I pick the

Page 346

Steven P, Feinstein, Ph.D

1 more conservative.  So that's another
2 consideration I would incorporate, which if
3 it's a difficult choice and/or a choice
4 that's difficult, maybe it's the right
5 choice but difficult to explain and
6 articulate and defend, I might choose the
7 more conservative.  I haven't decided
8 yet.
9
10 Q.  Is a constant inflation band
11 approach the approach that you typically
12 use in securities cases?
13 A.  More often than the percentage.
14 Constant dollar is used more often than the
15 constant percentage.
16 Q.  Is there any case in which you have
17 used another method, another securities
18 case?
19 A.  Besides percentage and dollar?
20 Q.  Yes.
21 A.  Well, when I use percentage, I also
22 have a -- another column in the damage
23 calculation exhibit that keeps track of
24 inflation dissipation that's not
25 recoverable because of the Dura cap.

Page 347

Steven P, Feinstein, Ph.D

1 So any time you use percentage,
2 you're necessarily using a combination of
3 percentage and a Dura cap analysis.
4 Q.  Well, I'm not sure that I understand
5 the answer to my question.
6 Is there any case in which you have
7 used another method besides the constant
8 inflation band approach?
9 A.  Well, I think by constant inflation,
10 you mean constant dollar.  Or we really
11 shouldn't even call it constant dollar,
12 because we don't hold the dollars constant.
13 We measure the inflation through time in
14 dollar terms rather than percentage terms.
15 But I have used -- and the
16 alternative to that is the percentage
17 inflation ribbon.
18 I've used both.  I use dollar more
19 than percentage.  But I use -- I've used
20 both.
21 But what I was trying to explain is
22 that when you use -- that I don't -- even
23 nowadays, because of the Dura case
24 decision, it's not every -- every inflation
25

Page 348

Steven P, Feinstein, Ph.D

1 ribbon is somewhat of a hybrid that also
2 takes into account dissipated inflation
3 that's not recoverable.
4 So it's not even just dollar
5 inflation or percent inflation, it's dollar
6 and/or percent inflation minus
7 unrecoverable Dura cap inflation.
8 Q.  Have you ever encountered any set of
9 allegations or facts that would make a
10 constant inflation band method
11 inapplicable?
12 A.  Yes, of course.  Constant dollar.
13 Q.  Let's take it in pieces.
14 Let's first let's do constant
15 dollar, since that's what you gravitate
16 toward.
17 Have you ever encountered an
18 instance or a set of allegations or facts
19 that would make a constant dollar method
20 inapplicable?
21 A.  Well, I've encountered facts in
22 cases where the percentage ribbon is the
23 better ribbon.  I mean, it wasn't that the
24 other one would be impossible to calculate.
25

Page 349

Steven P, Feinstein, Ph.D

1 But it's more consistent.  It's the
2 appropriate choice of methodology, given
3 the facts of the case.
4 Q.  Now let's take both -- now in that
5 case, you're saying that you didn't use
6 constant dollar, you used constant
7 percentage; is that right?
8 A.  I don't want to use the word
9 "constant," but I used a percentage, a
10 percentage inflation ribbon.
11 Q.  Now, have you ever encountered a set
12 of facts or allegations that would make a
13 constant dollar or a percentage ribbon
14 method inapplicable?
15 A.  By "inapplicable," you mean
16 inappropriate?
17 Q.  Inappropriate.
18 A.  Or impossible?
19 Q.  Well, we'll take them in turn.
20 Let's start first with impossible.
21 A.  No.
22 Q.  No?
23 A.  No.
24 Q.  What about inappropriate?
25

Page 350

Steven P, Feinstein, Ph.D

1
2     A.  Yes.
3     Q.  Okay.  And in that case or those
4  cases, how would or did you calculate
5  damages on a class-wide basis?
6     A.  I would have to look at those
7  reports to see the analysis that I did.
8  It's much more intricate than a market
9  efficiency analysis.
10        I take -- essentially, it's a
11 repeated, an iterative valuation exercise
12 to revalue the stock, taking in account
13 changing information over the course of the
14 class period, and then comparing that
15 but-for price to the actual price that
16 prevailed in the marketplace on each day in
17 the class period.
18     Q.  And do you expect that you might use
19 that method in this case?
20     A.  It's possible.
21     Q.  What are the facts that would give
22 rise to you using such an approach?
23     A.  If the -- okay.  If the facts were
24 changing frequently -- facts that are
25 deemed to be material, that either I deem

Page 351

Steven P, Feinstein, Ph.D

1
2  to be material based on valuation
3  principles or an assessment of what
4  analysts and other investors are saying
5  about the stock -- I mean, if they're
6  deemed -- if material facts keep
7  changing -- keep changing the value of the
8  company and if in the but-for world the set
9  of facts keeps changing, it would be
10 necessary to update the but-for price
11 frequently.
12     Q.  So it may be that you use a dollar
13 inflation band approach or a percentage
14 inflation band approach or some other
15 approach to this case; is that fair?
16     A.  No.  It's -- it's generally one or
17 the other.
18        The question that I was answering is
19 would it require continuous updating of the
20 but-for price, and it may or may not,
21 depending on how frequently the set of
22 relevant information changed.
23        I mean, analysts -- if you look at
24 analysts' reports, they generally don't
25 change their targets every day.  They

