# Exhibit B

Page 398

1

2              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
3                 C.A. NO. 4:08-CV-00160
4     - - - - - - - - - - - - - - - - - -x
      OHIO PUBLIC EMPLOYEES              :
5     RETIREMENT SYSTEM on Behalf of     :
      Itself and All Others Similarly    :
6     Situated,                          :
                                         :
7                          Plaintiff,    :
                                         :
8          v.                            :
                                         :
9     FEDERAL HOME LOAN MORTGAGE         :
      CORPORATION, a/k/a Freddie Mac,    :
10    RICHARD F. SYRON, PATRICIA L.      :
      COOK, ANTHONY S. PISZEL, and       :
11    EUGENE M. MCQUADE,                 :
                                         :
12                         Defendants.   :
      - - - - - - - - - - - - - - - - - -x
13

14

       DEPOSITION OF STEVEN P. FEINSTEIN, PHD, CFA
15                      (Vol. 2)
16               Boston, Massachusetts
               Thursday, August 17, 2017
17

18

19

20

21

22

23

24    REPORTED BY:  Deanna J. Dean, RDR, CRR
25    JOB NO. 129069

Page 399

Thursday, August 17, 2017
9:58 a.m.

Deposition of STEVEN P. FEINSTEIN, PHD, CFA, held at the offices of Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, before Deanna J. Dean, a Registered Professional Reporter, Registered Diplomate Reporter, Certified Realtime Reporter, and Notary Public of the State of Massachusetts.

Page 400

A P P E A R A N C E S

MARKOVITS, STOCK & DEMARCO
Attorneys for Plaintiff
   3825 Edwards Road
   Cincinnati, 45209

BY:  WILLIAM MARKOVITS, ESQ.

   (appearing via video conference)

MORGAN, LEWIS & BOCKIUS
Attorneys for Defendant Federal Home
Loan Mortgage Corporation, a/k/a Freddie Mac
   One Federal Street
   Boston, MA 02110

BY:  JASON FRANK, ESQ.
BY:  LIZA HAYS, ESQ.
BY:  EMILY RENSHAW, ESQ.

Page 401

A P P E A R A N C E S (cont'd.)

SIDLEY AUSTIN
Attorneys for Defendant Richard Syron
   1501 K Street Northwest
   Washington, DC 20005

BY:  FRANK VOLPE, ESQ.

   (appearing via speakerphone)

ZUCKERMAN SPAEDER
Attorneys for Defendant Patricia Cook
   1800 M Street Northwest
   Washington, DC 20036-5807

BY:  ADAM FOTIADES, ESQ.

   (appearing via video conference)

Page 402

A P P E A R A N C E S (cont'd.)

MURPHY & MCGONIGLE
Attorneys for Defendant Anthony Piszel
   1185 Avenue of the Americas
   New York, NY 10036

BY:  James Goldfarb, Esq.
   (appearing via video conference)

DECHERT
   Attorneys for Defendant Eugene McQuade
   Cira Centre
   2929 Arch Street
   Philadelphia, PA 19104

BY:  CATHERINE WIGGLESWORTH, ESQ.

   (appearing via video conference)

ALSO PRESENT:
   William Slater, Legal Video Specialist

Page 403

1
2      STIPULATIONS
3
4         IT IS HEREBY STIPULATED AND AGREED
5   by and between counsel for the respective
6   parties that the sealing and filing of the
7   deposition in court are waived; that the
8   witness shall read and sign the deposition
9   transcript under the pains and penalties of
10  perjury, within 30 days of receipt thereof.
11        IT IS FURTHER STIPULATED that all
12  objections, except as to the form of the
13  question, and motions to strike are reserved to
14  the time of trial.
15
16
17
18
19            - oOo -
20
21
22
23
24
25

Page 404

1            Steven P. Feinstein, PhD, CFA
2         P R O C E E D I N G S
3      THE VIDEOGRAPHER:  Here begins media
4   labeled No. 1 in Day 2 of the video
5   deposition of Steven P. Feinstein, PhD, in
6   the matter of Ohio Public Employees
7   Retirement System, et al., versus Federal
8   Home Loan Mortgage, et al., in the United
9   States District Court in the Northern
10  District of Ohio, Eastern Division, No.
11  4:08-CV-00160.
12      This deposition is being held at the
13  offices of Morgan Lewis, One Federal
14  Street, Boston, Massachusetts, on
15  August 17, 2017.  The time is approximately
16  9:58 a.m.
17      My name is Bill Slater.  I am the
18  legal video specialist from TSG Reporting,
19  Incorporated, headquartered at 747 Third
20  Avenue, New York, New York.
21      The court reporter is Deanna Dean in
22  association with TSG Reporting.
23      Will counsel please introduce
24  themselves for the record.
25      MR. FRANK:  Good morning, everyone.

Page 405

1         Steven P. Feinstein, PhD, CFA
2      Jason Frank from Morgan, Lewis & Bockius on
3   behalf of Freddie Mac.
4      MS. HAYS:  Good morning.  Liza Hays,
5   also from Morgan Lewis, on behalf of
6   Freddie Mac.
7      MS. RENSHAW:  Emily Renshaw, also
8   from Morgan Lewis, on behalf of Freddie
9   Mac.
10     MR. MARKOVITS:  Bill Markovits,
11  Markovits, Stock & DeMarco, on behalf of
12  OPERS.
13     MR. VOLPE:  Frank Volpe, Sidley
14  Austin, on behalf of Richard Syron,
15  participating by telephone.
16     MR. GOLDFARB:  James Goldfarb,
17  Murphy & McGonigle, for defendant Anthony
18  Piszel, participating by video.
19     MR. FOTIADES:  Adam Fotiades from
20  Zuckerman Spaeder, on behalf of Patty Cook,
21  appearing by video.
22     MS. WIGGLESWORTH:  Catherine
23  Wigglesworth from Dechert LLP on behalf of
24  Eugene McQuade, also participating by
25  video.

Page 406

1         Steven P. Feinstein, PhD, CFA
2      THE VIDEOGRAPHER:  Will the court
3   reporter please swear in the witness and we
4   can proceed.
5      STEVEN P. FEINSTEIN, PHD, CFA
6   a witness called for examination by counsel for
7   the Defendant, having been satisfactorily
8   identified and being first duly sworn by the
9   Notary Public, was examined and testified as
10  follows:
11         EXAMINATION
12  BY MR. FRANK:
13     Q.   Good morning, Dr. Feinstein.
14     A.   Good morning.
15     Q.   You'll recall you were deposed in
16  these offices last Thursday, August 10, 2017.
17  Correct?
18     A.   That's right.
19     MR. FRANK:  Let me mark as the first
20  exhibit an email that I received from
21  Mr. Markovits on August 11, 2017.
22      If we could mark that as Exhibit No.
23  110, please.
24      (Exhibit 110 is marked for
25  identification.)

1    Steven P. Feinstein, PhD, CFA
2    MR. MARKOVITS: Are you going to
3  send me that by PDF, or which email is it?
4  I sent you two in August.
5    MR. FRANK: Yes. This is an email
6  with a time stamp of 5:03 and we will send
7  it to you. I guess Ms. Renshaw already
8  sent it to you, Bill, so it will be
9  arriving momentarily.
10    But this is the email sent -- do you
11  have it?
12    MR. MARKOVITS: Yeah. Wonders of
13  technology, it's here.
14    MR. FRANK: Very good.
15  BY MR. FRANK:
16    Q. Dr. Feinstein, you'll see that
17  before you is Exhibit 110. It is an email from
18  Mr. Markovits to Ms. Renshaw and myself on
19  Friday, August 11, 2017, at 5:03 p.m. It
20  states in the text, "Attached are the codes
21  used to run the cross-checks discussed
22  yesterday. They don't keep the results. Just
23  run them and report to Dr. Feinstein if there's
24  an issue."
25    Do you see that?

1    Steven P. Feinstein, PhD, CFA
2    A. I do.
3    Q. Is it true that your firm doesn't
4  keep the results of the diagnostic tests it
5  runs?
6    A. Right. They're not printed out,
7  even, generally.
8    Q. Okay. And they report those results
9  to you only if there's an issue. Is that
10  correct?
11    A. Well, I -- yes -- no. I ask if
12  there's an issue, and they told me there were
13  none in this case. So it's not like they would
14  just bring it to me if there's an issue. I in
15  this case specifically remember asking is
16  there -- are there any issues that I should
17  know about.
18    Q. And you had asked about that in
19  preparation for your deposition. Is that
20  correct?
21    A. I believe I asked sooner, but I'm
22  not sure, for sure. No, I -- they routinely
23  would bring to my attention any issues if they
24  identify any issues, and I do recall at one
25  point asking if there are any issues in this

1    Steven P. Feinstein, PhD, CFA
2  case. I don't recall whether that was before
3  or exactly when that was.
4    Q. Okay. And in his next sentence in
5  the email, Mr. Markovits says, "I've asked" --
6  I believe the word is supposed to be "them."
7    "I've asked them to run them again
8  and get them to me."
9    Do you see that?
10    A. I do.
11    Q. And did you ask your team to run
12  certain diagnostic tests on Friday, August 11,
13  2017?
14    A. Yes.
15    Q. Okay. What diagnostic tests did you
16  ask them to run?
17    A. The binomial test, the bootstrap
18  test, and the Fisher exact test.
19    Q. And who ran those tests?
20    A. Miguel Villanueva.
21    MR. FRANK: Let's mark this document
22  as the next exhibit.
23    (Exhibit 111 marked for
24  identification.)
25  BY MR. FRANK:

