# Exhibit C

Page 486

1                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISON
3    - - - - - - - - - - - - - - - - -x
     OHIO PUBLIC EMPLOYEES                    :
4    RETIREMENT SYSTEM on Behalf              :
     of Itself and All Others                 :
5    Similarly Situated,                      :
                                              :
6            Plaintiff,                        :C.A. NO. 4:08-CV-00160
                                              :
7      v.                                     :
                                              :
8    FEDERAL HOME LOAN MORTGAGE               :
     CORPORATION, a/k/a Freddie               :
9    Mac, RICHARD F. SYRON,                   :
     PATRICIA L. COOK, ANTHONY S.             :
10   PISZEL, and EUGENE M. MCQUADE,           :
                                              :
11           Defendants.                       :
     - - - - - - - - - - - - - - - - -x
12

13   DEPOSITION OF STEVEN P. FEINSTEIN, PHD, CFA
14                  (Vol. 3)
15       Boston, Massachusetts 02110
16       Tuesday, November 14, 2017
17

18

19

20

21

22

23   REPORTED BY:  Deanna J. Dean, RDR, CRR
24   JOB NO. 133207
25

Page 487

```
 1
 2
 3                  Tuesday, November 14, 2017
 4                  9:42 a.m.
 5
 6
 7        Deposition of STEVEN P. FEINSTEIN, PHD, CFA,
 8    held at the offices of Morgan, Lewis & Bockius,
 9    One Federal Street, Boston, Massachusetts
10    02110, before Deanna J. Dean, a Registered
11    Professional Reporter, Registered Diplomate
12    Reporter, Certified Realtime Reporter, and
13    Notary Public of the State of Massachusetts.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 488

```
 1                 A P P E A R A N C E S
 2
 3    MARKOVITS, STOCK & DEMARCO
 4    Attorneys for Plaintiff
 5        3825 Edwards Road
 6        Cincinnati, OH 45209
 7    BY:  WILLIAM MARKOVITS, ESQ.
 8
 9
10      -and-
11    STRAUSS & TROY
12    Attorneys for Plaintiff
13        150 East 4th Street
14        Cincinnati, OH 45202
15    BY:  RICHARD WAYNE, ESQ.
16        (appearing via speakerphone)
17
18
19
20
21
22
23
24
25
```

Page 489

```
 1          A P P E A R A N C E S (cont'd.)
 2
 3    MORGAN, LEWIS & BOCKIUS
 4    Attorneys for Defendant Federal Home
 5    Loan Mortgage Corporation, a/k/a Freddie Mac
 6        One Federal Street
 7        Boston, MA 02110
 8    BY:  JASON FRANK, ESQ.
 9    BY:  LIZA HAYS, ESQ.
10
11
12
13
14    SIDLEY AUSTIN
15    Attorneys for Defendant Richard Syron
16        1501 K Street Northwest
17        Washington, DC 20005
18    BY:  FRANK VOLPE, ESQ.
19
20
21
22
23
24
25
```

Page 490

