# Exhibit G

1        MUKESH BAJAJ, PH.D.

2         UNITED STATES DISTRICT COURT

3        NORTHERN DISTRICT OF OHIO

4           EASTERN DIVISION

5

6   -----------------------------------

    OHIO PUBLIC EMPLOYEES RETIREMENT       )
7   SYSTEM, On Behalf of Itself and        )
    all Others Similarly Situated,         )
8                                          )
              Plaintiff                    )
9                                          )
    vs.                                    )  C.A. No. 4:08-CV-00160
10                                         )
    FEDERAL HOME LOAN MORTGAGE             )
11  CORPORATION, a/k/a FREDDIE MAC,        )
    RICHARD F. SYRON, PATRICIA L.          )
12  COOK, ANTHONY S. PISZEL AND            )
    EUGENE M. McQUADE,                     )
13                                         )
              Defendants                   )
14  -----------------------------------

15

16  VIDEOTAPED DEPOSITION OF MUKESH BAJAJ, PH.D.

17        TUESDAY, SEPTEMBER 26, 2017

18        MORGAN, LEWIS & BOCKIUS LLP

19           ONE FEDERAL STREET

20         BOSTON, MASSACHUSETTS

21

22

23  Reported by:  Sandra A. Deschaine, CSR, RPR,

24  CLR, CRA

25  Job No. 131040

Page 2

```
 1              MUKESH BAJAJ, PH.D.
 2              SEPTEMBER 26, 2017
 3
 4                   9:25 a.m.
 5
 6         Videotaped Deposition of Mukesh
 7    Bajaj, Ph.D., held at Morgan, Lewis &
 8    Bockius LLP, One Federal Street, Boston,
 9    Massachusetts, pursuant to Notice, before
10    Sandra A. Deschaine, a Shorthand Reporter,
11    Registered Professional Reporter, Certified
12    LiveNote Reporter, and Notary Public in and
13    for the Commonwealth of Massachusetts.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              MUKESH BAJAJ, PH.D.
 2    A P P E A R A N C E S:
 3       MARKOVITS, STOCK & DEMARCO
 4       Attorneys for the Plaintiff:
 5          3825 Edwards Road
 6          Cincinnati, Ohio 45209
 7          BY:  WILLIAM MARKOVITS, ESQUIRE
 8
 9       MORGAN, LEWIS & BOCKIUS
10       Attorneys for Freddie Mac:
11          One Federal Street
12          Boston, Massachusetts 02110
13          BY:  JASON FRANK, ESQUIRE
14             MICHAEL BLANCHARD, ESQUIRE
15
16       SIDLEY AUSTIN
17       Attorneys for Defendant Richard Syron:
18          1501 K Street, N.W.
19          Washington, DC 20005
20          BY:  FRANK VOLPE, ESQUIRE
21
22
23
24
25    (Appearances continued)
```

Page 4

```
 1              MUKESH BAJAJ, PH.D.
 2    APPEARANCES (continued)
 3       MURPHY & McGONIGLE
 4       Attorneys for Defendant Anthony Piszel:
 5          1185 Avenue of the Americas
 6          New York, New York 10036
 7          BY:  JAMES GOLDFARB, ESQUIRE
 8
 9       ZUCKERMAN SPAEDER
10       Attorneys for Defendant Patricia Cook:
11          1800 M Street, NW
12          Washington, DC 20036
13          BY:  ADAM FOTIADES, ESQUIRE
14          (Appearing telephonically)
15
16       STRAUSS & TROY
17       Attorneys for the Plaintiff:
18          150 East Fourth Street
19          Cincinnati, Ohio 45202
20          BY:  RICHARD WAYNE, ESQUIRE
21          (Appearing telephonically)
22
23
24
25    (Appearances continued.)
```

Page 5

```
 1              MUKESH BAJAJ, PH.D.
 2    APPEARANCES (continued)
 3       DECHERT
 4       Attorneys for Defendant Eugene McQuade:
 5          Cira Centre
 6          2929 Arch Street
 7          Philadelphia, Pennsylvania 19104
 8          BY:  MICHAEL DOLUISIO, ESQUIRE
 9          (Appearing telephonically)
10
11    Also Present:  Howard Lindenberg, Freddie
12                   Mac
13             Dan Bettencourt, Crowninshield
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

MUKESH BAJAJ, PH.D.

THE VIDEOGRAPHER: This is the start tape labeled Number 1 of the videotaped deposition of Mukesh Bajaj, in the matter of Ohio Public Employees Retirement System versus Federal Home Loan Mortgage Corporation, in the court United States District Court of Northern District of Ohio Eastern Division, civil action number 408CV00160.

This deposition is being held at Morgan, Lewis in Boston, Mass., on 9/26/2017 at approximately 9:25 a.m. My name is Carlo Barbeiri from TSG Reporting, Inc., and I'm the legal video specialist. The court reporter is Sandra Deschaine in association with TSG Reporting.

Will counsel please introduce themselves.

MR. MARKOVITS: Bill Markovits on behalf of Ohio Public Employees Retirement System and along with me is Dan Bettencourt of Crowninshield.

MR. FRANK: Jason Frank from

**Page 7**

MUKESH BAJAJ, PH.D.

Morgan, Lewis & Bockius on behalf of Freddie Mac.

MR. BLANCHARD: Michael Blanchard from Morgan, Lewis and Bockius on behalf of Freddie Mac.

MR. LINDENBERG: Howard Lindenberg, Freddie Mac.

MR. VOLPE: Frank Volpe, Sidley Austin, on behalf of Richard Syron.

MR. GOLDFARB: James Goldfarb, Murphy & McGonigle, on behalf of defendant Anthony Piszel.

MR. FOTIADES: Adam Fotiades, Zuckerman Spaeder, on behalf of Patti Cook.

MR. DOLUISIO: Michael Doluisio with Dechert on behalf of Eugene McQuade.

MR. WAYNE: Rick Wayne with Strauss Troy on behalf OPERS.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

MUKESH BAJAJ, Deponent, having first been satisfactorily identified by the

**Page 8**

MUKESH BAJAJ, PH.D.

production of his California driver's license and duly sworn by the Notary Public, was examined and testified as follows:

MR. MARKOVITS: Jason, before we begin, do you want to recite the stipulations?

MR. FRANK: Sure. And before I do that, I think that, for the sake of the record, we should be clear that some of the participants today are -- are participating by telephone, and those are Adam Fotiades, Mike Doluisio, and Rick Wayne, as I understand it. If I'm wrong, please someone on the telephone feel free to speak up.

With respect to the stipulations, Mr. Markovits, you can correct me if I'm wrong, but I believe the parties have agreed that all objections, except as to form, and all motions to strike will be reserved until such time as the testimony is offered to the Court. An objection on behalf of one defendant will be good for all defendants, and the

**Page 9**

MUKESH BAJAJ, PH.D.

witness will have 30 days from receipt of the final version of the transcript to review it, make any corrections necessary, and sign it.

EXAMINATION BY:
MR. MARKOVITS:

Q. All right. Dr. Bajaj, as you heard, my name is Bill Markovits. We've met before. Could you state your name for the record, please?

A. Yes. My name is Mukesh Bajaj.

Q. What is your home and business address?

A. My business address is 1999 Harrison Street, Suite 2700, Oakland, California, 94619, I believe. My home address is 4615 Rockingham Court, Oakland, California, 94619.

Q. And Dr. Bajaj, you understand you're under oath?

A. Yes.

Q. And that this is sworn testimony just as at trial?

A. Yes.

MUKESH BAJAJ, PH.D.

1
2  Q.  And I know you've testified in 50
3  or more matters.  So, unless you'd like to
4  hear them, I'm going to forego the standard
5  explanations of what a deposition is and
6  deposition rules.  Fair enough?
7      A.  Sure.
8      Q.  You and I met at a deposition in
9  this case in January of 2013; correct?
10     A.  Yes.
11     Q.  And when I last spoke to you in
12 2013, it was in part about a report you had
13 issued in 2012 that addressed Dr. Hallman's
14 opinions with regard to market efficiency;
15 correct?
16     MR. FRANK:  Objection.
17     A.  I'm sorry, can you repeat the
18 question.
19     Q.  Yes.  When I last spoke to you in
20 2013, we talked in part about how you
21 addressed Dr. Hallman's opinions with regard
22 to market efficiency; correct?
23     A.  Yes.
24     Q.  And your report of September 1st,
25 2017, that we'll be discussing, in part,

MUKESH BAJAJ, PH.D.

1
2  today, deals with you addressing Professor
3  Feinstein's opinion with regard to market
4  efficiency; correct?
5      A.  It addresses Dr. Feinstein's --
6      THE REPORTER:  I'm sorry, sir,
7  what was that?
8      A.  It addresses Dr. Feinstein's
9  opinions in his report, yes.
10     Q.  Which include opinions with regard
11 to market efficiency; correct?
12     A.  Yes.
13     Q.  Have your views of what is
14 required to establish market efficiency
15 changed since your report in 2012?
16     A.  Not with regards to economic
17 aspects of market efficiency.
18     Q.  With regard to any other aspect?
19     A.  I've become aware of Halliburton
20 -- the most recent version of Supreme Court's
21 Halliburton decision, which, as I understand,
22 explicitly permits Defendants to challenge
23 the presumption of reliance by questioning
24 whether the alleged disclosure defects
25 affected the stock price.  That's my layman's

MUKESH BAJAJ, PH.D.

1
2  description of what I understand.
3      Q.  And other than that change which
4  was brought about by Halliburton II, a change
5  with respect to some cases that was brought
6  about by Halliburton II, has your view, as an
7  economist of market efficiency, changed at
8  all since 2012?
9      MR. FRANK:  Objection.
10     A.  Well, as an economist, my views
11 evolved as literature in financial economics
12 evolves.  I think there has continued to be
13 additional evidence in economics on --
14 arising from the great recession as to how
15 markets can sometimes cease to function well.
16     Q.  Did that change your view of
17 market efficiency?
18     MR. FRANK:  Objection.
19     A.  Well, it's informed my views.
20     Q.  Did it change your view?  Listen
21 to my question, Dr. Bajaj.  And for
22 Mr. Goldfarb's benefit -- he chided me last
23 time for not saying this until towards the
24 end of the deposition, so I'll say it at the
25 beginning -- please answer my questions.

MUKESH BAJAJ, PH.D.

1
2  Listen carefully to my questions
3  and answer my questions, then maybe we'll get
4  out before the rush hour that we were talking
5  about before we began the deposition.
6      MR. FRANK:  Objection.  Dr. Bajaj
7  has been answering the questions, but
8  please feel free to pose another.
9      Q.  Did any literature since 2012 --
10 I'm not asking whether it informed your views
11 or supported your views -- I'm asking:  Did
12 any literature or anything else change your
13 views with regard to what is required to
14 establish market efficiency since you issued
15 your report in 2012?
16     MR. GOLDFARB:  Objection.
17     A.  No.
18     Q.  Your answer was, "No"?
19     A.  Yes.
20     Q.  Thank you.  Has your view of the
21 relevance of the Cammer and Krogman factors,
22 with respect to a determination of market
23 efficiency, changed at all since your report
24 in 2012?
25     A.  No.

Page 14

MUKESH BAJAJ, PH.D.

1
2    Q.  In providing your view of what is
3    required to establish market efficiency, do
4    you take into account the legal standard to
5    be applied?
6        A.  As I understand it, yes.
7        Q.  How do you do that?
8        A.  Well, I inform myself in
9    conversation with counsel and through
10   readings and literature.  I follow, what, if
11   any, changes that would have implications for
12   economic analysis have been made.  And, of
13   course, when I get involved in an assignment,
14   then I clarify my understanding with counsel.
15       Q.  And you've --
16       THE REPORTER:  "With counsel," did
17   you say?
18       MR. MARKOVITS:  "With counsel."
19       THE REPORTER:  Okay.
20   BY MR. MARKOVITS:
21       Q.  And you've done so in this case?
22       A.  Yes.
23       Q.  Your opinion regarding market
24   efficiency is based upon what a financial
25   economist would be satisfied, as to proof of

Page 15

MUKESH BAJAJ, PH.D.

1
2    market efficiency; correct?
3        MR. VOLPE:  Objection.
4        A.  Yes.
5        Q.  And for example, as a financial
6    economist, I believe you've indicated that if
7    the market is efficient, in your opinion, an
8    event study is necessary; correct?
9        A.  No.
10       Q.  You can prove market efficiency
11   without an event study?
12       A.  Well, it depends on what form of
13   market efficiency you're talking about.
14       Q.  Let's talk about the form of
15   market efficiency that's relevant to this
16   case.  Can you prove that form of market
17   efficiency --
18       MR. FRANK:  Objection.
19       Q.  -- without an event study in your
20   opinion?
21       MR. FRANK:  Objection.
22       A.  So it's my understanding that the
23   form that is relevant to this case would be
24   the semi-strong form of market efficiency.
25   And semi-strong form of market efficiency, by

Page 16

MUKESH BAJAJ, PH.D.

1
2    definition, requires proof of cause and
3    effect, which is conducted through an event
4    study whenever feasible.
5        Q.  So then, correct me if I'm wrong,
6    to paraphrase what you said, you believe that
7    a semi-strong form of market efficiency is --
8    is required.  And in order to prove that, you
9    need an event study; correct?
10       MR. GOLDFARB:  Objection.
11       A.  I think I answered your question
12   accurately, in that, the definition of
13   semi-strong form of market efficiency
14   requires you to examine cause and effect,
15   which is what an event study does; and so,
16   whenever it is feasible to conduct an event
17   study, that would be required.
18       Q.  And if it's not feasible, could
19   you still prove semi-strong market
20   efficiency?
21       MR. FRANK:  Objection.
22       A.  I can't answer that question since
23   I've not had an occasion to deal with such a
24   situation.  And I don't have an opinion on
25   that kind of a hypothetical circumstance.

Page 17

MUKESH BAJAJ, PH.D.

1
2    Q.  In using an event study to prove a
3    semi-strong form of market efficiency, you
4    would generally, as a financial economist,
5    use a 95 percent confidence interval; is that
6    correct?
7        A.  Can you repeat your question,
8    please?
9        Q.  In performing an event study to
10   prove a semi-strong form of market
11   efficiency, as a financial economist, you
12   would generally use a 95 percent confidence
13   interval; correct?
14       A.  I don't understand your question
15   as you worded it.  I understand the 95
16   percent significance, but I don't understand
17   your question as you worded it.
18       Q.  In performing an event study,
19   there's a number of procedures that you go
20   through.  But one thing you're doing is
21   looking for statistically significant price
22   impacts on given event dates; correct?
23       MR. FRANK:  Objection.
24       A.  In examining cause and effect, you
25   are testing what material cause is associated

Page 18

MUKESH BAJAJ, PH.D.

1
2   with statistically significant price effect,
3   which is measured through a statistical
4   analysis.  And the usual level of
5   significance for such an analysis is 95
6   percent.
7       Q.   So the usual level of significance
8   is 95 percent, which is a fairly high level
9   of statistical significance; correct?
10      MR. FRANK:  Objection.
11      A.   I can't speak to whether it's high
12  or low.  It depends on your perspective, but
13  that's the usual standard of certitude --
14      Q.   And it's --
15      A.   -- in statistics.
16      Q.   And it -- and it's a higher level
17  of certitude than more likely than not;
18  correct?
19      MR. FRANK:  Objection.
20      A.   I don't know how to interpret
21  "more likely than not."  In the context we
22  are talking about, are you saying more likely
23  than not in the call -- in the context of
24  cause and effect, or whether there is an
25  effect, the degree of certitude is more

Page 19

MUKESH BAJAJ, PH.D.

1
2   likely than not?
3       Q.   Well, let's take either.  Let's
4   take one at a time.  In -- in looking for
5   statistical significance, a 95 percent
6   confidence interval is a higher standard than
7   simply looking for more likely than not
8   statistical significance; correct?
9       MR. FRANK:  Objection.
10      A.   I don't think in statistics, level
11  of significance is thought of as more likely
12  than not.  It is generally thought of as a
13  probability of making what statisticians call
14  Type 1 error and Type 2 errors, so --
15      THE REPORTER:  I'm sorry, called
16  what?
17      A.   Type 1 error or Type 2 error.  So,
18  in this context, 95 percent level of
19  significance simply means the observed effect
20  is of large enough a magnitude that there is
21  5 percent or lower chance that it was
22  observed as a random phenomena without there
23  being any driving force.
24      Q.   What confidence interval would you
25  have used if you just wanted to prove that

Page 20

MUKESH BAJAJ, PH.D.

1
2   it's more likely than not, that it was not
3   caused by random forces?
4       MR. FRANK:  Objection.
5       A.   As I said, statisticians generally
6   do not think of the issue -- as you both
7   said.  You could say that, if it's a coin
8   flip, 50/50 chance as to whether an
9   observation is significant.  Then you could
10  use a P-value of 50 percent.  In that case,
11  you would as likely -- you would be as likely
12  to correctly conclude that you've observed an
13  effect as -- no, you haven't.  It's just a
14  random chance that manifested itself.
15      Q.   And what if you used a P-value of
16  51 percent?
17      A.   Well, then there would be 51
18  percent chance that you've actually observed
19  an effect, and 49 percent chance that it was
20  just a random observation.
21      Q.   So if you used a -- instead of
22  using a confidence interval of 95 percent, if
23  you used a confidence interval of 51 percent,
24  you could conclude, based upon that, that it
25  was more likely than not that it was not --

Page 21

MUKESH BAJAJ, PH.D.

1
2   that your result was not based on random
3   observation?
4       MR. FRANK:  Objection.
5       A.   I think what you probably meant to
6   say was level of significance of 51 percent,
7   rather than confidence interval --
8       Q.   All right.
9       A.   -- which is --
10      THE REPORTER:  "... rather than
11  confidence," what?
12      Q.   Interval.
13      A.   Interval -- which is a very
14  different concept.  Is that correct?  Did you
15  mean to say "level of significance"?
16      Q.   I'll go with that.
17      A.   Okay.  So could you repeat your
18  question?
19      Q.   So if, instead of using a 95
20  percent level of significance, you used a 51
21  percent level of significance, that would
22  still provide that the result is more likely
23  than not, not the result of random forces?
24      MR. FRANK:  Objection.
25      A.   I think you could say that.

Page 22

MUKESH BAJAJ, PH.D.

1
2    Q.  Do you know whether the legal
3    standard for proving market efficiency for
4    purposes of applying the Basic presumption
5    has changed since your report in December of
6    2012?
7    A.  Besides the issue we talked about
8    a little while ago regarding rebuttal of
9    presumption, it's my understanding that
10   market efficiency for reliance purposes is
11   based on informational efficiency and
12   semi-strong form version of market
13   efficiency, just as it was at the time I
14   issued my report in 2012.
15   Q.  You heard from the videographer
16   that this case is pending in the Northern
17   District of Ohio.  Are you familiar with what
18   circuit the Northern District of Ohio is in?
19   A.  I've heard about it.  I can't say
20   that I can recall it.
21   Q.  It's the sixth circuit.  And let
22   me ask you then as a follow-up to that:  Are
23   you familiar with the sixth circuit law
24   regarding the standard of market efficiency
25   that's required to satisfy the Basic

Page 23

MUKESH BAJAJ, PH.D.

1
2    presumption?
3    A.  No, I'm not aware of any
4    distinction that applies to sixth circuit in
5    connection with the issues we've been talking
6    about.
7    Q.  Okay.  Would it make a difference
8    to your opinion if the sixth circuit applied
9    a different legal standard for determining
10   market efficiency for the purpose of the
11   Basic presumption than the economic standard
12   upon which your economic opinion is based?
13   MR. MARKOVITS:  Bless you.
14   MR. FRANK:  Objection.
15   A.  My opinion is, of course, based on
16   economic standard, as informed by my
17   understanding of the legal framework.  And I
18   am not aware of any particular sixth circuit
19   law that is inconsistent with my
20   understanding of the legal principles that
21   guide the economic analysis.
22   Q.  As you sit here today, do you have
23   any idea whether -- bless you --
24   THE REPORTER:  Sorry.
25   Q.  -- whether the sixth circuit does

Page 24

MUKESH BAJAJ, PH.D.

1
2    or does not apply the Cammer-Krogman factors
3    in determining market efficiency?
4    A.  I'm not a lawyer, and I have not
5    informed myself of differences, if any, in
6    this regard in sixth circuit versus another
7    circuit.
8    Q.  Would it affect your opinion if
9    the sixth circuit did apply all of the
10   Cammer-Krogman factors in determining market
11   efficiency?
12   ** MR. FRANK:  Objection.
13   Q.  Bless you.
14   A.  In my report that I have offered,
15   I have already assumed that courts consider
16   all of the Cammer-Krogman factors of market
17   efficiency, so I don't understand your
18   question in that light.
19   Q.  So if that's the case, then sixth
20   circuit law, if they did apply all the
21   factors to a determination of market
22   efficiency, that wouldn't affect your
23   opinion; correct?
24   MR. FRANK:  Objection.
25   A.  As I've said, I already assumed

Page 25

MUKESH BAJAJ, PH.D.

1
2    that the relevant court would consider all of
3    Cammer and Krogman factors, given their
4    probative value as discussed in my report.
5    Q.  But your report doesn't address
6    Professor Feinstein's opinions with respect
7    to the Cammer-Krogman factors with the
8    exception of Cammer Factor 5; correct?
9    MR. FRANK:  Objection.
10   A.  I don't think that is correct, and
11   I can refer to my report to point you to
12   where it does discuss Dr. Feinstein's
13   opinions on various Cammer-Krogman Factors,
14   including Cammer Factor 5.
15   Q.  Okay.  We'll go over that in a
16   little bit.  Following the dismissal of the
17   case in 2013, when were you contacted about
18   resuming your work on the case?
19   A.  On or about November, December of
20   last year is my recollection.
21   Q.  Did you review the decision of the
22   sixth circuit?
23   A.  I think I did in the beginning.
24   I'm not a hundred percent sure.
25   Q.  Do you have a new engagement

<br>

Page 26

```
1        MUKESH BAJAJ, PH.D.
2   letter?  I know last time we talked about
3   your prior engagement letter.  Did you enter
4   into a new engagement letter?
5        A.  No, we are working under the same
6   preexisting engagement letter that was in
7   effect when I submitted my report in 2012.
8        Q.  Your rates have gone up a little
9   though?
10       A.  Yeah, there is a usual increase in
11  rates about once a year.
12       Q.  During the course of your most
13  recent engagement, have you communicated with
14  anyone at Freddie Mac, other than, perhaps,
15  Freddie Mac counsel?
16       A.  No.
17       Q.  Have you communicated with any of
18  the individual Defendants during the course
19  of your most recent engagement?
20       A.  No.
21       Q.  Have you communicated with any
22  lawyers other than the lawyers for Freddie
23  Mac during the course of your engagement?
24       MR. FRANK:  Objection.
25       A.  Not in connection with my work in
```

Page 27

```
1        MUKESH BAJAJ, PH.D.
2   this case.
3        Q.  In connection with your work in
4   other cases?
5        A.  Of course.
6        Q.  Which lawyers who were working on
7   this case have you communicated with -- with
8   respect to other cases?
9        MR. FRANK:  Objection.
10       A.  No, I think you misunderstood my
11  answer.  What I said was, I have, of course,
12  communicated with other counsel with whom I'm
13  working on other cases.  I'm not working on
14  any other cases with counsel that I'm working
15  on -- working with on the Freddie Mac case.
16       Q.  Okay.  You're billing your time at
17  $1050 per hour; is that correct?
18       A.  Yes.
19       Q.  Have you been paid for any of your
20  work since the resumption of your engagement?
21       A.  Yes.
22       Q.  How much have you been paid?
23       A.  I understand that -- that you are
24  entitled to invoices.  I don't have the
25  numbers in my head.  So maybe you could just
```

Page 28

