1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

```
OHIO PUBLIC EMPLOYEES       )
RETIREMENT SYSTEM, on       )  Case No. 4:08-cv-160
behalf of Itself and All    )  Youngstown, Ohio
Others Similarly            )  Friday, April 13, 2018
Situated,                   )  10:04 a.m.
                            )
          Plaintiff,        )
                            )
     vs.                    )
                            )
FEDERAL HOME LOAN           )
MORTGAGE CORPORATION, aka   )
Freddie Mac, et al.,        )
                            )
          Defendants.       )
```

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE BENITA Y. PEARSON**
**UNITED STATES DISTRICT JUDGE**

**HEARING**

**APPEARANCES:**

**For the Plaintiff:**
    Markovits, Stock & DeMarco
    **By:**  W. Benjamin Markovits, Esq.
    Suite 650
    3825 Edwards Road
    Cincinnati, Ohio  45209
    (513) 651-3700
    bmarkovits@msdlegal.com

    AND

**MARY L. UPHOLD, RDR, CRR**
Thomas D. Lambros Federal Building and U.S. Courthouse
125 Market Street, Room 337
Youngstown, Ohio  44503-1780
(330) 884-7424
Mary_Uphold@ohnd.uscourts.gov

    Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

1    **APPEARANCES (CONTINUED):**

2    **For the Plaintiff (Continued):**
         Strauss & Troy
3         **By:** Richard S. Wayne, Esq.
         Suite 400
4         150 East Fourth Street
         Cincinnati, Ohio  45202
5         (513) 621-2120
         rswayne@strausstroy.com

6
         Strauss & Troy
7         **By:** Robert R. Sparks, Esq.
         Suite 400
8         150 East Fourth Street
         Cincinnati, Ohio  45202
9         (513) 621-2120
         rrsparks@strausstroy.com

10
     **For the Defendant Federal Home Loan Mortgage, aka Freddie**
11   **Mac:**
         Morgan, Lewis & Bockius LLP
12        **By:** Jason D. Frank, Esq.
         One Federal Street
13        Boston, Massachusetts 02110
         (617) 951-8000
14        jason.frank@bingham.com

15        Morgan, Lewis & Bockius LLP
         **By:** Emily E. Renshaw
16        One Federal Street
         Boston, Massachusetts  02110
17        (617) 951-8000
         emily.renshaw@morganlewis.com

18
         Morgan, Lewis & Bockius LLP
19        **By:** Elizabeth Geyelin Hays, Esq.
         One Federal Street
20        Boston, Massachusetts  02110
         (617) 951-8075
21        liza.hays@morganlewis.com

22        Porter Wright Morris & Arthur LLP
         **By:** Hugh E. McKay, Esq.
23        Suite 500
         950 Main Avenue
24        Cleveland, Ohio  44113
         (216) 443-2580
25        hmckay@porterwright.com

1    **APPEARANCES (CONTINUED):**

2    **For the Defendant Federal Home Loan Mortgage, aka Freddie**
     **Mac (Continued):**
3         Howard S. Lindenberg, Associate General Counsel
          Party Representative
4
     **For the Defendant Richard F. Syron:**
5         Sidley Austin
          **By:**  Frank R. Volpe, Esq.
6         1501 K Street, NW
          Washington, DC  20005
7         (202) 736-8366
          fvolpe@sidley.com
8
     **For the Defendant Patricia L. Cook:**
9         Zuckerman Spaeder
          **By:**  Alecia L. Shelton, Esq.
10        Suite 2440
          100 East Pratt Street
11        Baltimore, Maryland  21202
          (410) 332-1245
12        ashelton@zuckerman.com

13   **For the Defendant Anthony S. Piszel:**
          Murphy & McGonigle
14        **By:**  James K. Goldfarb, Esq.
          21st Floor
15        1185 Avenue of the Americas
          New York, New York  10036
16        (212) 880-3961
          jgoldfarb@mmlawus.com
17
     **For the Defendant Eugene M. McQuade:**
18        Dechert
          **By:**  Michael S. Doluisio, Esq.
19        2929 Arch Street
          Philadelphia, Pennsylvania  19104
20        (215) 994-2325
          michael.doluisio@dechert.com
21
     **Also Present:**
22        Kevin Lewis, Plaintiff's Technical Consultant

23        John J. Danish, Freddie Mac Party Representative

24        Steven P. Feinstein, Ph.D.

25        Mukesh Bajaj, Ph.D.
                                      - - -

4

P R O C E E D I N G S

- - -

1    LAW CLERK:  The matter on the docket this morning

is Case Number 4:08-cv-160, Ohio Public Employees Retirement

System versus Federal Home Loan Mortgage Corporation, and

others.

        THE COURT:  Good morning, everyone.  Thank you for

standing.  Feel free to retake your seats.

        Let's start with the introductions.  Plaintiff's

counsel, if you would introduce yourself and those

accompanying you, especially at counsel's table or other

places in the courtroom.

        MR. MARKOVITS:  Yes, Your Honor.  Bill Markovits

on behalf of OPERS.  Along with me is Rick Wayne from

Strauss Troy on behalf of OPERS.  To the right of Mr. Wayne

is Kevin Lewis, who is our technical consultant.  And then

Professor Feinstein is in the courtroom with an associate of

his.  Rob Sparks of the Strauss Troy firm will also be

joining us shortly.  And there's a possibility that John

Danish of the Ohio Attorney General's Office will be joining

us shortly.

        THE COURT:  Thank you, Mr. Markovits.  Welcome to

you all.

        MR. MARKOVITS:  Thank you.

        THE COURT:  On behalf of the defense, will you

5

1    start with the introductions, those of you at counsel's

2    table, and then seated behind you and other places in the

3    courtroom.

4              MR. FRANK:  Good morning, Your Honor.  Jason Frank

10:05:23  5    from Morgan, Lewis & Bockius on behalf of the corporate

6    defendant, Freddie Mac.  Along with me from Morgan Lewis are

7    Emily Renshaw and Liza Hays.  In addition, our co-counsel in

8    the case is Hugh McKay.  And along with us is also

9    Dr. Mukesh Bajaj from Navigant Consulting who is in the

10:05:47  10   courtroom.  And finally, Your Honor, last but not least is

11   Howard Lindenberg from the General Counsel's Office of

12   Freddie Mac.

13             THE COURT:  Welcome to you all.  Thank you for the

14   schedule that you collaborated on.  It appears to be

10:06:03  15   reasonable to me.

16             Before we start with the opening statement -- and

17   it's suggested that Freddie Mac's opening statement will be

18   first; that's what you've agreed to, Mr. Frank?

19             MR. FRANK:  That's correct, Your Honor.

10:06:15  20             THE COURT:  Before we start with opening

21   statements, is there any reason that either side would ask

22   for a separation of witnesses?  We know in evidentiary

23   hearings, rules of evidence are relaxed.  But if there's a

24   reason, of course I understand that what's been opined by

10:06:29  25   Mr. Feinstein is already known to Mr. Bajaj -- and probably

1    I should be referring to you as doctor.  I mean no offense

2    by the reference I've used already.  If there is a request

3    for a separation, will you tell me now?

4         MR. FRANK:  Your Honor, there's no request for

10:06:46  5    sequestration of the witnesses.  I believe they know each

6    other's opinions.

7         MR. MARKOVITS:  Yes, no requests on behalf of the

8    plaintiffs, Your Honor.

9         THE COURT:  Makes sense, then.

10:06:54 10        Then the member of the defense team making Freddie

11   Mac's opening statement, are you ready?

12        MR. FRANK:  I am, Your Honor.

13        THE COURT:  Will you begin?

14        MR. FRANK:  I will.  Would you prefer that I speak

10:07:03 15   at the podium?

16        THE COURT:  I prefer you be wherever your voice

17   can be picked up by the microphone and where you are most

18   comfortable.

19        MR. FRANK:  Well, I am comfortable in either

10:07:14 20   place.  Can I be picked up by the microphone here?

21        THE COURT:  Mary?

22        THE REPORTER:  Yes.

23        MR. FRANK:  All right.  Thank you.

24        THE COURT:  All right, then.

10:07:19 25        MR. FRANK:  Good morning, Your Honor.  Thank you

7

1    for giving us the opportunity to present to you evidence

2    bearing on Freddie Mac's Daubert motion.  We believe that

3    what you hear today will be crucial to your consideration of

4    whether or not to exclude Dr. Feinstein, plaintiff's

10:07:31  5    proposed expert, his testimony, and to strike his report, as

6    well as your decision on OPERS' motion for class

7    certification.

8         The parties have agreed to an order of

9    presentation that you just referenced.  As you'll see,

10:07:46  10    Dr. Feinstein will testify first.  He'll be called by

11    counsel for plaintiff.  And following his testimony, cross

12    and redirect, we will be calling in rebuttal Dr. Bajaj, an

13    expert retained by Freddie Mac.

14         Following the testimony that you hear from the two

10:08:06  15    experts, Your Honor, we will be arguing the four motions:

16    the motion to exclude Dr. Feinstein's testimony and strike

17    his report; the motion to exclude Dr. Bajaj's testimony

18    filed by OPERS; the motion to exclude Dr. Gompers'

19    testimony, who isn't in the courtroom today; and finally,

10:08:22  20    OPERS' motion for class certification at the end of the day.

21         Your Honor, before I talk about the evidence that

22    I expect you will hear today, I am going to put that

23    evidence in context by speaking briefly about market

24    efficiency.

10:08:36  25         Freddie Mac has moved to exclude Dr. Feinstein's

8

1    opinion that Freddie Mac stock trades in an efficient

2    market, as you know from the papers.  Market efficiency is

3    an economic theory.  It is a creature of the science of

4    economics.

10:08:49    5         In Basic v. Levinson, the Supreme Court was

6    convinced by the science of economics that it could allow

7    securities plaintiffs to be excused from an essential

8    element of their claims.  Usually in a fraud case, whether

9    it's securities fraud or common law fraud, one of the

10:09:04    10   elements of the claim is reliance.  Security plaintiffs no

11   longer have to prove direct reliance on an allegedly

12   fraudulent statement in certain circumstances.

13        In the Basic case, they held they could be excused

14   from that element if a statement of material fact that is

10:09:25    15   false operates as a fraud on the market.  Therefore, as long

16   as a market is efficient, that is, that it consistently and

17   promptly incorporates available information, including on

18   those days when the allegedly material misstatement was

19   made, then there's a sufficient connection between the

10:09:44    20   statement and the plaintiff's losses that plaintiffs can be

21   excused from this essential element of their claims.

22        So instead of proving reliance, Your Honor,

23   plaintiff has to prove market efficiency.

24        If a plaintiff can't prove market efficiency, then

10:09:59    25   it's got to prove direct reliance, and that is fatal to a

1    motion for class certification, because in such a case, the

2    common issues would no longer predominate over individual

3    issues as required by Rule 23(b)(3).

4         Now, the evidence that you're going to hear in the

10:10:17  5    first half of the day, Your Honor, is as follows:  OPERS has

6    offered the testimony of Dr. Feinstein, an economist, on

7    market efficiency.  It is the only evidence they offer in

8    support of their motion for class certification.

9         The evidence will show that Dr. Feinstein's

10:10:37  10   testimony is exactly why the Daubert standards exist.  The

11   evidence will show that his approach here wasn't scientific,

12   but rather, designed to serve his clients' needs.

13        The court will recall that the parties previously

14   briefed class certification in the year 2012.  The evidence

10:11:00  15   will show that Dr. Feinstein, in connection with this

16   current round of work on class certification, that he

17   reviewed the prior experts' reports before he conducted any

18   tests in this case.

19        In connection with its initial motion, Dr. Hallman

10:11:20  20   submitted his report.  He tested six earnings dates.  You'll

21   hear the phrase "earnings dates" used over the course of the

22   day.  We're referring to the public announcements by a

23   public company, usually quarterly, as to its financial

24   results.

10:11:35  25        Dr. Hallman tested six earnings dates.  Now,

10

1    Dr. Feinstein knew that Hallman tested six earnings dates.

2    He knew that Hallman concluded that only two of those dates

3    were statistically significant.  He knew that Dr. Bajaj

4    criticized that work.  He actually ended up agreeing with

10:11:54  5    Dr. Bajaj's criticism, which established that only one out

6    of six dates was statistically significant.

7         So then, after knowing all of that, what did

8    Dr. Feinstein do in this case?  He decided to run two tests.

9    The first one was he decided he too was going to do an event

10:12:12  10    study.  But instead of testing six dates, he decided that he

11    was going to test only one date.  What's the one date he

12    chose?  He chose the one date that the prior experts had

13    agreed had a statistically significant result, and he

14    claimed that that supported his view that this market was

10:12:31  15    efficient.

16         What else did he do?  Well, on that single date

17    test, Your Honor, not only did he know that they agreed, he

18    knew it was a date that the plaintiff had specifically

19    chosen as the end of the class period.  He knew it was a

10:12:48  20    date with a huge stock price movement.  He knew the results

21    before he ever ran his test.

22         That's not good science.  It doesn't matter what

23    field of science you're in.  We hypothesize and we test

24    hypotheses.  We don't know the results and then run a test

10:13:04  25    that is simply going to confirm what we already know.

11

1          Then he ran a second test.  His second test is

2     called a Z-test.  The evidence will show that

3     Dr. Feinstein's Z-test is riddled with problems that justify

4     exclusion of that testimony.  It was based on insufficient

10:13:22  5     data, the first prong of the Daubert test.

6          Even according to the very textbooks that

7     Dr. Feinstein cites to support his Z-test, it violates

8     sample size requirements.  There are three sample size

9     requirements in one of the textbooks that he cites.  It's

10:13:39  10    supposed to -- the test is supposed to satisfy all three

11    requirements.  It doesn't satisfy one of them.

12          This test, Your Honor, it doesn't even test market

13    efficiency.  It's not accepted as a reliable method by

14    economists to test market efficiency.

10:13:55  15          The evidence will show that Dr. Feinstein made,

16    actually made up approaches in this case that he has never

17    used before, that no one has ever used before, just to avoid

18    a negative result for his client.

19          The evidence will show that he deviated from

10:14:12  20    standards that are set forth by the very economists on whom

21    he relies.  It will show that his approaches don't make

22    logical sense.

23          The evidence will show that his opinions don't

24    fail just one prong of the three prong reliability standard

10:14:28  25    under Daubert, but all three:  insufficient facts, not a

12

1    reliable method or principle, and a method or principle

2    that's not even applied reliably.

3              What Dr. Feinstein does, Your Honor, is not good

4    science.  And under Daubert, he should never be allowed to

10:14:46  5    present the opinions that he offers here to a jury.  As a

6    result, his testimony should be excluded, his report should

7    be stricken, and at the end of the day, we'll be arguing

8    that the motion for class certification should be denied.

9              Thank you, Your Honor.

10:15:01  10              THE COURT:  Thank you, sir.  May I ask this

11    question?  The schedule presented doesn't show that I should

12    expect testimony from expert Gompers.

13              Is that true?

14              MR. FRANK:  That is true, Your Honor.

10:15:14  15              THE COURT:  Fair enough.

16              Thank you.  The representative speaking for OPERS.

17              MR. MARKOVITS:  Yes, Your Honor.  Bill Markovits.

18              THE COURT:  Good morning.

19              MR. MARKOVITS:  Good morning, Your Honor.  Bill

10:15:27  20    Markovits on behalf of OPERS.  It's a pleasure to be back in

21    your courtroom, although, I have to say that I don't believe

22    it's necessary for us to be here, and I'd like to spend a

23    few minutes explaining why.

24              We're going to spend a lot of time today

10:15:45  25    addressing issues that have no relevance and no impact on

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

13

1    the primary issue to be determined today, which is class

2    certification.

3           On the facts that are either not disputed or can't

4    reasonably be disputed, class certification is warranted.

10:16:06  5    Now, we got a preview from Mr. Frank of the issues that he

6    wants to discuss today.  But I'd like to talk through what

7    are the relevant issues today.  Class certification, as Your

8    Honor knows, has a number of requirements under Rules 23(a)

9    and 23(b).  Under Rule 23(a), the defendants do not dispute

10:16:35  10   numerosity, commonality, typicality or adequacy of

11   representation.  So the 23(a) factors for class

12   certification are not in dispute.

13          Under 23(b), they do not dispute superiority.  The

14   only class certification factors that they dispute -- the

10:16:57  15   only class certification factor that they dispute is the

16   23(b) factor, predominance.  And even on that one, they

17   don't dispute that there are common issues of law in fact.

18   They just focus on one issue, which is, as Mr. Frank said,

19   the Basic presumption of reliance that allows -- the

10:17:23  20   fraud-on-the-market theory that allows the class-wide

21   reliance.

22          Now, courts throughout the country and within the

23   circuit have set out a number of factors to use when

24   determining whether there's an efficient market.  Because in

10:17:44  25   order to get a Basic presumption, as Mr. Frank said, you

14

1  have to prove that there's an efficient market.  That's the

2  burden on the plaintiff.  The court set out a number of

3  factors listed on this chart.  There are five Cammer

4  factors, three Krogman factors, and a number of courts will

10:18:03  5  look at does the stock trade on a national exchange.

6  In this case, defendants don't dispute Cammer

7  factors 1 through 4, they don't dispute any of the Krogman

8  factors, they don't dispute that the Freddie Mac common

9  stock traded on the New York Stock Exchange, which is a

10:18:20  10  national exchange.  The only factor they dispute is Cammer

11  5.

12  OPERS and its expert, Professor Feinstein, will

13  show that Cammer 5, the empirical factor, is met in this

14  case.  But one of the reasons I made this chart is because

10:18:46  15  if you take out the empirical factor, which is all the

16  defendants want to discuss here today, if you take out that

17  factor, market efficiency is still shown.

18  Courts throughout the country and within the Sixth

19  Circuit say that the Cammer -- that the market efficiency

10:19:04  20  can be determined on a combination of factors.  Cammer 5 is

21  not dispositive.

22  THE COURT:  Does that mean, then, that OPERS

23  concedes that the event study and the Z-test performed by

24  Dr. Feinstein failed as alleged in the motion to strike?

10:19:23  25  MR. MARKOVITS:  Absolutely not, Your Honor.  As I

15

1    said, we will show that Cammer 5 is, in fact, met in this

2    case.  My point this morning is that even if it were not,

3    even if we never even addressed Cammer 5, there's no

4    question that market efficiency is shown.

10:19:44  5          THE COURT:  I understand that answer, and I'll

6    continue to listen throughout the day for a better

7    discernment of an answer to my question, because I think the

8    deposition of Dr. Feinstein says that he relied upon the

9    event study and the Z-test in addition to those factors,

10:20:04  10   Cammer and Krogman factors.

11          But what I thought I've understood you to say is

12   that if empirical factor, Cammer number 5, were not

13   established, then you believe you still established market

14   efficiency, correct so far?

10:20:19  15         MR. MARKOVITS:  Absolutely.

16          THE COURT:  What I also believe I understand at

17   this early part of the hearing is that the event study and

18   Z-test are attributed largely, meaning what you'd like me to

19   consider as I consider your motion for class certification

10:20:30  20   comes primarily from Dr. Feinstein on those two points,

21   event study and Z-test?

22          MR. MARKOVITS:  No, Your Honor.  That's what I

23   would like -- the plaintiffs would like the court to

24   consider for Cammer 5.  Certainly that's the --

10:20:46  25         THE COURT:  And then the question -- stay there.

16

1    Because the question is, for Cammer 5, that which you'd like

2    me to consider comes from, as you have shown there, event

3    study and Z-test, correct?

4           MR. MARKOVITS:  Correct.

10:20:57   5           THE COURT:  And if there were another chart, event

6    study and Z-test evidence presented to the court, it's

7    coming to me from Dr. Feinstein?

8           MR. MARKOVITS:  That is correct.

9           THE COURT:  All right, I'm with you.

10:21:11  10           Let me ask this of you:  If your class isn't

11   certified, the class suggested especially as indicated in

12   your papers isn't certified, will OPERS persist with this

13   case?

14          MR. MARKOVITS:  I would have to consult with the

10:21:24  15   Attorney General's Office and with OPERS to determine that.

16   Normally, if cases aren't certified, the case does not

17   persist.  But that would be up to the client.

18          THE COURT:  Understood.  Back to wherever you

19   were, sir.

10:21:37  20          MR. MARKOVITS:  Thank you.

21          The point with regard to Cammer 5 is Dr. Feinstein

22   and the evidence itself clearly establishes undisputed

23   factors relating to market efficiency, the first four Cammer

24   factors, all the Krogman factors, and that the stock trades

10:21:57  25   on the national exchange.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

17

1    Defendants would like to extract from that by

2    focusing on the event study and the Z-test, and they concoct

3    dozens, or more than a dozen reasons why those tests are

4    supposedly insufficient.  But that's only one part of the

10:22:16  5    analysis, only one part of Dr. Feinstein's report and one

6    part of the analysis.  And, again, courts within the Sixth

7    Circuit and around the country have said that the other

8    factors are more than sufficient.

9    When you have -- when you have seven of the eight

10:22:37  10    Cammer and Krogman factors with the stock trading on the

11    national exchange, market efficiency is not even a close

12    call.  It should not be in dispute.  Couple that with the

13    fact that Dr. Bajaj did not make any effort to prove that

14    the market was inefficient.  He doesn't give an opinion that

10:22:56  15    the market is inefficient, and he did no testing -- unlike

16    in other cases he's been in, he did no testing in this case

17    to show market inefficiency.

18    What defendants and Dr. Bajaj have asked this

19    court is to adopt the position that this empirical factor,

10:23:15  20    Cammer 5, is necessary and dispositive.  No court, no court

21    post-Halliburton II has said that; many courts have said

22    that it is not.  No court has said that it is.  If this

23    court were to adopt the position suggested by defendants, it

24    would be the sole court in the country to do so.

10:23:40  25    Now, there's also an issue that's going to come up

18

1    today, I assume, with regard to price impact.  Because once

2    market efficiency is established, which we believe it

3    clearly is in this case, under the Halliburton II case, the

4    defendants have an opportunity to rebut the presumption of

10:23:58  5    reliance by showing a lack of price impact.

6         In this case, though, as you'll see, they attempt

7    to put the burden of showing price impact on plaintiff at

8    class certification.  That's not where the burden lies.  The

9    burden lies squarely on the defendant to show a lack of

10:24:16  10    price impact.

11         And that burden, which has been called daunting by

12    the courts and virtually irrebuttable by one of the Supreme

13    Court justices, cannot be met by Dr. Bajaj simply saying, "I

14    looked at the analyst report and I didn't see any

10:24:38  15    connection."  That cannot meet the burden.  That's just pure

16    ipse dixit.  And as you know, we do have motions to exclude

17    both Dr. Bajaj and Dr. Gompers for failure to follow the

18    legal standards, which is a violation of Daubert.

19         And let's get to Dr. Gompers.  You'll hear that

10:25:01  20    defendants and their expert, Dr. Gompers, are also asking

21    this court to adopt an interpretation of Comcast that has

22    been rejected each of the 11 times that Dr. Gompers has

23    raised it in post-Comcast cases.  He's raised it 11 times;

24    11 courts have rejected it.  It should be rejected here as

10:25:26  25    well.

19

1          Defendants' arguments are Comcast requires

2    Professor Feinstein to set out in detail his calculations.

3    That's contrary to the standard practice in courts around

4    the country, including within the Sixth Circuit, as we set

10:25:44    5    forth in our papers.

6          This is a typical 10b securities case.  Damages

7    can be determined class-wide using the typical out-of-pocket

8    damage methodology.

9          Let me get back for a second to my first point.

10:26:00    10    We're going to be discussing a number of issues today, but I

11    want to make sure that those issues don't distract from the

12    main issue, which is should this class be certified.  And

13    applying the undisputed facts with the appropriate legal

14    standards, we believe the answer is clearly yes.

10:26:26    15          Thank you.

16          THE COURT:  Let me ask a question of you.  And

17    I'll also allow you to weigh in, Mr. Frank.  There has been

18    a discovery dispute ongoing.  As you know, I referred it to

19    Magistrate Judge Baughman.

10:26:38    20          I think I can read between the lines well enough

21    to know that when a party files a motion for an oral

22    argument, it's also sometimes just an attempt to tell the

23    court, "Look, I'd really like to hear from you now, and if

24    there's any other information the parties can give you by

10:26:53    25    way of oral argument to help resolve that motion to compel,

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

20

1      we're here to do it."

2          Not having that answer yet from Judge Baughman

3      about the discovery that defense provided to the SEC that

4      apparently is in a format not understandable or readable by

10:27:12  5      your client, what effect, if any, does it have on your

6      ability to defend or prosecute the motions that are before

7      us at this hearing today?

8          MR. MARKOVITS:  That does not have an effect on

9      the motions that are before us today.  It will certainly

10:27:29 10      have an effect going forward, because we have been hamstrung

11      in discovery and we are trying to press forward as

12      expeditiously as possible.  We've had delays, and part of

13      the delay is a result of the improper discovery or the

14      discovery abuse that we believe took place with regard to

10:27:51 15      the ESI.

16          But that substantive discovery should have no

17      impact on the motions today.

18          THE COURT:  Thank you, Mr. Markovits.

19          Mr. Frank, would you like to answer that question?

10:28:04 20          MR. FRANK:  Your Honor, I agree with Mr. Markovits

21      on this point and this point only.  No.  We agree on many

22      things.  But on this point, we also agree, Your Honor.  We

23      do not believe that the discovery issue impacts the four

24      motions before the court today.

10:28:20 25          THE COURT:  And this might be an

21

1          oversimplification, but my understanding of the unresolved

2          issue before Judge Baughman, at least the largest one, is

3          who will bear the cost of converting the electronically

4          stored information into a format that's readable,

10:28:33  5      understandable to plaintiffs.

6                    Is that a fair summary?

7                    MR. FRANK:  Unfortunately, Your Honor, I think

8          that the ESI issues are a little more complex than that.

9          The plaintiffs had asked for the production we had made to

10:28:45  10     the SEC many years ago.  We provided that.  They're

11         unsatisfied with how easy it is to work with that and some

12         of the metadata that is there and that isn't there.

13                   So they've essentially asked for a reproduction of

14         materials that would take a very long time, it would cost a

10:29:07  15     lot of money, when, from our perspective, they have what

16         they asked for and they have what they need and we've been

17         proceeding.

18                   THE COURT:  Well, that doesn't sound all that

19         different from what I was thinking, maybe from what I said.

10:29:18  20     But what it means to me, Mr. Markovits, is what you have now

21         or what the defense has intended to give you from the SEC is

22         in a format that's unusable or not easily usable; is that

23         fair?

24                   MR. MARKOVITS:  That's fair, Your Honor.

10:29:38  25     THE COURT:  And what about the cost of making it

22

1    usable?  Right now that's an issue before Judge Baughman,

2    too, isn't it?

3              MR. FRANK:  It is if you accept their position

4    that it's unusable.  We believe it's usable, that they have

10:29:49  5    the documents that they need.  They have a lot of metadata.

6    We made a follow-up production --

7              THE COURT:  And the estimate of what it would cost

8    to put that in a format usable by plaintiffs is what?

9              MR. FRANK:  I don't know if I have a current

10:30:00  10    estimate now, but I don't think it would -- I think it's in

11    the many millions.  I don't know if it would exceed 10

12    million.

13              And I think that if -- and in terms of time, we're

14    talking about six months to a year to make a reproduction.

10:30:15  15              THE COURT:  We're talking about a 2008 case.  I

16    think the issue of time has flown by.  All right.  Thank

17    you.  You've helped me, you both have.

18              While this is still on Judge Baughman's docket,

19    you know, at any time I could, of course, after consulting

10:30:31  20    with him, make an adjustment.

21              And would just like you to know, defense counsel,

22    I don't see it unreasonable if this case proceeds that you

23    give the plaintiffs information that falls under appropriate

24    discovery in a format that can be accessible even if you've

10:30:50  25    already given it to a different party that had no problems

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

23

1    with it.

2         So just study that for a while throughout the day,

3    and at some point we hope that the docket will reflect that

4    Judge Baughman will give you his ruling, and should you be

10:31:06  5    dissatisfied with it, at least you know what my inclination

6    at this point is.

7         MR. FRANK:  We understand, Your Honor, and I

8    appreciate it.  If I could make one last point on that

9    issue.  I'd add that it is the defendants who filed the

10:31:16  10    motion for oral argument.  And I assure the court, it was

11    not to prompt a ruling, it wasn't intended in that way at

12    all, we just felt that there were issues in the reply brief

13    that were not addressed, that it might be helpful if we

14    addressed orally with the court, and we're still welcome to

10:31:31  15    meet with the magistrate judge to discuss those issues.

16         THE COURT:  Thank you for the clarification.

17         MR. FRANK:  Thank you.

18         THE COURT:  Next, examination of Dr. Feinstein.

19    And after that, there will be cross-examination by -- I mean

10:31:47  20    examination by OPERS, pardon me, then cross-examination by

21    Freddie Mac.  And then further examination, but only if

22    there's time reserved before your 45-minute lunch break.

23         Do you care to make that reservation now?

24         MR. MARKOVITS:  Yes, Your Honor.  I'd just like --

10:32:01  25    I spoke with Mr. Frank and we both agreed if the court would

24

1    agree that I would just reserve -- as the day goes on, we'll

2    just reserve the balance of any time not used in the initial

3    presentation.

4                THE COURT:  Except you will do the math.

10:32:16    5                MR. MARKOVITS:  Fine, Your Honor.

6                THE COURT:  All right.  And I might confirm that

7    the math is correct, but don't come back and say, "Oh, the

8    time we didn't use," because in my mind you will have used

9    it all.

10:32:27    10                MR. MARKOVITS:  Okay.

11                THE COURT:  Fair enough?

12                MR. MARKOVITS:  Fair enough.

13                THE COURT:  Okay.

14                MR. FRANK:  Your Honor, we appreciate that.  We

10:32:31    15    will do the math.  And I just want to address one

16    housekeeping issue regarding exhibits, if you wouldn't mind.

17                THE COURT:  Certainly, please.

18                MR. FRANK:  So the parties have agreed that for

19    the purposes of this hearing and this hearing only, that the

10:32:45    20    exhibits that they've exchanged will be admissible and

21    presumed authentic, and that there will not have to be

22    efforts to offer exhibits that would otherwise slow down the

23    proceedings.

24                THE COURT:  Thank you for that.

10:33:00    25                Mr. Markovits, that matches your understanding?

25

1          MR. MARKOVITS:  That does, Your Honor.  And what

2     we were planning to do also, again, if it meets with the

3     court's approval, is mark the exhibits as we present them

4     for the plaintiff as P1, 2, 3, 4 and on, and Mr. Frank

10:33:16    5     intended to mark his D1, 2, 3, 4 and on.

6          THE COURT:  Are they already marked or you intend

7     to mark them as you use them?

8          MR. MARKOVITS:  We're going to mark them as we use

9     them.

10:33:26   10          THE COURT:  Do you have what you need to do that?

11          MR. MARKOVITS:  I have exhibit stickers and a pen.

12     That's --

13          THE COURT:  All right.  Just do it expeditiously.

14     We know the sequence now, P1, D something, 1 probably will

10:33:38   15     be the first number.  Thank you.  And I apologize for any

16     inconvenience our technology malfunction has on your

17     presentation.

18          I've made a request that some help be brought to

19     us today, ideally during the break.  So we'll see what can

10:33:56   20     be achieved.  But I know that you understand the limitations

21     and are prepared to work around them, right?

22          MR. MARKOVITS:  Yes, Your Honor.

23          MR. FRANK:  Yes, Your Honor.

24          THE COURT:  Fair enough.  Is there anything more

10:34:07   25     before we call Dr. Feinstein?

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - DIRECT                    26

1              MR. MARKOVITS:  No, Your Honor.

2              THE COURT:  Dr. Feinstein, will you please

3      approach to be sworn?  Sir, one moment.  Step here.  My law

4      clerk will swear you in and then you'll go the direction you

10:34:26  5      were headed.

6              STEVEN P. FEINSTEIN, Ph.D., of lawful age, a

7      witness called by the Plaintiff, being first duly sworn, was

8      examined and testified as follows:

9              THE COURT:  Now, sir, if you will walk around; you

10:34:40  10      were right, this is your seat.  Make yourself comfortable in

11      the witness stand.  The water is fresh; if you'd like to

12      pour some, you're welcome to it.

13              THE REPORTER:  Judge, if you could ask everybody

14      to speak up, the sound system is not working.

10:35:02  15              THE COURT:  Mary, our court reporter, has just

16      told me that one of our many failings today is that the

17      sound system isn't working, so if you could please speak up.

18              THE WITNESS:  Yes, Your Honor.

19              MR. MARKOVITS:  May I proceed?

10:35:19  20              THE COURT:  Yes.

21              MR. MARKOVITS:  Thank you, Your Honor.

22          DIRECT EXAMINATION OF STEVEN P. FEINSTEIN, Ph.D.

23      BY MR. MARKOVITS:

24      Q.  Good morning, Professor Feinstein.  Would you please

10:35:24  25      introduce yourself to the court?

**FEINSTEIN - DIRECT**                                        27

1    **A.**   Good morning, Your Honor.  I'm Steven Feinstein.

2    **Q.**   Professor Feinstein, what's your business address?

3    **A.**   My business address is Crowninshield Financial

4    Research, 56 Harvard Street, Brookline, Massachusetts 02445.

10:35:40   5    **Q.**   What do you do for a living?

6    **A.**   I'm an Associate Professor of Finance at Babson

7    College.  I've been there since 1996.  In addition to that,

8    I do a fair amount of consulting and I founded a consulting

9    firm, which is my platform for financial analysis

10:35:55   10   consulting.

11   **Q.**   I know that defendants have not challenged your

12   qualifications, but let me put up a slide and I'd like you

13   very briefly to describe for the court your educational and

14   work background.

10:36:06   15           MR. MARKOVITS:  Slide 1, please.

16   BY MR. MARKOVITS:

17   **Q.**   Can you see that, Professor Feinstein?

18   **A.**   Not yet.  No.

19           THE COURT:  You're using your computer, aren't

10:36:21   20   you, sir?

21           MR. LEWIS:  Uh-huh.

22           THE COURT:  Ralph, was this working earlier?

23           MR. MARKOVITS:  Not working.

24           THE COURT:  It should be on HDMI.

10:36:37   25           MR. LEWIS:  It's coming.

MARY L. UPHOLD, RDR, CRR      (330) 884-7424

FEINSTEIN - DIRECT                                    28

1          MR. MARKOVITS:  Is it going to take this long for

2     it?

3          MR. LEWIS:  No.

4          THE WITNESS:  Okay, I have it.

10:36:48    5     BY MR. MARKOVITS:

6     Q.  Okay.  Could you briefly describe your educational and

7     work background?

8     A.  Sure.  Educational background, I have a Bachelor's

9     degree from Pomona College and a Master's M.Phil. and Ph.D.

10:37:05   10     degrees in economics with a concentration in finance from

11     Yale University.

12          In addition to the academic educational credentials, I

13     also was awarded the Chartered Financial Analyst designation

14     by the Chartered Financial Analyst Institute, which is the

10:37:19   15     premier designation for practicing financial analysts.

16          So I have the academic credentials and a professional

17     credential as well.

18     Q.  And you've already mentioned a little bit about your

19     teaching experience and business experience.  If you could

10:37:30   20     just state those briefly.

21     A.  I'm a Tenured Associate Professor of Finance at Babson

22     College.  Prior to that I was at Boston University.  In

23     addition to my teaching and research and college

24     responsibilities, I'm the Founder, President and Senior

10:37:45   25     Expert at Crowninshield Financial Research.  I've been

FEINSTEIN - DIRECT                    29

1    conducting financial analysis on a consulting basis for 22

2    years.

3    **Q.**  And could you describe for the court the nature and

4    purpose of your consultation in this case?

10:37:56    5    **A.**  I was asked to examine the market for Freddie Mac

6    stock, Freddie Mac stock itself, and make an assessment as

7    to whether the stock traded in an efficient market over the

8    course of the class period.

9         In addition to that, I was asked whether damages could

10:38:14    10    be calculated on a common basis using a common methodology

11    for all proposed class members, where that methodology is

12    consistent with the theory of liability of the plaintiffs.

13    **Q.**  And did the nature of your engagement change at any

14    point?

10:38:30    15    **A.**  Yes.

16    **Q.**  How?

17    **A.**  Well, after I filed my opening report, there were two

18    rebuttal reports, one from Professor Gompers and one from

19    Dr. Bajaj.  So I was asked to respond to those reports, read

10:38:42    20    what they said and assess if the arguments were valid and

21    respond to those arguments.

22         But also in those reports, they raised the price impact

23    argument, arguing that the alleged misrepresentations and

24    omissions had zero impact whatsoever on the price of Freddie

10:38:58    25    Mac stock.  So I was asked to analyze their argument and

**FEINSTEIN - DIRECT**                          30

1    their purported proof to see if it was valid.

2                MR. MARKOVITS:  May I approach, Your Honor?

3                THE COURT:  You may.

4    BY MR. MARKOVITS:

10:39:08    5    **Q.**  Professor Feinstein, I'm showing you what's been marked

6    as P1 for identification.

7                MR. MARKOVITS:  Would you like a copy?

8                THE COURT:  Thank you.

9    BY MR. MARKOVITS:

10:39:17    10    **Q.**  Could you identify that for the court, please?

11    **A.**  This is my report, the opening report on market

12    efficiency, which also includes the Comcast analysis, the

13    damage methodology analysis.

14                MR. MARKOVITS:  May I approach, Your Honor?

10:39:30    15                THE COURT:  You may.

16    BY MR. MARKOVITS:

17    **Q.**  Professor Feinstein, I'm showing you what's been marked

18    as P2.  Could you identify that for the court, please?

19    **A.**  This is my second report, the rebuttal report.

10:39:48    20    **Q.**  You mentioned that you addressed market efficiency,

21    class-wide damages and price impact.  Do you believe that

22    the work you've done could have been done by a layperson?

23    **A.**  No.

24    **Q.**  Do you feel that your testimony will aid the finder of

10:40:04    25    fact to understanding the work you will present?

1    **A.**  I do.

2              MR. MARKOVITS:  And, Kevin, could you put up slide

3    2, please?

4    BY MR. MARKOVITS:

10:40:17  5    **Q.**  Can you tell the court briefly what conclusions you've

6    reached?

7    **A.**  These are the conclusions on this slide.  Freddie Mac

8    stock did trade in an efficient market over the course of

9    the class period.  That's conclusion number one.

10:40:29  10   Damages in this matter can be computed for all class

11   members using a common methodology that is consistent with

12   plaintiff's allegations of liability.

13   And the third conclusion from the rebuttal report,

14   defendants have not failed -- have not proved that the

10:40:44  15   misrepresentations and omissions had zero impact on Freddie

16   Mac stock.

17   **Q.**  I want to start off by talking to you about your market

18   efficiency opinion.  Could you explain to the court what's

19   meant by "market efficiency"?

10:40:56  20   **A.**  Right.  And that's important.  Market efficiency is the

21   principle that the marketplace does not ignore material,

22   relevant, important information; that information that's

23   announced gets to the marketplace, it's disseminated through

24   the marketplace; that traders and investors are able to

10:41:18  25   trade on that information; and therefore, that information

**FEINSTEIN - DIRECT** <sup></sup>32

1    is reflected in the stock price.

2         So it's -- by contrast, an inefficient market would be

3    one where there are impediments to information flow, there

4    are impediments to trading so people can't trade on

10:41:34   5    information even if they had it, or for irrational reasons,

6    traders and investors simply ignored the information, or

7    perhaps they believed the stock in the company are so small

8    and so obscure that it's not worth their bother to analyze

9    the information and trade on the information.  That would

10:41:49  10    make the market inefficient.

11    **Q.**  Okay.  What methodology did you use to determine

12    whether the Freddie Mac stock traded in an efficient market

13    during the class period?

14    **A.**  I ran a battery of tests.  And it wasn't just the

10:42:01  15    Z-test and the event study.  I ran the tests that were

16    dictated by the Cammer and Unger factors.  This is not a

17    checklist of principles where each box has to be checked.

18    The Cammer and Unger factors -- the Cammer and Krogman

19    factors.  Unger and Krogman are used interchangeably.

10:42:20  20         The Cammer and Krogman factors are each a test of

21    market efficiency, and I ran the full battery of tests.  I

22    looked at trading volume; analyst coverage; the number of

23    market makers; the fact that the stock was traded on the New

24    York Stock Exchange; the principles underlying S-3

10:42:37  25    registration eligibility; market capitalization and flow

**FEINSTEIN - DIRECT** 33

1  under Krogman, that's how big the company is, I assessed

2  that and its implications for efficiency; I looked at the

3  bid-ask spread, which is the measure of how costly it is to

4  trade the stock, and I assessed the implications of that

10:42:54  5  with respect to market efficiency.

6  I did all of those tests, and in addition, the

7  empirical factor.  The empirical factor as called for by the

8  Cammer court, the Cammer court said it would be helpful that

9  if in addition to these other tests, there were empirical

10:43:10  10  demonstrations of the market actually behaving efficiently.

11  And so I ran standard tests -- the event study test and

12  the Z-test is widely used now -- to assess whether they

13  provide demonstrations of the market acting efficiently.

14  And they do.  And they do.

10:43:25  15  Q.  And how often have you used that approach, that

16  methodology to determine market efficiency?

17  A.  Always.  For 22 years, and dozens of cases.

18  MR. MARKOVITS:  All right.  Slide 3, please.

19  BY MR. MARKOVITS:

10:43:40  20  Q.  Would you tell the court what this slide reflects?

21  A.  This is a list of my market efficiency opinions over

22  the course of my career.

23  Q.  There's over 50 cases there.  Did you use the same

24  methodology, looking at the Cammer and Krogman factors and

10:43:59  25  considering whether the stock traded on a national market,

FEINSTEIN - DIRECT                    34

1   in all those cases?

2   **A.**  Yes.  Every one of these cases I ran the battery of

3   tests, the Cammer and Krogman factors, and an empirical test

4   examining to see if there was an empirical demonstration of

10:44:13   5   the stock behaving efficiently.

6   **Q.**  To your knowledge, do other economists use the same

7   methodology in securities cases when attempting to determine

8   whether or not there's an efficient market?

9   **A.**  They do.

10:44:25   10   **Q.**  Does this methodology generally require subjective or

11   objective determinations or both?

12   **A.**  All analysis, all research has some elements of

13   subjectivity.  The analyst has to make choices about, for

14   example, what data source to use.  But for the most part,

10:44:43   15   the Cammer and Krogman factors are very objective.  The

16   stock either trades actively or it doesn't.  It's either a

17   big company or it isn't.  So there's usually not

18   disagreement about whether those factors are satisfied in

19   indicating market efficiency.

10:44:58   20   **Q.**  And I know in this case there's not disagreement on

21   many of the factors, but I'm still going to ask you to

22   explain some of them or go over some of them with the court.

23           MR. MARKOVITS:  Slide 4, please.

24   BY MR. MARKOVITS:

10:45:12   25   **Q.**  Can you --

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - DIRECT                    35

1    **A.**  Okay.

2    **Q.**  -- go through this?  Yes.

3    **A.**  Let me do this.  Let me jump down to Krogman factor

4    number 1, which is the fourth one down, the forth bullet

10:45:22  5    point.  That says Freddie Mac is a very big company.

6    Krogman factor 1 is market capitalization.  That means,

7    what is the total value of all the outstanding stock.  It

8    was $42.1 billion during the class period, placing Freddie

9    Mac among the ten largest companies in the United States.

10:45:38  10   This is not an obscure company flying under the radar.

11   So Krogman 1, market capitalization, $42.1 billion.

12   And going to the top.  Trading volume, as you'd expect

13   from a big company like that, is very active, 19.9 million

14   shares traded per week.  It's well above standards that are

10:45:56  15   dictated in court cases as well as in the literature for

16   what would define an efficient market.

17   Twenty-one professional analysts covered Freddie Mac.

18   That is extensive, broad analyst coverage.  That means that

19   there are professionals whose job it was to receive the

10:46:12  20   information, digest the information and publicize to the

21   marketplace what this information means.  So there were 21

22   analysts over the course of the class period.

23   616 major institutions, that's defined by the SEC as

24   institutions that manage over a hundred million dollars of

10:46:26  25   other people's money, owned Freddie Mac stock.  Those major

FEINSTEIN - DIRECT                                    36

1    institutions have their own analysts.

2        So there was plenty of professional analyst coverage

3    making this market efficient.

4        Freddie Mac stock was listed on the New York Stock

10:46:39  5  Exchange and had at least seven market makers facilitating

6    the efficiency of that market.  The New York Stock Exchange

7    actually assigns a designated market maker, a specialist to

8    each stock that's listed on their exchange to facilitate the

9    trading and make sure it's an orderly market.  So this is a

10:46:56  10  probative factor for market efficiency as well as the other

11   factors.

12       Krogman 2, the bid-ask spread, that along with Cammer 3

13   tells you that there were no impediments to trading the

14   stock.  Anyone who wanted to trade Freddie Mac stock could

10:47:12  15  easily do so.  So the thing that might make the market

16   inefficient and inability to trade the stock did not apply

17   to Freddie Mac.  The average bid-ask spread was very narrow,

18   which means that it was inexpensive to trade this stock.

19       And Krogman 3 is a different kind of size factor.  It

10:47:28  20  looks at market capitalization but then subtracts out how

21   much of the stock is owned by insiders.  Krogman 3 says that

22   this stock was owned by the public, not by insiders, and it

23   was very big.  This stock was not being ignored by the

24   marketplace.

10:47:45  25       MR. MARKOVITS:  Okay.  Slide 4, please.

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

**FEINSTEIN - DIRECT**                    37

1          MR. LEWIS:  Slide 5 you mean?

2          MR. MARKOVITS:  I'm sorry, slide 5.

3   BY MR. MARKOVITS:

4   Q.  And you had skipped over the fourth Cammer factor, S-3,

5   and that's reflected on this slide.  Can you explain to the

6   court your findings with regard to Cammer factor 4?

7   A.  Well, okay.  Cammer factor 4 as cited by the Cammer

8   court and other courts, it's whether or not the stock is

9   eligible for S-3 registration.  And S-3 registration has

10  requirements such as the size and trading volume and the

11  filing of SEC-mandated reports.

12       So Freddie Mac stock was exempt from filing, but it

13  satisfied the trading criteria and the size criteria, which

14  are the criteria that the Cammer court said are the

15  important ones that indicate market efficiency.

16       So Freddie Mac stock did satisfy Cammer 4.  It

17  satisfied the components of Cammer 4 that the Cammer court

18  cited to are important.

19  Q.  Professor, you used the term "probative" before.  And

20  you've addressed Cammer factors 1 through 4, Krogman factors

21  1 through 3.  Are all of those probative of market

22  efficiency?

23  A.  Yes.

24  Q.  Are they all supported by economic principles?

25  A.  Yes.

10:47:55 (line 5)
10:48:13 (line 10)
10:48:32 (line 15)
10:48:51 (line 20)
10:49:06 (line 25)

FEINSTEIN - DIRECT                                    38

1    **Q.**  Do you need all of those factors to reach a finding of

2    market efficiency?

3    **A.**  Well, in the hypothetical, no.  And in this particular

4    case, they're all satisfied, so it's essentially moot.  But,

10:49:22  5    no, you don't.  This is not a checklist where you have to

6    check every box in order to conclude that the market is

7    efficient.  Each of these is a probative test of market

8    efficiency.

9    **Q.**  And how do you, as an economist, assess these factors?

10:49:36  10    **A.**  Well, I look at them holistically.  I look at them in

11    the totality.  And if all the factors point to market

12    efficiency, I would conclude that the stock trades in an

13    efficient market.

14    **Q.**  And in this case, how did these factors support your

10:49:51  15    finding that the market was efficient?

16    **A.**  These factors are the reason for my conclusion that the

17    market is efficient, and it wasn't even close.  Freddie Mac

18    is a big company.  It's not obscure.  There's no impediment

19    to trading.  There's no impediment to information flow.  And

10:50:08  20    there's demonstrations of it behaving efficiently.  It

21    wasn't even a close call.

22    **Q.**  Now I want to turn to Cammer factor 5 and ask if you'd

23    describe that factor for the court.

24    **A.**  The Cammer court said it would be helpful if there was

10:50:25  25    also a demonstration.  And that's what Cammer 5 is.  You

**FEINSTEIN - DIRECT**                    39

1    look at the stock price and observe, are there

2    demonstrations of the stock responding to information; are

3    there cases where there's indisputably important information

4    that emerged about the company that according to valuation

10:50:44  5    principles ought to move the stock price; and then you

6    observe to see, did the stock price move or didn't it.

7         And that's what I did.  That's the standard event study

8    test.  And I also did a collective event study test which

9    provided additional demonstrations of empirical

10:51:00  10   demonstrations of market efficiency.

11   **Q.**  So both those tests support empirical factor, which is

12   Cammer 5?

13   **A.**  They do.

14   **Q.**  Is Cammer 5 necessary for a determination of market

10:51:13  15   efficiency?

16   **A.**  No.  No, not -- well, it depends exactly how you mean

17   that.  If you have all the other factors indicating market

18   efficiency, then Cammer 5, it's icing on the cake; it's

19   icing on the cake, but not necessary.

10:51:31  20        On the other hand, if you could have drawn or if you

21   had conflicting information from the other factors, it would

22   be more important.  But when all the other factors point to

23   market efficiency, then it's icing on the cake.

24   **Q.**  So in this case, if you never even address Cammer

10:51:44  25   factor 5, would that change your opinion that the Freddie

1    Mac stock traded in an efficient market?

2    **A.**  It's hypothetical.  I always try to do a comprehensive

3    analysis.  But if there was some reason that I couldn't do

4    that analysis, it would not change my opinion.

10:52:01  5    **Q.**  And you talked about an event study and a Z-test that

6    you performed.  Is an event study required in order to

7    demonstrate Cammer factor 5?

8    **A.**  Well, there are different kinds of demonstrations.

9    There are different kinds of empirical tests that can be

10:52:18  10   run.  So event study is the most common, but it's not

11   always -- I wouldn't say it's required.

12   **Q.**  Did you perform an event study in this case?

13   **A.**  Yes.

14          MR. MARKOVITS:  Slide 6, please.

10:52:35  15   BY MR. MARKOVITS:

16   **Q.**  Can you describe for the court your event study?

17   **A.**  Well, what an event study does -- and it's important

18   that it be understood so it can't be distorted.  What an

19   event study does is it first requires the identification of

10:52:48  20   events, which based on the news, based on the news and based

21   on valuation principles, should cause a large, a big

22   movement in the stock price, either a big rise or a big

23   fall.  So it first requires identification of indisputably

24   important news events that should move the market.

10:53:11  25          And then it examines, after factoring out, after

**FEINSTEIN - DIRECT**

41

1    controlling for the marketplace and after controlling for a

2    peer group, whether the stock, in fact, did move a large

3    amount as it should, which would indicate that the market

4    reacted to the information and didn't ignore that

10:53:26  5    information.

6    **Q.**   What did your event study in this case show?

7    **A.**   Well, for a variety of reasons, I identified November

8    20th, 2007 as the ideal and most appropriate, in fact, only

9    appropriate date to run the traditional event study.  And I

10:53:40  10    can explain why if necessary.

11          But it's indisputable that that was an important date.

12    That the news on that date was important.  That the news on

13    that date was negative.  That the news on that date, if the

14    market was paying attention, should cause the price to fall.

10:53:55  15    And, in fact, the price did fall 28.7 percent when Freddie

16    Mac announced $2 billion of unexpected losses.

17          So that proves that this is an example, this is a

18    demonstration that the market did not ignore information.

19    This one demonstration proves that there were not

10:54:14  20    impediments to information flow and that there was not

21    impediments to trading.  When this big news came out, the

22    market reacted.

23    **Q.**   Now, as you know and we've already heard this morning,

24    defendants have criticized your use of a single date for the

10:54:26  25    event study.  Is there support for use of a single date?

**FEINSTEIN - DIRECT**

42

1    **A.**  Yes.

2    **Q.**  Does your single date event study demonstrate market

3    efficiency for the entire class period?

4    **A.**  In isolation, I would say no.  But in conjunction with

10:54:42  5    the other Cammer and Krogman factors, then yes.

6    **Q.**  Does --

7    **A.**  Because the other Cammer and Krogman factors are

8    observed throughout the class period, and this is a

9    demonstration that the kind of impediments that might make

10:54:55  10   the market inefficient did not bear on Freddie Mac stock.

11   **Q.**  Does Dr. Bajaj indicate what he believes the required

12   number of news days for such a study should be?

13   **A.**  No.

14   **Q.**  And you mentioned before, you talked about, I believe,

10:55:14  15   strongly material news or indisputably material news.  Let's

16   start off with, what's "material news"?

17   **A.**  Well, material news is the kind of information that

18   investors consider in making investment decisions, deciding

19   whether to buy or sell.  It's also the information they

10:55:31  20   would use in determining the correct valuation of the

21   security.

22   **Q.**  And why wouldn't you just look for material news when

23   you're looking for event dates?

24   **A.**  Because not all material news would have a correct

10:55:47  25   efficient market impact on the stock price -- okay.  Let me

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - DIRECT                    43

1   say it a different way.  Not all material news is going to

2   be so important that it should, according to valuation

3   principles, move the stock price so much that it will appear

4   to be statistically significant.

10:56:03  5       Some material news might have -- it will be material,

6   but it should have a modest impact on the stock price,

7   according to the correct valuation principles.  If it has a

8   modest impact, it will appear to be not significant and the

9   test will be indeterminate.  You won't know whether it was a

10:56:19  10  non-significant -- a non-statistically significant movement

11  because people ignore the news or because they didn't ignore

12  the news and the correct movement was a modest change.

13      So it's important to do -- when you're doing the market

14  efficiency event study, to pick only the most impactful kind

10:56:36  15  of news and events.

16  Q.  Are there articles or literature that give examples of

17  cases where you have clearly material news, terms that a

18  reasonable investor would be interested in that news, but it

19  doesn't have a statistically significant price reaction?

10:56:53  20  A.  Yes.  There's an article that's being -- that's widely

21  circulated, widely respected by Brav and Heaton.  Brav and

22  Heaton point out, they use an example that sounds a lot like

23  Freddie Mac.  They say it's a $42 million [sic] company in

24  their example.

10:57:07  25  Q.  42 billion would that be?

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

**FEINSTEIN - DIRECT**                44

1    **A.**   I'm sorry?

2    **Q.**   42 billion?

3    **A.**   42 billion.  I meant billion, yeah.

4    **Q.**   Yeah.

10:57:11   5    **A.**   42 billion.  They say it's a $42 billion company and

6    the company announces a $700 million loss.  Well, if you

7    take the percentage of $700 million versus 42 billion,

8    clearly it's economically material.  Clearly people are

9    going to care about 700 million.  But the percentage change

10:57:29   10   in the stock price when you calculate the percentage of what

11   700 million is of 42 billion, it will not -- it won't be

12   over the threshold for statistical significance.

13        So there's a difference recognized in the literature

14   between economic materiality and statistical significance.

10:57:44   15   **Q.**   And --

16   **A.**   And also --

17   **Q.**   I'm sorry, go ahead.

18   **A.**   -- the other kinds of news that could cause a -- the

19   other kind of conditions that might make material news not

10:57:53   20   cause a statistically significant change in an efficient

21   market is when the news is expected, in line with prior

22   expectations, so that the news maintains the price where it

23   used to be.

24        Or news that comes out in a -- simultaneously, if it's

10:58:11   25   positive news, it comes out with negative news, confounded

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - DIRECT                           45

1    or conflicted news, mixed news, if the news is mixed, it

2    might be very material, but it won't have a significant, a

3    statistically significant impact on the stock price.  It's a

4    very common situation.

10:58:23  5    **Q.**  And that gets to a follow-up question.  Can you

6    explain, would a material misrepresentation necessarily

7    cause a stock price to increase, decrease or stay the same,

8    or all of the above?

9    **A.**  All of the above.  The answer is all of the above,

10:58:41  10   because there could be a material misrepresentation that

11   maintains market -- the market's understanding of the

12   company at its old perception, when, in fact, the company

13   has become worse off.

14       So the reaction to a confirmatory or the kind of

10:59:00  15   misrepresentation that buoys the stock price would be that

16   the stock price is buoyed and doesn't fall.  So the impact

17   of a material misrepresentation could be that it holds the

18   stock price the same and prevents it from falling.

19   **Q.**  You've reviewed the report of Dr. Bajaj and his

10:59:18  20   deposition?

21   **A.**  I did read those.

22   **Q.**  Does he make any claim regarding the percentage of

23   material news days that in his view should be expected to

24   have a statistically significant stock price reaction?

10:59:30  25   **A.**  Yeah.  He was flat-out wrong.  He said 80 to 90

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - DIRECT                                    46

1    percent.  And the literature is clear that not all material

2    news will cause a statistically significant reaction.  But

3    he said 80 to 90 percent.

4    **Q.**  If you had to prove market efficiency, you had to show

10:59:49    5    a statistically significant stock price reaction to 80 to 90

6    percent of material news days, what would be the result?

7    **A.**  Well, there's literature on that, too.  Most stocks

8    would fail.  Most stocks that are even generally understood

9    to be the most efficient would fail that test.

11:00:06    10    **Q.**  So based on what you reviewed, do you have an

11    understanding of how Dr. Bajaj can claim that 80-90 -- 80 to

12    90 percent of material news days should have this

13    statistically significant stock price reaction?

14    **A.**  Well, I read his report and I read his deposition and

11:00:25    15    it seemed he tried to rehabilitate that opinion, which is

16    clearly wrong, by redefining material in a circular way.  He

17    said that it's material if it causes a significant reaction.

18        Well, if you define material to be that it causes a

19    significant reaction, then you'll have 100 percent.  He

11:00:41    20    redefined it with circularity to meet his prior testimony.

21    **Q.**  All right.  You've talked about the event study.  I

22    want to talk about the collective test you ran.

23        MR. MARKOVITS:  If you could put up slide 7,

24    please.

11:00:57    25    BY MR. MARKOVITS:

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

**FEINSTEIN - DIRECT**                47

1    **Q.**  First of all, what's a "collective test"?

2    **A.**  A collective test is a different kind of event study,

3    where instead of examining whether a momentous event causes

4    a significant change in the stock price, what it does is it

11:01:13    5    looks at -- it first selects dates, a group of dates on

6    which there is an elevated flow of information, on which

7    there are things happening with the company or news coming

8    out about the company so that there's an elevated flow of

9    information.

11:01:26    10    And then it compares the stock price dynamics in the

11    news group to the stock price dynamics -- stock price

12    dynamics in the non-news group.  If there's a significant

13    difference between the two, it proves that information

14    matters and that the marketplace is not ignoring

11:01:42    15    information, which is market efficiency.

16    **Q.**  What collective test did you run?

17    **A.**  It's described on this slide here.  I used a screen

18    where if an event was reported by The Wall Street Journal

19    and The New York Times, it satisfied the screen.  And I used

11:01:56    20    that screen because I knew that it's contentious and it

21    would be challenged, whether I was being subjective in the

22    choice of events.  So I delegated that decision of event

23    choice to the editors of The Wall Street Journal and The New

24    York Times.  It's their job to determine what is news and

11:02:11    25    what isn't.

**FEINSTEIN - DIRECT**                    48

1      So I identified these nine company events and then --

2  **Q.**  Can I stop you?  I'm sorry.  Can I stop you right

3  there, Professor?

4  **A.**  All right.

11:02:17  5  **Q.**  Is there support for your use of <u>The Wall Street</u>

6  <u>Journal</u> and <u>The New York Times</u>?

7  **A.**  Yes.  I mean, I would love to say that I invented and

8  claim this methodology, I would love to say that I can claim

9  credit for this methodology, but I can't.  It's in the

11:02:32  10  literature; it's widely used.

11  **Q.**  I'm sorry, I interrupted you.  Go ahead.

12  **A.**  Well, then, so the nine dates, because they're elevated

13  news dates and there's no screen to see if these are the

14  kind of dates that should cause a significant reaction, you

11:02:45  15  would -- not all of them need to cause a reaction.

16      What would indicate market efficiency is if there was a

17  higher incidence of statistical significance within the news

18  group as opposed to the non-news group.

19      And in this case, that's what happened.  44.4 percent

11:03:00  20  of the news events were statistically significant.  And only

21  5.9 of non-news events were statistically significant.

22      Well, I didn't stop there.  We all can see that 44.4

23  percent is bigger than 5.9 percent.  But statistics requires

24  a test to determine whether it's a meaningful difference and

11:03:19  25  a difference that couldn't happen by random chance alone.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

**FEINSTEIN - DIRECT**                                  49

1      And that's where the Z-test comes in.  The Z-test is

2   the underlying statistical engine of the collective test.

3   It's the Z-test that determines that 44.4 is, in fact,

4   bigger than 5.9.

5      And since the Z-test and confirmatory diagnostic tests

6   prove that the news events had different price dynamics than

7   the non-news events, I reached the conclusion that Freddie

8   Mac stock here empirically demonstrated market efficiency

9   again.

10   **Q.**  Does use of the Z-test methodology for examining

11   incidence rates have support in peer-reviewed articles?

12   **A.**  Yes.

13   **Q.**  Have you used the Z-test before in assessing Cammer

14   factor 5?

15   **A.**  I have.  Three cases that come to mind are the Marvell

16   Technologies case, Petrobras and ARCP, it's American Realty

17   Capital Properties, all used the Z-test.

18   **Q.**  Now, there's been a question raised about this, so let

19   me ask:  Was your sample size sufficient?

20   **A.**  Yes, the sample size was sufficient.  The challenge

21   that it was insufficient is just wrong.  The literature says

22   that with small sample, there may be small sample problems,

23   but -- and it also shows how to deal with the small sample

24   problems.  So it's not always a problem.

25      And the way you deal with the small sample problems are

**FEINSTEIN - DIRECT**   50

1    to check to see if, in fact, it's a valid criticism, is with

2    diagnostic tests.  I ran a battery of diagnostic tests.

3    This Z-test passes.

4    **Q.**  All right.  Let's get to that.

11:04:54  5          MR. MARKOVITS:  Slide 8, Kevin.

6    BY MR. MARKOVITS:

7    **Q.**  Does this describe the three diagnostic tests you ran?

8    **A.**  It does, Fisher's exact test, the Bootstrap test and

9    the Binomial test.  And the way to read this chart is that

11:05:09  10   if these p-values are less -- if the p-values were greater

11   than -- substantially greater than 5 percent, that would

12   indicate that the diagnostic tests do not support the

13   Z-test.

14         But if the p-values are less than 5 percent, it

11:05:24  15   indicates that there's not a problem, not only with small

16   sample, but all of the statistical challenges that they

17   raise.  These tests are immune from all of them, and the

18   Z-test is valid.

19   **Q.**  So challenges, they raised like pooled variance and

11:05:40  20   continuity correction.

21   **A.**  Right.

22   **Q.**  These diagnostic tests are immune to that?

23   **A.**  Right.  The Fisher exact test, the Bootstrap test, the

24   Binomial test do not require any of that.  They do not

11:05:50  25   require the -- they don't have the kind of variance in them

**FEINSTEIN - DIRECT**                                51

1    that one would have to make a decision as to whether to use

2    pooled or unpooled, and there's no continuity correction

3    ever necessary.  And so these are immune from all of those

4    statistical challenges.

11:06:05  5    The fact that these tests confirm the Z-test mean that

6    each of those issues that they raised should not have been

7    raised, they're not applicable here.

8    **Q.**  And how does adding in this Cammer 5 factor affect your

9    opinion on market efficiency?

11:06:18  10    **A.**  It confirms, it confirms what the other Cammer and

11    Krogman factors indicated.  This is a -- Freddie Mac stock

12    traded in an efficient market over the course of the class

13    period and there's empirical demonstrations of it happening.

14    **Q.**  Did Dr. Bajaj do any testing, such as he's done in

11:06:37  15    other cases, in this case to prove that the market was

16    inefficient?

17    **A.**  No.

18    **Q.**  Did he provide an opinion in this case that the market

19    was inefficient?

11:06:47  20    **A.**  No, he did not.

21    **Q.**  What are the biggest mistakes that you would say the

22    defendants and Dr. Bajaj have made in analyzing your work?

23    **A.**  Well, I can narrow it down to two biggest.  The first

24    is they ignored all the Cammer and Krogman factors except

11:07:05  25    for the empirical factor.  They ignored that those are

FEINSTEIN - DIRECT    52

1    dispositive.  Defendants' counsel ignored them in his

2    opening comments.  They simply disregard that trading

3    volume, analyst coverage, market makers, S-3 factors, market

4    capitalization, bid-ask spread and float all indicate that

11:07:26    5    Freddie Mac stock traded in an efficient market over the

6    course of the class period.  That's number one.

7        And number two is they consistently, repeatedly make

8    the logical and statistical mistake of claiming that if a

9    test fails to prove something, the test necessarily proves

11:07:40    10    the opposite.  Statistics textbooks are very clear that

11    that's a logical fallacy.

12        So, for example, Dr. Bajaj tried to see if the

13    misrepresentations and omissions had observable -- caused

14    verbal statistically significant changes in Freddie Mac's

11:08:01    15    stock on the misrepresentation and omission date.  His test

16    was weak.  His test failed.  But from the failure of his

17    test to prove price impact, he then concludes that there's

18    no price impact.  And that's just a fallacy.

19    Q.  I think there's an example that you used to explain

11:08:16    20    this to me that involved fishing.  Could you give that

21    example to the court?

22    A.  Well, again, I wish I could claim credit for it, but

23    this comes out of statistics textbooks.  If a fisherman puts

24    a line into the ocean to try to catch a fish and catches no

11:08:31    25    fish, that does not prove there are no fish in the ocean.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - DIRECT                    53

1    Catching a fish would prove there are fish in the ocean, but

2    not catching a fish does not prove there are no fish in the

3    ocean.

4        Q.  Professor, I want to switch topics here and talk about

11:08:44   5    price impact.  You're aware that when market efficiency is

6    proven, as in this case, the defendants have the opportunity

7    to rebut market efficiency by showing a lack of price

8    impact.

9        A.  I'm aware.

11:08:58   10   Q.  What would have to be done to show a lack of price

11   impact in this case?

12       A.  Well, no price impact means zero price impact.  It

13   would have to mean that there was no -- it would have to

14   mean that the information didn't cause the price to go up,

11:09:17   15   down or stay the same when the information came out, when

16   the misrepresentations and omissions were made.  It would

17   have to mean that the information didn't make the price go

18   up, down or stay the same when the corrective disclosures

19   came around.

11:09:33   20       And then, because it's an efficient market, you would

21   also have to prove that the information was the kind of

22   information that is just irrelevant to the valuation of

23   Freddie Mac stock.  And they did not do any of that.

24       Q.  In this case, would you expect that the

11:09:48   25   misrepresentations and omissions alleged in this case would

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

FEINSTEIN - DIRECT                          54

1    cause a statistically significant price movement in the

2    stock?

3    **A.**   Not when those misrepresentations and omissions were

4    made.  Because my understanding of the allegations is, the

11:10:01  5    allegations is the company was concealing increased risk,

6    the company was concealing that they weren't adhering to

7    underwriting standards.

8         So concealing something maintains the marketplace's

9    understanding of the company's condition as it previously

11:10:16  10   was.  And so the efficient market reaction to that would be

11   it maintains the stock price where it was.  The efficient

12   market reaction would be no price movement.

13   **Q.**   Okay.  Let's talk about November 20th, 2007.  Was there

14   a statistically significant stock price drop on November

11:10:31  15   20th?  And I believe one of your prior slides addressed

16   this, correct?

17   **A.**   Yeah.  It was not even close.  It was a dramatic drop

18   that clearly shows that the information that came out, the

19   loss that the company experienced was responsible for the

11:10:45  20   company's stock price plummeting that day.

21   **Q.**   Has Dr. Bajaj proven that no part of that large stock

22   price drop was related to the allegations in the complaint?

23   **A.**   No.  So, I mean, you would -- in order to prove no

24   price impact, you would have to show that the drop was not

11:11:02  25   caused by the announced loss, and you would have to show

FEINSTEIN - DIRECT                                           55

1    that the announced loss was not caused by, in any way

2    whatsoever in any form or to any degree, concealed risks

3    or -- in a previously concealed risk or previously concealed

4    underwriting standards being abandoned.

11:11:19   5    **Q.**   I'm going to switch topics again, and I want to talk

6    about your opinion with regard to a common damage

7    methodology.

8         What was your opinion again?

9    **A.**   That it exists.  That there is a methodology, that it's

11:11:33   10   a methodology that's not only commonly -- can be commonly

11   applied in this case to all class members, but it's commonly

12   applied in other cases like this one.

13   **Q.**   And when you say "other cases like this one," are you

14   talking about Section 10b cases?

11:11:46   15   **A.**   Yes.

16   **Q.**   What's the common damage method that's applied in

17   Section 10b cases?

18   **A.**   It's usually referred to as the out-of-pocket measure.

19   **Q.**   Have you given similar opinions regarding a common

11:11:57   20   damage methodology in other cases?

21   **A.**   Yes.

22   **Q.**   Have you seen other economists give similar opinions

23   regarding common damage methodology for 10b-5 cases using

24   out-of-pocket damages in other cases?

11:12:14   25   **A.**   Yes.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - DIRECT                     56

1    **Q.**  And would you say that the analysis that you performed

2    was typical of the analysis performed by economists in

3    reaching an opinion on common damage methodology in Section

4    10b cases?

11:12:25   5    **A.**  Yes.

6    **Q.**  Have you done an actual damage analysis?

7    **A.**  No, not yet.

8    **Q.**  Why not?

9    **A.**  I haven't been asked to.  I understand it's premature

11:12:33  10    at this stage.  And the full record has not yet been

11    developed yet.

12    **Q.**  Did the damages that you indicated could be applied

13    class-wide depend on the individual risk tolerance of the

14    investor?

11:12:47  15    **A.**  No.

16    **Q.**  Do they depend on whether or not the investor would

17    have bought the stock?

18    **A.**  No.

19    **Q.**  Do they depend on whether the loss resulted from a

11:12:59  20    corrective disclosure or materialization of the risk?

21    **A.**  It does not depend on the form of the event that

22    dissipated the artificial inflation.

23    **Q.**  And when you say -- is there something called an

24    inflation ribbon that gets dissipated in a case like this at

11:13:14  25    the end?

FEINSTEIN - DIRECT                    57

1     A.   Inflation is how much -- artificial inflation is how

2     much misrepresentations and omissions have inflated or

3     increased the stock price.  And the ribbon, the inflation

4     ribbon is the record, is the time series of inflation over

11:13:28   5     the course of the class period.

6          So the measure is essentially subject to a number of

7     statutory and case law provisions, it's essentially the

8     change in the inflation ribbon from when the investor bought

9     the stock to when the investor sold the stock.

11:13:43  10     Q.   Now, Dr. Gompers has raised some issues about your

11     ability to calculate that inflation ribbon, such as your

12     ability to separate fraud from non-fraud losses.

13          How would you address those issues?

14     A.   Well, the kind of financial analysis that's necessary

11:14:02  15     to do that is financial analysis that's applied every single

16     day by thousands of professional financial analysts in the

17     marketplace analyzing every security that's out there.

18          I mean, valuation -- the valuation exercise is to

19     determine how different pieces of information will impact

11:14:20  20     the value of a security.  And I would apply those very same

21     tools that are used every day by professional financial

22     analysts to this task, just as they do every day.

23     Q.   And are issues like separating out fraud from non-fraud

24     losses typical in 10b cases --

11:14:40  25     A.   Yes.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1    **Q.**  -- and loss causation analysis?

2    **A.**  Yes.

3    **Q.**  So it's something that you or other economists deal

4    with every time they address one of these cases, for the

11:14:49  5    most part?

6    **A.**  Not every time, but frequently.

7    **Q.**  Okay.  Professor Feinstein, I want to go back.  You

8    were looking at a slide earlier that had over 50 cases where

9    you've testified about market efficiency.  In those cases,

11:15:07  10    have opposing counsel sought to exclude your testimony under

11    Daubert?

12    **A.**  In many, if not most of them, they do.  It seems to be

13    a pretty routine tactic.

14    **Q.**  In any of those more than 50 cases, was your testimony

11:15:21  15    excluded under Daubert?

16    **A.**  No, never.

17         MR. MARKOVITS:  I have nothing further at this

18    time, Your Honor.

19         THE COURT:  Thank you.  Dr. Feinstein is passed

11:15:30  20    for cross-examination?

21         MR. MARKOVITS:  Yes, Your Honor.

22       CROSS-EXAMINATION OF STEVEN P. FEINSTEIN, Ph.D.

23    BY MR. FRANK:

24    **Q.**  Good morning, Dr. Feinstein.

11:15:48  25    **A.**  Good morning.

1            MR. FRANK:  Your Honor, we have prepared binders

2       of exhibits that may be used during Dr. Feinstein's

3       cross-examination.  Would you mind if myself and my team

4       distributed them?

11:16:00   5            THE COURT:  No, I don't mind.

6            MR. FRANK:  Thank you.

7            THE COURT:  Your exhibits then are already marked?

8            MR. FRANK:  They aren't already marked.

9            THE COURT:  How do you intend to mark them, then,

11:16:08  10      if you distribute them in advance of marking them?

11           MR. FRANK:  Well, I suppose we can -- we can mark

12      them right now.  And it will take me a moment to get to

13      them, so we'll mark them while I begin the

14      cross-examination, and then at the appropriate time, we can

11:16:23  15      distribute them.

16           MR. MARKOVITS:  Your Honor, just a technical

17      issue.  That monitor, because of technical difficulties, the

18      monitors were having us hooked up to our computer, so if

19      Mr. Frank is going to be putting anything up on the monitor,

11:16:37  20      we'll have to switch that wire.

21           MR. LEWIS:  I just need to get it --

22           MR. FRANK:  I won't be doing that on

23      cross-examination, we'll be doing that on the direct of the

24      next witness.

11:16:46  25           THE COURT:  Thank you for being ready, Mr. Lewis.

FEINSTEIN - CROSS                    60

1    It looks like you're still on the wait list for that.

2           So when you're ready, you may present, but it

3    seems it should be that the exhibits are marked before you

4    give them to --

11:16:59   5           MR. FRANK:  Thank you, Your Honor.

6           THE COURT:  -- the witness and hopefully also to

7    the court.

8    BY MR. FRANK:

9    **Q.**  Dr. Feinstein, for a market to be efficient, it needs

11:17:11   10   to be rapidly incorporating available information all the

11   time, right?

12   **A.**  Well, that's the perfect standard, the standard of

13   perfect informational efficiency.

14   **Q.**  That's what you testified at deposition was the

11:17:25   15   definition of market efficiency, correct?

16   **A.**  That's a definition of market efficiency.  It's an

17   operative definition of market efficiency.  It's not the

18   definition and the clarification, as I understand it, that

19   the Supreme Court presented in the Halliburton II case.  In

11:17:40   20   that case, as you know, they said it's a fairly modest

21   premise and it need not be perfect efficiency.

22          MR. FRANK:  Your Honor, we move to strike.

23   Doctor -- we move to strike the portion of the answer that

24   is opining on case law, Your Honor.

11:17:53   25          THE COURT:  I will overrule your motion to strike.

1         Listen, and I know already that there have been

2    complaints that Dr. Feinstein makes legal conclusions.

3         I'll ask you to refrain from that and just keep

4    your answers within the realm of the financial economist

11:18:08  5    that you're serving in the role as.

6         THE WITNESS:  Sure.

7         THE COURT:  My goal here is to better understand.

8    I think I can decipher what's a legal conclusion that should

9    be drawn by the court versus one coming from the witness.

11:18:19  10        Feel free to mention it, but I won't strike, I'll

11   just use it in an appropriate way.  Okay?

12        MR. FRANK:  Thank you, Your Honor.

13   BY MR. FRANK:

14   **Q.**  Dr. Feinstein, the definition of market efficiency that

11:18:29  15   you used here and that you applied here in reaching your

16   conclusions was that information needs to be rapidly

17   incorporating available information all the time, right?

18   **A.**  Yes.

19   **Q.**  Now, is it fair to say, Dr. Feinstein, that Cammer

11:18:45  20   factor 5 focuses on the essence of market efficiency?

21   **A.**  It focuses on it because it shows, it's a demonstration

22   of the cause and effect.  So it focuses on the market

23   behaving efficiently rather than indicators that indicate

24   that the market should be or is an efficient market.

11:19:07  25        So the other factors are the conditions under which a

1    market will be efficient.  The empirical factor is a

2    demonstration of the market actually behaving efficiently.

3         And so that's what I meant by the essence of market

4    efficiency is in that demonstration.

11:19:22  5    **Q.**  When you say that's what you meant, you're aware that

6    you have previously stated in litigation that the empirical

7    factor focuses on the essence of market efficiency?

8    **A.**  And I explained in the language around that sentence

9    what I just explained right now.

11:19:38  10    **Q.**  Is it fair to say that the fifth factor is very

11    important to the determination of market efficiency?

12    **A.**  It depends.  It depends on what the other Cammer and

13    Krogman factors indicate.

14    **Q.**  You were retained in the Groupon matter; is that right?

11:19:54  15    **A.**  Yes.

16    **Q.**  And you were deposed in that case?

17    **A.**  Yes.

18    **Q.**  And do you recall being deposed on February 12th of

19    2014 in Chicago in that case?

11:20:03  20    **A.**  Not specifically, but generally, yes.

21    **Q.**  And you were asked:  "In your opinion, is the fifth

22    factor the most important of the factors?"

23         And you answered, "It's different.  It's different

24    because it's the essence of market efficiency rather than an

11:20:19  25    indicator of market efficiency, so it's -- it's very

1    important."

2        Do you recall that?

3    **A.**  I'm saying the same thing today.

4    **Q.**  You agree it's very important?

5    **A.**  Well, it's very important.  It looks at market

6    efficiency a different way.  And its importance varies

7    depending on what the other Cammer and Krogman factors say.

8        So, I mean, in a case where the Cammer and Krogman

9    factors are not as dispositive as they are in this case, it

10   will grow in importance.

11   **Q.**  Now, in your initial report in this case, you reported

12   the results from two tests, correct?

13   **A.**  Yes.

14   **Q.**  The first test you performed in this case was a single

15   date event study that you testified earlier, right?

16   **A.**  That's right.

17   **Q.**  Prior to performing the single date event study, you

18   reviewed Dr. Hallman's report dated August 16 of 2012,

19   correct?

20   **A.**  Yes.

21   **Q.**  You knew that Dr. Hallman conducted an event study

22   based on the testing of dates that Freddie Mac released

23   earnings results, right?

24   **A.**  That's right.

25   **Q.**  You knew that he tested six earnings dates, correct?

**FEINSTEIN - CROSS**                              64

1    **A.**   That Dr. Hallman did, yes.

2    **Q.**   Yes.

3         You knew that Dr. Hallman concluded, based on his

4    testing, that only two of those six dates were statistically

11:21:25   5    significant, correct?

6              THE WITNESS:  Your Honor, I'd like to answer yes,

7    but I'd like to provide some context, if I may.

8              THE COURT:  Well, that's a question for Mr. Frank.

9              THE WITNESS:  Okay.  Yes.

11:21:36  10             THE COURT:  He now knows what you desire.  Would

11   you like him to provide that context to you or to

12   Mr. Markovits?

13             MR. FRANK:  I'd prefer he provide it to

14   Mr. Markovits given my limited time.

11:21:46  15             THE COURT:  So why don't you just continue to

16   answer Mr. Frank's questions, and if Mr. Markovits wants to

17   come back and allow you to provide the context, he'll be

18   able to.

19             THE WITNESS:  Okay.

11:21:55  20             Please repeat the question.

21   BY MR. FRANK:

22   **Q.**   I will try.

23        You knew that Dr. Hallman concluded that only two of

24   the six dates that he tested were statistically significant?

11:22:04  25   **A.**   Right.  And he provided reasons for the other four.

MARY L. UPHOLD, RDR, CRR       (330) 884-7424

FEINSTEIN - CROSS                    65

1    **Q.**  You knew that the two dates that he concluded had

2    statistically significant price reactions were August 30 and

3    November 20 of 2007, right?

4    **A.**  Correct.

11:22:17   5    **Q.**  And prior to performing your single date event study,

6    you also reviewed Dr. Bajaj's report from 2012, correct?

7    **A.**  That's right.  And Dr. Bajaj provided the reason why

8    the first four should not be statistically significant in an

9    efficient market.

11:22:35   10   **Q.**  Dr. Bajaj provided the reason or Dr. Hallman, did you

11   mean to say?

12   **A.**  Bajaj.  Dr. Bajaj provided the reason.  He said that

13   the news on those first four earnings dates was mixed.  If

14   you recall the argument they were having, Dr. Hallman

11:22:47   15   thought that the news was, even though not significant,

16   was -- that the stock price reactions, even though not

17   significant, were at least in the right direction.

18       And Dr. Bajaj said, "There was no right direction, the

19   news was mixed.  It could have gone in either direction."

11:23:02   20       If the news is mixed, then you wouldn't expect

21   necessarily a significant stock price reaction.  And those

22   dates are then not appropriate for a market efficiency event

23   study.

24   **Q.**  Dr. Feinstein, let's focus on August 30 and November

11:23:15   25   20th for a moment.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1        Now, you knew that when Dr. Hallman offered his opinion

2    that he failed to identify a structural break in the market

3    for Freddie Mac's common stock, that impacted his results,

4    correct?

11:23:32   5    **A.**   My recollection is Dr. Hallman used the generalized

6    least squares methodology to accommodate a structural break.

7    So do you mean before or after he did that?

8    **Q.**   Dr. Feinstein, do you recall that in Dr. Bajaj's report

9    in 2012, he identified that there was a structural break in

11:23:52  10   this market in August of 2007?

11   **A.**   Right.  He said there was one structural break, and

12   that one structural break occurred on August 8th, 2007.

13   **Q.**   Do you recall that the result of the identification of

14   that structural break impacted Dr. Hallman's results when

11:24:14  15   corrected for that break?

16   **A.**   No, what I recall is that he applied a different

17   methodology called feasible generalized least squares, which

18   one can apply to deal with changing volatility over the

19   course of a data series.

11:24:27  20   **Q.**   Isn't it true --

21   **A.**   I don't recall -- as I sit here now, I don't recall

22   if -- well, we know that November 20th, 2007 is significant

23   no matter how you looked at it.  As I sit here now, I don't

24   recall what happened to the earnings announcement that was

11:24:43  25   just before that one.

FEINSTEIN - CROSS                                67

**Q.**  You knew that Dr. Bajaj agreed with Dr. Hallman with respect to the computations relating to November 20th, 2007, correct?

**A.**  Agreed with him insofar as it being significant or agreed with him insofar as it not being affected by a structural break?

**Q.**  I'll put it another way.

You knew that Dr. Bajaj didn't criticize Dr. Hallman's finding of statistical significance with respect to November 20th, 2007, correct?

**A.**  That's true.

**Q.**  You knew that Dr. Bajaj did criticize Dr. Hallman with respect to his finding of statistical significance on August 30, 2007, right?

**A.**  Correct.

**Q.**  Okay.  And you actually agreed with Dr. Bajaj's conclusion that there was a structural break in August of 2007, right?

**A.**  August; that's right, August.  He said there was one structural break, only one structural break, and that it was in August of 2007.  He said that volatility was constant throughout the period prior to that.

**Q.**  And one of the things you did to confirm that Dr. Bajaj was right that there was a structural break in August, was you conducted what you call a Chow test, correct?

FEINSTEIN - CROSS                    68

1   A.   That's right.

2   Q.   And the results of your Chow test confirmed that

3   Dr. Bajaj was right that there was a structural break in

4   August, right?

11:26:15   5   A.   That's right.

6   Q.   Now, you reviewed the third amended complaint in this

7   case before conducting your event study, right?

8   A.   Of course.

9   Q.   And you knew that OPERS selected a class period that

11:26:30   10   ended on November 20th, 2007, right?

11   A.   Of course, yes.

12   Q.   Now, you knew that the Freddie Mac stock price fell 29

13   percent on that day, right?

14   A.   Right.  And I knew that there was also very important

11:26:43   15   news that came out that day that made it appropriate and

16   almost a necessary to include that date in the event study.

17   Q.   You concluded that -- well, strike that.

18       You're aware that the class period here is August 1st,

19   2006 to November 20th, 2007, correct?

11:26:59   20   A.   Right.

21   Q.   And you're aware that that constitutes 330 trading

22   days, right?

23   A.   Right.

24   Q.   And you concluded, in connection with developing your

11:27:11   25   single date event study, that there was only one date that

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - CROSS                69

1    was appropriate to test in a traditional event study manner,

2    correct?

3    **A.**   Well, yes, because the earnings dates, as I already

4    described, according to Dr. Bajaj, your own expert, were

11:27:30   5    mixed news, except for the last one.  He said they were

6    mixed news.  The literature says that mixed news events are

7    not appropriate for inclusion in a market efficiency event

8    study.

9         And beyond that, the allegations in this case are that

11:27:43   10   the company concealed its deteriorating position in terms of

11   risk and underwriting.  If a company conceals its condition

12   so as to appear uneventful, you should not be surprised that

13   there will, therefore, not be a lot of events to test for a

14   market efficiency event study.

11:28:05   15        And that's why I also did the collective test.

16   **Q.**   Putting aside the earnings dates, you concluded that in

17   the 330-day class period, there was not a single other date

18   that was appropriate to test in a traditional event study,

19   correct?

11:28:19   20   **A.**   That's correct, and so did Dr. Bajaj.  I invited

21   Dr. Bajaj -- in my deposition, I said, "I invite your expert

22   to propose other dates that ought to be tested."  He never

23   proposed any other dates that should be tested.

24   **Q.**   Did he ever put in a report that he concluded that

11:28:37   25   there were no other dates that were appropriate to test?

FEINSTEIN - CROSS                                         70

1    **A.**   No.   But the rebuttal, he never said that there was a

2    date that was a better date or an auxiliary date or a second

3    date or a third date that ought to be included.

4         No one in this case has ever said that there's a

11:28:54    5    specific date that should be included in the event study

6    aside from the November 20th, 2007.

7         The only exception is later, he said -- at the end of

8    his report, he says that the earnings announcement dates

9    might have been good dates to include, but he had previously

11:29:12   10    said those were mixed news.  So it's actually a conflicted

11    opinion.

12         But nobody has ever suggested to me, in the course of

13    this case, that there was another good date to test.  I

14    didn't find one, but neither did you.

11:29:24   15              MR. FRANK:  Your Honor, I promise I will restrain

16    myself and I will never move to strike at your request, but

17    it may be that I'm going to have to ask for a little time at

18    the end if we can't simply get answers to the questions.

19              THE COURT:  Listen, I overruled your motion to

11:29:37   20    strike and explained why.  But you are certainly well

21    capable of better controlling your witness.  So I didn't

22    mean to tie your hands entirely.

23              So the situation is this, Dr. Feinstein:  You have

24    points to make.

11:29:50   25              THE WITNESS:  Uh-huh.  Okay.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

**FEINSTEIN - CROSS**                    71

1    THE COURT:  Literally as well as figuratively.  Be

2    responsive to the question.  If Mr. Markovits wants you to

3    expound, he'll give you the opportunity to do that.

4    Mr. Frank has restrained himself and let you go on.

11:30:05  5    And I can't tell if you're happy with the response

6    or unhappy until now.

7    But feel free to pause, Mr. -- I mean, pardon me,

8    Doctor -- Dr. Feinstein, if necessary, but just answer the

9    question and we'll leave the rest to Doctor -- to Attorney

11:30:23  10    Markovits, should he choose to bring it up.

11    THE WITNESS:  Yes.

12    MR. FRANK:  Thank you, Your Honor.

13    BY MR. FRANK:

14    **Q.**  Dr. Feinstein, in the Groupon case, you tested two

11:30:33  15    dates, correct?

16    **A.**  I don't recall, but it's reasonable.

17    **Q.**  Do you recall that the class period in that case was

18    less than two months?

19    **A.**  I came prepared today to talk about this case.  I don't

11:30:43  20    remember the details of my prior cases.

21    **Q.**  You don't recall --

22    **A.**  I'll take your word for it.

23    **Q.**  Do you recall that you testified in that case that

24    testing only two dates was on the low side?

11:30:52  25    **A.**  Yes, that I do remember.

FEINSTEIN - CROSS                          72

1    **Q.**  And that was two dates over something -- a class period

2    less than two months, right?

3    **A.**  Yes.  I mean, that was the reason for there only being

4    two dates in that case.  And in this case, there are reasons

11:31:06  5    why only one date is available.

6    **Q.**  Now, in your report, you state that the statistically

7    significant result on November 20, quote, "demonstrates that

8    the common stock reacted promptly to new Company-specific

9    information, which demonstrates market efficiency."

11:31:28  10    That's in paragraph 136 of your report.  Do you recall

11    that?

12    **A.**  Yes.

13    **Q.**  You didn't mean to suggest that your single date event

14    study proves that Freddie Mac's stock price traded in an

11:31:39  15    efficient market throughout the class period, did you?

16    **A.**  Well, that is my conclusion from all of the analysis I

17    did and from the entire battery, but that wasn't my

18    conclusion from that test alone.

19    **Q.**  And you were asked on direct examination by

11:31:54  20    Mr. Markovits regarding your approaches to testing market

21    efficiency in this case, and do you recall testifying that

22    you've done it the same way for 22 years and dozens of

23    cases?

24    Do you recall that?

11:32:06  25    **A.**  Well, his question was about do I apply the battery of

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

**FEINSTEIN - CROSS**

1  tests that are the Cammer and Krogman factors, and that's

2  what my answer "yes" was about.

3   **Q.**  Now, so you didn't mean to suggest that for 22 years

4  and dozens of cases, you have applied a single date event

11:32:27  5  study and a Z-test, correct?

6   **A.**  Correct.  The empirical demonstration takes various

7  forms depending on the facts and circumstances of the case,

8  depending on the facts and circumstances of the company and

9  the company's experience over the proposed class period.

11:32:44  10   **Q.**  Now, in connection with Dr. Hallman's event study, he

11  had to run a regression analysis, correct?

12   **A.**  That's right.

13   **Q.**  And you had to do that, too; is that right?

14   **A.**  Yes.

11:32:56  15   **Q.**  And Dr. Hallman used a control period or estimation

16  period to do that, right?

17   **A.**  Yes.

18   **Q.**  And you used a different period, correct?

19   **A.**  That's right.

11:33:03  20   **Q.**  Now, with respect to the Z-test, that's a test that you

21  sometimes referred to as an FDT Z-test, correct?

22   **A.**  Yes, and sometimes it's referred to as the collective

23  test.

24   **Q.**  Well, there are other collective tests that aren't

11:33:20  25  Z-tests, correct?

**FEINSTEIN - CROSS**                    74

1    **A.**   Correct.

2    **Q.**   You refer to the Z-test that you ran here as an

3    FDT Z-test because it was discussed in an article by authors

4    with the initials F, D and T, correct?

11:33:35   5    **A.**   Right.  It was Ferrillo, Dunbar and Tabak, and they get

6    credit for applying a Z-test as the statistical engine

7    underlying a collective test.

8    **Q.**   As of the date of your report in this case, you had

9    never used a Z-test to assess market efficiency outside of

11:33:54   10   litigation, correct?

11   **A.**   Correct.

12   **Q.**   I'd like to --

13            MR. FRANK:  Are they marked?

14       (Pause.)

11:34:20   15            MR. FRANK:  If I could approach, Your Honor.

16            THE COURT:  You may.

17            MR. FRANK:  Thank you.  Allow me to ...

18            Do we have one for the court?  Thank you.

19            Thank you, Your Honor.

11:34:31   20            THE COURT:  Thank you.  Do you have two for us?

21            MS. RENSHAW:  Yes, we do.

22            THE COURT:  Would you give the other to my law

23   clerk then?  Thank you.

24            MR. FRANK:  Your Honor, can I have two minutes

11:34:50   25   just to ensure that the exhibits are all straight away and

75

1    we don't have any technical difficulties as we proceed?

2              THE COURT:  You may.

3              MR. FRANK:  Thank you.

4         (Pause.)

11:35:36  5              MR. FRANK:  Thank you, Your Honor.

6    BY MR. FRANK:

7    **Q.**  Dr. Feinstein -- and I apologize, is it "Feinstein"?

8    **A.**  I go by "Feinstein."

9    **Q.**  Thank you.

11:35:45  10   **A.**  My brother says "Feinstein," so ...

11   **Q.**  When he's on the stand, I'll try to adjust.

12        Dr. Feinstein, let me turn your attention to Tab 3,

13   which has been marked as Exhibit D3 in the binder before

14   you.

11:36:06  15        Is this the FDT article on which you relied in running

16   your FDT Z-test?

17   **A.**  Yes.

18   **Q.**  Okay.  And that article was published in a law review,

19   right?

11:36:17  20   **A.**  Yes.

21   **Q.**  It wasn't published in an economics or statistical

22   journal, right?

23   **A.**  Correct.

24   **Q.**  It was not peer reviewed in the sense that is used in

11:36:24  25   your field, right?

FEINSTEIN - CROSS                                    76

1    A.   In that sense, but it's peer reviewed in other senses.

2    Q.   Well, it is not what you generally consider a

3    peer-reviewed economics journal, right?

4    A.   Correct.

11:36:35  5    Q.   Other than that article, you don't know of any other

6    published articles supporting the Z-test in the context of

7    testing market efficiency, correct?

8    A.   Well, we talked about this in the deposition.  There's

9    another article that speaks of the collective test for

11:37:05  10   market efficiency purposes, it's the Seyhun and Hartzmark

11   article, but they don't use the Z statistical test as the

12   underlying statistical driver.  But it is a collective test

13   of the same type.

14   Q.   Now, let me turn your attention to Tab 4, which has

11:37:20  15   been marked as Exhibit D4.  Are you there, Dr. Feinstein?

16   A.   The declaration?

17   Q.   Yes.

18   A.   Yes.

19   Q.   This is the declaration you submitted in this case,

11:37:32  20   correct?

21   A.   Correct.

22   Q.   And let me turn your attention to paragraph 22 of your

23   declaration.  Do you see paragraph 22?

24   A.   Okay.

11:37:41  25   Q.   And this is a -- if you look at the first sentence,

1       this is a sentence where you referenced the Z-test, correct?

2       **A.**   Yes.

3       **Q.**   Okay.   And then in footnote 4, you cite statistical

4       textbooks that support or describe the Z-test, correct?

11:38:07    5       **A.**   Correct.

6       **Q.**   And one of those statistical manuals is the "Applied

7       Statistics for Public Policy" by Brian P. Macfie and Philip

8       M. Nufrio, correct?

9       **A.**   Yes.

11:38:22    10      **Q.**   Now, let me turn your attention to Tab 5, which has

11      been marked as Exhibit D5.

12      **A.**   Okay.

13      **Q.**   And this is an excerpt from the "Applied Statistics for

14      Public Policy" textbook that you cite, correct?

11:38:36    15      **A.**   Correct.

16      **Q.**   And let me turn your attention to page 323.   There are

17      small page numbers in the top of the page.

18      **A.**   One moment, if I can get my reading glasses on.

19              THE COURT:   Sure.

11:39:25    20              THE WITNESS:   Okay.

21      BY MR. FRANK:

22      **Q.**   Do you see the first -- there's a larger in bold and

23      italics "Sample Size"?

24      **A.**   What page are you on?

11:39:33    25      **Q.**   Page 323.

**FEINSTEIN - CROSS**     78

1    **A.**  323.  "Hypotheses" -- "Hypothesis Test for Difference

2    Between Proportions"?

3    **Q.**  There's a section above that that's labeled "Sample

4    Size."

5    **A.**  Yes.

6    **Q.**  Do you see that?

7    **A.**  Yes.

8    **Q.**  And the first sentence says, "Similar to the single

9    population proportion test covered in Chapter 12, when

11:39:51  10   testing for differences between population proportions, we

11   cannot test hypotheses involving proportions from small

12   samples."

13       Do you see that?

14   **A.**  I see that.

11:40:01  15   **Q.**  And then do you see that it states at the -- in the

16   second paragraph, the last sentence, "The following three

17   conditions must be met for both samples to assure the sample

18   sizes are sufficiently large enough to conduct a hypothesis

19   test for differences."

11:40:18  20       Do you see that?

21   **A.**  These are the conditions that define whether it's a

22   large sample or a small sample.

23   **Q.**  Well, these are the conditions that must be met to

24   assure that sample sizes are sufficiently large to conduct a

11:40:30  25   test, correct?

FEINSTEIN - CROSS                     79

1    **A.**  No, I disagree with that.  These are the conditions

2    that would be met that tell you that there is assuredly no

3    problem, no potential problem with small sample size.  If

4    there is a potential problem with small sample size, we can

11:40:46  5    see whether it's an actual problem for small sample size by

6    running diagnostic tests.

7    **Q.**  This textbook doesn't say that, does it?

8    **A.**  These tests do not tell you that the --

9          THE REPORTER:  I'm sorry, one at a time, please.

11:40:57  10          THE WITNESS:  -- diagnostic tests are important.

11    BY MR. FRANK:

12    **Q.**  Nothing is stated in this textbook about these

13    diagnostic tests curing sample size problems, is there?

14    **A.**  I don't recall whether they talk about the diagnostic

11:41:09  15    test, but it's well grounded in the literature that when

16    there are small sample property considerations, you can

17    check to see if it's a problem with Bootstrapping and

18    alternative tests such as the Fisher exact test, which is

19    immune to a small sample problem and the Binomial test.

11:41:27  20    Those tests are weaker tests, but they're immune to small

21    sample properties.

22    **Q.**  Sir, in your initial report, you don't even cite your

23    diagnostic test, do you?

24    **A.**  Correct.

11:41:36  25    **Q.**  In fact, at your deposition, you weren't even certain

FEINSTEIN - CROSS                        80

1    of the results of those tests, correct?

2    **A.**  No, I was certain.  I was.  I told you that I was.  I

3    told you that diagnostic tests were run and that they proved

4    that there were no small sample issues at play.

11:41:52  5    **Q.**  In your report, you don't cite any authority for the

6    proposition that diagnostic tests can cure sample size

7    problems, correct?

8    **A.**  In the opening report; but in the rebuttal report, it's

9    there.

11:42:03  10    **Q.**  In the rebuttal report, you don't cite any literature

11    supporting the view that your diagnostic tests can cure

12    these sample size problems, do you?

13    **A.**  No, I do.  The rebuttal report, which has those three

14    tests, cites to the authority for those tests.

11:42:20  15    **Q.**  Now, but before we go on, let's just confirm --

16    **A.**  Yeah, but --

17    **Q.**  -- which of these --

18                THE COURT:  No, no, no.

19    BY MR. FRANK:

11:42:27  20    **Q.**  -- which of these conditions your Z-test fails.  It

21    fails the first condition, correct, there's not 30

22    observations, right?

23    **A.**  Correct.

24    **Q.**  Okay.  And just so that the court can understand, the

11:42:39  25    second and third conditions, the way we do the arithmetic

FEINSTEIN - CROSS                                    81

1    there, n1 refers to the number of observations, correct?

2    **A.**  I'll take your word for it.  I believe so.

3    **Q.**  You're not sure?

4    **A.**  Well, yes.

11:43:02  5    **Q.**  And p1 refers to the proportion of the observations,

6    right?

7    **A.**  Correct.

8    **Q.**  Okay.  And so n1 here is 9, correct?

9    **A.**  Right.

11:43:12  10   **Q.**  And p1 here is 4 over 9, correct?

11   **A.**  Right.

12   **Q.**  Okay.  And 9 times 4 over 9, as I remember from the way

13   I used to do the arithmetic growing up, you just cross out

14   the 9s, so 9 times 4 over 9 is 4, correct?

11:43:29  15   **A.**  Correct.

16   **Q.**  Okay.  And we can agree that the number 4 is smaller

17   than, not greater than 5, right?

18   **A.**  Correct.

19   **Q.**  And the next -- the next -- so we fail condition one

11:43:36  20   and we fail condition two, right?

21   **A.**  Yes, but --

22   **Q.**  And we fail condition three as well, don't we, Doctor?

23   **A.**  Correct, which is why the diagnostic tests, which are

24   immune to small sample property issues, are important here.

11:43:53  25   They confirm that the test nonetheless --

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1    **Q.**  Doctor, I confirm that Mr. Markovits will give you an

2    opportunity.

3            THE COURT:  Doctor, stop.  Let Mr. Frank control

4    the examination.

11:44:16  5    BY MR. FRANK:

6    **Q.**  Now, you believe it was acceptable for your Z-test to

7    violate the sample size conditions due to the results of the

8    three tests you conducted that you call diagnostic tests,

9    right?

11:44:24  10   **A.**  That's right.

11   **Q.**  And in his report, Dr. Bajaj opined that there's a

12   structural break in this market in February of 2000 also,

13   correct?

14   **A.**  That's what he says.

11:44:35  15   **Q.**  He opined that if your three diagnostic tests are

16   adjusted to take into account the structural break, then

17   those diagnostic tests yield statistically insignificant

18   results, right?

19   **A.**  Can you say that again, please?

11:44:49  20   **Q.**  Dr. Bajaj offered the opinion that if your three

21   diagnostic tests are adjusted to take into account the

22   February structural break, that those diagnostic tests yield

23   statistically insignificant results, right?

24   **A.**  I don't think it was uniformly across all samples.  In

11:45:09  25   the latter sample is where he said it would be

FEINSTEIN - CROSS                    83

1    insignificant.

2    Q.   You accused Dr. Bajaj of data snooping, right?

3    A.   Data snooping, data mining.

4    Q.   You use those terms interchangeably?

11:45:22  5    A.   Data mining is really what he did.

6    Q.   Do you suspect --

7    A.   Actually, yes, in this case, data snooping is one of

8    the tricks that is often used in data mining, so we can use

9    them interchangeably here.

11:45:33  10    Q.   And you suspect he engaged in data snooping, correct?

11    A.   I do.

12    Q.   And you asked your team to check to make sure that

13    Dr. Bajaj's computations were correct, right?

14    A.   Well, I checked to see what kind of computations one

11:45:46  15    could run to create the illusion of a statistical break in

16    February of 2007 when he previously said and provided

17    evidence that there was only one break, and that one break

18    was in August of 2007.

19    Q.   Well, let's just talk about math for a second, Doctor.

11:46:01  20    Because parties and experts can have all sorts of disputes.

21    And when we can reach agreement, the courts love it.  And I

22    just want to make sure there's no disagreement over the

23    arithmetic.  So let's talk about arithmetic for a moment.

24    Okay?

11:46:16  25         You asked your team to make sure that Dr. Bajaj's

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

**FEINSTEIN - CROSS**

1    arithmetic calculations were correct, right?

2    **A.**  Well, actually, he didn't provide his arithmetic

3    calculations.  What I asked my team to do was to examine to

4    see if there are any calculations that could be run to see

11:46:34  5    if there was a statistical break, a structural break where

6    he said there might be one.

7    **Q.**  Well, let's talk about the different sorts of

8    calculations that are appropriate here.  First, you had run

9    a Chow test to assess whether there was a structural break

11:46:50  10    in August, right?

11    **A.**  Right.  That's where he said --

12    **Q.**  And you had concluded --

13    **A.**  -- there was one and only one break.

14    **Q.**  Sir, you had concluded that you agreed, based on your

11:46:59  15    Chow test, that there was a break in August, right?

16    **A.**  Yes.

17    **Q.**  Okay.  Now, after you saw that he asserted there was a

18    break in February, you had your team run a Chow test to

19    check his computations in February, correct?

11:47:11  20    **A.**  Correct.

21    **Q.**  And your team, and you ultimately, agreed that the

22    computations were correct, the Chow test was consistent with

23    a structural break, right?

24    **A.**  I can't agree with that.  That's not how you run a Chow

11:47:24  25    test.  You don't do data snooping and look throughout the

1    class period to find where it might pass.

2    Q.  Did your team run a Chow test on the February date?

3    A.  The Chow -- the computations we ran to confirm the

4    arithmetic --

11:47:35  5    Q.  And you confirmed the arithmetic was right, correct,

6    sir?

7    A.  -- but the appropriate --

8          THE COURT:  Stop, sir.  Were you finished with

9    your answer?

11:47:42  10          THE WITNESS:  No, I wasn't.

11          THE COURT:  Let him finish.

12          THE WITNESS:  The arithmetic we checked, but the

13   appropriate testing to see if there was a legitimate break

14   there is not what he did, and we confirmed that it's -- the

11:47:54  15   confirming the arithmetic is not the same as confirming the

16   results of a Chow test and confirming the conclusion of a

17   structural break.

18          THE COURT:  So it sounds as if you at least

19   confirmed the arithmetic?

11:48:08  20          THE WITNESS:  Correct.  That's right.

21          THE COURT:  Thank you, Mr. Frank.

22          MR. FRANK:  Thank you.

23   BY MR. FRANK:

24   Q.  Now, in connection with event studies and Z-tests in

11:48:23  25   the past, you have tested earnings dates, correct?

FEINSTEIN - CROSS                    86

1    A.   Right, when appropriate.

2    Q.   And in the past you've used earning dates as the dates

3    that were tested for purposes of an FDT Z-test, correct?

4    A.   When appropriate, yes.

11:48:36    5    Q.   You included earnings dates in your report for

6    Petrobras, right?

7    A.   Correct.

8    Q.   You included earning dates in your test for KBR,

9    correct?

11:48:44    10    A.   I just want to say included, but among other dates.

11    And this test here also included earnings dates among other

12    dates.

13    Q.   You included earnings dates in your Z-test in the

14    Electrobras case, right?

11:48:59    15    A.   Yes.

16    Q.   Did you exclude any earnings dates in those cases?

17    A.   I don't recall that I did.

18    Q.   Identifying earnings dates and testing earnings dates

19    was the rule that Dr. Hallman used in selecting dates to

11:49:12    20    test in his event study, correct?

21    A.   Right.

22    Q.   You didn't use that rule here, right?

23    A.   And I explained why.

24    Q.   Now, but just to be clear, you didn't use that rule,

11:49:23    25    right?

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - CROSS                    87

1    **A.**  Correct.

2    **Q.**  And you didn't use Dr. Hallman's rule because you knew

3    that it was already established that at least four of the

4    six earnings announcement dates were such that they would

11:49:34  5    not be statistically significant and you wanted to use a

6    different approach that would provide new information,

7    correct?

8    **A.**  Well, the second half of your statement is correct.  I

9    wanted to use a different approach that would provide new

11:49:47  10   information.  But the reason for not testing, running the

11   test on earnings dates was because it was mixed news and, as

12   I said in the deposition, that territory had already been

13   well trodden.  It was mixed news.  Your own expert said it

14   was mixed news, so it wasn't appropriate.

11:50:02  15   **Q.**  Well, you referred to your deposition, and you remember

16   being deposed by me in my offices in Boston, right?

17   **A.**  Right.

18   **Q.**  Okay.  And I asked you the following question and you

19   gave the following answer:

11:50:11  20       "Question:  Why shouldn't an economist like yourself

21   use the same rule?"  Referring to the Hallman rule.

22       You answered:  "Because it was already established that

23   at least four of the six earnings announcement dates were

24   such that they would not be statistically significant.  They

11:50:27  25   already established that.  So a different rule would provide

**FEINSTEIN - CROSS**                    88

1    new information."

2        Do you recall that?

3    **A.**  But they should not be statistically significant

4    because of the mixed news.

11:50:36  5    **Q.**  That's not what you said in answer to my question, is

6    it?

7    **A.**  It was.

8            THE COURT:  Doctor, yes or no?

9            THE WITNESS:  I disagree with your

11:50:43  10   characterization of my prior answer.

11   BY MR. FRANK:

12   **Q.**  Well, let me --

13   **A.**  It's because of the mixed use --

14           THE COURT:  Stop.  It's enough.  He'll ask the

11:50:49  15   next question.

16   BY MR. FRANK:

17   **Q.**  Let me be clear, because I don't want you to feel like

18   I'm characterizing your answer.  I want to read it correctly

19   into the record, and tell me if you were -- you actually

11:50:57  20   recall testifying to this.

21       I asked:  "Why shouldn't an economist like yourself use

22   the same rule?"

23       You answered:  "Because it was already established that

24   at least four of the six earnings announcement dates were

11:51:11  25   such that they would not be statistically significant.  They

FEINSTEIN - CROSS                                        89

1    already established that.  So a different rule would provide

2    new information."

3         Was that your testimony --

4    A.  Yes, I said --

11:51:24   5    Q.  -- at my offices?

6    A.  -- that the events were such that they would not be

7    statistically significant.  That means the information was

8    such that it should not be statistically significant.  It

9    doesn't mean that I then --

11:51:36   10              THE COURT:  Sir, leave it there.

11              THE WITNESS:  Okay.

12              THE COURT:  Mr. Markovits can come back to it if

13    he'd like to.

14    BY MR. FRANK:

11:51:41   15    Q.  Now, you selected this Wall Street Journal/New York

16    Times rule, correct?

17    A.  I used the newspaper screen for the event dates.

18    Q.  And the screen was that an event had to be reported

19    upon by both The New York Times and The Wall Street Journal,

11:52:01   20    correct?

21    A.  In an article about Freddie Mac, right.

22    Q.  And you had never used that rule in a prior case,

23    correct?

24    A.  I have not, correct.

11:52:18   25    Q.  And you testified earlier that it's widely used, but

FEINSTEIN - CROSS                                    90

1    what you were actually referring to is the practice by some

2    economists to use newspapers to identify when an earnings

3    announcement or another corporate announcement is made

4    public; isn't that right?

11:52:37    5    **A.**   No.

6    **Q.**   This rule isn't widely used, Doctor.  You've never seen

7    this rule used before, have you?

8    **A.**   I presented in my rebuttal report examples of

9    published, peer-reviewed articles in the finance literature

11:52:49   10    where the New York Times and Wall Street Journal are the

11    sources for identifying events.  That's in the rebuttal

12    report.

13    **Q.**   But this is a particular approach that it has to be

14    those two articles combined, and you created it for this

11:53:03   15    case, didn't you?

16    **A.**   I can't claim credit for the methodology of using The

17    Wall Street Journal and The New York Times to identify when

18    there's important news about a company.  That's in the

19    literature and I put that in the rebuttal.

11:53:22   20        I can claim credit for taking this well-established

21    methodology that's in the literature and applying it to

22    testing for market efficiency.

23    **Q.**   Have you -- strike that.

24        Let me turn your attention to Exhibit 5 of what --

11:53:40   25        MR. FRANK:  For the court's convenience, I will

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - CROSS                91

1    tell you, it's been marked as both D1 and P1.  It is the

2    report of Dr. Feinstein.  So it's in our binder as the first

3    exhibit.

4            THE COURT:  Thank you.  And it's also on the

11:53:53  5    docket, so I --

6            MR. FRANK:  We apologize for the loss of paper.

7            THE WITNESS:  Where should I --

8    BY MR. FRANK:

9    Q.  Exhibit 5.  It's page 79 of your report, Doctor.

11:54:10  10   A.  I'm having trouble finding what you're --

11   Q.  I'm sorry, Tab 1 in your binder --

12   A.  Tab 1.

13   Q.  -- is your report.  And if you turn to page 79, you'll

14   see Exhibit 5 to your report.

11:54:26  15   A.  Yes.

16   Q.  Now, it's your understanding that market efficiency

17   relates to the impact of published information on stock

18   prices, correct?

19   A.  Say that one more time, please.

11:54:41  20   Q.  It's your understanding that market efficiency relates

21   to the impact of company-specific information on stock

22   prices?

23   A.  Yes; it relates to it, yes.  It's whether or not that

24   information is being ignored such that it's reflected,

11:55:00  25   correct.

**FEINSTEIN - CROSS**   92

1    **Q.**  And when information is published to the market,

2    economists like yourself test whether or not it's being

3    ignored or being incorporated into stock prices, right?

4    **A.**  Correct.

11:55:12   5    **Q.**  And the timing of publication matters, doesn't it?

6    **A.**  Of the information?

7    **Q.**  The timing of the publication of the information

8    matters, right?

9    **A.**  Yes.

11:55:20  10    **Q.**  For example, if you felt that there was a material news

11    event on January 5th and that event was published, it was

12    made known to the market on January 6th, you'd want to test

13    the stock price reaction on the 6th, correct?

14    **A.**  No, not necessarily.  I mean, if it happened on the

11:55:40  15    5th, let's say it was testimony on Capitol Hill and it

16    happened on the 5th, and The New York Times and The Wall

17    Street Journal report about it the next day, we know it's an

18    important event, but we also know that people learned about

19    it when the testimony occurred, because there are other news

11:55:55  20    sources, the news wires and so forth.

21    **Q.**  And as an economist, you would want to check to be sure

22    when people learned about the event, correct?

23    **A.**  Right.  Generally, you'd want to test the event when it

24    happened.

11:56:07  25    **Q.**  Now, let's take a look at your Exhibit 5.  The first

**FEINSTEIN - CROSS**                                    93

1    date, you selected an effective date of news February 27th,

2    correct?

3       A.   Correct.

4       Q.   And here it says Freddie Mac, under "The New York

11:56:23  5    Times," we see an article was published on the 28th,

6    correct?

7       A.   Right.  It was about an announcement -- there was an

8    announcement made by the company on February 27th, and The

9    New York Times and Wall Street Journal wrote articles about

11:56:39  10    that announcement and Freddie Mac on the 28th.

11            So they identified that it was an important news event,

12    a news event, but the event occurred on the 27th.

13       Q.   Now let's take the next one.  We see you chose April

14    18th.

11:56:53  15       A.   Correct.

16       Q.   We see that there is an article on the 17th and an

17    article on the 19th, right?

18       A.   Right.

19       Q.   Okay.  And what -- now, that article on the 17th, did

11:57:04  20    you test the 17th to see the effect of the article on the

21    17th?

22       A.   No.  The event was -- what the 17th article said was

23    that Freddie Mac was going to testify and propose a plan.

24    There was basically an announcement that tomorrow, there was

11:57:19  25    going to be an announcement by Freddie Mac about how they

1    will help with subprime borrowers.

2    **Q.**  And you didn't do anything --

3    **A.**  So the event -- the event was on the 18th.  It was

4    announced that the event was going to take place on the

11:57:34  5    earlier day, and then The New York Times publishing a

6    Bloomberg article reported on the event on the 19th.

7    **Q.**  And you didn't include April 17th, the date of the

8    announcement by The Wall Street Journal, in your study,

9    right?

11:57:49  10   **A.**  Well, the event hadn't happened yet.  The testimony

11   that the article is about hadn't happened yet; it happened

12   on the 18th.

13   **Q.**  Now, one of the events that you selected for your

14   FDT Z-test was November 20th, right?

11:58:02  15   **A.**  Yes.

16   **Q.**  Now, please turn to Tab 3.  Tab 3 is the FDT article on

17   which you rely.  This has been marked as Exhibit -- as

18   Defendant's Exhibit D3.

19   **A.**  Yes.

11:58:17  20   **Q.**  And please turn to page 119 of the FDT article.

21        Are you there, Doctor?

22   **A.**  I am now.

23   **Q.**  Now, in this article, FDT explains how to construct a

24   Z-test to test for market efficiency, correct?

11:58:43  25   **A.**  They -- I don't -- I don't agree with that

1    characterization.

2    **Q.** Well, if you look at --

3    **A.** Because --

4         THE COURT:  Let him continue his question.

11:59:00  5         THE WITNESS:  Okay.

6    BY MR. FRANK:

7    **Q.** If you look at the article and you look at the bottom

8    of page 119, you'll see there's a sentence that says, at the

9    beginning of that paragraph, "Because stock prices move all

11:59:11  10    the time, one must compare the movements in response to news

11    stories with a control group of prices."

12         Do you see that?

13    **A.** Yes.

14    **Q.** Okay.  And they say, "One way to do this would be to

11:59:21  15    look at a sample of days in a class period exclusive of

16    those days alleged to be corrective disclosures and perform

17    a news search."

18         Do you see that?

19    **A.** I do see that.

11:59:31  20    **Q.** And they drop a footnote and they say, "The examination

21    would exclude those days in which a corrective disclosure

22    was made because plaintiffs would normally choose a class

23    period where corrective disclosures coincide with large

24    negative price movements; including those days in the

11:59:46  25    analysis would bias the results."

**FEINSTEIN - CROSS**                    96

1      Do you see that?

2    **A.**  I see that they're saying this is one way to do it, and

3    they have an opinion about whether or not the corrective

4    disclosures should be included.  I disagree with that

12:00:00  5    portion.  There's not just one way to do the test --

6          THE COURT:  Doctor, you've said enough.  I think

7    that's responsive.

8          Mr. Frank?

9          MR. FRANK:  Thank you.

12:00:07  10   BY MR. FRANK:

11   **Q.**  Now, you disagree that a corrective disclosure day

12   should be excluded, correct, you'd disagree with them on

13   that point?

14   **A.**  In some cases it might be appropriate to do so, but in

12:00:19  15   this case, that was the most appropriate day to look at.

16   **Q.**  You disagree with FDT on this point, correct?

17   **A.**  Yes.

18   **Q.**  Okay.

19   **A.**  Actually, I don't think you've characterized the point

12:00:27  20   correctly.  But I disagree with --

21   **Q.**  Now, you agree with them --

22   **A.**  Like the way you're characterizing --

23   **Q.**  Doctor --

24   **A.**  -- that I disagree with.

12:00:35  25   **Q.**  -- you agree with them that plaintiffs normally choose

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - CROSS

1    a class period where corrective disclosures coincide with

2    large negative price movements; do you agree with that?

3    **A.**   No.   I've had cases where the final corrective

4    disclosure is not significant, it's not large, it's not

12:00:47  5    always the case.

6    **Q.**   Isn't it fair to say that in most securities cases,

7    plaintiffs propose a class period that ends on a day where

8    there's a large negative price movement?

9    **A.**   I've had numerous cases where the end of the class

12:01:00  10   period is not a significant movement.

11   **Q.**   So it's not fair to say what I just said?

12   **A.**   I can't agree with it here.   I mean, I could do a

13   count, but I don't have the count here.

14        What comes to mind is numerous times I've looked at

12:01:12  15   class periods where the last day, the last corrective

16   disclosure is not a statistically significant movement.

17   Sometimes because it's a follow-up event that was expected,

18   for example.   So it's often the -- I would say it's often

19   the case that the last day is not statistically significant.

12:01:30  20   **Q.**   Now, you understand that OPERS has characterized

21   November 20th in this case as a corrective disclosure day --

22   **A.**   Yes.

23   **Q.**   -- right?

24        And you included your November -- November 20 in your

12:01:44  25   Z-test anyway, right?

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

98

1    **A.**   Anyway?  For good reason, yes.

2    **Q.**   Now, you ultimately chose, through this rule, nine

3    dates to test in your Z-test, right?

4    **A.**   Nine dates that were identified by articles in <u>The New</u>

12:02:01   5    <u>York Times</u> and <u>Wall Street Journal</u> about Freddie Mac, about

6    Freddie Mac events.

7    **Q.**   Now, in your view, the ninth date, November 20th, that

8    was a material news day, right?

9    **A.**   Yes.

12:02:15   10   **Q.**   In your view, the other eight days were not material

11   news days, correct?

12   **A.**   I never said that.  They weren't selected on the basis

13   of being material news days.  They were selected on the

14   basis of <u>The New York Times</u> and <u>The Wall Street Journal</u>

12:02:29   15   saying that those were newsworthy events.

16   **Q.**   I just want your opinion so that the court and I

17   understand what you believe regarding those other eight

18   dates.

19       In your view, are those other eight dates material news

12:02:41   20   dates or not?

21   **A.**   I'm just afraid that what I answer here could be taken

22   out of context.

23       For this test, they were not selected for purposes --

24   on the basis of being material news days or not, they were

12:02:55   25   selected on the basis of being elevated news flow days, days

1    on which events occurred such that more information was

2    coming out about Freddie Mac and -- about Freddie Mac

3    according to The Wall Street Journal and The New York Times.

4    I --

12:03:09   5             THE COURT:  I think that's enough, sir.

6             THE WITNESS:  Okay.

7             THE COURT:  Unless Mr. Frank would like you to go

8    on.

9    BY MR. FRANK:

12:03:16   10   Q.  No.  I'm all set.  Thank you, Doctor.

11       Three of the nine news dates -- should we call them

12   news dates, is that fair, the nine dates, would you call

13   them news dates?

14   A.  News event dates.

12:03:27   15   Q.  News event dates.

16       Three of the nine news event dates that you selected

17   are earnings dates, correct?

18   A.  That's right.

19   Q.  You testified that you -- during your deposition that

12:03:38   20   one of the reasons you did not want to examine the six

21   Hallman earnings dates was because you did not want to tread

22   over the same grounds.

23       Do you recall that?

24   A.  Well, that's why I didn't use that rule for picking

12:03:51   25   events.

**FEINSTEIN - CROSS**

100

**Q.** Nevertheless, three of the dates you tested were three of the dates he tested, right?

**A.** Because the objective screen of relying on what the editors of the New York Times and The Wall Street Journal identified picked those dates.

**Q.** Well, the --

**A.** I wasn't going to ad hoc eliminate them after it passed the screen.  That would be --

**Q.** Regardless of the reason why, I just need an answer to my question just so the record is clear.

You tested three dates that were the same as three of the six dates that Dr. Hallman tested, correct?

**A.** I included in a test, a collective test, three dates that were also dates looked at by Dr. Hallman.

**Q.** Now, let me turn your attention to Tab Number 6.  Tab Number 6, which is marked as Exhibit D6, is a New York Times article dated January 6, 2007.

Do you see that?

**A.** I do.

**Q.** It says, "Today in Business Freddie Mac Forecasts Losses."

Do you see that?

**A.** Yes.

**Q.** Now, January 6 is not one of the news event dates that you tested, correct?

1    **A.**  What tab had the list?

2    **Q.**  I believe that is Exhibit 5 of your report, which was

3    Tab 1 in Exhibit 5.

4    **A.**  I've got it.

12:05:27  5    **Q.**  You're there?

6    **A.**  Correct.

7    **Q.**  Okay.  So the record is clear, you didn't test January

8    6th in your Z-test, right?

9    **A.**  I didn't include that, correct.

12:05:37  10    **Q.**  Okay.  And did you not include that because you didn't

11    find a <u>Wall Street Journal</u> article about this event?

12    **A.**  A <u>Wall Street Journal</u> article about Freddie Mac about

13    this event, correct.

14    **Q.**  Okay.  So you excluded events even if they were

12:05:52  15    discussed by both newspapers because you had a criteria that

16    Freddie -- that the article had to be about Freddie Mac?

17    **A.**  I didn't exclude.  I didn't like go through events and

18    then exclude them.  I included them based on a screen.  I

19    included them if there were articles about the company.

12:06:13  20    **Q.**  Well, let me turn your attention to Exhibit D7, which

21    is behind Tab 7.

22    **A.**  Yes.

23    **Q.**  And this is an article that appeared in <u>The Wall Street</u>

24    <u>Journal</u> on January 6th, and at the end of the article, it

12:06:27  25    says, "Freddie Mac estimated it swung to a $550 million

FEINSTEIN - CROSS                    102

1    third-quarter loss from a year-earlier profit of $880

2    million, citing a drop in interest rates."

3         Do you see that?

4    A.   I see it.

5    Q.   So this is an event that was reported by both The New

6    York Times and The Wall Street Journal, but because it

7    didn't meet your precise selection criteria, it didn't make

8    it into your Z-test; is that fair to say?

9    A.   It didn't pass the screen.

10   Q.   Now, let's take a look at Exhibit D8, which is behind

11   Tab 8.

12        Do you see this?

13   A.   Yes.

14   Q.   Exhibit D8 is a Wall Street Journal article from the

15   Asia edition, which happened to be among the documents you

16   produced to us.  This document at its top says, "Business

17   Brief:  Freddie Mac."  And it's dated January 8th and it

18   states, "Home-mortgage financier Freddie Mac estimated that

19   it swung to a third-quarter net loss of $550 million from

20   net income of $880 million a year earlier, citing a drop in

21   interest rates."

22        Do you see that?

23   A.   I see that this is the Asia edition.  I see that

24   this -- this did not come up on the screen.  This did not

25   come up on the screen, and I think the reason is you dug

FEINSTEIN - CROSS                               103

1    deep.  I give you credit for that.  But this is the Asia

2    edition and I don't think this was in The Wall Street

3    Journal sources that I looked at.

4    Q.  So information could be reported by The Wall Street

12:08:15   5    Journal and The New York Times --

6    A.  No.

7    Q.  -- and yet not make it past your screen, correct?

8    A.  No, I disagree with you.  I see what you've done here.

9    I don't -- The Wall Street Journal and New York Times

12:08:31  10    sources that I looked at did not have this event reported by

11    both.  You've got a different edition of The Wall Street

12    Journal that has the event, but it's not an edition or the

13    version of The Wall Street Journal that was in my screen.

14              THE COURT:  Dr. Feinstein, you were in the room.

12:08:46  15    The parties didn't ask that witnesses be sequestered or

16    separated when Mr. Frank stood and said, "Judge, you'll be

17    happy to know that we've agreed on the authenticity of the

18    exhibits.  So every exhibit we give will be something that

19    is what it purports to be."

12:09:04  20              I just repeat that to you.

21              THE WITNESS:  Okay.

22              THE COURT:  So you're not being tricked in my

23    presence.

24              Is that the case, Mr. Markovits?

12:09:10  25              MR. MARKOVITS:  I would respectfully disagree,

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - CROSS                                     104

1    Your Honor, in the sense that if his screen was for Wall

2    Street Journal articles --

3              THE COURT:  The point is not whether or not he

4    found it, the point is whether or not this is indeed an Asia

12:09:23    5    edition Wall Street Journal article.  Full stop.

6              MR. MARKOVITS:  Full stop.  On that, we have no

7    disagreement.

8              THE COURT:  Thank you.  Keep that in mind.  If you

9    have another question, put it to the witness or move on.

12:09:33    10              MR. FRANK:  Thank you, Your Honor.

11   BY MR. FRANK:

12   Q.  Let me turn your attention to Exhibit D9, which is

13   behind Tab 9.

14        Do you see Exhibit D9 is a Wall Street Journal article

12:09:46    15   dated October 4th, 2006 with the title "Freddie Mac's Net

16   Quadruples"?

17        Do you see that?

18   A.  Yes.

19   Q.  And you didn't include among the dates you tested in

12:10:15    20   your Z-test an October 3 or October 4 date, did you?

21   A.  For good reason, yes.

22   Q.  Now, if you'd turn to Tab 10, which has Defendant's

23   Exhibit D10, you'll see that there's a New York Times

24   article dated October 2nd.

12:10:41    25        Do you see that?

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

**FEINSTEIN - CROSS**                                      105

1     **A.**  I do.

2     **Q.**  And at the bottom of that article, it says, the first

3     page, "Freddie Mac Call -- Freddie Mac, one of the

4     government-sponsored mortgage finance companies, will hold a

12:10:55  5     conference call for investors to discuss its preliminary

6     results for the first half and second quarter of 2006 on

7     Tuesday."

8         Do you see that?

9     **A.**  I see it.

12:11:06  10    **Q.**  And so these two articles were also identifying an

11    event, a news event for Freddie Mac, correct?

12    **A.**  These are not articles about Freddie Mac.  It's a <u>New</u>

13    <u>York Times</u> article --

14    **Q.**  Well, the first one is about Freddie Mac, correct?

12:11:19  15    **A.**  Well, the way you characterized it, but let's be clear,

16    it's not an article about Freddie Mac.

17    **Q.**  Well, let's look at D9.  Can we agree that the bold

18    title of D9 under <u>The Wall Street Journal</u> is "Freddie Mac's

19    Net Quadruples"?

12:11:34  20    **A.**  Right, that satisfies the screen.

21    **Q.**  Okay.  But <u>The New York Times</u> article that appears on

22    the next page that reports that the earnings announcements

23    about to come out, that doesn't satisfy the screen because

24    it doesn't have a subject line that says "Freddie Mac"?

12:11:50  25    **A.**  Correct.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - CROSS                    106

1    **Q.**  Do you think that it matters to investors whether or

2    not the name of the company is in the subject of the

3    article?

4    **A.**  I think it bears on the importance of the news

12:12:05  5    according to the editors.  The importance of the event

6    according to the editors is what it bears on.

7    **Q.**  Well, isn't an efficient market supposed to incorporate

8    all publicly available information?

9    **A.**  Right.

12:12:17  10   **Q.**  So whether or not it's in the top of a New York Times

11   article or in the middle of a New York Times article or the

12   bottom of a New York Times article, investors who are

13   following a company will trade on that information and not

14   assist the market to become efficient, correct?

12:12:36  15   **A.**  You're conflating -- yes, I believe that's the

16   definition of an efficient market, where people do not

17   ignore information, do not ignore news, and not all material

18   news elicits a statistically significant stock price

19   reaction.

12:12:48  20       But to run an empirical test to observe whether the

21   market is behaving empirically -- behaving efficiently, you

22   need an objective screening and you shouldn't deviate from

23   the objective screening.

24   **Q.**  Let me turn your attention to Exhibit D11.  D11 is a

12:13:07  25   Wall Street Journal article that's entitled "Freddie Mac Net

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

**FEINSTEIN - CROSS**                          107

1    Rises Amid Mortgage Tumult," correct?

2    **A.**  Yes.

3    **Q.**  And it's fair to say that at this time, there was a

4    mortgage tumult in the market; is that right?

12:13:21  5    **A.**  Yes.

6    **Q.**  There was a financial crisis brewing during this

7    period, correct?

8    **A.**  Yes.

9    **Q.**  Now --

12:13:37  10   **A.**  Well, yes.

11   **Q.**  This is a March 24th, 2007 article from The Wall Street

12   Journal that reports that "Freddie Mac reported a 3.8

13   percent increase in net income for 2006," right?

14   **A.**  Yes.

12:13:52  15   **Q.**  "Freddie Mac" is in the title, right?

16   **A.**  Right.

17   **Q.**  It reports an earnings announcement, correct?

18   **A.**  Okay.

19   **Q.**  Now let me turn your attention to D12.  D12 is a New

12:14:14  20   York Times article dated March 19th, 2007, several days

21   earlier, which reports in the second paragraph "Housing

22   Watch -- The housing sector will continue to draw attention

23   this week.  Among reports to be released are housing starts

24   for February (Tuesday) and existing-home sales for

12:14:35  25   February."

FEINSTEIN - CROSS                                        108

Do you see that?

**A.**  Yes.

**Q.**  And it refers to "Earnings Reports" at the bottom of

the first page.  And in the last sentence, it says, "Other

12:14:47  earnings reports this week are Barnes & Noble, Borders,

ConAgra, General Mills, Nike, Palm and Williams-Sonoma

(Thursday) and Freddie Mac (Friday)," correct?

**A.**  I --

**Q.**  That's what it says, right, Doctor?

12:15:01  **A.**  In an article that The New York Times determined was

not an elevated importance news event to such an extent that

it warranted an article about it, and cite -- an article

about Freddie Mac.  This is an article about a lot of other

things and Freddie Mac is mentioned at the bottom.  This is

12:15:19  not an article about Freddie Mac.

**Q.**  So if "Freddie Mac" had appeared in the subject line,

it would have met your screening?

**A.**  What do you mean "subject line," subject line of a

search?

12:15:29  **Q.**  Well, if you look at the article, it has a title,

right, it says, "Fed Meeting -- The Federal Reserve Open

Market Committee will conduct a two-day ..."

Do you see that?

**A.**  I see that.

12:15:40  **Q.**  Actually, it may be that the title of this article is

FEINSTEIN - CROSS                                      109

1    "The Week Ahead."

2        Do you see that?

3    **A.**   Yes.

4    **Q.**   And if that had said "The Week Ahead in the Life of

12:15:49   5    Freddie Mac," it would have met your criteria; is that

6    right?

7    **A.**   Well, yeah.  The screen was to identify events that

8    were important events in the life of Freddie Mac according

9    to the editors, important enough to warrant an article.

12:16:04   10   **Q.**   Now, do you -- strike that.

11       Do you know how these dates would have changed your

12   results had they been tested?

13   **A.**   I didn't include them in the screen, so I do not know.

14   They didn't pass the screen, so they weren't included in the

12:16:27   15   collective test, news event dates.

16   **Q.**   Now, you're aware that Dr. Bajaj offered the opinion

17   that it was an error for you to fail to employ a continuity

18   correction in your Z-test calculations, correct?

19   **A.**   I know he said that, and he's wrong.

12:16:45   20   **Q.**   Well, after you reviewed his report, you concluded that

21   from your perspective, the failure to include a continuity

22   correction was an error, but only an immaterial error,

23   correct?

24   **A.**   No.

12:16:56   25   **Q.**   Well, you remember that you ended up testifying in my

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1    office on three days, didn't you?

2    **A.**  Right.

3    **Q.**  That's because you hadn't provided your diagnostic test

4    results on the first day and you had to come back a second

12:17:11    5    day, right?

6        Do you remember that?

7    **A.**  It's because you requested that I come back for more

8    deposition testimony.

9    **Q.**  Well, and then you submitted a rebuttal report and we

12:17:19    10    got a right to a third deposition date, correct?

11    **A.**  Correct.

12    **Q.**  And do you recall that I asked you the following

13    question and you answered it as follows?  I asked --

14        MR. MARKOVITS:  I'm sorry.  Could we have a

12:17:32    15    deposition transcript and page?

16        MR. FRANK:  Sure.  This is from the third day of

17    the deposition, page 639, lines 10 to 14.

18    BY MR. FRANK:

19    **Q.**  I asked --

12:17:42    20        THE COURT:  Give Mr. Markovits a chance to get

21    there.

22        MR. FRANK:  Sure.

23        THE COURT:  Mr. Markovits, when you reach, let us

24    know.

12:17:48    25        MR. MARKOVITS:  Yes, thank you.

1    BY MR. FRANK:

2    **Q.**  "Is it fair to say, then, that from your

3    perspective" --

4         THE COURT:  Mr. Markovits, was that an "I've

12:17:56  5    gotten there"?

6         MR. MARKOVITS:  Oh, I am sorry.  Yes, Your Honor.

7         THE COURT:  Okay.  Fair enough.  Mr. Frank, go

8    ahead.

9         MR. FRANK:  Thank you.

12:18:01  10        THE COURT:  Sure.

11   BY MR. FRANK:

12   **Q.**  I asked:  "Is it fair to say, then, that from your

13   perspective, the failure to include a continuity correction

14   is an immaterial error?"

12:18:10  15        And you answered:  "In the context of all the findings,

16   yes, absolutely."

17        Do you recall that?

18   **A.**  I guess I was focused on the word "immaterial," not on

19   the word "error."

12:18:23  20   **Q.**  Okay.  So you think that your testimony that you gave

21   was inaccurate?

22   **A.**  Yeah.  I heard "immaterial."  I was answering yes that

23   I believe it was immaterial.

24   **Q.**  You don't think it was an error?

12:18:32  25   **A.**  No, because the diagnostic tests tell you that it's not

**FEINSTEIN - CROSS**                                        112

1      a problem.

2          **Q.** Well, wasn't it required under the principles of

3      statistics to include a continuity correction?

4          **A.** If it's immaterial, it's not an error.

12:18:45  5    **Q.** And what happened in my office on that day, you just

6      misheard the question?

7          **A.** Yeah, I heard the word "immaterial" and I answered yes,

8      because I thought it was immaterial.

9          **Q.** Do you actually remember this?

12:18:57  10   **A.** Well, I'm thinking how I would have answered it now if

11     you asked it right now.  I can -- my understanding hasn't

12     changed.  My opinion hasn't changed.  It's immaterial, it's

13     not an error.

14         **Q.** Your statements under oath have changed, but your

12:19:11  15   understanding hasn't changed; is that right?

16              MR. MARKOVITS:  Objection, Your Honor.

17              THE COURT:  Sustained.

18              MR. FRANK:  I'll move on.  Thank you, Your Honor.

19     BY MR. FRANK:

12:19:17  20   **Q.** Now, Dr. Bajaj calculated the impact of a continuity

21     correction here, correct?

22         **A.** I can't agree to that, because he didn't use the

23     diagnostic test.  So he didn't calculate the impact of not

24     using a continuity correction.  If he had used the

12:19:36  25   diagnostic test, he would have seen that it was immaterial.

FEINSTEIN - CROSS                                    113

1    **Q.**  But by the way, returning to your prior testimony, do

2    you recall that you had an opportunity to review your

3    deposition transcript and correct it for any errors?

4    **A.**  Yes.

12:19:50    5    **Q.**  Okay.  And you, in fact, reviewed the transcript and

6    you corrected it for errors?

7    **A.**  Yes.  I was still at that time focused on the word

8    "immaterial."

9    **Q.**  Well, you corrected it for errors and you provided us

12:20:02    10    with this list of errors that you caught and fixed; is that

11    right?

12    **A.**  Yes.

13    **Q.**  And you didn't correct this statement you made about

14    the continuity correction, did you?

12:20:14    15    **A.**  Correct.

16    **Q.**  Now, with respect to calculations, you're aware that

17    Dr. Bajaj offered the opinion that you should have employed

18    a continuity correction, right?

19    **A.**  Yes, he said that.

12:20:31    20    **Q.**  And you're aware that he performed a calculation that

21    if a continuity correction had been made, here's what the

22    results would be, right, he did that?

23    **A.**  Could I see his report?  Because that's --

24    **Q.**  You don't recall him --

12:20:43    25    **A.**  I recall that he did that.  Okay, if you're going to

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

1   ask what the change is, then I'd like to see the report.

2   **Q.**  I didn't ask you what the change is.

3       But you recall that he did a calculation, right?

4   **A.**  Right.

12:20:52  5   **Q.**  And you had your team test all of his calculations,

6   right?

7   **A.**  Yes.

8   **Q.**  Yeah.  And you never concluded that that calculation

9   was incorrect, correct?

12:21:03  10      I understand, Doctor, that you disagree whether, now,

11  you disagree whether or not there should have been a

12  continuity correction, but I'm just asking you about the

13  math so we know whether there's a dispute about the math.

14  **A.**  The arithmetic, right, there is no dispute about the

12:21:18  15  arithmetic.

16  **Q.**  No dispute?  I'm sorry?

17  **A.**  Correct, there is no dispute about the arithmetic.

18  **Q.**  Okay.  Now, you are aware that Dr. Bajaj testified in

19  the Freddie Mac/Kreysar matter, correct?

12:21:41  20  **A.**  I'm aware, yes.

21  **Q.**  Okay.  And you're aware that he did a put-call parity

22  test on the common stock of Freddie Mac in that matter,

23  correct?

24  **A.**  Yes.

12:21:50  25  **Q.**  Okay.  And you're aware -- and let me turn your

FEINSTEIN - CROSS                    115

1    attention to Tab 2, which is your rebuttal report.  This has

2    been marked as Exhibit D2.  And if I turn your attention to

3    paragraph 33, you'll see that you wrote, "In a related case

4    concerning Freddie Mac Series Z Preferred Stock, Dr. Bajaj

12:22:22   5    performed these same empirical tests, which he omits from

6    his report in the current case."

7        And then you have three block quotes from Dr. Bajaj's

8    Freddie Mac/Kreysar report; is that correct?

9    **A.**   Yes.

12:22:35   10   **Q.**   And the third one says, quote, "There was a significant

11   increase in put-call parity violations for Freddie Mac's

12   common stock during specific periods of capital market

13   turmoil before and during the alleged class period," closed

14   quote.

12:22:51   15       Do you see that?

16   **A.**   I see it.

17   **Q.**   Okay.  And you were aware that Dr. Bajaj had written

18   that in his report, correct?

19   **A.**   Yes.

12:22:59   20   **Q.**   Okay.  And you didn't do anything to test whether or

21   not that was correct, right?

22   **A.**   It's immaterial.  A put-call parity test is not a test

23   of stock market efficiency.

24   **Q.**   You didn't do anything to test whether or not that

12:23:14   25   statement was accurate, correct?

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - CROSS                                    116

1    **A.**  I did not check that; yeah, I did not check that.

2    **Q.**  And you don't have any reason to believe that there

3    weren't a significant increase in put-call parity violations

4    for Freddie Mac's common stock during this time, right?

12:23:29  5    **A.**  Which time?

6    **Q.**  Well, you read the Freddie Mac/Kreysar report, right?

7    **A.**  Right.

8    **Q.**  Okay.  You knew there was a class period in that

9    report, correct?

12:23:36  10   **A.**  Yeah.  What was it?

11   **Q.**  You know the class period overlapped with this class

12   period, right?

13   **A.**  I'm sorry.  I thought that class period began when this

14   one ends.

12:23:46  15   **Q.**  I think you may be thinking of the Kuriakose case.

16   This is the Freddie Mac/Kreysar case.

17       In any event, you were aware that he had run this weak

18   form test in that case, correct?

19   **A.**  I can't agree with that statement.  This is not a weak

12:24:01  20   form test.

21   **Q.**  You don't believe that a put-call parity violation test

22   is a weak form test?

23   **A.**  Correct, I do not believe that.  Put-call parity is

24   about a relationship in options prices.  This is a test of

12:24:14  25   whether or not option prices conform to a no arbitrage

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - CROSS                    117

1    restriction in the options market.  It's not an appropriate

2    test for stock market efficiency.

3    **Q.**  For weak form stock market efficiency --

4    **A.**  Any, because the stock can be --

12:24:26  5    **Q.**  Just answer my question, please.

6        You don't believe it's an appropriate test for weak

7    form market efficiency; is that correct?

8    **A.**  Correct, I do not believe that.

9    **Q.**  And just so the dispute --

12:24:34  10   **A.**  I know it's not.  I know that's the case.

11   **Q.**  Just so the dispute between the experts can be clear, I

12   want to be clear on this point as well.  You don't believe

13   that these failures -- strike that.

14       You don't believe that any failures to satisfy a weak

12:24:49  15   form market efficiency test are relevant to whether the

16   market is semi-strong form efficient, right?

17   **A.**  I didn't say that.  That's not what I said just now.

18   Are you asking me about my testimony just now?

19   **Q.**  No.  I want to understand your opinion about the

12:25:03  20   relationship between weak form tests and semi-strong form

21   tests.

22       And just to be clear, let there be --

23   **A.**  I think you need to give --

24   **Q.**  -- let there be no mistake.

12:25:12  25           THE COURT:  Let him finish.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1              THE WITNESS:  You need to allow me to explain --

2              THE COURT:  Dr. Feinstein, let him finish.

3              THE WITNESS:  I thought you meant me.

4              THE COURT:  He'll decide what it is he wants to

12:25:21  5    have on the record.

6              THE WITNESS:  Okay.

7       BY MR. FRANK:

8        Q.  Now, is it your view that weak -- strike that.

9            Is it your view that semi-strong form efficient markets

12:25:33  10   must satisfy weak form efficient market tests?

11       A.  It depends which test.

12       Q.  Well, let's take, for example, the put-call parity

13      violations.  Is that a weak form test?

14       A.  No.

12:25:49  15     Q.  Okay.  Let's take all the tests you believe are weak

16      form tests.  Okay?  If a stock market -- if a market for a

17      security doesn't satisfy weak form tests, that you accept

18      are weak form tests, can that stock market satisfy or be a

19      semi-strong form efficient market?

12:26:15  20     A.  In order to answer the question, you need to further

21      elaborate on your hypothetical.  Are you talking about

22      perfect efficiency or imperfect efficiency?

23       Q.  Well, you are using a definition --

24       A.  Because if you give me some latitude, I can explain

12:26:30  25   these terms so that we can all understand them.

**FEINSTEIN - CROSS**                          119

1    **Q.**  You're using a definition of "market efficient" in this

2    case, right?

3    **A.**  Yes.

4    **Q.**  And your definition is semi-strong form efficiency in

12:26:39  5    the informational sense, right?

6    **A.**  Yes.

7    **Q.**  Okay.  I'm going to use --

8        In order to test whether or not a market is semi-strong

9    form efficient in an informational sense, is it appropriate

12:26:57  10    to test whether or not a market is weak form efficient?

11    **A.**  In order to answer the question, I need to define some

12    terms.  Could I have some latitude to do that?

13    **Q.**  Well, are these terms not generally accepted in your

14    field?

12:27:12  15    **A.**  Well, you've left out the dichotomy of perfect versus

16    imperfect.  You've talked about the taxonomy -- you've

17    addressed -- you're mixing up different definitions of

18    efficiency.

19            THE COURT:  So let me ask this:  As put to you,

12:27:24  20    you're unable to answer Mr. Frank's question?

21            THE WITNESS:  Because it's un- -- it's not well

22    specified.

23            THE COURT:  Is that a yes?

24            THE WITNESS:  Yes, that's correct.  It's not a

12:27:31  25    well-specified question.

**FEINSTEIN - CROSS**                                    120

1    BY MR. FRANK:

2    **Q.**  Is it your view that market efficiency, in the

3    semi-strong informational sense, involves stock price

4    reactions to all available information?

12:27:48  5      I'll put that another way because you seem to be

6    struggling a little bit with it.

7    **A.**  No, I was about to answer it.

8    **Q.**  Now I've muddied the record so I'll try to make it

9    clear.

12:27:59  10  **A.**  The answer is yes, but the degree of all is what

11   defines whether it's perfect or imperfect.

12   **Q.**  Well, let's take -- let's just deal with subsets of

13   information right now.  The semi-strong form of market

14   efficiency deals with the subset of information that is all

12:28:20  15  available information, correct?  Or I should say the set.

16   It's not a -- the set of information is all available

17   information, correct?

18   **A.**  Correct, all publicly available information is what

19   semi-strong addresses.

12:28:33  20  **Q.**  And weak form, weak form efficiency relates to stock

21   price reactions to a subset of all available public

22   information, correct?

23   **A.**  Correct.  That information being old prices and old

24   volume numbers, usually off of charts.

12:28:47  25  **Q.**  Okay.  So if a market isn't responsive to the subset,

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

**FEINSTEIN - CROSS**                    121

1    that is, historical market prices, it cannot be said to be

2    responsive to all information, correct?

3    **A.**  It can be generally semi-strong efficient still.  It

4    can respond to important news events about the company where

12:29:12   5    there may be some inefficiency with respect to old prices

6    still.

7         So it can be the kind of efficiency the court is

8    concerned about, meaning that it responds to corporate

9    information, company information, misrepresentations and

12:29:26  10    omissions, and yet there might be some tiny vibrations in

11    the price that are correlated across time.

12    **Q.**  And you believe --

13    **A.**  Which --

14    **Q.**  And you believe you're aware of case law that

12:29:37  15    distinguishes between all the information and just practiced

16    historical price information?

17    **A.**  Is that a legal question?  Can I answer that?  Can I

18    give a legal answer?

19    **Q.**  I think you were just referring --

12:29:53  20         THE COURT:  Hold on one moment.  I think in terms

21    of whether or not you can answer the question, if you're

22    capable, yes.

23         But you have one minute left.

24         MR. FRANK:  I will wrap up, Your Honor.

12:30:01  25         THE COURT:  Well, can you?

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1          MR. FRANK:  I can.  I can.

2          THE COURT:  Would you like to rephrase your

3     question?

4          MR. FRANK:  I would like to withdraw that terrible

12:30:07   5     question, Your Honor.

6          THE COURT:  Don't worry, Dr. Feinstein, it's

7     withdrawn.

8          MR. FRANK:  Let me ask -- one minute will be a

9     stretch, but I will see if I can do it.

12:30:16  10          THE COURT:  Well, if you need just a few more than

11     that, I'll give it to you, meaning like ten, but something

12     less than that is ideal.

13          MR. FRANK:  Reasonable.  I think I'll be all

14     right, Your Honor.  Thank you.

12:30:26  15     BY MR. FRANK:

16     **Q.**  You testified on direct about the low power of event

17     studies in the Brav and Heaton article, correct?

18     **A.**  Yes.

19     **Q.**  Is it fair to say that the concerns raised in the Brav

12:30:36  20     and Heaton article about low power of event studies do not

21     apply in this case because the tests you conducted in this

22     case do not exhibit that issue?

23     **A.**  It's not fair to say that their concerns don't apply in

24     this case, because your expert is trying to apply weak tests

12:30:52  25     to show a lack of efficiency or a lack of responsiveness to

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

1    the -- the lack of price impact.  It's directly relevant to

2    this case because your expert is using weak tests and

3    drawing improper conclusions from them.

4    **Q.**  Let me turn your attention -- well, strike that.

12:31:14  5       You recall the first day of your testimony in my

6    office?

7    **A.**  Yes.

8    **Q.**  And for Mr. Markovits' benefit, I will refer to your

9    transcript on page 53 at line 20, where I asked you the

12:31:31  10   exact same question that I just asked you, and I said to

11   you:  "And is it fair to say that the concerns raised in

12   that article don't apply to this case, because in your view,

13   the event study and the Z-test you conducted here don't

14   exhibit those -- that issue?"

12:31:54  15      And you said:  "Yes, that's right."

16      And I asked you:  "The low power issue is not an issue

17   for the Freddie Mac case; fair to say?"

18      And you said:  "That's what I concluded from the data

19   and the statistical results.  Can we take a short break?"

12:32:13  20      Do you recall that?

21   **A.**  On the first day, before your expert submitted the

22   rebuttal.  My statement just now that it's relevant is

23   because in the rebuttal report, which occurred after that

24   testimony, your expert applied a lot of weak tests to draw

12:32:27  25   improper conclusions.

**FEINSTEIN - CROSS**

1      So it was a correct answer on the day you asked it.

2  The answer today, now that your expert, Dr. Bajaj, is using

3  weak tests to draw improper conclusions, is that the Brav

4  and Heaton criticism is highly relevant.

12:32:42  5  **Q.**  Dr. Bajaj doesn't use a weak test to draw improper

6  conclusions in this case, you just made that up, didn't you?

7  **A.**  No, I can tell you exactly where he does it.  He looks

8  at -- he draws -- he does a Z-test --

9  **Q.**  He didn't do any weak power tests in this case.

12:32:59  10  **A.**  He used weak tests, failed to find a relationship

11  between the misrepresentations and omissions, and based on

12  that failure to find a relationship, he said the

13  misrepresentations and omissions had no price impact.

14  **Q.**  That is --

12:33:11  15  **A.**  That's exactly the Brav and Heaton criticism.

16          THE COURT:  Stop.  Stop, Dr. Feinstein.  The

17  question is, please identify --

18  BY MR. FRANK:

19  **Q.**  Please identify all of the weak form tests that

12:33:18  20  Dr. Bajaj performed in this case.

21  **A.**  I didn't say weak form tests, and the Brav and Heaton

22  isn't about weak form efficiency tests, it's about tests

23  that have low power to give a determinant result, a

24  determinant conclusion.  The word weak here is about the

12:33:33  25  power of the test, not about the efficiency.

FEINSTEIN - REDIRECT                               125

1          MR. FRANK:  Your Honor, I'll pass the witness.

2    Thank you.

3          THE COURT:  All right.  Mr. Markovits, you've

4    reserved how much time for redirect examination?

12:33:49  5          MR. FRANK:  He has 19 minutes and we will afford

6    him 20, Your Honor.

7          MR. MARKOVITS:  We thought we had 20, but

8    hopefully I'll be less.

9          THE COURT:  Of course, Dr. Feinstein is all warmed

12:34:00  10   up for you.

11         REDIRECT EXAMINATION OF STEVEN P. FEINSTEIN, Ph.D.

12   BY MR. MARKOVITS:

13   Q.  Dr. Feinstein, let's start with that last point.  What

14   were you talking about when you were indicating that

12:34:13  15   Dr. Bajaj's rebuttal report had a test that had low power?

16   A.  He has a price impact test or a purported price impact

17   test where he looks at 27 alleged -- 27 of the allegations,

18   looks at the dates when the misrepresentations and omissions

19   occurred and runs a collective test to see if those -- to

12:34:38  20   see if there was a difference in the price dynamics on those

21   days versus the price dynamics on typical days.

22   Q.  Why does it have low power?

23   A.  Well, because the misrepresentations and omissions were

24   confirmatory misrepresentations and omissions that would not

12:34:52  25   be expected to move the stock market.  So the test is

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

FEINSTEIN - REDIRECT                    126

1    destined to fail.  It has low power to find a difference

2    between the two samples.

3    **Q.**  Now, a different subject.  Mr. Frank in his examination

4    handed you a booklet and went over a number of exhibits that

12:35:09  5    had articles from The Wall Street Journal, from The New York

6    Times that had some news about Freddie Mac, correct?

7    **A.**  Correct.  Or some mention.

8    **Q.**  Some mention.  Was that argument, that you should have

9    included other days that had both Wall Street Journal and

12:35:27  10    New York Times news about Freddie Mac, made in any report of

11    any expert on behalf of Freddie Mac or in any brief that you

12    read or document that you read that was produced by Freddie

13    Mac prior to today?

14    **A.**  Not that I recall.

12:35:41  15    **Q.**  Can you tell me, how often was there news about Freddie

16    Mac during the class period?

17    **A.**  2,900 articles written over that 16-month period that

18    mentioned Freddie Mac, that just mentioned it, in the way

19    that, for example, Mr. Frank pointed out.

12:36:02  20    **Q.**  So if you were going to run a Z-test or a collective

21    test, could you use as a screen as news days, news days

22    where there's some mention of Freddie Mac?

23    **A.**  No, because then pretty much every day would be

24    included in the news day samples.

12:36:18  25        What you need for this test is a distinction between

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - REDIRECT                    127

1    elevated news and typical days.  Elevated is the key.

2    **Q.**  A different point.

3            MR. MARKOVITS:  Slide 8, please.

4    BY MR. MARKOVITS:

12:36:35  5    **Q.**  Mr. Frank was talking to you about --

6            MR. LEWIS:  It will come up in a second.

7    BY MR. MARKOVITS:

8    **Q.**  I'm sorry, is it up on your screen?

9    **A.**  Not yet.  Now it is.

12:36:44  10   **Q.**  Mr. Frank was talking to you I believe about the Z-test

11   and your inclusion of the last date in the Z-test, which he

12   was showing you the article, the FDT article, if you will,

13   which suggests that you shouldn't include the last date,

14   correct, that's what --

12:37:04  15   **A.**  I recall, yes.

16   **Q.**  All right.  On slide 8, and in your original report,

17   did you calculate the collective event test excluding that

18   last date?

19   **A.**  Yes.  And even without November 20th, 2007, the

12:37:20  20   collective event test indicates market efficiency, it

21   indicates that the incidence rate of significance was

22   greater in the news event date group than in the typical

23   group, even excluding November 20th, 2007.

24   **Q.**  And that's the column to the right there.  And if you

12:37:38  25   take, for example, the Binomial test, it says, "0.54

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - REDIRECT                                    128

1    percent," correct?

2    **A.**   Right.  That number would have to be over 5 percent in

3    order for there to be a problem indicated.  It's well below

4    5 percent.  It proves a significant difference in the price

12:37:55  5  dynamics on news days than on non-news days.

6    **Q.**   I want to address a different point now.

7             MR. MARKOVITS:  Your Honor, may I approach the

8    witness?

9             THE COURT:  You may.

12:38:17  10  BY MR. MARKOVITS:

11   **Q.**   Mr. Feinstein, I show you what's been marked as P3.

12            MR. MARKOVITS:  (Handing.)

13            THE COURT:  Thank you, sir.

14   BY MR. MARKOVITS:

12:38:28  15  **Q.**   Could you identify that for the record, please?

16   **A.**   This appears to be an expert report written by Mr. --

17   by Dr. Bajaj, dated October 11, 2016.  It appears to be his

18   market efficiency report in the Allergan case.

19   **Q.**   Have you reviewed this report prior to today?

12:38:50  20  **A.**   Yes.

21   **Q.**   Mr. Frank was asking you about your event study, and in

22   your event study, your use of one day and it being the last

23   day of the period.

24            Do you recall that testimony?

12:39:05  25  **A.**   Yes.

FEINSTEIN - REDIRECT                    129

1    **Q.**  And in this case, in the Allergan case, was Dr. Bajaj

2    providing testimony for the plaintiff or the defendant?

3    **A.**  I believe it was for the plaintiff in this case, in

4    Allergan.

12:39:19  5    **Q.**  And in Allergan, his conclusion on behalf of the

6    plaintiff was that it was an efficient market?

7    **A.**  Correct.

8    **Q.**  Did he run an event study?

9    **A.**  Yes.

12:39:30  10   **Q.**  Did he also look at the Cammer and Krogman factors?

11   **A.**  He did.

12   **Q.**  I'd like you to turn to paragraph 14.

13   **A.**  Okay.

14            MR. MARKOVITS:  Kevin, could you put up Opinion 1,

15   please?

16   BY MR. MARKOVITS:

17   **Q.**  At paragraph 14, under "Opinion 1," Dr. Bajaj says,

18   "The Cammer and Unger factors indicate that Allergan stock

19   traded in an efficient market."

12:40:15  20           Do you see that?

21   **A.**  I do.

22   **Q.**  And the Unger factors are the same as the Krogman

23   factors; is that correct?

24   **A.**  Yes.

12:40:20  25   **Q.**  And from your prior review of Plaintiff's Exhibit 3,

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

1    was Dr. Bajaj's analysis of Cammer factors 1 through 4 and

2    the three Unger factors in Allergan consistent with your

3    analysis and methodology applied in this case?

4    **A.**  Yes.

12:40:40  5    **Q.**  Did Dr. Bajaj do an event study in Allergan?

6    **A.**  He did.

7             MR. MARKOVITS:  Slide 22, please, Kevin.

8    BY MR. MARKOVITS:

9    **Q.**  Could you turn to page 25, paragraph 53, please?  Are

12:41:00  10   you there?

11   **A.**  Page 25 --

12             MR. FRANK:  Your Honor, I object to this line of

13   questioning as beyond the scope of cross.

14             THE COURT:  Thank you.  Your objection is noted

12:41:08  15   and overruled.

16             THE WITNESS:  Paragraph 53?

17   BY MR. MARKOVITS:

18   **Q.**  I'm sorry, paragraph 53, which is actually --

19   **A.**  Page 24.

12:41:16  20   **Q.**  Yeah.

21             THE COURT:  Mr. Frank, if you'd like a few moments

22   to recross on this topic, I'll allow it.  All right?

23             MR. FRANK:  Thank you, Your Honor.

24             THE COURT:  So we're back to page 25, paragraph

12:41:29  25   53?

FEINSTEIN - REDIRECT                    131

1        MR. MARKOVITS:  I'm sorry, it's page 24, paragraph

2   53.

3   BY MR. MARKOVITS:

4   Q.  And is this where his description of his event study

5   starts?

6   A.  Yes.

7   Q.  And if you'd look at the slide, or you could look at

8   the report, how many events did Dr. Bajaj use in his event

9   study?

10  A.  Looking at the slide, it's three events.

11  Q.  One of those dates, April 22nd, was outside of the

12  class period?

13  A.  That's right, it was after the end of the class period.

14  Q.  So he used two events during the class period?

15  A.  Right.

16  Q.  Was one of those events the last day of the class

17  period?

18  A.  Correct.

19  Q.  We talked a little bit about the structural break,

20  Mr. Frank raised some questions about that.

21        MR. MARKOVITS:  Could you put up slide 42, please?

22        Jason, do you have this deposition testimony?

23  It's from Dr. Bajaj, January 11, 2013 --

24        MR. FRANK:  Page 176?

25        MR. MARKOVITS:  Yes.

12:41:39  5
12:41:49  10
12:42:00  15
12:42:23  20
12:42:47  25

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - REDIRECT                    132

1          MR. FRANK:  We do somewhere, thank you.

2          THE COURT:  Would you like until he has found it,

3    sir?

4          MR. FRANK:  He has it on the screen, so I'm okay,

12:42:55  5    Your Honor.  Thank you.

6    BY MR. MARKOVITS:

7    Q.  Can you explain to the court what your concern or issue

8    is with this new, newly discovered structural break of

9    Dr. Bajaj in his opposition report or rebuttal report?

12:43:09  10   A.  Well, his conclusion that it even exists is derived

11   from a violation of the scientific process.  He previously

12   examined the data and he previously opined and concluded, as

13   it says here on the slide, "volatility over this control

14   period was almost identical to volatility through August 8,

12:43:29  15   2007, during the class period."

16        So he previously said there was one structural break

17   that occurred on August 8, 2007.  He needed to say that when

18   he was attacking Dr. Hallman before me.  Now that he wants

19   to attack my work, he suddenly conveniently discovered that

12:43:49  20   there's another structural break.

21        The problem with that is it's data mining.  Data mining

22   is where -- it's essentially a bag of tricks that one can

23   apply in order to create the illusion that there's a

24   relationship or a break where one doesn't actually exist.

12:44:03  25        You look at various places where the -- you run the

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - REDIRECT                    133

1    test over and over and over again until you find one that,

2    according to random volatility, based on random volatility,

3    gives you the result you want.  And that appears to be what

4    he did.  And I have a number of reasons for believing that's

12:44:21    5    what he did.  The main -- one of the main ones being that he

6    said he previously examined the data, saw no break and now

7    he says there is one.

8              MR. MARKOVITS:  Slide 43, please.

9    BY MR. MARKOVITS:

12:44:33    10   **Q.**  Professor Feinstein, can you tell the court, what does

11   slide 43 reflect?  And I'll say it's from the docket, 214.

12   **A.**  Well, back when Dr. Bajaj wanted to argue that there

13   was only one structural break and that that one structural

14   break occurred in August of 2007, this is the exhibit he

12:44:54    15   presented.  This is from his report that he wrote in

16   response to Dr. Hallman.

17        And you can see he's got the early period and the

18   middle period, the way he drew this graph, it makes it looks

19   like it's the same.  He makes it look like it's the same.

12:45:10    20   And that when things become unusual, it's on August 1st,

21   2007.

22        So when it was convenient for him to say there was only

23   one structural break in August of 2007, this is the graph he

24   presented.  And this graph suggests that that's the case.

12:45:27    25             MR. MARKOVITS:  Could you put on slide 44, please?

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

**FEINSTEIN - REDIRECT**                                     134

1    BY MR. MARKOVITS:

2     **Q.**  And what is slide 44?

3     **A.**  So this was in his rebuttal report when he wished to

4    argue that there was another structural break now, and that

12:45:39   5    that structural break not only occurred in February of '07,

6    but occurred exactly on one of the event dates in February

7    of '07.

8        And it's a blowup where he's honing in to try to create

9    the illusion that there's something going on in February.

12:45:56   10   But, no.

11           MR. MARKOVITS:  Could you turn to slide 45,

12   please?

13   BY MR. MARKOVITS:

14    **Q.**  And what is slide 45?

12:46:05   15    **A.**  This is instructive.  This slide is very important, and

16   this slide -- I mean, it pains me enough to say it, but this

17   slide is the true indication of data mining.  If you compare

18   the two previous slides to what's going on in this slide,

19   you can see the tricks that are applied.

12:46:20   20       Your Honor, please note that in the lower left-hand

21   corner of this slide, where the Y axis begins, in the

22   previous two slides, it began in the natural place, zero

23   percent.  Now he's got the slide -- the axis beginning at 5

24   percent.  I mean, most graphs like this would start at zero.

12:46:40   25   He starts his at 5.  The previous graph went from 0 percent

FEINSTEIN - REDIRECT                                    135

1   to 50 percent.  This one goes from 5 to 30 percent.

2       So he's manipulated the axis and he's controlled the

3   amount of data that he's presenting on the slide to create

4   the visual illusion that something is going on in February

12:46:57   5   of 2007.  But it's a visual illusion.  This is one of the

6   tricks of essentially lying with statistics.

7       But there's something even more instructive.  Two other

8   very instructive things on this slide.  He does give the

9   numbers for the VIX level on average, he draws a green line

12:47:15   10   in the unshaded part and he gives a level at 11.5 percent,

11   and he gives the level in the shaded part at 15.19 percent.

12       So whereas the illusion, he tries to make the case that

13   there's a dramatic increase in volatility here, the numbers

14   that are presented here show that it's a much more modest

12:47:32   15   difference.

16       But what's very important also is that there are

17   statistical tests that one can run to see if there's a

18   meaningful difference between 11.5 and 15.19, the kind of

19   test that I ran when I was doing the collective test.

12:47:48   20       He has no test here.  There's no indication whether

21   this 11.5 versus 15.19 is a statistically significant,

22   important change in volatility that would require

23   recognition of a structural break.

24       And the one more thing I want to point out on this

12:48:04   25   slide, which was just -- I saw for the first time last

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1    night.

2         What we're talking about here, Dr. Bajaj's case

3    essentially is to argue that I have not proved market

4    efficiency, that perhaps the market is not efficient, that

12:48:19  5    there's no evidence or no indication that the market is

6    paying attention to information such that information is in

7    the stock price.

8         But if you look at point 2 in the description on this

9    slide, I'll read it, it says, "In my report, I noted," and

12:48:36  10   we'll skip 1, let's go to 2.  Point 2 says, "there were a

11   series of market-wide events resulting in a sharp

12   market-wide stock decline."

13        Well, that's market efficiency.  There he's making

14   plaintiff's case.  Here he's saying that events caused a

12:48:55  15   stock price reaction.  That's what we're arguing about

16   today, and here he inadvertently conceded that, in fact, the

17   market is efficient.

18   **Q.**  I want to just touch briefly on another issue, which is

19   this issue about why you didn't use earnings reports.  Could

12:49:16  20   you explain again to the court, because I think there was

21   some issue of your ability to explain answers, can you

22   explain why you didn't use the six earning dates?

23   **A.**  The proper design for a traditional event study is to

24   select events on the basis of was there -- was the news of

12:49:41  25   such import and did it arrive at such an unconfounded way

FEINSTEIN - REDIRECT                                    137

that based on valuation principles, the valuation principles

of finance, you would expect the price to move a significant

amount.

One of the things that would make news or a mix of news

not cause a significant reaction is if the news was mixed.

If on the same day there was some positive news that came

out about the company, and also some negative news, so that

the combined news is mixed and the stock price stays the

same or just moves a little bit in one direction or the

other, but not a significant amount.

The event -- the traditional event selection

methodology says to avoid those days, do not include the

days that have mixed news, because when you observe a

non-significant reaction, there's no way to know what caused

the non-significant reaction.

There's no way to know whether it was a weakness in the

power of the test because of the nature of the news, or a

weakness in the market because of potential inefficiency.

There's no way to separate those out.

Based on all these Cammer and Krogman factors, it's

pretty clear that using those dates would produce a non- --

would indicate a non-significant reaction, but that would

not be weakness in the marketplace, that would not be

weakness and efficiency in the marketplace, it would be

weakness in the test because of the mixed character of the

1    news on those days.

2         In other words, it just can't be informative.  Mixed

3    news days cannot be informative about market efficiency in

4    the traditional event study.

12:51:13  5    **Q.**  And in this case, has Dr. Bajaj argued that those

6    earnings dates were mixed news dates?

7    **A.**  He's the one who said so, right.  And I confirmed that,

8    I looked.

9              MR. MARKOVITS:  Can you --

12:51:24  10             THE WITNESS:  The Credit Suisse reports, for

11   example, they say that.

12             MR. MARKOVITS:  -- slide --

13   BY MR. MARKOVITS:

14   **Q.**  If you'd look at line [sic] 9, it's an excerpt from

12:51:35  15   Dr. Bajaj's prior report relating to Dr. Hallman --

16             THE COURT:  Which slide is this, sir?

17             MR. MARKOVITS:  Excuse me?

18             THE COURT:  Which slide are you showing now?

19             MR. MARKOVITS:  Is it not up?

12:51:50  20             THE COURT:  Right, it is up, but for the record,

21   you and your witness were speaking at the same time.  And

22   now it's also line 9?

23             MR. MARKOVITS:  No, I'm sorry, it's slide 9.

24             THE COURT:  Okay.

12:52:02  25             MR. MARKOVITS:  It's an excerpt from the report.

**FEINSTEIN - REDIRECT**                                     139

1    It's Docket Number 214-5, dash 5.

2            THE COURT:  Thank you.

3    BY MR. MARKOVITS:

4    **Q.**  Professor Feinstein, is this part of the basis for your

12:52:17  5    statement that Dr. Bajaj found mixed news?

6    **A.**  Yes.  He says that the -- he points out that

7    Dr. Hallman said the news was generally negative on two of

8    the days, positive on one of the days and in line on a

9    fourth day.  And then Dr. Bajaj says -- Dr. Hallman said

12:52:38  10    that.

11        Dr. Bajaj says that if you look at those same days,

12    you'll find inconsistent analyst commentary that indicates

13    the opposite.

14        So that there's a mix of news.  There's positive news

12:52:49  15    on the positive day that Dr. Hallman identified, but

16    Dr. Bajaj identifies negative news on that same day.  And

17    the days where Dr. Hallman found negative news, Dr. Bajaj

18    produced positive news.  So it was clearly mixed news.

19        And that's the explanation for why those were

12:53:06  20    non-significant price movements.  In an efficient market,

21    the efficient response to mixed news would be a

22    non-significant stock price reaction.

23    **Q.**  Dr. Feinstein, your opinion is that this market was

24    semi-strong form efficient?

12:53:20  25    **A.**  Yes.

FEINSTEIN - RECROSS                    140

1    **Q.**  If there was some lesser form of efficiency that was

2    legally required, general efficiency, by definition, would

3    that standard be met as well?

4         MR. FRANK:  Objection.

12:53:31   5         THE WITNESS:  Yes.

6         THE COURT:  Overruled.

7         MR. MARKOVITS:  I have nothing further at this

8    time.  I pass the witness for any recross on the Allergan

9    report.

12:53:40   10         THE COURT:  On that, certainly, but if there is --

11    you didn't use all of that ten minutes I was willing to give

12    you, so I think you may have seven of it left --

13         MR. FRANK:  Thank you.

14         THE COURT:  -- for recross-examination.

12:53:53   15         MR. FRANK:  Thank you, Your Honor.  The parties

16    agree that the most important factor of the day is the lunch

17    break, and so we will be very quick with our recross.

18         RECROSS-EXAMINATION OF STEVEN P. FEINSTEIN, Ph.D.

19    BY MR. FRANK:

12:54:04   20    **Q.**  Dr. Feinstein, you testified about the Allergan report

21    in your redirect, correct?

22    **A.**  Yes.

23    **Q.**  And this is a case in which Dr. Bajaj represented --

24    was retained by a plaintiff, correct?

12:54:14   25    **A.**  Correct.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

FEINSTEIN - RECROSS/FURTHER REDIRECT          141

1    **Q.**  And there were 39 trading days in that class period,

2    correct?

3    **A.**  I recall that's about right.

4    **Q.**  And he tested three of them in a traditional event

12:54:24  5    study, correct?

6    **A.**  Yes.

7    **Q.**  And in this case, there are 330 trading days, and you

8    tested only one date in a traditional event study, right?

9    **A.**  In the traditional, and nine in the collective test.

12:54:38  10          MR. FRANK:  I have no further questions, Your

11   Honor.

12          THE COURT:  Thank you.

13          Mr. Markovits, anything?

14          MR. MARKOVITS:  Just one more question, Your

12:54:47  15   Honor.

16          THE COURT:  All right, then.

17          MR. MARKOVITS:  Last question, just following up.

18    FURTHER REDIRECT EXAMINATION OF STEVEN P. FEINSTEIN, Ph.D.

19   BY MR. MARKOVITS:

12:54:52  20   **Q.**  Mr. Frank asked you if he tested three event days

21   during the class period.  It was actually two event days

22   during the class period and one after the class period,

23   right?

24   **A.**  That's right.

12:55:04  25          MR. MARKOVITS:  Nothing further, Your Honor.

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

142

1          THE COURT:  Certainly.

2          That sounds consistent with earlier testimony,

3     Mr. Frank.  Anything else?

4          MR. FRANK:  No, Your Honor.  Thank you.

12:55:09  5          THE COURT:  All right, then.  Then you're right,

6     we're now to the lunch break scheduled.  You've allotted

7     yourselves 45 minutes.  I think that's appropriate.  We can

8     agree, then, it's nearly five till noon, so we should resume

9     at -- I'll give you until a quarter -- pardon me, five till

12:55:29  10    one -- a quarter till two, an extra five minutes.

11          MR. FRANK:  Thank you, Your Honor.

12          MR. MARKOVITS:  Thank you, Your Honor.

13          THE COURT:  All right, then.  Please refresh

14     yourselves and we'll continue with the examination of

12:55:38  15    Dr. Bajaj.

16          MR. FRANK:  Thank you, Your Honor.

17          MR. MARKOVITS:  Thank you.

18          THE COURT:  We're adjourned for lunch.

19          LAW CLERK:  All rise.

20          THE COURT:  Don't mind me, I'm just going to tidy

21     my papers.  Feel free to move around.

22          Thank you, Doctor.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  Let me ask you, Counselors, is there

12:55:59  25    any reason Dr. Feinstein is required to stay in the

143

1    courthouse?

2          MR. FRANK:  I don't believe so, Your Honor.  I

3    think some things may depend.

4          MR. MARKOVITS:  He may stay if --

12:56:11  5          THE COURT:  He's certainly welcome to stay now.

6    Sometimes witnesses like to leave when they've completed

7    their testimony.  So I'd like you to tell us, because you

8    know while he's here, he remains under oath.  So you can't

9    speak with him privately about something like, "We're going

12:56:26  10    to call you again," without any further conversation.  But

11    if he is told now by me, that's probably best.  If you know.

12          MR. MARKOVITS:  We're not going to call him for

13    any further testimony.

14          MR. FRANK:  We're not going to call him either,

12:56:42  15    Your Honor.

16          THE COURT:  What's your intention, are you

17    staying?

18          THE WITNESS:  I was planning to stay.  I'd like to

19    stay.

12:56:47  20          THE COURT:  You're welcome to stay.

21          THE WITNESS:  Thank you.

22          THE COURT:  It sounds as if no one intends to call

23    you, but you'll be here if that changes.  Enjoy your lunch

24    break as well.

12:56:55  25          THE WITNESS:  Thank you.

144

1          THE COURT:  Certainly.

2      (Luncheon recess had at 12:57 p.m.)

145

AFTERNOON SESSION

- - -

(Proceedings resumed at 1:54 p.m.)

THE COURT:  It appears we had a time discrepancy.
Mr. Markovits, you took more like 90 minutes than 60 in
your -- pardon me, more like 75 than 60 in your examination.
So when your colleagues on the other side said you had about
19 minutes left, by my count, you really didn't.

MR. MARKOVITS:  We kept track as well.

MR. LEWIS:  We started at 10:34 a.m. to 11:14 a.m.

MR. MARKOVITS:  They had me right at 60, correct?

MR. LEWIS:  Yes.

THE COURT:  Sixty including your redirect
examinations?

MR. MARKOVITS:  Yes.

THE COURT:  My math is different, but if you're
happy with that, because what I want to make sure of is that
things are as fair as they should be and is in accord with
the schedule as they should be, because for the next
examination, there is 60 minutes, which was what was
allotted for Dr. Feinstein as well.  And I want to make sure
that you're comfortable with that and don't believe that you
will be slighted if I hold you to that 60 minutes.

Mr. Frank, or the one of you questioning your
expert?

146

1          MR. FRANK:  I think we can accomplish what we'd

2    like to accomplish in 60.  At the end, if I beg some leeway,

3    I may do that, but hopefully I can avoid prostrating myself

4    in that way.

13:56:04  5          THE COURT:  All right, then.  And it sounds like

6    the plaintiff's team has no problem with that because they

7    believe they didn't go over and hope you won't either.

8          MR. FRANK:  Very good.

9          THE COURT:  All right.  Sir, will you please call

13:56:15 10    your witness?

11          MR. FRANK:  Thank you, Your Honor.  We would call

12    Dr. Mukesh Bajaj to the stand.

13          THE COURT:  Dr. Bajaj, thank you for starting.

14    Approach to be sworn.

13:56:28 15          MUKESH BAJAJ, Ph.D., of lawful age, a witness

16    called by the Defendants, being first duly sworn, was

17    examined and testified as follows:

18          THE COURT:  Thank you, Doctor.  You saw where

19    Dr. Feinstein was.  If you'll position yourself there.

13:56:42 20          Have you already poured a cup of water?

21          Mr. CSO, please.

22          THE WITNESS:  Thank you, Your Honor.

23          THE COURT:  Thank you, sir.  Make yourself

24    comfortable there.  Now that our sound system is working --

13:57:01 25    right, Mary?

BAJAJ - DIRECT                    147

1          THE REPORTER:  Yes.

2          THE COURT:  -- the microphone will help.

3          Whenever you're ready, Mr. Frank.

4          MR. FRANK:  Thank you, Your Honor.

13:57:11  5          DIRECT EXAMINATION OF MUKESH BAJAJ, Ph.D.

6   BY MR. FRANK:

7   **Q.**  Dr. Bajaj, could you please describe your educational

8   history?

9   **A.**  Yes, happy to.  And good afternoon.

13:57:16  10  **Q.**  Good afternoon.

11         THE WITNESS:  And good afternoon, Your Honor.

12         THE COURT:  Good afternoon.

13         THE WITNESS:  So I got my Ph.D. in financial

14  economics from University of California at Berkeley.  Prior

13:57:25  15  to that I got an MBA from University of Texas at Austin.

16  And before that I had an undergraduate degree in chemical

17  engineering from Indian Institute of Technology in Delhi,

18  India.

19  BY MR. FRANK:

13:57:38  20  **Q.**  Would you please describe for the court your employment

21  history?

22  **A.**  I'm currently Managing Director in charge of securities

23  practice at Navigant Consulting, which is an international

24  economic consulting firm.

13:57:52  25         Prior to that joining Navigant, I was in similar firms

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

**BAJAJ - DIRECT**                                          148

1    that provided similar line of work, internationally as well.

2    I've been consulting for the last, let's say, 25-odd years.

3        And I also taught for seven years at University of

4    Southern California.  And since 1997, I've taught a total of

13:58:23  5    around 25 years at University of California Berkeley, 18-odd

6    years after 1997.

7    **Q.**  Have you published articles on the subject of financial

8    economics and event studies?

9    **A.**  Yes.  I've published more than 25 articles, including

13:58:43  10    some in the top finance journals, such as Journal of Finance

11    and Journal of Financial Economics.  A significant

12    proportion of my work has been on event studies and market

13    efficiency issues.

14    **Q.**  Have you peer-reviewed articles on the subject of

13:58:59  15    financial economics and event studies?

16    **A.**  Yes.

17    **Q.**  Have you taught graduate level courses on financial

18    economics and event studies?

19    **A.**  Yes.

13:59:05  20    **Q.**  Have you conducted event studies for purposes other

21    than litigation?

22    **A.**  Yes.

23    **Q.**  Would you mind describing those?

24    **A.**  Yes.  So, for example, I've used event studies to

13:59:16  25    consult with several Silicon Valley firms in connection with

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - DIRECT                                              149

1    the proposed acquisitions, and I have used event study in

2    order to advise clients in nonlitigation context as well.

3    **Q.**  Have you taught and published on the subject of market

4    efficiency?

13:59:32  5    **A.**  Yes.

6    **Q.**  What were you initially tasked to do in this case?

7    **A.**  I was asked to examine expert report by Dr. Hallman

8    that plaintiffs in this case had filed, I believe in 2012.

9    **Q.**  And did you reach any conclusions?

13:59:51  10   **A.**  Yes.

11   **Q.**  Can you summarize those conclusions?

12   **A.**  Yes.  I concluded that Dr. Hallman had not established

13   that Freddie Mac stock traded in an informationally

14   efficient market over the class period.

14:00:07  15   **Q.**  At some time did your assignment in this case change?

16   **A.**  Yes.

17   **Q.**  Why was that?

18   **A.**  Because plaintiffs put forth a new expert and a new

19   expert report by Dr. Feinstein.

14:00:20  20   **Q.**  What were you then tasked to do?

21   **A.**  I was asked to examine Dr. Feinstein's report and to

22   comment on his analyses and conclusions.

23            MR. FRANK:  Your Honor, may I approach?

24            THE COURT:  You may.

14:00:35  25            MR. FRANK:  Does the court have a copy of this?

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - DIRECT                           150

1              MS. RENSHAW:  No.

2              MS. HAYS:  May I approach?

3              THE COURT:  Thank you.  Please do.

4              MS. HAYS:  Here, Your Honor.

14:00:48  5              THE COURT:  Thank you.

6       BY MR. FRANK:

7        Q.  Dr. Feinstein -- excuse me.  It was a long morning.

8            Dr. Bajaj, you have before you a series of exhibits

9       that have been premarked.  Let me turn your attention to

14:01:12  10      Exhibit 3 -- I mean Tab 3.  This is Exhibit D14, Tab 3 in

11      the binder, Exhibit D14.

12            Do you have that before you?

13       A.  Yes.

14       Q.  Okay.  If you'd turn to paragraph 266.  Before we do

14:01:29  15      that, you recognize D14, correct?

16       A.  Yes.

17       Q.  What is D14?

18       A.  It is the amended complaint that's at issue in these

19      proceedings.

14:01:42  20      Q.  And you reviewed this amended complaint in connection

21      with your work?

22       A.  Yes.

23       Q.  If you'd turn --

24              THE COURT:  If you don't mind, it's the third

14:01:47  25      amended.

BAJAJ - DIRECT                                           151

1        MR. FRANK:  It is the third amended complaint, to

2   be accurate.  Thank you, Your Honor.

3        THE COURT:  Certainly.

4   BY MR. FRANK:

5   Q.  Now, if you'd turn to paragraph 266, which appears on

6   page 117 of the third amended complaint, you'll see the

7   second sentence states, "At all times relevant to this

8   Complaint, the market for Freddie Mac common stock was an

9   efficient market for the following reasons, among others:"

10       Do you see that?

11  A.  Yes.

12  Q.  And then in paragraph 267 on the next page, they state,

13  "As a result of the foregoing, the market for Freddie Mac

14  common stock promptly digested current information regarding

15  Freddie Mac from all publicly available sources and

16  reflected such information in the market prices for Freddie

17  Mac common stock at all relevant times."

18       Do you see that?

19  A.  Yes.

20  Q.  Is this consistent with how financial economists view

21  market efficiency?

22  A.  Yes.

23  Q.  Are there different levels of market efficiency?

24  A.  Yes.  There are three different levels of market

25  efficiency.

BAJAJ - DIRECT                                    152

1    Q.   What are the three different levels?

2    A.   So the weakest level of market efficiency, Your Honor,

3    is called the weak form of market efficiency.  And the way I

4    explain it to my classes is you shouldn't expect to see if

5    there's a publicly traded company that's in the business of

6    selling ice creams, that when the business is good in the

7    summer months, the price is high, and vice versa during

8    winter months.  Because that would create an opportunity for

9    investors to buy the stock in the winter months and sell it

10   in the summer months.

11        So in a market that is weak form efficient, you don't

12   find such exploitable price trends.  So charting a

13   historical stock price is not going to help you with regards

14   to meeting or exceeding your investment objective.  Market

15   at least incorporates historical price information correctly

16   in the stock price.  That's called the weak form of market

17   efficiency.

18   Q.   I believe you said there were three forms.  What are

19   the two other forms?

20   A.   So the second form of market efficiency, which builds

21   on the weak form of market efficiency, is the semi-strong

22   form of market efficiency.  Which states, just like the

23   passage in the complaint that counsel read, is that the

24   market not only takes into account historical prices in

25   setting today's prices, the market takes into account all

BAJAJ - DIRECT

153

1    relevant public information.  So if somebody were to come to

2    you and say, "Well, demand for oil is going up in emerging

3    market, so it's a good time to buy all stocks," that's not

4    going to help you outperform the market because that

5    information is already reflected in prices of oil stocks

6    today.  That's called the semi-strong form of market

7    efficiency.

8        And then finally, there's a theoretical artifact which

9    nobody believes describes the real world, but that's called

10   the strong form of market efficiency, which says both public

11   and private information is reflected in stock prices.  And

12   that's just a theoretical standard or threshold.

13   **Q.**   What is informational efficiency?

14   **A.**   So over the last 40, 50 years since Professor Fama

15   described market efficiency the way I have described it,

16   there has been a lot of research and some disagreement

17   amongst economists as to whether market prices are always

18   correct relative to their economic fundamentals.  Are there

19   instances when there could be price bubbles, for example, or

20   when prices are artificially depressed.

21       So one thing financial economists generally agree on,

22   while they may disagree on how often the market is correctly

23   fundamentally priced, is that if you have an efficient

24   market, it will reflect new information that is material

25   into stock prices promptly and in the correct direction.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - DIRECT                                              154

1    And that form of market efficiency, which is a

2    semi-strong form of market efficiency, but not in the

3    fundamental sense, is called informational efficiency, and

4    that is the standard that I understand to be applicable in

14:06:17  5    cases like this.

6    Q.   So is there semi-strong form informational efficiency

7    and semi-strong form fundamental efficiency?

8    A.   Yes.

9    Q.   Okay.  And what standard did you apply in this case?

14:06:29  10   A.   I applied the semi-strong form informational

11   efficiency, because that's the only type of efficiency that

12   is tested through event studies.  Event studies are, in

13   fact, the definition of semi-strong form of efficient market

14   hypothesis in the informational sense.

14:06:49  15   Q.   What makes markets efficient?

16   A.   So, generally, investors try to take into account

17   public information when they invest in stocks.  And once in

18   a while, when professional investors that follow certain

19   stocks professionally feel that the market is not correctly

14:07:17  20   priced in the fundamental sense, then they try to trade, or

21   even in an informational sense, then they try to trade to

22   take advantage of those mispricings.  They are called

23   arbitrageurs.

24        And it's the activity of arbitrageurs that is

14:07:37  25   considered the lifeblood of an efficient market.  That's

BAJAJ - DIRECT                                          155

1    what keeps market efficient.

2    Q.  Are large companies that are well followed always

3    efficient?

4    A.  Well, if you are considering investing in stock of a

14:07:56  5    large, well-followed company, it would be reasonable for you

6    to expect that the stock is reasonably efficiently priced in

7    the marketplace, and it's not well advised for you to

8    actively trade the stock in order to do better.

9         But that doesn't mean all large companies are always

14:08:18  10    correctly traded.  And, in fact, one of the Nobel Laureates

11    in economics, Professor Joseph Stiglitz, along with

12    Professor Grossman, wrote one of the seminal papers in

13    economics, which is called the Paradox of -- or the

14    "Impossibility of Informationally Efficient Market."

14:08:40  15         And there is the paradoxical question.  If the market

16    is always assumed by everybody to be efficient, then nobody

17    would have incentives to look for any information, look for

18    any mispricing, in which case, of course, the market will

19    cease to be efficient.

14:08:57  20         And the way they explain markets work in the real world

21    is that there is always some degree of inefficiency in

22    stocks that creates enough room for arbitrageurs to be doing

23    the kind of arbitrage trading that on average keeps markets

24    reasonably efficient.

14:09:18  25         So, in fact, while it's a good presumption that from

BAJAJ - DIRECT

156

the point of view of an investor, large, well-followed

stocks are efficiently priced, so don't bet your house

trying to speculate on a stock, that does not mean that

large company stocks are always, in fact, trading in an

efficient market.

**Q.**  How, if at all, does the notion of predictable

direction relate to semi-strong form market efficiency in

the informational sense?

**A.**  So may I explain this concept through an example?

**Q.**  Sure.

**A.**  So let's say a drug company is testing for efficacy of

a drug.  And they have a group of people in a blind study

who are being given the drug, and then a control group of

people who are being given placebo.

Now, you would only say this drug is efficacious if

people on the drug have better health outcomes than people

who are taking placebo.  You won't say that the drug is

efficacious just because it has more extreme outcomes.  If

the drug is killing every patient, you wouldn't call the

drug effective.

It's the same thing for market efficiency.  Whether or

not stocks promptly price material new information is a

backward statement, unless you consider the directionality

of that information; namely, when there is good news, stock

prices go up, when there is bad news, stock prices go down.

BAJAJ - DIRECT                                           157

1    And that is the definition of informational efficiency in

2    the semi-strong form sense.

3    **Q.**  How do economists test for market efficiency?

4    **A.**  Well, as I was describing, a market that is weak form

14:11:22   5    efficient -- that is not weak form efficient cannot, as a

6    matter of logic, be semi-strong form efficient.

7         So if one is doing an affirmative analysis, it's good

8    practice to first test whether the market is at least weak

9    form efficient.  Because unless it's weak form efficient, as

14:11:48  10    a matter of logic, it cannot be semi-strong form efficient.

11         And the main test, in fact, the only valid test of

12    semi-strong form of efficiency that follows from the

13    definition is an event study.

14         So if market is not weak form efficient, then the cause

14:12:10  15    and effect that you test in an event study; namely, date and

16    unexpected corporate announcement or information release

17    promptly get reflected in stock prices, could not be

18    properly tested because there would be no time consistency

19    between the price change you will be measuring and

14:12:30  20    associating with stock return.

21         So it is through event studies that economists,

22    financial economists test semi-strong form of informational

23    market efficiency.

24    **Q.**  Before we talk more about event studies, can you

14:12:46  25    explain to me the relationship of weak form market

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - DIRECT                        158

1  efficiency to semi-strong form market efficiency using your

2  ice cream truck example?

3  **A.**  So let's say booming sales in the summer months are not

4  taken into account by the market until fall.  So now you're

14:13:15  5  observing an event that happened in the fall to do an event

6  study.  Then the price change that you're observing and

7  seeing whether it corresponds to what was caused by that

8  event that you're studying wouldn't be the contemporaneous

9  price change, it will be the historical price change.

14:13:32  10       So, therefore, you cannot meaningfully test for

11  semi-strong form efficiency unless and until prices are at

12  least weak form efficient.  There is no disagreement in

13  economics literature on this issue, none whatsoever.

14  **Q.**  Now, assuming the market is weak form efficient, what

14:13:53  15  are tests of strong form efficiency?

16  **A.**  Event study is the only test of semi-strong form of

17  market efficiency that I can think of.

18  **Q.**  Now, you heard Dr. Feinstein testify about the Cammer

19  and Krogman factors, right?

14:14:12  20  **A.**  Yes.

21  **Q.**  How do the Cammer and Krogman factors relate to market

22  efficiency?

23  **A.**  So, again, if you'll indulge me, I'd like to use an

24  example.

14:14:22  25  **Q.**  Sure.

BAJAJ - DIRECT                    159

**A.**  So if a patient goes to an emergency room, Your Honor,

complaining of chest pain, the first thing that will happen

is somebody will take the pulse of the patient, the blood

pressure, check the vital signs.  Of course, if you don't

have a pulse, you are in trouble.  But just because you have

pulse doesn't mean you are healthy if you are complaining of

chest pain.

So these Cammer/Krogman factors, such as, is it a large

company stock, is it followed by many analysts, there's a

huge overlap in these factors.  They are basically

concentric circles or almost concentric circles of more or

less the same thing, actively traded, large stock that's

followed actively.

It is a good indicator of market efficiency.  It should

be looked at.  But it is not a proof of market efficiency,

especially in a context like this.

In a context like this, if the court were to say, "The

market for Freddie Mac stock was efficient throughout the

class period," what that means is every material disclosure

defect that is alleged is presumed to have distorted the

stock price during the class period.

You can't test for that presumption just by

Cammer/Krogman factors, just like you can't say vital signs

of a patient are indicative that the patient has no disease,

period.

BAJAJ - DIRECT                    160

1        You have to vigorously test for market efficiency

2   during the class period in order to be able to show that the

3   market was, in fact, semi-strong form efficient throughout

4   the class period, which is the passage in the complaint that

14:16:18  5   you read to me.

6   **Q.**  Is there any support for your view that the

7   Cammer/Krogman structural factors cannot reliably detect

8   lack of market efficiency?

9   **A.**   Yes.  I cited to several authorities in my paper.

14:16:31  10        First of all, Cammer/Krogman factors have never been

11   the way economists test for market efficiency.  There have

12   been a handful of economic studies, because in this

13   litigation context, people talk about Cammer/Krogman

14   factors, where these studies examined are these factors, in

14:16:52  15   fact, able to prove, in fact, that the market is efficient.

16        And the research shows Cammer/Krogman factors can't

17   even distinguish between stocks that are not even weak form

18   efficient, which is a lower standard than what is needed

19   here.

14:17:08  20        In fact, I have shown in my research, which I've also

21   cited in my report, showing cases where published research

22   in academic journals that was peer reviewed demonstrated

23   that a stock was trading in an inefficient market.

24   Cammer/Krogman factors would pass even for that.  It's like

14:17:30  25   pulse.  It's almost always there.  Every healthy -- every

**BAJAJ – DIRECT**

161

1    healthy person has a pulse, but that doesn't mean everybody

2    with pulse is healthy.  That's not a test of market

3    efficiency.

4    **Q.**  If I refer to some of the Cammer and Krogman factors as

14:17:46  5    structural factors, will you know what I'm referring to?

6    **A.**  Yes.  And that's a good term, by the way, because these

7    factors have to do with what the structure of the market is

8    like, is that generally conducive to market becoming

9    informationally efficient, it's not a test of whether the

14:18:02  10    market is, in fact, efficient.

11    **Q.**  Now, in this case, what test, if any, did Dr. Feinstein

12    conduct in an effort to examine Cammer factor 5, the

13    empirical factor?

14    **A.**  He claimed that he did an event study and a so-called

14:18:22  15    Z-test.

16    **Q.**  And what exactly is an event study?

17    **A.**  Well, an event study is a statistical examination of

18    whether unexpected material news results in contemporaneous

19    significant change in stock price.

14:18:49  20    **Q.**  Now, how do economists typically use event studies to

21    test market efficiency in securities litigation?

22    **A.**  Well, when the analysis is done correctly, they start

23    with a hypothesis of which events are material; therefore,

24    are anticipated to result in an effect that can be

14:19:14  25    associated with this cause.

BAJAJ - DIRECT                                    162

1      So identifying expected material events comes first.

2  Then you'll study the stock price change through statistical

3  analysis.  You identify how much of this change is due to

4  market-wide factors.  What remains is a measure of how the

14:19:35  5  stock price changed in reaction to the event you are

6  testing, and if that reaction is with sufficient degree of

7  certitude, i.e., statistically significant, then you

8  conclude this event did result in significant impact on the

9  stock price the way it was hypothesized to.

14:20:00  10  Q.  How many events do economists need to test to assess

11  market efficiency?

12  A.  Well, they should test all material events throughout

13  the class period, because the presumption plaintiffs are

14  seeking here is that the market was efficient throughout the

14:20:16  15  class period.

16  Q.  Let me pose a hypothetical:  Suppose you test multiple

17  news dates throughout a class period.  What percentage of

18  those days need to show statistically significant abnormal

19  returns for an economist to conclude that a market is

14:20:31  20  efficient?

21  A.  Such an experiment has no implication for market

22  efficiency whatsoever.  Again, with your permission, I can

23  elaborate through an example.

24  Q.  Sure.

14:20:42  25  A.  So let's say you gave me ten event dates and you said,

BAJAJ - DIRECT                    163

1    "On five of these event dates, the market price reacted

2    significantly."  You'd say, "Is 50 percent more than what

3    may happen on non-news dates," which give or take is usually

4    around 5 percent by the construction of the statistical

5    tests underlying event studies.

6        I would tell you there is no implication.  If, of the

7    ten days that you tested, five were material and five were

8    not, and you observed statistically significant price impact

9    on five non-material dates, and no impact on any of the

10   material dates, obviously this evidence says that the market

11   was not efficient.

12       If, on the other hand, the five days when the market

13   reacted were, in fact, the material news dates and others

14   were not, then this evidence would support market

15   efficiency.

16       And if two of the five days were material dates and

17   three were not, then I'd say the evidence doesn't support

18   that the market was efficient throughout the period in those

19   ten days.

20   Q.  What is the role of statistical significance in event

21   studies?

22   A.  It is absolutely necessary for event study to be

23   scientifically valid.

24   Q.  How do you determine what is material information for

25   purposes of an event study?

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - DIRECT                                    164

1    **A.**  You do that based on economic theory and reasoning

2    before you look at the stock price reaction.

3    **Q.**  What is "peek-ahead bias"?

4    **A.**  Well, peek-ahead bias is when you look at the results

14:22:19  5    before you conduct your analysis.  Because then the analysis

6    has no scientific validity whatsoever.  You already knew the

7    results.  All you did is you fit on the result a cause and

8    said, "This is cause and effect."  It isn't.

9    **Q.**  Allow me to pose another hypothetical:  Assume a

14:22:39  10   company operates one factory.  Assume the factory burns to

11   the ground on the last day of a proposed class period and

12   the stock price moves in a statistically significant manner.

13        Can you conclude from that event that the market for

14   that stock was efficient over the course of the class

14:22:54  15   period?

16   **A.**  Well, if the class period is 330 days long, just as in

17   this case, then you can see nothing by observing that on a

18   day the stock went down due to catastrophic event, it means

19   anything about whether the stock was correctly priced on 329

14:23:16  20   days before that event or not.

21        MR. FRANK:  Your Honor, at this time I'd like to

22   put on the screen if possible our first demonstrative

23   exhibit, D1.  Thank you.

24   BY MR. FRANK:

14:23:34  25   **Q.**  Dr. Bajaj, can you see Demonstrative Exhibit D1?

BAJAJ - DIRECT                    165

1    **A.**   Yes, I can, Counsel.

2    **Q.**   What does D1 represent?

3    **A.**   So D1 is simply plot of, a graph of Freddie Mac's stock

4    price over the class period at issue.  And you will see some

14:23:55  5    orange diamonds throughout this period.  I can tell you

6    there are 23 of them.  They represent the dates that the

7    plaintiffs have alleged were material misstatement dates.

8         And the last of these diamonds is on November 20, 2007.

9    On that day, of course, the stock dropped, as we heard, 29

14:24:21  10   percent when Freddie Mac announced catastrophically negative

11   news.

12   **Q.**   Did you review Dr. Feinstein's single date event study?

13   **A.**   Yes, I did.

14   **Q.**   And did you form an opinion regarding whether that

14:24:34  15   study was based on sufficient data?

16   **A.**   Yes.

17   **Q.**   What was your opinion?

18   **A.**   It was not based on sufficient data.

19   **Q.**   What is the basis for that opinion?

14:24:43  20   **A.**   Because it tested one day out of a 330-day class

21   period, over which period of time market conditions changed,

22   a lot happened in the company.  How could you conclude

23   anything about 329 preceding dates?

24   **Q.**   Is a single date event study a reliable method to

14:25:02  25   assess market efficiency over a 330-day class period?

BAJAJ - DIRECT                                   166

1    **A.**  It is not.

2    **Q.**  What about if you combine it with the structural

3    Cammer/Krogman factors, is it then a reliable method to

4    assess market efficiency over a 330-day trading day class

14:25:18  5    period?

6    **A.**  No, it is not, because Cammer/Krogman factors are

7    simply, as I said before, structural factors that in some

8    sense indicate market efficiency, they don't prove market

9    efficiency.

14:25:30  10   **Q.**  You understand that Dr. Feinstein chose to test

11   November 20th, right?

12   **A.**  Yes.

13   **Q.**  Do you have a view as to whether that was an

14   appropriate date to choose?

14:25:43  15   **A.**  Yes.

16   **Q.**  And what's your view?

17   **A.**  It is not.

18   **Q.**  Why not?

19   **A.**  Because the first thing I noticed when I read the

14:25:51  20   complaint is the plaintiffs have alleged right in the

21   complaint that on November 20th, Freddie Mac stock price

22   dropped by 29 percent, and that's the last day of their

23   class period.

24        You don't need to run an event study to know that that

14:26:09  25   date will be statistically significant.  Any kind of an

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - DIRECT                                    167

1    event study you can construct, it has to find that date to

2    be statistically significant.  So we've learned nothing new

3    beyond what's alleged in the complaint.  Just because you

4    ran a regression model, it doesn't prove anything.

5    **Q.**  Is the testing of one date to assess market efficiency

6    over a lengthy period of time a method that has been tested

7    by economists?

8    **A.**  Well, economists have commented on that method and said

9    it is not appropriate, whether it's one day or even a

10   handful of dates.  The FDT article that we talked about this

11   morning, or rather you talked about this morning, actually

12   came because in a proceeding like this, one of the

13   plaintiff's experts chose to satisfy the event study prong

14   of market efficiency test by pointing to a handful of days

15   and showing that the stock price reacted significantly.

16        One of the authors of FDT, the F of FDT, Fred Dunbar,

17   was the defendant's expert in that case.  That case was

18   Polymedica.  And based on his testimony, the court found,

19   and then the authors wrote an article saying, proof by

20   example doesn't work.  Even a handful of dates don't work.

21   You have to show consistently that the market reacts to

22   news.

23        And that was actually the genesis of the FDT paper.

24   And if you read it, Your Honor, you'll find many statements

25   to that effect.  And the paper specifically admonishes that

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - DIRECT                                168

1    you should not include the allegation-related dates, and

2    certainly the last day of the class period, in any kind of a

3    test of cause and effect.

4    **Q.**  Dr. Bajaj, is the method of testing a single date to

14:28:03  5    assess market efficiency over a 330-day trading day class

6    period a method that's generally accepted by economists?

7    **A.**  No.

8    **Q.**  Is there a known rate of error for this method?

9    **A.**  No.

14:28:14  10   **Q.**  Has it been subjected to peer review and publication?

11   **A.**  No.

12   **Q.**  In your opinion, did Dr. Feinstein reliably apply his

13   single date event study to the facts of this case?

14   **A.**  No, he did not.

14:28:24  15   **Q.**  Why not?

16   **A.**  Because the facts of this case are, you knew the result

17   before you even got started.  You knew that from reviewing

18   the complaint.  You knew that from reviewing Dr. Hallman's

19   report and my report.  So there is no new information you

14:28:43  20   have tested.  It's just not a valid test.

21   **Q.**  What is a Z-test?

22   **A.**  So Z-test was from the authors of the FDT article.

23   Now, Z-test has been around for decades, Your Honor, in

24   statistics.  It's a statistical test that says whether one

14:29:04  25   proportion is different from another proportion when you

**BAJAJ - DIRECT**                                    169

1    have two samples.

2         So, for example, if I wanted to test the hypothesis

3    whether men are more likely to watch Monday Night Football,

4    I could look at proportion of men that watch Monday Night

14:29:22  5    Football, compare that to proportion of women that watch

6    Monday Night Football, and I will put that into this black

7    box called Z-test and it will tell me whether the proportion

8    is statistically significantly different or not.

9         That's all Z-test is.  It is not a test that other than

14:29:43  10   non-peer-reviewed FDT article has ever been used in any

11   peer-reviewed economics or finance journal to test for

12   market efficiency.

13        And when we talk about Z-test, I would have further

14   insights as to why it's not a valid test.

14:30:01  15   **Q.**  Well, tell me, why do you believe a Z-test is not a

16   valid test to test market efficiency?

17   **A.**  So Fred Dunbar testified when you have a handful of

18   dates, proof by example is not sufficient to prove that the

19   market is efficient.

14:30:20  20        And as a polar opposite, he said, "Well, one thing you

21   could do is look at all the news dates throughout the class

22   period, see what proportion of those news dates produce a

23   statistically significant impact, and then compare that to

24   what proportion of non-news dates have a statistically

14:30:42  25   significant impact."

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ – DIRECT

1      And as a foundational matter, and they say it in their

2  paper, as a foundational test, this is a foundational test,

3  that may be somewhat informative, just like Cammer/Krogman

4  factors are informative, that maybe further examination will

14:31:04  5  show market efficiency.

6      Where these authors went wrong, Your Honor, is they

7  compared whether the fraction of non-news dates that show

8  statistically significant impact is lower than fraction of

9  news dates.

14:31:20  10      And if you are using 95 percent standard of

11  significance, which both Dr. Feinstein and I use, in your

12  event study, 5 percent of the dates, regardless of whether

13  they are news dates or non-news dates, are expected to be

14  statistically significant.  That's by construction.

14:31:39  15      So the fact that on 100 news dates, 200 news dates in

16  the FDT sample, if I recall correctly they had over 200 news

17  dates and over 500 non-news dates, it's interesting that on

18  these 200 news dates, the proportion of significant reaction

19  is more than 5 percent statistically significant according

14:32:02  20  to Z-test.

21      But that says nothing about market efficiency.  Market

22  efficiency is whether the market consistently reacts to

23  material news dates.

24      So if you were going to put a test of market efficiency

14:32:17  25  in Z-test context, what you would do is take all material

BAJAJ - DIRECT                          171

1    news dates and then see what fraction produce statistically

2    significant impact, and then you can test it against the

3    benchmark whether that is consistent.  You can see if you

4    observe 80 percent of the news dates react statistically

14:32:40    5    significant to material news, material news dates, you can

6    see whether that 80 percent given the sample size is close

7    enough to 100 percent to pass the consistency test.

8    **Q.**  Dr. Bajaj, if I can interrupt you for one moment.

9    **A.**  Yeah.

14:32:56   10    **Q.**  Let me ask you, you understood that Dr. Feinstein

11    applied a Z-test in this case to attempt to address --

12    assess market efficiency, right?

13    **A.**  Yes.

14    **Q.**  Okay.  And do you have an opinion regarding whether

14:33:15   15    Dr. Feinstein's Z-test was based on sufficient data?

16    **A.**  Yes.

17    **Q.**  What was your opinion?

18    **A.**  It was not.

19    **Q.**  What's the basis for that opinion?

14:33:24   20    **A.**  He tested 9 dates out of 30 [sic].  And, in fact --

21    **Q.**  I'm sorry, did you say 9 dates of 30?

22    **A.**  Nine dates out of 330.

23    **Q.**  Oh, thank you.

24    **A.**  And, in fact, the very statistics books that cover

14:33:40   25    Z-test have sample size requirements far in excess of nine

BAJAJ - DIRECT

1    for that test to be valid as a statistical matter, forget

2    about market efficiency.

3    **Q.**   Dr. Bajaj, before you on the screen is an excerpt of

4    the textbook that Dr. Feinstein cited.  Is this one of your

14:33:58  5    sources for concluding that Dr. Feinstein's test violated

6    sample size requirements?

7    **A.**   Yes.

8    **Q.**   And do you have an opinion as to whether

9    Dr. Feinstein's test violated the three sample size

14:34:10  10   requirements that are in this rectangle?

11   **A.**   Yes, it violated all three as you elicited earlier

12   today.

13   **Q.**   And what is -- I apologize.

14       Now, are you aware of any authority that allows an

14:34:34  15   economist to somehow cure or excuse violations of sample

16   size requirements in a Z-test?

17   **A.**   No.  This book, I looked at it from cover to cover, it

18   does not say that if you run Z-test on less than 30 sample

19   size, you can do the test that Dr. Feinstein characterized

14:34:56  20   as diagnostic test.  Those are totally separate tests.  They

21   are not designed for market efficiency.  They do nothing to

22   test market efficiency.  And they certainly do not cure the

23   problem of unreliability of Z-test done on nine

24   observations.  And that's just a statistical matter.

14:35:17  25   **Q.**   Let me turn your attention to Demonstrative Exhibit D3.

BAJAJ - DIRECT

Can you explain to us what Demonstrative Exhibit D3 depicts?

**A.**  So this demonstrative depicts that there was a large change in market-wide volatility on February 27, 2007.

**Q.**  Before you continue, can you explain to me, what is the relevance of market volatility to market efficiency?

**A.**  Yes.  So, Your Honor, you've heard a lot about statistically significant result or not.  So forget about stock prices and statistics.  Let's consider a simple example.  If I wanted to test whether on full moon days larger proportion of waves in a body of water are abnormally large, and if I were doing this test for a placid lake, where almost all the waves were less than one foot tall, a one foot high wave may be considered abnormally high, my standard error.

The measurement, the foot ruler through which I determine whether a wave was abnormally high or not is based on how large waves typically are, the volatility in the size of waves.  And for a placid lake, that may be less than one foot.  One foot may be more than two standard deviations of an, i.e., statistically significant.

Now, if I take the same yardstick of that foot and I go in the middle of a stormy ocean to do the same experiment on the effect of full moon wave -- full moon days, or nights, on size of the waves, I'm going to conclude suspiciously, incorrectly, that almost every wave is abnormally high.

BAJAJ - DIRECT                                    174

1    When in a stormy ocean, you need a much bigger yardstick.

2        So, therefore, statisticians, and this is the

3    statistical part of an event study, use something called a

4    standard error.  And if they say Freddie Mac stock price

14:37:38   5    after adjusting for market and industry effect on that day

6    went up by 3 percent, if the standard error of Freddie Mac

7    stock price volatility during that period was 1 percent,

8    then 3 percent is three standard deviations.  And that is

9    statistically significant.

14:37:59  10        But if during that period Freddie Mac stock price was

11    jumping around like my stormy ocean analogy, 3 percent

12    wouldn't be statistically significant.

13        So when you do an event study and you use a regression

14    model to identify significant dates or not, it's important

14:38:17  15    to pay attention to the macro environment and the background

16    noise or volatility against which you are testing whether

17    that date was significant or not.

18        And that's why you need to pay attention to what kind

19    of regime you are sampling your event dates from.

14:38:40  20    Q.  Now, what is the relationship -- well, before I go

21    there, do you see there's language on the slide that says,

22    "In my report, I noted that on February 27, 2007:  (1) the

23    VIX index and Freddie Mac implied volatility increased, (2)

24    there were a series of market-wide events resulting in a

14:39:03  25    sharp market-wide stock decline (the largest since

BAJAJ - DIRECT

1    9/11/2001) amidst fears of recession, and (3) the use of

2    Dr. Feinstein's Chow test showed a statistically significant

3    break"?

4        Do you see that language?

14:39:16  5    **A.**  Yes.

6    **Q.**  Now, in that language you referred to a "sharp

7    market-wide stock decline," right?

8    **A.**  Yes.

9    **Q.**  Did you hear Dr. Feinstein testify during his redirect

14:39:23  10   that that was proof of market efficiency here?

11   **A.**  I did.

12   **Q.**  What was your view of that testimony?

13   **A.**  It's besides the point.  Market efficiency and event

14   study and why we are in this courtroom today has to do with

14:39:35  15   whether firm-specific information --

16   **Q.**  What do you mean by "firm-specific information"?

17   **A.**  Namely information specific to Freddie Mac that is

18   unexpected and material can be assumed to have affected

19   Freddie Mac stock price.  So you do event studies on

14:39:53  20   firm-specific information, you control for market-wide drops

21   and market-wide volatility.  So he had it backwards, I

22   think.

23   **Q.**  Well, so if market-wide, the entire market of all

24   stocks in the country exhibit efficiency, what impact does

14:40:13  25   that have on whether Freddie Mac's stock price was

BAJAJ - DIRECT                    176

1    efficient?

2    **A.**  So in this particular case, the news really was on

3    February 26, Chairman Greenspan of Federal Reserve said,

4    "Hey, I fear a recession now."  And overnight, Chinese

14:40:39  5    market crashed, and the next day, the broad market indices

6    went down by a larger amount than had been the case since

7    9/11.

8         And if the market went down by 3 percent and Freddie

9    Mac went down by 3 percent, or 2 percent, or 4 percent, that

14:41:04  10    says nothing about market efficiency.

11    **Q.**  Dr. Bajaj, what is "data snooping"?

12    **A.**  Data snooping is when you look at the data, you see one

13    set of results and then you say, "Let me look at this data a

14    different way," and you keep doing that unless you -- until

14:41:23  15    you find results that you say, "Wow, how surprising, these

16    are significant results."

17    **Q.**  Did you engage in data snooping in this case?

18    **A.**  Absolutely not.  I did not.  I would not do that ever.

19    **Q.**  How did you discover this February structural break

14:41:38  20    that's depicted on Demonstrative Exhibit D3?

21    **A.**  So Professor Feinstein in his report, if I recall

22    correctly, had an opinion that on February 27, Freddie Mac

23    stock price changed statistically significantly.  And I was

24    obviously interested whether his measure of statistical

14:41:58  25    significance, like I gave an analogy before, was using the

BAJAJ - DIRECT

1    right yardstick, did he use a ruler to measure, what should

2    be measured by a yardstick.

3        And since he said he looked at all the information

4    throughout the class period carefully to look for material

14:42:17  5    dates, I looked at his own news story, and I looked at these

6    stories that are cited in my report and on this slide, and

7    it was clear to me, you should adjust your yardstick for

8    evaluating statistical significance of events after February

9    27th.

14:42:36  10   Q.  Now, why didn't you find this when you were analyzing

11   Dr. Hallman's report in the year 2012?

12   A.  Because Dr. Hallman had no statistically significant

13   date prior to August of 2007, so I had no reason to examine

14   whether or not he was using faulty yardstick to erroneously

14:42:59  15   conclude a date to be significant when it was not.

16   Q.  Well, are you aware that Dr. Feinstein has accused you

17   of having stated the opposite at a deposition five years ago

18   in this case?

19   A.  Yes, I heard that.

14:43:16  20   Q.  Let me draw your attention to Demonstrative Exhibit D6.

21   What does Demonstrative Exhibit D6 show?

22   A.  It shows that what I testified to in 2012 or '13,

23   whenever it was, was absolutely correct.  What I said in

24   that case was Dr. Hallman used one year prior to the

14:43:37  25   beginning of the class period, Your Honor, to fit his

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - DIRECT                          178

1    regression model in event study.  So he used the period

2    indicated in the first bar, August 1, 2005 to August 1,

3    2006.  The average volatility of Freddie Mac stock during

4    that period was 1.16 percent.

14:43:58  5        And when I suspected something was wrong with his

6    August date, I compared that to Freddie Mac stock price

7    volatility August 1, 2006, which is the start of the class

8    period, till August 8, 2007.  And I testified they are

9    virtually identical, and they are.

14:44:19  10   Q.  Now, let me draw your attention back to Exhibit D3.

11        Did you hear Dr. Feinstein testify earlier that this is

12   somehow misleading because you had a graph earlier that

13   showed much smaller differences in the February time period,

14   around the February structural break?

14:44:41  15        Do you recall that?

16   A.  Yes, I do.

17   Q.  What is your view of that testimony?

18   A.  So I'll leave aside the ad hominems.

19        But, Your Honor, what happened in the marketplace, if

14:44:51  20   we remember to the bad days of mortgage and market crisis,

21   is things got topsy-turvy in February.  Market volatilities

22   jumped.  Then in August, they jumped even more.  And then

23   nobody, or most people didn't anticipate, of course, by the

24   time you got to September 2008, our economy almost

14:45:20  25   collapsed.

BAJAJ - DIRECT                    179

1      So if you are showing that entire period on one chart,

2   and you're not doing a mile-long chart, the only way you can

3   fit September 2008 on that chart is the scale will be very

4   compressed, and it will tend to visually impair the clear

14:45:42   5   break when you look at this data on the date that you

6   went -- on the narrow date range that you are focusing on.

7      So, yes, scale has something to do with it, but it is

8   not misleading at all.

9   Q.  Dr. Bajaj, what is the impact of the February

14:46:00  10   structural break on Dr. Feinstein's Z-test results?

11   A.  So if you take out the last day of the class period,

12   which FTD authors clearly say it should not be part of it,

13   it should not be because of further reasons we've discussed,

14   and you simply correct for the structural break, his Z-test

14:46:23  15   results are statistically insignificant.

16   Q.  Now, what are the effects of your structural break on

17   Dr. Feinstein's so-called three diagnostic tests?

18   A.  So they fail even if you let the last day of the class

19   period in.

14:46:43  20   Q.  Please turn your attention to Demonstrative Exhibit D8.

21   What does Demonstrative Exhibit D8 show?

22   A.  So the first column, which shows three cells that have

23   "Insignificant" in it, Your Honor, runs Dr. Feinstein's

24   three so-called diagnostic tests in a regression model that

14:47:07  25   corrects for February 27 structural break as well as August

BAJAJ - DIRECT                    180

1    8 structural break.  And all of them are insignificant.

2        The right column says, but that's giving too much

3    credit to these tests, because the last day of class period

4    shouldn't be here.  And, of course, that doesn't help the

14:47:29  5  matters, all his purported diagnostic tests remain

6    insignificant.

7    Q.  Dr. Bajaj --

8            THE COURT:  Doctor --

9            May I ask the doctor a question?

14:47:40  10          MR. FRANK:  Please.

11           THE COURT:  You and Mr. Frank used the term

12   "structural break."  In your testimony you use it relative

13   to February 27th and again August 8th.

14           What do you mean by that term, as precisely as you

14:47:52  15  can tell me?

16           THE WITNESS:  Yes, Your Honor.  So remember our

17   discussion a little while ago whether a date is significant

18   or not?

19           THE COURT:  Certainly.

14:48:00  20          THE WITNESS:  It's judged based on what is called

21   a standard error, which says what's the level of bad ground

22   volatility relative to which you measure whether the price

23   reaction was large enough to be considered significant or

24   not.

14:48:15  25          So what happens is --

**BAJAJ - DIRECT**                    181

BY MR. FRANK:

**Q.**  Dr. Bajaj, can you explain a structural break using an
analogy?

**A.**  Yes.  So if you have -- if you've determined that your
yardstick in the Pacific Ocean to measure large waves is
three feet, and then you go into part of Pacific Ocean where
there's Category 4 hurricane, that yardstick ain't going to
be correct, right?

So what you do -- what you -- what you determine, when
there is a structural break, if your empirical relationship
that is the basis for you identifying whether a certain date
is statistically significant or not has changed, you need a
different yardstick.

So in this context, if background volatility jumped
starting February 27 and remained elevated relative to prior
period in the class period until August 8th and then it
jumped again, you need three different standard errors to
evaluate whether an event is significant or not.

A lower standard error for first part of the class
period, adjusted and higher standard error for the second
part, and adjusted again and even higher standard error for
the last part of the class period.

And when you make those changes, several of the four
dates that he said were statistically significant, in fact
two of the four, are not statistically significant.  The two

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

**BAJAJ - DIRECT**

182

1    that remain significant, one of the two is the last day of

2    the class period.

3        And when you apply his Z-test or his diagnostic test to

4    this evidence, it shows no statistical difference relative

14:50:13  5    to his purported non-news dates.

6        So on his own terms, he could not conclude market

7    efficiency, and he so testified in the hypothetical, Your

8    Honor.

9    Q.  Dr. Bajaj, when you use the analogy to the ocean and

14:50:30  10   choppy water versus a placid lake or a Category 5 hurricane,

11   what are you trying to measure that is analogous to market

12   efficiency?

13   A.  You are trying to measure when there is a material

14   event, did the stock price change by an amount that's large

14:50:50  15   enough relative to the background volatility for you to be

16   able to say with statistical certitude, yes, this was a

17   statistically significant reaction to the material news.

18   Q.  What does Exhibit D9 depict?

19   A.  So this is one of the other errors in Professor

14:51:13  20   Feinstein's Z-test, Your Honor, that is analogous and

21   related.  So he compares proportion of significant dates on

22   a small sample of nine observations with a much larger

23   sample of 321 observations.  And the Z-test for proportions

24   says the standard error of the proportion that you are

14:51:38  25   measuring is relative to how large your sample is.

BAJAJ - DIRECT                              183

1      And then you have such a, quote, unquote, "unbalanced

2  sample" with nine dates, whether the observed proportion is

3  by itself significant or not should be measured using 16.6

4  percent as the measure of your standard error.

5      In other words, if you have two proportions which are

6  less than 32 percent different, then they are not two

7  standard errors different and, hence, not significantly

8  different.

9      Whereas the 321-date sample, because that's a larger

10  sample, has much lower standard error -- if you go back to

11  that slide just for a second.

12      The standard error difference is over 12 times, Your

13  Honor.  And his Z-test, what he did, he took the average of

14  these two standard errors by pooling them to measure

15  statistical significance.  That overstates the significant

16  measuring stick, or yardstick of this type of stick, it

17  roughly doubles it.  And that's another error in his test.

18  **Q.**  Dr. Bajaj, what does Demonstrative Exhibit D10 depict?

19  **A.**  So this shows the six dates that Dr. Hallman had

20  tested, and Dr. Feinstein reviewed that report, of course.

21  **Q.**  And what's the difference between the green and the red

22  on this slide, the green circles and the red circles?

23  **A.**  The red circles mark the dates that Dr. Hallman claimed

24  were statistically significant.  There was only one, except

25  for the last date, which is purple.  Because that's not a

14:52:04  5
14:52:27  10
14:52:44  15
14:53:07  20
14:53:24  25

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - DIRECT                                        184

1    proper date, I did not want to mark it red.

2         So other than the last date, Dr. Hallman had found only

3    one statistically significant date out of six he chose to

4    test, which was August 30th.

14:53:39   5    **Q.**  And what does Demonstrative Exhibit D11 depict?

6    **A.**  So it shows you, regardless of how he selected them,

7    the dates that Dr. Feinstein looked at, nine dates.  There

8    is not a single date he tested during the first 43 percent

9    of the class period, Your Honor.

14:53:58   10        He tested nine dates.  He found three of them

11   significant, which are in the red circles, F1, F2 and F6.

12   F1 and F2, once you account for the structural break in

13   February, which is right around here, F1 is actually

14   February 27th, F1 and F2 are no longer significant.

14:54:18   15   **Q.**  But, Dr. Bajaj, let me interrupt you for one moment.

16   How many red circles do you see on D11?

17   **A.**  Four.

18   **Q.**  Okay.  And four are the statistically significant dates

19   according to Dr. Feinstein?

14:54:30   20   **A.**  Yes.

21   **Q.**  Okay.  And he tested a total of how many dates?

22   **A.**  Nine.

23   **Q.**  Okay.  Now let's take a look at Demonstrative

24   Exhibit D12, if I can get there.  D12.  Okay.

14:54:43   25        Now, what does Demonstrative Exhibit D12 depict?

BAJAJ - DIRECT                                    185

1    **A.**   I apologize for running ahead of myself a little.   I

2    get excited sometimes, Your Honor.

3    **Q.**   That's all right.

4         What does this slide show?

14:54:55   5    **A.**   This slide shows what I was saying a little earlier.

6    Once you correct for February 27 structural break, which

7    according to the statistical test he himself used, he can't

8    say was not significant, F1 and F2 are no longer

9    statistically significant.   They were significant because he

14:55:12  10    was using the wrong yardstick, Your Honor.

11         The only two dates that remain significant are August

12    30th and the last day of the class period, exactly what

13    Dr. Hallman claimed.

14    **Q.**   Dr. Bajaj, did you reach -- do you have a view as to

14:55:30  15    whether a Z-test is a reliable way to test for market

16    efficiency?

17    **A.**   It is not.

18    **Q.**   What is that view?

19    **A.**   Z-test has never been used in any peer-reviewed

14:55:41  20    economics or finance journal to test market efficiency.   It

21    is not the right test for various reasons we've been

22    discussing.

23    **Q.**   Do you have a view as to whether or not Dr. Feinstein

24    reliably applied his Z-test to the facts of this case?

14:55:55  25    **A.**   He did not.

BAJAJ - DIRECT                                    186

1    **Q.**  Why do you say that?

2    **A.**  Because he had a handful of days.  There are a lot of

3    problems with his selection of those dates, as you were

4    pointing out during your cross-examination, and the last day

14:56:10  5    of the class period shouldn't have been in his dates.  In

6    fact, none of the allegation-related dates, according to FDT

7    authors, should have been part of that test.

8    **Q.**  You testified earlier as to the meaning of peek-ahead

9    bias.  What, if any, relevance does peek-ahead bias have to

14:56:32  10    Dr. Feinstein's selection of dates for his Z-test?

11    **A.**  It is actually very pernicious.

12        So, Your Honor, it is true, especially in the old days

13    when people used to do event studies around evident changes

14    or earnings announcements, the way you identify those dates,

14:56:55  15    I used to do that myself in my published research, Your

16    Honor, you went through big, thick volumes of Wall Street

17    Journal index and looked for all the earnings announcement

18    dates, and once you had identified those dates, then you did

19    your event study.

14:57:11  20        So Wall Street Journal has been used to identify dates

21    lots of times in peer-reviewed articles.  Dr. Feinstein is

22    correct about that.

23        I don't recall seeing many New York Times, because New

24    York Times is not primarily a business paper, it's focused

14:57:27  25    on New York area, but it does have a business section, but I

BAJAJ - DIRECT                                187

1    could see somebody using a screen of looking at dates that

2    were covered by New York Times.

3        But when he imposed his selection criteria, he added

4    two elements that biased hopelessly his conclusions and made

5    them scientifically invalid.

6        First, he said an event has to be in both papers.  Now,

7    Wall Street Journal routinely covers earnings dates, and I

8    think Mr. Frank showed evidence to Dr. Feinstein that all

9    six of Dr. Hallman's earnings dates were covered in Wall

10   Street Journal.  New York Times covers those stories which

11   are unusual.  And, in part, how they determine unusual is

12   how did the market react to it.  These are both ex-post,

13   right?  Story appears after something else happened.  That's

14   how journalists know.

15       So if Wall Street Journal is going to say it, "Freddie

16   Mac announced earnings today," they do that routinely,

17   there's no bias in identifying dates that way.  But if Wall

18   Street Journal writes a special article devoting their

19   sparse column space to writing a story about Freddie Mac,

20   chances are the market went nuts that day, that's why they

21   wrote a special article with "Freddie Mac" in the headline.

22       And then on top of that, you say the date must be

23   covered also by New York Times?  That only compounds this

24   error.  In event study, you first identify dates and then

25   you test them.  If your identification method is ex-post,

BAJAJ - DIRECT                    188

1    namely something big happened, that's why you observe both

2    New York Times and Wall Street Journal writing big stories

3    about it, you've already selected a biased sample.

4         Not only that, FDT paper says don't pick any dates,

14:59:31  5    even without this two paper criteria, which they don't use,

6    if the story itself mentions the stock price.  For the same

7    reason, if the story is written to mention the stock price,

8    they're not going to write a story, "Freddie Mac announced

9    earnings and there was nothing that happened to stock

14:59:49  10   price."  They are more likely to write that story if

11   something happens.  So they say, "Don't pick such dates."

12        And both August 30th and November 30th, the articles

13   Dr. Feinstein has put in his exhibit that led him to pick

14   these dates, the articles in one or both of these papers

15:00:09  15   actually discuss the price reaction.

16        So, once again, he picked the last day of the class

17   period that the plaintiffs already told the whole world the

18   price dropped by 29 percent.  The nine dates he selected had

19   this, I would say, inadvertent, but nevertheless important,

15:00:32  20   peek-ahead bias, so the result is not reliable.

21   Q.  Dr. Bajaj --

22             THE COURT:  Mr. Markovits?

23             MR. MARKOVITS:  Excuse me.  I just wanted to

24   notify Mr. Frank and the court, we're about 65 minutes

15:00:43  25   already.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - DIRECT                                    189

1          MR. FRANK:  I have one question if I do it

2      correctly, two if I do it incorrectly.

3          THE COURT:  All right, then.  Keep track,

4      Mr. Markovits, in the event I need to distribute more time

15:00:51  5  to you for cross.  Thank you for letting me know.

6          Mr. Frank?

7          MR. FRANK:  Thank you.

8      BY MR. FRANK:

9   Q.  Dr. Bajaj, ultimately you've drafted two reports in

15:01:08  10  this case and have concluded that both Dr. Hallman and

11     Dr. Feinstein both failed to establish through an empirical

12     test that the market for Freddie Mac stock was efficient.

13         Are you surprised that -- are you surprised by the fact

14     that two economists tried to empirically test the cause and

15:01:29  15  effect relationship and were unable to show it?

16  A.  No, I'm not surprised at all.

17  Q.  Why not?

18  A.  Well, the reason is, as Dr. Feinstein testified, I

19     think including today, this was a very unusual, tumultuous

15:01:48  20  period.  During this period, we started what became the

21     Great Recession, which was worldwide.  And the center of

22     that recession was the mortgage market.  And at the center

23     of the mortgage market was Freddie Mac.

24         So in this tumultuous period, one of the things that

15:02:12  25  happened was there was systemic liquidity crisis.

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - DIRECT

190

1    Arbitrageurs that we talked about that keep markets

2    efficient, I cited in my report articles how arbitrageurs

3    couldn't afford to trade because they couldn't get credit

4    and their investors were getting impatient and withdrawing

15:02:35  5    their money.  So arbitrage activity, which is the lifeblood

6    of market efficiency, was severely constrained.

7         And, as Dr. Feinstein testified in his deposition,

8    there were also severe market dislocations, such as

9    tremendous violation of put-call parity, such as higher

15:02:58  10   rated bonds selling for lower priced and lower-rated bonds

11   as people tried to raise money somehow by selling the only

12   bonds that are liquid, which are the higher-rated bonds.

13        Prices became dislocated.  And when prices become

14   dislocated, and I picked that up in put-call parity test

15:03:16  15   that we talked about, it indicates market is not

16   functioning.  Put-call parity tests failing means two sets

17   of prices that should be in alignment are not.

18        What does that mean?  Either the option prices are

19   incorrect or stock prices are incorrect or they are both

15:03:37  20   incorrect.  Two out of three indicate stock prices might be

21   incorrect.  It is an important evidence of market

22   dislocation.

23        It is not surprising that during this period, despite

24   two attempts, both the economists failed to prove

15:03:58  25   semi-strong form of informational market efficiency.

BAJAJ - CROSS                                    191

1          MR. FRANK:  Your Honor, I pass the witness.  Thank

2    you.

3          THE COURT:  Thank you.  Dr. Bajaj is passed for

4    cross-examination.

15:04:11  5          MR. MARKOVITS:  That may be the only time when a

6    lawyer said one more question and actually asked one more

7    question.

8          CROSS-EXAMINATION OF MUKESH BAJAJ, Ph.D.

9    BY MR. MARKOVITS:

15:04:25 10   **Q.**  Good afternoon, Dr. Bajaj.

11   **A.**  Good afternoon, Counsel.

12   **Q.**  Good to see you again.

13   **A.**  Yes, we've been meeting for several years now.

14   **Q.**  For several years.

15:04:39 15        Dr. Bajaj, your opinion is that in order to prove that

16   a plaintiff is entitled to a presumption of reliance under

17   the fraud-on-the-market theory, plaintiff must show that the

18   stock traded on a semi-strong form of efficient market

19   during the class period?

15:04:57 20   **A.**  Yes.  And for clarification, in the informational

21   sense.

22   **Q.**  You're familiar that the fraud on the market

23   presumption reliance was established in the Supreme Court

24   case of Basic v. Levinson?

15:05:10 25   **A.**  Yes.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                              192

1   **Q.**  And you would agree that the Supreme Court in Basic

2   didn't clarify what constituted adequate proof of efficiency

3   for reliance purposes?

4   **A.**  No, I can't agree with that.  I thought it was clear,

15:05:25  5   but I'm not a lawyer.  If you say it was not sufficient

6   clarification, you can make that legal argument.

7            MR. MARKOVITS:  Could you put up slide 11, please?

8            MR. LEWIS:  Sure.  There you go.  It's coming.

9   He's got to bring it up.

15:05:45  10  BY MR. MARKOVITS:

11  **Q.**  Dr. Bajaj, you wrote an article along with a couple of

12  others called "Assessing Market Efficiency."

13       Do you recall that?

14  **A.**  Yes.

15:05:55  15  **Q.**  And do you recall in that article stating, "Basic did

16  not clarify what constituted adequate proof of efficiency

17  for reliance purposes"?

18  **A.**  Yes.  I was referring to the methodology; namely, it

19  didn't say you test Cammer/Krogman factors, et cetera,

15:06:11  20  et cetera.  That came through later case law.

21  **Q.**  So, again, getting back to my question, you would agree

22  the Supreme Court in Basic did not clarify what constituted

23  adequate proof of efficiency for reliance purposes?

24  **A.**  In that sense of methodology, correct, it did not

15:06:28  25  specify the methodology needed to test for market efficiency

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                                      193

1    for reliance purposes.

2    **Q.**  You'd agree that markets respond relatively promptly to

3    material information?

4    **A.**  If they are efficient, they should.

15:06:44  5    **Q.**  Currently, New York State -- New York Stock Exchange,

6    would you agree that in that exchange, the market typically

7    responds reasonably promptly to material information?

8    **A.**  In the same way that I would say 15-year-olds are

9    generally more healthy than 85-year-olds -- I have both in

15:07:15  10    my family -- yes.

11    **Q.**  Can you just answer -- possibly, maybe the answer is

12    no, but can you answer yes or no, markets typically respond

13    reasonably promptly to material information?

14          MR. FRANK:  Objection.

15:07:30  15          THE WITNESS:  In a general sense, the way I

16    explained, yes.

17          THE COURT:  That objection is overruled.  If

18    another objection comes, do it standing, but it wouldn't

19    have changed the ruling then.  All right?

15:07:43  20          MR. FRANK:  Thank you, Your Honor.  Thank you,

21    Your Honor.

22          THE COURT:  Certainly.

23    BY MR. MARKOVITS:

24    **Q.**  You're familiar with the amicus brief filed by the

15:07:54  25    financial economists in Halliburton II?

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - CROSS                                    194

1     A.  I've read it, yes.  I'm not an authority on it, but

2     I've read it.

3     Q.  And you're aware that that brief includes as

4     signatories both Eugene Fama and Robert Shiller?

15:08:11  5     A.  Yes.

6              MR. MARKOVITS:  Your Honor, may I approach?

7              THE COURT:  You may.

8     BY MR. MARKOVITS:

9     Q.  Dr. Bajaj, I'm holding -- I'm showing you what's been

15:08:21  10    marked as Plaintiffs' 4 --

11             THE COURT:  Thank you.

12    BY MR. MARKOVITS:

13    Q.  -- which is a copy of the brief of financial economists

14    as amici curiae in support of respondents in the Halliburton

15:08:35  15    II case.

16         And if you turn to small Roman -- I'm sorry.  If you

17    turn to pages 1 and 2, you'll see that the amici include

18    Eugene Fama and Robert Shiller.

19    A.  Yes.

15:08:57  20    Q.  And Eugene Fama is considered the father of the

21    efficient market hypothesis, correct?

22    A.  Yes.

23    Q.  And Robert Shiller is one of his harshest critics;

24    would that be fair?

15:09:12  25    A.  I think he is respectful and appreciates Professor

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                                              195

1    Fama's work and generally agrees with it, except he's

2    pointed out further evidence of why markets are not always

3    efficient.

4        Q.   And you've read over this brief, and you know that the

15:09:33  5    brief recognized that debates among economists about the

6    degree to which a price of a company stock reflects public

7    information, that there were these debates about -- among

8    economists about the degree to which the price of a company

9    stock reflect public information about a company, correct?

15:09:54  10    A.   Where are you reading from, Counsel?

11    Q.   I'm sorry.  If you go to the top of page 6, it says,

12    "Professional economists have debated for decades the extent

13    to which the securities markets actually conform to the

14    SSEMH."

15:10:06  15         Do you see that?

16    A.   Yes.

17    Q.   Okay.  And what does SSEMH refer to?

18    A.   Semi-strong form of efficient market hypothesis, I'm

19    pretty sure.

15:10:21  20    Q.   Do you recall reading -- if you turn back to page 4,

21    and the first full paragraph, second sentence, it says, "The

22    ECMH entails a great deal more than the modest proposition

23    that markets typically respond reasonably promptly to

24    material information."

15:10:43  25         Do you see that?

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - CROSS

1    A.   Yes, I do.

2    Q.   And do you see where it says, "That much is generally

3    viewed as common ground among contemporary economists"?

4         Do you see that next sentence?

15:10:56  5    A.   Correct, I do.

6    Q.   Would you agree that the modest proposition that

7    markets typically respond reasonably promptly to material

8    information is common ground among contemporary economists?

9    A.   Yes.  In that context, what they are saying is markets

15:11:17  10   that are not even -- that may not be fundamentally efficient

11   may still be informationally efficient; and when they are

12   efficient, then the definition of informational form of

13   semi-strong form of efficient market hypothesis is that the

14   markets promptly react in the correct direction through

15:11:43  15   material new information.

16   Q.   And I believe my question was, you would agree that

17   there's common ground among contemporary economists that

18   markets typically respond reasonably promptly to material

19   information?

15:11:54  20   A.   With the clarification that I provided, yes.  In that

21   context, that's true.

22              THE COURT:  Mr. Markovits?

23              MR. MARKOVITS:  Yes.

24              THE COURT:  I'd like to be clear on what ECMH

15:12:05  25   means.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                                          197

1    BY MR. MARKOVITS:

2     **Q.**  Yes.  Could you inform the court, please?

3     **A.**  Yes, Your Honor.  ECMH is an acronym for efficient -- I

4    know EMH should mean efficient market hypothesis.

15:12:25  5     **Q.**  Is it the efficient --

6              MR. FRANK:  Your Honor, it's -- yeah, I'm sorry.

7    BY MR. MARKOVITS:

8     **Q.**  -- efficient capital market hypothesis?

9     **A.**  Efficient capital market hypothesis.  Thank you.  I

15:12:35  10   was --

11              THE COURT:  Thank you all.

12              THE WITNESS:  -- missing that.

13   BY MR. MARKOVITS:

14    **Q.**  The modest premise -- I'm sorry.

15:12:43  15      The modest proposition here is that markets typically

16   respond reasonably promptly?

17    **A.**  Counsel, the proposition here is not a statement of

18   fact that all markets, all securities within the markets

19   always do this.  What they are saying is economists have

15:13:04  20   debated a lot about presence of bubbles, whether the market

21   prices reflect fundamentals properly or not, can there be

22   market inefficiency that's prolonged and systemic, was the

23   Japanese stock market overpriced in the '80s.

24      All that debate has developed since Fama came up with

15:13:24  25   his efficient market hypothesis.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                                    198

1    But a more modest way, more -- what is the word you

2    used?

3    **Q.**  Modest proposition.  Excuse me.  Excuse me.

4    **A.**  -- modest proposition is generally true of efficient

15:13:36  5    markets that even if they are not fundamentally efficient,

6    they, when efficient, react to material news.

7    They are not saying, "We've tested for all stocks for

8    all times and we can say all economists agree that all

9    stocks at all times trade in an informationally efficient

15:13:59  10    market according to this modest premise."  That's, of

11    course, not true.

12    THE COURT:  Why don't you stop there, because I

13    think Mr. Markovits is trying to direct you further.

14    MR. MARKOVITS:  I am.

15:14:10  15    THE COURT:  Thank you.

16    BY MR. MARKOVITS:

17    **Q.**  Dr. Bajaj, as you know, I'm on the clock.

18    **A.**  Sorry.

19    **Q.**  So when I ask a yes or no question, if you could

15:14:16  20    possibly give a yes or no answer, that would speed things

21    along.

22    **A.**  I will definitely try, Counsel.

23    **Q.**  All right.  Thank you.

24    Dr. Bajaj, you read the Supreme Court opinion in

15:14:28  25    Halliburton II?

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                            199

1    A.  Yes, I did.

2    Q.  Was it your impression that the Supreme Court, in large

3    part, agreed with the amicus brief of the financial

4    economists?

15:14:37  5    A.  They drew upon the distinction between fundamental and

6    informational economists to clarify that Basic was never

7    about fundamental efficiency, it was always about this more

8    modest premise of informational efficiency.  That was my

9    reading.

15:15:05  10         MR. MARKOVITS:  All right.  Could you put up slide

11    12, please?

12    BY MR. MARKOVITS:

13    Q.  Doctor, if you'd look at the screen, slide 12 has a

14    quote from Halliburton that says, "The academic debates

15:15:15  15    discussed by Halliburton have not refuted the modest premise

16    underlying the presumption of reliance.  Even the foremost

17    critics of the efficiency-capital-markets hypothesis

18    acknowledge that public information generally affects stock

19    prices."

15:15:30  20         Would you agree with that last statement, that "Even

21    the foremost critics of the efficiency-capital-markets

22    hypothesis acknowledge that public information generally

23    affects stock prices"?

24    A.  Yes, generally that is true.  I agree with that.

15:15:47  25    Q.  Thank you.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                                    200

1      And the Supreme Court said that debates about the

2   degree to which stock prices accurately reflect public

3   information are largely beside the point, didn't they?

4   **A.**  I think that's how they interpreted Basic.  That was

15:16:06  5   always the premise behind fraud-on-the-market theory.

6   **Q.**  And I want to turn back to the brief of the financial

7   economists.  And if you could look at page 5, second

8   paragraph.

9           MR. MARKOVITS:  Kevin, it's slide 14, I believe.

15:16:25  10  BY MR. MARKOVITS:

11  **Q.**  And this is important.  I want to focus on this, if you

12  will, what's on the screen, from the brief of the financial

13  economists.  It says, "The key point for present purposes is

14  that while the proposition that market prices respond

15:16:39  15  relatively promptly to material information about a stock is

16  true if the SSEMH is true, it does not depend on the SSEMH

17  being true."

18          Did I read that correctly?

19  **A.**  You did.

15:16:56  20  **Q.**  And SSEMH is a semi-strong efficient market hypothesis,

21  correct?

22  **A.**  Yes.  And they're referring to the fundamental form of

23  SSEMH, that even if that is not true, informational form of

24  SSEMH may still be true.  That's my reading of it.

15:17:16  25  **Q.**  Excuse me.  That's your reading.  It doesn't say that

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - CROSS                          201

1    there, does it?  It just says you don't have to have a

2    semi-strong efficient market in order for prices to respond

3    relatively promptly to material information; isn't that a

4    fair reading of that sentence?

15:17:34  5    **A.**  It is a reading, but it's not a fair reading.  If you

6    wish the court to hear my economic reading of this, I'm

7    doing my best, trying to be brief.

8    **Q.**  Now, thank you, Doctor.  I'll let the words speak for

9    themselves.

15:17:49  10   **A.**  Thank you.

11   **Q.**  That's fine.

12   **A.**  Thank you.

13   **Q.**  Your opinion in this case regarding market efficiency

14   is based in part upon your belief that proof of Cammer 5

15:18:04  15   factor is necessary to show market efficiency, correct?

16   **A.**  It is indeed true according to my belief and that of

17   many others, yes.

18   **Q.**  Let's stick to your belief.

19   **A.**  Okay.

15:18:16  20   **Q.**  You believe that Cammer 5 is necessary to show market

21   efficiency?

22   **A.**  For reliance purposes, yes; correct.

23   **Q.**  All right.  And your opinion is that to satisfy Cammer

24   factor 5, an event study must be performed?

15:18:34  25   **A.**  Yes.

BAJAJ - CROSS                                    202

1    Q.  Without an event study demonstrating cause and effect,

2    your opinion is there can be no finding of market

3    efficiency?

4    A.  Well, there can always be a finding, but on economic

15:18:49  5    evidence, I would not say that that would be sufficient

6    proof of market efficiency, leaving aside whatever other set

7    of factors some courts may or may not take into account to

8    reach a particular finding.

9    Q.  Let me add a word and see if I can get a yes or no

15:19:08  10   answer.

11        Without an event study demonstrating cause and effect,

12   your opinion is that there can be no valid finding of market

13   efficiency?

14   A.  Yeah, I would agree.

15:19:18  15   Q.  And your opinion is that the event study should show

16   price reactions to material news at a 95 percent confidence

17   level?

18   A.  Yes.

19   Q.  So in your opinion, even if Professor Feinstein can

15:19:36  20   show all of the other Cammer and Krogman factors were

21   handily met, and that Freddie Mac common stock traded on a

22   national exchange during the class period, this would not be

23   sufficient proof of an efficient market without proof

24   satisfying Cammer factor 5?

15:19:54  25   A.  For purposes of the presumption that is at issue in

BAJAJ - CROSS                                203

1    this case, yes.

2    **Q.**  You don't dispute that Freddie Mac traded on the New

3    York Stock Exchange during the class period?

4    **A.**  No.

15:20:06  5    **Q.**  You don't dispute that the three Krogman factors,

6    market capitalization, bid-ask spread and float, are met in

7    this case?

8    **A.**  No, I do not.

9    **Q.**  And you don't dispute that the first four of the five

15:20:23  10   Cammer factors are met?

11   **A.**  Again, I don't have them memorized, but if you are

12   referring to structural factors, I have no disagreement that

13   they are met.

14   **Q.**  Let me put this up for a second for reference purposes.

15:20:49  15        Can you see that all right, Doctor?

16   **A.**  I can, yes.

17        MR. MARKOVITS:  Thank you, Kevin.

18   BY MR. MARKOVITS:

19   **Q.**  The first Cammer factor is the average weekly trading

15:21:07  20   volume expressed as a percentage of the total outstanding

21   shares, correct?

22   **A.**  That's what your chart says, and I assume that's

23   correct according to Cammer.

24   **Q.**  You've applied the Cammer factors before.

15:21:21  25   **A.**  Yes, but I don't have memorized what is Cammer factor 1

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                            204

1    versus 2 versus 3.

2    **Q.**  You don't disagree with Professor Feinstein's

3    calculation for that factor, Cammer factor 1, of a 3 percent

4    average weekly trading volume?

15:21:36  5    **A.**  I have no reason to disagree with it.

6    **Q.**  You're aware that the Cammer case itself states that a

7    trading volume over 2 percent creates a strong presumption

8    of market efficiency?

9    **A.**  According to that factor, yes.

15:21:52  10   **Q.**  But you don't believe that the average weekly trading

11   volume, whether 2 percent or even higher, is probative

12   evidence of market efficiency, correct?

13   **A.**  It depends on what context we are talking about

14   probative.  It's not sufficient evidence, in my opinion, as

15:22:11  15   we've been discussing.

16   **Q.**  You don't believe it's probative evidence of market

17   efficiency, correct?

18   **A.**  It's probative like somebody being 15-year-old is

19   probative of that person being generally in good health.

15:22:26  20           MR. MARKOVITS:  Kevin, could you put up slide 20?

21           Jason, I'm going to be looking at his January

22   deposition, it's up there, on page 113:18.

23   BY MR. MARKOVITS:

24   **Q.**  Do you recall I took your deposition in January of

15:22:43  25   2013?

BAJAJ - CROSS                                    205

1    **A.**   Not the date, but I do remember we sat down, yes.

2    **Q.**   As you said, we've known each other a while.

3    **A.**   Yeah.

4    **Q.**   This is a portion of the transcript of the deposition.

15:22:54  5    Let me read this, and tell me if I read it correctly.  I

6    asked the question:  "And would I be correct in assuming

7    that you don't believe that any particular turnover

8    percentage, whether 2 percent or higher, would justify a

9    strong presumption of market efficiency?"

15:23:07  10   Answer:  "Well, I don't know what strong presumption

11   means in a legal decision.  But it is not probative

12   evidence, from an economic perspective."

13        Is that the answer you gave in 2013?

14   **A.**   I assume it is.  I have no reason to disagree with it.

15:23:23  15   **Q.**   And yet, let's take a look at your report in the

16   Allergan case.  In Allergan, you were hired by the

17   plaintiff's counsel to assess market efficiency for the

18   fraud on the market presumption?

19   **A.**   Yes.

15:23:39  20   **Q.**   You may have it in front of you.

21        MR. MARKOVITS:  Your Honor, may I approach?

22        THE COURT:  You may.

23   BY MR. MARKOVITS:

24   **Q.**   It's been previously marked as Plaintiff's 3.  Yes,

15:23:51  25   here you go.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                                    206

1    **A.**   Thank you for helping, Counsel.

2    **Q.**   In Allergan, you were hired by plaintiff counsel to

3    assess market efficiency for the fraud-on-the-market

4    presumption?

15:24:12   5    **A.**   Yes.

6    **Q.**   Your report was October 11th, 2016?

7    **A.**   It appears so, yes.

8    **Q.**   And if you look, I believe, I'm sorry, at page 7 of 30,

9    under "Summary of opinions."

15:24:30   10          MR. MARKOVITS:  Slide 21, please.

11   BY MR. MARKOVITS:

12   **Q.**   Your first opinion was:  "The Cammer and Unger factors

13   indicate that Allergan stock traded in an efficient market."

14          Did I read that correctly?

15:24:43   15   **A.**   Just one moment.

16          Yes, you did read it correctly, yes.

17   **Q.**   The Unger factors referred to are the same as the

18   Krogman factors in this case?

19   **A.**   I believe so, yes.

15:24:55   20   **Q.**   Now let's -- since we've been talking about it, let's

21   look how you handled Cammer factor 1, the average weekly

22   trading volume.

23          Could you turn to paragraph 21?

24          MR. MARKOVITS:  And that's slide 23, Kevin.

15:25:13   25          THE WITNESS:  Okay.

BAJAJ - CROSS                                    207

1    BY MR. MARKOVITS:

2    **Q.**  You found that the average weekly trading volume for

3    Allergan stock was 5.6 percent?

4    **A.**  That is correct, yes.

15:25:23  5    **Q.**  And you stated in your report, this created a strong

6    presumption of market efficiency?

7    **A.**  Did I say it created a strong presumption?  I don't

8    recall saying that.

9    **Q.**  Well, you're quoting the Cammer court where it says,

15:25:41  10   "turnover measured by average weekly trading of two percent

11   or more of the outstanding shares would justify a strong

12   presumption that the market for the security is an efficient

13   one."

14   **A.**  So I quoted the court decision.  I would never be

15:25:54  15   presumptuous to say that the court speaks for me.  So it was

16   not something I offered an opinion, I cited that court

17   decision.

18   **Q.**  So by quoting the Cammer court there's a strong

19   presumption of market efficiency if the active trading

15:26:08  20   volume was over two percent, you didn't mean to imply to the

21   court, looking at this report, that they should find a

22   strong presumption of market efficiency?

23   **A.**  No, I simply said that's what Cammer court said, these

24   are one of the factors that are looked at, this is how

15:26:23  25   Cammer court considered it, and this was the number, and it

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                                    208

1    does indicate market efficiency.

2         My language in the opinion says, "Allergan stock active

3    trading volume indicates market efficiency."  My opinion is

4    not either what you read or hear, it creates a strong

15:26:46  5    presumption of market efficiency by itself.

6    Q.  So you were just quoting the court, but you didn't

7    believe the court?

8    A.  No.  Again, Counsel, I don't want to get into any kind

9    of arguments about legal decisions with a learned counsel

15:27:00 10    like yourself.

11         What I would say is, you know, the court considered

12    several factors.  This was the same court that said Cammer

13    factor 5 is the essence of market efficiency.  So I'm not

14    here to pick a few words from this legal opinion or that

15:27:23 15    legal opinion and try to interpret it authoritatively.  I

16    stated what I stated.  I believe it's accurate.  I stick by

17    my opinion as it is stated where I stated my opinion, it is

18    an indicative of market efficiency the way I explained.

19         Sorry for the long answer.  I will try my best to keep

15:27:40 20    it as brief as I can without being misleading.

21    Q.  I think you can do better, Doctor, but we'll move on.

22    A.  Thank you for your confidence.

23    Q.  Freddie Mac common stock traded on the New York Stock

24    Exchange during the class period?

15:27:54 25    A.  Yes.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                                    209

1    **Q.**  You would agree that large capitalization stocks that

2    trade on a major stock exchange such as the New York Stock

3    Exchange are generally presumed to be efficient unless there

4    is evidence to the contrary?

15:28:10  5    **A.**  Where are you reading from?  What are you reading from?

6    **Q.**  I am reading a question.

7        You would agree, yes or no, that large capitalization

8    stocks that trade on major stock exchanges such as the New

9    York Stock Exchange are generally presumed to be efficient

15:28:24  10   unless there's evidence to the contrary?

11   **A.**  I think that would be a fair statement, yes.

12   **Q.**  I want to turn back to your Allergan report for a

13   second, Plaintiff's 3.

14   **A.**  Okay.

15:28:41  15   **Q.**  And at paragraph 18 of your report, you begin with the

16   following sentence.

17           MR. MARKOVITS:  Slide 25, Kevin.

18           MR. LEWIS:  Okay.

19   BY MR. MARKOVITS:

15:28:49  20   **Q.**  And it reads:  "Intuitively, for a large capitalization

21   stock like Allergan with many market analysts, high trading

22   volume, active flow of information and listing on a

23   well-developed public exchange such as the New York Stock

24   Exchange (NYSE), it is reasonable to infer that the observed

15:29:10  25   stock prices are determined in an efficient market."

BAJAJ - CROSS                                     210

1          Did I read that correctly?

2     **A.**  You did.

3     **Q.**  Okay.  Now --

4          MR. MARKOVITS:  Slide 26, Kevin.

15:29:20   5   BY MR. MARKOVITS:

6     **Q.**  I want to substitute "Freddie Mac" for "Allergan" in

7     that statement.

8          Would you agree that intuitively, for a large

9     capitalization stock like Freddie Mac with many market

15:29:33   10  analysts, high trading volume, active flow of information

11    and listing on a well-developed public exchange such as the

12    New York Stock Exchange, it is reasonable to infer that the

13    observed stock prices are determined in an efficient market?

14    **A.**  If my intuition were enough for purposes of this

15:29:50   15  hearing, Your Honor, then you should certify the class based

16    on these factors.

17         I have no disagreement with the statement as worded.

18    It's a preliminary statement.  Intuitively one thinks of

19    that, just like intuitively you think 15-year-olds are

15:30:08   20  healthy.

21    **Q.**  All right.  You would agree --

22    **A.**  It's intuitively the case.

23    **Q.**  You would agree that for a large capitalization stock

24    like Freddie Mac with many market analysts, high trading

15:30:16   25  volume, active flow of information and listing on a

BAJAJ - CROSS                          211

1    well-developed public exchange such as the New York Stock

2    Exchange, it is reasonable to infer that the observed stock

3    prices are determined in an efficient market?

4              MR. FRANK:  Objection, asked and answered.

15:30:31   5         THE WITNESS:  Yes.

6              THE COURT:  Thank you.  Overruled.

7    BY MR. MARKOVITS:

8     Q.  And, Dr. Bajaj, has your opinion in that regard changed

9    since the last time we spoke?

15:30:43  10   A.  No.  You know, if you read something to me in my

11   deposition and I didn't know the context where it was coming

12   from, and you read me some language and I reacted to it

13   differently because I interpreted it in certain ways

14   possible, I answered something else.

15:31:02  15        But my opinion is the same.  Intuitively, this makes

16   sense.

17   Q.  All right.  Well, let's go to your deposition.

18             MR. MARKOVITS:  Slide 27.

19             And it's the 9/26 deposition, Jason, at page 176.

15:31:16  20   BY MR. MARKOVITS:

21   Q.  And I asked you the question:  "Would you agree that

22   for a large capitalization stock like Freddie Mac with many

23   market analysts, a high trading volume, active flow of

24   information and a listing on the New York Stock Exchange,

15:31:29  25   it's reasonable to infer that stock prices are being

BAJAJ - CROSS                                    212

1    determined in an efficient market"?

2         And you did not agree?

3    **A.**   No, if you read my answer, what I said, "So I think I

4    expect stocks satisfying those characteristics many times to

15:31:47  5    be trading in an efficient market, but I wouldn't say those

6    factors would obviate the need for direct evidence on market

7    efficiency through Cammer factor 5 analysis."

8         My opinion has remained consistent whether I was

9    engaged by plaintiff's counsel or defense counsel in 2012 or

15:32:08  10   not.

11   **Q.**   Let's explore that, because then I go on to ask the

12   same question, and your answer is:  "No, I can't say yes to

13   the language that you used in your question."  Even though

14   that's the same language you used in a report you authored

15:32:22  15   in 2016; isn't that correct?

16   **A.**   So you got me there.  You didn't tell me where you were

17   reading from.  You read some language to me.  I interpreted

18   it in a certain way, and I thought it sounds more definitive

19   than I really believe, so I said as worded, I can't agree to

15:32:42  20   it.

21        I didn't correct that answer because it's correct.  If

22   you just state that language in isolation and you imply its

23   importance to be more than it is, then I wouldn't agree to

24   it.  I agree --

15:32:57  25             THE COURT:  I think you can stop there.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                                                213

1          MR. MARKOVITS:  Yes.

2          THE COURT:  I think --

3          MR. MARKOVITS:  We got the point.

4          THE WITNESS:  Okay.

15:33:04  5          THE COURT:  Exactly.  Thank you both.

6    BY MR. MARKOVITS:

7    Q.  Doctor, as we discussed before, your opinion is that

8    proof of Cammer factor 5 is necessary to prove market

9    efficiency and that an event study is necessary to prove

15:33:14  10   Cammer factor 5, correct?

11   A.  Certainly in a proceeding like this, for purpose like

12   this and circumstances like this, yes.

13   Q.  And you criticize Professor Feinstein for, among other

14   things, using only one date as an event date to test?

15:33:27  15   A.  Correct.

16   Q.  And even if he used two dates and found a statistically

17   significant price reaction on those two days, you would say

18   that the most that could prove is that on those two days,

19   there was cause and effect?

15:33:45  20   A.  I think that's fair when you're dealing with 330-day

21   class period, that won't be adequate.

22   Q.  I want to be clear.  Your opinion is that all that

23   would prove is that on those particular two days, there was

24   cause and effect?

15:34:03  25   A.  In a strict sense, yes.  Whether it's fair to infer,

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - CROSS                                        214

1    suppose the class period was 20 days, Your Honor, and --

2    **Q.**  Excuse me.

3    **A.**  I apologize.

4    **Q.**  Yes or no?

15:34:17  5    **A.**  Your questions.  Your answers.

6    **Q.**  Thank you, Doctor.

7    **A.**  Or my answers, but to your questions.

8    **Q.**  If you'd like, I'll answer the questions.

9         (Laughter.)

15:34:26  10   **A.**  I didn't want to give you a freebie in here, Counsel,

11   to write my testimony.

12   **Q.**  All right.  Let's move on from there.

13        In addition to criticizing Professor Feinstein for

14   using only one date, you also criticize him for using the

15:34:42  15   last day of the class period, correct?

16   **A.**  Yes.

17   **Q.**  And your opinion is that it's improper to use the last

18   day of the class period?

19   **A.**  If it's outcome determinative, yes.

15:34:55  20   **Q.**  Let's turn back to your Allergan report, Dr. Bajaj.

21   **A.**  Okay.

22   **Q.**  And if you could turn to paragraph 53 of your report.

23        MR. MARKOVITS:  And that's slide 22, Kevin.

24   BY MR. MARKOVITS:

15:35:16  25   **Q.**  And beginning at page [sic] 53, you talk about the

BAJAJ - CROSS                        215

1    event study you did in Allergan; is that correct?

2    **A.**  You said page 53?

3    **Q.**  I'm sorry, paragraph 53.

4    **A.**  Paragraph 53, yes.

15:35:29  5    **Q.**  Page 24 of 30.

6    **A.**  Yes, that's correct.

7    **Q.**  And on the slide, if you look at the slide, I've sort

8    of summarized, the class period was February 2nd, 2014

9    through April 21st, 2014.  And the event dates you tested

15:35:49  10   were April 11th, April 21st and April 22nd, correct?

11   **A.**  Yes.

12   **Q.**  And so the two dates, April 21st and 22nd, let's start

13   with April 22nd, that was right outside of the class period,

14   correct?

15:36:04  15   **A.**  Well, it was part of the event on April 21, yes.

16   **Q.**  Okay.  And April 21 was the last day of the class

17   period?

18   **A.**  Correct.

19   **Q.**  And then you also tested April 11.  You didn't test any

15:36:21  20   dates in the first half of that class period, did you?

21   **A.**  So you just want me to say yes or no or give any

22   context or not?

23   **Q.**  I just want you to say yes or no at this point.  It

24   would be appreciated.

15:36:32  25   **A.**  Yes.

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - CROSS                                216

1    **Q.**  You used an event date in the first half of that class

2    period?

3    **A.**  There was no event date in the first half of that class

4    period.

15:36:43  5    **Q.**  Okay.  You tested a handful of dates, two in the class

6    period, or three if you want to count the one outside the

7    class period?

8    **A.**  Out of 39, yes.

9    **Q.**  Okay.  What peer-reviewed article supports your use of

15:37:07  10   two event dates during the class period for your event study

11   in Allergan?

12   **A.**  Well, I'm not sure there is any peer-reviewed article

13   that has been written or should be written saying, in a

14   securities class action case, if you are faced with a

15:37:29  15   situation with 39-day class period, could you use two dates

16   regardless of specific facts of that case.  Peer-reviewed

17   articles are about general principles, general phenomena.

18       As an expert economist, it's my job to faithfully apply

19   that knowledge to the facts of this case.  So, therefore,

15:37:54  20   there is no such peer-reviewed article that I'm aware of.

21   **Q.**  All right.  So the answer is there is none?

22   **A.**  Yes.

23   **Q.**  Is there any peer-reviewed article that would support

24   the use of two event dates regardless of the length of the

15:38:09  25   class period?

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                                    217

1    **A.**  I don't know.  As I sit here, I can't put my tongue on

2    peer-reviewed articles.  I know that in law journals and

3    articles cited by Dr. Feinstein and myself, there is

4    definitely --

15:38:31  5    **Q.**  Limit yourself, please.  The question was peer-reviewed

6    articles.  That was the question Mr. Frank asked about with

7    Professor Feinstein.

8    **A.**  Okay, fair.

9    **Q.**  I'm asking the same question.

15:38:42  10       Were there peer-reviewed articles that would support

11   your use of two event dates in Allergan or two event dates

12   for a class period of any size?

13   **A.**  Not in that sense, yes.

14   **Q.**  What was the standard of control for your event study

15:38:59  15   in Allergan?

16   **A.**  Standard of control was 100 percent probability that I

17   tested 100 percent of material dates and found 100 percent

18   of them to be statistically significant.  There was no error

19   rate for that event study.

15:39:19  20   **Q.**  There is no error?

21   **A.**  Absolutely none.

22   **Q.**  What would the rate of error have been if you had used

23   three dates during the class period, would it have changed

24   at all?

15:39:31  25   **A.**  Well, if you had a Binomial test that said there are

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS

218

1    three material dates and you only look at one, what is the

2    probability that extrapolating from that one through three

3    would be done in error, I can't do the calculation in my

4    head, but it would be a very high error rate.

15:39:52  5    Q.  So let me ask this way:  You're saying there was no

6    rate of error because you appropriately tested three dates

7    and they showed a statistically significant price movement?

8    A.  No, there is no rate of error because I appropriately

9    tested 100 percent of material news dates.  That's the

15:40:08  10   reason there is no error.

11   Q.  And if Professor Feinstein, by testing the last day of

12   the class period, tested 100 percent of the material news

13   dates, then there would be no rate of error, or 100 percent

14   non-error, in his test as well?

15:40:25  15   A.  Not on the facts of the case, because the last date of

16   the class period and its significance was a foregone

17   conclusion.

18   Q.  Just on rate of error.  If he's testing -- if he's

19   testing the only material news day and it comes out to be a

15:40:44  20   statistically significant price reaction, then his rate of

21   error is the same as your rate of error in Allergan, isn't

22   it?

23   A.  If there was, in fact, only one material date, and he

24   tested that material date scientifically correctly, I would

15:41:04  25   not criticize his event study, period.

BAJAJ - CROSS                                          219

1    **Q.**  And in Allergan, did you prepare that event study

2    solely for the Allergan litigation?

3    **A.**  Well, that question was asked of me for Allergan

4    litigation, but I didn't design my methodology for Allergan

15:41:21  5    litigation.

6    **Q.**  Did you apply that methodology and do that event study

7    solely for the Allergan litigation?

8    **A.**  Anytime I file an expert report in a case, I file it

9    for that case.

15:41:34  10    **Q.**  Exactly.  In doing an event study, you look for

11    material news days; that's correct?

12    **A.**  Yes.

13    **Q.**  Your definition of materiality with respect to

14    financial news is information that would be expected to

15:41:51  15    result in a statistically significant stock price change?

16    **A.**  Expected ex-ante, yes.

17    **Q.**  Excuse me?  I'm sorry.

18    **A.**  Ex-ante expected, not after looking at the results.

19    **Q.**  Are you aware of a general legal definition of

15:42:09  20    materiality that talks about a news being material if it

21    would be viewed by the reasonable investor as having altered

22    the mix of information made available?

23    **A.**  I think we are venturing into a territory where you're

24    giving me more respect as a legal scholar than I deserve.

15:42:26  25    I'm not here to opine on definition of materiality from

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - CROSS

220

1    legal purposes, but I'll do my best to answer your question.

2    So if you wish to repeat it, with that caveat, I'll do my

3    best.

4    **Q.**  And I apologize for too much respect.

15:42:40  5    (Laughter.)

6    **Q.**  Have you -- have you heard of the following definition

7    of materiality that's sometimes used in the legal context,

8    which is that financial news is material if it would be

9    viewed by a reasonable investor as altering the total mix of

15:42:56  10   information made available?

11   **A.**  It sounds sort of familiar.  I can't tell you whether

12   you read some legal definition correctly or not.

13   **Q.**  Let me see if I can get you to agree with me on this:

14   That news that a reasonable investor might view as

15:43:13  15   significantly altering the total mix of information made

16   available would not necessarily be expected to result in a

17   statistically significant price movement; isn't that

18   correct?

19   **A.**  Now, the answer depends on whether you're doing the

15:43:34  20   examination for establishing market efficiency or having

21   obtained presumption of market efficiency for damage

22   purposes, you're saying if it was materially when if it was

23   not quantitatively material, we have the presumption

24   sanction by this court that it distorted the stock price.

15:44:00  25   So I think only fair answer to your question would have

MARY L. UPHOLD, RDR, CRR       (330) 884-7424

BAJAJ - CROSS                                                221

1    to give me more assumptions to be able to distinguish

2    between these two circumstances.

3    **Q.**  Let's switch topics, Dr. Bajaj, and let's talk a little

4    bit about the Z-test very briefly.

15:44:20  5    **A.**  Okay.

6    **Q.**  Now, a Z-test is a test of difference of proportions

7    between two samples?

8    **A.**  Yes.

9    **Q.**  It's a well known and basic statistical test?

15:44:30  10    **A.**  Yes.

11    **Q.**  It dates back decades?

12    **A.**  Yes.

13    **Q.**  And the use of the Z-test for market efficiency

14    purposes was suggested more than a decade ago?

15:44:41  15    **A.**  I think it was Fred Dunbar's work in Polymedica and

16    then in the FDT article, which if I recall correctly, was

17    published in 2004.

18    **Q.**  Which would be more than a decade ago?

19    **A.**  Yes, yes, correct.  I was thinking out loud.  The

15:44:58  20    answer --

21    **Q.**  Just checking my math.

22    **A.**  Yes.

23    **Q.**  All right.  The Z-test tests a difference in incidence

24    rates?

15:45:05  25    **A.**  It's a test of two proportions.  I don't know what you

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - CROSS                                    222

1    mean by "incidence rates" in the --

2    **Q.** It tested two proportions. The Fisher exact test is a

3    test of two proportions as well, correct?

4    **A.** It could be used as a test of two proportions. The

15:45:21  5    classic circumstance of Fisher exact test is if you have a

6    2x2 table, like if you asked whether Republicans are more

7    likely to be pro life in their political leaning or not, you

8    have males, females, Democrats, Republicans. Fisher exact

9    test is designed to deal with those situations.

15:45:44  10   **Q.** The Fisher exact test can be used to test different

11   proportions, correct?

12   **A.** Yes.

13   **Q.** And is there a -- there's no size requirement for the

14   Fisher exact test, is there?

15:46:00  15   **A.** Well, obviously there is some, because if you don't

16   have enough observations in some of the cells, then you

17   can't apply the Fisher exact test.

18   **Q.** But in this case, there's no sample size problem with

19   Professor Feinstein's use of the Fisher exact test?

15:46:18  20   **A.** No, there is. Professor Feinstein's use of the Fisher

21   exact test is a backstop to an insurmountable sample size

22   problem in the Z-test. Just because Fisher exact test

23   doesn't have a sample size requirement, it does not lead to

24   a conclusion that Dr. Feinstein's application of Fisher

15:46:43  25   exact test has no sample size problem.

BAJAJ - CROSS                                    223

1    **Q.**  The Fisher exact test results were valid based on the

2    sample size that he used?

3    **A.**  Again, I'm trying to give you short answers.  But I

4    can't agree those results are valid.  They are wrong in a

15:47:07   5    variety of different ways.

6    **Q.**  In terms of sample size, everything else put aside,

7    just in terms of sample size, his results are valid?

8    **A.**  You can apply Fisher exact test when called for with a

9    sample size of nine.

15:47:32   10    **Q.**  Let's switch topics and talk about whether the market

11    was inefficient.

12         You've not given an opinion that the market in which

13    Freddie Mac common stock traded during the class period was

14    inefficient, have you?

15:47:48   15    **A.**  Well, actually, I think, what I said in my report is

16    Dr. Feinstein and previously Dr. Hallman did not adequately

17    prove that the market was efficient, and if their evidence

18    can lead to any conclusion, it's that it was not.  I think I

19    do say that.

15:48:09   20    **Q.**  In other reports you've given, you've affirmatively

21    testified that your analysis showed the market was

22    inefficient, have you not?

23    **A.**  In some other reports, yes.

24    **Q.**  And you did not do so in this report, did you?

15:48:21   25    **A.**  Well, again, that's not technically quite correct,

BAJAJ - CROSS

224

1    because the court heard evidence that in a related case, in

2    Southern District of New York, Kreysar case, in connection

3    with that case, I did conduct put-call parity test that did

4    show evidence of market inefficiency during this class

15:48:45  5    period.

6    Q.    Let me stop you there, because first of all, that case

7    isn't this case.

8          But you did a put-call parity test in the Kreysar case.

9    You also have done tests such as put-call parity, serial

15:48:57  10   correlation or Y filters tests in other cases when you've

11   been acting as an expert for the defense, correct?

12   A.    Sometimes.

13   Q.    Yes.

14   A.    When asked to, yes.

15:49:06  15   Q.    Yes.  Such as the AIG case?

16   A.    Yes, correct.

17   Q.    And in the AIG case, you ran those tests and determined

18   that the market was not weak form efficient, and, therefore,

19   opined that the market was not semi-strong form efficient,

15:49:25  20   correct?

21   A.    In part, yes.

22   Q.    Okay.

23   A.    Which is the record of this case, too, by the way.

24   Q.    But in this case, you didn't run put-call parity,

15:49:31  25   serial correlation or Y filters tests, did you?

BAJAJ - CROSS                                            225

1    **A.**  I didn't repeat my analysis in the Kreysar case for

2    purposes of writing a report here, yes.

3    **Q.**  You didn't even present it in your report here, did

4    you?

15:49:43    5    **A.**  But you guys questioned me on it, your expert

6    questioned me on it --

7    **Q.**  Excuse me.  Answer my question, Doctor.

8         You didn't present to this court in your report as a

9    basis for your opinion any put-call parity test you ran in

15:49:55    10   any other case?

11   **A.**  In that narrow sense, yes.

12   **Q.**  Well, I don't think it's narrow, but we'll agree to

13   disagree.

14   **A.**  Okay.  Fair enough.

15:50:04    15   **Q.**  Let me switch topics and talk about price impact.

16        You've given an opinion that there was a lack of price

17   impact, even assuming market efficiency and assuming the

18   truth of the allegations in the third amended complaint,

19   there was a lack of price impact in this case?

15:50:39    20   **A.**  Correct.

21   **Q.**  And in part, your analysis of price impact was in

22   response to Professor Feinstein on that issue, you

23   indicated?

24   **A.**  No, that's not quite correct.  I give analysis,

15:50:56    25   affirmative analysis laying out my analysis and my reasons

BAJAJ - CROSS                                    226

1    as to why economic evidence does not support a finding of

2    price impact.

3              MR. MARKOVITS:  Slide 34, please, Kevin.

4    BY MR. MARKOVITS:

15:51:16  5    Q.  Going back to your deposition.  We were talking about

6    price impact.  Do you remember me asking you the question:

7    "But you'd agree that there may be nonpublic information

8    that would affect your price impact analysis following

9    discovery and you're open to looking at that?"

15:51:35  10            Answer:  "I'm always open to looking at all relevant

11   evidence.  My analysis here was, in part at least,

12   responsive to Dr. Feinstein.  And I didn't see him point to

13   any evidence, other than the large price drop on that day,

14   which was right there in the Complaint, and just repeating

15:51:50  15   Plaintiffs say so, that it was a revelation of alleged

16   fraud."

17            Did I read that correctly?

18   A.  Yes, I did say "in part," and you read that correctly.

19   Q.  Your view is that Dr. Feinstein didn't point to any

15:52:08  20   evidence of price impact?

21   A.  Well, that's not the only view on price impact I

22   expressed in my report, that's, in part, my view.

23   Q.  And you understand, though, it's not the burden on

24   Dr. Feinstein or OPERS, the plaintiff, to prove price

15:52:25  25   impact, it's the burden on the defense to prove a lack of

BAJAJ - CROSS                                                227

1    price impact?

2            MR. FRANK:  Objection, it calls for legal

3    conclusion.

4            THE COURT:  It does.  I'll sustain that objection.

15:52:34  5    Next question.

6    BY MR. MARKOVITS:

7    **Q.**  You understood the burden you faced was to show a lack

8    of price impact?

9    **A.**  I was told by counsel to examine economic evidence and

15:52:52  10    to render an opinion as to whether economic evidence showed

11    any price impact, and I found none.

12    **Q.**  And you're not giving an opinion on the truth or

13    falsity of plaintiff's allegations of fraud, correct?

14    **A.**  No, I'm not.

15:53:11  15    **Q.**  And you'd agree that there was a roughly 29 percent

16    stock decline on November 20th, 2007, which comfortably met

17    the requirements for statistical significance?

18    **A.**  Yes.

19    **Q.**  You're not giving an opinion that the

15:53:27  20    misrepresentations and omissions alleged had no price impact

21    on November 20th, 2007?

22    **A.**  So if you don't want me to explain, I'll simply answer

23    your question as yes and no, even though I think a yes or no

24    answer may not do justice to the analysis that I did and the

15:53:57  25    opinions that I reached.  But it's your call.  If you want

BAJAJ - CROSS                                     228

1    just yes or no answer, just ask the question.

2    **Q.**  Let's start with a yes or no answer.

3    **A.**  Okay.  So please ask the question.

4    **Q.**  You're not giving an opinion that the

15:54:10  5    misrepresentations and omissions alleged had no price impact

6    on November 20th, 2007?

7    **A.**  Actually, I think the answer would be yes.  Those

8    misstatement and omissions alleged in the complaint did not

9    have any price impact on November 20th, 2007.

15:54:35  10           MR. MARKOVITS:  Kevin, could you put up slide 37?

11   BY MR. MARKOVITS:

12   **Q.**  Looking at slide 37, Doctor, which is, again, your

13   deposition, page 92, beginning at line 23, "Question:  Is it

14   your opinion that the misrepresentations and omissions

15:54:54  15   alleged have no price impact on November 20th, 2007?"

16           "Answer:  No."  And then you go on with an explanation.

17           Do you see that?

18   **A.**  Yes, and that explanation is the key.  What it says is,

19   "My opinion is that when we look at the company's

15:55:12  20   announcement on November 20th, we consider the

21   contemporaneous market evidence on how that announcement was

22   perceived by the market, the price decline on that date does

23   not line up with Plaintiff's allegations regarding alleged

24   disclosure defects based on the analysis of public

15:55:31  25   information that I described."  Which included, by the way,

BAJAJ - CROSS                                             229

1    no price impact of misstatements.

2         So the fact is, a price is impacted, as I understand it

3    as an economist, when there is information and that leads to

4    a price change.  That's my working definition of "price

15:55:57  5    impact."

6         If you say none of the alleged 23 misrepresentations

7    are associated with significant stock price changes, because

8    it was all price maintenance theory, fair enough, you can

9    argue that, and then you say bad news was announced on

15:56:16  10   November 20th, when that bad news had no revelation that can

11   be tied to the fraud that you allege in 23 misstatements,

12   how on earth can logically you say that the fraud impacted

13   the price?  Market didn't learn anything about anything

14   having to do with the fraud on that day.

15:56:40  15   Q.   Let's explore that a little bit logically.  There was a

16   huge loss on November 20th, correct?

17   A.   Yes.

18   Q.   Catastrophic, I believe you called it earlier?

19   A.   Yes.

15:56:49  20   Q.   And it resulted in a statistically significant price

21   decline?

22   A.   Yes.

23   Q.   The plaintiffs have alleged that that loss came from

24   undisclosed credit risk.  Is that your understanding?

15:57:04  25   A.   Yes.

BAJAJ - CROSS                                    230

1    **Q.**  Without the benefit of all the discovery in the case,

2    how can you prove that that loss didn't come from the

3    undisclosed credit risk?

4    **A.**  I can.  Because subsequent to my deposition --

15:57:24  5    **Q.**  Did you say you can or you can't?

6    **A.**  I can.  Yes, I can.

7    **Q.**  Okay.

8    **A.**  So all these statements, all the analyst reports I

9    reviewed from November 20th to November 27th, all the mix of

15:57:40  10   public information I looked at, Your Honor, and all the

11   information cited in Professor Feinstein's rebuttal report

12   that came subsequently, shows that the reason for that $2

13   billion loss was that Freddie Mac held securities in its

14   portfolio which for GAAP valuation purposes were being

15:58:12  15   valued based on marks that they got from the market.

16        And given the market illiquidity, because liquidity

17   seized, the marks on those securities went down, which led

18   to a large GAAP loss, which analysts at the time realized

19   doesn't represent any credit loss.  And Freddie Mac said in

15:58:36  20   its press release, in its earnings call, radio analysts

21   concurred in their commentary that this was a GAAP loss.

22        Freddie Mac's only exposure to subprime or high-risk

23   loans came through triple-A rated securities in its

24   portfolio --

25   **Q.**  Doctor?

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

BAJAJ - CROSS                                    231

1    **A.**  -- which it had already disclosed.

2    **Q.**  Doctor, is the answer to my question yes, you can, is

3    what you're saying?

4    **A.**  Yes.

15:59:03  5    **Q.**  Okay.

6            THE COURT:  He can and he has.

7            (Laughter.)

8            THE COURT:  You won't ask him to do that again.

9            MR. MARKOVITS:  I didn't ask him to do it this

15:59:10  10   time, Your Honor, but I got an earful.

11   BY MR. MARKOVITS:

12   **Q.**  Let me try to clarify because I hear an explanation now

13   that I've never heard before and that's contrary to what's

14   in your deposition.  So let's explore what you've said

15   previously.

16   **A.**  The only thing I would say, it's not contrary to my

17   deposition.

18   **Q.**  Let's explore --

19   **A.**  Okay.

15:59:27  20   **Q.**  -- what you said previously.

21   **A.**  Go ahead.

22   **Q.**  You're not giving an opinion that Freddie Mac

23   accurately reported its exposure to credit risk for

24   nontraditional mortgages, are you?

15:59:35  25   **A.**  I'm saying there is absolutely no indication that they

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS                                    232

1   did --

2   **Q.**  You're not giving -- answer my question yes or no.  You

3   are not giving an opinion that Freddie Mac accurately

4   reported its exposure to credit risk from nontraditional

15:59:50  5   mortgages, are you?

6   **A.**  As of that time, yes.

7        MR. MARKOVITS:  Slide 38, please.

8   BY MR. MARKOVITS:

9   **Q.**  Again, from your deposition, "Question:  No.  I'm

16:00:04  10  sorry.  That's not my question.  I'll get there eventually.

11  But a basic foundational question here, I just want to

12  understand, you're not giving an opinion, one way or

13  another, that Freddie Mac accurately reported its exposure

14  to credit risk from nontraditional mortgages?"

16:00:18  15       "Answer:  No, I am not offering an opinion one way or

16  another."

17       Did I read that correctly?

18  **A.**  You did.  I'm not an accountant.  I'm not offering an

19  opinion --

16:00:28  20  **Q.**  That's my only question, was did I read that correctly?

21  Yes?

22  **A.**  Yes, you did.

23  **Q.**  All right.  And you're not opining that no part of the

24  losses and write-downs that were announced on November 20th,

16:00:38  25  2007, resulted from undisclosed credit risk from exposure to

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - CROSS

1    nontraditional loans, are you?

2    **A.**  Well, given the way that question is worded, the only

3    answer to that question that you can logically give is no.

4    **Q.**  All right.  You can't answer questions about what were

16:00:57    5    the components of the roughly $2 billion loss that was

6    announced on November 20th, 2007?

7    **A.**  I didn't look at their accounting, so I cannot, from

8    that perspective.  But I can look at what they announced --

9    **Q.**  The answer is no --

16:01:13    10    **A.**  Okay.

11    **Q.**  -- correct?  You can't answer questions -- the answer

12    is yes, you cannot answer questions about what the

13    components of that $2 billion loss were, correct?

14    **A.**  Yes.

16:01:21    15    **Q.**  You don't know to what extent Freddie Mac adhered to

16    its underwriting guidelines during the class period?

17    **A.**  Yes.

18    **Q.**  The answer is you don't know, correct?

19    **A.**  I don't know.  I'm not an expert on underwriting

16:01:36    20    guidelines.

21    **Q.**  And so you can't conclude that no part of the 29

22    percent stock decline on November 20th, 2007 was due to

23    Freddie Mac's failure to adhere to its underwriting

24    guidelines, can you?

16:01:47    25    **A.**  Series of questions that I have to answer the way I

234

1     have to, because I didn't do the work as an expert

2     accountant or an expert underwriter, lead to an answer to

3     that question which misleadingly connects the dots that

4     you're apparently trying to connect.  That's not --

16:02:17  5     **Q.**  I just want an answer to my question, Professor.

6     **A.**  Okay.

7     **Q.**  You can't conclude -- Doctor, I apologize.

8          You can't conclude that no part of the 29 percent stock

9     decline on November 20th, 2007, was due to Freddie Mac's

16:02:31  10    failure to adhere to its underwriting guidelines?

11    **A.**  No, I can't.  I haven't looked at those issues.

12    **Q.**  And, Doctor, you've been subject, in other cases, of

13    motions to exclude your testimony?

14    **A.**  Yes.

16:02:44  15    **Q.**  And in two of those cases, part or all of your

16    testimony was excluded by the court?

17    **A.**  Correct.

18          MR. MARKOVITS:  I have nothing further, Your

19    Honor.  I will pass the witness.

16:02:57  20          THE COURT:  Well, Mr. Frank is out of time, but if

21    you -- that begging you offered up, if you have ten

22    minutes --

23          MR. FRANK:  Should I begin begging now, Your

24    Honor?

16:03:12  25          THE COURT:  Would ten minutes be of assistance?

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

**BAJAJ - REDIRECT**

235

1          MR. FRANK:  I think I can easily be done within

2     ten minutes.

3          THE COURT:  Then I'll allow it.  And because it

4     appears that Mr. Markovits was not -- he hadn't completely

16:03:23  5     used his time, although you didn't --

6          MR. MARKOVITS:  I will cede my time to Mr. Frank.

7          THE COURT:  Thank you both.

8          MR. FRANK:  Thank you, Mr. Markovits.

9          REDIRECT EXAMINATION OF MUKESH BAJAJ, Ph.D.

16:03:31  10    BY MR. FRANK:

11    **Q.**  Good afternoon, Dr. Bajaj.

12    **A.**  Good afternoon.

13    **Q.**  You're almost there.  I just have a few brief questions

14    for you, Dr. Bajaj.

16:03:38  15         With respect to your testimony being excluded, was

16    there a change in the law that resulted in the exclusion of

17    your testimony?

18    **A.**  You know, I really cannot even answer that question.

19    These things happen.  I didn't take that as reflection on my

16:03:55  20    work.  It was whatever court's interpretation on some issue.

21    I don't want to sound defensive.  It happened.  I don't

22    remember anything of any substance about it.

23    **Q.**  You were asked some questions about the Z-test.  And

24    I'm just going to ask you some high-level questions about

16:04:18  25    the Z-test that I think put those questions in perspective.

**BAJAJ - REDIRECT**                                          236

1      Is Dr. Feinstein's Z-test a reliable method to assess

2  market efficiency?

3  **A.**   No.

4  **Q.**   Why not?

16:04:34   5  **A.**   For all the reasons we explained:  too small sample

6  size, a test that is misspecified, looking at news dates and

7  fraction of news dates does not logically tell you anything

8  about market efficiency.

9      In any case, all the data selection errors, all the

16:04:55  10  ex-post selection errors, and when you even correct for the

11  structural break and remove the last date, the Z-test is not

12  even statistically significant.

13      So on its own terms, it's not reliable.  It's not a

14  scientifically valid method for a purpose like this.

16:05:11  15  **Q.**   Well, Dr. Bajaj, let's put aside for a moment your

16  criticisms of Dr. Feinstein's application of the FDT Z-test

17  to this case, and let's just talk about the FDT Z-test

18  generally.

19  **A.**   Okay.

16:05:26  20  **Q.**   Is an FDT Z-test a reliable method for testing market

21  efficiency?

22  **A.**   No.  It has nothing to do with market efficiency.

23  **Q.**   Why is that?

24  **A.**   Because it compares fraction of news dates that are

16:05:41  25  associated with statistically significant reaction relative

BAJAJ - REDIRECT                    237

1    to non-news dates.

2        So as we looked at that example of ten news dates, five

3    reacting, there's no logical connection between what

4    proportion and market efficiency you need to focus on

16:05:58  5    material news dates.  Leave that aside.

6        Let's say you do a Z-test using properly selected

7    material news dates.  There was no look-ahead bias, nothing.

8        The hypothesis that is being told to this court to

9    accept is if the market reacts to material news, correcting

16:06:22  10   one of the flaws, large enough a proportion of times that

11   it's statistically more than 5 percent, that would be the

12   non-news date.  That is an efficient market.

13       Now, think about what that means in this context.

14   Plaintiffs have alleged 23 disclosure defects.  Let's take

16:06:43  15   the market reaction to be on 50 percent of the dates.  Does

16   that mean the court is to assume 50 percent of the time the

17   market reacts to news?  Which 50 percent?

18       There is no logical connection between the very premise

19   of the test and what that test is being used for, namely, a

16:07:07  20   presumption that all material disclosure defects throughout

21   the class period distorted the stock price.

22   Q.  Dr. Bajaj, is the Z-test a method generally accepted by

23   economists for assessing market efficiency?

24   A.  No.

16:07:22  25   Q.  Has it been subjected to peer review and publication?

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1    **A.**  No.

2    **Q.**  Is there a known rate of error for a Z-test's use in

3    assessing market efficiency?

4    **A.**  No.

16:07:31  5    **Q.**  Is the Z-test a method that has been tested by

6    economists to assess market efficiency?

7    **A.**  No.

8    **Q.**  Now, you were talking earlier about how Dr. Feinstein

9    applied the Z-test in this case.  In your opinion, did

16:07:48  10   Dr. Feinstein reliably apply the Z-test to the facts of this

11   case?

12   **A.**  No.

13   **Q.**  Why not?

14   **A.**  Because of all the errors I think I pointed to, ten

16:07:58  15   methodological errors in my report.  We covered a few of

16   those.  Not recognizing the February 27th structural break

17   date.  Not having enough sample size.  Using the last day of

18   the class period, even when FDT's authors explicitly

19   proscribe that.  Using other disclosure-related dates.  Not

16:08:24  20   applying continuity correction.  Using a pooled variance to

21   test to proportions.

22       All of the errors discussed in my report and today are

23   in one direction.  They overstate the significance of the

24   Z-test.  Some just lead to a biased conclusion, and some,

16:08:48  25   individually or collectively, are outcome determinative.

**BAJAJ - REDIRECT**                          239

1    It's a mess, and I don't mean that derogatorily.

2    **Q.**  Dr. Bajaj, you were asked some questions about your

3    report in the Allergan matter.

4        Do you recall that?

16:09:04    5    **A.**  Yes.

6    **Q.**  You were asked questions about having run an event

7    study on three dates in a case where there was a 39 trading

8    day class period, correct?

9    **A.**  Yes.

16:09:14    10   **Q.**  Were those the only dates that you -- sorry about that.

11       Were those the only tests you ran in that case?

12   **A.**  No.  Actually --

13   **Q.**  What other tests did you run in that case?

14   **A.**  I have language in that report saying that the number

16:09:26    15   of material news dates you can test is necessarily limited

16   by the short class period.  And, therefore, I did put-call

17   parity test for every second of every trading day for all of

18   those 39 dates, resulting in tens of millions of

19   observations.

16:09:49    20       And only after I had done all that work,

21   notwithstanding the fact that I said Cammer factor 1

22   indicates market efficiency, Cammer factor 2 does, event

23   study does, not until I had done all the work did I issue an

24   opinion that Allergan stock traded in an efficient market

16:10:12    25   over that class period.

**BAJAJ – REDIRECT**

1    **Q.**   What does a put-call parity test test for?

2    **A.**   So Nobel Prize winning economist Robert Merton showed

3    that if the market is pricing securities correctly, then

4    some combinations of put options and call options is

16:10:40  5    equivalent to owning the underlying stock.

6        So one way economists test whether markets are

7    functioning well or are prices dislocated is to compare the

8    price of the stock relative to the combination of

9    put-call -- puts and call options that is economically

16:11:04  10   equivalent to owning the stock.

11       And if there is a violation of that put-call parity,

12   then an arbitrageur could make profits exploiting that

13   put-call parity.

14       So how often do these violations occur is a direct

16:11:25  15   measure of how effectively arbitrageurs are keeping markets

16   efficient and not dislocated.  And this is a very powerful

17   test that allows you to determine whether market is

18   efficient or not.

19       And I thought in the Allergan case it was called for,

16:11:46  20   given that I could only test a handful of event dates over

21   the 39-day class period.

22            MR. FRANK:  Your Honor, I'll pass the witness

23   again.  Thank you for your indulgence, and thank

24   Mr. Markovits, too.  Thank you.

16:11:59  25            THE COURT:  You're certainly welcome.

BAJAJ - RECROSS                      241

1      MR. MARKOVITS:  Your Honor, could I have just -- I

2  would say one more question, maybe two?

3      THE COURT:  You may, sir, you may.

4      MR. MARKOVITS:  Thank you, Your Honor.

16:12:07  5      RECROSS-EXAMINATION OF MUKESH BAJAJ, Ph.D.

6  BY MR. MARKOVITS:

7  **Q.**  Dr. Bajaj, you were talking about the put-call parity

8  test.

9      Can you point to me any peer-reviewed article which

16:12:14  10  supports the use of the put-call parity test for determining

11  market efficiency in securities cases?

12  **A.**  I'm sorry, could you please repeat the question?

13  **Q.**  Yes.  Can you provide me with the name of any

14  peer-reviewed article that supports the use of the put-call

16:12:28  15  parity test for proof of market efficiency in securities

16  cases?

17  **A.**  So I can point you to cases where the court considered,

18  but there's no peer-reviewed article that says it's

19  appropriate for using in securities cases.

16:12:46  20  **Q.**  Right.  So there's no peer-reviewed article supporting

21  the put-call parity test that you did in Allergan?

22  **A.**  No, that's not true.  There are many peer-reviewed

23  articles in economics and finance that say it is an

24  appropriate test for testing market efficiency.  Those

16:13:02  25  articles were not written for securities cases alone.  As a

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

BAJAJ - RECROSS

242

1    general proposition --

2    **Q.**  Can you point me to any case where put-call parity has

3    been acknowledged by a court as proof of market efficiency?

4    **A.**  How about Polymedica?

16:13:18  5    **Q.**  It was acknowledged as proof of market efficiency in

6    Polymedica?

7    **A.**  It was acknowledged as a valid test of market

8    efficiency.  Fred Dunbar testified in that case.

9    **Q.**  The court will determine whether or not that's the

16:13:29  10   case.  Thank you.

11   **A.**  Thank you.

12           THE COURT:  Thank you both.

13           Mr. Frank, you're keeping your seat.

14           MR. FRANK:  I'm all set, Your Honor.  Thank you.

16:13:37  15           THE COURT:  All right, then.

16           Thank you, Doctor.  You're welcome to stay.

17           Counselors, do either one of you intend to re-call

18   Dr. Bajaj?

19           MR. FRANK:  No.  I think that we have completed

16:13:46  20   the evidentiary portion and after a brief break we're ready

21   to move on to the four oral arguments.

22           THE COURT:  Thank you.

23           Mr. Markovits, you're in agreement?

24           MR. MARKOVITS:  Yes.  Thank you.

16:13:59  25           THE COURT:  Thank you.  You're welcome to stay and

1    enjoy the remaining part of the proceedings.  We will have a

2    ten-minute recess and we'll return for oral argument on --

3    starting with the first motion to strike, and that's

4    Dr. Feinstein's testimony, and proceed as the schedule

16:14:15   5    shows.

6            THE WITNESS:  Thank you, Your Honor, especially

7    for your indulgence.

8            THE COURT:  You're more than welcome.  You both

9    were wonderful.  We're in recess.

10           (Recess at 4:14 p.m., and the proceedings resumed at

11            4:25 p.m.)

12           THE COURT:  The schedule shows that oral argument

13   on the motion to dismiss Dr. Feinstein will start with

14   Freddie Mac arguing first, followed by plaintiffs.

16:25:42   15           MR. FRANK:  Thank you, Your Honor.

16           THE COURT:  Certainly.  Sir, do you care to

17   reserve any of your 15 minutes for rebuttal?

18           MR. FRANK:  I will reserve as many minutes as I

19   can, Your Honor.  Do I need to indicate them in advance?

16:25:59   20           THE COURT:  So what you don't use, you'd like to

21   reserve, is that how you're doing it?

22           MR. FRANK:  Yes, Your Honor.

23           THE COURT:  All right, then.

24           MR. FRANK:  Thank you.

16:26:08   25           Your Honor, Dr. Feinstein's testimony is exactly

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

244

1    why Daubert standards exist.  He has literally made up tests

2    and techniques in order to avoid results that disfavor his

3    clients.

4            There are three prongs to the reliability standard

16:26:26  5    under Daubert.  Dr. Feinstein's opinions fail all three.

6    His opinions aren't based on sufficient facts.  They aren't

7    based on reliable methods.  And he didn't apply his methods

8    reliably to the facts of this case.

9            First, Your Honor, a quick word about

16:26:47  10   Cammer/Krogman.  Dr. Feinstein did not merely base his

11   opinions on the structural factors of Cammer/Krogman.  He

12   also based them on the empirical factor.  And the reason he

13   did that, you heard from Dr. Bajaj, which is that in the

14   real world, economists just do empirical testing.  They want

16:27:10  15   to find out is the market actually efficient.  They don't

16   just use the structural tests that, you know, a district

17   court identified years ago that is now broadly used by the

18   courts.  Economists dive in and they figure out is the

19   market efficient or not.  And that is why Dr. Feinstein

16:27:27  20   offered opinions based on empirical testing in addition to

21   the structural factors.

22           Now, as you know, he ran two empirical tests.

23   Both of those are seriously flawed.  If this were to ever go

24   to a jury, the court shouldn't allow him to testify to a

16:27:46  25   jury, as he picks made-for-litigation techniques and matches

245

1    different standards that aren't accepted by economists

2    generally in order to get to the desire that his client --

3    to get to the result his client desires.

4          His first test is his single date event study.

16:28:09  5    That's almost by definition not based on sufficient facts.

6    There was a 330 trading day class period here.  When

7    economists -- when you examine other cases where economists

8    try to assess market efficiency, you'll see that they pick

9    many dates.

16:28:25  10          The Freddie Mac/Kreysar case, there were dozens of

11    dates that were tested.  And economists try to show that the

12    market is efficient throughout the class period.  After all,

13    the point is that on the misrepresentation dates that are

14    alleged, that the market needs to be efficient on those

16:28:47  15    dates so that the supposed inflation that is caused by the

16    alleged lie affects the stock price.  That's why you need to

17    test many dates and throughout the class period.  Here, the

18    only event study that was run was run on the very last date

19    of the class period.

16:29:08  20          Now, in his report, if you read it, he ends up --

21    he writes that his event study proves market efficiency.

22    But he has recanted that statement both at deposition and

23    this court.  He says, "No, you have to take it holistically.

24    That alone doesn't prove market efficiency."  Nor could it

16:29:28  25    possibly.  It just doesn't logically make sense.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

246

1          THE COURT:  You mean holistically with the Cammer

2     and Krogman or Unger factors.

3          MR. FRANK:  With everything he has done.  In other

4     words --

16:29:40  5          THE COURT:  And the Z-test?

6          MR. FRANK:  And the Z-test.

7          THE COURT:  Okay.

8          MR. FRANK:  Now, in other words, he concedes it's

9     not enough.  And not only is it not enough, logically, it

16:29:48  10    doesn't make sense that it would establish market

11    efficiency.

12          And that's because the very definition of

13    "inefficiency" is a market that doesn't consistently react

14    to public information.  And, in other words, a market that

16:30:07  15    only sometimes reacts to public information is not

16    efficient.

17          So take our analogy that we discussed with

18    Dr. Bajaj during his direct examination of the company that

19    has only one factory.  That company may trade in an

16:30:23  20    inefficient market that is generally not responding to

21    material news.

22          But if it has a catastrophic event like its one

23    factory burns to the ground, it may on that one day respond

24    as everyone would expect, the price of that -- of a security

16:30:43  25    in that company would respond.  That doesn't make it

1       efficient for the prior year or so.  That doesn't tell us

2       anything.  Yes, it responded to a catastrophic event.  The

3       market may have been efficient on that single day.

4              The best that the plaintiffs can do is they cite

16:31:01  5   an article that actually criticizes a couple of outlier

6       cases that use too few dates.  The article that they

7       reference in their brief actually states, "A serious and, in

8       fact, fatal problem with this approach," the approach of

9       selecting a handful of dates, let alone one date, they were

16:31:18  10  dealing with a handful of dates, "is that one would expect

11      to see such results if stock price movements were completely

12      random and had no average correlation with news events."  We

13      can't just look at one date, that's consistent with

14      inefficiency.

16:31:36  15         Now, in Groupon, Dr. Feinstein tested two dates

16      over a seven-week class period.  And in that case, he

17      testified that that was on the low side.  This class period

18      is 330 trading days, which is approximately 66 weeks.  If

19      two is on the low side for 7 weeks, one for 66 weeks, this

16:31:57  20  isn't science, Your Honor.

21             We have cited to the court several cases that

22      reject event studies based on just a few dates and OPERS

23      does not distinguish those cases.  These are the Bell,

24      George and Kreysar cases that appear on pages 8 through 10

16:32:09  25  of our brief and page 4 of our reply.

248

1          Now, not only is it not based on sufficient facts,

2     it's not a reliable technique, for all of the reasons I've

3     just described.

4          Now, as the court is familiar, the Daubert case

16:32:23  5     set forth a number of factors to consider to assess whether

6     or not a technique or a method is reliable.  And we walk

7     through those in our brief, both with respect to the single

8     date study and with respect to the Z-test.

9          So with respect to the single date study, it's not

16:32:42  10    generally accepted by economists or peer reviewed.  OPERS

11    appears to concede that point.  There are no standards of

12    control or rates of errors.  There are -- this single date

13    study was prepared solely for litigation.

14         Now, don't be confused.  It is, of course, true

16:32:57  15    that every expert needs to apply methods to their

16    litigation.  But here there's something more problematic

17    about this single date event study.  And that is, when you

18    just describe what happens here, anyone can see how it was a

19    litigation-driven test.

16:33:17  20         A first expert, Dr. Hallman, tests six dates.  He

21    sees that two, according to him, are statistically

22    significant.  A second expert, Dr. Bajaj, criticizes it and

23    says, "You were wrong.  Only one was statistically

24    significant."  Plaintiffs move to substitute Dr. Hallman

16:33:35  25    with Dr. Feinstein.  And what does Dr. Feinstein decide to

249

1    do?  He tests just the one date that the parties agree upon.

2         That is not good science.  You're supposed to

3    hypothesize and then see your results.  You're not supposed

4    to know your results in advance.

16:33:50    5         In addition, in a securities case, you're not

6    supposed to take the last day of the class period, for the

7    very reasons that the authors of the FDT article say in that

8    article.  Everyone knows that plaintiffs choose a class

9    period in the vast majority of cases where the stock price

16:34:07   10    declines on the last day.  And so when you choose the last

11    day of the class period, you're skewing your results in

12    favor of your client.

13         In sum, the single date event study, that's not a

14    reliable technique.  It's not a technique that's based on

16:34:24   15    sufficient facts.  And it wasn't -- it was based really for

16    the purposes of litigation here.

17         Now, the Z-test fares no better, Your Honor.  It

18    too is based on insufficient facts.  We walked through one

19    of the textbooks today with Dr. Feinstein demonstrating that

16:34:40   20    the Z-test violates sample size requirements.

21         Now, Dr. Feinstein, he doesn't dispute that it

22    violates the sample size requirements.  His response is, "I

23    ran diagnostic tests."  Well, we are not familiar with any

24    literature in the field that says those diagnostic tests

16:34:59   25    cure the results of his invalid Z-test.

250

            But even if that could be true, and we don't

accept that it is, the problem with his diagnostic test is

that when you correct those tests for a structural break in

February, they have insignificant results, too.  When you

correct his Z-test for a structural break in February and

you don't include the final date, that's a statistically

insignificant result.

            So his Z-test, when it's corrected for the

structural break that Dr. Feinstein didn't recognize, it

yields statistically insignificant results.

            Now, I think it's worth talking for just a moment

about what a structural break is.  A structural break is

when the market, the average volatility changes in a

statistically significant way.

            So, in other words, when we're trying to measure

what size price change is unlikely to have occurred merely

by chance, what size wave in the ocean wasn't just by

chance, but it was actually so unusual that we take note of

it, you need a different ruler.  In the lake, you might need

a one foot ruler, and in the ocean you need the three foot

yardstick.

            And that structural break was found by Dr. Bajaj.

He didn't engage in any data snooping or data mining.  Your

Honor saw Dr. Bajaj today.  He's a man of integrity.  And he

identified this problem.  He tested it with a Chow test, and

251

1    the very Chow test that Dr. Feinstein's team had used to

2    verify an earlier structural break, the one in August.  And

3    ultimately, that structural break, which does exist, renders

4    these tests statistically insignificant.

5           Now, not only do we have the insufficient fact

6    problem that isn't solved -- now, remember what's going on

7    here.  They tested nine dates.  They need at least 30.  They

8    test nine dates.  Only four are statistically significant

9    according to them.  One is at the end of the class period.

10   So that leaves three.  So based on three supposedly

11   statistically significant dates, they're saying this whole

12   class period was efficient.

13          Not only do they -- I'm sorry?

14          THE COURT:  In your papers, there was more said

15   than I've heard today about none of the four dates being

16   within the first five months of the class period.

17          What would you like me to make of that?

18          MR. FRANK:  That's true, Your Honor, and we have

19   it on our last slide and I was going to argue more about it

20   later.

21          THE COURT:  Then I'll wait for it.

22          MR. FRANK:  Let me say this about that:  I think

23   that is directly relevant to the motion for class

24   certification.

25          But what I want to really talk about now is what

252

1    is bad science.  Like what Dr. Feinstein has done is bad

2    science.  It is true that it's not really a reliable

3    application of his test to not include any of the dates in

4    the early part of the class period, the first five months.

16:38:10  5    That's not really reliable.

6           They criticize Dr. Bajaj for doing something

7    similar.  But in a 39-day class period, they say, "Oh, you

8    only tested dates in April."  And Dr. Bajaj's response to

9    that is, "I looked for every material news date there was

16:38:25 10    and I tested every one.  It was only 39 trading days."

11           So I do think he could be criticized for that.

12    But there's a lot of other criticisms in terms of the

13    reliability of his application here.

14           But before turning to that -- oh, unless, I'm

16:38:42 15    sorry, Your Honor, you wanted to follow up.

16           THE COURT:  Well, maybe you'll get to this.  One

17    of the things that Dr. Bajaj said that I thought served to

18    bolster Dr. Feinstein's use of a single event date was the

19    period.  You know, he described it as tumultuous.  He

16:39:05 20    described it as catastrophic.  Well, the events that led up

21    to the recession, and that the mortgage market was the

22    center of the recession, and that the center of even that,

23    as if, you know, the eye of the hurricane, was Freddie Mac.

24           So if there is ever an occasion -- I mean, at some

16:39:25 25    point, while I understand Daubert requires that there be

253

1    sufficient data, reliable method and the reliable

2    application of the method, did we have an occasion for the

3    kind of science that Dr. Feinstein employed?

4         MR. FRANK:  Well, I think that when you have

16:39:44  5    market conditions like that, it sets the stage for market

6    inefficiency.  And if you use reliable tests and you applied

7    them reliably to sufficient data, you could then determine,

8    did we have an efficient matter -- an efficient market or an

9    inefficient market given these unusual market conditions.

16:40:05  10         THE COURT:  Uh-huh.

11         MR. FRANK:  Now, it's a little difficult to

12    discuss that here, because Dr. Feinstein didn't use a

13    reliable method.  He didn't apply it reliably.  He instead

14    used a method that is based on insufficient facts.  He used

16:40:23  15    a method that doesn't even test market efficiency, as

16    Dr. Bajaj explained.  And he played so many games with the

17    method, Your Honor.  We identified ten flaws in his

18    approach.  And then, during the cross-examination today, I

19    identified several more.

16:40:41  20         The fact of the matter is that this method doesn't

21    assess market efficiency.  And even if it could, which it

22    can't, the way Dr. Feinstein applied it here in this case is

23    simply not reliable.

24         And for all of those reasons, we believe that

16:41:00  25    Dr. Feinstein's -- his opinions shouldn't -- they should

254

1    never go to a jury.  His report should be stricken.  And he

2    shouldn't be -- his testimony should be excluded.

3            And to the extent I have any time left, and I may

4    not, I'll reserve that time.

16:41:15  5            THE COURT:  Well, I'll ask you a question I think

6    I know the answer to.  Of course, as you indicated well

7    before the matter of whether a jury hears this evidence, is

8    the question to be answered about class certification.  And

9    I think it's also your ask that I not consider

16:41:30  10   Dr. Feinstein's testimony for that determination.

11           MR. FRANK:  That's right, Your Honor.  As we'll

12   argue at that stage, you'll see one of the reasons, the very

13   first reason why class certification should be denied is

14   that they rely solely on Dr. Feinstein.  His opinion should

16:41:45  15   be excluded.  And once that happens, they have come forward

16   with no evidence to support their market efficiency burden.

17           THE COURT:  Thank you, Mr. Frank.

18           MR. FRANK:  Thank you.

19           THE COURT:  For plaintiff?

16:42:01  20           MR. MARKOVITS:  Thank you, Your Honor.

21           THE COURT:  Certainly.

22           MR. MARKOVITS:  May I proceed?

23           THE COURT:  Please do, yes.

24           MR. MARKOVITS:  Freddie Mac doesn't dispute that

16:42:11  25   Professor Feinstein is a highly qualified economist.  They

255

1    don't dispute that he is qualified to give an opinion on

2    market efficiency, something he's done more than 50 times

3    without exclusion.  They don't dispute that he applied

4    economic expertise within the legal standards established by

16:42:31  5    Cammer, Krogman and Halliburton II.  And they don't dispute

6    his methodology or his results with respect to Cammer 1

7    through 4, Krogman 1 through 3, or the fact that Freddie Mac

8    common stock trades on a national exchange.  They take issue

9    solely with the analysis of Cammer 5.

16:42:58  10         Kevin, could you put up slide 47, please?

11         In the Carpenters case, there was a very, very

12    analogous situation, where Dr. Finnerty gave an opinion and

13    there was the battle of the experts, which always takes

14    place on Cammer 5; but in that case, as here, the other

16:43:24  15    Cammer/Krogman factors were met, and what the court said in

16    that case I think applies here.  It's certainly -- it's not

17    binding, but I think it's persuasive authority, in terms of

18    saying, "... defendants' attack on Dr. Finnerty's opinion

19    focuses almost exclusively on the event studies he performed

16:43:50  20    in connection with Cammer 5.  This challenge is too narrow.

21    It is widely accepted that analysis of the Cammer and

22    Krogman factors is a reliable and accepted methodology for

23    establishing market efficiency."  And then it goes on.

24         And the same could be said in this case.  This is

16:44:08  25    a reliable method for establishing market efficiency.

256

Dr. Feinstein said that market efficiency was established without Cammer 5, that Cammer 5 was just icing on the cake.

And he specifically said that those factors, those structural factors, if you want to call them, would be sufficient here.

Freddie Mac, turning to Cammer 5, Freddie Mac doesn't disagree that an event study is an appropriate methodology to help assess Cammer factor 5.  In fact, they say it's absolutely required.  Freddie Mac's expert disagrees with how Professor Feinstein applied that methodology.  That's not surprising.  Again, in virtually every case, there is a disagreement with regard to event studies.  It's a rare case where that doesn't apply.

Let's look at some of those attacks on the event study.  The primary attack is that Professor Feinstein's event study must be rejected because it has only one event date.  Dr. Bajaj asserts that this shows, at most, that the market was efficient only on that date.

If, in fact, Professor Feinstein was using the event study alone to show efficiency during the class period, that argument might have some traction, but he's not.  He's using it in conjunction with the other Cammer and Krogman factors which are present throughout the class period.  He is using it as a demonstration, as he said, of market efficiency, not proof of market efficiency throughout

257

1      the class period.

2          The attack by Dr. Bajaj is particularly

3      interesting given his work as a plaintiff's expert in the

4      Allergan case.  Apparently, Professor Feinstein's use of two

16:46:19  5      dates is totally unacceptable for an event study -- or one

6      date is totally unacceptable, but two dates is acceptable in

7      the Allergan case.

8          THE COURT:  Well, I think emphasis was on the

9      difference in the periods of time.

16:46:34  10         MR. MARKOVITS:  But, Your Honor, and there's a

11     logical flaw with that argument, which is what Dr. Bajaj

12     said in deposition and agreed to here, was his position in

13     prior cases is that a two date -- when it was Dr. Hallman,

14     he said a two date event study, at most, proves that the

16:46:56  15     market was efficient on those two dates, period.  The same

16     would apply to his Allergan, which came after his critique

17     of Dr. Hallman.

18         THE COURT:  Uh-huh.

19         MR. MARKOVITS:  You can't extrapolate.  And I

16:47:11  20     didn't present it here, but we talked a little in his

21     deposition about how many dates can you extrapolate.

22     There's no peer-reviewed article that talks about that.

23     There's no peer-reviewed article that talks about

24     extrapolation.

16:47:23  25         What the event study does is simply demonstrates

258

1    market efficiency.  That on a particularly material news

2    day, strongly material news, the market reacted efficiently.

3            So, again, one day is totally unacceptable.  Two

4    days is acceptable.  Use of the last day of the class period

16:47:48    5    by Dr. Feinstein, totally unacceptable.  But when Dr. Bajaj

6    does it in the Allergan case, it's acceptable.

7            I know foolish consistency is the hobgoblin of

8    little minds, but here, in the legal context, it would be

9    nice to see.

16:48:10    10            They challenge his use of the one event date, but

11    they don't propose any other dates that he should have

12    looked at.

13            There's a halfhearted reference in one of their

14    briefs that he should have looked at earnings dates.  But as

16:48:27    15    Dr. Feinstein said, Dr. Bajaj said, "Well, the earning dates

16    have mixed news."  Well, if they have mixed news, they're

17    not appropriate to look at as events dates.

18            And, you know, they would just get into -- there's

19    just an argument about that.  So if there's mixed news, you

16:48:44    20    can't use them as events dates.  He used the only date that

21    he felt was appropriate to use as a test to show market

22    efficiency.  It showed market efficiency.  That supports all

23    of the other factors, which by themselves, virtually any

24    court that's considered it, there is no -- put it this way:

16:49:08    25    There is no court where all these factors have been met that

1     have said the market's not efficient, none.

2              A Z-test.  He did a Z-test, which is sometimes

3     also called a collective test, it's a type of test.  In the

4     case law that we cited in our briefs it's sometimes called a

5     news/non-news test.  And it's showing that principle that

6     came out in that brief of the financial economist and then

7     in Halliburton II, which is the general proposition that

8     news -- that stock prices tend to react to news.

9              That's what the news/non-news test does.  That's

10    why it's been accepted, particularly after Halliburton II.

11    Dr. Feinstein said he's used it in three cases.  In the

12    Petrobras case, for Cammer 5, his event study was -- I'm

13    sorry, his Z-test was accepted without any event study.  No

14    event study was done.  The Z-test was proof of Cammer 5.

15    What the court said in that case is the Z-test is a commonly

16    accepted statistical test.

17             Now, they say, "Well, his selection criteria was

18    bad."  What I will say for the record, darned if you do,

19    darned if you don't.  If he had looked at the news days and

20    tried to subjectively determine which were material in terms

21    of a higher information flow, they would have done what they

22    did with Dr. Hallman and said, "Wait, he didn't look at all

23    the news, that wasn't really positive, it was negative,"

24    things like that.

25             And the problem he faced is there are 2,900 news

260

1    days during the class period.  Every day there's something

2    mentioned about Freddie Mac.  So he developed an objective

3    screen, supported by the economic literature, of articles

4    that focused on Freddie Mac that were in both The Wall

16:51:16  5    Street Journal and New York Times.  Purely objective.

6              And that resulted in a certain number of dates

7    that were then tested.  And under the Z-test and under the

8    other tests that were run, showed that there was a

9    statistically significant difference in proportion between

16:51:33  10   news days and non-news days.

11             You raised the question about, well, why weren't

12   dates chosen from earlier in the time period?  They weren't

13   chosen one way or another by him, they were chosen by the

14   screen.  If there were dates earlier in the time period

16:51:47  15   where both The New York Times and The Wall Street Journal

16   had had a story about Freddie Mac, it would have been in the

17   Z-test.

18             So he used an objective criteria.  Now he's being

19   criticized for using an objective criteria.  I'm sure he

16:52:05  20   would have been criticized for using a subjective criteria

21   as well.

22             THE COURT:  You heard what I'll describe as

23   criticism of including New York Times in that screening.

24   Wall Street Journal, a business journal, recognized

16:52:18  25   worldwide, apparently.

261

1          What have you to say about including New York

2     Times?

3          MR. MARKOVITS:  New York Times also -- I believe

4     in our briefs we set forth various literature which talks

16:52:30  5     about using major newspapers.  The New York Times certainly

6     qualifies in that category.  And I believe there's also

7     cites to specific articles which suggest the use of The New

8     York Times.

9          I understand the distinction between a business

16:52:41  10    and a non-business newspaper, but The New York Times

11    certainly covers business.  It's not -- we're not talking

12    about the --

13         THE COURT:  You didn't choose USA Today.

14         MR. MARKOVITS:  Yeah.  Well, exactly.  But if

16:52:54  15    you're talking about, if there was material news about

16    Freddie Mac that came out, highly material news, strongly

17    material news, you would expect to find an article in both

18    The Wall Street Journal and The New York Times.

19         And that's what you found on a limited number of

16:53:11  20    occasions.  You found both of them carried that highly

21    material news.  That's the basis, that's the objective

22    screen, and that's the use of the Z-test.

23         The structural break, we show it on the slides.

24    That was data mining.  That was -- if you look at what

16:53:31  25    Dr. Bajaj said in his first go-round with Dr. Hallman, he

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

262

1    said the control period was steady through August 8th, not

2    in the two periods, but it was steady through August 8,

3    2007.

4         And then, when he had to find something to

16:53:51  5    discredit or attempt to discredit Dr. Feinstein's Z-test and

6    these other diagnostic tests, then all of a sudden we come

7    up with this February structural break, and then it's on a

8    chart which exaggerates the difference when it's not really

9    much of a difference at all.  And it's just an example, as

16:54:13  10    Dr. Feinstein said, of data mining or data snooping.

11         There were a whole bunch of other critiques.  And,

12    again, it goes back to what I said in the opening statement.

13    They throw a lot up against the wall, see what sticks.  A

14    lot of it doesn't matter.  You know, as we showed on the

16:54:39  15    diagnostic tests, you can't use the last day.  All right,

16    take the last day out.  The diagnostic tests still have a

17    valid result, a strong result that shows higher proportion

18    of news to the non-news days.

19         They have all these -- they're trying to make

16:54:58  20    up -- with a lack of substance, they're trying to make up

21    with quantity.  That's not an appropriate attack.

22         Again, they can bring these issues up at trial,

23    but Professor Feinstein, or "Feinstein," can talk through --

24    and there's not going to be any dispute on how he reached

16:55:22  25    his opinion, particularly on the undisputed Cammer/Krogman

1    factors and the fact that this trades on the New York Stock

2    Exchange.

3         I'm not going to -- I don't have time to and I

4    can't address all the other issues.  Just let me end by

16:55:39  5  saying that Professor Feinstein is a well-qualified

6    economist.  He's testified without exclusion over 50 times.

7    Their motion is without merit and should be denied.

8         Thank you, Your Honor.

9         THE COURT:  Thank you, Mr. Markovits.

16:55:54 10       Oral argument on the motion to exclude Dr. Bajaj.

11   Mr. Frank, you reserved no time and you had none left.

12        MR. FRANK:  I appreciate that, Your Honor.  Thank

13   you for reminding me.

14        THE COURT:  All right.  Certainly.

16:56:09 15       Mr. Markovits, that goes back to your team.

16        MR. MARKOVITS:  That's me again, Your Honor.

17        THE COURT:  It is.  All right, then.

18        MR. MARKOVITS:  And if I could just reserve the

19   balance if I have any.

16:56:20 20       THE COURT:  Certainly.

21        MR. MARKOVITS:  May it please the court.

22        Defense expert, Dr. Bajaj, is a financial

23   economist who has certain beliefs regarding market

24   efficiency.  To paraphrase some courts, the question isn't

16:56:41 25  whether he's right or wrong as an economist in his belief,

264

1    the question is whether his beliefs are contrary to the

2    legal standard.  And there can be no dispute that they are.

3          The law is clear also that an expert cannot

4    provide opinions that are contrary to the applicable legal

16:57:00  5    standard.  Under Daubert, such testimony is unreliable, it's

6    not helpful to the trier of fact, and it only steers to

7    confuse.

8          Dr. Bajaj's opinions are contrary to the legal

9    standard in at least the following respects.

16:57:16  10          Slide 48, please.

11          First, Dr. Bajaj would require OPERS to prove that

12    the market for Freddie Mac stock traded in a semi-strong

13    form of efficient market.

14          The Supreme Court in Halliburton II held that no

16:57:40  15    particular degree or type of efficient market must be shown,

16    just that the market is generally efficient.  And courts

17    since Halliburton II have specifically said a semi-strong

18    form of efficiency is not required.

19          THE COURT:  Is it your position that the

16:57:53  20    efficiency was weak?

21          MR. MARKOVITS:  No, Your Honor.  In fact, in this

22    case, Dr. Feinstein concluded that the efficiency was, in

23    fact, a semi-strong form of efficiency.  But that's -- he

24    didn't conclude that that was necessary.  In fact, he said

16:58:13  25    it wasn't necessary.  And that's not necessary under the

265

1      Halliburton standard.  The Halliburton standard talks about

2      general efficiency, not weak efficiency.

3                  THE COURT:  Uh-huh.

4                  MR. MARKOVITS:  It talks about general efficiency,

16:58:22   5   and it says, "No particular degree of efficiency."  We're

6      talking about the modest proposition that stocks -- that

7      news about a company will tend to affect its stock prices.

8                  THE COURT:  So that Dr. Bajaj insists that

9      semi-strong is required, and your expert has said that it

16:58:46  10   exists, what's -- I mean, the first point, what do you want

11     me to make of it?

12                 MR. MARKOVITS:  The import of that is, he's saying

13     it exists, but also certainly any lesser included standard,

14     such as general efficiency as set forth in Halliburton II,

16:59:01  15   is met as well.

16                 I don't want the situation where if at trial,

17     Dr. Bajaj is telling the jury, "You have to prove market

18     efficiency to the semi-strong level of efficiency."  That's

19     not the legal standard.

16:59:15  20                 It would be like saying, "You've got to prove that

21     we make our case beyond a reasonable doubt."

22                 THE COURT:  If that were your only disagreement,

23     would you be moving to strike his testimony?

24                 MR. MARKOVITS:  Probably not, Your Honor.

16:59:28  25                 THE COURT:  Yeah.

1          MR. MARKOVITS:  This, and I'll show how all his

2    testimony that's contrary to the legal standard compounds.

3          I probably wouldn't particularly, because as you

4    said, our expert has opined that the market is semi-strong

16:59:42   5    efficient.

6          But then he also talks about Cammer factor 5 as

7    being necessary.  And, again, he's saying not only that this

8    is an important factor, which some cases said, but it's

9    necessary and dispositive.

16:59:57  10          And the trouble is that his opinion on that is

11    contrary to cases around the country within the circuit that

12    hold that Cammer 5 is not necessary or dispositive.  It's

13    just one of the factors --

14          THE COURT:  You know, maybe I misunderstood your

17:00:12  15    cross-examination of Dr. Bajaj on that point, because I

16    thought you and he -- or you got him to agree that Cammer 5

17    was necessary, and he agreed.  And the next point was, is an

18    event study needed to prove Cammer 5, and he agreed with you

19    there as well.

17:00:31  20          MR. MARKOVITS:  Right.

21          THE COURT:  Do you remember that?

22          MR. MARKOVITS:  Yes, I do.  And what I was doing

23    there was establishing his view.

24          THE COURT:  I see.

17:00:38  25          MR. MARKOVITS:  Confirming his view.

267

1          THE COURT:  It was more tongue-in-cheek then?

2          MR. MARKOVITS:  Well, to some extent, Your Honor.

3   What I was trying to do was establish his view, which he had

4   already stated in deposition and I understood what his view

17:00:49   5   is, which is that Cammer 5 is required, and you have to do

6   an event study to prove it.

7          THE COURT:  And where I thought you and he broke

8   ranks was at the position of whether it's dispositive or

9   not.

17:01:02   10          MR. MARKOVITS:  No.  We actually break ranks

11   pretty strongly with it being necessary and can only be

12   shown through an event study.  Because as we pointed --

13          THE COURT:  And that's sort of where I interrupted

14   you during your opening.  If you have all of these factors,

17:01:21   15   but the challenge to the event study or the Z-test or the

16   collective event study fails you, what moment is there if

17   you would like me to believe that all of the courts that

18   have found the Cammer factors, Krogman factors, national

19   exchange to exist, why is it a problem for you then?

17:01:40   20          MR. MARKOVITS:  It's a problem because he's

21   testifying contrary to the legal standard.  He's saying that

22   Cammer factor 5 is necessary when it's not.  He's saying an

23   event study is required when it's not.  That's contrary to

24   the law of all the courts across the country.

17:01:56   25          THE COURT:  Number two Daubert, right, at least?

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

268

1          MR. MARKOVITS:  Yes.  And it's not reliable, it's

2     not helpful, it's confusing to the jury, or will be

3     confusing to the jury, to say, "You've got to have Cammer

4     factor 5."  Our expert is saying, "No, you don't."

17:02:11   5          The jury shouldn't have to weigh between those two

6     experts.  Dr. Bajaj's testimony is contrary to the legal

7     standard.  It can't stand, if that's true, and the case law

8     makes it clear that's true.

9          The next one -- and I'll show in a second how

17:02:24  10     these compound.

11          The next one is he has testified that material

12     news is news that's expected to cause a statistically

13     significant stock price reaction.  And that's why in

14     deposition I honed in on that, because I didn't understand,

17:02:42  15     how can you say, how is it possible to say when all the

16     empirical research shows that on earnings dates or other

17     material news dates, you have a relatively low percentage of

18     statistically significant stock price movement, how can he

19     say that you should be expected to have a stock price

20     movement on material news dates?

21          The answer is he just defines material news -- he

22     makes up a definition of material news that's supported

23     nowhere in economics, nowhere in the case law.  He says,

24     "Material news is news that's expected to move a price in a

17:03:19  25     statistically significant manner."  That's just made up out

269

1    of whole cloth.  And if that's not bad enough, not only is

2    it made up out of whole cloth, but it's contrary to the

3    legal definition of material.

4         So you can't have him testifying to a jury, "This

5    is what material news is," when the legal definition is, no,

6    material news is just news that a reasonable investor would

7    consider in pricing a stock.

8         And he says that market efficiency must be proven

9    to a 95 percent confidence level.  The legal standard, and

10   it's got to be proven by a preponderance of the evidence.

11        And this is where all his testimony contrary to

12   the legal standards compound.

13        Kevin, could you put up slide 49?

14        So when you put together Dr. Bajaj's opinion in

15   his statements, 1 through 5, he's saying, okay, you've got

16   to show that the market is semi-strong efficient.  The only

17   way you can show a semi-strong efficient market is to

18   establish Cammer 5.  The only way to establish Cammer 5 is

19   an event study.  To do an event study, you've got to show it

20   to a 95 percent confidence level.

21        So look what he's done.  He now makes the burden

22   on the plaintiff to show market efficiency to a 95 percent

23   confidence level instead of preponderance of the evidence.

24   This gets back to, he's essentially saying to the jury

25   they've got to prove it beyond a reasonable doubt, when the

270

1     legal standard is preponderance of the evidence.

2              Your Honor, defense economists are not immune to

3     Daubert.  And while it's not typical to have a Daubert

4     motion against defense economists, in this case it's called

17:05:14  5     for.

6              I know that typically what's happened, and you see

7     it with, actually, there's a lot of reported opinions on

8     Dr. Gompers and some on Dr. Bajaj as well, where a court

9     will just disregard his opinion.  In the Computer Science

17:05:28  10    case, the court said about Dr. Bajaj, what he said defies

11    common sense.  Apparently there was no Daubert motion, he

12    wasn't excluded.

13             But here, where he's giving point after point

14    after point that's contrary to the applicable legal

17:05:45  15    standard, that should not be able to stand.  And for that

16    reason, we ask that his testimony be stricken and excluded

17    under Daubert.

18             THE COURT:  Thank you, Mr. Markovits.

19             MR. MARKOVITS:  Thank you.

17:05:55  20             THE COURT:  Mr. Frank.

21             MR. FRANK:  Thank you, Your Honor.

22             Your Honor, at bottom, plaintiff's motion to

23    exclude the testimony of Dr. Bajaj was a tactical maneuver.

24    It was a tactical maneuver to offset the fact that

17:06:19  25    Dr. Feinstein's opinions are so riddled with errors,

271

1    inconsistencies and unscientific made solely as this

2    litigation approaches, that he fails to establish the

3    Daubert liability standard.

4         It was not until Freddie Mac notified OPERS that

17:06:34  5    it intended to file a Daubert motion seeking to exclude the

6    testimony of Dr. Feinstein that OPERS first indicated to

7    Freddie Mac that it would also move to exclude Freddie Mac's

8    expert.

9         These motions that are before you, the OPERS'

17:06:48  10   motions and the Freddie Mac motion, they are apples and

11   oranges.  Under Daubert -- Daubert has essentially two

12   prongs to it.  It's got a relevance prong and a reliability

13   prong.  We have moved under the reliability prong, and we've

14   explained that under reliability, the court takes into

17:07:06  15   account three factors, and we walk through that, and

16   Dr. Feinstein doesn't satisfy any of them.

17        They don't have those arguments with respect to

18   Freddie Mac's experts.  They can't argue that our experts

19   aren't qualified.  They can't argue that our experts'

17:07:24  20   opinions aren't reliable in the field.  They just don't walk

21   through those reliability factors.  They try to give a

22   little lip service to it because they're trying to match our

23   motion, but it's just not the case.

24        What you heard today and what you see in the brief

17:07:36  25   is essentially an effort to argue the law.  They're trying

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

272

1    to advance their class certification arguments.

2              Now, the fact of the matter is that Dr. Bajaj's

3    testimony is relevant and helpful to the court.  You heard

4    him today.  I hope you found him helpful and relevant.  He

17:07:56  5    isn't testifying to legal standards.

6              You'll notice a portion of our motion to exclude

7    Dr. Feinstein focused on legal standards.  And that was

8    because Dr. Feinstein's opinions, particularly at his

9    deposition --

17:08:13  10             THE COURT:  You think if you take it down it will

11   leave my mind?

12             MR. FRANK:  I'm trying to see the clock, Your

13   Honor, because I always fail to --

14             THE COURT:  Then I applaud you.

17:08:22  15             MR. FRANK:  Thank you, thank you.

16        (Laughter.)

17             THE COURT:  I'll tell you at any time what time it

18   is as well.

19             MR. FRANK:  Thank you.  I'll try to reserve -- I

17:08:28  20   have no time to reserve on this one, actually.

21        (Laughter.)

22             MR. FRANK:  You know, Your Honor, the fact of the

23   matter is that Dr. Bajaj's opinions are directly relevant to

24   the issues before the court.  His testimony bears directly

17:08:42  25   on a key element of plaintiff's case.  His testimony is

1    relevant to both market efficiency and price impact.

2        Now, Halliburton II didn't change the law on

3    market efficiency.  They try to argue -- they try to extract

4    this sentence to suggest that it's not semi-strong form

5    market efficiency in the informational sense, it's just

6    general efficiency.

7        But the point they miss is in the amici brief in

8    which that was referenced and in the case -- the decision of

9    the Supreme Court as well.

10       What the court is really talking about and what

11   Dr. Bajaj was explaining earlier today is just that the

12   court -- the courts don't require fundamental efficiency.

13   They require markets to be generally efficient in the

14   informational sense, not fundamentally efficient.  In other

15   words, the stock has to -- the stock price has to move

16   consistently when there's material news, in the expected

17   direction, but not in the precise amount.

18       That is what -- that is fundamental efficiency

19   that Dr. Bajaj referred to I believe as a myth.  It doesn't

20   have to move in the precise amount.  Markets don't have to

21   be that good.  But they do have to incorporate consistently

22   available information.

23       Now, Halliburton II didn't change the law.  If

24   you'll look at the sentence they rely upon in

25   Halliburton II, it's quoting Basic.  So there's nothing

1    really new there.

2         What Halliburton II really does do is it creates

3    the opportunity for defendants to come forward with price

4    impact evidence.  That's exactly what Dr. Bajaj has done.

17:10:32   5         Now, you know, in terms of semi-strong form

6    efficiency, you ask Dr. -- I mean, you asked

7    Mr. Markovits -- I'm not aware of any other degree other

8    than his J.D. -- you asked him about what his own expert

9    opines, and his own expert purports to use the same

17:10:52  10    standard.

11         I asked him at deposition:  "Now, when you say

12    semi-strong form efficient in the informational efficiency

13    sense, what do you mean?"

14         "That there's sufficient proof that the market

17:11:03  15    reflects and reacts to public information about the

16    company."

17         "Is that different from semi-strong form

18    efficiency?"

19         "No."

17:11:09  20         "Is it your opinion that the market for Freddie

21    Mac stock was semi-strong form efficient?"

22         "Yes."

23         That's Feinstein's deposition on page 575.

24         Now, Mr. Markovits also argues that Cammer factor

17:11:28  25    5 is necessary as an opinion of Dr. Bajaj's that's

275

1   problematic.

2           The fact of the matter is, Dr. Bajaj, again, he's

3   not testifying about legal standards and he doesn't have to

4   precisely match legal standards.  He needs to offer opinions

17:11:44  5   based on his experience as an economist, and hopefully those

6   opinions are helpful to the court.

7           I think, the fact of the matter is that in Basic

8   v. Levinson, the Supreme Court was convinced by the science

9   of economics.  It does find economists' testimony helpful.

17:12:03  10   And as a result, economists like Dr. Bajaj have been

11   testifying about principles of their field for decades.

12           Now, it's also a fact that there are numerous

13   cases that we've cited to the court that hold that Cammer

14   factor 5 is the essence of market efficiency, the most

17:12:25  15   important factor, the sine qua non of market efficiency.  So

16   to the extent that Dr. Bajaj says it's necessary, he's

17   actually on all fours with many courts.

18           Now, in addition, he says an event study is

19   required.  The cases also say, and Dr. Feinstein testifies

17:12:46  20   that an event study is the preeminent test used by

21   economists to assess market efficiency.  Dr. Feinstein has

22   said it in reports and cases acknowledge it as well.

23           With respect to the materiality of news, there are

24   multiple definitions of materiality.  There's actually

17:13:04  25   several legal definitions, and Mr. Markovits only shared one

276

1    of them with the court.

2         But the fact of the matter is that the whole point

3    of an event study is that economists test material news

4    because they expect it to affect market prices.  The whole

17:13:24  5    point of testing news to see whether there are stock price

6    reactions, that's Cammer factor 5.  And it's not -- his

7    understanding of materiality is consistent with his field,

8    and Mr. Markovits doesn't argue otherwise.

9         The fact of the matter is, the real problem we

17:13:46  10    have here today is Dr. Feinstein has deviated from good

11    science.  He's made so many arguments that aren't supported

12    by good science.  He applies tests that don't test what he's

13    supposed to test.  That is the Z-test.  He applies the test

14    in a self-serving way.  He deviates from what the FDT --

17:14:07  15    there's only one article about this Z-test in market

16    efficiency, FDT.  They say don't test the last day.  He

17    tests the last day.  They pool their standard errors.  They

18    unpool them.  He pools them.  All these little changes, they

19    end up affecting the outcome in favor of his client.

17:14:28  20         With respect to market efficiency having to be

21    proved at a 95 percent confidence level, I think that just

22    misstates Dr. Bajaj's testimony.  He's not changing the

23    standard of law that this court has to apply.  He's talking

24    about statistical significance and what economists do in an

17:14:49  25    event study, and what they do is when they test an event,

277

1    they need to determine that that event couldn't occur solely

2    by chance.  And what they do is they use a 95 percent

3    statistical significance level.

4         And I'll tell you a secret, Your Honor, but we

17:15:04  5    have to keep it in this room.  Dr. Feinstein, he used a 95

6    percent statistical significance level in his event study

7    and in his Z-test.  It's one of the only things he did that

8    does comply with good science.

9         So to criticize Dr. Bajaj as if he is somehow

17:15:27  10   trying to mislead the court into applying a different

11   standard, it's just not true.

12        Now, the fact of the matter is, the very

13   definition of a semi-strong form efficient market is that

14   the market is responding consistently to material news

17:15:44  15   throughout the period.  And Dr. Bajaj has actually given the

16   plaintiffs a break.

17        Why do I say that?  Because I actually -- when I

18   deposed Dr. Feinstein, he admitted that for, quote -- this

19   is page 97 of his deposition -- "for a market to be

17:16:04  20   efficient, it needs to be rapidly incorporating available

21   information all the time."  All the time.  100 percent.

22        Dr. Bajaj gives the plaintiffs a break and he

23   says, "Look, statistics recognizes that there's sometimes

24   noisy results.  And while I realize that the verbal -- that

17:16:25  25   the language of the -- that the very theory is all the time,

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

278

1    I would say 80 to 90 percent of the time."

2         That's what he said in the Freddie Mac/Kreysar

3    case.  The court adopted his reasoning there.  And that's

4    not -- it's not contrary to any legal standard.  The legal

17:16:40  5    standard is that it should be doing it, responding to

6    material news consistently.

7         So all told, Your Honor, Dr. Bajaj's opinions are

8    not challenged as unreliable under the Daubert standards,

9    they're challenged as not relevant.  And I hope you found

17:16:59  10   them relevant here today, and I hope you found them helpful,

11   and we'll be arguing more about them at the class

12   certification motion.

13        THE COURT:  Is there anything more you'd like to

14   say about the confusing aspect?  Because there are so

17:17:11  15   many -- well, there are some points of difference.  As you

16   point out, the 95 percent confidence level is not one of

17   them.  Except I think Mr. Markovits would say that Dr. Bajaj

18   would say it must be that, and as it happened, Dr. Feinstein

19   used it.

17:17:28  20        But just anything at all you care to say about

21   whether or not your expert's opinion would be confusing to a

22   jury because of the differences.

23        MR. FRANK:  Your Honor, I guess what I would say

24   is that this is an area that is complicated, and I believe

17:17:49  25   that Dr. Bajaj's opinions are the opinions that are

279

1    generally shared by economists.  And if he were to sit there

2    and toss away the science of economics in order to conform

3    everything he said to the law, I think that -- I think

4    that's the type of testimony that gets excluded on Daubert

17:18:10  5    grounds, because, frankly, it's not good science.  He has to

6    testify based on what the field of economics say, and he

7    has, and it's helpful and relevant.

8         And I actually think he's good at explaining his

9    concepts, you know, as complicated as they are.  So I don't

17:18:29  10   think it gets -- I don't think it should be excluded on

11   confusing grounds either.

12        As I said, I think the real problem here is that

13   Dr. Feinstein is just not engaged in good science and is

14   deviating from accepted methods and is applying his methods

17:18:42  15   in ways that aren't reliable.

16             THE COURT:  Thank you, Mr. Frank.

17             MR. FRANK:  Thank you, Your Honor.

18             THE COURT:  Certainly.

19        Your proposed schedule calls for a break.  Does

17:18:53  20   anyone need a break?

21             MR. MARKOVITS:  Your Honor, I believe I had a few

22   minutes.

23             THE COURT:  How many do you think you have?

24             MR. MARKOVITS:  According -- five, and I will take

17:19:00  25   less.  I will take two.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

280

1          THE COURT:  I think that's at least one finger

2     more than my math shows.  But if you think you have five,

3     I'll indulge you.

4          MR. MARKOVITS:  I will go three or four.

17:19:12    5          THE COURT:  All right.

6          MR. MARKOVITS:  Your Honor, I just wanted to

7     respond to that.  I don't know how this became about

8     Professor Feinstein.  This is a motion to exclude Dr. Bajaj.

9          THE COURT:  Well, you can't really keep them

17:19:29    10    separate, motion to exclude either expert, even from class

11    certification motion.  I think you've done well enough, but

12    you understand how it came together.

13         MR. MARKOVITS:  I understand, except here's the

14    difference and the major difference:  Professor Feinstein is

17:19:43    15    providing an economic opinion that's consistent with the

16    legal standards.  Dr. Bajaj is providing an economic opinion

17    that's inconsistent with the legal standards.

18         Halliburton II did effect a change.  We've briefed

19    that at length.  There is no case post-Halliburton II that

17:20:02    20    said you need to prove a semi-strong efficient market.

21    There are cases that say you don't.

22         There is no case that held that Cammer 5 is

23    necessary.  There are cases that say it isn't.

24         There is no case that has held an event study is

17:20:16    25    necessary.  There are many cases that say it's not.

281

1          There is no case that has held anywhere that

2     material news means a statistically significant price

3     movement.

4          And, yes, they both use the 95 percent confidence

5     level.  But, again, the only logical conclusions from

6     Dr. Bajaj's testimony, which is all contrary to the legal

7     standard, is that the plaintiff's burden of proof has risen

8     to a 95 percent confidence level.  That's different than

9     using a 95 percent confidence level in one factor, the

10     Cammer 5 factor, for an event study, because that's what

11     economists do.

12          So, Mr. Frank says, "Well, these are -- the views

13     of Dr. Bajaj are generally shared by other economists."  I

14     would ask Your Honor to look at the Groupon case, because I

15     thought it had a very -- the analysis there was directly on

16     point.

17          That involved Dr. Gompers, actually, who was

18     espousing some of the same type of opinions as Dr. Bajaj in

19     this case, and the court there said, "You know, it's not to

20     say that he's wrong as an economist, he's just not

21     testifying in conjunction with the legal standards."

22          And the case law is clear, and they haven't

23     disputed it.  An expert, including defense economists, don't

24     get a pass.  You can't, under Daubert, testify contrary to

25     the legal standards.  That's what Dr. Bajaj is doing here.

282

1     Thank you.

2         THE COURT:  Thank you, sir.

3         Does anyone require a break?

4         MR. FRANK:  Your Honor, a break would be greatly

5  appreciated.

6         THE COURT:  All right, then.  We have a ten-minute

7  recess and then we'll return.  Do you really intend to argue

8  the Dr. Gompers motion?

9         MR. FRANK:  I encourage the plaintiff to withdraw

10  the motion or to withdraw their desire to argue it.

11        THE COURT:  Well, I'll give you until the end of

12  your break to tell me how well that goes.

13     (Laughter.)

14        THE COURT:  We're in recess for ten minutes.

15     (Recess at 5:22 p.m., and the proceedings resumed at

16     5:33 p.m.)

17        THE COURT:  Thank you, everyone.  You can retake

18  your seats.

19        Our schedule now calls for oral argument on lead

20  plaintiff's motion to exclude the expert testimony of

21  Dr. Paul Gompers.  Mr. Markovits?

22        MR. MARKOVITS:  Your Honor, the parties have

23  reached an agreement to submit that on the papers.

24        THE COURT:  Thank you.  I will accept it on the

25  papers.

283

1          That means that we can now move to argument on

2     motion for class certification.  Mr. Markovits?

3          MR. MARKOVITS:  Thank you, Your Honor.

4          THE COURT:  And I remind you, 30 minutes are set

17:33:38  5     aside for that, up to 10 minutes of which may be reserved,

6     and we can follow the same schedule, what you don't use of

7     that 30 minutes, you can use for rebuttal.

8          MR. MARKOVITS:  Thank you, Your Honor.

9          THE COURT:  Okay.

17:33:48  10          MR. MARKOVITS:  May it please the court.

11          Going back to what I said in opening, defendants

12     don't dispute any of the Rule 23 requirements except

13     predominance.  Under 23(a), they don't dispute numerosity,

14     commonality, typicality, adequacy of representation.  I'm

17:34:08  15     happy to address any of those requirements if the court has

16     any concern.  If not, I'll move on.

17          THE COURT:  Please do.

18          MR. MARKOVITS:  Under 23(b), they don't dispute

19     superiority.  And the dispute on predominance boils down to

17:34:20  20     the presumption of reliance, which is shown through proof of

21     an efficient market.

22          Again, with seven of the eight Cammer/Krogman

23     factors handily met, with the common stock trading on the

24     New York Stock Exchange, with no proof by defendants of an

17:34:39  25     inefficient market, the question isn't even close in this

284

1    case.

2           OPERS has shown that Freddie Mac stock operated in

3    an efficient market during the class period.

4           Case law from around the country and within this

17:34:51  5    circuit supports that conclusion.  Any conclusion to the

6    contrary would be a definite outlier.

7           Now, defendants' argument, again, for class

8    certification goes something like this:  That market

9    efficiency must be shown to be semi-strong; that Cammer

17:35:12  10   factor 5 is necessary to show that semi-strong; that an

11   event study is necessary to show Cammer 5; that Professor

12   Feinstein's event study should be rejected and, therefore,

13   class certification should be denied.

14          Defendants are wrong on all counts.  And let me

17:35:30  15   explain why by synthesizing some of the briefing and

16   testimony you've heard here today.

17          First, let me go back to the Basic presumption of

18   reliance.  In Basic, the Supreme Court created the

19   fraud-on-the-market presumption, which allows a presumption

17:35:49  20   of reliance that the plaintiff can show by a preponderance

21   of the evidence that the stock traded in an efficient

22   market.

23          But again, the Supreme Court in Basic did not

24   clarify what was required for proof of market efficiency.

17:36:04  25   And even Dr. Bajaj recognized that in the article he wrote.

285

1          So as the courts began to apply the Basic

2     presumption, different standards evolved with courts

3     requiring different levels of proof of an efficient market.

4     Some required a high degree of efficiency, like the

17:36:25  5     Polymedica case that's cited a lot by the defendants, some a

6     lower degree like the DVI case.  Courts since Halliburton

7     have essentially rejected the Polymedica standard.  It can't

8     survive Halliburton II.

9          And in Halliburton II, Halliburton was asking the

17:36:42  10     court to toss out the fraud-on-the-market presumption,

11     arguing that basically the research since Basic in 1988

12     showed that the markets are not always highly efficient.

13          The amicus brief that we referred to by the

14     financial economists is very instructive in this regard.

17:37:06  15     Again, the economists who signed on included both Eugene

16     Fama, who is known as the father of the efficient market

17     hypothesis, and one of his harshest critics, Robert Shiller,

18     both signed on.

19          And the brief says, in part, that economists

17:37:23  20     disagree about whether markets perfectly process

21     information, how quickly they do so, but they do not

22     generally disagree about whether market prices respond to

23     new material information.  And the brief makes a very

24     important point.

17:37:41  25          Slide 14, Kevin.

286

1        I want to emphasize this point again stemming from

2   the brief.  Because what it says is -- and it should come up

3   shortly -- "The key point for present purposes is that while

4   the proposition that market prices respond relatively

5   promptly to material information about a stock is true if

6   the SSEMH is true, it does not depend on the SSEMH being

7   true."

8        Meaning you don't have to show that there's a

9   semi-strong efficient market to show that market prices

10  respond relatively promptly to material information about a

11  stock.

12       The court in Halliburton II cited to this amicus

13  brief and its opinion, and the court clarified the Basic

14  presumption.

15       Slide 51, Kevin, please.

16       It said that "The presumption was based on 'the

17  fairly modest premise' that 'market professionals generally

18  consider most publicly announced material statements about

19  companies, thereby affecting stock market prices.'"

20       It specifically says, 2404 is the reference, "A

21  market need only be 'generally efficient.'"

22       And it went on to say, "debates about the precise

23  degree to which stock prices accurately reflect public

24  information are," thus, "largely beside the point."

25       Again, the court said a presumption is based on a

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1    stock trading in a generally efficient market.

2              THE COURT:  Do you remember the discussion you had

3    with Dr. Bajaj about this part of the amicus brief, and his

4    answers included that fundamental form may not be true, but

17:39:35  5    informational may still be?

6              MR. MARKOVITS:  Yes.

7              THE COURT:  Do you recall that?

8              MR. MARKOVITS:  I do recall that, and that you

9    will find nowhere in the financial economist brief.  It is

17:39:46 10    clear what they were saying in the last slide was as

11    interpreted by the Halliburton II, as interpreted by courts

12    that have interpreted Halliburton II, that the fairly modest

13    premise that material news affect stock prices can be shown

14    outside of a semi-strong form of efficient market.  That no

17:40:05 15    particular level of market efficiency has to be proven.

16              And, again, courts subsequent to Halliburton II,

17    Carpenters in particular, the Carpenters case, specifically

18    did that analysis and said, "Defense, you're wrong.  You

19    don't have to show market efficiency at the semi-strong

17:40:24 20    level.  Halliburton II dealt with that."

21              So before -- after Basic, before Halliburton II,

22    the courts had varying ideas of what degree was required.

23    After Halliburton II, this idea that you need semi-strong

24    efficiency, that you need Cammer 5, that you need an event

17:40:48 25    study, those were all laid to rest.  And the courts have

288

1   been consistent in saying that those notions, the notions

2   espoused by Dr. Bajaj and the defendants, have been laid to

3   rest.

4           Slide 52, Kevin, please.

17:41:10  5       Here's a couple of examples of recent cases.  The

6   one at the top, the Forsta case, said, "To require an event

7   study 'would ignore the Supreme Court's recognition that

8   debates about the precise degree to which stock prices

9   accurately reflect public information' are 'largely beside

17:41:29  10  the point.'"

11          In the Carpenters case, which also said

12  semi-strong efficiency was not required, said, "In light of

13  Halliburton II 'in the ordinary case of a high volume stock

14  followed by a large number of analysts and traded on a

17:41:42  15  national exchange, whether a plaintiff can satisfy Cammer 5

16  is not dispositive.  Nor is an event study always

17  necessary.'"

18          And then in the Strougo case, "In light of

19  Halliburton II, 'requiring a plaintiff to submit proof of

17:41:57  20  market reactions - and to do so with an event study -

21  ignores Supreme Court precedent as well as practical

22  considerations."

23          THE COURT:  I appreciate that those are all

24  recent, but none are binding on this court, are they?

17:42:10  25      MR. MARKOVITS:  No, none are binding on this

289

1      court.  And the Sixth Circuit hasn't specifically ruled on

2      this, although courts within the Sixth Circuit have

3      acknowledged the Cammer and Krogman factors as probative,

4      something Dr. Bajaj does not, and acknowledged that the

17:42:29   5      Cammer 5 is not dispositive, that was in the Plumbers and

6      Pipefitters case, and have considered in Bovie, Burges,

7      Plumbers, the Plumbers and Pipefitters case, a number of

8      cases within the circuit have acknowledged generally that

9      you look at all these factors, you apply them, Cammer 5 is

17:42:52  10      not dispositive.

11              But you're correct, Your Honor, the Sixth Circuit

12      has not specifically ruled on this point.  Every circuit

13      that has ruled on this point, every court that's ruled on

14      this point post-Halliburton II has come to the same

17:43:08  15      conclusion, though.

16              Which brings us back to the point that defendants'

17      attack on Cammer 5, they, again, throw up dozens of attacks,

18      just distract from the primary question, which is:  Is the

19      market efficient?  And the answer there is clearly yes.

17:43:36  20              Halliburton II, as the defense has pointed out in

21      their brief, also clarified that defendants can rebut the

22      presumption of an efficient market at the class

23      certification stage by showing a lack of price impact.

24              However, the burden of production and persuasion

17:43:57  25      is squarely on defendants on this point.

290

1          Slide 53, please, Kevin.

2          In the Halliburton II, Justice Ginsburg says, "The

3     court recognizes that it is incumbent upon the defendant to

4     show the absence of price impact."

17:44:17   5          And Justice Thomas in dissent said, essentially,

6     "In practice, the so-called 'rebuttal presumption' is

7     largely irrebuttable."  Well, why did he say it's largely

8     irrebuttable?  Well, this case provides a good example of

9     why.  Because to prove a lack of price impact in this case,

17:44:37  10     defendants would have to show either that there was no

11     statistically significant price decrease on November 20th,

12     2007, or that no part of that statistically significant

13     decrease was linked to OPERS' allegations.

14          Well, there's no dispute that there was a

17:45:00  15     statistically significant decrease.  Professor Feinstein

16     mentioned that there are a number of cases where in the last

17     day of the class period, there's not necessarily a

18     statistically significant decrease.

19          This one there is a very large statistically

17:45:10  20     significant decrease.  The stock price dropped almost 30

21     percent.  And it would take far, far less than that to have

22     statistical significance.

23          So what defendants have to do is they have to

24     prove that no part of that decrease was related to OPERS'

17:45:27  25     allegations; that is, assuming OPERS' allegations are true,

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

291

1    can defendants show that no part of the loss that resulted

2    in the stock price drop was a result, for example, of

3    exposure to credit risk from nontraditional loans, one of

4    our allegations.

17:45:45    5              Can they show that no part of the loss that

6    resulted in the stock price drop was as a result of the

7    failure to follow their underwriting, resulting in a

8    materialization of the risk that was caused by that failure?

9              The answer is no.  And the fact is, they don't

17:46:06   10    even try.  Dr. Bajaj, as you saw in his testimony, his

11    deposition testimony, said that, in part, he was responding

12    to Professor Feinstein.

13              He states that he did no analysis, no analysis of

14    what comprised the loss that was announced.  He didn't even

17:46:26   15    look at all the information that came out on November 20th,

16    2007, he reviewed some analyst reports, looked at the press

17    release, and he was looking for what's called -- what he

18    called a corrective disclosure.  Finding no corrective

19    disclosure, he concluded there was no price impact.

17:46:44   20              That's not close to meeting the legal burden.

21    There can be price impact without a corrective disclosure or

22    an acknowledged corrective disclosure.  He has to show,

23    again, that no price -- no part of that loss was caused by

24    anything related to plaintiff's allegations.  And, again, he

17:47:05   25    has not even tried to do so.

 1          The final argument that defendants use to try to

 2    derail class certification is the Comcast-related argument.

 3    And as we set out in our brief, courts differ in their

 4    treatment of Comcast.  Some courts say it doesn't even apply

17:47:26  5    in the securities context.

 6          In the Sixth Circuit, there is Sixth Circuit law

 7    on this --

 8          Kevin, can you pull up 54, please?

 9          In the VHS case, the Sixth Circuit says, "Comcast

17:47:42  10    applies where there are multiple theories of liability,

11    those theories create separable effects, the combined

12    effects can result in aggregated damages."

13          Here -- you can pull that off, Kevin.

14          MR. LEWIS:  Pull what up?

17:47:58  15          MR. MARKOVITS:  You can pull that off.

16          MR. LEWIS:  Okay.

17          MR. MARKOVITS:  Here there are no multiple

18    theories of liability.  The theory is a violation of 10b-5.

19          There are no multiple damages.  The damages are

17:48:09  20    the out-of-pocket loss.

21          All damages will be determined by the standard

22    out-of-pocket measure described by Professor Feinstein.

23          Under Sixth Circuit law, Comcast is not even

24    applicable.

17:48:25  25          I keep wanting to go with his brother's

293

1    pronunciation.

2         THE COURT:  He's forgiving, I can see him.

3      (Laughter.)

4         MR. MARKOVITS:  Yet it's typical in securities

5    actions, and you're going to see this in virtually every

6    expert opinion by the plaintiff expert on market efficiency,

7    for the expert to just state, set out that the damages can

8    be determined on a class-wide basis, here's the theory,

9    here's how I determined the damages, and they're consistent

10   and can be determined on a class-wide basis.

11        If you look back at Dr. Bajaj's report again in

12   Allergan, he has two short paragraphs at the end of his

13   report which supposedly, according to him, meet the Comcast

14   requirement, and they're even in less detail than Professor

15   Feinstein's.

16        Yet defendants tried out Dr. Gompers to argue that

17   Comcast requires more, that it requires the level of detail

18   that's typically found later in the case at the loss

19   causation stage.  And that reading of Comcast, as we set

20   forth in our motion with regard to Dr. Gompers, has been

21   rejected by every court where he's raised it.

22        He has raised it -- after Comcast, he's been hired

23   by defense counsel in 11 cases to bring out that same

24   theory.  He has been shot down every single time.  He's 0

25   for 11.  Including cases in which the court has said,

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

294

1    "Dr. Gompers' approach here is contrary to the requirements

2    of Comcast."  It was rejected by those courts, that

3    approach.  It should be rejected here as well.

4          For all of those reasons, OPERS respectively

17:50:20  5    requests that the court grant its motion for class

6    certification.

7          THE COURT:  Thank you, Mr. Markovits.  The balance

8    of your time is reserved.

9          MR. MARKOVITS:  Thank you.

17:50:33  10         THE COURT:  Mr. Frank?

11         MR. FRANK:  Thank you, Your Honor.

12         Your Honor, first, let me begin by thanking you

13    for providing us so much time today to address these

14    matters.  We take them seriously and we appreciate the

17:50:58  15    court's time.

16         Your Honor, OPERS' motion for class certification

17    should be denied for four reasons.

18         First, OPERS' motion rests solely on the opinion

19    of Dr. Feinstein.  And as we've argued, Dr. Feinstein's

17:51:10  20    opinion should be excluded for the reasons we explained in

21    support of our Daubert motion.

22         Second, even if the court were to allow

23    Dr. Feinstein to testify as to his opinions, Dr. Feinstein

24    fails to establish that Freddie Mac stock traded in an

17:51:26  25    efficient market during the class period.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

1           Third, Dr. Bajaj has established a lack of price

2      impact.  The alleged misrepresentations did not impact the

3      price of the stock, and that rebuts any presumption of

4      reliance.

17:51:38   5           And fourth and finally, Dr. Feinstein failed to

6      demonstrate that he can calculate damages consistent with

7      plaintiff's theory of liability as required by the Comcast

8      Supreme Court decision.

9           Your Honor, I won't dwell on the Daubert point,

17:51:54  10      but suffice it to say that our Daubert motion, we believe,

11      is dispositive of the OPERS' class certification motion.  As

12      you know, we believe that his opinions should be excluded

13      under all three prongs of the standard.  If Dr. Feinstein's

14      testimony is excluded, of course, OPERS has nothing else to

17:52:13  15      support its motion.

16           Dr. Feinstein, however, even if he were allowed to

17      testify, just because a court allows experts to testify

18      doesn't mean it necessarily agrees with one expert or

19      another, and we believe that Dr. Feinstein, even if his

17:52:29  20      testimony is not excluded, has failed to demonstrate market

21      efficiency.

22           Dr. Feinstein's opinions, as you know, rest

23      exclusively on his consideration of the so-called

24      Cammer/Krogman factors.  Contrary to what OPERS wants you to

17:52:45  25      believe, all Cammer/Krogman factors are not entitled to

1    equal weight.  Seven of those factors are common to

2    virtually all large companies that trade on a national

3    securities exchange.

4           While OPERS cites one case from Missouri which

17:53:03  5    notes that there's a presumption that if you're on a large

6    exchange, you trade in an efficient market, that is not the

7    law of the land.  It's not the law in this court.

8           We know from studies from economists that not all

9    large companies that trade on national securities exchanges

17:53:17  10   are trading in efficient markets.  There are literally

11   dozens of examples of companies on NASDAQ and the New York

12   Stock Exchange that meet Cammer/Krogman factors that weren't

13   trading in efficient markets as established by the economic

14   literature.

17:53:35  15          As Dr. Bajaj testified, economists assessing

16   market efficiency outside of the litigation context assess

17   factor 5, empirical evidence of a cause and effect

18   relationship between material information and stock prices.

19          Now, I know you heard arguments about statistical

17:53:53  20   significance, and you asked me earlier about whether such a

21   thing would confuse the jury.  And, Your Honor, I commend to

22   your attention the Federal Judicial Center's Reference

23   Manual on Scientific Evidence.

24          The fact of the matter is that economists and

17:54:05  25   other scientists testify all across the country all the time

1    on the basis of their fields, and in particular, uses a

2    touchstone statistical significance at the 95 percent level.

3    That's actually specifically noted at I believe page 269 of

4    the Federal Judicial Center's Reference Manual.

17:54:26  5          It actually includes a footnote acknowledging that

6    the Supreme Court has implicitly embraced this level as the

7    accepted level of statistical significance.

8          Now, Your Honor, economists in the real world, I

9    know we think our world is the real world, but outside of

17:54:46  10   litigation, they don't even consider the other Cammer and

11   Krogman factors when assessing market efficiency.

12         That is why Dr. Feinstein testified in another

13   case that the fifth factor is the essence of market

14   efficiency.  That is why the First Circuit in the Xcelera

17:55:03  15   case stated, "In the absence of such a cause and effect

16   relationship, there is little assurance that information is

17   being absorbed into the market and reflected in its price."

18         That is why the Fifth Circuit in the Unger case

19   stated, "This causal connection goes to the heart of the

17:55:19  20   fraud-on-the-market theory."

21         That is why the Freddie Mac/Kreysar court referred

22   to the fifth factor as the critical factor and to all the

23   other factors as the less important factors.

24         Now, it's the fifth factor that matters, Your

17:55:36  25   Honor.  The fifth factor that, even as Dr. Feinstein admits,

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

298

1    is the essence of market efficiency.

2         Now, we don't have the time to discuss every

3    single case that's in the briefs, of course.  But I do want

4    to share with Your Honor a few facts that justify the denial

17:55:57   5    of the motion for class certification and that are

6    distinguishing facts when contrasted with cases that are

7    advanced by the plaintiffs.

8         First, Your Honor, in this case, there's a flawed

9    event study.  That matters to courts.  It's one thing for a

17:56:18  10    court to say, "I don't need to consider Cammer factor 5, I'm

11    just considering these other factors," which you want to

12    talk about outliers, those are outlier cases.

13         Most courts that discuss these factors understand

14    and acknowledge that Cammer factor 5 is the most important

17:56:34  15    factor, the essence, the sine qua non, all these phrases.

16    Those are the outliers.

17         But in any event, when we see a flawed event study

18    like this, courts care.  Because you -- because inferences

19    can be drawn from that.  It begs the question:  Why?  Why is

17:56:55  20    there a flawed event study?  Why is this most important

21    factor not being addressed?  Why is it that an expert came

22    into the courtroom with the purpose of establishing market

23    efficiency and failed to do it?  It is a troubling fact,

24    courts noted, and it's a distinguishing fact in some of

17:57:18  25    their relevant cases.

299

1          In addition, Your Honor, this case is unlike many

2     of the cases in the briefs before you, because of the reason

3     that the judge -- that you articulated earlier, and that

4     Dr. Bajaj testified to.  There was a financial crisis in

17:57:34  5     this country.  It began in the year arguably 2006, but

6     certainly in early 2007.

7          In February of 2007, there was a structural break

8     in this market.  You can see it on the chart, the volatility

9     changes.  And on that day, the chairman of the Fed noted

17:57:51  10    that the company was -- that the company -- that the country

11    was headed for a recession.  And the Dow dropped more than

12    it had dropped in six years since 9/11.

13         That was only the beginning.  In August, the

14    crisis continued.  And we see in the charts -- and I don't

17:58:14  15    know if I have the charts here.  But we see in the -- can we

16    pull up the volatility chart from August?

17         You see in the volatility chart from August how

18    very extreme the volatility was in this market.

19         Now, those are specific circumstances, Your Honor,

17:58:35  20    that should cause the court to take more -- even more

21    seriously than usual Cammer factor 5.  Why?  Because it is

22    simply the case that you can look at a company and you can

23    check some boxes:  What is it?  Is it traded on the New York

24    Stock Exchange?  What was its average volume during a

17:58:57  25    period?  I'm going to check some boxes.

1      But when you see irrational behavior in the

2  markets, these are the conditions that give rise to market

3  inefficiency.

4      And Dr. Bajaj was not surprised, and I'm not

17:59:12  5  surprised, that two experts have filed four reports with

6  this court, and they have utterly failed to establish market

7  efficiency.

8      Now, before turning to Dr. Feinstein's analysis of

9  the fifth factor, it's worth recounting a bit of history

17:59:32  10  here.  We've mentioned the Freddie Mac/Kreysar case in our

11  briefing and we've mentioned it a few times today.  And the

12  court may wonder what the relationship of that case to this

13  is.

14      That case was very similar to this case.  That

17:59:45  15  case also arose out of the subprime crisis.  I misstated a

16  fact earlier to the court.  I had thought that there was an

17  overlap with the class period.  It came just after this

18  class period.

19      THE COURT:  I think you were corrected by the

18:00:00  20  witness when you did that.

21      MR. FRANK:  I may have been.  I may have been.

22  But I did not want to mislead.

23      And that case also arose out of the subprime

24  crisis.  That case was, again, some of the very same

18:00:15  25  defendants whose counsel are here in this room, Mr. Syron,

301

1    Mr. Piszel and others.  That case related to the preferred

2    stock of Freddie Mac, and in that case, a purchaser of the

3    preferred stock brought claims based on some of the same

4    sorts of representations that are issued in this case.

5        In that case, the plaintiff's expert opined that

6    the market was efficient.  He testified that all of the

7    lesser Cammer factors were satisfied.  He tested 57 dates

8    and found that 16 had statistically significant price

9    reactions.

10       Dr. Bajaj testified at a Daubert hearing in that

11   case, too, and there, just like here, he explained why those

12   facts did not support a finding of market efficiency.  And

13   there, the court, Judge Cedarbaum in the Southern District

14   of New York, credited Dr. Bajaj and denied class

15   certification.

16       That brings us to this case.  Here, Dr. Feinstein

17   was retained to replace OPERS' first market efficiency

18   expert, Dr. Hallman.  Dr. Hallman conducted event studies on

19   six earnings dates.

20       Can I get Dr. Hallman's?  Oh, it just got turned

21   on.  Okay.  So this is the third-to-last slide, two back

22   from there.

23       So Dr. Hallman tested six earnings dates, Your

24   Honor.  The green ones are the ones that were not found to

25   be statistically significant.  And the H5 is August 30th,

18:00:33  (line 5)
18:00:48  (line 10)
18:01:04  (line 15)
18:01:19  (line 20)
18:01:36  (line 25)

1    and H6 is November 20th.  So he found those two dates to be

2    statistically significant.

3         And as you might expect, it was not too

4    complicated for Dr. Bajaj to look at this chart, or at least

18:01:53  5    these facts at the time, and say, "This is a gentleman who's

6    identified only two dates that responded statistically

7    significantly over the course of this entire class period.

8    Two out of six isn't always responding.  It's not most of

9    the time."

18:02:12  10        And the interesting thing here, Your Honor, is

11   that if you look at H5, H5 didn't take into account the

12   August structural break.  It was using the wrong yardstick

13   to measure what is an extreme price movement.  And when

14   Dr. Bajaj fixed that, H5 wasn't statistically significant

18:02:32  15   anymore, leaving only H6.  Okay.

16        Now, Dr. Feinstein entered the case at that point,

17   where an expert had essentially established that only one

18   out of six dates was statistically significant.  They

19   replaced Dr. Hallman with Dr. Feinstein.  And Dr. Feinstein

18:02:56  20   essentially agrees that there's a structural break there.

21   He agrees with the analysis that rendered that date

22   statistically insignificant.

23        Now, we'll get back to August 30th.  It has an

24   interesting story in this case.

18:03:12  25        Now, claiming -- in support of the motion to

303

1     substitute, Dr. Feinstein submitted a declaration.  His

2     sworn statement in that declaration was that, quote, "If

3     permitted by the court to provide a report and opinion on

4     market efficiency, I would prefer to conduct my own event

18:03:29   5     study so that I may apply the methodology in the manner I

6     usually do."

7          In fact, Dr. Feinstein deviated from accepted

8     methods and his own usual methods.  For example, the Z-test.

9     In the Z-test in the past, he had based them on earnings

18:03:48   10    dates.  In this case, for the first time, I believe ever,

11    for Dr. Feinstein, he didn't use all of the earnings dates

12    available.

13         Now, as we've discussed, Dr. Feinstein conducted

14    two studies.  His single date event study doesn't establish

18:04:05   15    market efficiency.  We've already -- I've talked about that

16    at length on his Daubert motion, and I won't bore the court

17    by repeating those arguments.

18         Suffice it to say that simply testing a single

19    date doesn't establish market efficiency.  It's not excused

18:04:24   20    by the fact that there's more volatility.  It's not excused

21    by the fact that this market was tumultuous.  If anything,

22    given the extreme volatility over the course of this class

23    period, it was incumbent upon Dr. Feinstein to test more

24    dates, not fewer dates.

18:04:48   25         Now, Dr. Feinstein's test, if it suggests

1    anything, it only suggests that we should be weary of his

2    methods.  He chose a date where he already knew the result.

3    He chose a date where he already knew that our retained

4    expert hadn't challenged that one date in terms of

18:05:12    5    statistical significance.  He chose a date when he already

6    knew that date was chosen by the plaintiff as the last day

7    of the class period.  He chose a date when he already knew

8    that that date had a 29 percent stock price decline.  And

9    then he claimed that there was not a single other date

18:05:33    10    during the class period that was appropriate for testing.

11    Now, Dr. Feinstein's Z-test also fails to

12    establish market efficiency.  It doesn't even test market

13    efficiency, as I explained earlier.  In fact, it doesn't

14    even test whether a market is sometimes efficient, because

18:05:53    15    it takes -- it doesn't take account of the direction of

16    stock price movements.

17    You may recall that Dr. Bajaj was testifying

18    earlier today that if you test -- if you want to test the

19    efficacy of a drug and you just test whether it causes a

18:06:09    20    change, and one of those changes is that a person dies upon

21    taking the drug, you can't then determine that that drug is

22    effective, you have to take into account directionality.

23    It's not merely whether something causes a change.

24    And let me give you an example of it that's in the

18:06:28    25    realm of market efficiency and not pharmacology.  If you,

305

for example, are testing unexpected good news, that is, a

company, the Wall Street expected its revenue to be

announced at $500 million and it has an upside surprise, it

comes out the day that it's due to announce its earnings and

18:06:51  it says, "We didn't earn 500 million as expected, we are

reporting 700 million," you expect that stock price to be

impacted because that's material news, and it to move in the

expected direction.  If it doesn't move, that's not evidence

of efficiency.  If it moves down, that's certainly not

18:07:14  evidence of efficiency, that's evidence of inefficiency.

The Z-test doesn't take into account that

directionality.

Now, amici briefs are not the law of the land.

But if you look at what Professor Fama has submitted,

18:07:32  Professor Fama's view of semi-strong form efficient markets

is that markets moved promptly and consistently in the

expected direction.

Now, Dr. Feinstein's test, so it doesn't test

market efficiency.  But even if it did, Your Honor, as we've

18:07:52  explained in our briefing and as Dr. Bajaj walked through

today, and as we explored on cross-examination, it's riddled

with numerous flaws.  We've walked through that it has an

insufficient sample size.  I won't walk through those dates

again.  It just violates those conditions.

18:08:10  Even if it didn't, it tests too few dates.  One of

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

306

the things he's done is that he could have done traditional

event testing and we could have been here where he tests

nine dates and says four of them are statistically

significant, and you could be comparing these cases to cases

like Freddie Mac/Kreysar, Strougo, which they referenced

where 5 of 15 were found to be statistically significant and

we could be arguing about traditional tests.

But because four of nine, but really three of

eight because he should drop off the last one, because those

numbers, they're just not good enough to show consistent

price reaction, he uses his collective test.  Yeah, in every

case where he applies it, his results are going to look

better than in the traditional event study testing.

Now, in addition to testing too few dates, his

date selection process is just unprecedented.  That is not

an accepted way of selecting dates.  And you can see -- you

don't have to be an economist to start to see the flaws in

it.

So he uses The Wall Street Journal and The New

York Times, but the article has to be about them, it can't

just be published.  He's looking -- he claims there were no

other material news date to test, but now he's testing dates

that supposedly have higher information flow.  But they

don't really have higher information flow, because he's

using dates that aren't actually on the same date that the

307

1    article comes out.

2         The whole thing makes no sense.  I think Dr. Bajaj

3    fairly described this entire situation as kindly as he

4    could, as a mess.  It's just a mess, Your Honor.

18:09:57  5         And this is just -- that's just his date selection

6    process, for which there is no acceptance in the scientific

7    community.

8         He includes the corrective disclosure date in his

9    Z-test.  His Z-test is based on the FDT article.  The FDT,

18:10:12  10   the authors of that article, said, "Don't include a

11   corrective disclosure date."  He does that.  That skews his

12   result in favor of his client.

13        In addition, Your Honor, he improperly pools

14   standard deviation estimates.  That sounds really

18:10:28  15   complicated, but in the end, in the end, all it's about is

16   the ruler and the yardstick we were talking about before.

17        When you have two different populations and one

18   you need to be measuring it with a ruler and the other you

19   need to be measuring it with a yardstick, you can't pool

18:10:47  20   them together and use the average of those two to measure

21   what -- to measure the phenomenon you're testing.  It is

22   scientifically improper.  FDT, they use the unpooled

23   approach.  He used the pooled approach.

24        He didn't employ a continuity correction.  At

18:11:08  25   deposition he was honest with me, Your Honor.  We had a

308

1    lengthy colloquy, which ended with the sentence that I

2    confronted him with today.  I said to him:  Isn't it fair to

3    say that that was an immaterial error?

4         And you know what he did?  He told me the truth;

18:11:23   5    from his perspective, that was an error.  And it was

6    immaterial, because when it's taken alone, it doesn't render

7    his results statistically insignificant.

8         But when you just combine it with a couple of

9    other things, it does.  You only have to do three things to

18:11:43  10    render -- there's a couple -- there's two ways to make his

11    test statistically insignificant.  Here they are:

12         One, you knock off the last day like you're

13    supposed to under FDT.

14         Two, you employ a continuity correction like

18:11:57  15    you're supposed to when he admitted to me it was an error

16    and as Dr. Bajaj testified you should employ a continuity

17    correction.

18         Three, you use unpooled estimates like FDT does in

19    their article and as they indicate you ought to in a

18:12:13  20    footnote.  Granted, a complicated economic footnote, but a

21    footnote.

22         And if you do those three things, his results are

23    statistically insignificant.

24         But there's another way that ends this whole

18:12:24  25    discussion.  His results are also statistically

309

1    insignificant when you take into account a structural break

2    in February.  He doesn't dispute the arithmetic.  There was

3    a structural break in February.  No one disputes what really

4    happened.  The Dow dropped more than it had in six years.

18:12:45    5    The chairman of the Feds said, "We're about to enter a

6    recession."  We actually did enter a recession.

7          When you take that into account, it has two

8    impacts I want to share with you.  First, if you take that

9    into account and drop off the -- I'm going to call it F9,

18:13:06    10   can you go to the next slide, please, actually the last

11   slide?  When you take that into account and you drop off F9,

12   his Z-test is statistically insignificant.

13         Now, remember, his Z-test, the only way he

14   justifies it because the sample size is too small, is he

18:13:22    15   says, "Well, trust my Z-test.  My diagnostic tests show that

16   my test is robust."

17         Well, guess what, all you have to do is

18   acknowledge that there's this structural break.  None of his

19   diagnostic tests work.  He only gets where he gets by

18:13:39    20   playing a lot of games with the science, Your Honor.  It's

21   not good science.  And it certainly doesn't support their

22   motion for market efficiency.

23         Unfortunately for everyone, Your Honor, I'm not

24   done.  There are more errors in his approach.  He also chose

18:14:00    25   to combine estimation periods resulting from the structural

310

1      break.  So remember, when you have a structural break,

2      you've got a different yardstick.  Now, when you have two

3      structural breaks, you have three different yardsticks.  In

4      one of his other cases, the Electrobras case, he treated

18:14:21  5      them separately.  Here he didn't do that.  He picks and

6      chooses.  It didn't work for him in this case.

7           Now, he -- in addition, Your Honor, he does not

8      account for the statistical error inherent in his market

9      model when calculating his Z statistic.

18:14:56  10          The problem here, Your Honor, is he has a test

11     upon a test.  And his test has a potential error.  And then

12     his test upon his test has a potential error.  And that's a

13     problem for scientists.  That's a problem for economists.

14     He doesn't account for the statistical error inherent in

18:15:14  15     such an approach.

16          For all of those reasons, he has failed to

17     establish market efficiency.

18          Now, Your Honor, I want to talk to you for a

19     moment about these dates, because he says that four of the

18:15:30  20     nine dates were statistically significant.  And when you

21     actually focus on the dates, it's interesting to see what

22     happens.

23          Okay.  Well, we've explained before, on this

24     slide, let me make clear what the four dates are that I'm

18:15:43  25     talking about.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

311

1        Okay.  F1 and F2, do you see how they're in red?

2        Actually, can we go back a slide?  It will make it

3   easier.  Okay.

4        F1 and F2, Dr. Feinstein says those are

18:15:57  5   statistically significant.  Okay?

6        F6 he says is statistically significant and F9.

7   F6 is August 30.  F9 is November 20.  Okay.

8        Now let's go to the next slide.  Here's what

9   happens when you start applying actual reliable principles

18:16:14  10   to his test.

11        F9, FDT says don't test it, that should drop out.

12        F1 and 2, when you take into account the

13   structural break, in February, those aren't statistically

14   significant.  You're left with F6.  He's got one date, Your

18:16:32  15   Honor, one date out of nine that has a statistically

16   significant result.

17        Now, you might say to me, "Jason, that's weird.

18   That's August 30th.  I thought you told me that Dr. Hallman

19   tested August 30th and that Dr. Bajaj criticized Dr. Hallman

18:16:53  20   and said, 'No, you missed the structural break in August.

21   When you take into account the structural break in August,

22   August 30th drops out.'"

23        And Dr. Feinstein agrees with that structural

24   break.  He agrees with the math.

18:17:07  25        How is it appearing on this chart again?  I'll

312

1    tell you.  Dr. Hallman, in conducting his regression, used

2    an estimation period from before the class period.

3             Now, you might say, "Okay, Jason, what's a

4    regression?  Mr. Frank, what's a regression?"

18:17:25   5         In order to do these event studies, Your Honor, we

6    try to pull out the effects of the market.  In other words,

7    we want to know what the firm-specific movement is.

8    Companies tend, when the market goes up, the stock price of

9    the company can sometimes go up.  It tends to go up.  When

18:17:44  10   their industry goes up, the stock price of a company in that

11   industry goes up.

12            So economists like Dr. Feinstein and like

13   Dr. Bajaj and like Dr. Hallman, they all agree on this, they

14   run in a regression and they try to pull out any impacts

18:18:00  15   that could be occurring from the market, on the one hand,

16   and from the specific industry on the other hand.  Okay.

17   And they try to use a control period to determine what is --

18   what is the standard relationship that we see.

19            August 30th, when you use Hallman's control

18:18:22  20   period, Dr. Bajaj is able to criticize it because he can

21   ignore the structural break and it gets knocked out.

22            Dr. Feinstein chose a different estimation period,

23   different control period.  That is data mining.

24            In other words, Dr. Feinstein saw the results of

18:18:44  25   August 30th, didn't actually disagree with them, saw that

313

1    they didn't help his client and decided, you know what, I've

2    got a different approach.  If I use a different approach,

3    maybe I can come up with new information.

4          And that's what happened.

18:19:02  5          So, Your Honor, I would submit to you, I have

6    submitted to you that a Z-test does not establish market

7    efficiency.  Testing for -- it doesn't do it at all.  It

8    doesn't matter how many dates he came up with.  He could

9    come up with nine out of nine.  It doesn't show that a

18:19:15 10   market is efficient.  That's not what a Z-test tests.

11   Dr. Bajaj explained that.  It just doesn't do it.

12         But what's worse, four out of nine certainly

13   doesn't do it.  But let me suggest to you that zero dates

14   out of nine, that doesn't do it.  This is a market that was

18:19:30 15   in turmoil.  This was a market that was in the midst of a

16   financial crisis.

17         And the financial crisis, as you've heard

18   testimony about and you rightly articulated earlier, was a

19   crisis that arose out of the mortgage market.  And the two

18:19:51 20   GSEs, Fannie Mae and Freddie Mac, they are the largest

21   participants in the U.S. mortgage market, and it's no

22   surprise that their stock prices might behave in irrational

23   ways, not in efficient ways.

24         And this really matters.  Why does it matter?

18:20:09 25   Because remember, in Basic, the court held that securities

314

1    fraud plaintiffs don't have to plead and prove reliance

2    anymore.  No more reliance requirement.  Instead, we're

3    going to presume, we're going to allow a presumption that

4    they're relying upon the integrity of the market.  If the

18:20:31  5    market is efficient.

6         So if the market is efficient and someone tells an

7    alleged lie, then that lie should impact the stock price.

8    But if plaintiffs don't prove the market is efficient,

9    there's no presumption of reliance.

18:20:49  10        And so, Your Honor, for those reasons, we believe

11    that Dr. Feinstein has failed to establish market

12    efficiency.

13        Now, let me talk -- feel free to interrupt me if I

14    go over time, Your Honor.

18:21:01  15        THE COURT:  Well, you're going over time,

16    Mr. Frank.  What more do you have to say?

17        MR. FRANK:  Well, Your Honor, I'm willing to rely

18    upon our briefs for the lack of price impact argument and

19    for the failure to comply with Comcast arguments.

18:21:14  20        The fact of the matter is that the only thing

21    Halliburton II did, it wasn't to change the market

22    efficiency standard.  I'm sure, you know, the court can

23    reread it or maybe it developed an impression already.  The

24    fact of the matter is it just provided defendants with the

18:21:29  25    opportunity to rebut market efficiency by showing a lack of

1   price impact to the specific statements.

2   THE COURT:  And I think you capture those points

3   in your opposition to the motion.

4   MR. FRANK:  We do.  We do.

18:21:44   5   THE COURT:  Including the footnote on Halliburton.

6   MR. FRANK:  But thank you for all your time, Your

7   Honor.  This motion for class certification, it should be

8   denied for all the reasons that we've discussed and briefed,

9   and we -- again, we really appreciate your time.

18:21:57   10   THE COURT:  Certainly.  You're welcome, sir.

11   Mr. Markovits, my estimate is what, 15 minutes?

12   MR. MARKOVITS:  I will not take that, Your Honor.

13   I too want to thank you for your incredible patience today.

14   I am sorely tempted to use one of my favorite quotes from *My*

18:22:19   15   *Cousin Vinny* and just sit down, but out of respect for

16   Mr. Frank and the court, I'll just say I disagree with what

17   he said.

18   (Laughter.)

19   MR. MARKOVITS:  What Mr. Frank said was basically

18:22:34   20   an attack on Cammer/Krogman.  And Cammer/Krogman are

21   supported by the Freeman case in the Sixth Circuit, the

22   Lambert case is in the Sixth Circuit.  I said before -- I

23   forgot to mention the Willis versus Big Lots case, which is

24   another one that adopts the Cammer/Krogman factor.

18:22:48   25   And I'm just going to talk about a couple of them.

316

1    Cammer factor 1, the trading volume.  Anything over two

2    percent, it creates a strong presumption that needs to be

3    rebutted.  They haven't rebutted it.

4            The trading on the New York Stock Exchange.

18:23:04  5    Dr. Bajaj agreed with me that large capitalization stocks

6    that trade on major stock exchanges such as the New York

7    Stock Exchange are generally presumed to be efficient unless

8    there's evidence to the contrary.  He had to agree with me

9    because he had testified to that in another case.

18:23:20  10           So where's the evidence to the contrary?  There's

11   no rebuttal here, no rebuttal evidence.  In other cases,

12   Dr. Bajaj has presented rebuttal evidence, evidence of

13   market inefficiency, he's done serial correlation tests,

14   Y filter trading tests, put-call parity tests.  He did not

18:23:40  15   do any of that in this case.  There's been no rebuttal of

16   the presumption of market efficiency in this case.

17           Again, as I said at the beginning, what we are

18   going to see and what we have seen today is an emphasis and

19   overemphasis on Cammer 5 as that's dispositive.

18:23:57  20           And defendants keep bringing up and Mr. Frank

21   brought up the Freddie Mac/Kreysar case.  That is the one

22   case, Your Honor, that didn't include all of the Cammer

23   factors had been met, but it's the one case where a judge,

24   Judge Cedarbaum in New York, dealing with preferred stock of

18:24:13  25   Freddie, adopted Dr. Bajaj's argument that Cammer factor 5

317

1    was dispositive.  That's since been overruled by the Second

2    Circuit in the Waggoner case.  That aspect -- that aspect of

3    Freddie Mac/Kreysar is no longer good law in the Second

4    Circuit.

18:24:38   5        Their challenge, again, to quote the Carpenters

6    case, their challenge is too narrow.  All these other

7    factors are met.

8        And I think with that, Your Honor, unless you have

9    any particular questions, I will rest.

18:24:55   10        THE COURT:  Well, none that I'd like to voice.

11   I think all of you have been incredibly helpful.

12        (Laughter.)

13        THE COURT:  You've given me much to think about,

14   and I will give everything that is left to be resolved much

18:25:08   15   thought.  And I thank you for your preparedness, for your

16   politeness not only to my staff and myself, but also to each

17   other.  Litigation doesn't always have to be contentious.

18        I did enjoy the testimony of the experts.  So I

19   know that each of you were put through paces that may not

18:25:27   20   have been as comfortable for you as you would have liked,

21   but I thought it went off pretty well.

22        Unless there's something more, I have nothing more

23   that I'll require of you today.  Is there, on behalf of

24   plaintiffs?

18:25:39   25        MR. MARKOVITS:  No, Your Honor.

318

1          THE COURT:  On behalf of the defense?

2          MR. FRANK:  No, Your Honor.  Thank you.

3          THE COURT:  Thank you all.  Please travel safely.

4     And feel free to start to move about.  The hearing is

18:25:48  5     adjourned.  I'll take some time to clean up my space.

6          MR. MARKOVITS:  Thank you, Your Honor.

7          MR. FRANK:  Thank you, Your Honor.

8          MR. McKAY:  Thank you, Judge.

9          THE COURT:  Certainly.

10        (Proceedings concluded at 6:25 p.m.)

11                          - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7          /s/ Mary L. Uphold        April 20, 2018
           Mary L. Uphold, RDR, CRR    Date
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

320

1                           I N D E X

2    **WITNESS:**                **CALLED BY:**            **PAGE:**

3    STEVEN P. FEINSTEIN,        Plaintiff                   26
     Ph.D.
4    MUKESH BAJAJ, Ph.D.         Defendants                 146

5                           * * * * *

6    **EXAMINATION:**                                    **PAGE:**

7    DIRECT EXAMINATION OF STEVEN P. FEINSTEIN,            26
     Ph.D., BY MR. MARKOVITS
8    CROSS-EXAMINATION OF STEVEN P. FEINSTEIN,             58
     Ph.D., BY MR. FRANK
9    REDIRECT EXAMINATION OF STEVEN P. FEINSTEIN,         125
     Ph.D., BY MR. MARKOVITS
10   RECROSS-EXAMINATION OF STEVEN P. FEINSTEIN,          140
     Ph.D., BY MR. FRANK
11   FURTHER REDIRECT EXAMINATION OF STEVEN P.            141
     FEINSTEIN, Ph.D., BY MR. MARKOVITS
12   DIRECT EXAMINATION OF MUKESH BAJAJ, Ph.D.            147
     BY MR. FRANK
13   CROSS-EXAMINATION OF MUKESH BAJAJ, Ph.D.             191
     BY MR. MARKOVITS
14   REDIRECT EXAMINATION OF MUKESH BAJAJ, Ph.D.          235
     BY MR. FRANK
15   RECROSS-EXAMINATION OF MUKESH BAJAJ, Ph.D.           241
     BY MR. MARKOVITS

16                          * * * * *

17                                                      **PAGE:**

18
     AFTERNOON SESSION                                    145

19                          * * * * *

20

21

22

23

24

25