UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM,** | Civil Action No. 4:08-cv-00160 |
| Plaintiff, | |
| v. | Judge Benita Y. Pearson |
| **FEDERAL HOME LOAN MORTGAGE CORPORATION, et al.** | Magistrate Judge Jennifer Dowdell Armstrong |
| Defendants. | |

**AMENDED DECLARATION OF W.B. MARKOVITS IN SUPPORT OF PLAINTIFF'S MOTION TO STRIKE PORTIONS OF THE REPORT AND EXCLUDE PORTIONS OF THE EXPERT TESTIMONY OF DR. MUKESH BAJAJ**

I, W.B. Markovits, declare as follows:

1. I am lead counsel for Plaintiff Ohio Public Employees Retirement System in the above-caption matter. I make this declaration in support of Ohio Public Employees Retirement System's Motion to Strike Portions of the Report and Exclude Portions of the Expert Testimony of Dr. Mukesh Bajaj and for Relief from Briefing Restrictions.

2. I was scheduled to depose Dr. Bajaj on February 29, 2024, beginning at 9:30 am EST. On that morning, at approximately 8:00 am EST, I received an email from defense counsel informing me that that Dr. Bajaj had taken ill and that the deposition would have to be postponed.

3. At defense counsel's request, the deposition was rescheduled for March 13, 2024, and was taken on that date. I deposed Dr. Bajaj for very close to the full seven hours.

4. I had requested the rough transcript as soon as possible, but did not receive it until the afternoon of March 14, 2024, precluding effective review by myself and OPERS' experts for inclusion of information or testimony resulting from that deposition in the Motion.

5.  I did not receive a paginated transcript until approximately 1:00 p.m. EDT on March 15, 2024.

6.  By contrast, the depositions of OPERS' experts were taken on: November 6, 2023 (fact deposition of Howard Shapiro); January 10, 2024 (expert deposition of Howard Shapiro); and December 20, 2023 (expert deposition of Dr. David Tabak).

7.  Attached are true and correct copies of:

Exhibit 1:    Expert Report of Mukesh Bajaj, Ph.D., dated January 19, 2024.

Exhibit 2:    *New York Times* article by Michael N. Grynbaum dated November 21, 2007, entitled *Loan Crisis Entangles Freddie Mac*.

Exhibit 3:    *New York Times* article by Floyd Norris dated November 22, 2007, entitled *From virtuous cycle to vicious credit cycle*.

Exhibit 4:    Backup data for Figure 3 at p. 44 of the Bajaj Report provided to OPERS counsel.

Exhibit 5:    Transcript of the Deposition of Dr. Mukesh Bajaj taken on March 13, 2024, dated March 15, 2024.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Tucson, Arizona, this 27th day of March, 2024.

*/s/ W.B. Markovits*
W.B. Markovits

# EXHIBIT 1

CONFIDENTIAL

---

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF OHIO

### EASTERN DIVISION

| | |
|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, | ) |
| | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) CIVIL ACTION NO. 4:08-CV-00160 |
| | ) |
| v. | ) |
| | ) |
| FEDERAL HOME LOAN MORTGAGE | ) JUDGE BENITA Y. PEARSON |
| CORPORATION, a/k/a FREDDIE MAC, | ) |
| RICHARD F. SYRON, PATRICIA L. | ) MAGISTRATE JUDGE |
| COOK, ANTHONY S. PISZEL AND | ) WILLIAM H. BAUGHMAN, JR. |
| EUGENE M. McQUADE, | ) |
| | ) |
| Defendants. | ) |

# EXPERT REPORT OF MUKESH BAJAJ, PH.D.

## January 19, 2024

CONFIDENTIAL

---

# Table of Contents

I. Qualifications...................................................................................... 5

II. Background and Scope of Assignment ............................................. 6

III. Summary of Opinions .................................................................... 11

IV. Economic Background.................................................................... 15

    A. Freddie Mac and the U.S. home mortgage market in 2006/2007 ............15

        1.  Freddie Mac general background ..................................... 15

        2.  Freddie Mac and the U.S. home mortgage market in 2006 and 2007 ............................................................................ 18

    B. Economic events of 2007: Subprime mortgage sector problems morph into unforeseen broader credit crisis and "what may be the worst housing downturn since the Great Depression".......................................20

        1.  2006 to mid-2007: "Subprime" downturn seen as "contained."........ 22

        2.  August 2007: Liquidity crisis and financial panic suddenly erupts. 23

        3.  Market participants, forecasters, and regulators did not foresee the liquidity crisis and worsening economic turmoil......................... 27

    C. Freddie Mac disclosures during the Relevant Period provided detailed information about the guaranteed and retained portfolios and reflected the changing mortgage market environment and growing risk....................................................................................................28

        1.  Increase in exposure to non-traditional mortgages to "mirror more of the market" ................................................................... 29

        2.  Mortgage credit risk and provision for credit losses ......................... 30

        3.  Other disclosed risks: Prepayment Risk, Interest Rate Spread Risk, and Interest Rate Volatility Risk .............................................. 40

        4.  Freddie Mac stock declined over 35% from October 1 to November 19, 2007 as the market assimilated materialization of disclosed risks.......................................................................... 44

V. The alleged misrepresentations and omissions did not have a statistically significant stock price impact, lack economic significance, and did not cause losses to OPERS............................................................... 49

    A. Summary ................................................................................49

    B. Freddie Mac's November 20, 2007 Q3 2007 financial results announcement ..........................................................................53

---

CONFIDENTIAL

C. Market reaction to Freddie Mac's November 20, 2007 announcement considering basic finance theory ...................................................58

    1.  Analyst reaction ................................................................. 58

    2.  TAC's incorrect claims....................................................... 60

    3.  The market was concerned with Freddie Mac's future ability to raise capital. .......................................................................... 64

    4.  Importance of capital for Freddie Mac's future growth ................... 67

D.  Freddie Mac's stock recovered after Freddie Mac priced and completed $6 billion non-convertible preferred stock capital raise on November 30, 2007...................................................................71

E.  The market's full reaction to the alleged corrective disclosure and materialization of concealed risk, including the cumulative stock return across the "capital raise dates," was not statistically significantly negative. ..................................................................78

F.  The Alleged Misrepresentations and Omissions Lacked Economic Significance...................................................................79

VI. Tabak does not establish materiality or loss causation. ................................. 80

A. Summary .................................................................................80

B. Tabak's unstated dependence on market efficiency, which has not been established. ......................................................................85

C. Tabak's fundamentally flawed "analysis" of the alleged November 20, 2007 corrective disclosure. .......................................................87

    1.  Tabak did not even read, let alone consider, the actual disclosures at issue. ............................................................................. 88

    2.  Tabak did not "see" confounding information because he did not look for any.......................................................................... 88

    3.  Tabak ignores the price impact of Freddie Mac capital raise on November 30 and its obvious implications for the stock price decline on November 20. ........................................................ 94

D.  The two arguments Tabak offers in purported support of his materiality and loss causation opinions are flawed, and his opinion is unsupported and incorrect.........................................................96

    1.  Tabak mischaracterizes my prior testimony. ...................................... 96

    2.  Tabak also fails to establish the materiality of alleged misrepresentations and omissions based on "Plaintiff's Appendix 1."97

        a.  Correcting only two of Tabak's errors undermines his conclusion ............................................................................. 100

CONFIDENTIAL

    b. Plaintiff's Appendix 1 is not a properly conducted "event study" because the event selection makes no sense. .................... 103

    c. Plaintiff's Appendix 1 is not a properly conducted "event study" because the events were not properly analyzed, or even analyzed at all. .......................................................................... 105

    d. Tabak claims Plaintiff's Appendix 1 shows the Freddie Mac "news that mattered to the market [on November 20, 2007] was company-specific," but did not even examine the "news." 106

  E. The Tabak Lottery Ticket Hypothetical is misplaced and proves nothing. ..............................................................................107

  F. Tabak's loss causation opinion is circular and he assumes his conclusion ..............................................................................110

VII. Tabak fails to offer an opinion on the amount of damages ........................ 111

VIII. Shapiro 's opinions are based on insufficient facts, are not based on a reliable methodology, and to the extent a methodology was employed, he applied it in an unreliable manner. ....................................................... 111

IX. The individual Defendant's trading in Freddie Mac securities was not unusual or suspicious in timing or amount, and their holdings in Freddie Mac securities declined substantially in value over the Relevant Period. .. 119

CONFIDENTIAL

---

# I.  Qualifications

1. I am a Senior Consultant in the Finance Practice of Charles River Associates ("CRA"). CRA is a leading global consulting firm that offers economic, financial, and strategic expertise to major law firms, corporations, accounting firms, and governments around the world.   My curriculum vitae is attached as Appendix 1.

2. In 1988, I graduated from the University of California at Berkeley earning a Ph.D. in Business Administration with a specialty in finance. I was awarded an M.B.A. from the University of Texas at Austin in 1987. I was awarded a Bachelor of Technology degree in 1981 from the Indian Institute of Technology in Delhi, India.

3. As a financial economist, I specialize in the study of capital markets, including the valuation of stocks, bonds, warrants, restricted stock and other complex contingent securities, intellectual property, intangible assets, corporate hedging practices (through derivatives and other methods), conducting event studies to determine the significance of stock price reactions to particular events, and analyzing market efficiency, materiality and loss causation issues related to securities class action claims.

4. Since 1996, I have been engaged as an expert in financial economics on numerous matters involving allegations of securities fraud, valuation of firms and their securities, intangible assets and intellectual property and transfer pricing by multinational corporations.  I have testified as an expert either in court or at a deposition in over 60 matters, including almost 30 matters concerning liability and/or damages issues in securities fraud cases.  In such securities fraud cases, I have testified on behalf of the U.S. Securities and Exchange Commission ("SEC") and the U.S. Attorney's Office in a criminal matter, as well as on behalf of both plaintiffs and defendants in civil and criminal matters.

5. In addition to my consulting work and business activities, I have taught graduate-level courses in corporate finance, investments and financial engineering as a visiting lecturer with the

CONFIDENTIAL

Haas School of Business ("Haas") at the University of California at Berkeley. At Haas, I served as a Graduate Student Instructor while earning my Ph.D. between 1983 and 1988. From 1988 to 1995, I was an Assistant Professor of Finance and Business Economics at the University of Southern California.

6. I have authored or co-authored more than 25 publications and working papers in the field of financial economics. My research has been published in *The Journal of Finance, The Journal of Financial Economics, The Journal of Financial Research, The Journal of Applied Finance, International Economic Review, Research in Finance, The Journal of Corporation Law, The Journal of Derivatives,* and *Research in Law and Economics.*

7. I am a member of the American Finance Association, the Western Finance Association, and the Financial Management Association, and I have lectured widely on a variety of issues in financial economics.

8. In this case, I have been retained by counsel for the Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company").  CRA is being compensated for my work at my hourly rate of $1,500 per hour. That compensation is not in any way dependent on the opinions I express on issues in this matter. I am independent of the Plaintiff and the Defendants in this matter. I have been assisted in my work on this case by my colleagues at CRA, for whose work CRA is being paid at their regular hourly rates.

9. The documents I have considered are cited throughout my report and/or listed in Appendix 2. If additional information becomes available, I reserve the right to supplement or modify the opinions set forth in this report.

## II. Background and Scope of Assignment

10. This report concerns a securities action brought by Plaintiff, Ohio Public Employees Retirement System ("OPERS" or "Plaintiff") against Defendants, Freddie Mac and certain Freddie

CONFIDENTIAL

Mac executive officers (collectively, "Defendants").[1]

11. OPERS alleges that throughout the period August 1, 2006 to November 20, 2007 (the "Relevant Period"), Defendants made material misrepresentations and omissions[2] "relating to, among other things,

> (i) [Freddie Mac's] exposure to or risk of loss from subprime mortgage loans and other nontraditional, high risk mortgages, including "Alt-A" mortgages (a mortgage industry term to describe reduced documentation/higher credit risk loans);
>
> (ii) its underwriting guidelines and Defendants' adherence to those guidelines,
>
> (iii) its loan analysis software and fraud detection systems,
>
> (iv) its risk management measures and its risk management performance, and
>
> (v) its capital position."[3]

And Plaintiff alleges the "primary fraud was Defendants' failure to disclose Freddie Mac's true subprime exposure."[4]

12. Plaintiff further alleges that these material misrepresentations and omissions caused the market price of Freddie Mac's common stock to be "artificially inflated" throughout the Relevant Period until November 20, 2007 Freddie Mac announced to the public its earnings for Q3 2007. [5,6] On that day, Freddie Mac announced losses of over $2 billion for the quarter including "significant

---

[1]   Third Amended Complaint, ECF No. 166 (the "Complaint" or "TAC").
[2]   I will refer to alleged misrepresentations and alleged omissions together as "misrepresentations," or "disclosure defects" except when I treat them separately, in which case I will indicate that I am doing so.
[3]   TAC, ¶2.
[4]   TAC, ¶3.
[5]   TAC, ¶269-278.
[6]   In this report I refer to Freddie Mac's specific financial quarters in numeric terms as Q1, Q2, Q3 or Q4 denoting the first through fourth quarters, respectively. Freddie Mac's Q3 2007 earnings release was issued before trading hours on November 20, 2007, and included: (a) a press release titled "Freddie Mac Reports Third Quarter 2007 Net Loss of $2.0 Billion or $3.29 Per Diluted Share, Core Business Growth Offset by Credit and Valuation Losses" ("Q3 2007 Earnings Release"); (b) Consolidated Financial Statements; (c) Core Tables; and (d) an Information Statement Supplement titled "FINANCIAL REPORT FOR THE THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2007" ("Q3 2007 Information Supplement").  Later that day at 10:00 a.m. ET, Freddie Mac held an earnings conference call with analysts where Freddie Mac discussed, among other things, a presentation titled "Freddie Mac's Third Quarter 2007 Financial Results November 20, 2007" ("Q3 2007 Slides").

CONFIDENTIAL

subprime losses" with more "significant losses expected."[7] These announcements allegedly revealed Freddie Mac's true "subprime exposure," "potential capital impairment," its "precarious financial position,"[8] and "the nature, extent and impact of the fraud…"[9]  OPERS also alleges that this November 20, 2007 corrective revelation caused Freddie Mac's common stock price to fall 29% that day as the stock "reflect[ed] the newly emerging truth about Freddie Mac's investments, risk management, financial condition and results," which in turn caused "foreseeable losses" and OPERS to suffer "damages."[10] Plaintiff seeks damages for alleged "violations of Sections 10(b) and 20(a) of the Exchange Act"  and "SEC Rule 10b-5 promulgated" thereunder.[11]

13. I understand from counsel that Plaintiff seeks damages according to a "materialization of risk theory of liability." As the Court noted, "OPERS claims that Defendants concealed certain risks that, when they materialized, caused the stock price to drop."[12]  In this report,  when I refer to the information released by Freddie Mac on November 20, 2007 as the "alleged corrective disclosure" or November 20, 20007 as the "alleged corrective disclosure date" I am using those phrases to mean Plaintiff's allegations based on their materialization of risk theory.

14. I also understand that while OPERS originally sought to represent a class of investors who purchased the common stock over the Relevant Period, certification of that class was denied by this Court on August 14, 2018[13] and the Sixth Circuit denied review.[14] Among other reasons, the Class Cert Order denied certification because OPERS "fail[ed] to demonstrate that Freddie Mac's stock traded in an efficient market,"[15] an essential prerequisite "[t]o benefit from the fraud-on-the market presumption" of reliance on alleged misstatements and omissions.[16]

---

[7]   TAC, ¶¶134, 139.
[8]   TAC, ¶¶4,6.
[9]   TAC, ¶271.
[10]  *See, e.g.*, TAC, ¶¶6, 191, 271, 277.
[11]  TAC, ¶14.
[12]  Memorandum of Opinion and Order, August 14, 2018, ECF No. 478 ("Class Cert Order"), page 38.
[13]  *See* Class Cert Order, pages 1-2 and 41.
[14]  *In re Ohio Pub. Emps. Ret. Sys.*, No. 18-0310 (6th Cir. Jan. 23, 2019) (order).
[15]  Class Cert Order, page 40.
[16]  *See* Class Cert Order, page 17 (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) ("*Halliburton II*")).

CONFIDENTIAL

15. Plaintiff previously made two attempts to establish market efficiency, first offering the expert testimony of Dr. Greg Hallman ("Hallman"),[17] who Plaintiff then replaced with Dr. Steven P. Feinstein ("Feinstein").[18]  I filed reports critiquing the reports and analyses of both experts and concluded that each failed to establish that the market for Freddie Mac common stock was efficient during the Relevant Period.[19] As noted above, the Court held that the Plaintiff failed sufficiently to establish market efficiency.  The Court also granted Freddie Mac's motion to strike Feinstein's report and exclude the testimony of Feinstein.[20]

16. At the Class Certification phase, in addition to market efficiency, I also analyzed and opined on the issue of "price impact."  I concluded that the alleged misrepresentations and omissions had no impact on the price of Freddie Mac's common stock over the Relevant Period.[21] The Court agreed. The Class Cert Order noted that "where plaintiffs have sufficiently established market efficiency, defendants may rebut the presumption of reliance with evidence of a lack of price impact" and found that my report "demonstrates that the alleged misstatements in the case at bar did not impact Freddie Mac's stock price, rebutting the presumption of reliance."[22]

17. Now, OPERS, pursuing this case as an individual action, has offered a third and new economic expert, Dr. David Tabak ("Tabak"), who filed a report dated November 16, 2023.[23] Tabak opines that "if asked," he "would be able to provide an opinion that loss causation existed" and "if asked," he would be able to "calculate damages."[24] Tabak clarified in his deposition that his opinion on loss causation is "that the alleged misrepresentations and omissions in this case did cause plaintiffs' alleged losses."[25] Regarding materiality, he concludes that "there is evidence in

---

[17]    Expert Report of Dr. Greg Hallman, August 16, 2012.
[18]    *See* Declaration of Professor Steven P. Feinstein, December 16, 2016; Report on Market Efficiency Professor Steven P. Feinstein, June 7, 2017.
[19]    *See* Expert Report of Mukesh Bajaj, Ph.D., December 14, 2012; Expert Report of Mukesh Bajaj, Ph.D., September 1, 2017 ("2017 Bajaj Class Certification Report").
[20]    Class Cert Order, pages 2-15, 41.
[21]    2017 Bajaj Class Certification Report, ¶16.
[22]    Class Cert Order, page 36.
[23]    Expert Report of David I. Tabak, Ph.D., November 16, 2023 ("Tabak Report").
[24]    Tabak Report, ¶32.
[25]    Deposition of David I. Tabak, December 20, 2023, ("Tabak Deposition"), at 53:8-18.

the record that is relevant to an understanding of the effect of the alleged misrepresentations and omissions on the market's valuation of Freddie Mac" and that that evidence shows Freddie Mac's November 20, 2007 alleged corrective disclosure was "company-specific" news that "mattered to the market" that "would allow a trier of fact to conclude that those alleged misrepresentations and omissions were material."[26]

18. Plaintiff has also filed a report by a former equity analyst covering Freddie Mac, Howard S. Shapiro ("Shapiro").[27]  He opines that three of the "primary" categories of information important to him as an analyst of Freddie Mac were "[c]redit risk, underwriting, and the related factor of economic capital," and that information he learned and reviewed since November 20, 2007 "regarding those three topics with respect to Freddie Mac would have dramatically changed [his] analysis of Freddie Mac's financial health during the Relevant Period," and also "makes it clear that credit risk, underwriting issues, and issues relating to economic capital were all major factors contributing to" Freddie Mac's losses reported that day.[28]

19. I have been asked by Freddie Mac's counsel to review and comment on these opinions in the Tabak and Shapiro reports, from an economic perspective, as they relate to the issues of materiality, loss causation, and damages.  I have also been asked: (a) to review the economic evidence as it relates to the Plaintiff's allegations that alleged misrepresentations and omissions caused losses to OPERS over the Relevant Period, and (b) to review the Freddie Mac stock trading behavior of Individual Defendants[29] over the Relevant Period in light of the TAC's claim that Defendants' alleged "fraudulent scheme"[30] allowed certain Freddie Mac executives to "implement insider trading incentives"[31] selling "well over 100,000 shares" to avoid the price decline on

---

[26]   Tabak Report, ¶¶3, 24, 35-36.
[27]   Expert Report of Howard S. Shapiro, November 17, 2023 ("Shapiro Report").
[28]   Shapiro Report, ¶3.
[29]   The Individual Defendants are former Freddie Mac executives Richard F. Syron, Patricia L. Cook, Anthony S. Piszel, and Eugene M. McQuade.
[30]   TAC, ¶271.
[31]   TAC, ¶7.

CONFIDENTIAL

November 20, 2007.[32]

20. It is my understanding from counsel that it is Plaintiff's burden to prove "materiality" and "loss causation" — "a causal connection between the defendants' alleged misrepresentations and the plaintiffs' economic losses"[33] — in order to claim damages. In this report I analyze and evaluate, from an economic perspective, materiality and loss causation and the related economic evidence.

21. I have been asked by counsel for Freddie Mac to be prepared to offer the opinions I previously offered at the class certification stage of this case at trial, if necessary and appropriate. I am prepared to do so, and I accordingly incorporate my opinions in those reports by reference.

## III. Summary of Opinions

22. Based on my expertise and experience as a financial economist and my analysis described in this report, I have reached the following primary opinions:

1) Contrary to the claims in the TAC, my analysis shows that the alleged misrepresentations and omissions did not have a statistically significant stock price impact and did not cause losses to OPERS. While Freddie Mac's stock declined on November 20, 2007 after Freddie Mac announced losses of $2 billion for its Q3 2007 and projected further losses in subsequent quarters, these losses and the price decline were related to the realization of previously disclosed risks of mortgage exposure. Such risks were realized given the rapidly deteriorating market conditions precipitated by an unprecedent residential real estate meltdown which sparked an unforeseen broader financial crisis. Shapiro predicted, in October 2007, that Freddie Mac would announce substantial losses in November 2007, evidencing the fact that those losses were the result of disclosed risks. More importantly, viewing the November 20, 2007 price

---

[32] TAC, ¶242.
[33] *Halliburton II*, 134 S. Ct. at 2415.

CONFIDENTIAL

decline in isolation is an incomplete and biased view of the market reaction to the information the Company reported that day. A major market concern on that day related to Freddie Mac's need to raise dilutive capital to meet regulatory requirements after analysts inferred from Company statements that day that its regulator OFHEO would not give relief on this requirement. Freddie Mac needed sufficient regulatory capital to meet its capital requirement and fulfill its mission to support struggling mortgage markets. Lack of sufficient capital would erode Freddie Mac's competitive position and potentially impair its future business prospects. However, these capital related concerns were alleviated by November 30, 2007 when Freddie Mac successfully raised capital on overall favorable terms and Freddie Mac's stock price largely recovered.

2) Tabak's opinion that the alleged misrepresentations and omissions caused losses to OPERS is not reliable because it is based on insufficient facts, flawed and/or unsubstantiated assumptions, and an unreliable methodology. Other than simply assuming that November 20, 2007 represented a corrective disclosure and materialization of allegedly concealed risks, Tabak did no analysis of, nor has he even reviewed, Freddie's Mac alleged November 20, 2007 corrective disclosure at issue or any of Freddie's Mac prior detailed disclosures about risks of its mortgage exposure. He admits he made no effort to disentangle the complex, potentially confounding non-allegation-related information released that day which could have caused the price decline, nor did he undertake any effort to tie specific information released by Freddie Mac to the materialization of allegedly concealed risks related to subprime and non-traditional mortgage[34] exposure rather than the materialization of known risks related

---

[34] "Nontraditional" mortgage loans do not have a fixed definition, but generally refer to loans that are different than traditional fixed rate interest mortgage loans, including but not limited to interest-only mortgage loans, Alt-A mortgage loans and payment-option adjustable rate ("ARM") loans. *See* Appendix 3 (Defendants' Glossary of Terms, ECF No, 320) at 4.

CONFIDENTIAL

to this exposure. The only "analysis" he offers is an interpretation of an irrelevant and inapplicable analysis of announcements of losses by other financial institutions that was performed by another consultant for Plaintiff. That original analysis contained numerous errors, and even after Tabak supposedly corrected some errors, he made new, fundamental errors. To claim loss causation, Tabak also proffers a hypothetical example involving hidden "lottery tickets," which he admits is an "oversimplification." His admitted "oversimplification" proves nothing about loss causation in this matter as it does not apply to the facts of this case and his theory is also inconsistent with the TAC and plaintiff's other expert, Shapiro. Overall, Tabak's loss causation opinion amounts to him effectively assuming his conclusion.

3) Tabak did not calculate damages, and I am therefore unable to comment on any actual damages calculation. Nonetheless, Tabak's opinion that he could calculate damages, "if asked," is not and would not be reliable as stated because it is based on insufficient facts, flawed and/or unsubstantiated assumptions, and an unreliable proposed methodology. By his own admission, his approach to a damages calculation is crucially dependent on the unsubstantiated assumption of the "fundamental" form of semi-strong market efficiency for Freddie Mac's stock over the Relevant Period which Tabak did not analyze, let alone establish. In fact, as the Class Cert Order found, OPERS failed to establish even a weaker standard of "informational" (as against fundamental) semi-strong market efficiency.

4) The Shapiro Report does not offer scientific, rebuttable, or testable analysis to support its opinions, makes claims inconsistent with Freddie Mac disclosures during the Relevant Period about "non-traditional" mortgage exposure, and offers opinions that contradict Tabak's assumptions.

CONFIDENTIAL

5) My analysis of Freddie Mac executives' stock trading behavior over the Relevant Period shows that the individual Defendants did not engage in trading in Freddie Mac securities that was unusual or suspicious in timing or amount.  They did not benefit from the alleged fraud during the Relevant Period.  Rather, their holdings in Freddie Mac stock declined substantially over the course of the Relevant Period.

23. I explain the bases for these opinions below. In addition, attached to this report are Appendices and Exhibits that include information referenced herein and analyses that further support my opinions.  These Appendices and Exhibits are as follows:

- Appendix 1: Curriculum Vitae of Mukesh Bajaj

- Appendix 2: Documents Considered

- Appendix 3: Defendants' Glossary of Terms

- Appendix 4: Market Model Description

- Exhibit 1: Case Shiller "Nominal" U.S. Home Price Index (1990 - 2008)

- Exhibit 2: Monthly FHFA House Price Index, Seasonally Adjusted Year-Over-Year Change in Monthly Values (1995 - 2008)

- Exhibit 3: TED Spread (2006 - 2007)

- Exhibit 4: Bloomberg U.S. Agency Fixed Rate MBS Average OAS (2006 - 2007)

- Exhibit 5: Chicago Board Options Exchange Volatility Index ("VIX") and Freddie Mac 30-day Implied Volatility (2006 - 2007)

- Exhibit 6: Tabak Appendix 1 Analysis

- Exhibits 7A – D: Details of individual Defendants' trading activity in Freddie Mac stock during the Relevant Period

- Exhibit A.1: Market Model Raw Data

CONFIDENTIAL

# IV. Economic Background

## A. Freddie Mac and the U.S. home mortgage market in 2006/2007

### 1. Freddie Mac general background

24. I understand that Freddie Mac has retained another expert, Dr. Chudozie Okongwu, to among other things, explain some aspects of mortgage loan terminology and discuss the prevailing conditions in the mortgage and housing markets during the Relevant Period. I have been instructed by counsel to assume the facts set forth in his report to be true. I have reviewed the report of Dr. Okongwu and I may rely on facts set forth therein. To support my opinion, I also summarize here some of the background facts regarding Freddie Mac's business and market events leading up to and during the Relevant Period.

25. Freddie Mac is a Government Sponsored Entity ("GSE") chartered by Congress in 1970 to "provide liquidity, stability, and affordability to the U.S. housing market."[35] Freddie Mac supported public policy goals of broader home ownership.[36]

26. Freddie Mac carried out its mission and generated income through two main business activities: "credit guarantee activities" and "investment activities."[37] The credit guarantee activities involved buying lender-originated residential mortgage loans, packaging them into mortgage-backed securities ("MBS"),[38] guaranteeing these securities, and then selling them to investors. Freddie Mac guaranteed that investors in these MBS would receive timely payments of principal and interest thereby assuming the risk of underlying mortgage borrower default. In

---

[35] Freddie Mac Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2006, March 23, 2007 ("Freddie Mac 2006 Annual Report"), page 1. *See also* Federal Home Finance Agency Office of Inspector General, *A Brief History Of The Housing Government-Sponsored Enterprises*, https://www.fhfaoig.gov/Content/Files/History%20of%20the%20Government%20Sponsored%20Enterpris es.pdf.

[36] Freddie Mac 2006 Annual Report, page 1.

[37] Freddie Mac 2006 Annual Report, page 3.

[38] These MBS included mortgage pass-through or "participation" certificates which are referred to as "PCs" in Freddie Mac's Annual and other financial reports. *See, e.g.*, Freddie Mac 2006 Annual Report, pages 4-5.

CONFIDENTIAL

exchange for bearing this risk Freddie Mac earned income by charging investors a fee.[39]  Freddie Mac's investment activities involved purchasing and holding whole (unsecuritized) mortgage loans, holding its own packaged MBS, and purchasing MBS not created by Freddie Mac which included both "agency" ("mortgage-related securities issued by GSEs or government agencies" with GSE payment guarantees) and "non-agency" MBS (MBS issued by private entities not carrying a GSE guarantee).[40]  The retained securities were recorded as assets on Freddie Mac's balance sheet.[41]

27. As of December 31, 2006, Freddie Mac was one of the "largest purchasers of mortgage loans in the U.S.," and its total mortgage portfolio was $1.8 trillion, or about 16% of the total $10.9 trillion U.S. residential mortgage debt outstanding.[42]

28. Although Freddie Mac was chartered by Congress, it funded itself and financed operations with private capital, including common stock, preferred stock and debt securities, and was responsible for making payments on these securities.[43]

29. As a GSE, Freddie Mac was regulated by the U.S. Department of Housing and Urban Development ("HUD") and the Office of Federal Housing Enterprise Oversight ("OFHEO").[44] Freddie Mac's regulators placed limitations on terms and principal amounts of loans and securities that could be purchased and/or guaranteed.[45]  Freddie Mac was subject to "affordable housing

---

[39]  Freddie Mac 2006 Annual Report, page 4.
[40]  For the retained portfolio, Freddie Mac invested in both "agency securities" ("mortgage-related securities issued by GSEs or government agencies") and "non-agency mortgage-related securities" (also sometimes called "private-label" RMBS). Freddie Mac 2006 Annual Report, page 4; *see also* page 41 (Table 19).
[41]  Freddie Mac 2006 Annual Report, pages 40-41.
[42]  Freddie Mac 2006 Annual Report, pages 1-2.
[43]  Freddie Mac 2006 Annual Report, pages 1, 4.
[44]  Freddie Mac 2006 Annual Report, pages 6-9.
[45]  *See, e.g.*, Freddie Mac 2006 Annual Report, page 3 ("Our charter establishes general parameters for the terms and principal amounts of the mortgages we may purchase …. Within our charter parameters, the residential mortgage loans we purchase or that underlie mortgage-related securities we purchase generally fall into one of two categories: Single-Family Mortgages. Single-family mortgages are secured by one- to four-family

CONFIDENTIAL

goals set by HUD" that are "intended to expand housing opportunities for low-and moderate income families."[46] OFHEO, the "safety and soundness regulator for Freddie Mac," as of 2004 required Freddie Mac to "maintain a mandatory target capital surplus of 30 percent over [its] minimum capital requirement, subject to certain conditions and variations" and that Freddie Mac "submit weekly reports" on capital levels.[47]  This regulatory capital requirement involved maintaining certain amounts of "Core capital" and "Total capital."  Core capital consisted of "the par value of outstanding common stock (common stock issues less common stock held in treasury), the par value of outstanding non-cumulative, perpetual preferred stock, additional paid-in capital and retained earnings, as determined in accordance with GAAP."[48]  Freddie Mac had to hold an amount of Core capital that was "the sum of 2.50 percent of aggregate on-balance sheet assets and approximately 0.45 percent of the sum of outstanding mortgage related securities [Freddie Mac] guaranteed and other aggregate off-balance sheet obligations."[49]  As noted, in 2004 OFHEO required Freddie Mac to maintain a mandatory target capital surplus of 30 percent over the minimum capital requirement.

30. Freddie Mac's principal competitors in the secondary mortgage market were Federal National Mortgage Association ("Fannie Mae"), a similarly chartered GSE also regulated by HUD and OFHEO, the Federal Home Loan Banks,[50] and other financial institutions that retain or

---

properties. The types of single-family mortgages we purchase include 40-year, 30-year, 20-year, 15-year and 10-year fixed-rate mortgages, interest-only mortgages, adjustable-rate mortgages, or ARMs, and balloon/reset mortgages."); page 4 ("In response to a request by the Office of Federal Housing Enterprise Oversight, or OFHEO, we announced on August 1, 2006 that we would voluntarily limit the growth of our Retained portfolio to no more than 2.0 percent annually (and 0.5 percent quarterly on a cumulative basis), based on its carrying value as contained in our minimum capital report to OFHEO filed on July 28, 2006, which was $710.3 billion.").

[46]  Freddie Mac 2006 Annual Report, page 6.

[47]  Freddie Mac 2006 Annual Report, pages 8-9.

[48]  Freddie Mac 2006 Annual Report, page 129.

[49]  Freddie Mac 2006 Annual Report, page 129.

[50]  The Federal Home Loan Bank System was created in the 1930s to "serve as a reserve credit system to support housing finance and provide relief to troubled homeowners and lending institutions." Federal Home Finance Agency Office of Inspector General, *A Brief History Of The Housing Government-Sponsored Enterprises*, page 1, https://www.fhfaoig.gov/Content/Files/History%20of%20the%20Government%20Sponsored%20Enterprises.pdf.

CONFIDENTIAL

securitize mortgages, such as commercial and investment banks, dealers and thrift institutions.[51] Freddie Mac's closest competitor was Fannie Mae, which had a very similar business model to Freddie Mac,[52,53] and which was subject to similar economic and regulatory forces, including the 30% OFHEO capital requirement.[54]

## 2. Freddie Mac and the U.S. home mortgage market in 2006 and 2007

31. Leading up to the Relevant Period, U.S. home prices had steadily increased over the last decade. Economist Robert Shiller noted that U.S. "[h]ome prices rose about 85% from 1997 to 2006 adjusted for inflation, the biggest national housing boom in U.S. history."[55] I understand that Dr. Okongwu has summarized facts relating to home prices and the risks to Freddie Mac relating to the decline in home price appreciation in his report (the "Okongwu Report"), and I assume the facts that he set forth on those issues to be true.

32. The rise in home prices was one of the factors that led to the proliferation of non-traditional mortgage products, also called alternative mortgage products. I understand that Dr. Okongwu has summarized facts relating to the proliferation of non-traditional mortgage products and the subprime market in the Okongwu Report, and I assume the facts that he set forth on those issues to be true.

33. Freddie Mac also discussed the risks posed by a decline in home price appreciation, its

---

[51] Freddie Mac 2006 Annual Report, page 3.

[52] Fox-Pitt Kelton, "Fannie Mae, Freddie Mac: Gulliver freed from the Lilliputians," August 22, 2007, page 8 (FMOPERS00116548) ("Fannie Mae and Freddie Mac have essentially two business lines, each of which stem from their charter requirements and the need to maintain liquidity in the mortgage markets. The first is their portfolio management business, in which the companies buy mortgages or mortgage-backed securities for investment, earn a spread on those investments and manage the resulting interest rate risk. The second business line is the credit guaranty business, in which guaranty the payment of principal and interest risk in return for a fee (called the "guaranty fee") paid from the mortgage coupon.")

[53] I note that Tabak admitted in his deposition that Fannie Mae was the most similar company to Freddie Mac in "terms of its business." Tabak Deposition, at 227:8-11.

[54] Fannie Mae Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2005, dated May 2, 2007 ("Fannie Mae 2005 Annual Report"), page 1; Freddie Mac 2006 Annual Report, pages 6-9.

[55] *See The Wall Street Journal*, "Yale's Shiller: U.S. Housing Slump May Exceed Great Depression," April 22, 2008.

CONFIDENTIAL

increased participation in the non-traditional mortgage markets in its disclosures, and the risks posed by that increased participation. In particular, with respect to its increased purchases of interest-only loans and option ARMs, it disclosed in its 2006 Annual Report the risks these products pose: "We expect each of these products to default more often than traditional products and we consider this when determining our credit and guarantee fees."[56]

34. In its Q2 2007 Information Supplement, Freddie Mac detailed that its exposure to interest only loans in its single-family mortgage portfolio related to its guarantee activities ("Single Family Guarantee Portfolio") was about 8% or about $128 billion and its exposure to Option ARMs in that portfolio was about 1%, or about $16 billion.[57] Freddie Mac also disclosed that loans classified as "Alt-A" were about $120 billion, or eight percent, of the total Single Family Guarantee Portfolio and that "[f]or these loans, our average credit score was 715 and our estimated current LTV ratios were 71 percent."[58]

35. Freddie Mac also further disclosed details regarding the credit characteristics of the loans in its Single Family Guarantee Portfolio loans showing borrowers with FICO credit scores less than 620 and 620-659, reporting, for example, that as of Q2 2007, 4% was to borrowers with credit scores below 620 and 9% was to borrowers with credit scores between 620 and 659.[59] Equity analysts covering Freddie Mac compared the "below 620" loans to the broader market of non-conforming "subprime" loans, noting the superior performance of Freddie Mac's loans.[60]

---

[56] Freddie Mac Financial Report for the Three and Six Months Ended June 30, 2007, dated August 30, 2007 ("Q2 2007 Information Supplement"), page 34.

[57] Q2 2007 Information Supplement, Table 22 -- Characteristics of Single-Family Mortgage Portfolio (footnote 1 showing "ending balances included in the data totaled $1,599 billion" as of June 30, 2007) and Table 23 -- Product Distribution.

[58] Q2 2007 Information Supplement, page 34.

[59] Q2 2007 Information Supplement, Table 22. Freddie Mac reported similar details in earlier reports, like its 2006 Annual Report.

[60] *See, e.g.*, Bear Stearns, "GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity As Well," November 20, 2007, page 2, ("Credit quality is deteriorating, reflecting the company's exposure to recent vintage high LTV, low FICO, and Alt A loans. Still, we estimate that Freddie Mac's credit risk is significantly below that reflected by non-conforming mortgages and by the market overall. For example, the delinquency rate on Freddie Mac's low FICO score risk of 2.86% at September 30 is significantly below an average of over 20% for outstanding non-conforming subprime mortgages.").

CONFIDENTIAL

36. For the retained portfolio, Freddie Mac disclosed that "at June 30, 2007 and December 31, 2006, we held investments of approximately $119 billion and $124 billion, respectively, of non-agency mortgage-related securities backed by subprime loans" and "[w]e believe that $55 billion and $54 billion of our single-family non-agency mortgage-related securities that are not backed by subprime loans are generally backed by Alt-A mortgage loans at June 30, 2007 and December 31, 2006, respectively."[61]

37. As Freddie Mac's involvement in the "non-traditional" mortgage market grew it explained both the risks[62] and benefits,[63] including helping it meet affordable housing goals.

## B. Economic events of 2007: Subprime mortgage sector problems morph into unforeseen broader credit crisis and "what may be the worst housing downturn since the Great Depression"[64]

38. In 2007, leading up to November 20, 2007, the U.S. residential real estate market, and eventually broader financial markets deteriorated dramatically after over a decade of consistent home price appreciation and home mortgage market expansion.  What began as a housing downturn primarily in the "subprime" sector and seen as "contained,"[65] eventually morphed in August 2007 into a broader global liquidity "crunch" in certain large financial markets (including

---

[61]  Freddie Mac Q2 2007 Information Supplement, page 34.

[62]  *See, e.g.*, Freddie Mac 2006 Annual Report, page 69 ("During the past several years, there was a rapid proliferation of nontraditional mortgage product types designed to address a variety of borrower and lender needs, including issues of affordability and reduced income documentation requirements. While features of these products have been on the market for some time, their prevalence in the market and our Total mortgage portfolio increased in 2006 and 2005. … We expect each of these products to default more often than traditional products and we consider this when determining our credit and guarantee fees."). *See also* Section IV.C below.

[63]  *See, e.g.*, Freddie Mac Guidance Announcement Conference Call Transcript, March 31, 2006, pages 3, 13 (noting increased involvement in non-traditional mortgages is both "good for business" and would help it achieve its affordable housing goals by providing liquidity to the "full range of the mortgage market.").

[64]  Morgan Stanley, "Mortgage Finance: In the long term, pricing trumps losses, but the short-term could still be volatile," October 26, 2007, page 3.

[65]  *See, e.g.*, *Reuters News*, "Treasury's Paulson Sees Housing Downturn Contained," March 28, 2007.

CONFIDENTIAL

the $10 trillion dollar "repo" market[66]) and financial panic, prompting emergency stabilizing actions from central banks around the world.  Despite these policy actions, conditions worsened in the last quarter of 2007 and continued to deteriorate into 2008, culminating in what is now called the "Great Recession," the "most severe financial crisis since the Great Depression" of the 1930s.[67] Home prices fell nationwide over 30%, unemployment levels reached 10%, and the U.S. stock market fell 55% with $8 trillion of wealth lost "between October 2007, when the stock market reached an all-time high, and October 2008."[68]  As Great Depression scholar and then Federal Reserve Chairman Mr. Ben Bernanke noted in 2010 (with the benefit of hindsight), "[t]he financial crisis that began in August 2007 has been the most severe of the post-World War II era and, very possibly--once one takes into account the global scope of the crisis, its broad effects on a range of markets and institutions, and the number of systemically critical financial institutions that failed

---

[66]  The "repo" market was part of what is commonly referred to as the "alternative", "parallel," or "shadow" banking sector. This sector is considered the set of institutions (such as SIVs, "conduits," and hedge funds) and markets (like the "repo" or "repurchase" financing market) which perform bank-like functions of taking deposits and extending credit but exist outside the traditional regulated banking system.  As Gary B. Gorton "Questions and Answers About the Financial Crisis," NBER Working Paper Series, *National Bureau of Economic Research*, February 2010 ("Gorton (2010)") notes: "This banking system (the 'shadow' or "parallel" banking system) -- repo based on securitization -- is a genuine banking system, as large as the traditional, regulated and banking system. It is of critical importance to the economy because it is the funding basis for the traditional banking system. Without it, traditional banks will not lend and credit, which is essential for job creation, will not be created." The size of the repo market in 2007 is not precisely known but has been estimated to be as large as $10 trillion (roughly the size of the total assets of the U.S. banking sector) [*See, e.g.*, Arvind Krishnamurthy, "How Debt Markets Have Malfunctioned in the Crisis," *Journal of Economic Perspectives*, Volume 24, No. 1, Winter 2010, pages 3-28 ("Krishnamurthy (2010)"), page 8; Gorton (2010); and Timothy F. Geithner, "Reducing Systemic Risk in a Dynamic Financial System," Remarks at The Economic Club of New York, New York City, June 9, 2008].

[67]  *See, e.g.*, Markus K. Brunnermeier, "Deciphering the Liquidity and Credit Crunch 2007-08," *Journal of Economic Perspectives*, Volume 23, No. 1, 2009, pages 77-100 ("Brunnermeier (2009)").

[68]  *See* N. Gregory Mankiw and Laurence Ball, "Macroeconomics and the Financial System," *Worth Publishers*, First Edition 2011, Chapter 19 (2011) ("Mankiw and Ball (2011)") ("**The U.S. Financial Crisis of 2007– 2009** … The United States experienced a 55 percent fall in the stock market, the failures of some of the country's most prestigious financial institutions, and a disruption in lending throughout the economy. The worst recession since the 1930s pushed the unemployment rate from under 5 percent in 2007 to over 10 percent in late 2009."); CoreLogic Special Report, *Evaluating the Housing Market Since the Great Recession*, February 2018, page 4 (noting housing prices fell "33 percent during the recession"); Brunnermeier (2009), page 89.

CONFIDENTIAL

or came close to failure--the worst in modern history."[69]

39. Dr. Okongwu has also summarized facts relating to these market conditions in the Okongwu Report, and I assume the facts that he set forth on those issues to be true.

## 1.  2006 to mid-2007: "Subprime" downturn seen as "contained."

40. As of May 2007, after rising "at an annual rate of nearly 9 percent from 2000 through 2005" home prices had decelerated and even declined in parts of the U.S., resulting in growing subprime mortgage defaults as borrowers were unable to refinance their ARMs prior to reset.[70] Exhibit 1 plots the Inflation Adjusted Case Shiller Home Price index and Exhibit 2 plots the monthly "year-over-year" change in the nominal Freddie Mac U.S. House Price Index (formerly "OFEHO Index").  These Exhibits show that after over a decade of steady "unprecedented" increases described, as noted above, by economist Robert Shiller as "the biggest national housing boom in U.S. history,"[71] growth in national home prices began to slow in 2005, and by 2007 prices began to decline year over year.

41. Along with home price declines, foreclosures and 90-day delinquency rates in adjustable-rate subprime mortgages (which accounted for two-thirds of all first-lien subprime mortgages) had increased "sharply" in 2006 to 11%, "about double the recent low seen in mid-2005."[72]

42. Despite this housing market downturn, these problems, primarily in the subprime sector, were viewed as self-contained by many observers, including then U.S. Treasury Secretary Henry Paulson who observed in his testimony before the U.S. Congress that in his view, the

---

[69]  Ben S. Bernanke, "Monetary Policy and the Housing Bubble," Annual Meeting of the American Economic Association, January 3, 2010.
https://www.federalreserve.gov/newsevents/speech/bernanke20100103a.htm.

[70]  Ben S. Bernanke, "The Subprime Mortgage Market," Speech at the Federal Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure and Competition, Chicago, Illinois, May 17, 2007 ("Bernanke (May 17, 2007)").

[71]  *See The Wall Street Journal*, "Yale's Shiller: U.S. Housing Slump May Exceed Great Depression," April 22, 2008.

[72]  Bernanke (May 17, 2007).

CONFIDENTIAL

economic damage from the housing downturn was "contained" and the decline in home prices appeared to have bottomed-out,[73] and Chairman Bernanke who did not expect "significant spillovers from the subprime market to the rest of the economy or to the financial system."[74]

## 2. August 2007: Liquidity crisis and financial panic suddenly erupts.

43. In July 2007, some "warning signs" in the economy had emerged, including the failure of two large Bear Stearns hedge funds heavily exposed to mortgage-backed derivative securities that created uncertainty which began to disrupt wider credit markets.[75] As the decade long "boom" in home prices was ending and delinquencies and losses on subprime and other mortgages rose, "banks started to worry about one another."[76]

44. However, it was not until Thursday, August 9, 2007, that global credit markets suddenly became ensnared in the throes of a severe and unforeseen credit crisis.[77] That morning, the investment bank unit of France's largest bank, BNP Paribas, announced that it had frozen redemptions for three investment funds and that, "[t]he complete evaporation of liquidity in certain market segments of the US securitisation market has made it impossible to value certain assets fairly regardless of their quality or credit rating."[78] BNP Paribas' comments ignited "fears of a

---

[73] *Reuters News*, "Treasury's Paulson Sees Housing Downturn Contained," March 28, 2007.

[74] Bernanke (May 17, 2007).

[75] *See, e.g.*, *Reuters News*, "EURO CORP-Crossover widens sharply as subprime strikes again," July 18, 2007.

[76] Mankiw and Ball (2019), page 547.

[77] *See, e.g.*, Joint Economic Committee United States Congress, THE U.S. HOUSING BUBBLE AND THE GLOBAL FINANCIAL CRISIS: VULNERABILITIES OF THE ALTERNATIVE FINANCIAL SYSTEM, June 2008 ("On August 9, 2007, BNP-Paribas ignited a severe global financial crisis when BNP-Paribas suspended cash redemptions from three of its hedge funds because of uncertainty about the value of subprime-related RMBS and tranches of subprime-related CMOs in these funds.") and Brunnermeier (2009), page 85. Some commentators assert that August 9, 2007 marks start of a new regime. A few days later, Northern Rock, the British lender was rescued from collapse by the Bank of England. Looking back, Adam Applegarth, then chief executive of Northern rock, said that August 9, 2007 "is the day the world changed." *The Guardian*, "The day the credit crunch began, 10 years on: 'the world changed'," August 3, 2017, 02:25 ET.

[78] BNP Paribas Press Release, "BNP Paribas Investment Partners temporarily suspends the calculation of the Net Asset Value of the following funds: Parvest Dynamic ABS, BNP Paribas ABS EURIBOR and BNP Paribas ABS EONIA," August 9, 2007.

credit crunch"[79] and "unprecedented disruptions" in financial markets.[80]

45. This contagion led to the sudden increase in various interest rate spreads. For instance, the TED spread (which measures the difference between the risky LIBOR rate and the risk-free U.S. Treasury bill rate and "widens in times of crises"[81]) widened dramatically, increasing from 55 basis points (bps)[82] on August 8, 2007 to 242.5 bps, on August 20, 2007, a change of 340%. See Exhibit 3. That same day, central banks around the world took emergency actions and injected billions into the banking system, including the largest-ever emergency operation by the European Central Bank (ECB).[83]

46. This eruption of illiquidity and counterparty uncertainty also led to the freezing up and "panic" in the massive, multi-trillion-dollar asset-backed commercial paper ("ABCP")[84] and repurchase ("Repo") markets,[85] key sources of funding for the banking system.[86]

47. These developments also coincided with a market-wide increase in the price of risk, and a dramatic drop in the market value of securitized assets as reflected in the sharp increase in

---

[79] *Reuters News*, "Europe shares fall as BNP Paribas spooks investors," August 9, 2007, 11:37.

[80] *Dow Jones News Service,* "WSJ: Countrywide: Co [*sic*] Faces 'Unprecedented Disruptions,'" August 9, 2007. *See also* Brunnermeier (2009), page 85.

[81] Brunnermeier (2009), page 85.

[82] One percent equals 100 basis points.

[83] *See, e.g.*, Brunnermeier (2009) ("In response to the freezing up of the interbank market on August 9, the European Central Bank injected €95 billion in overnight credit into the interbank market. The U.S. Federal Reserve followed suit, injecting $24 billion."); *Associated Press Newswires*, "ECB steps in to ease market fears by expanding cash," August 9, 2007; *The Street.com*, "Fed, ECB Respond to Credit Crunch," August 9, 2007; and *Associated Press Newswires*, "World Stocks Plunge on Credit Fears," August 10, 2007.

[84] ABCP stands for asset-backed commercial paper. As of January 2007, commercial paper was the largest U.S. short-term debt instrument with $1.97 trillion outstanding of which 57% was asset-backed. [Marcin Kacperczyk, and Philipp Schnabl, "When Safe Proved Risky: Commercial Paper during the Financial Crisis of 2007–2009", *Journal of Economic Perspectives*, Volume 24, No. 1, Winter 2010, pages 29-50. ("Kacperczyk and Schnabl (2010)")]

[85] The "run on repo" in 2007 was essentially a bank panic in the $10 trillion repo (or "repurchase") loan market that hedge funds and broker-dealers like Bear Stearns, Lehman Brothers, and others used to finance their trading and other daily operations. The size of the repo market in 2007 is not precisely known but has been estimated to be as large as $10 trillion (roughly the size of the total assets of the U.S. banking sector) [*See,* Krishnamurthy (2010), page 8; Gorton (2010); and Timothy F. Geithner, "Reducing Systemic Risk in a Dynamic Financial System," Remarks at The Economic Club of New York, New York City, June 9, 2008].

[86] Tobias Adrian, Christopher R. Burke, and James J. McAndrews, "The Federal Reserve's Primary Dealer Credit Facility," Federal Reserve Bank of New York, Current Issues in Economics and Finance, Volume 15, No. 4, August 2009.

CONFIDENTIAL

various mortgage-backed security and other asset spreads. For example, Exhibit 4 shows the increase in the Agency Option Adjusted Spread (OAS) over the Relevant Period, especially in the second half of 2007. This was a key credit spread for Freddie Mac, which as it disclosed, represented "basis risk" where increases could adversely affect the mark-to-market fair value of their mortgage portfolio and financial results.[87]

48. Figure 1 obtained from a November 19, 2007 Credit Suisse analyst report following Freddie Mac also shows the decline in AAA ABX index prices in the second half of 2007 (simultaneously illustrating the increase in spreads which move inversely to prices) which tracked a basket of derivatives referencing recent vintage non-agency "subprime" RMBS.[88]

---

[87] *See, e.g.*, Freddie Mac 2006 Annual Report, pages 48 and 60 (explaining that the basis risk ("mortgage-to-debt option-adjusted spread risk") is the "risk that interest rates in different market sectors will not move in tandem and will adversely affect shareholder value" and that "[t]his risk arises principally because we generally hedge mortgage-related investments with debt securities.") Freddie Mac also disclosed that the fair value of its net assets "can be significantly affected from period to period by changes in the net [option-adjusted spread] between the mortgage and agency debt sectors." I discuss Freddie Mac's disclosures of this and other risks in more detail in Section IV.C below.

[88] Nomura Fixed Income Research, "Synthetic ABS 101: PAUG and ABX.HE," March 7, 2005.

CONFIDENTIAL

**Figure 1: ABX "Subprime" RMBS Pricing[89]**



49. The Credit Suisse analyst discussed "credit spread widening" and used this index to track the market value of Freddie Mac's $120 billion non-agency subprime RMBS holdings in the retained portfolio which was 99.9% rated AAA as of June 30, 2007.[90]

50. The expected volatility of the stock market also increased, further indicating growing uncertainty in financial markets. Exhibit 5 shows the "VIX" index, a widely followed barometer of expected volatility in the U.S. stock market[91] and Freddie Mac's stock option implied volatility.[92] Consistent with the increase in the VIX index, Freddie Mac's stock also became more

---

[89] Reproduced from Credit Suisse, "Profitability Outlook Unfavorable; Are Security Impairments Down the Road?," November 19, 2007.

[90] *See* Freddie Mac Q2 2007 Information Supplement, page 34.

[91] VIX is the ticker symbol for the Chicago Board Options Exchange Volatility Index. The index is a "is a calculation designed to produce a measure of constant, 30-day expected volatility of the U.S. stock market, derived from real-time, mid-quote prices of S&P 500® Index (SPX℠) call and put options. On a global basis, it is one of the most recognized measures of volatility -- widely reported by financial media and closely followed by a variety of market participants as a daily market indicator." [http://www.cboe.com/products/vix-index-volatility/vix-options-and-futures/vix-index, accessed as of January 15, 2024.]

[92] Implied volatility is the future volatility estimate for Freddie Mac stock. The implied volatility that I report for Freddie Mac stock is computed by OptionMetrics, a well-known provider of such data, through prices of 30-day call options traded on the Company's stock.

CONFIDENTIAL

volatile over this period.

51. As the private sector involvement in the mortgage market shrank amidst the financial turmoil, Freddie Mac and Fannie Mae's role as GSEs expanded. GSE support of the mortgage market grew to $5 trillion in 2007, with market share of total mortgage originations increasing from 37.4 percent in 2006 to 75.6 percent by the fourth quarter of 2007.[93]  As I discuss later, analysts following Freddie Mac were concerned that the 30% capital surplus threshold required by its regulator OFHEO amidst rapidly deteriorating market conditions, which would create GAAP mark-to-market and other accounting-related losses for Freddie Mac that would reduce capital levels, would prevent Freddie Mac from taking advantage of profitable business opportunities in this environment.

### 3. Market participants, forecasters, and regulators did not foresee the liquidity crisis and worsening economic turmoil.

52. Despite the downturn in the housing market leading up to the second half of 2007, market participants, economic forecasters, and government regulators did not foresee the complex spillover effect into a broader liquidity crisis and the worsening economic turmoil that followed. As economists Mankiw and Ball note in their Macroeconomics textbook:

> [F]ew saw the subprime crisis as a threat to the entire financial system or economy. In mid-2007, economists estimated that financial institutions might lose a total of $150 billion on subprime mortgages—not pocket change, but not a lot compared to the U.S. annual GDP of $14 trillion."[94]

53. Indeed, as noted above, in the first half of 2007, then U.S. Treasury Secretary Henry Paulson thought the economic damage from the housing downturn was "contained" and the decline

---

[93]  OFHEO 2008 Report to Congress, Office of Federal Housing Enterprise Oversight, pages ii-iii. *See also* "Changes in the Mortgage Market Since the Crisis," *Federal Reserve Bank of St. Louis Review,* August 2011, noting that "remarkably, all private-label securitization of nonprime originations has disappeared since the collapse of both the subprime and Alt-A segments of the mortgage market. This raises the question of whether these market segments are viable without government support."

[94]  Mankiw and Ball (2011), page 547.

CONFIDENTIAL

in home prices appeared to have bottomed-out,[95] and Federal Reserve Chairman Bernanke similarly concluded in May 2007 that "the effect of the troubles in the subprime sector on the broader housing market will likely be limited, and we do not expect significant spillovers from the subprime market to the rest of the economy or to the financial system."[96]

54. This view shifted after the events of August 2007.  On August 31, 2007, Federal Reserve Chairman Bernanke stated that "the financial stress has not been confined to mortgage markets" and that "[c]redit spreads for a range of financial instruments have widened."[97]  He concluded that "[a]lthough this episode appears to have been triggered largely by heightened concerns about subprime mortgages, global financial losses have far exceeded even the most pessimistic projections of credit losses on those loans."

55. Perhaps the most direct way to observe the unforeseen spillover effect is to recognize the economic significance of the sudden spikes and volatile movements in the second half of 2007 in the "TED" spread. The sudden spike in these spreads on August 9, 2007 demonstrates the failure of market participants to predict the impact of problems in the subprime markets to other mortgage markets and the economy as a whole.  If market participants in general had foreseen that impact, these spreads would have increased earlier.

### C. Freddie Mac disclosures during the Relevant Period provided detailed information about the guaranteed and retained portfolios and reflected the changing mortgage market environment and growing risk.

56. Leading up to November 20, 2007, Freddie Mac disclosures during the Relevant Period provided detailed information about the composition of its guaranteed and retained portfolios, including the characteristics and amounts of non-traditional mortgages it held, and how this

---

[95]  *Reuters News,* "Treasury's Paulson Sees Housing Downturn Contained," March 28, 2007.
[96]  Bernanke (May 17, 2007).
[97]  Ben Bernanke, "Housing, Housing Finance, and Monetary Policy," Speech at the Federal Reserve Bank of Kansas City's Economic Symposium, Jackson Hole, Wyoming, August 31, 2007.

CONFIDENTIAL

exposure changed across the quarterly financial reporting periods.  These disclosures reflected the deteriorating mortgage market environment and growing risk.  The disclosures highlighted several primary risk categories relevant to the allegations, including: mortgage credit risk (and provision for credit losses) and how this risk related to changing economic and mortgage market conditions, especially declining home prices; interest rate or "spread" risk -- in particular basis risk from changes in option-adjusted spreads (OAS) on MBS; and interest rate volatility risk.

### 1. Increase in exposure to non-traditional mortgages to "mirror more of the market"

57. Long before the market-wide problems discussed above evolved into a financial crisis, Freddie Mac informed investors it was increasing its exposure to non-traditional (or "alternative") mortgages as these types of mortgages became more prevalent in the marketplace, disclosing that "[w]e expect each of these products to default more often than traditional products and we consider this when determining our credit and guarantee fees" and that "[o]ur purchases of interest-only and option ARM mortgage products increased in 2006, representing approximately 18 percent of our Total mortgage portfolio purchases as compared to 11 percent in 2005."[98]  In a March 31, 2006 conference call, Freddie Mac CEO Mr. Syron told analysts that this increased exposure to non-traditional mortgages was both good for business and would help Freddie Mac achieve its HUD mandated affordable housing goals by "mirror[ing] more of the market."[99]

58. The disclosures also reflected changing market conditions in 2007.  Freddie Mac's August 30, 2007 Q2 2007 Information Statement Supplement disclosed that:

> Due to _changes in market conditions during the first six months of 2007_, the GSEs have had greater opportunity to compete with the non-agency securitization market and consequently have collectively increased market share during the six months ended June 30, 2007. ... Although the demand by borrowers for non-traditional mortgages, such as interest-only and option ARMs, remained strong, we did not purchase any option ARM products during the six months ended June 30, 2007, in

---

[98] Freddie Mac 2006 Annual Report, page 69.
[99] Freddie Mac Guidance Announcement Conference Call Transcript, March 31, 2006, page 13.

*contrast to approximately $6 billion of option ARM purchases during the six months ended June 30, 2006. <u>Our purchases of interest-only mortgage loans during the six months ended June 30, 2007 and 2006, were 25 percent and 13 percent, respectively, of our total purchase volume.</u>*[100]

## 2. Mortgage credit risk and provision for credit losses

59. To enable investors to gauge its credit risk, Freddie Mac provided detailed economic characteristics of the mortgage loans underlying its guaranteed and retained portfolios, as well as data regarding past performance, expected future losses, and provisions for credit losses.

60. As Freddie Mac's 2005 Annual Report noted, it faced mortgage credit risk that a borrower might "fail to make timely payments on a mortgage or security [Freddie Mac] own[ed] or guarantee[d]."[101]  This credit risk was elevated due to changing conditions in the mortgage market and the broader economy, and in particular declining home prices, which as noted above, deteriorated nationally at an unprecedented rate during the Relevant Period.  As Freddie Mac noted in its August 30, 2007 Q2 2007 Information Supplement:

> *The <u>U.S. residential mortgage market continued to weaken</u> during the three and six months ended June 30, 2007, <u>as the rate of home price appreciation generally continued to decline</u>, with significant variations across regions and metropolitan areas. Estimates of nationwide home price appreciation for the full year of 2007 vary widely, with most indicating a slight overall decline in home prices and others indicating low or no growth. <u>We expect this trend to continue into 2008</u>. Home price appreciation is an important market indicator for us because it reflects the general trend in value associated with the single-family mortgage loans underlying our mortgage Participation Certificates, or PCs, and Structured Securities. <u>As home prices decline, the risk of borrower defaults and the severity of credit losses generally will increase.</u>*[102]

---

[100]  Freddie Mac Q2 2007 Information Supplement, page 40 (underline added).

[101]  Freddie Mac Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2005, dated June 28, 2006 ("Freddie Mac 2005 Annual Report"), page 63.  Freddie also disclosed that it faced "institutional credit risk" arising from "agreements with the following entities: mortgage loan insurers; mortgage seller/servicers; issuers, guarantors or third party providers of credit enhancements on non-Freddie Mac mortgage-related securities held in our Retained portfolio; mortgage investors and originators; and issuers, guarantors and insurers of investments held in both our Cash and investments portfolio." Freddie Mac 2006 Annual Report, page 78.

[102]  Q2 2007 Information Supplement, page 3 (emphasis added).

CONFIDENTIAL

61. In addition to the general economy and real estate market conditions, Freddie Mac's mortgage portfolio's credit risk was related to certain economic characteristics of mortgages within the portfolio, such as the "credit profile of the borrower on the mortgage, the features of the mortgage itself, [and] the type of property securing the mortgage."[103] Accordingly, the Company disclosed such key characteristics of its Single Family Guarantee Portfolio in detail.[104]

62. Specifically, for its Single Family Guarantee Portfolio, Freddie Mac disclosed the proportion of its portfolio that belonged to particular credit score ranges (i.e., FICO scores), and (original and current) loan-to-value ratio ("LTV ratio") ranges. The Company also disclosed the proportion of its Single Family Guarantee Portfolio comprising loans for particular purposes (purchase or cash-out refinance, among others), loans for particular types of property (1 unit or 2-4 unit) and loans by occupancy type (primary residence, second/vacation home and investment).

63. These characteristics are widely recognized as key factors in assessing the credit risk related to mortgages.[105]

64. For instance, Freddie Mac's disclosures were sufficient to enable an investor to calculate the share of the Company's Single Family Guarantee Portfolio that comprised loans to borrowers with FICO scores[106] less than 620 or 660 or the share dedicated to mortgages with LTV ratios above 80% or 90%. As an illustration, consider the Company's 2006 Annual Report where Freddie Mac disclosed that 10% and 5% of the single-family loans it had purchased during 2006 were loans made to borrowers with FICO scores from 620 to 659 and below 620, respectively.[107] By adding these two numbers (10% and 5%), an investor could determine that 15% of the

---

[103]  Freddie Mac 2006 Annual Report, page 66.

[104]  *See, e.g.*, Freddie Mac 2005 Annual Report, Table 37, page 67 and Freddie Mac 2006 Annual Report, Table 38, page 70.

[105]  *See, e.g.,* Robert B. Avery, Raphael W. Bostic, Paul S. Calem, and Glenn B. Canner (1996), "Credit Risk, Credit Scoring, and the Performance of Home Mortgages," *Federal Reserve Bulletin*.

[106]  As Freddie Mac disclosed, "Credit scores are a useful measure for assessing the credit quality of a borrower. Credit scores are numbers reported by credit repositories, based on statistical models, that summarize an individual's credit record and predict the likelihood that a borrower will repay future obligations as expected. FICO scores, developed by Fair, Isaac and Co., Inc., are the most commonly used credit scores today." Freddie Mac 2006 Annual Report, page 71.

[107]  Freddie Mac 2006 Annual Report, Table 38, page 70.

CONFIDENTIAL

Company's portfolio comprised mortgages to borrowers with FICO scores less than 660.

65. Freddie Mac also made similarly detailed disclosures in conjunction with its quarterly earnings announcements in 2007.  For example, in the presentation slides discussed on Freddie Mac's Q2 2007 August 30, 2007 conference call with analysts (information shown in even more detail in the accompanying Information Supplement[108]), Freddie Mac disclosed the following details for the loans underlying its Single Family Guarantee Portfolio:

### Freddie Mac — Single-family credit guarantee portfolio characteristics

| | Attribute | Total Portfolio As of June 30, 2007 [1] | Alt A | Option ARM | FICO<620 | Original LTV >90% | FICO<620 and Original LTV>90% |
|---|---|---|---|---|---|---|---|
| 1 | Balance (UPB $ Billions) | $1,599 | $120 | $16 | $61 | $102 | $10 |
| 2 | Share of Total Portfolio | 100% | 8% | 1% | 4% | 6% | 1% |
| 3 | Average UPB per loan | $138,291 | $199,896 | $223,265 | $128,138 | $122,243 | $111,527 |
| 4 | Fixed Rate (% of total portfolio) | 86% | 39% | 0% | 88% | 90% | 92% |
| 5 | Owner Occupied | 92% | 82% | 76% | 96% | 96% | 99% |
| 6 | Second Liens | 0% | 0% | 0% | 0% | 0% | 0% |
| 7 | % of Loans with Credit Enhancement | 16% | 20% | 15% | 33% | 91% | 94% |
| 8 | % Seriously Deliquent (D90+) | 0.42% | 1.13% | 0.97% | 2.46% | 1.43% | 4.13% |

66. Freddie Mac also provided further detailed breakdown by vintage, which was important to investors as more recent 2006 and 2007 vintages were performing worse than earlier vintages.

---

[108] *See* Table 22.

CONFIDENTIAL

---

![Freddie Mac logo] **Single-family credit guarantee portfolio characteristics**

| | Attribute | Total Portfolio As of June 30, 2007 [1] | Alt A | Option ARM | FICO<620 | Original LTV >90% | FICO<620 and Original LTV>90% |
|---|---|---|---|---|---|---|---|
| 1 | Balance (UPB $ Billions) | $1,599 | $120 | $16 | $61 | $102 | $10 |
| 2 | Share of Total Portfolio | 100% | 8% | 1% | 4% | 6% | 1% |
| 3 | Original Loan-to-Value (OLTV) | 71% | 74% | 71% | 76% | 96% | 97% |
| 4 | OLTV > 90% | 6% | 4% | 2% | 17% | 100% | 100% |
| 5 | Current Loan-to-Value (CLTV) | 60% | 71% | 69% | 66% | 82% | 82% |
| 6 | CLTV > 90% | 4% | 6% | 8% | 10% | 41% | 43% |
| 7 | CLTV > 100% | 1% | 1% | 1% | 2% | 9% | 9% |
| 8 | Average FICO Score | 724 | 715 | 713 | 591 | 691 | 589 |
| 9 | FICO < 620 | 4% | 4% | 3% | 100% | 10% | 100% |
| | **Book Year Concentration** | | | | | | |
| 10 | 2007 | 14% | 37% | 0% | 19% | 17% | 21% |
| 11 | 2006 | 20% | 37% | 30% | 23% | 20% | 22% |
| 12 | 2005 | 19% | 18% | 58% | 18% | 17% | 15% |
| 13 | 2004 | 14% | 4% | 12% | 13% | 14% | 11% |
| 14 | <= 2003 | 33% | 3% | 0% | 27% | 31% | 30% |

67. These disclosures reflect what market participants viewed as "non-traditional" mortgage categories that may carry higher credit risk, including "Alt-A," "Option ARM," "FICO<620," and "Original LTV > 90%."  Also, as I noted above, Freddie Mac's more detailed breakdown in its Information Supplement would allow investors to isolate exposure to even more fine-grained breakdowns, like loans with FICO less than 620 and FICO 620 to 659, thus disclosing to investors total exposure to loans with FICO less than 660. For example, Table 22 in the Q2 2007 Information Supplement presented the following details for borrower and loan characteristics (footnotes omitted) showing that 13% (4% < 620 + 9% 620-659) of the portfolio was for loans with borrower FICO less than 660 as of June 30, 2007:

CONFIDENTIAL

**Table 22 — Characteristics of Single-Family Mortgage Portfolio[1]**

| | Purchases During the Three Months Ended June 30, | | Purchases During the Six Months Ended June 30, | | June 30, | December 31, |
| | 2007 | 2006 | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|---|---|
| **Original LTV Ratio Range[2]** | | | | | | |
| Less than 60% | 17% | 20% | 18% | 20% | 23% | 24% |
| Above 60% to 70% | 14 | 15 | 14 | 15 | 16 | 16 |
| Above 70% to 80% | 54 | 53 | 54 | 53 | 48 | 46 |
| Above 80% to 90% | 6 | 7 | 6 | 7 | 7 | 7 |
| Above 90% to 100% | 9 | 5 | 8 | 5 | 6 | 7 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 74% | 72% | 73% | 72% | 71% | 70% |
| **Estimated Current LTV Ratio Range[3]** | | | | | | |
| Less than 60% | | | | | 47% | 52% |
| Above 60% to 70% | | | | | 17 | 18 |
| Above 70% to 80% | | | | | 21 | 20 |
| Above 80% to 90% | | | | | 11 | 8 |
| Above 90% to 100% | | | | | 3 | 2 |
| Above 100% | | | | | 1 | — |
| Total | | | | | 100% | 100% |
| Weighted average estimated current LTV ratio | | | | | 60% | 57% |
| **Credit Score[4]** | | | | | | |
| 740 and above | 42% | 43% | 42% | 42% | 45% | 45% |
| 700 to 739 | 23 | 24 | 23 | 24 | 23 | 23 |
| 660 to 699 | 19 | 19 | 19 | 20 | 18 | 18 |
| 620 to 659 | 10 | 10 | 10 | 10 | 9 | 9 |
| Less than 620 | 5 | 4 | 5 | 4 | 4 | 4 |
| Not available | 1 | — | 1 | — | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score | 719 | 722 | 719 | 720 | 724 | 725 |
| **Loan Purpose** | | | | | | |
| Purchase | 47% | 51% | 46% | 50% | 38% | 37% |
| Cash-out refinance | 33 | 34 | 34 | 35 | 30 | 29 |
| Other refinance | 20 | 15 | 20 | 15 | 32 | 34 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| 1 unit | 97% | 98% | 97% | 97% | 97% | 97% |
| 2-4 units | 3 | 2 | 3 | 3 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | | | |
| Primary residence | 89% | 89% | 89% | 89% | 92% | 92% |
| Second/vacation home | 6 | 7 | 6 | 6 | 5 | 5 |
| Investment | 5 | 4 | 5 | 5 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

68. Table 23 showed the following details for the underlying loan product type distribution (footnotes omitted), showing, for example that 7% were ARMs or Option ARMs and 8% were I/O Interest Only as of June 30, 2007:

CONFIDENTIAL

Table 23 — Product Distribution[1]

| | June 30, 2007 | December 31, 2006 |
|---|---|---|
| | (dollars in millions) | |
| *Single-family:* | | |
| 30-year amortizing fixed-rate[2] | 63% | 63% |
| 15-year amortizing fixed-rate | 17 | 19 |
| Adjustable-rate mortgages, or ARMs | 6 | 7 |
| Option ARMs | 1 | 1 |
| Interest-only | 8 | 5 |
| Balloon/Resets | 1 | 1 |
| Other | 1 | 1 |
| *Total single-family* | 97% | 97% |
| *Multifamily:* | | |
| Conventional[3] | 3% | 3% |
| *Total multifamily* | 3% | 3% |
| Total | 100% | 100% |
| Amounts related to: | | |
| Guaranteed PCs and Structured Securities: | | |
| Single-family | $1,563,116 | $1,442,306 |
| Multifamily | 7,745 | 8,415 |
| Structured Securities backed by non-Freddie Mac mortgage-related securities[4] | 21,663 | 26,302 |
| Mortgage loans in the Retained portfolio: | | |
| Single-family | 21,434 | 20,640 |
| Multifamily | 47,609 | 45,207 |
| Total | $1,661,567 | $1,542,870 |

69. During the Relevant Period, Freddie Mac also disclosed its exposure to subprime loans.

For example, in its 2006 Annual Report, Freddie Mac disclosed, in pertinent part:

> ***Subprime loans***. *Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low FICO scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by increasing the availability of mortgage credit.*
>
> *While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant. Also included in our credit guarantee portfolio are Structured Securities backed by non-agency mortgage-related securities where the underlying collateral was identified as being subprime by the original issuer. At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.*

CONFIDENTIAL

> *With respect to our Retained portfolio, we do not believe that any meaningful amount of the agency securities we hold is backed by subprime mortgages. However, at December 31, 2006 and 2005, we held approximately $124 billion and $139 billion, respectively, of non-agency mortgage-related securities backed by subprime loans. These securities include significant credit enhancement based on their structure and more than 99.9 percent of these securities were rated AAA at December 31, 2006.[109]*

70. By way of further example, for Q2 2007, Freddie Mac also disclosed that while "[p]articipants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime," and "[t]here is no universally accepted definition of subprime," "[w]e estimate that approximately $2 billion, or 0.1 percent, and $3 billion, or 0.2 percent, of loans underlying" the Single Family Guarantee Portfolio as of June 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans."[110]

71. Analysts following Freddie Mac noted its detailed credit risk characteristic disclosures in assessing Freddie Mac's financial performance. For example, an August 30, 2007 Bear Stearns analyst report commented on the detail provided in the Q2 2007 presentation slides, noting that "[t]he company provided some incremental information showing the exposure to certain controversial asset types: Alt-A (7.5%), Option ARMs (<1% of guaranteed book), FICO<620 (3.8%), over 90% LTV (6.4%), and combined high LTV and low FICO (0.6%)."[111]

72. A November 20, 2007 Bear Stearns report compared the FICO < 620 ("low FICO") category to "outstanding non-conforming subprime mortgages" and noted Freddie Mac's exposure to "recent vintage high LTV, low FICO, and Alt A loans":

> *Credit quality is deteriorating, reflecting the company's exposure to recent vintage high LTV, low FICO, and Alt A loans. Still, we estimate that Freddie Mac's credit risk is significantly below that reflected by non-conforming mortgages and by the market overall. For example, the delinquency rate on Freddie Mac's low FICO*

---

[109]  2006 Annual Report, page 69. (emphasis added).

[110]  Freddie Mac Q2 2007 Information Supplement, pages 33-34.

[111]  Bear Stearns, "Solid Q2 Results; Credit Risk Still Low Despite GAAP Distortions," August 30, 2007, page 1.

CONFIDENTIAL

*score risk of 2.86% at September 30 is significantly below an average of over 20% for outstanding non-conforming subprime mortgages.[112]*

73. Argus analysts, noting exposure details provided throughout 2007, commented that Freddie Mac "has significant exposure to the problem areas of the mortgage market - more so than Fannie Mae, in our view," including 4% of the guaranteed portfolio exposed to FICOs of 620 and below "the traditional cut-off line for being considered a subprime borrower."[113] The analysts also commented on mortgage characteristic details that were provided by Freddie Mac in quarterly disclosures prior to November 20, 2007:

> *Freddie Mac's total portfolio of mortgages and MBS was $1.66 trillion at September 30. Freddie also broke out various statistics regarding the composition of its portfolio. There is some overlap in these categories, but about $66 billion, or 4% of the portfolio, have FICOs of 620 and below, the traditional cut-off line for being considered a subprime borrower. But Freddie also had $131 billion, or 8% of its portfolio, in Alt-A loans, or so-called 'liar loans' for which borrowers typically do not have to prove assets or income. About $149 billion of loans are interest-only ARMs, of which about $15 billion are option ARMs. Freddie thus has significant exposure to the problem areas of the mortgage market - more so than Fannie Mae, in our view.*

74. Bank of America analysts also performed a detailed modeling analysis of the guarantee portfolios of Fannie Mae and Freddie Mac and used FICO < 620 as a proxy for "subprime."[114]

75. For the retained portfolio, Freddie Mac also provided detailed breakdown by exposure type, highlighting non-agency RMBS.  For example, Freddie Mac's Q2 2007 Information Supplement disclosed $119 billion of non-agency RMBS backed by "subprime" and about $55 billion backed by "Alt-A" held in the retained portfolio.[115]

76. These disclosures were also recognized by analysts following Freddie Mac. For example, as noted above, Credit Suisse analysts commented on November 19, 2007 that "Freddie's

---

[112]  Bear Stearns, "GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity As Well," November 20, 2007, page 2.
[113]  Argus, "Freddie Mac," December 6, 2007, page 3.
[114]  Bank of America, "Freddie Mac," November 29, 2007.
[115]  *See* Freddie Mac Q2 2007 Information Supplement, page 34.

CONFIDENTIAL

capital position may also be pressured by potential other than temporary impairments on its $120 billion subprime AAA portfolio in the coming quarters" and if recent "spread widening" did not reverse, "we believe that Freddie could recognize an other than temporary impairment of between $1-5 billion (for a 1-10% price move in the securities), resulting in additional portfolio sales and/or raising preferred stock."[116]

77. In addition to disclosing its key credit risk characteristics, the Company also disclosed how its mortgage portfolio had performed on a monthly basis by reporting the delinquency rates of different components of its single-family and multifamily mortgage portfolio.[117]

78. Prior to and during the Relevant Period, Freddie Mac disclosed its "credit risk sensitivity" on a quarterly basis, which represented the present value ("PV") of its "expected credit losses [in its single-family mortgage portfolio] from an immediate five percent decline in single-family home prices for the entire U.S." both with and without "receipt of private mortgage insurance claims and other credit enhancements."[118]  As the Company's credit risk sensitivity disclosure indicated, Freddie Mac's expected credit losses related to its single-family mortgage portfolio were likely to *increase* both in absolute terms (Net Present Value or "NPV"), and as a percentage of the size of the portfolio which varied over time ("NPV ratio" terms) and, over the Relevant Period, as conditions in the U.S. housing markets deteriorated.

79. The Company also disclosed its provision for credit losses on a quarterly basis, which increased over the Relevant Period.[119]  *See* Figure 2.

---

[116] Credit Suisse, "Profitability Outlook Unfavorable; Are Security Impairments Down the Road?," November 19, 2007.

[117] Freddie Mac disclosed that its "[s]ingle-family delinquencies are based on the number of mortgages 90 days or more delinquent or in foreclosure while multifamily delinquencies are based on net carrying value of mortgages 60 days or more delinquent or in foreclosure." Freddie Mac Monthly Volume Summary: August 2006, page 3, n. 12.

[118] Freddie Mac Supplement to June 28, 2006 Information Statement, dated January 5, 2007, page 7.

[119] *See* Figure 3.

CONFIDENTIAL

---

**Figure 2 – Every Quarter over the Relevant Period, Freddie Mac Recorded Increasingly Larger Provisions for Credit Losses**



(In Millions)

**Notes and Sources:** Freddie Mac Q1, Q2, and Q3 2007 Information Supplements and 2006 Consolidated Statement of Income.

80. Credit risk characteristics assist investors to forecast the Company's expected future credit losses.  Freddie Mac not only disclosed its relevant credit risk characteristics but also its expected future credit losses.  Analysts recognized the effect of deteriorating market conditions and that further losses were likely but uncertain.  For example, a J.P. Morgan analyst noted that Freddie Mac's Q1 2007 credit losses "were due to deteriorating credit conditions and we expect the continued weak housing market to drive more losses in upcoming quarters, although we cannot be certain how sizeable those losses may be."[120]

---

[120]  J.P. Morgan, "Freddie Mac, Mark-to-Market Items Muddy Otherwise In-line Quarter," June 14, 2007, page 2.

CONFIDENTIAL

### 3. Other disclosed risks: Prepayment Risk, Interest Rate Spread Risk, and Interest Rate Volatility Risk

81. In addition to mortgage credit risks, Freddie Mac also disclosed other risks related to changes in interest rates, including OAS spread risk and prepayment risk that could impact its financial statements, including net interest income and fair value of assets.

82. In the Single Family Guarantee Portfolio, changes in interest rates could cause declines in the fair value of the portfolio, resulting in income losses.[121]  Similarly, for the retained portfolio, Freddie Mac also noted exposure to changes in mortgage-to-debt OAS which could significantly affect Fair Value of Net Assets but that it did "not attempt to hedge or actively manage the basis risk represented by the impact of changes in mortgage-to-debt OAS because we generally hold a substantial portion of our mortgage assets for the long term and we do not believe that periodic increases or decreases in the fair value of net assets arising from fluctuations in OAS will significantly affect the long-term value of the Retained portfolio."[122]

83. Freddie Mac also noted interest rate volatility risk, explaining that "the risk that changes in the market's expectation of the magnitude of future variations in interest rates will adversely affect shareholder value," and that "[i]mplied volatility is a key determinant of the value of an interest-rate option. Since mortgage assets generally include the borrower's option to prepay a loan without penalty, changes in implied volatility affect the value of mortgage assets."[123]

84. Freddie Mac further disclosed how unanticipated changes in interest rates created prepayment risk, noting:

---

[121]  Freddie Mac 2006 Annual Report, page 60 ("Our credit guarantee activities also expose us to interest-rate risk because changes in interest rates can cause fluctuations in the fair value of our existing credit guarantee portfolio").

[122]  Freddie Mac 2006 Annual Report, page 48.

[123]  Freddie Mac 2006 Annual Report, page 60.  Freddie Mac also highlighted yield curve risk ("the risk that non-parallel shifts in the yield curve (such as a flattening or steepening) will adversely affect shareholder value. [Changes] in the shape, or slope, of the yield curve often arise due to changes in the market's expectation of future interest rates at different points along the yield curve…").

CONFIDENTIAL

*Changes in interest rates may also affect prepayment assumptions thus potentially impacting the fair value of our assets, including investments in our Retained portfolio, our derivative portfolio and our Guarantee asset. When interest rates fall, borrowers are more likely to prepay their mortgage loans by refinancing them at a lower rate. An increased likelihood of prepayment on the mortgages underlying our mortgage-related securities may adversely impact the performance of these securities. An increased likelihood of prepayment on the mortgage loans we hold may also negatively impact the performance of our Retained portfolio.[124]*

85. Freddie Mac's quarterly disclosures detailed how these risks affected financial results, as acknowledged and discussed by market analysts.  On August 30 2007, Freddie Mac reported its Q2 2007 financial results, noting that "[t]urmoil in the mortgage market … has led to an increase in mortgage and credit risk pricing which had a direct, negative impact on the valuation of our guarantee-related obligations" and that "[w]e expect further deterioration in the value of our guarantee-related obligations in the third quarter of 2007 as market conditions continue to worsen."[125] Freddie Mac reported a "provision for credit losses" of $320 million, noting that it "reflect[ed] weakening in the housing market."[126] Freddie Mac also reported mark-to-market losses of $205 million from "losses on loans purchased" and $187 million from "losses on certain credit guarantees."[127]

86. Analysts noted that "[credit] market deterioration in August will likely result in greater mark to market adjustments in [the third quarter of 2007]."[128]  And analysts noted the "five-fold" increase in the provision for credit losses to $320 million ("reflecting a deterioration on loans originated in 2006/07") and that mark-to-market losses on "credit guarantees and purchased loans also rose five times to $392m."[129]  They also commented that:

---

[124]  Freddie Mac 2006 Annual Report, page 16.
[125]  Q2 2007 Information Supplement, page 3.
[126]  Freddie Mac "Freddie Mac Releases Second Quarter 2007 Financial Results," dated August 30, 2007 ("Freddie Q2 2007 Earnings Release"), pages 1-2.
[127]  Freddie Mac Q2 2007 Earnings Release, page 2.
[128]  Bear Stearns, "Solid Q2 Results; Credit Risk Still Low Despite GAAP Distortions," August 30, 2007.
[129]  nabCapital, "At a glance – Freddie Mac: A Poor 2Q07 Result and an indication that the US mortgage market will remain tough for some time yet," August 31, 2007.

CONFIDENTIAL

_____

> *With less than 4% of Freddie's $1.6bn total mortgage portfolio having a FICO score below 620 and 8% being categorized as Alt A, the severity of the increase in Freddie's credit charges indicates the stress currently being seen in the mortgage markets is not solely limited to those categorized as subprime.[130]*

87. Prior to the November 20, 2007 release of Freddie Mac's Q3 2007 results, on October 26, 2007 Morgan Stanley analysts noted, in a report titled "In the long term, pricing trumps losses, but the short-term could still be volatile," and that they expected Freddie Mac to report in its upcoming earnings report in November "deteriorating credit and mark-to-market losses."[131] They also commented that in "coming quarters, investors may see mark-to-market losses on AAA-rated nonprime mortgage securities, where spreads have widened massively in recent months" and that "[f]inancial results will also likely include mark-to-market losses on guaranty contracts and guaranty assets, which may reflect increased loss expectations, pressure to guarantee unprofitable loans in order to make housing goals imposed by the Department of Housing and Urban Development, or random timing issues."[132]  Morgan Stanley analysts also forecasted ultimate credit losses, but noted that those forecast represented their "best guesswork, taken in the face of considerable uncertainty, in what may be the worst housing downturn since the Great Depression."[133]

88. Similarly, Fox-Pitt Kelton analysts – including Shapiro, who has been retained by Plaintiff in this case – predicted a $1.6 billion loss for Q3 2007.  Specifically, they noted in an October 24, 2007 report titled "Expect Large GAAP Loss In Quarter" that "[b]ased on data released today by FRE,[134] we now estimate that the company will report a large GAAP loss of around ($1.6 b), or around ($2.45) per share, in the 3rd quarter due to mark-to-mark changes in

_____

[130]  nabCapital, "At a glance – Freddie Mac: A Poor 2Q07 Result and an indication that the US mortgage market will remain tough for some time yet," August 31, 2007.

[131]  Morgan Stanley, "Mortgage Finance: In the long term, pricing trumps losses, but the short-term could still be volatile," October 26, 2007, page 1.

[132]  Morgan Stanley, "Mortgage Finance: In the long term, pricing trumps losses, but the short-term could still be volatile," October 26, 2007, page 5.

[133]  Morgan Stanley, "Mortgage Finance: In the long term, pricing trumps losses, but the short-term could still be volatile," October 26, 2007.

[134]  Freddie Mac had released its monthly Volume Summary report.

CONFIDENTIAL

excess of \$3 b on its interest rate derivative hedges and on its credit exposure"[135]

89. The "considerable uncertainty" in analysts' estimates and "extreme volatility" in market conditions is reflected in the growing dispersion of analysts' estimates leading up to the November 20, 2007 Q3 earnings announcement.  Figure 3 shows the range of analysts' EPS forecasts for Freddie Mac the day prior to each quarter's earnings announcements from Q4 2006 to Q3 2007, illustrating this growing range in the second half of 2007 as the credit crisis and real estate downturn intensified.[136]

---

[135]  Fox-Pitt Kelton, "Expect Large GAAP Loss In Quarter," October 24, 2007.
[136]  In the EPS analyst forecast data obtained from Eikon Refinitiv plotted in the Figure, three analyst firms appear to use a customized measure of earnings, while the others use GAAP earnings. Removing the estimates from those three analysts does not change the conclusions drawn from the Figure.

CONFIDENTIAL

**Figure 3: Dispersion of Freddie Mac Analyst EPS Estimates as of One Trading Date Prior to Each Earnings Announcement (Q4 2006 to Q3 2007)**



Notes and Sources: Refinitiv Eikon; Fox-Pitt, Kelton, "Buybacks Bolster Lackluster Results," March 23, 2007.

### 4. Freddie Mac stock declined over 35% from October 1 to November 19, 2007 as the market assimilated materialization of disclosed risks.

90. Leading up to the November 20, 2007 alleged corrective disclosure when Freddie Mac reported Q3 2007 financial results, Freddie Mac's stock price had declined over 35% (from around $63 to $37.50) from the start of October through November 19, 2007.  See Figure 4 below.

CONFIDENTIAL



**Figure 4: Freddie Mac's stock price declined by over 35% from October 5 to November 19, 2007**



Notes and Sources:  Market data obtained from CRSP; Market information discuss in main body of report.

91. This decline tracked the growing economic uncertainty in October and November as real estate and broader market conditions deteriorated and the financial crisis worsened. *See* Exhibits 3-5. An article in the Wall Street Journal on November 19, 2007 titled "Feel Default Heat -- Falling Home-Value Growth Affects Even Mortgage Titans' Stable Borrowers" commented on the effect of deteriorating mortgage market conditions on the GSEs' stock prices, noting that Freddie Mac's price was down 40% year to date, and quoted Joshua Rosner, an analyst at Graham Fisher &Co. in New York City who said that "[w]e are seeing unprecedented foreclosures and declines in home prices not seen since the Great Depression."[137]

---

[137] *The Wall Street Journal*, "Fannie, Freddie Feel Default Heat --- Falling Home-Value Growth Affects Even Mortgage Titans' Stable Borrowers," November 19, 2007.

CONFIDENTIAL

92. Figure 5 below shows Freddie Mac's stock price compared to the OAS spread, illustrating the sharp increase in the spreads in November and showing the correlation with Freddie Mac's stock decline, consistent with the sensitivity of Freddie Mac's financial results to the spreads, just as the Company had disclosed. On November 19, 2007, after market close *Reuters* reported that "[y]ield spreads on some U.S. mortgage-backed securities and agency debt reached multiyear wides on Monday as credit market concerns caused investors to flee spread products in favor of safer government bonds a day before Freddie Mac releases its third-quarter earnings report."[138]

---

[138] *Reuters News*, "MORTGAGES/AGENCIES-Spreads hit new wides; Freddie in focus," November 19, 2007, 4:24 PM. ("The yield premium on Fannie Mae MBS paying 6 percent interest versus the 5-year Treasury note widened to 2.167 percentage points on Monday versus 2.08 percentage points on Friday, according to Reuters data. Yield spreads on MBS are at their widest levels against Treasuries since at least 2004. Yield premiums on some U.S. agency debentures have gapped out to or near their widest in a decade, reflecting interest rate swaps and sharply lower Treasury yields in markets steeped in credit fears.")

CONFIDENTIAL

**Figure 5: Freddie Mac Stock Price (left axis) and OAS Agency MBS Spreads (right axis, inverted), July 1, 2007 to December 31, 2007**



**Notes and Sources:** CRSP, Bloomberg (Bloomberg U.S. MBS: Agency Fixed Rate MBS Average OAS, LD10OAS Index).

93. Figure 6 also plots Freddie Mac's stock price along with the AAA ABX index spread (an index tracked by analysts to estimate the market value of Freddie Mac's subprime RMBS exposure, as noted above) and illustrates that Freddie Mac's exposure to subprime credit risks it had already disclosed contributed to its stock price decline between October 5 and November 19, 2007.

CONFIDENTIAL

**Figure 6: Freddie Mac Stock Price (left axis) and AAA ABX 2006-2 Spread (right axis, inverted), July 1 to December 31, 2007**



**Notes and Sources:** CRSP, Markit.

94. The stock price decline tracking this market deterioration is consistent with the investors understanding Freddie Mac's detailed mortgage credit and interest rate risks disclosures detailed above in Section IV.C.  Indeed, as noted above, some analysts expected Freddie Mac to report billions in mark-to-market credit and other losses for Q3 2007 and expected losses for subsequent quarters.  A November 19, 2007 Bloomberg News article reported that:

> *With the U.S housing market slumping to its worst point in 16 years, investors are trying to determine just how many bad loans Freddie Mac and Fannie Mae own or have guaranteed. Freddie Mac, which plans to release third-quarter earnings*

CONFIDENTIAL

*tomorrow, <u>may report $1 billion to $5 billion in losses from credit defaults</u>, Credit Suisse Group analysts wrote in a research note today.[139]*

95. The Credit Suisse analyst referred to in the Bloomberg article also commented that day that "Freddie's capital position may also be pressured by potential other than temporary impairments on its $120 billion subprime AAA portfolio in the coming quarters," noting the "significant widening of ABX AAA spreads in October" compared to the second quarter.[140] On November 19, JP Morgan analysts similarly noted that day that "[w]e expect FRE to report a sizeable loss for 3Q07 driven by large mark-to-market losses and higher credit expenses partly offset by gains from the sale of securities in the quarter. Freddie is likely to report large negative marks on loans repurchased from PCs."[141]

# V. The alleged misrepresentations and omissions did not have a statistically significant stock price impact, lack economic significance, and did not cause losses to OPERS.

## A. Summary

96. On November 20, 2007, Freddie Mac reported its Q3 2007 financial results which included a quarterly earnings loss of $2.03 billion and an expectation that credit losses would "continue to increase for the remainder of 2007 and in 2008, especially if conditions, such as home prices and the rate of home sales, continue to deteriorate."[142] Freddie Mac's stock price per share closed at $26.74, a 29% decline from previous day closing price of $37.50. This 29% decline in stock price corresponds to a $7.1 billion decline in market capitalization of equity.[143]

97. Plaintiffs claim "[s]ubstantially all the announced losses came from Freddie Mac's

---

[139] *Bloomberg News*, "Freddie, Fannie Fall on Concern About Losses in Mortgage Market," November 19, 2007 14:37. (underline added)

[140] Credit Suisse, "Profitability Outlook Unfavorable; Are Security Impairments Down the Road?" November 19, 2007.

[141] JP Morgan, "Higher Credit Expenses and GA Loss Likely in 3Q, but Derivative Losses Likely Smaller than Fannie's," November 19, 2007.

[142] Freddie Mac Q3 2007 Press Release, page 3.

[143] Data obtained from Center for Research in Security Prices ("CRSP").

CONFIDENTIAL

investments in subprime, Alt-A and other nontraditional mortgages" and that this decline represents a correction of earlier material disclosure defects and realization of concealed subprime and nontraditional mortgage risks demonstrating that the alleged fraud "proximately caused foreseeable losses" to OPERS.[144]  As I explain below, this claim is incorrect.

98. The claim that "[s]ubstantially all the announced losses came from Freddie Mac's investments in subprime, Alt-A and other nontraditional mortgages" is also factually incorrect as plain reading of Freddie Mac's disclosures on that day shows.  For example, $1.5 billion of the approximately $5 billion in losses (that led to the overall net $2 billion quarterly loss announced on that day) related to mark-to-market losses on interest rate derivative positions, which are clearly unrelated to the allegations.

99. The claim also ignores that almost all of the remaining $3.5 billion in mortgage-related losses ($5 - $1.5 billion) could reasonably be explained by disclosed risks.  To understand why this distinction between disclosed and concealed risks is important, it is useful to consider the following.  According to basic financial theory, in a well-functioning and efficient stock market, stock market prices reflect forward-looking expectations.  If the market is not efficient, then analyzing stock prices to infer materiality and loss causation would be futile. But, if the market is efficient, assuming (as Plaintiffs allege) that Freddie Mac's negative stock price reaction on November 20, 2007 was caused by its Q3 2007 announcement (including the $2.03 billion Q3 loss), the reaction must be due to the unanticipated portion of the losses because the anticipated portion would already be priced into the stock.  The unanticipated losses, again as a matter of logic, could be due either only to the materialization of previously disclosed risks, only to the materialization of allegedly concealed risks, or a combination of both.  I understand from counsel that to prove their claim of damages caused by the alleged misrepresentations and omissions that concealed certain risks, it is Plaintiff's burden to prove that misrepresentations or omissions caused

---

[144]  TAC, ¶¶4, 271.

CONFIDENTIAL

the price decline about which Plaintiff complains.  Simply identifying a price drop and assuming this represented the materialization of alleged concealed risks, while ignoring the possible impact of disclosed risks, is insufficient.

100. For example, Plaintiff has made no effort to quantify the extent to which disclosed risks contributed to the $3.5 billion mortgage-related losses noted above.  The economic evidence suggests that these disclosed risks relating to loans that are not at issue in this case were a driver of these losses. This is consistent with a 2010 Chicago Federal Reserve study that found that while the news media had "carried countless stories about soaring defaults among subprime mortgage borrowers," default rates on prime loans which account for 75% of the total outstanding mortgages in the U.S., had increased "more rapidly" than subprime loans, with the percentage of loans in default within the first 12 months of origination for 2007 vintage loans more than doubling compared to 2005 vintage loans.[145]

101. In addition, even the portion of the loss relating to "investments in subprime, Alt-A and other nontraditional mortgages" cannot entirely be due to the alleged fraud because, as I have discussed above, Freddie Mac had already disclosed as of the end of Q2 2007, for its Single-Family Guarantee Portfolio, and $4 billion of exposure to mortgages with FICO < 620 which analysts compared to the broader private-label "subprime" market and $120 billion of Alt-A exposure. Freddie Mac also disclosed its increased purchases of Interest Only and option ARM loans, which it disclosed it expected to default at higher rates than traditional loans.  The portion of the $3.5 billion in mortgage-related losses could therefore easily be explained by these and other disclosed risks.  Freddie Mac had also disclosed its $119 billion "subprime" and $55 billion "Alt-A" non-agency RMBS held in the retained portfolio where impairments could be recognized in the future if market conditions did not improve, which analysts estimated could further deplete capital levels by $1-$5 billion.

---

[145]   Gene Amromin and Anna L. Paulson, "Default Rates on Prime and Subprime Mortgages: Differences & Similarities," *Federal Reserve Bank of Chicago*, 2010, page 1.

CONFIDENTIAL

102. More importantly, viewing the November 20, 2007 price decline in isolation is an incomplete and biased view of the market reaction to the information the Company reported that day. As discussed below, a major market concern on that day related to whether or not Freddie Mac would have sufficient regulatory capital after recognizing the losses announced on November 20, 2007 as well as potential future losses that might occur. Thus, the price decline cannot be analyzed while ignoring Freddie Mac's price recovery when Freddie Mac completed a $6 billion preferred share capital raise a mere seven trading days later, on November 30, 2007. Freddie Mac's market capitalization declined by $7.118 billion on November 20, 2007 but increased by $6.933 billion a week later, on the three days when the market learned information about the capital raise (November 27, 28, and 30, 2007, "capital raise days"). The difference of $185 million represents less than 1% of Freddie Mac's equity capitalization prior to the November 20th announcement and is economically immaterial. As analysts noted, the information about capital raise was important to stock investors because it alleviated concern in the market about Freddie Mac's ability to take advantage of profitable growth opportunities, given regulatory capital constraints exacerbated by "non-cash"[146] mark-to-market losses announced on November 20, 2007 that were driven by "[d]epressed market prices for illiquid assets" amidst the severe real estate market downturn and broader financial crisis. [147]

103. My statistical analysis of "excess" stock price changes (i.e., controlling for market-wide and industry-wide factors) on November 20 and the "capital raise days" further confirms the economic insignificance of the alleged corrective information and lack of loss causation because it demonstrates that the full market reaction was not distinguishable from zero. Thus, the economic evidence shows that Plaintiff's alleged misrepresentations and omissions were economically insignificant and did not cause losses to OPERS.

---

[146] Morgan Stanley, "Freddie Mac Reports 3Q07 Loss," November 20, 2007.
[147] Bear Stearns, "GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity As Well," November 20, 2007.

## B. Freddie Mac's November 20, 2007 Q3 2007 financial results announcement

104. On November 20, 2007 before trading hours, Freddie Mac reported a Q3 2007 loss of $2.03 billion, or $3.29 per share which "reflect[ed] a higher provision for credit losses and losses on mark-to-market items."[148]  Freddie Mac's CEO and CFO noted on the earnings conference call with analysts later that day that "the third quarter continued to represent a very difficult environment as falling housing prices, deteriorating mortgage credit, continued volatility in the fixed income market all contributed to a net loss of $2 billion," and that "[g]iven the continuation of the same market trends that produced these results through October and November, it's likely that the fourth quarter will prove difficult as well" with performance "about in line with the third quarter."[149]

105. Freddie Mac specified that the $2 billion Q3 2007 loss was driven by a $1.2 billion "provision for credit losses," and $3.8 billion of "mark-to-market losses" from (a) $1.5 billion on "interest-rate related items" and (b) $2.3 billion on "credit-related items."[150] Freddie Mac noted that the mark-to-market losses on the "interest rate related items" "were related to the impact of declining long-term interest rates on the value of the company's derivatives portfolio" and that $1.4 of the $2.3 billion mark-to-market losses on the "credit-related items" "were related to the impact of widening credit spreads on the value of the company's credit guarantee activities."[151] The $1.5 billion mark-to-market loss on "interest-rate related items" was entirely unrelated to Freddie Mac's single-family mortgage portfolio.

106. To better understand the remaining mortgage-related losses, i.e., the $1.2 billion "provision for credit losses," ("Item 1") and $2.3 billion "mark-to-market" loss from "credit-related items," ("Item 2") it is useful to briefly review Freddie Mac's business activities and Single-

---

[148]  Freddie Mac Q3 2007 Press Release, page 1.
[149]  "FRE - Q3 2007 Freddie Mac Earnings Conference Call," Final Transcript, November 20, 2007, 10:00 AM ET ("Freddie Mac Q3 2007 Earnings Call), page 3.
[150]  *See* Freddie Mac Q3 2007 Press Release and Q3 2007 Slides, slide 2.
[151]  Freddie Mac Q3 2007 Press Release, page 2.

CONFIDENTIAL

Family Guarantee Portfolio.

107. As I mentioned above, Freddie Mac carried out its mission and generated income through two main business activities: "credit guarantee activities" and "investment activities."[152] The credit guarantee activities involved buying lender-originated residential mortgage loans, packaging them into MBS (also called participation certificates or "PCs"), guaranteeing timely payment of interest and principal on these securities, and then selling them to investors to receive a fee for the guarantee.[153] Freddie Mac's investment activities (also referred to as retained portfolio investment activities) involved purchasing MBS/PCs (and sometimes unsecuritized mortgage loans) for investment, earning a spread on those investments (over its own funding cost), and managing the interest rate risk. Freddie Mac managed its interest risk by "closely matching the interest obligations on … debt with the expected cash inflows from [the] mortgage-related investments" and by using a variety of derivatives.[154] The retained securities were recorded as assets on Freddie Mac's balance sheet.[155]

108. These business activities and Freddie Mac's total single-family mortgage exposure are summarized in Table 1. The Table summarizes Freddie Mac's (1) Single-Family Guarantee Portfolio as of the end of Q3 2007 (part of which was held in the retained portfolio), and (2) single-family non-agency "subprime" and "Alt-A" RMBS held in the retained portfolio. The table shows that Freddie Mac's total single-family mortgage portfolio was about $1.66 trillion as of Q3 2007 (corresponding to the detailed loan characteristics described above in Section IV.C) and the retained portfolio contained $105 billion and $53 billion of single-family "subprime" and "Alt-A" non-agency MBS, respectively.

---

[152] Freddie Mac 2006 Annual Report, page 3.
[153] Freddie Mac 2006 Annual Report, page 4.
[154] Freddie Mac 2006 Annual Report, page 4.
[155] Freddie Mac 2006 Annual Report, pages 40-41.

CONFIDENTIAL

**Table 1: Freddie Mac Total Single-Family Mortgage Portfolio Based on Unpaid Principal Balances <u>and</u> Single-Family Non-Agency "Subprime" and "Alt-A" RMBS in Retained Portfolio (as of Q3 2007)**

|  |  | as of Sep. 30, 2007<br>($ b)<br>[a] |
|---|---|---|
|  | *Outstanding Guaranteed PCs and Structured Securities:* |  |
| [1] | Single-family | $1,291 |
|  | *Retained Portfolio (Securities):* |  |
| [2] | Guaranteed PCs and Structured Securities (Single-family) | $344 |
|  | *Retained Portfolio (Mortgage Loans):* |  |
| [3] | Single-family | $23 |
| [4] | **Total Single-Family Mortgage Portfolio ([1] +[2] +[3])** | **$1,658** |
|  | *Retained Portfolio (Non Freddie Mac Mortgage-Related Securities):* |  |
| [5] | Single-family non-agency backed by "subprime" | $105 |
| [6] | Single-family non-agency backed by "Alt-A" | $53 |

**Notes and Sources:**

[a]
[1]    Q3 2007 Information Supplement, Table 31, pg. 47.
[2]    = $1,634.5 billion - $1,290.748 billion. Q3 2007 Information Supplement, Table 31, pg. 47.
[3]    Q3 2007 Information Supplement, Table 23, pg. 32.
[4]    = [1] + [2] + [3].
[5]    Q3 2007 Information Supplement, pg. 33.
[6]    Q3 2007 Information Supplement, pg. 33.

109. Returning to the $1.2 billion provision for credit loss (Item 1), this loss related to the $1.6 trillion Single-Family Guarantee Portfolio and reflected "observed credit deterioration, particularly on 2006 and 2007 mortgage loan originations that have exhibited higher transition rates from delinquency to foreclosure, and higher expected severities of losses on a per-property basis resulting from slower home price appreciation and higher UPBs on those loans generating losses."[156]  As I discussed above in Section IV.C, Freddie Mac had disclosed detailed characteristics of its Single-Family Guarantee Portfolio (including a FICO segment breakdown, LTV range breakdown, portion of interest only (or "I/O), Option ARM, and vintage), and in particular that 2006 and 2007 vintage loans accounted for 20% and 14% of the total Single-Family

---

[156]   Freddie Mac Q3 2007 Press Release, page 3.

CONFIDENTIAL

Guarantee Portfolio as of June 20, 2007 and which were noted to be of higher credit risk.

110.  The second loss item (Item 2) related to Freddie Mac's mortgage exposure is the $2.3 billion mark-to-market losses on "credit-related items," of which $1.4 billion "were related to the impact of widening credit spreads on the value of the company's credit guarantee activities."[157] Freddie Mac's exposure to credit spreads was widely disclosed and discussed by analysts, as I noted above in Section IV.

111.  Although it did not affect GAAP earnings underlying the $2 billion quarterly net income loss, as part of its financial reporting, Freddie Mac also disclosed a quarterly decrease in the "fair value of net assets attributable to common stockholders, before capital transactions" of approximately $8.1 billion "compared to an increase of approximately $300 million in the third quarter of 2006."[158]  $5.9 billion of this reduction related to "investment activities in the company's retained portfolio" which included a "reduction in fair value of approximately $8.0 billion attributable to net mortgage-to-debt OAS widening in the third quarter of 2007," where $3.5 billion was "related to the impact of the net mortgage-to-debt OAS widening on the company's portfolio of non-agency mortgage-related securities."[159]

112.  Investors understood that while the non-agency securities held in the retained portfolio are accounted for as "available for sale" (AFS) and therefore "unrealized gains or losses do not pass through their income statements,"[160] "if the recent credit spread widening does not reverse over the coming quarters," "…Freddie could recognize an other than temporary impairment of between $1-5 billion (for a 1-10% price move in the securities) in 2008."[161]  While

---

[157]  Freddie Mac Q3 2007 Press Release, page 2.
[158]  Freddie Mac Q3 2007 Press Release, page 3.
[159]  Freddie Mac Q3 2007 Press Release, page 3 (underline added).
[160]  Citibank, "GSEs: Clarification of Subprime Exposure," July 27, 2007.
[161]  Credit Suisse, "Hostile Environment Weighs on Q3 Results; Sizable Capital Raise Needed," November 21, 2007 ("While the company indicated its non-agency AAA subprime portfolio should not be subject to impairment, we believe that if the recent credit spread widening does not reverse over the coming quarters, we believe that Freddie could recognize an other than temporary impairment of between $1-5 billion (for a 1-10% price move in the securities) in 2008.").

CONFIDENTIAL

unrealized mark-to-market losses on the non-agency securities in the retained portfolio did not contribute to the reported GAAP net income $2 billion loss on November 20, 2007, the possibility that such losses would need to be recognized in future quarters led to investor concerns as to whether Freddie Mac would have sufficient regulatory capital to meet their capital requirements, fulfill its government mandates, and take advantage of profitable growth opportunities.

113. Regarding its regulatory capital, Freddie also announced that "[e]stimated regulatory core capital was $34.6 billion at September 30, 2007, which represented an estimated $8.5 billion in excess of the regulatory minimum capital requirement, and an estimated $0.6 billion in excess of the 30 percent mandatory target capital surplus directed by OFHEO," and that "[r]etained portfolio sales in September and October largely reflected activities to manage to the 30 percent mandatory target capital surplus."[162] To "manage the 30% mandatory target capital surplus and respond to regulatory concerns, as well as to have the flexibility to manage its business," Freddie Mac also announced that the company was considering very near term capital raising alternatives.[163] In the earnings conference call with analysts on November 20, 2007, Freddie Mac's CFO Anthony Piszel commented that the capital raise would be a "large transaction," not in common stock, and would likely be in the "very, very near term."[164] On the same day, analysts predicted that Freddie Mac would need to raise around $5 billion of capital.[165]

114. Freddie Mac also clarified on the conference call that "[t]he reported [$1.5 billion] losses on [interest rate] derivatives are economically offset by gains on our debt funding programs and retained portfolio securities. However, given the vagaries of GAAP accounting, these offsetting gains are not reflected in the income statement. So again, for another quarter, our reported results have been significantly depressed by mark-to-market effects." And that "[t]his

[162] Freddie Mac Q3 2007 Press Release, page 3.
[163] Freddie Mac Q3 2007 Press Release, page 3.
[164] Freddie Mac Q3 2007 Earnings Call, page 17.
[165] Fox-Pitt-Kelton, "We think capital raise will be dilutive to common shareholders," November 20, 2007; Bear Stearns, "GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity As Well," November 20, 2007.

CONFIDENTIAL

GAAP accounting depresses our regulatory core capital, which is necessary for growth. It's also made it more difficult to communicate our results externally."[166]

115. As I discuss below, analysts understood that this capital/growth dynamic and mark-to-market losses could and did depress capital levels required by OFHEO regulations, impeding Freddie Mac's ability to take advantage of historic profitable growth opportunities presented by difficulties faced by Freddie's non-GSE competitors. Analysts also understood that the mark-to-market losses were driven by "[d]epressed market prices for illiquid assets which in some instances aren't reflective of the Freddie Mac assets being valued" and required by GAAP accounting.[167]

116.  Plaintiff claims that the observed price decline in Freddie Mac stock on November 20 represents a correction of earlier material disclosure defects and materialization of allegedly concealed risks demonstrating that the alleged fraud "proximately caused foreseeable losses" to OPERS.[168]  As I explain below, this claim is not correct and not consistent with the economic evidence, including a full analysis of the market response to the information Freddie Mac reported on November 20, 2007, which must necessarily include the price recovery after Freddie Mac raised $6 billion of capital by November 30.

## C. Market reaction to Freddie Mac's November 20, 2007 announcement considering basic finance theory

### 1. Analyst reaction

117. Just prior to November 20, 2007, while some analysts expected Freddie Mac to report losses totaling $1-5 billion which included "large mark-to-market losses" and "higher credit

---

[166]  Freddie Mac Q3 2007 Earnings Call, page 5.
[167]  Bear Stearns, "GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity As Well," November 20, 2007.
[168]  TAC, ¶¶271.

CONFIDENTIAL

expenses," Freddie Mac's earnings announced that day missed consensus expectations.[169]  For example, Credit Suisse analysts noted that "[t]he magnitude of the loss was nearly double our expectations" and was "exacerbated by higher derivative losses (falling interest rates and a weakening dollar), a significant reserve build during the quarter and higher credit related expenses."[170]

118. However, some analysts – including one of Plaintiff's proposed experts here, Shapiro – were not surprised.  Morgan Stanley analysts wrote that "3q07 results at Freddie were close to what we expected," noting that while "[t]he credit business is growing, with losses rising modestly and g-fees starting to increase," "non-cash GAAP markdowns and reserve builds are constraining regulatory capital, forcing the company to downsize its retained portfolio during a period when widening OAS spreads ought to be creating a substantial growth opportunity."[171] Bear Stearns analysts' comments reflected the impact of the liquidity and mortgage market crisis and noted that "GAAP accounting resulted in market valuation adjustments on derivatives of $1.4 billion and of about $2.3 billion for credit," and that "[d]epressed market prices for illiquid assets which in some instances aren't reflective of the Freddie Mac assets being valued are creating economic problems by reducing the capital available to support security purchases."[172]

119. Market analysts also specifically attributed the mark-to-market losses to disclosed interest rate spread risks.  Miller Tabak analysts in a November 20, 2007 report rated Freddie Mac a "STRONG BUY" and commented that "sooner or later there will be a cessation of the factors leading to the non-cash, nonoperating markdowns that make the GSEs' earnings reports appear

---

[169]  *Dow Jones News Service*, "UPDATE: Freddie Mac 3Q Loss Balloons, May Need Capital," November 20, 2007, 8:10 ET ("In the third quarter, the McLean, Va., firm reported a net loss of $2 billion, or $3.29 a share, compared with $715 million, or $1.17 a share a year ago. … The mean estimates of analysts polled by Thomson Financial were for a loss of 22 cents a share on revenue of $1.33 billion.").

[170]  Credit Suisse, "Hostile Environment Weighs on Q3 Results; Sizable Capital Raise Needed," November 21, 2007.

[171]  Morgan Stanley, "Freddie Mac: Reports 3Q07 Loss," November 20, 2007.

[172]  Bear Stearns, "GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity As Well," November 20, 2007.

CONFIDENTIAL

complicated on the surface," and that "[a]s soon as Treasury Bond yields hit a stable level, and as soon as Mortgage spreads over Treasuries hit a stable level, the great majority of those charges disappear."[173]

120. Contrary to the TAC's claim that Freddie Mac's November 20, 2007 announcement represents a correction of earlier material disclosure defects and materialization of concealed subprime and nontraditional mortgage risks, no analyst, even those surprised by the magnitude of the losses, asked on the earnings call that same day for more details on "subprime" or "non-traditional" loans in the Single-Family Guarantee Portfolio or questioned the veracity or detail of Freddie Mac's disclosures that day (or prior disclosures) about the Single-Family Guarantee Portfolio.  I have also reviewed all the available analyst reports issued in the week after the November 20 announcement and again, no analysts commented on the lack of details around "subprime" or "non-traditional" loans in the Single-Family Guarantee Portfolio or questioned the veracity or detail of Freddie's disclosures that day.

121. Bear Stearns analysts, as noted above, specifically discussed Freddie Mac's detailed FICO range disclosures for the Single-Family Guarantee Portfolio and noted that while, "Credit quality is deteriorating, reflecting the company's exposure to recent vintage high LTV, low FICO, and Alt A loans," "[s]till, we estimate that Freddie Mac's credit risk is significantly below that reflected by non-conforming mortgages and by the market overall. For example, the delinquency rate on Freddie Mac's low FICO score [i.e., < 620] risk of 2.86% at September 30 is significantly below an average of over 20% for outstanding non-conforming subprime mortgages."[174]

## 2.  TAC's incorrect claims

122. The  TAC  claims  that  "the  November  20,  2007  press  release  admitted  that  the

---

[173]  Miller Tabak, "FNM and FRE Price Action-Capital Levels and Even More Threatened Business Models," November 20, 2007.
[174]  Bear Stearns, "GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity As Well," November 20, 2007.

CONFIDENTIAL

Company had been investing in subprime, Alt-A and nontraditional mortgage products" and that "[s]ubstantially all the announced losses came from Freddie Mac's investments in subprime, Alt-A and other nontraditional mortgages."[175]  As shown above, both claims are simply incorrect.  On November 20, 2007 Freddie Mac did not admit that it had been investing in subprime, Alt-A and nontraditional mortgage products.  Freddie Mac had already made detailed disclosures of its exposure to such mortgage products in the Single Family Guarantee Portfolio and also (a) its intention to increase exposure to nontraditional mortgages to "mirror the market," (b) the fact that it expected its non-traditional mortgages to default at higher rates, and (c) its retained portfolio's exposure to non-agency RMBS "subprime" and "Alt-A" portfolios of $119 and $55 billion, respectively, as of June 30, 2007.  The TAC's claim is also contradicted by my review of analyst questions on the November 20, 2007 conference call where no analysts expressed surprise on these issues.

123. The claim that "[s]ubstantially all the announced losses came from Freddie Mac's investments in subprime, Alt-A and other nontraditional mortgages" is also simply incorrect. While I understand it is Plaintiff's burden to prove that undisclosed risks caused losses, I nonetheless note that the economic evidence suggests that it was disclosed risks that led to losses. Mortgage delinquency rates were rising across the spectrum of home loan mortgages, including mortgages in the Single Family Guarantee Portfolio that are not at issue in this case, amidst the "worst housing downturn since the great depression."[176]  In addition, $1.5 billion of the $5 billion in Q3 2007 losses were from interest rate derivatives, wholly unrelated to the allegations.

124. Citing to the statement of facts set forth in Exhibit A to the Non-Prosecution Agreement ("NPA") that Freddie Mac entered into with SEC on December 16, 2011 to "substantially support [its] claims," the Plaintiff alleges that Freddie Mac misled investors as to

---

[175]  TAC, ¶¶4, 227.
[176]  *See* Gene Amromin and Anna L. Paulson, "Default Rates on Prime and Subprime Mortgages: Differences & Similarities," *Federal Reserve Bank of Chicago*, 2010, page 1, cited above.

the number of "Caution Loans (C1, C2)" and "'Expanded Approval' (or 'EA') loans" in its Single Family Guarantee Portfolio.[177]  I understand that the Okongwu Report contains an analysis of the delinquency rates associated with Freddie Mac's Caution loans as compared to subprime loans that were identified as such upon origination, and I assume that the results of his analysis are accurate.  That analysis demonstrates that Freddie Mac's Caution loans for vintage years 2005-2007 did not perform like subprime loans during the Relevant Period.  They performed better.[178]  This analysis is also inconsistent with the conclusion that allegedly undisclosed risk associated with Freddie Mac's Caution loans caused Plaintiff's losses.

125. The TAC also claims that Freddie Mac "knowingly skirted its 80% LTV requirement by so-called 'piggyback loans'" and "did not disclose to what extent mortgages that it purchased were encumbered by piggyback loans until after the close of the Class Period."[179]  Piggyback loans, also called "simultaneous close seconds," "are junior lien mortgage loans taken out concurrently with the first mortgage to finance [a] home purchase" and "are generally used by homebuyers to finance more than 80% of the house value without paying private mortgage insurance, at least if the first lien is GSE-financed."[180]  I reviewed Freddie Mac's November 20, 2007 Q3 2007 Information Supplement, which provides details related to "piggyback" loans, noting that "as home prices increased during 2006 and prior years, many borrowers used second liens at the time of purchase which may reduce the original LTV ratio for the first lien to below 80%, thus avoiding requirements under our charter and underwriting standards for private mortgage insurance or other credit enhancements."[181]  The disclosure also stated that while "[f]ive percent of loans in our

---

[177]  TAC, ¶¶ 37, 61, 138.
[178]  See Okongwu Report, Section 5.
[179]  TAC, ¶¶64-65. While he does not opine on specific alleged misrepresentations or omissions and did not elaborate when asked in his deposition, in his deposition, Tabak did mention several times the TAC's alleged misrepresentation related to "piggyback" loans which could have led to the LTV ratio of loans being "misstated." Tabak Deposition, pages 140-143, 296.
[180]  Michael LaCour-Little, Charles A. Calhoun, Wei Yu, "What Role Did Piggyback Lending Play in the Housing Bubble and Mortgage Collapse?" *Journal of Housing Economics,* Volume 20, 2011, pages 81-100 ("Yu, et al. (2011)").
[181]  Q3 2007 Information Supplement, page 4.

CONFIDENTIAL

single-family mortgage portfolio had current LTV ratios above 90% at September 30, 2007, compared to 2% at December 31, 2006," "[i]ncluding this secondary financing, we estimate that the percentage of loans underlying our single-family portfolio with total LTV ratios above 90% has risen to <u>approximately 14%</u> at September 30, 2007.[182] This implies that as of September 30, 2007 about 14% minus 5%, or 9%, of Freddie Mac's single-family guarantee portfolio loans had piggyback seconds.

126. Analysts do not appear to have reacted to this disclosure. Like questions about alleged undisclosed details on "subprime" or "non-traditional" guarantee portfolio loans, no analysts asked on the earnings call that same day or commented in their reports in the week after November 20[183] about the new information provided on "piggyback" loans and the impact on LTV portfolio statistics. It is not surprising that no analysts commented on or asked about this detail following the November 20, 2007 earnings release, because it was widely known that "[p]iggyback lending played an important role in home sales, especially from 2004 to 2006."[184] A 2007 Federal Reserve study found that "about 22 percent of the homes purchased in 2005 with a first lien also included a ["piggyback"] second lien, … up from 14 percent in 2004."[185] A later 2011 academic study in the *Journal of Housing Economics* found that piggyback lending "was involved in about 22% of the one-to-four family owner occupied home purchases in 2006."[186] Thus, the market did *knew* about the greater prevalence of piggy-back loans than had been historically the case, and Freddie Mac's portfolio compared favorably to than the market as a whole on this measure as it contained

---

[182] Q3 2007 Information Supplement, page 4. The disclosure also noted "In general, higher total LTV ratios indicate that the borrower has less equity in the home at the time of origination and would thus be more susceptible to foreclosure in the event of a financial downturn." (underline added).

[183] Note that this is based on the analyst reports available to me, which are listed in Appendix 2.

[184] Yu, et al. (2011), page 81, and Alan Greenspan and James Kennedy, "Sources and Uses of Equity Extracted from Homes," Federal Reserve Board Staff Working Paper, 2007-20, page 33 ("According to data from HMDA, about 22 percent of the homes purchased in 2005 with a first lien also included a second lien, sometimes referred to as a "piggyback loan," up from 14 percent in 2004.").

[185] Alan Greenspan and James Kennedy, "Sources and Uses of Equity Extracted from Homes," Federal Reserve Board Staff Working Paper, 2007-20.

[186] Yu, et al. (2011), page 81 citing Avery, R.B., Brevoort, K.P., Canner, G.B., 2007. The 2006 HMDA data. Federal Reserve Bulletin 93, A73–A109.

far fewer piggyback loans (9% for Freddie Mac vs. about 22% for the broader market).  Also, while a mortgage with a certain LTV that includes a piggyback loan has higher credit risk than a mortgage with the same LTV without a piggyback loan, the second mortgage amount in a piggyback loan is subordinate to the first mortgage and does provide an equity cushion.  Plaintiff's implication that Freddie Mac's undisclosed "piggyback" loan details represented a material misstatement or omission does not appear to have support in the economic evidence.

127. Moreover, the total mortgage portfolio held by Freddie Mac and Fannie Mae as of September 30, 2007 was $4.8 trillion, which represents approximately a 40% share of the U.S. residential mortgage debt outstanding.[187]  Freddie Mac and Fannie Mae buy loans from the largest loan originators in the U.S.[188]  They provide their originators with a series of mortgage underwriting guidelines.[189]  Thus, given the size of the market share held by Fannie Mae and Freddie Mac, the number of mortgage market participants and millions of borrowers, millions of people would have known about piggy back loans and therefore the fact that Freddie Mac's portfolio likely included loans that were accompanied by piggy back loans.  For this reason as well, the economic evidence is inconsistent with a conclusion that the disclosure or lack of disclosure of piggy back loans was economically significant.

### 3. The market was concerned with Freddie Mac's future ability to raise capital.

128. While not asking questions about Freddie Mac's mortgage characteristic disclosure details related to subprime and nontraditional mortgages and the Single Family Guarantee

---

[187]  As of December 31, 2006, Freddie Mac and Fannie Mae held $1.8 trillion and $2.5 trillion, respectively while the U.S. residential mortgage market debt outstanding was $10.9 trillion. And, as of September 30, 2007, Freddie Mac and Fannie Mae held $2.0 trillion and $2.8 trillion, respectively while the U.S. residential mortgage market debt outstanding was $11.8 trillion.  *See* Q3 2007 Information Supplement, page 45; Fannie Mae Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2007, dated Feb. 27, 2008 ("Fannie Mae 2007 Annual Report"), page 1 and ("Fannie Mae 2005 Annual Report"), page 2; Freddie Mac 2006 Annual Report, page 2.
[188]  Freddie Mac 2006 Annual Report, page 2.
[189]  Freddie Mac 2006 Annual Report, page 66.

CONFIDENTIAL

Portfolio, analysts did express concern about Freddie Mac's need to raise capital given the mark-to-market and credit provision losses and related heightened regulatory risk.

129. For example, after asking "point blank, did you go to OFHEO and ask for relief on the 30% capital surcharge" on the earnings call with analysts,[190] Fox-Pitt Kelton analysts (including Shapiro) commented in a report later that day: "It is clear to us from the earnings call that FRE first spoke to OFHEO about capital relief and received a negative response — it seems OFHEO would rather dilute shareholders to protect the agency's safety and soundness."[191]  Fox-Pitt Kelton analysts (including Shapiro) noted in another report that day covering both Freddie Mac and Fannie Mae that "the dictates of the GAAP accounting treatment mean large mark-to-market losses and credit costs have risen" which "has placed a strain on capital adequacy, at least relative to the 30% OFHEO surcharge" and "given the significant rise in credit costs, it is possible that OFHEO could delay reducing the surcharge for safety and soundness reasons." They concluded that being "[c]apital constrained and unable to grow is not a recipe for outperformance," and "[i]n our opinion, FRE will need to raise at least $5.5 b of capital to shore up its capital base and provide for growth opportunities over the next year" which "will be very expensive for common shareholders."[192]

130. Citibank analysts commented that "[t]he upshot is that FRE is impacted by current market challenges, its GAAP accounting tends to emphasize the negatives while masking the positives, and its capital strength is in question. Nevertheless, we believe FRE will continue to guarantee and invest in mortgage-related securities, performing an important liquidity/stability function - reinforced by any new capital raised."[193] Merrill Lynch analysts, in a report titled "Big equity offering seems likely; Common & Preferred," observed that "Capital is the key issue," with

---

[190]  Freddie Mac Q3 2007 Earnings Call, page 13.

[191]  Fox-Pitt Kelton, "We think capital raise will be dilutive to common shareholders," November 20, 2007.

[192]  Fox-Pitt Kelton, "FNM and FRE: Capital Constrained – Downgrading to Underperform," November 20, 2007.

[193]  Citibank, "Losses Spur Need for New Capital; Charter/Mission Intact," November 20, 2007.

CONFIDENTIAL

the "capital raising campaign likely larger than expected," that "Freddie Mac will need to raise roughly $7B in capital over the next year to meet its regulatory capital requirements, as we think it could realize GAAP losses through 2009," and while they did "not think FRE is broken," "<u>the need to raise substantial amounts of capital in this market will largely make it look that way</u>."[194]

131. Analyst Jaret Seiberg of the Stanford Group noted that "[i]n the short term … the [Q3 Earnings news] puts Freddie Mac under heightened regulatory and legislative risk. But over the long term, he said in a note, that risk should diminish … [as] Fannie [Mae] (FNM) and Freddie are nearly the only players left in the mortgage securitization game and we expect the next administration to be much more friendly to them. Those are long-term positives."[195]

132. Analysts also directly linked Freddie Mac's losses and reduced capital levels to the ongoing liquidity crisis and broader turmoil in financial markets and "non-cash" GAAP markdowns.  As noted above, Bears Stearns analysts stated that, "[d]epressed market prices for illiquid assets which in some instances aren't reflective of the Freddie Mac assets being valued are creating economic problems by reducing the capital available to support security purchases."[196] The analysts also noted that "[w]e estimate the company may seek to raise $3-5 billion" and that while "[e]arly next year when the 30% surplus capital requirement is lifted, there should be a substantial capital excess," but "[u]ntil then, though the company's ability to provide liquidity and support the mortgage market may be limited."  Morgan Stanley analysts wrote that "non-cash GAAP markdowns and reserve builds are constraining regulatory capital, forcing the company to downsize its retained portfolio during a period when widening OAS spreads ought to be creating a substantial growth opportunity" and "[u]nfortunately, in the current environment, GAAP losses

---

[194] Merrill Lynch, "Big equity offering seems likely; Common & Preferred," November 21, 2007. (underline added).

[195] *Dow Jones Business News,* "UPDATE: Freddie Mac's Loss More Than Doubles; Firm May Halve Dividend," November 20, 2007.

[196] Bear Stearns, "Freddie Mac (FRE-$26.74-Peer Perform): GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity As Well," November 20, 2007.

CONFIDENTIAL

create a perception that the company's business model is struggling."[197]

133. Miller Tabak analysts noted concerns that Freddie Mac's capital raise might "fail," and that while there could be "a cessation of the factors [including increases in 'Mortgage spreads over Treasuries'] leading to the non-cash, non-operating markdowns that make the GSEs' earnings reports appear complicated on the surface," which would "make, the great majority of those charges disappear." These GAAP markdowns, "however, reduce the reported capital levels of the two GSEs, severely constraining their ability to do new business without their raising new capital."[198] And while Freddie Mac on November 20, 2007 "has already announced its intention to sell a large new issue of preferred stock," "[i]f that effort fails, there might be more room on the downside for the stock, but the business model is firmly intact."[199]

### 4. Importance of capital for Freddie Mac's future growth

134. To further understand Freddie Mac's November 20 equity market value decline, it is useful to consider basic financial economic theory of stock market prices. Financial theory holds that market prices of stocks can be thought of as the sum of (a) the value derived from business activities (assets) already in place and (b) the current value of expected future investment and growth opportunities, represented by the abbreviation PVGO (present value of future growth opportunities).[200]

135. Applying this framework to Freddie Mac's stock market value as of November 20, 2007, the PVGO was heavily dependent on Freddie Mac's OFHEO mandated 30% target capital surplus requirement. As illustrated above, analysts extensively explained and discussed the importance of OFHEO mandated regulatory capital limits. They viewed Freddie Mac's future

---

[197]  Morgan Stanley, "Freddie Mac Reports 3Q07 Loss," November 20, 2007.

[198]  Miller Tabak, "FNM and FRE Price Action – Capital Levels and Even More Threatened Business Models," November 20, 2007. (emphasis added).

[199]  Miller Tabak, "Huge Valuation Meltdown Tied to Credit Concerns, Likely Dividend Cut Cutting 2009 Price Target to $51.50, Maintain 'Strong Buy,'" November 21, 2007.

[200]  *See, e.g.*, Richard A. Brealey, Franklin Allen and Stewart C. Meyers, Principles of Corporate Finance, 10th Ed., ("Brealey, Allen, and Meyers"), pages 88-89.

CONFIDENTIAL

business growth prospects and ability to achieve its government mission of providing liquidity support to be "beneficiaries of the turmoil in mortgage markets."[201]  They also explained the impact of "non-cash" GAAP markdowns driven by "[d]epressed market prices for illiquid assets"[202] which could limit "growth opportunities" by "constraining regulatory capital"[203] unless, as Freddie Mac told investors it intended to do, the Company raised a "large" amount of capital to remain in compliance with OFHEO limits.  Even though much of these markdowns were simply phantom "non-cash" accounting losses required by GAAP accounting rules that were not expected to be realized, Freddie Mac still had to recognize the losses as reductions in core capital, even when it may have also had equal offsetting gains, which again, given the technicalities of GAAP accounting rules, it could not account for in its regulatory core capital.[204]

136.  Returning to the financial formula discussed above, the PVGO was also expected to be large.  As Fox-Pitt analysts (including Shapiro) wrote in their August 22, 2007 report Initiating Coverage with an "Overweight" rating:

> *Fannie Mae and Freddie Mac are finally set to emerge from their long restatement morass with new accounting procedures and operating systems in place. A Democratic Congress and fears of a broader meltdown in the housing sector have resulted in a new-found appreciation of the GSE role in housing finance and rising risk premia mean that investment and guaranty growth opportunities are better than they have been in some time. Credit costs are likely to rise, but this will be partially offset by a decline in operating costs.*[205]

---

[201] Fox-Pitt Kelton, "FNM and FRE: Capital Constrained – Downgrading to Underperform," November 20, 2007.

[202] Bear Stearns, "GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity As Well," November 20, 2007.

[203] Morgan Stanley, "Freddie Mac Reports 3Q07 Loss," November 20, 2007.

[204] *See, e.g.*, Freddie Mac Q3 2007 Earnings Call, page 5 ("During the third quarter, we recorded $1.5 billion in interest rate related mark-to-market losses, shown here on line three. Remember, we manage our interest rate exposures to very low levels. The reported losses on derivatives are economically offset by gains on our debt funding programs and retained portfolio securities. These offsetting gains are not reflected in the GAAP income statement. So again, for another quarter, our reported results have been significantly depressed by mark-to-market effects. This GAAP accounting depresses our regulatory core capital, which is necessary for growth.").

[205] Fox-Pitt Kelton, "Fannie Mae, Freddie Mac: Gulliver freed from the Lilliputians," August 22, 2007. (emphasis added).

CONFIDENTIAL

And similarly in their November 20, 2007 report, Fox-Pitt analysts wrote that "[o]ur investment thesis had assumed that Fannie Mae and Freddie Mac would be net beneficiaries of the turmoil in the mortgage markets and be able to grow both sides of their businesses at wider spreads and higher premium rates."[206]

137. Given the potentially large PVGO which depended on capital available to take advantage of the growth opportunities, but was limited by regulatory limits, Freddie Mac's announced losses constrained regulatory capital which in turn constrained growth opportunities. These opportunities were considered important and valuable in an environment of real estate turmoil where private players were dropping out of the market and GSEs were expected to fill the void.

138. Viewed within this economic framework, it is not surprising that Freddie Mac's stock price declined significantly on November 20, at least, from the perspective of a market participant concerned that Freddie Mac may not be able to raise enough new capital at a reasonable cost.

139. Some analysts also considered the price decline an overreaction.  Miller Tabak analysts noted that the price reaction was "overdone" and potentially driven by "fear," concluding that "there is nothing in their reported operating business cash flows that remotely justifies the price action seen over the past three trading days."[207]  Citibank analysts noted that "[w]hile the capital raise and dividend cut are painful for existing shareholders, <u>we believe the recent 30% pull-back in FRE's shares more than discounts the bad news</u> - as some investors expected high dilution" and "[m]oreover, we continue to view FRE's long-term outlook as positive."[208]  Even prior to November 20, 2007, Merrill Lynch analysts observed in an October 24, 2007 report that Freddie Mac and Fannie Mae "remain under pressure as the market rotates out of stocks exposed to the

---

[206]  Fox-Pitt Kelton, "FNM and FRE: Capital Constrained – Downgrading to Underperform," November 20, 2007.

[207]  Miller Tabak, "FNM and FRE Price Action – Capital Levels and Even More Threatened Business Models," November 20, 2007.

[208]  Citigroup, "Capital Actions Announced; Terms TBD," November 28, 2007. (underline added).

CONFIDENTIAL

deteriorating housing market," and while "[b]oth stocks have been viewed as good flight-to-quality stocks, as each has largely avoided the riskiest loans originated during the credit bubble and had benefited from a more favorable regulatory backdrop emanating from Washington," "[we think, however, that] investors have systematically avoided or rotated out of stocks that have significant exposure to weakening housing fundamentals <u>putting FNM and FRE in the path of fear-induced selling</u>."[209]

140. Hence, the potential negative overreaction on November 20, 2007 could be due to the market for Freddie Mac's stock being driven by fear and not being efficient. As Plaintiff's expert Tabak has recognized, economists have noted and studied the inconsistency between market efficiency and overreaction and underreaction in stock markets and how "one may diverge from the predictions of the EMH [efficient market hypothesis] in different ways, depending on the particular circumstances being studied."[210]

141. Regardless of whether the market for the stock was efficient (which Plaintiff has not established), or not, as I explain next, viewing the November 20, 2007 price decline in isolation is an incomplete and biased view of the market reaction to the information the Company reported that day. This is because within the next few trading days, the market's concerns about Freddie Mac not having access to sufficient capital at a reasonable cost were proven to be wrong and Freddie Mac's stock price largely recovered when Freddie Mac completed a $6 billion preferred share capital raise on November 30, 2007 on favorable terms.

---

[209] Merrill Lynch, "GSE stocks come into focus due to credit exposure," October 24, 2007. (underline added)
[210] *See, e.g.*, Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review*, Issue 1 Volume 78, Winter 2004, pages 108-111 ("The overall evidence on short-term overreaction or underreaction is somewhat uncertain, with different studies providing apparently contradictory results, though most financial economists now accept that one may diverge from the predictions of the EMH in different ways, depending on the particular circumstances being studied.").

CONFIDENTIAL

### D. Freddie Mac's stock recovered after Freddie Mac priced and completed $6 billion non-convertible preferred stock capital raise on November 30, 2007

142. While Freddie Mac's stock declined on November 20, 2007 following the Q3 2007 announcement and concerns over the effect of the losses on limited capital constraining valuable growth opportunities, the stock recovered by November 30, 2007 as Freddie Mac priced and completed a $6 billion non-convertible preferred stock capital raise, which Freddie Mac previewed on November 20 as part of an effort to increase capital levels. This rebound must be considered in evaluating loss causation.

143. Figure 7A shows the Freddie Mac's stock price movement over this period. This price recovery does not support the TAC's claim that material allegation-related information about previously unknown and concealed risks caused losses to Plaintiff. It demonstrates that there was no statistically significant portion of the stock price reaction on November 20 that was attributable to any alleged fraud. Rather, it shows that the price reactions were attributable to the market's concerns about Freddie Mac's access to capital in a difficult market environment and unprecedented credit turmoil and its relief that Freddie Mac was able quickly to obtain low cost capital, leaving no amount of stock price reaction attributable to Plaintiff's allegations.

CONFIDENTIAL

**Figure 7A: Freddie Mac stock recovered after $6 billion preferred share capital raise**



Price ($/share)

**Nov 20, 2007:** Freddie Mac price declined from $37.50 to $26.74 after Q3 $2 billion loss and announcement of intention to increase capital by issuing shares and possibly cutting common dividend.

**Nov 30, 2007:** Freddie Mac price closed at $35.07 after $6 billion non-convertible preferred share capital raise.

**Notes and Sources**: Market data obtained from CRSP; news information obtained from various Factiva articles and Freddie Mac press releases.

144. On November 27, there was news that Freddie Mac was planning to sell $5 to $6 billion in perpetual preferred stock that week with a coupon fixed at 8.25% for five years,[211] lower than the 8.75% coupon reported the prior day.[212] After the market closed on November 27, Freddie Mac announced that it would issue "$6 billion of noncumulative, perpetual preferred stock" and that the issuance was "expected to price in the near term."[213]  It would include a "larger offering of nonconvertible preferred shares and a substantially smaller offering of convertible preferred shares."[214]

---

[211]  *Dow Jones Capital Markets Report,* "Freddie Mac To Sell Up To $6B Perpetual Preferred Stk-Source," November 27, 2007, 13:56:00.
[212]  *Reuters News,* "Investors eye high-yielding Freddie Mac preferreds," November 26, 2007, 16:35:00.
[213]  *Dow Jones News Service,* "Freddie Mac Declares Qtrly Dividends," November 27, 2007, 16:26:00.
[214]  *Dow Jones News Service*, "Freddie Mac Declares Qtrly Dividends," November 27, 2007, 16:26:00.

CONFIDENTIAL

145. Merrill Lynch analysts, in a November 27, 2007 report, noted that Freddie Mac "announced, after the close, that it intends to issue $6B of preferred stock to achieve its regulatory capital requirement and to position it to pursue its mission objectives, confirming the high-end of the range floated earlier in the trading day."[215]  They further observed that "[t]he market responded favorably to the earlier discussion of a $5-$6b preferred deal, in combination with a strong tape, though we think the pricing and ultimate split on straight preferred to convertible could play a leading role in market demand," but that "[s]till, the FRE deal is large and the preferred market is crowded, based on comments from the ML Preferred Strategist, so we think pricing and structure will remain a point of uncertainty until the deal is completed." They also confirmed the "price talk earlier in the day" of an 8.25% coupon, which they thought "seems somewhat aggressive."

146. Speculation about the capital raise continued on November 28, with news reports speculating on the yield[216] and additional conjecture about the nonconvertible and convertible tranches of the issue.  The nonconvertible tranche was expected to be between $4 billion and $5 billion, and the convertible tranche between $1 billion and $2 billion.  The nonconvertible piece was expected to be pegged at a coupon of 8.5%-8.75% for five years, which would reset after five years to float over the three-month London interbank (Libor) offered rate.  The convertible deal's coupon was expected to be between 8.25% and 8.50%.[217]

147. On November 29, Freddie Mac provided an update on the $6 billion offering indicating that the issuance would involve "an offering only of non-convertible non-cumulative perpetual preferred stock," and that it would not involve convertible non-cumulative perpetual preferred stock.[218]  During the day there was speculation of the issuance being five times

---

[215]  Merrill Lynch, "Preferred offering a modest positive," November 27, 2007.
[216]  *Reuters News,* "UPDATE 3- Freddie Mac shares post biggest gain in 19 years," November 28, 2007, 11:16:00.
[217]  *Dow Jones Capital Markets Report,* "Freddie Mac Non-Conv Pfd Pegged At 8.5%-8.75% Coupon-Sources," November 28, 2007, 14:28:00.
[218]  *PR Newswire (U.S.),* "Freddie Mac Provides Update On Preferred Stock Offering", November 29, 2007, 09:30:00.

CONFIDENTIAL

oversubscribed and further speculation of the dividend yield between 8.375% and 8.5%.[219] Before the market closed on November 29, news sourcing investors familiar with the deal reported that Freddie Mac had sold $6 billion of non-convertible, non-cumulative, perpetual preferred stock at a dividend of 8.375% fixed for five years, after which the dividend would float over three-month Libor.[220]

148.  Freddie Mac announced the sale of only non-convertible "straight" preferred shares after market close on November 29 and said that the shares were expected to be issued on December 4, 2007.   As noted below, non-convertibility was "welcome news to common shareholders concerned about dilution" because the potential for converting the preferred shares to common would decrease the percentage of ownership of existing common shareholder and could  lead to a decrease in value.[221]  Freddie Mac provided more details on the preferred dividend rate of 8.375% being fixed through December 31, 2012, after which the "dividend rate would be the higher of 3-month LIBOR plus 416 basis points, or 7.875%."  Freddie Mac also announced that it would have "the option to redeem all or part of the shares on December 31, 2012 and on each fifth anniversary thereafter, at $25 per share plus accrued dividends."[222]

149.  As illustrated by the response of Freddie Mac's stock price (see Figure 7A above and 7B below), this successful capital raise alleviated market concerns about Freddie Mac's ability to raise preferred capital during the severe market turmoil on favorable pricing terms that were non-convertible and non-dilutive to common shareholders.

---

[219]   *Bloomberg News,* "Freddie Mac Offers Preferred Stock at 8.5 Percent Yield," November 29, 2007, 10:19:34; *Bloomberg News,* "Freddie to Sell Only Non-Convertible Preferred Shares (Update1), November 29, 2007, 11:07:41; *Bloomberg News,* "Freddie preferred stock deal 5 times oversubscribed, according to source,", November 29, 2007, 11:11:41; *Reuters News,* "Freddie Mac $6 bln preferred deal seen at 8.375 pct," November 29, 2007, 13:35:00; *Bloomberg News,* "Freddie Mac Launches Preferred Sale With Yield Of 8.375%," November 29, 2007, 14:39:57; *Bloomberg News,* "Freddie to Sell Only Non-Convertible Preferred Shares (Update3)," November 29, 2007, 14:49:36.

[220]   Briefing.com, "Freddie Mac sells $6 bln preferred stock at 8.375% dividend," November 29, 2007, 15:36:35.

[221]   Lehman Brothers, "Erratum: Updating Ests for Capital Raise," December 3, 2007.

[222]   Freddie Mac, Supplement to March 23, 2007 Information Statement, Unregistered Sales of Securities, November 30, 2007. *Reuters News,* "Freddie Mac sells $6 bln preferred shares," November 29, 2007, 16:24:00; *PR Newswire (U.S.),* "Freddie Mac Prices Offering of Non-Convertible Non-Cumulative Perpetual Preferred Stock," November 29, 2007, 16:45:00.

CONFIDENTIAL

**Figure 7B: Freddie Mac stock recovered after $6 billion preferred share capital raise**



**11/20/2007**: Freddie announces Q3 2007 $2 b loss and intention to increase capital by issuing shares and possibly cutting common dividend.

**11/27/2007:** News of expected $5-6 b preferred stock issuance with 8.25% coupon.
**11/28/2007:** Freddie confirms $6 b preferred issuance and 50% common share dividend cut.
**11/30/2007:** Freddie confirms favorable pricing of $6 b preferred issuance at 8.375% coupon and clarifies shares will be non-convertible to common (easing common share dilution concerns).

**Notes and Sources**: Market data obtained from CRSP; news information obtained from various Factiva articles and Freddie Mac press releases.

150. As the figure shows, over this period Freddie Mac's price declined by 0.75% across these four days. Freddie Mac's market capitalization declined by $7.118 billion on November 20 and increased by $6.933 billion on November 27, 28, and 30, 2007, a decline of $0.185 billion. This $0.185 billion decline across the four dates represents a 0.75% decline from Freddie Mac's market capitalization of $24.808 billion as of market close on November 19, 2007.[223] This 0.75% decline in market capitalization is economically insignificant.

151. Fannie Mae's stock followed a similar pattern. After declining 24.8% on November 20, 2007 from the prior trading day close of $37.58, the stock price increased on the Freddie Mac capital raise dates.[224] Fannie Mae's stock increased 1.66%, 9.86%, and 18.62% on November 27,

---

[223]  Data obtained from CRSP.
[224]  Data obtained from CRSP.

CONFIDENTIAL

28 and 30, 2007 (respectively), closing at $38.42 on November 30. Fannie Mae's stock market capitalization declined by $9.1 billion on November 20, 2007 and increased cumulatively $9.4 billion across the Freddie Mac capital raise dates.

152. Consistent with the application of the basic PVGO formula discussed above to Freddie Mac's November 20, 2007 price decline, analysts and news media commented favorably on Freddie Mac's capital raise. Thomson Financial news noted that "Shares of Freddie Mac continued to rally Friday after the company priced its $6 billion fixed-to-floating rate non-convertible non-cumulative perpetual preferred stock at $25 a share."[225] Lehman Brothers analysts on December 3, 2007 commented in detail on the capital raise and its positive implication for future business growth:

> *Following a 2-day road show, FRE placed $6B of preferred equity at a rate of 8.375% to bolster its capital position for this challenging turn in the mortgage cycle. Excess capital now stands at $14.5B, $6.5B above OFHEO requirements (keep in mind that this could drop by close to $2B if FRE takes a 4Q07 GAAP loss comparable to 3Q07, as expected). The securities were all straight preferred (no convertible preferred), which was welcome news to common shareholders concerned about dilution. The incremental capital should rebuild a capital cushion, absorb future credit costs, and provide room for modest incremental balance sheet growth.[226]*

Analysts from Bank of America noted in a November 29, 2007 report (prior to the November 30, 2007 Freddie Mac confirmation of pricing of the offering) that:

> *Yesterday after market close, FRE declared a $0.25 4Q07 dividend and announced plans to issue $6 billion of preferred stock a small amount of which would be convertible. The company did not provide a specific breakout, nor is pricing yet known. <u>We view FRE's preferred offering as in-line with our expectations and a positive for the company, since it will provide them with capital to meet their regulatory requirement, not to mention new business potential.</u>[227]*

153. Freddie Mac CDS spreads (which track the cost of insuring against default on the

---

[225] *AFX Asia*, "Shares of Freddie Mac Rally; $6B Preferred Stock Offering Priced Thursday," December 1, 2007.
[226] Lehman Brothers, "Erratum: Updating Ests for Capital Raise," December 3, 2007.
[227] Bank of America, "Freddie Mac," November 29, 2007. (underline added)

CONFIDENTIAL

underlying Freddie Mac debt securities), shown in Figure 8 below, also declined following the capital raise to pre-November 20, 2007 levels, further demonstrating easing of market concern about Freddie Mac's financial prospects.

**Figure 8: Freddie Mac CDS spread declined to pre-November 20, 2007 levels following completion of November 30, 2007 capital raise.**



**Notes and Sources:** Freddie Mac 5yr Senior CDS Spread (FHLMC CDS USD SR 5Y D14) obtained from Bloomberg LP.

154. Similarly, as shown in Figure 9, Freddie Mac's stock option implied volatility also declined by November 30, 2007 back to the pre-November 20, 2007 level, again further demonstrating easing of market concern about the uncertainty of Freddie Mac's financial prospects.

CONFIDENTIAL

**Figure 9: Freddie Mac's Implied Volatility declined to pre-November 20, 2007 level by November 30, 2007.**



**Source:** VIX data obtained from Bloomberg. FRE Implied Volatility obtained from Option Metrics. Implied volatility is computed by OptionMetrics, a well-known provider of such data, through prices of 30-day call options traded on the Company's stock.

### E. The market's full reaction to the alleged corrective disclosure and materialization of concealed risk, including the cumulative stock return across the "capital raise dates," was not statistically significantly negative.

155. To further analyze Plaintiff's claim that the price decline following Freddie Mac's November 20, 2007 announcement represented the impact of a corrective disclosure and materialization of concealed risk, I created a market model to analyze the company-specific stock returns after controlling for market-wide and industry-wide factors.  This model shows that even after controlling for these non-company specific effects, Freddie Mac's stock price reaction on the

full set of dates required to properly analyze the market reaction to the information Freddie Mac released on November 20, 2007 (November 20, 2007 plus the three dates when the market learned details about Freddie Mac's capital raise -- November 20, 27, 28, and 30, 2007, collectively the "capital raise dates"), was statistically insignificant and hence not distinguishable from zero.  This analysis is explained in detail and the results are summarized in Appendix 4.

156. Despite trying with two previous experts, Plaintiff has not successfully demonstrated that Freddie Mac stock traded in an efficient market during the period at issue. Tabak has not opined on market efficiency in this matter and testified in this deposition that he is "agnostic" on the issue.[228]  Of course, either the market is efficient, or it is not.  Given the results of my statistical market model analysis, that Freddie Mac's stock reaction collectively on the "capital raise dates" (i.e., the complete market reaction to the information Freddie Mac released on November 20, 2007) was statistically insignificant and hence not distinguishable from zero, this means that either (1) if the market is efficient, the market concern over Freddie Mac's capital position raised by the losses announced on November 20, 2007 was alleviated by November 30, 2007 and this confirms the alleged misrepresentations and omissions did not cause losses to OPERS;[229] or (2) the market is inefficient and it overreacted on November 20, 2007 (consistent with some analysts saying reaction was "overdone") and recovered by November 30, 2007.

157. In either case there is no loss causation. The economic evidence does not support the TAC's claim that material allegation-related information about previously unknown and concealed risks, which were allegedly revealed on November 20, 2007 caused losses to OPERS.

### F. The Alleged Misrepresentations and Omissions Lacked Economic Significance.

158. The lack of a statistically significant stock price reaction attributable to the alleged misrepresentations and omissions makes sense, from an economic perspective, when one considers

---

[228]  Tabak Deposition, at 22:11-15.
[229]  The lack of statistical significance.

CONFIDENTIAL

Freddie Mac's detailed credit risk disclosures.  For example, given the detailed disclosures that I discuss above, the allegation that it was a material omission for the Company not to disclose the share of its portfolio comprised of mortgages with certain internal designations, such as C1, C2 or EA, is illogical.  As I have discussed above, Freddie Mac made detailed disclosures about the credit characteristics of its Total Single Family Mortgage Portfolio, which investors could use to gauge the Company's credit risk profile.  For instance, given the Company's disclosures about the percentage of its mortgage portfolio to borrowers with different categories of FICO scores, investors could readily calculate the share of the Company's mortgage portfolio that consisted of loans to borrowers with FICO scores less than 660, or 620, by simply adding certain disclosed line items in Freddie Mac's Annual Reports.

159. Freddie Mac's disclosed mortgage credit risk characteristics are relevant from an economic perspective because they help shareholders gauge the Company's expected losses due to credit risk.  As I also discussed above, the Company also provided detailed disclosures about its portfolio's mortgage performance, expected losses and its provisions for credit losses.  In addition, the Company disclosed in its public reports a number of other risks facing the Company, as I discuss above and as set forth in the Okongwu Report.  Given this wealth of disclosed facts about the risks facing Freddie Mac and the lack of a statistically significant result to my event study, I conclude that the alleged misrepresentations and omissions lack economic significance.

# VI. Tabak does not establish materiality or loss causation.

## A. Summary

160. I have previously submitted expert reports in this matter responding to Plaintiff's first economic expert, Hallman as well as their second economic expert, Feinstein.[230]  In my expert report responding to Hallman, I concluded that Hallman failed to establish that Freddie Mac stock

---

[230]  Expert Report of Mukesh Bajaj, December 14, 2012 (addressing export report of Dr. Greg Hallman);  Expert Report of Mukesh Bajaj, PH.D., September 1, 2017 (addressing expert report of Steven Feinstein).

CONFIDENTIAL

traded in an efficient market during the Relevant Period, and that the economic evidence does not support a finding that the alleged misrepresentations and omissions inflated the price of Freddie Mac's common stock or that they were economically significant.  In my expert report responding to Feinstein, I concluded that Feinstein also failed to establish that Freddie Mac common stock traded in an efficient market during the Relevant Period, and I also concluded that economic evidence supports a finding that the alleged misrepresentations and omissions had no impact on the price of Freddie Mac's common stock.  This Court ruled that "OPERS has failed to establish market efficiency" and that "the alleged misstatements … did not impact Freddie Mac's stock price."[231]

161. Plaintiff's expert, Tabak, states that he examined "whether the record evidence would allow for economic opinions on the relevance and importance of the alleged misrepresentations and omissions that would allow a trier of fact to conclude that those alleged misrepresentations and omissions were material."[232]  He concludes that "there is evidence in the record that is relevant to an understanding of the effect of the alleged misrepresentations and omissions on the market's valuation of Freddie Mac" and that that evidence shows Freddie Mac's November 20, 2007 alleged corrective disclosure was "company-specific" news that "mattered to the market."[233] Shapiro also offers an opinion that the alleged misstatements impacted Freddie Mac's stock price and were material.[234]  I comment on Shapiro later in this report in Section VIII.

162. Tabak also states that based on his review of "evidence in the record,"[235] he "would be able to provide an opinion that loss causation existed."[236] During his deposition Tabak clarified

---

[231]  Class Cert Order, page 36.
[232]  Tabak Report, ¶34. (underline added).
[233]  Tabak Report, ¶¶3, 35-36.
[234]  Shapiro Report, ¶3 ("Information I have learned since November 20, 2007, regarding those three topics with respect to Freddie Mac would have dramatically changed my analysis of Freddie Mac's financial health during the Relevant Period…. My reports for Fox-Pitt leading up to November 20, 2007, generally put Freddie Mac stock ratings at a positive 'outperform.' This would have changed to 'underperform' if prior to November 20, 2007, I had known Freddie Mac's true financial status with respect to credit risk, underwriting and economic capital during the Relevant Period.").
[235]  Tabak Report, ¶2-3.
[236]  Tabak Report, ¶32.

that he is not opining that he "would be able to" opine on loss causation but he is in fact opining on loss causation.  It is his opinion "that the alleged misrepresentations and omissions in this case caused plaintiffs' alleged losses" when Freddie Mac announced its Q3 2007 financial results on November 20, 2007.[237]

163. My review and analysis of Tabak's opinions shows that Tabak has no basis for concluding materiality and loss causation.  His opinions are based on insufficient facts, flawed and/or unsubstantiated assumptions, unreliably applied methodologies, and they ignore economic evidence.

164. Tabak's materiality and loss causation opinions are based on two arguments. His first argument is that both Feinstein and I agree that Freddie Mac's November 20, 2007 stock price decline is statistically significant which Tabak claims indicates "the [Freddie Mac] news that day mattered to the market."[238]  And second, that an analysis done by another economic consulting firm Forensic Economics (for one of Plaintiff's counsel's legal filings) of stock price reactions following "fourteen disclosures of losses and/or write-downs by nine different companies" ("Plaintiff's Appendix 1") (or eight different companies in addition to Freddie Mac) shows Freddie Mac had a "disproportionately severe stock-price decline" on November 20, 2007 and this conclusion by Tabak purportedly demonstrates "that (unless there is another explanation) the market underestimated its exposure to subprime and nontraditional mortgages."[239]  He concludes from this assessment that "there is evidence in the record that is relevant to an understanding of the effect of the alleged misrepresentations and omissions on the market's valuation of Freddie Mac,"[240] which appears to be an indirect way of stating an opinion on materiality. Tabak also

---

[237] Tabak Deposition, at 53:8-18. ("Q. Is it your opinion that the alleged misrepresentations and omissions in this case caused plaintiffs' alleged losses? A. Well, again, I'm not discussing whether there are actual omissions or misrepresentations or simply allegations, but treating those allegations as true, they certainly at least contributed to the losses that plaintiff suffered in this case.").

[238] Tabak Report, ¶35.

[239] Tabak Report, ¶¶ 21, 25, 28.

[240] Tabak Report, ¶3.

CONFIDENTIAL

claims that if Plaintiffs prove their case at trial, linking the "unusually large stock-price decline on November 20, 2007 to the allegations," this is "the final step in demonstrating loss causation from an economic perspective."[241]

165. Having concluded that the market price drop for Freddie Mac stock was significant on November 20, 2007, Tabak then concludes that this decline was not caused by any confounding information.

166. Tabak 's conclusion that there was no confounding information is a textbook example of an opinion that is based on insufficient facts. Tabak reached his conclusion that there was no confounding information other than the alleged fraud that was revealed on November 20, 2007 without even reviewing the mix of information received by the market leading up to and on November 20th, or reviewing what Freddie Mac officially announced on November 20, 2007.[242] Tabak simply declared that "[a]t this point, I have seen no additional "confounding" (i.e., unrelated to the allegations) information on that date that would require a disaggregation of the price reaction into a portion unrelated to the allegations."[243] He did not see any confounding information because it appears he did not even look.

167. Notably, Tabak's made-for-litigation methodologies here differ from his approach to materiality and loss causation in other securities cases. In previous expert reports in other securities cases, Tabak employed careful statistical modeling and event study analysis which involves a detailed review of the mix of information released on and around alleged disclosure

---

[241]    Tabak Report, ¶29.

[242]    As discussed above, on November 20, 2007 Freddie Mac announced its Q3 2007 financial results which
         included an Earnings Release, an Information Supplement, Financial Statements and Core Tables, and an
         earnings slide presentation discuss on an Earnings Conference Call with analysts that day.

[243]    Tabak Report, ¶¶28, 30. In his deposition, he admitted that he did not even review Freddie Mac's November
         20, 2007 disclosure and he admitted that to "reach a final opinion on loss causation" he would have
         to "disaggregate out the confounding news from the allegation-related news." Tabak Deposition, at 58:2-9,
         66:8-12 and 203:10-15.

CONFIDENTIAL

dates (including potential confounding information),[244] but he did not do so here.  He testified that he was asked to perform essentially the same loss causation assignment in one of those matters as he was here and answer the same question as to whether the alleged misrepresentations and omissions caused losses to Plaintiffs but he did no such analysis in this matter.[245]

168. To reconcile his conclusion on loss causation with this Court's earlier finding that there was no "front-end" impact of the alleged disclosure defects, nor "back-end" corrective disclosure impact on November 20, 2007,[246] Tabak does not point to any new and previously overlooked fact or analysis.  Instead, he proffers a "simple example" of company losses on hidden "lottery tickets" ("Tabak Lottery Ticket Hypothetical") and claims an application of the Tabak Lottery Ticket Hypothetical to "this matter" helps "illustrate how [loss causation] works from an economic perspective."[247]

169. Tabak's opinions on loss causation and materiality are wrong and unsupported for at least the following reasons.  First, although he is "agnostic" about market efficiency in this matter,[248] his opinion about the November 20, 2007 market reaction to Freddie Mac's announcements depends on an unsubstantiated assumption of market efficiency which he himself said in his own published writing was required to use the event study methodology to quantify stock price reactions to new information, a method which in his deposition he testified he would also use in this matter to analyze loss causation and damages, as he has done in other matters.

170. Second, his analysis of the November 20, 2007 price reaction is incomplete and contradicted by a proper economic analysis of "evidence in the record" he has not reviewed.

---

244  See Expert Report of David I. Tabak, in *Sjunde AP-Fonden, et al. v. Gen. Elec. Co., et al.*, Case No. 17:-cv-8457 (S.D.N.Y.) ("To form my [loss causation] opinions, I have examined the six dates, or sets of dates, on which there was an alleged disclosure in the Complaint. The statistical analysis that I employ for this examination is the same that I am using in a report on market efficiency that I am submitting simultaneously in this matter. For each of these six dates or sets of dates, I identified (1) whether there was a statistically significant movement in GE's stock price; (2) what new information was provided to the market concerning GE; and (3) which new information caused the statistically significant stock price movement.,")
245  Tabak Deposition, at 51:22-53:7.
246  Tabak Report, ¶1.
247  Tabak Report, ¶9.
248  Tabak Deposition, at 22:11-15.

CONFIDENTIAL

Surprisingly, Tabak did not read Freddie Mac's prior detailed disclosures on subprime and non-traditional mortgage exposure and Freddie Mac's actual November 20, 2007 disclosures, he should have reviewed for potential confounding information.  Likewise, Tabak appears to have ignored Freddie Mac's post November 20, 2007 stock price recovery when it raised capital on November 30, 2007 alleviating market concerns about Freddie Mac's ability to grow its business after the losses announced on November 20.  As I explained earlier in this report, a proper analysis of the full market reaction to the information disclosed by Freddie Mac on November 20, 2007, must also include three following trading days when the market learned about Freddie Mac's $6 billion capital raise.  This proper analysis shows that the stock price recovered and that the cumulative change in the stock price is not statistically significant after controlling for market and industry factors.

171. Third, Tabak's adoption of Plaintiff's Appendix 1, cannot support his opinions.  It is a made-for-litigation method that is not reliable, based on insufficient facts, and applied in an unreliable manner.  This is an analysis he did not perform in the first instance, but instead adopted from another consulting firm that assisted Plaintiffs with a legal brief.  The analysis is replete with errors (Tabak claims to have corrected errors in the old analysis, but then made new errors) and is at bottom, irrelevant.

172. Fourth, the Tabak Lottery Ticket Hypothetical is misleading, based on a set of assumptions that are not applicable to the facts of this case, and proves nothing about loss causation here, as I explain below.

173. Overall, Tabak's opinions on materiality and loss causation are without merit, and he did nothing more than assume his conclusions.

## B. Tabak's unstated dependence on market efficiency, which has not been established.

174. As noted above, this Court found that Plaintiff and their expert Feinstein had failed to

CONFIDENTIAL

establish market efficiency for Freddie Mac's common stock over the Relevant Period.  Tabak does not say that he disagrees with the Court's finding that Plaintiff has not made a sufficient showing of market efficiency,[249] does not defend the prior work offered by plaintiff's two prior experts on this issue, Mr. Hallman and Feinstein, does not offer any analysis of market efficiency, or even mention the word market efficiency in his expert report.  When asked in his deposition about market efficiency, he testified that while he was "agnostic" on the issue; he did not need to establish efficiency to use an event study to analyze loss causation.[250] Although, in an apparent contradiction, he later testified that market efficiency was required to determine the direction and "correct" amount of stock price reaction to new information in an event study, and that quantification of a disaggregation of the impact of potential confounding information on the stock price on corrective disclosure dates was needed to analyze loss causation.[251]

175. Tabak's claim that he can use an event study to analyze loss causation without analyzing or establishing that Freddie Mac traded in an efficient market does not make logical sense.  Despite claiming it is not required, Tabak implicitly assumes market efficiency for his loss causation opinion.  It is true that one could mechanically conduct some statistical number crunching by estimating a market model regression and finding statistically significant excess returns on certain days when information is released, but that is not an event study unless the observed stock price movements can be said to have been caused by the event in question.  The essential economic link of enabling the economist to attribute causation of the change in price to the "event," is the theory of semi-strong market efficiency (i.e., the stock market price at all times

---

[249] Tabak said nothing in his report on this issue but did testify in his deposition that while he was not offering an opinion on whether the decision was "correct or incorrect," "there were some of the economic arguments in the market efficiency section [of the Class Cert Order] that I didn't think were quite on point. But you'd have to show it to me. It's been a while, especially in that area, in that section that I haven't reviewed probably in years." Tabak Deposition, pages 168:9-169:4.

[250] Tabak Deposition, at 31:10-14 ("And can you use an event study in a situation where a market for a particular security is not efficient? A. Of course.") (objection omitted).

[251] Tabak Deposition, at 66:8-12 ("But I certainly agree with you at the end of the day one will have to disaggregate out the confounding news from the allegation-related news to reach a final opinion on loss causation.")

CONFIDENTIAL

reflects all material, publicly available information and therefore stock prices should react promptly to new material information regarding stock value).[252]  If the market for the security is not semi-strong efficient at the time of the event, the causal link between the observed price change and material unexpected information is broken.  As I understand it, this link is the basis for the Supreme Court's finding in Basic (upheld in Halliburton II) that market efficiency is required for Plaintiff to claim the rebuttable presumption of reliance based on fraud on the market theory. Even though reliance is not at issue in this case, the Supreme Court's logic is clear: Without the market being efficient, there is no link between the value of unexpected material information and any observed changes in stock price.

176. In addition, to perform the quantification of the disaggregation of confounding information Tabak claims is necessary to reach his "final opinion" on loss causation, an assumption of market efficiency is also required. If not, there is no economic basis to use an event study to quantify and assess the economic materiality of the impact of the different pieces of information which require disaggregation.

177. Furthermore, as I discuss later in this report, at this damages/merit stage Tabak needs to establish an even more rigorous standard of market efficiency ("fundamental" semi-strong form) beyond what Plaintiff already claimed was required, but failed to show, at the Class Certification Stage in order to use an event study to quantify damages.

## C. Tabak's fundamentally flawed "analysis" of the alleged November 20, 2007 corrective disclosure.

178. Tabak's claim that "the large [November 20, 2007] decline in Freddie Mac's stock price indicates that (unless there is another explanation) the market underestimated its exposure to subprime and nontraditional mortgages" is based on a flawed interpretation of Freddie Mac's November 20 earnings announcement (which Tabak does not even "consider") and ignores

---

[252]  *See, e.g.*, 2017 Bajaj Class Certification Report, ¶26.

economic evidence indicating "another explanation."

## 1. Tabak did not even read, let alone consider, the actual disclosures at issue.

179. At the outset, Tabak's entire opinion has no basis as Tabak does not even analyze the information released on November 20, 2007, nor does he even list Freddie Mac's related disclosures in his "Documents Considered." Leaving aside this fundamental shortcoming, Tabak's "analysis" and discussion ignores the crucial economic context and market reaction to Freddie Mac's November 20, 2007 earnings announcement as I have discussed in detail above in Section V. Following this alleged corrective disclosure, analysts did not ask Freddie Mac for further details on the subprime and nontraditional exposure that was allegedly previously concealed, but rather expressed concern about Freddie Mac's need to raise capital to expand profitable business opportunities because of GAAP mark-to-market losses due in part to "[d]epressed market prices for illiquid assets"[253] and larger than expected credit provisions "as a result of continued weakness in the housing market."[254] This lack of questions and commentary from analysts following November 20 is consistent with Freddie Mac's extensive detailed disclosures (as also recognized by analysts) on the underlying mortgages in the single-family guarantee portfolio and the retained portfolio (as discussed in Section IV above).

## 2. Tabak did not "see" confounding information because he did not look for any.

180. In addition, Tabak's claim that "[a]t this point, I have seen no additional "confounding" (i.e., unrelated to the allegations) information on that date that would require a disaggregation of the price reaction into a portion unrelated to the allegations"[255] ignores

---

[253] Bear Stearns, "GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity As Well," November 20, 2007.
[254] Freddie Mac Q3 2007 Earnings Call; Freddie Mac Q3 2007 Press Release, page 1.
[255] Tabak Report, ¶30.

CONFIDENTIAL

substantial confounding company specific information disclosed on November 20, 2007. Tabak's erroneous conclusion is not surprising as he has not even considered Freddie Mac's actual disclosures and admits he did not perform a detailed disaggregation of potentially confounding information, even though he has done so in numerous other matters when given the same assignment by counsel.  He claims he read my deposition where I discussed potential confounding factors and quotes a portion of it in his report,[256] but I never claimed at the Class Certification phase to provide an analysis of confounding factors of the kind of rigor required for loss causation and economic materiality analysis at the merits phase.  I understand that it is Plaintiff's burden to provide this analysis, as Tabak acknowledged.[257]   He also testified in his deposition that he performed no statistical or quantitative analysis of confounding information but would need to do so to give a "final opinion" on loss causation, presumably at some later date.[258]

181. There are several pieces of potential confounding information that Tabak would have to disentangle to arrive at a proper loss causation conclusion and to determine whether the alleged disclosure defects that allegedly concealed some incremental part of Freddie Mac's exposure to subprime and Alt-A mortgages was economically material.

182. First, there is potentially material confounding non-allegation related information released on November 20, 2007.  As I described above, of Freddie Mac's $2 billion net quarterly losses (driven by $5 billion of mark-to-market items and credit provisions), $1.5 billion of this $2 billion in net loss would not exist without loss from interest rate derivatives, which is clearly unrelated to Plaintiff's allegations.  Freddie Mac's losses also stemmed from the realization of known risks about Freddie Mac's exposure to the rapidly deteriorating real estate and broader market conditions.  As discussed above in detail in Sections IV and V, it was known to the market that Freddie Mac operated only in the secondary mortgage finance market and thus, by its very

---

[256]  Tabak Deposition, at 92:21-93:2.
[257]  Tabak Deposition, page 108.
[258]  Tabak Deposition, at 65:13-66:12.

nature, was heavily exposed to the risks of the severe, unprecedented real estate and broader market downturn ("what may be the worst housing downturn since the Great Depression")[259] and ongoing financial crisis which was expected to deteriorate further as of November 20, 2007. These risks include the dramatic increase in market spreads, like the OAS Agency MBS spread which had a direct impact on the mark-to-market losses Freddie Mac was required by GAAP accounting rules to record, even if these marks did not represent ultimate expected realized losses on the underlying mortgage and MBS positions. This was recognized by analysts, as noted above, who observed that while "GAAP accounting resulted in market valuation adjustments on derivatives of $1.4 billion and of about $2.3 billion for credit," "[d]epressed market prices for illiquid assets which in some instances aren't reflective of the Freddie Mac assets being valued are creating economic problems by reducing the capital available to support security purchases."[260]

183. Second, Freddie Mac was also exposed to well-known and understood regulatory risk, which Tabak ignores. In particular, the OFHEO 30% capital requirement which, as discussed extensively above in Section V analysts, like Shapiro, worried would hamstring Freddie Mac's ability to take advantage of the historic growth opportunities available to Freddie Mac in the then-current market environment.  As Mr. Syron noted later in the Q4 2007 earnings call on February 28, 2008, access to capital was "absolutely crucial" and "on investors minds," noting that "[n]o one could have lived through the last six months in the financial markets and missed the fact that access to capital is absolutely crucial in investor's minds. Freddie Mac recognized our need to address capital in the fourth quarter of 2007 and took a positive affirmed step to issue $6 billion in deferred stock. As it turned out, we were the first in a long parade of companies to do so."[261]

184. A third potential confounding factor is any losses caused by Freddie Mac's large

---

[259]  Morgan Stanley, "Mortgage Finance: In the long term, pricing trumps losses, but the short-term could still be volatile," October 26, 2007.
[260]  Bear Stearns, "GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity as Well," November 20, 2007.
[261]  FRE – Q4 2007 Freddie Mac Earnings Conference Call, February 28, 2008, 1:00 PM ET, page 2.

CONFIDENTIAL

exposure to the numerous loans in its portfolio that are not at issue in this matter, which I understand are the "Accept" loans and not the "Caution" loans and which comprised the majority of the over $1.6 trillion Single Family Guarantee Portfolio.[262]  After all, Plaintiff's allegations in this case focus on non-traditional "Caution" loans, but there appears to be no dispute that Freddie Mac's portfolio included exposure over a trillion  dollars of traditional loans.  Tabak admitted that he did not know whether these "prime" loans, which are not at issue, contributed to the alleged corrective losses on November 20, 2007.[263] He also admitted that this would represent confounding information if it led to "larger losses than the market would anticipate."[264]  But that is exactly what happened beginning in 2007.  The rapidly rising prime delinquency rates (see Okongwu Report Section 3) and severe home price declines (see Exhibits 1 and 2) in the second half of 2007 (with further declines expected in the future), as discussed above in Section IV and in the Okongwu Report, suggests that traditional loans could have accounted for some portion of the unexpected November 20, 2007 losses.  This is also consistent with a 2010 Federal Reserve Bank of Chicago study which found that while the news media had "carried countless stories about soaring defaults among subprime mortgage borrowers," default rates on prime loans, which account for 75% of the total outstanding mortgages in the U.S., had increased "rapidly," especially for 2006 and 2007 vintages.[265] The study noted that:

> among prime loans made in 2005, 2.2 percent were 60 days or more overdue 12 months after the loan was made (our definition of default). For loans made in 2006, this percentage nearly doubled to 4.2 percent, and for loans made in 2007 it rose by another 20 percent, reaching 4.8 percent. By comparison, the percentage of subprime loans that had defaulted after 12 months was 14.6 percent for loans made in 2005, 20.5 percent for loans made in 2006, and 21.9 percent for loans made in 2007. To put these figures in perspective, only 1.4 percent of prime loans and less

---

[262]  *See* Okongwu Report, Section 5.
[263]  Tabak Deposition, at 262:23-263:4.
[264]  Tabak Deposition, at 263:5-21.
[265]  Gene Amromin and Anna L. Paulson, "Default Rates on Prime and Subprime Mortgages: Differences & Similarities," Federal Reserve Bank of Chicago, 2010, page 1.

CONFIDENTIAL

> *than 7 percent of subprime originated in 2002 defaulted within their first 12 months.*

And that:

> *the deterioration in the performance of prime loans happened more rapidly than it did for subprime loans. For example, the percentage of prime loans in default during their first 12 months grew by 95 percent between 2005 and 2006. Among subprime loans it grew by a relatively modest 53 percent.* [266]

185. Fourth, there are also several pieces of unexpected and potentially material information, even information pertaining to subprime and other nontraditional mortgages that was released November 20, 2007 that <u>do not pertain to the materialization of allegedly concealed risks but instead to materialization of previously disclosed risks about Freddie's exposure to such loan products</u>.

186. For example, Freddie Mac had disclosed its non-agency subprime RMBS holdings in its retained portfolio of $120 billion, which Plaintiff does not dispute.  While the market learned on November 20, 2007 that Freddie Mac did not report accounting losses on these positions, as such unrealized losses are not required under GAAP to be recognized on financial statements, analysts expressed concern that these positions might generate future realized losses, consistent with Freddie Mac's warning on November 20, 2007 that it expected to report even further losses in the coming quarter and year, given the trajectory of the market downturn.[267] Such concerns may also have contributed to some of the price drop Freddie Mac's stock experienced on that day. Credit Suisse, for example noted on November 21, 2007 that "While the company indicated its non-agency AAA subprime portfolio should not be subject to impairment, we believe that if the

---

[266]  Gene Amromin and Anna L. Paulson, "Default Rates on Prime and Subprime Mortgages: Differences & Similarities," Federal Reserve Bank of Chicago, 2010, page 1.

[267]  *See, e.g.*, Freddie Mac Q3 2007 Earnings Call, page 2. ("As you know, the third quarter continued to represent a very difficult environment as falling housing prices, deteriorating mortgage credit, continued volatility in the fixed income market all contributed to a net loss of $2 billion. Given the continuation of the same market trends that produced these results through October and November, it its likely that the fourth quarter will prove difficult as well. These results are not surprising, given the vagaries of our accounting that were tied to the housing accounting -- to the housing economy and we are taking strong steps to improve our business and our future financial results.")

CONFIDENTIAL

recent credit spread widening does not reverse over the coming quarters, we believe that Freddie could recognize an other than temporary impairment of between $1-5 billion (for a 1-10% price move in the securities) in 2008."[268]

187. In the Single Family Guarantee Portfolio, as I discussed above, prior to November 20, 2007 Freddie Mac had also disclosed its $120 billion Alt-A exposure, its $16 billion "nontraditional" Interest Only loan exposure, its $1 billion "nontraditional" Option ARM exposure, and its $63 billion and $203 billion FICO < 620 and FICO < 660 loan exposure (respectively).[269]  All of these disclosed positions could have contributed substantially to an unexpectedly large loss announced on that day, and any such losses would not represent the materialization of concealed risks, but materialization of previously disclosed risks. Freddie Mac also reported on November 20 as an update on the "current market environment and its impact on our G fee business," that:

> *our 2006 and 2007 books are expected to realize higher expected default costs than prior books for two reasons. First, the recent weakening in the house price -- of house prices have increased expected default costs for the 2006 and 2007 books compared to prior years. Second, there was an increase with risk layering mortgages. For example, mortgages with FICO scores less than 620 and original LTVs greater than 90, are more concentrated in the 2007 book and represent about 1% of purchases.[270]*

188. Despite admitting in his deposition that Fannie Mae was the most similar company to Freddie Mac in "terms of business,"[271] Tabak also did not even consider Fannie Mae's stock price reaction to Freddie Mac's announcements on November 20, 2007, a day when Fannie Mae did not announce any material unexpected news.  The 25% price decline that Fannie Mae experienced on the day that Freddie Mac made its earnings announcement demonstrates that most of the price drop

---

[268]  Credit Suisse, "Hostile Environment Weighs on Q3 Results; Sizable Capital Raise Needed," November 21, 2007.
[269]  *See* Section IV above.
[270]  Freddie Mac Q3 2007 Earnings Call, page 3.
[271]  Tabak Deposition, at 227:7-11.

CONFIDENTIAL

in Freddie Mac's stock price on November 20th was unrelated to anything specific to Freddie Mac that did not equally apply to Fannie Mae.  Of course, as I have discussed above, most of Freddie Mac's stock price drop on November 20th was reversed on November 27, 28, and 30, 2007 as Freddie Mac successfully raised capital needed to offset the effect of OFHEO not granting capital relief. Such regulatory capital concerns would equally apply to Fannie Mae and have nothing to do with the alleged fraud.[272]  Thus, in any reasoned analysis of the 29% stock price drop on Freddie's stock on November 20, 2007, one would consider Fannie Mae's stock price drop of 25% due to regulatory capital concerns.

189. In sum, Tabak's opinions are based on insufficient information because, among other things, he did not review a record replete with confounding information.  He found no confounding information for one simple reason: he did not look.

### 3. Tabak ignores the price impact of Freddie Mac capital raise on November 30 and its obvious implications for the stock price decline on November 20.

190. Tabak also opines that, although in his review of the record he found nothing to change "the conclusion that the materialization of the [undisclosed] risk accounted for the bulk of Freddie Mac's November 20, 2007 stock-price decline,"[273] he said he is "open to the possibility," that there are "other factors to consider."[274]  As I demonstrated above in Section V he ignores economic evidence in the record indicating an obvious candidate for "another explanation." Namely, concern over Freddie's need to raise substantial capital in a difficult market environment and unprecedented credit turmoil, a concern that was alleviated by November 30. Tabak does

---

[272]  I did not find any Fannie Mae specific news that could explain Fannie Mae's stock price drop.  One news article reported the downgrade by Plaintiff's expert: "Fox-Pitt analyst Howard Shapiro downgraded both Freddie Mac and Fannie Mae to underperform from outperform, saying the companies will have trouble exploiting opportunities to expand." *Dow Jones International News*, "With Capital Warning, Freddie Shifts From Solution To Problem," November 20, 2007.
[273]  Tabak Report, ¶¶28, 30.
[274]  Tabak Report, ¶28.

CONFIDENTIAL

mention Freddie Mac's need to raise capital following the November 20, 2007 announcement but concludes this is not an independent reason for the price decline.[275]

191. Tabak's speculation that Freddie Mac's stock price drop due to capital concerns is not a confounding factor because losses that generated the need for the capital raise stemmed from losses due to undisclosed risks makes no economic sense. Freddie Mac's regulatory capital is impaired by losses and its future capital needs regardless of whether these losses were created by materialization of previously disclosed or undisclosed risks. We know from the discussion above that reasons having nothing to do with alleged undisclosed risks caused losses on November 20th and Tabak has not provided any evidence that any of the losses announced on November 20th came from previously undisclosed risks. Moreover, Tabak ignores Freddie Mac's stock recovery by November 30, 2007 as Freddie Mac calmed market concerns over its ability to raise capital on favorable terms amidst market turmoil and a worsening financial crisis. This price recovery after the capital raise must be netted out before one can measure the stock price drop related to losses, for whatever other reasons. Once we do so, there is no statistically significant stock price decline to explain.

192. As I demonstrated above in Section V, illustrated by the response of Freddie Mac's stock price, CDS spreads, and stock option implied volatility (*see* Figures 7A, 7B, 8, and 9) and confirmed by market commentary, Freddie Mac's successful capital raise alleviated market concerns heightened on November 20, 2007 about its ability to raise preferred capital during the severe market turmoil on favorable pricing terms and non-convertible, non-dilutive to common shareholders.

193. My prior opinion that based on "an analysis of the economic evidence surrounding the November 20, 2007 disclosures," "there was no evidence to suggest that the Company's

---

[275] *See* Tabak Report, page 10, footnote 13 ("The closest example of a factor specific to Freddie Mac that Dr. Bajaj cites would be its potential need to raise capital. However, that need to raise capital was a result of Freddie Mac's losses due to the other factors cited, and thus might help explain the magnitude of the stock-price decline but would not be an independent reason for that decline.").

CONFIDENTIAL

disclosures were linked to the alleged misrepresentations and omissions in the Third Amended Complaint" is therefore supported by economic evidence Tabak ignores.

### D. The two arguments Tabak offers in purported support of his materiality and loss causation opinions are flawed, and his opinion is unsupported and incorrect.

#### 1. Tabak mischaracterizes my prior testimony.

194. As noted above, Tabak's opinions on materiality and loss causation are based primarily on two arguments.  First, he concludes that because both Feinstein and I concluded that Freddie Mac's stock price decline on November 20, 2007 was statistically significant, the alleged misstatement was material to investors. This conclusion mischaracterizes my expert reports and my deposition testimony.

195. In my response to the Feinstein report, I did not provide any event study.  What I had concluded was that the large price drop on November 20, 2007 does not by itself establish market efficiency even if it was statistically significant, contrary to Feinstein's claim.  I also concluded, and the Court agreed, that there was no price impact because the information in the alleged corrective disclosure and "how that announcement was perceived by the market," did not correspond to the alleged disclosure defects.  All Feinstein and I agreed on was the obvious: the price drop on November 20th was large and thus statistically significant.  In no way does this imply that I agreed with Feinstein that the price drop on November 20 established that any allegedly undisclosed information was material.  In fact, I demonstrated, and the Court agreed, that the price drop on November 20, 2007, was not related to the correction of any prior alleged misrepresentations.  My analysis in Section V above establishes that the economic evidence contradicts Plaintiff's allegation that market's reaction to Freddie Mac's announcement on November 20 establishes there were material prior disclosure defects.

CONFIDENTIAL

---

### 2. Tabak also fails to establish the materiality of alleged misrepresentations and omissions based on "Plaintiff's Appendix 1."

196. The second of two arguments Tabak offers in purported support of his opinion on materiality and loss causation is based on his incorrect and flawed reliance on Appendix 1 to Lead Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss the First Amended Complaint dated October 16, 2008 ("Plaintiff's Appendix 1").[276]  Tabak adopted this series of "very simplified event studies"[277] performed by another economic consulting firm that assisted Plaintiffs for a legal brief.  This analysis was not presented by either of Plaintiff's two prior experts Hallman or Feinstein. This analysis is a made-for-litigation approach, which is based on insufficient information, and replete with basic factual and data errors. Tabak claims to have corrected errors in the old analysis, but then made new errors, and he did nothing to address how meaningless this purported analysis is.

197. As an initial matter, I note that this analysis is a made-for-litigation approach that is not commonly used in securities cases.  I have never seen such an approach used before in an effort to establish materiality or loss causation.  During his deposition, Tabak could not recall any case (of the over hundred securities cases he has worked on) where he implemented such an "analysis" to purportedly isolate and analyze the materiality of company-specific corrective information.[278]

198. According to Tabak, Plaintiff's Appendix 1 "examines the stock-price movements" on fourteen disclosures of "massive losses" and/or write-downs caused by "the precipitous decline in house prices and the tight credit market"[279] ("14 Purported Comparable Disclosures" and "14 Purported Comparable Disclosure Dates") and "[i]t finds that the average one-day stock-price

---

[276]  Tabak Report, ¶22. *See also* Tabak Deposition, at 264:2-265:6.
[277]  Tabak Deposition, at 162:2-14.
[278]  Tabak Deposition, at 277:7-278:5.  Tabak has also not published an article on this approach.  Tabak Deposition, at 278:13-19.
[279]  Tabak Report, ¶21 (quoting Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint with Prejudice, dated September 2, 2008, page 9).

change is 0.85% looking at all fourteen disclosures and -1.09% if one positive outlier is excluded."[280]  Purportedly relying on "event study literature" that "looks at what happens when there are similar announcements by different companies at different points in time,"[281] Tabak compares Freddie Mac's stock price change on November 20, 2007 to the average one-day stock price change on the days of the 14 Purported Comparable Disclosures and claims that because "Freddie Mac's stock-price decline was over three times as large as that of the next-largest decline," "[t]he market was reacting to something that distinguished Freddie Mac from the other companies" and "[t]his demonstrates that the news that mattered to the market [released by Freddie Mac] was company-specific."[282]  In his deposition, he further clarified, that although it was not in his expert report, it was his opinion, as confirmed by his electronic workpapers, that Freddie Mac's stock price reaction to the alleged corrective disclosure was "statistically significant compared to the other price movements [he] examined" and a "statistically significant outlier" shown by his "t-statistic."[283]  Tabak concludes that "the record evidence would allow for economic opinions on the relevance and importance of the alleged misrepresentations and omissions that would allow a trier of fact to conclude that those alleged misrepresentations and omissions were material."[284]  Tabak also claims that if Plaintiffs prove their case at trial, linking the "unusually large stock-price decline on November 20, 2007 to the allegations," this is "the final step in demonstrating loss causation from an economic perspective."[285]

199. Even before discussing the various errors and fundamental flaws with Tabak's claims about Plaintiff's Appendix 1, on its face the analysis makes no economic sense.  That is because

---

[280]  Tabak Report, ¶¶21-22.
[281]  Tabak Deposition, pages 278:20-279:11.
[282]  Tabak Report, ¶¶24, 36.
[283]  Tabak Deposition, at 121:9-123:17 and 210:15-211:10.  *See also* Tabak Report Production, "Appendix 1 Replication.xls," worksheet Tab "Plaintiff Exhibit," cells "X:40" and "AF:40" showing the "t-statistic" of Freddie Mac's unadjusted (-13.83) and "Excess" returns (-15.32) compared to the "Average of Companies, excluding Freddie Mac."
[284]  Tabak Report, ¶34.
[285]  Tabak Report, ¶29.

CONFIDENTIAL

the analysis suggests that massive losses at other companies led to positive, not negative, stock price reactions for the securities of those companies.  More specifically, the analysis purportedly examines stock price reactions following various company announcements of "massive losses" and write-downs ranging from $247 million to $18.1 billion.[286]  In the version of Plaintiff's Appendix 1 Tabak claims he corrected,[287] the analysis of the 14 Purported Comparable Disclosure Dates shows overall average **positive** returns (excluding Freddie Mac) on the "Day of Disclosure" **of 2.14%,** and **0.10%** (also excluding the AMBAC date, which he erroneously calls a "positive outlier"[288]).

200. This computation, taken at face value suggests that investors did not react **negatively** to news of "massive" write-downs and losses of up to $18.1 billion.[289]  Even ignoring the fact that this result is driven by basic factual and computational errors, how would a finding that says that massive losses and write-downs by financial firms during the financial crisis did not result in significant stock price drops support the Plaintiff's claim that Freddie Mac's announcement of losses on November 20th somehow were driven by material undisclosed risks?  Regardless, the anomalous results of this "analysis" should have led Tabak to inquire further.

201. As I show below, there are numerous basic errors in Tabak's analysis and the

---

[286]  *See* Plaintiff's Appendix 1 to Memorandum in Opposition to Defendants' Motion to Dismiss the First Amended Complaint, Oct. 16, 2008 (columns titled "LOSS" and "WRITEDOWN").

[287]  Tabak Report, page 8, footnote 9. ("While I rely on information in the record for my analyses in this report, I have found some potential errors in the analysis. Redoing the analysis with alternative data does not qualitatively affect the analyses presented here and, in fact, results in a larger gap between Freddie Mac's one-day raw price movement and the most negative raw price movement related to the other fourteen announcements.").  I received Tabak's supporting datafiles and I understand the Excel file "Appendix 1 Replication.xlsx," worksheet Tabs "Plaintiff Exhibit" and "Plaintiff Exhibit (Priors)" represent Tabak's purported correction of Plaintiff's original analysis.

[288]  Tabak Report, ¶22. (emphasis added). I note below that this claim is erroneous as Tabak included AMBAC's January 22, 2008 announcement of a $3.2 billion quarterly net income loss as one of the 14 Purported Comparable Disclosure Dates when AMBAC's price <u>increased 28.6%</u> but ignored AMBAC's disclosure from six days earlier (January 16, 2008) when AMBAC warned it would report loss for the same quarter of $3.5 billion and AMBAC's price <u>fell 39%</u>.

[289]  Even the average "excess" returns in Tabak's purportedly corrected Plaintiff's Appendix 1 are overall positive, 2.49% excluding Freddie Mac, and 0.66% excluding Freddie Mac and AMBAC. *See* Tabak Report Production, "Appendix 1 Replication.xlsx," worksheet Tabs "Plaintiff Exhibit" and "Plaintiff Exhibit (Priors)."

CONFIDENTIAL

purported similar events are not similar in any way so Tabak cannot draw any conclusions from his comparison of Freddie Mac's November 20 price decline with these 14 announcements.

### a. Correcting only two of Tabak's errors undermines his conclusion

202. As I explain below, correcting only two of Tabak's errors in his adoption of Plaintiff's Appendix 1 invalidates his conclusion.

203. <u>First</u>, while purportedly making corrections to Plaintiff's original Appendix 1, Tabak made new errors that severely bias his results.  Tabak claims that "[w]hile I rely on information in the record for my analyses in this report, I have found some potential errors in the analysis. Redoing the analysis with alternative data does not qualitatively affect the analyses presented here and, in fact, results in a **<u>larger</u>** gap between Freddie Mac's one-day raw price movement and the most negative raw price movement related to the other fourteen announcements."[290]  But whatever errors Tabak found and fixed, he made new serious errors in the numbers that he purportedly corrected.

204. According to Plaintiff's original Appendix 1, Washington Mutual had a disclosure related to a write-down of $1.6 billion on December 10, 2007 and its stock price declined 2% on that day. My examination of Plaintiff's Appendix 1 and the economic evidence shows this was both an incorrect announcement date and an incorrect stock price change.

205. After trading hours on December 10, 2007, Washington Mutual issued a press release announcing a "series of actions designed to address the unprecedented challenges in the mortgage and credit markets by strengthening the company's capital and liquidity."[291]  Since the press release was published after trading hours on December 10, 2007, the correct date to analyze the

---

[290] Tabak Report, page 8, footnote 9. (underline added)
[291] *Business Wire*, "WaMu to Raise $2.5 Billion in Additional Capital, Reduce Dividend, Resize Home Loans Business and Cut Expenses to Fortify Capital Base; * Expects Net Loss for Fourth Quarter 2007 With Non-cash Writedown of Home Loans Segment Goodwill * Non-cash Writedown Will Not Affect Key Capital Ratios or Liquidity," December 10, 2007, 16:04.

stock price reaction to the information released by Washington Mutual is December 11, 2007. Tabak agrees.  He changed the "disclosure day" event to December 11, 2007 in his purported corrected analysis.[292]

206. Washington Mutual's share price declined 12.4% on December 11,[293] but Plaintiff's original Appendix 1 shows a decline of 6.6% on December 11, 2007.  Tabak also appears to agree that the price change was incorrect, however, in his purportedly corrected version of Appendix 1, he introduced an additional error claiming Washington Mutual's price <u>increased by 2.9%, instead of a decline of 12.4%</u>. (I refer to this error hereafter as the "Tabak WaMu Price Error")[294]

207. Tabak also makes another fundamental error in analyzing Washington Mutual's December 11, 2007 disclosure and comparing it to Freddie Mac.  The purpose of Tabak's adoption of Plaintiff's Appendix 1 was also to compare "**similar announcements**" to Freddie Mac's November 20, 2007 alleged corrective disclosure.  On December 10 (after hours), Washington Mutual, like Freddie Mac on November 20, 2007, announced quarterly losses and that "to address the unprecedented challenges in the mortgage and credit markets" it was issuing preferred shares and cutting its dividend.  However, Tabak ignored that when Washington Mutual announced that it raised and priced $2.9 billion in preferred shares, the stock price declined another 7.8%.[295]  Thus, taking full account of Washington Mutual's stock price decline over the two dates of inter-related announcements about financial losses and raising capital, the stock price declined by approximately 19% [ = (1.19 x 1.078) -1 ].

208. A more appropriate comparison to Freddie Mac would have been to acknowledge this

---

[292]  *See* Tabak Report Production, "Appendix 1 Replication.xlsx," worksheet Tabs "Plaintiff Exhibit" and "Plaintiff Exhibit (Priors)".

[293]  Stock prices from CRSP.  Plaintiffs' Appendix 1 shows the incorrect price of $18.65 for December 10, 2007. *See also*, *The News Tribune*, "Washington Mutual Stock Price Sinks 12.4 Percent on Bad News," December 12, 2007.

[294]  Tabak's replication incorrectly shows that Washington Mutual's stock price increased from $18.59 on December 10, 2007 to $19.13 on December 11, 2007.  *See* Tabak Report Production, Appendix 1 Replication.xls, tab "Plaintiff Exhibit," row 20.

[295]  *Reuters News*, "UPDATE 2- WaMu Prices $2.9 Bln of Convertible Shrs," December 12, 2007.

two-day 19% decline and compare it to Freddie Mac's price reaction on November 20, 27, 28, and 30, 2007, as discussed above in Section V which included Freddie Mac's quarterly losses, dividend cut and raising/pricing of $6 billion in preferred shares.  <u>Over this period Freddie Mac's price declined by only 0.75%[296] compared to Washington Mutual's decline of 19%</u>.  Similarly, my analysis discussed above in Section V.E and Appendix 4, shows that Freddie Mac's "excess" return, i.e., the return after controlling for market-wide and other factors, over this period was -2.8%, while Plaintiff's Appendix 1 shows Washington Mutual's excess return (after correcting the Washington Mutual error's, both the old and the new Tabak errors) was -13.8%.[297]  Clearly, comparing Freddie Mac to Washington Mutual provides no basis to conclude that Freddie Mac's price reaction was material, as Tabak incorrectly argues.

209. <u>Second</u>, in addition to making new errors and improper comparisons, Tabak failed to correct other serious errors in the old analysis.  According to Plaintiff's Appendix 1 and Tabak's "corrected" version, AMBAC Financial made a disclosure related to a loss of $3.3 billion on January 22, 2008 and its stock price **increased** 28.6%.  Tabak included this increase, though he recognized it as an outlier. But this computation is nonsensical because it ignores AMBAC's related disclosure from six days earlier (January 16, 2008) when AMBAC warned it would report a loss for the same quarter of $3.5 billion and AMBAC's **price fell 39%**.[298]  The next day, AMBAC's **price fell another 52%** when Moody's Investors Service put the company on review for a possible downgrade.[299]  Thus if Tabak had included the effect of these announcements in their entirety, they would show a total decline of about 62% ("Tabak AMBAC Event Error").[300]

---

[296] *See* Figure 7B. Freddie Mac's market capitalization declined by $7.118 billion on November 20 and increased by $6.933 billion on November 27, 28, and 30, 2007, a decline of $0.185 billion. This $0.185 billion decline across the four dates represents a 0.75% decline from Freddie Mac's market capitalization of $24.808 billion as of market close on November 19, 2007.

[297] My corrections to Tabak's purportedly corrected Plaintiff's Appendix 1 are included with this report as electronic work files.

[298] *Dow Jones News Service,* "UPDATE: Ambac to Raise $1B In Capital, Sees Big 4Q Losses," January 16, 2008.

[299] *Dow Jones News Service,* "AMBAC Comments on Recent Moody's Report," January 17, 2008.

[300] $-0.62 = [(1 - 0.39) * (1 - 0.52) * (1 + 0.286)] - 1$

210. Tabak's claim that because "Freddie Mac's stock-price decline was <u>over three times as large as that of the next-largest decline,</u>" "[t]he market was reacting to something that distinguished Freddie Mac from the other companies" and "[t]his demonstrates that the news that mattered to the market [released by Freddie Mac] was company-specific"[301] has no basis because "<u>Freddie Mac's stock-price decline was</u>" clearly not "<u>over three times as large as that of the next-largest decline.</u>"  Moreover, using the correct Freddie Mac reaction period to the alleged corrective information, i.e., on November 20, 27, 28, and 30, 2007, shows that Freddie Mac's price reaction of -0.75% was not even as "large" as the corrected "Average of Companies, excluding Freddie Mac" of -2.5% in Tabak's adoption of Plaintiff's Appendix 1 (correcting the Tabak WaMu Price Error and the Tabak AMBAC Event Error in addition to other price and return data errors), let alone "over three times as large."[302]

### b. Plaintiff's Appendix 1 is not a properly conducted "event study" because the event selection makes no sense.

211. In adopting Plaintiff's Appendix 1, Tabak claims to rely on "event study literature" that "looks at what happens when there are similar announcements by different companies at different points in time."[303]  Tabak has not explained why these companies or their announcements are in any way comparable to the alleged disclosures by Freddie Mac on November 20, 2007.[304]

212. Thus, Tabak compares the stock price reaction on the 14 Purported Comparable Disclosures to Freddie Mac's November 20, 2007 alleged corrective disclosure, but he has not determined why these 14 Purported Comparable Disclosures are at all comparable (beyond superficially and misleadingly claiming in his deposition that Defendants selected these dates as comparable in a legal brief, which is not true as Defendants simply used the announcements to

---

[301] Tabak Report, ¶¶24, 36.
[302] *See* Exhibit 6.
[303] Tabak Deposition, at 278:20-279:11.
[304] In deposition testimony, Tabak acknowledges that the company announcements were selected by Defendants' counsel and that the purpose of this analysis was not an event study as implemented by Plaintiff and adopted by Tabak. Tabak Deposition, at 229:18-22.

CONFIDENTIAL

argue that other financial firms were announcing real estate market and financial crisis related losses in the second half of 2007, which is of course true.)

213. Nevertheless, Tabak argues that "No matter what adjustments are made for market movements, Freddie Mac's stock-price decline will be an outlier compared to the other stock-price movements. For example, the most negative of the other first-day stock-price movements listed in Plaintiff's Appendix 1 was -8.53%. Freddie Mac's decline of 28.69% was thus over three times as large as that of the most negative of the other stock-price movements, which would make it a statistically significant outlier."[305] Of course, his computation of returns and selection of event dates was incorrect in crucial instances and this comparison is therefore incorrect.

214. In his deposition, Tabak confirmed that he did not do any analysis to compare the eight companies to Freddie Mac.[306] One indication that the eight companies may not be comparable to one another or to Freddie Mac is that Appendix 1 presents "excess returns" using three different industry indices.[307]  In addition, Tabak confirmed that only one company, Ambac, invested solely in the mortgage markets like Freddie Mac and that the others had "broader portfolio and activities."[308]  These other diversified companies would not be as adversely affected by an unprecedented downturn in the overall mortgage finance industry as compared to Freddie Mac, a monoline company invested only in the secondary mortgage market.  Though he did not do an analysis comparing the companies to Freddie Mac, he admitted that this comparability analysis is "certainly something you would want to consider if you were actually doing this for purposes of quantifying the difference."[309]  But that is exactly what he did here when he compared the average price change on this sample of announcements to Freddie Mac's stock price change, "quantifying the difference" to analyze statistical significance.

---

[305]  Tabak Report, ¶23.
[306]  Tabak Deposition, at 229:9-12.
[307]  *See* Plaintiff's Appendix 1, column "Industry Index Used." The Industry Index Used is described as a "representative industry index."
[308]  Tabak Deposition, at 231:15-232:3.
[309]  Tabak Deposition, at 232:4-18.

CONFIDENTIAL

215. Tabak's flawed event selection methodology is also evidenced by the fact that he also simply ignored the drop in stock price of Fannie Mae, Freddie Mac's "principal competitor,"[310] which he agreed is "the most similar to Freddie Mac in terms of its business,"[311] on the very same day, November 20, 2007.[312]  Fannie Mae's stock price fell 24.8% on November 20, 2007, even though Fannie Mae did not make any unexpected material announcement on that day.[313]  It is not clear to me how Tabak can conclude "that the news that mattered to the market was company-specific," when the price of Freddie Mac's principal competitor also declined specifically on the same day.

216. Given that both companies, Freddie Mac and Fannie Mae are GSEs, regulatory pressures affects both companies to the same degree.  The fact that the Fannie Mae stock price dropped on November 20, 2007 suggests that at least part of the Freddie Mac stock price drop was to regulatory and other issues that were endemic to the GSE business model.

### c. Plaintiff's Appendix 1 is not a properly conducted "event study" because the events were not properly analyzed, or even analyzed at all.

217. In addition to a flawed comparable company and event selection methodology, Tabak's analysis (or lack thereof) of the information released on the "events" is incomplete and wrong.  A fundamental part of an event study is to analyze the information released to determine whether it is new, value-relevant information on each date and whether there is other information that could have impacted the stock price on each date.  Tabak admits that he has done no such

---

[310]  Freddie Mac considers Fannie Mae as one of its principal competitors.  In its 2006 Annual Report, Freddie Mac states that "[o]ur principal competitors are the Federal National Mortgage Association, or Fannie Mae, a similarly chartered government-sponsored enterprise, or GSE, the Federal Home Loan Banks and other financial institutions that retain or securitize mortgages, such as commercial and investment banks, dealers and thrift institutions." And as "a result, we mainly compete for funds in the debt issuance markets with Fannie Mae and the Federal Home Loan Banks, which issue debt securities of comparable quality and ratings." Freddie Mac, 2006 Annual Report, pages 3-4.

[311]  Tabak Deposition, at 227:7-11.

[312]  Tabak Deposition, at 227:7-15.

[313]  Stock prices from CRSP.

analysis of the 14 Purported Comparable Disclosure Dates and thus cannot make any inferences about the stock price change on any of the dates. In his deposition testimony, Tabak confirmed that he did not look at all the news for each company and that he does not know if there was confounding information.[314]

218. One example of how this flawed event information analysis skews the results of his analysis is the example of AMBAC discussed above. Proper identification of the earlier loss announcement event would have identified a 39% decline, not a 28.6% increase as is claimed in Plaintiff's Appendix 1 (and Tabak's purported correction of Plaintiff's Appendix 1). Another example is the selection of CIBC's January 14, 2008 announcement when CIBC's stock price declined 2.14%. This ignores CIBC's earlier disclosure on December 6, 2007 when CIBC disclosed for the first time its $9.3 billion in subprime-RMBS backed CDO exposure hedged with monoline insurers and announced additional RMBS/CDO related losses for its unhedged portfolio.[315] CIBC's stock price declined 5.63% on December 6, 2007 which Tabak ignored.

### d. Tabak claims Plaintiff's Appendix 1 shows the Freddie Mac "news that mattered to the market [on November 20, 2007] was company-specific," but did not even examine the "news."

219. Tabak states that "the analysis of the stock-price changes for Freddie Mac and the other fourteen disclosures by other financial institutions," "demonstrates that the ultimate result of the alleged misrepresentations and omissions were economically meaningful when disclosed" and "that the news that mattered to the market was company-specific."[316]

220. But, Tabak could not have established that the "news that mattered to the market [on November 20, 2007] was company-specific" for an obviously simple reason that, as I have discussed above, Tabak admitted that he did not even review, let alone analyze the disclosure made

---

[314] Tabak Deposition, at 228:6-21.
[315] See Canadian Imperial Bank of Commerce, Form 6-K, December 6, 2007.
[316] Tabak Report, ¶36.

CONFIDENTIAL

by Freddie Mac on November 20, 2007.  In his deposition, Tabak confirms that he had not seen Freddie Mac's Information Statement Supplement dated November 20, 2007 before his deposition and that he did not rely on the disclosure for any of his opinions.[317]  In his deposition, Tabak also confirmed that he had not seen Freddie Mac's press release dated November 20, 2007 nor the presentation with financial results also dated November 20, 2007.[318]

221. In short, contrary to Tabak's claims, his adoption and interpretation of Plaintiff's Appendix 1 proves nothing about the materiality of Freddie Mac's November 20, 2007 alleged corrective disclosures or loss causation.

## E. The Tabak Lottery Ticket Hypothetical is misplaced and proves nothing.

222. The TAC alleges that the November 20, 2007 declines are "directly attributable to the market's reaction to revelations of the nature, extent and impact of the fraud at Freddie Mac."[319] This Court, based in part on my earlier testimony concluded "the alleged misstatements … did not impact Freddie Mac's stock price."[320]  Tabak has not offered any economic evidence to claim that the Court's conclusion was incorrect. However, he proffers an "oversimplification"[321] of a story about a company's losses on hidden "lottery tickets" and then claims an application of this hypothetical example to "this matter" helps "illustrate how [loss causation] works from an economic perspective."[322] It does not.

223. The Tabak Lottery Ticket Hypothetical assumes that a company "spends its entire cash holdings on lottery tickets, holds onto those lottery tickets for several quarters, and then all of the tickets come up losers [and] that as part of its next earnings announcement after the lottery tickets are revealed to be losers, the company announces unexpectedly poor earnings that it

---

317 Tabak Deposition, at 203:4-24.
318 Tabak Deposition, at 201:24-202:10 and 204:13-205:7.
319 TAC, ¶271.
320 Class Certification Opinion, page 36.
321 Tabak Deposition, at 180:10-13.
322 Tabak Report, ¶9.

CONFIDENTIAL

attributes to higher-than-expected costs but does not disclose that those costs were due to the purchase of lottery tickets."[323]   Tabak assumes that somehow the market reacted to corrective disclosures alleged by the Plaintiff even without knowing what was corrective on that day and assumes the market ultimately learned of the truth years later, by which time the market realized that its reaction to the hidden truth years earlier, while uniformed, was somehow correct and no further price reaction was therefore observed then.[324] As I discuss below, his example is misleading and does not apply to the facts of this case.

224. There are three main flaws with Tabak's "lottery ticket" hypothetical.

225. First, the Tabak Lottery Ticket Hypothetical assumes that "a company secretly spends its entire cash holdings on lottery tickets."[325]   Thus, the hypothetical example assumes that a company replaces a risk-less or risk-free asset (an asset with virtually no uncertainty in value) like cash with a risky asset like lottery tickets (an asset with uncertainty in value).   However, as I understand the allegations in this case, Plaintiff alleges that Freddie Mac held more "subprime" mortgages than mortgages with other characteristics.   All mortgages are assets that are accompanied by credit risk.   As a result, comparing the purchase of one mortgage versus a mortgage with credit characteristics indicating more risk cannot be fairly analogized to purchasing risk-free cash versus lottery tickets.  For this reason, Tabak readily admitted at his deposition that his hypothetical was an "oversimplification."[326]

226. The hypothetical example also assumes that "When the lottery tickets turned out to be losers, the risk materialized. Then, when the company disclosed that realization, in the form of lower earnings, its stock price fell."[327]   Since all types of mortgages are considered assets accompanied by risk, with values that are uncertain in the future, an announcement of lower

---

[323]   Tabak Report, ¶10.
[324]   Tabak Report, ¶¶17-18.
[325]   Tabak Report, ¶10.
[326]   Tabak Deposition, page 180.
[327]   Tabak Report, ¶11.

CONFIDENTIAL

earnings could be due to a change in the value of the allegedly undisclosed credit risk, disclosed credit risk or any other type of realization of risk. Tabak has not done any analysis to distinguish whether the stock price decline on November 20, 2007 was due to an earnings loss related to the different types of mortgages that Freddie Mac held. Thus, the hypothetical essentially assumes the conclusion. It is Tabak's assignment to determine whether undisclosed risk caused Plaintiff's alleged losses. Instead, he assumes it.

227. Second, the lottery ticket hypothetical example assumes "no mention of lottery tickets had ever been made."[328] This assumption is not applicable to this case because, as I detailed in Section IV above, Freddie Mac clearly disclosed extensive details about its exposure to the so-called "lottery tickets" in Tabak's example. In other words, Freddie Mac disclosed information on the credit characteristics of all loans in its guarantee portfolio, and it even disclosed information relating to the "non-traditional" loans it had purchased. In his deposition, Tabak confirmed that he did not review Freddie Mac's disclosures during the Relevant Period and as such he is not aware of Freddie Mac's disclosures.[329] As a result, Tabak has no basis for opining on whether disclosed risk or undisclosed risk caused any alleged losses.

228. Third, Tabak's lottery example assumes that the stock price decline on November 20, 2007 "was due solely to the losses on those lottery tickets."[330] As I discuss below, Freddie Mac disclosed several pieces of information on November 20, 2007, many of which are unrelated to Plaintiff's allegations. Tabak states that "[a]t this point, I have seen no additional "confounding" (i.e., unrelated to the allegations) information on that date that would require a disaggregation of the price reaction into a portion unrelated to the allegations." It is not clear how Tabak has determined this since he has not read, let alone analyzed, Freddie Mac's disclosures.

229. Given the foregoing, Tabak's counterfactual story about hypothetical lottery tickets is

---

[328] Tabak Report, ¶17.
[329] Tabak Deposition, at 185:4-199:10.
[330] Tabak Report, ¶17.

CONFIDENTIAL

misplaced and proves nothing.

### F. Tabak's loss causation opinion is circular and he assumes his conclusion

230. Overall, even putting aside the above fundamental shortcomings, Tabak's entire opinion on loss causation and materiality is unsubstantiated and he has done nothing more than assume his conclusions.

231. Tabak assumes liability, i.e., that the allegations of misrepresentations concealing exposure to subprime and non-traditional, higher-risk mortgages and other risks (i.e., the alleged "disclosure defects") are true.[331] Tabak does not opine that he disagrees with the Court's finding that there was no price impact of the alleged disclosure defects on the "front-end"[332] when inflation allegedly came into Freddie Mac's stock. On the "back-end"[333] he also does not opine that he disagrees with the Court's finding that there was no price impact, and assumes that the "truth" regarding the alleged disclosure defects was revealed on November 20, 2007 when the concealed risks materialized, and the stock price fell in excess of market or industry-wide factors. He also assumes that confounding information revealed on November 20, 2007 if it existed, did not explain 100% of the price decline, even though he admits he did no calculations "to determine how much any confounding information contributed to plaintiffs' alleged losses" and admits he would need to do a disaggregation of confounding and allegation-related news to reach a "final opinion" on loss causation.[334] He further admits he made no attempt to distinguish between the materialization of known risks and materialization of unknown risks related to the allegations that were disclosed on November 20, 2007 and that the materialization of known risks could have caused the losses.[335]

---

[331] Tabak Report, ¶29 and Tabak Deposition, at 46:11-47:23.
[332] Tabak Report, ¶1.
[333] Tabak Report, ¶1.
[334] Tabak Deposition, at 53:25-54:5 and 66:8-12.
[335] Tabak Deposition, at 167:23-168:4 ("And did you make any effort to identify the quantum of stock price decline here attributable to disclosed risk as opposed to the materialization of undisclosed risk? A. No, I did not.").

CONFIDENTIAL

He provides no analysis to establish his conjecture that Freddie Mac's stock price reaction on November 20, 2007 actually reacted to the alleged disclosure defects other than assuming Plaintiff's allegations are true.

232. Tabak is thus assuming, with no analysis, that the excess return on November 20, 2007 is not sufficiently explained by (a) confounding factors unrelated to the allegations (like the unprecedented real estate and financial market turmoil and Freddie Mac's non-mortgage related losses) and (b) the materialization of disclosed risks related to the allegations.  Hence, Tabak simply assumed his loss causation and materiality conclusions.

## VII. Tabak fails to offer an opinion on the amount of damages

233. Tabak says he was not asked to calculate, and has not calculated, damages in this case.[336]  In his own words, he was asked by Plaintiff's counsel "not to actually offer a damages analysis but simply basically to state whether such an analysis would be possible."[337]  I am not in a position to comment on his opinion on the amount of damages in this case or his calculation of damages, because he has not offered an opinion on the amount of damages and has not calculated damages.  I reserve any rights to comment on any damages opinion or calculation that he is hereafter allowed to offer.

## VIII. Shapiro 's opinions are based on insufficient facts, are not based on a reliable methodology, and to the extent a methodology was employed, he applied it in an unreliable manner.

234. Plaintiff's second expert, Shapiro, offers three main opinions: 1) "Credit risk, underwriting, and the related factor of economic capital were three of the primary categories of Freddie Mac information that were important to me as a financial analyst in assessing Freddie Mac's financial health;" 2) "Information I have learned since November 20, 2007, regarding those

---

[336]   Tabak Deposition, at 92:10-16, 99:22-100:5, and 101:9-15.
[337]   Tabak Deposition, at 283:17-20.

CONFIDENTIAL

three topics with respect to Freddie Mac would have dramatically changed my analysis of Freddie Mac's financial health;" and 3) "Information disclosed on November 20, 2007, helped to clarify that credit risk and economic capital issues played a role in the loss that occurred on that date (and that credit risk would likely cause large losses going forward)." [338]

235. The first opinion is his personal view about what he thinks is important.  I note that Shapiro was an equity analyst who published analyst reports relating to Freddie Mac during the Relevant Period.  While it is not clear from his analyst reports that these were in fact the subject that he thought were important (I note that he wrote little about underwriting), Shapiro has offered no methodology to identify what he regarded as important other than his own "say so."  As I discuss above, during the Relevant Period, Freddie Mac disclosed information on these three subject matters in its periodic reports, earnings calls and presentations and was required to submit weekly reports on its capital position to its regulator.

236. The second and third opinion seem to be offering an opinion that the alleged misstatements impacted Freddie Mac's stock price and were material. Shapiro implicitly opines on materiality without discussing materiality per se when he states that "[i]nformation I have learned since November 20, 2007, regarding [credit risk, underwriting and economic capital] with respect to Freddie Mac would have dramatically changed my analysis of Freddie Mac's financial health during the [Relevant Period] …. My reports for Fox-Pitt leading up to November 20, 2007, generally put Freddie Mac stock ratings at a positive 'outperform.' This would have changed to 'underperform' if prior to November 20, 2007, I had known Freddie Mac's true financial status with respect to credit risk, underwriting and economic capital during the Relevant Period."[339]

237. Shapiro does not provide recognized or reliable methodology or analysis to support his second and third opinions. He does not provide any evidence to indicate how the alleged concealed information revealed on November 20, 2007 would have changed his "analysis of

---

[338]  Shapiro Report, ¶3.
[339]  Shapiro Report, ¶3.

CONFIDENTIAL

Freddie Mac's financial health." For example, Shapiro mentions a "default model" he created around the Relevant Period based on "data from the rating agencies to develop assumptions for frequency of default and loss severity," "to better understand [Freddie Mac's] credit risk" in its single family guarantee portfolio.[340] He claims that the information that was concealed by Freddie Mac about its true exposure to Subprime-like, Alt-A, and other nontraditional mortgage loans "would have changed my contemporaneous analysis of the Company's financial health, the credit risk model I developed and my forecast of the Company's gross earnings."[341]  However, Shapiro does not provide the model nor does he provide any details about its assumptions or how the model worked, and hence his opinion cannot be analyzed or rebutted.  He also did not recreate his model or run any analysis on it as a basis for his opinions.  Again, his opinions in this regard are simply his say so.

238. In addition, Shapiro states that the credit risk model he developed "worked only in the context of a 'traditional' mortgage portfolio."[342] As I discuss above, Freddie Mac disclosed its increased exposure to non-traditional mortgages as these types of mortgages became more prevalent in the marketplace, and it also disclosed that it expected "these products to default more often than traditional products and we consider this when determining our credit and guarantee fees."[343]  Thus, this suggests that Shapiro did not change his credit model even though he knew, or should have known, that Freddie Mac was increasing its purchase of non-traditional mortgages.

239. Shapiro's opinions also appear to be based on incorrect and speculative statements about what he could have known at the time. In writing about his model, he claims:

> That model, however, worked only in the context of a "traditional" mortgage portfolio" and "[w]hat I did not know during the Relevant Period was the extent to which Freddie Mac was guaranteeing and/or purchasing non-traditional loans such as _reduced documentation loans, Bulk Alt-A loans_, caution loans (including C1, C2 and EA loans), risk-layered loans (including low/no doc with FICO <=

---

[340]  Shapiro Report, ¶¶19-21.
[341]  Shapiro Report, ¶32.
[342]  Shapiro Report, ¶21.
[343]  Freddie Mac 2006 Annual Report, page 24.

*680, <u>TLTV>90 and FICO<= 620</u>, DU EA1, EA2 & DU EA3), <u>interest-only and option arm loans.</u>[344]*

240. I cannot know what Shapiro did or did not know at the time, but Freddie Mac made extensive disclosures about its intentions to increase exposure to nontraditional mortgages, and then detailed disclosures about that exposure, including purchases of reduced documentation, or Alt-A loans, loans with TLTV>90 and FICO<620, interest-only, and option ARM loans.  As an example, on August 30, 2007 as part of Freddie Mac's Q2 2007 financial release, Freddie Mac detailed that 8%, or about $125 billion of its $1.56 trillion single family guarantee portfolio pertained to "interest-only" loans, and about 1%, or $16 billion pertained to Option ARMs.[345]  In addition, in that financial release Freddie Mac also disclosed the proportion of single family mortgage portfolio that had "FICO<620," and "Original LTV > 90%"  which is exactly what Shapiro states he "did not know" during the Relevant Period.

241. Shapiro's second and third opinions appear to be based in part on his effort to contrast external, public statements with what he terms "contemporaneous internal assessments." [346] To the extent this effort is a basis for his opinions on materiality and loss causation, it is flawed in numerous respects.

242. First, Shapiro has not considered sufficient evidence.  As discussed below, it appears that he cherry-picked quotes from documents provided to him by Plaintiff's counsel, while ignoring quotes in those same documents that were not consistent with his desired conclusions.

243. Second, Shapiro failed to consider sufficient evidence because he did not review deposition transcripts that related to the statements that he was considering.  Of the dozens of transcripts of testimony taken in this case and related matters, Shapiro reviewed a single transcript.[347]  He was not even aware that there were dozens of transcripts of witness testimony

---

[344]  Shapiro Report, ¶21. (emphasis added).
[345]  Freddie Mac Q2 2007 Information Supplement.
[346]  Shapiro Report, ¶39.
[347]  Deposition of Howard Shapiro, January 10, 2024 ("Shapiro Deposition – January"), at 432:25-433:10.  *See also* Shapiro Report, Materials Considered Exhibit.

CONFIDENTIAL

relating to this matter.[348]

244. Third, when confronted with deposition testimony that contradicted his opinions, he dismissed all testimony as unreliable, based on his speculation that it was the result of "coaching" by legal counsel and rendered less relevant due to the passage of time.[349]

245. Fourth, Shapiro sometimes contrasted external statements with internal assessments that did not even address the same subject of the external statements, let alone contradict them.[350]

246. Fifth, Shapiro's approach to contrasting external statements with internal assessments did not focus on "contemporaneous" internal assessments.  On their face, Exhibits 3 and 4 of his report contrast public statements with internal statements that are not contemporaneous, but rather many months and sometimes years apart.  At deposition, Shapiro testified that by "contemporaneous" he meant only during the approximately 16-month long Relevant Period.[351] Even that is not true, as the Exhibits reference documents outside the Relevant Period.[352]

247. Sixth, Shapiro reached conclusions that are not supported by the evidence he cites. For example, Shapiro stated in his report: "Indeed, Freddie Mac internally reported that these loans were defaulting more quickly and in greater numbers than even regular subprime loans, which generally default about 8x more than traditional 30-year fixed rate mortgages."[353]  His support for that statement was a May 2007 Credit Risk Monitoring Report.[354] In fact, as he admitted at deposition, that document did not support that fact, but rather the unremarkable proposition that Freddie Mac's loans that had higher risk defaulted more frequently than its overall book of loans.[355]

248. Seventh, Shapiro testified that he assumed that all contemporaneous internal

---

[348] Shapiro Deposition – January, at 616:19-23.
[349] Shapiro Deposition – January, at 616:19-23, at 616:24-618:8.
[350] *See* Shapiro Report, Exhibits 3, 4.
[351] Shapiro Deposition – January, at 601:6-602:3.
[352] Shapiro Deposition – January, at 602:15-21.
[353] Shapiro Report, ¶31.
[354] Shapiro Report, ¶31.
[355] Shapiro Deposition – January, at 444:18-445:23.

CONFIDENTIAL

assessments were true,[356] but he conveniently abandoned that assumption, as discussed in the paragraph below, when he encountered contemporaneous internal assessments inconsistent with his conclusions.

249. Eighth, Shapiro ignored documentary evidence that was inconsistent with his desired conclusions, even when his limited review of documents still resulted in his exposure to these facts. For example, he cited a presentation to Freddie Mac's Board of Directors in an effort to suggest that Freddie Mac purchased subprime loans, but that very board presentation included numerous statements that were consistent with Freddie Mac's public statements, including that "[o]ur involvement to date has been buying AAA tranches of others' securitizations" and "[w]e participate in subprime by buying AAA bonds in the retained portfolio."[357]  Shapiro ignored these facts, speculating at his deposition that the board was being misled by management.[358]  Likewise, the May 2007 Credit Risk Monitoring Report that Shapiro miscited, as described above, contained the statement that "Currently, no subprime loans are within the single family portfolio" on the exact page that Shapiro cited, and yet he ignored that statement as well.[359]  Even though that statement is consistent with Defendant Syron's external statement that "there are basically no subprime loans in the [guaranteed] portfolio," Shapiro ignored the consistent internal documentary evidence, testifying that it was simply a mistake.

250. Moreover, Shapiro's opinions are not consistent with his analyst reports and participation during earnings calls. On October 24, 2007 a Fox-Pitt Kelton analyst report published by Shapiro forecasted Q3 2007 losses that were similar to the actual mark-to-market losses disclosed by Freddie Mac on the alleged disclosure date, November 20, 2007.  The report states that: "[b]ased on data released today by FRE, we now estimate that the company will report a large

---

[356]  Shapiro Deposition – January, at 497:22-25.
[357]  Shapiro Deposition – January, at 498:5-17; 501:21-5-2:16.
[358]  Shapiro Deposition – January, at 498:5-17; 501:21-5-2:16.  *See also* Shapiro Deposition – January, at 507:12-508:19.
[359]  Shapiro Deposition – January, at 518:13-519:15.

CONFIDENTIAL

GAAP loss of around ($1.6 b), or around ($2.45) per share, in the 3rd quarter due to mark-to-mark changes in excess of $3 b on its interest rate derivative hedges and on its credit exposure. We stress that given the extreme volatility during Q3 that we have less confidence than normal in our estimates."[360]  In the same report, Shapiro writes about Freddie Mac's capital position, stating that "FRE ended the second quarter with a $2 b capital surplus on top of its minimum capital requirement and OFHEO surcharge. Yet in today's volume summary release, the company says that sales in its investment portfolio were necessary to maintain its 30% OFHEO-mandated capital surplus, which suggests that its capital surplus declined by over $2 b." Thus, Shapiro seemed to have sufficient information to be able to estimate these mark-to-market losses and Freddie Mac's capital position prior to November 20, 2007.

251. Notably, Shapiro's opinions and related testimony undermine Plaintiff's loss causation allegations.  In the TAC, Plaintiffs alleged "[a]s discussed above, *Freddie Mac's third quarter losses* disclosed on November 20, 2007 showed that Freddie Mac faced a previously non-disclosed yet serious financial risk from its conscious decision to increase its exposure to subprime and nontraditional mortgages."[361]  Likewise, in the Tabak Report, Tabak opined that "[t]he market was reacting to something that distinguished Freddie Mac from the other companies.  Plaintiff argues that this "something" was that *Freddie Mac's losses* were unexpectedly large because Defendants had understated Freddie Mac's exposure to the factors that were affecting the rest of the financial industry."[362]

252. Shapiro was retained by Plaintiff to, among other things, answer the following question: "Freddie Mac reported a loss of $2 billion (or $3.29 per diluted share) on November 20, 2007, and warned of further expected significant losses.  As an analyst, and based upon the information you have reviewed, what major factors contributed to the reported loss?"[363]  At

---

[360] Fox-Pitt Kelton, "Expect Large GAAP Loss In Quarter," October 24 2007.
[361] TAC, ¶135.
[362] Tabak Report, ¶24-25.
[363] Shapiro Report, ¶2.

deposition, Shapiro confirmed that "when Freddie Mac announced a $2 billion GAAP loss" he "was not surprised."[364] Shapiro's lack of surprise at the $2 billion loss Freddie Mac announced on November 20, 2007 contradicts the "materialization of concealed risks" loss causation theory that both the TAC and Plaintiff's other expert, Tabak, espouse. If market analysts were not surprised by Freddie Mac's announced losses, then the $2 billion loss could not have represented the materialization of undisclosed risks.

253. At deposition, Shapiro further stated that, during Freddie Mac's analyst conference calls, he asked questions that he thought were "important at the time [and] that hadn't been covered already."[365] During the analyst call on November 20, 2007, Shapiro's first question was not about credit risk, or underwriting standards, or the $2 billion loss, but rather his first question was on whether Freddie Mac asked OFHEO "for relief on the 30% capital surcharge" since Freddie Mac was proposing to dilute shareholders.[366] The analyst report that Shapiro issued after the November 20, 2007 disclosure also concentrates on Freddie Mac's (and Fannie Mae's) capital position. This confirms, as I state above, that the market was concerned over Freddie Mac's capital position in light of the losses announced on November 20, 2007 for the current and future quarters and current market conditions of illiquidity, volatility, and general deterioration.

254. Illustrating the extent to which no fraud was revealed on November 20, 2007, Shapiro thereafter, in mid-2008, recommended to investors that they buy Freddie Mac stock.[367]

---

[364] Deposition of Howard Shapiro, November 6, 2023, ("Shapiro Deposition - November") at 243:20-25. *See also* Shapiro Deposition - November, at 244:1-23 ("Q. In fact, the announcement of the $2 billion loss on November 20, 2007 was consistent with your prediction from October 24 of ·2007? A. Yes. Q. In fact, you predicted a $1.6 billion loss, right? A. Yes. Q. You write in the last sentence of the first paragraph "We stress that given the extreme volatility during Q3 that we have less confidence than normal in our estimates." Right? A. Yes. Q.·You knew that you might miss the mark to some extent, right? A. Yes. Q.· For that reason you were probably even less surprised it was a $2 billion loss because you knew that you could only have so much confidence in your estimates due to volatility, ·right? A.· Yes.").

[365] Shapiro Deposition - November, at 267:13-16.

[366] Shapiro's first question was "Hi. I just wanted to follow up on David's question and ask you point blank, did you go to OFHEO and ask for relief on the 30% capital surcharge? You are proposing to dilute shareholders, so please don't tell us that it's a question you do not want to answer on a public call." Freddie Mac Q3 2007 Earnings Call. *See also*, Shapiro Deposition - November, at 273:9-274:23.

[367] Fox-Pitt Kelton, "FRE: Now a Revenue Growth Story," May 14, 2008.

CONFIDENTIAL

255. In summary and consistent with my affirmative findings, my review and analysis of Shapiro's opinions shows that Shapiro has not established materiality or loss causation.  Rather, his opinions are based on insufficient facts, lack a basis in a reliable methodology, and to the extent his approach can be considered a methodology, he did not reliably apply it.

## IX. The individual Defendant's trading in Freddie Mac securities was not unusual or suspicious in timing or amount, and their holdings in Freddie Mac securities declined substantially in value over the Relevant Period.

256. I have also been asked by counsel to analyze the individual Defendant's trading records to determine if their trading pattern over the Relevant Period is consistent with allegations that these individual Defendants had a motive to commit fraud.  I am informed by counsel that trading by individual defendants in a company's securities that is unusual or suspicious in timing or amount such that individual defendants benefited from such sales may constitute evidence of motive and opportunity to commit fraud.

257. Upon reviewing the relevant trading records, I conclude that none of the individual Defendants engaged in trading that is unusual or suspicious in timing or amount.  To the contrary, the evidence shows that the individual Defendants' holdings of Freddie Mac securities declined substantially in value over the course of the Relevant Period.

258. Exhibits 7A - 7D detail information from the Form 4 disclosures during the Relevant Period that are publicly available, and Table 2 below shows the summary information of holdings during the same time period.

259. The Table shows that neither Richard Syron, Eugene McQuade, nor Anthony "Buddy" Piszel voluntarily sold any shares of Freddie Mac during the Relevant Period.[368]  Mr.

---

[368]  I understand from counsel that Buddy Piszel did not sell any shares during the proposed class period because he had none to sell, and that this fact was conceded by Plaintiffs.

CONFIDENTIAL

Syron, Ms. Cook, and Mr. McQuade were subject to involuntary, automatic forfeitures of shares "to cover taxes associated with the lapse of restrictions on stock."  Thus, there were no voluntary sales by these individual Defendants in Freddie Mac securities at all, let alone trades that are unusual or suspicious in timing or amount.

260. I do not characterize the disposition of shares that are automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on stock as "sale" of shares.  I understand that the purpose of such transactions, deemed Code F (for "forfeiture"), is different than that of voluntarily selling shares.

261. Patricia Cook, Executive Vice President and Chief Business Officer was the only individual Defendant to sell shares during the Relevant Period, but I understand that she did so pursuant to a pre-arranged Rule 10b5-1 trading plan.  Ms. Cook sold less than 10% of her holdings at the time, 7,105 shares, on January 3, 2007 for $68.20 per share.  This was the only time that Ms. Cook sold shares during the Relevant Period.

262. Table 2 below also shows that the value of Freddie Mac shares held by individual Defendants declined between the beginning and end of the Relevant Period, August 1, 2006 to November 20, 2007.  As of August 1, 2006, Mr. Syron owned over 360,000 Freddie Mac shares worth approximately $21 million.  And, as of November 20, 2007, the Freddie Mac shares held by Mr. Syron increased to approximately 422,000 shares and yet the value of his shares held declined by over $9 million to $11.3 million.

CONFIDENTIAL

**Table 2: Summary of individual Defendants' trading activity in Freddie Mac stock during the Relevant Period**

| | | | Beginning of Relevant Period | | | During Relevant Period | | | End of Relevant Period | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Executive [a] | Position [b] | Shares owned [c] | Price on August 1, 2006 [d] | Price * Shares owned ($mm) [e] | Shares acquired [f] | Shares sold [g] | Shares retained by company [h] | Shares owned [i] | Price on November 20, 2007 [j] | Price * Shares owned ($mm) [k] |
| [1] | Richard F. Syron | Chairman and CEO | 364,171 | $57.53 | $20.95 | 107,824 | - | 50,163 | 421,832 | $26.74 | $11.28 |
| [2] | Patricia L. Cook | Chief Business Officer | 77,587 | $57.53 | $4.46 | 34,642 | 7,105 | 13,488 | 91,636 | $26.74 | $2.45 |
| [3] | Eugene McQuade | President and COO | 209,456 | $57.53 | $12.05 | 71,778 | - | 42,723 | 238,511 | $26.74 | $6.38 |
| [4] | Anthony Piszel | Executive VP and CFO | - | | | 116,553 | - | - | 116,553 | $26.74 | $3.12 |

263. As of August 1, 2006, Ms. Cook owned approximately 78,000 Freddie Mac shares worth about $4.5 million.  And, as of the end of the Relevant Period, the Freddie Mac number of shares held by Ms. Cook increased to approximately 92,000 while the value of those shares declined by $2 million to $2.45 million.  Similarly, the value of the shares held by Mr. McQuade decreased during this time period.  Mr. McQuade held approximately 209,000 shares worth $12 million as of August 1, 2006 and over 238,000 shares worth approximately $6.4 million as of the end of the period.

264. In summary, I do not find any evidence that the individual Defendants engaged in trading in Freddie Mac securities that was unusual or suspicious in timing or amount.  They did not benefit from the alleged fraud during the Relevant Period.  Rather, their holdings in Freddie Mac stock declined substantially over the course of the Relevant Period.

Respectfully submitted,



Mukesh Bajaj, Ph. D

January 19, 2024



## Mukesh Bajaj
Senior Consultant

PhD, Business Administration,
Finance,
University of California, Berkeley

MBA, Business Administration,
University of Texas at Austin

Bachelor of Technology,
Indian Institute of Technology,
Delhi, India

Dr. Mukesh Bajaj is a Senior Consultant in CRA's Finance Practice. He has managed hundreds of consulting assignments involving economic and financial issues. His areas of expertise include: securities fraud, valuation of complex derivatives and intellectual property, insider trading, financial market microstructure, intangible assets, transfer pricing, interests in closely-held firms, warrants, restricted stock and other complex contingent securities, and purchase price allocation studies. He was previously Managing Director and Global Head of the Securities & Finance Practice at Navigant. Prior to that, Dr. Bajaj founded AFE Consulting and served as its President. Dr. Bajaj has also consulted on financial strategy and acquisition analysis.

Dr. Bajaj has testified in various Federal and State Courts, the Superior Court of California, the State Board of Equalization in California, the U.S. Tax Court, arbitrations, mediations and in IRS Appeals proceedings. He has also testified in Canadian and Australian courts, testified in JAMS arbitration and filed an expert report in the International Center for Settlement of Investment Disputes.

In addition to his consulting work, Dr. Bajaj has taught corporate finance, investments, and financial engineering courses in the MBA and Masters in Financial Engineering programs at the Haas School of Business at the University of California at Berkeley. Prior to his consulting practice, He was an assistant professor of finance and business economics at the University of Southern California where he taught undergraduate and graduate courses in finance. Dr. Bajaj is the recipient of several teaching awards and scholastic honors and has published several articles in leading academic and applied journals, such as *The Journal of Finance*, *The Journal of Financial Economics*, *The Journal of Financial Research*, *The Journal of Applied Finance*, *International Economic Review*, *Research in Finance*, and *Research in Law and Economics*.

### Expert Testimony on Record

*In re Synchronoss Technologies, Inc. Securities Litigation*, Civil Action No. 17-2978 (FLW) (LHG) in the United States District Court for the District of New Jersey. Testified in deposition regarding the efficiency of the market for Synchronoss Technologies' stock. Deposition in March 2021.

*In re Teva Securities Litigation*, No. 3:17-cv-00558 (SRU) in the United States District Court of Connecticut. Testified in deposition regarding the efficiency of the market for Teva Pharmaceuticals' ADS, Preferred Shares, and Notes. Deposition in October 2020.

*Wendy C. H. Wellin, as Special Administrator of the Estate of Keith S. Wellin and as Trustee of the Keith S. Wellin Florida Revocable Living Trust u/a/d December 11, 2001, v. Peter J. Wellin, et al.* and related cases, Civil Action Nos. 2:13-cv-01831-DCN, 2:13-cv-03595-DCN, and 2:13-cv-04067-DCN in the United States District Court for the District of South Carolina. Testified in depositions regarding the equivalent value of limited partnership units. Depositions in August 2018 and November 2018.

*The Tulalip Tribes, et al., v. The State of Washington, et al.*, Case No. 2:15-cv-00940 in the United States District Court for the District of Washington. Testified in deposition and at trial regarding the economic and governmental activities of the Tulalip tribe and the State of Washington and Snohomish County, respectively, and the relationship of such activities to sales and other taxes assessed by the State of Washington and Snohomish County. Deposition in July 2017. Trial in May 2018.

*Ohio Public Employees Retirement System, On Behalf of Itself and all Others Similarly Situated, v. Federal Home Loan Mortgage Corporation a/k/a Freddie Mac, Richard F. Syron, Patricia L. Cook, Anthony S. Pizel, and Eugene M. McQuade*, Civil Action No. 4:08-cv-160 in the United States District Court for the Northern District of Ohio, Eastern Division (Youngstown). Testified in depositions and a hearing concerning the efficiency of the market for Freddie Mac's common stock and the economic evidence as it related to the Plaintiff's allegations that alleged misrepresentations and omissions had an impact on the price of Freddie's Mac's stock. Hearing in April 2018. Depositions in January 2013 and September 2017.

*In re Allergan, Inc. Proxy Violation Securities Litigation,* C.A. 14-cv-02004 (N.D. Cal 2014). Testified in deposition on whether the common stock of Allergan Inc. traded in an efficient market during the Class Period and whether damages in the action are subject to a common formula that can be applied Class-wide (December 2016). Also testified in deposition on the economic materiality of alleged non-public information and damages allegedly caused by insider trading on this information (July 2017). Depositions in December 2016 and July 2017.

*OpenGate Capital, LLC, et al., v. Thermo Fisher Scientific Inc.*, Civil No. 13-475-GMS in the United States District Court for the District of Delaware. Testified in deposition regarding damages allegedly caused by claims of fraudulent misrepresentation in connection with the purchase of a division of Thermo Fisher by OpenGate. Deposition in November 2015.

*Continental Industries Group, Inc. v. FTS International Services, LLC, et al.*, Case Nos. 12-CV-05599 and 12-CV-06966 in the United States District Court, Southern District of New York. Testified in deposition and trial on economic damages resulting from the alleged breaches of two supply agreements between the Plaintiff and Defendants. Deposition in October 2014. Trial in October 2015.

*In re: UBS Financial Services, Inc. of Puerto Rico Securities Litigation*, Civil Case No.: 3:12-cv-01663-CCC, United States District Court for the District of Puerto Rico. Testified in deposition on economic issues related to certain Puerto Rico closed-end funds for class certification purposes. Deposition in September 2015.

*In the Matter of the Arbitration between Offshore Exploration and Production LLC, Claimant/Seller, v. Korea National Oil Corporation and Ecopetrol, S.A., Respondents/Purchasers*, ICDR Case No. 50 198 T 00825 1 in the International Centre for Dispute Resolution. Testified in arbitration proceedings on the calculation of prejudgment interest related to payments Claimant/Seller asserted should have been made pursuant to an escrow agreement between Claimant/Seller and Respondents/Purchasers. Arbitration in February 2014.

*Sekisui America Corporation and Sekisui Medical Co., Ltd. v. Richard and Mary Louise Trudel-Hart*, Case No. 12-CIV-03479 in the United States District Court, Southern District of New York. Testified in deposition on damages in an action alleging breach of contract arising out of the sale of a medical diagnostics company. Deposition in September 2013.

*Securities and Exchange Commission v. Manouchehr Moshayedi*, Case No. 12CV-01179-JVS-JPR in the United States District Court for the Central District of California. Testified in deposition regarding allegations by the SEC of insider trading against the founder and former CEO of STEC, a maker of custom memory solutions. Deposition in August 2013.

*In re American International Group, Inc. 2008 Securities Litigation*, Master File No. 08-CV-4772-LTS in the United States District Court, Southern District of New York. Testified in depositions and in an evidentiary hearing on market efficiency at class certification stage in a securities fraud class action alleging that Defendants materially misstated the extent to which AIG had accumulated exposure to the subprime mortgage market through its securities lending program and its credit default swap ("CDS") portfolio. Depositions in November 2011 and March 2012. Evidentiary Hearing in April 2013.

*Securities and Exchange Commission v. Fabrice Tourre*, Case No. 10-CV-3229 (KBF) in the United States District Court, Southern District of New York. Testified in deposition on the economic materiality of the nondisclosure of certain hedge fund positions with respect to a particular synthetic ABS CDO. Deposition in February 2013.

*Cora E. Bennett v. Sprint Nextel Corporation, Gary D. Forsee, Paul N. Saleh and William G. Arendt*, Case No. 09-CV-2122 EFM/KMH in the United States District Court for the District of Kansas. In the class-certification stage of a securities fraud class action, testified in deposition regarding the economic evidence supporting the claim that Sprint bonds traded in efficient markets throughout the Class Period. Deposition in June 2012.

*State of New Jersey, Department of Treasury, Division of Investment, on behalf of Common Pension Fund A. v. Merrill Lynch & Co. and Bank of America Corp.*, Case No. L-3855-09 in the Superior Court of New Jersey. Testified in deposition on the materiality of accounting allegations, loss causation and damages calculations in connection with transactions involving the purchase and subsequent conversion of a convertible preferred security to common stock. Deposition in May 2012.

*In re Richard Kirby v Centro Properties Ltd & Ors* (VID 326 of 2008), *Richard Kirby v Centro Retail Ltd & Ors* (VID 327 of 2008), and *Nicholas Stott v Pricewaterhouse Securities Ltd* (VID 1028 of 2010), in the Federal Court of Australia. In a pair of securities class action disputes in Australia, testified at trial on alleged disclosure deficiencies of two Australian REITs in connection with certain short-term and long-term debts and the effect of those disclosures on the prices of the REITs' two stapled securities, as well as on the condition of the global credit market during the class period. Trial in May 2012.

*In re Lehman Brothers Securities and ERISA Litigation*, Case No. 09-MD-2017 (LAK) in United States District Court, Southern District of New York. Testified in deposition on the market for structured products and the market's general awareness of credit risks associated with structured finance products in the class-certification stage of a securities fraud class action alleging materially false and misleading statements and omissions in the offering documents of principal-protected notes. Deposition in April 2012.

*In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 in the Court of Common Pleas for the State of South Carolina, County of Greenville. Testified in deposition on damages and loss causation for class action and derivatives suits arising from a merger. Deposition in April 2012.

*Bank of America National Association, and Banc of America Securities LLC v. Bear Stearns Asset Management Inc., Ralph Cioffi, Matthew Tannin, and Raymond McGarrigal*, Case No. 1:08-cv-0265-AJN in the United States District Court, Southern District of New York. Testified in deposition on damages related to a securitization transaction and the Defendants' alleged failure to disclose the financial condition of their hedge funds. Deposition in March 2012.

*Between: Howard Green and Anne Bell, and Canadian Imperial Bank of Commerce, Gerald McCaughey, Tom Woods, Brian G. Shaw, And Ken Kilgour*, No. CV-08-00359335-0000, Ontario Superior Court of Justice. Testified in deposition on loss causation in proceedings under the Class Proceedings Act, 1992 alleging that Defendants made various misrepresentations regarding CIBC's CDO exposure and the extent of impairment of CIBC's CDO positions. Deposition in December 2011.

*In re Tronox Inc. Securities Litigation*, No. 09 Civ. 06220 (SAS), United States District Court, Southern District of New York. Testified in deposition on market efficiency at class certification stage in a securities fraud class action alleging that Defendants materially misstated the extent of legacy environmental liabilities. Deposition in December 2011.

*In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, Case No. 1:09-MD-2072 in the United States District Court, Southern District of New York. (Appeal denied by United States Court of Appeals for the Second Circuit, May 31, 2012.) Testified in deposition and hearing before the Court on market efficiency at class certification stage in a securities fraud class action alleging misrepresentations concerning Freddie Mac's capitalization and credit risk exposure. Depositions in August 2011 and November 2011. Court hearing in November and December 2011.

*Estate of John F. Koons, III v. Commissioner of Internal Revenue*, Docket Nos. 19771-09 and 19772-09, in the United States Tax Court. Testified at trial regarding the valuation of certain membership interests in a limited corporation. March 2011.

*In Re Altria Group, Inc. v. United States of America*, Case No. 1:06-cv-09430-RJH in the United States District Court, Southern District of New York. Testified in deposition and at trial regarding economic issues affecting tax treatment of certain leveraged lease transactions. Deposition in December 2007. Trial in June-July 2009.

*Madison Tyler Holdings, LLC, et al., Claimants v. Financial Asset Trading & Technology of California, LLC, et al., Respondents*; *Financial Asset Trading & Technology of California, et al., Cross-Claimants, v. Madison Tyler Holdings, LLC, et al., Cross-Respondents*; and related arbitration *Madison Tyler Holdings, a Delaware Limited Liability Company, et al., Counter-Claimants and Respondents v. Rajashree Karwa, an individual, Counter-Respondent and Claimant*. Arbitration Before JAMS, JAMS Ref. No. 1220038462. Testified in deposition on economic analysis of source of value creation in algorithmic trading strategies. June 2009.

*Lawrence E. Jaffe Pension Plan, On Behalf of Itself and All Others Similarly Situated, v. Household International, Inc., et al.*, Case No. 02-C-5893 in the United States District Court, Northern District of Illinois, Eastern Division. Testified in deposition and at trial on loss causation and damages in a securities class action alleging securities fraud arising from purported accounting irregularities and predatory lending practices to subprime borrowers. Deposition in March 2008. Trial in May 2009.

*Guerrero Family Trust, Carmen De Leon Guerrero, Jose T. Tenorio Trust, Estate of Santiago C. Tenorio, Juan T. Guerrero, Jesus T. Guerrero, and AJT Trust, v. Kinki Nippon Tourist Co. LTD, Saipan Hotel Corporation, Pacific Development Inc., Pedro J.L. Igitol, in his official capacity of Secretary of Saipan Hotel Corporation, Morgan Stanley Japan Limited, Marianas Holdings, LLC, and K.K. ING Karuizawa Training Institute*, Civil Action No. 04-0574D in the Superior Court of the Commonwealth of the Northern Mariana Islands. Testified in deposition on damages arising from alleged abuse of fiduciary duty and dilution of minority shareholders' stock holding. July 2008.

*In the Matter of David A. Finnerty, et al., Administrative Proceeding*, File No. 3-11893, Before the Securities and Exchange Commission. Testified in trial regarding the trading patterns of certain NYSE specialists in connection with alleged violations of priority rules and securities laws. February and March 2008.

*In Re NYSE Specialists Securities Litigation*, Master File No. 03 Civ. 8264 (RWS) in the United States District Court, Southern District of New York. Testified in deposition on class certification issues relating to alleged trading-rule violations by New York Stock Exchange specialist firms. November 2007.

*Theo Bullmore and Phillip S. Stenger, as Joint Official Liquidators of Beacon Hill Master Ltd. (In Official Liquidation), Plaintiffs v. Ernst & Young Cayman Islands, Ernst & Young LLP, Beacon Hill, Asset Management, LLC, John D. Barry, Thomas Daniels, John Irwin, Mark Miszkiewicz, and ATC Fund Services (Cayman) Limited f/k/a ATC Fund Administrators (Cayman) Limited, Defendants*, Index No.: 104314/05 in the Supreme Court of the State of New York, County of New York. Testified in deposition on the causation and alleged damages experienced by the Beacon Hill Master Fund caused by an alleged improper audit by Ernst & Young Cayman Islands. September 2007.

*Sterling Savings Association and Sterling Financial Corporation v. United States of America, Defendant*, Case No. 95-829C in the United States Court of Federal Claims. Testified in deposition and at trial on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. Depositions in June 2002 and May 2004. Trial in July 2007.

*Adelphia Communications Corp., Plaintiff v. Deloitte & Touche LLP, (Defendant) v. John Rigas, Timothy Rigas, Michael Rigas and James Rigas (Additional Defendants)*, in the Court of Common Pleas, Philadelphia County. Testified in deposition on loss causation and damages issues related to alleged improper conduct by auditor. May 2007.

*David S. and Malia A. Litman v. United States of America*, Case No. 05-956T; *Robert B. and Michelle S. Diener v. United States of America*, Case No. 05-971T; *Hotels.com Inc. and Subsidiaries (f/k/a Hotel Reservations Network, Inc.) v. United States of America*, Case No. 06-285T. Judge Christine O.C. Miller in the United States Court of Federal Claims. Testified in deposition and at trial on valuation of 9.9 million shares of stock issued to certain former officers of Hotels.com for tax purposes. Deposition in July 2006. Trial in May 2007

*Jane Z. Astleford, Donor, Petitioner v. Commissioner of the Internal Revenue, Respondent*, Docket No 4342-06 in the U.S. Tax Court. Testified at trial on value of certain interests in a limited partnership. March 2007.

*United States of America v. Sanjay Kumar and Stephen Richards*, 04-CR-0846 (ILG), in the United States District Court, Eastern District of New York. Testified at trial on loss causation and damages issues in criminal securities fraud matter in which defendants pleaded guilty to improper revenue recognition related accounting irregularities. October 2006.

*The Procter and Gamble Company and Subsidiaries & Proctor and Gamble FSC (Barbados) vs. The United States of America*, Case number 1:05cv355 in United States District Court for the Southern District of Ohio, Western Division. Testified in deposition on fair market value of certain technologies donated by Proctor and Gamble to various entities in connection with a tax dispute. September 2006.

*United States of America v. Richard Volpe*, Indictment S1 05 Cr. 390 (SHS) in the United States District Court, Southern District of New York. Testified at trial on liability issues in criminal securities fraud matter alleging illegal trading by certain New York Stock Exchange specialists. August 2006.

*United States of America v. Robert Scavone*, Indictment S1 05 Cr. 390 (SHS) in the United States District Court, Southern District of New York. Testified at trial on liability issues in criminal securities fraud matter alleging illegal trading by certain New York Stock Exchange specialists. July 2006.

*United States of America v. Michael Hayward and Michael Stern*, Indictment S1 05 Cr. 390 (SHS) in the United States District Court, Southern District of New York. Testified at trial on liability issues in criminal securities fraud matter alleging illegal trading by certain New York Stock Exchange specialists. July 2006.

*Commonwealth Holdings, Inc., Profit Sharing Plan & Trust, James T. Waddill, IV et al. v. Salomon Smith Barney, Inc. and John Henry Spatz*, in a hearing before NASD. Testified on loss causation and damages aspects of Plaintiffs' claims arising from alleged securities fraud. September 2005.

*Messrs. Robert, Charles and John Switzer et al. v. Deutsche Bank et al.*, in a hearing before NASD. Testified on liability and damages aspects of Plaintiffs' damage claims arising from alleged unsuitable investments in certain leveraged debt obligations. June 2005.

*IDT Corp. v Telfonica S.A. et al.*, Case No. 01 CV 471 in the United States District Court for New Jersey. Testified in deposition on liability and loss causation aspects in a claim of alleged securities fraud. April 2005.

*Sherewin I. Ray et al. v. Citigroup Global Markets, Inc. f/k/a Salomon Smith Barney, Inc., Citigroup, Inc. and John Henry Spatz*, Case No. 03C3157 in the United States District Court for the Northern District of Illinois, Eastern Division. Testified in deposition on liability and loss causation in a claim of alleged securities fraud. March 2005.

*American National Bank and Trust Company of Chicago, as Trustee f/b/o Emerald Investments LP, and Emerald Investments LP, an Illinois Partnership v. Allmerica Financial Life Insurance and Annuity Company*. Testified in deposition on certain liability aspects in a breach of contracts claim involving certain mutual fund trading strategies. January 2005.

*In re WorldCom, Inc. ERISA Litigation*, Master File No. 02 Civ. 4816 (DLC) in the United States District Court, Southern District of New York. Testified in deposition on liability aspects of Plaintiffs' damage claims in an ERISA class action. January 2005.

*Xilinx Inc. and Subsidiaries v. Commissioner of Internal Revenue Service*, Docket Nos. 004142-01 and 00702-03. Testified in U.S. Tax Court on whether grant date value, or certain spread upon exercise, of employee stock options should be considered part of cost sharing pool in a cost sharing arrangement between Xilinx, Inc. and its Irish affiliate. Trial in July 2004. Submitted affidavit in connection with motion to dismiss in June 2002.

*Maxtor Corporation v. Koninklijke Philips Electronics N.V., Philips Semiconductors B.V., Philips Semiconductor International B.V., Philips Electronics North America Corporation, Philips Semiconductors, Inc., Philips Semiconductor Manufacturing, Inc., Philips France, Philips Japan, Ltd., and Does 1 through 25*, Case No. CV 808650 in the Superior Court of the State of California, County of Santa Clara. Testified in deposition on damages analysis in connection with alleged design failure of a chip used in manufacturing computer hard drives. March 2004.

*Mid-Continent Federal Savings Bank v. United States of America, Defendant*, Case No. 95-472C in the United States Court of Federal Claims. Testified in deposition and at trial in Court of Federal Claims on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. Deposition in April 2002. Trial in July 2003.

*Robert F. Flood v. Bessemer Trust Company, N.A.*; *Robert G. Vanneman; and Does 1-25 and Stephen Gorosh v. same defendants*. Testified in deposition on alleged damages due to failure to diversify. November 2002.

*Christine P. Rales, Plaintiff v. Steven M. Rales, Defendant*, Civil Action No. 02DR166-D in the Superior Court of District of Columbia. Testified in deposition on the fair market value of a block of 19.67 million shares of common stock of Danaher Corporation held by Stephen M. Rales. February 2002.

*American National Bank and Trust Company of Chicago, as Trustee f/b/o Emerald Investments LP, and Emerald Investments LP, an Illinois Partnership v. AXA Client Solutions, LLC, The Equitable Life Assurance Society of the United States, and AXA Financial, Inc.*, Case No. 00 C 6786. Testified in deposition on damages due to alleged breach of contract involving certain mutual fund trading strategies. May 2002.

*Statewide Savings Bank, S.L.A., Plaintiff v. United States of America, Defendant*, Case No. 95-779C in the United States Court of Federal Claims. Testified in deposition on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. February 2002.

*Charles T. McCord and Mary S. McCord, Donors, Petitioners v. Commissioner of Internal Revenue, Respondent*, Docket No 7048-00 in the U.S. Tax Court. Testified at trial on value of several interests in a limited partnership. May 2001.

*Estate of Elma Middleton Dailey, Deceased, K. Robert Dailey, II, Executor, Petitioner v. Commissioner of Internal Revenue, Respondent*, Docket Nos 6251-00 and 6262-00 in the U.S. Tax Court. Testified at trial on value of several interests in a limited partnership. May 2001.

*John G. Balletto v. Xoom.com, Inc.*, Case No. 306798 in the Superior Court of California, San Francisco County. Testified in deposition and at trial relating to damages due to alleged breach of contract. January 2001. Deposition in January 2001. Trial in March 2001.

*Edison International (1585456), Mission First Financial (1431482), Edison Capital (1417993), Edison Funding Company (1417994), Renewable Energy Capital Company (0715920), Mission Funding Epsilon (1426267) v. California Franchise Tax Board*. Testified before the State Board of Equalization on whether Mission First Financial and its parent company SCEcorp formed a unitary business for tax purposes during 1988 to 1990. December 2000.

*Framatome Connectors USA Holdings, Inc. and Subsidiaries, et al. v. Commissioner of Internal Revenue Service*, Docket No. 5030-98, 9160-99, 118 T.C. 32 (2002), aff'd, 108 Fed. Appx. 683, (2004). Testified in trial on whether Burndy Japan was a controlled foreign corporation of the petitioner for the years 1988, 1989 and 1992 under section 957(a) (2) of the Internal Revenue Code. October 2000.

*Barry G. Hittner, Receiver of American Universal Insurance Company v. Sequa Corporation, et al.*, M.D.L. No. 972, C.A. No. 1:92-512. Testified in deposition on the value of a $50 million note backed by certain real estate. June 2000.

*Estate of Richie C. Heck, Deceased, Gary Heck, Special Administrator, Plaintiff v. Commissioner of Internal Revenue Service, Defendant*. Docket No. 11619-99 in the U.S. Tax Court. Testified at trial on the valuation of a minority interest in F. Korbel & Bros., Inc. June 2000.

*American Heritage Bancorp, Plaintiff v. United States of America, Defendant*; *Federal Deposit Insurance Corporation, as successor to the rights of Home Federal Savings Bank, Plaintiff Intervenor v. United States of America, Defendant*. Case No. 90-3982C. Testified in deposition on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. May 2000.

*Estate of Robert H. Lurie, deceased, Ann Lurie, Executor v. Commissioner of Internal Revenue*, Docket No. 22639-94 in the U.S. Tax Court. Testified at trial on whether certain trusts accumulated assets from investments without transfers for inadequate consideration by the deceased. February 1999.

*Joseph K. Mitchell, et al., v. Central Investment Corporation*, Case No. A9700035, Special Proceedings in the Court of Common Pleas, Hamilton County, Ohio. Testified in deposition regarding fair cash value of a minority position in stock of a Pepsi-Cola bottling company in connection with a freeze-out merger. March 1998.

*Walter L. Gross, Jr. & Barbara H. Gross, Petitioners v. Commissioner of Internal Revenue Service, Respondent*, No. 4460-97; Calvin C. Linnemann & Patricia G. Linnemann, Petitioners v. Commissioner of Internal Revenue Service, Respondent, No. 4469-97. Testified at trial regarding the fair market value of a minority interest in a Pepsi-Cola bottling company, which Petitioners had claimed as a gift-tax liability. November 1997.

*R. J. R. Nabisco Inc. and Subsidiaries v. Commissioner*, Docket No. 3796-95 in the U.S. Tax Court. Testified at trial regarding the nature and useful economic life of cigarette package design for federal income taxation purposes. February 1997.

*Clinton, Inc. & Subsidiaries, Petitioner v. Commissioner of Internal Revenue, Respondent*, Docket No. 9885-95 in the U.S. Tax Court. Testified in deposition regarding reasonable executive compensation pursuant to Internal Revenue Code Section 162 (a) (1). August 1996.

*Fullers Jewelry, Inc., Plaintiff v. Dallas Central Appraisal District, Defendant*, Case No. 94-09169-B, District Court, Dallas County, Texas, 44th Judicial District. Testified in deposition regarding the value of merchandise inventory of a retail jewelry chain for purposes of ad valorem taxation. July 1996.

*American Marazzi, Inc., Plaintiff v. Dallas Central Appraisal District, Defendant*, Cause number 95-07028-B, District Court, Dallas County, Texas, 44th Judicial District. Testified in deposition regarding the value of merchandise inventory of a manufacturer and distributor of ceramic tiles for purposes of ad valorem taxation. June 1996.

*Terence Dean, et al. v. Dean Security, Inc. et al.* Testified in binding arbitration regarding damages due to breach of contract for the sale of a security company. March 1996.

*Advertiser's Dynamic Services, Co., Inc., Plaintiff v. United States of America, Defendant*, Case No. 3-94-CV-2079-G, District Court, North Dallas, Texas. Testified at trial regarding the nature of contracts between a publisher and salespersons for payroll tax purposes. February 1996.


## Publications

"Economic Consequences: The Real Cost of U.S. Securities Class Action Litigation," 2014, with Nikolai Caswell, Anand Goel, Sumon C. Mazumdar and Rahul Surana, issued by Institute for Legal Reform, U.S. Chamber of Commerce.

"Assessing Market Efficiency for Reliance on the Fraud-on-the-Market Doctrine after Wal-Mart and Amgen," with Sumon C. Mazumdar and Daniel A. McLaughlin, 2014, in James Langenfeld Ed., Research in Law and Economics, Volume 26, 161-207.

"The NUA Benefit and Optimal Investment in Company Stock in 401(K) Accounts," with Sumon C. Mazumdar, Vikram Nanda and Rahul Surana, 2009, in A. H. Chen Ed., Research in Finance, Volume 25, 203–227.

"Competition in IPO Underwriting: Time Series Evidence," with Andrew H. Chen and Sumon C. Mazumdar, 2008, in A. H. Chen Ed., Research in Finance, Volume 24, 1–25.

"A Matrix-Based Lattice Model to Value Employee Stock Options," with Sumon C. Mazumdar, Rahul Surana and Sanjay Unni, 2006, Journal of Derivatives 14, 9–26.

"Mean Reversion in Earnings and the Use of E/P Multiples in Corporate Valuation," with David Denis and Atulya Sarin, 2004, Journal of Applied Finance 14, 4–10.

"Securities Class Action Settlements: An Empirical Analysis," with Sumon C. Mazumdar and Atulya Sarin, 2003, Santa Clara Law Review 43, 1001–1033.

"Ownership Structure, Agency Costs and Dividend Policy," with Anand M. Vijh and Randolph W. Westerfield, 2002, in A. H. Chen Ed., Research in Finance, Volume 19, 1–28.

"The Cost of Raising Preferred Equity Capital," with Sumon C. Mazumdar and Atulya Sarin, 2002, Journal of Financial Research 25, 577–592.

"Firm Value and Marketability Discounts," with David J. Denis, Stephen P. Ferris and Atulya Sarin, 2001, Journal of Corporation Law 27, 89–115.

"Transfer Pricing and Foreign Exchange Risk," with Brian Becker and Jonathan Neuberger, Transfer Pricing Report, July 1999.

"Dividend Omissions and Forecasts of Future Earnings: Some Positive Evidence on Information Content of Dividends," 1999, in A. H. Chen Ed., Research in Finance, Volume 17, 13–39.

"The Relationship Between Ownership, Financing Decisions and Firm Performance: A Signaling Model," with Sudipto Dasgupta and Yuk-She Chan, 1998, International Economic Review 39, 723–744.

"Valuation for Smaller Capitalization Companies," with Scott D. Hakala, 1998, in Financial Valuation: Business and Business Interests – 1998 update, Warren, Gorham & Lamant.

"Trading Behavior and the Unbiasedness of the Market Reaction to Dividend Announcements," with Anand M. Vijh, 1995, Journal of Finance 50. (Abstract reprinted in Financial Management Collection, 1996.)

"Beyond Mere Compliance," with Anita S. Agarwal, Mortgage Banking, April 1993, 57–61.

"Dividend Clienteles and the Information Content of Dividend Changes," with Anand M. Vijh, 1990, Journal of Financial Economics 26, 193–219.

"The Efficient and Inefficient Media for Political Campaign Advertising," with Roland T. Rust and George T. Haley, 1984, Journal of Advertising 13, 45–49.

"Modeling of Non-Ideal Residence Time Distribution in a Continuous Flow Stirred Tank Reactor at Zero RPM," with D. Prasanna Rao, 1983, Indian Chemical Engineer, 24–27.

"Alternate Criteria for the Comparison of Regression Models," with Roland T. Rust, presented in Proceedings of the Southwestern Marketing Association, Spring 1983.

## Working Papers

"ESO Expensing Under the Revised FAS 123: A Practitioner's Guide," with Sumon C. Mazumdar, Sanjay Unni, and Anand Vijh, September 2005.

"Investment in Company Stock in 401(k) Accounts," with Sumon C. Mazumdar, May 2005.

"The New Accounting Rules for ESO Expensing: Not Quite As Easy As 123," with Sumon C. Mazumdar and Sanjay Unni, March 2005.

"Competition in IPO Underwriting: Time Series Evidence," with Andrew H. Chen, Sumon C. Mazumdar and Atulya Sarin, March 2003.

"Auditor Compensation and Audit Failure: An Empirical Analysis," February 2003.

"The Offer Yield of Preferred Stock," with Sumon C. Mazumdar and Atulya Sarin, March 2002.

"Signaling, Agency Costs and Ownership Structure: Theory and Empirical Implications," with Sudipto Dasgupta and Yuk–Shee Chan, mimeo, Hong Kong University of Science and Technology, 1997.

"Is it Appropriate to Use a Higher Discount Rate to Value Small Firms?" with Martin Hanan, Rick Knoll, and Mark Mitchell.

"Turnover in Equity Ownership, Risk and Return," September 1995.

## Professional History

2019 – present    Charles River Associates
                          Senior Consultant

2012 – 2019       Navigant Consulting
                          Managing Director and Global Head of the Securities & Finance Practice

1997 – 2014       Haas School of Business, University of California, Berkeley
                          Lecturer

2011 – 2012       AFE Consulting
                          Founder and President

1997 – 2011       LECG
                          Senior Managing Director and Practice Leader (2007 – 2011)
                          Member – Executive Management Committee (2007 – 2011)
                          Member – Management Advisory Committee (2003 – 2007)
                          Member – Board of Directors (2001 – 2003)
                          Managing Director (1999 – 2007)
                          Director (1999)
                          Affiliate (1998)
                          Principal (1998)
                          Senior Economist (1997)

1995 – 1997       BVS
                          Senior Associate

1988 – 1995       University of Southern California
                          Assistant Professor – Finance and Business Economics
                          Award from Faculty Research & Innovation Fund, University of Southern
                          California, 1990

1983 – 1988       University of California, Berkeley
                          Instructor
                          Graduate Student Instructor
                          •      Graduate Fellowship, University of California, Berkeley (1988)
                          •      Earl F. Cheit Award for Outstanding Teaching, Graduate School of
                                 Business, University of California, Berkeley (1986–1987)
                          •      Outstanding Graduate Student Instructor Award, University of
                                 California, Berkeley (1986–1987)
                          •      Outstanding Graduate Student Instructor Award, University of
                                 California, Berkeley (1985–1986)
                          •      Award for Best Technical Paper published in Indian Chemical
                                 Engineer (1983)

CONFIDENTIAL

# Appendix 2: Documents Considered

**Case Documents**
1. Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint with Prejudice, September 2, 2008.
2. Appendix 1 to Lead Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss the First Amended Complaint, October 16, 2008.
3. Third Amended Complaint, ECF No. 166, March 28, 2012.
4. Defendants' Glossary of Terms, ECF No. 320, June 9, 2014.
5. Lead Plaintiff's Glossary of Terms Used in Connection with Defendants' Motions to Dismiss the Third Amended Complaint, June 9, 2014.
6. Appeal from the United States District Court for the Northern District of Ohio at Youngstown. No. 4:08-cv-00160, United States Court of Appeals, (6th Cir. 2016), July 20, 2016.
7. Memorandum of Opinion and Order, ECF No. 478, August 14, 2018.
8. Order, In re Ohio Pub. Emps. Ret. Sys., No. 18-0310, United States Court of Appeals for the Sixth Circuit, January 23, 2019.

**Declarations and Expert Reports**
1. Expert Report of Dr. Greg Hallman, August 16, 2012.
2. Expert Report of Mukesh Bajaj, Ph.D., December 14, 2012.
3. Declaration of Professor Steven P. Feinstein, December 16, 2016.
4. Report on Market Efficiency Professor Steven P. Feinstein, June 7, 2017.
5. Expert Report of Mukesh Bajaj, Ph.D., September 1, 2017.
6. Expert Report of Paul A. Gompers, September 1, 2017.
7. Expert Report of David I. Tabak, Ph.D., November 16, 2023.
8. Expert Report of Howard S. Shapiro, November 17, 2023.
9. Expert Report of Dr. Chudozie Okongwu, January 19, 2024.

**Depositions**
1. Deposition of Howard Shapiro, November 6, 2023.
2. Deposition of David I. Tabak, December 20, 2023.
3. Deposition of Howard Shapiro, January 10, 2024.

**Court Opinions**
1. *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
2. *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2415 (2014).

**Freddie Mac Press Releases**
1. August 1, 2006, "Freddie Mac Voluntarily Adopt Temporary Limited Growth For Retained Portfolio."
2. August 21, 2006, "Recent Events - Legal Proceedings."
3. September 8, 2006, "Freddie Mac Holds Annual Stockholders' Meeting."
4. October 11, 2006, "Recent Events – Unregistered Sale of Equity Securities."

CONFIDENTIAL

    5. October 19, 2006, "Recent Events – Management."
    6. January 5, 2007, "Freddie Mac Provides Quarterly Market Update."
    7. January 17, 2007, "Recent Events – Unregistered Sales of Equity Securities."
    8. March 8, 2007, "Recent Events – Executive Compensation Actions."
    9. March 23, 2007, "Freddie Mac Reports 2006 Financial Results."
    10. April 12, 2007, "Recent Events – Unregistered Sale of Equity Securities."
    11. May 1, 2007, "Recent Events – Freddie Mac Announces that President Eugene McQuade Declines Opportunity to Become Chief Executive Officer."
    12. June 7, 2007, "Recent Events."
    13. June 14, 2007, "Freddie Mac Releases First Quarter 2007 Financial Results; Company Resumes Quarterly Reporting."
    14. July 19, 2007, "Recent Events – Unregistered Sales of Equity Securities."
    15. July 25, 2007, "Supplemental Non-Agency, Subprime Securities Portfolio Data."
    16. August 30, 2007, "Freddie Mac Releases Second Quarter 2007 Financial Results; Net Income of $764 Million, Fair Value Increase of $800 Million."
    17. September 7, 2007, "Recent Events."
    18. September 19, 2007, "Recent Events – Freddie Mac Announces Resignation of Jeffrey M. Peek From Board of Directors."
    19. September 27, 2007, "Recent Events – Unregistered Sale of Equity Securities."
    20. September 28, 2007, "Recent Events – Legal Proceedings."
    21. November 9, 2007, "Recent Events – Executive Compensation."
    22. November 20, 2007, "Freddie Mac Reports Third Quarter 2007 Net Loss of $2.0 Billion or $3.29 Per Diluted Share."
    23. November 27, 2007, "Recent Events – Equity Offerings."
    24. November 30, 2007, "Recent Events – Unregistered Sales of Equity Securities."

**Freddie Mac Financial Disclosures**
    1. 2005 Annual Report, "Information Statement and Annual Report to Stockholders for the fiscal year ended December 31, 2005," June 28, 2006.
    2. 2006 Annual Report, "Information Statement and Annual Report to Stockholders For the fiscal year ended December 31, 2006," March 23, 2007.
    3. 2006 Consolidated Financial Statements.
    4. 2007 Annual Report "Information Statement and Annual Report to Stockholders For the fiscal year ended December 31, 2007," February 28, 2008.
    5. Supplement dated October 3, 2006 to Information Statement dated June 28, 2006.
    6. Presentation, "Freddie Mac Update: October 2006."
    7. Supplement dated January 5, 2007 to Information Statement dated June 28, 2006.
    8. Presentation, "Freddie Mac Update: January 2007."
    9. Supplement dated March 23, 2007 to Information Statement dated March 23, 2007.
    10. Financial Statements and Core Tables, June 14, 2007.
    11. Consolidated Financial Statements, June 14, 2007.
    12. Presentation, "Freddie Mac's First Quarter 2007 Financial Results," June 14, 2007.

CONFIDENTIAL

13. Supplement dated June 14, 2007 to Information Statement dated March 23, 2007.
14. Financial Report for the Three Months Ended March 31, 2007, Information Statement Supplement to the 2006 Information Statement and Annual Report to Stockholders, Dated March 23, 2007, June 14, 2007.
15. Financial Statements and Core Tables, August 30, 2007.
16. Consolidated Financial Statements, August 30, 2007.
17. Presentation, "Freddie Mac's Second Quarter 2007 Financial Results," August 30, 2007.
18. Financial Report for the Three and Six Months Ended June 30, 2007, Information Statement Supplement to the 2006 Information Statement and Annual Report to Stockholders, dated March 23, 2007, August 30, 2007.
19. Supplement dated August 30, 2007 to Information Statement dated March 23, 2007.
20. Financial Statements and Core Tables, November 20, 2007.
21. Consolidated Financial Statements, November 20, 2007.
22. Presentation, "Freddie Mac's Third Quarter 2007 Financial Results," November 20, 2007.
23. Supplement dated November 20, 2007 to Information Statement dated March 23, 2007.
24. Financial Report for the Three and Nine Months Ended September 30, 2007, Information Statement Supplement to the 2006 Information Statement and Annual Report to Stockholders, dated March 23, 2007, November 20, 2007.

**Freddie Mac Conference Calls**
1. Thomson StreetEvents, "FRE - Freddie Mac Market Update," March 31, 2006.
2. Thomson StreetEvents, "FRE - Freddie Mac Market Update," August 1, 2006.
3. Thomson StreetEvents, "FRE - Freddie Mac Annual Shareholders Meeting," September 8, 2006.
4. Thomson StreetEvents, "FRE - Freddie Mac Market Update," October 3, 2006.
5. Thomson StreetEvents, "FRE - Freddie Mac Market Update," January 5, 2007.
6. Thomson StreetEvents, "FRE - Q4 2006 Freddie Mac Earnings Conference Call," March 23, 2007.
7. Thomson StreetEvents, "FRE – Freddie Mac Annual Stockholders' Meeting," June 8, 2007.
8. Thomson StreetEvents, "FRE - Q1 2007 Freddie Mac Financial Results Conference Call," June 14, 2007.
9. Thomson StreetEvents, "FRE – Freddie Mac Second Quarter 2007 Financial Results," August 30, 2007.
10. Thomson StreetEvents, "FRE – Q3 2007 Freddie Mac Earnings Conference Call," November 20, 2007.
11. Thomson StreetEvents, "FRE – Q4 2007 Freddie Mac Earnings Conference Call," February 28, 2008.

**Freddie Mac Volume Summaries**
1. Freddie Mac Monthly Volume Summaries for the months of August 2006 to November 2007.

CONFIDENTIAL

**Freddie Mac Form 4 Documents**

1. Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, June 5, 2006.
2. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, June 5, 2006.
3. Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, June 5, 2006.
4. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, August 2, 2006.
5. Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, September 1, 2006.
6. Statement of Changes in Beneficial Ownership, Form 4 for Anthony S. Piszel, December 7, 2006.
7. Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, December 31, 2006.
8. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, January 3, 2007.
9. Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, March 29, 2007.
10. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, March 29, 2007.
11. Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, March 29, 2007.
12. Statement of Changes in Beneficial Ownership, Form 4 for Anthony S. Piszel, March 29, 2007.
13. Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, April 1, 2007.
14. Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, May 6, 2007.
15. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, May 6, 2007.
16. Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, May 6, 2007.
17. Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, June 5, 2007.
18. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, June 5, 2007.
19. Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, June 5, 2007.
20. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, August 2, 2007.
21. Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, September 1, 2007.

CONFIDENTIAL

**Fannie Mae Documents**

1. Fannie Mae Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2005, May 2, 2007.
2. Fannie Mae Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2007, February 27, 2008.
3. Fannie Mae News Release, "Fannie Mae Files 2007 Quarterly Reports with the SEC," November 9, 2007.

**Analyst Reports**

1. Bank of America, "Freddie Mac Model Revisions: Raising PT and Reiterating Buy Rating," October 5, 2006.
2. Bear Stearns, "Mortgage Finance/GSEs: GSE Monthly: An Update on GSE Volume and Activity," June 2007.
3. Credit Suisse, "Mortgage Finance: June Monthly: Shaky Housing Fundamentals," June 1, 2007.
4. UBS, "Consumer Finance Monthly: Reordering Preferences; Top Pick Now ZION Over CIT, AXP; More Positive on GSEs," June 1, 2007.
5. UBS, "Consumer Finance Monthly: Reordering Preferences; Top Pick Now ZION Over CIT, AXP; More Positive on GSEs," June 1, 2007.
6. Deutsche Bank, "Daily MBS Market Commentary," June 3, 2007.
7. UBS, "U.S. Morning Meeting Highlights," June 4, 2007.
8. Deutsche Bank, "Daily MBS Market Commentary," June 5, 2007.
9. Lehman Brothers, "MBA Index Commentary," June 6, 2007.
10. Lehman Brothers, "Effect of 1Q07 HPA Update," June 6, 2007.
11. PiperJaffray, "Weekly Mortgage Update: Refi Apps Decline On Higher Rates; Purchase Apps Stable," June 6, 2007.
12. Bank of America, "GSEs Reporting Update; A Positive Step Towards the Return to Normalcy," June 8, 2007.
13. UBS, "US Morning Research Notes," June 8, 2007.
14. UBS, "US Banks wrap up," June 8, 2007.
15. Morgan Stanley, "Mortgage Finance: Market Volatility Widens GSE Basis," June 13, 2007.
16. PiperJaffray, "Weekly Mortgage Update: Will Higher Rates Spoil Stabilizing Purchase Market?" June 13, 2007.
17. Bear Stearns, "Freddie Mac Releases 1Q07 Results, Resumes Quarterly Reporting," June 14, 2007.
18. Bear Stearns, "Freddie Mac Releases 1Q07 Results Resumes Quarterly Reporting (Part 1)," June 14, 2007.
19. Bear Stearns, "Freddie Mac Releases 1Q07 Results Resumes Quarterly Reporting (Part 2)," June 14, 2007.
20. Credit Suisse, "Freddie Mac: Challenging Market Conditions Hamper Q1 Results," June 14, 2007.
21. JP Morgan, "Freddie Mac: Mark-to-Market Items Muddy Otherwise In-line Quarter," June 14, 2007.
22. UBS, "Freddie Mac: Reports 1Q GAAP Loss, But Operating Metrics Increasingly Positive," June 14, 2007.

CONFIDENTIAL

23. Barclays, "FRE Miss Not As Bad As It Looks," June 15, 2007.
24. Lehman Brothers, "The GSEs: Past, Present, and Future: Decoding Earnings, Fundamentals, Value," June 15, 2007.
25. Credit Suisse, "Credit Suisse Breakfast Banker," June 15, 2007.
26. FBR, "Freddie Mac: Industry Trends Point toward Upgrade-- Raising Price Target," June 15, 2007.
27. Argus, "Market Update," June 18, 2007.
28. Argus, "Freddie Mac," June 18, 2007.
29. Lehman Brothers, "The GSEs: Past, Present, and Future," June 18, 2007.
30. UniCredit, "Credit Flash: Freddie Mac with unexpected loss in Q1," June 18, 2007.
31. Lehman Brothers, "Freddie Mac Update Meeting with Mgt," June 20, 2007.
32. Lehman Brothers, "MBA Index Commentary," June 20, 2007.
33. UBS, "Freddie Mac: We Est. 1Q Op. EPS of $0.58; Enhanced Operating Model; Initiating 08-09 Estimates," June 21, 2007.
34. UBS, "Freddie Mac: We Est. 1Q Op. EPS of $0.58; Enhanced Operating Model; Initiating 08-09 Estimates," June 21, 2007.
35. UBS, "US Morning Research Notes," June 21, 2007.
36. UBS, "U.S. Morning Meeting Highlights," June 21, 2007.
37. "UBS, "GSE Update: Equity, MBS, Debt, and Regulatory Views on the GSEs – Conference Call Take-Aways," June 21, 2007.
38. UBS, "Morning Expresso - United States," June 21, 2007.
39. UBS, "US Morning Research Notes," June 21, 2007.
40. Bank of America, "Freddie Mac: May Data: Continued Portfolio Growth and Better Credit Quality," June 22, 2007.
41. Bear Stearns, "FRE: MAY DATA SHOW SOME PICKUP IN PURCHASES (PART 2)," June 22, 2007.
42. Bear Stearns, "Freddie Mac: May Data Show Some Pickup in Purchases," June 22, 2007.
43. Credit Suisse, "Freddie Mac: Volumes and Retained Portfolio Rise," June 22, 2007.
44. Credit Suisse, "Credit Suisse Breakfast Banker," June 25, 2007.
45. Argus, "Weekly Staff Report," June 25, 2007.
46. PiperJaffray, "Weekly Mortgage Update: Still Waiting For Housing Market Bottom," June 27, 2007.
47. Bank of America, "Fannie Mae: Model Revisions; Raising PT and Reiterating Buy Rating," June 28, 2007.
48. Citibank, "GSEs: Stars are Aligning," June 28, 2007.
49. Credit Suisse, "GSEs: March Capital - Fannie Earned About $1.1 bn in Q1," June 28, 2007.
50. Credit Suisse, "Credit Suisse Breakfast Banker," June 29, 2007.
51. PiperJaffray, "Specialty Finance Monthly: Economy Bumping Along During Housing Recession," July 3, 2007.
52. Credit Suisse, "Mortgage Finance: Housing Fundamentals Deteriorate Further," July 9, 2007.
53. UBS, "Consumer Finance Monthly: Top Picks Remain ZION, CIT, and AXP; In Mortgage, Downgraded MIs, Prefer GSEs," July 9, 2007.
54. Citibank, "Specialty/Mortgage Finance Earnings Preview: Subprime Redux," July 10, 2007.

CONFIDENTIAL

55. PiperJaffray, "Consumer Credit Growth Continued to Slow in May," July 10, 2007.
56. PiperJaffray, "Solid Jobs Softening Housing Recession Pain; Used Car Values Increase," July 10, 2007.
57. Bank of America, "Consumer and Specialty Finance Weekly: Mortgage 2Q07 Earnings Preview - The worst is still to come," July 13, 2007.
58. PiperJaffray, "Consumer Mortgage Preview: Another Tough Quarter; Slow Motion Recovery," July 13, 2007.
59. PiperJaffray, "This Housing Downturn Has More To Go," July 13, 2007.
60. Keefe, Bruyette & Woods, "Banks: Mortgage," July 16, 2007.
61. Fitch, "Fitch Rates Freddie Mac's $500MM Non-Cumulative Perpetual Preferred Stock 'AA-'," July 17, 2007.
62. Merrill Lynch, "GSEs more palatable; Pick entry-points carefully," July 17, 2007.
63. Citibank, "Freddie Mac: June Data Show Slight Retained Portfolio Growth, Lots of Moving Parts," July 23, 2007.
64. Credit Suisse, "Freddie Mac: Purchase Commitments Surge on Wider Option Adjusted Spreads," July 23, 2007.
65. UBS, "Freddie Mac: June Numbers Reflect Solid Credit Portfolio Growth; Slight Growth in Retained Portfolio," July 23, 2007.
66. Bear Stearns, "Freddie Mac Releases June Monthly Volume Summary," July 24, 2007.
67. Bear Stearns, "Freddie Mac Releases June Monthly Volume Summary (Part 1)," July 24, 2007.
68. Bear Stearns, "Freddie Mac Releases June Monthly Volume Summary (Part 2)," July 24, 2007.
69. Credit Suisse, "Credit Suisse Breakfast Banker," July 24, 2007.
70. Bank of America, "Consumer and Specialty Finance Weekly: Specialty Commercial Lenders 2Q07 Earnings Preview," July 27, 2007.
71. Citibank, "GSEs: Clarification of Subprime Exposure: No Cause for Alarm," July 27, 2007.
72. PiperJaffray, "Weekly Mortgage Update: Volatility Persists as Cycle Progresses," July 27, 2007.
73. UniCredit, "Covered Bond & Agency Monitor," August 2, 2007.
74. Morgan Stanley, "Fannie Mae: Quick Comment: What Happened; Key Takeaway," August 6, 2007.
75. Lehman Brothers, "GSEs Rally on Spec of Port Cap Relief," August 7, 2007.
76. Bear Stearns, "Some Good News on Retained Portfolio Growth Limits?," August 7, 2007.
77. Credit Suisse, "Mortgage Finance: Credit Tremors Cracking Housing Foundation," August 7, 2007.
78. Morgan Stanley, "Freddie Mac: Quick Comment: FRE Meeting Notes," August 8, 2007.
79. Morgan Stanley, "North America Equity Morning Summary," August 9, 2007.
80. UBS, "Consumer Finance Monthly: Credit and Liquidity Concerns Collapse Stock Valuations," August 9, 2007.
81. UBS, "Consumer Finance Monthly: Credit and Liquidity Concerns Collapse Stock Valuations," August 9, 2007.
82. Citibank, "Specialty/Mortgage Finance: More Negative Mortgage Industry Outlook; GSEs Positioned to Step Up," August 10, 2007.

CONFIDENTIAL

83. Credit Suisse, "GSEs - Favorable Environment, but Portfolio Caps to Remain for Now," August 10, 2007.

84. UBS, "Morning Expresso - United States," August 10, 2007.

85. Bear Stearns, "OFHEO Keeps Portfolio Caps in Place," August 13, 2007.

86. Credit Suisse, "Credit Suisse Breakfast Banker," August 13, 2007.

87. UBS, "Morning Expresso - United States," August 13, 2007.

88. UBS, "GSE Update: OFHEO Refuses FNM's Request to Increase Portfolio Cap; Buy FNM, FRE on Weakness," August 13, 2007.

89. UBS, "Mortgage Strategist: Highlights & Recommendations," August 14, 2007.

90. JP Morgan, "GSE Update: Changes To Loan Limits and Portfolio Caps Becoming More Likely With Continued Illiquidity," August 20, 2007.

91. UBS, "Mortgage Strategist: Highlights & Recommendations," August 21, 2007.

92. Fox-Pitt Kelton, "Fannie Mae, Freddie Mac: Gulliver freed from the Lilliputians," August 22, 2007.

93. Credit Suisse, "Freddie Mac: Business Activity Pulls Back; Retained Portfolio Grows," August 23, 2007.

94. Credit Suisse, "Credit Suisse Breakfast Banker," August 24, 2007.

95. Lehman Brothers, "Freddie Mac: 2Q07 Could Be Inflection Point for EPS," August 29, 2007.

96. PiperJaffray, "Mortgage Update: Mortgage/Housing Cycle-- From Bad to Worse," August 29, 2007.

97. Bank of America, "FRE: 2Q07 Results: Margins Show Stabilization, Closer to Timel (Part 1 of 2)," August 30, 2007.

98. Bear Stearns, "FRE: Solid Q2 Results Credit Risk Still Low Despite GAAP Distortio (Part 1)," August 30, 2007.

99. Bear Stearns, "FRE: Solid Q2 Results Credit Risk Still Low Despite GAAP Distortio (Part 2)," August 30, 2007.

100. Bear Stearns, "FRE: Solid Q2 Results Credit Risk Still Low Despite GAAP Distortio (Part 3)," August 30, 2007.

101. Bear Stearns, "Freddie Mac: Solid Q2 Results; Credit Risk Still Low Despite GAAP Distortions," August 30, 2007.

102. Credit Suisse, "Mortgage Finance: Liquidity Issues Temper Origination Outlook," August 30, 2007.

103. Friedman Billings Ramsey, "Freddie Mac: Improving Fundamentals Trump Near-Term Earnings Pressure," August 30, 2007.

104. Goldman Sachs, "Freddie Mac: 2Q07: Despite higher costs, our positive long-term outlook is intact," August 30, 2007.

105. Credit Suisse, "Freddie Mac: Falling Interest Rates Likely to Reverse Q2 Earnings Gains," August 31, 2007.

106. Credit Suisse, "Credit Suisse Breakfast Banker," August 31, 2007.

107. Merrill Lynch, "Freddie Mac: Credit proves to be bigger headwind, Maintain Neutral," August 31, 2007.

108. Miller Tabak, "Freddie Moves Into Higher-Margin Territory; Initiating 2009 Estimate of $8.55, 2009 Price Target of $77.72, Maintain 'Strong Buy'," August 31, 2007.

109. nabCapital, "At a glance – Freddie Mac: A Poor 2Q07 Result and an indication that the US mortgage market will remain tough for some time yet," August 31, 2007.

CONFIDENTIAL

110. PiperJaffray, "Freddie Mac: Benefiting From Shift To Traditional Lending Practices; Credit Costs Higher," August 31, 2007.

111. nabCapital, "Credit Today," September 3, 2007.

112. Credit Suisse, "Credit Suisse Breakfast Banker," September 3, 2007.

113. Lehman Brothers, "Freddie Mac: Trimming Estimates for Higher Credit Exp," September 4, 2007.

114. Friedman Billings Ramsey, "Non-Agency Originations to Plummet as Mortgage Banks Brace for Tougher Times," September 4, 2007.

115. UBS, "Mortgage Strategist: Highlights & Recommendations," September 4, 2007.

116. Lehman Brothers, "Old to New: Incr Role for FHA/GNMA & GSEs," September 5, 2007.

117. Bank of America, "Consumer and Specialty Finance Weekly: 2Q Origination Data: Increased Retail & Reduced 'Risk Product' Volumes," September 7, 2007.

118. PiperJaffray, "Weekly Mortgage Update: Mortgage Employment Correction Gaining Steam," September 7, 2007.

119. PiperJaffray, "PJC Specialty Finance Monthly: Avoiding Recession Crucial for Shares," September 10, 2007.

120. UBS, "Consumer Finance Monthly: Illiquidity and Credit Deterioration Continue to Erode EPS Outlook," September 12, 2007.

121. UBS, "Consumer Finance Monthly: Illiquidity and Credit Deterioration Continue to Erode EPS Outlook," September 12, 2007.

122. Citibank, "Specialty/Mortgage Finance Weekly," September 13, 2007.

123. UBS, "Morning Expresso - United States," September 13, 2007.

124. UniCredit, "Covered Bond & Agency Monitor," September 13, 2007.

125. Bank of America, "Consumer and Specialty Finance Weekly: The Tipping Point for Leverage Loans?," September 14, 2007.

126. Friedman Billings Ramsey, "What Will Mortgage Banks Do When the Fed Cuts Rates?," September 14, 2007.

127. Argus, "Market update," September 17, 2007.

128. Argus, "Freddie Mac," September 17, 2007.

129. Bank of America, "FRE: FRE at BAC 37th Annual Investment Conference," September 17, 2007.

130. Bear Stearns, "Short Sellers Could Get Squeezed More," September 18, 2007.

131. Credit Suisse, "Mortgage Finance: OFHEO Modifies GSE Portfolio Caps," September 19, 2007.

132. Stanford, "OFHEO to Let Fannie, Freddie Grow Portfolios by 2%," September 19, 2007.

133. UBS, "OFHEO Announces Changes to GSE Portfolio Cap Restrictions," September 19, 2007.

134. nabCapital, "Credit Today," September 20, 2007

135. Bank of America, "Freddie Mac: Model Revisions; Raising PT and Reiterating Buy Rating," September 20, 2007.

136. Keefe, Bruyette & Woods, "OFHEO Announces Modest Changes for the GSEs' Portfolios," September 20, 2007.

137. PiperJaffray, "PJC Mortgage Market Update: Fed Rate Cut Helpful, But Not A Cure-All," September 20, 2007.

138. UniCredit, "Covered Bond & Agency Monitor," September 20, 2007.

CONFIDENTIAL

139. Bank of America, "Consumer and Specialty Finance Weekly: Examining the Decline in Home Owner Equity," September 21, 2007.
140. Argus, "Weekly Staff Report," September 24, 2007.
141. Bear Stearns, "Mortgage Insurance:  Initiation of Coverage," September 24, 2007.
142. Bank of America, "Freddie Mac: Aug Data: Strong Rise in Retained Portfolio, Cont'd good G'teed Portfolio Growth," September 25, 2007.
143. Bear Stearns, "Freddie Mac: August Monthly Data Show Pickup in Retained Portfolio Growth," September 25, 2007.
144. Citibank, "Freddie Mac: August Data Shows Strong Retained Portfolio Growth," September 25, 2007.
145. Credit Suisse, "Freddie Mac: Strong Retained Portfolio Growth in August," September 25, 2007.
146. Fox-Pitt Kelton, "Freddie Mac: Monthly Data Shows Strong Growth," September 25, 2007.
147. Morgan Stanley, "Financial Services: Navigating Financial Services in a Challenging Macro Environment," September 25, 2007.
148. Morgan Stanley, "Navigating Financial Services in Challenging Macro Environment," September 25, 2007.
149. UBS, "GSE Update: Results and Outlook Reflect Growth in Guarantee Business, Higher Credit Costs," September 25, 2007.
150. UBS, "Morning Expresso - United States," September 25, 2007.
151. UBS, "Freddie Mac: August Numbers Reflect Strong Growth in Credit and Retained," September 25, 2007.
152. JP Morgan, "Freddie Mac: Preferred Offering Should Provide Capital Cushion Monthly Numbers In-Line," September 25, 2007.
153. Credit Suisse, "Credit Suisse Breakfast Banker," September 26, 2007.
154. Bear Stearns, "OFHEO Declares both Fannie and Freddie Adequately Capitalized at June 30," September 27, 2007.
155. Fitch, "Fitch Rates Fannie Mae's $1B Series P Preferred Stock 'AA-,'" September 28, 2007.
156. Fitch, "Fitch Rates Freddie Mac $500MM Non-Cumulative Perpetual Preferred Stock 'AA-,'" September 28, 2007.
157. Friedman Billings Ramsey, "Loan Modifications - Will They Save the Day," September 28, 2007.
158. PiperJaffray, "PJC Mortgage Market Update: Oncoming Train, Pictorial View of Mtg/Housing," September 28, 2007.
159. Fox-Pitt Kelton, "Freddie Mac: Gulliver Unbound," October 2, 2007.
160. Credit Suisse, "Mortgage Finance: Falling Origination Volumes Pose New Challenges," October 2, 2007
161. Lehman Brothers, "Mortgage Finance: Industry Overview: Leaders Emerging from 3Q Credit Meltdown," October 2, 2007.
162. Morgan Stanley, "Mortgage Finance: Notes from Washington," October 2, 2007.
163. Bank of America, "Consumer and Specialty Finance Weekly: Trends in the Reverse Mortgage Market," October 5, 2007.
164. Lehman Brothers, "Mortgage Finance: Industry Overview: Update on Mortgage Market Share," October 5, 2007.

CONFIDENTIAL

165. PiperJaffray, "Key Macro Statistics for Specialty Finance are Encouraging," October 5, 2007.

166. PiperJaffray, "PJC Mortgage Market Update: Correction Rolls On," October 5, 2007.

167. Stanford, "Mortgage Bankruptcy: Three Bills Advancing in Congress," October 5, 2007.

168. UBS, "Consumer Finance Monthly: We Expect Little to Cheer About in 3Q Earnings Reports," October 5, 2007.

169. UBS, "Consumer Finance Monthly: We Expect Little to Cheer About in 3Q Earnings Reports," October 5, 2007.

170. Argus, "Freddie Mac," October 9, 2007.

171. Bear Stearns, "Freddie Mac: Management Meetings; Wider OAS, Higher G' Fees, Business Investments Should Drive Business Growth," October 11, 2007.

172. Lehman Brothers, "Freddie Mac: GSE Prf'd Issuance: Benefits & Capacity," October 11, 2007.

173. Bank of America, "Consumer and Specialty Finance Weekly: Mortgage 3Q07 Earnings Preview - Continued Credit Deterioration," October 12, 2007.

174. Credit Suisse, "Mortgage Finance: Lift the Caps?," October 12, 2007.

175. Credit Suisse, "Credit Suisse Breakfast Banker," October 15, 2007.

176. Stanford, "Bank Regulator Report: Omnibus Could be Vehicle for GSE, Bankruptcy Bills," October 15, 2007.

177. Bear Stearns, "New Report, 'Guide for Navigating Current Market Assessing Impact of Deteriorating Credit on Earnings and Valuation,'" October 16, 2007.

178. PiperJaffray, "PJC Specialty Finance Monthly: Not As Bleak Outside Mortgage," October 16, 2007.

179. PiperJaffray, "3Q Mortgage Preview: Dreadful 3Q On Marks/Credit; Challenging Outlook Remains," October 16, 2007.

180. Lehman Brothers, "Fannie Mae: Rule Change Could Reduce Excess Capital," October 17, 2007.

181. UniCredit, "Covered Bond & Agency Monitor," October 18, 2007.

182. Bear Stearns, "OFHEO Proposal Would Likely Require More Risk Based Capital Not Total Capital," October 19, 2007.

183. PiperJaffray, "PJC Home Price Outlook: Impact On Home Improvement Retailers, Mortgage Lenders," October 19, 2007.

184. Bank of America, "Market Credit Concerns Create Buying Opp on GSEs," October 22, 2007.

185. Lehman Brothers, "Freddie Mac: Cutting PT for Multiple Compression," October 22, 2007.

186. Deutsche Bank, "DailyMBSMarketCommentary," October 22, 2007.

187. Lehman Brothers, "Mortgage Finance: Downgrading Mortgage & Spec Fin Sectors," October 22, 2007.

188. Friedman Billings Ramsey, "A Study of a Past Credit Cycle-- Book Values Do Not Protect Stock Valuations," October 23, 2007.

189. Bank of America, "Freddie Mac: Sept. Data: Strong G'teed Portfolio Growth; but Pullback in Retained Own Securities," October 24, 2007.

190. Bank of America, "FRE: Strong G'teed Portfolio Growth; but Pullback in Retained (Part 1 of 2)," October 24, 2007.

CONFIDENTIAL

191. Bear Stearns, "Freddie Mac September Data Show Strong Securitization Growth and Efforts to Build Capital at Sept 30," October 24, 2007.
192. Citibank, "Freddie Mac: September Data - Portfolio Sales Ensure Sufficient Capital Amidst Volatility," October 24, 2007.
193. Credit Suisse, "Freddie Mac: Large Drop in Retained Portfolio," October 24, 2007.
194. Fox-Pitt Kelton, "Freddie Mac: Expect Large GAAP Loss in Quarter," October 24, 2007.
195. Friedman Billings Ramsey, "Freddie Mac: Sells Assets to Maintain Capital Levels-- Downgrading to Market Perform," October 24, 2007.
196. Merrill Lynch, "GSE stocks come into focus due to credit exposure," October 24, 2007.
197. Merrill Lynch, "Freddie Mac: GAAP loss seems likely for Q3; Volatility back in focus," October 24, 2007.
198. Miller Tabak, "FRE September Activity: Surplus Limitation Surfaces, Delinquencies 0.46%," October 24, 2007.
199. UBS, "Freddie Mac: Numbers Reflect Strong G-Fee Portfolio Growth, But Imply 3Q FVNA Reduction," October 24, 2007.
200. Citibank, "Government Sponsored Enterprises: Credit Concerns Dominate, But Political Winds Remain Positive," October 25, 2007.
201. Credit Suisse, "Credit Suisse Breakfast Banker," October 25, 2007.
202. Fox-Pitt Kelton, "Smoot-Hawley Redux," October 25, 2007.
203. Bank of America, "Consumer and Specialty Finance Weekly: Specialty Commercial Lenders 3Q07 Earnings Preview," October 26, 2007.
204. Fox-Pitt Kelton, "Fannie Reports September Data," October 26, 2007.
205. Morgan Stanley, "Mortgage Finance: In the long term, pricing trumps losses, but the short-term could still be volatile," October 26, 2007.
206. PiperJaffray, "PJC Mortgage Update: Credit Crunch Exacerbates Downturn, Glimmers of Hope?," November 5, 2007.
207. Lehman Brothers, "FNM Becoming Timely; Thoughts on MI Risk," November 6, 2007.
208. Fox-Pitt Kelton, "GSEs: Expect Only Moderate Uptick in Losses," November 7, 2007.
209. Morgan Stanley, "Freddie Mac: Correction: Quick Comment: Mark-to-market risk for FRE," November 7, 2007.
210. Morgan Stanley, "Freddie Mac: Quick Comment: Mark-to-market risk for FRE," November 7, 2007.
211. UBS, "Mortgage Finance Update: NY AG Subpoenas GSEs in Conjunction with Appraisal Investigation," November 7, 2007.
212. Lehman Brothers, "Freddie Mac: Negative Marks Should Cause 3Q GAAP Loss," November 8, 2007.
213. Credit Suisse, "Mortgage Finance: New York AG Appraisal Probe; Implications for the Mortgage Market," November 8, 2007.
214. JP Morgan, "Fannie Mae: Credit Losses Likely to Rise, but Concerns Over Wamu Loans And Mis Seem Overdone - Corrected Note supersedes any previous version," November 8, 2007.
215. Bank of America, "Consumer Specialty and Mortgage Finance Weekly: Lowering our Mortgage Industry Originations Forecast," November 9, 2007.
216. Lehman Brothers, "FNM Credit Costs Rise Substantially," November 9, 2007.
217. Lehman Brothers, "Freddie Mac: Downgrade to 2-EW for Credit Concerns," November 12, 2007.

CONFIDENTIAL

218. Lehman Brothers, "Fannie Mae: Downgrade to 2-EW on Poor Credit Outlook," November 12, 2007.
219. Fox-Pitt Kelton, "Fannie Mae: This Glass is Half Full," November 13, 2007.
220. UBS, "Consumer Finance Monthly: 3Q Results Were as Dismal as Excepted, Except When They Were Worse," November 14, 2007.
221. PiperJaffray, "Freddie Mac: Reducing Price Target; Maintaining Estimates and MP," November 15, 2007.
222. UBS, "Consumer Finance Monthly: 3Q Results Were as Dismal as Excepted, Except When They Were Worse," November 15, 2007.
223. UBS, "Morning Expresso - United States," November 15, 2007.
224. Fox-Pitt Kelton, "Fannie Mae: Thoughts on SPO 03-3," November 16, 2007.
225. Morgan Stanley, "Freddie Mac: Revised Estimate For 3Q07," November 16, 2007.
226. Morgan Stanley, "Americas Equity Morning Summary," November 16, 2007.
227. UBS, "US Contextual Diary: Two Weeks Ahead," November 16, 2007.
228. Credit Suisse, "First Edition (19 November, 2007)," November 19, 2007.
229. Credit Suisse, "Freddie Mac: Profitability Outlook Unfavorable; Are Security Impairments Down the Road?," November 19, 2007.
230. JP Morgan, "Freddie Mac: Higher Credit Expenses and GA Loss Likely in 3Q, but Derivative Losses Likely Smaller than Fannie's," November 19, 2007.
231. Bear Stearns, "GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity As Well," November 20, 2007.
232. Citibank, "Freddie Mac: Losses Spur Need for New Capital; Charter/Mission Intact," November 20, 2007.
233. Credit Suisse, "Credit Suisse Breakfast Banker," November 20, 2007.
234. Fitch, "Amend: Fitch Places Freddie Mac's 'AA-' Preferred Stock on Rating Watch Negative," November 20, 2007.
235. Fox-Pitt Kelton, "We think capital raise will be dilutive to common shareholders," November 20, 2007.
236. Fox-Pitt Kelton, "FNM and FRE: Capital Constrained – Downgrading to Underperform," November 20, 2007.
237. Miller Tabak, "FNM and FRE Price Action - Capital Levels and Even More Threatened Business Models," November 20, 2007.
238. Morgan Stanley, "Freddie Mac: Reports 3Q07 Loss," November 20, 2007.
239. UBS, "First Read: Freddie Mac: Placing Under Review as We Clarify Credit and Capital Outlook," November 20, 2007.
240. JP Morgan, "Mortgage Finance: GSEs Likely to Remain Active in Securitization Business Despite Near-term Capital Issues," November 20, 2007.
241. Lehman Brothers, "Freddie Mac: '08 Estimate Using Base Case Now $2.28," November 21, 2007.
242. Credit Suisse, "Credit Suisse Breakfast Banker," November 21, 2007.
243. Credit Suisse, "Hostile Environment Weighs on Q3 Results; Sizable Capital Raise Needed," November 21, 2007.
244. Friedman Billings Ramsey, "Freddie Mac: Credit Cost Continues to Rise, Capital Declines-- Maintaining Underperform," November 21, 2007.
245. Goldman Sachs, "Freddie Mac: 3Q07: Core capital in decline, significant capital raise required," November 21, 2007.

CONFIDENTIAL

246. JP Morgan, "AsiaCreditToday," November 21, 2007.
247. Keefe, Bruyette & Woods, "Freddie Mac: FRE 3Q: Freddie Loses $3.29 in Earnings, $12 in Fair Value," November 21, 2007.
248. Merrill Lynch, "Big equity offering seems likely; Common & Preferred," November 21, 2007.
249. Miller Tabak, "Huge Valuation Meltdown Tied to Credit Concerns, Likely Dividend Cut Cutting 2009 Price Target to $51.50, Maintain 'Strong Buy," November 21, 2007.
250. PiperJaffray, "PJC Mortgage Update: Cash-Out Drops; Home Starts Continue Much-Needed Plummet," November 21, 2007.
251. Deutsche Bank, "Dbdaily: European Edition," November 22, 2007.
252. UniCredit, "Covered Bond & Agency Monitor," November 22, 2007.
253. UBS, "GSE Update: Downgrading GSEs as Credit Pressures Erode EPS and Dividend Outlook," November 26, 2007.
254. Bear Stearns, "Release of Freddie Mac Adjusted/Economic Earnings Model," November 27, 2007.
255. Credit Suisse, "Freddie Mac: Divided Halved and $6 Billion of Preferred Raised Stabilizes Current Capital Position," November 27, 2007.
256. Fitch, "Fitch Expects to Rate Freddie Mac's $6B Upcoming Preferred Stock 'A+,'" November 27, 2007.
257. Merrill Lynch, "Preferred offering a modest positive," November 27, 2007.
258. Portales Partners, "Raising Our Ratings on the GSEs," November 27, 2007.
259. UBS, 'Mortgage Strategist: Highlights & Recommendations," November 27, 2007.
260. UBS, "Freddie Mac: Announces $6B Preferred Stock Offering; Cuts 4Q Dividend by 50%," November 27, 2007.
261. Citibank, "Freddie Mac: Capital Actions Announced; Terms TBD," November 28, 2007.
262. nabCapital, "Credit Today," November 29, 2007.
263. Bank of America, "Freddie Mac," November 29, 2007.
264. Fox-Pitt Kelton, "The paradox of increased capital," November 30, 2007.
265. Lehman Brothers, "Erratum: Updating Ests for Capital Raise," December 3, 2007.
266. Lehman Brothers, "Freddie Mac: Fred Updating Estimates for Capital Raise," December 3, 2007.
267. Fitch, "Fitch Downgrades Freddie Mac's Preferred Stock to 'A+'; Off Rating Watch," December 4, 2007.
268. Argus, "Freddie Mac," December 6, 2007.
269. Prudential, "FRE: TAKEAWAYS FROM OUR MEETING WITH THE CFO," February 26, 2007.
270. Fox-Pitt Kelton, "Freddie Mac: Strong Total Portfolio Growth Continues in February," March 21, 2007.
271. Lehman Brothers, "Tune Out the Noise; '08 Results Preview," March 21, 2007.
272. Fox-Pitt Kelton, "Buybacks Bolster Lackluster Results," March 23, 2007.
273. Bank of America, "Despite weak '06 Results, Outlook is Positive, Reiterate Buy," March 28, 2007.
274. Lehman Brothers, "Freddie Mac: Highlights from Management Meetings," April 5, 2007.
275. Goldman Sachs, "Fannie and Freddie: Housing market gets worse before it gets better," December 12, 2007.

CONFIDENTIAL

276. Lehman Brothers, "Freddie Mac: Change of Earnings Forecast: Raising EPS for Recent G-fee Adjustments," December 19, 2007.
277. Fox-Pitt Kelton, "Cash flow analysis shows subprime impairment unlikely," January 24, 2008.
278. Fox-Pitt Kelton, "Cash flow analysis shows subprime impairment unlikely," January 25, 2008.
279. Fox-Pitt Kelton, "Mortgage Finance: More Signs of Healing - Monetary policy is working," February 5, 2008.
280. Fox-Pitt Kelton, "Freddie Mac: 4Q Preview: What To Expect," February 21, 2008.
281. Bear Stearns, "January Data Show Decline in PC Issuance and Retained Portfolio Balance," February 21, 2008.
282. Credit Suisse, "Portfolio Contracts and Overall Growth Slows; Delinquencies Continue to Rise," February 21, 2008.
283. Morgan Stanley, "Freddie Mac: Quick Comment: 5 bp Deterioration in Dec Delinquencies to 60 bps," February 21, 2008.
284. Fox-Pitt Kelton, "Freddie Mac: 4Q Preview: What To Expect," February 22, 2008.
285. Fox-Pitt Kelton, "Are market risk perceptions overstated?," March 3, 2008.
286. Fox-Pitt Kelton, "FRE: Accounting, FV questions still on investors' minds," March 5, 2008.
287. Fox-Pitt Kelton, "Freddie Mac: Upgrading to In Line," March 12, 2008.
288. Fox-Pitt Kelton, "FNM, FRE: OFHEO to reduce capital surplus," March 18, 2008.
289. Fox-Pitt Kelton, "Message to GSEs: Don't Go all Wobbly," April 11, 2008.
290. Fox-Pitt Kelton, "Fannie Mae: First Take: Difficult Quarter, as expected," May 6, 2008.
291. Fox-Pitt Kelton, "FPK Mortgage Conference - FNM/FRE Chances growing of resolution on regulator," May 7, 2008.
292. Fox-Pitt Kelton, "FRE: Now a revenue growth story," May 14, 2008.
293. Fox-Pitt Kelton, "Housing reform that the GSEs could live with," May 20, 2008.
294. Fox-Pitt Kelton, "GSEs: Strong portfolio growth," May 23, 2008.
295. Fox-Pitt Kelton, "Freddie Mac: The worst or best of times?," June 18, 2008.
296. Fox-Pitt Kelton, "FNM, FRE: Clear differences in performance emerge," June 25, 2008.
297. Fox-Pitt Kelton, "FNM, FRE: Unfounded Panic drives down shares," July 8, 2008.
298. Fox-Pitt Kelton, "FNM/FRE: Conversations with FASB," July 8, 2008.
299. Fox-Pitt Kelton, "FNM, FRE: Talk about insolvency," July 10, 2008.
300. Fox-Pitt Kelton, "Reasonable alternatives to a doomsday scenario," July 11, 2008.
301. Fox-Pitt Kelton, "OFHEO appears to give leeway on timing of capital raise," July 11, 2008.
302. Fox-Pitt Kelton, "FRE: Treasury-FRE deal good news all around," July 14, 2008.
303. Fox-Pitt Kelton, "GSEs: "New" Regulator spells out views on GSE reform legislation, capital and shareholder role," July 30, 2008.
304. Fox-Pitt Kelton, "Waiting for a ray of sunshine," July 30, 2008.
305. Fox-Pitt Kelton, "Capital adequacy crucial in near term," August 7, 2008.
306. Fox-Pitt Kelton, "Fannie Mae: It's all about capital (and we think they have enough)," August 8, 2008.
307. Fox-Pitt Kelton, "Fannie Mae: It's all about capital (and we think they have enough)," August 11, 2008.
308. Fox-Pitt Kelton, "FNM FRE Night of the Long Knives," August 19, 2008.

CONFIDENTIAL

309. Fox-Pitt Kelton, "FNM FRE Quick Comment on supposed spread widening," August 22, 2008.
310. Fox-Pitt Kelton, "Cont'd deterioration in housing, but affordability up; card data marginally improved," September 3, 2008.
311. Fox-Pitt Kelton, "FNM/FRE: The End of the Road," September 8, 2008.
312. Fox-Pitt Kelton, "Annc'd Gov't Intervention of GSEs a Net Positive for Banks," September 8, 2008.
313. Fox-Pitt Kelton, "A September to remember," September 29, 2008.
314. Fox-Pitt Kelton, "Freddie Mac: Continued portfolio declines," October 24, 2008.
315. Fox-Pitt Kelton, "Fannie Mae: No help yet to beleaguered mortgage market," October 30, 2008.
316. Fox-Pitt Kelton, "Focus on California: Signs of Improvement," October 31, 2008.
317. Fox-Pitt Kelton, "Fannie Mae: Large Losses, minimal capital mean little help to mort. market for some time," November 10, 2008.

**News Articles**
1. Reuters News, "Cash-strapped New Century taps Lazard as adviser," March 22, 2007.
2. Reuters News, "Treasury's Paulson Sees Housing Downturn Contained," March 28, 2007.
3. Bloomberg News, "New Century, Biggest Subprime Casualty, Goes Bankrupt (Update4)," April 2, 2007.
4. Reuters News, "EURO CORP-Crossover widens sharply as subprime strikes again," July 18, 2007.
5. The Washington Post, "Fannie, Freddie Shares Get Boost; Talk Widespread On Possible Easing of Limits," August 7, 2007.
6. Reuters News, "Europe shares fall as BNP Paribas spooks investors," August 9, 2007.
7. Dow Jones News Service, "WSJ: Countrywide: Co [sic] Faces 'Unprecedented Disruptions'," August 9, 2007.
8. Associated Press Newswires, "ECB steps in to ease market fears by expanding cash," August 9, 2007.
9. The Street.com, "Fed, ECB Respond to Credit Crunch," August 9, 2007.
10. Associated Press, "World Stocks Plunge on Credit Fears," August 10, 2007.
11. Dow Jones International News, "OFHEO Won't Authorize Fannie, Freddie To Grow Portfolios," August 10, 2007.
12. The Washington Post, "Bernanke Opposes Lift of Fannie, Freddie Caps," August 30, 2007.
13. The New York Times, "Citigroup Warns of 60% Earnings Drop in Third Quarter," October 1, 2007.
14. NPR, "Citigroup, UBS to Post Sharp Losses for Bad Loans," October 1, 2007.
15. The New York Times, "Citigroup Profit Fell 57% in Third Quarter," October 15, 2007.
16. Dow Jones Business News, "Wachovia Misses Forecasts; Takes $1.3 Billion Charge," October 19, 2007.
17. Dow Jones News Service, "Morgan Stanley Sees $3.7B Write Down," November 7, 2007.

CONFIDENTIAL

18. Dow Jones Newswires, "NY AG Cuomo To Issue Subpoenas To Freddie Mac, Fannie Mae," November 7, 2007.
19. Dow Jones Business News, "Bank of America Warns of Additional CDO Losses," November 13, 2007.
20. Reuters, "Before the Bell – Bear Stearns shares up on write-down view," November 14, 2007.
21. The Wall Street Journal, "Fannie, Freddie Feel Default Heat --- Falling Home-Value Growth Affects Even Mortgage Titans' Stable Borrowers," November 19, 2007.
22. Reuters News, "MORTGAGES/AGENCIES-Spreads hit new wides; Freddie in focus," November 19, 2007.
23. Bloomberg News, "Freddie, Fannie Fall on Concern About Losses in Mortgage Market," November 19, 2007.
24. Dow Jones Business News, "UPDATE: Freddie Mac's Loss More Than Doubles; Firm May Halve Dividend," November 20, 2007.
25. Dow Jones International News, "With Capital Warning, Freddie Shifts From Solution To Problem," November 20, 2007.
26. Dow Jones Business News, "Update: Freddie Mac's Loss More Than Doubles; Firm May Halve Dividend," November 20, 2007.
27. Dow Jones News Service, "UPDATE: Freddie Mac 3Q Loss Balloons, May Need Capital," November 20, 2007.
28. Reuters News, "Fannie Mae's credit spreads widen 7.6 pct - Markit," November 20, 2007.
29. Dow Jones Capital Markets Report, "OFHEO's Lockhart: Freddie, Fannie Books Better Than Average," November 21, 2007.
30. Reuters News, "Investors eye high-yielding Freddie Mac preferreds," November 26, 2007.
31. Dow Jones News Service, "Freddie Mac, Fannie Mae Cut To Neutral At UBS," November 26, 2007.
32. Dow Jones Capital Markets Report, "Freddie Mac To Sell Up To $6B Perpetual Preferred Stk-Source," November 27, 2007.
33. Dow Jones News Service, "Freddie Mac Declares Qtrly Dividends," November 27, 2007.
34. Dow Jones News Service, "Ofheo: 2008 Conforming Loan Limit To Remain At $417,000," November 27, 2007.
35. Reuters News, "UPDATE 3- Freddie Mac shares post biggest gain in 19 years," November 28, 2007.
36. Dow Jones Capital Markets Report, "Freddie Mac Non-Conv Pfd Pegged At 8.5%-8.75% Coupon-Sources," November 28, 2007.
37. Associated Press Newswires, "Fannie Mae EVP Robert J. Levin buys 5,000 shares of common stock," November 28, 2007.
38. PR Newswire (U.S.), "Freddie Mac Provides Update On Preferred Stock Offering," November 29, 2007.
39. Bloomberg News, "Freddie Mac Offers Preferred Stock at 8.5 Percent Yield," November 29, 2007.

CONFIDENTIAL

40. Bloomberg News, "Freddie to Sell Only Non-Convertible Preferred Shares (Update1)," November 29, 2007.
41. Bloomberg News, "Freddie preferred stock deal 5 times oversubscribed, according to source," November 29, 2007.
42. Reuters News, "Freddie Mac $6 bln preferred deal seen at 8.375 pct," November 29, 2007.
43. Bloomberg News, "Freddie Mac Launches Preferred Sale With Yield Of 8.375%," November 29, 2007.
44. Bloomberg News, "Freddie to Sell Only Non-Convertible Preferred Shares (Update3)," November 29, 2007.
45. Briefing.com, "Freddie Mac sells $6 bln preferred stock at 8.375% dividend," November 29, 2007.
46. Reuters News, "Freddie Mac sells $6 bln preferred shares," November 29, 2007.
47. PR Newswire (U.S.), "Freddie Mac Prices Offering of Non-Convertible Non-Cumulative Perpetual Preferred Stock," November 29, 2007.
48. Reuters News, "MORTGAGES/AGENCIES-Spreads mixed, extreme swings pause briefly," November 29, 2007.
49. Reuters News, "UPDATE 1-Fannie Mae Oct holdings jump driven by transaction," November 30, 2007.
50. AFX Asia, "Shares of Freddie Mac Rally; $6B Preferred Stock Offering Priced Thursday," December 1, 2007.
51. Business Wire, "WaMu to Raise $2.5 Billion in Additional Capital, Reduce Dividend, Resize Home Loans Business and Cut Expenses to Fortify Capital Base; * Expects Net Loss for Fourth Quarter 2007 With Non-cash Writedown of Home Loans Segment Goodwill * Non-cash Writedown Will Not Affect Key Capital Ratios or Liquidity," December 10, 2007.
52. Reuters, "UPDATE 3-WaMu to cut dividend, jobs; sets capital infusion," December 10, 2007.
53. The News Tribune, "Washington Mutual Stock Price Sinks 12.4 Percent on Bad News," December 12, 2007.
54. Reuters News, "UPDATE 2- WaMu prices $2.9 bln of convertible shrs," December 12, 2007.
55. Morgan Stanley, "Morgan Stanley Reports Fourth Quarter and Full Year Results," December 19, 2007.
56. Reuters, "UPDATE 5 – Bear Stearns has huge loss, cuts executive bonuses," December 20, 2007.
57. The New York Times, "Canadian Bank Hopes Stock Offer Calms Fears," January 15, 2008.
58. Citi, "Citi Reports Fourth Quarter Net Loss of $9.83 Billion, Loss Per Share of $1.99," January 15, 2008.
59. Dow Jones News Service, "UPDATE: Ambac To Raise $1B In Capital, Sees Big 4Q Losses," January 16, 2008.

CONFIDENTIAL

60. Dow Jones News Service, "AMBAC Comments on Recent Moody's Report," January 17, 2008.
61. The New York Times, "Write-Down Contributes to Profit Fall at Trust Bank," January 18, 2008.
62. Associated Press Newswires, "Bank of America, Wachovia profits plunge in fourth quarter," January 22, 2008.
63. Reuters, "UPDATE 5 – Ambac posts $3.3 bln loss, but shares surge," January 22, 2008.
64. The Wall Street Journal, "Yale's Shiller: U.S. Housing Slump May Exceed Great Depression," April 22, 2008.
65. The Guardian, "The day the credit crunch began, 10 years on: 'the world changed'," August 3, 2017.

**Publications**

1. Mark L. Mitchell and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," The Business Lawyer, February 1994.
2. Craig A. MacKinlay, "Event Studies in Economics and Finance," Journal of Economic Literature, Vol. 35, No. 1, pp. 13–39, March 1997.
3. Mukesh Bajaj, Atulya Sarin and Sumon C. Mazumdar, "The Costs of Issuing Preferred Stock," The Journal of Financial Research, Vol. XXV, No. 4, Pages 577-592, Winter 2002.
4. Paul A. Ferrillo, Frederick C. Dunbar, David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," St. John's Law Review, Issue 1 Volume 78, Winter 2004.
5. Souphala Chomsisengphet and Anthony Pennington-Cross, "The Evolution of the Subprime Mortgage Market," Federal Reserve Bank of St. Louis, January 2006.
6. Alan Greenspan and James Kennedy, "Sources and Uses of Equity Extracted from Homes," Federal Reserve Board Staff Working Paper, 2007-20.
7. Avery, R.B., Brevoort, K.P., Canner, G.B., 2007. The 2006 HMDA data. Federal Reserve Bulletin 93, A73–A109.
8. Markus K. Brunnermeier, "Deciphering the Liquidity and Credit Crunch 2007-08," Journal of Economic Perspectives, 23(1), Winter 2009, pages 77-100.
9. Gene Amromin and Anna L. Paulson, "Default Rates on Prime and Subprime Mortgages: Differences & Similarities," Federal Reserve Bank of Chicago, 2010.
10. Gary B. Gorton, "Questions and Answers About the Financial Crisis," NBER Working Paper Series, National Bureau of Economic Research, February 2010.
11. Arvind Krishnamurthy, "How Debt Markets Have Malfunctioned in the Crisis," Journal of Economic Perspectives, Volume 24, No. 1, Winter 2010, Pages 3-28.
12. Marcin Kacperczyk and Philipp Schnabl, "When Safe Proved Risky: Commercial Paper during the Financial Crisis of 2007–2009", Journal of Economic Perspectives—Volume 24, Number 1, Winter 2010, Pages 29–50.
13. Michael LaCour-Little, Charles A. Calhoun, Wei Yu, "What role did piggyback lending play in the housing bubble and mortgage collapse?" Journal of Housing Economics (2011).

CONFIDENTIAL

## Other

1. Robert B. Avery, Raphael W. Bostic, Paul S. Calem, and Glenn B. Canner, "Credit Risk, Credit Scoring, and the Performance of Home Mortgages," Federal Reserve Bulletin, 1996.
2. Nomura, "Synthetic ABS 101: PAUG and ABX.HE," March 7, 2005.
3. Ben Bernanke, "The Global Saving Glut and the U.S. Current Account Deficit," Remarks at the Sandridge Lecture, Virginia Association of Economics, Richmond, Virginia, March 10, 2005.
4. Interagency Guidance on Nontraditional Mortgage Product Risks, Federal Register, Vol. 71, No. 192, adopted October 2006, https://www.federalregister.gov/documents/2006/10/04/06-8480/interagency-guidance-on-nontraditional-mortgage-product-risks.
5. "The Subprime Mortgage Market: National and Twelfth District Developments," Federal Reserve Bank of San Francisco, 2007 Annual Report.
6. Ben S. Bernanke, "The Subprime Mortgage Market," Speech at the Federal Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure and Competition, May 17, 2007.
7. BNP Paribas Press Release, "BNP Paribas Investment Partners temporarily suspends the calculation of the Net Asset Value of the following funds: Parvest Dynamic ABS, BNP Paribas ABS EURIBOR and BNP Paribas ABS EONIA," August 9, 2007.
8. Ben S. Bernanke, "Housing, Housing Finance, and Monetary Policy," Speech at the Federal Reserve Bank of Kansas City's Economic Symposium, August 31, 2007.
9. David G. Wood, "Information on Recent Default and Foreclosure Trends for Home Mortgages and Associated Economic and Market Developments," U.S. Government Accountability Office, GAO-08-78R, October 16, 2007.
10. Office of Federal Housing Enterprise Oversight Report Congress, 2008.
11. Board of Governors of the Federal Reserve System, FOMC Statement, October 31, 2007.
12. Canadian Imperial Bank of Commerce, Form 6-K, December 6, 2007.
13. Joint Economic Committee United States Congress, "THE U.S. HOUSING BUBBLE AND THE GLOBAL FINANCIAL CRISIS: VULNERABILITIES OF THE ALTERNATIVE FINANCIAL SYSTEM," June 2008.
14. Timothy F. Geithner, "Reducing Systemic Risk in a Dynamic Financial System," Remarks at The Economic Club of New York, New York City, June 9, 2008.
15. Tobias Adrian, Christopher R. Burke, and James J. Mc. Andrews, "The Federal Reserve's Primary Dealer Credit Facility", Federal Reserve Bank of New York, Current Issues in Economics and Finance, Volume 15, Number 4, August 2009.
16. Ben S. Bernanke, "Monetary Policy and the Housing Bubble," Speech at the Annual Meeting of the American Economic Association, January 3, 2010.
17. 2010 Inside Mortgage Finance, Volume II.
18. Federal Reserve Bank of St. Louis, "Changes in the Mortgage Market Since the Crisis," August 2011.
19. CoreLogic Special Report, "Evaluating the Housing Market Since the Great Recession," February 2018.
20. Expert Report of David I. Tabak, Ph.D., SJUNDE AP-FONDEN et al., *individually and on behalf of all others similarly situated*, v. GENERAL ELECTRIC COMPANY et al., August 9, 2021.

CONFIDENTIAL

21. Securities and Exchange Commission, Office of Investor Education and Advocacy, "Insider Transactions and Forms 3,4, and 5." https://www.sec.gov/files/forms-3-4-5.pdf.

22. Federal Housing Finance Agency, "Fannie Mae and Freddie Mac," https://www.fhfa.gov/SupervisionRegulation/FannieMaeandFreddieMac/Pages/About-Fannie-Mae---Freddie-Mac.aspx.

23. Federal Housing Finance Agency, "The Federal Home Loan Bank System," https://www.fhfa.gov/SupervisionRegulation/FederalHomeLoanBanks/Pages/About-FHL-Banks.aspx.

24. Federal Housing Finance Agency, "Federal Home Loan Bank Act," https://www.fhfa.gov/Government/Pages/Federal-Home-Loan-Bank-Act.aspx.

25. Cboe, "Tradable Products," http://www.cboe.com/products/vix-index-volatility/vix-options-and-futures/vix-index.

26. Federal Home Finance Agency Office of Inspector General, "A Brief History Of The Housing Government-Sponsored Enterprises," https://www.fhfaoig.gov/Content/Files/History%20of%20the%20Government%20Sponsored%20Enterprises.pdf.

**Textbooks**

1. Gregory Mankiw and Laurence Ball, Macroeconomics and the Financial System, Worth Publishers, First Edition 2011.

2. Brealey and Meyers, Principles of Corporate Finance, Tenth Edition.

3. Peter Kennedy, "A Guide to Econometrics," Fifth Edition.

**Data**

1. Bloomberg.

2. Capital IQ.

3. CRSP.

4. Factiva.

5. Refinitiv Eikon.

6. Federal Housing Finance Agency, https://www.fhfa.gov/DataTools/Downloads/Pages/House-Price-Index.aspx.

7. Robert Shiller Online Data, http://www.econ.yale.edu/~shiller/data/Fig3-1.xls.

8. Markit.

9. OptionMetrics.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, On Behalf of Itself and all Others Similarly Situated, | ) ) ) ) |
| Plaintiff, | ) ) CIVIL ACTION NO. 4:08-cv-160 |
| vs. | ) ) JUDGE BENITA Y. PEARSON |
| FEDERAL HOME LOAN MORTGAGE CORPORATION a/k/a FREDDIE MAC, RICHARD F. SYRON, PATRICIA L. COOK, ANTHONY S. PISZEL, and EUGENE M. McQUADE, | ) ) MAGISTRATE JUDGE ) WILLIAM H. BAUGHMAN, JR. ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' GLOSSARY OF TERMS

Per this Court's May 16, 2014 Order, Federal Home Loan Mortgage Corporation ("Freddie Mac"), Richard F. Syron, Patricia Cook, Anthony Piszel, and Eugene McQuade hereby submit this Glossary of Terms.

**SUBPRIME MORTGAGE LOAN**:  Loans that originating lenders classify and label as "subprime" loans upon their origination, marketing, and sale are "subprime" loans.  Freddie Mac did not buy and hold in its guarantee portfolio loans classified by the originating lender as "subprime" loans upon their issuance, with the exception of a de minimus amount of Structured Securities that were backed by loans identified as being "subprime" by the original issuer.[1]

That said, there is not, and there was not during the putative class period, a universally accepted definition of the term "subprime" loan that originating lenders use, or have used, when

---

[1] See TAC ¶ 156; see also Freddie Mac 2006 Annual Report to Stockholders (Mar. 23, 2007), ECF No. 298-2 ("2006 Annual Report") at p. ID 12479 ("Also included in our credit guarantee portfolio are Structured Securities backed by non-agency mortgage-related securities where the underlying collateral was **identified as being subprime by the original issuer**.") (emphasis added); see also Freddie Mac 2007 Annual Report to Stockholders (Feb. 28, 2008), ECF No. 298-3 ("2007 Annual Report") at p. ID 12678-79 ("We estimate that approximately $6 billion and $3 billion of loans underlying our Structured Transactions at December 31, 2007 and 2006, respectively, were **classified as subprime mortgage loans**.") (emphasis added).

they classify, label, market, and sell loans as "subprime" loans.[2] "Subprime" loans typically are originated by specialized lenders, rather than by mainstream mortgage lenders.[3] As a group, these specialized subprime originators have been referred to as the "subprime channel."[4] Freddie Mac did not purchase and hold in its guarantee portfolio, during the relevant period, loans sold through "traditional subprime channels" of loan origination (except as noted above),[5] and the Third Amended Complaint ("TAC") does not allege otherwise.

**RISK-LAYERED MORTGAGE LOAN**: In the mortgage industry, "risk-layered mortgage loans" connote loans that have more than one characteristic associated with higher levels of credit risk.[6] The combination of multiple higher risk characteristics associated with a loan increases the degree of credit risk presented by that loan. For example, mortgages with both high LTV ratios and lower FICO credit scores typically experience higher rates of delinquency, default, and credit losses.[7] An article on which Plaintiff relies in the TAC discusses risk layering as it relates to the loans in Freddie Mac's guarantee portfolio, as of the end of the second quarter of 2007, as follows: "Loans to borrowers with a FICO credit score lower than 620 make up 4% of the total [Freddie Mac guarantee] portfolio. But, significantly, loans with both original LTVs over 90% and FICO scores below 620 make up a tiny proportion of the portfolio at less than 1%."[8]

---

[2] See Mem. of Law in Support of Freddie Mac's Motion to Dismiss ("MB") at 48-50 (collecting authority); 2006 Annual Report, ECF No. 298-2 at p. ID 12479; Thomas P. Lemke, Gerald T. Lins & Marie E. Picard, Mortgage-Backed Securities:  Developments and Trends in the Secondary Mortgage Market § 3:6 (2013-14 ed.) ("There is no single accepted or all-encompassing definition of 'subprime' and subprime mortgages are not homogenous."); SEC v. Mozilo, No. 09-cv-03994 (C.D. Cal.), Compl. ¶ 21, ECF No. 1. (referring to differing definitions of "subprime" loans, using as a cut-off loans to borrowers with FICO scores lower than either 620 or 660); MB at 17-18 (citing to documents referenced in the TAC evidencing that Freddie Mac disclosed all of the loans in its guarantee portfolio made to borrowers with FICO scores below either 620 or 660, and the TAC does not contest the accuracy of any of those disclosures); Kuriakose v. Federal Home Loan Mortg. Corp., 897 F. Supp. 2d 168, 182-83 (S.D.N.Y. 2012) (noting disclosure by Freddie Mac of all loans in its guarantee portfolio made to borrowers with FICO scores below either 620 or 660).

[3] Lemke, supra, § 3:5-6.

[4] See, e.g., Kuriakose, 897 F. Supp. 2d at 183 (referencing "traditional subprime channels").

[5] Id. (noting that Freddie Mac did not purchase or guarantee loans from "traditional subprime channels").

[6] See Conference of State Bank Supervisors, Am. Assoc. of Residential Mortg. Regulators, Guidance on Nontraditional Mortgage Product Risks ("CSBS/AARMR") at 5, available at http://www.csbs.org/regulatory/policy/policy-guidelines/Documents/CSBS-AARMR_FINAL_GUIDANCE.pdf.

[7] See 2007 Annual Report, ECF No. 298-3 at p. ID 12682.

[8] Mission Critical, Mortgage Risk Magazine (Oct. 2007), ECF No. 298-40 at p. ID 13708-09 (emphasis added).

A/76181907

Similarly, the report published by the Financial Crisis Inquiry Commission of the United States Congress stresses that the effects of "risk layering" account for the exponential difference in the delinquency rate between the GSE (i.e., Freddie Mac and Fannie Mae) and non-GSE loans that it studied with FICO scores below 660.[9] As the FCIC concluded, the non-GSE loans had a delinquency rate over 400% higher than the GSE loans that shared the same FICO score characteristic (i.e., 660 or below), because the non-GSE loans had many additional high-risk characteristics layered on top of the FICO score risk, while the GSE loans predominantly did not. Id. (reporting a 6.2% delinquency rate for the GSE loans with FICO scores below 660, versus a 28.3% delinquency rate for the non-GSE loans with FICO scores below 660); see also MB at 54-55. Based upon these differences in loan performance, the FCIC observed that "grouping all of these loans together," as if they are identical or very similar, "is misleading," given the effect that "risk-layering" has on the actual performance of such loans. See MB at 54-55 (quoting FCIC Report). For this reason, the FCIC Report concludes: "GSE mortgages with some riskier characteristics such as high loan-to-value ratios are not at all equivalent to those mortgages in securitizations labeled subprime and Alt-A by issuers."[10]

**SUBPRIME-LIKE LOAN**: The term "subprime-like loan" is not a term of art within the mortgage industry, and it does not have a definition. Rather, it is a descriptive term that would have a different meaning depending upon the person who used that term and the context in which it was used. While there is no definition of a "subprime-like loan," that description does connote what a "subprime-like loan" is *not*. A loan described as "subprime-*like*" is *not* a loan that was actually classified, labeled, and sold as a "subprime" loan by the lender that originated the loan. If it were, such a loan would not be referred to as "*like*" a "subprime" loan, but rather as a "subprime" loan. Generally speaking, a loan referred to as "subprime-like" might have some characteristics in common with a loan that an originating lender classified, labeled, and sold as a

---

[9] See also Fin. Crisis Inquiry Comm'n, Final Report of the Nat'l Comm'n on the Causes of the Fin. & Econ. Crisis in the U.S. (Jan. 2011), ECF No. 298-60 ("FCIC Report") at p. ID 14314-15.

[10] FCIC Report, ECF No. 298-60 at p. ID 14315.

3

"subprime" loan through the "subprime channel," while also possessing other attributes different from such loans.[11]   These differences have a substantial impact on the expected and actual performance of these loans.[12]

**NONTRADITIONAL MORTGAGE LOANS**:   The term "nontraditional mortgage loans" does not have a fixed definition in the mortgage industry.   Generally speaking, nontraditional mortgage loans are different than traditional fixed interest rate mortgage loans and include, but are not limited to, interest-only mortgages loans, Alt-A mortgage loans, and payment-option adjustable rate mortgages ("ARMs"), which may also be referred to as "alternative mortgage products."[13] Some of these products allow borrowers to exchange lower payments during an initial period for higher payments during a later amortization period.[14]   During the putative class period, as Freddie Mac disclosed, it expected nontraditional or alternative mortgage products that it purchased "to default more often than traditional products" that it purchased.[15]   Loans classified and labeled "subprime" by the originating lender may also be regarded as nontraditional mortgage loans.[16]   However, many types of loans that might be referred to as nontraditional mortgage loans are not "subprime" loans, and they present relatively lower levels of credit risk than loans classified and labeled "subprime" by the originating lender and sold through the "subprime channel."[17]

---

[11] See supra (section addressing "risk-layered mortgage loans" and discussing the significantly more negative performance of loans "labeled subprime and Alt-A by issuers," on the one hand, as compared to "GSE mortgages with some riskier characteristics such as high loan-to-value ratios" or lower FICO scores, on the other hand) (quoting FCIC Report).

[12] Id.

[13] CSBS/AARMR at 1; see also Freddie Mac Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2005 (June 28, 2006), ECF No. 298-1 ("2005 Annual Report" at p. ID 12246, 12308; 2006 Annual Report, ECF No. 298-2 at p. ID 12449, 12479; 2007 Annual Report, ECF No. 298-3 at p. ID 12596; Freddie Mac Form 10-Q for the Quarterly Period Ended June 30, 2008 (Aug. 6, 2008), ECF No. 298-5 ("Q2 2008 10-Q") at p. ID 12840; see infra (discussions of "Alt-A mortgage loans," "interest-only loans," "payment-option adjustable rate mortgage loans," and "alternative mortgage market").

[14] See id.

[15] See, e.g., 2005 Annual Report, ECF No. 298-1 at p. ID 12308.

[16] See Lemke, supra, § 3:5.

[17] See supra (section discussing "risk-layered mortgage loans" and discussing the significantly more negative performance of loans "labeled subprime and Alt-A by issuers," on the one hand, as compared to "GSE

---

4

**HIGH-RISK MORTGAGE LOANS**:  The term "high-risk mortgage loans" is not a term of art within the mortgage industry, and it does not have a fixed definition.  Rather, it is a descriptive term that would have a different meaning depending upon the person who used that term and the context in which it was used.  Mortgage loans with characteristics that are associated with higher levels of credit risk, such as mortgages with high LTV ratios or mortgages to borrowers who have lower credit (FICO) scores, are among the loans that would generally be regarded as giving rise to a relatively higher risk of default than loans that lack those characteristics.[18]  Generally speaking, the greater the amount of higher-risk credit characteristics associated with a loan, i.e., the greater the amount of "risk-layering" within a loan, the higher the risk that the loan will default.[19]  Examples of loans that would generally be regarded as presenting relatively higher degrees of credit risk include nontraditional (or alternative) mortgage products, such as interest-only loans, payment-option adjustable rate mortgages,[20] and loans originated with less documentation, such as Alt-A loans.[21]  Loans classified and labeled "subprime" by the originating lender would also be regarded as high-risk mortgage loans, as such loans generally present a high degree of credit risk.  However, many types of loans that might be referred to as high-risk loans are not "subprime" loans, and they present relatively lower levels of credit risk than loans labeled and classified as "subprime" by the originating lender, and sold through the "subprime channel."[22]

---

mortgages with some riskier characteristics such as high loan-to-value ratios" or lower FICO scores, on the other hand) (quoting FCIC Report).

[18] See, e.g., MB at 17; 2005 Annual Report, ECF No. 298-1 at p. ID 12310; 2006 Annual Report, ECF No. 298-2 at p. ID 12480; 2007 Annual Report, ECF No. 298-3 at p. ID 12681; Q2 2008 10-Q, ECF No. 298-5 at p. ID 12901; Transcript, Freddie Mac Second Quarter 2007 Financial Results (Aug. 30, 2007), ECF No. 298-36 at p. ID 13558 (disclosing the quantity of loans in its guarantee portfolio with certain higher-risk characteristics including, inter alia, FICO scores below 620; original LTVs over 90%; the combination of both FICO scores below 620 and original LTVs over 90% ).

[19] See supra (discussion of "risk-layered mortgage loans").

[20] See infra (discussion of "payment-option adjustable rate mortgages").

[21] See infra; see also 2007 Annual Report, ECF No. 298-3 at p. ID 12598.

[22] See supra (section addressing "risk-layered mortgage loans," and discussing the significantly more negative performance of loans "labeled subprime and Alt-A by issuers," on the one hand, as compared to "GSE mortgages with some riskier characteristics such as high loan-to-value ratios" or lower FICO scores, on the other hand) (quoting FCIC Report).

5

**ALT-A MORTGAGE LOANS**:  Although there is no universally accepted definition of Alt-A (short for "Alternative-A paper") in the mortgage industry, Freddie Mac principally acquired, during the relevant period, mortgage loans originated as Alt-A from its traditional lenders that largely specialized in originating prime mortgage loans.  These lenders typically originated Alt-A loans as a complementary product offering and generally followed an origination path similar to that used for their prime origination process.  In determining Freddie Mac's exposure to Alt-A loans in its guarantee portfolio, Freddie Mac classified mortgage loans as Alt-A if the lender that delivered them to Freddie Mac had classified the loans as Alt-A, or if the loans had reduced documentation requirements which indicated that the loan should be classified as Alt-A.[23]

**INTEREST-ONLY LOAN**:  In the mortgage industry, an "interest-only loan" is a mortgage loan that allows the borrower to pay only interest (either fixed-rate or adjustable-rate) for a fixed period of time before principal amortization payments are required to begin.[24]  After the end of the interest-only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan.[25]  An interest-only loan is a nontraditional mortgage loan.[26]

**PAYMENT-OPTION ADJUSTABLE-RATE MORTGAGE ("ARM")**:  In the mortgage industry, a payment-option "ARM" is a mortgage loan that permits a variety of repayment options, including minimum, interest-only, fully amortizing 30-year and fully amortizing 15-year payments.[27]  The minimum payment alternative for payment-option ARM loans allows the borrower to make monthly payments that may be less than the interest accrued for the period.[28]

---

[23] See, e.g., 2007 Annual Report, ECF No. 298-3 at p. ID 12679; Q2 2008 10-Q, ECF No. 298-5 at p. ID 12903.

[24] See, e.g., 2006 Annual Report, ECF No. 298-2 at p. ID 12479; 2007 Annual Report, ECF No. 298-3 at p. ID 12678; Q2 2008 10-Q, ECF No. 298-5 at p. ID 12967.

[25] Id.

[26] See supra.

[27] See, e.g., 2006 Annual Report, ECF No. 298-2 at p. ID 12479; 2007 Annual Report, ECF No. 298-3 at p. ID 12678; Q2 2008 10-Q, ECF No. 298-5 at p. ID 12967.

[28] Id.

A/76181907

The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance.[29]

**ALTERNATIVE MORTGAGE MARKET**: The term "alternative mortgage market" does not have a fixed definition in the mortgage industry. Generally, the term may be used to refer to the market for alternative mortgage products, which would include products discussed herein as "nontraditional mortgage loans."[30]

Dated: June 9, 2014

Respectfully submitted,

**FEDERAL HOME LOAN MORTGAGE CORPORATION**

By its attorneys,

/s/ Hugh E. McKay
Hugh E. McKay (0023017)
PORTER WRIGHT MORRIS & ARTHUR LLP
950 Main Avenue, Suite 500
Cleveland, OH  44113
Tel:  (216) 443-2580
Fax:  (216) 443-9011
E-mail: hmckay@porterwright.com

Jordan D. Hershman
Jason D. Frank
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA  02110-1726
Tel: (617) 951-8455
Fax: (617) 951-8736
E-mail: jordan.hershman@bingham.com
E-mail: jason.frank@bingham.com

---

[29] Id.
[30] See supra (discussion of "nontraditional mortgage loans").

A/76181907

**RICHARD F. SYRON**

By his attorneys,


*/s/ Frank R. Volpe*
John C. Fairweather (0018216)
Lisa S. DelGrosso (0064938)
Kerri L. Keller (0075075)
BROUSE MCDOWELL
388 S. Main Street, Suite 500
Akron, Ohio 44311
Tel: (330) 535-5711
Fax: (330) 253-8601
E-mail: jfairweather@brouse.com
E-mail: ldelgrosso@brouse.com
E-mail: kkeller@brouse.com

Thomas C. Green
Mark D. Hopson
Frank R. Volpe
Judith C. Gallagher
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8711
E-mail: tcgreen@sidley.com
E-mail: mhopson@sidley.com
E-mail: fvolpe@sidley.com
E-mail: jcgallagher@sidley.com


**PATRICIA L. COOK**

By her attorneys,


*/s/ Carl S. Kravitz*
John C. Fairweather (0018216)
Lisa S. DelGrosso (0064938)
Kerri L. Keller (0075075)
BROUSE MCDOWELL
388 S. Main Street, Suite 500
Akron, Ohio 44311
Tel: (330) 535-5711
Fax: (330) 253-8601

8

E-mail:  jfairweather@brouse.com
E-mail:  ldelgrosso@brouse.com
E-mail:  kkeller@brouse.com

Steven M. Salky
Carl S. Kravitz
Caroline E. Reynolds
John B. Timmer
ZUCKERMAN SPAEDER LLP
1800 M Street N.W., Suite 1000
Washington, DC  20036
Tel:  (202) 778-1800
Fax:  (202) 822-8106
E-mail:  ssalky@zuckerman.com
E-mail:  ckravitz@zuckerman.com
E-mail:  creynolds@zuckerman.com
E-mail:  jtimmer@zuckerman.com

**ANTHONY S. PISZEL**

By his attorneys,


*/s/ James K. Goldfarb*
Joseph C. Weinstein (0023504)
Saber W. VanDetta (0075098)
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH  44114-1304
Tel:  (216) 479-8500
Fax:  (216) 479-8780
E-mail:  joe.weinstein@squirepb.com
E-mail:  saber.vandetta@ squirepb.com

James K. Goldfarb
Michael V. Rella
Jonathan S. Bashi
MURPHY & MCGONIGLE, P.C.
1185 Avenue of the Americas
21st Floor
New York, NY  10036
Tel:   (212) 880-3999
E-mail:  jgoldfarb@mmlawus.com
E-mail:  mrella@mmlawus.com
E-mail:  jbashi@mmlawus.com

9

William E. Donnelly
MURPHY & MCGONIGLE, P.C.
555 13th Street, N.W., Suite 410
Washington, D.C. 20004
Tel: (202) 661-7000
Fax: (202) 661-7049
E-mail: william.donnelly@mmlawus.com

**EUGENE M. MCQUADE**

By his attorneys,

*/s/ Michael S. Doluisio*
Joseph C. Weinstein (0023504)
Saber W. VanDetta (0075098)
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH 44114-1304
Tel: (216) 479-8500
Fax: (216) 479-8780
E-mail: joe.weinstein@squirepb.com
E-mail: saber.vandetta@ squirepb.com

Andrew J. Levander
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Tel: (212) 698-3683
Fax: (212) 698-3599
E-mail: andrew.levander@dechert.com

Cheryl A. Krause
Michael S. Doluisio
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Tel: (215) 994-2139
Fax: (215) 655-2139
E-mail: cheryl.krause@dechert.com
E-mail: michael.doluisio@dechert.com

10

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 9, 2014, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

 */s/ Hugh E. McKay*                     
Hugh E. McKay

CONFIDENTIAL

# Appendix 4: Market Model Description

1. To estimate Freddie Mac's excess returns on November 20, 2007 and the "capital raise dates" (November 27, 28, and 30, 2007) (collectively, the "Freddie Mac Excess Return Dates"), and to assess the statistical significance of these excess returns, I follow a standard methodology and estimate a statistical "market model" to isolate Freddie Mac's "excess" or "abnormal" returns, *i.e.*, the stock return after accounting for non-company specific factors such as market- and industry-wide factors.[1]  The basic idea is to separate the effects on stock price of company-specific information from non-company-specific information.  A regression analysis is used to calculate the relationship between changes in a company's security price (in this case Freddie Mac stock) and corresponding changes in the value of other variables capturing market- or industry-wide effects, such as the S&P 500, a broad market index. Then, the estimated relationship (*i.e.*, the "market model") and the actual performance of the associated variables are used to compute the model's "predicted return" for the stock.

2. The security's "excess return" (or "abnormal return") is then calculated by subtracting the predicted return from the security's observed return.  The excess return measures the portion of the security's observed return that cannot be explained by contemporaneous changes in the market- or industry-wide factors captured by the model.  It can be thought of as the company-specific component of the return.

3. The market model I applied here uses the S&P 500 Total Return Index as the market index to capture market-wide factors, the S&P 500 Financials Total Return Index as the broader industry index to capture general financial industry factors, and Fannie Mae to capture unique

---

[1]  See, e.g., MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," Journal of Economic Literature 35 ("MacKinlay (1997)"), pages 13-39. By using a market model to analyze excess returns, I am not offering an opinion on nor accepting that Freddie Mac stock traded in an efficient market during the Relevant Period.

CONFIDENTIAL

---

GSE-specific industry factors.

4. As discussed in the main body of this report in Section IV.A, Fannie Mae is a GSE that is the most similar company from a business perspective to Freddie Mac.  As GSEs, both Freddie Mac and Fannie Mae were regulated by the U.S. Department of Housing and Urban Development ("HUD") and the Office of Federal Housing Enterprise Oversight ("OFHEO").[2]  The two companies were subject to affordable housing goals set by HUD.  Regulators also placed limitations on both firms regarding the terms and principal amounts of loans and securities that could be purchased and/or guaranteed.[3]  OFHEO, the "safety and soundness regulator" for Freddie Mac and Fannie Mae, required the companies to "maintain a mandatory target capital surplus of 30 percent over [its] minimum capital requirement, subject to certain conditions and variations" and that both companies "submit weekly reports" on capital levels.[4]  Analysts cover both GSEs in

---

[2]    Fannie Mae, 2005 Annual Report, page 1. Freddie Mac 2006 Annual Report, pages 6-9. HUD had "general regulatory power over Freddie Mac, including power over new programs, affordable housing goals and fair lending." OFEHO, a separate office within HUD with substantial independence, was the "safety and soundness regulator for Freddie Mac and Fannie Mae." OFHEO had "authority to: issue regulations to carry out its responsibilities; conduct examinations; require reports of financial condition and operation; develop and apply critical, minimum and risk-based capital standards, including classifying the capital levels not less than quarterly; prohibit excessive executive compensation under prescribed standards; and impose temporary and final cease-and-desist orders and civil money penalties, provided certain conditions are met."

[3]    *See*, *e.g.*, Freddie Mac 2006 Annual Report, page 3 ("Types of Mortgages We Purchase: Our charter establishes general parameters for the terms and principal amounts of the mortgages we may purchase …. Within our charter parameters, the residential mortgage loans we purchase or that underlie mortgage-related securities we purchase generally fall into one of two categories: Single-Family Mortgages. Single-family mortgages are secured by one- to four-family properties. The types of single-family mortgages we purchase include 40-year, 30-year, 20-year, 15-year and 10-year fixed-rate mortgages, interest-only mortgages, adjustable-rate mortgages, or ARMs, and balloon/reset mortgages.") and page 4 ("In response to a request by the Office of Federal Housing Enterprise Oversight, or OFHEO, we announced on August 1, 2006 that we would voluntarily limit the growth of our Retained portfolio to no more than 2.0 percent annually (and 0.5 percent quarterly on a cumulative basis), based on its carrying value as contained in our minimum capital report to OFHEO filed on July 28, 2006, which was $710.3 billion.")

[4]    Freddie Mac 2006 Annual Report, pages 8-9. In 2004 OFHEO "created a framework for monitoring [Freddie Mac's] capital due to our higher operational risk, including [Freddie Mac's] inability to produce timely financial statements in conformity with GAAP" and directed that Freddie Mac "maintain a mandatory target capital surplus of 30 percent over our minimum capital requirement, subject to certain conditions and variations;" that Freddie Mac "submit weekly reports concerning our capital levels;" and that Freddie Mac "obtain prior approval of certain capital transactions including common stock repurchases, redemption of any preferred stock or payment of dividends on preferred stock above stated contractual rates."  Fannie Mae 2005 Annual Report, page 26.

CONFIDENTIAL

the same reports and changed ratings on both simultaneously.[5]  Fannie Mae's stock returns can therefore be used as a proxy for the political and regulatory risk that affects both Freddie Mac and Fannie Mae.[6]

5.  One of the assumptions when estimating the market model is that the volatility of excess returns remains constant over the estimation and prediction (in this case "excess return") periods.[7]  To estimate the market model's parameters, I use data for the period from August 9, 2007 to November 19, 2007, the day before November 20, 2007, the alleged corrective disclosure date.  As I discuss in the main body of this report, financial market conditions shifted dramatically in the second half of 2007 and on August 9, 2007 global credit markets suddenly became ensnared in the throes of a severe and unforeseen credit crisis. This date marked the start of the global credit and liquidity crisis that eventually morphed into the Great Recession, and the start of a period of heightened market-wide volatility.[8]

6. Using the market model estimated over the estimation period to calculate the excess return, I then continue the standard procedure and assess the excess return's statistical significance to determine if the observed excess return is statistically significant relative to normal day-to-day variability reflecting vicissitudes of stock prices.  That is, I examine the question of "whether the

---

[5]  *See*, *e.g.*, Fox Pitt Kelton, "FNM and FRE: Capital Constrained – Downgrading to Underperform," November 20, 2007. See also, Merrill Lynch, "GSE stocks come into focus due to credit concerns," October 25, 2007 ("Fannie Mae (FNM; C-2-7; $58.27) and Freddie Mac (FRE; C-2-7; $53.24) remain under pressure as the market rotates out of stocks exposed to the deteriorating housing market. Both stocks have been viewed as good flight-to-quality stocks, as each has largely avoided the riskiest loans originated during the credit bubble and had benefited from a more favorable regulatory backdrop emanating from Washington. However, we think investors have systematically avoided or rotated out of stocks that have significant exposure to weakening housing fundamentals, putting FNM and FRE in the path of fear-induced selling.").

[6]  I note that Fannie Mae released its Q1, Q2, and Q3 2007 results on November 9, 2007. Fannie Mae News Release, "Fannie Mae Files 2007 Quarterly Reports with the SEC," November 9, 2007.  Fannie Mae told investors that "[r]esults for the first three quarters of 2007 reflect worsening housing market conditions, volatility in credit markets in the third quarter, and compression in net interest yield, each of which affected net income," and that "[c]redit related expenses, including the provision for credit losses, rose $1.6 billion, to $2.0 billion." Fannie Mae also stated that "[w]e expect the market forces that affected our results in the first three quarters of the year to continue through the end of the year."

[7]  *See*, *e.g.*, MacKinlay (1997), page 18.

[8]  *See* Section IV.B of this report.

CONFIDENTIAL

---

absolute value of the return is large enough so that the research can indicate with confidence that the return is relatively unusual."[9]  The statistical significance of excess returns in this context is typically assessed by calculating a standardized measure of the size of the excess return known as a "t-statistic."  The t-statistic is equal to the excess return divided by the market model's "standard error." Each t-statistic corresponds to a "p-value," which represents the probability under the assumption of the "null hypothesis," of obtaining a result equal to or more extreme than what was actually observed.  In this case, the "null" hypothesis is that the excess return is equal to zero, i.e., the stock return being analyzed was equal to the predicted return.  The p-value can be thought of as how likely it is the observed difference was due to chance.  The conventional level of statistical significance is a p-value of 5% or less.  In some contexts, the 10% level is also considered statistically significant.

7. Using the market model results and this standard statistical framework, I examined Freddie Mac's stock price reaction on November 20, 2007, the alleged corrective disclosure date, and the subsequent capital raise dates (i.e., the "Freddie Mac Excess Return Dates").  As shown in Table A.1 below, I find that Freddie Mac's cumulative stock price reaction over the four Freddie Mac Excess Return Dates is statistically insignificant at conventional levels, *i.e.*, the p-value is greater than 5%.  This means that the excess return is statistically indistinguishable from zero, i.e., one cannot rule out that the price reaction occurred by chance alone.

---

[9]    Mark L. Mitchell and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, February 1994.

CONFIDENTIAL

---

**Table A.1: Testing for statistical significance of excess returns on November 20, 27, 28, and 30, 2007 ("Freddie Mac Excess Return Dates")**

*Panel A: Testing for statistical significance of Freddie Mac Excess Return Dates*

| | Freddie Mac ("FRE") Log Return | FRE Predicted Log Return | FRE Excess Log Return | T-Statistic | P-value |
|---|---|---|---|---|---|
| 11/20/07 | -33.82% | -15.58% | -18.24% | -13.52 | 0.000 *** |
| 11/27/07 | 4.90% | 2.22% | 2.68% | 1.99 | 0.051 * |
| 11/28/07 | 13.40% | 7.78% | 5.62% | 4.17 | 0.000 *** |
| 11/30/07 | 17.26% | 10.17% | 7.10% | 5.26 | 0.000 *** |
| **CAR 4-days** | | | **-2.84%** | **-1.05** | **0.297** |

*Panel B: Parameters of market model*

| | |
|---|---|
| Number of Observations | 68 |
| Adjusted $R^2$ | 77.22% |
| Standard Error | 1.35% |

| *Coefficients* | Beta | T-statistic | P-Value |
|---|---|---|---|
| Alpha (Intercept) | (0.005) | -3.07 | 0.003 *** |
| S&P 500 Total Return Index | 1.751 | 12.72 | 0.000 *** |
| Orthogonalized Component of the S&P Financials TR Index | 1.103 | 5.29 | 0.000 *** |
| Orthogonalized Component of Fannie Mae | 0.543 | 6.35 | 0.000 *** |

* Denotes significance at the 10% level (in a two-tailed test).
** Denotes significance at the 5% level (in a two-tailed test).
*** Denotes significance at the 1% level (in a two-tailed test).

**Notes and Sources:** The above analysis is based on a market model estimated over August 9, 2007 to November 19, 2007, in which the daily close-to-close Freddie Mac stock logarithmic ("log") returns are regressed against an intercept term and the following variables: (1) the daily log returns of the S&P 500 Total Return Index; (2) the orthogonalized component of the S&P 500 Financials Total Return Index (i.e., the residuals from regressing the S&P 500 Financials Total Return Index log returns against the S&P 500 Total Return Index log returns); (3) the orthogonalized component of the log return on Fannie Mae stock (i.e., the residuals from the regressing the Fannie Mae common stock log returns against the log returns of the S&P 500 Total Return Index and the S&P Financials Total Return Index residuals). Fannie Mae and Freddie Mac data obtained from CRSP. Index data were obtained from Refinitiv Eikon. Freddie Mac and Fannie Mae stock returns are adjusted for dividends. The four alleged misrepresentation days in the TAC in the estimation period were excluded (August 30, September 10, 17, and November 7, 2007) from the model estimation. See Bajaj Class Cert Report, Appendix V listing alleged misrepresentation days, citing to the TAC. The t-statistic for the Cumulative Abnormal Return (CAR) was calculated as the sum of each day's abnormal (excess) log return divided by the regression standard error multiplied by the square root of the number of days (= 4).

CONFIDENTIAL



**Exhibit 1: Case Shiller "Nominal"  U.S. Home Price Index (1990 – 2008)**

**Notes and Sources**: http://www.econ.yale.edu/~shiller/data/Fig3-1.xls

CONFIDENTIAL

**Exhibit 2: Monthly FHFA House Price Index, Seasonally Adjusted
Year-Over-Year Change in Monthly Values (1995 - 2008)**



Year-Over-Year Change

**Notes and Sources:** Federal Housing Finance Agency (https://www.fhfa.gov/DataTools/Downloads/Pages/House-Price-Index.aspx). Year-over-year change is calculated from index values. Purchase-Only Index.

CONFIDENTIAL

**Exhibit 3: TED Spread (2006 – 2007)**



**Notes and Sources:** Bloomberg. "Calculated by taking the BBA LIBOR USD 3 Month minus the US Generic 3 Month Yield."

CONFIDENTIAL

## Exhibit 4: Bloomberg U.S. Agency Fixed Rate MBS Average OAS (2006 – 2007)



**Notes and Sources:** Bloomberg. The "Bloomberg US Mortgage Backed Securities (MBS) Index tracks agency mortgage backed pass-through securities (both fixed-rate and hybrid ARM) guaranteed by Ginnie Mae (GNMA), Fannie Mae (FNMA), and Freddie Mac (FHLMC). The index is constructed by grouping individual TBA-deliverable MBS pools into aggregates or generics based on program, coupon and vintage."

CONFIDENTIAL

## Exhibit 5: Chicago Board Options Exchange Volatility Index ("VIX") and Freddie Mac 30-day Implied Volatility (2006 – 2007)



**Notes and Sources:** VIX data obtained from Bloomberg. FRE Implied Volatility obtained from OptionMetrics. Implied volatility is computed by OptionMetrics, a well-known provider of such data, through prices of 30-day call options traded on the Company's stock.

CONFIDENTIAL

**Exhibit 6**
**Tabak Appendix 1 Analysis**

| | Company | Tabak Appendix 1 | | | Corrected | | |
|---|---|---|---|---|---|---|---|
| | | Day of Disclosure | | | Day of Disclosure | | |
| | | Date | Price | Return | Date | Price | Return |
| | [a] | [b] | [c] | [d] | [e] | [f] | [g] |
| [1] | Citigroup | 10/01/07 | 477.20 | 2.25% | 10/01/07 | 47.72 | 2.25% |
| [2] | Citigroup | 10/15/07 | 462.40 | -3.41% | 10/15/07 | 46.24 | -3.41% |
| [3] | Wachovia | 10/19/07 | 50.08 | -1.16% | 10/19/07 | 46.40 | -3.61% |
| [4] | Morgan Stanley | 11/08/07 | 53.68 | 4.86% | 11/08/07 | 53.68 | 4.86% |
| [5] | Bank of America | 11/13/07 | 46.27 | 5.21% | 11/13/07 | 46.27 | 5.21% |
| [6] | Bear Stearns | 11/14/07 | 97.49 | 0.95% | 11/14/07 | 103.27 | 2.38% |
| [7] | Washington Mutual | 12/11/07 | 19.13 | 2.90% | 12/11/07 | 17.42 | -12.37% |
| [8] | Morgan Stanley | 12/19/07 | 50.08 | 4.18% | 12/19/07 | 50.08 | 4.18% |
| [9] | Bear Stearns | 12/20/07 | 94.07 | -1.28% | 12/20/07 | 91.42 | 0.91% |
| [10] | Citigroup | 01/15/08 | 269.40 | -7.30% | 01/15/08 | 26.94 | -7.30% |
| [11] | Canadian Imperial | 01/15/08 | 35.00 | -2.87% | 01/15/08 | 68.75 | -2.14% |
| [12] | Washington Mutual | 01/18/08 | 12.46 | -6.95% | 01/18/08 | 13.55 | 8.75% |
| [13] | Bank of America | 01/22/08 | 37.39 | 3.95% | 01/22/08 | 37.39 | 3.95% |
| [14] | AMBAC Financial | 01/22/08 | 7.97 | 28.55% | 01/16/08 | 12.97 | -38.65% |
| [15] | Average of Companies, excluding Freddie Mac | | | 2.14% | | | -2.50% |

**Notes and Sources:**

[a]-[d]   Tabak Electronic Workpapers, Excel file "Appendix I Replication.xlsx," worksheet tab "Plaintiff Exhibit."

[f],[g]   CRSP.

[14][e]   Dow Jones News Service, "UPDATE: Ambac To Raise $1B In Capital, Sees Big 4Q Losses," January 16, 2008.

[15]   =AVERAGE([1]:[14]).

CONFIDENTIAL

**Exhibit 7A**
**Richard F. Syron Form 4 disclosures during Relevant Period**

| | Transaction date [a] | Title of security [b] | Ownership form [c] | Transaction code [d] | Acquired [e] | Disposed [f] | Price [g] | Amount of securities beneficially owned after the transaction [h] |
|---|---|---|---|---|---|---|---|---|
| [1] | Jun. 05, 2006 | Common Stock | Direct | A | | | | 364,171 |
| [1] | Dec. 31, 2006 | Common Stock | Direct | F | | 21,249 | $67.90 | 342,922 |
| [2] | Mar. 29, 2007 | Common Stock | Direct | A | 107,824 | | * | 450,746 |
| [3] | Apr. 01, 2007 | Common Stock | Direct | F | | 7,979 | $59.49 | 442,767 |
| [4] | May. 06, 2007 | Common Stock | Direct | F | | 8,193 | $66.31 | 434,574 |
| [5] | Jun. 05, 2007 | Common Stock | Direct | F | | 12,742 | $66.94 | 421,832 |
| [6] | **Total during Relevant Period** | | | | **107,824** | **50,163** | | |

**Notes and Sources:**

[1]    Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, June 5, 2006,  p.1.
[1]    Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, December 31, 2006,  p.1.
[2]    Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, March 29, 2007,  p.1.
[3]    Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, April 1, 2007,  p.1.
[4]    Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, May 6, 2007,  p.1.
[5]    Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, June 5, 2007,  p.1.
[6]    = sum([2]:[6]).

[d]    Transaction code A: Grant, award, or other acquisition of securities from the company (such as an option)
       Transaction code F: Payment of exercise price or tax liability using portion of securities received from the company.
       See: https://www.sec.gov/files/forms-3-4-5.pdf
[1]    Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[3]    Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on stock.
[4]    Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[5]    Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.

[g]
[2]    * Granted in consideration for services.

CONFIDENTIAL

**Exhibit 7B**
**Patricia L. Cook Form 4 disclosures during Relevant Period**

| | Transaction date [a] | Title of security [b] | Ownership form [c] | Transaction code [d] | Acquired [e] | Disposed [f] | Price [g] | Amount of securities beneficially owned after the transaction [h] |
|---|---|---|---|---|---|---|---|---|
| [1] | Jun. 05, 2006 | | | | | | | 77,587 |
| [2] | Aug. 02, 2006 | Common Stock | Direct | F | | 1,759 | $57.50 | 75,828 |
| [3] | Aug. 02, 2006 | Common Stock | Direct | F | | 1,946 | $57.50 | 73,882 |
| [4] | Jan. 03, 2007 | Common Stock | Direct | S | | 4,258 | $68.20 | 69,624 |
| [5] | Jan. 03, 2007 | Common Stock | Direct | S | | 2,847 | $68.20 | 66,777 |
| [6] | Mar. 29, 2007 | Common Stock | Direct | A | 34,642 | | * | 101,419 |
| [7] | May. 06, 2007 | Common Stock | Direct | F | | 1,993 | $66.31 | 99,426 |
| [8] | Jun. 05, 2007 | Common Stock | Direct | F | | 4,109 | $66.94 | 95,317 |
| [9] | Aug. 02, 2007 | Common Stock | Direct | F | | 1,748 | $56.61 | 93,569 |
| [10] | Aug. 02, 2007 | Common Stock | Direct | F | | 1,933 | $56.61 | 91,636 |
| [11] | **Total during Relevant Period** | | | | **34,642** | **20,593** | | |

**Notes and Sources:**

[1]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, June 5, 2006,  p.1.
[2]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, August 2, 2006,  p.1.
[3]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, August 2, 2006,  p.1.
[4]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, January 3, 2007,  p.1.
[5]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, January 3, 2007,  p.1.
[6]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, March 29, 2007,  p.1.
[7]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, May 6, 2007,  p.1.
[8]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, June 5, 2007,  p.1.
[9]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, August 2, 2007,  p.1.
[10]  Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, August 2, 2007,  p.1.
[11]  = sum([2]:[10]).

[d]   Transaction code A: Grant, award, or other acquisition of securities from the company (such as an option)
       Transaction code F: Payment of exercise price or tax liability using portion of securities received from the company.
       See: https://www.sec.gov/files/forms-3-4-5.pdf
[2]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[3]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[4]   Shares sold pursuant to a Rule 10b5-1 Plan dated October 19, 2006.
[5]   Shares sold pursuant to a Rule 10b5-1 Plan dated October 19, 2006.
[7]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[8]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[9]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[10]  Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.

[g]
[6]   * Granted in consideration for services.

CONFIDENTIAL

**Exhibit 7C**
**Eugene McQuade Form 4 disclosures during Relevant Period**

| | Transaction date [a] | Title of security [b] | Ownership form [c] | Transaction code [d] | Acquired [e] | Disposed [f] | Price [g] | Amount of securities beneficially owned after the transaction [h] |
|---|---|---|---|---|---|---|---|---|
| [1] | Jun. 05, 2006 | Common Stock | Direct | | | | | 209,456 |
| [2] | Sep. 01, 2006 | Common Stock | Direct | F | | 14,037 | $63.61 | 195,419 |
| [3] | Mar. 29, 2007 | Common Stock | Direct | A | 71,778 | | * | 267,197 |
| [4] | May. 06, 2007 | Common Stock | Direct | F | | 5,977 | $66.31 | 261,220 |
| [5] | Jun. 05, 2007 | Common Stock | Direct | F | | 9,290 | $66.94 | 251,930 |
| [6] | Sep. 01, 2007 | Common Stock | Direct | F | | 13,419 | $61.61 | 238,511 |
| [7] | **Total during Relevant Period** | | | | **71,778** | **42,723** | | |

**Notes and Sources:**

[1]  Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, June 5, 2006,  p.1.
[2]  Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, September 1, 2006,  p.1.
[3]  Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, March 29, 2007,  p.1.
[4]  Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, May 6, 2007,  p.1.
[5]  Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, June 5, 2007,  p.1.
[6]  Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, September 1, 2007,  p.1.
[7]  = sum([2]:[6]).

[d]  Transaction code A: Grant, award, or other acquisition of securities from the company (such as an option)
      Transaction code F: Payment of exercise price or tax liability using portion of securities received from the company.
      See: https://www.sec.gov/files/forms-3-4-5.pdf
[2]  Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[4]  Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[5]  Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[6]  Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.

[g]
[3]  *Granted in consideration for services.

CONFIDENTIAL

**Exhibit 7D**
**Anthony S. Piszel Form 4 disclosures during Relevant Period**

| | Transaction date [a] | Title of security [b] | Ownership form [c] | Transaction code [d] | Acquired [e] | Disposed [f] | Price [g] | Amount of securities beneficially owned after the transaction [h] |
|---|---|---|---|---|---|---|---|---|
| [1] | Dec. 07, 2006 | Common Stock | Direct | A | 78,940 | | * | 78,940 |
| [2] | Mar. 29, 2007 | Common Stock | Direct | A | 37,613 | | * | 116,553 |
| [3] | **Total during Relevant Period** | | | | **116,553** | - | | |

**Notes and Sources:**

[1]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Anthony S. Piszel, December 7, 2006,  p.1.
[2]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Anthony S. Piszel, March 29, 2007,  p.1.
[3]   = sum([1]:[2]).
[3]   Relevant Period: August 1, 2006 to November 20, 2007.

[d]   Transaction code A: Grant, award, or other acquisition of securities from the company (such as an option)
        Transaction code F: Payment of exercise price or tax liability using portion of securities received from the company.
        See: https://www.sec.gov/files/forms-3-4-5.pdf

[g]
[1]   * In consideration for services.
[2]   * Granted in consideration for services.

CONFIDENTIAL

**Exhibit A.1**
**Total returns of Freddie Mac common stock, S&P 500 Index, S&P 500 Financials Index, and Fannie Mae common stock**
August 8, 2007 to November 30, 2007

| | Trading Date [a] | Freddie Mac ("FRE") | | S&P 500 Total Return Index [d] | S&P 500 Financials Total Return Index [e] | Fannie Mae ("FNM") | | Logarithmic Total Returns | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Price [b] | Dividend [c] | | | Price [f] | Dividend [g] | FRE [h] | S&P 500 [i] | S&P 500 Financials [j] | FNM [k] |
| [1] | 08/08/07 | $62.64 | $0.00 | 2,333.24 | 616.99 | $66.75 | $0.00 | | | | |
| [2] | 08/09/07 | $61.67 | $0.00 | 2,264.50 | 593.87 | $65.93 | $0.00 | -1.56% | -2.99% | -3.82% | -1.24% |
| [3] | 08/10/07 | $61.95 | $0.00 | 2,265.36 | 593.16 | $66.46 | $0.00 | 0.45% | 0.04% | -0.12% | 0.80% |
| [4] | 08/13/07 | $61.52 | $0.00 | 2,264.58 | 588.39 | $64.12 | $0.00 | -0.70% | -0.03% | -0.81% | -3.58% |
| [5] | 08/14/07 | $59.41 | $0.00 | 2,223.71 | 574.36 | $62.88 | $0.00 | -3.49% | -1.82% | -2.41% | -1.95% |
| [6] | 08/15/07 | $60.28 | $0.00 | 2,193.40 | 568.79 | $61.45 | $0.00 | 1.45% | -1.37% | -0.98% | -2.30% |
| [7] | 08/16/07 | $61.34 | $0.00 | 2,200.61 | 588.80 | $65.15 | $0.00 | 1.74% | 0.33% | 3.46% | 5.85% |
| [8] | 08/17/07 | $63.70 | $0.00 | 2,254.68 | 610.14 | $67.25 | $0.00 | 3.78% | 2.43% | 3.56% | 3.17% |
| [9] | 08/20/07 | $63.53 | $0.00 | 2,254.07 | 605.22 | $67.50 | $0.00 | -0.27% | -0.03% | -0.81% | 0.37% |
| [10] | 08/21/07 | $64.16 | $0.00 | 2,256.52 | 608.10 | $68.98 | $0.00 | 0.99% | 0.11% | 0.47% | 2.17% |
| [11] | 08/22/07 | $64.89 | $0.00 | 2,283.09 | 613.14 | $69.38 | $0.00 | 1.13% | 1.17% | 0.83% | 0.58% |
| [12] | 08/23/07 | $64.04 | $0.00 | 2,280.68 | 610.41 | $68.13 | $0.00 | -1.32% | -0.11% | -0.45% | -1.82% |
| [13] | 08/24/07 | $63.60 | $0.00 | 2,307.22 | 613.76 | $67.19 | $0.00 | -0.69% | 1.16% | 0.55% | -1.39% |
| [14] | 08/27/07 | $62.58 | $0.00 | 2,287.62 | 605.38 | $66.48 | $0.00 | -1.62% | -0.85% | -1.37% | -1.06% |
| [15] | 08/28/07 | $61.20 | $0.00 | 2,234.02 | 585.80 | $63.57 | $0.00 | -2.23% | -2.37% | -3.29% | -4.48% |
| [16] | 08/29/07 | $63.25 | $0.00 | 2,283.58 | 596.78 | $65.76 | $0.00 | 3.29% | 2.19% | 1.86% | 3.39% |
| [17] | 08/30/07 | $60.07 | $0.00 | 2,274.16 | 590.16 | $63.40 | $0.00 | -5.16% | -0.41% | -1.12% | -3.65% |
| [18] | 08/31/07 | $61.61 | $0.00 | 2,299.71 | 599.12 | $65.61 | $0.00 | 2.53% | 1.12% | 1.51% | 3.43% |
| [19] | 09/04/07 | $62.25 | $0.00 | 2,323.83 | 606.11 | $65.71 | $0.00 | 1.03% | 1.04% | 1.16% | 0.15% |
| [20] | 09/05/07 | $60.15 | $0.00 | 2,298.16 | 594.26 | $62.79 | $0.00 | -3.43% | -1.11% | -1.97% | -4.55% |
| [21] | 09/06/07 | $59.39 | $0.00 | 2,308.35 | 593.07 | $62.07 | $0.00 | -1.27% | 0.44% | -0.20% | -1.15% |
| [22] | 09/07/07 | $59.31 | $0.00 | 2,269.32 | 584.47 | $62.52 | $0.00 | -0.13% | -1.70% | -1.46% | 0.72% |
| [23] | 09/10/07 | $58.75 | $0.00 | 2,266.51 | 583.94 | $62.76 | $0.00 | -0.95% | -0.12% | -0.09% | 0.38% |
| [24] | 09/11/07 | $59.25 | $0.00 | 2,297.41 | 591.72 | $63.73 | $0.00 | 0.85% | 1.35% | 1.32% | 1.53% |
| [25] | 09/12/07 | $58.77 | $0.00 | 2,298.14 | 590.61 | $62.84 | $0.00 | -0.81% | 0.03% | -0.19% | -1.41% |
| [26] | 09/13/07 | $58.00 | $0.50 | 2,317.63 | 600.15 | $62.10 | $0.00 | -0.46% | 0.84% | 1.60% | -1.18% |
| [27] | 09/14/07 | $57.37 | $0.00 | 2,318.11 | 599.89 | $61.28 | $0.00 | -1.09% | 0.02% | -0.04% | -1.33% |
| [28] | 09/17/07 | $56.55 | $0.00 | 2,306.25 | 595.41 | $60.52 | $0.00 | -1.44% | -0.51% | -0.75% | -1.25% |
| [29] | 09/18/07 | $59.52 | $0.00 | 2,373.63 | 621.93 | $62.54 | $0.00 | 5.12% | 2.88% | 4.36% | 3.28% |
| [30] | 09/19/07 | $61.16 | $0.00 | 2,388.15 | 625.64 | $63.98 | $0.00 | 2.72% | 0.61% | 0.60% | 2.28% |
| [31] | 09/20/07 | $59.89 | $0.00 | 2,372.61 | 614.79 | $62.52 | $0.00 | -2.10% | -0.65% | -1.75% | -2.31% |
| [32] | 09/21/07 | $60.35 | $0.00 | 2,383.55 | 616.25 | $62.72 | $0.00 | 0.77% | 0.46% | 0.24% | 0.32% |
| [33] | 09/24/07 | $59.50 | $0.00 | 2,371.03 | 608.66 | $61.48 | $0.00 | -1.42% | -0.53% | -1.24% | -2.00% |
| [34] | 09/25/07 | $59.53 | $0.00 | 2,370.26 | 606.73 | $61.68 | $0.00 | 0.05% | -0.03% | -0.32% | 0.32% |
| [35] | 09/26/07 | $59.55 | $0.00 | 2,383.53 | 610.43 | $61.59 | $0.00 | 0.03% | 0.56% | 0.61% | -0.15% |
| [36] | 09/27/07 | $59.99 | $0.00 | 2,392.92 | 615.23 | $62.00 | $0.00 | 0.74% | 0.39% | 0.78% | 0.66% |
| [37] | 09/28/07 | $59.01 | $0.00 | 2,385.72 | 612.65 | $60.81 | $0.00 | -1.65% | -0.30% | -0.42% | -1.94% |
| [38] | 10/01/07 | $60.30 | $0.00 | 2,417.44 | 625.39 | $62.49 | $0.00 | 2.16% | 1.32% | 2.06% | 2.73% |
| [39] | 10/02/07 | $62.04 | $0.00 | 2,416.83 | 630.64 | $65.08 | $0.00 | 2.84% | -0.03% | 0.84% | 4.06% |
| [40] | 10/03/07 | $62.47 | $0.00 | 2,406.30 | 631.06 | $66.04 | $0.00 | 0.69% | -0.44% | 0.07% | 1.46% |
| [41] | 10/04/07 | $63.19 | $0.00 | 2,411.41 | 632.55 | $67.39 | $0.00 | 1.15% | 0.21% | 0.24% | 2.02% |
| [42] | 10/05/07 | $63.43 | $0.00 | 2,435.16 | 640.30 | $67.30 | $0.00 | 0.38% | 0.98% | 1.22% | -0.13% |

CONFIDENTIAL

**Exhibit A.1**
**Total returns of Freddie Mac common stock, S&P 500 Index, S&P 500 Financials Index, and Fannie Mae common stock**
August 8, 2007 to November 30, 2007

| | Trading Date [a] | Freddie Mac ("FRE") Price [b] | Freddie Mac ("FRE") Dividend [c] | S&P 500 Total Return Index [d] | S&P 500 Financials Total Return Index [e] | Fannie Mae ("FNM") Price [f] | Fannie Mae ("FNM") Dividend [g] | Logarithmic Total Returns FRE [h] | Logarithmic Total Returns S&P 500 [i] | Logarithmic Total Returns S&P 500 Financials [j] | Logarithmic Total Returns FNM [k] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [43] | 10/08/07 | $62.80 | $0.00 | 2,427.33 | 635.00 | $66.99 | $0.00 | -1.00% | -0.32% | -0.83% | -0.46% |
| [44] | 10/09/07 | $62.78 | $0.00 | 2,447.03 | 640.27 | $66.95 | $0.00 | -0.03% | 0.81% | 0.83% | -0.06% |
| [45] | 10/10/07 | $62.05 | $0.00 | 2,443.02 | 634.12 | $66.40 | $0.00 | -1.17% | -0.16% | -0.97% | -0.82% |
| [46] | 10/11/07 | $60.78 | $0.00 | 2,430.55 | 632.69 | $65.95 | $0.00 | -2.07% | -0.51% | -0.23% | -0.68% |
| [47] | 10/12/07 | $60.63 | $0.00 | 2,442.12 | 632.43 | $66.04 | $0.00 | -0.25% | 0.48% | -0.04% | 0.14% |
| [48] | 10/15/07 | $59.00 | $0.00 | 2,421.67 | 620.82 | $64.90 | $0.00 | -2.73% | -0.84% | -1.85% | -1.74% |
| [49] | 10/16/07 | $57.62 | $0.00 | 2,405.76 | 609.29 | $63.75 | $0.00 | -2.37% | -0.66% | -1.87% | -1.79% |
| [50] | 10/17/07 | $56.22 | $0.00 | 2,410.22 | 608.42 | $62.19 | $0.00 | -2.46% | 0.19% | -0.14% | -2.48% |
| [51] | 10/18/07 | $54.70 | $0.00 | 2,408.46 | 601.89 | $60.91 | $0.00 | -2.74% | -0.07% | -1.08% | -2.08% |
| [52] | 10/19/07 | $53.05 | $0.00 | 2,346.78 | 584.24 | $58.85 | $0.00 | -3.06% | -2.59% | -2.98% | -3.44% |
| [53] | 10/22/07 | $52.82 | $0.00 | 2,355.74 | 589.89 | $58.15 | $0.00 | -0.43% | 0.38% | 0.96% | -1.20% |
| [54] | 10/23/07 | $53.24 | $0.00 | 2,376.47 | 593.64 | $58.27 | $0.00 | 0.79% | 0.88% | 0.63% | 0.21% |
| [55] | 10/24/07 | $51.05 | $0.00 | 2,370.71 | 589.01 | $56.20 | $0.00 | -4.20% | -0.24% | -0.78% | -3.62% |
| [56] | 10/25/07 | $50.59 | $0.00 | 2,368.43 | 585.33 | $57.26 | $0.00 | -0.91% | -0.10% | -0.63% | 1.87% |
| [57] | 10/26/07 | $52.69 | $0.00 | 2,401.07 | 600.19 | $60.03 | $0.00 | 4.07% | 1.37% | 2.51% | 4.72% |
| [58] | 10/29/07 | $51.75 | $0.00 | 2,410.33 | 600.05 | $57.42 | $0.50 | -1.80% | 0.38% | -0.02% | -3.58% |
| [59] | 10/30/07 | $51.95 | $0.00 | 2,394.81 | 596.82 | $56.99 | $0.00 | 0.39% | -0.65% | -0.54% | -0.75% |
| [60] | 10/31/07 | $52.23 | $0.00 | 2,423.67 | 601.56 | $57.04 | $0.00 | 0.54% | 1.20% | 0.79% | 0.09% |
| [61] | 11/01/07 | $49.43 | $0.00 | 2,360.21 | 574.25 | $54.50 | $0.00 | -5.51% | -2.65% | -4.65% | -4.56% |
| [62] | 11/02/07 | $48.33 | $0.00 | 2,362.21 | 564.98 | $52.61 | $0.00 | -2.25% | 0.08% | -1.63% | -3.53% |
| [63] | 11/05/07 | $47.34 | $0.00 | 2,350.69 | 557.06 | $52.00 | $0.00 | -2.07% | -0.49% | -1.41% | -1.17% |
| [64] | 11/06/07 | $49.39 | $0.00 | 2,379.05 | 566.63 | $55.39 | $0.00 | 4.24% | 1.20% | 1.70% | 6.32% |
| [65] | 11/07/07 | $45.13 | $0.00 | 2,310.41 | 538.24 | $49.79 | $0.00 | -9.02% | -2.93% | -5.14% | -10.66% |
| [66] | 11/08/07 | $43.82 | $0.00 | 2,309.18 | 540.69 | $49.80 | $0.00 | -2.95% | -0.05% | 0.45% | 0.02% |
| [67] | 11/09/07 | $41.70 | $0.00 | 2,276.26 | 541.46 | $49.00 | $0.00 | -4.96% | -1.44% | 0.14% | -1.62% |
| [68] | 11/12/07 | $40.00 | $0.00 | 2,253.53 | 542.26 | $47.06 | $0.00 | -4.16% | -1.00% | 0.15% | -4.04% |
| [69] | 11/13/07 | $44.56 | $0.00 | 2,319.86 | 568.97 | $49.20 | $0.00 | 10.80% | 2.90% | 4.81% | 4.45% |
| [70] | 11/14/07 | $44.19 | $0.00 | 2,304.06 | 565.52 | $47.82 | $0.00 | -0.83% | -0.68% | -0.61% | -2.84% |
| [71] | 11/15/07 | $41.86 | $0.00 | 2,273.74 | 548.18 | $43.04 | $0.00 | -5.42% | -1.33% | -3.11% | -10.53% |
| [72] | 11/16/07 | $40.72 | $0.00 | 2,285.67 | 544.03 | $40.69 | $0.00 | -2.76% | 0.52% | -0.76% | -5.61% |
| [73] | 11/19/07 | $37.50 | $0.00 | 2,245.81 | 527.71 | $37.58 | $0.00 | -8.24% | -1.76% | -3.05% | -7.95% |
| [74] | 11/20/07 | $26.74 | $0.00 | 2,256.02 | 520.86 | $28.25 | $0.00 | -33.82% | 0.45% | -1.31% | -28.54% |
| [75] | 11/21/07 | $26.00 | $0.00 | 2,220.21 | 509.33 | $29.23 | $0.00 | -2.81% | -1.60% | -2.24% | 3.41% |
| [76] | 11/23/07 | $26.47 | $0.00 | 2,257.95 | 525.02 | $32.20 | $0.00 | 1.79% | 1.69% | 3.03% | 9.68% |
| [77] | 11/26/07 | $24.50 | $0.00 | 2,205.49 | 503.76 | $28.92 | $0.00 | -7.73% | -2.35% | -4.13% | -10.74% |
| [78] | 11/27/07 | $25.73 | $0.00 | 2,238.52 | 517.01 | $29.40 | $0.00 | 4.90% | 1.49% | 2.60% | 1.65% |
| [79] | 11/28/07 | $29.42 | $0.00 | 2,303.17 | 543.47 | $32.30 | $0.00 | 13.40% | 2.85% | 4.99% | 9.41% |
| [80] | 11/29/07 | $29.51 | $0.00 | 2,304.43 | 539.40 | $32.39 | $0.00 | 0.31% | 0.05% | -0.75% | 0.28% |
| [81] | 11/30/07 | $35.07 | $0.00 | 2,322.34 | 555.01 | $38.42 | $0.00 | 17.26% | 0.77% | 2.85% | 17.07% |

**Notes and Sources:**

[a] to [c] CRSP.
[d],[e]  Refinitiv Eikon.
[f], [g]  CRSP.
[h]  =([b]+[c])/(price in [b] on a previous date per [a])-1.
[i]  =[d]/(price in [d] on a previous date per [a])-1.
[j]  =[e]/(price in [e] on a previous date per [a])-1.
[k]  =([f]+[g])/(price in [f] on a previous date per [a])-1.

Appendix



## Mukesh Bajaj
Senior Consultant

PhD, Business Administration,
Finance,
University of California, Berkeley

MBA, Business Administration,
University of Texas at Austin

Bachelor of Technology,
Indian Institute of Technology,
Delhi, India

Dr. Mukesh Bajaj is a Senior Consultant in CRA's Finance Practice. He has managed hundreds of consulting assignments involving economic and financial issues. His areas of expertise include: securities fraud, valuation of complex derivatives and intellectual property, insider trading, financial market microstructure, intangible assets, transfer pricing, interests in closely-held firms, warrants, restricted stock and other complex contingent securities, and purchase price allocation studies. He was previously Managing Director and Global Head of the Securities & Finance Practice at Navigant. Prior to that, Dr. Bajaj founded AFE Consulting and served as its President. Dr. Bajaj has also consulted on financial strategy and acquisition analysis.

Dr. Bajaj has testified in various Federal and State Courts, the Superior Court of California, the State Board of Equalization in California, the U.S. Tax Court, arbitrations, mediations and in IRS Appeals proceedings. He has also testified in Canadian and Australian courts, testified in JAMS arbitration and filed an expert report in the International Center for Settlement of Investment Disputes.

In addition to his consulting work, Dr. Bajaj has taught corporate finance, investments, and financial engineering courses in the MBA and Masters in Financial Engineering programs at the Haas School of Business at the University of California at Berkeley. Prior to his consulting practice, He was an assistant professor of finance and business economics at the University of Southern California where he taught undergraduate and graduate courses in finance. Dr. Bajaj is the recipient of several teaching awards and scholastic honors and has published several articles in leading academic and applied journals, such as *The Journal of Finance*, *The Journal of Financial Economics*, *The Journal of Financial Research*, *The Journal of Applied Finance*, *International Economic Review*, *Research in Finance*, and *Research in Law and Economics*.

### Expert Testimony on Record

*In re Synchronoss Technologies, Inc. Securities Litigation*, Civil Action No. 17-2978 (FLW) (LHG) in the United States District Court for the District of New Jersey.  Testified in deposition regarding the efficiency of the market for Synchronoss Technologies' stock. Deposition in March 2021.

*In re Teva Securities Litigation*, No. 3:17-cv-00558 (SRU) in the United States District Court of Connecticut. Testified in deposition regarding the efficiency of the market for Teva Pharmaceuticals' ADS, Preferred Shares, and Notes.  Deposition in October 2020.

*Wendy C. H. Wellin, as Special Administrator of the Estate of Keith S. Wellin and as Trustee of the Keith S. Wellin Florida Revocable Living Trust u/a/d December 11, 2001, v. Peter J. Wellin, et al.* and related cases, Civil Action Nos. 2:13-cv-01831-DCN, 2:13-cv-03595-DCN, and 2:13-cv-04067-DCN in the United States District Court for the District of South Carolina. Testified in depositions regarding the equivalent value of limited partnership units. Depositions in August 2018 and November 2018.

*The Tulalip Tribes, et al., v. The State of Washington, et al.*, Case No. 2:15-cv-00940 in the United States District Court for the District of Washington. Testified in deposition and at trial regarding the economic and governmental activities of the Tulalip tribe and the State of Washington and Snohomish County, respectively, and the relationship of such activities to sales and other taxes assessed by the State of Washington and Snohomish County. Deposition in July 2017. Trial in May 2018.

*Ohio Public Employees Retirement System, On Behalf of Itself and all Others Similarly Situated, v. Federal Home Loan Mortgage Corporation a/k/a Freddie Mac, Richard F. Syron, Patricia L. Cook, Anthony S. Pizel, and Eugene M. McQuade*, Civil Action No. 4:08-cv-160 in the United States District Court for the Northern District of Ohio, Eastern Division (Youngstown). Testified in depositions and a hearing concerning the efficiency of the market for Freddie Mac's common stock and the economic evidence as it related to the Plaintiff's allegations that alleged misrepresentations and omissions had an impact on the price of Freddie's Mac's stock. Hearing in April 2018. Depositions in January 2013 and September 2017.

*In re Allergan, Inc. Proxy Violation Securities Litigation,* C.A. 14-cv-02004 (N.D. Cal 2014). Testified in deposition on whether the common stock of Allergan Inc. traded in an efficient market during the Class Period and whether damages in the action are subject to a common formula that can be applied Class-wide (December 2016). Also testified in deposition on the economic materiality of alleged non-public information and damages allegedly caused by insider trading on this information (July 2017). Depositions in December 2016 and July 2017.

*OpenGate Capital, LLC, et al., v. Thermo Fisher Scientific Inc.*, Civil No. 13-475-GMS in the United States District Court for the District of Delaware. Testified in deposition regarding damages allegedly caused by claims of fraudulent misrepresentation in connection with the purchase of a division of Thermo Fisher by OpenGate. Deposition in November 2015.

*Continental Industries Group, Inc. v. FTS International Services, LLC, et al.*, Case Nos. 12-CV-05599 and 12-CV-06966 in the United States District Court, Southern District of New York. Testified in deposition and trial on economic damages resulting from the alleged breaches of two supply agreements between the Plaintiff and Defendants. Deposition in October 2014. Trial in October 2015.

*In re: UBS Financial Services, Inc. of Puerto Rico Securities Litigation*, Civil Case No.: 3:12-cv-01663-CCC, United States District Court for the District of Puerto Rico. Testified in deposition on economic issues related to certain Puerto Rico closed-end funds for class certification purposes. Deposition in September 2015.

*In the Matter of the Arbitration between Offshore Exploration and Production LLC, Claimant/Seller, v. Korea National Oil Corporation and Ecopetrol, S.A., Respondents/Purchasers*, ICDR Case No. 50 198 T 00825 1 in the International Centre for Dispute Resolution. Testified in arbitration proceedings on the calculation of prejudgment interest related to payments Claimant/Seller asserted should have been made pursuant to an escrow agreement between Claimant/Seller and Respondents/Purchasers. Arbitration in February 2014.

*Sekisui America Corporation and Sekisui Medical Co., Ltd. v. Richard and Mary Louise Trudel-Hart*, Case No. 12-CIV-03479 in the United States District Court, Southern District of New York. Testified in deposition on damages in an action alleging breach of contract arising out of the sale of a medical diagnostics company. Deposition in September 2013.

*Securities and Exchange Commission v. Manouchehr Moshayedi*, Case No. 12CV-01179-JVS-JPR in the United States District Court for the Central District of California. Testified in deposition regarding allegations by the SEC of insider trading against the founder and former CEO of STEC, a maker of custom memory solutions. Deposition in August 2013.

*In re American International Group, Inc. 2008 Securities Litigation*, Master File No. 08-CV-4772-LTS in the United States District Court, Southern District of New York. Testified in depositions and in an evidentiary hearing on market efficiency at class certification stage in a securities fraud class action alleging that Defendants materially misstated the extent to which AIG had accumulated exposure to the subprime mortgage market through its securities lending program and its credit default swap ("CDS") portfolio. Depositions in November 2011 and March 2012. Evidentiary Hearing in April 2013.

*Securities and Exchange Commission v. Fabrice Tourre*, Case No. 10-CV-3229 (KBF) in the United States District Court, Southern District of New York. Testified in deposition on the economic materiality of the nondisclosure of certain hedge fund positions with respect to a particular synthetic ABS CDO. Deposition in February 2013.

*Cora E. Bennett v. Sprint Nextel Corporation, Gary D. Forsee, Paul N. Saleh and William G. Arendt*, Case No. 09-CV-2122 EFM/KMH in the United States District Court for the District of Kansas. In the class-certification stage of a securities fraud class action, testified in deposition regarding the economic evidence supporting the claim that Sprint bonds traded in efficient markets throughout the Class Period. Deposition in June 2012.

*State of New Jersey, Department of Treasury, Division of Investment, on behalf of Common Pension Fund A. v. Merrill Lynch & Co. and Bank of America Corp.*, Case No. L-3855-09 in the Superior Court of New Jersey. Testified in deposition on the materiality of accounting allegations, loss causation and damages calculations in connection with transactions involving the purchase and subsequent conversion of a convertible preferred security to common stock. Deposition in May 2012.

*In re Richard Kirby v Centro Properties Ltd & Ors* (VID 326 of 2008), *Richard Kirby v Centro Retail Ltd & Ors* (VID 327 of 2008), and *Nicholas Stott v Pricewaterhouse Securities Ltd* (VID 1028 of 2010), in the Federal Court of Australia. In a pair of securities class action disputes in Australia, testified at trial on alleged disclosure deficiencies of two Australian REITs in connection with certain short-term and long-term debts and the effect of those disclosures on the prices of the REITs' two stapled securities, as well as on the condition of the global credit market during the class period. Trial in May 2012.

*In re Lehman Brothers Securities and ERISA Litigation*, Case No. 09-MD-2017 (LAK) in United States District Court, Southern District of New York. Testified in deposition on the market for structured products and the market's general awareness of credit risks associated with structured finance products in the class-certification stage of a securities fraud class action alleging materially false and misleading statements and omissions in the offering documents of principal-protected notes. Deposition in April 2012.

*In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 in the Court of Common Pleas for the State of South Carolina, County of Greenville. Testified in deposition on damages and loss causation for class action and derivatives suits arising from a merger. Deposition in April 2012.

*Bank of America National Association, and Banc of America Securities LLC v. Bear Stearns Asset Management Inc., Ralph Cioffi, Matthew Tannin, and Raymond McGarrigal*, Case No. 1:08-cv-0265-AJN in the United States District Court, Southern District of New York. Testified in deposition on damages related to a securitization transaction and the Defendants' alleged failure to disclose the financial condition of their hedge funds. Deposition in March 2012.

*Between: Howard Green and Anne Bell, and Canadian Imperial Bank of Commerce, Gerald McCaughey, Tom Woods, Brian G. Shaw, And Ken Kilgour*, No. CV-08-00359335-0000, Ontario Superior Court of Justice. Testified in deposition on loss causation in proceedings under the Class Proceedings Act, 1992 alleging that Defendants made various misrepresentations regarding CIBC's CDO exposure and the extent of impairment of CIBC's CDO positions. Deposition in December 2011.

*In re Tronox Inc. Securities Litigation*, No. 09 Civ. 06220 (SAS), United States District Court, Southern District of New York. Testified in deposition on market efficiency at class certification stage in a securities fraud class action alleging that Defendants materially misstated the extent of legacy environmental liabilities. Deposition in December 2011.

*In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, Case No. 1:09-MD-2072 in the United States District Court, Southern District of New York. (Appeal denied by United States Court of Appeals for the Second Circuit, May 31, 2012.) Testified in deposition and hearing before the Court on market efficiency at class certification stage in a securities fraud class action alleging misrepresentations concerning Freddie Mac's capitalization and credit risk exposure. Depositions in August 2011 and November 2011. Court hearing in November and December 2011.

*Estate of John F. Koons, III v. Commissioner of Internal Revenue*, Docket Nos. 19771-09 and 19772-09, in the United States Tax Court. Testified at trial regarding the valuation of certain membership interests in a limited corporation. March 2011.

*In Re Altria Group, Inc. v. United States of America*, Case No. 1:06-cv-09430-RJH in the United States District Court, Southern District of New York. Testified in deposition and at trial regarding economic issues affecting tax treatment of certain leveraged lease transactions. Deposition in December 2007. Trial in June-July 2009.

*Madison Tyler Holdings, LLC, et al., Claimants v. Financial Asset Trading & Technology of California, LLC, et al., Respondents*; *Financial Asset Trading & Technology of California, et al., Cross-Claimants, v. Madison Tyler Holdings, LLC, et al., Cross-Respondents*; and related arbitration *Madison Tyler Holdings, a Delaware Limited Liability Company, et al., Counter-Claimants and Respondents v. Rajashree Karwa, an individual, Counter-Respondent and Claimant.* Arbitration Before JAMS, JAMS Ref. No. 1220038462. Testified in deposition on economic analysis of source of value creation in algorithmic trading strategies. June 2009.

*Lawrence E. Jaffe Pension Plan, On Behalf of Itself and All Others Similarly Situated, v. Household International, Inc., et al.*, Case No. 02-C-5893 in the United States District Court, Northern District of Illinois, Eastern Division. Testified in deposition and at trial on loss causation and damages in a securities class action alleging securities fraud arising from purported accounting irregularities and predatory lending practices to subprime borrowers. Deposition in March 2008. Trial in May 2009.

*Guerrero Family Trust, Carmen De Leon Guerrero, Jose T. Tenorio Trust, Estate of Santiago C. Tenorio, Juan T. Guerrero, Jesus T. Guerrero, and AJT Trust, v. Kinki Nippon Tourist Co. LTD, Saipan Hotel Corporation, Pacific Development Inc., Pedro J.L. Igitol, in his official capacity of Secretary of Saipan Hotel Corporation, Morgan Stanley Japan Limited, Marianas Holdings, LLC, and K.K. ING Karuizawa Training Institute*, Civil Action No. 04-0574D in the Superior Court of the Commonwealth of the Northern Mariana Islands. Testified in deposition on damages arising from alleged abuse of fiduciary duty and dilution of minority shareholders' stock holding. July 2008.

*In the Matter of David A. Finnerty, et al., Administrative Proceeding*, File No. 3-11893, Before the Securities and Exchange Commission. Testified in trial regarding the trading patterns of certain NYSE specialists in connection with alleged violations of priority rules and securities laws. February and March 2008.

*In Re NYSE Specialists Securities Litigation*, Master File No. 03 Civ. 8264 (RWS) in the United States District Court, Southern District of New York. Testified in deposition on class certification issues relating to alleged trading-rule violations by New York Stock Exchange specialist firms. November 2007.

*Theo Bullmore and Phillip S. Stenger, as Joint Official Liquidators of Beacon Hill Master Ltd. (In Official Liquidation), Plaintiffs v. Ernst & Young Cayman Islands, Ernst & Young LLP, Beacon Hill, Asset Management, LLC, John D. Barry, Thomas Daniels, John Irwin, Mark Miszkiewicz, and ATC Fund Services (Cayman) Limited f/k/a ATC Fund Administrators (Cayman) Limited, Defendants*, Index No.: 104314/05 in the Supreme Court of the State of New York, County of New York. Testified in deposition on the causation and alleged damages experienced by the Beacon Hill Master Fund caused by an alleged improper audit by Ernst & Young Cayman Islands. September 2007.

*Sterling Savings Association and Sterling Financial Corporation v. United States of America, Defendant*, Case No. 95-829C in the United States Court of Federal Claims. Testified in deposition and at trial on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. Depositions in June 2002 and May 2004. Trial in July 2007.

*Adelphia Communications Corp., Plaintiff v. Deloitte & Touche LLP, (Defendant) v. John Rigas, Timothy Rigas, Michael Rigas and James Rigas (Additional Defendants)*, in the Court of Common Pleas, Philadelphia County. Testified in deposition on loss causation and damages issues related to alleged improper conduct by auditor. May 2007.

*David S. and Malia A. Litman v. United States of America*, Case No. 05-956T; *Robert B. and Michelle S. Diener v. United States of America*, Case No. 05-971T; *Hotels.com Inc. and Subsidiaries (f/k/a Hotel Reservations Network, Inc.) v. United States of America*, Case No. 06-285T. Judge Christine O.C. Miller in the United States Court of Federal Claims. Testified in deposition and at trial on valuation of 9.9 million shares of stock issued to certain former officers of Hotels.com for tax purposes. Deposition in July 2006. Trial in May 2007

*Jane Z. Astleford, Donor, Petitioner v. Commissioner of the Internal Revenue, Respondent*, Docket No 4342-06 in the U.S. Tax Court. Testified at trial on value of certain interests in a limited partnership. March 2007.

*United States of America v. Sanjay Kumar and Stephen Richards*, 04-CR-0846 (ILG), in the United States District Court, Eastern District of New York. Testified at trial on loss causation and damages issues in criminal securities fraud matter in which defendants pleaded guilty to improper revenue recognition related accounting irregularities. October 2006.

*The Procter and Gamble Company and Subsidiaries & Proctor and Gamble FSC (Barbados) vs. The United States of America*, Case number 1:05cv355 in United States District Court for the Southern District of Ohio, Western Division. Testified in deposition on fair market value of certain technologies donated by Proctor and Gamble to various entities in connection with a tax dispute. September 2006.

*United States of America v. Richard Volpe*, Indictment S1 05 Cr. 390 (SHS) in the United States District Court, Southern District of New York. Testified at trial on liability issues in criminal securities fraud matter alleging illegal trading by certain New York Stock Exchange specialists. August 2006.

*United States of America v. Robert Scavone*, Indictment S1 05 Cr. 390 (SHS) in the United States District Court, Southern District of New York. Testified at trial on liability issues in criminal securities fraud matter alleging illegal trading by certain New York Stock Exchange specialists. July 2006.

*United States of America v. Michael Hayward and Michael Stern*, Indictment S1 05 Cr. 390 (SHS) in the United States District Court, Southern District of New York. Testified at trial on liability issues in criminal securities fraud matter alleging illegal trading by certain New York Stock Exchange specialists. July 2006.

*Commonwealth Holdings, Inc., Profit Sharing Plan & Trust, James T. Waddill, IV et al. v. Salomon Smith Barney, Inc. and John Henry Spatz*, in a hearing before NASD. Testified on loss causation and damages aspects of Plaintiffs' claims arising from alleged securities fraud. September 2005.

*Messrs. Robert, Charles and John Switzer et al. v. Deutsche Bank et al.*, in a hearing before NASD. Testified on liability and damages aspects of Plaintiffs' damage claims arising from alleged unsuitable investments in certain leveraged debt obligations. June 2005.

*IDT Corp. v Telfonica S.A. et al.*, Case No. 01 CV 471 in the United States District Court for New Jersey. Testified in deposition on liability and loss causation aspects in a claim of alleged securities fraud. April 2005.

*Sherewin I. Ray et al. v. Citigroup Global Markets, Inc. f/k/a Salomon Smith Barney, Inc., Citigroup, Inc. and John Henry Spatz*, Case No. 03C3157 in the United States District Court for the Northern District of Illinois, Eastern Division. Testified in deposition on liability and loss causation in a claim of alleged securities fraud. March 2005.

*American National Bank and Trust Company of Chicago, as Trustee f/b/o Emerald Investments LP, and Emerald Investments LP, an Illinois Partnership v. Allmerica Financial Life Insurance and Annuity Company*. Testified in deposition on certain liability aspects in a breach of contracts claim involving certain mutual fund trading strategies. January 2005.

*In re WorldCom, Inc. ERISA Litigation*, Master File No. 02 Civ. 4816 (DLC) in the United States District Court, Southern District of New York. Testified in deposition on liability aspects of Plaintiffs' damage claims in an ERISA class action. January 2005.

*Xilinx Inc. and Subsidiaries v. Commissioner of Internal Revenue Service*, Docket Nos. 004142-01 and 00702-03. Testified in U.S. Tax Court on whether grant date value, or certain spread upon exercise, of employee stock options should be considered part of cost sharing pool in a cost sharing arrangement between Xilinx, Inc. and its Irish affiliate. Trial in July 2004. Submitted affidavit in connection with motion to dismiss in June 2002.

*Maxtor Corporation v. Koninklijke Philips Electronics N.V., Philips Semiconductors B.V., Philips Semiconductor International B.V., Philips Electronics North America Corporation, Philips Semiconductors, Inc., Philips Semiconductor Manufacturing, Inc., Philips France, Philips Japan, Ltd., and Does 1 through 25*, Case No. CV 808650 in the Superior Court of the State of California, County of Santa Clara. Testified in deposition on damages analysis in connection with alleged design failure of a chip used in manufacturing computer hard drives. March 2004.

*Mid-Continent Federal Savings Bank v. United States of America, Defendant*, Case No. 95-472C in the United States Court of Federal Claims. Testified in deposition and at trial in Court of Federal Claims on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. Deposition in April 2002. Trial in July 2003.

*Robert F. Flood v. Bessemer Trust Company, N.A.*; *Robert G. Vanneman; and Does 1-25 and Stephen Gorosh v. same defendants*. Testified in deposition on alleged damages due to failure to diversify. November 2002.

*Christine P. Rales, Plaintiff v. Steven M. Rales, Defendant*, Civil Action No. 02DR166-D in the Superior Court of District of Columbia. Testified in deposition on the fair market value of a block of 19.67 million shares of common stock of Danaher Corporation held by Stephen M. Rales. February 2002.

Charles River Associates

*American National Bank and Trust Company of Chicago, as Trustee f/b/o Emerald Investments LP, and Emerald Investments LP, an Illinois Partnership v. AXA Client Solutions, LLC, The Equitable Life Assurance Society of the United States, and AXA Financial, Inc.*, Case No. 00 C 6786. Testified in deposition on damages due to alleged breach of contract involving certain mutual fund trading strategies. May 2002.

*Statewide Savings Bank, S.L.A., Plaintiff v. United States of America, Defendant*, Case No. 95-779C in the United States Court of Federal Claims. Testified in deposition on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. February 2002.

*Charles T. McCord and Mary S. McCord, Donors, Petitioners v. Commissioner of Internal Revenue, Respondent*, Docket No 7048-00 in the U.S. Tax Court. Testified at trial on value of several interests in a limited partnership. May 2001.

*Estate of Elma Middleton Dailey, Deceased, K. Robert Dailey, II, Executor, Petitioner v. Commissioner of Internal Revenue, Respondent*, Docket Nos 6251-00 and 6262-00 in the U.S. Tax Court. Testified at trial on value of several interests in a limited partnership. May 2001.

*John G. Balletto v. Xoom.com, Inc.*, Case No. 306798 in the Superior Court of California, San Francisco County. Testified in deposition and at trial relating to damages due to alleged breach of contract. January 2001. Deposition in January 2001. Trial in March 2001.

*Edison International (1585456), Mission First Financial (1431482), Edison Capital (1417993), Edison Funding Company (1417994), Renewable Energy Capital Company (0715920), Mission Funding Epsilon (1426267) v. California Franchise Tax Board*. Testified before the State Board of Equalization on whether Mission First Financial and its parent company SCEcorp formed a unitary business for tax purposes during 1988 to 1990. December 2000.

*Framatome Connectors USA Holdings, Inc. and Subsidiaries, et al. v. Commissioner of Internal Revenue Service*, Docket No. 5030-98, 9160-99, 118 T.C. 32 (2002), aff'd, 108 Fed. Appx. 683, (2004). Testified in trial on whether Burndy Japan was a controlled foreign corporation of the petitioner for the years 1988, 1989 and 1992 under section 957(a) (2) of the Internal Revenue Code. October 2000.

*Barry G. Hittner, Receiver of American Universal Insurance Company v. Sequa Corporation, et al.*, M.D.L. No. 972, C.A. No. 1:92-512. Testified in deposition on the value of a $50 million note backed by certain real estate. June 2000.

*Estate of Richie C. Heck, Deceased, Gary Heck, Special Administrator, Plaintiff v. Commissioner of Internal Revenue Service, Defendant*. Docket No. 11619-99 in the U.S. Tax Court. Testified at trial on the valuation of a minority interest in F. Korbel & Bros., Inc. June 2000.

*American Heritage Bancorp, Plaintiff v. United States of America, Defendant*; *Federal Deposit Insurance Corporation, as successor to the rights of Home Federal Savings Bank, Plaintiff Intervenor v. United States of America, Defendant*. Case No. 90-3982C. Testified in deposition on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. May 2000.

*Estate of Robert H. Lurie, deceased, Ann Lurie, Executor v. Commissioner of Internal Revenue*, Docket No. 22639-94 in the U.S. Tax Court. Testified at trial on whether certain trusts accumulated assets from investments without transfers for inadequate consideration by the deceased. February 1999.

*Joseph K. Mitchell, et al., v. Central Investment Corporation*, Case No. A9700035, Special Proceedings in the Court of Common Pleas, Hamilton County, Ohio. Testified in deposition regarding fair cash value of a minority position in stock of a Pepsi-Cola bottling company in connection with a freeze-out merger. March 1998.

*Walter L. Gross, Jr. & Barbara H. Gross, Petitioners v. Commissioner of Internal Revenue Service, Respondent*, No. 4460-97; Calvin C. Linnemann & Patricia G. Linnemann, Petitioners v. Commissioner of Internal Revenue Service, Respondent, No. 4469-97. Testified at trial regarding the fair market value of a minority interest in a Pepsi-Cola bottling company, which Petitioners had claimed as a gift-tax liability. November 1997.

*R. J. R. Nabisco Inc. and Subsidiaries v. Commissioner*, Docket No. 3796-95 in the U.S. Tax Court. Testified at trial regarding the nature and useful economic life of cigarette package design for federal income taxation purposes. February 1997.

*Clinton, Inc. & Subsidiaries, Petitioner v. Commissioner of Internal Revenue, Respondent*, Docket No. 9885-95 in the U.S. Tax Court. Testified in deposition regarding reasonable executive compensation pursuant to Internal Revenue Code Section 162 (a) (1). August 1996.

*Fullers Jewelry, Inc., Plaintiff v. Dallas Central Appraisal District, Defendant*, Case No. 94-09169-B, District Court, Dallas County, Texas, 44th Judicial District. Testified in deposition regarding the value of merchandise inventory of a retail jewelry chain for purposes of ad valorem taxation. July 1996.

*American Marazzi, Inc., Plaintiff v. Dallas Central Appraisal District, Defendant*, Cause number 95-07028-B, District Court, Dallas County, Texas, 44th Judicial District. Testified in deposition regarding the value of merchandise inventory of a manufacturer and distributor of ceramic tiles for purposes of ad valorem taxation. June 1996.

*Terence Dean, et al. v. Dean Security, Inc. et al.* Testified in binding arbitration regarding damages due to breach of contract for the sale of a security company. March 1996.

*Advertiser's Dynamic Services, Co., Inc., Plaintiff v. United States of America, Defendant*, Case No. 3-94-CV-2079-G, District Court, North Dallas, Texas. Testified at trial regarding the nature of contracts between a publisher and salespersons for payroll tax purposes. February 1996.


## Publications

"Economic Consequences: The Real Cost of U.S. Securities Class Action Litigation," 2014, with Nikolai Caswell, Anand Goel, Sumon C. Mazumdar and Rahul Surana, issued by Institute for Legal Reform, U.S. Chamber of Commerce.

"Assessing Market Efficiency for Reliance on the Fraud-on-the-Market Doctrine after Wal-Mart and Amgen," with Sumon C. Mazumdar and Daniel A. McLaughlin, 2014, in James Langenfeld Ed., Research in Law and Economics, Volume 26, 161-207.

"The NUA Benefit and Optimal Investment in Company Stock in 401(K) Accounts," with Sumon C. Mazumdar, Vikram Nanda and Rahul Surana, 2009, in A. H. Chen Ed., Research in Finance, Volume 25, 203–227.

"Competition in IPO Underwriting: Time Series Evidence," with Andrew H. Chen and Sumon C. Mazumdar, 2008, in A. H. Chen Ed., Research in Finance, Volume 24, 1–25.

"A Matrix-Based Lattice Model to Value Employee Stock Options," with Sumon C. Mazumdar, Rahul Surana and Sanjay Unni, 2006, Journal of Derivatives 14, 9–26.

"Mean Reversion in Earnings and the Use of E/P Multiples in Corporate Valuation," with David Denis and Atulya Sarin, 2004, Journal of Applied Finance 14, 4–10.

"Securities Class Action Settlements: An Empirical Analysis," with Sumon C. Mazumdar and Atulya Sarin, 2003, Santa Clara Law Review 43, 1001–1033.

"Ownership Structure, Agency Costs and Dividend Policy," with Anand M. Vijh and Randolph W. Westerfield, 2002, in A. H. Chen Ed., Research in Finance, Volume 19, 1–28.

"The Cost of Raising Preferred Equity Capital," with Sumon C. Mazumdar and Atulya Sarin, 2002, Journal of Financial Research 25, 577–592.

 "Firm Value and Marketability Discounts," with David J. Denis, Stephen P. Ferris and Atulya Sarin, 2001, Journal of Corporation Law 27, 89–115.

"Transfer Pricing and Foreign Exchange Risk," with Brian Becker and Jonathan Neuberger, Transfer Pricing Report, July 1999.

"Dividend Omissions and Forecasts of Future Earnings: Some Positive Evidence on Information Content of Dividends," 1999, in A. H. Chen Ed., Research in Finance, Volume 17, 13–39.

"The Relationship Between Ownership, Financing Decisions and Firm Performance: A Signaling Model," with Sudipto Dasgupta and Yuk-She Chan, 1998, International Economic Review 39, 723–744.

"Valuation for Smaller Capitalization Companies," with Scott D. Hakala, 1998, in Financial Valuation: Business and Business Interests – 1998 update, Warren, Gorham & Lamant.

"Trading Behavior and the Unbiasedness of the Market Reaction to Dividend Announcements," with Anand M. Vijh, 1995, Journal of Finance 50. (Abstract reprinted in Financial Management Collection, 1996.)

"Beyond Mere Compliance," with Anita S. Agarwal, Mortgage Banking, April 1993, 57–61.

"Dividend Clienteles and the Information Content of Dividend Changes," with Anand M. Vijh, 1990, Journal of Financial Economics 26, 193–219.

"The Efficient and Inefficient Media for Political Campaign Advertising," with Roland T. Rust and George T. Haley, 1984, Journal of Advertising 13, 45–49.

"Modeling of Non-Ideal Residence Time Distribution in a Continuous Flow Stirred Tank Reactor at Zero RPM," with D. Prasanna Rao, 1983, Indian Chemical Engineer, 24–27.

"Alternate Criteria for the Comparison of Regression Models," with Roland T. Rust, presented in Proceedings of the Southwestern Marketing Association, Spring 1983.

## Working Papers

"ESO Expensing Under the Revised FAS 123: A Practitioner's Guide," with Sumon C. Mazumdar, Sanjay Unni, and Anand Vijh, September 2005.

"Investment in Company Stock in 401(k) Accounts," with Sumon C. Mazumdar, May 2005.

"The New Accounting Rules for ESO Expensing: Not Quite As Easy As 123," with Sumon C. Mazumdar and Sanjay Unni, March 2005.

"Competition in IPO Underwriting: Time Series Evidence," with Andrew H. Chen, Sumon C. Mazumdar and Atulya Sarin, March 2003.

"Auditor Compensation and Audit Failure: An Empirical Analysis," February 2003.

"The Offer Yield of Preferred Stock," with Sumon C. Mazumdar and Atulya Sarin, March 2002.

"Signaling, Agency Costs and Ownership Structure: Theory and Empirical Implications," with Sudipto Dasgupta and Yuk–Shee Chan, mimeo, Hong Kong University of Science and Technology, 1997.

"Is it Appropriate to Use a Higher Discount Rate to Value Small Firms?" with Martin Hanan, Rick Knoll, and Mark Mitchell.

"Turnover in Equity Ownership, Risk and Return," September 1995.

## Professional History

2019 – present   Charles River Associates
          Senior Consultant

2012 – 2019   Navigant Consulting
          Managing Director and Global Head of the Securities & Finance Practice

1997 – 2014   Haas School of Business, University of California, Berkeley
          Lecturer

2011 – 2012   AFE Consulting
          Founder and President

1997 – 2011   LECG
          Senior Managing Director and Practice Leader (2007 – 2011)
          Member – Executive Management Committee (2007 – 2011)
          Member – Management Advisory Committee (2003 – 2007)
          Member – Board of Directors (2001 – 2003)
          Managing Director (1999 – 2007)
          Director (1999)
          Affiliate (1998)
          Principal (1998)
          Senior Economist (1997)

1995 – 1997   BVS
          Senior Associate

1988 – 1995   University of Southern California
          Assistant Professor – Finance and Business Economics
          Award from Faculty Research & Innovation Fund, University of Southern California, 1990

1983 – 1988   University of California, Berkeley
          Instructor
          Graduate Student Instructor

- Graduate Fellowship, University of California, Berkeley (1988)
- Earl F. Cheit Award for Outstanding Teaching, Graduate School of Business, University of California, Berkeley (1986–1987)
- Outstanding Graduate Student Instructor Award, University of California, Berkeley (1986–1987)
- Outstanding Graduate Student Instructor Award, University of California, Berkeley (1985–1986)
- Award for Best Technical Paper published in Indian Chemical Engineer (1983)

CONFIDENTIAL

**Appendix 2: Documents Considered**

**Case Documents**
1. Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint with Prejudice, September 2, 2008.
2. Appendix 1 to Lead Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss the First Amended Complaint, October 16, 2008.
3. Third Amended Complaint, ECF No. 166, March 28, 2012.
4. Defendants' Glossary of Terms, ECF No. 320, June 9, 2014.
5. Lead Plaintiff's Glossary of Terms Used in Connection with Defendants' Motions to Dismiss the Third Amended Complaint, June 9, 2014.
6. Appeal from the United States District Court for the Northern District of Ohio at Youngstown. No. 4:08-cv-00160, United States Court of Appeals, (6th Cir. 2016), July 20, 2016.
7. Memorandum of Opinion and Order, ECF No. 478, August 14, 2018.
8. Order, In re Ohio Pub. Emps. Ret. Sys., No. 18-0310, United States Court of Appeals for the Sixth Circuit, January 23, 2019.

**Declarations and Expert Reports**
1. Expert Report of Dr. Greg Hallman, August 16, 2012.
2. Expert Report of Mukesh Bajaj, Ph.D., December 14, 2012.
3. Declaration of Professor Steven P. Feinstein, December 16, 2016.
4. Report on Market Efficiency Professor Steven P. Feinstein, June 7, 2017.
5. Expert Report of Mukesh Bajaj, Ph.D., September 1, 2017.
6. Expert Report of Paul A. Gompers, September 1, 2017.
7. Expert Report of David I. Tabak, Ph.D., November 16, 2023.
8. Tabak Report Production, "Appendix 1 Replication.xls."
9. Expert Report of Howard S. Shapiro, November 17, 2023.
10. Expert Report of Dr. Chudozie Okongwu, January 19, 2024.

**Depositions**
1. Deposition of Howard Shapiro, November 6, 2023.
2. Deposition of David I. Tabak, December 20, 2023.
3. Deposition of Howard Shapiro, January 10, 2024.

**Court Opinions**
1. *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
2. *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2415 (2014).

**Freddie Mac Press Releases**
1. August 1, 2006, "Freddie Mac Voluntarily Adopt Temporary Limited Growth For Retained Portfolio."
2. August 21, 2006, "Recent Events - Legal Proceedings."
3. September 8, 2006, "Freddie Mac Holds Annual Stockholders' Meeting."
4. October 11, 2006, "Recent Events – Unregistered Sale of Equity Securities."

CONFIDENTIAL

5. October 19, 2006, "Recent Events – Management."
6. January 5, 2007, "Freddie Mac Provides Quarterly Market Update."
7. January 17, 2007, "Recent Events – Unregistered Sales of Equity Securities."
8. March 8, 2007, "Recent Events – Executive Compensation Actions."
9. March 23, 2007, "Freddie Mac Reports 2006 Financial Results."
10. April 12, 2007, "Recent Events – Unregistered Sale of Equity Securities."
11. May 1, 2007, "Recent Events – Freddie Mac Announces that President Eugene McQuade Declines Opportunity to Become Chief Executive Officer."
12. June 7, 2007, "Recent Events."
13. June 14, 2007, "Freddie Mac Releases First Quarter 2007 Financial Results; Company Resumes Quarterly Reporting."
14. July 19, 2007, "Recent Events – Unregistered Sales of Equity Securities."
15. July 25, 2007, "Supplemental Non-Agency, Subprime Securities Portfolio Data."
16. August 30, 2007, "Freddie Mac Releases Second Quarter 2007 Financial Results; Net Income of $764 Million, Fair Value Increase of $800 Million."
17. September 7, 2007, "Recent Events."
18. September 19, 2007, "Recent Events – Freddie Mac Announces Resignation of Jeffrey M. Peek From Board of Directors."
19. September 27, 2007, "Recent Events – Unregistered Sale of Equity Securities."
20. September 28, 2007, "Recent Events – Legal Proceedings."
21. November 9, 2007, "Recent Events – Executive Compensation."
22. November 20, 2007, "Freddie Mac Reports Third Quarter 2007 Net Loss of $2.0 Billion or $3.29 Per Diluted Share."
23. November 27, 2007, "Recent Events – Equity Offerings."
24. November 30, 2007, "Recent Events – Unregistered Sales of Equity Securities."


**Freddie Mac Financial Disclosures**
1. 2005 Annual Report, "Information Statement and Annual Report to Stockholders for the fiscal year ended December 31, 2005," June 28, 2006.
2. 2006 Annual Report, "Information Statement and Annual Report to Stockholders For the fiscal year ended December 31, 2006," March 23, 2007.
3. 2006 Consolidated Financial Statements.
4. 2007 Annual Report "Information Statement and Annual Report to Stockholders For the fiscal year ended December 31, 2007," February 28, 2008.
5. Supplement dated October 3, 2006 to Information Statement dated June 28, 2006.
6. Presentation, "Freddie Mac Update: October 2006."
7. Supplement dated January 5, 2007 to Information Statement dated June 28, 2006.
8. Presentation, "Freddie Mac Update: January 2007."
9. Supplement dated March 23, 2007 to Information Statement dated March 23, 2007.
10. Financial Statements and Core Tables, June 14, 2007.
11. Consolidated Financial Statements, June 14, 2007.
12. Presentation, "Freddie Mac's First Quarter 2007 Financial Results," June 14, 2007.

13. Supplement dated June 14, 2007 to Information Statement dated March 23, 2007.
14. Financial Report for the Three Months Ended March 31, 2007, Information Statement Supplement to the 2006 Information Statement and Annual Report to Stockholders, Dated March 23, 2007, June 14, 2007.
15. Financial Statements and Core Tables, August 30, 2007.
16. Consolidated Financial Statements, August 30, 2007.
17. Presentation, "Freddie Mac's Second Quarter 2007 Financial Results," August 30, 2007.
18. Financial Report for the Three and Six Months Ended June 30, 2007, Information Statement Supplement to the 2006 Information Statement and Annual Report to Stockholders, dated March 23, 2007, August 30, 2007.
19. Supplement dated August 30, 2007 to Information Statement dated March 23, 2007.
20. Financial Statements and Core Tables, November 20, 2007.
21. Consolidated Financial Statements, November 20, 2007.
22. Presentation, "Freddie Mac's Third Quarter 2007 Financial Results," November 20, 2007.
23. Supplement dated November 20, 2007 to Information Statement dated March 23, 2007.
24. Financial Report for the Three and Nine Months Ended September 30, 2007, Information Statement Supplement to the 2006 Information Statement and Annual Report to Stockholders, dated March 23, 2007, November 20, 2007.

**Freddie Mac Conference Calls**
1. Thomson StreetEvents, "FRE - Freddie Mac Market Update," March 31, 2006.
2. Thomson StreetEvents, "FRE - Freddie Mac Market Update," August 1, 2006.
3. Thomson StreetEvents, "FRE - Freddie Mac Annual Shareholders Meeting," September 8, 2006.
4. Thomson StreetEvents, "FRE - Freddie Mac Market Update," October 3, 2006.
5. Thomson StreetEvents, "FRE - Freddie Mac Market Update," January 5, 2007.
6. Thomson StreetEvents, "FRE - Q4 2006 Freddie Mac Earnings Conference Call," March 23, 2007.
7. Thomson StreetEvents, "FRE – Freddie Mac Annual Stockholders' Meeting," June 8, 2007.
8. Thomson StreetEvents, "FRE - Q1 2007 Freddie Mac Financial Results Conference Call," June 14, 2007.
9. Thomson StreetEvents, "FRE – Freddie Mac Second Quarter 2007 Financial Results," August 30, 2007.
10. Thomson StreetEvents, "FRE – Q3 2007 Freddie Mac Earnings Conference Call," November 20, 2007.
11. Thomson StreetEvents, "FRE – Q4 2007 Freddie Mac Earnings Conference Call," February 28, 2008.

**Freddie Mac Volume Summaries**
1. Freddie Mac Monthly Volume Summaries for the months of August 2006 to November 2007.

CONFIDENTIAL

**Freddie Mac Form 4 Documents**

1. Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, June 5, 2006.
2. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, June 5, 2006.
3. Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, June 5, 2006.
4. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, August 2, 2006.
5. Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, September 1, 2006.
6. Statement of Changes in Beneficial Ownership, Form 4 for Anthony S. Piszel, December 7, 2006.
7. Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, December 31, 2006.
8. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, January 3, 2007.
9. Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, March 29, 2007.
10. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, March 29, 2007.
11. Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, March 29, 2007.
12. Statement of Changes in Beneficial Ownership, Form 4 for Anthony S. Piszel, March 29, 2007.
13. Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, April 1, 2007.
14. Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, May 6, 2007.
15. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, May 6, 2007.
16. Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, May 6, 2007.
17. Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, June 5, 2007.
18. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, June 5, 2007.
19. Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, June 5, 2007.
20. Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, August 2, 2007.
21. Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, September 1, 2007.

CONFIDENTIAL

**Fannie Mae Documents**

1. Fannie Mae Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2005, May 2, 2007.
2. Fannie Mae Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2007, February 27, 2008.
3. Fannie Mae News Release, "Fannie Mae Files 2007 Quarterly Reports with the SEC," November 9, 2007.

**Analyst Reports**

1. Bank of America, "Freddie Mac Model Revisions: Raising PT and Reiterating Buy Rating," October 5, 2006.
2. Bear Stearns, "Mortgage Finance/GSEs: GSE Monthly: An Update on GSE Volume and Activity," June 2007.
3. Credit Suisse, "Mortgage Finance: June Monthly: Shaky Housing Fundamentals," June 1, 2007.
4. UBS, "Consumer Finance Monthly: Reordering Preferences; Top Pick Now ZION Over CIT, AXP; More Positive on GSEs," June 1, 2007.
5. UBS, "Consumer Finance Monthly: Reordering Preferences; Top Pick Now ZION Over CIT, AXP; More Positive on GSEs," June 1, 2007.
6. Deutsche Bank, "Daily MBS Market Commentary," June 3, 2007.
7. UBS, "U.S. Morning Meeting Highlights," June 4, 2007.
8. Deutsche Bank, "Daily MBS Market Commentary," June 5, 2007.
9. Lehman Brothers, "MBA Index Commentary," June 6, 2007.
10. Lehman Brothers, "Effect of 1Q07 HPA Update," June 6, 2007.
11. PiperJaffray, "Weekly Mortgage Update: Refi Apps Decline On Higher Rates; Purchase Apps Stable," June 6, 2007.
12. Bank of America, "GSEs Reporting Update; A Positive Step Towards the Return to Normalcy," June 8, 2007.
13. UBS, "US Morning Research Notes," June 8, 2007.
14. UBS, "US Banks wrap up," June 8, 2007.
15. Morgan Stanley, "Mortgage Finance: Market Volatility Widens GSE Basis," June 13, 2007.
16. PiperJaffray, "Weekly Mortgage Update: Will Higher Rates Spoil Stabilizing Purchase Market?" June 13, 2007.
17. Bear Stearns, "Freddie Mac Releases 1Q07 Results, Resumes Quarterly Reporting," June 14, 2007.
18. Bear Stearns, "Freddie Mac Releases 1Q07 Results Resumes Quarterly Reporting (Part 1)," June 14, 2007.
19. Bear Stearns, "Freddie Mac Releases 1Q07 Results Resumes Quarterly Reporting (Part 2)," June 14, 2007.
20. Credit Suisse, "Freddie Mac: Challenging Market Conditions Hamper Q1 Results," June 14, 2007.
21. JP Morgan, "Freddie Mac: Mark-to-Market Items Muddy Otherwise In-line Quarter," June 14, 2007.
22. UBS, "Freddie Mac: Reports 1Q GAAP Loss, But Operating Metrics Increasingly Positive," June 14, 2007.

CONFIDENTIAL

23. Barclays, "FRE Miss Not As Bad As It Looks," June 15, 2007.
24. Lehman Brothers, "The GSEs: Past, Present, and Future: Decoding Earnings, Fundamentals, Value," June 15, 2007.
25. Credit Suisse, "Credit Suisse Breakfast Banker," June 15, 2007.
26. FBR, "Freddie Mac: Industry Trends Point toward Upgrade-- Raising Price Target," June 15, 2007.
27. Argus, "Market Update," June 18, 2007.
28. Argus, "Freddie Mac," June 18, 2007.
29. Lehman Brothers, "The GSEs: Past, Present, and Future," June 18, 2007.
30. UniCredit, "Credit Flash: Freddie Mac with unexpected loss in Q1," June 18, 2007.
31. Lehman Brothers, "Freddie Mac Update Meeting with Mgt," June 20, 2007.
32. Lehman Brothers, "MBA Index Commentary," June 20, 2007.
33. UBS, "Freddie Mac: We Est. 1Q Op. EPS of $0.58; Enhanced Operating Model; Initiating 08-09 Estimates," June 21, 2007.
34. UBS, "Freddie Mac: We Est. 1Q Op. EPS of $0.58; Enhanced Operating Model; Initiating 08-09 Estimates," June 21, 2007.
35. UBS, "US Morning Research Notes," June 21, 2007.
36. UBS, "U.S. Morning Meeting Highlights," June 21, 2007.
37. "UBS, "GSE Update: Equity, MBS, Debt, and Regulatory Views on the GSEs – Conference Call Take-Aways," June 21, 2007.
38. UBS, "Morning Expresso - United States," June 21, 2007.
39. UBS, "US Morning Research Notes," June 21, 2007.
40. Bank of America, "Freddie Mac: May Data: Continued Portfolio Growth and Better Credit Quality," June 22, 2007.
41. Bear Stearns, "FRE: MAY DATA SHOW SOME PICKUP IN PURCHASES (PART 2)," June 22, 2007.
42. Bear Stearns, "Freddie Mac: May Data Show Some Pickup in Purchases," June 22, 2007.
43. Credit Suisse, "Freddie Mac: Volumes and Retained Portfolio Rise," June 22, 2007.
44. Credit Suisse, "Credit Suisse Breakfast Banker," June 25, 2007.
45. Argus, "Weekly Staff Report," June 25, 2007.
46. PiperJaffray, "Weekly Mortgage Update: Still Waiting For Housing Market Bottom," June 27, 2007.
47. Bank of America, "Fannie Mae: Model Revisions; Raising PT and Reiterating Buy Rating," June 28, 2007.
48. Citibank, "GSEs: Stars are Aligning," June 28, 2007.
49. Credit Suisse, "GSEs: March Capital - Fannie Earned About $1.1 bn in Q1," June 28, 2007.
50. Credit Suisse, "Credit Suisse Breakfast Banker," June 29, 2007.
51. PiperJaffray, "Specialty Finance Monthly: Economy Bumping Along During Housing Recession," July 3, 2007.
52. Credit Suisse, "Mortgage Finance: Housing Fundamentals Deteriorate Further," July 9, 2007.
53. UBS, "Consumer Finance Monthly: Top Picks Remain ZION, CIT, and AXP; In Mortgage, Downgraded MIs, Prefer GSEs," July 9, 2007.
54. Citibank, "Specialty/Mortgage Finance Earnings Preview: Subprime Redux," July 10, 2007.

CONFIDENTIAL

55. PiperJaffray, "Consumer Credit Growth Continued to Slow in May," July 10, 2007.
56. PiperJaffray, "Solid Jobs Softening Housing Recession Pain; Used Car Values Increase," July 10, 2007.
57. Bank of America, "Consumer and Specialty Finance Weekly: Mortgage 2Q07 Earnings Preview - The worst is still to come," July 13, 2007.
58. PiperJaffray, "Consumer Mortgage Preview: Another Tough Quarter; Slow Motion Recovery," July 13, 2007.
59. PiperJaffray, "This Housing Downturn Has More To Go," July 13, 2007.
60. Keefe, Bruyette & Woods, "Banks: Mortgage," July 16, 2007.
61. Fitch, "Fitch Rates Freddie Mac's $500MM Non-Cumulative Perpetual Preferred Stock 'AA-'," July 17, 2007.
62. Merrill Lynch, "GSEs more palatable; Pick entry-points carefully," July 17, 2007.
63. Citibank, "Freddie Mac: June Data Show Slight Retained Portfolio Growth, Lots of Moving Parts," July 23, 2007.
64. Credit Suisse, "Freddie Mac: Purchase Commitments Surge on Wider Option Adjusted Spreads," July 23, 2007.
65. UBS, "Freddie Mac: June Numbers Reflect Solid Credit Portfolio Growth; Slight Growth in Retained Portfolio," July 23, 2007.
66. Bear Stearns, "Freddie Mac Releases June Monthly Volume Summary," July 24, 2007.
67. Bear Stearns, "Freddie Mac Releases June Monthly Volume Summary (Part 1)," July 24, 2007.
68. Bear Stearns, "Freddie Mac Releases June Monthly Volume Summary (Part 2)," July 24, 2007.
69. Credit Suisse, "Credit Suisse Breakfast Banker," July 24, 2007.
70. Bank of America, "Consumer and Specialty Finance Weekly: Specialty Commercial Lenders 2Q07 Earnings Preview," July 27, 2007.
71. Citibank, "GSEs: Clarification of Subprime Exposure: No Cause for Alarm," July 27, 2007.
72. PiperJaffray, "Weekly Mortgage Update: Volatility Persists as Cycle Progresses," July 27, 2007.
73. UniCredit, "Covered Bond & Agency Monitor," August 2, 2007.
74. Morgan Stanley, "Fannie Mae: Quick Comment: What Happened; Key Takeaway," August 6, 2007.
75. Lehman Brothers, "GSEs Rally on Spec of Port Cap Relief," August 7, 2007.
76. Bear Stearns, "Some Good News on Retained Portfolio Growth Limits?," August 7, 2007.
77. Credit Suisse, "Mortgage Finance: Credit Tremors Cracking Housing Foundation," August 7, 2007.
78. Morgan Stanley, "Freddie Mac: Quick Comment: FRE Meeting Notes," August 8, 2007.
79. Morgan Stanley, "North America Equity Morning Summary," August 9, 2007.
80. UBS, "Consumer Finance Monthly: Credit and Liquidity Concerns Collapse Stock Valuations," August 9, 2007.
81. UBS, "Consumer Finance Monthly: Credit and Liquidity Concerns Collapse Stock Valuations," August 9, 2007.
82. Citibank, "Specialty/Mortgage Finance: More Negative Mortgage Industry Outlook; GSEs Positioned to Step Up," August 10, 2007.

83. Credit Suisse, "GSEs - Favorable Environment, but Portfolio Caps to Remain for Now," August 10, 2007.
84. UBS, "Morning Expresso - United States," August 10, 2007.
85. Bear Stearns, "OFHEO Keeps Portfolio Caps in Place," August 13, 2007.
86. Credit Suisse, "Credit Suisse Breakfast Banker," August 13, 2007.
87. UBS, "Morning Expresso - United States," August 13, 2007.
88. UBS, "GSE Update: OFHEO Refuses FNM's Request to Increase Portfolio Cap; Buy FNM, FRE on Weakness," August 13, 2007.
89. UBS, "Mortgage Strategist: Highlights & Recommendations," August 14, 2007.
90. JP Morgan, "GSE Update: Changes To Loan Limits and Portfolio Caps Becoming More Likely With Continued Illiquidity," August 20, 2007.
91. UBS, "Mortgage Strategist: Highlights & Recommendations," August 21, 2007.
92. Fox-Pitt Kelton, "Fannie Mae, Freddie Mac: Gulliver freed from the Lilliputians," August 22, 2007.
93. Credit Suisse, "Freddie Mac: Business Activity Pulls Back; Retained Portfolio Grows," August 23, 2007.
94. Credit Suisse, "Credit Suisse Breakfast Banker," August 24, 2007.
95. Lehman Brothers, "Freddie Mac: 2Q07 Could Be Inflection Point for EPS," August 29, 2007.
96. PiperJaffray, "Mortgage Update: Mortgage/Housing Cycle-- From Bad to Worse," August 29, 2007.
97. Bank of America, "FRE: 2Q07 Results: Margins Show Stabilization, Closer to Timel (Part 1 of 2)," August 30, 2007.
98. Bear Stearns, "FRE: Solid Q2 Results Credit Risk Still Low Despite GAAP Distortio (Part 1)," August 30, 2007.
99. Bear Stearns, "FRE: Solid Q2 Results Credit Risk Still Low Despite GAAP Distortio (Part 2)," August 30, 2007.
100. Bear Stearns, "FRE: Solid Q2 Results Credit Risk Still Low Despite GAAP Distortio (Part 3)," August 30, 2007.
101. Bear Stearns, "Freddie Mac: Solid Q2 Results; Credit Risk Still Low Despite GAAP Distortions," August 30, 2007.
102. Credit Suisse, "Mortgage Finance: Liquidity Issues Temper Origination Outlook," August 30, 2007.
103. Friedman Billings Ramsey, "Freddie Mac: Improving Fundamentals Trump Near-Term Earnings Pressure," August 30, 2007.
104. Goldman Sachs, "Freddie Mac: 2Q07: Despite higher costs, our positive long-term outlook is intact," August 30, 2007.
105. Credit Suisse, "Freddie Mac: Falling Interest Rates Likely to Reverse Q2 Earnings Gains," August 31, 2007.
106. Credit Suisse, "Credit Suisse Breakfast Banker," August 31, 2007.
107. Merrill Lynch, "Freddie Mac: Credit proves to be bigger headwind, Maintain Neutral," August 31, 2007.
108. Miller Tabak, "Freddie Moves Into Higher-Margin Territory; Initiating 2009 Estimate of $8.55, 2009 Price Target of $77.72, Maintain 'Strong Buy,'" August 31, 2007.
109. nabCapital, "At a glance – Freddie Mac: A Poor 2Q07 Result and an indication that the US mortgage market will remain tough for some time yet," August 31, 2007.

110. PiperJaffray, "Freddie Mac: Benefiting From Shift To Traditional Lending Practices; Credit Costs Higher," August 31, 2007.
111. nabCapital, "Credit Today," September 3, 2007.
112. Credit Suisse, "Credit Suisse Breakfast Banker," September 3, 2007.
113. Lehman Brothers, "Freddie Mac: Trimming Estimates for Higher Credit Exp," September 4, 2007.
114. Friedman Billings Ramsey, "Non-Agency Originations to Plummet as Mortgage Banks Brace for Tougher Times," September 4, 2007.
115. UBS, "Mortgage Strategist: Highlights & Recommendations," September 4, 2007.
116. Lehman Brothers, "Old to New: Incr Role for FHA/GNMA & GSEs," September 5, 2007.
117. Bank of America, "Consumer and Specialty Finance Weekly: 2Q Origination Data: Increased Retail & Reduced 'Risk Product' Volumes," September 7, 2007.
118. PiperJaffray, "Weekly Mortgage Update: Mortgage Employment Correction Gaining Steam," September 7, 2007.
119. PiperJaffray, "PJC Specialty Finance Monthly: Avoiding Recession Crucial for Shares," September 10, 2007.
120. UBS, "Consumer Finance Monthly: Illiquidity and Credit Deterioration Continue to Erode EPS Outlook," September 12, 2007.
121. UBS, "Consumer Finance Monthly: Illiquidity and Credit Deterioration Continue to Erode EPS Outlook," September 12, 2007.
122. Citibank, "Specialty/Mortgage Finance Weekly," September 13, 2007.
123. UBS, "Morning Expresso - United States," September 13, 2007.
124. UniCredit, "Covered Bond & Agency Monitor," September 13, 2007.
125. Bank of America, "Consumer and Specialty Finance Weekly: The Tipping Point for Leverage Loans?," September 14, 2007.
126. Friedman Billings Ramsey, "What Will Mortgage Banks Do When the Fed Cuts Rates?," September 14, 2007.
127. Argus, "Market update," September 17, 2007.
128. Argus, "Freddie Mac," September 17, 2007.
129. Bank of America, "FRE: FRE at BAC 37th Annual Investment Conference," September 17, 2007.
130. Bear Stearns, "Short Sellers Could Get Squeezed More," September 18, 2007.
131. Credit Suisse, "Mortgage Finance: OFHEO Modifies GSE Portfolio Caps," September 19, 2007.
132. Stanford, "OFHEO to Let Fannie, Freddie Grow Portfolios by 2%," September 19, 2007.
133. UBS, "OFHEO Announces Changes to GSE Portfolio Cap Restrictions," September 19, 2007.
134. nabCapital, "Credit Today," September 20, 2007
135. Bank of America, "Freddie Mac: Model Revisions; Raising PT and Reiterating Buy Rating," September 20, 2007.
136. Keefe, Bruyette & Woods, "OFHEO Announces Modest Changes for the GSEs' Portfolios," September 20, 2007.
137. PiperJaffray, "PJC Mortgage Market Update: Fed Rate Cut Helpful, But Not A Cure-All," September 20, 2007.
138. UniCredit, "Covered Bond & Agency Monitor," September 20, 2007.

CONFIDENTIAL

139. Bank of America, "Consumer and Specialty Finance Weekly: Examining the Decline in Home Owner Equity," September 21, 2007.
140. Argus, "Weekly Staff Report," September 24, 2007.
141. Bear Stearns, "Mortgage Insurance:  Initiation of Coverage," September 24, 2007.
142. Bank of America, "Freddie Mac: Aug Data: Strong Rise in Retained Portfolio, Cont'd good G'teed Portfolio Growth," September 25, 2007.
143. Bear Stearns, "Freddie Mac: August Monthly Data Show Pickup in Retained Portfolio Growth," September 25, 2007.
144. Citibank, "Freddie Mac: August Data Shows Strong Retained Portfolio Growth," September 25, 2007.
145. Credit Suisse, "Freddie Mac: Strong Retained Portfolio Growth in August," September 25, 2007.
146. Fox-Pitt Kelton, "Freddie Mac: Monthly Data Shows Strong Growth," September 25, 2007.
147. Morgan Stanley, "Financial Services: Navigating Financial Services in a Challenging Macro Environment," September 25, 2007.
148. Morgan Stanley, "Navigating Financial Services in Challenging Macro Environment," September 25, 2007.
149. UBS, "GSE Update: Results and Outlook Reflect Growth in Guarantee Business, Higher Credit Costs," September 25, 2007.
150. UBS, "Morning Expresso - United States," September 25, 2007.
151. UBS, "Freddie Mac: August Numbers Reflect Strong Growth in Credit and Retained," September 25, 2007.
152. JP Morgan, "Freddie Mac: Preferred Offering Should Provide Capital Cushion Monthly Numbers In-Line," September 25, 2007.
153. Credit Suisse, "Credit Suisse Breakfast Banker," September 26, 2007.
154. Bear Stearns, "OFHEO Declares both Fannie and Freddie Adequately Capitalized at June 30," September 27, 2007.
155. Fitch, "Fitch Rates Fannie Mae's $1B Series P Preferred Stock 'AA-,'" September 28, 2007.
156. Fitch, "Fitch Rates Freddie Mac $500MM Non-Cumulative Perpetual Preferred Stock 'AA-,'" September 28, 2007.
157. Friedman Billings Ramsey, "Loan Modifications - Will They Save the Day," September 28, 2007.
158. PiperJaffray, "PJC Mortgage Market Update: Oncoming Train, Pictorial View of Mtg/Housing," September 28, 2007.
159. Fox-Pitt Kelton, "Freddie Mac: Gulliver Unbound," October 2, 2007.
160. Credit Suisse, "Mortgage Finance: Falling Origination Volumes Pose New Challenges," October 2, 2007
161. Lehman Brothers, "Mortgage Finance: Industry Overview: Leaders Emerging from 3Q Credit Meltdown," October 2, 2007.
162. Morgan Stanley, "Mortgage Finance: Notes from Washington," October 2, 2007.
163. Bank of America, "Consumer and Specialty Finance Weekly: Trends in the Reverse Mortgage Market," October 5, 2007.
164. Lehman Brothers, "Mortgage Finance: Industry Overview: Update on Mortgage Market Share," October 5, 2007.

165. PiperJaffray, "Key Macro Statistics for Specialty Finance are Encouraging," October 5, 2007.

166. PiperJaffray, "PJC Mortgage Market Update: Correction Rolls On," October 5, 2007.

167. Stanford, "Mortgage Bankruptcy: Three Bills Advancing in Congress," October 5, 2007.

168. UBS, "Consumer Finance Monthly: We Expect Little to Cheer About in 3Q Earnings Reports," October 5, 2007.

169. UBS, "Consumer Finance Monthly: We Expect Little to Cheer About in 3Q Earnings Reports," October 5, 2007.

170. Argus, "Freddie Mac," October 9, 2007.

171. Bear Stearns, "Freddie Mac: Management Meetings; Wider OAS, Higher G' Fees, Business Investments Should Drive Business Growth," October 11, 2007.

172. Lehman Brothers, "Freddie Mac: GSE Prf'd Issuance: Benefits & Capacity," October 11, 2007.

173. Bank of America, "Consumer and Specialty Finance Weekly: Mortgage 3Q07 Earnings Preview - Continued Credit Deterioration," October 12, 2007.

174. Credit Suisse, "Mortgage Finance: Lift the Caps?," October 12, 2007.

175. Credit Suisse, "Credit Suisse Breakfast Banker," October 15, 2007.

176. Stanford, "Bank Regulator Report: Omnibus Could be Vehicle for GSE, Bankruptcy Bills," October 15, 2007.

177. Bear Stearns, "New Report, 'Guide for Navigating Current Market Assessing Impact of Deteriorating Credit on Earnings and Valuation,'" October 16, 2007.

178. PiperJaffray, "PJC Specialty Finance Monthly: Not As Bleak Outside Mortgage," October 16, 2007.

179. PiperJaffray, "3Q Mortgage Preview: Dreadful 3Q On Marks/Credit; Challenging Outlook Remains," October 16, 2007.

180. Lehman Brothers, "Fannie Mae: Rule Change Could Reduce Excess Capital," October 17, 2007.

181. UniCredit, "Covered Bond & Agency Monitor," October 18, 2007.

182. Bear Stearns, "OFHEO Proposal Would Likely Require More Risk Based Capital Not Total Capital," October 19, 2007.

183. PiperJaffray, "PJC Home Price Outlook: Impact On Home Improvement Retailers, Mortgage Lenders," October 19, 2007.

184. Bank of America, "Market Credit Concerns Create Buying Opp on GSEs," October 22, 2007.

185. Lehman Brothers, "Freddie Mac: Cutting PT for Multiple Compression," October 22, 2007.

186. Deutsche Bank, "DailyMBSMarketCommentary," October 22, 2007.

187. Lehman Brothers, "Mortgage Finance: Downgrading Mortgage & Spec Fin Sectors," October 22, 2007.

188. Friedman Billings Ramsey, "A Study of a Past Credit Cycle-- Book Values Do Not Protect Stock Valuations," October 23, 2007.

189. Bank of America, "Freddie Mac: Sept. Data: Strong G'teed Portfolio Growth; but Pullback in Retained Own Securities," October 24, 2007.

190. Bank of America, "FRE: Strong G'teed Portfolio Growth; but Pullback in Retained (Part 1 of 2)," October 24, 2007.

191. Bear Stearns, "Freddie Mac September Data Show Strong Securitization Growth and Efforts to Build Capital at Sept 30," October 24, 2007.
192. Citibank, "Freddie Mac: September Data - Portfolio Sales Ensure Sufficient Capital Amidst Volatility," October 24, 2007.
193. Credit Suisse, "Freddie Mac: Large Drop in Retained Portfolio," October 24, 2007.
194. Fox-Pitt Kelton, "Freddie Mac: Expect Large GAAP Loss in Quarter," October 24, 2007.
195. Friedman Billings Ramsey, "Freddie Mac: Sells Assets to Maintain Capital Levels-- Downgrading to Market Perform," October 24, 2007.
196. Merrill Lynch, "GSE stocks come into focus due to credit exposure," October 24, 2007.
197. Merrill Lynch, "Freddie Mac: GAAP loss seems likely for Q3; Volatility back in focus," October 24, 2007.
198. Miller Tabak, "FRE September Activity: Surplus Limitation Surfaces, Delinquencies 0.46%," October 24, 2007.
199. UBS, "Freddie Mac: Numbers Reflect Strong G-Fee Portfolio Growth, But Imply 3Q FVNA Reduction," October 24, 2007.
200. Citibank, "Government Sponsored Enterprises: Credit Concerns Dominate, But Political Winds Remain Positive," October 25, 2007.
201. Credit Suisse, "Credit Suisse Breakfast Banker," October 25, 2007.
202. Fox-Pitt Kelton, "Smoot-Hawley Redux," October 25, 2007.
203. Bank of America, "Consumer and Specialty Finance Weekly: Specialty Commercial Lenders 3Q07 Earnings Preview," October 26, 2007.
204. Fox-Pitt Kelton, "Fannie Reports September Data," October 26, 2007.
205. Morgan Stanley, "Mortgage Finance: In the long term, pricing trumps losses, but the short-term could still be volatile," October 26, 2007.
206. PiperJaffray, "PJC Mortgage Update: Credit Crunch Exacerbates Downturn, Glimmers of Hope?," November 5, 2007.
207. Lehman Brothers, "FNM Becoming Timely; Thoughts on MI Risk," November 6, 2007.
208. Fox-Pitt Kelton, "GSEs: Expect Only Moderate Uptick in Losses," November 7, 2007.
209. Morgan Stanley, "Freddie Mac: Correction: Quick Comment: Mark-to-market risk for FRE," November 7, 2007.
210. Morgan Stanley, "Freddie Mac: Quick Comment: Mark-to-market risk for FRE," November 7, 2007.
211. UBS, "Mortgage Finance Update: NY AG Subpoenas GSEs in Conjunction with Appraisal Investigation," November 7, 2007.
212. Lehman Brothers, "Freddie Mac: Negative Marks Should Cause 3Q GAAP Loss," November 8, 2007.
213. Credit Suisse, "Mortgage Finance: New York AG Appraisal Probe; Implications for the Mortgage Market," November 8, 2007.
214. JP Morgan, "Fannie Mae: Credit Losses Likely to Rise, but Concerns Over Wamu Loans And Mis Seem Overdone - Corrected Note supersedes any previous version," November 8, 2007.
215. Bank of America, "Consumer Specialty and Mortgage Finance Weekly: Lowering our Mortgage Industry Originations Forecast," November 9, 2007.
216. Lehman Brothers, "FNM Credit Costs Rise Substantially," November 9, 2007.
217. Lehman Brothers, "Freddie Mac: Downgrade to 2-EW for Credit Concerns," November 12, 2007.

CONFIDENTIAL

218. Lehman Brothers, "Fannie Mae: Downgrade to 2-EW on Poor Credit Outlook," November 12, 2007.

219. Fox-Pitt Kelton, "Fannie Mae: This Glass is Half Full," November 13, 2007.

220. UBS, "Consumer Finance Monthly: 3Q Results Were as Dismal as Excepted, Except When They Were Worse," November 14, 2007.

221. PiperJaffray, "Freddie Mac: Reducing Price Target; Maintaining Estimates and MP," November 15, 2007.

222. UBS, "Consumer Finance Monthly: 3Q Results Were as Dismal as Excepted, Except When They Were Worse," November 15, 2007.

223. UBS, "Morning Expresso - United States," November 15, 2007.

224. Fox-Pitt Kelton, "Fannie Mae: Thoughts on SPO 03-3," November 16, 2007.

225. Morgan Stanley, "Freddie Mac: Revised Estimate For 3Q07," November 16, 2007.

226. Morgan Stanley, "Americas Equity Morning Summary," November 16, 2007.

227. UBS, "US Contextual Diary: Two Weeks Ahead," November 16, 2007.

228. Credit Suisse, "First Edition (19 November, 2007)," November 19, 2007.

229. Credit Suisse, "Freddie Mac: Profitability Outlook Unfavorable; Are Security Impairments Down the Road?," November 19, 2007.

230. JP Morgan, "Freddie Mac: Higher Credit Expenses and GA Loss Likely in 3Q, but Derivative Losses Likely Smaller than Fannie's," November 19, 2007.

231. Bear Stearns, "GAAP Loss Reflects Reduced Market Liquidity and Is Restricting Liquidity As Well," November 20, 2007.

232. Citibank, "Freddie Mac: Losses Spur Need for New Capital; Charter/Mission Intact," November 20, 2007.

233. Credit Suisse, "Credit Suisse Breakfast Banker," November 20, 2007.

234. Fitch, "Amend: Fitch Places Freddie Mac's 'AA-' Preferred Stock on Rating Watch Negative," November 20, 2007.

235. Fox-Pitt Kelton, "We think capital raise will be dilutive to common shareholders," November 20, 2007.

236. Fox-Pitt Kelton, "FNM and FRE: Capital Constrained – Downgrading to Underperform," November 20, 2007.

237. Miller Tabak, "FNM and FRE Price Action - Capital Levels and Even More Threatened Business Models," November 20, 2007.

238. Morgan Stanley, "Freddie Mac: Reports 3Q07 Loss," November 20, 2007.

239. UBS, "First Read: Freddie Mac: Placing Under Review as We Clarify Credit and Capital Outlook," November 20, 2007.

240. JP Morgan, "Mortgage Finance: GSEs Likely to Remain Active in Securitization Business Despite Near-term Capital Issues," November 20, 2007.

241. Lehman Brothers, "Freddie Mac: '08 Estimate Using Base Case Now $2.28," November 21, 2007.

242. Credit Suisse, "Credit Suisse Breakfast Banker," November 21, 2007.

243. Credit Suisse, "Hostile Environment Weighs on Q3 Results; Sizable Capital Raise Needed," November 21, 2007.

244. Friedman Billings Ramsey, "Freddie Mac: Credit Cost Continues to Rise, Capital Declines-- Maintaining Underperform," November 21, 2007.

245. Goldman Sachs, "Freddie Mac: 3Q07: Core capital in decline, significant capital raise required," November 21, 2007.

246. JP Morgan, "AsiaCreditToday," November 21, 2007.
247. Keefe, Bruyette & Woods, "Freddie Mac: FRE 3Q: Freddie Loses $3.29 in Earnings, $12 in Fair Value," November 21, 2007.
248. Merrill Lynch, "Big equity offering seems likely; Common & Preferred," November 21, 2007.
249. Miller Tabak, "Huge Valuation Meltdown Tied to Credit Concerns, Likely Dividend Cut Cutting 2009 Price Target to $51.50, Maintain 'Strong Buy," November 21, 2007.
250. PiperJaffray, "PJC Mortgage Update: Cash-Out Drops; Home Starts Continue Much-Needed Plummet," November 21, 2007.
251. Deutsche Bank, "Dbdaily: European Edition," November 22, 2007.
252. UniCredit, "Covered Bond & Agency Monitor," November 22, 2007.
253. UBS, "GSE Update: Downgrading GSEs as Credit Pressures Erode EPS and Dividend Outlook," November 26, 2007.
254. Bear Stearns, "Release of Freddie Mac Adjusted/Economic Earnings Model," November 27, 2007.
255. Credit Suisse, "Freddie Mac: Divided Halved and $6 Billion of Preferred Raised Stabilizes Current Capital Position," November 27, 2007.
256. Fitch, "Fitch Expects to Rate Freddie Mac's $6B Upcoming Preferred Stock 'A+,'" November 27, 2007.
257. Merrill Lynch, "Preferred offering a modest positive," November 27, 2007.
258. Portales Partners, "Raising Our Ratings on the GSEs," November 27, 2007.
259. UBS, 'Mortgage Strategist: Highlights & Recommendations," November 27, 2007.
260. UBS, "Freddie Mac: Announces $6B Preferred Stock Offering; Cuts 4Q Dividend by 50%," November 27, 2007.
261. Citibank, "Freddie Mac: Capital Actions Announced; Terms TBD," November 28, 2007.
262. nabCapital, "Credit Today," November 29, 2007.
263. Bank of America, "Freddie Mac," November 29, 2007.
264. Fox-Pitt Kelton, "The paradox of increased capital," November 30, 2007.
265. Lehman Brothers, "Erratum: Updating Ests for Capital Raise," December 3, 2007.
266. Lehman Brothers, "Freddie Mac: Fred Updating Estimates for Capital Raise," December 3, 2007.
267. Fitch, "Fitch Downgrades Freddie Mac's Preferred Stock to 'A+'; Off Rating Watch," December 4, 2007.
268. Argus, "Freddie Mac," December 6, 2007.
269. Prudential, "FRE: TAKEAWAYS FROM OUR MEETING WITH THE CFO," February 26, 2007.
270. Fox-Pitt Kelton, "Freddie Mac: Strong Total Portfolio Growth Continues in February," March 21, 2007.
271. Lehman Brothers, "Tune Out the Noise; '08 Results Preview," March 21, 2007.
272. Fox-Pitt Kelton, "Buybacks Bolster Lackluster Results," March 23, 2007.
273. Bank of America, "Despite weak '06 Results, Outlook is Positive, Reiterate Buy," March 28, 2007.
274. Lehman Brothers, "Freddie Mac: Highlights from Management Meetings," April 5, 2007.
275. Goldman Sachs, "Fannie and Freddie: Housing market gets worse before it gets better," December 12, 2007.

CONFIDENTIAL

276. Lehman Brothers, "Freddie Mac: Change of Earnings Forecast: Raising EPS for Recent G-fee Adjustments," December 19, 2007.

277. Fox-Pitt Kelton, "Cash flow analysis shows subprime impairment unlikely," January 24, 2008.

278. Fox-Pitt Kelton, "Cash flow analysis shows subprime impairment unlikely," January 25, 2008.

279. Fox-Pitt Kelton, "Mortgage Finance: More Signs of Healing - Monetary policy is working," February 5, 2008.

280. Fox-Pitt Kelton, "Freddie Mac: 4Q Preview: What To Expect," February 21, 2008.

281. Bear Stearns, "January Data Show Decline in PC Issuance and Retained Portfolio Balance," February 21, 2008.

282. Credit Suisse, "Portfolio Contracts and Overall Growth Slows; Delinquencies Continue to Rise," February 21, 2008.

283. Morgan Stanley, "Freddie Mac: Quick Comment: 5 bp Deterioration in Dec Delinquencies to 60 bps," February 21, 2008.

284. Fox-Pitt Kelton, "Freddie Mac: 4Q Preview: What To Expect," February 22, 2008.

285. Fox-Pitt Kelton, "Are market risk perceptions overstated?," March 3, 2008.

286. Fox-Pitt Kelton, "FRE: Accounting, FV questions still on investors' minds," March 5, 2008.

287. Fox-Pitt Kelton, "Freddie Mac: Upgrading to In Line," March 12, 2008.

288. Fox-Pitt Kelton, "FNM, FRE: OFHEO to reduce capital surplus," March 18, 2008.

289. Fox-Pitt Kelton, "Message to GSEs: Don't Go all Wobbly," April 11, 2008.

290. Fox-Pitt Kelton, "Fannie Mae: First Take: Difficult Quarter, as expected," May 6, 2008.

291. Fox-Pitt Kelton, "FPK Mortgage Conference - FNM/FRE Chances growing of resolution on regulator," May 7, 2008.

292. Fox-Pitt Kelton, "FRE: Now a revenue growth story," May 14, 2008.

293. Fox-Pitt Kelton, "Housing reform that the GSEs could live with," May 20, 2008.

294. Fox-Pitt Kelton, "GSEs: Strong portfolio growth," May 23, 2008.

295. Fox-Pitt Kelton, "Freddie Mac: The worst or best of times?," June 18, 2008.

296. Fox-Pitt Kelton, "FNM, FRE: Clear differences in performance emerge," June 25, 2008.

297. Fox-Pitt Kelton, "FNM, FRE: Unfounded Panic drives down shares," July 8, 2008.

298. Fox-Pitt Kelton, "FNM/FRE: Conversations with FASB," July 8, 2008.

299. Fox-Pitt Kelton, "FNM, FRE: Talk about insolvency," July 10, 2008.

300. Fox-Pitt Kelton, "Reasonable alternatives to a doomsday scenario," July 11, 2008.

301. Fox-Pitt Kelton, "OFHEO appears to give leeway on timing of capital raise," July 11, 2008.

302. Fox-Pitt Kelton, "FRE: Treasury-FRE deal good news all around," July 14, 2008.

303. Fox-Pitt Kelton, "GSEs: "New" Regulator spells out views on GSE reform legislation, capital and shareholder role," July 30, 2008.

304. Fox-Pitt Kelton, "Waiting for a ray of sunshine," July 30, 2008.

305. Fox-Pitt Kelton, "Capital adequacy crucial in near term," August 7, 2008.

306. Fox-Pitt Kelton, "Fannie Mae: It's all about capital (and we think they have enough)," August 8, 2008.

307. Fox-Pitt Kelton, "Fannie Mae: It's all about capital (and we think they have enough)," August 11, 2008.

308. Fox-Pitt Kelton, "FNM FRE Night of the Long Knives," August 19, 2008.

CONFIDENTIAL

309. Fox-Pitt Kelton, "FNM FRE Quick Comment on supposed spread widening," August 22, 2008.
310. Fox-Pitt Kelton, "Cont'd deterioration in housing, but affordability up; card data marginally improved," September 3, 2008.
311. Fox-Pitt Kelton, "FNM/FRE: The End of the Road," September 8, 2008.
312. Fox-Pitt Kelton, "Annc'd Gov't Intervention of GSEs a Net Positive for Banks," September 8, 2008.
313. Fox-Pitt Kelton, "A September to remember," September 29, 2008.
314. Fox-Pitt Kelton, "Freddie Mac: Continued portfolio declines," October 24, 2008.
315. Fox-Pitt Kelton, "Fannie Mae: No help yet to beleaguered mortgage market," October 30, 2008.
316. Fox-Pitt Kelton, "Focus on California: Signs of Improvement," October 31, 2008.
317. Fox-Pitt Kelton, "Fannie Mae: Large Losses, minimal capital mean little help to mort. market for some time," November 10, 2008.

**News Articles**
1. Reuters News, "Cash-strapped New Century taps Lazard as adviser," March 22, 2007.
2. Reuters News, "Treasury's Paulson Sees Housing Downturn Contained," March 28, 2007.
3. Bloomberg News, "New Century, Biggest Subprime Casualty, Goes Bankrupt (Update4)," April 2, 2007.
4. Reuters News, "EURO CORP-Crossover widens sharply as subprime strikes again," July 18, 2007.
5. The Washington Post, "Fannie, Freddie Shares Get Boost; Talk Widespread On Possible Easing of Limits," August 7, 2007.
6. Reuters News, "Europe shares fall as BNP Paribas spooks investors," August 9, 2007.
7. Dow Jones News Service, "WSJ: Countrywide: Co [sic] Faces 'Unprecedented Disruptions'," August 9, 2007.
8. Associated Press Newswires, "ECB steps in to ease market fears by expanding cash," August 9, 2007.
9. The Street.com, "Fed, ECB Respond to Credit Crunch," August 9, 2007.
10. Associated Press, "World Stocks Plunge on Credit Fears," August 10, 2007.
11. Dow Jones International News, "OFHEO Won't Authorize Fannie, Freddie To Grow Portfolios," August 10, 2007.
12. The Washington Post, "Bernanke Opposes Lift of Fannie, Freddie Caps," August 30, 2007.
13. The New York Times, "Citigroup Warns of 60% Earnings Drop in Third Quarter," October 1, 2007.
14. NPR, "Citigroup, UBS to Post Sharp Losses for Bad Loans," October 1, 2007.
15. The New York Times, "Citigroup Profit Fell 57% in Third Quarter," October 15, 2007.
16. Dow Jones Business News, "Wachovia Misses Forecasts; Takes $1.3 Billion Charge," October 19, 2007.
17. Dow Jones News Service, "Morgan Stanley Sees $3.7B Write Down," November 7, 2007.

CONFIDENTIAL

18. Dow Jones Newswires, "NY AG Cuomo To Issue Subpoenas To Freddie Mac, Fannie Mae," November 7, 2007.

19. Dow Jones Business News, "Bank of America Warns of Additional CDO Losses," November 13, 2007.

20. Reuters, "Before the Bell – Bear Stearns shares up on write-down view," November 14, 2007.

21. The Wall Street Journal, "Fannie, Freddie Feel Default Heat --- Falling Home-Value Growth Affects Even Mortgage Titans' Stable Borrowers," November 19, 2007.

22. Reuters News, "MORTGAGES/AGENCIES-Spreads hit new wides; Freddie in focus," November 19, 2007.

23. Bloomberg News, "Freddie, Fannie Fall on Concern About Losses in Mortgage Market," November 19, 2007.

24. Dow Jones Business News, "UPDATE: Freddie Mac's Loss More Than Doubles; Firm May Halve Dividend," November 20, 2007.

25. Dow Jones International News, "With Capital Warning, Freddie Shifts From Solution To Problem," November 20, 2007.

26. Dow Jones Business News, "Update: Freddie Mac's Loss More Than Doubles; Firm May Halve Dividend," November 20, 2007.

27. Dow Jones News Service, "UPDATE: Freddie Mac 3Q Loss Balloons, May Need Capital," November 20, 2007.

28. Reuters News, "Fannie Mae's credit spreads widen 7.6 pct - Markit," November 20, 2007.

29. Dow Jones Capital Markets Report, "OFHEO's Lockhart: Freddie, Fannie Books Better Than Average," November 21, 2007.

30. Reuters News, "Investors eye high-yielding Freddie Mac preferreds," November 26, 2007.

31. Dow Jones News Service, "Freddie Mac, Fannie Mae Cut To Neutral At UBS," November 26, 2007.

32. Dow Jones Capital Markets Report, "Freddie Mac To Sell Up To $6B Perpetual Preferred Stk-Source," November 27, 2007.

33. Dow Jones News Service, "Freddie Mac Declares Qtrly Dividends," November 27, 2007.

34. Dow Jones News Service, "Ofheo: 2008 Conforming Loan Limit To Remain At $417,000," November 27, 2007.

35. Reuters News, "UPDATE 3- Freddie Mac shares post biggest gain in 19 years," November 28, 2007.

36. Dow Jones Capital Markets Report, "Freddie Mac Non-Conv Pfd Pegged At 8.5%-8.75% Coupon-Sources," November 28, 2007.

37. Associated Press Newswires, "Fannie Mae EVP Robert J. Levin buys 5,000 shares of common stock," November 28, 2007.

38. PR Newswire (U.S.), "Freddie Mac Provides Update On Preferred Stock Offering," November 29, 2007.

39. Bloomberg News, "Freddie Mac Offers Preferred Stock at 8.5 Percent Yield," November 29, 2007.

40. Bloomberg News, "Freddie to Sell Only Non-Convertible Preferred Shares (Update1)," November 29, 2007.
41. Bloomberg News, "Freddie preferred stock deal 5 times oversubscribed, according to source," November 29, 2007.
42. Reuters News, "Freddie Mac $6 bln preferred deal seen at 8.375 pct," November 29, 2007.
43. Bloomberg News, "Freddie Mac Launches Preferred Sale With Yield Of 8.375%," November 29, 2007.
44. Bloomberg News, "Freddie to Sell Only Non-Convertible Preferred Shares (Update3)," November 29, 2007.
45. Briefing.com, "Freddie Mac sells $6 bln preferred stock at 8.375% dividend," November 29, 2007.
46. Reuters News, "Freddie Mac sells $6 bln preferred shares," November 29, 2007.
47. PR Newswire (U.S.), "Freddie Mac Prices Offering of Non-Convertible Non-Cumulative Perpetual Preferred Stock," November 29, 2007.
48. Reuters News, "MORTGAGES/AGENCIES-Spreads mixed, extreme swings pause briefly," November 29, 2007.
49. Reuters News, "UPDATE 1-Fannie Mae Oct holdings jump driven by transaction," November 30, 2007.
50. AFX Asia, "Shares of Freddie Mac Rally; $6B Preferred Stock Offering Priced Thursday," December 1, 2007.
51. Business Wire, "WaMu to Raise $2.5 Billion in Additional Capital, Reduce Dividend, Resize Home Loans Business and Cut Expenses to Fortify Capital Base; * Expects Net Loss for Fourth Quarter 2007 With Non-cash Writedown of Home Loans Segment Goodwill * Non-cash Writedown Will Not Affect Key Capital Ratios or Liquidity," December 10, 2007.
52. Reuters, "UPDATE 3-WaMu to cut dividend, jobs; sets capital infusion," December 10, 2007.
53. The News Tribune, "Washington Mutual Stock Price Sinks 12.4 Percent on Bad News," December 12, 2007.
54. Reuters News, "UPDATE 2- WaMu prices $2.9 bln of convertible shrs," December 12, 2007.
55. Morgan Stanley, "Morgan Stanley Reports Fourth Quarter and Full Year Results," December 19, 2007.
56. Reuters, "UPDATE 5 – Bear Stearns has huge loss, cuts executive bonuses," December 20, 2007.
57. The New York Times, "Canadian Bank Hopes Stock Offer Calms Fears," January 15, 2008.
58. Citi, "Citi Reports Fourth Quarter Net Loss of $9.83 Billion, Loss Per Share of $1.99," January 15, 2008.
59. Dow Jones News Service, "UPDATE: Ambac To Raise $1B In Capital, Sees Big 4Q Losses," January 16, 2008.

CONFIDENTIAL

60. Dow Jones News Service, "AMBAC Comments on Recent Moody's Report," January 17, 2008.
61. The New York Times, "Write-Down Contributes to Profit Fall at Trust Bank," January 18, 2008.
62. Associated Press Newswires, "Bank of America, Wachovia profits plunge in fourth quarter," January 22, 2008.
63. Reuters, "UPDATE 5 – Ambac posts $3.3 bln loss, but shares surge," January 22, 2008.
64. The Wall Street Journal, "Yale's Shiller: U.S. Housing Slump May Exceed Great Depression," April 22, 2008.
65. The Guardian, "The day the credit crunch began, 10 years on: 'the world changed'," August 3, 2017.

**Publications**

1. Mark L. Mitchell and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," The Business Lawyer, February 1994.
2. Craig A. MacKinlay, "Event Studies in Economics and Finance," Journal of Economic Literature, Vol. 35, No. 1, pp. 13–39, March 1997.
3. Mukesh Bajaj, Atulya Sarin and Sumon C. Mazumdar, "The Costs of Issuing Preferred Stock," The Journal of Financial Research, Vol. XXV, No. 4, Pages 577-592, Winter 2002.
4. Paul A. Ferrillo, Frederick C. Dunbar, David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," St. John's Law Review, Issue 1 Volume 78, Winter 2004.
5. Souphala Chomsisengphet and Anthony Pennington-Cross, "The Evolution of the Subprime Mortgage Market," Federal Reserve Bank of St. Louis, January 2006.
6. Alan Greenspan and James Kennedy, "Sources and Uses of Equity Extracted from Homes," Federal Reserve Board Staff Working Paper, 2007-20.
7. Avery, R.B., Brevoort, K.P., Canner, G.B., 2007. The 2006 HMDA data. Federal Reserve Bulletin 93, A73–A109.
8. Markus K. Brunnermeier, "Deciphering the Liquidity and Credit Crunch 2007-08," Journal of Economic Perspectives, 23(1), Winter 2009, pages 77-100.
9. Gene Amromin and Anna L. Paulson, "Default Rates on Prime and Subprime Mortgages: Differences & Similarities," Federal Reserve Bank of Chicago, 2010.
10. Gary B. Gorton, "Questions and Answers About the Financial Crisis," NBER Working Paper Series, National Bureau of Economic Research, February 2010.
11. Arvind Krishnamurthy, "How Debt Markets Have Malfunctioned in the Crisis," Journal of Economic Perspectives, Volume 24, No. 1, Winter 2010, Pages 3-28.
12. Marcin Kacperczyk and Philipp Schnabl, "When Safe Proved Risky: Commercial Paper during the Financial Crisis of 2007–2009", Journal of Economic Perspectives—Volume 24, Number 1, Winter 2010, Pages 29–50.
13. Michael LaCour-Little, Charles A. Calhoun, Wei Yu, "What role did piggyback lending play in the housing bubble and mortgage collapse?" Journal of Housing Economics (2011).

CONFIDENTIAL

**Other**

1. Robert B. Avery, Raphael W. Bostic, Paul S. Calem, and Glenn B. Canner, "Credit Risk, Credit Scoring, and the Performance of Home Mortgages," Federal Reserve Bulletin, 1996.
2. Nomura, "Synthetic ABS 101: PAUG and ABX.HE," March 7, 2005.
3. Ben Bernanke, "The Global Saving Glut and the U.S. Current Account Deficit," Remarks at the Sandridge Lecture, Virginia Association of Economics, Richmond, Virginia, March 10, 2005.
4. Interagency Guidance on Nontraditional Mortgage Product Risks, Federal Register, Vol. 71, No. 192, adopted October 2006, https://www.federalregister.gov/documents/2006/10/04/06-8480/interagency-guidance-on-nontraditional-mortgage-product-risks.
5. "The Subprime Mortgage Market: National and Twelfth District Developments," Federal Reserve Bank of San Francisco, 2007 Annual Report.
6. Ben S. Bernanke, "The Subprime Mortgage Market," Speech at the Federal Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure and Competition, May 17, 2007.
7. BNP Paribas Press Release, "BNP Paribas Investment Partners temporarily suspends the calculation of the Net Asset Value of the following funds: Parvest Dynamic ABS, BNP Paribas ABS EURIBOR and BNP Paribas ABS EONIA," August 9, 2007.
8. Ben S. Bernanke, "Housing, Housing Finance, and Monetary Policy," Speech at the Federal Reserve Bank of Kansas City's Economic Symposium, August 31, 2007.
9. David G. Wood, "Information on Recent Default and Foreclosure Trends for Home Mortgages and Associated Economic and Market Developments," U.S. Government Accountability Office, GAO-08-78R, October 16, 2007.
10. Office of Federal Housing Enterprise Oversight Report Congress, 2008.
11. Board of Governors of the Federal Reserve System, FOMC Statement, October 31, 2007.
12. Canadian Imperial Bank of Commerce, Form 6-K, December 6, 2007.
13. Joint Economic Committee United States Congress, "THE U.S. HOUSING BUBBLE AND THE GLOBAL FINANCIAL CRISIS: VULNERABILITIES OF THE ALTERNATIVE FINANCIAL SYSTEM," June 2008.
14. Timothy F. Geithner, "Reducing Systemic Risk in a Dynamic Financial System," Remarks at The Economic Club of New York, New York City, June 9, 2008.
15. Tobias Adrian, Christopher R. Burke, and James J. Mc. Andrews, "The Federal Reserve's Primary Dealer Credit Facility", Federal Reserve Bank of New York, Current Issues in Economics and Finance, Volume 15, Number 4, August 2009.
16. Ben S. Bernanke, "Monetary Policy and the Housing Bubble," Speech at the Annual Meeting of the American Economic Association, January 3, 2010.
17. 2010 Inside Mortgage Finance, Volume II.
18. Federal Reserve Bank of St. Louis, "Changes in the Mortgage Market Since the Crisis," August 2011.
19. CoreLogic Special Report, "Evaluating the Housing Market Since the Great Recession," February 2018.
20. Expert Report of David I. Tabak, Ph.D., SJUNDE AP-FONDEN et al., *individually and on behalf of all others similarly situated*, v. GENERAL ELECTRIC COMPANY et al., August 9, 2021.

CONFIDENTIAL

21. Securities and Exchange Commission, Office of Investor Education and Advocacy, "Insider Transactions and Forms 3,4, and 5." https://www.sec.gov/files/forms-3-4-5.pdf.
22. Federal Housing Finance Agency, "Fannie Mae and Freddie Mac," https://www.fhfa.gov/SupervisionRegulation/FannieMaeandFreddieMac/Pages/About-Fannie-Mae---Freddie-Mac.aspx.
23. Federal Housing Finance Agency, "The Federal Home Loan Bank System," https://www.fhfa.gov/SupervisionRegulation/FederalHomeLoanBanks/Pages/About-FHL-Banks.aspx.
24. Federal Housing Finance Agency, "Federal Home Loan Bank Act," https://www.fhfa.gov/Government/Pages/Federal-Home-Loan-Bank-Act.aspx.
25. Cboe, "Tradable Products," http://www.cboe.com/products/vix-index-volatility/vix-options-and-futures/vix-index.
26. Federal Home Finance Agency Office of Inspector General, "A Brief History Of The Housing Government-Sponsored Enterprises," https://www.fhfaoig.gov/Content/Files/History%20of%20the%20Government%20Sponsored%20Enterprises.pdf.

**Textbooks**

1. Gregory Mankiw and Laurence Ball, Macroeconomics and the Financial System, Worth Publishers, First Edition 2011.
2. Brealey and Meyers, Principles of Corporate Finance, Tenth Edition.
3. Peter Kennedy, "A Guide to Econometrics," Fifth Edition.

**Data**

1. Bloomberg.
2. Capital IQ.
3. CRSP.
4. Factiva.
5. Refinitiv Eikon.
6. Federal Housing Finance Agency, https://www.fhfa.gov/DataTools/Downloads/Pages/House-Price-Index.aspx.
7. Robert Shiller Online Data, http://www.econ.yale.edu/~shiller/data/Fig3-1.xls.
8. Markit.
9. OptionMetrics.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, On Behalf of Itself and all Others Similarly Situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| FEDERAL HOME LOAN MORTGAGE CORPORATION a/k/a FREDDIE MAC, RICHARD F. SYRON, PATRICIA L. COOK, ANTHONY S. PISZEL, and EUGENE M. McQUADE, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

CIVIL ACTION NO. 4:08-cv-160

JUDGE BENITA Y. PEARSON

MAGISTRATE JUDGE
WILLIAM H. BAUGHMAN, JR.

## DEFENDANTS' GLOSSARY OF TERMS

Per this Court's May 16, 2014 Order, Federal Home Loan Mortgage Corporation ("Freddie Mac"), Richard F. Syron, Patricia Cook, Anthony Piszel, and Eugene McQuade hereby submit this Glossary of Terms.

**SUBPRIME MORTGAGE LOAN**:  Loans that originating lenders classify and label as "subprime" loans upon their origination, marketing, and sale are "subprime" loans.  Freddie Mac did not buy and hold in its guarantee portfolio loans classified by the originating lender as "subprime" loans upon their issuance, with the exception of a de minimus amount of Structured Securities that were backed by loans identified as being "subprime" by the original issuer.[1]

That said, there is not, and there was not during the putative class period, a universally accepted definition of the term "subprime" loan that originating lenders use, or have used, when

---

[1] See TAC ¶ 156; see also Freddie Mac 2006 Annual Report to Stockholders (Mar. 23, 2007), ECF No. 298-2 ("2006 Annual Report") at p. ID 12479 ("Also included in our credit guarantee portfolio are Structured Securities backed by non-agency mortgage-related securities where the underlying collateral was **identified as being subprime by the original issuer**.") (emphasis added); see also Freddie Mac 2007 Annual Report to Stockholders (Feb. 28, 2008), ECF No. 298-3 ("2007 Annual Report") at p. ID 12678-79 ("We estimate that approximately $6 billion and $3 billion of loans underlying our Structured Transactions at December 31, 2007 and 2006, respectively, were **classified as subprime mortgage loans**.") (emphasis added).

they classify, label, market, and sell loans as "subprime" loans.[2] "Subprime" loans typically are originated by specialized lenders, rather than by mainstream mortgage lenders.[3] As a group, these specialized subprime originators have been referred to as the "subprime channel."[4] Freddie Mac did not purchase and hold in its guarantee portfolio, during the relevant period, loans sold through "traditional subprime channels" of loan origination (except as noted above),[5] and the Third Amended Complaint ("TAC") does not allege otherwise.

**RISK-LAYERED MORTGAGE LOAN**: In the mortgage industry, "risk-layered mortgage loans" connote loans that have more than one characteristic associated with higher levels of credit risk.[6] The combination of multiple higher risk characteristics associated with a loan increases the degree of credit risk presented by that loan. For example, mortgages with both high LTV ratios and lower FICO credit scores typically experience higher rates of delinquency, default, and credit losses.[7] An article on which Plaintiff relies in the TAC discusses risk layering as it relates to the loans in Freddie Mac's guarantee portfolio, as of the end of the second quarter of 2007, as follows: "Loans to borrowers with a FICO credit score lower than 620 make up 4% of the total [Freddie Mac guarantee] portfolio. But, significantly, loans with both original LTVs over 90% and FICO scores below 620 make up a tiny proportion of the portfolio at less than 1%."[8]

---

[2] See Mem. of Law in Support of Freddie Mac's Motion to Dismiss ("MB") at 48-50 (collecting authority); 2006 Annual Report, ECF No. 298-2 at p. ID 12479; Thomas P. Lemke, Gerald T. Lins & Marie E. Picard, Mortgage-Backed Securities: Developments and Trends in the Secondary Mortgage Market § 3:6 (2013-14 ed.) ("There is no single accepted or all-encompassing definition of 'subprime' and subprime mortgages are not homogenous."); SEC v. Mozilo, No. 09-cv-03994 (C.D. Cal.), Compl. ¶ 21, ECF No. 1. (referring to differing definitions of "subprime" loans, using as a cut-off loans to borrowers with FICO scores lower than either 620 or 660); MB at 17-18 (citing to documents referenced in the TAC evidencing that Freddie Mac disclosed all of the loans in its guarantee portfolio made to borrowers with FICO scores below either 620 or 660, and the TAC does not contest the accuracy of any of those disclosures); Kuriakose v. Federal Home Loan Mortg. Corp., 897 F. Supp. 2d 168, 182-83 (S.D.N.Y. 2012) (noting disclosure by Freddie Mac of all loans in its guarantee portfolio made to borrowers with FICO scores below either 620 or 660).

[3] Lemke, supra, § 3:5-6.

[4] See, e.g., Kuriakose, 897 F. Supp. 2d at 183 (referencing "traditional subprime channels").

[5] Id. (noting that Freddie Mac did not purchase or guarantee loans from "traditional subprime channels").

[6] See Conference of State Bank Supervisors, Am. Assoc. of Residential Mortg. Regulators, Guidance on Nontraditional Mortgage Product Risks ("CSBS/AARMR") at 5, available at http://www.csbs.org/regulatory/policy/policy-guidelines/Documents/CSBS-AARMR_FINAL_GUIDANCE.pdf.

[7] See 2007 Annual Report, ECF No. 298-3 at p. ID 12682.

[8] Mission Critical, Mortgage Risk Magazine (Oct. 2007), ECF No. 298-40 at p. ID 13708-09 (emphasis added).

A/76181907

Similarly, the report published by the Financial Crisis Inquiry Commission of the United States Congress stresses that the effects of "risk layering" account for the exponential difference in the delinquency rate between the GSE (i.e., Freddie Mac and Fannie Mae) and non-GSE loans that it studied with FICO scores below 660.[9]  As the FCIC concluded, the non-GSE loans had a delinquency rate over 400% higher than the GSE loans that shared the same FICO score characteristic (i.e., 660 or below), because the non-GSE loans had many additional high-risk characteristics layered on top of the FICO score risk, while the GSE loans predominantly did not. Id. (reporting a 6.2% delinquency rate for the GSE loans with FICO scores below 660, versus a 28.3% delinquency rate for the non-GSE loans with FICO scores below 660); see also MB at 54-55.  Based upon these differences in loan performance, the FCIC observed that "grouping all of these loans together," as if they are identical or very similar, "is misleading," given the effect that "risk-layering" has on the actual performance of such loans.  See MB at 54-55 (quoting FCIC Report).  For this reason, the FCIC Report concludes:  "GSE mortgages with some riskier characteristics such as high loan-to-value ratios are not at all equivalent to those mortgages in securitizations labeled subprime and Alt-A by issuers."[10]

**SUBPRIME-LIKE LOAN**:  The term "subprime-like loan" is not a term of art within the mortgage industry, and it does not have a definition.  Rather, it is a descriptive term that would have a different meaning depending upon the person who used that term and the context in which it was used.  While there is no definition of a "subprime-like loan," that description does connote what a "subprime-like loan" is *not*.  A loan described as "subprime-*like*" is *not* a loan that was actually classified, labeled, and sold as a "subprime" loan by the lender that originated the loan.  If it were, such a loan would not be referred to as "*like*" a "subprime" loan, but rather as a "subprime" loan.  Generally speaking, a loan referred to as "subprime-like" might have some characteristics in common with a loan that an originating lender classified, labeled, and sold as a

---

[9] See also Fin. Crisis Inquiry Comm'n, Final Report of the Nat'l Comm'n on the Causes of the Fin. & Econ. Crisis in the U.S. (Jan. 2011), ECF No. 298-60 ("FCIC Report") at p. ID 14314-15.

[10] FCIC Report, ECF No. 298-60 at p. ID 14315.

3

"subprime" loan through the "subprime channel," while also possessing other attributes different from such loans.[11]  These differences have a substantial impact on the expected and actual performance of these loans.[12]

<u>**NONTRADITIONAL MORTGAGE LOANS**</u>:  The term "nontraditional mortgage loans" does not have a fixed definition in the mortgage industry.  Generally speaking, nontraditional mortgage loans are different than traditional fixed interest rate mortgage loans and include, but are not limited to, interest-only mortgages loans, Alt-A mortgage loans, and payment-option adjustable rate mortgages ("ARMs"), which may also be referred to as "alternative mortgage products."[13]  Some of these products allow borrowers to exchange lower payments during an initial period for higher payments during a later amortization period.[14]  During the putative class period, as Freddie Mac disclosed, it expected nontraditional or alternative mortgage products that it purchased "to default more often than traditional products" that it purchased.[15]  Loans classified and labeled "subprime" by the originating lender may also be regarded as nontraditional mortgage loans.[16]  However, many types of loans that might be referred to as nontraditional mortgage loans are not "subprime" loans, and they present relatively lower levels of credit risk than loans classified and labeled "subprime" by the originating lender and sold through the "subprime channel."[17]

---

[11] See supra (section addressing "risk-layered mortgage loans" and discussing the significantly more negative performance of loans "labeled subprime and Alt-A by issuers," on the one hand, as compared to "GSE mortgages with some riskier characteristics such as high loan-to-value ratios" or lower FICO scores, on the other hand) (quoting FCIC Report).

[12] Id.

[13] CSBS/AARMR at 1; see also Freddie Mac Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2005 (June 28, 2006), ECF No. 298-1 ("2005 Annual Report" at p. ID 12246, 12308; 2006 Annual Report, ECF No. 298-2 at p. ID 12449, 12479; 2007 Annual Report, ECF No. 298-3 at p. ID 12596; Freddie Mac Form 10-Q for the Quarterly Period Ended June 30, 2008 (Aug. 6, 2008), ECF No. 298-5 ("Q2 2008 10-Q") at p. ID 12840; see infra (discussions of "Alt-A mortgage loans," "interest-only loans," "payment-option adjustable rate mortgage loans," and "alternative mortgage market").

[14] See id.

[15] See, e.g., 2005 Annual Report, ECF No. 298-1 at p. ID 12308.

[16] See Lemke, supra, § 3:5.

[17] See supra (section discussing "risk-layered mortgage loans" and discussing the significantly more negative performance of loans "labeled subprime and Alt-A by issuers," on the one hand, as compared to "GSE

4

**HIGH-RISK MORTGAGE LOANS**:  The term "high-risk mortgage loans" is not a term of art within the mortgage industry, and it does not have a fixed definition.  Rather, it is a descriptive term that would have a different meaning depending upon the person who used that term and the context in which it was used.  Mortgage loans with characteristics that are associated with higher levels of credit risk, such as mortgages with high LTV ratios or mortgages to borrowers who have lower credit (FICO) scores, are among the loans that would generally be regarded as giving rise to a relatively higher risk of default than loans that lack those characteristics.[18]  Generally speaking, the greater the amount of higher-risk credit characteristics associated with a loan, i.e., the greater the amount of "risk-layering" within a loan, the higher the risk that the loan will default.[19]  Examples of loans that would generally be regarded as presenting relatively higher degrees of credit risk include nontraditional (or alternative) mortgage products, such as interest-only loans, payment-option adjustable rate mortgages,[20] and loans originated with less documentation, such as Alt-A loans.[21]  Loans classified and labeled "subprime" by the originating lender would also be regarded as high-risk mortgage loans, as such loans generally present a high degree of credit risk.  However, many types of loans that might be referred to as high-risk loans are not "subprime" loans, and they present relatively lower levels of credit risk than loans labeled and classified as "subprime" by the originating lender, and sold through the "subprime channel."[22]

---

mortgages with some riskier characteristics such as high loan-to-value ratios" or lower FICO scores, on the other hand) (quoting FCIC Report).

[18] See, e.g., MB at 17; 2005 Annual Report, ECF No. 298-1 at p. ID 12310; 2006 Annual Report, ECF No. 298-2 at p. ID 12480; 2007 Annual Report, ECF No. 298-3 at p. ID 12681; Q2 2008 10-Q, ECF No. 298-5 at p. ID 12901; Transcript, Freddie Mac Second Quarter 2007 Financial Results (Aug. 30, 2007), ECF No. 298-36 at p. ID 13558 (disclosing the quantity of loans in its guarantee portfolio with certain higher-risk characteristics including, inter alia, FICO scores below 620; original LTVs over 90%; the combination of both FICO scores below 620 and original LTVs over 90% ).

[19] See supra (discussion of "risk-layered mortgage loans").

[20] See infra (discussion of "payment-option adjustable rate mortgages").

[21] See infra; see also 2007 Annual Report, ECF No. 298-3 at p. ID 12598.

[22] See supra (section addressing "risk-layered mortgage loans," and discussing the significantly more negative performance of loans "labeled subprime and Alt-A by issuers," on the one hand, as compared to "GSE mortgages with some riskier characteristics such as high loan-to-value ratios" or lower FICO scores, on the other hand) (quoting FCIC Report).

**ALT-A MORTGAGE LOANS**:  Although there is no universally accepted definition of Alt-A (short for "Alternative-A paper") in the mortgage industry, Freddie Mac principally acquired, during the relevant period, mortgage loans originated as Alt-A from its traditional lenders that largely specialized in originating prime mortgage loans.  These lenders typically originated Alt-A loans as a complementary product offering and generally followed an origination path similar to that used for their prime origination process.  In determining Freddie Mac's exposure to Alt-A loans in its guarantee portfolio, Freddie Mac classified mortgage loans as Alt-A if the lender that delivered them to Freddie Mac had classified the loans as Alt-A, or if the loans had reduced documentation requirements which indicated that the loan should be classified as Alt-A.[23]

**INTEREST-ONLY LOAN**:  In the mortgage industry, an "interest-only loan" is a mortgage loan that allows the borrower to pay only interest (either fixed-rate or adjustable-rate) for a fixed period of time before principal amortization payments are required to begin.[24]  After the end of the interest-only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan.[25]  An interest-only loan is a nontraditional mortgage loan.[26]

**PAYMENT-OPTION ADJUSTABLE-RATE MORTGAGE ("ARM")**:  In the mortgage industry, a payment-option "ARM" is a mortgage loan that permits a variety of repayment options, including minimum, interest-only, fully amortizing 30-year and fully amortizing 15-year payments.[27]  The minimum payment alternative for payment-option ARM loans allows the borrower to make monthly payments that may be less than the interest accrued for the period.[28]

---

[23] See, e.g., 2007 Annual Report, ECF No. 298-3 at p. ID 12679; Q2 2008 10-Q, ECF No. 298-5 at p. ID 12903.

[24] See, e.g., 2006 Annual Report, ECF No. 298-2 at p. ID 12479; 2007 Annual Report, ECF No. 298-3 at p. ID 12678; Q2 2008 10-Q, ECF No. 298-5 at p. ID 12967.

[25] Id.

[26] See supra.

[27] See, e.g., 2006 Annual Report, ECF No. 298-2 at p. ID 12479; 2007 Annual Report, ECF No. 298-3 at p. ID 12678; Q2 2008 10-Q, ECF No. 298-5 at p. ID 12967.

[28] Id.

A/76181907

The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance.[29]

**ALTERNATIVE MORTGAGE MARKET**: The term "alternative mortgage market" does not have a fixed definition in the mortgage industry. Generally, the term may be used to refer to the market for alternative mortgage products, which would include products discussed herein as "nontraditional mortgage loans."[30]

Dated:  June 9, 2014

Respectfully submitted,

**FEDERAL HOME LOAN MORTGAGE CORPORATION**

By its attorneys,

*/s/ Hugh E. McKay*
Hugh E. McKay (0023017)
PORTER WRIGHT MORRIS & ARTHUR LLP
950 Main Avenue, Suite 500
Cleveland, OH  44113
Tel:  (216) 443-2580
Fax:  (216) 443-9011
E-mail: hmckay@porterwright.com

Jordan D. Hershman
Jason D. Frank
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA  02110-1726
Tel: (617) 951-8455
Fax: (617) 951-8736
E-mail: jordan.hershman@bingham.com
E-mail: jason.frank@bingham.com

---

[29] Id.
[30] See supra (discussion of "nontraditional mortgage loans").

A/76181907

**RICHARD F. SYRON**

By his attorneys,


/s/ Frank R. Volpe
John C. Fairweather (0018216)
Lisa S. DelGrosso (0064938)
Kerri L. Keller (0075075)
BROUSE MCDOWELL
388 S. Main Street, Suite 500
Akron, Ohio  44311
Tel:  (330) 535-5711
Fax:  (330) 253-8601
E-mail:  jfairweather@brouse.com
E-mail:  ldelgrosso@brouse.com
E-mail:  kkeller@brouse.com

Thomas C. Green
Mark D. Hopson
Frank R. Volpe
Judith C. Gallagher
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC  20005
Tel:  (202) 736-8000
Fax:  (202) 736-8711
E-mail:  tcgreen@sidley.com
E-mail:  mhopson@sidley.com
E-mail:  fvolpe@sidley.com
E-mail:  jcgallagher@sidley.com


**PATRICIA L. COOK**

By her attorneys,


/s/ Carl S. Kravitz
John C. Fairweather (0018216)
Lisa S. DelGrosso (0064938)
Kerri L. Keller (0075075)
BROUSE MCDOWELL
388 S. Main Street, Suite 500
Akron, Ohio  44311
Tel:  (330) 535-5711
Fax:  (330) 253-8601

8

E-mail: jfairweather@brouse.com
E-mail: ldelgrosso@brouse.com
E-mail: kkeller@brouse.com

Steven M. Salky
Carl S. Kravitz
Caroline E. Reynolds
John B. Timmer
ZUCKERMAN SPAEDER LLP
1800 M Street N.W., Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
E-mail: ssalky@zuckerman.com
E-mail: ckravitz@zuckerman.com
E-mail: creynolds@zuckerman.com
E-mail: jtimmer@zuckerman.com

**ANTHONY S. PISZEL**

By his attorneys,

*/s/ James K. Goldfarb*
Joseph C. Weinstein (0023504)
Saber W. VanDetta (0075098)
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH 44114-1304
Tel: (216) 479-8500
Fax: (216) 479-8780
E-mail: joe.weinstein@squirepb.com
E-mail: saber.vandetta@ squirepb.com

James K. Goldfarb
Michael V. Rella
Jonathan S. Bashi
MURPHY & MCGONIGLE, P.C.
1185 Avenue of the Americas
21st Floor
New York, NY 10036
Tel: (212) 880-3999
E-mail: jgoldfarb@mmlawus.com
E-mail: mrella@mmlawus.com
E-mail: jbashi@mmlawus.com

9

William E. Donnelly
MURPHY & MCGONIGLE, P.C.
555 13th Street, N.W., Suite 410
Washington, D.C.  20004
Tel:  (202) 661-7000
Fax:  (202) 661-7049
E-mail:  william.donnelly@mmlawus.com

**EUGENE M. MCQUADE**

By his attorneys,

/s/ Michael S. Doluisio
Joseph C. Weinstein (0023504)
Saber W. VanDetta (0075098)
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH  44114-1304
Tel:  (216) 479-8500
Fax:  (216) 479-8780
E-mail:  joe.weinstein@squirepb.com
E-mail:  saber.vandetta@ squirepb.com

Andrew J. Levander
DECHERT LLP
1095 Avenue of the Americas
New York, NY  10036-6797
Tel:  (212) 698-3683
Fax:  (212) 698-3599
E-mail:  andrew.levander@dechert.com

Cheryl A. Krause
Michael S. Doluisio
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808
Tel:  (215) 994-2139
Fax:  (215) 655-2139
E-mail:  cheryl.krause@dechert.com
E-mail:  michael.doluisio@dechert.com

10

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2014, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

 /s/ Hugh E. McKay
Hugh E. McKay

A/76181907

# Appendix 4: Market Model Description

1. To estimate Freddie Mac's excess returns on November 20, 2007 and the "capital raise dates" (November 27, 28, and 30, 2007) (collectively, the "Freddie Mac Excess Return Dates"), and to assess the statistical significance of these excess returns, I follow a standard methodology and estimate a statistical "market model" to isolate Freddie Mac's "excess" or "abnormal" returns, *i.e.*, the stock return after accounting for non-company specific factors such as market- and industry-wide factors.[1]  The basic idea is to separate the effects on stock price of company-specific information from non-company-specific information.  A regression analysis is used to calculate the relationship between changes in a company's security price (in this case Freddie Mac stock) and corresponding changes in the value of other variables capturing market- or industry-wide effects, such as the S&P 500, a broad market index. Then, the estimated relationship (*i.e.*, the "market model") and the actual performance of the associated variables are used to compute the model's "predicted return" for the stock.

2. The security's "excess return" (or "abnormal return") is then calculated by subtracting the predicted return from the security's observed return.  The excess return measures the portion of the security's observed return that cannot be explained by contemporaneous changes in the market- or industry-wide factors captured by the model.  It can be thought of as the company-specific component of the return.

3. The market model I applied here uses the S&P 500 Total Return Index as the market index to capture market-wide factors, the S&P 500 Financials Total Return Index as the broader industry index to capture general financial industry factors, and Fannie Mae to capture unique

---

[1]     See, e.g., MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," Journal of Economic Literature 35 ("MacKinlay (1997)"), pages 13-39. By using a market model to analyze excess returns, I am not offering an opinion on nor accepting that Freddie Mac stock traded in an efficient market during the Relevant Period.

DRAFT – PRIVILEGED AND CONFIDENTIAL

---

GSE-specific industry factors.

4. As discussed in the main body of this report in Section IV.A, Fannie Mae is a GSE that is the most similar company from a business perspective to Freddie Mac.  As GSEs, both Freddie Mac and Fannie Mae were regulated by the U.S. Department of Housing and Urban Development ("HUD") and the Office of Federal Housing Enterprise Oversight ("OFHEO").[2]  The two companies were subject to affordable housing goals set by HUD.  Regulators also placed limitations on both firms regarding the terms and principal amounts of loans and securities that could be purchased and/or guaranteed.[3]  OFHEO, the "safety and soundness regulator" for Freddie Mac and Fannie Mae, required the companies to "maintain a mandatory target capital surplus of 30 percent over [its] minimum capital requirement, subject to certain conditions and variations" and that both companies "submit weekly reports" on capital levels.[4]  Analysts cover both GSEs in

---

[2] Fannie Mae, 2005 Annual Report, page 1. Freddie Mac 2006 Annual Report, pages 6-9. HUD had "general regulatory power over Freddie Mac, including power over new programs, affordable housing goals and fair lending." OFEHO, a separate office within HUD with substantial independence, was the "safety and soundness regulator for Freddie Mac and Fannie Mae." OFHEO had "authority to: issue regulations to carry out its responsibilities; conduct examinations; require reports of financial condition and operation; develop and apply critical, minimum and risk-based capital standards, including classifying the capital levels not less than quarterly; prohibit excessive executive compensation under prescribed standards; and impose temporary and final cease-and-desist orders and civil money penalties, provided certain conditions are met."

[3] *See*, *e.g.*, Freddie Mac 2006 Annual Report, page 3 ("Types of Mortgages We Purchase: Our charter establishes general parameters for the terms and principal amounts of the mortgages we may purchase …. Within our charter parameters, the residential mortgage loans we purchase or that underlie mortgage-related securities we purchase generally fall into one of two categories: Single-Family Mortgages. Single-family mortgages are secured by one- to four-family properties. The types of single-family mortgages we purchase include 40-year, 30-year, 20-year, 15-year and 10-year fixed-rate mortgages, interest-only mortgages, adjustable-rate mortgages, or ARMs, and balloon/reset mortgages.") and page 4 ("In response to a request by the Office of Federal Housing Enterprise Oversight, or OFHEO, we announced on August 1, 2006 that we would voluntarily limit the growth of our Retained portfolio to no more than 2.0 percent annually (and 0.5 percent quarterly on a cumulative basis), based on its carrying value as contained in our minimum capital report to OFHEO filed on July 28, 2006, which was $710.3 billion.")

[4] Freddie Mac 2006 Annual Report, pages 8-9. In 2004 OFHEO "created a framework for monitoring [Freddie Mac's] capital due to our higher operational risk, including [Freddie Mac's] inability to produce timely financial statements in conformity with GAAP" and directed that Freddie Mac "maintain a mandatory target capital surplus of 30 percent over our minimum capital requirement, subject to certain conditions and variations;" that Freddie Mac "submit weekly reports concerning our capital levels;" and that Freddie Mac "obtain prior approval of certain capital transactions including common stock repurchases, redemption of any preferred stock or payment of dividends on preferred stock above stated contractual rates."  Fannie Mae 2005 Annual Report, page 26.

DRAFT – PRIVILEGED AND CONFIDENTIAL

---

the same reports and changed ratings on both simultaneously.[5]  Fannie Mae's stock returns can therefore be used as a proxy for the political and regulatory risk that affects both Freddie Mac and Fannie Mae.[6]

5.  One of the assumptions when estimating the market model is that the volatility of excess returns remains constant over the estimation and prediction (in this case "excess return") periods.[7]  To estimate the market model's parameters, I use data for the period from August 9, 2007 to November 19, 2007, the day before November 20, 2007, the alleged corrective disclosure date.  As I discuss in the main body of this report, financial market conditions shifted dramatically in the second half of 2007 and on August 9, 2007 global credit markets suddenly became ensnared in the throes of a severe and unforeseen credit crisis. This date marked the start of the global credit and liquidity crisis that eventually morphed into the Great Recession, and the start of a period of heightened market-wide volatility.[8]

6. Using the market model estimated over the estimation period to calculate the excess return, I then continue the standard procedure and assess the excess return's statistical significance to determine if the observed excess return is statistically significant relative to normal day-to-day variability reflecting vicissitudes of stock prices.  That is, I examine the question of "whether the

---

[5]  *See*, *e.g.*, Fox Pitt Kelton, "FNM and FRE: Capital Constrained – Downgrading to Underperform," November 20, 2007. See also, Merrill Lynch, "GSE stocks come into focus due to credit concerns," October 25, 2007 ("Fannie Mae (FNM; C-2-7; $58.27) and Freddie Mac (FRE; C-2-7; $53.24) remain under pressure as the market rotates out of stocks exposed to the deteriorating housing market. Both stocks have been viewed as good flight-to-quality stocks, as each has largely avoided the riskiest loans originated during the credit bubble and had benefited from a more favorable regulatory backdrop emanating from Washington. However, we think investors have systematically avoided or rotated out of stocks that have significant exposure to weakening housing fundamentals, putting FNM and FRE in the path of fear-induced selling.").

[6]  I note that Fannie Mae released its Q1, Q2, and Q3 2007 results on November 9, 2007. Fannie Mae News Release, "Fannie Mae Files 2007 Quarterly Reports with the SEC," November 9, 2007.  Fannie Mae told investors that "[r]esults for the first three quarters of 2007 reflect worsening housing market conditions, volatility in credit markets in the third quarter, and compression in net interest yield, each of which affected net income," and that "[c]redit related expenses, including the provision for credit losses, rose $1.6 billion, to $2.0 billion." Fannie Mae also stated that "[w]e expect the market forces that affected our results in the first three quarters of the year to continue through the end of the year."

[7]  *See*, *e.g.*, MacKinlay (1997), page 18.

[8]  *See* Section IV.B of this report.

DRAFT – PRIVILEGED AND CONFIDENTIAL

---

absolute value of the return is large enough so that the research can indicate with confidence that the return is relatively unusual."[9]  The statistical significance of excess returns in this context is typically assessed by calculating a standardized measure of the size of the excess return known as a "t-statistic."  The t-statistic is equal to the excess return divided by the market model's "standard error." Each t-statistic corresponds to a "p-value," which represents the probability under the assumption of the "null hypothesis," of obtaining a result equal to or more extreme than what was actually observed.  In this case, the "null" hypothesis is that the excess return is equal to zero, i.e., the stock return being analyzed was equal to the predicted return.  The p-value can be thought of as how likely it is the observed difference was due to chance.  The conventional level of statistical significance is a p-value of 5% or less.  In some contexts, the 10% level is also considered statistically significant.

7. Using the market model results and this standard statistical framework, I examined Freddie Mac's stock price reaction on November 20, 2007, the alleged corrective disclosure date, and the subsequent capital raise dates (i.e., the "Freddie Mac Excess Return Dates").  As shown in Table A.1 below, I find that Freddie Mac's cumulative stock price reaction over the four Freddie Mac Excess Return Dates is statistically insignificant at conventional levels, *i.e.*, the p-value is greater than 5%.  This means that the excess return is statistically indistinguishable from zero, i.e., one cannot rule out that the price reaction occurred by chance alone.

---

[9]     Mark L. Mitchell and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, February 1994.

DRAFT – PRIVILEGED AND CONFIDENTIAL

---

**Table A.1: Testing for statistical significance of excess returns on November 20, 27, 28, and 30, 2007 ("Freddie Mac Excess Return Dates")**

*Panel A: Testing for statistical significance of Freddie Mac Excess Return Dates*

|  | Freddie Mac ("FRE") Log Return | FRE Predicted Log Return | FRE Excess Log Return | T-Statistic | P-value |
|---|---|---|---|---|---|
| 11/20/07 | -33.82% | -15.58% | -18.24% | -13.52 | 0.000 *** |
| 11/27/07 | 4.90% | 2.22% | 2.68% | 1.99 | 0.051 * |
| 11/28/07 | 13.40% | 7.78% | 5.62% | 4.17 | 0.000 *** |
| 11/30/07 | 17.26% | 10.17% | 7.10% | 5.26 | 0.000 *** |
| **CAR 4-days** |  |  | **-2.84%** | **-1.05** | **0.297** |

*Panel B: Parameters of market model*

| | |
|---|---|
| Number of Observations | 68 |
| Adjusted $R^2$ | 77.22% |
| Standard Error | 1.35% |

| *Coefficients* | Beta | T-statistic | P-Value |
|---|---|---|---|
| Alpha (Intercept) | (0.005) | -3.07 | 0.003 *** |
| S&P 500 Total Return Index | 1.751 | 12.72 | 0.000 *** |
| Orthogonalized Component of the S&P Financials TR Index | 1.103 | 5.29 | 0.000 *** |
| Orthogonalized Component of Fannie Mae | 0.543 | 6.35 | 0.000 *** |

\* Denotes significance at the 10% level (in a two-tailed test).
\*\* Denotes significance at the 5% level (in a two-tailed test).
\*\*\* Denotes significance at the 1% level (in a two-tailed test).

**Notes and Sources:** The above analysis is based on a market model estimated over August 9, 2007 to November 19, 2007, in which the daily close-to-close Freddie Mac stock logarithmic ("log") returns are regressed against an intercept term and the following variables: (1) the daily log returns of the S&P 500 Total Return Index; (2) the orthogonalized component of the S&P 500 Financials Total Return Index (i.e., the residuals from regressing the S&P 500 Financials Total Return Index log returns against the S&P 500 Total Return Index log returns); (3) the orthogonalized component of the log return on Fannie Mae stock (i.e., the residuals from the regressing the Fannie Mae common stock log returns against the log returns of the S&P 500 Total Return Index and the S&P Financials Total Return Index residuals). Fannie Mae and Freddie Mac data obtained from CRSP. Index data were obtained from Refinitiv Eikon. Freddie Mac and Fannie Mae stock returns are adjusted for dividends. The four alleged misrepresentation days in the TAC in the estimation period were excluded (August 30, September 10, 17, and November 7, 2007) from the model estimation. See Bajaj Class Cert Report, Appendix V listing alleged misrepresentation days, citing to the TAC. The t-statistic for the Cumulative Abnormal Return (CAR) was calculated as the sum of each day's abnormal (excess) log return divided by the regression standard error multiplied by the square root of the number of days (= 4).

CONFIDENTIAL



**Exhibit 1: Case Shiller "Nominal"  U.S. Home Price Index (1990 – 2008)**

Index Value

November 2007

June 2006 "Peak"

**Notes and Sources**: http://www.econ.yale.edu/~shiller/data/Fig3-1.xls

CONFIDENTIAL



## Exhibit 2: Monthly FHFA House Price Index, Seasonally Adjusted
## Year-Over-Year Change in Monthly Values (1995 - 2008)



**Notes and Sources:** Federal Housing Finance Agency (https://www.fhfa.gov/DataTools/Downloads/Pages/House-Price-Index.aspx). Year-over-year change is calculated from index values. Purchase-Only Index.

CONFIDENTIAL



**Exhibit 3: TED Spread (2006 - 2007)**

**Notes and Sources:** Bloomberg. "Calculated by taking the BBA LIBOR USD 3 Month minus the US Generic 3 Month Yield."

CONFIDENTIAL

## Exhibit 4: Bloomberg U.S. Agency Fixed Rate MBS Average OAS (2006 – 2007)



**Notes and Sources:** Bloomberg. The "Bloomberg US Mortgage Backed Securities (MBS) Index tracks agency mortgage backed pass-through securities (both fixed-rate and hybrid ARM) guaranteed by Ginnie Mae (GNMA), Fannie Mae (FNMA), and Freddie Mac (FHLMC). The index is constructed by grouping individual TBA-deliverable MBS pools into aggregates or generics based on program, coupon and vintage."

CONFIDENTIAL



**Exhibit 5: Chicago Board Options Exchange Volatility Index ("VIX") and Freddie Mac 30-day Implied Volatility (2006 - 2007)**



**Notes and Sources:** VIX data obtained from Bloomberg. FRE Implied Volatility obtained from OptionMetrics. Implied volatility is computed by OptionMetrics, a well-known provider of such data, through prices of 30-day call options traded on the Company's stock.

**Exhibit 6A**
**Richard F. Syron Form 4 disclosures during Relevant Period**

| | Transaction date [a] | Title of security [b] | Ownership form [c] | Transaction code [d] | Acquired [e] | Disposed [f] | Price [g] | Amount of securities beneficially owned after the transaction [h] |
|---|---|---|---|---|---|---|---|---|
| [1] | Jun. 05, 2006 | Common Stock | Direct | A | | | | 364,171 |
| [1] | Dec. 31, 2006 | Common Stock | Direct | F | | 21,249 | $67.90 | 342,922 |
| [2] | Mar. 29, 2007 | Common Stock | Direct | A | 107,824 | | * | 450,746 |
| [3] | Apr. 01, 2007 | Common Stock | Direct | F | | 7,979 | $59.49 | 442,767 |
| [4] | May. 06, 2007 | Common Stock | Direct | F | | 8,193 | $66.31 | 434,574 |
| [5] | Jun. 05, 2007 | Common Stock | Direct | F | | 12,742 | $66.94 | 421,832 |
| [6] | **Total during Relevant Period** | | | | **107,824** | **50,163** | | |

**Notes and Sources:**

[1]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, June 5, 2006,  p.1.
[1]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, December 31, 2006,  p.1.
[2]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, March 29, 2007,  p.1.
[3]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, April 1, 2007,  p.1.
[4]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, May 6, 2007,  p.1.
[5]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Richard F. Syron, June 5, 2007,  p.1.
[6]   = sum([2]:[6]).

[d]   Transaction code A: Grant, award, or other acquisition of securities from the company (such as an option)
      Transaction code F: Payment of exercise price or tax liability using portion of securities received from the company.
      See: https://www.sec.gov/files/forms-3-4-5.pdf
[1]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[3]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on stock.
[4]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[5]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.


[g]
[2]   * Granted in consideration for services.

**Exhibit 6B**
**Patricia L. Cook Form 4 disclosures during Relevant Period**

| | Transaction date [a] | Title of security [b] | Ownership form [c] | Transaction code [d] | Acquired [e] | Disposed [f] | Price [g] | Amount of securities beneficially owned after the transaction [h] |
|---|---|---|---|---|---|---|---|---|
| [1] | Jun. 05, 2006 | | | | | | | 77,587 |
| [2] | Aug. 02, 2006 | Common Stock | Direct | F | | 1,759 | $57.50 | 75,828 |
| [3] | Aug. 02, 2006 | Common Stock | Direct | F | | 1,946 | $57.50 | 73,882 |
| [4] | Jan. 03, 2007 | Common Stock | Direct | S | | 4,258 | $68.20 | 69,624 |
| [5] | Jan. 03, 2007 | Common Stock | Direct | S | | 2,847 | $68.20 | 66,777 |
| [6] | Mar. 29, 2007 | Common Stock | Direct | A | 34,642 | | * | 101,419 |
| [7] | May. 06, 2007 | Common Stock | Direct | F | | 1,993 | $66.31 | 99,426 |
| [8] | Jun. 05, 2007 | Common Stock | Direct | F | | 4,109 | $66.94 | 95,317 |
| [9] | Aug. 02, 2007 | Common Stock | Direct | F | | 1,748 | $56.61 | 93,569 |
| [10] | Aug. 02, 2007 | Common Stock | Direct | F | | 1,933 | $56.61 | 91,636 |
| [11] | **Total during Relevant Period** | | | | **34,642** | **20,593** | | |

**Notes and Sources:**

[1]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, June 5, 2006,  p.1.
[2]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, August 2, 2006,  p.1.
[3]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, August 2, 2006,  p.1.
[4]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, January 3, 2007,  p.1.
[5]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, January 3, 2007,  p.1.
[6]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, March 29, 2007,  p.1.
[7]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, May 6, 2007,  p.1.
[8]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, June 5, 2007,  p.1.
[9]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, August 2, 2007,  p.1.
[10]  Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Patricia L. Cook, August 2, 2007,  p.1.
[11]  = sum([2]:[10]).

[d]   Transaction code A: Grant, award, or other acquisition of securities from the company (such as an option)
        Transaction code F: Payment of exercise price or tax liability using portion of securities received from the company.
        See: https://www.sec.gov/files/forms-3-4-5.pdf
[2]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[3]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[4]   Shares sold pursuant to a Rule 10b5-1 Plan dated October 19, 2006.
[5]   Shares sold pursuant to a Rule 10b5-1 Plan dated October 19, 2006.
[7]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[8]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[9]   Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[10]  Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.

[g]
[6]   * Granted in consideration for services.

CONFIDENTIAL

**Exhibit 6C**
**Eugene McQuade Form 4 disclosures during Relevant Period**

| | Transaction date [a] | Title of security [b] | Ownership form [c] | Transaction code [d] | Acquired [e] | Disposed [f] | Price [g] | Amount of securities beneficially owned after the transaction [h] |
|---|---|---|---|---|---|---|---|---|
| [1] | Jun. 05, 2006 | Common Stock | Direct | | | | | 209,456 |
| [2] | Sep. 01, 2006 | Common Stock | Direct | F | | 14,037 | $63.61 | 195,419 |
| [3] | Mar. 29, 2007 | Common Stock | Direct | A | 71,778 | | * | 267,197 |
| [4] | May. 06, 2007 | Common Stock | Direct | F | | 5,977 | $66.31 | 261,220 |
| [5] | Jun. 05, 2007 | Common Stock | Direct | F | | 9,290 | $66.94 | 251,930 |
| [6] | Sep. 01, 2007 | Common Stock | Direct | F | | 13,419 | $61.61 | 238,511 |
| [7] | **Total during Relevant Period** | | | | **71,778** | **42,723** | | |

**Notes and Sources:**

[1]     Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, June 5, 2006,  p.1.
[2]     Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, September 1, 2006,  p.1.
[3]     Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, March 29, 2007,  p.1.
[4]     Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, May 6, 2007,  p.1.
[5]     Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, June 5, 2007,  p.1.
[6]     Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Eugene McQuade, September 1, 2007,  p.1.
[7]     = sum([2]:[6]).

[d]     Transaction code A: Grant, award, or other acquisition of securities from the company (such as an option)
        Transaction code F: Payment of exercise price or tax liability using portion of securities received from the company.
        See: https://www.sec.gov/files/forms-3-4-5.pdf
[2]     Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[4]     Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[5]     Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.
[6]     Shares automatically retained by Freddie Mac to cover taxes associated with the lapse of restrictions on restricted stock award.

[g]
[3]     *Granted in consideration for services.

CONFIDENTIAL

**Exhibit 6D**
**Anthony S. Piszel Form 4 disclosures during Relevant Period**

| | Transaction date [a] | Title of security [b] | Ownership form [c] | Transaction code [d] | Acquired [e] | Disposed [f] | Price [g] | Amount of securities beneficially owned after the transaction [h] |
|---|---|---|---|---|---|---|---|---|
| [1] | Dec. 07, 2006 | Common Stock | Direct | A | 78,940 | | * | 78,940 |
| [2] | Mar. 29, 2007 | Common Stock | Direct | A | 37,613 | | * | 116,553 |
| [3] | **Total during Relevant Period** | | | | **116,553** | - | | |

**Notes and Sources:**

[1]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Anthony S. Piszel, December 7, 2006,  p.1.
[2]   Federal Home Loan Mortgage Corporation, Statement of Changes in Beneficial Ownership, Form 4 for Anthony S. Piszel, March 29, 2007,  p.1.
[3]   = sum([1]:[2]).
[3]   Relevant Period: August 1, 2006 to November 20, 2007.

[d]   Transaction code A: Grant, award, or other acquisition of securities from the company (such as an option)
       Transaction code F: Payment of exercise price or tax liability using portion of securities received from the company.
       See: https://www.sec.gov/files/forms-3-4-5.pdf

[g]
[1]   * In consideration for services.
[2]   * Granted in consideration for services.

CONFIDENTIAL

**BACKUP TABLE A.1.1**
**Total returns of Freddie Mac common stock, S&P 500 Index, S&P 500 Financials Index, and Fannie Mae common stock**

August 8, 2007 to November 30, 2007

| | Trading Date [a] | Freddie Mac ("FRE") Price [b] | Divi- dend [c] | S&P 500 Total Return Index [d] | S&P 500 Financials Total Return Index [e] | Fannie Mae ("FNM") Price [f] | Divi- dend [g] | Logarithmic Total Returns FRE [h] | S&P 500 [i] | S&P 500 Financials [j] | FNM [k] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] | 08/08/07 | $62.64 | $0.00 | 2,333.24 | 616.99 | $66.75 | $0.00 | | | | |
| [2] | 08/09/07 | $61.67 | $0.00 | 2,264.50 | 593.87 | $65.93 | $0.00 | -1.56% | -2.99% | -3.82% | -1.24% |
| [3] | 08/10/07 | $61.95 | $0.00 | 2,265.36 | 593.16 | $66.46 | $0.00 | 0.45% | 0.04% | -0.12% | 0.80% |
| [4] | 08/13/07 | $61.52 | $0.00 | 2,264.58 | 588.39 | $64.12 | $0.00 | -0.70% | -0.03% | -0.81% | -3.58% |
| [5] | 08/14/07 | $59.41 | $0.00 | 2,223.71 | 574.36 | $62.88 | $0.00 | -3.49% | -1.82% | -2.41% | -1.95% |
| [6] | 08/15/07 | $60.28 | $0.00 | 2,193.40 | 568.79 | $61.45 | $0.00 | 1.45% | -1.37% | -0.98% | -2.30% |
| [7] | 08/16/07 | $61.34 | $0.00 | 2,200.61 | 588.80 | $65.15 | $0.00 | 1.74% | 0.33% | 3.46% | 5.85% |
| [8] | 08/17/07 | $63.70 | $0.00 | 2,254.68 | 610.14 | $67.25 | $0.00 | 3.78% | 2.43% | 3.56% | 3.17% |
| [9] | 08/20/07 | $63.53 | $0.00 | 2,254.07 | 605.22 | $67.50 | $0.00 | -0.27% | -0.03% | -0.81% | 0.37% |
| [10] | 08/21/07 | $64.16 | $0.00 | 2,256.52 | 608.10 | $68.98 | $0.00 | 0.99% | 0.11% | 0.47% | 2.17% |
| [11] | 08/22/07 | $64.89 | $0.00 | 2,283.09 | 613.14 | $69.38 | $0.00 | 1.13% | 1.17% | 0.83% | 0.58% |
| [12] | 08/23/07 | $64.04 | $0.00 | 2,280.68 | 610.41 | $68.13 | $0.00 | -1.32% | -0.11% | -0.45% | -1.82% |
| [13] | 08/24/07 | $63.60 | $0.00 | 2,307.22 | 613.76 | $67.19 | $0.00 | -0.69% | 1.16% | 0.55% | -1.39% |
| [14] | 08/27/07 | $62.58 | $0.00 | 2,287.62 | 605.38 | $66.48 | $0.00 | -1.62% | -0.85% | -1.37% | -1.06% |
| [15] | 08/28/07 | $61.20 | $0.00 | 2,234.02 | 585.80 | $63.57 | $0.00 | -2.23% | -2.37% | -3.29% | -4.48% |
| [16] | 08/29/07 | $63.25 | $0.00 | 2,283.58 | 596.78 | $65.76 | $0.00 | 3.29% | 2.19% | 1.86% | 3.39% |
| [17] | 08/30/07 | $60.07 | $0.00 | 2,274.16 | 590.16 | $63.40 | $0.00 | -5.16% | -0.41% | -1.12% | -3.65% |
| [18] | 08/31/07 | $61.61 | $0.00 | 2,299.71 | 599.12 | $65.61 | $0.00 | 2.53% | 1.12% | 1.51% | 3.43% |
| [19] | 09/04/07 | $62.25 | $0.00 | 2,323.83 | 606.11 | $65.71 | $0.00 | 1.03% | 1.04% | 1.16% | 0.15% |
| [20] | 09/05/07 | $60.15 | $0.00 | 2,298.16 | 594.26 | $62.79 | $0.00 | -3.43% | -1.11% | -1.97% | -4.55% |
| [21] | 09/06/07 | $59.39 | $0.00 | 2,308.35 | 593.07 | $62.07 | $0.00 | -1.27% | 0.44% | -0.20% | -1.15% |
| [22] | 09/07/07 | $59.31 | $0.00 | 2,269.32 | 584.47 | $62.52 | $0.00 | -0.13% | -1.70% | -1.46% | 0.72% |
| [23] | 09/10/07 | $58.75 | $0.00 | 2,266.51 | 583.94 | $62.76 | $0.00 | -0.95% | -0.12% | -0.09% | 0.38% |
| [24] | 09/11/07 | $59.25 | $0.00 | 2,297.41 | 591.72 | $63.73 | $0.00 | 0.85% | 1.35% | 1.32% | 1.53% |
| [25] | 09/12/07 | $58.77 | $0.00 | 2,298.14 | 590.61 | $62.84 | $0.00 | -0.81% | 0.03% | -0.19% | -1.41% |
| [26] | 09/13/07 | $58.00 | $0.50 | 2,317.63 | 600.15 | $62.10 | $0.00 | -0.46% | 0.84% | 1.60% | -1.18% |
| [27] | 09/14/07 | $57.37 | $0.00 | 2,318.11 | 599.89 | $61.28 | $0.00 | -1.09% | 0.02% | -0.04% | -1.33% |
| [28] | 09/17/07 | $56.55 | $0.00 | 2,306.25 | 595.41 | $60.52 | $0.00 | -1.44% | -0.51% | -0.75% | -1.25% |
| [29] | 09/18/07 | $59.52 | $0.00 | 2,373.63 | 621.93 | $62.54 | $0.00 | 5.12% | 2.88% | 4.36% | 3.28% |
| [30] | 09/19/07 | $61.16 | $0.00 | 2,388.15 | 625.64 | $63.98 | $0.00 | 2.72% | 0.61% | 0.60% | 2.28% |
| [31] | 09/20/07 | $59.89 | $0.00 | 2,372.61 | 614.79 | $62.52 | $0.00 | -2.10% | -0.65% | -1.75% | -2.31% |
| [32] | 09/21/07 | $60.35 | $0.00 | 2,383.55 | 616.25 | $62.72 | $0.00 | 0.77% | 0.46% | 0.24% | 0.32% |
| [33] | 09/24/07 | $59.50 | $0.00 | 2,371.03 | 608.66 | $61.48 | $0.00 | -1.42% | -0.53% | -1.24% | -2.00% |
| [34] | 09/25/07 | $59.53 | $0.00 | 2,370.26 | 606.73 | $61.68 | $0.00 | 0.05% | -0.03% | -0.32% | 0.32% |
| [35] | 09/26/07 | $59.55 | $0.00 | 2,383.53 | 610.43 | $61.59 | $0.00 | 0.03% | 0.56% | 0.61% | -0.15% |
| [36] | 09/27/07 | $59.99 | $0.00 | 2,392.92 | 615.23 | $62.00 | $0.00 | 0.74% | 0.39% | 0.78% | 0.66% |
| [37] | 09/28/07 | $59.01 | $0.00 | 2,385.72 | 612.65 | $60.81 | $0.00 | -1.65% | -0.30% | -0.42% | -1.94% |
| [38] | 10/01/07 | $60.30 | $0.00 | 2,417.44 | 625.39 | $62.49 | $0.00 | 2.16% | 1.32% | 2.06% | 2.73% |
| [39] | 10/02/07 | $62.04 | $0.00 | 2,416.83 | 630.64 | $65.08 | $0.00 | 2.84% | -0.03% | 0.84% | 4.06% |
| [40] | 10/03/07 | $62.47 | $0.00 | 2,406.30 | 631.06 | $66.04 | $0.00 | 0.69% | -0.44% | 0.07% | 1.46% |
| [41] | 10/04/07 | $63.19 | $0.00 | 2,411.41 | 632.55 | $67.39 | $0.00 | 1.15% | 0.21% | 0.24% | 2.02% |
| [42] | 10/05/07 | $63.43 | $0.00 | 2,435.16 | 640.30 | $67.30 | $0.00 | 0.38% | 0.98% | 1.22% | -0.13% |

CONFIDENTIAL

**BACKUP TABLE A.1.1**
**Total returns of Freddie Mac common stock, S&P 500 Index, S&P 500 Financials Index, and Fannie Mae common stock**

August 8, 2007 to November 30, 2007

| | Trading Date [a] | Freddie Mac ("FRE") Price [b] | Divi-dend [c] | S&P 500 Total Return Index [d] | S&P 500 Financials Total Return Index [e] | Fannie Mae ("FNM") Price [f] | Divi-dend [g] | Logarithmic Total Returns FRE [h] | S&P 500 [i] | S&P 500 Financials [j] | FNM [k] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [43] | 10/08/07 | $62.80 | $0.00 | 2,427.33 | 635.00 | $66.99 | $0.00 | -1.00% | -0.32% | -0.83% | -0.46% |
| [44] | 10/09/07 | $62.78 | $0.00 | 2,447.03 | 640.27 | $66.95 | $0.00 | -0.03% | 0.81% | 0.83% | -0.06% |
| [45] | 10/10/07 | $62.05 | $0.00 | 2,443.02 | 634.12 | $66.40 | $0.00 | -1.17% | -0.16% | -0.97% | -0.82% |
| [46] | 10/11/07 | $60.78 | $0.00 | 2,430.55 | 632.69 | $65.95 | $0.00 | -2.07% | -0.51% | -0.23% | -0.68% |
| [47] | 10/12/07 | $60.63 | $0.00 | 2,442.12 | 632.43 | $66.04 | $0.00 | -0.25% | 0.48% | -0.04% | 0.14% |
| [48] | 10/15/07 | $59.00 | $0.00 | 2,421.67 | 620.82 | $64.90 | $0.00 | -2.73% | -0.84% | -1.85% | -1.74% |
| [49] | 10/16/07 | $57.62 | $0.00 | 2,405.76 | 609.29 | $63.75 | $0.00 | -2.37% | -0.66% | -1.87% | -1.79% |
| [50] | 10/17/07 | $56.22 | $0.00 | 2,410.22 | 608.42 | $62.19 | $0.00 | -2.46% | 0.19% | -0.14% | -2.48% |
| [51] | 10/18/07 | $54.70 | $0.00 | 2,408.46 | 601.89 | $60.91 | $0.00 | -2.74% | -0.07% | -1.08% | -2.08% |
| [52] | 10/19/07 | $53.05 | $0.00 | 2,346.78 | 584.24 | $58.85 | $0.00 | -3.06% | -2.59% | -2.98% | -3.44% |
| [53] | 10/22/07 | $52.82 | $0.00 | 2,355.74 | 589.89 | $58.15 | $0.00 | -0.43% | 0.38% | 0.96% | -1.20% |
| [54] | 10/23/07 | $53.24 | $0.00 | 2,376.47 | 593.64 | $58.27 | $0.00 | 0.79% | 0.88% | 0.63% | 0.21% |
| [55] | 10/24/07 | $51.05 | $0.00 | 2,370.71 | 589.01 | $56.20 | $0.00 | -4.20% | -0.24% | -0.78% | -3.62% |
| [56] | 10/25/07 | $50.59 | $0.00 | 2,368.43 | 585.33 | $57.26 | $0.00 | -0.91% | -0.10% | -0.63% | 1.87% |
| [57] | 10/26/07 | $52.69 | $0.00 | 2,401.07 | 600.19 | $60.03 | $0.00 | 4.07% | 1.37% | 2.51% | 4.72% |
| [58] | 10/29/07 | $51.75 | $0.00 | 2,410.33 | 600.05 | $57.42 | $0.50 | -1.80% | 0.38% | -0.02% | -3.58% |
| [59] | 10/30/07 | $51.95 | $0.00 | 2,394.81 | 596.82 | $56.99 | $0.00 | 0.39% | -0.65% | -0.54% | -0.75% |
| [60] | 10/31/07 | $52.23 | $0.00 | 2,423.67 | 601.56 | $57.04 | $0.00 | 0.54% | 1.20% | 0.79% | 0.09% |
| [61] | 11/01/07 | $49.43 | $0.00 | 2,360.21 | 574.25 | $54.50 | $0.00 | -5.51% | -2.65% | -4.65% | -4.56% |
| [62] | 11/02/07 | $48.33 | $0.00 | 2,362.21 | 564.98 | $52.61 | $0.00 | -2.25% | 0.08% | -1.63% | -3.53% |
| [63] | 11/05/07 | $47.34 | $0.00 | 2,350.69 | 557.06 | $52.00 | $0.00 | -2.07% | -0.49% | -1.41% | -1.17% |
| [64] | 11/06/07 | $49.39 | $0.00 | 2,379.05 | 566.63 | $55.39 | $0.00 | 4.24% | 1.20% | 1.70% | 6.32% |
| [65] | 11/07/07 | $45.13 | $0.00 | 2,310.41 | 538.24 | $49.79 | $0.00 | -9.02% | -2.93% | -5.14% | -10.66% |
| [66] | 11/08/07 | $43.82 | $0.00 | 2,309.18 | 540.69 | $49.80 | $0.00 | -2.95% | -0.05% | 0.45% | 0.02% |
| [67] | 11/09/07 | $41.70 | $0.00 | 2,276.26 | 541.46 | $49.00 | $0.00 | -4.96% | -1.44% | 0.14% | -1.62% |
| [68] | 11/12/07 | $40.00 | $0.00 | 2,253.53 | 542.26 | $47.06 | $0.00 | -4.16% | -1.00% | 0.15% | -4.04% |
| [69] | 11/13/07 | $44.56 | $0.00 | 2,319.86 | 568.97 | $49.20 | $0.00 | 10.80% | 2.90% | 4.81% | 4.45% |
| [70] | 11/14/07 | $44.19 | $0.00 | 2,304.06 | 565.52 | $47.82 | $0.00 | -0.83% | -0.68% | -0.61% | -2.84% |
| [71] | 11/15/07 | $41.86 | $0.00 | 2,273.73 | 548.18 | $43.04 | $0.00 | -5.42% | -1.33% | -3.11% | -10.53% |
| [72] | 11/16/07 | $40.72 | $0.00 | 2,285.67 | 544.03 | $40.69 | $0.00 | -2.76% | 0.52% | -0.76% | -5.61% |
| [73] | 11/19/07 | $37.50 | $0.00 | 2,245.81 | 527.71 | $37.58 | $0.00 | -8.24% | -1.76% | -3.05% | -7.95% |
| [74] | 11/20/07 | $26.74 | $0.00 | 2,256.02 | 520.86 | $28.25 | $0.00 | -33.82% | 0.45% | -1.31% | -28.54% |
| [75] | 11/21/07 | $26.00 | $0.00 | 2,220.21 | 509.33 | $29.23 | $0.00 | -2.81% | -1.60% | -2.24% | 3.41% |
| [76] | 11/23/07 | $26.47 | $0.00 | 2,257.95 | 525.02 | $32.20 | $0.00 | 1.79% | 1.69% | 3.03% | 9.68% |
| [77] | 11/26/07 | $24.50 | $0.00 | 2,205.49 | 503.76 | $28.92 | $0.00 | -7.73% | -2.35% | -4.13% | -10.74% |
| [78] | 11/27/07 | $25.73 | $0.00 | 2,238.52 | 517.01 | $29.40 | $0.00 | 4.90% | 1.49% | 2.60% | 1.65% |
| [79] | 11/28/07 | $29.42 | $0.00 | 2,303.17 | 543.47 | $32.30 | $0.00 | 13.40% | 2.85% | 4.99% | 9.41% |
| [80] | 11/29/07 | $29.51 | $0.00 | 2,304.43 | 539.40 | $32.39 | $0.00 | 0.31% | 0.05% | -0.75% | 0.28% |
| [81] | 11/30/07 | $35.07 | $0.00 | 2,322.34 | 555.01 | $38.42 | $0.00 | 17.26% | 0.77% | 2.85% | 17.07% |

**Notes and Sources:**

[a] to [c]   CRSP.
[d],[e]   Refinitiv Eikon.
[f],[g]   CRSP.
[h]   =([b]+[c])/(price in [b] on a previous date per [a])-1.
[i]   =[d]/(price in [d] on a previous date per [a])-1.
[j]   =[e]/(price in [e] on a previous date per [a])-1.
[k]   =([f]+[g])/(price in [f] on a previous date per [a])-1.

# EXHIBIT 2

**The New York Times** | https://www.nytimes.com/2007/11/21/business/21housing.html

# *Loan Crisis Entangles Freddie Mac*

**By Michael M. Grynbaum**

Nov. 21, 2007

Losses at Freddie Mac underscored the continuing turmoil in the housing industry yesterday, and other developments reinforced the sense that conditions would not improve soon.

Freddie Mac, the big mortgage finance company, posted a $2 billion loss for the third quarter and warned that it might not have enough capital on hand to cover the mandatory reserves for its mortgage commitments.

The company has been battered by a rising wave of foreclosures tied to subprime mortgage defaults, and it is "seriously considering" cutting its stock dividend.

Freddie's misfortune is particularly rattling because the company is considered something of a backstop for the lending industry. With its implied guarantee of government backing, the housing market looks to Freddie, and its bigger sibling, Fannie Mae, to provide stable credit and financing for a wide swath of mortgages.

But yesterday's earnings report showed that even the gold standard of lending agencies was not immune to the toxic subprime securities that have infected much of the market.

The loss included a provision for credit losses of $1.2 billion, and it wrote down the value of some assets by $3.6 billion. And Freddie's outlook remained cloudy: executives said they did not expect earnings to improve in the fourth quarter, and they suggested that the government would not lower its 30 percent threshold for Freddie's reserves.

Shares of the company plummeted 28.7 percent, to $26.74, its lowest level in 11 years, while shares of Fannie Mae dropped 24.8 percent. Freddie will seek advice from Goldman Sachs and Lehman Brothers for its short-term efforts to shore up its reserves.

While many analysts said the poor earnings suggested that subprime problems had spread to new corners of the mortgage market, some said that they did not anticipate a significant tightening in Freddie's lending standards.

"One of the reasons why they are trying to do a significant capital raise is they want to be out there continuing to provide credit," said Frederick Cannon, a managing director at Keefe, Bruyette & Woods, who covers the housing sector.

But the agencies' exposure could also restrict the government's ability to intervene in the market.

"It makes any potential large federal response that much more difficult," said Joseph Brusuelas, chief United States economist at IdeaGlobal. "If the federal government were to respond aggressively to a greater-than-expected downturn in the housing sector, it would rely on Fannie and Freddie to do a lot of the heavy lifting."

In Freddie's case, the company warned about more problems in the coming months. "Without doubt, 2007 has been an extremely difficult year for the country's housing and credit markets," Richard F. Syron, Freddie Mac's chairman and chief executive, said in a statement.

# EXHIBIT
# 3

2/20/24, 9:41 AM
Floyd Norris: From virtuous circle to vicious credit cycle - The New York Times

**The New York Times**

https://www.nytimes.com/2007/11/22/business/worldbusiness/22iht-norris23.1.8431761.html

# Floyd Norris: From virtuous circle to vicious credit cycle

**By Floyd Norris**

Nov. 22, 2007

**NEW YORK** — It's not just subprime anymore. Freddie Mac, the U.S. government-sponsored mortgage lending enterprise, said this week that enough borrowers were defaulting on loans made this year or last that it needed to mark down the value of the loans by $1.2 billion.

How many of those loans were subprime?

None. But that does not make the losses any less real.

Freddie Mac historically did not buy subprime loans. But that did not stop it from buying some truly dubious loans. The borrowers may not have qualified as subprime, but many of the loans should have raised questions before they were made.

"The underwriting standards declined," said Anthony Piszel, chief financial officer of Freddie Mac. "That was across the board."

Those who made loans and expected to sell them quickly did not care much about assuring that the loans would be repaid. It turns out that the financial wizards who made it easy to transfer risk also guaranteed that more risks would be taken. They produced such innovations as Nina loans, which, Piszel said, "found their way into prime space."

Nina loans?

The abbreviation stands for "No income, no assets." It does not mean the loans went to people without either income or assets, only that the borrowers were not asked if they had either. I had known about "stated income" loans - also known as "liars' loans" - in which the bank took a borrower's word for how much he or she earned. But I had not realized you could borrow money without even being asked about your income.

Starting this month, Freddie will not guarantee such loans, which appear to default more often than other loans.

Each week seems to turn up more evidence of just how wide open the credit markets were, particularly for mortgages. Freddie Mac reports that two-thirds of the reserves it has set aside for bad loans come from loans given in 2006 and 2007.

Freddie's principal business is buying loans, guaranteeing them and then selling securities backed by those loans. It is the only link in the chain that has any reason to care about credit quality, and it appears that it did not care very much.

A kinder way to look at it is that competition forced the company to lower its standards. Either way, Freddie this week released data showing how its standards eroded. None of the loans on its books from 2003 or earlier call for payments of interest only. Almost a quarter of the loans it bought this year had that characteristic.

Freddie's report of a $2 billion loss in the third quarter sent its stock reeling and took with it that of its cousin and chief competitor, Fannie Mae. Both are likely to have to raise large amounts of capital to keep buying loans. That capital will not come cheap and will make it more important than ever that they have good profit margins. That, in turn, implies higher borrowing costs for those who do get mortgages.

Freddie needs to raise capital, in part because it expects to have a very bad fourth quarter and also because it has so far refused to take some losses. While it did not guarantee subprime loans, it did help to finance them by purchasing securities

backed by subprime mortgages. Freddie says it will not sell the securities and expects them to pay off in the end, so there is no need to report a loss on them. But it could not possibly sell them now for anything approaching what they cost.

Further, the $1.2 billion in write-downs on recent mortgages, while less than a quarter of one percent of the mortgage pool in question, are only a start.

Those losses are from loans that are already in foreclosure or close to it, or from homes where default seems near because of job losses.

The virtuous circle of 2005 clearly made the economy appear stronger. Easy credit helped raise home prices. Rising home prices made it appear that loans to risky borrowers were safe and encouraged people to take out new loans to finance consumption. That spending helped the economy grow and persuaded companies to hire.

Or, as Piszel told me, "As long as house prices were going up, it cured all evils."

The securitization market for mortgages is almost dead, save for those guaranteed by Fannie and Freddie. Banks that make loans now know that they may have to hold on to them, a fact that encourages prudence and discourages lending to those who most need loans.

Now we face the threat of the opposite, vicious, circle. Tight credit puts downward pressure on home prices. Lower home prices make it harder to refinance mortgages even for those with good credit, and discourage spending. That can cut corporate profits and lead to layoffs.

Today is known as "Black Friday" in U.S. retailing: the day after Thanksgiving that marks the start of holiday shopping season and that is supposed to be the day retailers finally get "into the black," or turn a profit.

But there are fears that this year the color black will instead describe consumer sentiment. During the past seven months, the Standard & Poor's 500 index is down 5 percent, while the S&P 500 department store index is off 42 percent.

Banks have not tightened up very much on credit cards. If access to credit were the only issue this holiday season, then sales would be healthy. But if consumers are scared, what began as a subprime crisis could spread to the entire U.S. economy.

A version of this article appears in print on in The International Herald Tribune

# EXHIBIT
# 4



**Notes and Sources:** Refinitiv Eikon; Fox-Pitt, Kelton, "Buybacks Bolster Lackluster Results," March 23, 2007.

**Analyst EPS Estimates for Freddie Mac as of One Trading Date Prior to Quarter End**

|  | Analyst<br>[a] | Q4 2006<br>[b] | Q1 2007<br>[c] | Q2 2007<br>[d] | Q3 2007<br>[e] |
|---|---|---|---|---|---|
| [1] | B. Riley Securities | | 0.98 | 0.88 | -1.50 |
| [2] | Bank of America | 1.37 | 0.69 | 0.44 | -0.40 |
| [3] | Credit Suisse | | | | -1.65 |
| [4] | Fox-Pitt Kelton | 1.27 | 1.38 | 0.96 | 0.98 |
| [5] | Goldman Sachs | 0.96 | 1.57 | 1.70 | 1.57 |
| [6] | Keefe, Bruyette & Woods | | | 1.03 | |
| [7] | Lehman Brothers | 1.36 | 1.02 | 0.89 | 0.43 |
| [8] | Merrill Lynch | 1.31 | 1.17 | 0.73 | 1.06 |
| [9] | Miller Tabak | | 0.62 | 2.59 | 0.43 |
| [10] | Morgan Stanley | | | | -3.01 |
| [11] | Piper Sandler | | | | -0.10 |
| [12] | Prudential Equity Group | 1.52 | | | |
|  |  |  |  |  |  |
| [13] | Standard Deviation | 0.17 | 0.32 | 0.64 | 1.37 |
| [14] | Minimum | 0.96 | 0.62 | 0.44 | -3.01 |
| [15] | Maximum | 1.52 | 1.57 | 2.59 | 1.57 |
| [16] | Range | 0.56 | 0.95 | 2.15 | 4.58 |

**Notes and Sources:**

[1]-[12]   Refinitiv Eikon. Analyst EPS estimate as of one trading date prior to earnings announcement.

[4][c]   Fox-Pitt, Kelton, "Buybacks Bolster Lackluster Results," March 23, 2007.

[13]   =STDEV.P([1]:[12]).

[14]   =MIN([1]:[12]).

[15]   =MAX([1]:[12]).

[16]   =[15]-[14].

| Date | Period | Analyst | EPS Estimate |
|---|---|---|---|
| 3/22/07 | FY2006Q4 | BANC OF AMERICA SECURITIES | 1.37 |
| 3/22/07 | FY2006Q4 | FOX-PITT KELTON COCHRAN CARONIA WALLER | 1.27 |
| 3/22/07 | FY2006Q4 | LEHMAN BROTHERS | 1.36 |
| 3/22/07 | FY2006Q4 | Permission Denied 32 | 1.31 |
| 3/22/07 | FY2006Q4 | Permission Denied 73704 | 0.96 |
| 3/22/07 | FY2006Q4 | PRUDENTIAL EQUITY GROUP, LLC | 1.52 |
| 6/13/07 | FY2007Q1 | B. RILEY SECURITIES | 0.98 |
| 6/13/07 | FY2007Q1 | BANC OF AMERICA SECURITIES | 0.69 |
| 6/13/07 | FY2007Q1 | LEHMAN BROTHERS | 1.02 |
| 6/13/07 | FY2007Q1 | MILLER TABAK & CO. | 0.62 |
| 6/13/07 | FY2007Q1 | Permission Denied 32 | 1.17 |
| 6/13/07 | FY2007Q1 | Permission Denied 73704 | 1.57 |
| 8/29/07 | FY2007Q2 | B. RILEY SECURITIES | 0.88 |
| 8/29/07 | FY2007Q2 | BANC OF AMERICA SECURITIES | 0.44 |
| 8/29/07 | FY2007Q2 | FOX-PITT KELTON COCHRAN CARONIA WALLER | 0.96 |
| 8/29/07 | FY2007Q2 | LEHMAN BROTHERS | 0.89 |
| 8/29/07 | FY2007Q2 | MILLER TABAK & CO. | 2.59 |
| 8/29/07 | FY2007Q2 | Permission Denied 32 | 0.73 |
| 8/29/07 | FY2007Q2 | Permission Denied 36576 | 1.03 |
| 8/29/07 | FY2007Q2 | Permission Denied 73704 | 1.7 |
| 11/19/07 | FY2007Q3 | B. RILEY SECURITIES | -1.5 |
| 11/19/07 | FY2007Q3 | BANC OF AMERICA SECURITIES | -0.4 |
| 11/19/07 | FY2007Q3 | CREDIT SUISSE | -1.65 |
| 11/19/07 | FY2007Q3 | FOX-PITT KELTON COCHRAN CARONIA WALLER | 0.98 |
| 11/19/07 | FY2007Q3 | LEHMAN BROTHERS | 0.43 |
| 11/19/07 | FY2007Q3 | MILLER TABAK & CO. | 0.43 |
| 11/19/07 | FY2007Q3 | Permission Denied 23816 | -3.01 |
| 11/19/07 | FY2007Q3 | Permission Denied 32 | 1.06 |
| 11/19/07 | FY2007Q3 | Permission Denied 73704 | 1.57 |
| 11/19/07 | FY2007Q3 | PIPER SANDLER COMPANIES | -0.1 |

**Panel 1**

| | Eikon Formulas |
|---|---|
| Ticker | FMCC.PK |
| Start | 03/22/07 |
| Fields | TR.EPSEstValue |
| Fiscal years | FQ42006 |

#NAME?

| Date | Period | Analyst | EPS Estimate |
|---|---|---|---|
| 3/22/07 | FY2006Q4 | BANC OF AMERICA SECURITIES | 1.37 |
| 3/22/07 | FY2006Q4 | FOX-PITT KELTON COCHRAN CARONIA WALLER | 1.27 |
| 3/22/07 | FY2006Q4 | LEHMAN BROTHERS | 1.36 |
| 3/22/07 | FY2006Q4 | Permission Denied 32 | 1.31 |
| 3/22/07 | FY2006Q4 | PRUDENTIAL EQUITY GROUP, LLC | 1.52 |

**Panel 2**

| | Eikon Formulas |
|---|---|
| Ticker | FMCC.PK |
| Start | 06/13/07 |
| Fields | TR.EPSEstValue |
| Fiscal years | FQ12007 |

#NAME?

| Date | Period | Analyst | EPS Estimate |
|---|---|---|---|
| 6/13/07 | FY2007Q1 | B. RILEY SECURITIES | 0.98 |
| 6/13/07 | FY2007Q1 | BANC OF AMERICA SECURITIES | 0.69 |
| 6/13/07 | FY2007Q1 | LEHMAN BROTHERS | 1.02 |
| 6/13/07 | FY2007Q1 | MILLER TABAK & CO. | 0.62 |
| 6/13/07 | FY2007Q1 | Permission Denied 32 | 1.17 |
| 6/13/07 | FY2007Q1 | Permission Denied 73704 | 1.57 |

**Panel 3**

| | Eikon Formulas |
|---|---|
| Ticker | FMCC.PK |
| Start | 8/29/07 |
| Fields | TR.EPSEstValue |
| Fiscal years | FQ22007 |

#NAME?

| Date | Period | Analyst | EPS Estimate |
|---|---|---|---|
| 8/29/07 | FY2007Q2 | B. RILEY SECURITIES | 0.88 |
| 8/29/07 | FY2007Q2 | BANC OF AMERICA SECURITIES | 0.44 |
| 8/29/07 | FY2007Q2 | FOX-PITT KELTON COCHRAN CARONIA WALLER | 0.96 |
| 8/29/07 | FY2007Q2 | LEHMAN BROTHERS | 0.89 |
| 8/29/07 | FY2007Q2 | MILLER TABAK & CO. | 2.59 |
| 8/29/07 | FY2007Q2 | Permission Denied 32 | 0.73 |
| 8/29/07 | FY2007Q2 | Permission Denied 36576 | 1.03 |
| 8/29/07 | FY2007Q2 | Permission Denied 73704 | 1.7 |

**Panel 4**

| | Eikon Formulas |
|---|---|
| Ticker | FMCC.PK |
| Start | 11/19/07 |
| Fields | TR.EPSEstValue |
| Fiscal years | FQ32007 |

#NAME?

| Date | Period | Analyst | EPS Estimate |
|---|---|---|---|
| 11/19/07 | FY2007Q3 | B. RILEY SECL | -1.5 |
| 11/19/07 | FY2007Q3 | BANC OF AMEI | -0.4 |
| 11/19/07 | FY2007Q3 | CREDIT SUISS | -1.65 |
| 11/19/07 | FY2007Q3 | FOX-PITT KEL1 | 0.98 |
| 11/19/07 | FY2007Q3 | LEHMAN BROT | 0.43 |
| 11/19/07 | FY2007Q3 | MILLER TABAK | 0.43 |
| 11/19/07 | FY2007Q3 | Permission Den | -3.01 |
| 11/19/07 | FY2007Q3 | Permission Den | 1.06 |
| 11/19/07 | FY2007Q3 | Permission Den | 1.57 |
| 11/19/07 | FY2007Q3 | PIPER SANDLE | -0.1 |

| | |
|---|---|
| B. RILEY SECURITIES | B. Riley Securities |
| BANC OF AMERICA SECURITIES | Bank of America |
| CREDIT SUISSE | Credit Suisse |
| FOX-PITT KELTON COCHRAN CARONIA WALLER | Fox-Pitt Kelton |
| Permission Denied 73704 | Goldman Sachs |
| Permission Denied 36576 | Keefe, Bruyette & Woods |
| LEHMAN BROTHERS | Lehman Brothers |
| Permission Denied 32 | Merrill Lynch |
| MILLER TABAK & CO. | Miller Tabak |
| Permission Denied 23816 | Morgan Stanley |
| PIPER SANDLER COMPANIES | Piper Sandler |
| PRUDENTIAL EQUITY GROUP, LLC | Prudential Equity Group |

# EXHIBIT
# 5

## Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF OHIO
2                 EASTERN DIVISION
   ----------------------------------
3  OHIO PUBLIC EMPLOYEES RETIREMENT
   SYSTEM, on behalf of itself and
4  all others similarly situated,
5           Plaintiffs,
   vs.                    Case No. 4:08-CV-160
6
   FEDERAL HOME LOAN MORTGAGE
7  CORPORATION A/K/A FREDDIE MAC,
   RICHARD F. SYRON, PATRICIA L.
8  COOK, ANTHONY S. PISZEL, AND
   EUGENE M. MCQUADE,
9
             Defendants.
10 ----------------------------------
11
12
13
14  ZOOM-CONFERENCE DEPOSITION OF DR. MUKESH BAJAJ
15            Washington, D.C.
16          Wednesday, March 13, 2024
17              9:30 a.m. EST
18
19
20
21  Reported By:  Goldy Gold, RPR
22  Job No.  J11026706
```

## Page 2

```
1        IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF OHIO
3                 EASTERN DIVISION
4  ----------------------------------
   OHIO PUBLIC EMPLOYEES RETIREMENT
5  SYSTEM, on behalf of itself and
   all others similarly situated,
6
             Plaintiffs,
7  vs.                    Case No. 4:08-CV-160
8  FEDERAL HOME LOAN MORTGAGE
   CORPORATION A/K/A FREDDIE MAC,
9  RICHARD F. SYRON, PATRICIA L.
   COOK, ANTHONY S. PISZEL, AND
10 EUGENE M. MCQUADE,
11           Defendants.
   ----------------------------------
12
13
14           VIDEO-CONFERENCE DEPOSITION OF
15 DR. MUKESH BAJAJ, taken on behalf of the Plaintiff,
16 at the law offices Morgan, Lewis & Bockius LLP,
17 beginning at 9:35 a.m. EST and ending at 6:00 p.m.
18 EST, on Wednesday, March 13, 2024, before Goldy Gold,
19 a Registered Professional Reporter and Notary Public
20 in and for the District of Columbia.
21
22
```

## Page 3

```
1  A P P E A R A N C E S:
2
   ON BEHALF OF OHIO PUBLIC EMPLOYEES RETIREMENT
3  SYSTEM:
4  BY:  BILL MARKOVITZ, ESQ. (Appearing by Zoom)
      Markovits, Stock & Demarco, LLC
5     119 East Court Street, Suite 530
      Cincinnati, OH  45202
6     (513) 665-0200
      cstock@msdlegal.com
7     wmarkovitz@msdlegal.com
8        - and -
9  BY:  ROBERT R. SPARK, ESQ. (Appearing by Zoom)
      BY:  RICHARD S. WAYNE, ESQ. (Appearing by Zoom)
10    Strauss Troy
      150 East 4th Street.  #4
11    Cincinnati, OH  45202-4018
      (513) 621-2120
12    rrsparks@strausstroy.com
      rwayne@strausstroy.com
13
14 ON BEHALF OF FEDERAL HOME LOAN MORTGAGE CORPORATION
   AND THE WITNESS:
15
   BY:  FREDERICK BLOCK, ESQ.
16    Morgan, Lewis & Bockius LLP
      1111 Pennsylvania Avenue NW
17    Washington, D.C. 20004
      202.739.5125
18    fred.block@morganlewis.com
19       - and -
20 BY:  VANESSA BROWN, ESQ.
      Morgan, Lewis & Bockius LLP
21    2222 Market Street
      Philadelphia, Pennsylvania 19103
22    vanessa.brown@morganlewis.com
```

## Page 4

```
1  A P P E A R A N C E S:
2
   ON BEHALF OF THE DEFENDANT RICHARD SYRON:
3
   BY:  FRANK R. VOLPE, ESQ. (Appearing by Zoom)
4     Sidley Austin LLP
      1501 K Street, N.W.
5     Washington, D.C. 20005
      202.736.8366
6     fvolpe@sidley.com
7
8  ON BEHALF OF THE DEFENDANT ANTHONY S. PISZEL:
9  BY:  JAMES K. GOLDFARB, ESQ. (Appearing by Zoom)
      Davis Wright Tremaine
10    1251 Avenue of the Americas, 21st Floor
      New York, New York 10020-1104
11    212.880.3961
      Jamesgoldfarb@dwt.com
12
13
   ON BEHALF OF THE DEFENDANT EUGENE M. MCQUADE:
14
   BY:  CARLA GRAFF, ESQ. (Appearing by Zoom)
15    Dechert LLP
      Cira Centre, 2929 Arch Street
16    Philadelphia, Pennsylvania 19104-2808
      215.994.2513
17    Carla.graff@dechert.com
18
19 ALSO PRESENT:
20    Barry Michael Parsons, Freddie Mac
21    Thomas Flack, Freddie Mac
22    Victoria Curry, (Appearing by Zoom)
```



DR. MUKESH BAJAJ          March 13, 2024
Ohio Public Employees vs Federal Home Loan       5—8

Page 5

```
1              I N D E X
2       Deposition of Dr. Mukesh Bajaj
3              March 13, 2024
4
5    EXAMINATION BY                         PAGE
6    Mr. Markovits                            6
7
8
9              E X H I B I T S
10   EXHIBITS        DESCRIPTION            PAGE
11   Exhibit 452  Mukesh Bajaj expert report and     9
                  appendices dated January 19, 2024
12
     Exhibit 453  New York Times article titled   161
13                "Loan Crisis Entangles Freddie
                  Mac
14
     Exhibit 454  New York Times article titled   166
15                "Floyd Norris, From Virtuous
                  Circle to Vicious Credit Cycle
16
     Exhibit 455  FM OPERS 00238114               236
17
18
19
20
21
22
```

Page 6

```
1          P R O C E E D I N G S
2    WHEREUPON,
3          MUKESH BAJAJ, Ph.D.
4    was called as a witness, having been duly sworn by a
5    Notary Public, was examined and testified as follows:
6                 EXAMINATION
7    BY MR. MARKOVITS:
8       Q.   Good morning, Dr. Bajaj.  Could you
9    state your full name and address for the record?
10      A.   Good morning, Counsel.  Nice to see you
11   again.
12      Q.   Good to see you.
13      A.   My full name is Mukesh Bajaj.  That's
14   M-u-k-e-s-h.  Bajaj is spelled B-a-j-a-j.  And did
15   you say you needed my address?
16      Q.   Yes, please.
17      A.   I don't remember our office address.  Do
18   you need my home address?
19      Q.   That will be fine.
20      A.   Okay.  It's 4615 Rockingham Court,
21   Oakland, California 94619.
22      Q.   All right.  Thank you.  I'm glad you're
```

Page 7

```
1    feeling better.
2       A.   Thank you.  I wanted to start there by
3    appreciating the courtesies all counsel extended me
4    when I came down with COVID when my deposition was
5    scheduled on February 29th.
6       Q.   That's fine.  In a show of sympathy, I
7    came down with COVID this weekend, but I'm on the
8    mend.  I was going to take this deposition from home,
9    but then my -- it just shows how good I am with
10   computers.  My computer at home froze out yesterday
11   during the deposition, so I'm here isolating at the
12   office, hopefully.
13      A.   Good luck.
14      Q.   Thank you.  We'll get through it.
15           MR. MARKOVITS:  Fred, I know Jason is a
16   stickler usually at these depositions for
17   stipulations.
18           Would you like me to put them on the
19   record?
20           MR. BLOCK:  Sure.
21           MR. MARKOVITS:  All right.  These are
22   the usual ones that I can recall:  That all
```

Page 8

```
1    objections, except as to form, and all motions
2    to strike are reserved until such time until
3    testimony is offered to the Court.
4        Is that agreeable?
5        MR. BLOCK:  Agreed.
6        MR. MARKOVITS:  And the parties agree to
7    the sufficiency of the credentials of the court
8    reporter?
9        MR. BLOCK:  Correct.
10       MR. MARKOVITS:  We agree the witness
11   will have 30 days after receiving the transcript
12   to read and sign before a notary public under
13   the pains and penalty of perjury, and if it
14   isn't signed within 30 days, it would be deemed
15   signed.
16       MR. BLOCK:  That's correct.
17       MR. MARKOVITS:  And objection on behalf
18   of one defendant will be an objection on behalf
19   of all defendants?
20       MR. BLOCK:  Also agreed.
21       MR. MARKOVITS:  All right.  Any other
22   stipulations?
```



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
9–12

Page 9

1       MR. BLOCK: Not at this time.
2       MR. MARKOVITS: And I assume those
3    stipulations are fine with other defense
4    counsel? If I hear nothing, I will assume
5    assent.
6       MR. GOLDFARB: Nothing.
7  BY MR. MARKOVITS:
8    Q.    Dr. Bajaj, you've been deposed many
9  times, including twice already by me in this case.
10  I'm not going to waste time with a lot of
11  preliminaries, except to ask: Is there any reason
12  why you cannot give full, complete, and truthful
13  testimony here today?
14    A.    No.
15    Q.    Thank you.
16       MR. MARKOVITS: Could we mark as
17    Exhibit 452 your current expert report and
18    appendices that's dated January 19, 2024.
19       [Exhibit 452, Mukesh Bajaj expert report
20       and appendices dated January 19, 2024, was
21       marked for identification.]
22

Page 10

1  BY MR. MARKOVITS:
2    Q.    All right. Dr. Bajaj, is Exhibit 452 a
3  true and correct copy of your report?
4    A.    It appears to be.
5    Q.    If you could turn to page 121 of your
6  report, is that your signature?
7    A.    Yes.
8    Q.    At the time you signed the report, was
9  it in final form?
10    A.    Yes.
11    Q.    Have you had occasion since you signed
12  your report to read it?
13    A.    I'm sorry. I couldn't hear the
14  question.
15       MR. BLOCK: You broke out real quickly.
16  BY MR. MARKOVITS:
17    Q.    Have you had occasion since you signed
18  the report to review the report?
19    A.    Yes.
20    Q.    How many times?
21    A.    A few times.
22    Q.    Are you aware of any mistakes in the

Page 11

1  report or its appendices?
2    A.    Well, I'd like to correct two
3  typographical mistakes on page 40 -- or paragraph 40,
4  let me check.
5       I believe it is paragraph 40.
6    Q.    Okay.
7    A.    So first, in the middle of the
8  paragraph, I think it's the second sentence, it says:
9  "Exhibit 1 plus inflation-adjusted allocation home
10  price index." The words "inflation adjusted" should
11  be replaced by the word "nominal Case-Shiller home
12  price index."
13       (Reporter clarification.)
14       THE WITNESS: Nominal. So instead of
15  the words "inflation adjusted," it should say
16  "nominal."
17       And then it says: "Exhibit 2 plus
18  monthly year-over-year change in nominal Freddie
19  Mac U.S. house price index." Instead of the
20  words "Freddie Mac," it should say "FHFA."
21       The titles of the exhibit reflect the
22  corrections I just made.

Page 12

1  BY MR. MARKOVITS:
2    Q.    Okay. Thank you. Anything else?
3    A.    Not that I know of.
4    Q.    If you could turn to paragraph 8 of your
5  report, that indicates that you were assisted in its
6  preparation by colleagues at Charles River
7  Associates; is that correct?
8    A.    Yes.
9    Q.    And Charles River Associates is your
10  current employer?
11    A.    I don't know if I would call it my
12  current employer. I have a contractual arrangement
13  where when I do expert work and need assistance, they
14  provide their professionals to provide that
15  assistance. I'm not an employee of Charles River
16  Associates.
17    Q.    Are you listed on their website?
18    A.    I haven't checked lately, but I assume
19  so.
20    Q.    Information received from your counsel
21  indicates that Charles River Associates has billed
22  close to 1.6 million, or about six to seven times the



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
13—16

Page 13

1  amount you billed on the project to date.

2          Does that sound about right to you?

3      A.    I don't monitor how much Charles River

4  Associates bills for services of its professionals,

5  so I couldn't say one way or another.

6      Q.    Okay.  What was Charles River

7  Associates' role in the preparation of Exhibit 452?

8      A.    Well, their role, as far as it was known

9  to me, was to assist me in research and drafting of

10  the report that you have just marked as Exhibit 452.

11      Q.    And I would've guessed that.  So I'm

12  looking for something a little bit more granular,

13  which is:  What was their primary role that you

14  directed them to assist you in the researching and

15  drafting of the report?

16          What type of analysis did they do, if

17  any, for example?

18      A.    Well, people I've worked with worked

19  under my direction and supervision.  And when I

20  wanted them to, for example, pull up data or charts

21  on home price appreciation, they would do that.  All

22  the pretty looking charts that you'll see in the

Page 14

1  report, they are well beyond my Excel capabilities,

2  at least currently.  So they helped me prepare those.

3          They helped me in proofreading my

4  report.  They helped me in background research on

5  topics that I requested their assistance on.  Those

6  are the kind of activities that they assisted me.

7      Q.    And I assume, regardless of whether

8  portions of the report were primarily drafted by you

9  or someone else, that you have approved every word in

10  the report, correct?

11      A.    Not only that.  There is no portion of

12  the report, other than the defendant's exhibit of

13  appendix -- I forget what it is called -- regarding

14  glossary of terms, that was drafted by anybody other

15  than myself.

16      Q.    Okay.  Have you or Charles River

17  Associates conducted any analysis since you were

18  asked to produce the report that's not reflected in

19  this report?

20      A.    Yes.

21      Q.    What analysis have you performed since

22  you were asked to do this report or since you

Page 15

1  finalized this report?

2      A.    Well, when I reviewed Mr. Shapiro's

3  rebuttal report, he alleged that my criticisms of his

4  report that are expressed in my report were somehow

5  uninformed by a fuller review of all the documents

6  that he cited in his report, besides the deposition

7  transcript and the exhibits to deposition transcripts

8  of Mr. Shapiro that I had already reviewed and

9  disclosed, that I relied upon when drafting my

10  report.

11          So to address that concern, since then,

12  I undertook a review of additional documents that

13  were cited by Mr. Shapiro in his report to see if my

14  conclusions that I expressed in my report -- marked

15  as Exhibit 452 -- are robust, and they are.

16      Q.    Did you review all the documents that

17  were cited in Mr. Shapiro's report?

18      A.    I believe so, yes.

19      Q.    Okay.  As I understand it, Charles River

20  Associates is being compensated for your work at the

21  rate of $1,500 per hour; is that correct?

22      A.    That is correct.

Page 16

1      Q.    Have you been paid?

2      A.    I don't track Charles River's

3  receivables from the client.  I understand that the

4  client is in good standing.  Charles River Associates

5  pays me with a lag after a payment is collected from

6  the client.

7          I don't recall having received a payment

8  from Charles River Associates yet, even though

9  I couldn't be sure it could have already been

10  deposited in my account.

11      Q.    Okay.  Dr. Bajaj, could you turn to

12  Appendix 2 of your report, Exhibit 452, which is the

13  documents considered?

14      A.    I have it.

15      Q.    Okay.  And there's 21 pages of documents

16  considered.

17          Is this the universe of documents you

18  considered in forming your opinions in your report?

19      A.    Correct.  I, of course, clarify that

20  when documents considered lists depositions of

21  Mr. Shapiro and Dr. Tabak, exhibits marked as part of

22  those deposition transcripts were included in the



DR. MUKESH BAJAJ                                    March 13, 2024
Ohio Public Employees vs Federal Home Loan          17–20

Page 17

1  documents considered by me in drafting my report.

2      Q.    Thank you for that clarification.

3            Did you review all the documents listed

4  in Appendix 2, personally?

5      A.    Anything that is cited in the report,

6  I've carefully reviewed the language.  Some of these

7  documents are materials that I am familiar with, that

8  I did not see the need to re-review.

9            So, for example, two court opinions

10  listed in Appendix 2, Basic, Inc. v. Levinson and

11  Halliburton Co. v. Erica P. John Fund, Inc., both

12  Supreme Court decisions.  I don't believe I reviewed

13  again before I drafted my report.

14           But far as I can recall, I did review

15  all the documents that have been considered -- that

16  are on the documents considered list.

17      Q.    And that would include -- there's an

18  extensive listing of analyst reports and news

19  articles in Appendix 2.

20           Did you review every one of those

21  analyst reports and every one of those news articles?

22      A.    Yes.

Page 18

1      Q.    Are there documents that you or

2  Charles River Associates reviewed for the purpose of

3  preparing your report that are not included in

4  Appendix 2?

5      A.    Sorry.  I missed your question.  Could

6  you repeat it?

7      Q.    Are there documents that you or Charles

8  River Associates reviewed to the purposes of

9  preparing your report that are not included in

10  Appendix 2?

11      A.    Not to my knowledge.

12      Q.    In connection with preparing your

13  report, did you ask your counsel or anyone else for

14  any information or documents?

15      A.    Yes.

16      Q.    Let's start with your counsel.

17           What information or documents did your

18  -- did you ask your counsel to obtain for you?

19      A.    One example I remember is that I wanted

20  to have a comprehensive list of financial analyst

21  reports that are listed in the documents considered

22  list.  Some of those reports are available to us from

Page 19

1  various commercial data vendors that made those

2  reports available.  Some -- for example, if I

3  remember correctly, by Goldman Sachs -- are not made

4  available through commercial data vendors.  Some of

5  the documents were available to me because of my

6  previous work in this case.  But I did request a

7  complete list of analyst reports that were part of

8  the discovery record in this case, and that was to

9  make sure that I have considered all analyst reports

10  that are part of the discovery record, to the extent

11  there were some holes in what was otherwise available

12  to me.

13      Q.    Anything else that you can think of?

14      A.    I think I requested a copy of the Sixth

15  Circuit decision that is cited in my report.  I can

16  quickly flip through to see if something else comes

17  to mind.

18           Oh, yes.  I requested a copy of

19  Dr. Okongwu's report and received that from counsel.

20           As I sit here right now, I can't recall

21  anything else that I requested from counsel.

22      Q.    Okay.  And you addressed this

Page 20

1  appreciably before or a few minutes ago, but you

2  reviewed the reports of both Howard Shapiro and Dr.

3  Tabak, right?

4      A.    Correct, I did.

5      Q.    And you said you went back after

6  finalizing this report and looked at all the

7  materials that Mr. Shapiro had cited in his report,

8  right?

9      A.    Well, what I said, to be clearer, is

10  that I had already reviewed exhibits that were marked

11  during Mr. Shapiro's two depositions before I

12  finalized this report.  But in order to address

13  Mr. Shapiro's allegation that, somehow, my opinions

14  might change if I undertook a more fulsome review of

15  other documents that he considered in writing his

16  report, I went back and looked at documents that he

17  cited in his report.

18      Q.    Right.  That's what I -- that's what

19  I said.  But in any case, did you do the same with

20  regard to Dr. Tabak?  Did you review the materials

21  that he cited in his report?

22      A.    As I sit here right now, I don't recall



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
21–24

Page 21

1    there being any relevant materials that he cited in
2    his rebuttal report that I felt the need to review,
3    for the same reason that I had not previously
4    reviewed them.
5        Q.    You listed two of the documents that you
6    reviewed, your prior reports in this case.  One's
7    dated December 14th, 2012, and the other,
8    September 1st, 2017, correct?
9        A.    That is correct.
10       Q.    And you would agree with me that there's
11   some overlap between Appendix 2 and the materials
12   that you listed as being considered in your prior
13   report, correct?
14          MR. BLOCK:  Objection to form.
15          THE WITNESS:  Yes, I agree, there is an
16   overlap in materials considered.
17   BY MR. MARKOVITS:
18       Q.    So to the extent materials were listed
19   in those prior reports as being considered but are
20   not listed here, would I be correct to assume that
21   they were not considered for the purposes of
22   preparing this report?

Page 22

1        A.    As far as I can recall, I think that
2    would be a fair inference, but I have not sat down
3    and cross-tallied documents-considered lists in my
4    previous two reports with this report.  But I, of
5    course, had available to me documents that I
6    considered in my previous two reports.  And the way I
7    understand how documents-considered list is
8    interpreted in this context, because those materials
9    were available to me, they would be within the broad
10   rubric of documents considered.
11       Q.    Have you spoken with anyone at Freddie
12   Mac to obtain information relating to your report?
13       A.    No.
14       Q.    Let me switch topics here and talk a
15   little bit about your background.
16          According to the professional history
17   attached to your report, you're a senior consultant
18   with Charles River Associates; is that correct?
19       A.    That is correct, yes.
20       Q.    For this case, you're providing what's
21   generally referred to as a litigation consulting
22   service.

Page 23

1        Would that be fair say?
2          MR. GOLDFARB:  Objection.
3          THE WITNESS:  I'd like to think of it as
4    providing expert consulting services and
5    producing this report, but you can characterize
6    it as providing litigation support or however
7    you choose.
8    BY MR. MARKOVITS:
9        Q.    Let's put it this way.  We'll use your
10   terms.  Is expert consulting service for the purposes
11   of litigation primarily the work that you perform for
12   Charles River Associates?
13       A.    That's fair, yes.
14       Q.    Some of the prior firms you worked with
15   were Navigant, AFB, and LECG, correct?
16       A.    Yes.
17       Q.    For those firms, were you also primarily
18   engaged in expert consulting services in the
19   litigation context?
20       A.    Well, the only clarification I would add
21   is sometimes I advise corporations on issues that may
22   be in connection with their regulatory obligations or

Page 24

1    in evaluating whether there could be potential
2    litigation.  So I don't know whether that would
3    necessarily be implied by the language you used, but
4    I think for the most part, what you said is fair.
5        Q.    Yeah, and that's why I used the term
6    "primarily," because I assumed you did some
7    consulting that might not be directly
8    litigation-related.
9        Would "primarily" be a good description?
10       A.    It could be a fair description on
11   average, of course, depending on the time period and
12   the clients.  There may be times when I do very
13   little in connection with litigation per se, and a
14   lot having to do with advising corporations, for
15   example, on setting appropriate transfer prices for
16   their cross-border transactions, which is much more
17   in the rubric of their regulatory and tax compliance
18   obligations, rather than litigation, even though any
19   of those positions could, of course, be subject to
20   future litigation.
21       Q.    Apart from providing expert testimony or
22   expert consulting in the litigation context in cases



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
25–28

Page 25

1   such as this one, do you have any experience with the
2   mortgage industry?
3       A.   Yes.
4       Q.   What is that?
5       A.   Well, first, since 2007, before the
6   mortgage crisis became as severe as it ultimately
7   did, I have been retained by, I would say, most of
8   the big financial services companies that had
9   exposure to mortgages or mortgage-backed securities
10  or derivatives on mortgage-backed securities, and
11  that work continued for many years and in this case,
12  even what's now 16 years later.  So I would say that
13  exposed me quite a bit to mortgage business.
14          Also, my wife and I are investors, and
15  we invest in several real estate and real estate
16  finance-related companies.  And since 2018, we have
17  been partial owners in an independent mortgage
18  banking firm.  Not that I run that company
19  day-to-day, not that I consider myself as, the way
20  insiders would call it, a mortgage guy.  You know,
21  I'm executive chairman of the firm, and my role is
22  more in a stewardship kind of role.  But, of course,

Page 26

1   I've been exposed to how mortgage business works as a
2   result of that involvement.
3       Q.   Now, in Appendix 2, one category of
4   documents considered were over 300 -- I think it's
5   317 analyst reports related to Freddie Mac, correct?
6       A.   I haven't counted, but I'm happy to take
7   your counting as true.
8       Q.   All right.  Fair enough.
9          And would you agree that these reports
10  generally provide a financial analysis of Freddie Mac
11  and make a recommendation to the investor regarding
12  Freddie Mac common stock?
13      MR. BLOCK:  Objection to form.
14      THE WITNESS:  Well, some of these may
15  sometimes be more educational in nature.  But
16  oftentimes, these reports do provide financial
17  analysis and recommendations to investing
18  public.
19  BY MR. MARKOVITS:
20      Q.   And you are not a CFA, are you?
21      A.   No, I'm not.
22      Q.   Have you ever run an investment

Page 27

1   portfolio?
2       A.   Well, my wife and I run our own
3   investment portfolio, but I don't offer my services
4   as a portfolio manager to other investors.
5       Q.   And who gets the final say, you or your
6   wife?
7       A.   It's always my wife.
8       Q.   Great answer, Doctor.  Great answer.
9          Have you ever published a securities
10  analyst report providing a company analysis and
11  recommendations?
12      A.   Can you repeat the question, please?
13      Q.   Sure.  Have you ever published a
14  securities analyst report, let's just say at the
15  nature of the analyst reports that you listed in your
16  Appendix 2?
17      A.   Well, I've never published an analyst
18  report on behalf of an investment bank working as
19  their investment analyst, if that's what your
20  question is referring to.
21      Q.   Okay.  Whether or not you were working
22  for an investment bank, have you ever published a

Page 28

1   securities analyst report similar to the ones in
2   Appendix 2 that you listed under analyst reports?
3       A.   So leaving aside for a minute the last
4   part of your question, similar to the ones listed in
5   analyst reports, which leads you to what I said
6   before -- in-house analyst reports published by
7   employees of investment banks -- I considered this
8   report and hundreds of other reports I have written
9   to be financial analyst reports.
10          It pertains to financial analysis of a
11  company.  It pertains to evaluating information
12  available to the market and interpreting it, in this
13  case, in light of the allegations that are at issue
14  in this case.
15      Q.   Have you ever participated in the
16  drafting of an analyst report and securities analyst
17  report for the purposes of providing a recommendation
18  to an investor?
19      A.   As I said, I have never been a portfolio
20  manager offering recommendations to other investors
21  or been an employee of an investment bank and
22  publishing their in-house analyst reports on



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
29–32

Page 29

1    companies that I'm assigned to follow.

2        Q.    You mentioned you've provided some

3    consulting services to institutions within the

4    mortgage industry.

5            In that context or in any other context,

6    do you have any experience assessing a financial

7    service company's exposure to nontraditional mortgage

8    loans?

9        A.    Quite a bit, actually.  As you can

10   imagine, once it appeared that financial markets were

11   in distress driven by mortgages, I was retained by

12   some of the biggest investment banks to look at their

13   exposure to mortgage-backed securities and

14   derivatives on those mortgage-backed securities, to

15   advise them on how they were valuing those securities

16   and to consider various risks that their exposure to

17   some securities could pose to those institutions.

18       Q.    In that context or any other context, do

19   you have any experience in evaluating the loan

20   analysis software used by financial companies?

21       MR. BLOCK:  Objection to form.

22       THE WITNESS:  So I would say in a broad

Page 30

1    sense, yes.  For example, many of the companies

2    use, in addition to third-party marks that they

3    use to value their mortgage-related

4    exposures, their own fundamental valuation

5    models, and I have worked with those models.

6            I have worked with models that are

7    designed to analyze structured, mortgage-backed

8    securities, such as True Intex.  I have, in that

9    sense, worked with a lot of mortgage loan

10    valuation models.

11   BY MR. MARKOVITS:

12       Q.    Okay.  Do you have any experience in

13   assessing a financial service company's underwriting

14   standards?

15       A.    If you are asking me whether I have been

16   a practicing professional underwriter of mortgages,

17   the answer is no.  But, of course, a company's

18   underwriting standards are part and parcel of its

19   credit risk evaluation.  And I'd say I do have

20   experience in understanding credit risk implications

21   of underwriting policies and models used by mortgage

22   companies.

Page 31

1        Q.    Do you have any experience assessing a

2    financial services company's fraud detection

3    capabilities?

4        A.    Again, those issues were, of course,

5    part of the overall evaluation when I was engaged by

6    various financial servicing companies.  And as an

7    investor in a mortgage banking company, of course, I

8    pay attention to whether there are some payer risks

9    or frauds embedded in mortgages a company produces.

10   So I am aware of those topics in that sense.

11       Q.    Your CV lists some publications and

12   working papers you were involved in.

13            Was the topic of any of those

14   publications or working papers the mortgage industry?

15       A.    Well, I did coauthor a piece with my

16   wife in 1993 that's listed here, "Beyond Mere

17   Compliance."  That's when she used to work with a

18   mortgage company, and we worked together on that

19   piece.  So that was definitely about mortgage

20   companies and quality control procedures that,

21   ideally, should be going beyond mere letter of the

22   regulatory compliance issues that a mortgage company

Page 32

1    faces.

2        Q.    Anything other than that 1993 article?

3        A.    No.  The rest of the publications there

4    are more targeted to -- are more in the nature of

5    academic writings on financial economics and not

6    particular to mortgage business per se.

7        Q.    Was the content of any of your

8    publications or working papers related to how

9    securities analysts perform their roles?

10       A.    I'm sorry.  Could you repeat your

11   question again?

12       Q.    Was the content of any of your

13   publications or working papers related to how

14   security analysts perform their roles?

15       A.    Did you say "context" or "content"?  I'm

16   sorry.  I couldn't hear.

17       Q.    Content.

18       A.    I wouldn't say so.

19       Q.    Dr. Bajaj, I'm turning to another topic.

20   I'm happy to go on or we could take a short break if

21   you'd like.  Whatever you prefer.

22       A.    I think a short break would be



DR. MUKESH BAJAJ                                           March 13, 2024
Ohio Public Employees vs Federal Home Loan                 33–36

Page 33

1  wonderful.  Thank you.
2          MR. MARKOVITS:  Off the record.
3          (Brief recess.)
4          MR. MARKOVITS:  Back on the record.
5  BY MR. MARKOVITS:
6      Q.    Dr. Bajaj, I'd like to turn now to the
7  question of what opinions you're intending to express
8  if the case moves forward.
9          If can you turn to page 11 of your
10  report, paragraph 22, you provide a summary of
11  opinions and you list five opinions; is that correct?
12     A.    That is correct.
13     Q.    Are those five opinions, as expressed in
14  more detail throughout the report, a complete
15  statement of the opinions you will express moving
16  forward?
17     A.    Well, I will answer, to the best of my
18  ability, all the questions I'm asked.  And to the
19  extent they elicit opinions, that will depend on the
20  question I'm asked.  But the five opinions that you
21  refer to encapsulate my opinions in this case as of
22  now.

Page 34

1      Q.    And we discussed earlier that you
2  previously submitted reports in this case in 2012, I
3  think it was, and in 2017.
4          Are you incorporating any prior opinions
5  you've given in this case?
6      A.    Just one moment, please.  Yes, there
7  were 2012 and '17, and as I say in my report that --
8  in paragraph 21, "I've been asked by counsel for
9  Freddie Mac to be prepared to offer the opinions I've
10  previously offered at class certification stage of
11  this case at trial, if necessary and appropriate.
12  I'm prepared to do so.  And I, accordingly,
13  incorporate my opinions in those reports by
14  reference."
15         Does that answer your question?
16     Q.    Perhaps.  So in the class certification
17  stage, are you referring both to your 2012 and 2017
18  reports?
19     A.    So I think the class certification stage
20  is the 2017 report.  But I recall in the last hearing
21  on this matter in Youngstown, you brought up my work
22  in the 2012 matter, which is a different but related

Page 35

1  case, and I did offer some testimony in that
2  connection.
3          And, of course, there is nothing in my
4  2012 report that is in any way inconsistent with any
5  of the opinions I'm offering in this report.  And to
6  the extent any of my work in connection with my 2012
7  report is relevant, I would be perfectly happy to
8  address any question that would be directed at that
9  work.
10     Q.    Let me try to narrow it down this way.
11         In your 2012 report, you gave an opinion
12  regarding materiality.  Are you intending, as this
13  case moves forward, to provide an opinion that the
14  misrepresentations and omissions that were alleged by
15  OPERS in this case are not material?
16     A.    Well, I am a financial economist.  I
17  understand that ultimate determination of materiality
18  as a legal term of art is for the trier of fact.  But
19  I do, of course, in this report and my earlier
20  reports, address economic issues that are pertinent
21  to the trier of fact's ultimate determination on
22  materiality.

Page 36

1          The other thing to note is, if I recall
2  correctly, in my previous reports that were both
3  during class certification stage, there was analysis
4  of economic significance that would be pertinent to
5  final determination on materiality.  And my
6  recollection is that at some point in time, there was
7  a Supreme Court decision that said that those
8  considerations should be reserved for the merits
9  stage of the case.
10         So in my 2017 report, I think what I
11  said was limited by the relevant Supreme Court
12  decision.  That's my recollection.
13     Q.    Doctor, is it fair to say that a common
14  theme throughout your reports, including your current
15  report, relates to Freddie Mac's disclosures during
16  the relevant period?
17     A.    Well, I would say not disclosures per
18  se, but disclosures that are essential to conducting
19  the analysis on economic significance of alleged
20  misstatements or loss causation analysis.  Obviously,
21  you cannot, as a financial economist, offer an
22  opinion on those topics without considering what the



DR. MUKESH BAJAJ          March 13, 2024
Ohio Public Employees vs Federal Home Loan          37—40

Page 37

1  market knew already as a result of Freddie Mac's
2  public disclosures or other publicly available
3  information.  And that would be a common theme in
4  these reports.
5      Q.    All right.  And, for example, on
6  pages -- I think it's 28 to 49 of your report, it's
7  headed at 4(c):  "Freddie Mac disclosures during the
8  relevant period provided detailed information about
9  the guaranteed and retained portfolios and reflected
10  the changing mortgage market environment and growing
11  risk."
12      Did I read that correctly?
13  A.    Yes.
14      Q.    You list -- going back to paragraph 11
15  of your report, you list, basically, a summary of
16  OPERS' allegations relating to misrepresentations and
17  omissions.
18      You would agree that those allegations
19  that you reflect there in paragraph 11 relate, in
20  part, to Freddie Mac's exposure to subprime and other
21  nontraditional loans, to its underwriting, to its
22  loan analysis software, to its fraud detection, and

Page 38

1  to its capital position?
2      A.    Paragraph 11 speaks for itself.  And
3  what you said in your question seems to reasonably
4  closely track the five items listed in paragraph 11.
5      Q.    Let's break that down a little.
6      One subject of OPERS' allegations
7  regarding misrepresentations and omissions during the
8  relevant period is Freddie Mac's exposure to risk of
9  loss from subprime and other nontraditional
10  mortgages, correct?
11  A.    I think that's a fair statement.
12  Q.    You're not providing an opinion on
13  whether Freddie Mac's disclosures relating to its
14  exposure to subprime and other nontraditional loans
15  during this period were accurate, are you?
16  A.    I'm not opining on truth or falsity of
17  Freddie Mac's disclosures, if that's what you're
18  referring to.
19  Q.    That is.  Thank you.
20      You're not providing an opinion on
21  whether Freddie Mac's disclosures relating to its
22  exposure to subprime and other nontraditional loans

Page 39

1  during this period were misleading, are you?
2      A.    Well, I think I do address that topic in
3  the context of my evaluation from an economic
4  perspective of allegations in the complaint and
5  Dr. Tabak and Mr. Shapiro's reports, that when an
6  allegation is made that Freddie Mac's disclosures
7  were misleading, that allegation is inconsistent with
8  disclosures Freddie Mac did make and other publicly
9  available information.  So, in that sense, I do
10  address whether or not the disclosures at issue were
11  allegedly misleading.
12      Q.    And what research or analysis did you do
13  to determine whether or not the disclosures relating
14  to the subprime and nontraditional loans were
15  misleading?
16      MR. BLOCK:  Objection to form.
17      THE WITNESS:  I think that's a very
18  broad question and pretty much describes the sum
19  and substance of the first 119 pages of my
20  121-page report.  Throughout that report, I lay
21  out various documents that demonstrated Freddie
22  Mac's public disclosures on topics that

Page 40

1  allegedly surprised the market.
2      I lay out public information that was
3  well-known in the marketplace, such as
4  developing risk, that were discussed by market
5  participants and were there for everybody to
6  see, as well as being reflected in various
7  Freddie Mac's financial statement disclosures.
8      I conduct various analyses that are all,
9  in a broad sense, related to addressing the
10  primary thrust of the plaintiff's complaint, as
11  I see it, that somehow what happened on
12  November 20th was, quote-unquote,
13  materialization of previously undisclosed risk.
14  BY MR. MARKOVITS:
15      Q.    Did you do any investigation into the
16  internal documents of Freddie Mac to determine to
17  what extent internal assessments by Freddie Mac were
18  consistent with their public external disclosures?
19      MR. BLOCK:  Objection to form.
20      THE WITNESS:  Yes.
21  BY MR. MARKOVITS:
22      Q.    And was your conclusion, based on that

DR. MUKESH BAJAJ                                                March 13, 2024
Ohio Public Employees vs Federal Home Loan                     41—44

Page 41

1  investigation, that they were consistent?
2      A.    What I would say is, again, I didn't
3  opine on truth or falsity of any disclosures.  But I
4  did not find any evidence, including evidence cited
5  by Mr. Shapiro, for example, supportive of the
6  allegation that somehow Freddie Mac's internal
7  deliberations were inconsistent with and, hence, made
8  false or misleading Freddie Mac's external
9  statements.
10     Q.    And is that an area of economic
11  expertise or simply a matter of judgment for the jury
12  to make?
13         MR. GOLDFARB:  Objection.
14         THE WITNESS:  Well, I would say it is an
15     area where a financial economist, evaluating
16     those documents and interpreting them in the
17     context of financial markets and allegations at
18     issue in this case, is hopefully helpful to the
19     jury to reach the ultimate conclusion on the
20     fact-finding role that the jury has.
21  BY MR. MARKOVITS:
22     Q.    Are you providing an opinion on whether

Page 42

1  Freddie Mac's disclosures relating to its exposure to
2  subprime and other nontraditional loans during the
3  relevant period omitted important information?
4      A.    Can you repeat your question again,
5  please?
6      Q.    Are you providing an opinion on whether
7  Freddie Mac's disclosures relating to its exposure to
8  subprime and other nontraditional loans during the
9  relevant period omitted important information?
10     A.    As I said before, Counsel, I'm not
11  offering any opinion on truth or falsity of Freddie
12  Mac's disclosure.  But in my extensive review of
13  Freddie Mac's disclosures and information publicly
14  available, as well as my review of internal documents
15  that Mr. Shapiro claims show that Freddie Mac's
16  external statements were somehow false or misleading,
17  led me to conclude that I did not see any evidence in
18  the record that I reviewed that would lead me to
19  conclude that Freddie Mac's disclosures during the
20  relevant period were false or misleading.
21     Q.    Yeah, but that wasn't my question,
22  Doctor.

Page 43

1      Q.    My question was:  Are you going -- I
2  need to understand what your opinions are going to be
3  going forward.  You know this, right?
4      A.    Yes.
5      Q.    Okay.  So what I'm trying to nail down
6  here, are you going to provide an opinion on whether
7  Freddie Mac's disclosures about subprime and
8  nontraditional loans during the relevant period did
9  or did not omit important information?
10         MR. BLOCK:  Objection to form.
11         THE WITNESS:  Counsel, I'm trying to be
12     responsive, and I answered that.  My opinion
13     would be not on ultimate truth or falsity, but
14     that I did not see any evidence that would be
15     consistent with the allegation that Freddie Mac
16     made misleading or false statements by omitting
17     certain relevant economic information.
18  BY MR. MARKOVITS:
19     Q.    I think it was a "yes" or "no" question,
20  but we'll move on.
21     A.    Okay.
22     Q.    Another subject of OPERS' allegations is

Page 44

1  whether Freddie Mac engaged in misrepresentations and
2  omissions during the relevant period regarding its
3  underwriting guidelines and adherence to those
4  guidelines, correct?
5      A.    I'm sorry, are you referring to --
6         MR. BLOCK:  You're back to paragraph 11,
7     right, Bill?
8         MR. MARKOVITS:  Yes.
9  BY MR. MARKOVITS:
10     Q.    If you look at 11, Roman II.
11         You understand that one of the subjects
12  of OPERS' allegations is whether Freddie Mac engaged
13  in misrepresentations and omissions during the
14  relevant period regarding its underwriting guidelines
15  and defendants' adherence to those guidelines,
16  correct?
17     A.    Yes.
18     Q.    And you're not providing an opinion on
19  whether Freddie Mac's disclosures relating to its
20  underwriting guidelines and adherence to those
21  guidelines during the relevant period were accurate,
22  correct?

DR. MUKESH BAJAJ                                                          March 13, 2024
Ohio Public Employees vs Federal Home Loan                               45–48

Page 45

1    A.    Well, again, I'd have to give you a
2    similar answer, that I'm not going to opine on the
3    ultimate determination of fact on that allegation.
4    But having reviewed all the record that I have
5    reviewed, including documents relied upon by
6    Mr. Shapiro, I did not find any evidence that would
7    be consistent with the said allegation.
8    Q.    And is that an opinion you intend to
9    give, that, "I've reviewed the evidence in this case
10   today and I've done my own analysis, and I've seen
11   nothing that, in my opinion, would suggest that
12   Freddie Mac's disclosures relating to its
13   underwriting and adherence to its underwriting were
14   inaccurate"?
15   A.    Well, I will answer the questions I'm
16   asked, and if I'm asked a question to elicit the
17   answer that I previously provided, I will be ready to
18   do so.
19   Q.    Yeah.  But so you understand, purpose of
20   this report is, in part, to set forth the opinions
21   that you intend to give so that we can understand
22   what opinions you intend to give.  Provided under the

Page 46

1    civil rules, you provide the opinions you intend to
2    give and the basis and the methodology supporting
3    them.
4          So what I'm asking here is -- whether
5    you're asked by us or not -- I'm asking you now:  Do
6    you intend to give an opinion that the disclosures by
7    Freddie Mac relating to its underwriting guidelines
8    and its adherence to those guidelines were accurate?
9    MR. BLOCK:  Objection to form.
10         Bill, wouldn't it depend what you do
11   with Shapiro?  Because I think that's the
12   disconnect here.  He's responding to
13   Mr. Shapiro's opinions.
14         MR. MARKOVITS:  Well, if he's responding
15   -- he knows what Mr. Shapiro's opinions are.  If
16   he intends to respond to Mr. Shapiro by giving
17   the opinion that "I've looked at all the
18   evidence.  And based on the evidence, in my
19   opinion, Freddie Mac's disclosures relating to
20   its underwriting guidelines and its adherence to
21   those guidelines were accurate," fine.  That's
22   all I'm asking.

Page 47

1          If that's what he intends -- an opinion
2    he intends to give, I need to know so then I can
3    inquire, all right, what's your basis?  What
4    have you done?  What's your methodology?
5          If he doesn't intend to give that
6    opinion, we'll move on.
7    MR. BLOCK:  So what is the question?
8    BY MR. MARKOVITS:
9    Q.    Did he intend to give an opinion that
10   Freddie Mac's disclosures relating to its
11   underwriting guidelines and its adherence to those
12   guidelines during the relevant period were accurate?
13   A.    Well, as I just heard the question, it
14   was in third-party, but I assume you wanted to ask me
15   that question.  And what are --
16   Q.    I've been asking you that question.
17   A.    Okay.
18   Q.    But go ahead.
19   A.    As I said before, I'm not going to offer
20   an opinion on whether or not Freddie Mac's disclosure
21   on the subject were true or false.  I do, if asked,
22   intend to offer an opinion that, based on my review

Page 48

1    of the record that I reviewed, I did not see any
2    evidence of such falsity.
3    Q.    You did no investigation to determine
4    whether its disclosures relating to underwriting and
5    its adherence to its underwriting standards were true
6    or false, correct?
7    A.    I don't believe I can agree with what
8    you're asking.  I, of course, did analysis and
9    reviewed documents to address the question about
10   alleged falsity of Freddie Mac's underwriting
11   guidelines and its adherence to those guidelines.
12   Q.    And let's explore that.
13         Did you, for example, ask Freddie Mac,
14   or ask your counsel to obtain from Freddie Mac,
15   information regarding the extent to which Freddie Mac
16   was adhering to its underwriting guidelines during
17   the relevant period?
18   A.    So I think the following --
19   Q.    Can you answer "yes" or "no," first,
20   Doctor?
21         Did you ask counsel or ask Freddie Mac
22   to provide you with the information from which you

DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
49–52

Page 49

1  could determine the extent to which Freddie Mac was
2  adhering to its underwriting guidelines during the
3  relevant period?
4        MR. BLOCK:  Objection to form.
5        THE WITNESS:  Yes.
6  BY MR. MARKOVITS:
7      Q.    What information did you request?
8      A.    Well, for example, I requested materials
9  that Mr. Shapiro cited in his report in order to
10  evaluate the merits of Mr. Shapiro's purported
11  analysis on that issue.
12      Q.    Other than materials cited in
13  Mr. Shapiro's report, did you ask Freddie Mac or
14  anyone for materials to indicate the extent to which
15  Freddie Mac was adhering to its underwriting
16  guidelines during the relevant period?
17      A.    Again, I would say, yes, in the sense
18  that I carefully reviewed Freddie Mac's disclosures
19  about its underwriting practices.  I informed myself
20  further of the fact, for example, that Freddie Mac
21  was not per se, in the business of underwriting
22  loans.  It was, in fact, prohibited by its charter

Page 50

1  from originating loans, that its business model
2  relied on third parties producing loans that they
3  provided reps and warranties were consistent with its
4  guidelines, and those parties' contracts with Freddie
5  Mac.
6        I learned about Freddie Mac's
7  disclosures about use of AUS used by Freddie Mac and
8  other AUSs that were prevalent in the marketplace.
9  So I did do a fair amount of work to evaluate the
10  allegation that you're referring to.
11      Q.    Did you determine the extent to which,
12  during the relevant period, Freddie Mac was adhering
13  to its own underwriting guidelines?
14      A.    In the sense that I have described in
15  answer to your several previous questions, yes.
16      Q.    What percentage of loans that -- that
17  Freddie Mac purchased or guaranteed during the
18  relevant period met its own underwriting guidelines?
19      A.    I had not seen any evidence in the
20  record, including evidence cited by Mr. Shapiro or in
21  the Third Amended Complaint, that a certain
22  percentage of Freddie Mac's loans did not meet its

Page 51

1  underwriting guidelines.
2        In fact, Freddie Mac made extensive
3  disclosures in its 2005 and 2006 annual financial
4  statements on the subject.
5      Q.    Yes.  Could you answer my question,
6  Doctor?  What percentage of loans during the relevant
7  period met Freddie Mac's underwriting guidelines?  Do
8  you know?
9      A.    If your question is about a certain
10  quantitative percentage, I don't know one way or
11  another that any loans that Freddie Mac bought did
12  not adhere to its underwriting guideline.
13      Q.    Do you know that any did?
14      A.    Freddie Mac made extensive disclosures
15  that it followed those underwriting guidelines, that
16  it had specific contracts with specific originators
17  of the loans that sometimes differed from those
18  guidelines.
19      Q.    Do you know that any -- do you know that
20  any did, Doctor?  You said you don't know that any
21  didn't.
22        Do you know that any did?

Page 52

1      A.    Counsel, I don't mean to frustrate you.
2  I am trying to be responsive while not giving
3  misleading answers.  Maybe you can ask me a narrower
4  question so you get the answer that you're trying to
5  elicit.
6      Q.    Did you ask Freddie Mac for any
7  information that would show to what extent they
8  followed their underwriting guidelines during the
9  relevant period?
10      A.    No.
11      Q.    Another subject of OPERS' allegations is
12  whether Freddie Mac engaged in misrepresentations or
13  omissions regarding its loan analysis software during
14  the relevant period.
15        Again, you're not providing an opinion
16  on whether Freddie Mac's disclosures relating to its
17  loan analysis software during the period were
18  accurate, correct?
19      A.    I'm not testifying to truth or falsity
20  on any of these alleged misrepresentations, if that
21  answers your question.
22      Q.    Okay.  We'll go with that to speed



DR. MUKESH BAJAJ                                                    March 13, 2024
Ohio Public Employees vs Federal Home Loan                         53–56

Page 53

1  things up a little.
2      A.    I'm happy to help.
3      Q.    Doctor, can you turn to paragraph 61 of
4  your report?  It's in conjunction with a general
5  theme we talked about earlier.
6          You assert, generally, that Freddie Mac
7  disclosed key credit characteristics of a single
8  payout rate guarantee portfolio in detail during the
9  relevant period, correct?
10     A.    I think that's a fair characterization.
11     Q.    Okay.  And the factors that you cite as
12  key factors are FICO scores -- and I think this in
13  the next paragraph -- FICO scores, LTV ratios, loans
14  for particular purposes, loans for particular types
15  of property, and loans by occupancy type, correct?
16     A.    Yes.  In addition to loan types, such as
17  its investment in interest-only arms -- interest-only
18  loans, its investment in Alt-A loans --
19         (Reporter clarification.)
20     THE WITNESS:  Alt-A.  A for agency,
21     I think.  In reference to its investments in its
22     retained portfolio, in mortgage-backed

Page 54

1      securities that were triple-A rated and backed
2      by subprime loans, its investment in --
3  BY MR. MARKOVITS:
4      Q.    Let me just stop you there for a second,
5  Doctor, because I think we're getting afield from my
6  question.
7      A.    Okay.
8      Q.    In paragraph 62, you list some
9  characteristics.  And in paragraph 62 of your report,
10  the characteristics that you list for a
11  single-family, guaranty portfolio are FICO scores,
12  LTD ratios, loans for particular purposes, loans for
13  a particular type of property, and loans by occupancy
14  type, correct?
15     A.    Yes, correct.
16     Q.    And then in paragraph 63, you say:
17  "These characteristics are widely recognized as key
18  factors in assessing the credit risk related to
19  mortgages," correct?
20     A.    Yes.
21     Q.    And then you have a footnote, and the
22  footnote cites a Federal Reserve bulletin from 1996,

Page 55

1  correct?
2      A.    That is correct, yes.
3      Q.    Is that Federal Reserve bulletin
4  assessing or discussing the key characteristics,
5  credit-risk characteristics for prime loans?
6      A.    I'd have to see the paper to answer
7  specific questions about language in that paper.
8      Q.    Fair enough.
9          Do you think that the 1996 bulletin was
10  addressing subprime and nontraditional loans, like
11  the ones we see for the relevant period?
12     MR. BLOCK:  Objection to form.
13     THE WITNESS:  Well, as an economist,
14     whether a loan is labeled prime or subprime, the
15     credit risk of the loan, regardless of its
16     label, depends on the type of loan product, the
17     characteristics of the borrower, the type of
18     property, and design features of the loan
19     product.  That was as true in 1996 as in 2007,
20     as remains true today.
21         So my citation was meant to convey that,
22     from an economic perspective, characteristics

Page 56

1      such as FICO scores and LTV ratio and other
2      factors listed in my report are well understood
3      to be key characteristics that can be used to
4      evaluate credit risk of a mortgage loan.
5  BY MR. MARKOVITS:
6      Q.    Is it your testimony that the
7  characteristics you cite at paragraph 61 and 62 of
8  your report are sufficient to assess the credit risk
9  for subprime and nontraditional loans purchased by
10  Freddie Mac during the relevant period?
11     MR. BLOCK:  Objection to form.
12     THE WITNESS:  Not necessarily.  And
13     Freddie Mac's disclosures did cover additional
14     subjects.
15         What I don't want to create an
16     impression is that paragraph 62 and 62 -- 63
17     refer to the entire list of credit risk
18     characteristics that Freddie Mac disclosed.
19         As you can see on page 32 and 33 of my
20     report, which are also paragraph 65, there were
21     various other credit risk characteristics that
22     Freddie Mac presumably thought would help



DR. MUKESH BAJAJ                                    March 13, 2024
Ohio Public Employees vs Federal Home Loan         57–60

Page 57

1    investors more fully assess credit risk in its
2    portfolio in that current environment.
3        Obviously, to the extent 2006 and 2007 vintages
4    and declining home price environment were
5    proving to have greater credit risk than earlier
6    vintages, you wouldn't expect to find that in
7    the Federal Reserve bulletin that we referenced
8    earlier.
9        Freddie Mac did make extensive
10   disclosures of various credit characteristics,
11   is a fair characterization of that section in my
12   report.
13   BY MR. MARKOVITS:
14   Q.    All right.  And if you -- let's talk
15   about those charts on pages 32, 33, 34, 35 of your
16   report, and let me ask the same questions.
17       Is it your opinion that the information
18   in those charts were sufficient -- would be
19   sufficient for someone to assess the credit risk from
20   Freddie Mac's subprime and nontraditional loans in
21   the time period covered by those charts?
22       MR. BLOCK:  Objection to form.

Page 58

1        THE WITNESS:  As you can see from titles
2    of those charts, Counsel, they pertain to
3    disclosures about Freddie Mac's aggregate
4    portfolio, not a particular subset of the
5    portfolio, unless that particular subset is
6    singled out.
7        For example, there are disclosures about
8    Alt-A loans, and option-arm loans, and loans
9    with FICO less than 620, and loans with original
10   LTV greater than 90 percent.  There are
11   disclosures by vintages.  There are disclosures
12   by owner-occupied and second lien, and loans
13   with credit enhancement.  These were disclosures
14   that pertain to the entirety of Freddie Mac's
15   portfolio.
16       And from an investor's point of view, an
17   investor such as OPERS, when they invest in
18   Freddie Mac stock, they're not buying a claim on
19   a subset of Freddie Mac's mortgage portfolio.
20   They're buying a claim on the entirety of their
21   portfolio.
22

Page 59

1    BY MR. MARKOVITS:
2    Q.    We're getting, again, a little far
3    afield from my question.
4        Is it your opinion that the credit risk
5    from subprime and nontraditional loans during the
6    relevant period would be assessed by an investor
7    using the information that you set forth here in your
8    report?
9        MR. BLOCK:  Objection to form.
10       THE WITNESS:  So if subprime loans are
11   defined by somebody as loans with FICO less than
12   620, those disclosures do give significant
13   information on credit risk of those loans.
14       If by "nontraditional loans," you mean
15   Alt-A loans, option-arm loans, loans with LTV
16   greater than 90 percent, and loans with LTV less
17   than 620 and LTV greater than 90 percent, those
18   are also covered by these disclosures.
19       So I don't know what you are referring
20   to in addition to this, when you seem to be
21   implying in your question that somehow these
22   disclosures were insufficient for some part of

Page 60

1    Freddie Mac's portfolio.
2    BY MR. MARKOVITS:
3    Q.    I'm not implying anything.
4        I'm asking you:  Is it your opinion that
5    this information is sufficient to assess the credit
6    risk from Freddie Mac subprime and nontraditional
7    loans during the relevant period?
8        MR. BLOCK:  Objection to form.
9        THE WITNESS:  Well, I don't know how you
10   define the word "sufficient" in your question.
11   I think for an investor in Freddie Mac stock,
12   these disclosures were sufficient in the sense
13   that they provided considerable information that
14   these disclosures were, if anything, more
15   detailed than disclosures that were being
16   provided by other similar companies during the
17   relevant period.  So in that sense, they were
18   sufficient.
19       If by "sufficient," you're asking me,
20   hey, there was a particular loan out of 8 or
21   10 million in Freddie Mac's portfolio, and did
22   Freddie Mac disclose on that loan there was a

DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
61—64

Page 61

1    certain fact that might affect its credit risk,
2    of course these disclosures are not designed to
3    be sufficient in that sense of the word.
4    BY MR. MARKOVITS:
5        Q.    Would these disclosures be sufficient
6    for an investor to estimate the losses that would
7    occur from credit risk based on these disclosures?
8        A.    These and other disclosures Freddie Mac
9    made of delinquency rates, of expected losses, and
10   various other source of information Freddie Mac made
11   available to investing public, it's my opinion as a
12   financial economist, that from that point of view,
13   often investor in Freddie Mac stock, these
14   disclosures were, at the time, sufficient.
15       Q.    Did you attempt to model the credit risk
16   of Freddie Mac during the relevant period, based on
17   the information that was publicly disclosed at the
18   time?
19       A.    Can you clarify what you mean by
20   "model"?
21       Q.    Yes.  I think one of your critiques of
22   Mr. Shapiro was that he had a model, but he didn't

Page 62

1    employ it with regard to his analysis of the risk
2    during the relevant period leading up to November 20,
3    2007, or in his analysis in that period.
4            The question I have for you is:  Did you
5    do any type of econometric modeling, taking this
6    information during the relevant period, prove the
7    point that it would be sufficient to estimate the
8    credit risk that Freddie Mac faced during that
9    period?
10           MR. BLOCK:  Objection to form.
11           Go ahead.
12           THE WITNESS:  I wasn't retained to do
13   what Mr. Shapiro was asked to do.  And my
14   comment on his work, and, as I saw, the lack of
15   --
16   BY MR. MARKOVITS:
17       Q.    Doctor, can you just answer my question
18   first, and then you can go into some of -- whatever
19   speech you want to give.
20           My question is:  Did you provide a
21   model?
22       A.    I did not provide an econometric model

Page 63

1    of Freddie Mac's portfolio's credit risk.
2        Q.    So if you're giving the opinion, or
3    intend to give us the opinion, that the disclosures
4    were sufficient for a reasonable investor to
5    determine that credit risk, that's something that, as
6    an economist, you can prove through modeling,
7    couldn't you?
8        A.    Again, Counsel, it's not my job to prove
9    --
10       Q.    I'm sorry.  Can you answer the question?
11   Isn't that something an economist could prove through
12   a model?
13           MR. BLOCK:  Objection to form.
14           THE WITNESS:  Not necessarily.  Models
15   are models.  My job was to evaluate whether
16   there is any evidence of disclosure defects
17   alleged in the complaint.  And for that purpose,
18   I didn't need to do any econometric model when
19   Freddie Mac itself ran those econometric models
20   and provided results of those econometric models
21   to the investing public on a monthly basis.
22           And I have not seen any allegation in

Page 64

1    the complaint that these models were cooked or
2    the results were false, so I didn't need to do
3    any models.
4    BY MR. MARKOVITS:
5        Q.    Have you done any investigation as to
6    whether the modeling was sufficient?  Haven't you
7    seen allegations in this case relating to the fact
8    that Freddie Mac's regulators were criticizing
9    Freddie Mac for its inability to model the risk from
10   the new or nontraditional loans?
11           MR. BLOCK:  Objection to form.
12           MR. MARKOVITS:  Let me just redo the
13   question.
14   BY MR. MARKOVITS:
15       Q.    Have you seen any evidence that OFHEO or
16   FHFA --
17           (Court reporter clarification.)
18       Q.    Are you aware of any evidence that OFHEO
19   or FHFA, during or after the relevant period,
20   criticized Freddie Mac for its inability to
21   accurately model the credit risk associated with
22   nontraditional loans?

DR. MUKESH BAJAJ                                                    March 13, 2024
Ohio Public Employees vs Federal Home Loan                         65–68

Page 65

1    A.    If you're going to ask me questions
2  about said criticisms, I would appreciate having a
3  document that I can refer to.
4    Q.    Okay.  I'm not asking about any
5  particular documents.  I'm asking:  In your review of
6  the evidence, did you come across anything that
7  suggested that OFHEO or FHFA criticized Freddie Mac
8  for the fact that its models couldn't accurately
9  gauge the credit risk associated with the newer or
10  nontraditional loans?
11    A.    I don't know that any document used
12  those words that are in your question.  I am aware of
13  regulators, as well as internal risk management
14  people, doing what they're supposed to do in risk
15  management, pointing out that newer products, that,
16  by definition, didn't have sufficient historical
17  record, when fed into credit risk models, would
18  result in conclusions which would have lower
19  precision than your, say, 30-year fixed rate
20  conforming mortgage, about which there was a lot more
21  data to perform statistical analysis.
22        That does not imply, at least as I read

Page 66

1  it, that Freddie Mac was somehow behind these loans
2  without understanding their risk, as Mr. Shapiro
3  alleges.
4    Q.    Going to Table 22 on page 34 of your
5  report, did you attempt to verify any of the data on
6  that chart?
7    A.    I assumed that the data published in the
8  financial reports was accurate, so I did not do any
9  forensic analysis of recomputing any of that data.
10        I'd like to add to the answer I just
11  gave.
12        When I said that I assume the data was
13  accurate, I don't mean it in the sense of ultimate
14  truth or falsity.  What I mean is that data was
15  disclosed and was available to investing public, and
16  I have not seen any evidence or even an allegation
17  backed up by any analysis that that data was not
18  accurate.
19    Q.    If I were to ask you to assume that the
20  data in the charts was inaccurate in any material
21  respect, you'd agree that it would affect the ability
22  to assess credit risk, correct?

Page 67

1        MR. BLOCK:  Objection to form.
2        THE WITNESS:  Can you repeat your
3        question, please?
4  BY MR. MARKOVITS:
5    Q.    If I were to ask you to assume the data
6  in the charts was inaccurate in some material
7  respect, would I be correct that that would affect
8  your opinion on whether one could gauge Freddie Mac's
9  exposure to credit risk based on this data?
10        MR. BLOCK:  Same objection.
11        THE WITNESS:  Aren't you asking me to
12        assume your position as being true, and then
13        asking me to say if I agree with your position?
14        I think your hypothetical assumes the ultimate
15        answer, so I don't know how to answer.
16  BY MR. MARKOVITS:
17    Q.    It's almost in totality.  If the data is
18  inaccurate, then you can't assess -- if the data is
19  inaccurate in a material respect, then you can't
20  accurately assess the credit risk, correct?
21        MR. BLOCK:  Objection to form.
22        THE WITNESS:  The only thing I would

Page 68

1        differ with is it's not almost a totality.  It
2        is a totality.  And I don't know how an expert
3        is supposed to comment on a totality.
4  BY MR. MARKOVITS:
5    Q.    Well, "yes" or "no" would be preferable.
6        You reviewed a number of secured analyst
7  reports regarding Freddie Mac leading up to
8  November 20th, 2007, correct?
9    A.    Yes.
10    Q.    Did any those reports assess the credit
11  risk to Freddie Mac being as large as was disclosed
12  on November 20th, 2007?
13    A.    Are you asking me, did any of the
14  writers of those reports predicted the future?  Of
15  course nobody did, except Mr. Shapiro, who did, I
16  might add, pretty accurately predict from public
17  information the losses that Freddie Mac announced on
18  November 20th and predicted that as a result of those
19  losses, it would have zero capital above the OFHEO's
20  30 percent surplus requirement by the end of that
21  quarter.
22        So some did predict.  But, of course, as



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024

Page 69

1  the credit prices worsened, market analysts and
2  companies were repeatedly surprised by how severe
3  that crisis was turning out to be.
4      Q.    Now, when you say that Mr. Shapiro
5  predicted it, what was his prediction on earnings per
6  share on a GAAP analysis?
7      A.    I don't remember the earnings per share
8  number.  But what I do remember, he's predicted a
9  $1.6 billion dollar loss which was pretty close to
10  $2 billion dollars that was ultimately announced.
11  And he also had a caveat that, given extreme
12  uncertainty, it's hard to make accurate loss
13  predictions.
14          Does that answer your question?
15     Q.    For the time -- for the time being, yes.
16          Would you consider a 20 percent
17  difference to be pretty close from an economic
18  statistical significance aspect?
19     A.    In that environment, yes.  When you look
20  at the chart in my report about the dispersion
21  analysis earnings forecast getting wider and wider
22  getting into the third quarter of 2007, and various

Page 70

1  disclosures by Freddie Mac as to how credit risk and
2  developing liquidity crisis was making it harder and
3  harder to predict credit losses, I think under those
4  circumstances, it was pretty close, yes.
5      Q.    We'll get to that chart.
6          But briefly on that chart, none of the
7  analysts that you cite in that chart predicted a loss
8  as great as it occurred, correct?
9      A.    I'd have to review the chart.
10     Q.    I think I can tell you from memory, the
11  lowest was a Morgan Stanley at $3.01, and the
12  earnings per share loss was $3.29, if that refreshes
13  your recollection?
14     A.    It doesn't, but if you're making that
15  representation, I'll take your representation.
16     Q.    All right.  Let's just move on then.
17          Let's go back to Table 22 of your report
18  on page 34.  Let's talk about LTV ratio for a second.
19          What is an LTV ratio?
20     A.    Which table are you referring to?
21     Q.    Table 22 on page 34.
22     A.    Okay.

Page 71

1      Q.    It discusses LTV ratios, correct?
2      A.    Give me a moment, please.
3          Yes, it does discuss an LTV ratio.
4      Q.    What is an LTV ratio?
5      A.    LTV stands for loan-to-value.  That's
6  the loan's unpaid principal balance in a loan Freddie
7  Mac invested in and had some risk due, relative to
8  value of the underlying property.
9      Q.    Do you know how Freddie Mac determined
10  the LTV ratio?
11     A.    I think I understand what that term
12  means and, therefore, how Freddie Mac determined it.
13     Q.    Apart from the general understanding of
14  what the term means, do you know how Freddie Mac
15  actually went about determining it during the
16  relevant period?
17     A.    I'm sorry.  Could you more specific?
18  I don't know what to say beyond my general
19  understanding.
20     Q.    I'm looking -- I'm sorry, Doctor.
21  Perhaps I'm not clear.
22          I'm looking to whether you know the

Page 72

1  methodology that Freddie Mac employed in its
2  determination of the LTV ratios that are displayed on
3  Table 22?
4      A.    Yes.  As I described it, it is the
5  loan's unpaid principal balance in the first lien
6  that Freddie Mac invested in, divided by value of the
7  underlying property.  That's what LTV ratio is.
8      Q.    Right.  And did they use a specific
9  model to determine that LTV ratio, to your knowledge?
10     A.    I don't know what you mean by "a
11  specific model."  It's a calculation.  I don't know
12  whether they used Excel or something else.
13     Q.    Do you know whether their method of
14  determining LTV ratios changed during the relevant
15  period?
16     A.    Not to my knowledge and recollection.
17     Q.    And you mentioned the LTV ratio depends,
18  in part, upon the value of the house, correct?
19     A.    Well, there are two things.  One is the
20  numerator, the other is a denominator, and the value
21  of the house is a denominator.
22     Q.    So the answer would be "yes"?



DR. MUKESH BAJAJ                                          March 13, 2024
Ohio Public Employees vs Federal Home Loan                73–76

Page 73

1    A.    Yes.

2    Q.    And the value of the house is generally

3 determined by an appraisal?

4    A.    Yes.

5    Q.    During the relevant period, was

6 appraisal fraud increasing?

7        MR. BLOCK:  Objection to form.

8        THE WITNESS:  I don't know for a fact

9   about Freddie Mac's portfolio.  I understand

10   from my readings that in the subprime sector of

11   the market for certain originators, it was

12   understood that their appraisal-related

13   guidelines were not requiring appraisals to be

14   conforming to uniform standards of professional

15   appraisal practices, or USPAP as it's called.

16       (Reporter clarification.)

17       THE WITNESS:  USPAP, U-S-P-A-P.

18 BY MR. MARKOVITS:

19   Q.    Do you know whether the appraisal

20   practices of Freddie Mac changed after the relevant

21   period?

22   A.    No.

Page 74

1    Q.    Do you know whether Freddie Mac had any

2 automated system during the relevant period for

3 detecting fraud?

4    A.    Well, if you're referring to the LP

5 model, which was Freddie Mac's automated underwriting

6 software, or AUS as it's called, it's my

7 understanding that Freddie Mac uniformly used the LP

8 model for its post-purchase quality control, even if

9 a loan they purchased was originally underwritten

10 using another AUS, such as Fannie Mae's AUS.

11   Q.    Was it your understanding that LP as an

12 AUS was being used to detect fraud within Freddie

13 Mac's portfolio?

14       MR. BLOCK:  Objection to form.

15       THE WITNESS:  What I was referring to

16   was Freddie Mac's 2005 and 2006 annual reports,

17   where I believe I appropriately summarized what

18   is stated in those reports.  Namely, that to the

19   extent fraud detection took place through

20   post-purchase quality control processes, Freddie

21   Mac used its LP software to conduct such

22   post-purchase quality controls.

Page 75

1 BY MR. MARKOVITS:

2    Q.    And apart from quality control, do you

3 know whether LP was intended to be an automated fraud

4 detection system?

5    A.    It's my understanding that it was a

6 software tool, and to the extent that software tool

7 could be used to detect fraud, in that sense, it

8 would be.  But a software system is not designed to

9 go and interview an appraiser.

10       And as I said before, Freddie Mac's

11   business model was to require loan originators that

12   sold loans to Freddie Mac, to provide certain

13   representations and warranties that covered any fraud

14   if it were detected, either through use of LP system

15   or however else it subsequently came to light.

16   Q.    Do you understand, Doctor, that there

17   are, in the mortgage industry, software systems that

18   are considered fraud detection systems?

19   A.    My understanding is there are a lot of

20   vendors coming up with a lot of systems that are

21   helpful and promise to do a lot of things.  I don't

22   know what you are referring to.

Page 76

1    Q.    So you don't know whether during the

2 relevant period, there were any automated fraud

3 detection systems that would have been available to

4 Freddie Mac to use?

5        MR. BLOCK:  Objection to form.

6        THE WITNESS:  I don't know any specifics

7   about any such systems that you are referring to

8   or whether Freddie Mac used them or did not use

9   them.  I can't speak to what was available to

10   Freddie Mac or not.

11       Is this a good time for us to take five

12   minutes?  Unless you're in the middle of a

13   question.

14       MR. MARKOVITS:  That's fine, Doctor.

15   Five minutes.

16       (Brief recess.)

17       MR. MARKOVITS:  Back on the record.

18 BY MR. MARKOVITS:

19   Q.    Dr. Bajaj, when we left, we were talking

20   about a little bit about fraud and the LTV ratios.  I

21   want to try to tie the two together.

22       Would you agree that fraudulent



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
77–80

Page 77

1  appraisals generally inflate the value of a house?

2      (Reporter Clarification.)

3      THE WITNESS:  Well, I presume in your

4  question, if the value of the house is deflated,

5  from a lender's perspective, that won't be

6  considered fraud.  That would be considered

7  conservative.  So in that sense, yes.

8  BY MR. MARKOVITZ:

9      Q.    And an inflated house value would

10  decrease the LTV ratio?  Another one of those tough

11  logical questions.

12      A.    I agree that if the denominator in the

13  LTV ratio is overstated, that would have the effect

14  of understating the computation of the ratio.

15      Q.    Doctor, I gave you the extra five

16  minutes.  Can I get a "yes" or "no"?

17      So you would agree fraudulent appraisals

18  would affect the accuracies of the LTV ratios on

19  Table 22?

20      MR. BLOCK:  Objection to form.

21      THE WITNESS:  Are you asking me to

22  assume that there were fraudulent appraisals, or

Page 78

1  are you asking me if there were fraudulent

2  appraisals that overstated value, that could

3  inflate the LTV ratio stated in Table 22?

4  BY MR. MARKOVITS:

5      Q.    If there were fraudulent appraisals that

6  increased -- inflated the house's value, that would

7  affect the LTV ratios on Table 22, correct?

8      A.    Yes.

9      Q.    And that would, in turn, falsely

10  minimize the perceived credit risk, at least based on

11  the LTV ratios, correct?

12      MR. BLOCK:  Objection to form.

13      THE WITNESS:  In that hypothetical, it

14  could.  It depends on the magnitude.  It depends

15  on the number of loans.  As I said, on a

16  $2 trillion portfolio, take average unpaid

17  principal balance of around $200,000, you're

18  talking about 10 million loans.  So if there

19  were ten loans out of 10 million loans, then it

20  would have no economically significant impact.

21  But if it were a million loans with fraudulent

22  appraisals, then it could.

Page 79

1  BY MR. MARKOVITS:

2      Q.    Do you have any information regarding

3  the percentage of Freddie Mac loans during the

4  relevant period that were affected by fraud?

5      A.    No.

6      Q.    You did no investigation about the

7  extent to which fraud affected Freddie Mac's

8  single-family guarantee portfolio?

9      A.    Are you asking me whether fraud in

10  appraisals affected stated LTV ratios in Table 22, or

11  are you asking me a more general question?

12      Q.    More generally.

13      A.    Can you repeat your question, please?

14      Q.    Did you investigate at all the extent to

15  which fraud affected Freddie Mac's single-family

16  portfolio during the relevant period?

17      A.    If by "investigate," you mean did I do

18  the forensic accounting exercise of double-checking

19  these numbers, the answer is no.  But I did, of

20  course, evaluate allegations of misstatements of some

21  of these numbers made by plaintiff and their expert,

22  Mr. Shapiro.

Page 80

1      Q.    I'm not asking whether you did an

2  independent evaluation.

3      I'm asking, for example, did you

4  investigate Freddie Mac's internal assessments or the

5  internal assessments of consultants with regard to

6  the extent to which Freddie Mac's single-family

7  portfolio was affected by fraud during the relevant

8  period?

9      A.    I only saw the materials that are in my

10  documents considered list, as supplemented by

11  materials cited in Mr. Shapiro's report.  I did not

12  look for materials of the nature you're referring to

13  outside of that universe.

14      Q.    The LTV ratios in Table 22 do not

15  include piggyback loans, correct?

16      A.    Those are LTV ratios for first lien

17  mortgages, and by definition, they would not include

18  piggyback loans in those computations.

19      Q.    The percentage of piggyback loans within

20  Freddie Mac's single-family mortgage portfolio was

21  not disclosed until the end of the relative period,

22  November 20th, 2007, correct?



DR. MUKESH BAJAJ

March 13, 2024

Ohio Public Employees vs Federal Home Loan

81–84

Page 81

1    A.    I know it was disclosed on
2    November 20th, 2007, and I seem to recall some
3    discussion of secondary financing in an earlier
4    period, but I can't put my finger on that as I sit
5    here right now.
6         Q.    In any case, on November 20th, 2007,
7    Freddie Mac disclosed that including piggyback loans,
8    a number of loans with an LTV over 90 percent
9    increased from 5 percent to 14 percent?  Is that your
10   recollection?
11        A.    It would be better if I saw what you're
12   referring to, or I can simply say that's not
13   inconsistent with my recollection.
14        Q.    Let's just go with not inconsistent.
15        A.    Okay.
16        Q.    You would agree that an 80 percent LTV
17   ratio with a 20 percent piggyback is a higher risk
18   than an 80 percent LTV ratio without the piggyback,
19   correct?
20        MR. BLOCK:  Objection to form.
21   BY MR. MARKOVITS:
22        Q.    Are you taking some time to look in your

Page 82

1    report and find where you address it?
2         A.    Yes.  There are several paragraphs
3    addressing that topic, and I'm trying to find those
4    paragraphs.
5              I think I've located it.  I think I
6    address those issues in paragraphs 125 through 127.
7    And if you repeat your question, I can answer it.
8         Q.    You'd agree that an 80 percent LTV ratio
9    with a 20 percent piggyback is a higher risk than an
10   80 percent LTV ratio without a piggyback, all else
11   being equal?
12        A.    Yeah, the key provision there being all
13   else being equal, because if the borrower had a FICO
14   score of 800 in the piggyback loans situation and had
15   a $5 million securities portfolio, that would be a
16   different picture then.  So, all else being equal, a
17   loan with certain LTV ratio without a piggyback loan
18   could have a higher credit risk than a loan with a
19   piggyback loan and the same LTV ratio as I state in
20   those paragraphs.
21        Q.    But generally speaking, all else being
22   equal, a loan with a piggyback is a higher risk loan

Page 83

1    than a loan without a piggyback, correct?
2         A.    Well, when you say "generally speaking,"
3    I don't know whether Freddie Mac's exposure to loans
4    with piggyback loans had lower than average or higher
5    than average FICO scores or other compensating
6    factors that could make the statement that you had in
7    your question incorrect.  But all else being equal, I
8    can agree to what you said.
9         Q.    And are you aware of any studies which
10   would indicate, again, generally speaking, the extent
11   to which delinquency rates of the piggyback loans
12   exceed the delinquency rates of the piggyback loans?
13        A.    Are you referring to the delinquency
14   rates of piggyback loans, meaning the second trusteed
15   loans?  Or are you saying delinquency rates on first
16   trustee loans that also have a piggyback loan?  What
17   are you asking me?
18        Q.    The delinquency of a first trustee's
19   loan that also have a piggyback loan?
20        A.    Yes, I'm aware of studies that examine
21   that issue, in particular for the agency mortgage
22   portfolio.  For example, in the FCIC report.

Page 84

1         Q.    And do you -- can you tell me, generally
2    speaking, what multiplier of delinquency rates are
3    there for loans with piggybacks versus loans without
4    piggybacks?
5         A.    Not as I sit here right now from memory.
6         Q.    You referred to paragraphs 125 to, I
7    think, 127 of your report.  Am I correct that you
8    suggest in those paragraphs that because it was known
9    that many loans included piggybacks during the
10   relevant period, the market would have assumed that
11   was the case with Freddie Mac?
12        A.    That is true.  And I also discuss,
13   either in those paragraphs or elsewhere, that when
14   Freddie Mac did make the disclosure for Q3 2007 that
15   you referred to, the market did not seem to be
16   surprised, and there were no questions on Freddie Mac
17   having considerably less proportional piggyback loans
18   in its portfolio than was generally the case in the
19   industry.
20        Q.    Why would the market assume that
21   Freddie Mac avoided piggyback loans?
22        A.    Can you repeat your question, please?



DR. MUKESH BAJAJ                                                    March 13, 2024
Ohio Public Employees vs Federal Home Loan                              85–88

Page 85

1    Q.    Why would the market during the relevant
2  period have assumed that Freddie Mac avoided
3  piggyback loans?
4    A.    I think the market is smarter than that.
5  We are talking about a company that lent to a
6  significant fraction of households in the country, a
7  company that, based on my back-of-the-envelope
8  calculations, was exposed to about 10 million loans,
9  and along with Fannie Mae, their market share by the
10  end of 2007 was, if I recall correctly, about
11  70 percent of the market.
12        So why would it be rational for the
13  market to assume that practices that were common in
14  the industry would somehow not touch Freddie Mac or
15  Fannie Mae?  That's the question.
16    Q.    Were subprime loans common in the
17  industry during that period of time?
18    A.    Yes.
19    Q.    And Freddie Mac claimed it wasn't
20  investing in subprime, correct?
21    A.    Well, I believe Freddie Mac's
22  disclosures were a lot more precise than that.

Page 86

1  Freddie Mac did say that it owned, if I recall
2  correctly, about $120 billion of private-label
3  securitizations in its retained portfolio that were
4  backed by subprime loans, but those were AAA where
5  they had laid off the credit risk.
6        Freddie Mac did disclose that it had
7  small proportions of loans backed by -- or a small
8  proportion of the investment in its guaranteed
9  portfolio, the so-called T deals, that were backed by
10  subprime loans.  I think those were less than
11  0.1 percent of Freddie Mac's portfolio or something
12  like that.
13        Freddie Mac did disclose that a
14  significant fraction of its loans had been made to
15  borrowers with FICO less than 620, which oftentimes
16  was --
17    Q.    We're getting very, very far afield from
18  my question, which was a "yes" or "no" question
19  again.  Let's just move on if we can.
20    A.    Okay.
21    Q.    And I ask, please, if you could -- if I
22  ask a "yes" or "no" question, could you possibly

Page 87

1  answer "yes" or "no."  Then if you need to explain,
2  you can go ahead and explain.  All right.
3        So you'd agree with me -- we agreed that
4  piggyback loans, all else being equal, are higher
5  credit risks than nonpiggyback loans, correct?
6    A.    Correct, all else being equal.
7    Q.    Yes.  And we can agree that prior to
8  November 20th, 2007, there was no disclosure by
9  Freddie Mac of the percentage of piggyback loans
10  within its single-family portfolio, correct?
11    A.    Yes, with the caveat I expressed before,
12  that I seem to recall some discussion of increased
13  use of secondary financing.  But as I sit here right
14  now, I can't lay my finger on what or where.
15    Q.    Can you tell from Table 22 -- going back
16  to Table 22, which is on page 34 of your report.
17        Can you tell from Table 22 whether the
18  loans reflected on that chart followed Freddie Mac's
19  underwriting guidelines?
20    A.    No.
21    Q.    Do you know what Freddie Mac means when
22  it identifies loans with material exceptions?

Page 88

1        MR. BLOCK:  Objection to form.
2        THE WITNESS:  I have an understanding of
3    what exceptions means.  The way you asked the
4    question, you talk about material exceptions,
5    and I don't know what you mean by "material" as
6    a qualifier in the question.
7  BY MR. MARKOVITS:
8    Q.    You've never seen that phrase, "material
9  exception," used in the Freddie Mac documents?
10    A.    Not that I recall right now.
11    Q.    Well, let's just assume the loans with
12  material exceptions are loans that did not comply
13  with Freddie Mac's underwriting standards, all right?
14    A.    Okay.
15    Q.    Using that definition, there's no
16  particular credit score associated with material
17  exceptions, correct?
18    A.    No.  There's a credit score associated
19  with every loan.  If you mean by "credit score," FICO
20  score of the borrower, I don't know what you're
21  getting to.
22    Q.    What I'm getting to is, you can't look



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
89–92

1  at the somebody's FICO score -- or look at the FICO
2  score on these charts and say, "Oh, that category is
3  a material exception"?
4          MR. BLOCK:  Objection to form.
5          THE WITNESS:  Not from this chart, no.
6  BY MR. MARKOVITS:
7      Q.    There's no particular LTV ratio
8  associated with the material exception, correct?
9          MR. BLOCK:  Objection to form.
10         THE WITNESS:  No.  As I said before,
11  there is LTV associated with each loan, so I
12  don't understand your question.
13  BY MR. MARKOVITS:
14      Q.    My question is:  You can't look at an
15  LTV ratio -- there could be an LTV ratio of whatever,
16  75 percent for a particular loan with a material
17  exception and 75 percent for a loan without a
18  material exception, correct?
19      A.    Okay.
20      Q.    Is that your understanding?
21      A.    Yes.  But a loan with material exception
22  would be a loan with less credit risk then a loan

1  without a purported material exception.
2      Q.    That wasn't my question, though.  I
3  mean, you can have the same LTV ratio for two
4  different loans, one that is a material exception and
5  one that is not, correct?
6          MR. BLOCK:  Objection to form.
7          THE WITNESS:  Is that one of your
8  tautological questions?  You're asking me to
9  assume that could happen.  Yes, that could
10  happen.
11  BY MR. MARKOVITS:
12      Q.    Do you have an understanding whether
13  delinquency rates on loans with material exceptions
14  are higher on average than those without material
15  exceptions?
16      A.    I don't recall such statistics as I sit
17  here right now.
18      Q.    So you can't say whether mortgage loans
19  with material exceptions had generally higher credit
20  risks than those without?
21      A.    Not in a quantitative sense, but I do
22  understand that all of Freddie Mac's loans, including

1  those with purported material exceptions -- it's my
2  understanding that part of what is represented in
3  Table 22, there weren't loans in some drawer
4  somewhere that were hidden and on which credit risk
5  characteristics were not reported as part of overall
6  credit risks characteristics of the entire portfolio
7  or the subset of portfolio that Freddie Mac
8  disclosed.
9      Q.    That wasn't my question, but all right.
10         Freddie Mac did not disclose during the
11  relevant period the number or percentage of loans in
12  its single-family portfolio with material exceptions,
13  correct?
14      A.    I don't have Freddie Mac's financial
15  disclosures memorized.  So if you want to represent
16  that fact, I can accept your representation, but I
17  don't remember from memory one way or another.
18      Q.    I think you mentioned earlier that some
19  of the loans in a single-family portfolio were
20  underwritten using other company's AUSs or
21  underwriting guidelines, correct?
22      A.    Yes.

1      Q.    Can you talk in Table 22 how many of the
2  loans reflected in that table were underwritten using
3  some other company's guidelines?
4      A.    No.
5      Q.    Do you know whether loans underwritten
6  during the relevant period using some other company's
7  guidelines were generally higher credit risk?
8      A.    I didn't see any evidence that there
9  were higher credit risk.
10      Q.    Did you perform any analysis as to the
11  strength of Freddie Mac's underwriting standards as
12  they were applied during the relevant period?
13      A.    Can you clarify what you mean by
14  analysis on strength of Freddie Mac's underwriting
15  procedures, or whatever was the question?
16      Q.    Let's put it this way:  To your
17  knowledge, could investors during the relevant time
18  period determine the extent to which Freddie Mac was
19  adhering to its underwriting standards?
20      A.    Yes.  I think a fair answer to that
21  question would be yes, based on disclosures I saw in
22  2005 and 2006 annual statements, and the knowledge



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
93—96

Page 93

1  that Freddie Mac bid on funded loans underwritten by
2  third-parties, but it always used LP to do
3  post-purchase quality control.  The implication being
4  that those loans were consistent with Freddie Mac's
5  underwriting guidelines.  And Freddie Mac even
6  discusses, if I recall correctly, in 2006, that
7  sometimes when it came to certain borrowers, there
8  were specific contracts with those borrowers that
9  addressed a segment of the market where those
10  underwriting guidelines may be modified.  So to that
11  extent, I would say yes.
12      Q.    Other than a general statement by
13  Freddie Mac that it utilized, at times, the
14  underwriting standards of other companies, did you
15  see any quantification during the relevant period of
16  the extent to which that was happening?
17      A.    I believe the answer is yes, because I
18  think either in 2005 or 2006, annual financial
19  statements of both, they did say that over the last
20  couple of years, they were buying loans that had been
21  funded when they were originally underwritten using a
22  different AUS than LP.  To the extent, yes, they did

Page 94

1  disclose that.
2      Q.    But that wasn't my question.
3      My question was:  Other than the
4  disclosure of that nature, did you see any disclosure
5  where they quantified the extent to which they were
6  relying on other companies' underwriting systems?
7      A.    Can you repeat your question, please?
8      Q.    During the relevant period, did you see
9  any disclosure where Freddie Mac disclosed the extent
10  to which -- quantified the extent to which they were
11  relying on other companies' automated underwriting
12  systems?
13      A.    If by "extent" and "quantify," you mean
14  a certain percentage, I don't recall seeing that
15  disclosure.
16          MR. MARKOVITS:  Off the record.
17          (Discussion ensued off the record.)
18          MR. MARKOVITS:  Back on the record.
19  BY MR. MARKOVITS:
20      Q.    You would agree with me that if Freddie
21  Mac was significantly deviating from its underwriting
22  standards during the relevant period, that would be

Page 95

1  information that would be important to a reasonable
2  investor?
3      A.    No.  Because it depends on the nature of
4  the deviation.  It depends on the effect of the
5  purported deviation.  So no, you cannot say that.
6      Q.    So even if they were significantly
7  deviating from their underwriting standards, in your
8  opinion, that would not be information that's
9  important to a reasonable investor?
10      A.    I disagree that you could make a general
11  statement that just because they were deviating, it
12  necessarily means that a reasonable investor would
13  want to know more than beyond what they were
14  disclosing.  I didn't say that under no circumstances
15  and with no hypothetical that could not be important
16  to an investor.
17      Q.    Switching to paragraph 77 in your
18  report, you note another credit -- or characteristic
19  regarding credit risk, which is delinquency risk,
20  correct?
21      A.    Yes.
22      Q.    I think later in your report, you

Page 96

1  discuss how Freddie Mac's delinquency rates were low.
2  And I think that's in paragraph 124, if you want to
3  take a look.
4      A.    I don't believe I said they were low.
5  I said they were lower than a benchmark group that
6  I discuss in paragraph 124.
7      Q.    Okay.  Fair enough.  What are
8  delinquency rates?
9      A.    I'm sorry.  Can you repeat?
10      Q.    What are delinquency rates?
11      A.    I believe Freddie Mac reported
12  delinquency rates on its single-family loans as
13  90 days or more late, and when it's multifamily,
14  60 days or more late.
15      Q.    Okay.  Let's focus on the single-family,
16  which would be the 90-day cutoff?
17      Is that your understanding?
18      A.    That is my understandings, correct.
19      Q.    And after 90 days, it was considered
20  seriously delinquent?
21      A.    I believe 90 days is considered
22  seriously delinquent.  It could become more seriously



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
97—100

Page 97

1  delinquent after 90 days, or it could become current.

2      Q.    Fair enough.

3            You'd agree that delinquency rates can

4  be important in assessing credit risk?

5      A.    Yes.

6      Q.    And your understanding and recollection

7  is that Freddie Mac disclosed in single-family

8  portfolio the delinquency rates -- the 90-day

9  delinquency rates?

10     A.    Yes.

11     Q.    Do you know how those delinquency rates

12 were calculated by Freddie Mac?

13     A.    I believe so.

14     Q.    And what's your understanding?

15     A.    My understanding is that a loan is

16 considered 90-days delinquent if a scheduled payment

17 has not been made for 90 days beyond its due date.

18     Q.    Do you know whether Freddie Mac's

19 reported delinquency rates included loans that were

20 renegotiated by Freddie Mac?

21     A.    I don't know one way or another.

22     Q.    Do you know whether Freddie Mac had a

Page 98

1  loan mitigation program?

2      A.    Yes, I remember that discussion in

3  Mr. Syron's speech to the Commonwealth Club of

4  California.

5      Q.    I think you may have answered this

6  already with your prior answer, but I don't know one

7  way or another.  But let's suppose Freddie Mac has a

8  mortgage where the homeowner hasn't paid in 120 days.

9            That would be considered in the serious

10 delinquent 90-day plus category, correct?

11     A.    Yes, that's my understanding.

12     Q.    And let's suppose that Freddie Mac

13 negotiates an extension allowing that homeowner to

14 begin payment in 60 days.  Once that extension is

15 negotiated, before the 60 days are up, do you know

16 whether Freddie Mac considered that loan as being

17 delinquent?

18     A.    As a factual matter and it is accounted

19 for in its reported delinquency ratios, I do not know

20 that.  I do recall Mr. Syron, I believe, in that

21 Commonwealth Club of California speech, saying that

22 they found that such accommodations cut foreclosure

Page 99

1  rates by 80 percent or more, if I remember correctly.

2  So it does apparently reduce credit risk and expected

3  losses, at least on average.

4      Q.    Do you know whether other financing

5  institutions in reporting delinquency rates during

6  the relevant period considered the original loan

7  terms or negotiated loan terms in reporting their

8  delinquency rates?

9      A.    No.

10     Q.    Do you know what SISA loans are?

11     A.    The term sounds familiar, but I don't

12 remember.

13     Q.    How about NINA loans?

14     A.    I think NI stands for no income.  I

15 don't recall what NA stands for.  Maybe no assets.  I

16 don't know.

17     Q.    Okay.  So I take it, it would be fair to

18 say you've done no analysis in this case relative to

19 NINA or SISA loans?

20     A.    That would be fair, yes.

21     Q.    Have you seen any disclosures of how

22 many NINA loans were in the single-family portfolio

Page 100

1  during the relevant period?

2      A.    I'm sorry.  Can you repeat your

3  question?

4      Q.    Have you seen any disclosures with

5  regard to how many NINA loans were in the

6  single-family portfolio during the relevant period?

7      A.    No.

8      Q.    Would that be the same with regard to

9  SISA loans?

10     A.    Yes.

11     Q.    Do you know whether Freddie Mac

12 disclosed the number or percentage of reduced

13 documentation loans in its single-family portfolio

14 during the relevant period?

15           MR. BLOCK: Objection to form.

16           THE WITNESS: I'm sorry.  Can you repeat

17     your question?

18 BY MR. MARKOVITS:

19     Q.    Do you know whether Freddie Mac

20 disclosed the number or percentage of reduced

21 documentation loans in its single-family portfolio

22 during the relevant period?



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
101–104

Page 101

1        MR. BLOCK:  Same objection.
2        THE WITNESS:  Yes.
3   BY MR. MARKOVITS:
4        Q.    And did they?
5        A.    Yes.
6        Q.    Do you know whether Freddie Mac's public
7   disclosures relating to reduced documentation loans
8   differed from its internal assessment?
9        A.    I've seen no such evidence in the
10  materials I've reviewed which I defined for you
11  before.
12       Q.    Do you know whether the delinquency
13  rates for reduced documentation loans were higher
14  than loans with documentation during the relevant
15  period?
16       MR. BLOCK:  Objection to form.
17       THE WITNESS:  Again, I don't recall
18       specifics, but it stands to reason that if a
19       loan is low documentation in the sense that
20       makes it a risker loan, then it would have a
21       higher probability of being delinquent.
22

Page 102

1   BY MR. MARKOVITS:
2        Q.    Can you turn to paragraph 37 of your
3   report?  If I can direct your attention to note 62.
4   Are you there, Doctor?
5        A.    Yes.
6        Q.    And there's a parenthetical that has a
7   long quote about nontraditional mortgage products.
8   And this is from the Freddie Mac 2006 annual report.
9   And then at the very end of that quote after the
10  ellipsis, it says:  "We expect each of these products
11  to default more often than traditional products, and
12  we consider this when determining our credit and
13  guaranty fees."
14       Do you see that?
15       A.    Yes.
16       Q.    What did you understand that report to
17  mean when it says:  "We considered this when
18  determining our credit and guaranty fees"?
19       A.    So it is my understanding that Freddie
20  Mac bought loans through -- or in two ways.  One is
21  the so-called flow channel, where they have contracts
22  with specific loan originators for a period of time,

Page 103

1   and that contract defines guaranty fees and other
2   terms during the duration of that contract.
3        And then they also bought loans in what
4   is called the bulk channel, where if a mortgage
5   banker were to offer a bid take on, say, 20 loans,
6   and Freddie Mac bids on some or all of those 20
7   loans, that that bulk channel obviously provides an
8   opportunity to set the price of the loan and guaranty
9   fees in accordance with the assessed risk in
10  realtime.
11       Whereas for flow channel, that
12  adjustment, subject to party's mutual bargaining
13  power, would be expected to happen with a lag.
14       Q.    Generally speaking, though, would you
15  understand that quote to mean that Freddie was
16  pricing for the higher risk of the products?
17       A.    Yes.  And the sense was that Freddie was
18  pricing to the market because they competitively bid
19  for loans in the marketplace.  So the market
20  determines the price, and Freddie, of course,
21  determines what its bid is going to be.
22       And generally, as an economist, you

Page 104

1   could expect market price of a loan.  Let's say a
2   loan has a certain unpaid principal balance, whether
3   various investors bid part of the loan, meaning,
4   100 percent off the unpaid principal balance or more
5   or less than that, depends on those investors
6   evaluation of credit characteristics of that loan.
7   And Freddie participated in that marketplace.  So in
8   that sense, of course, pricing does depend on
9   riskiness of the loan that Freddie Mac buys.
10       In addition, as I said, there are
11  guaranty fees that could vary by nature of product
12  and nature of investor, and sometimes subject to
13  contractual arrangements between Freddie Mac and
14  certain seller servicers who sold loans to Freddie
15  Mac.
16       Q.    Do you know whether Freddie Mac was
17  being compensated for its higher risk purchases
18  during the relevant period?
19       MR. BLOCK:  Objection to form.
20       THE WITNESS:  Yes.  On average, it was,
21       in the way that I explained.
22



Page 105

1  BY MR. MARKOVITS:

2      Q.    And did you investigate whether Freddie

3  Mac was being compensated for its purchase of

4  nontraditional higher risk loans during the relevant

5  period?

6          MR. BLOCK:  Objection to form.

7          THE WITNESS:  I don't know what you mean

8      by the word "investigate" in your question.

9  BY MR. MARKOVITS:

10     Q.    Well, did you look into whether to what

11 extent Freddie Mac was being compensated for its

12 purchases of nontraditional loans that are higher

13 risk during the relevant period?

14     A.    I did see certain internal documents

15 that Mr. Shapiro talked about, but I did not do any

16 econometric analysis mapping the compensation to

17 Freddie Mac coming from two sources.  One, the price

18 it paid for a certain loan.  If you buy a loan with

19 unpaid principal balance of a $100,000 for 98 percent

20 of that amount, say 98, and then you put it in a

21 security where, after your guaranty -- let's -- to

22 keep the example simple -- is it sells at par, namely

Page 106

1  100,000.  In that case, Freddie Mac has been

2  compensated $2,000 for that loan being risker.

3          In addition, Freddie Mac charged

4  guaranty fees.  And those are, by their very nature,

5  somewhat more sticky in the way that I described over

6  a short period of time, but generally reflected

7  competitive conditions in the marketplace, which, in

8  turn, depends on the nature of the product that

9  Freddie Mac bought.

10         So in that sense, yes, Freddie Mac was

11 compensated, because that's how markets work for

12 higher risk loan products that it was buying in order

13 to be part of its single-family portfolio.

14     Q.    Do you know whether during the relevant

15 period, internal assessments at Freddie Mac indicated

16 that it was purchasing higher risk nontraditional

17 products without being compensated for that higher

18 risk?

19     A.    Not any general statement.  I know

20 Mr. Shapiro referred to an internal document where

21 there was a reference to certain loan products that

22 Freddie Mac participated in in order to meet its

Page 107

1  HUD-mandated loans.  And there was some discussion

2  whether, in addition to the benefits Freddie derives

3  from fulfilling its requirements under HUD

4  requirements, whether the additional compensation it

5  was getting was necessarily commensurate with what

6  the price of that loan would have been if it did not

7  have those HUD-related benefits attached to it.

8          And that's my understanding of how

9  market works when you have a loan that is called a

10 CRA original loan, for example.  That loan is

11 considered as a credit for an investor, whether it's

12 Freddie Mac or Citibank --

13     Q.    Far afield here again.  Far afield.

14     A.    Okay.  If you say so.

15     Q.    I do.

16         Can you tell me, do you know whether,

17 internally, Freddie Mac, during the relevant period,

18 made the determination that it was purchasing higher

19 risk, nontraditional products without being

20 compensated for that higher risk?

21     A.    Can you repeat that question, please?

22 I'm sorry.

Page 108

1      Q.    Sure.  Do you know whether, during the

2  relevant period, Freddie Mac was purchasing higher

3  risk, nontraditional mortgage products without being

4  compensated for that higher risk?

5      A.    Yes, I've seen no evidence that Freddie

6  Mac was not --

7          MR. GOLDFARB:  Objection.

8          THE WITNESS:  Sorry.  Thank you.

9          I'm not aware of any evidence that, when

10     taken into account the additional regulatory

11     requirement benefits, Freddie Mac was buying any

12     higher risk loans for less than adequate

13     compensation determined in the marketplace.

14 BY MR. MARKOVITS:

15     Q.    You would agree that a factor the market

16 would look at in assessing credit risk is whether

17 Freddie Mac was being adequately compensated when it

18 purchased higher risk mortgages, correct?

19     A.    Has it been about an hour, because I'm

20 losing track of the question.  So would you please

21 indulge me and repeat it, and then I think it might

22 be a good time for a break.



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
109–112

Page 109

1    Q.    Yeah.  This was actually your question,
2   Doctor, so this is my last question and then we'll
3   both get something to eat.
4          You would agree that one factor the
5   market would look at in assessing credit risk is
6   whether Freddie Mac was being adequately compensated
7   when it purchased higher risk mortgages during the
8   relevant period?
9    A.    Yes.
10         MR. MARKOVITS:  Wow.  I'm going to end
11   on a yes.
12         THE WITNESS:  Happy to please, Counsel.
13         MR. MARKOVITS:  Let's break for lunch.
14         (Brief recess.)
15         MR. MARKOVITS:  Back on the record.
16   BY MR. MARKOVITS:
17    Q.    Dr. Bajaj, I hope they gave you a good
18   lunch.
19    A.    Thank you.  They did.
20    Q.    In your report, you note that during the
21   class certification phase, you analyzed and opined on
22   price impact.  And your conclusion at that time was

Page 110

1   that the alleged misrepresentations and omissions had
2   no impact on the price of Freddie Mac's common stock
3   over the relevant period; is that fair to say?
4    A.    I think so, yes.
5    Q.    Would it also be fair to say that your
6   opinion that there is a lack of price impact has not
7   changed since that time?
8    A.    Yes.
9    Q.    And as you note in your report -- and
10   you can look back at paragraph 16 if you'd like --
11   the court agreed with your opinion on price impact,
12   and held that a lack of price impact would rebut any
13   presumption of reliance, right?
14    A.    Yes.
15    Q.    Assuming there is no price impact as the
16   court found, it would be impossible to find that loss
17   causation exists, correct?
18    A.    I believe that is a correct statement,
19   with the caveat that through Dr. Tabak, plaintiff
20   seems to offer a theory that says lack of price
21   impact is not really lack of price impact if, in
22   essence, Freddie Mac, contrary to allegations and

Page 111

1   attack, hid truthful disclosures as the attack
2   alleged it made on November 20th.
3          While I consider that theory to be
4   highly dubious -- not in a value judgment sense, as
5   an economic matter -- there is additional evidence
6   that shows, regardless, there's not even a
7   significant price change when you look at the
8   November 20th disclosure along with the subsequent
9   rebound on Freddie's stock when the market's fear
10   about Freddie being able to access capital market
11   were shown to be unfounded.
12    Q.    We drifted away from the yes-or-no
13   answers we got right before lunch.
14          So the answer is, yes, assuming there's
15   no price impact, as the court found, it would be
16   impossible to find that loss causation exists, in
17   your opinion, correct?
18    A.    I think that's a fair statement, yes.
19    Q.    In your view, would it be possible for
20   an expert to provide an opinion that's consistent
21   with the class certification order where that opinion
22   concluded a calculation of inflation in Freddie Mac's

Page 112

1   stock price during the relevant period that was
2   greater than zero?
3          MR. BLOCK:  Objection to form.
4          THE WITNESS:  Well, if there was no
5          price impact of alleged inflationary statements,
6          then the price was never inflated, hence there
7          couldn't be any loss causation.  Furthermore, if
8          there was no price drop, that can be -- that can
9          be tied to alleged corrective disclosures, then
10         that further would make it impossible to, as a
11         matter of economic logic, compute damages.
12   BY MR. MARKOVITS:
13    Q.    And your opinion at class certification
14   was based in large part on your finding -- or based
15   in part, let's put it that way -- on your finding
16   that there was no back-end price impact on
17   November 20th, 2007, correct?
18    A.    Well, I would say it was based equally
19   on the finding that there was no, quote-unquote,
20   front-end price impact and there was also no back-end
21   price impact.
22    Q.    That's why I qualified to say "in part."



DR. MUKESH BAJAJ                                          March 13, 2024
Ohio Public Employees vs Federal Home Loan                 113—116

Page 113

1  All right.  Okay.
2      A.    I'll take it.
3      Q.    And your opinion that there was no
4  back-end price impact was based, at the time,
5  primarily upon your review of the analyst reports
6  that were published on or shortly after
7  November 20th, 2007, correct?
8      A.    Can you repeat the question, please?
9      Q.    Your opinion that there was no back-end
10  price impact in your prior report was based primarily
11  upon your review of analyst reports that were
12  published on or shortly after November 20th, 2007?
13      A.    No, because of your use of the word
14  "primarily."  Because equally key to my conclusions
15  and analysis was Freddie Mac's prior disclosures,
16  which would have formed a basis of what the market
17  would be reacting to on November 20th.  So it was
18  both, Freddie Mac's historical disclosures, as well
19  as market's reaction to those disclosures.  And I
20  should add also, given the market environment at that
21  time, that would have informed inappropriate
22  interpretation of that alleged event.

Page 114

1      Q.    And in your current report, you're also
2  providing an opinion that there was no back-end price
3  impact, correct?
4      A.    In my -- my conclusions in my current
5  report are sufficient to conclude that there was no
6  back-end price impact.  The way I understand the
7  scope of my engagement was that it went beyond price
8  impact analyst into loss causation analysis.  And not
9  only do I still maintain that November 20th
10  disclosures, as alleged by plaintiffs, could have
11  caused the price drop on the 20th, I had previously
12  said that those -- that price drop could be related
13  to markets' fears about Freddie Mac's ability to
14  raise capital, and they could involve realization of
15  disclosed risk.
16          And the work I have done now says that
17  of those at the potential explanations, alleged
18  materialization of undisclosed risk, realization of
19  previously disclosed risk, and market's nervousness
20  about Freddie's ability to raise capital and access
21  capital markets, I now have conclusive evidence that
22  you can explain -- to the extent without assuming

Page 115

1  market efficiency, you can explain anything -- that
2  once you take into account market's nervousness of
3  Freddie's ability to access markets, which was
4  shortly thereafter resolved, there is nothing left to
5  explain.
6          So to the extent there was something
7  left to be explained, then the question would be how
8  much of it could be due to previously disclosed risk,
9  and how much of it plaintiff could argue was due to
10  materialization of previously undisclosed risk.  But
11  we don't even get there.
12      Q.    So just to make sure I understand.  It
13  seems to me -- and you can correct me if I'm wrong --
14  that your current opinion is, in part, that there was
15  no price impact -- back-end price impact on
16  November 20th, 2007 based upon the review you did of
17  the analyst reports.  That's one of the factors that
18  you believe provides evidence of a back-end price
19  impact on November 20th, 2007, correct?
20      A.    Only in part, as I previously told you.
21  It was not just limited to review of analyst reports.
22      Q.    I understand, and that's why I said "in

Page 116

1  part."
2      A.    I don't think you said that in your
3  question, by the way.
4      Q.    I did, but --
5      A.    Okay.  Sorry.  I misheard it then.
6      Q.    Okay.  And another part on your opinion
7  that there was no back-end price impact on
8  November 20th, 2007 is based upon your opinion that
9  what happened there was, in part, the realization of
10  previously disclosed risks, correct?
11      A.    I said that could be the case.
12      Q.    Are you providing an opinion -- because
13  it appeared to me in reading your report that you
14  were providing an opinion that on November 20th, 2007
15  that there was a realization of previously disclosed
16  risks; am I incorrect?
17      A.    Yes, you are incorrect.
18      Q.    Okay.  You are not providing that
19  opinion?
20      A.    Well, I am providing an opinion that if
21  there was anything to be explained on November 20th,
22  it could well be explained -- and I understand it's



DR. MUKESH BAJAJ                                          March 13, 2024
Ohio Public Employees vs Federal Home Loan                117–120

Page 117

1  plaintiff's burden to show that the explanation was
2  realization of previously undisclosed risk.  But the
3  price drop on that day could be explained by
4  materialization of disclosed risk, in addition to
5  market's nervousness about whether Freddie will
6  maintain its access to capital markets, which was
7  crucial for Freddie Mac and --
8      Q.    Let's stop for a second.  So "could be"
9  is different than "would."
10         Are you saying on November 20, 2007 the
11  stock drop was, in part, because there were
12  materialization of previously disclosed risk or
13  because there could have been materialization of
14  previously disclosed risk?
15     A.    My opinion is two-part.  One, in my
16  review of plaintiff's expert's work, I have seen no
17  evidence to link the price drop on November 20th to
18  alleged realization of previously undisclosed risk.
19  And in particular, it entirely ignores plenty of
20  evidence that it could also be caused by realization
21  of previously disclosed risk.  However --
22     Q.    Right.  So are you or are you not -- are

Page 118

1  you giving the opinion that that the stock drop was,
2  in part, due to realization of previously disclosed
3  risk, or are you presenting that as a possibility?
4      A.    I'm saying it's a possibility that the
5  plaintiff -- it's my understanding -- has a burden to
6  exclude.  It has not done so.  And my review of the
7  evidence rules out that the price drop on that day
8  was due to disclosures of previously undisclosed
9  risk.  Furthermore, when you look at the rebound in
10  Freddie Mac's stock price --
11     Q.    That's a separate question.  Let stay on
12  topic here.  We'll get to that, I promise you.
13     A.    It doesn't matter to me whether you get
14  to it or not.  I was just trying to be complete, but
15  you are in charge.
16     Q.    Yeah.  I want to stick on the issue of
17  this realization.
18         Could you turn back to paragraph 22,
19  page 11 of your report?  Under your first opinion
20  there, under summary of opinions 221.  The second
21  sentence reads:  "While Freddie Mac's stock declined
22  on November 20th, 2007 after Freddie Mac announced

Page 119

1  losses of $2 billion for its Q3 2007 and projected
2  further losses in subsequent quarters, these losses
3  and the price decline were related to the realization
4  of previously disclosed risks of mortgage exposure."
5         Did I read that correctly?
6      A.    You did.
7      Q.    And that's why you can, perhaps,
8  understand my confusion here, because this seems to
9  be saying that you're providing the opinion that
10  those losses and price declines were related to the
11  realization of previously disclosed risk of mortgage
12  exposure, rather than just suggesting that it's a
13  possibility?
14     A.    Well, I was careful in using the words
15  "related to."  The accounting losses on that day were
16  clearly related to disclosure of, or rather,
17  materialization of previously disclosed risk, as
18  shown by the fact that Mr. Shapiro, based on public
19  information alone, predicted those losses.  So the
20  sentence that you read is then further clarified in
21  -- further down in that paragraph, which says --
22     Q.    No, I understand.  Let me -- let me just

Page 120

1  stick on topic here, Doctor.
2         So are you saying -- it appears to be
3  that you're saying here that all of the losses that
4  occurred on November 20th, 2007, these losses and the
5  price decline were related to the realization of
6  previously disclosed risks of mortgage exposure.
7         Is that your opinion?
8      A.    So I think the way you worded your
9  question, you said all of the losses.  What I would
10  like to say is there is no evidence that any of the
11  losses represented materialization of previously
12  disclosed risk.  And if they weren't due to
13  realization of previously undisclosed risk,
14  obviously, price change could be related to
15  materialization of previously undisclosed risk.
16  That's what I'm saying.
17     Q.    All right.  So you're saying it's almost
18  a totality.
19         You're saying because, in your opinion,
20  there was no materialization of a previously
21  undisclosed risk, that any of the losses had to be
22  due to a realization of previously disclosed risk; is



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
121–124

Page 121

1   that correct?

2       A.    I would say that there is absolutely no

3   evidence provided by the plaintiff --

4       Q.    No, no.  That's not my question, Doctor.

5           Are you saying that because there was no

6   evidence of nondisclosure of material risk and,

7   therefore, the entire loss must be due to the

8   disclosure of previously disclosed risk?

9       A.    The way you worded the question now,

10  yes.  Since there is no evidence that there were any

11  previously undisclosed risks that materialized, it

12  follows, therefore, supported by extensive evidence,

13  that there were materializations of previously

14  disclosed risk.

15      Q.    Okay.  And then it seems like -- and you

16  can correct me if I'm wrong, and I'm sure you will --

17  that in your current report, you're adding another

18  factor, possibly both through the loss causation and

19  price impact analysis -- but this idea of a stock

20  rebound.

21          Are you providing an opinion that

22  because of this stock rebound that you've analyzed,

Page 122

1   that there was no back-end price impact on

2   November 20th, 2007?

3       A.    You could confirm my earlier opinion

4   that there was no back-end price impact on

5   November 20th by my analysis of price rebound during

6   the seven trading days after November 20th.

7       Q.    You negate price impact by showing a

8   materialization of a disclosed risk.  Would you agree

9   with me you'd have to show not only that the risk was

10  previously disclosed, but that it was sufficiently

11  disclosed?

12      A.    Okay.  Can you repeat the question,

13  please?

14      Q.    To negate price impact by showing

15  materialization of a risk that was previously

16  disclosed, wouldn't you have to show not only the

17  risk was previously disclosed, but that it was

18  sufficiently disclosed?

19          MR. BLOCK:  Objection to form.

20          THE WITNESS:  I think that misstates my

21  testimony in the previous case, and certainly

22  misstates my opinions in this report.

Page 123

1           What I did not do in the previous

2   report, because it was not necessary to do a

3   forensic accounting exercise and say every

4   dollar of loss Freddie Mac disclosed on

5   November 20th, by some presumably subjective

6   opinion, was due to previously existing

7   disclosed risk.

8       My opinion in the last case was based on

9   ruling out the possibility that materialization

10  of disclosed -- undisclosed risk had anything to

11  do with price drop on November 20th.  And I

12  stand by that testimony.

13          And what my report does now is we are

14  past class certification stage.  I'm not

15  addressing price impact per se.  Not that

16  anything in my report is in any way, shape, or

17  form inconsistent with my past report.  My

18  assignment right now, if you look at the scope

19  of my report, is to provide loss causation

20  analysis.  What caused the price impact?

21      That was not within the scope of my

22  previous report.  I wasn't asked, nor do I

Page 124

1   understand it would be permitted at class

2   certification stage, to answer questions as to

3   what then caused the price drop.

4       I only said there is no price impact

5   because it could be what the plaintiff alleged.

6   And now, my assignment is -- and I have

7   provided -- loss causation analysis, which

8   answers the question, well, then, what did cause

9   the price drop to the extent you can attribute

10  price drop in a marketplace where there's been

11  no demonstration of market efficiency.  But that

12  is -- while important aside, that is a caveat

13  that I want to note.

14  BY MR. MARKOVITS:

15      Q.    Right.  Just so we're clear, Doctor.

16  You're not providing an opinion on the sufficiencies

17  -- the sufficiency of the prior disclosures by

18  Freddie Mac in this case?

19      A.    Can you clarify what you mean by

20  "sufficiency of prior disclosures"?

21      Q.    Yes.  Suppose -- let's take this

22  example.  Suppose there's significant credit risk



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
125–128

Page 125

1   that is undisclosed, and Freddie Mac, somewhere in a
2   financial statement in a footnote, says, "We may face
3   some credit risk." Courts and a jury would probably
4   say that's an insufficient disclosure to overcome a
5   material misrepresentation or omission relating to
6   the credit risk you face, that classic example that
7   you're coming up on the Grand Canyon as opposed to a
8   small ditch.
9          So the question I have is:  Are you
10  opining on the sufficiency of Freddie Mac's
11  disclosures with regard to the various allegations,
12  the credit risk, the underwriting, the fraud
13  detection, the capital position, the loan analysis
14  software?
15         Are you providing any opinion as to the
16  sufficiency of any prior disclosures that were made
17  by Freddie Mac with regard to those issues?
18         MR. BLOCK:  Objection to form.
19         THE WITNESS:  So the way you phrase the
20      question, and the way you defined sufficiency,
21      you're talking about a determination of facts
22      that are for the fact finders in this case to

Page 126

1   conclude, and I'm not offering any legal
2   opinions in this case.
3          But what I am doing is providing
4   evidence that, based upon objective data, based
5   on objective understanding of what market knew
6   getting into November 20th, what market learned
7   on November 20th, how market interpreted the
8   announcement of November 20th, there is no
9   evidence that any of the alleged previously
10  undisclosed risk caused the plaintiff's loss, as
11  alleged by plaintiff based on the price drop on
12  November 20th.
13  BY MR. MARKOVITS:
14  Q.    All right.  Let's talk about your
15  opinion as it relates to the review of the analyst
16  reports and other market information.
17         What was your methodology in addressing
18  either price impact or loss causation by review of
19  the 317 analyst reports you cited in Appendix 2?
20  A.    So my methodology in that regard was the
21  same methodology that any financial economist doing a
22  loss causation analysis would follow.  Namely, review

Page 127

1   all the information that was known to investors
2   getting into November 20th.  And in light of that
3   information, look at the event of November 20th and
4   conclude from a financial economics point of view
5   whether there is any loss causation or whether or not
6   alleged disclosure deficiencies were economically
7   significant.
8          And analyst reports, and along with
9   firm's financials, along with market data, along with
10  testimony of some of the officers to the extent I
11  reviewed it, all of them, taken together, led me to
12  the conclusions I expressed in this report.
13  Q.    So getting back to the analyst reports,
14  what were you looking for in your review the analyst
15  reports to determine whether OPERS allegations were
16  reflected in those reports?
17  A.    So I was seeing if whether, consistent
18  with tax allegations, was there any evidence in
19  contemporaneous analyst reports, including from
20  plaintiff's expert, Mr. Shapiro, that said, "Wow.  We
21  learned there was chockfull of undisclosed subprime
22  that explains these losses," or "They were chock-full

Page 128

1   of Alt-A or other high-risk loans that was not
2   previously disclosed," or that somehow Freddie
3   shocked the market about its capital position in a
4   way that would be a surprise to anyone, including
5   Mr. Shapiro, who was looking at companies'
6   disclosures prior to that date.
7          Mr. Shapiro, himself, forecasted in his
8   October 24 report that Freddie Mac, by end of the
9   third quarter, would not have capital cushion over
10  and above OFHEO's 30 percent surplus capital mandate.
11  Before November 20th, he forecasted that.
12         And there was no surprise, contrary to
13  his testimony now that he expressed in his report on
14  November 20th or any of the subsequent reports
15  through May of 2008, that said, "Wow.  I excepted
16  losses on November 20th, but I didn't expect future
17  losses were going to be forecasted."
18         And if you look at the indicators of
19  credit risk between September 30th, 2007 which was
20  the end of 3Q, which was announced on November 20th,
21  and November 20th, when that announcement took place,
22  almost two months had passed into the fourth quarter



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
129—132

Page 129

1  which had not yet been announced, anybody looking at
2  what was happening to ADX spreads, what was
3  happening to option adjusted spreads, what was
4  happening to delinquencies, what were new
5  developments disclosed by Freddie Mac on increased
6  delinquency rates, and in particular on 2006 and 2007
7  mortgages, et cetera et cetera, that there wouldn't
8  be further losses beyond third quarter.
9        So those are the kind of things that I
10  looked at, and that is my methodology.
11        Q.    Well, let's take writing as an
12  example.  What would you look for in an analyst
13  report to determine whether it reflected OFHEO's
14  allegations regarding Freddie Mac's
15  misrepresentations or omissions regarding
16  underwriting?
17        A.    Well, if the analysts were somehow
18  surprised that Freddie Mac was buying loans that had
19  not originally been run-through its LP model, and
20  that would have been totally illogical inference
21  based on what how market participants knew and how
22  the market worked.  And this was a big market

Page 130

1  involving millions of loans, and analysts, such as
2  Mr. Shapiro, who covered the other mortgage
3  companies.
4        I see it -- I see the fact that none of
5  the analysts asked any questions about OFHEO's
6  allegations about reported underwriting defects as an
7  indication that there were no revelations of
8  underwriting defects on that day, as alleged by
9  OPERS.
10        Q.    So let me ask you this:  Were you
11  looking for, essentially, a mirror of the exact
12  allegations in the Third Amended Complaint?
13        A.    No.  What I was looking for was --
14        Q.    Okay.  Then "no" is fine.
15        Were you looking just for the topic?  If
16  an analyst mentioned underwriting, would that be
17  sufficient in your view, or no?
18        A.    I don't know how to meaningfully answer
19  that question as posed, Counsel.  If something was
20  important and surprising to the market, the analyst
21  community is not known for being shy.  You would have
22  expected that to show up in the analyst reports, on

Page 131

1  the earnings calls.
2        Mr. Shapiro was very concerned that
3  capital constraints, if Freddie is not able to cap
4  the market, could hinder its growth opportunities.
5  And he mentioned that repeatedly on November 20th and
6  after November 20th, but he didn't once mention --
7        Q.    But --
8        A.    Let me finish, Counsel.
9        Q.    Sure.
10        A.    He didn't once mention that there was
11  any information that he or investment companies
12  learned on November 20th that had to do with any
13  purported underlying defects.  And he's still not
14  produced one iota of evidence saying that there were,
15  in fact, any underwriting defects, period.
16        All that we've seen are allegations
17  that, based on all the review I've done, have no
18  foundation in facts.
19        Q.    All right.  Did you review the OFHEO
20  report with regard to what they found on their review
21  of Freddie Mac's underwriting during the relevant
22  period?

Page 132

1        A.    Would you like me to point to what
2  report and what section?
3        Q.    Did you review the OFHEO -- just answer,
4  did you review the OFHEO report that related to
5  Freddie Mac's underwriting during the relevant
6  period?
7        MR. BLOCK:  Objection to form.
8        THE WITNESS:  If I recall correctly,
9  that was one of the documents cited by
10  Mr. Shapiro, and yes, I did review it.
11  BY MR. MARKOVITS:
12        Q.    Did you review a PricewaterhouseCoopers
13  report after FHFA took over as conservator with
14  regard to Freddie Mac's underwriting during the
15  relevant period?
16        A.    No.
17        Q.    Do you know whether either of those
18  reports addressed deficiencies in Freddie Mac's
19  underwriting during the relevant period?
20        A.    I can speak to the OFHEO report.  I
21  can't speak to the PricewaterhouseCoopers report that
22  you've mentioned because I have not seen it.



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
133—136

Page 133

1    Q.    Okay.  What is your understanding with
2  regards to the OFHEO report?
3    A.    So my understanding is a regulator,
4  especially concerned with developing credit risk in
5  the marketplace, but even more generally, would
6  always tell financial companies they examine, "You
7  can improve further here.  You can improve further
8  there.  You can do this better."  And I've not seen
9  any objective evidence saying that Freddie Mac
10  followed underwriting practices that would constitute
11  previously undisclosed risk that would not be based
12  on hindsight, but based on what was contemporaneous
13  evidence.
14    Q.    Let me turn the question to the issue of
15  exposure to subprime and nontraditional mortgages.
16      Let me ask you this:  On that issue,
17  when analyst reports or news, on November 20th or
18  afterwards, addressed an increase in losses resulting
19  from subprime or nontraditional mortgages, did you
20  ignore that in determining whether or not it was
21  related to plaintiff's allegations?
22      MR. BLOCK:  Objection to form.

Page 134

1      THE WITNESS:  That was a long question
2    with a lot of predicates.  Could you please read
3    it back?
4  BY MR. MARKOVITS:
5    Q.    Let me split it up.
6      In your review of the analyst reports
7  and other news on November 20th following your
8  analysis of price impact and loss causation, did you
9  see any analyst reports or articles or other news
10  that related to the plaintiff's allegations that
11  Freddie Mac failed to appropriately disclose its
12  exposure to subprime and nontraditional loans?
13    A.    What I saw and what I quoted in my
14  report were analyst concerns that Freddie Mac's
15  previously disclosed $120 billion-odd investment in
16  AAA-rated subprime loan backed securities, while they
17  may not currently -- meaning as of November 20th --
18  lead to accounting charges, that if the market
19  deteriorated further, more severely than was
20  anticipated at that time, that those charges could
21  come and they could further pressure Freddie Mac's
22  capital position.

Page 135

1      I also saw, and I quoted in my report,
2  that some of the analysts considered Freddie Mac's
3  disclosed investment in loans with FICO score below
4  620 or 660 as being, in some heuristic sense,
5  quote-unquote, subprime like, that when you look at
6  the losses on those loans, they were much below
7  subprime loans in private market capitalizations.
8      What I saw was FHFA -- no, I'm sorry --
9  FCIC analysis that said the worst performing, worst
10  5 percent in terms of performance of agency loans had
11  better performance in terms of 6 percent default
12  rate -- or DQ rate, delinquency rate, than the best
13  5 percent among private-label security loans.
14      What I saw in FCIC report is that any
15  attempt or any allegation that, somehow, you could
16  just look at a Freddie Mac loan, and based on its
17  FICO score or some other internal designation, call
18  it subprime and say, "Aha, a lot of risk," would be
19  misplaced, because those loans performed a lot better
20  than subprime loans.
21      What I also saw in --
22    Q.    Give me one second, Doctor.  Let me stop

Page 136

1  you there for a second.  When you said --
2    A.    I want to complete my sentence, Counsel.
3  What I also saw, for Dr. Okongwu's analysis showed,
4  that the loans at issue that plaintiff categorizes as
5  subprime, that Mr. Shapiro uncritically accepts as
6  subprime, perform a lot more like prime loans than
7  subprime loans.  I'm done.
8    Q.    And when you say "performed better" --
9  I wanted to stop you there so I didn't forget, but I
10  remembered.
11      When you say "perform better," what do
12  you mean by perform better?  In terms of delinquency
13  rates?
14    A.    Yes.
15    Q.    All right.  You'd agree with me that a
16  key piece of information that hit the market on
17  November 20th, 2007 was Freddie Mac's information
18  statement supplement?
19    A.    Of course, among other pieces of
20  information.  I don't know it I would characterize
21  that one as a key per se, but yeah, it was important,
22  yes.



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
137–140

Page 137

1        MR. MARKOVITS:  Goldy, could you hand
2    out what's under Tab 1, which was previously
3    marked as Exhibit 60, and is the information
4    statement supplement dated November 20th, 2007.
5  BY MR. MARKOVITS:
6        Q.    Dr. Bajaj, if you could take a look at
7    the document that was previously marked as
8    Exhibit 60.
9            You've reviewed this document before,
10   correct?
11       A.    Yes.
12       Q.    Could you look at page 1, the last full
13   paragraph, first sentence reads:  "The credit
14   performance of subprime and Alt-A loans, as well as
15   other nontraditional mortgage products, deteriorated
16   sharply during 2007."
17           Do you see that?
18       A.    Yes.
19       Q.    And that's not limited, at least by its
20   terms, to subprime AAA tranches, correct?
21       A.    I think it's talking about the entire
22   U.S. residential mortgage market.

Page 138

1        Q.    Okay.
2        A.    As you can see in the heading above this
3    paragraph, and looking at the very first paragraph,
4    it's talking about the U.S. residential market.
5    Market continued to weaken.  Next paragraph says:
6    "The national rate of home price appreciation."  And
7    then it says:  "Other trends in residential mortgage
8    market."  And it talks about credit concerns and
9    liquidity issues, and then it talks about credit
10   performance of those loans.
11           At least as I sit here right now, I
12   don't see these being about Freddie Mac's loans.  In
13   fact, the very next section heading is about our
14   business.
15           It seems to me that management is
16   discussing the overall U.S. mortgage market in this
17   section of the report, but I'm sure you'll correct me
18   if I'm wrong.
19       Q.    No, I think you're correct there.  So
20   based on that, you wouldn't link this to OFHEO's
21   allegations?
22       A.    A link?  This is not really precise

Page 139

1    enough a term from an economic perspective in talking
2    about loss causation analysis, but this is not --
3        Q.    Well, how can you determine -- let's
4    suppose this were directly related to Freddie Mac.
5            What would you use to determine whether
6    this could be viewed by a financial economist as a
7    recognition of a materialization of an unclosed risk
8    regarding subprime and nontraditional mortgages?
9        A.    First of all, I note the counterfactual
10   nature of the assumption you're asking me to make.
11   This did not pertain to Freddie Mac.
12       Q.    Right.
13       A.    Second, for this to be evidence that
14   would be relevant to loss causation analysis by a
15   financial economist, it would have to be about
16   Freddie Mac.  It would have to be tied to risk that
17   Freddie Mac allegedly did not disclose.  You would
18   have to rule out that Freddie Mac's extensive
19   disclosures about exposure to subprime loans,
20   exposure to loans that some people may define as
21   subprime loans, about other kind of relatively more
22   risky products that were larger part of market share

Page 140

1    in 2006 and 2007, such as the IO loans that Freddie
2    Mac disclosed, such as the option-arm loans that
3    Freddie Mac disclosed, that it referred to none of
4    those known risk disclosures.  It pertained to what
5    OPERS alleges to be previously undisclosed risk, and
6    it is not defendant's burden to prove that.
7            My understanding is it is plaintiff's
8    burden to prove that.  It's not enough to say, well,
9    if we assume this and we assume that, it could be
10   related to something.
11       Q.    I understand that.  We've been through
12   this.  I just want to clarify because there's two
13   different approaches that I want to understand which
14   one you're taking.  You may be taking both.
15           It appeared to me in your last report,
16   prior report, 2017, that the focus -- your price
17   impact focus was on the analysts didn't react --
18   there was no connection -- there was no connection
19   between the allegations and the -- what the analysts
20   talked about on November 20th or afterwards, and,
21   therefore, there was no price impact.
22           Now, there's a difference between saying



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
141—144

Page 141

1  that and saying, "Yeah, plaintiff alleged that they
2  hadn't disclosed subprime and nontraditional --
3  exposure to subprime and nontraditional loans, and
4  maybe the analysts talked about it, but it was
5  previously disclosed."
6      Do you see the difference between those
7  two approaches?  Yes or no?
8      A.  You asked me a question that would
9  probably take more than a page of the transcript with
10  a lot of predicates built into it.  Ask me a narrower
11  question if you want a very focused answer.
12      Q.  All right.  Here is the narrower
13  question.
14      Are you saying that none of the news
15  that came out on November 20th, 2007, or shortly
16  thereafter, related to the plaintiff's allegations
17  regarding the insufficient disclosure of subprime and
18  nontraditional loan credit risk?
19      MR. BLOCK:  Objection to form.
20      THE WITNESS:  So I'll go back and say
21  the word "related to" is not at all
22  well-defined.  Did it talk about the same words,

Page 142

1  subprime?  Yes.  Here is what I concluded
2  earlier, and here is what my current report
3  says.
4      What I concluded earlier in my class
5  certification report on price impact analysis is
6  that plaintiffs did not show -- not only
7  plaintiffs did not show, because I understand at
8  that stage, it is defendants' burden -- I could
9  conclusively say, based on Freddie Mac's
10  previous disclosures, Freddie Mac's
11  November 20th disclosures, and market commentary
12  on November 20th, that the price drop on
13  November 20th was unrelated to plaintiff's
14  allegations about materialization off previously
15  undisclosed risk, period.
16  BY MR. MARKOVITS:
17      Q.  All right.  Fair enough.
18      A.  There is a second part.  May I?
19      Q.  Go ahead.
20      A.  What I'm saying now -- because my
21  agreement is not to do price impact analysis.  My
22  agreement is to do a loss causation analysis.  So I'm

Page 143

1  offering an affirmative opinion that based on all the
2  records evidence that I have discussed in my report,
3  there is no evidence that any of the losses that
4  plaintiff claims they suffered on November 20th as a
5  result of materialization of undisclosed risk were
6  due to plaintiffs allegations.  And furthermore,
7  there aren't even any losses.
8      Q.  All right.  Let me take it a step at a
9  time.
10      Are you saying now, for loss causation
11  purposes, that all of the risks regarding subprime
12  and nontraditional mortgages were previously
13  disclosed?  All the risks that plaintiff alleged were
14  not disclosed, were, in fact, previously disclosed?
15      A.  So as we said earlier on this morning,
16  it's not my remit to determine --
17      Q.  I thought it is your remit on loss
18  causation, Doctor?  You just said --
19      A.  If you let me complete my sentence,
20  Counsel, maybe you won't be so upset.  It's not my
21  remit to determine truth or falsity of Freddie Mac's
22  disclosures.  My remit as a financial economist is to

Page 144

1  explain whether the allegations in the Third Amended
2  Complaint caused plaintiff's losses on November 20th.
3      Q.  Let me stop you there, and I understand.
4  And here's what's confusing me.  And if it's going to
5  confuse me, I guarantee it's going to confuse the
6  jury, which is this:
7      You seem to be saying that there was no
8  loss causation because many of the risks that we
9  allege had been previously disclosed.  And what I'm
10  simply trying to nail down, Doctor, is what risks are
11  you providing in the opinion were previously
12  disclosed?
13      Are you providing an opinion that the
14  risks relating -- credit risks relating to subprime
15  and nontraditional loans were previously disclosed?
16      MR. BLOCK:  Objection to form.
17      THE WITNESS:  I think you lawyers call
18  it a compound question.  Could you break down
19  the question?
20  BY MR. MARKOVITS:
21      Q.  Are you providing an opinion that the
22  risks relating to subprime and nontraditional loans



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
145–148

Page 145

1   were disclosed prior to November 20th, 2007?
2       MR. BLOCK:  Objection to form.
3       THE WITNESS:  I'm providing an opinion
4   that there is no evidence -- plaintiffs haven't
5   met their burden to show that any of the
6   purported undisclosed risk materialized on
7   November 20th.
8       Furthermore, as an affirmative opinion,
9   I am opining that no part of the price drop on
10  November 20th that plaintiffs allege caused
11  their losses could possibly be related to their
12  allegations, because not only is there many --
13  not only is their realization of previously
14  disclosed risk on that day -- for example, one
15  and a half billion dollar loss out of $2 billion
16  loss the credit reported that day --
17  BY MR. MARKOVITS:
18      Q.    Doctor, you are far, far afield from my
19  question.  My question was very limited.  Please
20  restrict yourself to my question, if you could.  The
21  deposition will get done a little quicker.  I will
22  get back to my sick bed, and you can go home.

Page 146

1       A.    Okay.
2       Q.    So here's the question:  Are you
3   providing an opinion -- you keep talking about
4   previously disclosed risk and materialization of
5   previously disclosed risk.
6       All I'm asking is:  Are you providing an
7   opinion that the risk relating to subprime and
8   nontraditional loans were previously disclosed to the
9   extent they materialized on November 20th, 2007?
10      MR. BLOCK:  Objection to form.
11  Compound.
12      THE WITNESS:  So thank you for asking
13  the question that way.  To the extent they
14  materialized on November 20th, I am opining that
15  no part of the risk that materialized on
16  November 20th support plaintiff's allegations
17  that it was materialization of previously
18  undisclosed risk.
19  BY MR. MARKOVITS:
20      Q.    Are you opining that the risk -- are you
21  opining the credit risk associated with disclosures
22  relating to underwriting, or Freddie Mac's adherence

Page 147

1   to underwriting, to the extent they materialized on
2   November 20th, 2007, had been previously disclosed?
3       A.    I'm not seeing any evidence that there
4   were any significant risks due to Freddie Mac's
5   failure in underwriting.  Freddie Mac did not
6   underwrite loans.  It bought loans underwritten by
7   other people who provided reps and warranties to
8   Freddie Mac.
9       Q.    Are you saying that Freddie Mac's
10  failure to adhere to its underwriting standards, to
11  the extent that those risks materialized on
12  November 20th, 2007, had been previously disclosed?
13      A.    I'm saying Freddie Mac did make
14  disclosures about these purported underwriting risks.
15  I've seen no evidence that any risk related to
16  Freddie Mac's underwriting were disclosed on that day
17  that would qualify as previously undisclosed risk, as
18  alleged by the plaintiff.
19      If you're done with your train of
20  thought, I think we've been going for about an hour.
21  Whenever convenient, if we can take a little break.
22      MR. MARKOVITS:  Okay.  That's fine.

Page 148

1       THE WITNESS:  Thank you.
2       (Brief recess.)
3       MR. MARKOVITS:  Back on the record.
4   BY MR. MARKOVITS:
5       Q.    Dr. Bajaj, can you look at page 2 of
6   what was previously marked as Exhibit 60 in the
7   information statement.  And if you look at the fourth
8   paragraph up that begins on September 30th, 2007,
9   there's a sentence sort of right in the middle of
10  that paragraph that says:
11      "While market conditions provided
12  favorable investment opportunities during the three
13  months ending September 30, 2007, by the end of
14  September 2007, we did not take full advantage of
15  these opportunities given our capital position."
16      Do you see that sentence?
17      A.    Yes.
18      Q.    Did you consider that sentence as
19  linking the negative news announced on that day to
20  OFHEO's allegations that Freddie Mac misrepresented
21  the strength of its capital position?
22      A.    No.  It was forecasted by analysts,



Page 149

1 including Mr. Shapiro, that with bidding off its
2 reserves and taking on credit losses, given the
3 market conditions, that Freddie Mac would be bumping
4 up on its 30 percent surplus OFHEO capital
5 requirement.  And there was commentary, including by
6 Mr. Shapiro, that OFHEO should simply take away that
7 30 percent surplus capital requirement or give relief
8 on that so Freddie Mac could take advantage of future
9 opportunities.  And Freddie Mac never told.  Its
10 capital was known.  It provided monthly disclosures
11 of its activities from where Mr. Shapiro, for
12 example, picked up that Freddie Mac was capital
13 constrained and sold some of its retained portfolio
14 in his October 24th announcement.
15      And Freddie Mac never told the investing
16 public that regardless of how bad the market gets and
17 how much losses we have, we'll be able to have enough
18 capital to continue to increase the size of our
19 balance sheet.  So I don't see how it is related to
20 plaintiff's allegations.
21      Q.    Is it your contention that the market
22 understood that in the three quarters ending

Page 150

1 September 30th, 2007 that Freddie Mac didn't have
2 sufficient capital to take advantage of market
3 opportunities?
4      A.    The market understood that that could
5 happen.  In that sense, it was a disclosed risk which
6 did materialize, and Mr. Shapiro actually predicted,
7 before Freddie Mac had announced, that that risk had
8 materialized.
9      Q.    This is one of the situations where I
10 just want to be clear.
11      So you're not saying this statement is
12 not related to plaintiff's allegations.
13      You're saying that this is one of those
14 situations where to the extent a risk materialized,
15 it had been previously disclosed?
16      A.    So, Counsel, you keep using the words
17 "related to."  We are all children of Adam and Eve
18 according to Biblical story.  We are all related to
19 each other.  To an economist, that's not sufficiently
20 precise.  So maybe you can --
21      Q.    Well, that's what I'm trying to
22 understand, because you seem to be talking in

Page 151

1 circles, Doctor.
2      What is sufficiently precise?  How do
3 you relate plaintiff's allegations?  What does it
4 take?  Would it take Freddie Mac making a corrective
5 disclosure on November 20th and saying, "By the way,
6 we misrepresented the strength of our capital
7 position," or is the fact that it disclosed that its
8 capital position was not strong sufficient?
9      As a financial economist, you tell me
10 what are you looking for to connect the allegations
11 to what is being said on November 20th, 2007?
12      MR. GOLDFARB:  Objection.
13      THE WITNESS:  Could you read back the
14 question, please?
15 BY MR. MARKOVITS:
16      Q.    You tell me.  Let's take it with regard
17 to capital.  You understand what plaintiff's
18 allegations are:  That Freddie Mac misrepresented the
19 strength of its capital position.
20      Other than saying "related," what
21 words -- how specific do you have to be as a
22 financial economist to say that that was an

Page 152

1 undisclosed risk that materialized on November 20th,
2 2007?
3      What in this document would Freddie Mac
4 have to say to link the allegations to the losses?
5      A.    So, Counsel, you didn't engage me to
6 make the plaintiff's case.  I don't think you would
7 have been happy with my opinions if you had.
8 Regardless --
9      Q.    Well, I think if we -- go ahead.
10      A.    I am sorry.  That's not fair.
11      Q.    No, I apologize.  That's not fair to
12 you, Doctor.  Go ahead.
13      A.    Yeah.  Okay.  That being said, if
14 Freddie Mac had said to the market, "We will have
15 sufficient capital, that without OFHEO providing us
16 additional relief to ride out a once in a lifetime
17 severe decline in home prices, freezing of liquidity
18 in the capital market, vagaries of GAAP accounting
19 that made us record one and a half billion dollars
20 impairment to capital," while ignoring an equal gain
21 realized on hedges on the other side of that interest
22 rate movement, so what did Freddie disclose



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
153—156

Page 153

1  previously that its statement that we no longer have
2  a cushion over and above OFHEO's 30 percent capital
3  requirement -- what is it that it said that amounted
4  to realization of previously disclosed risk?  You
5  tell me.
6          Everything is related to everything in
7  that vague sense of the word.  What -- where is the
8  misrepresentation that was corrected and it's the
9  TAC.  It's your complaint, Third Amended Complaint
10  that says market learned the truth on that day about
11  Freddie Mac's capital position.
12          Whereas, the reality is, we know your
13  expert, Mr. Shapiro, predicted it before that date.
14  That other people predicted that there may be capital
15  constraints, unless OFHEO grants regulatory relief.
16  Freddie Mac timely reported that OFHEO refused to
17  grant capital relief, and then it did what it could
18  do under the circumstances to say, "Hey, we are going
19  to raise additional capital to overcome its
20  constraints."
21          How is this a basis for any allegations
22  of security fraud?

Page 154

1      Q.    Well, you still haven't answered my
2  question, Doctor.  And I can tell you how it's a
3  basis for an allegation, because you're
4  misrepresenting Mr. Shapiro's opinion and you're
5  misrepresenting the allegations.
6          Putting that aside, let's suppose that
7  in the fall of 2007 Freddie Mac's spokespeople are --
8  when the market is concerned about the turmoil in the
9  market, Freddie Mac spokespeople are saying, "We're
10  going to be able to take advantage of this," when, in
11  fact, during that third quarter, they were not able
12  to take advantage of it because they were capital
13  constrained.
14          Would that be a sufficient
15  misrepresentation in your view?
16      A.    You have to show me which --
17      Q.    No, take that as a hypothetical.  If
18  they were saying, in the fall of 2007, "We have
19  strong capital position, and this is a situation
20  where our competitors may be getting weaker, but
21  we're getting electronic, and we're going to be able
22  to take advantage of marketplace opportunities,"

Page 155

1  when, in fact, as was revealed on November 20th,
2  2007, they weren't able to take advantage of market
3  opportunities.
4          Would that be a sufficient link in your
5  view?
6      A.    No.  Because in your hypothetical,
7  you're not telling me what Freddie Mac's officers
8  exactly told the market on what date.  And they
9  didn't say that, "Regardless of losses, we'll have
10  enough capital."  And seven trading days later, they
11  solved that problem.  So how did they misrepresent?
12      Q.    Those are two -- we'll get that.  Those
13  are two different issues on whether they
14  misrepresented something to cause them to be capital
15  constrained and then, by fortuity, seven days later
16  in a separate transaction, they were able to infuse
17  capital.  Those are two separate incidents, but we
18  can get to that later.
19          My question now simply -- and I
20  understand your answer, you're saying no.  That if
21  people were saying in the fall of 2007, that our
22  competitors are getting weaker and we're growing

Page 156

1  stronger, and that this is an opportunity for us,
2  when, in fact, it wasn't an opportunity given their
3  capital constraints, known to them but unknown to the
4  public at the time, you're saying that's not a
5  sufficient link?
6      A.    It could be a sufficient link if that
7  statement said that there may be a few days while we
8  are in the process of raising our capital, that we
9  may not have enough capital.  What the statements
10  that you mentioned in your hypothetical that "our
11  relative position was getting strong," was that
12  statement about over the coming year, over the coming
13  three years, over the coming three months?  You have
14  to give me a proper hypothetical, not try to force it
15  out if me or a yes-or-no answer to some misleading
16  hypothetical.
17      Q.    No, that's fine.  If that's the answer
18  you want to give, that's fine.
19          All right.  Let's look at page 4.  The
20  second paragraph, the second sentence says:  "The
21  increase in these delinquency transition rates
22  compared to our historical experience has been



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
157–160

Page 157

1  progressively worse for mortgage loans originated in
2  2005 through 2007.  We believe this trend is, in
3  part, due to the increase of nontraditional mortgage
4  loans, such as interest-only mortgages, as well as
5  increase in total loan-to-value or LTV ratios for
6  mortgage loans originated during these years."
7      Did I read that correctly?
8    A.  Yes.
9    Q.    Did you consider this as linking the
10  negative news announced on that day to OFHEO's
11  allegations relating to exposure to subprime and
12  nontraditional loans?
13    A.    I see no link between the statement and
14  OFHEO's allegations in this case, and I'm happy to
15  explain.
16    Q.    All right.  Go ahead.
17    A.    Okay.  So look at the sentences that --
18    Q.    Sorry.  Go ahead.
19    A.    Look at the first sentence in this
20  paragraph.  "For nine months ended September 30th,
21  2007, our single-family, credit guaranty portfolio
22  continued to experience increase in the rate at which

Page 158

1  loans transition from delinquency to foreclosure."
2      They had been saying in the speeches
3  leading up to September 30th, in earnings calls
4  leading up to September 30th, there were market
5  reported statistics that, even without any Freddie
6  Mac statements, indicated that for loans -- that
7  there was an increase in the rate at which loans
8  transitioned from delinquency to foreclosure.
9      There is nothing in this statement that
10  is inconsistent with their prior disclosures, with
11  the market knowledge, et cetera.
12      Second sentence:  "The increase in these
13  delinquency transition rates, compared to historical
14  experience, has been progressively worse for mortgage
15  loans originated in 2005 through 2007."
16      Again, they have been telling people
17  that recent vintages were more risky.  The market
18  knew recent vintages were more risky.  Analysts
19  understood it and wrote on the fact that recent
20  vintages were more risky.  And Freddie Mac, in its
21  prior disclosures, was breaking out in 2006 and
22  2005 -- and I don't remember whether even -- I don't

Page 159

1  remember about 2005, but 2006 and 2007 vintages --
2  showing that those vintages riskier.
3      So there is no wrongful disclosure that
4  is cured by this statement, which appears to be
5  truthful or consistent with the data and the facts as
6  known to the market.
7      Third sentence:  "We believe this trend
8  is, in part, due to increase of nontraditional
9  mortgage loans, such as interest-only mortgages, as
10  well as increase in loan-to-value ratios for mortgage
11  loans originated during these years."
12      They disclosed their increasing
13  participation in interest-only mortgages.  If I
14  recall correctly, they went from being 2 percent of
15  Freddie Mac's guaranteed portfolio to 9 percent of
16  Freddie Mac's guaranteed portfolio by September 30th,
17  and they reported all the increases in between
18  leading up to September 2007.
19      They did talk about, in various
20  speeches, in various earnings calls, that
21  loan-to-value ratios for more recent vintages were
22  higher, that recent vintages had more so-called

Page 160

1  nontraditional mortgage loans.
2      So there is no previously hidden truth
3  that is being revealed by this sentence.
4    Q.    Let me stop you there, Doctor.  So what
5  you're saying here is not that there's not
6  necessarily a link to plaintiff's allegations, but to
7  the extent there is any link, this has been
8  previously disclosed.  This is not undisclosed
9  material risk.  It's a previously disclosed material
10  risk, correct?
11    A.    Correct.
12    Q.    All right.  Apart from the analyst
13  reports, Appendix 2 has a list of news articles, and
14  I assume you read all those news articles, I believe
15  you indicated earlier?
16    A.    Yes.
17    Q.    How were those news articles chosen?
18    A.    So, Counsel, as I sit here right now, I
19  can give you my best answer, and I will correct it in
20  the transcript if my memory is not precise enough.
21    Q.    All right.
22    A.    My understanding is that we picked news



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
161—164

Page 161

1  articles that pertain to the topics we were
2  discussing that seem to be non-duplicative.
3  Sometimes you will have ten risk articles, each one
4  of them saying the very same thing.  Or sometimes
5  there will be four versions of, say, a Bloomberg news
6  article that will be time-stamped revised then,
7  revised at this time stamp, revised at that time
8  stamp.
9       So to the best of my recollection, we
10  avoided dumping into the record articles that did not
11  incrementally provide new information, and we tried
12  to be comprehensive in covering articles that talked
13  about the topics that were being discussed in the
14  report, and they were cited throughout the report.
15       MR. MARKOVITS:  Goldy, if you can hand
16  out the fifth tab -- the document at the fifth
17  tab.  And I think it's going to be Exhibit 453.
18       [Exhibit 453, New York Times article
19  titled "Loan Crisis Entangles Freddie Mac," was
20  marked for identification.]
21  BY MR. MARKOVITS:
22    Q.    Doctor, you have Exhibit 453 in front of

Page 162

1  you?
2    A.    Yes, I do.
3    Q.    Do you see it's a New York Times article
4  titled "Loan Crisis Entangles Freddie Mac"?
5    A.    Yes.
6    Q.    And do you see in the third paragraph,
7  it says:
8       "The company has been battered by a
9  rising wave of foreclosures tied to subprime mortgage
10  defaults, and it is, quote, seriously considering,
11  unquote, cutting its stock dividend"?
12    A.    Yes.
13    Q.    And this is dated November 21st, 2007?
14    A.    So it says, yes.
15    Q.    Do you know why this article wasn't
16  included in the list of the news articles you
17  reviewed?
18    A.    Give me a minute or two to review this.
19       I reviewed it now, and I'm happy to
20  answer your questions.
21    Q.    Do you know why this article is not
22  included in your list of news articles you reviewed?

Page 163

1    A.    Every paragraph in this article is
2  duplicative of what Freddie Mac announced the
3  previous day, or known facts.  There is no
4  information content in this article.
5    Q.    Where it says in the fifth paragraph:
6  Quote, "But yesterday's earnings report showed that
7  even the gold standard of lending agencies was not
8  immune to the toxic subprime securities that have
9  infected much of the market," end quote.
10       Do you see that?
11    A.    Yes, I do.
12    Q.    Would you agree that that discussion of
13  subprime relates to OFHEO's allegations regarding
14  subprime and nontraditional loans?
15    A.    Again, you continue to pose questions
16  using the words "relate to," which I don't know if
17  you mean to be deliberately that imprecise, or we can
18  just stipulate to the fact that when you use the
19  words "relate to," it does not mean it actually
20  revealed anything economically significant and
21  previously unknown pertaining to OFHEO's allegations,
22  because that was the filter that I would use as a

Page 164

1  financial economist.
2    Q.    Would you agree that this appears to
3  indicate -- at least as with regard to Mr. Greenbaum
4  of the New York Times -- a view that the
5  November 20th, 2007 earnings report of Freddie Mac
6  showed that the loss was, in his view, due to the,
7  quote, "toxic subprime securities that have infected
8  much of the market," end quote?
9    A.    No, it does not.  Let's go back to what
10  we were looking at in Exhibit 60.  I think you would
11  remember the language we discussed under market
12  overview, where Freddie Mac is discussing how trends
13  in the residential market that were particularly
14  acute for subprime market, that precipitated the
15  liquidity crisis, that resulted in widening of OAS
16  spreads, that resulted in Freddie taking increasing
17  losses, none of that has necessarily anything to do
18  with OFHEO's allegations in the complaint.
19       This is a journalist writing in layman's
20  terms what Freddie Mac announced the previous day.
21  This is not anything new, not anything economically
22  significant, and not a revelation that confirms



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
165–168

Page 165

1  OFHEO's allegations in this case.

2      Q.    Isn't this a journalist who is analyzing

3  Freddie Mac, presenting a view to the market that the

4  toxic subprime securities were a significant reason

5  for the losses that were announced in the earnings

6  report on November 20th?

7      A.    It doesn't say that at all.  When you

8  look at the paragraph that you're asking me to agree

9  with you on, it says:

10         "But yesterday's earnings report showed

11  that even the gold standard of lending agencies was

12  not immune to the toxic subprime securities that have

13  infected much of the market."

14         So causation chain here is, subprime

15  market, tightening liquidity, particularly starting

16  August 9th, raising TED spread, raising OAS spread,

17  creating declining marks on ABX.  And all of that,

18  even due to worsening economy, increasing delinquency

19  rates on prime loans -- all of those affected Freddie

20  Mac.

21         This paragraph does not say that

22  Freddie Mac was hiding chock-full of subprime loans

Page 166

1  from the investing public and the market learned

2  about them yesterday.

3      Q.    All right.

4         MR. MARKOVITS:  Goldy, could you hand

5  out Tab 4, and we'll mark it as Exhibit 454.

6         [Exhibit 454, New York Times article

7  titled "Floyd Norris, From Virtuous Circle to

8  Vicious Credit Cycle," was marked for

9  identification.]

10  BY MR. MARKOVITS:

11      Q.    Dr. Bajaj, do you have Exhibit 454?

12      A.    Yes, I do.  I'd like a minute to review

13  it, please.

14      Q.    Sure.

15      A.    Okay.  I read the article.

16      Q.    Exhibit 454 is a New York Times article

17  dated November 22nd, 2007.  Title was, "Floyd Norris,

18  From Virtuous Circle to Vicious Credit Cycle."

19      A.    Actually, so the record is clear, it

20  says at the end:  "A version of this article appears

21  in print in the International Herald Tribune."  I

22  don't know if it appeared before then or after then.

Page 167

1  And not that I know it matters, but I just wanted to

2  be clear.

3      Q.    Is this one of the articles that you

4  have listed in your report?

5      A.    I'd have to check.

6      Q.    Assuming it's not, do you have any

7  reason for why it would not be?

8      A.    I didn't see anything in this article

9  that talks about any inadequate disclosures by

10  Freddie Mac.  It's talking about the same thing

11  Freddie Mac was talking about in the information

12  supplement, namely borrowers were defaulting on

13  loans.

14      Q.    Wait a second, Doctor.  You say you

15  didn't see anything in here that talks about

16  inadequate disclosures.

17         Are you saying in the other 317 you cite

18  or whatever, there were discussions of inadequate

19  disclosures?

20      A.    No, I'm not saying that at all.  What I

21  said is --

22      Q.    Okay.  So let me ask you this question,

Page 168

1  Doctor.  If you go down to the fifth paragraph, there

2  is a quote:

3         Quote, "The underwriting standards

4  declined," end quote, "said Anthony Piszel, chief

5  financial officer of Freddie Mac," quote, "that was

6  across the board," end quote.

7         Do you see that?

8      A.    Yes, I do.

9      Q.    Would you agree that a decline in

10  underwriting standards provides support for

11  plaintiff's allegation that OPERS misrepresented its

12  adherence to its underwriting standards?

13      A.    Not at all.  When you look at the

14  sentence that you read, the sentence says:  "The

15  underwriting standards declined," that was across the

16  board.  It appears to me, Mr. Piszel is talking about

17  the vicious cycle that industrywide underwriting

18  standards declined.

19         That when industrywide underwriting

20  standards decline, most acutely in the subprime

21  space, that created the credit crisis that tightened

22  the spread that led to, in part, the losses.



DR. MUKESH BAJAJ                                          March 13, 2024
Ohio Public Employees vs Federal Home Loan                    169–172

Page 169

1        And what you ignore is the second and
2   third paragraph in this article, which says, how many
3   of these loans, namely loans held by Freddie Mac,
4   were subprime?  It says none, but that does not make
5   losses any less real.
6        So a balanced reading of this article
7   tells me there is nothing significant or new in this
8   article.  It is repeating what Freddie Mac announced
9   on November 20th, and it is not related to OFHEO's
10  allegations that Freddie actually hid a chock-full of
11  subprime loans or that it misrepresented its capital
12  or any of the other items in the list that we read
13  this morning about Freddie Mac's -- OFHEO's
14  allegations.
15      Q.    You don't read this article as
16  indicating that Freddie Mac's underwriting standards
17  declined?
18      A.    That's not what it says here.
19      Q.    Let's turn to the second page of the
20  article.  Look at the third paragraph up, where it
21  says:
22      "A kinder way to look at it is that

Page 170

1   competition forced the company to lower its
2   standards.  Either way, Freddie, this week, released
3   data showing how its standards eroded."
4        Would you say the statement, "Freddie,
5   this week, released data showing how its standards
6   eroded" relates to decline of its underwriting
7   standards?
8       A.    I believe this paragraph is talking
9   about the fact that, given where the market was
10  going, Freddie was investing ever larger amounts in
11  interest-only loans or other alternative mortgage
12  products, which had timely disclosed.  And whether
13  you want to characterize as that forced the company
14  to lower its standards, or Freddie was meeting the
15  market.
16       And when it says:  "Freddie, this week,
17  released data showing that its standards eroded,"
18  it's referring to data that Freddie released, which
19  had been releasing, which showed increased
20  delinquency rates, which showed worsening loan
21  quality industrywide.
22       Freddie Mac had a mission to support the

Page 171

1   market.  It supported the market.  And if the market
2   as a whole was going into a difficult period due to
3   excesses in the subprime corners of the market and
4   declining home prices, of course, Freddie Mac was not
5   immune to it, and Freddie Mac discussed it.
6       Q.    Well, that's one point of view.
7       Your report discusses at various points
8   what you describe as turmoil in the mortgage and
9   financial markets, particularly after August 2007,
10  correct?
11      A.    Yes.
12      Q.    In your view, did that turmoil benefit
13  Freddie Mac compared to its non-GSE competitors?
14      MR. BLOCK:  Objection to form.
15      THE WITNESS:  In the long run, it did.
16  But in the short run, it created a lot of
17  headwinds.  The fact that Freddie Mac had to eat
18  up its regulatory capital, building its
19  reserves, recognizing market to market losses,
20  marking down values of illiquid securities where
21  Freddie Mac always followed marks obtained from
22  the market, even if they were artificially

Page 172

1   depressed in that illiquid market environment,
2   those factors, of course, adversely affected
3   Freddie Mac.
4        But because a lot of Freddie Mac's
5   competitors that were doing private-label
6   securitizations were falling by the wayside,
7   that created opportunities for Freddie Mac to
8   increase its market share which it did.
9        One implication of the credit turmoil
10  was widening of the OAS spreads.  Widening of
11  OAS spreads works in two ways.  In the short
12  run, it forces Freddie Mac to take on accounting
13  losses in its marked to market calculations, but
14  OAS spread is also a measure of how much lower
15  interest rate investors are willing to buy
16  Freddie Mac's securities at relative to a
17  benchmark of LIBOR, and as that spread gets
18  larger, that allows Freddie Mac to make more
19  money on its business going forward.
20       So credit turmoil hurt Freddie Mac in
21  the short run, but as --
22

DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
173—176

Page 173

1  BY MR. MARKOVITS:

2  Q.    What is the short run, Doctor?

3  A.    Meaning the losses it had to recognize

4  in the third quarter.  But as the market analysts,

5  including Mr. Shapiro, recognized, it also created

6  opportunities for Freddie Mac to use its market power

7  and increase market share, to increase its GTs,

8  guarantee fees, to increase its margins.  And that

9  means with less competition and higher margins,

10  Freddie Mac would benefit -- was expected to benefit

11  in the long run.

12  Q.    But between August of 2007 and

13  November 20th of 2007, did the turmoil benefit

14  Freddie Mac compared to its non-GSE competitors?

15  A.    Well, given the sorry state of non-GSE

16  competitors, I would say yes, it did.  Because

17  Freddie Mac -- you see, Freddie Mac buys loans at

18  prices it has to pay given competition in the market,

19  and that's certainly true in realtime on bulk

20  business.  That's what's called spot pricing of risk.

21      If there are less -- fewer people

22  bidding on loans and they are sharing their bids,

Page 174

1  they are bidding lower amounts on loans.  And that

2  allows GSE to buy those loans cheaper, other things

3  being equal.  And in that sense --

4  Q.    Do you know whether that was the case

5  with regard to Freddie from August of 2007 through

6  November 20th, 2007?  Were they able to buy loans

7  cheaper?

8  A.    Why would that not be the case?

9  Q.    I'm asking you -- I'm not asking whether

10  it would or wouldn't be the case.  I'm asking:  Do

11  you know whether or not that was the case?

12      Have you done any factual inquiry, not

13  just assuming or guessing, but do you know one way or

14  another whether, during that period of time, Freddie

15  Mac was able to buy loans more cheaply?

16  A.    I didn't assume or guess.  I read the

17  market commentary, including from your expert that so

18  indicated.  Now, I didn't do a forensic exercise of

19  looking at loans Freddie Mac per shares in the

20  marketplace during that few-months period and

21  compared their margins to what it was purchasing when

22  Freddie Mac was under a lot of competitive pressure

Page 175

1  and had to offer aggressive bids.

2      If this is a good time, maybe we can

3  take a little break.  Or if you have another question

4  or two, I'm happy to break then.

5  Q.    Just another question or two.

6  A.    Okay.

7  Q.    Did the turmoil after August 2007,

8  before November 20th, 2007, cause greater risk for

9  Freddie Mac compared to its non-GSE competitors?

10  A.    I'm sorry.  I told you I'm good to go

11  for a question or two, but I did have difficulty

12  focusing on your question, so I'm going to ask you to

13  repeat it, please.

14  Q.    Did the turmoil that occurred between

15  August 2007 and November 20th, 2007 cause greater

16  risk for Freddie Mac compared to its non-GSE

17  competitors?

18  A.    The answer is yes and no.  To the extent

19  it caused Freddie Mac to recognize losses, to not be

20  able to have sufficient surplus capital, to the

21  extent it led to increased credit charge to all kinds

22  of loans, including prime loans, those factors hurt

Page 176

1  Freddie Mac or GSEs more generally.  I can't speak to

2  whether they hurt GSEs more than its competitors.

3      But in the long run, that turmoil also

4  created opportunities for Freddie Mac and GSEs,

5  generally, to increase their market share, to

6  increase their margins, even though that happens with

7  a little bit of a lag, to benefit from that turmoil,

8  and the disappearance of competition from the

9  marketplace.

10      Of course, as things progressed in 2008,

11  what appeared to be the worst crisis in a generation

12  until then, it got even worse.  And, you know, that,

13  of course, affected everybody, including GSEs.

14      And the market always knew that Freddie

15  Mac had a highly leveraged business model on 30 to

16  $40 billion of capital.  It had a $2 trillion balance

17  sheet.  So it was not a secret to the market that

18  Freddie Mac's business model was predicated on 50- to

19  70-X leverage ratio.

20      And if we get into a really severe

21  credit crisis, that would, of course, have an impact

22  on Freddie Mac.  And it was not a diversified



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
177–180

Page 177

1   company.  It was only in one line of business, that
2   is buying and guaranteeing loans and investing in
3   loans, as compared to some other financial companies
4   that had other lines of business as a
5   diversification.
6         MR. MARKOVITS:  I think that's a good
7   breakpoint.  See you back in five, ten minutes.
8         (Brief recess.)
9         MR. MARKOVITS:  Back on the record.
10  BY MR. MARKOVITS:
11     Q.    Dr. Bajaj, turning to a different topic,
12  a topic I think you want to get to and one I've heard
13  earlier today, which is this stock rebound issue.
14         You agree that Freddie Mac's stock
15  dropped on November 20th, 2007, correct?
16     A.    Yes.
17     Q.    Do you agree that was a statistically
18  significant stock drop, correct?
19     A.    Yes.
20     Q.    Can you give a brief definition of what
21  statistical significance is?
22     A.    So I'll use an analogy.  Let's say you

Page 178

1   look at a wave and you say, "Wow, that was a big
2   wave."  Well, it depends on the context.  If you are
3   in the middle of a stormy ocean, a ten-foot-high wave
4   may not be particularly big.  Whereas, if you're
5   looking at a placid lake, a ten-foot wave may be
6   really big.
7         So the concept of statistical
8   significance in this context is something of large
9   enough a magnitude that normal day-to-day variation,
10  without any specific reason, could not explain or
11  this would stand out.  So the concept of statistical
12  significance for November 29th [sic] price drop is
13  not that I did any --
14     Q.    November 20th?
15     A.    November 20th, is not that I offered an
16  event theory of that price drop, when I agreed with
17  your previous expert, Mr. Feinstein, that the price
18  drop was large enough, that it was likely
19  statistically significant.  So it's not surprising to
20  me that if you do a market model, yes, it would be
21  statistically significant.
22     Q.    I'm sorry.  Could you repeat again what

Page 179

1   the definition of statistical significance is?  Is it
2   some variation from the normal; is that correct?
3     A.    Yeah.  The common standard -- and I
4   should have completed my answer.  The common standard
5   statistician's use is if something is big enough to
6   occur without a specific reason less than 5 percent
7   of the time, then it is deemed to be statistically
8   significant.
9     Q.    Okay.  So the particular cutoff that's
10  generally used for statistical significant is less
11  than 5 percent is not statistically significant?
12     A.    The cutoff is 5 percent.  If the
13  magnitude is so large that it would be expected to
14  occur by chance alone less than 5 percent of the
15  time, then it is deemed to be statistically
16  significant.
17     Q.    Got it.  Okay.
18         Can you go to your report,
19  paragraph 188?
20         MR. BLOCK:  Page 93.
21  BY MR. MARKOVITS:
22     Q.    I'd like to ask you about the sentence

Page 180

1   that start on the second line from the bottom that
2   reads:
3         "The 25 percent price decline that
4   Fannie Mae experienced on the day that Freddie Mac
5   made the turning announcement demonstrates that most
6   of the price drop in Freddie Mac's stock price on
7   November 20th was unrelated to anything specific to
8   Freddie Mac that did not equally apply to Fannie
9   Mae," end quote.
10         Do you see that?
11     A.    Yes, I do.
12     Q.    Are you saying that the Freddie Mac
13  price drop was not company specific?
14     A.    Well, if Fannie Mae is the company most
15  similar to Freddie Mac, and the issue that was top of
16  mind for market on that day of November 20th was
17  whether these GSEs were trying, perhaps, to take
18  advantage of this market turmoil in the long run,
19  will or will not be able to raise capital at a
20  reasonable cost to take advantage of that, those
21  concerns also apply to Fannie Mae.
22         And the fact that, on November 20th,



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
181—184

Page 181

1  when Fannie Mae did not announce anything of any
2  import or anything at all, its stock also declined by
3  25 percent.  Coupled with the fact, as I say
4  elsewhere in my report, that when Freddie Mac's stock
5  price rebounded on its capital raise days, Fannie
6  Mae's stock price also rebounded.
7       Those two observations combined lead to
8  the only possible economic interpretation:  That the
9  price drop on November 20th, which recovered seven
10 trading days later, had to do with market's fears
11 that Freddie Mac will lose access to capital markets.
12 And that's why, when Freddie Mac's stock price
13 declined, so did Fannie Mae's.  And when Freddie Mac
14 was successfully able to raise capital, Fannie Mae's
15 stock price also rebounded.
16      These capital raise events did not
17 cancel out what OPERS alleges were revelations that
18 lowered the value of Freddie Mac as an economic
19 enterprise.  If there were bad loans that the market
20 learned about those days, and those loans were going
21 to lead to losses, and that was the prime determinant
22 of stock price drop on November 20th, or even if

Page 182

1  there were significant -- there were significant
2  disappointment about risks that were previously
3  disclosed but were manifested on that day, the effect
4  of those risks doesn't cancel out simply because
5  Freddie Mac raises capital.
6       If that effect had been an economically
7  significant part of the November 20th stock price
8  decline, why would that decline just disappear when
9  Freddie Mac, seven trading days later, raised
10 capital?  And why would Fannie Mae have parallel
11 stock price changes?
12      So that's the significance of looking at
13 what happened to Freddie Mac and Fannie Mae on
14 November 20th and the capital raise dates that I
15 analyze in my report.
16      Q.    Okay.  But my question was simply -- yes
17 or no -- are you saying that Freddie Mac's price drop
18 on November 20th, 2007 was not company specific?
19      A.    So it pertained to Freddie Mac, and of
20 course, it was, in that sense, company specific.  But
21 it also affected Fannie Mae.  In that sense, it was
22 not company specific, but GSE-business-model

Page 183

1  specific.  And market's concern about whether or not
2  this model would be economically viable on a
3  go-forward basis, having nothing to do with any
4  diminution in value on November 20th, that could be
5  disclosed -- that could be attributed to either
6  manifestations of previously disclosed risks, which
7  there could be many, or, as OPERS alleges,
8  realization of previously undisclosed risks.
9       The fact that the price drop disappears
10 says there is nothing to explain.  We don't need to
11 have a debate over how much of the price drop was
12 related to previously disclosed risks being realized
13 and how much of it was due to previously undisclosed
14 risks being realized, because there's nothing to
15 explain.
16      Q.    Okay.  So you're saying -- are you
17 saying that most of the price drop on November 20th,
18 2007 was common to both Freddie Mac and Fannie Mae?
19      A.    I'm saying that, but I'm saying more.
20 I'm saying not a lot of the price drop was common,
21 which your expert might say, "Aha, market learned
22 that Freddie Mac had chock-full of bad loans hidden

Page 184

1  in the drawers, and the market also bid down the
2  value of Fannie Mae because it suspected maybe Fannie
3  Mae does, too."
4       But what logical explanation would there
5  be other than what explanation I have offered?  For
6  not only Freddie Mac's stock price to recover,
7  meaning there's nothing left to explain for Freddie
8  Mac, but Fannie Mae's stock price recovering, too.
9       I think that proves -- and I don't mean
10 it in legal sense, but in an economic sense --
11 without a doubt, that no economically significant
12 part of the price drop on November 20th that OPERS
13 alleges caused its losses could be attributed to
14 either materialization of previously undisclosed
15 risks, or for that matter, materialization of
16 previously disclosed risks either.
17      Q.    Can you turn to note 272 of your report,
18 which I believe is on the next page?
19      It begins with:
20      "I did not find any Fannie Mae specific
21 news that can explain Fannie Mae's stock price drop."
22      Do you see that?



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
185—188

Page 185

1    A.    Yes.

2    Q.    So what news explained, in your view,

3  Fannie Mae's stock price drop on November 20th, 2007?

4    A.    As I just explained, the fact that

5  Fannie Mae's stock price dropped, and then when

6  Freddie Mac's stock price recovered on capital raise

7  date, so did Fannie Mae's, leads to only one logical

8  conclusion:  That Fannie Mae's stock price drop was

9  due to the same nervousness in the marketplace that

10  was not specific to Freddie Mac alone.

11        That whether or not GSEs' business model

12  would be viable because capital markets would be

13  willing to finance GSEs so they could ride out the

14  storm and they could take advantage of their

15  strengthened relative competitive position.

16    Q.    What specific announcement was made and

17  by whom that led the market to question is Fannie

18  Mae's ability to meet its regulatory capital

19  requirements?

20    A.    I did not study in detail every

21  announcement by Fannie Mae.  I looked at

22  November 20th, when, as I said, in footnote 272, the

Page 186

1  only thing I could find was Mr. Shapiro downgrading

2  both Freddie Mac and Fannie Mae.

3        And with all due respect, I don't think

4  his downgrade would lead to a 25 percent drop in

5  Fannie Mae's stock price or a 29 percent drop in

6  Freddie Mac's stock price.  And he explained his

7  reasons for those downgrades, and all of them had to

8  do with well-known issues, having no relationship to

9  alleged disclosure deficiencies.

10        But the fact that not only both the

11  stock price -- both companies' stock price dropped on

12  November 20th, both companies' stock price also

13  recovered analogously on Freddie Mac's capital raise

14  date.

15        I also present evidence in my report

16  that when you look at OAS spreads, once the capital

17  raise was completed, those OAS spreads reverted to

18  where they were prior to November 20th.

19        I also show evidence that implied

20  volatility on Freddie Mac and Fannie Mae's stock that

21  had spiked leading into November 20th -- or on

22  November 20th, also returned to its pre-November 20th

Page 187

1  level.

2        So when you look at all this evidence,

3  the only logical explanation I can think of is the

4  one I have offered.

5    Q.    Can you turn to your Appendix 4,

6  Table A1.  It's on the top, I think, of page 5 of 5.

7  Let me know when you're there.

8    A.    Appendix 4, market model description?

9        MR. BLOCK:  Table A1, right?

10        MR. MARKOVITS:  Yes.

11        THE WITNESS:  I'm on that page.

12  BY MR. MARKOVITS:

13    Q.    Okay.  Does Panel A at the top show that

14  the total drop in Freddie Mac's stock price on

15  November 20th, 2007 is 33.82 percent?

16    A.    Well, that is actually return of

17  logarithm of stock price.  Because, from a technical

18  perspective, when you run market models, because

19  stock return distributions are set to be log normal,

20  meaning the log of returns is set to be normal, and

21  regression analyses are predicated on underlying

22  return distribution being normal, what you see there

Page 188

1  is Freddie Mac's log return of 33.82.  And that's why

2  it's not the 29 percent number that we've been

3  talking about when we look at just the stock price

4  drop.  That's just a technicality.

5    Q.    Sure.  And does that Panel A also show a

6  company specific excess log return for Freddie Mac of

7  negative 18.24 percent?

8    A.    Yes.

9    Q.    And that's statistically significant at

10  the 5 percent level?

11    A.    Correct.

12    Q.    That controls for -- you did a market

13  control, it looks like, down below?

14    A.    Yes.

15    Q.    And that controls for Fannie Mae's stock

16  price movements, correct?

17    A.    Well, not in that way.  Because the way

18  a regression model works is on a particular day, you

19  look at the average relationship between return on a

20  stock and its industry component, and, therefore,

21  even though Fannie Mae returns are part of the

22  explanatory factor, it would be an incorrect



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
189–192

Page 189

1  interpretation to say that Freddie Mac's stock price
2  dropped by 18 percent over and above Fannie Mae's
3  stock price drop, as we discussed before.  Freddie
4  Mac's stock price drop was 29 percent, and Fannie
5  Mae's stock price drop was 25 percent on
6  November 20th.  So I think you can't overinterpret
7  regression results in that manner.
8      Q.   But you'd agree that the company
9  specific drop for Freddie Mac in terms of the excess
10  live return is negative 18.24 percent?
11      A.   In the technical sense, the way I
12  described and caveated, yes.
13      Q.   All right.  And then that's more than
14  half of the entire drop that occurred on that day,
15  correct?
16      A.   Well, again, you're comparing apples to
17  -- no, I take that back.
18          Are you saying 18 percent is more than
19  half of 33.8 percent?  If so, yes, your arithmetic is
20  correct.
21      Q.   Yes, that's what I was saying.  I'm glad
22  I didn't get that wrong.

Page 190

1          On your Panel A chart, you also include
2  three other dates in addition to November 20th, 2007,
3  and those are the 27th, 28th, and 30th, correct?
4      A.   Yes.
5      Q.   And the inclusion of those dates in that
6  chart is based on your opinion that the rebound of
7  the stock price through November 30th should be
8  considered, right?
9      A.   Well, I chose those dates specifically
10  because, as I described in my report, on those dates,
11  there was economically significant information about
12  Freddie Mac's capital raise attempts.  So,
13  collectively, those dates represent the rebound in
14  Freddie Mac's stock.
15          And if you look at all four days put
16  together, regardless of your previous question about
17  November 20th, over all those four days, the
18  statistical measure of excess log returns for Freddie
19  Mac was statistically insignificant when you combine
20  those four days.
21      Q.   And you said you used those additional
22  three days because there was information regarding

Page 191

1  regulatory capital; is that correct?
2      A.   No.  I describe over several paragraphs
3  in my report what the market was learning about
4  Freddie Mac's attempts to raise capital.
5          Initially, Mr. Shapiro and several
6  others feared on November 20th that new capital raise
7  was going to be very dilutive.  I think he said in
8  one of his analyst reports, he expected 20 percent
9  dilution.
10          And then as Freddie approached the
11  market, over the three dates, 27th, 28th, and 30th,
12  the market learned that there was strong appetite for
13  Freddie Mac's preferred offering, that Freddie Mac
14  could issue straight preferred stock without offering
15  any convertible offer stock which could be dilutive
16  if it were there.
17          And the preferred stock dividend, given
18  strong demand for that issue, ultimately ended up at
19  8.375 percent, which was lower than what the market
20  had feared.
21          So I do want to note here that while
22  we're talking about event studies and interpreting

Page 192

1  each day's excess returns over those four dates, I am
2  not saying that Freddie Mac's stock traded in an
3  efficient market and, hence, this event study can be
4  taken as what you would observe necessarily in an
5  informationally efficient market.
6          Either the stock was trading efficiently
7  or it was not.  If it was trading efficiently, then
8  it's clear that once you look at the capital raise
9  dates combined with November 20th, there is nothing
10  left to explain.
11          And if the stock was -- may I finish my
12  thought, please?
13          If the stock was not trading in an
14  efficient market, then it appears that November 20th
15  market price drop was an overreaction, which many
16  analysts said was probably the case.  Thank you.
17      Q.   Doctor, could you please, please,
18  please, limit your answers to my questions?  That
19  answer when well, well beyond my question.  Please
20  try to limit your answers to my questions.
21      A.   Okay.
22      Q.   Did you consider any of the other dates,



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
193—196

Page 193

1   the 21st, 22nd, 23rd, 24th, 25th, 26th, 29th, or are
2   you saying that there was no news regarding that
3   capital raise position of Freddie Mac during those
4   days?
5       A.    There was no economically significant
6   news on the dates that I did not include in my
7   regression analysis.
8       Q.    And you included November 27th, correct?
9       A.    Yes.
10      Q.    The P value on that day is 0.051?
11      A.    Yes.
12      Q.    That is not statistically significant at
13  the 5 percent level, correct?
14      A.    Well, as the table says that it's not --
15  it is significant at 10 percent level, but I'm really
16  looking at all four dates combined to capture both
17  the initial price drop and the subsequent rebound, so
18  that's why I included that date.  It's not the case
19  that you can ignore a day among a set of dates if
20  there is related information and not assess their
21  joint significance.  That is incorrect methodology.
22      Q.    But I thought that's what you just said

Page 194

1   you did with regard to the other dates in that
2   interim period.  You didn't include them because they
3   were not statistically significant?
4       A.    I didn't say that.  I say they were not
5   economically significant.  I didn't see any new
6   economic information that would be significant.
7           The way you do event studies properly
8   is, as an expert, you form a judgment on what is
9   economically significant, and then you run your
10  market model.  You don't run your market model and
11  then say, "Aha, statistical significance must be
12  something relevant."
13      Q.    So you're saying it's economically
14  appropriate to include November 27th in your
15  analysis, even though the stock reaction on that day
16  was not economically significant to the 5 percent
17  level?
18      A.    I think you meant statistically
19  significant.
20      Q.    Yes.  Thank you, Doctor.
21      A.    That is correct.  That's what I'm
22  saying.

Page 195

1       Q.    Okay.  And can you point me to support
2   in the economic literature for inclusion of a stock
3   price movement that's not statistically significant
4   in a study of this nature?
5       A.    Again, if you're asking me for an
6   academic paper as I sit here right now, I don't know
7   that I'll give you that reference.  But as a
8   financial economist who's done thousands of event
9   studies and published events studies in top finance
10  journals, it is appropriate methodology.
11          The opposite would not be appropriate,
12  is that if the market learns some information over
13  two dates and its related partial information, you
14  look at both the dates.
15          If the market says for a company, "Hey,
16  we're going to have $10 billion loss when we announce
17  our earnings," and stock price drops by 40 percent,
18  and then they announce in earnings that their loss
19  turned out to be not $10 billion, but $6 billion, and
20  the stock price goes up, there is no reasonable
21  economic justification for not looking at both of the
22  dates together to evaluate their significance.

Page 196

1           That's exactly what I did here, and I
2   think my explanation, regardless of some dense
3   academic article, makes common economic sense, I
4   hope.
5       Q.    And you're aware, I assume, that if you
6   remove the November 27th date from your analysis and
7   calculate a three-day return, the result would still
8   be a company specific statistically significant
9   decline?
10      A.    Why would I do that?
11      Q.    I'm asking:  Are you aware that if you
12  remove the November 27th date that's not
13  statistically significant, that the decline in stock
14  price overall over the three remaining dates would be
15  a statistically significant decline?
16      A.    I didn't do that.  I would never do
17  that.  It would be malpractice as a financial
18  economist to do that.  It would not be consistent
19  with my obligation to offer a fair analysis to the
20  Court.
21          And regardless of these regressions and
22  excess returns, I also provide the market cap drop on



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
197—200

Page 197

1  November 20th and the combined market cap gain on the
2  capital raise dates, and what remains is less than
3  1 percent.
4         So economically, commonsensically,
5  methodologically, I stand by what I did.  And I
6  reject any suggestion that I should have looked at
7  excluding November 27th.  I should not have, and I
8  did not do that calculation.
9      Q.    You know how to do that calculation,
10  correct?
11     A.    I know how to do a lot of things, but if
12  they're not the right thing to do, I don't do that.
13     Q.    I'm just asking you.  Answer my
14  question, please.  You know how to do the
15  calculation, correct?
16     A.    Yes, I have a computer.  I have Excel.
17  I can do calculations, yes.
18     Q.    And you would have the excess returns
19  for the 20th, 28th, and 30th, correct?
20     A.    I'm sorry.  Repeat your question?
21     Q.    Did you start the analysis by adding the
22  excess returns for November 20th, 28th, and 30?

Page 198

1      A.    No, I would not.  I would never do that.
2      Q.    I'm saying if you wanted to calculate
3  using just those three dates, you would start by
4  adding the excess returns for those three dates,
5  correct?
6         MR. BLOCK:  Why don't you take the "you"
7      out of it, then you might not have problems with
8      the question.
9         MR. MARKOVITS:  Thank you, Freddie.
10  BY MR. MARKOVITS:
11     Q.    If one wanted to calculate the excess
12  returns for those three dates combined, one would
13  first add the excess returns for those three dates,
14  correct?
15     A.    Well, if the supposed one was a
16  noneconomist lawyer, I would tell them that's totally
17  a wrong thing to do.  I suppose you can do anything.
18  You don't need me to answer that question.  You can
19  do it yourself.
20     Q.    Well, you can do it yourself, too.
21  You're an economist.  What I'm asking is:  You can do
22  the economic calculation to determine for those three

Page 199

1  days whether there's a statistically significant
2  decline if you excluded November 27th, correct?
3         You're capable of performing that
4  calculation, right?
5      A.    As I said, I'm capable of doing
6  something wrong, but I don't make it a habit to do
7  something incorrect.
8      Q.    So the answer is yes, correct?
9      A.    Yeah, I -- as I said three questions
10  ago, I can add and subtract, yes.
11     Q.    And the answer is yes.  All right.
12     A.    Okay.
13     Q.    And if you did that, do you have any
14  reason to dispute that there would still be a company
15  specific statistically significant decline using
16  those three dates?
17     A.    I don't know.  I did not do that
18  calculation, nor would I.
19     Q.    I understand that, Doctor.  If I told
20  you the T statistic was 2.36, would you agree that
21  that is statistically significant when using those
22  three dates?

Page 200

1      A.    I don't know whether it was 2.36 or
2  1.62.
3      Q.    I'm saying if I told you it was 2.36 for
4  a T statistic, you would agree that that would be
5  statistically significant, correct?
6      A.    Sir, I am a financial economist.  I --
7      Q.    Right, Doctor?  Is a T statistic of 2.36
8  statistically significant, yes or no?
9      A.    Yes, it is.
10     Q.    All right.  Thank you.
11        You also state in your opinion, in your
12  view, that the stock rebound that occurred by
13  November 30th has to be considered.  I think we've
14  heard that almost ad nauseam for the past 10,
15  15 minutes, correct?
16     A.    I don't know about ad nauseam, but yes,
17  it should be considered.
18     Q.    Fair enough.
19        And here, you're looking at ten days
20  out.  How many days out would your methodology
21  provide?
22     A.    I don't understand your question.



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
201–204

Page 201

1    Q.    Well, why didn't you look past
2    November 30th?
3    A.    There was no reason to look past
4    November 30th.  I was interested in understanding
5    which of the three potential reasons could be related
6    to stock price drop observed on November 20th.
7    Reason number one --
8    Q.    Do you know whether or not -- do you
9    know whether or not, Doctor, the stock declined after
10   November 30th for Freddie Mac?
11   A.    I don't know.  I didn't look at it.
12   There was no reason for me to look at it.
13   Q.    Are you aware of any case in which the
14   price declined from a corrected disclosure on one day
15   was offset by the price increase from a positive
16   disclosure on a different day when determining price
17   impact?
18   A.    Are you asking me about case law?
19   Q.    Yes.  Have you been involved in any
20   case, or do you know of any case, which a price
21   decline from a corrected disclosure from one day was
22   offset by a price increase from a positive disclosure

Page 202

1    on a different date when determining price impact?
2    A.    So I'm not a lawyer.  I don't pretend to
3    understand nuances of the difference between price
4    impact versus loss causation.  What I will tell
5    you --
6    Q.    I'm taking for either.  For either price
7    impact or loss causation, have you been -- let's
8    start with your involvement.
9         Have you been involved in any case where
10   you've taken the position that a price decline from a
11   corrected disclosure on one date had to be offset by
12   a price increase from a positive disclosure on a
13   subsequent date?
14   A.    Among over a hundred cases I've worked
15   on, I am certain I have.  It depends on whether the
16   two disclosure dates are related.  I gave you an
17   example.
18   Q.    Can you name one?
19   A.    Well, let me finish my answer, please,
20   Counsel.
21   Q.    All right.
22   A.    I gave you an example.

Page 203

1    Q.    The question was limited to whether
2    there were any cases.  You're not answering my
3    question, but go ahead.
4    A.    Okay.  I gave you an example.  A company
5    says on date one, we're going to have a $10 billion
6    loss.  Stock price goes down from $10 a share to,
7    say, $5 a share, 50 percent drop.  On day two, the
8    company says, "Hey, our loss is not $10 billion.
9    It's actually $4 billion."  And stock price goes up
10   on that day from $5 to $8.
11        I know of no qualified economist who
12   would say that you should not add these two dates
13   together and say that the loss announced by the
14   company led to a 20 percent and not a 50 percent
15   stock price decline.  You don't need a Ph.D. in
16   economics to reach that conclusion.
17        Now, are you asking me as I sit here
18   right now to give you, from recall, any of my
19   testimony on record where I looked at more than one
20   date together?  I'd have a hard time recalling a
21   specific case, but as I told you, I'm certain I've
22   done that because that's the right methodology, and I

Page 204

1    see it being done all the time.
2    Q.    All right.  If after this deposition you
3    can review or think of or come across any case that
4    you've been involved in where you've done this type
5    of analysis, could you let me know, please?
6    A.    Of course.  Actually, now that you
7    mentioned this, it doesn't mean there won't be other
8    examples.
9         If I recall correctly, your first expert
10   in class certification stage, Mr. Hallman, claimed
11   that even if stock price changed on a given
12   disclosure -- defective disclosure date was not
13   significant, he should add up and look at joint
14   economic significance of all the disclosure dates.
15        Your latest economic expert, Dr. Tabak,
16   often advances methodology that is predicated on the
17   very same reasoning, when he looks at a group of
18   dates when there is purportedly news versus group of
19   dates when there is no news.  That is also predicated
20   on the same reasoning, whether or not that
21   methodology is correct.
22        I will see if I can find examples, but I



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
205—208

Page 205

1 wanted to get you started by what I just described.

2    Q.    I appreciate that, although I don't

3 think those are valid comparisons, but in any case --

4 let's talk about in this case.  Not a situation where

5 you have a disclosure and then a correction, but

6 here, what you're saying is there was a disclosure of

7 a large loss, which -- and an indication of capital

8 constraints, in part, due to those large losses,

9 correct?

10    A.    Okay.

11    Q.    And then on -- as of November 20th --

12 and then what you're saying is, because they were

13 able to raise capital and the stock price went up,

14 are you saying there's no price impact, there's,

15 therefore, no loss causation, or what?

16    A.    So first of all, I'm saying there is no

17 loss causation.

18    Q.    Okay.

19    A.    Now, I happen to be a reforming

20 professor, and I'm happy to give you a very simple

21 example to clear up the confusion.  But if you're not

22 interested in learning that, I will resist my

Page 206

1 temptation.

2    Q.    Can you do it in two minutes or less?

3    A.    I think I can.

4    Q.    Go for it.

5    A.    Okay.  So consider a circumstance where,

6 hypothetically speaking, Freddie Mac announced losses

7 or whatever it announced on November 20th, and its

8 stock price went from $20 a share to $10 a share.

9 And what the market learned on November 20th is, hey,

10 we may not have access to capital, so our go-forward

11 long-term franchise value may be impaired, and the

12 market also learned about some losses.  So the

13 combined of effect of those two pieces of information

14 was a 50 percent drop in stock price from $10 to $5.

15    Now, imagine on date two, soon

16 thereafter, before things had changed, the whole

17 market had changed, consider a counterfactual.

18 Freddie Mac said, "Hey, we were able to raise capital

19 at fair prices," and the stock price went up from $5

20 to $7.50.

21    So an economist looking at this pattern

22 would say, "Yes, there was $5 a share stock price

Page 207

1 drop on date one.  It had to do with some bad news,

2 whether or not it was allegation related, and there

3 were concerns about capital."

4    But given that Freddie Mac soon was able

5 to raise capital and the price rebounded by $2.50,

6 you can interpret the remaining $2.50 as the effect

7 of bad news.

8    Now, consider another counterfactual --

9 or not so much a counterfactual.  On day two, Freddie

10 Mac says, "Hey, we've raised capital," and the stock

11 price goes to $10.  What is the only logical

12 inference of those two observations, that $5 a share

13 stock price drop on date one was fully accounted for

14 concern about Freddie Mac's ability to raise capital

15 which was resolved on day two, so there is nothing

16 left to explain.

17    That is the simple logic of what I did.

18 And when you combine it with the evidence I presented

19 about Fannie Mae's stock price, I don't see any other

20 explanation.

21    And your economist, Dr. Tabak, did not

22 criticize me for this logic, other than some

Page 208

1 back-of-the-hand comments that I don't, for the life

2 of me, understand.  He did not provide any

3 calculations of the type you're asking me to assume.

4 He did not provide any event study for these dates.

5 He did not review market information and say, "Hey,

6 there was some residual stock price drop."  And

7 suppose there were, as a plaintiff expert, he would

8 still have a burden to say the remaining stock price

9 drop had to do with materialization of undisclosed

10 risks and not materialization of disclosed risks.

11    Did I do it in two minutes?

12    Q.    Not really.

13    A.    Is this a good time for us to take a

14 little break?

15    MR. MARKOVITS:  A little break.

16    THE WITNESS:  Okay.  Thank you.

17    (Brief recess.)

18    MR. MARKOVITS:  Back on the record.

19 BY MR. MARKOVITS:

20    Q.    Dr. Bajaj, is your view that Freddie

21 Mac's announcements from November 27th through 30th,

22 2007 regarding its capital raise corrected any



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
209—212

Page 209

1  alleged misrepresentations or omissions?
2      A.    To the extent those misrepresentations
3  and omissions include such allegations about capital
4  raise, they obviously corrected those.
5      Q.    Is it your understanding that any of
6  plaintiff's allegations regard to misrepresentations
7  or omissions regarding Freddie's ability to raise
8  capital?
9      A.    So what are they about then?
10      Q.    Isn't that your understanding, that
11  they're about the ability to raise capital versus the
12  strength of Freddie Mac's capital position?
13      A.    If you're referring to -- and I'm
14  forgetting the words Dr. Tabak used -- is that the
15  allegations were about capital being insufficient and
16  not about ability to raise capital.  That statement
17  makes no economic sense, because why would lack of
18  capital be of consequence to investors if that lack
19  of capital can be remedied by ability to raise
20  capital.  And in this case that was demonstrated, so
21  I stand by the fact that to the extent there are some
22  allegations about capital issues -- which I frankly

Page 210

1  have never understood the nature of those
2  allegations -- the price rebound takes care of that.
3      Q.    You've been involved in damages
4  calculations for securities cases, correct?
5      A.    Yes.
6      Q.    You're familiar with the PSLRA, private
7  securities litigation format?
8      A.    Only in the sense of, as an economist,
9  I've heard the term and I understand that it imposes
10  some particular requirements, whatever that means
11  legally.  But I'm not a lawyer.  I don't really claim
12  to know about PSLRA.
13      Q.    Have you ever dealt with a PSLRA in
14  terms of the 90-day lookback period with regard to
15  any damage analysis in a securities matter?
16      A.    I'm not familiar with that provision.
17      Q.    So you are not -- you don't know whether
18  or not the PSLRA limits damages -- the difference
19  between the price paid and the mean trading price for
20  the 90-day period, beginning from the date of
21  correctional materialization?
22      A.    Again, I'm going to speak to whether or

Page 211

1  not a mandatory methodology is specified under PSLRA,
2  as you seem to imply in your question.  But, if there
3  is no loss causation, obviously there is no damage.
4  Whether you go 90 days past or you go 900 days past,
5  it doesn't matter.
6      Q.    But you went ten days past, correct?
7      A.    I went seven trading days past because
8  that was particularly relevant, given the evidence
9  and the allegations that I reviewed.
10      Q.    Did you look to see if there were other
11  announcements during that seven-business-day period
12  that could have accounted for some or all the Freddie
13  Mac stock increase?
14      A.    I did look at all the analyst reports.
15  I did look at what Freddie Mac announced.  And I did
16  not find anything that would account for the price
17  rebound in Freddie Mac's stock on the dates that are
18  the capital raise dates as per my report.
19      Q.    Let me give you a hypothetical, Doctor.
20  I want you to assume that a company misrepresents its
21  adherence to its underwriting during a relevant
22  period, and the risk relating to that

Page 212

1  misrepresentation materializes on a given date, and
2  that company stock drops 29 percent as a result.
3      I want you also to assume that seven
4  business days later, there's good news about an
5  infusion of capital for that company, and the stock
6  price increases by the same amount, 29 percent.
7      In your opinion, under that
8  hypothetical, is there a loss causation?
9      A.    I'm sorry.  I'm going to request you to
10  read the question again, please?
11      Q.    Okay.  Assume that for a given company,
12  it misrepresents adherence to its underwriting during
13  a relevant period, and that risk relating to that
14  misrepresentation materializes on a day of stock that
15  the company drops 29 percent as a result of that
16  materialization of that undisclosed risk.
17      I want you to also assume that seven
18  business days later, there's good news about an
19  infusion of capital, and the stock price for that
20  company increases by that same amount, 29 percent.
21      In your view, is there loss causation,
22  assuming there were no intervening price movements?



DR. MUKESH BAJAJ                                        March 13, 2024
Ohio Public Employees vs Federal Home Loan                213—216

Page 213

1    A.    Well, in your counterfactual hypothesis,
2  you do not provide me with a complete hypothetical in
3  the following sense.
4        If the company raises capital, in your
5  hypothetical, the stock price goes up by 29 percent.
6  The only way that would make economic sense is if the
7  capital was provided to the company at below market
8  prices, and people providing that capital did not
9  understand that they were giving away capital for a
10  song, while the shareholders of the company
11  understood that the company just got a bunch of free
12  money as capital raised and, therefore, as an
13  unrelated matter, its stock price went up.
14        So that's not, from an economic
15  perspective, a sensible hypothetical.  It's
16  incomplete.  It's counterfactual.  And I can't answer
17  whether, in that hypothetical, there would be loss
18  causation or not without having more details in the
19  hypothetical.
20    Q.    That might be your answer.  Let's try a
21  little bit different variation.  We'll probably get
22  the same answer, but let's see.

Page 214

1        On a given day, a company that had been
2  misrepresenting its exposure to poor underwriting
3  announces a loss that's attributable to that poor
4  underwriting, and the stock declines 29 percent as a
5  result.  Seven business days later, that company
6  enters into lucrative new contracts, and as a result
7  of those lucrative new contracts, the stock price
8  increases 29 percent.
9        Is there loss causation?
10    A.    Assuming that we are limited to that
11  hypothetical, the second announcement is unrelated to
12  that first announcement, and hence, you would not
13  offset the positive with the negative.
14        And if I may, I think I can give you a
15  better hypothetical.
16    Q.    No, that's okay.  I just wanted the
17  answer.
18    A.    Okay.
19    Q.    Am I correct that it's your opinion that
20  the stock drop on November 20th, 2007, was largely
21  caused over concerns about Freddie Mac's capital?
22    A.    Given the totality of the evidence, yes.

Page 215

1    Q.    And that's based primarily on your,
2  what, analysts review and news review?
3    A.    As well as my subsequent analysis of
4  stock price rebound on capital raise dates.
5    Q.    Okay.  I'm going to take a risk and
6  venture into the hypothetical world again.
7        Assume there was a financial crisis that
8  primarily impacts financial service companies and
9  many of those companies announce large losses.  But
10  when a company announces a large loss, but its stock
11  price does not move in a statistically significant
12  manner, all else being equal, meaning there's no
13  offsetting good news, does that suggest that the
14  market anticipated the loss?
15    A.    It's an incomplete hypothetical, but
16  that could be one of the reasons why the company
17  stock price didn't move.  For example, if the company
18  says, "We expect a $10 billion loss" and stock price
19  drops by 50 percent.  And then on day two they say,
20  "We have a $10 billion loss," the market's already
21  heard it.  You wouldn't expect the stock price to
22  move.

Page 216

1        And it would be incorrect to look at
2  just the second announcement and say, "Stock price --
3  or loss announcements had no effect on stock prices."
4  You would look at both of those dates together.
5    Q.    Got it.  Does the academic literature on
6  event studies analyze one single firm making one
7  announcement, or does it analyze multiple firms
8  making similar announcements at different points in
9  time?
10    A.    Well, it depends on the context.  I've
11  seen academic studies that look at one individual
12  company.  I've looked at more academic studies.
13  Given the question that they're trying to answer,
14  look at a large sample of companies making,
15  quote-unquote, similar announcements.
16    Q.    Can you name for me any academic article
17  that performs an event study on a single event for a
18  single firm?
19    A.    Again, I don't have the reference
20  memorized, but if I recall correctly, there is a
21  paper by Professor Brad Cornell that looked at a
22  single firm event study, but I'll have to look.  I



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
217–220

Page 217

1  can't recall right off the top of my head.

2      Q.    Would you agree that most of the

3  academic literature relating to event studies deals

4  with multiple firms making similar announcements at

5  different periods in time?

6      A.    Well, the key word is "similar."  And,

7  again, context is everything.  And I'm not aware of

8  academic studies that address circumstances like the

9  one we are dealing with today, that we face in

10  securities litigation, where there's an allegation

11  that a firm announced something and it was bad news

12  that must have been previously withheld.

13          Well, in that case, obviously, we are

14  looking at a very different circumstance than if the

15  question was, is it true that, on average, market

16  sees past what should be an economic nonevent, such

17  as a stock split?

18          And if you do observe a positive stock

19  price reaction on average upon announcement of stock

20  splits by a large sample of firms, what would be an

21  economically sensible explanation?  Academic studies

22  in general are of that genre, and that's why most

Page 218

1  academic studies look at a large sample of firms.

2      Q.    Let me switch topics.

3          You would agree that companies may fail

4  to disclose significant economic risks, correct?

5      A.    Are you asking me a particular company,

6  or are you saying it's hypothetical?

7      Q.    Hypothetically, yes or no, you would

8  agree that companies may fail to disclose significant

9  economic risks?

10          MR. BLOCK:  Objection to form.

11          THE WITNESS:  If you're asking me is it

12      true that companies are -- conduct criminal

13      acts, is it possible?  Yes, it is possible.

14      Anything is possible.  So I don't understand why

15      you're asking an expert economist to comment on

16      this hypothetical where your hypothetical

17      presupposes the answer.

18  BY MR. MARKOVITS:

19      Q.    It doesn't presuppose the answer.  I'm

20  just asking you:  Are you familiar that there are

21  nondisclosure cases where courts and juries have

22  determined that companies have failed to disclose

Page 219

1  significant social economic risks, correct?

2      A.    Oh, I see.  If you're asking me about

3  case law, I am not -- I wouldn't be surprised there

4  are cases like that, but I don't follow case law per

5  se.

6      Q.    Let's try this from an economic

7  perspective.  If there are significant undisclosed

8  economic risks that materialize, they could cause

9  unexpected losses, correct?

10      A.    Can you repeat the question again?

11      Q.    A significant undisclosed economic risk

12  materialized, they could cause unexpected losses,

13  correct?

14      A.    In the hypothetical, yes.

15      Q.    Unexpected losses if they're significant

16  may cause the stock price to drop, right?

17      A.    Again, as a purely hypothetical matter,

18  yes.

19      Q.    And this is true even if the cause of

20  the unexpected loss is not disclosed, right?

21      A.    Well, if you are talking about this in

22  the context of securities litigation, I understand

Page 220

1  that one might allege that.  That's not what your

2  complaint alleges in this case, and there would

3  still be --

4      Q.    If you could just limit yourself to my

5  question, please.

6          It's true that unexpected losses can

7  cause stock price to drop.  You've agreed with that.

8  And that's true even if the unexpected loss -- the

9  cause of the unexpected loss is not disclosed at the

10  time the loss is announced, correct?

11          MR. BLOCK:  Objection to form.

12          THE WITNESS:  Are you asking me to

13      assume that the company that experienced loss

14      due to materialization of previously undisclosed

15      risk lied to hide the cause for that loss?

16  BY MR. MARKOVITS:

17      Q.    Just did not disclose.  Whether they

18  lied or not, they did not disclose the loss.  There

19  is an undisclosed material risk that materializes and

20  the cause of the loss is not disclosed, and that can

21  cause the stock price to drop, whether or not the

22  cause is disclosed?



DR. MUKESH BAJAJ                                                    March 13, 2024
Ohio Public Employees vs Federal Home Loan                          221—224

Page 221

1       The company announces a $10 billion,
2   $100 million dollar, whatever, a significance portion
3   loss, its stock price can drop -- would likely drop,
4   even if it doesn't disclose the reason for that loss,
5   correct?
6       A.    Disclosure for reason of the loss or not
7   has nothing to do with your hypothetical.  If a
8   company announces an unexpected loss, then you expect
9   the stock price to drop, period.
10      Q.    Yes.  Good.  We're in agreement.
11      A.    Okay.
12      Q.    And if the cause of the unexpected loss
13  is not just clutters, then analysts would have no
14  reason to discuss it, correct?
15          MR. BLOCK:  Objection to form.
16          THE WITNESS:  If analysts do what
17      they're supposed to do and they analyze the
18      company, they are usually able to ferret out
19      what the cause of the loss is.  But if all the
20      analysts were asleep at the switch and the
21      company lied about reason for its loss and
22      misrepresented the reason, then in your

Page 222

1       hypothetical, what you propose could happen.
2   BY MR. MARKOVITS:
3       Q.    Let me get back to your opinion
4   regarding capital is one the reasons for the stock
5   price drop on November 20th, 2007.
6           Is it your opinion that the apparent of
7   capital that occurred on that date -- that was
8   disclosed on that date is not related to OFHEO's
9   allegations?
10      A.    If the stock price rebounded, then by
11  definition, OFHEO's allegation was not economically
12  significant with regards to capital or anything else.
13      Q.    Do you recognize that OFHEO's
14  allegations include allegations that Freddie Mac
15  misrepresented the strength of its capital position?
16      A.    I've seen that allegation, yes.
17      Q.    You'd agree that losses due to
18  undisclosed credit risk would likely contribute or
19  could contribute to a possible impairment of capital?
20      A.    Losses of any kind, whether related to
21  allegations or not, could lead to impairment of
22  capital.

Page 223

1       Q.    You'd agree that poor underwriting or
2   failure to follow underwriting standards could also
3   contribute to impairment of capital?
4       A.    Well, if it can be shown that the
5   alleged underwriting deficiencies caused economically
6   significant economic losses, then that could happen.
7       Q.    And similarly, you would agree that a
8   failure to engage in fraud detection can contribute
9   to an impairment of capital for a company like
10  Freddie Mac?
11      A.    Same answer --
12          MR. MARKOVITS:  Object to form.
13          THE WITNESS:  Same answer.
14  BY MR. MARKOVITS:
15      Q.    Can you turn to paragraph 20 of your
16  report, Doctor, on page 11?
17      A.    I see it.
18      Q.    If you look at the last line there, it
19  says: "In this report, I analyze and evaluate, from
20  an economic perspective, materiality and loss
21  causation and the related economic evidence."
22          And I just want to be clear here -- we

Page 224

1   talked a little bit about this before -- as this case
2   moves forward, are you intending to provide any
3   opinion regarding materiality, whether from an
4   economic perspective or otherwise?
5       A.    Well, I will provide an opinion on
6   economic significance.  And that's the sense in which
7   I say materiality from an economic perspective.  I
8   would not provide an opinion on ultimate conclusion
9   on materiality which is the province of the trier of
10  fact.
11      Q.    In the last section of your report,
12  Doctor, which is Section 9, I believe, you address
13  the individual defendants' trading in Freddie Mac's
14  securities.  It begins on page 119.
15      A.    Yes, I see it.
16      Q.    Are you familiar with the legal doctrine
17  of scienter as it applies in securities cases?
18      A.    Can you please repeat your question?
19      Q.    Are you familiar with the legal doctrine
20  of scienter as it applies in securities cases?
21      A.    Only in layman economic terms, that it
22  has to do with defendants' state of mind that can



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
225—228

Page 225

1  sometimes be inferred in a context like this, from
2  trading in a way that avoids impending loss that it
3  knew was going to happen.
4      Q.    Are you intending to provide any opinion
5  regarding whether individual defendants had scienter
6  in this case?
7      A.    No, I will provide opinion on facts
8  regarding their trading behavior, and that my
9  analysis shows that the individual -- that I did not
10  find any evidence that individual defendants engaged
11  in trading in Freddie Mac securities that was unusual
12  or suspicious in timing or amount, as I say in
13  paragraph 264, which is the last paragraph of my
14  report.
15      Q.    And is there any support in the economic
16  literature in terms of determining whether trading is
17  unusual or suspicious in timing or amount?
18      A.    Well, there is academic literature which
19  sees -- which analyzes whether, on average, insiders
20  sell before an economically material adverse event or
21  vice versa.
22          There is academic literature tracking

Page 226

1  returns that -- insiders rates of returns that
2  insiders realize on trading off their own company
3  stock, and whether those returns might raise a
4  question that they were trading on the basis of
5  insider information.
6          There is literature in economics on the
7  so-called strong form of market efficiency that looks
8  like --
9      Q.    Let me just stop you there, Doctor, for
10  a second in the interest of time.
11          Other than setting out in this section
12  the defendant's trading activity, what economic
13  analysis did you undertake to determine whether
14  defendant's trading was unusual or suspicious in time
15  and amount?
16      A.    Well, the analysis I did is laid out in
17  paragraphs 256 to 263.
18      Q.    And you analyzed stock sales during the
19  relevant period?
20      A.    Yes.
21      Q.    Could stock trades prior to the relevant
22  period bear on whether the stock sales of individual

Page 227

1  defendants were unusual and suspicious in time and
2  amount?
3      A.    Again, it's one of those hypotheticals.
4  If you asked me to assume that company officials knew
5  before the start of the relevant period that Freddie
6  Mac and the rest of the financial industry was going
7  to go through hell and they got rid of their stock
8  with that knowledge, then you can make that argument
9  in front of a court, but my analysis was limited to
10  the relevant period.
11      Q.    And in paragraph 257, you conclude that
12  none of the defendants engaged in trading that was
13  unusual or suspicious in timing and amount.  Then you
14  say:  "To the contrary, the evidence shows that
15  individual defendants' holdings of Freddie Mac's
16  securities declined substantially in value over the
17  course of the relevant period."
18      A.    You read that correctly.
19      Q.    Are you suggesting that because their
20  holdings declined substantially, none of the trades
21  could have been unusual or suspicious in timing or
22  not?

Page 228

1      A.    Well, if I recall correctly, my analysis
2  shows that there were no sales of shares, period,
3  suspicious or otherwise, except for a relatively
4  small sale by Ms. Cook during the relevant period.
5  And that, I understand to be pursuant a 10b-5 plan or
6  whatever that Safe Harbor is called.
7      Q.    Do you know what restrictions, if any,
8  there were under the sales by individual defendants
9  during the relevant period?
10      A.    Not as a factual matter.  I understand
11  that insiders are told, due to the kind of concerns
12  you are raising, not to trade company stock during a
13  certain period, for example, around earnings
14  announcement dates.  I don't know if it's a
15  requirement or it's learned ways, but I'm familiar
16  that companies do often have those policies.
17      Q.    In paragraph 264, in your summary
18  paragraph, you did not find any evidence that
19  individual defendants engaged in trading of Freddie
20  Mac securities that were unusual or suspicious in
21  timing and amount.  And then you say:  'They did not
22  benefit from the alleged fraud during the relevant



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
229–232

Page 229

1 period."

2       Are you limiting that second sentence to
3 the terms of trading and securities that was unusual
4 and suspicious in timing or amount, or are you
5 saying, generally, that you can conclude from the
6 lack of unusual or suspicious trading, that they did
7 not benefit from the alleged fraud?
8       MR. BLOCK:  Objection to form.
9       THE WITNESS:  I'm sorry.  That question
10      got complicated for me at this hour.
11 BY MR. MARKOVITS:
12      Q.   Yes, it did get a little bit
13 complicated.  Let me break it down.
14          Are you saying, generally, that you can
15 conclude from your analysis of their trading that
16 they did not benefit from the alleged fraud during
17 the relevant period?
18      A.   I'm not making a general conclusion.
19 That sentence appears in the context of my analysis,
20 which is that they did not actually sell stock during
21 the relevant period, except, as I said, for a small
22 amount of stock by Ms. Cook, pursuant to a

Page 230

1 prearranged sales plan.

2          And based on that finding, I can say
3 that that pattern of trading is not consistent with
4 the allegations in the complaint that insiders sold a
5 lot of shares to avoid impending stock price drop in
6 Freddie Mac.
7      Q.   You're not disputing that the defendants
8 may have benefitted in other ways?
9      MR. BLOCK:  Objection to form.
10      THE WITNESS:  Counsel, I didn't
11      interview those defendants or those officers,
12      but I can bet 100 to 1, they went through hell.
13      They suffered a lot of loss in wealth.  They
14      suffered a lot of follow-on action.
15 BY MR. MARKOVITS:
16      Q.   Let me stop you there, Doctor.  Aside
17 from what you can bet, did you do any analysis -- or
18 let me put it this way.
19          Are you going to give an opinion in this
20 case as to whether or not the individual defendants
21 benefited in any other way beyond the opinion you're
22 giving with respect to their stock sales?

Page 231

1      A.   I'm sorry.  That's an incomplete
2 hypothetical.  If they derived psychic benefits
3 about -- from trying to ride the share of sticking
4 with Freddie Mac during this difficult period, trying
5 to be good colleagues, yeah, that could be a benefit
6 to them, but I don't know what benefits you're
7 talking about.
8      Q.   Any benefit.  Are you going to give an
9 opinion -- what I was getting at -- or I thought you
10 said -- you're not generally giving an opinion that
11 the defendants did not benefit from the alleged
12 fraud; is that correct?
13      A.   As I told you before, my opinion is
14 limited to my analysis of stock trades during the
15 relevant period.
16      Q.   Okay.  Let's look -- I know you wanted
17 to talk about it, so let's look at Figure 3 in your
18 report, which is the chart on page 4 of 4.  You made
19 this before, I believe.  And that chart shows the
20 dispersion of Freddie Mac's analyst EPS estimates on
21 four different trading days, correct?
22      A.   I believe, as the title says, those are

Page 232

1 the last available EPS estimates by Freddie Mac
2 analysts on earnings per share one date before those
3 earnings were announced.
4          So, for example, for Q4 2006, it looks
5 at -- the day before Q4 2006, earnings were
6 announced.  If you look at all the analysts' EPS
7 forecasts, what was the range between the highest and
8 the lowest forecast, and it does so for four
9 quarters.
10      Q.   Got it.  And if I'm correct, the red
11 dots are the outer limits of the range, and the blue
12 dots are the estimates that fall in between those
13 outer limits, correct?
14      A.   That is correct, yes.
15      Q.   And how were the analysts chosen?
16      A.   So we looked at all the analysts whose
17 EPS estimates were available on the commercial data
18 source for earnings per share estimates by analysts.
19 That's called Refinitiv Eikon.  And I believe, to the
20 extent we had any analyst report that wouldn't be
21 covered within that database, we added that as well.
22          I am almost certain about my last



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
233—236

Page 233

1 statement, but if I misremember, I'll make sure
2 I correct the transcript.
3    Q.   Okay. And so, the analysts were limited
4 to that -- these particular dates: March 22nd,
5 June 13th, August 29th, and November 19th?
6    A.   Not quite. It's whatever analyst
7 estimates were available for Q4 2006 that were the
8 last available EPS estimate prior to Q4 2006, as is
9 common in these kind of estimates. Some of these
10 estimates could be a day old, some could be a week or
11 a month old. But what we wanted to do was look at
12 the latest estimates available from analysts about
13 that particular quarter as of the day before that
14 quarter's earnings were announced.
15    Q.   Okay. How far back did you go?
16        So if you were looking for the day
17 before up to March 22nd, how far back before
18 March 22nd did you search the database for EPS
19 estimates by analysts?
20    A.   I don't remember as I sit here today,
21 but I'm happy to look at it and add that to the
22 deposition transcript if you want me to.

Page 234

1        It's my understanding that the database
2 might have a procedure where they're not going to put
3 a five-year old estimate in the database for a
4 particular quarter. And analyst generally don't make
5 quarterly earnings forecasts too far prior to the
6 quarter.
7        Now, there could be some variation, but
8 my understanding from having looked at a lot of these
9 underlying data is there's some dispersion. Some may
10 be a week old, some may be four weeks old, but I
11 can't tell the outer limits of that as I sit here
12 right now. But we did provide you with all the
13 underlying data behind Figure 4 -- Figure 3.
14    Q.   Can you turn to page 43, note 136? And
15 that discusses the chart, correct? And it says: "In
16 the EPS analysts' forecast data obtained from Eikon
17 Refinitiv spotted in the figure, three analyst firms
18 appear to use a customized measure of earnings, while
19 the others used GAAP earnings. Removing the
20 estimates from those three analysts does not change
21 the conclusions drawn from the figure."
22        Do you see that?

Page 235

1    A.   Yes.
2    Q.   How is it determined which of the three
3 analysts appeared to use a customized measure?
4    A.   So we tried and succeeded in almost
5 every case to actually look at the data reported in
6 that database and match it to the underlying analyst
7 report. And when we did that, we realized that three
8 analyst firms, if I recall correctly, Fox-Pitt,
9 Prudential -- and the third name is escaping me right
10 now. They didn't forecast GAAP earnings.
11        And so, rather than give a conclusion
12 from Figure 3, which might amount to mixing different
13 measures of forecast, as a robustness check, we
14 looked at what happens if we exclude those three
15 analysts, and the range did not change. Meaning
16 those analysts that did not follow forecasting GAAP
17 earnings were not represented by red dots in
18 Figure 3.
19        MR. MARKOVITS: Okay. Goldy, could you
20    mark as Exhibit, I guess, 455 and hand out
21    what's Tab 2?
22        THE WITNESS: Counsel, I know we're

Page 236

1 getting late in the day. I just need no more
2 than five minutes just to take a quick break, if
3 that's okay with you.
4    MR. MARKOVITS: That's fine.
5    [Exhibit 455, FM OPERS 00238114, was
6 marked for identification.]
7    (Brief recess.)
8    MR. MARKOVITS: Back on the record.
9 BY MR. MARKOVITS:
10    Q.   Dr. Bajaj, you have in front of you
11 Exhibit 455, the first page of which I believe Kevin
12 put up on the screen there, which is FM OPERS
13 00238114, an Excel spreadsheet that was represented
14 to be the backup for the chart in your report.
15        Have you seen these documents before?
16    A.   Yes.
17    Q.   And if we take a look at what we see up
18 on the screen on the first page of Exhibit 455, that
19 shows the same dispersions on the chart in your
20 report, right?
21    A.   Well, I can compare it or I can take
22 your representation for it.



DR. MUKESH BAJAJ                                                        March 13, 2024
Ohio Public Employees vs Federal Home Loan                              237–240

Page 237

1    Q.    Well, take my representation for it for
2  now.
3    A.    Okay.
4    Q.    Could you turn to the second page of
5  Exhibit 455?  And that's the -- on the Excel
6  spreadsheet, it's labeled as the chart data.  And it
7  shows the EPS assessments for the various analyst
8  firms prior to the quarter's end, correct?
9    A.    That is correct, yes.
10    Q.    And different analyst firms appear, to
11  some extent, on the four different dates.  There's
12  some that overlap, but some not, correct?
13    A.    That is correct, because not all analyst
14  firms necessarily provide earnings forecast for all
15  quarters.  Sometimes analyst firms stop following a
16  company.  Sometimes they start following a company.
17  And there could also be incompletions in the database
18  that we had available and/or lack of completeness in
19  all analyst reports ever written with such estimates
20  during this period.
21    Q.    Okay.  You mentioned earlier the firms
22  that you believe were using something other than GAAP

Page 238

1  for earnings per share estimate.  Which of these
2  firms, 16 -- or 12 firms listed here were you
3  referring to?
4    A.    I do recall that Fox-Pitt Kelton was one
5  of these firms.  And I think I recall Prudential --
6  no, maybe not Prudential.  I don't remember from
7  memory alone, but if you would ask that question, we
8  would have provided you that answer, but it's not
9  something I recall as I sit here.
10    MR. MARKOVITS:  Freddie, can I request I
11    get the answer to that.  But also to the extent
12    we don't have them -- and you can let me know if
13    we have them -- can you provide any the actual
14    analyst reports that are being referenced here?
15    MR. BLOCK:  Given it's late in the day,
16    can you just follow up with me in an email
17    tomorrow.  We'll figure out what the answer is
18    and what we're willing to give you.
19    MR. MARKOVITS:  Yes.
20  BY MR. MARKOVITS:
21    Q.    Okay.  If you go to the third tab
22  labeled Eikon BITNET, that shows the EPS estimates

Page 239

1  that are reflected by the dots on the chart, correct?
2    For example, in the blue there, you see
3  up on the screen, begins 3/22/07?
4    A.    I'm sorry.  What are you referring to?
5    Q.    Look up on the screen.
6    A.    Oh, I see.
7    Q.    Do you see where it is highlighted?
8  That would show the firms that you were using for
9  your chart for 3/22/07, correct?
10    A.    Well, actually, I believe that is true
11  with one clarification.  The database does not
12  sometimes identify the firm --
13    Q.    Right.
14    A.    -- because it's not given permission, I
15  assume, to identify firm.  And when we could, we
16  traced the underlying analyst report and we did that
17  work to give you our decoding of the key as to --
18    Q.    That's the next tab.
19    MR. MARKOVITS:  Kevin, can you turn to
20    that tab?
21  BY MR. MARKOVITS:
22    Q.    So the permission -- for example, it has

Page 240

1  various ones with permission denied, and then I guess
2  you did the work to identify what those permission
3  denied firms were, correct?
4    A.    That is correct, yes.
5    Q.    Okay.  Now, turning back to Tab 3, for
6  the first date, there are six firms, correct?
7    A.    Correct.
8    Q.    Shown on this chart?
9    A.    Correct.
10    Q.    For the second date, it shows six firms,
11  correct?
12    A.    That, if I'm counting correctly, is
13  correct.
14    Q.    Now, I have a little question about
15  that.
16    MR. MARKOVITS:  Kevin, can you go back
17    to the chart date on the second tab?
18  BY MR. MARKOVITS:
19    Q.    That seems to indicate that there were
20  seven firms for the second quarter, and I was
21  wondering if you might explain why one was missing?
22    A.    I'd have to investigate that.  You know,



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
241–244

Page 241

1  maybe in the rush up providing back up and making it
2  as user friendly as possible, something fell through
3  the cracks, but I'd have to look into that.
4      Q.    And the third quarter -- second quarter
5  2007, there are eight firms that are reported,
6  correct?
7      A.    That seems to be correct, yes.
8      Q.    And then in the third quarter, there are
9  ten firms, correct?
10      A.    That appears to be correct, yes.
11      Q.    And Morgan Stanley had the lowest EPS
12  estimate, a loss of $3.01, correct?
13      A.    Well, on this page, I see $3.01 loss,
14  and I see permission denied.  I think you'd have to
15  correlate it to the next page to identify Morgan
16  Stanley at the firm --
17      Q.    Okay.  We're looking, I think, at a
18  different tab.  Look up at the screen.  I think it's
19  the second tab, which probably the second page
20  of 455, shows that the 3.01 is Morgan Stanley,
21  correct?
22      A.    I see that, yes.

Page 242

1      Q.    And so that would be the lowest EPS
2  estimate for the third quarter, correct?
3      A.    That is the lowest number, yes.
4      Q.    And that's the only quarter in which you
5  have an estimate for Morgan Stanley, right?
6      A.    That appears to be the case, yes.
7      Q.    And whether GAAP is used to estimate EPS
8  or some other measure, it could create a large
9  disparity, right?
10      A.    Well, it depends on what is used
11  instead.  And the only way for me to verify that was,
12  as I described earlier, three firms that we found
13  were not making GAAP earnings forecast, which all the
14  firms said was hard to do given intricacies of
15  Freddie Mac's accounting.  That it did not change the
16  range between the lowest and the highest estimates
17  represented in Figure 3 of my report, I guess, which
18  is the first page of 455 that you marked.
19      Q.    Did you ever value a company that did
20  not have a stock that traded in an efficient market?
21      A.    Yes, I've valued stocks of many private
22  companies.

Page 243

1      Q.    And can you describe for me how you
2  would do that, generally?
3      A.    Well, there are various usual
4  methodologies.  Sometimes you use what is called a
5  market approach, which is look at, for instance,
6  price earnings, multiples of publicly traded
7  companies that are deemed to be similar to the
8  company you're valuing, and then using those
9  multiples to estimate what the value of this company
10  might be if it were publicly traded.  Sometimes you
11  use fundamental valuation models, such as a
12  discounted cash flow method if you have all the
13  relevant data and the assumptions, then you could do
14  that.
15          Sometimes people also look at a version
16  of market approach where you look at the price at
17  which companies that are deemed to be similar were
18  purchased in a takeout or a takeover, and that gives
19  you some indication of what the value of that company
20  might be.
21          Now, some of these methods provide value
22  on an as-if publicly traded basis.  And if you're

Page 244

1  dealing with a private company that's not publicly
2  traded, then it may be appropriate to apply a
3  discount to that value determination for lack of
4  liquidity in that stock.
5          So that's the general methodology that
6  is used.
7          MR. MARKOVITS:  Goldy, how much time?
8          THE COURT REPORTER:  Six hours and
9  42 minutes.
10          MR. MARKOVITS:  Freddie, I will cede my
11  remaining time in case you want to ask
12  questions, but I warn you, if you do, I might
13  ask more.
14          MR. BLOCK:  Okay.  I don't think we have
15  any questions --
16          MR. MARKOVITS:  All right.
17          MR. BLOCK:  -- on behalf of Freddie Mac.
18  I don't know about any of the individual
19  defendants.
20          MR. GOLDFARB:  Let me see.  No, nothing
21  for Mr. Piszel.
22          MR. BLOCK:  Carla?



DR. MUKESH BAJAJ
Ohio Public Employees vs Federal Home Loan

March 13, 2024
245—248

Page 245

1        MS. GAFF:  Sorry.  Nothing for
2  Mr. McQaude.
3        MR. BLOCK:  I think we're done.
4        MR. MARKOVITS:  Goldy, will I have the
5  rough transcript tonight?
6        COURT REPORTER:  Yes, within the hour
7  you'll have it.
8        (Deposition concluded 6:00 p.m.)
9        (Reading and signing was requested.)
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 247

1        DEPONENT CERTIFICATE
2  Our Assignment No. J11026706
3  CASE NAME:  OPERS v Federal Home Loan Mortgage
4  Corporation, et al.
5
6        DECLARATION UNDER PENALTY OF PERJURY
7        I declare under penalty of perjury that I
8  have read the entire transcript of my Deposition
9  taken in the captioned matter or the same has been
10  read to me, and the same is true and accurate, same
11  and except for changes and/or corrections, if any, as
12  indicated by me on the DEPOSITION ERRATE SHEET
13  hereof, with the understanding that I offer these
14  changes as if still under oath.
15  _____
16        DR. MUKESH BAJAJ
16
17  Subscribed and sworn to on the _____ day of
18  _____, 2024 before me,
19  _____
20  Notary Public,
21  in and for the State of _____
22

Page 246

1        CERTIFICATE OF REPORTER/NOTARY PUBLIC
2
3        I, Goldy Gold, a Notary Public within and
4  for the District of Columbia, do hereby certify that
5  the within-named witness personally appeared before
6  me at the time and place herein set out, and after
7  having been duly sworn by me, according to the law,
8  was examined by counsel.
9        I further certify that the examination was
10  recorded stenographically by me and this transcript
11  is a true record of the proceedings.
12        I further certify that I am not of counsel
13  to any of the parties, nor in any way interested in
14  the outcome of this action.
15        As witness my hand and notarial seal this
16  15th day of March 2024.
17
18  _____
19        GOLDY GOLD, RPR
       Notary Public
20
21
  My Commission Expires:  February 29, 2028
22

Page 248

1        DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20
21  SIGNATURE:_____DATE:_____
22        DR. MUKESH BAJAJ



DR. MUKESH BAJAJ

March 13, 2024

Ohio Public Employees vs Federal Home Loan

249

Page 249

```
1            DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20
21   SIGNATURE:_____DATE:_____
22           DR. MUKESH BAJAJ
```

