**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM,**<br>Plaintiff,<br>v.<br>**FEDERAL HOME LOAN MORTGAGE CORPORATION, *et al*.**<br>Defendants. | Civil Action No. 4:08-cv-00160<br>Judge Benita Y. Pearson<br>Magistrate Judge Jennifer Dowdell Armstrong |

**OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO STRIKE PORTIONS OF THE REPORT AND EXCLUDE PORTIONS OF THE EXPERT TESTIMONY OF DR. MUKESH BAJAJ**

## INTRODUCTION[1]

Defendants assert that OPERS is "particularly bold" in seeking to exclude the testimony of Dr. Bajaj, given this Court's previous reliance on his testimony. Opp. at 1. But it is in fact Defendants who are bold in seeking to have Dr. Bajaj offer opinions that are beyond his expertise or are based on Dr. Bajaj's *ipse dixit* rather than any reliable methodology consistent with the requirements of *Daubert*.

## ARGUMENT

### I. DR. BAJAJ IS NOT QUALIFIED TO TESTIFY TO ANY AND ALL SUBJECTS, AND ANY TESTIMONY MUST BE RELIABLE.

OPERS does not contest that Dr. Bajaj, an economist, is qualified to testify to matters within his area of expertise. But he is not a historian, nor a securities analyst, and when he strays beyond his expertise or provides unreliable opinions, courts have recognized that his testimony must be excluded. *See*, *e.g*., *S.E.C. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) (excluding some of Dr. Bajaj's opinions based on lack of qualifications and some for methodological flaws). In *Tourre*, the Court held that Dr. Bajaj was not qualified to offer one of his proposed opinions stating: "He has no experience in the CDO industry apart from acting as an expert witness, yet he intends to opine about what information would and would not matter to CDO investors." *Id*. at 677. Applicable here, the Court also noted that, "Being a professional testifying expert in the financial area does not give an individual the qualification to opine in every financial area as to every type of analysis." *Id*. at 679. *See also Bank of Am., N.A. v. Bear Stearns Asset Mgmt*., 969 F. Supp. 2d

[1] OPERS submits this Reply in response to Freddie Mac's Memorandum of Law in Opposition to Plaintiff's Motion to Strike Portions of the Report and Exclude Portion of the Testimony of Dr. Mukesh Bajaj and Amended Memorandum of Law ("Opp."). ECF 531. OPERS' original memorandum, as amended, will hereinafter be referred to as "Mem." ECF 527.

339, 342-46 (S.D.N.Y. 2013) (granting *Daubert* motion because Dr. Bajaj's methodology was "inherently unreliable").[2]

As stated in OPERS' Mem., and discussed below, OPERS seeks only to exclude Dr. Bajaj's testimony where it strays beyond either his expertise or the requirements of *Daubert*. Mem. at 1-2.

## II. PORTIONS OF DR. BAJAJ'S OPINIONS ARE CONTRARY TO LAW OR UNRELIABLE AND SHOULD BE EXCLUDED

### A. Dr. Bajaj is not qualified to provide a history of the credit crisis, and such testimony is improper.

Dr. Bajaj should not be permitted to provide a factual narrative regarding the history of the credit crisis. Mem. at 2-3. He is not a historian; he has not published on the history of the credit crisis nor—unlike Mr. Shapiro, who will also testify as a fact witness—was he personally involved in analyzing the stock of financial companies as the credit crisis unfolded. Expert Report of Mukesh Bajaj, Ph.D. (ECF 527-1, Ex. 1, "Bajaj Report", c.v.); Deposition of Dr. Mukesh Bajaj at 28:15-29:1; 32:11-32:6; (ECF 527-1, Ex. 5, "Bajaj Dep."). He is simply an economist retained to address OPERS' arguments. Yet, based on his report, he intends to testify about the history of the credit crisis leading up to events on November 20, 2007, and shortly thereafter. Bajaj Report at ¶¶ 24-55. This is impermissible. Mem. at 2, citing *United States Sec. & Exh. Comm'n v. Mudd*, No. 11 CIV. 9202 (PAC), 2016 WL 2593980 at *4-7 (S.D.N.Y. May 4, 2106) (excluding presentation of history of the financial crisis with a version of the facts "in the guise of an expert

---

[2] Courts have also at times simply rejected Dr. Bajaj's opinion. *See, e.g., In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 121–22 (E.D. Va. 2012) (rejecting Bajaj's opinion, finding market efficiency, and certifying class); *Est. of Koons v. Comm'r of IRS*, 686 F. App'x 779, 797 (11th Cir. 2017) (affirming rejection of Bajaj opinion); *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 66–67 (S.D.N.Y. 2009) (rejecting Bajaj's opinion and certifying class).

opinion."); *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("It is also inappropriate for experts to become a vehicle for factual narrative.") (citing cases).

