**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM,<br><br>Plaintiff,<br><br>vs.<br><br>FEDERAL HOME LOAN MORTGAGE CORPORATION, *et al.*,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No. 4:08-cv-160<br><br>JUDGE BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE<br>JENNIFER DOWDELL ARMSTRONG |

**OMNIBUS MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ vi

**INTRODUCTION** ........ 1

**SUMMARY OF ARGUMENT** ........ 1

I. The Material Misrepresentations and Omissions ........ 3

II. Defendants' Scienter ........ 7

III. OPERS's Reliance ........ 8

IV. Loss Causation and Damages ........ 9

**FACT SECTION** ........ 12

I. Abandoning "Steady Freddie," Freddie Mac Implements a Risky New Strategy to "Touch More Loans." ........ 13

II. The Dam Breaks on November 20, 2007 ........ 16

III. Freddie Mac's Material Misrepresentations and Omissions Related to Underwriting ........ 19

A. Why Underwriting Standards and Quality Control Systems Were Such an Important Factor to Understanding Freddie Mac's Financial Health ........ 20

B. Freddie Mac's Material Omissions Regarding its Underwriting Standards and Quality Control Systems During the Relevant Period ........ 22

*1.* [redacted] ........ 23

*2.* [redacted] ........ 25

*3.* [redacted] ........ 27

*4.* [redacted] ........ 29

C. Representative Examples of Freddie Mac's Material Misrepresentations during the Relevant Period Regarding Underwriting Standards and Quality Control Systems ........ 32

IV. FREDDIE MAC'S MATERIAL MISREPRESENTATIONS AND OMISSIONS REGARDING INCREASING CREDIT RISK AND EXPECTED CREDIT LOSSES......................39

A. Why Credit Risk and Expected Credit Losses Were Such Important Indicators of Freddie Mac's Financial Health......................................................39

B. Defendants Received Repeated Warnings Regarding Freddie Mac's Increasing Credit Risk and Expected Credit Losses ............................................40

*1.* [redacted] ..............................41

*2.* [redacted] .....................................46

C. Freddie Mac's Material Misrepresentations Regarding Credit Risk and Projected Credit Losses..........................................................................52

V. DEFENDANTS' PUBLIC STATEMENTS MISLED THE PUBLIC INTO THINKING FREDDIE MAC HAD FAR LESS SUBPRIME EXPOSURE THAN IT ACTUALLY HAD ..........................................................................56

A. How Freddie Mac Measured and Monitored its Subprime Risk Exposure During the Relevant Period..........................................................56

B. Freddie Mac's Misrepresentations and Omissions Regarding its Subprime Exposure ...........................................................................64

VI. FREDDIE MAC'S INTERNAL MEASUREMENT OF ALT-A MORTGAGE EXPOSURE DIFFERED MATERIALLY FROM ITS PUBLIC DISCLOSURES REGARDING ALT-A MORTGAGE EXPOSURE ...........................................................................67

VII. ADDITIONAL EVIDENCE OF SCIENTER: OTHER EXAMPLES OF HOW THE INDIVIDUAL DEFENDANTS' PUBLIC STATEMENTS DURING THE RELEVANT PERIOD WERE CONTRARY TO THE CONTEMPORANEOUS INTERNAL REPORTS AND ASSESSMENTS THEY RECEIVED..................................................................71

Statement 1: *"Our release today demonstrates that our risk management approach is time-tested, and we continue to operate our business in a manner that is consistent with strong interest rate and credit risk management"*
(Defendant Syron, Aug. 1, 2006) .......................................................................72

Statement 2: *". . . but we have been cautious and I think you can expect us to be cautious on the most esoteric products"* (Defendant Syron, Oct. 3, 2006) ...............................................................................................75

*"While these numbers are still preliminary, they do point to the continued strength in our franchise and our ability to keep producing good, long-term*

*returns by focusing on fundamentals and keeping risks low"* (Defendant McQuade, Oct. 3, 2006) ....... 75

Statement 3: *It's why we have purchased the newer, more untraditional loans in a very prudent and balanced way – with very low credit losses as an added benefit"* (Defendant Syron, Oct. 18, 2006) ....... 75

Statement 4: Freddie Mac has *"continued to display very low and well-managed interest rate and credit exposures;"* and, on the *"credit risk side, the story is much the same."* (Defendant Piszel, Jan. 5, 2007) ....... 77

Statement 5: *"Credit has never been better"* (Defendant McQuade, Mar. 23, 2007) ....... 80

Statement 6: *"As we discussed in the past, at the end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio"* (Defendant Syron, May 14, 2007) ....... 82

Statement 7: *"On the second issue on credit quality, actually we have priced in already in how we do things. . . we are in pretty good shape and that we could see a material multiple of the credit losses that we are having now without it having a very adverse effect."* (Defendant Syron, Jan. 7, 2007) ....... 84

Statement 8: *"We take a disciplined approach to the acquisition of mortgage loans and generally participate in these products when we believe we are appropriately compensated for the credit risk."* (Defendant Freddie Mac, Aug. 30, 2007) ....... 84

Statement 9: *"Importantly, we have been able to price for this higher risk, because we source most of these loans through bulk purchases."* (Defendant Piszel, Aug. 30, 2007) ....... 84

VIII. DEFENDANTS' RELIANCE ON THE REPORTS AND OPINIONS OF ITS EXPERTS IS MISPLACED ....... 86

A. Professor John Coates ....... 87

B. Dr. Mukesh Bajaj ....... 87

C. Dr. Chudozie Okongwu ....... 88

**LEGAL ARGUMENT** ....... 89

I. LEGAL STANDARD ....... 89

II. THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO DEFENDANTS' MULTIPLE MATERIAL MISREPRESENTATIONS AND OMISSIONS ....... 90

A. Defendants' Material Misrepresentations and Omissions Regarding Freddie Mac's Deteriorating Underwriting ....... 91

B. Defendants' Material Misrepresentations and Omissions Regarding Credit Risk and Expected Credit Losses ....... 97

C. Defendants' Material Misrepresentations and Omissions Regarding Freddie Mac's Subprime Exposure ....104

*1.* [redacted] ....105

*2.* *<u>External Context:</u> Freddie Mac's March 23, 2007 public disclosure regarding "Subprime loans" cannot be squared with Defendants' post hoc, litigation-driven definition of "subprime."* ....109

*3.* *The Fannie Mae Subprime Cases Rejected Nearly Identical Arguments Made by Defendants Here* ....113

*4.* *The Sixth Circuit Already Considered Defendants' "Related Litigation" Case –* Kuriakose *– and Found that It Supported OPERS's Claims* ....115

D. Defendants' Material Misrepresentations and Omissions Regarding Freddie Mac's Exposure to Alt-A Loans ....117

III. THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING WHETHER DEFENDANTS' MATERIAL MISREPRESENTATIONS AND/OR OMISSIONS WERE MADE WITH SCIENTER ....120

A. Scienter Legal Standard ....120

B. OPERS has Established Scienter under the Scienter "Key Factor" (the Second *Helwig* Factor) and its Corollary (the Sixth *Helwig* Factor) ....123

C. The Third *Helwig* Factor Supports an Inference of Scienter ....127

D. The Ninth *Helwig* Factor Supports an Inference of Scienter ....129

E. The Remaining *Helwig* Factors & Confidential Witness Evidence ....132

IV. OPERS IS ENTITLED TO THE PRESUMPTION OF RELIANCE UNDER *AFFILIATED UTE* ....134

V. UNLESS REVISITED, THIS COURT'S DECISION ON PRICE IMPACT HAS MADE IT LEGALLY IMPOSSIBLE FOR OPERS TO ESTABLISH LOSS CAUSATION AND DAMAGES ....136

**CONCLUSION** ....140

## TABLE OF AUTHORITIES

### Cases


*Affiliated Ute Citizens v. U.S.*,
406 U.S. 128 (1972) ........ 8, 9, 134, 135

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008) ........ 92

*Baker v. City of Trenton*,
936 F.3d 523 (6th Cir. 2019) ........ 89

*Basic v. Levinson*,
485 U.S. 224 (1988) ........ 134

*Bd. of Sapphire Bay Condo. W. v. Simpson*,
No. CIV.A. 04-62, 2010 WL 8278411 (D.V.I. June 16, 2010) ........ 89

*Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*,
No. 3:16-CV-1106, 2019 WL 6251435 (N.D. Ohio Nov. 22, 2019) ........ 123

*Burges v. Bancorpsouth, Inc.*,
No. 3:14-CV-1564, 2017 WL 2772122 (M.D. Tenn. June 26, 2017) ........ 135

*Burkey v. Hunter*,
No. 4:17CV338, 2019 WL 950144 (N.D. Ohio Feb. 27, 2019) ........ 137

*Cent. States, Se. and Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
543 Fed. Appx. 72 (2d Cir. 2013) ........ 115, 116

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.,*
399 F.3d 651 (6th Cir. 2005) ........ 123, 127

*City of Providence v. Aeropostale, Inc.*,
No. 11 CIV. 7132 CM THK, 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ........ 93

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus.*,
29 F.4th 802 (6th Cir. 2022) ........ 7

*Cosby v. KPMG, LLP*,
No. 3:16-CV-121-TAV-DCP, 2021 WL 1828114 (E.D. Tenn. May 7, 2021) ........ 135

*Dodona I, LLC v. Goldman, Sachs & Co.,*
296 F.R.D. 261 (S.D.N.Y. 2014) ........ 136

*Doshi v. Gen. Cable Corp.*,
823 F.3d 1032 (6th Cir. 2016) ........................................................................133

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ..................................................120, 123, 127-128, 132-133

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ........................................................................................1, 10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ........................................................................................137

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.,*
270 F.3d 645 (8th Cir. 2001) ..........................................................................132

*Forman v. Meridien Bioscience*,
387 F.Supp.3d 791 (S.D. Ohio 2019)..........................................................123, 127

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ..........................................................................132

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................125

*Garden City Ret. Sys. v. Psychiatric Sols*,
No. 3:09-00882, 2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ...........................122, 126

*Goldman Sachs Grp., Inc. v. Ark. Tchrs. Ret. Sys.*,
594 U.S. 113 (2021) ..........................................................................................9

*Gruber v. Gilbertson*,
No. 16CV9727, 2021 WL 2482109 (S.D.N.Y. June 17, 2021)..................................120

*Hall v. Child.'s Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008) ............................................................104

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ........................................................................................138

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ........................................ 120-21, 123-24, 127, 129, 132-133

*Heritage Glob. Network L.A., Inc. v. Welch*,
No. 3:23-CV-00685, 2024 WL 695772 (M.D. Tenn. Feb. 20, 2024)...............................122

*Higginbotham v. Baxter Int'l Inc.*,
495 F.3d 735 (7th Cir. 2007) ........................................................................133

*House v. Players' Dugout, Inc.*,
No. 3:16-CV-00594-RGJ, 2022 WL (W.D. Ky. Aug. 22, 2022) ....................................139

*House v. Player's Dugout, Inc.*,
No. 22-5843, 2024 WL 495998 (6th Cir. Feb. 8, 2024).................................................139

*Howe v. City of Akron,*
801 F.3d 718 (6th Cir. 2015) ........................................................................140

*Hutson v. Fed. Express Corp.,*
No. 215CV02411STACGC, 2017 WL 437422 (W.D. Tenn. Feb. 1, 2017),
*aff'd*, 724 F. App'x 459 (6th Cir. 2018)...................................................................139

*In re Ancor Commc'ns, Inc. Sec. Litig.*,
22 F. Supp. 2d 999 (D. Minn. 1998) ...........................................................122, 126

*In re BancorpSouth, Inc.,*
No. 17-0508, 2017 WL 4125647 (6th Cir. Sept. 18, 2017).............................................135

*In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*,
757 F. Supp. 2d 260 (S.D.N.Y. 2010) ..............................................................100

*In re BankAtlantic Bancorp, Inc.*,
851 F. Supp. 2d 1299 (S.D. Fla. Aug. 2, 2011) ...................................................133

*In re Barclays PLC Sec. Litig.,*
No. 22 CIV. 8172 (KPF), 2024 WL 757385 (S.D.N.Y. Feb. 23, 2024)..........................100

*In re Blockbuster Inc. Sec. Litig.*,
No. 3:03-CV-0398-M, 2004 WL 884308 (N.D. Tex. Apr. 26, 2004)...............................102

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008) ..............................................................116

*In re Cardinal Health Inc. Sec. Litig.,*
No. C2-04-575, 2007 WL 1026347 (S.D. Ohio Mar. 29, 2007) .....................................132

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006)...........................................................122, 126, 132

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010) ..............................................................125

*In re CoreCivic, Inc.*,
No. 19-0504, 2019 WL 4197586 (6th Cir. Aug. 23, 2019) ....................9

*In re Countrywide Fin. Corp. Deriv. Lit.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ....................92

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*,
7 F.3d 357 (3d Cir. 1993) ....................120

*In re Dynex Capital, Inc.*,
No. 05 CIV. 1897HB, 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ....................124

*In re Envision Healthcare Corp. Sec. Litig.*,
No. 3:17-CV-01112, 2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ....................122, 126

*In re Envision Healthcare Corp. Sec. Litig.*,
No. 3:17-CV-01112, 2022 WL 4551876 (M.D. Tenn. Sept. 29, 2022) ....................123

*In re Fannie Mae 2008 Sec. Litig.*,
891 F. Supp. 2d 458 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013) .......... 113-14

*In re FirstEnergy Corp. Sec. Litig.*,
No. 2:20-CV-3785, 2023 WL 2709373 (S.D. Ohio Mar. 30, 2023), *opinion clarified*,
No. 2:20-CV-03785, 2023 WL 8105252 (S.D. Ohio Apr. 18, 2023) ....................135

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29, 36 (2d Cir. 2009) ....................10

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) ....................71, 105, 121, 126

*In re Huntington Bancshares Secs. Litig.*,
674 F. Supp. 2d 951 (S.D. Ohio 2009) ....................133

*In re MBIA, Inc., Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010) ....................119

*In re Metawave Commc'ns. Corp. Sec. Litig.*,
298 F. Supp. 2d 1056 (W.D. Wash. 2003) ....................132

*In re Moody's Corp. Sec. Litig.*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009) ....................125

*In re Nash Finch Co. Sec. Litig.*,
502 F. Supp. 2d 861 (D. Minn. 2007) ....................95, 102

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008)....................91

*In re NovaGold Res. Inc. Sec. Litig.*,
629 F. Supp. 2d 272 (S.D.N.Y. 2009)....................102

*In re Peoplesoft, Inc.*,
No. C 99-00472 WHA, 2000 WL 1737936 (N.D. Cal. May 25, 2000)....................125

*In re PMA Cap. Corp. Sec. Litig.*,
2005 WL 1806503 (E.D. Pa. July 27, 2005)....................92

*In re Retek Inc. Sec. Litig.*,
621 F. Supp. 2d 690 (D. Minn. 2009)....................137

*In re Sadia, S.A. Secs. Litig.*,
No. 08 Civ. 9528(SAS), 2009 WL 2356181 (S.D.N.Y. July 29, 2009)....................125

*In re Scholastic Corp. Secs. Litig.*,
252 F.3d 63 (2d Cir.2001)....................38, 125

*In re Signet Jewelers Ltd. Sec. Litig.*,
No. 16 CIV. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)....................101

*In re Skechers USA, Inc. Sec. Litig.*,
No. 18 Civ. 8039 (NRB), 2020 WL 1233759 (S.D.N.Y. Mar. 12, 2020)....................94, 104

*In re Sofamor Danek Grp.*,
123 F.3d 394 (6th Cir. 1997)....................100

*In re Upstart Holdings, Inc. Sec. Litig.*,
No. 2:22-CV-02935, 2023 WL 6379810
(S.D. Ohio Sept. 29, 2023)....................93, 95-96, 121-22, 126, 132

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Lit.*,
259 F.R.D. 490 (W.D. Wash. 2009)....................92

*In re Wellcare Mgmt. Grp. Sec. Litig.*,
964 F. Supp. 632, 639 (N.D.N.Y. 1997)....................132

*Izquierdo v. Boldin*,
No. 4:11CV01826, 2012 WL 2344611 (N.D. Ohio June 20, 2012)....................137

*King v. Steward Trumbull Mem'l Hosp., Inc.*,
30 F.4th 551 (6th Cir. 2022)....................88

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
897 F.Supp.2d 168 (S.D.N.Y. 2012) ........................................................... 115-16

*Lentell v. Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005) ..........................................................................116

*Levinson v. Basic Inc.*,
786 F.2d 741 (6th Cir. 1986) ..........................................................................120

*Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*,
731 F. Supp. 2d 689 (S.D. Ohio 2010)..................................................................91

*La. Sheriffs' Pension & Relief Fund, v. Cardinal Health, Inc., et al.*,
No. 2:19-CV-3347, 2021 WL 4397946 (S.D. Ohio Sept. 27, 2021)..............................101

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008)..................................................................122, 126

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
929 F. Supp. 2d 740 (M.D. Tenn. 2013) ................................................... 131-132

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001)..........................................................................125

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003)..........................................................................132

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ..................................................................101, 125

*OPERS v. Freddie Mac*,
64 F.4th 731 (6th Cir. 2023)....................................................................10, 136

*OPERS v. Freddie Mac*,
830 F.3d 376 (6th Cir. 2016)............................................ 5, 91, 95, 105, 108, 113-16, 135

*Pettrey v. Enter. Title Agency, Inc.*,
242 F.R.D. 384 (N.D. Ohio 2007)......................................................................137

*Pittman v. Unum Grp.*,
861 F. App'x 51 (6th Cir. 2021) .......................................................................132

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004)................................................... 121-122, 126, 132

*Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*,
2013 WL 1431680 (D.N.J. Apr. 9, 2013)....................91

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)....................93, 114

*Sanford v. Pershing, LLC*,
No. 3:15-CV-03832-N, 2024 WL 1748604 (N.D. Tex. Apr. 23, 2024)....................100

*SEC v. Biovail Corp*.,
No. 08 CIV. 2979 (LAK), 2010 WL 2465482 (S.D.N.Y. June 16, 2010)....................120

*SEC v. Czarnik*,
No. 10 Civ. 745(PKC), 2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010)....................126

*Serafin v. Brown*,
No. 4:22-CV-0467, 2023 WL 4490404 (N.D. Ohio July 11, 2023)....................88, 138

*Sheet Metal Workers Loc. 19 Pension Fund v. ProAssurance Corp.*,
600 F. Supp. 3d 1189 (N.D. Ala. 2021)....................92, 105

*Slayton v. Am. Express Co*.,
604 F.3d 758 (2d Cir. 2010)....................93

*Stein v. U.S. Xpress Enters., Inc.*,
No. 1:19-CV-98, 2020 WL 3584800 (E.D. Tenn. June 30, 2020)....................104

*Strougo v. Tivity Health*,
551 F. Supp. 3d 839 (M.D. Tenn. 2021)....................121, 132

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc*.,
531 F.3d 190 (2d Cir. 2008)....................122

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).................... 121-22, 126, 129

*U.S. SEC v. Mudd*,
885 F. Supp. 2d 654 (S.D.N.Y. 2012).................... 93, 104, 113-15, 119

*U.S. SEC v. Syron*,
934 F. Supp. 2d 609 (S.D.N.Y. 2013).................... 5, 104, 109-113, 115-116

*U.S. ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*,
34 F.4th 507 (6th Cir. 2022)....................129

*U.S. v. Donohue*,
726 F. App'x 333 (6th Cir. 2018)....................120

*U.S. v. U.S. Gypsum Co.*,
333 U.S. 364 (1947)....................89

*Weiner v. Tivity Health*,
365 F. Supp. 3d 900 (M.D. Tenn. 2019)....................93

*Weiner v. Tivity Health, Inc.*,
528 F. Supp. 3d 795 (M.D. Tenn. 2021)....................120, 122

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
2010 WL 4184465 (E.D. Mich. Oct. 21, 2010)....................116

*Willis v. Big Lots, Inc.*,
2016 WL 8199124 (S.D. Ohio Jan. 21, 2016)....................119

**Statutes**

15 U.S.C.A. § 78j (West)....................1

**Regulations**

17 C.F.R. § 240.10b-5....................1

**Rules**

Fed. R. Civ. P. 26(a)(1)(A)(iii)....................139

Fed. R. Civ. P. 37(c)(1)....................139

**Other Sources**

3 Newberg on Class Actions §7:35 (5th ed.)....................137

## INTRODUCTION

Plaintiff Ohio Public Employees Retirement System ("Plaintiff" or "OPERS") submits this consolidated memorandum in opposition to defendants' motions for summary judgment.[1]

To prevail on summary judgment in this case, Defendants must demonstrate that no genuine issue of material fact exists as to the following elements of OPERS's federal securities fraud claim under Section 10(b) of the Securities Act of 1934, 15 U.S.C.A. § 78j (West), and Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5: (1) material misrepresentations or omissions made by Defendants; (2) scienter; (3) OPERS'S reliance on the material misrepresentations or omissions made by Defendants; (4) loss causation; and (5) damages.[2] With respect to the elements of material misrepresentations and omissions, scienter and reliance, Defendants have failed to demonstrate that there are no genuine issues of material fact; and, therefore, Defendants' motion for summary judgment should be denied on those grounds. With respect to the remaining elements, this Court's August 14, 2018 decision denying class certification has the effect of preventing OPERS from demonstrating the elements of loss causation and damages; and, accordingly, unless the decision is reversed, summary judgment is warranted based upon OPERS's inability to establish the requisite elements of loss causation and damages.

## SUMMARY OF ARGUMENT

From August 1, 2006, through November 20, 2007 (the "Relevant Period"), Defendants essentially ignored Freddie Mac underwriting standards and dramatically increased Freddie Mac's

---

[1] Motions for summary judgment and memoranda in support were filed by defendant Federal Home Federal Home Loan Mortgage Corp. ("Freddie Mac" or "the Company") (Docs. 547-1, "Def. Memo."), Anthony Piszel (Doc. # 545, "Piszel Memo."), Eugene McQuade (Doc. # 546, "McQuade Memo"), and Richard Syron (Dkt. No. 544, "Syron Memo."). All defendants will be referred to collectively as "Defendants," while the individual defendants will be referred to as "Individual Defendants"). Although the late Patti Cook has been dismissed as a defendant (Doc. 513), misrepresentations and omissions attributable to her are still relevant with regard to Freddie Mac's corporate scienter. *See infra* Legal Argument § III.A.

[2] *See, e.g., Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 344 (2005).

exposure to highly-risky, nontraditional mortgage loans, [redacted]. This case is about how Defendants systematically misled the market regarding the Company's exposure to – and ability to measure – the credit risk and expected credit losses associated with the risky nontraditional mortgage loans Freddie Mac purchased during the Relevant Period.[3]

Defendants' efforts in this regard were all in the service of a fiction: Defendants maintained that, unlike other financial industry firms, Freddie Mac would not be undone by the housing crisis that was beginning to tear apart the world economy. The problem for Defendants – and the investing public – was that Freddie Mac was sitting on a time bomb of toxic mortgage assets that would inevitably explode as the housing crisis worsened. When that time bomb finally did go off on November 20, 2007, almost seven billion dollars of investor equity disappeared as a result of Defendants' monumentally bad business decisions. Defendants' bad business decisions, however, are not what makes this actionable securities fraud. Rather, the securities fraud here stems from the startling disconnect between (i) management's internal assessments that, [redacted], and (ii) Defendants' continued reassurances to the investing public throughout the Relevant Period that everything was going swimmingly.

