**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM,<br><br>Plaintiff,<br><br>vs.<br><br>FEDERAL HOME LOAN MORTGAGE CORPORATION a/k/a FREDDIE MAC, RICHARD F. SYRON, PATRICIA L. COOK, ANTHONY S. PISZEL, and EUGENE M. McQUADE,<br><br>Defendants. | CIVIL ACTION NO. 4:08-cv-160<br><br>JUDGE BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE JENNIFER DOWDELL ARMSTRONG |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**FREDDIE MAC'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**


PRELIMINARY STATEMENT ..... 1

UNDISPUTED MATERIAL FACTS IGNORED BY OPERS ..... 8

ARGUMENT ..... 14

I. THERE WAS NO "PRIMARY" FRAUD. ..... 15

A. There Is No Actionable Misstatement or Omission Regarding "Subprime Exposure." ..... 15

1. No Defendant Made a Material Misrepresentation Regarding Freddie Mac's "Subprime Exposure." ..... 15

a. OPERS Does Not Dispute the Bedrock Facts Establishing That Freddie Mac Did Not Have a Significant Amount of Subprime Loans in Its SF Guarantee Portfolio. ..... 16

b. Documents Where Several Former Employees Used the Term Subprime in Different Ways Do Not Give Rise to Genuine Issues of Material Fact. ..... 18

c. None of the Decisions Cited by OPERS Excuses It From Identifying a Genuine Issue of Material Fact. ..... 21

2. There Was No Material Omission Regarding Freddie Mac's "Subprime Exposure." ..... 23

B. There Is No Genuine Issue of Material Fact Regarding Whether Any Misrepresentation or Omission Regarding "Subprime Exposure" Was Made With Scienter. ..... 24

1. OPERS Concedes That *Helwig* Factors 1, 4, 5, 7, and 8 Do Not Support an Inference of Scienter. ..... 26

a. The Insider Stock Transactions Factor Negates Any Inference of Scienter (*Helwig* 1). ..... 26

b. Ancillary Lawsuits Negate Any Inference of Scienter (*Helwig* 5). ..... 26

c. There Is No Evidence Supporting *Helwig* Factors 4, 7, or 8. ..... 27

2. None of the Three *Helwig* Factors OPERS Invokes Supports Even an Inference of Scienter. ..... 27

a. The Allegedly Fraudulent "Subprime Exposure" Statements Were Not "Close In Time" To A Disclosure Of Inconsistent Information (*Helwig* 3). ..... 27

**TABLE OF CONTENTS**
(continued)

**Page**


b. There Is No Evidence Supporting Any Motive by Individual Defendants to Save Their Salaries or Jobs (*Helwig* 9). .......... 28

c. There Is No Evidence That Defendants Disregarded Internal Reports or Facts Contradicting Their Challenged Statements (*Helwig* 2 and 6) Regarding "Subprime Exposure." .......... 29

d. OPERS's "Core Operations" Theory Does Not Create a Genuine Issue Of Material Fact Regarding Scienter. .......... 32

e. OPERS's "Collective Scienter" Theory Does Not Create a Genuine Issue of Fact Regarding Scienter.......... 33

II. SUMMARY JUDGMENT SHOULD ENTER IN FREDDIE MAC'S FAVOR ON OPERS'S REMAINING THEORIES OF FRAUD. .......... 34

A. Summary Judgment Should Enter in Favor of Freddie Mac on OPERS's Claims Based on Statements About Alt-A and Credit Risk. .......... 34

1. There Is No Genuine Issue of Material Fact Regarding Whether Freddie Mac's Statements Quantifying Alt-A Holdings Were False or Made with Scienter. .......... 34

2. There Is No Genuine Issue of Material Fact Regarding Whether Statements Concerning Credit Risk Were False or Made With Scienter. .......... 38

B. Summary Judgment Should Enter In Favor of Freddie Mac On OPERS's Claims Based on Statements About Its "Underwriting Guidelines." .......... 46

1. OPERS's Claims Are Based On Statements Regarding Underwriting That Are Not Actionable As A Matter Of Law. .......... 46

a. Syron's June 8, 2007 Statement (Ex. 45).......... 47

b. Cook's September 10, 2007 Statement (Ex. 55).......... 47

c. Freddie Mac's 2006 Annual Report (March 23, 2007) (Ex. 21) .......... 47

d. OPERS's Chart of Additional Statements .......... 51

2. OPERS Fails To Identify Any Actionable Omission Of Material Fact Regarding Freddie Mac's Underwriting.......... 52

**TABLE OF CONTENTS**
(continued)

**Page**


a. OPERS Identifies Four Supposed Omissions, But None Are Actionable ..... 53

(1) Underwriting Standards and Quality Control Systems ..... 53

(2) Freddie Mac's Ability to Effectively Underwrite Nontraditional Mortgage Products ..... 54

(3) Freddie Mac's "Abandoned" Underwriting Standards ..... 55

(4) Freddie Mac's Increased Use of Exceptions ..... 56

b. OPERS Offers No Authority to Alter this Analysis. ..... 56

3. No Statement or Omission Concerning Underwriting Was Made with Scienter. ..... 58

C. Summary Judgment Should Enter in Favor of Freddie Mac on Other Alleged "Frauds" That OPERS Does Not Address. ..... 58

1. "Risk Management." ..... 58

2. "Loan Analysis Software and Fraud Detection Systems." ..... 59

3. "Capital Position." ..... 60

III. OPERS Cannot Establish Reliance on Any Challenged Statement. ..... 62

A. OPERS Did Not Directly Rely On Any Challenged Statement. ..... 62

B. The *Basic* Presumption of Reliance Does Not Apply. ..... 62

C. The *Affiliated Ute* Presumption of Reliance Does Not Apply. ..... 63

IV. OPERS CANNOT ESTABLISH LOSS CAUSATION. ..... 65

V. OPERS CANNOT PROVE DAMAGES ..... 68

CONCLUSION ..... 70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)....................63, 64, 65

*Almond v. ABB Indus. Sys., Inc.*,
2001 WL 242548 (S.D. Ohio Mar. 6, 2001), *aff'd*, 56 F. App'x 672 (6th Cir. 2003)....................39

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................7, 24, 25

*Backman v. Polaroid Corp.*,
910 F.2d 10 (1st Cir. 1990) (en banc)....................*passim*

*Baker v. City of Trenton*,
936 F.3d 523 (6th Cir. 2019)....................24

*In re BancorpSouth, Inc.*,
2017 WL 4125647 (6th Cir. Sept. 18, 2017)....................65

*Basic v. Levinson*,
485 U.S. 224 (1988)....................62, 63

*Bd. of Sapphire Bay Condo. W. v. Simpson*,
2010 WL 8278411 (D.V.I. June 16, 2010)....................24

*Berg v. Velocity Fin., Inc.*,
2021 WL 268250 (C.D. Cal. Jan. 25, 2021)....................57

*Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*,
596 F.3d 357 (6th Cir. 2010)....................69

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015)....................14

*Brokop Living Trust v. Farmland Partners, Inc.*,
2022 WL 1619939 (D. Colo. Apr. 5, 2022)....................30, 31, 35

*Cavalier Carpets, Inc.* v. *Caylor*,
746 F.2d 749 (11th Cir. 1984)....................64

*Cione v Gorr*,
843 F. Supp. 1199 (N.D. Ohio 1994)....................43

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ....................................................................................14, 64

*In re Copley Pharm., Inc. Sec. Litig.*,
1995 WL 169215 (D. Mass. Mar. 16, 1995)...............................................................48

*Cosby v. KPMG, LLP*,
2021 WL 1828114 (E.D. Tenn. May 7, 2021)...............................................................65

*In re Countrywide Fin. Corp. Deriv. Lit.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .......................................................................57

*Cox* v. *Collins*,
7 F.3d 394 (4th Cir. 1993) ............................................................................................64

*Crago v. Charles Schwab & Co.*,
2021 WL 4990234 (N.D. Cal. Oct. 27, 2021)...............................................................65

*In re Cypress Semiconductor Sec Litig.*,
891 F. Supp. 1369 (N.D. Cal. 1995), *aff'd*, 113 F.3d 1240 (9th Cir. 1997) ......................39, 42

*In re Diebold Nixdorf, Inc.*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ...............................................................32

*In re Diebold Sec. Litig.*,
2008 WL 3927467 (N.D. Ohio Aug. 22, 2008), *aff'd*, 590 F.3d 390 (6th Cir. 2009) ............................................................................................................25

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ....................................................................................27, 28

*Eisenstadt v. Centel Corp.*,
113 F.3d 738 (7th Cir. 1997) ........................................................................................39

*In re EveryWare Glob., Inc. Sec. Litig.*,
175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd*, 849 F.3d 325 (6th Cir. 2017).....................25, 26

*In re Fed. Nat. Mortg. Ass'n Sec., Deriv., ERISA Litig.*,
892 F. Supp. 2d 59 (D.D.C. 2012)..........................................................................29, 35

*Figures v. Board of Public Utilities of City of Kansas City, Kan.*,
967 F.2d 357 (10th Cir. 1992) ......................................................................................55

*In re FirstEnergy Corp. Sec. Litig.*,
2023 WL 2709373 (S.D. Ohio Mar. 30, 2023)..............................................................65

*In re Ford Co. Sec. Litig.*,
184 F. Supp. 2d 626 (E.D. Mich. 2001)...........................................................................5

*Glazer v. Formica Corp.*,
964 F.2d 149 (2d Cir. 1992)....................52

*Glenbrook Capital Ltd. P'Ship v. Kuo*,
525 F. Supp. 2d 1130 (N.D. Cal. 2007)....................32

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007)....................5

*Himler v. Comprehensive Care Corp.*,
790 F. Supp. 114 (E.D. Va. 1992)....................66

*Holdsworth v. Strong*,
545 F.2d 687 (10th Cir. 1976)....................64

*House v. Players Dugout, Inc.*,
2022 WL 3587823 (W.D. Ky. Aug. 22, 2022)....................69

*Howe v. City of Akron*,
801 F.3d 718 (6th Cir. 2015)....................69, 70

*Hutson v. Fed. Express Corp.*,
2017 WL 437422 (W.D. Tenn. Feb. 1, 2017)....................70

*In re Interbank Funding Corp. Sec. Litig.*,
629 F.3d 213 (D.C. Cir. 2010)....................64

*In re iRobot Corp. Sec. Litig.*,
527 F. Supp. 3d 124 (D. Mass. 2021)....................43

*Johnston v. HBO Film Mgmt., Inc.*,
265 F.3d 178 (3d Cir. 2001)....................64

*Joseph* v. *Wiles*,
223 F.3d 1155 (10th Cir. 2000)....................64

*In re K-tel Int'l, Inc. Sec. Litig.*,
300 F.3d 881 (8th Cir. 2002)....................52

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012).................... *passim*

*Latham v. ABX Air, Inc.*,
2012 WL 2409479 (S.D. Ohio June 26, 2012)....................23, 24

*Ley v. Visteon Corp.*,
543 F.3d 801 (6th Cir. 2008)....................5, 51

*Lincoln v. BNSF Ry. Co.*,
2020 WL 4000912 (D. Kan. July 15, 2020) ....................24

*Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorop.*,
731 F. Supp. 2d 689 (S.D. Ohio 2010) ....................57

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024).................... *passim*

*Microsoft Corp. v. Baker*,
582 U.S. 23 (2017)....................66

*Miller v. Champion Enter. Inc.*,
346 F.3d 660 (6th Cir. 2003) ....................44

*Mogenson v. Body Cent. Corp.*,
15 F. Supp. 3d 1191,1999 (M.D. Fla. 2014)....................45

*In re Nevsun Res., Ltd.*,
2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013)....................43

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)....................43

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
64 F.4th 731 (6th Cir. 2023) ....................8

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) ....................34

*OPERS v. Fed. Home Loan Mortg. Corp.*,
2018 WL 5024857 (6th Cir. 2018) ....................63

*OPERS v. Fed. Home Loan Mortg. Corp.*,
2022 WL 1027779 (6th Cir. 2022) ....................62

*OPERS v. Freddie Mac*,
830 F.3d 376 (6th Cir. 2016) ....................23, 56

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)....................52

*Parker v. Winwood*,
2017 WL 6886076 (M.D. Tenn. Oct. 17, 2017),
*aff'd*, 938 F.3d 833 (6th Cir. 2019)....................39

*Plymouth Cnty. Ret. Ass'n. v. Array Techs., Inc.*,
2023 WL 3569068 (S.D.N.Y. May 19, 2023) ....................44

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ....................28, 29

*Regents of the Univ. of Cal.* v. *Credit Suisse First Boston*,
482 F.3d 372 (5th Cir. 2007) ....................64

*Ricker v. Zoo Ent., Inc.*,
534 F. App'x 495 (6th Cir. 2013) ....................59, 61

*RJ Control Consultants, Inc. v. Multiject, LLC*,
100 F.4th 659 (6th Cir. 2024) ....................68

*Robinson v. Horizon Blue Cross Blue Shield of New Jersey*,
674 F. App'x 174 (3d Cir. 2017) ....................2

*Rodgers v. City of Cleveland*,
2006 WL 2371981 (N.D. Ohio Aug. 15, 2006) ....................21

*Roeder v. Am. Postal Workers Union, AFL-CIO*,
180 F.3d 733 (6th Cir. 1999) ....................14

*Roofer's Pension Fund v. Papa*,
687 F. Supp. 3d 604 (D.N.J. 2023) ....................14

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ....................65

*Santa Fe Indus. v. Green*,
430 U.S. 462 (1977)....................13, 59

*Schwab v. E*TRADE Fin. Corp.*,
285 F. Supp. 3d 745 (S.D.N.Y. 2018), *aff'd*, 752 F. App'x 56 (2d Cir. 2018)....................65

*SEC v. Syron*,
934 F. Supp. 2d 609, (S.D.N.Y. 2013)....................22

*Sherman v. Biglari*,
2020 WL 3000452 (N.D. Ohio June 4, 2020)....................23

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)....................43

*In re St. Jude Medical, Inc. Sec. Litig.*,
629 F. Supp. 2d. 915 (D. Minn. June 22, 2009)....................15, 16, 18

*Stein v. U.S. Xpress Enters., Inc.*,
2020 WL 3584800 (E.D. Tenn. June 30, 2020)....32

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
552 U.S. 148 (2008)....63

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....24

*In re The Goodyear Tire & Rubber Co. Sec. Litig.*,
436 F. Supp. 2d 873 (N.D. Ohio 2006)....25

*Titan Grp., Inc. v. Faggen*,
513 F.2d 234 (2d Cir. 1975)....63

*Tullis v. UMB Bank, N.A.*,
423 F. App'x 567 (6th Cir. 2011)....57

*U.S. v. U.S. Gypsum Co.*,
333 U.S. 364 (1947)....25

*In re Upstart Holdings, Inc. Sec. Litig.*,
2023 WL 6379810 (S.D. Ohio Sept. 29, 2023)....25, 33, 57

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
2 F.4th 1199 (9th Cir. 2021)....64

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)....63, 64

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....65

*Winer Family Trust v. Queen*,
503 F.3d 319 (3d Cir. 2007)....52

*Zaluski v. United Am. Healthcare Corp.*,
527 F.3d 564 (6th Cir. 2008)....53

**Statutes & Authorities**

15 U.S.C. § 78u-4(b)(1)(B)....14

17 C.F.R. § 240.10b-5....52

Fed. R. Civ. P. 23(c)(1)(C)....66

Fed. R. Civ. P. 26(a)(1)(A)(iii)....69

Fed. R. Civ. P. 37(c) ....................................................................................................68, 69

Fed. R. Civ. P. 56(a) ..........................................................................................................57

Fed. R. Civ. P. 56(c) ..........................................................................................................21

## PRELIMINARY STATEMENT

There was no fraud, and OPERS's Opposition[1] does not raise a genuine dispute of fact to the contrary. Indeed, the Opposition is most notable for its failure to acknowledge the undisputed facts that are dispositive of OPERS's claims. The undisputed record evidence—including documents referenced in Freddie Mac's Moving Brief, documents OPERS relies upon, and testimony from dozens of former Freddie Mac employees, including OPERS's so-called "Confidential Witnesses" (or "CWs")—establishes that Defendants made neither fraudulent statements nor actionable omissions. There is likewise no evidence in the record of any Defendant's scienter—no Defendant intentionally or recklessly attempted to deceive anyone, and OPERS fails to identify a genuine issue of material fact on the other elements of its claims, including reliance, loss causation, and damages.[2]

Only by ignoring the undisputed facts does the Opposition weave a fictitious tale of fraud. OPERS has no good answer to the fact that not one company employee testified that Defendants committed fraud. OPERS took the depositions of dozens of witnesses in this case, and received transcripts of dozens more in discovery. The Opposition largely ignores that testimony, failing to address the many facts based on witness testimony set forth in Freddie Mac's Moving Brief. Likewise, OPERS has no good answer to the fact that almost a dozen of the CWs cited in the TAC signed sworn declarations denying knowledge of any fraud. In response, OPERS has filed a declaration from its private investigator, but his statements and attached notes also cannot give rise

[1] ECF No. 558 ("Opposition" or "OB). Other capitalized terms not defined herein are defined as in Freddie Mac's Memorandum of Law In Support of Its Motion for Summary Judgment (ECF No. 547-1) ("Moving Brief" or "MB"). "Ex. __" refers to exhibits in Freddie Mac's Appendix (ECF No. 548, *et seq.*) "OPERS Ex." or "O-Ex" refer to OPERS's Opposition exhibits (presently filed under seal). Additionally, all emphases herein are added, unless otherwise noted.

[2] Freddie Mac incorporates by reference the Individual Defendants' reply briefs. *See* ECF Nos. 569-71.

to a genuine issue of material fact—they are inadmissible hearsay. *See infra* § I.B & n. 47.

Against the chorus of testimony establishing that there was no fraud, OPERS cites the lone voice of its paid expert, Howard Shapiro. Referencing statements from his written report as if they were contemporaneous statements from "one financial analyst who covered Freddie Mac during the Relevant Period," OPERS never mentions that Shapiro is its paid expert, other than to define his report in a single footnote.[3] But Shapiro's opinion testimony is not admissible for the reasons set forth in Freddie Mac's Motion to Exclude.[4] He is not qualified to offer his myriad opinions, and he flunks every test of reliability set forth in the Federal Rules. *See id.* Even were Shapiro's hyperbolic opinions admissible, they cannot give rise to a genuine dispute where the undisputed facts establish that the challenged statements were neither false nor misleading because the allegedly omitted information was disclosed or not required to be disclosed as discussed below.

While OPERS suggests that there is some sort of discord between the many witnesses asserting that there was no fraud, on the one hand, and contemporaneous documents, on the other (*see* OB 89), there is no such conflict. Aware of this fact, OPERS seeks to make up in volume what it lacks in substance. But the many documents OPERS submits do not give rise to any genuine issue as to falsity, scienter, or any other element of OPERS's claims.[5] To the contrary, they further illustrate the extent to which OPERS has ignored the facts that end this case and the lengths to which OPERS will go to distort the record.

