PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, | ) ) ) | CASE NO. 4:08CV0160 |
| Plaintiff, | ) ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) ) | |
| FEDERAL HOME LOAN MORTGAGE CORPORATION, *etc.*, *et al.*, | ) ) ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendants. | ) | [Resolving ECF No. 519] |

Pending is Plaintiff Ohio Public Employees Retirement System's ("OPERS") Motion to Exclude Expert Testimony of Prof. John Coates (ECF No. 519). Prof. Coates is a corporate disclosure practices expert proffered by Defendant Federal Home Loan Mortgage Corporation ("Freddie Mac") on Freddie Mac's disclosure processes. Plaintiff moves the Court for the entry of an Order excluding the report, opinions, and testimony of Prof. Coates, as well as all evidence that is based upon, or directly or indirectly references, Prof. Coates's report, opinions, or testimony. The Court has been advised, having reviewed the record, the parties' briefs, and the applicable law. For the reasons that follow, the motion is denied.

(4:08CV0160)

## I.

OPERS alleges that the "primary fraud" here is Freddie Mac's alleged "failure to disclose" its "true subprime exposure," focusing on the 170-page 2006 Information Statement (ECF No. 298-2). *See* Third Amended Complaint (ECF No. 166) at PageID #: 5571-72, ¶ 3; PageID #: 5604, ¶ 79; PageID #: 5636-38, ¶¶ 156-58.

Prof. Coates has 30-plus years of experience in the field of large public company disclosures and disclosure customs and practices in the securities industry. *See* Expert Report of Prof. John Coates (ECF No. 519-2) at PageID #: 23099-100, ¶ 4. From 1988 to 1997, he was a partner at Wachtell, Lipton, Rosen & Katz, a law firm in New York. While practicing law at Wachtell Lipton, Prof. Coates advised numerous financial institutions, including more than a dozen banks engaged in home lending, on disclosure issues. *See* ECF No. 519-2 at PageID #: 23100, ¶¶ 5-6. He subsequently joined the Harvard University faculty teaching courses through the law and business schools on disclosure obligations and customary practices. *See* ECF No. 519-2 at PageID #: 23099, ¶ 2. During his 25-plus year tenure at Harvard, Prof. Coates has also provided consulting services on disclosure issues to a wide variety of entities, which included reviewing disclosure practices of large public companies during 2007 and 2008. *See* ECF No. 519-2 at PageID #: 23101, ¶ 8; Transcript of Deposition of John Coates (ECF No. 519-3) at PageID #: 23230:18-25. In addition, he served on the Investor Advisory Committee of the Securities and Exchange Commission ("SEC"), which involved the review and assessment of disclosure controls, processes, and compliance. *See* ECF No. 519-2 at PageID #: 23101, ¶ 8. In 2021, Prof. Coates served as the SEC's General Counsel and Acting Director of the Division of

(4:08CV0160)

Corporation Finance,[1] which included advising the SEC Chair and other Commissioners on legal issues related to public company disclosures.  See ECF No. 519-2 at PageID #: 23101, ¶ 7; ECF No. 519-3 at PageID #: 23228:14-18.  Finally, he has testified as an expert witness more than 25 times at trial and numerous times by deposition on a variety of issues, including securities disclosure obligations and practices, corporate governance and controls, and related laws and regulations.  See ECF No. 519-2 at PageID #: 23101, ¶ 9 and PageID #: 23179.

     In arriving at his conclusions, including that Freddie Mac's processes for drafting and approving sub-sections of its disclosures was the same across the board, Prof. Coates reviewed several categories of key documents, including but not limited to:  (1) academic articles on public company disclosures, earnings calls, and the housing crisis; (2) depositions of 20 Freddie Mac employees taken in the present case, the SEC civil enforcement action[2] or the underlying SEC investigation, and exhibits; (3) Howard S. Shapiro's Expert Reports (ECF Nos. 522-3 and 522-4) and deposition transcripts (*e.g.*, ECF Nos. 522-5, 522-6, 548-135, and 559-123); (4) Freddie Mac Information Statements, *i.e.*, annual reports, and Information Statement Supplements from 2004-2007; (5) publicly filed disclosures for Fiscal Year 2006, filed in 2006, for 24 other public companies; (6) applicable legal regulations and related SEC publications; and, (7) numerous internal Freddie Mac documents produced in the case at bar relating to disclosure processes (*e.g.*, Disclosure Committee charter and minutes, draft and final disclosures, and emails concerning the

---

    [1] The Division responsible for setting disclosure requirements and reviewing public company filings.

