PEARSON, J.

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

OHIO PUBLIC EMPLOYEES )
RETIREMENT SYSTEM, )    CASE NO.  4:08CV0160
 )
    Plaintiff, )
 )    JUDGE BENITA Y. PEARSON
    v. )
 )
FEDERAL HOME LOAN MORTGAGE )    **MEMORANDUM OF OPINION**
CORPORATION, *etc.*, *et al.* )    **AND ORDER**
 )    [Resolving ECF Nos. 544, 545, 546, 547,
    Defendants. )    and 595]

Pending are:

Defendant Richard F. Syron's Motion for Summary Judgment (ECF No. 544);

Defendant Anthony S. Piszel's Motion for Summary Judgment on All Claims (ECF No. 545);

Defendant Eugene McQuade's Motion for Summary Judgment (ECF No. 546); and,

Defendant Federal Home Loan Mortgage Corporation's ("Freddie Mac") Motion for Summary Judgment (ECF No. 547).

The Court has been advised, having reviewed the record, the parties' briefs, and the applicable law.  The Court has also considered the parties' Certificates (ECF Nos. 580, 581, and 582) and the arguments of counsel offered during the oral argument held on May 21, 2025.  For the reasons that follow, the Court grants Defendants' motions.

### I. Background

Plaintiff Ohio Public Employees Retirement System ("OPERS") is a state pension fund that provides retirement, disability, survivor and health care benefits, and services for Ohio public employees.  Following a 29% drop in Freddie Mac stock prices in 2007, OPERS filed a class action suit alleging securities fraud against Freddie Mac and four senior officers (Syron,

(4:08CV0160)

Cook,[1] Piszel, and McQuade).  The Court denied OPERS' renewed motion for class

certification.  The Court also granted Freddie Mac's motion to exclude OPERS' expert  witness,

Dr. Feinstein, and denied OPERS' motion to exclude Freddie Mac's experts.  *Ohio Pub. Emps.*

*Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840 (N.D. Ohio

Aug. 14, 2018) (ECF No. 478).  OPERS then petitioned for review by the United States Court of

Appeals for the Sixth Circuit under Fed. R. Civ. P. 23(f).  Finding that an interlocutory appeal

was not warranted, the Sixth Circuit denied OPERS' petition for permission to appeal the class

certification decision.  *In re: Ohio Pub. Emps. Ret. Sys.*, No. 18-0310 (6th Cir. Jan. 23, 2019)

(order) (ECF No. 482).

Thereafter, OPERS filed a Request for *Sua Sponte* Summary Judgment arguing that the

class certification decision prevented its case from proceeding, as it precluded it from going

forward individually with its securities claims on the dispositive element of loss causation.

Defendants opposed OPERS' request.[2]  The Court subsequently agreed with OPERS and entered

summary judgment for Defendants.  *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg.*

*Corp.*, No. 4:08CV0160, 2020 WL 5593202 (N.D. Ohio Sept. 17, 2020) (ECF No. 498).  On

October 9, 2020, OPERS appealed both the class certification and summary judgment decisions.

*See* Notice of Appeal (ECF No. 500).

In January 2021, Freddie Mac moved the Sixth Circuit to dismiss the appeal for lack of

jurisdiction.  A divided motions panel denied the motion.  *Ohio Pub. Emps. Ret. Sys. v. Fed.*

---

[1]  Cook died during the pendency of the case at bar.  The claims asserted against
her in the Third Amended Complaint (ECF No. 166) were dismissed with prejudice.  *See*
Stipulation and Order approving the parties' Stipulation of Dismissal (ECF No. 514).
[2]  Piszel also indicated he would like the Court to consider a summary judgment
motion to be filed by him on the narrow issue of scienter without awaiting the conclusion
of discovery.  *See* ECF Nos. 489 and 491.

(4:08CV0160)

*Home Loan Mortg. Corp.*, No. 20-4082, 2022 WL 97152, at *2 (6th Cir. Jan. 6, 2022) (order).

OPERS raised numerous issues on appeal. After the case had been fully briefed, it was argued

before the merits panel on March 16, 2023. Freddie Mac continued to argue that the Court of

Appeals lacked jurisdiction. The merits panel found that it was not bound by the prior panel's

determination of jurisdiction. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 64

F.4th 731, 734 (6th Cir. 2023) (ECF No. 501). The Sixth Circuit held this Court's decision was

not final and thus there was no appellate jurisdiction "[b]ecause the district court's summary

judgment decision was manufactured by OPERS in an apparent attempt to circumvent the

requirements of Rule 23(f)." *Id.* at 733. The Court of Appeals reversed and remanded the case

for further proceedings, "at which point the district court may, but is not required to, revisit the

significant issues of law raised by OPERS." *Id.* at 736.

In June 2023, the Court held a Telephonic Status Conference. The Court set cutoff dates

for fact and expert discovery and the filing of *Daubert* and dispositive motions for the merit

stage of the present case. *See* Order (ECF No. 508).[3] The Court will now address the merits of

Defendants' motions for summary judgment.

## II. False Statements

The Court first addresses whether Defendants made materially false or misleading

statements about Freddie Mac's subprime exposure. For the reasons below, the Court finds that

---

[3] ECF No. 508 provides, in relevant part:

> Lead counsel of record shall confer with one another in person in order to prepare written stipulations as to all uncontested facts to be presented by the dispositive motion. The stipulations shall be filed with the Court on or before March 22, 2024. If there are no stipulations, a joint notice stating same shall be filed by the same date. These are mandatory requirements.

ECF No. 508 at PageID #: 23026, ¶ 6. Lead counsel timely filed a Joint Notice as to Uncontested Facts (ECF No. 523) stating they "have conferred and have been unable to reach an agreement on joint stipulations as to uncontested facts to be presented in the dispositive motions."

(4:08CV0160)

OPERS has failed to establish a genuine issue of material fact on this claim and grants summary

judgment in Defendants' favor.

**A.  Background and Parties' Arguments**

OPERS alleges that "[t]he primary fraud was Defendants' failure to disclose Freddie

Mac's true subprime exposure."  Third Amended Complaint (ECF No. 166) at PageID #: 5571,

¶ 3.  OPERS contends that Defendants materially misrepresented Freddie Mac's subprime

exposure by publicly reporting it as approximately 0.1% of the single-family portfolio while

internally measuring it at approximately 10%.  *See* OPERS' Omnibus Memorandum in

Opposition (ECF No. 559) at PageID #: 37471.  Specifically, OPERS argues that Freddie Mac

internally defined loans rated "Caution (C1 or C2) by LP" as "high-risk Subprimes" and used the

Segmentor model to estimate "the probability that a loan is 'subprime.' "  ECF No 559 at PageID

#: 37472-74 (quoting March 31, 2009 Mulligan Presentation (ECF No. 559-91) at FMAC-SEC

025548799).  According to OPERS, by mid-2007, Freddie Mac was measuring subprime

exposure at between 8.68% and 10.80% of its portfolio through these internal systems.  *See* ECF

No. 559 at PageID #: 37477-78.

OPERS argues that Defendants' public statements were "wildly misleading" because they

claimed the Company had "little to no exposure to the subprime risk-layered mortgage products"

and "basically no subprime exposure" while internally recognizing substantial subprime risk

through Caution loans and Segmentor scores.  ECF No. 559 at PageID #: 37479-81.

Defendants contend there was no "primary" fraud and that their statements about Freddie

Mac's subprime exposure were true when made.  ECF No. 547-1 at PageID #: 29355; ECF No.

574 at PageID #: 41924.  Defendants argue that all witnesses agree they accurately disclosed

Freddie Mac's subprime exposure, and the documentary record confirming it is

"overwhelming[ly]" in support of the testimony.  ECF No. 547-1 at PageID #: 29356.

4

(4:08CV0160)

       Defendants emphasize that Freddie Mac's public disclosure was "thoughtfully worded" because, as its 2006 Information Statement (ECF No. 559-9 at FMOPERS00205322)[4] explained, "there was no generally accepted definition of the term 'subprime.' " ECF No. 547-1 at PageID#: 29356-57.  They note that Freddie Mac qualified its subprime disclosure by using the phrase "based on lender-type, underwriting practice, and product structure." ECF No. 547-1 at PageID #: 29357 (quoting ECF No. 559-9 at p. 69).  Defendants argue that Freddie Mac's internal documents and testimony demonstrate that while the Company "purchased substantial amounts of subprime backed securities for its Retained Portfolio, it had no subprime loans in its SF Guarantee Portfolio, except for a very small amount of structured securities, called "T-deals," which it disclosed." ECF No. 547-1 at PageID#: 29357.

       Regarding the internal use of terms like "subprime" or "subprime-like," Defendants contend these do not create a genuine issue of material fact because (1) there is no universal definition of "subprime"; (2) Freddie Mac's public statements were qualified as "based on lender-type, underwriting practice, and product structure"; and (3) even the authors of internal documents using such terminology testified that Freddie Mac did not purchase subprime loans for its SF Guarantee Portfolio.  *See* ECF No. 547-1 at PageID #: 29358-59; ECF No. 574 at PageID #: 41927-28.

       Defendants also rely on expert analysis from their finance and economics expert, Dr. Okongwu, which shows that Freddie Mac's Caution loans "did not look like and did not perform like subprime loans" but rather "performed far closer to a set of prime loans." ECF No. 547-1 at PageID #: 29359; PageID #: 29315-16.

---

    [4]  Freddie Mac's annual reports were titled "Information Statement and Annual Report to Stockholders," and its quarterly reports were titled "Information Statement Supplements".  ECF No. 547-1 at PageID #: 29318 n. 112.

(4:08CV0160)

## B.  Legal Standard

Lead Plaintiff seeks redress for Defendants' alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder.  To prevail on its claims under Section 10(b) and Rule 10b–5, OPERS must prove, among other elements, that Freddie Mac made a material misrepresentation or omission.  *See Saxe v. Dlusky*, 268 Fed.Appx. 438, 440 (6th Cir. 2008) (affirming summary judgment on Section 10(b) claim when plaintiff "failed to establish that [the defendant] made any material misrepresentations or omissions"); *Escue v. Sequent, Inc.*, 869 F. Supp.2d 839, 851 (S.D. Ohio 2012) (granting summary judgment on Section 10(b) claim when there was neither a misrepresentation, omission or reliance).

## C.  Discussion

The evidence supports Defendants' position that Freddie Mac did not purchase loans from traditional subprime lenders or use subprime underwriting practices and product structures in its SF Guarantee Portfolio, except for the disclosed T-deals.  Multiple internal documents confirm this, including CPM reports (*see, e.g.*, ECF No.548-84 at PageID #: 31693) that repeatedly noted "[c]urrently, no subprime loans are within the SF portfolio."  ECF No. 574 at PageID #: 41925.

OPERS' argument relies heavily on Freddie Mac's internal risk management systems, particularly the Caution loan classifications and Segmentor model.  The evidence, however, shows these internal tools served different purposes than the public disclosures.  The Caution loan designation was an internal risk management tool that classified loans as requiring additional scrutiny, not necessarily as "subprime" in the traditional sense.  Similarly, Freddie Mac designed the Segmentor model to identify loans that might behave like subprime loans for

6

(4:08CV0160)

risk management purposes, but this does not establish that these loans were subprime based on "lender-type, underwriting practice, and product structure."

Likewise, the authors of internal documents using "subprime" or "subprime-like" terminology testified that they did not believe Freddie Mac purchased subprime loans for its SF Guarantee Portfolio.  *See* ECF No. 574 at PageID #: 41928.  Don Bisenius, whom OPERS frequently cites, explained that he used such terms "pejoratively" to refer generally to loans of lower credit quality, not to indicate actual subprime loans.  Deposition of Donald J. Bisenius (ECF No. 548-118) at PageID #: 32085-86.

Defendants' expert analysis provides evidence that Freddie Mac's Caution loans did not perform like subprime loans.  Dr. Okongwu's analysis compared Freddie Mac's Caution loans to actual subprime loans and found that they "look like, and perform like" prime loans rather than subprime loans.  ECF No. 574 at PageID #: 41926-27 (citing Dr. Okongwu's Amended Expert Report (ECF No. 548-19 at ¶ 13)).  This data contradicts OPERS' characterization of these loans as subprime.

The Court must also consider that securities law requires evaluation of statements in their full context, not based on selective quotations or impressions.  *See In re Copley Pharm., Inc. Sec. Litig.*, No. 94-11897-WGY, 1995 WL 169215, at *2 n.5 (D. Mass. Mar. 16, 1995) ("Securities law is not about fostering senses; it is about actual statements, whether or not they are true or false. . . .").  When the Court considers Freddie Mac's statements in their full context, including the qualifications about the lack of a universal definition of subprime and the specific criteria used for measurement, the statements accurately reflected the Company's exposure based on disclosed methodology.

While OPERS points to various internal communications using subprime-related terminology, this evidence does not establish that Freddie Mac's public statements were false.

7

(4:08CV0160)

As the Southern District of New York reasoned in *Kuriakose v. Fed. Home Loan Mortg. Corp.*,

*897 F. Supp.2d 168 (S.D.N.Y. 2012)*, *aff'd sub nom. Central States, Se. & Sw. Areas Pension*

*Fund v. Fed. Home Loan Mortg. Corp.*, *543 Fed.Appx. 72 (2d Cir. 2013)*, "the fact that Freddie

Mac employees attributed different definitions to the term 'subprime' in internal correspondence

has no bearing on whether Freddie Mac's public disclosures were misleading; rather it only

highlights that the term had no set definition." *Id.* at 183.

**D.  Conclusion**

After review, the Court finds that OPERS has failed to establish a genuine issue of

material fact regarding whether Defendants made false statements about Freddie Mac's subprime

exposure.  Witness testimony and documentary evidence support the public statements, which

include appropriate qualifications and accurately reflect the surrounding context.  The internal

risk management tools OPERS cites served different purposes than public disclosure and do not

establish the falsity of the qualified public statements.

Accordingly, the Court grants Defendants' motions for summary judgment on this issue.