Page 352

Steven P, Feinstein, Ph.D

1
2  change their targets when new, material
3  information comes out that changes their
4  assessment of the company.
5        So you can use the analysts -- how
6  frequently analysts update their price
7  targets as a standard for how frequently I
8  might have to update the but-for price.
9        But if it's the case that the
10 information set is changing so rapidly in
11 the but-for world, then I would update the
12 but-for price more frequently using
13 valuation tools.
14     Q.  And here further down in --
15     A.  I just want to say, not that I
16 would, but I may if I deem it to be
17 appropriate.
18     Q.  So in your report, in
19 Paragraph 152, Subsection 2, you write that
20 "The inflation ribbon is often constructed
21 by working chronologically backwards from
22 the final corrected disclosure to the state
23 of the class period."
24     A.  Start.
25     Q.  "...to the start of the class

Page 353

Steven P, Feinstein, Ph.D

1
2  period, accounting for alleged
3  fraud-related residual price declines as
4  they occur."
5        Do you see that?  It's on Page 43.
6     A.  Right.  So that's appropriate for a
7  case where the value of the information at
8  the beginning of the class period is
9  similar to the value of the omitted or
10 misrepresented information at the end of
11 the class period, and there's not a lot of
12 intervening changing and confounding,
13 non-fraud-related information, then that
14 approach is called for.
15     Q.  Now, you have identified at least
16 one structural break in this market during
17 the class period, correct?
18     A.  No, that's a structural break
19 referring to the volatility and the
20 regression parameters.
21        It's not necessarily a structural
22 break with respect to the value of the
23 omitted information.
24     Q.  Is it --
25     A.  I would have to check to see if it

Page 354

1            Steven P, Feinstein, Ph.D
2    does apply.
3        Q.  So is it possible that the value of
4    the omitted information may change over
5    these two different estimation periods that
6    you identified in your regression model?
7        A.  It is possible.
8        Q.  And how would you calculate that?
9        A.  I would see what other analysts are
10    saying about the value of information
11    before and after that period.
12            I would see how they changed their
13    valuations as a result of the changing
14    regime for this company and, perhaps, other
15    companies.
16        Q.  Now, specifically with respect to
17    what you wrote about constructing an
18    inflation ribbon by working chronologically
19    backwards --
20        A.  Right.
21        Q.  -- how, specifically, do you propose
22    to apply that approach to this case?
23        A.  I haven't decided yet.  This is a
24    tool that I could use if it's deemed
25    appropriate.

Page 355

1            Steven P, Feinstein, Ph.D
2            But I -- I can tell you this much, I
3    would certainly somehow make use of the
4    information that is provided to the
5    analysts as a result of the corrective
6    disclosure.  But I would also use valuation
7    tools to see if there needs to be
8    adjustments as we move backwards in time
9    through the class period.
10        Q.  And do you see where you use the
11    expression "final corrective disclosure"?
12        A.  Yes.
13        Q.  In this case, do you know what the
14    final corrective disclosure was, according
15    to plaintiffs?
16        A.  According to plaintiffs, what
17    they're alleging is that it's
18    November 20th, as of now.
19        Q.  Have you ever determined that you
20    could not measure inflation based on the
21    price declines caused by corrective
22    disclosures?
23        A.  Well, if you're saying that I had
24    to -- have I ever determined that that
25    information had to be disregarded?  No.

Page 356

1            Steven P, Feinstein, Ph.D
2            It's always -- it's valuable
3    information to consider in one way or
4    another.
5        Q.  Well, putting aside whether it had
6    to be disregarded, have you ever determined
7    that you couldn't measure inflation based
8    on price declines caused by corrective
9    disclosures?
10        A.  If you mean have I ever
11    determined -- I need to know more precisely
12    what you mean.
13            Are you asking has it ever been the
14    case where I observed a price decline, had
15    a corrective disclosure, and then concluded
16    that the inflation prior to that corrective
17    disclosure was some amount different from
18    the drop?  Is that the question?
19        Q.  That isn't, but I'm curious as to
20    your answer to that question, too.
21        A.  That question -- the answer to that
22    question is yes.
23        Q.  Well, what about -- is it correct to
24    say that the approach you plan to take is
25    to measure inflation based, at least in

Page 357

1            Steven P, Feinstein, Ph.D
2    part, on the price decline you observe in
3    connection with corrective disclosures?
4        A.  Of course.  I would take that
5    information into account.
6        Q.  Now, when you say you would take it
7    into account, will you be taking it into
8    account in terms of an arithmetic
9    calculation?  Or will you be taking it into
10    account in the sense that it will inform
11    your judgment and estimate?
12        A.  Both.  I mean, I don't expect that I
13    would just simply -- it's possible that I
14    would, but at this point I don't expect
15    that I would simply accept that drop number
16    as being the only relevant factor in the
17    damage calculation, and that -- or that the
18    inflation would necessarily, throughout the
19    class period, be exactly equal to that
20    final drop.
21            I don't expect that to be the case.
22    It may be.  But at this point, I don't
23    expect it to be.
24            But what we can observe when the
25    information became available to the

Page 358

1     Steven P, Feinstein, Ph.D
2  marketplace, it is important information
3  for conducting the valuation analysis.  I
4  would make use of it.
5     Q.  What other factors would you
6  consider?
7     A.  The changing value of information
8  over the course of the class period for --
9  among others.
10     Q.  What are the others you reference?
11     A.  Confounding information, both at the
12  time of the disclosure and earlier, and
13  what's ultimately either adjudicated or
14  what I'm instructed to assume about the
15  allegations as to which allegations and
16  information are actionable.
17     Q.  Anything else?
18     A.  Possibly.  As I sit here now, I
19  mean, those are the main things:  changing
20  value of information, confounding
21  information, and some determination as to
22  what allegations are deemed actionable,
23  that just from a legal perspective.
24     I mean, I can calculate the
25  economics of any piece of information, but