1    Steven P. Feinstein, PhD, CFA
2    Q. Dr. Feinstein, I've placed before
3  you a document that's been marked as Exhibit
4  111 that is labeled "Freddie Mac Collective
5  Test Robustness Checks."
6    Do you see that?
7    A. I do.
8    MR. FRANK: And for those
9  participating telephonically or by video,
10  this is the document that Mr. Markovits
11  produced to us on Friday.
12    Bill, do you have that document?
13    MR. MARKOVITS: Yes, I do.
14    MR. FRANK: Great.
15    Q. Now, is Exhibit -- no. Strike that.
16    Exhibit 111 shows the results of the
17  diagnostic tests that you had your team run on
18  Friday, August 11, 2017. Correct?
19    A. Mostly correct. There -- there's
20  one typographical error.
21    Q. Okay. And that typographical error
22  that you are -- well, strike that.
23    What typographical error are you
24  referring to?
25    A. On the rightmost column where the

Page 411

Steven P. Feinstein, PhD, CFA

1 numbers are, there are four numbers presented
2 vertically. The third one down is 0.17. My
3 understanding is that should be 1.17, the same
4 as the number directly above it.
5 Q. Now, do you review Exhibit 111
6 before -- well, strike that.
7 Did your team create Exhibit 111?
8 A. Yes.
9 Q. And did your team provide it to
10 Mr. Markovits?
11 A. Yes.
12 Q. Did you review Exhibit 111 before it
13 was provided to Mr. Markovits?
14 A. No.
15 Q. Okay. And do you know whether --
16 MR. MARKOVITS: Jason, if you could
17 hold one second. This is Bill.
18 I don't know if you received it, but
19 I sent to you a corrected -- and Emily -- a
20 corrected version of Exhibit 111.
21 MR. FRANK: We did receive it, and
22 I'll be entering it as an exhibit
23 momentarily.
24 MR. MARKOVITS: All right. Thank

Page 412

Steven P. Feinstein, PhD, CFA

1 you.
2 MR. FRANK: Bill, I assume you're
3 referring to the email you sent us at about
4 9:32 this morning?
5 MR. MARKOVITS: Yes.
6 MR. FRANK: Okay. Thank you.
7 BY MR. FRANK:
8 Q. Now, do you know whether or not you
9 reviewed Exhibit 111 before Mr. Markovits
10 provided it to me on Friday, August 11, 2017?
11 A. No. I mean, I do know. I reviewed
12 it yesterday.
13 Q. Okay. You reviewed Exhibit 111 for
14 the first time yesterday?
15 A. That's right.
16 Q. Okay. Now, in addition to having
17 results for Fisher's exact test, bootstrap
18 test, and a binomial test, Exhibit 111 also
19 reports z-test results. Correct?
20 A. That's right.
21 Q. Okay. And were those results --
22 strike that.
23 Were the z-tests that are referenced
24 there run prior to August 11, 2017?

Page 413

Steven P. Feinstein, PhD, CFA

1 A. Yes.
2 Q. Okay.
3 A. That's my understanding. They
4 repeated the same test that was run when I was
5 preparing my report.
6 Q. So these z-test results that appear
7 on Exhibit 111 represent an effort to rerun the
8 z-test that you referenced in your expert
9 report in this case?
10 A. That's right.
11 Q. Now, when you reviewed Exhibit
12 111 -- strike that. I apologize.
13 When did you say you first reviewed
14 Exhibit 111?
15 A. Yesterday, late afternoon.
16 Q. Okay. When you reviewed Exhibit 111
17 yesterday, did you identify any errors in the
18 document?
19 A. I did.
20 Q. Okay. What errors did you identify?
21 A. The one I spoke about moments ago.
22 Q. Okay. Did you -- the one you spoke
23 about being that the 0.17 percent next to
24 bootstrap test results and in the second column

Page 414

Steven P. Feinstein, PhD, CFA

1 should be 1.17 percent?
2 A. That's right.
3 Q. Did you identify any other errors in
4 the document?
5 A. No.
6 Q. Okay. So to the best of your
7 knowledge, Exhibit 111 is correct in all
8 respects, with the exception of that one error.
9 Is that correct?
10 A. Well, to the best of my knowledge,
11 I -- I didn't compare the -- I didn't compare
12 the output to the code, and I didn't -- I
13 relied on my team for that. And I didn't
14 compare the z-test results to what's in the
15 report, but I could do that. I haven't done it
16 yet.
17 Q. Well --
18 A. But, yes, to the best of my
19 knowledge, it's correct.
20 Q. Okay. Let's mark as the next
21 exhibit the corrected version.
22 MR. FRANK: If we could please mark
23 this as Exhibit 112.
24 (Exhibit 112 marked for

Page 415

1          Steven P. Feinstein, PhD, CFA
2      identification.)
3  BY MR. FRANK:
4      Q.   Okay.  I apologize.
5          So you have before you a document
6  that's been marked as Exhibit 112.  Correct?
7      A.   Yes.
8      Q.   Okay.  And Exhibit 112 consists of
9  an email from Mr. Markovits to me from this
10 morning at 9:31 a.m., I believe, attaching a
11 document titled "Freddie Mac Collective Test
12 Robustness Checks."  Correct?
13     A.   Yes.
14     Q.   And the robustness checks page is
15 identical to Exhibit 111 with the exception of
16 the error you previously identified.  Is that
17 correct?
18     A.   That's right.
19     Q.   Okay.  And so it's your
20 understanding that the attachment, the second
21 page of Exhibit 112, is the correct version of
22 the Freddie Mac collective test robustness
23 checks.  Correct?
24     A.   Yes.
25     Q.   Okay.  Now, this -- Exhibit 112 sets

Page 416

1          Steven P. Feinstein, PhD, CFA
2  forth, like Exhibit 111, the results of your
3  z-test.  Correct?
4      A.   Yes.
5      Q.   Why did your team provide to us the
6  results of the z-test as opposed to merely the
7  results of diagnostic tests that were run on
8  Friday, August 11, 2017?
9      A.   I'm not entirely sure what the --
10         MR. MARKOVITS:  Objection.
11     A.   -- instructions were.
12         MR. MARKOVITS:  Excuse me one
13 second, Doctor.
14         Objection.  Calls for speculation.
15 If you know.
16     A.   I don't know.
17     Q.   Okay.  You didn't instruct your team
18 to provide -- to create a document that
19 reflected z-test results.  Is that correct?
20     A.   Correct.
21     Q.   Did you instruct your team to create
22 a document like this and provide it to counsel?
23     A.   No.
24     Q.   Okay.  So this document that's been
25 identified as Exhibit 112 and the similar but

Page 417

1          Steven P. Feinstein, PhD, CFA
2  with one error in it document that's been
3  identified as Exhibit 111, those documents
4  weren't generated per your instruction.
5  Correct?
6      A.   It's not so black and white.  My
7  understanding is counsel, plaintiff's counsel
8  asked for this document and I allowed it.  I
9  permitted that.
10     Q.   Okay.  But --
11     A.   I gave the okay.
12     Q.   But you didn't determine what was
13 going to go in it and what wasn't going to go
14 in it.  Correct?
15     A.   No.  To some extent, I did.  I
16 did -- I understood that there was a request
17 from you, from defense counsel, for the
18 diagnostic test.  And so when I understood
19 that's what they were being asked to do, I, of
20 course, allowed that.
21         I don't see any -- I didn't see
22 any -- I didn't specifically allow or disallow
23 the z-test results to be printed here, but I
24 under -- it's reasonable that one would want
25 them there for comparison purposes.

Page 418

1          Steven P. Feinstein, PhD, CFA
2      Q.   Now, the z-test results we see in
3  the first column relate to what it states here
4  is WSJ/NYT news event days.
5          Do you see that?
6      A.   Yes.
7      Q.   Okay.  And WSJ is short for Wall
8  Street Journal.  Right?
9      A.   Yes.
10     Q.   And NYT is short for New York Times.
11 Right?
12     A.   Yes.
13     Q.   Okay.  And this is a reference to
14 the z-test that you ran that's discussed in
15 your report that relates to event days that you
16 selected using a Wall Street Journal/New York
17 Times election approach.  Correct?
18     A.   Yes.
19     Q.   Okay.  And there, it says the
20 p-value associated with those dates is
21 .0004 percent.
22         Do you see that?
23     A.   Yes.
24     Q.   And is it your understanding that
25 that is the correct p-value for the z-test that

1           Steven P. Feinstein, PhD, CFA
2    was run and discussed in your report?
3        A.    I would have to compare them.  So it
4    isn't, as I sit here right now, my
5    understanding.
6        Q.    Okay.  So you don't know one way or
7    another whether that's the correct p-value for
8    the z-test that's referenced in your report?
9        A.    I recall seeing the digit 4, but I
10   would have to compare this number to my report
11   to know for sure.
12       Q.    Let me show you your report which
13   was previously marked last week as Exhibit 96.
14           You have Exhibit 96 before you.
15   Correct?
16       A.    Yes.
17       Q.    Now, let me turn your attention to
18   Table 9 of Exhibit 96, which I believe appears
19   at the very end of the document.
20           Do you have Exhibit 9 in front of
21   you?
22       A.    I do.
23       Q.    Okay.  So Exhibit 9 of Exhibit 96 is
24   a set of results that you included at the end
25   of your expert report.  Correct?