```
 1          A P P E A R A N C E S (cont'd.)
 2
 3    ZUCKERMAN SPAEDER
 4    Attorneys for Defendant Patricia Cook
 5        100 East Pratt Street
 6        Baltimore, MD 21202
 7    BY:  ALICIA SHELTON, ESQ.
 8
 9
10
11
12    MURPHY & MCGONIGLE
13    Attorneys for Defendant Anthony Piszel
14        1185 Avenue of the Americas
15        New York, NY 10036
16    BY:  JAMES GOLDFARB, ESQ.
17
18
19
20
21
22
23
24
25
```

## Page 491

1    A P P E A R A N C E S (cont'd.)
2
3    DECHERT
4        Attorneys for Defendant Eugene McQuade
5        2929 Arch Street
6        Philadelphia, PA 19104
7    BY:  CATHERINE WIGGLESWORTH, ESQ.
8
9
10
11
12
13    ALSO PRESENT:
14
15    Carlo Barbieri, Legal Video Specialist
16
17    Nikolai Caswell, Navigant Economics
18
19    David F. Marcus, PhD
20    Senior VP, Cornerstone Research
21
22    Howard Lindenberg, Esq.
23    Managing Associate General Counsel, Freddie Mac
24
25

## Page 492

1    Steven P. Feinstein, PhD, CFA
2         P R O C E E D I N G S
3         THE VIDEOGRAPHER:  This is the start
4    tape labeled No. 1 of the videotaped
5    deposition of Dr. Stephen Feinstein in the
6    matter Ohio Public Employees Retirement
7    System versus Federal Home Loan Mortgage
8    Corporation, et al., in the court -- United
9    States Court of the Northern District of
10    Ohio, Case Action No. 4:08-CV-00160.
11         This deposition is being held at
12    Morgan Lewis at One Federal Street in
13    Boston, Mass., on 11/14/2017 at
14    approximately 9:42 a.m.
15         My name is Carlo Barbieri from TSG
16    Reporting Inc., and I'm the legal video
17    specialist.  The court reporter is Deanna
18    Dean in association with TSG Reporting.
19         Will the counsel please introduce
20    themselves.
21         MR. MARKOVITS:  Bill Markovits,
22    Markovits Stock & Demarco, on behalf of
23    Ohio Public Employees Retirement System.
24         MR. FRANK:  Good morning, everyone.
25    Jason Frank from Morgan Lewis & Bockius on

## Page 493

1    Steven P. Feinstein, PhD, CFA
2    behalf of Freddie Mac.
3         MS. HAYS:  Liza Hays, also from
4    Morgan Lewis, also on behalf of Freddie
5    Mac.
6         MR. MARCUS:  David Marcus with
7    Cornerstone Research.
8         MR. LINDENBERG:  Howard Lindenberg,
9    Freddie Mac.
10         MR. GOLDFARB:  James Goldfarb with
11    Murphy & McGonigle for the defendant
12    Anthony Piszel.
13         MR. VOLPE:  Frank Volpe from Sidley
14    Austin on behalf of Richard Syron.
15         MS. WIGGLESWORTH:  Catherine
16    Wigglesworth from Dechert LLP, appearing
17    telephonically on behalf of Eugene McQuade.
18         MS. FELTON:  Alicia Felton from
19    Zuckerman Spaeder appearing for Patricia
20    Cook.
21         MR. CASWELL:  Nikolai Caswell from
22    Navigant Consulting, appearing
23    telephonically.
24         THE VIDEOGRAPHER:  Will the court
25    reporter please swear in the witness.

## Page 494

1    Steven P. Feinstein, PhD, CFA
2    STEVEN P. FEINSTEIN, PHD, CFA
3    a witness called for examination by counsel for
4    the Defendant, having been previously
5    identified by the production of his driver's
6    license and being first duly sworn by the
7    Notary Public, was examined and testified as
8    follows:
9
10         MR. FRANK:  Good morning.
11         THE WITNESS:  Good morning.
12         MR. FRANK:  Before beginning the
13    examination this morning, I'll just have a
14    brief colloquy with counsel to put some
15    stipulations on the record.  Okay?
16         THE WITNESS:  Sure.
17         MR. FRANK:  Very good.
18    Mr. Markovits, good morning.
19         MR. MARKOVITS:  Good morning.
20         MR. FRANK:  Can we agree today that
21    the parties will reserve all objections
22    except as to form and all motions of strike
23    until the testimony is offered to the
24    court?
25         MR. MARKOVITS:  Yes.

Page 495

1    Steven P. Feinstein, PhD, CFA
2    MR. FRANK:  Can we also agree that
3  the witness will have 30 days to review and
4  sign the transcript under the pains and
5  penalties of perjury and that no formal
6  signing before a court reporter will be
7  necessary, 30 days from the receipt of the
8  final transcript?
9    MR. MARKOVITS:  Yes.
10    MR. FRANK:  And, finally, can we
11  stipulate to the sufficiency of the notice
12  of deposition and the subpoena and the
13  credentials of the court reporter and
14  videographer?
15    MR. MARKOVITS:  Yes.
16    MR. FRANK:  Very good.
17        EXAMINATION
18  BY MR. FRANK:
19    Q.   Dr. Feinstein, you may recall that
20  you've been deposed in these offices before.
21  Correct?
22    A.   Yes.
23    Q.   You were deposed on two days
24  previously.  Right?
25    A.   Yes.

Page 496

1    Steven P. Feinstein, PhD, CFA
2    Q.   Okay.  And this is -- so this is the
3  third day of your testimony here in this case.
4  Right?
5    A.   Yes.
6    Q.   Okay.  And you understand that --
7  strike that.
8        You relatively recently submitted a
9  rebuttal report in this case.  Correct?
10    A.   Yes.
11    Q.   What led to the development of that
12  rebuttal report?
13    A.   The receipt of two reports, one from
14  Paul Gompers and the other from Dr. Bajaj.  And
15  request from counsel that I respond to those.
16    Q.   And when you said "request from
17  counsel," you gestured to Mr. Markovits.
18  Correct?
19    A.   Yes.
20    Q.   Did someone from Mr. Markovits's
21  firm or Mr. Markovits himself give you a task
22  relating to the two reports that you just
23  mentioned, the report from Dr. Bajaj and the
24  report from Dr. Gompers?
25    A.   Yes.

Page 497

1    Steven P. Feinstein, PhD, CFA
2    Q.   What was that task?
3    A.   To write a response, a rebuttal
4  report with my responses to the contents of
5  those two defendants' experts' reports.
6    MR. FRANK:  Okay.  If we could mark
7  this as the next exhibit, which is Exhibit
8  No. 269.
9        (Exhibit 269 is marked for
10  identification.)
11    MR. FRANK:  Dr. Feinstein, if I
12  could steal the exhibit from you for one
13  moment so that I can show Ms. Hayes how
14  they're being filled out.
15        If you could just put the number and
16  date.  She can put her initials on them
17  later.
18        Thank you.
19  BY MR. FRANK:
20    Q.   Dr. Feinstein, I'm showing you a
21  document that's been marked as Exhibit 269.
22        What is Exhibit 269?
23    A.   This is the rebuttal report that I
24  wrote, and which I filed on October 16th of
25  this year.

Page 498

1    Steven P. Feinstein, PhD, CFA
2    Q.   And this year is 2017.  Correct?
3    A.   Yes.
4    Q.   Does this rebuttal report contain
5  all of your opinions relating to Dr. Bajaj's
6  report in this case?
7    A.   No.
8    Q.   Okay.  How did you determine what
9  opinions to include and what opinions to leave
10  out?
11    A.   Well, I tried to write a thorough
12  response, including my responses to all of the
13  opinions he expressed and all the arguments he
14  rose.
15        However, subsequently after writing
16  the report and actually while preparing for
17  this deposition, I noticed one more argument
18  that he buried in a footnote which I would have
19  wanted to respond to in the report if I had --
20  if it had been more prominently displayed by
21  Dr. Bajaj and I had noticed it sooner.
22    Q.   And do you ever use footnotes in
23  your reports?
24    A.   Yes, but I usually don't bury what I
25  would consider important arguments there.

Page 499

Steven P. Feinstein, PhD, CFA

1
2    So either it's not an important
3 argument which didn't merit response, but if
4 anyone ever does consider it an important
5 argument, then I would -- I can describe -- I
6 can discuss my response to it here today.
7    Q.  So you never put important arguments
8 in your footnotes.  Is that your testimony?
9    A.  Right.  If it's an important
10 argument, I try to include it in the body of
11 the report.
12    Q.  And what is this argument that was
13 in a footnote of Dr. Bajaj's report that you
14 just referenced?
15    A.  He referred to a serial correlation
16 test.  He said that a predicate matter -- that
17 in order to test semi-strong informational
18 efficiency, one should also do a test on
19 weak-form efficiency.  I disagree with that and
20 I would have explained why, if I had noticed it
21 sooner and if it had been more prominently
22 presented by Dr. Bajaj.
23    Q.  Okay.  Are there any other opinions
24 that you have relating to Dr. Bajaj's report
25 that you did not include in your rebuttal

Page 500

Steven P. Feinstein, PhD, CFA

1
2 report?
3    A.  None that I can think of as I sit
4 here right now.  It's possible that something
5 might arise in the course of the day today.
6 I'll let you know.  But as I sit here now, no.
7    Q.  In connection with your preparation
8 for your deposition, did you have an
9 opportunity to review Dr. Bajaj's report?
10    A.  Yes.
11    Q.  And was that the first time that you
12 reviewed Dr. Bajaj's report?
13    A.  No.
14    Q.  And in connection with your
15 preparation for your deposition, did you
16 identify any opinions that you have about Dr.
17 Bajaj's report that you didn't include in your
18 own report other than the opinion you just
19 referenced?
20    A.  No.
21    Q.  Does your rebuttal report that's
22 been marked as Exhibit 269 contain all of your
23 opinions about Dr. Gompers' report?
24    A.  Yes.
25    Q.  As you sit here today, you're not

Page 501

Steven P. Feinstein, PhD, CFA

1
2 aware of any opinions you have about
3 Dr. Gompers' report that you didn't include in
4 your rebuttal report?
5    A.  No opinions.  I mean, I might --
6 there are alternative ways of expressing my
7 opinion in response to his report that aren't
8 in this report, but no opinions.
9    Q.  Do you believe you left anything out
10 of your rebuttal report relating to
11 Dr. Gompers' report?
12    A.  No.
13    Q.  And with the exception of the
14 footnote issue you referenced a moment ago, do
15 you believe you left anything out of your
16 rebuttal report relating to Dr. Bajaj's report?
17    A.  No.  I mean I just want to emphasize
18 that as I was preparing for the deposition,
19 reviewing the documents and reading my report,
20 it occurred to me that there may have been a
21 clearer way of expressing some of my opinion --
22 one of my opinions in particular.  But the
23 opinion is the same.
24    Q.  What is the opinion that you believe
25 you could have expressed more clearly?

Page 502

Steven P. Feinstein, PhD, CFA

1
2    A.  That Dr. Gompers' entire report
3 really is, the thrust of it, the meaning of it,
4 what needs to be responded to is really
5 presented in one sentence of his entire report,
6 that he didn't really need 41 pages or 45 pages
7 to say what he was trying to say, that there
8 was one sentence that captured it.  And my
9 response to that one sentence reasonably could
10 have been sufficient to respond to his report.
11    Q.  Do you remember what the sentence
12 was?
13    A.  Yes.  It's a sentence in
14 paragraph -- it's paragraph 69 of his report.
15    Q.  And do you -- that's where the
16 sentence is, but do you remember the substance
17 of the sentence?
18    A.  Yes.
19    Q.  What was the substance of the
20 sentence?
21    A.  He said that it would be -- that
22 calculating damages in this case would be
23 complex, and then in parentheses he wrote "if
24 not impossible."
25    And I looked carefully to see does

Page 503

Steven P. Feinstein, PhD, CFA

1    Steven P. Feinstein, PhD, CFA
2  he ever say it's impossible.  He doesn't.  Not
3  in his report and not in his deposition,
4  either.  He sidestepped the question when it
5  was asked to him directly.  He never says it's
6  impossible.  So his opinion is that it would be
7  complex.
8        I'm not really disagreeing with
9  that, but the substance that I agree with is
10  that it's certainly possible.  I mean, it's --
11  it would be -- it would be complex.  It's not
12  an easy task, but it's certainly doable.
13        That's how I would respond in
14  once -- you know, I think responding to that
15  one sentence is essentially all that needed to
16  be responded to for Dr. Gompers.  Calculating
17  damages is possible.  It's complex.  But there
18  are experts, including myself, that can do it.
19    Q.   Anything else in your rebuttal
20  report that you believe you could have, in
21  retrospect, articulated more clearly?
22    A.   No.
23    Q.   Did you review your testimony in
24  this case at any time following your
25  depositions in this case?

Page 504

Steven P. Feinstein, PhD, CFA

1    Steven P. Feinstein, PhD, CFA
2    A.   Yes.
3    Q.   When was that?
4    A.   Well, when I first got the
5  transcript, and again in preparation for this
6  deposition.
7    Q.   You reviewed your two days of
8  testimony twice?
9    A.   Yes.  Yes.
10    Q.   Did you see anything that you -- in
11  your testimony that you viewed as incorrect?
12    A.   I don't recall that I did.  I think
13  there were -- there was a couple times that the
14  word "float" was written as "flow."  I don't
15  recall anything of substance.
16    Q.   Are you aware of any mistakes in
17  your testimony that you believe you should
18  correct?
19    A.   No.
20    Q.   Having reviewed your testimony, do
21  you believe your testimony accurately reflected
22  your opinions?
23    A.   Yes.
24    Q.   Other than this word "float" that
25  may have been incorrectly written as "flow,"

Page 505

Steven P. Feinstein, PhD, CFA

1    Steven P. Feinstein, PhD, CFA
2  are you aware of any other transcription errors
3  or typographical errors in your deposition
4  transcript?
5    A.   As I sit here now, no.
6    Q.   Are you aware of anything that you
7  said during your deposition in this case that
8  was not accurately recorded by the
9  stenographer, other than this word "float"
10  versus "flow"?
11    A.   I'm not.
12    Q.   After your deposition in this case,
13  did you perform any additional tests to assess
14  market efficiency?
15    A.   No.
16    Q.   Did you perform any tests to check
17  anything that was included by Dr. Bajaj in his
18  report?
19    A.   I recall asking my team to check to
20  make sure that his computations were accurate.
21  Aside from that, no.
22    Q.   Did your team report back to you
23  with respect to whether Dr. Bajaj's
24  computations were accurate?
25    A.   Right.  They found no errors.

Page 506

Steven P. Feinstein, PhD, CFA

1    Steven P. Feinstein, PhD, CFA
2    Q.   Your team found no --
3    A.   I mean no computational errors.  I
4  mean, there's certainly conceptual errors, but
5  no computational errors.
6    Q.   Your team found no computational
7  errors in Dr. Bajaj's work?
8    A.   Correct.
9    Q.   Did you limit your team as to what
10  they could or should test in terms of
11  computations in Dr. Bajaj's report?
12    A.   Yes.
13    Q.   In what way did you limit your team?
14    A.   The tests as Dr. Bajaj constructed
15  them and then executed them.
16    Q.   Did you have your team check all of
17  the tests that Dr. Bajaj constructed and
18  executed?
19    A.   Those that he reported.  Just what
20  he reported in his report.
21        MR. MARKOVITS:  Jason, I'm going to
22  object here.  I've given some leeway on
23  this, but as I understand it, the scope of
24  this deposition is limited to his rebuttal
25  report and any new opinions that he

Page 507

1    Steven P. Feinstein, PhD, CFA
2  addresses in his rebuttal report.  His work
3  that he did subsequent to the prior -- last
4  deposition or his review of the last
5  deposition or anything he did that doesn't
6  bear upon his opinions that are stressed on
7  the rebuttal are not within the scope of
8  this deposition.
9      I've given you some leeway.  I'll
10  continue to give you a little leeway.  But
11  if you could limit your questions to the
12  scope of his rebuttal report.  Thank you.
13      MR. FRANK:  I've heard your
14  objection.  We don't agree with you.  I
15  don't believe the judge set a limitation on
16  the scope of the deposition.
17      In any event, I believe that these
18  questions are directly related to his
19  rebuttal report and his opinions in them.
20      MR. MARKOVITS:  Okay.  If you read
21  the judge's order, you'll see that she did
22  limit the scope of the deposition.  You can
23  do that at a break.  But if there are
24  additional questions that go too deep along
25  these lines, I'll object and instruct not

Page 508

1    Steven P. Feinstein, PhD, CFA
2  to answer, consistent with the judge's
3  order.
4      MR. FRANK:  You can object as you
5  wish.
6  BY MR. FRANK:
7      Q.  Dr. Feinstein, did you include in
8  your rebuttal report any mention of the
9  computational accuracy of Dr. Bajaj's tests?
10      A.  I don't believe that I did.
11      Q.  Did you conduct any tests to assess
12  anything said by Dr. Gompers in his report or
13  at his deposition?
14      A.  I don't think there was anything
15  quantitative that needed to be checked.  So,
16  no.
17      Q.  Now, let me turn your attention to
18  Exhibit 2 to your rebuttal report.
19      A.  So, actually, I have a question
20  about that.  There's two additional -- there's
21  some unnumbered pages at the end of this report
22  that I don't believe were included in the
23  report.  So Exhibit A has Exhibit 1, 2, and 3
24  repeated without -- without numbers, which
25  would not have been part of the report.

Page 509

1    Steven P. Feinstein, PhD, CFA
2      Q.  Well, I will represent to you that
3  we took this report off the court's dockets,
4  and I understand that this was filed by counsel
5  for OPERS.  And so maybe it will make your life
6  easier if you refer to the numbers at the top
7  of the page which reflect the court filing.
8      And so why don't we right now turn
9  to page 63 of 70.  Do you see that, at the top
10  of the page?
11      A.  I do.
12      Q.  And page 63 of 70 says "Exhibit 1."
13  Correct?
14      A.  Yes.  That's right.
15      Q.  And if you look at the bottom of the
16  page, it says 59.  Right?
17      A.  Correct.
18      Q.  Okay.  And if you flip the page --
19      MR. GOLDFARB:  Jason, would you
20  accept that representation so there's no
21  dispute that what he's looking is, in fact,
22  at his report as filed and he accepted it
23  as his report?
24      MR. FRANK:  We'll get there.
25  Thanks, James.  We will.

Page 510

1    Steven P. Feinstein, PhD, CFA
2      Q.  And you see that -- if you flip the
3  page, you'll see page 60 is also Exhibit 1.
4  Correct?
5      A.  Yes.
6      Q.  And that's page 64 of 70.  Right?
7      A.  Correct.
8      Q.  And then page 65 of 70 is Exhibit 2.
9  Correct?
10      A.  Yes.
11      Q.  And then page 66 of 70 is Exhibit 3.
12  Correct?
13      A.  Yes.
14      Q.  Okay.  And then you see how page 67
15  of 70 is Exhibit 1 again.  Do you see that?
16      A.  Right.  It's an exact duplicate.  I
17  can see that.
18      Q.  And is Exhibit 2 that appears on
19  page 69 of 70 an exact duplicate?
20      A.  It is.
21      Q.  Okay.  And Exhibit 3 is an exact
22  duplicate of the earlier Exhibit 3?
23      A.  Right.
24      Q.  Okay.  Is it, do you have -- well,
25  strike that.

## Page 511

Steven P. Feinstein, PhD, CFA

1
2     Do you accept that Exhibit 269 is
3  your rebuttal report as filed by counsel for
4  OPERS?
5     A.   I have no reason to dispute that.
6  It's just that there are some pages at the end
7  that are replicated --
8     Q.   Right.
9     A.   -- redundantly included twice.
10     Q.   You've just noticed that the
11  exhibits at the end of your report were
12  included twice.  Is that correct?
13     A.   That's right.  Once with numbers,
14  page numbers, once without.
15     Q.   But you have no reason to believe
16  that Exhibit 269 isn't your rebuttal report.
17  Correct?
18     A.   Correct.
19     Q.   And, in fact, you actually believe
20  that Exhibit 269 is your rebuttal report,
21  except that its exhibits -- there are two sets
22  of them.  Correct?
23     A.   That's accurate.
24     Q.   All right.  And so why don't we deal
25  with the first set of exhibits.  I know they're

## Page 512

Steven P. Feinstein, PhD, CFA

1
2  identical, but just so we're on the same
3  literal page.
4     Page 63 of 70 is Exhibit 1.  Do you
5  see that?
6     A.   I do.
7     Q.   Okay.  And do you see under "Case
8  Documents," it says, "Deposition of Stephen P.
9  Feinstein, PhD," dated 10 August 2017?
10     A.   Yes.
11     Q.   Now, I took your deposition on two
12  days.  Correct?
13     A.   That's correct.
14     Q.   Is it true that you only reviewed
15  one of your deposition transcripts?
16     A.   No.  I reviewed both.
17     Q.   Okay.  And do you know why your --
18  this exhibit only identifies one of the
19  transcripts?
20     A.   No.  I don't think it matters, given
21  that it was described at the following week it
22  was a continuation of the same deposition.  But
23  it should -- I can imagine it being presented
24  both ways.
25     Q.   Now, let me turn your attention to

## Page 513

Steven P. Feinstein, PhD, CFA

1
2  Exhibit 2.  This is on page 65 of 70.
3     Do you see that?
4     A.   Yes.
5     Q.   Okay.  And who prepared Exhibit 2?
6     A.   My staff.
7     Q.   Okay.  And your staff is at your
8  company.  Right?
9     A.   Yes.
10     Q.   What's the name of your company
11  again?
12     A.   Crowninshield Financial Research,
13  Inc.
14     Q.   And how many employees are there of
15  Crowninshield?
16     A.   Eight.
17     Q.   Now, the first matter listed on
18  Exhibit 2 is In Re LSB Industries, Inc.,
19  securities litigation.
20     Do you see that?
21     A.   Yes.
22     Q.   And that's a securities case.
23  Right?
24     A.   Yes.
25     Q.   And did you give deposition

## Page 514

Steven P. Feinstein, PhD, CFA

1
2  testimony relating to market efficiency in that
3  case?
4     A.   Yes.
5     Q.   Any other subjects?
6     A.   I don't recall.  I'd have to see the
7  report or the transcript.  Most likely.
8     Q.   In terms of?
9     A.   Most likely it would have been the
10  same material covered in this case, but that's
11  most likely.  To know for sure, I'd have to
12  look at it.
13     Q.   Do you know the amount of your bills
14  in that case?
15     A.   No.
16     Q.   How much do you expect to be paid in
17  connection with that case?
18     A.   I have no idea.
19     Q.   Is it over $100,000?
20     A.   Like I said, no idea.  I leave that
21  to others at my firm.
22     Q.   Do you have a sense of how much time
23  you've spent on the LSB matter?
24     A.   A sense.  But I don't know with
25  specific -- specificity.

Page 515

Steven P. Feinstein, PhD, CFA

1
2   Q.   What's your sense?
3   A.   40 to 60 hours would be typical.
4   Q.   And are you charging your usual
5   rates in that matter?
6   A.   Yes.
7   Q.   And what's your usual rate?
8   A.   Well, it depends what year the case
9   was initiated, what year the engagement letter
10  was signed.  Currently the rate is 875 an hour.
11  In prior years, it was less.  And the rates are
12  held constant during the course of a case.
13  Q.   Do you see it says "master file
14  number 15-CV-" with a number of numbers?
15  A.   I do.
16  Q.   Do you understand that that 15 means
17  that the case was filed in the year 2015?
18  A.   I do.
19  Q.   Okay.  Do you know if you were
20  retained in 2015 or later in the LSB matter?
21  A.   Most likely it's later, but I don't
22  know for sure.  I'd have to see the engagement
23  letter to know for sure.
24  Q.   Do you know what your rate was in
25  2015?

Page 516

Steven P. Feinstein, PhD, CFA

1
2   A.   Just that it was less than it is
3   now.
4   Q.   Do you have a sense of how much time
5   others at Crowninshield have spent on the LSB
6   matter?
7   A.   A sense, yes.
8   Q.   What's your sense?
9   A.   Typically it's a 3 to 1 ratio.
10  About 3 hours of theirs to 1 of mine, maybe a
11  little more for some cases.
12  Q.   So that's approximately 120 to 180
13  hours?
14  A.   Correct.
15  Q.   And what are their rates?
16  A.   They range from $90 an hour to 450
17  or in that vicinity.
18  Q.   They range from $90 an hour to $450
19  an hour.
20  A.   Right.  Depending on the experience,
21  credentials, rank of the person working on the
22  case.
23  Q.   Is there a typical amount that you
24  get paid for a matter like LSB?
25  A.   I mean, yes, although each case has

Page 517

Steven P. Feinstein, PhD, CFA

1
2   its differences.  Some are easier, some are
3   harder, some are more time-consuming, some are
4   less time-consuming.  But there's a general
5   range if someone calls and says -- asks the
6   question before, you know, what's the ballpark
7   range, I have a range I can give them.
8   Q.   What is that range?
9   A.   Well, it used to be in the
10  neighborhood of $40,000 for a market
11  efficiency.  Now it's more in the 40 to 60,000,
12  unless there are three depositions.
13        MR. MARKOVITS:  Thank you, Jason.
14  A.   I mean, sometimes there are no
15  depositions and other times there are more.
16  Q.   So do you expect to be paid
17  somewhere around 40 to $60,000 for the LSB
18  matter?
19  A.   Well, also, that's up through --
20  that's up through writing the report.  Then,
21  you know, the deposition and preparation for
22  deposition would be more, and if there's a
23  rebuttal, there's additional hours.  Yeah, I
24  would say -- I mean, I don't know.  I'd have to
25  look at the records.  But I think that's a fair

Page 518

Steven P. Feinstein, PhD, CFA

1
2   initial estimate.  And I think it's more than
3   that because I think there was a rebuttal and
4   additional work that was requested.
5   Q.   So you tell potential clients or
6   clients that an expected range in terms of
7   expense is 40 to $60,000 through the writing of
8   the report.  Is that correct?
9   A.   That's right.
10  Q.   Do you give them an expected range
11  through deposition and rebuttal report?
12  A.   They rarely ask for it, but, I mean,
13  I think sometimes I do.
14  Q.   What's that expected range?
15  A.   And it would be, like, double that
16  amount, that same amount again.  Devoting
17  myself and the staff to a week or two weeks of
18  intensive work on a case amounts to about that
19  much money.
20  Q.   That is 80 to $120,000?
21  A.   For the total.  For then through
22  rebuttal.
23  Q.   Are rebuttal reports the norm in
24  securities cases?
25  A.   Not always.  More recently it's

Page 519

Steven P. Feinstein, PhD, CFA

1    become more common.
2          Q.   Do you know if there's a rebuttal
3    report in the LSB matter?
4          A.   I don't.  I do know -- and I
5    couldn't tell you which case, but I do know
6    there are a couple of cases in this list --
7    maybe it was LSB -- where defendants read my
8    report, heard my testimony, and chose to accept
9    or stipulate to or concede market efficiency,
10   that did happen recently.
11         Q.   What case was that?
12         A.   I'm not sure.  I'm looking at this.
13   I can tell you it wasn't ARCP and it wasn't
14   Freddie Mac, obviously.  But it could have
15   been -- it wasn't Eletrobras, so that leaves in
16   this list LSB, Resource Capital, and Insulet.
17   It could be LSB or Resource Capital.  Sometimes
18   the cases settle before rebuttal.
19         Q.   What are the total amount of fees
20   that you expect in the in re Resource Capital
21   Corp. Securities litigation?
22         A.   I just don't know.
23         Q.   And would you describe the LSB case
24   as a typical case for you?
25

Page 520

Steven P. Feinstein, PhD, CFA

1          A.   I really would have to review it.
2    You know, I came prepared here for this case.
3    And in order to speak knowledgeably about LSB,
4    I would have had to have reviewed the documents
5    for that case, and I didn't do that before
6    coming here today.
7          Q.   As you sit here today, you don't
8    recall whether the LSB case is a typical case
9    for you or not?
10         A.   I know that in recent months, and
11   this list represents recent months, there have
12   been some -- there's been a range of responses
13   from defendants to my work and to plaintiffs'
14   efforts, including conceding points, including
15   settling cases.
16         Q.   As you sit here today, you don't
17   recall whether the LSB case is a typical case
18   for you or not?
19         A.   Correct.
20         Q.   Now, let's take the most recent case
21   here, the In Re Insulet Corporation securities
22   litigation case.  Do you see that?
23         A.   I just want to -- let me -- just to
24   be comprehensive for the record, what is
25

Page 521

Steven P. Feinstein, PhD, CFA

1
2    occurring more commonly nowadays is defendants
3    will accept market efficiency, and the rebuttal
4    report will be about price impact rather than
5    market efficiency.
6          And since price impact would not
7    have been in my original report, the course --
8    the case takes a turn in a different direction.
9    That's why it's hard to say which ones are
10   typical and which ones are not.  And that's
11   been more common lately.
12         Q.   Now, I see that every one of these
13   cases in their name it says "securities
14   litigation."
15         Do you see that?
16         A.   I do.
17         Q.   Okay.  And I take it all of these
18   cases are, in fact, securities litigation
19   cases.  Correct?
20         A.   Yes.
21         Q.   Okay.  And every one of the six
22   cases listed in Exhibit 2 is a case where you
23   were retained to provide a -- an opinion on
24   market efficiency.  Correct?
25         A.   Yes.  At a minimum.  Could be also

Page 522

Steven P. Feinstein, PhD, CFA

1
2    damage model.  Could also be loss causation.
3    Could also be damages itself, and sometimes it
4    could be to opine on price impact, either as a
5    response to defendants or as an opening
6    preemptive argument.
7          Q.   In all six of these cases, you were
8    asked to offer opinions on behalf of a
9    plaintiff relating to their efforts to get a
10   class certified.  Is that correct?
11         A.   That is my understanding, yes.  Yes.
12         Q.   Do you happen to recall whether or
13   not -- strike that.
14         In the -- in all six of these cases,
15   you've given deposition testimony.  Correct?
16         A.   Yes.
17         Q.   Okay.
18         A.   That's what the exhibit reflects.
19         Q.   In the -- in re American Realty
20   Capital Properties, Inc., securities
21   litigation, you also gave testimony at an
22   evidentiary hearing.  Correct?
23         A.   Correct.
24         Q.   What was the nature of that
25   evidentiary hearing?

Page 523

Steven P. Feinstein, PhD, CFA

1
2    A.    Actually, it was very similar to the
3    issues in this case.  It was about market
4    efficiency, about the collective test I used to
5    assess market efficiency.  And it was about --
6    well, what the judge was considering, and I
7    guess what defendants wished to emphasize, was
8    the relative importance of the fifth Cammer
9    factor versus all the other factors.  That's
10   what the court testimony focused on.
11        Q.    Was that a Daubert hearing?
12        A.    I don't -- I don't think so.  I
13   don't think it -- I'm not sure.  It may have
14   been.  It may not have been.  I mean, if it
15   was, it was ruled in my favor.
16        Q.    To the extent that -- you just don't
17   recall whether or not it was a Daubert hearing?
18        A.    I think, as is sometimes typical,
19   defendants may have just thrown the kitchen
20   sink at the court.  I think it was -- my
21   understanding, as I sit here now, my
22   recollection, which I want to just be clear is
23   imperfect on cases that I didn't come here
24   prepared to talk about, is that the issue was
25   whether or not the court -- the class should be

Page 524

Steven P. Feinstein, PhD, CFA

1
2    certified, whether or not plaintiff satisfied
3    their burden for certification with respect to
4    market efficiency and the damage model.
5        Q.    As you sit here today, you don't
6    recall the American Realty Capital Properties
7    securities litigation evidentiary hearing being
8    a Daubert hearing.  Correct?
9        A.    Correct.  I don't recall one way or
10   the other.  My focus was on the substance of
11   the case.
12        Q.    And because that went to an
13   evidentiary hearing, did you get paid more than
14   in the cases where you did not attend an
15   evidentiary hearing?
16        A.    Well, there's no different rate.
17   The rate was fixed and the same rate, except
18   for the travel time to and from New York City
19   was at half time.
20            But there were more hours,
21   obviously.  There were hours we sat in court.
22   There were hours I was on the stand.  There
23   were hours I prepared for the testimony.
24        Q.    And you charged for those additional
25   hours?

Page 525

Steven P. Feinstein, PhD, CFA

1
2        A.    Yes.
3        Q.    Is that also another 40 to $60,000
4    for something like that?
5        A.    I don't recall.
6            MR. FRANK:  He gives half rate on
7    travel, Bill.
8            MR. MARKOVITS:  Okay.
9            MR. FRANK:  You should remember
10   that.
11            MR. MARKOVITS:  I will check over
12   the bills.
13        Q.    Now --
14        A.    The reason why -- one reason why my
15   recollection is imperfect is, one reason the
16   firm exists is so there's a separation between
17   the business part of the engagement and the
18   research and creative research part of the
19   business.  There are others at the firm that
20   take care of all of that stuff:  collecting
21   hours, invoicing, billing, and so forth.  I
22   don't do that.
23        Q.    You don't handle what are commonly
24   considered back-office tasks?
25        A.    Correct.  Other people at my firm

Page 526

Steven P. Feinstein, PhD, CFA

1
2    do.  I review invoices before they go out and
3    approve them to go out, but the preparation is
4    someone else, someone else's responsibility.
5        Q.    Now, this list relates solely --
6    solely to testimony provided since your June
7    report.  Correct?
8        A.    Yes.
9        Q.    It doesn't identify cases in which
10   you've been retained since your June report.
11   Correct?
12        A.    Correct.
13        Q.    In how many cases have you been
14   retained this year but haven't yet provided
15   testimony?
16        A.    I don't know.
17        Q.    Is it more than five?
18        A.    Since June?
19        Q.    Sure, since June.
20        A.    I really don't know.  I can tell you
21   there's -- we're a well-known firm and there's
22   fairly consistent flow of engagements.  But I
23   couldn't tell you whether it's two, three, or
24   five or more.  I just couldn't -- I don't know.
25   There are other folks at the firm who prepare

Page 527

Steven P. Feinstein, PhD, CFA

1  work project scheduling controls, and that's,
2  again, not me.  I mean, it's almost as if I
3  work for them rather than they work for me, is
4  how we discuss it.
5      Q.    And these cases listed here, are
6  these your only source of income other than
7  your professorship?
8      A.    Only material source.  I mean,
9  there's some minor sources.
10     Q.    What are you referring to?
11     A.    Occasionally I get a royalty check
12  for some book chapters I wrote.  Well, I mean,
13  there's an LLC that owns some real estate that
14  provides some income.
15     Q.    Anything else?
16     A.    No.  Maybe.  But as I sit here now,
17  not that comes to mind.
18     Q.    All right.  Let's turn to page 13 of
19  your rebuttal report, the exhibit that's before
20  you.
21     A.    Which page?
22     Q.    13.
23     A.    Now you're referring to the page
24  numbers at the bottom?

Page 528

Steven P. Feinstein, PhD, CFA

1      Q.    I'm sorry.  We should be very clear
2  about that.  I was referring to the page
3  numbers at the bottom.  It's page 17 of 70.
4      A.    Okay.
5      Q.    Now, in paragraph 42, you refer to a
6  case on which you worked called City of
7  Sterling Heights General Employees Retirement
8  System versus Prudential Financial Inc., et al.
9          Do you see that?
10     A.    Yes.
11     Q.    And you say -- in the sentence where
12  you introduce that case, you say, "In fact, I
13  performed a single event date event study in
14  conjunction with the collective test in the
15  Prudential matter for which the class was
16  certified."  Do you see that?
17     A.    Yes.
18     Q.    And you wrote that in response to
19  Dr. Bajaj's criticism that you had never used a
20  single event date event study to establish
21  market efficiency.  Is that correct?
22     A.    Correct.
23         (Exhibit 270 is marked for
24  identification.)

Page 529

Steven P. Feinstein, PhD, CFA

1  BY MR. FRANK:
2      Q.    Okay.  I'm showing you a document
3  that has been marked as Exhibit 270.
4         Do you recognize Exhibit 270?
5      A.    I do.
6      Q.    What is Exhibit 270?
7      A.    This is my report in the Prudential
8  matter.
9      Q.    This is the report that you were
10  referring to in paragraph 42 of your rebuttal
11  report in this case?
12     A.    Yes.
13     Q.    Now, let me turn your attention to
14  paragraph 86 in the Prudential report.
15         Well, strike that.
16         In paragraph 85, you write, "Of the
17  five Cammer factors, the empirical factor was
18  cited by the Cammer court as one of the most
19  convincing ways to demonstrate efficiency."
20         Do you see that?
21     A.    I do.  And I want to emphasize it
22  doesn't say it's the most important.  It
23  doesn't say that it's essential.  What it
24  says --

Page 530

Steven P. Feinstein, PhD, CFA

1      MR. VOLPE:  Objection.
2  Nonresponsive.
3      MR. MARKOVITS:  Will you allow him
4  to finish?
5      A.    What it says is that it's one of the
6  most convincing ways is what the court said,
7  and I included it because I agreed.
8      MR. VOLPE:  Objection.
9  Nonresponsive.  Move to strike.
10     Q.    Dr. Feinstein, I'm reserving motions
11  to strike, but I'll just -- I'll just ask you
12  to recall that if you don't answer my questions
13  but rather you just insert whatever you'd like
14  to say, the day is just going to be a much
15  longer day.
16         I think my question was simply of
17  the five Cammer factors, the empirical factor
18  was cited by the Cammer court as one of the
19  most convincing ways to demonstrate efficiency.
20         Do you see that?
21     A.    I see it.  And I do -- I will add
22  because I did take an oath to give
23  comprehensive answers, the whole truth, and --
24  I also saw that in my prior deposition it was

Page 531

Steven P. Feinstein, PhD, CFA

1    important to provide context to answers I was
2    giving you because oftentimes it would be -- my
3    answers would be cited without that context to
4    make it appear as if I was saying something I
5    wasn't.
6        So I want to -- and in particular,
7    with respect to this fifth Cammer factor, the
8    argument seemed to have been made that I
9    previously represented this factor to be the
10    most important one.
11        So since we're on that topic, I want
12    to point out that it does say and I do see that
13    it says the fifth Cammer factor is the
14    most convincing or one of the most convincing.
15    And I just want to point out that it doesn't
16    say what you previously said I said it said,
17    that it's the most important.
18        MR. VOLPE: Objection.
19    Nonresponsive. Move to strike.
20        Q. You'll see in paragraph 86 that you
21    wrote the following -- and please tell me
22    whether you were telling the truth when you
23    wrote this: "The empirical factor focuses on
24    the essence of market efficiency, whereas the
25

Page 532

Steven P. Feinstein, PhD, CFA

1    other four factors are indicators that
2    generally signal market efficiency."
3        A. That is absolutely true. And what
4    it means is that all of the factors have a role
5    in assessing market efficiency.
6        Q. Now, you wrote in paragraph 87 that
7    "I conducted two sets of empirical tests of the
8    efficiency of the market for Prudential common
9    stock."
10        Do you see that?
11        A. One moment.
12        Yes, I do.
13        Q. Now, you actually conducted an event
14    study analysis in the Prudential case. Right?
15        A. On a single event. The traditional
16    event study was a single event. The collective
17    test was on a group of events, just as in
18    Freddie Mac.
19        Q. Are you trying to mislead the court
20    in this matter, Dr. Feinstein?
21        A. No.
22        MR. MARKOVITS: Objection.
23        Q. Now, please take a look at
24    paragraph 96.
25

Page 533

Steven P. Feinstein, PhD, CFA

1        A. Event selection?
2        Q. Yes.
3        A. Yes.
4        Q. Do you see there that you wrote, "A
5    company's financial results and forecasts are
6    among the most important considerations to
7    investors assessing the value of its stock"?
8        Do you see that?
9        A. Yes.
10        Q. Was that statement true when you
11    wrote it?
12        A. Yes.
13        Q. It's still true today?
14        A. Yes.
15        Q. You also wrote, "Consequently, such
16    announcements typically contain material
17    information that could cause the stock price to
18    change."
19        Do you see that?
20        A. Yeah. And I do want to make sure
21    it's on the record that you asked me these
22    questions in the last deposition, so this is
23    not really responsive to my rebuttal. These
24    are the same questions you asked me before, and
25

Page 534

Steven P. Feinstein, PhD, CFA

1    I gave answers to explain why the Freddie Mac
2    case was unique and different from other cases,
3    including the Prudential case.
4        In the Freddie Mac case, prior
5    expert work by Dr. Bajaj and Dr. Holman
6    analyzed and evaluated earnings announcements
7    and debated about whether the news was mixed or
8    such that there would be a statistically
9    significant reaction elicited.
10        And I explained that Dr. Holman's
11    analysis made sense to me, but I was going to
12    proceed by staying out of that fray and look at
13    a different set of events.
14        You asked me that last time, and I
15    answered that last time.
16        Q. Have I ever asked you any questions
17    about your Prudential report?
18        A. No. But you asked me about the
19    importance of -- yes, you did by reference.
20    You said, "In prior reports, you looked at
21    earnings announcements."
22        And I said "Yes."
23        And you said, "In prior reports, you
24    said these were among the most important news
25

Page 535

1      Steven P. Feinstein, PhD, CFA
2  events."
3          And I said "Yes."  So by reference,
4  yes.
5      Q.   Take a look at paragraph 97.  Do you
6  see that?
7      A.   I do.
8      Q.   There, you wrote, "Numerous
9  well-known and highly regarded academic studies
10  (for example, Beaver 1968, Bolin Brown 1968,
11  Ball 1978, Watts 1978, Patell and Wolfson,
12  1984, and Ball and Kothari, 1991) have
13  specifically examined stock price movements
14  caused by earnings announcements and concur
15  that earnings announcements are generally
16  important information events."
17          Do you see that?
18      A.   I do.  And you --
19          MR. MARKOVITS:  Excuse me.  I'm
20  going to object.
21          Can you tell me how this relates to
22  his rebuttal report?  How does that
23  question relate to the opinions he's given
24  in the rebuttal report?  If you can explain
25  that to me, I'll allow him to answer the

Page 536

1      Steven P. Feinstein, PhD, CFA
2  question.
3          MR. FRANK:  Are you instructing the
4  witness not to answer?
5          MR. MARKOVITS:  I will instruct the
6  witness not to answer if you can't provide
7  a link between the question and the scope
8  of this deposition, which is limited to the
9  opinions that he's given in the rebuttal
10  report.
11          MR. FRANK:  You will soon see,
12  Mr. Markovits, that the statement in his
13  rebuttal report was terribly misleading,
14  and it was misleading because of what he
15  has said here relating to corporate
16  announcements and what he actually tested.
17  And you'll soon see how very misleading
18  that was.
19          If your expert wishes to mislead the
20  court, that's his prerogative, but I'm
21  allowed to correct it and show the court
22  exactly what he's doing.
23          MR. MARKOVITS:  That's a link.  I'll
24  accept your representation.  I will not
25  accept that he is misleading the court in

Page 537

1      Steven P. Feinstein, PhD, CFA
2  any respect, and I'd appreciate it if you
3  would avoid the pejoratives in your
4  questioning.
5          Thank you.
6          MR. FRANK:  In fairness,
7  Mr. Markovits, I don't think I've used any
8  pejoratives in my questioning.  I may have
9  in my explanation as to --
10          MR. MARKOVITS:  No.  You have in
11  your questioning as well, but the record
12  will reflect that.
13          Go ahead.
14  BY MR. FRANK:
15      Q.   I believe that my last question was
16  whether you saw the quote I just read on
17  paragraph 97.
18          Do you see that?
19      A.   Yeah, I do.  And I certainly see it
20  and you can add to the list that earnings
21  announcements have also been examined by
22  Dr. Holman and Dr. Bajaj in this case.
23          MR. VOLPE:  Objection.
24  Nonresponsive.
25      Q.   Now, in paragraph 98-- now, did --

Page 538

1      Steven P. Feinstein, PhD, CFA
2  strike that.
3          With respect to paragraph 97, do you
4  still stand by what you said in paragraph 97?
5      A.   Yes.
6      Q.   Okay.  Now, with respect to
7  paragraph 98, you wrote, "Consequently, a
8  pattern of greater stock price movement on
9  earnings and guidance announcement days as
10  compared to all other days is indicative of
11  market efficiency."
12          Do you see that?
13      A.   I do.
14      Q.   Do you still believe that?
15      A.   Yes.
16      Q.   Now, in paragraph --
17      A.   Just -- it's -- but don't take that
18  out of context.  There are situations where if
19  there's not a pattern of greater stock price
20  movement on earnings and guidance dates, it's
21  not indicative of market inefficiency.
22          So seeing that information moves the
23  price on the earnings and guidance days is a
24  demonstration of market efficiency.  But the
25  opposite is not true, such that if there's not

Page 539

Steven P. Feinstein, PhD, CFA

1  Steven P. Feinstein, PhD, CFA
2  significantly bigger movement on earnings and
3  guidance days, especially when a reason is
4  offered and apparent, that that would indicate
5  market efficiency.  And that's what I explained
6  in the prior deposition and in my writing.
7      Q.  Now, in paragraph 99, you write,
8  "Earnings announcements and guidance changes
9  took place on the following dates during the
10  class period."
11      Do you see that?
12      A.  Yes.
13      Q.  Okay.  And you list there seven
14  dates on which there were earnings
15  announcements or guidance changes.  Is that
16  correct?
17      A.  Right.
18      Q.  Now, those seven dates, did you test
19  those dates in this -- in connection with your
20  work on the Prudential report?
21      A.  In the context of a collective test,
22  not in the context of a traditional event study
23  focused on individual events, which is exactly
24  what I said in my two prior reports in the
25  Freddie Mac case.

Page 540

1  Steven P. Feinstein, PhD, CFA
2      Q.  Let me turn your attention to
3  paragraph 116.  Do you see in paragraph 116 you
4  write, "As shown in Exhibit 7, the respective
5  stock price reactions were significant at the
6  95 percent confidence level on six of the seven
7  earnings and guidance announcement event
8  dates?"
9      A.  That's a collective test.  This is
10  a -- yes.  And this is the -- in the context of
11  a collective test.
12      Q.  Is it your --
13      A.  It's described as a collective test
14  in the report.
15      Q.  Is it your view that Dr. Holman
16  performed a collective test in this case?
17      A.  No.
18      Q.  Well, he tested multiple dates,
19  didn't he?
20      A.  He did.
21      Q.  So --
22      A.  But his evaluation was on an
23  individual basis, not on -- I don't believe he
24  ran a binomial test or a test to determine what
25  I present in paragraphs 119 and 120 of this

Page 541

1  Steven P. Feinstein, PhD, CFA
2  test -- of this report for paragraph 121 and
3  122.
4      Q.  Let me turn your attention to
5  paragraph 120.  You write, "Given that six of
6  the seven event dates were indeed statistically
7  significant, we can conclude that Prudential
8  stock did respond to the news disseminated on
9  earnings and guidance announcement dates
10  demonstrating market efficiency throughout the
11  class period."
12      Do you see that?
13      A.  I do.
14      Q.  Was that a collective test?
15      A.  Yes.
16      Q.  How was that different than
17  Dr. Holman's test where he tested six dates and
18  concluded that because two of the six dates
19  were statistically significant that he
20  demonstrated market efficiency?
21      A.  I'll explain, but you need to
22  listen.
23      It's in paragraph 119.  119 states,
24  under the hypothesis and -- well, let's back
25  up.

Page 542

1  Steven P. Feinstein, PhD, CFA
2      I'm going to read all of 119 because
3  that's where it's explained.  "Under the null
4  hypothesis that Prudential stock does not
5  behave any differently on earnings and guidance
6  announcement dates and on ordinary days, there
7  would be only a 5 percent probability that any
8  such event would elicit a statistically
9  significant stock price reaction at the
10  95 percent confidence level.  Under this
11  hypothesis that the stock price behaves no
12  differently on earnings and guidance
13  announcement days than on ordinary days, the
14  probability that six of seven events would
15  be statistically significant" --
16      I just want to interject.  So I'm
17  analyzing them collectively.
18      -- "which was the result observed in
19  this case would be approximately 1 in 10
20  million."
21      So what I'm doing here is I
22  calculate from the binomial distribution a
23  specific probability of observing this
24  collective result.  In fact, that's what I say
25  next in paragraph 119.

Page 543

1    Steven P. Feinstein, PhD, CFA
2    "This cumulative probability is
3  assessed using a binomial distribution" --
4    So there's your distinction from
5  what Dr. Holman did.  Back to the text.
6    -- "computing the likelihood of six
7  out of seven positive results of individual
8  statistical significance where a positive
9  result has a probability of 5 percent and a
10  negative result has a probability of
11  95 percent."
12    So I concluded that six of seven
13  indicated that the stock reacts to information
14  by examining the seven events collectively.
15  That's not what Dr. Holman did.
16    Q.   What did Dr. Holman do?
17    A.   He provide to -- he provided reasons
18  for each individual result.  He said -- between
19  his opening report and his rebuttal, he said
20  that two were significant and that four were
21  not and the four that were not were not because
22  the news was mixed on those days.
23    So he was analyzing them from a news
24  perspective, on an individual -- on an
25  event-by-event basis, whereas I did not pick

Page 544

1    Steven P. Feinstein, PhD, CFA
2  these events because I observed any particular
3  earnings announcement date as being momentous
4  news.  I picked them because the literature
5  says generally earnings announcement dates have
6  great information flow.  And then I evaluated
7  them collectively.  I evaluated the result
8  collectively.
9    Q.   Where in your Prudential report does
10  it say that you selected these dates because
11  generally earnings dates have greater
12  information flow?
13    A.   Okay.  I mean, it's what we were
14  reading before with the quotes from Kothari and
15  such.
16    Here.
17    MR. MARKOVITS:  I think you were
18  reading before from paragraph 97.  That's
19  the Kothari reference.
20    THE REPORTER:  Could we go off the
21  record for a second?
22    MR. FRANK:  Sure.
23    MR. MARKOVITS:  Let's take a break.
24    THE VIDEOGRAPHER:  The time now is
25  10:38.  We're off the record.

Page 545

1    Steven P. Feinstein, PhD, CFA
2    (Recess taken from 10:38 to 10:53
3  a.m.)
4    THE VIDEOGRAPHER:  The time now is
5  10:53.  We're on the record.
6    (Exhibit 271 is marked for
7  identification.)
8  BY MR. FRANK:
9    Q.   Dr. Feinstein, I'm showing you a
10  document that's been marked as Exhibit 271.
11    MR. MARKOVITS:  Jason, before we
12  finished, I thought he was sort of in the
13  middle of an answer or he was going to look
14  for a response to your question about
15  earnings announcement dates conveying
16  information.
17    MR. FRANK:  The record's a little
18  muddled.  I think you jumped in and pointed
19  him to a paragraph, and then we went off
20  the record.  We can return to that, or if
21  you have questions for him you can
22  certainly ask them at the end.
23    Q.   Dr. Feinstein, do you have Exhibit
24  271 before you?
25    A.   I do.  So you don't want me to -- I

Page 546

1    Steven P. Feinstein, PhD, CFA
2  mean, it was paragraph 88 and 117 that has the
3  answer to your prior question.
4    Q.   Okay.
5    A.   I do have this exhibit, yes.
6    Q.   Thank you.  Okay.
7    Exhibit 271, what is Exhibit 271?
8    A.   This appears to be -- maybe you can
9  help me what the pronunciation -- the amici
10  curiae that I coauthored for the Halliburton
11  case.  Amici curiae brief, brief of financial
12  economist as amici curiae in support of
13  respondents.
14    Oh, wait.  This is not -- might not
15  be the one I coauthored.
16    No, this is not the one I
17  coauthored.  I'm sorry.  There is one I
18  coauthored.  This is not that one.
19    Q.   Okay.  So let's just be clear.  So
20  Exhibit 271, we can agree, is a brief of
21  financial economist as amici curiae in support
22  of respondents in the Halliburton case before
23  the Supreme Court.  Correct?
24    A.   Yes.  Yes.
25    Q.   Okay.  And you were just looking at

Page 547

1          Steven P. Feinstein, PhD, CFA
2    the -- on pages 1 and 2 for the lists of the --
3    of the particular amici, the friends of the
4    court, and you don't see your name there.
5    Correct?
6        A.   Correct.  Right.
7        Q.   But you do see Eugene Fama's name
8    there.  Right?
9        A.   Correct.
10       Q.   Who is Dr. Fama?
11       A.   He is a professor who has written
12   some seminal works on market efficiency.
13       Q.   Now, let me turn your attention to
14   page 4 of this brief.
15       A.   Yes.
16       Q.   Do you see in the middle of the page
17   it says, "Eugene Fama's seminal work in this
18   area distinguished among three different types
19   of efficiency."
20          Do you see that?
21       A.   I see that.
22       Q.   It says, "Weak-form efficiency means
23   that historical prices are not predictive of
24   future prices.  Excess profits cannot be earned
25   using strategies based on historical prices."

Page 548

1          Steven P. Feinstein, PhD, CFA
2        Q.   Do you see that?
3        A.   I see that, yes.
4        Q.   Do you agree with that definition of
5    weak-form efficiency?
6        A.   The choice of words is very
7    important here, because even Professor Fama has
8    written that serial correlation is not
9    inconsistent with market efficiency and that
10   some element of predictiveness is also
11   consistent with market efficiency.
12          Fama himself has written on the
13   subject, as have Richard Roll, Stephen LeRoy,
14   Campbell, Lo, and MacKinlay, John Campbell from
15   Campbell, Lo, and MacKinlay.
16          So the thought leaders in the field
17   now understand that there's been progress since
18   Eugene Fama's earliest seminal work in the
19   area, which is referred to here, that weak --
20   that serial correlation and some element of
21   predictiveness can have explanations that are
22   perfectly consistent with market efficiency.
23          So I would have to say that I do
24   agree that Eugene -- what's written here, that
25   Eugene Fama's seminal work in this area

Page 549

1          Steven P. Feinstein, PhD, CFA
2    distinguished among three different types of
3    market efficiency and that Eugene Fama's
4    earliest work in the area stated weak-form
5    efficiency means that historical prices are not
6    predictive of future prices.  And that if its
7    weak-form efficient, excess profits cannot be
8    earned using strategies based on historical
9    prices.
10          But since this 1970 work,
11   particularly work in the '80s and '90s showed
12   that the discipline understands that it's --
13   there are important exceptions, and in fact,
14   the exceptions are such that serial correlation
15   and predictiveness do not indicate market
16   efficiency.
17       Q.   Well, let's break that down a little
18   bit.
19          Is it correct to say that Eugene
20   Fama's seminal work in this area distinguished
21   among three different types of market
22   efficiency?
23       A.   Yes.
24       Q.   Okay.  Were those three different
25   types of market efficiency weak-form

Page 550

1          Steven P. Feinstein, PhD, CFA
2    efficiency, semi-strong form efficiency, and
3    strong-form efficiency?
4        A.   Yes.
5        Q.   Are the terms "weak-form
6    efficiency," "semi-strong form efficiency," and
7    "strong-form efficiency" commonly used by
8    economists to discuss different types of market
9    efficiency?
10       A.   Yes.
11       Q.   Do you sometimes use these terms to
12   discuss market efficiency?
13       A.   Yes.
14       Q.   Now, according to Dr. Feinstein,
15   what is weak-form efficiency?
16       A.   Weak-form efficiency refers to a
17   particular information set that the market