```
1        MUKESH BAJAJ, PH.D.
2   look at the invoices or you could ask me
3   questions.  Once you look at the invoices,
4   I'd be happy to answer those.
5        Q.  And the invoices would show what
6   you've been paid to date?
7        A.  I think so, yes.
8        MR. MARKOVITS:  Jason, do we have
9   those invoices?
10       MR. FRANK:  We do.
11       MR. MARKOVITS:  All right.  At a
12  break, can I get those invoices?
13       MR. FRANK:  You definitely can.
14       MR. MARKOVITS:  Thank you.
15  BY MR. MARKOVITS:
16       Q.  And would those invoices show,
17  generally, how much time you've spent working
18  on this matter following appeal, with the
19  exception of deposition preparation?
20       MR. FRANK:  Objection.
21       A.  I haven't seen the invoices that
22  counsel is going to turn over to you, but I
23  presume there would be full set of invoices.
24  And generally, our invoices are issued at the
25  end of a calendar month for work through the
```

Page 29

```
1        MUKESH BAJAJ, PH.D.
2   end of the previous calendar month.
3        Q.  Okay.  And you're working with
4   other people at Navigant on this engagement
5   as you did the last session we talked?
6        A.  Yes, several of my colleagues from
7   Navigant are assisting me on my work.
8        Q.  And those invoices would reflect
9   both your time and the time of your
10  colleagues at Navigant?
11       MR. FRANK:  Objection.
12       A.  That's my assumption, but let's
13  see the invoices when you get them.
14       Q.  All right.  Following your report,
15  which is dated September 1st, 2017, have you
16  done any work on this matter?
17       A.  Yes.
18       Q.  What work have you done since
19  September 1st?
20       A.  Primarily, I have reviewed
21  materials in preparation for my deposition
22  today.
23       Q.  Other than reviewing materials in
24  preparation for your deposition, did you do
25  any additional work?
```

Page 30

MUKESH BAJAJ, PH.D.

1
2   MR. FRANK:  Objection.
3   A.   While repeating some calculations,
4   reviewing calculations, I reviewed all of
5   that as -- in connection with preparing for
6   this deposition, only that kind of work.
7   Q.   Did you meet with anybody to
8   prepare for your deposition?
9   A.   Do you mean a Navigant colleague
10  or do you mean somebody else?
11  Q.   Well, let's start with other than
12  counsel, did you meet with anybody to prepare
13  for your deposition?
14  A.   Yes.
15  Q.   Who did you meet with?
16  A.   I met with a few of my colleagues
17  in connection with my preparation for this
18  deposition.
19  Q.   What was the purpose of those
20  meetings?
21  MR. FRANK:  Objection.
22  A.   Sometimes to gather material;
23  sometimes to review some calculations;
24  sometimes to brainstorm, ask questions.
25  Q.   Did you meet with counsel to

Page 31

MUKESH BAJAJ, PH.D.

1
2   prepare for your deposition?
3   A.   Yes.
4   Q.   On how many occasions?
5   A.   One occasion.
6   Q.   When did this take place?
7   A.   Yesterday.
8   Q.   How long did you meet for?
9   A.   Maybe six or seven hours.
10  Q.   Who did you meet with?
11  A.   I met with Mr. Frank.  I met with
12  Mr. Blanchard and Mr. Volpe and Mr. Linberg
13  (sic).
14  Q.   You've reviewed the Third Amended
15  Complaint in this case; correct?
16  A.   Yes.
17  Q.   You understand that, in part, the
18  allegations of the Third Amended Complaint
19  are that the Defendants made material
20  misrepresentations and omissions relating to
21  Freddie Mac's exposure to credit risk;
22  correct?
23  A.   That's generally consistent with
24  my understanding, but I'd appreciate having
25  the Complaint in front of me, so I can be

Page 32

MUKESH BAJAJ, PH.D.

1
2   careful about the verbiage that I agree with
3   or not.
4   THE REPORTER:  About the "verbiage
5   I," what?
6   THE WITNESS:  I agree to or not.
7   Can we take a break?
8   MR. MARKOVITS:  Sure.
9   THE WITNESS:  Okay.
10  THE VIDEOGRAPHER:  The time now is
11  10:00 o'clock.  We're off the record.
12  (Recess taken at 10:00 a.m. to 10:12 a.m.)
13  THE VIDEOGRAPHER:  The time now is
14  10:12.  We're on the record.
15  BY MR. MARKOVITS:
16  Q.   Dr. Bajaj, before we broke, I was
17  talking to you about the Third Amended
18  Complaint.  And I want to ask you:  Do you
19  understand that part of the allegations of
20  the Plaintiffs in this case are that the
21  Defendants made material misrepresentations
22  and omissions relating to Freddie Mac's
23  adherence to its underwriting guidelines?
24  A.   You know, it sounds somewhat
25  familiar.  But, as a lawyer, you delve into

Page 33

MUKESH BAJAJ, PH.D.

1
2   this terminology all the time, I don't.  So
3   it would helpful to me if I could have the
4   Complaint in front of me.
5   Q.   When you did your price impact
6   analysis, what complaint-related allegations
7   were you looking for?
8   MR. FRANK:  Objection.
9   A.   Again, I'd like to look at my
10  Complaint, where I explain what allegations
11  and what economic evidence I considered for
12  purposes of that opinion.
13  MR. GOLDFARB:  Objection.
14  MR. FRANK:  You're referring to
15  your report?
16  THE WITNESS:  My report.  I'm
17  sorry.
18  BY MR. MARKOVITS:
19  Q.   As you sit here today, after
20  writing the report and reviewing the reports
21  since September 1st, can you give me any
22  understanding of what Complaint-related
23  allegations you were considering in
24  determining whether there was price impact on
25  November 20th, 2007?

Page 34

MUKESH BAJAJ, PH.D.

1
2    A.  Yes, I can, if I have my report in
3  front of me.  Because I would prefer not to
4  speak from memory when talking about legal
5  language from the Complaint that my report
6  addressed.  I think it's only fair that I get
7  a chance to see that.
8    Q.  And I will give you that chance,
9  Doctor.  But before we go there, I would like
10  to know if you have any memory or
11  understanding of what Complaint-related
12  allegations you were considering when
13  determining whether there was price impact on
14  November 20th, 2007?
15    MR. FRANK:  Objection.
16    A.  Well, again, with the caveat -- I
17  understand it's my job to answer your
18  questions to the best of my ability -- but
19  with the caveat I don't have my report in
20  front of me, I believe I looked at the
21  disclosures on November 20th, by the company,
22  including but not limited to, the press
23  release, the information statements,
24  subsequent analyst call, various press
25  reports, analyst commentary.

Page 35

MUKESH BAJAJ, PH.D.

1
2    And I examined all that
3  information from an economic perspective as
4  to whether that information amounted to what
5  Plaintiffs characterize in the Third Amended
6  Complaint as corrective disclosures.
7    Q.  Again, what were the subject
8  matters of the misrepresentations or
9  omissions, to your understanding, that
10  Plaintiffs are alleging were disclosed or
11  materialized on November 20th?
12    MR. FRANK:  Objection.
13    A.  Again, my recall -- and I'd much
14  rather have my report in front of me where
15  the relevant section of the Complaint is
16  quoted -- there were allegations about
17  exposure to subprime risk, which had not been
18  allegedly disclosed.  There were allegations
19  about lack of adequate capital.
20    THE REPORTER:  "...of very good
21  capital," is that what you said?
22    THE WITNESS:  Lack of adequate
23  capital; something about underwriting
24  standards.  Those are the issues that I
25  sort of recall.

Page 36

MUKESH BAJAJ, PH.D.

1
2  BY MR. MARKOVITS:
3    Q.  Let's turn to your report, which
4  we will mark as Exhibit 187.  Thanks to
5  Mr. Frank.
6  (Exhibit 187, Expert Report of Mukesh
7  Bajaj, Ph.D., marked for identification.)
8    THE REPORTER:  Exhibit 187.
9    Q.  Dr. Bajaj, the court reporter has
10  handed you Exhibit 187.  Is that the report
11  you most recently wrote in this case?
12    A.  Yes.
13    Q.  Is that your signature on page 81
14  of the report?
15    A.  Yes.
16    Q.  Did you review a copy of
17  Exhibit 187 before you signed it?
18    A.  Yes.
19    Q.  And in reviewing it, did you
20  endeavor to make sure everything in
21  Exhibit 187 was true and accurate?
22    A.  Yes.
23    Q.  Every word in the report you have
24  either written or you've reviewed and
25  accepted; correct?

Page 37

MUKESH BAJAJ, PH.D.

1
2    A.  Yes.
3    Q.  Did you have the ability to
4  perform all the analysis that were necessary
5  to form your opinions given in the report?
6    A.  Yes.
7    Q.  Is there any analysis that you
8  were prevented from conducting that you feel
9  would have been helpful in generating your
10  opinions given in your report?
11    A.  Can you repeat the question,
12  please?
13    Q.  Is there any analysis that you
14  were prevented from conducting that you feel
15  would have been helpful in generating your
16  opinions reflected in your report?
17    A.  No.
18    Q.  Is there any further work you
19  intend to do with respect to obtaining
20  documents to support the opinions you have
21  given?
22    MR. GOLDFARB:  Can you read
23  back -- can you read back the question,
24  please?
25    MR. MARKOVITS:  I can't, but I

Page 38

1    MUKESH BAJAJ, PH.D.
2  assume the court reporter can.
3    MR. GOLDFARB:  Please.
4    THE REPORTER:  "Is there any
5  further work you intend to do with
6  respect to obtaining documents to
7  support the opinions you have given?"
8    THE WITNESS:  So, as I say in
9  paragraph 8, "If additional information
10 becomes available, I reserve the right
11 to supplement or modify opinions set
12 forth in this report."
13 BY MR. MARKOVITS:
14   Q.  As you sit here today, is there
15 any other documentary information that you
16 intend to pursue to support the opinions in
17 your report?
18   A.  Not at the current time.
19   Q.  Are there any further opinions you
20 intend to give in this case?
21   MR. FRANK:  Objection.
22   A.  The opinions I offer are in
23 response to questions posed of me, and I try
24 to answer them to the best of my ability.
25 And those questions today or on a future date

Page 39

1    MUKESH BAJAJ, PH.D.
2  may or may not elicit other opinions.
3    Q.  As you sit here today, have any
4  other questions been asked of you that would
5  solicit further opinions in this case?
6    A.  No, not as I sit here right now.
7    Q.  Is there any analysis that you
8  performed, other than that as reflected in
9  your report?
10   A.  For this case?
11   Q.  Yes.
12   A.  No.
13   Q.  Statements made in the report are
14 true and accurate?
15   A.  To the best of my information and
16 belief, yes.
17   Q.  When was the last time you
18 reviewed the report?
19   A.  Yesterday.
20   Q.  There's nothing in the report that
21 you would consider to be a mistake?
22   A.  Not that I'm aware of, as I sit
23 here right now.
24   Q.  Did counsel provide you with any
25 facts or data that you considered in forming

Page 40

1    MUKESH BAJAJ, PH.D.
2  the opinions to be expressed?
3    A.  I'm sorry.  Can you repeat the
4  question?
5    Q.  Did counsel provide you with any
6  facts or data that you considered in forming
7  the opinions you expressed?
8    A.  Yes.
9    Q.  What facts or data were provided
10 to you by counsel?
11   A.  So, for example, counsel provided
12 me with Dr. Feinstein's affidavit, his
13 report, some of the printouts of tests that
14 he conducted after submitting his report,
15 some of the data he produced, and various
16 other information listed in Appendix 2 of my
17 report -- some of which I gathered on my own,
18 but some of it was provided by counsel.
19   Q.  Turning to Appendix 2, would you
20 be able to indicate which were provided by
21 counsel?
22   MR. FRANK:  Objection.
23   Q.  Generally?
24   MR. FRANK:  Objection.
25   A.  So I'm not sure I can be

Page 41

1    MUKESH BAJAJ, PH.D.
2  comprehensive and have precise recall; but,
3  generally speaking, the documents considered
4  under the title of "Legal Documents" were
5  sent to me by counsel.  Declarations, expert
6  reports, and testimony, which cover various
7  declarations and reports and transcripts of
8  testimony by your expert Dr. Hallman and your
9  new expert, Dr. Feinstein, were provided to
10 me by counsel.
11   For the most part, academic
12 sources, of which I've listed 42, were
13 gathered by my team.
14   Q.  Were any of the academic sources
15 provided by counsel?
16   A.  I can't think of any, as I sit
17 here, unless it was a source that would have
18 been cited by one of your experts and was
19 part of discovery materials in that
20 connection.  I don't have a recall of that.
21 But mostly these are materials that I'm
22 familiar with, routinely rely upon, and I
23 gathered myself.
24   For analyst reports, there again,
25 I don't recall.  Because sometimes we get

Page 42

1          MUKESH BAJAJ, PH.D.
2   some reports from counsel through -- through
3   counsel from clients, so we don't have to
4   spend money getting them from data vendors.
5   But we always get any additional reports, if
6   we need them, through our own data vendor
7   subscriptions.
8          There may be some materials under
9   the title of "Other Cases," where we receive
10  those materials from counsel.  Items under
11  "News Articles" are items we collected.  And
12  that also pertains to items listed under
13  Freddie Mac and miscellaneous sources and
14  data sources.
15      Q.   Did counsel provide you with any
16  assumptions that you relied upon in forming
17  the opinions you expressed?
18      A.   Nothing comes to mind.
19      Q.   You're not opining the Defendants
20  did not engage in fraud, are you?
21      A.   In reviewing the market efficiency
22  evidence, I was agnostic with regard to
23  Plaintiff's allegations.  They did not matter
24  for my analysis one way or another.
25          For evidence -- economic evidence

Page 43

1          MUKESH BAJAJ, PH.D.
2   on price impact, I obviously considered
3   Plaintiff's allegations in the Third Amended
4   Complaint, and then examined contemporaneous
5   economic evidence to express the opinions
6   that I did.
7       Q.   For price impact though, you're
8   not opining that the Defendants did not
9   engage in fraud; correct?
10      A.   No, the scope of my analysis is
11  simply looking at Plaintiff's allegations as
12  expressed in the Third Amended Complaint and
13  examining contemporaneous public, economic
14  record to reach the opinions that I have
15  expressed in this report.
16      Q.   And let me just, perhaps, clarify
17  the question a little.  Because you'd agree
18  that one way that you could give an opinion
19  that there's no price impact is by opining
20  that there's no -- there was no fraud;
21  correct?
22      A.   Okay.  I'm following you.
23      Q.   All right.  I just want to make
24  sure.  That's not what you're doing in your
25  report; correct?

Page 44

1          MUKESH BAJAJ, PH.D.
2          MR. GOLDFARB:  Objection.
3       A.   If your question is whether I have
4   reached an opinion on the truth or lack
5   thereof of Plaintiff's allegations of fraud,
6   I did not do any such work.
7       Q.   Okay.  That was my question.
8   Thank you.
9          What is the efficient capital
10  markets hypothesis?
11      A.   So, generally speaking, economists
12  think of efficient market hypothesis as a
13  nested proposition.  There is weak form of
14  this hypothesis.
15          THE REPORTER:  "Weak"?
16      A.   Weak, w-e-a-k.  The weak form of
17  efficient market hypothesis says that price
18  of a security in a well-developed market
19  already reflects its historical values.  So
20  if you are charting a stock and you say,
21  Well, looks like the stock has dropped below
22  the range it has been traded in the last 50
23  days, that observation has no ability to
24  predict whether, in the future, the stock
25  will go up or it will go down.

Page 45

1          MUKESH BAJAJ, PH.D.
2          The current price already reflects
3   the historical prices and their patterns.  So
4   that's the weak form of efficient market
5   hypothesis.
6          What is more relevant, according
7   to my understanding to questions of reliance,
8   is the semi-strong form of market efficiency,
9   which says that all public information is
10  already reflected in the current stock price.
11          So, for example, if you have an
12  oil company stock and you read an article
13  which says that global oil consumption is
14  going to go up by about 3 percent a year for
15  the next 20 years and current capacity may
16  not be sufficient to service demand in 10
17  years, that information, if it is already
18  public, is not a sound basis for you to
19  predict whether a particular oil company
20  stock is going to go up or down from where it
21  is today.
22          The semi-strong form of market
23  efficiency is a statement that is tested in
24  economics literature by conducting event
25  studies, namely, does the stock price move

Page 46

MUKESH BAJAJ, PH.D.

1  
2 reasonably promptly to material new
3 information that is valued relevant.  And in
4 this context, sometimes a term is used called
5 "informational efficiency," as against
6 another term called "fundamental efficiency."
7     And it's my understanding that the
8 standard of market efficiency that is
9 applicable to exploring questions of reliance
10 has always been, since the Basic case,
11 semi-strong form of market efficiency in the
12 informational efficiency sense.  In other
13 words, it's not about whether the stock price
14 is correct from a fundamental point of view,
15 it is whether it correctly reacts to material
16 valued relevant information.
17     And then there is a benchmark,
18 which is just a theoretical benchmark, called
19 strong form of market efficiency, which
20 nobody believes has any practical
21 significance.  But it's just a theoretical
22 benchmark, which would say stock price today
23 reflects all public as well as all nonpublic
24 or private information.
25     Q.  Is there a dispute among

Page 47

MUKESH BAJAJ, PH.D.

1  
2 economists regarding the truth of the
3 efficient capital markets hypothesis?
4     MR. FRANK:  Objection.
5     A.  So economists always are learning
6 from empirical evidence.  And by now, there
7 is sufficient evidence that stock prices are
8 not always correctly priced in the
9 fundamental sense.  We could have bubbles,
10 which we often detect with hindsight, or
11 other phenomena where economists conclude
12 that prices were either too high or too low
13 relative to economic fundamentals, at least
14 with the benefit of hindsight.
15     There is also increasing evidence
16 that, while there are several market
17 institutions and characteristics that
18 facilitate stocks on well-developed markets
19 to generally trade in a semi-strong form of
20 market efficiency in the sense of
21 informational efficiency, there are times and
22 circumstances when that may not be the case.
23 So that's what I believe is the current
24 consensus view among financial economists.
25     Q.  And that was helpful, but it

Page 48

MUKESH BAJAJ, PH.D.

1  
2 wasn't an answer to my question, which --
3 would it be fair to say that there's a
4 dispute among economists as to the efficient
5 capital markets hypothesis?
6     MR. FRANK:  Objection.
7     A.  Yes.  So the latter evidence,
8 obviously, is evidence of -- call it dispute,
9 call it disagreement, call it a process of
10 discovery.  I don't think there is a dispute
11 among financial economists that, generally
12 speaking, stocks tend to trade in semi-strong
13 form efficient market on well-developed
14 markets.  But there can be disputes, in the
15 process of discovery, whether a particular
16 observed evidence of deviation from
17 semi-strong form of market efficiency is a
18 statistical artifact or true economic
19 phenomena, how prevalent it is or not.  Those
20 are the kind of, quote/unquote, "disputes" or
21 "disagreements" or "discussions" that take
22 place.
23     Q.  And for purposes of your opinion,
24 would it be correct to say that an efficient
25 market is one where the market price for a

Page 49

MUKESH BAJAJ, PH.D.

1  
2 stock rapidly reflects all public material
3 information throughout the class period?
4     A.  In the informational efficiency
5 sense, yes.
6     Q.  There's no consensus among
7 economists how rapidly information has to be
8 incorporated under the efficient capital
9 markets hypothesis; correct?
10     A.  Not really.  I think -- my sense
11 is that, for most purposes, economists
12 believe that for actively traded stocks,
13 information generally gets impounded --
14 new infor- -- new material information
15 generally gets impounded within one trading
16 day.  It could be within a matter of seconds
17 or not; and for certain kind of information,
18 it may take more than a day.  So I think it's
19 more an issue of fact and circumstances,
20 rather than a disagreement among economists.
21     Q.  In your earlier report and
22 testimony regarding Dr. Hallman's opinions,
23 you said that a market that reacts to news on
24 two out of six days is not an efficient one;
25 correct?

Page 50

MUKESH BAJAJ, PH.D.

1
2    A.  Yes.  Again, understanding that
3    when we talk about efficient market for the
4    rest of the day, my maintained assumption is
5    that you're talking about semi-strong form of
6    market efficiency and informational
7    efficiency.  And unless I make it clear
8    otherwise, I'm not talking about fundamental
9    efficiency, and I'm not talking about
10   anything other than semi-strong form of
11   market efficiency.
12        Q.  Fair enough.  We'll take that
13   assumption going forward, unless either you
14   or I indicate otherwise.  All right?
15        A.  Perfect.
16        Q.  All right.  So with that
17   understanding, are you assuming -- when you
18   say that a market that reacts to news two out
19   of six days is not an efficient one, are you
20   assuming that there has to be a statistically
21   significant reaction to news days in an
22   efficient market?
23        MR. FRANK:  Objection.
24        A.  No.
25        Q.  So you'd agree that a stock can

Page 51

MUKESH BAJAJ, PH.D.

1
2    react to news and react properly under a
3    semi-strong form of efficient market and that
4    reaction might not be statistically
5    significant?
6        A.  Well, when we say the stock reacts
7    to news, the only way to make that statement
8    is when the reaction is measured with
9    sufficient degree of statistical reliability,
10   because we measure these reactions, or lack
11   thereof, through statistical models.  So an
12   economist cannot say that the stock price
13   reacted to a certain piece of information
14   unless that reaction is capable of being
15   reliably measured, which requires a certain
16   degree of statistical certitude because the
17   tools of measurement are statistical in
18   nature.
19        Q.  Let's take Dr. Hallman's report as
20   an example.  Why would you expect there to be
21   a statistically significant reaction on more
22   than two of six news days?
23        A.  Well, if Dr. Hallman puts forth
24   six material news days and, hence, as
25   candidates for examining market efficiency

Page 52

MUKESH BAJAJ, PH.D.

1
2    through cause-and-effect analysis, then it
3    follows that if he chose the right dates, on
4    those dates, he had a hypothesis that there
5    was material news, he had a hypothesis as to
6    the implication for the direction in which
7    stock price should be expected to react to
8    that news.
9        And the test part, then, has to do
10   with whether or not, as required by the
11   definition of market efficiency and reliance,
12   on all, or almost all of those occasions, he
13   does, indeed, observe an effect associated
14   with the cause that he identified, and two
15   out of six just does not cut it.
16        Q.  And so I want to be careful how --
17   how we talk about this.  Because some of the
18   statements in your prior report and current
19   report talk about news and then some talk
20   about material news.  And I want to make sure
21   that we don't gloss over that distinction.
22        So when you say that a market that
23   reacts to news on two out of six days is not
24   an efficient one, you really mean a market
25   that reacts to material news on two out of

Page 53

MUKESH BAJAJ, PH.D.

1
2    six days is not an efficient one; correct?
3        A.  Well, I don't think I said what
4    you just stated I said.
5        Q.  All right.
6        A.  I think I could read my answer,
7    but what I said is:  If Dr. Hallman puts
8    forth six dates that are candidate for
9    cause-and-effect tests, and if they are
10   proper candidates, then, if he demonstrates
11   cause and effect through statistically
12   significant price movement in the anticipated
13   direction, that evidence would be consistent
14   with market being semi-strong form efficient
15   in the informational sense; and if it did
16   only on two of the six such dates, then that
17   evidence is insufficient to further the
18   belief that the market is semi-strong form
19   efficient.  That's not consistent with the
20   maintained hypothesis that the market is
21   semi-strong form efficient.
22        Q.  Is it your opinion that every
23   piece of material news about a stock should
24   be expected to move the stock price in a
25   statistically significant manner?

14

MUKESH BAJAJ, PH.D.

1
2       MR. GOLDFARB:  Objection.
3       A.  I think because -- sorry -- I
4   think because statistics are involved, I
5   won't go as far as to say in every instance,
6   but in almost every instance.  But what I
7   mean by that is, if you test a hundred dates
8   for cause and effect, then large enough of
9   those hundred dates satisfy what you would
10  expect under cause and effect for
11  statistically -- for the statistical
12  inference that the market reacts to material
13  news always.
14      So depending on the sample size,
15  if you demonstrate cause and effect on 80 or
16  90 percent of the dates, that would be
17  sufficient in my view.  There's always some
18  form of statistical noise, so the test is if
19  it's statistically close enough to be a
20  hundred percent of the time.  And close
21  enough depends on the sample size.
22      Q.  So are you defining "material
23  news" then, as news that moves a stock price
24  in a statistically significant manner?
25      A.  No.  I think you are saying it

MUKESH BAJAJ, PH.D.

1
2   backwards.  For a test to be scientific, an
3   economist has to identify material news
4   before peeking ahead and saying, "Yeah, the
5   stock moves on that date; therefore, the news
6   must be material."  That would turn the
7   statistical testing on its head and that
8   would be no honest evidence.  That would be
9   dishonest evidence.
10      Q.  Right.  But my question is:
11  You're saying that any news that an economist
12  identifies as material, before they do their
13  testing, that with some minor adjustments --
14  10 or 20 percent, I guess, under your prior
15  testimony -- you would expect all of that
16  material news to result in a statistically
17  significant price reaction?
18      MR. FRANK:  Objection.
19      A.  No, that's not the right way to
20  think about it.
21      Q.  Well, tell me how --
22      A.  All --
23      Q.  -- to think about it.
24      A.  All material value relevant news
25  would be, or should be, associated with a

MUKESH BAJAJ, PH.D.

1
2   stock-price effect.  So if you've got a
3   publicly traded company with market
4   capitalization of a billion dollars and one
5   of their trucks is destroyed in an evidence
6   (sic) and there's a loss of a hundred
7   thousand dollars, that would not be material
8   value relevant news, that would be too small
9   of a change to be picked up through an event
10  study analysis.  Event study is not designed
11  for those purposes.  I understand in legal
12  context there are ways of talking about
13  materiality that are not quantitative.
14      Q.  And that's the distinction I want
15  to make.  But first, let me get to -- you
16  keep adding on layers of qualifications, and
17  I want to just make sure I understand it.
18      So you're saying now all material
19  value relevant news should be accompanied by
20  a stock-price effect --
21      MR. FRANK:  Objection.
22      Q.  -- correct?
23      A.  Yes.
24      Q.  And when you say "a stock-price
25  effect" in that situation, you're saying all

MUKESH BAJAJ, PH.D.

1
2   material value relevant news should be
3   associated with a statistically significant
4   stock-price effect?
5       MR. FRANK:  Objection.
6       A.  Yes.
7       Q.  Okay.  So you're discounting the
8   possibility that there could be material
9   value relevant news that would not have a
10  statistically significant stock-price effect?
11      MR. FRANK:  Objection.
12      A.  I'm sorry.  I didn't understand
13  your question.
14      Q.  So, in your opinion, there should
15  be no material value relevant news that would
16  cause a stock-price reaction less than a
17  statistically significant one?
18      A.  Well, there, as I said, if you
19  observe that often enough, then you would say
20  you have not established, empirically, cause
21  and effect.  There's -- we talked about,
22  depending on the sample size, 80 to 90
23  percent threshold.  So if you had six
24  candidates for cause and effect and you
25  demonstrated cause and effect on two out of

Page 58

MUKESH BAJAJ, PH.D.

1
2    those six, that would not be sufficient to
3    demonstrate cause and effect.
4        Q.  What if Dr. Hallman's two
5    candidates were the two dates where there was
6    a statistically significant price reaction,
7    would that be enough to establish market
8    efficiency?
9        MR. FRANK:  Objection.
10       A.  Can you repeat your question?
11       Q.  What if Dr. Hallman's two
12   candidates were the two dates that did result
13   in a statistically significant price
14   reaction, would that be sufficient to
15   establish market efficiency in your opinion?
16       MR. FRANK:  Objection.
17       MR. GOLDFARB:  Objection.
18       A.  Are you asking me a counterfactual
19   hypothetical?  Because I believe he offered
20   six candidates.
21       Q.  Yes.  No, I'm asking a
22   counterfactual hypothetical.  What if there
23   were only two candidates, he chooses the two
24   candidates and both of those candidates have
25   a statistically significant price reaction,

Page 59

MUKESH BAJAJ, PH.D.

1
2    would that be sufficient to establish market
3    efficiency, in your opinion?
4        MR. FRANK:  Objection.
5        A.  So to give further clarification
6    that that price reaction would have to be in
7    the anticipated direction, have to be
8    reasonably quickly enough, it would not, even
9    then, be sufficient to establish semi-strong
10   form of market efficiency over a 330-day
11   class period.  At most, it would say that
12   there are reasons to believe that the two
13   event dates he tested, on those dates the
14   stock exhibited cause and effect.  To
15   generalize it to a 330-day class period would
16   not be sufficient.
17       Q.  Would it be sufficient for a
18   300-day class period?
19       A.  Again, it's a
20   fact-and-circumstances issue as to what is an
21   adequate sample size, and I think 300, as
22   long as those 300 dates are spread along the
23   class period, which they would more or less
24   have to, I would say yes.
25       Q.  No.  I'm saying suppose you had

Page 60

MUKESH BAJAJ, PH.D.

1
2    only two cause-and-effect analysis dates but
3    instead of 330-day class period, you had a
4    300-day class period?
5        A.  Oh, I see.  I would say no, that
6    would not be sufficient.
7        Q.  How about a 30-day class period?
8        A.  Probably, if that was a
9    comprehensive examination of material value
10   relevant news received over that 30-day class
11   period.
12       Q.  But I thought you just said a
13   little bit ago that the only thing you could
14   judge from two days was that there was a
15   cause and effect on those two days.  Now
16   you're saying you can extrapolate to 30 days?
17       MR. GOLDFARB:  Objection.
18       MR. FRANK:  Objection.
19       A.  Well, if -- again, depending on
20   facts and circumstances, extrapolating from
21   two days to a 30-day class period seems much
22   more reasonable, generally speaking, than
23   extrapolating from two days to a 330-day
24   class period; and, of course, if one could,
25   one should look at supplemental evidence.

Page 61

MUKESH BAJAJ, PH.D.

1
2    Maybe you had only two candidates to test
3    cause and effect because the class period was
4    short, then I would consider if the stock had
5    publicly traded options doing a put-call
6    parity test, which, in principle, can be
7    done for every second of every trading day.
8        Q.  Where in the economic literature
9    would I find any threshold for the number of
10   event dates that need to be tested out of a
11   class period in order to find an efficient
12   market for that class period?
13       MR. GOLDFARB:  Kindly repeat the
14   question.  I'm sorry, Bill.
15   BY MR. MARKOVITS:
16       Q.  Sure.  Where in the economic
17   literature would I find any indication of how
18   many event dates need to be tested to be able
19   to extrapolate market efficiency for a given
20   class period?
21       A.  Well, I don't know that there is a
22   bright line rule, but I have pointed to
23   several articles written in the context of
24   examination of reliance, which say a handful
25   of dates in a long class period is not

## Page 62

MUKESH BAJAJ, PH.D.

1  sufficient.  I think --
2
3      Q.  Are you talking about articles or
4  cases?
5      A.  So, as I was saying, there are
6  articles to that effect which are cited, and
7  I believe there are cases that have also
8  talked about this issue.  For example, I
9  recall in the Poly medical case, the Court
10  said, if I recall correctly, there may have
11  been five or six dates in a class period of a
12  few hundred dates.  That's obviously not
13  enough.
14      It is a little bit of a
15  fact-and-circumstance issue.  In this
16  particular case, for example, there was a
17  structural break.  So one would want to make
18  sure there are enough dates both before and
19  after the structural date, break date or
20  dates.  So it's a little bit of a
21  fact-and-circumstances issue.
22      But two event dates for a 330-day
23  class period, I think there is no evidence
24  that I'm aware of that would say it is
25  sufficient.  And I've cited several

## Page 63

MUKESH BAJAJ, PH.D.

1  authorities to the contrary.
2
3      MR. FRANK:  We've been going about
4  an hour, can we take a break now or...
5      MR. MARKOVITS:  Yeah.  We can take
6  a break in a half -- you mean we've gone
7  on an hour since the last break?
8      MR. FRANK:  Almost, yeah.
9      MR. MARKOVITS:  My goodness.  Time
10  flies.  Sure.
11      THE VIDEOGRAPHER:  The time now is
12  11:02.  Off the record.
13  (Recess taken at 11:02 a.m. to 11:15 a.m.)
14      THE VIDEOGRAPHER:  The time now is
15  11:15.  We're on the record.
16  BY MR. MARKOVITS:
17      Q.  Dr. Bajaj, we were talking earlier
18  about material news.  In that context, how do
19  you define "materiality"?
20      MR. FRANK:  Objection.
21      A.  What do you mean by "in that
22  context"?
23      Q.  Well, when you're talking about
24  material news, what do you mean by "material
25  news"?

## Page 64

MUKESH BAJAJ, PH.D.

1
2      A.  So if I'm talking about "material
3  news," in order to test the cause-and-effect
4  prong for market efficiency, then it would be
5  news that would be expected to have a
6  material or significant impact on the stock
7  price.
8      Q.  Would earnings announcements fall
9  into that category?
10      A.  Sometimes they do.
11      Q.  So if you were going to choose
12  earnings announcements as your events to
13  study for an event study, how would you
14  determine which earnings announcements are or
15  are not proper candidates for the event
16  study?
17      A.  Well, I don't think that question
18  can be fairly answered in the abstract,
19  unless it's in the context of a case.  Unless
20  I've thought about facts and circumstances in
21  that case.
22      THE REPORTER:  You haven't
23  thought?
24      A.  Unless I've thought about facts
25  and circumstances in that case.

## Page 65

MUKESH BAJAJ, PH.D.

1
2      Q.  Well, you've thought about it in
3  this case, so let's take earnings
4  announcements in this case that Mr. Hallman
5  reviewed.
6      How would he have determined
7  whether or not earnings announcements were
8  proper candidates for an event study?
9      MR. FRANK:  Objection.
10      MR. GOLDFARB:  Objection.
11      A.  I have not done the work that
12  Mr. Hallman did.  I have evaluated what he
13  did.  So I have not -- and I haven't looked
14  at Mr. Hallman's report since January of 2013
15  either.
16      Q.  As a matter of methodology, how
17  would you determine whether the earnings
18  announcements dates in this case were
19  appropriate candidates for an event study?
20      A.  Well, he claimed that he --
21      Q.  No.  No.  Sorry, Doctor.  Not what
22  he claimed.
23      How would you determine -- you
24  said that sometimes earnings announcement
25  dates that have material news are proper

Page 66

MUKESH BAJAJ, PH.D.

1
2  candidates; sometimes they're not.
3          How would you, in this case,
4  determine whether the earnings announcements
5  are proper candidates for an event study?
6          MR. FRANK:  Bill, please don't
7  interrupt the witness.
8          You can answer.
9          MR. MARKOVITS:  I'll try to
10  refrain as long as he answers my
11  question.
12          A.  I don't have those earnings
13  announcement dates in front of me.  I don't
14  have in front of me what the announcements
15  were and under what circumstances they were
16  made.  And without that information, I can't
17  tell you what I will do.  And I never was
18  tasked with affirmatively determining whether
19  a particular earnings announcement date was
20  material or not.  I was asked to simply