Defendants ignore OPERS' argument and caselaw on this point, instead arguing that Dr. Bajaj can provide "background facts," citing *SEC v. Ustian*, 2020 WL 416289 (N.D. Ill. Jan. 26, 2020). Opp. at 9-10. But *Ustian* did not allow expert testimony amounting to a simple narration of facts, but rather an analysis of analyst reports and market information during the relevant period. *Id*. at *2-3. As discussed below, regarding Dr. Bajaj's review of analyst reports and news articles, OPERS challenges Dr. Bajaj's methodology, not his qualifications. With respect to a proposed historical narrative of alleged "facts" surrounding the history of the financial crisis and its effect on the mortgage market, however, Dr. Bajaj is unqualified, and his testimony should be excluded accordingly. This is testimony that should instead be provided by a lay witness such as Mr. Shapiro. *Mudd*, 2016 WL 2593980 at *1.

**B. Dr. Bajaj's "stock recovery" opinion is contrary to law and unreliable.**

OPERS' initial brief demonstrated that Dr. Bajaj's "stock recovery" opinion is impermissible because it is contrary to the PSLRA. Mem. at 3. Defendants assert that Dr. Bajaj's 10-day look-back is not contrary to the PSLRA's 90-day look-back because, even though OPERS may have "damages" under a 90-day look-back, there was no "loss" under a 10-day look-back. Opp. At 3-4. This is pure sophistry, particularly when considering the history of the PSLRA.

Prior to the PSLRA look-back provision, some courts negated loss and damages if a stock price ever rebounded—even if only for a day—at any point after the corrective disclosure or materialization of the risk. *See Gruber v. Gilbertson*, 647 F. Supp. 3d 100, 121-122 (S.D.N.Y. 2022). *See also Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39–40 (2d Cir. 2012) (discussing early line of cases holding that a securities fraud plaintiff "*suffers no economic*

*loss* if the price of the stock rebounds to the plaintiff's purchase price at some point after the final alleged corrective disclosure.") (emphasis added). Dr. Bajaj would have this Court apply the approach that the PSLRA look-back provision was specifically written to negate. His opinion is contrary to law and should be excluded on this basis. Mem. at 3.

Dr. Bajaj's look-back analysis, albeit cloaked in economic jargon, is also based upon his *ipse dixit* with no reliable methodology. First and foremost, Defendants fail to explain how a negative price reaction from issues relating to capital strength is in any sense "cured" by later good news regarding an infusion of capital. Mem. at 4. They simply ignore this important point and provide *no* case support for Dr. Bajaj's approach on this issue. Defendants cite one article in support of Dr. Bajaj's analysis,[3] but that article is inapposite. The Ferrell-Saha article notes that following a corrective disclosure, the market sometimes continues to react to a misrepresentation, and those later stock price movements should analytically be included as additional corrective disclosures. Ferrell-Saha at 168. This would, for example, suggest that any analysis should include not only November 20 but also November 21, where there was an additional significant negative stock price reaction as the market continued to react to the materialization of the risk on November 20. Bajaj Report, Backup Table A.1.1. The article does *not* support the notion that positive stock price reaction following later good news that in no way corrects a misrepresentation should also be included—and analytically it should not.

---

[3] Opp. at 10, citing Allen Ferrell & Atanu Saha, *The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of Dura Pharmaceuticals v. Broudo*, 63 Bus. Law. 163, 175-78 (2007) ("Ferrell-Saha").

Dr. Bajaj also mixes and matches positive and negative as well as statistically significant and statistically insignificant stock price movements from November 20-30.[4] Defendants attempt to defend this by saying Dr. Bajaj chose the dates of November 20, 27, 29, and 30 because these were dates where news regarding Freddie Mac's capital reached the market. Opp. at 10-11. But his own report contradicts this. Dr. Bajaj asserts that capital-related news occurred on November 28, a date he did not include. Bajaj Report, ¶ 146. And there were articles on November 21 addressing capital-related issues that Dr. Bajaj failed to include, with the only apparent reason for doing so because inclusion would negate his finding of statistical insignificance.[5]

Dr. Bajaj's analysis regarding a "stock recovery" for the selected dates following November 20, 2007, is contrary to law, and his methodology for determining that "recovery" is both unsupported and unreliable. His opinion relating to "stock recovery" should be excluded.