[3] Freddie Mac generally purchased loans for its single-family credit guarantee portfolio – which is the focus of the parties' summary judgment briefing –in two ways: (1) "flow" purchases, in which Freddie Mac guaranteed mortgages originated by other financial institutions on a fixed pricing basis; and (2) "bulk" purchases, in which Freddie Mac purchased pools of mortgages on terms negotiated separately for each transaction. *See* Def. Memo., at 9-10. OPERS will refer to these collectively as "purchases" for ease of reference unless it is necessary to discuss them separately, in which case OPERS will refer to them as either "flow purchases" or "bulk purchases."

## I. THE MATERIAL MISREPRESENTATIONS AND OMISSIONS.

The seeds of Defendants securities fraud were sown two years prior to the Relevant Period with management's decision to abandon the Company's traditional business model [redacted]. [redacted]. For decades, Freddie Mac was content to purchase mostly prime mortgages – leaving to others the "esoteric"[4] nontraditional mortgages that came and went over the years. But by about 2004, the traditional mortgage market had leveled off just as nontraditional sales were increasing exponentially. Freddie Mac's executives were faced with a choice: (a) continue purchasing low-risk, lower-profit traditional mortgages and watch market share, profits (and bonuses) erode; or (b) increase Freddie Mac's purchases of high-risk (and theoretically higher-profit) nontraditional mortgages in the hope that the fees they charged would outstrip the credit risk. [redacted]

[redacted]

[4] *See* Exhibit ("Ex.") 7 to the Declaration of W.B. Markovits, "Final Transcript, FRE — Freddie Mac Market Update," Oct. 3, 2006 at FMOPERS00168556.

[redacted]; [redacted], Defendants repeatedly touted the Company's underwriting standards as a bulwark against the outsized credit risk generally associated with these highly risky mortgage loans. *See infra* Fact Section III.B. [redacted] In direct contrast to their repeated reassurances, however, Defendants never disclosed during the Relevant Period "that credit risk was increasing dramatically and there was increasing potential for catastrophic losses."[5] *See infra* Fact Section IV.B.

The longer Defendants concealed these internal problems, the longer the stock price remained artificially inflated. The longer the stock price remained artificially inflated, the greater the Individual Defendants' compensation. *See infra* Legal Argument § III.D. By early 2007, however, it was becoming increasingly difficult for Defendants to sustain the fiction. The housing crisis was beginning to wreak havoc on the nontraditional mortgage loan sector and investors increased their scrutiny of the financial firms who had participated in this sector. As investors learned the extent to which these 2005-, 2006- and 2007-vintage mortgages were defaulting, the questions invariably came: how many of these high-risk mortgages had Freddie Mac purchased?

---

[5] Ex. 3, Expert Report of Howard S. Shapiro, Nov. 17, 2023 at ¶34 ("Shapiro Report").

Would Freddie Mac's exposure to these mortgages result in the Company provisioning for increased credit losses? Would expected credit losses be significant enough to drag Freddie Mac below its regulator-required mandated minimum capital requirements? At this point, Defendants faced a second choice: tell the truth about the Company's exposure and undercut Freddie Mac's "prudent purchaser" sales pitch to investors; or lie about the Company's exposure and hope that the market would turn around. Freddie Mac chose the second option, which led to this securities fraud case.

Defendants have consistently sought to narrow the aperture of this case by focusing on the definition of the word "subprime" to the exclusion of their myriad underwriting and credit risk misinterpretations and omissions collected herein. Indeed, most of Defendants' 103-page brief is devoted to an argument that essentially boils down to "because there was no universal definition of 'subprime,' we were free to make whatever claims about Freddie Mac's subprime exposure we desired."[6]

There are several problems with Defendants' "ignore-underwriting-and-credit-risk-and-focus-on-subprime" approach. First, the Sixth Circuit already considered and rejected Defendants' subprime arguments *in this very case*, as did the court in *SEC v. Syron*.[7] *See infra* Legal Argument § II.C. Second, Defendants' subprime gambit ignores the entirety of OPERS's actual case. Whether they want to engage with it or not, this is a case about how Defendants misled the market regarding the Company's exposure to – and ability to measure – the credit risk and expected credit losses related to loans Freddie Mac purchased as a result of its "touch more loans" strategy. Even if they could somehow prevail on their subprime-related arguments, Defendants still haven't

---

[6] *See, e.g.,* Def. Memo., at 12-46; 60-82.

[7] *See OPERS v. Freddie Mac*, 830 F.3d 376 (6th Cir. 2016); *U.S. SEC v. Syron*, 934 F. Supp. 2d 609, 626-27 (S.D.N.Y. 2013).

meaningfully addressed their credit risk and underwriting misrepresentations and omissions. [redacted] Defendants had no duty to disclose Freddie Mac's subprime exposure during the Relevant Period; but once they did disclose Freddie Mac's subprime exposure, Defendants were obligated to tell the truth. The evidence is clear that they didn't tell the truth about Freddie Mac's subprime exposure, and no *post hoc* definitional shell game can obscure that fact.

Defendants play a similar shell game with respect to their Alt-A exposure. Defendants told investors that, as of June 30, 2007, only 8% of Freddie Mac's single family portfolio was classified as Alt-A mortgage loans. [redacted]. *See infra* Fact Section VI. In response to these facts, Defendants offer an even more tortured reading of their definition of "Alt-A" than their subprime definition. Again, there are several problems with Defendants' approach. [redacted]. *See infra* Fact Section VI. Second, the answer to the question, "Did Defendants knowingly lie about Freddie Mac's Alt-A exposure?" is not dispositive of this case. As noted above, if, somehow, this Court improperly weighs the evidence on summary judgment and finds as a factual matter that Defendants did not knowingly make material misrepresentations and omissions about Freddie

Mac's Alt-A (or even subprime) exposure, there is still overwhelming evidence of credit risk and underwriting misrepresentations and omissions — the issues at the heart of this case.

As set forth in detail below, there are, at the very least, genuine issues of material fact related to Defendants' misrepresentations and omissions across multiple dimensions: underwriting standards and risk assessments systems, credit risk and expected credit losses, subprime and Alt-A exposure and even Freddie Mac's economic capital position.

## II. DEFENDANTS' SCIENTER.

Defendants' conduct throughout the Relevant Period evidences a "knowing and deliberate intent to manipulate, deceive, or defraud" that, at best, could be characterized as "recklessness" sufficient to establish the scienter element.[8] In some instances, Defendants' public statements directly contradicted what they knew to be true. In others, Defendants knowingly omitted information that was critical to a full understanding of core components of Freddie Mac's business. Defendants voluntarily and repeatedly touted Freddie Mac's strong credit risk outlook and low expected credit losses, the quality and capabilities of its underwriting standards and risk assessment systems, and its capital position – all in a successful effort to reassure investors and analysts. But the success of this effort required the Individual Defendants to knowingly or recklessly make repeated misrepresentations and omissions of critical facts.

The requisite scienter is chargeable to Freddie Mac as well, because the individuals who uttered the misrepresentations and omissions did so with scienter and were senior executives or members of the board of directors who recklessly disregarded or tolerated the misrepresentations or omissions. For example, while Defendants publicly touted Freddie Mac's "disciplined approach to mortgage risk"[9] [redacted]

[8] *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus.*, 29 F.4th 802, 812 (6th Cir. 2022).
[9] Ex. 133, Richard Syron, Freddie Mac Morning Update (Aug. 20, 2007) (RFS_OPERS_0001657).

[redacted]

## III. OPERS's Reliance.

In accordance with *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128, 153–54 (1972), plaintiffs are entitled to a presumption of reliance where there is evidence that defendants were engaged in material omissions and/or half-truths. As set forth in detail below, OPERS has offered extensive evidence of Defendants' material omissions and/or half-truths in multiple contexts. For instance, OPERS offers evidence that [redacted]. *See infra* Fact Section III.B-C. OPERS offers evidence that Defendants concealed the fact that Freddie Mac's risk assessment systems [redacted]. *See infra* Fact Section III.B-C. And, Defendants omitted the fact that [redacted]

[redacted] *See infra* Fact Sections V and VI.

Evidence of material omissions alone is sufficient to warrant the presumption of reliance under *Affiliated Ute*; accordingly, Defendants are not entitled to summary judgment on the reliance element of OPERS's securities fraud cases as a matter of both law and fact.

## IV. Loss Causation and Damages.

As the Introduction explains, this Court previously concluded that OPERS is barred from offering evidence to support its theory of loss causation – *i.e.*, that Defendants' misrepresentations and omissions had the effect of maintaining Freddie Mac's artificially-inflated share price. This is called the "price maintenance theory" of demonstrating price impact (*i.e.*, that Defendants' misrepresentations and omissions had a material impact on the Company share price).[10] This Court also concluded that Defendants presented "overwhelming evidence" of a lack of price impact. The import of the Court's decisions is dispositive.

Without being able to rely on a price maintenance theory, OPERS cannot demonstrate price impact (*i.e.*, the impact of Defendants' misrepresentations and omissions on the Company share price). With no legal or practical ability to demonstrate price impact, OPERS cannot meet its legal burden of proving loss causation or provide a precise damages analysis.

After all, the law requires OPERS to disaggregate the economic losses OPERS suffered from the economic losses OPERS suffered that were directly attributable to Defendants' securities

[10] The price maintenance theory has been accepted by the U.S. Supreme Court and the Sixth Circuit. *See, e.g., Goldman Sachs Grp., Inc. v. Ark. Tchrs. Ret. Sys.*, 594 U.S. 113, 119-20 (2021) ("The specific theory of securities fraud that Plaintiffs allege is known as inflation maintenance. Under this theory, a misrepresentation causes a stock price to *remain* inflated by preventing preexisting inflation from dissipating from the stock price.") (emphasis in original) (citations omitted); *In re CoreCivic, Inc.*, No. 19-0504, 2019 WL 4197586, at *1 (6th Cir. Aug. 23, 2019) (recognizing that plaintiffs are legally entitled to establish price impact by "proceeding under a price maintenance theory").

fraud.[11] Without the ability to demonstrate price impact (or rely on the price maintenance theory), OPERS's expert testified that it would be impossible to provide a proper damages calculation that disaggregates the total economic losses OPERS suffered from the economic loss OPERS suffered that was directly attributable to Defendants' fraud.[12]

In recognizing these issues in its opinion sending the case back down on jurisdictional grounds, the Sixth Circuit invited this Court to "revisit the significant issues of law raised by OPERS"[13] – several of which related to price impact and loss causation. This Court previously signaled its disinclination to do so;[14] and, assuming it rejects the Sixth Circuit's invitation, summary judgment is inevitable because the Court's existing decisions bar OPERS, both legally and practically, from demonstrating the elements of loss causation and damages.

* * * * * *

As they have throughout this case, Defendants claim that the 29% drop in Freddie Mac's share price on November 20, 2007 was the result of "the Great Recession."[15] But this argument attempts to conflate reported losses and share price decline. These are two separate concepts. While Freddie Mac's reported losses may well have been caused by a worsening credit environment brought about by the Great Recession, Freddie Mac's share price dropped 29% because the truth had finally come to light about Freddie Mac's exposure to the toxic mortgage loans that caused the reported losses. This distinction is most evident when comparing the market's reaction to Freddie Mac's November 20, 2007 reported losses with the market's reaction to similar losses reported by other financial industry participants during this period.

---

[11] *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 36 (2d Cir. 2009) (disaggregation of losses not attributable to misrepresentations or omissions required under *Dura*).
[12] Ex. 4, Expert Report of David I. Tabak, Ph.D. (Nov. 16, 2023), at ¶¶3, 32-33 ("Tabak Report").
[13] *OPERS v. Freddie Mac*, 64 F.4th 731, 736 (6th Cir. 2023).
[14] Doc. #498 (granting summary judgment).
[15] Def. Memo., at 43-47.

Defendants originally attempted to use the fact that other financial firms suffered similar losses and writedowns in the period from October 2007 to January 2008 in support of a motion to dismiss.[16] But the market generally understood other firms' credit risk exposure at the time; so while these firms, like Freddie Mac, reported huge losses and writedowns, their share prices were in general minimally affected (and, in some cases, even increased). If the market understood Freddie Mac's true exposure to these toxic mortgage assets, its share price would have behaved similarly. As the following table[17] demonstrates, however, that is not what happened.

| Date of Disclosure | Company | Loss/ Write-Down | Share Price Return |
|---|---|---|---|
| 10/01/07 | Citigroup | $1.9 billion | 2.25% |
| 10/15/07 | Citigroup | $2.2 billion | -3.41% |
| 10/19/07 | Wachovia | $1.3 billion | -3.61% |
| 11/08/07 | Morgan Stanley | $3.7 billion | 4.86% |
| 11/13/07 | Bank of America | $247 million | 5.21% |
| 11/14/07 | Bear Stearns | $1.2 billion | 2.38% |
| **11/20/07** | **Freddie Mac** | **$2 billion** | **-28.69%** |
| 12/11/07 | Washington Mutual | $1.6 billion | -12.37% |
| 12/19/07 | Morgan Stanley | $3.6 billion | 4.18% |
| 12/20/07 | Bear Stearns | $854 million | 0.91% |
| 01/15/08 | Citigroup | $9.8 billion | -7.30% |
| 01/15/08 | Canadian Imperial | $462 million* | -2.14% |
| 01/18/08 | Washington Mutual | $1.87 billion | 8.75% |
| 01/22/08 | Bank of America | $5.44 billion | 3.95% |

[16] *See* Doc. #43, filed Sept. 2, 2008.

[17] There has been some dispute regarding the relevant disclosure dates and share price return. These disputes are not material. To avoid contention, Plaintiff uses the "corrected" dates and return asserted by defense expert Dr. Bajaj. (FMOPERS00238112). The firms and losses/writedowns cited were cited originally by Freddie Mac in its 2008 motion. (Doc. #43).

Each of the stocks listed in the chart above suffered large losses or write-downs within a few months of each other. And each of them – with the notable exception of Freddie Mac – had relatively minor stock price reactions. For the non-Freddie Mac firms, the market took the sizable losses in stride because it was expecting them. The converse is true of Freddie Mac: its share price dropped significantly because the truth regarding its exposure to these toxic mortgage loans had not been fully disclosed by November 2007. This chart is evidence that it was not the Great Recession that caused Freddie Mac's share price to drop on November 20, 2007, it was the materialization of the risk that Freddie Mac had been purchasing far greater exposure to these toxic mortgage assets than it had let on during the Relevant Period. This is the quantitative evidence of Defendants' fiction. Freddie Mac was not "unlike other financial industry firms" in terms of its exposure. Like its brethren, Freddie Mac had gorged at the toxic mortgage loan trough. Defendants' securities fraud occurred as a result of their decision to mislead the investing public about Freddie Mac's appetite.

## FACT SECTION

The American mortgage market is the largest of its kind in the world, with trillions of dollars of mortgages outstanding. Disruptions to this market would be catastrophic, especially for investors in fixed income securities and for borrowers who wish to purchase a home. Thus, Fannie Mae and Freddie Mac were "chartered by Congress" to bring stability and liquidity to the mortgage markets.[18] They bring this stability and liquidity to the market in two ways: (i) by guaranteeing mortgages against default, thus making it possible to create easily tradable mortgage-backed securities, and (ii) by purchasing these securities themselves for investment, thus providing

[18] Ex. 8A, Freddie Mac's Information Statement and Annual Report to Stockholders for the Fiscal Year Ended Dec. 31, 2006 at FMOPERS00205254 ("2006 Annual Report").

liquidity in times of stress.[19] During the Relevant Period, Freddie Mac was one of the largest purchasers of mortgage loans in the U.S.[20]

## I. ABANDONING "STEADY FREDDIE," FREDDIE MAC IMPLEMENTS A RISKY NEW STRATEGY TO "TOUCH MORE LOANS."

For the first twenty years after it was chartered, Freddie Mac was [redacted]

In the early 2000s, Freddie Mac was content to purchase mostly prime mortgages – leaving to others the more risky or "esoteric" subprime and other nontraditional mortgages that had begun to pervade the market. However, by about 2004, the market for prime mortgages had leveled off, subprime and other nontraditional products were increasing exponentially, and Freddie Mac was losing market share.

This situation presented Freddie Mac's executives with a choice: (a) continue purchasing low-risk, lower-profit prime mortgages and watch market share, profits (and bonuses) erode; or

---

[19] *Id.*

[20] *Id.*

[21] [redacted]

[22] [redacted]

[23] [redacted]

[24] [redacted]

(b) increase Freddie Mac's purchases of high-risk, higher-profit subprime and other nontraditional mortgages with the hope that the fees they charged would outpace the credit risk. Despite the recognition that the nontraditional loans were defaulting at an alarming rate Freddie Mac threw caution to the wind, [redacted] This strategy was called "touch more loans."

Freddie recognized internally that this new "touch more loans" strategy would be a problem to implement because [redacted] At the time of implementation, therefore, Freddie Mac knew the risks of the "touch more loans" strategy, [redacted]

[25] [redacted]

[26] [redacted]

[27] [redacted]

[redacted]”[28] [redacted].”[29] [redacted].”[30]

Freddie Mac also knew that the nontraditional mortgages it was purchasing through the “touch more loans” strategy [redacted],[31] [redacted] but Defendants ignored those concerning facts. In fact, internally senior executives openly acknowledged that:

> [redacted][32]

Even as far back as early 2006, Freddie Mac understood that its pre-“touch more loans” business risk management would work fine as long as housing price appreciation continued and

---

[28] [redacted]

credit risk remained low, but would fail in a changed risk environment. The "touch more loans" strategy required it to rely on [redacted],[33] and [redacted].[34] Freddie Mac implemented the "touch more loans" strategy in spite of these recognized weaknesses in the hope that the mortgage market would remain at its 2004-2005 peak indefinitely. This hope was unfounded.

## II. THE DAM BREAKS ON NOVEMBER 20, 2007.

On November 20, 2007, Freddie Mac released its earnings report, revealing a significant financial net loss of $2 billion for the third quarter.[35] The loss was primarily attributed to $1.2 billion in credit-related expenses (*i.e.*, "a higher provision for [future] credit losses") and a $3.6 billion mark-to-market loss in GAAP earnings (*i.e.*, a write-down in the value of its mortgage-related securities).[36] While some analysts expected significant GAAP losses based on prior Freddie Mac disclosures (although not as large as disclosed),[37] the surprising news was Freddie Mac's disclosure that "[t]he company expects credit losses to continue to increase for the remainder of 2007 and in 2008,"[38] and, accordingly, that it was obliged to raise several billion dollars, in part,

---

[33] [redacted]

[35] Ex. 10, Supplement dated Nov. 20, 2007 to Information Statement dated Mar. 23, 2007 (FMOPERS000169409-169433) ("Nov. 20, 2007 ISS"). The Nov. 20, 2007 ISS featured a Press Release titled "Freddie Mac Reports Third Quarter 2007 Net Loss of $2.0 Billion or $3.29 Per Diluted Share" at FMOPERS00169410.

[36] *Id* at FMOPERS00169410.

[37] For instance, Howard Shapiro, a financial analyst who covered Freddie Mac during the Relevant Period, "predicted a loss of around ($1.6b) and the loss disclosed on Nov. 20, 2007 was ($2.0b)." Ex. 5, Rebuttal Report of Howard S. Shapiro, Feb. 2, 2024 at ¶70 ("Shapiro Rebuttal") (Doc. 522-4).

[38] Ex. 10, Nov. 20, 2007 ISS at FMOPERS00169413. Mr. Shapiro pointed out that while "the initial size of the loss was not surprising, what was surprising was its genesis and the fact that future significant losses were expected. I had assumed that there would be a GAAP mark-to-market loss; but I had also assumed, as

continued

to reserve for the increased expected credit losses.[39] Freddie Mac explained that its provision for credit losses increased due to continued credit deterioration in our single-family credit guarantee portfolio, primarily due to 2006 and 2007 loan originations, as more loans transitioned from delinquency to foreclosure, delinquency rates increased and the expected severity of losses on a per-property basis increased.[40]

With these disclosures, Freddie Mac had finally owned up to the deleterious effects of its "touch more loans" strategy. Here, finally, Defendants began to tell the investing public what they had been privately – and repeatedly – warned about throughout the Relevant Period: "The changes in these delinquency transition rates, as compared to our historical experience, have been progressively worse for loans originated in 2006 and 2007. We believe this trend is, in part, due to greater origination volume of non-traditional loans . . . ."[41]

As discussed below, these disclosures were a dramatic departure from the tune Defendants had been singing in the months leading up to November 20, 2007 *e.g.*:

- "Credit has never been better." (March 23, 2007);
- Freddie Mac is "much better positioned for long-term profitability than we were a year ago." (June 14, 2007);
- "Freddie Mac's credit position is relatively strong with limited exposure to the riskiest mortgage products. . . . Bottom line, at a time when many of our competitors are weakening,

---

had other analysts, that such a loss would essentially have a one-time impact and that Freddie Mac would quickly bounce back The Nov. 20, 2007 disclosure made plain that this would not be the case." Ex. 5, Shapiro Rebuttal, at ¶70 (internal citations omitted).

[39] Ex. 11, Q3 2007 Earnings Call, Nov. 20, 2007 at FMAC-SEC 08215064748 and FMAC-SEC 08215064751-53.

[40] Ex. 10, Nov. 20, 2007 ISS at FMOPERS00169413.

[41] Ex. 12, Nov. 20, 2007 Extended Information Statement Supplement at FMOPERS00186777 ("Extended Nov. 20, 2007 ISS").