For example, the Opposition's "Fact Section" fails to address the many documents referenced in Freddie Mac's Moving Brief establishing that Freddie Mac only purchased securities

[3] *See* OB 4 n.5, 16 n.37, 23, 32, 40, 43.
[4] *See* ECF No. 522 (March 15, 2024).
[5] *See Robinson v. Horizon Blue Cross Blue Shield of New Jersey*, 674 F. App'x 174, 181 (3d Cir. 2017) (rejecting argument, which OPERS advances here (OB 89), that the volume of exhibits is relevant to whether there is a genuine issue of material fact).

backed by subprime loans for its Retained Portfolio, and did not purchase subprime loans for its SF Guarantee Portfolio (except for a small amount of undisputedly disclosed "T-deals"). OPERS ignores the fact that Freddie Mac deliberated for many years regarding whether to ***enter*** the subprime market by purchasing subprime loans in its SF Guarantee Portfolio. Because Freddie Mac's leaders would not consider entering a market they were already in, those documents prove that Freddie Mac's directors, officers, and employees did not believe that Freddie Mac was already purchasing subprime loans in the SF Guarantee Portfolio.

OPERS also relies on documents that directly refute its claims. More than one internal Freddie Mac report on which OPERS relies states on its face: "***Currently, no subprime loans are within the SF portfolio***."[6] As these documents evidence, Freddie Mac's public statements about its subprime exposure were entirely consistent with its internal statements. And Defendants had every reason to believe that was so. OPERS cannot create a genuine issue of material fact by ignoring the material facts.

Not content with ignoring the facts, OPERS resorts to distorting the record evidence. For example, OPERS relies on its Exhibit 96 to suggest that Freddie Mac's external disclosure of its Alt-A loans was inconsistent with its internal statements about Alt-A loans. Exhibit 96 establishes the opposite, as it sets forth several different Alt-A definitions at use at the Company, including an "External Definition," which is consistent with Freddie Mac's external disclosure. OPERS distorts this document in many ways, including by renaming the "External Definition" set forth in it to avoid alerting this Court to the obvious fact that the definition Freddie Mac used externally was the exact same as the definition it used internally.[7]

---

[6] Ex. 79, SF Credit Portfolio Monitoring Report ("CPM") (Dec. 2006) at FMAC-SEC 060955113; Ex. 81, SF CPM (Feb. 2007) at FMAC-SEC040049958; Ex. 84, SF CPM (May 2007) at FMAC-SEC 040067497.

[7] *Compare* O-Ex. 96 (Alt-A Definitions Pres.) at FMAC-SEC 067770691 with OB 70 (renaming the "External Definition" appearing on Ex. 96 as the "Investment and Capital Markets Definition").

OPERS also ignores facts in Freddie Mac's public disclosures. For example, OPERS ignores that Freddie Mac's 2006 Annual Report disclosed the very facts relating to its underwriting practices identified in an internal memorandum from Paul Mullings to CEO Syron—a document OPERS features in its Opposition to suggest that Syron knew something about underwriting that the market did not know. *See* OB 30-31 and *infra* § II.B (discussing Mullings memo). OPERS further ignores Freddie Mac's disclosures in its reports for the first and second quarters of 2007, which alerted the market to its expectation of near-term credit losses and the fact that its 2006 and 2007 books of loans were performing relatively poorly. *See infra* § II.A.2. These documents and many others establish that there was no false or misleading statement regarding credit risk, underwriting, or any other matter, let alone any intent to defraud.

Because the record evidence defeats its claims, OPERS resorts to further dubious tactics—gaslighting the Court and Defendants by arguing that the "primary" theory of fraud asserted in its TAC is not actually its primary theory of fraud; challenging for the first time eight statements that do not appear in the TAC; claiming a statement was "publicly touted" when it was not; covertly modifying a quote from an internal Freddie Mac document; removing from its table of companies that also suffered losses the company with the most dramatic negative stock price movement to avoid undermining its own argument; and even purporting to quote a judicial opinion when it actually had lifted that language from a losing brief in an unrelated case. The Court should countenance none of these tactics.

OPERS also ignores bedrock principles of federal securities law that bear on whether Defendants made false or misleading statements or had a duty to disclose allegedly omitted information. As Freddie Mac previously noted and as the Supreme Court recently held, a "pure omission"—the failure to disclose information in the absence of an inaccurate, incomplete, or

misleading statement—cannot give rise to liability under the federal securities laws.[8] A duty to disclose only arises where there is positive law requiring disclosure (such as the laws and regulations requiring period reports on Forms 10-K and 10-Q) or a statement that would be misleading absent the disclosure of the information. *Id.* To establish that a statement is misleading under the federal securities laws, OPERS must identify omitted information that is actually ***inconsistent*** with the challenged statement.[9] In the absence of such a statement, there is no duty to disclose the omitted information. *Id*. Thus, for example, there is no duty to disclose intra-quarterly results (such as the information in the internal reports cited by OPERS).[10] By way of further example, a statement that does not even discuss the subject of an alleged omission is not misleading for failure to mention the omitted information.[11]

To state the obvious, allegedly omitted information that is actually disclosed cannot give rise to a claim under the federal securities laws.[12] Though one would never know it from a review of OPERS's "Fact Section," Freddie Mac disclosed the following before and during (and in all cases before the end of) the Relevant Period:

- Freddie Mac had adopted a "Touch More Loans" strategy (*see infra* at 8-10)—*i.e.*, Freddie Mac was expanding its ability to purchase mortgage loans that it had not traditionally purchased and that it was going to be buying increasing amounts of non-traditional mortgages;
- Freddie Mac was buying more non-traditional mortgages, including reduced documentation loans, Interest-Only loans, and Option Arm loans (*see* MB 32-38);

[8] *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 266 (2024).

[9] *See Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (en banc).

[10] *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007).

[11] *See, e.g.*, *In re Ford Co. Sec. Litig.*, 184 F. Supp. 2d 626, 633-34 (E.D. Mich. 2001)), *aff'd*, 381 F.3d 563 (6th Cir. 2004) (dismissing claim based on statements that did "not relate" to the omitted information).

[12] *See, e.g.*, *Ley v. Visteon Corp.*, 543 F.3d 801, 807-08 (6th Cir. 2008) (affirming dismissal of securities fraud claims where allegedly undisclosed information was disclosed).

- The substantial increase and the precise percentages of its purchases of Interest-Only and Option ARM loans (*see id.*);
- Its SF Guarantee Portfolio included Alt-A loans in the amount of $53.6 billion, approximately 8% of its Total Mortgage Portfolio (*see id.*);
- All of those non-traditional loans had a greater risk of default than the loans Freddie Mac traditionally purchased (*see id.*);
- Its underwriting process not only included use of its automated underwriting system ("AUS") Loan Prospector, but also specific contracts tailored to specific customers (*see* MB 10-12);
- It was also increasingly purchasing loans by way of others' AUS, such as Fannie Mae's Desktop Underwriter (*see id.*);
- Purchasing loans from others' AUS gave rise to greater risk for Freddie Mac (*see id.*);
- The loans it purchased in recent years, and in particular 2006 and 2007, were transitioning from delinquent to foreclosed status at greater rates than earlier years (*see infra* at 11-13);
- The market conditions for purchasing loans were worsening, and one of the principal risks that Freddie Mac warned about, and which materialized, was a dramatic reversal in home price appreciation (*see* MB 41-42);
- Freddie Mac maintained reserves against anticipated losses in its SF Guarantee Portfolio, and it increased its loan loss reserves each quarter in 2007, given the increased risks it faced (*see infra* at 10-13);
- It expected, as of the end of the second quarter of 2007, to further increase its loan loss reserves in the third quarter and beyond to cover expected future losses in its SF Guarantee Portfolio, particularly given the risks associated with its 2006 and 2007 books of loans (*see id.*).

The foregoing facts are public and not subject to dispute. They doom OPERS's case. Because Freddie Mac's actual public statements disclosed, or are consistent with, the allegedly omitted information, those statements are not misleading, as a matter of law. Likewise, because Freddie Mac's actual public statements are consistent with the allegedly omitted information, the statements did not give rise to a duty to disclose that information—*i.e.*, there is no actionable omission. At bottom, OPERS has failed to identify facts establishing that Defendants made any false or misleading statement or any actionable omission.

OPERS also has failed to identify facts showing that any Defendant acted with scienter—*i.e.*, knew any challenged statement was false, was reckless with regard to the truth, or intended to conceal anything from the public. Not a single Freddie Mac witness testified to the contrary, and the documents upon which OPERS relies do not diverge from Defendants' external statements. Instead, OPERS asks the Court to ***infer*** scienter based principally on the allegation that Defendants were supposedly motivated to commit fraud by bonuses and stock dividends. Putting aside that this theory does not appear in the TAC, and that OPERS cannot amend its TAC through its Opposition, it is not consistent with the facts regarding compensation and dividends. *See infra* § I.B.2.b. Indeed, Defendants' lack of stock trading and substantial trading losses cut strongly against any inference of scienter. *See id; see also* MB 70-72. OPERS has failed to identify any "concrete evidence" of scienter, as required to defeat Freddie Mac's summary judgment motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Applying the above-cited legal principles to the undisputed facts, including facts that OPERS ignores, none of its claims should survive summary judgment. Defendants' statements about subprime were true, and none of the exhibits submitted by OPERS is inconsistent with those statements. *See infra* § I.B. Likewise, Freddie Mac's disclosure about Alt-A loans was true, and an examination of Freddie Mac's Alt-A disclosure as compared to the internal documents cited by OPERS only bolsters the fact that Freddie Mac engaged in a good faith effort to quantify Alt-A loans consistent with the market understanding of the term (and illustrates OPERS's effort to distort record evidence). *See infra* § II.A.1. OPERS's claims based on statements relating to underwriting standards and credit risk fail principally because the very information that OPERS claims was not disclosed was, in fact, disclosed. *See infra* §§ II.A.2; II.B. There was no duty to disclose any other information because no challenged statement was inconsistent with any

undisclosed information, and OPERS fails to identify any such duty. *See infra* § II.B.2. In addition, claims based on all of the challenged statements fail because OPERS fails to identify a genuine issue of material fact as to the issues of scienter, reliance, loss causation, and damages. *See infra* §§ II.A; II.B.3; III; IV; V.

Each of these grounds independently dictates the grant of summary judgment in favor of Freddie Mac. Importantly, while OPERS essentially concedes that summary judgment should enter against it, this Court should consider and rule against OPERS on all grounds, not just those invited by OPERS. This case has been pending for 16 years, and it is time for this Court to bring it to a definitive end. Ruling on all grounds now will promote efficient resolution of this long-running litigation.[13]

**UNDISPUTED MATERIAL FACTS IGNORED BY OPERS**

OPERS makes much of Freddie Mac's "Touch More Loans" strategy, but the strategy was no secret. As discussed below, the public record is rife with Freddie Mac's disclosures regarding this new strategy of buying more loans from Freddie Mac's customers than it previously had, including loans more representative of the market as a whole, *i.e.*, additional riskier loans, and more non-traditional loans that it previously had not purchased.[14] For example, on February 1, 2006 and February 8, 2006, months before the start of the Relevant Period, Defendants McQuade and Cook publicly explained that, to pursue the "Touch More Loans" strategy, Freddie Mac would

[13] OPERS acknowledges that summary judgment should enter. *See* OB 1 & 136-40. Previously, OPERS requested that the Court enter summary judgment against itself, seeking to expedite an appeal of the Court's class certification decision. *See* ECF No. 485. Following the Court's entry of summary judgment, the Sixth Circuit declined to exercise jurisdiction over OPERS's appeal, explaining that doing so "would invite protracted litigation and piecemeal appeals." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 64 F.4th 731, 735 (6th Cir. 2023). Were the Court to grant summary judgment by ruling on only OPERS's self-selected grounds, it would invite the possibility of another piecemeal appeal. *See id.*

[14] Exs. 162, 163, 164, and 165, McQuade and Cook Remarks, *see* MB 32-34 (discussing disclosures regarding increased purchases of non-traditional loans, including IO and Option-ARMS)]

"Expand [its] internal securitization capabilities" and "Increase [its] appetite for nontraditional GSE loan products."[15] In other words, Freddie Mac would both expand its ability to purchase non-traditional loans and it would agree to purchase more of them from its customers. In its public reports, Freddie Mac disclosed the actual increases in its purchases of non-traditional mortgage products. *See* MB 32-38.

The following year, in January 2007, Cook publicly explained how Freddie Mac's strategy of expanding its capabilities to purchase more loans and its appetite to purchase more non-traditional loans had served both its mission and business purposes.[16] She explained how the strategy of purchasing a "more representative mix" of what the market was originating and "new mortgage types" was good for Freddie Mac's mission of promoting homeownership, and in particular its goal of supporting communities in need. *Id.*

Cook then explained how Freddie Mac's strategy "makes good business sense as well." *Id.* She shared her expectation that Freddie Mac's future success, and in particular its ability to maintain market share, would depend on the "Touch More Loans" strategy, including, for example, a significant increase in purchases of Interest-Only and Option ARM loans:

> [Slide 5] During 2006, success in our mission contributed directly to success in our single-family securitization business. As we have discussed in the past, a large part of our future success hinges on **expanding our credit guarantee capabilities.**
>
> One recent example of these efforts is **our growth in IO [*i.e.*, Interest-Only] and Option ARM products in 2006**. As you can see, these accounted for approximately **17 percent** of our total mortgage purchases for the first nine months

[15] Ex. 162, McQuade Remarks (Feb. 1, 2006) at FMAC-SEC 039088466-67 and Ex. 164, Cook Slides (Feb. 8, 2006) at FMAC-SEC 082788331). See also Ex. 163, Cook Remarks, (Feb. 8, 2006).
[16] Ex. 165, Cook Remarks (Jan. 30, 2007) at FMAC-SEC 072804519.

> of 2006, and about **6 percent** of our total portfolio balance as of the end of September 2006.[17]

Not surprisingly, the "Touch More Loans" strategy had an impact on Freddie Mac's business. As internal reports cited by OPERS evidence, the overall credit risk of the SF Guarantee Portfolio was "relatively low," but the "credit quality" and "ex ante metrics" of loans Freddie Mac purchased in 2006 and 2007—*i.e.*, its 2006 and 2007 "books"—were, relative to earlier books, not as strong.[18] While OPERS cites SF Credit Portfolio Monitoring Reports and Enterprise Risk Management Committee reports as evidence that credit risk for some loans was rising (OB 46-49, 102-03), it makes no mention of these reports' reference to the greater context: while credit risk was expanding, overall credit quality was still good:

- "Overall SF credit portfolio risk is still relatively low."
- "[T]he current performance of the single-family (SF) portfolio is strong, but credit risk is increasing."
- "Existing portfolio is well diversified by key risk attributes, with historically low delinquencies and credit losses…portfolio is overwhelmingly concentrated in low-risk fixed-rate products."[19]

Consistent with these internal reports, Freddie Mac publicly disclosed the declining relative performance of its 2006 and 2007 books, its expected increased near-term credit losses, and an increase to its loan loss reserves. In its 2006 Annual Report released March 2007, it stated:

> Experience and recent market developments tell us to be careful, however, and we are **keeping a watchful eye on our 2006 book of business**. While we are in better position than many, **we have set aside increased loan loss reserves**, as our credit portfolio remains vulnerable to significant declines in house prices.[20]

---

[17] *Id.* at -4520.

[18] O-Ex. 55, ERMC Report (Dec. 13, 2006) at FMAC-SEC 075569073; O-Ex. 68, ERMC Report (Oct. 3, 2006) at FMAC-SEC 082820947; O-Ex. 67, ERMC Report (Jan. 18, 2007) at FMAC-SEC 072776239.

[19] *Id.*

[20] Ex. 21, 2006 Annual Report, at 5.

Freddie Mac disclosed the cause of the increased loan loss reserves and that it expected a rise in "near-term credit losses":

> We recorded **additional reserves in 2006** related to our single-family portfolio reflecting: **increased estimates of incurred losses** with respect to delinquent loans that are **expected to experience higher default rates based on their year of origination**; an observed increase in the transition rates of loans through delinquency to foreclosure and corresponding increases in the number of properties that we acquired as real estate owned; and increases in the expected severity of losses on a per-property basis, **driven in part by the expectation of low or slower home price appreciation** in certain areas.
>
> We expect that **near-term credit losses**, which include net charge-offs and expenses, **will rise while still remaining below longer-term historical levels**, as home price appreciation continues to slow significantly.[21]

Shortly thereafter, on June 14, 2007, reporting its results for the first quarter of 2007, Freddie Mac disclosed the relatively poorer performance of "mortgages originated in recent years," particularly its 2006 book, and its continued expectation of rising credit losses:

> **We expect that credit losses**, which include net charge-offs and REO expenses, **will rise** from the current historically low levels.
>
> * * *
>
> **The amount of non-performing assets increased 4 percent** during the three months ended March 31, 2007, to $9,971 million, due to increases in average loan size as compared to 2006 as well as higher volume associated with portfolio growth. **In addition, the delinquency transition rate**, which is the percentage of delinquent loans that proceed to foreclosure or are modified as a troubled debt restructuring, **has increased**. As a result, the balance of our REO, net, increased 18 percent during the three months ended March 31, 2007. **An observed increase in delinquency** transition rate is more pronounced **in mortgage loans originated in recent years, particularly mortgages originated during 2006.** Until the rate of nationwide housing appreciation returns to historical levels or regional economies improve, **we believe we will continue to experience higher delinquency transition rates and an increase in non-performing assets**.[22]

For the first quarter of 2007, the company increased its loan loss reserves from $420 million as of year-end 2006 to $525 million at March 31, 2007, an increase of **$125 million**, or **30%**:

---

[21] *Id.* at 38.

[22] Ex. 46, Q1 2007 ISS (June 14, 2007) at 13, 32.

> The total delinquency rate for our single-family credit guarantee portfolio declined to 50 basis points at March 31, 2007, as compared to 53 basis points at December 31, 2006. However, for the three months ended March 31, 2007, our single-family credit guarantee portfolio experienced increases in the rate at which loans transitioned from delinquency to foreclosure and higher losses on a per-property basis. **As a result of the observed credit deterioration, we increased our loan loss reserves by $125 million to $545 million at March 31, 2007 from $420 million at December 31, 2006.**[23]

On August 30, 2007, reporting its second quarter results, Freddie Mac disclosed its expectation that credit losses would continue to rise due to, among other things, the fact that it had purchased more loans, growing the size of its portfolio:

> **We expect that credit losses**, which include net charge-offs and REO expenses, **will continue to rise** from the current level.
>
> * * *
>
> The **amount of non-performing assets increased 14 percent** during the six months ended June 30, 2007, to $10,910 million from $9,546 million at December 31, 2006, **due to** increases in the average size of seriously delinquent loans compared to 2006, as well as **higher volume associated with portfolio growth**.[24]

Further, Freddie Mac disclosed an increase in its delinquency transition rate, driven by mortgages purchased in recent years, and in particular 2006 and 2007 purchases, which it expected to continue to lead to losses:

> **The increase in the delinquency transition rate is more pronounced in mortgage loans originated in recent years, particularly mortgages originated during 2006 and 2007.** Until the rate of nationwide housing appreciation increases or selected regional economies improve, **we believe we will continue to experience higher delinquency transition rates than those experienced in 2006 and an increase in non-performing assets**.[25]

For the second quarter of 2007, Freddie Mac raised its loan loss reserves yet again, by **$370 million** for a total of $790 million, or an **88% increase**, and publicly disclosed this increase:

> For the six months ended June 30, 2007, our single-family credit guarantee portfolio continued to experience increases in the rate at which loans transitioned

---

[23] *Id.* at 2.