    [2] *SEC v. Syron*, No. No. 1:11-cv-09201 (S.D.N.Y. filed Dec. 16, 2011) (the "SEC Action").

(4:08CV0160)

review and approval of disclosures).  *See* ECF No. 519-2 at PageID #: 23180-87; ECF No. 519-3 at PageID #: 23209:19 - PageID #: 23210:20.

Prof. Coates examined specific examples of Freddie Mac's disclosure processes from August 1, 2006 through November 20, 2007 (the "Relevant Period") for disclosures from each category of at-issue disclosures.  He compared Freddie Mac's 2006 disclosure of its exposure to subprime mortgages to subprime disclosures of other major financial institutions.  Next, he examined the disclosure process involved in preparing selected at issue disclosures, including the 2006 subprime-related disclosure in the 2006 Information Statement and the 2006 Earnings Release, *i.e.*, press release regarding financial results.  *See* ECF No. 519-2 at PageID #: 23142-51.

The purpose of having a vigorous and customary disclosure process is to increase the likelihood that public disclosures are correct.  As Prof. Coates explains, in making any statements contained within disclosures to the public, large public companies like Freddie Mac must comply with particular securities regulations designed to ensure accurate information is provided to the market.  *See* ECF No. 519-2 at PageID #: 23108-109, ¶¶ 29-30.  Prof. Coates quoted from the deposition of Dan Smith, a director in Freddie Mac's Investor Relations Department responsible for preparing earnings releases, to explain in his report and deposition testimony that Freddie Mac employed a four-step process for voluntary disclosures:  Step 1:  the investor relations group must "develop a good understanding as to what occurred in the quarter or period;" Step 2:  investor relations must then "work the details with the business areas and finance and legal to put the documents into presentable form for the executive;" Step 3:  investor

(4:08CV0160)

relations will then "show the early process draft to the executive and get their comments;" Step 4: investor relations will "iterate those [comments] through [the] disclosure committee, through legal, through finance to make sure that the comments and the phrasing and the emphasis and the details provided by the executive conformed to the" Company's other public statements. ECF No. 519-2 at PageID #: 23140, ¶ 91; *see also* ECF No. 519-3 at PageID #: 23331:10 - PageID #: 23332:22.

Disclosure practices at large public companies involve an iterative process across multiple departments with multiple steps to help ensure the sufficiency and accuracy of the information disclosed by the company. *See* ECF No. 519-2 at PageID #: 23118-21, ¶¶ 47-55. Freddie Mac's "disclosure process involved an iterative approach in which multiple departments and individuals reviewed drafts and provided input on the final document, and in which multiple individuals were involved in cross-checking the accuracy of disclosed figures" before the Individual Defendants made or signed off on the disclosures. ECF No. 519-2 at PageID #: 23127, ¶ 69. Prof. Coates opines that Freddie Mac's disclosure processes for the "at-issue disclosures" involved relevant departments and individuals (with different subject matter expertise) across Freddie Mac's organization and "were consistent with the Company's general disclosure practices" and "disclosure customs and practices in large public companies." *See* ECF No. 519-2 at PageID #: 23106, ¶ 24.a.; PageID #: 23144-51.

In paragraph 24.b. of his report, Prof. Coates offers the following summary of his opinion: "Freddie Mac's disclosure processes for the Information Statements and Earnings Releases containing the at-issue disclosures involved relevant departments and individuals and

5

(4:08CV0160)

were consistent with the Company's general disclosure practices and disclosure customs and practices in large public companies." ECF No. 519-2 at PageID #: 23106, ¶ 24.b.

## II.

The Federal Rules of Evidence, specifically Rule 702, "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Rule 702 governs the admissibility of expert testimony and codifies the Supreme Court's holdings in *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Expert testimony is admissible only if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the proposed testimony satisfies those standards. *See* Fed. R. Evid. 702 advisory committee's note (2000); *Daubert*, 509 U.S. at 592 n.10. "[R]ejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (quoting Fed. R. Evid. 702 advisory committee's note (2000)).