### III.  Alt-A Holdings

Next, the Court considers whether Freddie Mac's public statements about its Alt-A[5] loan

exposure were false or misleading.  The Court grants summary judgment for Defendants on this

issue, finding that the internal measurement differences do not render Freddie Mac's disclosures

false because the Company disclosed its methodology and applied it reasonably.

---

[5]  " 'Alt-A' refers to loans originated with reduced documentation requirements *and* that present increased credit risk."  ECF No. 574 at PageID #: 41945 (emphasis in original); ECF No. 559 at PageID #: 37481-82 (" 'Alt-A' is a mortgage industry term used to describe reduced documentation/higher credit risk loans.")

8

(4:08CV0160)

## A.  Background and Position of the Parties

OPERS contends that Freddie Mac made actionable misrepresentations by publicly using the broad Mortgage Credit Risk Analytics ("MCRA") definition to describe its Alt-A exposure while reporting exposure according to Investments & Capital Markets' (undisclosed and much narrower) definition.  *See* ECF No. 559 at PageID #: 37486.  OPERS argues that Freddie Mac's internal measurements showed approximately 29% Alt-A exposure as of June 30, 2007, while publicly disclosing only 8%.  See ECF No. 559 at PageID #: 37532.  Freddie Mac's August 30, 2007 Information Statement Supplement stated that it "classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements which indicate that the loan should be classified as Alt-A."  ECF No. 559-15 at FMOPERS00209043.  The Company estimated "approximately $120 billion, or eight percent" of its single-family mortgage portfolio as Alt-A mortgage loans.  ECF No. 559-15 at FMOPERS00209043.  Internal documents, however, show that Freddie Mac's Single Family Sourcing group calculated that approximately 29% of loans were labeled as "Low/No Doc" by the lender through Alt-A Special Characteristic Codes ("SCC").  Sept. 14, 2007 Alt A Definitions Presentation (ECF No. 559-104) at FMAC-SEC 067770691.

Defendants argue that summary judgment should be granted because (1) there is no universal definition of "Alt-A" loans, making any alleged misstatements immaterial; (2) OPERS cannot demonstrate that Freddie Mac's Alt-A disclosures were false or misleading; and (3) Defendants relied on robust internal processes to ensure disclosure accuracy.  ECF No. 547-1 at PageID #: 29379-80; ECF No. 574 at PageID #: 41943-44.

## B.  Legal Standard

In securities fraud cases, statements are materially false or misleading if they would mislead a reasonable investor about the nature of the investment.  *Basic Inc. v. Levinson*, 485

(4:08CV0160)

U.S. 224, 231-32 (1988); *In re Sotera Health Co. Sec. Litig.*, No. 1:23CV0143, 2025 WL

1648942, at *23 (N.D. Ohio March 19, 2025). As a result, courts analyzing falsity interpret

statements "as a reasonable investor would." *See Plymouth Cty. Ret. Ass'n v. ViewRay, Inc.*, No.

21-3863, 2022 WL 3972478, at *4 (6th Cir. Sept. 1, 2022). A statement may be literally true but

misleading in context if it creates a misleading impression. *Berson v. Applied Signal Tech., Inc.*,

527 F.3d 982, 985-86 (9th Cir. 2008).

**C. Discussion**

While the record shows differences between Freddie Mac's internal measurements and

external disclosures, these differences do not render the disclosures false or misleading. As

Defendants note, there is no universal definition of "Alt-A" loans in the mortgage industry and

OPERS does not dispute this. *See* ECF No. 574 at PageID #: 41943. The absence of a

standardized definition gives companies discretion in determining how to classify and report

such exposures.

Freddie Mac's August 30, 2007 Information Statement Supplement provided a clear

definition of how it classified Alt-A loans: "if the lender that delivers them to us has classified

the loans as Alt-A, or if the loans had reduced documentation requirements which indicate that

the loan should be classified as Alt-A." ECF No. 559-15 at FMOPERS00209043. This

definition, while broad, permitted Freddie Mac to exercise reasonable judgment in its

application.

The evidence shows that Freddie Mac applied this definition by selecting 28 of 93

available Alt-A SCCs for external reporting purposes. *See* Oct. 5, 2007 Alt-A Definitions

Memorandum (ECF No. 559-105) at PageID #: 41020-21; Sept. 14, 2007 Alt A Definitions

Presentation (ECF No. 559-104) at FMAC-SEC 067770691. While OPERS characterizes this as

an "inconsistency," the Court disagrees and finds that this represents a reasonable interpretation

10

(4:08CV0160)

of the disclosed definition, particularly the second category requiring that "reduced

documentation requirements . . .indicate that the loan should be classified as Alt-A."  ECF No.

559-15 at FMOPERS00209043.  That other internal groups used broader measurements for

different purposes does not invalidate the reasonableness of Defendants' disclosure

methodology.

OPERS has failed to demonstrate that Freddie Mac's Alt-A disclosures were false or

misleading.  The 29% figure OPERS cites, *see* ECF No. 559 at PageID #: 37483, reflects one

internal measurement that the Single Family Sourcing group used for risk assessment purposes,

*see* ECF No. 559-104 at FMAC-SEC 067770691, not necessarily the definitive measure of Alt-A

exposure under Freddie Mac's disclosed methodology.  The existence of multiple internal

definitions and measurements for different business purposes does not establish that the external

disclosure was inaccurate.

Moreover, the internal recognition of "inconsistency" between different measurement

approaches reflects appropriate internal discussion about complex definitions rather than

evidence of false external reporting.  Companies routinely use different metrics for different

purposes without rendering any single metric false or misleading.

Defendants have established that Freddie Mac maintained robust internal processes for

ensuring disclosure accuracy.  *See* ECF No. 547-1 at PageID #: 29380.  These processes included

professional judgment by qualified personnel in determining appropriate disclosure

methodologies.  The Court finds that Defendants' reliance on these established processes

supports the reasonableness of their Alt-A disclosures.

**D.  Conclusion**

The Court concludes that OPERS has failed to raise a genuine issue of material fact

regarding whether Freddie Mac's Alt-A disclosures were false and misleading.  Freddie Mac

(4:08CV0160)

provided a reasonable definition of its Alt-A classification methodology and applied that

definition through established internal processes.  OPERS has not shown how the existence of

different internal measurements for different business purposes establishes falsity in Freddie

Mac's disclosures.

### IV.  Credit Risk

The Court now turns to whether Freddie Mac's statements concerning credit risk

generally are actionable, or whether they constitute non-actionable puffery.

### A.  Legal Standard

Statements constitute non-actionable puffery when they are vague and indefinite

statements of optimism that reasonable investors would not rely upon.  *In re iRobot Corp. Sec.*

*Litig.*, 527 F. Supp.3d 124, 138-39 (D. Mass. 2021).  Courts frequently dismiss assertions about a

product's "value," "strength," or "quality" as immaterial puffery.  *See In re TransDigm Grp.,Inc.*

*Sec. Litig.*, 440 F. Supp.3d 740, 763-64 (N.D. Ohio 2020).

In addition, under the "Bespeaks Caution" doctrine, forward-looking statements

accompanied by sufficient cautionary language are protected "regardless of the actual state of

mind" of the defendant.  *Miller v. Champion Enter. Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).

### B.  Discussion

Three credit risk statements are at issue:  (1) "Credit has never been better" (McQuade,

March 23, 2007 Bloomberg News Article (ECF No. 43-24 at PageID #: 1351)); (2) "Freddie

Mac is much better positioned for long-term profitability than [it was] a year ago" (Syron, June

14, 2007 Conference Call (ECF No. 559-34) at PageID #: 39021); and, (3) "[Freddie Mac's]

credit position is relatively strong  with limited exposure to the riskiest mortgage products . . . .

Bottom line, at a time when many of our competitors are weakening, Freddie Mac's position is

growing stronger" (Cook, Sept. 10, 2007 (ECF No. 559-17) at FMAC-SEC 081749809).

12

(4:08CV0160)

   OPERS contends the statements were materially false and misleading for several reasons.

First, they argue Freddie Mac's internal documents contradicted the public statements.  Howard

S. Shapiro, an analyst who covered the Company during August 1, 2006 through and including

November 20, 2007 (the "Relevant Period"), explained "[t]he importance of these undisclosed

underwriting deficiencies to a fair evaluation of the Company's financial condition during the

Relevant Period cannot be overstated."  Shapiro Rebuttal Report (ECF No. 559-6) at p. 15, ¶ 33.

Second, OPERS points to internal reports showing credit quality was "worsening sharply" with

"credit loss forecast for 2007 [at] $450 million and $820 million for 2008, up 7% and 35%

respectively from the prior forecast."  Aug. 21, 2007 Enterprise Risk Management Committee

("ERMC") Reports (ECF No. 559-60) at FMAC-SEC 013147413.  OPERS contends that the

statements were "anchored in 'misrepresentation of existing facts' " and made specific assertions

about credit position that were objectively false rather than vague optimism.  ECF No. 559 at

PageID #: 37515.  Third, OPERS argues Defendants "did more than just offer rosy predictions;

[they] stated that the . . . situation was 'in good shape' or 'under control' while they allegedly

knew that the contrary was true."  ECF No. 559 at PageID #: 37515 (quoting *Novak v. Kasaks,*

*216 F.3d 300, 315 (2d Cir. 2000)*).  Finally, OPERS maintains Defendants had actual knowledge

the statements were false, noting that "[s]enior management understood throughout the Relevant

Period that credit losses were dramatically increasing" and "expected credit losses were

dramatically increasing."  ECF No. 559 at PageID #: 37517.

   Defendants contend OPERS is mismatching external positive statements and contrasting

them with negative internal statements concerning credit risk, "and not mentioning all of the

frank and forthright negative statements made to the market."  Transcript of Oral Argument

(ECF No. 594) at PageID #: 42956-57.  They assert Plaintiffs fail to put forth evidence that any

statements were actually false, failing to identify a witness or a document.  ECF No. 594 at

13

(4:08CV0160)

PageID #: 43026.  Defendants argue the statements OPERS cites are not actionable under five theories.

### 1.  Admissibility of McQuade's "Credit Has Never Been Better" Statement

Defendants argue that OPERS' reliance on McQuade's alleged statement that "[c]redit has never been better," which appeared in a March 2007 Bloomberg News Article, constitutes inadmissible hearsay that cannot be considered in support of OPERS' opposition at summary judgment.  ECF No. 574 at PageID #: 41948.  Defendants rely on *Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997), to support their position that newspaper articles quoting corporate officers are inadmissible hearsay, qualifying for no exception.  *Id.* at 743.

*Eisenstadt*, however, is a nearly three-decade-old Seventh Circuit decision that does not bind the Court.  It also did not establish that all newspaper articles are *per se* inadmissible hearsay.  In *Eisenstadt*, the Seventh Circuit was concerned not only with the hearsay nature of the newspaper article but also with the ambiguity of the statement at issue and the defendant's dispute as to its accuracy.  *Id.* at 744.

Under Fed. R. Civ. P. 56(c)(2), a party may object that cited materials "cannot be presented in a form that would be admissible in evidence."  "The Court cannot consider evidence at summary judgment that a jury could not consider at trial."  *Thomas v. Abercrombie & Fitch Co.*, 301 F.Supp.3d 749, 755 (E.D. Mich. 2018) (citing *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 681 (6th Cir. 2016).  In *Thomas*, the court acknowledged that while summary judgment materials must be capable of being "replaced by proper evidence at trial," this does not create an absolute bar against considering hearsay evidence when the proponent can demonstrate a path to admissibility.  *Id.* at 755.  As the *Thomas* court noted, " 'the party proffering a piece of evidence must show, or it must be 'obvious,' that the evidence 'can be replaced by proper evidence at trial.' "  *Id.*  (quoting *Eisenstadt*, 113 F.3d at 742).  In *Almond v. ABB Indus. Sys.*,

14

(4:08CV0160)

*Inc.*, No. C2-95-707, 2001 WL 242548 (S.D. Ohio March 6, 2001), the court excluded magazine articles because "Plaintiffs made absolutely no effort to procure admissible evidence to support their position" and the articles lacked "equivalent circumstantial guarantees of trustworthiness." *Id.* at *8. Therefore, the question is not whether the evidence is currently in admissible form, but whether it could be presented in admissible form at trial.

Courts have consistently required parties to "justify their reliance on hearsay or provide sufficient information (via affidavits or otherwise) to bring the hearsay evidence within one of the exceptions provided by the Federal Rules of Evidence." *See LaFlamboy v. Landek*, 587 F. Supp. 2d 914, 922 (N.D. Ill. 2008); *see also In re Oracle Corp. Sec. Litig.*, No. C01-00988 SI, 2009 WL 1709050, at *8-9 (N.D. Cal. June 19, 2009) (sustaining defendants' objections to statements by Oracle officials contained in newspaper and analyst reports).

The record demonstrates OPERS has failed to show any viable independent corroboration of the accuracy of the reported McQuade statement. OPERS' oral argument focused on the "trustworthiness and reliability" of the Bloomberg article. ECF No. 594 at PageID #: 43013. This suggests reliance on the residual exception in Fed. R. Evid. 807 which permits the admission of hearsay when "the statement is supported by sufficient guarantees of trustworthiness" and "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." OPERS has not identified any witness (who could corroborate the accuracy of the McQuade statement), corporate records or any other means by which the statement could be presented in admissible form at trial. In *Almond*, the court held "magazine articles [do not] have equivalent circumstantial guarantees of trustworthiness." 2001 WL 242548, at *8. OPERS' argument is that if they could get McQuade to testify at trial, he would probably confirm he made the statement. ECF No. 594 at PageID #: 43013.

15

(4:08CV0160)

This places OPERS in the same position as the plaintiffs in *Eisenstadt* and *Almond*, who "made absolutely no effort to procure admissible evidence to support their position."  *Almond*, 2001 WL 242548, at *8.  Without some demonstration that the Bloomberg article could be "replaced by proper evidence at trial," the Court cannot consider McQuade's statement for summary judgment purposes.