Page 359

1     Steven P, Feinstein, Ph.D
2  which ones relate to legally recoverable,
3  recompensable losses is a separate matter.
4  So I would need instruction from lawyers or
5  the court to that effect.
6     Q.  Let me turn your attention to
7  Paragraph 157 of your report, on Page 45 of
8  Exhibit 96.
9     Do you see where you say that "A
10  fundamental principle of financial
11  economics is that in an efficient market,
12  investors are not systematically wrong"?
13     A.  Yes.
14     Q.  Does that statement mean that
15  investors are not wrong on average?
16     A.  Yes, in an efficient market.
17     Q.  In an efficient market investors are
18  wrong -- are strike that.
19     In an efficient market, can
20  investors be wrong some of the time?
21     A.  Yes.
22     Q.  If investors are wrong some of the
23  time, how will you account for this in your
24  damages model?
25     A.  Well, I would apply the best damage

Page 360

1     Steven P, Feinstein, Ph.D
2  model available, which is, generally, based
3  on the assumption that the market's --
4  well, the reason why the best valuation
5  models are called the best valuation models
6  is that they're models that represent
7  typical -- what investors typically use to
8  value stock.
9     So I would use the models that,
10  according to the literature, that models
11  considered to best represent how investors
12  value stocks, which would be that they
13  aren't wrong, unless there's some evidence
14  to the contrary.
15     Q.  Is it fair to say that not all
16  investors have the same risk tolerance?
17     A.  Oh, that's fair.
18     Q.  Is there any way to test for this?
19     A.  There is.  It would be irrelevant to
20  this case, but there's a way to test.  The
21  literature has tests for risk tolerance.
22     Q.  Your proposed model doesn't account
23  for differing risk tolerance among
24  investors; fair to say?
25     A.  It doesn't need to because of the

Page 361

1     Steven P, Feinstein, Ph.D
2  nature of the model and the nature of the
3  model that's typically used in a 10b-5
4  case, which could be applied here.
5     Q.  Well, putting aside whether it needs
6  to or not, it doesn't account for differing
7  risk tolerances among investors, right?
8     A.  Right.  It's a model that could be
9  applied commonly to all investors in the
10  class.
11     Q.  Do you agree that there are risks
12  presented by loans to borrowers with lower
13  FICO scores?
14     A.  Yes.
15     Q.  Do you agree that the risks
16  presented by loans -- strike that.
17
18     (Exhibit No. 109 marked for
19     identification.)
20
21  BY MR. FRANK:
22     Q.  I'm going to show you an exhibit
23  that has been marked as 109.
24     What is Exhibit 109?
25     A.  This is one of those NERA

Page 362

```
 1          Steven P, Feinstein, Ph.D
 2  manuscripts written by David Tabak.
 3      Q.  And you've cited this manuscript by
 4  Dr. Tabak in your work, correct?
 5      A.  Did I cite it in this one?  In this
 6  case?
 7      Q.  Well, if you would like, let me turn
 8  your attention to Exhibit 95, which is your
 9  declaration.
10      A.  Okay.
11          Yes, it's there on Page 6.  Okay.
12      Q.  And so you cited this manuscript in
13  this case in your declaration, right?
14      A.  Yes.
15      Q.  And you've cited it in your work in
16  other cases, right?
17      A.  Yes.
18      Q.  Please turn to Page 2 of the
19  manuscript.
20      A.  Okay.
21      Q.  And this is Dr. Tabak, who is also
22  the same Dr. Tabak who co-authored the FDT
23  article, right?
24      A.  Right.
25      Q.  He's an authority on the FDT z-test,
```

Page 363

```
 1          Steven P, Feinstein, Ph.D
 2  correct?
 3      A.  Well, we've talked about that
 4  before.  He gets credit for being a
 5  co-author of the first paper on it.
 6          I think the word "authority" might
 7  have some legal connotation that I'm
 8  reluctant to agree to at this point.
 9      Q.  Nevertheless, you have cited him in
10  connection with your work on event studies
11  and z-tests, correct?
12      A.  Right.  And I've met him, and I've
13  talked to him.  I agree with a lot of
14  things he says and disagree with a lot of
15  other things he says.
16          The things I agree with, I've --
17  where we reach common agreement, I point
18  that out as being valuable information.
19      Q.  Do you see his -- the section of the
20  manuscript entitled "The
21  Proof-by-Example Approach"
22      A.  Yes.
23      Q.  And do you see he says, "Following
24  Cammer, there has been an evolving history
25  of how experts and lawyers presented
```

Page 364

```
 1          Steven P, Feinstein, Ph.D
 2  empirical facts that might have been deemed
 3  to show a cause-and-effect relationship
 4  between news and stock price movements."
 5          Do you see that?
 6      A.  Yes.
 7      Q.  And he further writes "An initially
 8  popular approach might be termed proof by
 9  example.  In this method, an expert or
10  counsel for plaintiffs would present a
11  handful of days with news followed by a
12  stock price movement."
13          Do you see that?
14      A.  Yes.
15      Q.  Did I read that correctly?
16      A.  Yes.  I don't think you understand
17  it correctly, but I think you see it
18  correctly.
19      Q.  Have I shared with you my
20  understanding of it?
21      A.  I am anticipating where you're going
22  with it, but let's see.
23      Q.  Now, do you agree that an initially
24  popular approach might be termed proof by
25  example?
```

Page 365

```
 1          Steven P, Feinstein, Ph.D
 2      A.  I know that some people have done
 3  backward event studies, which is what this
 4  is about, and I've never done a backward
 5  event study.
 6          And I know that the expert in
 7  PolyMedica, that he criticizes here or
 8  points out that the court criticized, used
 9  a backward event study, and it's the
10  backward event study that is what he means
11  by proof by example.
12      Q.  What is a backward event study?
13      A.  Backward event study is where you
14  first look at the data -- you first look at
15  the regression results to identify which
16  dates are statistically significant in
17  the -- in a time series of residual
18  returns.  And then on the basis of certain
19  days being statistically significant, pick
20  those days to bring to the court's
21  attention and say that these are -- these
22  days were statistically significant, and
23  then look for some news on those days that
24  reasonably could have been correlated with
25  the stock price to say that this is a --
```