1           Steven P. Feinstein, PhD, CFA
2        A.    Yes.
3        Q.    It's titled "Freddie Mac Collective
4    Test Result."  Correct?
5        A.    Just one moment, please.
6        Q.    Sure.
7        A.    (Reviewing document.)
8           Okay.
9        Q.    You've had a chance to look at
10   whatever portions of Exhibit 96 you wanted to
11   look at?
12       A.    Yes.
13       Q.    Okay.  And you observed in Exhibit
14   96 that both in paragraph 143 and in Exhibit 9
15   to your report -- that is, Exhibit 96 -- that
16   the p-value you report is .0005 percent.
17   Correct?
18       A.    That's right.
19       Q.    Okay.  And here on this page, it's
20   .0004 percent.  Right?
21       A.    Yes.
22       Q.    Do you know why there's a difference
23   between Exhibit 112 and Exhibit 96 on this
24   issue?
25       A.    I don't know for sure.  I know that

1           Steven P. Feinstein, PhD, CFA
2    the important thing is the asterisk that says
3    that it's statistically significant at the
4    95 percent confidence level, and both of those
5    numbers certainly are.
6           Again, without speculating, I -- it
7    could be due to just a rounding issue, whether
8    it was rounded up or down, and when this --
9    when Exhibit 111 and 112 were produced, how the
10   rounding was done, whether they rounded up or
11   down.
12       Q.    As you sit here today, do you know
13   what the correct p-value is for the FDT z-test
14   that you ran?
15       A.    Well, I know that it's -- I do know
16   that it's highly significant at the 95 or
17   99 percent confidence level; that if there's
18   any discrepancy whatsoever, it's out in the
19   ten-thousandths of a percent digit.  But I
20   don't know for sure whether it should be 4 or
21   5 -- .0004 percent or .0005 percent.
22           My inclination is to stand by my
23   report, given that the table we're talking
24   about was produced essentially at your request
25   and late on Friday afternoon.

1           Steven P. Feinstein, PhD, CFA
2        Q.    Well, will you -- you don't recall
3    me requesting that your team or you rerun your
4    z-test, do you?
5        A.    No.
6        Q.    And so as you sit here today, do you
7    know if the .0004 percent or the .0005 percent
8    number is the correct number?
9        A.    Well, I mean, I do know from
10   speaking to Alex Huang, who presented -- who
11   prepared this table, when I asked him about the
12   0.17 versus the 1.17, he said it was a
13   transcription error.  He was transcribing off
14   of what was on a computer screen.
15           So, again, I'm not a hundred percent
16   sure, but I think maybe what happened is he was
17   transcribing again the z-test results and wrote
18   4 instead of 5, probably because the digit in
19   that column was a 4, and it's 5 in the report
20   because there was -- the next digit after that
21   would have been rounded up, would have been
22   caused to be rounding up to 5 rather than down
23   to 4.  I think that's probably what happened,
24   but I can check to find out.
25           I know that once you're out -- you

Page 423

Steven P. Feinstein, PhD, CFA

1
2  know, once you're past 5 percent -- and here,
3  we're like, you know, ten-thousandths -- ten
4  thousandfold beyond that, it really doesn't
5  matter for statistical inference.
6       Q.  Well, Doctor, I guess what I'd say
7  is look.  We have limited time this morning.
8       A.  Yeah.
9       Q.  So if you could stick to answering
10  my questions, that will avoid the need for us
11  to go to the court or to by agreement get more
12  time.
13       To the extent there's anything you
14  want to say, you know, you can -- there's an
15  opportunity for that.  But if you could stick
16  to answering my questions, I'd appreciate it.
17       Now --
18       MR. MARKOVITS:  Before you continue,
19  this is Bill, and I'm going to object.  He
20  answered the question and provided an
21  explanation.
22       You can go ahead and ask your
23  questions, but don't instruct my witness.
24  Thank you.
25       MR. FRANK:  Bill, he's got to answer

Page 424

Steven P. Feinstein, PhD, CFA

1
2  my questions.  It's not much more
3  complicated than that.
4       MR. MARKOVITS:  He did answer
5  your --
6       MR. FRANK:  Can we agree, Bill, that
7  the stipulations that we agreed to last
8  time are going to apply to today?
9       MR. MARKOVITS:  Sure.
10       MR. FRANK:  Okay.  That would be
11  good.  Thank you.
12  BY MR. FRANK:
13       Q.  Now, with respect to the second
14  column, Dr. Feinstein, where we see "WSJ/NYT
15  News Event Days Excluding Corrective
16  Disclosure" to dates -- disclosure, and I'm
17  referring to Exhibit 112, what does -- what
18  does that column refer to?
19       A.  That's the p-value for there being
20  three of eight of the news events statistically
21  significant.
22       Q.  So that is the p-value for these
23  four different tests, excluding the
24  November 20, 2017, date.  Is that correct?
25       A.  Were you asking about all four

Page 425

Steven P. Feinstein, PhD, CFA

1
2  numbers or just the 0.20 number?
3       Q.  Well, right now I was asking for all
4  four numbers.
5       A.  Right.  So these are the p-values
6  for a test where we exclude the final
7  corrective disclosure from the news events,
8  even though it's identified by the New York
9  Times and Wall Street Journal as a news event,
10  and only focus on the eight other news events,
11  to see how many of those other eight
12  news events were statistically significant.
13       So it's the p-value for there being
14  three of eight significant news events out
15  of -- three significant news events out of
16  eight news events.
17       Q.  And when you say even though it's
18  identified by the New York Times and the Wall
19  Street Journal as a news event, what you mean
20  is that it's identified by your approach to
21  using those two newspapers to identify news
22  events.  Is that correct?
23       A.  Yes.
24       Q.  Okay.
25       Now, let's just turn your attention

Page 426

Steven P. Feinstein, PhD, CFA

1
2  to the 0.20 percent number.  Do you see that?
3       A.  I do.
4       Q.  And that is the p-value for a z-test
5  run just against the dates selected, excluding
6  the November 20, 2000, date.  Correct?
7       A.  Yes.
8       Q.  Okay.  And is this number,
9  0.20 percent, is that a typographical or
10  transcription error as well or is that the
11  correct number?
12       A.  I would want to check it.  I know
13  it's statistically significant.  That's what's
14  recorded in my report.  But whether it's 0.20,
15  given what we've already covered earlier today,
16  I'd want to check it again.  But as I sit here
17  now, I don't have any reason to believe it's
18  incorrect.
19       Q.  Well, actually, you -- you're aware
20  that the 1.17 percent number that we see next
21  to bootstrap test results on Exhibit 112, that
22  didn't appear in Exhibit 111.  Right?
23       A.  That's right.
24       Q.  Okay.  So that was one mistake in
25  Exhibit 111.  Right?

Page 427

Steven P. Feinstein, PhD, CFA
1
2       A.   A transcription error from the
3   computer screen is what I'm told.
4       Q.   Okay.  And -- I'm sorry.  When you
5   say transcription error, is that an error that
6   the system made or is that an error that a
7   human being made in transcribing numbers from
8   what the human being was seeing on the screen?
9       A.   The latter.
10      Q.   Okay.  So it was human error?
11      A.   Of just writing down what the screen
12  was indicating --
13      Q.   Okay.  And --
14      A.   -- into a table to present to you.
15      Q.   And you believe the .0004 percent
16  number, that that also may have been a
17  transcription error, given that it's different
18  from the results reported in your report.
19  Correct?
20      A.   Right.  It seems to be a reasonable
21  explanation that what was on the screen was
22  something like .00449, or 0004 with some other
23  digits afterwards, and maybe Alex truncated
24  rather than rounding up.  That's probably what
25  happened.

Page 428

Steven P. Feinstein, PhD, CFA
1
2       Q.   You're speculating, but you think
3   that's probably what happened?
4       A.   It's not pure speculation.  I mean,
5   I've been in his shoes before, transcribing
6   data off of a computer screen.  And when you
7   have -- when you're so far out in the
8   significant digits here, you know,
9   ten-thousandths of a percent, and you're under
10  the gun to get an exhibit out, you know, that
11  was just -- that was just asked for and you,
12  know, it's late Friday afternoon, I can imagine
13  him truncating at 4 rather than rounding up
14  from 4 to 5, based on digits that came after
15  the 4.  Seems like a reasonable explanation.
16      Q.   You suspect he made a rounding
17  error?
18      A.   Yes.
19      Q.   Okay.
20      A.   It's more of a transcription error.
21  Yeah, it would be transcription error that
22  he -- rather than just transcripting the --
23  transcribing the number he saw on the screen,
24  it's very likely he -- rather than -- rather
25  than rounding the number he saw on the screen,

Page 429

Steven P. Feinstein, PhD, CFA
1
2   he transcribed a digit he saw on the screen.
3   The better thing to do would have been to round
4   and then transcribe.
5       Q.   Okay.  Now, in the -- does that give
6   you cause, those two errors, to suspect that
7   maybe this 0.20 percent number isn't correct?
8       A.   Well, I -- it gives me cause to want
9   to check it, but I don't have any reason to
10  believe that it's wrong.
11          I did ask my team numerous times --
12  well, there were many people who checked over
13  the code to make sure that the code was exactly
14  what we had used previously and that it was
15  correct code.
16          Alex told me that he didn't have
17  anyone check over this exhibit before he sent
18  it out.  So the underlying code and the numbers
19  that are produced by the code and the numbers
20  that I relied on as diagnostics, I'm highly
21  confident are correct.
22      Q.   Now, when you say that Alex told you
23  that he didn't have anyone check over this
24  exhibit before he sent it out, are you
25  referring to the first version that went out

Page 430

Steven P. Feinstein, PhD, CFA
1
2   that's been marked as Exhibit 111 or the second
3   version that went out that was marked as
4   Exhibit 112?
5       A.   The first one, 111.
6       Q.   Okay.  Now, did people --
7       A.   By 1 -- well, I'm just anticipating
8   your next question.  I'll let you ask it.
9       Q.   Well, you were going to say that by
10  112, you had checked 111 over and made a
11  correction that now appears in 112.  Correct?
12      A.   Right.  So yesterday, preparing for
13  today, it was myself and Alex and Dan
14  Bettencourt and Miguel Villanueva, and we had
15  Exhibit 111, and I observed that -- the anomaly
16  in the numbers.  And then Alex said, "Oh.
17  Oops.  Looks like I made a transcription
18  error."  And the others agreed.
19      Q.   And while -- was there any attorney
20  present when you were meeting with Alex and Dan
21  and Miguel?
22      A.   No.
23      Q.   And during that conversation, did
24  you discuss any other errors or potential
25  errors on Exhibit 111?