18   is -- that the market is efficient with respect
19   to.  And that information set would be past
20   prices and volume data.
21       Q.   Is that information set public
22   information?
23       A.   Past prices and volume data is
24   public information, yes.  But it's an
25   example -- well, I'll wait for your questions

Page 551

1      Steven P. Feinstein, PhD, CFA
2   on it.
3      Q.   What is, according to Professor
4   Feinstein, semi-strong form efficiency?
5      A.   Efficiency with respect to a
6   different information set, that information set
7   being all public information.
8      Q.   The weak-form efficiency information
9   set is public information regarding past prices
10  and volume data?
11     A.   That's right.
12     Q.   Is that a subset of the semi-strong
13  form efficiency information set?
14     A.   Well, that's where the area is not
15  as black and white as it used to be.
16         Yes, it's true that past prices and
17  volume are public information.  But it is
18  possible -- I mean, the taxonomy, Fama's
19  taxonomy does recognize that the market can be
20  efficient with respect to some information but
21  not other information.
22         And so it's therefore possible that
23  the market can be efficient with respect to a
24  company's statements; representations, either
25  false or true; its earnings announcements; its

Page 552

1      Steven P. Feinstein, PhD, CFA
2   financial performance; behavior of the sector,
3   for example, while still allowing for some
4   potential minute inefficiency in the past stock
5   prices and volume that can only be detected
6   with the most powerful and creative statistical
7   tests, and which -- I'll leave it at that.
8          I mean, so the best analogy for
9   explaining this and for teaching it when I've
10  taught it is that it's certainly possible for
11  there to be unusual ripples on the surface of
12  the ocean or on the surface of a lake that are
13  hard to explain or perhaps are anomalous.  But
14  that would not prove that a 30-foot rogue wave
15  has no impact on a fishing boat that gets
16  capsized by the wave.
17         So it's possible for the market to
18  be efficient with -- and demonstrably efficient
19  with respect to the information that's relevant
20  in a securities case while still indicating
21  some predictiveness or anomalous pattern in
22  high-frequency ripples that are essentially
23  meaningless.
24     Q.   That was a long answer.  So let me
25  try to --

Page 553

1      Steven P. Feinstein, PhD, CFA
2      A.   It's a complicated subject and
3   requires some explanation.  A short answer
4   would have been insufficient.
5      Q.   Well, maybe it won't.  I want you to
6   work with me on this because I want to get you
7   down on the record, because I think it's
8   important.
9      A.   I am on the record on this topic.
10  I've written on the topic.  I've testified in
11  other cases on this topic.
12     Q.   What have you written on this topic?
13     A.   Other -- I've written reports in,
14  for example, the AIG case -- in response to Dr.
15  Bajaj, actually -- about serial correlation.
16     Q.   Outside of the litigation context,
17  have you written on this topic?
18     A.   No.
19     Q.   Now, let me see if I understand your
20  answer.  It is your view that is it possible
21  for a particular market for a particular stock
22  to be semi-strong form efficient but not
23  weak-form efficient.  Is that correct?
24     A.   No, I didn't say that.  But I said
25  it's possible for there to be anomalous and

Page 554

1      Steven P. Feinstein, PhD, CFA
2   perhaps even predictive patterns in -- it's
3   possible for there to be some serial
4   correlation, either positive or negative, and
5   some predictiveness in stock prices in an
6   efficient market.
7          So what may have once been
8   considered a test for weak-form efficiency,
9   it's possible for a stock not to pass that but
10  nonetheless be efficient in the semi-strong
11  sense.
12         And -- and the people who have
13  written on this -- and you should check these
14  sources -- Stephen LeRoy, probably the most
15  prominent; Campbell, Lo, and MacKinlay.  Fama
16  himself, when confronted with predictiveness
17  and serial correlation, responded to it in more
18  than one article and said that it's not
19  indicative, this predictiveness in serial
20  correlation, that some people find in some
21  stock prices is not indicative of weak-form
22  inefficiency or even semi-strong inefficiency.
23     Q.   Is it possible for a market to be
24  semi-strong form efficient but not weak-form
25  efficient?

Page 555

Steven P. Feinstein, PhD, CFA

1
2     A.    It's possible for a market -- well,
3  not the way -- not in the strictest
4  black-and-white definition of the terms, where
5  you say that all stock prices are -- all
6  past -- where stock prices and volume at that
7  time are public information and semi-strong
8  means it must be efficient with respect to all
9  public information.
10         But the caveat is that serial
11  correlation and predictiveness does not prove
12  anymore that the market is weak-form
13  inefficient.  So we really have to be very
14  careful that we distinguish between the random
15  walk model, a model in which there's no
16  predictiveness or serial correlation, and a
17  definition of weak-form efficiency.  They're
18  three separate things.
19     Q.    Okay.  Well, let's put aside the
20  random walk model and serial correlation, on
21  the one hand, and just discuss these
22  definitions on the other.
23     A.    Okay.
24     Q.    Okay?  So -- because I want to
25  understand your position.

Page 556

Steven P. Feinstein, PhD, CFA

1
2             Is it possible for a market to be
3  semi-strong form efficient but not weak-form
4  efficient?
5     A.    I already answered that question.  I
6  said with the strictest black-and-white
7  definitions of the term where the information
8  set in the weak-form efficiency definition is
9  public information, you'd have to say no.
10         But that still would not prove that
11  the market is not efficient with respect to a
12  company's financial information true-and-false
13  representations.
14     Q.    So let's talk about information sets
15  for a second, because I think this is what your
16  testimony is getting to.
17         Semi-strong form efficiency is an
18  efficiency that relates to a market
19  incorporating all publicly available
20  information.  Correct?
21     A.    Correct.
22     Q.    Weak-form efficiency is a form of
23  efficiency that relates to a market
24  incorporating publicly available stock prices
25  and volume data.  Correct?

Page 557

Steven P. Feinstein, PhD, CFA

1
2     A.    Yes.
3     Q.    And you'll agree that publicly
4  available stock prices and volume data is a
5  subset of all publicly available information.
6  Correct?
7     A.    Correct.
8     Q.    And the point you were making
9  earlier is that you believe that some tests for
10  weak-form efficiency don't actually establish
11  that a market is or is not weak-form efficient.
12         Is that what you were saying?
13     A.    Perfect.  Yes.
14     Q.    Okay.  And what are the tests that
15  you believe fail to establish whether or not a
16  market is weak-form efficient, that some in the
17  field previously had thought did establish
18  that?
19     A.    Right.
20         Autocorrelation tests.  I mean, Fama
21  has commented on these himself.  If you run a
22  battery -- if you run tests on different
23  periods of time, it's -- what he's pointed out
24  is that it's -- if you run it on different
25  securities and in different points in time,

Page 558

Steven P. Feinstein, PhD, CFA

1
2  you're likely just from random chance to find
3  incidences of apparent positive autocorrelation
4  and negative autocorrelation.
5         And Fama commented that it was
6  preposterous that the -- that some people would
7  say that the market is weak-form inefficient
8  because the prices are positive, are generally
9  positively autocorrelated, where other people
10  say they're generally negatively
11  autocorrelated.  So those tests -- you know,
12  Fama himself said it could be the -- that it
13  was likely an artifact of data mining.
14         Richard Roll said negative
15  correlation -- Richard Roll also agrees with
16  what I'm saying -- in fact, I learned it from
17  him -- that autocorrelation tests don't
18  establish weak-form efficiency, because he said
19  that the bid-ask spread is going to cause
20  negative autocorrelation in most times series
21  of stock prices.
22         Stephen LeRoy looked at the same
23  challenges to weak-form efficiency and the same
24  literature of tests on weak -- of using
25  autocorrelation tests to test market efficiency

Page 559

Steven P. Feinstein, PhD, CFA
1
2  and said that those tests are ignoring things
3  like time-varying risk premia, that it -- he
4  said that it's perfectly rational for there to
5  be some predictive element, for there to be
6  some autocorrelation because of time-varying
7  risk premia.
8        Fama -- well, Campbell, Lo, and
9  MacKinlay, I believe, citing Stephen Roll, or
10  at least alluding to Stephen Roll, have a
11  famous quote where they said that it used to be
12  the case -- they actually say that, that it
13  used to be the case that finding
14  autocorrelation was tantamount to finding
15  market inefficiency. But they write in their
16  quote this is no longer believed. We -- you
17  know, the profession has moved past that. We
18  reject that now.
19        And I'm not done.
20        They say -- so Campbell, Lo, and
21  MacKinlay -- I believe it's the Lo and
22  MacKinlay article -- say specifically, they
23  say -- they use the word "rational." They say
24  there are rational explanations for
25  autocorrelation that are consistent with market

Page 560

Steven P. Feinstein, PhD, CFA
1
2  efficiency.
3        So that's why it's not really useful
4  to test for weak-form efficiency in a
5  securities case. We go right after the
6  information that's -- that the court's
7  interested in, which is company
8  representations, either false or true, and
9  disclosures.
10        MR. VOLPE: Objection.
11  Nonresponsive.
12        Q.   And my question was what are the
13  tests that you believe fail to establish
14  whether or not a market has weak-form
15  efficiency, that some in the field previously
16  had thought did establish that?
17        Do you recall that, that I asked
18  that?
19        A.   That you asked that question?
20        Well, the answer is autocorrelation
21  tests.
22        Q.   Okay.  Now --
23        A.   But I don't want you to take that
24  out of context in -- without the context I
25  provided in my prior answer.

Page 561

Steven P. Feinstein, PhD, CFA
1
2        Q.   You think that the context you
3  provided helped --
4        A.   Yeah.  I don't want to give the
5  impression -- I've seen your briefs and I've
6  seen in your experts' writings, and I don't
7  want them to take -- to say Feinstein believes
8  the profession uses these tests to test
9  weak-form efficiency.  That's not just true.  I
10  mean, I just want to make sure it's on the
11  record that they -- that some people have done
12  this, some people may continue to do this, but
13  the thought leaders in the field say this is
14  not legitimate anymore.
15        MR. VOLPE: Objection.
16  Nonresponsive.  I don't think there was a
17  question.
18        Q.   Do you believe that it would be
19  misleading to say that Dr. Feinstein believes
20  that the sorts of tests that don't adequately
21  assess whether a market is weak-form efficient
22  include autocorrelation tests?
23        A.   That would be a true statement, but
24  I think you should also say that he supported
25  the statement with several cites from the

Page 562

Steven P. Feinstein, PhD, CFA
1
2  thought leaders in the field.
3        Q.   Now, are there any other kinds of
4  tests that some in the field previously had
5  thought proved or disproved weak-form
6  efficiency, that you believe do not prove or
7  disprove weak-form efficiency?
8        MR. MARKOVITS: Objection.  Asked
9  and answered.
10        A.   There are some tests which have to
11  be -- which are commonly used -- well, most
12  commonly, actually, by Bajaj, but they've been
13  proposed in the field and he's latched onto
14  them and used them in some cases but not this
15  one -- the Y filter test, for example, and a
16  trading strategy -- you know, the trading
17  strategy test.
18        But you've got to be very careful to
19  make sure the test is conducted appropriately,
20  taking into account the costs of trading,
21  which, when you do that, oftentimes the results
22  are not what they would be if you didn't take
23  that important factor into account.
24        Q.   Now, with respect to autocorrelation
25  tests, are there different kinds of

Page 563

Steven P. Feinstein, PhD, CFA

1   autocorrelation tests?
2   A.   Yes.
3   Q.   Do they have different names?
4   A.   Yes.
5   Q.   What are the names of the
6   autocorrelation tests of which you are aware?
7   A.   Well, there's the Durbin-Watson
8   test.  I think there's -- I think -- well, I
9   have to check my notes.  I used to be able to
10  do this more from memory than I can now.
11        But I think Breuschâ€"Pagan test looks
12  at autocorrelation.  There are a variety of
13  regression model tests.  The filter trading
14  rule test.  All give autocorrelation.
15  Q.   Is the filter trading rule test the
16  same as the Y filter test you just mentioned?
17  A.   It can be, but it doesn't have to
18  be.  It's -- I would say filter trading rule
19  test is the broader umbrella, and the Y filter
20  test is a more specific example under that
21  umbrella.
22  Q.   Now, you mentioned an answer or two
23  ago that there are some tests that Dr. Bajaj
24  has run in other cases that relate to weak-form
25

Page 564

Steven P. Feinstein, PhD, CFA

1   efficiency.  Is that right?
2   A.   That's right.
3   Q.   Okay.  And do you have a view as to
4   whether or not those tests that Dr. Bajaj has
5   run in other cases actually appropriately test
6   for weak-form efficiency?
7   A.   In general or in -- with respect to
8   his implementation in a particular case?
9         Well, what was the question?
10  Q.   Let's take them in turn.  First,
11  let's talk about in general.
12        The tests that you were referring to
13  that Dr. Bajaj runs to test for weak-form
14  efficiency, did those tests actually test for
15  weak-form efficiency?
16  A.   They test for a property that some
17  people associate with weak-form efficiency, but
18  they don't actually test for weak-form
19  efficiency because they don't control for the
20  potential of time-varying risk premia, bid-ask
21  spreads, and often, more often than not, the
22  costs of trading.
23  Q.   So you believe that the test --
24  well, strike that.
25

Page 565

Steven P. Feinstein, PhD, CFA

1         What is the property that some
2   people associate with weak-form efficiency to
3   which you just referred?
4   A.   Well, there are some people out
5   there that apparently are unfamiliar with the
6   literature, that still think that in order for
7   a stock to be weak-form efficient, it must
8   follow a random walk.  So it tests for
9   weak-form efficient -- it associates serial --
10  a premise of those tests is that if you find a
11  profitable trading rule and if you find
12  statistically significant or sometimes
13  economically significant serial correlation,
14  you have necessarily proved market efficiency.
15  That is not true anymore, as the literature
16  indicates, as literature dictates.
17  Q.   According to Dr. Feinstein, what is
18  a random walk?
19  A.   Random walk is a stochastic process
20  where movements have no memory, that the
21  distribution of movements going forward is in
22  no way -- is independent of any prior
23  movements, statistically, probabilistically
24  independent of all prior movements.
25

Page 566

Steven P. Feinstein, PhD, CFA

1   Q.   And when you used the word
2   "stochastic," was that s-t-o-c-h-a-s-t-i-c?
3   A.   I'm better at math than spelling.  I
4   think --
5   Q.   Why don't you give it a shot.
6   A.   S-t-o-c-h-a-s-t-i-c.
7   Q.   Thank you.
8         And what's a stochastic process?
9   A.   A random process.  A process with a
10  random element, or a process that's modeled as
11  being random.
12  Q.   Now, do you have a view as to
13  whether any of the tests that you have seen Dr.
14  Bajaj run in the past to assess weak-form
15  efficiency actually assess weak-form
16  efficiency?
17  A.   I think they have to be analyzed on
18  a case-by-case basis to see how he implements
19  the test.  See, the problem with finding --
20  see, a lot of his tests, the better ones of his
21  tests -- should I answer or not answer?  I
22  mean, I --
23  Q.   You can answer my questions however
24  you see fit.  We will move to strike anything
25

Page 567

Steven P. Feinstein, PhD, CFA

1  that's not responsive at a later date.
2      A.   So the better ones of his tests -- I
3  mean, simply finding statistical evidence or a
4  statistically significant period of time where
5  there's autocorrelation doesn't prove anything
6  because -- usually.  I should say typically
7  generally usually it doesn't prove anything,
8  unless you've made sure that there wasn't any
9  data mining, that you didn't, like, search a
10  number of different periods and then hone in on
11  a particular period where there, just from
12  random chance, could be -- could have been a
13  serially correlated patch of price movements.
14  And especially -- and they also have -- they
15  also usually -- those tests, the tests that
16  just look for statistical evidence,
17  statistically significant autocorrelation,
18  might not be economically significant.
19      The problem there is, especially in
20  the case of a securities case, the news can
21  be -- in retrospect, in hindsight, the news
22  could have been serially correlated.  Some
23  companies choose to make negative disclosures
24  in a staggered fashion, so they'll make an
25

Page 568

Steven P. Feinstein, PhD, CFA

1  announcement on Monday and they'll make an
2  announcement on Wednesday and they'll make an
3  announcement on Friday, and they'll maybe leak
4  something to particular analysts or newspeople,
5  so that the news comes out in a staggered
6  fashion.
7      If the news is serially
8  correlated -- well, in an efficient market.  In
9  a weak-form efficient market, the prices is
10  going to be serially correlated.  So then a
11  serial correlation test would prove -- would
12  not prove inefficiency in that case.
13      But in the better ones of his tests,
14  where he actually looks to see if there's a
15  profitable trading rule, he usually doesn't,
16  and I -- usually -- he usually can't, in the
17  work that I've seen him conduct, prove that the
18  rule would have been identified prior to its
19  implementation.  In other words, that
20  there's -- it's a stationary and persistent
21  phenomenon whereby someone in the marketplace
22  populated by competitive mutual funds and
23  investors and analysts would be able to
24  identify that the security is moving in a
25

Page 569

Steven P. Feinstein, PhD, CFA

1  serially correlated fashion, and then go and
2  implement a strategy that's profitable.
3      So it's not that hard to find
4  periods of time where a strategy would have
5  been profitable in hindsight.  The tests that
6  he runs and which are the better ones where
7  he's distinguishing between statistical
8  significance and economic significance don't do
9  that.
10      So I can't remember a time that I've
11  seen him do the tests in a reliable way.
12      Q.   Do you believe that it is possible
13  to reliably test for weak-form efficiency?
14      A.   There are so many issues associated
15  with weak-form efficiency, and there have been
16  so much -- there's so much literature written
17  on why the standard tests are not reliable
18  because there are explanations for apparent
19  autocorrelation that I'm not sure.
20      I mean, I would -- I would need to
21  review the literature.  I didn't come prepared
22  with that, having reviewed all of the
23  literature on what's been proposed.  I'm
24  well-versed in the state of the literature
25

Page 570

Steven P. Feinstein, PhD, CFA

1  generally, but specific tests that may recently
2  have been proposed, I'd want to review the
3  literature for those.
4      I would say -- well, let me just
5  summarize.  I would think most of the standard
6  tests that have been used in the past are now
7  known to be unreliable, but I'm sure people are
8  looking for tests that are more reliable.  So
9  it's -- there's hope.
10      Q.   As you sit here today, are you aware
11  of any test that can reliably identify whether
12  markets are weak-form efficient?
13      A.   I'm aware of tests and modifications
14  to prior tests that make the tests more
15  reliable than they used to be.
16      For example, in a filter test,
17  taking into account costs of trading, taking
18  into account that you have to be able to
19  predict the serial correlation in a sample of
20  data different from where you implement the
21  trading rule, those tests sidestep the known
22  deficiencies, so those tests are more reliable.
23      However, I don't know how those
24  tests would account for the potential of
25

Page 571

Steven P. Feinstein, PhD, CFA

1  time-varying risk premia and the other
2  considerations that Stephen LeRoy wrote about
3  in markets that are rational and efficient and
4  yet exhibit serial correlation.
5      Q.   And because of that, as you sit here
6  today, you're just not aware of a test that you
7  would feel comfortable conducting to determine
8  whether or not a market was weak-form
9  efficient?
10     A.   Well, the tests that I ran that
11 prove that the market's semi-strong efficient
12 speak to the weak-form efficiency.
13     Q.   How did they speak to weak-form
14 efficiency?
15     A.   Well, if we can prove that they're
16 not impediment -- the kind of things that might
17 make a market inefficient, either weak, strong
18 or semi-strong, those impediments can be
19 addressed with the Cammer and Unger factors and
20 an empirical test on semi-strong style
21 information.
22     Q.   If a market is proven to be
23 semi-strong form efficient, is a fortiori
24 weak-form efficient?

Page 572

Steven P. Feinstein, PhD, CFA

1      A.   Again, it's not as black and white
2  as you might think it is or as you make it.
3      What those tests directly prove is
4  that the market is efficient with respect to
5  the flow of economic financial company
6  information.
7      They also necessarily, as a side
8  matter, would prove that there are -- that the
9  market's paying attention, that investors and
10 analysts are paying attention, that they're
11 behaving rationally, that there are not
12 impediments to information flow, and that there
13 are not impediments to trading.
14     Those things would suggest the
15 market is weak-form efficient, but I guess it
16 really depends on your standard of proof that
17 you would need or that you're seeking.
18     Frankly, though, it's -- you know,
19 the ripples on the water are not what's
20 relevant in a securities case.  It's the big
21 waves that hit the ship.  And that's why the
22 tests that I ran in the semi-strong -- well,
23 the tests that I run of semi-strong focus on
24 that kind of information.

Page 573

Steven P. Feinstein, PhD, CFA

1      Q.   Now, are you aware of any literature
2  that supports the view that a company can be
3  semi-strong form efficient vis-a-vis non-price
4  and volume-related information but not
5  weak-form efficient?
6      A.   I believe the literature that
7  explains why autocorrelation tests are
8  unreliable is either explicitly or implicitly
9  expressed that that's consistent with -- that
10 they're -- that in the taxonomy of types of
11 information, a stock can be efficient with
12 respect to fundamental pricing information
13 without being efficient with respect to the
14 tiny ripples on the water, previous, you know,
15 patterns and past stock prices in volume.
16     But I don't think they would express
17 it in the way that it was expressed in your
18 question.  I don't know of anyone that uses a
19 quote similar to what you asked.
20     Q.   According to Dr. Feinstein, what is
21 strong-form efficiency?
22     A.   Well, that would mean that even
23 private information is represented or impounded
24 into the trading prices of publicly traded

Page 574

Steven P. Feinstein, PhD, CFA

1  securities.
2      Q.   Now -- excuse me -- what is the
3  relationship, according to you, between these
4  three different types of market efficiency and
5  the opinion that you rendered in your original
6  report and your rebuttal report?
7      A.   Well, that the taxonomy that Fama
8  proposed recognizes that a market can be
9  efficient with respect to one kind of
10 information without being efficient necessarily
11 with respect to another kind of information.
12 Therefore, it's important to test efficiency
13 with respect to information that's relevant in
14 the securities case:  fundamental pricing
15 information and disclosures and
16 allegation-related events.
17     Q.   You believe that Fama's work
18 recognizes that a market can be semi-strong
19 form efficient but not weak-form efficient?
20     A.   That's not what I said.  I don't
21 think he's ever -- well, I don't know if he's
22 testified in a case like this about market
23 efficiency.  But I think he -- he does
24 recognize that it's possible for a market to

Page 575

Steven P. Feinstein, PhD, CFA

1   Steven P. Feinstein, PhD, CFA
2   be -- well, at least theoretically, as a
3   theoretical construct, efficient with respect
4   to some information but not all information.
5       Q.   Is it your opinion that the market
6   for Freddie Mac stock was during the class
7   period semi-strong form efficient?
8       A.   Yes.
9       Q.   And do you sometimes --
10      A.   Informational.  In the informational
11  efficiency sense.  There's another dichotomy
12  besides the taxonomy of types of efficiency.
13      Q.   Well, let --
14      A.   There's informational that's
15  fundamental.  So semi-strong efficient in the
16  informational efficiency sense.
17      Q.   Now, when you say semi-strong
18  efficient in the informational efficiency
19  sense, what do you mean?
20      A.   That the market is -- that there's
21  sufficient proof that the market reflects and
22  reacts to public information about the company.
23      Q.   Is that different from semi-strong
24  form efficiency?
25      A.   No.

Page 576

1   Steven P. Feinstein, PhD, CFA
2       Q.   Are "semi-strong form efficiency"
3   and "informational efficiency" terms that can
4   be used interchangeably, in your view?
5       A.   No.
6       Q.   Why not?
7       A.   Information efficiency is a type of
8   efficiency about how a -- what a stock price
9   reacts to and whether the market uses or
10  ignores information.
11      Fundamental efficiency is about what
12  the price actually goes to, what the price
13  becomes as a result of information that's been
14  provided.
15      And then the taxonomy of
16  semi-strong, weak, and strong is a taxonomy
17  about the type of information that's at issue.
18  Is it simply high-frequency ripples like
19  patterns in past stock prices and volume or is
20  it the fundamental data that people use to
21  value stocks?  That would be the difference
22  between weak form and semi-strong form.
23      Q.   I didn't understand your answer.  So
24  I'm going to ask it -- my question in a
25  slightly different way.

Page 577

1   Steven P. Feinstein, PhD, CFA
2       What is the difference, if any,
3   between semi-strong form efficiency and
4   informational efficiency?
5       A.   One is one of three items in a
6   taxonomy of three, and the other is one half of
7   a dichotomy.  They're about two different
8   things entirely.  Semi-strong, weak, strong is
9   about the type of information.  Fundamental
10  versus informational is about the type of stock
11  reaction.
12      Q.   And the type of information we're
13  talking about in semi-strong form efficiency is
14  all publicly available information.  Correct?
15      A.   Yes.  But in the context of a
16  securities case, the focus is on fundamental
17  pricing information, fundamental -- information
18  that would -- that's used in valuation models.
19  Company announcements, company performance,
20  that sort of thing.
21      Q.   Now, you said that informational
22  efficiency is about the type of stock reaction.
23  Is that what you said?
24      A.   Right.  Right.
25      Q.   What do you mean by that?

Page 578

1   Steven P. Feinstein, PhD, CFA
2       A.   That the stock reacts rather than --
3   reacts to and the market digests and
4   incorporates and responds to information --
5   digests rather than ignores; that's
6   informational efficiency -- whereas the other
7   half of the dichotomy is stronger.  It goes
8   further and says not only does the market react
9   to it, but they react to it in a way such that
10  the price market arrives at conforms to a
11  particular pricing model.
12      Q.   Fundamental efficiency, in your
13  view, relates to whether or not the market
14  reacts in a certain magnitude to information.
15  Is that right?
16      A.   Well, that would be part of it.
17  Fundamental efficiency would say that the price
18  has to go to a particular price dictated by a
19  particular pricing model.  So it would indicate
20  the direction, the magnitude -- yeah, the
21  direction and magnitude, and the actual value
22  of the price arrived at.
23      Informational efficiency means that
24  the market reacts to the information.  They
25  don't ignore it.  And you can see that the

Page 579

1          Steven P. Feinstein, PhD, CFA
2     market reacts to the information via a variety
3     of observations.
4          Q.   And semi-strong form efficiency also
5     relates to whether the market reacts to
6     information.  Correct?
7          A.   Well, it's -- that's not about how
8     the market reacts.  So semi-strong can be
9     either semi-strong fundamental or semi-strong
10    informational.  The semi-strong is about the
11    information set that the market reacts to.  Is
12    the market -- does the market react to private
13    information, to the development of -- and
14    production transpiring of private information.
15         Q.   That would be strong form?
16         A.   Strong form is about -- is that
17    we're focusing on private information that's
18    not public and looking to see whether or not
19    the market incorporates that into its trading
20    prices.
21         Q.   Now, semi-strong form efficiency has
22    a directionality component.  Correct?
23         A.   Semi-strong fundamental efficiency
24    does, not semi-strong informational.
25         Q.   Let me turn your attention to

Page 580

1          Steven P. Feinstein, PhD, CFA
2     page 13 and 14 of the amici brief you have
3     before you.
4          I believe that's Exhibit 271.  Do
5     you have that in front of you?
6          A.   13 and 14?
7          Q.   Yes.
8          Do you see that the --
9          A.   One moment.  I want to --
10         Q.   Sure.  Read whatever you'd like.
11         A.   (Reviewing document.)
12         Yes.
13         Q.   Do you see that in the last
14    paragraph of this brief, it says, "It is not
15    accurate to say there is a 'consensus' among
16    economists rejecting the SSEMH"?
17         Do you see that?
18         A.   Yes.
19         Q.   Okay.  And do you understand that
20    the SSEMH refers to the semi-strong form
21    efficient market hypothesis?
22         A.   I do.
23         Q.   And then if you look at the last
24    sentence of that paragraph, do you see it says,
25    "Most important, economists generally agree

Page 581

1          Steven P. Feinstein, PhD, CFA
2     that material information, whether truthful or
3     fraudulent, will generally affect the price of
4     a stock and that the effect will be in a
5     predictable direction"?
6          Do you see that?
7          A.   I do.
8          Q.   Do you agree with that statement?
9          A.   That's an implication of fundamental
10    efficiency.  Or it's more fundamental than
11    informational, the last part.
12         The part that's on topic of
13    informational efficiency is that an implication
14    of informational efficiency is that the price,
15    whether -- that the price will be impacted by
16    material information, whether truthful or
17    fraudulent.
18         The direction of the movement,
19    that's an implication of fundamental
20    efficiency.
21         MR. VOLPE:  Objection.
22    Nonresponsive.
23         Q.   And do you believe there's any
24    literature that supports your view that
25    directionality is a function of fundamental

Page 582

1          Steven P. Feinstein, PhD, CFA
2     efficiency?
3          A.   It's an implication.  It stems from
4     the definition.  And there is some literature
5     describing what -- defining what fundamental
6     versus informational efficiency are.
7          Q.   What literature would you point to
8     that identifies the directionality of stock
9     price movements as an implication of
10    fundamental efficiency?
11         A.   Any literature that defines the
12    terms, because the direction is necessarily
13    dictated by a determination as to what the
14    right price is and what the right direction is.
15    And that's -- those are considerations in the
16    assessment of fundamental efficiency.
17         Specifically, one of the Fama
18    articles says that you can't test fundamental
19    efficiency without a pricing model because
20    you're necessarily testing them jointly.  And
21    that article is support for the principle that
22    the direction -- that directionality or correct
23    directionality is an element of fundamental
24    efficiency.
25         I mean, the -- I may have something

Page 583

1          Steven P. Feinstein, PhD, CFA
2   to add to that answer.
3          Actually, the decision in
4   Halliburton, which I don't believe there's been
5   articles written by economists disputing it,
6   the court said that with respect to semi-strong
7   informational efficiency, the degree to which
8   the price reaction was accurate is beside the
9   point.
10         So, clearly, it's -- the type of
11  efficiency that the court's interested in does
12  not require a test of whether the price
13  comports with a particular analyst's or
14  investor's assessment of what the correct
15  direction or price level has to be following
16  the information.
17     Q.   Let me turn your attention to page 3
18  of this brief.
19     A.   One moment, though.
20         I'd want to point out that that last
21  sentence that you're focusing on doesn't say
22  that directionality is an essential element of
23  informational efficiency.  It could be
24  interpreted to mean that when the market is
25  informational efficiency, good economists would

Page 584

1          Steven P. Feinstein, PhD, CFA
2   be able to reliably predict the direction of a
3   reaction.
4          It doesn't say that reliable
5   prediction of the direction or that the market
6   predicting -- the market moving in a particular
7   direction is an essential element of the
8   definition of informational efficiency.
9      Q.   Let me turn to --
10     A.   And I would agree with that.  That
11  makes sense.
12     Q.   Let me turn your attention to page 3
13  of the brief.  Do you see at the bottom of the
14  page there's a paragraph?
15         Could you do me a -- take a moment
16  and read the paragraph at the bottom of page 3.
17  Do you see that?
18     A.   Yeah.
19     Q.   It begins with the words "our
20  conclusion"?
21     A.   Yeah.
22     Q.   It states, "Our conclusion that
23  prices generally move reasonably promptly in
24  the predicted direction in response to
25  unexpected material public information

Page 585

1          Steven P. Feinstein, PhD, CFA
2   (favorable or unfavorable) is perfectly
3   consistent with the view that there are
4   sometimes anomalies in the way markets process
5   information and that bubbles can exist."
6      Q.   Do you see that?
7      A.   And it's a true statement.  They're
8   not saying that those are elements of the
9   definition of informational efficiency.
10     Q.   You don't think that here Professor
11  Fama and his colleagues were discussing the
12  type of efficiency that needs to be proven in
13  securities cases?
14     A.   They were discussing what the
15  profession -- consensus in the profession is
16  about efficiency.  And it goes beyond
17  informational efficiency in that paragraph.
18     Q.   And what is your understanding --
19  well, strike that.
20         Do you believe that a market that
21  responds to prices in directions that are not
22  predictable can be an efficient market?
23     A.   Well, predictable by whom?
24     Q.   By an economist.
25         Well, I think if the market is informational

Page 586

1          Steven P. Feinstein, PhD, CFA
2   efficient, other tools can be applied to
3   predict.  So I believe it's an implication
4   of informational efficiency, but it's not an
5   essential -- I mean, proving it is not an
6   essential element to proving market
7   efficiency.
8   One moment.
9   The definition is that the stock price moves
10  in reaction to information.  And that's also
11  the -- it's my understanding is the legal
12  standard outlined in Halliburton, that the
13  stock price moves.
14  I don't know --
15         THE WITNESS:  Can you just read what
16  I said just then?
17         *(Answer read back by the reporter.)
18     A.   All right.  That's what I wanted to
19  say.
20         I mean, there could be implications
21  of that.  I mean, once you know that the market
22  is informational efficient, it's reasonable to
23  apply valuation tools to predict the market, to
24  predict the market movements on the basis of
25  different information.  But it's not an

Page 587

Steven P. Feinstein, PhD, CFA

1  essential element of the definition of
2  informational efficiency.
3  Q.  Let me turn your attention to page 1
4  of your report, your rebuttal --
5  A.  I mean, I just want to add, because
6  if it were, then what would be -- what we would
7  be covering at depositions like this and what
8  the expert reports in a case like this would be
9  would be arguments between the experts as to
10  whose valuation model was better.
11  I mean, it's a good thing that the
12  courts have focused on informational rather
13  than fundamental efficiency considerations. I
14  mean, otherwise, you would have Dr. Bajaj
15  saying that he believes he's right about the
16  magnitude and direction of a movement and the
17  entire collective wisdom of the marketplace was
18  wrong, and that would be the proof that he
19  would try to offer that the market wasn't
20  informational efficient.
21  So it's a much more objective
22  analysis and a much more objective standard to
23  focus on really what is the definition of
24  informational efficiency, rather than move

Page 588

Steven P. Feinstein, PhD, CFA

1  towards implications that one might arrive at
2  by combining informational efficiency and
3  skill, using other tools that are outside the
4  definition of informational efficiency.
5  Q.  You just used the terms "magnitude"
6  and "direction of movement."  Is there a
7  difference between those two terms?
8  A.  Sure.  Magnitude is size, and
9  direction is direction.
10  Q.  And is fundamental efficiency the
11  notion that the market's getting the
12  magnitude -- not only direction but also the
13  magnitude correct?
14  A.  Yes.  Yes.  And it could be looked
15  at collectively or separately.
16  Q.  Now, let me turn you to page 1 of
17  your report.
18  Actually, I apologize.  Turn to
19  page 3, paragraph 12.
20  A.  Okay.
21  Q.  Okay.  And do you see at the first
22  sentence, you say, "Dr. Bajaj does not" --
23  A.  Where?
24  Q.  Of paragraph 12.  Page 3.

Page 589

Steven P. Feinstein, PhD, CFA

1  A.  Oh.  I'm looking at the -- the
2  Q.  Oh, I'm sorry.
3  A.  -- original report.
4  Q.  Now, we're looking at 269, the --
5  270 was the Prudential report, not the original
6  report, and 269 is your rebuttal report.
7  A.  And then after this question, we'll
8  take a break.  Okay?
9  Q.  Sure.  We can take a break right now
10  if you want.
11  A.  I'm curious to see what you want me
12  to look at.
13  Q.  Do you see paragraph 12?  It says,
14  the first sentence, "Dr. Bajaj does not dispute
15  that Freddie Mac stock exhibited a
16  statistically significant negative price
17  reaction to the revelation of new
18  company-specific information on 20 November
19  2007."
20  Do you see that?
21  A.  Right.  That's a true statement.
22  Q.  Okay.  And then do you see the last
23  statement?  You say in that paragraph, "This
24  price behavior demonstrates market efficiency

Page 590

Steven P. Feinstein, PhD, CFA

1  and in conjunction with the other Cammer and
2  Krogman factors proves the market was efficient
3  throughout the class period."
4  Do you see that?
5  A.  Yeah.  That's the opinion of my work
6  in this case.
7  Q.  So you believe --
8  A.  That's the essence of my opinion.
9  Q.  Well, this is an opinion that is not
10  based on your collective test.  Correct?
11  A.  No, it is.
12  Q.  In that sentence, you say "this
13  price behavior."  You're talking about the
14  price reaction on November 20th.  Correct?
15  A.  Well, let me just clarify right here
16  and right now that my conclusion of market
17  efficiency is based holistically on all of my
18  findings.
19  Q.  Okay.  And if you remove any one of
20  those findings, that doesn't fairly reflect
21  your conclusion.  Correct?
22  A.  No.  That's -- I think we have a
23  different definition of "holistic."
24  Q.  In other words, if you had never

Page 591

Steven P. Feinstein, PhD, CFA

1  done your collective test, would you have
2  concluded that the price behavior on
3  November 20th alone, in conjunction with the
4  other Cammer and Krogman factors, proves that
5  the market was efficient throughout the class
6  period?
7      A.   You asked me that in the last
8  deposition, and the answer now is the same as
9  it was then.  It's a hypothetical.  I remember
10  calling it that and calling you out on that
11  that it's a hypothetical.  Because the two
12  empirical tests do point in the same direction
13  towards efficiency.
14          It's hard to say specifically.  I
15  think there would have been less evidence, but
16  reasonably it would have been sufficient
17  evidence.  But there would have been less.
18  There would have been less evidence if, in
19  fact, there were -- if, in fact, there was less
20  evidence, there would have been less evidence.
21  I mean, you can't get around that.
22      Q.   But --
23      A.   But it's still -- I mean, I -- as
24  far as what the legal standard for proof is, I

Page 592

Steven P. Feinstein, PhD, CFA

1  mean, we've got two -- I mean, granted, it's in
2  the Second Circuit, but there are two recent
3  cases --
4      Q.   Well, hold on.
5      A.    -- where they said that you don't
6  need an empirical fact to test at all.
7      Q.   Well, hold on.
8          Doctor, are you a lawyer?
9      A.   I'm telling you what my
10  understanding of the legal standard now is for
11  proof.
12      Q.   Are you a lawyer?
13      A.   I am not a lawyer.
14      Q.   Are your opinions grounded upon any
15  legal expertise?
16      A.   No.
17      Q.   Are you offering an opinion on the
18  state of the law?
19      A.   Well, I am aware of what the Second
20  Circuit said about my research.  The Second
21  Circuit said my research --
22      Q.   Well, I didn't ask you about your
23  research or what the Second Circuit said.  I
24  simply asked you --

Page 593

Steven P. Feinstein, PhD, CFA

1      A.   But it goes to answer your question,
2  though.
3      Q.    -- are you offering an opinion on
4  the state of the law?
5      A.   I'm not sure how you define those
6  terms, the state of the law.  I know what
7  courts have said about my research.  They said
8  that even without the empirical factor, the
9  other Cammer and Krogman factors are sufficient
10  proof.  So that informs me as an economist
11  about the legal standard of proof.
12      Q.   Are you here as an advocate on
13  behalf of OPERS?
14      A.   Absolutely not.
15          MR. FRANK:  Why don't we take a
16  break here.
17          THE VIDEOGRAPHER:  The time now is
18  11:50.  We're off the record.
19          (Recess taken from 11:50 to 12:37
20  p.m.)
21          THE VIDEOGRAPHER:  The time now is
22  12:37.  We're on the record.
23  BY MR. FRANK:
24      Q.   Dr. Feinstein, good afternoon.

Page 594

Steven P. Feinstein, PhD, CFA

1      A.   Good afternoon.
2      Q.   So the opinions you offered in this
3  case are based on your understanding of the
4  field of financial economics.  Is that true?
5      A.   Yes.
6      Q.   Okay.  Now, as a financial
7  economist, the mere fact that a security trades
8  on the New York Stock Exchange is not enough
9  for you to conclude that the market for that
10  stock is semi-whether or not Freddie Mac stock
11  stock is semi-strong form efficient.  Correct?
12      A.   Depends what the standard of proof
13  is.  It certainly makes it more likely than
14  not.
15      Q.   Well, I'm talking about your
16  standard of proof.  You're a financial
17  economist.  Right?
18      A.   Yes.
19      Q.   And you have been asked in this case
20  to opine on whether or not Freddie Mac stock
21  traded in an efficient market.  Correct?
22      A.   Yes.
23      Q.   And for you, the mere fact that
24  Freddie Mac stock traded on the New York Stock
25  Exchange was not sufficient for you to conclude

Page 595

Steven P. Feinstein, PhD, CFA

1
2  with a sufficient degree of certainty that
3  Freddie Mac traded in an efficient market.
4  Correct?
5      A.   I would conclude from that fact that
6  it's more likely than not that it trades in
7  an efficient market.
8          And you asked these questions at the
9  last deposition.  I would want to do further
10  analysis, though, before saying that I have
11  proved it.
12     Q.   And you're not alone in this view
13  that you would want to do more analysis to
14  determine whether or not a stock trades in an
15  efficient market.  Correct?
16     A.   Again, it depends on the standard of
17  proof.  I think most economists would say that
18  inefficiency is rare.  And when you couple that
19  with a stock being listed on the New York Stock
20  Exchange, it makes it even more rare.  So that
21  fact alone would make it more likely than not
22  that the stock trades in an efficient market.
23         But I would think most economists
24  before they would say they have proved it
25  trades in an efficient market would want more

Page 596

Steven P. Feinstein, PhD, CFA

1
2  evidence than that.
3      Q.   In order to exclude the possibility
4  that this is one of those rare circumstances
5  where the stock trades in an efficient market,
6  you wanted to do more than just identify what
7  exchange it traded on.  Right?
8      A.   Yes.
9      Q.   And in order to do more, you did a
10  number of things.  Right?
11     A.   Yes.
12     Q.   One of those things was to assess
13  the structural factors outlined in the Cammer
14  and Krogman cases.  Right?
15     A.   Yes.
16     Q.   And another was to conduct tests to
17  assess the cause-and-effect relationship
18  between the information and stock price
19  movements.  Right?
20     A.   Yes.
21     Q.   Okay.  Now, you criticize Dr. Bajaj
22  in your rebuttal report for not performing
23  certain tests that he performed in other cases.
24  Is that right?
25     A.   Not precisely.  I really criticized

Page 597

Steven P. Feinstein, PhD, CFA

1
2  him for creating a double standard where he
3  criticized me for not doing tests precisely as
4  I've done them in other cases, and call him out
5  that he did the same thing that he was
6  criticizing me for.
7      Q.   Now, he performed several tests in
8  the Allergan case that he did not perform here.
9  Correct?
10     A.   Yes.
11     Q.   Okay.  Is it -- are you of the view
12  that he should have performed here the cases --
13  the tests that he performed in the Allergan
14  case?
15     A.   That's -- that wasn't my opinion.
16  My opinion wasn't that he should have performed
17  those tests.  My opinion was that the fact that
18  he didn't perform those tests suggests that
19  perhaps he's not being completely unbiased.
20     Q.   Well, do you have a view as to
21  whether he should have performed those tests or
22  not?
23     A.   I don't think those tests are
24  informative, either for Allergan or for this
25  case, for reasons I described before lunch.

Page 598

Steven P. Feinstein, PhD, CFA

1
2  But I don't -- I can't -- I don't know why he
3  would -- would not have done those, except for
4  if he had perhaps arrived at conclusions that
5  didn't support -- or findings that didn't
6  support his conclusion.  That seems to be the
7  best explanation of why he didn't do them.
8          So I just think it raises concerns
9  of impartiality rather than -- rather than
10  deprives the court of informative information.
11     Q.   You're concerned about Dr. Bajaj's
12  impartiality?
13     A.   Absolutely.  Yeah.  I could describe
14  many reasons why.  The way he describes my
15  work, the way he quotes me out of context, the
16  way he was selective in how he presented things
17  and said things certainly raised issues of
18  impartiality.  But I understand.
19     Q.   Do you -- if Dr. Bajaj had performed
20  the tests in this case that he performed in
21  Allergan, would you have wanted to consider the
22  results of those tests in forming your
23  conclusions here?
24     A.   Only if he had.  Only if he had
25  offered the -- those findings as supportive of

Page 599

Steven P. Feinstein, PhD, CFA

1
2  his conclusion.
3      Q.  If you were to discover that there
4  were tests done on whether Freddie Mac's common
5  stock traded in a weak-form efficient market,
6  is that a fact you would have wanted to know?
7      A.  I didn't understand.  I mean, what I
8  would want to know is why he chose not to do
9  it.  And if he had done it, I would evaluate
10  what he did.
11      Q.  Well, we've established earlier
12  you're not a lawyer.  But do you have an
13  understanding at this stage of the proceeding
14  as to whose burden it is to prove or disprove
15  market efficiency?
16      A.  Yes.
17      Q.  Whose burden is it?
18      A.  Plaintiffs'.
19      Q.  And do you happen to know what Dr.
20  Bajaj was tasked with doing in this case?
21      A.  Yes.  The same thing he was tasked
22  with doing in other cases where he did run
23  those tests, to evaluate my work.
24      Q.  And how do you know that?
25      A.  Pardon?

Page 600

Steven P. Feinstein, PhD, CFA

1
2      Q.  How do you know that?
3      A.  I think he said so in his -- in his
4  scope of work.
5      Q.  Now, do you know -- did you review
6  the Allergan report that he drafted?
7      A.  Yes.
8      Q.  Did you disagree with anything in
9  the Allergan report?
10      A.  Well, I'm not saying I agreed with
11  everything in the Allergan report, but I don't
12  recall seeing anything that I disagreed with.
13      Q.  Did he do anything in connection
14  with his work in Allergan that you thought was
15  illogical?
16      A.  Well, like I said, the serial
17  correlation tests are not reliable as
18  indicators of market efficiency.  So maybe
19  that's -- it's just they were unnecessary, so
20  it's a matter of judgment but not necessarily
21  illogical.
22      Q.  Outside of the litigation context,
23  have you analyzed whether a market is
24  efficient?
25      A.  Certainly.

Page 601

Steven P. Feinstein, PhD, CFA

1
2      Q.  In what context?
3      A.  Well, for 10 years I ran a program
4  at Babson College called the Babson College
5  Fund, where we would -- we managed a portion of
6  the college endowment, myself and -- well,
7  students under my auspices.  And I would -- I
8  would teach where to look for inefficiently
9  priced stocks and how to identify if a stock
10  may be priced inefficiently such that there was
11  a profit opportunity.
12      Q.  What tests did you use to identify
13  whether there were profit opportunities?
14      A.  Well, this was fundamental
15  efficiency.  But I would -- we would -- I
16  instructed the students to look for tests that
17  essentially failed the Cammer factors.  They
18  would look for small stocks that had little or
19  no analyst coverage, perhaps low volume, so
20  that these stocks would be overlooked by our
21  competitors who were institutional investors
22  and better-resourced investors.
23          And then they would do valuation
24  analyses to ascertain whether the market was
25  pricing those stocks too high or too low

Page 602

Steven P. Feinstein, PhD, CFA

1
2  relative to certain fundamental valuation
3  models.
4      Q.  Do you still manage a portion of the
5  college endowment?
6      A.  No.
7      Q.  When did that come to an end?
8      A.  I think it's in my first report.  I
9  have that in the resume section.
10      Q.  You don't remember offhand?
11      A.  No.
12      Q.  Why did that come to an end?
13      A.  I chose not to do it anymore.  And I
14  think I did it for about eight to ten years,
15  somewhere in that vicinity, and felt it was
16  time to turn it over to someone new.
17      Q.  Did you or your students use any
18  empirical analyses in connection with your work
19  for the fund?
20      A.  Sure.
21      Q.  What empirical tests did you use?
22      A.  Well, empirical -- depends what you
23  mean by "empirical."  Each of the Cammer
24  factors is, in fact, empirical.  You look at
25  volumes; you look at analyst coverage.  Those

Page 603

1        Steven P. Feinstein, PhD, CFA
2   are empirical facts.
3        But it was those combined with
4   valuation, fundamental valuation models.
5        Q.  You didn't use the z-test in that
6   context, did you?
7        A.  No.  You know, even Fama said that
8   it's virtually impossible to make money off of
9   serial correlation.  Fama wrote about this in
10  an article.
11       Q.  Outside of the litigation context,
12  have you ever used a z-test to assess market
13  efficiency?
14       A.  Oh, z-test.  I'm sorry.  I
15  thought -- I got a little confused.  I
16  apologize.  I thought we were talking about the
17  Y filter test.
18       Was your previous question about the
19  --
20       Q.  I'll read it back for you.
21       A.  Sorry.
22       Q.  I asked, "You didn't use the z-test
23  in that context, did you?"
24       A.  And I just said no.
25       Q.  No.  You said, "No.  You know, even

Page 604

1        Steven P. Feinstein, PhD, CFA
2   Fama said that it's virtually impossible to
3   make money off of serial correlation.  Fama
4   wrote about this in an article."
5        That was your answer.
6        A.  Oh.  Both parts of that answer are
7   correct, although the second one is more
8   addressed to a Y test than a z-test.  But, no,
9   I didn't use a z-test for purposes of
10  identifying profitable buying or selling
11  opportunities.
12       Q.  And so let me ask the next question
13  I asked, which I think caused you to recognize
14  that you had misheard me earlier.
15       I asked outside of the litigation
16  context, have you ever used a z-test to assess
17  market efficiency?
18       A.  No.
19       Q.  Now, let me turn you back to your
20  rebuttal report that is Exhibit 269.  Let me
21  turn your --
22       A.  I'm thinking now.  I just want to
23  amend -- there is some ongoing theoretical
24  research that I'm doing with Miguel Villanueva
25  that does use the z-test, but it's for a

Page 605

1        Steven P. Feinstein, PhD, CFA
2   working paper that we hope to publish.  And
3   that's outside of litigation.
4        Q.  And that hasn't been published yet?
5        A.  Correct.
6        Q.  And has that been submitted to any
7   journals or periodicals?
8        A.  No.  Not yet.
9        Q.  Okay.  Have you published any
10  academic papers on market efficiency in
11  peer-reviewed periodicals?
12       A.  Yes.
13       Q.  Okay.  What are those?
14       A.  The Journal of Financial Education,
15  experimental paper.
16       Q.  That's an article that you
17  published?
18       A.  Yes.
19       Q.  Anything else?
20       A.  There are some -- there's some
21  additional stuff.  I mean, there's the American
22  Bankruptcy Journal I published in, an article
23  about market efficiency that was coauthored.  I
24  would have to look at my list of publications
25  to give you more than that.

Page 606

1        Steven P. Feinstein, PhD, CFA
2        Q.  Now, in paragraph 14 on page 8 of 70
3   of your rebuttal report, you write, "Dr. Bajaj
4   challenges the validity of the z-test for
5   assessing market efficiency.  However, his
6   challenges are misguided as they are based upon
7   an improper definition of 'market efficiency.'"
8        Do you see that?
9        A.  Yes.
10       Q.  What do you believe was Dr. Bajaj's
11  definition of "market efficiency"?
12       A.  Well, he said that the z-test was
13  deficient because it didn't test
14  directionality, and directionality is
15  fundamental efficiency concept, and that's what
16  I meant here, not -- rather than an
17  informational efficiency concept.
18       Q.  Other than an issue of
19  directionality, do you believe that Dr. Bajaj
20  was basing his challenges on an improper
21  definition of "market efficiency"?
22       A.  That particular challenge was
23  about -- about directionality was based on the
24  improper definition.  He raises some other
25  challenges which I believe are also misguided

Page 607