21  examine the conclusions of Mr. Hallman's
22  report.
23          Q.  So you can't tell me what
24  methodology an economist would use to
25  determine whether earning announcements in

Page 67

MUKESH BAJAJ, PH.D.

1
2  any given case are proper candidates for an
3  event study.  Is that your testimony?
4          MR. GOLDFARB:  Objection.
5          A.  That's not my testimony.  I have
6  always -- I have already told you that any
7  candidate date for a cause-and-effect test
8  must be such that ex-ante -- before you look
9  at the results, before you look at the price
10  reaction -- you have an economic hypothesis
11  that this event is economically material to
12  the company; and, hence, expected to have a
13  price reaction that is statistically
14  significant and whether that reaction is in
15  the positive direction or negative direction.
16  That's the extent to which I can articulate
17  the methodology, in general, without
18  considering specific facts and circumstances.
19          Q.  And without considering specific
20  facts or circumstances, let's take earnings
21  announcements, under your hypothesis or your
22  methodology, you need to form a hypothesis of
23  whether an earnings announcement dates is
24  material in the sense that it would expect to
25  have a statistically significant reaction, do

Page 68

MUKESH BAJAJ, PH.D.

1
2  you look at that earnings announcement first
3  and examine what came out on that earnings
4  announcement before you determine whether
5  it's a proper candidate?
6          MR. FRANK:  Objection.
7          A.  I don't understand your question.
8  Can you read it back, please?
9          Q.  Do you look at the earnings
10  announcement -- its context, whether it was a
11  surprise, whether it was expected -- before
12  you determine whether to use it as a
13  candidate in your event study?
14          MR. GOLDFARB:  Objection.
15          A.  You look at all those things in
16  order to determine whether it is a candidate
17  for a cause-and-effect test.
18          Q.  So in this case, it would have
19  been appropriate for either Mr. Hallman or
20  Professor Feinstein to look at the six
21  earnings events dates and determine:  Well, I
22  can't use four of them because the earnings
23  were as expected, so I'm going to use two of
24  them because they were earnings surprise; and
25  in those two, there's a statistically

Page 69

MUKESH BAJAJ, PH.D.

1
2  significant reaction.  That would be a proper
3  event study?
4          MR. FRANK:  Objection.
5          A.  Under your hypothetical, if they
6  had examined six earnings announcements and,
7  in a principal manner, as you said,
8  determined two of those were candidates for a
9  cause-and-effect test and then gone ahead and
10  tested those two, that would be relevant
11  evidence without saying whether those two
12  cause-and-effect dates by themselves would be
13  sufficient to conclude that the stock traded
14  in a semi-strong form efficient market
15  throughout the 330-day class period.
16          Q.  Where might I find support in the
17  economic literature for the proposition that
18  in a semi-strong form of efficient market
19  every piece of material news would be
20  expected to move the stock price in a
21  statistically significant manner?
22          A.  I think it is almost so set in the
23  definition of semi-strong form market
24  efficiency, in the economic literature as I
25  have cited, it so says in several other

Page 70

MUKESH BAJAJ, PH.D.

1
2  publications that I have cited.
3      Q.  Can you point me to one such
4  publication that supports the proposition
5  that in a semi-strong form of efficient
6  market, material news would be expected to
7  move the stock price, in a statistically
8  significant manner, on every occasion?
9      A.  I can review my report and point
10  to a few instances.
11      Q.  Please do.
12      A.  Okay.  So on page 25 of my report,
13  Footnote 62 points to one of my studies,
14  which has further references; Footnote 65
15  points to Ferrillo, Dunbar and Tabak that
16  Dr. Feinstein cited.  It also -- there's also
17  Footnote 66, which is another writing by
18  David Tabak that I believe was cited by
19  Dr. Feinstein and...
20      Q.  And I just want to clarify, your
21  position is that these articles support the
22  proposition that in a semi-strong form
23  efficient market, every piece of material
24  news would be expected to move the stock
25  price in a statistically significant manner?

Page 71

MUKESH BAJAJ, PH.D.

1
2      MR. GOLDFARB:  Objection.
3      A.  With the caveat that we discussed
4  already, yes, these and other authorities,
5  including the Quasar decision and various
6  other authorities I have cited in my report.
7      Q.  If news is expected, there might
8  not be a statistically significant price
9  reaction; correct?
10      A.  Well, if it's affected --
11  expected, then it's not news.  News is, by
12  definition, new information.
13      Q.  So if the market is expecting --
14  let's take this case.  If the market is
15  expecting that there's going to be a $3.29
16  earning per share loss and the news comes out
17  on November 20th, 2007, there's a $3.29
18  earning per share loss, that's still news;
19  correct?
20      A.  I stand corrected.  I was talking
21  about stale information versus news.  That's
22  what I was focused on, rather than expected
23  or unexpected.  So it could be news but not
24  unexpected news, and it's only unexpected
25  news that would be expected to elicit a price

Page 72

MUKESH BAJAJ, PH.D.

1
2  reaction.
3      Q.  So that's another qualification,
4  unexpected news would be expected to elicit a
5  stock-price reaction; correct?
6      MR. FRANK:  Objection.
7      A.  In a semi-strong form efficient
8  market, yes.
9      Q.  And if news is unexpected and
10  material but there are confounding factors,
11  there might not be a statistically
12  significantly stock-price reaction; correct?
13      A.  Well, it depends on facts and
14  circumstances.  And I don't think you can
15  make a statement as general as you made it.
16      Q.  Why can't I make a general
17  statement that would be correct, that you
18  could have news that's unexpected and
19  material and, yet, have equally offsetting
20  confounding factors or confounding news?
21      MR. FRANK:  Objection.
22      Q.  And thereby, have no statistically
23  significant price reaction.  Wouldn't that be
24  correct?
25      MR. FRANK:  Objection.

Page 73

MUKESH BAJAJ, PH.D.

1
2      A.  Well, this latter statement gets
3  closer to being correct if you added more
4  structure to it.  If the confounding news is
5  in the opposite direction and simultaneously
6  received, then you may not see a
7  statistically significant price reaction.
8  Sometimes news is released on the same day,
9  but at different points in time.  And
10  economists routinely look at and try to stock
11  prices and things of that nature.  So that's
12  why I was saying that your previous statement
13  was a bit too general.
14      Q.  Would you agree that there can be
15  news that is both material, unexpected, and
16  value relevant that does not result in a
17  statistically significant stock-price
18  reaction?
19      A.  Can you repeat the question?
20      Q.  Would you agree that there could
21  be news that is material, unexpected, and
22  value relevant that does not result in a
23  statistically significant stock-price
24  reaction?
25      A.  Well, that could be the case if

Page 74

MUKESH BAJAJ, PH.D.

1
2  the market is not semi-strong form efficient.
3  That could be the case every once in a while,
4  going back to the earlier comment of 80 to 90
5  percent of the time, once you observe a
6  stock-price reaction.  So it's possible
7  sometime, but that shouldn't be the case on
8  which you can conclude that the market is
9  semi-strong form efficient.
10      Q.   You're familiar with the article
11  by Brav and Heaton titled, "Event Studies and
12  Securities Litigation Low Power Confounding
13  Effects and Bias"?
14      A.   Yes.
15      Q.   Cited in your report?
16      A.   If you say so, it's cited, it is.
17      Q.   Do you recall the example -- one
18  of the examples they give, where there's an
19  unexpected disclosure of a $700-million fraud
20  that results in accompanying stock decline in
21  a company with a $42-billion capitalization?
22  Do you recall that example?
23      A.   No, I don't recall it.
24      Q.   Well, let me set out the facts for
25  you generally.

Page 75

MUKESH BAJAJ, PH.D.

1
2  You've got a company, $42-billion
3  capitalization.  They announce a $700-million
4  fraud.  The stock reacts in the appropriate
5  direction and in the appropriate amount that
6  you would expect in a semi-strong form of
7  efficient market, but there's no
8  statistically significant price reaction
9  because $700 million in the context of a
10  $42-billion company would not provoke a
11  statistically significant price reaction.
12  Let's take that example.
13      Would it be your opinion that a
14  $700-million fraud is not material news under
15  that example?
16      MR. FRANK:  Objection.
17      A.   I would say that's an incomplete
18  hypothetical.  Because, generally, when a
19  company announces fraud, the stock-price
20  impact reflects more than the direct
21  dollar-for-dollar loss to that fraud and
22  anticipates all the collateral consequences,
23  including lawsuits by firms like yours, the
24  loss of reputation and other things.
25      But if you limit out all of those,

Page 76

MUKESH BAJAJ, PH.D.

1
2  by assumption, and you say that the standard
3  error, the normal random volatility in the
4  stock was so high that 700 million divided by
5  42 billion, which would be the measure of
6  direct-dollar impact of the fraud in your
7  example, would not be statistically
8  significant, then yes, of course.  In a
9  semi-strong form efficient market, it would
10  not be statistically significant and that
11  would be a reason not to pick that event as a
12  candidate for testing cause-and-effect
13  relationship.  The low power that they're
14  talking about is essentially that when
15  dollar-and-cents impact is small relative to
16  the company's market capitalization, then
17  event study is not the tool that would
18  statistically significantly pick up that
19  event.
20      Q.   Right.  And I understand that, but
21  that wasn't my question again.
22      My question was:  Is it your
23  opinion that, in that hypothetical, the
24  announcement of a $700-million fraud that was
25  not expected is not material news?

Page 77

MUKESH BAJAJ, PH.D.

1
2      MR. GOLDFARB:  Objection.
3      A.   Under all your assumptions and
4  with all the caveats I mentioned, in that
5  counterfactual hypothetical, it would not be
6  quantitatively material news.
7      Q.   And you say "quantitatively
8  material."  You're providing the testimony as
9  an economist; correct?
10      MR. FRANK:  Objection.
11      A.   I don't know what the connotation
12  is about an economist and quantitative
13  materiality, but I'm talking about
14  quantitative materiality that is measured
15  through stock-price impact.
16      Q.   So any time we talk about material
17  news, you're talking about quantitative
18  materiality?
19      MR. FRANK:  Objection.
20      A.   In the context of testing cause
21  and effect, obviously, yes.
22      Q.   Would you agree with me that that
23  type of fraud, a $700-million fraud, would be
24  viewed by a reasonable investor as having
25  significantly altered the total mix of

Page 78

MUKESH BAJAJ, PH.D.

1  MUKESH BAJAJ, PH.D.
2  information available?
3       MR. FRANK:  Objection.
4       A.  I think you're asking me a legal
5  question not an economic question.  I
6  understand there is a notion of qualitative
7  materiality.  And we talked about whether or
8  not a, quote/unquote, "fraud" has
9  implications over and above the dollars and
10 cents involved as a direct cost of that
11 fraud.
12      But, of course, if we were dealing
13 with allegations that Freddie Mac lost
14 $10,000 due to some fraud, then that
15 allegation might be legally actionable.  But
16 an event study would not be the tool to use,
17 either to evaluate market efficiency for
18 reliance purposes, or to use, at later stage,
19 for any kind of damage purposes.
20      Q.  So in choosing a candidate events
21 for an event study, you have to look at the
22 facts and circumstances; correct?
23      A.  Yes.
24      Q.  Okay.  And that requires some
25 level of subjectivity; correct?

Page 79

1  MUKESH BAJAJ, PH.D.
2       MR. FRANK:  Objection.
3       A.  Well, it requires some level of
4  well-informed and consistence with economic
5  science-based subjectivity.
6       Q.  And we've talked about and agreed
7  upon that when you talk about an efficient
8  market, you're talking about the semi-strong
9  form of efficiency; correct?
10      A.  And informational efficiency, yes.
11      Q.  And it's your understanding that a
12 semi-strong form of a market efficiency is
13 what's required in order to obtain the
14 presumption of reliance under Basic?
15      A.  Yes.
16      Q.  Where did you get that
17 understanding?
18      A.  As I explained in my report, it's
19 directly from the language in Basic, lots of
20 commentary on Basic over the years, economic
21 literature, the various authorities I have
22 cited in my report, and my experience both
23 teaching and consulting for the last 20, 25
24 years.
25      Q.  Would you agree that for the

Page 80

1  MUKESH BAJAJ, PH.D.
2  purposes of applying the Basic presumption,
3  an efficient market is one where market
4  professionals generally consider most
5  publicly announced material statements about
6  companies, thereby affecting stock market
7  prices?
8       MR. FRANK:  I'm sorry, Bill, you
9  just got a little fast for me.
10      Q.  Okay.  Would you agree that for
11 the purposes of applying the Basic
12 presumption, an efficient market is one where
13 market professionals generally consider most
14 publicly announced material statements about
15 companies, thereby affecting stock market
16 prices?
17      A.  Again, that was a mouthful, but
18 what I understood you to be saying, fairly
19 describes the process that makes market
20 semi-strong form efficient.  People consider
21 information.  They take action on the basis
22 of that information.  And those actions
23 result in that information being impounded in
24 security prices and they become semi-strong
25 form efficient.

Page 81

1  MUKESH BAJAJ, PH.D.
2       Q.  So do you agree with the statement
3  I made?
4       A.  Yes, that's a statement of
5  process.  I don't know what you mean by
6  "agree."  In what context?  For what purpose?
7  That's why I qualified.
8       Q.  You'd agree that public
9  information generally affects stock prices?
10      MR. FRANK:  Objection.
11      A.  When the market is efficient, that
12 is a fair, general statement.
13      Q.  You'd agree that efficiency is not
14 a binary yes-or-no question; correct?
15      MR. GOLDFARB:  Objection.
16      A.  Again, when you ask me to give
17 yes-or-no answer to some verbiage you're
18 picking up from some legal decision or some
19 technical treaties, I think you have to be
20 careful what that yes or no means.
21      So maybe, you can explain the
22 context in which you want me to say yes or no
23 and repeat your proposition.
24      Q.  In your opinion, in determining
25 market efficiency in the context of this

Page 82

MUKESH BAJAJ, PH.D.

1
2  case, do you view efficiency as a binary
3  question?
4      A.  No, because market could be
5  efficient with regards to one type of
6  information and maybe not another.  And in
7  that context is how I understand the language
8  that you're reading to me, that it's not a
9  binary question.
10     Q.  Would you agree that it's a matter
11 of degree?
12         MR. FRANK:  Objection.
13     A.  I -- it's obviously a matter of
14 degree.  We discussed weak form of market
15 efficiency, semi-strong form of market
16 efficiency, strong form of market efficiency.
17 Those are matters of degree.
18     Q.  Is the proposition that market
19 prices respond promptly to material
20 information about a stock true in a
21 semi-strong form efficient market?
22     A.  I'm sorry.  There was some
23 background noise, so I couldn't hear.
24     Q.  Is the proposition that market
25 prices respond relatively promptly to

Page 83

MUKESH BAJAJ, PH.D.

1
2  material information about a stock true in a
3  semi-strong form efficient market?
4          MR. GOLDFARB:  Objection.
5      A.  Yeah.  As a general proposition,
6  yes.
7      Q.  Does the proposition that market
8  prices respond relatively promptly to
9  material information depend upon proof of a
10 semi-strong form efficient market?
11         MR. FRANK:  Objection.
12     A.  Can you read your question again?
13     Q.  Does the proposition that market
14 prices respond relatively promptly to
15 material information depend upon proof of a
16 semi-strong form efficient market?
17         MR. FRANK:  Objection.
18     A.  So the proposition that you read
19 is the definition of semi-strong form
20 efficient market, as well as a description of
21 it.  And if one were required to prove that
22 for a certain period, a certain security
23 traded in a semi-strong form efficient
24 market, then one would need to prove that
25 proposition through cause-and-effect

Page 84

MUKESH BAJAJ, PH.D.

1
2  analysis.
3      Q.  Can't market prices respond
4  relatively promptly to material information
5  in the absence of a semi-strong form
6  efficient market?
7      A.  Maybe yes, maybe no.  They cannot
8  be presumed to have impounded that
9  information into prices if the market is not
10 semi-strong form efficient.
11     Q.  You would agree with me that a
12 company's stock price can become inflated,
13 because of something the company failed to
14 disclose at a particular point in time, an
15 omission?
16         MR. VOLPE:  Objection.
17     A.  Are you asking me a hypothetical
18 that says under some circumstances that can
19 happen, or do you care to more --
20     Q.  No, I'm just asking you --
21     A.  -- carefully define --
22     Q.  -- as a general proposition, a
23 company's stock price can become inflated
24 because of something the company failed to
25 disclose at a particular time, in other

Page 85

MUKESH BAJAJ, PH.D.

1
2  words, omission?
3          MR. FRANK:  Objection.
4      A.  Well, under certain circumstances,
5  if there is an omission and it is material
6  and the market cannot infer partially
7  corrective information through independent
8  research or announcements by other issuers
9  and the market is semi-strong form efficient,
10 then yes, it's possible for an omission to
11 result in stock-price inflation.
12         THE WITNESS:  Do you mind if I
13 take one minute to fill my water cup?
14         MR. MARKOVITS:  No, that's fine.
15         THE WITNESS:  Thank you.
16         THE VIDEOGRAPHER:  The time now is
17 11:50  We're off the record.
18 (Recess taken at 11:50 a.m. to 11:51 a.m.)
19         THE VIDEOGRAPHER:  The time now is
20 11:51.  We're on the record.
21 BY MR. MARKOVITS:
22     Q.  From an economist's perspective,
23 Dr. Bajaj, there's no fundamental difference
24 between telling a lie that causes inflation
25 and admitting to make a statement that causes

Page 86

MUKESH BAJAJ, PH.D.

1
2  inflation; correct?
3        A.  I think that is way too general a
4  statement for me to agree or disagree with.
5        Q.  You can't agree or disagree with
6  that statement?
7        A.  Not in the most general form that
8  you've stated it.  I'm not fighting you on
9  it.  I'm happy to agree to a reasonably
10  carefully worded statement.
11        Q.  You would agree that you don't
12  need a stock-price increase on the day a
13  company makes a false statement in order for
14  inflation to come into this company's stock
15  price; correct?
16        MR. FRANK:  Objection.
17        A.  Again, you are, with all due
18  respect, making statements that are way too
19  general for me to just agree or disagree
20  with.  And I'd like you to, maybe, give me a
21  more complete hypothetical.
22        Q.  Have your views on these issues
23  changed over time?
24        MR. GOLDFARB:  Objection.
25        A.  Well, I always try to learn over

Page 87

MUKESH BAJAJ, PH.D.

1
2  time, but nothing in this connection that
3  you're asking me about is the type of subject
4  matter on which my views have significantly
5  evolved in the last many years.
6        Q.  Do you recall being asked, in the
7  Jaffe matter, a question:  "You'll disagree
8  with me, won't you, Dr. Bajaj, that you don't
9  need a stock-price increase on the day a
10  company makes a false statement in order for
11  inflation to come into that company's stock
12  price?"
13        And you answered, "Yes, I do."
14        Do you recall that?
15        A.  Well, I don't recall that exact
16  question and the answer, and I have no
17  quarrel with, under appropriate
18  circumstances, agreeing, in the context of
19  that case, that the answer would be what it
20  was.
21        Q.  In that hypothetical question, the
22  context of the case, was that question
23  differed (sic) in the Jaffe case than the
24  question I just asked you two minutes ago?
25        MR. FRANK:  Objection.

Page 88

MUKESH BAJAJ, PH.D.

1
2        A.  Again, Counsel, I don't remember
3  when that question was asked, what was asked
4  before, what was asked later, what were the
5  facts that -- or the context under which that
6  question was asked.  I absolutely agreed with
7  that answer and I have no quarrel with that
8  answer.
9        All I requested is, rather than
10  reading a sentence without context from some
11  testimony I might have given ten years ago,
12  if you're going to ask me something useful
13  about this case, try to ask me more --
14        Q.  You don't think it's useful --
15        A.  -- well-defined questions.
16        Q.  All right.  So it was well defined
17  enough for you in the Jaffe case, but it's
18  not well defined enough for you in this case?
19        MR. FRANK:  Objection,
20  argumentative.
21        MR. GOLDFARB:  Objection.
22        MR. FRANK:  Why don't you pose
23  a --
24        MR. MARKOVITS:  All right.
25        MR. FRANK:  -- an appropriate

Page 89

MUKESH BAJAJ, PH.D.

1
2  question.
3  BY MR. MARKOVITS:
4        Q.  So this was a general question.
5  What more context do you need to answer the
6  question whether a stock-price increase on
7  the day a company makes a false statement can
8  cause inflation to come into the stock's
9  price?  What factual context does the answer
10  to that question depend on?
11        MR. FRANK:  Objection, compound
12  and argumentative.
13        A.  So there could be a false
14  statement that is an affirmative
15  misrepresentation.  That could result in
16  stock price going up, and thereby becoming
17  inflated, assuming that the statement was
18  quantitatively material, that the mix of
19  information was such that investors did not
20  have alternative ways to expect the content
21  of that statement at issue.
22        On the other hand, it could be a
23  circumstance where there is an omission.  A
24  company has one factory; that's its major
25  asset; its factory burns down; the company

Page 90

MUKESH BAJAJ, PH.D.

1  
2  has a duty to disclose to the market that the
3  factory has burned down; fails to do so.
4  That omission, with some other qualifying
5  assumptions as necessary, would generally be
6  a reasonable -- it would be reasonable to say
7  that omission may well have inflated the
8  company's stock price.
9       I'm not quarreling with the
10  general principles at all.
11       Q.  Well, that's the only question I
12  asked you, Dr. Bajaj, was the general
13  principle.
14       You don't need a stock-price
15  increase on the day a company makes a false
16  statement in order for inflation to come into
17  the company's stock price.  The answer to
18  that question is yes; correct?
19       MR. FRANK:  Objection.
20       A.  Counsel, with all due respect, you
21  are -- it sounds like, maybe not intending
22  to -- but you are badgering me a bit.  And I
23  think I'm trying to be respectful and answer
24  your questions, and --
25       Q.  We might have a little

Page 91

MUKESH BAJAJ, PH.D.

1  
2  disagreement there, Dr. Bajaj.  I don't think
3  you're being respectful in trying to answer
4  my questions but we'll press on.  And let's
5  hope that we can both get a little better at
6  that as we go forward.
7       My question is:  As a general
8  proposition, the answer is yes, to the
9  question you don't need a stock-price
10  increase on the day a company makes a false
11  statement in order for inflation to come into
12  that stock price; correct?
13       MR. FRANK:  Objection.  This has
14  not only been asked and answered, but I
15  believe, Bill, you already have the
16  answer you want.  So I'd ask that you
17  move on, given that you've already
18  received an answer and, indeed, the
19  answer that it appears that you want.
20       So I do think that, given that
21  you've already gotten the answer that
22  you want, this probably is getting very
23  close to badgering the witness.  So if
24  you can, please, pose another
25  question.

Page 92

MUKESH BAJAJ, PH.D.

1  
2       MR. MARKOVITS:  I'll move on.
3       MR. FRANK:  Thank you.
4       MR. MARKOVITS:  Because you're
5  asking me.
6       MR. FRANK:  Thank you.
7  BY MR. MARKOVITS:
8       Q.  You'd agree with me that a company
9  does not need to admit a committed fraud for
10  inflation to come out of the stock price?
11       A.  Under certain circumstances that
12  could be true.
13       Q.  Before lunch, let's get into one
14  more area.  Could you turn to your report at
15  paragraph 16 under "Summary of Opinions."
16  Under 16, Item Number 2), it states, "The
17  economic evidence supports a finding that the
18  alleged misrepresentations and omissions had
19  no impact on the price of Freddie Mac's
20  common stock."
21       Do you see that?
22       A.  Yes.
23       Q.  Is it your opinion that the
24  misrepresentations and omissions alleged have
25  no price impact on November 20th, 2007?

Page 93

MUKESH BAJAJ, PH.D.

1  
2       A.  No.  My opinion is that when we
3  look at the company's announcement on
4  November 20th, 2007, and we consider the
5  contemporaneous market evidence on how that
6  announcement was perceived by the market, the
7  price decline on that date does not line up
8  with Plaintiff's allegations regarding
9  alleged disclosure defects based on the
10  analysis of public information that I
11  described.
12       Q.  But I want to be clear about what
13  your opinion is.  Are you saying, in your
14  opinion, there is no price impact -- there
15  was no price impact on November 20th, 2007,
16  related to the allegations of Plaintiff's
17  Complaint?
18       A.  So related to in the sense that
19  the new information that the company provided
20  on that day and the market commentary
21  interpreting that information, does not lead
22  to a conclusion that the information on that
23  day was corrective of previous disclosure
24  defects alleged by the Plaintiffs.
25       Q.  You would agree that there was a

Page 94

1       MUKESH BAJAJ, PH.D.
2    statistically significant stock-price
3    reaction on November 20th, 2007; correct?
4        A.  Yes.
5        Q.  And adjusting for market and
6    industry factors, that was roughly a
7    29 percent decline; is that correct?
8        A.  If I recall correctly, the
9    Complaint talked about 29 percent stock-price
10   decline before adjustment; but, under these
11   circumstances, market and industry adjustment
12   usually does not make much of a difference.
13   With that caveat, yes.
14       Q.  And about how much of a percentage
15   decline would there need -- would there have
16   needed to be to reach statistical
17   significance?
18       A.  Again, I don't have the
19   statistical information of what the standard
20   effort was, but I do recall that the 29-odd
21   percent stock-price decline on that date was
22   statistically significant, very comfortably.
23       Q.  As an economist, how would you go
24   about proving that no part of that 29 percent
25   decline was caused by any of the

Page 95

1       MUKESH BAJAJ, PH.D.
2    misrepresentations or omissions either being
3    disclosed or the risk materializing on
4    November 20th, 2007?
5        MR. FRANK:  Objection.
6        A.  So, again, at this stage of the
7    case, what I was tasked to do was to examine
8    the information that the company put out,
9    take it at its face value, examine
10   contemporaneous commentary by market
11   participants, how they interpreted the
12   information when they viewed it from their
13   own informed perspective based on what
14   information they knew outside of what the
15   company put out, review contemporaneous
16   commentary by analysts on that date and
17   around that date.
18       And based on examination of that
19   economic evidence, which is public, I
20   concluded that the market evidence does not
21   support that that price drop was corrective
22   of disclosure defects that the Plaintiffs
23   have alleged in their Complaint, whether you
24   view them as simple corrective disclosures or
25   you view them as materialization of

Page 96

1       MUKESH BAJAJ, PH.D.
2    previously undisclosed risk.
3        Q.  And I want to explore your answer
4    a little bit.  You started off with, "At this
5    stage of the case."  Would your analysis of
6    price impact vary at a later stage of the
7    case or at a different stage of the case?
8        A.  Well, it could.  If I am provided
9    information that goes beyond what is public
10   information, that may or may not have an
11   impact on that question.  But right now, as I
12   told you, my assignment was to look at the
13   company's disclosures, consider the mix of
14   public information, consider contemporaneous
15   market interpretation of company's
16   disclosures, and see whether, in market's
17   view, the negative price reaction reflected
18   correction of alleged disclosure defects.
19       Q.  Is what you were asked to do a
20   valuation analysis in economist's terms?
21       A.  Well, using stock-price reaction
22   as a tool for valuation, you could say that.
23   But I did not go around building a valuation
24   model of the company and then, in that
25   context, said this information was disclosed

Page 97

1       MUKESH BAJAJ, PH.D.
2    on this day and it had X-dollar of an impact,
3    and whether the X-dollar impact had some
4    contribution from what the market learned
5    that day that was corrective in nature;
6    that's not what I did.
7        Q.  And you say there may be other
8    information that's not public information
9    that you would incorporate into your analysis
10   down the road.  What were you talking about
11   there?
12       A.  Well, I don't know.  I will look
13   at all the information that is relevant when
14   the discovery is complete.  And I will
15   consider all the evidence.  And when I've
16   considered all the evidence, I will keep an
17   open mind to reanalyze this issue.
18       But at this point in time, my
19   assignment was to look at public information
20   on that day, disclosure on that day, and
21   contemporaneous market commentary surrounding
22   that day, in light of mix of information that
23   was public going into that day.  And that's
24   what I did.
25       Q.  But you'd agree that there may be

Page 98

MUKESH BAJAJ, PH.D.

1
2  nonpublic information that would affect your
3  price impact analysis following discovery and
4  you're open to looking at that?
5      MR. FRANK:  Objection.
6      A.  I'm always open to looking at all
7  relevant evidence.  My analysis here was, in
8  part at least, responsive to Dr. Feinstein.
9  And I didn't see him point to any evidence,
10  other than the large price drop on that day,
11  which was right there in the Complaint, and
12  just repeating Plaintiffs say so, that it was
13  a revelation of alleged fraud.
14      Q.  Was it your understanding that
15  Professor Feinstein was opining with regard
16  to price impact?
17      A.  Well, he was interpreting the
18  market reaction on that day in a way that
19  would have implications for inference on
20  price impact.
21      Q.  Did you analyze whether there was
22  evidence that tied the stock-price decline on
23  November 20th to the materialization of any
24  of the risks that the Plaintiffs contend were
25  the subject of misrepresentation and

Page 99

MUKESH BAJAJ, PH.D.

1
2  omissions during the class period?
3      A.  Based on the public evidence that
4  I have seen, there is no basis for me to say
5  that any of the observed price reaction
6  represented materialization of previously
7  undisclosed risk, as Plaintiffs allege,
8  rather than negative developments in the
9  marketplace associated with disclosures and
10  risks that the market already knew.
11      Q.  What would you have to see from
12  market participants to determine that there
13  was a price impact or to provide evidence of
14  a price impact?
15      MR. FRANK:  Objection.
16      Q.  Let me just ask one of those.
17      What would you have to see from
18  market participants to determine that there
19  was evidence of a price impact?
20      MR. FRANK:  Objection.
21      A.  You know, this is a hypothetical
22  question you're posing of me.  I can't sit
23  here and think of all the things that I might
24  have observed but did not observe that would
25  have led me to reach a different conclusion.

Page 100

MUKESH BAJAJ, PH.D.

1
2      So, for example, if, on that date,
3  there was some discussion by analysts, "Hey,
4  it looks like Freddie Mac's loss is largely a
5  result of larger exposure it has to subprime
6  than they ever admitted."  As a hypothetical,
7  that would be, I think, a relevant fact to
8  consider.  That may or may not change the
9  opinion on price impact, depending on the
10  totality of disclosures on that date.
11      Q.  You're aware from Professor
12  Feinstein's Cammer analysis, that a number of
13  analysts followed Freddie Mac; correct?
14      A.  Yes.  I'm aware of that,
15  generally, not just through Dr. Feinstein's
16  report.
17      Q.  And those analysts would have had
18  access to financial information that was put
19  out by Freddie Mac; correct?
20      A.  I think that's a reasonable
21  inference.
22      Q.  And would it also be a reasonable
23  inference that they would have access to news
24  about the housing market decline?
25      A.  Yes.

Page 101

MUKESH BAJAJ, PH.D.

1
2      Q.  And they would know of the
3  problems faced by other institutions
4  resulting from the housing decline; correct?
5      MR. FRANK:  Objection.
6      A.  One would hope so.
7      Q.  Yeah.  So, you know, for example,
8  I would assume an analyst -- or would it be
9  reasonable to infer that an analyst following
10  Freddie Mac would be aware that Citigroup
11  announced billions of losses in October of
12  2007 relating to the housing decline?
13      MR. VOLPE:  Objection.
14      A.  I don't know that from memory, but
15  I'm happy to take your representation for it.
16      Q.  And would it be fair to assume
17  that analysts would be aware of billions in
18  losses and write-down by Morgan Stanley and
19  Bear Stearns in November of 2007?
20      A.  Are you talking about before
21  November 20th of 2007 or after November 20th?
22      Q.  These are both before.
23      A.  Okay.  If you say so.
24      MR. FRANK:  Objection.  Sorry.
25      Q.  And do you have any knowledge what

Page 102

MUKESH BAJAJ, PH.D.

1
2    the earnings consensus was among financial
3    analysts prior to November 20th, 2007?
4        MR. FRANK:  Objection.
5        A.   Not from memory.
6        MR. FRANK:  I'm sorry.
7        A.   Not from memory.  But I believe I
8    have mentioned those facts in my report.
9        Q.   And at least in the Third Amended
10   Complaint, I'll represent that it's stated
11   that there was an earnings consensus of a
12   one-cent loss.
13           Does that sound like something
14   that you also have in your report?
15       MR. FRANK:  Objection.
16       A.   I wouldn't be surprised if that
17   was the case, but I don't recall.
18       Q.   And do you recall, though, that on
19   November 20th, 2007, the earning per share
20   loss was actually $3.29?
21       A.   It sounds familiar.
22       Q.   That would qualify as an earnings
23   surprise; correct?
24       A.   Yes.
25       Q.   A pretty significant earnings

Page 103

MUKESH BAJAJ, PH.D.

1
2    surprise in this case?
3        A.   Yes.
4        Q.   What, in your view, was the cause
5    of the 29 percent stock decline on November
6    20th, 2007?  Cause or causes.
7        MR. VOLPE:  I'm sorry.  What was
8        that last part?
9        MR. MARKOVITS:  Cause or causes.
10   BY MR. MARKOVITS:
11       Q.   What, in your view, was the cause
12   or causes of the November 20th, 2007, stock
13   decline for Freddie Mac?
14       MR. FRANK:  Objection.
15       A.   So I think I've discussed the
16   evidence as to what the market participants
17   contemporaneously thought, on or about page
18   29 of my report; and, also, on or about 875
19   of my report, and I can look at those pages
20   and share with you the results of my research
21   as to what contemporaneous market commentary
22   attributed that price reaction to.
23       Q.   Without reviewing your report in
24   detail, do you have any memory or
25

Page 104

MUKESH BAJAJ, PH.D.

1
2    understanding of what your review found with
3    regard to the primary reasons for the
4    29 percent stock decline?
5        A.   So without my answer being
6    necessarily complete and comprehensive, I
7    believe a significant portion of the earnings
8    miss was attributed to Freddie Mac requiring
9    significant mark-to-market adjustments on its
10   retained portfolio.  Given the fact that
11   liquidity was disappearing from mark to