**C. Dr. Bajaj's market disclosure analysis is unreliable.**

Dr. Bajaj reviewed news articles and analyst reports and opined based on this review that the market was not reacting to materialization of undisclosed risks on November 20, 2007, but rather to concerns regarding Freddie Mac's capital adequacy. As OPERS pointed out in its memorandum, Dr. Bajaj's opinion is premised on the idea that to establish loss causation, following a large earnings loss, the market must recognize that the loss was caused by a materialized risk.

---

[4] OPERS also noted that there would still be statistically significant decline if: 1) Dr. Bajaj had dropped November 27, a date where the stock price movement was statistically insignificant; or 2) Dr. Bajaj included November 21, a date where the stock price movement was statistically significant; or 3) included all dates between November 20-30, whether statistically significant or not. Mem. at 4-5. Defendants argue this requires expert testimony (Opp. at 10-11) but, notably, they do not dispute the conclusions.

[5] For example, after the November 20 disclosure, it was announced on November 21 that a number of analysts had cut price targets or downgraded Freddie Mac stock, in part due to capital issues. *See* Supplemental Declaration of W.B. Markovits ("Supp. Markovits Decl."), ¶ 2, Ex.1 (Reuters News, *Freddie Mac shares drop on analyst price cuts* (Nov. 21, 2007)).

Mem. at 5. This is not true; a materialization of undisclosed risks that causes a large earnings loss may result in a drop in stock price regardless of whether the market understands the cause(s) of the loss. *Id*. Defendants fail to respond to this point, essentially leaving unchallenged OPERS' illustration of how Dr. Bajaj's market analysis opinion is flawed and unreliable, warranting exclusion.

Also unreliable, and warranting exclusion, is Dr. Bajaj's application of his review methodology. Dr. Bajaj could not explain what criteria he used to determine whether the analyst reports or news articles reflected any recognition by the market of the risks alleged by OPERS to be misrepresented. Mem. at 6. More egregiously, Dr. Bajaj simply ignored news articles that contradicted his thesis. Mem. at 6-7. Articles in one of the most prominent news publications in the country, *The New York Times*, directly reflected a market view that credit risk and underwriting were at the heart of the large loss that occurred on November 20, 2007. *Id*.

A November 21 *New York Times* article expressed a market view that the large $2 billion loss announced the prior day was caused by subprime lending, stating in part:

> The company has been battered by a rising wave of foreclosures tied to subprime mortgage defaults, and it is "seriously considering" cutting its stock dividend. . . . But yesterday's earnings report showed that even the gold standard of lending agencies was not immune to the toxic subprime securities that have infected much of the market.

(ECF 527-1, Ex. 2). In deposition, Dr. Bajaj simply ignored the plain language above. When asked whether the article presented a view to the market that toxic subprime securities were a reason for the announced losses, Dr. Bajaj said: "It doesn't say that at all." Bajaj Depo at 165:2-13. A November 22 *New York Times* article expressed a different market view that the large $2 billion loss was *not* caused by subprime, but rather by other nontraditional loans taken on due to lowered underwriting standards:

> "The underwriting standards declined," said Anthony Piszel, chief financial officer of Freddie Mac. That was across the board." . . . A kinder way to look at it is that competition forced the company to lower its standards. Either way, Freddie this week released data showing how its standards eroded.

(ECF 527-1, Ex. 3). When asked whether this article suggests that Freddie Mac's underwriting standards declined, Dr. Bajaj said: "That's not what it says here." *Id*. at 168:1-6. This is the epitome of "*ipse dixit*."

Defendants engage in similar semantic gymnastics in attempting to provide support for Dr. Bajaj's strained (to say the least) interpretation of the two articles. With regard to the first article, Defendants argue it is talking about the effect of subprime on the market as a whole and not Freddie Mac, and they cite as evidence that the author used the term "toxic subprime *securities*" while Freddie Mac only holds loans, not securities. Opp. at 12-13. Again, the plain language of the article makes it clear that the author was blaming subprime mortgage *defaults* for the losses disclosed on November 20.