Freddie Mac's position is growing stronger." (September 10, 2007).[42]

One example of nontraditional loans that Freddie Mac had hidden from public view until November 20, 2007 were the so-called piggyback loans, which were second mortgage loans designed to disguise a borrower's true current loan-to-value (LTV) ratio. Prior to November 20, 2007, Freddie Mac disclosed the percentage of loans in its single-family portfolio with current LTV (loan-to-value) ratios above 90% without including so-called piggyback loans.[43] On November 20, 2007, however, Freddie Mac began including piggyback loans in its LTV ratio disclosures. This made a material difference in the Company's LTV ratios. By including piggyback loans in its LTV metrics, the single-family guarantee portfolio's reported LTV ratios above 90% (*i.e.*, the loans at greatest risk of transitioning into delinquency) jumped from 4% to approximately 14%.[44] This new disclosure alone altered the public's understanding of Freddie Mac's credit risk.[45]

When the true risks of Freddie Mac's "touch more loans" strategy materialized on November 20, 2007, the market was shocked – and reacted swiftly. Freddie Mac's share price immediately fell by approximately 30%.[46] That same day financial analysts like Mr. Shapiro downgraded their ratings of Freddie Mac's financial health from "outperform" to "underperform."[47] Critically, the reason for the "downgrade was not based on the quantum (size)

---

[42] See *infra* Fact Section IV.C and Legal Argument § II.B for a detailed discussion of how Defendants knew that these statements were false when they made them.
[43] Ex. 5, "Shapiro Rebuttal" at ¶53(c).
[44] Ex. 10, Nov. 20, 2007 ISS at FMOPERS00186746.
[45] *Compare* Ex. 13, Aug. 30, 2007 Information Statement Supplement to the Mar. 23, 2007 Annual Report to the Stockholders at FMOPERS 00209013 ("Aug. 30, 2007 ISS") *with* Ex. 12, Extended Nov. 20, 2007 ISS at FMOPERS00186746. *See also* Ex. 5, Shapiro Rebuttal, at ¶¶53-54 (noting that Freddie Mac's previous "data-based disclosures," including LTV ratios, "obscured, rather than illuminated, the actual credit risk being undertaken").
[46] *See, e.g.,* Ex. 115, Deposition of Howard Shapiro, Nov. 6, 2023 at 267:2-5 ("Shapiro Dep.").
[47] Ex. 5, Shapiro Rebuttal at ¶50. As Mr. Shapiro explained, "that disclosure alone forced me to change my opinion that Freddie Mac common stock would outperform its sector in the next twelve months, to one where I expected the stock to underperform its sector." *Id*. at ¶69.

of the loss disclosed; it was based on the nature of the loss disclosed (*i.e.*, the revelation that credit quality was much worse than previously disclosed, and that this would be an ongoing issue which would lead to a drain on capital and a constraint on future growth)."[48]

This November 20, 2007 disclosure also marked the materialization of the risk that "additional capital would be needed in the near future" – and, of "more importance, any additional capital would in large part have to be used to address future losses, rather than to fund future growth."[49] This need for additional capital was directly contrary to what Howard Shapiro and other financial analysts covering Freddie Mac understood to be the case in the fall of 2007.[50] As Mr. Shapiro noted, "Freddie Mac executives were claiming that the Company would benefit from the credit crisis by taking advantage of growth opportunities; and the analyst reports, predictably, reflected that optimism."[51] In fact, the opposite was true. Given the November 20, 2007 materialization of the risk related to its credit risk, underwriting and economic capital,[52] "Freddie Mac, like other financial institutions involved in the mortgage crisis, was going to be hurt by the turmoil" for the foreseeable future.[53]

## III. FREDDIE MAC'S MATERIAL MISREPRESENTATIONS AND OMISSIONS RELATED TO UNDERWRITING.

Because of the monoline nature of its business activities, three key metrics were of outsized importance in analyzing and understanding the Company's financial health: (1) underwriting standards and quality control; (2) credit risk and expected credit losses; and (3) economic capital.[54]

[48] *Id*.
[49] *Id*. at ¶¶71-72.
[50] *Id*. at ¶72.
[51] *Id*. (citing Ex. 3, Shapiro Report, at ¶38.)
[52] Ex. 115, Shapiro Dep., at 268:1-15 (noting that, prior to Nov. 20, 2007, Freddie Mac did not "telegraph really in any real way the substantial risk in credit costs and losses" that had occurred and were expected to continue).
[53] *Id*. at ¶72.
[54] Ex. 3, Shapiro Report at ¶3(a).

However, during the Relevant Period, Freddie Mac misrepresented and failed to disclose material facts about each of these metrics which led the investing public to believe that Freddie Mac was a company that was safe and secure. The following section details the evidence demonstrating how Defendants' statements misled the investing public into believing that Freddie Mac [redacted]

### A. Why Underwriting Standards and Quality Control Systems Were Such an Important Factor to Understanding Freddie Mac's Financial Health.

"Underwriting" means "the process by which Freddie Mac and other mortgage lenders analyzed a loan to determine whether to approve it or, in Freddie Mac's case, to purchase or guarantee it."[55] In a less technical sense, it is helpful to think of underwriting standards collectively as a checklist. If a prospective mortgage loan checks all the boxes on the checklist, Freddie Mac will agree to purchase or guarantee the loan. If it doesn't check all the boxes, Freddie Mac is supposed to decline to purchase or guarantee it (unless it is compensated for the additional risk).[56] Since Freddie Mac is involved in the purchase and guarantee of mortgage loans, underwriting is a critical component in ensuring that Freddie Mac purchases and guarantees only mortgage loans that meet its internal quality and credit standards.[57] Conversely, "quality control" means "the process of reviewing loans that were already in the [Single-Family or "SF"] Portfolio to confirm retroactively that such loans met the Company's underwriting standards at the point that they came into the SF Portfolio – and continued to meet them at the time of the review."[58] Quality control is

[55] *Id*. at ¶41.
[56] *Id*. at ¶45.
[57] *Id*. at ¶43.
[58] *Id*. at ¶42.

equally important because it is, in a sense, the internal audit to make sure the Company is actually following its stated credit policy.[59]

Freddie Mac publicly recognized the importance of underwriting standards and quality control to its effort to manage credit risk. For instance, in its August 30, 2007 Information Statement Supplement to the March 23, 2007 Annual Report to the Stockholders, Freddie Mac stated: "To manage our mortgage credit risk, we focus on three key areas: underwriting requirements and quality control standards; portfolio diversification; and portfolio management activities, including loss mitigation and the use of credit enhancements."[60] Freddie Mac's underwriting requirements were ostensibly bound up in its credit policy – basically a clear, defined set of rules for reviewing and approving mortgage loans coming into the SF Portfolio.[61] Freddie Mac articulated its credit policy during the Relevant Period as follows: "We take a disciplined approach to the acquisition of mortgage loans and generally participate in [higher risk mortgage] products when we believe we are appropriately compensated for the credit risk."[62]

During the Relevant Period, Freddie Mac used a number of different underwriting systems and quality control processes for monitoring credit risk, [redacted][63] An AUS

[59] *Id.* at ¶44.
[60] Ex. 13, Aug. 30, 2007 ISS at FMOPERS 00209040 ("Aug. 30, 2007 ISS"). [redacted]
[61] *Id.*
[62] *Id.* at FMOPERS 00209042. As an aside, this statement appears to directly contradict [redacted]
[redacted]

is a proprietary software tool that allows a company to "score" the estimated risk of default for each loan.[64] As part of its loan acquisition and securitization process, Freddie Mac traditionally provided mortgage loan originators with a series of mortgage underwriting standards and/or AUS tools – including LP – to ensure that originators were selling to Freddie Mac only loans that met Freddie Mac's underwriting standards.[65]

As Freddie Mac began to implement the "touch-more-loans" strategy, however, two problems immediately became apparent. First, Freddie Mac's underwriting standards would not allow the Company to actually purchase these new nontraditional loans (*i.e*., the loans were riskier than the Company's credit policy would allow).[66] Second, Freddie Mac's underwriting systems, including LP, could not effectively model the credit risk associated with these new loans.[67] But instead of fixing these problems, management ignored the underwriting system deficiencies and simply worked around, and/or, in many cases, totally abandoned, its underwriting standards. This led to both material omissions and material misrepresentations as management tried to stay ahead of the investing public related to the ruse.

**B. Freddie Mac's Material Omissions Regarding its Underwriting Standards and Quality Control Systems During the Relevant Period.**

As discussed in greater detail below, Freddie Mac never disclosed to the investing public that it (1) [redacted]; (2) [redacted] (3) [redacted]

[64] Ex. 2, Written Responses to Certain of Plaintiff's Notice of Rule 30(b)(6) Deposition Topics, page 11, Topic No. 1G.
[65] *See* Ex. 8A, 2006 Annual Report at FMOPERS00205319 ("We use a process of delegated underwriting for the single-family mortgages we purchase or securitize. In this process, we provide originators with a series of mortgage underwriting standards and the originators represent and warrant to us that the mortgages sold to us meet these requirements.").
[66] *See* Ex. 3, Shapiro Report, at ¶¶52-53.
[67] *Id*. at ¶¶50-51.

[redacted]; and (4) [redacted]. *See* Fact Section III, *infra*. One financial analyst who covered the Company during the Relevant Period, Howard S. Shapiro, explained that the "importance of these undisclosed underwriting deficiencies to a fair evaluation of the Company's financial condition during the Relevant Period cannot be overstated"[68] because "the information withheld demonstrates that the Company did not have the tools to adequately understand the relative risk associated with the loans coming into the SF Portfolio; and if the Company's own risk management team could not accurately model the relative risk associated with these loans, then neither the Company nor the public had any meaningful way of assessing the SF Portfolio's credit risk."[69]

**1. *Freddie Mac failed to disclose to the investing public that its underwriting standards and quality control systems were ineffective throughout the Relevant Period.***

After switching to its "touch-more-loans" business strategy, Freddie Mac almost immediately recognized its "underwriting standards and quality control processes were insufficient to protect the [single-family portfolio] from taking on "bad" loans."[70] For instance, [redacted]

[redacted]

[68] Ex. 5, Shapiro Rebuttal, at ¶33.
[69] Ex. 3, Shapiro Report, at ¶58; Ex. 5, Shapiro Rebuttal, at ¶35.
[70] Ex. 3, Shapiro Report, at ¶50.

[redacted][71]

[redacted].”[72]

[redacted]

---

[71] [redacted]

[redacted].

[73] The ERMC was established in 2006 as a "senior-level management committee." The Committee was chaired by Freddie Mac's Chief Enterprise Risk Officer, and the other members included Syron, Cook and McQuade. During the Relevant Time, "the ERMC was responsible for the corporate oversight and direction for enterprise risk management ("ERM"), recommending an ERM framework for Board approval, and providing the Board with a comprehensive review of risk." Ex. 2, Written Responses to Certain Plaintiff's Notice of Rule 30(b)(6) Deposition Notices at p. 39. The ERMC met at least quarterly and had the authority to prevent transactions from taking place if they were not consistent with the risk framework established by Freddie Mac's Board." *Id.* [redacted]

continued

[redacted][75]

**2.** [redacted]

Freddie "had virtually no ability to effectively underwrite the nontraditional mortgage products that were making up an increasing portion of the [single-family portfolio] during the Relevant Period."[76] [redacted]

---

[redacted]

[76] Ex. 3, Shapiro Report, at ¶51.

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted] [redacted]

---

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

- [redacted]

[redacted]

Recognizing that its underwriting systems were not built for the nontraditional mortgage risk associated with its "touch more loans" strategy, "Freddie Mac essentially abandoned its underwriting standards altogether over the Relevant Period – effectively outsourcing the job to Fannie Mae and other third parties whose underwriting standards were far less stringent than Freddie Mac's."[85]

Senior management was warned of the danger of this new approach throughout the Relevant Period. [redacted]

---

[83] [redacted]

[redacted]

[85] Ex. 3, Shapiro Report, at ¶52.

[86] [redacted]

[redacted][87]

[redacted].”[88]

[redacted].”[89] [redacted]”[redacted] [redacted]

---

[87] [redacted]

[redacted]

[redacted]

Freddie Mac internally recognized during the Relevant Period that the Company was consciously subverting its underwriting standards by overemploying what it termed "credit policy exceptions."[94] Credit policy exceptions are when management essentially overrides the Company's underwriting standards to purchase or guarantee loans that the credit policy would otherwise not permit.[95] [redacted]

[redacted]

91 [redacted]

[redacted]

94 Ex. 3, Shapiro Report, at ¶53.

95 *Id.*

96 [redacted]

[redacted]

[redacted]

> [redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted].[101] As Mr. Shapiro, the financial analyst who covered Freddie Mac during the Relevant Period noted, the evidence of the Company "overemploying what it termed 'credit policy exceptions'" was essentially management making "'exceptions' to the rules so that it could technically claim it was not violating the Company's underwriting guidelines."[102]

At bottom, Freddie Mac's shift to its "touch-more-loans" strategy created an increasingly-catastrophic problem: the Company lacked the underwriting infrastructure and quality control processes necessary to adequately model the credit risk associated with "touching" these new nontraditional loans.[103] [redacted]

### C. Representative Examples of Freddie Mac's Material Misrepresentations during the Relevant Period Regarding Underwriting Standards and Quality Control Systems.[105]

Freddie Mac's public statements regarding its underwriting standards and quality control systems were inconsistent with its internal assessments. On June 8, 2007, for instance, Syron stated in the context of underwriting that "[c]redit risk management is another comparative advantage for Freddie Mac."[106] Similarly, on September 10, 2007, Cook stated that "[o]ur credit position is

---

[redacted]

[102] Ex. 5, Shapiro Rebuttal, at ¶32; *see also* Ex. 3, Shapiro Report, at ¶53.

[103] *See* Ex. 3, Shapiro Report, at ¶¶50-53.

[104] [redacted]

[105] *See also* Ex. 134 (chart collecting representative examples of Freddie Mac's material misrepresentations and omissions during the Relevant Period).

[106] Ex. 14, Prepared Remarks for Richard F. Syon at Freddie Mac Annual Stockholders' Meeting, June 8, 2007 at FMAC-SEC 014810449 ("Syron Prepared Remarks, June 8, 2007").

relatively strong with limited exposure to the riskiest mortgage products."[107] They made these statements despite [redacted]. What follows is a timeline of internal warnings – supporting and augmenting the warnings set forth in Fact Section III.B *supra*, leading up to Defendants' misrepresentations.

[redacted]

[107] Ex. 15, Prepared Remarks of Patti Cook at Lehman Brothers Financial Services Conference, Sept. 10, 2007 at FMAC-SEC 081749809 ("Cook Remarks, Sept. 10, 2007").

[108] [redacted]

[redacted]

[redacted] [redacted] [redacted]

[redacted]

---

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

The above timeline demonstrates that, by mid-2007, it was clear that Defendant Syron and Ms. Cook knew and understood the [redacted] Nevertheless, they made material misrepresentations regarding the Company's underwriting standards and quality control systems throughout the Relevant Period.

In addition to the Individual Defendants' material misrepresentations during the Relevant Period, the Company's March 23, 2007 Information Statement contained several misleading disclosures about its underwriting standards and quality control systems. As background, the Freddie Mac Annual Information Statement contained a "Mortgage Credit Risk" section that devoted an entire disclosure to "Underwriting Requirements and Quality Control Standards."[120] This disclosure (a) identified and described Freddie Mac's underwriting systems and processes, and then (b) reassured investors that "[t]hese statistically-based risk assessment tools increase our ability to distinguish among single-family loans based on their expected risk, return and importance to our mission."[121] In that same underwriting disclosure, the Company claimed that "[w]e provide originators with written standards and/or automated underwriting software tools, such as Loan Prospector and other quantitative credit risk management tools that are designed to evaluate single-family mortgages and monitor the related mortgage credit risk for loans we may purchase."[122]

These statements paint a misleading portrait of the Company in two respects. [redacted]

---

[120] Ex. 8A, 2006 Annual Report at FMOPERS00205319.
[121] *Id.*
[122] *Id*.

[redacted]. As Mr. Shapiro noted, "[t]hese statements, and others like them, reassured the public that the Company was (a) following its internal rules to ensure[, in Cook's words, that the Company had] 'limited exposure to the riskiest mortgage products,' and (b) had a detailed understanding of what it takes from an underwriting perspective to ensure that credit risk from new purchases/guarantees remained under control."[123] Neither of these statements were even remotely true, as [redacted]

[redacted]

[redacted]

[redacted]

[123] Ex. 3, Shapiro Report, at ¶48.

[124] [redacted]

[redacted]

- [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[132] *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (noting that a plaintiff may "rel[y] on post-class period data to confirm what a defendant should have known during the class period").

[redacted]

## IV. Freddie Mac's Material Misrepresentations And Omissions Regarding Increasing Credit Risk And Expected Credit Losses.

### A. Why Credit Risk and Expected Credit Losses Were Such Important Indicators of Freddie Mac's Financial Health.

In this context, "credit risk" means "the chance that a borrower may default on his/her mortgage and the expected loss should such a default occur."[133] Credit risk was a critical factor in understanding Freddie Mac's financial health during the Relevant Period because its credit risk business was roughly 45% of its gross earning in any given year.[134] Expected credit losses, essentially credit risk expressed as a function of projected economic losses from mortgage defaults, were also critical because they served as a proxy for future earnings. To provide some additional context regarding the importance of credit risk and expected credit losses, even a small percentage increase in expected credit losses in a portfolio the size of Freddie Mac's (more than $1.6 trillion) would be significant; a more substantial percentage increase due to increased credit risk could be catastrophic.[135] For example, a 1% increase in expected losses due to increased credit risk in a $1.6 trillion portfolio translates to an increase of $16 billion in losses—and that increase could easily constrain Freddie Mac's economic and regulatory capital.[136] If Freddie Mac cannot properly model credit risk, it cannot accurately forecast expected earnings.[137]

[133] Ex. 3, Shapiro Report, at ¶17.
[134] *Id*. at ¶18.
[135] *Id*. at ¶17.
[136] *Id*.
[137] *Id*. at ¶18.

**B. Defendants Received Repeated Warnings Regarding Freddie Mac's Increasing Credit Risk and Expected Credit Losses.**

Freddie Mac primarily tasked two departments with understanding the risk of loss associated with the loans it was purchasing: [redacted]"[139] Defendants failed to disclose this information during the Relevant Period. Instead, they reassured the investing public over and over again that the Company's credit position had "never been better" and was "growing stronger." (*see infra* Section IV.B.2).

Mr. Shapiro, the financial analyst covering Freddie Mac during the Relevant Period, stated in this context that:

> Had Freddie Mac publicly disclosed the contemporaneous internal assessments presented by the ERMC and the [Credit Portfolio Monitoring Group], my analysis of the Company's credit risk, and, ultimately, its financial health, would have been dramatically different. The contemporaneous internal assessments recognized that the Company's SF guarantee portfolio was a ticking time bomb that management seemed in no hurry to defuse. The data being presented in these 2006 and 2007 documents were not just yellow flashing lights, they were bright red stop signs and Freddie Mac – by way of its public disclosures, at least – was signaling that there was nothing but green lights ahead.[140]

---

[138] *See* Ex. 2, Written Responses to Certain Plaintiff's Notice of Rule 30(b)(6) Deposition Topics at p. 39 (regarding role of ERMC). *See also* [redacted] Ex. 117, SEC Deposition of Hanqing Zhou, Dec. 2, 2009 (FMOPS00001418) at 11:13-24.

[139] [redacted]

[140] Ex. 3, Shapiro Report, at ¶39.

He went on to conclude that if he had been privy to the ERMC's and Credit Portfolio Monitoring Group's internal assessments during the Relevant Period when he was following the Company, he would have "rated the stock as 'Underperform' and advised our clients to avoid purchasing it."[141]

The following sections document the role of these departments in credit risk analysis and credit loss modeling and highlight their monthly warnings to senior executives regarding the increasing likelihood of a catastrophic credit loss event – warnings that went unheeded throughout the Relevant Period.

### 1. *Freddie Mac's Credit Portfolio Monitor Group repeatedly warned executive management that credit risk and projected credit losses were rising during the Relevant Period.*

Even with the Company's degraded underwriting systems, management began observing increasing credit risk in the single-family portfolio not long after implementing its "touch more loans" strategy. Because managing credit risk was essentially the Company's primary operational concern, Freddie Mac had an entire team dedicated solely to tracking and reporting credit risk, [redacted]

[redacted]

[141] *Id*. at ¶40.

[142] [redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]. As one financial analyst remarked upon learning of the "untested mortgage product" classification after the fact, "[i]t was as if Freddie Mac was putting on a blindfold and drawing mortgages out of a hat 35 times out of 100 and then hoping that they wouldn't default."[154]

---

149 [redacted]

[redacted]

154 Ex. 3, Shapiro Report, at ¶22.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted][redacted]

[redacted][redacted] [redacted][redacted]

[redacted][redacted] [redacted] [redacted][redacted] [redacted] [redacted][redacted] [redacted]

---

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted].

[redacted]

---

[redacted]

[redacted]

**C. Freddie Mac's Material Misrepresentations Regarding Credit Risk and Projected Credit Losses.**[201]

[redacted]

On March 23, 2007, Defendant McQuade publicly stated in a Bloomberg News interview that "Credit has never been better."[202] This statement was objectively – and demonstrably – untrue.

[redacted]

---

[200] [redacted].

[201] *See also* Ex. 134 (chart collecting representative examples of Freddie Mac's material misrepresentations and omissions during the Relevant Period).

[202] Ex. 129, Mar. 23, 2007 article by Bloomberg News.

[203] [redacted]

- “[redacted]
- [redacted]

[redacted]

> [redacted]

[redacted] Similarly, on June 14, 2007, Defendant Syron publicly stated that Freddie Mac was “much better positioned for long-term profitability than we were a year ago.”[207] [redacted]

---

[204] [redacted]

[redacted]

[207] Ex. 16, FRE – Q1 2007 Freddie Mac Financial Results Conference Call, June 14, 2007 at FMOPERS 00169045 (“Q1 2007 Financial Results Call”).

[208] [redacted]

[redacted]

Finally, on September 10, 2007, Ms. Cook stated that "Freddie Mac's credit position is relatively strong with limited exposure to the riskiest mortgage products. . .. Bottom line, at a time when many of our competitors are weakening, Freddie Mac's position is growing stronger. . .. Freddie is well positioned to succeed and produce shareholder value in the long term."[212] Again, this statement could not possibly be reconciled with the Company's internal assessments of "Freddie Mac's position."

[redacted]

> [redacted]

210 [redacted]

[redacted]

212 Ex. 15, Cook Remarks, Sept. 10, 2007 at FMAC-SEC 081749809.

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

## V. DEFENDANTS' PUBLIC STATEMENTS MISLED THE PUBLIC INTO THINKING FREDDIE MAC HAD FAR LESS SUBPRIME EXPOSURE THAN IT ACTUALLY HAD.

During the Relevant Period, investors and financial analysts were focused generally on institutional exposure to subprime. [redacted]

### A. How Freddie Mac Measured and Monitored its Subprime Risk Exposure During the Relevant Period.

To understand why the public statements identified in Legal Argument § II.C below were false and misleading, it is critical to first understand how Freddie Mac internally calculated and monitored its exposure to subprime risk. Freddie Mac used several different systems for monitoring subprime risk in the single-family portfolio during the Relevant Period, but none was more central to its overarching credit risk assessment than Loan Prospector® ("LP").[219]

LP was a proprietary software tool that allowed Freddie Mac to "score" the estimated risk of default for each loan. LP generated a credit risk score for each loan based on performance models calibrated to loans in Freddie Mac's credit guarantee portfolio, as well as other data acquired by Freddie Mac.[220] Prior to its shift to "touch more loans," Freddie Mac used these scores

---

[218] [redacted]

[219] Ex. 8A, 2006 Annual Report at FMOPERS00205319.

[220] *Id.*

to set the terms under which it would purchase a loan (or a series of loans) from a loan originator.[redacted]

[redacted]

By contrast, Caution meant that the system had identified concerns about the loan's creditworthiness. Caution Loans had multiple higher risk characteristics, leading to 2-3 times greater default costs.[225] [redacted]

---

221 [redacted]

225 *See, e.g.,* Ex. 42, Mar. 2-3, 2007 BOD Meeting at FMAC-SEC 047450742.