[24] Ex. 52, Q2 2007 ISS (Aug. 30, 2007) at 17, 36.

[25] *Id.* at 36.

> from delinquency to foreclosure and higher losses on a per-property basis. **As a result of the observed credit deterioration, we increased our loan loss reserves by $370 million to $790 million at June 30, 2007 from $420 million at December 31, 2006.**[26]

Freddie Mac also warned investors that it expected to increase reserves even further in future periods, expressly identifying the performance of Interest-Only mortgages and mortgages originated in 2006 and 2007 as the cause for anticipated increased future reserves:

> **We expect to make further additions to our loan loss reserves in future periods, particularly related to interest-only mortgages and mortgages originated in 2006 and 2007.**[27]

These disclosures devastate OPERS's case, which may explain why the Opposition omits them.

The witness testimony, public statements and internal documents all line up—there was no fraud about subprime loans or any other matter.[28] With 20/20 hindsight, it was unfortunate that the Company embarked on the "Touch More Loans" strategy prior to the greatest-ever collapse of the U.S. residential real estate market. But Defendants told the investing public about its strategy, as well as the risks and effects of that decision. Defendants cannot be held liable for failing to predict the future. Even if the decision to adopt this strategy were poor management—though the record does not support even that charge—mismanagement is not securities fraud. *See Santa Fe Indus. v. Green*, 430 U.S. 462, 479 (1977). As discussed further below, the undisputed facts refute any argument that Defendants committed any fraud, including any alleged failure to disclose its expected rising credit losses, the comparative credit weakness of its 2006 and 2007 books, or the impact of the weakening housing market on its portfolio and near-term expectations.

---

[26] *Id.* at 4.

[27] *Id.*

[28] *See, e.g.*, MB at 51-52, n.262; *see also* Mooney (SEC) Tr. 305:2-19; 306:1-12, 335:22-339:9.

## ARGUMENT

None of the statements challenged by OPERS is false or misleading. Taking a scattershot approach, OPERS's TAC challenged as false or misleading dozens of statements during the Relevant Period. *See* TAC ¶¶ 139-92. In its Opposition, OPERS challenges a total of 31 statements. *See* Exs. 168 & 169. While OPERS sometimes characterizes Defendants' statements or even invents statements that no Defendant ever uttered,[29] this Court is required to address the challenged statements on a "statement-by-statement basis," eschewing an analysis of "the overall impression made by a set of statements." *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491-92 (6th Cir. 2015); *see City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 682 (6th Cir. 2005).

Among the statements challenged by OPERS are four statements that were not challenged in the TAC, as the PSLRA requires. *See* 15 U.S.C. § 78u-4(b)(1)(B) (requiring complaint to, *inter alia*, "specify each statement alleged to have been misleading"). OPERS cannot amend its TAC at this late date through its opposition brief. *See Roeder v. Am. Postal Workers Union, AFL-CIO*, 180 F.3d 733, 737 n.4 (6th Cir. 1999) (refusing to consider claims not pled in the complaint and raised, for the first time, on summary judgment).[30] Courts regularly preclude securities fraud plaintiffs from asserting at summary judgment that non-pled statements or omissions are actionable. *See, e.g.*, *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 624-25 (D.N.J. 2023) (refusing to consider statement discussed in opposition to summary judgment but not previously

[29] *See, e.g.,* OB 2 ("Defendants maintained that, unlike other financial industry firms, Freddie Mac would not be undone by the housing crisis that was beginning to tear apart the world economy.").

[30] OPERS has not sought leave to amend a fifth time to pursue new claims regarding statements, and it should not be permitted to do so now. Freddie Mac would not consent to a request to amend at this late date.

pleaded) (citing cases); *In re St. Jude Medical, Inc. Sec. Litig.*, 629 F. Supp. 2d. 915, 921 (D. Minn. June 22, 2009) (refusing to consider new theory of fraud).

Disregarding statements OPERS does not defend and those it raises for the first time in its Opposition, only 27 statements remain at issue. These statements are at Exhibits 168 and 169 and each is not actionable for the reasons discussed therein and below.

# I. THERE WAS NO "PRIMARY" FRAUD.

Twelve years ago, in the fourth Complaint filed in this case (*i.e.*, the TAC) OPERS alleged that "***[t]he primary fraud*** was Defendants' failure to disclose Freddie Mac's true subprime exposure." TAC ¶ 3. Indeed, that allegation has been at the core of this case since it was first filed.[31] Years of discovery, briefing, and appeals ensued. Now, OPERS relegates its "primary fraud" claim to a tertiary role, declining to address it until page 56. OPERS's strategy shift is not surprising, as its primary fraud claim lacks any basis in the record evidence.

## A. There Is No Actionable Misstatement or Omission Regarding "Subprime Exposure."

### 1. No Defendant Made a Material Misrepresentation Regarding Freddie Mac's "Subprime Exposure."

Defendants' statements about Freddie Mac's subprime exposure were true when made, and there is no genuine dispute of material fact on that issue. OPERS does not contest the unanimous testimony of Freddie Mac employees that the company's subprime disclosures were accurate and truthful. *See* MB 61-65. Further, OPERS ignores the wealth of documents establishing that Defendants' statements about subprime exposure were accurate. Indeed, multiple documents on which OPERS itself relies to try to support its claims evidence that the challenged statements were correct. So, OPERS resorts to taking documents out of context and arguing that, while Freddie

[31] *See* Complaint (Jan. 18, 2008) (ECF No. 1) at 3 (Introduction).

Mac admittedly did not purchase loans from the traditional subprime market, some of its loans performed like subprime loans. *See* OB 63. This tactic fails for several reasons. The authors of the documents on which OPERS's relies deny that Freddie Mac had subprime loans. In addition, the documents are not inconsistent with the challenged statement. And the only empirical evidence before this Court establishes that Freddie Mac's loans did not perform like subprime loans. OPERS submits no contrary evidence, and its arguments and cases are no substitute.

#### a. OPERS Does Not Dispute the Bedrock Facts Establishing That Freddie Mac Did Not Have a Significant Amount of Subprime Loans in Its SF Guarantee Portfolio.

In its Moving Brief, Freddie Mac set forth the facts establishing its limited participation in the subprime market, supported by witness testimony and a large documentary record. *See* MB 15-22. Not disputing that substantial documentary record, OPERS focuses on immaterial facts.

Before and during the Relevant Period, Freddie Mac considered purchasing subprime loans for its SF Guarantee Portfolio, but decided not to do so beyond the relatively small amount of previously purchased and disclosed "T-deals." *See* MB 16-19. Freddie Mac's deliberation process spanned several years, and it generated many documents that are completely consistent with Freddie Mac's external disclosures regarding subprime. *Id*. Many other internal documents, including those OPERS relies upon, also evidence that Freddie Mac did not purchase subprime loans in its SF Guarantee Portfolio beyond the T-Deals. *See* MB 19-20. For example, OPERS cites various CPM reports and states that they "went into granular detail with respect to the portfolio's composition and performance." OB 42. While this is true, OPERS fails to inform the Court that, as shown below, these same internal reports repeatedly note: "***Currently, no subprime loans are within the SF portfolio***":

**Definition:**

1. Alternative Mortgage Products
   - Interest Only
   - Option ARM
2. Sub-prime Mortgages*
3. Bulk Alt A
4. Risk Layered Products
   - Low/no Doc with FICO<=680
   - TLTV>90 and FICO <= 620
   - TLTV>95 and FICO <= 680
   - DU EA1, EA 2 & DU EA 3

**Position Limits :** $2.4 Billion in economic capital

*Currently, no sub-prime loans are within the SF portfolio

These reports[32] constitute uncontradicted evidence that Freddie Mac did not have undisclosed subprime loans in its SF Guarantee Portfolio, and they are entirely consistent with Freddie Mac's disclosures. OPERS makes no mention of this, of course. But ignoring this determinative evidence does not make it go away, nor does it give rise to a genuine issue of material fact.

In the TAC, OPERS alleged that Freddie Mac's Caution Loans were subprime loans. TAC ¶ 33. But the undisputed evidence demonstrates that Caution Loans were not subprime loans, and they behaved nothing like subprime loans. MB 20-21. Freddie Mac's expert, Dr. Chudozie Okongwu, conducted an empirical analysis comparing the performance of Freddie Mac's Caution Loans to a large set of subprime loans originated during the Relevant Period, and determined that this key predicate for OPERS's "primary fraud" theory is entirely incorrect. *See* MB 20-21. Specifically, Dr. Okongwu compared "loan-level data (from Freddie Mac) for the Caution Loans to loan-level data [from a leading data provider, CoreLogic]" for "single-family mortgage loan originations in 2005, 2006, and 2007."[33] Dr. Okongwu found that, far from being equivalent to subprime loans, Freddie Mac's Caution Loans look like, and perform like, the CoreLogic set of prime loans. *Id.* ¶ 13. In fact, if one sets aside interest-only Caution Loans (which Freddie Mac

[32] Ex. 81, SF CPM (Feb. 2007) at FMAC-SEC 040049958; *see also* Ex. 79, SF CPM (Dec. 2006) at FMAC-SEC 060955113.

[33] Ex. 19, Okongwu Rep. ¶ 13; *see also* ¶ 9 (defining Caution Loans).

disclosed it was purchasing in greater numbers and expected to default at higher rates (*see* MB 4, 32-38), the remaining Caution Loans performed almost ***identically*** to prime loans, and not remotely like subprime loans. *Id.* ¶ 136. Figure 22 from Dr. Okongwu's report (*id.*) graphically demonstrates this comparison and the baseless nature of OPERS's claim:

**Figure 22**
**Method 2: Loan-Level Comparison of Serious Delinquency Rates, Incl. Foreclosure and REO – 2006 Vintage**
**Q1 2006 – Q3 2008**




**b. Documents Where Several Former Employees Used the Term Subprime in Different Ways Do Not Give Rise to Genuine Issues of Material Fact.**

Ignoring this evidence, OPERS cites several documents where the terms "subprime" or "subprime-like" were used by several Freddie Mac employees—and in particular former employees Don Bisenius and John Straka. *See* OB 56-66. Those documents do not render false or misleading Freddie Mac's subprime disclosures.

First, Bisenius and Straka testified ***that they did not believe the company purchased subprime loans for its SF Guarantee Portfolio***.[34] Indeed, Bisenius explained that he used the term "pejoratively," simply to refer generally to loans of lower credit quality. MB 30-31. Such a vague view of the term cannot possibly render Freddie Mac's specific statements false or misleading. OPERS also tries to make use of an economic forecasting model called Segmentor created by Straka to argue that Freddie Mac calculated "the probability that a loan is subprime." OB 59-63. But OPERS fails to inform the Court that Straka explained the limits and inputs to the Segmentor model, including that ***it was not designed to classify Freddie Mac's "subprime exposure***," and "***does not predict the likelihood of a loan being subprime***," and "does not even predict the performance of a closed prime loan."[35] In other words, OPERS attempts to use short-hand phrases employed by Straka to mean something that he did not mean.

Second, even if OPERS's selected documents were evidence that Bisenius, Straka, or anyone else held the view that a significant number of loans within the SF Guarantee Portfolio were subprime loans based on their personal perspective or even a mortgage model's output, that would not save OPERS's claims because the challenged public statements are not rendered false or misleading by such views. For a statement to be false or misleading, the statement must be contrary to or at least inconsistent with the allegedly undisclosed facts. *See infra* § II.B.2 (discussing *Polaroid*). It is undisputed that there is no universal definition of the term "subprime" and Freddie Mac disclosed as much. *See* MB 27.[36] The disclosure at the heart of this case is Freddie Mac's statement that "we believe, based on lender-type, underwriting practice, and

[34] Ex. 125, Straka Tr. (Jan. 14, 2015) 218:14-22; Ex. 119, Bisenius Tr. (Dec. 4, 2014) 590:10-20; 592:12-15 (testifying that "what Freddie Mac had said was accurate," adding that he "would attest to it every time because it was right," as the "disclosures that Freddie Mac had made … were true and accurate.").

[35] Ex. 160, Straka Tr. (Jan. 14, 2015) at 154:10-17.

[36] *See also* MB 14, n.58; Ex. 110, Romano Tr. (Sept. 9, 2014) at 301:1-3.

product structure" the company did not believe that the number of so-called subprime loans in its SF Guarantee Portfolio was significant.[37] None of the documents submitted to this Court by OPERS—***not one***—tends to show that anyone at Freddie Mac believed that it had a significant amount of subprime loans "based on lender type, underwriting practice, and product structure." *See Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 183 (S.D.N.Y. 2012) ("[T]he fact that Freddie Mac employees attributed different definitions to the term 'subprime' in internal correspondence has no bearing on whether Freddie Mac's public disclosures were misleading; rather it only highlights that the term had no set definition.").

For this reason as well, Freddie Mac's public disclosure is not inconsistent with the single comment in a 15-page internal report that "[l]oan-level risk grades blur as capital retreats in the subprime market, increasing the likelihood that we may already be purchasing subprime loans under existing acquisition programs." OB 28, 35 (O-Ex. 56). The comment expresses at most a concern about borrowers who previously would have bought subprime loans instead purchasing prime loans. It is not evidence that Freddie Mac actually was purchasing subprime loans, and it certainly does not evidence that Freddie Mac had any significant amount of loans in its SF Guarantee Portfolio based on lender-type, underwriting practice, or product structure. Similarly, the "Glossary of Terms" that OPERS cites (OB 83) is not inconsistent with Freddie Mac's public disclosure.

Unable to argue that Freddie Mac purchased subprime loans from subprime lenders, OPERS argues that Freddie Mac's senior management believed that loans in the SF Guarantee Portfolio were "subprime" to the extent they "would behave like a typical subprime loan." OB 106. As support, OPERS relies on Straka's communications with his colleague, John Mulligan,

[37] Ex. 21, 2006 Annual Report, at 69.

discussing the Segmentor model. *Id.*[38] Those documents, however, do not evidence even that Straka believed that Freddie Mac purchased subprime loans because they do not establish that Freddie Mac's loans behaved like subprime loans. *See supra* § I.A.1. Dr. Okongwu's analysis establishes that they do not. *See supra* § I.A.1.a.

OPERS also cites presentations used at a senior executive and a board meeting in February and March 2007. OB 107. Those documents are part of a wealth of evidence establishing that Freddie Mac was ***not*** buying subprime loans. *See* MB 17-18. OPERS does not dispute that the purpose of these meetings was for Freddie Mac to determine whether it should ***enter*** the subprime market. *See* MB 16-20. Indeed, the March 2007 presentation states that Freddie Mac's "involvement in subprime" has been limited to "buying AAA tranches of others' securitizations"—*i.e.*, AAA-rated securities backed by subprime loans for the Retained Portfolio.[39]

**c. None of the Decisions Cited by OPERS Excuses It From Identifying a Genuine Issue of Material Fact.**

In arguing that Freddie Mac somehow failed to disclose its true subprime exposure, OPERS mainly relies on two cases involving motions to dismiss—*SEC v. Syron* and the Sixth Circuit's 2016 decision in this case. OB 104. Neither supports OPERS because, unlike on a motion to dismiss, here OPERS must "cit[e] to particular parts of materials in the record." Fed. R. Civ. P. 56(c)*; see Rodgers v. City of Cleveland*, 2006 WL 2371981, at *7 (N.D. Ohio Aug. 15, 2006) (conclusory allegations are insufficient to defeat summary judgment).

[38] Segmentor is a mortgage-scoring model developed by Dr. John Straka that was used in connection with Freddie Mac's Loan Prospector automated underwriting system. The Segmentor model compared the risk characteristics of a loan as against a pool of sample loans, and provided a weighted "risk score," also referred to as a "Segmentor Score," for each loan. *See, e.g.*, Ex. 160, Straka Tr. (Jan. 14, 2015) at 139:19-140:11, 264:12-265:13.

[39] Ex. 83 at FMAC-SEC 047450781 (*see* MB 18).

In *Syron*, the court found the SEC had sufficiently ***alleged*** that the SF Guarantee Portfolio had "total exposure to subprime loans" "between $141 billion and $244 billion – 10% to 14%" of the portfolio for the relevant period. 934 F. Supp. 2d 609, 616-17, 631 (S.D.N.Y. 2013). Unlike then, OPERS now must offer evidence to support its allegation. But it hasn't.[40] Nor could it because a wealth of evidence establishes the contrary, and further, the evidence establishes that the Defendants did not act with scienter. The *Syron* court did not have the benefit of any evidence, including a deluge of documents and witness testimony uniformly demonstrating that Freddie Mac's disclosures were truthful and made in good faith. *See* MB 26-41.

OPERS's reliance on Judge Sullivan's distinction of *Kuriakose* does not save OPERS[41]. As noted above, Judge Sullivan was ruling on the pleadings and lacked a fully developed record to assess scienter. In addition, unlike Judge Sullivan, Freddie Mac also cited *Kuriakose* to explain why none of Freddie Mac's disclosures were false or misleading, and it is telling that OPERS fails to engage on this point. As Judge Keenan held in *Kuriakose*:

> Plaintiffs' claims are made even more tenuous by the fact that in annual and quarterly statements, ***Freddie Mac routinely detailed the credit characteristics of the loans in its guarantee portfolio, divulged the specific credit scores of borrowers in its guarantee portfolio, and disclosed loan-to-value ratios.***
>
> Plaintiffs allege in the TAC that Freddie Mac misled investors as to the number of "Caution Loans (C1, C2) and EA [Expanded Approval] loans" in its guarantee portfolio. According to Plaintiffs, these loans should have been labeled as "subprime;" and failure to classify them as such constituted a material misstatement. ***Plaintiffs' arguments fail because Freddie Mac's broad disclosure [of] all of its loan characteristics was an accurate way to relay information to investors, given the confusion surrounding the term "subprime."*** Freddie Mac's

[40] Notably, the SEC later decided to drop its lawsuit after the close of discovery, and, after finding no evidence of wrongdoing after a lengthy internal investigation, FHFA moved for the dismissal of derivative claims against Freddie Mac's former officers. *See* MB 57.

[41] Even on the issue of scienter, Judge Sullivan recognized differences in the limited records before him and the *Kuriakose* court, underscoring the fact that this Court now has a full factual record before it, unlike Judge Sullivan, who was limited to the SEC's pleadings. *Syron*, 934 F. Supp. 2d at 633.