Furthermore, a *Daubert* analysis includes consideration of Fed. R. Evid. 403. *Daubert*, 509 U.S. at 595. Therefore, courts in the Sixth Circuit employ a four prong test to determine the admissibility of expert opinions: "(1) that the witness, a qualified expert, (2) was testifying to a proper subject, (3) which conformed to a generally accepted explanatory theory, and (4) the

6

(4:08CV0160)

probative value of the testimony outweighed its prejudicial effect." *United States v. Smithers*, 212 F.3d 306, 312 (6th Cir. 2000) (citing *United States v. Green*, 548 F.2d 1261 (6th Cir.1977)).

### III.

OPERS does not challenge Prof. Coates's qualifications as a disclosure expert. It does, however, set forth three reasons to exclude his testimony. First, Prof. Coates's opinions regarding Freddie Mac's disclosure practices are irrelevant, and would not help the jury. Second, he did not analyze "disclosure customs and practices in large public companies" in connection with his report. Third, Prof. Coates did not analyze the "at-issue disclosures" in the case at bar to be in a position to determine whether they "were consistent with the Company's general disclosure practices." And, with respect to the two "at-issue disclosures" he purported to analyze, OPERS claims that Prof. Coates failed to confirm that Freddie Mac actually followed each step of the disclosure process he outlined. OPERS' Memorandum in Support (ECF No. 519-1) at PageID #: 23078.

### A.

OPERS argues that Prof. Coates's testimony regarding Freddie Mac's disclosure practices (and their consistency with industry customs) should be excluded on both relevance and Fed. R. Evid. 403 grounds. The Court sees it differently. Prof. Coates's testimony that Freddie Mac's disclosure processes were comparable to those of other large public companies will be helpful to the jury in determining whether it is more likely that the public disclosures at the center of this securities case were accurate and less likely that any Individual Defendant acted with the

7

(4:08CV0160)

requisite scienter.[3] *See* Fed. R. Evid. 702(a) (An expert witness's testimony must "help the trier of fact to understand the evidence or to determine a fact in issue."). Courts allow expert testimony of this nature, finding it relevant to the determination of plaintiffs' claims. *See, e.g.*, Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 218 (3d Cir. 2006) (Berckeley sought to introduce expert testimony about whether it complied with federal securities law and the court found "customs and business practices in the securities industry at the time . . . provides an important context which will aid the jury in determining whether Berckeley had the requisite scienter at the time. . . .").

**B.**

Next, OPERS contends, even if the Court finds that Prof. Coates's opinions regarding Freddie Mac's disclosure processes for preparing public disclosures are relevant, his full opinion in this situation – that Freddie Mac's disclosure processes during the Relevant Period were consistent with "disclosure customs and practices in large public companies" – should be excluded under Rule 702 for its lack of reliability. As stated above, Prof. Coates reviewed publicly filed disclosures for Fiscal Year 2006, filed in 2006, for 24 other public companies in arriving at his conclusions in the present case. *See* ECF No. 519-2 at PageID #: 23180-87; ECF No. 519-3 at PageID #: 23209:19 - PageID #: 23210:20. According to OPERS, he was unable to identify even one "large public company" who made up the comparator group identified in his

---

[3] In order to prove its securities fraud claims, OPERS must demonstrate that an Individual Defendant acted with a "knowing and deliberate intent to manipulate, deceive, or defraud and recklessness," which requires a showing of "an extreme departure from the standards of ordinary care." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016).

8

(4:08CV0160)

report. And despite opining that Freddie Mac's disclosure practices during the Relevant Period were consistent with other large public companies' disclosure practices, Prof. Coates failed to provide the names of the companies in his comparator group or review any such disclosure practices in connection with preparing his report. *See* ECF No. 519-1 at PageID #: 23081. Prof. Coates, however, testified during cross-examination at his deposition that he benchmarked Freddie Mac's disclosure practices against all large public companies:

> Q. Professor Coates, I'd like to direct your attention back to paragraph 24.a. of your report, and specifically, I want to talk about the final clause in that paragraph, that Freddie Mac's processes during the relevant period for determining disclosure of information to the public were consistent with disclosure customs and practices in large public companies.
> \* \* \*
> Q. I want to focus on the last part of this opinion, "consistent with disclosure customs and practices in large public companies."
> Did you identify in your report any of the large public companies upon which you based the opinion summarized in paragraph 24.a.?
> \* \* \*
> A. Not by specific name. This opinion is a general one that's based on my review of large public company disclosures over my career. And the processes they follow, you know, company by company are not typically available real-time in the public domain, but they're processes that I've helped create, been part of, overseen, and have testified about on many occasions.
> So this is a general opinion about large public companies subject to the same market and legal and accounting expectations and norms as Freddie Mac.
> Q. So you can't identify today any large public companies upon which you based your opinion that's summarized in paragraph 24.a.?
> \* \* \*
> A. In some generic sense, all of them. I've sat at the SEC on top of the "corp fin" division which reviews public filings by companies generally, not a subset, and engages in back and forth with companies about their processes.
> I've written about Sarbanes-Oxley and the requirements of attestation controls and procedures which are a part of the disclosure of large public companies. I've prepared large public company disclosures.
> But like I'm not -- what I'm saying is I'm not picking out a single company to benchmark. This is a general process because large public companies