### 2.  Accurate Historical Statements Defense

Defendants contend McQuade's "credit has never been better" statement reflected accurate historical data at the time it was made, noting the statement was immediately followed by accurate delinquency rate data showing 20 or 30 percent improvement over the prior year.  ECF No. 574 at PageID #: 41949.  As Defendants emphasize, "accurate statements of historical fact are not actionable, as a matter of law, for failing to disclose concerns about future results."  ECF No. 574 at PageID #: 41949; *see also* ECF No. 547-1 at PageID #: 29374 (citing *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) and *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997) ("a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data")).

To the extent any of the credit risk statements reflect accurate historical performance data available at the time they were made, they cannot form the basis for securities fraud liability here.  Companies are not required to qualify accurate reports of past successes by mentioning possible future challenges.  Likewise, OPERS has not challenged the underlying accuracy of the historical data supporting these statements.

### 3.  Puffery Analysis

Defendants characterize the statements as vague, indefinite expressions of optimism that cannot support securities fraud claims, arguing that statements about being "better positioned" or "growing stronger" constitute non-actionable puffery.  ECF No. 574 at PageID #: 41952 (citing

16

(4:08CV0160)

*In re iRobot*, 527 F. Supp.3d at 138-39).  Defendants note that Syron's statement addressed multiple factors including "high asset quality, low risk exposure and improving operations" that supported the optimistic assessment.  ECF No. 574 at PageID #: 41950.

The credit risk statements fall within the established puffery doctrine.  Terms like "better positioned," "growing stronger," and "relatively strong" lack objective standards against which investors could measure performance.  These generalized expressions of corporate optimism, even if ultimately proven wrong by events, cannot support securities fraud claims as a matter of law.

### 4.  "Bespeaks Caution" Doctrine

Defendants also invoke the "Bespeaks Caution" doctrine, asserting that the statements were forward-looking and that Freddie Mac provided meaningful cautionary language in its risk disclosures.  ECF No. 574 at PageID #: 41952.  In the Sixth Circuit, "if the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind."  ECF No. 574 at PageID #: 41953 (quoting *Miller*, 346 F.3d at 672).

The forward-looking nature of statements about being "better positioned for long-term profitability" and having a "growing stronger" position, combined with Freddie Mac's extensive cautionary language about credit risks in its public filings, triggers protection under *Miller*.  This provides an additional, independent basis for dismissing the credit risk claims regardless of any internal contradictory evidence.

### 5.  Mixed Internal Evidence

The internal Freddie Mac documents OPERS cites contain both positive and negative assessments.  As Defendants demonstrate, OPERS cherry-picked negative portions while ignoring contradictory evidence showing "[o]verall SF credit portfolio risk is still relatively

17

(4:08CV0160)

low," ERMC Reports, Oct. 3, 2006 (ECF No. 559-76) at FMAC-SEC 082820947, and describing the single-family portfolio as "well diversified by key risk attributes," ERMC Reports, June 12, 2007 (ECF No. 559-77) at FMAC-SEC 082820599.

The mixed nature of internal documents undermines OPERS' falsity claims. When internal assessments contain both positive and negative elements, Defendants cannot be faulted for emphasizing the positive aspects in public communications, particularly when the statements constitute puffery or forward-looking projections accompanied by cautionary language.

## C. Conclusion

The evidence, viewed in the light most favorable to OPERS, does not create genuine disputes sufficient to survive summary judgment on whether the credit risk statements were false or misleading. First, the McQuade statement cannot be considered due to inadmissible hearsay concerns and OPERS' failure to demonstrate a path to admissibility at trial. Second, the remaining statements constitute either accurate historical facts, non-actionable puffery or forward-looking statements protected by the "Bespeaks Caution" doctrine. The mixed nature of internal documents, containing both positive and negative assessments, undermines any claim that the public statements were objectively false. Defendants are entitled to summary judgment on the falsity element of OPERS' credit risk claims.

## V. Underwriting Guidelines

Next, the Court considers whether Freddie Mac's statements or alleged omissions concerning its underwriting guidelines are actionable.

## A. Legal Standard

Section 10(b) and Rule 10b–5 establish an implied private cause of action. *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 267 (2014). "To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material

(4:08CV0160)

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (internal quotation

marks and citation omitted); *see also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,

601 U.S. 257, 266 (2024) (a "pure omission"—the failure to disclose information in the absence

of an inaccurate, incomplete, or  misleading statement—cannot give rise to liability under federal

securities law.  Statements that are merely vague and indefinite statements of optimism or

corporate puffery are not actionable.  *See, e.g.*, *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v.

JP Morgan Chase Co.*, 553 F.3d 187, 205-206 (2d Cir. 2009) (bank's statements that risk

management processes were "highly disciplined" and "set the standard" for "integrity" were

"precisely the type of 'puffery' that this and other circuits have consistently held to be

inactionable").

     "*Macquarie* is clear:  something cannot be a pure omission if it involves 'affirmative

assertions' or 'statements made.' " *In re FirstEnergy Corp. Sec. Litig.*, --- F.4th --- Nos. 23-

3940/ 3943/ 3945/ 3946/ 3947, 2025 WL 2331754, at *12 (6th. Cir. Aug. 13, 2025) (citing

*Macquarie*, 601 U.S. at 264).  A duty to disclose arises only when positive law requires

disclosure or when one "omit[s] to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R.

§ 240.10b–5(b).

**B.  Challenged Statements**

     OPERS challenges three primary statements regarding Freddie Mac's underwriting

practices:  (1) references to "prudent underwriting standards" ((ECF No. 559-40) at FMAC-SEC

081749567); (2) claims of maintaining a "disciplined approach in underwriting" (ECF No. 559-

25) at FMOPERS00186213); and, (3) factual statements about having "developed internal credit

(4:08CV0160)

policies and appraisal, underwriting and other purchase policies and guidelines" (ECF No. 559-9) at FMOPERS00205256).

## C.  Discussion

OPERS alleges four categories of omissions, and each fails to meet the legal standard for actionable securities fraud.

### 1.  Ineffective Underwriting Standards and Quality Control

OPERS contends Freddie Mac failed to disclose that its "underwriting standards and quality control systems were ineffective throughout the Relevant Period."  ECF No. 559 at PageID #: 37438-40.  This allegation fails for multiple reasons.

First, OPERS has not identified any specific public statement that was rendered misleading by this supposed omission.  Under *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st. Cir. 1990), a company is not required to publish every fact about every subject it voluntarily discloses, but only such facts "that are needed so that what was revealed would not be 'so incomplete as to mislead.' " *Id.* at 16 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir.1968) (en banc), *cert. denied*, 394 U.S. 976 (1969).

Second, this represents precisely the type of "soft information" that courts recognize companies have no duty to disclose absent specific misleading statements about the same subject matter.  In the Sixth Circuit, courts distinguish "hard information"—"typically historical information or other factual information that is objectively verifiable"—from "soft information"—"predictions and matters of opinions." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir. 2008) (citation omitted).  No duty exists to disclose soft information unless "it is virtually as certain as hard facts." *Id.* (citations omitted).

(4:08CV0160)

## 2. Inability to Underwrite Nontraditional Products

OPERS claims Freddie Mac failed to disclose its inability to effectively underwrite nontraditional mortgage products during the Relevant Period. ECF No. 559 at PageID #: 37440-42. Again, OPERS has not identified any specific statement rendered misleading by this omission. Likewise, the evidence undermines OPERS' position. Even Shapiro, OPERS' expert, acknowledges that Freddie Mac "nodded to this deficiency in its August 30, 2007, Information Statement Supplement." ECF No. 559-4 at Page 15. If Freddie Mac disclosed the issue, there can be no pure omission claim.

The Office of Federal Housing Enterprise Oversight ("OFHEO") is Freddie Mac's regulator. OPERS' reliance on the November 2006 examination by is weak. While OFHEO identified concerns about reporting practices, the same letter explicitly states that OFHEO "agreed" with Freddie Mac "that securities disclosures accurately represent underwriting standards and actual business practice." ECF No. 559-133 at FMAC-SEC 021277051. This finding directly contradicts OPERS' misleading disclosure theory.

## 3. "Abandoned" Underwriting Standards

OPERS alleges Freddie Mac essentially abandoned its underwriting standards altogether by outsourcing to third parties with less stringent standards. ECF No. 559 at PageID #: 37442-44. This theory fails because Freddie Mac disclosed its deviation from historical underwriting practices.

Freddie Mac expressly disclosed that it was increasingly relying on alternative automated underwriting systems "that differ from our normal standards" and this strategy "could increase our credit risk." 2005 Annual Report (ECF No. 548-20) at PageID #: 30177-78. Under *Backman*, disclosing the existence and general nature of alternative underwriting approaches was

21

(4:08CV0160)

not misleading merely because Freddie Mac did not quantify the extent of reliance or

characterize the approach as "abandonment."

### 4. Increased Use of Exceptions

OPERS contends Freddie Mac failed to disclose "that it dramatically increased the use of

'exceptions' to work around its underwriting standards."  ECF No. 559 at PageID #: 37444-47.

This claim fails because OPERS has not identified any public statement about underwriting

exceptions that was rendered misleading.  *See* ECF No. 574 at PageID #: 41965.

*Backman* directly governs this scenario.  Just as Polaroid was not required to disclose the

extent of below-cost sales when it disclosed the fact of such sales, Freddie Mac was not required

to quantify its use of exceptions when it disclosed its increasing reliance on alternative

underwriting approaches.  *See Backman*, 910 F.2d at 16.

## D.  Conclusion

OPERS has failed to establish either actionable misrepresentations or omissions

regarding Freddie Mac's underwriting guidelines.  The challenged statements constitute either

corporate puffery or accurate factual representations.  The alleged omissions fail because OPERS

has not identified specific misleading statements that required additional disclosure.

## VI.  Misrepresentation or Omission

The Court now turns to whether OPERS relied on any alleged misrepresentation or

omission.

## A.  Legal Standard

To prevail on a Section 10(b) claim, a plaintiff must establish "reliance upon the [alleged]

misrepresentation or omission."  *Halliburton II*, 573 U.S. at 267.  "The traditional (and most

direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's

22

(4:08CV0160)

statement and engaged in a relevant transaction . . . based on that specific representation." *Id.*

(citing *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 461(2013)).

When plaintiffs cannot show direct reliance, they may invoke presumptions of reliance. The fraud-on-the-market presumption under *Basic*, applies when securities trade in an efficient market. *Basic*, 485 U.S. at 248 n. 27. Alternatively, in circumstances involving a failure to disclose, the *Affiliated Ute* presumption may apply. Under *Affiliated Ute*, "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). Rather, "the facts withheld [must] be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153-54. In other words, the predicate for liability is a "causal connection between a defendant's misrepresentation and a plaintiff's injury." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008).

The *Affiliated Ute* presumption is "narrow" and applicable solely when "reliance is impossible or impractical to prove" because "no positive statements were made." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2 F.4th 1199, 1206 (9th Cir. 2021). The presumption does not extend to cases involving "half-truths," or "representations that state the truth only so far as it goes, while omitting critical qualifying information." *Macquarie*, 601 U.S. at 263 (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (2016)).

**B.  Discussion**

OPERS cannot establish reliance under any available legal theory. First, OPERS has failed to demonstrate direct reliance on any challenged statement. OPERS concedes that "the OPERS representative responsible for monitoring Freddie Mac during the relevant period . . . does not recall reviewing the specific misrepresentations asserted." ECF No. 559 at PageID #:

23

(4:08CV0160)

37551 n. 591 (citing Deposition of Timothy Swingle (ECF No. 559-131 at 42:14-23; 51:16 - 52:7).  Moreover, OPERS' only other employee who invested in Freddie Mac stock "simply applied an algorithm without references to Freddie Mac's disclosures." ECF No. 574 at PageID #: 41971 (citing Deposition of Erick D. Weis (ECF No. 548-134) at 21:3 - 24:3, 30:25 - 31:19, 37:19 - 38:8, 51:21 - 53:7).  There is no genuine dispute of material fact that OPERS did not directly rely on any challenged statement.

Second, OPERS cannot invoke the *Basic* presumption of reliance.  As OPERS acknowledges, the Court previously determined at class certification that OPERS failed to establish that Freddie Mac's stock traded in an efficient market during the Relevant Period.  *See* ECF No. 559 at PageID #: 37549 (citing ECF No. 478 at PageID #: 22772).  OPERS agrees it cannot "avail itself of the *Basic* presumption of reliance" based on the Court's prior orders.  ECF No. 559 at PageID #: 37549.  OPERS presents no evidence warranting reconsideration of the Court's holding.[6]

Third, OPERS' attempt to invoke the *Affiliated Ute* presumption fails for multiple reasons.  OPERS never previously asserted this theory and has instead consistently argued for the *Basic* presumption and acknowledged to the Sixth Circuit that it would be unable to avoid summary judgment without the *Basic* presumption.  *See* Pl's Pet. For Permission to Appeal Order Denying. Class Certification, 2018 WL 5024857, at *21 (6th Cir. 2018) ("OPERS must prove market efficiency at summary judgment and trial to establish reliance.").

More fundamentally, the *Affiliated Ute* presumption does not apply to the case at bar.  A review of OPERS' Third Amended Complaint (ECF No. 166) reveals that its claims are

---

[6]  OPERS declares it "will reserve its rights to raise that issue on appeal." ECF No. 559 at PageID #: 37549 n. 584.

(4:08CV0160)

premised on Defendants' alleged affirmative misrepresentations, not pure omissions.  *See* ECF No. 166 at ¶¶ 7, 139-89, 212-24, 269.  While the Third Amended Complaint references "omissions," it makes clear that any omissions claims are directly related to Defendants' "representations."  ECF No. 166 at ¶ 137.  To the extent OPERS asserts omissions claims, they are based on alleged "half-truths," or partial disclosures that allegedly omit material qualifying information.  *Macquarie*, 601 U.S. at 264 (explaining "the difference between a pure omission and a half-truth is the difference between a child not telling his parents he ate a whole cake and telling them he had dessert").