Page 366

Steven P, Feinstein, Ph.D

1  Steven P, Feinstein, Ph.D
2  that the significant drop or rise in the
3  stock price was a result of the identified
4  news that was identified only after one
5  observed the statistically significant
6  stock price movement.
7  And it's an improper analytical
8  approach because we know that 5 percent,
9  roughly, of all residual stock returns will
10  be statistically significant, spuriously
11  so, just because of the nature of
12  statistical significance and what it really
13  means by design.
14  And so you cannot conclude from this
15  methodology -- from that backward
16  methodology that information caused the
17  stock price to move.
18  That's what was done in PolyMedica.
19  That's what the court rebutted in
20  PolyMedica.  Not just that it was only five
21  days, but that the five days were picked on
22  the basis of them being statistically
23  significant, not on the basis of there
24  having been important news that transpired
25  on those days.

Page 367

1  Steven P, Feinstein, Ph.D
2  Q.  You believe that Dr. Tabak is
3  identifying here a problem with first
4  identifying statistically significant days
5  and only second identifying news associated
6  with those days?
7  A.  Yes.
8  Q.  Is that right?
9  A.  Yes, and because he cites the
10  PolyMedica case, and that's what the
11  problem was with the expert in the
12  PolyMedica case.
13  Q.  You believe that the better way to
14  conduct an event study is to not know what
15  days are statistically significant but,
16  rather, identify days based solely on an
17  assessment of news; is that correct?
18  A.  Well, that would be a better way to
19  do it.  But if you already do know what the
20  statistically significant result is, you
21  better have a very compelling -- you better
22  have very compelling facts to support the
23  selection of that date on the basis of news
24  alone, not on the basis of it being
25  statistically significant, which is what I

Page 368

1  Steven P, Feinstein, Ph.D
2  did in this case.
3  I mean, I would not have picked that
4  day -- I did not pick November 20th as the
5  subject of the event study because it was a
6  statistically significant day.  I picked it
7  because it was indisputably a red-letter
8  important information date in the life of
9  this company.
10  Q.  Well, in addition, as you testified
11  earlier, you were unable to find a single
12  other day among all the other 329 days that
13  you thought were appropriate for testing;
14  is that right?
15  A.  That were ideal candidates, right.
16  That's the case.
17  So that's also why it was restricted
18  to a single event, but also why the
19  collective event test was motivated.
20  Q.  Now, Dr. Tabak here does not mention
21  anything about selecting dates on the basis
22  of previously knowing their statistically
23  significant results, does he?
24  A.  That's what he -- I mean, he's
25  referring to the PolyMedica case.  That's

Page 369

1  Steven P, Feinstein, Ph.D
2  where it's elaborated upon, this
3  methodology that is rebutted, refuted.
4  He's talking about simply pointing
5  out a handful of examples where it appears
6  that there were stock price movements that
7  were large.
8  Well, that methodology is legitimate
9  if the proper event study methodology is
10  followed, but it's not legitimate if the
11  backward event study is followed.
12  Q.  Do you see where he writes, "A
13  serious and, in fact, fatal problem with
14  the approach is that one would expect to
15  see such results if stock price movements
16  were completely random and had no average
17  correlation with news events"?
18  Do you see that?
19  A.  That's only a true statement in a
20  backward event study.  It's not a true
21  statement if the event study is run
22  appropriately.
23  Q.  Why is it not true if the event
24  study is run appropriately?
25  A.  Because if the event study is run

Page 370

Steven P, Feinstein, Ph.D

1     Steven P, Feinstein, Ph.D
2          appropriately and you first identify the
3     dates to test because of the news and then
4     observe that the stock price did move, the
5     inescapable conclusion is that you've
6     established, you've demonstrated that the
7     price reacts to news.
8          If, on the other hand, you pick the
9     dates because the stock price moved and
10    then look for some news, after the fact,
11    that may or may not be relevant, then you
12    have that serious problem, because that's
13    what could happen.
14         And under that approach, one would
15    expect to see such results if stock price
16    movements were completely random and had no
17    average correlation with news events.
18         You will not see significant event
19    study results when stock price movements
20    are completely random and have no average
21    correlation with news events if the event
22    study is run appropriately in the forward
23    direction rather than the reverse
24    direction.
25         So he must be referring to

Page 371

1     Steven P, Feinstein, Ph.D
2     reverse -- backward event studies.
3          Q.  Have you ever talked to Dr. Tabak
4     about this issue?
5          A.  I think in the course of -- in the
6     context of litigation, where we both served
7     as experts, we've communicated, you know,
8     via our reports.
9          But no, I haven't had a discussion
10    with him about that.
11         Q.  Your interpretation of this section
12    is that it's solely an attack on -- what
13    was the expression that you used?
14         A.  Backward event studies.
15         Q.  -- backward event studies; is that
16    correct?
17         A.  Right.  Because it's not the case
18    with forward, correctly run event studies
19    that you will see examples of statistically
20    significant results, statistically
21    significant price movements on
22    information -- on big information dates
23    when stock price movements are completely
24    random and have no average correlation with
25    news events.  That's just not the case.