Page 431

Steven P. Feinstein, PhD, CFA

A.   No.  Well, potential errors.
I asked -- no.  The answer's no.
Q.   Well, what did you ask, if anything,
regarding the accuracy of Exhibit 111?
A.   Well, I asked who he had check it,
and that's when I found out that he had no one
check it, that he said it was a last-minute
request, that they -- my understanding and the
understanding that was conveyed to my team is
that the request was for the underlying code,
so that you folks can duplicate/replicate the
diagnostics.  And then my understanding is they
provided that code, and then subsequent to
providing that code, they were asked for a
tabulation of the results.  And that was the
process.
Q.   You don't recall during your
deposition last week that I asked for any
calculations or work papers that related to any
diagnostic tests that you ran?
A.   Right.  In our possession.  These
are -- we don't print these out generally.  I
mean, we don't print them out.  I mean, this
was the first time they were ever printed out

Page 432

Steven P. Feinstein, PhD, CFA

and tabulated in one place.
It's sort of like a red light
indicator on the dashboard of your car.  If
your car's not overheating, it doesn't light
up.  You can rely on the fact that it's not
lighting up.  Most people don't take a picture
of their dashboards to document and memorialize
that their -- that the indicator lights weren't
on.  That's the story here.  I mean, if the --
if there's a reason for concern, then it would
be printed out and reported, but if there's
absolutely no reason for concern, we don't
print them out.
Q.   Now, with respect to this number,
the 0.20 percent number, does that number
appear anywhere in your report that's been
identified -- I apologize -- marked as Exhibit
96?
A.   It's alluded to, but it's not -- the
number itself is not provided.  What's written
in the report is that the test was repeated
excluding the final corrective disclosure, and
that the result, the statistical result was
still highly significant, that the news days

Page 433

Steven P. Feinstein, PhD, CFA

had different dynamics than the non-news days.
And that's in the paragraph after the one we
were just talking about moments ago --
Q.   Are you referring --
A.   -- in the report.
Q.   Are you referring to paragraph 144
of your report?
A.   Yes.
Q.   Okay.  So in your report, in
paragraph 144, you allude to the test, but
the -- at that time you had not included in
your report or provided to counsel the results
of that z-test.  Correct?
A.   No, the result is here.  The result
is that -- that the prior -- the previously
reported results of significance is robust to
using three -- using eight news events instead
of nine.
Q.   That's --
A.   I'll just read it:  "The test
produces the same result supporting the same
conclusion even if one were to remove the
allegation-related event."
So the result's here.  The result is

Page 434

Steven P. Feinstein, PhD, CFA

that three of eight is a statistically
significant difference from the incidence rate
of significance in the non -- among the
non-news days.
Q.   Well, you understand that
statistical tests yield numerical results.
Correct?
A.   Numerical and qualitative.  You
derive qualitative conclusions from the
quantitative statistics.
Q.   Did you include anywhere in your
report the numerical results that are alluded
to in paragraph 144?
A.   No.  Just the conclusion.
Q.   So for the first time -- strike
that.
The first time you shared the
numerical results that are alluded to in
paragraph 144 is in the document marked Exhibit
111.  Is that correct?
A.   The numerical z-test statistic from
which the conclusion in the report is based.
Q.   Right.  That's what I'm asking
about.

1       Steven P. Feinstein, PhD, CFA
2       A.   Right.
3       Q.   So the first time you provided to
4  counsel the numerical result of your FDT z-test
5  as compared to the WSJ/NYT news event dates,
6  excluding the corrective disclosure date, is
7  Exhibit 111.  Right?
8       A.   Well, I'll grant you the 0.20 and
9  the p-value is not in the report, but what 144
10 is is a robustness check that is reported, that
11 says three if you use three of eight instead of
12 four of nine, it's still significant.  That's
13 what is reported.  But the 0.20 p-value that
14 indicates that conclusion is not in my report.
15      Q.   All right.  Now --
16      A.   I'm -- it was, however, presented in
17 the code that was provided to you before my
18 first deposition.
19      Q.   What was presented in the code that
20 was provided to us before your first
21 deposition?
22      A.   The code that produces the code
23 and -- that the z-test code and the z-test
24 results is my understanding were there.
25      Q.   So you -- you believe that you --

1       Steven P. Feinstein, PhD, CFA
2  that this 0.20 percent number was actually
3  provided to counsel after your report but prior
4  to your first -- the first day of your
5  deposition?
6       A.   As I sit here now, I don't have any
7  reason to believe it wasn't.  I think that's --
8  I believe it was.
9       Q.   Do you know for sure?
10      A.   No.
11      Q.   Now, with respect to the z-test that
12 has results listed here for both the -- all of
13 the news dates you selected and the news dates
14 excluding November 20th, were those z-tests run
15 on the basis of two separate regression models?
16      A.   Could you repeat that, please.
17      Q.   The z-tests that are referenced here
18 on Exhibit 112, those were based on two
19 different regression models.  Is that correct?
20      A.   No.  My understanding is it was the
21 same regression model for both sets of tests.
22      Q.   Didn't you identify a structural
23 break in the market for Freddie Mac's common
24 stock?
25      A.   Oh, I thought you were referring

1       Steven P. Feinstein, PhD, CFA
2  to -- I thought you were referring to a
3  different regression model or a different
4  regression -- I thought you were referring to
5  there being eight news events instead of nine
6  news events, and so there being a different
7  approach to the regression for the second
8  column than for the first column.  That's not
9  what you are asking.
10      Q.   Right.
11      A.   You wanted to know whether for all
12 of these, there were two separate regressions,
13 one for the -- before the structural break and
14 one for after the structural break.
15           That is the case, that there were --
16 it's the same regression model and the same
17 regression design, but they were run over two
18 separate data periods, one before the break and
19 one after the break.
20      Q.   And just for the sake of clarity,
21 are these two different z-tests or one z-test
22 that would appear in the -- that we see in the
23 two columns?
24      A.   This is two separate z-tests:  one
25 that tests for three of eight significant

1       Steven P. Feinstein, PhD, CFA
2  events and one that tests for four of nine.
3       Q.   Okay.  And when you ran your z-test,
4  did you -- let's take each in turn.
5           When you ran your z-test on all of
6  the WSJ/NYT news event dates, did you apply it
7  separately to each of the two periods you
8  identified before the structural break and
9  after the structural break?
10      A.   Did I run a separate z-test for the
11 events before the structural break and a
12 separate z-test for the events after is what
13 you're asking?
14      Q.   Yes.
15      A.   No.
16      Q.   And that's the same for the second
17 column.  Correct?
18      A.   That's right.
19           MR. FRANK:  Let's mark the
20 Eletrobras report.  And if we could
21 distribute that to counsel.
22           (Exhibit 113 is marked for
23 identification.)
24 BY MR. FRANK:
25      Q.   Dr. Feinstein, I'm showing you a

1    Steven P. Feinstein, PhD, CFA
2  document that's been marked as Exhibit 113.
3       Do you have Exhibit 113 before you?
4       A.  I do.  And I'd like a moment to
5  review it.
6       Q.  Sure.
7       MR. FRANK:  While the doctor is
8  reviewing the report, I'll state for the
9  record -- well, I'll ask.
10      Bill, have you received it yet?
11      MR. MARKOVITS:  No, I have not.
12      MR. FRANK:  Okay.  It's large.  You
13  should get it soon.
14      I will state for the record that
15  previously in Dr. Feinstein's deposition,
16  we introduced Exhibit 103, which was the
17  report on market efficiency by
18  Dr. Feinstein in the Eletrobras matter.
19  Exhibit 113 is his report with all its
20  exhibits.
21  BY MR. FRANK:
22      Q.  Dr. Feinstein, I'm happy to give you
23  as much time as you need to go over the report.
24  Does it make sense for us to go off the record
25  briefly so that you can have enough time that

1    Steven P. Feinstein, PhD, CFA
2  you need to take a look at it?
3       A.  I'm just about done.
4       Q.  Okay.
5       A.  All I need is one more minute.
6  I see.  Okay.  I'm ready.
7       MR. MARKOVITS:  Jason?
8       MR. FRANK:  Yes.
9       MR. MARKOVITS:  Sorry, Doctor.
10      Jason, let me just take this
11  opportunity to reiterate what was stated in
12  emails with -- and conversations, which is
13  that the scope of this continuation is
14  limited to the three diagnostic
15  cross-checks that were performed by
16  Dr. Feinstein and nothing beyond that.
17      I gave you already a little leeway
18  with regard to the z-test results because
19  of apparent discrepancy or possible
20  discrepancy of those results in the report
21  which [audio unintelligible].  But we are
22  not going to get into anything but those
23  diagnostic cross-checks that were the
24  additions that were provided to you.
25      MR. FRANK:  Bill, I'll state for the

1    Steven P. Feinstein, PhD, CFA
2  record that we agreed to limit the scope to
3  the tests and testing set forth on the
4  document that you provided to us, and the
5  document you provided to us is labeled at
6  the top "Robustness Checks."  And
7  presume -- I mean, I think that you will
8  see very quickly how we will be connecting
9  our questioning to the document and in
10  particular the robustness checks that
11  purport to be on this document.
12      So, look.  You know, we've always
13  managed to work through issues
14  cooperatively, and I think this is an issue
15  where you'll find very quickly that we have
16  not strayed from our agreement.
17      MR. MARKOVITS:  We'll see.  I just
18  wanted to make sure we're clear on the
19  record, and if we go beyond the scope, he
20  is not going to be answering questions.
21      MR. FRANK:  Well, look.  If we have
22  to disagree, we'll cross that bridge when
23  we come to it.  All right.
24      MR. MARKOVITS:  Yeah.  All right.
25  BY MR. FRANK:

1    Steven P. Feinstein, PhD, CFA
2       Q.  Now, just to be clear, on Exhibit
3  112, you provided to us for the first time the
4  numerical result of your z-test on eight rather
5  than all nine of the dates you tested.
6  Correct?
7       A.  Yes.
8       Q.  Okay.  Now, did you do that in an
9  effort to somehow establish that your FDT
10  z-test on all nine of the test dates was
11  robust?
12      A.  Do what?
13      Q.  Did you provide to us the results of
14  testing on just eight of the dates in an effort
15  to show that your testing on all nine of the
16  dates was robust or otherwise justified?
17      A.  Well, if you're asking about Exhibit
18  111 or 112, the answer is no.  If you're asking
19  about the paragraph -- I believe it was 143?
20      Q.  144.
21      A.  -- 144 in my report, then the answer
22  is yes.
23      Q.  So, in other words, you discussed a
24  test based on just the eight dates, excluding
25  November 20th, in an effort to support your

Page 443

1    Steven P. Feinstein, PhD, CFA
2  test on the nine dates.  Is that correct?
3    A.   Right.  I was preemptively
4  anticipating what issues someone might raise
5  about the choice of events, and addressed it.
6    Q.   And the testing that you did on the
7  nine dates and the eight dates in this case
8  was --
9    A.   And which we were talking about this
10 case.  Right?  My answer was about --
11   Q.   Right.
12   A.   -- the current case, not Eletrobras.
13   Q.   Right.
14   A.   Okay.
15   Q.   And the testing that you did on the
16 dates in this case was based on a regression
17 model that took into account two different
18 volatility periods.  Is that correct?
19   A.   That's right.  And it was -- I stand
20 by it being correct.
21   Q.   And in the Eletrobras case, you also
22 identified a structural break there.  Correct?
23   A.   Yes.
24   Q.   Okay.  And you ran three z-tests
25 there.  Correct?

Page 444

1    Steven P. Feinstein, PhD, CFA
2    A.   That's right.
3    Q.   You ran one z-test that did not take
4  into account the structural break that you
5  identified.  Correct?
6    A.   That's not accurate.  It's -- you --
7    MR. MARKOVITS:  Let me object.  You
8  are getting beyond the scope here.  You
9  knew as of last deposition that he had
10 identified the structural break.  You knew
11 pursuant to the paragraph in his report
12 that he had done -- that he had done both
13 three of eight and four of nine.  You had
14 the opportunity to question him about that
15 at that time.
16   This continuation of the deposition
17 is intended to be solely limited to the
18 three diagnostic cross-checks that were
19 performed and that he discussed at the
20 deposition but the code for which or the
21 results for which had not been provided.
22   We provided those.  You have the
23 opportunity to question him about those.
24 You do not have the opportunity to revisit
25 any issues regarding to the z-tests that

Page 445

1    Steven P. Feinstein, PhD, CFA
2  were performed because you now think there
3  are questions you should have asked last
4  week that you forgot to ask or your
5  consultants had not told you to ask.
6  That's not what this continuation is about.
7    MR. FRANK:  Bill, I respectfully
8  disagree.  I'm asking him about a test
9  whose results he provided to me for the
10 first time on Friday.
11 BY MR. FRANK:
12   Q.   Now, Dr. Feinstein, this WSJ/NYT
13 news event days, excluding corrective
14 disclosure, do you see that, with the
15 .20 percent?
16   A.   Yes.
17   Q.   Okay.  Now, that test was based on a
18 regression model -- strike that.
19     Did that test in any way -- strike
20 that.
21     Have you in any other case run a
22 test like that where you excluded a single date
23 in order to demonstrate that your other z-test
24 results were robust or otherwise justified?
25   MR. MARKOVITS:  Objection.  Beyond

Page 446

1    Steven P. Feinstein, PhD, CFA
2  the scope of this deposition, and I'll
3  allow him to answer this, but that's it,
4  Jason.
5    A.   I may have.  I don't know for sure.
6  I'd have to check prior reports.
7    Q.   As you sit here today, you can't
8  think of a case in which you did that?
9    A.   Well, I'll share with you my
10 thinking.  If that -- that when I write a
11 paragraph such as 144, which is a preemptive
12 response to an anticipated potential challenge,
13 I'm -- it's based on my experience with what
14 kind of challenges are raised.
15     So I think the issue may have been
16 raised before.  I don't recall if it was raised
17 early enough where when the issue became
18 relevant again I would have written it into a
19 report.  I may have; I may not have.  I just
20 don't recall for sure.
21   Q.   And if I refer to the two different
22 periods in this case that you used to run the
23 test that's reflected in the results that
24 appears on Exhibit 112 as .20 percent --
25   A.   Yes.

Page 447

Steven P. Feinstein, PhD, CFA
1
2    Q.   -- as intervals, the two -- if I
3  refer to the two different periods as
4  intervals, is that language you would
5  understand?
6    A.   Yes.
7    Q.   Okay.  Sometimes when you run tests
8  based on not the entire class period, you'll
9  refer to that as an interval?
10    A.   Yes.
11    Q.   Okay.  And in this case --
12    MR. MARKOVITS:  Jason -- objection.
13  It's again beyond the scope.
14    Stick to the three diagnostic
15  cross-checks that are the reason for the
16  continuation of the deposition, please.
17    MR. FRANK:  Bill, I've been given a
18  new result that is next to something called
19  z-test, and I'm allowed to ask the witness
20  about it.  And we specifically agreed to
21  ask him about the test and testing that's
22  referenced in the document you provided to
23  me.
24    MR. MARKOVITS:  No.  Jason, that's
25  incorrect.  What was agreed to was that the

Page 448

Steven P. Feinstein, PhD, CFA
1
2  scope of the deposition would be limited to
3  the three diagnostic cross-checks.  You
4  knew that that's what the scope was going
5  to be limited to.  I'm not going to permit
6  additional questions regarding the z-tests
7  you asked him about last week.
8    If you have questions about these,
9  ask them.  Otherwise, we're not going to
10  answer any more questions.
11    MR. FRANK:  If you can mark the next
12  document as an exhibit, I'd appreciate it.
13  Thank you.
14    Can you send that to counsel,
15  please.
16    (Exhibit 114 marked for
17  identification.)
18  BY MR. FRANK:
19    Q.   Dr. Feinstein, I'm showing you a
20  document that's been marked as Exhibit 113 --
21  114.  Exhibit 114.
22    Do you have Exhibit 114 before you?
23    A.   Yes.
24    Q.   Do you see where -- that this is an
25  email from Ms. Renshaw, Emily Renshaw, to Bill

Page 449

Steven P. Feinstein, PhD, CFA
1
2  Markovits, dated August 16, 2017, at
3  11:50 a.m.?
4    A.   I do.
5    Q.   Do you see that it says, "Bill, this
6  is to confirm that we agreed to resume
7  Dr. Feinstein's deposition tomorrow at
8  9:45 a.m. for no more than two hours"?
9    Do you see that?
10    A.   Yes.
11    Q.   Do you see that it then says, "The
12  subject matter shall be limited to anything
13  relating to the tests and testing reflected in
14  the document produced to us on Friday"?
15    Do you see that?
16    A.   I see that.
17    Q.   I read that correctly?
18    A.   Yes.  I mean, I -- I mean, again,
19  I -- it's something for you and the other --
20    MR. MARKOVITS:  Jason, I'm going to
21  object.  I am going to object and instruct
22  him not to answer anything beyond what's in
23  my email to you, which says, "Our position
24  is that the scope of the deposition is
25  limited to the three cross-checks that were

Page 450

Steven P. Feinstein, PhD, CFA
1
2  performed and for which you recently
3  received documentation.  If this is not
4  agreeable, let's resolve the issue with the
5  court immediately."
6    You did not choose to take that
7  issue to the court.  You can certainly do
8  so down the road.  But he is not going to
9  answer any questions beyond those limited
10  to the three cross-checks that were
11  discussed last week on official
12  documentation.
13    MR. FRANK:  Bill, for the record,
14  are you willing to identify the date and
15  time of the email you were just reading
16  from?
17    MR. MARKOVITS:  It's part of the
18  exhibit you just -- it's down below the
19  email from Emily.  It's Wednesday,
20  August 15, 10:51 a.m.
21    MR. FRANK:  Ah, I see.
22    All right.  And I -- okay.  Very
23  good.  Thank you for identifying that.
24  BY MR. FRANK:
25    Q.   And Dr. Feinstein, do you see for

Page 451

1          Steven P. Feinstein, PhD, CFA
2   the record in response, I -- well, Ms. Renshaw
3   replied at 11:50 a.m.?
4          Do you see that?
5      A.   I think the record speaks for
6   itself.
7      Q.   Well, do you see what I'm referring
8   to?
9      A.   No.  Which --
10     Q.   Do you see that Mr. Markovits was
11  referring to an email dated 10:51 a.m.?
12         Do you see that?
13     A.   Yes.  Yes.
14     Q.   And Ms. Renshaw replied at
15  11:50 a.m.
16         Do you see that?
17     A.   I see that.
18     Q.   Okay.  Did you ever see this email
19  from -- any of these emails from or to
20  Mr. Markovits before today?
21         MR. MARKOVITS:  I'm going to object
22     and instruct -- I'm going to object and
23     instruct him not to answer.
24     Q.   All right.  Now, turning to -- let's
25  see.