```
1              Steven P. Feinstein, PhD, CFA
2     but for other reasons.
3          Q.   For reasons unrelated to his
4     definition of "market efficiency"?
5          A.   They're closely related but not
6     totally unrelated.  I mean, his -- some of
7     his -- one of his challenges is related to his
8     definition of "materiality" and the -- and the
9     role of materiality in market efficiency.  He
10    made a mistake there which led to another one
11    of his misguided challenges.
12         Q.   What is the mistake he made
13    regarding the role of materiality in market
14    efficiency?
15         A.   He opined that 80 to 90 percent of
16    tested events in a collective test would have
17    to be statistically significant in order for
18    that to be an indicator of market efficiency,
19    which generally is logistically impossible by
20    design of a significance test.
21         Q.   Is that logistically impossible in
22    your collective test because your collective
23    test is not a test of dates on which material
24    news was released to the market but rather a
25    test where dates with higher information flow
```

Page 608

```
1              Steven P. Feinstein, PhD, CFA
2     was released to the market?
3          A.   Well, I'm not going to accept the
4     premise that these are not dates on which
5     material news was released to the market.  The
6     problem is that he defined material as being
7     dates or being information that would
8     reasonably elicit a statistically significant
9     reaction.  That's how he defined "materiality."
10    That was the problem.
11         Q.   Is that not how you define
12    "materiality"?
13         A.   It's not at all how I define
14    "materiality."
15         Q.   How do you define "materiality"?
16         A.   That the news is important to a
17    typical investor or analyst in the sense that
18    it would affect their valuation or transaction
19    decisions, not necessarily cause their
20    valuations to change by an amount over the
21    threshold at the 95 percent confidence level
22    for statistical significance.
23         Q.   If material news doesn't cause a
24    valuation to change by an amount over the
25    threshold at the 95 percent confidence level
```

Page 609

```
1              Steven P. Feinstein, PhD, CFA
2     for statistical significance, how is it
3     possible to test whether or not news is
4     material?
5          A.   Well, one way is in a collective
6     test.  The -- well, I don't -- we're not
7     testing here whether the news is material.
8     We're testing whether the market is efficient.
9     That's what this analysis is about.
10             You want -- so your question is
11    about something different.  Your question is,
12    how do you test if news is material?
13             Well, okay.  Several ways.  With
14    reference to the literature.  The literature
15    tells us which news comprises arguments and
16    valuation models, which news historically,
17    according to other people's analyses and tests,
18    changes valuations, which news is important to
19    investors for transactions and value decisions.
20    It's what the literature is about.
21             You can also test materiality.  It's
22    not going to be a short answer, but you asked
23    how do you test materiality without doing --
24    without observing that it has a 95 -- that it's
25    over the threshold for 95 percent confidence
```

Page 610

```
1              Steven P. Feinstein, PhD, CFA
2     significance.
3              You can also see did analysts
4     discuss that news?  Did the company discuss
5     that news?  Did newspapers report on that news?
6     These are other tests of materiality.
7          Q.   Now, you write in paragraph 14,
8     because -- I'll read the whole sentence.
9              "The statistical issues Dr. Bajaj
10    raises as challenges to the validity of the
11    z-test findings are erroneous and moot because,
12    as Dr. Bajaj acknowledges multiple times in his
13    report, none of the purported statistical
14    problems he identifies affect the qualitative
15    results of the z-test in this case."
16             Do you see that?
17         A.   That's correct.
18         Q.   Now, isn't it a fact that Dr. Bajaj
19    identified a number of criticisms that, when
20    taken together, affected the results of your
21    z-test?
22         A.   Oh.  He has to bend over backwards
23    and use three or four of these at a time in
24    order to arrive at a change in a qualitative
25    result.  But individually they didn't.
```

Page 611

Steven P. Feinstein, PhD, CFA

1
2      He himself said that if you use the
3  continuity adjustment, you still have a
4  significant result.  If you use the unpooled
5  variance, you would still have -- the z-test
6  would still indicate significance.
7      It's only when you do those two
8  things and knock out the last -- irrationally
9  and inappropriately knock out the last event
10  that he started to get results that -- where he
11  weakened the z-test to such an extent that he
12  ended up with inclusive results instead of
13  conclusive results indicating market
14  efficiency.
15     Q.   When you said "irrationally and
16  inappropriately," you were referring to the
17  statement in the FDT article that said in a
18  collective test you shouldn't include the last
19  day of the class period.  Is that right?
20     A.   No.  No, I wasn't referring to the
21  FDT article, and I don't think necessarily
22  that's what the FDT article is -- is dictating
23  for all possible situations.
24      It's irrational and inappropriate to
25  eliminate the November 20, 2007, date, because

Page 612

Steven P. Feinstein, PhD, CFA

1
2  it was unequivocally -- unequivocally satisfied
3  the selection criteria, and it's an
4  unequivocally important date based on the
5  news -- not on its price movement, but based on
6  the news -- important date in the life of this
7  company, regardless of what -- who else noticed
8  that it was an important date, regardless
9  whether analysts noticed that or investors
10  noticed that or attorneys noticed that or the
11  court notices that.
12      Regardless of who else notices that,
13  Holman or Bajaj, any reasonable analyst looking
14  for the material information announcements
15  would identify that day as being one.  And so
16  to simply say that other people have noticed it
17  too, therefore it must be excluded from a
18  statistical test, is inappropriate.
19      I guess "inappropriate" is the right
20  word, not "irrational."
21     Q.   And you think that the rules set
22  forth in the FDT article about excluding the
23  last day of the class period is an
24  inappropriate rule?
25     A.   In some cases, it might be

Page 613

Steven P. Feinstein, PhD, CFA

1
2  appropriate.  If there's not -- you would not
3  pick it because it was a drop.  But if it was
4  indisputable that it was important news, you
5  should pick it.  And if the FDT article says
6  don't, that's incorrect, too.
7      If it's important news, it should be
8  analyzed.  If it's important news, the market's
9  reaction to that news should be analyzed in a
10  test of the question:  Does the market ignore
11  news or incorporate news?
12     Q.   Now, in paragraph 18, you write, in
13  the second sentence, "Dr. Bajaj incorrectly
14  contends that without a z-test, proof that
15  alleged inflationary events were statistically
16  significant at a greater incidence rate than
17  typical days in the class period.  The alleged
18  misrepresentations and omissions could not
19  possibly have impacted the Freddie Mac stock
20  price."
21      Do you see that?
22     A.   I do.
23     Q.   And I'll confess to you I don't know
24  if there's a missing word or if I'm just slow,
25  but I did not understand that sentence.

Page 614

Steven P. Feinstein, PhD, CFA

1
2      So can you explain to me what you
3  meant to convey by that sentence?
4     A.   Sure.  There's two ways to edit it
5  so it would be easier to understand.  We can
6  either add the word "without" before the word
7  "proof," so that it's "without a z-test,
8  without proof that alleged inflationary events
9  were statistically significant at a greater
10  incidence rate than typical days in the class
11  period."  That's one way to understand it.  Or
12  move the comma from after the word "z-test" to
13  after the word "proof":  "that without a z-test
14  proof, that alleged inflationary events."
15      So what I'm saying here is Dr. Bajaj
16  ran the z-test.  I mean, after criticizing the
17  z-test and saying that it was inappropriate and
18  poorly constructed and et cetera, he actually
19  used it and said that because it didn't find a
20  difference in the dynamics, the price dynamics
21  on misrepresentation dates versus all other
22  days, that that would prove that the alleged
23  misrepresentations and omissions had no price
24  impact.
25      And that's what he said.  I mean,

Page 615

Steven P. Feinstein, PhD, CFA

1 his conclusion was that because the z-test on
2 misrepresentation dates did not indicate
3 different price dynamics, therefore he thinks
4 he proved no price impact. He's just wrong,
5 for a variety of reasons.
6     Q.   I see.
7     A.   And there other reasons that are
8 laid out here.
9     Q.   So -- now, you used the z-test.
10 Right?
11    A.   Yes.
12    Q.   Okay.  Now, you're not criticizing
13 Dr. Bajaj for using a test that you think is an
14 effective test, are you?
15    A.   I am.  I'm criticizing him for on
16 the one hand saying it's an invalid test and
17 then embracing it.  I think that's indicative
18 of bias.
19    Q.   Well, is it possible that he used
20 the test because, even though he thinks it's
21 not a probative test, he knew that you do think
22 it's a probative test, and therefore it would
23 be a way for the two of you to be on -- to be
24 communicating, so to speak?

Page 616

Steven P. Feinstein, PhD, CFA

1     A.   I mean, anything's possible.  But he
2 didn't -- the way he was so forceful in his
3 conclusion, saying that this test proves no
4 price impact, says that he's embracing the
5 test, and it's hard to accept that he's
6 embracing the test after he rejected the test.
7 It seems like he embraces it when he wants to
8 and rejects it when he wants to.
9     Q.   Well, do you think that -- did you
10 conduct any test to determine whether or not
11 there was a price impact on the
12 misrepresentation and omission dates?
13    A.   No.
14    Q.   And is a z-test an appropriate way
15 to test whether or not there's an alleged price
16 impact on misrepresentation and omission dates?
17    A.   Not really.
18    Q.   Why not?
19    A.   Well, because typically,
20 misrepresentations and omissions maintain the
21 mix of information by concealing negative or
22 adverse developments or conditions.  So,
23 typically, what you see -- would see on those
24 misrepresentations and omissions dates is no

Page 617

Steven P. Feinstein, PhD, CFA

1 new news and no price movement.  So a test
2 that's looking for price movement is
3 inappropriate for that purpose.
4     On the other hand, I mean, if it
5 found it -- I mean, if you did find significant
6 movements or discernible movements, that would
7 suggest that there was price impact.  But not
8 finding price movements is not going to prove
9 that there was no price impact.  And since his
10 test was to see if there was no price impact,
11 it's inappropriate.
12    Q.   Heads I win, tails you lose?
13    A.   Well, blame classical statistical
14 hypothesis testing for that.  I mean, that's
15 what hypothesis testing does.  You set a null
16 hypothesis and you test the hypothesis.  You
17 can -- you can perhaps reject the hypothesis
18 based on the results.  But if the test fails to
19 reject the hypothesis, that doesn't prove the
20 hypothesis true.  That's written about in
21 almost every introductory statistical textbook,
22 and I believe I referenced it in my report as
23 well.
24    Q.   So if Dr. Bajaj had found

Page 618

Steven P. Feinstein, PhD, CFA

1 statistical price movements on
2 misrepresentation and omission dates, that
3 would have been indicative of price impact.  Is
4 that right?
5     A.   Well, he did.  Actually, he did find
6 evidence of it, but then he looked for ways to
7 dismiss it.  Yes, it would have been evidence.
8     Q.   And if that -- if such statistically
9 significant price movements on those dates
10 would have been indicative of price impact, it
11 was therefore incumbent upon him to test those
12 dates.  Correct?
13    A.   I didn't understand.
14    Q.   Well, it's your view that if there
15 was statistically significant price movements
16 on the misrepresentation and omission dates,
17 that would be proof of price impact.  Correct?
18    A.   I don't know if I could make a
19 blanket statement.  It would certainly be
20 indicative.
21    Q.   And accordingly --
22    A.   I would also have to do confounding
23 information tests and analysis of the
24 information, and basically confounding

Page 619

Steven P. Feinstein, PhD, CFA

1
2  information is what I would be most concerned
3  with.
4      Q.    Taking confounding information into
5  account, it was therefore incumbent upon
6  Dr. Bajaj, who was assessing price impact, to
7  test the misrepresentation and omission dates.
8  Correct?
9      A.    Well, I mean, my report was not
10  about price impact.  His report was about price
11  impact.
12          That makes sense.  Makes sense that
13  he should look at those dates to see if there
14  was proof of price impact.  But if he doesn't
15  find -- I mean, if the test is inconclusive,
16  you can't draw the conclusion that there was no
17  price impact.
18      Q.    Well, there's only two sets of dates
19  that it made logical sense for him to look at.
20  Correct?
21      A.    Do you mean the misrepresentation
22  dates and then the disclosure date?
23      Q.    Right.
24      A.    Right.
25      Q.    And so --

Page 620

Steven P. Feinstein, PhD, CFA

1
2      A.    Or the realization of the risk date.
3      Q.    Well, we'll get to that.
4          But to summarize, there were two
5  sets of dates that it made sense for him to
6  look at.  One is the -- one set is the
7  misrepresentation and omissions dates.
8  Correct?
9      A.    Well, actually, I'm not -- it's not
10  something I wrote about.  But as I sit here
11  now, if he was trying to prove there was no
12  price impact, he would have to look at every
13  date to see if there was price impact on any of
14  the dates.  There may have been price impact on
15  other dates that weren't identified as a
16  realization of the risk date or as a
17  misrepresentation date.  I mean --
18      Q.    What other dates are you referring
19  to?
20      A.    Other dates in the class period.
21  There were -- I mean, if -- the allegations are
22  that the company concealed various exposures
23  and risks and deficiencies at the company from
24  the investing public, and because of that, the
25  marketplace was surprised when poor performance

Page 621

Steven P. Feinstein, PhD, CFA

1
2  resulted.
3          So you might want to look on other
4  dates in addition to the November 20, 2007,
5  date to see if there was a surprise about poor
6  performance or adverse developments on other
7  case as well.  I don't think it needs to be --
8  it should be limited to just the dates that are
9  cited in the complaint.
10      Q.    Well, let's be specific.  If he's
11  not supposed to only test the dates on which a
12  misrepresentation or omission was made, in the
13  date on which the plaintiff says that there was
14  either a corrective disclosure or the
15  materialization of an allegedly concealed risk,
16  what other dates do you think he should have
17  been testing?
18      A.    He should have examined at least the
19  news on each date to see if there were other
20  dates on which the market was surprised by
21  developments on account of having been deceived
22  about the company's condition.
23      Q.    Have you drawn a conclusion about
24  whether or not the defendant in this case, the
25  defendants, Freddie Mac and several of its

Page 622

Steven P. Feinstein, PhD, CFA

1
2  former officers, actually made
3  misrepresentations or omissions?
4      A.    No.
5      Q.    Now --
6      A.    But the test would require that he
7  accept as a working hypothesis plaintiffs'
8  allegations.
9      Q.    Why is that?
10      A.    Because that's what he's trying to
11  test.  Did the information that plaintiffs
12  allege was concealed have an impact on the
13  price, either moving it up or moving it down.
14  And it doesn't necessarily have to be on a
15  disclosure date or -- a disclosure date that
16  was cited by the lawyers or even a
17  representation date cited by the lawyers --
18      Q.    You believe --
19      A.    -- in order to see -- in order to
20  see if, in fact, the information that they
21  allege was concealed had an impact on the
22  price.
23          So I just want to be clear that the
24  test -- you said does he only have to test
25  those dates, and this is the reason why I would

Page 623

Steven P. Feinstein, PhD, CFA

1  think he would need to test more than just
2  those dates.  He'd have to do his own
3  independent evaluation of which dates need to
4  be tested, not just picking the dates out of
5  the complaint that were mentioned.
6      Q.   You think he would need to review
7  the news on every date of the class period?
8      A.   Like I did, yes.
9      Q.   And you reviewed the news on every
10  date of the class period for the purposes --
11  for the purpose of identifying a material news
12  date or dates to test.  Is that right?
13     A.   Well, for determining what would be
14  a reasonable selection rule for a collective
15  event study test and for then picking those
16  dates.
17     And in connection with that effort,
18  you reviewed the news relating to Freddie Mac
19  on every date of the class period?
20     A.   Yes.
21     Q.   And was your news review limited to
22  the New York Times and Wall Street Journal?
23     A.   No.  It's cited in my exhibit, in
24  the first report, which articles I looked at.

Page 624

Steven P. Feinstein, PhD, CFA

1      Q.   And that news review informed the
2  rule that you chose for selecting news for your
3  collective test?
4      A.   Yes.
5      Q.   And it also informed your decision
6  on what date to test for your event study?
7      A.   The single-event study, yes.
8      Q.   And you ultimately determined that
9  there was only one appropriate date to test for
10  your single-date event study.  Is that right?
11     A.   Yes.
12     Q.   And that was based on that news
13  review?
14     A.   The news review.  The analyst's
15  commentary.  Company statements.  All of the
16  information about the company.
17     Q.   Okay.  Now --
18     A.   Well, I identified that there was
19  one best date to test.  There may have been --
20  but Dr. Bajaj didn't recommend that there
21  should have been other dates.
22     Q.   Do you believe there were other good
23  dates to test?
24     A.   I found that the -- I determined no,

Page 625

Steven P. Feinstein, PhD, CFA

1  in the course of my analysis.
2      Q.   Now, let me turn your attention to
3  page 8 of your rebuttal report.  Do you see in
4  paragraph 27 you're discussing anomalies
5  observed in the literature?
6      A.   Yes.
7      Q.   Okay.  And in the middle of that
8  paragraph, you write, "Dr. Bajaj references
9  four academic articles in which the authors
10  investigate anomalous events where a handful of
11  stocks exhibited isolated and brief periods of
12  inefficiency."
13     Do you see that?
14     A.   Yes.
15     Q.   And then at the bottom of that
16  paragraph, in connection with discussing an
17  article in the Journal of Finance, you
18  mentioned that -- or you can even go to the top
19  of page 9, where you write, "For example, one
20  study examines impediments to arbitrage" --
21     A.   Wait.  I lost you.  Where are you?
22     Q.   The top of page 13 of 17.
23     A.   "For example, one study."  Okay.
24     Q.   "For example, one study examines

Page 626

Steven P. Feinstein, PhD, CFA

1  impediments to arbitrage using a sample of 82
2  situations between 1985 and 2000 where the
3  market value of a company is less than that of
4  its ownership stake in a publicly traded
5  subsidiary."
6      Do you see that?
7      A.   Yes.
8      Q.   And are those 82 situations among
9  the handful of events you were referring to in
10  the earlier sentence in paragraph 27?
11     A.   Yes.  I mean, it's a 15-year period
12  and there are between 4- and 10,000 publicly
13  traded stocks in that period.  That would --
14  that's a handful, yes.
15     Q.   And so over that 15-year period, it
16  appears that there's five or so companies a
17  year that fall into this category, on average?
18     A.   I didn't do that math, but I mean, I
19  consider 82 to be a small number relative to
20  the 4,000 to 10,000 publicly traded companies
21  over that period in the United States.
22     Q.   Now --
23     A.   And then the rest of the paragraph,
24  I mean, says that it's not necessarily a

Page 627

Steven P. Feinstein, PhD, CFA

1  profitable -- it's not necessarily profitable
2  information to know that this price anomaly may
3  have been apparent.
4      Q.   Let me turn your attention to --
5  now, do you recall that I previously asked you
6  about a pooled estimate of the standard error
7  based on both populations at your -- on the
8  first day of your deposition?
9      A.   I do.
10     Q.   And in your rebuttal report, you
11 addressed the pooled versus unpooled issue.
12 Correct?
13     A.   Yes.
14     Q.   Now, let me turn your attention to
15 that section of your rebuttal report, which, if
16 I get there quickly enough, it's on page 36 of
17 70 or page 32.
18         Do you see that?
19     A.   Yes.
20     Q.   That's subsection T?
21     A.   Yes.
22     Q.   And you write in the middle of the
23 first paragraph -- strike that.
24         So this is a section in D that's

Page 628

Steven P. Feinstein, PhD, CFA

1  both on the unpooled standard error and the
2  inclusion of a continuity correction.  Right?
3      A.   Well, it has -- yes.
4      Q.   Now, the first paragraph,
5  paragraph 92, relates to the unpooled issue,
6  and the second paragraph relates to the
7  continuity correction.  Right?
8      A.   No.  The second paragraph has the
9  two combined, the two effects combined.  So
10 they're not taken independently.
11     Q.   I see.
12         Now, in the first paragraph, you
13 write -- in the third sentence, you write,
14 "That is, while I dispute the need for a
15 variance adjustment or an alternative variance
16 estimator, making the changes Dr. Bajaj
17 recommends has absolutely no effect on the
18 qualitative results and conclusions of the
19 test."
20         Do you see that?
21     A.   That's correct.
22     Q.   Now, why do you dispute the need for
23 a variance adjustment or an alternative
24 variance estimator?

Page 629

Steven P. Feinstein, PhD, CFA

1      A.   Because under the null hypothesis
2  that's being tested, the pooled estimator gives
3  you better Type I and Type II error.  So it's
4  the better estimator.  Moving to an unpooled
5  weakens the test unnecessarily.
6      Q.   And so do you believe there's any
7  circumstance where it's appropriate to use the
8  unpooled approach?
9      A.   Yes.
10     Q.   And what is that circumstance?
11     A.   If the hypothesis of any quality was
12 in the opposite direction, that -- well, in
13 this case, in my case, the null hypothesis was
14 that the news events had a lower incidence of
15 significance.  If the null hypothesis was the
16 opposite, then the unpooled variance would be
17 more -- would be appropriate.
18     Q.   Do you recall during the first day
19 of your deposition me asking you questions
20 about the pooled versus unpooled approach?
21     A.   Yes.
22     Q.   And after that first day, did you
23 talk to anyone about the pooled versus unpooled
24 approach?

Page 630

Steven P. Feinstein, PhD, CFA

1      A.   Sure.
2      Q.   Who did you talk to?
3      A.   Miguel Villanueva.
4      Q.   Anyone else?
5      A.   No.
6      Q.   And what did Miguel say to you and
7  what did you say to him regarding the pooled
8  versus unpooled approach?
9      A.   I don't recall specifically.  I
10 mean, it's never been an issue for me or for
11 Miguel because of the diagnostics we ran and
12 which we presented to you, which are immune
13 from this criticism, which don't require a
14 decision as to whether to use pooled or
15 unpooled, but also because the test had passed
16 the diagnostics previously, so it just didn't
17 matter.
18     Q.   Is Miguel -- Miguel works at your --
19     A.   Yes.
20     Q.   -- company.  Right?
21     A.   Right.
22     Q.   Is he also a professor at Babson?
23     A.   No.
24     Q.   Is he affiliated at Babson in any

Page 631

Steven P. Feinstein, PhD, CFA

1
2  way?
3      A.   No.
4      Q.   Was he a student of yours?
5      A.   No.
6      Q.   Now, after the first day of your
7  deposition, did you read any literature
8  regarding the pooled versus unpooled approach?
9      A.   I don't know the exact timing.  I
10  know the issue's been raised in other cases, so
11  I've looked at it.  I don't recall whether it
12  was before or after.
13      Q.   But you do recall reviewing
14  literature regarding the pooled versus unpooled
15  approach?
16      A.   Yes.
17      Q.   What literature did you review?
18      A.   There's literature on the subject.
19  It's in statistical books and journals.  I also
20  did my own analysis.  There's analytical --
21  rather than just blindly accepting what's in a
22  general textbook, one can do an analytical
23  evaluation of the power of the test, the Type I
24  error and the Type II error of a test, with and
25  without -- with pooled and with unpooled

Page 632

Steven P. Feinstein, PhD, CFA

1
2  variance.  I did some analysis there, and it
3  just further confirmed that what I had told you
4  in the last deposition was correct:  this is a
5  nonissue.
6      Q.   Did you do an analytical evaluation
7  of the power of the test in this case after
8  your deposition?
9      A.   I don't know whether it was in this
10  case.  I mean, the issue has been raised in
11  other cases as well, and at some point I did
12  it.
13      Q.   When you say it just further
14  confirmed that what you told me in the last
15  deposition was correct, did you have in mind
16  work that you had actually done in this case?
17      A.   I don't -- no.  I remember that at
18  the time I was -- at the time of the
19  deposition, based on everything I had done up
20  to the deposition, which I conveyed to you, I
21  was satisfied it was a nonissue, and I'm still
22  satisfied it was a nonissue.  I don't remember
23  exactly the timing of when I did further
24  analysis.  I'm planning to write -- I'm
25  planning to write an article on the subject.

Page 633

Steven P. Feinstein, PhD, CFA

1
2      Actually, I think it was long after
3  the deposition, so I shared some of these ideas
4  with statistics professors at Babson.  I am
5  100 percent convinced I'm right and can prove
6  it.
7      Q.   What statistics professors did you
8  share these ideas with?
9      A.   I don't know.  I just -- my office
10  recently changed at Babson, so I'm actually
11  surrounded by a number of them and I don't
12  remember specifically who I talked to.  But
13  when they asked what I was working on, because
14  I was meeting a new group of people at the
15  school, I said this might be -- this is
16  something that I'm interested in working on and
17  that it might be of interest to them as well.
18      Q.   Do you remember any of them
19  expressing an opinion to you regarding the
20  merits of the pooled versus the unpooled
21  approach?
22      A.   I think they liked what I found.  In
23  this particular case, you can prove that the
24  power of the test increases and the Type I
25  error decreases if you use the pooled variance,

Page 634

Steven P. Feinstein, PhD, CFA

1
2  given what the null hypothesis is.
3      Q.   When you say --
4      A.   Usually there's a trade-off of
5  Type I and Type II error.  In this case, they
6  both move in a better direction using the
7  better estimator.
8      Q.   And when you say "in this case," you
9  mean the Freddie Mac case?
10      A.   Yeah.
11      Q.   And do you have calculations that
12  show that?
13      A.   No.  These were scratch paper,
14  back-of-the-envelope things in an academic
15  setting.  I didn't save any notes.  When it's
16  published, I'll send it to you.
17      Q.   Are you planning to testify in this
18  case that the power of the test increases and
19  the Type I error decreases if you use the
20  pooled variance?
21      A.   No.  What I would testify in this
22  case is that it's moot.  It's moot even
23  according to Dr. Bajaj's own work.  That's
24  enough.  The rest, I'll save for an academic
25  setting.

Page 635

Steven P. Feinstein, PhD, CFA

1
2    Q.   Why do you believe it's moot even
3    according to Dr. Bajaj's own work?
4    A.   It says so in paragraph 92, that
5    when he changed it, he got a Z-statistic of
6    2.32, which is still significant at the
7    95 percent level.
8    Q.   Do you believe that it's unfair for
9    Dr. Bajaj to identify what he perceives as a
10   number of errors that you've made and to assess
11   them collectively and identify that they do
12   have a qualitative effect on your results?
13   A.   In this setting, actually, yes,
14   because he's being one-sided.  He's not
15   pointing out that the binomial test, the
16   bootstrap test, and the Fisher exact test all
17   -- none of those have a requirement that you
18   make a decision between using a pooled and
19   unpooled variance.  So it sidesteps the issue
20   that he considers to be important.  And all
21   three of those tests confirm the result of the
22   z-test.
23       So the fact that he simply
24   disregards the fact that there's analytic and
25   empirical proof that the argument is moot is

Page 636

Steven P. Feinstein, PhD, CFA

1
2    unfair.  Yeah, it's not unfair, it's just
3    uninformative.  I mean, it's a waste of -- it's
4    a waste.  Leave it at that.
5    Q.   You think those three diagnostic
6    tests that you just mentioned are very
7    important?
8    A.   Only because he raised the issue,
9    the diag -- and he recognized in his report
10   that he raised the issue.  So he knows that
11   those tests were run.  He knows what the
12   results of those tests were.  That should have
13   been enough to prove to him that it's moot.
14   Q.   He addressed those issues, those
15   tests in his report, didn't he?
16   A.   Do you want to show me where?  I
17   don't think he --
18   Q.   You don't recall?
19   A.   I don't recall that he -- my
20   recollection is that he disregarded them, that
21   he did not address them appropriately.  The
22   appropriate response to seeing that all three
23   diagnostic tests confirmed the z-test is that
24   whatever academic disagreement we may have
25   about the proper construction of the variance

Page 637

Steven P. Feinstein, PhD, CFA

1
2    estimator is moot and has no bearing on whether
3    or not Freddie Mac stock traded in an efficient
4    market over the course of the class period.
5    Q.   Now, in paragraph 92, do you see
6    where I read a moment ago that you "dispute the
7    need for a variance adjustment or an
8    alternative variance estimator"?
9        Do you see that?
10   A.   Yes.
11   Q.   Now, in paragraph 93, you don't say
12   that you dispute the need for a continuity
13   correction.  Correct?
14   A.   I say it's moot.  I mean, I --
15   correct.
16   Q.   Now, do you dispute that you should
17   have used a continuity correction?
18   A.   I dispute that it's a relevant
19   issue.
20   Q.   Well, assume for a second that you
21   conducted a test and that all the facts were
22   the same here.  But if you used the continuity
23   correction, it would have rendered your results
24   qualitatively different than if you hadn't used
25   it.

Page 638

Steven P. Feinstein, PhD, CFA

1
2        In that case, do you believe that
3    you should have used a continuity correction?
4    A.   Not necessarily, because there are
5    diagnostic tests that prove that the choice of
6    using a continuity correction or not doesn't
7    matter.  The facts, the empirics, the stock
8    returns prove that Freddie Mac stock moved more
9    on high news-flow days than on all the other
10   days.  It's an undisputable fact, given the
11   prices and the collection of tests.
12       The explanation for why when he
13   bends over backwards and then not only makes
14   these two corrections but also throws out an
15   important date, why he would get an
16   inconclusive result instead of a statistically
17   significant finding reasonably is more because
18   of how he weakened the test than how the market
19   may have been weak in the first place.
20   Q.   Well --
21   A.   This is what he's -- what he's doing
22   is -- he can't do anything to change the market
23   from being efficient to inefficient, but he can
24   raise issues that give the appearance of the
25   test failing to find the efficiency, and that's

Page 639

```
1          Steven P. Feinstein, PhD, CFA
2    what he's done here.
3          So if what we're after is the
4    truth -- and that is what we're after -- then
5    he should have looked at all four versions
6    collectively rather than just continue with
7    this critique combining a continuity
8    correction, an unpooled variance, and a
9    dismissal of an important event date.
10        Q.   Is it fair to say, then, that from
11   your perspective, the failure to include a
12   continuity correction is an immaterial error?
13        A.   In the context of all the findings,
14   yes.  Absolutely.
15        Q.   Now, let me turn to --
16        A.   Can we have just a one-minute break?
17        Q.   Sure.
18        A.   I just left my water outside.
19             MR. FRANK:  Off the record.
20             THE VIDEOGRAPHER:  The time now is
21   13:29, and we're off the record.
22             (Recess taken from 1:29 to 1:30
23   p.m.)
24             THE VIDEOGRAPHER:  The time now is
25   13:30.  We're back on the record.
```

Page 640

```
1          Steven P. Feinstein, PhD, CFA
2    BY MR. FRANK:
3        Q.   Now, with respect to the pooled
4    versus unpooled approach, you didn't have any
5    concerns about Dr. Bajaj's actual calculations.
6    Correct?
7        A.   No.
8        Q.   Okay.  And after the first day of
9    your deposition in this case, did you make any
10   effort to determine whether or not Ferrillo,
11   Dunbar, and Tabak used the unpooled calculation
12   in their article that discusses the z-test?
13       A.   Yes.  I looked at the footnote you
14   directed me to, and it doesn't have the words
15   "pooled" or "unpooled" in there at all.
16       Q.   Well, did you do anything to attempt
17   to replicate their calculation?
18       A.   I don't recall.
19       Q.   As you sit here today, do you know
20   whether or not FDT used a pooled or unpooled
21   approach in their calculation in that article?
22       A.   What I did check was a Tabak report
23   where he used the test, and I saw that he used
24   the pooled variance in that report.  But
25   because it's a moot issue, I didn't discuss it.
```

Page 641

```
1          Steven P. Feinstein, PhD, CFA
2    But it was something I was looking at.  I
3    remember -- you actually mentioned, I think, in
4    the second deposition, you know, what would
5    Tabak say?  So I wanted to go see what Tabak
6    did.  But I didn't -- it's been a while.  I
7    just don't recall one way or the other.
8        Q.   Do you believe you saw an article
9    where Tabak used a pooled approach?
10       A.   No.  It was a forensic report.
11       Q.   Where he was testifying on behalf of
12   a plaintiff?
13       A.   I don't recall which side he was
14   testifying for.
15       Q.   Do you remember which report it was?
16       A.   I don't.  I don't.
17       Q.   And you didn't mention it in your
18   rebuttal report.  Is that right?
19       A.   Correct.
20       Q.   Now, with respect to the continuity
21   correction, you didn't have any concerns about
22   Dr. Bajaj's calculations with respect to that.
23   Correct?
24       A.   Well, my concern was that it was
25   unnecessary.
```

Page 642