12   market at that time and most market backed
13   securities, whether subprime or prime
14   market-based securities, was subject to
15   markdown over that period by Freddie Mac and
16   other financial institutions.
17           There was a concern as to
18   whether -- even if these mark-to-market
19   losses turned out to be temporary, it would,
20   in the meantime, limit Freddie Mac's
21   participation in the mortgage market
22   consistent with its mission to support
23   liquidity in that market.
24           Without additional capital, there
25   was some concern whether, in those market

Page 105

MUKESH BAJAJ, PH.D.

1
2    conditions, capital rates could be quickly
3    accomplished and at what cost; and, of
4    course, the market was learning, for Freddie
5    Mac and other financial institutions that
6    were exposed to U.S. mortgage market, both
7    for subprime and prime mortgages, that
8    default rates were going up.  Losses were
9    increasing, probability of a recession, which
10   would lead to further deteriorated trends was
11   increasing.
12           And these were the type of
13   concerns that market participants expressed
14   when explaining the stock-price drop on
15   November 20th.
16       MR. FRANK:  Bill, allow me to
17       propose, at this time, that we take a
18       lunch break.  I have various strong
19       arguments, if you're not in favor of
20       such a break.
21       MR. MARKOVITS:  No, you've
22       convinced me.
23       THE VIDEOGRAPHER:  The time now is
24       12:21 Off the record.
25   (Recess taken at 12:21 p.m. to 1:07 p.m.)

Page 106

MUKESH BAJAJ, PH.D.

1
2          THE VIDEOGRAPHER:  The time now is
3   13:07.  We are on the record.
4   BY MR. MARKOVITS:
5          Q.   Dr. Bajaj, before the lunch break,
6   you had listed various items that, in your
7   view, may have contributed to the 29 percent
8   stock decline.
9          Can you tell me which of the items
10  that, in your view, may have contributed to
11  that 29 percent stock decline were, in your
12  view, unexpected?
13         Let me just give you, by way of
14  example, you -- you -- one of the items you
15  mentioned -- what brought that to mind is you
16  talked about the housing decline, but the
17  housing decline wouldn't have been unexpected
18  on November 20th.  The market knew about the
19  housing decline at that point.
20         So which of the items that you
21  discussed would have been, in your view,
22  unexpected that it would have led to that
23  abnormal return?
24         MR. FRANK:  Objection.
25         A.   So, you know, Counsel, actually

Page 107

MUKESH BAJAJ, PH.D.

1
2   it's very interesting --
3          Q.   Yes.
4          A.   -- it's very interesting that you
5   feel housing decline would have been expected
6   as of November 20th.  There are some very,
7   very, in my view -- I'm a quantitative guy --
8   breathtaking charts that show no matter how
9   market expectations were coming down, the
10  reality was always significantly worse over
11  that period.
12         So if you have a chart which says,
13  as of date one, there's an expectation of
14  housing price declines that goes at a certain
15  rate, by the time you get to day two, you're
16  already below where the expected path would
17  be on day two.  And expectations evolve.  And
18  this continued to happen.  And unfortunately,
19  we know that even as of November 2007,
20  housing declines were not in the ninth
21  inning.  They were probably in the first or
22  the second inning.
23         So I think, not just for Freddie
24  Mac, if you look at most big financial
25  companies that were exposed to U.S. mortgage

Page 108

MUKESH BAJAJ, PH.D.

1
2   market, pretty much every quarter it was a
3   surprise to the market how much worse the
4   mortgage market fundamentals had become.
5          And Freddie Mac had what, $1 1/2
6   trillion balance sheet?  So, like, $2 billion
7   is a very large loss.  In relation to the
8   balance sheet, it's not all that surprising
9   to me, in light of having looked at evidence
10  during that period, that a further
11  deterioration in market fundamentals in the
12  housing market, the drying up of the
13  liquidity, which was driving the lowering of
14  marks, could add up to billions of dollars.
15         And I think if you look at the
16  history of major financial institutions,
17  starting with beginning of 2007 till end of
18  2008, I think those multibillion-dollar
19  losses stopped being nonroutine and shocking.
20         So I think the underlying
21  fundamentals were really about unexpectedly
22  severe deterioration, and housing
23  fundamentals compounded by the fleeing of
24  liquidity from the marketplace, whereby, for
25  mark-to-market accounting purposes, marks

Page 109

MUKESH BAJAJ, PH.D.

1
2   kept coming down more than would have
3   increased nearly and dissipated even a month
4   or two ago, leave aside a quarter ago.
5          So I think those were the biggest
6   factors, in my view.
7          Q.   The biggest unexpected factors?
8          A.   Yes.
9          Q.   Okay.  Could you turn to your
10  report at paragraph 67, please?  And in that
11  paragraph you talk about looking at the press
12  relief -- release and the transcripts of the
13  investor conference call on November 20th,
14  2007?
15         A.   I apologize.
16         Q.   Paragraph 67.
17         A.   Sixty-seven.  I heard 867.
18         Q.   I'm sorry.
19         A.   I'm sorry.
20         Q.   Okay.  And in paragraph 67 of your
21  report, you talk about looking at the press
22  release for economic evidence and the
23  transcript of the investor conference call on
24  November 20th, 2007.
25         *Do you see that?

Page 110

MUKESH BAJAJ, PH.D.

1
2    A.  Yes.
3    Q.  You don't mention the information
4  statement that was released on that day,
5  although earlier today I believe you did
6  mention it.
7        Did you review that as well?
8    A.  Yes.
9    Q.  Okay.  And then if you look at
10  page 103 of 370, if you look at the top of
11  the report and look at page 103 of 370.
12        MR. FRANK:  I'm sorry.  What are
13    you referring to?
14        MR. MARKOVITS:  Page 103 of 370 at
15    the very top.
16        THE WITNESS:  Okay.  I have it.
17  BY MR. MARKOVITS:
18    Q.  Okay.  Which is part of the
19  documents considered.  And you have Freddie
20  Mac sources and it doesn't list the
21  information statement.  Is that just an
22  oversight?
23    A.  Looks like it is, unless that
24  information statement is part of some other
25  document and that's why it didn't get

Page 111

MUKESH BAJAJ, PH.D.

1
2  separately picked up.
3    Q.  But -- and -- regardless of
4  whether there was an oversight, the bottom
5  line is:  You reviewed the information
6  statement as part of your analysis with
7  regard to price impact; correct?
8    A.  I don't have a memory or a picture
9  of information statement in my mind as I sit
10  here today, but I know I reviewed all the
11  information statements over this period.
12    Q.  And I believe you earlier -- and
13  you'll correct me if I'm wrong, I'm sure --
14  acknowledged that one of the allegations of
15  the Plaintiff's Complaint relates to
16  misrepresentations or omissions with regard
17  to its exposure to credit risk; is that
18  correct?
19        MR. FRANK:  Objection.
20    A.  I have listed, in paragraph 9 of
21  my report, five items from the Third Amended
22  Complaint.  And, I guess, credit risk would
23  be a component of several of these items.
24    Q.  Particularly, item small (i);
25  correct?

Page 112

MUKESH BAJAJ, PH.D.

1
2    A.  Yeah, that was -- that would be
3  related to credit risk.
4    Q.  So let's just talk about it in
5  terms of exposure to nontraditional
6  mortgages.  Can I use that as a summary of
7  small (i) and we'll understand what we mean?
8        MR. FRANK:  Objection.
9    A.  Well, here I have used the term
10  "nontraditional" coming from the Complaint.
11  And I understand that your use of this term
12  today means, as it says in that item, "risk
13  of loss from subprime mortgage loans and
14  other high-risk mortgages, including all
15  three mortgages.  Is that a fair
16  understanding --
17    Q.  That's fair.
18    A.  -- of how you would use that term?
19    Q.  Yes.
20    A.  Okay.
21    Q.  Just so I don't have to repeat
22  that long phrase every time.
23    A.  Okay.
24    Q.  So with that terminology, is it
25  your opinion that Freddie Mac accurately

Page 113

MUKESH BAJAJ, PH.D.

1
2  reported its exposure to credit risk from
3  nontraditional loans?
4        MR. FRANK:  Objection.
5    A.  In connection with the analysis of
6  what the market reacted to on November 20th,
7  I did not see in the information that was
8  released on that day by Freddie Mac, and as
9  it was interpreted contemporaneously to
10  include admissions that Freddie Mac's
11  exposure to its subprime or Alt-A loans, or
12  other kind of so-called nontraditional loans,
13  was higher than, consistent with the range
14  market would have anticipated in light of its
15  various disclosures.
16    Q.  Thank you, but that wasn't quite
17  the answer to the question I asked, which is:
18  You're not giving an opinion that Freddie Mac
19  accurately reported its credit risk or its
20  exposure to credit risk from nontraditional
21  mortgages, are you?
22        MR. FRANK:  Objection.
23    A.  I'm sorry.  I didn't understand
24  your question.  Are you asking me whether I
25  have seen some evidence that on November

Page 114

MUKESH BAJAJ, PH.D.

1
2 20th, market learned that Freddie Mac had not
3 been disclosing these things accurately?
4 I -- I don't understand your question.
5    Q.  No.  I'm sorry.  That's not my
6 question.  I'll get there eventually.  But a
7 basic foundational question here, I just want
8 to understand, you're not giving an opinion,
9 one way or another, that Freddie Mac
10 accurately reported its exposure to credit
11 risk from nontraditional mortgages?
12    A.  No, I am not offering an opinion
13 one way or another.
14    Q.  You are offering the opinion,
15 though, and correct me if I'm wrong, that any
16 misrepresentations or omissions relating to
17 Freddie Mac's exposure to credit risk from
18 nontraditional mortgages played no part in
19 the stock decline of November 20th?
20       MR. FRANK:  Objection.
21    A.  Could you repeat the question?
22    Q.  Yes.  It's my understanding that
23 you are giving the opinion that any
24 misrepresentations or omissions relating to
25 Freddie Mac's exposure to credit risk from

Page 115

MUKESH BAJAJ, PH.D.

1
2 nontraditional mortgages played no part in
3 the stock decline of November 20th?
4       MR. FRANK:  Objection.
5    A.  So what gives me pause is the
6 verbiage "played no part."  The only way I
7 can interpret that topic in the context of
8 price impact is whether any disclosure on
9 that day, or any information market learned
10 pursuant to the disclosures by Freddie Mac on
11 that date, revealed to the market that
12 Freddie Mac had been underreporting credit
13 risk from nontraditional mortgage products,
14 as you say.
15    Q.  You'd agree that on November 20th,
16 2007, Freddie Mac disclosed large losses and
17 write-downs; correct?
18       MR. FRANK:  Objection.
19    A.  It disclosed losses and
20 write-downs, yes.
21    Q.  And you would agree that those
22 losses and write-downs were caused, in
23 significant part, by Freddie Mac's
24 deteriorating credit?
25       MR. FRANK:  Objection.

Page 116

MUKESH BAJAJ, PH.D.

1
2    A.  The losses and write-downs were,
3 in part, driven by deteriorating credit in
4 the mortgage market; and, of course, Freddie
5 Mac was exposed to the mortgage market as the
6 market knew.
7    Q.  Are you opining that no part of
8 the losses and write-downs resulted from
9 undisclosed credit risk from -- exposure from
10 nontraditional loans?
11       MR. FRANK:  Objection.
12    A.  I'm sorry.  I'm going to ask you
13 to repeat the question.
14    Q.  Sure.  Are you opining that no
15 part of the -- of the losses and write-downs
16 resulted from undisclosed credit risk from
17 exposure to nontraditional loans?
18       MR. GOLDFARB:  Objection.
19    A.  No, I'm not analyzing components
20 of the loss that Freddie Mac reported on that
21 day.  In a way, implied by your question, I'm
22 only analyzing whether the market, when it
23 reacted to the disclosures on that day, any
24 part of that reaction reflected market
25 learning about previously undisclosed

Page 117

MUKESH BAJAJ, PH.D.

1
2 disclosure deficiencies as alleged in the
3 Complaint.
4    Q.  Are you opining that no part of
5 the market's reaction on that day was due to
6 materialization of risks that were caused by
7 Freddie Mac's exposure to undisclosed
8 nontraditional loans?
9       MR. GOLDFARB:  I'm sorry.  Would
10    you please repeat?
11       MR. MARKOVITS:  Yeah.  I'd better
12    repeat that because that's not what I
13    meant to ask.
14 BY MR. MARKOVITS:
15    Q.  Are you opining that no part of
16 the 29 percent stock decline, on November
17 20th, 2007, was due to the materialization of
18 credit losses that resulted from undisclosed
19 exposure to risk from nontraditional loans?
20       MR. FRANK:  Objection, form.
21    A.  For the market to react to
22 whatever it reacted to on that day, a
23 necessary condition is that the market
24 learned something that it did not previously
25 know.  So regardless of whether or not there

Page 118

MUKESH BAJAJ, PH.D.

1
2 were undiscovered exposures and risks from
3 those exposures, and regardless of whether or
4 not some of the risks that realized and were
5 reported by Freddie Mac arose from such
6 sources, the market's reaction on that day
7 that caused the 29 percent stock-price
8 decline, there is no evidence that any part
9 of it came from disclosures that would have
10 informed the market of the disclosure defects
11 alleged in the Complaint.
12      Q.  And that may have implications for
13 a corrective disclosure situation.  I'm
14 talking about materialization of the risk
15 now.
16           So my question is this.  Let me
17 give you an example.  You don't fully
18 disclose your exposure to nontraditional
19 mortgage risk.  On November 20th, you have an
20 unexpected $2-billion loss that results from
21 that undisclosed exposure.  The market
22 doesn't know that that loss results from the
23 exposure but the market reacts because it's
24 unexpected, and the stock goes down
25 29 percent.

Page 119

MUKESH BAJAJ, PH.D.

1
2      Are you saying that the market has
3 to realize that the loss was from the
4 undisclosed exposure to nontraditional
5 mortgages in order for there to be a
6 materialization of the risk?
7           MR. FRANK:  Objection.
8      A.  So the market can only -- if the
9 object of the analysis is the price drop on
10 the 29th, Freddie Mac announced a loss, the
11 market price dropped, at least in part,
12 related to the loss that Freddie Mac
13 announced.  I didn't see any commentary that
14 said, we know quite a bit about Freddie Mac's
15 guaranteed portfolio positions, its retained
16 portfolio positions, its lines of business
17 that it is in.  And this $2-billion loss
18 cannot be explained by mortgage market
19 fundamentals, unless there was an undisclosed
20 risk exposure that was not previously
21 disclosed and now that it has materialized.
22           In other words -- but nobody in
23 the marketplace said that this $2-billion
24 loss is not consistent with materialization
25 of previously known and disclosed credit risk

Page 120

MUKESH BAJAJ, PH.D.

1
2 that is on Freddie Mac's balance sheet.  So
3 there is no evidence that I have available,
4 based on everything that I have reviewed,
5 that allows me to link the price drop on that
6 case to market learning, previously
7 undisclosed risk that have now materialized.
8 That is the extent of my analysis.
9           I've not sat down and looked at
10 Freddie Mac's accounting statement, work
11 papers or what have you.  I can't answer
12 questions about what were the components of
13 that $2-billion loss.  Freddie Mac announced
14 $2-billion loss.  There was a price decline.
15 Nobody said, Hey, this $2-billion loss is
16 inconsistent with previously disclosed risk,
17 period.
18      Q.  Okay.  If it was consistent with
19 previously disclosed risk, it wouldn't be
20 unexpected?
21           MR. FRANK:  Can we go off the
22 record for one second --
23           MR. MARKOVITS:  Sure.
24           MR. FRANK:  -- and figure out our
25 telephonic issues.

Page 121

MUKESH BAJAJ, PH.D.

1
2           THE VIDEOGRAPHER:  The time now is
3 13:32.  We're off the record.
4 (Recess taken at 1:33 p.m. to 1:33 p.m.)
5           THE VIDEOGRAPHER:  The time now is
6 13:33.  And we're on the record.
7           MR. MARKOVITS:  I thought I had
8 finished a question.
9           Could you read back the last
10 question?
11           THE REPORTER:  "If it was
12 consistent with previous -- "If it was
13 consistent with previously disclosed
14 risk, it wouldn't be unexpected."  And
15 then we got him to go off the record.
16           MR. FRANK:  Objection.  You can
17 answer.
18      A.  That's not true at all, as a
19 matter of economics.  So, for example, you
20 can have an insurance company that provides a
21 lot of property insurance in Florida.
22 Everybody knows that the company provides a
23 lot of property insurance in Florida.  So
24 it's known that it's exposed to risk of
25 property damage in Florida.

Page 122

MUKESH BAJAJ, PH.D.

1
2    And then, a hurricane of the
3 century hits Florida.  That's a negative
4 development, and you could see the stock
5 price of that insurance company, if it's
6 publicly traded, take a hit because now it's
7 just realized a lot of losses.  The losses
8 were not expected because the hurricane was a
9 probability but not a certainty.  But in this
10 example, there is no implication that, just
11 because there were unexpected losses, there
12 must have been some undisclosed risk.  That
13 is not a logical inference.
14    Q.   So I just want to make sure I
15 understand your opinion and your testimony.
16    If Freddie Mac discloses on
17 November 20th or one of the analysts states
18 on November 20th, "Freddie Mac took a large
19 loss in their credit position, in large part,
20 stemming from nontraditional mortgages,"
21 which they took on in 2006 and 2007, would
22 be -- would that be sufficient, in your view,
23 to tie price impact on November 20th, 2007,
24 to the allegations of the Complaint?
25    MR. FRANK:  Objection.

Page 123

MUKESH BAJAJ, PH.D.

1
2    A.   I'd have to see the details but
3 not necessarily.  Freddie Mac told the whole
4 world.  And if I recall correctly, Third
5 Amended Complaint actually cites to Freddie
6 Mac's disclosures that, in its retained
7 portfolio, it had mortgage back securities of
8 subprime mortgages.  They were securities
9 that were rated AAA.
10    And, in fact, from what I recall
11 on November 20th, Freddie Mac announced that
12 it took some marks on securities in its
13 retained portfolio backed by subprime
14 mortgages, but said they were all rated AAA
15 and we don't ultimately expect to realize any
16 losses.
17    In this, a liquid market, there is
18 an effect on the marks.  And I don't recall
19 anybody saying that the $2-billion loss
20 announced by Freddie Mac is not reconcilable
21 or is particularly surprising, given that
22 we've heard announcements by Citigroup, as
23 you said, and Morgan Stanley and a lot of
24 other financial forums as to what kind of
25 markdowns people are taking on their

Page 124

MUKESH BAJAJ, PH.D.

1
2 portfolios.
3    Nobody said this indicates that
4 Freddie Mac's credit risk exposure to
5 nontraditional products must be greater than
6 what they have so far disclosed.  I did not
7 see that commentary.
8    Q.   Did you see commentary that said
9 that the credit losses that were taken were
10 tied to increased and unexpected credit
11 losses on nontraditional mortgages?
12    A.   I don't particularly remember the
13 language, but I don't think such a statement
14 would be logically related to an inference,
15 that just because there were unexpected
16 losses, there must have been undisclosed bad
17 stuff out there.
18    And going back to my hurricane
19 example, losses from hurricane in Florida
20 were unexpectedly large.  But that doesn't
21 have any necessary implication that the
22 insurance company was secretly exposed to
23 property risk in Florida, and that's the only
24 reason losses were unexpectedly large.  The
25 new development could be unexpectedly large.

Page 125

MUKESH BAJAJ, PH.D.

1
2    Q.   So, in your view, you can rule out
3 price impact because nobody specifically
4 said, "There's a larger than expected
5 exposure to nontraditional loans, and we
6 believe they weren't truthful in their prior
7 exposure."  You need that second clause, and
8 if you don't have that second clause, you
9 rule out price impact?
10    MR. FRANK:  Objection.
11    A.   The answer is no for two reasons.
12 I don't think I conditioned my statement to
13 the second clause in your hypothetical.
14    Q.   All right.  So without the second
15 clause, can you have price impact -- can you
16 rule out price impact if there's a statement
17 that the loss -- unexpected loss was caused,
18 in large part, due to credit losses stemming
19 from nontraditional mortgages?  Can you rule
20 out that those credit losses were due to --
21 or related to risks that were not previously
22 disclosed?
23    MR. FRANK:  Objection.
24    A.   Sir, I'm not a lawyer, and I'm not
25 going to get into what the Court will

Page 126

MUKESH BAJAJ, PH.D.

1  consider as adequate evidence of price impact
2  on this materialization of risk theory.  I
3  don't understand the nuances from a legal
4  perspective.
5       As a matter of economic logic and
6  economic evidence, I did not see anything
7  linking the disclosures on that day or
8  market's interpretation of those disclosures,
9  to new learning by the market of previously
10  undisclosed risk or exposures.  And as a
11  matter of economic logic, a loss is announced
12  and that is a surprise and the market price
13  reacts, can you bet on the basis of those
14  observations alone, rule out that there may
15  be some fraud behind the loss, as a matter of
16  logic, you can't.  But you can't demonstrate
17  any evidence linking the loss to the fraud
18  either.
19       Q.  So your testimony is you can't
20  rule out that that loss was linked to a
21  failure to disclose the true extent of the
22  risk of nontraditional mortgages; right?
23       MR. FRANK:  Objection.
24       A.  You're asking me can you rule out

Page 127

MUKESH BAJAJ, PH.D.

1  the unknowable.  We observed the loss.  That
2  was unexpected.  We saw no evidence that
3  anybody learned that loss as stemming from
4  previous disclosure defects.
5       And if you ask me a logical
6  question, based on this observation, can you
7  rule out that there was never any fraud that
8  wasn't ever told to the market but existed?
9  No.  I can't, as a matter of logic, rule it
10  out.  But, by the same token, there is no
11  evidence that indicates that there was.
12       Q.  Okay.  So what you're saying at
13  this point is that you have not seen
14  sufficient evidence, from your perspective,
15  for Plaintiffs to show -- to prove that there
16  was price impact on November 20th, 2007?
17       MR. FRANK:  Objection.
18       A.  Based on all the evidence that the
19  market learned on November 20th and prior to
20  November 20th, as represented in the mix of
21  information in the marketplace as of November
22  20th, there is no evidence that links any of
23  the price drop to either materialization of
24  previously undisclosed risk or corrective

Page 128

MUKESH BAJAJ, PH.D.

1  disclosures of any other type of disclosure
2  defects that are alleged in the Complaint.
3       Q.  Okay.  And could you answer my
4  question, which is:  You are testifying that
5  the Plaintiffs cannot prove that there was
6  price impact on November 20th, 2007, as a
7  result of undisclosed credit risk arising
8  from nontraditional mortgages?
9       MR. FRANK:  Objection.
10       A.  I can't testify to what the
11  Plaintiffs can or cannot do.  But on the
12  basis of the evidence that I examined and we
13  are discussing, that evidence does not seem
14  like -- it's inconsistent with a claim that
15  it links the price drop on November 20th to
16  Plaintiff's allegations.
17       Q.  Do you know to what extent Freddie
18  Mac adhered to its underwriting guidelines
19  during the class period?
20       A.  I haven't examined that issue and
21  I don't know.
22       Q.  You're not opining that Freddie
23  Mac fully and accurately disclosed its
24  adherence or lack of adherence to its

Page 129

MUKESH BAJAJ, PH.D.

1  underwriting guidelines?
2       A.  Correct.
3       Q.  Are you opining that no part of
4  the 29 percent stock decline on November
5  20th, 2007, was due to Freddie Mac's failure
6  to adhere to its underwriting guidelines?
7       A.  What I am opining on is, there is
8  no economic evidence that I saw that would
9  allow me to conclude that some part of the
10  price decline on November 20th was caused by
11  Freddie Mac's failure to adhere to its
12  previously disclosed underwriting guidelines.
13       Q.  If Freddie Mac disclosed that it
14  had -- let's suppose Freddie Mac disclosed
15  that it failed to adhere to its underwriting
16  guidelines on November 20th, would that be a
17  sufficient link for you?
18       MR. FRANK:  Objection.
19       A.  I think that's an incomplete
20  hypothetical.  I assume you're asking me a
21  hypothetical.  Are you asking me a
22  hypothetical?
23       Q.  Yes.
24       A.  Okay.  I would say that's an

Page 130

MUKESH BAJAJ, PH.D.

1     MUKESH BAJAJ, PH.D.
2  incomplete hypothetical.
3     Q.  In what respect?
4     A.  Well, Freddie Mac would have
5  announced, "We are not adhering to our
6  previously disclosed underwriting guidelines.
7  We've, in fact, been more strict in not
8  disclosing underwriting guidelines "
9     Q.  Good qualification.  All right.
10  Let's say they disclose that they were not
11  adhering and that they were being less strict
12  or more relaxed, would that be a sufficient
13  link to the Plaintiff's allegations, in your
14  view?
15     MR. FRANK:  Objection.
16     A.  Well, then there would be
17  questions of whether the deviations were
18  material, whether relaxing those underwriting
19  guidelines, on the one hand, increased credit
20  losses, but on the other hand, might have
21  done more than offsetting good.  So it
22  depends on facts and circumstances.
23     Q.  So in this circumstance, if there
24  were reports that Freddie Mac had relaxed its
25  underwriting guidelines, in the context of

Page 131

1     MUKESH BAJAJ, PH.D.
2  this November 20th, 2007, stock decline,
3  that, in and of itself, wouldn't be a
4  sufficient link for you to suggest that some
5  part of that 29 percent stock decline was
6  caused by the relaxation of underwriting
7  guidelines?
8     A.  So in your --
9     MR. FRANK:  Objection.  Sorry.
10     A.  In your hypothetical, are you
11  asking if there were reports prior to
12  November 20th that Freddie Mac was relaxing
13  its guidelines or something different?
14     Q.  Something different, after
15  November 20th.
16     A.  Again, just to be precise, not to
17  not be forthcoming, when you say "after
18  November 20th," presumably, you don't mean
19  November 22nd only here?  You mean on
20  November 20th?
21     Q.  No.  I mean, let's -- let's do the
22  time period that you were talking about,
23  which was the November 20th and the following
24  week.  There were analysts' reports and news
25  articles and various public information that

Page 132

1     MUKESH BAJAJ, PH.D.
2  related back to November 20th; correct?
3     A.  They were discussing what they
4  learned on November 20th.  If they also
5  discussed what they learned on November 27th,
6  for example -- and by then, the 29 percent
7  stock price had already happened -- then,
8  obviously, it couldn't be related to the
9  29 percent stock-price drop on November 20th.
10     Q.  But if there was -- if there was
11  an indication that -- or there was a
12  recognition that the November 20th stock
13  decline -- strike that.
14     Let's suppose there was a
15  recognition post-November 20th that there had
16  been a relaxation of underwriting standards
17  and that was unexpected and new, would that
18  be a sufficient link in your view?
19     A.  Again, I think you're giving me an
20  incomplete hypothetical.  Stock-price decline
21  happened on November 20th.
22     THE REPORTER:  Twenty-ninth?
23     A.  November 20th.  I did not see any
24  discussion, that I can recall, in the
25  analysts' reports discussing their

Page 133

1     MUKESH BAJAJ, PH.D.
2  interpretation of the new information
3  received by the market on November 20th, that
4  said, you know, "I told my clients to sell
5  the stock, even after it had declined by
6  20 percent, because I learned that they had
7  relaxed their underwriting guidelines, and
8  that was a negative surprise to me that
9  warranted my expecting that the stock price
10  would go down further."
11     They don't have to be exact same
12  words, but I saw no commentary that said,
13  when the market reacted on November 20th, and
14  there was a 29 percent stock-price decline,
15  that contemporaneous commentary said, "Hey,
16  it looks like Freddie Mac relaxed its
17  underwriting guidelines and that's not good
18  for Freddie Mac, so stocks should go down."
19  There was no such commentary, or in the
20  spirit of such commentary, that I can recall.
21     Q.  And let's talk about if there were
22  no words.  Let's suppose that there was,
23  undisclosed to the public, a significant
24  relaxation of underwriting standards by
25  Freddie Mac; as a result of which, there were

MUKESH BAJAJ, PH.D.

1
2   large credit losses that were disclosed on
3   November 20th.  What link, beyond that, does
4   there have to be, in your view, to show price
5   impact under a materialization of the risk
6   standard?
7        A.  So, again, my -- listening to your
8   question tells me that maybe there's some
9   legal nuance you're referring to, to
10  establish the link that you're talking about.
11  And I want to make clear I'm not a lawyer,
12  and I don't understand those nuances.
13       As an economist, what I can do is
14  I can look at mix of public information at a
15  point in time -- new, unexpected information
16  received at that point in time -- the market
17  price reaction current -- currently with that
18  new information and say whether the
19  concurrent new information interpreted in
20  light of mix of public information that
21  existed is consistent with the hypothesis
22  that the 29 percent stock-price drop
23  represented realization of previously
24  undisclosed risks or correction of disclosure
25  defects alleged by the Plaintiffs.  That's

MUKESH BAJAJ, PH.D.

1
2   the beginning and the end of what I did and
3   what I am able to do, given my expertise.
4        Q.   Right.  And I want to explore one
5   component of that, which is the realization
6   of previously undisclosed risks.
7        So you have underwriting
8   standards.  Freddie Mac ignores them.
9   There's a $2-billion loss.  The market reacts
10  to that $2-billion unexpected loss with a
11  stock decline of 29 percent.  What more,
12  under your analysis, needs to be done to link
13  up the undisclosed underwriting violations or
14  lack of adherence with the 29 percent stock
15  decline?
16       MR. FRANK:  Objection.
17       A.   You know, I don't understand the
18  question.  And what is it about my previous
19  answer that you're trying to supplement so I
20  am responsive to the latest question?  I just
21  don't understand it.
22       Q.   All right.  Your answer was that
23  you analyzed the information and you looked
24  at both, whether there was a corrective
25  disclosure with the realization of an

MUKESH BAJAJ, PH.D.

1
2   undisclosed risk.  I want to focus on the
3   realization of the undisclosed-risk prong of
4   your answer.
5        And I'm providing a hypothetical.
6   The hypothetical is:  I view a realization of
7   undisclosed risk as they didn't follow their
8   underwriting standards; they didn't disclose
9   that they weren't following the underwriting
10  standards.  Unexpected $2-billion loss.
11  Stock goes down 29 percent.
12       Tell me why that's not the
13  realization of an undisclosed risk.
14       MR. FRANK:  Objection.
15       A.   So, in your hypothetical, are you
16  assuming that the cause of that $2-billion
17  loss, which, in your hypothetical, was
18  realization of credit losses from risks not
19  previously disclosed, in your hypothetical,
20  does the market know that was the source of
21  loss or a part of the loss or not?
22       Q.   No.  I'm saying let's just suppose
23  they don't know.  The market, on November
24  20th, doesn't know, let's suppose, that
25  Freddie Mac was not following its

MUKESH BAJAJ, PH.D.

1
2   underwriting guidelines, but, in point of
3   fact, the $2-billion unexpected loss, which
4   the market reacted to, resulted from their
5   failure to adhere to underwriting guidelines.
6   Is that, in your view, the realization of an
7   undisclosed risk?
8        MR. FRANK:  Objection.
9        A.   From an economic perspective, as
10  against whatever legal nuance there may or
11  may not be, the link that you're drawing on
12  that hypothetical would only be observed in
13  what economists call strong form efficient
14  market; namely, market reacts to not only
15  what is publicly known, but the market reacts
16  to things that are not even public.
17       So if the legal framework that
18  guides the analysis of an economist, such as
19  myself, was, that we assume a strong form
20  efficient market, then from an economic
21  logical perspective, I would say under your
22  hypothetical that link would be there.  But
23  that's not my understanding.
24       Q.   Okay.
25       A.   And that's not my understanding of

Page 138

1          MUKESH BAJAJ, PH.D.
2  either the legal context or how the world
3  works.  The market does not react to what it
4  doesn't know.  So I don't know what kind of a
5  link there would be to market's reaction and
6  something that was unknown and present
7  simultaneously.  I don't understand what kind
8  of a link there would be.
9          Q.  All right.  Let's explore that a
10 little, Doctor.  Semi-strong form efficient
11 market.
12         A.  Yes.
13         Q.  Large publicly traded stock, like
14 Freddie Mac, discloses a $2-billion loss.  No
15 explanation of the loss.  The market doesn't
16 understand or know why that loss occurred.
17 Are you testifying that the market wouldn't
18 react in that situation?
19         A.  No, I said nothing of the sort.
20         MR. GOLDFARB:  Objection.
21         Q.  All right.  So the market would
22 likely react; correct?
23         A.  The market would react to an
24 unexpected loss, period.
25         Q.  Right.  And so, you got an

Page 139

1          MUKESH BAJAJ, PH.D.
2  unexpected $2-billion loss.  The market
3  reacts likely by a stock decline; correct?
4          A.  Okay.
5          Q.  All right.  And that would happen
6  in a semi-strong form efficient market;
7  correct?
8          A.  Okay.
9          Q.  Now, what I want to ask you is:
10 Let's assume the market didn't know why there
11 was the $2-billion unexpected loss, but I'm
12 asking you to assume that it was related to
13 undisclosed failure to adhere to underwriting
14 standards, why isn't that the realization of
15 an undisclosed risk under the two-pronged
16 answer you gave last -- a few questions back,
17 which talked about corrective disclosures and
18 realization of undisclosed risks?
19         MR. FRANK:  Objection.
20         A.  So in your hypothetical, you built
21 that link in by assumption, by asking me to
22 assume a hypothetical where the market learns
23 of the loss, and you know the market didn't
24 know this loss was due to fraud, and then
25 you're asking me if the market reacts to the

Page 140

1          MUKESH BAJAJ, PH.D.
2  loss, was it reacting to the fraud?  The
3  answer is tautologically yes, under the
4  assumption of that hypothetical.  There is no
5  economic analysis.
6          Q.  Right.
7          A.  No factual analysis that would
8  lead to your hypothetical getting an answer
9  different from where you are leading me to.
10 It's not a rebuttable hypothesis.
11         Q.  Fair enough.  So that, if the
12 proof in this case were to show that a large
13 part of the $2-billion loss that occurred on
14 November 20th, 2007, was due to undisclosed
15 failures to adhere to underwriting standards,
16 then you would agree with me that those price
17 impact?
18         MR. VOLPE:  Objection.
19         A.  Not as I understand the term
20 "price impact" from an economic perspective.
21         Q.  And what is the -- how do you
22 understand price impact from an economic
23 perspective?
24         A.  It's impact on the price due to
25 new public information.  Market learns

Page 141

1          MUKESH BAJAJ, PH.D.
2  something new, the price reacts.  There is an
3  impact that goes from information to the
4  price.
5          Q.  Then we'd have to qualify at least
6  one prong of your answer, as I understand it.
7  Price impact from an economic perspective
8  would mean materialization and disclosure of
9  a previously undisclosed risk; correct?
10 Because if it needs new public information,
11 you're saying it needs to be disclosed.  So
12 you can't have materialization of an
13 undisclosed risk that creates price impact,
14 given your economic definition of the term,
15 absent disclosure?
16         A.  Disclosure or inference or
17 something that links in the marketplace the
18 alleged realization of risk with the
19 observable price decline; otherwise, it's in
20 the head of whoever is making the assumption.
21 There is no objective observable that would
22 connect the two.
23         MR. FRANK:  Bill, we've been going
24         about an hour.  Can we take a short
25         break now?

36

Page 142