Similarly, Defendants argue that in the second article, Mr. Piszel was speaking about market-wide underwriting standards, not Freddie Mac standards. Opp. at 13. First, this makes no sense, because "across the board" would include Freddie Mac. Even if Defendants are right, and Mr. Piszel was talking about the industry as a whole, the proper answer to the posed deposition question ("You don't read this article as indicating that Freddie Mac's underwriting standards declined?") could be "Yes, but that was true across the whole industry." It could not be, "That's not what it says here." Bajaj Depo at 169:15-18. Second, Defendants simply ignore the subsequent quote cited above, which makes it clear that the author was addressing the erosion of *Freddie Mac's* underwriting standards.

It is clear that Dr. Bajaj's market analysis opinion is unreliable, as it is a made-for-litigation approach, using unknown criteria, with conclusions based solely on Dr. Bajaj's say-so. For these reasons, Dr. Bajaj's market analysis opinion should be excluded.

**D. Dr. Bajaj's opinions based on disclosed risks are misleading and unreliable.**

OPERS seeks to exclude Dr. Bajaj's opinions and testimony regarding Freddie Mac's "extensive" disclosures and their sufficiency. Mem. at 8-10. Such testimony is irrelevant and likely to confuse the jury. *Id*., citing *United States Sec. & Exch. Comm'n v. Mudd*, No. 11 CIV. 9202 (PAC), 2016 WL 2593980, at *7 (S.D.N.Y. May 4, 2016) and *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 386 (6th Cir. 2016). The "extent" of disclosures is irrelevant because: the disclosures are alleged to be false or misleading; *some* truth does not neutralize the deceptive; and Dr. Bajaj has done nothing to test the disclosures for accuracy and is not opining they are accurate. Mem. at 8-10; *see also* Bajaj Depo. at 52:19-21 ("I'm not testifying to truth or falsity on any of these alleged misrepresentations . . . ."). Nor is Dr. Bajaj qualified to opine on the sufficiency of the disclosures.

OPERS pointed out that, with regard to disclosures, the Sixth Circuit noted that "not every mixture with the true will neutralize the deceptive," and "If it would take a financial analyst to spot the tension between the one and other, whatever is misleading will remain materially so, and liability should follow." Mem. at 8, *citing OPERS,* 830 F.3d at 386. Defendants argue that the Sixth Circuit's observations were made at the motion to dismiss stage, and "do not bear on Dr. Bajaj's opinions now." Opp. at 7. This is incorrect as a matter of law. The Sixth Circuit was quoting this proposition from a Supreme Court case involving a review of summary judgment. *Id*., *quoting Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1097 (1991). The proposition

applies regardless of the stage of the case.[6] Moreover, expert testimony regarding "usefulness" of disclosures should be excluded where the allegation is that the disclosures were "materially false or misleading." Mem. at 8, citing *United States Sec. & Exch. Comm'n v. Mudd*, No. 11 CIV. 9202 (PAC), 2016 WL 2593980, at *7 (S.D.N.Y. May 4, 2016).

An entire section of Dr. Bajaj's report is spent discussing Freddie Mac's "detailed" disclosures during the Relevant Period. Bajaj Report, Section IV(C). Dr. Bajaj noted that "detailed" characteristics were provided to "enable investors to gauge its credit risk." *Id*. at ¶ 59. He claimed that the disclosed characteristics were "widely recognized as key factors in assessing the credit risk related to mortgages." *Id*. at ¶ 62. And he opined that the stock price decline of Freddie Mac was "consistent with the investors understanding Freddie Mac's detailed mortgage credit and interest rate risks disclosures . . . ." *Id*. at ¶ 94. In deposition, Dr. Bajaj testified that it was his opinion that the disclosures were sufficient for an investor to estimate the losses that would occur from credit risk. Bajaj Dep., at 61:5-14.

Defendants do not defend Dr. Bajaj's opinion and testimony. Instead, in order to avoid the case law that would render Dr. Bajaj's report and testimony on this point inadmissible, Defendants change tack. They now claim OPERS "misunderstands" his report and testimony, and all he is doing is reviewing public information "that serves as a basis for his opinions on price impact and loss causation." Opp. at 5-7. They argue that Dr. Bajaj simply uses the "extensive disclosures" to explain the cause of the stock price decline on November 20, 2007, and why that decline does not

---

[6] Many courts have noted this proposition at the summary judgment stage, including a case cited by Defendants. *See United States Sec. & Exch. Comm'n v. Ustian*, No. 16 C 3885, 2019 WL 7486835, at *36 (N.D. Ill. Dec. 13, 2019) (denying summary judgment). *See also S.E.C. v. True N. Fin. Corp*., 909 F. Supp. 2d 1073, 1104 (D. Minn. 2012) (granting and denying in part summary judgment); *Freeland v. Iridium World Commc'ns, Ltd.,* 545 F. Supp. 2d 59, 72 (D.D.C. 2008) (denying summary judgment).

appear to have been caused by "the materialization of any risks that OPERS alleges were concealed." Opp. at 6.