226 [redacted]

[redacted]

---

[redacted] *See also* Ex. 84, Feb. 15, 2007 email to the Individual Defendants, among others, in which Gary Kain indicated that "the largest subprime originators [in 2007] will likely be the large, regulated originators that make up the bulk of our prime purchases: Wells Fargo, Countrywide, Citibank, Chase, WAMU, and potentially Bank of America." FMAC-SEC 071186950 (also exhorting Freddie Mac to "step into the subprime market in a broader fashion and provide leadership in shaping what the market looks like in the future"); [redacted]

[redacted]

[redacted]

[redacted]

---

[redacted].

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| --- | --- | --- | --- | --- | --- |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| | | | | | |
|---|---|---|---|---|---|
| | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

### B. Freddie Mac's Misrepresentations and Omissions Regarding its Subprime Exposure.[257]

Throughout the Relevant Period, Defendants made a series of misleading and/or outright false statements regarding the Company's exposure to subprime risk. Freddie Mac's March 23, 2007 Information Statement was where it first acknowledge subprime:

> **Subprime loans.** Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low FICO scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. . . .[258]

[redacted]. But then Freddie Mac's March 23, 2007 subprime statement veers off into actionable fraud:

> While we do not characterize the single-family loans . . . in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant. . . . At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.[259]

---

[257] *See also* Ex. 134 (chart collecting representative examples of Freddie Mac's material misrepresentations and omissions during the Relevant Period).
[258] Ex. 8A, 2006 Annual Report at FMOPERS00205322.
[259] *Id*.

This statement is wildly misleading in multiple respects. [redacted]

And the Individual Defendants compounded the Information Statement's misleading effect, with what were at best half-truths that provided false reassurance regarding Freddie Mac's credit risk exposure. For example, on March 23, 2007, Defendant Piszel stated: "We have little to no exposure to the subprime risk-layered mortgage products that have drawn so much activity recently."[262]

Then, on May 17, 2007, Defendant Syron stated at a UBS Global Financial Services Conference that, "at the end of 2006, Freddie Mac had basically no subprime exposure in our [single-family] guarantee business."[263] [redacted]

---

260 [redacted]

[redacted]

262 Ex. 18, FRE – Q4 2006 Freddie Mac Earnings Conference Call, Mar. 23, 2007 at FMAC-SEC 025967951.

263 Ex. 19, May 14, 2007, Richard F. Syron's Speech at the UBS 2007 Global Financial Services Conference at FMOPERS00186212-186215 ("May 14, 2007 Syron Speech").

[redacted].

Finally, in its August 30, 2007 Information Statement Supplement, Freddie Mac's "Subprime Loans" disclosure stated: "We estimate that approximately $2 billion, or 0.1 percent, and $3 billion, or 0.2 percent of loans underlying our single-family mortgage portfolio at June 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans."[265] [redacted]

Again, Freddie Mac's internal assessments of its subprime exposure were dramatically divergent from its public statements regarding its subprime exposure. [redacted]"[267]

## VI. Freddie Mac's Internal Measurement of Alt-A Mortgage Exposure Differed Materially From Its Public Disclosures Regarding Alt-A Mortgage Exposure.

Freddie Mac senior executives and officials were also aware that Freddie Mac's public disclosures regarding its Alt-A exposure could not be reconciled with their internal measurements. [redacted]

---

264 [redacted]

265 Ex. 13, Aug. 30, 2007 ISS at FMOPERS00209012.

266 [redacted]

[redacted][268] The public statement anchoring Defendants' misrepresentations and omissions related to its Alt-A exposure can be found in Freddie Mac's August 30, 2007 Information Statement Supplement:

> In determining our Alt-A exposure in loans underlying our single-family mortgage portfolio, we have classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements which indicate that the loan should be classified as Alt-A. We estimate that approximately $120 billion, or eight percent of loans underlying our single-family mortgage portfolio at June 30, 2007 were classified as Alt-A mortgage loans.[269]

Throughout the Relevant Period, Defendants made a series of Alt-A related statements consistent with the above public disclosure. For instance, on the August 30, 2007 earnings call, Defendant Piszel stated: "we have low exposure to [Alt-A] and risk-layered loans, and when taken together, these represent about 8 percent of the total single-family guarantee portfolio."[270]

At the September 10, 2007 Lehman Brothers 5th Annual Financial Services Conference, Cook stated that "[o]n the Alt-A side, as of the end of June, [the single-family portfolio] guaranteed $120 billion of loans that were either identified by the originator as Alt-A or had reduced levels of documentation."[271] Cook also stated that, "on an absolute basis, Freddie Mac has very low exposures to Alt-A and risk layered mortgage products. When taken together, these represent about 8 percent of our total single-family guarantee portfolio."[272]

On September 17, 2007, at the Bank of America Securities 37th Annual Investor Conference, Defendant Piszel again stated: "Another major reason for our strong credit

---

268 [redacted]

[redacted]

270 Ex. 20, Final Transcript, "FRE – Freddie Mac Second Quarter 2007 Financial Results," Aug. 30, 2007 at FMAC-SEC 082147868 ("FRE – Freddie Mac Q2 7007 Results").
271 Ex. 15, Cook Remarks, Sept. 10, 2007 at FMAC-SEC 081749810.
272 *Id*.

performance relative to the market is that we have very low exposures to Alt-A and risk layered mortgage products. Taken together, these represent about 8 percent of our total single-family guarantee portfolio. . ."[273]

These public statements, however, did not track Freddie Mac's internal measurements of its Alt-A exposure. [redacted]

The mechanics for Defendants' external definition of Alt-A – a loan is Alt-A "if the lender that delivers them to us has classified the loans as Alt-A"[276] [redacted]

[273] Ex. 21, Prepared Remarks of Buddy Piszel, Bank of America 37th Annual Investment Conference, Sept. 17, 2007 at FMAC-SEC 081749815.

[274] [redacted]

[276] Ex. 13, Aug. 30, 2007 ISS at FMOPERS00209043.

[redacted][281] It is also the exact definition Freddie Mac's August 30, 2007 Information Statement Supplement contemporaneously – and Defendants currently – purported to employ.[282]

[redacted]

---

277 [redacted].

282 See, *e.g.,* Def. Memo., at 36 (recognizing that "Freddie Mac categorized as 'Alt-A' . . . all loans it held in its SF Guarantee Portfolio that had been classified as 'Alt-A' by the lender delivering the loan to Freddie Mac"); Ex. 13, Aug. 30, 2007 ISS at FMOPERS00209043 (reproduced above).

[redacted]

[redacted]

[redacted]

---

[redacted].

[redacted]

[redacted] [redacted]90

## VII. ADDITIONAL EVIDENCE OF SCIENTER: OTHER EXAMPLES OF HOW THE INDIVIDUAL DEFENDANTS' PUBLIC STATEMENTS DURING THE RELEVANT PERIOD WERE CONTRARY TO THE CONTEMPORANEOUS INTERNAL REPORTS AND ASSESSMENTS THEY RECEIVED.

In Fact Sections III-VI, above, OPERS provided numerous examples of how Defendants' public statements – regarding underwriting policies and risk assessment systems, credit risk and expected credit losses, subprime and Alt-A exposure, etc. – contradicted management's

[288] [redacted]

[289] *See, e.g., In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1007 (S.D. Ohio 2008) (noting that the "context in which a statement is made is essential in determining whether a statement is" actionable).

[290] [redacted].

contemporaneous internal assessments and discussions regarding the subject matter contained in those statements.[291] The following section identifies nine public statements made by the Individual Defendants juxtaposed against additional evidence that those external statements were inconsistent with Defendants' contemporaneous internal reports and assessments – "the 'key factor' to a finding of scienter."[292]

| **Statement 1** | **August 1, 2006** |
|---|---|
| ***"Our release today demonstrates that our risk management approach is time-tested, and we continue to operate our business in a manner that is consistent with strong interest rate and credit risk management"*** – Defendant Syron[293] | |

[redacted]

[redacted]

[291] *See, e.g.,* Ex. 129 Mar. 23, 2007 article by Bloomberg News, Defendant McQuade's statement regarding credit risk and expected credit losses; Ex. 14, Syron Prepared Remarks, June 8, 2007; Ex. 13 Defendant Freddie Mac's Aug. 30, 2007 statements regarding subprime and Alt-A exposure; Ex. 15 Cook Remarks, Sept. 10, 2007.

[292] See Legal Argument § III.B for a discussion of how the Sixth Circuit has recognized "as the 'key factor' to a finding of scienter" the "divergence between internal reports and external statements on the same subject."

[293] Ex. 22, Final Transcript, FRE-Freddie Mac Market Update, Aug. 1, 2006 at FMAC-SEC 082788980.

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

At the time he publicly stated that Freddie Mac's "risk management approach is time-tested, and we continue to operate our business in a manner that is consistent with strong interest rate and credit risk management,"[305] Defendant Syron clearly had been made aware that Freddie Mac was no longer employing that "time-tested" risk management approach.

---

301 [redacted]

[redacted]

305 Ex. 22, Final Transcript, FRE-Freddie Mac Market Update, Aug. 1, 2006 at FMAC-SEC 082788980.

| Statement 2 | October 3, 2006 |
| --- | --- |
| ***"... but we have been cautious and I think you can expect us to be cautious on the most esoteric products"*** – Defendant Syron[306] ***"While these numbers are still preliminary, they do point to the continued strength in our franchise and our ability to keep producing good, long-term returns by focusing on fundamentals and keeping risks low"*** – Defendant McQuade[307] | |

| Statement 3 | October 18, 2006 |
| --- | --- |
| ***"It's why we have purchased the newer, more untraditional loans in a very prudent and balanced way – with very low credit losses as an added benefit."*** – Defendant Syron[308] | |

At the time these October statements were made, Defendants understood that (a) [redacted] (b) [redacted] (c) [redacted]

[redacted]

[306] Ex. 7, Final Transcript of FRE- Freddie Mac Market Update, Oct. 3, 2006 at FMOPERS00168556.
[307] *Id*. at FMOPERS00168552.
[308] Ex. 24A, Oct. 18, 2006, Prepared Remarks of Dick Syron at RFS_OPERS_0001695-96.
[309] *See* Fact Section IV.B, *supra*.
[310] [redacted].

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]."[317]

[redacted]

Defendants Syron and McQuade clearly had been made aware, for instance, that Freddie Mac was no longer in a position "to keep producing good, long-term returns by focusing on fundamentals and keeping risks low."[320]

| **Statement 4** | **January 5, 2007** |
|---|---|
| Freddie Mac has ***"continued to display very low and well-managed interest rate and credit exposures;"*** and, on the ***"credit risk side, the story is much the same."*** – Defendant Piszel[321] | |

[redacted]."

[redacted]

317 [redacted]

320 Ex. 23, Final Transcript of FRE- Freddie Mac Market Update, Oct. 3, 2006 at FMAC-SEC 082789080

321 Ex. 132, FRE-Freddie Mac Market Update, dated Jan. 5, 2007 at FMAC-SEC 025969955.

[redacted]

[redacted]

---

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

On January 5, 2007, however, Defendant Piszel continued to publicly reassure the market that Freddie Mac had "very low" and "well-managed" credit risk exposure [redacted]

---

[redacted]

| **Statement 5** | **March 23, 2007** |
|---|---|
| ***"Credit has never been better"*** – Defendant McQuade[335] | |

As discussed above, this statement is wildly misleading, [redacted]

[redacted]

[335] Ex. 129, Mar. 23, 2007 article by Bloomberg News.

[336] [redacted]

[redacted]

[redacted]

[redacted].

[redacted]

| **Statement 6** | **May 14, 2007** |
| --- | --- |
| *"As we discussed in the past,* ***at the end of 2006, Freddie had basically no subprime exposure in our guarantee business****, and about $124 billion of AAA rated subprime exposure in our retained portfolio"* – Defendant Syron[348] | |

[redacted]

---

[redacted]

348 Ex. 19, May 14, 2007 Syron Speech at FMOPERS00186212-15.

349 [redacted]

[redacted]

continued

[redacted]

> [redacted]

[redacted]

[redacted] demonstrating

---

[redacted]

[redacted]

the falsity of his May 14, 2007 public statement claiming that "at the end of 2006, Freddie had basically no subprime exposure in our guarantee business."[354]

| **Statement 7** | **January 7, 2007** |
|---|---|
| ***"On the second issue on credit quality, actually we have priced in already in how we do things***. . . we are in pretty good shape and that we could see a material multiple of the credit losses that we are having now without it having a very adverse effect." – Defendant Syron[355] | |

| **Statement 8** | **August 30, 2007** |
|---|---|
| ***"We take a disciplined approach to the acquisition of mortgage loans and generally participate in these products when we believe we are appropriately compensated for the credit risk."*** – Defendant Freddie Mac[356] | |

| **Statement 9** | **August 30, 2007** |
|---|---|
| ***"Importantly, we have been able to price for this higher risk, because we source most of these loans through bulk purchases."*** – Defendant Piszel[357] | |

Each of the above statements were clearly intended to reassure investors that even though Freddie Mac was taking on some higher-risk nontraditional product, it was being compensated for that higher risk. This was false, as internal documents demonstrate.

[redacted]

[354] Ex. 19, May 14, 2007 Syron Speech at FMOPERS00186212-15.
[355] Ex. 25, Jan. 7, 2007 Transcript "FRE – Freddie Mac Market Update" at FMAC-SEC 025969962.
[356] Ex. 13, Aug. 30, 2007 ISS at FMOPERS00209042.
[357] Ex. 20, Final Transcript, FRE – Freddie Mac Second Quarter 2007 Financial Results, Aug. 30, 2007 at FMAC-SEC 082147868-082147869.
[358] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

---

359 [redacted]

[redacted]

[redacted]

[redacted]

[redacted].

[redacted]

## VIII. DEFENDANTS' RELIANCE ON THE REPORTS AND OPINIONS OF ITS EXPERTS IS MISPLACED.

Freddie Mac provides the reports and in some cases testimony of three proposed experts in support of its motion: Professor John Coates;[364] Dr. Chudozie Okongwu;[365] and Dr. Mukesh Bajaj.[366] For reasons more fully explained in OPERS's briefing on its motions to strike and exclude these experts, none of these reports or testimony erases, or negates, the overwhelming evidence adduced herein sufficient to establish a genuine issue of material fact in this case; and, accordingly, even if these experts are not stricken pursuant to OPERS's *Daubert* motions, these reports and testimony do not provide any basis for summary judgment here.[367]

### A. Professor John Coates

Freddie Mac cites Professor Coates' opinion that Freddie Mac had "a robust disclosure practice consistent with customs and practices for other large public companies."[368] Even if true, and OPERS has offered significant evidence in briefing on this issue to demonstrate that it is not

---

[364] Appendix in Support of Motion for Summary Judgment ("DAppx.") (Doc. 548), Exhs. 18 (Report), 138 (Transcript).
[365] DAppx., Exhs. 19 (Report), 139 (Transcript).
[366] DAppx., Exhs. 17 (Report).
[367] OPERS incorporates by reference the briefing regarding its motions to exclude, including: Plaintiff's Memorandum in Support of Its Motion to Exclude Expert Testimony of Prof. John Coates (Doc. 519-1) ("Coates Memo"); Reply Memorandum in Support of Plaintiff's Motion to Exclude Expert Testimony of Prof. John Coates (Doc. 536) ("Coates Reply"); Plaintiff's Memorandum in Support of Motion to Strike and Exclude the Report and Testimony of Dr. Chudozie Okongwu (Doc. 521-1) ("Okongwu Memo); Plaintiff's Reply Memorandum in Support of Motion to Strike and Exclude the Report and Testimony of Dr. Chudozie Okongwu (Doc. 535) ("Okongwu Reply"); Ohio Public Employees Retirement System's Amended Memorandum in Support of Motion to Strike Portions of the Report and Exclude Portions of the Expert Testimony of Dr. Mukesh Bajaj (Doc. 527) ("Bajaj Memo"); Ohio Public Employees Retirement System's Reply Memorandum in Support of Motion to Strike Portions of the Report and Exclude Portions of the Expert Testimony of Dr. Mukesh Bajaj (Doc. 537) ("Bajaj Reply").
[368] Brief at 26, and notes 138, 139.

true, this opinion is irrelevant on summary judgment. OPERS's case does not concern the adequacy of Freddie Mac's *procedure* relating to its disclosure practice, but rather the *content* of those disclosures. The question is whether the statements Defendants actually made to the investing public, or their failures to disclose material information, were false and misleading.[369]

**B. Dr. Mukesh Bajaj**

Freddie Mac cites Dr. Bajaj in support of its argument relating to the Individual Defendants' share acquisition, sales and value during the Relevant Period.[370] To the extent this is simply factual narration, it is improper.[371] In any event, this testimony bears little on summary judgment, inasmuch as Defendants' scienter is proven primarily by their misrepresentations and omissions that were contrary to known facts.[372]

**C. Dr. Chudozie Okongwu**

Freddie Mac relies on Dr. Okongwu's report multiple times to define and characterize undisputed events and common terms.[373] As discussed in detail in OPERS' Motion to Exclude, Dr. Okongwu's offering of background facts, historical context, definitions of terms, and comparing facts of different loans is not the province of an expert.

---

[369] Coates Memo at 2-3; Coates Reply at 12-13. Coates comparison of Freddie Mac's disclosure practices to those of other "large public companies" is also infirm because he failed to use replicable methodology to reach that opinion, could not name one "large public company" he compared Freddie Mac to, and failed to review disclosure practices of any other company in preparing his report. Coates Memo at 4-15; Coates Reply at 1-12.

[370] Brief at 52 notes 263, 265, 266; 71 at note 348; 72 at n. 349.

[371] *See* Bajaj Memo.

[372] *Id.*

[373] *See, e.g.,* Def. Memo., at 12 (underwriting of subprime mortgages varied from lender-to-lender); at 14 (characteristics of adjustable rate mortgages and "no universal definition of subprime mortgages"); at 39 (the content of Freddie Mac's public disclosures); at 43 (market forecasts of other participants and intervention of government); at 44-45 (general housing prices and market delinquency rates); and at 46 (market foreclosure rates).

Freddie Mac also cites Dr. Okongwu's report and proffered opinions for the proposition that Freddie Mac's Caution Loans are not "like" subprime loans.[374] But, as discussed in OPERS's Motion to Exclude, Dr. Okongwu's opinions on this issue are irrelevant and unreliable.[375] Dr. Okongwu knew shockingly little about the data he used as a reference, never verified its contents, and never attempted to determine whether the data was representative of the market.[376]

His comparison of these two datasets without application of any scientific or specialized knowledge is unreliable and irrelevant. Dr. Okongwu's opinion is based on a fallacious apples-to-oranges comparison – comparing Freddie Mac Caution Loans to CoreLogic subprime loans, rather than comparing them to Freddie Mac's subprime loans.

Dr. Okongwu did nothing to refute the premise that Freddie Mac failed to disclose that a substantial proportion of its Caution Loans behaved – in terms of credit risk – like Freddie Mac's subprime loans.

## LEGAL ARGUMENT

### I. Legal Standard.

This Court has framed its objective at the summary judgment stage as being "limited to determining 'whether there is a genuine issue for trial.'"[377] The Court's duty in this context "does not extend to weighing evidence or determining the truth of the matter."[378] As Defendants' themselves recognize, they have the burden of demonstrating that there is no genuine issue as to

---

[374] Def. Memo., at 21.
[375] ECF No. 521, pg. 21.
[376] *Id*.
[377] *Serafin v. Brown*, No. 4:22-CV-0467, 2023 WL 4490404, at *3 (N.D. Ohio July 11, 2023) (Pearson, J.) ("at the summary judgment stage, the Court's objective is limited to determining 'whether there is a genuine issue for trial' and does not extend to weighing evidence or determining the truth of the matter.") (citation omitted).
[378] *Id. See also King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 559–60 (6th Cir. 2022) (reversing summary judgment).

any material fact and that they are entitled to judgment as a matter of law.[379] And, while OPERS must produce more than "the mere existence of a scintilla of evidence" demonstrating a genuine issue of material fact, the Court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences."[380] Once OPERS has produced more than a "mere scintilla of evidence," "the court may not credit the moving party's version of events against the opponent, even if the quantity of the moving party's evidence far outweighs that of its opponent."[381] These are the summary judgment standard's basic tenets.

Relatedly, Defendants and OPERS have each marshalled thousands of pages of evidence supporting their respective positions (which alone should demonstrate something about the existence of a genuine issue of material fact). Defendants base much of their argument on the testimony of Freddie Mac employees (or former employees) taken years after the fact. OPERS bases much of its argument on contemporaneous documents that conflict with that testimony. When this sort of conflict arises, the U.S. Supreme Court has held that "oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight."[382] Weighing the evidence is never appropriate at summary judgment, but elevating after-the-fact testimony that conflicts with contemporaneous documentation above that documentation would violate binding Supreme Court precedent.

---

[379] Def. Memo., at 59.
[380] *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019).
[381] *Bd. of Sapphire Bay Condo. W. v. Simpson*, No. CIV.A. 04-62, 2010 WL 8278411, at *2 (D.V.I. June 16, 2010) ("if non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's version of events against the opponent, even if the quantity of the moving party's evidence far outweighs that of its opponent"; denying summary judgment).
[382] *U.S. v. U.S. Gypsum Co.,* 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

## II. There are Genuine Issues of Material Fact as to Defendants' Multiple Material Misrepresentations and/or Omissions.

OPERS has presented evidence that Defendants made material misrepresentations and omissions across multiple dimensions with one overarching goal: to conceal the fact that Freddie Mac's "touch more loans" strategy was straining its ability to remain solvent. Argument § II.A addresses Defendants' misrepresentations and omissions in the underwriting context – and how those misrepresentations and omissions masked the fact that [redacted], and (b) "did not have the tools to adequately understand the relative risk associated with the loans coming into the [single-family portfolio.]"[383] Argument § II.B addresses Defendants' misrepresentations and omissions regarding its credit risk and expected credit losses – and how those misrepresentations and omissions obscured internal warnings "that credit risk was increasing dramatically and there was increasing potential for catastrophic losses."[384] [redacted]

### [redacted] Defendants' Material Misrepresentations and Omissions Regarding Freddie Mac's Deteriorating Underwriting.

As detailed in Fact Sections III.B-C and attached Ex. 134, Defendants made multiple material misrepresentations and omissions regarding Freddie Mac's underwriting standards and risk assessment systems. Analyzing these very misrepresentations and omissions at the pleading

---

[383] Ex. 3, Shapiro Report, at ¶58 (collecting documentary examples).
[384] *Id*. at ¶34.

stage, the Sixth Circuit immediately recognized the problem: "Freddie Mac's financial reports highlighted rigorous underwriting requirements and quality control standards as key focus areas for management of credit risk," yet "[a]ll the while . . . Freddie Mac disregarded its internal controls through such practices as . . . excessive application of exceptions to otherwise non-qualifying loans, purchase of increasingly risky products, and reliance on outdated evaluative software and fraud detection measures."[385] With actual evidence supporting each of the allegations (*see supra* Fact Sections III.B-C), the Sixth Circuit's treatment of Freddie Mac's underwriting-related misrepresentations and omissions provide strong guidance at the summary judgment stage.