> method of disclosing information made it possible for a reasonable investor to, with little effort, take his own measure of risk in Freddie Mac's loan portfolio.
>
> * * *
>
> Throughout the Class Period, Freddie Mac made investors aware of its exposure to "non-traditional" mortgages. Whether executives referred to these loans as "risky," "non-prime," "subprime-like," or "subprime" is irrelevant since ***Freddie Mac fully disclosed the composition of the company's portfolio.***[42]

The Sixth Circuit's 2016 decision in this case also does not support the denial of summary judgment. As this Court knows, that decision was on a single issue—loss causation—on a motion to dismiss. It provides no support to OPERS's claims that any statement made by Freddie Mac regarding subprime was false. And it certainly was not based on "identical facts" (OB 115), but rather no facts at all—just OPERS's unsupported TAC allegations. *OPERS v. Freddie Mac*, 830 F.3d 376, 386 (6th Cir. 2016) ("if OPERS's allegations of systemic mismanagement within Freddie Mac are to be believed—as all well-pleaded allegations must be at this stage."); 388 ("Taking the allegations in the Complaint as true…").

Finally, OPERS claims that the "Fannie Mae subprime cases rejected nearly identical arguments made by the defendants here." OB 113. As with *Syron*, those were decided on the pleadings, without the wealth of documentary and testimonial evidence available here.

### 2. There Was No Material Omission Regarding Freddie Mac's "Subprime Exposure."

OPERS does not respond to any of Freddie Mac's arguments relating to four alleged omissions in the TAC. MB 66-67 (citing TAC ¶¶ 134-38). Thus, summary judgment should enter on claims based on these allegations. *See Sherman v. Biglari*, 2020 WL 3000452, at *9, n.13 (N.D. Ohio June 4, 2020) (failure to respond to an argument results in a waiver of the claim); *Latham v.*

[42] *Id*. at 182, 185.

*ABX Air, Inc.*, 2012 WL 2409479, at *4 (S.D. Ohio June 26, 2012) (when plaintiff does not respond to challenges raised in a defendant's motion the claims should be dismissed).

**B. There Is No Genuine Issue of Material Fact Regarding Whether Any Misrepresentation or Omission Regarding "Subprime Exposure" Was Made With Scienter.**

To avoid summary judgment on the issue of scienter, OPERS must identify "***concrete evidence***," *Anderson*, 477 U.S. at 256,[43] from which a reasonable juror could find that Defendants "acted with…a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). There is no such concrete evidence. *See* MB 68-77. Not a single percipient witness has testified that any Freddie Mac officer, director, or employee acted with scienter. *Id.* at 50-52. Many witnesses testified to Freddie Mac's good faith, including OPERS's own CWs. *See id.* & Exs. 1-11 (CW declarations). In fact, each CW has affirmed that they are not (and never were) aware of any false or misleading public statement, much less any intention to mislead investors. *Id.* OPERS has no good response to the CW declarations. Instead, OPERS submits a declaration of its former private investigator, attaching his purported notes of conversations with the CWs. The contents of that declaration and those notes are rank hearsay that cannot be considered at summary judgment.[44] Because OPERS never took the CWs' depositions, the only admissible, relevant evidence from them is their declarations.

---

[43] OPERS suggests that it need provide only more than a scintilla of evidence to survive summary judgment. OB 89 nn. 380-81 (citing *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019) and *Bd. of Sapphire Bay Condo. W. v. Simpson*, 2010 WL 8278411, at *2 (D.V.I. June 16, 2010)). *Baker* does not say that; it makes clear that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be ***insufficient***; there must be evidence on which the jury could reasonably find for the plaintiff." 936 F.3d at 529 (citing *Anderson*, 477 U.S. at 252). To the extent *Sapphire*, a never-cited 2010 Virgin Islands case, could be read to lower this standard, it should be disregarded as inconsistent with Supreme Court and Sixth Circuit precedent.

[44] *See Lincoln v. BNSF Ry. Co.*, 2020 WL 4000912, at *14-17 (D. Kan. July 15, 2020) (refusing to consider at summary judgment, as hearsay subject to no exception, investigator's notes of employee conversations).

Because it cannot identify any direct evidence of scienter, OPERS does not even try. Instead, it asks the Court to ***infer*** scienter based principally on the supposed "divergence between internal reports and external statements on the same subject." OB 123. But there was no such divergence, as discussed above and further below.[45]

If the Court is inclined to infer anything, it should infer the absence of scienter, given the complete absence of all nine *Helwig* factors on which courts rely in assessing scienter. OPERS claims that, in arguing that the absence of the *Helwig* factors suggests no scienter, Freddie Mac "misstates the applicable standard." OB 121 n.525. This is flat wrong. Courts in this Circuit frequently look to the *Helwig* factors in assessing whether there is a strong inference of scienter. They also consistently hold that, while those factors are non-exhaustive, "the ***absence*** of these factors indicates the ***absence*** of scienter." *In re The Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 900 (N.D. Ohio 2006).[46] The single case OPERS cites does not conclude otherwise.[47] Where the *Helwig* factors are absent, there is no inference of scienter, let alone "concrete evidence" of it. *Anderson*, 477 U.S. at 256.

---

[45] For this reason OPERS's reliance on *U.S. v. U.S. Gypsum Co*., 333 U.S. 364, 396 (1947) for the proposition that testimony should be given little weight when in conflict with contemporaneous documents (OB 89) is misplaced.

[46] *See also In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 860 (S.D. Ohio 2016) ("The Court's finding that Plaintiffs have not sufficiently pleaded scienter is buttressed by the absence of allegations under the *Helwig* factors"), *aff'd*, 849 F.3d 325 (6th Cir. 2017); *In re Diebold Sec. Litig.*, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008) ("[T]he absence of [*Helwig*] factors indicates the absence of scienter.") (citation omitted), *aff'd*, 590 F.3d 390 (6th Cir. 2009).

[47] OPERS again mischaracterizes *Upstart*, 2023 WL 6379810, at *23. *See* OB 121 n.525. That case does not stand for the proposition that "the absence of one or more [of the *Helwig* factors] 'does not meaningfully detract from a strong inference of scienter.'" OB 121. In *Upstart*, Judge Marbley held that, on a motion to dismiss, the absence of a few *Helwig* factors did not detract from the strong inference of scienter drawn from other *Helwig* factors. *See* 2023 WL 6379810, at *20-23. *See also EveryWare Glob.*, 175 F. Supp. 3d at 860 (Judge Marbley acknowledging that the "absence of allegations under the *Helwig* factors" cuts against any inference of scienter).

### 1. OPERS Concedes That *Helwig* Factors 1, 4, 5, 7, and 8 Do Not Support an Inference of Scienter.

Of the nine *Helwig* factors, OPERS argues that five—Nos. 1, 4, 5, 7, and 8—are "not applicable to this case." OB 132. Freddie Mac agrees that factors 4, 7, and 8 are not applicable because OPERS does not even allege facts supporting them. *See* MB 77. *Helwig* factors 1 and 5 ***are*** relevant, but they cut ***against*** any inference of scienter. As with other inconvenient facts, OPERS hopes the Court will ignore them. It should not.

#### a. The Insider Stock Transactions Factor Negates Any Inference of Scienter (*Helwig* 1).

OPERS has no response to Freddie Mac's argument that all the evidence concerning insider stock transactions cuts drastically against any inference of scienter. *See* MB 70-72. In fact, OPERS completely abandons its "insider trading" theories, now conceding in footnote 557 of its Opposition that (contrary to its TAC) the Individual Defendants actually did not sell shares during the Relevant Period. *See* OB 129 n.557.[48] Hoping to sweep the impact of these facts under the rug, OPERS now claims that *Helwig* Factor 1 (suspicious insider trading) is "not applicable to this case." OB 132. That is incorrect; the ***lack*** of insider trading and Freddie Mac's $2.2 billion ***purchase*** is compelling evidence against a finding of scienter.

#### b. Ancillary Lawsuits Negate Any Inference of Scienter (*Helwig* 5).

In *Kuriakose*, the most analogous "ancillary lawsuit," Freddie Mac faced nearly identical securities fraud claims. *See* MB 75-76. Freddie Mac did not "quickly settle" that case; it prevailed on a motion to dismiss. Judge Keenan's scienter conclusion bears repeating:

> [T]he ***bevy of truthful disclosures that Freddie Mac made*** throughout the Class Period, covering everything from detailed credit characteristics to extensive risk

[48] OPERS goes so far as to speculate that the ***reason*** Individual Defendants sold no shares is because they "are intelligent people: they would realize that stock sales during the Relevant Period would raise alarm bells in the industry." *Id.* As with much of its Opposition, this allegation is an improper and utterly speculative attempt to amend its TAC.

> assessments, also negates an inference of scienter. ***It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures.*** If Freddie Mac executives sought to shield its investors from "learning the truth" of its business, they needed to be measurably more opaque.

*Kuriakose*, 897 F. Supp. 2d at 185. The same is true here and, thus, *Kuriakose* undermines OPERS's claims. Unsurprisingly, as with other facts it finds inconvenient, OPERS simply ignores *Kuriakose*'s scienter holding. *See* OB 132 (deeming *Helwig* factor 5 "not applicable"). Again, *Helwig* factor 5 applies and cuts against any inference of scienter.

**c. There Is No Evidence Supporting *Helwig* Factors 4, 7, or 8.**

OPERS does not identify evidence (and there is none) relating to any: bribery (*Helwig* 4); misleading disclosure of accounting information (*Helwig* 7); or a conflict of interest between interested and disinterested directors (*Helwig* 8).

**2. None of the Three *Helwig* Factors OPERS Invokes Supports Even an Inference of Scienter.**

**a. The Allegedly Fraudulent "Subprime Exposure" Statements Were Not "Close In Time" To A Disclosure Of Inconsistent Information (*Helwig* 3).**

OPERS argues that a misrepresentation may be considered "close" in time under *Helwig* 3 if it was made six weeks prior to the alleged corrective disclosure. OB 127-29 (citing *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018)). OPERS does not identify a single challenged statement concerning Freddie Mac's "subprime" exposure made within six weeks of the alleged November 20, 2007 disclosure. *See* OB 127-29. Indeed, when arguing *Helwig* 3, OPERS identifies no "subprime" statements at all. *See id.* And the only "subprime" statements OPERS challenges in the Opposition are statements made in March, May, and August of 2007, many months before the November 20, 2007 corrective disclosure—and thus well outside the outer limit of *Helwig* 3. *See Dougherty*, 905 F.3d at 981 (reiterating that a "four-month gap"

between alleged misrepresentation and corrective disclosure is not so close in time that it can support any inference of scienter). *Helwig* 3 does not support any inference of scienter.[49]

**b. There Is No Evidence Supporting Any Motive by Individual Defendants to Save Their Salaries or Jobs (*Helwig* 9).**

Abandoning its insider trading allegations, OPERS offers two new theories, neither of which appears in the TAC. OPERS now argues that Individual Defendants undertook a risky "'touch more loans' initiative" because, according to OPERS, Defendants could "maximize" their compensation by "increas[ing] market share – which would have the effect of increasing Freddie Mac's share price." OB 131. OPERS also offers the confusing claim that the Individual Defendants were able to "profit from their fraud regardless of whether their RSUs and stock options had fully vested, and independent of any stock sales" because they received dividends on those unvested options and dividend equivalents on unvested RSUs. OB 130-31.

OPERS should not be allowed to make these new allegations 16 years into the case. *See supra* 14-15 (collecting cases rejecting theories not pleaded in complaint). These allegations did not appear in the TAC, and OPERS should not be allowed to assert them now. *Id.*

Even so, OPERS new bonus and dividend allegations are the sort of generic allegations that "can be imputed to all corporate officers" and, accordingly, do not support scienter. *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 690 (6th Cir. 2004).[50] Scienter is only supported by evidence of "concrete benefits that could be realized by one or more of the false statements and

[49] Indeed, OPERS challenges only two statements relating to any subject that were possibly made within the "six weeks" before November 20, 2007. One—Cook's October 2007 quote in a magazine—is hearsay and not admissible. *See infra* § II.A.2. The other—a November 7, 2007 statement concerning Freddie Mac's fraud detection efforts—was not "corrected" by the November 20, 2007 disclosure, which revealed nothing about mortgage fraud detection. In short, no challenged statement allegedly corrected by Freddie Mac's November 20, 2007 disclosure was made so close in time to give rise, even "minimally," to any inference of scienter.

[50] Every single one of OPERS's cases, all decided on motions to dismiss, recognizes and applies this well-established principle. OB 132 n.571 (citing cases).

wrongful nondisclosures alleged." *Id.* OPERS identifies no evidence of a concrete benefit following from any misrepresentation or omission. In addition, these generic allegations do not even apply to two of the three Individual Defendants, given the specific circumstances of their employment. *See* ECF No. 569 (McQuade Reply); ECF No. 571 (Piszel Reply).

OPERS's new dividend allegation also fails because it ignores Freddie Mac's dividend history. The company's dividend increased only ***3 cents*** (from $0.47 to $0.50) during the Relevant Period.[51] OPERS identifies no evidence suggesting that business-as-usual dividend payments, which benefited all stockholders (including OPERS), somehow demonstrate fraud. Nor does OPERS present any evidence to support its speculation that "the Individual Defendants influenced Freddie Mac to declare and pay dividends on its common stock." OB 130.

**c. There Is No Evidence That Defendants Disregarded Internal Reports or Facts Contradicting Their Challenged Statements (*Helwig* 2 and 6) Regarding "Subprime Exposure."**

Arguing that Defendants' public statements are inconsistent with contemporaneous internal reports and assessments, OPERS relies on the same allegations it uses to support its claim that Freddie Mac somehow failed to accurately disclose its "subprime exposure." OB 124. For the same reason those allegations do not establish that any statement was false, they do not demonstrate that anyone at Freddie Mac acted with scienter. *See supra* §§ I.A; I.B.[52]

This is especially so for the Individual Defendants and Cook who all relied on a detailed disclosure process designed to produce accurate public disclosures—a process with which OPERS does not take issue. Courts do not hesitate to grant summary judgment in similar cases where senior executives relied on sound disclosure processes. *See, e.g.*, *In re Fed. Nat. Mortg. Ass'n*

[51] Ex. 21, Annual Report, at 18.

[52] OPERS cites two cases, both non-binding out-of-circuit decisions decided on motions to dismiss where allegations were presumed to be true. *See* OB 124-25 (citing *In re Dynex Cap., Inc.*, 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) and *In re Citigroup Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010)).

*Sec., Deriv., ERISA Litig*., 892 F. Supp. 2d 59, 71-74 (D.D.C. 2012) (granting former CEO of Fannie Mae summary judgment in securities fraud case because he relied "in good faith on the professional judgment of the company's internal and external accounting and auditing personnel" and there was "no basis for plaintiff to contend that [the CEO] was reckless in relying on this reporting and certification process."); *Brokop Living Trust v. Farmland Partners, Inc.*, 2022 WL 1619939, at *7 (D. Colo. Apr. 5, 2022) ("Plaintiff has <u>not</u> presented any evidence disputing the fact that Defendants relied on the professional judgment of qualified accountants and auditors who uniformly and consistently concluded that the loans were not related-party transactions.") (emphasis in original). OPERS offers no evidence to suggest that Freddie Mac's officers were reckless in relying on the Company's disclosure process, which vetted both their oral and written statements relating to subprime loans and all other matters.

OPERS focuses on Syron's May 14, 2007 statement that "Freddie had basically no subprime exposure in our guarantee business." OB 82. OPERS argues that he knew this statement was false because Syron was informed at the February 2007 offsite and at a March 2007 board meeting that the "worst 10% of [Freddie Mac's] Flow Business" were "subprime-like loans."[53] As noted above, OPERS's argument ignores that the express purpose of the two meetings in February and March 2007 was to determine ***whether*** Freddie Mac should enter the subprime market. *See supra* § I.A.1.a. Further, the slide does not state that Freddie Mac was buying subprime loans (which it was not), or even evidence that Freddie Mac's loans performed like subprime loans (which they did not). See MB 16-19, 20-21. It defies logic to conclude that senior executives believed that Freddie Mac was already purchasing subprime loans for its SF Guarantee Portfolio based on a single slide from a presentation during the multiple meetings they held to determine

[53] *Id.* (citing Ex. 83, Board of Directors Pres. (Mar. 2007) at FMAC-SEC 047450743; O-Ex. 92, SET Offsite Pres. (Feb. 6-7, 2007) at FMOPERS00186941.

whether they should begin buying subprime loans for the SF Guarantee Portfolio. Further, OPERS asks this Court to ignore a wealth of documents and testimony that Freddie Mac had essentially no subprime loans in its SF Guarantee Portfolio and that Freddie Mac's senior officers believed that to be true. *See* MB 16-20, 50-52.

Similarly, OPERS's reliance on an email from Doug Levy regarding Syron's draft speech (OB 83) is misplaced. On its face, it is apparent the email was not sent to Syron, and OPERS offers no evidence that he ever saw it.[54] Accordingly, it is not evidence of Syron's state of mind. In addition, the Levy email undercuts OPERS entire subprime claim, because it is an internal document evidencing that Levy believed that Freddie Mac's subprime disclosure in the Information Statement was accurate.[55]

Further, Levy's email simply provided a "minor comment[]" for "consideration," suggesting that the speech hew more closely to the more detailed disclosure in the 2006 Information Statement that had been published several weeks earlier. *Id.* Thus, OPERS's theory only makes sense if Syron's statement differed materially from the "subprime" disclosure in the Information Statement. There is no material difference between the two statements:

| 2006 Information Statement (March 23, 2007) | Syron's May 14, 2007 Statement |
|---|---|
| "While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, ***we believe that, based on lender-type, underwriting practice and product structure***, ***the number of loans underlying these securities that are subprime is not significant***." "With respect to our retained portfolio, we do not believe that any meaningful amount of the agency securities we hold is backed by subprime mortgages. . . . we held approximately $124 billion and $139 billion, respectively, of non-agency mortgage-related securities backed by subprime loans." | "***As we discussed in the past***, at the end of 2006, ***Freddie basically had no subprime exposure in our guarantee business***, and about $124 billion of AAA rated subprime exposure in our retained portfolio." |

[54] *See* Ex. 85, Levy Email (May 11, 2007).

[55] Ex. 85, Levy Email (May 11, 2007) ("Look back at the subprime language in the annual report and use that as a guide to what to say. Basically, we said we don't have a definition of subprime and we don't acquire loans from subprime lenders.").

While there is no material difference between these statements, even if there were, OPERS offers no evidence that Syron believed there was any difference.[56] *See Glenbrook Capital Ltd. P'Ship v. Kuo*, 525 F. Supp. 2d 1130, 1141 (N.D. Cal. 2007) (plaintiff's argument based on the difference between a sale being based on "the vast majority" of an entity's revenues, assets, and liabilities versus "substantially all the [entity's] assets" was a "semantics argument" and insufficient to establish scienter). Of course, OPERS offers no response to Levy's testimony that "[Syron's] statement on its own is completely accurate."[57]

**d. OPERS's "Core Operations" Theory Does Not Create a Genuine Issue Of Material Fact Regarding Scienter.**

OPERS argues that scienter should be imputed to Defendants under the "core operations" theory, on the argument that subprime issues were "of great importance to the investing community". OB 126. The "core operations" theory is a pleading theory that has no application at this stage. *Stein v. U.S. Xpress Enters., Inc.*, 2020 WL 3584800, at *39 (E.D. Tenn. June 30, 2020) (observing that the theory is only a "supplementary consideration that may bolster other *well-pleaded* facts."); *see also In re Diebold Nixdorf, Inc.*, 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021) (explaining that "the core operations theory—at best—constitutes supplemental support for *alleging scienter* but does not independently establish scienter").