9

(4:08CV0160)

>generally are under the same market and other constraints in following those processes.

ECF No. 519-3 at PageID #: 23227:7 - PageID #: 23229:4. Prof. Coates, then, had no need to re-review disclosure-related documents for other large public companies or to seek access to those companies' non-public disclosure-related documents that he already reviewed and knew. *See* First Tenn. Bank Nat'l Ass'n v. Barreto, 268 F.3d 319, 335 (6th Cir. 2001) (allowing "expert testimony derived largely from [the expert's] own practical experiences throughout forty years in the . . . industry). He also reviewed and depended on publicly available documents on disclosure customs, *see* ECF No. 519-2 at PageID #: 23180-87, which further support his extensive experience.

## C.

Finally, OPERS asserts Prof. Coates has no methodologically reliable basis for his opinions. It contends that Prof. Coates should be precluded from offering his opinion in paragraph 24.b. of his report (ECF No. 519-2 at PageID #: 23106, ¶ 24.b.) for three (3) reasons. First, his prepared-for-litigation presentation of facts about Freddie Mac's disclosures should be excluded as a matter of law because general background information "is not in dispute, nor is an expert necessary to explain those topics." *Sec. & Exch. Comm'n v. Mudd*, No. 11 Civ. 9202 (PAC), 2016 WL 2593980, at *5 (S.D.N.Y. May 4, 2016). Second, Prof. Coates failed to verify that the iterative disclosure processes Freddie Mac adopted for its disclosures were actually consistent with "disclosure customs and practices in large public companies." Third, Prof. Coates failed to verify that Freddie Mac actually followed the "iterative processes" he identified

(4:08CV0160)

in his report for the external disclosures (*e.g.*, Information Statements) and voluntary disclosures (*e.g.*, Earnings Releases).

The subject of Prof. Coates's opinion, however, is in dispute. Indeed, OPERS has designated its own proposed expert, Howard S. Shapiro, to offer opinions on the subject. *See* ECF Nos. 522-3 and 522-4. "Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *Highland Cap. Mgmt., L.P., v. Schneider*, 551 F. Supp.2d 173, 182 (S.D.N.Y. 2008) (holding that an expert "may testify as to the customs and practices of the industry" because such testimony was "relevant to this case and may prove helpful to the jury"). The Court finds that Prof. Coates's deposition testimony provides evidence for the reliability of his methodology and its reliable application to the facts of the case at bar.

**1.**

OPERS maintains Prof. Coates failed to verify that Freddie Mac actually followed the "iterative processes" he identified in his report for external disclosures (*e.g.*, Information Statements). While Prof. Coates may have articulated Freddie Mac's "iterative process" for external disclosures in his report, *see* ECF No. 519-2 at PageID #: 23106, ¶ 24.b., OPERS argues that his opinion in this context has no methodologically reliable basis and, therefore, should be excluded.

Freddie Mac sets forth its reasons for why Prof. Coates is a recognized disclosure expert, whom is qualified to offer his proposed testimony. *See* ECF No. 532 at PageID #: 26259-61. "Because [his] methodology was informed by and conducted in accordance with [his]

11

(4:08CV0160)

professional experience, [Prof. Coates's] opinion as a nonscientific expert meets the Daubert reliability prong." Sec. and Exch. Comm'n v. Bankatlantic Bancorp, Inc., No. 12-60082-CIV-SCOLA/OTAZO-REYES, 2013 WL 12009694, at *7 (S.D. Fla. Nov. 14, 2013). It is for this reason that federal courts in other securities cases have admitted expert testimony based on a comparable methodology, *i.e.*, comparing a party's actions with broader industry practice. *See e.g.*, Berckeley, 455 F.3d at 218; Bankatlantic, 2013 WL 12009694 at *10.