Finally, even if this were a pure omissions case, the Supreme Court's decision in *Macquarie* held that "pure omissions" are not actionable under Rule 10b–5.  *Id.* at 264, 266. According to Freddie Mac, "[i]f a 'pure omission' is no longer actionable, it is unclear how any plaintiff could ever be entitled to a presumption of reliance on one."  ECF No. 574 at PageID #: 41974.

OPERS' response fails to raise a genuine issue of material fact regarding reliance. OPERS cites internal communications, such as a "Morning Update" (ECF No. 559-141) in which Syron described Freddie Mac as "strong and well capitalized."  But this document was not a public communication, is not referenced in the Third Amended Complaint (ECF No. 166), and constitutes merely a vague expression of optimism that is immaterial as a matter of law.

## C.  Conclusion

OPERS cannot establish reliance under any theory.  It has not demonstrated direct reliance, cannot invoke the *Basic* presumption due to the absence of an efficient market, and cannot belatedly assert the *Affiliated Ute* presumption, which does not apply to cases involving affirmative misrepresentations or half-truths.  Accordingly, Defendants are entitled to summary judgment on this issue.

25

(4:08CV0160)

## VII.  Loss Causation

Next, the Court considers whether OPERS can prove loss causation.

### A.  Legal Standard

To establish loss causation under federal securities law, a plaintiff must prove "that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).  As the Supreme Court explained in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), "a person who 'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts . . . become generally known' and 'as a result' share value 'depreciate[s].' " *Id.* at 344 (alterations in original) (quoting Restatement Second, of Torts § 548A, comment b (1977))).

The Sixth Circuit clarified that in evaluating loss causation, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original). The plaintiff bears the burden of proving that the alleged misrepresentations or omissions, rather than other market forces, caused the claimed losses.

### B.  Discussion

OPERS alleges that Freddie Mac's November 20, 2007 disclosure caused its losses by revealing previously concealed risks, specifically: (a) substantial involvement in the nontraditional low credit mortgage industry; (b) that at least $200 billion of its $700 billion mortgage portfolio was at high risk; and, (c) a record $2 billion loss on its mortgage investments for the third quarter of 2007, with more losses expected. ECF 166 at ¶ 134.  OPERS asserts that

26

(4:08CV0160)

this revelation "caught the investing public completely by surprise."  ECF No. 166 at ¶ 6; *see also* ECF No. 166 at ¶¶ 191, 271.

The record, however, exposes holes in OPERS' loss causation theory.  Most notably, OPERS' expert witness, Shapiro—a financial analyst who followed Freddie Mac at the time— issued a report on October 24, 2007, nearly a month before the November 20 disclosure, predicting a $1.6 billion loss "[b]ased on data released today by [Freddie Mac]" due to "its credit exposure."  Fox Pitt Report (ECF No. 548-142) at PageID #: 32624.  This undermines the claim that the market was caught "completely by surprise" and suggests that the information forming the basis of the November 20, 2007 disclosure was already available to market participants.

Defendants argue that the risks revealed on November 20, 2007 were "not previously **concealed**, but were robustly **disclosed**."  ECF No. 547-1 at PageID #: 29394 (emphasis in original).  They contend that throughout 2007, Freddie Mac disclosed that it was raising loan loss reserves because it expected increasing credit losses in future periods, making the November announcement unsurprising to the market.  ECF No. 574 at PageID #: 41974-77.

OPERS responds that the Court's prior class certification decision "legally precludes" it from offering evidence of loss causation.  ECF No. 559 at PageID #: 37553.[7]  OPERS' expert, Dr. Tabak, acknowledges that he "would be able to provide an opinion that loss causation existed" but concedes he cannot do so consistent with the Court's prior determinations.  Tabak Report (ECF No. 548-15) at PageID #: 29574, ¶ 32.  Notably, Dr. Tabak did not review Freddie

---

[7]  "OPERS recognizes, however, that if the Court continues to apply the rationale of its prior decisions, this will logically involve granting judgment to Defendants on the elements of loss causation and damages."   Letter dated April 30, 2024 from W. B. Markovits, one of the attorneys for OPERS, to Jason Frank, one of the attorneys for Freddie Mac (ECF No. 548-152).

(4:08CV0160)

Mac's disclosures, including the November 20, 2007 press release.  *See* Deposition of Dr. Tabak (ECF No. 548-136) at 240:18-21.

"[B]ased on this Court's price impact decision, which is the law of the case, it's conceded [by OPERS] that summary judgment is warranted on loss causation and damages. . . ."  ECF No. 594 at PageID #: 42986.  Defendants correctly note, however, that a class certification decision does not preclude a plaintiff from offering competent evidence at summary judgment.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018).  After all, Fed. R. Civ. P. 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment."  OPERS' decision not to offer loss causation evidence—whether for "economic or (perceived) procedural expediency"—cannot excuse its burden of proof.  ECF No. 574 at PageID #: 41975.

OPERS attempts to support its loss causation theory by showing that Freddie Mac's stock declined 28.69% on November 20, 2007, while other financial institutions announcing similar losses during the same period experienced minimal or even positive stock price movements. ECF No. 559 at PageID #: 37425.  For example, when Morgan Stanley announced a $3.7 billion loss on November 8, 2007, its stock increased 4.86%, and when Bank of America announced a $247 million loss on November 13, 2007, its stock rose 5.21%.  ECF No. 559 at PageID #: 37426.

Defendants, however, point out that OPERS omitted AMBAC Financial from its updated table (ECF No. 559 at PageID #: 37426) despite AMBAC being included in the original analysis with a positive return of 28.6% (ECF No. 47-1).  AMBAC's price fell 39% six days earlier.  *See* ECF No. 574 at PageID #: 41976-77 (citing Dr. Bajaj Report (ECF No. 548-17) at PageID #: 29771 n. 288).  According to Freddie Mac, this selective omission undermines the reliability of OPERS' analysis. *See* ECF No. 574 at PageID #: 41977.

(4:08CV0160)

The fundamental problem with OPERS' loss causation claim is that it fails to demonstrate that the November 20, 2007 corrective disclosure revealed risks that were previously concealed rather than risks that were already known to the market.  The evidence, including Shapiro's October 2007 analysis (ECF No. 548-142 at PageID #: 32624) predicting similar losses based on Freddie Mac's prior disclosures, suggests that market participants already possessed the information necessary to anticipate Freddie Mac's reported losses.

## C.  Conclusion

OPERS has failed to establish loss causation as a matter of law.  First, OPERS has not offered any admissible evidence to support its loss causation theory, instead relying on a perceived procedural bar.  Second, the record evidence demonstrates that the risks revealed on November 20, 2007 were not previously concealed but were available to the market through Freddie Mac's prior disclosures, as evidenced by OPERS' own expert's prediction weeks before the announcement.  Third, OPERS' analysis is methodologically flawed and appears to selectively omit contrary evidence.

Because OPERS cannot prove that "the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged," summary judgment in favor of Defendants on the issue of loss causation is appropriate.  *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384 (emphasis in original; citation omitted).

## VIII.  Damages

The Court now turns to whether OPERS should be allowed to present evidence of damages at trial.

## A.  Legal Standard

To prevail on a Section 10(b) claim, a plaintiff must prove economic loss, *i.e.*, damages.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (citing *Stoneridge Inv. Partners,*

29

(4:08CV0160)

*LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  Fed. R. Civ. P. 26(a)(1)(A)(iii)

requires that all parties, "without awaiting a discovery request, provide to the other parties . . .a

computation of each category of damages claimed by the disclosing party. . . ."  Rule 26(e)(1)

requires parties to timely supplement their Rule 26(a) disclosures and discovery responses.  Rule

37(c)(1) enforces these disclosure requirements, providing that "[i]f a party fails to provide

information or identify a witness as required by Rule 26(a) or (e), [then] the party is not allowed

to use that information or witness to supply evidence on a motion, at a hearing, or at a trial,

unless the failure was substantially justified or is harmless. . . ."

**B.  Discussion**

    **1.  Mandatory Disclosure**

    The undisputed facts establish that OPERS has failed to comply with its mandatory

disclosure obligations regarding damages computations.  *See, e.g.*, Joint Certificate (ECF No.

582) at PageID #: 42857 ("OPERS has not provided a computation of its damages.").  In its

initial Rule 26(a)(1) disclosures dated June 22, 2012, OPERS stated that it was "premature to

provide any computation of any category of damages at this time."  Instead, OPERS declared it

would "provide defendants with an expert report containing a computation of the damages

claimed in this action at the appropriate time, consistent with orders issued by the Court."  ECF

No. 548-155 at PageID #: 33089, ¶ 10(C).

    On October 10, 2023, OPERS served supplemental Rule 26(a)(1) disclosures, which

state:  "[t]he materials supporting [OPERS'] out of pocket losses have previously been provided

to Defendants," and "[a]ny additional calculation of damages will be provided by a

representative of OPERS or a designated expert witness."  ECF No. 548-14 at PageID #: 29561.

The supplement, however, disclosed nothing concrete and merely deferred to future testimony

from unspecified sources.

(4:08CV0160)

When Freddie Mac noticed the Rule 30(b)(6) deposition of OPERS seeking information regarding damages, OPERS designated its Portfolio Manager Erick Weis to testify on the topic. ECF No. 548-134 at 15:16-21.  Critically, Weis testified that he did not believe "OPERS [had] made any effort to quantify its damages in this case" and that he did not know "what OPERS' damages are." ECF No. 548-134 at 123:16-20.  This testimony directly contradicts OPERS' supplemental disclosures suggesting that a company representative would provide damage calculations.

OPERS' expert, Dr. David Tabak, likewise failed to provide any damages computations. While Dr. Tabak opined that "damages to OPERS can be calculated" and that he had "not uncovered any information that would prevent the calculation of damages," ECF No. 548-15 at ¶¶ 3, 30, OPERS never asked him to calculate damages, ECF No. 548-136 at 99:22-100:5; 101:9-15.  Dr. Tabak confirmed that he offered no damages computations and testified that in over 100 cases in which he provided expert testimony, this was the only case where he was not asked to calculate damages. ECF No. 548-136 at 282:16-284:16.  OPERS acknowledges that it has "not produc[ed] [a] specific damage calculation." ECF No. 559 at PageID #: 37555.[8]

### 2.  Undisclosed Evidence

Rule 37(c)'s prohibition on the use of undisclosed evidence is "automatic and mandatory." *RJ Control Consultants, Inc. v. Multiject, LLC*, 100 F.4th 659, 668 (6th Cir. 2024) (quoting *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn., P.C.*, 388 F.3d 976, 983 (6th Cir. 2004)).  Courts routinely grant summary judgment when a party is prohibited from offering

---

[8]  In its view, OPERS suffered an out-of-pocket loss in the range of approximately $18 million (LIFO) to $27 million (FIFO).  *See* Chart titled "Summary of OPERS' Losses in Freddie Mac Common Stock" (ECF No. 5-1 at PageID #: 113).  Attorney Markovits repeated this view during oral argument before the Sixth Circuit.  *See* 20-4082 Ohio Public Employees Ret v FHLMC (March 16, 2023) at 1:57.

(4:08CV0160)

damages computations due to failure to produce them in discovery. *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 369 (6th Cir. 2010) (affirming summary judgment when plaintiff's failure to disclose damages computations left "no evidence of [damages] left to consider").

OPERS argues that its failure should be excused as "substantially justified or is harmless" under Rule 37(c)(1). ECF No. 559 at PageID #: 37554. The Sixth Circuit applies a five-factor test to evaluate this defense: (1) surprise to the opposing party; (2) ability to cure the surprise; (3) disruption to trial; (4) importance of the evidence; and, (5) the reason for the failure to produce. *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (citing *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014)).

All factors weigh against OPERS. First, Defendants would be surprised by any late damages' calculations after the close of discovery. Second, OPERS provides no authority supporting its position that Defendants were required to cure potential surprise by filing a sanctions motion during discovery. Third, a late disclosure would disrupt trial proceedings, particularly given OPERS' stated intention to pursue an appeal and potentially return to the district court for trial. Fourth, damages evidence is critically important as an essential element of OPERS' securities fraud claims. *Matrixx*, 563 U.S. at 37-38. Fifth, OPERS offers no adequate justification for its 16-year failure to provide required computations.

OPERS contends that the Court's prior rulings on price maintenance and price impact precluded meaningful damages calculations. *See* ECF No. 559 at PageID #: 37554; ECF No. 594 at PageID #: 42976 ("This Court has already determined, as a matter of law, that there's no price impact, which makes it legally impossible for there to be loss causation and damages."). Even if those rulings affected the viability of OPERS' damages theories, they did not excuse OPERS' procedural obligation to provide whatever computations it could formulate. The proper

32

(4:08CV0160)

course would have been to provide calculations consistent with available legal theories or to seek appropriate relief from the Court regarding the disclosure requirements.

## C.  Conclusion

OPERS' failure to provide mandatory damages computations over 16 years of litigation constitutes a violation of Fed. R. Civ. P. 26(a)(1)(A)(iii) and 26(e)(1).  This failure is neither substantially justified nor harmless under the circumstances.  Pursuant to Rule 37(c)(1), OPERS is precluded from offering any damages evidence at trial.  Because OPERS cannot prove damages – an essential element of its Section 10(b) claim – summary judgment is granted in favor of Defendants on this basis.

## IX.  "Control Person" Liability

Next, the Court considers whether OPERS can establish "control person" liability against Syron, Piszel, and/or McQuade under Section 20(a).