Page 372

1     Steven P, Feinstein, Ph.D
2     It's only the case, as I said
3     before, with reverse event studies,
4     backwards event studies.
5          Q.  And accordingly, you think that it
6     is appropriate, so long as an event study
7     is constructed correctly, to prove market
8     efficiency by using only a few, or in this
9     case, one example; is that correct?
10         A.  Well, we talked about this earlier.
11    No, that's not what I testified to.
12         What I said was that these empirical
13    results, in concert with the Cammer and
14    Unger test results, proves to a high degree
15    of statistical and professional certainty
16    market efficiency.
17         Proof, but to a lesser degree, is
18    offered only by the test, but it is to a
19    lesser degree.  And that's -- and I'm
20    not -- that's not my opinion in this case.
21    I'm not drawing my conclusion on the basis
22    of that test alone.  I'm offering my
23    opinion on the basis of that test in
24    concert with the other evidence, the Cammer
25    and Unger results.

Page 373

1     Steven P, Feinstein, Ph.D
2          Q.  Now, just to be clear, if you were
3     to discover that your z-test was flawed and
4     that it did not result in statistically
5     significant results, would you change your
6     opinion in this case that Freddie Mac's
7     common stock traded in an efficient market?
8          A.  I would have to see why it was
9     thought to be flawed.  I would have to know
10    that first.  I would have to see what I
11    potentially got wrong.
12         Q.  Well --
13         A.  I would certainly consider it.  It
14    could change my opinion.
15         I mean, I'm a scientist.  I'm going
16    to take into account information and
17    evidence and data.
18         I won't disregard it, but I also
19    will weight that evidence and data
20    appropriately.  I want to know why it's
21    thought to be flawed.
22         If it's thought to be flawed because
23    it doesn't conform to one textbooks's menu
24    of conditions when, in fact, the literature
25    says that it doesn't have to conform to one

Page 374

```
 1            Steven P, Feinstein, Ph.D
 2   textbook's menu of conditions if other
 3   diagnostics are satisfied, I would give it
 4   less weight, you know, the conflicting
 5   evidence less weight.
 6        If, on the other hand, I'm convinced
 7   that I didn't do it correctly and that the
 8   results indicate something opposite, I
 9   would take that into account and revise my
10   opinion appropriately.
11        But at this point, I don't see that
12   it's likely.
13     Q.  Well, assume for the sake of this
14   question that you conclude that the test
15   was flawed.  You conclude -- you've become
16   convinced the z-test just isn't supposed to
17   be run on a sample size that small
18   regardless of what diagnostic tests are
19   done thereafter.
20        If you yourself reach that
21   conclusion and, therefore, the z-test, you
22   weren't relying upon it anymore, do you
23   believe that you would maintain your
24   opinion solely based on your analysis of
25   the Cammer and Krogman factors one through
```

Page 375

```
 1            Steven P, Feinstein, Ph.D
 2   four and six through eight and solely based
 3   on your single-event event study that
 4   Freddie Mac's common stock traded in an
 5   efficient market?
 6     A.  I would rather wait and see what the
 7   compelling evidence is.
 8        I can tell you that during a break,
 9   I examined the binomial probability of
10   having three out of eight significant
11   events when, in fact, the dynamics -- under
12   the null hypothesis of news events and
13   non-news events having the same dynamics,
14   and it only came out to 0.5 percent, and
15   that's a test that's not subject to the
16   same constraints or potential criticisms as
17   the z-test.
18        I mean, it's, essentially, as we
19   talked about, before diagnostic.
20        0.5 percent is far below the 5
21   percent cutoff for reasonably rejecting the
22   null hypothesis.
23        So that just gives me more
24   confidence that I did it right and the
25   diagnostic supports my use of the z-test,
```

Page 376

```
 1            Steven P, Feinstein, Ph.D
 2   but I will --
 3     Q.  Perhaps you don't understand my
 4   hypothetical --
 5     A.  -- but if I'm confronted with
 6   compelling evidence that my analysis is
 7   wrong, I very well may change my opinion.
 8     Q.  Well, I'm just trying to understand
 9   what, from your perspective, is sufficient
10   evidence to establish market efficiency.
11        So I think you're struggling with
12   the underlying arguments here and maybe if
13   we do it chronologically, it would be
14   easier.
15        You examined the Cammer factors one
16   through four, correct?
17     A.  Right.
18     Q.  And you did the Krogman factors six
19   through eight, correct?
20     A.  Right.
21     Q.  And the first thing you did in terms
22   of factor five was you did your
23   single-event event study, correct?
24     A.  Yes.
25     Q.  Now, chronologically, that is how
```

Page 377

```
 1            Steven P, Feinstein, Ph.D
 2   you proceeded; is that right?
 3     A.  That's right.
 4     Q.  And that was before you even did the
 5   z-test, right?
 6     A.  That's right.  That's right.
 7     Q.  Before you did the z-test, were you
 8   comfortable concluding that you had
 9   sufficient economic evidence to opine that
10   Freddie Mac's common stock traded in an
11   efficient market?
12     A.  To a lesser degree of confidence and
13   for a more limited period of time.  I mean,
14   if you're looking at that point in
15   isolation without any other test being
16   considered.
17        That's what we talked about earlier
18   when we looked at the paragraph where I
19   said that that result offered proof.
20     Q.  And what was the period of time that
21   you felt comfortable opining upon at that
22   time?
23     A.  Well, if you look at that paragraph,
24   it doesn't have a time frame.  It doesn't
25   say, throughout the entire class period.
```

Page 378

Steven P, Feinstein, Ph.D

1   It says that it's proof of market
2   efficiency, which it is, for that day and
3   reasonably for some period of time around
4   that day.
5         In concert with the other factors
6   and the other tests, I can extrapolate and
7   deduce that the market for Freddie Mac
8   stock was efficient throughout the class
9   period.
10        But based on that one test, my
11  opinion stands as how I expressed it.
12  Q.  Now, this is going to be hard for
13  you because now we're going to deal with a
14  hypothetical that isn't the real world.
15  A.  Okay.
16  Q.  Assume that you hadn't done the
17  single-event event study.
18  A.  Okay.
19  Q.  *All you've got is the Cammer,
20  Krogman factors, and on factor five, all
21  you've got is the z-test but not your
22  single-event event study.
23  A.  *Okay.
24  Q.  *In your view, would that have been