Page 452

1          Steven P. Feinstein, PhD, CFA
2          Turning back to Exhibit 112 that was
3   provided to us this morning, did you ever run
4   an FDT z-test in this case that did not take
5   into account in any way the structural break in
6   the market?
7          MR. MARKOVITS:  Objection.  I'll let
8      him answer this, but we're not going down
9      this road, Jason.  That's not related to
10     the three cross-checks that were at issue
11     from last week.  This is the last question
12     about the z-test that he's going to answer.
13     A.   I don't believe so.
14     Q.   Now, are the three diagnostic tests
15  that we see on Exhibit 112 an effort to
16  establish the robustness of the z-test results
17  that appear above them?
18     A.   Not originally, that's not what they
19  were for.
20     Q.   Now --
21     A.   Well, you said -- and I want to be
22  clear about my answer.  I mean, they weren't
23  run and produced in order to make an argument
24  defending the z-test.  They were run and
25  produced in order to establish the legitimacy

Page 453

1          Steven P. Feinstein, PhD, CFA
2   of the z-test qualitative result, which is what
3   a diagnostic does.
4      Q.   Is it fair to say that the purpose
5   of these diagnostic tests is to account for
6   issues arising from the small sample size of
7   the z-test?
8      A.   Well, actually, I just want to be
9   real clear about my last answer.
10         These tests were run as a diagnostic
11  to identify if there was an issue.  And as it
12  relates to your second question is the issue
13  that these would address are the asymptotic --
14  small sample asymptotic properties of the
15  z-test.  And the diagnostic indicates that
16  there's no issue, no problem with the small
17  sample asymptotic properties of the z-test.
18     Q.   If these results are correct --
19     A.   Which ones?
20     Q.   If the results that you report on
21  Exhibit -- or -- strike that.
22         If the results that your team has
23  reported on Exhibit 112 are correct, you
24  believe those results establish that there's no
25  problem with the small sample size of the

Page 454

1          Steven P. Feinstein, PhD, CFA
2   z-tests that you ran.  Is that correct?
3      A.   In this particular case, with this
4   data, with these results, yes.
5      Q.   Okay.
6      A.   That's the case.
7      Q.   Now, did you run your Fisher exact
8   test in a way that took into account the
9   structural break in the market?
10     A.   The Fisher exact test is an
11  incidence test, and the incidence -- I'm
12  sharing with you my thinking to answer the
13  question -- the incidence is the incidence of
14  significance, and significance is indicated by
15  a different regression before the break as
16  after the break.
17         So, yes, my Fisher exact test did
18  take into account the structural break.
19     Q.   It took it into account insofar as
20  it was based on the regression model that
21  informed whether price movements were
22  statistically significant.  Is that correct?
23     A.   The two regression models, each for
24  a respective interval, yes.
25     Q.   Was there one regression model in

Page 455

Steven P. Feinstein, PhD, CFA

1
2  this case or two regression models that you
3  used?
4      A.   Depends what you mean by "model."
5  Some people use the word "model" to mean the
6  regression equation, what the right-hand side
7  variables are and what the left-hand side
8  variable is.  If that's the case, there's only
9  one model.
10         But if by "model" you mean what data
11  the regression was estimated over, it was
12  estimated over two separate intervals.
13      Q.   And did the Fisher exact test run --
14  strike that.
15         Did your team run the Fisher exact
16  test for each of the two intervals that you
17  identified?
18      A.   The Fisher exact test is run over
19  the entire class period, for all of the events
20  from the entire class period, but using
21  significance indicated by each of two
22  respective regression interval estimates.
23      Q.   So the Fisher exact test was not run
24  over just the first interval of the class
25  period or the second interval of the class

Page 456

Steven P. Feinstein, PhD, CFA

1
2  period.  Correct?
3      A.   That's right, nor was the z-test,
4  because of the nature of the data.
5      Q.   Do you know what the results of the
6  z-test would have been had you run them over
7  the two different intervals?
8      A.   Well, I think it's inappropriate to
9  do that.  You don't need to do that.  And in
10  this case, it would be inappropriate to do
11  that, since we're talking about nine events.
12  And if you'd split the nine events between the
13  two samples, you're going to get a weak -- a
14  weak test, and if -- a weak test won't indicate
15  anything because of its weakness.  Can't be
16  used.
17      Q.   When you say a weak test, do you
18  mean that the sample size would have been too
19  small to yield statistically reliable results?
20      A.   Well, let's be clear about -- I
21  mean, we're talking -- there's nine events,
22  and -- can I have my report?  It's here.
23         We have -- you'd only have four in
24  the second period and only five events in the
25  first period.  The fewer events, the weaker the

Page 457

Steven P. Feinstein, PhD, CFA

1
2  test becomes.  And, yes, I believe that running
3  it on just those four -- just four events or
4  just five events would be too small to allow
5  one to properly interpret the results.  I mean,
6  the nine over the entire period is large enough
7  so that reliable inferences can be made, but if
8  we divide the period up so you only have four
9  in one period and five in the other,
10  individually those samples are not large enough
11  to make reliable inferences from the
12  statistical results.
13      Q.   In your view, what number is too
14  large -- too small?  Where's the cutoff?
15         Strike that, because the record's
16  messy.  I asked two questions.
17         In your view, what is the numerical
18  cutoff?
19      A.   It's indicated by the data.  It's
20  indicated by these diagnostic tests.  These
21  diagnostic tests will tell you whether the data
22  is -- whether there are enough events in order
23  to make reliable inferences.  So these
24  diagnostic tests indicate whether you have
25  enough or do not have enough.

Page 458

Steven P. Feinstein, PhD, CFA

1
2      Q.   So if the z-test yielded a
3  statistically significant result, but the
4  Fisher exact test yielded results that were
5  statistically insignificant, what would your
6  conclusion have been?
7      A.   Well, I'd want to also look at the
8  binomial and the bootstrap test.
9  Hypothetically, I can't, as I sit here now,
10  tell you what -- the answer to your
11  hypothetical, because that's not what happened
12  here.
13      Q.   Well -- so assume the following
14  facts.  Assume your z-test is as it is and that
15  all three of these diagnostic tests yielded
16  statistically insignificant results.  What
17  conclusion would you have drawn?
18      A.   I would conclude that the z-test did
19  not indicate that -- reliably that the news
20  events were different from the non-news events
21  in terms of their dynamics.
22      Q.   Assume that the z-test yielded
23  statistically significant results and that two
24  of the three diagnostic tests yielded
25  statistically insignificant results.  What

1        Steven P. Feinstein, PhD, CFA
2    would your conclusion be then?
3        A.    Again, it's a hypothetical.  It's a
4    bridge I'd cross when I got to it.  I'd have
5    less confidence in the z-test results than I do
6    when all three tests support the z-test.
7        If two of three, I'd have to do
8    further research.  I'd put more weight in the
9    bootstrap test than the Fisher and the
10   binomials.  I'd have to know what the bootstrap
11   test is saying.
12       Q.    So assume in our hypothetical that
13   your z-test produced statistically significant
14   results, and that your bootstrap test yielded
15   statistically insignificant results.
16       A.    Right.
17       Q.    The other diagnostics yielded
18   statistically significant results.  What would
19   your conclusion be in that circumstance?
20       A.    That -- first of all, that's like
21   the red light of your dashboard going off that
22   your engine's overheating; there's a problem
23   with your engine.  That would indicate that
24   there was a problem with the z-test and that
25   its result was not reliably indicating anything

1        Steven P. Feinstein, PhD, CFA
2    one way or the other.  It's not proof of
3    inefficiency, but I don't think it could be
4    used to support a finding of efficiency.
5        Q.    Now, assume that the z-test results
6    were statistically significant and that of the
7    diagnostic tests, the Fisher exact test was the
8    only one where there was a significantly
9    insignificant result.
10       What would your conclusion be in
11   that circumstance?
12       A.    I don't know.  I'd have to think
13   about that.  There's literature on the Fisher
14   exact test, and there's some -- some people
15   believe it's too conservative.
16       So you're saying that bootstrap
17   would support the z-test results and the
18   binomial test also supports it, and only the
19   Fisher exact test does not support it.  I've
20   never -- I've never faced that.  In all my
21   years of doing this, I've never faced that
22   exact scenario, so I don't know.  If -- it's --
23   well, that would be like you're driving your
24   car and the red light goes off intermittently.
25   You know, it goes on and off.  It's cause for

1        Steven P. Feinstein, PhD, CFA
2    concern, but I don't know what I would conclude
3    from it.  I've never faced it, and it's
4    certainly not what happened in this case.
5        Q.    If any of these three diagnostic
6    tests yielded statistically insignificant
7    results, are there any further tests you can
8    think of that you would run?
9        A.    There's none that I've never had to
10   run, because these three tests are -- this is a
11   battery of diagnostic tests on an issue that --
12   you know, I know we're here for this purpose,
13   but it's an issue that I never anticipated you
14   folks would raise, given the strength of these
15   results, which essentially is what's implicitly
16   in the binomial test.  I mean, analyst
17   quantitative methods, analysts can see these
18   results and roughly estimate the binomial
19   p-value in their head and know that these
20   results were so strong that the asymptotic
21   products of the z-test are not what's causing
22   the result.  What's causing the result is that
23   the news days are -- have a different price
24   dynamic than the non-news days.
25       But nonetheless, I know there's a

1        Steven P. Feinstein, PhD, CFA
2    literature on additional tests that can be run.
3    They're -- they get more obscure as you move
4    away from these three.
5        Q.    Are you able to do the binomial test
6    in your head?
7        A.    Not in my head.  I can do it on
8    paper and with a calculator.
9        You want to test me?
10       Q.    Maybe.
11       The binomial test, is that a test
12   that is designed to identify whether the
13   results of your z-test are statistically
14   significant as compared to a 5 percent
15   benchmark?
16       A.    It could be a 5 -- the answer to
17   your question is no.  I mean --
18       Q.    Why is that?
19       A.    Because it could be a 5 percent.  It
20   could be a 5.9 percent.  It could be a
21   6 percent.  It could be -- I mean, what we know
22   from -- we know from this particular
23   application of the z-test and the binomial test
24   is that, by design, a non-news day has a
25   probability of statistical significance of

Page 463

Steven P. Feinstein, PhD, CFA
1
2  being -- appearing to be statistically
3  significant approximately 5 percent of the
4  time.
5        So the binomial test takes that
6  information into account to determine how
7  likely it is that you would get four of nine
8  events significant when each event has
9  approximately a 5 percent probability of
10  appearing statistically significant spuriously.
11       Q.   Well --
12       A.   Under the -- under the null
13  hypothesis that the market is not efficient
14  such that news days and non-news days behave
15  exactly the same.
16       Q.   So isn't the binomial test comparing
17  the incidence that you observe as against a
18  5 percent probability relating to randomness?
19       A.   I know what you're trying to say,
20  but you didn't quite say it right.
21       Q.   What's the right way to say it?
22       A.   What it does -- I mean, the way
23  these numbers here are for a test, that test --
24  if significance has a 5 percent probability
25  under the null hypothesis, how likely is it