```
1          Steven P. Feinstein, PhD, CFA
2        Q.   Well, to be clear, let -- and this
3    will help if we go --
4        A.   Sure.
5        Q.   -- just help us get out of here a
6    little bit earlier.
7             You didn't believe that Dr. Bajaj
8    made any calculation mistakes in connection
9    with his calculations of the continuity
10   correction.  Correct?
11       A.   That is correct.
12       Q.   Okay.  Did you talk to anyone after
13   the first day of the deposition about the use
14   of a continuity correction?
15       A.   No.
16       Q.   Did you read any literature about
17   the use of a continuity correction?
18       A.   I think I did, yes.
19       Q.   What literature did you review, if
20   you recall?
21       A.   I don't recall.
22       Q.   And do you remember the substance of
23   what you read?
24       A.   The substance was what the intent of
25   a continuity correction was.
```

Page 643

1    Steven P. Feinstein, PhD, CFA
2        Q.   Can we understand what the
3    intent of a continuity correction was?
4        A.   Right.
5        Q.   And what's that intent?
6        A.   Well, the same thing as the intent
7    of using Fisher's exact test as a diagnostic.
8        Actually, Dr. Bajaj actually
9    explains the theory pretty well in his report,
10   that it's -- it has to do with when the sample
11   is relatively small, an adjustment to account
12   for the binomial distribution not converging to
13   the normal distribution smoothly.
14       But a better correction or
15   adjustment or diagnostic is to use Fisher's
16   exact test, and why he didn't do that or why he
17   didn't base his conclusion on that is
18   mysterious.
19       Q.   Well, Fisher's exact test isn't a
20   correction or an adjustment, is it?
21       A.   It's a diagnostic of this z-test.
22   It's an alt --
23       Q.   Now, you used the word "diagnostic."
24   In the academic community, the financial
25   economist community, are the Fisher's exact

Page 644

1    Steven P. Feinstein, PhD, CFA
2    test, the binomial test, and the bootstrap test
3    commonly referred to as diagnostic tests?
4        A.   Well, in this case, it is.  I mean,
5    it is -- that's what they are.  I don't know
6    how other people refer to them.
7        Q.   It's not your experience that people
8    generally refer to those tests as diagnostic
9    tests?
10       A.   I think they could.  I mean, someone
11   understanding what the issue here was, that
12   there's a z-test, and there was a challenge to
13   the z-test on the basis of the sample size.  I
14   think it's reasonable that someone would say,
15   well, let's run the Fisher exact test as a
16   diagnostic test to see if it supports the
17   finding of the z-test or not.
18       Q.   I'm just trying to understand how
19   these terms are commonly used in your
20   community.
21       Are these three tests -- the
22   bootstrap test, the binomial test, and the
23   Fisher's exact test -- commonly referred to in
24   your economic community as diagnostic tests?
25       A.   They're not commonly referred to,

Page 645

1    Steven P. Feinstein, PhD, CFA
2    period, all of these tests, because there's a
3    whole battery -- there's libraries full of
4    statistical tests for different purposes.  So
5    that's why, you know, it's not something that
6    would -- would be raised in a lunchtime
7    conversation on a regular basis.
8        However, I mean, I'll grant that
9    some people might consider these alternative
10   tests.  But when the alternative tests are run
11   to confirm the original test, I think it's
12   reasonable to refer to them as a diagnostic
13   test.
14       Q.   Now, what -- turning to the issue of
15   dummy variables, do you remember discussing
16   dummy variables in your rebuttal report?
17       A.   Yes.
18       Q.   Okay.  What, if any, relationship is
19   there between using a pooled approach and using
20   dummy variables?
21       A.   That's such a vague question.
22       I don't know.  That's a better
23   question for a take-home exam than an oral
24   exam.
25       Q.   Unfortunately, Mr. Markovits is only

Page 646

1    Steven P. Feinstein, PhD, CFA
2    allowing me the verbal exam.
3        A.   I don't know.  I don't know what
4    you're getting at.  I don't know how to answer
5    the question.
6        Q.   Now, turning to paragraph 98 of your
7    report, do you see that you discuss the issue
8    of subinterval examinations?
9        A.   Where?  What paragraph are we on?
10       Q.   Paragraph 98.
11       A.   Yes.
12       Q.   Okay.  And you discuss this, the
13   subinterval issue, in paragraphs 98 and 99?
14       A.   Yes.
15       Q.   And is it correct to say that it's
16   your view that it was appropriate to examine
17   the data in the Eletrobras case because the
18   class period was longer than it is in this
19   case?
20       A.   Well, the longer class period
21   allowed one to test, with a reasonably powerful
22   test, subperiods.  It wasn't necessary in
23   Eletrobras, and it wasn't necessary in this
24   case.
25       Q.   So why did you do it in Eletrobras?

Page 647

Steven P. Feinstein, PhD, CFA

1
2    A.    Well, it was a longer class period
3    so it was possible to run the test on
4    subperiods, but it wasn't necessary there,
5    either.  It was possible to do it, so I thought
6    maybe there's some additional information for a
7    four-year class period could be gathered from
8    doing it that way.  But it was not necessary
9    there, just as it's not necessary here.
10         But not only is it not necessary
11   here, dividing up a 16-month class period into
12   two or three pieces weakens the test.  So when
13   you find a nonsignificant or an inconclusive
14   finding, it's not a finding about the market.
15   It's a finding about the power of the test.
16   Q.    Well, it weakens the test only
17   because there were only so many dates that you
18   tested using your New York Times/Wall Street
19   Journal rule.  Correct?
20   A.    No.  It weakens the test because
21   it's a shorter period.  It's a shorter period
22   with necessarily fewer news events and fewer
23   non-news events.
24   Q.    So it was a weaker test than
25   Eletrobras because you divided the periods?

Page 648

Steven P. Feinstein, PhD, CFA

1
2    A.    It would have been -- well, no.  It
3    was -- it would be weaker in this case to
4    divide the period because each period would be
5    smaller than the periods -- the divided periods
6    in Eletrobras.
7    Q.    Well, when you divided the periods
8    in Eletrobras, did you create a situation where
9    the test in Eletrobras was weaker?
10   A.    Absolutely.  The power of the test
11   is weaker in those subsections.  I believe in
12   Eletrobras I may have also looked at it
13   collectively.  I just don't recall.  But, I
14   mean, when you divide a four-year period, it's
15   not going to be as big an issue, as much of an
16   effect on the power of the test as when you
17   divide a 16-month class period.
18   Q.    And why were you willing to make the
19   test weaker in Eletrobras?
20   A.    Because it didn't make the test much
21   weaker when you've got a four-year class period
22   to work with.
23   Q.    And is there a way to measure how
24   much weaker you make the test when you
25   divide -- divide it?

Page 649

Steven P. Feinstein, PhD, CFA

1
2    A.    Well, I mean, there are -- there is
3    analysis.  There's test power analysis.  What
4    I -- again, I didn't think that was necessary
5    to do, given that from my experience in
6    statistical principles, a two-year period is
7    plenty -- will produce a plenty strong enough
8    test.
9    Q.    Now, you earlier testified that by
10   dividing the periods, you were able to obtain
11   additional information.
12        Do you recall that?
13   A.    Right.  But it wouldn't be the case
14   if you did it in a 16-month period, because,
15   again, you'd be learning more about the test
16   and the test power -- the test weakness,
17   really -- rather than any weakness in the
18   market.
19   Q.    So let's talk about Eletrobras for a
20   second.  You said that in Eletrobras, by
21   dividing the test, you were able to obtain
22   additional information.  Correct?
23   A.    Right.
24   Q.    What is the additional information
25   you were referring to?

Page 650

Steven P. Feinstein, PhD, CFA

1
2    A.    Well, if the class period had been
3    just the first couple years, would that class
4    period have been provably efficient.
5    Q.    In other words, you were able to
6    identify additional information regarding the
7    different stock price behaviors in the
8    different periods?
9    A.    Over a four-year period, that's a
10   more relevant question than it is over a
11   16-month period.
12   Q.    Why do you say that?
13   A.    Less changes over 16 months than
14   over four years.  Less reasonably could change.
15   More things can change over four years than
16   would change over 16 months.
17   Q.    Isn't it a fact that this was a
18   particularly turbulent market in the latter
19   half of 2007?
20   A.    Right, which makes it particularly
21   important that the event in the single-event
22   study, single-event event study that was tested
23   was during that most turbulent piece.  If the
24   data proved the market efficient using the most
25   turbulent piece, you can infer that in less

Page 651

Steven P. Feinstein, PhD, CFA

1
2  turbulent times, the market would have been
3  behaving well, as well.
4      Q.   So based on that one date event
5  study, you believe you can draw inferences
6  about what happened during earlier periods?
7      A.   Well, that's the question you've
8  asked so many times now, and I know I'm -- I
9  want to give short answers, but I just wouldn't
10 want to allow my answer to be taken out of
11 context.
12      My conclusions are derived from a
13 holistic examination of all the tests.  I'm not
14 going to -- I didn't draw it just from any one
15 finding.
16      Q.   Now, in terms of drawing this
17 distinction between Eletrobras and this case,
18 one case having a long enough class period to
19 divide it into subintervals and this case not,
20 what is the line?  What is too long?  What's
21 too short?
22      A.   I don't know.  I never really had to
23 consider that.  I can tell you that -- well,
24 see, the thing is you don't need to divide it
25 up.  It's just that in some cases you can.  So

Page 652

Steven P. Feinstein, PhD, CFA

1
2  that's why in this case it wasn't necessary to
3  establish a bright line for how long would have
4  been too long and how long would have not been
5  long enough.
6      Q.   What period is long enough such that
7  you can divide it up?
8      A.   I can tell you four years could
9  easily be divided up.  I wouldn't have a
10 problem with dividing a four-year period up.
11      Q.   What about three years?
12      A.   I might.  I don't know.  I'd have to
13 think about that some.
14      Q.   Have you divided up class periods in
15 other cases?
16      A.   Yes.
17      Q.   What other cases?
18      A.   I don't recall, but I know I have.
19      Q.   What's the shortest class period
20 that you've divided up?
21      A.   I don't recall.  I'm sure you'll
22 look it up.
23      Q.   Shorter than four years?
24      A.   Probably.
25      Q.   Now, in Dr. Holman's report --

Page 653

Steven P. Feinstein, PhD, CFA

1
2  strike that.
3      In response to Dr. Holman's report,
4  Dr. Bajaj recognized a structural break on
5  August 9, 2007.  Correct?
6      A.   He does.
7      Q.   And --
8      A.   And he says there was no break
9  before that.  That's what he said in response
10 to Dr. Holman.
11      Q.   I don't believe you're fairly
12 characterizing the record, but we -- your
13 counsel can explore that with you at another
14 time.
15      Now, he found that taking that
16 structural break into account affected
17 Dr. Holman's calculations.  Correct?
18      A.   It affected his -- right -- his
19 calculation of background volatility such that
20 he challenged the finding of significance of
21 one earnings date.
22      Q.   Now, when you were tasked in this
23 case with the assignment for testing for market
24 efficiency, you tested whether Dr. Bajaj was
25 correct about a structural break on August 9th.

Page 654

Steven P. Feinstein, PhD, CFA

1
2  Correct?
3      A.   Right.
4      Q.   And you used a Chow test.  Right?
5      A.   Yes.
6      Q.   Had Dr. Bajaj used a Chow test or
7  was that your own idea?
8      A.   I usually use a Chow test.  I don't
9  recall whether he did or not.
10      Q.   Okay.
11      A.   I think he might not have.  But I
12 don't recall.
13      Q.   And based on your use of the Chow
14 test, you discovered that Dr. Bajaj was
15 correct.  Right?
16      A.   That it was reasonable to break the
17 class period there for statistical purposes,
18 not for market efficiency purposes.  There was
19 no reason that the market should necessarily be
20 inefficient prior to that when it was easily
21 observed to be efficient subsequent, although
22 different statistics would -- calculations
23 would have to be run separately for the two
24 pieces.
25      Q.   Right.  Because the way you test for

Page 655

Steven P. Feinstein, PhD, CFA

1  market efficiency is by using statistical
2  techniques.  Correct?
3      A.   In addition to the Cammer and
4  Unger -- other Cammer and Unger factors, which
5  is one of the reasons those are important
6  factors too.
7      Q.   Well, when you have these different
8  periods of time and you're assessing for market
9  efficiency using statistics, the two different
10  periods matter.  Correct?
11      A.   Right.
12      Q.   Okay.  Now, in response --
13  responding to your report, Dr. Bajaj recognized
14  a structural break on February 27, 2007.
15  Correct?
16      A.   He proposed that there was one.
17  It's not clear how he arrived at that when he
18  previously said that there was constant
19  volatility over that stretch of time prior to
20  the break he previously said was the only
21  break.
22      Q.   Putting aside any characterizations
23  or mischaracterizations of Dr. Bajaj's
24  testimony, let me ask you this.

Page 656

Steven P. Feinstein, PhD, CFA

1      When Dr. Bajaj identified a
2  structural break on February 27, 2007, he
3  criticized you for not taking that into account
4  in your analysis.  Correct?
5      A.   I'm not sure he really did.  He said
6  there was one, but it's not clear whether he
7  found it from data snooping or whether there
8  really was one.
9      Q.   You don't think he criticized you
10  for not taking that into account?
11      A.   No, no.  I was taking issue with the
12  premise of your question.  You said when he
13  found it.  Depends what you mean by "found it."
14  Does it really exist and he detected it, or did
15  he go data snooping to find a date that he
16  could say was a break?  It's not clear.
17      Q.   Well, regardless --
18      A.   Given that he previously said he
19  tested the data and hadn't found a break there,
20  I went with the latter hypothesis that it's not
21  a legitimate break and is just a statistical
22  remnant of data snooping.
23      Q.   Again, putting aside your
24  mischaracterizations of Dr. Bajaj, let me ask

Page 657

Steven P. Feinstein, PhD, CFA

1  you this.
2      MR. MARKOVITS:  Objection.  I
3  believe it's not a mischaracterization.  If
4  you want to take that out of the question,
5  you can ask him a question.
6      MR. FRANK:  I'm going to ask him a
7  new question.  And you can ask him anything
8  you want about Dr. Bajaj's testimony at
9  another time.
10      Q.   Dr. Bajaj criticized you for not
11  taking into account a structural break on
12  February 27, 2007, in your analysis.  Correct?
13      A.   Yes.
14      Q.   Okay.  And so you tested whether or
15  not he was correct about there being a
16  structural break there by using a Chow test.
17  Right?
18      A.   That's not quite accurate.  I tested
19  what a Chow test would show for that particular
20  date.
21      Q.   What did it show?
22      A.   It showed that there was the
23  appearance of a structural break, but it could
24  be a spurious result found by Dr. Bajaj from

Page 658

Steven P. Feinstein, PhD, CFA

1  data snooping.
2      Q.   You didn't mention that in your
3  rebuttal report, did you?
4      A.   No, I do.
5      Q.   Where in your rebuttal report do you
6  state that you ran a Chow test on February 27,
7  2007?
8      A.   I told you I checked his analysis.
9  I checked his numbers.  But I was not convinced
10  that that was a legitimate break.  It's
11  page 34, part G.  Dr. Bajaj's identification of
12  an additional structural break appears to be an
13  exercise in data snooping.
14      So I'm not disputing his arithmetic,
15  but I am disputing his scientific method.
16      Q.   Well, so let me be clear here,
17  because I don't believe it says this in your
18  report.  So I just want the record to be clear.
19      You actually ran a Chow test on
20  February 27, 2007.  Is that correct?
21      A.   Yeah.  I believe so.
22      Q.   And I understand it's your view that
23  Dr. Bajaj may have found that as a result of
24  data snooping.  Is that right?

Page 659

Steven P. Feinstein, PhD, CFA

1
2    A.    Yes.
3    Q.    Okay.
4    A.    Meaning testing many different dates
5  and when previously he concluded an exact
6  opposite conclusion.
7    Q.    Well, do you happen to know whether
8  or not Dr. Bajaj tested many different dates?
9    A.    Not for sure.
10    Q.    You suspect he did?
11    A.    Yes.
12    Q.    Okay.  Now --
13    A.    And then concocted an argument as to
14  why that would be a legitimate date.
15    Q.    You suspect that?
16    A.    Yes.
17    Q.    Now --
18    A.    And the reason for that suspicion is
19  his abrupt and dramatic change in opinion from
20  his prior report.
21    Q.    Now, do you happen to know what
22  the -- well, strike that.
23        Did you run the Chow test yourself
24  or did someone on your team run the Chow test?
25    A.    Someone on my team, and told me what

Page 660

Steven P. Feinstein, PhD, CFA

1
2  was found.
3    Q.    And what did they -- and who was
4  that?
5    A.    That would be Miguel.
6    Q.    And what did he tell you he found?
7    A.    That if you -- that if you did run a
8  test on that date, it would indicate a
9  significant -- a statistical structural break.
10  Not a market efficiency break, but a
11  statistical relationship break.
12    Q.    And that information was something
13  you took into account in drafting your rebuttal
14  report.  Correct?
15    A.    Right.
16    Q.    And do you happen to remember the
17  numbers?
18    A.    No.
19    Q.    Did you -- do you still have those
20  calculations?
21    A.    I don't know.  I mean, the purpose
22  was just to, like I said earlier today, to
23  verify his arithmetic and assertions.
24    Q.    And you agreed with his arithmetic,
25  if not his assertions.  Correct?

Page 661

Steven P. Feinstein, PhD, CFA

1
2    A.    Yes.
3    Q.    And you don't mention that you agree
4  with his arithmetic anywhere in this report.
5  Correct?
6    A.    Probably not.
7    Q.    Is there a reason why you left out
8  of your report that you ran the Chow test on
9  the February 27, 2007, date and that it
10  confirmed that there was a statistically
11  significant result on that date?
12    A.    There's a reason.
13    Q.    Yeah.  What's the reason?
14    A.    The evidence that it was data
15  snooping, that this is not a legitimate
16  scientific method result.
17    Q.    And so, as a result, you didn't want
18  to disclose to me or to the court that you had
19  run a Chow test and identified that the
20  calculation was actually correct regardless of
21  how it was found?
22    A.    That's not a fair characterization.
23  It just wasn't relevant to the reply.  What was
24  more relevant was that it was clearly a --
25  clearly -- there were clear indications of data

Page 662

Steven P. Feinstein, PhD, CFA

1
2  snooping.
3    Q.    You don't think it was relevant to
4  the rebuttal that there actually was a
5  structural break on that date according to the
6  Chow test?
7    A.    I'm not sure there was.  It says
8  right here in 103, "Dr. Bajaj previously
9  concluded that there was no structural break
10  prior to August 2007."
11    Q.    Where does he say in his testimony
12  that there was no structural break prior to
13  August 2007?
14    A.    In his deposition, January 11, 2013,
15  page 181, he said, "Well, there's a sudden
16  spike on August 9th."  That's August 9, 2007.
17  "And if I recall correctly, the volatility
18  during the control period" -- that's the
19  earlier period -- "was almost identical to the
20  volatility for the part of the class period
21  until August 8."
22        So he's saying it's constant
23  throughout.
24    Q.    And so he was recalling from memory
25  the volatility of a control period compared to

45

Page 663

Steven P. Feinstein, PhD, CFA

1  
2  the volatility for the part of the class period
3  up to August 8th.  Is that right?
4       A.   Well, it's not just that.  He's --
5  in his response to Dr. Holman, he said he ran
6  structural break tests and found only this one.
7       Q.   But is he saying --
8       A.   He only reported -- well, just like
9  you said, he only reported that one of
10  August 9th.
11      Q.   Do you know whether or not
12  Dr. Holman reported statistically significant
13  price movements on any dates prior to
14  August 9th?
15      A.   No.  There were four nonsignificant
16  and then the two.  And he puts the break
17  exactly on the day of the second -- of the
18  first of the two significant earnings
19  announcements.
20      Q.   Of the two, there was one August 9th
21  and one on November 20th?
22      A.   Right.
23      Q.   Now, is --
24      A.   So that tells me that -- well, I'll
25  wait for your question.

Page 664

Steven P. Feinstein, PhD, CFA

1  
2       Q.   So there was no reason for Dr. Bajaj
3  to attempt to identify structural breaks prior
4  to August 9, 2007, was there?
5       MR. MARKOVITS:  Objection.  Calls
6  for speculation.
7       You can make your arguments about
8  why Dr. Bajaj came up with this new theory,
9  but he -- you don't have to make the
10  arguments to Dr. Feinstein.  That's more
11  for brief.
12      You're not questioning the witness
13  now on what he put in his rebuttal report.
14  You're just arguing with the witness and
15  trying to excuse Dr. Bajaj changing his
16  testimony in his report, which is fine, but
17  why don't you do it in a brief rather than
18  here today.
19      MR. FRANK:  The witness has accused
20  Dr. Bajaj in his rebuttal report of data
21  snooping.  I'm just exploring the basis for
22  that accusation.
23      MR. MARKOVITS:  I -- go ahead.
24  BY MR. FRANK:
25      Q.   Now, in this document --

Page 665

Steven P. Feinstein, PhD, CFA

1  
2       A.   In his deposition -- on page 35 of
3  my report, I cite his deposition.  He didn't
4  just say he didn't test it.  He said that the
5  earlier period was consistent.
6       Q.   Well, my question was was there a
7  reason for Dr. Bajaj to attempt to identify
8  structural breaks prior to August 9, 2007?
9       Are you aware of such a reason in
10  response to Dr. Holman's report?
11      A.   Yes.  I mean, if he was really
12  interested in running what he would consider to
13  be valid statistical tests and that valid
14  statistical tests have to be on periods where
15  the dynamics are stationary, rather than
16  winning an argument with another expert, he
17  would have tested -- whatever -- whatever
18  motivated him to look for a break now should
19  have motivated him to look for a break then.
20      Q.   Doctor, is volatility the only
21  factor in assessing a structural break?
22      A.   No.
23      Q.   What are other factors?
24      A.   The relationship among the variables
25  in the model.

Page 666

Steven P. Feinstein, PhD, CFA

1  
2       Q.   And what are the variables in the
3  model?
4       A.   Well, it's the return on the -- on
5  Freddie Mac stock, the return on the PeerIndex,
6  return on the market index, and an intercept
7  term.
8       Q.   Is that all?
9       A.   Yes.  I believe so, as I sit here
10  now.  Maybe I'm missing something.  But as I
11  sit here now, I think that's it.
12      Q.   Now, let me turn your attention to
13  paragraph 110 of your rebuttal report.
14      Do you see there you say, "Dr. Bajaj
15  does not dispute that Freddie Mac stock
16  exhibited a statistically significant price
17  decline following the 20 November 2007
18  corrective disclosure"?
19      Do you see that?
20      A.   Yes.
21      Q.   And then in the next sentence, you
22  say, "Dr. Bajaj does not dispute that the
23  residual decline on 20 November 2007 following
24  the corrective disclosure that day was negative
25  32.13 percent."

Page 667

1      Steven P. Feinstein, PhD, CFA
2      Do you see that?
3      A.  I don't think he disputed that.
4      Q.  Now, do you see how you refer to the
5  disclosures on November 20, 2007, as corrective
6  disclosures?
7      A.  Yes.
8      Q.  In connection with your work on this
9  case, have you formed a view that disclosures
10 that Freddie Mac made on November 20, 2007,
11 were corrective disclosures?
12     A.  In the sense that they -- we talked
13 about this last time, that "corrective" could
14 either mean corrective of the information or
15 "corrective" could also mean corrective of the
16 inflation in the stock price.
17     And the allegation is that the
18 events and the announcements of November 20,
19 2007, dissipated some artificial inflation that
20 was in the stock price on that day and prior to
21 that day, that the market would not have been
22 as surprised by the news that day had they been
23 fully informed of conditions in the company
24 prior to that.
25     So corrective in the sense -- I'm

Page 668

1      Steven P. Feinstein, PhD, CFA
2  actually just -- the word "corrective" is
3  appropriate in the sense that the allegation is
4  that that day and the news that day dissipated
5  inflation.
6      Q.  Now, are you aware that the
7  plaintiff in this case has argued both that
8  November 20, 2007, disclosures represented
9  corrective disclosures or, alternatively, that
10 they represented materialization of allegedly
11 disclosed risks?
12     Are you aware of that?
13     A.  First of all, allegedly undisclosed
14 risks.
15     Q.  Oh.  I apologize.  Let me do it
16 again.  You're exactly right.  I misspoke.
17     Are you aware that the plaintiff in
18 this case has alleged both that the
19 November 20, 2007, disclosures represented
20 corrective disclosures or, alternatively, that
21 they represented the materialization of
22 allegedly undisclosed risks?
23     A.  My understanding is that plaintiffs'
24 allegation is that the events of November 20,
25 2007, may have corrected the price but didn't

Page 669

1      Steven P. Feinstein, PhD, CFA
2  necessarily -- weren't necessarily a production
3  of information that corrected what the
4  misunderstandings of the company were on
5  account of alleged misrepresentations and
6  omissions.  So maybe the way you're using
7  "corrective" and the way the plaintiffs use
8  "corrective" and the way I'm using "corrective"
9  are all -- are three different definitions.
10     But my understanding is that their
11 argument is that it was a realization of the
12 risk that day and that the stock price would
13 not have fallen as dramatically had there been
14 appropriate disclosure previously.  That's the
15 theory of liability.
16     MR. MARKOVITS:  Jason, can we take a
17 short break?
18     MR. FRANK:  Sure.
19     THE VIDEOGRAPHER:  The time now is
20 14:01.  We're off the record.
21     (Recess taken from 2:01 to 2:18
22 p.m.)
23     THE VIDEOGRAPHER:  The time now is
24 14:18.  We're on the record.
25 BY MR. FRANK:

Page 670

1      Steven P. Feinstein, PhD, CFA
2      Q.  Dr. Feinstein, I am showing you a
3  document that was previously marked as
4  Exhibit 187.
5      Do you recognize Exhibit 187?
6      A.  Yes.
7      Q.  Now, allow me to turn your attention
8  to the page 71 of 370.
9      Well, I'll back up.
10     What is Exhibit 187?
11     A.  This is Dr. Bajaj's report in
12 response to my report filed in this matter on
13 September 1st.
14     Q.  Thank you.
15     Now, let me turn your attention to
16 page 71 of 370.
17     A.  Okay.
18     Q.  Do you see on page 71 of 370 there
19 is a table that is entitled "Table 2"?
20     A.  Yes.
21     Q.  And this table is entitled not just
22 "Table 2" but also "Dr. Feinstein's z-test and
23 robustness check presenting his results
24 collectively and separately for regression
25 estimation periods, as he did in the Eletrobras

Page 671

1    Steven P. Feinstein, PhD, CFA
2 case, by correcting his event study regression
3 model."
4        Do you see that?
5    A.   I see it.  I disagree with it, but I
6 see it.
7    Q.   You disagree that that's the title
8 of the table?
9    A.   No.  I agree, but I don't think -- I
10 disagree with what he wrote, that it's not
11 correcting any event study regression model.
12 If anything, what he's doing is intentionally
13 eviscerating the power of the test.
14    Q.   But you have no dispute that that is
15 how he labeled his table?
16    A.   Correct.
17    Q.   Okay.  Now -- then underneath that
18 title, it says, "Freddie Mac collective test
19 robustness checks."
20        Do you see that?
21    A.   I do.
22    Q.   Okay.  And then it has two -- the
23 table kind of has two sections.  Right?  One is
24 "WSJ/NYT News Event Days" and the other is
25 "WSJ/NYT News Event Days Excluding Alleged

Page 672

1    Steven P. Feinstein, PhD, CFA
2 Corrective Disclosure."
3        Do you see that?
4    A.   Yes.
5    Q.   Okay.  And did your team
6 double-check all of the calculations in this
7 table?
8    A.   Probably not.
9    Q.   So you, as you sit here today, you
10 don't have any reason to believe that these
11 calculations are incorrect, do you?
12    A.   Arithmetically?
13    Q.   Let's just deal with arithmetically
14 right now.
15    A.   I have no reason to believe not.
16    Q.   Okay.  Now, do you understand what
17 the first column is doing that is labeled
18 "Dr. Feinstein Estimation Period 1a, 1b, and
19 2"?
20    A.   I thought I did, but now that I look
21 at it, I'm puzzled.  There's something wrong.
22    Q.   Just let me know when you've had a
23 chance to review everything you wish to review.
24    A.   All right.  I -- well, you correct
25 me if I'm wrong.  Do you want me to tell you

Page 673

1    Steven P. Feinstein, PhD, CFA
2 what it is?
3    Q.   What you understand it to be.
4    A.   So he's running the -- he's testing
5 for the statistical significance of the news
6 and non-news days, but use -- across the entire
7 class period in the first column, but using
8 different regressions for each of the three
9 periods that he purportedly identifies.
10    Q.   If he takes into account the
11 February 27, 2007, structural break, what
12 effect does that have on the statistical
13 significance of the Fisher's exact test
14 results?
15    A.   Well, he says that it would not be
16 significant at the 5 or 10 percent level.
17    Q.   And do you disagree with his
18 calculation?
19    A.   I don't -- like I said, I don't --
20 what I disagreed with when I read the report
21 was that it was necessary to break the period
22 into three periods.  So that's why I wasn't as
23 involved in verifying these numbers.  The
24 entire approach is misguided.  But I -- as I
25 sit here now, I don't have a reason to dispute

Page 674

1    Steven P. Feinstein, PhD, CFA
2 the arithmetic.  I do dispute the conclusions.
3    Q.   Now, when he takes into account the
4 February 27, 2007, structural break, what
5 effect does that have on the statistical
6 significance of the bootstrap test results?
7    A.   I take issue with you saying he
8 takes into account the break, because you're
9 assuming that there is, in fact, a break there
10 and that it needed to be taken into account and
11 that it was appropriate to run a separate
12 regression.  I dispute all of that.  But,
13 nonetheless, if you do that calculation
14 arithmetically, you arrive at these numbers.
15        To me, as I read this, it looked
16 like he was bending over backwards to try to
17 arrive at numbers like this that just barely
18 fall outside the 10 percent significance level
19 or 90 percent confidence level.
20    Q.   Well, your Chow test indicated there
21 was a structural break in February 2007.
22 Right?
23    A.   No.  My Chow test said that if you
24 go -- that it -- but it could be spurious, that
25 there was some -- I didn't dispute his

Page 675

Steven P. Feinstein, PhD, CFA

1  arithmetic, but I disputed his scientific
2  process in concluding there was, in fact, a
3  break there.
4      Q.   What was his scientific process?
5      A.   Well, that's the problem.  I mean
6  his process clearly was different from what he
7  had applied in this very case earlier.  He went
8  looking for more breaks.
9      Q.   You don't know what his process was,
10  do you?
11      A.   His process was that while he
12  previously concluded there were no previous
13  breaks, he now wanted to find some reason to
14  break the regression period up into smaller
15  pieces.  That seems to be what his process was.
16      Q.   That's your speculation?
17      A.   No.  No.  That's what he did.  I
18  mean, it's clear.  It's indisputable that he
19  previously testified there were no previous
20  breaks.  He previously found no previous
21  breaks.  And now, when he found a need to try
22  to cast some doubt on my findings, he's
23  changing his position and saying there is a
24  break.

Page 676

Steven P. Feinstein, PhD, CFA

1      Q.   He never testified that there were
2  no previous breaks.  You're just making that
3  up, aren't you?
4      A.   Not at all.  I wrote -- I cited it
5  in my report, the portion of his deposition
6  where he said that the prior period was
7  constant, and he also reported no prior breaks
8  earlier in his earlier work, studying the very
9  same data.  The very same data.
10      Q.   When you said you cited in your
11  report, that was the volatility comment that
12  you had read to us earlier into the record.  Is
13  that right?
14      A.   Right.
15      Q.   Now, the binomial test results,
16  turning to that, when he takes into account the
17  February 27, 2007, structural break, what
18  does -- what effect does that have on the
19  statistical significance of the binomial test
20  result?
21      A.   I take issue with the way you're
22  phrasing the question.  I mean, take into
23  account, when he -- what we should say
24  instead -- I'll answer the questions if you

Page 677

Steven P. Feinstein, PhD, CFA

1  phrase it this way.
2      When he breaks the period up into
3  smaller regression samples, he's going to have
4  a weaker test that finds inconclusive results
5  each time.
6      Q.   So assume for the sake of my next
7  question that there actually is a structural
8  break on February 27, 2007.  Can you do that?
9      A.   Okay.  I'll assume the hypothetical.
10      Q.   Assume that --
11      A.   And that it was found without any
12  data snooping or without any data or
13  conclusion-driven process.  Results -- without
14  a results-driven process.  Without an objective
15  of making it look like the news events behaved
16  no differently than the non-news events.
17      Q.   Well, here's the thing.  Here's your
18  problem.  I'm allowed to choose the
19  hypotheticals, so here's the hypothetical I'm
20  going to choose.
21      A.   Okay.
22      Q.   Assume you ran a Chow test on your
23  own, without anyone else suggesting it to you,
24  that identified a structural break on

Page 678

Steven P. Feinstein, PhD, CFA

1  February 27, 2007, and that you came to believe
2  on your own that there actually was a
3  structural break on February 27, 2007.  Okay?
4      A.   Okay.
5      Q.   Assume that.
6      A.   Right.
7      Q.   Do you have any reason to believe
8  that the calculations that Dr. Bajaj included
9  in his report in the first column of Table 2 on
10  page 71 of 370 is inaccurate in any way?
11      A.   Under that hypothetical, no.
12      Q.   Now, let me ask you this.  Turn your
13  attention, please, to paragraph 142 on page 63
14  of 370.
15      A.   Oh, I --
16      Q.   Page 63 of 370.  Page 63 of 370.
17      A.   Okay.
18      Q.   Okay.  Do you see paragraph 142?
19      MR. MARKOVITS:  Page 63 of 370?
20      MR. FRANK:  I'm trying to help.
21      Q.   Do you see in paragraph 142 --
22      A.   Yes.
23      Q.   -- it says, "There are at least
24  three primary pieces of economic evidence

Page 679

Steven P. Feinstein, PhD, CFA

1  establishing a structural break on February 27,
2  2007"?
3
4      Do you see that?
5      A.  I do.
6      Q.  It says, "First, the VIX index and
7  implied volatility for Freddie Mac stock
8  starting on February 27, 2007, through August
9  8, 2007, nearly doubled from their prior levels
10 over the previous year."
11     Do you see that?
12     A.  Yes.
13     Q.  Did you or anyone on your team check
14 to see if that was true?
15     A.  We looked at his graph.  I looked at
16 his graph.
17     Oh, wait.
18     Q.  Did you --
19     A.  Let me -- what does he -- he cites
20 to Appendix VIII.  And if you look at his
21 graph, and you look at the 30-day implied
22 volatility, you see that for much of this --
23     MR. MARKOVITS:  What's the page
24 number at the top?
25     THE WITNESS:  128.

Page 680

Steven P. Feinstein, PhD, CFA

1
2      A.  If you look at August 1, 2006, we're
3  north of 20 percent for the 30-day implied
4  volatility.  Again, why he chose that one
5  instead of others is left unanswered.  But
6  we're north of 20 percent.  And if we look at
7  much of the period around April 2007, we're in
8  the same ballpark.
9      Q.  So you disagree with the statement
10 that the VIX index implied volatility for
11 Freddie Mac stock starting on February 27,
12 2007, through August 8, 2007, nearly doubled
13 from their prior levels over the previous year?
14     A.  Based on his own Exhibit 8, that
15 would not be accurate for all dates.
16     Q.  Well, putting aside whether it's
17 accurate for all dates, did you disagree with
18 the statement generally?
19     A.  Yes.
20     Q.  Okay.  And did you include that in
21 your rebuttal report?
22     A.  No.  And it's that I described that
23 I thought his scientific process was lacking
24 and that I relied on the fact that he hadn't
25 argued that there was a structural break ever

Page 681

Steven P. Feinstein, PhD, CFA

1
2  before, even though he examined the very same
3  data previously.
4      Q.  And so looking at Appendix VIII, you
5  don't see the difference between the period
6  leading up to February 27th and the period
7  after February 27th?
8      A.  Well, I see -- if you look just
9  locally, there's a difference.  But if you look
10 at the entire period, you see there's plenty of
11 dates within the August 1st to February 2007 --
12 August 1, 2006, to February 1, 2007, that are
13 the same level subsequently.
14     There's a bubble right at the
15 beginning and there's, of course, a -- he wants
16 to -- he wants to run the test for February --
17 for these dates around February.  He wants to
18 run the test for February 27, 2007, on a period
19 that includes August 1, 2007.
20     So there's his problem.  He's saying
21 that this first hill in the end of February
22 '07, beginning of March '07, is identical and
23 stationary relative to this period at the end
24 of the graph.
25     Q.  Well, he actually --

Page 682

Steven P. Feinstein, PhD, CFA

1
2      A.  And that's just not right.
3      Q.  He actually did an average from
4  August 1, '06, to February 26, '07.  Right?
5      A.  Well, I know about the average.  But
6  as far as running the test, he wants to use
7  this -- he wants to use this period from
8  February 27, 2007, I believe it's through
9  August of 2007, as one regression period.
10     Q.  Doctor, I assure you it will go so
11 much faster if you answer my questions.  I'm
12 really -- that's the way this works.
13     So if you look at Appendix VIII, he
14 put on Appendix VIII the VIX average from
15 August 1, '06, to February 25, 2007.  Correct?
16     A.  Yes.
17     Q.  And that average was 11.5 percent.
18 Correct?
19     A.  Yes.
20     Q.  And then he also put the VIX average
21 from February 27 to August 8, 2007.  Correct?
22     A.  Right.
23     Q.  And that average was 15.19 percent.
24 Is that right?
25     A.  I'm not going to dispute that you're

Page 683

Steven P. Feinstein, PhD, CFA

1  reading the table right. You're just
2  interpreting it wrong.
3  
4      Q.   And --
5      A.   Because what he did with that is he
6  said that let's run an event study on -- for a
7  date, February 27, 2007, assuming that the
8  dynamics on that date are the same as the
9  dynamics on August 1, 2007.
10      Q.   Now, did he also say on
11  paragraph 142 of his report -- that is, page 63
12  of 370 -- did he also say, "Second, there were
13  a series of marketwide events that appeared to
14  roil financial markets, resulting in a sharp
15  marketwide stock market decline, the largest
16  since 2001, amid subprime mortgage problems and
17  fears of recession"?
18      Do you see that?
19      A.   I see it.
20      Q.   Did you disagree with that
21  statement?
22      A.   That's not what happened on
23  February 7, 2007.
24      Q.   Well, do you see, in Footnote 168,
25  he says, "On February 26, 2007, former fed

Page 684

Steven P. Feinstein, PhD, CFA

1  chairman Alan Greenspan warned of the
2  possibility of a recession in 2007"?
3  
4      Do you see that?
5      A.   Right.
6      Q.   Do you have any reason to believe
7  that statement was false?
8      A.   No.
9      Q.   And do you see then he says -- he
10  writes, "The next day the Dow Jones Industrial
11  Average fell 3.3 percent, its largest drop
12  since 2001, following a similar sharp decline
13  in China Shanghai Composite Index"?
14      A.   Yes.
15      Q.   Do you see that?
16      A.   I do.
17      Q.   Do you have any reason to believe
18  that was false?
19      A.   No.
20      Q.   Okay.  Now, then he says -- back to
21  paragraph 142 -- "Third, the use of
22  Dr. Feinstein's Chow test when applied to
23  Dr. Feinstein's market model to analyze the
24  periods from August 1, 2006, to February 26,
25  2007, and February 27, 2007, to August 8, 2009,

Page 685

Steven P. Feinstein, PhD, CFA

1  yield a" -- "yields a result statistically
2  significant at the 95 percent confidence level,
3  demonstrating that 'there was a structural
4  change in the regression relationship.'"
5      Do you see that?
6      A.   Yeah.
7      Q.   And you understood he was quoting
8  your report there.  Correct?
9      A.   Where?  What paragraph?
10      Q.   So if you read what I just read, at
11  the end, he drops Footnote 169, and then he --
12  that footnote says "Feinstein report
13  paragraph 126."
14      Do you see that?
15      A.   No.
16      Well, he's not -- that quote -- that
17  quote doesn't refer to February 27, 2007, in my
18  report.
19      Q.   No.  Presumably that quote addresses
20  the use of your Chow test in reference to
21  August 9, 2007.  Correct?
22      A.   That's right.
23      Q.   And he was just applying your
24  language in the same way, given that he had
25  

Page 686

Steven P. Feinstein, PhD, CFA

1  used your Chow test in the same way he -- you
2  had used it.  Correct?
3      A.   That's your characterization, not
4  mine.
5      Q.   Do you disagree with that?
6      A.   I disagree that what he did was a
7  legitimate structural break investigation.
8      Q.   Do you in your rebuttal report deal
9  with the three primary pieces of economic
10  evidence that he discusses in paragraph 142?
11      A.   In the sense that I know that you
12  can go and look for evidence to support a
13  conclusion that you posit a priori.
14      Q.   And do you have any reason --
15  putting aside your accusations of data
16  snooping, do you have any reason to believe
17  that February 27, 2007, wasn't a structural
18  break in the market for Freddie Mac securities?
19      A.   With the emphasis on putting aside
20  the flaw in the analysis, that is the flaw in
21  the analysis.
22      Q.   Your view is that the reason why
23  February 27, 2007, shouldn't be considered is
24  solely because it's the result of what you call

Page 687

1          Steven P. Feinstein, PhD, CFA
2   data snooping?
3          A.    And that he never identified it
4   before having analyzed the same data.  And he
5   testified, at least with respect to volatility,
6   which is what the VIX and the implied
7   volatility are about, that there was stationary
8   over that period of time.  He previously
9   concluded that, having analyzed this very same
10  data.
11         Q.    And those are all arguments you made
12  in support of your data snooping contention.
13  Correct?
14         A.    Yes.
15         Q.    And so the reason why you believe
16  February 27, 2007, shouldn't be considered as a
17  structural break is because you believe it was
18  identified as a result of data snooping.
19  Right?
20         A.    Yes.  And the problem with data
21  snooping is there may be -- either it's not a
22  legitimate date altogether or there may be
23  another date that's even better to use.
24         Q.    Now, how do you explain the fact
25  that the Chow test resulted in a statistically

Page 688

1          Steven P. Feinstein, PhD, CFA
2   significant result?
3          A.    Data snooping.  That's my
4   explanation.
5          Q.    So, in other words, even though the
6   result is statistically significant, it should
7   be disregarded because of the way in which it
8   was discovered?
9          A.    We call that, in statistics,
10  spurious significance, if it's found in a
11  process that violates scientific process.
12         Q.    But if it were to be found that
13  Dr. Bajaj did not engage in data snooping, you
14  would then accept -- you would then accept
15  February 27, 2007, as a structural break date?
16         A.    Not necessarily.
17         Q.    Why not?
18         A.    Well, there might be other days that
19  are a better day to place the break, in which
20  case the subsequent test, follow-up test, would
21  have to be run over different periods.
22         Q.    Did you do that?
23         A.    No.
24         Q.    Why not?
25         A.    Because I -- because I concluded

Page 689

1          Steven P. Feinstein, PhD, CFA
2   from comparing Dr. Bajaj's reports and
3   testimony in this case for this -- before my
4   report and after my report, that it was data
5   snooping.  It just shouldn't be taken
6   seriously, that finding, because of -- he
7   previously said that there was stationary,
8   there was no break there, and now --
9          Q.    But --
10         A.    -- now that it's convenient for his
11  new purpose, he changes his tune.