```
1        MUKESH BAJAJ, PH.D.
2        MR. MARKOVITS:  Sure.
3        THE VIDEOGRAPHER:  The time now is
4   14:03.  We're off the record.
5   (Recess taken at 2:03 p.m. to 2:22 p.m.)
6        THE VIDEOGRAPHER:  The time now is
7   14:22.  We're on the record.
8   BY MR. MARKOVITS:
9        Q.  You earlier, I believe,
10  acknowledged that one of the allegations of
11  Plaintiff's Complaint relates to
12  misrepresentation of its capital position?
13  That's --
14       A.  Yes.
15       Q.  That's in your report at
16  paragraph 9, small (v); correct?
17       A.  Yes.
18       Q.  Are you opining that no part of
19  the 29 percent stock decline on November
20  20th, 2007, was due to disclosure of
21  previously undisclosed weakness in Freddie
22  Mac's capital position?
23       A.  I don't understand the question.
24  Capital is how much originally contributed
25  capital in all the additions to retained
```

Page 143

```
1        MUKESH BAJAJ, PH.D.
2   earnings you had.  And if you have losses,
3   that reduces capital.  That's the way I
4   understand it.
5        So I don't understand your
6   question as to -- can you -- can you explain
7   that to me?
8        Q.  Sure.  In the analysts' reports
9   that you reviewed and in Freddie Mac's
10  disclosures, there were discussions relating
11  to its precarious capital position as of that
12  point in time.
13       A.  Okay.
14       Q.  Is that correct?
15       A.  There were discussions about the
16  need to raise additional capital for it to
17  support the market, yes.
18       Q.  And are you opining that that
19  situation had no relation to the 29 percent
20  stock decline?
21       MR. FRANK:  Objection.
22       A.  The fear that capital market --
23  the fear that Freddie Mac would have to raise
24  additional capital or may want to raise
25  additional capital, and in those market
```

Page 144