This amounts to saying: "Dr. Bajaj is not going to opine that the disclosures were sufficient to prevent any misrepresentations or omissions; he is simply going to opine that because of the disclosures there were no undisclosed risks arising from the misrepresentations or omissions that were realized on November 20, 2007." This is an attempted sleight of hand; there is no substantive difference between the two opinions, and both are impermissible.

Dr. Bajaj's "extensive disclosure" opinion and analysis should be excluded.

**E. Dr. Bajaj's opinions on materiality are contrary to law and unreliable.**

Defendants' assertion that Dr. Bajaj's report avoids offering opinions on materiality is false.[7] Opp. at 5. Defendants state, however, that going forward Dr. Bajaj will restrict himself to offering opinions about the "economic significance" of information and avoid use of the term "material" ("where possible"). *Id*.

Given that Defendants do not appear to contest this aspect of OPERS' motion, OPERS asks that the Court grant the relief requested: precluding Dr. Bajaj from offering opinions or testimony relating to "materiality" or "economic materiality," and striking from consideration any such aspect of his report.[8]

---

7 For example, Dr. Bajaj's report states in part: "In this report I analyze and evaluate, from an economic perspective, materiality and loss causation and the related economic evidence." Bajaj Report, ¶ 20.

8 While expert reports and C.V.s are generally inadmissible at trial, OPERS would ask that no consideration be given to Dr. Bajaj's report for the purposes of summary judgment to the extent it addresses "materiality." *Timothy S. Sudeith, Plaintiff, v. E&J Trailer Sales and Service, Inc., et al., Defendants. Additional Party Names: Ryan Salter*, No. 2:20-CV-00063-EBA, 2024 WL 1198002, at *8 (E.D. Ky. Feb. 2, 2024) (expert report and C.V. generally inadmissible).

**F. Dr. Bajaj's chart relating to dispersion of EPS estimates is unreliable.**

Dr. Bajaj opines that analyst EPS estimates for Freddie Mac widened in the quarters preceding November 20, 2007, an opinion he supports with a chart in his report. Bajaj Report at 44 (¶ 89 and Figure 3). Dr. Bajaj's analysis as reflected in Figure 3 demonstrates the epitome of a results-driven methodology that amounts to no reliable methodology at all, requiring exclusion of both Dr. Bajaj's opinion and the chart.

Dr. Bajaj's chart is misleading. First, given overlapping dots used to reflect data points, it is impossible tell from the chart that six analyst reports were used for Q4 2006, seven for Q1 2007, eight for Q2 2007, and ten for Q3 2007—with the increase in the number of analysts alone likely to result in a wider range of estimates. Mem. at 11-12. Second, it is impossible to tell from the chart that different firms were used for analysis in different quarters—instead of using to the extent possible estimates from the same analyst firms throughout. *Id*. Third, the chart mixes GAAP and non-GAAP estimates, without identifying which are which, and the difference between the two can have a dramatic effect. *Id*. All of this masks the fact that this is not an apples-to-apples comparison.

But the problems created by the issues above are far eclipsed by those apparent from Defendants' April 3, 2024 production of back-up data for the chart. This long-requested, but only recently produced, back-up data demonstrates that Dr. Bajaj's chart is not only error-ridden but, more importantly, is the result of a "methodology" that was simply geared to support Dr. Bajaj's opinion that the EPS estimates were widening, and as explained below could just as easily support an opinion that they were narrowing. Supp. Markovits Decl., ¶¶ 5-6, Ex. 3.

When asked how the analyst estimates reflected on Figure 3 were chosen, Dr. Bajaj testified it was his understanding the chart used all of the analyst estimates available from a third-

party data source, as well any analyst report he had that was not in that source's database. Bajaj Dep., 232:16-21. The April 3 production demonstrates that neither of these propositions is correct. Not all analyst estimates produced by the third-party data source were used, and neither were all analyst estimates that Dr. Bajaj or his consulting group otherwise possessed. Supp. Markovits Decl., ¶ 4-5. Instead, a mix-and-match selection of analyst estimates was used by Dr. Bajaj with no apparent methodology other than to support his thesis that there was a widening of estimates.