In addition to the Sixth Circuit's treatment of Freddie Mac's misleading underwriting statements, many courts have held that where a financial institution "touts but then abandons its conservative loan underwriting standards without disclosing the change, statements concerning its lending policies are materially misleading."[386] Indeed, the case law is rife with examples of defendants making actionable, misleading claims about their "high-quality," "conservative," "prudent" or "disciplined" underwriting policies or guidelines without bothering to notify the investing public that they had abandoned these underwriting policies/guidelines.[387]

---

[385] *OPERS v. Freddie Mac*, 830 F.3d at 386 (internal citations to the TAC omitted).

[386] *Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.,* 731 F. Supp. 2d 689, 706 (S.D. Ohio 2010) (statements concerning soundness or reliability of Fifth Third's underwriting standards or practices are material); s*ee also Prudential Ins. Co. of Am. v. Goldman, Sachs & Co*., 2013 WL 1431680, at *7 (D.N.J. Apr. 9, 2013) (MTD denied) ("Plaintiffs contend that Defendants abandoned their underwriting guidelines despite representing to investors that due diligence was conducted on the mortgage originators and loan underwriting guidelines before purchasing the loans for securitization.").

[387] *See, e.g., In re New Century*, 588 F. Supp. 2d 1206, 1225-26 (C.D. Cal. 2008) ("The Court also finds that the alleged statements cannot be chalked up to 'mere puffery' . . . . Here, Plaintiffs offer New Century's statements that it observed standards of high-quality credit and underwriting, and set those statements against detailed allegations of practices that utterly failed to meet those standards. That is sufficient to plead false and misleading statements."); *Sheet Metal Workers Loc. 19 Pension Fund v. ProAssurance Corp.*, 600 F. Supp. 3d 1189, 1215–17 (N.D. Ala. 2021) (court must view the alleged misstatements regarding ProAssurance's conservatism, discipline, and caution in the broader context in which they were made; statements, including in calls to analysts, about ProAssurance's "reasonable," "disciplined," "conservative," "prudent," and "cautious" approaches to setting its reserves, underwriting, and protecting its balance sheet

continued

That is precisely what the evidence shows Freddie Mac did here.[388] Given the overwhelming case law and evidence here, OPERS's claims regarding Freddie Mac's underwriting misrepresentations and omissions are clearly actionable.

Defendants claim to have neutralized the material omissions and misrepresentations about effectively outsourcing underwriting to third parties by citing a partial disclosure from Freddie Mac's March 23, 2007 Information Statement:[389]

> In many cases, underwriting standards are tailored under contracts with individual customers. We have been expanding the share of mortgages we purchase that were underwritten by our seller/servicers using alternative automated underwriting systems or agreed-upon underwriting standards that differ from our system or guidelines.[390]

---

not puffery when viewed in context); *In re Countrywide Fin. Corp. Deriv. Lit.,* 554 F. Supp. 2d 1044, 1072, 1076–77 (C.D. Cal. 2008) (finding that the underwriting practices of a mortgage originator would be among the most important information on which investors rely and statements including representations, for example, that Countrywide actively managed credit risk, applied more stringent underwriting standards for riskier loans such as ARMs, and only retained high credit quality mortgages in its loan portfolio, were actionably misleading); *Atlas v. Accredited Home Lenders Holding Co*., 556 F. Supp.2d 1142, 1155 (S.D. Cal. 2008) (representations that underwriting standards were better and more conservative than other subprime mortgage lenders; relied on by analysts; but then widespread exceptions to underwriting were actionable; also noting that "[a]lthough Defendants' allegedly false and misleading statements regarding Accredited's underwriting policies are not as easily quantified, as a mortgage lender, Accredited's underwriting practices would be among the most important information looked to by investors."); *In re Washington Mut., Inc. Sec., Deriv. & ERISA Lit.,* 259 F.R.D. 490, 505–06 (W.D. Wash. 2009) ("If WaMu's lending environment was fraught with such extreme departure from any plausible conception of "standards," a statement that the Company followed underwriting standards to manage or mitigate credit risk would mislead a reasonable investor."); *In re PMA Capital Corp. Sec. Litig*., 2005 WL 1806503, at *17 (E.D. Pa. July 27, 2005) (statement about defendants' "disciplined underwriting" was not puffery).

[388] *Compare* Fact Section III.B.3 (detailing management's systematic abandoning of underwriting standards to "touch more loans") *with* Ex. 32, Jan. 30, 2007 Prepared Remarks of Patti Cook, Citigroup Financial Services Conference (discussing "our prudent underwriting standards") (FMAC-SEC 081749564-68 at 67); Ex. 19, May 14, 2007 Syron Speech (discussing "disciplined approach in underwriting the credit risk we take on" and "disciplined approach to credit underwriting") at FMOPERS00186213-186215; Ex. 26, May 17, 2007 Patti Cook Speech at the Lehman Brothers 10th Annual Financial Services Conference (discussing "disciplined approach in underwriting the credit risk we take on") (FMOPERS00191678); Ex. 27, Freddie Mac First Quarter 2007 Financial Results Review (June 14, 2007) (Mr. Syron discussing how Freddie Mac has achieved growth "while maintaining a disciplined approach in underwriting the credit risk we take on.") (FMAC-SEC 006971340).

[389] *See, e.g.,* Def. Memo., at 11 (citing 2006 Information Statement, at 66).

[390] Ex. 6, Coates Report, at ¶131(b).

As an initial matter, this characterization of the Company's evolving policy on outsourcing its underwriting to third parties was wildly misleading. [redacted].[393]

As many securities fraud cases have noted in this context, "the safe harbor would not protect from liability a person who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."[394] That analogy is an apt one here. Freddie Mac cautioned investors that it was "expanding the share of mortgages we purchase" through third-party underwriting systems; it did not, however, explain [redacted].

---

391 [redacted].

393 *See, e.g., City of Providence v. Aeropostale, Inc.*, No. 11 CIV. 7132 CM THK, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) (safe harbor does not apply to material omissions; does not apply to statements of current or historical fact; vague or boilerplate disclaimers are insufficient) (citing cases); *Slayton v. Am. Express Co.*, 604 F.3d 758, 770-71 (2d Cir. 2010) (rejecting boilerplate and generalized warnings as insufficient to invoke safe harbor); *U.S. S.E.C. v. Mudd*, 885 F. Supp. 2d 654, 666–67 (S.D.N.Y. 2012) ("Finally, even if FNMA's credit metrics, warnings, or other disclosures could be considered corrective, to preclude liability the Defendants would have to show that these disclosures were conveyed to the public " 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements.").

394 *Weiner v. Tivity Health*, 365 F. Supp. 3d 900, 911 (M.D. Tenn. 2019); *see also In re Upstart,* 2023 WL 6379810, at *17 (S.D. Ohio Sept. 29, 2023); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (neither the safe harbor nor the bespeaks caution doctrine "provides [any] protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

Far from "contain[ing] sufficiently meaningful information about the specific risks addressed,"[395] this cautionary language actually misled the investing public [redacted].[396] And, as Mr. Shapiro explained, this misleading characterization prevented financial analysts like himself from being able to fairly evaluate the Company's financial condition during the Relevant Period.[397]

Perhaps more problematic is Defendants' selective editing of the underwriting disclosure they cited to support their plea for safe harbor. The sentence Defendants left out – for obvious reasons – provides critical context. That sentence is included below in bold italics:

> In many cases, underwriting standards are tailored under contracts with individual customers. We have been expanding the share of mortgages we purchase that were underwritten by our seller/servicers using alternative automated underwriting systems or agreed-upon underwriting standards that differ from our system or guidelines. ***We regularly monitor the performance of mortgages purchased using the systems and standards, and if they underperform mortgages originated using Loan Prospector, we may seek additional guarantee fee compensation for future purchases of similar mortgages.***[398]

Contrary to Freddie Mac's suggestion, senior management knew that Freddie Mac "had virtually no ability to effectively" monitor the performance of these loans.[399] [redacted]

[395] *In re Skechers USA, Inc. Sec. Litig*., No. 18 Civ. 8039 (NRB), 2020 WL 1233759, at *7-8 (S.D.N.Y. Mar. 12, 2020) (explaining that to trigger PSLRA safe harbor, warnings must contain sufficiently meaningful information about specific risks addressed by alleged misstatements).

[396] Ex. 5, Shapiro Rebuttal, at ¶33 (The importance of these undisclosed underwriting deficiencies (*i.e.*, that the universe of alternative underwritten loans had "expanded" to roughly half of all mortgages the Company had purchased") to a fair evaluation of the Company's financial condition during the Relevant Period cannot be overstated. In my experience as a financial analyst, understanding that the "expansion" Freddie Mac obliquely references was actually a full-on abandonment of its underwriting standards would have significantly altered the "total mix" of information available to the investing public.").

[397] *Id*. *See also* Ex. 3, Shapiro Report, at ¶¶52, 54-57 ("Knowing that Freddie Mac had abandoned its underwriting standards for a significant percentage of its SF Portfolio during the Relevant Period – whether through the increased use of exceptions or through the use of third-party underwriting systems – would have changed my contemporaneous analysis of the Company's financial health and my forecast of the Company's gross earnings").

[398] Ex. 6, Coates Report, at ¶131(b).

[399] Ex. 3, Shapiro Report, at ¶51 (collecting documentary examples).

[redacted].[403]

Finally, Defendants argue that they had no "duty to characterize pejoratively [Freddie Mac's] underwriting software or any efforts to revise that software."[404] But that's not the issue here. The issue, as the Sixth Circuit in this case has already pointed out,[405] is whether Freddie Mac had a duty to ensure that its public statements about its underwriting standards and systems were consistent with its internal assessments of those standards and systems. A recent case out of the Southern District of Ohio, *In re Upstart Holdings, Inc. Sec. Litig.*,[406] perfectly crystallizes this issue. In *Upstart*, the company's success as a loan originator rose and fell with its underwriting practices and ability to originate performing loans.[407] The *Upstart* defendants made a series of misleading statements about the relative strength of the company's underwriting; and, like

[400] [redacted]

[403] *See, e.g., In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007) ("[I]f Defendants knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized, and that their forward-looking statements were false and misleading, then their forward-looking statements were not protected by the safe harbor.").

[404] Def. Memo., at 88.

[405] *OPERS v. Freddie Mac*, 830 F.3d at 386.

[406] *In re Upstart*, 2023 WL 6379810 (S.D. Ohio Sept. 29, 2023).

[407] *Id*. at *23.

Defendants here, claimed those statements were not actionable. The court disagreed: "Even assuming Velocity's underwriting practice statements are opinion statements (which they are not), they are actionable because Defendants omitted that the underwriting practices had been relaxed to allow for increased short-term loan originations and that Velocity's practices allow for more non-performing loans than other lenders – making the statements about the Company's underwriting practices misleading."[408] The *Upstart* rationale applies with equal force in this case.

OPERS has offered overwhelming evidence that, despite Defendants public statements praising (and claiming to follow) Freddie Mac's underwriting standards and quality control processes, Defendants knew that (a) [redacted]";[409] (b) Freddie Mac "had virtually no ability to effectively underwrite the nontraditional mortgage products that were making up an increasing portion of the [Single Family] Portfolio";[410] (c) management had essentially outsourced Freddie Mac's underwriting responsibilities to "third parties whose underwriting standards were far less stringent than Freddie Mac's";[411] and (d) management was consciously "subverting" Freddie Mac's "underwriting standards by overemploying what it termed 'credit policy exceptions.'"[412] Based on the case law and the evidence presented, therefore, summary judgment should be denied as to Defendants' multiple, material misrepresentations and omissions related to Freddie Mac's underwriting standards and systems.

---

[408] *Id*.
[409] [redacted]
[410] Ex. 3, Shapiro Report at ¶51 (collecting documentary examples).
[411] *Id*. at ¶52 (collecting documentary examples).
[412] *Id*. at ¶53 (collecting documentary examples).

### B. Defendants' Material Misrepresentations and Omissions Regarding Credit Risk and Expected Credit Losses.

As set forth above, OPERS has offered evidence demonstrating that Defendants were well aware that the Company's credit risk and expected credit losses were increasing dramatically throughout the Relevant Period,[413] yet continued to falsely reassure the market that credit risk and expected credit losses were under control.[414] Defendants ignore the entirety of this evidence. Instead, they offer a one-and-a-half page rebuttal citing snippets of other, less damaging statements to suggest that the universe of their credit risk misrepresentations and omissions are mere "accurate statements of historical fact" or "corporate puffery" or "bespeak caution."[415] Ignoring the actionable misrepresentations, however, does not make them go away. Consider, for instance, three of Defendants' misrepresentations in this context juxtaposed against the contemporaneous internal assessments related to those misrepresentations.[416]

- On March 23, 2007, Defendant McQuade publicly stated in a Bloomberg News interview that "***Credit has never been better***."[417]

[redacted]

---

[413] *See, e.g., supra* Section IV.B.
[414] *See supra* Section IV.C.
[415] Def. Memo., at 78-81, 86-87.
[416] *See* Ex. 134 (chart collecting representative examples of Freddie Mac's material misrepresentations and omissions during the Relevant Period); *see also* Ex. 3, Shapiro Report, Exhs. 3 and 4.
[417] Ex. 129, Mar. 23, 2007 article by Bloomberg News.
[418] See *supra*, at 45-46 and 50-51 for a detailed timeline of these warnings. *See also* Fact Section VII, Statement 5 providing additional scienter evidence that Defendant McQuade understood its falsity at the time he made the statement.

[redacted][420]

- On June 14, 2007, Defendant Syron publicly stated that Freddie Mac was "***much better positioned for long-term profitability than we were a year ago***."[421]

This statement cannot exist in the same universe with the Company's contemporaneous internal assessments. [redacted].[424]

[419] [redacted]

[redacted]

[421] Ex. 16, Q1 2007 Financial Results Call at FMOPERS 00169045.

[422] [redacted]

[redacted]

- On September 10, 2007, Cook stated that "Freddie Mac's credit position is relatively strong with limited exposure to the riskiest mortgage products. . .. *Bottom line, at a time when many of our competitors are weakening, Freddie Mac's position is growing stronger*. . .. Freddie is well positioned to succeed and produce shareholder value in the long term."[425]

Again, this statement is objectively – and verifiably – false. [redacted]

[redacted]

[redacted]

[425] Ex. 15, Cook Remarks, Sept. 10, 2007 at FMAC-SEC 08174909 (emphasis added).

[426] [redacted]

Defendants' attempts to sidestep these credit risk-related misrepresentations are telling. Rather than addressing them, Defendants cherry-pick several innocuous credit risk statements and assert that they fall into one of three legal safe harbors. None of these safe harbors, however, provide the relief Defendants seek for the misrepresentations highlighted above. OPERS will address each of Defendants' safe harbor arguments below.

First, Defendants cannot avail themselves of the "accurate statements of historical fact" safe harbor because none of these misrepresentations has anything to do with "disclosure of accurate historical data."[430] Defendants' credit risk misrepresentations contained no historical data whatsoever (*e.g.*, "credit never been better;" Freddie is "much better positioned for long-term profitability than it was a year ago;" and "Freddie's "credit position . . . is growing stronger," etc.); they were objectively false statements made to reassure investors that the Company's credit position was on an upward trajectory.

Second, Defendants cannot support a claim that these misrepresentations were mere "corporate puffery." As the Second Circuit noted in a similar securities fraud case, Defendants here "did more than just offer rosy predictions; the defendants stated that the ... situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true.... [T]hese statements were plainly false and misleading."[431] In other words, statements that are "anchored in 'misrepresentation of existing facts.'" cannot be considered "corporate puffery" under the law.[432]

---

[430] *In re Sofamor Danek Grp*., 123 F.3d 394, 401 n.3 (6th Cir. 1997).
[431] *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000).
[432] *In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010); *see also In re Barclays PLC Sec. Litig.,* No. 22 CIV. 8172 (KPF), 2024 WL 757385, at *13 (S.D.N.Y. Feb. 23, 2024) (not puffery where Barclays asserted it "operated a sound system of internal control" but in fact had no system of internal control with regard to issuance of particular securities); *Sanford v. Pershing, LLC*, No. 3:15-CV-03832-N, 2024 WL 1748604, at *7 (N.D. Tex. Apr. 23, 2024) (denying summary judgment, finding opinion-based statements anchored in misrepresentations of existing facts are not puffery).

This is especially true in this context, where such statements were "made to reassure investors" – during actual investor calls – about an issue that "was of importance to investors."[433] Defendants made these statements on investor calls on an issue (credit risk management) that they explicitly recognized as "an extremely important aspect of our business as it is essential not only to our safety and soundness, but to our expected economic returns."[434]

*In re Signet Jewelers* is particularly instructive here. As in this case, the *Signet* defendants made false representations on investor calls regarding the company's "credit portfolio" health.[435] Rejecting the defendants' puffery claims, *Signet* noted that "many of the challenged statements regarding the strength and management of Signet's credit portfolio were [part of] an effort to reassure the investing public about the portfolio's health."[436] The statements highlighted above were not mere "rosy projections;" they were, in light of the Company's repeated warnings on the issue, "plainly false and misleading."

Third, even the credit risk-related misrepresentations Defendants do address do not fall under the "bespeak caution" safe harbor. For instance, Defendants cite misrepresentations like "our guarantee business is positioned to weather even a harsh credit environment" and "Management continues to expect credit losses to remain low by historical standards" as statements that "bespeak caution."[437]

---

433 *La. Sheriffs' Pension & Relief Fund, v. Cardinal Health, Inc., et al.,* No. 2:19-CV-3347, 2021 WL 4397946, at *7 (S.D. Ohio Sept. 27, 2021)

434 Defendant Piszel himself recognized the materiality of credit risk to the Company's overall financial position, noting that credit "risk management . . . is an extremely important aspect of our business as it is essential not only to our safety and soundness, but to our expected economic returns." Ex. 25, Jan. 7, 2007 Transcript "FRE – Freddie Mac Market Update" at FMAC-SEC 025969955.

435 *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 CIV. 6728 (CM), 2018 WL 6167889, at *11–12 (S.D.N.Y. Nov. 26, 2018)

436 *Id*.

437 Def. Memo., at 81.

As an initial matter, even if this Court agreed that the statements Defendants cite "bespeak caution," such statements do nothing to shield Defendants from liability for the objectively false and misleading statements highlighted above.[438] That said, neither the case law nor the factual evidence support Defendants claims with respect to the statements they cite. Courts have repeatedly held that the "bespeak caution" safe harbor "does not apply to forward-looking statements if made with 'actual knowledge' that they are false or misleading."[439] Here, Defendants had "actual knowledge" that even the forward-looking statements they cite were false and misleading.

Contrary to Freddie Mac's suggestion, senior management did not expect credit losses to remain low by historical standards; nor did they believe that Freddie Mac's guarantee business was well positioned to withstand a harsh credit environment. In fact, the opposite was true. [redacted]

[438] *See, e.g., In re Blockbuster Inc. Sec. Litig.*, No. 3:03-CV-0398-M, 2004 WL 884308, *7 (N.D. Tex. Apr. 26, 2004) ("If the representation or omission is fraudulent, independent of the existence of a forward-looking statement, the representation or omission is not shielded simply because a forward-looking statement exists."); *In re Nash Finch*, 502 F. Supp. 2d at 873 ("[I]f Defendants knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized, and that their forward looking statements were false and misleading, then their forward-looking statements were not protected by the safe harbor.").

[439] *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 291 (S.D.N.Y. 2009).

[redacted]

[redacted]

These were not the internal assessments of a company who "continued to expect credit losses to remain low by historical standards."[444] [redacted] Because they "had no basis for their optimistic statements and

---

[441] Ex. 41, Dec. 2006 SF CPMR at FMAC-SEC 060955105.
[442] *Id.*
[443] Ex. 56, Apr. 24, 2007 ERMC Reports at FMAC-SEC 082536357.
[444] Def. Memo., at 81.
[445] *Id*. As Mr. Shapiro noted in his reports, Defendants' economic capital misrepresentations and omissions neatly map onto Defendants' credit risk and underwriting misrepresentations and omissions because Freddie Mac's capital impairment at the end of the Relevant Period was "a derivative effect of the credit risk and underwriting issues discussed previously." Ex. 3, Shapiro Report, at ¶66. Freddie Mac recognized how tightly its economic capital position was tied to credit risk and underwriting. [redacted] Mr. Shapiro concluded that "[s]ubsequent statements by Freddie Mac officers that Freddie Mac's position was 'growing stronger' and that the market disruption presented an 'opportunity' were false or at the very least misleading, given that its increasing capital constraints demonstrated it was getting weaker, and prevented

continued

already knew that certain risk had become reality,"[446] Defendants' cannot avail themselves of the "bespeak caution" safe harbor for the credit risk-related misrepresentations cited in their memorandum.[447]

Based on the case law and the evidence presented, therefore, summary judgment should be denied as to Defendants' multiple, material misrepresentations and omissions related to Freddie Mac's credit risk and expected credit losses.

**C. Defendants' Material Misrepresentations and Omissions Regarding Freddie Mac's Subprime Exposure.**

As the court in *U.S. S.E.C. v. Syron* court pointed out, the question regarding Defendants' subprime-related misrepresentations is a highly fact-specific one: "when Freddie Mac and its executives used the term 'subprime,' what did reasonable investors understand them to mean by it?"[448]

To answer that question, the Sixth Circuit in this case (and the *Syron* court reviewing nearly identical allegations[449]) recognized the importance of "engaging carefully with the facts of a given

---

it from realizing market opportunities." Ex. 3, Shapiro Report, at ¶68. In other words, the same fact issues that prevent summary judgment on Defendants' false and misleading credit risk and underwriting statements prevent summary judgment on Defendants' false and misleading economic capital statements.

[446] *Hall v. Child.'s Place Retail Stores, Inc*., 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) (despite the protections afforded by the PSLRA's safe harbor or the bespeaks caution doctrine, forward-looking statements "are not protected where defendants had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality.").

[447] *See also In re Skechers*, 2020 WL 1233759, at *7-8 (explaining that to trigger PSLRA safe harbor, warnings must contain sufficiently meaningful information about specific risks addressed by alleged misstatements); *Mudd*, 885 F. Supp. 2d at 666–67 ("Finally, even if FNMA's credit metrics, warnings, or other disclosures could be considered corrective, to preclude liability the Defendants would have to show that these disclosures were conveyed to the public " 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements."); *Stein v. U.S. Xpress Enterprises, Inc.*, No. 1:19-CV-98, 2020 WL 3584800, at *9 (E.D. Tenn. June 30, 2020) ("[M]isrepresentation of present or historical facts cannot be cured by cautionary language"; otherwise, an offeror "could knowingly misrepresent historical facts" while "disclaim[ing] those misrepresented facts with cautionary language" about risk purportedly contingent but actually manifested." (citations omitted).