Regardless, OPERS's core operations theory lacks merit. OPERS claims that "***[a]s one court noted, these subprime and Alt-A*** 'statements cover topics that [Defendants] voluntarily and repeatedly discussed with the public, which demonstrates [their] sensitivity towards the issues. . . . The statements were often made in answer to questions from investors, which implies an intent to emphasize and induce reliance upon the statements." OB 126 (quoting *Upstart*, 2023 WL

---

[56] For this same reason, Syron's statement cannot be a misstatement of *material* fact.

[57] Ex. 111, Levy Tr. (Sept. 23, 2014) 209:21-210:20.

6379810 at *23). OPERS misleadingly mischaracterizes *Upstart*, which did not involve disclosure of subprime or Alt-A loans. Rather, the case related to alleged misrepresentations about Upstart's "proprietary AI model" and "business model and retention of loans"—matters not at issue in this case. *Id.* at *11. The fact that the *Upstart* plaintiffs sufficiently pled that these models were core operations of Upstart sufficient to survive a motion to dismiss has no bearing on whether subprime loans constitute core operations of Freddie Mac sufficient to infer scienter at summary judgment. *Upstart*, 2023 WL 6379810 at *24.

And subprime loans were obviously not a "core component" of Freddie Mac's business when it believed, based on lender-type, underwriting practice, and product structure that it ***did not hold any significant amount of subprime loans in its SF Guarantee Portfolio***.[58] Moreover, the company disclosed that it did not classify loans as prime or subprime for purposes of its business and also that there was no universal definition of that term. This Court should not apply the "core operations" theory here.

#### e. OPERS's "Collective Scienter" Theory Does Not Create a Genuine Issue of Fact Regarding Scienter.

Tacitly acknowledging that it cannot show that any Individual Defendant knew of supposedly contrary internal information concerning Freddie Mac's "subprime" exposure, OPERS argues that "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." OB 122. As with all of its other scienter arguments, this "collective scienter" scienter theory lacks supporting evidence. The purpose of the "collective scienter" theory is to impute to the corporation the states of mind of

[58] Aside from the fact that they all are motion to dismiss cases, the cases cited at OB 121-22 n.527 for the proposition that "high-level executives can be presumed to be aware of matters central to their business's operation" are inapposite because holding subprime loans in the SF Guarantee Portfolio was not a core component of Freddie Mac's business.

more than one corporate officer or senior employee. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 475 (6th Cir. 2014). But, as explained above, no group of employees believed that Freddie Mac's public statements were false or misleading—not a single witness has testified to that allegation, and no document supports it.

## II. SUMMARY JUDGMENT SHOULD ENTER IN FREDDIE MAC'S FAVOR ON OPERS'S REMAINING THEORIES OF FRAUD.

In addition to challenging statements relating to subprime, OPERS challenges statements and alleged omissions relating to Alt-A loans, credit risk generally, and underwriting. But these theories fare no better than its abruptly demoted "primary fraud" theory. This Court should enter summary judgment on OPERS's claims based on all those statements because OPERS fails to identify a genuine issue of material fact as to their accuracy, they were vague and indefinite statements of optimism that are immaterial as a matter of law, or they are immune from liability under the bespeaks caution doctrine. In addition, OPERS fails to identify any facts suggesting that any challenged statement was made with scienter.

### A. Summary Judgment Should Enter in Favor of Freddie Mac on OPERS's Claims Based on Statements About Alt-A and Credit Risk.

#### 1. There Is No Genuine Issue of Material Fact Regarding Whether Freddie Mac's Statements Quantifying Alt-A Holdings Were False or Made with Scienter.

OPERS does not dispute that there is no universal definition of "Alt-A." OPERS instead contends that Defendants' Alt-A statements became actionable "once Defendants began publicly using the broad MCRA definition to describe Freddie Mac's Alt-A exposure (*i.e.*, lender-defined Alt-A or reduced documentation loans) but reporting that exposure according to Investments & Capital Markets' (undisclosed and much narrower) definition." OB 71. There are several fatal problems with OPERS's argument.

As an initial matter, OPERS fails to identify any evidence of scienter: nothing in the record demonstrates that Freddie Mac's senior executives, the Individual Defendants, or Cook had any reason to believe that the quantification of Freddie Mac's Alt-A exposure was incorrect for any reason, let alone received or knew about the documents on which OPERS relies. OB 66-71; 117-120.[59] OPERS fails to cite any testimony by anyone stating that they discussed the classification of Alt-A with any of the Individual Defendants or Cook. And OPERS fails to establish that any Defendant was aware of any document that contradicted Freddie Mac's Alt-A disclosures; indeed, the documents on which OPERS relies post-date those disclosures. *See, e.g.*, O-Ex. 96.

OPERS does not contest that Freddie Mac's senior executives had put in place a robust process for ensuring that the company's disclosures were accurate. *In re Fannie Mae*, 892 F. Supp. 2d at 71-74 (granting former CEO Fannie Mae summary judgment in securities fraud case because he relied "in good faith on the professional judgment of the company's internal and external accounting and auditing personnel"); *see Brokop*, 2022 WL 1619939 at *7, *9 (D. Colo. Apr. 5, 2022) (no scienter where defendant relied on others' professional judgment). While it argues that this process does not prove definitively that statements were accurate (OB 86-87), it has no response to the argument that Defendants were entitled to rely on this process, which undermines any inference of scienter. MB 22-26. In short, OPERS has failed to (and cannot) identify even a scintilla of evidence that Freddie Mac's disclosure of its Alt-A holdings was made with scienter. For this reason alone, summary judgment should enter on OPERS's "Alt-A" claims.

OPERS also fails to identify evidence that Freddie Mac's "Alt-A" disclosure was false or misleading. Freddie Mac's external definition of Alt-A ties directly to the "External Definition"

---

[59] Given that none of the documents relied upon by OPERS in its Alt-A section were sent to any of the Individual Defendants or Cook, it is not surprising that OPERS does not cite any support for statements like "Defendants actually understood that this percentage [of Alt-A loans] was more like 29% -- 3.6 times greater than what Defendants were reporting." OB 117.

of Alt-A evidenced in OPERS's Ex. 96. OPERS contends that Freddie Mac's external definition was the "MCRA" definition referenced in Ex. 96, but to get there, OPERS engages in some sleight of hand, which is refuted by Ex. 96 itself.

OPERS's Exhibit 96 sets forth various definitions of Alt-A used at Freddie Mac, including an MCRA definition (all loans in lender-designated "low doc" and "no doc" programs, regardless of credit risk) and Freddie Mac's "External Definition."[60] As OPERS acknowledges, the very term "Alt-A" refers to loans originated with reduced documentation requirements ***and*** that present increased credit risk. *See* OB 66 ("'Alt-A' is a mortgage industry term used to describe reduced documentation/**higher credit risk** loans."). Undisputed testimony demonstrates that not all reduced-documentation mortgage programs present higher risk; indeed, some reduced-documentation programs yield loans that perform much better than a pool of average prime loans. MB 37-38. OPERS does not even respond to the undisputed testimony on this subject. As Exhibit 96 evidences, Freddie Mac's "External Definition" of Alt-A was not the "MCRA" definition, but rather a narrower set of reduced-documentation loans, taking into account credit risk.[61]

To argue that Freddie Mac publicly used the "MCRA" definition, OPERS ignores facts on the face of its Exhibit 96. For example, in an obvious effort to conceal from the Court the fact that Freddie Mac's external disclosure matched the "External Definition" set forth in Exhibit 96, OPERS misleadingly refers to the "External Definition" as the "Investment & Capital Markets" definition. OB 71. Likewise, OPERS ignores that Exhibit 96 evidences that the MCRA definition was based on all "low/no doc" programs identified by lenders, not Alt-A programs. In fact, purporting to quote the document, OPERS argues that there were "'more than 90+ **Alt-A** SCC

[60] O-Ex. 96, Alt-A Definitions Pres., at FMAC-SEC 067770691.
[61] O-Ex. 96 at FMAC-SEC 067770691.

codes' in use at the Company." OB 69[62] OPERS adds "Alt-A" into the quote without telling the Court: the document actually states that the definition is based on "more than 90+ SCC codes."[63] As the document further explains with regard to this MCRA definition:

> Broadest 'low/no doc' definition. If any of the SCC codes **labeled as low/no doc by the lender** (through the SCC code), they are included in this definition **regardless of credit quality**.

*Id.* Thus, contrary to OPERS's misleading argument, the "90+ SCC codes" were "low doc/no doc" codes, not "Alt-A" codes. *Id.*[64]

OPERS also ignores the evidence on the face of Exhibit 96 demonstrating that the "External Definition" identified in that document was the best of the various definitions in use at Freddie Mac for purposes of external disclosure. On the one hand, the document establishes that Freddie Mac was not attempting to choose a definition that would arrive at a low number of Alt-A loans: of the multiple definitions in use at Freddie Mac, the external definition captured 8% of the SF Guarantee Portfolio, far more than any other definition in use at Freddie Mac other than the ill-suited "Low/No Doc" definition. *Id.*[65] Further, according to Exhibit 96, Freddie Mac used its external reporting definition because it was a "***[b]etter representation of market Alt-A definition***" that was "***[c]omparable to Fannie [Mae] and other external definitions***."[66] In sum, OPERS's

[62] Matt Vincent in SF Credit Management "defined and maintained" a list of "Special Characteristic Codes," or "SCCs." *See* O-Ex. 97, Chen Memo (Oct. 5, 2007). This list allowed for the identification of "lender specific reduced loan documentation programs, for internal tracking purposes." *Id.*

[63] *Id.* at FMAC-SEC 067770691.

[64] *See also* Ex. 161, Zhou Tr. (Sept. 14, 2017) at 160:2-161:10 ("They are not – the reason they are not in the – in our defined flow Alt-A is, even though these borrowers are like prime lenders, but they did not designate these particular programs as Alt-A . . ."); ("***they were not in our definition because they were not designated by lender as Alt-A*** and they are not – they are not identified, flagged, by the credit risk as a higher risk because of low or no documentation.").

[65] OPERS's repeated statement that Freddie Mac's MCRA definition yielded Alt-A loans in the amount of 29% of the SF Guarantee Portfolio (*see* OB 6, 8, 68, 117) misrepresents OPERS's Ex. 96, which evidences that 29% represented only "Year-to-Date 8/31/07 purchases," not total outstanding loans in the SF Guarantee Portfolio. *See* O-Ex. 96 at FMAC-SEC 067770691.

[66] O-Ex. 96 at FMAC-SEC 067770691.

Exhibit 96 does not establish that Freddie Mac misrepresented its "Alt-A" exposure, but rather that, forced to grapple with a term lacking a universal definition, Freddie Mac presented to the public information that hewed closely to the market's and others' definitions of the term.

OPERS fails to identify any other document establishing that any statement about Freddie Mac's Alt-A loans was false or misleading. The documents it cites are all consistent with the fact that Freddie Mac employees were doing their best to arrive at a sensible approach to defining "Alt-A" and were not trying to mislead anyone regarding Alt-A loans.

**2. There Is No Genuine Issue of Material Fact Regarding Whether Statements Concerning Credit Risk Were False or Made With Scienter.**

OPERS's contentions that Freddie Mac's statements about "credit risk" across the SF Guarantee Portfolio also fail. Those contentions are largely grounded on the argument that Freddie Mac's exposure to subprime and Alt-A loans was greater than disclosed. *See* MB 86-87. But as set forth above (*see supra* §§ I.A.1.a; II.A), that argument lacks any evidentiary support.

Further, as discussed above, Freddie Mac shared, on a quarterly basis throughout the Relevant Period, the ***precise credit risk characteristics*** of its SF Guarantee Portfolio. As a result, OPERS's hyperbolic claim that Freddie Mac and the investing public lacked any way to assess the SF Portfolio's credit risk (OB 23) is simply contrary to the undisputed evidence. Freddie Mac provided to the market detailed information concerning the very credit risk characteristics that are important to investors. *See* MB 66.

Turning to the three "credit risk" statements on which OPERS focuses, none is actionable because it is either an accurate statement of historical fact, a vague and indefinite statement of optimism, or protected by the bespeaks caution doctrine. OPERS fails to point to any statement rendered misleading by any alleged omission, giving rise to a duty to disclose that omission. *See*

*infra* § II.B.2 (discussing *Polaroid*).[67] In addition, OPERS fails to identify any genuine issue of fact respecting whether any of these statements was made with scienter.[68]

***"Credit has never been better."*** OPERS argues that Eugene McQuade made the foregoing statement to a Bloomberg reporter, as reflected in the reporter's article. *Id.* OPERS claims that the statement was false because "contemporaneous Single-Family Credit Portfolio Monitoring and ERMC reports were warning management that credit was dramatically deteriorating." *Id.* This statement cannot support securities fraud liability.

First, no admissible evidence proves that McQuade even made the statement. The Bloomberg article is plainly hearsay: an out-of-court statement by the Bloomberg reporter that OPERS offers to prove the truth of its contents—*i.e.*, that McQuade said "credit has never been better." Courts grant summary judgment for defendants on securities fraud claims based on statements allegedly made in newspaper articles because the articles are hearsay, qualifying for no exception. *See, e.g.*, *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 743 (7th Cir. 1997) (affirming summary judgment for securities fraud defendant and disregarding as inadmissible newspaper article containing challenged statements); *In re Cypress Semiconductor Sec Litig.*, 891 F. Supp. 1369, 1374 (N.D. Cal. 1995), *aff'd*, 113 F.3d 1240 (9th Cir. 1997)(same).[69]

Second, even if the Court could consider the Bloomberg article, the statement was an accurate statement of historical fact, which is not actionable as a matter of law. MB 78-79. The

---

[67] For example, applying this legal principle, because OPERS fails to identify any statement regarding "Untested Mortgage Products" or its ability to reliably assess their credit risk OPERS fails to identify a misleading statement or actionable omission. *See* OB 8.

[68] OB 52 (TAC ¶ 164) (March 23, 2007 Bloomberg Article); *see also* OB 17, 40, 80-83, 97-98, 100 (discussing same statement). *See* OB § IV.C. ("Freddie Mac's Material Misrepresentations Regarding Credit Risk and Projected Credit Losses").

[69] *See also Parker v. Winwood*, 2017 WL 6886076, at *9 (M.D. Tenn. Oct. 17, 2017) (granting defendants summary judgment and refusing to consider newspaper articles submitted in opposition), *aff'd*, 938 F.3d 833 (6th Cir. 2019); *Almond v. ABB Indus. Sys., Inc.*, 2001 WL 242548, at *7-8, 29 (S.D. Ohio Mar. 6, 2001) (same), *aff'd*, 56 F. App'x 672 (6th Cir. 2003).

article was published on March 23, 2007, the date that Freddie Mac released its financial results for the year 2006. According to the article, the statement was not made in a vacuum, but followed immediately by a statement concerning delinquency rates in the SF Guarantee Portfolio for 2006:

> "Credit has never been better." Freddie Mac's delinquency rate "is about 20 percent or 30 percent less than it was a year ago at this time," he said.[70]

As Freddie Mac's Annual Report for 2006 evidences, McQuade's statement was accurate; its delinquency rate was between 20 and 30 percent lower than its delinquency rate for 2005, and OPERS fails to identify any facts proving otherwise.[71]

OPERS argument appears to be that McQuade's statement about Freddie Mac's historical results was misleading because he did not mention that internal reports during the first quarter of 2007 evidenced deteriorating credit. But blackletter securities law precludes that claim: accurate statements of historical fact are not actionable, as a matter of law, for failing to disclose concerns about future results. MB 78-79 (discussing accurate statement of historical fact). Likewise, Freddie Mac had no duty to disclose intra-quarterly results. *See supra* 5 n.12.[72]

***"[Freddie Mac is] much better positioned for long-term profitability than we were a year ago."***[73] OPERS argues that "contemporaneous internal assessments of [Freddie Mac's] long-term profitability" reflected a less favorable outlook. OB 53-54, 98. However, OPERS does not identify any internal document speaking to Freddie Mac's "***long-term*** profitability," but rather short-term profitability or the profitability of only the Company's most recent loan purchases.[74]

---

[70] Ex. 41, Bloomberg News Article (Mar. 23, 2007) at 2.
[71] Ex. 21, 2006 Annual Report, at 125.
[72] To the extent the statement "credit has never been better" is removed from its context, it is obviously a vague and indefinite statement that is not actionable as a matter of law. *See* MB 79-80.
[73] OB 53 (TAC ¶ 177) (Ex. 47, Syron, June 14, 2007 Conference Call); *see also* OB 17, 98, 100, 123 n.534, 135 n.588.
[74] OB 53-54.

The fact that "ex ante"[75]—*i.e.*, forecasted—profitability on Freddie Mac's ***newly*** purchased loans may have been less than previously forecasted does not necessarily mean that Freddie Mac was not better positioned for ***long-term*** profitability than it had been a year before.

Indeed, during this same conference call, Syron discussed various reasons that Freddie Mac believed it was "better positioned for ***long-term*** profitability than [its was] a year ago." For instance, although Syron warned of "headwinds," including that, in the "first quarter of '07," "[h]ousing prices declined" and "[m]ortgage credit tightened," he also discussed Freddie Mac's "high asset quality, low risk exposure and improving operations." Syron described these as "strengths" which "point[ed] to Freddie Mac's durability as a franchise, despite volatility found in financial results under both GAAP and fair value." Mr. Syron further highlighted that Freddie Mac's "guarantee business [had grown] at an annualized rate of about 16 percent," which was "twice the rate of the market as a whole."[76] As discussed in Freddie Mac's 2006 Annual Report, Freddie Mac's "net income grew last year to approximately $2.2 billion, up roughly 4 percent from 2005" and "[r]eturn on common equity was 8.6 percent, up from 7.7 percent for 2005."[77] Fair value grew at an even greater rate. Syron attributed Freddie Mac's improved performance to, among other things, "strong growth of 10.6 percent in our credit guarantee portfolio—slightly outpacing the overall market." Regarding credit risk, Syron explained:

[75] O-Ex. 55, ERMC Report (Dec. 13, 2006) at FMAC-SEC 075569073; O-Ex. 68, ERMC Report (Oct. 3, 2006) at FMAC-SEC 082820947; O-Ex. 67, ERMC Report (Jan. 18, 2007) at FMAC-SEC 072776239.
[76] Ex. 47, Conference Call (June 14, 2007).
[77] Ex. 21, 2006 Annual Report, at Chairman's Message, 2.

> On the credit risk side, Freddie Mac's exposures remained well controlled and our total single-family 90-day delinquencies actually declined during the year. At year's end, only 6 percent of our total mortgage portfolio was in nontraditional mortgages and the portfolio's average loan-to-value ratio was 57 percent. Experience and recent market developments tell us to be careful, however, and we are keeping a watchful eye on our 2006 book of business. While we are in better position than many, we have set aside increased loan loss reserves, as our credit portfolio remains vulnerable to significant declines in house prices.

*Id.* OPERS identifies no facts supporting that any of these positive year-over-year figures was false. Taken as a whole (instead of cherry-picking clips out of context as OPERS does),[78] Syron's comments were consistent with internal information.