OPERS quotes from the Freddie Mac 2006 Annual Report, which provides as to subprime mortgages, in relevant part:

> Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have *a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans*. Such characteristics might include a combination of high loan-to-value ratios, low FICO scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by increasing the availability of mortgage credit.
> While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, *we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant*. Also included in our credit guarantee portfolio are Structured Securities backed by non-agency mortgage-related securities where the underlying collateral was identified as being subprime by the original issuer. At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.

ECF No. 298-2 at PageID #: 12479 (emphasis added). Prof. Coates testified as follows during

12

(4:08CV0160)

cross-examination at his deposition:

> Q. Did you review any documents in which external reporting [was] working with the business areas to determine what percent of the loans in the portfolio came from originators using lower underwriting standards such as limited or no documentation of a borrower's income?
> \* \* \*
> A. Again, I'm not -- did I review any? I believe I have seen, yes, testimony and/or documents reflecting the kind of information you're just talking about. And in fact, I think that is part of the basis for the statement in -- on [ECF No. 298-2 at PageID #: 12479], that based on lender type underwriting practice product structure, the number of loans underlying these securities that are subprime is not significant. And I do believe I remember seeing evidence to suggest that that was a focus leading up to the finalization of that disclosure.

ECF No. 519-3 at PageID #: 23306:20 - PageID #: 23307:13. Freddie Mac disclosed that it did not characterize its loans as prime or subprime, and as Prof. Coates testified, Freddie Mac disclosed in specific detail the credit characteristics of its loans. *See* ECF No. 519-3 at PageID #: 23298:18 - PageID #: 23302:4. OPERS also disregards Prof. Coates's additional testimony that Freddie Mac would have had to disclose those very loans, *i.e.*, loans with a high probability of default, in other ways.

> A. So, again, I don't remember anything specific sitting here today. Again, I will note that where loans have high probability of default, a lending institution has to provide for the loss in the income statement and then reflect the accumulation of that in the allowance account on the balance sheet.
> And so actually always, as far as I know, throughout this period required quantitative disclosure of forward-looking information about likelihood of default was embedded directly in the financial statements for the portfolio as a whole, all of which I would have thought would have been something relevant to assessing the question you just asked me.
> But no, I don't have anything memorized today about that in the disclosure process sitting here for, you know, like Bates stamp numbers and the like, no.

ECF No. 519-3 at PageID #: 23304:16 - PageID #: 23305:9.

(4:08CV0160)

**2.**

OPERS also argues that Prof. Coates failed to verify that Freddie Mac actually followed the "iterative processes" he identified in his report for voluntary disclosures (*e.g.*, Earnings Releases). As stated above, in paragraph 91 of his report, ECF No. 519-2 at PageID #: 23140, Prof. Coates summarized the "iterative process" Freddie Mac used to create its voluntary disclosures, such as earnings releases. Prof. Coates was not required to repeat his review for every voluntary disclosure Freddie Mac made during the multi-year period here. And OPERS has not cited any evidence that any of Freddie Mac's voluntary disclosures did not go through the very same disclosure process as the press release that accompanied the subprime-related disclosure in the 2006 Information Statement. Because Prof. Coates's expert opinions are sufficiently reliable and relevant, the criticisms OPERS advances are issues of weight rather than admissibility. *In re Scrap Metal*, 527 F.3d at 530 ("[M]ere weaknesses in the factual basis of an expert witness' opinion bear on the weight of the evidence rather than on its admissibility.") (citation and ellipsis omitted); *Allstate Ins. Co. v. Ayman Tarabishy, M.D., PLLC*, No. 2:22-cv-12736, 2025 WL 366440, at *4 (E.D. Mich. Jan. 31, 2025) ("any such difference goes to the weight, not admissibility, of [the proposed expert's] testimony, and Defendants remain free to explore any areas of weakness or conflict on cross examination"). Prof. Coates's testimony will assist the jury in its evaluation of the at-issue disclosures, their context, their development, and the alleged scienter of the Individual Defendants.

14

(4:08CV0160)

## IV.

For the foregoing reasons and those that have been articulated in the memorandum of the points and authorities on which Freddie Mac relies, OPERS' Motion to Exclude Expert Testimony of Prof. John Coates (ECF No. 519) is denied.

IT IS SO ORDERED.

| | |
|---|---|
|   March 11, 2025   |   /s/ Benita Y. Pearson   |
| Date | Benita Y. Pearson |
| | United States District Judge |