## A.  Legal Standard

Section 20(a) of the Securities Exchange Act creates a cause of action for "control person" liability and has two requirements for a finding of control person liability:  (1) "the controlled person must have committed an underlying violation of the securities laws or [the] rules and regulations promulgated thereunder" and (2) "the controlling person defendant . . . must have directly or indirectly controlled the person liable for the securities law violation."  17 C.F.R. § 230.405; *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp.2d 951, 975 (S.D. Ohio 2009) (citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696 (6th Cir. 2004), abrogated on other grounds by *Matrixx, supra*); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 667 (6th Cir. 2005).  Control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.  A

33

(4:08CV0160)

controlling person is liable "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).  A Section 20(a) claim must be predicated on at least one underlying violation of securities law by a controlled party, which would be Freddie Mac in the present case.  *Frank v. Dana Corp.*, 646 F.3d 954, 962 (6th Cir. 2011).  Absent a sufficiently pleaded underlying violation, the Section 20(a) claim cannot survive.  *In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp.3d 846, 870 (W.D. Ky. 2014).

**B. Discussion**

OPERS cannot establish control person liability under Section 20(a) against Syron, Piszel, and/or McQuade for two independent reasons.  First, there is an absence of an underlying securities law violation.  Second, Syron, Piszel, and McQuade acted in good faith and did not induce any alleged securities law violations.

**1.  No Underlying Securities Law Violation**

As established in the preceding sections, OPERS has failed to adequately plead the essential elements of a securities fraud claim against Freddie Mac.  Specifically, the Third Amended Complaint (ECF No. 166) fails to allege material misrepresentations or omissions and fails to establish a strong inference of scienter.  *See Frank*, 646 F.3d at 962 (requiring underlying securities law violation as predicate for Section 20(a) claim).  Without a viable underlying securities violation by the controlled entity, Section 20(a) liability cannot attach to Syron, Piszel, and/or McQuade.

**2.  Good Faith Defense**

Assuming *arguendo* that OPERS could establish an underlying securities violation, Syron, Piszel, and McQuade are entitled to the statutory good faith defense under Section 20(a). The statute provides that controlling persons are not liable if they "acted in good faith and did

34

(4:08CV0160)

not directly or indirectly induce the act or acts constituting the violation or cause of action."  15

U.S.C. § 78t(a).

The record demonstrates that Syron, Piszel, and McQuade acted in good faith throughout

the Relevant Period.  OPERS has failed to assert facts suggesting that Syron, Piszel, and/or

McQuade knowingly participated in, induced, or encouraged any alleged fraudulent conduct.

OPERS offers no response to Piszel's argument that the Section 20(a) claim against him fails,

even if someone had committed a primary securities law violation, because he "acted in good

faith and did not directly or indirectly induce the act or acts constituting the violation or cause of

action."  ECF No. 545-1 at PageID #: 28156 (quoting 15 U.S.C. § 78t(a)).  Likewise, OPERS has

not put forth any admissible evidence that Syron, Piszel, and/or McQuade (1) had actual

knowledge of any material misrepresentations or omissions, (2) deliberately encouraged or

participated in any allegedly deceptive practices, (3) acted with reckless disregard for the

accuracy of disclosed information or (4) failed to implement appropriate oversight or compliance

measures.

The absence of such evidence negates OPERS' control person claims.  *See, e.g.*, *In re*

*Fed. Nat. Mortg. Ass'n Sec., Deriv., and ERISA Litig.*, 892 F. Supp.2d 59, 71-74 (D.D.C. 2012)

(granting former Fannie Mae CEO summary judgment in securities fraud case because he

"relie[d] in good faith on the professional judgment of the company's internal and external

accounting and auditing personnel").

### 3. Lack of Culpable Participation

Beyond the good faith defense, OPERS has failed to demonstrate that Syron, Piszel,

and/or McQuade engaged in any conduct that would support control person liability.  The Third

Amended Complaint (ECF No. 166) relies on conclusory allegations of control without

(4:08CV0160)

establishing Syron, Piszel, and/or McQuade's direct involvement in any allegedly fraudulent

acts.  Such allegations are insufficient to state a claim for relief under current pleading standards.

Syron, Piszel, and McQuade's positions as senior officers, standing alone, do not

establish the type of culpable participation required for Section 20(a) liability.  OPERS must

allege specific facts demonstrating how each Individual Defendant used their control to further

or facilitate the alleged securities violations, which they fail to do.

## C.  Conclusion

OPERS' Section 20(a) control person liability claims against Syron, Piszel, and

McQuade fail as a matter of law because OPERS cannot establish an underlying securities law

violation by Freddie Mac.  Even if OPERS could establish such a violation, the Individual

Defendants are protected by the statutory good faith defense, as OPERS has failed to put forth

any admissible evidence suggesting the Syron, Piszel, and/or McQuade knowingly participated

in or induced any alleged fraudulent conduct.

The Third Amended Complaint's (ECF No. 166) reliance on conclusory allegations and

the Individual Defendants' positions, without more, is insufficient to state a viable claim for

control person liability.  Accordingly, the Court grants Syron, Piszel, and McQuade summary

judgment on all Section 20(a) claims.

## X.  Scienter

## A.  Legal Standard

To prevail on a claim under Section 10(b) of the Securities Exchange Act of 1934 and

Rule 10b-5, a plaintiff must establish that the defendant acted with scienter, "a mental state

embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights,*

*Ltd.*, 551 U.S. 308, 319 (2007) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94, and n.

12 (1976).  A plaintiff may satisfy this element by showing either (1) a "knowing and deliberate

36

(4:08CV0160)

intent to manipulate, deceive, or defraud" or (2) "recklessness." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 812 (6th Cir. 2022) (quoting *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016). The Sixth Circuit defines recklessness as "highly unreasonable conduct which is an extreme departure from the standard of ordinary care," and it must rise to the level of "conscious disregard," typically shown through "multiple, obvious red flags." *Id.* (quoting *Doshi*, 823 F.3d at 1039).

On summary judgment, the Court must determine whether a reasonable jury could find a strong inference of scienter. *See Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 916-17 (6th Cir. 2007). A strong inference is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Courts assess scienter holistically, considering all allegations and evidence collectively, not in isolation. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 473 (6th Cir. 2014) (citing *Tellabs*, 551 U.S. at 322-23); *Frank*, 646 F.3d at 961. Under the totality of the circumstances analysis, scienter is established when the facts alleged collectively give rise to a strong inference of at least recklessness. *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 485 (6th Cir. 2010) *see also In re Telxon Corp. Sec. Litig.*, 133 F. Supp.2d 1010, 1026 (N.D. Ohio Sept 29, 2000) ("[T]he Sixth Circuit employs a form of 'totality of the circumstances' analysis").

The Sixth Circuit has identified several factors relevant to the scienter analysis. *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) (en banc), abrogated on other grounds by *Tellabs*, *supra*. The "*Helwig* factors," that are "probative of securities fraud," are as follows:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(4:08CV0160)

   (3)  closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

   (4)  evidence of bribery by a top company official;

   (5)  existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

   (6)  disregard for the most current factual information before making statements;

   (7)  disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

   (8)  the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

   (9)  the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Id.* at 552.  Courts within this Circuit continue to consider the *Helwig* factors as helpful in assessing whether a plaintiff has shown that there is a strong inference of scienter.  *See In re The Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp.2d 873, 900 (N.D. Ohio 2006); *In re Diebold Sec. Litig.*, No. 5:05CV2873, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008) ("[T]he absence of [the *Helwig*] factors indicates the absence of scienter.").

   In contrast, evidence of good faith, robust internal controls, or reasonable reliance on internal audit systems may negate an inference of scienter.  *See In re Fannie Mae*, 892 F. Supp.2d at 71-74 (granting former Fannie Mae CEO summary judgment in securities fraud case because he "relie[d] in good faith on the professional judgment of the company's internal and external accounting and auditing personnel" and "there [was] no basis for plaintiffs to contend that [the CEO] was reckless in relying on this reporting and certification process").  Likewise, motives common to most corporate officers, such as preserving a high corporate credit rating, maintaining a high stock price or sustaining the appearance of profitability, are insufficient to plead scienter.  *Novak*, 216 F.3d at 307; *see also Inter-Local Pension Fund GCC/IBT v. General*

(4:08CV0160)

*Elec. Co.*, 445 Fed. Appx. 368, 370 (2d Cir. 2011) (noting that the allegations were legally

insufficient to establish motive for scienter purposes).  Instead, plaintiffs must allege that

defendants stood to gain in a concrete and personal way from the fraud, such as through insider

trading during the class period.  *Novak*, 216 F.3d at 307-308.

To survive summary judgment, OPERS must identify specific facts from which a

reasonable jury could find Defendants acted with fraudulent intent or with recklessness so severe

as to be the functional equivalent of intent.

## B.  Scienter as to Subprime Loan Disclosures

OPERS' allegations focus on the divergence between Defendants' internal assessments of

subprime exposure and their public statements during the Relevant Period.  OPERS argues this

divergence supports an inference of scienter under *Helwig* Factors 2, 3, 6, and 9.  *See* ECF No.

559 at PageID#: 37538-47.[9]  The Court addresses each in turn.

### 1.  *Helwig* Factor 2 – Divergence Between Internal Reports and External Statements on the Same Subject

OPERS points to internal reports indicating that Freddie Mac tracked loans with higher

credit risk characteristics in its single-family guarantee portfolio.  ECF No. 559 at PageID#:

37520.  According to OPERS, these internal materials reflected estimates that between 8.68%

and 10.8% of the portfolio had features associated with subprime loans.  ECF No. 559 at PageID

#: 37422 (citing Table 1:  Caution Loans in the Single-Family Portfolio (as of June 30, 2007)

(ECF No. 559 at PageID #: 37476) and Table 2:  Share of Loans Purchased with Segmentor

Score <1700 in the Single-Family Portfolio (as of July 31, 2007) (ECF No. 559 at PageID #:

37477)).  OPERS contrasts these figures with senior executives' public claims.  On May 17,

---

[9]  OPERS concedes that *Helwig* Factors 1, 4, 5, 7, and 8 are "not applicable to this case."  ECF No. 559 at PageID #: 37547.

(4:08CV0160)

2007, Syron stated at a UBS Global Financial Services Conference that "at the end of 2006, Freddie [Mac] had basically no subprime exposure in our [single-family] guarantee business," ECF No. 559-25 at FMOPERS00186214.  In its August 30, 2007 Information Statement Supplement, Freddie Mac's "Subprime Loans" disclosure stated:  "We estimate that approximately $2 billion, or 0.1 percent, and $3 billion, or 0.2 percent of loans underlying our single-family mortgage portfolio, at June 30, 2007 and December 31, 2006, respectively, were backed by subprime mortgage loans.", or that subprime loans made up only 0.1 or 0.2 percent of the portfolio.  ECF No. 559-15 at FMOPERS00209012.  OPERS argues this disparity between internal assessments and external disclosures demonstrates scienter.  *See* ECF No. 559 at PageID #: 37542.

Defendants argue Freddie Mac had no single, universally accepted definition of the term "subprime" during the Relevant Period.  *See* ECF No. 547-1 at PageID#: 29369.  Instead, Freddie Mac used different ways to measure loan risk, and the public statements focused only on loans from lenders known for subprime lending.  *See* ECF No. 547-1 at PageID #: 29358.  According to Defendants, the internal reports OPERS references used informal or varied terminology to describe higher-risk loans, but public disclosures focused only on loans from originators classified as subprime lenders.  Defendants maintain this was a much smaller group than what internal reports were tracking.  *See* ECF No. 547-1 at PageID #: 29325.

Defendants point to unrebutted testimony relating to whether Syron, Piszel, and/or McQuade knew any statement was false.  *See* ECF No. 594 at PageID#: 42944.  Syron testified "I believed that the attestation process and the sub-attestations and the sub-attestations to that had all been provided to me[,] so I had every reason to be confident that the statements were correct and fulsome."  ECF No. 548-123 at 364:9-17.  McQuade repeatedly testified that he did not believe or otherwise disregard any information reflecting that Freddie Mac was actually

40

(4:08CV0160)

purchasing loans from subprime originators beyond what it disclosed.  ECF No. 548-108 at 77:6-10; 256:4-9; 259:5-10; 307:1-5; 307:18 - 308:1.  McQuade believed Freddie Mac's disclosures, including those in its annual and quarterly reports, were accurate and not misleading.  ECF No. 548-108 at 290:8-291:20; 297:11-16.  Piszel testified he "was told from the minute that [he] got there that we did not buy subprime loans."  ECF No. 548-99 at 29:24-25; *see also* ECF No. 548-99 at 29:20 - 30:6; 87:8-20; ECF No. 548-100 at 189:5-9.

OPERS' evidence does not establish a divergence between internal and external messaging.  Internal tools used to monitor credit risk served a different function than external reporting.  Internally, Freddie Mac tracked risk across a broad spectrum.  Publicly, it described exposure in terms of how many loans came from subprime lenders.  These were two different frames of reference.  This distinction aligns with the reasoning in *Kuriakose*, wherein the Southern District of New York noted that in the absence of a settled definition of "subprime," internal variation in terminology did not support a finding of fraud.  *Kuriakose*, 897 F. Supp.2d at 183.

The materials OPERS cites may reflect differences of opinion and changing classifications, but they do not amount to a contradiction supporting a strong inference of scienter.  The record, when viewed as a whole, shows Freddie Mac based its statements on one reasonable interpretation of subprime exposure, even if others in the Company used different metrics internally.  Therefore, *Helwig* 2 does not support an inference of scienter.

### 2.  *Helwig* Factor 3 – Closeness in Time Between an Allegedly Fraudulent Statement or Omission and a Later Inconsistent Disclosure

OPERS argues Freddie Mac executives made public statements shortly before the Company disclosed substantial financial losses, supporting a strong inference of scienter.  According to OPERS, several of the challenged statements occurred within weeks of the

(4:08CV0160)

November 20, 2007 earnings release disclosing a $2 billion quarterly net loss.  ECF No. 559 at PageID #: 37431; 37543.

OPERS highlights statements between early September and early November 2007, including a September 10 presentation in which Cook stated that Freddie Mac was "growing stronger" while competitors were weakening.  ECF No. 559-17 at FMAC-SEC 081749809. OPERS contends this was misleading, given internal concerns at the time about deteriorating credit conditions.  ECF No. 559 at PageID #: 37543.  OPERS also points to a November 7, 2007 press release which emphasized the Company's fraud detection and internal controls.  See ECF No. 559-36.  OPERS argues the press release omitted material facts about weaknesses identified in an internal audit.  ECF No. 559 at PageID #: 37543-44.