Page 379

Steven P, Feinstein, Ph.D

1   enough for you to opine that Freddie Mac's
2   common stock traded in an efficient
3   market?
4   A.  *You're right.  I just don't see the
5   point of pondering the hypothetical.
6   That's not happened.  It's not what's
7   relevant to my opinion.  Maybe it's
8   relevant to your cross-examination and
9   potential criticism of my opinion.
10        But from my perspective, I didn't
11  have to ponder that hypothetical because I
12  had this abundance of evidence that all
13  pointed in the direction of market
14  efficiency.
15        MR. FRANK: Let's take a brief
16  break here, and then we'll wrap up.
17        MR. MARKOVITS: Great.
18        THE VIDEOGRAPHER:  We are
19  going off the record at 5:19.
20
21        (Recess taken from 5:19 p.m.
22        to 5:33 p.m.)
23
24        THE VIDEOGRAPHER:  We are back

Page 380

Steven P, Feinstein, Ph.D

1   on the record at 5:33.
2
3         MR. MARKOVITS:  Can I have the
4   last two questions and answers.
5
6         *(Record read.)
7
8         THE WITNESS:  Could I add to
9   my answer?
10  BY MR. FRANK:
11  Q.  Yes, you can add to your answer.
12  A.  Well, I had some time to ponder the
13  hypothetical.
14        And this Cammer-Krogman factor,
15  especially the degree of the strength by
16  which Freddie Mac satisfied those, is
17  sufficient, based on my understanding of
18  Halliburton II and what the court explained
19  -- or the Supreme Court explained was
20  necessary to prove market efficiency in a
21  securities case, that those alone is
22  sufficient to satisfy the court that
23  Freddie Mac stock traded in an efficient
24  market over the course of the class period.

Page 381

Steven P, Feinstein, Ph.D

1   So given that, the empirical tests
2   in this case are icing on the cake.
3   They're a demonstration of the market
4   efficiency that's already sufficiently
5   proved by the Cammer and Krogman factors.
6         So if someone came to me and said
7   that one or both or either or both of my
8   empirical tests were in some way flawed, I
9   would want to know why they thought they
10  were flawed.  I would want to know whether
11  they thought they were flawed because they
12  don't provide a demonstration of market
13  efficiency, which wouldn't change my
14  opinion.
15        But if they said that they actually
16  provide a demonstration of inefficiency,
17  then I would consider it and see if they
18  were right about that, and it could
19  conceivably change my opinion.
20  Q.  Is it your opinion that had you not
21  run the empirical tests that you ran,
22  namely, the single-event event study and
23  the FDT z-test, that you, nevertheless, had
24  sufficient economic evidence to conclude

Page 382

Steven P, Feinstein, Ph.D

1     that Freddie Mac's common stock traded in
2     an efficient market?
3     A.  With the standard of confidence or
4     standard of proof of it being more likely
5     than not, yes, it was far more likely than
6     not based on those Cammer and Krogman
7     factors; it is far more likely than not
8     based only on the Cammer and Krogman
9     factors, excluding the empirical factor,
10    that Freddie Mac stock trades in an
11    efficient market, because generally,
12    inefficient stocks are a rare exception,
13    inefficient markets are a rare exception.
14    They become even more rare when you're
15    looking at large companies, even more rare
16    when you're looking at large companies that
17    are actively traded, even more rare when
18    it's large companies that are actively
19    traded with abundant analyst coverage, and
20    even more rare if you add in the factor,
21    you know, the narrow bid-ask spread -- that
22    it has a narrow bid-ask spread, and even
23    rarer than that if you take into account
24    that it's listed on the New York Stock

Page 383

Steven P, Feinstein, Ph.D

1     Exchange.
2     So it -- I wouldn't say it's 100
3     percent iron-clad proof without a
4     demonstration, but it certainly satisfies
5     the standard of being far more likely than
6     not on the basis of all the Cammer and
7     Krogman factors, exclusive of the empirical
8     factor.
9     Q.  Are you aware of any academic
10    literature that supports your view that a
11    market is more likely than not efficient
12    based solely on the structural Cammer and
13    Krogman factors, excluding the fifth
14    empirical factor?
15    A.  Yes.
16    Q.  What academic literature is that?
17    A.  It's the Barbara Griffen article.
18    They look at -- they find it on the basis
19    of analysts' coverage and volume.  They
20    conclude that those factors distinguish
21    efficient from inefficient stocks.
22    Q.  And have you ever authored an expert
23    report in a securities case where you opine
24    that the -- that a company's security

Page 384

Steven P, Feinstein, Ph.D

1     traded on an efficient market based solely
2     on the structural Cammer-Krogman factors
3     and not additional empirical testing?
4     A.  No.  Because -- frankly, it's
5     because the standard of proof that I need,
6     I think, exceeds the standard of proof and
7     the quantity of evidence that courts have
8     explained they need.  So, my work tends to
9     be overkill.
10    Q.  What is the standard of proof that
11    you need in order to formulate the opinion
12    that a security trades in an efficient
13    market?
14    A.  You said it yourself.  I haven't,
15    and I wouldn't, author a report concluding
16    that the stock was efficient if I didn't
17    have some demonstration -- some empirical
18    demonstration of the efficiency.
19    But in the hypothetical, my
20    understanding is that the evidence without
21    the empirical is sufficient, given what the
22    courts have explained they need.
23    Q.  Well, I believe my -- I've offered
24    several hypotheticals and some time has