Page 464

Steven P. Feinstein, PhD, CFA
1
2  that you'll get -- out of nine draws, out of
3  nine rolls of the dice, out of nine iterations,
4  four of those being statistically significant.
5        It would be essentially this:  If
6  you have -- and I know there's some kids' games
7  where they have multi-sided dice.  Imagine you
8  had a 20-sided die.  There's 20 sides on it.
9  The numbers go from 1 to 20.  You know that
10  theoretically or by construction of the die, if
11  it's a fair die, each number on that die should
12  have a 5 percent probability of appearing when
13  you roll that die.
14       So the binomial test takes that die
15  and asks the question if I roll it nine times,
16  how likely is it that I'll get four number 1s?
17  How likely is that the die will show the number
18  1 four times out of nine?
19       Frankly, everyone's got an intuitive
20  feel that that's really unlikely.  The binomial
21  test goes beyond the intuitive feel and makes a
22  calculation to show that it's got a probability
23  of 0.06 percent that that could happen.  In
24  other words, it's 0.06 percent that you can get
25  four of nine of news events appearing

Page 465

Steven P. Feinstein, PhD, CFA
1
2  statistically significant by random chance
3  alone.  Since that's such a small probability,
4  we reject the random fluctuation alone
5  hypothesis in favor of the alternative
6  hypothesis that news days have different
7  dynamics.  The stock price reacts to news.
8  That's what the binomial test does.
9        We could also run it assuming a
10  6 percent probability, but we know that, by
11  design, statistical significance at the
12  95 percent confidence level has a 5 percent
13  probability.
14       Q.   Well, let's take the more
15  traditional die, the six-sided die.  You're
16  familiar with the more traditional die.
17  Correct?
18       A.   Absolutely.  Sure.
19       Q.   Yeah.
20       And so you roll the die, and I guess
21  we know that -- well, you roll the die and you
22  get a number.  You get the number 1.
23       A.   Okay.
24       Q.   Is there a way of conducting the
25  binomial test as against that event?  How

Page 466

Steven P. Feinstein, PhD, CFA
1
2  random is it to roll the -- a six-sided die and
3  get any particular number?
4        A.   Well, that's not binomial.  That's a
5  uniform distribution, so that wouldn't be a
6  binomial test.  And I'm not sure what
7  hypothesis you're testing, but that's not a
8  binomial event.
9        Q.   Well --
10       A.   If you're saying 1 -- getting the
11  number 1 is a success and getting the numbers 2
12  through 6 is a failure -- they use the names
13  "success" and "failure" in the literature.
14  Sometimes they use "hits" and "no hits."
15       So let's say 1 is a hit and 2
16  through 6 is not a hit.  Well, then, that
17  becomes a binomial event.
18       Q.   Well, let's take your 20-sided die,
19  then, and you roll it six times.
20       A.   Okay.
21       Q.   And twice you get the same number.
22       A.   Okay.
23       Q.   Is there a way to use the binomial
24  test to identify whether getting the same
25  number twice out of six rolls yields a

Page 467

Steven P. Feinstein, PhD, CFA

1  statistically significant result?
2
3      A.   Yes.  Meaning a result that
4  wouldn't -- you can test whether that could or
5  could not, or reasonably could or reasonably
6  could not happen by random chance alone.
7      Q.   And are you able to do that off the
8  top of your head or not?
9      A.   For some simple -- for some simple
10 ones, I can do it.  I would need paper and
11 calculator.
12     Q.   Okay.
13     A.   But I can do most of those.
14     Q.   So -- but two out of six, right off
15 the top of your head, you can't do that?
16     A.   I could do two out of six.
17     Q.   Off the top of your head?
18     A.   With -- I would need to write it
19 down.
20     Q.   Okay.  And what about one out of
21 six?
22     A.   1 out of 6.  I can tell you right
23 now 1 out of 6 has a 16 percent probability.
24 It's 1:6 probability.  It's a little bit more
25 than 16 percent.

Page 468

Steven P. Feinstein, PhD, CFA

1
2      Q.   And that --
3      A.   So getting the number 1 could happen
4  16 percent of the time, or a little bit more
5  than that.
6      Q.   And is that -- now, 16 percent of
7  the time is a lot more than 5 percent of the
8  time.  Right?
9      A.   That's right.  So you would not
10 reject that that could happen by random chance
11 alone.  Rolling the die and getting the number
12 1 certainly can happen by random chance alone.
13     Q.   Well, 16 percent is a lot higher
14 than 5 percent, isn't it?
15     A.   That's right.  That's -- if -- what
16 you need is a p-value that's lower than
17 5 percent in order to reject the null
18 hypothesis that what you observed happened by
19 random chance alone.
20     Q.   And two out of six, if one out of
21 six is 16 percent, isn't -- is it not
22 arithmetically obtainable?  In other words,
23 it's not going to be 8 percent; it's not that
24 simple?
25     A.   Well, wait.  We're not talking about

Page 469

Steven P. Feinstein, PhD, CFA

1
2  six die rolls, are we?
3      Q.   Yes.  We're talking about six --
4      A.   I'm sorry.  I thought we were
5  talking about six-sided die.
6      Q.   No, no, no.
7      A.   Hitting the number 1 --
8      Q.   We're on the 20-sided --
9      A.   Hitting the number 1 when there's a
10 6-sided die has a 16 -- a 1:6 probability.
11     Q.   Right.
12     A.   If you want to roll the dice six
13 times now -- what's the question?  What's the
14 probability of getting at least 1:1?
15     Q.   Let's back up.  Let's be clear, just
16 so that we have no confusion.
17     A.   All right.
18     Q.   20-sided die.
19     A.   Okay.
20     Q.   You roll it six times.
21     A.   Right.
22     Q.   You get the number 1 once.
23     A.   Right.
24     Q.   What is the -- can you take that set
25 of events -- I rolled the die six times.  I got

Page 470

Steven P. Feinstein, PhD, CFA

1
2  the number 1 once.
3      A.   Right.
4      Q.   Can you take that and do a binomial
5  calculation to determine whether that was
6  statistically significant as compared to the 5
7  percent random chance probability?
8      A.   Well, just for -- you could -- you
9  could apply the test, but it's an extremely
10 weak test.  You would likely find that getting
11 the number 1 can happen by random chance alone,
12 and therefore you have not proved that the
13 number 1 is more likely to come up than the
14 other numbers.
15     Q.   Why would it be an extremely weak
16 test?
17     A.   Well, there's -- there's a power
18 function associated to each test, and it's --
19 it's complicated.
20          But you -- the probability of
21 getting -- of that result under both hypotheses
22 is fairly close, and therefore it doesn't --
23 the actual observing that result doesn't
24 differentiate which hypothesis is driving the
25 die, randomness or that the die is weighted so

Steven P. Feinstein, PhD, CFA

that the number 1 shows up more often.

Q.   So without even doing any actual
written calculations using a calculator, you
can tell me right now that one in six is not
going to reveal a statistically significant
result under a binomial test?

A.   Okay.  Let's be really clear.

20-sided die.  You're rolling it six
times.  You get the number 1 once.

Q.   Right.

A.   Yeah.  I don't think you're going to
get -- it's not a good test design.  You're not
going to be able to make meaningful inferences
based on whatever you observe.

Q.   What about getting the number 1
twice?

A.   Then I've got to start doing some
calculations for that.

Q.   Okay.

Why don't we take a break here, and
we'll resume and finish up with what time we
have remaining.

A.   Okay.

THE VIDEOGRAPHER:  The time is

Steven P. Feinstein, PhD, CFA

11:06.  We're off the record.

(Recess taken from 11:06 to 11:26
a.m.)

THE VIDEOGRAPHER:  This is the
beginning of Media 2, Day No. 2, in the
deposition of Steven Feinstein.  We're back
on the record.  The time is 11:26.

BY MR. FRANK:

Q.   Dr. Feinstein, you testified earlier
before the break that you've seen some
literature that suggests that the Fisher exact
test can be too conservative.

Do you recall that?

A.   Yes.

Q.   What literature were you referring
to?

A.   I don't recall specifically, but
it's in the literature --

Q.   Do you remember --

A.   -- statistics.

Q.   Do you remember any particular
author or professor or practitioner who said
that?

A.   Well, it's just part of my general

Steven P. Feinstein, PhD, CFA

knowledge in quantitative methods.  I -- I can
review the literature.  Not here, but, you
know, when I have available -- the sources
available to me and then provide something.

Q.   Well, all I've got here right now is
you.  So I get --

A.   Well, you have the literature and
you've got two hired experts.

Q.   Oh, I'm talking about right now.
Right now.  And so right now I'm just going to
ask you questions, and hopefully from your
memory you can share with me what you know.

Can you think, as you sit here
today, of any human being other than yourself
who has expressed the view that the Fisher
exact test may be too conservative?

A.   I can't name anyone for you, but I'm
certain that this is in the literature.

Q.   As you sit here today, can you
identify any particular textbook or treatise or
article in which the view is expressed that the
Fisher exact test can be too conservative?

A.   Working strictly from memory, no.

Q.   And now -- by the way, do you have

Steven P. Feinstein, PhD, CFA

Exhibit 112 before you?

A.   Yes.

Q.   Do you see where it says "Fischer
Exact Test Results"?

A.   Yes.

Q.   And it's spelled F-i-s-c-h-e-r?

A.   Should be -- yeah, there's no C.

Q.   There's no C?

A.   Right.

Q.   That's a typo?

A.   Yes.

Q.   Okay.

Now, also, you testified earlier
about the binomial test, and I take it that
it -- your team in this case used 5 percent as
a benchmark.  Is that correct?