12         Q.    Well, putting aside whether he
13  actually said what you just said he said,
14  what -- did you make an effort to look for any
15  structural breaks over the period?
16         A.    I did.  I looked to see whether what
17  he said about Dr. Holman's analysis was
18  accurate, and I accepted that.
19         Q.    But did you independently look for
20  any dates that might represent a structural
21  break?
22         A.    Personally, I did not.
23         Q.    Did anyone on your team?
24         A.    They may have.  I just don't recall.
25         Q.    Is it a good idea to look to see

Page 690

1          Steven P. Feinstein, PhD, CFA
2   whether or not there are any structural breaks
3   when you're trying to assess market efficiency?
4          A.    Not necessarily.
5          Q.    It's not something that you would
6   advise your team to do?
7          A.    It depends.  There was a break that
8   was identified that split the class period.  I
9   know that -- and I -- I know that if you divide
10  the period into smaller and smaller pieces, you
11  weaken the test, not the market.
12              In other words, you're going to find
13  inconclusive results from the test, not because
14  the market is inefficient but because your
15  tests are eviscerated.  And given that he
16  previously testified that they were stationary
17  over the period prior to the latter break, I
18  accepted that.
19         Q.    Do you think that Dr. Holman engaged
20  in any data snooping?
21         A.    I didn't assess one way or the
22  other.
23         Q.    You don't have a view one way or
24  another?
25         A.    Correct.

Page 691

Steven P. Feinstein, PhD, CFA
1
2    Q.   He may have?
3    A.   Well, if I don't have what -- I
4  have -- I don't have for Dr. Holman what I have
5  for Dr. Bajaj, which is reports written before
6  and after my report.  Dr. Bajaj's assignment
7  changed and then suddenly he starts changing
8  his conclusions.  That tells me something.  And
9  I don't have that same information about what
10  Dr. Holman either did or would have done.
11    Q.   Did any of your conclusions change
12  from your first report to your second report?
13    A.   No.
14    Q.   In your view, are there any new
15  conclusions in your second report?
16    A.   Well, the first report didn't
17  explicitly have the diagnostic test and they're
18  in the second report.  They're presented.  They
19  were presented between the two reports as well,
20  but they're in the second report.
21    I was not -- there was no
22  opportunity to address price, the price impact
23  argument of Dr. Bajaj previously, so that's
24  new.
25    Certainly I -- my reactions and

Page 692

Steven P. Feinstein, PhD, CFA
1
2  responses to Dr. Gompers and Dr. Bajaj could
3  not have been in my first report and they're in
4  the second report.
5    Q.   Why were your diagnostic tests set
6  forth in your second report?
7    A.   Well, for completeness.  I mean,
8  they were cited in the deposition, they were
9  provided to us in exhibit, and for completeness
10  of the record it made sense to put it in.
11    Q.   But you didn't think it made sense
12  to put in the rebuttal report your Chow test on
13  February 27th for completeness?
14    A.   That was just -- like I said, that
15  was just verifying what we thought was his
16  arithmetic.
17    Q.   Now, in connection with -- do you
18  remember testifying earlier in connection with
19  the weak-form efficiency that one of the issues
20  that you believe create a problem for assessing
21  weak-form efficiency is time-varying risk
22  premia?
23    A.   Right.
24    Q.   What are time-varying risk premia?
25    A.   Essentially it means that -- that

Page 693

Steven P. Feinstein, PhD, CFA
1
2  investors have different appetites for risk,
3  potentially different appetites for risk, and
4  that that might change over time.
5    But specifically in Stephen LeRoy's
6  work where it comes into play is that as a
7  result of a drop in the stock price, people may
8  become more risk-averse such that the demand
9  for the security actually falls and then the
10  stock price may fall again.
11    So you may have a -- the fact about
12  how a stock price change might change risk
13  preferences or aversion could actually impose
14  an autocorrelation process on the stock.  And
15  that's why -- and it would be perfectly
16  rational, and it may even be predictable, but
17  it wouldn't be a true arbitrage opportunity or
18  even a profitable opportunity consistent with
19  people's appetites for risk.
20    Q.   So can you explain to me, using very
21  small, simple words, how time-varying risk
22  premia creates an issue that prevents weak-form
23  efficiency tests from accurately identifying
24  weak-form efficient markets?
25    A.   Maybe.

Page 694

Steven P. Feinstein, PhD, CFA
1
2    What might be better is just to
3  direct you to the literature, and you can read
4  the abstract and the conclusion.  And it's
5  quite clear from the literature.  But
6  essentially what these authors explain is that
7  in a perfectly rational and perfectly efficient
8  market, where all information is being
9  received, there's no impediments to
10  information, it's being traded on, it's being
11  digested, and all actors are rational, they --
12  the price may still have autocorrelation.  A
13  drop in a price may foretell a subsequent drop
14  in the price, even though the market's
15  efficiently processing information and all
16  investors are rational.
17    That's what the models show, that
18  that is possible, if not the actual likely
19  depiction of what's going on in the
20  marketplace.
21    Q.   And how does that relate to
22  time-varying risk premia?
23    A.   That it -- a change in the price
24  causes investors' appetites for risk to change,
25  which then causes another change in the price.

Page 695

Steven P. Feinstein, PhD, CFA

1
2   Well, here.  Again, I mean, it's --
3   I know the conclusions of the reports.  I know
4   that if I had the opportunity I can prepare a
5   lecture with a PowerPoint slides, you know, for
6   interested parties.
7   But essentially it's this.  Suppose
8   you invest in the stock market or a particular
9   stock, and then you lose money.  You're now
10  poorer.  As a result of being poorer, you're
11  now going to be more cautious, so you're going
12  to pull some of your money out of the market.
13  That makes the market go down again.  There's
14  nothing irrational about that, and yet it would
15  be an autocorrelative process.
16  And there's nothing about that that
17  says that you're ignoring information.  It
18  simply says that you're processing it now in
19  light of the fact that you are a little more
20  afraid of the market.
21  Q.   And are economists unable to value
22  time-varying risk premia such that it -- they
23  can't adjust for it in these weak-form
24  efficiency tests?
25  A.   That's what the articles say.  The

Page 696

Steven P. Feinstein, PhD, CFA

1
2   articles say that when you observe zero
3   correlation, it's not an inefficiency in the
4   marketplace.  It's how rational people react to
5   fear.  How rational people react to rational
6   caution and optimization of their investment
7   decisions.
8   Q.   And is time-varying risk premia the
9   sort of thing that you can calculate on a daily
10  basis such that it can be adjusted for?
11  A.   Potentially, yeah.  Potentially.
12  There are measures of sentiment and there are
13  measures -- there are implied risk premia
14  measures that can be accounted for and adjusted
15  for and incorporated into these valuation
16  models.
17  Q.   And if that's the case, can't a
18  weak-form efficiency test adjust for
19  time-varying risk premia?
20  A.   I've never seen it done.  That's
21  actually a pretty good suggestion.  I think
22  you -- I think someone might be well-advised to
23  do literature in that area.
24  Q.   But you haven't seen any literature
25  on that subject?

Page 697

Steven P. Feinstein, PhD, CFA

1
2   A.   Not as I sit here now, I don't
3   recall.  It's possible it might have been
4   another paper or that I'm just not thinking of
5   it right now.  It's possible that it's out
6   there.
7   Q.   But you're not aware of any
8   economist that's ever valued time-varying risk
9   premia?
10  A.   No.  No, I think they do.  There are
11  articles.  Yeah, I'm quite sure there are
12  articles that seek to identify changes in risk
13  preferences.  But relating it specifically to
14  show -- as I sit here now, I don't recall any
15  that related specifically to a finding of
16  serial correlation in prices.  I might be
17  wrong, as I sit here now.
18  Q.   As you sit here now --
19  A.   I don't have the bibliography
20  memorized.  It's a good research topic, so it's
21  likely that someone out there tackled it at
22  some point.  I just couldn't cite it for you.
23  Q.   Well, as you sit here now is
24  time-varying risk premia a problem associated
25  with the assessment of weak-form efficiency

Page 698

Steven P. Feinstein, PhD, CFA

1
2   markets or not?
3   A.   What they do is they disallow you
4   from concluding from a finding of serial
5   correlation that the market is weak-form
6   inefficient.
7   Q.   And you're just not aware of any
8   research that suggests that you can value
9   time-varying risk premia such that you can
10  adjust for it in a weak-form efficiency test?
11  A.   That's right.
12  Q.   And are you aware of any research
13  indicating that you can value time-varying risk
14  premia in other contexts?
15  A.   Yes.  I think there is -- there is
16  literature on assessing changing market
17  preferences for risk.
18  Q.   And what literature do you have in
19  mind, if any?
20  A.   I don't have it memorized.  I
21  couldn't cite it for you as I sit here now.  I
22  can certainly cite it for you when I get back
23  to my office and have my sources available.
24  Q.   Mr. Markovits will not allow me to
25  accompany you to your office.

Page 699

Steven P. Feinstein, PhD, CFA

1
2   MR. MARKOVITS:  If you ask nicely.
3   Q.   So we have to go based on your
4   memory here.
5   A.   Your question is, can I cite for you
6   the literature?  No.  Am I aware that there's
7   some literature?  Yeah.
8   Q.   Can you identify any author or any
9   publication?
10   A.   No, not now.
11   Q.   All right.
12   MR. MARKOVITS:  By the way, if you
13   do that study now, you have to give Jason
14   partial credit.
15   MR. FRANK:  At least a footnote.
16   MR. VOLPE:  Yes.  Put in a footnote.
17   That's what I was just going to say.
18   Q.   Okay.  Now, in a case -- strike
19   that.
20   So you understand that, in a
21   securities case, defendants are entitled to
22   attempt to rebut any presumption of price
23   impact.  Right?
24   A.   Yes.
25   Q.   Okay.  And in a case involving

Page 700

Steven P. Feinstein, PhD, CFA

1
2   materially false statements, does it make sense
3   to test the dates on which the statements were
4   made?
5   A.   It makes sense, but I don't think
6   that would be the end-all of the required
7   analysis.
8   Q.   What other dates -- and you
9   testified earlier that you think that someone
10   should test every date in the class period.  Is
11   that right?
12   A.   Well, if you could approve that a
13   piece of information had no price impact,
14   you've got to look at a lot of dates.
15   Q.   Well, let's use a simple
16   hypothetical.  An alleged lie on Monday,
17   allegedly the truth comes out on Friday.  You
18   would think that an expert trying to assess
19   market impact would test the dates Monday and
20   Friday.  Right?
21   A.   If it's known with certainty that
22   nothing relevant -- I mean, it would be an
23   assumption, not a conclusion, that nothing
24   relevant happened on Tuesday, Wednesday, and
25   Thursday.  But that's an assumption that would

Page 701

Steven P. Feinstein, PhD, CFA

1
2   have to be proved by whoever was trying to
3   assess that the information -- that the lie had
4   no impact on the press.  They would --
5   Q.   But is that --
6   A.   It would make sense to test Monday;
7   it would make sense to test Friday.  But if you
8   really want to prove that the lie had no
9   impact, you couldn't just assume that nothing
10   happened on Tuesday, Wednesday, and Thursday.
11   Q.   So if you see stock prices rise on
12   Wednesday, you should test that.  You see it
13   rise on Wednesday, and you'd want an expert to
14   do what?  Try to --
15   A.   Address -- address that it -- either
16   with reference to valuation principles or
17   reference to statistical testing.  Could be
18   either one.  Address that day and that price to
19   rule out that it had anything to do with the
20   alleged lie.
21   Q.   And if you wanted to argue that
22   there was price impact, what dates would you
23   look at?
24   A.   Well, that's an interesting thing.
25   You have an easier job.  You have an easier

Page 702

Steven P. Feinstein, PhD, CFA

1
2   job.  If you can prove that the price moved
3   when the lie was corrected, that establishes
4   it.  You don't have to also prove that there
5   was impact on Thursday and Wednesday and
6   Tuesday.  Proving that it had an impact on
7   Friday proves that it had an impact, so you
8   would look at Friday.  Friday would be the most
9   reasonable day to look at.  Monday would also
10   be reasonable, because there may be proof.
11   There may be evidence there.
12   If you stopped and there was no
13   impact on those two days, you had -- you would
14   not have proved it, but you'd be perfectly free
15   to also look at Tuesday, Wednesday, and
16   Thursday.
17   Q.   Now, take -- let's take our
18   hypothetical.  There's a complaint.  The
19   complaint alleges lie on Monday; truth came out
20   on Friday.  Okay?
21   What does one need to do to assess
22   whether or not there was a price impact of the
23   alleged lie on Friday?
24   A.   Lie -- the lie is on Monday; the
25   truth comes out on Friday?

Page 703

1         Steven P. Feinstein, PhD, CFA
2    Q.  Right.
3    A.  Well, you would have to see if
4 there -- well, you want to prove that there's
5 no price. You want to test whether or not
6 there was no price -- I'm getting confused
7 here.
8        What would you have to do in order
9 to -- can you please just repeat the question?
10    Q.  Sure.
11        The complaint alleges -- okay.
12 Let's take our hypothetical. There's a
13 complaint. The complaint alleges a lie on
14 Monday. Truth came out on Friday. What does
15 one need to do to assess whether or not there
16 was a price impact of the alleged lie on
17 Friday?
18    A.  Okay. So in your hypothetical, the
19 truth comes out on Friday?
20    Q.  That's the allegation.
21    A.  Okay. You'd want to test a number
22 of things. You'd want to see whether there was
23 any movement in the price whatsoever on Friday,
24 significant or otherwise. You'd want to see
25 whether the information, according to the

Page 704

1         Steven P. Feinstein, PhD, CFA
2 literature, the finance literature, all the
3 people that have studied price impacts before
4 us, whether that information is considered
5 material information. You'd want to see
6 whether the company ever represented that
7 information to be material information. You'd
8 want to see whether analysts have ever cited
9 that information as being material information,
10 relevant information, or arguments in their
11 valuation models. You would look at whether
12 that information reasonably has a role in
13 generally accepted valuation models.
14        Then you can also just empirically
15 examine whether, in fact, if there was a
16 statistically significant movement, can it be
17 explained entirely by other factors that are
18 unrelated to the lie.
19        Those are the things you'd have to
20 do -- those are the things you could do to
21 assess whether it did or did not have a price
22 impact.
23    Q.  Now, let's change our hypothetical a
24 little bit. The lie isn't an affirmative
25 statement. It is an omission.

Page 705

1         Steven P. Feinstein, PhD, CFA
2        So there's a complaint. The
3 allegation is that there is an omission on
4 Monday and the truth comes out on Friday. Does
5 that change your analysis?
6    A.  Well, if the burden is to prove that
7 there was no price impact, you would have to
8 show that the information was, according to all
9 those sources -- the company, finance
10 literature, analysts -- has no role in the
11 valuation of the security. Or you mean -- you
12 said there was an announcement about that lie
13 or you could also see there was no information
14 about that lie provided that day, no
15 information provided in any way about that lie
16 that came out on Friday. Either of those could
17 be used to prove no price impact.
18    Q.  So is it fair to say that in
19 assessing whether or not there's price impact,
20 one needs to look at the date on which the
21 truth allegedly came out and determine whether
22 or not that information actually was the
23 alleged truth or the allegedly concealed
24 information?
25    A.  That's one thing you'd look at.

Page 706

1         Steven P. Feinstein, PhD, CFA
2 You'd also look at whether the truth, by virtue
3 of it being the truth and by virtue of it
4 coming out had an impact on the stock price.
5 Maybe it had an impact on performance of the
6 company. I mean, maybe there wasn't a mere
7 corrective disclosure. Maybe it wasn't an
8 announcement that previously we lied and now
9 we're telling the truth. But maybe there are
10 developments that are disclosed on that Friday
11 that would -- that were surprising because
12 there had previously been a lie about it and it
13 wouldn't have been surprising had there not
14 been a lie about it. You'd have to look at
15 that, too. That's something you'd need to look
16 at.
17    Q.  Now, in this case, did you reach a
18 determination as to whether or not November 20,
19 2007, constituted a corrective disclosure date
20 or not?
21    A.  Let me be real careful and just make
22 sure that I'm going to use the same words now
23 that I used before.
24        I think there's a lot of evidence I
25 observed that would suggest that there was

56

Page 707

Steven P. Feinstein, PhD, CFA

1
2  price impact.  But my conclusion, my formal
3  conclusion is that Dr. Bajaj did not prove
4  price -- no price impact.
5       Q.   Okay.  So my question was a
6  little --
7       A.   He failed to prove no price impact.
8  I am not specifically saying there was.
9       Q.   Okay.  Let me re-ask my question,
10 and I want you to let me know whether you have
11 a different answer upon listening to it again.
12       Now, in this case, did you reach a
13 determination as to whether or not November 20,
14 2007, constituted a corrective disclosure date?
15       A.   How are you defining "corrective
16 disclosure date"?
17       Q.   Well, what do you understand the
18 phrase "corrective disclosure date" to mean?
19       A.   Well, it could mean a number of
20 things.  It could mean a date when previous
21 misunderstandings are -- about the company were
22 corrected, so that the information is
23 corrected.  So if the market was previously
24 misled to believe something, they -- their
25 understanding was correct.  So it could be a

Page 708

Steven P. Feinstein, PhD, CFA

1
2  correction of information.
3       It could be corrective of price
4  inflation where prices inflated on account of
5  misrepresentations and omissions, and then
6  something happens on that date that causes that
7  inflation to dissipate.
8       So those are two different things
9  that it could mean.  I did not draw a
10 conclusion that I presented in either report
11 that says that November 20th was a corrective
12 disclosure date.  It's essentially -- I'm
13 assuming the allegations for that purpose.
14       Q.   For the purposes of assessing price
15 impact, you assumed that plaintiffs'
16 allegations were true?
17       A.   Yes.  That there were
18 misrepresentations and omissions.  I observed
19 that there was negative news on November 20th
20 that did make the stock price go down.  That's
21 my conclusion.
22       Economic theory says -- now,
23 plaintiffs -- plaintiffs allege that the price
24 went down because of factors related to the
25 misrepresentations and omissions, and the

Page 709

Steven P. Feinstein, PhD, CFA

1
2  market would not have been as surprised and
3  that the price went down because of some
4  information that was disclosed that was
5  corrective, specifically corrective of prior
6  misrepresentations and omissions.
7       So the piece of that that's my own
8  conclusion is that the price went down on
9  November 20th specifically because of the
10 negative news, the negative company-specific
11 news.  But it's -- but I'm assuming from
12 plaintiffs' allegations that that news was
13 related to the misrepresentations and
14 omissions.
15       I mean, that's -- the assumption is
16 a reasonable one and that it's also supported
17 by economic theory.
18       Q.   So just so that I'm clear, you
19 assumed for the plaintiffs' allegations that
20 the news that came out on November 20, 2007,
21 was related to the misrepresentations and
22 omissions that plaintiffs had alleged in their
23 complaint?
24       A.   Actually, I didn't -- I mean, for
25 purposes of market efficiency, I didn't need to

Page 710

Steven P. Feinstein, PhD, CFA

1
2  do that.  But starting with that assumption,
3  that would tell me what Dr. Bajaj would have to
4  do -- he would have to disprove that in order
5  to prove no price impact.
6       Q.   Well, let me just be clear.  Let's
7  talk about price impact.
8       A.   Okay.
9       Q.   And you offered opinions on price
10 impact.  Correct?
11       A.   Well, no.  The opinion on price
12 impact is that Dr. Bajaj proved nothing.
13       Q.   Well, don't you say in your report
14 on page 7 -- 37, page 37, in subheading 1,
15 don't you say, "The statistically significant
16 decline in Freddie Mac stock in response to the
17 November" -- "to the 20 November 2007
18 disclosure event which Dr. Bajaj does not
19 dispute is direct evidence of price impact"?
20       A.   I do.  That's what I said before.  I
21 said there was plenty of evidence I observed in
22 the course of this analysis and writing this
23 report that is supportive of price impact, but
24 I didn't draw the conclusion that there was
25 price impact.  My conclusion is Dr. Bajaj

Page 711

1           Steven P. Feinstein, PhD, CFA
2     proved nothing with respect to price impact.
3         Q.    So -- and I'm -- just to be clear,
4     you are not offering an opinion in this case as
5     to whether or not the alleged
6     misrepresentations or omissions actually caused
7     price impact?
8         A.    My conclusions are on page 3, 4, 5,
9     and 6.  There's 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,
10    11, 12, 13 paragraphs.
11           The report speaks for itself.  But,
12    yeah.  The answer is yes.
13        Q.    Just in the event that there's any
14    confusion, your conclusions are laid out in a
15    section of your report entitled "Conclusions"
16    on page 3, which go to page 6.  And I should
17    not -- I shouldn't interpret headings elsewhere
18    in the report as your conclusions.  Is that
19    fair?
20        A.    Well, no.  The heading is that
21    there's plenty of evidence of price impact
22    which a valid test of price impact -- which
23    Dr. Bajaj purports to have conducted -- should
24    have addressed.  That's why that heading on
25    page 37 is there.

Page 712

1           Steven P. Feinstein, PhD, CFA
2           But I -- I don't -- I just want to
3     make sure.  I don't recall that I came right
4     out and said I found there to be price impact
5     and my conclusion is that there was price
6     impact.
7           My conclusion is that he did not
8     prove that there was no price impact.
9         Q.    And so, to be clear, your opinion
10    with respect to the price impact issues in the
11    case is solely that Dr. Bajaj has failed to
12    establish a lack of price impact.  Is that
13    correct?
14        A.    Right.
15        Q.    You are not --
16        A.    Well, no, no.  And that he failed to
17    address direct evidence of price impact
18    appropriately.
19        Q.    Okay.  But you are not offering an
20    opinion that the alleged misrepresentations or
21    omissions in this case actually resulted in
22    price impact.  Is that right?
23        A.    That's a loss causation argument, a
24    loss causation analysis which I have not yet
25    conducted.

Page 713

1           Steven P. Feinstein, PhD, CFA
2         Q.    You're not opining that the alleged
3     misrepresentations or omissions caused price
4     impact.  Right?
5           At this stage.
6         A.    You said concluding -- I have not --
7     I am not offering a conclusion at this stage,
8     right, at this stage, that there was loss, that
9     there was price impact.
10          What I am concluding is that he did
11    not prove no price impact.  He looked at some
12    areas related to price impact but simply wasn't
13    comprehensive enough to rule it out.  And he
14    didn't deal appropriately with the direct
15    evidence of price impact.
16        Q.    And when you say "direct evidence of
17    price impact," what are you referring to?
18        A.    The company announced a $2 billion
19    loss on November 20, 2007, and they provided --
20    you know, in explaining where that $2 billion
21    loss came from, they talked about their
22    exposure to subprime mortgages, their exposure
23    to nontraditional risky mortgages.
24          The decline that occurred on that
25    day that was clearly statistically significant,

Page 714

1           Steven P. Feinstein, PhD, CFA
2     indicating that it was caused by
3     company-specific news, is direct evidence of
4     price impact.  I mean, the information that was
5     available that day is that it had a lot to do
6     with the allegations of representations and
7     omissions, the substance of those allegations.
8     That's direct evidence.
9           That's what I mean.  The drop.  The
10    allegation that the drop was caused by what was
11    previously -- at least in part, by what was
12    previously concealed from investors.  It has to
13    be dealt with appropriately, and he didn't deal
14    with it appropriately.  He kind of brushed it
15    off.
16        Q.    I'm showing you a document that's
17    previously been marked as Defendant's
18    Exhibit 30.
19          Defendant's Exhibit 30 is the third
20    amended complaint in this case.  Have you ever
21    seen Defendant's Exhibit 30 before?
22        A.    Yes.
23        Q.    Okay.  Have you read it?
24        A.    Yes.
25        Q.    Okay.  I want to draw your attention

Page 715

1    Steven P. Feinstein, PhD, CFA
2  to paragraph 2 of the third amended complaint.
3      Do you see paragraph 2?
4      A.  Yes.
5      Q.  Paragraph 2 says, "Throughout the
6  class period, defendants made a series of
7  materially false and misleading public
8  statements relating to, among other things:
9  1.  Its exposure to or risk of loss from
10  subprime mortgage loans and other
11  nontraditional high-risk mortgages, including
12  Alt-A mortgages (a mortgage industry term to
13  describe reduced documentation/ higher credit
14  risk loans);
15  2.  Its underwriting guidelines and defendants
16  adherence to those guidelines;
17  3.  Its loan analysis software and fraud
18  detection systems;
19  4.  Its risk management measures and its risk
20  management performance;
21  and, 5, its capital position."
22  Do you see that?
23      A.  I do.
24      Q.  Okay.  So is it your understanding
25  that plaintiffs have alleged that defendants

Page 716

1    Steven P. Feinstein, PhD, CFA
2  made a series of materially false and
3  misleading public statements about these five
4  different subjects?
5      A.  No.  It mean -- you said is it my
6  understanding -- it is my understanding that
7  this is what they have done.  Yeah, that that's
8  what plaintiffs are alleging.
9      Q.  Okay.  Now, in --
10      A.  I'm not independently verifying that
11  is my point.
12      Q.  I understand.  That's your
13  understanding of their allegations?
14      A.  Right.
15      Q.  All right.  And did you look at the
16  company's disclosures on November 20, 2007?
17      A.  Certainly.
18      Q.  You looked at the press release?
19      A.  Absolutely.  The press release, the
20  information statement, and the conference call.
21      Q.  And the information statement and
22  the press release and the conference call, were
23  there any statements in there regarding the
24  company's loan analysis software and fraud
25  detection systems?

Page 717

1    Steven P. Feinstein, PhD, CFA
2      A.  I don't recall that there was.
3      Q.  Were there --
4      A.  I mean -- I mean -- I don't want to
5  say that none -- the point is not explicitly,
6  but plaintiffs' allegations are that the
7  failures and the deficiencies in that area is
8  what caused the negative news that the company
9  disclosed that day.
10      Q.  For the purposes of your price
11  impact work, you assumed those allegations to
12  be true?
13      A.  No, that's not -- that's not
14  accurate.  I didn't need to, but I did -- I did
15  seek to determine whether Dr. Bajaj dealt with
16  that linkage, and he simply did not.  There's a
17  linkage there and he simply did not deal with
18  the possibility that it was the failures in the
19  company's risk control and fraud detection and
20  risk analysis systems that led to the
21  $2 billion loss, the cut in the dividend, and
22  the vulnerable capital position that was
23  announced that day, November 20th.
24      Q.  Let me show you a document that has
25  been previously marked as Defendant's Exhibit

Page 718

1    Steven P. Feinstein, PhD, CFA
2  No. 27.  Defendant's Exhibit No. 27 is the
3  company's annual report from 2006.
4      Have you ever seen this document
5  before?
6      A.  Yes.
7      Q.  Let me turn your attention to
8  page 69.
9      A.  Okay.
10      Q.  Do you see on page 69 it says --
11  actually, first, let me turn your attention --
12  yes.  Let's stick on page 69.
13      On page 69, do you see where it
14  says, at the top of the page, "During the past
15  several years, there was a rapid proliferation
16  of nontraditional mortgage product types
17  designed to address a variety of borrower and
18  lender needs, including issues of affordability
19  and reduced income documentation requirements."
20      Do you see that?
21      A.  Yes.
22      Q.  Okay.  And by the way, can you turn
23  to the front of the document.
24      Do you know when this document was
25  made public?

Page 719

Steven P. Feinstein, PhD, CFA

1
2    A.   March 23, 2007.
3    Q.   So this was in the middle of the
4  proposed class period here.  Is that your
5  understanding?
6    A.   Correct.
7    Q.   Okay.  Now, turning back to page 69,
8  it says, "While features of these products have
9  been on the market for some time, their
10  prevalence in the market and our total mortgage
11  portfolio increased in 2006 and 2005."
12       Do you see that?
13    A.   Yes.
14    Q.   Did you understand that Freddie Mac
15  had disclosed to the market that the prevalence
16  of nontraditional mortgage product types in its
17  portfolio increased in 2005 and in 2006?
18    A.   Oh, I knew about this language, but
19  I also know --
20       MR. MARKOVITS:  I'm going to object.
21  This is well beyond the scope of his
22  rebuttal report.  There's no link between
23  any opinion he's given in his rebuttal
24  report and these questions.
25       MR. FRANK:  There is a direct link

Page 720

Steven P. Feinstein, PhD, CFA

1
2  if you read his rebuttal report and in
3  particular the sections on price impact.
4       MR. MARKOVITS:  No.  Because he's --
5  he's assuming, just as Dr. Bajaj did, for
6  the purpose of his analysis, the truth of
7  the allegations.
8       Dr. Bajaj, if you recall, testified
9  that for the purposes of price impact, he
10  assumed the truth of the allegations and
11  misrepresentations and omissions.  He was
12  not opining whether the non -- the extent
13  of the exposure to nontraditional mortgages
14  was appropriately disclosed or was not,
15  just like Dr. Feinstein did not in his
16  rebuttal report and is not today opining
17  whether those disclosures were made or were
18  not made.
19       He's assuming, just as Dr. Bajaj did
20  for price impact, because discovery is not
21  closed, that the allegations are true.  And
22  then the only question is, assuming the
23  truth of the allegations and knowing that
24  the stock declined 20 percent on
25  November 20th, can you rule out price

Page 721

Steven P. Feinstein, PhD, CFA

1
2  impact?
3       That is the burden of the
4  defendants.  It's not the burden of the
5  plaintiffs to prove price impact at this
6  time in time.  It's not the burden of
7  Dr. Feinstein to opine as to the truth of
8  the allegations in the complaint.
9       So there is no link between this
10  truth on the market defense that you try to
11  keep putting forward in the briefs.  Truth
12  on the market defense has no place at this
13  stage of the case, and it certainly has no
14  place in this deposition because
15  Dr. Feinstein is not opining as to the
16  truth of the allegations of the complaint
17  for the purposes of his rebuttal report.
18  BY MR. FRANK:
19    Q.   Dr. Feinstein, allow me to turn your
20  attention to paragraph 130 of your rebuttal
21  report.  So leave the annual report open for a
22  second and just turn back to your rebuttal
23  report and turn to paragraph 130, please.  It's
24  on page 47 of 70.
25       Now, do you see there in

Page 722

Steven P. Feinstein, PhD, CFA

1
2  paragraph 130, you wrote, "The company's
3  disclosures and its information statement on 20
4  November 2007 establish the connection between
5  exposure to subprime and nontraditional
6  mortgage products and the company's reported
7  poor results and weakened capital position."
8       Do you see that?
9    A.   Yes.
10    Q.   And then you say, "The following
11  excerpts demonstrate this link."
12       Do you see that?
13    A.   Yes.
14    Q.   And then you identify a series of --
15  I guess it's six excerpts from the company's
16  November 20th supplement to its information
17  statement, which was essentially its
18  third-quarter report.  Right?
19    A.   Correct.
20    Q.   Okay.  And you cite those in order
21  to establish a link between exposure to
22  subprime and nontraditional mortgage products
23  and the company's results.  Is that right?
24    A.   Yes, in rebuttal to Dr. Bajaj who
25  said there was no link.

Page 723

1         Steven P. Feinstein, PhD, CFA
2         MR. MARKOVITS:  Again, I'm going to
3   object.  You're either confused or
4   attempting to confuse the witness, because
5   neither in his rebuttal report nor in his
6   testimony has he ever said that there
7   has -- there was misrepresented exposure to
8   nontraditional loans.  That is the
9   allegation of the complaint.
10        Dr. Bajaj assumed that to be true
11  for the purposes of his price impact
12  analysis.  Similarly, Dr. Feinstein assumes
13  that it would be true for his analysis of
14  Dr. Bajaj's analysis.
15        The only question is, is there a
16  link?  This says on paragraph 130 that
17  there's a connection between exposure to
18  subprime and nontraditional mortgages and
19  the loss.
20        The question that will have to be
21  determined at a later date is did Freddie
22  Mac lie about the extent of its exposure or
23  was it telling the truth about the extent
24  of the exposure?  But the question of
25  whether there was a link between what

Page 724

1         Steven P. Feinstein, PhD, CFA
2   happened on November 20th and its exposure
3   is set out here.  That has nothing to do
4   with whether Dr. Feinstein is opining in
5   any way, shape, or form that Freddie Mac
6   misrepresented its exposure to
7   nontraditional loan products or not.
8         So, again, you're either confused or
9   attempting to confuse the witness.
10        MR. FRANK:  Mr. Markovits, we
11  disagree.  I'm always open to the
12  possibility that I'm confused.  I'm not
13  attempting to confuse the witness.
14        MR. MARKOVITS:  All right.  Then
15  I'll take it that you're confused.
16        MR. FRANK:  And I will represent to
17  you that I do not believe I am confused.
18        But what I'd like to do, because
19  we're running out of tape -- the recording
20  device shuts off soon -- is why don't we
21  take a brief break here and we will resume.
22        But I reserve all rights to resume
23  questioning along these lines, because I
24  don't believe I'm confused.
25        THE VIDEOGRAPHER:  The time now is

Page 725

1         Steven P. Feinstein, PhD, CFA
2   15:23.  We're off the record.
3         (Recess taken from 3:23 to 3:42
4   p.m.)
5         THE VIDEOGRAPHER:  The time now is
6   15:42.  We're on the record.
7   BY MR. FRANK:
8         Q.   All right.  I will short-circuit
9   this for Mr. Markovits' sake.
10        You reviewed the 2006 annual report.
11  Is that right?
12        A.   Yes.
13        Q.   Did you review page 69?
14        A.   Yes.
15        Q.   Any recollection of doing that?
16        A.   Yes.
17        Q.   Okay.  You are aware that Freddie
18  Mac was buying more nontraditional mortgage
19  products in 2005 and 2006?
20        A.   I'm aware that the allegation is
21  that the disclosure was not full.
22        Q.   Well, before we get to the
23  allegation, were you aware that Freddie Mac
24  disclosed that it was buying more
25  nontraditional mortgage products in 2005 and

Page 726

1         Steven P. Feinstein, PhD, CFA
2   2006?
3         A.   Can you just direct me to that line?
4         Q.   Sure.  It's the second sentence on
5   the top of the page.  "While features of these
6   products have been on the market for some time,
7   their prevalence in the market and our total
8   mortgage portfolio increased in 2006 and 2005."
9         A.   Yes.
10        Q.   Okay.
11        A.   Yes.
12        Q.   And were you aware that Freddie Mac
13  disclosed that it expected those products to
14  default more often?
15        MR. MARKOVITS:  Again, I'm going to
16  object this is going beyond the scope of
17  his rebuttal report and has no connection
18  to his opinions.
19        But go ahead.
20        A.   That's what they said in that
21  paragraph.
22        Q.   And do you see below on the page
23  there was a section on subprime loans?
24        A.   Yes.
25        Q.   You previously read this disclosure

Page 727

1    Steven P. Feinstein, PhD, CFA
2 relating to subprime loans?
3    A.  I did.
4    Q.   And were you aware that Freddie Mac
5 disclosed that on December 31, 2006, and 2005,
6 we held approximately 124 billion and 139
7 billion, respectively, of nonagency
8 mortgage-related securities backed by subprime
9 loans?
10    A.  That's what they wrote.
11    Q.   All right. Now, did you
12 independently reach a conclusion, based on your
13 expertise in economics, that disclosures on
14 November 20, 2007, corrected earlier
15 misrepresentations or omissions concerning the
16 subjects referenced in paragraph 2 of the third
17 amended complaint that we looked at before the
18 break?
19    A.   Almost.  The answer is -- would be
20 no to specifically what you said.  But I
21 reached a conclusion that they were related,
22 that the disclosures and the material -- and
23 the risk that was materialized were related to
24 the allegations, and that they certainly may
25 have, that they may have been corrective

Page 728

1    Steven P. Feinstein, PhD, CFA
2 disclosures or that -- of the alleged
3 misrepresentations and omissions.
4    Q.   So, just so that the record is
5 clear, you reached a conclusion that the
6 disclosures may have been corrective
7 disclosures.  Is that right?
8    A.   That's right.  That there certainly
9 was a connection between the factors that the
10 company was attributing the loss and the other
11 negative news to; and the alleged
12 misrepresentations and omissions; and that that
13 was not fully investigated or appropriately
14 investigated by Dr. Bajaj, that connection; and
15 did not rule out the factors the company
16 attributed its loss and dividend cut and
17 capital raise to.  He did not appropriately
18 rule out that those were related to the
19 allegations.
20    Q.   Now, if he had appropriately ruled
21 out that those -- strike that.
22        If Dr. Bajaj had appropriately ruled
23 out that the announced loss on November 20,
24 2007, were related to the allegations, would
25 that have been sufficient to establish a lack

Page 729

1    Steven P. Feinstein, PhD, CFA
2 of price impact?
3    A.   If he could have proved that none
4 of -- none, not any of the loss that occurred
5 that day, and not any of the vulnerable capital
6 position that was announced that day, and not
7 any of the dividend cut that was announced that
8 day, had anything to do with what plaintiffs
9 are alleging was concealed from the public,
10 that would have established -- at least with
11 respect to those three elements, that would
12 have established that there was no price impact
13 on that day.
14        So, in other words, if he could have
15 established that nothing -- that none of
16 that -- none of that negative news was caused
17 by anything to do with the allegations, then at
18 least for that day, he would have established
19 no price impact.
20    Q.   And it's not your opinion that the
21 negative news caused price impact -- strike
22 that.
23        It's not your opinion that the
24 alleged misreps or omissions caused price
25 impact on that day, but rather it's your

Page 730

1    Steven P. Feinstein, PhD, CFA
2 opinion that Dr. Bajaj didn't do enough to
3 establish that they didn't.  Is that right?
4    A.   I don't think he did anything,
5 really.  He didn't -- he certainly did not --
6 yeah.  He did not do enough.  He did very
7 little.  But he certainly did not do enough to
8 establish that the loss and the dividend cut
9 and the vulnerable capital position and the
10 actual affirmative disclosures of specific
11 facts that are alleged to have been -- that
12 are -- that were information that is alleged to
13 have been concealed from the public earlier.
14 He did not establish that those things had
15 no -- did not cause the loss, did not cause the
16 factors that caused the loss.
17    Q.   I think you jumped ahead on me, so
18 let me try again.  I'll try in a different way.
19        With respect to price impact, you
20 have reached a conclusion.  Is that correct?
21    A.   The conclusion is -- yes, I have
22 reached a conclusion.
23    Q.   Let's take it in pieces.
24    A.   Okay.
25    Q.   You've reached a conclusion.

Page 731

1           Steven P. Feinstein, PhD, CFA
2    Correct?
3        A.   Yes.
4        Q.   The conclusion you reached was that
5    Dr. Bajaj did not do enough to establish a lack
6    of price impact.  Is that correct?
7        A.   Well, he didn't do it.  He didn't
8    establish no price impact.
9        Q.   Okay.
10       A.   His analysis was just not
11   sufficient.  And in the course of arriving at
12   that conclusion, there were findings of
13   linkages that he dismissed of direct evidence
14   of price impact that he simply disregarded.
15       Q.   Now, did you reach a conclusion that
16   there was evidence of -- that the
17   misrepresentations and omissions affirmatively
18   caused price impact?
19       A.   Assuming the truth?
20       Q.   I'm not asking you about
21   assumptions.  I'm asking about conclusions.
22       A.   Well, I reached a conclusion there
23   was direct evidence of price impact, but I
24   didn't draw the conclusion that there was price
25   impact --

Page 732

1           Steven P. Feinstein, PhD, CFA
2        Q.   Now --
3        A.   -- because it wasn't within the
4    scope of -- that wasn't my burden.  It wasn't
5    in the scope of my engagement.
6        Q.   In connection with your engagement,
7    did any attorney ask you to make any
8    assumptions regarding price impact?
9        A.   Yes.
10       Q.   What were you asked to assume?
11       A.   That the allegations were true, that
12   there had not been full prior -- prior full and
13   appropriate disclosure about those issues that
14   we earlier addressed, that are written in the
15   complaint.
16       Q.   Were you asked to assume that all of
17   the allegations in the third amended complaint
18   were true or only that some of the allegations
19   in the third amended complaint were true?
20       A.   I would have to say some.  The
21   allegations, I mean, I believe the complaint
22   mentions market efficiency.  I wasn't asked to
23   assume that, of course.  I was asked to assume
24   the allegations with respect to
25   misrepresentations and omissions were true.

Page 733

1           Steven P. Feinstein, PhD, CFA
2        Q.   Okay.  So we've just identified one
3    subset of allegations that you weren't asked to
4    assume were true, and that is market efficiency
5    allegations.  Is that right?
6        A.   Correct.
7        Q.   Were there any other allegations
8    that you weren't supposed to assume were true?
9        A.   The only assumptions I was asked to
10   assume were true, and that was --
11       Q.   I'm going to stop you just because
12   you misspoke.  You said the only assumptions
13   that you were asked to assume.  I think you
14   meant --
15       A.   The only allegations that I was
16   asked to assume true --
17       Q.   The record's a mess.  The record's a
18   mess, so let me clean it up.
19            What allegations were you asked to
20   assume were true?
21       A.   That the misrepresentations and
22   omissions in those five categories that are
23   spelled out in the early part of the complaint
24   were, in fact, misrepresentations and
25   omissions, that that actually happened, that

Page 734

1           Steven P. Feinstein, PhD, CFA
2    there were misrepresentations and omissions
3    such that the market wasn't appropriately
4    informed about things like exposure to
5    nontraditional risky mortgages and the
6    company's ability to detect fraud and adhere
7    to -- and the company's adherence to
8    underwriting those sorts of things and its
9    vulnerability with respect to capital position.
10            I was asked to assume that the
11   misrepresentations and omissions such that the
12   market wasn't fully informed about those issues
13   was true, that it was -- that it was true that
14   there were misrepresentations and omissions
15   about those issues.
16       Q.   Were you asked to assume that any
17   other allegations were true?
18       A.   No.
19       Q.   In connection with your work on
20   price impact, did counsel provide to you any
21   facts on which you were asked to rely?
22       A.   What do you mean, provide facts?
23       Q.   Well, did they provide to you any
24   documents that they asked you to rely upon?
25       A.   They provided documents that I

Page 735