```
1        MUKESH BAJAJ, PH.D.
2   conditions, that would be a costly endeavor,
3   would, of course, have contributed to some of
4   the stock-price decline.
5        Q.  Okay.  And if their capital
6   position that was disclosed on November 20th
7   was worse than had been previously disclosed
8   and was a result, in part, on -- of
9   misrepresentations regarding the strength of
10  their capital position, misrepresentations or
11  omissions, in your opinion, would that show
12  price impact?
13       MR. FRANK:  Objection.
14       A.  I'm sorry.  Can you repeat your
15  question?
16       Q.  Sure.  If on November 20th, part
17  of what was disclosed was a weakness in
18  capital position that caused analysts and
19  stockholders concern and led, in part, to the
20  29 percent stock decrease, and, in addition,
21  that disclosure was contrary to prior
22  representations regarding Freddie Mac's
23  contrary capital position, such that the
24  prior representations or omissions were
25  fraudulent, would that constitute price
```

Page 145

```
1        MUKESH BAJAJ, PH.D.
2   impact, in your view?
3        MR. FRANK:  Objection.
4        A.  So any time a company announces
5   losses, those losses would lead to a
6   reduction in its capital.  Are you asking me
7   that some of the losses that led to erosion
8   in capital were due to fraud, or are you
9   asking me to assume that the beginning level
10  of capital was fraudulently overstated, so
11  the decline in capital from the previous
12  level to the level disclosed on November 20th
13  was caused by a misstatement of previous
14  amount of capital?  I'm not understanding
15  this hypothetical.
16       Q.  All right.  Let's suppose that
17  there was a misrepresentation or omission by
18  Freddie Mac prior to November 20th of its
19  capital position and the strength of its
20  capital position, such that the market
21  believed that Freddie Mac could, from a
22  capital perspective, weather the housing
23  crisis storm.  And let's suppose that on
24  November 20th, the market learned that the
25  capital position of Freddie Mac was not as
```

Page 146

MUKESH BAJAJ, PH.D.

1
2  strong as previously represented and that the
3  capital position was going to cause
4  difficulties for Freddie Mac going forward.
5  Is that a sufficient link to prove price
6  impact, in your view?
7          MR. FRANK:  Objection.
8      A.  So I think the hypothetical you
9  gave me is incomplete.  And I can explain
10  why, to me, it is incomplete.
11      Q.  Okay.
12      A.  So let's say there is a company
13  which has capital of $10, and the company has
14  an unexpected loss having nothing to do with
15  fraud of $2.  So if you started with $10 of
16  capital, you have $2 of loss, now you have $8
17  of capital.  And now, that $8 of capital may
18  be less than ideal in the new market
19  conditions, so the company is anticipated to
20  raise additional capital.
21          In this scenario, if the loss that
22  led to reduction of capital is not due to
23  fraud, disclosed or not, the reduction in
24  capital may well be unanticipated, but that
25  would be unanticipated mechanically from the

Page 147

MUKESH BAJAJ, PH.D.

1
2  loss being unanticipated.  And in this
3  scenario, I don't see how you link the fraud
4  to the realization that $8 of capital in my
5  example is less than ideal and the company
6  would like to raise more capital.
7          Did I misunderstand your
8  hypothetical, or is there something more to
9  it?
10      Q.  Well, I think you did, but so --
11  but let's just take your hypothetical and
12  let's switch the assumption a little.  Let's
13  suppose the loss was due to fraud.  So it
14  goes down from $10 to $8 due to fraud.  Is
15  that a price impact link, in your view?
16          MR. FRANK:  Objection.
17      A.  It seems to be, by your
18  assumption, that the loss that led to the
19  capital decline was due to fraud, then, of
20  course, the concern due to lack of adequate
21  capital is therefore, by inductive logic,
22  related to the fraud and that would establish
23  the link.
24          But this is a hypothetical.  I
25  want to clarify.  I've seen no evidence along

Page 148

MUKESH BAJAJ, PH.D.

1
2  the lines that the loss was due to the fraud,
3  whether disclosed or undisclosed.  I know we
4  focused on disclosures a little while ago,
5  but I want to make sure that -- I have seen
6  no evidence that any of the loss announced on
7  that day that was higher than expected was
8  due to the alleged fraud, regardless of
9  whether that was disclosed or not.
10      Q.  You're aware that Professor
11  Feinstein's report addresses the eight
12  Cammer-Krogman factors; correct?
13      A.  Uh-huh.  Yes.
14      Q.  And in your view, if Cammer 5 --
15  Cammer *Factor 5 is not part of the analysis,
16  your opinion is that a Plaintiff cannot prove
17  market efficiency sufficient for the Basic
18  presumption to apply; correct?
19          MR. FRANK:  Objection.
20      A.  Yes, under these and almost any
21  other circumstance I can imagine.
22      Q.  In your opinion, Cammer Factor 5
23  requires an event study?
24      A.  Yes.  Because Cammer Factor 5 is
25  about cause and effect.  And the way a

Page 149

MUKESH BAJAJ, PH.D.

1
2  financial economist finds cause-and-effect
3  relationship is through an event study.
4      Q.  Now, without an event study
5  demonstrating cause and effect, your opinion
6  is there can be no finding of market
7  efficiency?
8      A.  The economic evidence would be
9  insufficient, in my opinion, to conclude
10  semi-strong form of market efficiency.
11      Q.  So, in your opinion, if Cammer
12  Factor 5 is not addressed and found, the
13  other Cammer-Krogman factors are irrelevant
14  because they're neither sufficient
15  individually or collectively to prove market
16  efficiency?
17      A.  I wouldn't quite say they are
18  irrelevant.  They are structural factors that
19  inform our judgment that market conditions
20  facilitate market efficiency, but they are
21  not sufficient, either individually or
22  collectively, to establish semi-strong form
23  of market efficiency.
24      Q.  Is Cammer Factor 5, in your view,
25  both necessary and sufficient to prove market

Page 150

```
1              MUKESH BAJAJ, PH.D.
2   efficiency?
3            MR. FRANK:  Objection.
4         A.  Well, it's certainly necessary.  I
5   can imagine circumstances where Cammer
6   Factor 5 is not implemented sufficiently
7   thoughtfully that it would not be sufficient.
8         Q.  Let's assume it's implemented
9   thoughtfully and correctly.  In your view,
10  that provides direct evidence of market's
11  efficiency; correct?
12           MR. FRANK:  Objection.
13           MR. GOLDFARB:  Objection.
14        A.  Yes, recognizing that the words
15  "thoughtfully and correctly" have been left
16  unspecified here, yes.  If there is an
17  adequate showing from an economic perspective
18  of Cammer Factor 5, then, assuming the market
19  is at least weak form efficient, then that
20  Cammer Factor 5 analysis would be direct
21  demonstration of cause-and-effect
22  relationship, i.e., semi-strong form of
23  market efficiency.
24        Q.  So if Cammer Factor 5 is addressed
25  and found and found properly, the other
```

Page 151

```
1              MUKESH BAJAJ, PH.D.
2   Cammer-Krogman Factors would not be necessary
3   to find market efficiency, in your view?
4            MR. FRANK:  Objection.
5         A.  They may have some marginal
6   relevance in giving you comfort that market
7   conditions are such that you can have -- that
8   they would facilitate market efficiency and
9   your Cammer Factor 5 study is reliable.  And,
10  in that sense, they would be helpful; but by
11  themselves, they are not sufficient.
12        Q.  You're aware that many courts have
13  found market efficiency without resolving
14  Cammer Factor 5 in the Plaintiff's favor?
15           MR. FRANK:  Objection.
16        A.  I don't keep track of court
17  decisions.  If they have, then I don't know
18  the circumstances.  But from an economic
19  perspective, I think there is isn't an
20  adequate showing of market efficiency without
21  a sound Cammer Factor 5 analysis.
22        Q.  You didn't do an event study to
23  determine market efficiency in this case;
24  correct?
25           MR. GOLDFARB:  Objection.
```

Page 152

```
1              MUKESH BAJAJ, PH.D.
2         A.  It was not within the scope of my
3   assignment to do an affirmative analysis of
4   market efficiency in this case.  As I
5   understand it, it's Plaintiff's burden to
6   make that showing.
7         Q.  I believe you're correct.
8            But in other cases where
9   testifying on behalf of a defendant with
10  respect to market efficiency, you've done
11  event studies; correct?
12        A.  In some cases, I might have.  In
13  some cases, I might not have, depending on my
14  assignment in that case.
15        Q.  And the null hypothesis in
16  Professor Feinstein's event study --
17        A.  Actually, may I --
18        Q.  Yes, you may.
19        A.  -- just clarify my answer
20  slightly?
21        Q.  Sure.
22        A.  So to the extent I explored
23  Mr. Hallman's model, talked about
24  deficiencies in that model, replicated his
25  results and explored the implications of
```

Page 153