The unreliability of Dr. Bajaj's methodology is demonstrated by the following: by using his methodology but simply modifying a few of the analyst estimates used (still using analyst estimates either from Dr. Bajaj's third-party source or from Dr. Bajaj's "Documents Considered") one can "prove" that—during the latter part of 2007—analyst estimate ranges were narrowing, not widening.

**Figure 1: Dispersion of Freddie Mac Analyst EPS Estimates as of One Trading Date Prior to Each Earnings Announcement (Q2 2007 to Q3 2007).**




**Notes and Sources:** ECF 527-1, Ex. 4; Supp. Markovits Decl., Exs. 8, 9. *See* Supp. Markovits Decl., Ex. 3 at 2 for full Notes and Sources.

The chart above uses six analyst estimates in each of the last two quarters. Changing a few of the analyst estimates used in Q2 2007 increases the range of estimates from 2.15 to 2.59. Supp. Markovits Decl., ¶¶ 5-6, Ex. 3. Doing the same for Q3 2007 decreases the range of estimates from 4.58 to 1.14. *Id*.

The fact that Dr. Bajaj's "methodology" can be used to prove either a widening or narrowing of EPS estimates demonstrates that it is unreliable, and his opinion and chart must therefore be excluded. *Williams v. Syphan*, No. 22-3222, 2023 WL 1305084, at *3 (6th Cir. Jan. 31, 2023) (excluding expert opinion where expert failed to demonstrate "that this opinion stemmed from a reliable methodology that he reliably applied").

**G. Dr. Bajaj's opinion regarding individual defendants' stock trading is improper**

Defendants ignore OPERS' point regarding Dr. Bajaj's opinion relating to individual stock trading: while OPERS is content to deal with other infirmities relating to this testimony through cross-examination, Dr. Bajaj should not be able to conclude from his analysis that "[Individual Defendants] did not benefit from the alleged fraud during the Relevant Period." Mem. at 13. This should be obvious, inasmuch as there are many ways in which Defendants may have benefited from the alleged fraud other than through stock trades. *Id*.

Instead of simply conceding this point, however, Defendants argue that the breadth of Dr. Bajaj's opinion is supported by case law. Opp. at 15. It is not, and Dr. Bajaj's broad conclusion is unreliable. While some case law indicates that a lack of stock benefit or stock losses can be *one* factor to consider in assessing scienter, no case holds that this factor alone negates scienter.[9]

[9] Defendants cite *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671 (6th Cir. 2004) in support of their position. Opp. at 15. But in *PR Diamonds*, the absence of benefit from stock sales was only one of seven factors the Court considered when assessing scienter, and even with respect to that

Dr. Bajaj's opinion should be limited to preclude his improper, misleading, and unreliable conclusion that the individual defendants did not benefit from the alleged fraud.

**CONCLUSION**

For the reasons set forth above, Plaintiff respectfully requests this Court to grant its Motion to exclude portions of Dr. Bajaj's reports and testimony.

Dated: April 5, 2024

Respectfully submitted,

**OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM**

By its attorneys,
OHIO ATTORNEY GENERAL
DAVE YOST

*/s/ W.B. Markovits*

W.B. Markovits (0018514)
Christopher D. Stock (0075443)
Terence R. Coates (0085579)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
E-mail: bmarkovits@msdlegal.com
E-mail: cstock@msdlegal.com
E-mail: tcoates@msdlegal.com

*Special Counsel to the Attorney General of the State of Ohio and Lead Counsel for Plaintiff*

Richard S. Wayne (0022390)
William K. Flynn (0029536)
Robert R. Sparks (0073573)
Stephen E. Schilling (0086897)
**STRAUSS TROY CO., LPA**
150 East Fourth Street
Cincinnati, Ohio 45202

---

factor the Court noted that it had never held that factor *alone* "defeats an inference of scienter." *Id.* at 691.

Telephone: (513) 621-2120
Facsimile: (513) 629-9426
E-mail: rswayne@strausstroy.com
E-mail: wkflynn@strausstroy.com
E-mail: rrsparks@strausstroy.com
E-mail: seschilling@strausstroy.com

*Special Counsel to the Attorney General of the State of Ohio and Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2024, a copy of the foregoing was served upon counsel of record for all parties by being filed with the Court's electronic-filing system, in accordance with Fed. R. Civ. P. 5(b)(2)(E).

*/s/ W.B. Markovits*
W.B. Markovits