[448] *Syron*, 934 F. Supp. 2d at 625.

[449] *See, e.g., Syron*, 934 F. Supp. 2d at 629.

case and considering them in their full context."[450] In this case, Defendants subprime-related misrepresentations must be viewed in two separate, but overlapping, contexts: (1) the internal context, in which senior management understood that subprime risk was increasing in the single-family portfolio and, as a result, developed multiple systems in an attempt to track and monitor that "subprime exposure";[451] and (2) the external context, in which (a) Freddie Mac's *post hoc* definition of "subprime" was not at all apparent from (and, in many ways, contradicted) its contemporaneous public disclosures' definition;[452] and (b) investors were concerned about the extent to which Freddie Mac would be impacted by – in Defendants' words – "The Subprime Credit Crisis."

As set forth below, Defendants' public reassurances that "Freddie Mac had basically no subprime exposure" in its single-family guarantee portfolio are materially misleading – especially given the context around which Defendants made these statements.

[redacted]

[redacted]

---

[450] *OPERS v. Freddie Mac*, 830 F.3d at 388; *see also Sheet Metal Workers*, 600 F. Supp. 3d at 1215–17 (court must view the alleged misstatements regarding *ProAssurance*'s conservatism, discipline, and caution in the broader context in which they were made); *In re Huffy*, 577 F. Supp. 2d at 1007 (noting that the "context in which a statement is made is essential in determining whether a statement is" actionable).
[451] *See supra* Fact Section V.A.
[452] *See supra* Fact Section V.B.
[redacted]

[redacted] Parenthetically, this evidence *directly contradicts* Defendants' position in this litigation that "subprime" means loans purchased through subprime-only loan channels.[455] [redacted]

[redacted] Parenthetically, this evidence *directly contradicts* Defendants' position in this litigation that the investing public could determine for itself Freddie Mac's subprime exposure

[redacted] Ex. 84, Feb. 15, 2007 email to the Individual Defendants, among others, in which Gary Kain indicated that "the largest subprime originators [in 2007] will likely be the large, regulated originators that make up the bulk of our prime purchases: Wells Fargo, Countrywide, Citibank, Chase, WAMU, and potentially Bank of America." FMAC-SEC 071186950 (also exhorting Freddie Mac to "step into the subprime market in a broader fashion and provide leadership in shaping what the market looks like in the future"); [redacted]

455 *See* Def. Memo., at 14.

[redacted]

457 *Id*.

through its disclosure of the portfolio's loan characteristics, such as LTVs, FICOs, loan purposes, property type, etc.[458]

[redacted]

458 Def. Memo., at 39.

[redacted]

continued

Freddie Mac's detailed measurement and monitoring of "subprime exposure" throughout the Relevant Period is the internal context in which Defendants made the following representations:

- "We have little to no exposure to the subprime risk-layered mortgage products that have drawn so much activity recently." – Defendant Piszel, March 23, 2007 Earnings Call with Investors[465]

- "at the end of 2006, Freddie Mac had basically no subprime exposure in our [single-family] guarantee business." – Defendant Syron, May 14, 2007 UBS Global Financial Services Conference[466]

- "at the end of 2006, Freddie had basically no subprime exposure in our [single-family] guarantee business." – Ms. Cook, May 17, 2007 Lehman Brothers 10th Annual Financial Services Conference[467]

- "We estimate that approximately $2 billion, or 0.1 percent, and $3 billion, or 0.2 percent of loans underlying our single-family mortgage portfolio at June 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans." – Freddie Mac, August 30, 2007 Information Statement Supplement[468]

Given this context, the Sixth Circuit itself recognized that the vast distance between Freddie Mac's internal "classification" of subprime exposure in the single-family portfolio (approximately 10%) and its public statements regarding the same (0.1%) was sufficient to support OPERS's securities fraud claims against Defendants.[469]

---

[redacted]

[465] Ex. 18, FRE – Q4 2006 Freddie Mac Earnings Conference Call, Mar. 23, 2007 at FMAC-SEC 025967951. Mark Wiedman also testified that McQuade, Syron, Cook were present at offsite. Ex. 124, Deposition of Mark Wiedman at FMOPERS00181692. Note that while the slide show is labeled "Working Draft" it was actually the one presented. FMOPERS00206551.

[466] Ex. 19, May 14, 2007 Syron Speech at FMOPERS00186214. *See also* Sept. 21, 2010 Deposition of Richard Syron, at 195:12-196:23 (confirming that he made this statement at the May 14, 2007 Conference in question) (FMOPERS00212177-243).

[467] Ex. 28, May 11, 2007 Patti Cook Lehman Brothers Talking Points at FMAC-SEC 006972156-67. *See also* Ex. 121, Dec. 9, 2014 Deposition of Patricia Cook, at 417:22-418:19 (admitting she used this language on May 17, 2007 in the Lehman Brothers conference). (FMOPERS00184956-57).

[468] Ex. 13, Aug. 30, 2007 ISS at FMOPERS00209043.

[469] *OPERS v. Freddie Mac*, 830 F.3d at 386.

Finally, in an attempt to provide their own internal context, Defendants point to a number of documents and *post hoc* witness testimony documenting senior management's evaluation of expanding its business plan to include purchasing subprime loans directly "from a subprime sourcing channel."[470] These meetings, Defendants claim, show that Freddie Mac was not purchasing subprime loans from a subprime channel.[471] This is a classic misdirection. *Having an organizational debate about expanding purchasing directly into the "subprime channel" does not excuse Defendants from telling the truth about Freddie Mac's existing subprime exposure from loans already purchased through the traditional "prime channel."* In rejecting Defendants' attempt to conflate the two, the *Syron* court pointed out that "Freddie Mac executives may indeed, on occasion, have used the term 'subprime' in its narrower sense of loans from self-described subprime originators," but that does not "negate the allegations that Syron and Cook [and Piszel] understood that subprime generally referred to the types of risk loans that they knew Freddie Mac was already acquiring."[472]

**2. *<u>External Context:</u> Freddie Mac's March 23, 2007 public disclosure regarding "Subprime loans" cannot be squared with Defendants' post hoc, litigation-driven definition of "subprime."***

Defendants are asking this Court to make an intensely factual determination – inappropriate at the summary judgment stage – that a reasonable investor would have understood that when Freddie Mac used the term "subprime" in its public statements, it really meant loans from "dedicated subprime lenders who originated subprime loans using varied underwriting practices."[473]

---

[470] Def. Memo., at 16-19.
[471] Def. Memo., at 16-19, 62.
[472] *Syron*, 934 F. Supp. 2d at 633.
[473] Def. Memo., at 14.

As their sole support for this claim, Defendants point to Freddie Mac's subprime disclosure in its March 23, 2007 Information Statement:[474]

> **Subprime loans.** Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low FICO scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. . . .[475] [hereinafter referred to as the "Prefatory Paragraph"]
>
> While we do not characterize the single-family loans . . . in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant. . . . At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.[476]

OPERS addresses this disclosure at length in Fact Section V above and will not reproduce that discussion here. The *Syron* court also addressed this disclosure at length. In comparing this disclosure with Defendants' litigation-driven definitions of "subprime," the *Syron* court found that "Defendants point to no statements [in the disclosure] that would have apprised investors of those definitions. As a result, investors had nothing to go on but context, and the context in which those terms were used."[477]

When viewing this disclosure in context, the *Syron* court held that "reasonable investors could have understood the Prefatory Paragraph to set forth Freddie Mac's operative definition of 'subprime.'"[478]

---

[474] Def. Memo., at 61-62.
[475] Ex. 8A, 2006 Annual Report at FMOPERS00205322.
[476] *Id*.
[477] *Syron*, 934 F. Supp. 2d at 627.
[478] *Id*.

Because Defendants arguments here are identical to those that *Syron* rejected, it is worth quoting the *Syron* court's rationale in full:

> The Prefatory Paragraph contains the disclosures' most detailed discussion of the characteristics of subprime loans. Moreover, as a logical matter, just because Freddie Mac acknowledges that there is no universally accepted definition of subprime does not necessarily mean it has not adopted a particular definition for its own purposes. Here, particularly given the importance of the term "subprime" to the mortgage industry, a reasonable investor plausibly could have interpreted the Prefatory Paragraph to be setting forth Freddie Mac's definition of the term.
>
> That risk was especially great in the 2006 [Information Statement or "IS"], which each [Information Statement Supplement] in 2007 incorporated by reference. Immediately following the Prefatory Paragraph, the 2006 IS stated: "While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant." This statement is confusing in its own right—Freddie Mac first states that it does not characterize Single Family loans as subprime and then proceeds to do just that. The confusion surrounding Freddie Mac's use of the term "subprime" only deepens when the statement following the Prefatory Paragraph is viewed in context. In the Prefatory Paragraph, Freddie Mac stated that subprime loans "typically have a mix of *credit characteristics* that indicate a higher likelihood of default and higher loss severities than prime-loans. Such characteristics might include ... originations using *lower underwriting standards* such as limited or no documentation of a borrower's income." (*Id.* (emphasis added).) This portion of the Prefatory Paragraph belies Defendants' argument that "underwriting practice," as used in the 2006 IS, "plainly did not refer to a 'mix of credit characteristics' of the loans but rather to the characteristics of the loans' *issuers*." [*see* Def. Memo., at 62 (repackaging this argument)] In fact, the Prefatory Paragraph identifies underwriting practice as a credit characteristic, placing it in the same category as metrics such as LTV ratios and credit scores. Thus, when the 2006 IS stated that, "based on ... underwriting practice ..., the number of loans underlying [Single Family] securities is not significant," a reasonable investor could have believed that Freddie Mac was using "subprime" in the sense of risky credit characteristics. That understanding would have generated a misimpression regarding Single Family's exposure, for with $141 billion of C1, C2, and EA loans, Single Family's exposure to loans with risky credit characteristics was quite significant.[479]

---

[479] *Syron*, 934 F. Supp. 2d at 626-27 (internal citations omitted).

The *Syron* court's finding that "a reasonable investor could have believed Freddie Mac was using 'subprime' in the sense of risky credit characteristics" is only magnified in the context of Defendants' contemporaneous statements. On the same day Freddie Mac made the misleading subprime disclosure, Defendant Piszel stated: "[w]e have little to no exposure to the subprime risk-layered mortgage products that have drawn so much activity recently."[480] Then, on May 17, 2007, Defendant Syron stated at a UBS Global Financial Services Conference that, "at the end of 2006, Freddie Mac had basically no subprime exposure in our [single-family] guarantee business"[481] – after Syron himself was warned that this would mislead investors.[482] In other words, neither of these statements even remotely suggests that Defendants were cabining their definition of "subprime" to "dedicated subprime lenders who originated subprime loans using varied underwriting practices."[483] As the *Syron* court noted, such statements "purported to describe all of Single Family's subprime exposure, and each failed to set forth the narrow manner in which Defendants assert they employed the term 'subprime.'"[484]

Furthermore, the court noted, the "contexts of those statements only magnified the danger of misrepresentation. For example, Syron made [a public statement claiming that Freddie Mac did not underwrite any subprime business directly][485] in response to a question from an analyst who

[480] Ex. 18, FRE – Q4 2006 Freddie Mac Earnings Conference Call, Mar. 23, 2007 at FMAC-SEC 025967951 (FMAC-SEC 025967947-57).
[481] Ex. 19, May 14, 2007 Syron Speech at FMOPERS00186214. *See also* Ex. 120, Sept. 21, 2010 Deposition of Richard Syron, at 195:12-196:23 (confirming that he made this statement at the May 14, 2007 Conference in question) (FMOPERS00212177-243).
[482] Ex. 94, May 11, 2007 Levy Email (citing the "basically no subprime exposure" statement and warning: "We need to be careful how we word this. Certainly our portfolio includes loans that under some definitions would be considered subprime. . . . We should reconsider making as sweeping a statement as we have 'basically no subprime exposure.'") at FMAC-SEC 077461317-19.
[483] Def. Memo., at 14.
[484] *Syron*, 934 F. Supp. 2d at 628.
[485] *See* Final Transcript, FRE – Q4 2006 Freddie Mac Earnings Conference Call, at 5 (Mar. 23, 2007) ("Fortunately, at least speaking for ourselves as a GSE, we as you know weren't involved in underwriting much of that [subprime] business – any of that business directly") (FMAC-SEC047253444-454).

used the term 'subprime' to refer to 'higher LTV products' – that is, to loans defined by a credit characteristic."[486] The *Syron* court noted that a "reasonable investor could believe that by responding as he did, without clarifying his different understanding of 'subprime,' Syron implicitly adopted the questioner's definition of the term."[487] Against this backdrop, the *Syron* court concluded, Defendants' statements were actually "reinforcing the misimpression that Single Family contained few loans at risk of default."[488]

***3. The Fannie Mae Subprime Cases Rejected Nearly Identical Arguments Made by Defendants Here.***

Given the similarities between Freddie Mac and Fannie Mae, the Fannie Mae subprime securities fraud cases are also instructive – especially since the Sixth Circuit cited them favorably in this case.[489] As the Sixth Circuit noted,[490] the Fannie Mae defendants claimed that their false statements were not actionable because "FNMA provided extensive credit metrics, which corrected any misimpression created by FNMA's subprime and Alt-A definitions" and "FNMA increasingly warned investors about attendant risks as the housing market deteriorated."[491] The Fannie Mae court, however, rejected defendants arguments: "defendants' reports 'did not define subprime loans' by these metrics, nor did they measure loans by adequacy of documentation to show Alt-A exposure."[492] *Mudd* found, and the Sixth Circuit recognized,[493] that that "the publicly

[486] *Syron*, 934 F. Supp. 2d at 628.
[487] *Id*.
[488] *Id*.
[489] *OPERS v. Freddie Mac*, 830 F.3d at 386 (quoting *Mudd* rationale rejecting Fannie Mae defendants' similar truth-on-the-market and bespeak caution arguments)
[490] *Id*.
[491] *Compare Mudd*, 885 F. Supp. 2d at 666 *with* Def. Memo., at 32-42 (asserting that these misrepresentations and omissions are not actionable in view of the disclosures that Freddie Mac made regarding: (1) its intent to increase its participation in non-traditional mortgage markets; (2) the increased risk presented by non-traditional mortgage loans; (3) the precise credit characteristics of the loans in its guarantee portfolio; and (4) the fact that there is no universally accepted definition of the term "subprime" loan). *See also Fannie Mae*, 891 F. Supp. 2d at 471-72.
[492] *OPERS v. Freddie Mac*, 830 F.3d at 386 (quoting *Mudd*, 885 F. Supp. 2d at 667).
[493] *Id*.

available information did not correct, clarify or render immaterial FNMA's subprime and Alt-A exposure disclosures, because it was not clear to investors at that point that FNMA's subprime and Alt-A exposure excluded EA, MCM and lender-selected low-documentation loans"[494] Indeed, as the court *In re Fannie Mae 2008 Sec. Litig*. court pointed out, "even if the value and characteristics of [Fannie Mae's] subprime holdings were well known, this would not necessarily affect an investor's reliance on [Fannie Mae's] risk management statements."[495] [redacted] Given the nearly identical fact patterns and allegations, these courts' rationale with respect to Fannie Mae should logically apply with equal force to Freddie Mac in this context (especially in light of the Sixth Circuit's discussion of them in this case).[496]

The *Mudd* court also rejected Defendants' assertion that its disclaimers and warnings regarding the housing market render any misrepresentations or omissions immaterial here.[497] As *Mudd* noted, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."[498] Indeed, "a reasonable investor might not have been concerned about future risk in the subprime market, given [the defendants'] representation that FNMA's subprime exposure was 'about zero percent.'"[499] With Defendants making virtually the same representations during the Relevant Period (*e.g.*, "we have little to no exposure to the

[494] *Mudd*, 885 F. Supp. 2d at 667 (noting that Fannie Mae's "failure to include approximately $100 billion of EA and MCM loans in its subprime exposure calculations and approximately $341 billion in lender-selected low-documentation loans in its Alt-A exposure calculations" was not immaterial).
[495] *Fannie Mae*, 891 F. Supp. 2d at 478.
[496] *OPERS v. Freddie Mac*, 830 F.3d at 386.
[497] *Compare Mudd*, 885 F. Supp. 2d at 666-67 *with* Def. Memo., at 41-43 (asserting that Freddie Mac warned investors that, if real estate values declined, or credit tightened, or interest rates changed, it was likely to incur unavoidable losses) (internal citations omitted).
[498] *Mudd*, 885 F. Supp. 2d at 667 (citing *Rombach,* 355 F.3d at 173).
[499] *Id*.

subprime, risk-layered mortgage products that have drawn so much note recently,"[500] and "we have basically no subprime exposure in our [single-family] guarantee business"[501]), the *Mudd* court's observation regarding the reasonable investor's false sense of security is as applicable here as it was with respect to Fannie Mae's housing market disclaimers and warnings.

#### *4. The Sixth Circuit Already Considered Defendants' "Related Litigation" Case –* **Kuriakose** *– and Found that It Supported OPERS's Claims.*

Ignoring both the Sixth Circuit decision in this case and the *Syron* decision on identical facts, Defendants instead inexplicably focus on *Kuriakose v. Freddie Mac*.[502] The reason this is inexplicable is because the Sixth Circuit addressed *Kuriakose*[503] at length in its opinion and concluded that not only does it not support Defendants' position, it actually bolsters OPERS's: "That case, though not controlling in the Sixth Circuit and factually distinguishable, lends support to our conclusions. November 20, 2007, is indeed a familiar date but it stands at the beginning of the class period in *Central States*; here it stands as the *end* of the class period. That makes all the difference."[504] Here is why the Sixth Circuit understood that the class period dates "makes all the difference:"

> The court in *Central States* emphasized that on the first day of its class period, Freddie Mac "reported a loss of more than $2 billion, causing its stock price to fall from $37.50 at the close of trading on November 19 to $26.74 at the close of trading on November 20." *Id*. On that day, Freddie Mac also disclosed "its increased involvement in nontraditional mortgage markets and the 'greater credit risks' from 'increased delinquencies and credit losses' involving nontraditional mortgage

[500] Ex. 18, FRE – Q4 2006 Freddie Mac Earnings Conference Call, Mar. 23, 2007 at FMAC-SEC 025967951.

[501] Ex. 19, May 14, 2007 Syron Speech at FMOPERS00186 214. *See also* Ex. 120, Sept. 21, 2010 Deposition of Richard Syron, at 195:12-196:23 (confirming that he made this statement at the May 14, 2007 Conference in question) (FMOPERS00212177-243).

[502] Def. Memo., at 58-59 (citing *Kuriakose v. Federal Home Loan Mortg. Corp*., 897 F. Supp. 2d 168 (S.D.N.Y. 2012).

[503] To be precise, the Sixth Circuit actually addressed the Second Circuit case affirming *Kuriakiose*, which was captioned *Central States, Southeast and Southwest Areas Pension Fund v. Federal Home Loan Mortgage Corp.*, 543 Fed. Appx. 72 (2d Cir. 2013).

[504] *OPERS v. Freddie Mac*, 830 F.3d at 387.

> products." *Id*. Given these disclosures, the court reasoned, investors could not "plausibly allege that they were not on notice of the true gravity of Freddie's situation until corrective disclosures began to be published on July 3, 2008." *Id*. at 74–75. Based on the class period in the present case, OEPRS could and did plausibly allege that it was not on notice. OPERS's position differed from that of Central States, as it had purchased stock before November 20 under the misimpression (allegedly fostered by Freddie Mac) that Freddie Mac adequately protected its higher-risk purchases, had virtually no subprime exposure, and enjoyed more success than its competitors. The subsequent revelation of loss on the November 20 close of *this* class is well within the "zone of risk" that Freddie Mac allegedly concealed here. *Lentell*, 396 F.3d at 173.

OPERS is at a loss to explain why Defendants would cite to the *Kurikose* case for the proposition that it is "Related Litigation" when the Sixth Circuit has already determined that, because of its later class period, it does not apply to these facts. For good measure, the *Syron* court also considered *Kuriakose* in connection with Defendants' arguments and summarily distinguished it from the facts at issue here.[505]

* * * * *

As many courts have noted in the securities fraud context, while defendants have no affirmative duty to speak, "once Defendants did make statements, they were obligated to share complete information."[506] Indeed, even "an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it--or other statements made--materially misleading."[507]

When Defendants made these subprime-related statements they were obligated to share the fact that management's internal assessments placed the Company's subprime exposure at approximately 10% — far beyond what Defendants were publicly representing at the time.

[505] *Syron*, 934 F. Supp. 2d at 633.
[506] *Wilkof v. Caraco Pharm. Lab'ys, Ltd*., 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2010).
[507] *In re Bristol Myers Squibb Co. Sec. Litig*., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008).

**D. Defendants' Material Misrepresentations and Omissions Regarding Freddie Mac's Exposure to Alt-A Loans.**

As set forth in Fact Section VI above, and the Chart attached as Exhibit 134, Freddie Mac senior executives and officials were aware that Freddie Mac's public disclosures regarding its Alt-A exposure could not be reconciled with their internal measurements [redacted]

Defendants' response to this clear discrepancy is to offer another tortured reading of a previous public disclosure. This time, Defendants would have the Court believe that when Freddie Mac stated in its August 30, 2007 Information Statement Supplement that it "classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements which indicate that the loan should be classified as Alt-A,"[508] it really meant:

> Freddie Mac categorized as "Alt-A": (1) all loans it held in its SF Guarantee Portfolio that had been classified as "Alt-A" by the lender delivering the loan to Freddie Mac, and (2) those loans that, while not classified as "Alt-A" by the lender delivering the loan to Freddie Mac, had nonetheless been underwritten with reduced documentation requirements and, in addition, presented credit risks that, in Freddie Mac's view, were generally equivalent to the credit risk presented by those loans Freddie Mac purchased that had been classified as "Alt-A" by the delivering lender.[509]

As an initial matter, there is, charitably, a genuine issue of material fact as to whether a reasonable investor would have understood the public disclosure – and its relatively concise, clear

[508] Ex. 13, Aug. 30, 2007 ISS at FMOPERS00209043 (emphasis added).
[509] Def. Memo., at 36-37.

characterization of Alt-A – to mean what Defendants are now saying it means. But, more to the point, even Defendants' made-for-litigation definition would result in an Alt-A exposure of approximately 29% of the single-family portfolio at the time Defendants made these material misrepresentations and omissions.

In the final analysis, however, the context is what sinks Defendants' attempts to rationalize their Alt-A misrepresentations and omissions. It bears repeating: Freddie Mac's public disclosure stated that it "classified mortgage loans as Alt-A" if either of the following was true: (a) "the lender that delivers them to us has classified the loans as Alt-A;" or (b) "the loans had reduced documentation requirements which indicate that the loan should be classified as Alt-A."[510]

[redacted]

Even Defendants concede this point, citing a June 14, 2007 statement from Cook: "The mix of our portfolio that is ***defined as Alt-A by our customers***, ***because that is really the only way you get at that designation,*** we would estimate . . . [to be] less than 10" percent.[515] Failing to

---

[510] Ex. 13, Aug. 30, 2007 ISS at FMOPERS00209043.