OPERS also intentionally ignores the many positive statements from the internal reports it cites that reflect Freddie Mac's internal assessment that "***Overall SF credit portfolio risk is still relatively low***."[79] OPERS ignores other positive internal assessments of credit risk, including:

- "[T]he current performance of the single-family (SF) portfolio is strong, but credit risk is increasing"[80]
- "Existing portfolio is well diversified by key risk attributes, with historically low delinquencies and credit losses…portfolio is overwhelmingly concentrated in low-risk fixed-rate products" *Id.*
- "The single-family portfolio is concentrated in low risk, fixed-rate product. The existing portfolio is well diversified by key risk attributes."[81]

The facts, drawn from the very documents OPERS cites, demonstrate that Syron's challenged public statement was consistent with Freddie Mac's internal statements, and based on data that OPERS does not challenge as false.

---

[78] OPERS ignores its own axiom that context is critical in assessing purported misstatements. *See, e.g.*, OB 94, 117, 120 n.521 (citing *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 371 (3d Cir. 1993) ("[W]e must consider an alleged misrepresentation within the context in which the speaker communicated it.")).

[79] O-Ex. 68, ERMC Report (Oct. 3, 2006) at FMAC-SEC 082820947.

[80] O-Ex. 55, ERMC Report (Dec. 13, 2006) at FMAC-SEC 075569073.

[81] O-Ex. 69, ERMC Report (June 12, 2007) at FMAC-SEC 082820599.

Moreover, Syron's statement that Freddie Mac was "much better positioned for long-term profitability than we were a year ago" is a non-actionable vague and indefinite statement of optimism. *See* MB 79-80; *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 138-39 (D. Mass. 2021) (finding statement that "company was '***well positioned*** to continue [its] growth trajectory) in the market . . . not actionable" puffery).[82] OPERS claims that the Second Circuit "noted in a similar securities fraud case" that this statement was somehow not "corporate puffery." OB 100. But the case, *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000), is of no help to OPERS for at least two reasons. First, like almost all the cases OPERS cites, *Novak* involved a motion to dismiss where the court had to accept as true the allegation that the company knew its inventory controls were lacking and as a result the company failed to account for millions in inventory. *Id*. at 304. Second, the circumstances in *Novak* are completely different from the statement here, which relates to optimism about ***long-term*** prospects. *See id.* at 315.[83]

Syron's statement is also not actionable under the "bespeaks caution" doctrine. MB 80-81. OPERS incorrectly argues that the doctrine does not apply because "Defendants had 'actual knowledge' that even the forward-looking statements they cite were false and misleading" and

[82] *Accord In re Nevsun Res., Ltd.*, 2013 WL 6017402, at *9 (S.D.N.Y. Sept. 27, 2013) ("courts have generally not found actionable statements such as '***things are going very well***,' a company is '***well positioned***,' or operations are 'successful,' unless the statements addressed concrete and measurable areas of the defendant company's performance."); *Cione v Gorr*, 843 F. Supp. 1199, 1205 (N.D. Ohio 1994) (statement like "we're ***well positioned for long-term growth***" is an immaterial "puffing" statement).

[83] OPERS's other cases are similarly inapposite. For instance, *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11-12 (S.D.N.Y. Nov. 26, 2018) also involved a motion to dismiss and statements regarding the company's current business, as opposed to optimistic predictions about the company's long-term prospects. Moreover, here, unlike in OPERS's cases, "Freddie Mac routinely detailed the credit characteristics of the loans in its guarantee portfolio, divulged the specific credit scores of borrowers in its guarantee portfolio, and disclosed loan-to-value ratios," *Kuriakose*, 897 F. Supp. 2d at 182, allowing investors to draw their own conclusions with respect to Freddie Mac's vague and indefinite qualitative statements. OPERS's additional motion to dismiss cases are also inapposite because there is no evidence of any "misrepresentation of existing facts." OB 100 & n.432 (citing *In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010); *In re Barclays PLC Sec. Litig.*, 2024 WL 757385 (S.D.N.Y. Feb. 23, 2024); *Sanford v. Pershing, LLC*, 2024 Wl 1748604 (N.D. Tex. Apr. 23, 2024)).

Defendants "knew that certain risks had become reality." OB 102. That argument is contrary to controlling law. In the Sixth Circuit, if, as here, "the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, ***a defendant's statement is protected regardless of the actual state of mind***." *Miller v. Champion Enter. Inc.*, 346 F.3d 660, 672 (6th Cir. 2003). This is because companies are not required to accurately predict the future. *See Plymouth Cnty. Ret. Ass'n. v. Array Techs., Inc.*, 2023 WL 3569068 at *11 (S.D.N.Y. May 19, 2023) ("Plaintiff's argument collapses to merely a quarrel with [defendant's] ability to accurately predict the future. Such arguments do not pass muster as sufficient to sustain claims of fraud."). In any event, OPERS identifies no evidence that Defendants knew any statement was false or misleading.

***"Freddie Mac's credit position is relatively strong with limited exposure to the riskiest mortgage products…Bottom line, at a time when many of our competitors are weakening, Freddie Mac's position is growing stronger…Freddie is well positioned to succeed and produce shareholder value in the long term."***[84] OPERS alleges that this statement was inconsistent with internal reports reflecting that "Freddie Mac's position was weakening."[85] For many reasons, claims based on this statement cannot survive summary judgment.

First, as it did in trying to challenge Mr. Syron's statement, OPERS bases its argument against Cook's statement on internal reports addressing "[redacted]."[86] But like Syron, Cook was addressing Freddie Mac's "***long term***" outlook. And as it did in trying to challenge Syron's statement, OPERS again omits the positive, consistent portions of internal documents demonstrating its claims are unfounded. For instance, OPERS cites

[84] OB 54 (TAC ¶ 184) (Ex. 55, Cook Remarks (Sept. 10, 2007)).
[85] OB 54; *see* O-Ex. 52, ERMC Report (Aug. 21, 2007) at FMAC-SEC 013147413.
[86] OB 99 (quoting O-Ex. 110, Minutes (Sept. 6, 2007)); *see also* OB 54-55 (quoting O-Ex. 52, ERMC Report (Aug. 21, 2007) (discussing "***2006 & 2007 book years***")); OB 55 (quoting O-Ex. 73, Email (Aug. 29, 2007) (also discussing 2006 and 2007 purchases)).

an August 30, 2007 memorandum which, like other internal materials, cautions that Freddie Mac's 2006 and 2007 loan purchases were "riskier than historical averages."[87] But OPERS conveniently ignores the portion of the memo stating that, while the 2006 and 2007 books were riskier than historical averages, Freddie Mac was not predicting a severe downturn:

> [S]ome in the media have speculated that 50% of the loans originated in 2006 and 2007 would ultimately default and result in a 50% severity. ***Our experience would not suggest such a cynical view of expected performance.*** Our current models indicate total expected cumulative default rates of ***1.9%*** on our existing single-family book. If we look back to actual historical performance, using the 1983 to 1993 book years, our average cumulative default rate was also less than 2%, with a peak of approximately 3%...Additionally, loss severities today are lower (approximately 17%) as compared to a historical high of around 35%.[88]

Furthermore, Cook's statement is comparative in nature, stating that Freddie Mac believed it was "growing stronger" by comparison to its competitors. Such a statement is vague and indefinite and, accordingly, not actionable. But even if it were actionable, to disprove it, one would have to show the relative "strength" of Freddie Mac's competitors and show that Freddie Mac was not, by comparison, "growing stronger." OPERS has not attempted to do that, and it can identify no evidence supporting such a conclusion.[89]

Cook's statements that "Freddie Mac's position is ***growing stronger***" and "Freddie is ***well positioned*** to succeed . . . in the long term" are also vague and indefinite statements of optimism. *See Mogenson v. Body Cent. Corp.*, 15 F. Supp. 3d 1191,1999, 1212-13 (M.D. Fla. 2014) (holding that several allegedly false and misleading statements were inactionable corporate puffery,

---

[87] OB 55 (quoting O-Ex. 64, Romano Memo (Aug. 30, 2007)).

[88] O-Ex. 64 at FMAC-SEC 0041491.

[89] OPERS sprinkles throughout its papers a handful of additional statements that it categorizes as relating to "credit risk" generally. For the same reasons discussed above, none supports denying Freddie Mac's Motion. In addition, those not challenged in the TAC should be disregarded. *See* Ex. 169. Others are nonactionable puffery. *See, e.g.*, Ex. 168 ("[W]e have an incredibly high quality book of business"). Others are forward-looking statements that bespeak caution in outlook. *See, e.g.*, *id.* ("Management continues to expect credit losses to remain low by historical standards").

including statements that "[We] . . . remain confident in our ***long-term growth outlook***" and "we have operational initiatives underway that we believe will enhance our ability to achieve our ***long-term growth objectives***."). They are also forward-looking statements accompanied by meaningful cautionary language in Freddie Mac's risk disclosures and, accordingly, not actionable under the "bespeaks caution" doctrine.[90]

For all of the reasons discussed in Section I.B and directly above, OPERS also has failed to identify a genuine dispute of fact regarding whether any of the foregoing statements were made with scienter. OPERS satisfies none of the *Helwig* factors relating to these statements, including in particular whether statements are inconsistent with internal reports. To the contrary, as discussed above, these statements were consistent with these internal reports.

### B. Summary Judgment Should Enter In Favor of Freddie Mac On OPERS's Claims Based on Statements About Its "Underwriting Guidelines."

#### 1. OPERS's Claims Are Based On Statements Regarding Underwriting That Are Not Actionable As A Matter Of Law.

Pointing to nine statements in total, OPERS contends that "Defendants made multiple material misrepresentations and omissions regarding Freddie Mac's underwriting standards and risk assessment systems."[91] Notably evasive in identifying the relevant statements, scattering them across its briefing, OPERS's "pin the tail on the public statement" approach appears to be deliberate: It would prefer to speak in generalities than address Freddie Mac's actual public statements, none of which was false or misleading.

---

[90] In its Moving Brief, Freddie Mac demonstrated that many of the statements OPERS challenged in the TAC were not actionable as a matter of law because they were (1) accurate statements of historical fact; (2) vague and indefinite statements of optimism or corporate puffery; or (3) statements that "bespeak caution" in outlook. *See* MB 78-81. OPERS does not respond to many statements that Freddie Mac demonstrated were inactionable, focusing only on these three "credit risk" statements. *See* OB 97-104.

[91] OB 90; *see also id*. at 32 (Syron's June 2007 statement); *id*. at 32–33 (Cook's September 2007 statement); Exhibit No. 134 (listing eight "primary misrepresentation and omissions" regarding underwriting, including Syron's June 2007 statement and the 2006 Annual Report, but not Cook's September 2007 statement).

**a. Syron's June 8, 2007 Statement (Ex. 45)**

OPERS challenges Syron's June 2007 statement that "[c]redit risk management is another comparative advantage for Freddie Mac." OB 32. This statement, opining on an area of "comparative advantage" is inactionable as a matter of law. As noted above, statements are not actionable when they are "vague and indefinite statements of optimism or corporate puffery." MB 88 (collecting authorities). Syron's statement is exactly that.

In addition, OPERS fails to muster evidence that this statement was false or misleading. OPERS identifies no facts showing that Freddie Mac did not actually possess an advantage vis-à-vis its competitors in managing credit risk, and there is no genuine dispute of material fact as to the falsity of the statement.

**b. Cook's September 10, 2007 Statement (Ex. 55)**

OPERS challenges Cook's September 2007 statement that "[o]ur credit position is ***relatively*** strong with limited exposure to the riskiest mortgage products." OB 32–33. This statement—which does not even mention "underwriting"—is not actionable for similar reasons.

It is inactionable as a matter of law because the reference to relative strength is corporate puffery. *See supra*, § II.A.2; MB 88 (collecting authorities). It also bespeaks caution in outlook. MB 80-81. Further, Freddie Mac did have "limited exposure to the riskiest mortgage products," *i.e.*, subprime loans purchased from the subprime origination channel. OB 33. OPERS has not attempted to show otherwise.

**c. Freddie Mac's 2006 Annual Report (March 23, 2007) (Ex. 21)**

OPERS contends that the 2006 Information Statement "contained several misleading disclosures about its underwriting standards and quality control systems." OB 32. OPERS asserts

that the section of Freddie Mac's Annual Report[92] relating to this subject was misleading because it "***suggest[ed]*** that Freddie Mac's underwriting systems had the ability to accurately model the 'expected risk and return' related to the increasing share of nontraditional loans it was purchasing" and "***impl[ied]*** that Freddie Mac was requiring originators to qualify the loans they were selling to Freddie Mac through Freddie Mac's underwriting standards and Loan Prospector."[93]

This statement cannot give rise to liability, as a matter of law. First, it does not appear in the TAC. *See supra* 14. Moreover, the securities laws are about whether actual statements are true or false, not "implications" and the like. *In re Copley Pharm., Inc. Sec. Litig.*, 1995 WL 169215, at *2, n.5 (D. Mass. Mar. 16, 1995). In addition, OPERS offers no competent evidence to show that Freddie Mac's statement was false. For example, OPERS has offered no evidence that Freddie Mac did not actually "provide originators with written standards and/or automated underwriting software tools, such as Loan Prospector and other quantitative credit risk management tools that are designed to evaluate single-family mortgages and monitor the related mortgage credit risk for loans we may purchase." ECF No. 558-9 at 66. Similarly, OPERS offers no evidence that Freddie Mac could not "distinguish among single-family loans based on their expected risk, return and importance to our mission." *Id.* OPERS's failure to proffer any evidence contradicting the statement alone precludes liability. In fact, OPERS repeatedly acknowledges that Freddie Mac monitored mortgage performance. *See, e.g.*, OB 41–46 (detailing Freddie Mac's efforts to monitor credit risk, including with a "dedicated team"). And the challenged statement is couched in relative terms. For instance, Freddie Mac stated that "statistically-based risk assessment tools ***increase*** our ability to distinguish among single-family loans based on their

[92] Ex. 21, 2006 Annual Report, at 66.
[93] OB 36 (quoting Ex 21 at 66).

expected risk, return and importance to our mission." OB 36. Yet OPERS identifies no evidence suggesting that there was no such increase.

OPERS could not offer any evidence showing these statements' falsity because the very documents OPERS relies upon show that Freddie Mac's external statements about underwriting were entirely consistent with Freddie Mac's internal discussion of underwriting. The Opposition fixates on a January 12, 2007 memorandum from Paul Mullings to show that Freddie Mac's external statements differed from what was known internally.[94] That document, however, proves the opposite. Mullings's memorandum explained that there were three reasons for Freddie Mac's increasing use of credit waivers and exceptions: [redacted] *Id.* Freddie Mac's disclosures in its 2006 Annual Report mirrors Mullings taxonomy.

**Mullings category one (*i.e.*, increased "customer focus")**. The Information Statement expressly disclosed that, "[i]n many cases, underwriting standards are tailored under contracts with individual customers."[95] Just as Mullings internally identified a more pronounced [redacted]s leading to "[redacted] in customer contracts, Freddie Mac externally disclosed the same.

**Mullings category two (*i.e.*, increased loan purchases from alternative automated underwriting systems)**. Similarly, the Annual Report expressly disclosed that Freddie Mac had

[94] OB 30-31 (quoting O-Ex. 58, Mullings Memo (Jan. 12, 2007).
[95] Ex. 21, 2006 Annual Report, at 66.

"been expanding the share of mortgages we purchase that were underwritten by our seller/servicers using alternative automated underwriting systems or agreed-upon underwriting standards that differ from our system or guidelines." *Id.*

**Mullings category three (*i.e.*, increased purchases of non-traditional loans)**. The Annual Report also explained that, "[d]uring the past several years, there was a rapid proliferation of nontraditional mortgage product types designed to address a variety of borrower and lender needs, including issues of affordability and reduced income documentation requirements." *Id.* at 69. Although "features of these products have been on the market for some time, their prevalence in the market and our Total mortgage portfolio increased in 2006 and 2005." *Id.* Freddie Mac added that it "expect[ed] each of these products to default more often than traditional products and we consider this when determining our credit and guarantee fees." *Id.* As part of this discussion, the Information Statement specifically described its increased purchases of "[i]nterest-only mortgages" and "[o]ption ARM loans," among other products. *Id.* In short, the very document that OPERS featured in its Opposition evidences that there was no daylight between Freddie Mac's external and internal statements.

Freddie Mac's underwriting disclosures were completely consistent with, and not in any way rendered misleading by the omission of the fact that Freddie Mac was increasing the number of exceptions from its historical underwriting policies. Indeed, as the Mullings's memo demonstrates, Freddie Mac's increasing number of internal credit exceptions was *explained by* the very facts that it disclosed: tailoring contracts with specific customers, increasingly relying on Alt-AUS to purchase loans, and increasingly purchasing non-traditional mortgage loans. Given that OPERS points to no public statement about credit exceptions at all, and given that the underwriting disclosures were consistent with increased exceptions, Freddie Mac had no duty to disclose the

number of its credit exceptions, and OPERS points to no such duty. *See supra* § II.B.2 (discussing *Polaroid*).

Equally unavailing is OPERS's comment that Freddie Mac engaged in "selective editing" of its disclosure on underwriting by omitting the final sentence of the disclosure relating to the fact that Freddie Mac continued to monitor the performance of loans. OB 94. The comment is rich coming from OPERS, given the fact that it misleadingly excerpted a sliver of it in the "Fact Section" (*see* OB 22 n.65) and then quoting the remainder of the disclosure that is fatal to its argument more than 50 pages later (OB 94). Regardless, OPERS identifies no genuine issue of fact regarding whether Freddie Mac monitored it portfolio's performance. Its brief is rife with evidence that Freddie Mac did.

In contending that the 2006 Information Statement contained false statements, OPERS relies heavily on pronouncements by Howard Shapiro, its putative expert witness, about what Freddie Mac's statements "suggest" or "imply." OB 36–37 & n.123. Putting aside the fact that Shapiro's opinions, including his underwriting opinions which he is not qualified to offer, should be excluded on *Daubert* grounds (*see* ECF No. 522), his hyperbolic criticism of Freddie Mac having supposedly "abandoned" underwriting standards is simply based on information that Freddie Mac actually disclosed, including its increasing reliance on Alt-AUS. Disclosed facts cannot support a securities fraud claim.[96]

**d. OPERS's Chart of Additional Statements**

In its Opposition Brief, OPERS addresses only the three statements discussed above. Buried deep in its exhibits, OPERS includes a chart of what it terms the nine "primary misrepresentation and omissions" regarding underwriting, identifying two of the foregoing

[96] *See, e.g.*, *Ley*, 543 F.3d at 807-08.

statements (not Cook's) and six others. *See* ECF No. 558-142. None of these tacked-on statements gives rise to liability for the same reasons already discussed. Many do not mention underwriting at all. All are "vague and indefinite statements of optimism or corporate puffery" that are inactionable as a matter of law. *See* Ex. 168; MB 88 (collecting cases). Others are forward-looking statements accompanied by meaningful cautionary language. *See* Ex. 168.