OPERS notes that the Sixth Circuit has treated a six-week gap between an allegedly misleading statement and a later corrective disclosure as a sufficient time for the third *Helwig* factor.  ECF No. 559 at PageID #: 37542-43 (citing *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018)).  OPERS maintains that multiple public statements occurring within this six-week window downplayed risk, overstated underwriting standards or misrepresented internal controls, and the subsequent November 20 disclosure revealed the true scope of Freddie Mac's exposure.  See ECF No. 559 at PageID #: 37543.

Defendants respond that the November 2007 disclosure was not inconsistent with prior statements.  They argue public commentary during this period reflected known risks in the market and did not conceal any information that later came to light.  See ECF No. 547-1 at PageID #: 29372.  They also point to case law holding that proximity alone does not establish scienter without specific facts showing a defendant knew the statements were false when made. ECF No. 547-1 at PageID #: 29372. (citing *Konkol v. Diebold, Inc.*, 590 F.3d 390, 401 (6th Cir. 2009)*, abrogated on other grounds by *Matrixx, supra*).  Likewise, Defendants respond that none

42

(4:08CV0160)

of the specific statements OPERS challenges regarding "subprime" exposure fall within the six-week window OPERS identifies in its brief.  According to Defendants, the only such statements occurred in March, May, and August of 2007 and are too remote to support an inference of scienter under *Helwig* 3.  In addition, Defendants argue that OPERS fails to identify any allegedly false "subprime" statements within the six-week period preceding the disclosure.  *See* ECF No. 574 at PageID #: 41936.

The Court agrees that a short time between public assurances and later disclosures may, in some cases, support an inference of scienter.  *See Helwig*, 251 F.3d at 552.  Proximity between statements, however, must still be evaluated in the context of the full record.  Here, while several statements occurred within six weeks of the November 20 corrective disclosure, the content of those statements and the nature of the loss disclosure do not clearly contradict each other.  The statements OPERS cites do not concern subprime loans.  Without more, *Helwig* 3 is insufficient to support a strong inference of scienter.

### 3. *Helwig* Factor 6 – Disregard for the Most Current Factual Information Before Making Public Statements

OPERS contends that Defendants possessed information suggesting their public statements were inaccurate, establishing scienter under *Helwig* 6.  OPERS argues that when combined with alleged satisfaction of *Helwig* 2 (Divergence Between Internal Reports and External Statements), the evidence demonstrates Defendants' scienter.  *See* ECF No. 559 at PageID #: 37538-42.  The Court disagrees.

OPERS cites *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp.2d 206 (S.D.N.Y. 2010), and *In re Moody's Corp. Sec. Litig.*, 599 F. Supp.2d 493 (S.D.N.Y. 2009), arguing that evidence demonstrating defendants possessed "information suggesting that their public statements were not accurate" suffices to establish scienter.  ECF No. 559 at PageID #: 37540.  OPERS maintains

43

(4:08CV0160)

that Defendants' internal calculations were inconsistent with their public statements.  ECF No. 559 at PageID #: 37541-42.

The cases OPERS relies on involved clear evidence of disparities between what the company knew internally and what it disclosed publicly.  In *Citigroup*, the defendant internally recognized risk and began adjusting its collateralized debt obligations ("CDOs") holdings exposure while simultaneously downplaying and denying the same risks to investors.  *In re Citigroup*, 753 F. Supp.2d at 238.  Similarly, in *Moody's Corp*, the defendant had "access to information suggesting that the Company's public statements were inaccurate."  *In re Moody's*, 599 F. Supp.2d at 515.

OPERS' evidence is significantly weaker than that in the precedents it cites.  OPERS relies primarily on Defendant Syron's May 14, 2007 statement that "Freddie had basically no subprime exposure in our guarantee business."  ECF No. 559-25 at FMOPERS00186214. OPERS contends this statement contradicts information from February and March 2007 meetings wherein Defendants were allegedly informed that the "[w]orst 10% of [Freddie Mac's] Flow Business" constituted "subprime-like loans."  ECF No. 559-101 at FMAC-SEC 7517989 (showing McQuade/Cook being responsible for presenting this information to the Board); ECF No. 559-50 at FMAC-SEC 047450743.

This fails to establish scienter for several reasons.  First, as Defendants note, "the express purpose of the two meetings in February and March 2007 was to determine ***whether*** Freddie Mac should enter the subprime market."  ECF No. 574 at PageID #: 41939 (emphasis in original).  The meetings neither established Freddie Mac was already purchasing subprime loans nor provided evidence that Freddie Mac's existing loans performed like subprime loans.

OPERS provides no evidence suggesting Freddie Mac acted inconsistently regarding subprime loans or had access to information indicating that its public statements were inaccurate.

44

(4:08CV0160)

Defendants assert Syron, Cook, Piszel, and McQuade "all relied on a detailed disclosure process designed to produce accurate public disclosures." ECF No. 574 at PageID #: 41938.  They argue good faith reliance on the professional judgment of internal and external accounting and auditing personnel negates claims of reckless reliance on disclosure processes.  ECF No. 574 at PageID #: 41939; *see also In re Fannie Mae*, 892 F. Supp.2d at 71-74.

The Court finds the evidence insufficient to establish *Helwig* 6.  OPERS has failed to present evidence sufficient to demonstrate that Defendants disregarded current information before making public statements.  Unlike the defendants in *Citigroup* and *Moody's*, there is no evidence Defendants recognized internal risks while publicly denying them or had access to contradictory information.  The record instead reflects that Defendants relied upon established disclosure processes, and the public statements OPERS cites do not contain inherent contradictions regarding subprime loan exposure.

Most significantly, OPERS has presented no evidence any Defendant subjectively believed their public statements were factually inaccurate or consciously disregarded current information when making such statements.  This distinguishes the present case from the precedents OPERS cites, wherein the defendants demonstrably possessed contradictory internal information.

Accordingly, the Court finds that *Helwig* 6 is not satisfied in the case at bar.

### 4.  *Helwig* Factor 9 – Personal Financial Motivation

OPERS asserts Syron, Piszel, and McQuade "had a strong motivation pursuant to the ninth *Helwig* factor to engage in the material misrepresentations and omissions at issue here." ECF No. 559 at PageID #: 37544.  Namely, personal compensation through bonuses, stock awards, and dividend equivalents tied to Freddie Mac's stock performance and portfolio growth. ECF No. 559 at PageID #: 37545.

45

(4:08CV0160)

In 2006 and 2007, Syron, Piszel, and McQuade received over 80 percent of their compensation from bonuses and stock-related awards tied directly to the Company's portfolio growth and stock price.  *See* ECF No. 559 at PageID #: 37545 (citing Freddie Mac's 2008 Proxy Statement (ECF No. 559-38) at PageID #: 39220).  OPERS argues this created a financial incentive to pursue the risky "touch more loans" strategy which replaced the conservative "Steady Freddie" model despite internal warnings about the Company's inability to assess associated risks.  ECF No. 559 at PageID #: 37546.  This strategy allegedly inflated performance metrics used to justify compensation, enabling the executives to profit significantly.  OPERS argues these compensation structures created concrete, personal financial benefits that courts recognize as supporting a strong inference of scienter.  *See* ECF No. 559 at PageID #: 37547.

Defendants raise two main responses.  First, they argue OPERS did not include these compensation claims in the Third Amended Complaint (ECF No. 166) and should not be allowed to add them now.  Second, they contend these are generic allegations applicable to most corporate executives.  *See* ECF No. 574 at PageID #: 41937.  They cite *PR Diamonds*, which requires concrete benefits tied to specific false statements to support scienter.  *PR Diamonds*, 364 F.3d at 690.  The desire to appear successful does not comprise a motive for fraud.  *Id.* Defendants argue OPERS has not shown any specific benefit from particular misrepresentations. Regarding dividends, Defendants note these were routine payments benefiting all shareholders, including OPERS.  There is no evidence the senior officers improperly influenced dividend decisions for personal gain.  ECF No. 574 at PageID #: 41938.

The Court agrees with Defendants for several reasons.  First, OPERS may not raise new theories this late in the case when they were not properly included in the complaint.  *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (holding that a plaintiff may not expand its claims to assert new theories for the first time in response to summary judgment

46

(4:08CV0160)

or on appeal) (citations omitted).  "To permit a plaintiff to do otherwise would subject defendants to unfair surprise."  *Tucker v. Union of Needletraders, Indus. & Textile Empls.*, 407 F.3d 784 788, (6th Cir. 2005).  Second, the compensation structure OPERS describes is standard across corporate America.  Most executives receive bonuses and stock awards based on company performance.  This does not prove intent to defraud.  Courts require more than general financial incentives to prove intent to defraud.  *See Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001); *Chill v. Gen. Elec. Co.*,101 F.3d 263, 268 (2d Cir. 1996).  The compensation must create specific benefits tied to the alleged false statements, not just general corporate success.  *In re Criimi Mae, Inc. Sec. Litig.*, 94 F.Supp.2d 652, 660 (D. Md. 2000).

OPERS has failed to show that Syron, Piszel, and/or McQuade received concrete benefits specifically from the alleged misrepresentations about subprime loans.  The fact that senior officers benefited from company growth and stock price increases is normal and happens at virtually every public company.  The dividend allegations are particularly weak since these payments benefited all shareholders equally, including OPERS itself.  Simply benefiting from company growth does not prove fraudulent intent.  OPERS' compensation evidence does not support a finding that Defendants intended to defraud investors regarding subprime lending practices.

Therefore, this factor does not establish the required intent for securities fraud.

**5. Conclusion**

The Court concludes that OPERS has failed to establish a strong inference of scienter regarding Defendants' subprime loan disclosures under each of the four *Helwig* factors OPERS relies on.  Under the totality of circumstances analysis, the facts alleged collectively do not give rise to a strong inference of at least recklessness.  *In re Telxon Corp.*, 133 F. Supp. 2d at 1026.

47

(4:08CV0160)

Helwig 2 fails because OPERS has not demonstrated a clear divergence between internal assessments and external statements, as the different metrics served distinct purposes and reflected reasonable interpretations of subprime exposure in the absence of a universally accepted definition. Helwig 3 is insufficient because, while some statements occurred within six weeks of the November 2007 disclosure, the content of those statements does not clearly contradict the nature of the loss disclosure, and the specific subprime-related statements fall outside this timeframe. Helwig 6 is not satisfied because OPERS has presented no evidence Defendants subjectively believed their public statements were inaccurate or consciously disregarded current information, distinguishing this case from precedents involving demonstrable internal contradictions. Finally, Helwig 9 fails because the compensation structures reward general company performance rather than concrete benefits tied to specific false statements about subprime exposure.

Accordingly, OPERS' scienter arguments regarding subprime loan disclosures are insufficient to survive Defendants' motions for summary judgment.

## C. Scienter as to Alt-A Holdings

OPERS contends Freddie Mac misrepresented its exposure to Alt-A mortgage loans, claiming the Company publicly reported approximately 8% Alt-A exposure as of June 30, 2007, while internally knowing the actual figure was around 29%. See ECF No. 559 at PageID #: 37532. OPERS maintains Freddie Mac engaged in securities fraud by publicly using a broad MCRA definition to describe Alt-A exposure, while reporting based on an undisclosed and much narrower Investments & Capital Markets's definition. OPERS argues this created actionable securities fraud once Defendants began using inconsistent definitions internally versus externally, with senior executives knowing of the discrepancy but continuing to make false public statements. See ECF No. 559 at PageID #: 37486.

48

(4:08CV0160)

Freddie Mac raises three responses.  First, "Alt-A" lacks any concrete, universally

accepted definition in the mortgage industry, making falsity impossible to establish as a matter of

law.  *See* ECF No. 547-1 at PageID #: 29379.  While OPERS argues "Alt-A" is a mortgage

industry term used to describe reduced documentation/higher credit risk loans, there is a

difference between just reduced documentation loans and reduced documentation loans that have

higher credit risk.  *See* ECF No. 594 at PageID #: 42952-53.  Second, OPERS fails to identify

any evidence that shows senior executives at Freddie Mac knew the Alt-A calculation was

incorrect or were aware of contradictory internal documents.  *See* ECF No. 574 at PageID #:

41944.  In fact, the 29% OPERS points to does not refer to 29% of the single-family portfolio.

Rather, it refers to "Year-to-Date 8/31/07 purchases" under Freddie Mac's MCRA definition (all

loans in lender-designated "low doc" and "no doc" programs, regardless of credit risk).  *See* ECF

No. 594 at PageID #: 42954 (citing ECF No. 559-104 at FMAC-SEC 067770691).  The 8%

figure refers to the percent of credit book outstanding ("cr. Book O/S"), which Freddie Mac used

for its "External Definition."  ECF No. 594 at PageID #: 42955.  Third, Defendants relied on

robust internal processes and professional judgment to ensure disclosure accuracy.  ECF No.

547-1 at PageID #: 29380.  Defendants emphasize Freddie Mac's external definition focuses on

loans that present higher credit risk, rather than all loans regardless of risk level.  ECF No. 574 at

PageID #: 41945.  Finally, Defendants note that OPERS does not cite a witness who will testify

on scienter as to Alt-A issues.  *See* ECF No. 594 at PageID #: 42945-46.