Page 385

Steven P, Feinstein, Ph.D

1     passed, so let me just formulate this new
2     one.
3     You come to conclude that the two
4     empirical tests you ran aren't reliable.
5     For one reason or another, you cannot rely
6     upon your single-event event study or your
7     FDT z-test.
8     Given that set of circumstances, but
9     all of the other factors staying the same,
10    would you personally be willing to offer an
11    opinion that Freddie Mac's common stock
12    traded in an efficient market?
13    A.  I would need to know why -- I would
14    need to know what that compelling evidence
15    was that the tests were flawed.
16    And I would need to know whether the
17    correction of the test simply removed those
18    tests as demonstrations of efficiency or
19    became demonstrations of inefficiency.
20    If it were the latter and there were
21    demonstrations of inefficiency, I can tell
22    you, I would certainly consider it and I
23    would certainly consider revising my
24    opinion.

97 (Pages 382 to 385)

Page 386

Steven P, Feinstein, Ph.D

1    Steven P, Feinstein, Ph.D
2       If it's simply that there's a
3    quibble about the way I ran the test,
4    again, I have to think about that, but
5    it's -- the other evidence is so strong
6    that it very well might not change my
7    opinion, and I would still -- my
8    understanding of the -- of what Halliburton
9    II, what the courts have said, that the
10   other evidence would be sufficient for the
11   court for purposes of determining and
12   establishing market efficiency.
13      Q.  If you were to reach your own
14   conclusion that your event study test and
15   your z-test resulted in statistically
16   insignificant results, would you view that
17   as evidence supporting a conclusion of
18   inefficiency?
19      A.  I would -- it would erode, to some
20   extent, my confidence in the conclusion.
21   But not so far below the standard of more
22   likely than not that the market was still
23   efficient.
24      And that's -- again, I'm -- it was a
25   hypothetical question.  I just want to

Page 387

1    Steven P, Feinstein, Ph.D
2    caveat my answer that it's -- I suspect
3    that would be my reaction.  And confronted
4    with a different reality, it might be a
5    different reaction.
6       Q.  Well, let's put aside for a second
7    prior hypotheticals and just talk about the
8    z-test.
9       If Miguel were to say to you, I made
10   a calculation error.  When I correct for my
11   error, the results of the z-test are
12   statistically insignificant.
13      In your view, would that result be
14   evidence of market inefficiency, regardless
15   of whether it establishes it or not, does
16   it --
17      A.  No.
18      Q.  -- does it weigh against a finding
19   of efficiency because it's evidence of
20   market inefficiency?
21      MR. MARKOVITS:  Objection.
22   It's a compound question; two different
23   questions.
24      A.  Well, we would still know
25   indisputably that four of nine of those

Page 388

1    Steven P, Feinstein, Ph.D
2    events were statistically significant, and
3    you can observe that four of nine is a much
4    higher incidence rate than 5 percent or 6
5    percent, which seems to be the incidence
6    rate for all other days.
7       The question is, would a z-test
8    indicate that difference in incidence rates
9    as being statistically significant?
10      So, I mean, it wouldn't -- it would,
11   to some extent, diminish my confidence in
12   the result.
13      But addressing a hypothetical with a
14   degree of uncertainty, given how strong the
15   other Cammer factors are for Freddie Mac, I
16   don't think it would necessarily -- it
17   wouldn't necessarily change my opinion
18   about whether it was more likely than not
19   to be trading in an efficient market.
20   BY MR. FRANK:
21      Q.  Well, put aside the z-test strand
22   here and let's talk about a z-test in a
23   hypothetical test.
24      You run a z-test.  It results in a
25   statistically insignificant number.

Page 389

1    Steven P, Feinstein, Ph.D
2       Is that evidence of market
3    inefficiency?
4       A.  It depends.  It's case specific.  It
5    depends on -- at that point, you would look
6    at the events and see, do the events compel
7    that there should have been more
8    significance.
9       So it would depend.  It very well
10   could, depending on the case and the facts.
11      If these were -- if there's no good
12   explanation for why the sock failed the
13   z-test, it could be evidence of
14   inefficiency.  It could be.
15      THE WITNESS:  So at this time,
16   gentleman --
17      MR. GOLDFARB:  Can we take a
18   break before you go off the record?
19      MR. FRANK:  Okay.  Let's take
20   one more break.
21      THE VIDEOGRAPHER:  We are off
22   the record at 5:45.
23
24      (Recess taken from 5:45 p.m.
25   to 5:58 p.m.)

Page 390

Steven P, Feinstein, Ph.D

1

2

3        THE VIDEOGRAPHER:  We are back
4    on the record at 5:58 p.m.
5

6        MR. FRANK:  Unless you
7    gentlemen have your own questions you'd
8    like to ask, at this time I would like to
9    suspend the deposition.
10       For the first time today, we learned
11   that Dr. Feinstein ran tests that were not
12   mentioned in his report and for which we
13   were not provided any calculations or other
14   relevant documents, including work papers.
15       We ask that you produce to us any
16   documents that constitute such calculations
17   or work papers or other relevant documents,
18   including any metadata that would show when
19   these tests were conducted.  And upon
20   receiving them, we will consider whether or
21   not we can close the deposition or whether
22   we will need to resume at another time.
23       We understand that you may or may
24   not agree with the position we're taking,
25   and you should, of course, feel free to put

Page 391

Steven P, Feinstein, Ph.D

1

2    your position on the record, but we -- I
3    reiterate my request for those materials.
4    Leading up to the deposition, we asked you
5    for all materials underlying and supporting
6    his report and opinions, and we just never
7    did receive any materials relating to some
8    of the matters that we heard, to which Dr.
9    Feinstein testified today.
10       MR. MARKOVITS:  And our
11   position on the record is that this
12   deposition is concluded, that those tests
13   that were described were ministerial
14   diagnostics, that you shouldn't keep the
15   deposition open for them.
16       However, as we discussed and we
17   agreed, we will look for the documentation
18   of those tests and see if it's already been
19   provided.
20       If not, and if it exists, it will be
21   provided.  We'll attempt to do so by
22   tomorrow, and then we can both decide from
23   there what the appropriate course of action
24   is.
25       MR. FRANK:  Fair enough.