A.   5 percent for the probability of an
event being -- appearing to be to be
statistically significant by random chance
alone, yes.  That's called the size of the
t-test underlying the significance test.

Q.   Now, was using that 5 percent number
dictated by the statistical literature or did
your team have a choice as to what number it

Steven P. Feinstein, PhD, CFA

could use as a benchmark?

A.    Well, it's dictated by me.  When I designed these -- the use of these diagnostics, it's because that's the -- I mean, it's not as clear-cut.  I mean, it's both.  It's, you know, dictated by me based on what's in the literature.  The size of the significance test is 5 percent.  Therefore, 5 percent is the probability of a random event, randomly appearing statistically significant.

Q.    Now, based on the regression model or models that you used in this case, didn't you identify 23 statistically significant dates out of the total 330 dates?

A.    That's right.

Q.    Could you have used that fraction as expressed in a percentage as the benchmark in your binomial test?

A.    I'm not sure it makes sense to use the 23 out of 330.  It could make sense to use the -- what would be then -- the 14 out of 321. It could make sense.  But still I think the 5 percent is the better choice, because it's analytic rather than estimated.

Steven P. Feinstein, PhD, CFA

Q.    How do you get to 14 out of 321?  By taking out -- by dummying out the nine days you observed?

A.    No, not dummying them out.

Q.    Taking them out?

A.    Look -- taking them out using the observed percentage or proportion of non-news days that appeared to be statistically significant.  I mean, that's essentially what the z-test does is it estimates from the data what the two samples' incidence rate of significance is, whereas the binomial test uses the analytics from the underlying t-test.

Q.    Now --

A.    So the -- that's why they're different tests.

Q.    Now, do you recall earlier testifying about the power of a test that examined only six events?

A.    I do recall that.

Q.    Is there anything that statisticians or economists do to calculate the power of a test?

A.    There are power tests.

Steven P. Feinstein, PhD, CFA

Q.    Did you apply any of those power tests in this case to your analyses?

A.    It wasn't necessary.  The power test tells you what is the probability of an indication of nonsignificance when, in fact, the true phenomenon is significance.

So because the tests here indicated significance, all of them, there was no need to test the power of the test.  It was clearly powerful enough.

Q.    Well, let's put aside the issue of whether it was necessary to test the power. Okay?  Can we put that aside for a moment?

A.    Sure.

Q.    Okay.  Did you test the power of your tests here?

A.    In a sense, yes, by observing that they all indicated statistical significance, which proves they were all powerful enough.

Q.    What tests did you run to test the power of your tests here?

A.    I just explained it by I observed that they all indicated statistical significance, which means that it was not the

Steven P. Feinstein, PhD, CFA

case that it was -- that the test was too weak to identify statistical significance.

Q.    Are there statistical tests that you can run to identify the power of a test?

A.    There are, but observing that the outcome of a false indication of nonsignificance did not happen indicates enough that the power of the test is sufficient.

Q.    What are the names of these tests that you can run to identify the power of a test?

A.    I've got to -- they're power function tests as the general class of tests. I can't name them for you.

Q.    Did you run any power function tests in this case?

A.    Well, I'm going to stick to my earlier answer.  Observing statistical significance from all of these tests is -- provides all one needs to know about power. The tests were powerful enough.

Q.    So your answer is you didn't need to run any power function tests.  Right?

A.    No.  No.  My answer is that the

Page 479

1   Steven P. Feinstein, PhD, CFA
2   statistical significance of these test results
3   is a sufficient power test for this
4   application.
5       Q.   So --
6       A.   It is a power test.  It was run.
7   And you have the results.  You've always had
8   them.
9       Q.   Well, what is the power test that
10  was run?
11      A.   That these tests --
12      MR. MARKOVITS:  Objection.  It's
13  been asked and answered.
14      Go ahead.
15      A.   That the z-test indicates
16  statistical significance tells you that there
17  was not an issue with low power.
18      Q.   And in addition to that, did you run
19  any other power function tests?
20      A.   No.
21      Q.   And are there any calculations that
22  you haven't provided to us to date that
23  evidenced the power of the tests that you did
24  run?
25      A.   No.

Page 480

1   Steven P. Feinstein, PhD, CFA
2       Q.   Okay.  Now, Dr. Feinstein, on the
3   first day of your deposition, as you know, a
4   transcript was created, and I'm reading from it
5   on page 45.
6       I asked you at line 5, "Well, is the
7   Fisher exact test a statistical test?"
8       You answered:  "Yes."
9       I asked:  "And does it yield
10  numbers?"
11      You answered:  "Yes."
12      I asked:  "And those numbers, what
13  were those numbers?"
14      You answered:  "I don't recall.  I
15  know that they were just not over the threshold
16  to indicate any issue with sample size."
17      I asked:  "Do you have a record of
18  the test, the Fisher's exact test that you
19  ran?"
20      You answered:  "Yes."
21      Now that several days have passed,
22  did you come to find that your firm didn't have
23  a record of the Fisher exact test?
24      A.   No, that answer was correct.  We
25  provided the code.  You said do I have a record

Page 481

1   Steven P. Feinstein, PhD, CFA
2   of the test that was run.  That's the code that
3   was provided.
4       Q.   Did the code -- when you say "the
5   code," are you referring to code that enabled
6   other economists to run the test?
7       A.   Yes.
8       Q.   Okay.  So this is -- you didn't have
9   a record of the results of the test; you had a
10  record of the code that would enable someone
11  else to run the test.  Is that right?
12      A.   And that was your question:  Do I
13  have a record of the test that was run?
14      Yes.
15      MR. FRANK:  Okay.  At this time I
16  have no further questions.
17      And unless you have questions,
18  Bill -- well, I'll ask you:  Do you have
19  any questions?
20      MR. MARKOVITS:  No, I have no
21  questions.
22      MR. FRANK:  Okay.  Well, then, we
23  can conclude this deposition.
24      Thank you all for your time.
25      THE VIDEOGRAPHER:  This is the end

Page 482

1   Steven P. Feinstein, PhD, CFA
2   of Media No. 2, Day 2 in the deposition.
3   The time is 11:37.  We're off the record.
4       THE REPORTER:  Counsel, before you
5   all hang up, can you tell me if you need to
6   order a transcript?
7       MR. MARKOVITS:  This is Bill
8   Markovits.  We'd like our regular delivery
9   transcript, sure.
10      THE REPORTER:  Okay.  Anybody else?
11      MR. GOLDFARB:  This is James
12  Goldfarb with Murphy & McGonigle for Mr.
13  Piszel.  Same order as last week's
14  transcript.
15      Thank you.
16      MR. FOTIADES:  This is Adam Fotiades
17  from Zuckerman Spaeder for Patty Cook.
18  Just like James, same order as last week.
19      THE REPORTER:  Okay.  Great.
20      (Witness excused and deposition
21  concluded at 11:38 a.m.)
22
23
24
25

Page 483

1    ERRATA SHEET FOR THE TRANSCRIPT OF:
2    Case Name:  Ohio Public Employees Retirement System
     v. Federal Home Loan Mortgage Corp.
3    Dep. Date:  August 17, 2017
     Deponent:  Steven P. Feinstein, PhD, CFA
4
     CORRECTIONS:
5
     Pg. Ln. Now Reads    Should Read    Reason
6    ___ ___ _____ _____ _____
7    ___ ___ _____ _____ _____
8    ___ ___ _____ _____ _____
9    ___ ___ _____ _____ _____
10   ___ ___ _____ _____ _____
11   ___ ___ _____ _____ _____
12   ___ ___ _____ _____ _____
13   ___ ___ _____ _____ _____
14   ___ ___ _____ _____ _____
15   ___ ___ _____ _____ _____
16   ___ ___ _____ _____ _____
17
18            _____
19            Signature of Deponent
20   SUBSCRIBED AND SWORN BEFORE ME
21   THIS____DAY OF_____, 2017.
22
23   _____
24   (Notary Public)  MY COMMISSION EXPIRES:_____

Page 484

1    C E R T I F I C A T E
2
3        I, Deanna J. Dean, a Registered Diplomate
4    Reporter, Certified Realtime Reporter, and
5    Massachusetts Notary Public, do hereby certify that
6    the foregoing, to the best of my knowledge, skill
7    and ability, is a true and accurate transcript of
8    my computer-aided electronic stenographic notes of
9    the deposition of STEVEN P. FEINSTEIN, PHD, CFA,
10   who was duly sworn, taken at the place and under
11   the circumstances present on the date hereinbefore
12   set forth.
13       I further certify that I am neither attorney
14   or counsel for, nor related to or employed by any
15   of the parties to the action in which this
16   deposition was taken, and further that I am not a
17   relative or employee of any attorney or counsel
18   employed in this case, nor am I financially
19   interested in this action.
20
21
     _____
22       Deanna J. Dean, RDR, CRR
         Signed this 18th day of August, 2017
23       My MA commission expires December 28, 2018
24

Page 485

1    I N D E X
2
3    Examination                    Page
4    STEVEN P. FEINSTEIN, PHD
5    By Mr. Frank                   406
6
7
8    E X H I B I T S
9
10   Number     Description            Page
11   Exhibit 110  8/11/17 Email from Markovits to  406
12       Frank and Renshaw
13   Exhibit 111  Freddie Mac Collective Test    409
14       Robustness Checks
15   Exhibit 112  8/17/17 Email from Markovits to  415
16       Frank and Renshaw with Attached
17       Document Titled "Freddie Mac
18       Collective Test Robustness
19       Checks"
20   Exhibit 113  6/30/17 Report on Market      438
21       Efficiency by Steven P. Feinstein,
22       PhD, CFA (Eletrobras Case)
23   Exhibit 114  8/16/17 Email from Renshaw to   448
24       Markovits