```
1                Steven P. Feinstein, PhD, CFA
2    requested.  They provided documents, but these
3    are documents that I had requested.
4        Q.   And I want to be clear, Doctor.
5             The federal rules, they allow me to
6    inquire about assumptions you were asked to
7    make and about facts that they provided to you,
8    that they asked you to rely upon.  So I'm not
9    trying to -- I'm not trying to get into
10   communications between you and counsel, but I'm
11   just trying -- I'm just trying to understand
12   those two categories.
13            We talked about assumptions.  So now
14   let's talk about facts for a second.  Did they
15   share with you verbally any facts that -- on
16   which they asked you to rely?
17       A.   They didn't ask me to rely on any
18   facts, no.  It was up to me to choose whether
19   to rely on facts or not.
20       Q.   And they provided you documents at
21   your request.  Is that right?
22       A.   Yes.
23       Q.   And the documents that you
24   considered, you listed at the end of your
25   report.  Is that right?
```

Page 736

```
1                Steven P. Feinstein, PhD, CFA
2        A.   Yes.  Yes.
3        Q.   Okay.  Now, you reviewed the Q3 2007
4    information statement.  Is that right?
5        A.   Yes.
6        Q.   And I notice that in your report,
7    you note that the terms "subprime" and
8    "nontraditional" appear 51 and 26 times,
9    respectively, in that report.  Do you remember
10   doing an analysis like that?
11       A.   Right.  Because Dr. Bajaj said that
12   there was no mention, and I just wanted to show
13   that there was mention of those terms.
14       Q.   I think Dr. Bajaj said there was no
15   mention of those terms in the press release.
16   Is that right?
17       A.   Right.  But that's -- that's a
18   half-truth.  I mean, if the information
19   releases that day was the formal information
20   release, information statement, the conference
21   call and the press release, to say that there's
22   no mention of it in the press release is not
23   even a half-truth.  It's a one-third truth.
24       Q.   Well, it was actually technically
25   true that there were no mention of those terms
```

Page 737

```
1                Steven P. Feinstein, PhD, CFA
2    in the press release.  Right?
3        A.   A half-truth is technically true,
4    but it's still a half-truth.
5        Q.   I would think a half-truth is only
6    half true.
7             MR. MARKOVITS:  There's a proverb:
8    "A half-truth is a whole lie."  I can send
9        you that proverb.
10       Q.   So your counsel has just established
11   that half-true isn't true at all.
12            MR. GOLDFARB:  Only for a securities
13       litigation lawsuit.
14       A.   Well, the point is that, you know --
15       Q.   There's no question pending, Doctor.
16       A.   -- he's trying to make a point that
17   it had nothing -- that the announcements had
18   nothing to do with subprime, and he pointed to
19   only one of the three pieces that came -- of
20   disclosures, venues that came -- that happened
21   that day.
22       Q.   Well, do you know how many times in
23   Freddie Mac's second-quarter 2007 supplement to
24   its information statement the terms "subprime"
25   and "nontraditional" were used?
```

Page 738

```
1                Steven P. Feinstein, PhD, CFA
2        A.   No.
3        Q.   Did you run that analysis?
4        A.   No.
5        Q.   Why not?
6        A.   That's not what I was responding.  I
7    mean, this is a rebuttal report.  I was
8    responding to Dr. Bajaj.  He didn't say there
9    was no mention on that day, so I didn't need to
10   check it.
11       Q.   It didn't seem reasonable for you --
12   for Dr. Bajaj to assume that if subprime or
13   nontraditional mortgages were a cause of the
14   stock price drop on November 20th, that they
15   would get mentioned in the November 20th press
16   release?
17       A.   It was reasonable that if he was
18   going to cite to that as evidence, then he
19   would have or should have been more
20   comprehensive and not make it look like there
21   was no mention that day of subprime.  There was
22   plenty of mention of subprime that day.
23       Q.   You don't think that the mere fact
24   that the term appeared in the supplement to the
25   information statement's actually indicative of
```

Page 739

1 Steven P. Feinstein, PhD, CFA
2 a connection between the alleged fraud and the
3 stock price drop that day, do you?
4 A. I don't. But that's the -- I was
5 responding to the argument that he constructed.
6 He's the one that mentioned or that talked
7 about -- mentioned whether something appeared,
8 whether words appeared.
9 MR. MARKOVITS: Keep crossing them
10 out, Jason. Keep going.
11 Q. Now, turn to page 50 of your own
12 report, please.
13 A. Bottom page 50 or top page 50?
14 Q. So -- I apologize. Turn to
15 paragraph 50.
16 Now -- well, strike that. I believe
17 I asked you about that already.
18 Turn to paragraph 52 just below.
19 Now, this is a section of your report -- if you
20 look just above paragraph 52, you'll see a
21 subheading where you write, "The z-test is a
22 widely used statistical test that has been used
23 in literature and accepted by courts as
24 demonstrative of market efficiency."
25 Do you see that?

Page 740

1 Steven P. Feinstein, PhD, CFA
2 A. In 52?
3 Q. Above 52 there's a heading.
4 A. Yes.
5 Q. Do you see the heading?
6 A. Yes. Yes.
7 Q. Okay. And now, when you wrote it's
8 been used in literature, are you referring to
9 the articles that you identify below in this
10 section?
11 A. No. No, I was referring to -- well,
12 the z-test is used in a lot of -- in the
13 literature in a lot of places. But as -- for
14 testing market efficiency, it's in the FDT
15 test -- article.
16 Q. So in this section that's entitled
17 "The z-test is a widely used statistical test
18 that has been used in literature and accepted
19 by courts as demonstrative of market
20 efficiency," you refer to an amicus brief in
21 paragraph 53, several cases in paragraph 54 --
22 A. Right.
23 Q. -- and a Hartzmark article in
24 paragraph 55?
25 A. Well, the Hartzmark article talks

Page 741

1 Steven P. Feinstein, PhD, CFA
2 about the collective test, which is very
3 similar to the z-test, but they use a
4 different -- they use the bootstrap instead of
5 the actual z-test. But it's still a collective
6 test that compares high-information days with
7 low-information days to see if the price
8 dynamics are the same.
9 Q. Well, let's talk about the Hartzmark
10 article for a second.
11 (Exhibit 272 is marked for
12 identification.)
13 BY MR. FRANK:
14 Q. I'm showing you a document that's
15 been marked as Exhibit 272. Is Exhibit 272 the
16 Hartzmark article that you reference in your
17 rebuttal report?
18 A. I think -- no. No. Oh, yeah. Yes,
19 it is. On the cover it just says Seyhun, but
20 on the inside it does say Hartzmark and Seyhun.
21 So it is, yeah.
22 Q. This is the same article?
23 A. This doesn't seem to be the
24 published version. Well, maybe I'm wrong.
25 No, this is a working paper at,

Page 742

1 Steven P. Feinstein, PhD, CFA
2 what, University of Michigan, and the version
3 that's cited is the published version. I would
4 imagine they're similar.
5 Q. They both bear the same title.
6 Correct?
7 A. Yes.
8 Q. The title of the Exhibit 272 is,
9 "The Curious Incident of the Dog That Didn't
10 Bark and Establishing Effect-and-Cause in Class
11 Action Securities Litigation."
12 Is that right?
13 A. Yes.
14 Q. In your report, you cite a Virginia
15 Law & Business Review article entitled "The
16 Curious Incident of the Dog That Didn't Bark in
17 Establishing Cause-and-Effect in Class Action
18 Securities Litigation."
19 Is that right?
20 A. Right.
21 Q. And they're both 2011 documents.
22 Right?
23 A. Yes.
24 Q. Okay. Now, is this the Hartzmark
25 article that you referred to in the first day

Page 743

```
 1          Steven P. Feinstein, PhD, CFA
 2    of your deposition testimony?
 3          A.   It's the unpublished version of it.
 4          Q.   Now, this Hartzmark article actually
 5    doesn't discuss a z-test.  Is that right?
 6          A.    Well, it depends whether you mean by
 7    the z-test the actual statistical test that's
 8    used to compare the news and the non-news
 9    samples.  That would be accurate.  But if you
10    mean by the z-test a collective test -- let me
11    try to say this correctly.
12          The z-test is a statistical test
13    that's used for testing market efficiency and a
14    wide variety of other applications.  So that's
15    statistical tests they don't use, but people
16    have been talking about a z-test as the
17    collective test of comparing news and non-news
18    days, and in that sense it is an article about
19    that.
20          They don't use the same statistical
21    test.  They use a bootstrap test, which I also
22    ran.
23          Q.   Okay.  So this article discusses the
24    bootstrap test.  Is that correct?
25          A.   This article discusses a lot of
```

Page 744

```
 1          Steven P. Feinstein, PhD, CFA
 2    things.  It discusses how to -- you know,
 3    how -- why comparing news days to non-news days
 4    establishes market efficiency when there's
 5    different price dynamics.  And the logistics of
 6    how they establish that there's a significant
 7    difference is with a bootstrap statistical
 8    process rather than a z -- statistical z-test.
 9          Q.   They discuss a collective test.  The
10    collective test they discuss is not the z-test?
11          A.   I wouldn't even say it that way.
12    Fair enough.  I mean, it's -- all it is when
13    you get -- everything's the same about the
14    z-test and the test they use until you get to
15    how to statistically establish that the two
16    samples are different.  Instead of using the
17    statistical z-test, they use a bootstrap test.
18    I also used a bootstrap test, and it's in the
19    rebuttal report.
20          Q.   I understand.  But I'm just trying
21    to cut to the chase.
22          This is an article that discusses
23    the bootstrap test, not the z-test.  Is that
24    right?
25          A.   It discusses a collective test for
```

Page 745

```
 1          Steven P. Feinstein, PhD, CFA
 2    market efficiency and employs a bootstrap test
 3    for distinguishing between the two samples.
 4          Q.   Okay.  Now, in terms of the amicus
 5    brief that you cite in paragraph 53, that's an
 6    amicus brief that you coauthored.  Is that
 7    right?
 8          A.   Right.
 9          Q.   Now, are you aware of any other
10    literature in which the z-test is used other
11    than -- well, strike that.
12          Are you aware of any statistical --
13    strike that.
14          Are you aware of any literature in
15    which the z-test is used in connection with
16    establishing market efficiency that isn't set
17    forth in this section of your report, other
18    than the FDT article?
19          A.   Well, the FDT article, the
20    Hartzmark/Seyhun, the amicus brief court
21    opinions -- no.  Besides those, no.
22          Q.   Okay.  Well, let's just stick with
23    academic literature for a moment.
24          So in terms of academic literature,
25    are you aware of any article where the z-test
```

Page 746