```
1              MUKESH BAJAJ, PH.D.
2   making corrections, in that sense, I've done
3   an event study.  And the same applies to
4   Dr. Feinstein, in that I replicated his
5   models, replicated his analysis, pointed out
6   shortcomings in his analysis and explored the
7   implications of it.
8            I did event-study work in
9   connection with the fact that mine is a
10  rebuttal report.  I did not do
11  Dr. Feinstein's job for him.
12        Q.  And the object of an event study
13  for a Plaintiff's expert is to disprove the
14  null hypothesis and demonstrate that the
15  market is efficient?
16           MR. FRANK:  Objection.
17        A.  Can you repeat the question?
18        Q.  The object of the event study that
19  Dr. Hallman and Professor Feinstein were
20  conducting was to disprove the null
21  hypothesis and demonstrate that the market is
22  efficient?
23           MR. FRANK:  Objection.
24        A.  I'm sorry.  Your question is
25  incomplete.  Did you say -- what did you say
```

Page 154

MUKESH BAJAJ, PH.D.

1  
2  their null hypothesis is supposed to be?
3  Q. Well, let's start there. What is
4  the null hypothesis for -- for Dr. Feinstein
5  and -- or for Professor Feinstein and
6  Dr. Hallman?
7  MR. FRANK: Objection.
8  A. Well, I have a more recent memory
9  of Dr. Feinstein. I haven't looked at
10  Dr. Hallman's report since early 2013. So
11  I'll speak to that, if you don't mind.
12  Q. Fine.
13  A. Dr. Feinstein has tasked his
14  event-study analysis as whether or not he can
15  reject the null hypothesis that market is not
16  efficient. So, in other words, if the null
17  hypothesis is that there is no price response
18  to any cause, then the market is inefficient.
19  And if I show threshold level of evidence
20  that says there is sometimes a cause and
21  effect, barely more than enough to reject the
22  hypothesis that there is no cause and effect,
23  that is adequate showing of market
24  efficiency.
25  And that is a key issue and a key

Page 155

MUKESH BAJAJ, PH.D.

1  
2  blindside on Dr. Feinstein's part, leaving
3  aside his implementation, problems and all
4  the other mistakes he made that I pointed out
5  and his evidence not being sufficient on its
6  own terms, the market efficiency definition
7  is, and he admitted so, that if a market is
8  semi-strong form efficient, all material
9  cause events will lead to an effect.
10  It's not cause events will
11  sometimes lead to an effect and sufficiently
12  numerous that the market is not demonstrably
13  inefficient. The threshold is -- the
14  standard is it will happen every time, not
15  barely more than 5 percent or 6 percent of
16  the time. That's the way he formulated his
17  statistical calculations.
18  Now, as I said --
19  Q. I'm sorry.
20  A. -- all the time, given that we are
21  talking about statistical tests, may mean
22  practically 80 to 90 percent of the time.
23  But by definition of market efficiency -- and
24  if you think about basic and reliance and for
25  what purpose market efficiency is being

Page 156

MUKESH BAJAJ, PH.D.

1  
2  tested -- it's not just about statistics.
3  The presumption of reliance is if
4  you -- Plaintiffs alleged 25 disclosure
5  defects, if the Court says you have
6  presumption of reliance, for all 25 of those
7  disclosure defects, you are entitled to the
8  presumption that they impacted the stock
9  price. Not 20 percent of them did, not 30
10  percent of them did, not 10 percent of them
11  would.
12  There would be no point in the
13  test, which is the basis for market
14  efficiency, which is common issues
15  predominate.
16  If you have a class period and you
17  alleged 25 misrepresentations, and based on
18  your evidence provided by your expert, you
19  could tell the Court, "Your Honor, there's 25
20  percent chance that if there is a cause,
21  there is an effect." There cannot be a
22  common class with common issues that
23  predominate. Because which of the 25 alleged
24  misrepresentations would elicit a price
25  impact, 25 percent of them? Which ones?

Page 157

MUKESH BAJAJ, PH.D.

1  
2  That would lead to individual issues
3  predominating.
4  So the logic of this is that
5  there's a blindside in the way Professor
6  Feinstein set up his test, leaving aside all
7  his implementation errors, all his
8  methodological errors, all his statistical
9  calculations.
10  Q. Are you done?
11  A. Yes.
12  Q. I believe the question was: What
13  was Dr. Feinstein's null hypothesis? You
14  then proceeded, for about a 5-minute lecture,
15  that had nothing to do with the answer to
16  that question.
17  Could you please confine your
18  answers to the questions asked.
19  You indicated the null hypothesis
20  for Professor Feinstein was that the market
21  was inefficient; correct?
22  MR. FRANK: Objection.
23  A. Yes.
24  Q. All right. To demonstrate that
25  the market was inefficient with an event

Page 158

MUKESH BAJAJ, PH.D.

1
2  study, the null hypothesis would have to be
3  that the market is efficient; correct?
4       MR. FRANK:  Objection.
5       A.  I don't know that I can agree to
6  any such statement.  I don't understand what
7  you're asking me and what's the significance
8  of it and what is the relevance of it in the
9  context of testing for market efficiency for
10 reliance.
11      Q.  All right.  Forget about the
12 context of testing market efficiency for
13 reliance.  Let's talk about just the context
14 of testing market efficiency.  If we wanted
15 to test for market inefficiency and use an
16 event study to do so, the null hypothesis
17 would be that the market is efficient;
18 correct?
19      MR. FRANK:  Objection.
20      A.  So it is true that a demonstration
21 that market evidence is inconsistent with
22 market efficiency often enough would lead to
23 a valid statistical conclusion and an
24 economic conclusion that the market was not,
25 in fact, efficient for the period tested, for

Page 159

MUKESH BAJAJ, PH.D.

1
2  the type of events tested, et cetera.
3       Q.  And one of your criticisms of
4  Professor Feinstein is that he performed a
5  mechanical review of the Cammer-Krogman
6  factors; is that correct?
7       MR. VOLPE:  Objection.
8       A.  Yes.
9       Q.  And you similarly used that term
10 "mechanical" when applying or when reviewing
11 Dr. Hallman's analysis of the Cammer-Krogman
12 factors; correct?
13      A.  Yes.
14      Q.  And you've used that phrase
15 "mechanical" in other reports where you've
16 addressed opposing experts' application of
17 the Cammer-Krogman factors; correct?
18      A.  Yes, whenever I see a checklist
19 approach -- there are eight factors -- check
20 the Box 1, done; check the Box 2, done.  I
21 call that a mechanical way of addressing
22 Cammer-Krogman factors.
23      Q.  Okay.  That was going to be my
24 next question.  So that's what you mean by
25 "mechanical"?

Page 160

MUKESH BAJAJ, PH.D.

1
2       A.  Yes, without explaining
3  necessarily how it ultimately leads to the
4  overall conclusion of the market efficiency,
5  if that's what you're conclusion is.
6       Q.  So how would one perform a
7  nonmechanical review of, let's say, Cammer
8  Factor 1, average weekly trading volume?
9       A.  So one would explain why, from an
10 economic perspective, weekly trading volume
11 being above a threshold would facilitate
12 market efficiency.  Depending on the context
13 and finding, one might even say that it's not
14 necessarily a monotonic relationship, that
15 more volume is always good.
16          Sometimes too much volume can
17 indicate overly speculative trading activity
18 that would actually impede market efficiency.
19 One would put that in context of what the
20 volume was, how does it relate to
21 contemporaneous evidence on other large
22 stocks traded in very developed markets.
23          One might say:  Was there enough
24 trading volume by institutions?  Did the
25 market handle large trading well?  So I would

Page 161

MUKESH BAJAJ, PH.D.

1
2  hope that, instead of being a checklist of
3  factors, one would give a little economic
4  motivation for the factor, look at the
5  empirical evidence and explain why, in a
6  particular case, your findings support the
7  conclusion of market efficiency.
8       Q.  Could you turn to paragraph 96 of
9  your report?  In this you're talking about
10 the Z-test, and you provide an example where
11 you say, "Suppose there were 100 material
12 news days for publicly traded 'Company A,'
13 over a class period of 500 days in total."
14          And I want to focus on the next
15 sentence.  "The logic of Basic and
16 informationally efficient markets dictates
17 that all or most of these 100 news days
18 should result in statistically significant
19 abnormal returns for Company A."
20          Do you see that?
21      A.  Yes.
22      Q.  Are you defining material news
23 there in that sentence -- or in those two
24 sentences, as -- when you're talking about a
25 hundred material news days, are you defining

Page 162

MUKESH BAJAJ, PH.D.

material news as news that is likely to
produce a statistically significant abnormal
return?

A.  That is likely to be materially
significant for valuation of the company and
important to investors; and, hence, expected
to return, result in a statistically
significant stock-price reaction.

Q.  So if you're defining the hundred
material news days as days on which you would
expect a statistically significant abnormal
return, isn't the conclusion that those news
days should result in a statistically
significant abnormal return in tautology?

A.  No, but that's the hypothesis
you're testing.  As an economist, you observe
a certain piece of information that -- you're
wearing your economic hat, it tells you it is
material news.  It should be expected to
result in a material stock-price effect.  And
then you test whether it, in fact, does or
not.  That's where the test comes in.

You're ex-ante hypothesis is that
it should, and then you check whether that

Page 163

MUKESH BAJAJ, PH.D.

hypothesis is actually something that
happens.  And you do that on each of the
hundred news dates.  And if you find that
there was a price reaction on 30 or 40 or 20
or 12 of them, regardless of the proportion
of non-news dates when there is price
reaction, that is not sufficient evidence, in
my opinion, to conclude market efficiency for
reliance purposes.

Q.  I want to read something to you
and see if you agree with it.

A.  Okay.

Q.  "In fact, Defendants have
frequently argued that some large number of
dates with news should be associated with
statistically significant stock-price
movements.  Yet, it is not clear if there is
any case in which Defendants have cited some
empirical or even sound theoretical basis for
an argument that there should be some minimum
fraction of news days associated with
statistically significant returns."

Would you agree with that
statement?

Page 164

MUKESH BAJAJ, PH.D.

MR. GOLDFARB:  Objection.

A.  I think I may have more than one
comments on that statement, but it was kind
of a longish statement.  If you don't mind
repeating it and maybe putting it in two or
three parts, I'd be able to be more
responsive to you.

Q.  Sure.  There's two sentences.
Let's split them up.

MR. GOLDFARB:  Are you reading
from his report here?

MR. MARKOVITS:  No.

MR. GOLDFARB:  Okay.

MR. MARKOVITS:  It's actually
from -- there's no hidden ball here.
It's from Dr. Tabak's work titled "What
Should We Expect When Testing For Price
Response to News and Security
Litigation," which I believe you cited
in your report.

BY MR. MARKOVITS:

Q.  And on page 5 of that article,
Dr. Tabak states -- I'll just go with the
first sentence -- "In fact, Defendants have

Page 165

MUKESH BAJAJ, PH.D.

frequently argued that some large number of
dates with news should be associated with
statistically significant price movements."

Actually, I don't really care if
you degree or disagree with that.  So let's
move on to the second statement.

A.  You have to be of help.

MR. GOLDFARB:  Objection.  So
there's no question?

MR. MARKOVITS:  There's no
question there.

MR. GOLDFARB:  Okay.

MR. MARKOVITS:

Q.  Moving on.  Let's just focus on
the second part of his quote.

"Yet, it is not clear if there is
any case in which Defendants have cited some
empirical or even sound theoretical basis for
an argument that there should be some minimum
fraction of news days associated with
statistically significant returns."

Would you agree with that
statement?

A.  So first, I'd have to see the

Page 166

1       MUKESH BAJAJ, PH.D.
2  sentence in the context in which David Tabak
3  wrote it.  But taking the sentence on its own
4  terms, without the context and with that
5  caveat, I absolutely disagree.
6       The definition of market
7  efficiency and the whole basis of reliance is
8  that Plaintiffs should be able to benefit
9  from a presumption that, as long as they have
10  demonstrated a material disclosure defect
11  that's actionable, the Court will presume,
12  without further examination, that in each and
13  every one of those instances there has been a
14  price impact.
15       By the definition of market
16  efficiency, which Dr. Feinstein agreed with,
17  the implication is in each and every percent,
18  a hundred percent of the cases, in each and
19  every case, when there is material news,
20  there should be a price impact.
21       And there are many authorities,
22  some of which I've cited in my report, that
23  are absolutely consistent with that.  And
24  Judge Cedarbaum couldn't be clearer in a
25  related case of Freddie Mac-Quasar.

Page 167

1       MUKESH BAJAJ, PH.D.
2       That is the standard.  That's her
3  understanding of the standard too, to say
4  that there is no magic number in proportion.
5  The most charitable interpretation of that
6  sentence is, it is, in fact, a magic number.
7  It's a hundred percent.  But given the noise
8  in the data, depending on the sample size,
9  sometimes you could say, "Well, 80 percent of
10  material news days eliciting a price response
11  is close enough to be statistically
12  inextinguishable from a hundred, sometimes it
13  might be 90."
14       And I've given you some
15  calculations, some examples as to how that
16  less than a hundred percent but close enough
17  to a hundred percent works.  And that is the
18  standard.  There is no other standard.
19       Q.  And you mentioned Judge Cedarbaum.
20  With all due respect to Judge Cedarbaum, do
21  you know whether or not her view on this
22  issue is in distinct minority of courts that
23  have addressed it?
24       MR. FRANK:  Objection.
25       A.  I'm not somebody who researches

Page 168

1       MUKESH BAJAJ, PH.D.
2  judge's decisions and categorizes them.  I
3  don't know.
4       Q.  Let's talk briefly about Cammer
5  Factor 1, the average weekly trading volume.
6  And I can pull out his report, if you'd like,
7  so you can refresh your recollection.
8       But Professor Feinstein found an
9  average weekly trading volume of 3 percent;
10  is that correct?
11       A.  I don't remember.  Maybe you
12  should pull out his report.
13       MR. MARKOVITS:  Let's go off the
14  record for one second, please.
15       THE WITNESS:  As long as you're
16  going off the record, can I go to the
17  washroom?
18       THE VIDEOGRAPHER:  The time is
19  14:45.
20       MR. MARKOVITS:  Excuse me?
21       THE VIDEOGRAPHER:  We're off the
22  record.
23  (Recess taken at 2:45 p.m. to 3:12 p.m.)
24       THE VIDEOGRAPHER:  The time now is
25  15:12.  We're on the record.

Page 169

1       MUKESH BAJAJ, PH.D.
2  BY MR. MARKOVITS:
3       Q.  Dr. Bajaj, before the break, we
4  were just talking about average weekly
5  trading volume in Professor Feinstein's
6  report, which you have now in front of you
7  and it has been previously marked as
8  Exhibit 96.  And if you would look at
9  paragraph 54 of that report, I believe it can
10  confirm that Professor Feinstein found an
11  average weekly trading volume of 3 percent.
12       A.  Okay.
13       Q.  Do you disagree with Professor
14  Feinstein's calculations with respect to that
15  factor?
16       A.  I haven't double-checked his
17  calculations, but I'm happy to accept his
18  calculations.
19       Q.  Would you agree that average
20  weekly trading volume of Freddie Mac stock
21  was above 2 per -- 2 percent as a percentage
22  of total outstanding shares?
23       MR. VOLPE:  Objection.
24       MR. MARKOVITS:  You object.
25       MR. VOLPE:  I'm sorry?

Page 170

MUKESH BAJAJ, PH.D.

1
2      MR. MARKOVITS:  I think he's
3   trying to keep himself awake.
4      A.  I agree 3 percent is higher than
5   2 percent.
6      Q.  All right.  Are you aware that
7   many courts hold that anything above
8   2 percent justifies a strong presumption of
9   market efficiency?
10      MR. FRANK:  Objection.
11      A.  I can take your representation for
12   it.
13      Q.  You don't believe, however, that
14   the average trading volume above 2 percent is
15   probative evidence with regard to market
16   efficiency; correct?
17      MR. FRANK:  Objection.
18      A.  No, I don't think it's very
19   probative all by itself.  I think it's among
20   the mix of factors, a helpful fact.  That's
21   it.
22      Q.  And we can go back and look at
23   this, if you'd like, but, in your prior
24   deposition, we were talking about Cammer
25   Factor 1.  And you said, "But it is not

Page 171

MUKESH BAJAJ, PH.D.

1
2   probative evidence from an economic
3   perspective."
4      Have your views on that point
5   evolved?
6      MR. FRANK:  Objection.
7      A.  I think I said what I said in the
8   context I said it.  And I agree that just
9   this factor by itself would not be strongly
10   probative of market efficiency.  It's a
11   structural factor.  It's a factor courts look
12   at.  And in the mix of other evidence, it is
13   helpful to note.
14      Q.  So with the qualification that it
15   may not be strongly probative, would you
16   agree that it's probative in some respect
17   with regard to market efficiency?
18      MR. FRANK:  Objection.
19      A.  By itself, it does not have a
20   significant probative value.  I would not
21   call a stock as trading in an efficient or an
22   inefficient market based on this factor
23   alone.
24      Q.  And I want to make sure we're on
25   the same page when we're talking about using

Page 172

MUKESH BAJAJ, PH.D.

1
2   the term "probative."  When you say something
3   is "probative," do you mean that it makes the
4   issue to be proved more or less likely?
5      MR. FRANK:  Objection.
6      A.  Probative, meaning helpful.  I
7   wouldn't assign likelihood to it.  It's
8   indicated.  It's helpful.  But, by itself,
9   it's not sufficient evidence.
10      Q.  And that wasn't the question,
11   though.  Let's -- let's just talk about it in
12   the context of market efficiency.  Is a high
13   average weekly volume probative of market
14   efficiency in the sense that it's evidence
15   that tends to make proof of an -- the
16   existence of an efficient market more likely?
17      A.  Yes.
18      Q.  Just touching back on your price
19   impact analysis.  You reviewed certain
20   analyst reports between November 20th and
21   27th; correct?
22      A.  I'd have to refresh my memory but
23   somewhere around there.
24      Q.  And you can refresh your memory if
25   you need to answer this question.  Do you

Page 173

MUKESH BAJAJ, PH.D.

1
2   know -- did you review all analyst reports
3   that took place over those dates or some
4   subset?
5      MR. MARKOVITS:  *Jason, 129, 12 to
6   20.
7      A.  So in paragraphs -- in paragraph
8   171 of my report, I discuss which analyst
9   reports I reviewed.  I cite to them, and I
10   explain how I selected the reports that I
11   reviewed.  I can elaborate if that's
12   necessary.
13   BY MR. MARKOVITS:
14      Q.  Well, you have a report cited in
15   two footnotes.  In Footnote 211, you have a
16   report cited by Dr. Feinstein; and then in
17   Footnote 212, you say, "These analyst reports
18   include the six mentioned in the previous
19   footnote as well as..." and then you go on to
20   list various reports.
21      My question is, to your knowledge,
22   is that the sum total of reports by analysts
23   that came out between November 20th and 27th
24   or is it some subset?
25      A.  So, as I say in the sentence that

Page 174

```
1            MUKESH BAJAJ, PH.D.
2    begins right after Footnote 11, which are the
3    reports that Dr. Feinstein reviewed, in fact,
4    none of the analyst reports over the seven
5    days, November 20 to 27, that I reviewed
6    considered Freddie Mac's disclosures, so on
7    and so forth.
8            And then, Footnote 212 says that
9    the reports that are referenced in that
10   sentence include six that were reviewed by
11   Dr. Feinstein and referenced -- or cited in
12   Footnote 211, as well as additional reports
13   that I reviewed.
14           As I sit here right now, I can't
15   tell you that there is absolutely no other
16   report that I may not have reviewed in this
17   connection, but it was my intention to review
18   reports comprehensively that were issued
19   between November 20th and November 27th.
20           THE PHONE:  Interruption.
21           MR. MARKOVITS:  Siri doesn't need
22   to use a speaker.  Siri was just reading
23   my mind.
24   BY MR. MARKOVITS:
25       Q.  During the class period, Freddie
```

Page 175

```
1            MUKESH BAJAJ, PH.D.
2    Mac's common stock traded on the New York
3    Stock Exchange; correct?
4        A.  I'd have to refresh my
5    recollection on that.  Do you have a citation
6    to Dr. Feinstein's report where he discusses
7    that issue?
8            MR. GOLDFARB:  I'm sorry.  Would
9    you read back the question and answer,
10   please?
11           MR. MARKOVITS:  The question was
12   whether Freddie Mac common stock traded
13   on the New York stock exchange during
14   the class period.
15           MR. GOLDFARB:  The common stock?
16           MR. MARKOVITS:  Yes.
17   BY MR. MARKOVITS:
18       Q.  I believe page 19 of Professor
19   Feinstein's report addresses that.
20       A.  Okay.  I see that.
21       Q.  And you'd agree that the New York
22   Stock Exchange is a large national exchange?
23       A.  Yes.
24       Q.  You'd agree that it's likely that
25   most stocks traded on the New York Stock
```

Page 176

```
1            MUKESH BAJAJ, PH.D.
2    Exchange most times are efficient?
3            MR. FRANK:  Objection.
4        A.  I've not done an empirical
5    analysis, and I don't know what you mean by
6    "most."  But I think it's a fair inference
7    that many of the stocks traded on the New
8    York Stock Exchange trade in an efficient
9    market many times.
10       Q.  Okay.  You can't agree that most
11   stocks trade most times on the New York Stock
12   Exchange in an efficient market?
13           MR. FRANK:  Objection.
14       A.  I think it's a bit imprecise.  So
15   without empirical evidence, I don't know if I
16   want to say most.  But I have no difference
17   of opinion that New York Stock Exchange is a
18   well-developed market and it facilitates
19   stocks trading efficiently.
20       Q.  Would you agree that for a large
21   capitalization stock like Freddie Mac, with
22   many market analysts, a high trading volume,
23   active flow of information, and a listing on
24   the New York Stock Exchange, it's reasonable
25   to infer that stock prices are being
```

Page 177