[redacted]

[515] Def. Memo., at 36 (citing Doc. #548-47, Q1 2007 Earnings Call Tr., at 12 (June 14, 2007)) (emphasis in original).

accurately cite information regarding one of the core components of the business will always constitute a material misrepresentation.[516]

The information Defendants failed to disclose was also critical: [redacted]

[redacted] The plain meaning of Defendants' Alt-A disclosures – especially in the context of heightened interest in subprime and Alt-A exposure due to, in Cook's words, "the current unrest in the financial markets [that] is causing turmoil for many mortgage companies"[519] – created "a substantial likelihood that the omitted information would have been viewed by the

[516] *See, e.g.*, *Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *17 (S.D. Ohio Jan. 21, 2016) ("Failing to accurately cite the progress of the merchandise category is material given the importance of the merchandising operations to Big Lots' business model.").

[redacted]

[519] Ex. 15, Cook Remarks, Sept. 10, 2007 at FMAC-SEC 081749809. *See also Mudd*, 885 F. Supp. 2d at 666-67 (finding that understanding Fannie Mae's true exposure to low-doc Alt-A loans "would have been particularly important to investors because of the volatility in the housing and secured-transactions markets."); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 584-86 (S.D.N.Y. 2010) (holding that a failure to disclose that 1% of the insurers' portfolio was exposed to assets backed in part by residential-mortgage-backed securities was material because of volatility in the housing and secured-transaction markets).

reasonable investor as having significantly altered the 'total mix' of information made available."[520]

The weight of the evidence presented here, combined with the fact-specific context in which Defendants made these public statements, preclude summary judgment as to Defendant's material misrepresentations and omissions related to Freddie Mac's Alt-A exposure.[521]

## III. There are Genuine Issues of Material Fact Regarding Whether Defendants' Material Misrepresentations and/or Omissions Were Made with Scienter.

### A. Scienter Legal Standard.

Scienter involves mixed questions of law and fact, making its determination "peculiarly within the province of the trier of fact" and inappropriate for summary judgment unless "the nonmoving party rests merely upon conclusory allegations, improbably inferences, and unsupported speculation."[522] In order to determine scienter, the Sixth Circuit directs courts to review the allegations holistically to determine whether the facts alleged give rise to a strong inference of scienter.[523] As part of this holistic review, courts in the Sixth Circuit typically consider the non-exhaustive list of so-called *Helwig* factors: (1) insider trading at a suspicious time or in an

[520] *United States v. Donohue*, 726 F. App'x 333, 342–43 (6th Cir. 2018).
[521] *See, e.g., S.E.C. v. Biovail Corp*., No. 08 CIV. 2979 (LAK), 2010 WL 2465482, at *2 (S.D.N.Y. June 16, 2010) ("issues of scienter and materiality are difficult ones on which to grant summary judgment as they are particularly fact and context dependent."); *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig*., 7 F.3d 357, 371 (3d Cir. 1993) ("[W]e must consider an alleged misrepresentation within the context in which the speaker communicated it.").
[522] *Weiner v. Tivity Health, Inc*., 528 F. Supp. 3d 795, 811–12 (M.D. Tenn. 2021) (citations omitted); *see also Levinson v. Basic Inc*., 786 F.2d 741, 749 (6th Cir. 1986), *vacated*, 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) ("Because summary judgment is generally inappropriate for issues of scienter, knowledge and intent . . . this issue must be first decided by the district court and may not be decided by us as a matter of law."); *Biovail Corp*., 2010 WL 2465482, at *2 ("issues of scienter and materiality are difficult ones on which to grant summary judgment as they are particularly fact and context dependent."); *Gruber v. Gilbertson*, No. 16CV9727, 2021 WL 2482109, at *12 (S.D.N.Y. June 17, 2021) (courts should be lenient in allowing scienter to withstand summary judgment because such issues "are appropriate for resolution by the trier of fact.").
[523] *See Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018).

unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.[524]

These factors are non-exhaustive; *and the absence of one or more "does not meaningfully detract from a strong inference of scienter*."[525] While courts in this Circuit still apply the *Helwig* factors, they also follow *Tellabs* guidance and review the evidence "holistically," incorporating the *Helwig* factors as one part of this holistic review.[526]

Considerations relevant to a holistic scienter analysis may include, for example, whether the statements or omissions related to core components of Freddie Mac's business, because the more central a fact or omission is to a company's core operations, the "more likely its executive acted with scienter."[527]

---

[524] *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 317–18, 322–23 (2007).
[525] *In re Upstart*, 2023 WL 6379810, at *23 (quoting *Strougo v. Tivity Health*, 551 F. Supp. 3d 839, 851 (M.D. Tenn. 2021)). Defendants attempt to argue otherwise, by stating that the absence of certain factors "negate" any inference of scienter (Def. Memo., at 70-77), but this misstates the applicable standard.
[526] *Tellabs*, 551 U.S. at 310; *see In re Upstart Holdings,* 2023 WL 6379810, at *20.
[527] *In re Upstart*, 2023 WL 6379810, at *23 (citing *In re Huffy*, 577 F. Supp. 2d at 1000). While it is correct that "fraudulent intent cannot be inferred *merely* from [individual defendants] positions in the Company and alleged access to information," this is in reference to situations where executives may not know about, for example, "accounting issues [that are] relatively arcane in nature and scope" and that do not "pertain[ ] to central, day-to-day operational matters." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir.
continued

Other relevant considerations include whether the misrepresentations covered topics "voluntarily and repeatedly discussed," or were made in answer to questions, or were made to reassure investors or analysts.[528]

Finally, courts have held that it "is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."[529] Scienter for Defendant Freddie Mac's misrepresentations can be established through any of the following:

"a. The individual agent who uttered or issued the misrepresentation; b. Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance; c. Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance[.]"[530]

---

2004). The Sixth Circuit has held, however, that "high-level executives *can* be presumed to be aware of matters central to their business's operation." *Id.* (citation omitted) (emphasis added); *see also Heritage Glob. Network L.A., Inc. v. Welch*, No. 3:23-CV-00685, 2024 WL 695772, at *14 (M.D. Tenn. Feb. 20, 2024) (court could infer strongly each defendant was aware fund was failing in business with "single, central operational strategy."); *In re Envision Healthcare Corp. Sec. Litig*., No. 3:17-CV-01112, 2019 WL 6168254, at *21–22 (M.D. Tenn. Nov. 19, 2019) ("[H]igh-level executives can be presumed to be aware of matters central to their business's operation."); *Garden City Ret. Sys. v. Psychiatric Sols*, No. 3:09-00882, 2011 WL 1335803, at * 57 (M.D. Tenn. Mar. 31, 2011) (same); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 724 (S.D. Ohio 2006) (same); *In re Ancor Commc'ns, Inc. Sec. Litig.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) (same).

[528] *In re Upstart*, 2023 WL 6379810, at *23.

[529] *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc*., 531 F.3d 190, 195 (2d Cir. 2008); *see also Makor Issues & Rts., Ltd. v. Tellabs Inc.,* 513 F.3d 702, 710 (7th Cir. 2008) ("But it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud. Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.").

[530] *Weiner v. Tivity Health, Inc*., 528 F. Supp. 3d 795, 811–12 (M.D. Tenn. 2021) (citations omitted).

### B. OPERS has Established Scienter under the Scienter "Key Factor" (the Second *Helwig* Factor) and its Corollary (the Sixth *Helwig* Factor).

The Sixth Circuit has recognized the second *Helwig* factor ("divergence between internal reports and external statements on the same subject") "as the 'key factor' to a finding of scienter."[531] And, because of their similarly, courts generally consider the second *Helwig* factor in conjunction with the sixth *Helwig* factor ("disregard of the most current factual information before making statements").[532] Where these factors are present – especially *Helwig* factors (2) and (6) – courts will generally find that scienter has been established.[533]

Throughout the Relevant Period, Defendants made numerous public statements about the Company's credit risk profile and underwriting standards and systems that directly contradicted their internal assessments on these same issues. And Defendants made these misrepresentations and omissions, in many cases, despite receiving contemporaneous internal assessments to the contrary.[534] Because OPERS has already detailed the divergence between Defendants' public statements on underwriting, credit risk, subprime and Alt-A and their internal assessments on these issues, OPERS will offer only a summary of that evidence herein.

[531] *Dougherty*, 905 F.3d at 981; *see also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.,* 399 F.3d 651, 688 (6th Cir. 2005); *Forman v. Meridien Bioscience*, 387 F. Supp. 3d 791, 797 (S.D. Ohio 2019); *Boynton Beach Firefighters' Pension Fund v. HCP, Inc*., No. 3:16-CV-1106, 2019 WL 6251435, at *4 (N.D. Ohio Nov. 22, 2019).
[532] *Helwig,* 251 F.3d at 552.
[533] *See, e.g., Forman,* 387 F. Supp.3d at 797 (finding scienter based upon factors 2 and 6); *Dougherty*, 905 F.3d at 981 (finding scienter based upon factors 2 and 6, with factor 3 "minimally" in plaintiff's favor and no other factor applicable); s*ee also In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-CV-01112, 2022 WL 4551876, at *12 (M.D. Tenn. Sept. 29, 2022) (finding a strong inference of scienter based on the second *Helwig* factor alone where plaintiffs have shown "the divergence between internal reports and external statements").
[534] *Compare, e.g.,* Ex. 16, Q1 2007 Financial Results Call, Defendant Syron's June 14, 2007 public statement that Freddie Mac was "much better positioned for long-term profitability than we were a year ago." (n. 207, *supra*) *with* [redacted]

The evidence of the second and sixth *Helwig* factors in this case is overwhelming. In Fact Section III above, OPERS highlighted the divergence between Defendants' public statements on underwriting and the numerous, contemporaneous internal reports [redacted]

In Fact Section IV above, OPERS highlighted the divergence between Defendants' public statements on credit risk and expected credit losses and the numerous, contemporaneous internal reports [redacted]

In Fact Section V above, OPERS highlighted the divergence between Defendants' public statements regarding the Company's subprime exposure and the numerous, contemporaneous internal reports [redacted] And, in Fact Section VI above, OPERS highlighted the divergence between Defendants' public statements regarding the Company's Alt-A exposure and the numerous, contemporaneous internal reports [redacted]

Several cases finding that plaintiffs have established scienter with respect to analogous fact patterns are instructive. First, consider Defendants' underwriting misrepresentations and omissions. In the *Dynex Capital* case, as in this case, management disregarded its underwriting standards to allow the company to take on risky mortgage loans.[535] In finding scienter established, the *Dynex Capital* court held that "[t]here is considerable authority for the proposition that a company's failure to follow an internal policy can form the basis of an inference of

---

[535] *In re Dynex Capital, Inc.*, No. 05 CIV. 1897HB, 2009 WL 3380621, at *12–13 (S.D.N.Y. Oct. 19, 2009).

recklessness."[536] Second, consider Defendants' credit risk and expected credit loss misrepresentations and omissions in the context of the *Citigroup* securities litigation case.

There, the court noted that "Citigroup was taking significant steps internally to address increasing risk in its CDO portfolio but at the same time it was continuing to mislead investors about the significant risk those assets posed. This incongruity between word and deed establishes a strong inference of scienter."[537] In sum, where the evidence demonstrates that Defendants are in possession of "information suggesting that their public statements were not accurate," such evidence is sufficient to establish that Defendants "had the requisite scienter."[538]

Scienter is especially pronounced where the misrepresentations and omissions concern "a business's core operations." Courts have repeatedly drawn the inference that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers."[539]

Here, underwriting and credit risk (along with economic capital) were the "primary categories of Freddie Mac information that were important to [the investing community] in

---

[536] *Id*. at 12 (citing *In re Sadia, S.A. Secs. Litig.,* No. 08 Civ. 9528(SAS), 2009 WL 2356181, *11 (S.D.N.Y. July 29, 2009) (citing *In re Scholastic Corp. Secs. Litig.,* 252 F.3d 63, 77 (2d Cir.2001) ("[D]efendants' asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness."); *Novak,* 216 F.3d at 311 (defendants "knowingly sanctioned procedures that violated the Company's own markdown policy").

[537] *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010); s*ee also In re Moody's Corp. Sec. Litig*., 599 F. Supp. 2d 493, 515 (S.D.N.Y. 2009) ("Plaintiff's allegations are sufficient to show that McDaniel had 'information suggesting that their public statements were not accurate.' These allegations are sufficient to allege that McDaniel had the requisite scienter.").

[538] *In re Moody's Corp. Sec. Litig*., 599 F. Supp. 2d 493, 515 (S.D.N.Y. 2009) ("Plaintiff's allegations are sufficient to show that McDaniel had 'information suggesting that their public statements were not accurate.' These allegations are sufficient to allege that McDaniel had the requisite scienter.").

[539] *In re Peoplesoft, Inc.*, No. C 99-00472 WHA, 2000 WL 1737936, *3 (N.D. Cal. May 25, 2000); *see also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 199 (S.D.N.Y. 2010) ("It is also alleged that Defendants' misstatements concerned a 'core' operation - EGAM's mortgage-based investments which E*TRADE depended upon for much of its financial results establish scienter."); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001) (scienter element satisfied as to patent statement because information regarding patent protection was "obviously important," critical to company's core performance, and about which the company had "ample opportunity to become familiar").

assessing Freddie Mac's financial health during the Relevant Period."[540] As was the case in *Tellabs*, it cannot be reasonably argued that "no member of the company's senior management who was involved in authorizing or making public statements about" underwriting and credit risk was aware that these statements were diametrically opposed to nearly all the available internal assessments regarding these issue.[541] Under Sixth Circuit precedent, "high-level executives can be presumed to be aware of matters central to their business's operation"[542] – and the disconnect between their public statements on these matters and the internal assessments provided to them leaves little doubt as to scienter in this case.

Finally, consider the Defendants' subprime and Alt-A misrepresentations and omissions – in which Defendants took affirmative steps to make optional disclosures on issues of great importance to the investing community (*i.e.*, subprime and Alt-A exposure were not regulatorily mandated disclosures). As one court noted, these subprime and Alt-A "statements cover topics that [Defendants] voluntarily and repeatedly discussed with the public, which demonstrates [their] sensitivity towards the issues. . .. The statements were often made in answer to questions from investors, which implies an intent to emphasize and induce reliance upon the statements."[543] As set forth in Fact Sections V-VI above, Defendants' internal calculations of subprime and Alt-A

---

[540] Ex. 3, Shapiro Report, at ¶3(a).

[541] *See Tellabs Inc.,* 513 F.3d at 710 ("The 5500 and the 6500 were Tellabs's most important products. . . . That no member of the company's senior management who was involved in authorizing or making public statements about the demand for the 5500 and 6500 knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel our incredulity."); *see also SEC v. Czarnik*, No. 10 Civ. 745(PKC), 2010 WL 4860678, at *6 (S.D.N.Y. Nov. 29, 2010) (Securities fraud claims "typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.") (internal citations omitted).

[542] *PR Diamonds, Inc.,* 364 F.3d at 688; *see also In re Envision Healthcare Corp. Sec. Litig*., No. 3:17-CV-01112, 2019 WL 6168254, at *21–22 (M.D. Tenn. Nov. 19, 2019); *In re Huffy*, 577 F. Supp. 2d at 1000 ("[T]he more central a fact is to a company's core operations the more likely its executive acted with scienter." (citation omitted)); *Garden City Ret. Sys.*, 2011 WL 1335803, at *57; *In re Cardinal Health*, 426 F. Supp. 2d at 724; *In re Ancor*, 22 F. Supp. 2d at 1005 (D. Minn. 1998).

[543] *In re Upstart*, 2023 WL 6379810, at *23.

exposure were magnitudes greater than their public disclosures on these topics – again, topics that had become critically important to investors during the Relevant Period. Even in the light most favorable to Defendants, which would flip the summary judgment standard on its head, Defendants' public disclosures misled the investing public as to how the Company was internally recognizing subprime and Alt-A exposure.[544]

The Sixth Circuit's guidance in this context is clear: the divergence between internal reports and external statements is a "key factor," as well as the "most significant one," in establishing an inference of scienter.[545] OPERS has established, through a mountain of evidence across multiple "core business functions," a pattern of (i) divergence between internal reports and Defendants' external statements and (ii) Defendants' disregard of the most current factual information before making statements. With the second and sixth *Helwig* factors thus established, a genuine issue of material fact remains on scienter sufficient to deny Defendants summary judgment on that basis.

**C. The Third *Helwig* Factor Supports an Inference of Scienter.**

With respect to the third *Helwig* factor, "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information," the Sixth Circuit has analyzed the gap between the fraudulent statement and the later disclosure on a spectrum that stretches from one week (probative of scienter) to four months (not probative).[546] In one particular case, the Sixth Circuit held that a "six-week gap between [the fraudulent statement and the later

---

[544] *See supra* Fact Sections V-VI.
[545] *City of Monroe,* 399 F.3d at 688 (divergence between internal reports and external statements the "key factor" regarding inference of recklessness for scienter); *Dougherty*, 905 F.3d at 981 (second *Helwig* factor, divergence, is "the key factor" as well as the "most significant one"); s*ee also Forman,* 387 F. Supp. 3d at 797 ("The Court reiterates its previous conclusion that the allegations in the Amended Complaint satisfy the second and sixth *Helwig* factors and are a key factor supporting a finding of scienter.").
[546] *Dougherty*, 905 F.3d at 981.

disclosure] falls comfortably in between" one week and four months.[547] Here, the risks related to the Company's true exposure to a mountain of toxic mortgage assets (along with the recognition that expected credit losses would skyrocket in the near term as the Company worked through these toxic mortgage assets) materialized in connection with a November 20, 2007 disclosure.

The Sixth Circuit's "six-week gap" would stretch backward in time to approximately October 6, 2007. Within that window, Defendants made multiple misrepresentations and omissions related to credit risk, underwriting standards and fraud detection. For instance, Cook falsely stated at a September 10, 2007 Lehman Brothers Financial Services Conference: "Bottom line, at a time when many of our competitors are weakening, Freddie Mac's position is growing stronger."[548]

This was obviously untrue,[549] which became apparent to the investing public on November 20, 2007.[550] Also within that window, Cook falsely implied that Freddie Mac was purchasing nontraditional mortgages only where such products "come in line with our [underwriting] guidelines"[551] — pointedly omitting the fact [redacted] Finally, Defendant Freddie Mac issued a press release within that window (November 7, 2007) in which it misled the investing public on its fraud detection ability, falsely touting "its leadership role in the industry through our active internal fraud investigations, quality control activities, [and other] remedial steps."[553]

---

547 *Id*.
548 Ex. 15, Cook Remarks, Sept. 10, 2007 at FMAC-SEC 081749809.
549 *See supra* Fact Section IV.C and Legal Argument § II.B.
550 *See* Ex. 3, Shapiro Report, at ¶3(b) ("Information disclosed on Nov. 20, 2007 helped to clarify that credit risk and economic capital issues played a role in the loss that occurred on that date (and that credit risk would likely cause large losses going forward).").
551 *Id*. at 11.
[redacted]
553 *See* Ex. 29, Nov. 7, 2007 Press Release titled "Freddie Mac Statement in Response to New York Attorney General Subpoenas" (referenced as being posted "to the web" in a Nov. 7, 2007 email with the subject "Updated Response to NY AG") (FMAC-SEC 082438140).

[redacted]

Given the evidence identified within the Sixth Circuit's "six-week" lookback window, the third *Helwig* factor also augurs in favor of an inference of scienter.

**D. The Ninth *Helwig* Factor Supports an Inference of Scienter.**

The ninth *Helwig* factor addresses the "self-interested motivation of defendants in the form of saving their salaries or jobs." As with the other *Helwig* factors, it must be considered holistically, in context, and with the use of common sense.[556]

Considering the extensive indicia of scienter under the "key *Helwig* factors" 2 and 6 – along with the evidence evincing scienter under the third *Helwig* factor, common sense, and the context (*i.e.*, the "touch more loans" initiative turbocharged Individual Defendants' incentives to increase market share, which would accordingly turbocharge their compensation) – the Individual Defendants had a strong motivation pursuant to the ninth *Helwig* factor to engage in the material misrepresentations and omissions at issue here.[557]

---

[redacted]

[556] *Tellabs*, 551 U.S. at 326; *United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*, 34 F.4th 507, 515-16 (6th Cir. 2022).

[557] Mr. Piszel inappropriately conflates Helwig factors 9 and 1, arguing that his lack of stock sales (*Helwig* 1) "dispatch OPERS's 'motive' contention." (*Helwig* 9). (Doc. 545-1 at 26). Moreover, the Individual Defendants are intelligent people: they would realize that stock sales during the Relevant Period would raise alarm bells in the industry.

The Individual Defendants' compensation during the Relevant Period came primarily from bonuses and stock awards, which in turn were dependent on, and tied to, the growth of Freddie Mac's portfolio.[558] In 2006 Syron received over 87% of his compensation—approximately $12 million out of $14.73 million total—from portfolio bonuses and stock related awards.[559] This same trend held true for 2007.[560] Piszel received 87% of his compensation in 2006—approximately $3.2 million out of $3.6 million in total—from portfolio bonuses and stock related awards.[561] McQuade similarly received 81% of his compensation in 2006—approximately $6.2 million out of $7.6 million total—from portfolio bonuses and stock related awards.[562]

The Individual Defendants also received significant compensation from Freddie Mac in the form of stock options and restricted stock units ("RSUs"), which generally vested over four years, 25% per year.[563] The longer the stock price remained artificially inflated, the greater the Individual Defendants' compensation. Whenever the Individual Defendants influenced Freddie Mac to declare and pay dividends on its common stock, the stock options and RSUs they held entitled them to "dividend equivalents," which were immediate cash payments equal to the number of RSUs they held multiplied by the dividend paid on each outstanding share of common stock.[564]

This allowed the Individual Defendants to profit from their fraud regardless of whether their RSUs and stock options had fully vested, and independent of any stock sales.[565] In 2006,

[558] *See generally* Ex. 30, 2007 Proxy Statement (FMAC-SEC 076069745-076069853) and Exs. 31A and 31B, 2008 Proxy Statement (FMAC-SEC 082224099-82224224); *see also* Exhibit 17 to Defendant Freddie Mac's Motion for Summary Judgment (Dkt. 548-17 at 178-181); Exhibit 153 to Defendant Freddie Mac's Motion for Summary Judgment (Dkt. 548-153)
[559] Ex. 31A, 2008 Proxy Statement at FMAC-SEC 082224163.
[560] *Id.*
[561] *Id.*
[562] *Id.*
[563] Ex. 30, 2007 Proxy Statement at FMAC-SEC 076069792, 076069794 and 076069803, Ex. 31A, 2008 Proxy Statement at FMAC-SEC 082224156.
[564] Ex. 30, 2007 Proxy Statement at FMAC-SEC 076069794
[565] *Id.*

Syron, McQuade, and Piszel and Cook respectively received $1,652,274, $635,934, $39,470, and $301,832 for these dividend equivalents on their RSUs and stock options.[566] In 2007, Syron, McQuade, Piszel, and Cook respectively received $898,444, $324,805, $168,561, and $205,959 in dividend equivalents, all based on the value of Freddie Mac's stock.[567] The bonuses in question are significant compared to the Individual Defendants' 2007 base salaries of $1,200,000 for Syron, $600,000 for McQuade, and $650,000 for Piszel.[568]

Based on their compensation packages, the easiest way to maximize Individual Defendants' compensation would be increase market share — which would have the effect of increasing Freddie Mac's share price. And, sure enough, Defendants changed the business model just before the Relevant Period from the "Steady Freddie" approach of purchasing safe, traditional 30-year fixed-rate mortgages to the disastrous "touch more loans" initiative – all in an explicit bid to increase market share.[569]

Defendants' self-interest in maximizing their compensation caused them to implement the "touch more loans" strategy [redacted] The Individual Defendants' decision to implement the "touch more loans" strategy to increase market share – and,

[566] *Id*. at FMAC-SEC 076069803.
[567] Ex. 31A, 2008 Proxy Statement at FMAC-SEC 082224164.
[568] Doc. 79-30 at 8 of 10; *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 786 (M.D. Tenn. 2013) (holding that the ability to enhance compensation by 100% of regular salaries creates an inference of scienter).
[569] *See supra* Fact Section I; *see also* Shapiro Report, at ¶¶10-13 (noting that the "touch more loans" strategy was a bid to "maintain or even increase its market share").
[redacted]

thus, maximize RSUs and stock options – is an indicium of scienter under the ninth *Helwig* factor.[571]

These facts provide a motivation well beyond the basic "desire to protect [a] position within a company or increase [] compensation."[572] They demonstrate "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[573] The Individual Defendants' bonuses were huge in comparison to their base salary,[574] and the bonuses were directly tied to fraudulent metrics arising from Freddie Mac's acquisition of nontraditional loans,[575] all of which is evidence of scienter.