#### 2. OPERS Fails To Identify Any Actionable Omission Of Material Fact Regarding Freddie Mac's Underwriting.

OPERS fares no better in contending that Freddie Mac made four omissions. OB 22–32. In keeping with its obfuscating approach, OPERS all but ignores the relevant legal framework, which Freddie Mac set forth in its Moving Brief. A duty to disclose arises only when positive law requires disclosure or when one "omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. A "pure omission"—the failure to disclose information in the absence of an inaccurate, incomplete, or misleading statement—cannot give rise to liability under federal securities law. *Macquarie*, 601 U.S. at 264, 266 (2024).

A statement that is allegedly "so incomplete as to mislead" is only actionable under very narrow circumstances. *See Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990).[97] The First Circuit's *en banc* ruling in *Polaroid* illustrates how very narrowly the courts construe what it means for a statement to be misleading and thus to give rise to a duty to disclose. *Id*. at 16. In *Polaroid*, the plaintiffs alleged, inter alia, that certain of Polaroid's disclosures concerning the sales price and number of sales of its Polavision instant movie camera (which proved to be a commercial

[97] *See also Winer Family Trust v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007) (applying *Polaroid* in affirming dismissal of securities fraud claims); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897-99 (8th Cir. 2002) (same); *Oran v. Stafford*, 226 F.3d 275, 285-87 (3d Cir. 2000) (same); *Glazer v. Formica Corp.*, 964 F.2d 149, 156-57 (2d Cir. 1992) (same).

disaster) were misleading in violation of the federal securities laws. *Id*. In its ruling, the First Circuit stressed that "complete and accurate" disclosure does not require that a company publish every fact about every subject it voluntarily discloses: "This does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.'" *Id*. Applying this principle to the plaintiff's allegations, the court found that Polaroid was not required to disclose other, related information regarding sales and pricing: "Disclosing that Polavision was being sold below cost was not misleading by reason of not saying how much below. Nor was it misleading not to report the number of sales, or that they were below expectations." *Id*.

Applying these legal principles, OPERS has failed to identify any statement regarding "underwriting" that required further disclosure to make it not misleading.[98]

**a. OPERS Identifies Four Supposed Omissions, But None Are Actionable**

**(1) Underwriting Standards and Quality Control Systems**

OPERS contends that "Freddie Mac failed to disclose to the investing public that its underwriting standards and quality control systems were ineffective throughout the Relevant Period." OB 23. This is not an actionable omission for several reasons. First, in its TAC, OPERS did not plead this omission, and it cannot now amend its complaint at summary judgment. *See* TAC ¶ 138(a) (alleging omissions); *see also supra* 14-15 (collecting cases refusing to consider new theories in opposition to summary judgment). This pleading failure aside, OPERS does not

[98] In the Sixth Circuit, courts distinguish "hard information"—"typically historical information or other factual information that is objectively verifiable"—from "soft information"—"predictions and matters of opinion[s]." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir. 2008) (quotations omitted). No duty exists to disclose soft information unless it is "virtually as certain as hard facts." *Id.*

identify any statement, addressing the same subject matter, that was rendered "so incomplete as to mislead." *See* OB 23–25. OPERS merely cites to Shapiro's opinions, which fail to identify any public statement from Freddie Mac that was rendered misleading by the supposed omission.[99] Further, this is the sort of "soft information" that a company would have no duty to disclose. *See supra* 54 n.98.

**(2) Freddie Mac's Ability to Effectively Underwrite Nontraditional Mortgage Products**

OPERS contends that Freddie Mac "had virtually no ability to effectively underwrite the nontraditional mortgage products that were making up an increasing portion of the [single-family portfolio] during the Relevant Period."[100] Once again, in its TAC, OPERS has not pleaded that this was an omission, and it cannot now amend its complaint via summary judgment briefing. *Compare id. with* TAC ¶ 138(a) (alleging omissions). Similarly, OPERS has again failed to identify any statement rendered misleading by the supposed omission. *See* OB 25–27. Instead, OPERS—copying and pasting from Shapiro's report—simply states that Freddie Mac "nodded to this deficiency near the end of the Relevant Period (in its August 30, 2007 Information Statement Supplement), but then falsely claimed that it had remediated the issue." OB 25–26.[101] In other words, even accepting Shapiro's unsupported speculation, the one statement OPERS identifies actually ***disclosed*** (*i.e.*, "nodded to") the supposedly omitted information. And again, even assuming that Shapiro's hyperbolic opinion was admissible, this is the sort of "soft information: that a company has no duty to disclose. *See supra* 54 n.108.

---

[99] OB 23 n.70 (citing Ex. 16, Shapiro Rep.(Nov. 17, 2023) at ¶ 50).
[100] OB 25 (quoting Ex. 16, Shapiro Rep. (Nov. 17, 2023) at ¶ 51).
[101] Aside from this throwaway line, OPERS does not argue—let alone identify any evidence supporting—that this statement was false. *See* OB 90–97.

OPERS also hoists itself with its own petard by relying on a 2006 examination by the Office of Federal Housing Enterprise Oversight ("OFHEO"). OB 95. OPERS contends that, in November 2006, OFHEO [redacted][102] But OPERS ignores that, in the very same letter, the OFHEO [redacted]"[103] Once again, OPERS willfully ignores facts that defeat its argument.[104]

**(3) Freddie Mac's "Abandoned" Underwriting Standards**

OPERS contends that Freddie Mac omitted that it "essentially abandoned its underwriting standards altogether over the Relevant Period—effectively outsourcing the job to Fannie Mae and other third parties whose underwriting standards were far less stringent than Freddie Mac's."[105] This alleged omission does not appear in the TAC, and OPERS cannot now amend its complaint at summary judgment. *Compare id. with* TAC ¶ 138(a) (alleging omissions). OPERS also has failed again to identify any duty to disclose based on a statement rendered misleading by the supposed omission. *See* OB 27–29. Regardless, OPERS is wrong that Freddie Mac did not disclose that it was deviating from its historical underwriting standards. Freddie Mac expressly disclosed just that. *See supra*, § II.B.1.c; MB 11.

---

[102] OB 95 (quoting O-Ex. 125, OFHEO Conclusion Letter (Nov. 8, 2006)).
[103] O-Ex. 125 at FMAC-SEC 021277051.
[104] OPERS's reliance on a September 2008 draft letter from FHFA to Syron regarding underwriting issues is misplaced. OB 37-38. That it is a draft, on the one hand, and sent long after the Relevant Period, on the other, render it irrelevant and inadmissible to whether any challenged statement was false or made with scienter. *See, e.g.*, *Figures v. Board of Public Utilities of City of Kansas City, Kan.*, 967 F.2d 357, 360 (10th Cir. 1992) (draft letter from agency was properly excluded as "hearsay" because it did not "represent the findings of an agency or government office."). Further, citation to such a draft makes no sense whatsoever considering FHFA's conclusion, after a lengthy investigation, that none of the company's officers violated the securities laws "in connection with the Company's acceptance and management of credit risk from 2004 through 2007." MB at 56.
[105] OB 27 (quoting Ex. 16, Shapiro Rep. (Nov. 17, 2023) at ¶ 52).

**(4) Freddie Mac's Increased Use of Exceptions**

OPERS contends that Freddie Mac "failed to disclose to the investing public that it dramatically increased the use of 'exceptions' to work around its underwriting standards during the Relevant Period." OB 29. This newly minted allegation should also be disregarded. *Compare id. with* TAC ¶ 138(a) (alleging omissions). Also, OPERS again fails to identify any statement rendered misleading by the supposed omission. *See* OB 29–32. In fact, OPERS points to no Freddie Mac statement about underwriting exceptions at all. *See id.* Accordingly, *Polaroid* is directly on point. For example, disclosing that Freddie Mac was "increasingly" relying on Alt-AUS was not misleading by reason of not saying the amount of that increase or that it led to internal exceptions from historical underwriting guidelines. *See Polaroid Corp.*, 910 F.2d at 16.[106]

**b. OPERS Offers No Authority to Alter this Analysis.**

OPERS's discussion of legal authorities is as misguided as its analysis of Freddie Mac's underwriting statements and supposed omissions. Few of OPERS's cited cases are on point, and not one comes close to avoiding summary judgment for Freddie Mac.

Bizarrely, OPERS invokes the Sixth Circuit's 2016 decision in this case reversing dismissal on loss-causation grounds, portraying this decision as having "recognized the problem" with Freddie Mac's underwriting practices. OB 91 (citing *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 386 (6th Cir. 2016) ("*OPERS*")). The decision did no such thing. The Sixth Circuit merely recited OPERS's pleading-stage allegations, repeatedly emphasizing the axiom that a court must "accept as true" any "well-pleaded allegations" in evaluating a motion to dismiss. *OPERS*, 830 F.3d at 386. That the Sixth Circuit recited OPERS's

[106] OPERS contends that Defendants engaged in "selective editing of the underwriting disclosure they cited to support their plea for safe harbor." OB 94. Freddie Mac neither selectively edited the disclosure nor invoked a "safe harbor" defense; rather it quoted the disclosure to show that Freddie Mac disclosed its approach to underwriting and the very information OPERS now argues was concealed. *See* MB 11.

pleading-stage allegations eight years ago has no bearing on whether OPERS has furnished ***evidence*** showing a genuine dispute of material fact at summary judgment. After all, plaintiffs "cannot merely rely on the allegations in their complaint to defeat summary judgment." *Tullis v. UMB Bank, N.A.*, 423 F. App'x 567, 570 (6th Cir. 2011).[107] This case illustrates the wisdom of that axiom, as the TAC centered on theories that OPERS has now abandoned and testimony from confidential witnesses, each of whom has now attested that there was no fraud.

Worse yet is OPERS's mindboggling discussion of *Upstart*, which is miscited in almost every imaginable way. OB 95 (citing *In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810 (S.D. Ohio Sept. 29, 2023)). OPERS contends that this case "perfectly crystallizes" the issue of "whether Freddie Mac had a duty to ensure that its public statements about its underwriting standards and systems were consistent with its internal assessments of those standards and systems." *Id*. But the quotation OPERS relies upon, ostensibly showing that the "court disagreed" that certain statements were inactionable corporate puffery, is nowhere to be found in the *Upstart* opinion. *Id*. at 96. In fact, that quotation does not come from the *Upstart* court (or any court, for that matter); it comes from another plaintiff's brief, in another case, in another district. *See Berg v. Velocity Fin., Inc.*, 2020 WL 9216469 at *10 (C.D. Cal.). The *Berg* court rejected that argument, dismissing the claim because the "identified statements about [the defendants'] underwriting practice is corporate puffery, they cannot support a" securities claim. *Berg v. Velocity Fin., Inc.*,

---

[107] OPERS's footnoted cases on underwriting fare no better. *See* OB 91 nn.386–87. These non-binding authorities from district courts outside of the Sixth Circuit were all decided on a motion dismiss, where the question was whether the plaintiffs had plausibly alleged their claims—not (as here) whether there is a genuine dispute as to any material fact based on evidence, and whether Freddie Mac is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). In addition, many of these cases are unsurprisingly distinguishable on their facts. For instance, many involve underwriting disclosures from loan originators, which Freddie Mac is not. *See, e.g.*, *Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorop.*, 731 F. Supp. 2d 689, 706 (S.D. Ohio 2010); *In re Countrywide Fin. Corp. Deriv. Lit.*, 554 F. Supp. 2d 1044, 1072, 1076–77 (C.D. Cal. 2008); *see also* OB 91 n.386 (citing same).

2021 WL 268250, at *4 (C.D. Cal. Jan. 25, 2021). *Berg* actually "perfectly crystalizes" why this Court should grant Freddie Mac summary judgment.

**3. No Statement or Omission Concerning Underwriting Was Made with Scienter.**

The Opposition does not address scienter in its "underwriting" argument, confirming the absence of scienter. *See* OB 90–97. Instead, OPERS simply proclaims elsewhere that "Defendants knew Freddie Mac had no comprehensive credit risk strategy and knew that its systems could not adequately measure the increasing risk from its 'touch more loans' strategy." *Id.* at 7. As explained above, Freddie Mac's internal and external statements on underwriting were consistent. *See supra* § II.B.1.c (comparing Mullings's memorandum to Annual Report, showing that Freddie Mac's internal discussion aligned point-for-point with the company's public statements). These internal documents establish not just the accuracy of Freddie Mac's public statements, but also Defendants' good faith in making them. Similarly, regarding omissions, OPERS has not pointed to even a scintilla of evidence that anyone intended to conceal anything relating to underwriting. Because OPERS fails to show a genuine dispute of material fact on scienter, summary judgment should enter for Freddie Mac.

**C. Summary Judgment Should Enter in Favor of Freddie Mac on Other Alleged "Frauds" That OPERS Does Not Address.**

OPERS essentially abandons its claims based on alleged misrepresentations concerning "loan analysis software and fraud detection systems"; "risk management measures and…performance"; and the adequacy of Freddie Mac's capital position. *See* TAC ¶ 2. Freddie Mac moved for summary judgment on each theory, and it should enter as to each.

**1. "Risk Management."**

In its Opposition, OPERS does not defend its claims based on "risk management" statements challenged in the TAC or address Freddie Mac's related arguments. *See* MB 90-91.

Rather, it subsumes the "risk management" category in its "underwriting" category. *See, e.g.*, OB 37-38 (discussing statements concerning risk management in the context of underwriting standards); *see also* O-Ex. 134 at 1 (categorizing challenged statements as "Underwriting/Risk Management"). OPERS's "underwriting" theory fails for the reasons discussed *supra* § II.B.

**2. "Loan Analysis Software and Fraud Detection Systems."**

OPERS does not respond to Freddie Mac's arguments relating to "loan analysis software and fraud detection systems." MB 91-93.[108] As discussed in Freddie Mac's Moving Brief, the only statement OPERS challenged even arguably relating to these two subjects was a single passage from a November 7, 2007 press release in which Freddie Mac stated:

> Freddie Mac has a longstanding commitment to fighting mortgage fraud, as evidenced by its leadership role in the industry through our active internal fraud investigations, quality control activities, Freddie Mac-instituted remedial steps, and assistance with criminal prosecutions.[109]

OPERS claimed that the November 7 statement was false because Defendants "knew that at least 10% of Freddie Mac's mortgages were infected by fraud," and "intentionally obstructed implementation" of fraud detection software that allegedly would have identified more mortgage fraud. TAC ¶¶ 193; *see id.* ¶¶ 106-13. Confronted with a wall of evidence defeating that allegation (*see* MB 92-93), OPERS abandons it.

Instead, OPERS pivots to yet another new theory: that the November 7 statement was false or misleading because it "failed to disclose that the Company had just issued a 'Counterparty

---

[108] OPERS's allegation that Freddie Mac should have replaced its internal "risk evaluation software," Quantum, with a better "risk evaluation" tool (*see* TAC ¶¶96-98, OB 15), that allegation is, at best, one of mismanagement, which cannot support a federal securities fraud claim. *See Santa Fe*, 430 U.S. at 479 ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."); *Ricker v. Zoo Ent., Inc.*, 534 F. App'x 495, 500 (6th Cir. 2013) (affirming grant of motion to dismiss where plaintiff's allegations showed "at most, that [the company] was financially mismanaged, not that Defendants fraudulently misled the public").

[109] *See* MB 92 (citing TAC ¶ 189).

Credit Risk Management Audit' in which concluded [sic] that 'absence of a robust data-mining tool limits the Company's ability to detect potential mortgage fraud prior to Freddie Mac incurring significant losses, or in identifying entities that should be added to the Exclusionary List.'" OB 129. OPERS cannot assert such new allegations for the first time in an effort to avoid summary judgment. *See supra* 14-15. In any event, this new allegation fails because OPERS fails to identify any duty to disclose this internal audit report. *See supra* § II.B.2 (discussing *Polaroid*). Critically, the November 7 statement does not even discuss data-mining tools, and it is in no way inconsistent with this alleged omission. *Id.* Summary judgment should enter for Freddie Mac on claims based on this November 7 statement concerning "fraud detection."

### 3. "Capital Position."

Confronted with undisputed evidence that Freddie Mac accurately disclosed its capital position (*see* MB 94-96), OPERS abandons any independent "capital position" claims asserted in its TAC. Its Opposition does not mention any of the statements on the subject challenged in its TAC. Summary judgment should enter for that reason alone with respect to each of the statements challenged at TAC ¶¶ 212-26. *See supra* at § I.A.2 (discussing cases holding that failure to respond to argument waives claim).

Unable to identify any specific "capital position" statement that was allegedly false or misleading, OPERS alludes to "misrepresentations and omissions" concerning "Freddie Mac's economic capital position" (OB 7) as a "derivative effect of the credit risk and underwriting issues discussed previously." OB 103 n.445. OPERS apparently asks the Court to conclude that every single (unidentified) statement Freddie Mac made during the Relevant Period related to its "capital position" was false necessarily given that Freddie Mac's statements concerning credit risk and underlying were allegedly false. *See id.*

But OPERS offers no admissible or cogent evidence to support that claim. The only "evidence" OPERS cites is an unsupported and conclusory passage from Shapiro's report that, in hindsight, Freddie Mac's capital position must have been impaired given "credit risk and underwriting issues."[110] Shapiro is neither an auditor nor accountant, and neither OPERS nor Shapiro performs any analysis to support any analysis or calculation to demonstrate that Freddie Mac was not adequately capitalized at any point in time. Nor, critically, does OPERS even attempt to demonstrate that any Individual Defendant or senior manager ***knew*** that its capital position was (allegedly) worse than Freddie Mac publicly stated. There is zero evidence of scienter with respect to any (unidentified) "capital position" statement.

On the last page of its last Exhibit (No. 134), OPERS challenges for the first time in this 16-year-old case an August 20, 2007 "Morning Update" in which Syron stated that Freddie Mac was "strong and well capitalized."[111] No claim can be based on this statement. First, OPERS does not challenge this statement in its TAC and, accordingly, it should be disregarded. *See supra* 14-15. Second, though OPERS asserts without basis that the statement was "publicly touted," the statement was ***internal*** to Freddie Mac; "Morning Update" messages from Syron were distributed internally to employees.[112] The document evidences as much on its face, both in its language[113], and its posted location: Freddie Mac's intranet.[114] Ironically, by challenging this ***internal*** statement, which OPERS claims was false, OPERS undermines its own claims: this internal statement is consistent with Freddie Mac's external statements regarding its capital position.

---

[110] *Id.* (quoting Ex. 16, Shapiro Report (Nov. 17, 2023) at ¶ 66).
[111] *See* O-Ex. 134 at 4 (citing O-Ex. 133, Syron Morning Update (Aug. 20, 2007)).
[112] Ex. 166 (Ducanes Declaration) (attesting that Syron's "Morning Update" was an internal-only communication).
[113] *See, e.g.*, Ex. 133 (asking employees to "[k]eep working hard and pulling together").
[114] The document reflects that it was posted to "fhlmc.com," the company's intranet, which was and is not accessible externally. Ex. 167 (Semukha-Greenberg Declaration).

Third, it is a vague and indefinite statement of optimism. *See supra* § II. Summary judgment should enter for Freddie Mac on all claims based on statements regarding capital.