OPERS' claim fails because "Alt-A" has no universal definition.  Multiple witnesses

testified that Alt-A is "nebulous," has "no concrete definition," and means "many different

things" to different market participants.  Deposition of Don Bisenius (ECF No. 548-91) at 73:22

("I think Alt-A is a very nebulous term"); Deposition of Matthew A. Vincent (ECF No. 548-104)

at 157:22-25 ("There is no concrete definition of Alt-A.  It's a term that's used for many

(4:08CV0160)

different things.  So I do not have a definition of Alt-A."); Deposition of Peter J. Federico (ECF No. 548-93) at 78:7 ("there is no single clear definition of Alt-A"); Deposition of HanqingZhou (ECF No. 548-94) 30:4-7 ("it's a very difficult issue because there's very little uniformity in the definition.  Different reading (sic) agency has different views or multiple views.").  Courts cannot impose liability for statements that do not have one objective meaning, and defendants cannot be held liable for interpreting it differently than plaintiffs prefer.  *See In re Volkswagen AG Sec. Litig.*, 661 F. Supp.3d 494, 517 (E.D. Va. 2023) ("The plaintiff must identify a *factual* statement or omission—that is, one that is demonstrable as being true or false") (emphasis in original; internal quotation marks and citations omitted).  Freddie Mac's definition focuses only on reduced-documentation loans carrying higher credit risk, rather than counting all reduced-documentation loans regardless of their actual risk level.  The evidence shows Freddie Mac chose its definition to provide clearer risk disclosure, not to mislead investors.

OPERS also fails to present evidence that Syron, Piszel, and/or McQuade discussed Alt-A classification issues or were aware of contradictory documents.  Moreover, the Company had robust disclosure processes in place, and management reasonably relied on these systems.  ECF No. 547-1 at PageID #: 29380.  Courts have granted summary judgment in similar cases when defendants relied in good faith on professional judgment and established processes.  *See Brokop Living Trust v. Farmland Partners, Inc.*, No. 18-cv-02104-DME-NYW, 2022 WL 1619939, at *7 (D. Colo. April 5, 2022); *In re Fannie Mae*, 892 F. Supp.2d at 71-74.

Summary judgment is warranted in favor of Defendants on the Alt-A holdings claims.  OPERS has not established securities fraud because Alt-A's lack of universal definition makes falsity impossible to prove as a matter of law.  Even if OPERS could establish falsity, no evidence suggests Defendants acted with scienter.  Without evidence of intent to deceive or

(4:08CV0160)

reckless disregard for truth, and given the inherent ambiguity in Alt-A's definition, OPERS'

claims fail as a matter of law.

### D.  Scienter as to Credit Risk

OPERS explains credit risk as "how likely a given loan within the portfolio is going to

default," and that it is "inversely proportional to the company's financial health."  "As credit risk

is rising, the company's financial health is decreasing."  ECF No. 594 at PageID #: 42989.

OPERS contends Freddie Mac's statements concerning credit risk generally were made with

scienter.  As stated in Section IV.B. above, three credit risk statements are at issue:  (1) "Credit

has never been better" (McQuade, March 23, 2007 Bloomberg News Article (ECF No. 43-24 at

PageID #: 1351)); (2) "Freddie Mac is much better positioned for long-term profitability than [it

was] a year ago" (Syron, June 14, 2007 Conference Call (ECF No. 559-34) at PageID #: 39021);

and, (3) "[Freddie Mac's] credit position is relatively strong  with limited exposure to the riskiest

mortgage products . . . .  Bottom line, at a time when many of our competitors are weakening,

Freddie Mac's position is growing stronger" (Cook, Sept. 10, 2007 (ECF No. 559-17) at FMAC-

SEC 081749809).

OPERS contends the statements were materially false and misleading for several reasons.

First, they argue Freddie Mac's internal documents contradicted the public statements, with one

analyst explaining "[t]he importance of these undisclosed underwriting deficiencies to a fair

evaluation of the Company's financial condition during the Relevant Period cannot be

overstated."  Shapiro Rebuttal Report (ECF No. 559-6) at p. 15, ¶ 33.  Second, OPERS points to

internal reports showing credit quality was "worsening sharply" with "credit loss forecast for

2007 [at] $450 million and $820 million for 2008, up 7% and 35% respectively from the prior

forecast."  Aug. 21, 2007 Enterprise Risk Management Committee ("ERMC") Reports (ECF No.

559-60) at FMAC-SEC 013147413.  OPERS contends the statements were "anchored in

51

(4:08CV0160)

'misrepresentation of existing facts' " and made specific assertions about credit position that were objectively false, rather than vague optimism.  ECF No. 559 at PageID #: 37515 (quoting *In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*, 757 F. Supp.2d 260, 310 (S.D.N.Y. 2010) (quoting *Novak*, 216 F.3d at 315)).  Third, OPERS argues Defendants "did more than just offer rosy predictions; [they] stated that the [] situation was 'in good shape' or 'under control' while they allegedly knew the contrary was true."  ECF No. 559 at PageID #: 37515 (quoting *Novak*, 216 F.3d at 315).  Finally, OPERS asserts Defendants had actual knowledge the statements were false, noting that "[s]enior management understood throughout the Relevant Period that credit losses were dramatically increasing" and "understood . . . expected credit losses were dramatically increasing."  ECF No. 559 at PageID #: 37517.

Defendants contend OPERS is mismatching external positive statements and contrasting them with negative internal statements concerning credit risk, without mentioning all the frank and forthright negative statements made to the market.  ECF No. 594 at PageID #: 42956-57. They assert OPERS does not put forth evidence that any statements were false, failing to identify a witness or a document.  ECF No. 594 at PageID #: 43026.

Defendants argue the statements OPERS cites are not actionable under three theories. First, they contend the statements reflected accurate historical data at the time they were made, noting McQuade's "[c]redit has never been better" statement was immediately followed by accurate delinquency rate data in the SF Guarantee Portfolio for 2006 ("Freddie Mac's delinquency rate is about 20 percent or 30 percent less than it was a year ago at this time").  ECF No. 43-24 at PageID #: 1351.  The same data is presented in Freddie Mac's 2006 Annual Report. *See* ECF No. 548-21 at pages 73 or 125.  As Defendants emphasize, "accurate statements of historical fact are not actionable, as a matter of law, for failing to disclose concerns about future results."  *Kolominsky v. Root, Inc.*, 100 F.4th 675, 686 (6th Cir. 2024); *see also In re Sofamor,*

52

(4:08CV0160)

123 F.3d at 401 n.3 ("a violation of federal securities law cannot be premised upon a company's

disclosure of accurate historical data").  Second, Defendants characterize the statements as

vague, indefinite expressions of optimism that cannot support securities fraud claims, arguing

that statements about being "better positioned" or "growing stronger" constitute non-actionable

puffery.  *See, e.g.*, *In re iRobot*, 527 F. Supp.3d at 139 (finding statement that "the company was

'well positioned to continue [its] growth trajectory' in the market is not actionable" puffery).

Third, Defendants invoke the "Bespeaks Caution" doctrine, asserting that the statements were

forward-looking and accompanied by meaningful cautionary language in risk disclosures.  ECF

No. 574 at PageID #: 41952.  Defendants note that, in the Sixth Circuit, "if the statement

qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a

defendant's statement is protected regardless of the actual state of mind."  ECF No. 574 at

PageID #: 41953 (quoting *Miller*, 346 F.3d at 672).

        As stated in Section IV.B.1. above, Defendants also argue that OPERS' reliance on

McQuade's statement that "[c]redit has never been better" constitutes inadmissible hearsay that

cannot support summary judgment.  ECF No. 574 at PageID #: 41948.  For the reasons set forth

in Section IV.B.1, the Court cannot consider McQuade's quoted statement for summary

judgment purposes.

        In addition, Defendants assert that McQuade's statement in the March 2007 Bloomberg

News Article is still the kind of corporate optimism or puffery that is not actionable as a matter

of law.  ECF No. 594 at PageID # 43030.  Puffery refers to vague, optimistic statements that,

"both on their own terms and in context, lack[] a standard against which a reasonable investor

could expect them to be pegged."  *City of Monroe*, 399 F.3d at 671.  As stated previously, courts

frequently dismiss assertions about a product's "value," "strength," or "quality" as immaterial

puffery.  *See TransDigm Grp.*, 440 F. Supp.3d at 763-64.  The internal documents OPERS cites

53

(4:08CV0160)

contain both positive and negative assessments.  OPERS cherry-picked negative portions of the

documents while ignoring contradictory evidence showing "[o]verall SF credit portfolio risk is

still relatively low," ERMC Reports, Oct. 3, 2006 (ECF No. 559-76) at FMAC-SEC 082820947,

and describing the portfolio as "well diversified by key risk attributes," ERMC Reports, June 12,

2007 (ECF No. 559-77) at FMAC-SEC 082820599.  The statements about being "better

positioned" or "growing stronger" constitute vague expressions of optimism that cannot support

securities fraud liability as a matter of law, particularly when, as Defendants note, Syron's

statement addressed multiple factors including "high asset quality, low risk exposure and

improving operations" that supported the optimistic assessment.  ECF No. 574 at PageID #:

41950.  The evidence, viewed in the light most favorable to OPERS, does not create genuine

disputes sufficient to survive summary judgment on these credit risk statements.

### E.  Scienter as to Underwriting Guidelines

OPERS argues that Defendants' statements and omissions concerning underwriting

guidelines were materially false and misleading.  According to OPERS, the language in Freddie

Mac's disclosures "misled the investing public on the extent to which Freddie Mac had

abandoned its underwriting standards and policies," preventing financial analysts "from being

able to fairly evaluate the Company's financial condition during the Relevant Period."  ECF No.

559 at PageID #: 37509 (citing Shapiro Rebuttal Report (ECF No. 559-6)).  OPERS points out

that for 80 percent of the loans coming into Freddie Mac's portfolio, Defendants were not

following the underwriting standards that they publicly advertised.  ECF No. 594 at PageID #:

42993.  OPERS further emphasizes Defendants alleged "selective editing" of an underwriting

disclosure, noting Defendants omitted a critical sentence about monitoring loan performance

while knowing "senior management knew that Freddie Mac 'had virtually no ability to

effectively' monitor the performance of these loans."  ECF No. 559 at PageID #: 37509 (citing

(4:08CV0160)

Shapiro Report (ECF No. 559-4) at pages 15-16, ¶ 51).  In addition, OPERS contends that

Freddie Mac relied on third-party underwriting standards instead of its own internal systems, and

that these third-party standards were significantly riskier than those used by comparable

institutions, such as Fannie Mae and Wells Fargo.  ECF No. 594 at PageID #: 42996.  OPERS

cites an August 30, 2007 Memorandum (ECF No. 559-72) from Ray Romano, Senior Vice

President of Credit Policy, in which he states that 35 percent of the loans being purchased could

not have been originated under Freddie Mac's own systems, a fact the Company did not disclose

to the investing public.  ECF No. 594 at PageID #: 42997.

OPERS points to internal evidence showing senior executives at Freddie Mac recognized

throughout the Relevant Period that Freddie Mac did "not yet have a rigorous data validation

process in place to understand the quality of data provided by our customers," ERMC Reports,

July 27, 2006 (ECF No. 559-57) at FMAC-SEC 082133151; ERMC Reports, Aug. 17, 2006

(ECF No. 559-58) at FMAC-SEC 082133080, and was "taking on increased operational risks

[related to its 'touch more loans' strategy] when our core systems cannot handle those products,

increasing errors and limiting capacity," ECF No. 559-57 at FMAC-SEC 082133125."  OPERS

cites November 2006 warnings from OFHEO that "[c]urrent [underwriting] reporting practices

are inadequate for effective credit risk oversight and portfolio management."  ECF No. 559-133

at FMAC-SEC 021277048.  OPERS argues despite public statements praising Freddie Mac's

underwriting standards, Defendants knew these standards and processes were "inadequate for

effective credit risk oversight and portfolio management" and Freddie Mac "had virtually no

ability to effectively underwrite the nontraditional mortgage products that were making up an

increasing portion of the [Single Family] Portfolio."  ECF No. 559 at PageID #: 37511 (quoting

ECF No. 559-133 at FMAC-SEC 021277048; Shapiro Report (ECF No. 559-4) at page 15, ¶ 51.

OPERS asserts that these are not puffery statements, as they can be directly contrasted with

(4:08CV0160)

internal assessments and documents Syron, Cook, Piszel, and McQuade received disproving those statements.  *See* ECF No. 594 at PageID #: 43003-43004.

OPERS highlights the increase in credit waivers and exceptions, noting "[t]he total number of credit waivers and exceptions increased from 286 in 2004 to 770 in 2005" and "[a]s of April 30, 2006, there were 612 exceptions approved for eight of the Top Sellers with a combined volume of $41.9 billion – 80% of the total loan volume."  ECF No. 559-133 at FMAC-SEC 021277048.  OPERS contends Freddie Mac management was "migrating away from utilizing our credit guide as our primary risk management tool" and using "increased use of credit policy exceptions that expand on current policy and guide parameters."  June 7, 2007 Presentation (ECF No. 559-65) at FMOPERS 00115798.  In support, OPERS cites *In re Upstart Holdings, Inc. Sec. Litig.*, No. 2:22-cv-02935, 2023 WL 6379810 (S.D. Ohio Sept. 29, 2023), claiming it "perfectly crystallizes" the legal issue of whether a company's public statements about underwriting must align with internal assessments.  ECF No. 559 at PageID #: 37510.

Defendants respond that OPERS has neither shown falsity nor scienter.  They argue Freddie Mac's internal discussions and external statements about underwriting standards were consistent, not contradictory.  They point to a January 2007 memorandum by Paul Mullings (ECF No. 559-66) which explains changes to underwriting practices in terms of customer focus, alternative automated underwriting systems, and the increased acquisition of non-traditional loan products.  ECF No. 574 at PageID #: 41958.  Defendants note Freddie Mac disclosed these same themes in its 2006 Annual Report (ECF No. 548-21).  *See* ECF No. 574 at PageID #: 41958-59.  As such, they assert that the cited document "proves the opposite" of OPERS' theory.  ECF No. 574 at PageID #: 41958.  Defendants also argue that Freddie Mac had no duty to disclose the number of credit exceptions, especially in the absence of any public statement directly addressing them.  *See* ECF No. 574 at PageID #: 41959-60.  As to scienter, Defendants contend

(4:08CV0160)

that OPERS offers no evidence that anyone at Freddie Mac believed its disclosures were misleading or acted with intent to defraud.  *See* ECF No. 574 at PageID #: 41967.