Page 392

Steven P, Feinstein, Ph.D

1

2        I'll just add, given what you just
3    said, that if these are just truly
4    ministerial tests, we do not want to spend
5    unnecessary time on matters that are not
6    going to be the subject of testimony and
7    matters that will never be submitted to a
8    court.  And if it is plaintiff's position
9    that these tests are not going to be cited
10   in any way to support the doctor's opinion
11   and are never going to be submitted to the
12   court, then please let us know that,
13   because we do not want to spend time on
14   matters that don't merit it.
15       But to the extent that your
16   intentions are otherwise, the doctor's
17   intentions are otherwise, we'll, obviously,
18   need to know that, and then we, too, will
19   act accordingly.
20       MR. MARKOVITS:  Fair enough.
21       MR. FRANK:  Okay.  Thank you
22   all.
23       MR. MARKOVITS:  Thank you.
24       THE VIDEOGRAPHER:  We are off
25   the record.  The time is 6:02.

Page 393

Steven P, Feinstein, Ph.D
(Deposition suspended at 6:02 p.m.)

99  (Pages 390 to 393)

Page 394

```
 1              Steven P, Feinstein, Ph.D
 2                   CERTIFICATION
 3        I, DARLENE M. COPPOLA, a Notary Public, do hereby
 4   certify that STEVEN P. FEINSTEIN, PH.D., after having
 5   satisfactorily identifying himself, came before me on
 6   the 10th day of August, 2017, in Boston, Massachusetts,
 7   and was by me duly sworn to testify to the truth and
 8   nothing but the truth as to his knowledge touching and
 9   concerning the matters in controversy in this cause;
10   that he was thereupon examined upon his oath and said
11   examination reduced to writing by me; and that the
12   statement is a true record of the testimony given by
13   the witness, to the best of my knowledge and ability.
14        I further certify that I am not a relative or
15   employee of counsel/attorney for any of the parties,
16   nor a relative or employee of such parties, nor am I
17   financially interested in the outcome of the action.
18        WITNESS MY HAND THIS 14th day of August, 2017.
19
20
21   _____     My commission expires:
     DARLENE M. COPPOLA
22   NOTARY PUBLIC               November 11, 2022
23   REGISTERED MERIT REPORTER
24   CERTIFIED REALTIME REPORTER
25   Today's Date:   August 14, 2017
```

Page 395

```
 1              Steven P, Feinstein, Ph.D
 2   To:      William Markovits, Esquire
 3   Copied to:    Jason D. Frank, Esquire
 4            Frank Volpe, Esquire
 5            James Goldfarb, Esquire
 6            Catherine Wigglesworth, Esquire
 7            Adam Fotiades, Esquire
 8   From:    Darlene M. Coppola, CRR, RMR
 9   Deposition of:   STEVEN P. FEINSTEIN, PH.D.
10   Taken:       August 14, 2017
11   Action:      OPERS Vs. Freddie Mac, et al.
12          _____
13
14        Enclosed is a copy of STEVEN P. FEINSTEIN,
15   PH.D.'s deposition.  Pursuant to the Rules of Civil
16   Procedure, Dr. Feinstein has thirty days to sign the
17   deposition from today's date.
18        Please have Dr. Feinstein sign the enclosed
19   signature page.  If there are any errors, please have
20   him mark the page, line and error on the enclosed
21   correction sheet.  He should not mark the transcript
22   itself.  This addendum should be forwarded to all
23   interested parties.
24        Thank you for your cooperation in this matter.
25        UNITED STATES DISTRICT COURT
```

Page 396

```
 1              Steven P, Feinstein, Ph.D
 2           NORTHERN DISTRICT OF OHIO
 3               EASTERN DIVISION
 4
 5   **********************************
 6   OHIO PUBLIC EMPLOYEES RETIREMENT
     SYSTEM, on Behalf of Itself and
 7   all Others Similarly Situated,
 8           Plaintiff
 9   vs.           CA NO. 4:08-CV-00160
10   FEDERAL HOME LOAN MORTGAGE
     CORPORATION, a/k/a FREDDIE MAC,
11   RICHARD F. SYRON,
     PATRICIA L. COOK,
12   ANTHONY S. PISZEL and
     EUGENE M. MC QUADE,
13
           Defendants
14
     **********************************
15        I, STEVEN P. FEINSTEIN, PH.D., say that I have
16   read the foregoing deposition and hereby declare under
17   penalty of perjury the foregoing is true and correct:
18   (as prepared)  (as corrected on errata.)
19        Executed this _____ day of _____, 2017,
20   at _____, _____.
21
22
23
24   _____
          STEVEN P. FEINSTEIN, PH.D.
25
```

Page 397

```
 1   NAME OF CASE:
 2   DATE OF DEPOSITION:
 3   NAME OF WITNESS:
 4   Reason Codes:
 5       1. To clarify the record.
 6       2. To conform to the facts.
 7       3. To correct transcription errors.
 8   Page _____ Line _____ Reason _____
 9   From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25       _____
```

100  (Pages 394 to 397)