```
 1          Steven P. Feinstein, PhD, CFA
 2    is discussed in connection with assessing
 3    market efficiency other than the FDT article?
 4          A.   The -- what we're talking about here
 5    is an application of a widely used statistical
 6    test.  You say other than.  I mean, there are
 7    two articles -- well, there's the FDT article
 8    that specifically applies this well-known,
 9    commonly used statistical test to the realm of
10    market efficiency.  And aside from that one, I
11    do not know of other published articles about
12    it -- about it in the context of market
13    efficiency.
14          Q.   Okay.  Now, let me turn your
15    attention to your defense in your rebuttal
16    report of your event selection methodology.
17    This, I believe, starts on paragraph 83, that
18    is page 32 of 70 of your rebuttal report.
19          A.   Okay.
20          Q.   Now, if you look at paragraph 86,
21    you write -- you're responding to Dr. Bajaj's
22    argument that your selection process was
23    unprecedented and speculative.  And you
24    write -- well, more specifically at the very
25    end of the paragraph 85, you write, "Dr. Bajaj
```

## Page 747

Steven P. Feinstein, PhD, CFA

1   asserts that my 'method of selecting news days
2   renders my test highly speculative' and that
3   there is 'no scientific authority to support
4   the notion that my selection criteria is
5   reliable.'"
6
7            And you respond in paragraph 8 and
8   following, you write in all caps, "Dr. Bajaj is
9   wrong. He is either unaware of or disregards
10  the numerous academic papers in the finance
11  literature that identify events based on news
12  appearing in the Wall Street Journal and the
13  New York Times. This event selection
14  methodology is well supported and widely used.
15  For example," and you cite a number of what
16  appear to be articles.
17           Do you see that?
18      A.   Yes.
19      Q.   Now, in the first one, it says the
20  usual -- "The usual published sources, for
21  example, the Wall Street Journal or the New
22  York Times, are used to select the announcement
23  dates."
24           Do you see that?
25      A.   Yes.

## Page 748

Steven P. Feinstein, PhD, CFA

1      Q.   Now, in that article, was the Wall
2   Street Journal and the New York Times used to
3   select dates randomly or were there a
4   particular kind of information that the Wall
5   Street Journal or the New York Times was used
6   to identify?
7      A.   Well, the authors relied on the Wall
8   Street Journal and the New York Times to
9   identify announcement dates.
10     Q.   So isn't that case different from
11  this case insofar as there was a particular
12  kind of news that the authors were looking for?
13     A.   Well, the connection is that they
14  relied on the Wall Street Journal and the New
15  York Times for identifying events.
16     Q.   And -- well --
17     A.   That's common practice.
18     Q.   They were looking for a particular
19  kind of event in that circumstance. Right?
20     A.   So was I. I was looking for events
21  that had important news with respect to Freddie
22  Mac.
23     Q.   Well, you had never seen your
24  approach used, done in -- strike that.

## Page 749

Steven P. Feinstein, PhD, CFA

1            This is the first time you ever used
2   that approach. Right?
3      A.   Well, there were reasons for it,
4   which I explained in the last deposition.
5      Q.   My question was a little bit
6   different.
7      A.   I never used exactly that
8   methodology. But the methodology -- you know,
9   the facts and circumstances of the case have to
10  be considered in applying the methodology,
11  applying generally accepted, widely used tools.
12  In this case, those tools had to be applied
13  this way.
14     Q.   Had you ever seen a methodology used
15  before where the newspaper dates were not the
16  dates used to identify the events?
17     A.   Yes. That's -- well, I did that
18  way. I mean, because if we're looking for days
19  when there was -- I used the New York Times and
20  the Wall Street Journal as screens to identify
21  when important news came out. But the day of
22  the publication is not the day that should be
23  tested. It should be the day of the event
24  that's reported in the article.

## Page 750

Steven P. Feinstein, PhD, CFA

1            So they're the screens that
2   basically attest that something important
3   happened with respect to Freddie Mac. It would
4   be wrong to test the publication date rather
5   than the event date.
6      Q.   Weren't you looking for dates that
7   had a higher information flow?
8      A.   Yeah. But the higher information
9   flow, I mean, these are papers that are usually
10  published the next morning after -- these are
11  papers that are published in the morning. If
12  the event happened on a Wednesday, they will be
13  reported Thursday morning.
14           The information flow will be from a
15  variety of sources -- television, the internet.
16  It will affect the market on Wednesday.
17           The Thursday publication in the Wall
18  Street Journal and the New York Times, its
19  purpose is to say that this is an important
20  day. That the effect of these publications
21  each identified that event as being an
22  important event is what the screen -- is how I
23  used those publications for the screen.
24     Q.   Are you aware of any literature that

Page 751

Steven P. Feinstein, PhD, CFA

1  supports the notion that the news that day
2  should be used is not the date of the
3  publication of a newspaper?
4  A.   I think this first one, we could --
5  do you have it here?  We could look at it if
6  they're using it to identify announcement
7  dates.  Well, if you're using the Wall Street
8  Journal, for example, to identify earnings
9  announcement dates, the date of the event is
10  going to be the day before the publication in
11  the Wall Street Journal.  So that's typical.
12  Q.   Are you aware of whether -- of the
13  selection process used by the New York Times or
14  the Wall Street Journal to identify what events
15  got coverage?
16  A.   Did I talk to the editors to see how
17  they screen?  I think it's -- it's reasonable
18  that they pick days, they pick events that they
19  consider newsworthy.  I think that's common
20  knowledge.  Wall Street Journal and the New
21  York Times pick events to cover that they
22  consider newsworthy.
23  Q.   Are large stock price movements
24  sometimes newsworthy?

Page 752

Steven P. Feinstein, PhD, CFA

1  A.   Sometimes.  But these -- the content
2  of these articles was about things that
3  happened, not about the -- not only about a
4  particular reaction.
5  Q.   Is it possible that the newspapers
6  covered events in part because there were large
7  stock price reactions to these events?
8  A.   I don't think so.  If you look at
9  the events, the events were important things
10  that happened that may have elicited in some
11  cases large stock price movements.
12      But they identified events -- I
13  mean, the fact -- using the Wall Street Journal
14  and the New York Times together is so that we
15  can identify events, not just stock price
16  movements.  If you used like a paper that was
17  more focused on investment advice, for example,
18  that might be the case.  But if it's the Wall
19  Street Journal and the New York Times, they're
20  covering important events in the life of the
21  company.  That's what they do.
22  Q.   You don't think that the Wall Street
23  Journal and the New York Times pay attention to
24  investment-related information?

Page 753

Steven P. Feinstein, PhD, CFA

1  A.   What I'm saying is that they're not
2  specifically investment advice publications,
3  which is where -- that and certain analyst
4  reports react to price movements rather than
5  the actual developments in the life of the
6  company.
7  Q.   Isn't it possible that the Wall
8  Street Journal or the New York Times reporters
9  who covered events took into account stock
10  price movements in deciding whether or not to
11  cover them?
12      MR. MARKOVITS:  Objection as
13  to possible.
14  A.   Well, I mean, I don't recall seeing
15  an article that says there was a large movement
16  and we have no idea what was going on.
17  Certainly in the life of this company, I think
18  sometimes that occurs.  But that's not what
19  was -- happened in these events.
20  Q.   Now, if you turn to paragraph 88 of
21  your report, you see that Ferrillo, Dunbar, and
22  Tabak identify various ways to select news
23  dates for a z-test.
24      Do you see that?

Page 754

Steven P. Feinstein, PhD, CFA

1  A.   Including major newspapers.
2  Q.   And they say -- do you see what I
3  just referred you to?
4  A.   Yes.
5  Q.   Okay.  Now, they say there are
6  various ways to select news dates, and one of
7  the issues is the choice of news sources to be
8  searched.  And they say, for example, major
9  newspapers and press wires versus all available
10  news sources.
11      Do you see that?
12  A.   Yes.
13  Q.   And you chose two major newspapers
14  and did not include press wires.  Is that
15  right?
16  A.   Yes.
17  Q.   Why was that?
18  A.   Well, I was looking for a screen
19  that would identify the big important
20  developments in the life of this company.
21  Q.   And one screen that --
22  A.   And, frankly, the issue that you
23  raised before would be relevant if it wasn't --
24  if you broadened the search out to include

Page 755

Steven P. Feinstein, PhD, CFA

1    analyst reports or investor advice
2    publications, where they would just say there's
3    something going on at Freddie Mac.  We don't
4    really know what it is, but the price is
5    falling or the price is rising.
6           I mean, picking the New York Times
7    and the Wall Street Journal, respected
8    publications, widely read, with respected
9    editors, is a way of screening what's big news.
10      Q.    And one of the things they suggested
11   was whether to limit the search to those
12   stories where the company name and/or ticker is
13   mentioned in the headline, mentioned in the
14   headline and lead paragraph, or mentioned
15   anywhere in the story.
16          Do you see that?
17      A.    Right.  Yes.  Each of the articles I
18   picked were about Freddie Mac.
19      Q.    And so did you use one of those
20   screens; that is, mentioned in the headline,
21   the headline and lead paragraph, or anywhere in
22   the story?
23      A.    This is something we covered in the
24   last deposition, so I'm going to have to look

Page 756

Steven P. Feinstein, PhD, CFA

1    at my last report to describe to you the
2    selection procedure.  Do we have it?
3           Wrong report.
4           Do you have -- do I have it?  The --
5      Q.    I don't think your old report's been
6    reintroduced here.
7      A.    Well, that's what your question's
8    about.  I would need to see it.
9      Q.    You don't remember offhand what the
10   selection procedure was?
11     A.    It's in the report.
12     Q.    I understand.
13     A.    The report speaks for itself.
14     Q.    I understand.
15     A.    What I do remember is the articles
16   are about Freddie Mac.  Usually when I use
17   Factiva, there's a search parameter that -- for
18   the -- the company they consider the subject of
19   the article.
20     Q.    Now, are you aware of any paper or
21   brief in a case or a report where your same
22   methodology was used?  Event selection
23   methodology.
24     A.    I can't say one way or the other.

Page 757

Steven P. Feinstein, PhD, CFA

1    As I sit here right now, at the end of the day
2    I can't name it for you, but I can't rule it
3    out, either.
4      Q.    Now, if you look at paragraph 86, at
5    the top of page 30, you'll see that you cite an
6    article from the Journal of Banking & Finance
7    entitled "Do Managers Time the Market?
8    Evidence from Open-Market Share Repurchases."
9           Do you see that?
10     A.    Yes.  Yes.
11     Q.    And in that article, they looked at
12   open-market repurchase programs as reported by
13   the Wall Street Journal.
14          Do you see that?
15     A.    They rely on the Wall Street Journal
16   to identify the event dates.
17     Q.    But in that case, there was an ex
18   ante identification of the type of event date
19   they wanted to address.  Correct?
20     A.    I don't recall specifically but
21   sounds reasonable.
22     Q.    And in the next article from the
23   Journal of Law and Economics, it says,
24   "Searching the Wall Street Journal and the New

Page 758

Steven P. Feinstein, PhD, CFA

1    York Times and the Washington Post, we
2    identified nine press dates from 1988 to 1990
3    on which articles appeared indicating
4    significant changes in the likelihood that the
5    commission would adopt increased penalties for
6    corporate crimes including fraud."
7           Do you see that?
8      A.    Yes.
9      Q.    And, again, that was an effort ex
10   ante to identify the type of information they
11   were looking for.  Correct?
12     A.    Right.
13     Q.    Okay.  And you hadn't identified ex
14   ante the type of information you were looking
15   for here, had you?
16     A.    No, I had.
17     Q.    Well, you weren't looking for
18   earnings dates, were you?
19     A.    Not -- I wouldn't rule them out.  It
20   was -- if the New York Times and the Wall
21   Street Journal considered a development to be
22   an important development in the life of Freddie
23   Mac and it was such that it was reported in
24   both, it was included.

Page 759

Steven P. Feinstein, PhD, CFA

1
2  Q.   But you didn't care whether it was a
3  stock buyback program, whether it was earnings
4  dates, whether it was a discussion about
5  particular kind of information.  You were just
6  interested in the fact that those two entities
7  wrote articles on or near the same date about
8  the same subject?
9      A.   Oh, about the same subject.  That's
10 what's the important thing.
11     Q.   Did I get that right?
12     A.   No, I mean, I was interested in
13 events that the Wall Street Journal and the New
14 York Times both considered to be important
15 news.  If they both considered it to be
16 important news, the underlying principle is
17 that it was an important day in the life of
18 Freddie Mac such that there would be high news
19 flow those days.
20     Q.   And you ex ante didn't make a
21 determination of what kind of news you wanted
22 to identify.  Correct?
23     A.   I didn't do that -- well, if I had,
24 then Bajaj and perhaps you would be criticizing
25 that it was a subjective screen.

Page 760

Steven P. Feinstein, PhD, CFA

1
2      Here, I left it to the Wall Street
3  Journal and New York Times to identify what
4  they consider big news.  That's what they do.
5  That's what those -- that's what people rely on
6  the Wall Street Journal and the New York Times
7  for.  You know, of course, the writing and the
8  reporting is good, but their selection of
9  what's big news is part of the role they serve
10 in society and in the financial markets.
11     Q.   Is it your view that selecting
12 earnings dates as a -- the kind of date you
13 want to review ex ante is a subjective
14 determination?
15     A.   No.  But in this particular case, as
16 I described in my last deposition, that
17 wouldn't have been appropriate to use earnings
18 dates.
19     Q.   Because you already knew what the
20 results were?
21     A.   Well, not just that I knew what the
22 results were.  It's because there was already a
23 debate -- it was already reported why four of
24 the six were not -- were not and should not
25 elicit statistically significant movements.

Page 761

Steven P. Feinstein, PhD, CFA

1
2      I actually -- I looked at that
3  argument and Dr. Holman's report and I verified
4  it.  He said it was mixed news on those four.
5  I saw that Dr. Bajaj disagreed.
6      If I had just repeated Dr. Holman's
7  methodology, the way I would have done it is
8  the way I did it in Prudential.  I would have
9  said that let's look at the dates based on the
10 news that should, and the only one of the dates
11 that indisputably should elicit a statistically
12 significant movement, according to Dr. Bajaj
13 and Dr. Holman together, was the last one and
14 which was included.
15     So, I mean, the point is what I
16 made -- the point I made last time was that
17 that ground was already well tread.  And, you
18 know, throwing my hat in the ring and agreeing
19 with Bajaj or agreeing with Holman on it didn't
20 seem like the most informative approach for
21 purposes of establishing market efficiency or
22 finding evidence that it wasn't efficient.
23     Q.   What do you mean "the most
24 informative approach"?  What do you mean by
25 that?

Page 762

Steven P. Feinstein, PhD, CFA

1
2      A.   The arguments over the earnings
3  announcement dates were already out there on
4  the table.  Holman said they were important
5  dates to look at.  Holman said that the first
6  four were mixed news and so that they wouldn't
7  reasonably elicit statistically significant
8  reactions.  Holman said the last two were
9  significant.  Bajaj said the last one was but
10 the second-to-last one wasn't.
11     I just didn't see anything that the
12 court could gain from additional analysis
13 there.
14     Q.   Let's turn to the -- strike that.
15     Well, did you understand that when
16 you became the new expert substituting for
17 Dr. Holman, that those old -- older arguments
18 between Dr. Holman and Dr. Bajaj would no
19 longer be before the court?
20     MR. MARKOVITS:  Objection.
21     A.   Actually, I didn't know one way or
22 the other how that would be treated.  But it
23 didn't make sense to me to start anew with a
24 different approach.
25     Q.   Let's turn to the damages section of

Page 763

Steven P. Feinstein, PhD, CFA

1  your report.
2      A.  If I could -- well, I just want to
3  elaborate just a bit.
4      Q.  I'll wait for your counsel to ask
5  you a question at the end of --
6      A.  All right.  I don't -- we'll leave
7  it at that.  We'll leave it at that.
8          No.  I just want to point out that
9  had I used -- had I appropriately included an
10  analysis of the earnings announcements, it's
11  pretty clear what Dr. Bajaj's, or whoever your
12  expert would have been, how they would have
13  criticized it.  They would have said it was
14  invalid because I already knew the results.
15          MR. VOLPE:  Objection.
16  Nonresponsive.  No question pending.
17      Q.  Now, on page 48 of your report, that
18  is page 52 of 70, 48 if you look at the bottom
19  of the page, do you see there's a section that
20  is Roman numeral IV, critique of the Gompers
21  report?
22      A.  Yes.
23      Q.  Okay.  And that section begins with
24  paragraph 134.  Do you see that?

Page 764

Steven P. Feinstein, PhD, CFA

1      A.  It does.
2      Q.  And it goes all the way to
3  paragraph 155.  Do you see that?
4      A.  Yes.
5      Q.  Okay.  And so paragraphs 134 through
6  155 contain your entire rebuttal to
7  Dr. Gompers.  Is that correct?
8      A.  Yes.
9      Q.  Okay.
10      A.  As I said earlier, it really can be
11  condensed to a couple of sentences, really.
12      Q.  Now, did you leave anything
13  important out?
14      A.  I don't believe I did.
15      Q.  Now, Dr. Gompers had a number of
16  criticisms of your opinion on damages.
17  Correct?
18      A.  He did.
19      Q.  And you addressed them all in these
20  paragraphs.  Is that right?
21      A.  Right.  The overriding addressing of
22  his opinion is that his conclusion says that it
23  would be a complex matter to calculate damages.
24  I don't dispute that.

Page 765

Steven P. Feinstein, PhD, CFA

1          He says if not impossible -- well,
2  he doesn't say it's impossible.  He doesn't --
3  he refuses to opine that it's impossible, both
4  in his report and in his deposition.
5          So he did not say it's impossible,
6  and I say it's possible.  And I have -- I
7  can -- that's what this -- that's what I do in
8  this section.  It is possible.
9      Q.  Mr. Volpe is going to move to strike
10  everything after the word "right," and I'm
11  going to join him at a later date.
12          MR. VOLPE:  Move to strike.
13  Nonresponsive.
14      Q.  Now, you don't have any opinions
15  regarding his critique that you didn't put in
16  here, do you?
17          MR. MARKOVITS:  Are you saying that
18  he address every sentence in the multiple
19  pages of the 140-some pages in Bajaj's and
20  Gompers' report?  Obviously, he didn't.
21          MR. FRANK:  I'll clarify in case
22  there's any confusion.
23      Q.  You don't have any opinions
24  regarding Dr. Gompers' critique of you that you

Page 766

Steven P. Feinstein, PhD, CFA

1  didn't put in your report, do you?
2      A.  Yes, I do.
3      Q.  What's that?
4      A.  That it wasn't necessary for him to
5  recap or recount the history of the 2007-2008
6  financial crisis, or most of what's in there
7  just wasn't necessary.  He puts that in there
8  in order to assert ultimately that it would be
9  difficult to calculate damages, but he refuses
10  to say it would be impossible to calculate
11  damages.
12          And he also -- so I didn't put in
13  here that virtually everything in his report
14  was not necessary, because his conclusion
15  ultimately is something I can agree with, which
16  is that it would be -- it's complex.  Complex,
17  but not impossible.
18      Q.  Doesn't he opine that you did not
19  articulate a damages model that could calculate
20  damages in this case?
21      A.  Oh, I refute that here.  I did -- I
22  write my damages model.  So there is a damages
23  model, and that's refuted right here.
24      Q.  You don't agree with that opinion of

Page 767

Steven P. Feinstein, PhD, CFA

1
2    his?
3        A.    Absolutely.  I totally disagree.
4    And, frankly, I think 11 courts have also
5    disagreed with him on the subject.
6        Q.    But you understand -- you understand
7    that's his opinion?
8        A.    That I did not articulate a damage
9    model?
10       Q.    That can calculate damages in this
11   case consistent with the theory of liability.
12       A.    And I totally disagree with that.
13       Q.    But you understand that's his
14   opinion.  Right?
15       A.    Well, it's compound.  Your question
16   is compound because his statement is compound.
17       So about half of it is, did I
18   articulate a model?  Yes, I do.  I think he
19   thinks I didn't, but yes, I did articulate a
20   model.  Can it calculate damages?  I say yes.
21   He says it would be hard.  It would be complex,
22   that using that model would be complex.
23       I don't disagree with that.  I mean,
24   it's not impossible, but it would be -- it's
25   certainly possible.  People do that every day,

Page 768

Steven P. Feinstein, PhD, CFA

1
2    value stocks under a wide variety of
3    assumptions and scenarios and information flow.
4        Q.    Let me turn your attention to
5    paragraph 136.
6        A.    Okay.
7        Q.    There you write, "Dr. Gompers has
8    four main criticisms of the damages methodology
9    described in the Feinstein report."
10       Do you see that?
11       A.    I do.
12       Q.    Now, let's look at the first one.
13   You write -- this is the first criticism of Dr.
14   Gompers -- "that my proposed methodology 'fails
15   to articulate any specific methodology for
16   calculating damages.'"
17       Do you see that?
18       A.    Yes.
19       Q.    You understood that was one of his
20   criticisms of you.  Right?
21       A.    Yes.
22       Q.    You don't agree with that, do you?
23       A.    Correct.
24       Q.    Okay.  If he's right about that,
25   what does that mean?

Page 769

Steven P. Feinstein, PhD, CFA

1
2        A.    I don't know.  That's for the court
3    to determine.
4        Q.    Okay.  But you disagree with --
5        A.    I think it's wrong.  I think it's
6    clearly wrong.
7        Q.    Okay.  Now, his second criticism of
8    you is "that my proposed damages model is
9    inconsistent with plaintiffs' materialization
10   of risk theory of liability."
11       Do you see that?
12       A.    Yes.
13       Q.    You disagree with him.  Right?
14       A.    Yes.
15       Q.    You understood that was his opinion,
16   though?
17       A.    Yes.
18       Q.    Okay.  That's one of his criticisms
19   of you.  Right?
20       A.    One moment.
21       Okay.  Yes.
22       Q.    He has a third criticism of you.
23   Correct?
24       A.    Yes.
25       Q.    That is that you "have not

Page 770

Steven P. Feinstein, PhD, CFA

1
2    articulated a methodology that can account for
3    changes in market conditions during the
4    proposed class period."
5        Do you see that?
6        A.    Yes.
7        Q.    Okay.  That was one of his
8    criticisms of you.  Right?
9        A.    Yes.
10       Q.    You don't agree with him, do you?
11       A.    Correct.
12       Q.    Okay.  And, finally, he has a fourth
13   criticism, according to you, which is that "my
14   proposed damages approach fails to distinguish
15   among multiple types of alleged
16   misrepresentations."
17       Do you see that?
18       A.    I do.
19       Q.    Do you agree with him?
20       A.    No.
21       Q.    Okay.  Now --
22       A.    I mean, I -- if what he means is
23   that the approach cannot, the damage model
24   cannot, then I certainly disagree with that.
25       Q.    Well, let's talk about what he

Page 771

1          Steven P. Feinstein, PhD, CFA
2     actually wrote.
3          A.   It's false.  What he wrote is false.
4          Q.   You disagree with him?
5          A.   Correct.
6          Q.   You think he's wrong?
7          A.   Yes.
8          Q.   You don't agree with him?
9          A.   That's right.
10         Q.   Okay.  Now, you in paragraph 145
11    mention several "commonly used valuation
12    tools."
13         A.   Right.
14         Q.   It appears about five lines down.
15    You write, "Among the commonly used valuation
16    tools that are available to investors and
17    analysts in real time."
18             Do you see that?
19         A.   Yes.
20         Q.   Okay.  And then you list several
21    valuation tools.  Is that right?
22         A.   I do.
23         Q.   One of them is valuation multiple
24    models.  Do you see that?
25         A.   Yes.

Page 772

1          Steven P. Feinstein, PhD, CFA
2          Q.   And apparently there are a number of
3     different ones.  There are those based on
4     earnings, EBIDTA, revenue, book value, and cash
5     flow.  Is that right?
6          A.   Yes.
7          Q.   There are multiple different kinds
8     of multiple models?
9          A.   Right.
10         Q.   Okay.  And then there's a second
11    category, discounted cash flow models.  Right?
12         A.   Yes.
13         Q.   And then there's something called
14    return attribution analysis.  Right?
15         A.   Yes.
16         Q.   Of those three different types of
17    models, which do you propose to use here?
18         A.   I have all of them at my disposal.
19    The marketplace did; so would I.
20         Q.   But which one are you going to use
21    in this case?
22         A.   That's -- that's -- the specific
23    implementation of the model, the model, is to
24    calculate an inflation ribbon, which is the
25    difference between the actual price that

Page 773

1          Steven P. Feinstein, PhD, CFA
2     prevailed in the marketplace and the price that
3     would have prevailed had there been full
4     disclosure.  It's to use the inflation ribbon
5     and look at changes in the inflation ribbon.
6     That's the model.
7              And so it's really the construction
8     of the but-for price that he's questioning, can
9     that be done.  I would have all the tools at my
10    disposal that market participants have in real
11    time, and that's what this paragraph says.
12         Q.   Have you ever heard the expression
13    "out-of-pocket damages"?
14         A.   Yes.
15         Q.   In a securities case, what's the
16    definition of "out-of-pocket damages," if you
17    know?
18         A.   Well, what I've heard is that this
19    model that I've articulated is the definition
20    of out-of-pocket damages -- out-of-pocket
21    damages, the loss that was -- the loss that
22    occurred on account of the misrepresentations
23    and omissions, being the change in the
24    inflation from the -- it's exactly what I
25    described as the model.  I've heard the model

Page 774

1          Steven P. Feinstein, PhD, CFA
2     that I described as being a model of
3     out-of-pocket damages.
4          Q.   Is it fair to say that you just
5     haven't decided yet which one of these
6     valuation tools you would use to calculate
7     damages in this case?
8          A.   Well, it's premature.  I mean, the
9     discovery's not complete.  The full record's
10    not complete.  The evidence and proof of what I
11    previously was led -- was required -- what I
12    was previously asked to assume has not yet been
13    fully developed and presented.
14             I mean, the connection between
15    misrepresentations and omissions, market
16    expectations for, for example, the
17    November 20th earnings announcement and the
18    actual loss that was reported, that record has
19    to be developed before I know which of these
20    tools is best to establish the but-for price.
21         Q.   Is it fair to say that you haven't
22    selected from among these valuation tools to
23    calculate damages because, in your view, it's
24    premature?
25         A.   Yes --

Page 775

Steven P. Feinstein, PhD, CFA

1
2    Q.    Now --
3    A.    -- it's premature.  The model is
4    established.  The model of how one was damaged,
5    if the allegations are true, is there.  It's
6    articulated.  The -- even the implementation to
7    the extent that one would require evaluation of
8    the stock under alternative scenarios, under
9    full disclosure scenarios, is there.
10            What valuation tools, you know, it's
11    when you get that granular.  What valuation
12    tools specifically would be applied for that,
13    the full record needs -- the full record that
14    informs me, or whoever the forensic analyst is,
15    of specifically what are the actionable and
16    established misrepresentations and omissions
17    that impacted the price, that's what needs to
18    be done.  That's what needs to be provided or
19    further developed in order to pick the tools.
20    Q.    Now, if you -- assume that the
21    record is developed.  Assume you're the expert
22    retained to calculate damages on behalf of the
23    plaintiffs.
24            Will you be choosing from among only
25    these three tools that you identified or will

Page 776

Steven P. Feinstein, PhD, CFA

1
2    there be more?
3    A.    Well, these are examples of the
4    tools that are available to the marketplace and
5    would also be available to me.  There are more.
6    Q.    So we don't know which one of these
7    models you would use?
8    A.    These aren't models.  These are
9    tools to implement the well-articulated model.
10    Q.    Is it fair to say that valuation
11    multiple models aren't models?
12    A.    This is not a damage model.  It's a
13    valuation model.  A valuation model is a tool
14    within the damage model.  So which tools to use
15    to value the stock under alternative hypotheses
16    and alternative scenarios needs to wait.
17    Q.    And the damages model you articulate
18    is the same as the definition of out-of-pocket
19    damages.  Is that right?
20    A.    You know, I really -- to the best of
21    my recollection, but I would rather not say.
22    I'd rather call the model the -- rather than
23    name the model, I'd rather just stick with my
24    description of the model.
25    Q.    Well, your description of the model,

Page 777

Steven P. Feinstein, PhD, CFA

1
2    is that a description that applies to every
3    securities litigation case?
4    A.    10b-5 class action cases.  That's
5    the model that courts and Congress have agreed
6    is an appropriate model.
7    Q.    And so, in your view, the Comcast
8    requirement -- well, strike that.
9            Are you familiar with the fact that
10    there's a Comcast requirement?
11    A.    I'm not a lawyer.  I'm familiar with
12    the Comcast decision and what it says.
13    Q.    And you're familiar that it requires
14    at the class certification stage for plaintiffs
15    to identify a model for damages that is
16    consistent with the plaintiffs' theory of
17    liability.  Is that correct?
18    MR. MARKOVITS:  Objection.  Calls
19    for a legal conclusion.
20    A.    I understand that that's a
21    requirement of plaintiffs.
22    Q.    And so is it your understanding is
23    that -- is it your understanding that in a
24    securities case, that requirement is easily
25    satisfied by articulating what you have done in

Page 778

Steven P. Feinstein, PhD, CFA

1
2    your report here in every securities case?
3    A.    I know there are some securities
4    cases where experts have proposed alternative
5    damage models, and sometimes they succeed and
6    sometimes they fail to satisfy the court that
7    they've articulated a model that's consistent
8    with the theory of liability.
9            But I don't know of a case where the
10    standard model used by courts and referenced by
11    Congress has failed to satisfy the court.
12            But I'm not a lawyer.  I mean,
13    that's my -- my understanding is that the -- is
14    that what's meant by the Comcast requirement is
15    satisfied by articulating this sort of
16    methodology, this sort of model to this level
17    of specificity.
18    Q.    Now, in paragraph 145, you mention
19    literature regarding valuation effects of
20    factors such as reputation and quality of
21    accounting.
22            Do you see that?
23    A.    Yes, I do.
24    Q.    And how would that literature impact
25    any work you might ultimately do on damages?

74

Page 779

Steven P. Feinstein, PhD, CFA

1
2    A.   Oh.  Well, there's a literature that
3   says specifically, for example, what's the
4   relationship between economically quantifiable
5   inflation and reputation effects, for example.
6        So there's a literature that talks
7   about how reputation is used or viewed by the
8   marketplace in a way that impacts the stock
9   price.  I would likely use that in that case.
10        There's a literature on what
11  investors typically do when they don't have
12  access to information that they would otherwise
13  want.  Acrolaw work.  Lemons law analysis and
14  models are an example of that.  So -- and there
15  are others.  There's literature about the types
16  of things -- about how various effects that
17  might be at play in the ultimate but-for
18  scenario that I'm asked to analyze affect the
19  stock price.
20        Q.   Now, is that literature literature
21  that you would use to modify how you use the
22  valuation tools that you identified just before
23  it?
24        A.   Most likely.  It could be -- it
25  could augment them.  But I don't know of a case

Page 780

Steven P. Feinstein, PhD, CFA

1
2   where the marketplace for a large publicly
3   traded security like Freddie Mac stock has said
4   we don't know how to value this stock and we're
5   not going to price it.  The marketplace
6   virtually continuously prices every publicly
7   traded security, and they use these tools.  And
8   so would I.
9        Q.   Now, let me turn your attention back
10  to the Hartzmark -- actually, do we now have
11  the -- let's take a brief break here.
12        THE VIDEOGRAPHER:  The time now is
13  16:44, and we're off the record.
14        (Recess taken from 4:44 to 4:58
15  p.m.)
16        THE VIDEOGRAPHER:  The time now is
17  16:58.  We're on the record.
18  BY MR. FRANK:
19        Q.   Do you recall at the beginning of
20  the deposition, Dr. Feinstein, you referred to
21  a footnote in Dr. Bajaj's report that you
22  thought contained an opinion that he shouldn't
23  have put in a footnote?
24        A.   Yes.
25        Q.   What was that footnote, if you

Page 781

Steven P. Feinstein, PhD, CFA

1
2   recall?
3        A.   We actually covered it.
4        Q.   I'm just trying to remember.
5        A.   It was about serial correlation.  He
6   said it was that before one tests semi-strong
7   efficiency, one should check for serial
8   correlation to test weak-form efficiency.
9        Q.   And do you have this exhibit before
10  you that is Dr. Bajaj's report?
11        I believe it was previously marked
12  as Exhibit 187.
13        A.   Yes.
14        Q.   And do you recall where this
15  footnote was in his report, by any chance?
16        A.   No.  Look, he's got 200 footnotes.
17  If you look at page 80, page 80 has the 212th
18  footnote.  So there's quite a lot of footnotes.
19  I don't remember which number it was.
20        Q.   Did you testify that you didn't --
21  because it was in a footnote, that you -- was
22  it that you did not include in your rebuttal
23  report reactions you had to the footnote?  Is
24  that right or am I misremembering?
25        A.   No, that's right.  But we covered it

Page 782

Steven P. Feinstein, PhD, CFA

1
2   pretty well today.
3        Q.   We covered it?  So there's
4   nothing -- there's no opinions you have
5   vis-Ã -vis Dr. Bajaj's report that haven't been
6   expressed either in your own report or
7   expressed today by you at your deposition?
8        A.   No.  I -- during the break I was
9   thinking through what we've covered today, and
10  there's one other thing I'd want to say about
11  it.
12        Q.   What else would you like to say?
13        A.   Well, I mean, when he took -- when
14  he slices and dices the class period into three
15  periods and then runs a binomial test, he's
16  really condemning the test to fail from the
17  outset.
18        I mean, you don't even have to run
19  the test.  If there's three periods and he's
20  only accepting that there were three
21  significant events, then there's really either
22  only going to be one significant event per
23  period or some periods will have no significant
24  events.
25        So it's really a poorly -- if he

Page 783

Steven P. Feinstein, PhD, CFA

1
2  does it that way, if he really believed that
3  those were appropriate slicing and dicings of
4  the class period, then it would be an
5  inappropriate test to run, because you would --
6  it just has no power.  It would have no power
7  to distinguish efficient from inefficient
8  markets, the way he ran it.
9          So it's -- I mean, it's -- again,
10 it's not -- he's not detecting a defect in the
11 market.  What he's detecting is a defect he
12 built into the test.
13     Q.   Well, who chose the dates for the
14 test?
15     A.   He did.  I mean, he chose the points
16 to where to slice -- if that's what you meant.
17 He chose these break points.
18     Q.   No, that's not what I asked.
19          Who chose the dates to test?
20     A.   I chose the dates to test.
21     Q.   Was there any limit --
22     A.   But it makes sense to run it if it's
23 being run over the entire class period.  It
24 doesn't make sense to run it if you're going to
25 run it over pieces of the class period.

Page 784

Steven P. Feinstein, PhD, CFA

1
2     Q.   Was there any limit to the number of
3  dates that you could choose?
4     A.   If I -- if the screen had not
5  identified an appropriate number of tests to
6  run over either the whole period or some
7  portion of the period that I thought was
8  necessary to run it over, I would have
9  understood that the test had no power to
10 distinguish efficient from inefficiency from
11 the beginning and therefore I wouldn't have run
12 it.
13          But he went ahead and that's what he
14 did.  So he's making it look like he found a
15 defect in the market when, in fact, it's a
16 defect he could have identified and explained
17 in the test the way he ran it, the way he chose
18 to run it.
19     Q.   Did you engage in more than one
20 effort to identify what you just referred to as
21 a screen?
22     A.   He could.
23     Q.   No.  Did you engage in more than one
24 effort to identify --
25     A.   No.

Page 785

Steven P. Feinstein, PhD, CFA

1
2     Q.   -- the selection process?
3     A.   No.  Because the screen did identify
4  an appropriate number of events to run over a
5  test of 16 months.
6     Q.   And so on your first shot, your
7  screen identified nine dates, and you thought
8  that that was an appropriate number of dates?
9     A.   Right.  If it identified just one,
10 then the screen would have failed.
11     Q.   And at the time that you identified
12 nine dates, you knew already that there was a
13 structural break in the class period, at least
14 one.  Correct?
15     A.   Yeah.  But don't -- don't conclude
16 from that that the way I ran the test over the
17 whole period is incorrect.  It's still
18 incorrect.
19          The structural break is a break in
20 the statistics, and that was taken into account
21 for determining which events were significant.
22 It's not a structural break in the market
23 efficiency.
24          MR. MARKOVITS:  Professor, I believe
25     you said, "It's still incorrect."  Did you

Page 786

Steven P. Feinstein, PhD, CFA

1
2  mean it's still correct?
3          THE WITNESS:  I'm not sure.
4     Q.   Well, I'll ask the question again.
5  You can give it another go.
6     A.   All right.  Yeah.  Let me just put
7  on the record that I might have misspoken on
8  the last answer and I want to correct it.
9     Q.   At the time that you identified nine
10 dates, you already knew that there was a
11 structural break in the class period, at least
12 one.  Correct?
13     A.   One.  There was one.
14     Q.   Now, let me turn your attention to
15 Footnote 40 of Dr. Bajaj's report that appears
16 on page 20 of 370.
17     A.   Footnote 40 on page 19?
18     Q.   Yes.  19 of 81.
19     A.   That's the footnote.  That's it.
20     Q.   Footnote 40 is the footnote that you
21 read that you reacted to?
22     A.   Right.
23     Q.   I got lucky.
24     A.   You did.
25     Q.   And that's the footnote that you

Page 787

1      Steven P. Feinstein, PhD, CFA
2  were testifying about this morning.  Correct?
3      A.   Yes.
4      Q.   Okay.  And that's the footnote that
5  you believe you've already shared on the record
6  why you believe that footnote is not correct.
7  Is that fair to say?
8      A.   Yes.
9      Q.   Okay.  I will not rehash old ground.
10      Now, at this time I'm going to pass
11  the witness, but I will say that if no one else
12  has questions then it's my intention to suspend
13  today, because I believe that there is data or
14  documents that should have been produced that
15  was not produced.
16      And so I'm going to ask that any
17  calculations that were considered by you in
18  connection with your rebuttal report, including
19  any Chow test you ran or your team ran and
20  including any other tests you ran to assess --
21  to assess calculations be provided to us.
22  Because under the rules, I believe those
23  were -- that was data that you considered in
24  connection with forming your opinion, opinions,
25  and I believe we're entitled to it.

Page 788

1      Steven P. Feinstein, PhD, CFA
2      I will tell you that it is my hope
3  that the production of that material does not
4  lead to yet another day of depositions.  But I
5  do believe we are entitled to that material,
6  and I would like to see that material before we
7  make decisions about actually concluding the
8  deposition.
9      So at this time, having said that, I
10  will pass the witness.
11      MR. MARKOVITS:  Okay.  We disagree,
12  but I'm going to have a few questions -- we
13  disagree as to the issues you just raised.
14  But we will address it and we'll move on
15  from there.
16      But, meanwhile, I have a few
17  questions to clarify the record.
18      EXAMINATION
19  BY MR. MARKOVITS:
20      Q.   Dr. Feinstein, you testified earlier
21  in the deposition about the Prudential case,
22  which is referenced in your rebuttal report.
23  Correct?
24      A.   Yes.
25      Q.   Why did you cite the Prudential

Page 789

1      Steven P. Feinstein, PhD, CFA
2  case?
3      A.   Because it is a case, and a prior
4  case that I did, in which there were two
5  empirical tests for Cammer 5.  One was an
6  events study, and it was a traditional events
7  study that examined one single date, exactly
8  the same as in the Freddie Mac case.  And the
9  collective test similarly was very similar to
10  the collective test run in the Freddie Mac
11  case.
12      So I included that in my rebuttal
13  report because there was a question as to
14  whether or not I've ever used exactly this
15  methodology before, and that's an example of
16  where I did do a single-event event study for
17  the Cammer 5 capture.
18      Q.   Is the description in your rebuttal
19  report of the Prudential case misleading in any
20  respect?
21      A.   No.
22      Q.   I want to direct your attention to
23  the third amended complaint previously marked
24  as Exhibit 30.  In that, there are a number of
25  allegations regarding misrepresentations and

Page 790

1      Steven P. Feinstein, PhD, CFA
2  omissions alleged by the plaintiffs.  Correct?
3      A.   Yes.
4      Q.   Are you opining or have you ever
5  opined as to the truth of those
6  misrepresentations or omissions?
7      Let me strike that and be a little
8  more clear.
9      Are you providing any opinion as to
10  whether or not plaintiffs are correct in their
11  allegations of misrepresentations and
12  omissions?
13      A.   No.
14      Q.   Why not?
15      A.   It wasn't necessary for the work
16  that I did.  What was the necessary with
17  respect to the price impact was that I assume
18  that, in fact, there are those
19  misrepresentations and omissions.  So it wasn't
20  necessary, and with respect to loss causation,
21  it's premature.
22      Q.   What's the relevance of November 20,
23  2007, with regard to your opinions?
24      A.   Well, that's a date on which
25  plaintiffs allege that there were corrective

Page 791

1      Steven P. Feinstein, PhD, CFA
2  disclosures, specific information provided that
3  corrected incorrect information that was
4  provided previously, and on which there was a
5  realization of the risk that was allegedly
6  underestimated on account of misrepresentations
7  and omissions, either underestimated or
8  concealed.
9      Q.  I want to just touch briefly on Dr.
10  Gompers' critiques, part of which dealt with
11  issues such as confounding events or change in
12  market conditions, multiple misrepresentations.
13      Can all those add to the complexity
14  of a damage analysis?
15      MR. FRANK:  Objection.
16      A.  They can, but they're not unusual.
17  Every case has those features.  Every analysis
18  of security over a span of time will reasonably
19  have features like that.
20      So it's not unusual, it's not
21  unique, that kind of challenge and complexity
22  that needs to be addressed in calculating
23  damages.
24      MR. MARKOVITS:  I have nothing
25  further.

Page 792

1      Steven P. Feinstein, PhD, CFA
2      EXAMINATION
3  BY MR. FRANK:
4      Q.  Dr. Feinstein, you have before you
5  Exhibit 270.  That's your report in Prudential.
6      A.  Yes.
7      Q.  Is it your testimony that in
8  Prudential, you only considered one date in
9  connection with potential disclosures?
10      A.  No.  I considered several, just as I
11  considered several in the Freddie Mac case, but
12  arrived at one that was appropriate to test,
13  just like -- just as I did in Freddie Mac.
14      Q.  What are the several dates you
15  considered in the Freddie Mac case?
16      A.  Well, as we talked about today, I
17  considered using the earnings announcements,
18  but rejected doing that for a variety of
19  reasons.
20      Q.  Now, I see that in the Prudential
21  case, you included discussion of the various
22  dates that you considered testing but didn't.
23      Did you include a discussion in your
24  Freddie Mac report of the dates that you
25  considered including but did not?

Page 793

1      Steven P. Feinstein, PhD, CFA
2      A.  I don't think it was in the report,
3  but it was certainly in the deposition.
4      Q.  Now, other than the Prudential case,
5  have you -- strike that.
6      Now, in the Prudential case, you
7  actually did test earnings announcements dates.
8  Is that correct?
9      A.  Only as a -- in the collective test.
10  So there was no deep-dive information analysis
11  on each of them to see if they should be
12  included in an individual event study --
13  individual-event events study.  But they were
14  included in the collective test because it was
15  reasonable to do so.
16      Q.  What's a deep-dive information
17  analysis?
18      A.  An assessment as to whether the
19  nature of the news that emerged that day would
20  reasonably elicit a statistically significant
21  stock price reaction.  That's not done for the
22  events in a collective test.  It is done for
23  events analyzed in an individual-event event
24  study.
25      Q.  Now, you used -- ultimately, did you

Page 794

1      Steven P. Feinstein, PhD, CFA
2  test some of the earnings announcements dates
3  in this case?
4      A.  Some, yes.
5      Q.  Okay.
6      A.  Because they were included in the
7  collective test.  They were identified as
8  important matters by the New York Times and the
9  Wall Street Journal.
10      Q.  They were identified using your New
11  York Times/Wall Street Journal event selection
12  criteria?
13      A.  Yes.
14      Q.  They weren't tested because you
15  tested all earnings announcements dates.  Is
16  that right?
17      A.  Correct.
18      Q.  If you had tested all earnings
19  announcement dates, you would have ultimately
20  tested a different set of dates than what you
21  actually tested.  Is that correct?
22      A.  Do you mean in an individual
23  events study -- individual-event event study or
24  a collective events study to test?
25      Q.  Well, either one.  Let's be

Page 795

1          Steven P. Feinstein, PhD, CFA
2    concrete.
3          You did a z-test in this case.
4    Right?
5        A.   Yes.
6        Q.   And you used a Wall Street
7    Journal/New York Times event selection
8    methodology that you devised for this case.
9    Right?
10       A.   Right.
11       Q.   And --
12       A.   Well, yes.
13       Q.   Yeah.  And you --
14       A.   Applied.  I would use the word
15    "applied," not "devised."  That I applied in
16    this case.
17          As I wrote in my rebuttal report,
18    using the Wall Street Journal and the New York
19    Times is in the literature, that other people
20    have done this.
21       Q.   Other people have used this precise
22    event selection methodology that you used?
23       A.   They've relied on the New York Times
24    and Wall Street Journal to identify events.
25       Q.   I see.  It's at the end of the day.

Page 796

1          Steven P. Feinstein, PhD, CFA
2    You've got to answer my question or the day
3    gets really long.
4          Other people have used this precise
5    event selection methodology selection method
6    that you used?
7        A.   Not the exact precise, but something
8    similar.
9        Q.   Something similar insofar as they
10    also used the New York Times and the Wall
11    Street Journal in other cases to help them
12    identify dates?
13       A.   Right.
14       Q.   Now, using the event selection
15    methodology that you used in this case, you
16    ended up identifying some earnings
17    announcements.  Right?
18       A.   Could I see the original report?
19       Q.   I'm not trying to play games with
20    you, but I don't know if I have --
21          MR. MARKOVITS:  Did you say the
22    event study methodology?
23          MR. FRANK:  Event selection
24    methodology, I think I said.
25          MR. MARKOVITS:  For -- you're

Page 797

1          Steven P. Feinstein, PhD, CFA
2    talking for his event study?
3          MR. FRANK:  No.  We've been talking
4    about a z-test.
5          MR. MARKOVITS:  Okay.
6        Q.   And I said using the event selection
7    methodology that you used in this case, you
8    ended up identifying some earnings
9    announcements.  Right?
10       A.   Well, I just want to verify.  It's
11    late in the day, and I know it's in a table in
12    my report.  I'd rather refer to my report than
13    do it from memory.
14       Q.   Sure.
15       A.   I know November 20th is there.  I
16    don't recall what the other date was.
17          I'm looking at page 79, using the
18    bottom of the page numbers, and it's Exhibit 5.
19    So it's there:  "Freddie Mac earnings dropped
20    45 percent, August 30, 2007."
21       Q.   Right above that, two lines above,
22    "Freddie Mac reports another quarterly loss"?
23       A.   Right.  There too.
24       Q.   So it looks like that the dates that
25    were selected by the event selection

Page 798

1          Steven P. Feinstein, PhD, CFA
2    methodology that you used in this case, at
3    least three of those dates were earnings
4    announcement dates.  Correct?
5        A.   Correct.
6        Q.   Now --
7        A.   But they were picked for the screen
8    reasons that we talked about, not because they
9    were earnings announcements dates.
10       Q.   Now, were those dates that had been
11    previously tested by Dr. Holman?
12       A.   Yes.
13       Q.   Now, since Dr. Holman had previously
14    selected those dates, why did you retread old
15    ground?
16       A.   Because they were selected by a
17    different screen, not because they were
18    earnings announcement dates.
19       Q.   And Dr. Holman's screen had
20    identified only one statistically significant
21    day out of six.  Right?
22       A.   Well, he says two.  Bajaj challenged
23    one of them.
24       Q.   And your approach got four dates out
25    of nine.  Is that right?

Page 799

Steven P. Feinstein, PhD, CFA
1
2     A.   I don't think they were those
3  earnings announcement dates, were they?  Let me
4  check.
5         June 15th or June 14th is not
6  significant.  August 30th is.
7         MR. MARKOVITS:  What was the
8  question pending?
9     Q.   The question was your approach got
10  four dates out of nine.  Is that right?
11     A.   Correct.
12     Q.   Two of those dates were earnings
13  announcements dates.  Is that right?
14     A.   Yes.
15     Q.   All right.
16     A.   But they're identified because they
17  were New York Times/Wall Street Journal article
18  identified dates.
19     Q.   And those are dates that had been
20  tested before by Dr. Holman.  Right?
21     A.   Yes.  But he arrived at testing them
22  for a different reason.
23     Q.   He used the approach that you
24  traditionally used, that is, looking at
25  earnings announcement dates.  Right?

Page 800

Steven P. Feinstein, PhD, CFA
1
2     A.   That's not quite right.  What I
3  would have done is exactly -- if I were the
4  first expert in this case, what's in the
5  Prudential report, the deep dive on those days
6  for his individual event study, he did an
7  individual-event event study -- he should have
8  done a deep dive -- to determine whether there
9  was mixed news prior to testing them.  He did
10  the analysis of whether there was mixed news
11  after testing them.
12     Q.   Are you sure you wouldn't have done
13  what you did in the Eletrobras report?
14     A.   I'm not sure what you're referring
15  to.
16     Q.   Well, the Prudential report you say
17  is a case where you used a single-event events
18  study.  Correct?
19     A.   I found one event that was an
20  appropriate event to test --
21     Q.   And you've --
22     A.   -- in the single, individual-event
23  event study.
24     Q.   And you've drafted literally dozens
25  of these reports.  Correct?

Page 801

Steven P. Feinstein, PhD, CFA
1
2     A.   Yes.
3     Q.   Have you found any other reports
4  where you only tested a single event for an
5  event study?
6     A.   I think we did find one, but it was,
7  like, subject to a protective order or under
8  seal type thing.  There may have been more than
9  one like that.
10     Q.   Can you name that case?
11     A.   I don't remember it, as I sit here
12  now.  But that's what I recall finding out at
13  the office.
14     Q.   Any cases that you can tell us about
15  other than Prudential?
16     A.   No.  Not -- because I don't remember
17  as I sit here now.
18     Q.   Do you have a memory of there being
19  other cases that aren't subject to protective
20  order where there is a single-event event
21  study?
22     A.   No.
23        MR. FRANK:  I'll pass the witness.
24        MR. MARKOVITS:  No further
25  questions.

Page 802

Steven P. Feinstein, PhD, CFA
1
2        MR. FRANK:  Thank you for your time.
3     We'll suspend the deposition pending
4  receipt of those documents.
5        THE VIDEOGRAPHER:  The time now is
6     17:20.  We're off the record.
7        (Witness excused and deposition
8  suspended at 5:20 p.m.)
9
10
11
12
13
14
15
16
17
18     _____
19        Signature of Deponent
20  SUBSCRIBED AND SWORN BEFORE ME
21  THIS____DAY OF_____, 2017.
22
23     _____
24  (Notary Public)  MY COMMISSION EXPIRES:_____
25

Page 803

1    ERRATA SHEET FOR THE TRANSCRIPT OF:
2    Case Name:  Ohio Public Employees Retirement
     System v. Federal Home Loan Mortgage Corp.
3    Dep. Date:  November 14, 2017
     Deponent:  Steven P. Feinstein, PhD, CFA
4
         CORRECTIONS:
5
     Pg. Ln.  Now Reads      Should Read    Reason
6    ___ ___  _____  _____  _____
7    ___ ___  _____  _____  _____
8    ___ ___  _____  _____  _____
9    ___ ___  _____  _____  _____
10   ___ ___  _____  _____  _____
11   ___ ___  _____  _____  _____
12   ___ ___  _____  _____  _____
13   ___ ___  _____  _____  _____
14   ___ ___  _____  _____  _____
15   ___ ___  _____  _____  _____
16   ___ ___  _____  _____  _____
17   ___ ___  _____  _____  _____
18       _____
19       Signature of Deponent
20   SUBSCRIBED AND SWORN BEFORE ME
21   THIS____DAY OF_____, 2017.
22
23   _____
24   (Notary Public)  MY COMMISSION EXPIRES:_____
25

Page 804

1         C E R T I F I C A T E
2
3        I, Deanna J. Dean, a Registered Diplomate
4    Reporter, Certified Realtime Reporter, and
5    Massachusetts Notary Public, do hereby certify that
6    the foregoing, to the best of my knowledge, skill
7    and ability, is a true and accurate transcript of
8    my computer-aided electronic stenographic notes of
9    the deposition of STEVEN P. FEINSTEIN, PHD, CFA,
10   who was duly sworn, taken at the place and under
11   the circumstances present on the date hereinbefore
12   set forth.
13       I further certify that I am neither attorney
14   or counsel for, nor related to or employed by any
15   of the parties to the action in which this
16   deposition was taken, and further that I am not a
17   relative or employee of any attorney or counsel
18   employed in this case, nor am I financially
19   interested in this action.
20
21
22   _____
23        Deanna J. Dean, RDR, CRR
24   Signed this 28th day of November, 2017
25   My MA commission expires December 28, 2018

Page 805

1         I N D E X
2
3    Examination                    Page
4    STEVEN P. FEINSTEIN, PHD, CFA
5      By Mr. Frank              495,307
6      By Mr. Markovits              788
7
8
9         E X H I B I T S
10
11   Number     Description          Page
12   Exhibit 269  10/16/17 Rebuttal Report of   497
13        Dr. Weinstein
14   Exhibit 270  Report of Dr. Weinstein in    528
15        Prudential Matter
16   Exhibit 271  Brief of Financial Economist  545
17        as Amici Curiae in Support of
18        Respondents in Halliburton Case
19   Exhibit 272  Article by H. Nejat Seyhun    741
20        Titled "The Curious Incident
21        of the Dog That Didn't Bark
22        and Establishing Effect-and-Cause
23        in Class Action Securities
24        Litigation"
25