```
1            MUKESH BAJAJ, PH.D.
2    determined in an efficient market?
3            THE REPORTER:  "Inefficient"?
4            MR. MARKOVITS:  In an efficient.
5            MR. FRANK:  Objection.
6        A.  So I think I expect stocks
7    satisfying those characteristics many times
8    to be trading in an efficient market, but I
9    wouldn't say that those factors would obviate
10   the need for direct evidence on market
11   efficiency through Cammer Factor 5 analysis.
12       Q.  But would the answer to my
13   question be yes, that for large
14   capitalization stock like Freddie Mac with
15   many market analysts, high trading volume,
16   active flow of information and a listing on
17   the New York Stock Exchange, it's reasonable
18   to infer that stock prices are being
19   determined in an efficient market?
20           MR. FRANK:  Objection.
21       A.  No, I can't say yes to the
22   language that you used in your question.  I
23   would say that all those factors facilitate
24   an efficient market.
25       Q.  Could you look back at the
```

Page 178

MUKESH BAJAJ, PH.D.

1
2   Footnote 212 of your report, which cites in
3   it various analysts' reports.  Did you review
4   these analysts' reports?
5        MR. FRANK:  Objection.
6        A.  Yes.
7        Q.  And I know that, for example, for
8   the report, I know some of them may have been
9   written by you, some of them may have been
10  written by others and reviewed and accepted
11  by you, but I want to clarify.  With regard
12  to reviewing these analysts' reports, was the
13  review done by anybody else and reported to
14  you, or did you actually review these analyst
15  reports in coming to the opinions that you
16  gave in this report?
17       MR. FRANK:  Objection.
18       A.  Both.
19       Q.  Both.  Some of them were reviewed
20  by others, or they were reviewed by others
21  and then you reviewed them?
22       A.  They were collected by others,
23  preliminarily reviewed by others, and then I
24  reviewed them.
25       Q.  Okay.  So the reports mentioned

Page 179

MUKESH BAJAJ, PH.D.

1
2   here would have been reviewed by others and
3   then reviewed by you prior to you signing off
4   on the report?
5        A.  Prior to my writing or accepting
6   elements of writings in paragraph 171.
7        Q.  Okay.  And if you'd look at
8   paragraph 212.
9        MR. FRANK:  Paragraph or footnote?
10       MR. MARKOVITS:  Oh, I'm sorry.
11  Thank you.
12  BY MR. MARKOVITS:
13       Q.  Footnote 212, about the fifth line
14  down, a few words in, there's a quote,
15  "Freddie Mac's strong retained portfolio
16  growth in August with an analyst report dated
17  November 25th, 2007."
18       Do you see that?
19       A.  Yes.
20       Q.  And it's your contention that that
21  analyst report showed no contention -- or
22  connection between Plaintiff's allegations
23  and the disclosures that took place on
24  November 20th, 2007?
25       MR. FRANK:  Objection.

Page 180

MUKESH BAJAJ, PH.D.

1
2        A.  On my conclusion from reviewing
3   that and other reports referenced in that
4   paragraph, is that none of these reports
5   considered Freddie Mac's disclosures on
6   November 20th, 2007, to be indicative of
7   previously undisclosed risks about business
8   model or materialization of undisclosed risk
9   related to Freddie Mac's subprime exposure.
10       MR. MARKOVITS:  Do you have that
11  report?  Could you mark this, please?
12       THE REPORTER:  188, Exhibit 188.
13  (Exhibit 188, Bates Nos. FMOPERS00221555
14  through -1560, marked for identification.)
15  BY MR. MARKOVITS:
16       Q.  Dr. Bajaj, I show you what's been
17  marked as Exhibit 188, which is an analyst's
18  report about Freddie Mac with the title,
19  "Strong Retained Portfolio Growth in August."
20  And this is the analyst's report that's cited
21  in that Footnote 212; correct?
22       A.  So I notice in Footnote 212 the
23  date of the report is November 25, 2007.  And
24  I think the exhibit that you handed me, on
25  top, right-hand side, it indicates a date of

Page 181

MUKESH BAJAJ, PH.D.

1
2   25th September, 2007.  So I don't understand
3   that discrepancy.
4        The paragraph talks about reports
5   between November 20 and November 27th, and
6   Exhibit 188 seems to be a report that was
7   issued on September 25, 2007.
8        Q.  Exactly, Dr. Bajaj.  It's a report
9   by Credit Suisse dated September 25th
10  not November 25th, 2007, with a title,
11  "Strong Retained Portfolio Growth in August."
12       Would this indicate to you that
13  the footnote reference is incorrect and, in
14  fact, this analyst report took place before
15  November 20th, 2007?
16       MR. FRANK:  Objection.
17       A.  Well, I'd have to look into it.
18  Maybe that's the -- that's the issue.  Or
19  maybe there is another report that is dated
20  November 25, 2007.  I'd just have to look
21  into that.
22       Q.  Okay.  But you'd agree with me
23  that the report, Exhibit 188, that's in your
24  hand and in my hand, could not -- or should
25  not have been considered by you for

Page 182

MUKESH BAJAJ, PH.D.

1
2  determining whether or not there was a price
3  impact on November 20th, 2007?
4        MR. GOLDFARB:  Objection.
5        MR. FRANK:  Objection.
6        A.  There's nothing wrong in looking
7  at reports prior to that announcement date to
8  understand what was the mix of information in
9  the market as of that announcement date.  But
10  that footnote obviously refers to a report on
11  November 25.  And I'd have to look into why
12  the report that you've handed me is dated
13  September 25.  Maybe it's an error, or maybe
14  there is another report.  I can't tell you,
15  as I sit here right now.
16        Q.  And you said there's nothing wrong
17  with looking at reports prior to November
18  20th.  But you didn't do that as part of your
19  analysis, did you?
20        MR. FRANK:  Objection.
21        A.  I think my -- my report cites many
22  analyst reports.  Some of them are probably
23  prior to November 20th.  I just don't
24  remember and it's late in the day, but you
25  have the Documents Considered List.

Page 183

MUKESH BAJAJ, PH.D.

1
2        Q.  Yeah.  Well, let's look at that on
3  page 137 at the top of your report.  Under
4  "Analysts Reports" it lists 16.
5        A.  Okay.
6        Q.  I don't see any with a date before
7  November 20th, do you?
8        A.  No, I don't.
9        Q.  Would that indicate that you
10  didn't review any analyst reports or
11  considered any analyst reports that took
12  place before November 20th?
13        A.  Yes, it's --
14        MR. FRANK:  Objection.  I'm sorry.
15        A.  Yes, it's not in the -- no such
16  reports are in the Documents Considered List.
17        Q.  Dr. Bajaj, one of your critiques
18  regarding Professor Feinstein is that his
19  approach to an event study in this case is
20  not the same approach he has taken in other
21  cases; correct?
22        A.  Yes.
23        Q.  You're not opining that simply
24  because Professor Feinstein took a different
25  approach, his results are unreliable, are

Page 184

MUKESH BAJAJ, PH.D.

1
2  you?
3        A.  No.  I point to the way in which
4  he has done -- he has used methodology that
5  he has never before employed, and that
6  methodology leads to an unreliable and biased
7  conclusion.  Those are the differences that I
8  pointed out not for the sake of difference.
9        Q.  Because economists can and do use
10  different approaches, depending on the facts
11  and circumstances in the case; correct?
12        A.  In general, yes.
13        Q.  In fact, you've done so in cases,
14  haven't you?
15        A.  I'm sure I tailor my approach
16  depending on facts and circumstances.
17        Q.  And let me talk about a number of
18  those.  In prior cases where you've addressed
19  a plaintiff expert report on market
20  efficiency, you performed various analyses,
21  such as put-call parity, serial correlation,
22  and the Y-filter test; correct?
23        A.  In some cases, I have.
24        Q.  And you've used the results of
25  each of those tests in prior cases to support

Page 185

MUKESH BAJAJ, PH.D.

1
2  your opinion of market inefficiency; correct?
3        A.  Or the other way around, depending
4  on the results.  I've used the results of
5  those tests to explain my conclusion in favor
6  of market efficiency as well.
7        Q.  In the AIG case, you performed all
8  three of those tests to support an opinion
9  regarding market inefficiency; correct?
10        A.  In part, yes.
11        Q.  And the Court went on and
12  certified that class; correct?
13        A.  It's my understanding that the
14  case was settled before a decision on market
15  efficiency question.
16        Q.  Let's get back to those tests:
17  put-call parity, serial correlation, and
18  Y-filter.  It's not impossible to perform
19  those tests in this case, is it?
20        A.  I assume so.
21        Q.  You assume it's not impossible?
22        A.  Yes.
23        Q.  If those tests were applied in
24  this case and showed -- or supported a claim
25  of market inefficiency, that would be strong

## Page 186

MUKESH BAJAJ, PH.D.

empirical evidence of market inefficiency;
correct?

MR. FRANK:  Objection.

A.  Not necessarily.  The test of
market efficiency for this purpose is the
cause-and-effect factor.  Those tests may or
may not add to the evidence depending on how
they are conducting their results, et cetera.

Q.  My question was:  If you perform
put-call parity, serial correlation, and
Y-filter tests, and the results of those
tests suggested market inefficiency, that
would be strong empirical evidence of market
inefficiency; correct?

MR. FRANK:  Objection.

A.  Again, it depends on the results.
The serial correlation and Y-filter tests are
actually tests of weak form of market
efficiency, and those should be foundational
tests before one does the test of semi-strong
form of market efficiency, which
Dr. Feinstein did not do.

If the evidence shows that the
market was not weak form efficient, then the

## Page 187

MUKESH BAJAJ, PH.D.

inquiry should end there.  Because regardless
of anything you find in an event study, there
is no basis to conduct that event study.  The
link between cause and effect is broken.
Because you don't know cause on a certain
date is being associated with effect that is
contemporaneous in absence of weak form
market efficiency.

If the weak form market efficiency
tests do not show a violation of weak form
market efficiency, then doing a test like
put-call parity could provide supplemental
evidence, but there is no substitute to
conducting a well carried out
cause-and-effect test, especially for
reliance purposes, before you conclude the
market to be semi-strong form efficient.

Q.  I think we have a little
misunderstanding here, Dr. Bajaj.  I'm not
talking about what Professor Feinstein would
need to do to show market efficiency.  I'm
talking about what you could do to show that
the market was not efficient.

And so one of the things that

## Page 188

MUKESH BAJAJ, PH.D.

you've just talked about, as I understood it,
was that if you were to perform serial
correlation tests and Y-filter trading
momentum tests, and they were to show that
the market was not even weak form efficient,
then, by definition, it could not be the
semi-strong efficiency that you indicate in
your view is required for market efficiency
in this case; correct?

A.  Yes.

Q.  So had you performed those tests
and found that the market was not even a weak
form efficient, that would be strong
empirical evidence of market inefficiency in
this case; correct?

MR. FRANK:  Objection.

A.  I don't want to argue with the
qualifier "strong."  It would be evidence of
market inefficiency in the semi-strong form
sense.

Q.  I want to turn a little bit to
Professor Feinstein's Z-test.  Now, you would
disagree that the Z-test is a generally
accepted and widely used statistical test for

## Page 189

MUKESH BAJAJ, PH.D.

testing incidences in two populations;
correct?

A.  For testing whether two
proportions and two subsamples are the same.
That test has been around decades and widely
used for that purpose.

Q.  And can you turn in your report to
page 40, note 105.  You say, "For example, if
we assume a thousand news dates and a
thousand non-news dates and that 5%, or 50,
of the non-news dates are statistically
significant, then Dr. Feinstein's Z-test
would only require 68 of the news days (or
6.8%) to be statistically significant, to
conclude there was a statistically
significant difference and therefore that the
market was efficient according to his
Z-test."

Do you see that?

A.  Yes.

Q.  Assuming you have 50 non-news
dates and 68 news dates, as suggested in your
example, with a statistically significant
reaction, the results of that test are

Page 190

MUKESH BAJAJ, PH.D.

1
2 statistically significant; correct?
3      A.   Well, the only thing that is
4 statistically significant, given the sample
5 sizes of 1000 news dates, 1000 non-news
6 dates, and 50 non-news dates being
7 statistically significant, a proportion 6.8
8 percent of news dates is higher than a
9 proportion of 5 percent of non-news dates
10 statistically speaking.  The two proportions
11 are statistically different.  That's all that
12 experiment will show you.
13      Q.   Couldn't you -- you could reject
14 the null hypothesis that the incidence rate
15 in population 1 is the same as the incident
16 rate in population 2, couldn't you?
17      A.   Again, ignoring the fact that
18 incident rate in this context should also
19 consider direction, which Z-test does not do,
20 it is true that with a sample size of a
21 thousand, 6.8 percent incidence rate is
22 statistically larger than 5 percent incidence
23 rate.
24      Q.   And a correct conclusion from a
25 statistical standpoint would be that the

Page 191

MUKESH BAJAJ, PH.D.

1
2 incidents in these two -- or the incident
3 rates in these two samples are statistically
4 significantly different at the 95 percent
5 confidence level; correct?
6      A.   Again, ignoring the context,
7 ignoring the direction, if it was, for
8 example, a thousand men and a thousand women
9 and 68 of the thousand men liked watching
10 baseball and only 50 of a thousand women
11 liked watching baseball on television, then
12 you could statistically reliably conclude
13 that a larger fraction of men like watching
14 baseball on television.
15      Q.   There would be a statistically
16 significant difference at the 95 percent
17 confidence level?
18      A.   Yes.
19      Q.   You discussed various -- what you
20 label as "flaws" in Professor Feinstein's
21 Z-test.  I want to talk to you about a few of
22 them.
23           The first one is -- you allege as
24 Flaw Number 1 -- a small sample size; is that
25 correct?

Page 192

MUKESH BAJAJ, PH.D.

1
2      MR. FRANK:  Objection.
3      Q.   It's on page 44 of your report.
4      MR. FRANK:  Objection.
5      A.   You said page 44?
6      Q.   I believe so.  Page 44 towards the
7 bottom, Flaw 1.
8      A.   So under the heading of,
9 "Statistical Errors and Assumptions" that
10 bias is results in favor of finding market
11 efficiency, this is Flaw Number 1.
12      Q.   And the flaw you allege there is
13 too small a sample size; correct?
14      A.   Well, I wouldn't use the word
15 "alleged."  The flaw that I discuss there is
16 too small a sample size for the test to be
17 reliable according to the very authorities
18 that the test is based on.
19      Q.   Well, let me stick with
20 allegation.  Are there statistical tests to
21 determine whether the results of a particular
22 statistical analysis is robust despite a
23 small sample size?
24      MR. FRANK:  Objection.
25      A.   There are alternative statistical

Page 193

MUKESH BAJAJ, PH.D.

1
2 tests, other than Z-test, that are not
3 subject to the sample size -- minimum sample
4 size requirements that Dr. Feinstein's Z-test
5 fails to meet.
6      Q.   You've applied tests before,
7 statistical tests to determine whether the
8 results of a particular analysis are robust
9 regardless of the sample size; correct?
10      MR. FRANK:  Objection.
11      A.   Actually, tests of robustness of
12 sample size is a very different issue than a
13 different test that does not have the same
14 kind of minimum sample size requirements.
15 And that's the distinction I'm trying to
16 draw.
17           And if you're asking this in the
18 context of various tests that Dr. Feinstein
19 submitted in his deposition, that he claimed
20 to be robustness tests, I think a more
21 accurate characterization would be those are
22 different tests.  They are not tests of
23 robustness of Z-test, per se.
24      Q.   Would you agree that the Fisher
25 Exact test is a test to test the robustness

Page 194

MUKESH BAJAJ, PH.D.

1  of a small sample size?
2  A.  That is incorrect.  And that's why
3  I'm trying to be careful in my answer.
4  Fisher Exact test is a test that can be used
5  to test statistical difference in proportion
6  in situations where you have sample sizes
7  that are lower than the minimum sample size
8  required of Z-test.
9  Q.  Then I'm misunderstanding
10  something.
11  So you can apply a Fisher Exact
12  test, where you have minimum sample sizes
13  that are lower than what would otherwise be
14  required in a Z-test.  Is that what you're
15  saying?
16  MR. FRANK:  Objection.
17  A.  Yes.  The requirements of minimum
18  sample sizes for Z-test do not apply when
19  you're conducting a different test called
20  Fisher Exact test.  It's a misnomer to call
21  Fisher Exact test a test of robustness of
22  Z-test, per se.
23  Q.  But you seem to be saying, unless
24  I'm misunderstanding, which is entirely

Page 195

MUKESH BAJAJ, PH.D.

1  possible, that you can use the Fisher Exact
2  test and use a smaller sample size in the
3  Z-test than what would otherwise be normally
4  be required?
5  MR. FRANK:  Objection.
6  A.  I'm sorry.  I lost your verbiage,
7  so maybe you can repeat it.
8  Q.  That if you have -- let me just
9  try to flip it around.
10  You're performing a Z-test.  You
11  have a smaller sample size than normally is
12  required or is optimal.  Can you use a Fisher
13  Exact test to reach the conclusion that the
14  results of your Z-test are still tenable?
15  A.  So --
16  MR. FRANK:  Objection.  I'm sorry.
17  You can answer.
18  A.  If you have a sample size that's
19  smaller than minimum required for Z-test, you
20  may, in those situations, sometimes conduct
21  Fisher Exact test, because that test does not
22  have similar minimum size requirements.
23  If you've done a Z-test
24  inappropriately and you've gotten a result,

Page 196

MUKESH BAJAJ, PH.D.

1  and then you run a different test, it's a
2  misnomer to call it a robustness test.  It's
3  a test that's allowed to be applied for
4  smaller samples.  And you obtain a result.
5  You can take the latter result as
6  not being subject to the small sample
7  criticism.  As a matter of logic, you can't
8  confirm a result of a test which is
9  inappropriately applied.  You did a different
10  test.  That's the test you should have done.
11  It's not a robustness check.  It's a
12  different test.
13  Q.  All right.  But you're not
14  quarreling with the fact that the different
15  tests that were applied by Professor
16  Feinstein had significant results, they would
17  support the same conclusion that was reached
18  by the Z-test?
19  MR. FRANK:  Objection.
20  A.  That would be an overstatement.
21  As I explained at length in my report, while
22  that may be true in a situation where he
23  dummies out the dates where he includes
24  November 20th, where he pulls the significant

Page 197

MUKESH BAJAJ, PH.D.

1  and nonsignificant dates in two different
2  periods with very different regime, as he
3  acknowledges, in that case, with all those
4  errors, Fisher Exact test, that is not
5  subject to the small sample size criticism,
6  per se, did find statistically different
7  proportions, which does not speak to that
8  test being correctly applied.
9  It does not speak to the results
10  being significant, had the test been
11  conducted with other errors corrected, as
12  Professor Feinstein himself has applied the
13  test in different situations in his earlier
14  reports.
15  MR. FRANK:  Bill, can we take a
16  brief biobreak here?
17  MR. MARKOVITS:  Sure.
18  MR. FRANK:  Thank you.
19  THE VIDEOGRAPHER:  The time is
20  15:55.  We're off the record.
21  (Recess taken at 3:55 p.m. to 4:07 p.m.)
22  THE VIDEOGRAPHER:  The time now is
23  16:07.  We're on the record.
24  BY MR. MARKOVITS:

Page 198

MUKESH BAJAJ, PH.D.

Q.  Dr. Bajaj, could you turn to page
58 of your report, where you have titled
something called "Flaw 7," where you allege
that there's a flaw because Dr. Feinstein
choose -- chose to dummy out certain
variables.

Do you see that?

A.  Yes.

Q.  You agree that using dummy
variables is the economically appropriate
methodology?

MR. FRANK:  Objection.

A.  Not always.

Q.  You're not saying it's an
invalid -- invalid approach; correct?

A.  I'm saying, in this case, it is an
invalid approach.

Q.  Well, when I read your report
here, you say it's -- "This approach, while
not necessarily invalid in the abstract, is
inconsistent with the model he used in the
Petrobras case."

Do you see that?

A.  Yes.

Page 199

MUKESH BAJAJ, PH.D.

Q.  And where do you allege that it's
invalid as opposed to just inconsistent with
a prior approach?

MR. FRANK:  Objection.

A.  In that it is outcome
determinative.  And given the hypothesis he
is testing, it would be a better approach not
to dummy out the dates.  It is therefore not
the correct approach in this circumstance.

Q.  Okay.  I'm not following the logic
of that.

Why is it not the correct approach
to use in this case, because it would have
resulted in a different outcome?

MR. GOLDFARB:  Objection.

A.  Well, for one, when you dummy-out
dates that, on average, have higher
volatility, you artificially lower the
standard error.  And in this case, it is that
artificial lowering of the standard error
that causes enough of his eight or nine dates
to be become statistically significant to
give the result that he then reports.

Q.  And where in your report does it

Page 200

MUKESH BAJAJ, PH.D.

suggest that this was a flaw because it
lowered the standard error?

A.  It does when it discusses that
just changing the single aspect of his model
would make the statistical significance of
his result disappear.  And I also provide
results of regression with and without
dummying the dates to show how different the
standard error is.

Q.  And is it often the case that
there is a difference in results where you
dummy out or do not dummy out certain
variables?

MR. FRANK:  Objection.

A.  I don't know if it is often the
case.  It can be the case.

Q.  Could you turn to page 61 of your
report.  You allege that there's, Flaw 9,
Dr. Feinstein failed to correct for
volatility change in February of 2007.

Do you see that?

A.  Yes.

Q.  In your first report you
criticized Dr. Hallman for failing to address

Page 201

MUKESH BAJAJ, PH.D.

a structural break on August 9th, 2007;
correct?

A.  Yes.

Q.  You said nothing in that first
report about a structural break in February
of 2007?

A.  Correct.

Q.  And that finding in your first
report was based off of the VIX volatility
index in Freddie Mac's implied option
volatility; correct?

A.  I don't remember.  As I said, I
haven't reviewed that result -- report in a
while, but I can take your representation for
it.

Q.  Whatever analysis you did in your
prior report, it did not show a structural
break in February of 2007; correct?

MR. FRANK:  Objection.

A.  I was analyzing in that report the
difference in volatility between
Dr. Hallman's estimation period, which was
prior to the beginning of the class period,
relative to the class period.  I did not

Page 202

MUKESH BAJAJ, PH.D.

1  MUKESH BAJAJ, PH.D.
2  focus on an in-sample during class period
3  regression analysis in that case, because
4  that's the not what Dr. Hallman had put
5  forth.  Here I did, because it was responsive
6  to what Dr. Feinstein did.
7      Q.  Didn't you testify earlier in this
8  action that the volatility prior to August
9  9th, 2007, was almost identical to the
10  volatility during the control period and then
11  it spiked up beginning on August 9th?
12      A.  I recall something like that
13  comparing the preclass period control period.
14  That was the case in that matter to
15  volatility prior to August 9th during the
16  class period.  I did not compare different
17  intervals within the class period in an
18  in-sample context.
19      Q.  Dr. Bajaj, have there ever been
20  motions made to exclude all or part of your
21  testimony in a case?
22      A.  Yes.
23      Q.  Have any of those been successful?
24      A.  On two occasions, the Court acted
25  on those motions.

Page 203

1  MUKESH BAJAJ, PH.D.
2      Q.  In which two cases?
3      A.  One was Febreze Toray v SEC, and
4  the second was Bank of America v Bear Stearns
5  Asset Management.
6      Q.  And in both of those cases, all or
7  a part of your opinions were excluded?
8      MR. FRANK:  Objection.
9      A.  In the first case, the Court
10  narrowed the scope of my opinion.  And in the
11  second case, the Court ruled that my opinion
12  would not be consistent with the way she
13  viewed what I was measuring.
14      Q.  Are you aware that Dr. Gompers has
15  issued a report in this case?
16      A.  Yes.
17      Q.  Do you know Dr. Gompers?
18      A.  Only by name.
19      Q.  You've never worked with him on a
20  matter before?
21      A.  Not directly.  We may have been
22  both involved in the same matter on the same
23  or opposite sides, but I've not worked with
24  him.
25      Q.  Did you review his report in this

Page 204

1  MUKESH BAJAJ, PH.D.
2  case?
3      A.  I looked at it, but I did not
4  review it.  Maybe spent a minute or two.
5      Q.  Did you talk with Dr. Gompers
6  about this case at all?
7      A.  No.
8      MR. GOLDFARB:  Objection.
9      Q.  Did you talk with anybody about
10  Dr. Gomper's report?
11      MR. FRANK:  Objection.
12      A.  No.
13      Q.  From your review of Dr. Gomper's
14  report, are you aware that his report
15  addresses the issue of classwide damages?
16      A.  I understand that to be the case.
17      Q.  Have you, in other matters,
18  addressed the issue of classwide?
19      A.  Yes.
20      Q.  In what matters?
21      A.  I don't know that I can tell you
22  from memory alone.  But in a recent matter,
23  in the Allergan case, I opined on classwide
24  damages among other issues.
25      THE REPORTER:  "... I opined,"

Page 205

1  MUKESH BAJAJ, PH.D.
2  what?
3      A.  I opined on classwide damages
4  among other issues.
5      Q.  And that was on behalf of a
6  Plaintiff; correct?
7      A.  I was engaged by Plaintiff's
8  counsel in that matter.
9      Q.  And have you been engaged by any
10  defense counsel in cases to opine on damages?
11      MR. FRANK:  Objection.
12      A.  Yes.
13      Q.  Okay.  And have those engagements
14  included opining on the ability of -- or at
15  the class certification stage to show
16  classwide damages?
17      MR. FRANK:  Objection.
18      A.  I don't recall, other than, of
19  course, in the Allergan case.
20      Q.  Have you had any discussions -- or
21  did you have any discussions with regard to
22  providing any opinions relating to classwide
23  damages in this case?
24      MR. FRANK:  Objection.
25      A.  No.

Page 206

1  MUKESH BAJAJ, PH.D.
2  MR. MARKOVITS:  Jason, I know this
3  may sadden you, and, particularly Frank,
4  but if we take a short break, I believe
5  I can wrap up quickly, if not be done
6  now.
7  MR. FRANK:  Very good.
8  THE VIDEOGRAPHER:  The time now is
9  16:18  We are off the record.
10  (Recess taken at to 4:18 to 4:34 p.m.)
11  THE VIDEOGRAPHER:  The time now is
12  16:34.  We're on the record.
13  MR. MARKOVITS:  Dr. Bajaj, I have
14  no further questions at this time.  I
15  understand your counsel may have a few
16  for you, and I may have to ask you some
17  as a follow-up, but for now I am done,
18  for now.  Thank you.
19  EXAMINATION
20  BY MR. FRANK
21  Q.  Good afternoon, Dr. Bajaj.
22  A.  Good afternoon.
23  Q.  Dr. Bajaj, do you recall being
24  asked questions by Mr. Markovits regarding
25  levels of statistical significance?

Page 207

1  MUKESH BAJAJ, PH.D.
2  A.  Yes.
3  Q.  And you understand -- strike that.
4  What level of statistical
5  significance did Dr. Feinstein use in his
6  report?
7  A.  Ninety-five percent.
8  Q.  Is that a standard level of
9  statistical significance in your profession?
10  A.  Yes.
11  Q.  Is that a widely accepted level of
12  statistical significance in your profession?
13  A.  Yes.
14  Q.  Now, is there any support in the
15  academic literature in your field for using a
16  level of statistical significance of 51
17  percent to assess market efficiency?
18  A.  No.
19  Q.  Is there any support in the
20  academic literature for using a level of
21  statistical significance of less than 90
22  percent to assess market efficiency?
23  A.  No.
24  Q.  Are you aware of any cases where a
25  court has relied upon an expert who used a

Page 208

1  MUKESH BAJAJ, PH.D.
2  level of statistical significance of less
3  than 90 percent to assess market efficiency?
4  A.  No.
5  Q.  If Dr. Feinstein had used a level
6  of statistical significance of 51 percent,
7  would that have affected your opinions or the
8  basis for your opinions in any way?
9  A.  No.
10  Q.  Would you have criticized
11  Dr. Feinstein for using a level of
12  statistical significance of 51 percent?
13  A.  Yes.
14  Q.  Why?
15  A.  Because it's not an accepted
16  standard, and I've never seen another expert
17  use such a level.
18  MR. FRANK:  I have no further
19  questions at this time.
20  MR. MARKOVITS:  Surprisingly, nor
21  do I.
22  THE VIDEOGRAPHER:  The time now is
23  16:37.
24  MR. FOTIADES:  This is Adam
25  Fotiades.  We would like to get an

Page 209

1  MUKESH BAJAJ, PH.D.
2  electronic count of the transcript only.
3  We've been receiving hard copies, and I
4  just -- an hour or so ago I sent an
5  email to someone at your firm saying we
6  do not want a hard copy going forward,
7  electronic copy but not hard.
8  (Deposition concluded at 4:38 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 210

1      MUKESH BAJAJ, PH.D.
2  COMMONWEALTH OF MASSACHUSETTS
3  SUFFOLK, SS.
4
5      I, Sandra A. Deschaine, Registered
6  Professional Reporter and Notary Public
7  within and for the Commonwealth of
8  Massachusetts at large, do hereby certify:
9      That MUKESH BAJAJ, PH.D., the witness
10  whose deposition is hereinbefore set forth,
11  was duly sworn by me and that such deposition
12  is a true record of the testimony given by
13  such witness; that the witness is hereby
14  reading and signing.
15      I further certify that I am not related
16  to any of the parties to this action by blood
17  or marriage and that I am in no way
18  interested in the outcome of this matter.
19      IN WITNESS WHEREOF, I have hereunto set
20  my hand this 7th day of October, 2017.
21
22  _____
23      Sandra A. Deschaine, CSR, RPR, CLA
24  My Commission Expires
25  July 5, 2024

Page 211

1      MUKESH BAJAJ, PH.D.
2  ERRATA SHEET FOR THE TRANSCRIPT OF:
3  Case Name:    Ohio Public Employees
4  Retirement System vs. Federal Home Loan
5  Mortgage Corporation, et al.
6  Dep. Date:    September 26, 2017
7  Deponent:    Mukesh Bajaj, Ph.D.
8      CORRECTIONS:
9  Pg. Ln.  Now Reads   Should Read    Reason
10  ___ ___  _____  _____  _____
11  ___ ___  _____  _____  _____
12  ___ ___  _____  _____  _____
13  ___ ___  _____  _____  _____
14  ___ ___  _____  _____  _____
15  ___ ___  _____  _____  _____
16  ___ ___  _____  _____  _____
17  ___ ___  _____  _____  _____
18  ___ ___  _____  _____  _____
19  ___ ___  _____  _____  _____
20  ___ ___  _____  _____  _____
21
22  _____
23      Mukesh Bajaj. Ph.d.
24  SUBSCRIBED AND SWORN BEFORE ME
25  THIS____DAY OF_____,2017

Page 212

1      MUKESH BAJAJ, PH.D.
2          INDEX
3  WITNESS                    PAGE
4  Mukesh Bajaj
5   By Mr. Markovits              9
6
7  EXHIBIT    DESCRIPTION        PAGE
  Exhibit    Expert Report of Mukesh    36
8  187      Bajaj, Ph.D.
9  Exhibit    Bates Nos. FMOPERS00221555    180
  188      through -1560
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25