**E. The Remaining *Helwig* Factors & Confidential Witness Evidence.**

The remaining *Helwig* factors (1, 4-5, 7-8) are not applicable to this case; although, the absence of certain *Helwig* factors "does not meaningfully detract from a strong inference of scienter,"[576] especially given the totality of the scienter evidence adduced in this case.

---

[571] *See N. Port Firefighters' Pension*, 929 F. Supp. 2d at 785 (holding that the ability to enhance compensation by 100% of regular salaries creates an inference of scienter); *see also In re Cardinal Health*, 426 F. Supp. 2d at 737–38, *judgment entered sub nom. In re Cardinal Health Inc. Sec. Litig.,* No. C2-04-575, 2007 WL 1026347 (S.D. Ohio Mar. 29, 2007) (court considers motivation to keep stock price high in order to profit from compensation packages); *In re Upstart*, 2023 WL 6379810, at *22 (compensation incentives tied to performance based pay may support scienter); *Florida State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 661 (8th Cir. 2001); *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (strong inference of scienter because defendants' eligibility for stock options and executive bonuses were based principally on the company's financial performance); *In re Metawave Communications Corp. Sec. Litig.,* 298 F. Supp. 2d 1056, 1071 (W.D. Wash. 2003) ( "Scienter can be established even if there were no sales of stock by officers during the class period, if there were other motives for fraud, such as receiving benefits tied to the company's financial performance."); *In re Wellcare Mgmt. Group Sec. Litig.,* 964 F. Supp. 632, 639 (N.D.N.Y. 1997) ("[T]he Court will not disregard, as irrelevant, allegations that incentive compensation was affected by the alleged fraudulent conduct.").
[572] Freddie Brief at 73, citing *PR Diamonds*, 364 F.3d at 690, *abrogated on other grounds by Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011).
[573] *Dougherty*, 905 F.3d at 982.
[574] *See supra* n. 570.
[575] *Pittman v. Unum Grp.*, 861 F. App'x 51, 57 (6th Cir. 2021).
[576] *Strougo*, 551 F. Supp. 3d at 851 ("That several *Helwig* factors are inapplicable here does not meaningfully detract from a strong inference of scienter, as the factors are 'non-exhaustive.'"); *In re Upstart*
continued

Defendants' final argument in this context is that the confidential witnesses mentioned in OPERS's pleading should be discounted because they now claim to be unaware of fraud and "affirmatively testified to a lack of scienter."[577] As a factual matter, these current declarations of the confidential witnesses are at odds with the contemporaneous notes taken in 2008 by David Hirsch (currently Chief, Crypto Assets and Cyber Unit in the Division of Enforcement at the SEC), who interviewed the confidential witnesses in 2008, and his memoranda documenting the results of those interviews.[578] Comparing Freddie Mac's current confidential witness declarations to Hirsch's 2008 investigation memoranda reveals the witness's unsurprising lack of memory, not a lack of scienter.[579] In any event, OPERS's case is based on the contemporaneous documents, not on declarations of previously confidential witnesses taken more than 15 years after the events in question. The fact that these witnesses cannot remember events that occurred in 2006 and 2007 has no bearing on the present case or summary judgment.

As a matter of law, the Sixth Circuit allows reliance on confidential witnesses when ruling on the validity of pleadings if the facts "support the probability that a person in the confidential witness's position would possess the information alleged."[580] But this case is past the motion-to-dismiss stage. And the identified confidential witnesses are no longer "anonymous sources" subject to discount.[581] Freddie Mac's attempt to reargue the allegations of the pleadings is

---

*Holdings*, 2023 WL 6379810, at *23 (same); *Dougherty,* 905 F.3d at 981–82 (reversing dismissal based in part on lack of scienter; holding scienter was established despite absence of many *Helwig* factors).

[577] Def. Memo., at 50. *See also* Piszel Memo., at 8, 23.

[578] Ex. 1, Declaration of David Hirsch.

[579] *Compare* DAppx., Exhs. 1–11, *with* Declaration of David Hirsch, Exhs. A–K.

[580] *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1037, n.2 (6th Cir. 2016); *accord In re Huntington Bancshares Secs. Litig.*, 674 F. Supp. 2d 951, 960 (S.D. Ohio 2009).

[581] *Doshi*, 823 F.3d at 2037, n.2 (citing *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 735, 756–57 (7th Cir. 2007)); *see also In re BankAtlantic Bancorp, Inc.*, 851 F. Supp. 2d 1299, 1312 (S.D. Fla. Aug. 2, 2011) (stating that discrepancies in confidential witness statements "is essentially a credibility question," and, "[s]uch discrepancies may be attributed to a witness's changing memory or, in the case of a whistleblowing

continued

immaterial here on summary judgment now that the previously confidential witnesses have been identified. At best, Defendant Freddie Mac's and Defendant Piszel's arguments about confidential witnesses have introduced disputed facts that make summary judgment all the more unwarranted. They otherwise have no bearing on scienter.

## IV. OPERS IS ENTITLED TO THE PRESUMPTION OF RELIANCE UNDER *AFFILIATED UTE*.

In addition to demonstrating individual reliance on defendants' misrepresentations and/or omissions (*i.e.*, offering direct evidence that plaintiff relied on such misrepresentations and/or omissions in purchasing or selling securities), courts will simply presume that plaintiffs have established the reliance element of a securities fraud action – and, thus, obviate the need for plaintiffs to demonstrate individual reliance – in two difference circumstances: (1) where the statements at issue become public and the public information is reflected in the market price of the security (the *Basic* presumption of reliance);[582] and (2) where there is evidence that defendants were engaged in material omissions and/or half-truths (the *Affiliated Ute* presumption of reliance).[583]

This Court previously decided that Freddie Mac's common stock did not trade in an efficient market during the Relevant Period, and, therefore, OPERS could not avail itself of the *Basic* presumption of reliance.[584] However, because OPERS has offered evidence that Defendants were engaged in material omissions and half-truths (*e.g.*, failure to disclose management's total abandonment of underwriting standards; concealing the fact that risk assessment systems had no

---

confidential witness, the desire to remain in a former employer's good graces once the protection of confidentiality has been removed").

582 *Basic v. Levinson*, 485 U.S. 224 (1988).

583 *Affiliated Ute*, 406 U.S. at 153–54 (1972).

584 Doc. #478 (finding that the *Basic* presumption is inapplicable). Of course, OPERS disagrees with this Court's finding on market efficiency – and, indeed, a finding that Freddie Mac common stock did not trade in an efficient market would mark a dramatic (and unprecedented) shift in the law regarding what stocks meet that *Basic* burden – but will reserve its rights to raise that issue on appeal.

meaningful ability to measure credit risk and expected credit losses from "touch more loans" purchases; subprime and Alt-A definitional shell games, etc.),[585] *the Affiliated Ute* presumption of reliance is warranted here.

In *Affiliated Ute*, the Court held that a presumption of reliance is applicable in securities fraud cases involving material omissions. This includes both failures to disclose material facts (pure omissions) as well as misleading statements that conceal the actual truth (half-truths).[586]

As set forth in Fact Sections III.C and IV.C, *supra*, the securities fraud at issue here revolves around the materialization of *undisclosed* risks; and, as such, Defendants' material omissions and half-truths loom large in this case.[587] While OPERS certainly has identified several outright misrepresentations,[588] this case primarily focuses on the undisclosed risks that, when materialized, resulted in the precipitous stock decline, causing injury to OPERS and thousands of other investors.

Given the materiality of Defendants' omissions and half-truths,[589] OPERS is entitled to the *Affiliated Ute* presumption of reliance.[590] And, accordingly, Defendants' arguments regarding

[585] *See supra* Fact Sections V-VI.
[586] *In re FirstEnergy Corp. Sec. Litig.*, No. 2:20-CV-3785, 2023 WL 2709373, at *19 (S.D. Ohio Mar. 30, 2023), *opinion clarified*, No. 2:20-CV-03785, 2023 WL 8105252 (S.D. Ohio Apr. 18, 2023); *Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2021 WL 1828114, at *6–7 (E.D. Tenn. May 7, 2021) (affirming district court application of *Affiliated Ute* presumption of reliance where combination of omissions and misrepresentations, and finding that audit opinion was *both* false and omitted material information); *see also In re BancorpSouth, Inc.,* No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) (noting that the district court did not abuse its discretion in applying the *Affiliated Ute* presumption of reliance at the class certification stage in a material omission case).
[587] *OPERS v. Freddie Mac,* 830 F.3d at 384 (recognizing materialization of the risk).
[588] *See, e.g.,* Defendant Syron's statement that Freddie Mac was "much better positioned for long-term profitability than we were a year ago;" Cook's statement that "Freddie had basically no subprime exposure in our [single-family] guarantee business;" Defendant Piszel's statement that Freddie Mac's Alt-A exposure was only 8% of the single-family guarantee portfolio; *etc*.
[589] *See supra* Fact Sections III and IV.
[590] *In re FirstEnergy Corp. Sec. Litig*., 2023 WL 2709373 at *20; *see also Cosby*, , 2021 WL 1828114, at *6 (even cases characterized as mixed cases of affirmative misstatements and omissions will warrant the presumption of reliance under *Affiliated Ute*); *Burges v. Bancorpsouth, Inc.*, No. 3:14-CV-1564, 2017 WL

continued

OPERS's ostensive inability to prove an efficient market (and, thus, reliance under *Basic*) are irrelevant.[591]

## V. Unless Revisited, This Court's Decision on Price Impact has Made it Legally Impossible for OPERS to Establish Loss Causation and Damages.

On September 17, 2020, this Court made two findings that render summary judgment on loss causation and damages inevitable: (1) it recognized that its class certification decisions on price maintenance and price impact were "case-dispositive;" and (2) it informed the parties that it would not be revisiting these issues.[592]

When the Sixth Circuit reversed this previous grant of summary judgment on jurisdictional grounds, it concluded its Opinion by noting that, on remand, "the district court may, but is not required to, revisit the significant issues of law raised by OPERS"[593] – with one of those "significant issues" being this Court's rejection of OPERS' price maintenance theory.[594]

If this Court declines to take the Sixth Circuit up on its invitation to "revisit these significant issues," then summary judgment is "straightforward" because OPERS cannot demonstrate loss

2772122, at *10 (M.D. Tenn. June 26, 2017) (same); *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270 (S.D.N.Y. 2014) (noting that "the theory behind the *Affiliated Ute* presumption ... is not undermined simply because a defendant makes misstatements at the same time it omits material information").

[591] While the OPERS representative responsible for monitoring Freddie Mac during the relevant period recalls in general that he would review earnings, press releases, listen to conference calls, and read sell side research reports relating to Freddie, it is correct that, given the passage of time, the OPERS representative does not recall reviewing the specific misrepresentations asserted. *See* Ex. 123, Oct. 24, 2023 Deposition of Tim Swingle, at 42:14-23; 51:16-25.

[592] See Doc. ¶498, at 3-6. In a decision reversed solely on a jurisdictional basis, the Court granted summary judgment in favor of defendants, noting in part that "Freddie Mac's Opposition (ECF No. 490), however, does not attempt to explain how any further discovery, "new evidence," or additional expert opinion could change the Court's determination of a lack of price impact." (ECF No. 498 at 3).

[593] *OPERS v. Freddie Mac*, 64 F.4th at 736.

[594] The other issues were: i) the exclusion of the entirety of the report and testimony of OPERS' expert witness, Dr. Feinstein; ii) the holding that empirical evidence under Cammer 5 is necessary to establish market efficiency; iii) the determination that OPERS needed to establish a semi-strong level of market efficiency; and iv) the holding that Comcast requires proof of damages as part of class certification. *Id*.

causation or damages where it is foreclosed from relying on the price maintenance theory for proving price impact.

Courts uniformly apply the stringent "law of the case" standard to class certification decisions, allowing modification or reconsideration only if certain requirements are met. 3 Newberg on Class Actions §7:35 (5th ed.) (citing cases, including *Pettrey v. Enter. Title Agency, Inc*., 242 F.R.D. 384, 385 (N.D. Ohio 2007)).

This Court has already indicated that it does not believe the requirements for modification or reconsideration are met,[595] and thus the Court's findings rejecting the price maintenance theory and finding "overwhelming" evidence negating price impact are the law of the case. Accordingly, if this Court declines to take the Sixth Circuit up on its invitation to revisit its determinations relating to price maintenance and price impact, this will necessarily result in a grant of summary judgment to Defendants on the elements of loss causation and damages."[596]

This is true from both a legal perspective and an economic perspective. Legally, price impact is a critical component of loss causation, which in turn is necessary to prove damages.[597] To prove loss causation under the law, a securities plaintiff must show both price impact and a link

[595] *See infra* n. 608.

[596] Defendants ask this Court to engage in the unnecessary exercise of reviewing and analyzing hundreds of pages of briefing and thousands of pages of exhibits, allegedly to avoid "piecemeal litigation." Def. Memo., at 7. *But see Burkey v. Hunter*, No. 4:17CV338, 2019 WL 950144, at *7 (N.D. Ohio Feb. 27, 2019) (Pearson, J.), *aff'd*, 790 F. App'x 40 (6th Cir. 2020) (because no genuine issue regarding deliberate indifference, "the Court need not address whether a clearly established right exists," and grants summary judgment); *Izquierdo v. Boldin*, No. 4:11CV01826, 2012 WL 2344611, at *4 (N.D. Ohio June 20, 2012) (finding no constitutional violation occurred during search warrant, "the Court need not address Boldin's additional grounds for relief," and grants summary judgment); *In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690, 708 (D. Minn. 2009) (granting summary judgment based on failure to demonstrate triable fact question for jury on loss causation; court "need not address the parties' falsity and scienter arguments.").

[597] *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011) (holding that to prove loss causation a plaintiff must "show that a misrepresentation that affected the integrity of the market price [price impact] also caused a subsequent economic loss").

between that price impact and the plaintiff's economic loss.[598] The same is true from an economic perspective.

Indeed, OPERS's expert, Dr. Tabak, opined that it would be impossible to establish loss causation (and, therefore, damages) as an economist consistent with this Court's prior determinations.[599] In other words, the Court's decision effectively bars OPERS from offering evidence to support its theory on loss causation – and, as a result, damages.

Defendants offer two disingenuous arguments in this context in an effort to provide alternative grounds for supporting summary judgment here.

First, Defendants claim that summary judgment is warranted because OPERS has not "bothered" to offer evidence of loss causation.[600] With respect to loss causation, Defendants know full well that this Court's decision legally precludes OPERS from offering evidence of loss causation.

As far as Defendants' affirmative case on loss causation is concerned, they offer a three-sentence "truth on the market" argument – claiming that all material risks were 'robustly disclosed."[601] Not only is that objectively false given the full weight of evidence cited in Fact Sections III-VI above, it is, at the very least, a question of fact for the jury.[602] In any event, OPERS remains ready, willing and able to provide evidence supporting loss causation if this Court reconsiders its decision or if OPERS's eventual appeal is successful.

---

[598] *See also* 44 No. 3 Securities Regulation Law Journal (discussing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*") and noting "[p]rice impact is thus an essential precondition for any Rule 10b-5 class action").
[599] Ex. 4, Tabak Report, at ¶32.
[600] Def. Memo., at 99.
[601] Def. Memo., at 99.
[602] *See, e.g., Serafin v. Brown*, No. 4:22-CV-0467, 2023 WL 4490404, at *3 (N.D. Ohio July 11, 2023) (Pearson, J.) ("at the summary judgment stage, the Court's objective is limited to determining 'whether there is a genuine issue for trial' and does not extend to weighing evidence or determining the truth of the matter.") (citation omitted).

Second, Defendants assert that summary judgment is warranted due to OPERS's failure to present computations of each category of damages claimed.[603] OPERS in fact disclosed as early as 2008 that, in its view, it suffered an out-of-pocket loss in the range of approximately $18 million (LIFO) to $27 million (FIFO).[604] Any more precise delineation of damages was precluded, however, as a result of this Court's determinations regarding price maintenance and price impact, which eliminated *any* damages. If there is no price impact – that is, if the alleged misrepresentations and omissions had no impact on the price of OPERS's shares in Freddie Mac – then OPERS could not have legally or practically suffered any damages. Moreover, even if OPERS could have set out damages in a manner consistent with this Court's holding,[605] Defendants proper remedy was to seek sanctions before the close of discovery.[606]

Given the context, OPERS's failure to calculate damages more specifically than what it provided was "substantially justified or harmless" pursuant to Fed. R. Civ. P. 37(c)(1). The Sixth Circuit has developed a several-factor test to determine if a disclosure decision was "substantially justified or harmless" pursuant to Fed. R. Civ. P. 37(c)(1).[607] All relevant factors demonstrate that

[603] Def. Memo., at 99-103, *citing* Fed. R. Civ. P. 26(a)(1)(A)(iii) and 37(c)(1).

[604] ECF No. 5-2, filed Jan. 22, 2008, had on p. 7 a chart titled "Summary of OPERS' Losses in Freddie Mac Common Stock" showing net losses on a FIFO basis of $27,699,643 and on a LIFO basis $18,463,427.

[605] Defendants misrepresent Dr. Tabak's opinion in this regard. Defendants argue that Dr. Tabak testified he *could* calculate damages but "was not asked to calculate damages by OPERS." Def. Memo., at 102. This is a gross mischaracterization of his testimony. Dr. Tabak clearly testified that, given this Court's determinations regarding price maintenance and price impact, any determination regarding loss causation or damages is precluded. *See* Ex. 122, Dec. 20, 2023 Deposition of David I. Tabak, at 284:19-285:4, 285:25-286:17; 19:23-21:8 ("Tabak Dep."). Dr. Tabak further confirmed that he believed there is loss causation in this case, and that damages can be calculated, but only if this Court's determination is either reconsidered or reversed. *See id*. at 99:13-21; 101:9-22.

[606] *House v. Players' Dugout, Inc*., No. 3:16-CV-00594-RGJ, 2022 WL 3587823, at *2–6 (W.D. Ky. Aug. 22, 2022), *aff'd in part, rev'd in part and remanded sub nom. House v. Player's Dugout, Inc*., No. 22-5843, 2024 WL 495998 (6th Cir. Feb. 8, 2024).

[607] *House*, 2022 WL 3587823, at *2–6 ((setting out Rule 37(c)(1) factors); *see also Hutson v. Fed. Express Corp*., No. 215CV02411STACGC, 2017 WL 437422, at *5 (W.D. Tenn. Feb. 1, 2017), *aff'd*, 724 F. App'x 459 (6th Cir. 2018) (finding that "Plaintiff's failure to disclose the precise amount of her claim for damages was harmless" and noting that, under controlling Sixth Circuit law, the exclusion of damages evidence is

continued

OPERS's decision not to update its economic losses was "substantially justified or harmless:" Defendants could not have been surprised by OPERS's actions, given the Court's price impact ruling; Defendants could have "cured" any surprise by requesting the Rule 37 sanction before discovery closed; the failure to produce specific damages will not disrupt trial proceedings, given that a trial is impossible under the law of the case and, in any event, has been pushed back to late October 2025; specific damage evidence was unimportant given the Court's ruling; and OPERS's reason for not producing specific damage calculation is substantially justified.

At bottom, this Court's decisions on price maintenance and price impact are case-dispositive. If this Court declines the Sixth Circuit's invitation to "revisit" those "substantial issues of law" it enumerated, then OPERS cannot legally establish loss causation or damages, warranting summary judgment as to those two elements of OPERS's securities fraud case.

## CONCLUSION

For the foregoing reasons, OPERS respectfully requests that Defendants' motions for summary judgment be denied in their entirety.[608]

Dated: June 28, 2024

Respectfully submitted,

OHIO ATTORNEY GENERAL
DAVE YOST

*<u>/s/ W.B. Markovits</u>*
W.B. Markovits (0018514)
Christopher D. Stock (0075443)
Terence R. Coates (0085579)
MARKOVITS, STOCK & DEMARCO, LLC

---

an abuse of discretion when the defendant "had all the information relevant to the computation of damages in its possession" and "had a full opportunity during [the plaintiff's] deposition to question [her] about damages"); *Howe v. City of Akron,* 801 F.3d 718, 748 (6th Cir. 2015) (reversing district court's decision to exclude testimony and exhibit as "an overreaction and an abuse of discretion").

[608] OPERS acknowledges that the Court's prior decisions concerning loss causation and damages logically require summary judgment for Defendants on those issues, as it has since those decisions were entered. *See* Doc# 485 at 1-2. OPERS maintains its position that those decisions are erroneous, but recognizes that it is precluded from arguing these issues further before this Court at this stage of the case. *Id.* at 4-5.

119 East Court St., Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
E-mail: bmarkovits@msdlegal.com
E-mail: cstock@msdlegal.com
E-mail: tcoates@msdlegal.com

*/s/ Richard S. Wayne*
Richard S. Wayne (0022390)
William K. Flynn (0029536)
Robert R. Sparks (0073573)
Stephen E. Schilling (0086897)
STRAUSS TROY CO., LPA
150 East Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 621-2120
Facsimile: (513) 629-9426
E-mail: rswayne@strausstroy.com
E-mail: wkflynn@strausstroy.com
E-mail: rrsparks@strausstroy.com
E-mail: seschlling@strausstroy.com

*Special Counsel to the Attorney General of the State of Ohio and Counsel for Lead Plaintiff*