## III. OPERS CANNOT ESTABLISH RELIANCE ON ANY CHALLENGED STATEMENT.

### A. OPERS Did Not Directly Rely On Any Challenged Statement.

In its Opposition, OPERS fails to identify any evidence showing that OPERS reviewed and relied on any challenged statement; OPERS has repeatedly conceded as much.[115] In fact, it concedes in a footnote that "the OPERS representative responsible for monitoring Freddie Mac during the relevant period…does not recall reviewing the specific misrepresentations asserted," OB 136 n.591, and its only other employee who invested in Freddie Mac stock simply applied an algorithm without references to Freddie Mac's disclosures.[116] There is no genuine dispute of material fact concerning whether OPERS directly relied on any challenged statement—it did not.

### B. The *Basic* Presumption of Reliance Does Not Apply.

Freddie Mac also explained in its Moving Brief that this Court determined that, at class certification, OPERS failed to establish that Freddie Mac's stock traded in an efficient market during the Relevant Period, depriving OPERS of the ability to claim the "fraud-on-the-market" presumption of reliance under *Basic v. Levinson*, 485 U.S. 224 (1988). *See* MB 96-97. OPERS agrees, stating that it cannot "avail itself of the *Basic* presumption of reliance" based on the Court's prior orders. OB 134. While OPERS "reserve[s] its rights to raise that issue on appeal" (OB 134 n.584), it does not present any evidence that would warrant the Court's revisiting its holding that OPERS has failed to demonstrate that Freddie Mac's stock traded in an efficient market during the Relevant Period. Accordingly, the *Basic* presumption of reliance does not apply.

---

[115] *See* MB 96-97; Reply Br. of Pl.-Appellant, *OPERS v. Fed. Home Loan Mortg. Corp.*, 2022 WL 1027779, at *7 (6th Cir. 2022).

[116] MB 55-56 (citing Ex. 134, Weis Tr. (Oct. 25, 2023)).

### C. The *Affiliated Ute* Presumption of Reliance Does Not Apply.

Having conceded that it cannot avoid summary judgment under either of the foregoing theories of reliance, OPERS offers a brand-new argument: that the "*Affiliated Ute* presumption of reliance" should apply because "defendants were engaged in material omissions and/or half-truths." OB 134-35. OPERS has never before in this case asserted that *Affiliated Ute* applies—not at class certification or on multiple appeals to the Sixth Circuit. Rather, it has always argued for the application of *Basic*'s "fraud-on-the-market" presumption of reliance, even telling the Sixth Circuit that it would be ***unable*** to avoid summary judgment without the *Basic* presumption.[117]

OPERS's attempt to switch horses to *Affiliated Ute* at this late stage should be rejected for two reasons: (1) it does not apply to this case, which is premised on alleged false and misleading statements not "pure omissions"; and (2) even if it did apply, it has not survived the Supreme Court's decision in *Macquarie*.

In 1972, in *Affiliated Ute*, the Supreme Court held that, respecting securities fraud claims, "if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154 (1972)). The rationale for this presumption was that, in securities fraud cases based on omissions, "in which ***no positive statements exist***: reliance as a practical matter is ***impossible*** to prove." *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017); *see Titan Grp., Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975) ("Unlike instances of affirmative misrepresentation where it can be demonstrated that the injured party relied upon affirmative statements, in instances of ***total non-***

[117] *See* Pls.' Pet. For Permission to Appeal Order Den. Class Certification, *OPERS v. Fed. Home Loan Mortg. Corp.*, 2018 WL 5024857, at *21 (6th Cir. 2018) ("OPERS ***must*** prove market efficiency at summary judgment and trial to establish reliance").

***disclosure***, as in *Affiliated Ute*, it is of course ***impossible*** to demonstrate reliance"). In other words, *Affiliated Ute* provided a "narrow presumption," applicable only where "reliance is impossible or impractical to prove" because "***no positive statements were made***." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2 F.4th 1199, 1206 (9th Cir. 2021).

The *Affiliated Ute* presumption does not apply here where a review of OPERS's TAC reveals that its claims are based on Defendants' alleged misrepresentations, not pure omissions. *See e.g.*, TAC ¶¶ 7, 139-89, 212-24, 269. While the TAC pays lip service to "omissions," it makes clear that, to the extent it pleads any omissions claims, they are directly related to Defendants' "representations." TAC ¶ 137.[118] To the extent OPERS asserts any omissions claims, they are based on alleged "half-truths"—*i.e.*, alleged "representations that state the truth only so far as it goes, while omitting critical qualifying information." *Macquarie*, 601 U.S. at 263 (explaining "the difference between a pure omission and a half-truth is the difference between a child not telling his parents he ate a whole cake and telling them he had dessert"); *see also City of Monroe*, 399 F.3d at 675 (distinguishing between pure omissions and "selective, incomplete disclosure").

As noted above, the *Affiliated Ute* presumption does not apply to "half-truths," and OPERS's contention otherwise (OB 134) is without support. While the Sixth Circuit has not addressed the issue, ***eight*** Courts of Appeals have held that the *Affiliated Ute* presumption did not apply to "half-truths."[119] In cases involving "half-truths," the rationale behind the *Affiliated Ute* presumption does not exist because plaintiffs could theoretically demonstrate reliance on those "half-truths"—*i.e.*, actual statements that the plaintiff could have relied upon. *See Holdsworth v.*

[118] *See also* TAC ¶ 225 ("*Despite its public statements to the contrary, …").*

[119] *See In re Volkswagen*, 2 F.4th at 1204; *Waggoner*, 875 F.3d at 93 & n.24; *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 219-220 (D.C. Cir. 2010); *Regents of the Univ. of Cal.* v. *Credit Suisse First Boston*, 482 F.3d 372, 384 (5th Cir. 2007); *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 192-93 (3d Cir. 2001); *Joseph* v. *Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000); *Cox* v. *Collins*, 7 F.3d 394, 395-396 (4th Cir. 1993); *Cavalier Carpets, Inc.* v. *Caylor*, 746 F.2d 749, 756 (11th Cir. 1984).

*Strong*, 545 F.2d 687, 695 (10th Cir. 1976); *Crago v. Charles Schwab & Co.*, 2021 WL 4990234, at *4 (N.D. Cal. Oct. 27, 2021); *Schwab v. E*TRADE Fin. Corp.*, 285 F. Supp. 3d 745, 755 (S.D.N.Y. 2018), *aff'd*, 752 F. App'x 56 (2d Cir. 2018).[120]

In addition, even if this case were a "pure omissions" case, the *Affiliated Ute* presumption in Section 10(b) cases appears to have been implicitly abrogated by this year's *Macquarie* decision where the Supreme Court held that "pure omissions" are not actionable under Rule 10(b) and SEC Rule 10b-5. *See* 601 U.S. at 264, 266. If a "pure omission" is no longer actionable, it is unclear how any plaintiff could ever be entitled to a presumption of reliance on one.

## IV. OPERS CANNOT ESTABLISH LOSS CAUSATION.

Summary judgment should enter for Freddie Mac for the independent reason that there is no genuine issue of material fact with respect to whether any alleged misrepresentation or omission caused OPERS's losses. *See* MB 97-99. First, OPERS has failed to offer any evidence of loss causation. *See* MB 99. OPERS claims that it failed to provide such evidence because it is "legally preclude[ed]" from doing so based on the Court's prior class certification decision. OB 138. Not so. Although a class certification decision may involve a limited consideration of the merits of the matter, *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), a decision on class certification is ***not*** a decision on the merits for the purposes of successive stages of the matter, including summary judgment or trial. *See, e.g.*, *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996,

[120] The cases OPERS cites for the proposition that the *Affiliated Ute* presumption applies to "half-truths" (OB 135 n.586) do not so hold. *In re BancorpSouth, Inc.*, 2017 WL 4125647 (6th Cir. Sept. 18, 2017) is an unpublished order denying Rule 23(f) review of a class-certification order in which the court did not evaluate the application of *Affiliated Ute* to half-truths. *Cosby v. KPMG, LLP*, 2021 WL 1828114, at *7 (E.D. Tenn. May 7, 2021) found that plaintiffs "may invoke the *Affiliated Ute* presumption as to the alleged omissions," but not to misrepresentations. In *In re FirstEnergy Corp. Sec. Litig.*, which is currently on appeal, the court likewise found that the *Affiliated Ute* presumption applied where "the communications at issue are primarily omissions-based." 2023 WL 2709373, at *20 (S.D. Ohio Mar. 30, 2023), *opinion clarified*, 2023 WL 8105252 (S.D. Ohio Apr. 18, 2023).

1006 (9th Cir. 2018).[121] Indeed, Rule 23 states that "[a]n order that grants or denies class certification ***may be altered or amended*** before final judgment." Fed. R. Civ. P. 23(c)(1)(C). That the Court previously excluded OPERS's proffered market efficiency expert at class certification—where the Court was not deciding the merits of the case—did not prevent OPERS from offering competent expert or other evidence at summary judgment to support loss causation (or any other element) to either sway this Court to change its ruling or to preserve the issue for appeal. Indeed, OPERS's current expert, Dr. Tabak, says that he could have offered a loss causation opinion using his usual methods (albeit one that OPERS told him would have been inconsistent with the Court's prior decisions), but OPERS just did not ask him to do so.[122] OPERS has simply chosen not to advance evidence of loss causation. Whether for economic or (perceived) procedural expediency, OPERS's choice is dispositive of the loss causation element.

OPERS's choice aside, Freddie Mac is entitled to summary judgment on loss causation for more fundamental reasons. OPERS alleges that it suffered losses upon Freddie Mac's November 20, 2007 disclosure of a $2 billion loss with more losses expected. *See* MB 98. But the fact that Freddie Mac was about to incur a loss of that magnitude and expected even more losses to follow was expressly disclosed, not concealed as OPERS asserts. Proof of this fact is that OPERS's own "expert" witness, Shapiro, issued a report a month before the November 20 disclosure that accurately predicted, "[b]ased on data released today by [Freddie Mac]," that Freddie Mac would incur a $1.6 billion loss due at least in part to "its credit exposure."[123] In other words, neither the market nor OPERS's own expert was caught "completely by surprise" by the $2 billion loss

---

[121] *See also Microsoft Corp. v. Baker*, 582 U.S. 23, 34 (2017) (holding that, following denial of class certification, plaintiffs could continue to litigate the case and develop additional evidence requiring certification of class); *Himler v. Comprehensive Care Corp.*, 790 F. Supp. 114, 116 (E.D. Va. 1992) ("[D]enial of a motion for class certification ***does not*** affect the merits or the level of proof required").

[122] Ex. 136, Tabak Tr. (Dec. 20, 2023) at 99:22-100:5; 101:13-15.

[123] *Id.* at 99 (quoting Ex. 142, Fox-Pitt Kelton report (Oct. 24, 2007) at 1).

Freddie Mac announced on November 20, 2007, as OPERS alleges. TAC ¶ 6.[124] Tellingly, OPERS ignores this evidence devastating to its loss causation theory.

At his deposition, aware that he had, weeks before November 20, 2007, accurately predicted that Freddie Mac would incur $1.6 billion in losses due to its "credit exposure," Shapiro amended the opinion he had already offered in his expert report. His amended opinion, interlineated here to highlight Shapiro's flip-flop, is that the November 20, 2007 disclosure "clarifie[d] that credit risk, underwriting issues, and the constraints on Freddie Mac's capital were all major factors contributing to ~~the reported [$2 billion] loss~~ ***unexpected future losses and capital insufficiency reported by Freddie Mac on that date***.[125] But even this amended opinion fails to demonstrate loss causation because, again, Freddie Mac had previously disclosed what Shapiro claims was omitted—*i.e.*, that Freddie Mac expected to suffer "future losses." As discussed *supra* 10-13, throughout 2007, Freddie Mac disclosed that it was raising its loan loss reserves because it expected increasing credit losses in future periods. Because it reported in the two prior quarters that it expected future credit losses, the announcement in the third quarter of 2007 that it expected additional losses could not have been a "surprise," as OPERS contends.

In its Opposition, OPERS presents a revised version of an analysis it first used in 2008 in a legal brief (Plaintiff's Appendix 1) which OPERS's expert, Dr. Tabak adopted in his report after claiming to correct certain errors. OB 11. That table proves little more than OPERS is willing to manipulate record evidence to advance its arguments. Putting aside the fundamental flaws with this analysis, which OPERS's expert has never employed before,[126] OPERS has omitted from its

[124] *See* Ex. 135, Shapiro I Tr. (Nov. 6, 2023) at 243:17-25 ("Q. At this time you expected a $1.6 billion GAAP loss, is that right? A. Yes. Q. So when Freddie Mac announced a $2 billion GAAP loss on November 20th of 2007, you were not particularly surprised, correct? . . . A. ***I was not surprised***.").

[125] Ex. 137, Shapiro II Tr. (Jan. 10, 2024) at 311:17–25 (alterations added to illustrate changed opinion).

[126] Ex. 17, Bajaj Report (Jan. 19, 2024) at ¶¶ 196-221.

own table any mention of AMBAC, which was originally included in Plaintiff's original Appendix 1 (*see* ECF No. 47-1) as well as in Tabak's adoption of the Appendix with a positive return of 28.6%. Freddie Mac's expert explained in his report that AMBAC experienced a negative return decline of 39%, a fact that is utterly inconsistent with OPERS effort to show that Freddie Mac's negative return of 28.69% was unusual.[127] OPERS omits this fact because it undermines its point.

In sum, OPERS has failed to submit to this Court any evidence that the decline in Freddie Mac's stock price was caused by either the materialization of any undisclosed risk or any corrective disclosure. For this independent reason, summary judgment should enter for Freddie Mac.

## V. OPERS CANNOT PROVE DAMAGES.

OPERS acknowledges that it has "not produc[ed] specific damages calculations." OB 140.[128] Because OPERS has failed to provide its damages computations, Rule 37(c) prohibits it from offering any damages computations "on a motion, at a hearing, or at a trial" unless OPERS demonstrates that its failure was "substantially justified or harmless." Rule 37(c)'s prohibition of evidence that a party fails to produce as required by Rule 26(a) is not within the Court's discretion—it is "automatic and mandatory," as the Sixth Circuit recently reiterated. *RJ Control Consultants, Inc. v. Multiject, LLC*, 100 F.4th 659, 668 (6th Cir. 2024) (affirming district court's exclusion of plaintiffs' expert witness as "automatic and mandatory" under Rule 37(c) where plaintiffs failed to provide required Rule 26(a) expert report by expert discovery deadline).

[127] The Bajaj Report also notes that the next day, AMBAC's price fell another 52% when Moody's Investors Service put the company on review for a possible downgrade, and if all three AMBAC announcements are taken in their entirety (the original OPERS's date plus the two additional corrected dates), they would show a total decline of about 62%. Ex. 17 at ¶ 209.

[128] OPERS alludes to an exhibit to its 2008 lead-plaintiff motion in which it "disclosed" losses on a "LIFO" ("last-in-first-out") and "FIFO" ("first-in-first-out") basis. OB 139 n.604. But damages and losses are not the same thing, and OPERS does not argue otherwise. Nor has OPERS ever treated this LIFO/FIFO analysis as its damages; for the last decade, OPERS promised in discovery responses that it would offer an expert or corporate representative to testify to damages. *See* MB 100-03. It has failed to provide either.

Given that Rule 37(c) is "automatic and mandatory," courts routinely grant summary judgment where a party is prohibited from offering damages computations due to a failure to produce them in discovery. *See* MB 103 & n.466 (collecting cases including *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 369–70 (6th Cir. 2010) (affirming grant of summary judgment where, due to plaintiff's failure to disclose its damages computations, there was "no evidence of [damages] left to consider.")). It is not true, as OPERS argues, that Freddie Mac was required to "seek sanctions before the close of discovery" for Rule 37(c) to apply. *See* OB 139. The single case OPERS cites does not stand for that proposition.[129] In fact, it confirms that, even in the absence of a motion for sanctions, "[Rule] 37(c)(1) requires ***absolute compliance*** with Rule 26(a); that is, it '***mandates*** that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *House*, 2022 WL 3587823 at *3 (citing cases including *Bessemer*, 596 F.3d at 370).

OPERS's violation was neither harmless nor substantially justified. To resolve those issues, Sixth Circuit courts consider five factors—surprise, ability to cure surprise, disruption of trial, importance of the evidence, and the reason for the failure to produce—none of which favors OPERS. *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). Freddie Mac will be surprised by the proffer of a damages calculation months or years after the close of discovery, and OPERS cites no authority for the odd proposition (OB 140) that Freddie Mac was required to cure that potential surprise by filing a sanctions motion. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii); ECF No. 508, Scheduling Order (June 23, 2023). OPERS's argument that a late disclosure will not disrupt trial

[129] *See* OB 139 n.606 (citing *House v. Players Dugout, Inc.*, 2022 WL 3587823, at *2-6 (W.D. Ky. Aug. 22, 2022)). *House* is distinguishable, as there defendants possessed (but had not produced) the documents from which the damages computation could be performed, and the computation was based on defendants' own expert's testimony at trial. *See House*, 2022 WL 3587823 at *4-5.

(OB 140) also lacks any basis and ignores its hope to prevail on appeal and return to this Court for trial. And, of course evidence of OPERS's damages is important—it is an element of its claims.

Finally, OPERS has no good explanation for failing to provide its damages computations. Even had the Court's prior rulings "precluded" it from offering such evidence at trial (OB 139) (they didn't), those rulings did not preclude it from providing damages calculations in discovery.[130] OPERS chose to avoid effort and expense over compliance with controlling procedure and law. Summary judgment should enter for Freddie Mac on the element of damages.

## CONCLUSION

Summary judgment should enter for Freddie Mac (and all Defendants) on all claims.

Date: August 30, 2024

Respectfully submitted,

*s/ Hugh E. McKay*

Hugh E. McKay (Ohio Bar #0023017)
PORTER WRIGHT MORRIS & ARTHUR LLP
950 Main Avenue, Suite 500
Cleveland, OH 44113
Tel: (216) 443-2580
Fax: (216) 443-9011
E-mail: hmckay@porterwright.com

Jason D. Frank (admitted *pro hac vice*)
Emily E. Renshaw (admitted *pro hac vice*)
Andrew M. Buttaro
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110-1726
Tel: (617) 951-8455
Fax: (617) 951-8736
E-mail: jason.frank@morganlewis.com
E-mail: emily.renshaw@morganlewis.com
E-mail: andrew.buttaro@morganlewis.com

[130] *Hutson v. Fed. Express Corp.*, 2017 WL 437422 at *5 (W.D. Tenn. Feb. 1, 2017) does not support OPERS. There, unlike here, the defendant had all relevant information to compute damages and failed to take the opportunity to examine plaintiff on damages. *Howe* is also no help to OPERS—there, the district court itself was part of the cause of the late damages disclosure. 801 F.3d at 750.

______________________________

Frederick L. Block (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Tel: (202) 739-5125
Fax: (202) 739-3001
Email: fred.block@morganlewis.com

*Counsel for Federal Home Loan Mortgage Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ Hugh E. McKay*
Hugh E. McKay

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)**

Pursuant to Local Rule 7.1(f), I hereby certify that this document complies with this Court's May 8, 2024 Order permitting Freddie Mac to file a reply brief of up to 70 pages. ECF No. 550.

*/s/ Hugh E. McKay*
Hugh E. McKay