In addition, Defendants maintain OPERS' reliance on *In re Upstart* is misplaced.  The quotation OPERS cites in support of their theory does not appear in the *Upstart* opinion but rather comes from a plaintiff's memorandum in an unrelated case which rejected that claim as non-actionable puffery.  *See* ECF No. 574 at PageID #: 41966 (citing *Berg v. Velocity Fin., Inc.*, No. 2:20-cv-06780-RGK-PLA, 2020 WL 9216469, at *10 (C.D. Cal. Nov. 30, 2020)).  The *Berg* court rejected that argument, dismissing the claim because the "identified statements about Defendants' underwriting practice is corporate puffery, they cannot support a [securities] claim." *Berg v. Velocity Fin., Inc.*,  No. 2:20-cv-06780-RGK-PLA,  2021 WL 268250, at *4 (C.D. Cal. Jan. 25, 2021).

OPERS fails to raise a genuine dispute of material fact regarding either the falsity of the underwriting-related statements or the presence of scienter.  The internal documents OPERS cites, including the Mullings memorandum, are consistent with Freddie Mac's external disclosures.  There is no evidence Defendants concealed information about underwriting practices, nor any showing Defendants acted with the requisite mental state.  *In re Upstart* does not aid OPERS because the court there dealt with a failure to disclose its AI underwriting practices, while Freddie Mac affirmatively disclosed its evolving underwriting strategy, including its use of nontraditional loan products and alternative underwriting systems.  *See In re Upstart*, 2023 WL 6379810, at *3.  *Berg* and *In re Upstart* undermine OPERS' theory as neither case establishes a general duty to disclose internal assessments or characterizations of underwriting adjustments.  Rather, *In re Upstart* focused on whether the defendants made repeated, detailed statements on core business practices while omitting known risks, an analysis not applicable here.  *Id.*  The record lacks any direct or circumstantial evidence that Defendants

57

(4:08CV0160)

made the challenged statements with an intent to deceive or with reckless disregard for the truth.

Statements are not misleading if allegedly omitted information was disclosed. *Ley v. Visteon Corp.*, 543 F.3d 801, 808 (6th Cir. 2008), abrogated on other grounds by *Matrixx, supra*). A duty to disclose only arises from positive law or if a statement would be misleading absent disclosure, pure omissions are not actionable. *Macquarie*, 601 U.S. at 259. OPERS must point to an affirmatively misleading external statement given internal information, not omissions. A statement is misleading only if inconsistent with omitted information. *Backman*, 910 F.2d at 17 (holding that Polaroid's failure to disclose declining sales did not violate Rule 10b–5 when its quarterly report disclosed ongoing losses from the product and there was no affirmative misstatement or duty to update). Freddie Mac disclosed its evolving underwriting standards and that it had been expanding its share of mortgages it purchased which were underwritten using alternative automated systems. Under *Backman*, it had no duty to disclose what percent of the time it did so. As such, summary judgment is appropriate on this issue.

## F. Scienter as to Risk Management

According to OPERS, Freddie Mac made materially false and misleading statements concerning its risk management practices, particularly in relation to its underwriting processes and oversight systems. They contend Defendants publicly advertised their "time-tested risk management approach" while privately acknowledging substantial deficiencies in internal models, data systems, and credit risk oversight. *See* ECF No. 559 at PageID #: 37452-54. OPERS relies on communications from the Federal Housing Finance Agency ("FHFA"), a Freddie Mac regulator, during and after the Relevant Period, including a September 2008 draft letter to then-CEO Richard Syron, (ECF No. 559-136) identifying persistent failures to correct known risk management issues. *See* ECF No. 559 at PageID #: 37452. These included warnings that Freddie Mac's "models [were] not performing well," that its internal controls were "unsafe

(4:08CV0160)

and unsound," and that the absence of adequate model oversight had a "pervasive negative impact" on Freddie Mac's operations.  ECF No. 559-136.

OPERS argues that, despite such warnings, Defendants continued to make public statements suggesting Freddie Mac's risk management practices were robust, thereby misleading investors.  According to OPERS, these statements falsely implied Freddie Mac was applying its underwriting standards uniformly and had a detailed understanding of portfolio credit risks.  *See* ECF No. 559 at PageID #: 37453.  In their view, the disconnect between public assurances and private knowledge supports a finding of scienter.

Defendants respond that OPERS' "risk management" theory is simply a repackaging of their underwriting claims and fails for the same reasons.  They note Freddie Mac disclosed at length its practices for managing interest rate and mortgage credit risk, including underwriting requirements, quality control standards, portfolio diversification, and credit enhancements.  *See* ECF No. 547-1 at PageID #: 29385.  Freddie Mac's 2006 Annual Report (ECF No. 548-21), for example, contains nearly 25 pages detailing risk management measures, with 15 pages devoted to credit risk.  *See* ECF No. 547-1 at PageID #: 29385-86.  Defendants argue that OPERS ignores these detailed disclosures and fail to identify a single misleading statement from them.  *See* ECF No. 547-1 at PageID #: 29386.

According to Defendants, there is no evidence Syron, Piszel, and/or McQuade acted with scienter or intended to deceive investors regarding Freddie Mac's risk management.  ECF No. 547-1 at PageID #: 29386.  At most, Defendants assert OPERS alleges a "fraud by hindsight" theory, a routinely rejected theory in the Sixth Circuit.  ECF No. 547-1 at PageID #: 29386 (citing *La. Sch. Emps.'*, 622 F.3d at 484-85 (rejecting securities fraud claims resting on hindsight and speculation); *In re Goodyear*, 436 F. Supp.2d at 903 (" 'fraud by hindsight,' [is] a technique that has been flatly rejected by [the] Sixth Circuit.").

(4:08CV0160)

   The record supports Defendants' position.  OPERS fails to meaningfully distinguish its risk management theory.  Rather, it relies on its underwriting claims without identifying any specific public statement concerning risk management that was materially false or misleading.  *See* ECF No. 574 at PageID #: 41967.  The internal FHFA assessments do not, standing alone, establish Freddie Mac's public statements were false when made.  Nor do they show Defendants acted with scienter.  OPERS does not connect the cited deficiencies to specific misrepresentations or omissions, and the evidence does not demonstrate Defendants were aware that their statements about risk management were materially misleading.

   Accordingly, because OPERS has failed to identify actionable statements concerning risk management or to present evidence of scienter, summary judgment is granted in Defendants' favor on this issue.

### G.  Scienter as to Loan Analysis and Fraud Detection Systems

   Freddie Mac argues OPERS fails to identify any specific false or misleading statements made by the Company in support of its "loan analysis software" allegations.  *See* ECF No. 547-1 at PageID #: 29386.  Freddie Mac also contends that no one at the Company believed the fraud detection statements were false when they issued them, defeating a finding of scienter.  *See* ECF No. 547-1 at PageID #: 29387.  Without an actual challenged statement, there can be no valid Section 10(b) securities fraud claim.  *Macquarie*, 601 U.S. at 259.  Regarding Freddie Mac's "fraud detection systems," OPERS points to only one statement from a November 7, 2007 press release about Defendant's "long-standing commitment to fighting mortgage fraud."  ECF No. 559-36.  Defendants contend this statement was factually accurate based on uncontradicted testimony that Freddie Mac maintained an industry-leading fraud prevention unit since 1989.  Deposition of Jenny Herzog as 30(b)(6) Designee of Freddie Mac (ECF No. 548-126) at 169:24-170:5.

(4:08CV0160)

OPERS now suggests, for the first time in opposition to summary judgment, that the statement was misleading due to the non-disclosure of an internal audit reflecting limitations in fraud detection technology.  ECF No. 559 at PageID #: 37544 (citing May 17, 2007 Die Memo (ECF No. 559-121)).  According to Defendants, OPERS cannot raise this new theory for the first time to avoid summary judgment and OPERS identifies no duty to disclose the internal audit report.  *See* ECF No. 574 at PageID #: 41968-69.

This argument fails for several reasons.  First, a plaintiff may not raise new factual theories of liability for the first time at summary judgment.  *Bridgeport Music, Inc.*, 508 F.3d at 400.  Second, OPERS identifies no independent duty to disclose the internal audit.  Courts in this Circuit have consistently held that "[a]n omission is actionable under Rule 10b-5 only when there is a duty to disclose."  *See In re Goodyear*, 436 F. Supp.2d at 902.  Here, the November 7 statement made no reference to data-mining tools, and OPERS has not shown that the omission of the audit report rendered the statement misleading in context.  Third, the record offers no evidence any Defendant believed the November 7 press release was false when they made it.  Without any evidence of contemporaneous knowledge of falsity or recklessness, OPERS cannot establish scienter.  *La. Sch. Emps.'*, 622 F.3d at 484-85.  Finally, OPERS does not meaningfully respond to Defendants' arguments concerning its "loan analysis software."  *See* ECF No. 547-1 at PageID #: 29386-89; ECF No. 574 at PageID #: 41968.  Although OPERS criticizes Freddie Mac's Quantum software as outdated and unable to handle nontraditional mortgage products, it does not identify any actual public statement by Freddie Mac about the software that was false or misleading.  *See* ECF No. 547-1 at PageID #: 29386.  As stated above, a Section 10(b) claim cannot proceed based solely on omissions or general critiques of internal operations.  *Macquarie*, 601 U.S. at 259.

(4:08CV0160)

Summary judgment is warranted for Defendants on this issue because (1) OPERS has failed to identify a materially false or misleading statement regarding Freddie Mac's fraud detection or loan analysis systems, and (2) there is no evidence any Defendant acted with scienter.

## H. Scienter as to Capital Position

OPERS argues Freddie Mac misled investors regarding its capital position in violation of Section 10(b) and Rule 10b–5. Specifically, OPERS maintains Defendants falsely portrayed Freddie Mac as well-capitalized throughout the Relevant Period, despite internal warnings of mounting credit risk and potential capital strain. *See* ECF No. 559 at PageID #: 37422, 37518.

Defendants contend that all public statements concerning Freddie Mac's capital position were accurate, adequately disclosed, and inactionable. *See* ECF No. 547-1 at PageID #: 29389–91. The record confirms that at no point during the Relevant Period did Freddie Mac fall below its core capital requirements, and OPERS has not produced evidence to the contrary. ECF No. 547-1 at PageID #: 29389. Freddie Mac points to the fact that OFHEO formally designated the company as "adequately capitalized for year-end 2006 and all four quarters of 2007." 2008 OFHEO Report (ECF No. 548-145) at PageID #: 32722.

Freddie Mac also disclosed forward-looking risks likely to impact its capital levels, including the economic trends and housing prices. *See* ECF No. 547-1 at PageID #: 29390-91. The statements regarding capital adequacy that OPERS challenges include generic references to Freddie Mac's capital strength and preparedness to weather market stress, statements that are either expressions of corporate optimism, historical facts, or forward-looking assessments accompanied by meaningful cautionary language. For the reasons previously discussed, they are not actionable.

(4:08CV0160)

OPERS' response fails to raise a genuine issue of material fact.  First, it cites internal communications, such as a "Morning Update" describing Freddie Mac as "strong and well capitalized" (ECF No. 559-141) to suggest these statements were misleading.  *See* ECF No. 559-142 at PageID #: 41578.  But this "Morning Update" was not a public communication, is not referenced in the Third Amended Complaint (ECF No. 166), and constitutes a vague expression of optimism, which is immaterial as a matter of law.  Second, OPERS invokes a hindsight critique based on internal risk warnings communicated to senior management in 2006 and 2007 including deteriorating credit quality, increased expected losses, and weakening risk metrics on Freddie Mac's Enterprise Risk Dashboard.  *See* ECF No. 559 at PageID #: 37422.  OPERS, however, presents no evidence that these internal forecasts invalidated Freddie Mac's public statements about its then-current capital levels, or that Defendants disbelieved the truth of their disclosures when made

To sustain a securities fraud claim, plaintiffs must demonstrate more than poor future performance or internal risk forecasting.  They must identify a materially false or misleading statement made with scienter.  *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023).  Moreover, OPERS does not contest Defendants' arguments concerning the independent capital position claims in its opposition brief and appears to have abandoned it.  Failure to respond to a well-supported motion for summary judgment on a particular issue constitutes abandonment of that claim.  *See Little Caesar Enters., Inc. v. Little Caesars ASF Corp.*, No. 17-cv-12329, 2019 WL 12054755, at *3 (E.D. Mich. March 27, 2019)* (citing *Brown v. VHS of Mich.*, 545 Fed.Appx. 368, 372 (6th Cir. 2013)* ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.")).

(4:08CV0160)

Accordingly, summary judgment is granted in Defendants' favor on the capital position claims because OPERS fails to identify any actionable misstatement or evidence of scienter, and fails to meaningfully respond to the arguments raised.

## XI.  Conclusion

Viewing OPERS' probative evidence and all reasonable inferences drawn therefrom in the light most favorable to Plaintiff, the Court concludes that there is no genuine issue of material fact, and the movants are entitled to a judgment as a matter of law.  For the foregoing reasons and those that have been articulated in the memoranda of the points and authorities on which Defendants rely,

Defendant Richard F. Syron's Motion for Summary Judgment (ECF No. 544) is granted.

Defendant Anthony S. Piszel's Motion for Summary Judgment on All Claims (ECF No. 545) is granted.

Defendant Eugene McQuade's Motion for Summary Judgment (ECF No. 546) is granted.

Defendant Federal Home Loan Mortgage Corporation's Motion for Summary Judgment (ECF No. 547) is granted.

The parties' Joint Motion to Amend Civil Trial Order (ECF No. 595) is denied as moot.  Final judgment will be entered in favor of Defendants and against OPERS on the Third Amended Complaint (ECF No. 166).


IT IS SO ORDERED.


| August 29, 2025 | /s/ Benita Y. Pearson |
| Date | Benita Y. Pearson |
| | United States District Judge |